Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
        jjm@johnsonmaylaw.com


Krystal Mikkilineni, PHV pending
Robert E. Richards, *PHV pending*
Tirzah Roussell, *PHV pending*
DENTONS
215 10th Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
        Robert.richards@dentons.com
        Tirzah.roussell@dentons.com

Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE, INC., *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-40158-NGH<br><br>(Joint Administration Requested) |

---

[1]    The Debtors in the Chapter 11 Cases along with the last four digits of their respective tax identification number or registration number in the applicable jurisdiction are: Millenkamp Cattle, Inc. (3892); Idaho Jersey Girls LLC (4467); East Valley Cattle, LLC (8613); Millenkamp Properties, L.L.C. (4003); Millenkamp Properties II LLC (7719); Millenkamp Family LLC (8279); Goose Ranch, LLC; Idaho Jersey Girls Jerome Dairy LLC (3431); Black Pine Cattle LLC; and Millenkamp Enterprises LLC.

#3882288

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER AUTHORIZING
DEBTORS TO HONOR PREPETITION OBLIGATIONS TO CRITICAL VENDORS**

**COMES NOW** Millenkamp Cattle, Inc. ("<u>Millenkamp Cattle</u>") and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), by and through their undersigned counsel, and respectfully move the Court, on an emergency basis (the "<u>Motion</u>"), pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code[2] and Bankruptcy Rules[3] 6003 and 6004 for entry of an order, authorizing, but not directing, the Debtors to pay certain prepetition claims (each a "<u>Critical Vendor Claim</u>" and collectively, the "<u>Critical Vendor Claims</u>") of certain vendors and service providers ( each a "<u>Critical Vendor</u>" and collectively, the "<u>Critical Vendors</u>") that provide feed and other essential services that are central to the Debtors' operations.

In addition, the Debtors further request the Court authorize, but not direct, banks and financial institutions (the "<u>Banks</u>") to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims. A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as Exhibit A (the "<u>Proposed Interim Order</u>").

In support of this Motion, the Debtors have separately filed the Declaration of William John Millenkamp in Support of Debtors' First Day Motions (the "<u>Millenkamp Declaration</u>"). In further support of this Motion the Debtors respectfully represent as follows:

---

[2]    References herein to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et seq*.
[3]    References herein to the Bankruptcy Rules refer to the Federal Rules of Bankruptcy Procedure

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On April 2, 2024 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for District of Idaho (the "Court") commencing the Chapter 11 Cases. The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

5.      No trustee, examiner, or official statutory committee of unsecured creditors (such official committee, the "Committee") has yet been appointed in the Chapter 11 Cases.

6.      The Debtors are ten affiliates that collectively own and operate several businesses, including a calf ranch raising approximately 50,000 calves located in Jerome, Idaho; a dairy heifer feedlot in Declo, Idaho, raising approximately 60,000 head of dairy cattle; a dairy operation at the Declo facility where the dairy cattle are milked several times a day; farming operations in Jerome, Twin Falls and Cassia counties; and custom harvest & trucking throughout the Magic Valley.

7.      The Debtors operate as a single enterprise, which includes common usage of debt and banking facilities.

8.      Millenkamp Cattle is the primary entity from which all operations are directed, the revenues received, and the payables disbursed.  Millenkamp Cattle is the operational entity which owns all of the cattle, feed, and equipment used to care for the cattle, employs the employees, and receives and disburses the majority of the monies.  Millenkamp Cattle does not own any real property.

9.      Information regarding the Debtors' history and business operations, capital structure, and secured indebtedness can be found in the Millenkamp Declaration.

**A. <u>Critical Vendor Claims</u>**

10.      As the Debtors operate a large and complex dairy operation and feedlot, it is vital that the Debtors are able to maintain relationships and operations with Critical Vendors. Any disruption with the Debtors' Critical Vendors could immediately and irreparably impair the Debtors' assets, and most importantly, their animals. The literal lifeblood of the Debtors' operations are their cattle.

