Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
        jjm@johnsonmaylaw.com


Krystal Mikkilineni, *PHV pending*
Robert E. Richards, *PHV pending*
Tirzah Roussell, *PHV pending*
DENTONS
215 10th Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
        Robert.richards@dentons.com
        Tirzah.roussell@dentons.com

Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re<br><br>MILLENKAMP CATTLE, INC., *et. al.*,<br><br>Debtors.[1] | Case No. 24-40158-NGH<br><br>Chapter 11 |

---

[1] The Debtors in the Chapter 11 Cases along with the last four digits of their respective tax identification number or registration number in the applicable jurisdiction are: Millenkamp Cattle, Inc. (26-0603892); Idaho Jersey Girls LLC (46-3084467); East Valley Cattle, LLC (20-3238613); Millenkamp Properties, L.L.C. (26-0604003); Millenkamp Properties II LLC (84-3797719); Millenkamp Family LLC (46-1868279); Goose Ranch, LLC; Idaho Jersey Girls Jerome Dairy LLC (81-4713431); Black Pine Cattle LLC; and Millenkamp Enterprises LLC. The location of the Debtors' service address for purposes of the Chapter 11 Cases is 471 N 300 W., Jerome, ID 83338.

**EMERGENCY MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (A)
AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING; (B)
GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED
CREDITORS; AND (C) SETTING A FINAL HEARING**

Millenkamp Cattle, Inc. ("Millenkamp Cattle") and its affiliated debtors and debtors in

possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11

Cases"), by and through their undersigned counsel, and respectfully move the Court pursuant to

sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 4001.1 of the Local Rules of Bankruptcy

Procedure for the District of Idaho (the "Local Rules" or "LBR"), for the entry of an interim

Order, substantially in the form attached hereto as "Exhibit A" (the "Interim Order") and a final

order (the "Final Order") (together with the Interim Order, the "DIP Orders") (1) authorizing the

Debtors to enter into a senior secured, superpriority debtor in possession financing facility with

Sandton Capital Partners LP ("Sandton" or the "DIP Lender") in an (a) interim amount not to

exceed $15 million and only as needed to avoid immediate and irreparable harm, and (b) after a

final hearing, an amount up to total lending of not more than $35 million (as amended, modified

or otherwise in effect from time to time, the "DIP Facility"), substantially on the terms set forth

in the Declaration of William John Millenkamp ("Millenkamp Declaration") filed in support of

this Motion and the DIP Term Sheet, attached as "Exhibit B" hereto, and (c) granting the DIP

Liens and the DIP Superpriority Claims (in each case, as defined below); (2) authorizing the

Debtors to grant adequate protection in favor of Rabo, MetLife, and Conterra; (3) modifying the

automatic stay as imposed by section 362 of the Bankruptcy Code to the extent necessary to

implement and effectuate the terms of the DIP Facility and the DIP Orders; and (4) scheduling an

interim hearing to approve the proposed Interim Order and a final hearing with respect to the relief requested herein (the "Final Hearing"). This Motion is based upon the files and records herein, the accompanying Millenkamp Declaration, the exhibits thereto, and the anticipated consent of the Pre-Petition Secured Lenders, described herein.

1.      On April 2, 2024 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for District of Idaho (the "Court") commencing the Chapter 11 Cases. The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner, or official statutory committee of unsecured creditors (such official committee, the "Committee") has yet been appointed in the Chapter 11 Cases.

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rule 2002, 4001 and 9014 and LBR 4001.1.

## **FACTUAL BACKGROUND**

### **a) The Debtors and the Events Leading to Bankruptcy**

3.      The Debtors are ten affiliates that collectively own and operate several businesses, including a calf ranch raising approximately 50,000 calves located in Jerome, Idaho; a dairy heifer feedlot in Declo, Idaho, raising approximately 60,000 head of dairy cattle; a dairy operation at the Declo facility where the dairy cattle are milked several times a day; farming operations in Jerome, Twin Falls and Cassia counties; and custom harvest & trucking throughout the Magic Valley.

4.     The facts and events leading to the bankruptcy are outlined in the Millenkamp Declaration, filed in support of this Motion, and incorporated by reference herein.

**b) <u>Structure of Debtors and Their Operations</u>**

5.     Through the ten Debtor entities, the Debtors operate as a single enterprise, which includes common usage of debt and banking facilities.

6.     Millenkamp Cattle is the primary entity from which all operations are directed, the revenues received and the payables disbursed.  Millenkamp Cattle is the operational entity which owns all of the cattle, feed, and equipment used to care for the cattle, employs the employees, and receives and disburses the majority of the monies.  Millenkamp Cattle does not own any real property.

7.     Idaho Jersey Girls Jerome Dairy, LLC owns 80 acres and an 1,120-animal unit concentrated animal feeding operation in Jerome, Idaho (the "<u>Jerome Feedlot</u>" or "<u>Millenkamp Milkers</u>"). The Jerome Feedlot is leased to Millenkamp Cattle.

8.     Millenkamp Properties, L.L.C. owns 720 acres and a 6,000-animal unit concentrated animal feeding operation in Jerome Idaho (the "<u>Calf Ranch</u>"),  a 40-acre feed storage site ("<u>Ridgeway</u>")  and 4,638 acres in Cassia County ("<u>Moonshine Ranch</u>"), and another 80 acres in Jerome County (the "<u>German Dairy</u>"). These properties are also leased to Millenkamp Cattle.

9.     Millenkamp Properties II LLC owns 968 acres in Twin Falls County ("<u>Canyonlands</u>") and 278 acres in Jerome County (the "<u>McGregor Property</u>"). The Canyonlands and McGregor Property are also leased to Millenkamp Cattle.

10.     Goose Ranch LLC owns a 600-acre farm on Snake River below Minidoka Dam in Cassia County (The "<u>Goose Ranch Property</u>"). The Goose Ranch Property is also leased to Millenkamp Cattle.

11.     East Valley Cattle, LLC owns a 11,668-acre farm and a 51,285-animal unit capacity dairy and feedlot in Cassia County near Declo, Idaho ("East Valley Facilities"). This is also leased to Millenkamp Cattle.

12.     Millenkamp Cattle leases from Mike Thompson a 1200 head feedlot ("Thompson Feedlot") in Jerome, Idaho.

13.     Millenkamp Cattle leases approximately 4280 irrigated acres of farm ground ("Cassia Creek") from Eagle Creek Northwest, LLC that is adjacent to the East Valley Facilities in Declo, Idaho.

14.     As stated above, Millenkamp Cattle operates all the real property owned or leased by the various Millenkamp entities.  This includes the farms, Calf Ranch, Idaho Jersey Girls and the East Valley Facilities.

15.     Millenkamp Cattle, Inc. d/b/a Idaho Jersey Girls operates the German Dairy and East Valley Facilities.

16.     Millenkamp Cattle, Inc. d/b/a Black Pine Cattle also provides custom heifer raising services at the East Valley Facilities.

17.     As of the Petition Date, the Debtors' consolidated unaudited financial statement reflected total assets of approximately $643,000,000 ($493M real property; $150M personal property) and total liabilities of approximately $339,000,000 (Metlife $181M; Rabo $ $92M; Conterra $19M; A/P $47M).

18.     The Debtors' real estate portfolio consists of approximately 20,000 acres with an approximate estimated value of $ 493,000,000.

19.     The Debtors have approximately $35,000,000 in total unsecured debt, including disputed, unliquidated or contingent claims.

c) **Current Circumstances and Access to Cash**

20.     As explained below, virtually all of the Debtors' income is subject to pre-petition perfected pledges.  The Debtors have immediate needs for access to debtor-in-possession financing.  The Debtors have substantial trade payables, many classified as critical vendors, consistent with the operations of a large organization that receives substantial trade support in the form of traditional credit terms.  While the length of terms has begun to shorten as the trade balances grow, the Debtors will have access to normal or near normal unsecured credit terms provided the Debtors have access to substantial liquidity in the form of post-petition term loan financing.

21.     During this time allocated to reorganizing the Debtors' businesses, the Debtors require additional cash as well as the use of cash proceeds that comprises the collateral of the existing Pre-Petition Secured Lenders (as defined below) and the proceeds of the proposed DIP Facility, mainly to fund day-to-day operations and maintain and preserve the value of the Debtors' businesses (including the Pre-Petition Cash Collateral).  The availability to the Debtors of sufficient working capital and liquidity to finance their operations is vital to their ability to maintain such operations and is necessary for the preservation of the value of the estates as a whole.

22.     As of March 31, 2024, the Debtors had approximately $17 million of cash on hand. Further the Debtors expect to spend approximately $20.71 million during the first four weeks of the case and collect cash receipts of $17.05 million, including pre-petition receivables.  Cash shortfall in the first four weeks is anticipated to be $3.7 million.  Although the Debtors anticipate collecting in excess of an additional $1.7 million in pre-petition accounts receivable at the Petition Date after the four-week period and expect to generate approximately $11.51 million in new post-petition receivables over the first four-week period, all accounts receivable are Cash Collateral of

the Pre-Petition Secured Lenders.  As a result, to survive the opening phases of the Chapter 11 cases and beyond, the Debtors must obtain access to pre-petition cash collateral by stipulation or order of this Court, as proposed in the Cash Collateral Motion.

23.     As a result of the above circumstances, the Debtors seek authority during the interim period and pursuant to the terms of the Interim Order, to borrow up to $15 million under the proposed term loan DIP Facility during the interim period, and up to an additional $20 million following entry of the Final Order.

24.     The terms of the DIP Facility are the result of a wide-ranging market exploration by the Debtors and their professionals.  In January, 2024, the Debtors and their professionals began to search for possible debtor-in-possession ("DIP") financing.  The Debtors have solicited DIP financing proposals, including the existing holders of the Pre-Petition Obligations, and received three DIP Financing proposals.  All three DIP Financing proposals received required a priming lien under Bankruptcy Code section 364(d).  The Debtors solicited, but have not received, a DIP financing proposal from MetLife.  The Sandton proposal is superior in multiple respects to the other proposals received, including, without limitation, duration, availability, overall cost, other terms and covenants and openness to converting some or all of the DIP Facility into an exit facility. A summary of the principal terms expressly agreed to by Sandton as DIP Lender is described below beginning at paragraph 35, and a copy of the proposed DIP Term Sheet is attached as Exhibit B.

25.     As discussed more fully below, the Debtors propose to secure their obligations under the DIP Facility by, among other things, granting the DIP Lender under the DIP Facility first-priority priming liens on, and security interests in, substantially all of the Debtors' assets, with certain exceptions and, in each case, subject to the "Carve Out", as defined and described more

fully below.  The DIP Facility and DIP Orders also provide the DIP Lender with allowed superpriority administrative expense claims.

26.    The DIP Facility and DIP Orders provide for, among other things, agreed budgetary constraints on the proceeds of the DIP Facility.  The proceeds of the DIP Facility will provide liquidity for up to 12 months to fund the Chapter 11 Cases.

27.    The Pre-Petition Secured Lenders are provided adequate protection through an "equity cushion" on their collateral, and, under the proposed DIP Orders solely to the extent of any diminution in the value of their respective interests in the Pre-Petition Collateral resulting from, among other things, the subordination to the Carve Out (as defined herein) and to the DIP Liens (as defined herein), the Debtors' use, sale, or lease of such Pre-Petition Collateral, including Cash Collateral, and the imposition of the automatic stay from and after the Petition Date (collectively, and solely to the extent of such diminution in value, the "Diminution in Value") as more fully set forth in the DIP Orders (and subject to the Carve Out and the Debtors' preserved rights pursuant to section 506(c) of the Bankruptcy Code), in the form of replacement security interests in and liens on substantially all of the Debtors' assets and property (with certain exclusions) and superpriority claims (in each case, in accordance with their relative priorities, and junior and subject to the liens and superpriority claims granted to the DIP Lender).  If the Debtors are unable to obtain approval of the use of Cash Collateral and the DIP Facility, their ability to reorganize will be jeopardized, substantially reducing recoveries to all creditors.  Entry of the Interim Order and, after the requisite notice and the Final Hearing, the Final Order is therefore (a) critical to the Debtors' ability to preserve the Debtors' assets; (b) in the best interests of the Debtors and their estates; and (c) necessary to avoid irreparable harm to the Debtors, their creditors and their assets, businesses, goodwill, reputation, and employees.  Further, access to the proceeds under

the DIP Facility is necessary to avoid immediate and irreparable harm to the value of the Debtors'

assets and the care of the livestock. The Debtors, therefore, respectfully request this Motion be

granted.

**d) <u>Overview of Debt Structure</u>**

**i) Rabo Pre-Petition RLOC Credit Agreement**

28.    Under that certain Third Amended and Restated Loan and Security Agreement,

dated as of April 21, 2021, as Amended, the "<u>Pre-Petition RLOC Credit Agreement</u>" and

collectively with all security, pledge, intercreditor, guaranty agreements, and other

documentation executed in respect thereof, the "<u>Pre-Petition RLOC Documents</u>", by and among

the Debtors[2], collectively as borrower, the lenders from time to time party thereto (in such

capacity, collectively, the "<u>Pre-Petition RLOC Lenders</u>"), and Rabo AgriFinance LLC ("<u>Rabo</u>"),

as sole lead arranger, agent, and swing-line lender (in its capacity as agent for the benefit of the

Pre-Petition RLOC Lenders and each Issuer (as defined in the Pre-Petition RLOC Credit

Agreement), the "<u>Pre-Petition RLOC Agent</u>" and collectively with the Pre-Petition RLOC

Lenders and the Issuers, the "<u>Pre-Petition RLOC Secured Parties</u>" and each, a "<u>Pre-Petition

RLOC Secured Party</u>"), the Debtors were provided with an asset-based revolving line of credit

facility (the "<u>Pre-Petition RLOC Facility</u>") consisting of (a) revolving commitments in an

aggregate amount of up to $91,000,00.00; (b) a swing-line credit facility for the Pre-Petition

RLOC Agent to make Swing Line Advances (as defined in the Pre-Petition RLOC Credit

Agreement) in an aggregate amount of up to $7,500,000.00; and (c) a letter-of-credit facility for

the issuance of stand-by letters of credit in an aggregate amount of up to $1,000,000.00.

---

[2] Nondebtors Susan Millenkamp as Trustee of the WJM 2012 Trust; William Millenkamp as Trustee of
the SJM 2012 Trust; William John Millenkamp and Susan Jo Millenkamp (the "<u>Non-Debtor Borrowers</u>")
also executed the Pre-Petition RLOC Credit Agreement. The Debtors and the Non-Debtor Borrowers are
referred to herein as the "<u>Borrowers</u>."

29.     As of the Petition Date, the Debtors were indebted to the Pre-Petition RLOC Secured Parties pursuant to the Pre-Petition RLOC Documents (a) in the aggregate principal amount of not less than $93,842,831.04[3] on account of Loans (as defined in the Pre-Petition RLOC Credit Agreement), plus (b) interest, fees, expenses, and all other amounts, obligations, and Liabilities (as defined in the Pre-Petition RLOC Credit Agreement) owing under or in connection with the Pre-Petition RLOC Documents (clauses (a) and (b), collectively, the "Pre-Petition RLOC Obligations").

30.     Pursuant to the terms of the Pre-Petition RLOC Credit Agreement, the Debtors granted to the Pre-Petition RLOC Agent a security interest to and in substantially all of the Debtors' and Borrowers' personal property, excluding their real property, and all other property defined as the "Collateral" in the Pre-Petition RLOC Credit Agreement (referred to herein as the "Pre-Petition RLOC Collateral" and the liens and security interests granted to or for the benefit of the Pre-Petition RLOC Secured Parties therein, the "Pre-Petition RLOC Personal Property Liens").  The Pre-Petition RLOC Collateral includes, among other interests, (each as defined in the Pre-Petition RLOC Credit Agreement):  all Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and, notably, the Borrowers' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Borrowers' milk and other dairy products (the "Milk Receivables").  The Pre-Petition RLOC Secured Parties' lien and security interest extends to all accessions to, substitutions for, and all replacements, products, and proceeds of the Pre-Petition RLOC Collateral.  As described below, the Pre-Petition RLOC Secured Parties' interest in the Milk Receivables is subject to the First Intercreditor Agreement (as defined below) entered into

---

[3] Amount calculated as of December 11, 2023.

between them and MetLife (as defined below).  Further, as consideration for the Pre-Petition

RLOC Agent to enter into that certain Forbearance Agreement, made effective as of October 22,

2022, the Borrowers granted, among other things, a second priority mortgage on the Pre-Petition

MetLife Real Estate Collateral (defined below) to secure the Pre-Petition RLOC Obligations,

subject to the Second Intercreditor Agreement (defined below).  Accordingly, on October 20,

2022, the Borrowers executed and delivered that certain Mortgage, Assignment of Rents,

Security Agreement, and Fixture Filing (Second Priority), in favor of the Pre-Petition RLOC

Agent, to secure any and all obligations owed to the Pre-Petition RLOC Secured Parties, which

was recorded in Cassia County, as Instrument No. 2022-004552, Twin Falls County as

Instrument No. 2022018722, and Jerome County as Instrument No. 2224759 (the "Pre-Petition

RLOC Second Mortgage" and together with the Pre-Petition RLOC Personal Property Liens, the

"Pre-Petition RLOC Liens").

