Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
       jjm@johnsonmaylaw.com


Krystal Mikkilineni, *PHV pending*
Robert E. Richards, *PHV pending*
Tirzah Roussell, *PHV pending*
DENTONS
215 10th Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
       Robert.richards@dentons.com
       Tirzah.roussell@dentons.com

Attorneys for the Debtors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE, INC., *et al.,*<br><br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-_____<br><br>(Joint Administration Requested) |

---

[1]  The Debtors in the Chapter 11 Cases along with the last four digits of their respective tax identification number or registration number in the applicable jurisdiction are: Millenkamp Cattle, Inc. (26-0603892); Idaho Jersey Girls LLC (46-3084467); East Valley Cattle, LLC (20-3238613); Millenkamp Properties, L.L.C. (26-0604003); Millenkamp Properties II LLC (84-3797719); Millenkamp Family LLC (46-1868279); Goose Ranch, LLC (No EIN); Idaho Jersey Girls Jerome Dairy LLC (81-4713431); Black Pine Cattle LLC (No EIN); and Millenkamp Enterprises LLC (No EIN).  The location of the Debtors' service address for purposes of the Chapter 11 Cases is 471 N 300 W., Jerome, ID 83338.

DECLARATION OF WILLIAM JOHN MILLENKAMP IN SUPPORT OF FIRST DAY MOTIONS –
Page 1

## DECLARATION OF WILLIAM JOHN MILLENKAMP IN SUPPORT OF FIRST DAY MOTIONS

I, William John Millenkamp, hereby state and declare as follows:

1.      I am the duly appointed and authorized Chief Executive Officer of Millenkamp Cattle, Inc.; Black Pine Cattle LLC; East Valley Cattle, LLC; Idaho Jersey Girls Jerome Dairy LLC; Millenkamp Enterprises LLC; Millenkamp Family LLC; Millenkamp Properties, L.L.C.; Millenkamp Properties II LLC; Goose Ranch LLC; and Idaho Jersey Girls, LLC (each, a "Debtor" and collectively, the "Debtors" or "Millenkamp Cattle"). Attached hereto as Exhibit A is an organizational summary chart of the Debtors.

2.      I am also the President of Millenkamp Cattle, Inc., and a Member or Managing Member of Idaho Jersey Girls Jerome Dairy LLC; Black Pine Cattle LLC; Millenkamp Enterprises, LLC; and East Valley Cattle, LLC.

3.      Millenkamp Cattle, Inc. is the sole Member of Idaho Jersey Girls, LLC.

4.      William J. Millenkamp, Susan J. Millenkamp, William J. Millenkamp as Trustee of the SJM 2012 Trust, and Susan J. Millenkamp as Trustee of the WJM 2012 Trust are the Members of Millenkamp Family LLC, sole member of Goose Ranch LLC, Millenkamp Properties, L.L.C. and Millenkamp Properties II LLC.

5.      Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.      The Debtors are ten affiliate entities that collectively, among other things, own and operate a large dairy operation and feedlot where they raise dairy and beef cows.

## GENERAL OVERVIEW

7.      I was raised in the Midwest where the Millenkamp name is well known in the cattle industry. In 1991, as a teenager, I moved to Oregon where I met my wife, Susie, who was also raised in the cattle industry. We eventually moved to Idaho to start our own family cattle business.

8.      In 1996, with just 40 acres in Jerome, 7 calves, and a small operating line of credit, Susie and I began a calf-raising operation.

9.      Since then, our operations have grown into a large vertically integrated agribusiness, comprised of five complementary divisions in which Susie and I, and our four children are all involved.

10.      The calf ranch is operated at our Jerome, Idaho location and is made up of several hundred acres of land where approximately 50,000 calves reside.

11.      In 2006, we started operating a dairy heifer feedlot in Declo, Idaho. At this location we began raising approximately 60,000 head of dairy cattle.

12.      In 2013, we purchased our first dairy, and two years later, we established Idaho Jersey Girls Dairy which at the time consisted of one milk barn, two rotaries and 15,000 head of dairy cattle that are located at our Declo, Idaho facility.

13.      In 2018, we constructed an enclosed commodity barn and began construction of a cattle processing barn.

14.      In 2019, construction began for a second milk barn that was completed in 2020, which added an additional four rotary milking carousels to our operations.

15.      In 2021, we further expanded with construction of a renewable energy methane digester with East Valley Development, LLC which is partnership between BP and CleanEnergy.

16.     As of today, our operations encompass approximately 20,000 acres. We maintain cattle operations in three locations in Jerome, Idaho and main dairy location in Declo, Idaho.  We custom raise day old calves for approximately twenty-five (25) separate dairies and ship milk to not less than two processors.

