CASSIA COUNTY
RECORDED FOR:
TITLEONE - BURLEY
04:19:06 PM 10-01-2018
**2018-003847**
NO. PAGES: 60    FEE: $105.00
JOSEPH W. LARSEN
COUNTY CLERK
DEPUTY: CVELASQUEZ
Electronically Recorded by Simplifile

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:
Metropolitan Life Insurance Company
c/o MetLife Investment Advisors, LLC
10801 Mastin Blvd., Suite 930
Overland Park, KS 66210

ELECTRONICALLY RECORDED
STAMPED FIRST PAGE NOW
INCORPORATED AS PART OF
THE ORIGINAL DOCUMENT.

18311603

## INTERCREDITOR AGREEMENT

This Intercreditor Agreement (this "**Agreement**") dated effective as of September 18, 2018, is made by and among RABO AGRIFINANCE LLC, formerly known as Rabo Agrifinance, Inc., a Delaware limited liability company, in its capacity as agent for the benefit of certain lenders and other secured parties ("**RAF**"), and METLIFE REAL ESTATE LENDING LLC, a Delaware limited liability company ("**MetLife**").

### RECITALS

A.    MetLife is making or has made certain loans to WILLIAM JOHN MILLENKAMP a/k/a Bill Millenkamp, SUSAN JO MILLENKAMP a/k/a Susie Millenkamp, EAST VALLEY CATTLE, LLC, an Idaho limited liability company ("**East Valley**"), MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), MILLENKAMP FAMILY LLC, an Idaho limited liability company ("**Millenkamp Family**"), IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company ("**Idaho Jersey**"), GOOSE RANCH LLC, an Idaho limited liability company, and MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company (individually and collectively, the "**MetLife Borrower**"), in the original aggregate principal amount of up to One Hundred Sixty-Five Million Four Hundred Thousand and 00/100 Dollars ($165,400,000.00) (the "**MetLife Loans**"), which will be evidenced by (i) that certain Promissory Note A made by the MetLife Borrower to the order of MetLife in the original principal amount of One Hundred Six Million and 00/100 Dollars ($106,000,000.00) dated as of even date herewith, and (ii) that certain Promissory Note B made by the MetLife Borrower to the order of MetLife in the original principal amount of up to Fifty-Nine Million Four Hundred Thousand and 00/100 Dollars ($59,400,000.00) dated as of even date herewith (together, the "**MetLife Notes**") dated of even date herewith and which will be secured, in part, by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing from certain of the MetLife Borrowers for the benefit of MetLife, dated of even date herewith (the "**MetLife Mortgage**"), which will create a lien upon certain real property owned by the certain of the MetLife Borrowers and located in Cassia and Jerome Counties, Idaho, as further described on Exhibit A attached hereto and incorporated herein by this reference, and the buildings, structures and related improvements (including fixtures) and equipment (including livestock equipment, dairy equipment and irrigation equipment located thereon (herein, collectively, the "**Real Property**"), and certain personal property, including without limitation an assignment of certain milk proceeds of certain of the MetLife Borrowers, forming a part of the MetLife Priority Personal Property Collateral (as such term is defined below).

B.    Pursuant to that certain Second Amended and Restated Loan and Security dated as of September 18, 2018, RAF, together with certain others lenders and secured parties identified therein, has agreed to extend loans and certain other financial accommodations to MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho

1

**EXHIBIT 16**

ELECTRONICALLY RECORDED
STAMPED FIRST PAGE NOW
INCORPORATED AS PART OF
THE ORIGINAL DOCUMENT.

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:
Metropolitan Life Insurance Company
c/o MetLife Investment Advisors, LLC
10801 Mastin Blvd., Suite 930
Overland Park, KS 66210

**Instrument # 2184033**
JEROME COUNTY, JEROME, IDAHO
10-01-2018   04:04:37 PM   No. of Pages: 60
Recorded for: TITLEONE - BURLEY
MICHELLE EMERSON   Fee: $187.00
Ex-Officio Recorder Deputy: jw
Electronically Recorded by Simplifile

18311603

## INTERCREDITOR AGREEMENT

This Intercreditor Agreement (this "**Agreement**") dated effective as of September 18, 2018, is made by and among RABO AGRIFINANCE LLC, formerly known as Rabo Agrifinance, Inc., a Delaware limited liability company, in its capacity as agent for the benefit of certain lenders and other secured parties ("**RAF**"), and METLIFE REAL ESTATE LENDING LLC, a Delaware limited liability company ("**MetLife**").

