# EXHIBIT 5

Effective as of October 20, 2022

**VIA EMAIL**

Millenkamp Cattle, Inc.                         Givens Pursley LLP
471 North 300 West                              601 W. Bannock St.
Jerome, Idaho 83338                             Boise, ID 83702
Attn: William Millenkamp                        Attn: L. Edward Miller

                                                Bush Kornfeld LLP
                                                601 Union St, #5000
                                                Seattle, WA 98101
                                                Attn: Jay Kornfeld

**RE:**    Forbearance: Rabo Agrifinance LLC, as Agent for the Lenders and other Secured Parties
(the "**Agent**") and Millenkamp Cattle, Inc., Idaho Jersey Girls LLC, East Valley Cattle,
LLC, Millenkamp Properties, L.L.C., Millenkamp Properties II LLC, Millenkamp Family
LLC, Goose Ranch LLC, Idaho Jersey Girls Jerome Dairy LLC, Black Pine Cattle LLC,
Millenkamp Enterprises LLC, Susan Millenkamp as Trustee of the WJM 2012 Trust,
William Millenkamp as Trustee of the SJM 2012 Trust, William John Millenkamp, and
Susan Jo Millenkamp (collectively, the "**Borrowers**" and each a "**Borrower**"), and certain
financial institutions as Lenders (the "**Lenders**" and together with the Agent, the "**Lender
Parties**"), are parties to that certain Third Amended and Restated Loan and Security
Agreement, dated April 21, 2021 (as amended, restated, or modified from time to time,
including pursuant to this Agreement, the "**Loan Agreement**"). Capitalized terms used but
not otherwise defined in this letter have the meanings given in the Loan Agreement, the
Financing Agreements, or the Default Notices (as defined below), as applicable

Ladies and Gentlemen:

The Borrowers have requested that the Agent forbear from exercising certain rights and
remedies under the Financing Agreements in connection with the Borrowers' defaults or asserted
defaults, including those set forth in the Notices of Default the Agent issued to the Borrowers on
November 2, 2021, February 9, 2022, February 17, 2022 (the "**Third Default Notice**"), March 16,
2022 (the "**Fourth Default Notice**"), and June 10, 2022 (collectively, the "**Default Notices**").
These defaults include: (i) the Borrowers' failure to maintain a minimum Borrowing Base Excess
for the periods ending July 31, 2021 through July 31, 2022; (ii) the existence of a lien claim against
certain of the Borrowers' property, which the Lender Parties assert to be a default, as well as
pending litigation disclosed to the Agent which includes litigation regarding construction defect
claims and disputed amounts due to lien claimants that have provided construction work and/or
materials to the Borrowers; (iii) the Transfer Defaults (as defined below); (iv) the Interest Defaults
(as defined below); (v) the Security Defaults (as defined below); (vi) the Maturity Default (as
defined below); (vii) the Borrowers failure to pay all liabilities when due, including amounts owed
to trade vendors and suppliers, including those related to construction work and/or materials

provided to the Borrowers; and (viii) the defaults that exist or have been asserted by MetLife Real Estate Lending LLC and/or Metropolitan Life Insurance Company (individually and collectively, as the context may require, "**MetLife**") as set forth in the Forbearance Agreement between the Borrowers and MetLife provided by the Borrowers to the Agent, through its counsel, to the extent such matters may be defaults by the Borrowers under the terms of the Loan Agreement or related documents (collectively, the "**Existing Matured Defaults**"). As of the date hereof, the Existing Matured Defaults remain Matured Defaults and neither the Borrowers nor the Agent are aware of any Defaults, other than the Existing Matured Defaults. The Agent and the Lenders are willing to so forbear, subject to the following terms set forth in this letter agreement (this "**Agreement**").

1.    <u>**Forbearance and Forbearance Period**</u>.

a.    Upon satisfaction of the conditions set forth in this Agreement, the Agent agrees to forbear from exercising the rights and remedies under the Financing Agreements, the Loan Agreement, and all related agreements, and applicable law arising from the Existing Matured Defaults subject to the terms and conditions of this Agreement. Without waiving any of the Borrowers' obligations under the Financing Agreements or the Loan Agreement, the Agent will forbear from exercising the rights and remedies under the Financing Agreements, the Loan Agreement, and all related agreements, and applicable law as a result of the Existing Matured Defaults for the period commencing on the Effective Date (as hereinafter defined) and expiring on the date upon the earlier to occur of (the "**Forbearance Period**"): (a) June 30, 2023; (b) the occurrence of any Termination Event (as defined below); or (c) the mutual, written agreement of the Agent, the Lender Parties, and the Borrowers that the Forbearance Agreement shall be terminated. Notwithstanding the foregoing, the Forbearance Period may be extended in accordance with Section 1(d) below.

b.    Notwithstanding the foregoing or the Agent's forbearance hereunder: (i) the Lender Parties have not waived, are not by this Agreement waiving, and have no intention of waiving, any Defaults or Matured Defaults (including, without limitation, the Existing Matured Defaults), which may be continuing on the date hereof or any Defaults or Matured Defaults that may occur after the date hereof; (ii) the Agent has not agreed to forbear with respect to any of the rights or remedies concerning any Defaults or Matured Defaults (other than, during the Forbearance Period, with respect to the Existing Matured Defaults to the extent expressly set forth herein) occurring at any time; and (iii) this Agreement does not waive, modify, extend or amend the Maturity Date. The Agent reserves the right to exercise any or all of the rights and remedies under the Loan Agreement and the other Financing Agreements as a result of any other Defaults or Matured Defaults occurring at any time. The Agent has not waived any of such rights or remedies, and nothing in this Agreement, and no delay on its part in exercising any such rights or remedies, may or will be construed as a waiver of any such rights or remedies.

c.    During the Forbearance Period, the Lender Parties shall have no obligation to make any Advances, as otherwise set forth in the Loan Agreement or the other Financing Agreements; *provided, however*, that the foregoing language shall not restrict the ability of the Agent or the Lenders to make any protective advances or similar advances, as authorized in the Sections 10.3 and 10.25 of the Loan Agreement.

d.    Notwithstanding anything to the contrary in this Agreement, the Agent shall extend the Forbearance Period and the deadline by which the funding of the Refinancing Commitment (as defined below) must close through August 30, 2023 (subject to Sections 1(a)(b) and 1(a)(c) of this Agreement) if the Borrowers and the CRO (to the extent the CRO remains engaged) send a request for extension to the Agent on or before June 15, 2023 (the "**Extension Request**") and:

i.    The Extension Request contains a fully executed term sheet or commitment letter from a recognized financial institution providing for terms to refinance the Loan in full and only subject to receipt of audited financial statements for the year ending 2022;

ii.    The Borrowers are current with all payments of principal, interest, and fees to under the Loan and no Defaults, Matured Defaults, or Termination Events (other than the Existing Matured Defaults) have occurred; and

iii.    The Borrowers pay to the Agent a $50,000 extension fee, which fee the Agent shall distribute, pro rata, to each of the Lenders.

2.    **Definitions**. For purposes of this Agreement (and not for any other purpose, including the Loan Agreement), the following capitalized terms shall have the meanings indicated:

a.    "**Actual Payments to Pre-Existing Payables**" shall be the amount actually paid to Pre-Existing Payables net of new value received from such vendor in the form of new trade credit after such payment.

b.    "**Borrowing Base Margin**" shall mean an amount determined in accordance with the calculation set forth on **Schedule 1** and shall include the addition of, among other things, the Forbearance Add Back, and, for clarification, the amount of the Eligible Deposit Accounts used for the calculation of the Borrowing Base Margin shall include: (i) through and including September 30, 2022, (A) all funds received by Borrowers from the Additional Funding, as if such funds had been received and held by Borrowers on September 30, 2022, even though received after September 30, 2022, and (B) all cash held in deposit accounts that are subject to a Deposit and Control Agreement in favor of the Agent, and (ii) after September 30, 2022, all cash held in deposit accounts that are subject to a Deposit and Control Agreement in favor of the Agent, provided that such amount cannot exceed the average balance of such deposits for the prior thirty days (if such amount does exceed such average balance, then such amount shall be treated as being equal to the average balance of such deposits for the prior thirty days).

c.    "**Budgeted Payments to Pre-Existing Payables**" shall be the amount set forth in the Cash Flow Forecast to be paid to Pre-Existing Payables.

d.    "**Construction CapEx Budget**" shall include any new construction work, be updated monthly, and, among other things: (i) be created by the Borrowers, with the assistance and approval of the CRO (as defined below), (ii) include the then-existing appraised value and as-completed appraised value of the property, if available, on which such construction will occur, (iii) set forth the work that is to be performed as well as an estimated timeline for when such work is estimated to be completed and the estimated costs of such work. All new construction work

contemplated by the Budget (as defined below) or the Construction CapEx Budget shall be subject to the CRO's approval and oversight, and the Borrowers will obtain all appropriate lien waivers. The initial Construction CapEx Budget and the work set forth therein, as set forth in Section 3(f)(i) hereof, shall be subject to the approval of the Required Lenders, in their sole discretion. Any subsequent Construction CapEx Budgets, or updates thereto, and the work set forth therein, shall be subject to the approval of the Agent, in its sole discretion.

e.        "**Forbearance Add Back**" shall refer to the Agent's accommodation of providing a positive upward adjustment of the Borrowing Base Margin during the Forbearance Period, which shall equal $3,700,000 as of June 30, 2022, which amount shall include, among other things, an adjustment of the herd value reflecting the Borrowers' current composition of Cattle and the market value of such Cattle solely for purposes of calculating the Borrowing Base Margin, determined by the Agent, in its sole discretion. For the avoidance of doubt, the Forbearance Add Back shall not have any effect on the amounts that the Borrowers are able to draw under the Loan.

f.        "**Forbearance Premium Default Rate**" shall refer to the rate equal to: (i) for the period through the thirtieth (30) day after the Effective Date, the lesser of (A) the Monthly Rate plus 300 basis points, and (B) the Highest Lawful Rate, and (ii) on and after thirty-one (31) days from the Effective Date, the lesser of (A) the Monthly Rate plus 750 basis points, and (B) the Highest Lawful Rate; *provided, however*, that the rate determined pursuant to subclause (ii) of this Section 2(f) shall also come into effect in the event a Termination Event occurs after the Effective Date.

g.        "**Interest Adjustment Date**" shall refer to the first day of the calendar month immediately following the Milestone Completion Date, provided that no Termination Event has then occurred and is continuing, which date shall occur (if ever) no later than December 1, 2022.

h.        "**Interest Defaults**" shall refer to the Borrowers' continued failure to pay interest on the Loans accrued at the Default Rate when due since they first accrued on November 1, 2021, other than the amounts satisfied by the account sweeps that occurred on June 3, 2022 and June 15, 2022, as required under Section 2.2 of the Loan Agreement and constitutes a Matured Default pursuant to Section (a)(ii) of the definition of Matured Default.

i.        "**Liquidity Milestones**" shall refer to the Initial Funding Milestone, the Additional Funding Commitment Milestone, the Additional Funding Milestone, and the Borrowing Base Milestone (each as defined below).

j.        "**Maturity Default**" shall refer to the Borrowers' failure to pay the remaining principal balance of the Loans as of the stated Maturity Date, June 1, 2022, as required under Section 2.2(a) of the Loan Agreement, which became a Matured Default on June 6, 2022 pursuant to Section (a)(i) of the definition of Matured Default.

k.        "**Milestone Completion Date**" shall refer to the earliest date (if ever) upon which both of the following have occurred: (i) the Borrowers have timely satisfied all of the Liquidity Milestones (as defined in Section 2(i) hereof), and (ii) the Borrowing Base Satisfaction

Date (as defined in Section 5(b) hereof) shall have timely occurred, (subject to the condition that the Borrower Base Satisfaction Date shall have occurred (if ever) no later than November 14, 2022).

l.      "**Monthly Rate**" shall refer to the per annum rate equal to (i) prior to the effectiveness of the SOFR Amendment, the sum of (A) the LIBOR Rate in effect from time to time plus (B) 500 basis points, or (ii) upon the effectiveness of the SOFR Amendment, the sum of (A) Term SOFR in effect from time to time plus (B) the Term SOFR Adjustment plus (C) 500 basis points.

m.      "**Net Operating Cash Flow**" shall refer to, during a given week: (i) all of the Borrowers' cash receipts from operations, excluding (A) proceeds from new financing and operating expenses netted in advance of the Borrowers' receipt (including but not limited to FOB fees, hauling, national promotion, and like expenses paid for by customers and automatically deducted) and (B) any capital calls paid to KANS, LLC, as provided for in Section 4(b) of this Agreement; minus (ii) all operating expenses actually paid (operating expenses do not include any debt service or any payments of Pre-Existing Payables); minus (iii) $3,500,000.

n.      "**Pre-Existing Payables**" shall be the amount of past due payables due to trade vendors as set forth in the Budget.

o.      "**Restricted CapEx Amounts**" shall refer to, collectively, any amounts that accrue or otherwise become payable for the Construction CapEx and the Non-Construction CapEx (each as identified in the Budget and/or the Construction CapEx Budget), or any other engineers, contractors, or other parties in connection with or arising from any construction project (the "**Construction Payables**").

p.      "**Security Defaults**" shall refer to the Borrowers' failure to take certain actions the Agent requested in the Third Default Notice and the Fourth Default Notice in order to preserve, perfect, and protect the Agent's liens in certain Collateral.

q.      "**Term SOFR Adjustment**" shall refer to eleven (11) basis points.

r.      "**Transfer Defaults**" shall refer to the Matured Defaults arising from the Borrowers' unauthorized transfer to, and encumbrance by, Argonaut Insurance Company ("**Argonaut**") of approximately $9,000,000.00 (the "**Transferred Assets**"), pursuant to that certain Control Agreement (the "**Control Agreement**") dated August 9, 2021 by and between Borrower East Valley Cattle, LLC, Argonaut, and Morgan Stanley Smith Barney LLC ("**Morgan Stanley**"), which caused Matured Defaults by, among other things:

i.      allowing a lien to encumber the Transferred Assets, which is prohibited by Section 7.1 of the Loan Agreement and constitutes a Matured Default pursuant to Sections (c) and (o) of the definition of Matured Default;

ii.      impermissibly transferring and/or disposing of the Transferred Assets, which was not cured within thirty days, which is prohibited by Sections 4.14, 4.15, 6.3, and 7.6 of the Loan Agreement and constitutes a Matured Default pursuant to Sections (c) and (d) of the definition of Matured Default;

iii.    using the Transferred Assets for purposes not expressly permitted under the Loan Agreement, which was not cured within thirty days, which is prohibited by Section 6.9 of the Loan Agreement and constitutes a Matured Default pursuant to Section (c) of the definition of Matured Default; and

iv.    breaching the Control Agreement by stating that the Transferred Assets were not subject to encumbrances, which is prohibited by and constitutes a Matured Default pursuant to Section (n) of the definition of Matured Default.

3.    **Conditions Precedent**. In addition to any other conditions set forth herein, this Agreement shall only become effective upon the satisfaction of all of the following:

a.    The Borrowers have bound a Directors and Officers insurance policy (the "**D&O Insurance**") in the amount of at least $5,000,000.00 (or such lesser amount as is acceptable to the CRO). Walter Popiel from Riveron Consulting LLC, has been appointed and shall be chief restructuring officer (the "**CRO**"). The CRO shall assist the Borrowers to, among other things, (i) manage and operate the Borrowers and the Collateral, including but not limited to the Borrowers' cash flow and accounts (ii) develop and implement a plan to obtain bridge mezzanine and/or equity financing, (iii) manage and oversee ongoing and future construction projects at the Borrowers' real property and any related construction bonds, with any such bonds to be authorized by the Agent, and (iv) develop and implement a plan for obtaining the Refinancing Commitment (as defined below) on or before February 28, 2023 to retire the Loans and the indebtedness thereunder, which shall close no later than June 30, 2023. The Borrowers shall have delivered a copy of the D&O Insurance policy to the Agent, when received.

b.    The Borrowers shall pay all amounts due under the Loan Agreement as of the payment date occurring on October 1, 2022, including all interest accrued at the then-applicable non-Default Rate pursuant to Section 2.2(b) of the Loan Agreement. For the avoidance of doubt, except as otherwise explicitly set forth in this Agreement, the Borrowers shall remain obligated to satisfy all other monthly payments and other obligations pursuant to Section 2.2 of the Loan Agreement.

c.    The Borrowers shall, with the prior written consent of MetLife, have granted to the Agent, for the benefit of the Secured Parties, a continuing second priority security interest in all collateral securing the MetLife Term Loan and any other indebtedness that the Borrowers owe to MetLife, and shall cause the Agent to be named as a mortgagee and loss payee on any insurance related to such collateral, junior in priority to MetLife (collectively, the "**Additional Property**"), all as evidenced by such documents as the Agent deems reasonably necessary, in form and substance agreeable to the Agent in the Agent's sole discretion. In connection with the herein-described grant of a security interest in the Additional Property, the Borrowers hereby make the representations, warranties, and covenants as set forth in the Further Assurance Agreement attached hereto as **Schedule 2** (the "**Further Assurance Agreement**") and by this reference incorporated herein. This arrangement shall be subject to, and governed by, an Intercreditor Agreement in the form that has been negotiated and agreed to between Agent and MetLife, which Intercreditor Agreement shall be executed on or before the Effective Date. The Borrowers agree that the foregoing grant of the Additional Property is a material inducement for the Agent to enter into this Agreement and, as such, if MetLife is unwilling or unable to agree to

the terms of an Intercreditor Agreement acceptable to Agent, in its sole discretion, this Agreement will not become effective and Agent will have no obligation to forbear from the exercise of its remedies.

d.    The Borrowers shall have issued to Argonaut and Morgan Stanley irrevocable instructions attached hereto as **Exhibit 1**.

e.    The Borrowers shall have prepared, with the assistance of the Financial Advisor (as defined below) and/or the CRO, and delivered to the Agent (with copies to the Lenders), each in form and substance acceptable to the Required Lenders, in their sole discretion, (i) an initial operating budget for the Forbearance Period (the "**Budget**") and the initial Construction CapEx Budget, each prepared with the assistance and subject to the approval the CRO, and attached hereto as **Schedule 3**. The Budget shall thereafter be updated upon the reasonable request of the Agent or the Required Lenders or upon the discretion of the CRO, and such updated Budgets shall be provided promptly to the Agent and the Required Lenders, and the Construction CapEx Budget shall be updated and delivered monthly on the first day of each month; (ii) a cash flow forecast for the Forbearance Period showing projected cash receipts and cash disbursements of the Borrowers, on a consolidated basis, over the immediately succeeding 13-week period (the "**Cash Flow Forecast**"); and (iii) a Borrowing Base report reflecting the actual collateral shortfall/excess as of June 30, 2022 and the projected shortfall/excess for the Forbearance Period (together with the Cash Flow Forecast, the "**Initial Financial Reports**"). Notwithstanding the foregoing, any subsequent Budgets, Construction CapEx Budgets, or Cash Flow Forecasts, or updates thereto, shall be subject to the approval of the Agent, in its sole discretion.

f.    The Borrowers shall have granted to the Agent an irrevocable assignment of the economic interests of the membership interests in KANS LLC, including its revenue rights.

g.    Subject to already existing assignment/pledge to MetLife of that certain Manure Supply Agreement by and between Millenkamp Cattle, Inc., and East valley Development, LLC, effective October 8, 2021 and related to the future digester, the Borrowers shall have executed an assignment of all digester receivables in favor of the Agent and as additional Collateral for the Loan.

h.    The Borrowers have identified to the Agent, with sufficient specificity, as acceptable to the Agent in the Agent's sole discretion, including but not limited to the identity of the lienholder, the amount of such lien, and the dates the Borrowers incurred the underlying indebtedness and the lien attached, an updated schedule of all Idaho statutory liens that, as of the Effective Date or with the passage of time, as determined by the Agent in the Agent's sole discretion, could prime the Agent's security interests in any Collateral, including but not limited to seed and farm labor liens, chemical liens, commodity liens, or agister liens in form and detail acceptable to the Agent in its sole discretion.

i.    The Agent may obtain, or the Borrowers shall promptly obtain upon the Agent's request at Borrowers' sole cost and expense, an appraisal of the Additional Property. In the event that the Agent obtains such an appraisal, the costs and expenses incurred by the Agent in connection therewith shall constitute additional Liabilities.

