### LOAN AND SECURITY AGREEMENT

between

MILLENKAMP CATTLE, INC., IDAHO JERSEY GIRLS, LLC, EAST VALLEY CATTLE, LLC,
IDAHO JERSEY GIRLS JEROME DAIRY LLC, MILLENKAMP FAMILY LLC, MILLENKAMP
PROPERTIES, L.L.C., MILLENKAMP PROPERTIES II LLC, GOOSE RANCH, LLC, WILLIAM J.
MILLENKAMP, AND SUSAN J. MILLENKAMP

as Borrowers

and

CONTERRA AGRICULTURAL CAPITAL, LLC

as Lender

Dated as of October 20, 2022

**This Loan and Security Agreement and the rights and obligations evidenced hereby are subordinate to the payment in full of the obligations owing to the Senior Loan Agent as described in and pursuant to the terms of that certain Intercreditor and Subordination Agreement dated as of October 20, 2022 between Rabo AgriFinance LLC, as Senior Loan Agent, and Conterra Agricultural Capital, LLC; and each holder of this Loan and Security Agreement, by its acceptance hereof, shall be bound by the provisions of that Subordination Agreement.**

EXHIBIT 2                    Page 1 of 68

## TABLE OF CONTENTS

**ARTICLE I Definitions** ...................................................................................................... **1**

    *1.1 Defined Terms* ...................................................................................................... 1

    *1.2 Use of Defined Terms* .......................................................................................... 7

**ARTICLE II Representations and Warranties** .................................................................... **7**

    *2.1 Representations and Warranties of Borrowers* .................................................. 7

    *2.2 Survival of Representations and Warranties* ...................................................... 9

**ARTICLE III Terms of Loan and Documents** ................................................................... **9**

    *3.1 Agreement to Borrow and Lend* .......................................................................... 9

    *3.2 Loan Documents* ................................................................................................. 9

    *3.3 Place, Manner and Application of Payments* ..................................................... 10

    *3.4 Joint and Several Obligations* ............................................................................ 10

    *3.5 Grant of Security Interests in Borrowing Base Assets* ....................................... 10

    *3.6 Perfection of Security Interest in Borrowing Base Assets* ................................. 10

**ARTICLE IV Loan Expenses and Advances; Security of Security Instrument for Same** ............... **11**

    *4.1 Loan Expenses* .................................................................................................... 11

    *4.2 Fees* .................................................................................................................... 11

    *4.3 Time of Payment of Fees* .................................................................................... 11

    *4.4 Protective Advances* ........................................................................................... 12

    *4.5 Expenses and Advances Secured by Loan Documents* ....................................... 12

**ARTICLE V Conditions Precedent to the Closing of the Loan** ...................................... **12**

    *5.1 Conditions Precedent to Closing* ........................................................................ 12

**ARTICLE VI Borrowers' Agreements** .............................................................................. **14**

    *6.1 Borrowers' Covenants* ........................................................................................ 14

**ARTICLE VII Casualties** .................................................................................................... **20**

    *7.1 Lender's Election to Apply Insurance Proceeds to Indebtedness* ....................... 20

    *7.2 Borrowers' Obligation to Rebuild and Use of Proceeds Therefor* ..................... 21

**ARTICLE VIII Events of Default** ....................................................................................... **21**

    *8.1 Events of Default* ................................................................................................ 21

    *8.2 Miscellaneous* ..................................................................................................... 23

**ARTICLE IX Lender's Remedies in Event of Default** ..................................................... **24**

    *9.1 Remedies Conferred Upon Lender* ..................................................................... 24

    *9.2 Non Waiver of Remedies* ..................................................................................... 24

**ARTICLE X General Provisions** ........................................................................................ **24**

ii

EXHIBIT 2                                                                 Page 2 of 68

*10.1 Captions* ................................................................................................................................ 24

*10.2 Successors and Assigns* .......................................................................................................... 24

*10.3 Merger* ................................................................................................................................... 25

*10.4 Notices* .................................................................................................................................. 25

*10.5 Writing, Modification, Waiver* ................................................................................................ 26

*10.6 Governing Law* ...................................................................................................................... 26

*10.7 Reimbursement for Loan Expenses* ......................................................................................... 26

*10.8 Acquiescence Not to Constitute Waiver of Lender's Requirements* .......................................... 26

*10.9 Disclosures by Lender* ........................................................................................................... 26

*10.10 Disclaimer by Lender.* ......................................................................................................... 26

*10.11 Right of Lender to Make Advances to Cure Defaults* ............................................................ 27

*10.12 Definitions Include Amendments* ......................................................................................... 28

*10.13 Time is of the Essence* ......................................................................................................... 28

*10.14 Execution in Counterparts* ................................................................................................... 28

*10.15 Waiver of Consequential Damages* ...................................................................................... 28

*10.16 Claims Against Lender* ........................................................................................................ 28

*10.17 Jurisdiction* ......................................................................................................................... 28

*10.18 Set-Offs* .............................................................................................................................. 29

*10.19 Severability* ......................................................................................................................... 29

*10.20 Waiver of Jury Trial* ............................................................................................................ 29

*10.21 Subordination Agreement* .................................................................................................... 29

**EXHIBITS**

**EXHIBIT A**          Legal Description of the Land

iii

EXHIBIT 2

**This Loan and Security Agreement and the rights and obligations evidenced hereby are subordinate to the payment in full of the obligations owing to the Senior Loan Agent as described in and pursuant to the terms of that certain Intercreditor and Subordination Agreement dated as of October ___, 2022 between Rabo AgriFinance LLC, as Senior Loan Agent, and Conterra Agricultural Capital, LLC; and each holder of this Loan and Security Agreement, by its acceptance hereof, shall be bound by the provisions of that Subordination Agreement.**

## LOAN AND SECURITY AGREEMENT

Loan # SC1001

This Loan and Security Agreement (this **"Agreement"**) is entered into as of October 20, 2022, by and among Millenkamp Cattle, Inc., an Idaho corporation, Idaho Jersey Girls, LLC, an Idaho limited liability company, East Valley Cattle, LLC, an Idaho limited liability company, Idaho Jersey Girls Jerome Dairy LLC, an Idaho limited liability company, Millenkamp Family LLC, an Idaho limited liability company, Millenkamp Properties, L.L.C., an Idaho limited liability company, Millenkamp Properties II LLC, an Idaho limited liability company, Goose Ranch, LLC, an Idaho limited liability company, William J. Millenkamp, an individual, and Susan J. Millenkamp, an individual (collectively, **"Borrowers"**), and Conterra Agricultural Capital, LLC, an Iowa limited liability company (**"Lender"**).

Borrowers and Lender hereby agree as follows:

### ARTICLE I
### Definitions

*1.1 Defined Terms.* Capitalized terms used, but not otherwise defined, herein shall have the respective meanings set forth in the Security Instrument, as defined below. The following terms as used herein shall have the following meanings:

**"Accounts"** means all of Borrowers' present and future rights (including, without limitation, rights under any Margin Accounts) to payment for Inventory or other goods sold or leased or for services rendered, which rights are not evidenced by instruments or chattel paper, regardless of whether such rights have been earned by performance and any other "accounts" (as defined in the Internal Revenue Code and UCC).

**"Affiliated Party"** means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Unless otherwise specified, "Affiliated Party" means an Affiliated Party of Borrowers.

**"Agreement"** means this Loan Agreement, as originally executed or as may be hereafter supplemented or amended from time to time in writing.

1

EXHIBIT 2                                    Page 4 of 68

**"Borrowing Base Assets"** means the following property and interests in property of Borrowers, whether now owned or existing or hereafter acquired or arising and wheresoever located: all Accounts, Inventory, Equipment, Farm Products, goods, General Intangibles, commercial tort claims, Deposit Accounts, Margin Accounts, commodity accounts, commodity contracts, securities accounts, investment property, instruments, letter of credit rights, Documents, chattel paper, electronic chattel paper, tangible chattel paper, all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing (including without limitation, proceeds of insurance policies insuring any of the foregoing), all books and records pertaining to any of the foregoing (including without limitation), customer lists, credit files, computer programs, printouts and other computer materials and records), and all insurance policies insuring any of the foregoing.

**"Borrowing Base Certificate"** means the certificate signed by an officer of Millenkamp Cattle, Inc. and provided to any Operating Lender pursuant to the terms of any applicable Operating Loan Agreement.

**"Change of Control"** means (i) the sale, transfer or other disposition of assets constituting all or substantially all of Borrowers' assets, (ii) the merger or consolidation of either of the Borrowers with or into another entity (except a merger or consolidation in which the existing owners of Borrowers continue to hold more than 75% of the voting power of Borrowers or the surviving or acquiring entity), or (iii) the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a Person or group of affiliated Persons (other than to the Borrowers or an owner of one of the Borrowers, or an underwriter of Borrowers' securities), of the Borrowers' membership interests if, after such transfer, such Person or group of affiliated Persons would hold more than 25% of the voting power of such Borrower (or the surviving or acquiring entity).

**"Closing"** means the disbursement of Loan proceeds.

**"Closing Date"** means the date of the Closing.

**"Default"** means any event which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default.

**"Deposit Accounts"** means, (a) all deposit accounts (as defined in the Internal Revenue Code and UCC) of Borrowers, as applicable, now or hereafter maintained with Lender or any of Lender's affiliates, and (b) deposit accounts (as defined in the Internal Revenue Code and UCC) at other banks or financial institutions acceptable to Lender.

**"Documents"** means any and all warehouse receipts, bills of lading or similar documents of title relating to goods in which Borrowers at any time have an interest and any other "documents" (as defined in the Internal Revenue Code and UCC).

**"Environmental Laws"** means all federal, state, and local laws and regulations governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge or disposal of any Hazardous Materials.

**"Environmental Proceedings"** has the meaning set forth in Section 2.1.3.

2

EXHIBIT 2                                    Page 5 of 68

"**Equipment**" means any and all goods, other than Inventory, (including without limitation, equipment, machinery, motor vehicles, implements, tools, parts and accessories) that are at any time owned by Borrowers, together with any and all accessions, parts and appurtenances thereto and any other "equipment" (as defined in the Internal Revenue Code and UCC).

"**Event of Default**" has the meaning set forth in Section 8.1.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

"**Farm Products**" means all personal property of Borrowers used or for use in farming or livestock operations, including without limitation, seed and harvested or un-harvested crops of all types and descriptions, whether annual or perennial and including trees, vines and the crops growing thereon, native grass, grain, feed, feed additives, feed ingredients, feed supplements, fertilizer, hay, silage, crop residues, supplies (including without limitation, chemicals, veterinary supplies and related goods), livestock of all types and descriptions (including without limitation, the offspring of such livestock and livestock in gestation) and any other "farm products" (as defined in the Internal Revenue Code and UCC).

"**Forbearance Agreement**" means that certain letter agreement dated as of October 20, 2022 by and among the borrowers party to the Senior Loan Agreement and the Senior Loan Agent.

"**GAAP**" means generally accepted accounting principles, consistently applied.

"**General Intangibles**" means all of Borrowers' present and future right, title and interest in and to any customer deposit accounts, deposits, rights related to prepaid expenses, chose in action, causes of action and all other intangible personal property of every kind and nature (other than Accounts), including without limitation, payment intangibles, beneficial interests in trusts, corporate or other business records, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, registrations, copyrights, licenses, franchises, customer lists, tax refunds, tax refund claims, customs claims, guarantee claims, contract rights, membership interests, partnership interests, Equity Interests, cooperative memberships or patronage benefits, obligations payable to Borrowers for capital stock or other claims against any Borrowers, rights to any government subsidy, set aside, diversion, deficiency or disaster payment or payment in kind, milk bases, brands and brand registrations, Commodity Credit Corporation storage agreements or contracts, leasehold interests in real and personal property, Water Rights, and any security interests or other security held by or granted to Borrowers to secure payment by any Account Debtor of any of the Accounts, and any other "general intangibles" (as defined in the Internal Revenue Code and UCC).

"**Governmental Approvals**" has the meaning set forth in Section 2.1.9.

"**Governmental Authority**" means any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court or administrative tribunal.

"**Hazardous Materials**" means any hazardous or toxic substances, materials or wastes, including but not limited to (a) solid, semi-solid, liquid or gaseous substances which are toxic, ignitable,

3

EXHIBIT 2                                        Page 6 of 68

corrosive, carcinogenic or otherwise dangerous to human, plant or animal health or well-being; or (b) those substances, materials, and wastes listed in the U.S. Department of Transportation Table (49 CFR 972.101) or by the Environmental Protection Agency as "hazardous substances" (40 CFR Part 302); or (c) such substances, materials and wastes which are or become regulated under any applicable local, state or federal law for the protection of human health or the environment including, without limitation, any material, waste or substance which is (i) petroleum, (ii) oil, (iii) asbestos, (iv) polychlorinated biphenyls, (v) waste oils, (vi) designated as a "hazardous substance" pursuant to § 311 of the Clean Water Act (33 U.S.C. § 1321) or listed pursuant to §307 of the Clean Water Act (33 U.S.C. § 1317), (vii) defined as a "hazardous waste" pursuant to § 1004 of the Resource Conservation and Recovery Act (42 U.S.C. § 6903), or (vii) defined as a "hazardous substance" pursuant to § 101 of the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601).

"**Intercreditor Agreements**" means (a) the Subordination Agreement (as defined in Section 10.21) and (b) at any time any intercreditor agreement or agreements between Lender and any other creditors with respect to any Borrowing Base Asset or Real Estate.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder from time to time.

"**Inventory**" means any and all goods which shall at any time constitute "inventory" (as defined in the Internal Revenue Code and UCC) or Farm Products of Borrowers, wherever located (including without limitation, goods in transit and goods in the possession of third parties), or which from time to time are held for sale, lease or consumption in Borrowers' business, furnished under any contract of service or held as raw materials, work in process, finished inventory or supplies (including without limitation, packaging and/or shipping materials).

"**Land**" means the real property legally described in Exhibit A.

"**Laws**" means, collectively, all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including judicial opinions or precedential authority in the applicable jurisdiction.

"**Liabilities**" means any and all liabilities, obligations and indebtedness of Borrowers to Lender of any and every kind and nature, at any time owing, arising, due or payable and howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise and whether arising or existing under this Agreement or any of the other financing agreements or by operation of law.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, option, levy, execution, attachment, garnishment, hypothecation, assignment for security, deposit arrangement, encumbrance, charge, security interest, or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever, on or of such asset, and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

4

EXHIBIT 2                                    Page 7 of 68

**"Loan"** means the loan to be made by Lender to Borrowers on or about the date hereof in the original principal amount of $16,500,000.00.

**"Loan Documents"** means this Agreement, the other documents and instruments listed in Section 3.2 of this Agreement, any documents amending, restating, replacing, extending, or otherwise modifying this Agreement and/or the documents listed in Section 3.2 of this Agreement, and all other documents given by any Borrower to Lender from time to time to evidence or secure, or otherwise relating to, the Loan.

**"Loan Fee"** has the meaning set forth in Section 4.2.

**"Loan Maturity"** means October 20, 2023.

**"Loan Parties"** means Borrowers and any other Person hereafter guarantying or granting any security interest or other lien to secure, all or any portion of the indebtedness arising hereunder.

**"Margin Accounts"** means, collectively, all commodity accounts and all commodity contracts and (to the extent not including in commodity accounts or commodity contracts) all Swap Contracts maintained by Borrowers with respect to Inventory.

**"Note"** means Borrowers' promissory note dated the date hereof, payable to the order of Lender in the original principal amount of $16,500,000.00, plus interest, together with any note issued in substitution or exchange therefor, and as the same may be amended, modified or restated from time to time.

**"Operating Lender"** means, from time to time, (i) while the Senior Loan Agreement is in effect, the Senior Loan Agent, and (ii) after the termination of the Senior Loan Agreement and the indefeasible payment in full of the borrowers' obligations thereunder, the lender (which may be Lender) with which Borrowers have entered into fully executed bona fide agreements (each an **"Operating Loan Agreement"**) to provide such operating loans as may be required to continue the operations of Borrowers and their affiliates substantially in accordance with Borrowers' past practices. If at any time there is more than one Operating Lender (as determined without giving effect to this sentence), "Operating Lender" for purposes of this Agreement means the Person or Persons so designated by Lender from time to time in its sole discretion.

**"Permitted Exceptions"** means those matters to which the interest of Borrowers in the Real Estate or Borrowing Base Assets are subject at the Closing Date or at any time thereafter, so long as in each case Lender has approved such matters in advance in writing.

**"Person"** means any individual, entity, corporation, limited liability company, partnership, trust or other organized group of persons.

**"Project"** means the Land, any improvements thereto, and all rights, privileges, easements, hereditaments, and appurtenances, thereunto relating or appertaining and all personal property, fixtures and equipment owned by Borrowers and pledged to Lender pursuant to the Security Instrument.

5

EXHIBIT 2                    Page 8 of 68

**"Real Estate"** means that portion of the Project constituting real property.

**"Security Instrument"** means the Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing of even date herewith, granted by Borrowers to Lender, as originally executed or as may be hereafter supplemented or amended from time to time in writing, with respect to that portion of the Project located in Jerome County, Idaho.

**"Senior Loan Agreement"** means that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, by and among Millenkamp Cattle, Inc., an Idaho corporation, Idaho Jersey Girls LLC, an Idaho limited liability company, East Valley Cattle, LLC, an Idaho limited liability company, Millenkamp Properties, L.L.C., an Idaho limited liability company, Millenkamp Properties II LLC, an Idaho limited liability company, Millenkamp Family LLC, an Idaho limited liability company, Goose Ranch LLC, an Idaho limited liability company, Idaho Jersey Girls Jerome Dairy LLC, an Idaho limited liability company, Black Pine Cattle LLC, an Idaho limited liability company, Millenkamp Enterprises LLC, an Idaho limited liability company, Susan Millenkamp as Trustee of the WJM 2012 Trust, William Millenkamp as Trustee of the SJM 2012 Trust, William John Millenkamp, and Susan Jo Millenkamp, and Rabo AgriFinance LLC, a Delaware limited liability company, in its capacity as agent for the lenders and other secured parties (in such capacity, the "Senior Loan Agent"), as sole lead arranger, and as a lender, and the other financial institutions party thereto in accordance with the provisions thereof.

**"Subordinated Debt"** means any subordinated, unsecured debt of Borrowers that is subordinated to the Liabilities in accordance with a subordination agreement or subordination agreements, in form and substance acceptable to Lender.

**"Swap Contract"** means (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency options, spot contracts or any other similar transactions of any of the foregoing (including, but without limitation, any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., or any International Foreign Exchange Master Agreement for the purpose of limiting the mark risk of holding currency, a security, or a commodity in either the cash or futures market.

**"Title Insurer"** means TitleOne Insurance Company, or such other title insurance company licensed in the State of Idaho, as may be approved by Lender in connection with the Loan.

**"Title Policy"** means an ALTA Loan Policy of Title Insurance or other policy of title insurance acceptable to Lender in Lender's sole discretion, in each case as more fully described in Section 5.1.2(a) of this Agreement.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of Idaho.

6

EXHIBIT 2                                    Page 9 of 68

*1.2 Use of Defined Terms.*  Defined terms may be used in the singular or the plural. When used in the singular preceded by "a", "an", or "any", such term shall be taken to indicate one or more members of the relevant class. When used in the plural, such term shall be taken to indicate all members of the relevant class. Pronouns and other references to any gender shall include all genders. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, and (c) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time. Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall be construed in conformity with GAAP.  Financial statements and other information required to be delivered by Borrowers to Lender pursuant hereto shall be prepared in accordance with GAAP as in effect at the time of such preparation.

## ARTICLE II
### Representations and Warranties

*2.1 Representations and Warranties of Borrowers.*  To induce Lender to execute this Agreement and perform the obligations of Lender hereunder, Borrowers hereby represent and warrant to Lender as follows:

**2.1.1**    On the Closing Date and thereafter, Borrowers will have good and marketable fee simple title to the Project, subject only to the Permitted Exceptions.

