```
                    UNITED STATES BANKRUPTCY COURT

                        DISTRICT OF IDAHO

                       TWIN FALLS, IDAHO


MILLENKAMP CATTLE, INC.,        )  Bankruptcy Petition
471 North 300 West              )  # 24-40158-NGH
Jerome, Idaho 83338             )
                                )
                                )
Tax ID/EIN: 26-0603892          )  Twin Falls, Idaho
                                )  April 10, 2014
    Debtor.                     )  9:02 a.m. to 10:04 a.m.
. . . . . . . . . . . . . . )
```



```
                        VOLUME I OF I
   PARTIAL TRANSCRIPT FROM BEGINNING OF HEARING INCLUDING THE
             TESTIMONY OF MATTHEW ROBERT McKINLAY
           BEFORE THE HONORABLE NOAH G. HILLEN
              UNITED STATES BANKRUPTCY JUDGE
```



```
COURT RECORDER:                 TRANSCRIPTION BY:

MELANIE BATTLE                  TAMARA A. WEBER, CSR
U.S. District Court             P.O. Box 387
                                Caldwell, Idaho  83606




Proceedings recorded by electronic recording.  Transcript
produced by transcription service.
```

```
APPEARANCES:

For the Debtor:                    MR. MATTHEW T. CHRISTENSEN
                                   Johnson May, PLLC
                                   199 N. Capitol Boulevard
                                   Suite 200
                                   Boise, Idaho 83702

                                   MS. KRYSTAL R. MIKKILINENI
                                   MS. TIRZAH R. ROUSSELL
                                   Dentons Davis Brown
                                   215 Tenth Street
                                   Suite 1300
                                   Des Moines, Iowa 50309

For Metlife Real Estate           MR. RON C. BINGHAM, II
Lending LLC and Metropolitan      Attorney at Law
Life Insurance Company:           3424 Peachtree Road NE
                                   Suite 1600
                                   Atlanta, Georgia 30326

                                   MR. NIKOLAUS F. SCHANDLBAUER
                                   20 F Street NW
                                   Suite 500
                                   Washington, DC 20001

                                   MR. KIMBELL D. GOURLEY
                                   Attorney at Law
                                   P.O. Box 1097
                                   Boise, Idaho 83701

For Rabo AgriFinance, LLC:        MS. SHEILA RAE SCHWAGER
                                   Hawley Troxell Ennis & Hawley, LLP
                                   877 Main Street, Suite 200
                                   P.O. Box 1617
                                   Boise, Idaho 83702

                                   MR. ANDREW SCHOULDER
                                   Attorney at Law
                                   1301 Avenue of The Americas
                                   New York, New York 10019-6022

For Western States Equipment      MR. JON B. EVANS
Company:                          Dorsey & Whitney, LLP
                                   101 S. Capitol Boulevard
                                   Suite 1701
                                   Boise, Idaho 83702-7705
```

```
APPEARANCES:  (Cont'd)

For Conterra Holdings, LLC        MR. JOHN O'BRIEN
                                  Spencer Fane, LLP
                                  1700 Lincoln Street
                                  Suite 2000
                                  Denver, Colorado 80203

                                  MR. ZACHARY FAIRLIE
                                  Spencer Fane, LLP
                                  1000 Walnut
                                  Suite 1400
                                  Kansas City, Missouri 64106

                                  MR SCOTT C. POWERS
                                  Spencer Fane, LLP
                                  10 Exchange Place
                                  Eleventh Floor
                                  Salt Lake City, Utah 84111

For Committee of Corn Silage      MR. MATTHEW W. GRIMSHAW
Growers:                          Grimshaw Law Group, P.C.
                                  800 West Main Street
                                  Suite 1460
                                  Boise, Idaho 83702

For Viterra USA Grains, LLC       MR. DANIEL C. GREEN
and Viterra USA Ingredients,      Racine Olson, PLLP
LLC:                              201 East Center
                                  P.O. Box 1391
                                  Pocatello, Idaho 83204

For Land View, Inc.:              MR. GERY W. EDSON
                                  Attorney at Law
                                  P.O. Box 448
                                  Boise, Idaho 83701

For MWI Veterinarian              MR. AARON ROBERT BELL
Supply, Inc.:                     Evans, Keane LLP
                                  P.O. Box 959
                                  Boise, Idaho 83701

For CNH Industrial Capital        MS. MEREDITH LEIGH THIELBAHR
America, LLC:                     Gordon & Rees - Seattle
                                  701 Fifth Avenue
                                  Suite 2100
                                  Seattle, Washington 98104
```

```
APPEARANCES:  (Cont'd)

For Viserion Grain, LLC:      MR. BRIAN FARIA
                             Sawtooth Law Offices, PLLC
                             1101 West River Street
                             Suite 110
                             Boise, Idaho 83702

For Sandton Capital Partners, MR. RICHARD BERNARD
LLP:                         Attorney at Law
                             1177 Avenue of The Americas
                             41st Floor
                             New York, New York 10036

                             MR. JOHN F. KURTZ
                             Kurtz Law, PLLC
                             910 West Main
                             Suite 364
                             Boise, Idaho 83702

For the U.S. Trustee:        MR. JASON NAESS
                             DOJ - UST
                             550 West Fort Street
                             Suite 698
                             Boise, Idaho  83701
```

I N D E X

RABO AGRIFINANCE WITNESS:                    PAGE    LINE

    McKINLAY, Matthew Robert
Direct Examination by Ms. Schwager           14      11
Cross-Examination by Mr. Christensen         35      17


E X H I B I T S

RABO AGRIFINANCE EXHIBITS:                   PAGE    LINE

Ex. No. 3014 - Draft Bowing Base
    Certificate 2/29/24
        Admitted                             30      9

Ex. No. 3020 - Order Appointing
    Receiver 2/16/24
        Admitted                             17      25

```
 1                    (Proceedings begin.)

 2          COURT:  All right.  We're back on the record.  Case No.

 3     24-40158.  Before we get started this morning, I'm going to

 4     check in with counsel to see if we have any preliminary matters

 5     that we need to address.  I'll start with the debtor, Mr.

 6     Christensen or Ms. Mikkinlineni?

 7          MR. CHRISTENSEN:  Your Honor, at the end of the hearing

 8     yesterday, the Court inquired about cash collateral use.  I have

 9     followed up with our client.  There's one payment that they need

10     to be able to make today for feed to a vendor known as Land

11     View.  So approximately $80,000.  I've discussed that with Met's

12     counsel, Rabo's counsel and Conterra's counsel.

13          The proposal is that the Court just orally enter an

14     order essentially continuing the terms of the interim written

15     order through today with the additional -- that additional

16     payment authorized to be made today but, otherwise, the terms of

17     that interim order would still be in effect through today rather

18     than through yesterday.

19          COURT:  All right.  So just that one $80,000 payment to

20     Land View?

21          MR. CHRISTENSEN:  Approximately 80,000.

22          COURT:  Okay.  Any additional preliminary matters that

23     we need to address?

24          MR. CHRISTENSEN:  I guess I can tell the Court from the

25     debtor's standpoint, we don't have further witnesses to call.
```

1    We may have rebuttal witnesses depending on the testimony that

2    comes from Rabo but, other than that, we are finished with our

3    witnesses.

