Sheila R. Schwager, ISB No. 5059
Brent R. Wilson, ISB No. 8936
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5261
Email: sschwager@hawleytroxell.com
    bwilson@hawleytroxell.com

Andrew J. Schoulder (admitted pro hac vice)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com

Attorneys for Rabo AgriFinance LLC

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF IDAHO

|  |  |
|---|---|
| In re | Chapter 11 |
| MILLENKAMP CATTLE, INC., *et al.,* | Case No. 24-40158 (NGH) |
| Debtors.[1] | (Joint Administration Requested) |

### THIRD SUPPLEMENT TO RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION

---

[1] The Debtors in the Chapter 11 Cases along with the last four digits of their respective tax identification number or registration number in the applicable jurisdiction are: Millenkamp Cattle, Inc. (3892); Idaho Jersey Girls LLC (4467); East Valley Cattle, LLC (8613); Millenkamp Properties, L.L.C. (4003); Millenkamp Properties II LLC (7719); Millenkamp Family LLC (8279); Goose Ranch, LLC (N/A); Idaho Jersey Girls Jerome Dairy LLC (3431); Black Pine Cattle LLC (N/A); and Millenkamp Enterprises LLC (N/A). The location of the Debtors' service address for purposes of the Chapter 11 Cases is 471 N 300 W., Jerome, Idaho 83338.

Rabo AgriFinance, LLC, in its capacity as agent and lender ("**RAF**"), hereby files this Third Supplement to RAF's *Omnibus Objection to Emergency Motion Authorizing the Debtors to Obtain Post-Petition Financing and Granting Adequate Protection (Dkt. No. 24)* ("**Sandton DIP Financing**"), filed as Docket No. 81 on April 3, 2024, as supplemented by the Supplement thereto filed on April 4, 2024 (Dkt. No. 99) (the "**First Supplement**"), as further supplemented by the Second Supplement thereto filed on April 8, 2024 (Dkt. No. 131) (the "**Second Supplement**" and collectively, the "**Objections**"), and in objection to that *Notice of Preferred Post-Petition Financing Proposal (Dkt. No. 120)* (the "**Priming DIP Facility Notice**"), and in support thereof states as follows:[2]

On April 11, 2024, the Debtors filed their *Supplement to Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing; (B) Granting Adequate Protection for Pre-Petition Secured Creditors; and (C) Setting a Final Hearing* (Dkt. No. 170) (the "**DIP Supplement**"). Attached to the DIP Supplement as Exhibit A was the proposed Credit Agreement with Sandton Capital Solutions Master Fund VI, LP (the "**Proposed Sandton DIP Agreement**") and attached as Exhibit B, a revised proposed interim DIP Order (the "**Proposed Interim DIP Order**"). RAF respectfully submits that the Proposed Sandton DIP Agreement and order do not remedy the objections raised to the Sandton DIP Financing.

1. **The Non-Economic Considerations are Illusory**

Throughout the hearing on April 9 and April 10 (the "**Interim DIP Hearing**"), the Debtors repeatedly argued that the Sandton financing proposal provided for a an "exit option", which the Debtors called a key "non-economic consideration." Yet, during the Interim DIP Hearing, RAF

---

[2]    Capitalized terms used but not defined in this second supplement to the Objections shall have the meanings ascribed to them in the Objections.

elicited testimony from Mr. Millenkamp and Ms. Kati Churchill, demonstrating that this exit option is illusory, as the proposed DIP Terms indicated there was no definitive agreement by Sandton as to an exit option. Yet, the Debtors continued to insist that this Court should defer to the Debtors' business judgment in selecting a financing proposal that is 2.5x more expensive than the Alternative Rabobank Proposal. When pressed for responses in regard to the competing financing proposals, Mr. Millenkamp - shareholder and essentially chief executive officer - denied knowledge or recollection of key deal provisions with respect to the Proposed DIP Agreement and the Alternative Rabobank Proposal. Yet, Mr. Millenkamp requests that the Court defer to his business judgment in selecting the Sandton proposal.

