UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| MILLENKAMP CATTLE, INC., ) | Bankruptcy Petition |
| 471 North 300 West ) | # 24-40158-NGH |
| Jerome, Idaho 83338 ) | |
| ) | |
| ) | |
| Tax ID/EIN: 26-0603892 ) | Twin Falls, Idaho |
| ) | April 9, 2024 |
| Debtor. ) | |
| . . . . . . . . . . . . . . . ) | |


VOLUME I OF I
EVIDENTIARY HEARING
BEFORE THE HONORABLE NOAH G. HILLEN
UNITED STATES BANKRUPTCY JUDGE


COURT RECORDER:               TRANSCRIPTION BY:

MELANIE BATTLE                TAMARA A. WEBER, CSR
U.S. District Court           P.O. Box 387
                              Caldwell, Idaho  83606


Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

```
APPEARANCES:

For the Debtor:                  MR. MATTHEW T. CHRISTENSEN
                                 Johnson May, PLLC
                                 199 N. Capitol Boulevard
                                 Suite 200
                                 Boise, Idaho 83702

                                 MS. KRYSTAL R. MIKKILINENI
                                 MS. TIRZAH R. ROUSSELL
                                 Dentons Davis Brown
                                 215 Tenth Street
                                 Suite 1300
                                 Des Moines, Iowa 50309

For Metlife Real Estate          MR. RON C. BINGHAM, II
Lending LLC and Metropolitan     Attorney at Law
Life Insurance Company:          3424 Peachtree Road NE
                                 Suite 1600
                                 Atlanta, Georgia 30326

                                 MR. NIKOLAUS F. SCHANDLBAUER
                                 20 F Street NW
                                 Suite 500
                                 Washington, DC 20001

                                 MR. KIMBELL D. GOURLEY
                                 Attorney at Law
                                 P.O. Box 1097
                                 Boise, Idaho 83701

For Rabo AgriFinance, LLC:       MS. SHEILA RAE SCHWAGER
                                 Hawley Troxell Ennis & Hawley, LLP
                                 877 Main Street, Suite 200
                                 P.O. Box 1617
                                 Boise, Idaho 83702

                                 MR. ANDREW SCHOULDER
                                 Attorney at Law
                                 1301 Avenue of The Americas
                                 New York, New York 10019-6022

For Western States Equipment     MR. JON B. EVANS
Company:                         Dorsey & Whitney, LLP
                                 101 S. Capitol Boulevard
                                 Suite 1701
                                 Boise, Idaho 83702-7705
```

```
APPEARANCES:  (Cont'd)

For Conterra Holdings, LLC       MR. JOHN O'BRIEN
                                 Spencer Fane, LLP
                                 1700 Lincoln Street
                                 Suite 2000
                                 Denver, Colorado 80203

                                 MR. ZACHARY FAIRLIE
                                 Spencer Fane, LLP
                                 1000 Walnut
                                 Suite 1400
                                 Kansas City, Missouri 64106

                                 MR SCOTT C. POWERS
                                 Spencer Fane, LLP
                                 10 Exchange Place
                                 Eleventh Floor
                                 Salt Lake City, Utah 84111

For Committee of Corn Silage     MR. MATTHEW W. GRIMSHAW
Growers:                         Grimshaw Law Group, P.C.
                                 800 West Main Street
                                 Suite 1460
                                 Boise, Idaho 83702

For Viterra USA Grains, LLC      MR. DANIEL C. GREEN
and Viterra USA Ingredients,     Racine Olson, PLLP
LLC:                             201 East Center
                                 P.O. Box 1391
                                 Pocatello, Idaho 83204

For Land View, Inc.:             MR. GERY W. EDSON
                                 Attorney at Law
                                 P.O. Box 448
                                 Boise, Idaho 83701

For MWI Veterinarian             MR. AARON ROBERT BELL
Supply, Inc.:                    Evans, Keane LLP
                                 P.O. Box 959
                                 Boise, Idaho 83701

For CNH Industrial Capital       MS. MEREDITH LEIGH THIELBAHR
America, LLC:                    Gordon & Rees - Seattle
                                 701 Fifth Avenue
                                 Suite 2100
                                 Seattle, Washington 98104
```

```
APPEARANCES:  (Cont'd)

For Viserion Grain, LLC:      MR. BRIAN FARIA
                             Sawtooth Law Offices, PLLC
                             1101 West River Street
                             Suite 110
                             Boise, Idaho 83702

For Sandton Capital Partners, MR. RICHARD BERNARD
LLP:                         Attorney at Law
                             1177 Avenue of The Americas
                             41st Floor
                             New York, New York 10036

                             MR. JOHN F. KURTZ
                             Kurtz Law, PLLC
                             910 West Main
                             Suite 364
                             Boise, Idaho 83702

For the U.S. Trustee:        MR. JASON NAESS
                             DOJ - UST
                             550 West Fort Street
                             Suite 698
                             Boise, Idaho  83701
```

```
                    I N D E X

                                        PAGE   LINE

MOTIONS                                  14     15

DEBTOR'S WITNESSES:                      PAGE   LINE

    MILLENKAMP, William
Direct Examination by Ms. Mikkilineni     31     1
Cross-Examination by Ms. Schwager         63    14
Cross-Examination by O'Brien             165    20
Cross-Examination by Mr. Naess           171     4
Redirect Examination by Ms. Mikkilineni  193    25
Recross-Examination by Ms. Schwager      203     8
Recross-Examination by Mr. O'Brien       209     1
Furth. Redir. Exam. by Ms. Mikkilineni   209    20

    CHURCHILL, Kati
Direct Examination by Ms. Mikkilineni    210    24
Cross-Examination by Mr. Schoulder       223    20
Cont'd Cross-Exam. by Mr. Schoulder      242    16
Redirect Exam. by Ms. Mikkilineni        268     1
Recross-Examination by Mr. Schoulder     269    12


RABO AGRIFINANCE WITNESS:                PAGE   LINE

    KOKINI, Daniel
Direct Examination by Mr. Schoulder      240     4
```

E X H I B I T S

| DEBTOR'S EXHIBITS: | PAGE | LINE |
|---|---|---|
| DX 1009 - Inventory List | | |
| Admitted | 62 | 18 |
| DX 1011 - Rabo DIP Proposal | | |
| Admitted | 25 | 25 |
| DX 1012 - Sandton DIP Proposal | | |
| Admitted | 25 | 25 |
| DX 1013 - Schoulder letter to O'Brien | | |
| Admitted | 25 | 25 |
| DX 1015 - 4/8 Updated DIP Budget | | |
| Admitted | 25 | 25 |
| DX 1016 - Amended Western States Lease | | |
| Admitted | 16 | 20 |
| DX 1017 - 3/6 Draft Budget | | |
| Admitted | 25 | 25 |

| METLIFE EXHIBITS: | PAGE | LINE |
|---|---|---|
| MX 2000 - Promissory Note A | | |
| Admitted | 27 | 19 |
| MX 2001 - Promissory Note B | | |
| Admitted | 27 | 19 |
| MX 2002 - Promissory Note C | | |
| Admitted | 27 | 19 |
| MX 2003 - Promissory Note D | | |
| Admitted | 27 | 19 |
| MX 2004 - Promissory Note E | | |
| Admitted | 27 | 19 |
| MX 2005 - Promissory Note 199858 | | |
| Admitted | 27 | 19 |
| MX 2006 - 2018 Mortgage | | |
| Admitted | 27 | 19 |

```
METLIFE'S EXHIBITS:  (Cont'd)              PAGE   LINE

MX 2007 - First Amendment to 2018
   Mortgage
       Admitted                              27     19


MX 2008 - Second Amendment to
   2018 Mortgage
       Admitted                              27     19


MX 2009 - 2019 Mortgage
       Admitted                              27     19


MX 2010 - Milk Creek Assignment
   Agreement (Note A)
       Admitted                              27     19


MX 2011 - Milk Creek Assignment
   Agreement (Note B)
       Admitted                              27     19


MX 2012 - Milk Creek Assignment
   Agreement (Note C)
       Admitted                              27     19


MX 2013 - Milk Creek Assignment
   Agreement (Note C)
       Admitted                              27     19


MX 2014 - Milk Creek Assignment
   Agreement (Notes D and E)
       Admitted                              27     19


MX 2015 - Intercreditor Agreement
   (RAF)
       Admitted                              27     19


MX 2016 - First Amendment to
   Intercreditor Agreement (RAF)
       Admitted                              27     19


MX 2017 - Second Amendment to
   Intercreditor Agreement (RAF)
       Admitted                              27     19


MX 2018 - Third Amendment to
   Intercreditor Agreement (RAF)
       Admitted                              27     19
```

```
METLIFE'S EXHIBITS:  (Cont'd)            PAGE  LINE

MX 2019 - Subordination and
    Intercreditor Agreement (RAF)
       Admitted                          27    19

MX 2020 - Subordination and
    Intercreditor Agreement
    (Conterra)
       Admitted                          27    19

RABO AGRIFINANCE EXHIBITS:               PAGE  LINE

RX 3000 - Third Amended and Restated
    Loan and Security Agreement 4/21/21
       Admitted                          26    21

RX 3001 - First Amendment to Third
    Amended and Restated Loan and
    Security Agreement 6/23/21
       Admitted                          26    21

RX 3002 - Second Amendment to Third
    Amended and Restated Loan and
    Security Agreement 10/21/22
       Admitted                          26    21

RX 3003 -Intercreditor Agreement
    9/18/18
       Admitted                          26    21

RX 3004 - Milk Check Assignment
    Agreement
       Admitted                          26    21

RX 3005 - Collateral Assignment
    of Milk Contracts
       Admitted                          26    21

RX 3006 - Long-Term Forbearance
    Agreement effective 10/20/22
       Admitted                          26    21

RX 3007 - Subordination and
    Intercreditor Agreement 10/20/22
       Admitted                          26    21

RX 3008 - DL Control Account
    Agreement
       Admitted                          26    21
```

```
RABO AGRIFINANCE EXHIBITS:  (Cont'd)        PAGE  LINE

RX 3010 - Notice of Termination of
    Forbearance Agreement 8/14/23
        Admitted                            26    21

RX 3011 - Rabo AgriFinance - Borrowing
    Base Certificate for Millenkamp
    Cattle et al 3/31/23
        Admitted                            26    21

RX 3012 - Rabo AgriFinance - Borrowing
    Base Certificate for Millenkamp
    Cattle et al 5/31/23
        Admitted                            26    21

RX 3013 - Rabo AgriFinance - Borrowing
    Base Certificate for Millenkamp
    Cattle et al 12/31/23
        Admitted                            26    21

RX 3014 - Draft Borrowing Base
    Certificate 2/29/24
        Denied                             230    17

RX 3016 - Sandton Priming DIP
    Facility and RAF Proposed
    DIP Facility
        Admitted                            26    21

RX 3021 - 8 Week Cash Flow
    Budget - Receivership Action
        Admitted                            26    21

RX 3022 - Cash Flow Budget as of
    March 22, 2024
        Admitted                            26    21

RX 3029 - Debtor's Cash
    Collateral Motion filed 4/2/24
        Admitted                            26    21

RX 3030 - Debtor's DIP Financing
    Motion filed 4/2/24
        Admitted                            26    21
```

```
RABO AGRIFINANCE EXHIBITS:  (Cont'd)        PAGE   LINE

RX 3031 - Declaration of William
    John Millenkamp in support
    of First Day Motions filed
    4/2/24
        Admitted                              26     21

RX 3032 - DIP Proposal Comparison
        Admitted                             242      8

RX 3034 - Rabo Bank Term Sheet
    as of 4/8/24
        Admitted                              26     21

RX 3038 - Email Exchange
        Admitted                             276      3

CONTERRA EXHIBITS:                           PAGE   LINE

CX 7001 - Conterra endorsed to
    Ag Funding SC II LLC
        Admitted                             166     21

CX 7002 - Loan and Security Agreement
    10/20/22
        Admitted                             166     21

CX 7003 - Financing Statement filed
    with the Idaho Secretary of State
    on 2/19/24 as Doc. No. 20240226411
        Admitted                             166     21

CX 7004 - Financing Statement filed
    with the Idaho Secretary of State
    on 2/20/24 as Doc. No. 20240226555
        Admitted                             166     21

CX 7005 - Note borrowers executed and
    delivered a Mortgage, Assignment
    of Rents, Security Agreement and
    Fixture Filing 10/20/22
        Admitted                             166     21

CX 7006 - Conterra endorsed to Rooster
    Capital IV LLC
        Admitted                             166     21
```

```
CONTERRA EXHIBITS:  (Cont'd)                    PAGE    LINE

CX 7007 - Note borrowers executed and
   delivered a Mortgage, Security
   Agreement, Assignment of Rents and
   Fixture Filing dated 10/20/22
        Admitted                               166     21

CX 7008 - Financing Statement filed
   with the Idaho Secretary of State
   on 10/28/22 as Doc. 20221833441
        Admitted                               166     21

CX 7009 - Financing Statement filed
   with the Idaho Secretary of State
   on 10/28/22 as Instrument 2224756
        Admitted                               166     21

CX 7010 - Note borrowers executed
   and delivered a Milk Check
   Assignment Agreement to Glambia
   Foods, Inc. 10/26/22
        Admitted                               166     21
```

1                    (Proceedings begin.)

2       CLERK:  All rise, please.  The United States Bankruptcy

3  Court for the District of Idaho is now in session.  The

4  Honorable Noah G. Hillen presiding.

5       COURT:  Thank you.  Please be seated.

6       Good morning, everyone.  This is Case No. 24-40158,

7  Millenkamp Cattle, Incorporated.  A number of matters before the

8  Court today.  Let's go ahead and start with appearances starting

9  here on my right.

10      MR. GOURLEY:  Thank you, Your Honor.  Kim Gourley

11  appearing on behalf of the MetLife entities and on my left, I

12  introduce to the Court Mr. Ron Bingham and Mr. Nick

13  Schandlbauer.  And then additionally, Your Honor, the MetLife

14  representative back in the corner here is Jeremy Rasmussen.

15      COURT:  Good morning.

16      MR. CHRISTENSEN:  Matt Christensen, Your Honor,

17  representing the debtors.  I also have with me two of the

18  attorneys from Dentons:  Krystal Mikkinlineni and Terzah

19  Russell.  We also have several representatives of the debtor

20  here in the courtroom as well.  Immediately behind us is Bill

21  Millenkamp, the president and owner.

22      COURT:  Okay.

23      MS. SCHWAGER:  Good afternoon, Your Honor.  Sheila

24  Schwager representing Rabo AgriFinance and next to me admitted

25  pro hoc is Mr. Andrew Schoulder.

1          MR. SCHOULDER:  Good morning, Your Honor.

2          COURT:  Good morning.

3          MR. NAESS:  Good morning, Your Honor.  Jason Naess on

4     behalf of the U.S. Trustee.

5          COURT:  Good morning.

6          MR. O'BRIEN:  Good morning, Your Honor.  John O'Brien

7     on behalf of Conterra, the loan servicer for Ag Funding SC and

8     the loan servicer for Rooster.  And with me is my colleague Zach

9     Fairlie and also Scott Powers.

10          COURT:  Good morning.

11          MR. KURTZ:  Good morning, Your Honor.  John Kurtz on

12     behalf of Sandton Capital Partners, LP, and with me is Richard

13     Bernard who is an attorney from New York.  We have filed a

14     motion for him to be admitted pro hoc but I don't know if it's

15     been granted yet.  Thank you, Your Honor.

16          COURT:  Good morning, Mr. Kurtz.  Good morning.

17          MR. EVANS:  Good morning, Your Honor.  J.B. Evans on

18     behalf of Western States Equipment Company.

19          COURT:  Good morning, Mr. Evans.

20          MR. BELL:  Good morning, Your Honor.  Aaron Bell on

21     behalf of MWI Veterinary Supply, Incorporated.

22          COURT:  Good morning.

23          MR. GRIMSHAW:  Good morning, Your Honor.  Matt Grimshaw

24     on behalf of the ad hoc Committee of Corn Silage Growers.

25          COURT:  Good morning, Mr. Grimshaw?

```
 1              MS. LLOYD:  Good morning, Your Honor.  Karen Lloyd on
 2   behalf of CNH.
 3              COURT:  Good morning.
 4              MR. GREEN:  Good morning, Your Honor.  Dan Green on
 5   behalf of Viterra.
 6              COURT:  Good morning, Mr. Green.
 7              MR. EDSON:  Gery Edson, Your Honor, for Land View.
 8              COURT:  Good morning, Mr. Edson.
 9              MR. FARIA:  Brian Faria on behalf of Viserion Grain.
10              COURT:  Good morning.
11              MR. McCRANEY:  Zach McCraney on behalf of Glambia
12   Foods.
13              COURT:  Good morning.  Any party wish to make an
14   appearance on the record in this case?
15              All right.  Mr. Christensen, I'll start with you.  Are
16   there any preliminary matters that we need to address before we
17   get started today?
18              MR. CHRISTENSEN:  Your Honor, there's four -- I think
19   four substantive motions set for today and two motions to
20   shorten time -- I guess I should say five substantive motions
21   and two motions to shorten time on two of those motions.
22              Those two shorten time motions and the motions they
23   relate to deal with the Western States amended lease and the
24   assumption and adequate protection for those -- for that lease.
25   That I think is somewhat a separate issue from the three other
```

```
 1   remaining motions which are the cash collateral, the DIP motion
 2   and the critical vendor motion.  Those three are somewhat tied
 3   together and so I don't know if the Court wants to deal with the
 4   Western States motions first, get those dealt with and then move
 5   to the larger motions or do the larger motions and then come
 6   back to the Western States.  I don't know that I have a
 7   preference either way.
 8          There's one exhibit in our exhibit list that is the
 9   Western States lease just so it was part of the record.  We
10   could probably get that exhibit admitted and then deal with that
11   motion and then that's done.  And then there are some
12   stipulations on other exhibits from multiple parties as well
13   that we can get into.
14          COURT:  All right.  Do we want to address the Western
15   States matter first, get that out of the way, before tackling
16   the other three motions then?
17          MR. CHRISTENSEN:  That's fine with me, Your Honor.  I
18   don't know that anyone else has any objection to that.
19          COURT:  Any objection by any of the parties to that
20   approach?
21          MR. GOURLEY:  No, Your Honor.  No objection.  The only
22   comment I'd make is we do have some stipulations as to admission
23   of exhibits if the Court wants to deal with that procedurally
24   before we start with the oral arguments and testimony or if the
25   Court wants to defer, we'll go with what the Court wants.
```

1      COURT:  Do those stipulations impact the Western States

2  motions at all?

3      MR. CHRISTENSEN:  Just to the extent that one exhibit

4  in our book is the Western States lease.  The lease was also

5  attached to I think both motions or filed.  So it's sort of in

6  the record already.  We put it in the exhibit list just to make

7  sure it was there.

8      COURT:  Why don't we address the Western States motions

9  first and before we get into that motion, we can address any

10  sort of evidentiary issues and stipulations associated with that

11  motion and then we'll tackle the other motions and any

12  stipulations associated with those next.

13      MR. CHRISTENSEN:  So the exhibit for that lease in the

14  debtor's exhibit list is Exhibit 1016, 1016.  My understanding

15  from speaking with at least the parties at the table up here is

16  that there's no objection to admission of that exhibit.

17      COURT:  All right.  Is there any objection to the Court

18  admitting Debtor's Exhibit 1016 which I understand is the

19  Western States lease?  Exhibit 1016 is admitted.

20          (Debtor's Exhibit No. 1016 admitted.)

21      MR. CHRISTENSEN:  Thank you.  From an evidentiary

22  standpoint, I think that's it for that motion.  I can just do

23  argument now, Your Honor.

24      COURT:  All right.

25      MR. CHRISTENSEN:  The Western States lease is a lease

1  of, at this point, approximately 41 loader tractors that are

2  used at the debtor's facilities for loading feed into the feed

3  trailers to get to the cattle, for pushing and moving manure

4  around.  There is a very definite and obvious need for those

5  loaders to be at the facilities.

6       They're the lease that's being assumed.  There was a

7  prepetition lease with Western States that started just under

8  two years ago, went through June of 2024.  Prior to the

9  petition, there was several months of defaults on that lease.

10 Western States had declared a default, was seeking to repossess

11 those loaders and that -- those efforts are what resulted in the

12 amended and restated rental agreement which is the exhibit and

13 was attached to the motions.

14      So that amended and restated agreement contains

15 provisions for the remaining regular lease payments as well as

16 how the debtor would pay the past due amounts that became past

17 due after the end of last year.  So there's basically two

18 payments under that lease each month, one regular monthly

19 payment and one a catch-up payment to cure the default.

20      COURT:  When are the regular payments due each month?

21      MR. CHRISTENSEN:  The regular payments would be due

22 essentially by the 5th day of each month and then the past due

23 payments are due on the 15th of each month.  The way that the

24 agreement reads is there's an invoice that's sent on the 25th of

25 each month by Western States and the debtors have 10 days to

1    then pay that.  That's where the 5th is a little bit fluid

2    depending on how many days of the month there were.

3        Western States has agreed for the April payments,

4    because we're still waiting for cash collateral to be approved,

5    so for those payments to be paid essentially later this week

6    assuming that the cash collateral's approved so that we won't be

7    immediately in default under that assumed lease.

8        COURT:  And there is sufficient line item allocated in

9    the budget to make these payments?

10        MR. CHRISTENSEN:  So in the budget, the budget that

11    was -- well, there's a budget exhibit that I can refer to but

12    there's essentially two line items in there.  There's one item

13    that's just equipment lease payments and there's other equipment

14    that's also leased but that line item includes the regular lease

15    payment for Western States on a monthly basis and then there's a

16    separate -- separate section of the budget that is essentially

17    critical vendors payments that it's listed as there and Western

18    States past due payment is listed in that category.

19        So it's in the budget.  Assuming the budget is

20    approved, then the payments will continue.  That lease just goes

21    through June as I mentioned.  The anticipation is there will be

22    a new lease that's negotiated and signed for post-June operation

23    of those -- or of loaders.

24        So I think both Western States and the debtor's

25    positions are these are necessary items for the debtor.  We need

```
 1   to have the tractors available.  We've negotiated a resolution

 2   to keep those there, get Western States repaid and we'd request

 3   that that lease be assumed.

 4         I guess there's two different motions.  One is our

 5   motion to assume the lease which would include the cure payments

 6   outlined in the lease and then Western States also filed a

 7   motion for adequate protection which is -- the result of both

 8   motions is the same.  We're of course assuming the lease and

 9   making the payments.  The payments are the adequate protection

10   that they requested.

11         And both of those motions were set on shortened time

12   largely because the payments are currently due and they're at

13   risk of picking up the loaders if we can't get the lease

14   assumed.  So that's the reason for shortening time.

15         COURT:  All right.  And is there any concern with

16   respect to Rule 6003 and -- which states that except to the

17   extent relief is necessary to avoid immediate and irreparable

18   harm, the Court shall not within 20 days after the filing of the

19   petition issue an order granting the following:  A motion to

20   assume or assign an executory contract or an expired lease.

21         MR. CHRISTENSEN:  I think the exception at the

22   beginning of that phrase is exactly why we're making the request

23   now.  Absent the loaders being present, there's no way to get

24   the feed to the cattle that need to be fed.  Absent the loaders

25   being there and able to be used, there's no way to remove the
```

1    waste from the pens that the cattle are all in.  So there would

2    be harm to nearly 100,000 or more than 100,000 head of cattle if

3    we can't feed them and we can't clean up after them.

4            So that exception in the first phrase of Rule 6003 I

5    think is what gets us out of that restriction.

6            COURT:  All right.  Anything else, Mr. Christensen?

7            MR. CHRISTENSEN:  No, Your Honor.  Thank you.

8            COURT:  All right.  Mr. Evans.

9            MR. EVANS:  Thank you, Your Honor.  J.B. Evans for

10   Western States.  I won't repeat the different things that Matt

11   said here.  I agree.  We've got loaders out at -- Western States

12   has loaders out.  They're essential to the debtor's operations.

13   We've filed our motion for adequate -- conditioning the future

14   use of the equipment on providing adequate protection.  That's

15   Docket No. 43 and are seeking the entry of an order providing

16   for adequate protection as set forth in the motion.  To my

17   knowledge, no party has objected.  I understand you've reviewed

18   the pleadings and I would stand for any questions you have on

19   the motion.

20           COURT:  Just real quick procedurally, is there any

21   objection to the Court granting Western States Equipment's

22   motion for order shortening time with respect to that motion for

23   adequate protection?  I'm going to go ahead and grant that

24   motion, Mr. Evans, and I'll -- I'm inclined to simply note in

25   our minute entry today that it's granted unless you want a

```
 1    formal order.

 2            MR. EVANS:  A minute entry is great.  Thank you, Your

 3    Honor.

 4            COURT:  All right.  Kind of in a similar vein in a

 5    question that I asked Mr. Christensen, is there any concern on

 6    your part in regard to Rule 6003 and the ability to enter an

 7    order today on a motion to assume or sign an executory contract?

 8            MR. EVANS:  I would echo Mr. Christensen's sentiments

 9    that the exigent nature of securing the continuing use of the

10    equipment and also my client's interest in the equipment is a

11    valid exception.  There would be significant harm to the

12    debtor's estate in the absence of the relief sought such that an

13    exception to Rule 6003 is appropriate here.

14            COURT:  Is it necessary for the Court to enter an order

15    assuming that executory contract today or is it possible to

16    simply set this over for a final hearing after that 21-day

17    period and then grant your motion for adequate protection that

18    requires the debtor to at least make the April and May lease

19    payments on that lease?

20            MR. EVANS:  Procedurally, I understand what you're

21    saying with that approach and that's acceptable to Western

22    States.

23            COURT:  All right.  And I guess one of the concerns I

24    have is granting that executory contract -- granting the debtor

25    authority to assume that executory contract today which does
```

```
 1    include some prepetition arrearages just without having other

 2    parties the opportunity to weigh in on a pretty significant

 3    amount of shortened time with respect to those payments.

 4           As far as adequate protection, would it be sufficient

 5    adequate protection from your perspective if the debtor was

 6    ordered to make the current April and May lease payments but

 7    defer any payments on the back due lease until that final

 8    hearing on May 8?

 9           MR. EVANS:  Yes, Your Honor.  That's acceptable.

10           COURT:  All right.

11           MR. EVANS:  That works for us.  So it would be May 8.

12    At that time, there would have been one back rent and two

13    monthly rent payments so we're just basically holding off on the

14    April 15 back rent payment pending the final hearing?

15           COURT:  Correct.

16           MR. EVANS:  I understand.  Yeah, thank you, Your Honor.

17           COURT:  All right.  Anything further?

18           MR. EVANS:  Nothing further from me.

19           COURT:  All right.  Does counsel for MetLife wish to

20    weigh in with respect to this motion?

21           MR. GOURLEY:  Your Honor, MetLife takes no position and

22    is not -- did not file an objection and is not opposing.

23           COURT:  All right.  Counsel for Rabo AgriFinance?

24           MS. SCHWAGER:  Your Honor, no objection.  Thank you.

25           COURT:  Mr. Naess?
```

1          MR. NAESS:  Thanks, Your Honor.  To the extent that the

2     Court's inclined to delay the payment of that critical vendor

3     payments until May, the United States has no objection.  We are

4     concerned about securable vendor payments and think that

5     additional time might be necessary for parties in interest

6     including the other unfavored unsecured creditors to weigh in on

7     that.

8          COURT:  Thank you, Mr. Naess.  Counsel for Conterra.

9          MR. O'BRIEN:  No objection, Your Honor.  Thank you.

10          COURT:  All right.  And we do have a number of other

11     counsel participating as well not necessarily in the courtroom

12     well.  Do any of those parties wish to appear and be heard with

13     respect to this motion?

14          All right.  Mr. Christensen, anything further from you

15     on this?

16          MR. CHRISTENSEN:  Your Honor, I know we dealt with

17     shortening time on Mr. Evans' motion.  Do we want to also deal

18     with shortening time on the debtor's motion?

19          COURT:  Let's address that as soon as we -- as soon as

20     I rule on Western States Equipment's motion -- the motion to

21     condition use of their equipment or receive adequate protection

22     and motion to assume -- a motion to assume the unexpired lease.

23          MR. CHRISTENSEN:  Okay.  I don't have anymore comments

24     on that motion then.

25          COURT:  All right.  What I'm going to do is set the

1    Docket 114 -- that's the executory contract motion -- over for a

2    final hearing on May 8 at 9:00 a.m.  That's in person here in

3    Boise.  I'm going to grant Western States' Docket 43, the motion

4    requesting adequate protection and I'm going to require for

5    purposes of adequate protection that the debtor make the regular

6    monthly payments due under the lease.  That's Exhibit 1016 which

7    has been admitted.

8           It sounds like there is a payment due on April 5 and a

9    payment due on May 5 prior to that May 8 hearing.  The past due

10   rental payment that is due on April 15 will be deferred for

11   consideration in connection with that final hearing.

12          Would you like to prepare a form of order for the

13   Court, Mr. Evans?

14          MR. EVANS:  Yes, Your Honor.

15          COURT:  All right.  And other than the debtor, do any

16   other parties wish to endorse the form of that order?  All

17   right.  It sounds like only Mr. Christensen, his endorsement is

18   necessary.

19          MR. EVANS:  Great.  Thank you, Your Honor.

20          COURT:  All right.  All right.  Let's take up debtor's

21   motion to shorten time for notice of interim hearing.  That's

22   Docket No. 28 which was previously granted in part with respect

23   to the wage motion.  Are there any objections to the Court

24   granting the balance of that motion to shorten time today?

25          MS. SCHWAGER:  No objection, Your Honor, from Rabo.

1   COURT:  It sounds like there's no objection.  I'll go

2   ahead and grant Docket 28, that motion to shorten time, Mr.

3   Christensen.  I'm inclined to simply note that in our minute

4   entry unless any party would like a formal order?  It sounds

5   like that minute entry is acceptable.

6   All right.  Let's go ahead and tackle the remaining

7   motions, Mr. Christensen.  Any preliminary matters that we need

8   to address in regard to the three remaining motions?

9   MR. CHRISTENSEN:  There are some stipulations on

10  exhibits.  Your Honor, there's exhibits from the debtors,

11  there's exhibits from Rabo.  I believe there's also exhibits

12  from Met and Conterra.  Those two I think were submitted in the

13  form of attachments to a declaration rather than separate

14  exhibits.

15  With regard -- I'll address the debtor's exhibits

16  first.  I've spoken with the parties at the tables and believe

17  there is agreement to admit Debtor's Exhibits 1011, 1012, 1013,

18  1015 -- 1016 was already admitted -- and 1017.

19  COURT:  All right.  Is there any objection to the

20  admission of Exhibits 1011, 1012, 1013, 1015 and 1017?

21  MS. SCHWAGER:  No objection, Your Honor.

22  MR. GOURLEY:  No, Your Honor.

23  COURT:  Hearing no objection, the Court will admit

24  Exhibit 1011, 10123, 1013, 1015 and 1017.

25  (Debtor's Exhibit Nos. 1011, 1012, 1013, 1015 and

1             1017 admitted.

2        MR. CHRISTENSEN:  With regard to Rabo's exhibits, I can

3   tell you the ones the debtor will stipulate to and then probably

4   Ms. Schwager can address the rest or she can just address all of

5   them.

6        COURT:  Let's go ahead and have Ms. Schwager simply

7   address the Rabo exhibits in bulk.

8        MS. SCHWAGER:  Good morning, Your Honor.  The debtor

9   has stipulated to Exhibits 3000 to 3008.  So that's 3001, 2, 3,

10   4, 5, 6, 7, 8.  And then 3010, 3011, 3012, 3013, 3016, 3021,

11   3022, 3029, 3030 and 3031 and 3034.  And I have circulated the

12   exhibits to other counsel and have not received any objection.

13        COURT:  Thank you, Ms. Schwager.  Is there any

14   objection to the admission of Exhibits 3000 through 3008, 3010,

15   through 3013, 3016, 3021, 3022, 3029, 3030, 3031 and 3034?

16        MR. GOURLEY:  No objection from MetLife, Your Honor.

17        MR. O'BRIEN:  No objection from Conterra.

18        COURT:  All right.  Hearing no objection, the Court

19   will admit Exhibits 3000 through 3008, 3010 through 3013, 3016,

20   3021, 3022, 3029, 3030, 3031 and 3034.

21            (Rabo AgriFinance Exhibit Nos. 3000 through 3008,

22             3010 through 3013, 3016, 3021, 3022, 3029, 3030,

23             3031 and 3034 admitted.)

24        COURT:  All right.  And should we have MetLife address

25   its exhibits as well?

1          MR. GOURLEY:  Thank you, Your Honor.  Your Honor,

2     MetLife designated its exhibits as 2000 through 2020.  We've

3     provided that list of exhibits and all the actual physical

4     exhibits to all counsel.  It is my understanding that all

5     counsel have stipulated to the authenticity of all the documents

6     for purposes of admission.

7          I'll defer to Mr. O'Brien on Conterra.  They had

8     originally raised a potential issue as to relevancy but I think

9     that's been withdrawn.  Assuming it's been withdrawn, we would

10    move that the MetLife's Exhibits 2000 through 2020 be admitted.

11         COURT:  All right.  Is there any objection to admitting

12    MetLife's Exhibits 2000 through 2020?

13         MR. O'BRIEN:  No objection from Conterra.

14         MS. SCHWAGER:  No objection from Rabo, Your Honor.

15         MR. CHRISTENSEN:  No objection.

16         COURT:  All right.  Hearing no objection, the Court

17    will admit MetLife's Exhibits 2000 through 2020.

18         MR. GOURLEY:  Thank you, Your Honor.

19           (MetLife's Exhibit Nos. 2000 through 2020 admitted.)

20         COURT:  All right, Mr. Christensen.  Are there any --

21    sorry.

22         MR. FAIRLIE:  Good morning.  Zach Fairlie on behalf of

23    Conterra.  Your Honor, Conterra also filed its exhibits at

24    Docket 132 which they're attached to a declaration by Mr. Paul

25    Erickson which details the authenticity of the loan documents.

1      In addition to being filed on the docket at Docket 132,

2  we also provided copies to all the parties and my understanding

3  is that there isn't any objections to those exhibits being

4  admitted and those exhibits are marked 1 through 10 and we would

5  offer those into evidence.  Your Honor, I do have paper copies

6  of those exhibits if you'd like a paper copy.

7      COURT:  Okay.  I'm going to have you simply remark

8  those exhibits starting with 7000 just so it's consistent with

9  our exhibit marking procedure.  We could do that during break.

10  I believe that puts your exhibits at 7000 through 7009?

11      MR. FAIRLIE:  I think it would be 7011.

12      COURT:  Did you mark 1 through 10?

13      MR. FAIRLIE:  Uh-huh.

14      COURT:  So we're starting with 0.

15      MR. FAIRLIE:  Oh, so if we can start with 0, then yes,

16  it would be 7000 through 7010.

17      COURT:  All right.  Are there any objections to the

18  admission of the Conterra exhibits which are set forth in Docket

19  132?  We'll get those marked at the break starting with No.

20  7000.

21      MR. GOURLEY:  No objection from MetLife, Your Honor.

22      MR. CHRISTENSEN:  Your Honor, I don't know that we

23  would have an objection.  I just wasn't able to identify what

24  the exhibits were before about a half hour before the hearing

25  this morning.  I haven't had a chance to actually look at them.

1    I don't think we'll have any objection but I wonder if we may

2    just defer dealing with those exhibits until after that break

3    when they get renumbered and I can have a look at them before

4    then.

5            COURT:  All right.

6            MR. FAIRLIE:  That's fine with us, Your Honor.

7            COURT:  Okay.  We'll simply defer ruling on the

8    Conterra exhibits for the time being until those are marked and

9    we can address them as needed.

10           Just one other preliminary matter.  I know that MetLife

11   has prepared an exhibit list and it was circulated.  Is that

12   filed and of record on the docket?

13           MR. GOURLEY:  No, Your Honor.  But it was provided to

14   Madam Clerk as far as having the list of our exhibits and it

15   also is attached to our exhibit list for the witnesses.  But we

16   did not file it on the record.

17           COURT:  All right.  All right.  Mr. Christensen,

18   additional preliminary matters before we get started?

19           MR. CHRISTENSEN:  Your Honor, we don't have anything

20   more preliminary.  I will note for the Court Ms. Mikkinlineni

21   will be dealing with some of the witnesses and then making the

22   argument on behalf of the debtor.  I may cross-examine some of

23   the witnesses from other parties but she'll be dealing with our

24   witnesses.

25           COURT:  All right.  Mr. Gourley, any additional

1  preliminary matters from your perspective?

2          MR. GOURLEY:  No, Your Honor.  Thank you.

3          COURT:  All right.  Counsel for Rabo, any preliminary

4  matters to address?

5          MS. SCHWAGER:  No, Your Honor.  Thank you.

6          COURT:  U.S. Trustee's Office?

7          MR. NAESS:  No.  Thank you.

8          COURT:  And Conterra.

9          MR. O'BRIEN:  None from Conterra.  Thank you.

10          COURT:  All right.  Any preliminary matters from any

11  additional party that's appeared?

12          All right.  Ms. Mikkinlineni, are you ready to proceed?

13          MS. MIKKINLINENI:  Yes, Your Honor.  Thank you.  We're

14  going to call Mr. William Millenkamp to the stand.

15          COURT:  All right.  Please come on up to the witness

16  stand.  Before having a seat, you'll need to get sworn in by the

17  courtroom deputy.

18          CLERK:  Good morning.  I'll have you remain standing.

19  Please raise your right hand.

20                          (WILLIAM JOHN MILLENKAMP is sworn.)

21          CLERK:  Thank you.  Please have a seat and once seated,

22  please state your name and spell your last name for the record.

23          WITNESS:  My name is William John Millenkamp,

24  M-i-l-l-e-n-k-a-m-p.

25          CLERK:  Thank you.

                              DIRECT EXAMINATION

QUESTIONS BY MS. MIKKINLINENI:

Q.  Good morning, Mr. Millenkamp.  What is your involvement in
Millenkamp Cattle?

A.  I am the owner and operator of Millenkamp Cattle.

Q.  What's your experience in farming?

A.  My experience in farming is I was born and raised on a farm
and in the farming business ever since.

Q.  You've been farming your whole life?

A.  Yes.

Q.  And is your family also involved in your farming?

A.  Yes.  My -- I was born and raised in eastern Iowa.  My dad
and my brother still farm where I was raised.  They're still
crop farmers and dairy cattle dealers and as far as my family,
my whole family's involved in our business.  My oldest son is
right under me in my operation.  His name is Jake.  Ellie Mae
does all my bank reconciliation.  My daughter Trudy is involved
with all the consumables -- purchasing of all the consumables
and I have a 16-year-old son that will be on the farm soon also.

Q.  And how did you end up farming in Idaho?

A.  As I said, my dad was dairy cattle broker which means he
would go out and purchase cattle from auctions, cattle growers,
dairy farmers, consolidate them and his customer base was
usually dairy farmers in the west coast similar to a guy like
myself.

1        Back in the day, all dairy expansion, the cattle that

2   they had to purchase, most of them come out of the midwest so

3   west coast dairy farmers would buy cattle off my dad and my

4   family.  Doing that, they would travel to our farm a lot of

5   times, buy the cattle themselves.

6        We had a smaller farm with usually two to three

7   employees plus my brothers so we were a good portion of the

8   help.  Our customers got to know us really well over the years

9   and I was offered a job by one of our customers, the Young

10  family out of Oregon.  So after I graduated high school, I went

11  to work on about a thousand cow dairy farm in Klamath Falls,

12  Oregon.

13  Q.  So since you've been farming your whole life, it's fair to

14  say that you have extensive knowledge in this area.

15  A.  I believe I do.

16  Q.  Can you provide a description of the operations and how each

17  Millenkamp entity works together?

18  A.  Our farm surprises of close to 20,000 acres of ground, over

19  100,000 cattle, 500 employees.  Under that, it's broken to about

20  five different separate segments.

21  Q.  And what are those five different segments?

22  A.  Dairy, custom calf raising, farming, beef cattle and

23  trucking.

24  Q.  And where are all the operations located?

25  A.  The operations are within 80 miles of each other.  The calf

1    ranch and two other facilities are in Jerome so the calf ranch

2    is Jerome.  We have a small dairy in Jerome and also a feedlot

3    in Jerome and then the larger dairy is 30 miles east of Burley.

4    Q.  Can you describe the dairy operations?

5    A.  The dairy operations, there are two facilities.  Like I

6    said, there's a smaller one in Jerome.  The large dairy's east

7    of Burley.  We're milking about 35,000 cows.  About half of our

8    work force is dedicated to the dairy operation and we've been

9    dairying for about 13 years.

10   Q.  Can you describe the custom calf raising?

11   A.  Custom calf raising, for people that don't understand what

12   that is, that would be like a daycare center.  So we have other

13   dairy farmers that want us to raise their day-old baby calves so

14   they choose to do that.  It's very labor intense and takes a lot

15   of skilled labor to do that.

16           When we started in business back in 1996, we started

17   raising calves.  That's where my business started.  We grew that

18   into a calf raising facility and we bring in approximately 250

19   calves a day and then raise them up to about seven months of age

20   and return them back to the owners.

21   Q.  Can you describe the beef division?

22   A.  The beef division, we have a cow-calf operation and then we

23   also have dairy beef cross calves.  These are calves that are

24   non-dairy replacements so a milking cow, would either have a

25   dairy replacement or now a beef calf so we take those beef

1    calves, we raise those at the calf ranch and then we send those

2    from the calf ranch on to another facility to raise them to fats

3    so the beef -- when we say the beef, the calf ranch is tied into

4    our beef division.  We also are a minority partner with AgriBeef

5    on a True West beef plant.

6    Q.  Can you describe the farming division?

7    A.  The farming division is either irrigated ground or pasture.

8    The pasture's designated to the beef cattle.  All the farm

9    ground is crops, mostly alfalfa and corn raised to feed those

10   hundred thousand cattle and then we do rent a little bit of our

11   ground out to potato farming.

12   Q.  Can you describe the trucking division?

13   A.  The trucking division, there's roughly 50 semis.  The

14   majority of the work is designated to our farm's needs which

15   would be hauling livestock -- hauling livestock, hauling manure,

16   hauling feed on a daily basis.

17   Q.  And does Millenkamp Cattle own all of the assets associated

18   with those divisions?

19   A.  Millenkamp Cattle owns all the personal property.

20   Q.  And is the real estate owned by the other entities?

21   A.  Yes.

22   Q.  Who are your primary lenders right now?

23   A.  Primary lenders would be MetLife on the real estate, Rabo,

24   Ag on the short-term, Conterra as well along with Beamo

25   (phonetic) as a participant with Rabo and Homestead as a

1   participant with Rabo.

2   Q.  And what's your loan history with MetLife?

3   A.  MetLife's history would be close to 2005, we started doing

4   business with MetLife on a long-term real estate loan to

5   current.

6   Q.  Who's your primary contact with MetLife?

7   A.  Clear Creek Mortgage and the guy's name is Hiram Finney and

8   that's who we've been doing business with since I've moved to

9   Idaho.

10  Q.  What's your loan history with Rabo?

11  A.  We started doing business with Rabo approximately 2010 on

12  real estate and approximately 2015, we switched Rabo from being

13  a long-term lender to being our short-term lender.

14  Q.  Did you go back to MetLife at that point?

15  A.  Yes.

16  Q.  And why did you decide to go back to MetLife?

17  A.  The reason we went back to MetLife and switched Rabo from

18  long-term to our short-term lender was a conversation we had

19  with those two lenders, with MetLife and with Rabo and myself.

20  We planned a large dairy expansion.  Those plans were started

21  roughly in 2010 but about 2015, we knew we were going to do

22  another expansion.

23          Rabo was better suited for the short-term lender and

24  wanted to do the short-term side and MetLife wanted to do more

25  in the long-term lending.  And the other reason we chose those

1    two was they had a very good reputation working together.  I

2    should say working well together if you get into rough times

3    financially.  That's why we chose that marriage.

4    Q.  And when did you say Millenkamp Cattle expanded its

5    operations?

6    A.  We've been in constant growth since we've started but I

7    think what you're referring to is in 2019, we decided to expand

8    on our dairy operations significantly.

9    Q.  And you worked with Rabo and MetLife to expand during that

10   2019 period?

11   A.  Yes, and prior to that.

12   Q.  Can you kind of describe what happened with that expansion

13   along the way with MetLife and Rabo?

14   A.  2019, we decided to do a large expansion.  Sat down with

15   Rabo MetLife together, told them about the scope of the project,

16   the money that was going to need to be borrowed to do the

17   project and we started construction.  To stick to MetLife, the

18   plan was that they would borrow money upfront for the

19   construction and there would be another loan at the end of the

20   construction project to finalize the financing needs.

21        We've done approximately 11 loans with MetLife.  Normal

22   course of business was they give you the green light verbally,

23   maybe through e-mails.  Their one demand -- MetLife's demand was

24   when we finalized the construction that they would not fund

25   until the construction was 100 percent finished.  There was an

1  appraisal done and they made us make sure there was no liens on

2  any of our assets.

3       Rabo was onboard with that plan.  Rabo knew that we

4  would be using some short-term money to fund the construction

5  and Rabo was good with Met's conditions that they put on us with

6  the lien and the appraisal.  So everything was going according

7  to the plan.  Construction was finished.  We ordered our

8  appraisal which we got.  We had a couple construction liens that

9  we bounded around to clean that up and satisfy MetLife and the

10  $45 million that MetLife committed to us never came.

11  Q.  And what was happening with Rabo's loan during that time?

12  Was it getting ready to mature?

13  A.  During this -- yeah, during this time frame, our line with

14  Rabo was maturing.  MetLife -- sorry, Rabo decided not to issue

15  a new line but put us under a forbearance agreement while we

16  waited for MetLife to fund the 45 million and approximately June

17  or July of '23, MetLife refused or denied that loan and Rabo put

18  us in default.

19  Q.  And did Rabo require at any point additional funding from a

20  third party?

21  A.  Yes.  Yes, they did.

22  Q.  And where did that come from?

23  A.  To please Rabo during the waiting process of MetLife, Rabo

24  demanded us to bring some more cash into the business so we

25  reached out to Conterra and we borrowed approximately $18

1   million from Conterra to throw at our short-term line, Rabo's

2   line, and also Rabo requested a second on all of our real estate

3   which we had significant equity in.

4   Q.  After Rabo issued the notice of default, was there any sort

5   of -- what happened with your steer sales after the notice of

6   default?

7   A.  After the notice of default, Rabo started putting the

8   squeeze on us through keeping all butcher cow, cull cow proceeds

9   and a lot of our steer proceeds -- steer proceeds which is a

10  significant part of our income.

11  Q.  What did that do to your operations?

12  A.  It put a stranglehold on our operations.  We were dealing

13  with money going out and not enough money coming in.

14  Q.  When did the receivership start?

15  A.  I believe the beginning of February.

16  Q.  What did the receiver have direct authority over during the

17  receivership?

18  A.  Finances.

19  Q.  Did they have authority over operations?

20  A.  No.

21  Q.  Were there any negative financial issues during the

22  receivership?

23  A.  Everything the receivership touched turned into a negative

24  on our finances.

25  Q.  Did it have an impact on the vendors that you work with?

1   A.  Every single person that the receivership was in contact

2   with, it hurt our relationship.

3   Q.  Did the receiver offer payments to any of the vendors?

4   A.  To the best of my knowledge -- and I believe that I probably

5   talked to every vendor that they talked to, most of the vendors

6   were made promises that were never kept through promises of

7   payments and/or letters of credit on the bigger vendors.

8   Q.  And would you say that damaged your business?

9   A.  Yes, massively.

10  Q.  Did the vendors threaten to not sell their feed in the

11  future to you?

12  A.  We've had lots of threats.  Most vendors -- you develop

13  long-term relationships with most vendors.  Most vendors we do

14  business with on handshake and trust.  I've never lied to a

15  vendor so this was new territory that the majority what come

16  from the receivership never -- they never got paid.  The

17  promises were not kept.

18  Q.  Would you say the vendors trust the receiver?

19  A.  Absolutely not.

20  Q.  Would you say the vendors trust Rabo?

21  A.  Absolutely not.

22  Q.  Do you think the receiver helped or hurt the business?

23  A.  100 percent hurt our business.

24  Q.  How many years has Millenkamp Cattle been in business?

25  A.  Twenty-eight.

1    Q.  Have you lost money in any of those years?

2    A.  Just last year.

3    Q.  And why do you think you lost money last year?

4    A.  Last year could have been the toughest dairy year in history

5    which means high feed prices, low milk prices.  But with that

6    even being said, the other portions of our business, the calf

7    raising, the farming, the trucking, the beef cattle --

8    especially the beef cattle.  We made quite a bit of money in

9    those other sectors.

10           But the real reason that we lost money was extra

11   expenses that were placed on me through default interest, 10

12   million bucks there, several million dollars on financial

13   advisors, legal fees, opportunity lost.  Those were the real

14   losses in our business.  Without those, we would have made money

15   our 28th year in a row.

16   Q.  And you stated earlier that your company's owned various

17   pieces of real estate in Idaho; is that correct?

18   A.  Yes.

19   Q.  Are you familiar with the real estate and the values of the

20   real estate?

21   A.  Yes, very.

22   Q.  Are you familiar with other agricultural real estate in

23   Idaho and recent sales of real estate?

24   A.  Yes.

25   Q.  Are you familiar with construction costs related to the

1    facilities located on the real estate?

2    A.  Yes.

3    Q.  Based on your knowledge, what do you believe the real estate

4    is valued at today?

5    A.  Around 500 to 550 million.

6    Q.  And is there a digester on the property?

7    A.  Yes, there's one being constructed now.

8    Q.  Can you explain what the digester is and how it adds value

9    to the real estate?

10   A.  We entered into a deal with it's called East Valley

11   Development.  East Valley Development is owned by BP which is

12   British Petroleum and Clean Energy and they are building

13   approximately a $225 million digester on our farm right now.

14   Q.  And does that directly benefit the cash flow at all?

15   A.  It has a lot of really good benefits.  Part of the $220

16   million asset is about half of it, $107 million is designated

17   to -- for manure separation equipment.  That equipment would be

18   necessary for us to run a dairy of the size that we have.

19          The digester partnership is spending all their money on

20   these assets.  What we're excited about, that $107 million asset

21   that they paid for is on our property and owned by us so it will

22   be part of our new appraisal so we know that our new appraisal

23   will jump by $107 million there along with real estate values

24   have gone up recently and there's lots of miscellaneous

25   construction projects that are not on any of the appraisals.

1          The second thing that's good about the digester is just

2     operational savings and some of the royalties.  That combination

3     will be about $10 million a year income.

4     Q.  And the $107 million value you associate with the digester,

5     is that included in your 500 to $550 million real estate value?

6     A.  Yes.

7     Q.  Do MetLife, Rabo and Conterra have security interests in the

8     real estate?

9     A.  Yes.

10    Q.  How much is approximately owed to MetLife right now?

11    A.  Around 180 million.

12    Q.  And how much is currently owed to Rabo?

13    A.  88 million.

14    Q.  How much is currently owed to Conterra?

15    A.  18 million.

16    Q.  So if you take all those together, the approximate total

17    amount owing is 287 million; is that correct?

18    A.  Correct.

19    Q.  And you stated the value in the real estate today is

20    approximately 500 to 550 million; is that right?

21    A.  Yes.

22    Q.  So would you say the secured lenders are over-secured in the

23    real estate?

24    A.  Yes.

25    Q.  And in fact, they're almost $200 million over-secured; is

1    that correct?

2              MS. SCHWAGER:  Objection, Your Honor.  Leading.

3              WITNESS:  I think they're grossly over --

4              COURT:  Sustained.  Hold on.  The objection is

5    sustained.

6    BY MS. MIKKINLINENI:

7    Q.  How much do you think the secured lenders are over-secured?

8    A.  Over 200 million.

9    Q.  I'd like to pull up Debtor's Exhibit 1009.  Do you recognize

10   this document, Mr. Millenkamp?

11   A.  Yes.

12   Q.  What is it?

13   A.  It is a dairy inventory report.

14   Q.  And is it the current inventory?

15   A.  Yes.

16   Q.  For Millenkamp Cattle?

17   A.  Yes.

18   Q.  Who created this?

19   A.  My general manager, David Heida, and myself and office

20   manager Lisa Nelson.

21   Q.  And did you make the format for this inventory?

22   A.  No, I did not.

23   Q.  What is the format based off of?

24   A.  The format is based off a borrow base report that we have to

25   turn in to Rabo Bank monthly.

1  Q.  Based on this inventory report, what's your current head

2  count for cattle?

3  A.  83,729.

4  Q.  What's the total value for the cattle?

5  A.  140 million roughly.

6  Q.  How did you determine the value per head for each of these

7  types of cattle?

8  A.  We believe that is market value based off the best of our

9  knowledge.  I would say daily we're looking to see what beef

10 cattle, dairy cattle are bringing through auctions based off the

11 CME or any other way we can find out what market value is.

12 Q.  How did the values that you saw for current recent sales

13 reports, how did those compare to the values you put on this

14 inventory?

15 A.  We believe it's conservative based off the last couple

16 months of say big auctions that we've seen at our sale barns.

17 There was one just a couple days ago that the cattle sold 3 to

18 $400 higher than what value we placed on this report.

19 Q.  So the value per head might actually be worth more than

20 what's on here?

21 A.  Yes, could be.

22 Q.  Are there any liens above Rabo on the cattle?

23 A.  No.

24 Q.  If we can scroll down, please.  What's next on this

25 inventory here?

1   A.  Title of silage.  Under that, it's haylage and triticale and

2   corn silage.

3   Q.  Can you explain what silage is?

4   A.  Silage is, for people that don't know, it's alfalfa.  You

5   can either bale it or it's dry hay or you can chop it, you know,

6   anything -- so if you take alfalfa, alfalfa's hay.  You chop it,

7   you call it haylage so it's a wet hay product.

8   Q.  And what's the value you associated with the silage?

9   A.  The value on it is the cost that we have in it.

10  Q.  What did you put down on this inventory?

11  A.  $133 per ton.

12  Q.  And that's for the haylage?

13  A.  That's for the haylage and the corn silage, the same.  $104

14  per ton.  That was based off the cost and our accounting firm

15  helps track all that.

16  Q.  And the total you have here is approximately 21 million for

17  the haylage; is that correct?

18  A.  Yes.

19  Q.  Do you normally record value for silage on a cost basis?

20  A.  Yes.  We have audited financial.  That's what they demand of

21  us.

22  Q.  Will you please explain the hay and other feed category?

23  A.  Yes.  Dairy hay, feeder hay, it's dry hay.  Dairy hay goes

24  to dairy cattle.  Feeder hay goes to heifers and dry cows.

25  There's a difference in quality so there's a difference on what

1    we pay for it.  Straw.  We use straw for two reasons.  We feed a

2    little bit of it.  We also use the majority of it for bedding

3    the cattle.

4    Q.  And what is the total value associated with all of this hay

5    and other feed?

6    A.  All those prices were based off of cost.

7    Q.  Is that how you normally value this type of asset?

8    A.  Yes.

9    Q.  And did you assign -- it looks like you've assigned a $2.8

10   million total value to the hay and other feed; is that correct?

11   A.  Correct.

12   Q.  And there are liens on this feed; is that correct?

13   A.  Correct.

14   Q.  After deduction of the liens, what's the total equity in

15   this feed?

16   A.  Close to $12 million.

17   Q.  Can you explain the growing crop investment?

18   A.  The growing crop investment is generally the expenses that

19   we have put into -- into the fall.  So last fall, we would have

20   been doing a lot of tillage work, planting, fertilizing,

21   composting.  Those are expenses that we put into our crop that

22   we'll harvest the following year.

23   Q.  And what do you have it valued at?

24   A.  Close to 4 million.

25   Q.  And how did you determine that value?

1    A.   Cost.

2    Q.   Are there any ag liens on the growing crop?

3    A.   No.

4    Q.   What is the equipment and rolling stock category?

5    A.   Equipment and rolling stock would be all tractors, loaders,

6    trailers, pickups, all equipment used on the farm.

7    Q.   And are you familiar with the values of equipment in your

8    industry and operations?

9    A.   Yes, very.

10   Q.   What value did you associate with your equipment here?

11   A.   There's an appraised value of 19 million.

12          MS. SCHWAGER:  Your Honor, objection.  The debtors had

13   informed me that the value that's set forth on this exhibit for

14   equipment comes from an appraisal that is an exhibit for the

15   debtors of 2022, that they do not have the appraiser available

16   to cross-examine and, therefore, I don't believe that that --

17   that the debtor obtaining information from an appraisal that I

18   cannot then cross-examine the actual party that conducted the

19   appraisal is not helpful and should be excluded.

20          In addition, Your Honor, it's a 2022 appraisal of which

21   there's been different equipment that's been acquired and let go

22   during that time.  Thank you, Your Honor.

23          COURT:  All right.  I'll sustain the objection to the

24   extent the debtor is testifying as to that appraiser's value

25   from that 2022 appraisal.  Go ahead.

BY MS. MIKKINLINENI:

Q.  Mr. Millenkamp, you're familiar with the equipment that you

own, correct?

A.  Correct.

Q.  And you're familiar based on your years of experience with

the values that are associated with equipment in your industry,

correct?

        MS. SCHWAGER:  Your Honor, objection.  Leading.

        COURT:  Sustained.  Go ahead and rephrase your

question.

BY MS. MIKKINLINENI:

Q.  Are you familiar with the values associated with equipment

in your industry?

A.  Yes.

Q.  Why are you familiar with the values of equipment associated

in your industry?

A.  I've been in business myself for 30 years.  Been around it

my whole life.  I buy or sell equipment almost on a weekly

basis.  I would say that I would be an expert on the value of

this kind of equipment whether it's on my farm or on any other

farm.  And then as far as on my land, it's the same way.

Q.  And what do you think the equipment is valued at?

A.  Over $20 million.

Q.  And are there current liens on the equipment?

A.  Yes.  There's approximately $3 million worth of -- sorry.  I

1    don't believe there's any liens on the equipment.  We owe $3

2    million as far as I know on some of that $20 million bucket of

3    equipment.

4    Q.  Will you please explain the supplies, parts and inventory

5    category?

6    A.  Supplies, parts and inventory would be all mechanical parts,

7    all -- all the parts that keep all the milking facilities put

8    together.  A lot of it's electronic components, basic farm

9    parts.

10   Q.  And what value do you associate with those assets?

11   A.  Approximately 4 million.

12   Q.  Are there any liens on those supplies and parts and

13   inventory above Rabo?

14   A.  No.

15   Q.  Will you please explain the calf hutches category?

16   A.  A calf hutch is housing for baby calves, calves that come in

17   as a day old up to 90 days.  It would be like a doghouse

18   basically for a calf.

19   Q.  And what value do you associate with the calf hutches?

20   A.  The value we took was $100 per hole and that was based off

21   some recent sales of hutches.

22   Q.  What's the total value?

23   A.  A little over $2 million.

24   Q.  And are there any liens above Rabo on the calf hutches?

25   A.  No.

```
 1    Q.  So after deduction of the lien amounts above Rabo, what's

 2    the total amount left over at the bottom there?

 3    A.  Around 180 million.

 4    Q.  And how much is currently owed to Rabo again?

 5    A.  88 million.

 6    Q.  So based on these valuations, is Rabo over-secured in the

 7    personal property?

 8    A.  Yes, extremely.

 9         MS. SCHWAGER:  Calls for a legal conclusion.

10         COURT:  Overruled.  Go ahead.

11    BY MR. CHRISTENSEN:

12    Q.  You can answer.

13    A.  Extremely over-secure.

14    Q.  So taking into account the equity cushion in the real estate

15    that you previously testified to and the equity cushion in the

16    personal property, do you believe Rabo's over-secured?

17    A.  Grossly, yes.

18         MS. MIKKINLINENI:  I would like to offer Debtor's

19    Exhibit 1009 into evidence.

20         COURT:  Is there any objection to the admission of

21    Exhibit 1009?

22         MS. SCHWAGER:  Yes, there is, Your Honor.  We don't

23    have any underlying support for the documents that the debtor

24    was referencing.  This is the first time we've ever been

25    provided a report that a herd value is what it is and he
```

1  spoke -- he started to testify that the equipment value was

2  based on the appraisal and so since it has valuations in there

3  from the hearsay report which I can't cross-examine the

4  appraiser, I would object to the admission of this exhibit.

5           COURT:  Can you scroll -- I can look at it.  Are there

6  any other objections to the admission of Exhibit 1009?

7           MR. O'BRIEN:  None from Conterra, Your Honor.

8           MR. GOURLEY:  No objection from MetLife, Your Honor.

9           COURT:  I'm going to overrule the objection, Ms.

10  Schwager.  There's certainly a line item for tractors and other

11  equipment but it doesn't specifically reference the appraisal

12  and the debtor was prohibited from testifying with respect to

13  the value of that appraisal.

14           MS. SCHWAGER:  Thank you, Your Honor.

15           COURT:  Go ahead.

16           MS. MIKKINLINENI:  Thank you, Your Honor.

17  BY MS. MIKKINLINENI:

18  Q.  I'd like to pull up Debtor's Exhibit 1015.  Mr. Millenkamp,

19  do you recognize this document?

20  A.  Yes.

21  Q.  Is it your understanding this is the current budget that was

22  submitted for your DIP motion?

23  A.  Yes.

24  Q.  Within this document, there are milk prices.  How did you

25  determine the milk prices?

1    A.  We determined milk prices based off Glambia's pay formula.

2    Glambia's milk processor that we ship the majority of our milk

3    to, they have a unique formula to them.  A lot of that's based

4    off commodities that are traded off the CME.  For example, block

5    cheese, barrel cheese, whey and a butter component.

6    Q.  Can you explain what CME is?

7    A.  Chicago Mercantile Exchange.

8    Q.  And can you scroll to the critical vendor section, please?

9    Mr. Millenkamp, are the vendors listed here as critical vendors,

10   are they the ones that you've identified as critical?

11   A.  Yes.

12   Q.  And how did you determine that they were critical?  Did you

13   consult with anyone else in your business?

14   A.  Yes.

15   Q.  Who did you consult with?

16   A.  My son, my general manager, my operations manager and my

17   cattle manager.

18   Q.  Can you get the goods and supplies from other vendors in the

19   same quantities and in the same time frame you need them in

20   order to continue care for the cattle?

21   A.  No.

22   Q.  Can you kind of explain that a little bit?

23   A.  There's been a lot of debate on how to create this critical

24   vendor list.  There's so much knowledge that goes with a

25   critical vendor.  It could be an electrician, for example.  It

1   could be a barn maintenance person.

2            Our dairy's unique in size and scale and how automated

3   it is and how modern it is so there's not a lot of people that

4   would -- you couldn't hire another electrician off the street

5   just to come in at a snap of a finger and figure out how to fix

6   a problem when you've never been on the farm before.

7            It's a massive facility.  Without seeing it -- some

8   people in this room have seen it.  They would understand it.  If

9   you haven't, it's just big.  When we say we have $4 million

10  worth of parts, we have those because we run 365, 24 hours a

11  day.  Every day we run.  There's no down time.  We can't be

12  broke down.  We have to have people there to fix it on demand.

13  Parts on demand.  A lot of the parts that we need I don't carry.

14  Some of our critical vendors carry those.  It's hard to live

15  without them.

16            On other vendors, it's -- you know, are there other

17  companies that are big enough to handle our account?  That's

18  another thing.  There's -- our size limits what vendors can

19  actually handle our needs so every one of those is different but

20  they're, you know, all critical.

21  Q.  So you believe these critical vendors are necessary to your

22  operations?

23  A.  Yes.

24  Q.  And what would happen to the livestock if you were not able

25  to move forward with these critical vendors?

1    A.  Well, if you can't feed them, they're going to die.

2    Q.  Did you solicit proposals for DIP financing prior to filing

3    bankruptcy?

4    A.  Yes.

5    Q.  And who did you contact?

6    A.  I contacted MetLife.  Rabo was aware, Conterra and Forbes.

7    Q.  Did you contact Sandton as well?

8    A.  Sorry.  And Sandton.

9    Q.  Were you able to find any financing that would have been

10   unsecured?

11   A.  No.

12   Q.  Were you able to find any financing that did not include a

13   priming lien?

14   A.  No.

15   Q.  How many DIP proposals did you ultimately receive?

16   A.  Three.

17   Q.  And who were those from?

18   A.  Idaho Milk, Sandton, Rabo.

19   Q.  I'm going to pull up Debtor's Exhibit 1012.  Do you

20   recognize this document?

21   A.  Yes.

22   Q.  Is it the DIP proposal you received from Sandton?

23   A.  Yes.

24   Q.  How much is the total loan amount Sandton is offering?

25   A.  45 million.

1    Q.  Are there any conditions on the funding?

2    A.  I believe there's a couple.

3    Q.  Do you want to scroll down, please, to the -- keep going.

4    Go back up.

5    A.  There was a revenue and an operating milestone.

6    Q.  Are those based on the budget that we just went over?

7    A.  Yes.

8    Q.  Is there an exit financing option with this --

9    A.  Yes.

10   Q.  What is Sandton's reputation in the dairy industry?

11   A.  As far as I know, it's very good.  I know that they've

12   worked with other dairy farms in southern Idaho that I know very

13   well so their reputation is good.

14   Q.  And Sandton would be someone that Millenkamp Cattle would be

15   comfortable getting into a long-term relationship with?

16   A.  Yes.  On a couple of these other dairies, these guys were in

17   very tough shape and Sandton helped them exit and keep their

18   farm.

19   Q.  I'm going to pull up Debtor's Exhibit 1011 -- I'm sorry.

20   Scratch that.  Don't pull it up yet.  Did Rabo submit a DIP

21   proposal prior to filing bankruptcy?

22   A.  Yes.

23   Q.  What was the DIP loan conditioned upon?

24   A.  One, they wanted a release.  Another one, they wanted us to

25   liquidate all of our steers which is a significant part of our

1   profitability and they also wanted us to sell real estate.

2   Q.  Was that going to be through a private sale or an auction?

3   A.  Private.

4   Q.  And who was that -- was there an offer for that sale?

5   A.  Yeah.  Interestingly, yeah, there was an offer from one of

6   the -- from Homestead which is a participant with Rabo.

7   Q.  And how much was that offer?

8   A.  16 million.

9   Q.  Do you believe that was current market value?

10  A.  I believe it was half of market value.

11  Q.  Was Rabo only going to provide the DIP up to the amount of

12  the sale?

13  A.  Yes.

14  Q.  Was the 16 million enough to fund operations?

15  A.  No.

16  Q.  So was it feasible?

17  A.  It was not feasible.

18  Q.  And you said that Rabo's prior offer involved steer sales.

19  Can you describe that a little bit more?

20  A.  Rabo was going to put a condition on -- I don't remember

21  whether it was 12 or 15 million but basically would force us to

22  liquidate steers.  They wanted all the proceeds and that would

23  leave a large inventory hole in our operation and an inability

24  to make money off that sector of our business which has been our

25  number one profitability last year.

1    Q.  Did the prior offer require a personal guarantee and a

2    non-compete from you?

3    A.  Yes.

4    Q.  And how was Rabo wanting to treat MetLife in that prior

5    proposal?

6    A.  They wanted to cram them down and prime them.

7    Q.  Were they going to provide any payment to MetLife?

8    A.  Zero principal and zero interest payments to MetLife.

9    Q.  What would that have resulted in?

10   A.  More delays, more cost for us, more stress between MetLife

11   and our business.

12   Q.  I'm going to pull up Debtor's Exhibit 1011.  Do you

13   recognize this document?

14   A.  Yes.

15   Q.  Was it -- is it the current DIP proposal by Rabo?

16   A.  Yes.

17   Q.  What is the initial amount being offered by Rabo?

18   A.  15 million.

19   Q.  Based on the term sheet, are the additional draws in their

20   proposal conditioned upon anything?

21   A.  Yes.

22   Q.  If we'll scroll down to the milestones section.  That's

23   okay.  Is it your understanding that there was a condition that

24   there must be agreed upon revenue restructuring and operating

25   milestones?

1    A.  Yes.

2    Q.  Was that restructuring portion part of Sandton's term sheet?

3    A.  No.

4    Q.  So based on what we just talked about about Rabo's prior DIP

5    proposal, what do you think this restructuring milestone means?

6    A.  Well, through living -- through the receivership, their goal

7    was to liquidate my whole company and sell my farm and reading

8    this, they want the same thing.  The goal is to sell the farm.

9    Q.  Are the additional funds also conditioned on a plan being

10   acceptable to Rabo?

11   A.  Yes.

12   Q.  Is Sandton requiring that?

13   A.  No.

14   Q.  Are the additional draws conditioned on borrowing base

15   calculations?

16   A.  Yes.

17   Q.  And is Sandton requiring that?

18   A.  No.

19   Q.  Is a priming lien required for Rabo's term sheet?

20   A.  Yes.

21   Q.  Is there an intercreditor agreement between Rabo and

22   MetLife?

23   A.  Yes.

24   Q.  Is there an intercreditor agreement between Rabo and

25   Conterra?

1   A.  Yes.

2   Q.  Did the debtors consider the intercreditor agreement issues

3   when considering the Rabo debt proposal?

4   A.  Yes.

5   Q.  Did you anticipate objections by MetLife and Conterra?

6   A.  Yes.

7   Q.  Did you have any concerns as to whether the DIP would still

8   be an option based on that litigation?

9   A.  Yes, I had a lot.

10  Q.  Did you have any fear that you might wind up with no DIP?

11  A.  Yes, I did.

12  Q.  Could you survive with no DIP?

13  A.  No.

14  Q.  Is there any intercreditor concern with Sandton's term

15  sheet?

16  A.  No.

17  Q.  Based on Rabo's current term sheet, would they consider

18  converting the DIP into an exit facility?

19  A.  No.

20  Q.  What's your comfort level with Rabo as a long-term

21  relationship?

22  A.  I have no comfort in doing business with Rabo going forward.

23  Q.  Have you had vendors concerned about who you would pick as a

24  DIP lender?

25  A.  Yes.  I've had numerous phone calls from people with that

```
 1   question, yes.

 2   Q.  What were their concerns?

 3   A.  Their concern was that through the receivership --

 4           MS. SCHWAGER:  Your Honor, objection.  Hearsay.

 5           COURT:  Sustained.

 6   BY MS. MIKKINLINENI:

 7   Q.  Do you believe your vendors would be concerned going forward

 8   with Rabo?

 9   A.  Yes.

10   Q.  Is there a chance that they would not continue working with

11   you if you went forward with Rabo?

12           MS. SCHWAGER:  Your Honor, speculation.

13           COURT:  I'll sustain the objection.

14   BY MS. MIKKINLINENI:

15   Q.  What do you think the outcome would be with your vendors if

16   you went forward with Rabo?

17           MS. SCHWAGER:  Same objection, Your Honor.

18           COURT:  Sustained.

19   BY MS. MIKKINLINENI:

20   Q.  Are there staff and employee concerns with going forward

21   with Rabo?

22   A.  Yes.

23   Q.  Would you have those same vendor and employee issues with

24   Sandton?

25   A.  No.
```

1  Q.  Does this current DIP proposal from Rabo still require you

2  to set aside the steer sale proceeds for Rabo?

3  A.  Yes.

4  Q.  Are you planning on selling steers without replacing those

5  steers in your operations?

6  A.  No.

7  Q.  And why not?  Can you explain that division a little bit

8  more?

9  A.  As I said earlier, it's the most profitable segment of our

10  business.  We like to keep a steady inventory so as we sell

11  cattle weekly, we replace them with new baby calves.  It's the

12  same model I've been using for years.

13  Q.  Did you receive a DIP proposal from another lender?

14  A.  Yes.

15  Q.  And who was that from?

16  A.  Idaho Milk.

17  Q.  And who submitted Idaho Milk's proposal to the debtor?

18  A.  Paul Erickson from Conterra.

19  Q.  Were there any concerns regarding the intercreditor

20  agreements?

21  A.  Yes.

22  Q.  Did Rabo in particular raise issues regarding this?

23  A.  Yes.  I believe they sent a cease and desist order to

24  Conterra.

25  Q.  They sent a letter to Conterra?

1    A.  Yep, yes.

2    Q.  I'm going to pull up Debtor's Exhibit 1013.  Is this the

3    letter that you're referring to?

4    A.  Yes.

5    Q.  And what happened to Idaho Milk's DIP proposal?

6    A.  When they were threatened by that, they pulled their offer.

7    Q.  So they withdrew it after receiving this letter from Rabo?

8    A.  Yes.

9         MS. MIKKINLINENI:  I have no further questions.

10        COURT:  What's that last exhibit number?

11        MS. MIKKINLINENI:  I'm sorry.  What was that?

12        COURT:  What was that last exhibit number?

13        MS. MIKKINLINENI:  1013, Your Honor.

14        COURT:  1013.  Thank you.  And I just want to clarify

15   the record with respect to Exhibit 1009.  I did overrule the

16   objection but that exhibit is admitted.

17        MS. MIKKINLINENI:  Thank you.

18             (Debtor's Exhibit No. 1009 admitted.)

19        COURT:  All right.  It's about 10:30.  Do we want to

20   take a quick break before we cross-examine?

21        MS. SCHWAGER:  That would be great, Your Honor.  Thank

22   you.

23        COURT:  Let's take about a ten-minute break or so and

24   reconvene.

25        CLERK:  All rise, please.

1                              (Recess taken.)

2              COURT:  Please be seated.  All right.  When we left

3    off, we were about to start cross-examination.  Do the parties

4    have a preference as to the order in which cross-examination

5    occurs?  I guess I'm inclined to simply kind of go from my right

6    to left if that works.

7              MS. SCHWAGER:  Absolutely, Your Honor.

8              COURT:  All right.  Let's go ahead and start with

9    counsel for MetLife, please.

10             MR. GOURLEY:  Thank you, Your Honor.  We have no

11   questions.

12             COURT:  All right.  And counsel for Rabo.

13             MS. SCHWAGER:  Thank you, Your Honor.

14                          CROSS-EXAMINATION

15   QUESTIONS BY MS. SCHWAGER:

16   Q.  Sheila Schwager representing Rabo AgriFinance.  How are you,

17   Mr. Millenkamp?

18   A.  Good.

19   Q.  Good.  Mr. Millenkamp, in front of you is a binder that says

20   RAF exhibits.

21   A.  Yes.

22   Q.  Can you put that in front of you, please?  And can I have

23   you turn to Exhibit 3006?  Do you recall signing the forbearance

24   agreement in favor of Rabo AgriFinance, Mr. Millenkamp?

25   A.  Yes.

1   Q.  And is Exhibit 3006 a copy of that agreement?

2   A.  I believe it is.

3   Q.  And that agreement was drafted effective October 20, 2022.

4   Do you recall that?

5   A.  I don't recall the exact time.

6   Q.  On page 1 of that exhibit, do you see that it's dated

7   effective October 20, 2022?

8   A.  Yes.

9   Q.  Do you have any reason to believe that that's not a correct

10   effective date?

11   A.  No.

12   Q.  Under the terms of that forbearance agreement, you were

13   granted until June 30, 2023, to pay the loans off; is that

14   correct?

15   A.  Correct.

16   Q.  And at that time you entered into that forbearance

17   agreement, you acknowledge that the loans had matured on June 1,

18   2022.  Do you recall that?

19   A.  Yes.

20   Q.  And that you had failed to maintain the required borrowing

21   base for certain periods?  Do you recall that?

22   A.  Yes.

23   Q.  And that you had transferred $9 million contrary to the

24   terms of the loan documents?  Do you recall that?

25   A.  Can you ask that again?

1    Q.  Sure.  You had transferred $9 million contrary to the terms

2    of the loan documents.  Do you recall that?

3    A.  Yes, I remember talking to my loan officer about getting

4    approval to do that.

5    Q.  And was that contrary to the terms of the loan documents?

6    A.  I don't remember.

7    Q.  Okay.  So if you look at page 1 of that forbearance, do you

8    see it says, "The borrowers have requested," in the first

9    sentence?

10   A.  Yes, I do.

11   Q.  "That the agent forbear from exercising certain rights

12   around remedies in connection with the borrower's default."

13   Do you see that reference?

14   A.  Yes.

15   Q.  Do you see the reference in sub part 3 that says the

16   transfer defaults is defined below?

17   A.  Yes.

18   Q.  And if you turn to page 5 of the signed forbearance

19   agreement, do you see under sub part R where it defines transfer

20   default?

21   A.  I don't.  I don't see pages numbered in mine.

22   Q.  Okay.  So if you turn to the fifth page which for you, it

23   might just be three -- three flips because it's double-sided.

24   A.  Okay.

25   Q.  And sub part R of the agreement where it says "transfer

1    defaults"?

2    A.  Yes.

3    Q.  Do you see that you had agreed that you had unauthorized

4    transfer to an encumbrance by Argonaut Insurance Company of

5    approximately $9 million called the transfer assets pursuant to

6    the control agreement dated August 9, 2021.  Do you see that?

7    A.  Yes.

8    Q.  So does that refresh your memory that there was a transfer

9    default under the terms of the forbearance agreement that you

10   signed?

11   A.  Yes.

12   Q.  And under that terms of the agreement, you agreed as a

13   condition to the forbearance that you could satisfy a milestone

14   of maintaining a borrowing base of $10 million.  Do you recall

15   that?

16   A.  Yes.

17   Q.  And you agreed if you did not comply with the terms and

18   milestones of that agreement that Rabo AgriFinance could

19   increase the interest rate.  Do you recall that?

20   A.  Yes.

21   Q.  And did you default under the terms of the forbearance

22   agreement?

23   A.  Yes.

24   Q.  Did you pay off the loans by June 30, 2023?

25   A.  No.

```
1    Q.  And after the forbearance agreement, did you -- was that
2    part of the forbearance that you obtain that $20 million
3    mezzanine financing?
4    A.  Yes.
5    Q.  Can I have you, Mr. Millenkamp, turn to Exhibit 3011 in that
6    same book?  Are you there, Mr. Millenkamp?
7    A.  Yes.
8    Q.  And what is that document?
9    A.  It's a borrowing base certificate.
10   Q.  Is that your signature on that document?
11   A.  Yes.
12   Q.  What is the purpose of a borrowing base certificate?
13   A.  Something Rabo uses to gauge where borrowing base margins
14   are.
15   Q.  And what -- why do you understand that Rabo wants a
16   borrowing base certificate?
17   A.  Well, on this occasion, they use it to put us into default.
18   Q.  What are you portraying in a borrowing base certificate to
19   Rabo when you sign those documents?
20   A.  The value that -- a lot of it's inventory is what it would
21   be.
22   Q.  So the value of your herds?  Is that correct?
23   A.  I don't place a value on it, no.  More inventory.
24   Q.  I'm sorry.  What's the distinction?
25   A.  Can you ask the question again?
```

1    Q.  Sure.  What are you valuing when you sign this borrowing

2    base certificate and providing it to Rabo?

3    A.  I don't believe I'm placing a value on it.

4    Q.  Why are you signing that document?

5    A.  I'm signing it because I am the one turning in the

6    inventories.  Rabo's the one placing the value on most of it.

7    Q.  Did Rabo insert the number 102, 545, 223 (sic) under total

8    herd value on Exhibit 3011?

9    A.  I don't know who entered that number.

10   Q.  Was it -- do you believe it could have been Rabo?

11   A.  I believe it's turned in by us.  The values are placed by

12   Rabo.

13   Q.  And how does Rabo place those values?  How do they transmit

14   that information to you?

15   A.  They tell us what values they place on our livestock and the

16   advance rates.

17   Q.  So is there an e-mail correspondence from Rabo telling you

18   to put on this borrowing base certificate the value of a 102,

19   545, 23 and then they ask you to sign it and send it back?  Is

20   that what you're saying?

21   A.  I don't understand your question, Sheila.

22   Q.  Okay.  You said that Rabo placed the value.

23   A.  They're the ones that place the value on our livestock, yes.

24   Q.  So how did you get the number 102, 545, 223 from Rabo to

25   place on a borrowing certificate that you're then sending back

1    to Rabo?

2    A.   How did I get the value?

3    Q.   From Rabo?  In what form of communication?

4    A.   Probably through e-mail.

5    Q.   And do you recall receiving an e-mail from Rabo that said,

6    Mr. Millenkamp put 102, 545, 223 as your herd value?

7    A.   I don't send e-mails.  I don't send these e-mails.  I don't

8    do this spreadsheet.

9    Q.   Okay.  So why do you think you got an e-mail from Rabo that

10   told you to put 102,000 on a herd value?

11   A.   I don't know where you're going with this.  I don't

12   understand the question.

13   Q.   You don't need to know where I'm going.  You just need to

14   answer the factual question.

15   A.   I'm not trying to be argumentive.  I don't get your

16   question.

17   Q.   You testified that Rabo gave you the value of 102,545,223 to

18   put on this borrowing base.

19   A.   I didn't say they gave me the 102.  I said that they tell us

20   what value they place on our livestock.

21   Q.   And what value do they place?

22   A.   Every animal's different.

23   Q.   So are you saying they -- explain to me what you mean by

24   Rabo places a value on the livestock.

25   A.   If we turn an inventory report in for our borrowing base,

1  they place a value on, for example, a milk cow at one number, a

2  baby calf as one number, beef cattle at a different number.

3  Q.  And do they -- in what communication do you receive that

4  from Rabo?

5  A.  I don't remember.  I'm sure they e-mail us the values.

6  Q.  You're sure but you don't receive the e-mails.

7  A.  It's -- as far as I know, it's a fill-in-the-blank.  We turn

8  in the inventory.  They place the values per head.

9  Q.  When you say it's a fill-in-the-blank, where are you filling

10  in the blanks on this borrowing base?

11  A.  I still don't understand what you're asking here.

12  Q.  Well, you said that you fill in the blanks.  What blanks are

13  you filling in?

14  A.  Inventory.  Cattle inventory.

15  Q.  Where do you get the inventory cattle?

16  A.  Off our software program, DairyComp.

17  Q.  Okay.  So you took -- so let's just focus on Exhibit 3011,

18  the signed borrowing base for March 31, 2023.  For eligible

19  dairy cattle of a collateral value of 81,125,168, did you pull

20  that number from your software?

21  A.  No.

22  Q.  Okay.  What number did you pull?

23  A.  The number we would have pulled off our DairyComp software

24  would have been the inventory of the livestock.

25  Q.  So the number of livestock?

1    A.  Yes.

2    Q.  And then you multiplied it by a price that Rabo gave you?

3    A.  Yes.

4    Q.  And how often did Rabo give you those prices?

5    A.  I don't remember.

6    Q.  Did you disagree with the prices that Rabo gave you?

7    A.  Yes, I do disagree with the prices.

8    Q.  Did you?

9    A.  Did I?

10   Q.  Uh-huh.

11   A.  On this -- no, I did not.

12   Q.  Why didn't you?

13   A.  Because I don't have a choice on what value Rabo places on

14   my borrowing base.

15   Q.  How do you know if you don't have a choice if you didn't go

16   back and question the price or dispute the price?

17   A.  We have in multiple occasions talked to Rabo about how low

18   they valued my livestock.

19   Q.  And what's their response?

20   A.  They're not going to move their value up.

21   Q.  So you did question the value.  Is that what you're saying?

22   A.  I have in the past questioned the value that they place on

23   our livestock, yes.

24   Q.  And what's the basis for that?

25   A.  Because it's about half of market value.

1    Q.  And how do you know that?

2    A.  Because I'm very familiar with what livestock's bringing

3    because I'm on the buying and selling end of it daily.

4    Q.  And you have been -- your borrowing base, regardless if

5    you're using the numbers that Rabo provides for the pricing,

6    it's been deteriorating, correct?  It's been declining.

7    A.  It's hard to keep track because Rabo has not consistently

8    valued my livestock the same as my peers in the same area.

9    Q.  Why weren't you able to pay the loan when it matured in

10   2022?

11   A.  At that date, we were waiting for a loan to come in from

12   MetLife.

13   Q.  So you did not have sufficient cash flow to pay your loan

14   obligations as of June 2022.  Is that correct?

15   A.  Prior to that, we negotiated going into a forbearance

16   agreement so I don't believe I have asked to pay off the loan

17   because we were going to enter into a forbearance agreement

18   while we were waiting for MetLife to fund.

19   Q.  And under the terms of that forbearance agreement, you

20   represented to Rabo that you could maintain a $10 million

21   borrowing base under the pricing or conditions that Rabo gave

22   you at the time.  Is that correct?

23   A.  If they didn't move the value of my livestock, if they were

24   not inconsistent valuing my livestock compared to my peers, I

25   could have.

1  Q.  Why didn't you address that when you signed the forbearance

2  agreement?

3  A.  We did address it.

4  Q.  How did you address it?

5  A.  We had conversations with Rabo about how they value the

6  livestock and how they inconsistently value my livestock.

7  Q.  But you still went forward under the forbearance agreement

8  representing that you could maintain a borrowing base of $10

9  million.  Is that correct?

10  A.  Yes, with -- basically with a gun to our head, yes.

11  Q.  Did you look at other resources so that you didn't have to

12  go forward with Rabo such as selling off certain parts of your

13  property that would allow you still to stay in operations?

14  A.  Yes.  I looked at every possible avenue to find solutions on

15  our financing.

16  Q.  And were you not able to find any lenders who would find

17  that your operations were sufficiently viable to issue alone?

18  A.  I did find two.

19  Q.  So why wasn't Rabo paid off?

20  A.  Rabo wasn't paid off because I needed a loan from MetLife to

21  secure the two short-term lenders that I had available at the

22  time.

23  Q.  So you couldn't find a lender that would come in and find

24  you were financially stable enough to take out the Rabo loan

25  that was matured?  Is that correct --

1    A.  Correct.

2    Q.  -- in June of 2022?  So as of -- on Exhibit 3011, as of

3    March 31, 2023, you're out of compliance with the forbearance

4    agreement.  Is that correct?

5    A.  Correct.

6    Q.  And if you turn to -- well, and let me back up.  So in your

7    inventory report, your -- you testified that the herd collateral

8    value was 140 million.  Correct?

9    A.  Correct.

10   Q.  Which is $38 million more than in March 31, 2023.  Correct?

11   A.  Correct.

12   Q.  And you also testified that you thought that the receiver

13   had hurt your operations recently.  Is that correct?

14   A.  Absolutely yes.

15   Q.  And you've had to sell livestock and Rabo has retained those

16   collateral proceeds; is that correct?

17   A.  Yes.

18   Q.  So how does your herd value increase from 102 million to 140

19   million as of today's date?

20   A.  The value that you guys are using -- that Rabo's using is

21   based off the value that they want to place on the livestock and

22   the market value is significantly higher, close to double of

23   what Rabo is placing on our herd today.

24   Q.  What is the number that Rabo's placing on your herd today?

25   A.  Well, if you talk milk cows, I believe it's $1,200 a cow.

1    Q.  And the market is --

2    A.  22 to $2,600 a cow.

3    Q.  In the inventory report that you have, you listed the entire

4    value of the personal property at 178 million.  Do you see that

5    or do you not recall that?

6    A.  I recall that, yes.

7    Q.  And in this borrowing base, you have it at 128,999.  Do you

8    see that?

9    A.  Yes.

10   Q.  Do you recall that in your motion for use of cash collateral

11   and motion for DIP financing that you initially filed and you

12   have a declaration, you testified that the personal property

13   value was 150 million.  Do you recall that?

14   A.  No.

15   Q.  Okay.  Do you think that that would have been an incorrect

16   representation that the value was 150 million of personal

17   property as of April 2, 2024?

18   A.  No.

19   Q.  I'm sorry?

20   A.  No.

21   Q.  You think that the personal property was worth 150 million

22   as of April 2, 2024?

23   A.  I believe it's worth 178 million today.

24   Q.  Okay.  Can I have you --

25   A.  I don't think you're comparing apples to apples.

1    Q.  Can I have you turn to Exhibit 3031, paragraph 38?

2    A.  Which one, Sheila?

3    Q.  It's Exhibit 3031, paragraph 38.

4    A.  Okay.

5    Q.  Do you see in that paragraph 38 where you're declaring under

6    penalty of perjury that the unaudited financial statements

7    reflect total assets of 643 million of which you attribute 493

8    million to real property and 150 million to personal property?

9    A.  Yes.

10   Q.  So why in your declaration did you say the personal property

11   value was 150 million but now you're contending it's 178

12   million?

13   A.  I don't know the discrepancy.  I'm imagining the most recent

14   one that they added equipment and possibly the hutches and I

15   don't know what else they would have added on there that they

16   missed on the first one.

17   Q.  Well, do you know?  This is your declaration that you signed

18   on April 2, 2024.  Did you check whether these other items of

19   personal property were included?

20   A.  I'm not sure.

21   Q.  So you don't know, as you sit here today -- let me back up.

22   When you said that on April 2 that the personal property was

23   valued at 150 million, what personal property were you referring

24   to?

25   A.  I'm not sure.  Is it listed?

```
 1    Q.  It's not.  Have you gone through a list of your personal

 2    property to try to come up with an accurate fair market value?

 3    A.  Yes.

 4    Q.  And where is that list?

 5    A.  I don't know where that list is.

 6    Q.  And how long ago did you do that?

 7    A.  I've done a couple recently.  As recently as a couple days

 8    ago.

 9    Q.  Did you do a list prior to your declaration being filed on

10    April 2, 2024?

11    A.  I think so.

12    Q.  Why didn't you attach that to your declaration?

13    A.  I don't know why they did not.

14    Q.  Well, when you signed it, did you ask about itemization of

15    personal property that you were representing the value was 150

16    million?

17    A.  I did not.  I hire people to do that, Sheila.

18    Q.  But you're signing a declaration, right?  So --

19    A.  Yes.

20    Q.  Okay.  Do you know what personal property you were valuing

21    at 150 million at the time you signed your declaration?

22    A.  I don't -- without that list, I couldn't tell you exactly

23    how we got to $150 million.

24    Q.  When you say we got to 150 million, who was involved in the

25    we?
```

1   A.  I'd have to refer to my general manager and I don't

2   remember -- there's been a lot going on.  I don't remember who

3   we worked on it with.

4   Q.  Were you personally working on it?

5   A.  I probably was.

6   Q.  But you don't recall?

7   A.  I'm -- like I said, I've been working on a lot of different

8   things.

9   Q.  Okay.  On this inventory report that you testified from

10  today where you testified that the equipment was worth

11  19,294,200, do you have an itemized list to substantiate that

12  value?

13  A.  Yes, we do somewhere.

14  Q.  Is that a list that you created?

15  A.  It was from an appraiser.

16  Q.  So you're referring to a 2022 appraisal for the itemization

17  that's of the equipment that's reflected in that $19 million

18  value?

19  A.  It's based off an appraiser and my own knowledge.

20  Q.  And that was 2022.  So has any of that equipment been sold

21  or transferred?

22  A.  Yes.  And actually the current value is higher than that

23  currently.

24  Q.  How do you know that?

25  A.  Because we had another appraisal done.

1  Q.  And do you have a list of what that appraisal -- when was

2  that appraisal done?

3  A.  Sometime in '23.

4  Q.  So why is it that you're reflecting on this inventory list

5  in the 2022 appraisal?

6  A.  Maybe it was -- I believe it could have been a typo because

7  there was one done in '22 and in '23.

8  Q.  And so you think the value's higher and it's based on a 2023

9  appraisal?

10 A.  It could be higher, yes.  I'm not sure.  I don't remember

11 the exact numbers.

12 Q.  So you don't really know what consists of the 19,294,200

13 that you have on this inventory list.  Is that correct?

14 A.  I could not recite every piece of equipment that is on that

15 list but, yes, we do have that list.

16 Q.  Why wasn't it filed with the court?

17 A.  I have no idea.

18 Q.  Do you have -- when you are referring to the 19,294,200,

19 does this consist of the new CNH equipment that you recently

20 purchased?

21 A.  I don't recall.  What equipment are you referring to?

22 Q.  Do you recall that in this case, CNH filed an objection?

23 A.  I just heard about that, yes.

24 Q.  And what -- well, I won't ask that.  In that objection, CNH

25 states that you entered into two retail installment contracts to

1  purchase 55 tractors from CNH on February 6, 2024.  Is that a

2  true statement?

3  A.  I believe we entered into a lease on those tractors.

4  Q.  So is CNH wrong when it attached two retail installment

5  contracts to its objection?

6  A.  I don't understand what they did.  I haven't had time to

7  check into it.

8  Q.  But you don't believe that you purchased two tractors from

9  CNH on February 6, 2000 -- or 55 tractors, sorry, on February 6,

10  2024?

11  A.  We had a purchase on some tractors and we had a lease of

12  some tractors.  So without getting -- I don't know all the

13  details.  I'd have to check into it.

14  Q.  So if CNH filed with its objection two retail installment

15  contracts that showed that you purchased 55 tractors on February

16  6, 2024, would you have any reason to dispute that was a

17  valid -- an accurate statement?

18  A.  No.  But I'd like to see the information.

19  Q.  Okay.  Do you recall that as of February 5, 2024, the

20  receivership petition had been filed --

21  A.  Yes.

22  Q.  -- in state court to put the debtors into receivership?

23  A.  Yes.

24  Q.  And that hearing was set for February 9.  Do you recall

25  that?

1    A.  I don't remember all the particular dates.  We were in court

2    several times with the receivership.

3    Q.  In early February.

4    A.  Sometime in February, yes.

5    Q.  And as of the bankruptcy petition date under this retail

6    contract -- two retail contracts we just talked about that had

7    55 tractors, you owe under those two retail contracts $3

8    million.  Does that sound correct?

9    A.  Without looking at it, I couldn't recall.

10   Q.  You don't remember entering into a retail installment

11   contract where you would obligate the debtor to $3 million?

12   A.  I don't remember the exact numbers.

13   Q.  Okay.  Do you recall that you entered on that same date

14   right before the receivership hearing, you entered into a lease

15   for 16 tractors and remotes on February 6?  Does that sound

16   familiar?

17   A.  I don't remember that exactly, no.

18   Q.  If CNH had filed an objection in this bankruptcy court where

19   it attached a lease where you had leased 16 tractors and it's

20   dated February 6, 2024, would you have any reason to dispute

21   that?

22   A.  I don't know.  I'd have to check it out.

23   Q.  Do you remember entering -- right before the receivership

24   entering into these contracts with CNH where you leased and

25   purchased 81 tractors?

1    A.  I don't remember exactly when that happened.

2    Q.  That's a significant transaction, is it not?

3    A.  Yes.

4    Q.  And if the contracts are dated February 6, 2024, would you

5    have any reason to dispute them?

6    A.  I'd have to look at it.

7    Q.  Okay.  We'll get those for you.  So in that -- do you recall

8    obligating the debtors to $12.2 million to purchase 81 new

9    tractors right before the receivership?

10   A.  We entered into a lease -- these are not a purchase.

11   Q.  Leased and purchased, correct, 81 tractors?

12   A.  You'd have to show me the paperwork.

13   Q.  Okay.  We'll pull that.  I don't want to delay it but we'll

14   definitely get that before we get off the stand.

15          When you enter into contracts to obligate the debtors

16   to $12.2 million, is that not a significant factor for you?

17   A.  Yearly, we roll in and out of leases so I would say no, it's

18   not significant.

19   Q.  And when -- and right before the receivership, you're having

20   cash flow issues, correct?

21   A.  No.  I had banking issues that created some cash flow

22   issues.

23   Q.  You were not able to pay your debts as they became due.  Is

24   that correct?

25   A.  Can you ask specifically?  What are you asking?

1   Q.  Did you pay the Millenkamp Cattle, Inc., pay its debts

2   due -- when they came due, an invoice -- a feed invoice became

3   due, were you able to pay all of those invoices as they became

4   due?

5   A.  No, I couldn't during the receivership.  It was pretty

6   bobbled with those guys.

7   Q.  Prior to the receivership, were you able to pay your debts

8   as they became due?

9   A.  Which debts?

10  Q.  Feed vendors.

11  A.  We constantly pay feed vendors.  What specifically are you

12  asking?

13  Q.  Were you delinquent before the receivership in your bills

14  owed to your feed vendors?

15  A.  On some, yes.

16  Q.  And did you have feed vendors file lawsuits to keep you from

17  using the feed that were on your operations?

18  A.  Yes.

19  Q.  So as of -- when you -- when the receivership petition was

20  filed, Millenkamp Cattle was not able to pay its debts as they

21  became due.  Isn't that correct?

22  A.  Yes, when Rabo was sweeping all the cash, that did happen.

23  Q.  And that is -- when you say Rabo was sweeping all the cash,

24  were you not still receiving milk assignment checks?

25  A.  Yes, I was receiving milk checks.

1    Q.  And were you using those milk checks to operate?

2    A.  Yes.

3    Q.  Okay.  So Rabo was not sweeping all of the cash, correct?

4    A.  No, they were sweeping a significant amount of cash.

5    Q.  And the significant amount of cash, was that the livestock

6    that you were selling?

7    A.  Yes, and sometimes the milk checks they would hold for a

8    certain period of time.

9    Q.  Were the milk checks -- prior to the receivership, were the

10   milk checks going to Rabo for Rabo to hold or were they going

11   directly to Millenkamp?

12   A.  As far as I remember, Rabo would freeze our account at times

13   so that's the same as sweeping the check.

14   Q.  But ultimately, you had all the milk proceeds to operate

15   your -- Millenkamp Cattle?

16   A.  If the lines were froze by Rabo, the answer would be no.  If

17   the lines were not frozen, then I would answer yes.

18   Q.  Okay.  And were they frozen when the receivership petition

19   was filed?

20   A.  I don't remember.

21   Q.  Okay.  So why if you're having issues, regardless of why the

22   issues are there for cash flow, why would you be entering into

23   contracts and leases to obtain brand-new equipment and incur

24   debt of $12.2 million?

25   A.  When you run a business like ours and it takes the amount of

1    equipment -- several hundred pieces of equipment, you're

2    constantly replacing equipment.  Most of our large equipment is

3    leased.  All the lease -- leases usually have time -- one-year

4    leases, two-year leases.  So the lead time on getting this

5    equipment replaced is six months to a year so you're entered

6    into commitments with these companies and they want their old

7    equipment back and they want to replace it with the new

8    equipment.

9            So for us, we're replacing one lease payment for

10   another lease payment.  The difference between an old lease and

11   a new lease is usually higher but it's insignificantly higher

12   for our whole overall budget.

13   Q.  Well, when you're insolvent and you can't just take out the

14   lease of the used equipment at the lower amount versus getting

15   brand-new equipment at the higher amount, isn't that something

16   you have to take into account for the benefit of your creditors?

17   A.  Well, the receivership and Rabo tried to work a deal with

18   Western States Cat and that was completely bobbled.

19   Q.  You're not -- whoa, whoa, whoa.  We're not even at the

20   receivership yet.  So we're talking about right before the

21   receivership, you decided to actually purchase 55 new tractors

22   from CNH.  That's not even a lease.  And then if you talk about

23   the lease, it's less amount of money to operate with older

24   equipment than it is to lease brand-new equipment, correct?

25   A.  You're incorrect.  It's -- unless you own the equipment.

1    It's cheaper for us to keep our equipment up to date than it is

2    to run junk and deal with the mechanic and issues and the cost.

3    Operational costs go up when you keep old equipment.

4    Q.  And were they all junk, the leased equipment?

5    A.  I would wouldn't say junk.  That's in the eye of the

6    beholder but they were definitely going to cost more to keep

7    them than to replace them.

8    Q.  Did you -- you went through it item by item to determine

9    whether all of the tractors that you were replacing on leases

10   needed to be replaced?

11   A.  Item by item, no.  I judge it as a group of tractors and I

12   know the operational cost of running those 50 tractors and I

13   know the operational cost of running the new tractors.

14   Q.  So that addresses leases.  What about the 55 new Kubotas --

15   A.  I'm talking about the owned -- I'm talking about the owned

16   ones.

17   Q.  Right.  So what about the CNH 55 Kubota tractors that you

18   purchased?

19   A.  That's what I was talking about, Sheila.  It's cheaper to

20   replace the old ones and buy new ones.  The operation --

21   Q.  So buy brand-new tractors.

22   A.  Yes, it is.

23   Q.  Versus leasing.

24   A.  Yep.  Operational cost is cheaper by --

25   Q.  What is that operational cost to you?

1   A.  I don't -- I don't know exactly without looking at the

2   numbers.

3   Q.  What numbers are you looking at to determine that it would

4   cost you more to maintain a tractor that's not brand-new?

5   A.  When you buy new tractors, you have warranties on them.  You

6   know the cost of the tractors.  You know you have no operational

7   expenses because it's covered under warranty and I compare that

8   with keeping the older tractors and having to replace motors and

9   hydraulic systems and tires and so on and so forth.  So easily,

10  it's cheaper for the company to replace the tractors on our

11  schedule.

12  Q.  To always get brand-new tractors.

13  A.  Yes.

14  Q.  And you have an analysis of this where you've went through

15  what the operational costs would be for old tractors versus

16  brand-new?

17  A.  Yes.

18  Q.  And are you going to provide that?

19  A.  I wasn't asked for it.

20  Q.  Now, in the budget you filed with your DIP motion, you

21  proposed to pay $4 million to H&M as a critical vendor, correct?

22  A.  Correct.

23  Q.  And then in the recent one, 402 million, right?

24  A.  I don't remember the difference.

25  Q.  Okay.  Do you remember why you increased it --

1   A.  No, I don't.

2   Q.  -- in this recent budget?

3   A.  No.

4   Q.  Were you a participant in the -- working on the budget that

5   was filed last night?

6   A.  Yes.

7   Q.  But that's another 200,000 that you're giving to a creditor

8   that's going out of the estate and you don't remember why?

9   A.  No, I don't remember why.

10  Q.  What is your ownership interest in H&M?

11  A.  50 percent.

12  Q.  And how much is H&M owed?

13  A.  I don't remember.  Like 4 and a half million I think.

14  Q.  So you're talking about paying H&M almost in full through

15  your critical vendor motion?

16  A.  Correct.

17  Q.  Does H&M have an ag lien on the feed?

18  A.  Yes.

19  Q.  And what's the value of that ag lien?

20  A.  The whole 4 and a half million or whatever we owe.

21  Q.  And you proposed to pay a silage group $5 million.  Do you

22  recall that?

23  A.  Yes.

24  Q.  How many creditors are in this group?

25  A.  I don't recall for sure but I'm thinking about 15 or so.

1   Q.  And what are they owed collectively?

2   A.  I don't remember.

3   Q.  Is it more than $5 million?

4   A.  I don't remember.

5   Q.  Why do you remember what's owed to H&M but not to the silage

6   group?

7   A.  Because I just talked to -- we talked more about the H&M one

8   recently because we put them high on the critical vendor list

9   and they're going to start harvesting within 30 days.

10  Q.  Your silage group that you're only paying 5 million to,

11  there's 16 of them.  Do you have any reason to believe that is

12  paying them in full?

13  A.  I don't remember.

14  Q.  Who decides who's a critical vendor?

15  A.  A group -- a group of us.

16  Q.  And who's the group?

17  A.  Myself, my general manager David Heida.

18  Q.  Anybody else?

19  A.  A little bit from two of my other foremen.

20  Q.  Who?

21  A.  Two of my other foremen, Mario Orcanonza (phonetic) and Mark

22  Harrison.

23  Q.  Are there any other critical vendors that the debtors have

24  an interest in?

25  A.  No.

1    Q.  What is the criteria that this group uses to decide whether

2    or not they're a critical vendor?

3    A.  A vendor that's irreplaceable to give us the goods or

4    services that we need in the time frame that we need it.

5    Q.  Have you reached out to other vendors to see whether or not

6    you could obtain feed?

7    A.  Yes.

8    Q.  And who have you reached out to?

9    A.  Whether it was through me or third party, it would be

10   Scoular, J.D. Heiskell, Valerian, Viterra, Bunge, U.S.

11   Commodities.  Maybe a few others.  I can't remember them all.

12   Q.  Viterra's on the critical list, right?

13   A.  Yes.

14   Q.  Critical -- are any of those others that you just

15   referenced?

16   A.  I don't remember.  I think J.D. Heiskell's on there.

17   Q.  So have you reached out to other vendors that are not on the

18   critical vendor list to see whether or not they would supply

19   feed so that you don't have to pay critical vendors?

20   A.  There's not any other feed suppliers in our area that could

21   supply us.

22   Q.  How do you know that?

23   A.  Because I'm in the industry.

24   Q.  So the answer is no, you didn't -- you haven't reached out

25   to anybody else other than what's on your critical vendor list?

1    A.  There's people that -- I would not reach out of the area

2    because they can't supply us and I believe I listed all the feed

3    suppliers that are big enough to handle our volume.

4    Q.  Didn't the receiver come up at the last minute with someone

5    to feed when your feed vendors obtained TRO's and you wouldn't

6    go forward with that feed vendor?

7    A.  I don't believe they did.  Do you have --

8    Q.  You have no idea what I'm talking about?

9    A.  I don't remember, no.

10   Q.  Okay.

11   A.  Can you give me some --

12   Q.  I will, yes.  Can I have you turn to Exhibit 3013?  And do

13   you see this is a borrowing base certificate from Millenkamp

14   Cattle dated December 31, 2023?

15   A.  Yes.

16   Q.  Do you recall the Lisa Millenkamp -- well, let me back up.

17   Who is Lisa Millenkamp to Millenkamp Cattle?

18   A.  What's your question?

19   Q.  What's her position at Millenkamp?

20   A.  Lisa's our office manager.

21   Q.  And would you have her forward the financial information to

22   Rabo under the terms of your agreement?

23   A.  Yes.

24   Q.  And did she forward this December 31, 2023?

25   A.  I'm not sure but I'm assuming yes.

1    Q.  Is this -- are the following -- are the pages that are

2    listing the backup for that borrowing base, do those come from

3    your system, the Millenkamp Cattle system?

4    A.  Yes.  Probably.

5    Q.  So what was the borrowing base as of December 31, 2023?

6    A.  It looks like negative 3 million.

7    Q.  So it went from the March 31 of 7.3 million positive which

8    still was not within the borrowing base minimum and decreased to

9    3.86.  Is that correct?

10   A.  Correct.

11   Q.  And what was the cause for that decrease?

12   A.  Lots of it was default interest.

13   Q.  Do you know how much default interest you paid?

14   A.  Around 8 million I believe in '23.

15   Q.  And what was your -- did you say 8 million?

16   A.  I'm guessing, yes.

17   Q.  What was your -- did you have a profit at the end of

18   December of 2023 or a loss?

19   A.  No.  Loss.

20   Q.  And what was the extent of the loss?

21   A.  I don't recall.

22   Q.  Does 16 million sound correct?

23   A.  It could, yes.

24   Q.  So it didn't -- it wasn't all because of default interest,

25   correct?

1    A.  The other big chunk was financial advisors, lawyers,

2    opportunity lost.

3    Q.  And the loss of opportunity was due to what?

4    A.  The lack of financing and support from our banks to operate

5    normally and make the kind of deals that we usually do.  So a

6    lot of it was making bad feed deals because we were high risk to

7    our vendors.

8    Q.  And why were you high risk to your vendors?

9    A.  Because my banking relationship was not good.

10   Q.  And you couldn't find other financing from somebody other

11   than MetLife or Rabo; is that correct?

12   A.  Correct.

13   Q.  And the reason that you were paying default interest was

14   because you were in default under the terms of the forbearance

15   agreement; is that correct?

16   A.  Correct.

17   Q.  And if you turn to Exhibit 314 (sic), do you recognize that

18   document?

19   A.  Yes.

20   Q.  And what is that document?

21   A.  It's a borrowing base.

22   Q.  And was this during the receivership when this borrowing

23   base was created?

24   A.  Yes.

25   Q.  Did you provide access to the receiver to obtain the type of

1    information necessary to create the borrowing base?

2    A.  Yes, we believe so.

3    Q.  Is there anything in this borrowing base that you believe is

4    not accurate?

5    A.  Yes.  The whole thing.

6    Q.  And why is that?

7    A.  Because Ampleo did not have the knowledge to put that

8    together.  We had -- the other reason is we had our normal

9    accounting firm that's done it for 10 years say that there was

10   significant holes in it and that they weren't even close.

11   Q.  When you say your accounting firm, did your accounting firm

12   review the borrowing bases that we've just talked about?

13   A.  Yes.

14   Q.  And did they find any holes in those borrowing bases?

15   A.  No.

16   Q.  Okay.  So what specifically were the holes on Exhibit 3014?

17   A.  I don't remember.  There was numerous ones.  We didn't get

18   into it because we didn't put any credit in this borrowing base

19   because it was done wrong.

20   Q.  And can you explain to us what was done wrong on the

21   borrowing base?

22   A.  Well, you have a receivership come in that's incompetent to

23   do work like this.  They didn't understand DairyComp where we

24   get our cattle inventories, they don't understand EZfeed which

25   controls our commodity inventories.  They just didn't understand

1    what they were doing.

2    Q.  Did you sit down and explain to the receiver your system so

3    that the receiver could accurately project your borrowing base?

4    A.  Our office gave the receivership all the -- you know, the

5    answers to all their questions, yes.

6    Q.  So why wasn't this borrowing base in compliance?  Because

7    you said that it's because they couldn't understand your system

8    but then you explain your system so why doesn't this borrowing

9    base have accurate information?

10   A.  They had access to 100 percent of our data.  They just

11   weren't smart enough to interpret it and put it into a borrowing

12   base.

13   Q.  Did you sit down and explain to them how to interpret it?

14   A.  I believe Lisa did but they didn't understand it.

15   Q.  Did you see Lisa do it?

16   A.  I seen Lisa working with Ampleo numerous times.  I don't

17   remember every time what they were doing.

18   Q.  On this borrowing base, it states that there are certain

19   liens filed by feed suppliers which may impair eligible feed

20   volumes that's presented on this borrowing base.  Would you

21   agree with that statement, that the ag liens would affect a

22   borrowing base?

23   A.  I never seen this borrowing base until right now so I

24   don't -- I don't know.

25   Q.  You've never seen this borrowing base?

1   A.  I haven't seen this borrowing base, no.

2   Q.  Okay.  And the decline in the borrowing base, that's not

3   affected by interest, correct?

4   A.  I believe it's an expense.

5   Q.  Are interest expenses set forth on your borrowing base

6   certificate?

7   A.  No.

8   Q.  Okay.  So a borrowing base isn't going to deal with default

9   interest that you're paying out or be reflected, correct?

10  A.  It would be in as an expense.

11  Q.  Under what category?

12  A.  I don't know what category it's in.

13  Q.  What was that?

14  A.  I don't know what category it would be in.

15  Q.  So are you not really the person -- even though you're

16  signing the borrowing bases, are you really not the person that

17  understands the information behind it?

18  A.  Our accounting firm puts it together.

19  Q.  And then do you send it -- you sign off on it?

20  A.  I sign off on it.

21  Q.  And what's the purpose of you signing off on it?  Do you

22  look at it for accuracy?

23  A.  Yes.

24  Q.  So when you sign off on a borrowing base, you've reviewed it

25  with your system to make sure it's accurate?  Is that correct?

1    A.  What do you mean the system?

2    Q.  You said that you pull the information from -- what did you

3    call it?  It started with A, your system software.

4    A.  DairyComp, EZfeed and QuickBooks.

5    Q.  EZfeed.  Sorry, it wasn't an A.  Yes.  So are you going back

6    and verifying that those are correct?

7    A.  No, I'm not.

8    Q.  Then how -- when you say you sign off on them to project

9    that they're correct, how do you know they're correct?

10   A.  I look at previous borrowing base and, for example, this one

11   that shows minus 13 million, it was a significant change from

12   the month before so I know we didn't lose that kind of money.

13   Q.  So you say I know we didn't lose that kind of money.  Did

14   you go back and review the numbers to figure out why it was

15   showing something?

16   A.  Yes.  I called Kristen Zubbizareta from Eide Bailly who's

17   been my accountant for 10 years and I said, "I didn't see this

18   but somebody called and told me that the borrowing base that

19   Ampleo turned in wasn't even close."  I talked to my accountant.

20   I said, "What do you think?"  And she started laughing.  And she

21   says, "I'll fix it when we can start working for you again."

22   Q.  So it was -- but you have a loss at the end of the year of

23   $16 million, correct?

24   A.  Correct.

25   Q.  Okay.  You had testified to this Court that there was a

1   value of 178 million in personal property.  Do you recall that?

2   A.  Yes.

3   Q.  What is your education?

4   A.  I graduated high school.

5   Q.  Have you ever worked for a business that values personal

6   property?

7   A.  No.

8   Q.  Have you ever taken any education courses that teach you how

9   to value personal property?

10  A.  No.

11  Q.  The personal property value includes leased equipment from

12  companies like CNH, correct?

13  A.  Can you repeat that, please?

14  Q.  Yes.  The personal property value of 178 million, that

15  includes leased equipment from companies like CNH, correct?

16  A.  No.

17  Q.  And Western States.  You didn't include any of your leased

18  equipment in the personal property itemization?

19  A.  I don't believe they did all the lease stuff.

20  Q.  You said "they did."  Who's "they"?

21  A.  The appraiser.

22  Q.  In 2023 or 2022?

23  A.  Every time.

24  Q.  But you're the one who testified as to value so were you

25  looking -- not looking at leased equipment.  You were only

1    looking at personal property equipment that Millenkamp Cattle

2    had purchased?

3    A.  Yes.

4    Q.  And you have an itemized list of that personal property?

5    A.  Yes.

6    Q.  That you created?

7    A.  With the appraisers, yes, and my office staff.

8    Q.  So is it the appraiser that valued it or is it you that

9    valued it?

10   A.  The appraiser appraised it.

11   Q.  And you can't tell the Court today when you set forth a

12   value of 178 million what items of equipment are included within

13   that 178 million?

14   A.  Not without the list in front of me.

15   Q.  How do you know it doesn't include leased equipment?

16   A.  Because I've talked to my office staff about it.

17   Q.  But today, you couldn't recall whether you're going off the

18   2022 appraisal or the 2023 --

19   A.  I did recall.  I said it was '23.  You said '22.  I believe

20   it was '23.

21   Q.  But isn't it true you testified today on direct examination

22   that it was from a 2022 appraisal report?

23   A.  I said I believe it was a typo.  I think it was '23.

24   Q.  And you submitted evidence that wasn't -- that wasn't

25   admitted that was a 2022 appraisal report; not a 2023.  Correct?

1    A.  I believe what I said was you're referring to a '22

2    appraisal.  I said I believe it was a typo.  I believe that that

3    appraisal was done in '23.

4    Q.  Does the personal property that you value at 178 million

5    include those lenders that have purchase money security

6    interest?

7    A.  And what's a -- what is that?

8    Q.  So like when -- right before the receivership when you

9    bought the 55 or the 22 tractors from CNH rather than having

10   Rabo finance it, CNH allowed you credit.  That's a purchase

11   money security interest.  Did you include those lenders -- or

12   those items of equipment in your personal property valuation?

13   A.  As an example, since those are brand-new, we probably placed

14   brand-new value on them minus the debt that we have on those

15   tractors.

16   Q.  You say you probably did that.

17   A.  Yes.  That's what we do.

18   Q.  Did you do that as part of this valuation?

19   A.  I would have to double-check to make sure that's what our

20   office and the appraisers did.

21   Q.  Is it the offer -- your office and the appraisers that are

22   providing that value or is it you?  Because you're testifying

23   before this Court that the creditors are over-secured and I'm

24   trying to understand where this value and the credibility of

25   this value is coming from.

1    A.  The banks ask us to do appraisal.  We have an appraiser come

2    in there.  They look at the equipment.  They place the value on

3    the equipment.  When it's finished, I look at the appraisal to

4    make sure that it looks right overall to me.

5    Q.  And what do you do to make sure it looks right?  Do you do

6    any independent valuations?  Do you pull other valuations of

7    other equipment items?

8    A.  Sometimes we would look at some online sales on like

9    equipment to see what the value that the appraisers or putting

10   on compared to what it's selling for.  So yes, we do some of

11   that.

12   Q.  And you have an appraisal that has equipment at what value?

13   A.  I believe around 19 million.

14   Q.  Well, is it or isn't it?

15   A.  Can you ask the question again?

16   Q.  Yeah.  I'm trying to understand your valuation of the

17   equipment.  So is it 19 million?

18   A.  I just answered that question.

19   Q.  Okay.  That's fine.  I thought you asked it with a question

20   but that's fine.  When you are valuing the equipment at 178

21   million, are you taking out -- do you know whether in fact the

22   debts of all PMSI creditors were taken out?

23   A.  If it would be easier, take all $16 million off the 178 and

24   you guys would still be grossly over-secured.  So if it

25   streamlines --

1    Q.  That doesn't answer the question.

2    A.  -- everything, we could do that.

3    Q.  Mr. Millenkamp, that doesn't answer the question.  I'm

4    trying to understand your value that you've set before the Court

5    of 178 and what's included or not included in it.  So does it

6    need to be reduced by 16 million?

7    A.  I don't know.

8    Q.  You don't know.

9    A.  No.  The answer is no.

10   Q.  So in your inventory that you provided, it says that there's

11   tractors and other equipment of 2.979.  Is that -- less current

12   liens.  Is that a purchase money security interest lien that

13   you're referencing?

14   A.  I believe so.

15   Q.  Well, do you know?

16   A.  Not without looking at everything, no.

17   Q.  What would you look at?

18   A.  I'd have to sit down with our office manager and see who we

19   owe money to on the equipment that's on the list.

20   Q.  Would you owe more -- so these credit agreements like CNH

21   set up on that $3 million for the purchase of the tractors, do

22   you have other creditors like that, that John Deere, anybody

23   else?

24   A.  Yes.

25   Q.  And how many purchase contracts do you have with John Deere?

1    A.  I don't recall.

2    Q.  And were those -- the value of those items taken out of the

3    equipment?

4    A.  I believe so, yes, yes.

5    Q.  And what makes you believe that?

6    A.  Because every time we do an appraisal, after we get the

7    appraised numbers, we take off the debt that we have with

8    whoever's carrying the equipment.

9    Q.  But you reference that as $2.9 million on your inventory

10   sheet and the CNH contract alone was 3 million.

11   A.  I believe that the purchase of what you're talking about is

12   not on the current appraisal.  Okay?  Because it was happening

13   the same time we were turning in all these numbers.  So we based

14   it off our last appraisal so that's what we went off of.

15   Q.  Which was 2023; not 2022?

16   A.  I believe so, yes.

17   Q.  Okay.  And that appraisal took into account purchase money

18   security interest; is that correct?

19   A.  Correct.

20   Q.  And that was to the tune of 2.9 million.

21   A.  At the time, yes.

22   Q.  Who else do you have as those type of creditors before John

23   Deere?

24   A.  Farmers National Bank carries some debt on some

25   miscellaneous equipment.

1    Q.   Who else?

2    A.   CNH Capital.

3    Q.   Other than the new tractors that were recently purchased?

4    A.   We've had an ongoing deal with those guys.

5    Q.   So that's a yes, there are other purchase contracts out with

6    CNH?

7    A.   I don't believe so, no.

8    Q.   Okay.  And is that because the new tractors replaced the old

9    tractors?

10   A.   Yes.

11   Q.   So it replaced the old tractors that were in this 2023

12   appraisal?

13   A.   Yes.

14   Q.   So that -- but then it didn't account for the new tractors

15   and the debt on the new tractors.

16   A.   You're comparing apples and oranges.  You're -- what time

17   frame are you talking about?  We turned in the database off the

18   time on the appraisal.  Not today.  Not off of today.

19   Q.   On your inventory report that's dated April 2, 2024, are you

20   not issuing an opinion to this Court that the personal property

21   value is 178 million?

22   A.   Yes.

23   Q.   As of today?

24   A.   Yes.

25   Q.   But you didn't take into account tractors that were no

1   longer on -- that you had put in the value, new tractors that

2   had replaced them and the debt of the new tractors.  Is that

3   correct?

4   A.   That would be correct.

5   Q.   Okay.  And you have no idea how that number varies when you

6   take into account those factors?

7   A.   That's why I said today I believe that the appraised value

8   on the equipment would be higher than what we showed because we

9   had some equipment transfer in and some equipment transfer out.

10  So if we were going to do a new appraisal, it would be higher

11  than the 19 million that we stated.

12  Q.   But you don't know that, right?  You haven't sat down and

13  provided an itemized valuation for this Court to opine on the

14  value of the personal property.  Isn't that correct?

15  A.   We went off our last appraisal.

16  Q.   Okay.  When you have these new leases, are they replacing

17  old equipment?  And that old leased equipment goes back to the

18  lessor; is that correct?

19  A.   Correct, yes.

20  Q.   And what does the lessor do with that old equipment when it

21  comes back?  Does it sell it?

22  A.   I don't know.

23  Q.   Does it junk it?

24  A.   They sell it I'm sure.

25  Q.   And people purchase those older tractors that you have let

1    go back to the lessor and bought new tractors for; is that

2    correct?

3    A.  Correct.

4    Q.  Of the valuation that you provided on the inventory list,

5    does it consist of vehicles?

6    A.  Yes.

7    Q.  Does it consist of vehicles of which Rabo is a second

8    lienholder?

9    A.  I don't know.

10   Q.  So you don't know if that valuation takes into account a

11   priority lien over Rabo in vehicles?

12   A.  Can you ask the question again?

13   Q.  Yes.  You do not know if your valuation takes into account

14   the debt that is ahead of Rabo in vehicles?

15   A.  Yes, it does.

16   Q.  And how does it take -- where does it take that into account

17   on your inventory list?

18   A.  After we do an appraisal and the appraiser places the value

19   on the equipment, then we go back and look at the debt that we

20   have on whoever -- whoever's got the first position on the

21   equipment and we take that off the value.

22   Q.  Do you know that if you haven't gone through the list and

23   deducted out vehicles that have liens on them?

24   A.  Yes, we did do that.  Every time we do the appraisal, we do

25   that.

1    Q.  What about vehicles from the day of the appraisal of 2023 to

2    the date of this inventory report?  Have you accounted for it?

3    A.  No, we have not.  That's why I said the new appraisal will

4    come in higher.

5    Q.  And you're not an appraiser, correct?

6    A.  No.  I'm just the guy that pays for it all.

7    Q.  Right.  And you don't have any educational background on how

8    to value personal property.  Is that correct?

9    A.  I'm very uneducated, Sheila.

10   Q.  That's not the purpose, Mr. Millenkamp.  Just trying to

11   understand the basis behind the valuation.

12   A.  I understand your purpose.

13   Q.  Does the 150 -- it's not 150 anymore.  That was what was in

14   your declaration.  Does the 178 million include all of the dairy

15   milking equipment of which MetLife retains a first lien?

16   A.  The dairy equipment is not part of the 178 million.

17   Q.  And the irrigation equipment?

18   A.  No, it does not.

19   Q.  So in your declaration, when you said that all personal

20   property was valued at 150 million, why didn't you exclude the

21   irrigation equipment and the dairy milking equipment from that

22   statement?

23   A.  I don't understand the question.  I believe that the dairy

24   equipment belongs to MetLife and I believe the pivots belong to

25   MetLife.

1    Q.  Correct.  But you valued all of your personal property.

2    A.  I did not value the dairy milking equipment and the bucket

3    of personal property and I did not put the pivots in the bucket

4    of personal property.

5    Q.  And how would we know that?

6    A.  I don't know.

7    Q.  Okay.  When you were testifying about the inventory list,

8    you stated that Rabo was the only lienholder.  Do you recall

9    that?

10   A.  Can you ask that again?

11   Q.  Yeah.  When you were testifying about the inventory list,

12   the livestock, you testified that Rabo was the only lienholder.

13   Do you recall that testimony?

14   A.  Yes.

15   Q.  Isn't it true that Conterra also has a lien on livestock?

16   A.  Yes.

17   Q.  So that lien goes into effect as well, right, effects the

18   value?

19   A.  Correct, yes.

20       MS. SCHWAGER:  Your Honor, I'm going to a new exhibit.

21   Should we break for lunch or do you want me to keep pushing

22   through?

23       COURT:  How much longer do you think the next section

24   of your examination's going to take?

25       MS. SCHWAGER:  I can try to in the interim tone it

1    down -- I have more than ten minutes but I will try to shorten

2    it as much as I can.

3         COURT:  Do we want to break until about 1:00?  Is that

4    going to give the parties enough time to get lunch and do what

5    you need to do?  All right.  Let's go ahead and do that.  We

6    will break until 1:00 and reconvene then.

7         MS. SCHWAGER:  Thank you, Your Honor.

8         CLERK:  All rise, please.

9                        (Recess taken.)

10        COURT:  All right.  We are back on the record.  Ms.

11   Schwager, when we left off, you were in the middle of your

12   cross-examination.  Are you ready to proceed?

13        MS. SCHWAGER:  I am, Your Honor.  Thank you.

14        COURT:  Go ahead.

15        MS. SCHWAGER:  And Your Honor, if I could start so that

16   we can just clean this up with CNH's objection and

17   Mr. Millenkamp not seeing the documents that I was referring to.

18   If I could -- I only have two copies plus mine so I have three

19   and it is Docket 126 for the Court.  Can I give the witness a

20   copy and opposing counsel?  Is the Court able to pull up Docket

21   126?

22        COURT:  I think that's fine.  Is that going to be

23   sufficient for everybody else as far as having a copy in front

24   of you, counsel?

25        MS. SCHWAGER:  It will be brief, Your Honor.  I just

1    want to clarify what Mr. Millenkamp couldn't remember.

2         COURT:  All right.  Go ahead.

3         MS. SCHWAGER:  Can I approach the witness, Your Honor?

4         COURT:  Go ahead.

5         MS. SCHWAGER:  Your Honor, I'd go ahead and mark that

6    as Exhibit 3035 which I'll do after court if that's okay.

7         COURT:  All right.  Just real quick, did you give a

8    copy to Ms. Battle as well?

9         MS. SCHWAGER:  Can I after --

10        CLERK:  Yes, yes.

11        MS. SCHWAGER:  I apologize.  I can -- can I approach

12   the bench?

13        COURT:  Go ahead.

14   BY MS. SCHWAGER:

15   Q.  Mr. Millenkamp, can you turn to the exhibit that's attached

16   to the document that I just handed you which is 1, 2, 3, 4, 5,

17   6th page?

18        COURT:  Just one quick clarification.  That's

19   Exhibit 3035?

20        MS. SCHWAGER:  Yes, Your Honor.  And it's entitled CNH

21   Industrial Capital America's "Limited Objection to Debtor's

22   Emergency Motion for Interim and Final Orders."

23        COURT:  And if I look at the binder that's provided to

24   me, it looks like there's already an Exhibit 3035.  Is that

25   correct?

1    MS. SCHWAGER:  It's not in my binder, Your Honor.  So

2  3036 -- 7.  3037.  I apologize for that, Your Honor.

3    COURT:  Just to clarify for the record then, we're

4  going to mark this as Exhibit 3037.

5    MS. SCHWAGER:  Correct, Your Honor.  Thank you.  Docket

6  126.  And perhaps I should let counsel have time to pull it up.

7  Just let me know when you're ready.  You're ready?  Thank you,

8  Your Honor.

9  BY MS. SCHWAGER:

10  Q.  Mr. Millenkamp, can you turn to that first exhibit which is

11  page 11 of 15?

12    UNIDENTIFIED SPEAKER:  Which exhibit?

13    MS. SCHWAGER:  It's the first exhibit.  It's Exhibit 1

14  of 6 to Docket 126.

15  BY MS. SCHWAGER:

16  Q.  Were you able to locate that, Mr. Millenkamp?

17  A.  No.

18  Q.  So if you flip through that --

19  A.  Mine goes to page 10.  I have no page 11 and then it turns

20  into something else.

21  Q.  And does it turn into a document that says Exhibit 1 of 6, a

22  CNH retail installment contract?

23  A.  Yes.  1 of 6, yeah.

24  Q.  Do you recognize this exhibit?

25  A.  Yes.

1    Q.  And what is it?

2    A.  It's an agreement on some tractors that we either leased or

3    purchased.

4    Q.  Well, is it called the retail installment sale contract and

5    security agreement?

6    A.  Yes.

7    Q.  Would you recognize that as a contract for sale versus a

8    lease?

9    A.  Yes.

10   Q.  Okay.  And so if you recall, in your questioning, you

11   weren't sure whether you had signed a purchase contract on

12   February 6, 2024, for 25 new Kubota tractors.  Does this help

13   refresh your memory?

14   A.  Yes.

15   Q.  And what was the purchase price for that?

16   A.  I can't read it.

17   Q.  What was that?

18   A.  I can't read it.

19   Q.  Do you see on line 8 where it says deferred payment price,

20   $1,034,818?

21   A.  Yes.

22   Q.  Is that the price you would pay if you paid it over time

23   with interest?

24   A.  Yes.

25   Q.  And you said this was entered into on February 6; is that

1    correct?

2    A.  Yes.

3    Q.  And then if you turn to page 30 which is Exhibit 2 to that

4    objection.

5    A.  What page do you want me on?

6    Q.  Page 30 which is Exhibit 2 to that objection.

7    A.  Okay.

8    Q.  Do you recognize that document?

9    A.  Is it the one that says the agreement provisions?

10   Q.  I'm sorry?

11   A.  I don't know what you're referring to.

12   Q.  Do you recognize Exhibit 2?  Is that your signature on

13   Exhibit 2 on the first page of Exhibit 2, page 30 of 115?

14   A.  Yes.

15   Q.  Do you recognize that agreement?

16   A.  Yes, yep.

17   Q.  What is that agreement?

18   A.  For a purchase of some tractors.

19   Q.  And how many tractors was that?

20   A.  I think 47, 48.

21   Q.  Were they new Case IH Maxum tractors?

22   A.  Yes.

23   Q.  And that was on February 6, 2024, right before the

24   receivership?

25   A.  Yes.

```
 1    Q.  Okay.  Did you tell CNH that a receivership petition had

 2    been filed against Millenkamp when you entered into these

 3    contracts totaling $12.1 million?

 4    A.  I talked to the guy from Burk's Tractor who we buy the

 5    equipment from.

 6    Q.  Do you know whether CNH knew that you were in a

 7    receivership?

 8    A.  No, I do not.

 9    Q.  What did you tell Burk's Tractor?

10    A.  That we were in a receivership.

11    Q.  And did that concern Burk's Tractor?

12    A.  No.

13    Q.  They had no follow-up questions -- did he ask what a

14    receivership was?

15    A.  He knew.

16    Q.  Did he know you could potentially lose the ability to enter

17    into contracts if a receiver was appointed?

18    A.  I don't know.

19    Q.  You had no further conversations other than you're -- a

20    petition's been filed; is that correct?

21    A.  Yes.  I made them aware of that, yes.

22    Q.  Did you get the consent of Rabo to trade in the equipment

23    that's reflected in those exhibits to purchase the new tractors?

24    A.  Not that I remember.

25    Q.  But you were in default at that time under your forbearance
```

1  agreement, right?

2  A.  Yes.

3  Q.  And it had been terminated?

4  A.  Yes.

5  Q.  So why didn't you seek the consent of Rabo before you traded

6  in all of those tractors?

7  A.  I wasn't aware I needed to.

8  Q.  You understood that Rabo had a security interest in those

9  tractors that were being traded in?

10  A.  Yes.

11  Q.  Okay.  Can we go back to the inventory report that you

12  testified about?

13         MS. SCHWAGER:  And Matt, what exhibit is that?  Is it

14  1014?

15         MR. CHRISTENSEN:  1009.

16         MS. SCHWAGER:  I'm sorry?

17         MR. CHRISTENSEN:  9.  1009.

18         MS. SCHWAGER:  1009.

19  BY MS. SCHWAGER:

20  Q.  And do you recall we've talked about your valuation of

21  personal property, correct?

22  A.  Yes.

23  Q.  So at the top of that exhibit, you had valued your livestock

24  at 140 million; is that correct?

25  A.  Yes.

1   Q.  And if these values were correct and if your personal

2   property values were correct at 178 million, why couldn't you

3   refinance and pay Rabo off?

4   A.  Why couldn't I refinance with whom?

5   Q.  That's my question.  If you have these type of values, why

6   aren't you able to obtain a refinance or another lender to pay

7   off the matured loan?

8   A.  I don't know why Rabo doesn't want to refinance me.

9   Q.  Why couldn't you find a third party lender if you have these

10  type of values that would provide you a loan and pay Rabo off?

11  A.  2023 was maybe the worst dairy year in history.  There's

12  very few large dairy lenders left in the industry.  A lot of

13  their dairies -- a lot of their clients, dairymen, are in tough

14  financial shape and there's not a lot of banks taking on new

15  customers.

16          As far as what I know, what I've been told is they want

17  to let the dust settle from 2023.  Also a couple wanted to wait

18  and see my audit of financials that come in in April.  And

19  another reason that we had a tough time is Mike Hayes personally

20  from Rabo liked to call other lenders and spook them and I

21  believe they scared off -- that he scared off a potential

22  lender -- one of our potential lenders.  So those are the

23  reasons I believe that we haven't been refinanced yet.

24  Q.  When you talk about how 2023 was -- is so difficult for the

25  dairy farmers, doesn't that affect the value of the personal

1  property?

2  A.  No.

3  Q.  Why not?

4  A.  They don't go hand-in-hand.

5  Q.  But when you're saying that diarymen are having a hard time

6  so that it's difficult for them to get financing, what are they

7  having a hard time about?  Did milk prices go down?

8  A.  In 2023, yes, the milk prices were not profitable.

9  Q.  And feed prices went up.

10 A.  Yes.

11 Q.  And does that not affect the value of dairy cattle and dairy

12 operations?

13 A.  No, not at all.

14 Q.  Okay.  You said that it was 2023 that was difficult but your

15 forbearance -- or you matured in June of 2020 -- 2022.  So if

16 you have these type of values in 2022, why were you not able to

17 refinance and take out Rabo?

18 A.  I'm not stating that the values that we were looking at were

19 in 2022.  These are for April 22 of 2024.

20 Q.  Okay.  And the underlying -- how did you come up with the

21 underlying -- the underlying values to value your herd?  Where

22 did you obtain that information?

23 A.  How we obtained it was I have a good network of peers that I

24 talk to on a weekly, probably daily basis from cattle brokers to

25 other dairy farmers to sale yards, to financial advisors, to

1    other banks, to peers all the way across the country.  My

2    networking goes across the United States with most big dairies

3    across the United States I know personally or am related to on

4    my wife's side.  So I have very good firsthand knowledge of what

5    livestock is worth on a daily basis.  On the way here this

6    morning, I made two phone calls to people to find out in their

7    opinion what the values were just to double check these numbers.

8    Q.  And who were those people?

9    A.  David Brown and Todd Davis.

10   Q.  And where are they located?

11   A.  Todd Davis is a cattle broker out of Logan, Utah and Dave

12   Brown is from Lynden, Washington.

13   Q.  And had they inspected your herd?

14   A.  They've -- between the two of them, they've probably been on

15   my farm 100 times.

16   Q.  And so what was the conversation you had with them?

17   A.  My conversation is, "Good morning.  How's it going?"

18   Chitchat.  What are cattle bringing?

19   Q.  And so are you the person that put the number in the value

20   per head and the total value on this inventory sheet?

21   A.  On this particular one, my general manager David Heida,

22   myself and a financial advisor Kander, with Glen, looked at

23   these numbers to approve it.

24   Q.  Looked at the numbers but who actually created the numbers

25   and put them on the sheet?

1    A.  David Heida.

2    Q.  Okay.  Do you know whether any discounts were taken in this

3    $140 million valuation to reflect the risk of bird flu?

4    A.  No.  That has not affected the market.

5    Q.  So there's been no discount?

6    A.  Zero.  Cattle have actually gone up since the bird flu.

7    Q.  If your cattle were to get bird flu, what would happen to

8    the value of your cattle?

9    A.  My opinion, the cattle would be worth the same.

10   Q.  They would what?

11   A.  Be worth the same.

12   Q.  Okay.  Cattle sales are subject to market fluctuations,

13   correct?

14   A.  Can you ask that again?

15   Q.  Sure.  Cattle sales are subject to market fluctuations,

16   correct?

17   A.  What do you mean cattle sales?  Cattle values or cattle

18   sales?

19   Q.  Cattle values.

20   A.  Can you ask the question again, please?

21   Q.  Sure.  Cattle values are subject to market fluctuations,

22   correct?

23   A.  Correct.

24   Q.  And in your valuation analysis that's set forth in this

25   inventory list, did you provide a discount for market

1    fluctuations?

2    A.  Yes.

3    Q.  And what was that discount?

4    A.  2 to $300 per head.

5    Q.  And if you sold all the livestock, you would flood the

6    market, right?  So if you had to liquidate this $140 million

7    worth of livestock, it would flood the market, correct?

8    A.  I'm not sure.

9    Q.  You're not sure that if you put 100,000 head of cattle into

10   the market that that's not going to affect the market price?

11   A.  On the beef side, no, it would have no impact.  On the dairy

12   heifer side, no impact and it depends on if you try to sell them

13   in one day or over a month.  I would say if you tried to sell

14   the milking cows over a month, with the extreme demand on

15   livestock, I would say no.

16   Q.  So no discount was taken into account for that aspect?

17   A.  We took a 2 or $300 discount just to be conservative.

18   Q.  So now you've taken a $400 discount?  Is that correct, per

19   head?

20   A.  No, total.

21   Q.  Well, before you said on market fluctuations, you took a 200

22   a head discount.  And then you said you took a 200 discount just

23   to be safe if you had to flood the market but you didn't think

24   it would account for anything.

25   A.  Maybe you heard me incorrectly.  I didn't give any discount

1   on the fact that it would flood the market because I don't think

2   I would flood the market today.

3   Q.  Okay.  That was my question.  What documents did you review

4   to compile -- I'm sorry.  You did tell me that.  The documents

5   that you reviewed to compile this valuation, why was it not

6   submitted as an exhibit?

7   A.  I don't know.

8   Q.  Did you provide it to be -- the backup data to anybody?

9   A.  Not that I know of.

10   Q.  Do you have a milk contract with Glambia?

11   A.  No.

12   Q.  Do you -- and why don't you have a milk contract with

13   Glambia?

14   A.  Because Glambia does not offer milk contracts to anybody

15   along with AgriPure and several other processors.

16   Q.  Does Innovative Food Solutions, do they offer milk

17   contracts?

18   A.  Sometimes.

19   Q.  Do you have one with them?

20   A.  I believe we do on some of the milk that goes to them.

21   Q.  And these are the -- are these the sole purchasers of the

22   Millenkamp milk or do you have other purchasers?

23   A.  As of today, yes.

24   Q.  Now, each dairy cow is subject to a milk base, correct?

25   A.  No.

1   Q.  That's incorrect, that the cows are not subject to a milk

2   base?

3   A.  No.  Individual cows are not subject to milk base.

4   Q.  When you sell the cows, is Glambia -- does that affect the

5   value -- does milk base at all come into account when you're

6   selling cows to third-party purchasers?

7   A.  I have no idea.  The question makes no sense.  Can you ask

8   that again?

9   Q.  Tell me what a milk base is.

10  A.  Glambia does not have milk base.

11  Q.  I didn't ask if Glambia had milk base.  I asked you what a

12  milk base is.

13  A.  I don't know.  You'd have to be specific to what processor

14  because every processor --

15  Q.  I'm asking this processor.

16  A.  I'm not a processor.  I'm a dairy farmer.

17  Q.  Okay.  So you have no idea whether milk base affects your

18  operations?

19  A.  Glambia does not have a milk base.

20  Q.  That wasn't my question, Mr. Millenkamp.  Does milk base

21  affect your operations?

22  A.  The question does not make sense.  Can you please ask it a

23  different way?

24  Q.  Are you -- it doesn't make sense that milk base does not

25  affect your operations?  You don't -- tell me what milk base

1   means to Millenkamp Cattle.

2   A.  It doesn't mean anything.  You'd have to ask Glambia that

3   question; not me.

4   Q.  It doesn't affect any of the value of your livestock?

5   A.  If you call Glambia, they're going to --

6   Q.  I'm not asking Glambia.  I'm asking you.

7   A.  If you --

8   Q.  As the person who values your livestock, does milk base

9   affect your livestock in any manner?

10  A.  No.

11  Q.  Okay.

12  A.  For the record, that question did not make sense.

13  Q.  You've explained that and I will confess, I am not a

14  livestock operator.  Okay.  In this -- you had valued -- in your

15  testimony, you had valued real property as 500 million to 550

16  million.  Do you recall that testimony?

17  A.  Yes.

18  Q.  Are you a real estate appraiser?

19  A.  No.  I'm uneducated.

20  Q.  People -- that's all right.  I'm not going to argue with

21  you.  Have you taken any valuation courses or education to value

22  real estate?

23  A.  No.

24  Q.  How many separate properties are included in your value of

25  the real property?

1    A.   I'm not sure.

2    Q.   Does eight sound right?

3    A.   Yes.

4    Q.   Do you know what those eight properties are called?

5    A.   I'm sure you have a list.  Could you --

6    Q.   East Valley Dairy?

7    A.   Yes.

8    Q.   German Dairy?

9    A.   Yes.

10   Q.   Idaho Jersey Girls Dairy?

11   A.   Yes.

12   Q.   Millenkamp Canyon Lands?

13   A.   Yes.

14   Q.   Goose Ranch?

15   A.   Yes.

16   Q.   McGregor?

17   A.   Yes.

18   Q.   Moonshine Ranch?

19   A.   Yes.

20   Q.   Calf Ranch?

21   A.   Yeah.

22   Q.   Any others that were included within this value?

23   A.   Not that I'm aware of.

24   Q.   Okay.  Do you own any other properties besides those that

25   we've identified?

1    A.    No.

2    Q.    How many acres are included in those eight properties?

3    A.    Around 19,000.

4    Q.    And how does that value get separated between each of the

5    eight properties that you have provided a 500 million to 550

6    million --

7    A.    Can you ask that again, please?

8    Q.    Sure.    How does the value of 500 to 550 million get applied

9    to each of those eight properties?

10    A.    Each of them over the past has been individually appraised.

11    Q.    Right.    But you gave a value to the Court today of a certain

12    valuation.    So how would you separate your value on each of

13    those eight properties?

14    A.    If I have to place value on it, the same networking we use

15    to find out what cattle are worth, I use the same kind of

16    network to find out what properties, dairies are worth locally.

17    I'm also very aware of what construction costs.    I'm also aware

18    on how appraisals work and how appraisers look at construction

19    cost and like sales in the area and how that's all compiled.

20    Q.    So is that what you did on -- in coming up with that value

21    of 500 to 550 million?    You used that source of network that

22    you're talking about?

23    A.    Yes.

24    Q.    And so who did you talk to in regard to the eight properties

25    to come to a valuation?

1   A.  I'm constantly talking to different people about sales,

2   dairies that have been sold, dairies that have been bought,

3   property that's been sold.  It gets compiled on maybe a daily or

4   weekly basis.

5   Q.  Do you have those compilations?

6   A.  No.

7   Q.  Did you use those compilations to come up with your values?

8   A.  Yes.

9   Q.  What did you do with those compilations?

10   A.  They're in my head.

11   Q.  Well, you said that you were looking at various

12   compilations.  Is that incorrect?

13   A.  I didn't say I was looking at that.  I said I use those

14   resources to come up with a value of that property.

15   Q.  So how did you -- can you explain to us the different values

16   you came up with on each of those eight properties to come up

17   with the 500 to 550 million value?  How did you separate out

18   those values on each of the eight properties?

19   A.  You'd have to ask me specific questions.

20   Q.  And I'm -- okay.  So what's -- what value did you determine

21   was East Valley Dairy?

22   A.  I don't remember.

23   Q.  Where would we get that information?

24   A.  In my office.

25   Q.  And what would we look at?

1    A.  What was your question?

2    Q.  What would we look at in your office to get what that number

3    is for East Valley Dairy?

4    A.  I would look at current appraisals and I would compare that

5    to all the other information that I put together.

6    Q.  In your head?

7    A.  Yes.

8    Q.  What dairies did you look at as far as sales and purchases

9    to come up with the valuation you came up with?

10   A.  The most recent one would be Mike Aardema's dairy and new

11   construction costs that some of my peers have done and the

12   recent construction costs that I've incurred.

13   Q.  So what was the breakdown for the Mike Aardema dairy?

14   A.  I know how many cows he milks and how much land he has and

15   what they're trying to sell it for.

16   Q.  So have they sold it yet?

17   A.  Not that I'm aware of.

18   Q.  So why would you use the mike Aardema dairy as a valuation

19   criteria for you to determine your value?

20   A.  Because the place was sold and they couldn't get financing.

21   So there was a seller and a committed buyer.  Something happened

22   to their financing so, yes, I used that number.

23   Q.  Okay.  Any others?

24   A.  I used Big Sky Dairies.  They just spent a bunch of money on

25   new construction.  I talked to Ron Offutt dairy, RDO out of

1    Columbia River Dairies.  Their dairy manager's Jeff Wendler.  I

2    talked to him recently about what it's going to cost them to

3    build their new facilities that they're building.

4    Q.  Was there any sales that took place of those dairies?

5    A.  On that particular place, no.  It was an all new

6    construction.

7    Q.  So which -- what information did you evaluate as far as

8    sales that occurred to determine the values that you provided

9    today?

10   A.  Make Aardema's was the biggest most recent place in the

11   area.  There's not a lot of places like mine you can compare to

12   so there's numerous little old dairies that are sold but that's

13   not apples to apples so that would be irrelevant but I still

14   keep an eye on what those places are bringing.

15   Q.  So did you specifically go through each of the properties

16   and value each of those properties based upon the compilations

17   in your head?

18   A.  Yes.

19   Q.  And this itemized list is back at your office?

20   A.  Yes.

21   Q.  And you used the appraisals?  Is that correct?  And then

22   your compilations in your head.

23   A.  Yes.

24   Q.  And so you independently didn't value the real property.

25   You used the source of the third-party appraisers; is that

1  correct?

2  A.  That was part of it.

3  Q.  Do you understand valuation approaches that are used by

4  appraisers in each of -- when they come up with an appraisal

5  number?

6  A.  I believe I do.

7  Q.  And did you use any of those approaches?

8  A.  I'm not sure if I did.

9  Q.  Well, what do you mean you're not sure if you did?

10  A.  If I have land in Jerome County and my neighbor's ground

11  sells for 17,000 bucks an acre, I would assume that my ground

12  would be worth $17,000 an acre.

13  Q.  But did that happen?

14  A.  Yes.

15  Q.  What was the sale that you looked at that you utilized to

16  come up with your values?

17  A.  Well, for a specific, there's 160 acres that's adjacent to

18  my German Dairy that just got sold for $17,800 that was bought

19  by Larsen Farms and I was -- we were looking at it and we had it

20  offered to us so I knew firsthand.

21  Q.  And that had sold?

22  A.  Yes.

23  Q.  And so you utilized that approach with what property?  Would

24  that apply to all of the eight properties?

25  A.  I didn't use that approach because if I use that approach,

1   the $500 million estimated appraised value would go to more like

2   600 or 650 million.  I just used a very ultra conservative

3   number on the appraised value.

4   Q.  So you were -- you were going off of the appraisal that a

5   third party did; not some independent valuation that you did?

6   A.  Like I answered twice, I used the previous appraisal as one

7   of the tools to come up with what I think the value is.

8   Q.  Okay.  Can I have you turn to Exhibit 3031, please?  And we

9   had talked about this exhibit before, your declaration that was

10  filed on April 2, 2024.  Do you recall in this declaration that

11  you filed with the Court a week ago that you opined that the

12  real property value was 493 million?

13  A.  Approximately, yes.

14  Q.  So -- and how did you determine that value, the 493 million?

15  A.  The same way I previously told you.

16  Q.  So what is the basis for increasing it by another 50 million

17  in one week?

18  A.  I was rounding it off.  So if you'd like to use 493, that

19  would be fine.

20  Q.  So are you saying with your testimony today that the real

21  property valued between 500 million and 550 million is

22  inaccurate?

23  A.  Can you ask that again, please?

24  Q.  Yes.  Today, you testified that the real property value is

25  between 500 million and 550 million.  Is that not accurate?

1  A.  Well, I guess on the 493 million, that's what we are

2  guessing our new appraisal will come in at because that's what

3  we were told.  And then you also asked me what I think the

4  property's really worth and I said at least 500 to 550 million.

5  So maybe the question's a little bit different and I'm answering

6  it in a different value.

7  Q.  So that was actually a question from your attorneys that had

8  asked you what your value -- what you valued the real property

9  for the benefit of the Court and are you saying that it's not

10  550 million but instead, it's 493 million?

11  A.  Can you ask that again?

12  Q.  Yes.  I was just clarifying that I had not asked that

13  question.  Your counsel had asked that question to have you

14  testify before the Court what the value of the real property

15  was.  And in that testimony, you said it was between 500 million

16  and 550 million.  So I'm trying to -- but you just said that the

17  value was 493 million in your declaration.  So I'm trying to

18  figure out what is the value of the real property that you're

19  contending exists.

20  A.  Can you just ask me the question?  You're reciting what my

21  attorney said.  Is there a question in that?

22  Q.  Yes.  Is it inaccurate that it's 500 -- that you believe the

23  value of the real property is 550 million?

24  A.  I'm real confident it would be worth $493 million plus.

25  Q.  Okay.  So --

1   A.  Plus.

2   Q.  And what is the basis for increasing that over the 493

3   million in one week?

4   A.  If you would like to stick at 493, it doesn't make a

5   difference.

6   Q.  And the basis for that --

7   A.  The question is different.

8   Q.  What question's different?  What question's different?

9   A.  I believe you asked two different questions maybe.

10  Q.  No.  So let's make sure the record's clear.  You testified

11  before this Court that the value of the property was between 500

12  million and 550 million this morning.  Your declaration says it

13  was 493 million.  What is the value that you contend the real

14  property of those eight properties consists of?

15  A.  I don't remember being asked that question that way.  Could

16  maybe have the Court find that?

17  Q.  Is it your testimony you do not recall -- let me back up.

18  Do you contend the real property value's 550 million?

19  A.  I believe it's 493 million is what we put in this.

20  Q.  Okay.  We can move on.

21          MS. SCHWAGER:  Your Honor, can I take just a few

22  minutes?  Sorry.  I've misplaced something and want to keep it

23  running.

24          COURT:  That's fine.

25          MS. SCHWAGER:  Here it is.  Sorry.  Sorry about that.

```
 1    BY MS. SCHWAGER:

 2    Q.  Okay.  Exhibit 3007.  Would you mind turning to 3007?  Are

 3    you at that document, Mr. Millenkamp?

 4    A.  Yes.

 5    Q.  Is that your signature on the 18th page of that document?

 6    A.  What did you ask?

 7    Q.  Is that your signature on the 18th page of that document?

 8    A.  I can't find that page.

 9    Q.  Do you see on the screen 18 of 48?  It says "Acknowledgment

10    of Debtor William John Millenkamp"?

11    A.  Yes.

12    Q.  Is that your signature?

13    A.  Yes.

14    Q.  Do you understand this document to be the intercreditor

15    agreement that was entered into between MetLife and Rabo when

16    Rabo obtained the second lien on the real estate?

17    A.  Yes.

18    Q.  And under the terms of that agreement, did you understand

19    that until MetLife's paid in full, Rabo's prohibited from

20    recovering through a foreclosure on the property?

21    A.  Yes.

22    Q.  And most of the MetLife loans are not due until 2038.  Is

23    that correct?

24    A.  I don't remember what's the date.

25    Q.  Do you want to turn to -- is there a binder up there called
```

1    MetLife Exhibits?

2    A.  Yes.

3    Q.  And if you turn to Exhibit 1 of the MetLife Exhibits on

4    page -- page 1 in the fifth paragraph, do you see where it says

5    loan -- it defines loan maturity date and it says August 15,

6    2038?

7            COURT:  For the record, this is Exhibit 2000 --

8            WITNESS:  2001?

9            MS. SCHWAGER:  Yeah, I don't have --

10           WITNESS:  We don't have a 1.  I have a 2001.

11   BY MS. SCHWAGER:

12   Q.  Okay.  2001.

13   A.  Is that the one?

14   Q.  Uh-huh.

15   A.  Okay.

16   Q.  On the first page.  Is that correct that that's the maturity

17   date, 2038?

18   A.  I don't see it in there.

19   Q.  Okay.  So are you on page 1 of 12 of Exhibit 2001,

20   promissory note?

21   A.  Yes.  Where's it at in the document?

22   Q.  The second to last paragraph, do you see the defined term,

23   the loan maturity date?

24   A.  I see it now.

25   Q.  And you see it's August 15, 2038?

1    A.  Yes.

2    Q.  Is that consistent with most of the MetLife loans --

3    long-term loans?

4    A.  I don't know if it's consistent.  I'll have to take your

5    word for it that that's when they mature.

6    Q.  Okay.  And you recall when you were testifying today about

7    Rabo that Rabo had a short-term loan?

8    A.  Yes.

9    Q.  What do you understand a short-term loan to be?

10   A.  They're our operating lender.

11   Q.  Does the short-term loan mean it has an earlier maturity

12   date?

13   A.  Yes.

14   Q.  So when you entered into those short-term loans, did you

15   anticipate that you would have the ability to pay those loans

16   off on their maturity dates?

17   A.  Yes.

18   Q.  Now, your adequate protection proposal in this bankruptcy

19   case is to replace Rabo's interest which is in right now

20   immediate available cash.  It has collateral in the milk

21   proceeds, right?

22   A.  Yes.

23   Q.  And you want to use those milk proceeds, correct?

24   A.  Yes.

25   Q.  And you want to sell livestock and you want to use those

```
 1   proceeds; is that correct?

 2   A.  Yes.

 3   Q.  So you're taking Rabo's interest in immediately available

 4   cash and personal property that could be liquidated and sold in

 5   a fairly easy manner with a junior lien on real property that's

 6   restricted in Rabo's recovery rights.  Is that correct?

 7   A.  Can you ask that again, please, one more time?

 8   Q.  You bet.  Your adequate proposal -- and let me know if it's

 9   wrong.  But it's to replace Rabo's interest in immediately

10   available cash and personal property that could be liquidated --

11   sold fairly easy with a junior lien on real property of which

12   it's restricted in certain recovery rights until MetLife's paid

13   in full.

14   A.  I'm not sure.

15   Q.  Well, we just talked about the fact that you admitted that

16   in paragraph 9, Rabo's restricted in its recovery rights until

17   MetLife's paid.  Correct?

18   A.  I believe so.

19   Q.  So you're not sure if that's what you're asking the Court to

20   do is to give another lender priority over Rabo so it no longer

21   has the first right to the cash.  Are you trying to do that?

22   A.  I believe we are.

23   Q.  Okay.  So you're taking Rabo's right away from the cash and

24   you're putting it on a junior lien in real property that has

25   restricted recovery rights.  Is that your proposal?
```

1  A.  I believe so.

2  Q.  Okay.  What happens to the value of the real property if the

3  dairy goes dark and it's no longer operating?

4  A.  I'm not sure.

5  Q.  So you can value your real property at 493 million but you

6  don't know what the value will be if the dairy is no longer

7  operating.  Is that correct?

8  A.  I would not know for sure the value, no.

9  Q.  Okay.  And when you're talking to these various sources and

10  getting this compilations in your head, have any of these

11  dairies gone dark and someone's tried to sell them?

12  A.  Not that I'm aware.

13  Q.  Okay.  Can I have you turn to Exhibit 3021?  Do you recall,

14  Mr. Millenkamp, filing this budget in the receivership action on

15  February 23?

16  A.  Yes.

17  Q.  Is it true under this budget that you were reporting that

18  you would not need any loans to cash flow through April 21,

19  2024?

20  A.  I don't remember.

21  Q.  Well, if you look at this budget, are you -- this budget

22  which goes through April 21, are you requesting -- is there any

23  additional financing in there other than the use of the milk

24  checks and the livestock?

25  A.  I don't believe so.

1  Q.  So at the receivership, you were representing that if you

2  had access to livestock proceeds and milk proceeds that you

3  would not need a loan, is that correct, through April 21?

4  A.  I believe that was assuming that I would get the milk check

5  but Rabo's holding onto my last milk check.

6  Q.  Right.  So that's what we just talked about.  If you were

7  able to get milk proceeds, livestock proceeds, your

8  representation was you would not need any financing.  You were

9  not at that time in bankruptcy.

10  A.  I think so.

11  Q.  Okay.  Did you meet with Rabo AgriFinance on March 13 and 14

12  in Minneapolis to discuss a potential consensual plan and

13  potential DIP terms?

14  A.  Yes.

15  Q.  Do you recall -- can I have you turn to Exhibit 3022?  Do

16  you recall providing this cash flow budget depicted in Exhibit

17  3022 to Rabo after that meeting?

18  A.  I'm not sure if it's the same one but I will agree with you.

19  I don't know.

20  Q.  Do you recall providing a budget to Rabo after the

21  Minneapolis meeting?

22  A.  Afterwards?

23  Q.  Yes.

24  A.  I don't remember if we did or didn't.

25  Q.  Okay.  Can you take a look at this exhibit?  Does it appear

1  to depict what your budget would have been -- proposed budget

2  would have been in in March of 2024?

3  A.  I don't know.

4  Q.  Who would know, Mr. Millenkamp?

5  A.  Probably Kander.

6  Q.  Did Kander provide this budget to Rabo?

7  A.  I believe so.

8  Q.  At your direction?

9  A.  I'm assuming so, yes.  I don't remember who provided it.

10 Q.  Did you -- who is Kander?

11 A.  Kander's a financial advisor that we're working with.

12 Q.  And do they -- are they at your direction?

13 A.  I believe they're at their own direction.

14 Q.  Well, would they be entitled to send Rabo a budget that you

15 had not approved?

16 A.  I don't think so.

17 Q.  Okay.  Now, this budget purports for Millenkamp Cattle that

18 you only needed DIP financing of 22.6 million.  Does that sound

19 right?

20 A.  It could be right.

21 Q.  So if you look at that second page, do you see DIP financing

22 and it has a total as of August 11 of 22,600,000?  Does that

23 sound -- do you recall having those conversations of how much --

24 A.  Yes, I recall having some conversations, yes.

25 Q.  And does 22.6 sound like the number that you were saying

1    that Millenkamp Cattle needed?

2    A.  It could be, yes.

3    Q.  And you did not anticipate in this budget having to sell

4    livestock, correct, that Rabo and Conterra have an interest in

5    to operate.

6    A.  What is your question?

7    Q.  If you look at this budget, you're not anticipating that

8    livestock will need to be sold and utilized in the operations as

9    part of that 22 million DIP financing.

10   A.  Okay.

11   Q.  Is that accurate?

12   A.  I think so.

13   Q.  You didn't need livestock and you could -- in the March of

14   2024, you believed you'd only need 22 million in DIP financing

15   with no livestock proceeds.

16   A.  I'm not sure what it said then.

17   Q.  Do you recall having -- were you not involved in the budget

18   process in these negotiations with Rabo?

19   A.  Yeah, part of it, yes.  I was a little busy at the time as

20   you're aware.

21   Q.  But I mean certainly they're running these by you, right,

22   because you're having to decide what makes the operations work,

23   correct?

24   A.  Correct.

25   Q.  Can I have you turn to Exhibit 330 (sic)?  And

1    Mr. Millenkamp, do you recognize this exhibit as the motion you

2    filed to request that the Court approve Sandton as the DIP

3    lender?

4    A.  Yes.

5    Q.  And if you could turn to Exhibit C which is a budget that

6    you have -- you had submitted with that motion which is 45 of

7    65.  Do you see that page?

8    A.  Which page?

9    Q.  45 of Exhibit 3030.

10   A.  Page 35?

11   Q.  45.

12   A.  Sorry.  I found it.

13   Q.  Do you recognize this exhibit as the budget you filed in

14   support of requesting the approval of Sandton's proposal?

15   A.  Yes.

16   Q.  And under this budget, you're contemplating selling $11

17   million worth of livestock and using those proceeds to operate.

18   Is that correct?

19   A.  Correct.

20   Q.  And those proceeds are collateral proceeds of Rabo

21   AgriFinance and Conterra, correct?

22   A.  Correct.

23   Q.  And you don't propose paying the 11 million to the RLOC

24   loans for the loss of that collateral, correct?

25   A.  That's because we're going to replace them with another $11

1    million worth of cattle.

2    Q.  Are you going to pay Rabo?

3    A.  On this budget, I don't believe so.  The value of the cattle

4    will stay the same during the process.

5    Q.  But aren't you proposing that your DIP financer have a

6    priming lien in those livestock so over and above Rabo?

7    A.  I believe so yes.

8    Q.  So Rabo doesn't get the benefit of that $11 million of

9    replaced livestock.  Isn't that correct?  Isn't it your first

10   prime DIP lender that gets it under your proposal?

11   A.  I believe so.

12   Q.  Okay.  Now, in this budget, you're only saying you need 19.3

13   million for a DIP loan.  Is that correct?

14   A.  I'm not sure what the total is.

15   Q.  Well, did you review it before it was provided to the Court?

16   A.  Yes.  I don't remember what the question was.

17   Q.  Okay.  Fair enough.  Let's look at page 47 of 65.

18   A.  Which one?

19   Q.  47 of 65.  And do you see there at the bottom, it says DIP

20   financing?  It has a total of $19,300,000 through August 11,

21   2024?

22   A.  Yes.

23   Q.  But the motion that was filed with this budget was seeking

24   35 million.  Is that correct?

25   A.  Yes.

1  Q.  And why is that?

2  A.  Can you ask that question again?

3  Q.  Yeah.  If this budget which takes you through projected

4  income and expenses, it says that you need DIP financing of

5  $19,300,000 but you've requested 35 million.  Why is there a

6  difference?

7  A.  I'm not sure why the difference is.  You'd have to ask

8  Kander.

9  Q.  But aren't you the one who is requesting the DIP financing

10  and saying what's necessary for the operations?

11  A.  Yes.  But they have more expertise in answering this.

12  Q.  Are you concerned as the debtor in possession on behalf of

13  the creditors of taking on $35 million of debt if a budget shows

14  that you need 19 million?

15  A.  Sandton provided us an opportunity to borrow the money in

16  (inaudible) so if we don't need it, I won't borrow it.

17  Q.  So when you presented this budget to the creditors and the

18  Court, you're asking for approval of 35 million but you haven't

19  shown how that entire amount will be utilized; is that correct?

20  A.  Correct.  I'll let Kander do that.

21  Q.  But you're the person who makes those decisions on behalf of

22  the creditors, right?

23  A.  Correct.

24  Q.  Today, you went through some testimony where you were

25  comparing the terms that were offered by Rabo and Sandton.  Do

1    you recall that testimony?

2    A.  Yes.

3    Q.  And you were -- you were asked about revenue and operating

4    milestones.  Do you recall that?

5    A.  Yes.

6    Q.  And you testified that Sandton wasn't requiring any revenue

7    and operating milestones.  Do you recall that testimony?

8    A.  I think they asked for some sort of operating milestone.

9    Q.  Milestones?  Do you recall testifying that Rabo had required

10   them?

11   A.  Yes.

12   Q.  Okay.  Can you turn to Exhibit 1011?

13   A.  Which one?

14   Q.  Exhibit 1011.  It's the debtor's binder.  Were you able to

15   get to that exhibit, Mr. Millenkamp?

16   A.  Yes.

17   Q.  And you recognize that these are terms that have been

18   offered by Rabo for DIP financing, the term sheet?

19   A.  Yes.

20   Q.  Do you see on the third page -- well, it's not the third

21   page.  Yeah, third page of that exhibit.  It says "Revenue and

22   operating milestones," and then it says "None."  Do you see that

23   reference?

24   A.  Yes.

25   Q.  So was your testimony correct that Rabo was requiring

1    revenue and operating milestones?

2    A.  Last time I seen it, they had revenue and operating

3    milestones in it.

4    Q.  So have you not seen this latest proposal by Rabo?

5    A.  When did you turn it in?

6    Q.  It was filed at 4:15 yesterday.

7    A.  I'm not sure if I've seen it or not.

8    Q.  You don't recall it?

9    A.  No.

10    Q.  And then if you turn to Exhibit 1012 which is the -- is it

11    1012?  Yes, 1012 which is the term sheet that Sandton provided

12    you and you testified about today.  Do you see that document?

13    A.  1012?

14    Q.  Uh-huh.  Do you understand this to be the Sandton term sheet

15    that you testified about this morning?

16    A.  Yes.

17    Q.  And if you'd turn to the fourth page of that exhibit.  Do

18    you see at the top it says "revenue and operating milestones"?

19    A.  Yes.

20    Q.  Do you see that contrary to what you had testified about,

21    Sandton actually does have revenue and operating milestones?

22    A.  Yes.

23    Q.  And what are those?

24    A.  Revenue milestone to be such that borrower (inaudible)

25    within 20 percent the rolling budget revenue projections.

1  Operating milestones will be typical for a business of this

2  nature and ensure that borrower maintains inventory and property

3  plant and equipment in good standing.

4  Q.  So does it concern you that Sandton has revenue operating

5  milestones and Rabo does not?

6  A.  No, it does not concern me that Sandton has it.

7  Q.  And they don't put in there what those actual terms are

8  going to be.  They just say typical for a business of this

9  nature.  Is that correct?

10 A.  Correct.

11 Q.  So what happens if you can't agree to those operating

12 milestones that they want to put into place?

13 A.  I haven't heard of anybody that had a problem negotiating

14 that with Sandton.

15 Q.  But what happens if you do?  What happens if you can't reach

16 an agreement because you don't know what those terms are as you

17 sit here today, right?  You don't know what those typical

18 business nature terms are that Sandton's going to require.

19 A.  Bobby Rice assured me that that would not be an issue.

20 Q.  Okay.  What was the conversation you had with Mr. Rice in

21 regard to the revenue and operating milestones that would not be

22 an issue?

23 A.  The conversation was don't worry about it.  It's not going

24 to be an issue.

25 Q.  Okay.  And if he's wrong, what happens?

1    A.  He's the main guy.  He's the one that decides.

2    Q.  Do you have it in a signed writing of what those terms are

3    going to be to make sure that you will be agreeable to them?

4    A.  No.  I believe his word is good and he's got a good

5    reputation of his word.

6    Q.  Did you believe that with MetLife when you said that they

7    promised you that they would make a loan and then they decided

8    not to go forward with it?

9    A.  Yes, I did.

10   Q.  Okay.  What are the maximum capital expenditures that will

11   be permitted under the proposed loan?

12   A.  I don't recall.

13   Q.  Did you review this term sheet?

14   A.  Yes.

15   Q.  In this DIP financing, is there going to be exit financing?

16   A.  They talked about it, yes.

17   Q.  So because you talked about it, there's going to be exit

18   financing or didn't they agree that they will consider it?

19   A.  I believe they considered it, yep.

20   Q.  So you have no defined agreement that in fact there will be

21   exit financing, correct?

22   A.  I'm going off their good word and their good reputation.

23   Q.  But the answer is yes, you don't have any agreement in

24   writing?

25   A.  No, I do not.

1   Q.  Okay.  And at what point in time --

2   A.  I do have -- I do have a handshake.

3   Q.  Okay.  And do they have loan documents that require that all

4   material terms be in writing in order to be enforceable?

5   A.  I don't know.

6   Q.  Have you not -- have you seen any of their DIP agreement

7   that you would be required to sign on behalf of the -- as a

8   debtor in possession?

9   A.  I don't recall.

10  Q.  But would you recall if someone had provided a DIP agreement

11  in front of you to review?

12  A.  I've seen six or eight DIP budgets in the last few days.

13  Q.  DIP budgets but have you seen --

14  A.  Or DIP -- sorry.  DIP term sheets.

15  Q.  Right.  But have you seen a DIP loan agreement that actually

16  sets forth the terms that the estate will be bound by as far as

17  the DIP financing?

18  A.  I don't believe I have.

19  Q.  Okay.  Don't you think that would be important to have in

20  place before you request the Court to give $45 million?

21  A.  I don't know if it's important or not.  I thought that's

22  what the term sheet was for.

23  Q.  You think the term sheet lays out all the terms of the loan

24  between you and the potential DIP financer?

25  A.  I'm not sure.

1    Q.  Okay.  What does it mean in the term sheet when it says

2    you'll enter into an exclusivity agreement?

3    A.  I'm not sure.

4    Q.  Does that mean -- well, what does exclusivity mean to you?

5    A.  I don't know what it means.

6    Q.  Okay.  Well, did you ask anyone when you read the term

7    sheet?

8    A.  I don't believe I did.

9    Q.  You didn't ask anyone or you didn't read it?

10   A.  I don't recall.

11   Q.  You don't recall reading this term sheet that you --

12   A.  Yeah, I don't recall -- I don't remember that specific

13   portion of the term sheet.

14   Q.  Okay.  Do you recall that the term sheet provides that -- it

15   has a confidentiality provision in it that you can't disclose

16   the term sheet or other terms?  Do you recall that provision in

17   the term sheet?

18   A.  I do remember that part of it.

19   Q.  And what do you remember about it?

20   A.  Just that -- I remember reading that.  I don't remember

21   whose term sheet that was on.  Like I said, I read six or seven

22   different term sheets in the last few days.

23   Q.  So do you know what the purpose of the confidentiality

24   provision in the term sheet would be when it's part of a

25   bankruptcy filing?

1    A.  Not for sure.

2    Q.  Do you know what your limitations would be placed on hedging

3    arrangements?

4    A.  No.

5    Q.  Does it concern you if you have limitations on hedging

6    arrangements?

7    A.  No, because I haven't been able to hedge for a while

8    because -- because of Rabo.

9    Q.  Because you were in default?  Is that correct?

10   A.  Yes.  And the fact that I didn't have a hedge line with

11   Rabo.

12   Q.  And you don't need the hedge line as part of the operations.

13   A.  No.

14   Q.  If the Court declines to grant priming rights to Sandton on

15   an interim basis until the final hearing, will Sandton still

16   issue the interim loan before the final hearing?

17   A.  I'm not sure.

18   Q.  Have you had that conversation with Sandton?

19   A.  I don't recall if we did or didn't.  There's multiple

20   conversations happening even without me.

21   Q.  So you can't say today whether or not a loan will go

22   forward?

23   A.  No, I can't.

24   Q.  Okay.  If you take the $45 million loan from Sandton and you

25   enter into these DIP loan agreements and you default under the

1   term like you don't need a milestone, what happens to the assets

2   of the estate?

3   A.  It's due to be (inaudible).

4   Q.  So would it be possible that Sandton's then going to

5   foreclose as the first lienholder on all of the property of the

6   estate and the creditors don't realize any of the value?

7   A.  I'm not sure.

8   Q.  You don't know if they're going to give your DIP lender

9   those rights?

10  A.  I don't recall.

11  Q.  Do you recall what the maturity date is of the DIP loan?

12  A.  I believe it's about a year.

13  Q.  Okay.  Let's look at that on the second page of Exhibit

14  1012.  Do you see the column that says "maturity"?

15  A.  Yes.

16  Q.  And do you see it says that it has to be paid back the

17  earliest of the effective date of the plan or closing on a sale

18  of the borrower's assets.  Are you planning on selling assets?

19  A.  I don't understand your question.

20  Q.  Okay.  So the DIP lender says maturity date.  That's going

21  to be the earliest of these terms.  The one term is the

22  effective date of the plan or closing on a sale or a portion of

23  the borrowers assets.  Are you planning on selling assets?

24  A.  Not today, I'm not.

25  Q.  Do you have any inclination to sell assets to pay the DIP

1    loan?

2    A.   Not yet, I don't.

3    Q.   And what will be the determining factor?

4    A.   I haven't decided yet.

5    Q.   So you don't have a plan on how the DIP loan will be repaid?

6    Is that correct?

7    A.   We're looking at different options.

8    Q.   What options are you looking at?

9    A.   Getting refinanced.

10   Q.   Who are you planning on getting refinanced from?

11   A.   We're talking to multiple people.

12   Q.   Are these the same people you were talking to in June of

13   2022?

14   A.   No.

15   Q.   When you were going to pay Rabo off?

16   A.   No.

17   Q.   So how is it different now than it was in 2022 as to

18   refinancing?

19   A.   I'm talking to different sources of money.

20   Q.   Do you have any agreements as to those different sources of

21   money?

22   A.   No.

23   Q.   It goes on to say it's the earlier of the effective date of

24   the plan, selling of assets or nine months from the date of

25   origination subject to an extension for a total of up to twelve

1    months.   Is there an extension fee for that nine months to

2    twelve months?

3    A.   I don't remember.

4    Q.   Wouldn't that be an important factor because those fees are

5    going to affect the bankruptcy estate, right, and the ability to

6    have cash to pay creditors?

7    A.   I believe they would.

8    Q.   It would affect them.

9    A.   Yes.

10   Q.   So shouldn't you know whether or not there's an extension

11   fee?

12   A.   I don't remember.

13   Q.   If -- and then it goes on to say lender will consider

14   converting some or all of the DIP to exit financing in

15   conjunction with an emergence from Chapter 11 subject to the

16   terms agreeable to lender and lender's internal approvals.   Is

17   that the exit financing that you were discussing that you don't

18   have an agreement on?

19   A.   No.

20   Q.   That's not the exit financing?

21   A.   No.

22   Q.   Okay.   What is?

23   A.   I'm talking to other sources of money about getting

24   refinanced.

25   Q.   So you had made those same statements to Rabo in June of

1    2022 and for two years, you were not able to obtain that

2    additional -- that refinancing --

3    A.   Those --

4    Q.   Now you're -- just a second.  You're now in bankruptcy and

5    you have a DIP lender coming in at high fees who's taking a

6    first priority on all of your property and you don't have a

7    means -- you don't have a set agreement on how you're going to

8    take out that DIP lender.  Is that your testimony?

9    A.   In 2022, we had two offers on short-term, both Farm Credit

10   and Rabo, based off Rabo -- or excuse me, MetLife coming in with

11   $45 million.  We all waited around for that money that never

12   came.  We're done talking about that.  Now we're talking to

13   other bankers about getting refinanced into the future.

14   Q.   When did MetLife tell you they weren't going to make you

15   that loan?

16   A.   I believe it was June of '23.

17   Q.   And you still have not been able to obtain financing but

18   you're relying upon that in order to keep a DIP lender from

19   foreclosing on all of your assets?

20   A.   I have $400 million worth of equity.  I'll be able to get

21   refinanced.  I'm trying to --

22   Q.   Why were you not able to get refinanced with $400 million of

23   equity up to today?

24   A.   I explained it earlier.  With the 2023 dairy crisis,

25   everything's put the brakes on.  They're being very cautious.

1    It takes time to do a deal of this size.

2    Q.  And they're no longer cautious?

3    A.  I'm not saying they're not cautious.

4    Q.  But you're relying upon that for the DIP -- to take out the

5    DIP financing.

6    A.  Yes.

7    Q.  Okay.  You met with Rabo on March 13 and 14 to discuss

8    bankruptcy, cash collateral and potential DIP terms; is that

9    correct?

10   A.  Correct.

11   Q.  But you decided to move forward with Sandton on the proposed

12   DIP terms instead that we just discussed, right?

13   A.  Correct.

14   Q.  When did you tell Rabo you did not intend to proceed as

15   indicated at the meeting held in March?

16   A.  I don't recall.

17   Q.  Was it the day that you filed the motion for your DIP

18   approval and your bankruptcy?

19   A.  I don't remember.

20   Q.  Do you ever remember instructing your attorneys to contact

21   Rabo and tell them that you were not interested in DIP

22   financing?

23   A.  I don't recall.

24   Q.  You don't recall whether or not you told your attorneys

25   that?

1   A.  No, I don't.

2   Q.  Do you recall ever telling Rabo that you were not going to

3   go forward with DIP financing?

4   A.  I don't recall.

5   Q.  If I told you that Rabo -- the first time Rabo determined

6   that you were not going to go forward with them was when you

7   filed bankruptcy, would you have any reason to dispute that?

8   A.  No.

9   Q.  Before filing the Sandton proposal in bankruptcy, why didn't

10  you reach out to Rabo to determine if Rabo would provide better

11  terms?

12  A.  Can you repeat that, please?

13  Q.  Sure.  Before filing the Sandton proposal, why didn't you

14  reach out to Rabo to determine if Rabo would provide better

15  terms than Sandton for the benefit of the estate?

16  A.  Rabo made their offer.  How was I to know they were going to

17  come back and counter it.

18  Q.  Do you negotiate contracts in your operations?

19  A.  Not with somebody like Rabo, no.

20  Q.  So what do you mean not with somebody like Rabo?  You

21  weren't willing to go back to Rabo to see if they would provide

22  better terms for -- that would benefit the estate?

23  A.  Rabo's goal has been to liquidate the farm so, no, I don't

24  believe that they were going to act in good faith and negotiate.

25  Q.  So you weren't even going to give them the chance to give

1   less fees, reduced interest, meet the same terms as your DIP

2   proposal as far as -- in fact give better terms.  No

3   restrictions on the covenants.  You weren't willing to go back

4   to a third party to see if you could make the estate more

5   profitable?

6   A.  Rabo's made it clear that they want to liquidate my farm.

7   Q.  Well, haven't they filed proposals that don't require the

8   sale of property?

9   A.  I'm not sure.

10  Q.  Because you're not even looking at what Rabo files?

11  A.  They looked at it -- they sent it at 5:00 last night.  I

12  don't remember if I seen it all.

13  Q.  What about the two other proposals that Rabo had submitted

14  that were less fees, reduced interest, didn't have the

15  conditions that you were concerned about, had no release, right?

16  No release in the proposals that Rabo presented in bankruptcy

17  court?

18  A.  What's your question?

19  Q.  Did you review those?

20  A.  I answered the question before.

21  Q.  That you did review them?

22  A.  I reviewed multiple term sheets in the last few days.

23  Q.  Why wouldn't you have reached out and had discussions with

24  Rabo if their terms were better for the estate?

25  A.  It's not about terms.  It's about the survival of my farm

1  and 500 jobs and our business and through the receivership, I've

2  learned that the only thing Rabo wants to do is sell the farm

3  and I believe their position is currently still the same and

4  their previous term sheets state basically that they were going

5  to liquidate the farm.

6  Q.  Isn't it true that -- well, let me step back.  Wouldn't Rabo

7  be bound by a court order and the terms that are set forth in

8  the court in the loan documents as to what it can and cannot do?

9  A.  I don't know but they're very good about weaseling their way

10  out of stuff and getting me into court and trying to, you know,

11  back door sell my farm.

12  Q.  Or are they enforcing the terms of the loan documents,

13  Mr. Millenkamp?

14  A.  Yes, they are.

15  Q.  Okay.  So if in bankruptcy you had a loan that didn't allow

16  for the sale of property unless there's a default similar to

17  your DIP, why wouldn't you go forward with that?

18  A.  Because I wouldn't trust anything to do with Rabo because

19  they don't act in good faith.

20  Q.  Okay.  So -- isn't it true that at the March meeting, Rabo

21  contemplated a four-month exit as your business being a going

22  concern?

23  A.  I don't recall.

24  Q.  You don't recall either way or you don't recall Rabo

25  actually making that offer?

1    A.  I don't recall.

2    Q.  Either way.  Okay.  After Rabo made its first proposal, you

3    then went back to Sandton to see if you could get better terms,

4    correct?

5    A.  I don't recall.

6    Q.  Well, how did you end up getting the proposal from Sandton?

7    A.  We reached out to Sandton and we reached out to Conterra and

8    we knew that Rabo was going to propose a term sheet.

9    Q.  And so you took Rabo's term sheet and went to those

10   parties --

11   A.  I didn't --

12   Q.  -- and negotiated terms?

13   A.  I didn't do anything.

14   Q.  Who did it?

15   A.  I don't know who did it.

16   Q.  Did you know it was going on?

17   A.  I knew there was some -- some term sheets going back and

18   forth, yes.

19   Q.  Was nobody consulting with you --

20   A.  Yeah.

21   Q.  -- as to what those term sheets said?

22   A.  Yes.

23   Q.  Okay.  So did you understand that they took Rabo's term

24   sheet and went to these other creditors to see if you could get

25   better terms for your estate?

1   A.  I don't know who went to who.

2   Q.  You didn't know if that was going on?

3   A.  I thought it was public information and everybody was

4   looking at the term sheets that were public records.  I don't

5   think anybody really had to go back and forth.  Everybody had

6   that in front of them.

7   Q.  Did you go back to Sandton to get better terms than what

8   Rabo was offering in its proposal?

9   A.  No.  I believe Sandton come back.  I think everybody did

10  their own deal.  Conterra came back themselves.  Sandton come

11  back themselves.

12  Q.  How do you know that if you -- people were just doing it

13  behind the scenes?

14  A.  Because it's public knowledge.  People wanted it.  People

15  wanted the DIP financing.

16  Q.  What will be different about the business this year that

17  will position the company to be able to repay its debts besides

18  hoping for milk prices to increase and feed prices to fall?

19  A.  Hopefully less legal fees, less financial advisors, less

20  default interest and we're also already looking at 30 percent

21  less costs in feed and milk prices are higher than they were

22  last year.

23  Q.  But when you talk about less in attorney fees when you're

24  attempting to prime all three of your secured lenders, do you

25  not think that that's going to cause attorney fees and costs?

1   A.  Not the kind of attorney fees that I've had.

2   Q.  And what do you base that on?

3   A.  Based off having to pay everybody's attorney's fees over the

4   last few years.

5   Q.  How do you know how much it's going to cost going in the

6   future?

7   A.  Just a good guess.

8   Q.  Have you reviewed the budget that sets forth the legal fees?

9   A.  Yeah, and we feel like the budget was high.

10  Q.  And so why did you put -- allow those fees to go in the

11  budget?

12  A.  To be conservative.  On the high side.

13  Q.  So do you have other expenses that are overstated in the

14  budget?

15  A.  Not that I'm aware.

16  Q.  Just the attorney fees?

17  A.  You never know on attorneys.

18  Q.  And why is it that it's just the attorney fees that are

19  overstated?

20  A.  It's our best guess.

21  Q.  That doesn't answer the question.  Why is it that you

22  overstated the attorney fees and that's the only expense on your

23  entire budget that we can look at and understand that's the one

24  that's overstated?

25  A.  I have a better feel on all the other expenses but the

1    attorneys' fees are a wild card.

2    Q.   And so how did you come up with the number?

3    A.   My attorneys came up with it.

4    Q.   Okay.  What is -- have you taken any business classes?

5    A.   No, I'm uneducated.

6    Q.   Have you taken any financial courses?

7    A.   No.

8    Q.   When you were talking about the differences between Sandton

9    and Rabo's terms, you complained that Rabo required a release.

10   Isn't it true that the latest offer by Rabo doesn't require a

11   release?

12   A.   I've negotiated with Rabo and Mike Hayes multiple times and

13   they've said that they're not going to ask for release and then

14   about the second you're ready to shake hands and sign your name

15   to a document, then they demand a release.  So I'm assuming that

16   they're going to do the same thing they've done in the past

17   several times.

18   Q.   So in your choice in deciding not to negotiate with Rabo to

19   get better terms for the estate, it's because you don't think

20   that Rabo will be bound by a court order and the terms that a

21   court approves?

22   A.   I believe not everything can go in a court order and you

23   still have to deal with people and they've proven that you

24   cannot deal with them in good faith or in any sort of trust.

25   Q.   You also talked about livestock and Rabo restricting your

1    livestock from being sold.  Are you aware that in the most

2    recent cash collateral terms that -- that Rabo does not restrict

3    you from replacing your livestock?  So long as you maintain your

4    borrowing base, then there's no issue with replacing livestock.

5    Are you aware of that?

6    A.  No.

7    Q.  And does the latest offer by Rabo require a sale lease back?

8    A.  To their partner Homestead or who are you referring to?

9    Q.  Anybody.  Does it require a sale lease back?

10   A.  Not that I'm aware.

11   Q.  And when you call Homestead Rabo's partner, what do you mean

12   by that?

13   A.  They're partners on our operating line.

14   Q.  Are they?  Are they part of your --

15   A.  I'm not sure -- I don't know.  It's a secret.  I've asked.

16   I never got a straight answer so I don't know if Homestead's

17   still in or out of our deal.

18   Q.  So you don't know whether or not they're a lender that the

19   agent -- or that Rabo's an agent for?  Is that what you're

20   referring to when you refer to a partnership?

21   A.  Currently, I don't know but for sure, they were.

22   Q.  Right.  They were a lender like BMO, right?

23   A.  Correct.

24   Q.  So do you think BMO is Rabo's partner?

25   A.  I believe they are, yes.

1   Q.  And so what you -- I just want to make sure I understand

2   when you're saying they're a partner.

3   A.  A participant.  A partner.

4   Q.  So they're a lender under the loan documents that Rabo is

5   the agent for.  Is that what you mean?

6   A.  Yeah, but I feel they have -- Homestead and Rabo, it's kind

7   of a partnership also.

8   Q.  Well, something else besides being a lender under the loan

9   documents?

10  A.  Yeah, probably.

11  Q.  What is it?

12  A.  Well, they're trying to sell a huge portion of my farm to

13  Homestead for half the value so that would make them some sort

14  of partner.

15  Q.  Was Rabo selling the property?

16  A.  No, they're forcing the property.  They tried to force the

17  property be sold.

18  Q.  And how were they forcing it?

19  A.  On the previous term sheet, they were forcing that.

20  Q.  So are they forcing it or were they giving you a proposal

21  for a way to pay back the DIP so that your assets are not

22  foreclosed upon?

23  A.  I don't know how you -- you can say it either way.

24          MS. SCHWAGER:  I have no further questions, Your Honor.

25          COURT:  Mr. Naess.  We've been going for about an hour

1    and a half since lunch.  Do we want to take a break or do you

2    have questions for the debtor?

3         MR. NAESS:  I do have questions.  Whether we take a

4    break now -- I anticipate it will be a little while.  I have a

5    number of questions regarding the critical vendors.

6         COURT:  All right.  Why don't we take about a ten-

7    minute break and we'll reconvene.

8         CLERK:  All rise, please.

9                              (Recess taken.)

10        COURT:  Be seated.  All right.  We are back on the

11   record.  I believe cross-examination for Mr. -- from Mr. Naess

12   was in store.  Is that correct?

13        MR. NAESS:  Sure, Your Honor.  And during the break, we

14   had a conversation with Conterra's counsel.  It sounds like

15   their examination will be very quick relative to ours.  So it

16   might make sense to have them go first and then we'll just

17   finish up.

18        COURT:  All right.  Let's go ahead and proceed in that

19   fashion.

20                         CROSS-EXAMINATION

21   QUESTIONS BY MR. O'BRIEN:

22   Q.  Good afternoon, Mr. Millenkamp.  My name's John O'Brien.

23   I'm the attorney for Conterra and we've met before.

24   A.  Hi, John.  Yes.

25   Q.  Good seeing you again.

1          MR. O'BRIEN:  Just preliminary, Your Honor.  I spoke

2     with Mr. Christensen.  I think that we now have an agreement

3     that the debtor doesn't have an objection to the admissibility

4     of Conterra's exhibits which can be found attached to the

5     Erickson declaration which was filed at Docket 132.

6          MR. CHRISTENSEN:  That's true, Your Honor.  I think

7     they've all been relabeled with new numbers.  So whatever those

8     new numbers are, that's what we're stipulating to is the

9     admission of those.

10         COURT:  All right.  And I believe those are marked as

11    7001 through 7010?

12         CLERK:  Correct, Your Honor.

13         COURT:  All right.  Is there any objection to the Court

14    admitting Exhibits 7001 through 7010?

15         MR. GOURLEY:  No objection from MetLife.  But just

16    clarification.  Are we skipping 7000?  Is that what's occurring?

17         COURT:  I think we are, yes.

18         MR. GOURLEY:  Okay.

19         COURT:  All right.  Hearing no objection, the Court

20    will admit Exhibits 7001 through 7010.

21             (Conterra's Exhibit Nos. 7001 through 7010 admitted.)

22    BY MR. O'BRIEN:

23    Q.  And Mr. Millenkamp, I just have a very few questions to

24    focus in on Conterra's loan and loan positions.  And how many

25    loans does -- how many loans do you have with Conterra?

1    A.  Two.

2    Q.  And were both those loans made in 2022?

3    A.  Yes.

4    Q.  And sometimes I've heard people refer to those loans as the

5    mezzanine loans.  Is it your understanding that those are also

6    the mezzanine loans as some people have called them?

7    A.  Well, the one I would refer to is the bigger one as the mez

8    loan.  The second one was the German Dairy.

9    Q.  And I would agree with you on that.  Thank you.  And let me

10   first -- and the total amount of those two loans together are in

11   the original principal amount of a little bit over $18 million?

12   A.  Yes.

13   Q.  Okay.  And I'd like to focus on the smaller of the two loans

14   first, the ones that you described as the German Dairy loan.

15   Are you familiar with that loan?

16   A.  Yes.

17   Q.  And was that loan in the original principal amount of

18   $2,549,750?

19   A.  Yes.

20   Q.  And is that loan secured by a first lien on a facility known

21   as the German Dairy?

22   A.  Yes.

23   Q.  And is that an 80-acre parcel?

24   A.  Yes.

25   Q.  And are there about 53 acres irrigated farmland?

```
 1    A.  Yes.

 2    Q.  And about 25 acres, a dairy facility with a parlor on it?

 3    A.  Yes.

 4    Q.  And roughly two acres are waste?

 5    A.  Yes.

 6    Q.  And is that facility, is that generally where you put the

 7    (inaudible)?

 8    A.  It's -- I would refer to a special needs dairy.

 9    Q.  Okay.

10         MR. O'BRIEN:  If I could ask the courtroom deputy to

11    bring up Exhibit 3031.

12         COURT:  And it gets to the parties that are controlling

13    the presentation.

14         MR. O'BRIEN:  Oh.  Can somebody -- can you do that?

15    And this is the only exhibit I have so --

16    BY MR. O'BRIEN:

17    Q.  There we go and if I can draw your attention to page 7 of

18    this document.  And I believe this document is one of our

19    declarations.  Do you see that?

20    A.  Yes.

21    Q.  And can you scroll just a little bit more to see the whole

22    chart?  And this itemizes out your real estate?

23    A.  Yes.

24    Q.  And the second -- in the second box in this chart, it says

25    German Dairy property.  Is that the property on which Conterra
```

1  has the first lien?

2  A.  Yes.

3  Q.  And it gives an appraised value there of $4,250,000.  Is

4  that more or less what you think the value of the German Dairy

5  is?

6  A.  Yes.

7  Q.  And if there was -- and Conterra has the first lien on that

8  property.  Is that right?

9  A.  Yes.

10  Q.  And there are no other liens on that property; is that

11  correct?

12  A.  Not that I'm aware of.

13  Q.  Okay.  So if there was a 30 or $40 million DIP loan in favor

14  of a DIP lender that took a priming lien on the German Dairy,

15  then Conterra's loan on the German Dairy or at least its

16  collateral value would be obliterated.  Is that a fair

17  statement?

18  A.  Yes.

19  Q.  Okay.  And then now I'd like to talk about the bigger loan

20  which you've also described as the mez loan.  Is that a loan in

21  the original principal amount of $16,500,000?

22  A.  Yes.

23  Q.  And that was also made in 2022.

24  A.  Yes.

25  Q.  And is that loan secured by a second lien on the personal

1  property that's also pledged to Rabo?

2  A.  Yes.

3  Q.  And that would include the livestock and the inventory

4  equipment supplies, farm products?

5  A.  Yes.

6  Q.  And then is the second Conterra loan, the mez lien for

7  $16,500,000, is that also secured by a third lien on the balance

8  of your real estate?

9  A.  Yes.

10  Q.  So if we were to go back to this chart here, is it fair to

11  say that the big loan in favor of Conterra is secured by a third

12  position on all the property on this chart except for the German

13  Dairy property on which Conterra has the first lien?

14  A.  Yes.

15  Q.  Okay.  And then just my last question.  There's been -- I

16  see on some of the statements and schedules a reference to a

17  company called Viterra.

18  A.  Viterra.

19  Q.  Viterra.  And then there's also Conterra which is my client.

20  A.  Correct.

21  Q.  And is there any relationship between the two?

22  A.  Not that I'm aware of.

23  Q.  Just a coincidental name?

24  A.  Yes.

25  Q.  Thank you.

 1          MR. O'BRIEN:  That's all the questions I have.  Thank

 2    you, Mr. Millenkamp.  Thank you, Your Honor.

 3          COURT:  Thank you.  All right, Mr. Naess.

 4                    CROSS-EXAMINATION

 5    QUESTIONS BY MR. NAESS:

 6    Q.  Good morning, Mr. Millenkamp.  I'm Jason Naess from the U.S.

 7    Trustee's Office.  Hopefully, my questions won't be too basic

 8    but I'm at a bit of disadvantage compared to the other parties.

 9    This is all new to us.

10          You asked both this morning -- it might have been both

11    times this morning about who the critical vendors protocol team

12    is and the first time you responded yourself, your son, the

13    general manager, the operations manager and the cattle manager.

14    And then the second time you responded, yourself, the general

15    manager David Heida and then two foremen, a Mario Orcananza and

16    I think it was a Mark Harrison.  Are those two foremen the

17    operations manager and the cow manager?

18    A.  Yes.  They're the same people.

19    Q.  Okay.  And the second time, you didn't mention your son.  Is

20    he also part of that team?

21    A.  Yes.

22    Q.  Can you describe for me how that protocol team functions?

23    Do you meet or --

24    A.  How it functions on a daily basis or this particular deal?

25    Q.  Sure, yeah.  On this particular deal in deciding who are

1    critical vendors.

2    A.  My son's right underneath me.  I keep him aware of what's

3    going on.  He deals with a lot of the day-to-day operations so

4    he has a big appreciation for who we need to have around to run

5    our business.

6    Q.  Okay.

7    A.  Mark Harrison is my operations manager.  He's worked for me

8    for 27 years.  He's the guy that keeps the place running

9    basically.  Everything, rolling stock, milk parlors, everything,

10   water, everything.  Mario Orcanonza has been with me 21 years.

11   He's the cattle operations guy.  Without equipment, without Mark

12   maintaining the facilities, he can't do his job on taking care

13   of the livestock.  And then David Heida is our general manager

14   so, yeah, they all know the ins and outs of what it takes to run

15   the needs of the farm on a daily hourly basis.

16   Q.  Okay.  And are the decisions as to who's a critical vendor

17   and who's not a critical vendor a consensus process or how does

18   that work?

19   A.  Ultimately, it lays on me but they -- you know, if you would

20   ask each one of those people individually, we would all come to

21   the same list.  Most of it is common sense.  Maybe not for

22   people that aren't involved in our business but with that group

23   of guys, it would be.  We would all know how critical each one

24   of the suppliers, vendors or feed brokers are.

25   Q.  Okay.  And that was one of my questions is whether there was

1  a leader to that team and it sounds like there is and that would

2  be you?

3  A.  Yes.

4  Q.  Okay.  And when you're I guess analyzing the critical

5  vendors, do you get together in a room and say we've got this

6  list of people who say they're not going to provide us feed or

7  not going to provide us services unless we give them a

8  prepetition payment.  Do we give them that payment or not or

9  how -- how does that process work?

10 A.  We don't sit down and have that kind of meeting.  David

11 Heida and I do often.  We did the majority of the work, you

12 know, the sit-down work.  But he does the least when it comes to

13 actually keeping the place rung.

14         His background, he's a lawyer unfortunately but that's

15 how we use him and, you know, the other guys are the guys that

16 get it done on a daily basis.  So David and I are the ones that

17 sat down and created the list.  The other guys -- the other --

18 you know, Jake, Mario and Mark are giving us their input.

19 Q.  Okay.  So the list itself is created primarily by you and

20 David Heida?

21 A.  David, yeah, yeah.

22 Q.  Okay.  And there's been an adjustment as far as, you know,

23 what we've seen in this bankruptcy so far.  On April 2, there

24 was a cash collateral budget that was filed that had a certain

25 list.  I think there were about 15 critical vendors on it.  And

1   then last night, there was another cash collateral budget that

2   was filed as a supplement that had roughly 40 critical vendors

3   on it.  What happened between the 2nd and yesterday?

4   A.   There's been a big debate with our team which means with me,

5   David Heida and our lawyers.  We're not in agreement on the

6   critical vendor.

7        When I was asked by my excellent lawyers who would be a

8   critical vendor and I answered by, "Who's not?"  And I didn't

9   mean that sarcastically and it started off with like, "Bill,

10  you're crazy."  And, you know, we went back and forth and they

11  were telling me we can't have very many critical vendors.  We

12  can't have very many critical vendors.  The Court doesn't like

13  it.  You're not going to like it.  So on and so forth.  And

14  there's just a lot of critical vendors.

15       Now, our lawyers don't know that.  They're not running

16  a big farm the way we are.  They don't appreciate it.  They

17  don't understand the ins and outs of the daily demands of

18  running a farm of our scale 365 days a year, 24 hours a day

19  nonstop.  We can't be broke down.

20       So yeah, it just -- and with, you know, David Heida

21  who's an employee of ours, you know, we're beating each other up

22  daily.  On the way here, we were still arguing about it and we

23  were talking specifics on every critical vendor.  How can we

24  live without this person?  And our team could not answer me how

25  I could not live without whatever person is on that list, they

1  can't replace them.  So I said if you guys can't replace them,

2  then how do we not put them down as a critical vendor?  I mean

3  it's unfortunate I guess that the list is larger than some

4  people would like but I can't live without -- I can give an

5  explanation on each one in detail but Mark, Mario, Jake and I

6  are the ones that decide how to keep the place running.  We

7  can't live without those critical vendors.

8       Now, in time, can you replace a lot of them?  Yes.  But

9  unfortunately, time could be weeks, months or years to replace a

10  lot of these guys and, unfortunately, we have sometimes hours to

11  get -- when we need these people whether it's through their

12  service or the parts they supply or whatever -- their knowledge

13  base.  You can't -- you can't come up with those guys at 3:00 in

14  the morning on a Sunday.  You know, you just -- these people

15  don't grow on trees so that's why the list was created that you

16  have in front of you.

17  Q.  Okay.  Very good.  As far as background for my edification,

18  you know, I had a number of questions about things that kind of

19  came up in testimony this morning about the receivership.  So I

20  guess prior to the receivership, what was your relationship with

21  the vendors at that time?

22  A.  Prior to the receivership, our payables were growing.  But

23  we have a really good relationship with almost all of our

24  vendors.  They have a lot of faith in me, our business and my

25  word.  We were getting a few calls, "Hey, you're late.  What's

1    your plan?"  That's not out of the ordinary considering 2023 was

2    the worst dairy year around.

3           So I would assume that most dairies are in the same

4    position as we are by falling behind on the vendors.  But the

5    vendors -- our vendors are great.  What really caused the most

6    chaos for us is when the rumblings came out of a receiver and

7    the receivership started.  Then it was a storm with the vendors.

8    Q.  Okay.  And I think I heard this morning or earlier this

9    afternoon that maybe just prior to the receivership, there had

10   been some payments that were not made to feed vendors.  It

11   sounds like -- I mean that's consistent with what you just said,

12   that maybe some payments had been missed.  Is that correct?

13   A.  I wouldn't say missed.  They were just late.

14   Q.  Okay.  That's fair.  And I think I also heard that some of

15   the feed vendors had instituted lawsuits prior to the

16   receivership?  Did I hear that correctly or is --

17   A.  Correct.  And the biggest thing on the lawsuits is the corn

18   silage guys.  So last fall, prior to harvesting the corn silage

19   which would have been in September -- so we were in the middle

20   of the bad milk prices so all the farmers have common sense and

21   they know, hey, the dairy industry is hurt.  Are we going to get

22   paid on time?

23          So I have a partner on my chopping company.  It's

24   called H & M who happens to be a farmer.  His name is Brian

25   Hudick (phonetic) and he is the liaison between the farmers and

1   us.  He rounds up all the silage -- the corn silage that we need

2   to buy from the farmers.

3        And all these other farmers had the same concern and

4   they reached out to Brian and Brian reached out to me on payment

5   and generally we pay half of our corn silage bill in November

6   and half in January.  It's always been that way.  They just

7   wanted to know if those payments were going to be made.

8        Now, if I didn't get stuck into a receivership or a

9   bankruptcy, we would have cash flowed our way through it.  At

10  the time -- at the time, we didn't know exactly how much money

11  Rabo was going to sweep because they would never tell us what

12  they were going to do.  They weren't questioning -- they weren't

13  consistent on how many steer proceeds and butcher cow proceeds

14  they were going to take.

15       But again, back to the farmers -- the farmers' concern

16  with the corn silage, were they going to get paid.  Rabo Bank --

17  so Brian Hudick, my chopping partner, reached out to my banker

18  which happens to be H & M's banker.  I bank with Rabo.  Our

19  chopping business banks with Rabo.  Brian Hudick went to Rabo

20  and said, hey --

21       MS. SCHWAGER:  Your Honor, this is hearsay.

22       COURT:  I'll sustain the objection.

23       MR. NAESS:  That's fine.

24  BY MR. NAESS:

25  Q.  So I guess were there any other vendors besides the corn

1  silage vendors that instituted a lawsuit?

2  A.  Yes.

3  Q.  Okay.  Who were those?

4  A.  There was miscellaneous trucking companies, hay suppliers, a

5  few other ones.

6  Q.  And even though there were late payments, were those

7  suppliers, service providers still providing the service?

8  A.  The corn silage guys cut us off.  The chopping companies

9  liened all the silage.  There's a couple of them that have

10  threatened with a lawsuit.  They have liens on the actual -- for

11  instance, straw.  They can still come out and pick it up.  So

12  yeah.  And then there was also several threats or conversations

13  about being cut off permanently going forward.

14  Q.  Okay.  And I heard this morning that there were some

15  temporary restraining orders.  Was that part of the receivership

16  or was that before the receivership?

17  A.  The restraining orders had to do with the corn silage.

18  Q.  All right.  Let's see.  After the receivership was

19  commenced, it's my recollection that -- how you described this

20  morning was the receiver was running the financial side of

21  things and you were running the operations side.  Is that

22  accurate?

23  A.  Yes.

24  Q.  Okay.  And during that period, my understanding is that some

25  of the service providers were not getting paid.  There were

1  promises of payment, promises of letters of credit but those

2  weren't necessarily being fulfilled.  Is that accurate?

3  A.  That's very accurate.

4  Q.  Okay.  During that period of time, were the service --

5  services still being provided even though the payments weren't

6  being made?

7  A.  Some were and some weren't and some were in limbo.

8  Q.  Okay.  From your discussion with the vendors, is it your

9  understanding that the vendors also see the issues that arose

10  during the receivership as being caused by the receiver; not by

11  operations?

12  A.  Yes.

13  Q.  How would you describe the level of trust that currently

14  exists between the vendors and yourself, Millenkamp Cattle, now

15  that you're out of the receivership and into bankruptcy?

16  A.  There will be very few vendors that won't do business with

17  us.  You know, there's some upset vendors.  I believe probably

18  98 percent of them we'll be back to doing business with.  I just

19  haven't had a chance to talk to everyone.  But the ones I've

20  talked to, we'll go back to normal with them.

21  Q.  Okay.  And would that be back to normal based on current

22  cash on demand payments?  They'll provide services as long as

23  you're paying them cash?

24  A.  For the most part.

25  Q.  Okay.  I guess you've hedged the answer a little bit.  What

1   about for those that aren't included in the most part?  What do

2   you anticipate happening with those?

3   A.  I can't read everybody's mind.  I don't know what

4   everybody's going to do.  A lot of it depends on the DIP

5   financing and how they get treated in that.

6   Q.  Okay.  And one of the things that I'll have some questions

7   about probably, some of the individual or maybe all of the

8   individual creditors on that list as far as what they've

9   communicated to you regarding the DIP financing.

10          My reason for doing that, I get, right, that everybody

11  on the list is needed for your operation.  I get that.  I think

12  the bigger question in our mind is whether or not payments on

13  prepetition debt is needed in order for them to continue to

14  provide the services.

15  A.  Uh-huh.

16  Q.  So in your declaration that was provided on the first day,

17  there are approximately I think $35 million worth of total

18  unsecured debt that was identified.  Is that your understanding

19  of the amount of unsecured debt?

20  A.  Yes.

21  Q.  And some of that debt might be disputed or unliquidated or

22  contingent claims?  Is that accurate that there might be some of

23  those claims that are disputed?

24  A.  Not that I'm aware of.

25  Q.  Okay.  Okay.  Do you know if the updated cash collateral

1    budget, the updated request for critical vendor amounts has been

2    served on parties other than those that are electronically

3    served?  You might not know.

4    A.  I don't know.

5    Q.  Okay.  Do you know if anything else in the cash collateral

6    budget has changed other than the critical vendors between what

7    was filed on day 1 and what was filed yesterday?

8    A.  Not that I'm aware.

9    Q.  Do you know if all the critical vendors that were included

10   in the initial cash collateral budget are also in the

11   supplemental cash collateral budget that was filed last night?

12   A.  I'm not sure.

13   Q.  Okay.  If we can look at Exhibit 1015 which is in the

14   debtor's binder.  We'll primarily be looking at pages 16 and 18

15   of that exhibit.  Probably flipping back between those two

16   pages.

17   A.  1015?

18   Q.  Correct, yeah.  And it's also the one that's on the screen

19   there.

20   A.  Okay.

21   Q.  It might be easier to read it there.  A little bit bigger

22   font.  So the first critical vendor that's identified is Aden

23   Brook Trading Corp.  What kind of service do they provide?

24   A.  They bring in the majority of our dry hay and straw.

25   Q.  Okay.  And the budget on page 18 indicates that you're

1    proposing a total of $800,000 paid to them as a critical vendor

2    payment.  Do you know what period that amount of 800,000

3    represents?  Is that like a week's worth of feed, a month's

4    worth of feed?

5    A.  We do about 250 to $350,000 a week in business with them.

6    Q.  Okay.  Do you happen to know what period that $800,000 would

7    be for?  Was it prior to the receivership?  Was it during the

8    receivership?

9    A.  Prior I believe.

10   Q.  Okay.  Has Aden Brook Trading Corp told you that they will

11   stop providing service if they don't get paid that $800,000?

12   A.  Yes, and I've told the receivers the same thing when the

13   receivers were dealing with them.

14   Q.  How did they communicate that to you?  Was it a phone call

15   or --

16   A.  On the phone.

17   Q.  Okay.  Do you recall when that took place other than --

18   A.  Almost daily.

19   Q.  Okay.  Do you recall who from that entity contacted you?

20   A.  Steve Lam.

21   Q.  And since those communications, have they continued to

22   provide feed to you -- does Aden Brook Trading Corp provide feed

23   to you today?

24   A.  Yes.

25   Q.  So I guess even though they said that they would stop, they

1   haven't really stopped yet?

2   A.  Yet.

3   Q.  Okay.  Have they indicated to you whether -- if they're paid

4   cash for feed that's provided, they'll keep providing service

5   even if they don't get paid that 800,000 immediately?

6   A.  They said they were going to stop doing business with us.

7   They were going to ride it out for a while and see how this all

8   goes and our DIP financing and then go from there.

9   Q.  How about American Calf Products?  They indicate they're

10  owed $100,000.  Have they communicated to you that they will

11  stop service?

12  A.  Yes.

13  Q.  How did they do that?

14  A.  Verbally.

15  Q.  Okay.  Do you recall who it was that told you that and when

16  that happened?

17  A.  I can't remember the guy's name.  That was probably three

18  weeks ago.  I don't recall his name.  There's not a lot --

19  American Calf Products is feed and there's only a couple on the

20  west coast that bring in quality milk replacer.  So they're

21  critical as far as there's not very many people to replace them

22  and the quality that I can get.

23  Q.  Are they still providing services to today?

24  A.  Yes, they did -- I believe they did cut us off and they're

25  kind of on and off.  We bought some milk -- there's two milk

1  replacer companies that we deal with and I believe they did cut

2  us off for a bit.

3  Q.  Okay.  Are they currently -- even if they cut you off for a

4  bit, are they currently back to providing --

5  A.  I don't know.

6  Q.  Is that Carnmae Corp (phonetic) -- Carnmae One is the next

7  one, 200,000.  Have they communicated to you that they will stop

8  providing feed?

9  A.  They -- they said the cost was going to go up significantly.

10  Q.  Okay.

11  A.  To probably make it unaffordable.

12  Q.  Okay.  Did they say it would not go up if they were paid

13  their prepetition amount?

14  A.  Business would be normal, yeah, if we would --

15  Q.  Did they put any timelines on that?  And I guess what I'm

16  saying is after the plan's confirmed, I think all these payments

17  are fine, right, for prepetition debt under a plan.  What I'm

18  trying to understand is during the interim before plan is

19  confirmed, have they indicated if we don't get our $200,000

20  before the plan's confirmed, we're going to stop providing

21  services or are they fine waiting?

22  A.  They're going to jack the prices up.

23  Q.  Okay.  Will the prices come back down, do you know, once --

24  A.  I have no idea.

25  Q.  Okay.  H & M custom, 4.25 million.  Is it my understanding

1    that H & M Cattle owns a 50 percent interest in --

2    A.  H & M is the chopping company that I'm 50 percent partners.

3    This is probably the most unique critical vendor because it's

4    the only one that I'm involved with.  I would put them as the

5    most -- the highest critical vendor because of the service they

6    provide.  And the service that they provide is chopping all of

7    it our farm ground which is ours and others.  So they're

8    chopping probably 20,000 acres -- or 10,000 acres of corn and

9    10,000 acres of hay three or four times.  It takes a massive

10   amount of equipment, a massive worth of dollars, 40 employees,

11   very niche business.  We start in 30 days.

12           We have as many choppers as any other chopping company

13   in the state.  Probably more choppers so there's nobody in the

14   state that could replace H & M.  And I'm under about a

15   three-week window to start chopping again and they haven't

16   gotten paid since last year.

17   Q.  I think I misspoke.  So H & M is 50 percent owned by

18   Millenkamp Cattle.

19   A.  Millenkamp Cattle and Brian Hudick are the partners in H &

20   M.

21   Q.  Okay.  And so I guess you as Millenkamp Cattle have told --

22   you as H & M -- 50 percent owner of H & M have told Millenkamp

23   Cattle we're going to cut you off feed?

24   A.  No.  Brian Hudick is the managing partner.  He says he's not

25   chopping our feed in three weeks if he doesn't get paid.

1   Q.  Doesn't get paid current or doesn't get paid for past?

2   A.  Past.  Past and current.

3   Q.  Okay.  Maybe to speed things along, I'm going to go through

4   the list here and the question will be for each have they

5   indicated to you that they will not provide service if they

6   don't get paid past prior to plan confirmation.  So Healthy

7   Earth Enterprise, have they communicated that to you?

8   A.  Yes.

9   Q.  Do you recall when and who it was?

10  A.  Last week.  Ray Saline (phonetic).  Part owner of Health

11  Earth.

12  Q.  Okay.  J.D. Heiskell, have they made that communication to

13  you?

14  A.  Todd Gearheart, I don't communicate with him.  My general

15  manager does so I can't -- I can't -- I can't answer that but

16  they provide a (inaudible).  It's minerals that we feed our --

17  close-up minerals.  Very few people do that.  That's what makes

18  them critical to us.

19  Q.  Okay.  Land View.

20  A.  Land View is the guy -- we owe them more money than anybody

21  else.  They provide mixed grain to us.  Nobody else can handle

22  the volume of mixed feed which makes those guys very critical.

23  Q.  Have they indicated they're going to stop providing feed?

24  A.  Yes.  Yep.

25  Q.  When and who was it?

1    A.   During the receivership.  I don't remember when.

2    Q.   Okay.

3    A.   Dan Noble is the guy.

4    Q.   Are they still providing feed?

5    A.   Yes.

6    Q.   Okay.

7    A.   All these vendors are kind of -- I could answer them all the

8    same way.  They're waiting to hear about how all this goes.

9    They all want to do business with us in the future but, you

10   know, a lot of them can't afford it or won't do it without

11   payment.

12   Q.   Okay.  Silage group, I think there was an estimation there

13   were 15 different entities involved in that?

14   A.   Uh-huh.

15   Q.   How does the communication happen with them?  Is there

16   somebody who's representing the rest of them?

17   A.   They have an attorney that represents them and they're

18   talking to us and they made us an offer so that's what they told

19   us.  What makes those critical too is we buy -- to buy corn from

20   a farmer, it's hard to establish those kind of farmers.  It

21   takes years.  It's taken my whole business career and if you

22   don't pay the farmers, you're not going to get feed from them

23   next year so where is my corn going to come from this October

24   when they haven't gotten paid?

25           And they've relayed the message to Matt Christensen,

1  their counsel to ours, that, you know, some guys are already not

2  going to do business with us and if they don't get any money, I

3  assume that list is going to grow a lot more.

4  Q.  So is there anybody on the list that has not communicated to

5  you that they will stop providing services if they don't get

6  paid their prepetition amount?

7  A.  Not everyone through me but through -- a couple of them was

8  through employees.  You know, like Schows Truck Center, for

9  example, and it's Boyce Equipment, Coastline Equipment.  Those

10  would be the only ones I haven't talked to myself.  They talked

11  to my employees that relayed the information to me.

12  Q.  Okay.  Is there anyone on that list that has stopped

13  providing services?

14  A.  Yes.  On the trucking deal, there's two or three of those

15  guys that quit hauling for us.  All those guys are -- it's a

16  group -- those of all truckers that we hire in to help us when

17  we chop corn so we hire outside trucks and they also haul manure

18  in the winter.  So those trucks are employed throughout the

19  whole year and, yeah, some of them have already quit.

20        You know, they're willing to come back if they get

21  money and what makes me extremely nervous, those are -- we don't

22  owe those guys a lot of money but they're a hard no on coming

23  back in three weeks if they're not paid.  That's why you'll see

24  some of those.  We want to pay them 100 percent and we're not --

25  we might have choppers to chop.  We might not have trucks to

1  haul the feed in.

2  Q.  Okay.  How were the amounts that were included in this table

3  determined?  Was it something that you proposed?  Was it

4  something the creditors proposed?  How did you arrive at these

5  numbers?

6  A.  Both.  The corn silage guys, you know, the attorneys kind of

7  took care of that.  I believe they brought us an offer but every

8  single one of those was based off conversations that I had and I

9  tried to negotiate and sweet talk them as much as I can.  So

10  those were -- you know, those were determined by conversations

11  that we had about what they would live with.  So some of them

12  you're going to see are maybe going to get paid at a higher

13  percentage and some are not.  So everyone's a little different

14  based on conversations that we had.

15  Q.  And right now, we're a little bit in the dark as to, you

16  know, what percentage of the actual claims that each of these

17  parties has, these payments represent.  You know, it sounded

18  like H & M was almost full payment of the prepetition claim.  Is

19  that pretty typical where it's nearly full payment of its

20  prepetition claim that you're proposing?

21  A.  Not on all of them, no, no.  Every one of them is different.

22  Are you asking specifically about H & M or generally?

23  Q.  Yeah.  That's the only one -- I heard some testimony this

24  morning that, you know, it's $4.5 million.  There's 4.25 here.

25  I was just wondering if that was typical for these creditors?

1   A.   No, every single one is different based off conversations

2   that we had and what we can negotiate with them and what they'd

3   be willing to do to go forward doing our business.

4   Q.   Okay.  And are there other creditors that have had similar

5   communications with you that, you know, maybe we're going to

6   stop providing services that aren't including on this list?

7   A.   I've had conversations with probably three times as many

8   people as that and I've talked them into doing business with us,

9   right?  So we have other critical vendors that are not on this

10  list but those vendors have told me that they're not going to

11  stop providing service so we didn't put them on the list.

12  Q.   Okay.  I guess how do you weigh or how do you judge -- I

13  mean I think you testified this morning, you said a couple of

14  times that there had been threats -- various threats at various

15  times throughout the last few months as you've gone pre-

16  receivership, receivership and now the bankruptcy.  How do you

17  determine the credibility of those threats?  You know, this

18  person we can keep, you know, as long as they're going to be

19  paid current, they're going to be good but the other, they're

20  not.

21  A.   We have long-term relationships with most of these guys.  A

22  lot of these people actually own their own companies.  They're

23  people like me.  People I have done business with for years and

24  years and years and some of them are even my friends on that

25  list.  So yeah, you're going to take them -- you're going to

1  take their word for, you know, when they said they're going to

2  cut you off, they're going to cut you off.

3      Now, that's what you can go off of, their word, letters

4  from attorneys.  We get plenty of those and we've had plenty of

5  guys quit us for a week or two to, you know, give us a little

6  taste of what it's like to not have them around.  So there's

7  plenty of that going on too.  Everyone's different, you know.

8  It's truly -- it's a nightmare to deal with all that.

9  Q.  Sure.  Have your conversations -- when you were having these

10 conversations with creditors, are they nuanced to the point

11 where you're talking -- you're saying to us three weeks, but,

12 you know, give us three months and then we'll have a plan in

13 place and then we'll be able to pay you?  You know, have you had

14 that kind of conversation?  Just wait a little longer and we're

15 going to -- we're in this bankruptcy to reorganize.  We'll get

16 reorganized and we'll pay?  Have you had those conversations?

17 A.  To be honest, the receivership really screwed up a lot of my

18 good credit.  Even as much as they trust us and the relationship

19 as we got -- as good of a relationship as we've got, the

20 receiver went through and burnt the bridge down on a lot of

21 these guys.  Now, I'm trying to put a lot of that back together

22 which I'll attempt but I'm going into them and they're all

23 ticked off.  You know, they've been promised, they've been

24 promised and then they go out and tell their banks it's coming.

25 And now they're more hostile.  So I'm dealing with a very

1   hostile group of vendors and that's what I get to deal with.

2   Q.  Sure.

3   A.  I mean I'm having multiple conversations with one vendor to

4   try to wait this out.  And it also takes a lot of time and,

5   unfortunately, I mean I have 280 vendors on the list.  I do

6   business with 800 people -- I have 200 -- sorry, I have 800

7   vendors every two years, okay?  280 of them we owe money to

8   right now.

9           It takes a lot of time to do this.  I have to run a

10  business, prepare for a bankruptcy, babysit a receivership and

11  try to deal with trying to figure out who's going to do business

12  with you and who's not.  So yeah, it's time-consuming but I've

13  talked to every single person on that list.

14  Q.  Sure.  Okay.

15  A.  Or somebody from my company has or myself.

16  Q.  Okay.  And that's what we're trying to understand, you know.

17  I think I heard that the relationship was soured during the

18  receivership but they trust you.  You're back in charge.  Just

19  trying to understand how patient are these people.

20  A.  They lost a lot of patience.  Like people that had

21  patience -- people don't like getting lied to.  That's not

22  normal coming from Millenkamp Cattle.  It's never happened.

23  Deliberate lies, lies from the bank.  They're pissed about it

24  and they're taking it out on me and they have power over us

25  because they're critical vendors.  These are -- these are smart

1  people.  If they know they're non-replaceable, they'll stop

2  doing business with you.

3  Q.  Okay.

4  A.  And unfortunately with us, our size -- it's not like you

5  just call Joe's Repair Shop and they come.  You need a very,

6  very big Joe's Repair Shop that's very sophisticated to do

7  business with us.  They -- it's -- I'm even learning how

8  valuable a lot of vendors are that I didn't even know.

9  Q.  And is it your plan that most of these payments will come

10  from the debtor in possession financing?  Is that how you plan

11  on paying them?

12  A.  Yes.

13  Q.  Okay.  Without that financing, can you pay these vendors?

14  A.  No.

15  Q.  Okay.  If you weren't paying these vendors, would you need

16  the financing?

17  A.  Excuse me?

18  Q.  If you weren't paying these vendors, would you need the

19  financing?

20  A.  No.

21  Q.  Okay.

22         MR. NAESS:  I don't have any additional questions, Your

23  Honor.

24         COURT:  Thank you, Mr. Naess.  All right.  Redirect.

25                      REDIRECT EXAMINATION

```
 1    QUESTIONS BY MS. MIKKINLINENI:

 2    Q.  Good afternoon, Mr. Millenkamp.  You were asked earlier I

 3    think this morning about a $9 million transfer of collateral.

 4    Do you remember that?

 5    A.  Yes, I do.

 6    Q.  Did you talk to the loan officer at Rabo regarding that

 7    transfer?

 8    A.  Yes, I did.

 9    Q.  And did he approve the transfer?

10    A.  Yes, he did.

11    Q.  You were also asked about the differences in the $150

12    million evaluation in your declaration and the $178 million

13    valuation of your personal property in the inventory exhibit

14    that we provided today.  Is that your -- do you recall that?

15    A.  Yes.

16    Q.  The $150 million amount in your declaration that you

17    associated with the personal property, was that an estimate?

18    A.  Yes, it was.

19    Q.  And do you think it was a conservative estimate?

20    A.  Yes, I do.

21           MS. SCHWAGER:  Your Honor, leading.

22           COURT:  Overruled.

23    BY MS. MIKKINLINENI:

24    Q.  And for the $178 million that you associated with the

25    personal property on your inventory listing at Exhibit 1009, did
```

1    you come up with that through a more thorough analysis?

2    A.  Yes.

3    Q.  And even if the personal property was valued at $150

4    million, Rabo would still be over-secured, correct?

5    A.  Correct.

6    Q.  You were also asked about the 2023 appraisal of the

7    equipment, correct?

8    A.  Correct.

9    Q.  And you were asked whether you had an equipment list

10   associated with this equipment on the inventory listing.  Is

11   that correct?

12   A.  Yes.

13   Q.  I'm going to pull up Exhibit 1010.  Can you scroll down?

14   There should be a spreadsheet on there.  Is this the equipment

15   list that you've been relying on?

16   A.  Yes.

17   Q.  Mr. Millenkamp, how much are you buying and selling

18   equipment?

19   A.  Almost weekly.

20   Q.  And what's your view on education versus experience when it

21   comes to valuing assets?

22   A.  You have to have experience to do something like this.

23   Q.  And do you think your experience is valuable in this

24   valuation of equipment?

25   A.  Yes.

1   Q.  I'm going to pull up Exhibit 1009.  And this is back to your

2   inventory listing, right?

3   A.  Yes.

4   Q.  Can we scroll down to the equipment?  You were also asked

5   about the CNH tractors.  Do you remember that?

6   A.  Yes.

7   Q.  Was the value of the new CNH tractors included in this

8   equipment list?

9   A.  No.

10  Q.  So the $3 million owed to CNH is not included either; is

11  that correct?

12  A.  Correct.

13  Q.  So it's a net zero.

14  A.  Yes.

15  Q.  And even if you took the $16 million of the equipment off of

16  the valuation, there would still be a total value of 160

17  million.  Is that correct?

18  A.  Correct.

19          MS. SCHWAGER:  Your Honor, I know that we need to move

20  this along but every question's leading.  I would object.

21          COURT:  All right.  Make the objection while the

22  question's being asked.

23          MS. MIKKINLINENI:  I just want to clarify because

24  Mr. Millenkamp was listed as one of their witnesses as well so

25  I'm viewing this also as a cross-examination.

```
 1              COURT:  Had the parties had any discussion about --
 2              MS. SCHWAGER:  No, Your Honor.  It's redirect.
 3              COURT:  All right.  We'll treat this as redirect unless
 4    there's an agreement between the parties to combine cross and
 5    redirect.
 6              MS. MIKKINLINENI:  Thank you, Your Honor.
 7    BY MS. MIKKINLINENI:
 8    Q.  You also talked about milk proceeds in your testimony.  Do
 9    you remember that?
10    A.  Yes.
11    Q.  Did Rabo delay getting those milk proceeds to you at any
12    point?
13    A.  Yes.
14    Q.  How did that affect your operations?
15    A.  We can't pay our vendors on time.
16    Q.  You also provided testimony regarding your borrowing base.
17    Do you remember that?
18    A.  Yes.
19    Q.  I'm going to pull up Exhibit 3011.  And you heard -- or --
20    scratch that.  Is your understanding that the borrowing base in
21    2023 decreased by approximately $11 million?
22    A.  Yes.
23    Q.  Is this the borrowing base for March of 2023?
24    A.  Yes.
25    Q.  Can you scroll down, please?  Do you see there it says
```

1   "producer payables" on the left?

2   A.  Yes.

3   Q.  What's the amount associated with that?

4   A.  29,500,00.

5   Q.  I'm going to pull up Exhibit 3013.  Can you scroll back up

6   for a minute?  Is this the borrowing base certificate for

7   December of 2023?

8   A.  Yes.

9   Q.  Can you scroll down?  Do you see producer payables there?

10  A.  Yes.

11  Q.  And what's the amount?

12  A.  Approximately 42 million.

13  Q.  So your producer payables increased from March of 2023 to

14  December of 2023; is that correct?

15  A.  Yes.

16  Q.  Why did they increase?

17  A.  Because they took the proceeds from the steers.

18  Q.  Can you elaborate?  What did that -- what happened when they

19  took -- who's they?

20  A.  Rabo took the proceeds of the steers and our inventory

21  decreased.

22  Q.  And then were you unable to pay vendors?

23  A.  Correct.

24  Q.  So your account's payable increased?

25  A.  Yes.

```
 1   Q.  Is the dairy equipment included in your real estate value?

 2   A.  Yes.  Can you ask that again, please?

 3   Q.  The dairy equipment value, is that in your -- is that in the

 4   value that you put on the real estate?

 5   A.  The milk equipment?

 6   Q.  Yes, yes.

 7   A.  Yes is the answer.

 8   Q.  So it's not in your personal property.

 9   A.  No.

10   Q.  I'm going to pull up Exhibit 3031.  Can you go to page 7,

11   please?  Can you read paragraph 38 just to yourself?  Do you see

12   how you included -- how you were light on the consolidated --

13         MS. SCHWAGER:  Your Honor, leading.

14   BY MS. MIKKINLINENI:

15   Q.  Can you read out loud paragraph 38?

16         MS. SCHWAGER:  Your Honor, he's testifying.  He doesn't

17   need to read from his declaration.

18         COURT:  I think we can all read it.  Go ahead and

19   answer her question.

20         MS. MIKKINLINENI:  Thank you.

21   BY MS. MIKKINLINENI:

22   Q.  Do you see that you relied upon the consolidated unaudited

23   financial statement in this paragraph?

24   A.  Yes.

25   Q.  So did you rely on your consolidated unaudited financial
```

1  statement when you came up with the value for the real estate

2  and the personal property here?

3  A.  Yes.

4  Q.  So your unaudited financial statement would have said that

5  the real estate is valued at 493 million; is that right?

6  A.  Yes.

7  Q.  And what do you think it's worth today, your real estate?

8  A.  Minimum 493 million.

9  Q.  And you earlier testified it was 500 to 550.

10        MS. SCHWAGER:  Your Honor, he just answered the

11 question.  She's leading him.

12        COURT:  Let her finish the question.

13 BY MS. MIKKINLINENI:

14 Q.  You earlier -- you earlier testified that it's between 500

15 and 550 million.  Do you still believe that?

16 A.  Yes.

17 Q.  Thank you.  Can you pull up the Rabo term sheet, Exhibit

18 1011?  Can you go to the additional funding?  Let's see.  Okay.

19 The funding dates box there.  For the additional draws, is it

20 based on any type of milestones?

21 A.  Yes.

22 Q.  What's it conditioned on there?

23 A.  Subject to mutually agreed restructuring milestones.

24 Q.  And then can you scroll down to the covenant section,

25 please?  Before I get to that, you had testified earlier

1    regarding the restructuring milestones, correct?

2    A.   Correct.

3    Q.   And again, what do you think restructuring means?

4    A.   Gives them the tools to liquidate my farm.

5    Q.   And this term sheet is still -- is this subject to financial

6    covenants?

7    A.   Yes.

8    Q.   Is it your understanding that Sandton has provided a draft

9    DIP loan agreement as of today?

10   A.   Yes.

11   Q.   And Rabo provided a DIP loan agreement just last night

12   around 10:00 p.m.  Is that correct?

13   A.   Yes.

14   Q.   So you haven't had a chance to review either of those yet,

15   have you?

16   A.   No.

17   Q.   But you do have draft loan agreements, correct?

18   A.   Yes.

19   Q.   When you met with Rabo in Minneapolis regarding their DIP

20   loan, did they talk to you about the sale lease back?  Was it a

21   requirement at that time?

22   A.   Yes.

23   Q.   Did they make that clear?

24   A.   Crystal clear.

25   Q.   Were they willing to move forward at that time without a

1    sale lease back?

2    A.  They wanted the sale lease back and they wanted a release.

3    Q.  And were they insistent upon a private sale?

4    A.  Yes.

5    Q.  Would a public sale have resulted in an increased value in

6    your opinion?

7    A.  Yes.

8    Q.  Did Rabo indicate during that meeting in Minneapolis that

9    they did not want you to discuss the terms with any other

10   lenders or parties?

11   A.  Yes.

12   Q.  If we go back to the critical vendor list, I don't think we

13   necessarily need to pull it up but let me know if you want to

14   look at it.  Do all of the feed vendors listed on your critical

15   vendor list have liens?  Just the feed vendors.

16   A.  Yes.

17   Q.  And the feed vendors include H & M, correct?

18   A.  Yes.

19   Q.  And so H & M also has a lien.

20   A.  Yes.

21   Q.  Do the feed vendors with these liens make up the majority of

22   your critical vendors?

23   A.  Yes, the majority.

24   Q.  You were asked whether you still need DIP financing even if

25   you weren't going to pay your critical vendors.  Do you remember

1    that question?  Do you still need financing to meet your

2    operational needs?

3    A.  Yes.

4           MS. MIKKINLINENI:  I have no further questions.  Thank

5    you.

6           COURT:  Counsel for Rabo, additional cross-examination.

7           MS. SCHWAGER:  Very short, Your Honor.

8                        RECROSS-EXAMINATION

9    QUESTIONS BY MS. SCHWAGER:

10   Q.  Mr. Millenkamp, did you sign the deposit control agreement

11   where you were supposed to deposit livestock proceeds?

12   A.  I don't recall.

13   Q.  Can you turn to Exhibit 3008?  Are you there?  Were you able

14   to pull that?

15   A.  Yes.

16   Q.  Do you see the second to last page of that exhibit's your

17   signature?

18   A.  Yes.

19   Q.  And is the first page entitled "Deposit Control Account

20   Control Agreement"?

21   A.  Yes.

22   Q.  And under the terms of this deposit control agreement, did

23   you agree to deposit livestock proceeds into this account?

24   A.  Yes.

25   Q.  And did you deposit livestock proceeds into that account?

1   A.  I don't recall.

2   Q.  Well, if you agreed to do it, would you not have deposited

3   the funds as you agreed?

4   A.  The million dollar question is where all the deposits were

5   made over the whole receivership so I have no idea.  We still

6   have a few million dollars missing and unaccounted for.

7   Q.  Prior to the receivership, did you deposit all livestock

8   proceeds into the account that is the subject of the deposit

9   control account?

10  A.  I don't know.

11  Q.  So there -- you may not have?  You may have chosen not to do

12  that?

13  A.  I don't know.  I don't handle the deposits.

14  Q.  And do you give instructions about the deposits of the

15  livestock proceeds going into that account because that's what

16  you agreed to?

17  A.  I'm not sure what I was told on that.  I don't know where

18  all the money went.

19  Q.  Let me back up.  Did you instruct anybody at your operations

20  -- since you aren't the ones who deposit, did you instruct them

21  that the company is required to put livestock proceeds in the

22  deposit control account?

23  A.  I would imagine Rabo's the one that gave the instructions to

24  my office manager.

25  Q.  So are you saying that you did not?  You did not make sure

1    that your office manager was depositing the collateral proceeds

2    into the account?

3    A.  I don't recall if I had that conversation.

4    Q.  Okay.  You think that would have been important to do where

5    you've signed an agreement that that's what you're going to do

6    with collateral proceeds?

7    A.  I'm assuming all the money went where it was supposed to.

8    Q.  And what is that assumption based on?

9    A.  Because we always put the money where it's supposed to,

10   where Rabo wants it.

11   Q.  So do you recall on August 11, 2023, with Mr. Heida -- he's

12   your manager that you're talking about, right, your general

13   manager?

14   A.  Yes.

15   Q.  That he informed Rabo that there are no funds in the D.L.

16   Evans account because all funds have been expended to preserve

17   collateral in accordance with the disbursement of funds

18   attached?

19   A.  I don't recall.

20   Q.  You don't recall -- do you recall shortly after this August

21   11, 2023, e-mail that Rabo terminated the forbearance agreement

22   because the collateral proceeds had been converted?

23   A.  I don't recall.

24   Q.  Okay.  Can you turn to exhibit -- sorry, Your Honor.  --

25   3010?  Do you recall receiving this termination of the

 1    forbearance letter from -- on behalf of Rabo on August 14, 2023?

 2    A.  I don't recall it, no.

 3    Q.  But you recall there was a time when collateral -- or when

 4    livestock proceeds had to be paid directly to Rabo, right?

 5    A.  I do not recall the specifics.  No, I do not.

 6    Q.  You testified to that today that the reason that your

 7    payables went up is because your proceeds were going to Rabo.

 8    Isn't that what your testimony was?

 9    A.  That the inventory was dropping and Rabo sweeping a lot of

10    my steer proceeds.

11    Q.  So a few minutes ago with your counsel when she was asking

12    you questions, you testified that your payables in the borrowing

13    base went up.

14    A.  Yes.

15    Q.  Because Rabo was taking the livestock proceeds.  Do you

16    recall that testimony?

17    A.  And the inventory was decreasing.

18    Q.  Okay.  So you testified the payables went up because Rabo

19    was taking proceeds.  Is that correct?

20    A.  And the inventory was decreasing.

21    Q.  Okay.  And then -- but isn't it true that it wasn't until

22    August of 2023 that livestock proceeds were going to Rabo?

23    A.  I don't remember.

24    Q.  So how can you testify that it's Rabo's fault that your

25    payables were going up if you don't even know when Rabo was

1   taking collateral -- livestock collateral proceeds?

2   A.  Because you asked specifics, if I remember a specific time

3   on where the money was and I answered no but I do know that our

4   inventory decreased during that period of time.

5   Q.  So you don't know if when your payables were going up Rabo

6   was even directing the collateral proceeds to --

7   A.  They were directing collateral proceeds from about August 1

8   until today.

9   Q.  Of 2023, correct?

10  A.  Yes, yep.

11  Q.  Okay.  And did Rabo up until the receivership provide

12  protective advances of $16 million?

13  A.  I'm not sure of the dollar amount.

14  Q.  Was it significant?

15  A.  Yes.

16  Q.  Do you have any reason to dispute that the number was less

17  than $16 million?

18  A.  I dispute classifying it as a protective advance.  I looked

19  at revolving cash flow.

20  Q.  On a matured loan, Mr. Millenkamp?

21  A.  Yeah, that's how I --

22  Q.  So you believe a matured loan continues to revolve?

23  A.  When Rabo uses the term "protective advance," they want

24  everybody to believe they put extra money into the operation

25  when the fact is they just revolved money that we deposited.

1  Q.  On the livestock proceeds?

2  A.  Yes.

3  Q.  Because you were getting the milk proceeds, right?  You were

4  able to use those except for you testified there may have been a

5  freeze and then a release but --

6  A.  Yes, correct.

7  Q.  But you received the milk proceeds?

8  A.  Yes, correct.

9  Q.  So you received the milk proceeds.  The livestock proceeds

10  starting in August of those that sent them to Rabo went to Rabo

11  and then Rabo gave you $16 million regardless of what you call

12  it.

13  A.  Rabo swept --

14  Q.  Is that correct?

15  A.  Rabo swept -- Rabo swept somewhere around 35 million over

16  that time frame and decided to revolve about 16 of it which they

17  called a protective advance.

18  Q.  And with that money, you could pay payables.

19  A.  Pay some of the payables.

20       MS. SCHWAGER:  I have no further questions, Your Honor.

21       COURT:  Thank you, counsel.  Mr. Naess, any additional

22  cross-examination?

23       MR. NAESS:  No.  Thank you, Your Honor.

24       COURT:  All right.  And Mr. O'Brien?

25       MR. O'BRIEN:  Just one minute.

```
 1                           RECROSS-EXAMINATION

 2     QUESTIONS BY MR. O'BRIEN:

 3     Q.  You said that Rabo had been asking you for a release -- Rabo

 4     had been asking you for a release?

 5     A.  They've been demanding a release.

 6     Q.  Like for what?

 7     A.  I believe they want a release so there could be no lawsuits

 8     in the future about lender liability issues and predatory

 9     lending.

10     Q.  Who at Rabo's been asking for that?  Has it been an officer

11     or their attorneys or --

12     A.  Mike Hayes.

13     Q.  Mike Hayes?

14     A.  Mike Hayes.

15     Q.  Thank you.

16            COURT:  All right.  Ms. Mikkinlineni, do you have any

17     additional questions for this witness?

18            MS. MIKKINLINENI:  I just have one more question.

19            COURT:  All right.

20                       FURTHER REDIRECT EXAMINATION

21     QUESTIONS BY MS. MIKKINLINENI:

22     Q.  Mr. Millenkamp, you were asked about the deposit account

23     control agreement at D.L. Evans Bank, correct?

24     A.  Correct.

25     Q.  Did D.L. Evans Bank sign that agreement?
```

1    A.  I don't remember.

2    Q.  Do you see that signature page in front of you have?

3    A.  No.

4    Q.  So was it even enforceable in your opinion?

5    A.  Not if they didn't sign it, I wouldn't think so.

6    Q.  Thank you.

7         MS. SCHWAGER:  We have no further questions, Your

8    Honor.

9         COURT:  Anything further from any other counsel?  All

10   right.  Thank you, you may step down.

11        WITNESS:  Thank you.

12        COURT:  Do you have additional witnesses that you'd

13   like to call?

14        MS. MIKKINLINENI:  I do, Your Honor.  Kati Churchill.

15        COURT:  All right.  Let's have Ms. Churchill come up to

16   the stand and please remain standing when you get up here to be

17   sworn in by Ms. Battle, the courtroom deputy.

18                         (KATI CHURCHILL is sworn.)

19        COURT:  Please have a seat.  When you're seated, please

20   state your name and spell your last name for the record.

21        WITNESS:  My name is Kaitlyn Churchill,

22   C-h-u-r-c-h-i-l-l.

23        CLERK:  Thank you.

24                    DIRECT EXAMINATION

25   QUESTIONS BY MS. MIKKINLINENI:

1    Q.  Good afternoon, Ms. Churchill.  Can you tell us where you

2    work?

3    A.  I work for Kander, LLC.

4    Q.  What's your position there?

5    A.  Director.

6    Q.  How long have you been there?

7    A.  I've worked with Kander for four years.

8    Q.  Can you tell us about your educational background?

9    A.  Yes.  I have a bachelor's degree in agricultural finance.  I

10   have an MBA and I also have a master's in agricultural

11   economics.

12   Q.  Has Kander filed an application to be employed in this case?

13   A.  We have.

14   Q.  What's your experience with serving as financial advisor in

15   bankruptcy cases?

16   A.  I have over 12 years of experience working as an FA in

17   different bankruptcy cases.  I have also worked alongside my

18   partners in cases where we have been the CRO or court-appointed

19   receiver.  These have all been agricultural cases as well.

20   Q.  And how long have you been working with Millenkamp Cattle?

21   A.  Since the summer of 2021.

22   Q.  What was Kander helping with?

23   A.  Kander's primary responsibility was financial reporting,

24   operational reporting and preparing forecasting and budgets.

25   Q.  How many different professionals have you worked with in

1    this matter?

2    A.  We've worked with various professionals throughout the

3    course of this matter.  We've worked closely with Millenkamp's

4    CPA, Eide Bailly.  We've provided financial reporting for costs,

5    budgets and operational reporting to various lenders in this

6    case.  We've also worked with the various financial advisors who

7    have been both for Millenkamp and for the lenders throughout

8    this case and, most recently, we have shared our forecasts with

9    the previous receiver, Ampleo.

10   Q.  And so have each of these professionals utilized your

11   financial reporting and budgets?

12   A.  That is my understanding, yes.

13   Q.  I'm going to pull up Exhibit 1015.  Do you recognize this

14   document?

15   A.  I do.

16   Q.  Who prepared it?

17   A.  This document was prepared by myself in cooperation and deep

18   conversation with the Millenkamp management team.

19   Q.  Will you please walk us through this budget on a big

20   picture?

21   A.  Absolutely.  This budget is kind of a direct cash flow

22   budget for the period that it's looking at.  This particular

23   iteration of this budget runs from the filing date of April 2

24   through an anticipated exit here in the week that ends -- if you

25   could scroll for me.  I believe it's August 11.  In this

1    budget -- thank you.  In this budget -- if you'd pause for just

2    a moment.  Oh, yeah.  Thank you.  August 11.

3            So in this budget, we're essentially taking a look at

4    all of the different net cash receipts that would be coming in

5    to the operations and then cash disbursements.  Each individual

6    one of these line items has assumptions built into them that

7    have been discussed with management.  They're based on

8    historicals.  They're also based on management's best

9    understanding of the situation at the time and the cash cycles

10   of each one of these receipts and disbursements has been built

11   into the weekly timing of those receipts and disbursements.

12           Additionally, this also --

13           COURT:  Just make sure you're asking questions to guide

14   the witness so we don't get narrative testimony.

15           WITNESS:  Thank you.

16   BY MS. MIKKINLINENI:

17   Q.  What does the green highlighting mean?

18   A.  Absolutely.  So the green highlighting here is the first

19   four weeks of this motion.  This is what management has

20   determined to be the critical payments that must happen for the

21   ongoing business during this interim period.

22   Q.  And what would happen if these items -- these green

23   highlighted items were not paid during the interim period?

24   A.  It has been my understanding in discussion with management

25   that if these items were not paid, the critical vendor payments

1    here, this would cause severe issues within the operations and

2    issues accessing critical vendors and if COD payments were not

3    made to these vendors, they would not continue doing business

4    and the Millenkamp operations would not be able to operate as

5    necessary to protect both the business and the cattle.

6    Q.  And does the interim period also include payroll expenses?

7    A.  Yes, it does.

8    Q.  When will the non-green items be paid?

9    A.  These will be delayed until a final order is ordered in the

10   cash collateral motion.

11   Q.  How did you make the decision on which expenses are

12   necessary during the interim period?

13   A.  Those decisions were made by Millenkamp management.

14   Q.  The original budget submitted with the DIP motion showed

15   cash on hand as of March 31 at 1.17 million.  Is that correct?

16   A.  That is correct.

17   Q.  What does this updated budget show?

18   A.  This updated budget first begins on a different day.  So the

19   opening cash balance is from April 2 which would have been the

20   date of filing.  Additionally, the milk check that was in the

21   previous version of this budget to be received the week ending

22   in April 7 was not received by Millenkamp Cattle.  That was held

23   by Rabo.  This budget also shows actual cash receipts and

24   disbursements for week 1 and week 1 is closed.

25   Q.  So what is the amount of cash on hand as of April 2?

1    A.  Could you scroll down for me, please?  Approximately

2    $268,000.

3    Q.  What is the total amount estimated to be spent during the

4    first four weeks?

5    A.  That would be $19.7 million.

6    Q.  What is the expected amount to be collected during the first

7    four weeks?

8    A.  Approximately $12.3 million.

9    Q.  Does that result in a cash shortfall during those first four

10   weeks?

11   A.  Yes, it does.

12   Q.  Is additional financing needed for the business and

13   operations?

14   A.  Yes.

15   Q.  How will the DIP proceeds be used?

16   A.  The DIP proceeds will be used for critical vendor payments

17   and the payments for COD purchases and expenditures that are

18   deemed necessary during this interim period.

19   Q.  And does Millenkamp Cattle have an operating line that they

20   can draw upon?

21   A.  They do not.

22   Q.  Is there trade credit?

23   A.  There is not.

24   Q.  And the Sandton DIP term is a $45 million DIP loan.  Is that

25   correct?

1    A.   That is my understanding, yes.

2    Q.   What's the advantage of having the $45 million versus just

3    35 million?

4    A.   The additional $10 million does give Millenkamp a bit of a

5    longer runway here during the period without access to having an

6    operating line of credit and trade credit.  It also provides

7    financing for Millenkamp through this period.

8    Q.   How much does this budget show it needs in DIP financing?

9    A.   Could you scroll to the next page for me?  One more.  Thank

10   you.  This model shows $24.6 million through August 11.

11   Q.   And so is that through -- is that prior to confirmation of a

12   plan?

13   A.   That is correct.

14   Q.   So will additional money be needed from the DIP after

15   confirmation?

16   A.   This model that we're looking at right here only -- only

17   covers the period through the 11th.

18   Q.   But is it your understanding the 45 million can be used

19   beyond confirmation?

20   A.   Could you ask that question again?

21   Q.   The amount left over in the DIP from the 45 million, that

22   can be used beyond this budget, beyond -- beyond the

23   confirmation date?

24   A.   It's my understanding that if the confirmation date were to

25   be longer than the period of this budget, then the DIP financing

1  would be available through that period and then the terms of the

2  DIP financing -- the exit from the DIP financing would be

3  determined by the terms in the terms sheet.

4  Q.  Are steer sales incorporated into this budget?

5  A.  They are.

6  Q.  How do the steer sales work?

7  A.  Sure.  Could you please scroll up to the steer sale portion?

8  Thank you.  It would be in the top section.

9       So in this model here, you'll see in the net cattle

10 sales receipts line, this is the proceeds from livestock sale

11 that would be coming into the Millenkamp operations.  In this

12 iteration of the model, 100 percent of those proceeds are

13 returning back into the operations to be used for operational

14 cash flow.  And in these models -- in this model, the steer

15 sales are modeled at a level which would be considered ordinary

16 course.  So this is not a permanent reduction in the size of the

17 herd.  It is just the normal course sale of livestock.

18 Q.  And where could you tell in the budget that it's not a

19 permanent reduction?

20 A.  You can see in the feed component here that the feed cost

21 stays relatively stable through this entire model and what that

22 indicates is that the underlying number of animals on feed

23 remains constant throughout the model.

24 Q.  Is anything being provided to Rabo, MetLife and Conterra in

25 this budget?

1   A.  Could you please scroll down for me?  Pause for just a

2   moment.  So you'll see right here that interest payments are

3   being paid to Rabo in this model and then interest only payments

4   are being made to Conterra and MetLife as well.

5   Q.  Is that just shown in a different section?

6   A.  Yes.  The interest payments to Rabo are shown here in the

7   cash payments and the interest payments to Conterra and MetLife

8   are shown as assignments off of the milk check as they've been

9   traditionally handled.

10  Q.  Have there been differences in this budget over the last

11  four weeks?

12  A.  There have.

13  Q.  I want to pull up Exhibit 3021.  Do you recognize this

14  document?

15  A.  I do.

16  Q.  What was the purpose of this budget?

17  A.  This cash position budget was put together for -- with

18  Kander and Millenkamp to show how Millenkamp could survive to

19  filing a bankruptcy.  So at this point, the opening date of this

20  model was February 6 -- or February 26, I apologize, and you'll

21  notice if you scroll down to the bottom here that this budget --

22  sorry.  The bottom of the first page.  Thank you.  This budget

23  does not reflect a cash need.  This was intentionally built to

24  show what the cash flows could be to maintain a positive cash

25  balance and make it to a filing.

1   Q.  And was this created during the receivership?

2   A.  Yes.

3   Q.  And who collaborated on this budget?

4   A.  This version of the budget was produced from Kander and

5   David Heida and Bill Millenkamp.

6   Q.  Pull up Exhibit 1017.  Do you recognize this document?

7   A.  I do.

8   Q.  When was this budget created?

9   A.  This budget was created March 5 and 6.

10  Q.  And who worked on this budget?

11  A.  This budget was a collaborative process between Kander,

12  Ampleo, Millenkamp management and Mike Hayes.

13  Q.  What were the primary differences between the budget we just

14  looked at during the receivership and this budget?

15  A.  Sure.  So just structural difference.  You'll notice this is

16  only seven weeks.  This model was made a week later and only

17  covered through the same end date but it is only seven weeks

18  versus the previous eight weeks.

19          This model has full payments in it for the feed used.

20  So essentially what this model was built for was to try to

21  figure out what the cash need was for Millenkamp given the

22  critical vendor payments necessary at the time based on the

23  discussions that Millenkamp and the receiver had had with

24  different critical vendors.  If you could scroll down for me for

25  just a moment, I'll point something out here.

1          This model here in the yellow box, you'll see this

2     shows a cash need through week 6 which was the anticipated

3     filing of the bankruptcy and, essentially, this was built to

4     find the cash need between the current day and making it to the

5     beginning of the bankruptcy filing.  The prime -- sorry.

6     Q.  Was Mr. Millenkamp -- with this budget, was he trying to get

7     additional financing at this point?

8               MR. SCHOULDER:  Leading.

9               COURT:  Hold on.

10              WITNESS:  Oh, I'm sorry.

11              COURT:  Can you reask that question?

12    BY MS. MIKKINLINENI:

13    Q.  Was Mr. Millenkamp trying to get additional financing at

14    this point?

15              COURT:  Overruled.

16    BY MS. MIKKINLINENI:

17    Q.  You can go ahead and answer the question.

18    A.  Yes.  The purpose of this budget was for Kander, Ampleo and

19    Mr. Millenkamp to put forth a budget that would show what

20    additional bridge financing was necessary.  Kander provided this

21    to Ampleo when it was finalized and it is my understanding that

22    Ampleo either presented this or used this as the basis for

23    discussions with Rabo.

24    Q.  Pull up Exhibit 3022.  Do you recognize this document?

25    A.  I do.

1    Q.  And when was this created?

2    A.  This was created March 22 or finalized March 22.

3    Q.  And who worked on this?

4    A.  This was a work product of Kander, Millenkamp management --

5    Kander and Millenkamp management.

6    Q.  What was the purpose of this budget?

7    A.  This budget you'll notice is a longer period.  It extends

8    through the end of August -- or the middle of August for the

9    first time.  This is an expansion of the previous model and the

10   purpose of this budget was to calculate a DIP need through that

11   August 11 date.

12   Q.  Were you using any DIP term sheet for this?

13   A.  This was based on Millenkamp management's initial

14   understanding of Rabo's DIP -- initial DIP proposal.

15   Q.  With the expansion to 130 days, did that change anything?

16   A.  Certain expense categories came into play that were not in

17   the previous models just based on the time of year that we're

18   looking at now.  So this now goes into the farming season so

19   things like chemicals and seed and custom farming are now part

20   of the scope of the period where they weren't before.

21   Q.  Was there a difference in the livestock sale proceeds in

22   this budget compared to the other ones we just looked at?

23   A.  Yes.

24   Q.  What's the difference?

25   A.  In the previous budgets, the steer sales were split 60/40

1    between Millenkamp and Rabo and the -- this current budget shows

2    100 percent of those proceeds going to Rabo.

3    Q.  And that was based on Rabo's term sheet; is that correct?

4    A.  It was.

5    Q.  Did you create an alternative DIP budget with different

6    terms?

7    A.  We did.

8    Q.  And what terms were those based on?

9    A.  Those were based on alternative DIP lending scenarios.

10   Q.  What was happening with the steer sales in those versions?

11   A.  I apologize for cutting you off.  In this scenario, the

12   proceeds for the steer sales were -- were being used in the

13   operational cash flow instead of being swept by Rabo.

14   Q.  And did those other versions include any sort of sale lease

15   back?

16   A.  No, they did not.

17   Q.  Pull up Exhibit 3015.

18   A.  Thank you.

19   Q.  Do you recognize this document?

20   A.  I do.

21   Q.  When was it created?

22   A.  This document was finalized March 29.

23   Q.  And who worked on this one?

24   A.  This would have been a work product of Kander and Millenkamp

25   management.

1    Q.  What was the purpose of this budget?

2    A.  Can I please see through the total page on this budget?  I

3    believe it will be scrolling two to three pages.  Okay.  Thank

4    you.  This was requested by Rabo as a long-term 30-month budget

5    to model the impact of their DIP loan and a hypothetical exit.

6    Q.  And had you previously finalized and determined the exit

7    plan prior to this version?

8    A.  No.

9    Q.  And you said this was hypothetical?

10   A.  It was.  There are placeholder values in here for certain

11   exit terms that had not yet been finalized.

12   Q.  Is this the debtor's exit plan?

13   A.  No.

14   Q.  Give me one minute.  I think I left a note over there.

15            MS. MIKKINLINENI:  I have no further questions.

16            WITNESS:  Thank you.

17            COURT:  Cross-examination by counsel for MetLife.

18            MR. GOURLEY:  No questions.  Thank you, Your Honor.

19            COURT:  Counsel for Rabo AgriFinance.

20                          CROSS-EXAMINATION

21   QUESTIONS BY MR. SCHOULDER:

22   Q.  Good afternoon, Ms. Churchill.

23   A.  Good afternoon.

24   Q.  I don't think we've met before.  I'm Andrew Schoulder from

25   Norton, Rose, Fulbright.  I just want to start off going back to

1    your testimony with respect to Exhibit 3035.  That was the

2    declaration that you filed in connection with the receiver

3    action, wasn't it?

4            MR. CHRISTENSEN:  Your Honor, I don't think 3035 is in

5    the record at this point.  Nor have we seen a copy of it.

6            COURT:  I don't believe that's been admitted.

7            MS. SCHWAGER:  You haven't seen a copy?

8            MR. CHRISTENSEN:  Not in the exhibits for today.  I saw

9    a copy in the receiver case.

10           COURT:  3035?

11           MR. SCHOULDER:  Correct.  Yes, Your Honor.

12           COURT:  Okay.

13           MS. SCHWAGER:  Sorry if I'm -- 3035.

14           MR. CHRISTENSEN:  I don't have 3035.

15           MR. GOURLEY:  Both of those, 3035 and 3036.  I think

16   they came in this morning but I'm not positive.

17           MR. SCHOULDER:  That's okay.  That's okay.  That's all

18   right.

19   BY MR. SCHOULDER:

20   Q.  Let's go back to the budget that you were reviewing with

21   debtor's counsel at Exhibit 3021.  In connection with -- you

22   testified before that you prepared this budget in connection

23   with the receivership, correct?

24   A.  We prepared this budget in conversation with Millenkamp

25   management during the course of the receivership I believe.

1    Q.  Okay.  And it's correct that you filed a declaration in the

2    receivership attaching this budget.  Is that correct?

3    A.  That is correct.

4    Q.  And the declaration was submitted to the state court

5    receivership action to support that the debtors would not need

6    protective advances over the 60-day exclusive period; is that

7    right?

8    A.  That is correct.

9    Q.  Okay.  It's also correct, isn't it, that during that 60-day

10   period, the debtors did in fact require protective advances.

11   Isn't that right?

12   A.  I believe so, yes.

13   Q.  And is it your recollection that it was approximately $5.8

14   million of protective advances that were made during the

15   receivership?  Is that right?

16   A.  I don't have that number in front of me but if you do, I

17   will agree to that, yes.

18   Q.  Okay.  So going back to -- if you could scroll down to the

19   bottom.  No, I'm sorry to the bottom of the first page.  Thank

20   you.  I appreciate it.  So despite the forecast here that shows

21   there's no need for protective advances, the debtors in fact

22   needed a $5.8 million protective -- $5.8 million of protective

23   advances during the receivership action.  Right?

24   A.  This model is built upon a varying number of assumptions and

25   many of those assumptions did not match the reality during that

1    period.

2    Q.  Okay.  That's fair.  If you could be so kind as to turn to

3    Exhibit 3012.  Do you recognize this document, Ms. Churchill?

4    A.  I do.

5    Q.  And what do you recognize this document to be?

6    A.  I recognize this to be the May borrowing base for Millenkamp

7    Cattle submitted to Rabo.

8    Q.  Okay.  Question.  Earlier Mr. Millenkamp testified that

9    interest is deducted on the borrowing base.  That's not correct,

10   is it?

11   A.  That was not my understanding of Mr. Millenkamp's testimony.

12   Q.  Well, Mr. Millenkamp -- and perhaps -- strike that.

13   Earlier, Mr. Millenkamp testified that the borrowing base was

14   negatively impacted because of the need to pay default interest

15   and professional fees.  Assuming whether or not you may have

16   heard him or not at that time, could we agree that default

17   interest and professional fees are not actually deducted from

18   the borrowing base?

19   A.  I believe the implication of Mr. Millenkamp's comments were

20   that fees used to pay default interest and professional fees

21   were not used to pay other producer payables which are on the

22   borrowing base.

23   Q.  But they don't -- but the payment of default interest and

24   professional fees is not a deduction on the borrowing base, is

25   it?

1   A.  Not explicitly.

2   Q.  Well, have you reviewed the calculation of the borrowing

3   base in the loan agreement?

4   A.  Can you ask the question another way?

5   Q.  Have you, as the debtor's financial advisor -- strike that.

6   Do you participate in the preparation of the borrowing base

7   certificates?

8   A.  I do not.

9   Q.  Are you familiar with the calculation -- the debtor's

10  calculation of the borrowing base under their loan agreement?

11  A.  Mathematically familiar with it, yes.

12  Q.  Are you aware of whether or not there is an expressed

13  deduction in the loan agreement for default interest and

14  professional fees as a deduction?

15  A.  No, there is not on the borrowing base.

16  Q.  Thanks.  Okay.  Could you just scroll up slightly, please?

17  Scroll down slightly, please.  Sorry.  At the bottom of this

18  document, the total collateral on the line item is $127 million,

19  correct?

20  A.  That is correct.

21  Q.  And if we could just turn to Exhibit 3013.  Thank you.  If

22  you could scroll down slightly to where the total collateral

23  value is.  Thank you.  And on this borrowing base, this shows a

24  total collateral value of $118 million approximately?

25  A.  That's correct.

1  Q.  And this borrowing base, if you just scroll up slightly

2  more.  I just want to see the date.  So this is dated December

3  31, 2023.  Right?

4  A.  That's correct.

5  Q.  Can we go to exhibit -- so between the two borrowing bases

6  that we just looked at, right, the first one being $127 million,

7  correct?

8  A.  Correct.

9  Q.  And this one being $118 million, right?

10  A.  Correct.

11  Q.  Could we agree that between the two borrowing bases, there

12  was an 8.3 million decline in the total collateral value

13  reported?  Is that right?

14  A.  Mathematically, yes, that is correct.

15  Q.  Thank you.  Could we turn to Exhibit 3014, please, with the

16  caveat that I know that this was prepared in connection with the

17  receivership with contribution by the receiver.  Right?  Is it

18  your understanding that the receivers were using the debtor's

19  historical information to prepare this borrowing base?

20  A.  I don't have direct knowledge of how the receiver made this

21  borrowing base.

22  Q.  Okay.  But were you -- you testified earlier that you were

23  working with the receivership to assist them in understanding

24  financial information.  Is that right?

25  A.  That is correct.

1   Q.  And you were providing them with financial information to

2   assist them in performing their duties as required by the

3   receivership order; is that right?

4   A.  Yes, on certain -- certain matters and certain reports.

5   Q.  Okay.  Thank you.  And this -- this document, this borrowing

6   base shows as of February 2024 I believe that the total

7   collateral value is now at $110 million; is that right?

8   A.  That is what this document shows.

9        MS. MIKKINLINENI:  Objection.  This is a draft form of

10   this borrowing base and it's -- it's not -- I'm sorry, what?

11   It's not admitted into evidence either.

12        COURT:  I'll sustain the objection to the extent we're

13   asking questions about the borrowing base certificate that is

14   not yet in evidence so --

15        MR. SCHOULDER:  Are you opposing admission of this into

16   evidence?

17        MS. MIKKINLINENI:  Yes.

18        COURT:  Well, do you want to offer it for admission?

19   Maybe we can flush that out.

20        MR. SCHOULDER:  Yes, Your Honor.  This was prepared by

21   the state court-appointed receiver in connection with his duties

22   and obligations under the receivership order.  As I mentioned to

23   Ms. Churchill, I'm not -- I understand that they have

24   reservations about the validity of their information, that they

25   weren't responsible for the preparation of the information and

1   I've already acknowledged that this was prepared by the receiver

2   in connection with his performance of his duties.

3           So I will stipulate that the debtors did not prepare

4   this receiver -- this particular borrowing base certificate.

5           COURT:  All right.  Are there any objections to the

6   admission of Exhibit 3014?

7           MS. MIKKINLINENI:  We do continue to object to it.  It

8   wasn't prepared by Ms. Churchill.  The receiver is listed as a

9   witness for them.  They can ask these questions to the receiver.

10          COURT:  All right.  Are you challenging the

11  authenticity of the exhibit at this time based on the witness'

12  inability to authenticate this is what it purports to be?

13          MS. MIKKINLINENI:  Yes, Your Honor.

14          COURT:  All right.  I'll sustain the objection as to

15  this witness.

16          MR. SCHOULDER:  Okay.

17                  (Rabo Agrifinance Exhibit 3014 denied.)

18  BY MR. SCHOULDER:

19  Q.  Ms. Churchill, earlier, Mr. Millenkamp testified that the

20  herd value in his calculation experience is approximately $140

21  million.  Are you aware of that valuation by Mr. Millenkamp?

22  A.  Yes, I heard that testimony this morning.

23  Q.  Okay.  And have you as the debtor's financial advisor

24  reviewed any information that Mr. Millenkamp used to arrive at

25  that valuation?

1    A.  I personally have been somewhat involved in that but my

2    partner Ken Nofziger has provided more direct counsel with

3    Mr. Millenkamp than I have on that matter.

4    Q.  Are you aware of whether Kander, your firm, received any

5    information from Mr. Millenkamp in connection with the

6    preparation of that valuation?

7    A.  Could you ask that question another -- or --

8    Q.  Sure.  Are you aware of whether or not Kander received any

9    information from Mr. Millenkamp that he used to come up with the

10   $140 million valuation?

11   A.  Kander participated in discussions with Mr. Millenkamp.

12   Q.  And in those discussions, did Kander receive any information

13   used by Mr. Millenkamp to come up with that valuation?

14   A.  Kander reviewed the auction sale report for one individual

15   auction that Mr. Millenkamp had reviewed.  The remainder of his

16   data for that was compiled by Mr. Millenkamp as he spoke to

17   earlier.

18   Q.  Okay.  And so Kander didn't do any independent verification

19   of Mr. Millenkamp's $140 million valuation of the herd; is that

20   right?

21   A.  I'm sorry.  I don't think I understand the question.

22   Q.  All right.  I'll restate.

23   A.  Thank you.

24   Q.  Did Kander independently verify Mr. Millenkamp's $140

25   million valuation of the herd?

1    A.   Kander did not independently verify that.

2    Q.   Okay.  Thank you.  Now, earlier, Mr. Millenkamp testified

3    that he valued the real estate at approximately at minimum $493

4    million.  Is that right?

5    A.   Yes, I did hear that testimony today.

6    Q.   And did Kander perform any independent verification of that

7    valuation?

8    A.   Kander participated in discussions with Mr. Millenkamp about

9    that valuation.

10   Q.   Okay.  And did Kander review any documentation used by

11   Mr. Millenkamp in coming up with that valuation?

12   A.   I personally did not.

13   Q.   Are you aware of whether your partner reviewed any

14   information?

15   A.   I am not aware if that happened or didn't happen.

16   Q.   Are you aware of whether or not Kander received any

17   information from Mr. Millenkamp to support his valuation?

18   A.   The use of the word "received" makes it sound like if there

19   are e-mails and documentation into that, I'm not sure.  I know

20   there have been conversations.

21   Q.   Okay.  And just to confirm because I'm on different time

22   zones and it's been a long day.

23   A.   Understood.

24   Q.   You did testify or you didn't that Kander didn't perform any

25   independent verification analysis of that valuation.  Is that

1   right?

2   A.   That is correct.

3   Q.   Okay.  I'm sorry.  Thank you for humoring me.

4   A.   Thank you.

5   Q.   I just want to talk to you about the DIP proposals that the

6   debtors received and reviewed.  As the debtor's financial

7   advisor, part of your job is to evaluate the debtor's DIP

8   financing proposals.  Is that right?

9   A.   That is correct.

10  Q.   And were you -- did you play a role in reviewing the

11  debtor's DIP financing proposals?

12  A.   I did.  My partner and I did.

13  Q.   Okay.  In your experience just generally, right -- not in

14  this particular instance but just generally, there are a number

15  of factors that you as a financial advisor typically view as

16  important in evaluating a DIP financing proposal.  Is that

17  right?

18  A.   That's correct.

19  Q.   Pricing, that would be an important component, right?

20  A.   Pricing is an important component.

21  Q.   Not the only component --

22  A.   Correct.

23  Q.   -- but it is a component.  I agree.  And what about the

24  covenants of the DIP financing proposal?  Are those important?

25  A.   Yes.  I mean there are a host of important issues when

```
1    negotiating different terms and comparing different offers.
2    Q.   Okay.  What about the termination rights of the lender?
3    Those would be another important aspect of evaluating DIP
4    proposals.  Is that right?
5    A.   That's correct.
6    Q.   Duration?  I'm sure duration is an important factor in
7    evaluating the proposal; is that right?
8    A.   That's correct.
9    Q.   And it's fair to say and we're not, is that as a debtor, you
10   don't want the duration to be too long.  Is that right?
11   A.   Can you phrase your question differently for me, please?
12   Q.   Sure.  It's true that the longer the Chapter 11 case goes
13   on, the more fees and interest accrue and become payable under a
14   DIP facility.  Correct?
15   A.   That's feasibly correct, yeah.
16   Q.   Right.  So in evaluating DIP proposals, the duration --
17   would you agree that the duration should be viewed relative to
18   the costs of the estate of that duration?  Is that right?  Would
19   you agree?
20   A.   Yes.  Would you mind stating your question again?
21   Q.   Sure.
22   A.   I apologize.
23   Q.   If the case goes on for a really long time, it will cost the
24   estate more money under the DIP facility because of accrued fees
25   and interest.  Is that right?
```

1    A.  That is correct.

2    Q.  Right.  So a long duration is not necessarily always the

3    best thing for the estate.  Is that right?

4    A.  Not necessarily.  Correct.

5    Q.  Can we turn to Exhibit 3032, please?  Have you seen this

6    document before?

7    A.  I have not.

8    Q.  That's okay.  Ms. Churchill, for your information,

9    Exhibit 3032 is a -- is a comparison that FTI Consulting

10   prepared to compare the different proposals submitted by

11   Sandton, Conterra and Rabo Bank.  Right?  And you haven't seen

12   it before.  That's okay.  We'll just walk through it.

13   A.  Understood.

14   Q.  Let's just start at the top where you see commitment.  The

15   Sandton proposal is $45 million; is that right?

16   A.  That is correct.

17   Q.  And Conterra and Rabo Bank, they're $35 million, right?

18   A.  Also correct.

19   Q.  Yeah.  Let's go to the maturity date.  There's no difference

20   in the various proposals with respect to the initial maturity

21   date, is there?

22   A.  No.

23   Q.  And with respect to the option for maturity extension,

24   there's no difference in those proposals, is there?

25   A.  No.

1    Q.  So let's move on to the interest.  What's the interest for

2    Sandton's proposal?

3    A.  Sandton is a 12.5 percent fixed interest rate.

4    Q.  Okay.  And Rabo Bank is what interest rate?

5    A.  6.5.

6    Q.  Are you aware of the -- strike that.  So I think it's fair

7    to say that 6.5 percent is lower than 12.5 percent?

8    A.  Yes, that is fair to say.

9    Q.  Let's turn to the fees that are compared in the different

10   proposals.  The Sandton proposal has an issuance fee of 1.5

11   percent.  Is that right?

12   A.  That's correct.

13   Q.  And the Rabo Bank proposal is 1 percent.  Is that right?

14   A.  Correct.

15   Q.  And what's Sandton's exit fee?

16   A.  Sandton's exit fee is 1.5 percent.

17   Q.  And Rabo Bank.

18   A.  0.75 percent.

19   Q.  What about the renewal fee for Sandton?

20   A.  1.5 percent.

21   Q.  And Rabo Bank?

22   A.  1 percent.

23   Q.  And what's the unuse fee for Sandton?

24   A.  The -- do you mean what's the amount or what does it

25   represent?

1    Q.  The percent -- the fee.

2    A.  1 percent.

3    Q.  And is there a fee for Rabo Bank for unused funds?

4    A.  There is not.

5    Q.  No.  If we could just scroll down for the -- to where it

6    says "implied interest and fee costs."  And for your

7    information, this is a new document you're seeing for the first

8    time.  FTI made a number of assumptions in terms of applying the

9    fees to the loans over a period of time and if you need a chance

10   to look at the footnotes, go ahead and take a look at the foot-

11   notes to see how they arrived at their information.  I'll just

12   wait till you --

13   A.  Do I have a paper copy of this up here as well?  Is it in

14   any of these binders?

15   Q.  Yes.  It is exhibit -- I'll tell you.

16          COURT:  It's 3032.

17          WITNESS:  Thank you.

18          MR. SCHOULDER:  It's 3032.

19          MS. MIKKINLINENI:  Your Honor, I'm going to object to

20   any line of questioning regarding these calculations and

21   assumptions.  They were not prepared by Ms. Churchill.  They

22   have listed an FTI witness.  That would be the proper witness

23   for this.  I'm objecting as to authenticity.

24          COURT:  All right.  It looks like this exhibit also has

25   not been admitted into the record as well.

```
1          MS. MIKKINLINENI:  Correct.

2          COURT:  I think it's fair for you to object in regard

3    to questioning the witness in regard to the contents of this

4    document.  It's not admitted.  I'll sustain the objection.

5          MR. SCHOULDER:  Your Honor, Ms. Churchill did indicate

6    that she reviewed all the DIP proposals and so if any of this

7    information is incorrect or she's seeing for the first time, it

8    shouldn't be -- and I would assume that if Ms. Churchill was

9    reviewing the information and calculating and comparing

10   proposals that she would be able to tell us if she didn't agree

11   with any of the calculations.

12         MS. MIKKINLINENI:  She hasn't had time to review these

13   calculations in detail so she shouldn't be testifying as to

14   them.

15         COURT:  All right.  I'm going to sustain the objection.

16         MR. SCHOULDER:  On the record, Your Honor, we reserve

17   the right to -- once we bring FTI back on to authenticate which

18   we intend, we just reserve the right to have Ms. Churchill take

19   the stand again to discuss the comparison if that's okay.

20         MR. CHRISTENSEN:  Your Honor, Ms. Churchill's already

21   had to change her flight plans because she was testifying today.

22   In this case, there was an agreement with Ms. Schwager that this

23   would be her direct by them as well.  We object to recalling her

24   later and making her change her plans again tomorrow.

25         MS. SCHWAGER:  Your Honor, there was that agreement but
```

1    we also agreed that she could go earlier to accommodate travel

2    plans but otherwise we would call FTI to authenticate and get it

3    on the record and then she could testify from it as to the DIP

4    proposals that she said that she reviewed.

5              COURT:  Do you have somebody from FTI here right now

6    who would be able to authenticate?

7              MR. SCHOULDER:  Yes, Your Honor.

8              COURT:  All right.  In order to accommodate travel

9    schedules, what I'm going to do is have you call that witness

10   right now simply to authenticate this document to see if it will

11   be admitted.

12             MR. SCHOULDER:  Thank you, Your Honor.

13             COURT:  All right.  Can I have you step down, please?

14             WITNESS:  Thank you.

15             COURT:  All right.  Who is the witness that you'd like

16   to call to authenticate this record?

17             MR. SCHOULDER:  Your Honor, for Rabo AgriFinance, we

18   are calling Mr. Dan Kokini of FTI Consulting.

19             COURT:  Please come on up to the witness stand.  Remain

20   standing when you get here and raise your right hand so Ms.

21   Battle, the courtroom deputy, can swear you in.

22             MR. KOKINI:  Can I bring this up there?

23             COURT:  That's fine.

24                        (DANIEL KOKINI is sworn.)

25             CLERK:  Thank you.  Please have a seat and once seated,

1    please state your name and spell your last name for the record.

2           WITNESS:  Sure.  My name is Daniel Kokini, K-o-k-i-n-i.

3           CLERK:  Thank you.

4                    DIRECT EXAMINATION

5    QUESTIONS BY MR. SCHOULDER:

6    Q.  Thank you, Mr. Kokini.  You're being called right now to

7    accommodate schedules and for the purposes of authenticating the

8    document that is listed as Exhibit 3032.  Do you see that

9    document in front of you?

10   A.  Yes.

11   Q.  And do you recognize that document?

12   A.  Yes.

13   Q.  What do you recognize that document to be?

14   A.  It is a comparison of the economic proposals of the various

15   DIP proposals from Rabo Bank, Conterra and Sandton.

16   Q.  And what did you review in preparing this document?

17   A.  I reviewed the various proposals that were available at the

18   time that I prepared it.  I understand more proposals have come

19   out since or been updated since.

20   Q.  And while we'll go back -- go into your background --

21   A.  Sorry.  Let me just -- now that more proposals have come

22   out, the updated DIP budget affects how some of these

23   calculations -- what the result is of these calculations.

24   Q.  So just to clarify, you created this chart before the

25   debtors filed their DIP budget from last night?

1    A.  Correct, yeah.

2    Q.  Okay.  I wanted to make sure we're clear on the record.  And

3    while we can review your background a little bit later on in

4    terms of more detail, could you explain to the Court what your

5    background is in terms of being able to calculate the fees

6    relative to the various proposals?

7    A.  My -- you mean my personal background?

8    Q.  Correct.

9    A.  So I have a bachelor's degree in finance with a

10   concentration in financial accounting from Pennsylvania State

11   University.  I've worked in various jobs in investment banking

12   and as a restructuring financial advisor for the last roughly 18

13   years.  And I'm currently on the board of directors of

14   California Pizza Kitchen as chair of the audit committee.

15   Q.  So in your -- in your experience and in various roles as

16   both a board member and a financial advisor, do you have

17   experience calculating interest and fees on loans?

18   A.  Yes.

19   Q.  And what types of assumptions did you make with respect to

20   this proposal?

21   A.  So I used the term sheets that were filed and used to the

22   best of our ability the language that was in the term sheets to

23   be able to calculate, you know, the various fees and interest

24   per those term sheets.

25            MR. SCHOULDER:  Your Honor, I would submit that in

1    light of Mr. Kokini's testimony that unless debtor's counsel

2    disagrees, given the time frame that we're trying to work in.

3             COURT:  Are you offering Exhibit 3032 for admission?

4             MR. SCHOULDER:  Yes, I am, Your Honor.

5             COURT:  Any objection?

6             MS. MIKKINLINENI:  No.

7             COURT:  All right.  3032 is admitted.

8                  (Rabo AgriFinance Exhibit No. 3032 admitted.)

9             COURT:  Let's have the witness step down since he was

10   called simply for a limited purpose with respect to that

11   document and we can resume the cross-examination of Ms.

12   Churchill.  Thank you.

13           All right.  I'll remind you you're still under oath,

14   Ms. Churchill.  Go ahead.

15           WITNESS:  Thank you.

16                  CONTINUED CROSS-EXAMINATION

17   QUESTIONS BY MR. SCHOULDER:

18   Q.  Ms. Churchill, turning to the -- if you could just roll

19   slightly up to the first box so she can see it.  Thank you.  No,

20   the first box where the fees are calculated.  Thank you.  Right

21   there.  In the column marked Sandton, do you see if you go all

22   the way down to where it says total, what's the fees that are

23   calculated in there for Sandton?

24   A.  There are two scenarios here.  Which are you asking about?

25   Q.  I'm sorry.  The (inaudible) renewal scenario, the nine-month

1    case.

2    A.  The total is 4.97 million.

3    Q.  So the $4.97 million would be included in the priming liens;

4    is that right?

5    A.  That would be my understanding.

6    Q.  Right.  So the total priming debt wouldn't be $45 million if

7    fully funded.  It would be -- it would be approximately $50

8    million; is that right?

9    A.  Yes.  And without adequate time to fully review this, I'm

10   taking these numbers as they are but yes.

11   Q.  Totally understand and very fair.  Turning to the Rabo Bank

12   column, the total for Rabo Bank in the nine-month case, what is

13   that number?

14   A.  1.95 million.

15   Q.  Doing rough math, that's -- the Sandton proposal is

16   approximately 2.5 times more expensive than the Rabo Bank

17   proposal; is that right?

18   A.  That's correct.

19   Q.  Now, if you could just go to the next line item down below,

20   you see where it says "total including minimum cash"?

21   A.  Yes, I see that.

22   Q.  One line up where it says "minimum cash covenant."  What

23   does it say underneath Sandton's proposal?

24   A.  1.5 million.

25   Q.  Okay.  And what about Rabo Bank?  What does it say there?

1    A.  It says zero.

2    Q.  Zero.  Ms. Churchill, could you tell us what a minimum cash

3    covenant is?

4    A.  I believe the minimum cash covenant here was what needed to

5    be held aside beyond just the 4.9 million in fees.

6    Q.  Okay.  So that means the debtors cannot use that $1.5

7    million during the pendency of the Chapter 11 cases; is that

8    right?

9    A.  That is correct, yes.

10   Q.  All right.  And how do the debtors intend to fund that

11   minimum cash covenant of $1.5 million?

12   A.  I'm sorry.  I don't believe I understand the question.

13   Q.  Well, before -- just approximately, how much cash on hand do

14   the debtors have right now?

15   A.  At the beginning of this week, it was 200 something

16   thousand.  250,000.

17   Q.  Right.  So it's safe to say that the debtors would not be

18   able to fund this $1.5 million cash reserve out of cash on hand.

19   Is that right?

20   A.  That would be fair to say.

21   Q.  So they would need to draw on the DIP facility to fund that

22   $1.5 million cash reserve.  Is that right?

23   A.  That's correct.

24   Q.  And when the debtors draw on the credit facility, the

25   amounts drawn begin to accrue interest, don't they?

1  A.  That is correct.

2  Q.  And they pay fees for those amounts, correct?

3  A.  Yes.

4  Q.  Right.  So the debtors are paying fees and interest on $1.5

5  million they cannot use to benefit the estate, is that right,

6  under the Sandton proposal?

7  A.  That is correct.

8  Q.  All right.  And that doesn't exist under the Rabo Bank

9  proposal, does it?

10 A.  No.

11 Q.  All right.  That's probably better -- you know, again,

12 putting aside pricing, covenants and everything else, that's

13 better for the estate, isn't it?

14 A.  If we're comparing just the minimum cash covenant, yes.

15 Q.  Right.  And the -- and we agreed before that the debtors are

16 paying more fees and interest under the Sandton proposal than

17 under the Rabo Bank proposal; is that right?

18 A.  That is correct.

19 Q.  Okay.  Because before, we discussed that a part of the kind

20 of analysis is -- in terms of valuing two proposals is the

21 covenants, right?

22 A.  Correct.

23 Q.  Right.  And so this would be a covenant that would need to

24 be weighed in determining what's the best offer for the estate.

25 Is that right?

1    A.  Yes.

2    Q.  Okay.  Ms. Churchill, the DIP agreement for Sandton --

3    strike that.  Withdrawn.  Is there a signed DIP agreement

4    between the debtors and Sandton right now?

5    A.  Not that I'm aware of.

6    Q.  Is there a draft DIP agreement that has been filed publicly

7    for creditors to review with Sandton?

8    A.  I'm not sure of its filing status.

9    Q.  Okay.  Is it fair to say that the Sandton DIP agreement is

10   still being negotiated?

11   A.  That's my understanding.

12   Q.  Okay.  Can you tell us what covenants are in the Sandton

13   proposal -- in the Sandton DIP agreement that's currently being

14   negotiated?

15   A.  I recall that in the Sandton DIP agreement, there was a 20

16   percent revenue covenant within budget.  I also recall that

17   there was language that stated essentially industry standard

18   terms -- terms is the wrong word.  Covenants.

19   Q.  Okay.  But as we sit here today, you don't know what those

20   industry standard terms are right now, do you?

21   A.  That's correct.

22   Q.  Generally, in your experience in 14 years as a financial

23   advisor, would it be important for the Court and creditors to be

24   able to evaluate what the covenants are before committing the

25   debtor in possession to $25 million of DIP loans, interest and

1  fees during the interim period?

2  A.  I'm sorry.  I need you to restate the question.

3  Q.  Sure.  Based upon your experience --

4  A.  Yes.

5  Q.  -- would you agree that it would be important for the Court

6  and creditors to be able to value weight the specific covenants

7  of a DIP agreement before the debtor in possession is committed

8  to $25 million of indebtedness, interest and fees?  Would you

9  agree with that?

10  A.  It's been my understanding that Mr. Millenkamp has a great

11  level of comfort with the Sandton negotiation process and that

12  he is most comfortable with the Sandton DIP terms and how it

13  will impact his business.

14  Q.  Right.  He has a handshake, right?

15  A.  Do you work in agriculture, sir?

16  Q.  I work for Rabo AgriFinance.  Is a handshake binding, Ms.

17  Churchill?

18  A.  It's not but people's word is good and it is the underlying

19  foundation of the document that's going to be put together.

20  Q.  Okay.  Could you enforce a handshake in court?

21  A.  No, sir, you cannot.

22  Q.  Right.  So as we stand here today, the creditors who are

23  owed -- Rabo AgriFinance $90 million has no idea how to evaluate

24  the covenant package in the DIP agreement.  Is that right?

25  A.  The covenant package is not available to review at this

1    time.

2    Q.  Right.

3    A.  Yes.

4    Q.  And in evaluating a creditor's adequate protection, would

5    you agree that seeing what the covenants are would be important?

6    A.  I agree that it's certainly part of a decision process.

7    Q.  Right.  What about termination rights?  What are the

8    termination rights in the Sandton DIP agreement?

9    A.  I'd have to see them to speak on them.  I have reviewed it

10   but --

11   Q.  All right.  And you would agree though that in evaluating a

12   DIP agreement proposal where the debtors are now seeking to --

13   asking this Court to allow them to draw $25 million, knowing the

14   termination rights would be an important consideration, right?

15   A.  Yes.

16   Q.  Right.  Because otherwise we don't know how the loan

17   accelerates.  Is that right?

18   A.  That's a fair statement.

19   Q.  Or we don't know what the lender's remedies are.  Is that

20   right?

21   A.  That's a fair statement.

22   Q.  Right.  So I mean without seeing the remedies, the lender

23   could potentially have a provision in there that no one is aware

24   of that says he's going to convert his debt for all the equity

25   of the company.  That's possible, isn't it?

1    A.   Is that not possible on all of these offers that we're

2    discussing?

3    Q.   Have you seen the Rabo Bank DIP agreement that was filed

4    yesterday evening?

5    A.   I have not.

6    Q.   Okay.

7                      (Discussion off the record.)

8    BY MR. SCHOULDER:

9    Q.   Sorry, Ms. Churchill.  I am trying to get you out of here.

10   A.   Thank you.

11   Q.   Can we turn to exhibit -- sorry.  I've overflipped.  3029,

12   please.  And if we could go to Exhibit B, please.  Thank you.

13            Now, you stated earlier that you assist in the

14   preparation of this DIP budget alongside the Millenkamp

15   management team; is that right?

16   A.   That's correct.

17   Q.   And Mr. Millenkamp approved this budget prior to it being

18   filed with the bankruptcy court; is that right?

19   A.   That's correct.

20   Q.   According to this budget that was filed on the first day of

21   the case, the DIP financing need for the interim period of May 6

22   to May 12, that was $5 million, correct?

23   A.   I'm doing the quick math in my head but, yes, that appears

24   correct.

25   Q.   Okay.  And the total commitment under the Sandton DIP at

1    that time was $35 million.  Is that right, at the time of the

2    filing of this budget, the commitment was $35 million for

3    Sandton; is that right?

4    A.  I don't recall.  I believe that to be correct but I don't

5    recall specifically.

6    Q.  Okay.  And if it would be helpful, we could flip back to the

7    comparison chart which is on -- just to refresh your

8    recollection of what the -- what it originally was.

9    A.  Thank you.

10   Q.  Which was Exhibit 3032.

11   A.  Yes.

12   Q.  You see at the top?  I'm sorry.  That was -- that's -- this

13   is the new one.  So previously all the lenders all were

14   providing commitment for $35 million, correct?

15   A.  That's my understanding.

16   Q.  Right.  And then as part of its final offer, Sandton

17   increased its proposal to $45 million.  Is that right?

18   A.  That is correct.

19   Q.  All right.  Let's go back to Exhibit 3029, Exhibit B,

20   please.  Under the April 2 Sandton proposal, the interim

21   commitment was $15 million; is that right?

22   A.  That's correct.

23   Q.  And then could you please turn to Debtor's Exhibit 1012?

24   A.  Hopefully.

25   Q.  So under this proposal, what is the new initial draw amount

1  for the interim DIP order period?

2  A.  You're speaking on Exhibit 1012?

3  Q.  Correct.

4  A.  I'm sorry.  Can you ask me the question one more time?

5  Q.  Sure.  What is the initial draw amount that the debtor's

6  requesting for the initial interim period?

7  A.  The initial draw amount in this proposal is 25 million.

8  Q.  Okay.  And earlier, you testified that the interim period --

9  the financing need was $5 million under the budget.  Is that

10 right?

11 A.  That is correct.

12 Q.  And going down to where it says "funding dates."  Do you see

13 where it says "funding dates"?

14 A.  I do, yes.

15 Q.  And right below -- the second bullet.  Could you read that

16 bullet for us?

17 A.  "Lender believes based on most recent DIP budget that the

18 total required DIP loan could reach 45 million."

19 Q.  So after making this filing with respect to the lender's

20 belief, the debtors filed an updated DIP budget on April 8

21 showing a total DIP need for $45 million.  Correct?

22 A.  That's not correct.

23 Q.  What's not correct about it?

24 A.  The total DIP need in the April 8 budget is not $45 million.

25 Q.  Well, what's the total commitment?  $45 million?

1    A.  The total commitment in the term letter is $45 million.

2    Q.  Right.

3    A.  The total calculation is not.

4    Q.  Was it the debtors that came to the conclusion that $45

5    million was needed or was it Sandton?

6    A.  This term letter says that the lender believes that.

7    Q.  Right.  So this was a decision being made by Sandton for the

8    benefit of the estates.  Not the debtor's for the benefit of the

9    estates.  Is that right?

10   A.  The debtors have not come to a $45 million conclusion if

11   that is what you're asking.

12   Q.  But you're proposing a debt facility for $45 million, aren't

13   you?

14   A.  I think I need you to restate the question.

15   Q.  Sure.

16   A.  Sorry.

17   Q.  Before -- before on April 2 --

18   A.  Yes.

19   Q.  -- the DIP proposal was for a $35 million total all in DIP

20   facility.  Correct?

21   A.  That's correct.

22   Q.  All right.  And then on February 6, this Saturday; is that

23   right?  February 6 -- thanks.  I'm just reading.  Mr.

24   Christensen corrected me.  It's not February.  It's really

25   April.  Mr. -- on April 6, the debtors filed this new DIP

1  proposal seeking a total DIP of $45 million.  Correct?

2  A.  The debtors filed the DIP proposal indicating the Sandton --

3  it's my understanding that the debtors were indicating selecting

4  Sandton as their DIP proposal.

5  Q.  Right, right.  And as part of that indication, the debtors

6  increased the amount of debt that they would borrow from Sandton

7  from $35 million to $45 million.  Is that right?

8  A.  That's the total committed amount.  Not the draw amount.

9  Q.  Right.  Mr. Millenkamp testified earlier that he intended to

10  draw or expected to draw approximately 39 to $40 million to pay

11  critical vendors.  Is that right?

12  A.  I don't recall hearing the testimony that way.

13  Q.  Okay.  So after filing a DIP proposal seeking a total

14  commitment for $35 million on April 2, on April 6, the debtors

15  file a new proposal for a total commitment of $45 million.

16  A.  That's correct.

17  Q.  Right.  And the reason why, according to this proposal filed

18  by the debtors, for the increase in the total facility is

19  because, according to this proposal, the debtors filed and

20  selected, the lender believes, based upon the most recent DIP

21  budget that the total required DIP loan could reach $45 million.

22  That's what this proposal says, right, the lenders believe.  Is

23  that right?

24  A.  That's the lender's belief, yes, sir.

25  Q.  Right.  And so based upon that belief, the debtors increased

1   the amount of debt they are seeking to incur in connection with

2   these Chapter 11 cases.  Is that right?

3   A.  I don't agree with the characterization of that, no.

4   Q.  Did you independently verify the lender's belief?

5   A.  Independently verify the lender's belief.

6   Q.  Well, the lender believes you needed $45 million and so the

7   debtors agreed with the lender.

8   A.  The debtors -- the debtors sought to seek out the Sandton

9   proposal for a myriad of reasons including Sandton's

10  relationship and the debtor's relationship with alternative

11  parties such as Rabo.  I'm sorry.  Go ahead.

12  Q.  No, that's all right.  We'll move on.  Let's turn to

13  Exhibit 1014 which is -- I believe it should be the DIP budget

14  that the debtors filed last night.

15          MR. CHRISTENSEN:  1015.

16  BY MR. SCHOULDER:

17  Q.  1015.  I apologize.  We had to scramble a little bit to get

18  new exhibits in so I apologize.  Okay.  So according to this new

19  DIP budget that you participated in the preparation of; is that

20  right?

21  A.  That's correct.

22  Q.  And that was alongside the debtor's management?

23  A.  Yes.

24  Q.  And what about -- what about Sandton?  Did Sandton

25  contribute to the preparation of this budget?

1  A.  No.

2  Q.  Okay.  According to this DIP financing budget, the total

3  need for the period from the petition date through May 6, May

4  12, that's the interim period, right, is $14.6 million.  Is that

5  right?  I'm just adding up all the yellow --

6  A.  No, I understand.  The hearing is set for May 8 so that 5

7  million -- I don't know which side of May 8 that falls on.

8  Q.  Okay.  We could split the baby.

9  A.  Okay.

10  Q.  We'll call it 12 and a half, right?

11  A.  Sure, yes.

12  Q.  So between April 2 and April 8, the debtor's DIP financing

13  for the interim period effectively increases three times in that

14  span of a window, is that right, that seven-day period?

15  A.  That is correct.

16  Q.  All right.

17  A.  However, there are other differences in this model.  This is

18  partially a timing so the change from the model that was filed

19  on April 2 and the one that was filed here last night, they have

20  a different start date.  April 1 versus April 2.  The first week

21  of this budget also, the one that was filed last night, is based

22  off of last week and there is no milk check receipt.  Last week

23  in the original filing of this budget, the one that was filed on

24  April 2, there was -- and I'm going to ball park the number

25  because I'm not looking at it but it was something like 4 and a

1    half million dollars worth of milk proceeds coming in to the

2    business in week 1 which are not in this updated model.

3    Q.  Okay.

4    A.  So part of that is this.  In the span of a week, also,

5    Mr. Millenkamp has been operating his business in a new

6    landscape where the critical vendor payments are changing daily

7    based on the conversations that he's having with vendors.

8            So a lot of the critical vendors in the original budget

9    versus this one, so the April 2 one versus this one, many of

10   those payments are just moved up into an earlier period.

11   They're moved from left to right but they're not materially

12   changed.  There are some differences in the critical vendor

13   portion of those two budgets but the majority of the difference

14   is just the shifting.

15   Q.  Right.  You would agree it's not a nominal -- it's not a

16   nominal increase, is it?

17   A.  No.  It's not a nominal increase but over the course of the

18   entire period versus the original budget, there's left to right

19   shifting but not major increases to the critical vendor

20   payments.

21   Q.  So just changing gears here, Ms. Churchill, are you familiar

22   with the maturity date for the Rabo AgriFinance prepetition

23   secured facility?

24   A.  Not off the top of my head.

25   Q.  Okay.  Just to spare you the additional time of going

1   through exhibits, if I told you it was June 1, 2022, does that

2   sound about right?

3   A.  That sounds about right, yes.

4   Q.  Right.  That's roughly 20 months ago, isn't that right?

5   A.  Yes.

6   Q.  Okay.  And are you -- earlier you testified that you've been

7   working with the debtor since sometime in the summer of 2021.

8   Right?

9   A.  That's correct.

10  Q.  And so you were engaged and working with the debtors at the

11  time the Rabo AgriFinance loan matured; is that right?

12  A.  That's correct.

13  Q.  Are you familiar with the debtor's efforts from October 2022

14  when they entered into the forbearance agreement through the

15  petition date to refinance the Rabo AgriFinance credit facility?

16  A.  I don't recall.

17  Q.  Are you familiar with their efforts?

18  A.  I'm sorry.  I don't recall the efforts.

19  Q.  That's all right.  It's a long day.  Were you aware during

20  the period of your engagement that the debtors were attempting

21  to refinance the RLOC facility from the period of June 2022 up

22  until the petition date?  Were you aware of that?

23  A.  I'm sorry.  I don't recall.

24  Q.  Okay.  You're the financial advisor for the company, right?

25  A.  Yes.

1   Q.  Right.  And part of your role would be assisting the debtors

2   in a marketing process for financing -- a refinancing, wouldn't

3   it be?

4   A.  Millenkamp has had multiple financial advisors through the

5   course of this period and Kander's specific responsibilities

6   were financial reporting, operational metric reporting and

7   forecasting.

8   Q.  Okay.  So you didn't receive any request for information

9   from different potential refinancing sources that you had to

10  provide information to?

11  A.  I'm sorry.  Can you ask the question again?

12  Q.  Did you receive requests from potential lenders who were

13  interested in refinancing the debtors?

14  A.  Kander prepared multiple forecasts and budgets over the

15  course of our engagement for a various amount of scenarios.  I

16  don't recall specific scenarios.

17  Q.  All right.  So you've had no knowledge of any marketing

18  process the debtors were running for a refinancing of the Rabo

19  AgriFinance facility.  Is that your testimony?

20  A.  That is my testimony.

21  Q.  Okay.  As of the petition date, the total secured debt is

22  approximately $292 million; is that right?

23  A.  That sounds accurate.

24  Q.  Right.  That's a combination of MetLife, Conterra and Rabo

25  AgriFinance; is that right?

1    A.  Correct.

2    Q.  Do you have -- do the debtors have a current commitment to

3    refinance the Rabo AgriFinance RLOC prepetition facility?

4    A.  I'm sorry.  Can you --

5    Q.  Do the debtors have any commitment at this present time for

6    refinancing of Rabo AgriFinance's $90 million of debt?

7    A.  Not to my understanding.

8    Q.  Do you have any approximation of what the debtor's EBITDA to

9    debt leverage ratio was as of the petition date?

10   A.  I do not.

11   Q.  As a financial advisor evaluating DIP proposals, wouldn't it

12   be important to know the debt to leverage ratio in evaluating

13   different proposals for new debt?

14   A.  Internal financials for January and February have not been

15   provided as the CPA firm that provides all of Millenkamp's

16   internal financials, Eide Bailly, is not currently engaged.

17   Q.  Right.  But you're not able using historical assumptions and

18   your general knowledge of the debtor's business and it's capital

19   structure to come up with a ball park debt to leverage ratio --

20   strike that.  You've been working with the company since 2021,

21   correct?

22   A.  That's correct.

23   Q.  You're aware of their finances, correct?

24   A.  That's correct.

25   Q.  And you're aware of the capital structure and where all the

1    debt sits.  Is that right?

2    A.  Yes.

3    Q.  And in preparing financial statements, you're also familiar

4    with their earnings.  Is that right?

5    A.  We don't prepare the financial statements.

6    Q.  But in assisting the company and monitoring and reporting

7    and everything you do as a financial advisor, you are aware of

8    their earnings, aren't you?

9    A.  Yes.

10   Q.  Right.  And so as a financial advisor, you could calculate

11   an assumed leverage ratio for the debtors, couldn't you?

12   A.  Yes.

13   Q.  Right.  And you haven't calculated a leverage ratio in

14   evaluating the current DIP proposals?

15   A.  I have not.

16   Q.  Just generally, if you add $45 million or $50 million when

17   you consider the fees and interest to the $292 million of debt

18   that's currently sitting on the company, the leverage ratio

19   would increase.  Is that right?

20   A.  Of secured debt, yes.

21   Q.  Uh-huh.

22   A.  Yes.  Sorry.  I apologize.

23   Q.  No worries.  You don't have a commitment from Sandton to

24   convert the DIP facility into an exit facility, do you?

25   A.  I believe Sandton's terms said that -- and I don't have the

 1   language here in front of me.  Can we open Sandton's most recent

 2   term sheet?  Can I ask that?  I apologize.

 3   Q.  Sure.  There we go.

 4   A.  So Sandton has indicated that they will consider an exit

 5   financing.

 6   Q.  Consideration is not a commitment, is it?

 7   A.  No.

 8   Q.  Right.  And they haven't -- have they expressed any terms

 9   under which they would consider exit financing?

10   A.  I believe Mr. Millenkamp is having discussions with exit

11   financing partners.

12   Q.  Right.  But this says lender to consider exit financing.

13   Lender is Sandton here, right?

14   A.  That's correct.

15   Q.  And so are you aware of what -- of any terms that Sandton

16   has identified under which it would consider exit financing?

17   A.  I am not.

18   Q.  Right.  Do you know if Mr. Millenkamp has received any terms

19   from Sandton with respect to, you know, the manner in which they

20   would provide exit financing or convert the DIP into an exit

21   facility?

22   A.  I can't speak to what Mr. Millenkamp has received.

23   Q.  Okay.  The terms under which Sandton would provide an exit

24   facility, those would still be subject to the bankruptcy court's

25   order in connection with a confirmation hearing, wouldn't it?

1  A.  That's my understanding, yes.

2  Q.  Right.  So it's possible that Sandton's proposed terms and

3  commitment, if they ever come to fruition, could be denied by

4  this Court for a number of reasons under the bankruptcy code.

5  Is that right?

6  A.  Could that not be with any terms that are brought from any

7  potential exit financing?

8  Q.  Right.  But we're talking about the Sandton proposal though.

9  A.  I understand.  Can you ask me the question again?

10  Q.  Right.  So it's possible that the Sandton proposal to

11  provide exit financing if they ever provided terms and

12  commitment, those terms and commitment, that could be denied by

13  this Court in connection with the judge's consideration of a

14  Chapter 11 plan.  Is that right?

15  A.  That is correct.

16  Q.  Right.  So there's a lot of contingencies in the statement

17  of the Sandton proposal that Sandton will consider exit

18  financing.  Is that right?  Well, let's just review, right?

19  They have to provide a commitment.  They have to provide terms

20  for that commitment.  And then this Court has to approve those

21  terms.  So that's at least three contingencies there, right?

22  A.  That's correct.

23  Q.  Right.  Ms. Churchill, what is the debtor's go forward plan

24  to repay Rabo AgriFinance for its credit facility that's now

25  matured over 20 months?

1   A.  It is my understanding that the debtor would seek to

2   refinance.

3   Q.  Right.  And they don't have any proposals or commitments

4   yet, right?  That's just their plan.

5   A.  I'm not aware of any proposals that they have or don't have.

6   Q.  So in order to exit bankruptcy, they would need to find a

7   way of repaying or -- well, they would have to find a way of

8   repaying Sandton and they would have to find a way of

9   compensating Rabo AgriFinance for $90 million of senior secured

10  debt.  Is that right?

11  A.  That's correct.

12  Q.  Right.  And for 20 months, the debtors have not been able to

13  find a single lender to replace just $90 million of debt.  Is

14  that right?

15  A.  I believe Mr. Millenkamp spoke to that earlier today.

16  Q.  Well, I'm asking you Ms. Churchill.

17  A.  That's correct.

18  Q.  Right.  And so now -- now the debtors will have the

19  additional burden of not just refinancing $90 million but also

20  refinancing the $45 million DIP facility.  Isn't that right?

21  A.  We keep speaking of $45 million DIP facility.  Without

22  recognizing that none of the budgets that have been filed in

23  this case have ever touched $45 million DIP need.

24  Q.  Right.  And Ms. Churchill, what's the projected use to pay

25  critical vendors of the DIP?

1   A.  The current budget has $18.8 million payments to critical

2   vendors over the course of the 130 days.

3   Q.  That's 130 days but do you plan on exiting in 130 days?

4   A.  That's currently the plan.

5   Q.  Right.  So to exit in 130 days, you would need a plan of

6   reorganization.  Do you have a plan of reorganization?

7   A.  We have not put together a full plan of reorganization at

8   this time.

9   Q.  Right.  And you would need to have a negotiated deal with

10  your primary stakeholders as part of that plan of

11  reorganization.  Do you have those -- do you have those

12  agreements?

13  A.  The debtor does not yet have a plan of reorganization filed

14  or discussed in court.

15  Q.  Right.  So we don't have assigned DIP agreement.  We don't

16  have a way to repay currently Sandton and you don't have an exit

17  refinancing proposal to take up Rabo AgriFinance but you're

18  telling us that the debtors intend to exit from Chapter 11 in

19  130 days?

20  A.  Yes.

21  Q.  Mr. Christensen has a lot of work ahead of him.  Apart from

22  the 2002 (sic) appraisal of the real estate, could you confirm

23  there are no other updated appraisals for that real estate; is

24  that right?

25  A.  I'm not aware of any.

1  Q.  And has Kander conducted a marketing process to test the

2  market value of the real estate?

3  A.  No.

4  Q.  Have the debtors engaged a broker to conduct the marketing

5  process to test the market value of the real estate?

6  A.  I'm unaware.

7  Q.  At present, the debtors do not intend to liquidate their

8  assets; is that right?

9  A.  That's correct.

10 Q.  Okay.  Have the debtors engaged an investment banker to test

11 the market value of the debtor's business on a going concern

12 basis?

13 A.  I'm not aware of that.

14 Q.  You would need that type of evaluation in order to put

15 forward a plan of reorganization, wouldn't you?

16 A.  I'm sorry.  Can you ask the question again?

17 Q.  You would need -- I'll withdraw it.  The point of an

18 appraisal is to identify and confirm value based upon a certain

19 methodology.  Isn't that right?

20 A.  That's correct.

21 Q.  Right.  And the point of having an investment banker test

22 the market value of the debtor's estates as a going concern

23 value is a way of determining value for the debtors on a going

24 concern basis.  Is that right?

25 A.  These are two methods of approximating value, yes.

1   Q.  Right.  And so in order to confirm a plan, you would need to

2   have evaluation to be able to support the debtor's burden,

3   wouldn't you?

4   A.  I don't believe that an appraisal or an investment banking

5   broker's opinion of value are the only two ways to assess the

6   value of the enterprise.

7   Q.  Okay.  I'm trying to skip stuff to get you out.  Really

8   genuinely, I'm trying to.  I put all my stickies down that I was

9   going to ask you about.  On direct exam, you were talking

10  with -- with counsel about the debtor steer sales.  Do you

11  recall your testimony?

12  A.  I do, yes.

13  Q.  All right.  Good.  And earlier, Mr. Millenkamp would have

14  testified that he would have been profitable had he been able to

15  keep the steer sale -- the sale of the steers in the business.

16  Do you remember that testimony?

17  A.  I generally remember that testimony.

18  Q.  I'm not quoting him.

19  A.  Yeah.

20  Q.  Under the current -- so under the current budget that you

21  filed yesterday evening, you're showing and you testified

22  earlier on direct that the debtors still are not generating

23  enough cash which requires draws in the DIP facility.

24  A.  That's correct.

25  Q.  Right.  So even though Mr. Millenkamp now under your budget

1  has access to steer sales, he still can't generate sufficient

2  cash flow to be able to support operations without drawing debt.

3  Is that right?

4  A.  That's correct.  I would also direct you to see the critical

5  vendor payments that are required during this period under this

6  budget.

7  Q.  Right.  But he's going to have to continue to pay critical

8  vendors into perpetuity as long as he continues to operate the

9  business.  Right?

10 A.  Yes.  There's a difference between paying critical vendors

11 for current services versus the payment of critical vendor

12 prepetition AP I believe.

13 Q.  Right.  So he still has steer sales and still needs to draw

14 debt in order to support and sustain his operation, correct?

15 A.  That's correct.  I just -- I don't agree with the

16 characterization necessarily.

17 Q.  Okay.  I'm sure -- I'm sure counsel will clarify and make

18 you happier with my characterization.

19         MR. SCHOULDER:  No further questions, Your Honor.

20         COURT:  Mr. Naess, do you have any questions for the

21 witness?

22         MR. NAESS:  I do not.

23         COURT:  All right.  Mr. O'Brien.

24         MR. O'BRIEN:  Conterra has no questions.  Thank you.

25         COURT:  All right.  Redirect.

REDIRECT EXAMINATION

1

2   QUESTIONS BY MS. MIKKINLINENI:

3   Q.  I just have a few questions, Ms. Churchill.  Is it your

4   understanding the Rabo DIP credit agreement is still being

5   negotiated as well?

6   A.  That is my understanding, yes.

7   Q.  Based on Rabo's term sheet, will they even consider exit

8   financing?

9   A.  It does not appear so.

10  Q.  And would an exit facility benefit the estates here?

11  A.  Yes.

12  Q.  You testified on cross regarding the receivership action

13  budget.  Do you know which budget I'm talking about?

14  A.  Yes.  This is the first budget we reviewed.

15  Q.  Yes.  You testified as to milk check proceeds.  Do you know

16  if those projected milk check proceeds were actually received by

17  the debtors?

18  A.  I would have to look at the period of that budget

19  specifically but I am aware that milk check proceeds have been

20  swept by -- or assigned to Rabo over the course of this time

21  frame.  So the anticipated milk proceeds coming into the

22  business in that model were not reflective of Tuesday -- actual

23  cash receipted into the business.

24  Q.  Was the need for protective advances due to Rabo keeping all

25  of the milk proceeds projected on this budget?

```
 1    A.  Yes, in part.  I would say the additional part of that would
 2    be that the net cattle sale receipts in this budget were a 60/40
 3    split with 60 percent to Rabo and 40 percent to Millenkamp and
 4    it is my understanding that was not the reality over the course
 5    of this time frame.
 6    Q.  What was the reality?
 7    A.  That 100 percent of the livestock sales were going to Rabo.
 8         MS. MIKKINLINENI:  No further questions.  Thank you.
 9         WITNESS:  Thank you.
10         COURT:  Any additional cross?
11         MR. SCHOULDER:  Yes, Your Honor.  I'll be very brief.
12                     RECROSS-EXAMINATION
13    QUESTIONS BY MR. SCHOULDER:
14    Q.  I just have a few questions for you, Ms. Churchill.  Counsel
15    just asked you about negotiating with Rabo on their DIP
16    agreement.  Do you recall that?
17    A.  Yes.
18    Q.  All right.  Are you aware of any negotiations with Rabo Bank
19    with respect to any of its proposals?
20    A.  I have not been part of any negotiations.
21    Q.  Okay.  Are you aware of the first proposal that Rabo Bank
22    made in connection with its objection to the debtor's proposed
23    DIP facility?
24    A.  I'm sorry.  Could you ask that question again?
25    Q.  Are you aware that Rabo Bank made a proposal to the debtors
```

1   in connection with its objection to the original DIP facility of

2   $35 million?  Are you aware of that?

3   A.  Of Rabo's initial?

4   Q.  Yes.

5   A.  I don't -- I don't recall.

6   Q.  Right.

7   A.  I apologize.

8   Q.  So as a financial advisor, you would have been asked to

9   review that proposal, wouldn't you?

10  A.  I have reviewed the DIP proposals.

11  Q.  You just said you're not aware of Rabo Bank's proposal.

12  A.  I'm -- I apologize if I have misspoken.  I am -- I'm unsure

13  of which Rabo proposal you're speaking of.

14  Q.  Okay.  Are you aware of any negotiations between the debtors

15  and Rabo Bank with respect to any proposal submitted by Rabo

16  Bank to the debtors for DIP financing?

17  A.  I am unaware of negotiations.

18  Q.  You stated that -- you just testified when counsel asked you

19  about Rabo Bank not offering an exit facility.  Is that what

20  your testimony was?

21  A.  That is -- yes.

22  Q.  Has anybody from the debtors asked Rabo as part of

23  negotiations whether it would consider an exit facility?

24  A.  I'm unaware of what's been asked of Rabo.

25  Q.  All right.  You mentioned steer sales.

1    A.   Yes.

2    Q.   And a 60/40 split.

3    A.   That's correct.

4    Q.   And you stated that the debtors didn't receive their share

5    of the proceeds.  Is that right?

6    A.   I stated that was my understanding, yes.

7    Q.   Do you have any understanding of what amounts Rabo Bank

8    should have paid in steer proceeds to the debtors?

9    A.   I do not.

10   Q.   So how do you know that the -- that Rabo Bank did not turn

11   over proceeds?

12   A.   It's my understanding through conversation with the

13   Millenkamp team that steer sales have been wholly collected by

14   Rabo.

15   Q.   But you haven't independently confirmed that?

16   A.   I'm sorry?

17   Q.   You haven't independently confirmed that, have you?

18   A.   No.

19   Q.   Right.  So you just said that in your budget, your budget

20   was impacted by the fact that Rabo Bank did not turn over

21   proceeds from the sale of the steers.  Wasn't that your

22   testimony?

23   A.   That's correct.

24   Q.   So how could you have adjusted the budget to reflect that

25   impact without knowing the amount that Rabo Bank withheld?

1   A.  Each of these budgets has had a set of assumptions about the

2   head count of steer that would be sold and so in each different

3   iteration of the budget, there have been assumptions on where

4   those proceeds would be allocated.

5   Q.  You are aware that Rabo Bank during the case -- during the

6   receivership rather advanced $5.8 million of protective

7   advances, are you?

8   A.  I am.

9   Q.  Right.

10          MR. SCHOULDER:  Your Honor, I'm going to ask to

11  introduce as an exhibit a communication between myself and Mr.

12  Christensen regarding what Ms. Churchill just testified in terms

13  of amounts that were owing by Rabo Bank in respect of steer

14  sales.  Unfortunately, I only have two copies.

15          COURT:  All right.  Could we put one of those copies on

16  the overhead projector just so it's available for folks to see

17  on the display?  That's probably the fastest and best way to do

18  this.

19          All right.  Would you like a hard copy, Ms. Churchill?

20          WITNESS:  No, this is fine.  Thank you, Your Honor.

21          COURT:  All right.  Do we want to mark that one?

22          CLERK:  Yes.  It's 3038.

23          COURT:  Let's mark this as Exhibit 3038.

24                  (Rabo AgriFinance Exhibit No. 3038 marked.)

25  BY MR. SCHOULDER:

1    Q.  Ms. Churchill, do you recognize who sent this e-mail?

2    A.  I recognize this is from Matt Christensen.

3    Q.  And who is Matt Christensen?

4    A.  Matt Christensen is counsel for the debtor.

5    Q.  And who did he send this e-mail to?

6    A.  A host of folks.

7    Q.  That's okay.  We'll leave it at that.  And the subject line

8    of the e-mail is beef checks; is that right?

9    A.  Yes, I see that.

10    Q.  And to save you the time of reading out loud, I'll read it

11    for you.  "Andrew, as you know, Millenkamp's budget is based at

12    least in part on income from cattle sales.  Per the receivership

13    order, Millenkamp through the receiver was to receive 100

14    percent of the cull cow proceeds and 40 percent of the steer

15    proceeds."  Do you see that?

16    A.  Yes, I see that.

17    Q.  Okay.  "And since the receivership began, there are several

18    beef checks that have been issued by the buyers but not paid to

19    Millenkamp.  Below is a chart of the outstanding beef checks

20    that have not been paid."  And below this chart, you see that

21    Mr. Christensen lists out a number of -- a number of figures.

22    Do you see that?

23    A.  Yes.

24    Q.  And among the figures, he lists out 100 percent MC Dairy

25    cull cattle.  Do you know what that means?

1   A.  I assume that to mean Millenkamp Cattle.

2   Q.  Right.  And you agree that Mr. Christensen is indicating

3   that Millenkamp was to receive 705,000 -- approximately

4   $705,0007 of cull cow proceeds.

5   A.  I understand that to be what this chart indicates.

6   Q.  Right.  And next to that, it lists 40 percent of MC steers.

7   Is that right?

8   A.  Yes.

9   Q.  Okay.  And under the total column for this, it states that

10  the total is approximately $493,000.

11  A.  Yes, I see that.

12  Q.  So between the two columns, it's approximately $1.2 million.

13  Is that right?

14  A.  Yes.

15  Q.  All right.  And you're aware, aren't you, that Rabo Bank

16  under the receivership -- that Rabo AgriFinance, sorry, under

17  the receivership order had no commitment or obligation to

18  provide any protective advances.  Is that right?

19  A.  That is my understanding, yes.

20  Q.  And so it's only obligation was under the receivership order

21  was to provide 60 percent of the cull -- I'm sorry.  Strike

22  that.  It's only obligation -- financial obligation under the

23  receivership order was to provide 40 percent of the Millenkamp

24  steer sale proceeds back to the company.  Is that right?

25  A.  That's my understanding, yes.

1   Q.  And our financial obligation was to turn over 100 percent of

2   the cull cattle proceeds.  Correct?

3   A.  Correct.

4   Q.  So in total, that's $1.2 million that Mr. Christensen says

5   that should have been paid over to the debtors.  Is that right?

6   A.  That's what this states, yes.

7   Q.  Okay.  And earlier, you confirmed your understanding that

8   Rabo Bank had advanced $5.8 million as protective advances

9   during the pendency of the receivership, correct?

10  A.  That's my understanding, yes.

11  Q.  Right.  And that's in addition to returning the milk checks

12  that were paid over to Rabo Bank.  Correct?

13  A.  I do not know.

14  Q.  Okay.  But you are aware that Rabo Bank was -- as it

15  received milk checks with the exception of the milk check that

16  arrived right before the bankruptcy was turning those proceeds

17  over to the debtors, correct?

18  A.  Through a certain period, yes.

19  Q.  All right.  You would agree then that $5.8 million is

20  greater than $1.2 million.

21  A.  Yes, I would agree to that.

22  Q.  Right.  Thank you.

23       MR. SCHOULDER:  No further questions, Your Honor.

24  Moving Exhibit 3038 into the record.

25       COURT:  Any objection to the admission of Exhibit 3038?

1              MR. CHRISTENSEN:  No, Your Honor.

2              COURT:  All right.  We'll admit that.

3                   (Rabo AgriFinance Exhibit No. 3038 admitted.)

4              COURT:  Can we get a copy of 3038 for the record for

5    us?

6              MR. SCHOULDER:  Yes, Your Honor.  May I approach?

7              COURT:  Please do.  Hand that to Ms. Battle, please.

8              CLERK:  Thank you.

9              MR. SCHOULDER:  Thank you.

10             COURT:  All right, Ms. Mikkinlineni.  Do you have any

11   additional questions for the witness?

12             MS. MIKKINLINENI:  No, Your Honor.

13             COURT:  All right.  I think this is probably a good

14   time for us to break.  You may step down.  Thank you.

15             WITNESS:  Thank you, Your Honor.

16             COURT:  I appreciate you -- counsel cooperating in

17   order to get Ms. Churchill and her testimony done today so she

18   can accommodate her travel schedule.

19             It sounds like we need to come back tomorrow.  The

20   Court is available.  Counsel, do we want to start tomorrow at

21   9:00 a.m.?  Does that work for everybody?

22             MS. SCHWAGER:  That does work, Your Honor.  Thank you.

23             COURT:  All right.  We'll plan on doing that.  The

24   record -- the recording of today's proceeding will be on our

25   docket probably tomorrow morning so if you all have folks who

 1   are interested as to what happened today, hopefully that will be

 2   on the docket soon.

 3        I also want to say I appreciate you all cooperating on

 4   running the tech.  I know that kind of largely fell on your

 5   shoulders over there but it did help the situation move a little

 6   faster.  So I thank you for that.

 7        With respect to the debtor, I think its authorization

 8   to use cash collateral terminated today or terminates today.  Is

 9   there a concern with respect to cash collateral use for the

10   debtor given that we still need to go forward tomorrow?

11        MR. CHRISTENSEN:  Your Honor, I probably can't answer

12   that without talking to Mr. Millenkamp and Mr. Heida first.  So

13   I don't know.

14        COURT:  Okay.  Well, I guess I'll leave that up to the

15   parties to discuss after we adjourn.  If there is an issue with

16   respect to cash collateral use that we need to discuss, we can

17   take that up first thing tomorrow morning and address it at that

18   time.

19        Mr. Christensen, is there anything else that we need to

20   address tonight before add Judge?

21        MR. CHRISTENSEN:  The only last thing we would have is

22   if the Court can excuse Ms. Churchill.  She may still be here

23   tomorrow because I think the flight got moved to tomorrow but if

24   she can be excused so she doesn't need to worry about sticking

25   around longer than she needs to.

```
 1              COURT:  All right.  Any objection to that?

 2              MS. SCHWAGER:  No objection from Rabo, Your Honor.

 3              COURT:  All right.  I think at this time you will be

 4     excused, Ms. Churchill.  Anything further from MetLife?

 5              MR. GOURLEY:  Yes, Your Honor.  As far as scheduling

 6     tomorrow, I don't know how many witnesses and how long it's

 7     going to go.  Does the Court have the entire day or just half a

 8     day for tomorrow?

 9              COURT:  That's a good question.  I think I'm generally

10     available tomorrow so we can take all day if we have to.

11              MR. GOURLEY:  Thank you.

12              COURT:  All right.  Counsel for Rabo AgriFinance,

13     anything else we need to discuss before adjourning?

14              MS. SCHWAGER:  No, Your Honor.  Thank you very much.

15              COURT:  All right.  And Mr. Naess?

16              MR. NAESS:  Nothing.  Thank you.

17              COURT:  Counsel for Conterra?

18              MR. O'BRIEN:  Nothing today.  Thank you.

19              COURT:  All right.  And the other counsel who have

20     appeared in the gallery, anything else for the good of the

21     order?

22              All right.  Thank you, counsel.  I appreciate your

23     working together to get this done today even though we stayed a

24     little bit longer.  We'll reconvene tomorrow at 9:00 a.m.

25              CLERK:  All rise, please.
```

1                          (Proceedings concluded.)

                    I, court-approved transcriber, certify that the

          foregoing is a correct transcript from the official electronic

          sound recording of the proceedings in the above-entitled matter.




            __/s/ Tamara A. Weber_____          __4/22/24_____

          Signature of Approved Transcriber              Date



            _Tamara A. Weber_____

          Typed or Printed Name