11.       The Debtors' Critical Vendors include, among other things, vendors supplying feed, chemicals, equipment, repairs, and maintenance, vital supplies, veterinary services and medicine, payroll services, and trucking services.

12.      In total, the Debtors believe they owe approximately $31.6 million to all such vendors and service providers that might constitute Critical Vendors as of the Petition Date, but the constraints of these Chapter 11 cases mean they will only be able to pay a portion of that amount prior to plan confirmation.

13.      By this Motion, the Debtors seek authority to continue to pay and/or honor the prepetition claims of the Critical Vendors up to $31.6 million (the "<u>Critical Vendor Cap</u>"), with, (i) an interim amount of up to $5.2 million, and only as needed to avoid immediate and irreparable

harm; and (ii) an additional amount, of up to $27.6 million and only as needed to avoid immediate and irreparable harm.

14.    In addition, the Debtors reserve the right to request an increase in the Critical Vendor Cap. The amounts to be paid to the Critical Vendors are already provided for in the Debtors' operating Budget (the "Budget") submitted with the Debtors' motion for authority to use cash collateral (the "Cash Collateral Motion").

15.    The estimated amounts of Critical Vendor Claims set forth herein are exclusive of any amounts that may be owed to Critical Vendors that may be entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code (the "Critical Vendor 503(b)(9) Claims"). By this Motion, the Debtors also request authority to pay the 503(b)(9) Claims of any Critical Vendor to the extent the Debtors determine it is necessary and appropriate in accordance with the procedures and protocol set forth herein; provided, however, any amounts paid by the Debtors in satisfaction of such 503(b)(9) Claims shall not be included in or subject to the Critical Vendor Cap. The Critical Vendor 503(b)(9) Claims amount to approximately $750,000.

16.    The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their Estates. To that end, the Debtors and their advisors have engaged in an extensive process of reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships—which, if lost, could materially harm the Debtors' cattle , the Debtors' businesses, reduce their enterprise value, and/or impair their restructuring process—all in an effort to identify only those most critical vendors using their business judgment (the "Protocol"). Such Protocol is on-going.

17.     During the Protocol process, the Debtors have deemed certain vendors as critical because each of these Critical Vendors hold an unpaid prepetition claim for the provision of goods and services and meet one or more of the following criteria:  (a) the vendor is essential to caring for the cattle; (b) the vendor allows the Debtors to continue to operate and maintain their businesses post-petition under reorganization of the Debtors' assets for the benefit of creditors; (c) the vendor is indispensable for providing vital goods and services (such as feed and vet services);(d) replacing such vendor would be prohibitively expensive or said vendor is otherwise critical to prevent the diversion of management and key personnel to solicit other vendors during the extensive transitional period[4]; (d) the Debtors believe the vendor will refuse to deliver goods and provide services without payment of the prepetition claim and the automatic stay imposed by section 362(a) of the Bankruptcy Code will be inadequate to address the issue;  (e) cash on delivery is unlikely to provide the requisite incentive for the vendor to continue providing goods or services; (f) the Debtors lack a long-term contractual relationship with the vendor that would oblige the vendor to continue the prepetition relationship, and the Debtors are otherwise without adequate leverage to compel performance on commercially reasonable terms; or (g) the Debtors will suffer immediate and irreparable harm if the vendor is not specially incentivized to continue providing essential goods or services.

18.     Moreover, many of the Debtors' Critical Vendors cannot be easily replaced by another vendor, as many other vendors are not equipped to handle the size and complexity of Debtors' operations.

19.     The Debtors will use commercially reasonable efforts to require the vendor to sign

---

[4] Additionally, the Debtors acknowledge that while some of these Critical Vendors are not the only vendors in the area that provide these vital goods or services, switching to other providers at this critical juncture will incur substantial time, energy, and unnecessary distraction during the extensive transitional period.

a post-petition agreement with normalized terms and conditions that contractually bind the vendor to continue providing essential goods and services post-petition (the "Critical Vendor Agreement").