### ii)  Pre-Petition MetLife Loans

31.     Metropolitan Life Insurance Company ("MLIC") and MetLife Real Estate

Lending LLC (collectively, "MetLife") are the owners and holders of certain commercial real

estate loans (collectively, the "Pre-Petition MetLife Loans" and, together with all related

mortgages and other existing or future documents evidencing, securing, or executed in

connection with the Pre-Petition MetLife Loans, in each case, as Amended, referred to herein as

the "Pre-Petition MetLife Loan Documents") made by MetLife to the MetLife Borrowers.[4]  The

Pre-Petition MetLife Loans are secured by liens in and security interests on the MetLife

Borrowers' real property and certain of the MetLife Borrowers' personal property, including: (x)

---

[4] The "MetLife Borrowers" are, collectively, the Non-Debtor Borrowers, Debtor Millenkamp Cattle,
Debtor East Valley Cattle, LLC, Debtor Idaho Jersey Girls LLC, Debtor Idaho Jersey Girls Jerome Dairy,
LLC, Debtor Goose Ranch LLC, Debtor Millenkamp Family LLC, Debtor Millenkamp Properties,
L.L.C., and Debtor Millenkamp Properties II, LLC.

crops grown after a foreclosure; (y) all wells, underground pipelines, sprinklers, and similar irrigation equipment located at the real property, as well as all lines, valve openers, pipes, and similar items pertaining to such irrigation equipment; and (z) all milking equipment located at the real property (the "Pre-Petition MetLife Real Estate Collateral").  The Pre-Petition MetLife Loans are further secured, subject to the First Intercreditor Agreement (defined below), by the Milk Receivables (the "MetLife Milk Priority Claim," and collectively with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition MetLife Collateral" and all liens and security interests on and in the Pre-Petition MetLife Collateral, the "Pre-Petition MetLife Liens").  As of the Petition Date, the MetLife Borrowers were indebted to MetLife, in the aggregate principal amount of approximately $180,473,929.72 under the Pre-Petition MetLife Loan Documents (collectively, the "Pre-Petition MetLife Obligations").

32.    Rabo and MetLife are parties to (i) that certain Intercreditor Agreement, dated as of September 18, 2018, (as Amended, the "First Intercreditor Agreement") and (ii) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022 (as Amended, the "Second Intercreditor Agreement" and, together with the First Intercreditor Agreement, the "MetLife Intercreditor Agreements").  Pursuant to the First Intercreditor Agreement, Rabo agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition MetLife Collateral to those of MetLife, and MetLife agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition RLOC Collateral (other than any such property that may also constitute Pre-Petition MetLife Collateral) to those of Rabo.  Additionally, the First Intercreditor Agreement recognizes that Rabo and MetLife have separately entered into Milk Check Assignment Agreements (the "Milk Agreements") with Debtor Millenkamp Cattle and a milk purchaser, Glanbia Foods, Inc. ("Milk Purchaser").  The Milk Agreements direct the Milk

Purchaser to make certain payments directly to Rabo (in certain situations) and MetLife (on a monthly basis), rather than to Millenkamp Cattle.  Pursuant to the terms of the First Intercreditor Agreement, MetLife's priority interest in any Milk Receivables is equal to the aggregate amount of, in any month, the amount of the monthly installment payment of principal and accrued interest then due and payable by the applicable Debtors to MetLife, with such amount being capped at one month's principal and interest payment, unless MetLife has provided written notice to Rabo that amounts exceeding one month's principal and interest payment are due, owing, and unpaid.  As of the Petition Date, Rabo has not received any such written notice and is unaware of any monthly principal and interest payments that are due, owing, and unpaid to MetLife.  On September 18, 2018, Rabo, Millenkamp Cattle, and the Milk Purchaser also entered into a Collateral Assignment of Milk Contracts, pursuant to which Millenkamp Cattle assigned to Rabo all contracts and proceeds related to certain purchase agreements between Millenkamp Cattle and the Milk Purchaser, to secure the obligations owed to the Pre-Petition RLOC Secured Parties.  Subject to the foregoing, during the Borrowers' default under the Pre-Petition RLOC Documents, Rabo may collect the Milk Receivables.  Other than the foregoing subordination, MetLife and Rabo expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of the Pre-Petition RLOC Secured Parties' rights, privileges, powers, or remedies with respect to the Pre-Petition RLOC Obligations or the Pre-Petition RLOC Collateral.  Likewise, Rabo and MetLife expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of MetLife's rights, privileges, powers, or remedies with respect to the Pre-Petition MetLife Loans or the Pre-Petition MetLife Collateral.  MetLife does not have any lien or security interest in any of the Debtors' Livestock, including, but not limited to, dairy cattle.

### iii) Pre-Petition Conterra Loans

33.    Conterra Agricultural Capital, LLC ("Conterra" and, collectively with the Pre-Petition RLOC Secured Parties and MetLife, the "Pre-Petition Secured Lenders") and certain of the Debtors are parties to certain loan and security agreements (collectively, the "Pre-Petition Conterra Documents") pursuant to which, among other things, Conterra agreed to make certain loans and financial accommodations (i) in a principal amount of $16,500,000 (the "Pre-Petition Conterra Mezzanine Loan") and (ii) in a principal amount of $2,549,750 (the "Pre-Petition Conterra Mortgage Note" and together with the Pre-Petition Conterra Mezzanine Loan and all obligations under the Pre-Petition Conterra Documents, the "Pre-Petition Conterra Obligations" and, together with the Pre-Petition RLOC Obligations and the Pre-Petition MetLife Obligations, the "Pre-Petition Secured Obligations").  As of the Petition Date, the Debtors were indebted to Conterra, in the aggregate amount of approximately $21,486,023.04.  The Pre-Petition Conterra Mezzanine Loan is secured by second priority liens and security interests in the Pre-Petition RLOC Collateral (the "Pre-Petition Conterra Mezzanine Collateral") and third priority mortgage on the Pre-Petition MetLife Real Estate Collateral (the "Pre-Petition Conterra Mezzanine Liens").  The Conterra Mortgage Note is secured by a first priority mortgage on certain real property owned by certain of the Debtors known as "German Dairy" located at 162 West 400 North, Jerome, Idaho 83338 (the "Pre-Petition Conterra Real Estate Collateral" and together with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition Real Estate Collateral" and collectively with the Pre-Petition RLOC Collateral and the Pre-Petition MetLife Collateral, the "Pre-Petition Collateral") and located in Jerome County, Idaho (the "Pre-Petition Conterra Real Estate Lien" and, together with the Pre-Petition Conterra Mezzanine Liens, the "Pre-Petition Conterra Liens" and collectively with the Pre-Petition RLOC Liens and the Pre-Petition MetLife

Liens, the "Pre-Petition Liens").  The Pre-Petition Conterra Mezzanine Collateral and the Pre-Petition Conterra Real Estate Collateral is collectively referred to herein as the "Pre-Petition Conterra Collateral").

34.    The Pre-Petition Conterra Liens are subject to (i) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022, by and between MetLife and Conterra (as Amended, the "Conterra-MetLife Intercreditor Agreement") and (ii) that certain Intercreditor and Subordination Agreement, dated as of October 20, 2022, by and between the Pre-Petition RLOC Agent and Conterra (as Amended, the "Conterra-RLOC Intercreditor Agreement" and together with the MetLife Intercreditor Agreements, the "Intercreditor Agreements" and together with the Pre-Petition RLOC Documents, the Pre-Petition MetLife Loan Documents, and the Pre-Petition Conterra Documents, the "Pre-Petition Loan Documents").[5]

## BANKRUPTCY RULE 4001 STATEMENT

35.    In accordance with Bankruptcy Rule 4001, the following sets forth a concise summary of material terms of the proposed DIP Facility and the DIP Orders[6]:

| SECURED CREDITORS<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | Rabo (as defined above)<br>MetLife (as defined above)<br>Conterra (as defined above) |
|---|---|
| BORROWERS<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | Millenkamp Cattle, Inc.<br>Idaho Jersey Girls LLC<br>East Valley Cattle, LLC<br>Millenkamp Properties, L.L.C.<br> Millenkamp Properties II LLC<br>Millenkamp Family LLC<br>Goose Ranch, LLC |

---

[5] The description of any of the Pre-Petition Loan Documents in this Motion is intended as a summary only, and to the extent that there is any conflict in this summary and the applicable Pre-Petition Loan Document, the applicable Pre-Petition Loan Document controls.

[6] This summary is not intended to limit the terms of the DIP Facility, including in respect of any use of Cash Collateral, in each case as set forth in the DIP Term Sheet, the Interim Order and the Final Order. Reference should be made to the Interim Order, the DIP Term Sheet and the Final Order for the full terms thereof.

| | |
|---|---|
| | Idaho Jersey Girls Jerome Dairy LLC<br>Black Pine Cattle LLC<br>Millenkamp Enterprises LLC |
| **GUARANTORS**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | None |
| **DIP LENDER**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | Sandton Capital Partners LP and/or one or more of its affiliated funds and accounts. |
| **DIP FACILITY**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | Senior revolving credit facility in an aggregate principal amount of up to $35 million (the "DIP Loan Commitment") with the priority as described by the header "Security and Priority" below, provided that, prior to the entry of the Final Order, only up to $15 million (the "Interim Funding Amount") will be made available by the DIP Lender. |
| **FUNDING DATES**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | **Initial Draw, $15 million**, available on the entry of the Interim Order approving the DIP Loan on an interim basis.<br><br>**Additional Draws of an Additional $20 million**. Available for the first 9 months (subject to extension) of the DIP Loan subject to mutually agreed Revenue and Operating Milestones. Minimum Additional Draws of $5 million and subject to a 7-day advance notice. |
| **USE OF PROCEEDS**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | The DIP Loan will be available to the Borrowers to fund each Borrower's expenses in accordance with the Budget attached to the Motion as Exhibit C. The Budget shall be agreed by the Borrowers and the Lender and will include, without limitation, budgeted professional fees. |
| **REPAYMENT DATE**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | Lender will be entitled to immediate repayment of all outstanding obligations under the DIP Loan on the earliest of (the "Repayment Date"):<br><br>(a) the effective date of the plan of reorganization or closing on a sale of all or a portion of the Borrowers' assets; and<br><br>(b) 9 months from the date of origination, subject to extensions as set forth below (for a |

| | |
|---|---|
| | total of up to 12 months from the date of origination).<br><br>(c ) Lender will consider converting some or all of the DIP to an exit financing facility in conjunction with an emergence from Chapter 11 (subject to terms agreeable to Lender and Lender's internal approvals.) |
| **PREPAYMENT** | The DIP Loan will be prepayable in full or in part by the Borrowers on one or more occasions. There will be a mandatory repayment of the DIP Loan upon the sale of any assets outside of the ordinary course of business or the Budget. |
| **LOAN INTEREST RATES & FEES**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | (i)    <u>Issuance Fee</u>: issuance fee of 2.5% on the Initial Draw and each Additional Draw, which fee will be earned and payable on the date of each draw (Issuance Fee will be capitalized on the balance of the DIP Loan).<br><br>(ii)    <u>Cash Interest</u>: None.<br><br>(iii)    <u>PIK Interest</u>: PIK interest at 15% <u>per annum</u> on the outstanding Principal Amount, which shall be added to the Principal Amount on a monthly basis. PIK'ed interest will not be counted against draw limits for any of the contemplated draws.<br><br>(iv)    <u>Exit Fee</u>:  exit fee of 2.5% on the total drawn amount. Such exit fees will be earned on the date of the applicable draw and payable on the earlier to occur of the date: (a) the DIP Loan is required repaid in full; and (b) the DIP Loan is paid in full or in part prior (on a <u>pro rata</u> basis) to the Repayment Date.<br><br>(v)    <u>Default Interest Rate</u>: During the occurrence and continuance of an Event of Default, the PIK Interest rate will increase by 200 b.p.<br><br>(vi)    <u>Renewal Fee</u>:  If the DIP Loan is not repaid on or before the Repayment Date, time being of the essence, the |

| | |
|---|---|
| | Borrowers will pay to the Lender, in addition to all other amounts as set forth in this Term Sheet, a renewal fee of 2.5% of the Total Principal Amount, which shall extend the Repayment Date by an additional 3 months (the Renewal Fee will be capitalized on the balance of the DIP Loan at the time of extension). Borrower shall be entitled to one (1) 3-month extension period at the Repayment Date (based on mutually agreed Revenue and Operating Milestones). |
| | (vii)   Unused Fee: Unused Fee at 2.5% per annum on the undrawn outstanding Principal Amount, which shall be added to the Principal Amount on a monthly basis. Unused Fee will not be counted against draw limits for any of the draws contemplated herein. |
| | (viii)  Minimum Multiple of Invested Capital: cash fee at exit such that the Lender's multiple of invested capital for each advance (the Initial Advance and each Additional Advance individually), exclusive of any fees, shall be no less than 1.15x. |
| **REVENUE & OPERATING MILESTONES** BR 4001(c)(1)(B) LBR 4001-1 | Revenue Milestone to be such that Borrower is within 20% of their rolling Budget revenue projections. Operating Milestones will be typical for a business of this nature and ensure that Borrower maintains inventory and property plant and equipment in good standing. |
| **COLLATERAL SECURITY & PRIORITY** BR 4001(c)(1)(B) LBR 4001-1 | The DIP Loan shall be secured by the DIP Liens, which shall be granted in the DIP Credit Documents and approved by the Bankruptcy Court in the DIP Orders, on the existing and after-acquired real property and personal, tangible and intangible, assets of the Borrowers including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, accounts, other receivables, chattel paper, contract rights, |

|  | inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, general intangibles, avoidance actions to the extent provided in the Interim DIP Order and Final DIP Order, investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds (the "DIP Collateral").  The DIP Liens shall be effective and perfected as of the Petition Date upon entry of the Interim Order, without need for any additional filings or documentation, except to the extent requested by the DIP Lender in its sole discretion.

The DIP Liens shall, pursuant to section 364(d)(1) of the Bankruptcy Code, be valid, perfected, continuing, enforceable, non-avoidable first priority liens and security interests on the DIP Collateral of each Borrower, and shall prime all other liens and security interests on the DIP Collateral, including any liens and security interests in existence on the Petition Date, and any other current or future liens granted on the DIP Collateral, including any adequate protection or replacement liens granted on the DIP Collateral (the "Primed Liens").

Except with respect to the Carve-Out, the DIP Liens shall not be subject to surcharge under section 506(c) or any other provision of the Bankruptcy Code.

The DIP Loan shall, pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim |
|---|---|

DEBTORS' DIP FINANCING MOTION – Page 19

| | status in the Chapter 11 Cases of each Borrower (the "DIP Superpriority Claims"), which DIP Superpriority Claims in respect of the DIP Facility shall have priority over any and all claims against the Borrowers. |
|---|---|
| **ADEQUATE PROTECTION**<br>BR 4001(b)(1)(B)(iv), (c)(1)(B)(i), (c)(1)(B)(ii), (d)(1)(A)(i)<br>LBR 4001-1 | (1) adequate protection payments. (2) replacement lien, (3) preservation of Debtors' equity cushion through continuous maintenance of real property and (4) super priority expenses of administration for any proven Diminution of Value, as follows.<br><br>First, use of DIP Facility proceeds and Cash Collateral in accordance with the Budget to provide adequate protection payments equivalent to post-petition, non-default interest on the outstanding balances of (1) Rabo; (2) MetLife; and (3) Conterra, for the Debtors following the closing of the DIP Facility. Adequate protection payments and other advances under the DIP Facility will be subject to compliance with minimum liquidity or maximum DIP budget variance financial covenants and the absence of any other Default or Event of Default which has not been cured to the extent provided in the DIP Facility.<br><br>Second, to the extent of the Diminution of Value of the interest of the Pre-Petition Secured Lenders in the Prepetition Collateral, the Debtors propose to provide replacement liens. The Prepetition Secured Lenders shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, additional and replacement security interests and Liens in the DIP Collateral, which shall be junior only to the Carve Out and the DIP Liens securing the DIP Loan. Proceeds of Prepetition Replacement Liens shall be allocated amongst Prepetition Secured Lenders in accordance with the terms of the Intercreditor Agreements. "Bankruptcy Recoveries" shall mean any claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on |

behalf of the Debtors or the estates of the Debtors under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.

Third, to preserve the prepetition value of the Debtors real property and improvements, the Debtors will use DIP Facility proceeds and Cash Collateral in accordance with the Budget and in the ordinary course to continue to maintain all of the pre-petition real property securing the Debtors' obligations due to the Prepetition Secured Lenders in good repair.