17.     Our operations employ approximately 513 employees.

18.     The operations are comprised of five main divisions: (1) Idaho Jersey Girls Dairy which is located in Declo, Idaho, (2) a calf ranch which is located in Jerome, Idaho, (3) farming in Jerome, Twin Falls and Cassia Counties, (4) a feedlot located in Jerome & cow-calf operation in Declo, and (5) custom harvest & trucking through the Magic Valley.

19.     We manage approximately 110,000 head of cattle, inclusive of Idaho Jersey Girls Dairy which consists of approximately 37,000 Jersey and Jersey mixed milking cows that produce approximately 2 million pounds of milk daily. The milk is sold primarily to Glanbia and Innovative Food Solutions.  We accomplish this with six rotary milking parlors and by utilizing programmable logic control technology, robotics, and state of the art heat recovery technology.

20.     The Idaho Jersey Girls Dairy is approximately 11,688 acres bordered by the 4,640-acre Moonshine Ranch for a total contiguous land area of approximately 16,328 acres located in Declo, Idaho. The Idaho Jersey Girls Dairy supports approximately 65,000 head of dairy cattle and youngstock, while Moonshine Ranch maintains a 1,000 head Angus calf-cow operation.

21.     The calf ranch operation receives approximately 250 calves per day and is home to approximately 50,000 calves. The calf ranch is approximately 782 acres located in Jerome, Idaho.

22.     Our operations also consist of farming in which we implement responsible crop rotation and nutrient management to support operations.

23.     The feedlots and cow-calf operations are additional revenue streams that increase

the synergy and infrastructure of the farm and adjoining properties. For example, the Jerome Idaho

Feedlots (defined below) consists of 80 acres in Jerome, Idaho and supports 2,500 head of cattle.

24.     We also operate a trucking operation that supports all aspects of our operations. We

harvest all silages used in our operations through our partnership with H & M Custom, LLC, which

provides control of quality and availability for our most critical forage input costs.

## CORPORATE STRUCTURE

25.     As our farming operations grew, it became necessary to set up corporate entities to

deal with various aspects of those operations.

26.     Through ten entities, the Debtors operate as a single enterprise, which includes

common usage of debt and banking facilities.

27.     Millenkamp Cattle, Inc., is the primary entity from which all operations are

directed, the revenues received and the payables disbursed.  Millenkamp Cattle, Inc. is the

operational entity which owns all of the cattle, feed, and equipment used to care for the cattle,

employs the employees, and receives and disburses the majority of the monies.  Millenkamp Cattle,

Inc., does not own any real property.

28.     Idaho Jersey Girls Jerome Dairy, LLC owns 80 acres and a 1,120-animal unit

concentrated animal feeding operation in Jerome, Idaho (the "Jerome Feedlot" or "Millenkamp

Milkers"). The Jerome Feedlot is leased to Millenkamp Cattle, Inc.

29.     Millenkamp Properties, L.L.C. owns 720 acres and a 6,000-animal unit

concentrated animal feeding operation in Jerome Idaho (the "Calf Ranch"),  a 40-acre feed storage

site ("Ridgeway")  and 4,638 acres in Cassia County ("Moonshine Ranch"), and another 80 acres

in Jerome County (the "German Dairy"). These properties are also leased to Millenkamp Cattle, Inc.

30.    Millenkamp Properties II LLC owns 968 acres in Twin Falls County ("Canyonlands") and 278 acres in Jerome County (the "McGregor Property"). The Canyonlands and McGregor Property are also leased to Millenkamp Cattle, Inc.

31.    Goose Ranch LLC owns a 600-acre farm on Snake River below Minidoka Dam in Cassia County (The "Goose Ranch Property"). The Goose Ranch Property is also leased to Millenkamp Cattle, Inc.

32.    East Valley Cattle, LLC owns a 11,668-acre farm and a 51,285-animal unit capacity dairy and feedlot in Cassia County near Declo, Idaho ("East Valley Facilities"). This is also leased to Millenkamp Cattle, Inc.

33.    Millenkamp Cattle, Inc., leases from Mike Thompson a 1200 head feedlot ("Thompson Feedlot") in Jerome, Idaho.

34.    Millenkamp Cattle, Inc., leases approximately 4280 irrigated acres of farm ground ("Cassia Creek") from Eagle Creek Northwest, LLC that is adjacent to the East Valley Facilities in Declo, Idaho.

35.    As stated above, Millenkamp Cattle, Inc. operates all the real property owned or leased by the various Millenkamp entities.  This includes all the farms, Calf Ranch, Idaho Jersey Girls and the East Valley Facilities.

36.    Millenkamp Cattle, Inc. d/b/a Idaho Jersey Girls operates the German Dairy and East Valley Facilities.

37.    Millenkamp Cattle, Inc. d/b/a Black Pine Cattle also provides custom heifer raising services at the East Valley Facilities.