### RECITALS

A. MetLife is making or has made certain loans to WILLIAM JOHN MILLENKAMP a/k/a Bill Millenkamp, SUSAN JO MILLENKAMP a/k/a Susie Millenkamp, EAST VALLEY CATTLE, LLC, an Idaho limited liability company ("**East Valley**"), MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), MILLENKAMP FAMILY LLC, an Idaho limited liability company ("**Millenkamp Family**"), IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company ("**Idaho Jersey**"), GOOSE RANCH LLC, an Idaho limited liability company, and MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company (individually and collectively, the "**MetLife Borrower**"), in the original aggregate principal amount of up to One Hundred Sixty-Five Million Four Hundred Thousand and 00/100 Dollars ($165,400,000.00) (the "**MetLife Loans**"), which will be evidenced by (i) that certain Promissory Note A made by the MetLife Borrower to the order of MetLife in the original principal amount of One Hundred Six Million and 00/100 Dollars ($106,000,000.00) dated as of even date herewith, and (ii) that certain Promissory Note B made by the MetLife Borrower to the order of MetLife in the original principal amount of up to Fifty-Nine Million Four Hundred Thousand and 00/100 Dollars ($59,400,000.00) dated as of even date herewith (together, the "**MetLife Notes**") dated of even date herewith and which will be secured, in part, by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing from certain of the MetLife Borrowers for the benefit of MetLife, dated of even date herewith (the "**MetLife Mortgage**"), which will create a lien upon certain real property owned by the certain of the MetLife Borrowers and located in Cassia and Jerome Counties, Idaho, as further described on Exhibit A attached hereto and incorporated herein by this reference, and the buildings, structures and related improvements (including fixtures) and equipment (including livestock equipment, dairy equipment and irrigation equipment located thereon (herein, collectively, the "**Real Property**"), and certain personal property, including without limitation an assignment of certain milk proceeds of certain of the MetLife Borrowers, forming a part of the MetLife Priority Personal Property Collateral (as such term is defined below).

B. Pursuant to that certain Second Amended and Restated Loan and Security dated as of September 18, 2018, RAF, together with certain others lenders and secured parties identified therein, has agreed to extend loans and certain other financial accommodations to MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho

1

97966865.2 0053564-00330

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:
Metropolitan Life Insurance Company
c/o MetLife Investment Advisors, LLC
10801 Mastin Blvd., Suite 930
Overland Park, KS 66210

18311603

## INTERCREDITOR AGREEMENT

This Intercreditor Agreement (this "**Agreement**") dated effective as of September 18, 2018, is made by and among RABO AGRIFINANCE LLC, formerly known as Rabo Agrifinance, Inc., a Delaware limited liability company, in its capacity as agent for the benefit of certain lenders and other secured parties ("**RAF**"), and METLIFE REAL ESTATE LENDING LLC, a Delaware limited liability company ("**MetLife**").

RECITALS

A. MetLife is making or has made certain loans to WILLIAM JOHN MILLENKAMP a/k/a Bill Millenkamp, SUSAN JO MILLENKAMP a/k/a Susie Millenkamp, EAST VALLEY CATTLE, LLC, an Idaho limited liability company ("**East Valley**"), MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), MILLENKAMP FAMILY LLC, an Idaho limited liability company ("**Millenkamp Family**"), IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company ("**Idaho Jersey**"), GOOSE RANCH LLC, an Idaho limited liability company, and MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company (individually and collectively, the "**MetLife Borrower**"), in the original aggregate principal amount of up to One Hundred Sixty-Five Million Four Hundred Thousand and 00/100 Dollars ($165,400,000.00) (the "**MetLife Loans**"), which will be evidenced by (i) that certain Promissory Note A made by the MetLife Borrower to the order of MetLife in the original principal amount of One Hundred Six Million and 00/100 Dollars ($106,000,000.00) dated as of even date herewith, and (ii) that certain Promissory Note B made by the MetLife Borrower to the order of MetLife in the original principal amount of up to Fifty-Nine Million Four Hundred Thousand and 00/100 Dollars ($59,400,000.00) dated as of even date herewith (together, the "**MetLife Notes**") dated of even date herewith and which will be secured, in part, by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing from certain of the MetLife Borrowers for the benefit of MetLife, dated of even date herewith (the "**MetLife Mortgage**"), which will create a lien upon certain real property owned by the certain of the MetLife Borrowers and located in Cassia and Jerome Counties, Idaho, as further described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference, and the buildings, structures and related improvements (including fixtures) and equipment (including livestock equipment, dairy equipment and irrigation equipment located thereon (herein, collectively, the "**Real Property**"), and certain personal property, including without limitation an assignment of certain milk proceeds of certain of the MetLife Borrowers, forming a part of the MetLife Priority Personal Property Collateral (as such term is defined below).

B. Pursuant to that certain Second Amended and Restated Loan and Security dated as of September 18, 2018, RAF, together with certain others lenders and secured parties identified therein, has agreed to extend loans and certain other financial accommodations to MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho

1

limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST, WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST, WILLIAM JOHN MILLENKAMP, and SUSAN JO MILLENKAMP (collectively, the "**Borrower**", whether as a borrower or as a guarantor of said loans) to finance its dairy and farming operations and general working capital, including, without limitation, the production of milk, raising of livestock and the growing of crops, all subject to the terms and conditions set forth therein.