4.      **Borrowers' Covenants**. In addition to the covenants set forth in the Financing Agreements, each Borrower agrees to the following additional covenant(s) during the Forbearance Period:

a.      The Borrowers will not (i) pay any fees, charges, or compensation to any of the Borrowers' general partners, limited partners, members, shareholders, or other related persons or entities, if any, or to any affiliates thereof, other than normal monthly draws consistent with past practices and set forth in the Budget; and (ii) make, nor to permit to be made, any distributions, capital calls, or other disbursements (including without limitation, any distributions of any kind, returns of capital, or repayments of any loans (in each case, whether in cash, assets, equity interests, or proceeds of any kind)) to any of the Borrowers' general partners, limited partners, members, shareholders, joint ventures (other than satisfying any capital call during the Forbearance Period with respect to the Borrowers' interest in KANS LLC, after (A) receiving consent from (1) the Agent after providing advance disclosure of such capital call if such capital call is in an amount less than or equal to $500,000.00, or (2) the Required Lenders after providing advance disclosure of such capital call if such capital call is in an amount greater than $500,000.00, and (B) obtaining the prior approval of the CRO; *provided, however,* and notwithstanding the foregoing, that upon satisfying the Initial Funding Milestone, the Borrowers may satisfy capital calls of amounts less than or equal to $200,000.00 with respect to the Borrowers' interest in KANS LLC after (x) providing advance disclosure of such capital call to the Agent and (y) obtaining the prior approval of the CRO), third party entities, including but not limited to KANS LLC, except as set forth above in this Section 4(a), or any of its affiliates, or other related persons or entities, if any; and (iii) make any distributions in violation of Section 7.9 of the Loan Agreement.

b.      The actual, cumulative Net Operating Cash Flow shall, averaged on a running weekly basis from the beginning of measurement forward, exceed cumulative Net Operating Cash Flow set forth in the Budget, averaged on a running weekly basis from the beginning of measurement forward for the measurement period. Measurement shall begin no earlier than the week ending October 21, 2022 and shall include at least two prior weeks of actuals, at a minimum.

c.      Actual Payments to Pre-Existing Payables shall not be greater than 120% or less than 80% of the Budgeted Payments to Pre-Existing Payables, measured on a cumulative basis, beginning the week ending October 21, 2022 and shall include at least two prior weeks of actuals, at a minimum.

d.      The Borrowers acknowledge and agree that they shall not make any payments for any Restricted CapEx (the "**CapEx Moratorium**"), except as follows:

i.      Upon satisfying the Initial Funding Milestone, the Borrowers may pay the Restricted CapEx, but only to the extent as set forth in the Budget or the Construction CapEx Budget, as applicable, and as approved by the CRO; *provided, however*, that if the Borrowing Base Margin falls below the Borrowing Base Cure Threshold (as defined below) after the occurrence of the Interest Adjustment Date, the CapEx Moratorium will become effective immediately as of the date of the Borrowing Base Certificate evidencing that the Borrowing Base Margin has fallen below the Borrowing Base Cure Threshold and the Borrowers shall not make any payments in respect

of Restricted CapEx, regardless of whether such amounts are accrued, payable, or were otherwise previously approved or scheduled to be paid;

ii.     The CapEx Moratorium shall not prohibit the Borrowers from making payments to ensure necessary repairs and maintenance are made (including, as necessary, payments on old construction invoices owed to repair and maintenance vendors that are required to sustain ongoing operations), solely to the extent that the CRO has approved such payments and informs the Agent of such necessary repairs and maintenance in advance or, to the extent not possible to inform the Agent in advance, as immediately thereafter as possible.

e.     The Borrowers shall pay, and shall cause to be paid, before any fine, penalty interest, or cost may be added thereto, all payroll, sales, occupancy, and other taxes, governmental charges, and assessments required to be paid by the Borrowers and shall file all federal, state, county, and municipal tax returns and reports required to be filed by the Borrowers.

f.     The Borrowers shall continue to engage Stapleton Group, Inc. as their financial advisor (the "**Financial Advisor**"), unless the CRO determines otherwise; *provided, however*, that the Borrowers may change the identity of the Financial Advisor upon the request of the CRO, with the prior written consent of the Agent.

g.     Upon the request of the Agent, the Borrowers shall use commercially reasonable efforts to secure the Line of Credit B Advances through the recordation of titles to the Borrowers' equipment by a third-party recording service. The Borrowers shall pay all costs associated with such recordings, if requested by the Agent. The Agent reserves the right to charge interest at the applicable Default Rate on the Line of Credit B Advances if the Agent determines, in its sole discretion, that the Borrowers are not using best efforts to secure such Loan by all such equipment and equipment titles to the Agent's satisfaction. No Default, Matured Default, or Termination Event under this Section 4(g) shall be deemed to have occurred for so long as the Borrowers continue to demonstrate their commercially reasonable efforts to effect the foregoing, as determined by Agent in its sole discretion.

h.     The Borrowers shall not incur any additional Indebtedness except: (i) with respect to the Initial Funding; (ii) with respect to the Additional Funding; or (iii) as otherwise provided herein or as provided for in Sections 7.1(a), (b), (d), (e), and (f) and 7.4(a), (b), (c) (d), (e), and (g) of the Loan Agreement; *provided, however*, to the extent that there is a conflict between Section 7.4(c) of the Loan Agreement, on the one hand, and the CapEx Moratorium or the Restricted CapEx Amounts, on the other hand, then the CapEx Moratorium or Restricted CapEx Amounts, as applicable, shall control; or (iv) with respect to purchase money security interests securing amounts related to Equipment (as defined in the Loan Agreement) or for maintenance capital expenditures, in each case, as set forth in the Budget as equipment CapEx and approved by the CRO.

i.     During the Forbearance Period, the Borrowers shall not sell, or enter into any new contracts to sell, any Dairy Products ("**New Dairy Contracts**") without first providing the Agent with an assignment of such contracts and proceeds for such Dairy Products. The foregoing limitation shall not apply to any of the Borrowers' existing contracts to sell Dairy

Products; *provided, however*, that the Borrowers shall not pledge any such existing contracts to any other party, whether directly or indirectly, without the Agent's prior written consent. Notwithstanding the remainder of this Section 4(i), in the event of the establishment of the Lockbox (as defined below), the proceeds of any such New Dairy Contracts shall be become subject to the Lockbox, if the Agent directs the establishment of the Lockbox.

j.      As consideration for the forbearance contained herein, on or before the Effective Date, the Borrowers shall pay to the Agent an amount equal to twenty-five basis points (.25%) of the unpaid principal balance of the Liabilities under the Loan Agreement (the "**Forbearance Fee**"). The Agent shall provide to the Borrowers a calculation of the Forbearance Fee prior to the Effective Date. The Agent shall distribute the Forbearance Fee, pro rata, to each of the Lenders.

k.      As of August 31, 2022, the balance in the escrow accounts maintained by the Borrowers with Morgan Stanley was $8,954,663.57.

l.      Upon the request of the CRO, in its sole discretion, the Borrowers shall cause the Board of Directors for Millenkamp Cattle, Inc. and each of its direct and indirect subsidiaries to be comprised of three (3) members, of which: (i) one (1) member shall be an independent director designated by the Agent, in the Agent's sole discretion, which director shall have prior independent third-party board experience; (ii) one (1) member shall be an independent director designated by the Borrowers, subject to the approval of the Agent which approval shall not be unreasonably withheld, which director shall have prior independent third-party board experience; and (iii) one (1) director shall be William John Millenkamp.

m.      Notwithstanding anything to the contrary in the Loan Agreement or the other Financing Agreements, the Borrowers shall continue to comply with the covenants set forth in Sections 6 and 7 of the Loan Agreement, as supplemented by the terms of this Agreement. To the extent that there is any conflict between this Agreement and the Loan Agreement regarding the foregoing, the terms of this Agreement shall control.

n.      In connection with grants set forth in Section 3(d) of this Agreement, the Borrowers shall provide to the Agent the documents and other items and information set forth in the Further Assurance Agreement, and shall provide to the Agent all other related information or documentation as Agent reasonably requests.

o.      In the event that any of the Borrowers acquire additional real property or fixtures on or after the Effective Date in accordance with the Loan Agreement, the Borrowers shall immediately notify the Agent of such acquisition and grant to the Agent, for the benefit of the Secured Parties, a continuing second priority security interest in such property, and shall cause the Agent to be named as a mortgagee and loss payee on any insurance related to such property, all as evidenced by such documents as the Agent deems reasonably necessary, in form and substance agreeable to the Agent in the Agent's sole discretion. In connection with such grant, the Borrowers shall provide to the Agent all documents and other items and information as Agent reasonably requests. The Borrowers acknowledge and agree that the foregoing grant is a material inducement for the Agent to enter into this Agreement and the Agent would not enter into this Agreement without such covenant.

p.      Within seventy-five (75) calendar days after the Effective Date, which period the Agent shall extend for an additional thirty (30) days if the Borrowers establish diligent pursuit (as determined by the Agent in the Agent's reasonable discretion), the Borrowers shall: (i) contact each creditor with an interest in a Paid Off Lien (as defined below); (ii)  cause to be terminated each financing statement corresponding to a Paid Off Lien; and (iii) provide evidence to the Agent of such termination promptly upon such termination. For purposes hereof, the term "**Paid Off Lien**" shall mean a lien that has been paid off as explicitly stated in Exhibit 5A to the Loan Agreement but whose corresponding such financing statement(s) has not been terminated by operation of law or the filing of a termination statement.

q.      No Borrower shall provide an assignment or collateral assignment of any of its contracts (a "**Contract Assignment**") to any third party, except with respect to the Initial Funding, to the extent directly related to the property securing the Initial Funding, or the Additional Funding, to the extent that such contract has been assigned to the Agent. Notwithstanding the foregoing, any Borrower may provide a Contract Assignment to MetLife, as MetLife may require, but may only do so if such Borrower or Borrowers also provides a substantially identical Contract Assignment to the Agent, which shall be subject to any Intercreditor Agreements between the Agent and MetLife.

5.      **Milestones**. During the Forbearance Period, the Borrowers shall meet the following milestones (collectively, the "**Milestones**"):

a.      The Borrowers shall obtain the following:

i.      Financing (the "**Initial Funding**") in the aggregate amount of $5,400.000.00, funded on or before thirty (30) days following the Effective Date (the "**Initial Funding Milestone**"), of which $2,900,000.00 has been funded to the Borrowers prior to the Effective Date;

ii.      A commitment for additional funding (the "**Additional Funding Commitment**"), on or before September 23, 2022, for additional funding in the amount of at least $15,000,000.00 (the "**Additional Funding Commitment Milestone**"), which the Borrowers have obtained. The Additional Funding Commitment shall be fully funded (the "**Additional Funding**") on or before the Effective Date, and such funding will be a condition precedent to the occurrence of the Effective Date (the "**Additional Funding Milestone**"); and

iii.      A commitment, on or before March 31, 2023, to fully refinance the Loan and all of the Liabilities evidenced thereunder (including all principal, interest, and expenses) (the "**Refinancing Commitment**"). The funding of the Refinancing Commitment shall close no later than June 30, 2023, subject to Section 1(d) above. The Refinancing Commitment, and the transactions contemplated thereby (the "**Refinancing Transactions**"), shall be in form and substance agreeable to the Agent, in the Agent's sole discretion. The Agent shall cooperate with the Refinancing Transactions to the extent necessary to complete such transactions and timely close the Refinancing Commitment, including executing or causing to be executed such necessary documents agreeable to the Agent in the Agent's sole discretion.

b.      The Initial Funding provided by MetLife may be in the form of a loan secured by the existing mortgage(s) executed by the Borrowers in favor of MetLife and the Initial Funding provided by any party other than MetLife may be in the form of a first lien mortgage on the real property more fully described in **Schedule 6** attached hereto and the Additional Funding may be in the form of second lien funding, a mezzanine loan, subordinated debt (included subordinated convertible notes), or equity funding. The Agent and Borrowers acknowledge and intend that: (i) the Initial Funding shall not be secured by any of the Collateral; and (ii) the Additional Funding will be in the form of mezzanine financing secured by (A) a second lien in the Collateral, excluding the Additional Property, which will be subject to an Intercreditor Agreement substantially in the form of that attached hereto as **Exhibit 2**, and (B) a third lien on the Additional Property, which shall be governed by the Intercreditor Agreement and such mortgage documents as required by MetLife, in form and substance substantially similar to those entered into by and between MetLife and the Agent with respect to the Agent's interest in the Additional Property and as otherwise agreeable to MetLife and the Agent. In the event that the Borrowers fail to satisfy the Additional Funding Milestone because the Agent exercises its discretion to reject any such proposed Intercreditor Agreement or because MetLife rejects any proposed mortgage documents, such failure shall still constitute a Termination Event.

c.      For purposes of this Agreement only, and not any other purpose (including the Loan Agreement), after adjusting for the Borrowers' right to pay down the principal balance of the Loan, upon the earlier to occur of the Borrowing Base Satisfaction Date and September 30, 2022, and in either case continuing thereafter, the Borrowing Base Margin shall be greater than or equal to $10,000,000.00 (the "**Borrowing Base Cure Threshold**").

Notwithstanding the foregoing, subject to Section 12(a)(viii) hereof, the Borrowers shall have been deemed to have satisfied their obligation under this Section 5(c) to meet the Borrowing Base Cure Threshold on the date on which the Borrowers first deliver to the Agent a Borrowing Base Certificate evidencing that the Borrowing Base Margin as of September 30, 2022, which, for clarity, may include the funds Borrowers received from the Additional Funding, is greater than or equal to the Borrowing Base Cure Threshold (the "**Borrowing Base Milestone**") and such date shall referred to as the "**Borrowing Base Satisfaction Date**."

6.      **Interest.** At all times during the Forbearance Period and thereafter, and as consideration for the forbearance contained herein, Borrower shall pay interest on the amounts outstanding under the Loan and Financing Agreements as follows:

a.      <u>Applicable Rate.</u>

i.      The Advances and all other Liabilities that bear interest under the terms of the Loan Agreement shall bear interest at the Forbearance Premium Default Rate from the date of the commencement of the Forbearance Period through, but not including, the occurrence of the Interest Adjustment Date. In the event that the Interest Adjustment Date has not occurred as of the Effective Date, then the Advances and all other Liabilities that bear interest under the terms of the Loan Agreement shall bear interest at the Forbearance Premium Default Rate on and after the Effective Date subject to the following:

(1)    if the Interest Adjustment Date occurs on or before December 1, 2022, the Advances and all other Liabilities that bear interest under the terms of the Loan Agreement shall bear interest at the Monthly Rate from and after such Interest Adjustment Date; or

(2)    if the Interest Adjustment Date does not occur by December 1, 2022, the Advances and all other Liabilities that bear interest under the terms of the Loan Agreement shall continue to bear interest at the Forbearance Premium Default Rate.

ii.    Notwithstanding Section 6(a)(i), upon the occurrence of a Termination Event and until such time as the Agent terminates this Agreement pursuant to Section 12(d) of this Agreement or otherwise, the Advances and all other Liabilities that bear interest under the terms of the Loan Agreement shall bear interest at the Forbearance Premium Default Rate. Further, in the event that such Termination Event occurs as a result of the Borrowing Base Margin falling below the Borrowing Base Cure Threshold at any point after the Borrowing Base Satisfaction Date, the Forbearance Premium Default Rate shall be implemented and effective retroactive to the date that is forty-five (45) days before the date on which the Borrowing Base Certificate evidencing that the Borrowing Base Margin fell below the Borrowing Base Cure Threshold was required to be sent to the Agent pursuant to the Loan Agreement and Section 8(f) hereof. No election by the Agent or direction by the Required Lenders shall be required before interest begins to accrue at the Forbearance Premium Default Rate in accordance with this subsection (a).

iii.    In the event that this Agreement is terminated, whether by mutual agreement of the Parties, by the Agent in its discretion following a Termination Event, or otherwise, then the controlling language regarding interest under the Loan shall revert to that in the Loan Agreement, including but not limited to Section 2.2 thereof.

b.    [Intentionally Omitted].

c.    Payment.

i.    Notwithstanding whether the Monthly Rate or the Forbearance Premium Default Rate are then in effect, on and after the date of the commencement of the Forbearance Period, the Borrowers shall pay to the Agent an amount equal to the amount of interest accrued on the Advances and all other Liabilities that bear interest under the terms of the Loan Agreement at the Monthly Rate on the first day of each month, in accordance with Section 2.2(b) of the Loan Agreement.

ii.    In the event that the Forbearance Premium Default Rate is then in effect, then in addition to amounts payable in accordance with Section 6(c)(i) above, the Borrowers shall also pay to the Agent, in kind, on each monthly payment date through January 1, 2023, the difference between the Forbearance Premium Default Rate, whichever is in effect at such time, and the Monthly Rate (such difference, the "**PIK Interest**"), which PIK Interest shall be accrued and paid in accordance with the provisions of this Section 6(c)(ii). The Borrowers shall pay to the Agent in cash all then accrued PIK Interest, together

with each Lender Party's accrued costs, expenses, and other disbursements (including but not limited to those under Sections 10.2, 10.3, and 10.4 of the Loan Agreement), in full on January 1, 2023. All interest accruing after January 1, 2023 (whether at the Monthly Rate or the Forbearance Premium Default Rate) shall be paid in full in cash to the Agent. The Agent shall provide to the Borrowers a calculation of the amount of PIK Interest and the Lender Parties' costs, expenses, and other disbursements upon reasonable request.

        d.    <u>Acknowledgement</u>. Agent acknowledges and confirms that the Agent applied certain of the funds that it swept from the Borrowers' deposit accounts, which sweeps occurred on June 3, 2022 and June 15, 2022, and certain of the funds that it holds in suspense toward the payment of (i) accrued interest in the amount of $2,529,506.92, bringing accrued interest for Line of Credit A current through June 23, 2022 and Line of Credit B, Line of Credit C, and the Swing Line current through June 1, 2022, and (ii) costs and expenses in the amount of $147,119.23.

        e.    <u>Subsequent Adjustment</u>. No later than three (3) calendar days after the Effective Date, the parties to this Agreement shall execute a SOFR Amendment. For the avoidance of the doubt, this Agreement and any subsequent SOFR Amendment are not intended to be, and shall not be interpreted as being, integrated transactions. This Agreement and any SOFR Amendment are separate, distinct transactions. For purposes hereof, the term "**SOFR Amendment**" shall mean any amendment to this Agreement or the Loan Agreement that replaces the utilization of the LIBOR Rate with a comparable Secured Overnight Financing Rate (SOFR).

        7.    **<u>Representations and Warranties</u>**. Each Borrower represents and warrants, as of the Effective Date, as follows:

        a.    <u>Organization, Authority, Due Execution</u>. Each Borrower is duly organized and existing in good standing under the laws of the state of its organization and in good standing in the state in which the Collateral is located, as applicable. Each Borrower has taken all necessary action required by such Borrower's organizational documents to authorize the execution and delivery of this Agreement and the performance by such Borrower of its obligations hereunder. This Agreement has been duly executed and delivered by or on behalf of each Borrower. This Agreement and the Financing Agreements constitute legal, valid, and binding obligations of each Borrower, enforceable against such Borrower and the Collateral in accordance with their respective terms.

        b.    <u>Borrower Independent Representation</u>. Each Borrower: (i) has consulted with its own counsel with respect to the execution and delivery of this Agreement; (ii) has not relied upon the representations or advice of the Lender Parties or counsel to the Lender Parties in connection with this Agreement; (iii) has knowingly and voluntarily entered into this Agreement after comprehensive negotiations; and (iv) acknowledges that the Agent and the Lender Parties have not acted as such Borrower's fiduciary with regard to the transactions described in this Agreement.

        c.    <u>Accuracy of Financing Agreements Representations</u>. Each of the representations and warranties of each Borrower contained in the Financing Agreements is true and complete in all material respects as if given as of the Effective Date.

d.      Consents and Authorizations. Each Borrower has obtained all necessary approvals and authorizations from all applicable third parties to execute and deliver this Agreement, including, without limitation, any and all franchisors, co-lenders, management companies, governmental authorities, ground lessors, and labor unions, to the extent applicable.

e.      No Reinstatement, Modification, or Novation of Loan; No Waiver. Except as expressly set forth in this Agreement, each Borrower acknowledges and agrees that: (i) this Agreement (A) is not intended to be, and shall not be deemed or construed to be, a reinstatement, novation, release, modification, amendment, or waiver of the Loan or the Financing Agreements or any provisions thereof, except to the extent such are explicitly modified or amended herein, (B) shall not be deemed to cure any existing or imminent defaults under the Financing Agreements, and (C) is not a waiver of the Lender Parties' right to receive any and all sums which may be or become due or payable under the Financing Agreements or otherwise; (ii) the Agent and the Required Lenders, as applicable, have not, do not, and may never waive, release, or compromise any events, occurrences, acts, or omissions that may constitute or give rise to any Defaults or Matured Defaults that existed, may have existed, may presently exist, or may arise in the future; (iii) the Agent reserves all of its rights and remedies with respect to the Loan and the Financing Agreements; (iv) the Agent's agreement to forbear in the taking of any actions or enforcing any remedies solely as to the Existing Matured Defaults, and to perform as provided herein, shall not, except as expressly provided herein, invalidate, impair, negate, or otherwise affect or constitute a waiver of the Agent's ability to take any actions or enforce any remedies under the Financing Agreements or otherwise; and (v) the execution and delivery of this Agreement shall not, except as otherwise specifically set forth herein (A) constitute an extension, modification, or waiver of any aspect of any of the Financing Agreements; (B) extend the Maturity Date or any other due date of any payment or performance of any obligations under the Financing Agreements or payable in connection with the Financing Agreements; (C) give rise to any obligation on the part of the Agent or the Required Lenders, as applicable, to extend, modify, or waive any term or condition of the Financing Agreements; (D) establish any course of dealing with respect to the Financing Agreements; or (E) give rise to any defenses or counterclaims to the right of the Lender Parties to compel payment of any obligations under the Financing Agreements or otherwise enforce their rights and remedies set forth in the Financing Agreements after the Effective Date.

f.      No Offset. No Borrower has any defenses, set offs, claims, counterclaims, or causes of action of any kind or nature whatsoever against any of Released Parties (as defined below) with respect to the Loan, the Financing Agreements, or any indebtedness under the Financing Agreements and to the extent that such Borrower might otherwise have any of such claims, such Borrower waives, releases, and relinquishes any and all of such defenses, setoffs, claims, and counterclaims.

g.      Taxes. The Borrowers have filed (or caused to be filed) all federal, state, county, and municipal tax returns and reports required to be filed prior to the Effective Date and the Borrowers have paid (or caused to be paid) all payroll taxes, sales taxes, and other taxes, governmental charges, and assessments (including all past due fines, penalties and interest) which have become due prior to the Effective Date.

h.    First Priority Perfected Lien. The Agent has valid, first priority perfected liens upon, and security interests in, all of the Collateral except as otherwise may be set forth in the Financing Agreements.

i.    Accuracy of Information. All information furnished to the Agent and the Lender Parties by or on behalf of the Borrowers in connection with this Agreement and the transaction contemplated herein is true, correct and complete in all material respects. Any such information relating to the Borrowers' financial condition accurately reflects such financial condition as of the date(s) thereof, including all contingent liabilities of every type, and each Borrower further represents that its financial condition has not changed materially or adversely since the date(s) of such documents.

j.    No Defaults. Except for the Existing Matured Defaults or cross-defaults relating thereto, to their knowledge after making due inquiry, no Borrower is in default under the Loan Agreement, any other Financing Agreements, or any other contract, lease, or commitment to which such Borrower is a party or is otherwise bound, nor do any circumstances exist that, given the passage of time, would cause such a default to occur.