**2.1.2**    Except as previously disclosed to Lender in writing, no litigation or proceedings are pending, or to Borrowers' knowledge are threatened in writing, against any Loan Party (i) which might affect the validity or priority of either Security Instrument, (ii) which might affect the ability of any Loan Party to perform any obligations pursuant to and as contemplated by the terms and provisions of this Agreement and the other Loan Documents, or (iii) which could materially and adversely affect the operations or financial condition of any Loan Party. Without limitation of the foregoing, to Borrowers' knowledge, there are no pending or threatened proceedings or actions to revoke, attack, invalidate, rescind, or modify the Project or any part thereof, or any building or other permits heretofore issued with respect thereto, or asserting that such zoning or permits do not permit the current use or occupancy of the Project, other than applications and proceedings initiated by Borrowers and others to modify certain water rights.

**2.1.3**    To Borrowers' knowledge, there are no pending civil (including actions by private parties), criminal, or administrative proceedings adversely affecting the Project relating to environmental matters (**"Environmental Proceedings"**), and Borrowers have no knowledge of any threatened Environmental Proceedings or any facts or circumstances that may give rise to any future Environmental Proceedings.

**2.1.4**    The execution, delivery and performance of this Agreement and the other Loan Documents by the Loan Parties have not constituted (and will not, upon the giving of notice or lapse of time or both, constitute) a breach or default under any other agreement to which any Loan Party is a party or may be bound or affected, or a violation of any Law by any Loan Party.

7

EXHIBIT 2                    Page 10 of 68

**2.1.5**    This Agreement and the other Loan Documents constitute legal, valid and binding obligations of Borrowers and are enforceable against Borrowers in accordance with their respective terms subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting enforcement of creditors' rights generally and limitations imposed by general principles of equity.

**2.1.6**    To Borrowers' knowledge: (i) no condemnation of any portion of the Project, (ii) no condemnation or relocation of any roadways abutting the Project, and (iii) no denial of access to the Project from any point of access to the Project, has commenced or is contemplated by any Governmental Authority.

**2.1.7**    All financial statements furnished to Lender by Borrowers fairly present the financial condition of Borrowers as of the date thereof (in the case of the balance sheet) or with respect to the period covered thereby (in the case of the income statement and cash flows), and all other information previously furnished by Borrowers to Lender in connection with the Loan was true, complete and correct in all material respects as of the date thereof and did not fail to state any material fact necessary to make the statements made not misleading.

**2.1.8**    No material adverse change in the operations or financial condition of Borrowers has occurred since the respective effective dates of any financial statements previously submitted to Lender.

**2.1.9**    The Project and its use as a commercial farming operation with all accessory uses does not violate in any material respect: (i) any Law (including subdivision, zoning, building, and wetlands protection Laws), or (ii) any building permits, restrictions of record, or any agreement affecting the Project or any part thereof. Neither the zoning nor any other right to construct or to use the Project is to any material extent dependent upon or related to any real property other than the Project. Without limiting the generality of the foregoing, all material consents, licenses and permits and all other authorizations or approvals (collectively, **"Governmental Approvals"**) required to operate the Project have been obtained.

**2.1.10**    The Project has adequate water and electrical supply, other required public utilities, and means of appropriate access between the Project and public highways and none of the foregoing will be materially delayed or impeded by virtue of any requirements under any applicable Laws; and all of the foregoing comply in all material respects, with all applicable Laws.

**2.1.11**    To Borrowers' knowledge, no building or other improvement at the Project encroaches upon any building line, setback line, side yard line, or any recorded or visible easement (or other easement that Borrowers have knowledge of with respect to the Project).

**2.1.12**    The Land is taxed separately without regard to any other real property and for all purposes the Land may be mortgaged, conveyed, and otherwise dealt with without including any land not described on Exhibit A.

**2.1.13**    Borrowers' representations and warranties with respect to compliance with Environmental Laws are stated in the environmental indemnity agreement described in Section **Error! Reference source not found.**.

8

EXHIBIT 2                         Page 11 of 68

**2.1.14**    The assets of Borrowers are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

**2.1.15**    Borrowers and all Affiliated Parties are in compliance with all applicable state and federal farming programs to which Borrowers and such Affiliated Parties may be subject.

**2.1.16**    No Event of Default has occurred and is continuing.

**2.1.17**    No event has occurred and no circumstance exists as a result of which the information concerning Borrowers that has been provided to Lender in connection herewith would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

**2.1.18**    The Loan is made exclusively for agricultural, commercial, investment, or business purposes and no portion of the proceeds of the Loan shall be used for any consumer, personal, family, or household purpose.

**2.1.19**    Each Loan Party that is not a natural person is a legal entity duly organized, validly existing and in good standing under the laws of its respective state of organization, and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

***2.2 Survival of Representations and Warranties.***    Borrowers agree that all of the representations and warranties set forth in Section 2.1 of this Agreement and elsewhere in this Agreement will be true at the Closing Date and shall survive the making of the Loan.

### ARTICLE III
### Terms of Loan and Documents

***3.1 Agreement to Borrow and Lend.***    Subject to all of the terms, provisions and conditions set forth in this Agreement, Lender agrees to make, and Borrowers agree to accept the Loan described in this Agreement.

***3.2 Loan Documents.***    In consideration of Lender's entry into this Agreement and Lender's agreement to make the Loan, Borrowers agree that they will on or prior to the Closing Date, execute and deliver or cause to be executed and delivered to Lender the following documents and instruments in form and substance acceptable to Lender:

**3.2.1**    The Note;

**3.2.2**    The Security Instrument, executed by Borrowers and securing the Note, which Security Instrument shall be a valid and subsisting third-priority encumbrance and Lien on the Real Estate, subject only to the Permitted Exceptions and to leases of all or any part of the Project to tenants;

EXHIBIT 2                    Page 12 of 68

**3.2.3**      Completed UCC financing statements from each appropriate jurisdiction as is necessary, in Lender's sole discretion, to perfect Lender's security interest in the assets of Borrowers; and

**3.2.4**      Such other papers and documents as may be required by this Agreement or as Lender may reasonably require.

***3.3 Place, Manner and Application of Payments.***  Borrowers shall make all payments under this Agreement, the Note and the other Loan Documents in the form of cash, check or money order. Borrowers shall make all such payments at Lender's office at 5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266, or at such other place as Lender from time to time requires. Except to the extent required by applicable law, so long as no Event of Default has occurred and is continuing, payments will be applied, first, to collection expenses and protective advances under the Security Instrument and this Agreement, second, to accrued but unpaid interest under the Note, third, to the principal balance of the Note, and finally to late charges and other amounts payable under the Note, the Security Instrument and any related document. Payments following and during the continuance of an Event of Default shall be applied in such order as Lender may in its sole discretion determine.

***3.4 Joint and Several Obligations.***  All obligations of Borrowers under this Agreement and the other Loan Documents shall be joint and several.

***3.5 Grant of Security Interest in Borrowing Base Assets.***  Each Borrower, as grantor, hereby pledges and grants to Lender, as secured party, and hereby creates a continuing lien and security interest in favor of Lender in and to all of such Borrower's right, title, and interest in and to the Borrowing Base Assets, wherever located, whether now existing or hereafter from time to time arising or acquired. The Borrowing Base Assets secure the due and prompt payment and performance of Borrower's obligations under this Agreement, the Note, and the other Loan Documents.

***3.6 Perfection of Security Interest in Borrowing Base Assets.***

3.6.1      Borrowers shall, from time to time, as may be required by Lender with respect to all Borrowing Base Assets, immediately take all actions as may be requested by the Lender to perfect the security interest of Lender in the Borrowing Base Assets. Without limitation of the foregoing, with respect to all Borrowing Base Assets over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, Borrowers shall promptly take all actions as may be requested from time to time by Lender so that control of such Borrowing Base Asset is obtained and at all times held by Lender. All of the foregoing shall be at the sole cost and expense of Borrowers.

3.6.2      Borrowers hereby irrevocably authorize Lender at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Borrowing Base Assets, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by Borrowers hereunder, without the signature of Borrowers where permitted by law, including the filing of a financing statement describing the collateral therein as "all assets" or "all personal property" of Borrowers or words of

10

EXHIBIT 2                    Page 13 of 68

similar effect or as being of an equal or lesser scope or with greater detail. Borrowers agree to provide all information required by Lender pursuant to this Agreement promptly to Lender upon request.

3.6.3    With prior written notification to Borrowers, Borrowers hereby irrevocably authorize Lender at any time and from time to time to notify all buyers, commission merchants, selling agents, and other persons regarding Lender's security interest in any of the Borrowing Base Assets constituting Farm Products under this Agreement and the other Loan Documents; provided, however, Lender shall have no obligation to provide or give such notice and the failure to provide or give such notice shall not in any way constitute a waiver of any provisions of this Agreement or any other Loan Document.

3.6.4    Borrowers agree that at any time and from time to time, at the expense of Borrowers, Borrowers will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that Lender may request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any of the Borrowing Base Assets.

**ARTICLE IV**
**Loan Expenses and Advances; Security of Security Instrument for Same**

*4.1 Loan Expenses.*    Borrowers have previously paid a refundable deposit of $3,000.00 to Lender for due diligence costs and other expenses incurred by Lender, including any appraisals and inspections, in connection with the transactions contemplated by this Agreement. In addition to the foregoing, Borrowers agree to pay all expenses of the Loan, including all amounts payable pursuant to Section 4.2 of this Agreement, and also including all recording charges, title insurance charges, costs of any surveys, insurance policy premiums, costs for certified copies of instruments, cash deposits required to be made with the Title Insurer or other escrow agent for administering Loan disbursements, fees and expenses of Lender's attorneys, and all costs and expenses incurred by Lender in connection with the determination of whether Borrowers have performed the obligations undertaken by Borrowers under this Agreement or have satisfied any conditions precedent to the obligations of Lender under this Agreement. All such expenses, charges, costs and fees shall be Borrowers' obligation regardless of whether the Loan is disbursed in whole or in part unless such failure to disburse is due to Lender's wrongful failure to disburse hereunder. Provided no Event of Default exists and remains uncured, Lender shall endeavor in good faith to consult with Borrowers prior to incurring any expenses, charges, costs or fees to be reimbursed by Borrowers hereunder; provided, however, the failure to so consult by Lender shall not release Borrowers from any reimbursement obligation under this Article IV, nor shall Lender's consulting with Borrowers give Borrowers any approval rights over Lender's decision to incur any expenses, charges, costs or fees pursuant to this Agreement.

*4.2 Fees.*    Borrowers agree, as consideration for the execution of this Agreement by Lender, to pay an origination fee (the **"Loan Fee"**) in the amount of $300,000.00 for the Loan, which Loan Fee shall be due and payable on or before the Closing Date.

*4.3 Time of Payment of Fees.*    The Loan Fee shall be payable by Borrowers to Lender as set forth in Section 4.2. Borrowers shall pay all other fees and expenses incurred by Lender at the Closing Date and on

11

EXHIBIT 2                              Page 14 of 68

demand at such subsequent times as Lender may determine. Lender may require the payment of such fees and expenses as a condition to any disbursement of the Loan.

**4.4 Protective Advances.** Lender may make advances under this Agreement or the other Loan Documents to protect Lender's interest in this Agreement, the Security Instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the rate then applicable to principal under the Note shall be due and payable on demand and secured by this Agreement, the Security Instrument or other instrument providing security for the Note. Without limiting the generality of the foregoing, Lender may, as it deems appropriate in its sole discretion: (a) make one or more protective advances with respect to Borrowers' violation of Section 6.1.25 of this Agreement; and (b) assess a fee to Borrowers in an amount equal to ten percent (10%) of any such protective advance.

**4.5 Expenses and Advances Secured by Loan Documents.** Any and all advances or payments made by Lender as permitted under this Agreement from time to time, and any amounts expended by Lender pursuant to Section 4.4 of this Agreement, including reasonable attorneys' fees and expenses, if any, and all other expenses of the Loan shall, as and when advanced or incurred by Lender, constitute additional indebtedness evidenced by the Note and secured by this Agreement, the Security Instrument and the other Loan Documents to the same extent and effect as if the terms and provisions of this Agreement were set forth therein, whether or not the aggregate of such indebtedness shall exceed the face amount of the Note.

## ARTICLE V
## Conditions Precedent to the Closing of the Loan

**5.1 Conditions Precedent to Closing.** Borrowers agree that Lender's obligation to disburse the proceeds of the Loan is conditioned upon the satisfaction of all the following conditions precedent:

**5.1.1** No Event of Default shall have occurred under this Agreement, and Borrowers shall have timely complied with and performed all of Borrowers' covenants, agreements and obligations hereunder (including those under Section 3.2), which by their terms are required to have been complied with and performed by Borrowers, and no material adverse change shall have occurred in the financial condition of Borrowers or the Project.

**5.1.2** Borrowers shall have furnished to Lender the following on or before the Closing Date, all of which shall be in form and substance satisfactory to Lender and its counsel:

(a) A policy of title insurance in the full aggregate amount of the Loan, issued by the Title Insurer, insuring the Security Instrument as valid and subsisting third-priority encumbrances on the Real Estate and all appurtenant easements as required by Lender, subject only to the Permitted Exceptions and to leases of all or any part of the Project to tenants. The Title Policy shall (1) contain a comprehensive endorsement if the improvements on the Real Estate have been completed to the requisite stage; (2) specifically insure Lender that no restrictions of record affecting the Real Estate have been violated; and (3) contain such other endorsements as Lender may reasonably require, including endorsements with respect to contiguity, access and encroachments. Before the Closing, Lender shall accept in lieu of the Title Policy a commitment for the issuance of the Title Policy, issued by the Title Insurer, establishing that the Title Insurer is prepared

12

EXHIBIT 2                    Page 15 of 68

to issue the Title Policy on the terms stated above without qualification or conditions, and thereafter the Title Policy shall be promptly issued. Borrowers shall deliver to Lender a legible copy of all underlying documents and instruments referred to in the Title Policy or in any preliminary title report or commitment obtained from the recorder's office or other appropriate source. Borrowers agree to deliver to the Title Insurer such other papers, instructions and documents as the Title Insurer may require for the issuance of the Title Policy and which are described in the above-referenced commitment.

(b)    The following with respect to insurance:

(i)    Original or duplicate original insurance policies for which the premiums have been fully prepaid. Such insurance shall insure the Project against loss or damage by fire or other casualty, with extended coverage and with coverage for such other hazards as Lender may require. Such insurance shall contain a replacement cost and agreed amount endorsement, an endorsement covering so called "soft costs" or "extra expenses";

(ii)    All insurance required hereunder shall be with companies and in form, amounts and with coverage and deductibles satisfactory to Lender and with a mortgagee's loss payable clause attached naming Lender as mortgagee.  All policies required hereunder shall provide that the insurance evidenced thereby shall not be cancelled or modified without at least thirty (30) days' prior written notice from the insurance carrier to Lender and shall provide that no claims shall be paid thereunder without ten (10) days' advance written notice to Lender. Further, Borrowers shall deliver renewal certificates of all insurance required hereunder, together with written evidence of full payment of the annual premiums therefor, at least thirty (30) days before the expiration of the existing insurance.

(c)    Evidence satisfactory to Lender, as Lender may require, that the Project, has adequate water, gas and electrical supply, other required public utilities, means of access between the Project and public highways. Borrowers also shall have furnished to Lender evidence satisfactory to Lender that no such supply or facilities will be delayed or impeded by virtue of any requirements under any Laws including environmental protection or control Laws and that all such facilities (existing and to be constructed) shall comply with any and all applicable Laws including environmental protection and control Laws. If any of such facilities are located or are to be located in land beyond the Project, other than land which has been dedicated to the public or to the utility which is to furnish the service, Borrowers shall have forwarded to Lender evidence to Lender of the existence of permanent easement rights therefor benefiting the Project, in form and substance satisfactory to Lender, which easement rights shall be covered by the Liens of the Security Instrument and which Liens shall be insured under the Title Policy.

(d)    Evidence satisfactory to Lender, as Lender may require, that the Loan is authorized and that the individuals executing this Agreement and the other Loan Documents on behalf of Borrowers have been duly authorized by all appropriate action to execute and deliver this Agreement and the Loan Documents on behalf of Borrowers.

13

EXHIBIT 2                    Page 16 of 68

(e)        Evidence satisfactory to Lender, as Lender may require, that the Project is benefited by such easements or other rights as may be necessary for vehicular and pedestrian ingress and egress, the installation and maintenance of utilities and other site improvements, and the operation of the Project including any reciprocal easement and/or operating agreement for the Project.

(f)        Evidence satisfactory to Lender, as Lender may require, that the Project is in compliance with all applicable zoning and building codes, environmental Laws, and other Laws of applicable Governmental Authority.

(g)        As Lender may require, current searches of all Uniform Commercial Code financing statements and all effective financing statements filed with the applicable Secretary of State against Borrowers showing that no Uniform Commercial Code financing statements or effective financing statements are filed or recorded against any Loan Party covering all or any part of the Project other than the Permitted Exceptions.

(h)        Executed copies of all contracts related to the Project as Lender may require.

**5.1.3**        Borrowers shall have complied with all other applicable requirements of this Agreement.

**ARTICLE VI**
**Borrowers' Agreements**

*6.1 Borrowers' Covenants.*   Borrowers further covenant and agree as follows:

**6.1.1        Inspection by Lender.**   Borrowers will cooperate with Lender in arranging for inspections of the Project and Borrowing Base Assets by Lender and its agents and representatives at any time and from time to time. Except in cases of emergencies, Lender shall provide reasonable notice to Borrowers prior to any inspection.

**6.1.2        Mechanics' Liens and Contest Thereof.**   Borrowers will not suffer or permit any mechanics' lien claims to be filed or otherwise asserted against Borrowers' interest in the Project, and will promptly discharge, or cause any tenant to discharge, the same if any claims for lien or any proceedings for the enforcement thereof are filed or commenced; provided, however, that Borrowers shall have the right to contest in good faith the validity of any such lien or claim upon furnishing to the Title Insurer such security or indemnity as it may require to induce the Title Insurer to issue its Title Policy insuring against all such claims, liens, or proceedings.

**6.1.3        Settlement of Mechanics' Lien Claims.**   If Borrowers shall fail to promptly discharge any mechanics' lien claim filed or otherwise asserted or to give security or indemnity in the manner provided in Section 6.1.2 hereof, or, having given such security or indemnity, shall thereafter fail to maintain such indemnity or security so required by the Title Insurer for its full amount, or, upon adverse conclusion of any such contest, shall fail to cause any judgment or decree to be satisfied and lien to be promptly released, then, and in any such event, Lender may, at its election (but shall not be required to) (i) procure the release and discharge of any such claim and

14

EXHIBIT 2                    Page 17 of 68

any judgment or decree thereon, without inquiring into or investigating the amount, validity or enforceability of such lien or claim and (ii) effect any settlement or compromise of the same, or may furnish such security or indemnity to the Title Insurer, and any amounts so expended by Lender, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute additional indebtedness evidenced by the Note and secured by the Security Instrument and the other Loan Documents (even if the total amount of indebtedness would exceed the face amount of the Note).

**6.1.4    Renewal of Insurance.**    Borrowers shall timely pay all premiums on all insurance policies required under this Agreement from time to time, including at all times all insurance described in Section 5.1.2(b); and when and as additional insurance is required from time to time during the term of the Loan and when and as any policies of insurance may expire, furnish to Lender, premiums prepaid, additional and renewal insurance policies in companies, coverage and amounts satisfactory to Lender, all in accordance with Sections 5.1.2(b) of this Agreement, as applicable.    Notwithstanding the foregoing, in the event of an Event of Default under this Agreement, Lender shall have the right, but not the obligation, to place and maintain insurance required to be placed and maintained by Borrowers hereunder and treat the amounts expended therefor as additional indebtedness evidenced by the Note and secured by the Security Instrument and the other Loan Documents (even if the total amount of indebtedness would exceed the face amount of the Note).