4         COURT:  All right.  Let me hear from other counsel with

5    respect to the cash collateral issue before we tackle any other

6    preliminary matters.  Counsel for MetLife.

7         MR. BINGHAM:  Your Honor, no opposition to that

8    adjustment to the interim order on behalf of MetLife.

9         COURT:  All right.  Counsel for Rabo.

10        MS. SCHWAGER:  Good morning, Your Honor.  Sheila

11   Schwager for Rabo AgriFinance.  No objection to what Mr.

12   Christensen has proposed.  I would ask that by noon today, we do

13   receive an accounting of any livestock that has been sold

14   because the livestock proceeds were to go into an account in

15   favor of Rabo AgriFinance.

16        And if we could get an agreement as to an inspection of

17   the collateral since the petition date.  We would like to get

18   that coordinated.  Other than that, Your Honor, there's no

19   objection to the same form of order just going through today

20   with that payment.

21        COURT:  All right.  And have you discussed the

22   livestock accounting with the debtor at this point?

23        MS. SCHWAGER:  I have.  I have.  And they have told me

24   that they're contacting the office this morning and we should

25   have it.

1        COURT:  Okay.  All right.  Mr. Christensen, any follow-

2   up comments on that accounting issue?

3        MR. CHRISTENSEN:  I guess just a clarification.  Under

4   the terms of the interim order, the proceeds of the livestock

5   sales weren't to be held in an account for Rabo.  A portion of

6   the DIP loan was to be set aside to be held in an account for

7   Rabo.  So I'd just clarify that.  It's not that the cash needs

8   to be held.  It's already been used to pay the cash collateral

9   payments.

10        MS. SCHWAGER:  And he's absolutely right on that.

11        COURT:  All right.  Do we need to adjust anything with

12   respect to the order orally today in regard to the accounting?

13        MS. SCHWAGER:  In regard to the accounting?  No.  Well,

14   I mean the -- no.  We just would need an accounting of livestock

15   sold through today.

16        COURT:  All right.  And from your perspective, is that

17   required already in the written order?

18        MS. SCHWAGER:  Yes.  Well, except for the date.  But

19   the accounting, it is not expressly stated I don't believe.

20        COURT:  In other words, so Mr. Christensen's asking --

21   I guess the agreement was that we're going to continue the terms

22   of the prior -- the cash collateral order, modify the budget for

23   that approximate $80,000 payment to Land View.  Is there any

24   proposal that you're suggesting that we needed to make to

25   account for -- or to modify that order with respect to the

1   livestock proceed accounting?

2          MS. SCHWAGER:  Yes, Your Honor.  We would just -- not

3   as to the account.  He's exactly right.  It was to be funded

4   from the DIP financing in favor -- issued in favor of Rabo.  But

5   we would like an accounting of any livestock that has been sold

6   so that we know what proceeds were supposed to be going in there

7   from the date of the petition through today's date.  I

8   understand the debtors are working on that but I would like that

9   to be a requirement that that information is provided.

10         COURT:  Okay.  And is there any objection by the debtor

11  as to providing that accounting by noon today?

12         MR. CHRISTENSEN:  No.

13         COURT:  All right.  Mr. Naess, any comments from the

14  U.S. Trustee regarding the cash collateral issue?

15         MR. NAESS:  No.  Thank you, Your Honor.

16         COURT:  Mr. O'Brien.

17         MR. O'BRIEN:  No objection.  Thank you, Your Honor.

18         COURT:  All right.  So consistent with the agreement of

19  the parties then, the Court will orally modify that prior cash

20  collateral order and continue debtor's cash collateral use upon

21  the same terms and conditions set forth therein except that the

22  debtor will be able to make an approximately $80,000 payment

23  through use of cash collateral for feed to Land View.

24         Also require that debtor also provide an accounting of

25  livestock sales to Rabo AgriFinance by noon today  with the

1    parties' comments on the record.

2         All right.  That addresses the cash collateral issue.

3    I understand there's a preliminary issue from Mr. O'Brien?

4         MR. O'BRIEN:  Yes, Your Honor.  Thank you.  I think

5    this is going to largely or substantially take care of

6    Conterra's objection.  I think we have two issues and just to --

7    or two agreements and just to repeat where Conterra is.  It has

8    two loans.  It has the small loan that's otherwise known as the

9    Rooster loan that is secured by the first priority lien on the

10   German Dairy which is an 80-acre parcel.  And then Conterra has

11   the second larger loan otherwise known as the Nez (phonetic)

12   loan that's secured by a second priority lien on the personal

13   property collateral including the livestock and a third priority

14   lien on the balance of the real estate.

15        So just with that background, we have I think two

16   stipulations to largely resolve Conterra's involvement.  First

17   is under either proposal, whether it's Sandton's or Rabo's, the

18   parties agree that Conterra will receive adequate protection in

19   the form of monthly adequate protection payments at the pre-

20   default rate of interest on both loans on and after the April 2,

21   2024, petition date payable monthly by no later than the 10th

22   day of the following month.  And so we'll get those adequate

23   protection payments on both loans at the prepetition default

24   rate.  And so that's the first -- the first resolution.

25        Second stipulation with respect to the German Dairy,

1    Conterra's Rooster loan will retain the first lien on the German

2    Dairy and under either DIP proposal, the DIP lender will have a

3    second lien on the German Dairy.  And then that DIP lender,

4    whoever wins out, will continue or will be in a position to

5    prime Conterra with respect to the balance of the real estate

6    collateral but not the German Dairy.

7            So I hope that makes sense.  It was put together pretty

8    quickly.  Thank you, Your Honor.

9            COURT:  All right.

10           MR. BERNARD:  Your Honor, may I be heard?

11           COURT:  Let me hear from the other parties and I'll

12   call you as well just with respect to the agreement in regard to

13   Conterra first.  I'll start with counsel for MetLife.  Any

14   objections to that proposal?

15           UNIDENTIFIED SPEAKER:  Your Honor, no objection by

16   MetLife to do that Conterra adequate protection (inaudible).

17           COURT:  All right.  Counsel for the debtor.

18           MR. CHRISTENSEN:  We don't have any objection to the

19   proposal.  I just want to clarify.  The interest payments would

20   be paid on the prepetition non-default rate.  Is that correct?

21           MR. O'BRIEN:  That is correct.

22           MR. CHRISTENSEN:  I thought I heard default rate and I

23   just wanted to clarify the non-default rate.

24           COURT:  All right.  Counsel for Rabo?

25           MS. SCHWAGER:  No objection, Your Honor.

```
1              COURT:  Mr. Naess.

2              MR. NAESS:  No objection.

3              COURT:  All right.  And Sandton.

4              MR. BERNARD:  Sandton.

5              COURT:  And remind me of your name.  I know Mr. Kurtz

6    is your local counsel.

7              MR. BERNARD:  Yes, Your Honor.  Richard Bernard, Faegre

8    Drinker, on behalf of Sandton.  I just wanted to clarify.  The

9    adequate protection payment of interest portion, that's an

10   agreement that the debtors made.  They'll include it in their

11   budget.  We're going to fund the budget but we're not

12   affirmatively agreeing to pay -- Sandton's not affirmatively

13   agreeing to directly pay adequate protection payments to

14   Conterra.  Just as a clarification.

15             And then the second part is correct.  We're agreeing

16   that we will not prime German Dairy collateral and that we'll

17   just take the second lien on that.

18             COURT:  All right.

19             MR. BERNARD:  Thank you, Your Honor.

20             MR. O'BRIEN:  And we agree with that (inaudible) then

21   that the debtor is actually the one that needs to make the

22   adequate protection payment.  The points are under either DIP,

23   funding will be available so the debtor can make those monthly

24   payments.

25             COURT:  All right.  Any additional comments with
```

1   respect to this agreement?  All right.  Anything further

2   preliminarily from the debtor?