The Proposed Sandton DIP Agreement does not remedy the objection to the Debtors' inability to demonstrate how the Debtors will repay the proposed Sandton financing, a material factor in determining whether RAF is adequately perfected if primed by the Sandton DIP Financing. *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 883 (Bankr. E.D. Pa. 2017) ("Even if the court gave "credence to the [debtor's] speculative projections," it was "clear that the [proposed financing] will not shore up the floundering enterprise" as the debtor could not account "for how the loan [would] be repaid" at maturity."); *In re Timber Products, Inc.*, 125 B.R. 433, 440 (Bankr. W.D. Pa. 1990) (finding that debtors had fail to carry burden on adequate protection as to oversecured creditor when repayment "was speculative in light of the absence of an operating history and is inconsistent with industry averages and performances."); *In re Shaw Industries, Inc.*, 300 B.R. 861, 863-64 (Bankr. W.D. Pa. 2003) (denying proposed financing where the debtors' industry was in an unprecedented downturn, debtors were operating at a loss, and structural issues in the industry were unlikely to abate in the near future). Because priming has grave consequences to the creditor that is being primed, courts must be "particularly cautious when evaluating whether

the subordinated creditor is adequately protected." *Stoney Creek*, 364 B.R. at 890; *In re Tempe Land Co., LLC*, 2009 WL 1211622 (Bankr. D. Ariz. May 1, 2009) (denying DIP financing priming lien on an "indubitable equivalent" adequate protection basis, noting that the court was not persuaded by the debtor's projections of an increase in value of the property secured by the primed liens, and noting that the DIP loan proposed proceeds were to largely go to lender fees and interest reserves, which did not benefit the project securing the loans).

The Debtors rely upon the purported ability with Sandton to convert some or all of the obligations into exit financing, but that is not what the term sheet stated, nor what the Proposed Sandton DIP Agreement states.

Under section 8.01(j)(ii) of the Proposed DIP Agreement, an Event of Default will occur upon "the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Debtor, **unless such plan or disclosure statement contains provision for the payment in full of the Obligations on or prior to the Maturity Date** (an "**Approved Plan**")." Proposed DIP Agreement, Dkt. No. 170, Ex. A, § 8.01(j)(ii) (emphasis added). In their closing argument, the Debtors attempted to distinguish the Sandton proposal and the Alternative Rabobank Proposal by pointing to Rabobank's requirement that the debtor-in-possession obligations be paid in full as a condition to an acceptable plan of reorganization. Yet, the Proposed DIP Agreement requires the identical treatment. Moreover, the amorphous "exit option" is limited to a single sentence in the Proposed DIP Agreement that is buried within section 2.13. The provision is no more committal than it was in Sandton's term sheet, stating, "The Lender in its **sole discretion may elect to convert** some or all of the Obligations into exit financing in connection with a Reorganization Plan. Proposed DIP Agreement, Dkt. No. 170, Ex. A, § 2.13 (emphasis added).

The foregoing provisions run entirely counter to the Debtors' position that a key non-economic consideration is Sandton's willingness to convert the proposed Revised Priming DIP Facility into an exit facility. As argued at the Interim DIP Hearing, and now evidenced by the Proposed DIP Agreement, the non-economic consideration is illusory.

The other non-economic factor referenced by the Debtors was a speculative intercreditor dispute if Rabobank, was the DIP lender.  Yet, this Court is more than able to evaluate and timely address a fully integrated agreement of which Rabobank is not even a party, just as the state Receiver court did when MetLife raised various issues.  Further, if the parties to the contract, RAF and MetLife, determined that there was an issue to be litigated amongst themselves, the proper venue and jurisdiction for that contract dispute is in state court.

As set forth in the Objections and demonstrated to this Court, the Debtors have failed to carry their burden to demonstrate the wherewithal or a plan to repay the obligations arising under the Proposed DIP Agreement, as well as the RLOC Facility. For the reasons set forth in the Objection and herein, RAF respectfully submits that it is not adequately protected if primed by Sandton and therefore requests that the Court deny the DIP Motion.

## 2. **The Entire Fairness Standard Is Relevant and Not Met.**

The Debtors argued that deference should be given to the Debtors' business judgment in selecting debtor-in-possession financing.  However, RAF respectfully submits that under well-established law, the entire fairness standard must be taken into account. *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (applying entire fairness standard in analyzing a proposed DIP financing which would inure to the economic benefit of the Debtors' owner); *In re Hoku Corp.,* 554 B.R. 901, 913 (Bankr. D. Idaho 2016) (applying entire fairness standard).  Once the entire fairness standard is triggered, the board has the burden to demonstrate that the transaction

is inherently fair to stakeholders by demonstrating both fair dealing (i.e., process) and fair price. *Brown v. Brewer*, No. CV06-3731-GHK SHX, 2010 WL 2472182, at *3 (C.D. Cal. June 17, 2010) ("A showing of entire fairness requires proof that the transaction is the product of both fair dealing and fair price.)