**B.  Proposed Conditions to Receiving Payment**

20.     To minimize the amount of payments required if the relief sought herein is granted, the Debtors will utilize the Protocol to analyze and pay Critical Vendor Claims.  The Debtors' Protocol can be generally summarized as follows:

a)  All aspects of any proposed payment of Critical Vendor Claims will be scrutinized for, among other things, the amount of payment at issue, the terms offered by the particular vendor, whether the supplier is party to an executory contract, and the business need for the particular goods or services at issue.

b)  All requests for Critical Vendor treatment, or vendors refusing to supply goods and services due to non-payment of a prepetition claims, will be received and reviewed by the Debtors and their advisors.

c)  The Debtors, at their discretion, using their business judgment, and pursuant to the Protocol, shall pay the Critical Vendors, subject to certain accountability requirements (the "Accountability Requirements"). The Accountability Requirements shall include: (i) filing under seal a report on a monthly basis that details the Critical Vendor payments (the "Interim Critical Vendors Report"), with a final report filed under seal once the cap has been met (the "Final Critical Vendors Report"), with viewing privileges only for the Debtors, the Official Committee of Unsecured Creditors, and the United States Trustee, to include: (a) a list of the Critical Vendors; (b) the amount paid to each individual Critical Vendor; (c) a description of the supplies or services provided to the Debtors; and (d) an

explanation for how each payment was determined by the carefully-designed Protocol overseen by a core, centralized team consisting of senior members of Debtors' management and professional advisors; (ii) an *in camera* hearing during which the Court may review the foregoing information in the presence of the Debtors, the Official Committee of Unsecured Creditors, and the United States Trustee; and (iii) if there is an objection to any payment by any party in interest, such objection may be heard by this Court at a hearing in open court.

d)   Furthermore, to ensure timely payment to Critical Vendors, the Debtors propose that the Interim Order be issued, subject to final approval by the Court in the Final Order, each of which provides authorization for the Debtors to make rolling payment of (i) an interim amount of up to approximately $5.2 million and (ii) an additional final amount of up to approximately $27.7 million, towards the prepetition claims (up to the Critical Vendor Cap) to Critical Vendors.

**C.   <u>Vendor Agreements</u>**

21.   The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to supply goods and services to the Debtors (i) on the normal and customary trade terms, practices, and programs (including credit limits, pricing rebates, cash discounts, timing of payments, coupon reconciliation, and other applicable terms and programs) that were in effect between such Critical Vendor and the Debtors within the six month period prior to the Petition Date (the "<u>Customary Trade Terms</u>"), or (ii) such other trade terms as agreed to by the Debtors and Critical Vendor. If the Debtors are unable to negotiate the continued supply of goods or the provision of services upon Customary Trade Terms, the Debtors seek authority, based on their business judgment, to pay the Critical Vendor all or a portion of their

Critical Vendor Claims in return for the continued supply of critical goods or the provision of services.

22.     To ensure that Critical Vendors continue doing business with the Debtors on Customary Trade Terms or on such other terms as agreed to by the Debtors and a Critical Vendor, the Debtors will use commercially reasonable efforts to require the vendor to sign a post-petition agreement with normalized terms and conditions that contractually bind the vendor to continue providing essential goods and services post-petition. The Debtors propose that the letter will be delivered to, and executed by the Critical Vendors, along with a copy of the order granting the relief requested herein, and (ii) that payment of Critical Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the order of the United States Bankruptcy Court for the District of Idaho, dated _____, 2024, in the chapter 11 cases of _____ (Case No. 24-_____(___)), authorizing the Debtors to pay pre-petition obligations of Critical Vendors.

23.     If the Debtors, in their discretion, determine that a Critical Vendor has not complied with the terms and provisions of the Critical Vendor Agreement or has failed to continue to comply with the Customary Trade Terms or such other terms that are individually agreed to by the Debtors and such Critical Vendor, following the date of the agreement, the Debtors may:

a)     return the parties to the positions they held immediately prior to entry of the Order with respect to all pre-petition claims;

b)     declare that any Critical Vendor Agreement between the Debtors and such Critical Vendor is terminated;

9

c) declare that payments made to such Critical Vendor on account of its Critical Vendor Claims are deemed to have been in payment of then-outstanding (or subsequently accruing) post-petition claims of such Critical Vendor without further order of the Court or action by any person or entity;

d) recover or seek disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the post-petition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defenses; and

e) seek damages, disgorgement, or other appropriate remedies against any breaching Critical Vendor.