Fourth, to the extent of the Diminution of Value of the allowed interests of the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Secured Lenders shall have an allowed superpriority administrative expense claim (the "Prepetition Superpriority Claim"), which shall have priority (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Carve Out), in the Chapter 11 Cases under section 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases will be senior to, prior to, or on

| | |
|---|---|
| | parity with the Prepetition Superpriority Claim (for purposes hereof, such liens will be deemed part of the "Prepetition Replacement Liens"). |
| **CARVE-OUT** | The DIP Liens, DIP Superpriority Claim the Prepetition Liens, the Prepetition Replacement Liens, and the Prepetition Superiority Claims are subordinate only to the following (collectively, the "Carve-Out"): |
| | (i)    all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate; |
| | (ii)    all reasonable and documented fees and expenses incurred by a trustee under Bankruptcy Code section 726(b), in an aggregate amount not to exceed $250,000; |
| | (iii)    to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise (unless subsequently disallowed), all unpaid fees and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328, or 363 or by the Committee, pursuant to Bankruptcy Code sections 328 and 1103 (collectively, the "Professional Persons"). |
| **COVENANTS**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | Affirmative, negative, and other financial and operational covenants customary for transactions of this type, including:<br><br>i)    Minimum cash balance of at least $1,500,000. (which may be funded from borrowed funds).<br>ii)    Maximum capital expenditures. |

| | |
|---|---|
| | iii) No dividends or any other upstream payments. |
| | iv) No change of control, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code. |
| | v) Maintenance of appropriate insurances and having the Lender as a beneficiary of such insurance policies. |
| | vi) Limitations on additional debt, guarantees, and hedging arrangements, including the subordination of all intercompany indebtedness. |
| | vii) Limitations on liens and further negative pledges. |
| | viii) Limitations on sales, transfers, and other dispositions of assets, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code. |
| | ix) Limitations on loans and investments. |
| | x) Limitations on creating new subsidiaries or becoming a general partner in any partnership. |
| | xi) Limitations on transactions with affiliates except as permitted. |
| **CONDITIONS**<br>BR 4001(c)(1)(B)<br>LBR 4001-1 | The obligation of the DIP Lender to make available the DIP Facility shall be subject to the satisfaction (or waiver by the DIP Lender, in its sole and absolute discretion) of the following conditions:<br><br>(a) The DIP Credit Documents shall have been executed and delivered by each party thereto, in form and substance satisfactory to the DIP Lender;<br>(b) The Petition Date shall have occurred, and each Borrower shall be a debtor and debtor in possession;<br>(c) The Interim Order shall have been entered, authorizing and approving the making of the loans in the amounts consistent with those set forth in the "DIP Facility" section above and the |

| | granting of the superpriority claims and liens and other liens referred to under the heading "Security and Priority" (such order, the "Interim Order" and together with the Final Order, the "DIP Orders"), which Interim Order shall not have been vacated, reversed or stayed in any respect; |
|---|---|
| **REPRESENTATIONS & WARRANTIES** BR 4001(c)(1)(B) LBR 4001-1 | Usual and customary representations and warranties, including organization in good standing, validity of agreements, tax status, compliance with law, and operational and financial disclosures. |
| **EVENTS OF DEFAULT** BR 4001(c)(1)(B) LBR 4001-1 | Events of Default will include, in addition to other such events customarily found in transactions similar to the DIP Loan: <br> i) Payment defaults. <br> ii) Covenant defaults. <br> iii) Representation or warranty breaches. <br><br> Among other remedies, upon the occurrence of an Event of Default, the Lender may accelerate all of the DIP Loan obligations. |
| **EXPENSES** BR 4001(c)(1)(B) LBR 4001-1 | The Borrowers will be responsible for the Lender's out of pocket fees and expenses incurred by the Lender to put the DIP Loan in place, to manage the DIP Loan, and to enforce the terms of the DIP Loan (absent an event of default) up to an amount not to exceed $200,000. |
| **CONTINGENCIES** BR 4001(c)(1)(B) LBR 4001-1 | Lender has completed its due diligence. |

## LEGAL DISCUSSION

a)        Adequate Protection

36.        The purpose of adequate protection under Bankruptcy Code section 363 is to compensate a secured lender solely for the diminution in value of its collateral.  *Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 689-90 (N.D. Cal. 2007) citing *In re Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 377, 108 S.Ct. 626 (1988)).   Adequate protection

payments are not to be used to compensate the creditor for lost interest or to provide lost opportunity costs. *In re Weinstein*, 227 B.R. 284, 296 (9th Cir. BAP 1998) citing *In re Timbers*. An equity cushion, standing alone, provides adequate protection justifying the restraint of lien enforcement by a bankruptcy court. <u>In re Mellor</u>, 734 F.2d 1400, 1401 (9th Cir. 1984). Adequate protection is not meant to be a guarantee that a creditor will be paid in full. Instead, the Court must determine whether the creditor's interests are protected as nearly as possible against the possible risks to that interest. *In re Ernst Home Ctr.*, 209 B.R. 955, 966 (Bankr. W.D. Wash. 1997); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 267 (Bankr.C.D.Cal.1988)).

37.    The Debtors will be granting replacement liens, interest payments and superpriority claims as adequate protection, which is commonplace. *See, e.g., MBank Dallas N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtors to replace a lien on cash with a lien on property likely to be worth five times as much); *Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale. Inc.)*, 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtors would likely constitute adequate protection for the secured creditor); *Wrecelesham Grange*, 221 B.R. at 981) (noting that a replacement lien of equal value on postpetition rents is adequate protection); *In re Stein*, 19 B.R. 458. 459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock and equipment resulted in an increase rather than a decrease in collateral, and debtors were granted authority to use cash collateral to meet operating expenses during chapter 11 proceedings). Finally, the Pre-Petition Secured Obligations each have a sufficient equity cushion arguably entitling them to postpetition interest, which they are being paid in the form of adequate protection payments. For the foregoing reasons, the Debtors respectfully

submit that the adequate protection proposed by the Debtors (described in more detail above) is appropriate and should be approved.

38.    The Debtors have an immediate need to obtain post-petition financing to maintain, preserve and protect their assets and have provided terms for adequate protection of the Senior Secured Lenders' interests in the Cash Collateral, and on that basis, the Debtors anticipate the Senior Secured Lenders will consent to the DIP Facility.  For these reasons, the Debtors respectfully request the Court authorize the Debtors to obtain the DIP Facility pursuant to the terms of the proposed Interim Order filed herewith.

### b)  Postpetition Financing

39.    Section 364(c) of the Bankruptcy Code provides that:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503 (b) (1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or, 507 (b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

Section 364(d)(1) of the Bankruptcy Code provides that:
The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A)    the trustee is unable to obtain such credit otherwise and;

(B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

40.     The Debtors are unable to procure the required funds in the form of unsecured credit or unsecured debt with an administrative priority. The DIP Loan is in the best interest of the Debtors' estates and creditors because it is the only means at this critical juncture of continuing operations during the Debtors' efforts to restructure their business to maximize value for the estate, to the extent the use of Cash Collateral proves inadequate. The circumstances of this case thus require the Debtors to obtain financing under section 364(c).

41.     The terms of the DIP Loan reflect good faith, arm's-length negotiations between the Debtors and the DIP Lender, as well as the Debtors' exercise of sound business judgment. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to obtain postpetition financing pursuant to section 364 (c) and (d) of the Bankruptcy Code.

42.     Generally, courts apply a three-part test to determine whether debtors in possession may obtain credit under section 364(c) of the Bankruptcy Code. Under such test, the Debtors may incur postpetition financing under the DIP Facility pursuant to section 364(c) if they demonstrate that (a) they cannot obtain credit unencumbered or without superpriority status, (b) the DIP Facility is necessary to preserve the assets of their estates, and (c) the terms of the DIP Facility are fair, reasonable and adequate given the circumstances of the Debtors, as Borrowers, and the proposed lenders. *See In re Crouse Group. Inc.*, 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); *and In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

43.     In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor in possession to incur superpriority senior secured or "priming" liens if (a) the debtor is unable to obtain financing from another source, and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. 11 U.S.C. § 364(d)(1); *see also Aqua Assocs.*, 123 B.R. at 196. Additionally, consent to priming by the

prepetition secured creditors obviates the need to show adequate protection. *See Anchor Sav. Bank FSB v. Sky Valley. Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the Debtors of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if it is unable to obtain unsecured or junior secured credit and either (i) the prepetition secured creditors have consented or (ii) their interests in the collateral are adequately protected.

### (i)    The Debtors are Unable to Obtain Unsecured or Junior Secured Credit

44.    To show that the credit required is not obtainable on an unsecured basis, the Debtors need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c) or (d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Sav. Bank*, 99 B.R. at 120 n.4 (noting that the debtors satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames,* 115 B.R. at 37-40 (Debtors in possession must show that it has made a reasonable effort to seek other sources of financing under §§ 364(a) and (b) of the Bankruptcy Code). Thus, "[the] statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107,113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require [the Debtors] to conduct such an exhaustive search for financing" where the Debtor "suffers some financial stress and has little or no unencumbered property"), *aff'd subnom., Anchor Sav. Bank*, 99 B.R. at 117.

45.    As discussed above and in the Millenkamp Declaration filed in support of this

Motion, the Debtors' assets are subject to the Prepetition Liens asserted by the Prepetition

Secured Lenders. Because of the Debtors' prepetition debt, obtaining the financing needed as

unsecured debt on an administrative priority basis, or as debt which would be secured solely by

liens junior to the liens of the Prepetition Secured Lenders, was not a viable option. Indeed, all

of the proposals for DIP financing which the Debtors received required a super-priority lien as a

condition of the DIP lending. The Debtors thus concluded that adequate alternative financing

terms more favorable than those to be provided by the DIP Lender under the DIP Facility are

currently unobtainable.

      (ii)        **The Prepetition Secured Creditors' Interests Are Adequately Protected**

      46.      If the Debtors are unable to obtain credit under the provisions of section

364(c) of the Bankruptcy Code, the Debtors may obtain credit secured by a senior or equal

lien on property of the estate that is already subject to a lien (*i.e.*, a priming lien). *See* 11

U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of any pre-

existing secured creditor's interests in the property on which the senior lien is supposed to be

granted. *See id.; see also Aqua,* 123 B.R. at 196. Although the Bankruptcy Code does not

explicitly define "adequate protection," section 361 of the Bankruptcy Code provides that it

may take the form of (1) a cash payment or periodic cash payments to the extent that there

is a decrease in the lien holder's property interest; (2) an additional or replacement lien to the

extent that there is a decrease in the lien holder's property interest; or (3) other relief that will

result in a secured party's realizing the indubitable equivalent of its property interest. *See* 11

U.S.C. § 361.

      47.      Where a debtor's proposed use of funds from additional postpetition financing

augments the value of the secured creditor's collateral, adequate protection exists. *Sky Valley,*

100 B.R. at 114 (noting the flexible nature of § 361(3) and collecting cases). The Debtors believe that the measures of protection set forth in the DIP Facility and the Interim Order constitute adequate protection. In addition to replacement liens on substantially all assets, junior in priority only to the DIP Liens and any existing senior liens (and subject to the Carve Out), the Prepetition Secured Lenders will receive superpriority administrative expense claims. Moreover, the use of any DIP Facility proceeds shall be solely in accordance with the Budget. Accordingly, the DIP Facility not only maintains the value of the collateral in which the Prepetition Secured Lenders are receiving replacement liens, it increases the collateral base and strengthens the value of the Debtors' business.

48.     Moreover, an "equity cushion" can provide the Prepetition Secured Lenders with adequate protection. "Under the 'equity cushion' theory, if a debtor has equity in a property sufficient to shield the creditor from either the declining value of the collateral or an increase in the claim from accrual of interest or expenses, then the creditor is adequately protected." *See Equitable Life Assurance Soc. v. James River Assocs. (In re James River Assocs)*, 148 B.R. 790, 796 (E.D. Va. 1992) (*citing In re Kost*, 102 B.R. 829, 831 (D. Wyo. 1989); *In re Lane*, 108 B.R. 6, 7 (Bankr. D. Mass. 1989)). "Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection. Case law has almost as uniformly held that an equity cushion under 11% is insufficient to constitute adequate protection. Case law is divided on whether a cushion of 12% to 20% constitutes adequate protection." *James River Assocs.*, 148 B.R. at 796 (*quoting Kost*, 102 B.R. at 831-32 (internal citations omitted)); *see also In re Rogers Dev. Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (15% to 20% equity cushion held to be sufficient to provide adequate protection to a creditor even though the Debtors had no equity in the property); *but see In re Schaller*, 27 B.R. 959, 961-62 (W.D. Wis.

1983) (17% to 18% cushion held not to offer adequate protection where cushion was being rapidly eroded by the daily accrual of interest on the debt); *In re Pitts*, 2 B.R. 476, 478 (Bankr. C.D. Cal. 1979) (holding a 15% cushion to be "minimal"). Here, the Debtors believe that the value of the collateral is approximately $643 million, which provides more than a 20% equity cushion for the Prepetition Secured Lenders, even if the entire value of the Carve Out is included in the debt used to calculate the equity cushion. This value of the collateral package includes:(a) real property and improvements currently, (b) personal property, and (c) accounts receivables. *See* Millenkamp Declaration.

49.    Finally, as mentioned above, consent may take the place of adequate protection under section 364(d)(1) of the Bankruptcy Code, and the Debtors hope to obtain consent of at least some of the Prepetition Secured Lenders to use the Cash Collateral, at least on an interim basis, and enter into the DIP Facility on the terms set forth in the DIP Orders.

**(iii)    The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estates**

50.    The Debtors believe the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtors' ongoing operations pending approval and confirmation of a plan will signal the Debtors' continued strength. The DIP Facility will also ensure the continued high quality care of livestock. Furthermore, as is more fully explained in the Millenkamp Declaration filed in support of this Motion, the Debtors and their professionals undertook an effort to obtain the best available terms for DIP financing. Based upon these efforts, the interest rates and fees appear to be consistent with the existing market for debtor in possession loans of this nature. The Debtors believe that the proposed DIP Facility is the best financing available and well within the exercise of sound business judgment.

51.    Bankruptcy courts consistently defer to a debtor's business judgment on most

business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See Trans World Airlines. Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment... [were] reasonable under the circumstances and in the best interests [of the Debtors] and its creditors"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the Debtors'] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible."). In fact, "[m]ore exacting scrutiny [of the Debtors' business decisions] would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank. N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *see also Simasko Prod.*, 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court." (quoting *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the proposed DIP Facility.

52.     Moreover, the Debtors have made a concerted good faith effort to obtain credit on the most favorable terms available. Specifically, prepetition, in connection with the marketing of the Debtors' assets, the Debtors also sought debtor in possession financing from interested parties, none of whom would agree to provide financing on a junior or *pari passu* basis, under the same favorable terms as the DIP Lender. Given the dire circumstances facing the Debtors, the DIP Facility described in this Motion was ultimately determined to provide the requisite

liquidity on the most advantageous terms given the circumstances. Absent consent, distracting and costly litigation over the propriety of any priming or *pari passu* third party debtor in possession financing would likely have ensued, with potentially severe consequences for the Debtors, their estates, and creditors.  Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lender, engaged in negotiations with the DIP Lender regarding the proposed terms, and eventually agreed to the DIP Lender's proposal as the proposal best suited to the Debtors' needs. The terms and conditions of the DIP Facility were negotiated by the parties (and their legal and financial advisors) in good faith and at arms' length, and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and to preserve the going concern status of the Debtors as well as the value of the Prepetition Collateral.

53.     Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(c) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

### c) Good Faith

42.     The proposed terms and conditions of the DIP Loan are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  *See* Millenkamp Declaration. Accordingly, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code with respect to the DIP Loan.

### d) Request for Interim and Final Hearing

43.    Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors respectfully request that the Court set a date for the Interim Hearing and a Final Hearing after entry of the Interim Order and approve the provisions for notice of the Final Hearing and the objection procedures that are set forth in the Interim Order.

44.    Should the Court grant the Motion and enter the DIP Orders, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

45.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Idaho, (ii) the Prepetition Secured Lenders and their counsel, (iii) the DIP Lender and its counsel, (iv) the Debtors' 20 largest unsecured creditors (including counsel if known), and (v) all parties requesting notices pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

46.    No previous motion for the relief sought herein has been made to this or any other court.

### CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order in the form of the proposed Interim Order submitted herewith, authorizing the Debtors to obtain post-petition financing as set forth herein and setting a final hearing at such time as the Court may direct.

DATED this 2nd day of April, 2024.

*/s/ Matt Christensen*
MATTHEW T. CHRISTENSEN
Attorney for the Debtors

**<u>EXHIBIT A</u>**

**<u>(Proposed Interim Order – forthcoming as a Supplement)</u>**

## **EXHIBIT B**

### **(Sandton Term Sheet – see attached)**

**TERM SHEET**
**Millenkamp Cattle, Inc., et al**

This term sheet (this "Term Sheet") summarizes the principal terms of a potential financing (the "DIP Loan") between the Borrowers and Sandton Capital Partners LP and its Assigns ("Sandton"). Term Sheet is not a commitment to lend and is non-binding upon Sandton. It is subject to conditions including, but not limited to, duly executed and binding documentation to be executed and delivered by the parties (the "Definitive Documents") and approved by the Bankruptcy Court. By receipt of these terms and conditions, the recipient acknowledges that these materials are confidential and proprietary to Sandton and, in consideration for Lender providing these materials to the recipient, the recipient undertakes not to disclose or provide these materials to third parties (excluding properly retained advisors) without the consent of Sandton.

| | |
|---|---|
| **Lender:** | Sandton Capital Partners LP and/or one or more of its affiliated funds and accounts (the "Lender"). |
| **Borrowers:** | Millenkamp Cattle, Inc., East Valley Cattle, LLC, Idaho Jersey Girls Jerome Dairy LLC, Millenkamp Enterprises LLC, MIllenkamp Properties II LLC, Millenkamp Properties LLC, Goose Ranch LLC, Black Pine Cattle LLC, Millenkamp Family LLC, and Idaho Jersey Girls, LLC (collectively, the "Borrower"). |
| **DIP Loan Amount:** | Total Principal Amount not in excess of $35 million (see proviso in Funded Amount below). |
| | Subject to the entry of a final order (the "Final DIP Order") approving the DIP Loan by a United States Bankruptcy Court having jurisdiction over the Borrowers' bankruptcy cases (the "Bankruptcy Court"). |
| **Use of Proceeds:** | The DIP Loan will be available to the Borrowers to fund each Borrowers' expenses in accordance with the budget attached as Annex A (the "Budget"). The Budget will be agreed to by the Borrowers and the Lender and will include, without limitation, budgeted professional fees. |

| Funded Amount: | The Funded Amount will be immediately available on the Funding Date (subject to Funding Date provisions).<br><br>• **Initial Draw: $15 million**.  This amount will be immediately available for draw in accordance with the Definitive Documents upon the approval and entering of the Initial DIP Order by the Bankruptcy Court.<br><br>• **Maximum Additional Draws upon Final DIP Order $20 million**.  The maximum Additional Draws will be $20 million in total (assuming Additional Draw, see below). |
|---|---|
| Funding Dates: | • **Initial Draw, $15 million**, available on the entry of an interim order (the "Interim DIP Order") approving the DIP Loan on an interim basis.<br><br>• Lender believes, based on the most recent DIP budget, that the total required DIP loan could reach $35 million.<br><br>• **Additional Draws of an Additional $20 million**. Available for the first 9 months (subject to extension) of the DIP Loan subject to mutually agreed Revenue and Operating Milestones. Minimum Additional Draws of $5 million and subject to a 7 day advance notice. |
| Maturity: | Lender will be entitled to immediate repayment of all outstanding obligations under the DIP Loan on the earliest of (the "Repayment Date"):<br><br>(a) the effective date of the plan of reorganization or closing on a sale of all or a portion of the Borrowers' assets; and<br><br>(b) 9 months from the date of origination, subject to extensions as set forth below (for a total of up to 12 months from the date of origination).<br><br>(c ) Lender will consider converting some or all of the DIP to an exit financing facility in conjunction with an emergence from Chapter 11 (subject to terms agreeable to Lender and Lender's internal approvals.) |
| Amortization: | None. |

| Prepayment: | The DIP Loan will be prepayable in full or in part by the Borrowers on one or more occasions. There is a mandatory repayment of the DIP Loan upon the sale of any assets outside of the ordinary course of business or the Budget. |
|---|---|
| **Loan Interest Rates and Fees:** | The DIP Loan interest rates and fees will be as follows: |

The DIP Loan interest rates and fees will be as follows:

(i)    <u>Issuance Fee</u>: The Borrowers agree to an issuance fee of 2.5% on the Initial Draw and each Additional Draw, which fee will be earned and payable on the date of each draw (Issuance Fee will be capitalized on the balance of the DIP Loan).