## FINANCIAL OVERVIEW

38.     As of the date of this Declaration, the Debtors' consolidated unaudited financial statement reflected total assets of approximately $643,000,000 ($493 million real property; $150 million personal property) and total liabilities of approximately $339,000,000 (Metlife $181 million; Rabo $92 million; Conterra $19 million; A/P $47 million).

39.     The various Millenkamp entities own certain real property located in Jerome, Twin Falls or Cassia counties.  Those properties were appraised at the request of MetLife in 2022.  Based on those appraisals, the value of the property in 2022 was as follows:

| Property Description | 2022 Appraised Value |
|---|---|
| East Valley Dairy property (Cassia County) | $325,540,000.00 |
| German Dairy property (Jerome County) | $4,250,000.00 |
| Idaho Jersey Girls Jerome Dairy (Jerome Cty) | $2,400,000.00 |
| Canyonlands property (Twin Falls Cty) | $10,000,000.00 |
| Goose Ranch property (Cassia Cty) | $10,265,000.00 |
| McGregor property (Jerome Cty) | $3,869,280.00 |
| Moonshine Ranch (Cassia Cty) | $5,800,000.00 |
| Calf Ranch (Jerome Cty) | $27,000,000.00 |
| TOTAL | $389,124,280.00 |

40.     Based on those appraised values, the passage of time since the appraisals, and additional improvements that have been made to some of the properties, I estimate the property values have increased since 2022, with a total 2024 aggregate property value of approximately $493,000,000.00.

41.     The Debtors have approximately $35,000,000 in total unsecured debt, including disputed, unliquidated or contingent claims.

## CAPITAL STRUCTURE

42.     _Pre-Petition RLOC Credit Agreement._   Under that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended, the "Pre-Petition RLOC Credit Agreement" and collectively with all security, pledge, intercreditor, guaranty

agreements, and other documentation executed in respect thereof, the "Pre-Petition RLOC Documents"), by and among the Debtors, collectively as borrower, the lenders from time to time party thereto (collectively, the "Pre-Petition RLOC Lenders"), and Rabo AgriFinance LLC, as sole lead arranger, agent, and swing-line lender (in its capacity as agent for the benefit of the Pre-Petition RLOC Lenders and each Issuer (as defined in the Pre-Petition RLOC Credit Agreement), the "Rabo" and collectively with the Pre-Petition RLOC Lenders and the Issuers, the "Pre-Petition RLOC Parties" and each, a "Pre-Petition RLOC Party"), the Debtors were provided with an asset-based revolving line of credit facility (the "Pre-Petition RLOC Facility") consisting of (a) revolving commitments in an aggregate amount of up to $91,000,00.00; (b) a swing-line credit facility for Rabo to make Swing Line Advances (as defined in the Pre-Petition RLOC Credit Agreement) in an aggregate amount of up to $7,500,000.00; and (c) a letter-of-credit facility for the issuance of stand-by letters of credit in an aggregate amount of up to $1,000,000.00.

43.    *Pre-Petition RLOC Collateral.*  Pursuant to the terms of the Pre-Petition RLOC Credit Agreement, the Debtors granted to Rabo a security interest to and in substantially all of the Debtors' personal property, excluding their real property, and all other property defined as the "Collateral" in the Pre-Petition RLOC Credit Agreement (referred to herein as the "Pre-Petition RLOC Collateral" and the liens and security interests granted to or for the benefit of the Pre-Petition RLOC Parties therein, the "Pre-Petition RLOC Personal Property Liens").  The Pre-Petition RLOC Collateral includes, among other interests, (each as defined in the Pre-Petition RLOC Credit Agreement): all Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and the Debtors' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Debtors' milk and other dairy products (the "Milk Receivables").  As described below, the Pre-

Petition RLOC Parties' interest in Milk Receivables is subject to the First Intercreditor Agreement (as defined below) entered into between them and MetLife (as defined below). Further, as consideration for Rabo to enter into that certain Forbearance Agreement, made effective as of October 22, 2022, the Debtors granted, among other things, a second priority mortgage on the Pre-Petition MetLife Real Estate Collateral (defined below) to secure the Pre- Petition RLOC Obligations, subject to the Second Intercreditor Agreement (defined below). Accordingly, on October 20, 2022, the Debtors executed and delivered that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (Second Priority), in favor of Rabo, to secure any and all obligations owed to the Pre-Petition RLOC Parties (the "Pre-Petition RLOC Second Mortgage" and together with the Pre-Petition RLOC Personal Property Liens, the "Pre-Petition RLOC Liens").