C.  The Borrower's dairy and farming operations are located primarily on the Real Property.

D.  RAF's credit accommodations to the Borrower are secured, without limitation, by a security interest in the following described property now owned or hereafter acquired by the Borrower, each as defined in the Idaho Uniform Commercial Code as applicable (collectively, the "**RAF Collateral**"):

(i) Accounts (including, without limitation, Milk Receivables and brokerage accounts), contract rights, commodity accounts, hedging accounts, documents, documents of title, payment intangibles, investment property, chattel paper, and instruments;

(ii) Deposit accounts;

(iii) Inventory and goods;

(iv) Instruments, letter of credit rights, documents, warehouse receipts, bills of lading, documents of title, commodity contracts, chattel paper, electronic chattel paper, tangible chattel paper, and securities accounts;

(v) Equipment consisting of farm machinery and Rolling Stock, but excluding fixtures and equipment constituting MetLife Priority Personal Property Collateral;

(vi) Commercial tort claims (specifically described as those Commercial Tort Claims which are proceeds of any of the other RAF Collateral);

(vii) Farm products, including, without limitation, crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in Borrower's dairy and farming operations, and products of crops and livestock in their unmanufactured state;

(viii) General intangibles, including, without limitation, to all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Borrower has any right or interest, whether by ownership, license, contract or otherwise;

(ix) All proceeds of any crop insurance, price support payment or other government program;

2

97966865.2 0053564-00330

(x) Rights and interests under any interest rate swap, interest rate caps, interest rate collars or other similar agreement for the purpose of fixing or limiting interest expense, or foreign exchange, currency hedging, commodity hedging, security hedging or other agreement by Borrower or certain of their principals or any of their affiliates for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets;

(xi) Accessions, attachments and other additions to the RAF Collateral;

(xii) Substitutes or replacements for any RAF Collateral, all proceeds, products, rents and profits of any RAF Collateral, all rights under warranties and insurance contracts covering the RAF Collateral, and any causes of action relating to the RAF Collateral;

(xiii) Books and records pertaining to any RAF Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory; and,

(xiv) Insurance policies or proceeds insuring any of the RAF Collateral.

E.  It is a condition precedent to MetLife's agreement to make the MetLife Loans to the MetLife Borrower, and RAF's agreement to extend financial accommodations to the Borrower, that RAF and MetLife enter into this Agreement in order to confirm the relative priorities of their respective security interests in and/or liens on the "Collateral" (as such term is defined below).

1. Definitions. The following capitalized terms shall have the following meanings for all purposes in this Agreement:

"**Carveout Collateral**" means any and all Rolling Stock.

"**Collateral**" means any and all property or assets of the Borrower, whether real, personal or mixed, or tangible or intangible, upon which either or both RAF and MetLife at any time have a lien or security interest.

"**Crops**" means all crops of whatever nature now growing or at any time in the future to be grown on the Real Property, and all such crops after they are harvested, and all proceeds and products thereof. For purposes of this definition, crops shall become growing crops (a) on the date of planting, if the crops are row crops, and (b) on January 1 of each year, if the crops are perennial, orchard or vineyard crops.

"**Foreclosure**" means the sale of any parcel of the Real Property by MetLife at a judicial or non-judicial foreclosure sale under a MetLife Mortgage or other similar proceeding or acquisition of the Real Property by MetLife through a transfer in lieu of foreclosure.

"**License Expiration Date**" means the date which is the earlier of (i) the date that RAF Priority Collateral is removed from the Real Property or (ii) November 1 in the year in which a Foreclosure occurs, provided, however, that in no event shall the License Expiration Date occur prior to a date that is 120 days following a Foreclosure, which date shall be extended one day for each day that RAF may be prohibited from removing the RAF Priority Collateral due to reasons beyond the control of RAF (including, without limitation, the bankruptcy of any Borrower).

3

97966865.2 0053564-00330

"**MetLife Milk Proceeds Priority Claim**" means the aggregate of, in any month, the amount of the monthly installment payment of principal and accrued interest then due and payable under the MetLife Notes; including adjustments from time to time to the amount of such payment limited to changes in the rate of interest thereon, if any, but not including adjustments in respect of any increase in the original principal indebtedness owed by the MetLife Borrower to MetLife, without the prior written consent of RAF. The MetLife Milk Proceeds Priority Claim shall be cumulative to the extent that the Milk Receivables accrue each month but are not paid to MetLife on a monthly basis for whatever reason except during such time as any Borrower is subject to a bankruptcy or insolvency proceeding under federal or state law, the parties agree that the MetLife Milk Proceeds Priority Claim shall accumulate in an amount not to exceed six (6) times the monthly scheduled principal and interest payments of the MetLife Notes; provided that MetLife's right to priority in Milk Receivables due to the MetLife Borrower or any of them in excess of one month's priority amount (as set forth above) shall be subject to, and conditioned upon, MetLife providing written notice to RAF of each Milk Receivable due to the MetLife Borrower or any of them (or portion thereof) not paid to MetLife, with such notice to be provided within twenty (20) days of any such missed payments. The failure of MetLife to provide the above described notice with respect to one missed payment shall not constitute a waiver of priority with respect to future missed payments nor prevent MetLife from accumulating future missed payments upon proper notice. However, the missed payments that may be accumulated shall not include any missed payment for which MetLife failed to give timely notice as provided above.