k.    Milk Contracts. The Borrowers are not party to any milk check or contract assignment agreements other than: (i) that certain Collateral Assignment of Milk Contracts, dated September 18, 2018, between the Agent and Millenkamp Cattle, Inc.; (ii) those certain Milk Check Assignment Agreements for Glanbia Foods, Inc., dated September 26, 2018, between Glanbia Foods, Inc., Millenkamp Cattle, Inc., and the Agent; (iii) that certain Milk Check Assignment Agreement for Glanbia Foods, Inc., dated September 26, 2018, between Glanbia Foods, Inc., Millenkamp Cattle, Inc., and MetLife in relation to MetLife Note A; (iv) that certain Milk Check Assignment Agreement for Glanbia Foods, Inc., dated September 26, 2018, between Glanbia Foods, Inc., Millenkamp Cattle, Inc., and MetLife in relation to MetLife Note B; (v) those certain Milk Check Assignment Agreements for Glanbia Foods, Inc., dated April 15, 2020, and December 9, 2020, between Glanbia Foods, Inc., Millenkamp Cattle, Inc., and MetLife in relation to MetLife Note C; and (vi) that certain Milk Check Assignment Agreement for Glanbia Foods, Inc., dated April 21, 2021, between Glanbia Foods, Inc., Millenkamp Cattle, Inc., and MetLife in relation to MetLife Note D (collectively, the "**Milk Assignment Agreements**").

l.    No Other Assignments. Other than the Milk Assignment Agreements, that certain assignment agreement related to digester receivables from one or more of the Borrowers to MetLife (a copy of which the Borrowers shall have provided to the Agent prior to the Effective Date), and the assignment of rents, water, mineral, oil, and gas rights, and other items specified in Exhibit 5A, Part 4,## 24, 27 of the Third Amended and Restated Loan and Security Agreement, the Borrowers are not party to any other assignment agreements with MetLife.

m.    Customers. As of the Effective Date, the Borrowers' only customers for milk, cream, and other dairy products (collectively, the "**Dairy Products**") are Glanbia Foods, Inc., High Desert Milk, Inc., and Innovative Food Solutions U.S.A., LLC.

n.    Loan Figures. As of October 14, 2022, the principal amounts outstanding under the Loans are as follows: (i) under Line of Credit A the Borrowers owe $84,078,765.55, representing the funded amount of the Line of Credit A Commitment, which amount is comprised

of $84,078,765.55 of borrowings under the Line of Credit A Advances and $0.00 of borrowings under the Swing Line Advances; (ii) under Line of Credit B the Borrowers owe $5,002,974.57, representing the funded amount of the Line of Credit B Commitment; and (iii) under Line of Credit C the Borrowers owe $3,001,072.42, representing the funded amount of the Line of Credit C Commitment.

        o.    <u>No Other Liens</u>. As of the Effective Date, there are no: (i) Idaho statutory liens that, as of the Effective Date or with the passage of time, as determined by the Agent in the Agent's sole discretion, could prime the Agent's security interests in any Collateral, including but not limited to seed and farm labor liens, chemical liens, commodity liens, or agister liens, except as have been previously disclosed to Agent by Borrowers; or (ii) any construction or mechanics' liens affecting any of the Borrowers' property, except as have been previously disclosed to Agent by Borrowers, and in each case of clauses (i) and (ii) above, as explicitly disclosed in **Schedule 4** attached hereto.

        p.    <u>No Guaranty or Pledge</u>. Neither William Millenkamp, Susan J. Millenkamp, nor any of their immediate family members or any trust related to any of the foregoing provided MetLife with a personal guaranty or pledge of the equity of any of the Borrowers.

        q.    <u>No Assignments of Contracts</u>. As of the Effective Date, no Borrower has executed any Contract Assignment except to the extent explicitly disclosed to the Agent.

    8.    **Financial Reporting**. In addition to and without limiting or modifying (except as explicitly set forth herein) all reporting and financial reporting required to be provided under the Financing Agreements, during the Forbearance Period:

        a.    The Borrowers shall hold weekly update calls between the Agent, the Lenders, the Financial Advisor, and the CRO, at a date and time reasonably agreeable to the Lender Parties. To the extent the Lender Parties consent, these updates may be provided to the Lender Parties through submission of a weekly reporting package.

        b.    The Borrowers shall provide an AFCID inspection during the month of September 2022 to the Agent (with copies to the Lenders), with subsequent AFCID inspections to be provided to the Agent (with copies to the Lenders) at the Agent's request.

        c.    The Borrowers shall provide to the Agent (with copies to the Lenders) updates on all construction projects, the costs to complete such projects, and the status of any construction bonds, with such detail and specificity as the Agent reasonably requires.

        d.    The Borrowers, with the assistance of the Financial Advisor and the approval of the CRO, shall prepare and comply with, in addition to the Budget and the Construction CapEx Budget: (i) weekly updates to the Cash Flow Forecast; (ii) weekly estimated Borrowing Base reports; (iii) weekly calculations of total accounts payable and accounts payable related to feed (subsections (i), (ii), and (iii), collectively, a "**Weekly Report**"); and (iv) Borrowing Base Certificates in accordance with Section 8(f) herein. The initial Weekly Report is attached hereto as **Schedule 5**. The Borrowers shall deliver each Weekly Report to the Agent no later than Sunday for the following week's reporting period, and each such Weekly Report shall be subject to the

approval of the Agent, in its reasonable discretion. Each Weekly Report shall, among other things: (A) describe in reasonable detail the aggregate cash receipts and cash disbursements of the Borrowers; (B) specifically identify the variance to actual for any deviations from the prior Weekly Report period; and (C) specifically identify the variance to actual for any deviations from the Initial Financial Reports. With respect to the Borrowing Base Certificates, (x) the Borrowers will provide the Borrowing Base Certificates in accordance with the Reporting provisions, as set forth herein, (y) the Borrowers shall utilize separate form Borrowing Base Certificates for each of dairy cattle and beef cattle, which forms shall be substantially identical to the applicable forms as set forth in Schedule 1, and (z) each Borrowing Base Certificate shall be signed and approved by both William Millenkamp and the CRO.

e.    Without limiting Sections 10.7, 10.8, or 10.9 of the Loan Agreement, and subject to attorney-client privilege or work product restrictions: (i) the Lender Parties shall be entitled to receive and review any final documents or materials prepared by or with the assistance of the Financial Advisor and/or the CRO required hereunder or in the Financing Agreements; (ii) to the extent that the Financial Advisor and/or the CRO prepared any such documents or materials in reliance on underlying documents, materials, or financials, the Lender Parties shall have the right to receive and review such underlying documents, materials, or financials, whether non-public or confidential, *provided, however*, that if any of the Lender Parties seek to receive or review such documents, materials, or financials, then such items shall be disseminated to all of the Lender Parties simultaneously, except that to the extent information is disseminated to the Agent for further dissemination to the Lender Parties, this Section 8(e) will be deemed satisfied; (iii) the Financial Advisor and the CRO are authorized to discuss the items identified in subsections (i) and (ii) above with the Agent and the other Lender Parties, *provided, however*, that no such discussions may be held without the Agent's participation; and (iv) the Financial Advisor and the CRO are authorized to provide responsive information to the Lender Parties regarding the Borrower's operations and financial information, whether non-public or confidential, *provided, however*, that such responsive information shall not be provided to any one of the Lender Parties without simultaneously providing such responsive information to all of the other Lender Parties, except that to the extent information is disseminated to the Agent for further dissemination to the Lender Parties, this Section 8(e) will be deemed satisfied. By executing this Agreement, the Borrowers have hereby directed and authorized the Financial Advisor and the CRO to comply with the foregoing. In the event that there are any attorney-client privilege or work product restrictions in any of the foregoing, the Borrowers and the Lender Parties shall make commercially reasonable efforts to resolve such attorney-client restrictions.

f.    The documents and information, including Borrowing Base Certificates, that the Borrowers are required to furnish or cause to be furnished to the Agent (with copies to the Lenders) shall be provided within forty-five days (45) after the end of each month pursuant to Sections 6.1(c), (d), (g), and (h) of the Loan Agreement, *provided* that Borrowers may (but shall not be required to) furnish such Borrowing Base Certificates to the Agent within thirty (30) days after the end of each month in accordance with the foregoing.

g.    The Borrowers shall update the Cash Flow Forecast with an actual to forecast and deliver the Budget to the Agent no later than 5:00 p.m. (Central Time) on the Effective Date and in accordance with Section 8(d)(i) of this Agreement.

h. The Borrowers shall provide to the Agent (with copies to the Lenders) detailed updates and third-party verifications on the completion of the Borrowers' digester equipment, including by:

i. Verifying that the digester equipment is financed by a third-party holding a purchase money security interest in such equipment, to the extent any Borrower is a party so such agreements;

ii. Providing budget on revenue contribution from the digester; and

iii. Providing all copies of construction contract and financing arrangements regarding the digester to which any Borrower is a party.

i. Notwithstanding anything to the contrary in this Section 8, any requirement of this Section 8 to provide copies of any documents or information to the Lenders shall be deemed satisfied if such documents or information are timely provided to the Agent for the further dissemination to the Lenders.

9. **Release**. The Borrowers, for themselves and on behalf each of their respective members, officers, directors, shareholders, partners, and managers, and all of the heirs, executors, administrators, successors and assigns of each of the foregoing ("**Releasing Parties**"), hereby unconditionally and irrevocably fully waive, release, acquit, settle, and discharge any and all claims, counterclaims, liabilities, damages, defenses, demands, and causes of action that any of the Releasing Parties has or may have against any of the Released Parties as of the date of this Agreement, related to or that may have arisen, may arise or are or become assertable as a result of events occurring in connection with the Loan, this Agreement and the other Financing Agreements, including any claims, causes of action or defenses based on the negligence of the Lender Parties or any of the other Released Parties or on any other "lender liability" theories and do hereby intend to waive, release, compromise and settle such claims and matters, whether known or unknown, whether reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured and whether they arose collaterally, directly, derivatively or otherwise between the Releasing Parties and the Released Parties (collectively, the "**Released Claims**"). Releasing Parties acknowledge that this provision has been specifically bargained for by the Lender Parties as a material inducement to the execution of this Agreement. The term "**Released Parties**" shall mean, individually and collectively, the Agent, the Lenders executing this Agreement, any parties appointed and/or serving as servicer of the Loan, any officers, directors, trustees, employees, agents, servicers, attorneys, subsidiaries, parents and affiliates of the Agent or the Lenders executing this Agreement, and each of the foregoing parties' predecessors in interest, and each and all of their respective past, present and future partners, members, managers, certificate holders, officers, directors, shareholders, employees, agents, contractors, representatives, participants and heirs and each and all of the successors and assigns of each of the foregoing.

10. **Covenant Not to Sue**. The Borrowers, on behalf of themselves and each and every one of the Releasing Parties, covenant and agree never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature

whatsoever against any of the Released Parties by reason of or in connection with any of the Released Claims.

11.     [**Intentionally Omitted**].**Termination Events; Rights and Remedies**.

a.      Each of the following shall constitute a "**Termination Event**" for this Agreement:

i.      if any Borrower fails to timely perform any of its obligations under this Agreement or to comply with any term, condition, covenant, Milestone, or other provision set forth in this Agreement, unless (A) the Agent, in its sole discretion, grants a cure period for performance or compliance with such term, condition, or covenant (in which case the Forbearance Period shall terminate if the applicable Borrower does not comply by the expiration of the cure period), (B) the Agent otherwise waives, in writing (including via email), the Borrowers' failure to so perform or comply, or (C) in the case of any Specified Payment Defaults (as defined below), such default is cured pursuant to Section 12(b) of this Agreement;

ii.     if any representation or warranty of any Borrower in this Agreement or that is contained in any certificate, document, or financial or other statement furnished by the Borrowers at any time under or in connection with this Agreement or otherwise shall prove to have been untrue or inaccurate in any material respect;

iii.    the occurrence of a Default or Matured Default under the Financing Agreements, other than (A) the Existing Matured Defaults, (B) the filing of any mechanics' liens or initiation of any action for the collection of outstanding obligations in connection with the Restricted CapEx Obligation, or (C) with respect to the Borrowing Base Excess provisions of the Loan Agreement, including but not limited to Section (e)(ii) of the definition of Matured Default, so long as the Borrowers are in compliance with Section 5(b) of this Agreement.

iv.     the occurrence of any default or event of default not otherwise subject to a forbearance agreement, or Metlife's exercise of remedies related to any such default or event of default, under the loan documents between the Borrowers and MetLife or any forbearance agreement entered into between the Borrowers and MetLife, other than any cross defaults under such documents triggered or otherwise occurring as a result of (A) the Existing Matured Defaults or (B) the filing of any mechanics' liens or initiation of any action for the collection of outstanding obligations of the Restricted CapEx Obligation;

v.      the occurrence of any Debtor Proceeding

vi.     the commencement of any action, suit, litigation, investigation, or other proceeding against the Released Parties by any Borrower or entity controlled by, affiliated with, related to, or under common control with any Borrower;

vii.    if any Borrower shall file or institute against any of the Released Parties any lawsuit, complaint, administrative claim, adversary proceeding, or other legal action, directly or indirectly, relating to the Loan or the Collateral;

viii.    in the event that (A) the Borrowing Base Satisfaction Date does not occur on or before November 14, 2022 or (B) the Borrowing Base Satisfaction Date timely occurs on or before November 14, 2022, but the Borrowing Base Margin falls below the Borrowing Base Cure Threshold at any time thereafter; and

ix.    failure to comply with any of the terms, conditions, covenants, or agreements in Section 8 of this Agreement within three (3) calendar days of written notice (which may be made via email) to the Borrowers from the Agent (or its counsel).

b.    The lender of the Additional Funding shall have the right, but not the obligation, to cure any of the Borrowers' Specified Payment Defaults. Specifically, upon the occurrence of any Specified Payment Defaults, the Agent shall provide the Additional Funding lender with notice of such default, upon receipt of which the Additional Funding lender shall have fourteen (14) days to cure such default (the "**Cure Period**"). If the Additional Funding lender does not cure such Specified Payment Default within the Cure Period, then such default shall become a Termination Event pursuant to the remainder of this Section 12. Any funding by the Additional Funding lender to cure such Specified Payment Defaults shall be added to the Additional Funding, on the same terms thereof, provided that the inclusion of such additional indebtedness does not otherwise affect any other material term of the Additional Funding agreements. For purposes hereof, the term "**Specified Payment Defaults**" shall mean any default with respect to the Borrowers' obligations to pay the Forbearance Fee, to make any payments required under Sections 3(b) or 6 of this Agreement, or to maintain the Borrowing Base Margin at or above the Borrowing Base Cure Threshold.

c.    The Agent shall provide notice to the Lenders within three (3) Business Days upon: (i) becoming aware of the occurrence of a Termination Event, and (ii) the occurrence of either of clauses 12(a)(i)(A) or (B).

d.    For the avoidance of doubt, and subject to Section 14(a) of this Agreement, the Borrowers, the Agent, and the Lenders executing this Agreement acknowledge and agree that a Termination Event shall not constitute a Default or Matured Default under the Loan Agreement, and the Agent's waiver of any such Termination Event in accordance with the terms herein shall not constitute a waiver of a Default or Matured Default under the Loan Agreement.

e.    Upon the occurrence of a Termination Event, the Agent may, and at the direction of the Required Lenders shall, immediately terminate this Agreement, without any advance notice to the Borrowers, and: (i) any forbearance or deferment granted under this Agreement shall immediately terminate; and (ii) the Agent shall be entitled to exercise any and all of the rights available under this Agreement, the Financing Agreements, by operation of law, and/or in equity.

f.    Without limiting the generality of the foregoing, the Borrowers acknowledge and agree that following the occurrence of a Termination Event the Agent shall have the right to the appointment of a receiver to manage and operate the Borrowers and the Collateral, in its sole discretion, and the Borrowers hereby irrevocably consent to the entry of an order appointing a receiver and agree to fully cooperate with, consent to, and not contest the Agent's efforts to effect the immediate appointment of a receiver in the event the Agent elects to exercise

such right, including, without limitation, the execution by the Borrowers of a consent order appointing a receiver. The Borrowers agree to, and shall not contest, the Agent's filing of any stipulation and consent to entry of judgment for the appointment of a receiver upon the occurrence of a Termination Event.

g.    The Borrowers shall be liable to the Lender Parties, jointly and severally and on a recourse basis, for any actual loss, damage, cost, expense, liability, claim or other obligation incurred by the Lender Parties (including attorneys' fees and costs reasonably incurred) arising out of or in connection with: (i) any Borrower and/or any Affiliate of any Borrower seeking a defense, judicial intervention, or injunctive or any other equitable relief of any kind in connection with any other enforcement action or any exercise or assertion of rights or remedies by the Agent on behalf of the Lender Parties under or in connection with the Financing Agreements or this Agreement (an "**Action**"), *provided* that the court before which such Action is proceeding determines that such defense or request for judicial intervention or injunctive or any other equitable relief is unwarranted, without merit, or not raised in good faith; or (ii) the Borrowers asserting, in a pleading filed in connection with an Action, any defense against the Agent or any right in connection with the Loan, provided that the court before which such Action is proceeding determines that the Borrowers' defense is unwarranted, without merit, or not raised in good faith.

13.    **Recourse**. Notwithstanding any limitation on the Borrowers' liability set forth in the Loan Agreement or other Financing Agreements, each Borrower agrees that in the event: (i) any Borrower fails to timely perform any obligation of under this Agreement, including, without limitation, such Borrower's payment obligations hereunder; (ii) any representation or warranty of such Borrower in this Agreement shall be untrue or inaccurate in any material respect; or (iii) such Borrower fails to comply with the cash management provisions under the Loan Agreement or the other Financing Agreements, then the Borrowers shall each be fully and personally liable to the Lender Parties for all losses related to or arising from such failure to perform or breach, including, but not limited to, any and all unpaid payments and any actual costs and fees incurred by the Lender Parties, including legal fees.

14.    **Miscellaneous**.

a.    <u>Effect on the Notes and the Financing Agreements</u>. The Borrowers, the Agent, and Lenders party hereto agree that (i) the Loan Agreement, the Notes, and all other Financing Agreements remain unmodified and are not being amended by this Agreement; (ii) the terms of the Loan Agreement, the Notes, and all other Financing Agreements shall remain in full force and effect except to the extent that any terms of this Agreement conflict with such terms, in which case this Agreement shall control unless and until the Agent terminates this Agreement pursuant to Section 12(d) or otherwise, in which event the terms of the Loan Agreement, the Notes, and all other Financing Agreements shall control; (iii) the Loan Agreement, the Notes, and other Financing Agreements shall remain in full force and effect, and are hereby ratified and confirmed; (iv) a Termination Event shall not, in and of itself, constitute a Default or Matured Default, *provided, however*, that notwithstanding Section 12(c) of this Agreement, if any act or omission that constitutes a Termination Event hereunder would also constitute a Default or Matured Default under the Loan Agreement, then the occurrence of such act or omission may constitute a Default or Matured Default, as applicable, pursuant to and in accordance with the terms of the Loan Agreement.

b.      Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and all understandings (oral or written) and agreements heretofore had between the parties are merged in or contained in this Agreement. This Agreement shall constitute a Financing Agreement.

c.      Future Negotiations. Each Borrower acknowledges and agrees that: (i) the Lender Parties have no obligation whatsoever to discuss, negotiate, or agree to any restructuring of the Loan, or any modification, amendment, restructuring, or reinstatement of the Financing Agreements or to forbear from exercising its rights and remedies under the Financing Agreements, except as may be expressly provided in this Agreement; (ii) if there are any future discussions among the Lender Parties or any Borrower concerning any such restructuring, modification, amendment, or reinstatement, then no restructuring, modification, amendment, reinstatement, compromise, settlement, agreement, or understanding with respect to the Loan, the Financing Agreements, the Collateral, or any aspect thereof shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by authorized representatives of such parties as required under this Agreement and the Loan Agreement; and (iii) no Borrower shall assert or claim in any legal proceedings or otherwise that any such agreement exists except in accordance with the terms of this Section.

d.      Counterparts; Electronic Signatures. This Agreement may be executed in several counterparts, each of which shall constitute an original but which, collectively, shall constitute one agreement, and shall be deemed to have been executed and delivered when the Agent has received electronic counterparts hereof executed by all parties listed on the signature pages hereto. Documents executed, scanned (in .PDF or similar reprographic format), and/or executed (and, as appropriate, witnessed and/or notarized) electronically using electronic signature software (e.g., DocuSign or similar software), or similar methods (each a method of "**Electronic Execution**") and transmitted electronically shall be deemed original signatures for purposes of this Agreement and all matters related thereto, with such Electronic Execution having the same legal and binding effect as original signatures. The parties agree that this Agreement may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act (E-Sign Act), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act (UETA) and any applicable state law. Any document accepted, executed or agreed to in conformity with such laws will be binding on all parties the same as if it were physically executed and the Borrowers consent to the use of any third party electronic signature capture service providers as may be chosen by the Agent.

e.      Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, successors and assigns, *provided, however*, that the Borrowers may not assign or delegate any rights hereunder or any interest herein without obtaining the prior written consent of the Agent, which may be withheld in its sole discretion, and any such assignment or attempted assignment shall be void and of no effect.

f.      Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be

ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

g.    <u>Survival of Provisions</u>. In addition to that which may be otherwise specified herein, the covenants, acknowledgments, representations, warranties, waivers, releases, agreements, and obligations of the Borrowers contained in this Agreement, shall survive the expiration of the Forbearance Period or termination of this Agreement, including but not limited to Sections 1(c), 3(e), 3(g), 3(h), 4, 9, 10, 11, 12(e), 12(f), and 13 of this Agreement and any grants of additional collateral including but not limited to as set forth in Section 3(c) of this Agreement and the Further Assurance Agreement.

h.    <u>Waiver of Jury Trial</u>. The provisions of Section 10.13 of the Loan Agreement are hereby incorporated in full as though set forth herein.

i.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the state of New York and the applicable Laws of the United States of America, without giving effect to conflict of laws principles.