**6.1.5    Payment of Taxes.** Borrowers shall pay all special assessments and all real estate taxes, assessments and charges of every kind upon the Project before the same become delinquent; provided, however, that Borrowers shall have the right to pay any such tax under protest or to otherwise contest any such tax, assessment or charge, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also prevents the sale or forfeiture of the Project or any part thereof or any interest therein, (ii) Borrowers have notified Lender in writing in advance of their intent to contest such taxes, and (iii) Borrowers have deposited security in form and amount satisfactory to Lender, in its sole judgment, and increases the amount of such security so deposited promptly after Lender's request therefor. If Borrowers fail to commence such contest or, having commenced to contest the same, and having deposited such security required by Lender for its full amount, shall thereafter fail to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended by Lender shall be deemed to constitute additional indebtedness evidenced by the Note and secured by the Security Instrument and the other Loan Documents (even if the total amount of indebtedness would exceed the face amount of the Note).

**6.1.6    Personal Property.** (a) All of Borrowers' personal property, fixtures, furnishings, furniture, attachments and equipment located on or used in connection with the Project, if any, shall always be located at the Project to the extent necessary for the operation of the Project and shall also be kept free and clear of all chattel mortgages, conditional vendor's liens and all other liens, encumbrances and security interests of any kind whatever, other than purchase money security interests, (b) Borrowers will be the absolute owner of said personal property, fixtures, attachments and equipment, other than purchase money security interests, water withdrawal and

15

EXHIBIT 2                    Page 18 of 68

distribution equipment, and irrigation systems, and (c) Borrowers shall, from time to time, furnish Lender with evidence of such ownership satisfactory to Lender, including searches of applicable public records.

6.1.7    **Lender's Attorney Fees and Expenses.** If at any time hereafter prior to repayment of the Loan in full, Lender employs counsel for advice or other representation (whether or not any suit has been or shall be filed and whether or not other legal proceedings have been or shall be instituted and, if such suit is filed or legal proceedings instituted, through all administrative, trial, and appellate levels) with respect to the Loan, the Project or any part thereof, this Agreement or any of the Loan Documents, or to protect, collect, lease, sell, take possession of, or liquidate any of the Project, or to attempt to enforce any security interest or Lien on any of the Project, or to enforce any rights of Lender, or any obligations of Borrowers, or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or any other agreement, instrument or document heretofore or hereafter delivered to Lender by or for the benefit of Borrowers, or to negotiate any proposed restructuring of the Loan, then, in any such event, all of the reasonable attorneys' fees and expenses arising from such services, and all expenses, costs and charges relating thereto, shall be paid by Borrowers on written demand and if Borrowers fail to pay such fees, costs and expenses, payment thereof by Lender shall be deemed to constitute additional indebtedness evidenced by the Note and secured by the Security Instrument and the other Loan Documents (even if the total amount of indebtedness would exceed the face amount of the Note).

6.1.8    **Lender's Action for its Own Protection Only.** The authority herein conferred upon Lender, and any action taken by Lender, to inspect the Project will be exercised and taken by Lender for Lender's own protection only and may not be relied upon by Borrowers or any other party for any purposes whatsoever; and Lender shall not be deemed to have assumed any responsibility to Borrowers or any other party with respect to any such action herein authorized or taken by Lender, the proper construction of improvements that make up any part of the Project, or the performance of contracts, subcontracts or purchase orders by any contractor, subcontractor or material supplier, the prevention of mechanics' liens from being claimed or asserted against any of the Project, or the performance under any lease or other agreement. Any review, investigation or inspection conducted by Lender, any consultants retained by Lender, or any agent or representative of Lender in order to verify independently the satisfaction by Borrowers of any conditions precedent to the Closing under this Agreement, the performance by Borrowers of any of the covenants, agreements and obligations of Borrowers under any of the Loan Documents, or the truth of any representations and warranties made by Borrowers hereunder (regardless of whether or not the party conducting such review, investigation or inspection should have discovered that any of such conditions precedent were not satisfied or that any such covenants, agreements or obligations were not performed or that any such representations or warranties were not true), shall not affect (or constitute a waiver by Lender of) (i) any of Borrowers' representations and warranties under this Agreement or Lender's reliance thereon, or (ii) Lender's reliance upon any certifications of Borrowers required under this Agreement or any other facts, information or reports furnished to Lender by Borrowers in connection with the Loan.

6.1.9    **Furnishing Information.** Borrowers shall cause to be delivered to Lender: (i) as soon as available and in all events no later than one hundred twenty (120) days after the close of each fiscal year of Borrowers, the separate financial statements of Borrowers (such statements to

16

EXHIBIT 2                    Page 19 of 68

include a balance sheet and cash flow statement for the year just ended, an income statement for such year, and a statement of contingent liabilities as of the end of such year); and (ii) copies of all tax returns filed by any Loan Party within thirty (30) days of the filing or mailing of such returns (including, if any extension is filed thereon, a copy of such extension within ninety (90) days after the close of the fiscal year just ended and a copy of the corresponding tax return no later than October 15th of the year in which such extension was filed). Borrowers shall certify and supply a compliance certificate with each financial statement provided.  Additionally, Borrowers shall:

(a)     promptly supply Lender (in no event later than ninety (90) days after Lender's written request) with such other financial statements, reports and information concerning the Project and the Loan Parties' affairs and property as Lender may hereafter reasonably request from time to time;

(b)     annually supply Lender with proof acceptable to Lender that all real and personal property taxes have been paid, or are being contested in accordance with Section 6.1.5;

(c)     promptly notify Lender of any condition or event which constitutes (or which upon the giving of notice or lapse of time or both would constitute) an Event of Default;

(d)     promptly notify Lender of any material adverse financial change in their financial condition, and maintain a standard and modern system of accounting in accordance with generally accepted accounting principles;

(e)     at any time during regular business hours following reasonable notice permit Lender or any of its agents or representatives to have access to and examine all of their books and records regarding the operation of the Project;

(f)     promptly, and in any event not more than thirty (30) days after the occurrence thereof, notify Lender of any change in the terms and provisions of any contract or lease to which any Loan Party is a party, including without limitation any change in the terms of any lease covering all or any part of the Project and any termination or expiration (for any reason) of any such lease;

(g)     annually, and at any time upon Lender's reasonable request, supply Lender with a copy of each Operating Loan Agreement entered into by any Loan Party and not previously delivered to Lender; and

(h)     within forty-five (45) days of each month-end provide supply Lender with a copy of any Borrowing Base Certificate and any compliance certificate to be delivered pursuant to any Operating Loan Agreement to which any Borrowers may be a party.

**6.1.10     Documents of Further Assurance.** Borrowers shall, from time to time, upon Lender's request, execute, deliver, record and furnish, or cause to be executed, delivered, recorded and furnished, such documents as Lender may reasonably deem necessary or desirable to (a) perfect and maintain perfected the Liens granted by Borrowers to Lender under the Security Instrument;

17

EXHIBIT 2                              Page 20 of 68

(b) correct any errors of a typographical nature or inconsistencies which may be contained in any of the Loan Documents; and (c) consummate fully the transaction contemplated under this Agreement.

**6.1.11    Furnishing Reports.** Borrowers shall provide Lender promptly after receipt with copies of all non-privileged, written inspections, reports, and test results received by Borrowers from time to time from third parties not affiliated with Borrowers which in any way relate to the Project, or any part thereof.

**6.1.12    Operation of Project.** As long as any portion of the Loan remains outstanding, the Project shall be operated as a commercial farming operation, including storage.

**6.1.13    Management Contracts.** Borrowers shall not enter into, modify, amend, waive any material provision of, terminate or cancel any management contracts or agreements, without the prior written notice to Lender.

**6.1.14    Furnishing Notices.** Borrowers shall deliver to Lender copies of all written notices of default or violation received or given by Borrowers (or their agents or representatives) under any loan or credit agreement to which any of Borrowers may be a party, within ten (10) days after such notice is given or received, as the case may be. Borrowers shall also deliver to Lender copies of all written notices of default or violation received or given by Borrowers (or their agents or representatives) under any leases of Land or property in the Project, within ten (10) business days after such notice is given or received, as the case may be. Borrowers shall also provide Lender with copies of all written notices of default or violation pertaining to the Project or any part thereof received by Borrowers (or their agents or representatives) from any Governmental Authority or from any insurance company providing insurance pertaining to the Project (including crop insurance), within three (3) business days after such notices are received.

**6.1.15    Indemnification.** Borrowers shall indemnify, defend and hold Lender, and its partners, officers, directors, employees, attorneys, agents, participants and successors and assigns (collectively, **"Lender Indemnified Persons"**), harmless from and against all claims, injury, damage, loss, costs (including attorneys' fees and costs) and liability of any Lender Indemnified Person by reason of (i) Borrowers' ownership, operation or maintenance of the Project; (ii) any other action or inaction by, or matter which is the responsibility of, Borrowers; and (iii) the breach of any representation or warranty or failure to fulfill any obligations of Borrowers under this Agreement or any other Loan Document.

**6.1.16    Insurance Reporting Requirements.** Borrowers shall promptly notify the insurance carrier or agent therefor (with a copy of such notification being provided to Lender) if there is any material increase in hazard relating to the Project.

**6.1.17    Compliance with Laws.** Except for compliance with Environmental Laws (which is governed by the Environmental Indemnity Agreement), Borrowers shall promptly comply in all material respects with all applicable Laws of any Governmental Authority having jurisdiction over Borrowers or the Project.

18

EXHIBIT 2                    Page 21 of 68

6.1.18    **Organizational Documents.**  Without the prior written consent of Lender, Borrowers shall not permit or suffer any amendment or modification of Borrowers' organizational documents.

6.1.19    **Lost Note.**  Borrowers shall, if the Note is mutilated, destroyed, lost, or stolen, promptly deliver to Lender upon request by Lender, in substitution therefor, a new promissory note containing the same terms and conditions as the Note with a notation thereon of the unpaid principal and accrued and unpaid interest.

6.1.20    **Encumbrances.**  Except for those Liens presently in existence as of the Closing Date and reflected in Borrowers' financial statements, Liens securing any renewals, extensions, refundings or refinancings of indebtedness secured by Liens disclosed to Lender prior to entering into this Agreement, and Liens that may arise in the ordinary course of business pursuant to agricultural lien or other statutes under state law, and including any such Liens that exist as of the Effective Date of this Agreement, Borrowers shall not create, incur, assume or suffer to exist any Liens of any nature whatsoever on or with regard to any of Borrowers assets (including, without limitation, the Borrowing Base Assets) other than: (a) Liens securing the payment of taxes, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which Borrowers shall, if appropriate under GAAP, have set aside on Borrowers books and records, as applicable, adequate reserves; (b) Liens securing deposits under workmen's compensation, unemployment insurance, social security and other similar laws, or securing the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing indemnity, performance or other similar bonds for the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing statutory obligations or surety bonds, or securing indemnity, performance or other similar bonds in the ordinary course of Borrowers' business, which are not past due; (c) Liens securing appeal bonds securing judgments not in excess of $100,000.00; (d) Liens in favor of Lender; (e) zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Borrowers' real property, and other Liens on property which are subordinate to the Liens of Lender and which do not, in Lender's sole determination: (i) materially impair the use of such property, or (ii) materially lessen the value of such property for the purposes for which the same is held by Borrowers; (f) purchase money security interests securing amounts relating to items of Equipment (provided that no such purchase money security interests shall extend to or cover other property of Borrowers other than the items of Equipment so acquired); (g) Permitted Exceptions; and (h) Liens described in an Intercreditor Agreement.

6.1.21    **Indebtedness.**  Except for the obligations and indebtedness presently in existence as of the Closing Date and reflected in Borrowers' financial statements, Borrowers shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any obligations or indebtedness, direct or indirect fixed or contingent, except: (a) the Liabilities; (b) Subordinated Debt in amounts that approved in writing by Lender in its discretion; (c) trade obligations, including producer payables and normal accruals in the ordinary course of Borrowers business not yet due and payable, or with respect to which Borrowers are contesting in good faith the amount or validity thereof by appropriate proceedings, and then only to the extent that any of Borrowers, as applicable, has set aside on its books adequate reserves, if appropriate under GAAP; (d) indebtedness secured by Liens permitted under Section 6.1.20; (e) indebtedness in respect of

19

EXHIBIT 2                    Page 22 of 68

insurance premiums, performance bonds, bid bonds, surety bonds or other similar obligations arising in the ordinary course of business, and any refinancings thereof to the extent not provided to secure the repayment of other indebtedness; (f) indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; and (g) unsecured intercompany indebtedness not otherwise prohibited under this Agreement.

**6.1.22** **Guaranties and Other Contingent Obligations.** Except as permitted under Section 6.1.21, Borrowers shall not guarantee, endorse or otherwise in any way become or be responsible for obligations of any other Person, whether by agreement to purchase the indebtedness of such Person or through the purchase of goods, supplies or services, or maintenance of working capital or other balance sheet covenants or conditions, or by way of stock purchase, capital contribution, advance or loan for the purpose of paying or discharging any indebtedness or obligation of such Person or otherwise, except: (a) for endorsements of negotiable Instruments for collection in the ordinary course of business; (b) that Borrowers may indemnify their officers, directors, managers, and owners to the extent permitted under each of Borrowers' Organizational Documents and the laws of the State in which each of the Borrowers is organized; (c) that Borrowers may indemnify title insurers under indemnity agreements to title insurers to cause such title insurers to issue title insurance policies to Borrowers or Lender; (d) customary indemnity obligations arising in the ordinary course of transactions permitted by and consummated in accordance with this Agreement; and (e) guarantees of indebtedness under Section 6.1.21.

**6.1.23** **Loans to, Investments in, and Transactions with Affiliated Parties.** Except for advances for travel and expenses to Borrowers' officers, directors, managers, general partners or employees in the ordinary course of business, Borrowers shall not make any loans to or investments in any Affiliated Parties. All transactions with Affiliate Parties shall be bona fide arm's length transactions that are no less favorable to Borrowers than would be a similar transaction with a non-affiliated third person.

**6.1.24** **Omnibus Covenants.** Notwithstanding anything to the contrary in this Agreement, Borrowers will do all things which the Senior Loan Agreement, any Operating Loan Agreement or the Forbearance Agreement requires any or all of the Borrowers to do. Additionally, notwithstanding anything to the contrary in this Agreement, Borrowers shall not take or fail to take any action resulting in a Default or Matured Default (each as defined in the Senior Loan Agreement, or any comparable term in any Operating Loan Agreement) or a Termination Default (as defined in the Forbearance Agreement).

**6.1.25** **Material Adverse Effect**. Borrowers shall not enter into enter any amendment or other modification of any Senior Loan Document that would have a material adverse effect on Lender as determined by Lender in its sole discretion.

## ARTICLE VII
### Casualties

*7.1 Lender's Election to Apply Insurance Proceeds to Indebtedness.* In the event of any loss or damage to any portion to the Project due to fire or other casualty, Lender shall have the right, but not the obligation, to settle insurance claims for more than $250,000.00, and if Lender elects not to settle such

20

EXHIBIT 2                    Page 23 of 68

claim then Borrowers shall settle such claim, or cause such claim to be settled, and such settlement shall be subject to Lender's prior written approval. Borrowers shall have the right to settle claims, or cause such claims to be settled, for less than such amount, provided that Lender shall have the right to settle any claim that Borrowers have not settled or caused to be settled on or before one hundred twenty (120) days after the date of such loss. If (i) no Default or Event of Default exists hereunder at the time of such fire or casualty and at the time such proceeds would be disbursed; (ii) the Project can be restored to economic viability within a reasonable period of time but in any event no later than ninety (90) days before the Loan Maturity; and (iii) Borrowers comply with all conditions set forth in Section 7.2 of this Agreement, Borrowers shall be entitled to use the proceeds of settlement of fire and casualty insurance claims to rebuild the Project. In all other cases, Lender shall have the right (but not the obligation) to collect, retain and apply to any obligations of Borrowers under this Agreement all insurance proceeds (after deduction of all expense of collection and settlement, including attorney and adjuster fees and expenses), and if such proceeds are insufficient to pay such amount in full, to declare the balance remaining unpaid on the Note and all other obligations secured by the Security Instrument to be due and payable forthwith and to avail itself of any of the remedies afforded thereby as in the case of any default beyond applicable cure periods thereunder. Any proceeds remaining after application to any obligations of Borrowers under this Agreement shall be paid by Lender to Borrowers or the party then entitled thereto.

*7.2 Borrowers' Obligation to Rebuild and Use of Proceeds Therefor.*  If Lender does not elect to or is not entitled to apply fire or casualty insurance proceeds to any obligations under this Agreement, as provided under Section 7.1 of this Agreement, Lender shall have the right (but not the obligation) to collect and retain such proceeds, and after deduction of all expenses of collection and settlement, including attorneys' and adjusters' fees and expenses, to release the same to Borrowers, provided that Borrowers shall:

**7.2.1**    Expeditiously repair and restore (or cause to be expeditiously repaired and restored) all damage to the portion of the Project in question resulting from such fire or other casualty, and

**7.2.2**    If the proceeds of fire or casualty insurance (and the undisbursed available Loan proceeds) are, in Lender's sole judgment, insufficient to complete the repair and restoration of the portion of the Project so affected, then Borrowers shall promptly deposit, or cause to be deposited, with Lender the amount of such deficiency.