3          MR. CHRISTENSEN:  No, Your Honor.

4          COURT:  Counsel for MetLife.

5          UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

6          COURT:  Counsel for Rabo.

7          MS. SCHWAGER:  To start?

8          COURT:  Preliminary matters.  Sorry.

9          MS. SCHWAGER:  No preliminary matters.  Sorry.  I was

10  distracted.

11         COURT:  Mr. Naess.

12         MR. NAESS:  No.  Thank you.

13         COURT:  All right.  And I believe we've addressed all

14  the preliminary matters for Conterra.  It looks like we're ready

15  to get started.

16         Mr. Christensen, you indicated the debtor does not have

17  additional witnesses to call.  Does the debtor rest at this

18  time?

19         MR. CHRISTENSEN:  We reserve the right to call rebuttal

20  witnesses but other than that, yes.

21         COURT:  All right.  Counsel for MetLife.

22         UNIDENTIFIED SPEAKER:  No witnesses, Your Honor.

23         COURT:  All right.  Counsel for Rabo?

24         MS. SCHWAGER:  Yes, Your Honor.  Thank you.  I'll call

25  Matt McKinlay.

1          COURT:  Mr. McKinlay, please come on up to the witness

2   stand.  Remain standing and raise your right hand so Ms. Battle,

3   the courtroom deputy, can swear you in.

4                    (MATTHEW ROBERT McKINLAY is sworn.)

5          CLERK:  Thank you.  Please have a seat.  After you're

6   seated, please state your name and spell your last name for the

7   record.

8          WITNESS:  Sure.  Matthew Robert McKinlay,

9   M-c-K-i-n-l-a-y.

10         CLERK:  Thank you.

11                    DIRECT EXAMINATION

12  QUESTIONS BY MS. SCHWAGER:

13  Q.  Thank you, Mr. McKinlay.  Can you provide the Court with

14  your educational background?

15  A.  Sure.  I graduated in 1996 with a Bachelor of Science Degree

16  in finance from the University of Utah.  1999, I graduated with

17  an MBA from the Marriott School of Management at Brigham Young

18  University.  I'm also credentialed as a certified management

19  accountant and certified turnaround professional.

20  Q.  And after obtaining your MBA, where were you employed?

21  A.  I was hired full-time by Target Corporation in 1999.  I had

22  worked as an intern there in the summer of '98 in between my MBA

23  program.  I worked there as a financial analyst and was later

24  promoted to a senior financial analyst.

25  Q.  And did you go somewhere else after Target?

A.  Yes.  About three years later, I was hired by Best Buy
Corporation in Minneapolis as a manager of capital investment
analysis.

Q.  And are you still with Best Buy?

A.  No.  In 2004, I was recruited by Albertsons here in Boise
and worked for Albertsons from 2004 to 2007 working first as the
manager of capital investment analysis and then as the director
of finance planning and analytics.

In 2007, I was hired by a company called DBSI, a real
estate development company.  They filed a Chapter 11 in 2008 and
I was retained by the Chapter 11 trustee in that case to help
administer the bankruptcy on behalf of the estate.  And then
from that point, I became self-employed doing turnaround and
restructuring work from 2008 forward.

Q.  And is that what your current role is, turnaround work and
restructuring?

A.  Yeah.  I'm currently one of a handful of owners of CFO
Solutions, LLC, which does business as Ampleo and we're a group
of finance and accounting professionals and other professionals
that provide consulting services.  My role within the firm, I
head up all of the turnaround and restructuring related projects
of the company.

Q.  And do you have any ag -- agricultural experience?

A.  Yes.  A number.  I've served as court-appointed receiver or
other court fiduciary of several ag businesses including

1  livestock operators, dairies, row crop growers and other ag

2  businesses.  For example, we were the CRO of a 200,000 head

3  swine facility.  We've been receiver of calf ranch facilities.

4  I was the bankruptcy plan agent for a dairy up in Washington.

5  Bankruptcy plan administrator for a potato grower in eastern

6  Idaho.  I know ag fairly well.

7  Q.  And was Ampleo appointed as a receiver over the Millenkamp

8  debtors?

9  A.  It was.

10  Q.  And what duties did you understand you had as a receiver?

11  A.  Well, a receiver's an agent of the court.  It's an

12  independent fiduciary of the court with the purpose to serve the

13  interests of the court and all creditors.  In other words, we

14  didn't have a dog in the fight but we were provided with custody

15  and control of the company to administer the company during the

16  time of insolvency.

17  Q.  And Mr. McKinlay, can I have you turn to Exhibit 3020?

18  There should be a binder there that says RAF exhibits.

19       MS. SCHWAGER:  Would you be able to pull that up for

20  us?

21       UNIDENTIFIED SPEAKER:  Yeah.

22       MS. SCHWAGER:  By the way, I thank you very much for

23  doing that yesterday.  It did help it go a lot faster.

24       WITNESS:  I'm there.

25  BY MS. SCHWAGER:

1    Q.  Do you recognize this document?

2    A.  I do.

3    Q.  What is it?

4    A.  This is the order appointing Ampleo as receiver of

5    Millenkamp and its affiliates.  It was entered February 16,

6    2024, in the state court action.

7    Q.  Do you recall the judge that entered that receivership

8    order?

9    A.  Yes.  It was Judge Miller.

10           MS. SCHWAGER:  And Your Honor, I'd like to move for the

11   admission of the order appointing receiver.

12           COURT:  Any objection?

13           MR. CHRISTENSEN:  Our objection is more of a relevance

14   objection, Your Honor.  I don't know what the receiver order has

15   to do with any of the motions before the Court today.

16           MS. SCHWAGER:  Your Honor, Mr. Millenkamp testified at

17   length yesterday that the receiver had damaged his business,

18   damaged relationships with feeding vendors and was the cause of

19   financial issues.  And this order governs the receivership and

20   the terms that the borrowers were to comply with under a state

21   order and it governed the terms of the receiver and so,

22   therefore, we would submit that it's highly relevant.

23           COURT:  I'll overrule the objection.  Exhibit 3020 is

24   admitted.

25           (Rabo AgriFinance Exhibit No. 3020 admitted.)

1    BY MS. SCHWAGER:

2    Q.  Mr. McKinlay, do you have any ill will to Mr. Millenkamp --

3    well, did you have any ill will to Mr. Millenkamp when Amplea

4    was appointed by the state court as a receiver?

5    A.  Of course not, no.

6    Q.  And do you have any ill will toward Mr. Millenkamp today

7    after going through the receivership process?

8    A.  No.  I'd very much like to see Mr. Millenkamp and his

9    business succeed.