Mr. Millenkamp directly and indirectly, though his wife (a co-borrower under the RLOC Facility) and trusts (also-co-borrowers under the RLOC Facility), controls 100% of the Debtors' equity. Millenkamp Decl. ¶ 1-4. Through Mr. Millenkamp's testimony and the testimony of Ms. Kati Churchill, it is clear that Mr. Millenkamp is responsible for making all of the Debtors' business and corporate decisions. Consequently, the Debtors' request to enter into the Proposed DIP Agreement should be reviewed under the entire fairness standard.[3]

At the Interim DIP Hearing, RAF established that the Debtors did not even attempt to negotiate with Rabobank and it was clear that neither Mr. Millenkamp nor his financial advisor had read one of the four Rabobank proposals. There was no process, and here there can be no question that the Sandton proposal is 2.5x more expensive than the financing offered by Rabobank, which affects all of the creditors of the Bankruptcy Estate.

RAF respectfully submits that the Debtors did not select the Sandton proposal in the exercise of their fiduciary duties to the stakeholders. Rather, the evidence at the Interim DIP Hearing demonstrated that Mr. Millenkamp's grudge against RAF is what led the Debtors to their decision to choose Sandton over the Rabobanks' proposals. However, there is no precedent supporting that an equity owner's adverse feelings against a lender is sufficient to satisfy the entire fairness doctrine, let alone the business judgment standard.

---

[3] Idaho law requires objectivity from directors, imposing liability in part when challenged conduct was the result of "[a] lack of objectivity due to the director's familial, financial …business relationship … or a lack of independence…". Idaho Code Ann. § 30-29-831(a)(2)(iii) (West).

### 3. **Interim DIP Priming is Not Warranted.**

To the extent that this Court is inclined to approve the DIP Motion on an interim basis, RAF respectfully requests that the Court deny the Debtors request to grant priming liens during the interim period. The Debtors are not seeking a nominal amount of financing during the interim phase. Rather, the Debtors are seeking to subordinate RAF's first priority liens by $25 million on an interim basis. Courts have held that proposed adequate protection is the indubitable equivalent of a secured creditor's interest in property if "there is no reasonable doubt but that the [creditor] will receive the full value of what it bargained for when it made the contract with the debtor." *In re Cady*, No. 06-00502, 2007 WL 2215384, *3 (Bankr. D. Idaho July 30, 2007) (citing *In re Wiersma*, 03.1 I.B.C.R. 42, 49 (Bankr. D. Idaho 2003);[4] *see also In re November 2005 Land Inv'rs, LLC*, 636 Fed. App'x at 726. In this case, RAF bargained for a first priority lien position, in personal property, which is readily able to be liquidated in contrast to a restricted junior lien in real property. Based on the evidence at the Interim DIP Hearing, there *is* reasonable *doubt* that RAF will receive the full value of what it bargained for when it made the contract, if primed by Sandton on the personal property interest.

If the interim priming DIP is granted[5], RAF and other stakeholders would be irreparably harmed given the *material amount of debt* that the Debtors are proposing to subordinate RAF to at this interim, emergency, stage. All of the interested parties, including RAF, are entitled to have sufficient due notice and time to address this extraordinary requested relief. Indeed, it is for this

---

[4]  While *In re Cady* discussed the indubitable equivalent standard with respect to confirmation, courts in the Ninth Circuit have found "there is every reason to construe the same words to mean the same thing in both § 361 and § 1129 because both sections address how to assure that the present economic values of secured claims are not adversely affected." *In re Hollister*, 628 B.R. 154, 158 (Bankr. C.D. Cal. Mar. 8, 2021)

[5]  If financing is approved on an interim basis, RAF requests that the Debtors revise the agreement to include the revisions reflected in **Exhibit A**, which RAF submits is a benefit to the Debtors' estates.

reason, among others, that priming liens are rarely, *if ever*, granted in this District on an interim

basis.  LBR, Appendix I (b)(5).

WHEREFORE, for the reasons set forth herein, in the Objections (as supplemented), and

the evidence presented at the Interim DIP Hearing, RAF respectfully requests that this Court deny

the DIP Motion.

Dated: April 15, 2024                    Hawley Troxell Ennis & Hawley LLP

Sheila R. Schwager, ISB No. 5059
Attorneys for Rabo AgriFinance LLC

59797.0007.17053661.2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of April, 2024, I electronically filed the foregoing THIRD SUPPLEMENT TO RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| Krystal R. Mikkilineni | krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | tirzah.roussell@dentons.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Jon B. Evans | evans.jb@dorsey.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine Patrice Reynard | janine@averylaw.net |
| Sheila Rae Schwager | sschwager@hawleytroxell.com |
| Brent Russel Wilson | bwilson@hawleytroxell.com |
| Zachary Fairlie | zfairlie@spencerfance.com |
| John O'Brien | jobrien@spencerfane.com |
| Gery W. Edson | gedson@gedson.com |
| Aaron Bell | abell@evanskeane.com |
| Brian Faria | brian@sawtoothlaw.com |
| Robert A. Faucher | rfaucher@hollandhart.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| Karyn Lloyd | klloyd@grsm.com |
| James Justin May | jjm@johnsonmaylaw.com |
| Rhett Michael Miller | rmiller@magicvalley.law |
| Robert E. Richards | robert.richards@dentons.com |
| Holly Roark | holly@roarklawboise.com |