24. Some of the Critical Vendors may also possess or have the right to assert agricultural liens (the "Liens") on the Debtors' assets based upon the claims held by those Critical Vendors. As a further condition of receiving payment, the Debtors propose that a Critical Vendor must agree to take whatever action is necessary to remove the Lien at the Critical Vendor's sole expense.

25. Finally, the Debtors propose to maintain a matrix summarizing (i) the name of each Critical Vendor paid, and (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim (and any 503(b)(9) Claims).  This matrix will be provided, upon request, to the Office of the United States Trustee and the professionals retained by any official committee appointed in the Chapter 11 Cases; provided, that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone,

10

including any member of such statutory committee, without the prior written consent of the Debtors.

## **BASIS FOR REQUESTED RELIEF**

1.      As stated, by this Motion, the Debtors seek authority to continue to pay and/or honor the prepetition claims of the Critical Vendors up to $31.6 million (the "Critical Vendor Cap"), with, (i) an interim amount, prior to confirmation of up to $5.2 million, and only as needed to avoid immediate and irreparable harm; and (ii) an additional amount of up to $27.6 million and only as needed to avoid immediate and irreparable harm and in the Debtors' discretion, in the ordinary course of the Debtors' business, and pursuant to the carefully designed Protocol overseen by a core, centralized team consisting of the Debtors' senior management and professional advisors.

2.      In addition, the Debtors reserve the right to request an increase in the Critical Vendor Cap. The amounts to be paid to the Critical Vendors are already provided for in the Debtors' operating Budget (the "Budget") submitted with the Debtors' motion for authority to use cash collateral (the "Cash Collateral Motion").

3.      The Debtors seek authority to pay a portion of pre-petition claims of the Critical Vendors because they are crucial to the well-being of the cattle and to preserving the value of the Debtors' business operations and their viability as a going-concern enterprise. As discussed herein, the Critical Vendors are so essential to the Debtors' operations that the lack of any of their goods or services, even for a short duration, would destroy the Debtors' operations and cause irreparable harm to the Debtors' cattle and milk supply. Accordingly, the Debtors respectfully request that the Court authorize the relief requested herein pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code.

4.     Such action has been recognized as a legitimate practice in bankruptcy proceedings by the Supreme Court. *Czyzewski v Jevic Holding Corp.,* 137 S. Ct. 973, 985, 197 L. Ed. 2d 398 (2017) (listing critical vendor orders that allow payment of essential supplier prepetition invoices as legitimate exceptions to the common priority scheme)[5]. Indeed, the Supreme Court reasoned that critical vendor orders supported "significant Code-related objectives." *Id.* In *Jevic*, the Supreme Court offered several appropriate considerations for courts in determining whether to grant motions for payment of critical vendors: (a) preserve the debtor as a going concern; (b) make the disfavored creditors better off; (c) promote the possibility of a confirmable plan; (d) restore the status quo *ante*; or (e) protect reliance interests. *Id.* Granting the Debtors' Motion will meet these objectives and is authorized pursuant to the Court's powers under section 105(a) of the Bankruptcy Code. 11 U.S.C. § 105 ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].").