(ii)    <u>Cash Interest</u>: None.

(iii)    <u>PIK Interest</u>: The Borrowers will pay the Lender PIK interest at 15% <u>per</u> <u>annum</u> on the outstanding Principal Amount, which shall be added to the Principal Amount on a monthly basis. PIK'ed interest will not be counted against draw limits for any of the draws contemplated herein.

(iv)    <u>Exit Fee</u>: The Borrowers will pay the Lender an exit fee of 2.5% on the total drawn amount. Such exit fees will be earned on the date of the applicable draw and payable on the earlier to occur of the date: (a) the DIP Loan is required repaid in full; and (b) the DIP Loan is paid in full or in part prior (on a <u>pro</u> <u>rata</u> basis) to the Repayment Date.

(v)    <u>Default Interest Rate</u>: During the occurrence and continuance of an Event of Default, the PIK Interest rate will increase by 200 b.p.

(vi)    <u>Renewal Fee</u>: If the DIP Loan is not repaid on or before the Repayment Date, time being of the essence, the Borrowers will pay to the Lender, in addition to all other amounts as set forth in this Term Sheet, a renewal fee of 2.5% of the Total Principal Amount, which shall extend the Repayment Date by an additional 3 months (the Renewal Fee will be capitalized on the balance of the DIP Loan at the time of extension). Borrower shall be entitled to one (1) 3-month extension period at the Repayment Date (based on mutually agreed Revenue and Operating Milestones).

(vii)    <u>Unused Fee</u>: The Borrowers will pay the Lender an Unused Fee at 2.5% <u>per</u> <u>annum</u> on the undrawn outstanding Principal Amount, which shall be added to the Principal Amount on a monthly basis. Unused Fee will not be counted against draw limits for any of the draws contemplated herein.

(viii)    <u>Minimum Multiple of Invested Capital</u>: The

| | |
|---|---|
| | Borrowers will pay the Lenders a cash fee at exit such that the Lender's multiple of invested capital for each advance (the Initial Advance and each Additional Advance individually), exclusive of any fees, shall be no less than 1.15x. |
| **Revenue and Operating Milestones:** | Revenue Milestone to be such that Borrower is within 20% of their rolling Budget revenue projections. Operating Milestones will be typical for a business of this nature and ensure that Borrower maintains inventory and property plant and equipment in good standing. |
| **Collateral Security and Priority:** | The collateral for the DIP Loan (the "Collateral") will include pursuant, to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, a fully perfected security interest in all of the existing and after-acquired real property and personal, tangible and intangible, assets of the Borrowers including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, general intangibles, avoidance actions to the extent provided in the Interim DIP Order and Final DIP Order, investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds. |
| **Covenants:** | Affirmative, negative, and other financial and operational covenants customary for transactions of this type, including:<br><br>• Minimum cash balance of at least $1,500,000. (which may be funded from borrowed funds).<br>• Maximum capital expenditures.<br>• No dividends or any other upstream payments.<br>• No change of control, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code.<br>• Maintenance of appropriate insurances and having the Lender as a beneficiary of such insurance policies.<br>• Limitations on additional debt, guarantees, and hedging arrangements, including the subordination of all intercompany indebtedness. |

|  |  |
|---|---|
|  | <ul><li>Limitations on liens and further negative pledges.</li><li>Limitations on sales, transfers, and other dispositions of assets, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code.</li><li>Limitations on loans and investments.</li><li>Limitations on creating new subsidiaries or becoming a general partner in any partnership.</li><li>Limitations on transactions with affiliates except as permitted.</li></ul> |
| **Exit Financing:** | Lender to consider exit financing. |
| **Representations and Warranties:** | Usual and customary representations and warranties, including organization in good standing, validity of agreements, tax status, compliance with law, and operational and financial disclosures. |
| **Events of Default:** | Events of Default will include, in addition to other such events customarily found in transactions similar to the DIP Loan:<ul><li>Payment defaults.</li><li>Covenant defaults.</li><li>Representation or warranty breaches.</li></ul>Among other remedies, upon the occurrence of an Event of Default, the Lender may accelerate all of the DIP Loan obligations. |
| **Expenses:** | The Borrowers will be responsible for the Lender's out of pocket fees and expenses incurred by the Lender to put the DIP Loan in place, to manage the DIP Loan, and to enforce the terms of the DIP Loan (absent an event of default) up to an amount not to exceed $200,000. |
| **Contingencies:** | Lender has completed its due diligence. |
| **Governing Law, Waiver of Jury Trial, Jurisdiction:** | In connection with the transaction outlined in this Term Sheet, all parties agree: (i) that the law of the State of New York governs without regard to any conflict of law principals; (ii) to the waiver of a trial by jury; and (iii) to the jurisdiction of the state and federal courts located in New York County, New York. The Definitive Documents will be governed by New York law. |
| **Exclusivity:** | Borrower and Lender will enter into an exclusivity agreement upon general acceptance of terms pursuant to this Term Sheet. |
| **Confidentiality:** | Borrower shall not disclose to any person or entity the terms or conditions of this term sheet or any information about the transaction, including, without limitation, the existence, status, nature, terms or conditions of the discussions or actions by the parties relating to the potential transaction except Borrower may disclose such matters (i) to those of its employees and other agents who need to know such matters for the sole |

|  | purpose of permitting Borrower to evaluate or consummate the potential transaction, (ii) as explicitly approved in advance in writing by Lender or (iii) to the extent, in the reasonable judgment of Borrower, required by any applicable law or order, in which case Seller shall use commercially reasonable efforts to allow Borrower reasonable time to comment on such disclosure in advance thereof. |
|---|---|
| **Definitive Documents:** | The DIP Loan will be documented by, among other things, a promissory note, security, and credit agreement, all of which will be subject to Bankruptcy Court approval. |
| **Brokers:** | Each of the parties represent to each other that no broker or other intermediary is entitled to any payments or compensation with respect to the transactions as set forth in this Term Sheet. |

[Signature page follows]

## TERM SHEET
### Millenkamp Cattle, Inc., et al

This Term Sheet sets forth the present status of negotiations between the Parties to aid in reaching a final binding definitive purchase and sale agreement. The Parties understand and agree that such agreement(s) will contain additional material terms and conditions, which are not addressed in this Term Sheet.

Sincerely,
**Sandton Capital Partners LP**

*Robert Rice*

Robert C. Rice
Principal

**Borrower:     Millenkamp Cattle, Inc., et al**

Agreed and Accepted this 1st day of April, 2024

By: _____

**Its:** _____

## EXHIBIT C

### (Budget – see attached)

# EXHIBIT C

**130 Day Cash Flow Budget**

| | Wk6 | Wk7 | Wk8 | Wk9 | Wk10 | Wk11 | Wk12 | Wk13 |
|---|---|---|---|---|---|---|---|---|
| | 1-Apr | 8-Apr | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May |
| | 7-Apr | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May |
| **SUMMARY CASH FLOW** | | | | | | | | |
| **Net Cash Receipts** | | | | | | | | |
| Net Milk Checks | $ 4,572,663 | $ - | $ 6,345,818 | $ - | $ 4,931,123 | $ - | $ 6,099,933 | $ - |
| Dairy Revenue Protection | - | - | - | - | - | 1,250,000 | - | - |
| Custom Feeding Receipts | - | - | - | 1,376,400 | - | 1,290,375 | - | 1,290,375 |
| Net Cattle Sales Receipts | - | - | - | 427,500 | 864,750 | 427,500 | 1,252,875 | 88,500 |
| Trucking Income | - | 37,500 | - | 40,000 | - | 15,000 | - | 15,000 |
| Digester Income | - | - | 240,000 | - | 225,000 | - | 225,000 | - |
| AR Collections | - | 2,502,375 | 1,476,646 | 35,410 | 1,752,375 | - | - | - |
| Collection Timing Contingency | - | - | - | - | - | - | - | - |
| **TOTAL Cash Receipts** | **$ 4,572,663** | **$ 2,539,875** | **$ 8,062,464** | **$ 1,879,310** | **$ 7,773,248** | **$ 2,982,875** | **$ 7,577,808** | **$ 1,393,875** |
| | | | | | | | | |
| **Cash Disbursements** | | | | | | | | |
| Payroll | $ 1,224,551 | $ - | $ 1,148,016 | $ - | $ 1,148,016 | $ - | $ - | $ 1,148,016 |
| EE Benefits | 68,389 | - | - | - | 68,389 | - | - | - |
| Owner Salary | 10,000 | - | - | - | 10,000 | - | - | - |
| **Total Salary & Wages** | **1,302,940** | **-** | **1,148,016** | **-** | **1,226,405** | **-** | **-** | **1,148,016** |
| | | | | | | | | |
| **AP Payments to Critical Vendors** | | | | | | | | |
| Feed | 1,570,800 | 1,570,800 | 570,800 | 570,800 | 1,570,800 | 570,800 | 570,800 | 70,800 |
| Vet/Med | 125,000 | 125,000 | - | 125,000 | 125,000 | - | 125,000 | 125,000 |
| Repairs & Maintenance | 40,000 | 40,000 | 238,690 | 40,000 | 40,000 | 40,000 | 238,690 | 40,000 |
| Chemicals | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 |
| Other | - | - | - | - | - | - | - | - |
| **Total AP Payments to Critical Vendors** | **1,769,100** | **1,769,100** | **842,790** | **769,100** | **1,769,100** | **644,100** | **967,790** | **269,100** |
| | | | | | | | | |
| Ongoing Op. Expenses - COD | | | | | | | | |
| Feed | 2,072,000 | 2,072,000 | 2,072,000 | 2,072,000 | 2,077,000 | 2,077,000 | 2,077,000 | 2,077,000 |
| Straw Bedding | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 |
| Cattle | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Supplies | 110,000 | 110,000 | 110,000 | 110,000 | 127,000 | 127,000 | 127,000 | 127,000 |
| Utilities | - | - | 250,000 | - | - | - | 386,000 | - |
| Vet/Med | 150,000 | 150,000 | 150,000 | 150,000 | 173,000 | 173,000 | 173,000 | 173,000 |
| Fuel | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 |
| Trucking | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 |
| Compost Turning & Hauling | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| Semen | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 |
| Repairs & Maintenance | 195,000 | 195,000 | 195,000 | 195,000 | 279,000 | 279,000 | 279,000 | 279,000 |
| Insurance | - | - | 179,000 | - | - | - | 179,000 | - |
| Chemicals | - | - | - | 310,000 | 310,000 | 310,000 | 310,000 | 310,000 |
| Seed | - | - | - | - | - | 105,000 | 105,000 | 105,000 |
| Custom Farming | - | - | - | - | - | 33,000 | 33,000 | 33,000 |
| Rent | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 360,000 |
| Professional Fees | 210,000 | 160,000 | 160,000 | 160,000 | 195,000 | 160,000 | 160,000 | 175,000 |
| Loan/Lease Payments | 314,339 | 119,865 | 102,679 | 37,402 | 319,368 | 119,865 | 102,679 | 37,402 |
| Rabo Interest Payment | - | - | - | - | 691,612 | - | - | - |
| Other | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 |
| **Total Ongoing Op. Expenses - COD** | **3,556,339** | **3,311,865** | **3,723,679** | **3,539,402** | **4,676,980** | **3,888,865** | **4,436,679** | **4,175,402** |
| | | | | | | | | |
| Other Disbursements | | | | | | | | |
| UST Fees | - | - | - | - | - | - | - | - |
| **Total Other Disbursements** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **TOTAL Cash Disbursements** | **$ 6,628,379** | **$ 5,080,965** | **$ 5,714,486** | **$ 4,308,502** | **$ 7,672,486** | **$ 4,532,965** | **$ 5,404,470** | **$ 5,592,519** |
| | | | | | | | | |
| **Starting Cash** | **$ 1,173,552** | **$ 17,837** | **$ 76,747** | **$ 2,424,725** | **$ 95,532** | **$ 196,295** | **$ 46,205** | **$ 2,219,543** |
| Net Change in Cash | (2,055,716) | (2,541,090) | 2,347,978 | (2,429,193) | 100,762 | (1,550,090) | 2,173,338 | (4,198,644) |
| **Ending Cash, Before DIP** | **$ (882,163)** | **$ (2,523,253)** | **$ 2,424,725** | **$ (4,468)** | **$ 196,295** | **$ (1,353,795)** | **$ 2,219,543** | **$ (1,979,100)** |
| | | | | | | | | |
| **DIP Financing** | **900,000** | **2,600,000** | **-** | **100,000** | **-** | **1,400,000** | **-** | **2,000,000** |
| **Ending Cash** | **$ 17,837** | **$ 76,747** | **$ 2,424,725** | **$ 95,532** | **$ 196,295** | **$ 46,205** | **$ 2,219,543** | **$ 20,900** |

| First Four Weeks, through April 28 | | |
|---|---|---|
| Cash Receipts | $ 17,054,311 | |
| Interim Cash Collateral | 20,709,332 | $ (3,655,020) |
| Delay Until Final Cash Collateral | 1,049,000 | [1] |
| Post-Petition AR Generated | $ 11,511,055 | |

[1] The light yellow color denoted categories split between Interim and Delay. The split is as follows: (1) $50,000 of professional fees are included in the Interim Cash Collateral for Eide Bailly; (2) 50% of the weekly Other amount is for Livestock Hauling, Testing and Trimming is included in Interim Cash Collateral

130 Day Cash Flow Budget

| | | Wk14 | Wk15 | Wk16 | Wk17 | Wk18 | Wk19 | Wk20 | Wk21 |
|---|---|---|---|---|---|---|---|---|---|
| | | 27-May | 3-Jun | 10-Jun | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul |
| | | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun | 7-Jul | 14-Jul | 21-Jul |
| **SUMMARY CASH FLOW** | | | | | | | | | |
| **Net Cash Receipts** | | | | | | | | | |
| | Net Milk Checks | $ 5,112,960 | $ - | $ - | $ 6,708,106 | $ - | $ 5,527,961 | $ - | $ 6,773,099 |
| | Dairy Revenue Protection | - | - | - | - | - | - | - | - |
| | Custom Feeding Receipts | - | 1,290,375 | - | 1,376,400 | - | - | 1,290,375 | - |
| | Net Cattle Sales Receipts | 1,188,500 | 88,500 | 1,576,625 | 88,500 | 1,268,500 | 88,500 | 1,576,625 | 88,500 |
| | Trucking Income | - | 15,000 | - | 16,000 | - | - | 15,000 | - |
| | Digester Income | 225,000 | - | 240,000 | - | 225,000 | - | - | 225,000 |
| | AR Collections | - | - | - | - | - | - | - | - |
| | Collection Timing Contingency | - | - | - | - | - | - | - | - |
| | **TOTAL Cash Receipts** | $ 6,526,460 | $ 1,393,875 | $ 1,816,625 | $ 8,189,006 | $ 1,493,500 | $ 5,616,461 | $ 2,882,000 | $ 7,086,599 |
| | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | |
| | Payroll | $ - | $ 1,224,551 | $ - | $ 1,148,016 | $ - | $ 1,148,016 | $ - | $ 1,148,016 |
| | EE Benefits | 68,389 | - | - | - | - | 68,389 | - | - |
| | Owner Salary | 10,000 | - | - | - | - | 10,000 | - | - |
| | **Total Salary & Wages** | 78,389 | 1,224,551 | - | 1,148,016 | - | 1,226,405 | - | 1,148,016 |
| | | | | | | | | | |
| | **AP Payments to Critical Vendors** | | | | | | | | |
| | Feed | 1,570,800 | 570,800 | 570,800 | 70,800 | 70,800 | 1,570,800 | 70,800 | 70,800 |
| | Vet/Med | - | 125,000 | 125,000 | - | 125,000 | 125,000 | - | 125,000 |
| | Repairs & Maintenance | 40,000 | 40,000 | 238,690 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| | Chemicals | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 |
| | Other | - | - | - | - | - | - | - | - |
| | **Total AP Payments to Critical Vendors** | 1,644,100 | 769,100 | 967,790 | 144,100 | 269,100 | 1,769,100 | 144,100 | 269,100 |
| | | | | | | | | | |
| | Ongoing Op. Expenses - COD | | | | | | | | |
| | Feed | 2,083,000 | 2,083,000 | 2,083,000 | 2,083,000 | 2,083,000 | 2,083,000 | 2,083,000 | 2,083,000 |
| | Straw Bedding | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 |
| | Cattle | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| | Supplies | 127,000 | 127,000 | 127,000 | 403,000 | 127,000 | 127,000 | 127,000 | 498,000 |
| | Utilities | - | - | - | - | - | - | - | - |
| | Vet/Med | 173,000 | 173,000 | 173,000 | 173,000 | 173,000 | 173,000 | 173,000 | 173,000 |
| | Fuel | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 | 114,000 |
| | Trucking | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 |
| | Compost Turning & Hauling | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| | Semen | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 |
| | Repairs & Maintenance | 279,000 | 279,000 | 279,000 | 279,000 | 279,000 | 279,000 | 279,000 | 279,000 |
| | Insurance | - | - | 179,000 | - | - | - | - | 179,000 |
| | Chemicals | 310,000 | 310,000 | 310,000 | 310,000 | 310,000 | 43,000 | 43,000 | 43,000 |
| | Seed | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 31,000 | 31,000 | 31,000 |
| | Custom Farming | 33,000 | 33,000 | 33,000 | 33,000 | 33,000 | 17,000 | 17,000 | 17,000 |
| | Rent | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| | Professional Fees | 195,000 | 160,000 | 160,000 | 160,000 | 210,000 | 160,000 | 160,000 | 160,000 |
| | Loan/Lease Payments | 319,368 | 109,776 | 108,627 | 4,142 | 42,432 | 314,339 | 119,865 | 102,679 |
| | Rabo Interest Payment | 691,612 | - | - | - | 691,612 | - | - | - |
| | Other | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 |
| | **Total Ongoing Op. Expenses - COD** | 4,820,980 | 3,884,776 | 4,062,627 | 4,182,142 | 4,559,044 | 3,732,339 | 3,537,865 | 4,197,679 |
| | | | | | | | | | |
| | Other Disbursements | | | | | | | | |
| | UST Fees | - | - | - | - | - | - | - | - |
| | **Total Other Disbursements** | - | - | - | - | - | - | - | - |
| | **TOTAL Cash Disbursements** | $ 6,543,469 | $ 5,878,426 | $ 5,030,417 | $ 5,474,258 | $ 4,828,144 | $ 6,727,844 | $ 3,681,965 | $ 5,614,795 |
| | | | | | | | | | |
| | **Starting Cash** | $ 20,900 | $ 3,890 | $ 19,339 | $ 5,547 | $ 2,720,295 | $ 85,651 | $ 74,268 | $ 74,303 |
| | Net Change in Cash | (17,009) | (4,484,551) | (3,213,792) | 2,714,748 | (3,334,644) | (1,111,384) | (799,965) | 1,471,803 |
| | **Ending Cash, Before DIP** | $ 3,890 | $ (4,480,661) | $ (3,194,453) | $ 2,720,295 | $ (614,349) | $ (1,025,732) | $ (725,697) | $ 1,546,106 |
| | | | | | | | | | |
| | **DIP Financing** | - | 4,500,000 | 3,200,000 | - | 700,000 | 1,100,000 | 800,000 | - |
| | **Ending Cash** | $ 3,890 | $ 19,339 | $ 5,547 | $ 2,720,295 | $ 85,651 | $ 74,268 | $ 74,303 | $ 1,546,106 |