44.    *Pre-Petition MetLife Loans*. Metropolitan Life Insurance Company ("MLIC") and MetLife Real Estate Lending LLC (collectively, "MetLife") are the owners and holders of certain commercial real estate loans (collectively, the "Pre-Petition MetLife Loans" and, together with all related mortgages and other existing or future documents evidencing, securing, or executed in connection with the Pre-Petition MetLife Loans, in each case, as amended, referred to herein as the "Pre-Petition MetLife Loan Documents") made by MetLife to the MetLife Borrowers.[2] The Pre-Petition MetLife Loans are secured by liens in and security interests on the MetLife Borrowers' real property and certain of the MetLife Borrowers' personal property, including: (x) crops grown after a foreclosure; (y) all wells, underground pipelines, sprinklers, and similar irrigation equipment located at the real property, as well as all lines, valve openers, pipes, and

---

[2]    The "MetLife Borrowers" are, collectively, Debtor Millenkamp Cattle, Inc., Debtor East Valley Cattle, LLC, Debtor Idaho Jersey Girls LLC, Debtor Idaho Jersey Girls Jerome Dairy, LLC, Debtor Goose Ranch LLC, Debtor Millenkamp Family LLC, Debtor Millenkamp Properties, L.L.C., and Debtor Millenkamp Properties II, LLC.

similar items pertaining to such irrigation equipment; and (z) all milking equipment located at the real property (the "Pre-Petition MetLife Real Estate Collateral"). The Pre-Petition MetLife Loans are further secured, subject to the First Intercreditor Agreement (defined below), by the Milk Receivables (the "MetLife Milk Priority Claim," and collectively with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition MetLife Collateral" and all liens and security interests on and in the Pre-Petition MetLife Collateral, the "Pre-Petition MetLife Liens").

45.    *MetLife Intercreditor Agreements.*  Rabo and MetLife are parties to (i) that certain Intercreditor Agreement, dated as of September 18, 2018, (as Amended, the "First Intercreditor Agreement") and (ii) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022 (as Amended, the "Second Intercreditor Agreement" and, together with the First Intercreditor Agreement, the "MetLife Intercreditor Agreements").  Pursuant to the First Intercreditor Agreement, Rabo agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition MetLife Collateral to those of MetLife, and MetLife agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition RLOC Collateral (other than any such property that may also constitute Pre-Petition MetLife Collateral) to those of Rabo.  Additionally, the First Intercreditor Agreement recognizes that Rabo and MetLife have separately entered into Milk Check Assignment Agreements (the "Milk Agreements") with Debtor Millenkamp Cattle, Inc. and a milk purchaser, Glanbia Foods, Inc. ("Milk Purchaser").

46.    On September 18, 2018, Rabo, Millenkamp Cattle, Inc. and the Milk Purchaser also entered into a Collateral Assignment of Milk Contracts, pursuant to which Millenkamp Cattle, Inc. assigned to Rabo all contracts and proceeds related to certain purchase agreements between Millenkamp Cattle, Inc. and the Milk Purchaser, to secure the obligations owed to the Pre-Petition RLOC Parties.

47.     *Pre-Petition Conterra Loans.*  Conterra Agricultural Capital, LLC ("Conterra" and,

collectively with the Pre-Petition RLOC Parties and MetLife, the "Pre-Petition Secured Parties")

and certain of the Debtors are parties to certain loan and security agreements (collectively, the

"Pre-Petition Conterra Documents") pursuant to which, among other things, Conterra agreed to

make certain loans and financial accommodations (i) in a principal amount of $16,500,000 (the

"Pre-Petition Conterra Mezzanine Loan") and (ii) in a principal amount of $2,549,750 (the "Pre-

Petition Conterra Mortgage Note" and together with the Pre-Petition Conterra Mezzanine Loan

and all obligations under the Pre-Petition Conterra Documents, the "Pre-Petition Conterra

Obligations" and, together with the Pre-Petition RLOC Obligations and the Pre-Petition MetLife

Obligations, the "Pre-Petition Secured Obligations").  The Pre-Petition Conterra Mezzanine Loan

is secured by second priority liens and security interests in the Pre- Petition RLOC Collateral and

third priority mortgage on the Pre-Petition MetLife Real Estate Collateral (the "Pre-Petition

Conterra Mezzanine Liens").  The Conterra Mortgage Note is secured by a first priority mortgage

on certain real property owned by certain of the Debtors known as "German Dairy" located at 162

West 400 North, Jerome, Idaho 83338 (the "Pre-Petition Conterra Real Estate Collateral" and

together with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition Real Estate

Collateral" and collectively with the Pre-Petition RLOC Collateral and the Pre-Petition MetLife

Collateral, the "Pre-Petition Collateral") and located in Jerome County, Idaho (the "Pre-Petition

Conterra Real Estate Lien" and, together with the Pre-Petition Conterra Mezzanine Liens, the "Pre-

Petition Conterra Liens" and collectively with the Pre-Petition RLOC Liens and the Pre-Petition

MetLife Liens, the "Pre-Petition Liens").