"**MetLife Priority Personal Property Collateral**" means, collectively, (a) the personal property, irrigation equipment, dairy equipment and fixtures described on attached Exhibit B, excluding the Carveout Collateral, (b) the Post-Foreclosure Crops, and (c) Milk Receivables, but only up and to the extent of the MetLife Milk Proceeds Priority Claim.

"**Milk Receivables**" means, collectively, all milk or other dairy product sale proceeds (as represented by checks or other forms of payment issued from time to time for the benefit of the Borrower) owing from time to time by purchasers of milk or other dairy products from the Borrower.

"**Post-Foreclosure Crops**" means all Crops that become growing crops after the date of a Foreclosure.

"**RAF Priority Collateral**" shall have the meaning specified for such term in paragraph 4(b) below.

"**Rolling Stock**" means all mobile or motor vehicles, tractors, trucks, loaders, forklifts, trailers, and farm implements owned by Borrower together with all attachments, implements, and equipment related thereto or used in conjunction therewith.

2.  Parties Intended to be Benefited. Except as expressly otherwise provided herein, all understandings, covenants, and agreements contained herein are solely for the benefit of RAF and MetLife, and there is no other person or entity (including, without limitation, the Borrower or any of its principals or affiliates) that is intended to be benefited, in any way, by this Agreement.

3.  No Limitation Intended. Nothing contained in this Agreement is intended to affect or limit, in any way the security interests, encumbrances, or liens that MetLife or RAF has or hereafter acquires in any of the Collateral, insofar as the rights of the Borrower and/or any third parties are involved. RAF and MetLife specifically reserve any and all of their respective rights, security interests, encumbrances, liens

4

97966865.2 0053564-00330

and rights to assert security interests, encumbrances, and liens against the Borrower, and any third parties.

4. Priorities. Subject to the conditions in this Agreement:

(a) RAF hereby subordinates any and all security interests or liens that RAF now has or hereafter acquires in (i) the Real Property and any easements, leases, appurtenances, or similar agreements benefiting the Real Property (including, without limitation, easements, leases or similar agreements for livestock waste disposal), and all buildings, structures and improvements located thereon, (ii) any leases or rents arising from leases of the Real Property, and (iii) any MetLife Priority Personal Property Collateral, to the perfected security interests or liens that MetLife now has or may hereafter acquire therein or thereon;

(b) MetLife hereby subordinates any and all security interests or liens, including, without limitation, statutory landlord's liens, that MetLife now has or hereinafter acquires in or on any and all RAF Collateral, except for those items included in the definition of MetLife Priority Personal Property Collateral (such RAF Collateral, less such excepted items, being referred to herein as the "**RAF Priority Collateral**"), to the perfected security interests or liens that RAF now has or may hereafter acquire therein or thereon.

(c) Notwithstanding the foregoing, the parties acknowledge that RAF does not have any security interest in the Real Property or the MetLife Priority Personal Property Collateral (excluding Milk Receivables), and that any further encumbrances on the Real Property or the MetLife Priority Personal Property Collateral (excluding Milk Receivables) would constitute an event of default under the MetLife Notes and the MetLife Mortgage.

(d) MetLife does not have any security interest or any other lien or encumbrance in any portion of the Milk Receivables in excess of the MetLife Milk Proceeds Priority Claim, and MetLife shall not obtain any security interest or any other lien or encumbrance in any portion of the Milk Receivables in excess of the MetLife Milk Proceeds Priority Claim without RAF's prior written consent to be given, if at all, in RAF's sole discretion.

5. Distribution of Proceeds of the Collateral. Prior to commencement by MetLife or RAF of any action to enforce any default rights or remedies or of any bankruptcy or other insolvency proceeding commenced by or against MetLife Borrower or Borrower (singularly or collectively, an "**Enforcement Proceeding**"), MetLife and RAF shall each be entitled to receive and retain payments in accordance with their respective agreements with the MetLife Borrower or Borrower, as applicable, regardless of the source of those payments, except only that, as between RAF and MetLife, all proceeds of the sale, collection, exchange, or other disposition of Milk Receivables shall be distributed (a) to MetLife, in an amount up to the amount of the MetLife Milk Proceeds Priority Claim, and (ii) the balance, if any, to RAF. After an Enforcement Proceeding, Milk receivables shall continue to be distributed as set forth in the foregoing sentence, and as between MetLife and RAF (a) the proceeds of the MetLife Priority Personal Property Collateral shall be paid to MetLife for application against all indebtedness owing to MetLife under MetLife's loan documents with the MetLife Borrower, and the balance of such proceeds remaining after payment in full of all such indebtedness, if any, shall be paid to RAF for application against all indebtedness owing to RAF and other secured parties under RAF's loan documents with Borrower, and (b) the proceeds of the RAF Priority Collateral shall be paid to RAF for application against all indebtedness owing to RAF and other secured parties under RAF's loan documents with Borrower, and the balance of such proceeds remaining after payment in full of all such indebtedness, if any, shall be paid to MetLife for application against all indebtedness owing to MetLife under MetLife's loan documents with the MetLife Borrower. In the event MetLife at any time receives proceeds from the Milk Receivables (including without limitation proceeds represented by milk or other dairy product checks) in excess of the then applicable MetLife Milk Proceeds Priority Claim that remains unpaid as of such date, MetLife shall