j.    <u>No Waiver</u>. Except as expressly set forth in this Agreement, no failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, or privilege under this Agreement or under the Financing Agreements or applicable law shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege under this Agreement or under the Financing Agreements or applicable law preclude any other or further exercise thereof or of any other right, remedy, power or privilege. The Agent's acceptance of payment on account of the indebtedness under the Financing Agreements or other performance by any Borrower after the occurrence of a Default, Matured Default, or Termination Event shall not be construed as a waiver of such Default, Matured Default, or Termination Event, any other Default, Matured Default, or Termination Event or any of the Lender Parties rights or remedies. References herein to the Existing Matured Defaults do not in any way create a waiver of other delinquencies, Defaults, or Matured Defaults that are not specified herein or that have or might occur with respect to any Borrower's obligations under the Financing Agreements. Except as otherwise set forth herein, the Lender Parties reserve all of their rights and remedies in connection with any and all defaults under the Financing Agreements, including but not limited to any rights and remedies in connection with any defaults discovered by the Lender Parties after the Effective Date.

l.    <u>Reaffirmation</u>. Except as otherwise provided herein and notwithstanding anything to the contrary, each Borrower hereby reaffirms, assumes, and binds itself in all respects to all of the obligations, liabilities, duties, covenants, terms, and conditions that are contained in the Financing Agreements. The Parties acknowledge and agree that the all of the Collateral does and shall continue to secure the Loan, the Agent's security interests in such Collateral remain valid, binding, perfected, continuing, enforceable, and non-avoidable, and the Borrowers shall remain responsible for all fees, costs, and expenses incurred by the Agent and the Lenders executing this Agreement, which amounts will accrue and constitute obligations under the Loan, as set forth in the Financing Agreements, including Article 10 of the Loan Agreement.

j.    Notices. All notices, requests, demands, and other communications between the parties under this Agreement shall be in writing and shall be given in accordance with the Loan Agreement.

k.    Notice of this Agreement. The Borrowers agree that notice of this Agreement was properly given and received for all purposes under the Financing Agreements, including this Agreement, notwithstanding whether notice was given in the manner provided for, or to all the notice parties set forth, in the Financing Agreements. The Borrowers waive any defenses or claims based on the failure of any person or entity to receive notice of this Agreement.

l.    Tolling of Statute of Limitations. Each and every statute of limitations or other applicable law, rule, or regulation governing the time by which the Agent must commence legal proceedings or otherwise take any action against any Borrower with respect to any breach or default that exists on or prior to the expiration or termination of the Forbearance Period and arises under or in respect of the Financing Agreements shall be tolled during the Forbearance Period. The Borrowers agree, to the fullest extent permitted by law, not to include such period of time as a defense (whether equitable or legal) to any legal proceeding or other action by the Agent in the exercise of its rights or remedies referred to in the immediately preceding sentence.

m.    Admissibility. In the event of any Borrower's default under, and termination or expiration of, this Agreement or any other Financing Agreements, and notwithstanding any federal, state, or local statute, rule (such as Federal Rule of Evidence 408), or common law regarding admissibility of any conduct, statement, or document relating to settlement discussions and attempts to compromise, each Borrower specifically agrees that this Agreement and all attachments executed in conjunction herewith shall be wholly admissible for the purpose of proving any Borrower's liability to the Lender Parties under, and the validity of and amount outstanding under, this Agreement and the other Financing Agreements. Each Borrower's agreement and waiver under this Section 14(m) shall survive the maturity, termination, or expiration of this Agreement, the Notes, the Financing Agreements, and the Loan.

n.    Further Assurances; Cooperation. The Borrowers shall, on or before the tenth (10th) day after written request therefor, do such acts and things, at their expense, as the Agent in its discretion may deem necessary or advisable from time to time (a) to preserve, perfect and protect the Agent's Liens on the Collateral, including the Additional Property, whether now owned or hereafter acquired, and (b) to preserve, perfect, and protect the rights and remedies of the Agent and the Lenders under this Agreement. The Borrowers shall also reasonably cooperate and assist the Agent in perfecting security interests in any of the Collateral, including the Additional Property, and removing and/or terminating, or causing to be removed and/or terminated, released filings.

15.    **Effective Date**. Provided the Agent receives a counterpart (or counterparts) of this Agreement duly executed by the Borrowers and all conditions precedent set forth herein are satisfied, together with payment of the Forbearance Fee, the "**Effective Date**" of this Agreement shall be as set forth on the first page of this Agreement.

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the day and year first above written.

**BORROWERS**

MILLENKAMP PROPERTIES II LLC

By:  Millenkamp Family LLC
　　　an Idaho limited liability company
　　　its sole member

　　　By: _____
　　　　　WILLIAM J. MILLENKAMP
　　　　　Manager

**BORROWERS**

_____
WILLIAM JOHN MILLENKAMP

_____
SUSAN JO MILLENKAMP

EAST VALLEY CATTLE, LLC,
an Idaho limited liability company

By: _____
　　　WILLIAM J. MILLENKAMP
　　　Manager

IDAHO JERSEY GIRLS JEROME DAIRY LLC,
an Idaho limited liability company

By: _____
　　　WILLIAM J. MILLENKAMP
　　　Manager

*[Forbearance Agreement Signature Pages]*

IDAHO JERSEY GIRLS LLC,
an Idaho limited liability company

By: _____
WILLIAM J. MILLENKAMP
Manager


GOOSE RANCH LLC,
an Idaho limited liability company

By:    Millenkamp Family LLC
       an Idaho limited liability company
       its sole member

       By: _____
       WILLIAM J. MILLENKAMP
       Manager


MILLENKAMP PROPERTIES, L.L.C.,
an Idaho limited liability company

By:    Millenkamp Family LLC
       an Idaho limited liability company
       its sole member

       By: _____
       WILLIAM J. MILLENKAMP
       Manager


MILLENKAMP CATTLE, INC.,
an Idaho corporation

By: _____
WILLIAM J. MILLENKAMP
President

By: _____
SUSAN J. MILLENKAMP
Secretary


*[Forbearance Agreement Signature Pages]*

MILLENKAMP FAMILY LLC,
an Idaho limited liability company

By: _____
      WILLIAM J. MILLENKAMP
      Manager


WJM 2012 Trust

By: _____
Susan J. Millenkamp, as Trustee of the WJM 2012
      Trust


SJM 2012 Trust

By: _____
William J. Millenkamp, as Trustee of the SJM 2012
      Trust


BLACK PINE CATTLE LLC,
an Idaho limited liability company

By: _____
      WILLIAM J. MILLENKAMP
      Manager


MILLENKAMP ENTERPRISES LLC,
an Idaho limited liability company

By: _____
      WILLIAM J. MILLENKAMP
      Manager


*[Forbearance Agreement Signature Pages]*

**SOLE LEAD ARRANGER,**
**AGENT AND LENDER**
RABO AGRIFINANCE LLC

By _____

Name _____

Its _____

**LENDER**

BANK OF THE WEST


By _____

Name _____

Its _____


*[Forbearance Agreement Signature Pages]*

USA.605285517.68/2VS

**LENDER**
HAPPY VALLEY USA CREDIT III, LLC

By _____

Name _Andrea Davidson_

Its _VP of Finance & Operations_

*[Forbearance Agreement Signature Pages]*

**EXHIBIT 1**

**Irrevocable Escrow Instructions**

**[begins on the following page]**

## INSTRUCTION LETTER TO SECURITIES INTERMEDIARY

October [ ], 2022

Argonaut Insurance Company
P.O. Box 469011
San Antonio, TX 78246
Attn: Mr. Wyeth Shabel


Morgan Stanley Smith Barney LLC

_____

_____

Attn: _____

      Re:   Control Agreement dated as of August 9, 2021 (the "Control Agreement") among East Valley Cattle, LLC, as Account Holder; Argonaut Insurance Company, as Secured Party; and Morgan Stanley Smith Barney LLC, as Securities Intermediary.
      Morgan Stanley Account Number 612-052459-139

Ladies and Gentlemen:

This Instruction Letter ("Instruction Letter"), pertains to that certain Control Agreement referenced above. Initially capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Control Agreement.

The Account Holder hereby absolutely and irrevocably directs, instructs, and authorizes the Securities Intermediary to, upon the Securities Intermediary's receipt of a Termination Notice from the Secured Party (or other satisfactory evidence that the obligations of the Account Holder to the Secured Party have been satisfied), release the Collateral to the following account in the custody and control of Rabo Agrifinance LLC, a Delaware limited liability company:

| | |
|---|---|
| Correspondent Bank: | US Bank<br>#1 US Bank Plaza<br>St. Louis, MO 63101 |
| ABA Routing Number: | 081000210 |
| For credit to:<br>Account Number: | Rabo Agrifinance LLC<br>1001087913 |
| For further credit to: | Rabo Agrifinance LLC – East Valley Cattle |
| Contact: | Servicing Department<br>(314) 317-8000 |

This instruction provided by the undersigned shall remain in full force and effect, is absolute, irrevocable, and final, and is not subject to revocation, cancellation, modification, or amendment without the written consent of Rabo Agrifinance LLC.

**IN WITNESS WHEREOF**, the undersigned has caused this Instruction Letter to be executed and delivered as of the day and year first above written.

Account Holder

**EAST VALLEY CATTLE, LLC**

_____
William J. Millenkamp, Member

# SCHEDULE 1

## Borrowing Base Margin Calculation

# General Instructions for Completing the
# Rabo AgriFinance Borrowing Base Certificate

**Requested data should be entered into the light yellow shaded cells only.**
All other data elements and fields are driven by formulas that will automatically calculate and populate based on data entered into the shaded cells.

**The final Borrowing Base Certificate is housed on the green tab titled "Borrowing Base".**
Aside from the shaded cells, all information for this tab is derived from data entered into the various input tabs.

**There are seven total input tabs, each of which are distinguished by a gold tab.  As applicable, data for the shaded cells in each of these tabs should be entered to complete the final Borrowing Base Report.**
Pricing
Owned Cattle
Customer Cattle
Feed Inv & Prepaids
Growing Crop
AR & AP
Hedge & Demand Accts
*Note:  The "Customer Finance Summary" tab is created entirely by data entered into the "Customer Cattle" tab.  While it drives parts of the final Borrowing Base Report, data should not be entered directly into this tab.*

**Pricing** - Enter date, pricing, gain/weight, and hedging data.

**Owned Cattle** - Enter identifying information (lot, type, sex), number of head, and current weight data for company owned cattle, procurement cattle, and pasture cattle.

**Customer Cattle** - Enter margin requirements and identifying information (customer name, note, lot, type, sex), number of head, current weight data, and customer financing information for customer cattle.

**Customer Finance Summary** - Once all data has been entered into the "Customer Cattle" tab, select the "Refresh Customer Finance Summary" button on the "Customer Cattle" tab to populate this tab.  No data should be entered directly into this tab.

**Feed Inv & Prepaids** - Enter identifying information (description, location, units) and pricing information for feed and grain inventories and prepaid feed and input expenses.

**Growing Crop** - Enter growing crop budget and investment information and crop plan details.

**AR & AP** - Enter information for packers accounts receivable, other accounts receivable, cattle down payments, accounts payable, and cattle deposits received.

**Hedge & Demand Accts** - Enter information for hedge accounts, demand (deposit) accounts, and related book overdraft/pending transactions.

**Where necessary, additional instructions have been included within each of the tabs.**
This will be to the right of all data cells in a gray shaded box and/or in *blue, italic font* throughout the tab.  (Note, instructions within gray shaded boxes will not print unless default settings are adjusted).

# Rabo AgriFinance, Inc.
## *BORROWING BASE CERTIFICATE*

| TO: | **Rabo AgriFinance, Inc.** |
|---|---|
| FROM: | |
| DATE: | **04/30/2022** |
| Prepared By: | |

*(if different from signer below)*

| | |
|---|---|
| Percentage Occupancy | #DIV/0! |
| Total Head in Yard | |
| Yard Capacity | |

| | # of Head | Collateral Value **A** | Advance Rate | | Borrowing Base Value **B** |
|---|---|---|---|---|---|
| *Company Owned Cattle (see attached reports)* | | | | | |
| Eligible Hedged Cattle | - | - | 85% | = | |
| Eligible Option Protected Cattle | | - | 80% | = | |
| Eligible Cattle (unhedged) | 6,826 | $10,864,103 | 75% | = | $8,148,077 |
| Eligible Pasture Cattle | 16,710 | $11,134,713 | 75% | = | $8,351,035 |
| Eligible Breeding Cattle | | - | 75% | = | |
| Eligible Procurement Cattle *(less than 30 days)* | - | - | 100% | = | - |
| **Total Livestock Inventory** | 23,536 | $21,998,816 | | | $16,499,112 |
| *Operational Items (see attached reports)* | | | | | |
| Notes Receivable - Cattle and Feed Financed | - | $0 | 100% | = | $0 |
| Feed Accounts Receivable | | $0 | 100% | = | $0 |
| Packer Accounts Receivable *(less than 10 days)* | | $0 | 100% | = | $0 |
| Accounts Receivable *(less than 30 days)* | | $0 | 80% | = | $0 |
| Feed and Grain Inventory | | $0 | 75% | = | $0 |
| Prepaid Feed and Input Expenses | | $0 | 80% | = | $0 |
| Investment in Growing Crops *(lower of YTD input cost OR 60% of projected harvest value)* | | $0 | 100% | = | $0 |
| Cattle Down Payments | | $0 | 80% | = | $0 |
| Commodity Hedge Accounts | | $0 | 100% | = | $0 |
| Demand Deposit Accounts | | $0 | 100% | = | $0 |
| | | $0 | | | $0 |
| *Less: (see attached reports)* | | | | | |
| Related Payables and Liabilities | | $0 | 100% | = | $0 |
| Cattle Deposits Received | | $0 | 100% | = | $0 |
| Book Overdraft/Outstanding Transactions | | $0 | 100% | = | $0 |
| Total Collateral Value | | $21,998,816 | | | |
| Total Borrowing Base | | | | | $16,499,112 |

| | |
|---|---|
| Month End RAF Loan Balance | |
| Plus: Accrued Interest RLOC | |
| *Adjusted Loan Balance* | $0 |
| ***Borrowing Base Excess/(Deficit)*** | **$16,499,112** |
| ***COLLATERAL MARGIN*** | $21,998,816 |

| ***Maximum Loan-to-Collateral*** | **75.00%** |
|---|---|
| ***Actual Loan-to-Collateral*** | **0.00%** |

The undersigned warrants that the above Borrowing Base Certificate and its supporting schedules are true and accurate, that there exists no event of default under any agreement executed by the undersigned in favor of Rabo AgriFinance, Inc., and that the undersigned is authorized to execute this certificate.

There are no liens, claims or reservations of title other than those included above that would precede the bank's claims to the assets included in this borrowing base.

BY: _____     TITLE: _____

| Borrowing Base Date:<br>*(must be a month end)* | 04/30/2022 |
|---|---|
| **Pricing Month:** | May-22 |

Worksheet Instructions

### Finish Month & Market Data

| Finish Month | CME Futures<br>Price ($/cwt) | Basis<br>($/cwt) | Basis Adjusted<br>Futures Price |
|---|---|---|---|
| May-22 | $141.90 | $0.00 | $141.90 |
| Jun-22 | $132.65 | $0.00 | $132.65 |
| Jul-22 | $132.65 | $0.00 | $132.65 |
| Aug-22 | $135.28 | $0.00 | $135.28 |
| Sep-22 | $135.28 | $0.00 | $135.28 |
| Oct-22 | $142.48 | $0.00 | $142.48 |
| Nov-22 | $142.48 | $0.00 | $142.48 |
| Dec-22 | $148.45 | $0.00 | $148.45 |
| Jan-23 | $148.45 | $0.00 | $148.45 |
| Feb-23 | $152.38 | $0.00 | $152.38 |
| Mar-23 | $152.38 | $0.00 | $152.38 |
| Apr-23 | $155.28 | $0.00 | $155.28 |
| May-23 | $155.28 | $0.00 | $155.28 |
| Jun-23 | $149.70 | $0.00 | $149.70 |

### Basis:

| Month | Basis ($/cwt) |
|---|---|
| January | |
| February | |
| March | |
| April | |
| May | |
| June | |
| July | |
| August | |
| September | |
| October | |
| November | |
| December | |

### Gain/Weight Data

| | Holstein | Beef |
|---|---|---|
| Cost To Finish ($/lb) | $1.350 | $1.050 |
| Avg. Fat Gain/Day (lb) | 2.65 | 2.65 |
| Steer Out Weight (lb) | 1,350 | 1,500 |
| Heifer Out Weight (lb) | 1,350 | 1,450 |

### Discount/Premium Data

| | |
|---|---|
| Holstein Premium/Discount ($/cwt) | $0.00 |
| Fat (Beef) Premium/Discount ($/cwt) | $0.00 |

### Company Owned Cattle Only
*(excludes pasture & procurement cattle)*

| | |
|---|---|
| % Hedged | 0.0% |
| % Unhedged | 100.0% |
| % Option Protected | 0.0% |

Owned Cattle

| Cutoff Date | 04/30/2022 |
| --- | --- |

| TOTALS | HEAD | CATTLE VALUE |
| --- | --- | --- |
| Company Cattle (Inside) | 6,826.0 | $10,864,102.89 |
| Procurement Cattle | - | - |
| Pasture Cattle | 16,710.0 | $11,134,713.28 |
| **Total** | **23,536.0** | **$21,998,816.17** |

**COMPANY CATTLE**

| LOT #/ID | CATTLE TYPE (B)eef/(H)olstein | SEX (h)eifer/(s)teer/ (m)ixed | CURRENT HEAD | CURRENT WEIGHT | PROJECTED OUT WEIGHT | PROJECTED OUT MONTH | $ VALUE PER CWT | $ PREMIUM/ DISCOUNT PER CWT | ADJUSTED $ VALUE PER CWT | $ VALUE PER HEAD | COST TO FINISH $ VALUE PER HEAD | NET LOT $ VALUE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | - | - | | - | | | | |
| | | | | | - | - | - | | - | - | - | - |
| | | | | | - | - | - | | - | - | - | - |
| | | | | | - | - | - | | - | - | - | - |
| | | | | | - | - | - | | - | - | - | - |
| | | | | | - | - | - | | - | - | - | - |
| | | | | | - | - | | | | | | |
| | h | s | 220.0 | 676.25 | 1,350 | Jan-23 | $148.45 | | $148.45 | $2,004.08 | $909.56 | $240,792.75 |
| | h | s | 558.0 | 755.75 | 1,350 | Dec-22 | $148.45 | | $148.45 | $2,004.08 | $802.24 | $670,625.33 |
| | h | s | 219.0 | 835.25 | 1,350 | Nov-22 | $142.48 | | $142.48 | $1,923.41 | $694.91 | $269,041.50 |
| | h | s | 54.0 | 914.75 | 1,350 | Oct-22 | $142.48 | | $142.48 | $1,923.41 | $587.59 | $72,134.55 |
| | h | s | 250.0 | 994.25 | 1,350 | Sep-22 | $135.28 | | $135.28 | $1,826.21 | $480.26 | $336,487.50 |
| | h | s | 1,013.0 | 1,073.75 | 1,350 | Aug-22 | $135.28 | | $135.28 | $1,826.21 | $372.94 | $1,472,167.58 |
| | h | s | 1,136.0 | 1,153.25 | 1,350 | Jul-22 | $132.65 | | $132.65 | $1,790.78 | $265.61 | $1,732,584.60 |
| | h | s | 1,188.0 | 1,232.75 | 1,350 | Jun-22 | $132.65 | | $132.65 | $1,790.78 | $158.29 | $1,939,395.15 |
| | h | s | 1,778.0 | 1,312.25 | 1,350 | May-22 | $141.90 | | $141.90 | $1,915.65 | $50.96 | $3,315,414.38 |
| | h | s | 374.0 | 1,391.75 | 1,392 | May-22 | $141.90 | | $141.90 | $1,974.89 | | $738,610.08 |
| | h | s | 28.0 | 1,471.25 | 1,471 | May-22 | $141.90 | | $141.90 | $2,087.70 | | $58,455.71 |
| | h | s | 5.0 | 1,550.75 | 1,551 | May-22 | $141.90 | | $141.90 | $2,200.51 | | $11,002.57 |
| | h | s | 1.0 | 1,630.00 | 1,630 | May-22 | $141.90 | | $141.90 | $2,312.97 | | $2,312.97 |
| | h | s | 1.0 | 1,710.00 | 1,710 | May-22 | $141.90 | | $141.90 | $2,426.49 | | $2,426.49 |
| | | | 1.0 | 1,868.75 | 1,869 | May-22 | $141.90 | | $141.90 | $2,651.76 | | $2,651.76 |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |
| | | | | | - | - | | | | | | |

Owned Cattle

| | | | | | - | - | | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| | | | | | - | - | | - | - | - | - | - | - |
| **TOTAL HEAD PROCUREMENT CATTLE** | | | | | - | - | **TOTAL PROCUREMENT CATTLE $ VALUE** | | | | | | - |

| PASTURE CATTLE | CATTLE TYPE (P)asture | SEX (h)eifer/(s)teer/ (m)ixed | CURRENT HEAD | CURRENT WEIGHT | $ VALUE PER CWT | $ VALUE PER HEAD | NET LOT $ VALUE |
|---|---|---|---|---|---|---|---|
| LOT #/ID | | | | | | | |
| | p | s | 2,802.0 | 119.75 | $205.00 | $245.49 | $687,855.98 |

| BREEDING HERD | CATTLE TYPE (B)ull,(C)ow. (P)airs | CURRENT HEAD |
|---|---|---|
| LOCATION/#ID | | |
| | | |

Owned Cattle

| | p | s | 2,464.0 | 199.25 | $205.00 | $408.46 | $1,006,451.60 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | p | s | 2,568.0 | 278.75 | $205.00 | $571.44 | $1,467,451.50 | | | | |
| | p | s | 2,861.0 | 358.25 | $205.00 | $734.41 | $2,101,154.16 | | | | |
| | p | s | 2,600.0 | 437.75 | $205.00 | $897.39 | $2,333,207.50 | | | | |
| | p | s | 2,330.0 | 517.25 | $191.00 | $987.95 | $2,301,917.68 | | | | |
| | p | s | 1,085.0 | 596.75 | $191.00 | $1,139.79 | $1,236,674.86 | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |
| | | | | | FALSE | - | - | | | | |