## ARTICLE VIII
### Events of Default

*8.1 Events of Default.*  The occurrence of any one or more of the following shall constitute an **"Event of Default,"** as such term is used herein:

**8.1.1**    Borrowers fail to pay any interest or principal under the Note from three (3) days after when due;

**8.1.2**    Borrowers default in the performance of any of Borrowers' other covenants, agreements and obligations under this Agreement or any other Loan Document involving the payment of money and fail to cure such default within ten (10) days; provided, however, Borrowers' failure (not more than once per calendar year) to pay taxes or insurance premiums when

21

EXHIBIT 2                    Page 24 of 68

due shall not be deemed to be an Event of Default hereunder until Borrowers have failed to cure such failure within ten (10) days after notice thereof from Lender;

**8.1.3**  Borrowers default in the performance of any of Borrowers' non-monetary covenants, agreements and obligations under this Agreement or any other Loan Document and fail to cure such default within thirty (30) days after written notice thereof from Lender, except that if such default is susceptible of cure but cannot be cured within thirty (30) days, it shall not constitute an Event of Default if Borrowers promptly commence the cure of such default and diligently and continuously pursue such cure to completion with completion occurring not later than sixty (60) days after the initial notice;

**8.1.4**  Any representation or warranty (including the representations and warranties of Borrowers set forth in Article II of this Agreement), statement, report or certificate now or hereafter made by any Borrower, was not true and correct in any material respect when made;

**8.1.5**  (i) Any Loan Party or Affiliated Party shall be or become insolvent, however defined; or admit in writing such Person's inability to pay debts as they mature; or make a general assignment for the benefit of such Person's creditors; or cease to do business in the ordinary course; or (ii) any Loan Party or Affiliated Party shall institute any bankruptcy, insolvency, reorganization, dissolution, liquidation or similar proceeding relating to such Person under the laws of any jurisdiction; or any Loan Party or Affiliated Party shall take any action to authorize any such proceeding; or any such proceeding shall be instituted against any Loan Party or Affiliated Party and shall not be dismissed or discharged within sixty (60) days after its commencement; or any Loan Party or Affiliated Party shall admit all of the material allegations with respect to any such proceeding; or an order for relief or similar order shall be entered in any such proceeding; or (iii) any Loan Party or Affiliated Party shall apply for the appointment of any receiver, trustee or similar officer for such Person or for all or substantially all of such Person's property; or any Loan Party or Affiliated Party shall take any action to authorize any such appointment; or an action for any such appointment shall be commenced by any other Person and such action shall not be dismissed or discharged within 60 days after its commencement; or any Loan Party or Affiliated Party shall admit all of the material allegations with respect to any such action; or any such appointment shall be made, with or without the consent of the applicable Loan Party or Affiliated Party; or (iv) a warrant, writ of attachment, execution or similar process shall be issued or levied against any substantial part of the property of any Loan Party or Affiliated Party and shall not be fully released, stayed, vacated or bonded within 60 days after such issuance or levy; or (v) any Loan Party that is a natural person shall die;

**8.1.6**  A breach or default occurs under any other Loan Document and continues beyond the applicable grace period, if any, contained therein;

**8.1.7**  All or substantially all of the assets of any Loan Party or Affiliated Party are attached, seized, subjected to a writ of distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors, and the same is not vacated, stayed, dismissed, set aside or otherwise remedied within sixty (60) days after the occurrence thereof;

22

EXHIBIT 2                    Page 25 of 68

**8.1.8**        Any Loan Party is enjoined, restrained or in any way prevented by any court order or other  Governmental Authority from conducting all or a substantial part of such Person's business affairs; or any proceeding is filed or commenced seeking to enjoin, restrain or in any way prevent any Loan Party from conducting all or a substantial part of such Person's business affairs and such proceeding is not vacated, stayed, dismissed, set aside or remedied within thirty (30) days after the filing thereof;

**8.1.9**        There is any material adverse change in the financial operation of the Project or the financial condition of any Loan Party or Affiliated Party;

**8.1.10**        Any Change of Control occurs;

**8.1.11**        (i) Any material provision of any of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any material provision of any Loan Document; or any Loan Party denies any or further liability or obligation under any material provision of any of the Loan Documents, or purports to revoke, terminate or rescind any material provision of any of the Loan Documents or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any of the Loan Documents; or (ii) any Lien purported to be created under any of the Loan Documents shall cease to be (other than pursuant to the terms thereof), or shall be asserted by any Loan Party or any other person or entity not to be, a valid and perfected Lien on the Project, with the priority required by any of the applicable Loan Documents;

**8.1.12**        There occurs any termination or attempted termination of any guaranty except as expressly permitted hereunder or under any of the Loan Documents;

**8.1.13**        Any Loan Party assigns, sells, pledges, grants, conveys, mortgages, encumbers, transfers, hypothecates, or otherwise encumbers any interest or other rights in al or any part of the Borrowing Base Assets or Project, without the express written consent of Lender;

**8.1.14**        A final judgment or decree is entered as against any Loan Party or any Affiliated Party of any Loan Party by a court of competent jurisdiction in an amount in excess of $100,000.00 and has not been satisfied, vacated, discharged, stayed or bonded pending appeal within 60 days from entry thereof;

**8.1.15**        Any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of all or any part of the Project or any other impairment of Lender's interest in all or any part of the Project or rights under the Security Instrument;

**8.1.16**        A default or event of default (however defined) shall occur under any other bond, debenture, note, securitization agreement or other evidence of indebtedness (including any Operating Loan Agreement) or similar obligation of any Loan Party, or under any indenture, loan agreement, credit agreement, security agreement, mortgage, deed of trust  or other instrument or agreement under which any such evidence of indebtedness or similar obligation has been issued or by which it is governed or secured, and (in each case) the expiration of the applicable grace period, if any, specified in such evidence of indebtedness, indenture, or other instrument; or

23

EXHIBIT 2                                Page 26 of 68

**8.1.17**    Borrowers shall fail at any time to have in effect a then-effective Operating Loan Agreement in an amount and otherwise in all respects satisfactory to Lender in its sole discretion.

**8.2 Miscellaneous.**  Notwithstanding any term hereof:

**8.2.1**    Any action or performance of any obligation required of Borrowers pursuant to any loan to which this Loan is subordinate shall not constitute an Event of Default under this Agreement or any of the Loan Documents.

**8.2.2**    Borrowers shall not be obligated to take any action or perform any obligation pursuant to this Agreement or any of the Loan Documents which would constitute a default under any loan or loans to which this Loan is subordinate.

**8.2.3**    Lender shall not take any action allowed under this Agreement or any of the Loan Documents if doing so would result in a default by Borrowers under any loan or loans to which this Loan is subordinate.

## ARTICLE IX
### Lender's Remedies in Event of Default

**9.1 Remedies Conferred Upon Lender.**  Upon the occurrence of any Event of Default, Lender shall, in addition to all remedies conferred upon Lender by Law and by the terms of the Note, Security Instrument and the other Loan Documents, have the right but not the obligation to pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that all such remedies shall be cumulative and that no such remedy shall be to the exclusion of any other:

**9.1.1**    Take any action that, in Lender's sole judgment, is necessary or appropriate to fulfill the covenants, agreements and obligations of Borrowers under this Agreement and the Loan Documents;

**9.1.2**    Declare the Note to be immediately due and payable;

**9.1.3**    Use and apply any monies deposited by Borrowers with Lender, regardless of the purpose for which the same was deposited, to cure any such default or to apply on account of any indebtedness under this Agreement which is due and owing to Lender; and

**9.1.4**    Exercise or pursue any other right or remedy permitted under this Agreement or any of the Loan Documents or conferred upon Lender by operation of Law.

**9.2 Non Waiver of Remedies.**  No waiver of any breach or default hereunder shall constitute or be construed as a waiver by Lender of any subsequent breach or default or of any breach or default of any other provision of this Agreement.

24

EXHIBIT 2                              Page 27 of 68

## ARTICLE X
## General Provisions

**10.1 Captions.**  The captions and headings of various Articles and Sections of this Agreement and exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way, the scope or intent of the provisions hereof.

**10.2 Successors and Assigns.**  This Agreement shall inure to the benefit of and shall be binding on the parties hereto and their respective successors and assigns permitted hereby, except that Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of Lender. Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement, the Note and the other Loan Documents at any time and from time to time without the consent of Borrowers. In addition, Lender may sell participations in or to all or a portion of its rights and obligations under this Agreement, the Note and the other Loan Documents at any time and from time to time without the consent of Borrowers. In order to facilitate such assignments and participations, Borrowers shall execute such further documents, instruments or agreements as Lender may reasonably require.

**10.3 Merger.**  This Agreement and the Loan Documents and instruments delivered in connection herewith, as may be amended from time to time in writing, constitute the entire agreement of Borrowers and Lender with respect to the Project and the Loan, and all prior discussions, negotiations and document drafts are merged herein and therein. Neither Lender nor any employee of Lender has made or is authorized to make any representation or agreement upon which Borrowers may rely unless such matter is made for the benefit of Borrowers and is in writing signed by an authorized officer of Lender. Borrowers agree that they have not and will not rely on any custom or practice of Lender, or on any course of dealing with Lender, in connection with the Loan unless such matters are set forth in this Agreement or the Loan Documents or in an instrument made for the benefit of Borrowers and in a writing signed by an authorized officer of Lender.

**10.4 Notices.**  Any notice, demand, request or other communication that any party may be required or may desire to give hereunder or under any other Loan Document shall be in writing, addressed as follows and shall be deemed to have been properly given if hand delivered, if sent by electronic mail, if sent by reputable overnight courier (effective the business day following delivery to such courier) or if mailed (effective four (4) business days after mailing) by United States registered or certified mail, postage prepaid, return receipt requested:

If to Borrowers:    Millenkamp Cattle, Inc.
471 North 300 West
Jerome, Idaho 83338
Attn: William Millenkamp
Email: bill@millenkmap.com
with a copy to:

Givens Pursley LLP
601 W. Bannock St.
Boise, ID 83702
Attn: L. Edward Miller

25

EXHIBIT 2                    Page 28 of 68

|                  |                                                    |
|------------------|----------------------------------------------------|
| If to Lender:    | Conterra Agricultural Capital, LLC                 |
|                  | 5465 Mills Civic Parkway, Suite 201                |
|                  | West Des Moines, IA 50266                           |
|                  | Attention: Mark A. Smith                            |
|                  | Email: mark.smith@conterraag.com                   |
|                  |                                                    |
|                  | with a copy by email to:                           |
|                  |                                                    |
|                  | Email: legal@conterraag.com                        |

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice. Notices given in any other fashion shall be deemed effective only upon receipt. Notice given by Lender to any Borrower at the address determined as set forth in this Section 10.4 shall be deemed sufficient as to each Borrower, regardless of whether each Borrower is sent a separate copy of such notice or even specifically identified in such notice.

**10.5 *Writing, Modification, Waiver.*** No modification, waiver, amendment, discharge or change of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.

**10.6 *Governing Law.*** This Agreement shall be governed by and construed under the laws of the State of Idaho.

**10.7 *Reimbursement for Loan Expenses.*** Lender is hereby authorized, without any specific request or direction by Borrowers, to make disbursements from time to time in payment of or to reimburse Lender for all expenses of the Loan and fees payable to Lender in accordance with the Loan Documents.

**10.8 *Acquiescence Not to Constitute Waiver of Lender's Requirements.*** Each and every covenant and condition for the benefit of Lender contained in this Agreement may be waived by Lender, provided, however, that to the extent that Lender may have acquiesced in any noncompliance with any conditions precedent to the Closing or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Lender of such requirements with respect to any future disbursements of Loan proceeds.

**10.9 *Disclosures by Lender.*** Without limiting Lender's rights to make disclosures generally, Borrowers specifically acknowledge that Lender may deliver any documents and information which Lender has or hereafter acquires relating to the Loan, to any Loan Party, the Project or any other matter that has been furnished by any Loan Party to any assignee, participant, prospective assignee or prospective participant in Lender's rights under the Loan Documents and to servicer or prospective servicer of the Loan, or to any issuer or prospective issuer, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the Loan, together with any rating agency rating such certificates or securities and each investor and prospective investor therein,

**10.10 *Disclaimer by Lender.***

26

EXHIBIT 2                    Page 29 of 68

**10.10.1**    This Agreement is made for the sole benefit of Borrowers and Lender (and Lender's successors and assigns and participants, if any), and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Lender pursuant to this Agreement. Lender shall not be liable to any contractors, subcontractors, supplier, laborer, tenant or other third-party for labor or services performed or materials supplied in connection with the Project. Lender shall not be liable for any debts or claims accruing in favor of any such third-parties against Borrowers or others or against the Project. Neither Borrower shall be an agent of Lender for any purpose. Except as expressly set forth in the Loan Documents, Lender is not and shall not be an agent of Borrowers for any purpose. Lender, by making the Loan or any action taken pursuant to any of the Loan Documents, shall not be deemed a partner or a joint venturer with Borrowers or fiduciary of Borrowers. Lender shall not be deemed to be in privity of contract with any contractor or provider of services to the Project, nor shall any payment of funds directly to a contractor or subcontractor or provider of services be deemed to create any third-party beneficiary status or recognition of same by Lender;

**10.10.2**    Lender shall have no liability, obligation or responsibility whatsoever with respect to any improvements at the Project. Any inspections of the Project made by or through Lender are for purposes of administration of the Loan only and Borrowers are not entitled to rely upon the same with respect to the quality, adequacy or suitability of the Land or of any materials or workmanship;

**10.10.3**    By accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Lender;

**10.10.4**    Lender neither undertakes nor assumes any responsibility or duty to Borrowers to select, review, inspect, supervise, pass judgment upon or inform Borrowers of any matter in connection with the Project, and Borrowers shall rely entirely upon their own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrowers by Lender in connection with such matters is for the protection of Lender only and neither Borrowers nor any third-party is entitled to rely thereon;

**10.10.5**    Lender owes no duty of care to protect Borrowers against negligent, faulty, inadequate or defective building or construction;

**10.10.6**    Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any farming operations, construction on, or occupancy or use of, all or any portion of the Project, including without limitation any loss, claim, cause of action, liability, indebtedness, damage or injury caused by, or arising from: (i) any defect in any building, structure, grading, fill, landscaping or other improvements thereon or in any on site or offsite improvement or other facility therein, thereon or relating thereto; (ii) any act or omission of Borrowers, or any of Borrowers' agents, employees, independent contractors, licensees or invitees;

27

EXHIBIT 2                              Page 30 of 68

(iii) any accident at the Project or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrowers or any licensees, employees, invitees, agents, independent contractors or other representatives to maintain all or any portion of the Project in a safe condition; and (v) any nuisance made or suffered on any part of the Project.

**10.11 *Right of Lender to Make Advances to Cure Defaults.*** If either Borrower shall fail to perform in a timely fashion any of such Borrower's covenants, agreements or obligations contained in this Agreement or any of the Loan Documents to which such Borrower is a party, Lender may (but shall not be required to) perform any of such covenants, agreements and obligations. Loan proceeds advanced by Lender in the exercise of its judgment that the same are needed to protect its security for the Loan are deemed to be obligatory advances hereunder and any amounts expended (whether by disbursement of undisbursed Loan proceeds or otherwise) by Lender in so doing, including any amounts expended by Lender pursuant to Section 4.4 or 9.1.1 shall constitute additional indebtedness evidenced and secured by the Note, the Security Instrument and the other Loan Documents.

**10.12 *Definitions Include Amendments.*** Definitions contained in this Agreement which identify documents, including the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

**10.13 *Time is of the Essence.*** Time is hereby declared to be of the essence of this Agreement and of every part hereof.

**10.14 *Execution in Counterparts.*** This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**10.15 *Waiver of Consequential Damages.*** In no event shall Lender be liable to Borrowers for consequential damages, whatever the nature of a breach by Lender of its obligations under this Loan Agreement, or any of the Loan Documents, and Borrowers for themselves and for all Affiliated Parties hereby waive all claims for consequential damages.

**10.16 *Claims Against Lender.*** Lender shall not be in default under this Agreement, or under any other Loan Documents, unless a written notice specifically setting forth the claim of Borrowers or other claimant shall have been given to Lender and Lender does not remedy or cure the default, if any there be, promptly (but not later than 30 days, except that if such default is susceptible of cure but cannot be cured within thirty (30) days, it shall not constitute a default if Lender promptly commences the cure of such default and diligently and continuously pursues such cure to completion with completion occurring not later than sixty (60) days after the initial notice) thereafter. If it is determined in any proceedings that Lender has improperly failed to grant its consent or approval, where such consent or approval is required by this Loan Agreement or any other Loan Documents, the sole remedy of Borrowers or such claimant shall be to obtain declaratory relief determining such withholding to have been improper, and for themselves, all Affiliated Parties, Borrowers hereby waive all claims for damages or set off against Lender resulting from any withholding of consent or approval by Lender.

28

EXHIBIT 2                    Page 31 of 68

***10.17 Jurisdiction.***  With respect to any suit, action or proceedings relating to this Agreement, the Project, or any of the Loan Documents, each party irrevocably (i) submits to the non-exclusive jurisdiction of the courts of the State of Idaho, sitting in Sully County, and of the United States District Court for the District of Idaho and any appellate court from any thereof, and (ii) waives any objection which such party may have at any time to the laying of venue of any proceedings brought in any such court, waives any claim that any proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to any proceedings, that such court does not have jurisdiction over such party. Nothing in this Agreement shall preclude either party from bringing any proceedings in any other jurisdiction nor will the bringing of any proceedings in any one or more jurisdictions preclude the bringing of any proceedings in any other jurisdiction.

***10.18 Set-Offs.***  (i) From time to time in connection with the payment of interest due and payable under the Note, and (ii) in all other instances, after the occurrence and during the continuance of an Event of Default, Borrowers hereby irrevocably authorize and direct Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital, from time to time upon the request of Lender to charge Borrowers' accounts and deposits, and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Note or under any other Loan Documents. Borrowers hereby grant to Lender a lien in and to all such accounts and deposits maintained by Borrowers.

***10.19 Severability.***  The parties hereto intend that each provision in this Agreement comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Agreement is found by a court of law to be in violation of any applicable local, state, or federal law, statute, ordinance, administrative or judicial decision, or public policy, and if such courts declare such portion, provision, or provisions of this Agreement to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of the parties hereto that such portion, provision, or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, and that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void, or unenforceable portion, provision, or provisions were not contained therein, and that the rights, obligations, and interests of Borrowers and Lender under the remainder of this Agreement shall continue in full force and effect.

***10.20 Waiver of Jury Trial.***  BORROWERS AND LENDER EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

***10.21      Subordination Agreement.***  Lender (a) acknowledges that it has received a copy of the Intercreditor and Subordination Agreement of even date herewith (the "**Subordination Agreement**") by and between Lender, as junior creditor, and Senior Loan Agent, (b) acknowledges the subordination of Liens and payment rights in respect of the Loan provided for in the Subordination Agreement and (c) agrees that it will be bound by and will take no actions contrary to the provisions of the Subordination Agreement. The foregoing provisions are intended as an inducement to the Senior Loan Agent to permit the Borrowers' incurrence of indebtedness under this Agreement and the granting of Liens on the Borrowing Base Assets

29

EXHIBIT 2                    Page 32 of 68

to secure the Liabilities.  In the event of any conflict or inconsistency between the provisions of the Subordination Agreement and this Agreement, the provisions of the Subordination Agreement shall control.

**PURSUANT TO IDAHO STATUTES § 9-505(5), A PROMISE OR COMMITMENT TO LEND MONEY OR TO GRANT OR EXTEND CREDIT IN AN ORIGINAL PRINCIPAL AMOUNT OF FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) OR MORE, MADE BY A PERSON OR ENTITY ENGAGED IN THE BUSINESS OF LENDING MONEY OR EXTENDING CREDIT, MUST BE IN WRITING TO BE LEGALLY BINDING UPON SUCH PERSON OR ENTITY.**

*[remainder of page intentionally left blank – signature pages follow]*

30

EXHIBIT 2                    Page 33 of 68

IN WITNESS WHEREOF, Borrowers and Lender have executed this Agreement as of the day and year first set forth above.

**BORROWERS:**

**MILLENKAMP CATTLE, INC.,**
an Idaho corporation

By:    William J. Millenkamp
Its:    President

**IDAHO JERSEY GIRLS, LLC,**
an Idaho limited liability company

By:    William J. Millenkamp
Its:    Managing Member

**EAST VALLEY CATTLE, LLC,**
an Idaho limited liability company

By:    William J. Millenkamp
Its:    Member

**IDAHO JERSEY GIRLS JEROME DAIRY, LLC,**
an Idaho limited liability company

By:    William J. Millenkamp
Its:    Managing Member

By:    Susan J. Millenkamp
Its:    Managing Member

**MILLENKAMP FAMILY LLC,**
an Idaho limited liability company

By:    William J. Millenkamp
Its:    Manager

By:    Susan J. Millenkamp
Its:    Manager

Signature Page to Loan Agreement

**MILLENKAMP PROPERTIES, L.L.C.,**
an Idaho limited liability company

By:  Millenkamp Family LLC, its Member

By:  William J. Millenkamp
Its:  Manager

By:  Susan J. Millenkamp
Its:  Manager


**MILLENKAMP PROPERTIES II LLC,**
an Idaho limited liability company

By:  Millenkamp Family LLC, its Member

By:  William J Millenkamp
Its:  Manager

By:  Susan J. Millenkamp
Its:  Manager


**GOOSE RANCH, LLC,**
an Idaho limited liability company

By:  Millenkamp Family LLC, its Member

By:  William J. Millenkamp
Its:  Manager

By:  Susan J. Millenkamp
Its:  Manager


**WILLIAM J. MILLENKAMP,**
an individual

William J. Millenkamp


Signature Page to Loan Agreement

EXHIBIT 2                    Page 35 of 68

**SUSAN J. MILLENKAMP**,
an individual

Susan J. Milenkamp

**LENDER:**

**CONTERRA AGRICULTURAL CAPITAL, LLC**,
an Iowa limited liability company

By:        Mark A. Smith
Its:        COO & General Counsel

Signature Page to Loan Agreement

EXHIBIT 2                    Page 36 of 68

**EXHIBIT A**

**Legal Description of the Land (attached)**

EXHIBIT 2                    Page 37 of 68

## Exhibit A

TRACT A - CASSIA COUNTY

PARCEL NO. 1:
TOWNSHIP 12 SOUTH, RANGE 26 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 1:          SW¼SE¼

Section 12:        NW¼NE¼

PARCEL NO. 2:
TOWNSHIP 12 SOUTH, RANGE 26 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 1:          NW¼SE¼

PARCEL NO. 3:
TOWNSHIP 12 SOUTH, RANGE 26 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 1:          Lots 1, 2, 3, and 4, S½NW¼, NE¼SE¼, S½NE¼

Section 2:          Lots 1 and 2, S½NE¼

PARCEL NO. 4:
TOWNSHIP 11 SOUTH, RANGE 26 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 36:        W½

Section 35:        E½ EXCEPTING THEREFROM:

Beginning at a point which is 25 feet West and 20 feet North of the Southeast corner of said Section 35;
Thence West 100 feet;
Thence North 100 feet;
Thence East 100 feet;
Thence South 100 feet to the Point of Beginning.