10   Q.  Now, under the terms of the receivership order, did the

11   debtors have the exclusive right to file bankruptcy?

12   A.  Yes.  The court granted Millenkamp with a 60-day exclusive

13   period to file a bankruptcy.

14   Q.  And was the receiver given the authority to file bankruptcy

15   on behalf of the debtors after that period?

16   A.  After the exclusive period, yes, the receiver would have had

17   the authority to file BK -- bankruptcy on behalf of the

18   borrowers.

19   Q.  Now, two weeks into the receivership, had the debtors

20   complied with the receivership order?

21           MR. CHRISTENSEN:  Objection.

22           WITNESS:  No.

23           MR. CHRISTENSEN:  Vague.  If there's a specific term

24   she wants to point to but just generally asking if they had

25   complied with the order is pretty vague.

1              COURT:  Overrule the objection.  Go ahead.

2    BY MS. SCHWAGER:

3    Q.  Go ahead and answer the question.

4    A.  No, they hadn't complied.

5    Q.  And how had they not complied with the state court order?

6    A.  Well, under the order appointing the receiver, Millenkamp

7    was to turn over books, records, bank accounts, mail, provide

8    access to facilities, employees, systems and very few of those

9    were complied with fully.  There was limited access granted but

10   not in the spirit of the order or not as required under the

11   order rather.

12   Q.  And had you hired a consultant named Justin Roloffs

13   (phonetic) as part of the receivership?

14   A.  I had, yes.

15   Q.  And what was -- why did you hire Mr. Roloffs?

16   A.  Well, although I speak dairy somewhat, I'm not a dairy

17   expert.  Justin Roloffs is and so I had hired Justin as the

18   receiver's consultant to come and inform me on how the dairy

19   operation was functioning, to give me some ideas as to what

20   improvements would be made or how he might help the liquidity

21   crisis that we were facing.  And Justin was agreeable to that

22   and had signed an engagement agreement with me to help.

23   Q.  And what happened in regard to Mr. Roloffs?

24   A.  Justin was in the Jerome and Burley area --

25              MR. CHRISTENSEN:  Objection, Your Honor.  This is

1    hearsay.

2           MS. SCHWAGER:  What happened?

3           MR. CHRISTENSEN:  Mr. McKinlay was not present for what

4    happened so he can't testify about what happened.

5    BY MS. SCHWAGER:

6    Q.  As the -- as the person who was in charge of this

7    receivership, were those who were boots on the ground, were they

8    obligated to report to you as to what was occurring?

9    A.  Yes.

10   Q.  And were you -- did you authorize the retention of Mr.

11   Roloffs?

12   A.  I did, yes.

13   Q.  And were you informed that there was an event with Mr.

14   Roloffs where he was precluded from doing the work that you

15   engaged him for?

16   A.  There was.

17          MR. CHRISTENSEN:  Objection.  If he was informed of it,

18   it was hearsay.

19          COURT:  Does the order appointing the receiver appoint

20   Mr. McKinlay specifically as an individual or did it appoint his

21   company?

22          MR. CHRISTENSEN:  His company.

23          COURT:  And was Mr. Roloffs an agent of that company?

24          MR. CHRISTENSEN:  Your Honor, I guess the debtor's

25   position is he was not.  He was not authorized to be employed by

1   Mr. McKinlay under the terms of that order.  So no, we don't

2   believe he was employed as an agent of the company.

3        COURT:  In other words, is Mr. McKinlay testifying as

4   an agent as the entity that was appointed by the receiver and,

5   in that capacity, is he able to testify what happened during the

6   receivership?

7        MR. CHRISTENSEN:  I don't believe he can testify what

8   happened when he was not present for what happened.  If they

9   want to have Mr. Roloffs testify, we're happy to have Mr.

10  Roloffs testify.  Mr. McKinlay was not present for what he's

11  going to testify about.

12       MS. SCHWAGER:  Your Honor, I would submit that this is

13  not hearsay.  This is an event that occurred that affected the

14  state court order and, in fact, it was a proceeding before the

15  state court order which Mr. McKinlay was going to proceed to

16  testify.

17       COURT:  All right.  I'll overrule the objection.  Go

18  ahead.

19  BY MS. SCHWAGER:

20  Q.  What happened in regard to Mr. Roloffs, Mr. McKinlay?

21  A.  Well, I informed Mr. Millenkamp that we had -- that I had or

22  the receiver had retained Mr. Roloffs and that I would

23  appreciate his cooperation as Mr. Roloffs visits the property.

24  Mr. Millenkamp told me that Mr. Roloffs wasn't welcome on the

25  property and that he better not step foot to which I had a phone

 1   call with Mr. Roloffs and said, "Hey, to keep the peace, why

 2   don't you just stay back for now."

 3          He had traveled to be on site and was parked at the

 4   hotel room and decided he would comply with my instruction and

 5   not go on the property but he wanted to get an overview of the

 6   lay of the land.  So he drove around the county roads around the

 7   perimeter of the dairy property.  Mr. Millenkamp spotted his

 8   vehicle and pursued him on I-84 at a high speed which ultimately

 9   culminated in Mr. Roloffs being stopped by Idaho State Patrol.

10   Q.  Now, Ampleo had its attorneys file an emergency motion

11   within the two weeks of the state court proceeding.  Is that

12   correct?

13   A.  That's correct.

14   Q.  And you had filed a declaration in support of that motion;

15   is that correct?

16   A.  That's correct.

17   Q.  As well as Mr. Roloffs had submitted a declaration?

18   A.  That's correct.

19   Q.  So due to the noncompliance that you testified about and the

20   event with Mr. Roloffs, what happened at the hearing -- at the

21   emergency motion hearing?  What did the court rule?

22   A.  Well, we sought a couple things in that -- in that emergency

23   motion -- or in the emergency hearing.  We sought greater

24   compliance with the order.  For instance, the access that we had

25   been provided with the prior two weeks was extremely limited and

restrictive.  We also had not yet been provided with access to

bank accounts which were concerning.  And we also became aware

of the highly liquid state of the company and so we sought a

revision of the order appointing the receiver to remove the

exclusive period by which the debtor may file a bankruptcy.  We

felt like the debtor or the borrower in this case could not last

60 days.

With respect to certain activities where -- with

respect to access, I'll give you an example.  The receiver was

entitled to access to all of the debtor's books and records and

borrower's books and records.  We were provided with log-in

access to some systems that we tunneled into through a system

called TeamViewer.  There was a password that got reset every

night on TeamViewer so each morning as we tried to access the

systems, we had to be provided with a new password.  And

sometimes it took until 2:00 in the afternoon for the Millenkamp

staff to give us that password which highly restricted our

ability to retrieve access.

Further, the systems were -- instead of providing

access to -- there are several cubes of feed and dairy comp, a

number of them, and we had been provided with just a couple for

the dairy operation.  Nothing with respect to the calf ranch

operation for example.

We weren't provided with QuickBooks access to many of

the entities and the access that we did have, again, we were

1    restricted by that TeamViewer access which required a new

2    password each day.

3         We weren't able to download QuickBooks to make a backup

4    copy to use locally.  There were restrictions placed there.  We

5    also -- the borrower banked primarily with Mechanics Bank and we

6    had not been provided with access to those accounts at Mechanics

7    Bank and really were flying blind as to what the cash needs of

8    the company were.