Evan Thomas Roth                     evan@sawtoothlaw.com

Meredith Leigh Thielbahr            mthielbahr@grsm.com

John F. Kurtz, Jr.                          jfk@kurtzlaw.com

Matthew A Sturzen                     matt@shermlaw.com

Cheryl Rambo                            cheryl.rambo@isp.idaho.gov

James Niemeier                          jniemeier@mcgrathnorth.com

Jason Ronald Naess                    Jason.r.naess@usdoj.gov

John D Munding                         john@mundinglaw.com

Zachery J McCraney                   ZJMcCraney@hollandhart.com

Jed W. Manwaring                      jmanwaring@evanskeane.com

Laura E Burri                             lburri@morrowfischer.com

Morton R. Branzburg                  mbranzburg@klehr.com

Aaron Robert Bell                      abell@evanskeane.com

And any others receiving cm/ecf notices

_____

Sheila R. Schwager

# EXHIBIT A

resulting in a future economic benefit to such Person, and that are required to be capitalized in accordance with GAAP.

"**Capital Lease Obligations**" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve Out**" has the meaning specified in the DIP Orders.

"**Case**" or "**Cases**" has the meaning specified in the recitals to this Agreement.

"**Cash and Cash Equivalents**" means the Permitted Investments described in clauses (a) through (h) of the definition of Permitted Investments.

"**Cash Collateral Motion**" means the *Emergency and Continuing Motion for Interim and Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and Setting a Final Hearing* filed by Debtors with the Bankruptcy Court on April 2, 2024 seeking an order of the Bankruptcy Court authorizing, among other things, the Debtors' use of Cash Collateral.

"**Cash Collateral Order**" means (a) that certain *Interim Order Granting Debtors' Emergency Motion for Authorization to use Cash Collateral and to Schedule a Final Hearing* entered by the Bankruptcy Court on April [   ], 2024, (b) that certain *Second Interim Order granting Debtors' Emergency Motion for Authorization to use Cash Collateral* entered by the Bankruptcy Court on April [12], 2024 and (c) any final order entered by the Bankruptcy Court pursuant to the Cash Collateral Motion.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to

4

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Perfection Certificate**" shall mean that certain perfection certificate, executed and delivered by each Borrower in favor of the Lender in accordance with Section 6.20 hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Permitted Disposition**" means any of the following:

    (a)    Dispositions of Inventory (including livestock, subject to the DIP Orders) in the ordinary course of business;

    (b)    non-exclusive licenses and sub-licenses of Intellectual Property of a Borrower or any of its Subsidiaries in the ordinary course of business;

    (c)    Dispositions of Equipment in the ordinary course of business that is substantially worn-out, damaged, obsolete or, in the judgment of a Borrower, is no longer useful or necessary in its business or that of any Subsidiary and is replaced with similar property having at least equivalent value;

    (d)    Dispositions among the Borrowers or by any Subsidiary to a Borrower;

    (e)    Dispositions by any Subsidiary which is not a Borrower to another Subsidiary that is not a Borrower;

    (f)    Dispositions of Accounts in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy, workout or similar proceedings, to the extent approved by the Bankruptcy Court;

    (g)    Dispositions consisting of short-term rentals of Equipment to its customers in the ordinary course of business;

    (h)    the granting of Permitted Encumbrances;

    (i)    any involuntary loss, damage or destruction of property;

    (j)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

    (k)    (i) the lapse of registered patents, trademarks, copyrights and other intellectual property of any Borrower or any of its Subsidiaries that are, in the reasonable business judgment of such Borrower or such Subsidiary, no longer material to, or no longer used or useful in or not economically desirable for, the business of such Borrower or such Subsidiary or (ii) the abandonment of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business, so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights and (B) such lapse is not materially adverse to the interests of the Borrowers and their Subsidiaries,

17

(d)    <u>Reduction of Commitments</u>.  The Initial Term Loan Commitment shall be automatically and permanently reduced to zero on the date of the Borrowing of the Initial Term Loan.  The aggregate Delayed Draw Term Loan Commitment shall be automatically and permanently reduced to zero on the Maturity Date. The Commitments shall terminate on the date that is five (5) Business Days after the date hereof if the Closing Date has not occurred by such date.