5.     Furthermore, bankruptcy judges in this circuit (including this court) have routinely granted similar critical vendors motions. *See, e.g In re Victor Valley Community Hospital*, No. 6:10-bk-39537-CB (Bankr. C.D. Cal. Sept. 17, 2010) (No. 34); *In re Downey Regional Medical Center-Hosp., Inc.*, No. 2009-BK-34714-BB (Bankr. C.D. Cal. Oct. 19, 2009) (No. 148); *In re Humboldt Creamery*, LLC, 2009 WL 2820552 (Bankr. N.D. Cal. Apr. 23, 2009) ([n]othing in the Bankruptcy Code forbids payment on a prepetition debt before confirmation of a plan, and Rule 6003(b) specifically contemplates such payments" concluding that "prepetition debt, and especially a priority debt, may be paid before confirmation if in the best interests of the estate");

---

[5] Some have misconstrued *Matter of B & W Enterprises, Inc*., 713 F.2d 534 (9th Cir. 1983) as prohibiting Critical Vendors Motions altogether. Such notions are contrary to the Supreme Court's analysis in Jevic. Instead, B & W Enterprises, Inc. should be narrowly construed: the debtor may not use 11 U.S.C. § 510 to subvert the Bankruptcy Code's priority scheme without evidence of misconduct by the creditor not receiving payment on prepetition expenses. Matter of *B & W Enterprises, Inc*., 713 F.2d at 537.

*In re Laurel Fertility Care*, Case No. 14-30403-DM-11 (Bankr. N.D. Cal. May 21, 2014) (approving motion for authority to pay prepetition critical vendor); *In re Montgomery-Sansome, LP*, Case No. 17-30515-HLB (Bankr. N.D. Cal. Sept. 20, 2017) (approving motion for authority to pay prepetition critical vendor and wage claim); *In re Safe Haven Health Care, Inc.*, Case No. 18-01044-JDP, Docket Nos. 38 and 69 (Bankr. D. Idaho, 2018).

### A. Payment of the Critical Vendor Claims Is Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code.

6.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain pre-petition claims where a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would").

7.      "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in the Ninth Circuit have consistently declined to interfere with corporate decisions absent a showing of bad

faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v.Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1046 (2009).

8.      The Court may also rely on its equitable powers under section 105 of the Bankruptcy Code to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Accordingly, the Court may authorize the Debtors to pay the Critical Vendor Claims because such relief is necessary for the Debtors to carry out their fiduciary duties under sections 1107(a) of the Bankruptcy Code. Under section 1107(a) of the Bankruptcy Code, "the debtor in possession has the same fiduciary duties and liabilities as a trustee.

9.      Allowing a debtor to honor prepetition obligations under section 105(a) authority is appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

10.     When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *In re Anchorage Nautical Tours, Inc*., 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); s*ee also In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would a trustee for a debtor out of possession.").

11.    Numerous courts have acknowledged that payment of pre-petition obligations, irrespective of statutory priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other stakeholders. See, *e.g., Czyzewski v. Jevic Holding Corp*., 137 S. Ct. 973, 985 (2017) (noting that courts have approved distributions that are not consistent with ordinary priority rules in instances where significant Code-related objectives, such as enabling a successful reorganization, would be served and listing examples such as "first-day wage orders that allow payment of employees' prepetition wages, critical vendor orders that allow payment of essential suppliers' prepetition invoices, and roll-ups that allow lenders who continue financing the debtor to be paid first on their prepetition claims"); *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition claim because debtor could not survive without maintaining customer relationship); *In re Financial News Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed if "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the chapter 11 process").

12.    Although there is a Ninth Circuit decision which fails to recognize the grant of authority given by the Bankruptcy Code to elevate certain prepetition payments over others, that case is easily distinguishable from these Chapter 11 Cases and the relief sought herein, as the prepetition payments at issue there were made by the debtor without notice, hearing, or

15

authorization from the Bankruptcy Court. *In Matter of B & W Enterprises, Inc.,* 713 F.2d 534, 535 (9th Cir. 1983).

13.     Furthermore, although the B & W court noted that the "necessity of payment" doctrine was established in railroad reorganization cases, *Id.* at 535, numerous courts have extended the doctrine beyond the railroad reorganization context. *See, e.g., In re Structurlite Plastics Corp*., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately"); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of prepetition wage and benefit obligations was in the best interest of creditors and necessary for the successful reorganization of the debtor and granting the debtor's motion to pay prepetition employee expenses); *In re Chateaugay Corp.*, 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that Bankruptcy Courts have the authority to authorize the debtor to pay certain prepetition claims).