130 Day Cash Flow Budget

|  | Wk22 22-Jul 28-Jul | Wk23 29-Jul 4-Aug | Wk24 5-Aug 11-Aug | TOTAL 1-Apr-24 11-Aug-24 |
|---|---|---|---|---|
| **SUMMARY CASH FLOW** | | | | |
| **Net Cash Receipts** | | | | |
| Net Milk Checks | $ - | $ 5,658,971 | $ - | $ 51,730,633 |
| Dairy Revenue Protection | - | - | 750,000 | 2,000,000 |
| Custom Feeding Receipts | 1,290,375 | - | 1,290,375 | 10,495,050 |
| Net Cattle Sales Receipts | 864,750 | 88,500 | 1,252,875 | 11,231,500 |
| Trucking Income | 15,000 | - | 15,000 | 183,500 |
| Digester Income | - | 225,000 | - | 1,830,000 |
| AR Collections | - | - | - | 5,766,806 |
| Collection Timing Contingency | - | - | - | - |
| **TOTAL Cash Receipts** | **$ 2,170,125** | **$ 5,972,471** | **$ 3,308,250** | **$ 83,237,489** |
| | | | | |
| **Cash Disbursements** | | | | |
| Payroll | $ - | $ - | $ 1,224,551 | $ 10,561,749 |
| EE Benefits | - | 68,389 | - | 341,945 |
| Owner Salary | - | 10,000 | - | 50,000 |
| **Total Salary & Wages** | **-** | **78,389** | **1,224,551** | **10,953,694** |
| | | | | |
| **AP Payments to Critical Vendors** | | | | |
| Feed | 70,800 | 1,571,400 | - | 13,275,000 |
| Vet/Med | 125,000 | - | - | 1,500,000 |
| Repairs & Maintenance | 40,000 | 40,000 | - | 1,316,071 |
| Chemicals | 33,300 | 33,900 | - | 600,000 |
| Other | - | - | - | - |
| **Total AP Payments to Critical Vendors** | **269,100** | **1,645,300** | **-** | **16,691,071** |
| | | | | |
| Ongoing Op. Expenses - COD | | | | |
| Feed | 2,083,000 | 2,083,000 | 2,083,000 | 39,509,000 |
| Straw Bedding | 38,000 | 38,000 | 38,000 | 722,000 |
| Cattle | 75,000 | 75,000 | 75,000 | 1,425,000 |
| Supplies | 127,000 | 127,000 | 127,000 | 2,345,000 |
| Utilities | - | - | 163,000 | 1,700,000 |
| Vet/Med | 173,000 | 173,000 | 173,000 | 3,195,000 |
| Fuel | 114,000 | 114,000 | 114,000 | 2,166,000 |
| Trucking | 52,000 | 52,000 | 52,000 | 988,000 |
| Compost Turning & Hauling | 80,000 | 80,000 | 80,000 | 1,520,000 |
| Semen | 55,000 | 55,000 | 55,000 | 1,045,000 |
| Repairs & Maintenance | 279,000 | 279,000 | 279,000 | 4,965,000 |
| Insurance | - | - | - | 716,000 |
| Chemicals | 43,000 | - | - | 3,272,000 |
| Seed | 31,000 | 12,000 | 12,000 | 988,000 |
| Custom Farming | 17,000 | 4,000 | 4,000 | 340,000 |
| Rent | 6,000 | 6,000 | 6,000 | 468,000 |
| Professional Fees | 160,000 | 210,000 | 160,000 | 3,275,000 |
| Loan/Lease Payments | 37,402 | 319,368 | 115,947 | 2,747,545 |
| Rabo Interest Payment | - | 691,612 | - | 2,766,449 |
| Other | 85,000 | 85,000 | 85,000 | 1,615,000 |
| **Total Ongoing Op. Expenses - COD** | **3,455,402** | **4,403,980** | **3,621,947** | **75,767,994** |
| | | | | |
| Other Disbursements | | | | |
| UST Fees | - | 250,000 | - | 250,000 |
| **Total Other Disbursements** | **-** | **250,000** | **-** | **250,000** |
| **TOTAL Cash Disbursements** | **$ 3,724,502** | **$ 6,377,669** | **$ 4,846,497** | **$ 103,662,759** |
| | | | | |
| **Starting Cash** | **$ 1,546,106** | **$ 91,729** | **$ 86,530** | **$ 1,173,552** |
| Net Change in Cash | (1,554,377) | (405,199) | (1,538,247) | (20,425,270) |
| **Ending Cash, Before DIP** | **$ (8,271)** | **$ (313,470)** | **$ (1,451,717)** | **$ (19,251,717)** |
| | | | | |
| **DIP Financing** | **100,000** | **400,000** | **1,500,000** | **19,300,000** |
| **Ending Cash** | **$ 91,729** | **$ 86,530** | **$ 48,283** | **$ 48,283** |

**130 Day Cash Flow Budget**

| | Wk6 | Wk7 | Wk8 | Wk9 | Wk10 | Wk11 | Wk12 | Wk13 |
|---|---|---|---|---|---|---|---|---|
| | 1-Apr | 8-Apr | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May |
| | 7-Apr | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May |

**DETAILS**

**Cash Receipts**

**NET MILK CHECKS**

| | Wk6 | Wk7 | Wk8 | Wk9 | Wk10 | Wk11 | Wk12 | Wk13 |
|---|---|---|---|---|---|---|---|---|
| Milk Check Date | 1-Apr | | 18-Apr | | 1-May | | 18-May | |
| Period | 3/1 - 3/15 | | 3/16 - 3/31 | | 4/1 - 4/15 | | 4/16 - 4/30 | |
| Days | 15 | | 16 | | 15 | | 15 | |
| Avg Milking Head | 33,915 | | 33,915 | | 34,065 | | 34,065 | |
| lbs/hd/day | 58.3 | | 58.3 | | 58.3 | | 58.3 | |
| Total Lbs | 29,644,577 | | 31,620,882 | | 29,775,690 | | 29,775,690 | |
| | | | | | | | | |
| GLANBIA | 85% | | 85% | | 85% | | 85% | |
| lbs | 23,519,607 | | 26,877,750 | | 25,309,336 | | 25,309,336 | |
| CWT | 235,196 | | 268,777 | | 253,093 | | 253,093 | |
| $/CWT | $20.00 | | $20.00 | | $20.74 | | $20.74 | |
| Gross | $ 4,704,368 | | $ 5,376,061 | | $ 5,248,498 | | $ 5,248,498 | |
| *less* | | | | | | | | |
| National Dairy Promos | (11,760) | | (13,439) | | (12,655) | | (12,655) | |
| ID Dairy Commissions | (25,872) | | (29,566) | | (27,840) | | (27,840) | |
| Haul & Hauling Surcharge | (204,621) | | (233,836) | | (220,191) | | (220,191) | |
| Conterra *(Int Only)* | (21,000) | | - | | (21,000) | | - | |
| MetLife *(Int Only)* | (552,000) | | (133,000) | | (552,000) | | (133,000) | |
| Net Milk Check | $ 3,889,116 | $ - | $ 4,966,220 | $ - | $ 4,414,812 | $ - | $ 4,854,812 | $ - |
| | | | | | | | | |
| IFS | 15% | | 15% | | 15% | | 15% | |
| lbs | 6,124,970 | | 4,743,132 | | 4,466,353 | | 4,466,353 | |
| CWT | 61,250 | | 47,431 | | 44,664 | | 44,664 | |
| $/CWT | $12.00 | | $20.00 | | $12.40 | | $20.74 | |
| Gross | $ 734,996 | | $ 1,438,831 | | $ 553,828 | | $ 1,298,583 | |
| *less* | | | | | | | | |
| National Dairy Promos | - | | (5,434) | | - | | (4,466) | |
| ID Dairy Commissions | - | | (11,955) | | - | | (9,826) | |
| ISDA Mill Levy | - | | (1,956) | | - | | (1,608) | |
| Haul & Hauling Surcharge | (51,450) | | (39,842) | | (37,517) | | (37,517) | |
| Rabo AgriFinance | | | | | | | | |
| Other | - | | (45) | | - | | (45) | |
| Net Milk Check | $ 683,547 | $ - | $ 1,379,598 | $ - | $ 516,310 | $ - | $ 1,245,121 | $ - |
| | | | | | | | | |
| TOTAL Net Milk Checks | $ 4,572,663 | $ - | $ 6,345,818 | $ - | $ 4,931,123 | $ - | $ 6,099,933 | $ - |

**CUSTOM FEEDING RECEIPTS**

| | Wk6 | Wk7 | Wk8 | Wk9 | Wk10 | Wk11 | Wk12 | Wk13 |
|---|---|---|---|---|---|---|---|---|
| Custom Feeding Income | | | | 22-Apr | | 8-May | | 22-May |
| Period | | | | 3/16 - 3/31 | | 4/1 - 4/15 | | 4/16 - 4/30 |
| Days | | | | 16 | | 15 | | 15 |
| $/hd/day | | | | $3.70 | | $3.70 | | $3.70 |
| Custom Feeding, Headcount | | | | 23,250 | | 23,250 | | 23,250 |
| Custom Feeding Income | $ - | $ - | $ - | $ 1,376,400 | $ - | $ 1,290,375 | $ - | $ 1,290,375 |
| | | | | | | | | |
| TOTAL Custom Feeding Receipts | $ - | $ - | $ - | $ 1,376,400 | $ - | $ 1,290,375 | $ - | $ 1,290,375 |

| | Wk14 27-May 2-Jun | Wk15 3-Jun 9-Jun | Wk16 10-Jun 16-Jun | Wk17 17-Jun 23-Jun | Wk18 24-Jun 30-Jun | Wk19 1-Jul 7-Jul | Wk20 8-Jul 14-Jul | Wk21 15-Jul 21-Jul |
|---|---|---|---|---|---|---|---|---|
| **DETAILS** | | | | | | | | |
| **Cash Receipts** | | | | | | | | |
| **NET MILK CHECKS** | | | | | | | | |
| Milk Check Date | 1-Jun | | | 18-Jun | | 1-Jul | | 18-Jul |
| Period | 5/1 - 5/15 | | | 5/16 - 5/31 | | 6/1 - 6/15 | | 6/16 - 6/30 |
| Days | 15 | | | 16 | | 15 | | 15 |
| Avg Milking Head | 34,215 | | | 34,215 | | 34,365 | | 34,365 |
| lbs/hd/day | 59.0 | | | 59.0 | | 60.0 | | 60.0 |
| Total Lbs | 30,280,275 | | | 32,298,960 | | 30,928,500 | | 30,928,500 |
| | | | | | | | | |
| GLANBIA | 85% | | | 85% | | 85% | | 85% |
| lbs | 25,738,234 | | | 27,454,116 | | 26,289,225 | | 26,289,225 |
| CWT | 257,382 | | | 274,541 | | 262,892 | | 262,892 |
| $/CWT | $21.05 | | | $21.05 | | $22.06 | | $22.06 |
| Gross | $ 5,416,920 | | | $ 5,778,048 | | $ 5,798,325 | | $ 5,798,325 |
| less | | | | | | | | |
| National Dairy Promos | (12,869) | | | (13,727) | | (13,145) | | (13,145) |
| ID Dairy Commissions | (28,312) | | | (30,200) | | (28,918) | | (28,918) |
| Haul & Hauling Surcharge | (223,923) | | | (238,851) | | (228,716) | | (228,716) |
| Int Only   Conterra | (21,000) | | | - | | (21,000) | | - |
| Int Only   MetLife | (552,000) | | | (133,000) | | (552,000) | | (133,000) |
| Net Milk Check | $ 4,578,816 | $ - | $ - | $ 5,362,271 | $ - | $ 4,954,546 | $ - | $ 5,394,546 |
| | | | | | | | | |
| IFS | 15% | | | 15% | | 15% | | 15% |
| lbs | 4,542,041 | | | 4,844,844 | | 4,639,275 | | 4,639,275 |
| CWT | 45,420 | | | 48,448 | | 46,393 | | 46,393 |
| $/CWT | $12.60 | | | $21.05 | | $13.20 | | $22.06 |
| Gross | $ 572,297 | | | $ 1,403,285 | | $ 612,384 | | $ 1,434,083 |
| less | | | | | | | | |
| National Dairy Promos | - | | | (4,693) | | - | | (4,639) |
| ID Dairy Commissions | - | | | (10,326) | | - | | (10,206) |
| ISDA Mill Levy | - | | | (1,690) | | - | | (1,670) |
| Haul & Hauling Surcharge | (38,153) | | | (40,697) | | (38,970) | | (38,970) |
| Rabo AgriFinance | | | | | | | | |
| Other | - | | | (45) | | - | | (45) |
| Net Milk Check | $ 534,144 | $ - | $ - | $ 1,345,835 | $ - | $ 573,414 | $ - | $ 1,378,553 |
| | | | | | | | | |
| **TOTAL Net Milk Checks** | $ 5,112,960 | $ - | $ - | $ 6,708,106 | $ - | $ 5,527,961 | $ - | $ 6,773,099 |

| **CUSTOM FEEDING RECEIPTS** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Custom Feeding Income | | 8-Jun | | 22-Jun | | | 8-Jul | |
| Period | | 5/1 - 5/15 | | 5/16 - 5/31 | | | 6/1 - 6/15 | |
| Days | | 15 | | 16 | | | 15 | |
| $/hd/day | | $3.70 | | $3.70 | | | $3.70 | |
| Custom Feeding, Headcount | | 23,250 | | 23,250 | | | 23,250 | |
| **Custom Feeding Income** | $ - | $ 1,290,375 | $ - | $ 1,376,400 | $ - | $ - | $ 1,290,375 | $ - |
| | | | | | | | | |
| **TOTAL Custom Feeding Receipts** | $ - | $ 1,290,375 | $ - | $ 1,376,400 | $ - | $ - | $ 1,290,375 | $ - |

|  | | Wk22<br>22-Jul<br>28-Jul | Wk23<br>29-Jul<br>4-Aug | Wk24<br>5-Aug<br>11-Aug | | TOTAL<br>1-Apr-24<br>11-Aug-24 |
|---|---|---|---|---|---|---|
| **DETAILS** | | | | | | |
| **Cash Receipts** | | | | | | |
| **NET MILK CHECKS** | | | | | | |
| Milk Check Date | | | 1-Aug | | | |
| Period | | | 7/1 - 7/15 | | | |
| Days | | | 15 | | | 137 |
| Avg Milking Head | | | 34,365 | | | 34,165 |
| lbs/hd/day | | | 60.0 | | | 59.0 |
| Total Lbs | | | 30,928,500 | | | 276,181,573 |
| | | | | | | |
| GLANBIA | | | 85% | | | |
| lbs | | | 26,289,225 | | | 233,076,054 |
| CWT | | | 262,892 | | | 2,330,761 |
| $/CWT | | | $22.50 | | | $21.15 |
| Gross | | $ | 5,915,417 | | $ | 49,284,462 |
| *less* | | | | | | |
| National Dairy Promos | | | (13,145) | | | (116,538) |
| ID Dairy Commissions | | | (28,918) | | | (256,384) |
| Haul & Hauling Surcharge | | | (228,716) | | | (2,027,762) |
| Int Only Conterra | | | (21,000) | | | (105,000) |
| Int Only MetLife | | | (552,000) | | | (3,292,000) |
| Net Milk Check | $ - | $ | 5,071,638 | $ - | $ | 43,486,778 |
| | | | | | | |
| IFS | | | 15% | | | |
| lbs | | | 4,639,275 | | | 43,105,519 |
| CWT | | | 46,393 | | | 431,055 |
| $/CWT | | | $13.50 | | | $20.12 |
| Gross | | $ | 626,302 | | $ | 8,674,591 |
| *less* | | | | | | |
| National Dairy Promos | | | - | | | (19,233) |
| ID Dairy Commissions | | | - | | | (42,313) |
| ISDA Mill Levy | | | | | | (6,924) |
| Haul & Hauling Surcharge | | | (38,970) | | | (362,086) |
| Rabo AgriFinance | | | | | | - |
| Other | | | - | | | (180) |
| Net Milk Check | $ - | $ | 587,332 | $ - | $ | 8,243,854 |
| | | | | | | |
| TOTAL Net Milk Checks | $ - | $ | 5,658,971 | $ - | $ | 51,730,633 |
| | | | | | | |
| | | | | | | |
| **CUSTOM FEEDING RECEIPTS** | | | | | | |
| Custom Feeding Income | | 22-Jul | | 8-Aug | | |
| Period | | 6/16 - 6/30 | | 7/1 - 7/15 | | |
| Days | | 15 | | 15 | | 122 |
| $/hd/day | | $3.70 | | $3.70 | | $3.70 |
| Custom Feeding, Headcount | | 23,250 | | 23,250 | | 23,250 |
| Custom Feeding Income | $ 1,290,375 | $ - | | $ 1,290,375 | $ | 10,495,050 |
| | | | | | | |
| TOTAL Custom Feeding Receipts | $ 1,290,375 | $ - | | $ 1,290,375 | $ | 10,495,050 |