48.     *Conterra Intercreditor Agreement.* The Pre-Petition Conterra Liens are subject to

(i) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022, by and

between MetLife and Conterra (as Amended, the "Conterra-MetLife Intercreditor Agreement")
and (ii) that certain Intercreditor and Subordination Agreement, dated as of October 20, 2022, by
and between Rabo and Conterra (as Amended, the "Conterra-RLOC Intercreditor Agreement" and
together with the MetLife Intercreditor Agreements, the "Intercreditor Agreements" and together
with the Pre-Petition RLOC Documents, the Pre-Petition MetLife Loan Documents, and the Pre-
Petition Conterra Documents, the "Pre-Petition Loan Documents") [3].

## EVENTS LEADING UP TO BANKRUPTCY

49.     In 2019, Millenkamp Cattle began constructing a $250 million dairy expansion to
add four new state of the art rotary parlors and an enclosed cross ventilation barn to double milking
capacity of the current dairy facility.  The project was to be funded through Millenkamp Cattle's
two lenders, Rabo, who would provide the short-term operating revolving line of credit and
MetLife, who would provide the long-term lending secured by the farm ground and dairy facilities.
Construction of the new project began in 2019 and ran unimpeded during the COVID pandemic
through its completion in 2021.

50.     The deal between Millenkamp Cattle, Rabo and MetLife was to complete the
construction project, reappraise the property after its completion and use the large equity cushion
Millenkamp Cattle maintained in the real property to pay down the Rabo revolving line of credit
("RLOC").  On approximately eleven separate occasions over the past twenty years, MetLife in
its ordinary course of business, has refinanced Millenkamp Cattle's long-term real property debt
to restructure its overall business financing.  During this time, Rabo changed Millenkamp Cattle's
borrowing base margin from $0 to $10 million.  This created a huge hurdle considering

---

[3]     The description of any of the Pre-Petition Loan Documents in this Declaration is intended as a summary only,
and to the extent that there is any conflict in they summary and the applicable Pre-Petition Loan Document, the
applicable Pre-Petition Loan Document controls.

Millenkamp Cattle was in final phases of construction. The increase in $10 million to the borrowing base was directly in contravention of Rabo lending standards to Millenkamp Cattle's peers. This resulted in the undervaluing of Millenkamp Cattle's steers in excess of $7 million.

51.    During the end of the construction project in August of 2021, Millenkamp Cattle was left with a Hobson's Choice, trigger a default under the Rabo loan because the borrowing base would drop below the new $10 million margin or trigger a default under the MetLife loan covenants by allowing a construction lien to encumber the real property. Millenkamp Cattle, upon the verbal approval of Rabo's local agent, Charles Hopkins, used monies from its RLOC to bond a construction lien placed on the real property, as having clear title was a prerequisite for the new MetLife loan. MetLife and Rabo were both aware of the course of action.

52.    In 2022, MetLife commissioned appraisals of the Millenkamp Cattle properties to ensure the future loans would be within MetLife's usual 60/40 debt to equity ratios. The 2022 appraisals of the Millenkamp Cattle real properties determined MetLife had approximately $393 million in appraised real property collateral while it maintained approximately $190 million in debt. The appraisals at the time did not take into account the value of the $107 million manure separation facility that had commenced construction and was to be paid for by East Valley Development, LLC, a joint venture between Clean Energy and BP to construct a renewable methane digester facility on the Millenkamp Cattle property.

53.    In June of 2022, the Rabo RLOC loan matured, and Rabo issued a notice of default. To cure the default, Millenkamp Cattle and Rabo entered into a forbearance agreement. Millenkamp Cattle, with the consent of MetLife through an intercreditor agreement with Rabo, provided Rabo a second position mortgage upon the real property. Additionally, Conterra

provided $16.5 million of mezzanine money to bridge into the MetLife refinance and to satisfy Rabo's borrowing base margin requirements.

54.     In February of 2023, Rabo issued another notice of default to Millenkamp Cattle because the borrowing base dropped under the $10 million borrowing base loan covenant.  During this time, Rabo was always paid the monthly interest it was due and MetLife continued to receive its principal and interest payments, even though the dairy industry was experiencing historically low milk prices and historically high feed prices.  Millenkamp Cattle was able to successfully sustain its revenues during these challenging times because of a consistent milk hedging strategy and other sectors of Millenkamp Cattle's business, such as custom calf raising, fat and feeder cattle raising, farming and trucking, generated additional revenues.  These revenues ensured Rabo and MetLife were paid.

55.     In May and June of 2023, Millenkamp Cattle received term sheets from two banks to refinance its existing revolving line of credit with Rabo.  Both term sheets were conditioned upon MetLife providing approximately $45 million in additional financing to pay off $16.5 million in mezzanine debt and decrease the outstanding RLOC balance.  Although a traditional 60/40 debt to equity ratio on approximately $500 million of appraised real property would have enabled Millenkamp Cattle to borrow over $100 million from MetLife, Millenkamp Cattle sought only $45 million.  This would have resulted in an extremely conservative loan to debt ratio for MetLife.