5

immediately, without any demand by RAF, turn over and deliver to RAF the amount of such proceeds in excess of the then applicable MetLife Milk Proceeds Priority Claim, properly endorsed, if requiring an endorsement.

6. <u>Access</u>. MetLife agrees that RAF may, at any time during the one hundred twenty (120) day period following a Foreclosure, enter upon the Real Property upon reasonable notice, to permit RAF or its agents or employees to take possession of the RAF Priority Collateral and to exercise RAF's rights, powers and remedies with respect to the RAF Priority Collateral. Such one hundred twenty (120) day period shall be extended one day for each day that RAF may be prohibited from removing the RAF Priority Collateral due to reasons beyond the control of RAF (including, without limitation, the bankruptcy of any Borrower), provided that RAF otherwise complies with the requirements hereof during the period of any such extension. RAF shall further be permitted, upon reasonable notice (except in the case of an emergency to prevent loss of collateral), to enter upon the Real Property for purposes of cultivation and/or harvesting of any Crops growing thereon other than Post-Foreclosure Crops (the "**RAF Crops**"), and for the purpose of caring for, removing or liquidating any livestock (including, without limitation, the production of milk) located thereon (the "**RAF Livestock**") for the period up to the License Expiration Date. Following the Foreclosure, RAF shall notify MetLife of its election to cultivate and/or harvest the RAF Crops or care for the RAF Livestock within thirty (30) days of RAF's receipt of a notice of Foreclosure from MetLife, or such rights hereunder shall be deemed waived without further action. To that end, MetLife hereby grants to RAF a nonexclusive license (the "**License**"), to the extent of MetLife's right of possession, occupancy, and control, as follows:

(a) The License shall give RAF or RAF's authorized agent the right to enter and use all or any portion of the Real Property on which RAF Crops, RAF Livestock or any other items of RAF Priority Collateral are located, and any water or water rights appurtenant thereto identified on attached <u>Exhibit C</u> and fixtures located thereon that are within MetLife's possession, to care for, irrigate, cultivate, produce and harvest the RAF Crops, RAF Livestock and the other RAF Priority Collateral.

(b) The License shall give RAF or RAF's authorized agent the right to use all livestock equipment, dairy equipment and/or irrigation equipment located on the Real Property, at RAF's expense, as needed by RAF for the purposes authorized by the License. MetLife will not prohibit or preclude RAF from using, or interfere with RAF's use of, any such property for the purposes authorized by the License, and MetLife will not sell or otherwise dispose of such property during the term of the License.

(c) Subject to the respective time limitations above, the License shall give RAF or RAF's authorized agent the right to complete, harvest, assemble, remove, market and sell the RAF Crops, RAF Livestock and the other RAF Priority Collateral.

(d) RAF shall have no obligation to pay MetLife for the License or the use of any of the Borrower's property within MetLife's possession, including, without limitation, under the terms of any lease between or among any Borrower, for the purposes authorized by the License, except as specifically provided herein to the contrary.

(e) Even though the License is nonexclusive, MetLife will not, and will not grant a license to any other party that would permit that party to, unreasonably or materially interfere with RAF's ability to complete, harvest, assemble and remove the RAF Crops, RAF Livestock or other RAF Priority Collateral within the time frame set forth above.

(f) RAF's exercise of the rights granted by the License shall be at RAF's own risk as to the quality, quantity, condition, operability, adequacy and suitability of the Real Property, water, and any of the Borrower's property located thereon, or the legality or enforceability of such License or of

6

MetLife's possession of the Real Property; and MetLife has not made and will not make any representations or warranties to RAF regarding such matters.

(g) If RAF exercises the rights granted by the License, RAF shall do so in accordance with the standards and practices customarily employed for similar dairy and crop farming operations in the vicinity and in compliance with all applicable laws, ordinances and regulations, including those relating to agricultural chemicals, toxic materials, hazardous materials and petroleum products.

(h) RAF agrees that it shall be responsible for all water, electrical and other expenses related to RAF's activity on the Real Property pursuant to such License, and that it will be responsible for the proper maintenance and, to the extent caused by RAF's use, the repair of any equipment or fixtures used by RAF or its agents in the course of activities conducted on the Real Property pursuant to the provisions of this paragraph 6 (the liability for any such repair being limited to $10,000.00 per single occurrence, or $50,000.00 in the aggregate), all such costs and expenses shall be deemed to be additional advances to Borrower and secured by the RAF Priority Collateral and shall be part of the indebtedness owing by Borrower to RAF to which the subordination of MetLife applies.