Owned Cattle

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | FALSE | - | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | | | | | FALSE | | - |
| | **TOTAL PASTURE CATTLE** | | 16,710.0 | | | | $11,134,713.28 |

| | | |
|---|---|---|
| | | |
| **TOTAL BREEDING LIVESTOCK** | | |

Customer Cattle

| Cutoff Date | 04/30/2022 |
|---|---|

| Margin Requirement as a: | Value (% OR $) | Method of Margin |
|---|---|---|
| Percentage (%) of Market Value | | Method 1 |
| $/Head | | Method 2 |
| Method of Margin *(MUST Enter 1 or 2)* | | |

| CATTLE & FEED FINANCING | |
|---|---|
| Total CATTLE & FEED financed | - |
| Less Out of Margin | - |
| Available BB Margin | - |
| Cattle Value | - |
| Margined Cattle Value | - |
| **Borrowing Base Value** | - |
| # Head | - |

| FEED FINANCING | |
|---|---|
| Total FEED financed | - |
| Less Out of Margin | - |
| Available BB Margin | - |
| Cattle Value | - |
| Margined Cattle Value | - |
| **Borrowing Base Value** | - |
| # Head | - |

Refresh Customer Finance Summary

**CUSTOMER CATTLE**

| CUSTOMER NAME/ID | CATTLE NOTE #/ID | LOT #/ID | CATTLE TYPE (f)owell (h)olstein (m)ixed | SEX (h)eifer/(s)teer/ (m)ixed | CURRENT HEAD | CURRENT WEIGHT | CATTLE NOTE $ BALANCE | $ FEED ADVANCED | $ INTEREST BALANCE | PROJECTED OUT WEIGHT | PROJECTED OUT MONTH | $ VALUE PER CWT | $ PREMIUM/ DISCOUNT PER CWT | ADJUSTED $ VALUE PER CWT | $ VALUE PER HEAD | COST TO FINISH $ VALUE PER HEAD | NET LOT $ VALUE | TOTAL $ LOAN BALANCE | CURRENT MARGIN | REQUIRED MARGIN | MARGIN EXCESS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Customer Name or ID | Total Cattle Note Balance | Total Feed Advanced | Total Interest | Total Loan Balance | Total Cattle (Lot) Value | Total Margin Required | Total Margin Excess (Deficit) | Total Head |
|---|---|---|---|---|---|---|---|---|
| (blank) | - | - | - | - | - | - | - | |

**No data entry is required on this page.**
all data pulls from the Customer Cattle Ta

| TOTAL CUSTOMER FINANCE CATTLE/FEED | | - | | - | | - | | |

**Rabo AgriFinance, Inc.**

*BORROWING BASE SUPPLEMENTAL SCHEDULE*

*FEED AND GRAIN INVENTORY AND PREPAID EXPENSES*

**Name:** 0
**Date:** 04/30/2022

**FEED AND GRAIN INVENTORY**
*(unhide up to 40 additional rows between rows 20 and 61 as needed)*

| DESCRIPTION | LOCATION | NUMBER OF UNITS | UNITS (e.g. BU./LBS./TONS) | UNIT PRICE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | Total Market Value of Feed & Grain | |

**PREPAID FEED AND INPUT EXPENSES**
*(unhide up to 40 additional rows between rows 75 and 116 as needed)*

| DESCRIPTION | VENDOR OR SUPPLIER |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | Total Prepaid Expenses |

| TOTAL VALUE |
|---|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| $0.00 |

| TOTAL VALUE |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| $0.00 |

## Rabo AgriFinance, Inc.
### *BORROWING BASE SUPPLEMENTAL SCHEDULE*
### *INVESTMENT IN GROWING CROP SCHEDULE AND CROP PLAN*

**Name:  0**
**Date:   04/30/2022**

| EXPENSE CATEGORY | $ INVESTED PRIOR TO THIS MONTH | $ INVESTED THIS MONTH | TOTAL $ INVESTED YEAR-TO-DATE | TOTAL $ BUDGETED YEAR-TO-DATE |
|---|---|---|---|---|
| **Labor Hired** | | | $0.00 | |
| **Repairs/Maintenance** | | | $0.00 | |
| **Seed** | | | $0.00 | |
| **Fertilizer/Chemicals** | | | $0.00 | |
| **Machine Hire** | | | $0.00 | |
| **Supplies** | | | $0.00 | |
| **Fuel & Oil** | | | $0.00 | |
| **Insurance** | | | $0.00 | |
| **Utilities** | | | $0.00 | |
| **Freight/Trucking** | | | $0.00 | |
| **Other** | | | $0.00 | |
| | | | $0.00 | |
| **Totals** | $0.00 | $0.00 | $0.00 | $0.00 |

*Totals for expense category is not to exceed 60% of the projected value of the harvested revenue including government payments*

### CROP PLAN

| CROP DESCRIPTION | ACRES (NET) | YIELD/ACRE | $/UNIT | TOTAL CROP VALUE | GOV'T PAYMENT |
|---|---|---|---|---|---|
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | **Totals** | $0.00 | $0.00 |

**Rabo AgriFinance, Inc.**
*BORROWING BASE SUPPLEMENTAL SCHEDULE*
*ACCOUNTS RECEIVABLE / ACCOUNTS PAYABLE*

**Name:** 0
**Date:** 04/30/2022

### PACKER ACCOUNTS RECEIVABLE

| NAME | CATTLE SHIPPED DATE | DOLLAR AMOUNT | BORROWING BASE AMOUNT |
|---|---|---|---|
|  |  |  | $0.00 |
|  |  |  | $0.00 |
|  |  |  | $0.00 |
|  |  |  | $0.00 |
|  |  |  | $0.00 |
| | | **Total Packer A/R** | **$0.00** |

### MISC. ACCOUNTS RECEIVABLE

| NAME | DESCRIPTION | INVOICE DATE | DOLLAR AMOUNT | BORROWING BASE AMOUNT |
|---|---|---|---|---|
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
| | | | **Total Misc. A/R** | **$0.00** |

### CATTLE DOWN PAYMENTS

| NAME | DESCRIPTION | DATE | DOLLAR AMOUNT |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| | **Total Cattle Down Payments** | | **$0.00** |

### ACCOUNTS PAYABLE
*(enter dollar values as a negative number)*

| NAME | DESCRIPTION | INVOICE DATE | DOLLAR AMOUNT |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| | | **Total A/P** | **$0.00** |

### CATTLE DEPOSITS RECEIVED
*(enter dollar values as a negative number)*

| NAME | DESCRIPTION | DATE | DOLLAR AMOUNT |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| | **Total Cattle Deposits** | | **$0.00** |

## Rabo AgriFinance, Inc.

### *BORROWING BASE SUPPLEMENTAL SCHEDULE*
### *COMMODITY HEDGE ACCOUNTS AND BANK ACCOUNTS*

**Name:  0**
**Date:   04/30/2022**

### HEDGE ACCOUNTS

| BROKER | ACCOUNT NUMBER |
|--------|----------------|
|        |                |
|        |                |
|        |                |
|        |                |
|        |                |
|        |                |
|        |                |
|        |                |
|        | **Total NLV** |

### DEMAND ACCOUNTS

| BANK | DESCRIPTION |
|------|-------------|
|      |             |
|      |             |
|      |             |
|      |             |
|      | **Total Book Balance** |

### BOOK OVERDRAFT/OUTSTANDING PENDING TRANSACTIONS
*(enter outgoing dollar values as a negative number and incoming dollar values as a positi*

| BANK OR COUNTERPARTY | DESCRIPTION |
|----------------------|-------------|
|                      |             |
|                      |             |
|                      |             |
|                      |             |
|                      | **Total Amount** |

| NET LIQUIDATING VALUE |
| --- |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| $0.00 |

| RECONCILED BOOK BALANCE |
| --- |
| |
| |
| |
| |
| |
| |
| $0.00 |

*ve number)*

| AMOUNT |
| --- |
| |
| |
| |
| |
| |
| |
| $0.00 |

| Borrower | Millenkamp Cattle Inc. | | | | | | | | | | | | | | | Based on 6/21/22 Cattle |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operation Type | Dairy | | | | | | | | | | | | | | | Updated Springer Definition |
| RM/RA | Hopkins/Pyle | | | | | | | | | | | | | | | Updated Steer Valuation |
| Loan Number(s) | 22115442;22115444 | | | | | | | | | | | | | | | |
| Commitment Amount | $  91,000,000 | | | | | | | | | | | | | | | Removed MetLife Milk Assignment |

| | 01/31/21 | 02/28/21 | 03/31/21 | 04/30/21 | 05/31/21 | 06/30/21 | 07/31/21 | 08/31/21 | 09/30/21 | 10/31/21 | 11/30/21 | 12/31/21 | 01/31/22 | 02/28/22 | 03/31/22 | 04/30/22 | Pro Forma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livestock -Milking/Dry Cows | 33,257 | 34,214 | 35,029 | 36,050 | 36,565 | 36,458 | 36,170 | 35,774 | 35,442 | 35,757 | 36,022 | 36,853 | 37,843 | 38,529 | 39,005 | 39,194 | 39,194 |
| Livestock - Springers | 4,516 | 4,176 | 3,635 | 3,098 | 2,965 | 4,874 | 3,012 | 3,207 | 2,874 | 3,422 | 4,047 | 3,844 | 3,811 | 3,824 | 3,539 | 3,223 | 3,672 |
| Livestock - Heifers 0-21 months | 32,223 | 30,750 | 29,504 | 29,822 | 28,180 | 28,241 | 28,118 | 27,879 | 27,522 | 26,402 | 25,272 | 25,043 | 24,432 | 24,003 | 23,860 | 23,693 | 22,643 |
| Steer Calves - 0-5 Months | 8,013 | 9,594 | 11,320 | 11,456 | 12,420 | 13,108 | 12,034 | 11,360 | 11,584 | 11,328 | 10,618 | 10,597 | 10,844 | 11,429 | 12,506 | 12,960 | |
| Steer Calves - 5+ Months | 6,550 | 5,824 | 4,472 | 3,491 | 3,959 | 4,467 | 6,654 | 9,559 | 10,059 | 10,994 | 12,008 | 12,691 | 12,175 | 12,258 | 11,576 | 11,275 | 23,536 |
| Fat Steers/ Beef Cows | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **Total Livestock Inventory** | 87,059 | 87,058 | 86,460 | 86,417 | 86,589 | 89,648 | 88,488 | 90,279 | 89,981 | 90,403 | 90,467 | 91,528 | 91,605 | 92,543 | 92,986 | 92,845 | 91,545 |

| | Advance Rates | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $40.64 | ($0.05) | ($71.57) | $484.40 | $425.96 | $279.49 | $157.58 | ($32.12) | ($46.38) | ($47.73) | ($98.54) | ($85.83) | ($65.03) | ($155.63) | ($234.68) | ($206.28) | ($109.81) |

| Collateral Analysis | Advance Rates | 01/31/21 | 02/28/21 | 03/31/21 | 04/30/21 | 05/31/21 | 06/30/21 | 07/31/21 | 08/31/21 | 09/30/21 | 10/31/21 | 11/30/21 | 12/31/21 | 01/31/22 | 02/28/22 | 03/31/22 | 04/30/22 | Pro Forma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livestock - Milking Cows- Dry Cows | 75% | 46,559,800 | 47,899,600 | 49,040,600 | 50,470,000 | 51,191,000 | 51,041,200 | 50,638,000 | 50,083,600 | 49,618,800 | 50,059,800 | 50,430,800 | 51,594,200 | 52,980,200 | 53,940,600 | 54,607,000 | 54,871,600 | 54,871,600 |
| Livestock - Springers | 75% | 6,774,000 | 6,264,000 | 5,452,500 | 4,647,000 | 4,447,500 | 4,311,000 | 4,518,000 | 4,810,500 | 4,311,000 | 5,133,000 | 6,070,500 | 5,766,000 | 5,716,500 | 5,736,000 | 5,308,500 | 4,834,500 | 5,508,000 |
| Livestock - Heifers 0-21 months | 75% | 26,219,476 | 25,546,076 | 25,076,832 | 25,448,741 | 25,278,255 | 25,626,087 | 25,388,065 | 25,194,599 | 25,343,594 | 24,072,952 | 22,935,210 | 22,722,900 | 22,165,740 | 21,651,742 | 21,236,296 | 20,773,136 | 18,344,000 |
| Steer Calves - 0-5 Months | 75% | 3,125,070 | 3,741,660 | 4,414,800 | 4,467,840 | 4,843,800 | 5,112,120 | 4,693,260 | 4,430,400 | 4,623,060 | 4,417,320 | 4,141,020 | 4,132,830 | 4,229,160 | 4,457,310 | 4,877,340 | 5,054,400 | |
| Steer Calves - 5+ Months | 75% | 5,895,000 | 5,241,600 | 4,024,800 | 3,141,900 | 3,563,100 | 4,020,300 | 5,988,600 | 8,603,100 | 9,053,100 | 9,894,600 | 10,807,200 | 11,421,900 | 10,957,500 | 11,032,200 | 10,418,400 | 10,147,500 | 21,998,816 |
| Fat Steers/ Beef Cows | 75% | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 |
| **Total Livestock Inventory** | | 91,073,346 | 91,192,936 | 90,509,532 | 90,675,481 | 91,823,655 | 92,610,707 | 93,725,925 | 95,622,199 | 95,449,554 | 96,076,272 | 96,884,730 | 98,137,830 | 98,549,100 | 99,317,852 | 98,947,536 | 98,181,136 | 103,222,416 |
| Feed, Grain, & Misc. Inventory | 75% | 20,398,299 | 18,927,835 | 16,075,212 | 15,255,414 | 14,268,780 | 17,019,711 | 17,053,445 | 16,659,376 | 27,277,759 | 30,198,867 | 29,045,374 | 25,834,930 | 23,531,334 | 25,368,044 | 18,619,449 | 18,619,449 | |
| Pre Paid Feed | 80% | | | | | | | | | | | | | | | | | |
| Milk Accounts Receivable | 100% | 9,531,338 | 8,658,664 | 10,675,835 | 11,610,679 | 12,098,393 | 10,626,840 | 10,605,763 | 10,811,605 | 12,173,807 | 14,258,530 | 11,209,296 | 11,772,293 | 14,265,240 | 13,503,649 | 13,936,213 | 16,639,415 | 16,639,415 |
| Trade Accounts Receivable | 80% | 2,713,521 | 3,133,915 | 2,774,841 | 3,256,640 | 3,445,098 | 2,660,182 | 2,645,257 | 2,593,199 | 2,828,456 | 2,701,932 | 3,443,049 | 3,615,196 | 2,817,250 | 2,783,466 | 2,327,563 | 3,355,967 | 3,355,967 |
| Deposit Accounts | 100% | | | | | | | | | | | | | | | | | |
| Growing Crop Input Costs | 100% | 1,735,499 | 2,184,526 | 2,418,383 | 3,226,480 | 1,921,800 | 204,438 | - | - | - | 874,740 | 1,113,310 | 3,990,575 | 4,412,135 | 4,403,277 | 4,731,261 | 5,003,482 | 5,003,482 |
| Commodity Accounts | 100% | 8,077,609 | 8,137,653 | 8,387,508 | 8,348,543 | 8,614,760 | 608,337 | 1,339,163 | 1,787,826 | 2,036,124 | 2,821,922 | 3,126,015 | 1,798,942 | 1,755,725 | 443,712 | 291,623 | 277,747 | 277,747 |
| **Total Other Assets** | | 42,456,266 | 41,042,593 | 40,331,779 | 41,697,756 | 40,348,831 | 31,119,508 | 31,643,628 | 31,852,006 | 44,316,146 | 50,855,996 | 47,537,004 | 47,011,936 | 46,781,884 | 42,687,231 | 41,654,704 | 43,896,060 | 43,896,060 |
| Less: Accounts Payable | 100% | 13,691,648 | 14,259,405 | 15,974,994 | 11,434,940 | 11,514,480 | 11,887,662 | 10,845,451 | 13,774,852 | 23,613,738 | 27,450,003 | 26,314,732 | 29,937,564 | 28,418,818 | 30,260,873 | 32,711,109 | 32,986,501 | 32,986,501 |
| **Total Collateral Value** | | 119,837,964 | 117,976,124 | 114,866,317 | 120,938,297 | 120,658,006 | 111,842,653 | 114,524,102 | 113,699,353 | 116,151,962 | 119,484,265 | 118,107,002 | 115,212,202 | 116,912,166 | 111,744,210 | 107,891,131 | 109,090,695 | 114,131,975 |
| **Total Borrowing Base** | | 91,427,349 | 89,819,148 | 87,665,163 | 93,804,245 | 93,445,878 | 83,903,012 | 86,300,208 | 85,110,319 | 84,904,443 | 87,374,594 | 86,015,874 | 83,495,973 | 85,828,558 | 80,969,772 | 77,596,723 | 79,219,355 | 83,000,315 |
| Beginning Loan Balance | | 90,075,619 | 89,820,900 | 90,172,321 | 76,341,669 | 77,870,591 | 73,713,198 | 80,600,617 | 86,259,341 | 86,548,079 | 89,081,097 | 89,565,349 | 86,659,085 | 88,289,534 | 86,966,221 | 86,750,571 | 87,304,364 | 87,304,364 |
| Plus: Accrued Interest | | | | | | | | | | | | | | | | | | |
| Plus: Other | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Less: Payments in Transit | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Loan Balance Adjusted | | 90,075,619 | 89,820,900 | 90,172,321 | 76,341,669 | 77,870,591 | 73,713,198 | 80,600,617 | 86,259,341 | 86,548,079 | 89,081,097 | 89,565,349 | 86,659,085 | 88,289,534 | 86,966,221 | 86,750,571 | 87,304,364 | 87,304,364 |
| **Borrowing Base Excess/(Deficit)** | | 1,351,730 | (1,752) | (2,507,158) | 17,462,576 | 15,575,287 | 10,189,814 | 5,699,591 | (1,149,022) | (1,643,636) | (1,706,503) | (3,549,475) | (3,163,112) | (2,460,977) | (5,996,449) | (9,153,848) | (8,085,009) | (4,304,049) |
| **COLLATERAL MARGIN** | | 29,762,345 | 28,155,224 | 24,693,996 | 44,596,628 | 42,787,415 | 38,129,455 | 33,923,485 | 27,440,012 | 29,603,883 | 30,403,168 | 28,541,653 | 28,553,117 | 28,622,632 | 24,777,989 | 21,140,560 | 21,786,331 | 26,827,611 |
| Maximum Loan-to-Collateral | | 76.29% | 76.13% | 76.32% | 77.56% | 77.45% | 75.02% | 75.36% | 74.86% | 73.10% | 73.13% | 72.83% | 72.47% | 73.41% | 72.46% | 71.92% | 72.62% | 72.72% |
| Actual Loan-to-Collateral | | 75.16% | 76.13% | 78.50% | 63.12% | 64.54% | 65.91% | 70.38% | 75.87% | 74.51% | 74.55% | 75.83% | 75.22% | 75.52% | 77.83% | 80.41% | 80.03% | 76.49% |
| % of Commitment Outstanding | | 98.98% | 98.70% | 99.09% | 83.89% | 85.57% | 81.00% | 88.57% | 94.79% | 95.11% | 97.89% | 98.42% | 95.23% | 97.02% | 95.57% | 95.33% | 95.94% | 95.94% |

As of 2/28/2022 BB margin declined by USD 3.5mln to (USD 5.996mln) indicating negative cash flow. This was a result of above average expenses and some construction costs paid. LFR is currently working on a forbearance agreement with the client to extend the RLOC 6 months. Margin/cow is (USD 155.63)/cow with LTV of 77.83%. Collateral margin is USD 24.778mln.

Prior month-
LTV: 75.52%
Margin: (USD 2.46mln)
Margin/cow: (USD 65.03)/cow
As of 1/31/22 BB improved by USD 702 to (USD 2.461mln) indicating positive cash flow. Milk prices were above break even levels during the month. The construction project continues to progress with excess cashflows being the primary payment method at this time. MetLife is working on a new term loan to reimburse the purchase and improvements to the German Dairy, and funding the remaining +/- USD 3.0mln of the current construction LOC. Millenkamp has paid all past due interest current, but has not paid any default interest at this time. Margin/cow is negative (USD 65.03)/cow with LTV of 75.52%. Collateral margin is USD 28.623mln.

Prior month-
LTV: 75.22%
Margin: (USD 3.163mln)
Margin/cow: (USD 85.83)/cow
As of 12/31/21 BB margin improved by USD 386k to negative (USD 3.16mln). Milk prices were strong during the month. Client's previously had uncleared checks added to the loan balance. At month end clients had a positive bank balance, which reduces the loan balance line item even though the RLOC was not actually paid down. Construction continued during the month, which limited the available cash flow. Margin/cow is negative (USD 85.83)/cow with LTV of 75.22%. Collateral margin is USD 28.553mln.

Prior month-
LTV: 75.83%
Margin: (USD 3.549mln)
Margin/cow: (USD 98.54)/cow
As of 11/30/21 BB margin declined by USD 1.842mln to negative (USD 3.55mln). Sweep account has been turned off as of 11/1/21 and clients have been operating off of cash flow. BB margin is behind current forecast by +/- USD 1.1mln. Margin/cow is negative (USD 98.54)/cow with LTV of 75.83%. Collateral margin is USD 28.54mln.

Prior month-
LTV: 74.55%
Margin: (USD 1.706mln)
Margin/cow: (USD 47.73)/cow
As of 10/31/21 BB margin declined by USD 63k to negative (USD 1.706mln). Negative cash flow was a result of purchasing additional feed and incurred construction expenses. Movement in the BBR margin is in line with projection. BB margin is expected to improve in November and December per provided projection. Margin/cow is negative (USD 47.73)/cow with LTV of 74.55%. Collateral margin is USD 30.403mln.

Prior month-
LTV: 74.51%
Margin: (USD 1.644mln)
Margin/cow: (USD 46.38)/cow

**SCHEDULE 2**

**Further Assurance Agreement**

**[begins on following page]**

# FURTHER ASSURANCE AGREEMENT

This Further Assurance Agreement is dated as of October 20, 2022, and is by WILLIAM JOHN MILLENKAMP a/k/a Bill Millenkamp, SUSAN JO MILLENKAMP a/k/a/ Susie Millenkamp, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, MILLENKAMP CATTLE, INC., an Idaho corporation, MILLENKAMP FAMILY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, MILLENKAMP ENTERPRISES, LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST, WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST, and MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company (collectively, the "**Borrowers**") in favor of RABO AGRIFINANCE LLC, a Delaware limited liability company, as agent for the Lenders and other Secured Parties (the "**Agent**").