                    ALSO EXCEPTING the following described tract:

Part of the SW¼SE¼, more particularly described as follows:

Beginning at the South ¼ section corner of said Section 35, said corner marked by a 5/8 inch rebar; Thence South 89°48'07" East along the South line of Section 35 for a distance of 35.00 feet to a ½ inch rebar which shall be the Point of Beginning;
Thence North 00°11'53" East for a distance of 219.16 feet to a ½ inch rebar;
Thence North 49°21'41" East for a distance of 346.29 feet to a ½ inch rebar;

EXHIBIT 2                    Page 38 of 68

Thence along a non-tangent curve to the left for a distance of 836.37 feet to a ½ inch rebar; said curve having a radius of 1358.85 feet and a central angle of 35°15'56" with a long chord of bearing of South 58°38'55" East for a distance of 823.23 feet;
Thence South 00°11'53" West for a distance of 19.72 feet to a ½ inch rebar on the South line of Section 35;
Thence North 89°48'07" West along the South line of Section 35 for a distance of 966.50 feet to the Point of Beginning.

PARCEL NO. 5:
TOWNSHIP 12 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 1:        N½, EXCEPT the following described tract:

Beginning at the Northwest corner and running thence East 250 feet;
Thence South 174 feet;
Thence West 250 feet;
Thence North 174 feet to the Point of Beginning.

PARCEL NO. 6:
TOWNSHIP 12 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 6:        Lots 1, 2, 3 and 4

PARCEL NO. 7:
TOWNSHIP 11 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 31:        SW¼

PARCEL NO. 8:
A 30 foot wide Pipeline Easement as created by Warranty Deed recorded May 15, 1992 as Instrument No. 219021, records of Cassia County, Idaho, located in the SE¼ of said Section 31 of Township 11 South, Range 28 East of the Boise Meridian, Cassia County, State of Idaho, more particularly described as follows:

Beginning at the Southeast corner of said Section 31, said corner marked by a U.S. General Land Office pipe with brass cap; thence North 88°41'16" West along section line for 36.14 feet to the Point of Beginning;
Thence North 88°41'16" West along section line for 30.00 feet to a point;
Thence North 1°18'44" East for 46.48 feet to a point;
Thence North 44°29'16" West for 1841.47 feet to a point;
Thence North 88°31'26" West for 1211.50 feet to a point on the West line of the SE¼;
Thence North 0°18'45" East along the West line of the SE¼ for 30.00 feet to a point;
Thence South 88°31'26" East for 1224.24 feet to a point;
Thence South 44°29'16" East for 1866.27 feet to a point;
Thence South 1°18'44" West for 59.16 feet to the Point of Beginning.

PARCEL NO. 9:
TOWNSHIP 11 SOUTH, RANGE 26 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 35:        Part of the SW¼SE¼, more particularly described as follows:

EXHIBIT 2                    Page 39 of 68

Beginning at the South ¼ section corner of said Section 35, said corner marked by a 5/8 inch rebar; Thence South 89°48'07" East along the South line of Section 35 for a distance of 35.00 feet to a ½ inch rebar which shall be the Point of Beginning;
Thence North 00°11'53" East for a distance of 219.16 feet to a ½ inch rebar;
Thence North 49°21'41" East for a distance of 346.29 feet to a ½ inch rebar;
Thence along a non-tangent curve to the left for a distance of 836.37 feet to a ½ inch rebar; said curve having a radius of 1358.85 feet and a central angle of 35°15'56" with a long chord of bearing of South 58°38'55" East for a distance of 823.23 feet;
Thence South 00°11'53" West for a distance of 19.72 feet to a ½ inch rebar on the South line of Section 35;
Thence North 89°48'07" West along the South line of Section 35 for a distance of 966.50 feet to the Point of Beginning.

PARCEL NO. 10:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 13:        ALL

PARCEL NO. 11:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 22:        E½

Section 26:        NW¼ and E½, EXCEPT a part of the SE¼SE¼, described as follows:

Beginning at the Southeast corner of said Section 26; said point marked by a U.S. Government Brass Cap; thence North 89°59' West (Basis of Bearing) along section line for 443.86 feet to a ½ inch rebar, which shall be the Point of Beginning;
Thence North 89°59' West along said section line for 290.70 feet to a ½ inch rebar;
Thence North 0°39'53" West for 59.71 feet to a ½ inch rebar;
Thence South 88°51'10" West for 32.32 feet to a ½ inch rebar;
Thence South 0°39'18" East for 59.05 feet to a ½ inch rebar on section line;
Thence North 89°59' West along said section line for 122.05 feet to a ½ inch rebar;
Thence North 0°45'03" West for 439.49 feet to a ½ inch rebar;
Thence South 74°47'15" East for 85.63 feet to a ½ inch rebar;
Thence South 41°26'14" East for 556.38 feet to the Point of Beginning.

Section 27:        NE¼

PARCEL NO. 12:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 27:        SW¼

PARCEL NO. 13:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

EXHIBIT 2                    Page 40 of 68

Section 27:        NW¼ and SE¼

PARCEL NO. 14:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 35:        S½ EXCEPTING THEREFROM the following described tract of land:

Beginning at the Northwest corner of the SW¼ of said Section 35;
Thence running East along the centerline of said Section 35 to the Northeast corner of the SE¼ thereof;
Thence South along the East boundary line of said Section 35 a distance of 24 feet;
Thence West on a line parallel with and 24 feet South of the centerline of said Section 35 to the West boundary line thereof;
Thence North along said West boundary line of said Section 35 for 24 feet to the Point of Beginning.

PARCEL NO. 15:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 35:        N½

PARCEL NO. 16:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 36:        ALL

PARCEL NO. 17:
TOWNSHIP 11 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 31:        Part of the SW¼NW¼ of said Section 31, more particularly described as follows:

Beginning at the Northwest corner of said Section 31, said corner marked by a U.S. General Land Office Pipe with brass cap; thence South 0°06'00" West along section line for 1919.63 feet to the POINT OF BEGINNING;
Thence South 89°54'00" East for 108.07 feet to a point;
Thence South 0°06'00" West for 100.00 feet to a point;
Thence North 89°54'00" West for 108.07 feet to a point on section line;
Thence North 0°06'00" East along section line for 100.00 feet to the Point of Beginning.

PARCEL NO. 18:
TOWNSHIP 12 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 2:        N½

Section 3:        N½

PARCEL NO. 19:
TOWNSHIP 12 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

EXHIBIT 2                    Page 41 of 68

Section 4:          NE¼ (Lots 1 and 2 and the S½NE¼)

PARCEL NO. 20:
TOWNSHIP 11 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 31:          N½ and SE¼, EXCEPT the following described tract:

Beginning at the Northwest corner of said Section 31, said corner marked by a U.S. General Land Office Pipe with brass cap; Thence South 0°06'00" West along section line for 1919.63 feet to the Point of Beginning;
Thence South 89°54'00" East for 108.07 feet to a point;
Thence South 0°06'00" West for 100.00 feet to a point;
Thence North 89°54'00" West for 108.07 feet to a point on section line;
Thence North 0°06'00" East along section line for 100.00 feet to the Point of Beginning.

PARCEL NO. 21:
TOWNSHIP 11 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 32:          W½

PARCEL NO. 22:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 26:          SW¼

PARCEL NO. 23:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 35:          The North 24 feet of the S½ of said Section 35, more particularly described as follows:

Beginning at the Northwest corner of the SW¼ of said Section 35;
Thence East along the centerline of the said section to the Northeast corner of the SE¼ thereof;
Thence South along the East boundary line of said Section 35 a distance of 24 feet;
Thence West on a line parallel with and 24 feet South of the centerline of said section to the West boundary line of said section;
Thence North 24 feet to the Point of Beginning.

PARCEL NO. 24:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 34:          ALL

PARCEL NO. 25:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

EXHIBIT 2                    Page 42 of 68

Section 26:        Part of the SE¼SE¼ described as follows:

Beginning at the Southeast corner of said Section 26; said point marked by a U.S. Government Brass Cap; thence North 89°59' West (Basis of Bearing) along section line for 443.86 feet to a ½ inch rebar, which shall be the Point of Beginning;
Thence North 89°59' West along said section line for 290.70 feet to a ½ inch rebar;
Thence North 0°39'53" West for 59.71 feet to a ½ inch rebar;
Thence South 88°51'10" West for 32.32 feet to a ½ inch rebar;
Thence South 0°39'18" East for 59.05 feet to a ½ inch rebar on section line;
Thence North 89°59' West along said section line for 122.05 feet to a ½ inch rebar;
Thence North 0°45'03" West for 439.49 feet to a ½ inch rebar;
Thence South 74°47'15" East for 85.63 feet to a ½ inch rebar;
Thence South 41°26'14" East for 556.38 feet to the Point of Beginning.

PARCEL NO. 26:
An access easement for the benefit of Parcel No. 25 as conveyed by Quitclaim Deed between the Hunsaker Family Partnership, a Limited Partnership, and Reginald Hunsaker and Ruth J. Hunsaker, husband and wife, individually, Grantors, and Jack M. Hunsaker and Bonita P. Hunsaker, Grantees, dated August 10, 1983 and recorded August 12, 1983 as Instrument No. 154185 on Film No. 139, records of Cassia County, more particularly described as follows:

TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 26:        Part of the SE¼SE¼ described as follows:

Beginning at the Southeast corner of said Section 26, said point marked by a U.S. Government Brass Cap which shall be the Point of Beginning;
Thence North 89°59' West (Basis of Bearing) along section line for 443.86 feet to a ½ inch rebar;
Thence North 41°26'14" West for 33.36 feet to a point;
Thence South 89°59' East for 466.09 feet to a point on section line;
Thence South 0°21' West along said section line for 25.0 feet to the Point of Beginning.

PARCEL NO. 27:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 22:        W½

TRACT B - CASSIA COUNTY:

PARCEL NO. 1:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 10:        All, EXCEPT the N½NW¼NW¼ and N½NE¼NW¼ of Section 10:

                   ALSO EXCEPTING the following described tracts:

                   Tract No. 1:

EXHIBIT 2                              Page 43 of 68

Beginning at the Northwest corner of said Section 10, said corner marked by a U.S. Government Brass Cap; Thence South 0°09'00" East (Basis of Bearing) along section line for 1219.10 feet to a ½ inch rebar which shall be the Point of Beginning;
Thence North 89°51' East for 300.00 feet to a ½ inch rebar;
Thence South 0°09'00" East for 300.00 feet to a ½ inch rebar;
Thence South 89°51' West for 300.00 feet to a ½ inch rebar on section line;
Thence North 0°09'00" West along said section line for 300.00 feet to the Point of Beginning.

Tract No. 2:
Beginning at the Northwest corner of the Northeast corner of said Section 10; Thence South 127.5 feet to the True Point of Beginning;
Thence South 255.6 feet;
Thence East 199.5 feet;
Thence North 179 feet;
Thence Northwest 213.69 feet to the True Point of Beginning.

Section 11:      Beginning at a point on the North line of Section 11, said point being 1760.7 feet West of the Northeast corner of said Section 11;
Thence at right angles South 489.7 feet;
Thence North 88°40' West 671.9 feet;
Thence North 9°34' East 160.7 feet;
Thence North 85°59' West 1253.6 feet;
Thence South 6°47' West 953.6 feet;
Thence South 4°37' West 1661.7 feet;
Thence South 89°37' West 1307.8 feet more or less to the West line;
Thence North 0°21' East along the West line 3156.8 feet, more or less to the Northwest corner;
Thence East along said North line 3430.4 feet, more or less to the Point of Beginning.

Section 14:      Beginning at the Southwest corner of Section 14;
Thence South 89°26' East along the South line 1535.1 feet;
Thence North 19°49' West 4452.0 feet more or less to the West line;
Thence South 0°21' West 4173.0 feet more or less to the Point of Beginning.

Section 15:      All

Section 16:      S½ and the NW¼

Section 17:      SE¼SE¼

PARCEL NO. 2:
A water pipeline easement as conveyed by Warranty Deed from Raft River Ranches, Inc., a corporation to Preston R. Allen and Roland R. Allen, dated October 21, 1976 and recorded December 1, 1976 as Instrument No. 94693 on Film No. 105, records of Cassia County, Idaho, described as follows:

TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 14:      An easement 60 feet wide being 30 feet left and 30 feet right of the following described line:

Beginning at a point on the East line of said Section 14, said point being 1637 feet North of the Southeast corner of Section 14;

EXHIBIT 2                    Page 44 of 68

Thence North 67°24' West 5694 feet more or less to the West line of Section 14, said point being North 0°21' West 3773 feet from the Southwest corner of Section 14.

Section 22:          An easement 60 feet wide being adjacent to and 60 feet right of the following described line:

Beginning at the North quarter corner of said Section 22;
Thence South along the Meridianal centerline of Section 22 for a distance of 2500 feet;
Thence at right angles West 154 feet.

PARCEL NO. 3:
TOWNSHIP 10 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 35:          SW¼, W½SE¼, S½NW¼, EXCEPTING that part of the NW¼ described as follows:

Beginning at the Northeast corner of the NW¼ of said Section 35; Thence South 34°9'30" East 588.37 feet to a point on center line of Yale Road; Thence South 57°36' West for 2,040.63 feet to the True Point of Beginning;
Thence South 19°54' East 254.96 feet to a point;
Thence South 57°36' West 175 feet to a point;
Thence North 19°54' West 254.96 feet to a point;
Thence North 57°36' East 175 feet to the True Point of Beginning.

AND ALSO EXCEPT the portion deeded to the Burley Highway District for highway purposes, as disclosed by Warranty Deed, dated July 28, 2005 and recorded September 20, 2007 as Instrument No. 2007-318339, records of Cassia County, Idaho.

TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 2:          W½, EXCEPTING that part of the NW¼NW¼ described as follows:

Beginning at the Northwest corner of the NW¼NW¼;
Thence South 1599 feet;
Thence North 59°02' East 324 feet;
Thence North 28°10' East 1195 feet;
Thence North 25°56' West 294 feet;
Thence North 87° West 530 feet more or less to the Point of Beginning.

Section 3:          E½, EXCEPTING that portion thereof that lies North of a line running as follows:

Beginning at the South Quarter section corner;
Thence North 1320 feet;
Thence North 42°38' East 1056 feet;
Thence North 69°26' East 1231.5 feet;
Thence North 19°42' East 924 feet;
Thence North 59°02' East 541 feet more or less to the East boundary of said Section 3.

Section 9:          All, EXCEPTING THEREFROM the following described tracts:

          Tract No. 1:
Beginning at a point in the Northeast corner of NE¼NE¼;

EXHIBIT 2                              Page 45 of 68

Thence due South along section line 250 feet;
Thence due West 1550 feet;
Thence due North 250 feet;
Thence due East along section line to the Point of Beginning.

Tract No. 2:
Beginning at the Northwest corner of said Section 9, said corner marked by a U.S. General Land Office Pipe with brass cap, which shall be the Point of Beginning;
Thence South 89°47'00" East along section line for 200.00 feet to a ½ inch rebar;
Thence South 0°07'33" East for 295.16 feet to a ½ inch rebar on section line;
Thence North 89°47'00" West for 200.00 feet to a ½ inch rebar on section line;
Thence North 0°07'33" West along said section line for 295.16 feet to the Point of Beginning.

Tract No. 3:
Beginning at the Northeast corner of said Section 9, said corner marked by a 5/8 inch rebar; Thence South 00°11'27" East (South rec.) along the East section line for a distance of 250.00 feet to the Point of Beginning;
Thence South 00°11'27" East continuing along said line for a distance of 191.53 feet;
Thence South 86°39'00" West for a distance of 37.48 feet to a ½ inch rebar;
Thence South 86°39'00" West for a distance of 1614.99 feet to a ½ inch rebar;
Thence North 00°11'27" West for a distance of 294.52 feet to a ½ inch rebar;
Thence North 89°46'36" West for a distance of 1401.98 feet to a ½ inch rebar;
Thence North 00°11'27" West for a distance of 224.97 feet to a ½ inch rebar;
Thence North 00°11'27" West for a distance of 25.00 feet to the North section line;
Thence South 89°46'51" East along said line for a distance of 399.52 feet to the North ¼ section corner marked by a 5/8 inch rebar;
Thence South 89°46'36" East along the North section line for a distance of 1102.45 feet;
Thence South 00°11'27" East (South rec.) for a distance of 25.00 feet to a ½ inch rebar;
Thence South 00°11'27" East (South rec.) for a distance of 225.00 feet to a ½ inch rebar;
Thence South 89°46'36" East (East rec.) for a distance of 1525.00 feet to a ½ inch rebar;
Thence South 89°46'36" East (East rec.) for a distance of 25.00 feet to the Point of Beginning.

PARCEL NO. 4:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 10:        Part of the NW¼, more particularly described as follows:

Beginning at the Northwest corner of said Section 10, said corner marked by a U.S. Government Brass Cap; Thence South 0°09'00" East (Basis of Bearing) along section line for 1219.10 feet to a ½ inch rebar which shall be the Point of Beginning:
Thence North 89°51' East for 300.00 feet to a ½ inch rebar;
Thence South 0°09'00" East for 300.00 feet to a ½ inch rebar;
Thence South 89°51' West for 300.00 feet to a ½ inch rebar on section line;
Thence North 0°09'00" West along said section line for 300.00 feet to the Point of Beginning.

PARCEL NO. 5:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 10:        Part of the NE¼, more particularly described as follows:

EXHIBIT 2                    Page 46 of 68

Beginning at the Northwest corner of the Northeast corner of said Section 10; Thence South 127.5 feet to the True Point of Beginning:
Thence South 255.6 feet;
Thence East 199.5 feet;
Thence North 179 feet;
Thence Northwest 213.69 feet to the True Point of Beginning.

PARCEL NO. 6:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 10:        Part of the NE¼NW¼, more particularly described as follows:

Beginning at the Northwest corner of the NE¼ of said Section 10; Thence South 89°55' West along section line of said Section 10 for 208.72 feet to a point; Thence South 0°05' East for 52.0 feet to the True Point of Beginning;
Thence South 0°05' East for 290.4 feet to a point;
Thence South 89°55' West for 150.0 feet to a point;
Thence North 0°05' West for 290.4 feet to a point;
Thence North 89°55' East for 150.0 feet to the True Point of Beginning.

PARCEL NO. 7:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 10:        Part of the N½NE¼NW¼, more particularly described as follows:

Beginning at the N¼ section corner of said Section 10, said corner marked by a U.S. GLO iron pipe with brass cap which shall be the Point of Beginning:
Thence South 00°07'39" East along the East line of the NW¼ for a distance of 660.78 feet to a ½ inch rebar at the Southeast corner of the N½NE¼NW¼;
Thence South 89°55'40" West along the South line of the N½NE¼NW¼ for a distance of418.04 feet to a ½ inch rebar;
Thence North 00°07'39" West for a distance of 607.86 feet to a ½ inch rebar;
Thence North 00°07'39" West for a distance of 52.97 feet to the North line of Section 10;
Thence North 89°56'00" East along said line for a distance of 418.04 feet to the Point of Beginning;

EXCEPTING THEREFROM, the following described parcel:

Beginning at the N¼ corner of said Section 10; Thence South 89°56'00" West (South 89°55' West, rec.) along the North section line for a distance of 208.72 feet; Thence South 00°04'00" East (South 00°05' East, rec.) for a distance of 52.00 feet to a point which shall be the Point of Beginning:
Thence South 00°04'00" East (South 00°05' East, rec.) for a distance of 290.40 feet;
Thence South 89°56'00" West (South 89°55' West, rec.) for a distance of 150.00 feet;
Thence North 00°04'00" West (North 00°05' West, rec.) for a distance of 290.40 feet;
Thence North 89°56'00" East (North 89°55' East, rec.) for a distance of 150.00 feet to the Point of Beginning.