9         And in addition, my team was housed in a milk barn

10   facility.  Granted a very nice milk barn facility but tucked

11   away on the side of the main dairy operation away from

12   employees, away from other offices, away from the computers.

13   And it was pretty clear that we weren't welcome there.  For

14   example, the bathrooms were locked on us, restricting our use of

15   bathrooms to an outhouse that was several hundred yards away

16   outside.  The temperature was kept at 58 degrees inside the milk

17   barn.  And so we wanted to make the court aware that the terms

18   of the order had not been complied with at least during the

19   initial two weeks of the receivership.

20   Q.  And what was the court's response to this emergency hearing?

21   A.  Well, the court effectively admonished Millenkamp to comply

22   with the order.  Verbally asked Millenkamp to comply to grant us

23   with access to bank accounts, to cooperate with us.  He

24   indicated that we were entitled to access the facilities that

25   we'd otherwise been restricted from accessing.  He indicated we

1    were able to talk with employees which we had otherwise been

2    prevented from accessing.

3         He also admonished Millenkamp to sign the necessary

4    paperwork to grant us access to the bank accounts both at

5    Mechanics Bank and Farmers Bank and hinted -- while he didn't

6    grant a revision of the order at that time lifting the

7    restriction on -- or the exclusive period to file a bankruptcy,

8    the Court indicated that it would be willing to consider that in

9    the short-term if necessary.

10   Q.  And did the court set another hearing to determine if the

11   order was being complied with after that hearing?

12   A.  It did.  The court seemed very concerned by the actions in

13   the initial two weeks and set a hearing to ensure that his

14   admonishment was -- or that what he was asking the Millenkamps

15   to do was complied with.

16   Q.  And then on March 15, two weeks later, Ampleo had its

17   attorney file a second status report?  Is that correct?

18   A.  That's correct.

19   Q.  And do you recall that?

20   A.  I do.

21   Q.  And why was this report necessary?

22   A.  Well --

23   Q.  Or request.  I'm sorry.

24   A.  We again -- we had exhausted -- under the order appointing

25   the receiver, the order -- or the act of the receivership

1    provided some liquidity to the estate to the tune of 4 and a

2    half to $5 million.  We exhausted that within the first couple

3    weeks and, at that point, did not have approval for additional

4    financing.

5            The state of the company became very critical at that

6    point and we didn't know, for example, whether we were going to

7    have feed trucks roll the next day.  It was a very delicate

8    situation and we felt like we had a fiduciary duty to inform the

9    court of the delicate state of affairs.

10           And so the next motion that we made laid out, one, what

11   had happened with respect to the access to books, records, bank

12   accounts and those type of things and it also informed the court

13   of the highly liquid state of affairs of the operation.

14   Q.  And when you say the report informed the court of the

15   status, of the access, had it improved at that point?

16   A.  It had improved.  Not completely but there was improvements

17   there.

18   Q.  Now, ultimately, did the court state it was going to reduce

19   the exclusivity period for the debtors to file bankruptcy?

20   A.  Ultimately -- I don't recall specifically except to say that

21   the court indicated that it would be willing to lift the

22   exclusive period about April 2.

23   Q.  And was there -- do you recall if there was a hearing set in

24   state court on April 3?

25   A.  That's right.  There was a hearing set such that had a

1  Chapter 11 filing not occurred, I think the court was willing to

2  lift that exclusivity period.

3  Q.  Now, as the receiver, once the state -- or the receivership

4  order was entered, what had you anticipated occurring with

5  Mr. Millenkamp upon the entry of that order?

6  A.  Well, Mr. Millenkamp is an exceptional operator.  He knows

7  how to operate a dairy and a calf ranch.  We would have liked to

8  have worked very collaboratively and would have welcomed that

9  collaborative approach.  That's what we expected.  We expected

10  compliance with the order.  We expected to have access to books,

11  records, systems, locations, employees.  We would have expected

12  cooperation in our negotiations with feed vendors and equipment

13  suppliers and other vendors to help improve what was a very hard

14  situation.

15  Q.  And did you have that cooperation?

16  A.  No.

17  Q.  Can I have you turn to Exhibit 3014 in that same notebook?

18  A.  I'm there.

19  Q.  And do you recognize this document?

20  A.  I do.

21  Q.  And what is it?

22  A.  This is a borrowing-based certificate.  This was prepared by

23  my team dated February 29, 2024.

24  Q.  And do you know where the information was obtained to create

25  this borrowing-based certificate?

1    A.  I do.

2    Q.  And where was it obtained?

3    A.  It was provided to us by Lisa Nelson, the Millenkamp office

4    manager.

5    Q.  And do you have experience with borrowing basis?

6    A.  Yes.  I've prepared dozens of borrowing basis for dozens of

7    lenders and borrowers.  I'm very familiar with how they work.

8    Q.  At the bottom of this exhibit, it says, "Ampleo references

9    certain feed liens that might be affected."  How did the feed

10   liens affect that certificate -- or the borrowing base?  Sorry.

11   A.  Well, the borrowing base is meant to show what lending

12   capacity or the secured position of, in this case, Rabo

13   AgriFinance and Rabo had agreed to advance on certain assets of

14   the Millenkamp operation and we had understood that certain

15   liens from other feed suppliers and choppers had been perfected.

16   And to the extent those liens stood in front of Rabo, that would

17   have further impaired their -- the borrowing base certificate.

18   It would have impaired Rabo's position or secured position.

19        MS. SCHWAGER:  Your Honor, I'd move for the admission

20   of Exhibit 3014.

21        COURT:  Any objection?

22        MR. CHRISTENSEN:  Your Honor, can I ask a couple of

23   questions in aid of that objection?

24        COURT:  Go ahead.

25        MR. CHRISTENSEN:  At the top of this form, Mr.

1    McKinlay, it says it's a draft.

2            WITNESS:  Yes.

3            MR. CHRISTENSEN:  Was it ever finalized?

4            WITNESS:  No.

5            MR. CHRISTENSEN:  And it was subject to material edits.

6    What were the material edits?

7            WITNESS:  Well, historically, this report had been

8    prepared by the debtor's accounting firm Eide Bailly.  And Eide

9    Bailly would go through a month-end close to post non-cash

10   entries in the debtor's books and records.  Eide Bailly has not

11   performed a month-end close process.

12           But what we did, what my firm did was we took the exact

13   documents that Millenkamp would provide to Eide Bailly or an

14   accounting firm and we went through the same exercise that Eide

15   Bailly did but without the benefit of having effectively a

16   closed period.

17           But upon our information and belief, based on the

18   documents that Millenkamp provided with us -- or to us, we

19   followed the same procedures that Eide Bailly would have in

20   preparing the borrowing base.

21           MR. CHRISTENSEN:  And at the bottom just before the

22   lien language, there's a phrase that says, "Ampleo has not

23   independently verified data presented here and makes no written

24   or implied representation as to its accuracy."  Is that still

25   true?

1          WITNESS:  That's correct.

2          MR. CHRISTENSEN:  So Your Honor, I guess with the

3    caveat that this is a draft that was never finalized, that's not

4    verified -- that is not verified as accurate, we don't object to

5    its admission but I don't know what utility it actually has.