**2.02**    *Borrowings of Loans.*

(a)    Each Borrowing of Loans shall be made upon the Borrowers' irrevocable notice to the Lender, which may be given by telephone. Each such notice must be received by the Lender not later than 11:00 a.m. (i) on the Business Day of the Borrowing of the Initial Term Loans, and (ii) seven Business Days prior to the requested date of the Borrowing of the Delayed Draw Term Loans (unless waived by the Lender). Each telephonic notice by the Borrowers pursuant to this <u>Section 2.02(a)</u> must be confirmed promptly by delivery to the Lender of a written Committed Loan Notice appropriately completed and signed by a Responsible Officer of the Borrowers. Each Borrowing of Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof <u>(or, if the then available Commitment is less than $5,000,000, the then remaining Commitment amount)</u>. Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Loans to be borrowed.

(b)    The Lender, without the request of the Borrowers, may advance any interest, fee, service charge (including direct wire fees), Lender Expenses, or other payment to which the Lender is entitled from the Borrowers pursuant hereto or any other Loan Document and may charge the same to the Loan Account. The Lender shall advise the Borrowers of any such advance or charge promptly after the making thereof. Any amount which is added to the principal balance of the Loan Account as provided in this <u>Section 2.02(b)</u> shall bear interest at the interest rate then and thereafter applicable to the Loans.

**2.03**    *Repayment of Loans.* The Borrowers shall repay to the Lender the aggregate principal amount of all Loans outstanding on the Maturity Date.

**2.04**    *Extension of Maturity Date.* Upon written request of the Borrowers not later than 30 days prior to the Maturity Date, the Lender may approve one extension of the Maturity Date for a successive three-month period. Any such extension shall not be effective unless the Lender (a) provides written consent to such extension, which may be withheld in its sole and absolute discretion and (b) receives payment of the Extension Fee.  If the Lender does not extend the Maturity Date, then the Borrowers shall repay all Obligations on the original Maturity Date in accordance with this Agreement, except to the extent Lender consents in its sole discretion to convert some or all of the Obligations under an exit facility prior to the Maturity Date <u>pursuant to a Reorganization Plan approved by the Bankruptcy Court pursuant to a final non-appealable order</u>.

**2.05**    *Optional Prepayments.* The Borrowers may, upon irrevocable notice to the Lender, at any time or from time to time voluntarily prepay Loans in whole or in part, plus all amounts due under <u>Section 2.07(c)</u> and <u>Section 2.08</u>; <u>provided</u>, that, (i) such notice must be

27

Borrowers will issue, in lieu thereof, a replacement Note in favor of the Lender (or its permitted assigns), in the same principal amount thereof and otherwise of like tenor.

**2.11** *Payments Generally; Clawback.*

(a)    All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein with respect to the payment of interest and fees in kind, rather than in cash, all payments by the Borrowers hereunder shall be made to the Lender in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. All payments received by the Lender after 2:00 p.m., at the option of the Lender, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    Except for payments and other amounts received by the Lender and applied in accordance with the provisions of <u>Section 8.03</u> (or required to be applied in accordance with <u>Section 2.06</u>), all payments and any other amounts received by the Lender from or for the benefit of the Borrowers shall be applied as follows: first, to pay principal of, and interest on, any portion of the Loan the Lender may have advanced pursuant to the express provisions of this Agreement for which the Lender has not then been reimbursed by the Borrowers, second, to pay all other Obligations then due and payable and third, as the Borrowers shall so designate.

(c)    The provisions of this <u>Section 2.11</u> shall be subject in all respects to the DIP Orders.

**2.12** *Priority and Liens.*

(a)    <u>Priority</u>. The Obligations, and the Liens of the Security Documents, shall have the priority specified in the applicable DIP Order.

(b)    <u>Collateral; Grant of Lien and Security Interest</u>.

(i)    Each Borrower hereby grants the Lender a security interest in the Collateral to secure the payment and performance of the Obligations. Upon entry of the Interim DIP Order ~~or~~and, in the case of liens granted under section 364(d), the Final DIP Order~~, as the case may be~~, the Liens and security interests in favor of the Lender under the Security Documents shall be valid, perfected, continuing, enforceable non-avoidable first priority Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than the Carve Out and any Pre-Petition Priority Liens. Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been repaid in cash.

(ii)    Notwithstanding anything herein to the contrary ~~(i)~~ all proceeds received by the Lender from the Collateral subject to the Liens granted under the Security

31

Documents and by the DIP Orders shall be subject to the Carve Out ~~and (ii) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral~~.

(c)    <u>Grants; Rights and Remedies</u>. The Liens and security interests granted under the Security Documents may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the DIP Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

(d)    <u>No Filings Required</u>. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order ~~or~~<u>and, in the case of liens granted under section 364(d)</u>, the Final DIP Order~~, as the case may be~~. The Lender shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement~~,~~ <u>or</u> the Interim ~~DIP~~ Order or the Final DIP Order~~, as the case may be,~~ <u>(as applicable)</u> or any other Loan Document; provided, that the Lender shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement.