14.     Moreover, since *B & W*, the Ninth Circuit has noted in other instances that certain pre-petition payments should be authorized regardless of whether they are priority payments under the Bankruptcy Code. *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987). In that case, in rejecting the appellants' argument that the cross-collateralization clause in a financing agreement violated the "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Court of Appeals noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental tenet – rehabilitation of debtors, which may supersede the policy of equal treatment." *Id.* The Ninth Circuit further stated that: [c]ases have permitted unequal treatment of prepetition debts when necessary for rehabilitation, in such contexts as (i) prepetition

wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts. *Id*.

15.     Numerous Courts within the Ninth Circuit have followed the reasoning of *In re Adams Apple* in holding that the payment of certain pre-petition claims is not categorically barred when the payments promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225, at *8 (Bankr. W.D. Wash. Oct. 22, 2015) (citing *In re Adams Apple Inc.* for proposition that it "is permissible to treat prepetition debts unequally when necessary for rehabilitation."); *Gordon v. Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity" to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right the "entire [chapter 7] system would suffer a massive breakdown").

16.     As set forth in the Millenkamp Declaration, the Debtors have ample liquidity in the form of cash on hand and a commitment for approximately $35 million in debtor-in-possession financing.

17.     The Debtors believe that some of the Critical Vendors will demand that the Debtors satisfy their pre-petition obligations as a condition of doing business on a go-forward basis as a result of the commencement of the Chapter 11 Cases.  Non-performance of Critical Vendors, such as feed vendors, would unquestionably and irreparably harm the Debtors' business operations, especially the Debtors' animals.

18.     Thus, the Debtors believe that the goods and services provided by the Critical Vendors are so vital that the costs associated with even the briefest of disruption in goods and services would exceed the Critical Vendors' pre-petition claims. Therefore, payment of the Critical

Vendors' Claims as requested in this Motion is plainly an exercise of sound business judgment and necessary to a successful reorganization. Accordingly, the Court should authorize the Debtors to pay the Critical Vendor Claims as requested herein.

19.     Moreover, as noted above, the amounts proposed to be paid to the Debtors' most critical vendors, up to the Critical Vendor Cap, and in the ordinary course of the Debtors' business, pursuant to the Protocol, have already been included in the Budget.  Accordingly, the Debtors have the financial ability to make the payments proposed to be made to the Debtors' most critical vendors, and such payments will not render the Debtors' Estates administratively insolvent.

20.     For the reasons noted above, the Debtors' ability to pay and/or honor the pre-petition claims (up to the Critical Vendor Cap) of the Critical Vendors is instrumental to the Debtors' maintenance of their operations, health of the cattle, reorganization efforts, and is in the best interests of the Estates and their creditors. Any disruption in the Debtors' ability to pay and/or honor such claims (up to the Critical Vendor Cap) would undoubtedly cause immediate and irreparable harm to the value of the Debtors' business and assets. To avoid this result, the Debtors should be permitted to pay and/or honor the pre-petition claims of the Critical Vendors, in the Debtors' discretion, and in the ordinary course of the Debtors' business in accordance with the Protocol terms and conditions set forth herein.

**B.  Section 503(b)(9) Allows for Prepetition Payment on Goods Received within Twenty (20) Days Prior to Petition Date**

21.     Alternatively, section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within twenty (20) days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." *See also In re Brown & Cole Stores, LLC*, 375 B.R. 873, 878 (B.A.P. 9th Cir. 2007). (recognizing that § 503(b)(9) applies to critical vendors supplying

goods). These claims must be paid in full for the Debtors to confirm a chapter 11 plan. See 11 U.S.C. § 1129(a)(9)(A).

22.    In fact, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors submit that they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1). Courts have regularly authorized the payment of claims arising under section 503(b)(9) in the ordinary course of business. *See e.g. In re Chassix Holdings, Inc*., No. 15-10578 (Bankr. S.D.N.Y. Apr. 14, 2015) (No. 275).