| | | Wk6<br>1-Apr<br>7-Apr | Wk7<br>8-Apr<br>14-Apr | Wk8<br>15-Apr<br>21-Apr | Wk9<br>22-Apr<br>28-Apr | Wk10<br>29-Apr<br>5-May | Wk11<br>6-May<br>12-May | Wk12<br>13-May<br>19-May | Wk13<br>20-May<br>26-May |
|---|---|---|---|---|---|---|---|---|---|
| **NET CATTLE SALES** | | | | | | | | | |
| **HEADCOUNT SOLD** | | | | | | | | | |
| | Cull - Voluntary | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| | Cull - Involuntary | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| | Feeders | - | 750 | - | 1,125 | - | 750 | - | 1,125 |
| | Fats | 100 | - | 100 | - | - | 125 | - | 125 |
| | Open Heifers | 100 | - | 100 | - | - | - | - | - |
| | **TOTAL HEADCOUNT SOLD** | **325** | **875** | **325** | **1,250** | **125** | **1,000** | **125** | **1,375** |
| **SUMMARY - AMOUNT** | | | | | | | | | |
| $925 | Cull - Voluntary | $  83,250 | $  83,250 | $  83,250 | $  83,250 | $  83,250 | $  83,250 | $  83,250 | $  83,250 |
| $150 | Cull - Involuntary | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 |
| $1,035 | Feeders | - | 776,250 | - | 1,164,375 | - | 776,250 | - | 1,164,375 |
| $2,590 | Fats | 259,000 | - | 259,000 | - | - | 323,750 | - | 323,750 |
| $800 | Open Heifers | 80,000 | - | 80,000 | - | - | - | - | - |
| | **TOTAL AMOUNT** | **427,500** | **864,750** | **427,500** | **1,252,875** | **88,500** | **1,188,500** | **88,500** | **1,576,625** |
| | **Fats & Feeders** | $  259,000 | $  776,250 | $  259,000 | $  1,164,375 | $  - | $  1,100,000 | $  - | $  1,488,125 |
| 0% | Amount to Rabo | - | - | - | - | - | - | - | - |
| 100% | Amount to Millenkamp | 259,000 | 776,250 | 259,000 | 1,164,375 | - | 1,100,000 | - | 1,488,125 |
| | **Culls & Open Heifers** | $  168,500 | $  88,500 | $  168,500 | $  88,500 | $  88,500 | $  88,500 | $  88,500 | $  88,500 |
| 0% | Amount to Rabo | - | - | - | - | - | - | - | - |
| 100% | Amount to Millenkamp | 168,500 | 88,500 | 168,500 | 88,500 | 88,500 | 88,500 | 88,500 | 88,500 |
| | **TOTAL To Millenkamp** | **427,500** | **864,750** | **427,500** | **1,252,875** | **88,500** | **1,188,500** | **88,500** | **1,576,625** |
| | **TOTAL Net Cattle Sales Receipts** | | | | $  427,500 | $  864,750 | $  427,500 | $  1,252,875 | $  88,500 |

| | | | 8-Apr | | 22-Apr | | 8-May | | 22-May |
|---|---|---|---|---|---|---|---|---|---|
| **TRUCKING INCOME** | | | | | | | | | |
| **Trucking Income** | | | 3/1 - 3/15 | | 3/16- 3/31 | | 4/1 -4/15 | | 4/16 - 4/30 |
| Period | | | 15 | | 16 | | 15 | | 15 |
| Days | | | $2,500 | | $2,500 | | $1,000 | | $1,000 |
| Income per Day | | | | | | | | | |
| | Trucking Income | $  - | $  37,500 | $  - | $  40,000 | $  - | $  15,000 | $  - | $  15,000 |
| | **TOTAL Trucking Income** | $  - | $  37,500 | $  - | $  40,000 | $  - | $  15,000 | $  - | $  15,000 |

| | | | 15-Apr | | 30-Apr | | 15-May | | |
|---|---|---|---|---|---|---|---|---|---|
| **DIGESTER INCOME** | | | | | | | | | |
| **Digester Income Check Date** | | | 3/16 - 3/31 | | 4/1 -4/15 | | 4/16 -4/30 | | |
| Period | | | 16 | | 15 | | 15 | | |
| Days | | | $15,000 | | $15,000 | | $15,000 | | |
| Income per Day | | | | | | | | | |
| Digester Penalty Income | $  - | $  - | $  240,000 | $  - | $  225,000 | $  - | $  225,000 | $  - |
| **Digester Income Check Date** | | | | | | | | | |
| Income per Day | | | | | | | | | |
| Digester Income | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - |
| **TOTAL Digester Income** | $  - | $  - | $  240,000 | $  - | $  225,000 | $  - | $  225,000 | $  - |

| | | Wk14<br>27-May<br>2-Jun | Wk15<br>3-Jun<br>9-Jun | Wk16<br>10-Jun<br>16-Jun | Wk17<br>17-Jun<br>23-Jun | Wk18<br>24-Jun<br>30-Jun | Wk19<br>1-Jul<br>7-Jul | Wk20<br>8-Jul<br>14-Jul | Wk21<br>15-Jul<br>21-Jul |
|---|---|---|---|---|---|---|---|---|---|
| **NET CATTLE SALES** | | | | | | | | | |
| **HEADCOUNT SOLD** | | | | | | | | | |
| | Cull - Voluntary | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| | Cull - Involuntary | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| | Feeders | - | 750 | - | 1,125 | - | 750 | - | 1,125 |
| | Fats | - | 125 | - | 125 | - | - | - | - |
| | Open Heifers | - | 100 | - | - | - | - | - | - |
| | **TOTAL HEADCOUNT SOLD** | **125** | **1,100** | **125** | **1,375** | **125** | **875** | **125** | **1,250** |
| **SUMMARY - AMOUNT** | | | | | | | | | |
| $925 | Cull - Voluntary | $ 83,250 | $ 83,250 | $ 83,250 | $ 83,250 | $ 83,250 | $ 83,250 | $ 83,250 | $ 83,250 |
| $150 | Cull - Involuntary | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 |
| $1,035 | Feeders | - | 776,250 | - | 1,164,375 | - | 776,250 | - | 1,164,375 |
| $2,590 | Fats | - | 323,750 | - | 323,750 | - | - | - | - |
| $800 | Open Heifers | - | 80,000 | - | - | - | - | - | - |
| | **TOTAL AMOUNT** | **88,500** | **1,268,500** | **88,500** | **1,576,625** | **88,500** | **864,750** | **88,500** | **1,252,875** |
| | **Fats & Feeders** | $ - | $ 1,100,000 | $ - | $ 1,488,125 | $ - | $ 776,250 | $ - | $ 1,164,375 |
| 0% | Amount to Rabo | - | - | - | - | - | - | - | - |
| 100% | Amount to Millenkamp | - | 1,100,000 | - | 1,488,125 | - | 776,250 | - | 1,164,375 |
| | **Culls & Open Heifers** | $ 88,500 | $ 168,500 | $ 88,500 | $ 88,500 | $ 88,500 | $ 88,500 | $ 88,500 | $ 88,500 |
| 0% | Amount to Rabo | - | - | - | - | - | - | - | - |
| 100% | Amount to Millenkamp | 88,500 | 168,500 | 88,500 | 88,500 | 88,500 | 88,500 | 88,500 | 88,500 |
| | **TOTAL To Millenkamp** | **88,500** | **1,268,500** | **88,500** | **1,576,625** | **88,500** | **864,750** | **88,500** | **1,252,875** |
| | **TOTAL Net Cattle Sales Receipts** | **$ 1,188,500** | **$ 88,500** | **$ 1,576,625** | **$ 88,500** | **$ 1,268,500** | **$ 88,500** | **$ 1,576,625** | **$ 88,500** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **TRUCKING INCOME** | | | | | | | | | |
| **Trucking Income** | | | 8-Jun | | 22-Jun | | | 8-Jul | |
| Period | | | 5/1 - 5/15 | | 5/16 - 5/31 | | | 6/1 - 6/15 | |
| Days | | | 15 | | 16 | | | 15 | |
| Income per Day | | | $1,000 | | $1,000 | | | $1,000 | |
| | Trucking Income | $ - | $ 15,000 | $ - | $ 16,000 | $ - | $ - | $ 15,000 | $ - |
| | **TOTAL Trucking Income** | **$ -** | **$ 15,000** | **$ -** | **$ 16,000** | **$ -** | **$ -** | **$ 15,000** | **$ -** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **DIGESTER INCOME** | | | | | | | | | |
| **Digester Income Check Date** | | | 30-May | | 15-Jun | | 30-Jun | | 15-Jul |
| Period | | | 5/1 - 5/15 | | 5/16 - 5/31 | | 6/1 - 6/15 | | 6/16 - 6/30 |
| Days | | | 15 | | 16 | | 15 | | 15 |
| Income per Day | | | $15,000 | | $15,000 | | $15,000 | | $15,000 |
| Digester Penalty Income | | $ 225,000 | $ - | $ 240,000 | $ - | $ 225,000 | $ - | $ - | $ 225,000 |
| **Digester Income Check Date** | | | | | | | | | |
| Income per Day | | | | | | | | | |
| Digester Income | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | **TOTAL Digester Income** | **$ 225,000** | **$ -** | **$ 240,000** | **$ -** | **$ 225,000** | **$ -** | **$ -** | **$ 225,000** |

| | | Wk22 | Wk23 | Wk24 | | TOTAL |
|---|---|---|---|---|---|---|
| | | 22-Jul | 29-Jul | 5-Aug | | 1-Apr-24 |
| | | 28-Jul | 4-Aug | 11-Aug | | 11-Aug-24 |
| **NET CATTLE SALES** | | | | | | |
| **HEADCOUNT SOLD** | | | | | | |
| | Cull - Voluntary | 90 | - | - | | 1,530 |
| | Cull - Involuntary | 35 | - | - | | 595 |
| | Feeders | - | 750 | - | | 8,250 |
| | Fats | - | - | - | | 700 |
| | Open Heifers | - | - | - | | 300 |
| | **TOTAL HEADCOUNT SOLD** | **125** | **750** | **-** | | **11,375** |
| | | | | | | |
| **SUMMARY - AMOUNT** | | | | | | |
| $925 | Cull - Voluntary | $ 83,250 | $ - | $ - | | $ 1,415,250 |
| $150 | Cull - Involuntary | 5,250 | - | - | | 89,250 |
| $1,035 | Feeders | - | 776,250 | - | | 8,538,750 |
| $2,590 | Fats | - | - | - | | 1,813,000 |
| $800 | Open Heifers | - | - | - | | 240,000 |
| | **TOTAL AMOUNT** | **88,500** | **776,250** | **-** | | **12,096,250** |
| | | | | | | |
| | **Fats & Feeders** | $ - | $ 776,250 | $ - | | $ 10,351,750 |
| 0% | Amount to Rabo | - | - | - | | - |
| 100% | Amount to Millenkamp | - | 776,250 | - | | 10,351,750 |
| | | | | | | |
| | **Culls & Open Heifers** | $ 88,500 | $ - | $ - | | $ 1,744,500 |
| 0% | Amount to Rabo | - | - | - | | - |
| 100% | Amount to Millenkamp | 88,500 | - | - | | 1,744,500 |
| | **TOTAL To Millenkamp** | **88,500** | **776,250** | **-** | | **12,096,250** |
| | | | | | | |
| | **TOTAL Net Cattle Sales Receipts** | **$ 864,750** | **$ 88,500** | **$ 1,252,875** | | **$ 11,231,500** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **TRUCKING INCOME** | | | | | | |
| **Trucking Income** | | 22-Jul | | 8-Aug | | |
| Period | | 6/16 - 6/30 | | 7/1 - 7/15 | | 137 |
| Days | | 15 | | 15 | | 1,339 |
| Income per Day | | $1,000 | | $1,000 | | $1,339 |
| Trucking Income | | $ 15,000 | $ - | $ 15,000 | | $ 183,500 |
| | | | | | | |
| **TOTAL Trucking Income** | | $ 15,000 | $ - | $ 15,000 | | $ 183,500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **DIGESTER INCOME** | | | | | | |
| **Digester Income Check Date** | | 30-Jul | | | | |
| Period | | 7/1 - 7/15 | | | | |
| Days | | 15 | | | | 122 |
| Income per Day | | $15,000 | | | | $15,000 |
| Digester Penalty Income | | $ - | $ 225,000 | $ - | | $ 1,830,000 |
| | | | | | | |
| Digester Income Check Date | | | | | | |
| Income per Day | | | | | | |
| Digester Income | | $ - | $ - | $ - | | $ - |
| | | | | | | |
| **TOTAL Digester Income** | | $ - | $ 225,000 | $ - | | $ 1,830,000 |

| | Wk6<br>1-Apr<br>7-Apr | Wk7<br>8-Apr<br>14-Apr | Wk8<br>15-Apr<br>21-Apr | Wk9<br>22-Apr<br>28-Apr | Wk10<br>29-Apr<br>5-May | Wk11<br>6-May<br>12-May | Wk12<br>13-May<br>19-May | Wk13<br>20-May<br>26-May |
|---|---|---|---|---|---|---|---|---|
| **AR COLLECTED** | | | | | | | | |
| **Custom Feed AR** | | | | | | | | |
| Ah-Zet Dairy | - | 14,247 | - | - | 14,247 | - | - | - |
| B&H Farms | - | 9,578 | - | - | 9,578 | - | - | - |
| Ciocca Dairy | - | 7,576 | - | - | 7,576 | - | - | - |
| deJong Dairy | - | 19,490 | - | - | 19,490 | - | - | - |
| Diamond B Dairy | - | 43,640 | - | - | 43,640 | - | - | - |
| Double V, LLC | - | 981 | - | - | 981 | - | - | - |
| Eagle View East | - | 29,433 | - | - | 29,433 | - | - | - |
| Eagle View Farms, LLC 1700 | - | 31,864 | - | - | 31,864 | - | - | - |
| Eagle View Farms. | - | 42,869 | - | - | 42,869 | - | - | - |
| Heglar Creek Dairy | - | 42,058 | - | - | 42,058 | - | - | - |
| J & V Dairy | - | 21,969 | - | - | 21,969 | - | - | - |
| Jack Verbree Dairies | - | 516,284 | - | - | 516,284 | - | - | - |
| Moss Farms | - | 54,990 | - | - | 54,990 | - | - | - |
| Nelsen Farms LLC | - | 27,450 | - | - | 27,450 | - | - | - |
| No View Dairy, LLC | - | 53,445 | - | - | 53,445 | - | - | - |
| Oppedyk Dairy | - | 61,639 | - | - | 61,639 | - | - | - |
| Prime Ridge Beef, LLC | - | - | - | - | - | - | - | - |
| Red Rock Dairy | - | 8,316 | - | - | 8,316 | - | - | - |
| Reynolds Creek Calf Ranch, LLC | - | 590,358 | - | - | 590,358 | - | - | - |
| Schilder Dairy, LLC. | - | 34,540 | - | - | 34,540 | - | - | - |
| Silva Brothers | - | 6,560 | - | - | 6,560 | - | - | - |
| South View Dairy | - | 37,126 | - | - | 37,126 | - | - | - |
| Stouder Holsteins LLP | - | 46,119 | - | - | 46,119 | - | - | - |
| Van Dyk Dairy | - | 51,845 | - | - | 51,845 | - | - | - |
| **Custom Feed AR Collection** | $ - | $ 1,752,375 | $ - | $ - | $ 1,752,375 | $ - | $ - | $ - |
| | | | | | | | | |
| **Milk Checks** | | | | | | | | |
| Milk Check in Transit from Rabo - Glanbia | - | - | - | - | - | - | - | - |
| Milk Check in Transit from Rabo - IFS | - | - | - | - | - | - | - | - |
| **Milk Checks AR Collection** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | |
| **Digester** | | | | | | | | |
| East Valley Development LLC | - | 750,000 | 210,000 | | - | - | - | - |
| **Digester AR Collection** | $ - | $ 750,000 | $ 210,000 | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | |
| **Cattle Sales - Fats & Feeders** | | | | | | | | |
| Fredin Brothers Inc. | - | - | - | | - | - | - | - |
| True West Beef | - | - | 518,000 | | - | - | - | - |
| **Cattle Sales (Fats & Feeders) AR Collection** | $ - | $ - | $ 518,000 | $ - | $ - | $ - | $ - | $ - |
| 0% Amount to Rabo | - | - | - | | - | | | |
| 100% Amount to Millenkamp | - | - | 518,000 | | - | | | |
| | | | | | | | | |
| **Cattle Sales - Culls & Open Heifers** | | | | | | | | |
| Cargill Meat Solutions Corporation | - | - | 695,600 | - | | - | - | - |
| Producers Livestock | - | - | 43,146 | 35,410 | | - | - | - |
| Valley Beef | - | - | 9,900 | | | - | - | - |
| **Cattle Sales (Culls & Open Heifers) AR Collect** | $ - | $ - | $ 748,646 | $ 35,410 | $ - | $ - | $ - | $ - |
| 0% Amount to Rabo | - | - | - | - | | | | |
| 100% Amount to Millenkamp | - | - | 748,646 | 35,410 | | | | |
| **SUMMARY** | | | | | | | | |
| Custom Feed AR Collection | - | 1,752,375 | - | - | 1,752,375 | - | - | - |
| Milk Checks AR Collection | - | - | - | - | - | - | - | - |
| Digester AR Collection | - | 750,000 | 210,000 | - | - | - | - | - |
| Cattle Sales (Fats & Feeders ) AR to Millenkamp | - | - | 518,000 | - | | - | - | - |
| Cattle Sales (Culls & Open Heifers) AR Collect | - | - | 748,646 | 35,410 | - | - | - | - |
| **TOTAL AR Collections to Millenkamp** | $ - | $ 2,502,375 | $ 1,476,646 | $ 35,410 | $ 1,752,375 | $ - | $ - | $ - |