56.     On June 9, 2023, after the completion of a major construction expansion, MetLife, inconsistent with its past practices of lending monies to Millenkamp Cattle, refused to provide any further funding to Millenkamp Cattle to ensure a refinance of its short-term lending RLOC.  Therefore, due to MetLife refusing to fund the $45 million that they had previously committed to Rabo issued a Notice of Default in July 2023.  During this time, the dairy industry was

experiencing its worst financial crisis in the past twenty years and the banking environment had shut down lending on not only real property, but also RLOCs from the dairy industry's largest lenders.

57.    In August of 2023, Rabo began sweeping steer and cull cow proceeds and has continually done so to the present date.  Since August of 2023 Rabo has swept over $25 million and has failed to revolve the money back in the ordinary course to ensure cattle are fed, approximately 513 employees are paid, and accounts payable are maintained on customary terms. Rabo swept funds and added them to principal, default interest and excessive attorney and financial advisor fees.

58.    The inability of Millenkamp Cattle to use the swept steer and cull cow proceeds, slowly starved Millenkamp Cattle of the working capital it needed to keep vendors paid on a timely basis.  This was a deliberate action of Rabo to squeeze Millenkamp Cattle and its vendors out of working capital and eventually force the Chapter 11 filings.  Rabo knew the milk checks and custom calf raising funds were not enough to cover the amounts swept and would leave Millenkamp Cattle with a monthly shortfall.

59.    While Rabo continued to squeeze Millenkamp Cattle of its working capital, it collected not only its interest, but also its default interest and attorneys' fees.  Had Rabo simply revolved the monies that Millenkamp Cattle generated from its steers and cull cows, Millenkamp Cattle would have been able to pay all its bills in its ordinary course of business.  Rabo's loan has been one of, if not their single best, returning loans from not only a yield perspective, but also security.  Similarly, MetLife has continually received its monthly interest and principal without fail.  Except for 2023, Millenkamp Cattle has been profitable for the past 27 years and would have

been profitable in 2023 had it had not been forced to pay over $15 million in default interest, attorneys fees, financial advisor fees and lost opportunity costs.

60.     On January 22, 2024, Rabo filed its Verified Petition For Appointment of Receiver in the Fifth Judicial District of State of Idaho, County of Ada.  After extensive negotiations, on February 16, 2024, Millenkamp Cattle and Rabo entered into an Order Appointing Receiver.  The order provided that Millenkamp Cattle had the exclusive right to file a Chapter 11 bankruptcy petition during the first 60 days of the effective date of the order and that Millenkamp Cattle would continue to manage the operations like it has done historically.

61.     The Receiver created a feeding frenzy among Millenkamp Cattle's vendors by making promises to vendors on payments it could not keep.  For example, Rabo and the Receiver promised millions of dollars in letters of credit to vendors, but failed to honor those promises and instead blamed each other when the promises were not fulfilled. The Receiver continually stirred the pot to create a run by vendors in an attempt to skirt the aforementioned time frames and force an immediate Chapter 11 filing by the Receiver.

62.     The Receivership milked the Millenkamp Cattle estates of nearly $2 million with absolutely no benefit.  Baseless allegations of the Receiver, in violation of its fiduciary duty to the Millenkamp Cattle estates, hauled Millenkamp Cattle into court on three separate occasions.  The Receiver's goal was to quickly sell an $800M company under an expedited 363 sale without regard to the hundreds of millions of dollars of equity that Millenkamp built over the past twenty-seven years.

63.     The issues that led these Chapter 11 Cases were not based on the operations or financial issues of the Debtors; rather, these issues were brought on by the lending institutions which refused to work cooperatively with each other and the Debtors.

## CASH COLLATERAL AND DIP FINANCING

64.     It is essential to the continued operation of the Debtors that they obtain authority to use cash collateral to fund payroll and other operating needs, including the costs of administration of these Chapter 11 Cases.  Currently, the Debtors' free cash is manifesting insufficient for operating until postpetition receivables have been generated, and the prepetition accounts on which the Debtors would ordinarily rely upon to fund operations consist of the Secured Lenders' cash collateral.

65.     The Debtors have insufficient funds to operate unless they use cash collateral, as they hold no unencumbered funds and do not have sources of unencumbered funds, and the present circumstances require the Debtors to make use of cash collateral in order to maintain their ongoing business for the benefit of their estates and creditors.  The Debtors have an immediate need to use cash collateral to maintain, preserve and protect their assets.