(i) RAF agrees to indemnify and hold MetLife and its respective agents, officers, directors, employees, attorneys, successors and assigns harmless from any claim, action, cause of action, suit, or judgment for personal injury or loss of life (including reasonable attorneys' fees), arising from any action or negligence of RAF and/or any of its agents, suffered by any person upon the Real Property at the direction, authorization, instance or request of RAF or RAF's authorized agents, including, without limitation, any such expense, loss or liability for damage to the Real Property or any property located thereon arising from RAF's failure to comply with the provisions of subsection (g) above, provided, however, that in no event shall RAF have any obligation to indemnify MetLife or any of the above parties for any of the foregoing due to the negligence of, or the willful and deliberate acts of, MetLife or such parties.

(j) In the event that RAF desires to maintain the RAF Livestock on the Real Property for any period longer than the one hundred twenty (120) day period granted by the License, MetLife and RAF hereby agree to negotiate in good faith for a short term lease of the Real Property and all livestock equipment, dairy equipment and/or irrigation equipment located thereon on commercially reasonable terms.

(k) The License granted herein shall expire upon the License Expiration Date.

The parties intended that the provisions of this paragraph 6 shall be binding upon MetLife itself and/or upon any third party who acquires the Real Property pursuant to Foreclosure.

7. <u>Notice of Possession by MetLife</u>. If MetLife acquires ownership or possession of all or any part of the Real Property in any manner other than by trustee's, sheriff's or similar deed following a Foreclosure, MetLife shall give RAF written notice of such acquisition within ten (10) days of the date of such acquisition, and the date of such acquisition shall be deemed the date of Foreclosure for the purposes of this Agreement.

8. <u>RAF's Security Interest in Crops After Foreclosure</u>. RAF's security interest in Post-Foreclosure Crops shall terminate as of the date of Foreclosure; however, RAF's security interest in RAF Crops shall continue without modification or loss of priority on and after such date, subject to the provisions of this Agreement. If RAF fails to timely give MetLife notice exercising the License, or having exercised the License terminates the License, then RAF's security interest in RAF Crops shall terminate (i) if the License is not exercised, on the expiration of the period to exercise the License, or (ii) if the License is terminated, on such termination.

7

97966865.2 0053564-00330

9. <u>No Obligation to Exercise Rights to Cultivate Crops or Care for Livestock</u>. RAF shall have no obligation to exercise its rights under the License or to care for, irrigate, cultivate, produce or harvest RAF Crops or RAF Livestock prior to or following the Borrower's default and/or a Foreclosure. Specifically, and for the avoidance of doubt, RAF shall have no obligation at any time to care for the RAF Livestock for any reason including, without limitation, the production of milk for the purpose of generating Milk Receivables whether for the benefit of RAF or MetLife with respect to any pending or future MetLife Milk Proceeds Priority Claim. MetLife shall have no duty or obligation to maintain, care for, cultivate, or harvest any crops or livestock growing on the Real Property.

10. <u>Notice of Default</u>. Upon any breach or default by the MetLife Borrower in any obligations secured by the MetLife Mortgage or under any of the Borrower's obligations to RAF, MetLife or RAF, as the case may be, will give the other party written notice thereof, provided that any failure by either party hereunder to provide such notice to the other party shall not give rise to any liability whatsoever on the part of such party to the other party hereunder or to the Borrower.

11. <u>Effectiveness of Subordinations</u>.

(a) The subordinations, agreements and priorities set forth herein shall remain in full force and effect, regardless of whether any party hereto in the future seeks to rescind, amend, terminate, or reform by litigation or otherwise, their respective agreements with the Borrower.

(b) The subordinations, agreements and priorities set forth herein are expressly conditioned upon the nonavoidance and perfection of the security interests, encumbrances, and/or liens to which another security interest, encumbrance, and/or lien is subordinated, and if the security interests, encumbrances, and/or liens to which another security interest is subordinated, are not perfected or are avoided, for any reason, then the subordination provided for herein shall not be effective as to that particular collateral which is the subject of the unperfected or avoided security interest.

(c) The subordinations, agreements, and priorities specified herein are applicable irrespective of the time or order of attachment or perfection of the security interests or other interests referred to herein, the time or order of filing of financing statements, or recording of mortgages or deeds of trust, the acquisition of purchase money or other security interests, or the time of giving or failure to give notice of the acquisition or expected acquisition of purchase money or other security interests.