**WHEREAS**, on or about October 20, 2022, the Agent and the Borrowers entered into that certain Forbearance Agreement (the "**Forbearance Agreement**"). Capitalized terms used but not defined herein shall have the definition ascribed to such terms in the Forbearance Agreement, except as otherwise noted.

**WHEREAS**, pursuant to the Forbearance Agreement, the Agent agreed, among other things, to forbear from exercising certain rights and remedies in connection with Borrowers' ongoing Defaults and Matured Defaults under the Loan Agreement and in partial consideration therefore, the Borrowers agreed to grant to the Agent, for the benefit of the Lenders and the Secured Parties, a second priority security interest in the Additional Property.

**NOW, THEREFORE**, in consideration of the foregoing and of the terms and conditions contained herein, the Borrowers and the Agent agree as follows:

       A.      **Representations and Warranties Regarding the Additional Property:** The Borrowers hereby represent and warrant to the Agent and the Secured Parties as follows:

       1.      _Validity of Documents_. The execution, delivery, and performance of that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing executed by the Borrowers and made as of the date hereof, encumbering the Additional Property (as amended, restated, extended, renewed or otherwise modified, as used herein, the "**Mortgage**"), and all such other documents made by the Borrowers simultaneously herewith (as the same may be amended, restated, extended, renewed, or otherwise modified, and together with the Forbearance Agreement, collectively, as used herein, the "**Documents**"): (a) are within the power of the Borrowers; (b) have been authorized by all requisite action; (c) have received all necessary approvals and consents; (d) will not violate, conflict with, breach, or constitute (with notice or lapse of time, or both) a default under (i) any law, order or judgment of any court, governmental authority, or the governing instrument of the Borrowers or (ii) any indenture, agreement, or other instrument to which the Borrowers is a party or by which the Borrowers or any of the Additional Property are bound or affected; (e) will not result in the creation or imposition of any lien, charge, or encumbrance upon

any of their properties or assets except for those in the Documents; and (f) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of the Mortgage and Uniform Commercial Code filings). The Documents constitute legal, valid, and binding obligations of the Borrowers.

2.    <u>Litigation</u>. Except as disclosed to the Agent by the Borrowers in writing, with respect to certain lien claims and litigation pending with respect to the Additional Property and certain funds escrowed with respect to such matters, there is no action, suit, or proceeding, judicial, administrative, or otherwise (including any condemnation or similar proceeding), pending or, to the best knowledge of the Borrowers, threatened or contemplated against, or affecting, the Borrowers or the Additional Property which would have a material adverse effect on either the Additional Property or the Borrowers' ability to perform the obligations under the Documents.

3.    <u>Status of the Additional Property.</u>

a.    Except as set forth in the next sentence, the Additional Property is not located in an area identified by the Secretary of Housing and Urban Development, or any successor, as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, or the National Flood Insurance Reform Act of 1994, as each have been or may be amended, or any successor law (collectively, the "**Flood Acts**"). Borrower hereby discloses that the Raft River runs through part of the Additional Property. As a result, a small portion of the Additional Property may fall within an area identified as a flood hazard area, though this condition would be unlikely to have a material adverse effect on either the Additional Property or its use.

b.    The Borrowers have all necessary (i) certificates, licenses, and other approvals, governmental and otherwise, for the operation of the Additional Property and the conduct of its business, and (ii) zoning, building code, land use, environmental, and other similar permits or approvals, all of which are currently in full force and effect and not subject to revocation, suspension, forfeiture, or modification. The Additional Property and its use and occupancy are in full compliance with all applicable laws, and the Borrowers have received no notice of any violation or potential violation of applicable laws which has not been remedied or satisfied, and the zoning classification of the Additional Property permits the use of the Additional Property as intended.

c.    Subject to the immediately following sentence, the Additional Property is served by all utilities (including water and sewer) required for its current and intended use. Certain portions of the Additional Property are not served by utilities, but such lack of utility service does not have a material adverse effect on either the Additional Property and the operations thereon, or the Borrowers' ability to perform the obligations under the Documents.

d.    To the extent applicable with respect to the nature and current and intended use of the Additional Property, any and all public or private roads and streets necessary to serve the Additional Property for its current and intended use have been completed, are serviceable, and, with respect to the public roads, are legally open. To the extent that any portion of the Additional Property is not accessible by roads/streets, such lack of access would not have a material adverse

effect on either the Additional Property and the operations thereon, or the Borrowers' ability to perform the obligations under the Documents.

        e.      The improvements constituting a portion of the Additional Property (now existing or to be constructed, collectively, the "**Improvements**") are free from damage caused by fire or other casualty.

        f.      Except as disclosed to the Agent on the Borrowers' financial statements or otherwise disclosed in writing to Agent by the Borrowers with respect to certain unpaid costs and expenses, including generally that the Borrowers owe a number of vendors for labor, materials, supplies, and equipment, all other costs and expenses for labor, materials, supplies, and equipment used in the construction of the Improvements have been paid in full.

        g.      Except as disclosed to the Agent on the Borrowers' financial statements or otherwise disclosed in writing to Agent by the Borrowers, the Borrowers own and have paid in full for all fixtures and equipment used in connection with the operations at the Additional Property, free of all security interests, liens, or encumbrances except MetLife's security interests reflected in those documents, copies of which the Borrowers have provided to the Agent, and those created by the Documents.

        h.      To the Borrowers' knowledge, after due inquiry, the Additional Property is assessed for real estate tax purposes as one or more wholly independent tax lot(s), separate from any adjoining land or improvements, and no other land or improvements are assessed and taxed together with the Additional Property.

        4.      <u>Illegal Activity</u>. No portion of the Additional Property has been purchased, improved, fixtured, equipped or furnished with proceeds of any illegal activity and, to the best of the Borrowers' knowledge, there are no illegal activities at or on the Additional Property.

        B.      **<u>Covenants and Agreements Regarding the Additional Property</u>**: The Borrowers hereby covenants and agree with the Agent and the Secured Parties as follows:

        1.      <u>Defense of Title, Litigation, and Rights under the Documents.</u> The Borrowers shall forever warrant, defend, and preserve the Borrowers' title to the Additional Property, the validity, enforceability, and priority of the Documents and the lien or security interest created thereby, and any rights of the Agent and Secured Parties under the Documents against the claims of all persons, and shall promptly notify the Agent of any such claims. The Agent (whether or not named as a party to such proceedings) is authorized and empowered (but shall not be obligated) to take such additional steps as it may deem necessary or proper for the defense of any such proceeding or the protection of the lien, security interest, validity, enforceability, or priority of the Documents, title to the Additional Property, or any rights of the Agent under the Documents, including the employment of counsel, the prosecution and/or defense of litigation, the compromise, release, or discharge of such adverse claims, the purchase of any tax title, the removal of any such liens and security interests, and any other actions the Agent deems necessary to protect its interests and those of the Secured Parties. The Borrowers authorize the Agent to take any actions required to be taken by the Borrowers, or permitted to be taken by the Agent in the Documents, in the name and on

behalf of the Borrowers. The Borrowers shall reimburse the Agent on demand for all expenses (including attorneys' fees) incurred by it in connection with the foregoing and the Agent's exercise of its rights under the Documents. All such expenses of the Agent, until reimbursed by the Borrowers, shall be part of the obligations evidenced by the Loan Agreement, bear interest from the date of demand at the Default Rate, and shall be secured by the Additional Property, the Collateral, and all other collateral for the Loan.

    2.    <u>Compliance with Laws and Operation and Maintenance of Additional Property.</u>

    a.    <u>Repair and Maintenance</u>. The Borrowers will operate and maintain the Additional Property in good order, repair, and operating condition. The Borrowers will promptly make all necessary repairs, replacements, additions, and improvements necessary to ensure that the Additional Property shall not in any way be diminished or impaired. The Borrowers will not cause or allow any of the Additional Property to be misused, wasted, or to deteriorate, and the Borrowers will not abandon the Additional Property. No new building, structure, or other improvement shall be constructed on the land constituting a portion of the Additional Property nor shall any material part of the Improvements be removed, demolished, or structurally or materially altered, without the Agent's prior written consent. Without limiting the Agent's rights and remedies under the Loan Agreement or otherwise, if the Borrowers fails to maintain or repair the Additional Property in compliance with the requirements of this Section, then the Agent may impose additional requirements upon the Borrowers including monetary reserves or financial equivalents, until such time as the Agent receives proof satisfactory to the Agent of such compliance.

    b.    <u>Replacement of Additional Property</u>. Without in any way limiting the obligations of the Borrowers set forth in the Loan Agreement with respect to the existing Collateral, the Borrowers will keep the Additional Property fully equipped and will replace all worn out or obsolete fixtures and equipment with comparable fixtures or equipment to the extent allowed under the Forbearance Agreement, which replacement fixtures and equipment shall be encumbered by a lien in favor of the Agent. The Borrowers will not, without the Agent's prior written consent, remove any personal property constituting any portion of the Additional Property unless the same is replaced by the Borrowers with a comparable article owned by the Borrowers free and clear of any lien or security interest (other than the MetLife's security interest and those created by the Documents).

    c.    <u>Compliance with Laws</u>. The Borrowers shall comply with and shall cause the Additional Property to be maintained, used, and operated in compliance with all (i) present and future laws, Environmental Laws (as defined below), ordinances, regulations, rules, orders and requirements (including zoning and building codes) of any governmental or quasi-governmental authority or agency applicable to the Borrowers or the Additional Property (collectively, the "**Laws**"); (ii) orders, rules, and regulations of any regulatory, licensing, accrediting, insurance underwriting or rating organization, or other body exercising similar functions; (iii) duties or obligations of any kind imposed by law, covenant, condition, agreement, or easement, public or private; and (iv) policies of insurance at any time in force with respect to the Additional Property. If proceedings are initiated or the Borrowers receive notice that the Borrowers or the Additional Property is not in compliance with any of the foregoing, then the Borrowers will promptly send

the Agent notice and a copy of the proceeding or violation notice. The Borrowers shall maintain all necessary (A) certificates, licenses, and other approvals, governmental and otherwise, for the operation of the Additional Property and the conduct of its business and (B) zoning, building code, land use, environmental and other similar permits or approvals, in full force and effect. Without limiting the Agent's rights and remedies under the Loan Agreement, Mortgage, or otherwise, if the Additional Property is not in compliance with all Laws, then the Agent may impose additional requirements upon the Borrowers including monetary reserves or financial equivalents, until such time as the Agent receives proof satisfactory to the Agent of such compliance.

        d.     <u>Zoning and Title Matters</u>. The Borrowers shall not, without the Agent's prior written consent, (i) initiate or support any zoning reclassification of the Additional Property or variance under existing zoning ordinances; (ii) modify or supplement any of the Permitted Encumbrances (as defined in the Mortgage); (iii) impose any restrictive covenants or encumbrances upon the Additional Property; (iv) execute or file any subdivision plat affecting the Additional Property; (v) consent to the annexation of the Additional Property to any municipality; (vi) permit the Additional Property to be used by the public or any person in a way that might make a claim of adverse possession or any implied dedication or easement possible; (vii) cause or permit the Additional Property to become a non-conforming use under zoning ordinances or any present or future non-conforming use of the Additional Property to be discontinued; or (viii) fail to comply with the terms of the Permitted Encumbrances.

        e.     <u>Utility Service</u>. The Additional Property shall be served by all utilities (including water and sewer) required for its current and intended use and operations.

        f.     <u>Separate Tax Lot</u>. The Additional Property shall be assessed for real estate tax purposes as one or more wholly independent tax lot(s), separate from any adjoining land or improvements and no other land or improvements shall be assessed and taxed together with the Additional Property.

        3.     <u>Insurance</u>. The Borrowers shall obtain and maintain the insurance required by the Agent pursuant to Section 6.5 of the Loan Agreement, and provide the Agent with evidence thereof satisfactory to the Agent within thirty (30) days of the Effective Date, and thereafter provide such satisfactory evidence of required insurance as may be requested from time to time by the Agent.

        4.     <u>Liens and Liabilities</u>. The Borrowers shall not perform any work on the Additional Property or the Improvements unless expressly permitted by the Forbearance Agreement or otherwise approved by the Agent. The Borrowers shall pay when due all claims and demands of mechanics, materialmen, laborers and others for any such work performed that is expressly permitted by the Forbearance Agreement or otherwise approved by Agent, or, in connection therewith, materials delivered for the Additional Property or the Improvements (collectively, "**Additional Property Payables**"); *provided, however*, that the Borrowers shall have the right to contest in good faith any such Additional Property Payables, including based on construction defects or substandard work, so long as the Borrowers do so diligently, by appropriate proceedings and without prejudice to the Agent or the Secured Parties and provided that neither the Additional Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest. In the event that the Borrowers shall contest any such Additional

Property Payables, the Borrowers shall promptly notify the Agent of such contest and thereafter shall, upon the Agent's request, promptly provide a bond, cash deposit or other security satisfactory to the Agent to protect the interest and security of the Secured Parties should the contest be unsuccessful. If the Borrowers shall fail to immediately discharge or provide security against any such Additional Property Payables as aforesaid, then the Agent may do so, and any and all expenses incurred by the Agent, together with interest thereon at the Default Rate from the date incurred by the Agent until actually paid by the Borrowers, shall be immediately paid by the Borrowers on demand and shall be secured by the Documents and other instruments securing the Loan. The Borrowers shall, at their sole expense, do everything necessary to preserve the lien and security interest created by the Documents and their priority. Nothing in the Documents or the Forbearance Agreement shall be deemed or construed as constituting the consent or request by the Agent, express or implied, to any contractor, subcontractor, laborer, mechanic, or materialman for the performance of any labor or the furnishing of any material for any improvement, construction, alteration, or repair of the Additional Property.

5.    <u>Inspection</u>. Without in any way limiting the rights of the Agent and the Secured Parties under Section 8.2(b) of the Loan Agreement, the Borrowers shall permit the Agent and any person designated by the Agent to enter upon the Additional Property and conduct tests or inspect the Additional Property at all reasonable times and for reasonable purposes, and any and all costs and expenses relating to such tests and inspections shall be paid or reimbursed by the Borrowers promptly upon demand. The Borrowers shall assist the Agent and such person in effecting said inspection.

6.    <u>Additional Security</u>. No other security now existing or taken later to secure the Loan shall be affected by the execution of the Documents and all additional security shall be held as cumulative. The taking of additional security, execution of partial releases, or extension of the time for the payment obligations of the Borrowers shall not diminish the effect and lien of the Documents or any other Documents relating to the Loan and shall not affect the liability or obligations of any maker or guarantor. Neither the acceptance of the Documents nor their enforcement shall prejudice or affect the Agent's right to realize upon or enforce any other security now or later held by the Agent for the benefit of the Secured Parties. The Agent may enforce the Documents or any other security in such order and manner as it may determine in its discretion.

7.    <u>Further Acts</u>. The Borrowers shall take all necessary actions to (i) keep valid and effective the lien and rights of the Agent under the Documents and (ii) protect the lawful owner of the Documents. Promptly upon request by the Agent, and at the Borrowers' expense, the Borrowers shall execute additional instruments and take such actions as the Agent reasonably believes are necessary or desirable to (a) maintain or grant the Agent a second-priority, perfected lien on the Additional Property (including, without limitation, causing any entities into which the Borrowers may be divided to grant to the Agent a second-priority, perfected lien on the Additional Property), (b) grant to the Agent to the fullest extent permitted by Laws, the right to foreclose on, or transfer title to, the Additional Property non-judicially, (c) correct any error or omission in the Documents, and (d) effect the intent of the Documents, including filing/recording the Documents, additional mortgages, financing statements, and other instruments.

C.    **Environmental Representations, Warranties and Covenants**

1.      Environmental Representations and Warranties. The Borrowers represent and warrant, to the best of the Borrowers' knowledge (after due inquiry and investigation), that: (i) there are no Hazardous Materials (defined below) or underground storage tanks affecting the Additional Property (the phrase "**affecting the Additional Property**" shall mean "in, on, under, stored, used, or migrating to or from the Additional Property") except for Hazardous Materials that are (1) in compliance with Environmental Laws (defined below), (2) have all required permits, and (3) are in only the amounts necessary to operate the Additional Property; (ii) there are no past, present, or threatened Releases (defined below) of Hazardous Materials in violation of any Environmental Law affecting the Additional Property; and (iii) there is no past or present non-compliance with Environmental Laws or with permits issued pursuant thereto. "**Environmental Law**" means any present and future federal, state, and local laws, statutes, ordinances, rules, regulations, standards, policies, and other government directives or requirements, as well as common law, that apply to the Borrowers or the Additional Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act. "**Hazardous Materials**" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("**PCBs**") and compounds containing them; lead and lead-based paint; Microbial Matter, infectious substances, asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Additional Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Environmental Law. "**Release**" of any Hazardous Materials includes any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, pumping, pouring, escaping, dumping, disposing or other movement of Hazardous Materials. "**Microbial Matter**" shall mean the presence of fungi or bacterial matter which reproduces through the release of spores or the splitting of cells, including, but not limited to, mold, mildew and viruses, whether or not such Microbial Matter is living. In connection with the representations and warranties made herein, the Borrowers have completed the environmental questionnaire attached to the Forbearance Agreement.

2.      Environmental Covenants. The Borrowers covenant and agree that: (i) all use and operation of the Additional Property shall be in compliance with all Environmental Laws and required permits; (ii) there shall be no Releases of Hazardous Materials affecting the Additional Property in violation of Environmental Laws; (iii) there shall be no Hazardous Materials affecting the Additional Property except in compliance with all Environmental Laws, in compliance with all required permits, and in only the amounts necessary to operate the Additional Property; (iv) the Borrowers shall keep the Additional Property free and clear of all liens and encumbrances imposed by any Environmental Laws due to any act or omission by the Borrowers or any person (the "**Environmental Liens**"); (v) the Borrowers shall, at their sole expense, fully and expeditiously cooperate in all activities performed in connection with this Section including providing all relevant information and making knowledgeable persons available for interviews; (vi) the Borrowers shall, at their sole expense, (A) perform any environmental site assessment or

other investigation of environmental conditions at the Additional Property upon the Agent's request, should any event occur or circumstances exist that would, in the Agent's sole but reasonable determination, warrant such assessment or investigation, (B) share with the Agent the complete and accurate results and reports, and the Agent and the Secured Parties shall be entitled to rely on such results and reports, and (C) complete any remediation of Hazardous Materials affecting the Additional Property or other actions required by any Environmental Laws (the Agent, for itself and on behalf of the Secured Parties may elect to perform such assessments and complete such remediation described in this clause (vi) at its sole and absolute discretion, at the expense of the Borrowers); and (vii) the Borrowers shall immediately notify the Agent in writing after any of them becomes aware of (A) the presence, Release, or threatened Release, of Hazardous Materials affecting the Additional Property, (B) any non-compliance of the Additional Property with any Environmental Laws, (C) any actual or potential Environmental Lien, (D) any required or proposed remediation of environmental conditions relating to the Additional Property, or (E) any written or oral communication or notice from any person relating to Hazardous Materials, or any oral communication relating to or alleging any violation or potential violation of Environmental Law.

3.    <u>Agent's Rights</u>. The Agent and any person designated by the Agent may enter the Additional Property to assess the environmental condition of the Additional Property and its use (provided that no more than one such assessment shall be conducted unless the same is conducted in connection with a sale or transfer of all or any portion of the Loan, or any other event occurs or circumstances exist that would, in the Agent's sole but reasonable determination, warrant such assessment), including (i) conducting any environmental assessment or audit (the scope of which shall be determined by the Agent) and (ii) taking samples of soil, groundwater, or other water, air, or building materials, and conducting other invasive testing at all reasonable times when (A) a default has occurred under the Documents, (B) the Agent reasonably believes that a Release has occurred or the Additional Property is not in compliance with all Environmental Laws, or (C) the Loan is being considered for sale (any out-of-pocket expenses incurred in connection with the entry under clause (C) only shall be at the Agent's expense unless a default under the Documents has occurred). The Borrowers shall cooperate with and provide access to the Agent and such other person in connection with such activities.

D.    **Definitions.** The following shall apply from and after the date hereof

1.    All provisions with respect to the "Mortgaged Property" and "Collateral" in the Loan Agreement are hereby incorporated by reference to also apply to the Additional Property.

2.    All provisions with respect to the "Mortgage" pursuant to the terms of the Loan Agreement in the Loan Agreement are hereby incorporated by reference to also apply to the Mortgage.

E.    **Miscellaneous.**

1.    The Miscellaneous Provisions of the Forbearance Agreement, as set forth in Section 14 thereof, except for Sections 14(a), (g), and (l), shall apply and be incorporated by reference to this Further Assurance Agreement.

2.      In addition to that which may be otherwise specified herein, the covenants, acknowledgments, representations, warranties, waivers, releases, agreements, and obligations of the Borrowers contained in this Further Assurance Agreement, shall survive the expiration of the Forbearance Period or the termination of the Forbearance Agreement.