PARCEL NO. 8:
TOWNSHIP 10 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 35:        Part of the NW¼, more particularly described as follows:

EXHIBIT 2                    Page 47 of 68

Beginning at the Northeast corner of the NW¼ of said Section 35; Thence South 34°9'30" East 588.37 feet to a point on the centerline of Yale Road; Thence South 57°36' West for 2040.63 feet to the True Point of Beginning;
Thence South 19°54' East 254.96 feet to a point;
Thence South 57°36' West 175 feet to a point;
Thence North 19°54' West 254.96 feet to a point;
Thence North 57°36' East 175 feet to the True Point of Beginning.

PARCEL NO. 9:
TOWNSHIP 11 SOUTH, RANGE 27 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 9:        Part of the NW¼NW¼ of said Section 9 more particularly described as follows:

Beginning at the Northwest corner of said Section 9, said corner marked by a U.S. General Land Office pipe with brass cap, which shall be the Point of Beginning;
Thence South 89°47'00" East along section line for 200.00 feet to a ½ inch rebar;
Thence South 0°07'33" East for 295.16 feet to a ½ inch rebar;
Thence North 89°47'00" West for 200.00 feet to a ½ inch rebar on section line;
Thence North 0°07'33" West along said section line for 295.16 feet to the Point of Beginning.


TRACT C - CASSIA COUNTY

TOWNSHIP 9 SOUTH, RANGE 25 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 2:        All of Lots 2, 3, 4, SE¼SW¼ and S½SE¼, SAVE AND EXCEPT the following described parcel:

Beginning at a BLM brass cap at the Southeast section corner of said Section 2;
Thence South 89°54' West for 329.82 feet;
Thence North 986.08 feet;
Thence North 44°27' West for 467.29 feet to a BLM brass cap;
Thence North 89°53' East 656.7 feet;
Thence South 1320 feet to the True Point of Beginning.

Section 3:        Lot 2

Section 10:       W½NE¼, NE¼NW¼ (also designated as Lot 1) and SE¼NW¼ EXCEPTING THEREFROM the following described parcel:

A strip of land 50 feet in width, lying 25 feet on each side of the following described line:

Beginning at a point on the North and South Center line of said Section 10, 2603 feet South of the Northwest corner of the Northeast Quarter of said Section 10;
Thence North 87°20' West 890 feet;
Thence North 89°25' West 430 feet.

Section 11:       NW¼

TRACT D - JEROME COUNTY

EXHIBIT 2                    Page 48 of 68

PARCEL NO. 1:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 27:        NW¼NW¼; SW¼NW¼

PARCEL NO. 2:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:        SE¼, EXCEPTING THEREFROM the South 25 feet of the S½SE¼ for public highway right-of-way
by Judgment dated October 26, 1981, recorded October 30, 1981 as Instrument Number 260993, Jerome County
records.

Section 33:        N½NE¼, EXCEPTING THEREFROM the North 25 feet of the N½NE¼ for public highway right-of-
way by Judgment dated October 26, 1981, recorded October 30, 1981 as Instrument Number 260993, Jerome
County records.

PARCEL NO. 3:
TOWNSHIP 7 SOUTH, RANGE 16 EAST BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:        SE¼NE¼

                   EXCEPTING THEREFROM a parcel of land located in the SE¼NE¼, described as follows:

Commencing at a 5/8 inch rebar marking the Southeast corner of the SE¼NE¼ of said Section 28, being also the
POINT OF BEGINNING;
Thence along the South line of the SE¼NE¼ of said Section 28, North 89°21'55" West, a distance of 1319.69 feet;
Thence along the West line of the SE¼NE¼ of said Section 28, North 00°10'18" East, a distance of 1318.95 feet to a
5/8 inch rebar;
Thence along the North line of the SE¼NE¼ of said Section 28, South 89°21'19" East, a distance of 827.74 feet to a
½ inch rebar;
Thence parallel to the East line of the SE¼NE¼ of said Section 28, South 00°14'47" West, a distance of 286.96 feet
to a ½-inch rebar;
Thence parallel to the North line of the SE¼NE¼ of said Section 28, South 89°21'19" East, a distance of 325.28 feet
to a ½ inch rebar;
Thence parallel to the East line of the SE¼NE¼ of said Section 28, North 00°14'47" East, a distance of 38.59 feet to
a ½ inch rebar;
Thence parallel to the North line of the SE¼NE¼ of said Section 28, South 89°21'19" East, a distance of 168.39 feet
to the intersection with the East line of the SE¼NE¼ of Section 28;
Thence along the East line of the SE¼NE¼ of said Section 28, South 00°14'47" West, a distance of 1070.34 feet to
the POINT OF BEGINNING.

PARCEL NO. 4:
TOWNSHIP 7 SOUTH, RANGE 16 EAST BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:        Part of the SE¼NE¼, more particularly described as follows:

EXHIBIT 2                    Page 49 of 68

Commencing at a 5/8 inch rebar marking the Southeast corner of the SE¼NE¼ of said Section 28, being also the POINT OF BEGINNING;

Thence along the South line of the SE¼NE¼ of said Section 28, North 89°21'55" West, a distance of 1319.69 feet;

Thence along the West line of the SE¼NE¼ of said Section 28, North 00°10'18" East, a distance of 1318.95 feet to a 5/8 inch rebar;

Thence along the North line of the SE¼NE¼ of said Section 28, South 89°21'19" East, a distance of 827.74 feet to a ½ inch rebar;

Thence parallel to the East line of the SE¼NE¼ of said Section 28, South 00°14'47" West, a distance of 286.96 feet to a ½-inch rebar;

Thence parallel to the North line of the SE¼NE¼ of said Section 28, South 89°21'19" East, a distance of 325.28 feet to a ½ inch rebar;

Thence parallel to the East line of the SE¼NE¼ of said Section 28, North 00°14'47" East, a distance of 38.59 feet to a ½ inch rebar;

Thence parallel to the North line of the SE¼NE¼ of said Section 28, South 89°21'19" East, a distance of 168.39 feet to the intersection with the East line of the SE¼NE¼ of Section 28;

Thence along the East line of the SE¼NE¼ of said Section 28, South 00°14'47" West, a distance of 1070.34 feet to the POINT OF BEGINNING.

PARCEL NO.  5:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:       SW¼NE¼;

PARCEL NO. 6:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:       NW¼NE¼, EXCEPTING THEREFROM that portion lying North and West of the North Side Canal Company lateral.

PARCEL NO. 7:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:       E½NW¼, NW¼NW¼, SW¼NW¼, EXCEPTING THEREFROM the South 10 Acres;

ALSO EXCEPTING THEREFROM that part of the SW¼NW¼, described as follows:

Commencing at the Northwest corner of said Section 28;

Thence South 0°23'30" East along the West boundary of said Section 28, 1761.83 feet to the TRUE POINT OF BEGINNING;

Thence South 36°14'06" East, 457.64 feet;

Thence South 38°11'57" East, 170.68 feet;

Thence South 45°28'11" East, 64.61 feet;

Thence North 89°52'42" West, 418.37 feet to the West boundary of said Section 28;

Thence North 0°23'30" West along the West boundary of said Section 28, 547.70 feet to the TRUE POINT OF BEGINNING.

TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,

EXHIBIT 2                          Page 50 of 68

JEROME COUNTY, IDAHO

Section 28:          That portion of the NW¼NE¼ lying North and West of the North Side Canal Company lateral.

                          EXCEPTING THEREFROM that part of the NW¼NE¼, described as follows:

Commencing at the Northwest corner of said Section 28;
Thence South 89°49'39" East along the North boundary of said Section 28, 2646.28 feet, to the Northwest corner of
the NW¼NE¼, said point being the TRUE POINT OF BEGINNING;
Thence continuing South 89°49'39" East along the North boundary of said Section 28, 143.71 feet;
Thence South 0°23'17" East, 118.00 feet;
Thence North 89°49'39" West, 143.71 feet to a point on the West boundary of said NW¼NE¼;
Thence North 0°23'17" West along the West boundary of said NW¼NE¼, 118.00 feet to the TRUE POINT OF
BEGINNING.

PARCEL NO. 8:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:          Portion of the SW¼NW¼, described as follows:

Commencing at the Southwest corner of the SW¼NW¼ of said Section;
Thence South 89°53'08" East, along the South line of the SW¼NW¼ of said Section, 1017.36 feet to the TRUE
POINT OF BEGINNING;
Thence North 66°30'17" West, 415.61 feet;
Thence North 60°28'11" West, 72.97 feet;
Thence North 52°35'55" West, 141.53 feet;
Thence North 45°28'11" West, 61.96 feet;
Thence South 89°52'42" East, 904.69 feet;
Thence South 0°23'23" East, 329.77 feet to a point on the South line of the SW¼NW¼ of said Section;
Thence North 89°53'08" West along the South line of the SW¼NW¼ of said Section, 305.69 feet to the TRUE
POINT OF BEGINNING.

PARCEL NO. 9:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:          That part of the NW¼NE¼, described as follows:

Commencing at the Northwest corner of said Section 28;
Thence South 89°49'39" East along the North boundary of said Section 28, 2646.28 feet to the Northwest corner of
the NW¼NE¼, said point being THE TRUE POINT OF BEGINNING;
Thence continuing South 89°49'39" East along the North boundary of said Section 28, 143.71 feet;
Thence South 0°23'17" East, 118.00 feet;
Thence North 89°49'39" West, 143.71 feet to a point on the West boundary of said NW¼NE¼;
Thence North 0°23'17" West along the West boundary of said NW¼NE¼, 118.00 feet to THE TRUE POINT OF
BEGINNING.

PARCEL NO. 10:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

EXHIBIT 2                              Page 51 of 68

Section 34:      E½SE¼; AND That part of the SW¼SE¼ lying South of the right of way of the U-4 lateral or coulee of the North Side Canal Company, Ltd., as located and operated over and across said land,

EXCEPTING THEREFROM the following described tracts:

Tract No. 1:
Commencing at the Southeast corner of Section 34; Thence North 89°47' West, 2033.74 feet along the Southerly boundary of Section 34 to THE TRUE POINT OF BEGINNING;
Thence North 0°13'00" East, 283.88 feet to the Southerly bank (right of way) of the Northside Canal Company "U-4" Lateral;
Thence along said "U-4 Lateral South 70°46'54" West, 79.00 feet;
South 52°49'10" West, 79.35 feet;
South 45°31'07" West, 73.56 feet;
Thence departing said lateral South 4°01'42" East, 158.10 feet to the Southerly boundary of Section 34;
Thence South 89°47' East, 178.11 feet along the Southerly boundary of Section 34 to THE TRUE POINT OF BEGINNING.

Tract No. 2:
Beginning at the Southeast corner of Section 34;
Thence North 89°47'00" West, 1866.74 feet along the Southerly boundary of Section 34 to THE TRUE POINT OF BEGINNING;
Thence North 0°13' East, 355.00 feet to the Southerly bank of the Northside Canal Company "U-4"Lateral;
Thence South 67°08'57" West, 181.51 feet along the Southerly bank of said Lateral;
Thence South 0°13' West, 283.88 feet to the Southerly boundary of Section 34;
Thence South 89°47'00" East, 167.00 feet along said Southerly boundary to THE TRUE POINT OF BEGINNING.

Tract No. 3:
Beginning at the Southeast corner for Section 34, THE TRUE POINT OF BEGINNING;
Thence North 89°47'00" West, 672.70 feet along the Southerly boundary of Section 34;
Thence North 0°11'26" West, 451.32 feet;
Thence South 89°47'00" East, 672.70 feet to the Easterly boundary of Section 34;
Thence South 0°11'26" East, 451.32 feet along the Easterly boundary of Section 34 to THE TRUE POINT OF BEGINNING.

Tract No. 4:
Beginning at a point on the south line of said SW¼SE¼, which point is 287 feet east of the Southwest corner of said SW¼SE¼;
Thence in an easterly direction along said south line 144 feet;
Thence running North 5°30' West 176 feet to the center of the U-4 lateral of the North Side Canal Co. Ltd as now constructed;
Thence Southwesterly along said centerline of said lateral 242 feet to the Point of Beginning.

PARCEL NO. 11:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:      Part of the SW¼NW¼, and Part of the NW¼SW¼, described as follows:

Commencing at a 5/8-inch iron pin with a plastic cap stamped PLS 3623 marking the Southwest corner of the Northwest ¼ of said Section 28, being also the POINT OF BEGINNING, from which an aluminum cap stamped PLS

EXHIBIT 2                    Page 52 of 68

884 marking the Southwest corner of the Southwest ¼ of said Section 28 bears South 00°06'53" West at a distance of 2639.06 feet, and also from which a ½-inch iron pin with cap stamped PLS 884 marking the Northwest corner of the Northwest ¼ of said Section 28 bears North 00°05'13" East at a distance of 2639.50 feet;

Thence along the West line of the Southwest ¼ of the Northwest ¼ of said Section 28, North 00°05'13" East, a distance of 329.94 feet to the Northwest corner of the South 10 Acres of said Southwest ¼ of the Northwest ¼, being also the Southwest corner of a parcel of land described as Parcel No. 36 in a Quitclaim Deed to L&S Land Holdings LLC as recorded in the Jerome County Recorder's Office on December 31, 2008 as Instrument Number 2086830.

Thence along the North line of said 10 acres, being also the South line of said Parcel No. 36, South 89°21'43" East, a distance of 418.77 feet (North 89°52'42" West, 418.37 feet, record) to the Southeast corner of said Parcel No. 36, being also the Northwest corner of a parcel of land described as Parcel No. 2 in a Warranty Deed to William J. and Susie J. Millenkamp as recorded in the Jerome County Recorder's Office on March 2, 2005 as Instrument Number 2051133;

Thence along the Westerly line of said Parcel No. 2 the following bearings and distances;

South 45°00'52" East, a distance of 61.09 feet (North 45°28'11" West, 64.96 feet, record);

Thence South 52°06'54" East, a distance of 141.47 feet (North 52°35'55" West, 141.53 feet, record);

Thence South 59°59'23" East, a distance of 72.92 feet (North 60°28'11" West, 72.97 feet, record);

Thence South 66°01'21" East, a distance of 418.43 feet to a ½-inch iron rod with plastic cap stamped PLS 3623 marking the intersection with the South line of the Southwest ¼ of the Northwest ¼ of said Section 28 (North 66°30'17" West, 415.61 feet, record);

Thence along the South line of said Southwest ¼ of the Northwest ¼, North 89°21'54" West, a distance of 229.89 feet to the intersection with the W3 Lateral of the North Side Canal Company;

Thence along the center of said W3 Lateral the following bearings and distances;

South 33°36'43" West, a distance of 232.99 feet to the beginning of a curve tangent to said line;

Thence Southwesterly and Westerly a distance of 292.87 feet along the curve concave to the Northwest, having a radius of 338.33 feet, a central angle of 49°35'51", and being subtended by a chord that bears South 58°24'39" West 283.81 feet;

Thence South 83°12'35" West tangent to said curve, a distance of 96.35 feet to the beginning of a curve tangent to said line;

Thence Westerly, Southwesterly and Southerly a distance of 107.95 feet along the curve concave to the Southeast, having a radius of 75.00 feet, a central angle of 82°28'03", and being subtended by a chord that bears South 41°58'33" West 98.87 feet;

Thence South 00°44'31" West tangent to said curve, a distance of 201.65 feet to the beginning of a curve tangent to said line;

Thence Southerly, Southwesterly and Westerly a distance of 153.04 feet along the curve concave to the Northwest, having a radius of 110.00 feet, a central angle of 79°42'55", and being subtended by a chord that bears South 40°35'58" West 140.99 feet;

Thence South 80°27'26" West tangent to said curve, a distance of 141.62 feet;

Thence South 85°21'09" West, a distance of 24.78 feet to a ½-inch rebar with cap stamped PLS 9858 marking the intersection with the West line of the Northwest ¼ of the Southwest ¼ of said Section 28;

Thence along the West line of said Northwest ¼ of the Southwest ¼, North 00°06'53" East, a distance of 770.52 feet to the POINT OF BEGINNING.


ALSO INCLUDED


TOWNSHIP 7 SOUTH, RANGE 16 EAST BOISE MERIDIAN,
JEROME COUNTY, IDAHO


Section 28:        Part of the SW¼NW¼, previously described as Parcel No. 36 in Quitclaim Deed from Luis M. & Sharon Bettencourt to L&S Land Holdings as recorded on December 31, 2008 as Instrument Number 2086830, now being described as follows:

EXHIBIT 2                         Page 53 of 68

Commencing at a ½-inch iron pin with cap stamped PLS 884 marking the Northwest corner of the West ½ of said Section 28; Thence along the West line of the Northwest ¼ of said Section 28, South 00°05'13" West, a distance of 1761.60 feet (South 00°23'30" East, 1761.83 feet, record), to a ½-inch iron pin marking the POINT OF BEGINNING.
Thence South 35°44'37" East, a distance of 457.46 feet (South 36°14'06" East, 457.64 feet, record);
Thence South 37°41'44" East, a distance of 170.64 feet (South 38°11'57" East, 170.68 feet, record);
Thence South 45°00'52" East, a distance of 65.53 feet (South 45°28'11" East, 64.61 feet, record) to the North line of the South 10 Acres of the Southwest ¼ of the Northwest ¼ of said Section 28;
Thence along the North line of said South 10 Acres, North 89°21'43" West, a distance of 418.77 feet (North 89°52'42" West, 418.37 feet, record) to the West line of the Southwest ¼ of the Northwest ¼ of said Section 28;
Thence along the West line of said Southwest ¼ of the Northwest ¼, North 00°05'13" East, a distance of 547.97 feet (North 00°23'30" West, 547.70 feet, record) to the POINT OF BEGINNING.

ALSO INCLUDED

TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:        Part of the NE¼SW¼, described as follows:

Commencing at a brass cap marking the Southeast corner of the Southwest ¼ of said Section 28, from which an aluminum cap stamped PLS 884 marking the Southwest corner of the Southwest ¼ of said Section 28 bears North 89°22'57" West at a distance of 2646.57 feet; Thence along the East line of said Southwest ¼, North 00°05'51" East, a distance of 1931.80 feet to a ½-inch rebar with plastic cap stamped PLS 9858 marking the POINT OF BEGINNING.
Thence North 39°19'22" West, a distance of 125.38 feet to a ½-inch rebar with plastic cap stamped PLS 9858;
Thence North 42°05'52" West, a distance of 294.98 feet to a ½-inch rebar with plastic cap stamped PLS 9858;
Thence North 44°25'46" West, a distance of 368.54 feet to a ½-inch rebar with plastic cap stamped PLS 9858;
Thence North 51°33'57" West, a distance of 89.01 feet to a ½-inch rebar with plastic cap stamped PLS 9858;
Thence North 72°47'53" West, a distance of 237.80 feet to a ½-inch rebar with plastic cap stamped PLS 9858;
Thence North 84°18'05" West, a distance of 124.52 feet to a ½-inch rebar with cap stamped PLS 9858 marking the intersection with the North line of the Northeast ¼ of the Southwest ¼ of said Section 28;
Thence along the North line of said Northeast ¼ of the Southwest ¼, South 89°21'54" East, a distance of 957.25 feet to a 5/8-inch rebar with aluminum cap stamped PLS 9858 marking the Northeast corner of said Northeast ¼ of the Southwest ¼;
Thence along the East line of said Northeast ¼ of the Southwest ¼, South 00°05'51" West, a distance of 706.46 feet to the POINT OF BEGINNING.