6          COURT:  I understand.  The exhibit's admitted.

7          MS. SCHWAGER:  Thank you, Your Honor.

8          (Rabo AgriFinance Exhibit No. 3014 admitted.)

9    BY MS. SCHWAGER:

10   Q.  Mr. McKinlay, if you turn back one exhibit to Exhibit 3013.

11   A.  I'm there.

12   Q.  If you compare that February 26, 2024, borrowing base to

13   March 31, 2023, borrowing base, what does it indicate as to the

14   personal property collateral position of Rabo?

15   A.  Well, the total collateral in December -- at the end of

16   December 2023 was about 118 million which had a lending value of

17   82.8 million.  Two months later in February of 2024, the total

18   collateral had declined by $8 million to 110.8 million and the

19   borrowing capacity had declined by, what's that, 5 and a half

20   million, from 82.8 to 77.2 million.  At the same time, the loan

21   balance increased from 85.9 million to 90.1 million.

22   Q.  Thank you.  How long was the receivership in place?

23   A.  We were installed February 16 and the automatic stay imposed

24   by the bankruptcy effectively terminated the receivership.  I

25   don't know if the state court action has been terminated but we

1  effectively have been penciled down since April 2.

2  Q.  And after a few state court hearings, were you granted full

3  access to the financials?

4  A.  I don't believe we've ever been provided with full access,

5  no.

6  Q.  What was your understanding of the RLOC collateral position?

7  A.  My understanding with respect to Rabo AgriFinance?

8  Q.  Yeah.  Sorry.  Yes.  I said RLOC.  That's been a defined

9  term we've been using.  I apologize.

10  A.  It was eroding and eroding at a very rapid pace through the

11  receivership both on the numerator side and on the denominator

12  side meaning Rabo was continuing to advance funds so its loan

13  balance was increasing and the collateral value that was

14  securing, in this case, Rabo's debt was deteriorating.

15  Q.  Now based upon what you did review, what is your opinion as

16  to the debtor's financial status?

17  A.  I believe that the debtor is insolvent.  It's unable to pay

18  its debts as they become due and I believe that during the

19  receivership, my estimate was that the business was consuming

20  about $3 million of cash per month meaning the hole was getting

21  deeper.

22  Q.  Was the debtors acting as if they were an insolvent company?

23       MR. CHRISTENSEN:  Objection.  Vague.

24       COURT:  Sustained.  Go ahead and ask a different

25  question.

1    BY MS. SCHWAGER:

2    Q.  In your review and oversight as a receiver, did you believe

3    that the debtors were financially acting as if they were

4    insolvent?

5    A.  No.

6    Q.  Why is that?

7    A.  Well, as a turnaround professional, I'm taught that when a

8    company enters into the zone of insolvency, its fiduciary duties

9    change.  The debtor becomes obligated to act on behalf of the

10   interests of the creditors of the estate rather than the equity

11   holders for example.

12        And Millenkamp was very much in growth mode.

13   Millenkamp was ordering new tractors.  He was committing to

14   custom farmers to farm and plant and cultivate a 2024 crop.  It

15   was -- any efforts that the receiver made to bring cash into the

16   business such as sell nonperforming assets were met with

17   resistance and that's not typical for a borrower that's in an

18   insolvent situation.

19   Q.  Did you see expenses being incurred -- just regular expenses

20   being incurred that you would not normally see in an insolvent

21   situation?

22   A.  Yes.

23   Q.  And what were those?

24   A.  The debtor's facilities were beautiful.  They're white

25   lapped-side dairy facilities, tile floors, beautiful kitchens

1   and we observed that windows were being washed three times a

2   week in those facilities.  The janitors were constantly cleaning

3   the facilities.  There were graders several times a week grading

4   the parking lots of the operations to keep things smooth.

5   Typically in a situation like this, I see companies seek to look

6   for ways to save money, to pare back their expense structure.  I

7   didn't see that here.

8   Q.  Now, you heard Mr. Millenkamp -- you were here yesterday,

9   correct?

10  A.  I was.

11  Q.  And you heard Mr. Millencamp's testimony that the

12  receivership had hurt the relationship with feed vendors.  Did

13  you hear that testimony?

14  A.  I did, yes.

15  Q.  And do you agree with that statement?

16  A.  I vehemently disagree with that statement.

17  Q.  And why is that?

18  A.  Well, the receiver -- I believe that the receiver and

19  Millenkamp were very much confusing the market.  There was --

20  there were mixed signals being sent into the market based on

21  what the receiver was trying to accomplish and the messages or

22  instructions that Mr. Millenkamp was providing those same

23  vendors.

24  Q.  And what would have sent an even -- a same message?  What

25  would you have wanted to occur with Mr. Millenkamp as far as the

1    feed vendors go?

2    A.   I very much would have liked to have worked collaboratively,

3    you know, for the common purpose to keep cows fed, to keep milk

4    produced, to keep employees paid, trucks rolling and those type

5    of things.

6         We would call -- for example, the first couple of days

7    we were installed, my colleague, Glenn Karlberg, who was

8    primarily responsible for negotiating with feed suppliers had a

9    couple phone calls with feed suppliers and was quickly

10   admonished by Mr. Millenkamp for not including him on those

11   calls.

12        And so Glenn began including Mr. Millenkamp on those

13   calls and, for a time, we were working cooperatively although

14   Mr. Millenkamp was very much shaping the message that he wanted

15   communicated to those feed suppliers.

16        Ultimately, the number of calls that we were fielding

17   became impractical to include Mr. Millenkamp on all of those

18   calls but we were communicating messages to feed suppliers such

19   as we're working on a budget that includes a plan to get you

20   paid, that includes a plan to keep feed trucks rolling and the

21   message that Mr. Millenkamp was delivering to the market was

22   very different and was confusing the feed suppliers and who was

23   in charge and it made for a difficult operating situation.

24        The tractors with Western States is a great example.

25   The Millenkamp operation had 43 tractors coming off lease in

1    June of 2023.  I entered into negotiations with Western States

2    and I was concerned as a fiduciary of the business as to whether

3    the company -- whether it was a prudent business decision to

4    enter into a long-term agreement for 43 new replacement tractors

5    knowing that the company was insolvent and questioning whether

6    the company would have the ability to meet its obligations under

7    a new lease for a long-term.

8          Mr. Millenkamp had a call shortly after -- or his

9    counsel instructing Western States that it's full steam ahead.

10    Yes, continue to prepare for the delivery of those 43 tractors

11    and it was very confusing to the market.

12          MS. SCHWAGER:  Thank you, Your Honor.  I have no

13    further questions.

14          COURT:  All right.  Counsel for MetLife.

15          UNIDENTIFIED SPEAKER:  No questions, Your Honor.

16          COURT:  Counsel for the debtor.

17                     CROSS-EXAMINATION

18    QUESTIONS BY MR. CHRISTENSEN:

19    Q.  Mr. McKinlay, good morning.

20    A.  Good morning.

21    Q.  I want to go back a little bit to some of your background.

22    You discussed some of the ag businesses that you've worked with

23    before and we did a deposition earlier where we went through a

24    lot of those specific businesses.

25          You heard Mr. Millenkamp testify yesterday about the

1    five different divisions that his companies essentially run.