(e)    <u>Further Assurances</u>. The Borrowers shall take any other actions reasonably requested by the Lender from time to time to cause the attachment, perfection and first priority of, and the ability of the Lender to enforce, the security interest of the Lender in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Borrower's signature thereon is required therefor, (c) causing the Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, and (e) obtaining the consents and approvals of any Governmental Authority or third party and taking all actions required by the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

**2.13**    *No Discharge; Survival of Claims*. The Borrowers agree that to the extent that the Obligations have not been paid in full, (i) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (ii) the DIP Superpriority Claim granted to the Lender pursuant to the DIP Orders and the Liens granted to the Lender pursuant to the DIP Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan. The Lender in its sole discretion may elect to

Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Borrower is a party; and

(iii)    such documents and certifications as the Lender may require to evidence that each Borrower is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation.

(c)    <u>Perfection and Priority of Liens</u>. Receipt by the Lender of the following:

(i)    searches of Uniform Commercial Code filings in the jurisdiction of formation of each Borrower or where a filing would need to be made in order to perfect the Lender's security interest in the Collateral, copies of the financing statements on file in such jurisdictions and evidence that no Liens exist other than Permitted Liens;

(ii)    UCC financing statements for each appropriate jurisdiction as is necessary, in the Lender's sole discretion, to perfect the Lender's security interest in the Collateral;

(iii)    duly executed notices of grant of security interest in the form required by the Security Agreement as are necessary, in the Lender's sole discretion, to perfect the Lender's security interest in the intellectual property of the Borrowers.

(d)    <u>Closing Certificate</u>. Receipt by the Lender of a certificate signed by a Responsible Officer of the Borrower certifying that the conditions specified in <u>Sections 4.02(a)</u> and <u>(b)</u> have been satisfied.

(e)    <u>Fees</u>. Receipt by the Lender of any fees required to be paid on or before the Closing Date, to the extent invoiced prior to the Closing Date.

(f)    <u>Request for Credit Extension</u>. Receipt by the Lender of a Committed Loan Notice in accordance with the requirements hereof with respect to the Initial Term Loan.

(g)    <u>Due Diligence; PATRIOT ACT</u>. The Lender shall have received all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(h)    <u>Collateral Requirement</u>. On or prior to the Closing Date, the Security Agreement and the ~~Interim~~Final DIP Order (upon its entry in the Cases), shall be effective to create in favor of the Lender, legal, valid and enforceable: (i) first priority (except for Pre-Petition Priority Liens) perfected security interests in and Liens on all of the Collateral that is not subject to a Pre-Petition Priority Lien; and (ii) junior perfected security interests in and Liens on the Collateral that is subject to Pre-Petition Priority Lien, in each case, subject to the Carve Out.

(i)    <u>Interim DIP Order</u>. Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior consent of the Lender in its sole discretion. If the Interim

36

DIP Order is the subject of a pending appeal in any respect, neither the Interim DIP Order nor the making of the Loans or the performance by any Borrower of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(j)    Budget. The Lender shall have received and not have objected to a detailed weekly budget (the "**Approved Budget**") of projected receipts and expenditures of the Borrowers for the period commencing on the Petition Date and continuing through the period specified in the DIP Orders, delivered to the Lender on or prior to the Closing Date, which shall set forth forecasted (A) cash receipts, (B) cash operating disbursements, (C) cash bankruptcy disbursements and (D) net cash flow.

(k)    Outside Date. The Closing Date shall have occurred within ~~2~~five (5) Business Days after the Interim Order Entry Date.[1]

**4.02**    *Conditions Precedent to All Loans.* The Lender shall not be required to make any Loan unless and until the following conditions are satisfied:

(a)    Representations and Warranties. The representations and warranties of the Borrowers contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (or, if any such representation or warranty is qualified by materiality or Material Adverse Effect, it shall be true and correct in all respects) on and as of the date of such Loan, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) as of such earlier date.

(b)    Default. No Default shall exist, or would result from such proposed Loan or from the application of the proceeds thereof.

(c)    Loan Notice. The Lender and shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)    Other Orders. (i) All orders (if any) providing for payment of pre-petition indebtedness of the Borrowers or affecting in any way the Obligations or Collateral submitted for entry in the Cases (in each case, other than the DIP Orders) shall be reasonably satisfactory in form and substance to the Lender, as entered, and shall not deviate from the form thereof approved by the Lender in any material respect which is adverse to the interests of the Lender and (ii) all motions and other documents to be filed by the Debtors with the Bankruptcy Court in connection with the DIP Facility or that could reasonably be expected to affect the DIP Facility, the Collateral or the rights or remedies of the Lender shall be in form and substance reasonably satisfactory to the Lender. For the avoidance of the doubt, the Lender has consented to the filed Critical Vendor Motion.