23.    Thus, payment of claims for supplies and services received by the Debtors' Critical Vendors within 20 days prior to the Petition Date must be allowed as administrative expenses, and this Court should allow the Debtors to pay these claims in accordance with the relief requested in this Motion.

24.    The Debtors will be filing a separate motion for allowance and payment of section 503(b)(9) claims that are claims of parties that are not considered a Critical Vendor under this Motion.

### BANK AUTHORITY TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS ISSUED AND TRANSFERS

25.    The Debtors further request that the Court authorize, but not direct, the Debtors' Banks to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic funds transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims. The Debtors also seek authority, but not direction, to issue new post-petition checks or effect new post-petition electronic funds transfers in replacement of any checks or transfer requests on account of any Critical Vendor Claims dishonored or rejected as a result of the Chapter 11 Cases.

## RESERVATION OF RIGHTS

26.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NO PRIOR REQUEST

27.     No prior request for the relief requested herein has been made to this or any other Court.

## NOTICE

28.     The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) Internal Revenue Service; (c) the Idaho Department of Revenue; (d) the parties included on the Debtors' list of 20 largest unsecured creditors; and (e) all parties entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice is required.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request the Court enter an Interim order:

1)     affirming the adequacy of the notice given;

2)     granting the Motion in the interim;

3)     authorizing, but not directing, the Debtors to continue to pay and/or honor the pre-petition claims (up to $5.2 million, assuming the final hearing is within 4 weeks of the interim hearing) of the Critical Vendors, in the ordinary course of the Debtors'

business, in the Debtors' discretion, and in accordance with the Protocol and the Budget; and

4)      granting such other and further relief as the Court deems just and proper under the circumstances.

**WHEREFORE**, the Debtors also respectfully request that this Court hold a final hearing on the Motion and issue a Final Order:

1)      affirming the adequacy of the notice given;

2)      granting the Motion in its entirety;

3)      authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims (up to a total of $27.6 million) of the Critical Vendors, in the ordinary course of the Debtors' business, in the Debtors' discretion, and in accordance with the Protocol and the Budget; and

4)      granting such other and further relief as the Court deems just and proper under the circumstances.

DATED this 2nd day of April 2024.

JOHNSON MAY

*/s/ Matt Christensen*

MATTHEW T. CHRISTENSEN
Attorney for the Debtor

**EXHIBIT A**
**Proposed Interim Order**

**INTERIM ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF
AN ORDER AUTHORIZING DEBTORS TO HONOR PREPETITION OBLIGATIONS
TO CRITICAL VENDORS**

The *Debtor's Emergency Motion for Entry of an Order Authorizing Debtors to Honor Prepetition Obligations to Critical Vendors* (the "Motion") and the Court, having reviewed the Motion and having held a hearing on the relief requested in the Motion; and having heard the statements of counsel in support of the relief requested in the Motion at the hearing, finds that the Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, that this is a core matter under 28 U.S.C. § 157(b)(2), that notice of the Motion and the Hearing were sufficient under the circumstances and that no further notice need be given; and the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing, therefore

**IT IS HEREBY ORDERED** that:

1.      The Motion is granted on an interim basis subject to the terms of this Interim Order.

2.      Notice of the Emergency Motion was appropriate under the circumstances and in compliance with the Bankruptcy Code and Bankruptcy Rules.

3.      The Court will hold a Final Hearing on the Motion on _____.

4.      The Debtors are authorized, but not directed, in their sole discretion, to continue to pay and/or honor the prepetition claims of their most critical vendors in an interim amount of up to $5.2 million [*subject to adjustment based on the final hearing date*] in the Debtors' discretion and in the ordinary course of the Debtors' business, pursuant to the Protocol as described in

the Motion in accordance with the Budget and subject to certain Terms and Conditions and the

Accountability Requirements, as set forth more fully in the Motion.


//end of text//



Order submitted by:


Matthew T. Christensen
Attorney for the Debtors