**130 Day Cash Flow Budget**

| | Wk14 27-May 2-Jun | Wk15 3-Jun 9-Jun | Wk16 10-Jun 16-Jun | Wk17 17-Jun 23-Jun | Wk18 24-Jun 30-Jun | Wk19 1-Jul 7-Jul | Wk20 8-Jul 14-Jul | Wk21 15-Jul 21-Jul |
|---|---|---|---|---|---|---|---|---|
| **AR COLLECTED** | | | | | | | | |
| **Custom Feed AR** | | | | | | | | |
| Ah-Zet Dairy | - | - | - | - | - | - | - | - |
| B&H Farms | - | - | - | - | - | - | - | - |
| Ciocca Dairy | - | - | - | - | - | - | - | - |
| deJong Dairy | - | - | - | - | - | - | - | - |
| Diamond B Dairy | - | - | - | - | - | - | - | - |
| Double V, LLC | - | - | - | - | - | - | - | - |
| Eagle View East | - | - | - | - | - | - | - | - |
| Eagle View Farms, LLC 1700 | - | - | - | - | - | - | - | - |
| Eagle View Farms. | - | - | - | - | - | - | - | - |
| Heglar Creek Dairy | - | - | - | - | - | - | - | - |
| J & V Dairy | - | - | - | - | - | - | - | - |
| Jack Verbree Dairies | - | - | - | - | - | - | - | - |
| Moss Farms | - | - | - | - | - | - | - | - |
| Nelsen Farms LLC | - | - | - | - | - | - | - | - |
| No View Dairy, LLC | - | - | - | - | - | - | - | - |
| Oppedyk Dairy | - | - | - | - | - | - | - | - |
| Prime Ridge Beef, LLC | - | - | - | - | - | - | - | - |
| Red Rock Dairy | - | - | - | - | - | - | - | - |
| Reynolds Creek Calf Ranch, LLC | - | - | - | - | - | - | - | - |
| Schilder Dairy, LLC. | - | - | - | - | - | - | - | - |
| Silva Brothers | - | - | - | - | - | - | - | - |
| South View Dairy | - | - | - | - | - | - | - | - |
| Stouder Holsteins LLP | - | - | - | - | - | - | - | - |
| Van Dyk Dairy | - | - | - | - | - | - | - | - |
| **Custom Feed AR Collection** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Milk Checks** | | | | | | | | |
| Milk Check in Transit from Rabo - Glanbia | - | - | - | - | - | - | - | - |
| Milk Check in Transit from Rabo - IFS | - | - | - | - | - | - | - | - |
| **Milk Checks AR Collection** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Digester** | | | | | | | | |
| East Valley Development LLC | - | - | - | - | - | - | - | - |
| **Digester AR Collection** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Cattle Sales - Fats & Feeders** | | | | | | | | |
| Fredin Brothers Inc. | - | - | - | - | - | - | - | - |
| True West Beef | - | - | - | - | - | - | - | - |
| **Cattle Sales (Fats & Feeders) AR Collection** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 0%  Amount to Rabo | - | - | - | - | - | - | - | - |
| 100%  Amount to Millenkamp | - | - | - | - | - | - | - | - |
| **Cattle Sales - Culls & Open Heifers** | | | | | | | | |
| Cargill Meat Solutions Corporation | - | - | - | - | - | - | - | - |
| Producers Livestock | - | - | - | - | - | - | - | - |
| Valley Beef | - | - | - | - | - | - | - | - |
| **Cattle Sales (Culls & Open Heifers) AR Collect** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 0%  Amount to Rabo | - | - | - | - | - | - | - | - |
| 100%  Amount to Millenkamp | - | - | - | - | - | - | - | - |
| **SUMMARY** | | | | | | | | |
| Custom Feed AR Collection | - | - | - | - | - | - | - | - |
| Milk Checks AR Collection | - | - | - | - | - | - | - | - |
| Digester AR Collection | - | - | - | - | - | - | - | - |
| Cattle Sales (Fats & Feeders ) AR to Millenkam | - | - | - | - | - | - | - | - |
| Cattle Sales (Culls & Open Heifers) AR Collect | - | - | - | - | - | - | - | - |
| **TOTAL AR Collections to Millenkamp** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**130 Day Cash Flow Budget**

| | Wk22<br>22-Jul<br>28-Jul | Wk23<br>29-Jul<br>4-Aug | Wk24<br>5-Aug<br>11-Aug | TOTAL<br>1-Apr-24<br>11-Aug-24 |
|---|---|---|---|---|
| **AR COLLECTED** | | | | |
| **Custom Feed AR** | | | | |
| Ah-Zet Dairy | - | - | - | 28,494 |
| B&H Farms | - | - | - | 19,157 |
| Ciocca Dairy | - | - | - | 15,152 |
| deJong Dairy | - | - | - | 38,981 |
| Diamond B Dairy | - | - | - | 87,280 |
| Double V, LLC | - | - | - | 1,962 |
| Eagle View East | - | - | - | 58,867 |
| Eagle View Farms, LLC 1700 | - | - | - | 63,727 |
| Eagle View Farms. | - | - | - | 85,738 |
| Heglar Creek Dairy | - | - | - | 84,115 |
| J & V Dairy | - | - | - | 43,938 |
| Jack Verbree Dairies | - | - | - | 1,032,569 |
| Moss Farms | - | - | - | 109,980 |
| Nelsen Farms LLC | - | - | - | 54,901 |
| No View Dairy, LLC | - | - | - | 106,889 |
| Oppedyk Dairy | - | - | - | 123,278 |
| Prime Ridge Beef, LLC | - | - | - | - |
| Red Rock Dairy | - | - | - | 16,632 |
| Reynolds Creek Calf Ranch, LLC | - | - | - | 1,180,716 |
| Schilder Dairy, LLC. | - | - | - | 69,079 |
| Silva Brothers | - | - | - | 13,120 |
| South View Dairy | - | - | - | 74,252 |
| Stouder Holsteins LLP | - | - | - | 92,237 |
| Van Dyk Dairy | - | - | - | 103,690 |
| **Custom Feed AR Collection** | $ - | $ - | $ - | $ 3,504,751 |
| | | | | |
| **Milk Checks** | | | | |
| Milk Check in Transit from Rabo - Glanbia | - | - | - | |
| Milk Check in Transit from Rabo - IFS | - | - | - | |
| **Milk Checks AR Collection** | $ - | $ - | $ - | $ - |
| | | | | |
| **Digester** | | | | |
| East Valley Development LLC | - | - | - | 960,000 |
| **Digester AR Collection** | $ - | $ - | $ - | $ 960,000 |
| | | | | |
| **Cattle Sales - Fats & Feeders** | | | | |
| Fredin Brothers Inc. | - | - | - | - |
| True West Beef | - | - | - | 518,000 |
| **Cattle Sales (Fats & Feeders) AR Collection** | $ - | $ - | $ - | $ 518,000 |
| 0%   Amount to Rabo | - | - | - | - |
| 100%  Amount to Millenkamp | - | - | - | 518,000 |
| | | | | |
| **Cattle Sales - Culls & Open Heifers** | | | | |
| Cargill Meat Solutions Corporation | - | - | - | 695,600 |
| Producers Livestock | - | - | - | 78,555 |
| Valley Beef | - | - | - | 9,900 |
| **Cattle Sales (Culls & Open Heifers) AR Collect** | $ - | $ - | $ - | $ 784,055 |
| 0%   Amount to Rabo | - | - | - | - |
| 100%  Amount to Millenkamp | - | - | - | 784,055 |
| | | | | |
| SUMMARY | | | | |
| Custom Feed AR Collection | - | - | - | 3,504,751 |
| Milk Checks AR Collection | - | - | - | - |
| Digester AR Collection | - | - | - | 960,000 |
| Cattle Sales (Fats & Feeders ) AR to Millenkan | - | - | - | 518,000 |
| Cattle Sales (Culls & Open Heifers) AR Collect | - | - | - | 784,055 |
| **TOTAL AR Collections to Millenkamp** | $ - | $ - | $ - | $ 5,766,806 |

| | Wk6 1-Apr 7-Apr | Wk7 8-Apr 14-Apr | Wk8 15-Apr 21-Apr | Wk9 22-Apr 28-Apr | Wk10 29-Apr 5-May | Wk11 6-May 12-May | Wk12 13-May 19-May | Wk13 20-May 26-May |
|---|---|---|---|---|---|---|---|---|
| **Cash Disbursements** | | | | | | | | |
| **PAYROLL** | | | | | | | | |
| **Payroll Check Date** | 5-Apr | | 20-Apr | | 5-May | | | 20-May |
| Period | 3/16 - 3/31 | | 4/1 - 4/15 | | 4/16 - 4/30 | | | 5/1 - 5/15 |
| Headcount | 502 | | 502 | | 502 | | | 502 |
| Days | 16 | | 15 | | 15 | | | 15 |
| Wages, Daily per person | $140 | | $140 | | $140 | | | $140 |
| Total Wages | $ 1,127,118 | | $ 1,056,673 | | $ 1,056,673 | | | $ 1,056,673 |
| | | | | | | | | |
| Less EE Tax Liability | (121,003) | | (113,440) | | (113,440) | | | (113,440) |
| Net Payroll Liability | $ 1,006,115 | | $ 943,233 | | $ 943,233 | | | $ 943,233 |
| | | | | | | | | |
| FITW43 and Related Taxes, EE | $ 111,970 | | $ 104,972 | | $ 104,972 | | | $ 104,972 |
| FITW43 and Related Taxes, ER | 86,225 | | 80,835 | | 80,835 | | | 80,835 |
| FUTA and Related Taxes, ER | 1,956 | | 1,833 | | 1,833 | | | 1,833 |
| ID and Related Taxes, EE | 9,033 | | 8,468 | | 8,468 | | | 8,468 |
| IDSUI and Related Taxes, ER | 9,253 | | 8,674 | | 8,674 | | | 8,674 |
| Tax Liability | $ 218,436 | | $ 204,783 | | $ 204,783 | | | $ 204,783 |
| TOTAL Payroll | $ 1,224,551 | $ - | $ 1,148,016 | $ - | $ 1,148,016 | $ - | $ - | $ 1,148,016 |
| | | | | | | | | |
| **EE Benefits** | | | | | | | | |
| Blue Cross of Idaho | $ 25,172 | | | | $ 25,172 | | | |
| Pan American Life Insurance Group | 43,217 | | | | 43,217 | | | |
| Workers' Compensation RX Solutions | - | | | | - | | | |
| TOTAL EE Benefits | $ 68,389 | $ - | $ - | $ - | $ 68,389 | $ - | $ - | $ - |

130 Day Cash Flow Budget

| | Wk14 27-May 2-Jun | Wk15 3-Jun 9-Jun | Wk16 10-Jun 16-Jun | Wk17 17-Jun 23-Jun | Wk18 24-Jun 30-Jun | Wk19 1-Jul 7-Jul | Wk20 8-Jul 14-Jul | Wk21 15-Jul 21-Jul |
|---|---|---|---|---|---|---|---|---|
| **Cash Disbursements** | | | | | | | | |
| **PAYROLL** | | | | | | | | |
| **Payroll Check Date** | | 5-Jun | | 20-Jun | | 5-Jul | | 20-Jul |
| Period | | 5/16 - 5/31 | | 6/1 - 6/15 | | 6/16 - 6/30 | | 7/1 - 7/15 |
| Headcount | | 502 | | 502 | | 502 | | 502 |
| Days | | 16 | | 15 | | 15 | | 15 |
| **Wages, Daily per person** | | $140 | | $140 | | $140 | | $140 |
| **Total Wages** | | $ 1,127,118 | | $ 1,056,673 | | $ 1,056,673 | | $ 1,056,673 |
| Less EE Tax Liability | | (121,003) | | (113,440) | | (113,440) | | (113,440) |
| **Net Payroll Liability** | | $ 1,006,115 | | $ 943,233 | | $ 943,233 | | $ 943,233 |
| FITW43 and Related Taxes, EE | | 111,970 | | 104,972 | | 104,972 | | 104,972 |
| FITW43 and Related Taxes, ER | | 86,225 | | 80,835 | | 80,835 | | 80,835 |
| FUTA and Related Taxes, ER | | 1,956 | | 1,833 | | 1,833 | | 1,833 |
| ID and Related Taxes, EE | | 9,033 | | 8,468 | | 8,468 | | 8,468 |
| IDSUI and Related Taxes, ER | | 9,253 | | 8,674 | | 8,674 | | 8,674 |
| **Tax Liability** | | $ 218,436 | | $ 204,783 | | $ 204,783 | | $ 204,783 |
| **TOTAL Payroll** | $ - | $ 1,224,551 | $ - | $ 1,148,016 | $ - | $ 1,148,016 | $ - | $ 1,148,016 |
| **EE Benefits** | | | | | | | | |
| Blue Cross of Idaho | $ 25,172 | | | | | $ 25,172 | | |
| Pan American Life Insurance Group | 43,217 | | | | | 43,217 | | |
| Workers' Compensation RX Solutions | - | | | | | - | | |
| **TOTAL EE Benefits** | $ 68,389 | $ - | $ - | $ - | $ - | $ 68,389 | $ - | $ - |

Page 14 of 18

**130 Day Cash Flow Budget**

| | Wk22<br>22-Jul<br>28-Jul | Wk23<br>29-Jul<br>4-Aug | Wk24<br>5-Aug<br>11-Aug | TOTAL<br>1-Apr-24<br>11-Aug-24 |
|---|---|---|---|---|
| **Cash Disbursements** | | | | |
| **PAYROLL** | | | | |
| Payroll Check Date | | | 5-Aug | |
| Period | | | 7/16 - 7/31 | |
| Headcount | | | 502 | 502 |
| Days | | | 16 | 138 |
| Wages, Daily per person | | | $140 | $140 |
| Total Wages | | | $ 1,127,118 | $ 9,721,392 |
| | | | | |
| Less EE Tax Liability | | | (121,003) | (1,043,650) |
| Net Payroll Liability | | | $ 1,006,115 | $ 8,677,743 |
| | | | | |
| FITW43 and Related Taxes, EE | | | $ 111,970 | $ 965,744 |
| FITW43 and Related Taxes, ER | | | 86,225 | 743,687 |
| FUTA and Related Taxes, ER | | | 1,956 | 16,868 |
| ID and Related Taxes, EE | | | 9,033 | 77,906 |
| IDSUI and Related Taxes, ER | | | 9,253 | 79,803 |
| Tax Liability | | | $ 218,436 | $ 1,884,007 |
| TOTAL Payroll | $ - | $ - | $ 1,224,551 | $ 10,561,749 |
| | | | | |
| EE Benefits | | | | |
| Blue Cross of Idaho | | $ 25,172 | | $ 125,860 |
| Pan American Life Insurance Group | | 43,217 | | 216,085 |
| Workers' Compensation RX Solutions | | - | | - |
| TOTAL EE Benefits | $ - | $ 68,389 | $ - | $ 341,945 |

| | Wk6 | Wk7 | Wk8 | Wk9 | Wk10 | Wk11 | Wk12 | Wk13 |
|---|---|---|---|---|---|---|---|---|
| | 1-Apr | 8-Apr | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May |
| | 7-Apr | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May |
| **INITIAL PAYMENTS TO CRITICAL VENDORS** | | | | | | | | |
| | | | | | | | | |
| **Feed** | **1,570,800** | **1,570,800** | **570,800** | **570,800** | **1,570,800** | **570,800** | **570,800** | **70,800** |
| Aden Brook Trading Corp | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 |
| American Calf Products | - | - | - | - | - | - | - | - |
| Carne I Corp. | - | - | - | - | - | - | - | - |
| H&M Custom | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | - | 500,000 | - |
| Land View, Inc-Livestock- Animal Care | - | 1,000,000 | - | - | - | 500,000 | - | - |
| PerforMix Nutrition Systems | - | - | - | - | - | - | - | - |
| Receptor Food Group | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 |
| Wada Farms | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 |
| Viterra USA Grain, LLC | - | - | - | - | - | - | - | - |
| [Silage Group] | 1,000,000 | - | - | - | 1,000,000 | - | - | - |
| | | | | | | | | |
| **Vet/Med** | **125,000** | **125,000** | **-** | **125,000** | **125,000** | **-** | **125,000** | **125,000** |
| MWI Veterinary - Black Pine | - | - | - | - | - | - | - | - |
| MWI Veterinary - Milkers | - | - | - | - | - | - | - | - |
| MWI Veterinary - Millenkamp | 125,000 | 125,000 | - | 125,000 | 125,000 | - | 125,000 | 125,000 |
| MWI Veterinary Idaho Jersey Girls | - | - | - | - | - | - | - | - |
| | | | | | | | | |
| **Repairs & Maintenance** | **40,000** | **40,000** | **238,690** | **40,000** | **40,000** | **40,000** | **238,690** | **40,000** |
| The Dairy Solutions Group | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 |
| Automation Werx, LLC | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 |
| Green Source Automation | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 |
| Progressive Dairy Service and Supplies | - | - | - | - | - | - | - | - |
| Elevation Electric | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 |
| Clear Water Products, LLC | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 |
| Western States Cat | | | 198,690 | | | | 198,690 | |
| | | | | | | | | |
| **Chemicals** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** |
| Rocky Mountain Agronomics | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 |
| Clear Lakes Products | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 |
| | | | | | | | | |
| **Other** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Butte Irrigation Inc | | | | | | | | |
| **Total AP Payments to Critical Vendors** | **$ 1,769,100** | **$ 1,769,100** | **$ 842,790** | **$ 769,100** | **$ 1,769,100** | **$ 644,100** | **$ 967,790** | **$ 269,100** |