66.     The Debtors' continued operations are dependent on using the Debtors' milk receivables (the "Milk Receivables") and receivables from the sale of cattle (among other things). Prior to the bankruptcy cases being filed, the Debtors operated under the supervision of a Receiver appointed in Idaho state court.  Despite the clear need for the milk and cattle proceeds, Rabo insisted on seizing all milk and cattle proceeds and "revolving" those funds to the Receiver as "protective advances."  This created a largely unworkable situation where the Debtors remained dependent on Rabo's continued willingness to revolve the milk proceeds (the cattle proceeds were not always revolved to the Receiver).  Further, pursuant to the Collateral Assignment of Milk Contracts and Milk Agreements, Debtors' milk purchaser provided Milk Receivables to Rabo on April 1, 2024.  As of the date of filing this Declaration, Rabo has refused to release the Milk

Receivables to the Debtors or Receiver absent an interim order approving the Debtors' use of Cash Collateral.

67.     The Milk Receivables are imperative to the continuance of the Debtors' business operations this week.  The Debtor also needs to pay certain feed and other suppliers on a COD basis to continue receiving necessary items to keep cattle fed.  Further, without the milk receivables, the Debtors will be unable to fund payroll due on Friday, April 5, 2024, and they risk losing employees necessary to continue operations (including continued care of the cattle).

68.     The Debtors also have immediate need for access to debtor-in-possession financing. In anticipation of the commencement of the Chapter 11 Cases, the Debtors have reached out to their secured lenders and other potential lenders seeking debtor-in-possession financing ("DIP Financing").

69.     The Debtors have substantial trade payables, many classified as critical vendors, consistent with the operations of a large organization that receives substantial trade support in the form of traditional credit terms.  While the length of terms has begun to shorten as the trade balances grow, the Debtors will have access to normal or near normal unsecured credit terms provided the Debtors have access to substantial liquidity in the form of post-petition term loan financing.

70.     The Debtors need DIP Financing to maintain liquidity to finance their operations during the reorganization process. It is vital for the Debtors to have liquidity to feed the Debtors' cattle, to pay employees and suppliers, to pay rent and insurance premiums, and to hire and pay professionals. DIP Financing will also comfort the Debtors' vendors who are aprehensive about the Debtors filing for bankruptcy.

71.     DIP Financing will further allow the Debtors to focus on reorganizing their affairs, operating the business and negotiating a plan of reorganization with their creditors and other parties in interest.

72.     The Debtors have solicited DIP financing proposals and received three DIP Financing proposals.  All three DIP financing proposals received required a priming lien under Setion 364(d).  The Debtors solicited but did not receive a DIP Financing proposal from MetLife. The Debtors have executed a term sheet with Sandton Capital Partners LP ("DIP Lender") for approximately $35 million in debtor-in-possession financing (the "DIP Facility").  The DIP Lender's proposal is superior in multiple respects to the other proposals received, including, without limitation, duration, availability, overall cost, other terms and covenants and openness to converting some or all of the DIP Financing into an exit facility.  I believe and therefore assert that the negotiations with all DIP financing proposal parties were conducted in good faith and at arm's length.

73.      In light of the circumstances, based on the Debtors' projections, I believe the proposed DIP Facility will provide the Debtors' additional liquidity to pay expenses necessary to sustain their operations and further fund payments contemplated by the Debtors' First Day Motions.

**FIRST DAY PLEADINGS**

74.     I have reviewed each of the First Day Motions, Proposed Orders, and Exhibits thereto, (or have otherwise had their contents explained to me), and the facts set forth therein and true and correct to the best of my knowledge, information and belief.

75.     Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enabling the Debtors to make the transition to, and effectively administer these Chapter 11

cases with minimum disruption to their business operations or loss of value; (b) constitutes a critical amount of the Debtors' ability to successfully maximize value for the benefit of their estates; and (c) will permit the Debtors to expediently and efficiently proceed through their Chapter 11 cases, which would benefit all stakeholders.

I declare under penalty of perjury, under the laws of the State of Idaho and the laws of the United States, that the foregoing is true and correct and is executed this 2nd day of April, 2024.

William John Millenkamp

1978761_19



# BILL & SUSIE MILLENKAMP
## ENTITY OWNERSHIP
*As of July 31, 2022*

**IDAHO JERSEY GIRLS JEROME DAIRY LLC**
*FORMED 05/05/16*

**MILLENKAMP ENTERPRISES LLC**[6]
*FORMED 02/27/15*

**KANS LLC**[8]
SOLE PURPOSE IS TO PROVIDE CATTLE TO PROCESSING PLANT
*JOINED 11/24/20*

**BLACK PINE CATTLE LLC**[6]
*FORMED 01/05/12*

23%

**MILLENKAMP CATTLE, INC.**
OPERATES 720 ACRE JEROME, IDAHO FARM AND 6,000 ANIMAL UNIT CALF RANCH FACILITIES, RIDGEWAY SITE
OPERATES FARM AND FEED LOT AT EAST VALLEY FACILITIES, MCGREGOR PROPERTY, GOOSE RANCH PROPERTY, AND JEROME FEEDLOT
*FORMED 07/25/2007*