12. <u>Notice</u>. Whenever it is provided herein that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon either of the parties by the other, or whenever either of the parties desires to give or serve upon the other a communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be delivered either in person with receipt acknowledged or by registered or certified mail, return receipt requested, postage prepaid, addressed to each party at its address set forth below, or at such other address as may be substituted by notice given as herein provided. Giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Every notice, demand, request, consent, approval, declaration or other communication hereunder shall be deemed to have been duly given or served on the date on which personally delivered, with receipt acknowledged, or three (3) days after the same shall have been deposited in the United States mail. Failure or delay in delivering copies of any notice, demand, request, consent approval, declaration, or other communication to the person designated above to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration, or other communication. The failure or oversight of a party in providing notice shall not affect the right of any party under this Agreement nor shall it nullify or render void or have any adverse impact upon any action taken by either party under this Agreement.

8

97966865.2 0053564-00330

13. **Waiver of Marshalling.** MetLife and RAF each specifically waives and renounces any rights, under any applicable statutes, which each may have, whether at law or in equity, to require the other party hereto to marshal any Collateral, or any portion thereof, or to otherwise seek satisfaction from any particular assets of the Borrower, or from any particular Borrower, any particular principal of Borrower, or any guarantor or third party.

14. **Additional Documents.** MetLife and RAF agree to execute and deliver, upon the request of the other, such documents and instruments (appropriate for filing, if requested) as may be reasonably necessary or appropriate to fully implement or to fully evidence the understandings and agreements contained in this Agreement.

15. **Governing Law.** The validity of this Agreement, its construction, interpretation and enforcement, and the rights of the parties hereunder, shall be determined under, governed by and construed in accordance with the laws of the State of Idaho. MetLife and RAF each waives any right it may have to assert the doctrine of *forum non conveniens* or to object to the venue for any action hereunder in any state or federal court located in the State of Idaho, and hereby consents to any court-ordered relief entered in such courts.

16. **Attorneys' Fees.** In the event it becomes necessary for either MetLife or RAF to commence any proceedings or actions to enforce the provisions of this Agreement, the court or body before which the same shall be tried may award to the prevailing party all costs and expenses thereof, including, but not limited to, reasonable attorneys' fees, the usual and customary and lawfully recoverable court costs, and all other expenses in connection therewith, at trial or on appeal.

17. **Parties; Successors and Assigns.** Notwithstanding that the terms "MetLife" and "RAF" are, for drafting convenience, defined as MetLife and RAF, nothing herein shall impose any liabilities or obligations on any one or more of the parties comprising MetLife or RAF, as the case may be, due to the actions or inactions of another party comprising MetLife or RAF, as the case may be, and no actions or inactions of any one or more of the parties comprising either MetLife or RAF, as the case may be, shall be necessary in order for another party comprising MetLife or RAF to have all rights and benefits of MetLife or RAF, as the case may be, hereunder. This Agreement shall inure to the benefit of, the successors and assigns of MetLife and RAF, and shall be binding upon the successors and assigns of MetLife and RAF.

18. **Counterparts.** This Acknowledgment may be executed in any number of counterparts, each of which shall be deemed to be an original, admissible into evidence, and all of which together shall be deemed to be a single instrument.

19. **Termination of Agreement.** The agreements contained herein shall continue in full force and effect until either of MetLife Borrower's or Borrower's obligations and liabilities to either of RAF and MetLife, as applicable, are paid and satisfied in full and all corresponding financing arrangements, liens, and security interest are terminated and/or released. At such time, RAF and MetLife, as applicable, shall execute and deliver to the other any reasonable documentation evidencing such releases and the termination of this Agreement.

20. **Borrowers Indemnity.** The Borrower, by the execution of its acknowledgment hereto, agrees to indemnify and hold MetLife and RAF, and their respective agents, officers, directors, employees, attorneys, successors and assigns, harmless from and against any and all claims, actions, damages, costs, expenses (including reasonable attorneys' fees, to include outside counsel fees and all allocated costs of in-house counsel) and/or liability arising from or in any manner relating to MetLife's and/or RAF's compliance with this Agreement and/or the exercise of any of its rights hereunder. Borrower, by the execution of its acknowledgment hereto, hereby irrevocably authorizes MetLife to

9

97966865.2 0053564-00330

comply with any instructions or directions that RAF may give to MetLife pursuant hereto and/or in connection with RAF's exercise of its rights, powers and remedies with respect to the RAF Collateral. Borrower's obligations and agreements hereunder shall be joint and several.

21.   Effect of Bankruptcy. This Agreement shall be and remain enforceable notwithstanding any bankruptcy or other insolvency proceeding by or against the Borrower or its principals.

22.   No Waiver; Integration; Amendments. No delay, failure or discontinuance of MetLife or RAF in exercising any right, power or remedy hereunder or under any of its respective loan documents shall affect such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect the further exercise thereof or the exercise of any other right, power or remedy. The rights, powers and remedies of MetLife and RAF hereunder are cumulative and not exclusive. Any waiver, permit, consent or approval of any kind by MetLife or RAF of any breach of or default under this Agreement, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in such writing. This Agreement constitutes the entire understanding of the parties as to the matters set forth in this Agreement. This Agreement may be amended or modified only in writing signed by RAF and MetLife.