*[signature pages follow]*

**BORROWERS**

MILLENKAMP PROPERTIES II LLC

By:  Millenkamp Family LLC
     an Idaho limited liability company
     its sole member

     By: _____
         WILLIAM J. MILLENKAMP
         Manager

_____
WILLIAM JOHN MILLENKAMP

_____
SUSAN JO MILLENKAMP


EAST VALLEY CATTLE, LLC,
an Idaho limited liability company

By: _____
    WILLIAM J. MILLENKAMP
    Manager


IDAHO JERSEY GIRLS JEROME DAIRY LLC,
an Idaho limited liability company

By: _____
    WILLIAM J. MILLENKAMP
    Manager


IDAHO JERSEY GIRLS LLC,
an Idaho limited liability company

By: _____
    WILLIAM J. MILLENKAMP
    Manager


[*Further Assurance Agreement Signature Pages*]

GOOSE RANCH LLC,
an Idaho limited liability company

By:    Millenkamp Family LLC
        an Idaho limited liability company
        its sole member

        By: _____
              WILLIAM J. MILLENKAMP
              Manager


MILLENKAMP PROPERTIES, L.L.C.,
an Idaho limited liability company

By:    Millenkamp Family LLC
        an Idaho limited liability company
        its sole member

        By: _____
              WILLIAM J. MILLENKAMP
              Manager


MILLENKAMP CATTLE, INC.,
an Idaho corporation

By: _____
      WILLIAM J. MILLENKAMP
      President

By: _____
      SUSAN J. MILLENKAMP
      Secretary


MILLENKAMP FAMILY LLC,
an Idaho limited liability company

By: _____
      WILLIAM J. MILLENKAMP
      Manager


[*Further Assurance Agreement Signature Pages*]

WJM 2012 Trust

By: _____
Susan J. Millenkamp, as Trustee of the WJM 2012
    Trust

SJM 2012 Trust

By: _____
William J. Millenkamp, as Trustee of the SJM 2012
    Trust

BLACK PINE CATTLE LLC,
an Idaho limited liability company

By: _____
    WILLIAM J. MILLENKAMP
    Manager

MILLENKAMP ENTERPRISES LLC,
an Idaho limited liability company

By: _____
    WILLIAM J. MILLENKAMP
    Manager

[*signature pages continue*]

[*Further Assurance Agreement Signature Pages*]

**SOLE LEAD ARRANGER,**
**AGENT AND LENDER**
RABO AGRIFINANCE LLC

By _____
Name _____
Its _____

*[Further Assurance Agreement Signature Pages]*

## SCHEDULE 3

### Initial Budget and Construction CapEx Budget

**(Schedule 3)**

## Millenkamp Construction Budget to Actual

| Final Completion Date: 03/31/23 | Remaining Budget | Accounts Payable | Unvouchered AP | Budget Plus AP | Funds Disbursed through 9/30/22 | Remaining Disbursements |
|---|---|---|---|---|---|---|
| Milk Barn #2 | $ 700,000 | $ 126,267 | $ 81,402 | $ 907,669 | $ (211,680) | $ 695,989 |
| Storage Shop | $ 550,000 | $ 237,205 | $ 102,047 | $ 889,252 | $ (264,890) | $ 624,363 |
| Cross Vent Barn #1 | $ 100,000 | $ 406,192 | $ 128,671 | $ 634,863 | $ (494,005) | $ 140,858 |
| Employee Housing | $ 275,000 | $ 21,952 | $ 218,568 | $ 515,520 | $ (163,383) | $ 352,137 |
| Pressure Washer Building | $ 350,000 | $ 69,071 | $ 15,380 | $ 434,451 | $ (79,477) | $ 354,975 |
| Generator Building | $ 75,000 | | | $ 75,000 | $ - | $ 75,000 |
| Connection Structure | $ 25,000 | | | $ 25,000 | $ - | $ 25,000 |
| Digester/Manure Project | | $ 4,038 | $ - | $ 4,038 | $ (4,038) | $ - |
| Contingency | $ 400,000 | | | $ 400,000 | $ - | $ 400,000 |
| **Grand Total** | **$ 2,475,000** | **$ 864,726** | **$ 546,068** | **$ 3,885,794** | **$ (1,217,472)** | **$ 2,668,322** |



## Schedule 3 — Statement of Operations 2022

| Statement of Operations 2022 | Actual 2022 JAN. | Actual 2022 FEB | Actual 2022 MAR | Actual 2022 APR | Actual 2022 MAY | Actual 2022 JUN | Actual 2022 JUL | Actual 2022 AUG | Proj. 2022 SEP | Proj. 2022 OCT | Proj. 2022 NOV | Proj. 2022 DEC | 2022 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Milk Sales | 15,107,990 | 14,471,076 | 16,847,226 | 19,427,085 | 20,546,707 | 17,754,395 | 18,130,589 | 17,789,621 | 17,074,846 | 18,316,517 | 17,072,862 | 17,511,329 | 210,120,221 |
| Custom Feeding | 1,435,923 | 1,284,749 | 1,467,920 | 1,506,671 | 1,584,016 | 1,563,810 | 1,612,193 | 1,627,429 | 1,433,790 | 1,481,583 | 1,433,790 | 1,481,583 | 17,913,472 |
| Cow & Steer Sales | 2,140,036 | 1,313,242 | 1,281,293 | 2,334,165 | 4,529,403 | 3,782,674 | 4,375,569 | 1,791,193 | 4,500,000 | 2,770,000 | 4,270,000 | 4,270,000 | 38,077,571 |
| Other Cattle Sales | 955 | 902 | | 12,021 | 65,772 | | | | | | | | 79,650 |
| Gain (Loss) on Milk Derivatives | (166,271) | (137,256) | (152,089) | (13,878) | (8,568) | | (111,725) | | 6,500 | 6,500 | 6,500 | 6,500 | (598,016) |
| Trucking Income | 81,500 | 65,166 | (58,968) | 21,174 | 79,781 | 41,932 | 87,751 | 438,917 | | | | | 783,252 |
| Patronage Dividends | | | 2,903 | | 51,486 | | | | | | | | 54,388 |
| Other | | | | (2,145) | 37,954 | 1,006,910 | (16,862) | (5,804) | | | | | 1,020,053 |
| **Total Revenue** | 18,600,187 | 16,997,877 | 20,188,285 | 23,285,095 | 26,835,297 | 24,192,639 | 24,188,240 | 21,429,631 | 23,015,136 | 22,574,600 | 22,783,152 | 23,369,412 | 267,459,356 |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| Feed | 12,295,496 | 11,665,190 | 14,261,033 | 13,659,790 | 14,243,128 | 12,989,147 | 13,819,089 | 15,128,238 | 13,460,774 | 14,005,388 | 13,553,601 | 14,005,388 | 163,090,651 |
| Steers | 3,187,309 | 1,449,454 | 2,730,065 | 1,580,652 | 4,363,118 | 4,368,637 | 5,122,181 | 2,200,851 | 2,284,728 | 2,386,131 | 2,475,218 | 2,553,485 | 34,701,829 |
| Steer Cost Inventoried | (2,688,131) | (2,646,509) | (3,159,870) | (3,299,175) | (3,373,568) | (3,181,793) | (3,190,233) | (3,143,539) | (2,917,755) | (3,015,014) | (2,917,755) | (3,015,014) | (36,548,356) |
| Heifer Cost Capitalized | (2,836,078) | (2,653,537) | (2,495,522) | (3,117,725) | (3,115,970) | (2,940,491) | (3,740,676) | (2,996,986) | (2,922,478) | (2,922,478) | (2,922,478) | (3,019,864) | (35,684,283) |
| Farm (Income) Loss | 331,199 | 437,241 | 479,136 | 672,150 | 675,356 | 886,872 | 740,810 | 344,244 | 809,851 | 607,301 | 587,710 | 607,301 | 7,778,171 |
| Other | 437,241 | | | | | (607,263) | (1,839,104) | (2,504,330) | | (1,282,738) | | | |
| **Total Cost of Goods Sold** | 10,289,754 | 8,271,839 | 11,324,842 | 9,501,692 | 12,792,764 | 14,043,133 | 11,635,066 | 12,342,509 | 15,025,487 | 9,681,174 | 10,776,296 | 11,131,266 | 127,091,266 |
| **Gross Profit** | 8,310,433 | 8,726,038 | 8,863,443 | 13,783,403 | 14,043,113 | 12,877,680 | 12,554,174 | 9,087,122 | 15,025,487 | 12,893,426 | 12,006,855 | 12,238,146 | 140,416,044 |
| *Gross Margin (%)* | 44.7% | 51.3% | 43.9% | 59.2% | 52.3% | 53.2% | 51.9% | 42.4% | 65.3% | 57.1% | 52.7% | 52.4% | 52.5% |
| Depreciation on Dairy Herd | 1,041,838 | 1,067,726 | 1,088,057 | 1,089,522 | 1,119,767 | 1,129,713 | 1,133,168 | 1,094,246 | 1,086,079 | 1,122,282 | 1,086,079 | 1,122,282 | 13,177,753 |
| Loss on Sale of Herd | 817,607 | 719,209 | 689,256 | 114,401 | 888,493 | 672,491 | 637,576 | 1,074,916 | 623,492 | 644,275 | 623,492 | 644,275 | 8,118,062 |
| (Gain) Loss on Sale of Wet Cows | | | | (282,862) | 82,140 | (32,040) | | | | | | | (205,327) |
| **Total Herd Replacement** | 1,859,445 | 1,786,935 | 1,774,313 | 921,061 | 2,090,400 | 1,770,164 | 1,770,744 | 2,169,162 | 1,709,571 | 1,766,556 | 1,709,571 | 1,766,556 | 21,090,419 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Labor | 2,092,920 | 1,904,079 | 2,132,067 | 2,054,884 | 2,135,571 | 2,143,057 | 2,197,070 | 2,141,295 | 2,092,094 | 2,161,753 | 2,092,019 | 2,161,753 | 25,308,446 |
| Depreciation – PP&E | 542,422 | 542,477 | 561,544 | 551,757 | 553,930 | 552,747 | 551,593 | 551,247 | 546,411 | 564,625 | 564,625 | 564,625 | 6,648,010 |
| Amortization | 10,842 | 10,843 | 10,843 | 10,841 | 10,845 | 10,844 | 10,841 | 10,841 | 10,753 | 11,111 | 10,753 | 11,111 | 130,868 |
| Contract Services | 7,071 | 190 | 17,071 | 2,042 | 7,023 | 7,923 | 7,023 | 7,410 | 7,192 | 12,288 | 12,279 | 12,288 | 99,800 |
| Equipment Lease | 169,814 | 171,500 | 169,814 | 257,400 | 187,341 | 89,190 | 187,842 | 198,791 | 177,482 | 183,399 | 177,482 | 183,399 | 2,153,454 |
| Milk Hauling | 477,650 | 448,397 | 495,994 | 555,335 | 599,462 | 522,769 | 620,747 | 610,200 | 514,580 | 547,342 | 528,768 | 545,445 | 6,466,689 |
| Milk Promotions | 92,134 | 86,351 | 95,249 | 100,423 | 90,865 | 99,652 | 105,718 | 106,864 | 99,533 | 96,882 | 103,029 | 99,333 | 1,176,003 |
| Livestock Hauling | 47,888 | 48,433 | 14,574 | 89,916 | 18,076 | 19,146 | 26,041 | 14,005 | 42,379 | 43,702 | 43,202 | 43,202 | 450,564 |
| Compost Turning & Hauling | 15,564 | | 122,190 | 72,965 | 67,812 | 67,812 | 96,549 | 43,805 | 62,381 | 64,460 | 62,381 | 64,460 | 740,379 |
| Livestock Testing & Trimming | 81,316 | 35,351 | 82,283 | 15,454 | 89,662 | 39,063 | 68,485 | 74,489 | 62,381 | 60,261 | 60,261 | 60,261 | 729,267 |
| Veterinary & Medicine | 513,406 | 446,651 | 536,193 | 603,517 | 677,781 | 530,588 | 582,448 | 832,171 | 642,751 | 642,751 | 664,176 | 664,176 | 7,336,609 |
| Semen | 493,467 | 128,932 | 90,007 | 467,185 | 445,432 | 332,548 | 523,466 | 489,497 | 459,662 | 459,662 | 474,884 | 474,884 | 5,340,626 |
| Supplies | 506,822 | 336,224 | 604,336 | 507,758 | 644,244 | 364,208 | 523,466 | 552,147 | 625,286 | 625,286 | 646,129 | 646,129 | 6,582,035 |
| Repairs & Maintenance | 286,863 | 288,717 | 646,657 | 597,407 | 482,874 | 480,333 | 923,032 | 952,147 | 625,286 | 603,868 | 646,129 | 603,868 | 7,137,181 |
| Fuel & Oil | 238,058 | 165,370 | 226,412 | 184,383 | 176,314 | 168,898 | 168,898 | 175,528 | 187,404 | 193,651 | 187,404 | 193,651 | 2,265,971 |
| Utilities | 64,399 | 164,659 | 116,725 | 32,184 | 121,803 | 191,790 | 112,793 | 155,188 | 115,259 | 119,101 | 119,101 | 115,259 | 1,438,261 |
| Trucking Expense | 91,991 | 48,628 | 37,131 | 139,449 | 372,301 | 233,015 | 363,900 | 694,632 | 247,975 | 248,345 | 179,940 | 179,940 | 2,837,247 |
| Professional Fees | 29,141 | 37,125 | 36,177 | 22,890 | 17,552 | 17,552 | 33,961 | 97,132 | 35,593 | 35,593 | 35,593 | 35,593 | 433,899 |
| Contract Services | | 50,377 | 51,705 | 49,697 | 52,751 | 49,731 | 55,404 | 55,404 | 58,326 | 58,326 | 60,270 | 60,270 | 602,261 |
| Taxes & Licenses | 50,288 | 13,700 | 36,124 | 4,221 | 158,855 | 31,424 | 35,412 | 4,115 | 56,325 | 60,659 | 116,000 | 42,014 | 4,265,816 |
| Insurance | 167,894 | 60,390 | 1,002,987 | 57,339 | 115,244 | 1,129,431 | 117,917 | 489,497 | 661,333 | 661,333 | 116,000 | 47,010 | |
| Advertising & Donations | 1,000 | | 36,124 | 4,221 | 2,511 | 2,511 | 424 | 4,115 | 40,659 | 42,014 | 40,659 | 40,659 | |
| Finance & Service Charges | 2,724 | 12,498 | 47,735 | 58,161 | 37,365 | 40,335 | 57,238 | 47,174 | 47,010 | 47,010 | 45,464 | 39,680 | |
| Miscellaneous | 4,781 | 18,098 | 9,607 | 8,360 | 12,147 | 6,016 | 7,108 | 38,774 | 38,400 | 38,400 | 38,400 | 39,680 | |
| **Total Operating Expenses** | 6,206,828 | 5,864,358 | 5,544,829 | 6,097,941 | 7,255,429 | 7,209,437 | 7,440,138 | 8,033,323 | 7,541,867 | 7,223,010 | 6,941,735 | 7,714,215 | 83,612,075 |
| **Income/(Loss) from Operations** | 244,160 | 1,074,745 | 1,271,958 | 5,097,393 | 4,697,304 | 3,898,079 | 3,343,292 | (1,115,363) | 5,775,049 | 3,903,857 | 3,355,550 | 2,757,374 | 33,429,621 |
| *Operating Margin (%)* | 1.3% | 6.3% | -2.7% | 26.2% | 17.5% | 16.1% | 13.8% | -5.2% | 25.1% | 17.3% | 14.7% | 11.8% | |
| **Other Income/(Expense)** | | | | | | | | | | | | | |
| Rental Income | 1,439 | 1,439 | 439 | 439 | 439 | 1,439 | 439 | 2,439 | 2,439 | 4,650 | 4,650 | 4,650 | 54,890 |
| Interest Income | | 190 | 955 | 2,042 | 4,641 | 7,507 | 11,003 | 15,222 | 15,222 | 5,200 | 5,200 | 5,374 | 63,098 |
| Interest Expense | (1,108,749) | (1,040,881) | (1,104,641) | (1,126,260) | (1,173,345) | (1,500,210) | (1,493,581) | (1,678,600) | (1,538,762) | (3,075,131) | (1,708,463) | (1,751,983) | (18,300,615) |
| Gain on Sale of Property, Plant, & Equipment | | | | | | 39,966 | | 271,357 | (235,000) | | | | 310,722 |
| Forgiveness of Debt | | | | | | | | | | | | (10,000) | (295,607) |
| **Total Other Income/(Expense)** | (1,107,120) | (1,040,252) | (1,103,247) | (1,120,779) | (1,142,279) | (1,451,898) | (1,482,139) | (1,386,582) | (1,764,062) | (3,075,104) | (1,708,763) | (1,751,960) | (18,137,195) |
| **Total Net Income/(Loss)** | (862,960) | 34,493 | (1,648,076) | 4,977,162 | 3,555,025 | 2,446,181 | 1,861,153 | (2,504,945) | 4,010,988 | 828,743 | 1,646,787 | 1,005,415 | 15,349,987 |
| *Net Profit Margin (%)* | -4.6% | 0.2% | -8.2% | 21.4% | 13.2% | 10.1% | 7.7% | -11.7% | 17.4% | 3.7% | 7.2% | 4.3% | 5.7% |
| **EBITDA** | 1,988,953 | 2,834,976 | 1,271,958 | 7,909,393 | 6,576,798 | 5,844,898 | 5,259,268 | 1,059,940 | 7,192,993 | 5,601,898 | 4,998,493 | 4,455,416 | 54,994,960 |
| *EBITDA Margin (%)* | 10.7% | 16.7% | 6.3% | 34.0% | 24.5% | 24.2% | 21.7% | 4.9% | 31.3% | 24.8% | 21.9% | 19.1% | 20.6% |

| Schedule 3<br>Statement of Operations 2023 | Proj.<br>2023<br>JAN. | Proj.<br>2023<br>FEB | Proj.<br>2023<br>MAR | Proj.<br>2023<br>APR | Proj.<br>2023<br>MAY | Proj.<br>2023<br>JUN | Proj.<br>Total |
|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | |
| Milk Sales | $ 17,290,337 | $ 15,863,232 | $ 16,805,844 | $ 17,318,664 | $ 18,087,384 | $ 16,580,520 | $ 101,945,981 |
| Custom Feeding | 1,481,583 | 1,338,204 | 1,481,583 | 1,433,790 | 1,481,583 | 1,433,790 | 8,650,533 |
| Cow & Steer Sales | 3,770,000 | 3,770,000 | 3,770,000 | 3,770,000 | 3,770,000 | 3,770,000 | 22,620,000 |
| Other Cattle Sales | - | - | - | - | - | - | - |
| Gain (Loss) on Milk Derivatives | - | - | - | - | - | - | - |
| Trucking Income | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 39,000 |
| Patronage Dividends | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - |
| **Total Revenue** | **$ 22,548,420** | **$ 20,977,936** | **$ 22,063,927** | **$ 22,528,954** | **$ 23,345,467** | **$ 21,790,810** | **$ 133,255,514** |
| **Cost of Goods Sold** | | | | | | | |
| Feed | $ 14,005,388 | $ 12,650,028 | $ 14,005,388 | $ 13,553,601 | $ 14,005,388 | $ 13,553,601 | $ 81,773,395 |
| Steers | 2,298,699 | 2,372,568 | 2,438,593 | 2,507,935 | 2,569,914 | 2,625,311 | 14,813,020 |
| Steer Cost Inventoried | (3,015,014) | (2,723,238) | (3,015,014) | (2,917,755) | (3,015,014) | (2,917,755) | (17,603,790) |
| Heifer Cost Capitalized | (3,019,894) | (2,727,646) | (3,019,894) | (2,922,478) | (3,019,894) | (2,922,478) | (17,632,286) |
| Custom Feed | 607,301 | 548,530 | 607,301 | 587,710 | 607,301 | 587,710 | 3,545,853 |
| (Gain) Loss on Feed and Cattle Derivatives | - | - | - | - | - | - | - |
| Farm (Income) Loss | - | - | - | - | - | (291,564) | (291,564) |
| **Total Cost of Goods Sold** | **$ 10,876,480** | **$ 10,120,241** | **$ 11,016,374** | **$ 10,809,013** | **$ 11,147,695** | **$ 10,634,825** | **$ 64,604,628** |
| **Gross Profit** | **$ 11,671,940** | **$ 10,857,695** | **$ 11,047,553** | **$ 11,719,941** | **$ 12,197,772** | **$ 11,155,985** | **$ 68,650,886** |
| *Gross Margin (%)* | *51.8%* | *51.8%* | *50.1%* | *52.0%* | *52.2%* | *51.2%* | *51.5%* |
| Depreciation on Dairy Herd | 1,122,282 | 1,013,674 | 1,122,282 | 1,086,079 | 1,122,282 | 1,086,079 | 6,552,676 |
| Loss on Sale of Herd | 644,275 | 581,926 | 644,275 | 623,492 | 644,275 | 623,492 | 3,761,733 |
| (Gain) Loss on Sale of Wet Cows | - | - | - | - | - | - | - |
| **Total Herd Replacement** | **$ 1,766,556** | **$ 1,595,599** | **$ 1,766,556** | **$ 1,709,571** | **$ 1,766,556** | **$ 1,709,571** | **$ 10,314,409** |
| **Operating Expenses** | | | | | | | |
| Labor | 2,161,753 | 1,952,551 | 2,161,753 | 2,092,019 | 2,161,753 | 2,092,019 | 12,621,846 |
| Depreciation - PP&E | 564,625 | 509,984 | 564,625 | 546,411 | 564,625 | 546,411 | 3,296,681 |
| Amortization | 11,111 | 10,036 | 11,111 | 10,753 | 11,111 | 10,753 | 64,876 |
| Rent - Land & Facilities | 12,688 | 11,460 | 12,688 | 12,279 | 12,688 | 12,279 | 74,084 |
| Equipment Lease | 183,399 | 165,650 | 183,399 | 177,482 | 183,399 | 177,482 | 1,070,811 |
| Milk Hauling | 541,651 | 496,944 | 526,473 | 542,538 | 572,954 | 535,194 | 3,215,754 |
| Milk Promotions | 102,672 | 101,958 | 93,542 | 99,101 | 102,125 | 107,850 | 607,248 |
| Livestock Hauling | 43,792 | 39,554 | 43,792 | 42,379 | 43,792 | 42,379 | 255,689 |
| Compost Turning & Hauling | 64,460 | 58,222 | 64,460 | 62,381 | 64,460 | 62,381 | 376,364 |
| Livestock Testing & Trimming | 62,269 | 56,243 | 62,269 | 60,261 | 62,269 | 60,261 | 363,573 |
| Veterinary & Medicine | 664,176 | 599,901 | 664,176 | 642,751 | 664,176 | 642,751 | 3,877,929 |
| Semen | 186,261 | 168,236 | 186,261 | 180,252 | 186,261 | 180,252 | 1,087,522 |
| Supplies | 474,984 | 429,018 | 474,984 | 459,662 | 474,984 | 459,662 | 2,773,294 |
| Repairs & Maintenance | 646,129 | 583,601 | 646,129 | 625,286 | 646,129 | 625,286 | 3,772,561 |
| Fuel & Oil | 601,998 | 543,740 | 601,998 | 582,579 | 601,998 | 582,579 | 3,514,891 |
| Utilities | 193,651 | 174,910 | 193,651 | 187,404 | 193,651 | 187,404 | 1,130,670 |
| Trucking Expense | 119,101 | 107,575 | 119,101 | 115,259 | 119,101 | 115,259 | 695,396 |
| Professional Fees | 193,440 | 193,440 | 193,440 | 193,440 | 193,440 | 193,440 | 1,160,640 |
| Contract Services | 35,093 | 31,697 | 35,093 | 33,961 | 35,093 | 33,961 | 204,898 |
| Taxes & Licenses | 60,270 | 54,438 | 60,270 | 58,326 | 60,270 | 58,326 | 351,902 |
| Insurance | 116,000 | 116,000 | 992,000 | 116,000 | 116,000 | 992,000 | 2,448,000 |
| Advertising & Donations | 42,014 | 37,948 | 42,014 | 40,659 | 42,014 | 40,659 | 245,307 |
| Finance & Service Charges | 47,010 | 42,461 | 47,010 | 45,494 | 47,010 | 45,494 | 274,478 |
| Miscellaneous | 39,680 | 35,840 | 39,680 | 38,400 | 39,680 | 38,400 | 231,680 |
| **Total Operating Expenses** | **$ 7,168,227** | **$ 6,521,406** | **$ 8,019,920** | **$ 6,965,076** | **$ 7,198,983** | **$ 7,842,482** | **$ 43,716,094** |
| **Income/(Loss) from Operations** | **$ 2,737,157** | **$ 2,740,689** | **$ 1,261,078** | **$ 3,045,294** | **$ 3,232,233** | **$ 1,603,932** | **$ 14,620,382** |
| *Operating Margin (%)* | *12.1%* | *13.1%* | *5.7%* | *13.5%* | *13.8%* | *7.4%* | *11.0%* |
| **Other Income/(Expense)** | | | | | | | |
| Rental Income | $ 4,650 | $ 4,200 | $ 4,650 | $ 4,500 | $ 4,650 | $ 4,500 | 27,149 |
| Interest Income | 5,374 | 4,854 | 5,374 | 5,200 | 5,374 | 5,200 | 31,376 |
| Interest Expense | (1,533,260) | (1,562,232) | (1,562,314) | (1,563,212) | (1,596,852) | (1,595,100) | (9,412,969) |
| Investment Earnings (Loss) in H&M Custom, LLC | - | - | - | - | - | - | - |
| Gain on Sale of Property, Plant, & Equipment | - | - | - | - | - | - | - |
| Forbearance Fee | (10,000) | (10,000) | (10,000) | - | - | - | (30,000) |
| **Total Other Income/(Expense)** | **$ (1,533,237)** | **$ (1,563,179)** | **$ (1,562,291)** | **$ (1,553,511)** | **$ (1,586,828)** | **$ (1,585,399)** | **$ (9,384,445)** |
| **Net Income/(Loss)** | **$ 1,203,920** | **$ 1,177,511** | **$ (301,213)** | **$ 1,491,782** | **$ 1,645,404** | **$ 18,533** | **$ 5,235,938** |
| *Net Profit Margin (%)* | *5.3%* | *5.6%* | *-1.4%* | *6.6%* | *7.0%* | *0.1%* | *3.9%* |
| **EBITDA** | **$ 4,435,198** | **$ 4,273,436** | **$ 2,959,119** | **$ 4,698,237** | **$ 4,940,274** | **$ 3,256,875** | **$ 24,563,140** |
| *EBITDA Margin (%)* | *19.7%* | *20.4%* | *13.4%* | *20.9%* | *21.2%* | *14.9%* | *18.4%* |