TRACT E

CASSIA COUNTY

PARCEL NO. 1:
TOWNSHIP 11 SOUTH, RANGE 26 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 36:        E½

JEROME COUNTY

PARCEL NO. 2:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

EXHIBIT 2                    Page 54 of 68

Section 21:        That portion of the N½SW¼, lying South of the centerline of the Northside Canal Company "W" Canal, more particularly described as follows:

Commencing at the Northwest corner of said N½SW¼; Thence South 0°07'58" East, 562.38 feet along the Westerly boundary of said N½SW¼ to the center of the Northside Canal Company "W" Canal and THE TRUE POINT OF BEGINNING;
Thence South 0°07'58" East, 758.11 feet to the Southwest corner of said N½SW¼;
Thence South 89°41'11" East, 2643.72 feet to the center of said "W" Canal;
Thence Westerly along the approximate center of said "W" Canal the following courses and distances:
Thence North 26°19'12" West, 237.37 feet;
Thence North 44°56'58" West, 199.28 feet;
Thence South 52°21'52" West, 240.71 feet;
Thence North 67°19'08" West, 646.97 feet;
Thence North 87°18'51" West, 178.79 feet;
Thence North 64°23'23" West, 203.61 feet;
Thence South 73°01'14" West, 419.96 feet;
Thence South 62°58'56" West, 355.62 feet (335.62 feet recorded);
Thence North 71°13'41" West, 561.62 feet to THE TRUE POINT OF BEGINNING.

PARCEL NO. 3:
TOWNSHIP 10 SOUTH, RANGE 20 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 10:        A parcel of land located in the N½NW¼, described as follows:

Commencing at the Northeast corner of the N½NW¼, which corner bears North 8°44'54" West, 213.81 feet from Station 296+20.43 of Interstate 80N, Project No. 1-80N-3(18)191 Highway Survey; Thence South 0°06'44" East along the East line of said N½NW¼, a distance of 378.42 feet to a point that bears South 9°11'09" East, 160.00 feet from Station 295+60.35 of said Highway Survey and being the REAL POINT OF BEGINNING;
Thence South 79°55'36" West, 640.33 feet to a point in a line parallel with and 170.0 feet Southerly from the centerline and opposite Station 289+20.09 of said Highway Survey;
Thence along said parallel line as follows:
Westerly along a 5899.58 foot radius curve right 1603.00 feet to a point which bears South 6°22'56" West, 170.0 feet from Station 273+63.28 of said Highway Survey;
North 83°37'04" West, 398.99 feet to a point in the West line of said N½NW¼ and bears South 6°22'56" West, 170.0 feet from the Station 269+64.29 of said Highway Survey;
Thence South 0°03'34" East along said West line 842.0 feet, more or less, to the Southwest corner of said N½NW¼;
Thence Easterly along the South line of said N½NW¼, a distance of 2640.0 feet, more or less, to the Southeast corner thereof;
Thence North 0°06'44" West along the East line of said N½NW¼ a distance of 942.0 feet, more or less, to THE REAL POINT OF BEGINNING.

EXCEPTING THEREFROM a parcel of land described as follows:

Beginning at the North quarter corner of said Section 10; Thence South 0°04'39" West along the center section line of said Section 10 for a distance of 370.80 feet to the South right of way line of Interstate 80N, Project No. I-80N-3(18)191 and being the REAL POINT OF BEGINNING;
Thence from the REAL POINT OF BEGINNING South 0°04'39" West along the center section line of said Section 10 for a distance of 951.05 feet to the Southeast corner of the N½NW¼;
Thence North 89°58'21" West along the South line of the N½NW¼ for a distance of 233.66 feet;

EXHIBIT 2                                    Page 55 of 68

Thence North 0°04'39" East for a distance of 910.82 feet to the South right of way line of Interstate 80N;
Thence North 79°57'46" East along the South right of way line of Interstate 80N for a distance of 223.00 feet;
Thence North 84°56'39" East along the South right of way line of Interstate 80N for a distance of 14.19 feet to the REAL POINT OF BEGINNING.

FURTHER EXCEPTING THEREFROM that part of the NW¼, described as follows:

Commencing at the Northwest corner of said Section 10; Thence South 0°00'13" West along the West boundary of said Section 10 for a distance of 1073.5 feet to THE TRUE POINT OF BEGINNING;
Thence North 89°30'00" East for a distance of 210.00 feet;
Thence South 0°00'13" West parallel with the West boundary of Section 10 for a distance of 211.04 feet;
Thence South 89°30'00" West for a distance of 113.0 feet;
Thence North 84°00'00" West for a distance of 97.5 feet to a point on the West boundary of Section 10;
Thence North 0°00'13" East along the West boundary of Section 10 for a distance of 200.00 feet to THE TRUE POINT OF BEGINNING.

PARCEL NO. 4:
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 34:        SE¼NE¼; NE¼NE¼

PARCEL NO. 5
TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 28:        NE¼NE¼, more particularly described as follows:

Beginning at the Northeast corner of said Section 28, said point being the TRUE POINT OF BEGINNING;
Thence North 89°39' West along the North boundary of the NE¼NE¼, 1320.00 feet, more or less, to the Northwest corner of NE¼NE¼;
Thence South 0°02' East along the West boundary of the NE¼NE¼, 1320.00 feet, more or less, to the Southwest corner of the NE¼NE¼;
Thence South 89°39' East along the South boundary of the NE¼NE¼, 1320.00 feet, more or less, to the Southeast corner of the NE¼NE¼;
Thence North 0°02' West along the East boundary of the NE¼NE¼, 1320.00 feet, more or less, to the TRUE POINT OF BEGINNING.

TRACT F – JEROME COUNTY

TOWNSHIP 7 SOUTH, RANGE 16 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 29:        S½NE¼NE¼

TRACT G - CASSIA COUNTY

PARCEL NO. 1:
TOWNSHIP 12 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

EXHIBIT 2                    Page 56 of 68

Section 2:          W½SW¼

Section 3:          SE¼, E½SW¼, S½NW¼

Section 4:          All

Section 9:          SW¼

Section 10:         All

Section 11:         W½NW¼, NW¼SW¼; W½SE¼, SW¼SW¼, E½SW¼, SE¼NW¼, SW¼NE¼

Section 13:         W½, W½E½

Section 14:         All

Section 15:         All

TOWNSHIP 12 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 3:          Lots 2, 3, 4 and W½SW¼

                    SAVE AND EXCEPT, the following described property:

Part of Lot 4, more particularly described as follows:

Beginning at the Northwest corner of said Section 3, said corner marked by a U.S. General Land Office pipe with
cap; Thence South 89°27'00" East along section line for 42.58 feet to a ½ inch rebar which shall be the POINT OF
BEGINNING;
Thence South 89°27'00" East along section for 226.35 feet to a ½ inch rebar;
Thence South 2°34'06" West for 238.97 feet to a ½ inch rebar;
Thence North 88°01'42" West for 212.97 feet to a ½ inch rebar in the center of a gravel road;
Thence North 0°40'58" West along the center of said road for 233.59 feet to the POINT OF BEGINNING.

PARCEL NO. 2:
TOWNSHIP 12 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 3:          Part of Lot 4, more particularly described as follows:

Beginning at the Northwest corner of said Section 3, said corner marked by a U.S. General Land Office pipe with
cap; Thence South 89°27'00" East along section line for 42.58 feet to a ½ inch rebar which shall be the POINT OF
BEGINNING;
Thence South 89°27'00" East along section for 226.35 feet to a ½ inch rebar;
Thence South 2°34'06" West for 238.97 feet to a ½ inch rebar;
Thence North 88°01'42" West for 212.97 feet to a ½ inch rebar in the center of a gravel road;
Thence North 0°40'58" West along the center of said road for 233.59 feet to the POINT OF BEGINNING.

PARCEL NO. 3:
TOWNSHIP 12 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,

EXHIBIT 2                          Page 57 of 68

CASSIA COUNTY, IDAHO

Section 9:          E½

PARCEL NO. 4:
TOWNSHIP 11 SOUTH, RANGE 28 EAST OF THE BOISE MERIDIAN,
CASSIA COUNTY, IDAHO

Section 35:         SE¼NE¼ and E½SE¼

Section 34:         Part of the SE¼SW¼ more particularly described as follows:

Beginning at the Southwest corner of the SE¼SW¼ of Section 34, the TRUE POINT OF BEGINNING;
Thence North along the West boundary of the SE¼SW¼ of Section 34 for 400 feet;
Thence East along a line parallel to the South boundary of said SE¼SW¼, Section 34 for 600 feet;
Thence South 400 feet to the South boundary of the SE¼SW¼ of Section 34;
Thence West along the South boundary of the SE¼SW¼ of Section 34 for 600 feet to the POINT OF BEGINNING.

PARCEL NO. 5:
A 25 foot easement for ingress and egress to the E½SE¼ of Section 35, Township 11 South, Range 28 East, Boise Meridian and for Section 36, Township 11 South, Range 28 East Boise Meridian, as reserved in Warranty Deed dated April 1, 1986 and recorded May 8, 1986 as Instrument No. 178224 on Film No. 180, records of Cassia County, Idaho, more particularly described as follows:

Beginning at the Southwest corner of the E½SW¼, Section 34, Township 11 South, Range 28 East Boise Meridian;
Thence East along the North boundary of Section 3, Township 12 South, Range 28 East of the Boise Meridian to a point that is 25 feet West of the Northeast corner of said Section 3;
Thence South 25 feet;
Thence East 25 feet to the East boundary of said Section 3;
Thence continuing East and 25 feet South of the North boundary of Section 2, Township 12 South, Range 28 East, Boise Meridian, to the East boundary of said Section 2;
Thence North 25 feet to the Northeast corner of said Section 2;
Thence West along the North boundary of said Section 2 to the Northwest corner of said Section 2;
Thence North 25 feet;
Thence West to the West boundary of the E½SW¼ of Section 34, Township 11 South, Range 28 East Boise Meridian;
Thence South 25 feet to the POINT OF BEGINNING.

TRACT H – TWIN FALLS COUNTY

Lots 1 through 8, inclusive, and Parcels A and B, PAULSON SUBDIVISION, Twin Falls County, Idaho, filed in Book 17 of Plats, Page 39.  Affidavit of Correction recorded September 4, 2001 as Instrument No. 2001-015902.

TRACT I – TWIN FALLS COUNTY

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 9:          Part of Lot 9, more particularly described as follows:

EXHIBIT 2                                    Page 58 of 68

A parcel of ground located between the Southerly high water mark of the Snake River and the Northerly right-of-way line of the County Road, being part of Lot 9 in Section 9 and Lot 12 in Section 4 of Township 9 South, Range 15 East Boise Meridian, more particularly described as follows:

Beginning at the centerline of the County Road right of way as it intersects Lot 9 in Section 9, being THE TRUE POINT OF BEGINNING;
Thence Easterly along the centerline of said County Road right-of-way for a distance of 450 feet;
Thence North approximately 250 feet to the high water line of the Snake River;
Thence Southwesterly along the high water line of the Snake River to the point where the Snake River intersects the Westerly boundary of Section 9;
Thence South approximately 150 feet to the centerline of the County Road right--of-way, being THE TRUE POINT OF BEGINNING.

TRACT J – TWIN FALLS COUNTY

PARCEL NO. 1:
TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 5:          Lots 10, 19 and 20


TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 5:          SW¼SW¼

SAVE AND EXCEPT a parcel of land located in Government Lot 22, more particularly described as follows:

Commencing at the Southwest Section corner of said Section 5 from which the S¼ corner of said Section 5 bears South 89°21'06" East, 2671.89 feet, said Southwest section corner of Section 5 being THE TRUE POINT OF BEGINNING;
Thence North 00°20'00" East along the West boundary of said Government Lot 22 for a distance of 168.01 feet;
Thence South 89°40'00" East for a distance of 11.75 feet to a point on the Southerly rim of the Snake River;
Thence along the Southerly rim of the Snake River on the following courses:
North 43°15'43" East, 23.49 feet;
South 81°49'29" East, 150.08 feet;
North 85°23'40" East, 128.99 feet;
South 87°20'13" East, 89.08 feet;
North 68°53'37" East, 45.37 feet;
Thence South 28°37'14" West for a distance of 216.48 feet to a point on the South boundary of said Government Lot 22;
Thence North 89°21'06" West along the South boundary of said Government Lot 22 for a distance of 333.58 feet to the Southwest section corner of said Section 5 and being THE TRUE POINT OF BEGINNING.

SUBJECT TO:
1.  A 25.00 foot wide county road easement along the South and West boundaries of the before described parcel.

PARCEL NO. 2:
TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

EXHIBIT 2                    Page 59 of 68

Section 8:          Lots 2, 4, 5 and the NE¼NW¼


TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 8:          Part of Government Lot 1, more particularly described as follows:

Beginning at the East quarter corner for Section 8; Thence North 0°52'21" West, 736.56 feet along the Easterly boundary of Section 8 to the Northeast corner of Government Lot 1; Thence North 41°45'07" West, 612.36 feet along the boundaries of Government Lots 1 and 4 to Angle Point 4; Thence North 52°52'21" West, 493.46 feet along said boundary between Government Lots 1 and 4 to an existing fence and THE TRUE POINT OF BEGINNING;
Thence North 52°52'21" West, 152.02 feet along said boundary between Lots to Angle Point Number 3;
Thence North 68°55'21" West, 456.73 feet along said boundary to the Northwest corner of Government Lot 1;
Thence South 0°52'44" East, 272.78 feet along the Westerly boundary of Government Lot 1 to an existing fence corner;
Thence North 88°14'05" East, 543.45 feet along said fence to the Easterly boundary of Government Lot 1 and THE TRUE POINT OF BEGINNING.


SAVE AND EXCEPT the following described:

Beginning at the East quarter corner for Section 8; Thence North 0°52'21" West, 736.56 feet along the Easterly boundary of Section 8 to the Southeast corner to Government Lot 4 and THE TRUE POINT OF BEGINNING;
Thence North 0°52'21" West, 724.23 feet along the Easterly boundary of Section 8 to an existing fence corner;
Thence North 84°01'11" West, 407.11 feet along the existing fence;
Thence South 88°14'05" West, 385.47 feet along said fence to the Southwesterly boundary of Government Lot 4;
Thence South 52°52'21" East, 493.46 feet along the Southwesterly boundary of Government Lot 4 to Angle Point Number 4;
Thence South 41°45'07" East, 612.36 feet along the Southwesterly boundary of said Government Lot 4 to THE TRUE POINT OF BEGINNING.

TRACT K – TWIN FALLS COUNTY

Part of Lots 7, 8, 9, 11, 12, 13 and 14, of Section 9, Township 9 South, Range 15 East Boise Meridian, and part of Lot 12 of Section 4, Township 9 South, Range 15 East Boise Meridian, Twin Falls County, Idaho, more particularly described as follows:

Beginning at the Meander corner on the South bank of the Snake River lying on the section line common to Sections 9 and 10 of Township 9 South, Range 15 East Boise Meridian, said corner being marked by a U.S. General Land Office pipe with brass cap; Thence South 00°10'20" West along the Section line common to Sections 9 and 10 for 427.10 feet to a point on the North side of the Upper Brandon Ditch which shall be THE POINT OF BEGINNING;
Thence South 00°10'20" West along section line for 433.61 feet to a ½ inch rebar on the South rim of the Snake River Canyon;
Thence North 76°23'56" West (North 76°25' West rec.) along said canyon rim for 223.07 feet (223 feet rec.) to a ½ inch rebar;
Thence North 70°29'12" West (North 70°40' West rec.) along said canyon rim for 159.73 feet (160 feet rec.) to a ½ inch rebar;
Thence North 74°43'47" West (North 75°02' West rec.) along said canyon rim for 584.51 feet (585 feet rec.) to a point;

EXHIBIT 2                    Page 60 of 68

Thence South 87°33'41" West (South 87°16' West rec.) along said canyon rim for 676.63 feet (677 feet rec.) to a point;

Thence North 81°38'59" West (North 81°57' West rec.) along said canyon rim for 853.57 feet (854 feet rec.) to a point;

Thence South 81°00'27" West (South 80°43' West rec.) along said canyon rim for 780.55 feet (781 feet rec.) to a point;

Thence North 77°19'51" West (North 77°38' West rec.) along said canyon rim for 731.66 feet (732 feet rec.) to a point;

Thence North 21°59'03" West (North 22°18' West rec.) along said canyon rim for 340.01 feet (340 feet rec.) to a point;

Thence North 86°24'08" West (North 86°42' West rec.) along said canyon rim for 384.80 feet (385 feet rec.) to a point;

Thence North 61°45'47" West (North 62°07' West rec.) along said canyon rim for 134.92 feet to a ½ inch rebar at the Southeast corner of that property as deeded to Frank Strobel by Warranty Deed recorded 6 Oct. 1978, as Instrument No. 745567;

Thence North 00°41'23" West (North 00°55'00" West rec.) along the East line of the Strobel property for 1184.54 feet (1184.61 feet rec.) to a ½ inch rebar on the centerline of a county road also being the South line of the property as deeded to Associated McCullough Enterprises by Warranty Deed recorded 10 Oct. 1986 as Instrument No. 910242;

Thence on a curve to the left on the centerline of said county road Associated McCullough Enterprises property line for 440.12 feet to a point, said curve having a central angle of 8°09'06" and a radius of 3093.47 feet with a long chord bearing of North 69°54'35" East (North 69°40'43" East rec.) for a distance of 439.75 feet from the previous point;

Thence North 65°50'02" East (North 65°36'10" East rec.) along the centerline of said county road/Associated McCullough Enterprises property line for 573.60 feet to a point;

Thence on a curve to the right on the centerline of said county road/Associated McCullough Enterprises property line for 346.23 feet to a point, said curve having a central angle of 39°40'28" and a radius of 500.00 feet with a long chord bearing of North 85°40'15" East for a distance of 339.35 feet from the previous point;

Thence South 74°29'30" East (South 74°43'22" East rec.) along the center line of said county road/Associated McCullough Enterprises property line for 267.72 feet to a point;

Thence on a curve to the right on the centerline of said county road/Associated McCullough Enterprises property line for 238.60 feet to a point, said curve having a central angle of 13°40'16" and a radius of 1000.00 feet with a long chord bearing of South 67°39'22" East (South 67°53'13" East rec.) for a distance of 238.04 feet from the previous point;

Thence South 60°49'13" East (South 61°03'05" East rec.) along the centerline of said county road/Associated McCullough Enterprises property line for 54.35 feet to a point on the section line common to Sections 4 and 9;

Thence South 89°47'46" East (North 89°58'22" East rec.) along said section line for 55.16 feet to a meander corner on the South bank of the Snake River, said corner being marked by a U.S. General Land Office pipe with brass cap;

Thence South 69°09'42" East along the high water line of the Snake River for 107.56 feet to a point;

Thence South 36°50'03" East along said high water line for 324.38 feet to a point;

Thence South 28°01'36" East along said high water line for 188.40 feet to a point;

Thence South 71°51'23" East along said high water line for 266.27 feet to a point;

Thence South 85°01'19" East along said high water line for 128.00 feet to a point;

Thence South 77°56'56" East along said high water line for 186.93 feet to a point;

Thence South 70°15'54" East along said high water line for 277.05 feet to a point;

Thence South 3°16'00" West (South 2°49'21" West rec.) for 57.04 feet to a point on the North line of that property as deeded to William S. Slaughenhauft by Warranty Deed recorded 6 June 1975 as Instrument No. 681182;

Thence North 68°21'57" West (North 68°43' West rec.) along the North line of the Slaughenhauft property for 136.00 feet to a point;

Thence on a curve to the left along the North line of the Slaughenhauft property for 35.00 feet to a ½ inch rebar, said curve having a central angle of 2°03'24.4" and a radius of 975.00 feet with a long chord bearing of North 69°23'39" West (North 69°44'42" West rec.) for a distance of 34.99 feet from the previous point;

EXHIBIT 2                    Page 61 of 68

Thence South 13°17'28" West (South 12°56'25" West rec.) along the West line of the Slaughenhauft property for 266.15 feet (266.10 feet rec.) to a ½ inch rebar on the South side of an irrigation ditch known as the Lower Brandon Ditch, said point also being the Northwest corner of that property as deeded to Philip Smith by Warranty Deed recorded 6 Nov. 1978, as Instrument No. 613816;

Thence South 23°03'03" West (South 22°42' West rec.) along the West line of the Smith property for 429.47 feet to a ½ inch rebar on the North side of the Upper Brandon Ditch;

Thence North 85°47'05" East (North 85°23' East rec.) along the Smith property line on the North side of the Upper Brandon Ditch for 240.50 feet (240.0 feet rec.) to a point;

Thence South 46°41'06" East (South 47°03' East rec.) along the Smith property line on the North side of the Upper Brandon Ditch for 197.00 feet to a point;

Thence South 65°36'54" East (North 65°15' East rec.) along the Smith property line on the North side of the Upper Brandon Ditch for 93.80 feet to a point;

Thence North 88°11'54" East (North 87°50' East rec.) along the Smith property line on the North side of the Upper Brandon Ditch for 446.20 feet to a point;

Thence South 68°30'06" East (South 68°52' East rec.) along the Smith property line on the North side of the Upper Brandon Ditch for 224.60 feet to a point;

Thence South 69°48'06" East (South 70°10' East rec.) along the Smith property line on the North side of the Upper Brandon Ditch for 417.00 feet to a point;

Thence South 70°34'06" East (South 70°56' East rec.) along the Smith property line on the North side of the Upper Brandon Ditch for 420.00 feet to THE POINT OF BEGINNING.