2    There's the calf ranch, the beef cattle growing, the dairy, the

3    farming and the trucking all as part of one big enterprise.  Do

4    you remember that testimony?

5    A.  Yes.

6    Q.  Have any of the projects you've worked on in the past

7    encompassed that scope of activity, all five activities in one

8    enterprise?

9    A.  Well, it's typical for a dairy -- a dairy facility to also

10    have a farming operation and a trucking operation, yes.

11    Similarly, it's typical for a calf ranch operation to have a

12    calf ranch operation, a trucking operation and a farming

13    operation, yes.  Yes, I have operated businesses with all five

14    operations.

15    Q.  Can you tell me which projects you worked on that had all

16    five operations in one business?

17    A.  The Mensonides Dairy operation had all five.  A smaller

18    scale.

19    Q.  Okay.  That was my next question.  How many of these that

20    you've worked on had over 100,000 head of cattle?

21    A.  None have had more than 100,000 head of cows.  I have worked

22    on operations with more than 100,000 head of other livestock.

23    Q.  Was the other livestock milking livestock or were they

24    like -- I know there was a pig ranch that you worked on.

25    A.  Yeah.

1   Q.  I'm assuming there wasn't any milking as part of that

2   operation?

3   A.  Not pigs, no.

4   Q.  Okay.  Were any of the projects with large livestock

5   populations milking populations?

6   A.  I've been involved in probably eight or nine other dairies,

7   none as large as Millenkamp.

8   Q.  What's the largest dairy you've worked on before Millenkamp?

9   A.  Probably Mensonides.

10  Q.  And how many head did that dairy have?

11  A.  I think between 10 to 15,000 head.

12  Q.  With regard to the receiver -- the receivership process in

13  the state court, you mention there were three things you went

14  back to the court to get.  One was greater compliance with the

15  order.  The second one was access to bank accounts.  The third

16  was a revision of the order to allow you to file a bankruptcy

17  case rather than the Millenkamps.  Correct?

18  A.  Generally I think that's right.  There may have been

19  additional things but I think you've summarized them.

20  Q.  And those were kind of the broad general categories.  There

21  maybe were specific things within those.

22  A.  Correct.

23  Q.  The bankruptcy filing, you never did get that changed by the

24  court prior to the Chapter 11 cases that we're here for today

25  being filed.  Correct?

1    A.  Right.

2    Q.  The access to the banking accounts, soon after the

3    receivership was ordered, you or other Ampleo people were copied

4    on e-mails that were sent to the bank requesting they be added.

5    Correct?

6    A.  Correct.

7    Q.  And ultimately, after the state court ordered it be done

8    again, you were added to all of the bank accounts, correct?

9    A.  After Millenkamp -- after Mr. and Mrs. Millenkamp signed the

10   appropriate paperwork, we were added to the Mechanics Bank

11   accounts, yes.

12   Q.  And the access to the facilities that you sought, you

13   ultimately got that as well.  Correct?

14   A.  Ultimately, yes.

15   Q.  So two of the three things you went back to the state court

16   for you received, correct?

17   A.  We got access to those other things toward the end of March,

18   yes.

19   Q.  Were you -- on the bank accounts, were you also offered by

20   Ms. Nelson, essentially the bookkeeper, the controller for the

21   company, to use her log-ins and passwords in the meantime?

22   A.  The first day, she -- or the second day, she offered to

23   allow us to log in that time to the Mechanics bank account with

24   her log-in credentials so we could download bank statements.

25   Q.  And are you aware that she continued making that offer to

```
 1    Ampleo personnel for weeks after that?

 2    A.  I'm not aware of subsequent offers for that, no.

 3    Q.  Did you -- you reviewed the documents that were filed in the

 4    state court proceeding, the receivership proceeding?

 5    A.  I did.

 6    Q.  Including a declaration from Ms. Nelson indicating that she

 7    had offered multiple times to let her log-ins be used?

 8    A.  I saw that in her declaration.  She had never made that

 9    offer to me.

10    Q.  But you don't dispute she made it to Ampleo personnel?

11    A.  I don't dispute that she made that declaration.  I have no

12    firsthand knowledge that she offered that to other Ampleo

13    personnel.

14    Q.  Okay.  How many Ampleo personnel were working on the

15    project?

16    A.  I think we had seven involved.

17    Q.  Do you know if those seven people requested the same thing

18    multiple times from Ms. Nelson?

19    A.  Possibly.

20    Q.  In March -- you testified mid March that the state of the

21    company was critical.  That's why you went back to the state

22    court again, correct?

23    A.  That's correct.

24    Q.  And in mid March, you were aware that the Millenkamp

25    entities and Rabo were negotiating potential DIP terms and plan
```

1  support agreements in a bankruptcy case, correct?

2  A.  I was aware of those discussions, yes.

3  Q.  You knew that Millenkamp people were actively preparing the

4  bankruptcy filing at that time?

5  A.  We had been told that, yes.

6  Q.  Okay.  You had been involved in discussions with candor

7  related to budgets for the bankruptcy case, correct?

8  A.  I'll also note Mr. Millenkamp told me that there's no

9  expletive way he's ever filing for bankruptcy and I was taking

10  him at his word.

11  Q.  You're also aware he filed a declaration with the state

12  court under oath saying he was filing bankruptcy, correct?

13  A.  Correct.

14  Q.  So which word were you believing?

15  A.  That's a great question.

16  Q.  Okay.  You had mentioned certain things that indicated the

17  debtor wasn't acting like an insolvent debtor.  One of them you

18  said you proposed selling nonperforming assets.

19  A.  Yes.

20  Q.  What did you propose be sold?

21  A.  Whenever I come into a situation -- an insolvent situation,

22  there's usually nonperforming assets.  For example, we're

23  currently receiver of a multi-unit restaurant chain.  As we look

24  at the chain with 20 or so locations, five of them are

25  unprofitable and we're asking ourselves the question would the

1    estate -- would the position of the estate improve by closing

2    those five locations.  Or, you know, with a wholesaler.  Are

3    there items being sold that have been sitting on the shelves for

4    years that aren't benefitting the estate?  They're nonperforming

5    inventory.

6           So one of the things that we looked at here or intended

7    to use Justin Roloffs to look at here was what are the

8    nonperforming assets of the estate.  It's typical in a dairy

9    situation that you've got cows that are on their fourth, fifth

10   and sixth lactation cycles that aren't producing.  They're

11   dragging down the average production of the herd and we ought to

12   consider the value or the benefit to the estate, the short-term

13   liquidity that would come by selling some of those nonperforming

14   assets.  Similarly perhaps --

15   Q.  Let me interrupt you just a bit.  My question was what did

16   you propose to Millenkamp to sell?  Can you tell me what was

17   proposed that he refused?

18   A.  We proposed that he sell beef steer.  We proposed that he

19   stop purchasing baby animals.  We proposed that we bring Justin

20   Roloffs in to help us evaluate what -- which of the replacement

21   herd or milk cows should be sold.

22   Q.  So the proposal to sell beef steer, there were beef steer

23   sold.  Correct?

24   A.  Not to the extent that we would have liked to have seen.

25   Q.  And if the beef steer had been sold, where would those

1  proceeds have gone?