---

[1] NTD:  changed to be consistent with Section 2.01(d).

US.363276657.05

insurance proceeds constituting Collateral; (iv) incurring any indebtedness; (v) seeking to amend or modify any of the rights granted to the Secured Parties under the Interim DIP Order or the Loan Documents; (vi) objecting to or challenging in any way the Liens, the Obligations, the Collateral (including cash collateral) or any other claims or liens, held by or on behalf of any of the Secured Parties; (vii) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims or causes of action or other actions to recover or disgorge payments against the Secured Parties, or any of their affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (viii) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens, or any other rights or interests of the Secured Parties; or (ix) seeking to subordinate, recharacterize, disallow, or avoid the Obligations.

(c)     No portion of the proceeds of any Loan shall be used in any manner that causes or might cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the FRB or any other regulation thereof.

**6.12**   *Information Regarding the Collateral*. Furnish to the Lender at least fifteen (15) days (or such shorter period as the Lender may agree) prior written notice of any change in: (i) any Borrower's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Borrower's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility, but excluding in-transit Collateral); (iii) any Borrower's organizational structure or jurisdiction of incorporation or formation; or (iv) any Borrower's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. Except as otherwise agreed by the Lender, the Borrowers agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Lender to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral (except for Pre-Petition Priority Liens).

**6.13**   *Lender Meetings and Conference Calls*. Cause a Responsible Officer and any other Authorized Officers or other advisors of the Borrowers requested by the Lender, to participate in meetings with the Lender and its representatives as reasonably requested, and cause such officers to be available to meet with the Lender by phone every two weeks, if requested by the Lender.

**6.14**   *Environmental Laws*. Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all material environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws in all material respects pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under,

51

doubt, that actual disbursements are greater than the projected disbursements) (any negative or positive variances not exceeding the limitations set forth in this clause (b) are referred to in this Agreement as "**Permitted Variances**").

**7.17**   *Case Matters*.

(a)    Assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)    avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non- bankruptcy law), in each case, in whole or in part, the Obligations or the DIP Liens; or reversing, modifying, amending, staying or vacating the DIP Orders, without the prior written consent of the Lender;

(ii)    granting priority for any administrative expense, secured claim or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations, except as provided under the Carve Out or to the extent expressly permitted under the DIP Orders;

(iii)    granting or imposing, under Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the DIP Lien except to the extent expressly permitted under the DIP Orders;

(iv)    permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders, the Cash Collateral Orders and this Agreement;

(v)    modifying, altering, or impairing in any manner the DIP Liens, or any of the Lender's rights or remedies under the DIP Orders, this Agreement, any of the other Loan Documents or any documents related thereto (including the right to demand payment of all Obligations and to enforce its Liens and security interests in the Collateral), whether by Reorganization Plan, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Borrower or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

57

(b)    Seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding.

(c)    Make any payments or transfer any property on account of claims asserted by any vendors of any Borrower for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Lender or unless otherwise consented to by the Lender.

(d)    Return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Lender or unless otherwise consented to by the Lender.

~~(e) Propose to the Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, without the prior written consent of the Lender.~~

(e)    [Omitted]

(f)    (i) Make payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court after notice and hearing, (B) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget, and (C) as approved by the Lender, or (ii)(A) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (B) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business.

**7.18**    *Maximum Capital Expenditures*. The Borrowers shall not make, or permit their Subsidiaries to make, Capital Expenditures except Capital Expenditures in the ordinary course of business and as set forth in the Approved Budget.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01**    *Events of Default*. Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Borrowers fail to pay when and as required to be paid herein, (i) any amount of principal of any Loan, or (ii) any interest on any Loan, or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document.