| **Operating Expenses COD - Schedule for Certain Categories** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **Professional Fees** | **210,000** | **160,000** | **160,000** | **160,000** | **195,000** | **160,000** | **160,000** | **175,000** |
| Johnson May | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Kander LLC | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Eide Bailly LLP | 50,000 | - | - | - | - | - | - | 15,000 |
| Ampleo | - | - | - | - | - | - | - | - |
| Parsons Behle & Latimer | - | - | - | - | - | - | - | - |
| Dentons | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| DIP Lender Professionals | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Professionals (Appraisers, Etc.) | - | - | - | - | 15,000 | - | - | - |
| Givens Pursley | - | - | - | - | 20,000 | - | - | - |
| | | | | | | | | |
| **Loan/Lease Payments** | **314,339** | **119,865** | **102,679** | **37,402** | **319,368** | **119,865** | **102,679** | **37,402** |
| CNH Capital - 222603 | 42,722 | - | - | - | 42,722 | - | - | - |
| CNH Capital - 765512 | 17,170 | - | - | - | 17,170 | - | - | - |
| CNH Capital - 765530 | 21,780 | - | - | - | 21,780 | - | - | - |
| CNH Capital - 765542 | 27,173 | - | - | - | 27,173 | - | - | - |
| CNH Capital - 765552 | 62,665 | - | - | - | 62,665 | - | - | - |
| CNH Capital - 765784 | 68,528 | - | - | - | 68,528 | - | - | - |
| CNH Capital -210982 | 45,400 | - | - | - | 45,400 | - | - | - |
| CNH-Productivity Plus BP 373203 | - | 41,290 | - | - | - | 41,290 | - | - |
| CNH-Productivity Plus MC 373662 | - | 30,928 | - | - | - | 30,928 | - | - |
| Daimler Truck Financial - 3001 | 26,369 | - | - | - | 26,369 | - | - | - |
| Daimler Truck Financial- 84001 | - | 37,557 | - | - | - | 37,557 | - | - |
| Farmers National Bank. | - | - | 98,538 | - | - | - | 98,538 | - |
| John Deere Credit | 2,533 | 10,089 | 4,142 | 4,750 | 7,562 | 10,089 | 4,142 | 4,750 |
| MetLife Agricultural Finance | - | - | - | 32,652 | - | - | - | 32,652 |

**130 Day Cash Flow Budget**

| | Wk14 27-May 2-Jun | Wk15 3-Jun 9-Jun | Wk16 10-Jun 16-Jun | Wk17 17-Jun 23-Jun | Wk18 24-Jun 30-Jun | Wk19 1-Jul 7-Jul | Wk20 8-Jul 14-Jul | Wk21 15-Jul 21-Jul |
|---|---|---|---|---|---|---|---|---|
| **INITIAL PAYMENTS TO CRITICAL VENDORS** | | | | | | | | |
| | | | | | | | | |
| **Feed** | **1,570,800** | **570,800** | **570,800** | **70,800** | **70,800** | **1,570,800** | **70,800** | **70,800** |
| Aden Brook Trading Corp | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 | 33,300 |
| American Calf Products | - | - | - | - | - | - | - | - |
| Carne I Corp. | - | - | - | - | - | - | - | - |
| H&M Custom | 500,000 | - | 500,000 | - | - | - | - | - |
| Land View, Inc-Livestock- Animal Care | - | 500,000 | - | - | - | 500,000 | - | - |
| PerforMix Nutrition Systems | - | - | - | - | - | - | - | - |
| Receptor Food Group | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 | 27,800 |
| Wada Farms | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 | 9,700 |
| Viterra USA Grain, LLC | - | - | - | - | - | - | - | - |
| [Silage Group] | 1,000,000 | - | - | - | - | 1,000,000 | - | - |
| | | | | | | | | |
| **Vet/Med** | **-** | **125,000** | **125,000** | **-** | **125,000** | **125,000** | **-** | **125,000** |
| MWI Veterinary - Black Pine | - | - | - | - | - | - | - | - |
| MWI Veterinary - Milkers | - | - | - | - | - | - | - | - |
| MWI Veterinary - Millenkamp | - | 125,000 | 125,000 | - | 125,000 | 125,000 | - | 125,000 |
| MWI Veterinary Idaho Jersey Girls | - | - | - | - | - | - | - | - |
| | | | | | | | | |
| **Repairs & Maintenance** | **40,000** | **40,000** | **238,690** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** |
| The Dairy Solutions Group | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 |
| Automation Werx, LLC | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 |
| Green Source Automation | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 | 8,300 |
| Progressive Dairy Service and Supplies | - | - | - | - | - | - | - | - |
| Elevation Electric | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 |
| Clear Water Products, LLC | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 |
| Western States Cat | - | - | 198,690 | - | - | - | - | - |
| | | | | | | | | |
| **Chemicals** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** | **33,300** |
| Rocky Mountain Agronomics | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 | 22,200 |
| Clear Lakes Products | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 |
| | | | | | | | | |
| **Other** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Butte Irrigation Inc | - | - | - | - | - | - | - | - |
| **Total AP Payments to Critical Vendors** | **$ 1,644,100** | **$ 769,100** | **$ 967,790** | **$ 144,100** | **$ 269,100** | **$ 1,769,100** | **$ 144,100** | **$ 269,100** |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Operating Expenses COD - Schedule for Certain Cat** | | | | | | | | |
| | | | | | | | | |
| **Professional Fees** | **195,000** | **160,000** | **160,000** | **160,000** | **210,000** | **160,000** | **160,000** | **160,000** |
| Johnson May | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Kander LLC | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Eide Bailly LLP | - | - | - | - | 15,000 | - | - | - |
| Ampleo | - | - | - | - | - | - | - | - |
| Parsons Behle & Latimer | - | - | - | - | - | - | - | - |
| Dentons | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| DIP Lender Professionals | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Professionals (Appraisers, Etc.) | 15,000 | - | - | - | 15,000 | - | - | - |
| Givens Pursley | 20,000 | - | - | - | 20,000 | - | - | - |
| | | | | | | | | |
| **Loan/Lease Payments** | **319,368** | **109,776** | **108,627** | **4,142** | **42,432** | **314,339** | **119,865** | **102,679** |
| CNH Capital - 222603 | 42,722 | - | - | - | - | 42,722 | - | - |
| CNH Capital - 765512 | 17,170 | - | - | - | - | 17,170 | - | - |
| CNH Capital - 765530 | 21,780 | - | - | - | - | 21,780 | - | - |
| CNH Capital - 765542 | 27,173 | - | - | - | - | 27,173 | - | - |
| CNH Capital - 765552 | 62,665 | - | - | - | - | 62,665 | - | - |
| CNH Capital - 765784 | 68,528 | - | - | - | - | 68,528 | - | - |
| CNH Capital -210982 | 45,400 | - | - | - | - | 45,400 | - | - |
| CNH-Productivity Plus BP 373203 | - | 41,290 | - | - | - | - | 41,290 | - |
| CNH-Productivity Plus MC 373662 | - | 30,928 | - | - | - | - | 30,928 | - |
| Daimler Truck Financial - 3001 | 26,369 | - | - | - | - | 26,369 | - | - |
| Daimler Truck Financial- 84001 | - | 37,557 | - | - | - | - | 37,557 | - |
| Farmers National Bank. | - | - | 98,538 | - | - | - | - | 98,538 |
| John Deere Credit | 7,562 | - | 10,089 | 4,142 | 9,779 | 2,533 | 10,089 | 4,142 |
| MetLife Agricultural Finance | - | - | - | - | 32,652 | - | - | - |

|  | Wk22 | Wk23 | Wk24 | TOTAL |
|---|---|---|---|---|
|  | 22-Jul | 29-Jul | 5-Aug | 1-Apr-24 |
|  | 28-Jul | 4-Aug | 11-Aug | 11-Aug-24 |
| **INITIAL PAYMENTS TO CRITICAL VENDORS** | | | | |
| **Feed** | **70,800** | **1,571,400** | **-** | **13,275,000** |
| Aden Brook Trading Corp | 33,300 | 33,900 | - | 600,000 |
| American Calf Products | - | - | - | - |
| Carne I Corp. | - | - | - | - |
| H&M Custom | - | - | - | 4,000,000 |
| Land View, Inc-Livestock- Animal Care | - | 500,000 | - | 3,000,000 |
| PerforMix Nutrition Systems | - | - | - | - |
| Receptor Food Group | 27,800 | 27,400 | - | 500,000 |
| Wada Farms | 9,700 | 10,100 | - | 175,000 |
| Viterra USA Grain, LLC | - | - | - | - |
| [Silage Group] | - | 1,000,000 | - | 5,000,000 |
| **Vet/Med** | **125,000** | **-** | **-** | **1,500,000** |
| MWI Veterinary - Black Pine | - | - | - | - |
| MWI Veterinary - Milkers | - | - | - | - |
| MWI Veterinary - Millenkamp | 125,000 | - | - | 1,500,000 |
| MWI Veterinary Idaho Jersey Girls | - | - | - | - |
| **Repairs & Maintenance** | **40,000** | **40,000** | **-** | **1,316,071** |
| The Dairy Solutions Group | 3,900 | 3,700 | - | 70,000 |
| Automation Werx, LLC | 5,600 | 4,800 | - | 100,000 |
| Green Source Automation | 8,300 | 8,900 | - | 150,000 |
| Progressive Dairy Service and Supplies | - | - | - | - |
| Elevation Electric | 11,100 | 11,300 | - | 200,000 |
| Clear Water Products, LLC | 11,100 | 11,300 | - | 200,000 |
| Western States Cat | - | - | - | 596,071 |
| **Chemicals** | **33,300** | **33,900** | **-** | **600,000** |
| Rocky Mountain Agronomics | 22,200 | 22,600 | - | 400,000 |
| Clear Lakes Products | 11,100 | 11,300 | - | 200,000 |
| **Other** | **-** | **-** | **-** | **-** |
| Butte Irrigation Inc | - | - | - | - |
| **Total AP Payments to Critical Vendors** | **$ 269,100** | **$ 1,645,300** | **$ -** | **$ 16,691,071** |

| **Operating Expenses COD - Schedule for Certain Cat** | | | | |
|---|---|---|---|---|
| **Professional Fees** | **160,000** | **210,000** | **160,000** | **3,275,000** |
| Johnson May | 50,000 | 50,000 | 50,000 | 950,000 |
| Kander LLC | 30,000 | 30,000 | 30,000 | 570,000 |
| Eide Bailly LLP | - | 15,000 | - | 95,000 |
| Ampleo | - | - | - | - |
| Parsons Behle & Latimer | - | - | - | - |
| Dentons | 50,000 | 50,000 | 50,000 | 950,000 |
| DIP Lender Professionals | 30,000 | 30,000 | 30,000 | 570,000 |
| Professionals (Appraisers, Etc.) | - | 15,000 | - | 60,000 |
| Givens Pursley | - | 20,000 | - | 80,000 |
| **Loan/Lease Payments** | **37,402** | **319,368** | **115,947** | **2,747,545** |
| CNH Capital - 222603 | - | 42,722 | - | 213,610 |
| CNH Capital - 765512 | - | 17,170 | - | 85,850 |
| CNH Capital - 765530 | - | 21,780 | - | 108,899 |
| CNH Capital - 765542 | - | 27,173 | - | 135,865 |
| CNH Capital - 765552 | - | 62,665 | - | 313,324 |
| CNH Capital - 765784 | - | 68,528 | - | 342,642 |
| CNH Capital -210982 | - | 45,400 | - | 227,000 |
| CNH-Productivity Plus BP 373203 | - | - | 41,290 | 206,450 |
| CNH-Productivity Plus MC 373662 | - | - | 30,928 | 154,641 |
| Daimler Truck Financial - 3001 | - | 26,369 | - | 131,844 |
| Daimler Truck Financial- 84001 | - | - | 37,557 | 187,787 |
| Farmers National Bank. | - | - | - | 394,151 |
| John Deere Credit | 4,750 | 7,562 | 6,171 | 114,875 |
| MetLife Agricultural Finance | 32,652 | - | - | 130,609 |

## KEY ASSUMPTIONS - CASH RECEIPTS

**Average daily production/hd goes up due to weather**
**Milk prices are based on Glanbia pricing model for Millenkamp components**

|  | March | April | May | June | July |
|---|---|---|---|---|---|
| Avg Milking Hd | 33,915 | 34,065 | 34,215 | 34,365 | 34,365 |
| Avg Milk Price | $20.00 | $20.74 | $21.05 | $22.06 | $22.50 |
| lbs/hd/day | 58.3 | 58.3 | 59.0 | 60.0 | 60.0 |

**Custom Feeding income is based on daily rate, with headcounts remaining consisten**

$/hd/day     $3.70

**Net Cattle Sales Receipts is based on**

|  |  |  | per head |  |
|---|---|---|---|---|
| Weekly Dairy Cull | 90 | at | $925 |
| Weekly Involuntary Cull | 35 | at | $150 |

| Feeders: | 750 hd every two weeks |
|---|---|
|  | 375 hd once a month | per head |
|  | **1,875 Monthy** | $1,035 |
|  | which is: | $2.30 per lb |
|  |  | 450 lbs |

| Fats: | 700 hd over through Aug 11 |
|---|---|
|  |  | per head |
|  |  | $2,590 |
|  | which is: | $1.85 per lb |
|  |  | 1,400 lbs |

| Open Heifers: | 300 hd over through Aug 11 |
|---|---|
|  |  | per head |
|  |  | $800 |
|  | which is: | $0.84 per lb |
|  |  | 950 lbs |

|  | % to Millenkamp | % to Rabo |
|---|---|---|
| **Culls and Open Heifers** | 100% | 0% |
| **Fats and Feeders** | 100% | 0% |

Collection Cycle - eg. sales in Week 6 collected in Week 9 (15-21 days)

## KEY ASSUMPTIONS - CASH RECEIPTS (cont)

**Daily Trucking Income**            $10,000

**Digester Penalty Payments**            in AR, expected to collect before May

| Period | Amount | Collection Date | $/Day |
|--------|--------|-----------------|-------|
| 3/16 - 3/31 | $    240,000 | 15-Apr | $    15,000 |

For April, May, June, July payments, follows the same schedule.
*1st half of month billed on 15th, paid end of month. 2nd Half billed on last day of month, collected 15th*

**AR as of Mar31, 2024**

| | | | |
|--|--|--|--|
| Custom Feeding AR Total | $    3,504,751 | Expected to collect 100% | |
| | $    1,752,375 | by | 14-Apr |
| | $    1,752,375 | by | 5-May |
| Fats & Feeders AR Total | $    518,000 | 100% to Millenkamp | |
| Culls & Open Heifer AR Total | $    784,055 | 100% to Millenkamp | |

## KEY ASSUMPTIONS - CASH DISBURSEMENTS

Initial Payments to Critical Vendors is payment of antecedent debt

        Detail by Vendor on next tab, rows 325+, or page 16-18 of the printed document

Feed Costs are COD with the assumption that Millenkamp has use of the silage pits & haylage

| | | | | Hd | $/hd/day | |
|---|---|---|---|---|---|---|
| **Est Weekly cost of feed is** | | $ | 2,615,734 | based on avg daily costs of: | | |
| | | Average Headcount: Milk Cows | | 33,915 | $7.12 | |
| | | Average Headcount: Dry Cows | | 5,799 | $3.70 | |
| | | Average Headcount: Custom Ranch + Steer | | 46,315 | $1.75 | |
| | | Average Headcount: BP Custom + Heifers | | 16,968 | $1.75 | |
| | | | | Weighted Daily Avg | $3.63 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Less Silage** | daily tons | 450 | at | $104/ton | $ | 327,600 |
| **Less Haylage** | daily tons | 235 | at | $136/ton | $ | 223,720 |

Straw: Need to purchase $400k for 8 weeks. 1/3 is for feed and included in the $2.78M, the other 2/3 is for Bedding

Cattle purchases of $75k/week is based on 375hd of Day Olds/wk at $200/hd

Categories: 'Supplies' through 'Insurance', 'Rent' and 'Other' are straight lined wkly based on historical daily spend

Chemicals, Seed, Custom Farming: Spend starts to ramp up in late April and early May

        *Planting occurs mid May and this budget is assuming a planting of this current crop*

Loan and Lease payments based on payment schedules, as checked against LTD schedule and recent payments

The budget assumes weekly cash disbursements to the following professionals:

| **Professional Fees** | Weekly, during BK Period | | |
|---|---|---|---|
| Johnson May | $ | 50,000 | *Also Includes* |
| Kander LLC | | 30,000 | Eide Bailly LLP |
| Dentons | | 50,000 | Professionals (Appraisers, Etc.) |
| DIP Lender Professionals | | 30,000 | Givens Pursley |
| | $ | 160,000 | |

**DEBT SERVICE**

| | | |
|---|---|---|
| **MetLife** | Int Only | |
| **Conterra** | Int Only | |
| **Rabo** | 0% of Net Sales - Culls and Open Heifers | *applied to Principal* |
| | 0% of Net Sales - Fats and Feeders | *applied to Principal* |
| | Y/N: Y - Additional Cash Payment to be Applied to Interest | |

| **DIP LOAN REQUIRED** | **$  19,300,000** |
|---|---|