**EAST VALLEY DEVELOPMENT LLC**
5% DIGESTER REVENUE SHARE ONLY

**Bill**[1] (13.92%)

**Susie**[2] (13.42%)

**WJM 2012 Trust**[4] (36.08%)

**SJM 2012 Trust** (36.58%)

100%

50%

**MILLENKAMP FAMILY LLC**
*FORMED 12/26/12*

**H&M CUSTOM, LLC**[5]
CROP HARVESTING PARTNERSHIP
*FORMED 5/30/2014*

**MILLENKAMP CATTLE, INC. D/B/A IDAHO JERSEY GIRLS**
OPERATES GERMAN DAIRY AND EAST VALLEY DAIRY
*FORMED 08/07/2014*

**MILLENKAMP CATTLE, INC. D/B/A BLACK PINE CATTLE**
PROVIDES CUSTOM HEIFER RAISING SERVICES AT EAST VALLEY FACILITIES
*FORMED 01/11/2012*

100%

100%

100%

**MILLENKAMP PROPERTIES II LLC**
OWNS 968 ACRES IN TWIN FALLS COUNTY (CANYONLANDS[7]) AND 278 ACRES IN JEROME COUNTY (MCGREGOR)
*FORMED 07/05/2018*

**MILLENKAMP PROPERTIES, L.L.C.**
OWNS 720 ACRE AND 6,000 ANIMAL UNIT CAFO JEROME, IDAHO, FARM AND CALF RANCH FACILITIES, 40 ACRE RIDGEWAY SITE, 4638 ACRE MOONSHINE RANCH IN CASSIA COUNTY, AND 80 ACRE GERMAN DAIRY IN JEROME COUNTY
*FORMED 07/25/2007*

**GOOSE RANCH LLC**
OWNS 600 ACRE FARM ON SNAKE RIVER BELOW MINIDOKA DAM (CASSIA COUNTY). LEASED TO MILLENKAMP CATTLE, INC.
*FORMED 12/26/2012*

**JEROME FEEDLOT**
80 ACRES, 1,120 ANIMAL UNIT CAFO IN JEROME, IDAHO. LEASED TO MILLENKAMP CATTLE, INC.

100%

**EAST VALLEY CATTLE, LLC**[3] OWNS 11,300 ACRE FARM AND 51,285 ANIMAL UNIT CAPACITY DAIRY/FEED LOT IN CASSIA COUNTY NEAR DECLO, IDAHO (EAST VALLEY FACILITIES). LEASED TO IDAHO JERSEY GIRLS/MILLENKAMP CATTLE, INC.
*FORMED 08/04/2005*

**RAFT RIVER RECHARGE GROUP LLC**
EVC HOLDS A 16⅔% MEMBERSHIP INTEREST
*FORMED 05/18/2015*

EXHIBIT A

[1] Owned by Bill as separate property pursuant to Separate Property Agreement dated effective December 31, 2012. The Millenkamp Family LLC Operating Agreement shows that Bill owns 50% of the company.  However, the Unanimous Consent of Managers dated effective 12/31/2012 consented to the transfer of 38.54% of the company to The WJM 2012 Trust, all of which was Bill's separate property.
[2] Owned by Susie as separate property pursuant to Separate Property Agreement dated effective December 31, 2012. The Millenkamp Family LLC Operating Agreement shows that Susie owns 50% of the company.  However, the Unanimous Consent of Managers dated effective 12/31/2012 consented to the transfer of 39.07% of the company to The SJM 2012 Trust, all of which was Susie's separate property.
[3] Currently owned by Bill. Anticipated that ownership will be transitioned to Millenkamp Family LLC at some point.
[4] The WJM 2012 Trust now owns Farm Bureau Life Insurance Company Policy # 040 01208595 (i.e., Bill's life insurance policy).
[5] Millenkamp Cattle, Inc. owns a 50% membership interest in H&M Custom, LLC, with the other 50% membership interest owned by Heuttig Custom, LLC (Brian Heuttig) of Hazelton, Idaho.
[6] Shell entity created to enter into new ventures. No activity at this time.
[7] Canyonlands Properties are comprised of various 2018 acquisitions from Toolson (a/k/a Paulson Subdivision), Baggett, Quality Truss, Kelley's Orchard, Beaudet, Eagle Creek Northwest (a/k/a UBS) and J & C Custom.
[8] Millenkamp Cattle, Inc. holds a 23% minority interest, Psoas LLC owns other 77% interest. Sole purpose of the LLC is to provide cattle to AgriBeef processing plant.

gf13hd01vw