23.   RAF Disclosure. RAF shall have no obligation to disclose to MetLife any information or material about the Borrower that is acquired by RAF in any manner, even if MetLife is unsuccessful in obtaining any such information or material from the Borrower.

24.   MetLife Disclosure. MetLife shall have no obligation to disclose to RAF any information or material about the MetLife Borrower that is acquired by MetLife in any manner, even if RAF is unsuccessful in obtaining any such information or material from the Borrower.

25.   Remedies Enforcement - RAF. Nothing contained in this Agreement shall impose on RAF any direct or indirect obligations to MetLife of any kind with respect to the manner or time in which RAF exercises or refrains from exercising any of its rights or remedies with respect to the indebtedness of the Borrower to RAF or any of the RAF Priority Collateral. MetLife understands that there may be various agreements between RAF and the Borrower evidencing and governing the indebtedness of the Borrower to RAF, and MetLife acknowledges and agrees that such agreements are not intended to confer any benefits on MetLife. Nothing contained in this Agreement shall impose on RAF any obligation to MetLife with respect to the administration of the indebtedness of the Borrower to RAF and any of RAF's agreements with the Borrower. Nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of RAF with respect to the indebtedness of the Borrower to RAF or any security therefor, including, without limitation, RAF's right to: (a) waive or release any of RAF's security or rights; (b) waive or ignore any defaults by the Borrower; and/or (c) restructure, renew, modify or supplement the indebtedness of the Borrower to RAF, or any portion thereof, or any agreement with the Borrower relating thereto. This Agreement shall not create any obligation of RAF to give notice to or seek the consent of MetLife prior to the exercise of any rights, privileges, powers and remedies of RAF in connection with the indebtedness of the Borrower to RAF.

26.   Remedies Enforcement - MetLife. RAF understands that there may be various agreements between MetLife and the MetLife Borrower evidencing and governing the indebtedness of the MetLife Borrower to MetLife, and RAF acknowledges and agrees that such agreements are not intended to confer any benefits on RAF. Nothing contained in this Agreement shall impose on MetLife any obligation to RAF with respect to the administration of the indebtedness of the MetLife Borrower to MetLife and any of MetLife's agreements with the MetLife Borrower. Except as set forth in this Agreement, nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of MetLife with respect to the indebtedness of the MetLife Borrowers to MetLife or any security therefor, including, without limitation, MetLife's right to: (a) waive or release any of MetLife's security or rights; (b) waive or ignore any defaults by the MetLife Borrower; and/or (c) subject to the limitations set

10

forth in the definition of "MetLife Milk Proceeds Priority Claim", restructure, renew, modify or supplement the indebtedness of the MetLife Borrower to MetLife, or any portion thereof, or any agreement with the MetLife Borrower relating thereto. This Agreement shall not create any obligation of MetLife to give notice to or seek the consent of RAF prior to the exercise of any rights, privileges, powers and remedies of MetLife in connection with the indebtedness of the MetLife Borrower to MetLife.

27. <u>No Commitment to Lend</u>. It is understood and agreed that this Agreement shall in no way be construed as a commitment or agreement by RAF to make financing available to the Borrower and that RAF may terminate any such financing at any time, in accordance with RAF's agreements with the Borrower. Upon any termination of RAF's financing to the Borrower, RAF will give MetLife written notice thereof, provided that RAF's failure to provide such notice shall not give rise to any liability whatsoever on the part of RAF to MetLife or the Borrower.

28. <u>WAIVER OF JURY TRIAL</u>. METLIFE AND RAF EACH HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS AGREEMENT, AS IT MAY BE AMENDED FROM TIME TO TIME, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

[SIGNATURE PAGE FOLLOWS]

11

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

Address:
14767 North Outer 40 Road, Suite 400
Chesterfield, MO 63017

**RAF:**
RABO AGRIFINANCE LLC, formerly known as Rabo Agrifinance, Inc., a Delaware limited liability company

By: _____
Name: Krishna A. Walker
Title: Vice President

Address:
Agricultural Investments
10801 Mastin Blvd., Suite 930
Overland Park, KS 66210

**METLIFE:**
METLIFE REAL ESTATE LENDING LLC,
a Delaware limited liability company

By:   MetLife Investment Advisors, LLC,
      its investment manager

By:_____
Name:_____
Title:_____

97966865.2 0053564-00330

STATE OF Missouri )
                  ) ss.
County of St. Louis )

On September 14, 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared Krishna Walker, known or identified to me to be the Vice President of **Rabo AgriFinance LLC**, the limited liability company that executed the within and foregoing instrument, and acknowledged to me that he executed the same for and on behalf of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public for
Residing at St Charles Mo
My commission expires: 7-16-2021

> TAMMIE J. SCOTT
> Notary Public – Notary Seal
> St Charles County – State of Missouri
> Commission Number 13481333
> My Commission Expires Jul 16, 2021

97966865.2 0053564-00330