WEP

**SCHEDULE 4**

**Disclosed Liens**

*Confidential and Privileged*

## STATUTORY AGRICULTURAL LIENS INFORMATION

Below is information provided pursuant to ongoing negotiations between Agent and Borrowers regarding terms of a forbearance agreement. In that context, the parties have discussed various statutory liens under Idaho law that may arise in the agricultural sector and may, under certain circumstances, provide the holder of such lien with a priming position vis-à-vis other existing liens.

**Idaho Code 45-303** - Lien on Crops - Farm Laborers Lien.

Borrowers' records reflect no outstanding payable related to this statute as of the June 27, 2022. Pursuant to the statute, a claimant must file a claim of lien with the Secretary of State between 30 days before or 120 after providing labor. Neither Borrowers' UCC search as provided to Agent, nor a lien search on the Idaho Secretary of State website, reflect any filings asserting a farm laborers' lien and Borrowers are aware of none.

**Idaho Code 45-304** – Lien on Crops – Seed Lien.

Borrowers' records reflect an outstanding payable of approximately $76,314 to Northwest Seed, Inc. as of June 27, 2022. Payment of this payable was issued on June 29, 2022, such that there do not appear to be any currently pending payables with respect to this lien statute.

Pursuant to the statute, a claimant must file a claim of lien with the Secretary of State between 30 days before or 120 after providing seed. Neither Borrowers' UCC search as provided to Agent, nor a lien search on the Idaho Secretary of State website reflect any filings asserting a seed lien, and Borrowers are aware of none.

**Idaho Code 45-805 –** Lien on Cattle - Agister's Lien

Borrowers' cattle with a value of approximately $6 million is currently located at Beef City LLC's feedlot, where Beef City provides services, including boarding and feeding such cattle. As of June 28, 2022, Beef City, LLC is owed $2,147,924.41 for such services.

**Idaho Code 45-1801 *et seq*** – Lien on Feed - Agricultural Commodity Dealer Lien

As of June 27, 2022, Borrowers owed approximately $21,970,950 to providers of grain, and approximately $2,295,133 to providers of forage (consisting of silage, haylage, triticale, hay, straw, seed, rye grass and barley), both of which constitute components of feed for Borrowers' cattle.

1. Grain Inventory

As of the end of May 2022, Borrowers maintained approximately $3,346,012 in grain inventory, including grain in transit. This grain inventory would have been fully consumed within approximately three days of its receipt by Borrowers and replaced by new grain

*Confidential and Privileged*

inventory in the ordinary course of business. This cycle will continue in the ordinary operation of Borrowers' businesses, such that there is typically approximately three days of grain on hand that would be subject to an ordinary course and arising lien by the suppliers that provided that grain. Once it is consumed within the roughly three day period following delivery, the suppliers of that grain would no longer hold a lien claim, as the feed would no longer exist. Thus, at any given time there would be short term, ordinary course liens that exist against the grain inventory, up to its value, and such liens would be extinguished quickly as the grain is fed to the cattle. In short, the measure of any liens under this statute is limited to the value of the grain on hand, which is typically three days' worth of grain with a current value of $3,346,012.

    2.  <u>Forage Inventory</u>

As of the end of May 2022, Borrowers were in possession of approximately $11,755,335 in forage inventory. Of this total, approximately $8,320,475 relates to forage inventory provided by third parties ("Third-Party Provided Forage"), with the balance grown and provided through Borrowers' operations.

The vast majority of the Third-Party Provided Forage has been paid for in full, and thus there would be no liens that would arise against it, since the lien under this statute follows the grain delivered. The annual payment cycle for most of the Third-Party Provided Forage is structured so that the full amount is paid in two payments: October/November, and the following January. The majority of the Third-Party Provided Forage that Borrowers still possess was paid for in full in Oct/Nov 2021 and January 2022. There is only approximately $476,513 of Third-Party Provided Forage unpaid for, which would be the measure of Third-Party Forage Inventory which could be subject to liens by existing forage accounts payable.

Pursuant to the statute, in order to maintain a lien after 180 days from attachment, a lien claimant must have filed a notice of lien with the Idaho Secretary of State within the 180 days. Neither Borrowers' UCC search as provided to Agent, nor a lien search on the Idaho Secretary of State website reflect any filings asserting an agricultural commodity dealer lien.

**Idaho Code 28-9-322A** – Lien on Crops – Supplier of Chemicals for Application to Crops

The statute provides that in certain circumstances, a supplier of chemicals may obtain a priority security interest in the crops to which chemicals were applied or, to the extent the crops were not yet in the ground as of the application, to the next production crop. As of June 27, 2022, the Borrowers owed approximately $691,534 to suppliers of chemicals applied to crops. The chemicals were applied to crops planted after December 15, 2021. Among other things, in order for a chemical supplier to have obtained a priority lien, the Agent would have had to have been provided with notification and an opportunity to respond and a UCC-1 financing statement must have been filed with the Secretary of State within 20 days after delivery of the chemicals. Neither Borrowers' UCC search as provided to Agent, nor a lien search on the Idaho Secretary of State website, reflect any filings asserting a chemical supplier lien and Borrowers are aware of none.

*Confidential and Privileged*

ff309601zz

**SCHEDULE 5**

**Initial Weekly Report**

WEP

| Schedule 5 / 13 Week Cash Flow — Week Ending | Proj. 10/15/2022 | Proj. 10/22/2022 | Proj. 10/29/2022 | Proj. 11/5/2022 | Proj. 11/12/2022 | Proj. 11/19/2022 | Proj. 11/26/2022 | Proj. 12/3/2022 | Proj. 12/10/2022 | Proj. 12/17/2022 | Proj. 12/24/2022 | Proj. 12/31/2022 | Proj. 1/7/2023 | Proj. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Net Milk Checks (Net of Hauling + Promotion) | 9,188,295 | 353,550 | 719,397 | 8,792,953 | 430,000 | 9,685,257 | 369,967 | 8,035,367 | 951,221 | 250,000 | 8,671,605 | 327,382 | 8,748,321 | 54,063,218 |
| Cattle Feeding | 265,656 | 353,550 | 719,397 | 380,054 | 430,000 | 369,967 | 401,461 | 401,461 | 327,382 | 327,382 | 327,382 | 327,382 | 98,317 | 3,655,545 |
| Cow & Steer Sales | 265,677 | | | 719,397 | 815,845 | 815,845 | 815,845 | 815,845 | 683,420 | 683,420 | 683,420 | 683,420 | 199,799 | 8,254,878 |
| Trucking Income | | 1,517 | 1,517 | 1,517 | 1,517 | 1,517 | 1,517 | 1,517 | 1,463 | 1,463 | 1,463 | 1,463 | 371 | 16,838 |
| **Total Operating Receipts** | 531,333 | 9,543,361 | 720,913 | 9,883,921 | 1,247,361 | 10,871,685 | 1,218,823 | 9,254,190 | 1,963,486 | 1,012,265 | 9,684,069 | 1,012,265 | 9,046,808 | 65,990,479 |
| **Other Operating Receipts** | | | | | | | | | | | | | | |
| **Total Personnel Expenses** | | 1,025,931 | | 1,097,064 | 2,515 | 15,838 | 1,047,064 | | 1,046,009 | | 1,046,009 | | | 5,280,420 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Livestock Testing & Hauling | | 61,311 | | 53,600 | | 86,111 | | 128,320 | | | 54,820 | 55,429 | 27,074 | 466,665 |
| Veterinary & Medicine | 262,767 | 204,206 | | 225,280 | | 329,441 | | 493,085 | | | 213,951 | 209,610 | 104,031 | 2,042,352 |
| Semen | | 32,190 | | 77,035 | | 89,293 | | 136,084 | | | 60,990 | 60,990 | 28,708 | 485,270 |
| Supplies | 78,717 | 174,104 | | 150,440 | | 242,188 | | 381,900 | | | 153,833 | 153,833 | 76,383 | 1,359,918 |
| Repairs & Maintenance | 12,913 | 123,553 | | 261,288 | | 311,625 | | 473,931 | | | 211,326 | 211,326 | 99,994 | 1,705,991 |
| Fuel & Oil | 1,388 | 114,351 | | 243,823 | | 290,220 | | 441,437 | | | 196,008 | 196,008 | 93,138 | 1,578,157 |
| Utilities | 3,088 | 70,652 | | 63,838 | | 109,267 | | 150,809 | | | 61,393 | 61,393 | 31,819 | 543,202 |
| Trucking Expense | | 43,108 | | 37,996 | | 60,644 | | 90,684 | | | 38,534 | 38,534 | 19,129 | 328,619 |
| Professional Fees | | 61,985 | 16,985 | 45,985 | 16,985 | 93,358 | 16,985 | 127,938 | | | 68,672 | 68,672 | 26,994 | 544,570 |
| Contract Services | | 12,702 | | 11,196 | | 17,869 | | 26,714 | | | 11,354 | 11,354 | 5,636 | 96,653 |
| Taxes & Licenses | | 21,815 | | 19,228 | | 30,689 | | 45,880 | | | 19,500 | 19,500 | 9,680 | 186,247 |
| Advertising & Donations | 415 | 15,207 | | 13,404 | | 68,858 | | 99,319 | | | 308,491 | 308,491 | 20,955 | 835,181 |
| Finance & Service Charges | 358 | 17,060 | | 14,965 | | 20,901 | | 31,475 | | | 13,658 | 13,658 | 6,641 | 118,710 |
| Miscellaneous | 2,379 | 14,362 | | 12,659 | | 24,673 | | 36,546 | | | 15,113 | 15,113 | 7,711 | 135,574 |
| **Total Operating Expenses** | 370,027 | 966,627 | 16,985 | 1,230,736 | 16,985 | 1,766,087 | 16,985 | 2,644,092 | | | 1,439,429 | 1,424,610 | 557,874 | 10,441,424 |
| **Cost of Goods** | | | | | | | | | | | | | | |
| Feed | 952,717 | 7,207,150 | | 8,433,679 | 725,000 | 5,869,560 | | 5,433,879 | 789,698 | 250,000 | 4,670,021 | 600,000 | 4,621,866 | 39,563,503 |
| Steers | | 232,739 | | | | 228,699 | | 76,233 | | | 50,496 | 16,832 | | 604,961 |
| Custom Feed | | | | | | | | | | | | | | — |
| Farming | | 5,139 | 352 | 42,252 | 121,600 | 27,118 | 25,877 | 244,477 | 35,728 | 35,728 | 35,728 | 35,728 | 59,872 | 669,577 |
| **Total Cost of Goods** | 952,717 | 7,445,027 | 352 | 8,475,931 | 846,600 | 6,125,377 | 25,877 | 5,754,588 | 835,426 | 285,728 | 4,756,245 | 652,561 | 4,681,738 | 40,838,152 |
| **Other Operating Disbursements** | | | | | | | | | | | | | | |
| Rent - Land & Facilities | | | | | | | | | | | | | | 28,110 |
| Equipment Lease | | | 40,537 | 92,848 | 87,753 | 13,829 | 40,000 | 46,424 | 87,753 | 14,290 | 45,806 | | 46,424 | 487,549 |
| Insurance | | | | | | | | | | | | | | 777,345 |
| Heifer & Cow Purchases | | 13,017 | 13,017 | 13,017 | | 116,000 | | | | | 661,333 | | | 39,052 |
| Owner Draws | | | | 10,725 | | | | | | 10,725 | | | | 21,450 |
| Non-Construction CapEx | | 195,973 | 195,973 | 195,973 | 223,973 | 223,973 | 223,973 | 223,973 | | 536,705 | 268,586 | 268,586 | | 2,557,659 |
| Construction CapEx | | 116,667 | 116,667 | 33,333 | 103,600 | 103,600 | 103,600 | 59,200 | 76,316 | 76,316 | 76,316 | 76,316 | 66,667 | 1,008,596 |
| **Total Other Operating Disbursements** | | 325,657 | 366,194 | 345,896 | 415,325 | 457,402 | 367,573 | 329,597 | 164,068 | 638,036 | 1,052,041 | 344,902 | 113,091 | 4,919,743 |
| **Total Operating Disbursements** | 1,322,743 | 9,763,242 | 383,530 | 11,419,627 | 1,281,426 | 8,364,694 | 1,457,499 | 8,728,277 | 2,045,504 | 923,764 | 8,284,725 | 1,422,073 | 5,352,703 | 61,479,743 |
| **Operating Cash Flow** | (791,410) | (219,881) | 337,383 | (1,265,706) | (34,064) | 2,506,992 | (238,677) | 525,912 | (82,018) | 88,500 | 1,399,345 | (1,409,808) | 3,694,105 | 4,510,060 |
| **Non-Operating Receipts** | | | | | | | | | | | | | | |
| **Total Non-Operating Receipts** | | 19,000,000 | | | | 4,650 | | | | 5,570 | | | | 19,010,220 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| **Total Debt Service** | | 3,651,368 | | 2,094,989 | | 415,766 | | 2,201,363 | | | 415,766 | | 2,106,490 | 10,885,741 |
| Forbearance Fee | | 235,000 | | | | 10,000 | | | | 10,000 | | | | 255,000 |
| **Total Other Non-Operating Disbursements** | | 13,235,000 | | 2,094,989 | | 425,766 | | 2,201,363 | | 10,000 | 415,766 | | 2,106,490 | 13,235,000 |
| **Total Non-Operating Disbursements** | | 16,886,368 | | (2,094,989) | | (421,116) | | (2,201,363) | | (4,430) | (415,766) | | (2,106,490) | 24,140,741 |
| **Non-Operating Cash Flow** | | 2,113,632 | | (2,094,989) | | (421,116) | | (2,201,363) | (82,018) | 84,070 | 983,579 | (1,409,808) | 1,587,616 | (5,130,521) |
| **Net Cash Flow** | (791,410) | 1,893,751 | 337,383 | (3,360,694) | (34,064) | 2,085,875 | (238,677) | (1,675,451) | (82,018) | 84,070 | 983,579 | (1,409,808) | 1,587,616 | (619,861) |

| Schedule 5 Weekly Cash/Projected Borrowing Base | Proj. 1 10/15/2022 | Proj. 2 10/22/2022 | Proj. 3 10/29/2022 | Proj. 4 11/5/2022 | Proj. 5 11/12/2022 | Proj. 6 11/19/2022 | Proj. 7 11/26/2022 | Proj. 8 12/3/2022 | Proj. 9 12/10/2022 | Proj. 10 12/17/2022 | Proj. 11 12/24/2022 | Proj. 12 12/31/2022 | Proj. 13 1/7/2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash (Book) | $ 2,268,368 | $ 1,476,957 | $ 3,370,709 | $ 3,708,091 | $ 347,397 | $ 313,333 | $ 2,399,208 | $ 2,160,531 | $ 485,081 | $ 403,063 | $ 487,133 | $ 1,470,712 | $ 60,904 |
| +/- Net Cash Flow In/(Out) | $ (791,410) | $ 1,893,751 | $ 337,383 | $ (3,360,694) | $ (34,064) | $ 2,085,875 | $ (238,677) | $ (1,675,451) | $ (82,018) | $ 84,070 | $ 983,579 | $ (1,409,808) | $ 1,587,616 |
| +/- Revolver Draw/(Paydown) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| +/- Other | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Ending Cash (Book) | $ 1,476,957 | $ 3,370,709 | $ 3,708,091 | $ 347,397 | $ 313,333 | $ 2,399,208 | $ 2,160,531 | $ 485,081 | $ 403,063 | $ 487,133 | $ 1,470,712 | $ 60,904 | $ 1,648,519 |
| **Projected Borrowing Base** | | | | | | | | | | | | | |
| Total Collateral | $ 116,282,026 | $ 131,549,382 | $ 133,875,666 | $ 131,358,666 | $ 132,929,821 | $ 132,141,153 | $ 132,811,235 | $ 129,295,936 | $ 129,834,433 | $ 130,940,542 | $ 128,694,376 | $ 128,656,606 | $ 127,553,406 |
| Total Lending Value | $ 82,177,211 | $ 97,020,117 | $ 98,995,122 | $ 96,374,412 | $ 97,939,763 | $ 97,133,103 | $ 97,791,673 | $ 94,358,833 | $ 95,063,771 | $ 96,336,321 | $ 94,256,596 | $ 94,385,268 | $ 93,566,881 |
| Book Cash | $ 1,476,957 | $ 3,370,709 | $ 3,708,091 | $ 347,397 | $ 313,333 | $ 2,399,208 | $ 2,160,531 | $ 485,081 | $ 403,063 | $ 487,133 | $ 1,470,712 | $ 60,904 | $ 1,648,519 |
| Total O/S Line | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 | $ 87,115,975 |
| Collateral Margin / (Deficit) | $ (4,938,764) | $ 9,904,142 | $ 11,879,147 | $ 9,284,437 | $ 10,823,788 | $ 10,017,128 | $ 10,675,698 | $ 7,242,857 | $ 7,947,796 | $ 9,220,346 | $ 7,140,621 | $ 7,289,292 | $ 6,450,906 |
| Revaluation of Cows & Steers | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 | $ 3,700,000 |
| **Market Collateral Margin / (Deficit)** | **$ (1,238,764)** | **$ 13,604,142** | **$ 15,579,147** | **$ 12,984,437** | **$ 14,523,788** | **$ 13,717,128** | **$ 14,375,698** | **$ 10,942,857** | **$ 11,647,796** | **$ 12,920,346** | **$ 10,840,621** | **$ 10,989,292** | **$ 10,150,906** |
| Collateral Advance Rate | 78% | 69% | 68% | 69% | 68% | 69% | 68% | 70% | 70% | 69% | 71% | 71% | 71% |

| Schedule 5 | | | | | | |
|---|---|---|---|---|---|---|
| AP Summary | Current | 1 – 30 | 31 – 60 | 61 – 90 | > 90 | TOTAL |
| Total AP: | 15,478,819.11 | 12,543,099.94 | 2,905,359.03 | 3,133,464.64 | 4,936,624.87 | 38,997,367.59 |
| | | | | | | |
| Feed Only: | 10,733,637.52 | 8,990,727.26 | 2,422,725.33 | 1,224,551.14 | 2,176,213.10 | 25,547,854.35 |
| | | | | | | |
| Construction AP Only: | 12,099.38 | 182,129.01 | 184,732.28 | 2,555.12 | 0.00 | 381,515.79 |



**SCHEDULE 6**

**Initial Funding Collateral Legal Description**

**Legal Description:**

**PARCEL NO. 1**

**TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN, JEROME COUNTY, IDAHO**

**Section 26: SE¼SW¼**

**PARCEL NO. 2**

**TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN, JEROME COUNTY, IDAHO**

**Section 26: SW¼SW¼**