SUBJECT TO an existing county road right of way along the Northern most line of the above described property being noted in the description as road centerline.

TRACT L – TWIN FALLS COUNTY

PARCEL NO. 1:
TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 9:      Being a portion of that certain 14.31 acre parcel of land as shown on that certain Record of Survey recorded March 17, 2016, as Instrument No. 2016-004084, of official record, in the office of the County Recorder of Twin Falls County, said parcel of land also being a portion of Government Lots 9 and 11, more particularly described as follows:

Commencing at the West quarter corner of said Section 9, said corner bears North 00°52'28" West 2641.88 feet from the Southwest corner of said Section 9; Thence, North 00°54'26" West 1573.95 feet along the West boundary of said Section 9 to the Southwest corner of said parcel of land and being the REAL POINT OF BEGINNING;

Thence, North 00°54'26" West 783.01 feet along said West boundary to a point on the centerline of River Road (County Road);

Thence, South 86°36'57" East 369.14 feet along said centerline;

Thence, along the arc of a tangent 1156.07 foot radius curve to the left, through a central angle of 06°18'51", an arc distance of 127.40 feet and a chord distance of 127.34 feet that bears South 89°46'23" East along said centerline;

Thence, leaving said centerline, South 25°41'20" West 188.46 feet;

Thence, South 00°55'00" East 739.37 feet to a point on the Northeasterly boundary of that certain Plat entitled "Paulson Subdivision", recorded May 4, 2001, as instrument number 2001-007826, of official records, in said office of the county recorder of Twin Falls County;

Thence, North 70°15'00" West 439.41 feet along said Northeasterly boundary to said REAL POINT OF BEGINNING.

EXHIBIT 2                    Page 62 of 68

Subject to a 25.00 foot wide county roadway easement being parallel with and adjoining the North boundary of the hereinabove described parcel.

PARCEL NO. 2:
TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 9:          Being a portion of that certain 14.31 acre parcel of land as shown on that certain Record of Survey recorded March 17, 2016, as Instrument No. 2016-004084, of official record, in the office of the County Recorder of Twin Falls County, said parcel of land also being a portion of Government Lots 9 and 11, more particularly described as follows:

Commencing at the West quarter corner of said Section 9, said corner bears North 00°52'28" West 2641.88 feet from the Southwest corner of said Section 9; Thence, North 00°54'26" West 2356.96 feet along said West boundary to a point on the centerline of River Road (County Road); Thence, South 86°36'57" East 369.14 feet along said centerline;
Thence, along the arc of a tangent 1156.07 foot radius curve to the left, through a central angle of 06°18'51"; an arc distance of 127.40 feet and a chord distance of 127.34 feet that bears South 89°46'23" East along said centerline and being the REAL POINT OF BEGINNING;
Thence, leaving said centerline, South 25°41'20" West 188.46 feet;
Thence, South 00°55'00" East 739.37 feet to a point on the Northeasterly boundary of that certain Plat entitled "Paulson Subdivision", recorded May 4, 2001, as instrument number 2001-007826, of official records, in the office of the county recorder of Twin Falls County;
Thence, South 70°15'00" East 297.66 feet along said Northeasterly boundary;
Thence, continuing along said Northeasterly boundary, South 62°07'00" East 7.41 feet to the Southeast corner of said parcel of land;
Thence, North 00°55'00" West 1041.23 feet along the East boundary of said parcel of land to a point on said centerline of River Road;
Thence, along the arc of a non-tangent 1156.07 foot radius curve to the right, through a central angle of 10°01'48", an arc distance of 202.38 feet and a chord distance of 202.12 feet that bears South 82°03'18" West along said centerline to said REAL POINT OF BEGINNING.

Subject to a 25.00 foot wide county roadway easement being parallel with and adjoining the North boundary of the hereinabove described parcel.

TRACT NO. M – TWIN FALLS COUNTY

PARCEL NO. 1:
TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 17:        A parcel of land located in a portion of N½NE¼ and SW¼NE¼, being more particularly described as follows:

Commencing at the North quarter corner of Section 17 and being THE REAL POINT OF BEGINNING;
Thence South 89°13'29" East, 2666.01 feet to the Northeast corner of Section 17;
Thence South 00°36'24" East, 1021.06 feet along the East boundary of Section 17;
Thence North 89°22'41" West, 700.00 feet;
Thence South 00°36'24" East, 300.00 feet to a point in the South boundary of NE¼NE¼, Section 17;
Thence North 89°22'41" West, 633.33 feet to the Northeast corner of SW¼NE¼, Section 17;
Thence South 00°35'19" East, 732.86 feet along the East boundary of SW¼NE¼, Section 17;

EXHIBIT 2                    Page 63 of 68

Thence North 89°45'41" West, 296.45 feet (shown of record to be 285.9 feet) along the Southerly boundary of that parcel of land described in Deed Instrument No. 840798;
Thence North 30°40'41" West, 288.06 feet along said boundary;
Thence South 59°19'19" West, 51.25 feet along said boundary to the center of a concrete headgate spillway mentioned in said Deed Instrument No. 840798;
Thence along the spillway ditch mentioned in said Deed Instrument as follows:
North 59°30'03" West, 21.92 feet;
North 43°49'26" West, 37.21 feet;
North 37°12'27" West, 43.12 feet;
North 54°06'58" West, 164.97 feet;
North 53°53'37" West, 113.31 feet;
North 53°08'10" West, 250.16 feet;
North 47°43'30" West, 52.14 feet;
North 50°09'39" West, 67.78 feet;
North 57°46'28" West, 18.15 feet;
North 74°23'53" West, 19.55 feet;
North 80°13'05" West, 18.06 feet;
North 89°26'44" West, 214.21 feet to a point on the West boundary of NE¼, Section 17;
Thence North 00°34'15" West, 40.03 feet to the Southwest corner of NW¼NE¼, Section 17;
Thence North 00°34'15" West, 1328.18 feet along the West boundary of said NW¼NE¼, to THE REAL POINT OF BEGINNING.

PARCEL NO. 2:
TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 9:          Part of the W½, more particularly described as follows:

Beginning at the Southwest corner of said Section;
Thence North 89°54'12" East, 899.16 feet along the South boundary of Section 9;
Thence North 00°05'48" West, 380.00 feet;
Thence North 89°54'12" East, 567.06 feet;
Thence South 01°56'02" East, 380.20 feet to the South boundary of Section 9;
Thence North 89°54'12" East, 1,216.54 feet to the South quarter corner of Section 9;
Thence North 00°25'31" West, 2,384.42 feet;
Thence South 89°09'26" West, 75.00 feet to the Southwest corner of Tract No. 7 as shown on the survey recorded in Book 28, Page 1589 as Instrument No. 713365, records of Twin Falls County, Idaho;
Thence South 00°25'31" East, 342.23 feet;
Thence along a curve left:
Delta - 76°48'26"
Radius - 1,355.74 feet
Arc - 1,817.42 feet
Chord - 1,684.36 feet
Long Chord Bearing - North 53°43'40" West;
Thence along a curve right:
Delta - 28°36'58"
Radius - 500.00 feet
Arc - 249.72 feet
Chord - 249.14 feet
Long Chord Bearing - North 77°49'24" West;
Thence North 63°30'55" West, 1,187.91 feet;

EXHIBIT 2                Page 64 of 68

Thence South 00°55'00" East, 3,624.43 feet along the West boundary of Section 9 to THE TRUE POINT OF BEGINNING.

SUBJECT TO a 25.00 foot wide county road easement along the West and South boundaries.

AND SUBJECT TO a 50.00 foot wide access and utility easement located in Section 9, described as follows:

Commencing at the Southwest corner of said Section 9;
Thence North 89°54'12" East, 2,669.95 feet to THE TRUE POINT OF BEGINNING, said point lies South 89°54'12" West, 25.00 feet from the South quarter corner of said Section 9;
Thence North 00°25'31" West, 2,384.10 feet;
Thence South 89°09'28" West, 50.00 feet;
Thence South 00°25'31" East, 2,383.44 feet to the South boundary of Section 9;
Thence North 89°54'12" East, 50.00 feet to THE TRUE POINT OF BEGINNING.

SAVE AND EXCEPT the East 75 feet thereof

ALSO EXCEPTING the following described:

Commencing at the Southwest corner of said Section 9, from which the South quarter corner of Section 9 bears North 89°54'12" East, 2695.04 feet, said Southwest corner of Section 9 being THE TRUE POINT OF BEGINNING;
Thence North 00°52'42" West along the West boundary of the SW¼ of Section 9 for a distance of 1032.21 feet;
Thence South 88°22'24" East for a distance of 85.17 feet;
Thence South 38°24'37" East for a distance of 258.67 feet;
Thence South 40°28'04" East for a distance of 84.45 feet;
Thence South 43°23'07" East for a distance of 80.22 feet;
Thence South 45°07'17" East for a distance of 91.34 feet;
Thence North 82°31'01" East for a distance of 16.96 feet;
Thence South 45°54'58" East for a distance of 173.02 feet;
Thence South 69°19'28" East for a distance of 318.78 feet;
Thence North 75°17'34" East for a distance of 30.82 feet;
Thence South 86°36'38" East for a distance of 444.53 feet;
Thence North 88°54'26" East for a distance of 333.64 feet;
Thence South 01°04'37" West for a distance of 359.90 feet;
Thence South 22°21'58" East for a distance of 37.36 feet to a point on the South boundary of the SW¼ of said Section 9;
Thence South 89°54'12" West along the South boundary of the SW¼ of Section 9 for a distance of 1658.59 feet to THE TRUE POINT OF BEGINNING.

SUBJECT TO a 25.0 foot wide county road easement along the South and West boundaries of the before described parcel.
EXCEPT a parcel of land located in the SW¼ of said Section 9, Township 9 South, Range 15 East of the Boise Meridian, Twin Falls County, Idaho, being more particularly described as follows:
Commencing at the Southwest corner of Section 9, said point lies South 89°54'12" West, 2694.95 feet from the South quarter corner of Section 9;
Thence North 89°54'12" East, 899.16 feet along the South boundary of Section 9 to THE REAL POINT OF BEGINNING;
Thence North 00°05'48" West, 380.00 feet;
Thence North 89°54'12" East, 567.06 feet;
Thence South 01°56'02" East, 380.20 feet to a point on the South boundary of Section 9;

EXHIBIT 2                    Page 65 of 68

Thence South 89°54'12" West, 579.25 feet along the South boundary of Section 9 to THE REAL POINT OF BEGINNING.

TOGETHER WITH a 20.00 foot wide non-exclusive vehicular access easement parallel with, adjoining and East of the East boundary of the above excepted parcel.

AND SUBJECT TO a 25.00 foot wide county roadway easement parallel with and adjoining the South boundary of the above excepted parcel.

PARCEL NO. 3
TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN,
TWIN FALLS COUNTY, IDAHO

Section 16:      NW¼NW¼, EXCEPT the South 190 feet of the West 490 feet thereof.

SUBJECT TO Highway District right of way.

PARCEL NO. 4:
A Right-of-Way over an existing roadway across the South 190 feet of the West 490 feet of the NW¼NW¼ of said Section for ingress and egress as created by Warranty Deed by and between Gerald G. Akland and Ann Akland, husband and wife, Grantors unto James E. Paulson and Glennys Paulson, husband and wife, grantees, dated January 6, 1982 and recorded January 18, 1982 as Instrument No. 815467, records of Twin Falls County, Idaho.

TRACT N – JEROME COUNTY

PARCEL NO. 1:
TOWNSHIP 10 SOUTH, RANGE 20 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 12:      NW¼ and that part of the W½NE¼ lying West of the Main Canal of the North Side Canal Co., Ltd.

EXCEPTING THEREFROM that portion thereof conveyed to the State of Idaho for highway purposes and particularly described as follows:

A parcel of land being on both sides of the centerline of Interstate 80N, Project No. I-80N-3(18)191 Highway Survey as shown on the plans thereof now on file in the office of the Department of Highways of the State of Idaho, and being a portion of the N½NW¼ and a portion of the NW¼NE¼ of Section 12, Township 10 South, Range 20 East Boise Meridian, described as follows:

Beginning at the Northwest corner of Section 12, Township 10 South, Range 20 East Boise Meridian, which corner bears North 0°01'06" East, 125.00 feet from Station 375+50.15 of said Interstate 80N, Project No. I-80N-3(18)191 Highway Survey;
Thence North 89°50'44" East along the North line of said Section 12 a distance of 3110.59 feet to a point in the centerline of the Main Canal of the North Side Canal Co., that bears North 0°12'06" East, 136.42 feet from Station 406+59.84 of said Highway Survey;
Thence South 30°32'54" East along the centerline of said canal 344.92 feet to a point in a line parallel with and 160.00 feet Southerly from the centerline and bears South 0°12'06" West from Station 408+36.19 of said Highway Survey;
Thence North 89°47'54" West along said parallel line 817.76 feet to a point opposite Station 400+18.43 and angle point of 0°11'00" left of said Highway Survey;

EXHIBIT 2                    Page 66 of 68

Thence South 86°19'16" West, 1089.74 feet to a point that bears South 0°01'06" West 230.29 feet from Station 389+30.47 of said Highway Survey;

Thence South 71°05'03" West, 564.86 feet to a point that bears South 0°01'06" West, 413.57 feet from Station 383+96.17 of said Highway Survey;

Thence South 56°08'59" West, 639.57 feet to a point in a line parallel with and 770.00 feet Southerly from the centerline and bears South 0°01'06" West from Station 378+65.12 of said Highway Survey;

Thence North 89°58'54" West along said last parallel line 262.21 feet to a point opposite Station 376+02.91 of said Highway Survey;

Thence South 0°11'14" East, 245.38 feet to a point that bears South 0°01'06" West, 1015.38 feet from Station 376+03.79 of said Highway Survey;

Thence South 7°31'58" West, 186.13 feet to a point that bears South 0°01'06" West, 1199.90 feet from Station 375+79.34 of said Highway Survey;

Thence South 89°48'46" West, 25.00 feet to a point in the West line of said Section 12 that bears South 0°01'06" West, 1200.00 feet from Station 375+54.34 of said Highway Survey;

Thence North 0°11'14" West along said West line 1325.00 feet, more or less, to THE PLACE OF BEGINNING.

ALSO included that part of the NW¼SW¼ and the E½SW¼ lying North and East of Gravity Lateral of North Side Canal Co., Ltd., and that part of the SW¼SW¼ lying North and East of the "C" Lateral of the North Side Canal Co., Ltd., all in Section 12, Township 10 South, Range 20 East Boise Meridian, Jerome County, Idaho.

ALSO included that part of the NE¼NW¼ of Section 13, Township 10 South, Range 20 East Boise Meridian, lying North and East of the Gravity Lateral of the North Side Canal Co., Ltd.

EXCEPTING THEREFROM the following described tracts:

     Tract No. 1:
A parcel of land in the SE¼NW¼ of Section 12, described as follows:

From the Northwest Section Corner of Section 12, Township 10 South, Range 20 East Boise Meridian, a distance of 2187.6 feet along the West section line of Section 12 on a bearing of South 0°01' West; Thence 1756.3 feet on a bearing of North 87°25' East to THE POINT OF BEGINNING;

From this Point of Beginning, a distance of 172.0 feet on a bearing of North 87°25' East;

Thence a distance of 170.3 feet on a bearing of South 0°05' East;

Thence a distance of 171.8 feet on a bearing of South 89°55' West;

Thence a distance of 162.8 feet on a bearing of North 0°05' West to THE POINT OF BEGINNING.

     Tract No. 2:
Part of the W½NE¼ of Section 12, described as follows:

Beginning at the East Quarter corner for Section 12; Thence South 89°59'38" West, 2196.92 feet; Thence along the Southerly boundary of the NE¼ of said Section 12 to the center of the Northside Canal Company "Northside Main Canal" the TRUE POINT OF BEGINNING;

Thence South 89°59'38" West, 143.26 feet along said boundary;

Thence North 32°42'37" East, 620.34 feet;

Thence North 9°07'14" East, 226.05 feet;

Thence North 5°52'42" West, 1318.85 feet;

Thence North 12°10'06" West, 287.93 feet to the Southerly boundary of frontage road;

Thence East 130.00 feet to the center of the "Northside Main Canal";

Thence along said center line of canal the following courses:

South 12°10'06" East, 287.93 feet;

South 4°13'54" East, 1315.50 feet;

EXHIBIT 2                    Page 67 of 68

South 5°50'27" West, 224.36 feet;
South 29°38'17" West, 600.51 feet to THE TRUE POINT OF BEGINNING.

Tract No. 3:

That part of the SW¼ of Section 12 and that part of the NE¼NW¼ of Section 13, Township 10 South, Range 20 East of the Boise Meridian, Jerome County, Idaho, described as follows:

Beginning at the Southeast corner of Section 12; Thence South 89°49'40" West, 2645.16 feet along the Southerly boundary to the South Quarter corner of Section 12, THE TRUE POINT OF BEGINNING;
Thence South 0°16'08" East, 562.06 feet along the Easterly boundary of NE¼NW¼, Section 13;
Thence North 22°15'00" West, 606.53 feet to the Northerly boundary of Section 13;
Thence North 0°52'09" West, 857.85 feet;
Thence North 0°20'27" West, 894.57 feet;
Thence North 28°39'42" East, 499.12 feet to the Easterly boundary of SW¼, Section 12;
Thence South 0°09'22" East, 2189.59 feet along said Easterly boundary to THE TRUE POINT OF BEGINNING.

PARCEL NO. 2:
TOWNSHIP 10 SOUTH, RANGE 20 EAST OF THE BOISE MERIDIAN,
JEROME COUNTY, IDAHO

Section 12:        A parcel of land located in the SE¼NW¼, more particularly described as follows:

From the Northwest section corner of Section 12, Township 10 South, Range 20 East Boise Meridian, a distance of 2187.6 feet along the West section line of Section 12 on a bearing of South 0°01' West;
Thence 1756.3 feet on a bearing of North 87°25' East to THE POINT OF BEGINNING;
From this Point of Beginning, a distance of 172.0 feet on a bearing of North 87°25' East;
Thence a distance of 170.3 feet on a bearing of South 0°05' East;
Thence a distance of 171.8 feet on a bearing of South 89°55' West;
Thence a distance of 162.8 feet on a bearing of North 0°05' West to THE POINT OF BEGINNING.

EXHIBIT 2                    Page 68 of 68