2  A.  60 percent -- the agreement from the financing support

3  agreement would have provided that 60 percent would have gone to

4  Rabo AgriFinance, 40 percent would have come to the estate.

5  Q.  And that agreement was part of the receivership order

6  itself, correct?

7  A.  I don't recall if it was in the order or whether it was

8  pursuant to a separate agreement but they were entered about the

9  same time.

10  Q.  Okay.  Was there anything else that you proposed to

11  Mr. Millenkamp to sell?

12  A.  Well, the restrictions that were imposed upon us for access

13  to books, records didn't enable to us to make a deep analysis --

14  Q.  So no.

15  A.  -- on what could be sold.

16  Q.  So there wasn't any other proposals that he refused?

17  A.  Aside from those three that we've discussed here, no, not

18  that I can recall.

19  Q.  Okay.  Do you recall the receiver order requiring both

20  Mr. Millenkamp and yourself be involved in communications with

21  vendors and farmers and dairy buyers and that sort of thing?

22  A.  I recall -- if we want to the turn to the order, we can read

23  the language together.  I recall that there was to be some

24  collaboration there.  I don't recall the specific language.

25  Q.  So if we go to Exhibit 3020, page 13 -- well, actually page

1   12.

2   A.  I'm there.

3   Q.  Page 12, scroll down a little bit to the bottom paragraph.

4   This bottom paragraph starts what's known as the operation

5   agreement that was in that receiver order.  Correct?

6   A.  That's correct.

7   Q.  And if you'll go to the next page, the continued paragraph.

8   On that first line, there's a sentence that starts, "For so long

9   as the operation agreement is in effect --" which what was your

10  understanding on how long the operation agreement was to be in

11  effect?

12  A.  It was the 60-day exclusivity period.

13  Q.  Okay.  So as long as we're still in the pre-bankruptcy 60-

14  day period, the operation agreement's in effect.  Correct?  So

15  continuing that line, "The receiver and Mr. Millenkamp shall

16  jointly engage and communicate with milk customers, feed

17  vendors, farmers, other creditors and stakeholders."  Correct?

18  A.  Correct.

19  Q.  So when Mr. Millenkamp said, "I need to be involved in those

20  communications you're having with the vendors," he was asking

21  you to comply with the order.  Correct?

22  A.  I don't see it that way.

23  Q.  Okay.  Ultimately, the state court -- I think essentially

24  both parties brought this issue to the state court and said

25  that's not really working, Judge, and essentially agreed that

1   communications could happen without one another.  Correct?

2   A.  That sounds right.  I don't recall specifically the court

3   providing those instructions but it wouldn't surprise me if we

4   went back through the record and found that.

5   Q.  And I'll represent there wasn't any order -- written order

6   from the state court judge that said.  That was an -- it was

7   just sort of inherent in that discussion at the hearing that

8   day.

9   A.  That's fair.

10  Q.  Now, can we go to Exhibit 3014?  This is that draft

11  borrowing base that you put together.  If you'll scroll in there

12  down to -- not that far.  Right there.  On the "other than

13  cattle borrowing base," there's a producer payables line there

14  for $40,000.  Do you see that?

15  A.  $40 million, yes.

16  Q.  Sorry.  $40 million.  The lien creditors that you mention in

17  the footnote at the bottom are included in that 40 million,

18  correct?

19  A.  That's correct.

20  Q.  So the fact that they have liens wouldn't otherwise adjust

21  the numbers on this sheet, correct, because they're already

22  accounted for?

23  A.  I don't think that's accurate.

24  Q.  Okay.  What would be accurate?  If the amount owed to them

25  is already included in the deduction, what impact would the fact

1   that they have a lien have on the bottom line number?

2   A.  Yeah.  Let me strike that.  I think that is right.  Because

3   the advance percentage is reduced by 100 percent, I think your

4   statement is right.

5   Q.  Okay.  But then with regard to the Western States lease you

6   mentioned at the end, what was it that was being leased from

7   Western States?

8   A.  There were 43 roughly tractors.  These were primarily used

9   to haul feed and manure across the --

10  Q.  So they're loaders.

11  A.  Loaders.

12  Q.  Correct?

13  A.  Yes.

14  Q.  Tractors is a very broad term.  I'm trying to depict exactly

15  what this was.

16  A.  Yeah.

17  Q.  Loaders you said used to haul feed and remove manure,

18  correct?

19  A.  That's my understanding.

20  Q.  In other words, the loaders are what's lifting the feed into

21  the feed trailers.  They're not actually hauling the feed to the

22  pens, correct?

23  A.  Correct.

24  Q.  And removing the manure from the pens.

25  A.  That's correct.

1  Q.  Would you characterize those as necessary to continuing the

2  operation?

3  A.  I would character some of those as necessary.

4  Q.  Okay.  What was Western State's position at the time the

5  negotiations were happening regarding those loaders that were

6  present?

7  A.  They were threatening to and had begun to pick them up from

8  the facility.

9  Q.  Because the existing lease hadn't been paid, correct?

10  A.  They were several months in arrears.  Correct.

11  Q.  Okay.  And you -- your concern was the ability to continue

12  servicing that lease, correct?

13  A.  Yes.

14  Q.  What concern did you have for the ability to continue to

15  feed and clean up after the cattle?

16  A.  I had concern as to whether 43 were necessary.  I had

17  concern as to whether several year -- whether signing a lease

18  that would obligate the company for millions of dollars of cash

19  that we didn't have a means to pay was impairing the existing

20  creditors further.  I felt it was improper.  I felt it was

21  fraudulent to enter a lease agreement at the expense of other

22  creditors without a known ability to repay.

23  Q.  What would the impact on the creditors be if the cattle

24  didn't survive?

25  A.  It would be devastating.

1    Q.  And that didn't play a concern?

2    A.  It played a huge concern.

3    Q.  What explorations did you make to find a replacement for

4    those loaders?

5    A.  We had several discussions with Western States as to what we

6    could do to continue to operate the existing tractors without

7    entering into a long-term lease agreement.

8    Q.  And were any of those fruitful?

9    A.  And we considered whether -- whether we needed 43.  Could we

10   get by with 25?  Those discussions were fruitful but they were

11   also undermined by discussions that were occurring at the same

12   time with the message that it's full steam ahead.  Let's keep

13   going.  So ultimately, they didn't bear fruit because there were

14   mixed signals in the market.

15   Q.  Okay.

16           MR. CHRISTENSEN:  Your Honor, that's all I have.

17           COURT:  Thank you, Mr. Christensen.  Cross-examination

18   by the United States Trustee?

19           MR. NAESS:  No.  Thank you, Your Honor.

20           MR. O'BRIEN:  None from Conterra.

21           COURT:  All right.  Any redirect?

22           MS. SCHWAGER:  No redirect.  Thank you, Your Honor.

23           COURT:  You may step down.  Thank you.

24           WITNESS:  Thank you.

25                   (Requested portion ends.)

1         I, court-approved transcriber, certify that the

2    foregoing is a correct transcript from the official electronic

3    sound recording of the proceedings in the above-entitled matter.

4

5

6     /s/ Tamara A. Weber          4/14/24

7    Signature of Approved Transcriber      Date

8

9     Tamara A. Weber

10   Typed or Printed Name