58

(b)   <u>Specific Covenants</u>. (i) Any Borrower fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.01</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.18</u>, <u>or 6.19</u> or ~~6.20 or~~ <u>Article VII</u>; or (ii) any of the Borrowers fails to perform or observe any term, covenant or agreement of the Security Agreement with respect to any portion of the Collateral <u>and such default continues beyond any applicable cure period</u>; or

(c)   <u>Other Defaults</u>. Any Borrower fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) the date such Borrower obtains knowledge of a breach of any such covenant or agreement or (ii) the Borrower's receipt of notice from the Lender of any such breach; or

(d)   <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)   <u>Cross-Default</u>. Other than with respect to the Pre-Petition Obligations and Pre-Petition Loan Documents or any defaults caused by the filing of the Cases or defaults barred by the automatic stay of the Bankruptcy Code, any Borrower or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (after giving effect to the expiration of any applicable grace periods), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs (after giving effect to the expiration of any applicable grace periods), the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)   <u>Invalidity of Loan Documents</u>. (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or payment in full of all the Obligations, ceases to be in full force and effect (other than in accordance with its terms); or any Borrower or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Borrower denies that it has any or further liability or obligation under any provision of any Loan Document (other than as a result of the discharge of such Borrower in accordance with the terms of the applicable Loan Document), or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Borrower or any other Person not to be, a valid and perfected Lien on any Collateral (other than as a result of Lender's

59

(vi)     the entry of an order in the Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document in a manner adverse to the interests of the Lender; or

(vii)     the payment of, or application by any Debtor for authority to pay, any prepetition claim other than amounts set forth in the Approved Budget; or

(viii)     the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor for an order seeking the appointment of an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery); or

(ix)     the sale of any of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code (except to the extent such sale constitutes a Permitted Disposition), through a Reorganization Plan confirmed by the Bankruptcy Court in the Cases, or otherwise, except to the extent that such sale results in the payment in full of the Obligations on or prior to the Maturity Date; or

(x)     the dismissal of any of the Cases, or if any Debtor files a motion or other pleading seeking the dismissal of the Cases; or

(xi)     the conversion of any of the Cases from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code, or if any Debtor files a motion or other pleading seeking the conversion of any of the Cases under section 1112 of the Bankruptcy Code or otherwise; or

(xii)     any Debtor files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof with respect to Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Lender; or

(xiii)     any Debtor files a motion or application seeking to challenge, subordinate, disgorge, avoid or require repayment of, or the entry of an order in the Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(xiv)     the failure of any Debtor to perform any of its obligations under the DIP Orders or any violation of any of the terms of the DIP Orders, subject to any applicable grace or cure periods set forth therein; or

61

(xxvi)  the payment of any administrative expense claim of $50,000 or more, unless such claim is expressly set forth in the Approved Budget or otherwise approved by the Lender in writing; or

(xxvii) (A) any Debtor, holder of an Equity Interest in any Debtor or any Affiliate of any Debtor commences, or any Debtor supports any Person, in any proceeding challenging or seeking to challenge the validity and priority of the DIP Liens against the Lender or the Loan Documents, or the disallowance of the Obligations (or any of them), or (B) any material provision of the DIP Orders or any Order governing the use of Cash Collateral (as defined in the applicable DIP Order) shall, in each case, cease to be valid and binding unless, in any case under this clause (xxiii), the Lender shall have consented to the same; or

(xxviii)        if  the  confirmation  order  with  respect  to  any Reorganization Plan is entered in form and substance which is not acceptable to the Lender in respect of the treatment of the claims of the Lender; or

(xxix)  any Debtor shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date (other than, in each case, as permitted under this Agreement, the DIP Orders, any cash collateral order or an Approved Plan or relief sought in any "first day" motions filed on the Petition Date); or

(xxx)  ~~an application or motion for any of the orders described in this Section 8.01(i) shall be made by a Person other than the Lender and such application is not, to the extent requested by the Lender, contested by the Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal; or~~[Omitted]

(xxxi)  the cessation of Liens or superpriority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Collateral Documents and the Collateral; or

(xxxii) the entry by the Bankruptcy Court of an interim DIP order other than the Interim DIP Order, or a Final DIP Order that is not acceptable to the Lender in its sole discretion.

**8.02**    *Remedies Upon Event of Default.* Upon the occurrence and during the continuance of any Event of Default, the Lender shall deliver a written notice to the Borrowers (a "**Termination Declaration**") and any notice required under the DIP Orders, that, pursuant to and subject to the DIP Orders, the automatic stay provision of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the Lender to: (i) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and (ii) to the extent not prohibited by the DIP Orders, proceed to protect, enforce and exercise

63

## ARTICLE IX
## MISCELLANEOUS

**9.01** *Amendments, Etc*. No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Borrower therefrom, shall be effective unless in writing signed by the Lender, and approved by an order of the Bankruptcy Court, upon notice, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**9.02** *Notices; Effectiveness; Electronic Communications*.

(a)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number or the address, electronic mail address or telephone number specified for such Person on Schedule 9.02. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications. Notices and other communications to the Borrowers and the Lender may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Lender. The Lender may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications. Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    Change of Address, Etc. Each Borrower and the Lender may change its address, e-mail or telephone number for notices and other communications hereunder by notice to the other parties hereto.

(d)    Reliance by the Lender. The Lender shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any

65