UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

```
MILLENKAMP CATTLE, INC.,         )  Bankruptcy Petition
471 North 300 West               )    # 24-40158-NGH
Jerome, Idaho 83338              )
                                 )
                                 )
Tax ID/EIN: 26-0603892           )    Twin Falls, Idaho
                                 )    April 10, 2014
         Debtor.                 )
. . . . . . . . . . . . . . . .  )
```

VOLUME I OF II
CONTINUED EVIDENTIARY HEARING
BEFORE THE HONORABLE NOAH G. HILLEN
UNITED STATES BANKRUPTCY JUDGE

```
COURT RECORDER:              TRANSCRIPTION BY:

MELANIE BATTLE               TAMARA A. WEBER, CSR
U.S. District Court              P.O. Box 387
                             Caldwell, Idaho  83606
```

Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | MR. MATTHEW T. CHRISTENSEN<br>Johnson May, PLLC<br>199 N. Capitol Boulevard<br>Suite 200<br>Boise, Idaho 83702 |
| | MS. KRYSTAL R. MIKKILINENI<br>MS. TIRZAH R. ROUSSELL<br>Dentons Davis Brown<br>215 Tenth Street<br>Suite 1300<br>Des Moines, Iowa 50309 |
| For Metlife Real Estate<br>Lending LLC and Metropolitan<br>Life Insurance Company: | MR. RON C. BINGHAM, II<br>Attorney at Law<br>3424 Peachtree Road NE<br>Suite 1600<br>Atlanta, Georgia 30326 |
| | MR. NIKOLAUS F. SCHANDLBAUER<br>20 F Street NW<br>Suite 500<br>Washington, DC 20001 |
| | MR. KIMBELL D. GOURLEY<br>Attorney at Law<br>P.O. Box 1097<br>Boise, Idaho 83701 |
| For Rabo AgriFinance, LLC: | MS. SHEILA RAE SCHWAGER<br>Hawley Troxell Ennis & Hawley, LLP<br>877 Main Street, Suite 200<br>P.O. Box 1617<br>Boise, Idaho 83702 |
| | MR. ANDREW SCHOULDER<br>Attorney at Law<br>1301 Avenue of The Americas<br>New York, New York 10019-6022 |
| For Western States Equipment<br>Company: | MR. JON B. EVANS<br>Dorsey & Whitney, LLP<br>101 S. Capitol Boulevard<br>Suite 1701<br>Boise, Idaho 83702-7705 |

```
APPEARANCES:  (Cont'd)

For Conterra Holdings, LLC     MR. JOHN O'BRIEN
                               Spencer Fane, LLP
                               1700 Lincoln Street
                               Suite 2000
                               Denver, Colorado 80203

                               MR. ZACHARY FAIRLIE
                               Spencer Fane, LLP
                               1000 Walnut
                               Suite 1400
                               Kansas City, Missouri 64106

                               MR SCOTT C. POWERS
                               Spencer Fane, LLP
                               10 Exchange Place
                               Eleventh Floor
                               Salt Lake City, Utah 84111

For Committee of Corn Silage   MR. MATTHEW W. GRIMSHAW
Growers:                       Grimshaw Law Group, P.C.
                               800 West Main Street
                               Suite 1460
                               Boise, Idaho 83702

For Viterra USA Grains, LLC    MR. DANIEL C. GREEN
and Viterra USA Ingredients,   Racine Olson, PLLP
LLC:                           201 East Center
                               P.O. Box 1391
                               Pocatello, Idaho 83204

For Land View, Inc.:           MR. GERY W. EDSON
                               Attorney at Law
                               P.O. Box 448
                               Boise, Idaho 83701

For MWI Veterinarian           MR. AARON ROBERT BELL
Supply, Inc.:                  Evans, Keane LLP
                               P.O. Box 959
                               Boise, Idaho 83701

For CNH Industrial Capital     MS. MEREDITH LEIGH THIELBAHR
America, LLC:                  Gordon & Rees - Seattle
                               701 Fifth Avenue
                               Suite 2100
                               Seattle, Washington 98104
```

```
APPEARANCES:  (Cont'd)

For Viserion Grain, LLC:       MR. BRIAN FARIA
                               Sawtooth Law Offices, PLLC
                               1101 West River Street
                               Suite 110
                               Boise, Idaho 83702


For Sandton Capital Partners,  MR. RICHARD BERNARD
LLP:                           Attorney at Law
                               1177 Avenue of The Americas
                               41st Floor
                               New York, New York 10036


                               MR. JOHN F. KURTZ
                               Kurtz Law, PLLC
                               910 West Main
                               Suite 364
                               Boise, Idaho 83702


For the U.S. Trustee:          MR. JASON NAESS
                               DOJ - UST
                               550 West Fort Street
                               Suite 698
                               Boise, Idaho  83701
```

```
                        I N D E X

                                         PAGE   LINE

MOTIONS                                    7      7

RABO AGRIFINANCE WITNESS:                PAGE   LINE

      McKINLAY, Matthew Robert
Direct Examination by Ms. Schwager        15     11
Cross-Examination by Mr. Christensen      36     17

      KOKINI, Daniel
Further Direct Examination by Mr. Schoulder  49   8
Cross-Examination by Mr. Christensen      80     22
Cross-Examination by Mr. O'Brien          97     1
Redirect Exam. by Mr. Schoulder           98     8


REBUTTAL WITNESS:                        PAGE   LINE

      MILLENKAMP William
Direct Examination by Mr. Christensen    102     14


DEBTOR'S CLOSING ARGUMENT                 109     9
                                          150     14

METLIFE'S CLOSING ARGUMENT               122      8

SANDTON'S CLOSING ARGUMENT               125     14

RABO AGRIFINANCE'S CLOSING ARGUMENT      128      5

U.S. TRUSTEE'S CLOSING ARGUMENT          143      3

CONTERRA'S CLOSING ARGUMENT              149     19


RULING                                   152      9
```

E X H I B I T S

| RABO AGRIFINANCE EXHIBITS: | PAGE | LINE |
|---|---|---|
| RX 3014 - Draft Borrowing Base<br>Certificate 2/29/24<br>    Admitted | 31 | 8 |
| RX 3015 - Rabo - Debtor's Long-Term<br>Projections as of 3/29/24<br>    Admitted | 87 | 12 |
| RX 3020 - Order Appointing<br>Receiver 2/16/24<br>    Admitted | 18 | 25 |
| RX 3033 - Debtor's Leverage Summary<br>as of the Petition Date<br>    Admitted | 64 | 10 |
| RX 3036 - Rabo Bank Redline Term Sheet<br>    Admitted | 109 | 3 |
| RX 337 - Creditor CNH Industrial Capital<br>America, LLC, Objection to Debtor's<br>Emergency Motion for Interim and Final<br>Orders, Doc. No. 126<br>    Admitted | 109 | 3 |
| RX 3039 - Supplement to Rabo AgriFinance<br>LLC's Second Supplement to Rabo<br>AgriFinance LLC's Omnibus Objection<br>    Admitted | 71 | 11 |
| RX 3040 - Supplement to Motion to<br>Obtain Post-Petition Financing<br>    Admitted | 77 | 23 |

1           (Proceedings begin.)

2           COURT:  All right.  We're back on the record.  Case No.

3    24-40158.  Before we get started this morning, I'm going to

4    check in with counsel to see if we have any preliminary matters

5    that we need to address.  I'll start with the debtor, Mr.

6    Christensen or Ms. Mikkinlineni?

7           MR. CHRISTENSEN:  Your Honor, at the end of the hearing

8    yesterday, the Court inquired about cash collateral use.  I have

9    followed up with our client.  There's one payment that they need

10   to be able to make today for feed to a vendor known as Land

11   View.  So approximately $80,000.  I've discussed that with Met's

12   counsel, Rabo's counsel and Conterra's counsel.

13          The proposal is that the Court just orally enter an

14   order essentially continuing the terms of the interim written

15   order through today with the additional -- that additional

16   payment authorized to be made today but, otherwise, the terms of

17   that interim order would still be in effect through today rather

18   than through yesterday.

19          COURT:  All right.  So just that one $80,000 payment to

20   Land View?

21          MR. CHRISTENSEN:  Approximately 80,000.

22          COURT:  Okay.  Any additional preliminary matters that

23   we need to address?

24          MR. CHRISTENSEN:  I guess I can tell the Court from the

25   debtor's standpoint, we don't have further witnesses to call.

1    We may have rebuttal witnesses depending on the testimony that

2    comes from Rabo but, other than that, we are finished with our

3    witnesses.

4         COURT:  All right.  Let me hear from other counsel with

5    respect to the cash collateral issue before we tackle any other

6    preliminary matters.  Counsel for MetLife.

7         MR. BINGHAM:  Your Honor, no opposition to that

8    adjustment to the interim order on behalf of MetLife.

9         COURT:  All right.  Counsel for Rabo.

10        MS. SCHWAGER:  Good morning, Your Honor.  Sheila

11   Schwager for Rabo AgriFinance.  No objection to what Mr.

12   Christensen has proposed.  I would ask that by noon today, we do

13   receive an accounting of any livestock that has been sold

14   because the livestock proceeds were to go into an account in

15   favor of Rabo AgriFinance.

16        And if we could get an agreement as to an inspection of

17   the collateral since the petition date.  We would like to get

18   that coordinated.  Other than that, Your Honor, there's no

19   objection to the same form of order just going through today

20   with that payment.

21        COURT:  All right.  And have you discussed the

22   livestock accounting with the debtor at this point?

23        MS. SCHWAGER:  I have.  I have.  And they have told me

24   that they're contacting the office this morning and we should

25   have it.

1        COURT:  Okay.  All right.  Mr. Christensen, any follow-

2   up comments on that accounting issue?

3        MR. CHRISTENSEN:  I guess just a clarification.  Under

4   the terms of the interim order, the proceeds of the livestock

5   sales weren't to be held in an account for Rabo.  A portion of

6   the DIP loan was to be set aside to be held in an account for

7   Rabo.  So I'd just clarify that.  It's not that the cash needs

8   to be held.  It's already been used to pay the cash collateral

9   payments.

10       MS. SCHWAGER:  And he's absolutely right on that.

11       COURT:  All right.  Do we need to adjust anything with

12  respect to the order orally today in regard to the accounting?

13       MS. SCHWAGER:  In regard to the accounting?  No.  Well,

14  I mean the -- no.  We just would need an accounting of livestock

15  sold through today.

16       COURT:  All right.  And from your perspective, is that

17  required already in the written order?

18       MS. SCHWAGER:  Yes.  Well, except for the date.  But

19  the accounting, it is not expressly stated I don't believe.

20       COURT:  In other words, so Mr. Christensen's asking --

21  I guess the agreement was that we're going to continue the terms

22  of the prior -- the cash collateral order, modify the budget for

23  that approximate $80,000 payment to Land View.  Is there any

24  proposal that you're suggesting that we needed to make to

25  account for -- or to modify that order with respect to the

1    livestock proceed accounting?

2            MS. SCHWAGER:  Yes, Your Honor.  We would just -- not

3    as to the account.  He's exactly right.  It was to be funded

4    from the DIP financing in favor -- issued in favor of Rabo.  But

5    we would like an accounting of any livestock that has been sold

6    so that we know what proceeds were supposed to be going in there

7    from the date of the petition through today's date.  I

8    understand the debtors are working on that but I would like that

9    to be a requirement that that information is provided.

10           COURT:  Okay.  And is there any objection by the debtor

11   as to providing that accounting by noon today?

12           MR. CHRISTENSEN:  No.

13           COURT:  All right.  Mr. Naess, any comments from the

14   U.S. Trustee regarding the cash collateral issue?

15           MR. NAESS:  No.  Thank you, Your Honor.

16           COURT:  Mr. O'Brien.

17           MR. O'BRIEN:  No objection.  Thank you, Your Honor.

18           COURT:  All right.  So consistent with the agreement of

19   the parties then, the Court will orally modify that prior cash

20   collateral order and continue debtor's cash collateral use upon

21   the same terms and conditions set forth therein except that the

22   debtor will be able to make an approximately $80,000 payment

23   through use of cash collateral for feed to Land View.

24           Also require that debtor also provide an accounting of

25   livestock sales to Rabo AgriFinance by noon today with the

1    parties' comments on the record.

2         All right.  That addresses the cash collateral issue.

3    I understand there's a preliminary issue from Mr. O'Brien?

4         MR. O'BRIEN:  Yes, Your Honor.  Thank you.  I think

5    this is going to largely or substantially take care of

6    Conterra's objection.  I think we have two issues and just to --

7    or two agreements and just to repeat where Conterra is.  It has

8    two loans.  It has the small loan that's otherwise known as the

9    Rooster loan that is secured by the first priority lien on the

10   German Dairy which is an 80-acre parcel.  And then Conterra has

11   the second larger loan otherwise known as the Nez (phonetic)

12   loan that's secured by a second priority lien on the personal

13   property collateral including the livestock and a third priority

14   lien on the balance of the real estate.

15        So just with that background, we have I think two

16   stipulations to largely resolve Conterra's involvement.  First

17   is under either proposal, whether it's Sandton's or Rabo's, the

18   parties agree that Conterra will receive adequate protection in

19   the form of monthly adequate protection payments at the pre-

20   default rate of interest on both loans on and after the April 2,

21   2024, petition date payable monthly by no later than the 10th

22   day of the following month.  And so we'll get those adequate

23   protection payments on both loans at the prepetition default

24   rate.  And so that's the first -- the first resolution.

25        Second stipulation with respect to the German Dairy,

1    Conterra's Rooster loan will retain the first lien on the German

2    Dairy and under either DIP proposal, the DIP lender will have a

3    second lien on the German Dairy.  And then that DIP lender,

4    whoever wins out, will continue or will be in a position to

5    prime Conterra with respect to the balance of the real estate

6    collateral but not the German Dairy.

7            So I hope that makes sense.  It was put together pretty

8    quickly.  Thank you, Your Honor.

9            COURT:  All right.

10           MR. BERNARD:  Your Honor, may I be heard?

11           COURT:  Let me hear from the other parties and I'll

12   call you as well just with respect to the agreement in regard to

13   Conterra first.  I'll start with counsel for MetLife.  Any

14   objections to that proposal?

15           UNIDENTIFIED SPEAKER:  Your Honor, no objection by

16   MetLife to do that Conterra adequate protection (inaudible).

17           COURT:  All right.  Counsel for the debtor.

18           MR. CHRISTENSEN:  We don't have any objection to the

19   proposal.  I just want to clarify.  The interest payments would

20   be paid on the prepetition non-default rate.  Is that correct?

21           MR. O'BRIEN:  That is correct.

22           MR. CHRISTENSEN:  I thought I heard default rate and I

23   just wanted to clarify the non-default rate.

24           COURT:  All right.  Counsel for Rabo?

25           MS. SCHWAGER:  No objection, Your Honor.

```
 1              COURT:  Mr. Naess.

 2              MR. NAESS:  No objection.

 3              COURT:  All right.  And Sandton.

 4              MR. BERNARD:  Sandton.

 5              COURT:  And remind me of your name.  I know Mr. Kurtz

 6    is your local counsel.

 7              MR. BERNARD:  Yes, Your Honor.  Richard Bernard, Faegre

 8    Drinker, on behalf of Sandton.  I just wanted to clarify.  The

 9    adequate protection payment of interest portion, that's an

10    agreement that the debtors made.  They'll include it in their

11    budget.  We're going to fund the budget but we're not

12    affirmatively agreeing to pay -- Sandton's not affirmatively

13    agreeing to directly pay adequate protection payments to

14    Conterra.  Just as a clarification.

15              And then the second part is correct.  We're agreeing

16    that we will not prime German Dairy collateral and that we'll

17    just take the second lien on that.

18              COURT:  All right.

19              MR. BERNARD:  Thank you, Your Honor.

20              MR. O'BRIEN:  And we agree with that (inaudible) then

21    that the debtor is actually the one that needs to make the

22    adequate protection payment.  The points are under either DIP,

23    funding will be available so the debtor can make those monthly

24    payments.

25              COURT:  All right.  Any additional comments with
```

1  respect to this agreement?  All right.  Anything further

2  preliminarily from the debtor?

3          MR. CHRISTENSEN:  No, Your Honor.

4          COURT:  Counsel for MetLife.

5          UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

6          COURT:  Counsel for Rabo.

7          MS. SCHWAGER:  To start?

8          COURT:  Preliminary matters.  Sorry.

9          MS. SCHWAGER:  No preliminary matters.  Sorry.  I was

10 distracted.

11         COURT:  Mr. Naess.

12         MR. NAESS:  No.  Thank you.

13         COURT:  All right.  And I believe we've addressed all

14 the preliminary matters for Conterra.  It looks like we're ready

15 to get started.

16         Mr. Christensen, you indicated the debtor does not have

17 additional witnesses to call.  Does the debtor rest at this

18 time?

19         MR. CHRISTENSEN:  We reserve the right to call rebuttal

20 witnesses but other than that, yes.

21         COURT:  All right.  Counsel for MetLife.

22         UNIDENTIFIED SPEAKER:  No witnesses, Your Honor.

23         COURT:  All right.  Counsel for Rabo?

24         MS. SCHWAGER:  Yes, Your Honor.  Thank you.  I'll call

25 Matt McKinlay.

1     COURT:  Mr. McKinlay, please come on up to the witness

2     stand.  Remain standing and raise your right hand so Ms. Battle,

3     the courtroom deputy, can swear you in.

4                    (MATTHEW ROBERT McKINLAY is sworn.)

5     CLERK:  Thank you.  Please have a seat.  After you're

6     seated, please state your name and spell your last name for the

7     record.

8     WITNESS:  Sure.  Matthew Robert McKinlay,

9     M-c-K-i-n-l-a-y.

10    CLERK:  Thank you.

11                    DIRECT EXAMINATION

12    QUESTIONS BY MS. SCHWAGER:

13    Q.  Thank you, Mr. McKinlay.  Can you provide the Court with

14    your educational background?

15    A.  Sure.  I graduated in 1996 with a Bachelor of Science Degree

16    in finance from the University of Utah.  1999, I graduated with

17    an MBA from the Marriott School of Management at Brigham Young

18    University.  I'm also credentialed as a certified management

19    accountant and certified turnaround professional.

20    Q.  And after obtaining your MBA, where were you employed?

21    A.  I was hired full-time by Target Corporation in 1999.  I had

22    worked as an intern there in the summer of '98 in between my MBA

23    program.  I worked there as a financial analyst and was later

24    promoted to a senior financial analyst.

25    Q.  And did you go somewhere else after Target?

1  A.  Yes.  About three years later, I was hired by Best Buy

2  Corporation in Minneapolis as a manager of capital investment

3  analysis.

4  Q.  And are you still with Best Buy?

5  A.  No.  In 2004, I was recruited by Albertsons here in Boise

6  and worked for Albertsons from 2004 to 2007 working first as the

7  manager of capital investment analysis and then as the director

8  of finance planning and analytics.

9       In 2007, I was hired by a company called DBSI, a real

10  estate development company.  They filed a Chapter 11 in 2008 and

11  I was retained by the Chapter 11 trustee in that case to help

12  administer the bankruptcy on behalf of the estate.  And then

13  from that point, I became self-employed doing turnaround and

14  restructuring work from 2008 forward.

15  Q.  And is that what your current role is, turnaround work and

16  restructuring?

17  A.  Yeah.  I'm currently one of a handful of owners of CFO

18  Solutions, LLC, which does business as Ampleo and we're a group

19  of finance and accounting professionals and other professionals

20  that provide consulting services.  My role within the firm, I

21  head up all of the turnaround and restructuring related projects

22  of the company.

23  Q.  And do you have any ag -- agricultural experience?

24  A.  Yes.  A number.  I've served as court-appointed receiver or

25  other court fiduciary of several ag businesses including

1    livestock operators, dairies, row crop growers and other ag

2    businesses.  For example, we were the CRO of a 200,000 head

3    swine facility.  We've been receiver of calf ranch facilities.

4    I was the bankruptcy plan agent for a dairy up in Washington.

5    Bankruptcy plan administrator for a potato grower in eastern

6    Idaho.  I know ag fairly well.

7    Q.  And was Ampleo appointed as a receiver over the Millenkamp

8    debtors?

9    A.  It was.

10   Q.  And what duties did you understand you had as a receiver?

11   A.  Well, a receiver's an agent of the court.  It's an

12   independent fiduciary of the court with the purpose to serve the

13   interests of the court and all creditors.  In other words, we

14   didn't have a dog in the fight but we were provided with custody

15   and control of the company to administer the company during the

16   time of insolvency.

17   Q.  And Mr. McKinlay, can I have you turn to Exhibit 3020?

18   There should be a binder there that says RAF exhibits.

19          MS. SCHWAGER:  Would you be able to pull that up for

20   us?

21          UNIDENTIFIED SPEAKER:  Yeah.

22          MS. SCHWAGER:  By the way, I thank you very much for

23   doing that yesterday.  It did help it go a lot faster.

24          WITNESS:  I'm there.

25   BY MS. SCHWAGER:

1   Q.  Do you recognize this document?

2   A.  I do.

3   Q.  What is it?

4   A.  This is the order appointing Ampleo as receiver of

5   Millenkamp and its affiliates.  It was entered February 16,

6   2024, in the state court action.

7   Q.  Do you recall the judge that entered that receivership

8   order?

9   A.  Yes.  It was Judge Miller.

10      MS. SCHWAGER:  And Your Honor, I'd like to move for the

11  admission of the order appointing receiver.

12      COURT:  Any objection?

13      MR. CHRISTENSEN:  Our objection is more of a relevance

14  objection, Your Honor.  I don't know what the receiver order has

15  to do with any of the motions before the Court today.

16      MS. SCHWAGER:  Your Honor, Mr. Millenkamp testified at

17  length yesterday that the receiver had damaged his business,

18  damaged relationships with feeding vendors and was the cause of

19  financial issues.  And this order governs the receivership and

20  the terms that the borrowers were to comply with under a state

21  order and it governed the terms of the receiver and so,

22  therefore, we would submit that it's highly relevant.

23      COURT:  I'll overrule the objection.  Exhibit 3020 is

24  admitted.

25          (Rabo AgriFinance Exhibit No. 3020 admitted.)

1    BY MS. SCHWAGER:

2    Q.  Mr. McKinlay, do you have any ill will to Mr. Millenkamp --

3    well, did you have any ill will to Mr. Millenkamp when Amplea

4    was appointed by the state court as a receiver?

5    A.  Of course not, no.

6    Q.  And do you have any ill will toward Mr. Millenkamp today

7    after going through the receivership process?

8    A.  No.  I'd very much like to see Mr. Millenkamp and his

9    business succeed.

10   Q.  Now, under the terms of the receivership order, did the

11   debtors have the exclusive right to file bankruptcy?

12   A.  Yes.  The court granted Millenkamp with a 60-day exclusive

13   period to file a bankruptcy.

14   Q.  And was the receiver given the authority to file bankruptcy

15   on behalf of the debtors after that period?

16   A.  After the exclusive period, yes, the receiver would have had

17   the authority to file BK -- bankruptcy on behalf of the

18   borrowers.

19   Q.  Now, two weeks into the receivership, had the debtors

20   complied with the receivership order?

21           MR. CHRISTENSEN:  Objection.

22           WITNESS:  No.

23           MR. CHRISTENSEN:  Vague.  If there's a specific term

24   she wants to point to but just generally asking if they had

25   complied with the order is pretty vague.

1          COURT:  Overrule the objection.  Go ahead.

2    BY MS. SCHWAGER:

3    Q.  Go ahead and answer the question.

4    A.  No, they hadn't complied.

5    Q.  And how had they not complied with the state court order?

6    A.  Well, under the order appointing the receiver, Millenkamp

7    was to turn over books, records, bank accounts, mail, provide

8    access to facilities, employees, systems and very few of those

9    were complied with fully.  There was limited access granted but

10   not in the spirit of the order or not as required under the

11   order rather.

12   Q.  And had you hired a consultant named Justin Roloffs

13   (phonetic) as part of the receivership?

14   A.  I had, yes.

15   Q.  And what was -- why did you hire Mr. Roloffs?

16   A.  Well, although I speak dairy somewhat, I'm not a dairy

17   expert.  Justin Roloffs is and so I had hired Justin as the

18   receiver's consultant to come and inform me on how the dairy

19   operation was functioning, to give me some ideas as to what

20   improvements would be made or how he might help the liquidity

21   crisis that we were facing.  And Justin was agreeable to that

22   and had signed an engagement agreement with me to help.

23   Q.  And what happened in regard to Mr. Roloffs?

24   A.  Justin was in the Jerome and Burley area --

25          MR. CHRISTENSEN:  Objection, Your Honor.  This is

```
 1  hearsay.
 2          MS. SCHWAGER:  What happened?
 3          MR. CHRISTENSEN:  Mr. McKinlay was not present for what
 4  happened so he can't testify about what happened.
 5  BY MS. SCHWAGER:
 6  Q.  As the -- as the person who was in charge of this
 7  receivership, were those who were boots on the ground, were they
 8  obligated to report to you as to what was occurring?
 9  A.  Yes.
10  Q.  And were you -- did you authorize the retention of Mr.
11  Roloffs?
12  A.  I did, yes.
13  Q.  And were you informed that there was an event with Mr.
14  Roloffs where he was precluded from doing the work that you
15  engaged him for?
16  A.  There was.
17          MR. CHRISTENSEN:  Objection.  If he was informed of it,
18  it was hearsay.
19          COURT:  Does the order appointing the receiver appoint
20  Mr. McKinlay specifically as an individual or did it appoint his
21  company?
22          MR. CHRISTENSEN:  His company.
23          COURT:  And was Mr. Roloffs an agent of that company?
24          MR. CHRISTENSEN:  Your Honor, I guess the debtor's
25  position is he was not.  He was not authorized to be employed by
```

1   Mr. McKinlay under the terms of that order.  So no, we don't

2   believe he was employed as an agent of the company.

3        COURT:  In other words, is Mr. McKinlay testifying as

4   an agent as the entity that was appointed by the receiver and,

5   in that capacity, is he able to testify what happened during the

6   receivership?

7        MR. CHRISTENSEN:  I don't believe he can testify what

8   happened when he was not present for what happened.  If they

9   want to have Mr. Roloffs testify, we're happy to have Mr.

10  Roloffs testify.  Mr. McKinlay was not present for what he's

11  going to testify about.

12       MS. SCHWAGER:  Your Honor, I would submit that this is

13  not hearsay.  This is an event that occurred that affected the

14  state court order and, in fact, it was a proceeding before the

15  state court order which Mr. McKinlay was going to proceed to

16  testify.

17       COURT:  All right.  I'll overrule the objection.  Go

18  ahead.

19  BY MS. SCHWAGER:

20  Q.  What happened in regard to Mr. Roloffs, Mr. McKinlay?

21  A.  Well, I informed Mr. Millenkamp that we had -- that I had or

22  the receiver had retained Mr. Roloffs and that I would

23  appreciate his cooperation as Mr. Roloffs visits the property.

24  Mr. Millenkamp told me that Mr. Roloffs wasn't welcome on the

25  property and that he better not step foot to which I had a phone

1  call with Mr. Roloffs and said, "Hey, to keep the peace, why

2  don't you just stay back for now."

3          He had traveled to be on site and was parked at the

4  hotel room and decided he would comply with my instruction and

5  not go on the property but he wanted to get an overview of the

6  lay of the land.  So he drove around the county roads around the

7  perimeter of the dairy property.  Mr. Millenkamp spotted his

8  vehicle and pursued him on I-84 at a high speed which ultimately

9  culminated in Mr. Roloffs being stopped by Idaho State Patrol.

10  Q.  Now, Ampleo had its attorneys file an emergency motion

11  within the two weeks of the state court proceeding.  Is that

12  correct?

13  A.  That's correct.

14  Q.  And you had filed a declaration in support of that motion;

15  is that correct?

16  A.  That's correct.

17  Q.  As well as Mr. Roloffs had submitted a declaration?

18  A.  That's correct.

19  Q.  So due to the noncompliance that you testified about and the

20  event with Mr. Roloffs, what happened at the hearing -- at the

21  emergency motion hearing?  What did the court rule?

22  A.  Well, we sought a couple things in that -- in that emergency

23  motion -- or in the emergency hearing.  We sought greater

24  compliance with the order.  For instance, the access that we had

25  been provided with the prior two weeks was extremely limited and

1    restrictive.  We also had not yet been provided with access to

2    bank accounts which were concerning.  And we also became aware

3    of the highly liquid state of the company and so we sought a

4    revision of the order appointing the receiver to remove the

5    exclusive period by which the debtor may file a bankruptcy.  We

6    felt like the debtor or the borrower in this case could not last

7    60 days.

8            With respect to certain activities where -- with

9    respect to access, I'll give you an example.  The receiver was

10   entitled to access to all of the debtor's books and records and

11   borrower's books and records.  We were provided with log-in

12   access to some systems that we tunneled into through a system

13   called TeamViewer.  There was a password that got reset every

14   night on TeamViewer so each morning as we tried to access the

15   systems, we had to be provided with a new password.  And

16   sometimes it took until 2:00 in the afternoon for the Millenkamp

17   staff to give us that password which highly restricted our

18   ability to retrieve access.

19           Further, the systems were -- instead of providing

20   access to -- there are several cubes of feed and dairy comp, a

21   number of them, and we had been provided with just a couple for

22   the dairy operation.  Nothing with respect to the calf ranch

23   operation for example.

24           We weren't provided with QuickBooks access to many of

25   the entities and the access that we did have, again, we were

1  restricted by that TeamViewer access which required a new

2  password each day.

3        We weren't able to download QuickBooks to make a backup

4  copy to use locally.  There were restrictions placed there.  We

5  also -- the borrower banked primarily with Mechanics Bank and we

6  had not been provided with access to those accounts at Mechanics

7  Bank and really were flying blind as to what the cash needs of

8  the company were.

9        And in addition, my team was housed in a milk barn

10  facility.  Granted a very nice milk barn facility but tucked

11  away on the side of the main dairy operation away from

12  employees, away from other offices, away from the computers.

13  And it was pretty clear that we weren't welcome there.  For

14  example, the bathrooms were locked on us, restricting our use of

15  bathrooms to an outhouse that was several hundred yards away

16  outside.  The temperature was kept at 58 degrees inside the milk

17  barn.  And so we wanted to make the court aware that the terms

18  of the order had not been complied with at least during the

19  initial two weeks of the receivership.

20  Q.  And what was the court's response to this emergency hearing?

21  A.  Well, the court effectively admonished Millenkamp to comply

22  with the order.  Verbally asked Millenkamp to comply to grant us

23  with access to bank accounts, to cooperate with us.  He

24  indicated that we were entitled to access the facilities that

25  we'd otherwise been restricted from accessing.  He indicated we

1    were able to talk with employees which we had otherwise been

2    prevented from accessing.

3          He also admonished Millenkamp to sign the necessary

4    paperwork to grant us access to the bank accounts both at

5    Mechanics Bank and Farmers Bank and hinted -- while he didn't

6    grant a revision of the order at that time lifting the

7    restriction on -- or the exclusive period to file a bankruptcy,

8    the Court indicated that it would be willing to consider that in

9    the short-term if necessary.

10   Q.  And did the court set another hearing to determine if the

11   order was being complied with after that hearing?

12   A.  It did.  The court seemed very concerned by the actions in

13   the initial two weeks and set a hearing to ensure that his

14   admonishment was -- or that what he was asking the Millenkamps

15   to do was complied with.

16   Q.  And then on March 15, two weeks later, Ampleo had its

17   attorney file a second status report?  Is that correct?

18   A.  That's correct.

19   Q.  And do you recall that?

20   A.  I do.

21   Q.  And why was this report necessary?

22   A.  Well --

23   Q.  Or request.  I'm sorry.

24   A.  We again -- we had exhausted -- under the order appointing

25   the receiver, the order -- or the act of the receivership

1  provided some liquidity to the estate to the tune of 4 and a

2  half to $5 million.  We exhausted that within the first couple

3  weeks and, at that point, did not have approval for additional

4  financing.

5           The state of the company became very critical at that

6  point and we didn't know, for example, whether we were going to

7  have feed trucks roll the next day.  It was a very delicate

8  situation and we felt like we had a fiduciary duty to inform the

9  court of the delicate state of affairs.

10          And so the next motion that we made laid out, one, what

11 had happened with respect to the access to books, records, bank

12 accounts and those type of things and it also informed the court

13 of the highly liquid state of affairs of the operation.

14 Q.  And when you say the report informed the court of the

15 status, of the access, had it improved at that point?

16 A.  It had improved.  Not completely but there was improvements

17 there.

18 Q.  Now, ultimately, did the court state it was going to reduce

19 the exclusivity period for the debtors to file bankruptcy?

20 A.  Ultimately -- I don't recall specifically except to say that

21 the court indicated that it would be willing to lift the

22 exclusive period about April 2.

23 Q.  And was there -- do you recall if there was a hearing set in

24 state court on April 3?

25 A.  That's right.  There was a hearing set such that had a

1    Chapter 11 filing not occurred, I think the court was willing to

2    lift that exclusivity period.

3    Q.  Now, as the receiver, once the state -- or the receivership

4    order was entered, what had you anticipated occurring with

5    Mr. Millenkamp upon the entry of that order?

6    A.  Well, Mr. Millenkamp is an exceptional operator.  He knows

7    how to operate a dairy and a calf ranch.  We would have liked to

8    have worked very collaboratively and would have welcomed that

9    collaborative approach.  That's what we expected.  We expected

10   compliance with the order.  We expected to have access to books,

11   records, systems, locations, employees.  We would have expected

12   cooperation in our negotiations with feed vendors and equipment

13   suppliers and other vendors to help improve what was a very hard

14   situation.

15   Q.  And did you have that cooperation?

16   A.  No.

17   Q.  Can I have you turn to Exhibit 3014 in that same notebook?

18   A.  I'm there.

19   Q.  And do you recognize this document?

20   A.  I do.

21   Q.  And what is it?

22   A.  This is a borrowing-based certificate.  This was prepared by

23   my team dated February 29, 2024.

24   Q.  And do you know where the information was obtained to create

25   this borrowing-based certificate?

1    A.  I do.

2    Q.  And where was it obtained?

3    A.  It was provided to us by Lisa Nelson, the Millenkamp office

4    manager.

5    Q.  And do you have experience with borrowing basis?

6    A.  Yes.  I've prepared dozens of borrowing basis for dozens of

7    lenders and borrowers.  I'm very familiar with how they work.

8    Q.  At the bottom of this exhibit, it says, "Ampleo references

9    certain feed liens that might be affected."  How did the feed

10   liens affect that certificate -- or the borrowing base?  Sorry.

11   A.  Well, the borrowing base is meant to show what lending

12   capacity or the secured position of, in this case, Rabo

13   AgriFinance and Rabo had agreed to advance on certain assets of

14   the Millenkamp operation and we had understood that certain

15   liens from other feed suppliers and choppers had been perfected.

16   And to the extent those liens stood in front of Rabo, that would

17   have further impaired their -- the borrowing base certificate.

18   It would have impaired Rabo's position or secured position.

19           MS. SCHWAGER:  Your Honor, I'd move for the admission

20   of Exhibit 3014.

21           COURT:  Any objection?

22           MR. CHRISTENSEN:  Your Honor, can I ask a couple of

23   questions in aid of that objection?

24           COURT:  Go ahead.

25           MR. CHRISTENSEN:  At the top of this form, Mr.

1    McKinlay, it says it's a draft.

2            WITNESS:  Yes.

3            MR. CHRISTENSEN:  Was it ever finalized?

4            WITNESS:  No.

5            MR. CHRISTENSEN:  And it was subject to material edits.

6    What were the material edits?

7            WITNESS:  Well, historically, this report had been

8    prepared by the debtor's accounting firm Eide Bailly.  And Eide

9    Bailly would go through a month-end close to post non-cash

10   entries in the debtor's books and records.  Eide Bailly has not

11   performed a month-end close process.

12           But what we did, what my firm did was we took the exact

13   documents that Millenkamp would provide to Eide Bailly or an

14   accounting firm and we went through the same exercise that Eide

15   Bailly did but without the benefit of having effectively a

16   closed period.

17           But upon our information and belief, based on the

18   documents that Millenkamp provided with us -- or to us, we

19   followed the same procedures that Eide Bailly would have in

20   preparing the borrowing base.

21           MR. CHRISTENSEN:  And at the bottom just before the

22   lien language, there's a phrase that says, "Ampleo has not

23   independently verified data presented here and makes no written

24   or implied representation as to its accuracy."  Is that still

25   true?

1          WITNESS:  That's correct.

2          MR. CHRISTENSEN:  So Your Honor, I guess with the

3    caveat that this is a draft that was never finalized, that's not

4    verified -- that is not verified as accurate, we don't object to

5    its admission but I don't know what utility it actually has.

6          COURT:  I understand.  The exhibit's admitted.

7          MS. SCHWAGER:  Thank you, Your Honor.

8              (Rabo AgriFinance Exhibit No. 3014 admitted.)

9    BY MS. SCHWAGER:

10   Q.  Mr. McKinlay, if you turn back one exhibit to Exhibit 3013.

11   A.  I'm there.

12   Q.  If you compare that February 26, 2024, borrowing base to

13   March 31, 2023, borrowing base, what does it indicate as to the

14   personal property collateral position of Rabo?

15   A.  Well, the total collateral in December -- at the end of

16   December 2023 was about 118 million which had a lending value of

17   82.8 million.  Two months later in February of 2024, the total

18   collateral had declined by $8 million to 110.8 million and the

19   borrowing capacity had declined by, what's that, 5 and a half

20   million, from 82.8 to 77.2 million.  At the same time, the loan

21   balance increased from 85.9 million to 90.1 million.

22   Q.  Thank you.  How long was the receivership in place?

23   A.  We were installed February 16 and the automatic stay imposed

24   by the bankruptcy effectively terminated the receivership.  I

25   don't know if the state court action has been terminated but we

1   effectively have been penciled down since April 2.

2   Q.  And after a few state court hearings, were you granted full

3   access to the financials?

4   A.  I don't believe we've ever been provided with full access,

5   no.

6   Q.  What was your understanding of the RLOC collateral position?

7   A.  My understanding with respect to Rabo AgriFinance?

8   Q.  Yeah.  Sorry.  Yes.  I said RLOC.  That's been a defined

9   term we've been using.  I apologize.

10  A.  It was eroding and eroding at a very rapid pace through the

11  receivership both on the numerator side and on the denominator

12  side meaning Rabo was continuing to advance funds so its loan

13  balance was increasing and the collateral value that was

14  securing, in this case, Rabo's debt was deteriorating.

15  Q.  Now based upon what you did review, what is your opinion as

16  to the debtor's financial status?

17  A.  I believe that the debtor is insolvent.  It's unable to pay

18  its debts as they become due and I believe that during the

19  receivership, my estimate was that the business was consuming

20  about $3 million of cash per month meaning the hole was getting

21  deeper.

22  Q.  Was the debtors acting as if they were an insolvent company?

23          MR. CHRISTENSEN:  Objection.  Vague.

24          COURT:  Sustained.  Go ahead and ask a different

25  question.

1   BY MS. SCHWAGER:

2   Q.  In your review and oversight as a receiver, did you believe

3   that the debtors were financially acting as if they were

4   insolvent?

5   A.  No.

6   Q.  Why is that?

7   A.  Well, as a turnaround professional, I'm taught that when a

8   company enters into the zone of insolvency, its fiduciary duties

9   change.  The debtor becomes obligated to act on behalf of the

10  interests of the creditors of the estate rather than the equity

11  holders for example.

12          And Millenkamp was very much in growth mode.

13  Millenkamp was ordering new tractors.  He was committing to

14  custom farmers to farm and plant and cultivate a 2024 crop.  It

15  was -- any efforts that the receiver made to bring cash into the

16  business such as sell nonperforming assets were met with

17  resistance and that's not typical for a borrower that's in an

18  insolvent situation.

19  Q.  Did you see expenses being incurred -- just regular expenses

20  being incurred that you would not normally see in an insolvent

21  situation?

22  A.  Yes.

23  Q.  And what were those?

24  A.  The debtor's facilities were beautiful.  They're white

25  lapped-side dairy facilities, tile floors, beautiful kitchens

1   and we observed that windows were being washed three times a

2   week in those facilities.  The janitors were constantly cleaning

3   the facilities.  There were graders several times a week grading

4   the parking lots of the operations to keep things smooth.

5   Typically in a situation like this, I see companies seek to look

6   for ways to save money, to pare back their expense structure.  I

7   didn't see that here.

8   Q.  Now, you heard Mr. Millenkamp -- you were here yesterday,

9   correct?

10  A.  I was.

11  Q.  And you heard Mr. Millenkamp's testimony that the

12  receivership had hurt the relationship with feed vendors.  Did

13  you hear that testimony?

14  A.  I did, yes.

15  Q.  And do you agree with that statement?

16  A.  I vehemently disagree with that statement.

17  Q.  And why is that?

18  A.  Well, the receiver -- I believe that the receiver and

19  Millenkamp were very much confusing the market.  There was --

20  there were mixed signals being sent into the market based on

21  what the receiver was trying to accomplish and the messages or

22  instructions that Mr. Millenkamp was providing those same

23  vendors.

24  Q.  And what would have sent an even -- a same message?  What

25  would you have wanted to occur with Mr. Millenkamp as far as the

1   feed vendors go?

2   A.   I very much would have liked to have worked collaboratively,

3   you know, for the common purpose to keep cows fed, to keep milk

4   produced, to keep employees paid, trucks rolling and those type

5   of things.

6        We would call -- for example, the first couple of days

7   we were installed, my colleague, Glenn Karlberg, who was

8   primarily responsible for negotiating with feed suppliers had a

9   couple phone calls with feed suppliers and was quickly

10  admonished by Mr. Millenkamp for not including him on those

11  calls.

12       And so Glenn began including Mr. Millenkamp on those

13  calls and, for a time, we were working cooperatively although

14  Mr. Millenkamp was very much shaping the message that he wanted

15  communicated to those feed suppliers.

16       Ultimately, the number of calls that we were fielding

17  became impractical to include Mr. Millenkamp on all of those

18  calls but we were communicating messages to feed suppliers such

19  as we're working on a budget that includes a plan to get you

20  paid, that includes a plan to keep feed trucks rolling and the

21  message that Mr. Millenkamp was delivering to the market was

22  very different and was confusing the feed suppliers and who was

23  in charge and it made for a difficult operating situation.

24       The tractors with Western States is a great example.

25  The Millenkamp operation had 43 tractors coming off lease in

1    June of 2023.  I entered into negotiations with Western States

2    and I was concerned as a fiduciary of the business as to whether

3    the company -- whether it was a prudent business decision to

4    enter into a long-term agreement for 43 new replacement tractors

5    knowing that the company was insolvent and questioning whether

6    the company would have the ability to meet its obligations under

7    a new lease for a long-term.

8             Mr. Millenkamp had a call shortly after -- or his

9    counsel instructing Western States that it's full steam ahead.

10   Yes, continue to prepare for the delivery of those 43 tractors

11   and it was very confusing to the market.

12            MS. SCHWAGER:  Thank you, Your Honor.  I have no

13   further questions.

14            COURT:  All right.  Counsel for MetLife.

15            UNIDENTIFIED SPEAKER:  No questions, Your Honor.

16            COURT:  Counsel for the debtor.

17                        CROSS-EXAMINATION

18   QUESTIONS BY MR. CHRISTENSEN:

19   Q.  Mr. McKinlay, good morning.

20   A.  Good morning.

21   Q.  I want to go back a little bit to some of your background.

22   You discussed some of the ag businesses that you've worked with

23   before and we did a deposition earlier where we went through a

24   lot of those specific businesses.

25            You heard Mr. Millenkamp testify yesterday about the

1  five different divisions that his companies essentially run.

2  There's the calf ranch, the beef cattle growing, the dairy, the

3  farming and the trucking all as part of one big enterprise.  Do

4  you remember that testimony?

5  A.  Yes.

6  Q.  Have any of the projects you've worked on in the past

7  encompassed that scope of activity, all five activities in one

8  enterprise?

9  A.  Well, it's typical for a dairy -- a dairy facility to also

10  have a farming operation and a trucking operation, yes.

11  Similarly, it's typical for a calf ranch operation to have a

12  calf ranch operation, a trucking operation and a farming

13  operation, yes.  Yes, I have operated businesses with all five

14  operations.

15  Q.  Can you tell me which projects you worked on that had all

16  five operations in one business?

17  A.  The Mensonides Dairy operation had all five.  A smaller

18  scale.

19  Q.  Okay.  That was my next question.  How many of these that

20  you've worked on had over 100,000 head of cattle?

21  A.  None have had more than 100,000 head of cows.  I have worked

22  on operations with more than 100,000 head of other livestock.

23  Q.  Was the other livestock milking livestock or were they

24  like -- I know there was a pig ranch that you worked on.

25  A.  Yeah.

1   Q.  I'm assuming there wasn't any milking as part of that

2   operation?

3   A.  Not pigs, no.

4   Q.  Okay.  Were any of the projects with large livestock

5   populations milking populations?

6   A.  I've been involved in probably eight or nine other dairies,

7   none as large as Millenkamp.

8   Q.  What's the largest dairy you've worked on before Millenkamp?

9   A.  Probably Mensonides.

10   Q.  And how many head did that dairy have?

11   A.  I think between 10 to 15,000 head.

12   Q.  With regard to the receiver -- the receivership process in

13   the state court, you mention there were three things you went

14   back to the court to get.  One was greater compliance with the

15   order.  The second one was access to bank accounts.  The third

16   was a revision of the order to allow you to file a bankruptcy

17   case rather than the Millenkamps.  Correct?

18   A.  Generally I think that's right.  There may have been

19   additional things but I think you've summarized them.

20   Q.  And those were kind of the broad general categories.  There

21   maybe were specific things within those.

22   A.  Correct.

23   Q.  The bankruptcy filing, you never did get that changed by the

24   court prior to the Chapter 11 cases that we're here for today

25   being filed.  Correct?

1  A.  Right.

2  Q.  The access to the banking accounts, soon after the

3  receivership was ordered, you or other Ampleo people were copied

4  on e-mails that were sent to the bank requesting they be added.

5  Correct?

6  A.  Correct.

7  Q.  And ultimately, after the state court ordered it be done

8  again, you were added to all of the bank accounts, correct?

9  A.  After Millenkamp -- after Mr. and Mrs. Millenkamp signed the

10  appropriate paperwork, we were added to the Mechanics Bank

11  accounts, yes.

12  Q.  And the access to the facilities that you sought, you

13  ultimately got that as well.  Correct?

14  A.  Ultimately, yes.

15  Q.  So two of the three things you went back to the state court

16  for you received, correct?

17  A.  We got access to those other things toward the end of March,

18  yes.

19  Q.  Were you -- on the bank accounts, were you also offered by

20  Ms. Nelson, essentially the bookkeeper, the controller for the

21  company, to use her log-ins and passwords in the meantime?

22  A.  The first day, she -- or the second day, she offered to

23  allow us to log in that time to the Mechanics bank account with

24  her log-in credentials so we could download bank statements.

25  Q.  And are you aware that she continued making that offer to

1   Ampleo personnel for weeks after that?

2   A.  I'm not aware of subsequent offers for that, no.

3   Q.  Did you -- you reviewed the documents that were filed in the

4   state court proceeding, the receivership proceeding?

5   A.  I did.

6   Q.  Including a declaration from Ms. Nelson indicating that she

7   had offered multiple times to let her log-ins be used?

8   A.  I saw that in her declaration.  She had never made that

9   offer to me.

10  Q.  But you don't dispute she made it to Ampleo personnel?

11  A.  I don't dispute that she made that declaration.  I have no

12  firsthand knowledge that she offered that to other Ampleo

13  personnel.

14  Q.  Okay.  How many Ampleo personnel were working on the

15  project?

16  A.  I think we had seven involved.

17  Q.  Do you know if those seven people requested the same thing

18  multiple times from Ms. Nelson?

19  A.  Possibly.

20  Q.  In March -- you testified mid March that the state of the

21  company was critical.  That's why you went back to the state

22  court again, correct?

23  A.  That's correct.

24  Q.  And in mid March, you were aware that the Millenkamp

25  entities and Rabo were negotiating potential DIP terms and plan

1  support agreements in a bankruptcy case, correct?

2  A.  I was aware of those discussions, yes.

3  Q.  You knew that Millenkamp people were actively preparing the

4  bankruptcy filing at that time?

5  A.  We had been told that, yes.

6  Q.  Okay.  You had been involved in discussions with candor

7  related to budgets for the bankruptcy case, correct?

8  A.  I'll also note Mr. Millenkamp told me that there's no

9  expletive way he's ever filing for bankruptcy and I was taking

10 him at his word.

11 Q.  You're also aware he filed a declaration with the state

12 court under oath saying he was filing bankruptcy, correct?

13 A.  Correct.

14 Q.  So which word were you believing?

15 A.  That's a great question.

16 Q.  Okay.  You had mentioned certain things that indicated the

17 debtor wasn't acting like an insolvent debtor.  One of them you

18 said you proposed selling nonperforming assets.

19 A.  Yes.

20 Q.  What did you propose be sold?

21 A.  Whenever I come into a situation -- an insolvent situation,

22 there's usually nonperforming assets.  For example, we're

23 currently receiver of a multi-unit restaurant chain.  As we look

24 at the chain with 20 or so locations, five of them are

25 unprofitable and we're asking ourselves the question would the

1    estate -- would the position of the estate improve by closing

2    those five locations.  Or, you know, with a wholesaler.  Are

3    there items being sold that have been sitting on the shelves for

4    years that aren't benefitting the estate?  They're nonperforming

5    inventory.

6            So one of the things that we looked at here or intended

7    to use Justin Roloffs to look at here was what are the

8    nonperforming assets of the estate.  It's typical in a dairy

9    situation that you've got cows that are on their fourth, fifth

10    and sixth lactation cycles that aren't producing.  They're

11    dragging down the average production of the herd and we ought to

12    consider the value or the benefit to the estate, the short-term

13    liquidity that would come by selling some of those nonperforming

14    assets.  Similarly perhaps --

15    Q.  Let me interrupt you just a bit.  My question was what did

16    you propose to Millenkamp to sell?  Can you tell me what was

17    proposed that he refused?

18    A.  We proposed that he sell beef steer.  We proposed that he

19    stop purchasing baby animals.  We proposed that we bring Justin

20    Roloffs in to help us evaluate what -- which of the replacement

21    herd or milk cows should be sold.

22    Q.  So the proposal to sell beef steer, there were beef steer

23    sold.  Correct?

24    A.  Not to the extent that we would have liked to have seen.

25    Q.  And if the beef steer had been sold, where would those

1   proceeds have gone?

2   A.   60 percent -- the agreement from the financing support

3   agreement would have provided that 60 percent would have gone to

4   Rabo AgriFinance, 40 percent would have come to the estate.

5   Q.   And that agreement was part of the receivership order

6   itself, correct?

7   A.   I don't recall if it was in the order or whether it was

8   pursuant to a separate agreement but they were entered about the

9   same time.

10  Q.   Okay.  Was there anything else that you proposed to

11  Mr. Millenkamp to sell?

12  A.   Well, the restrictions that were imposed upon us for access

13  to books, records didn't enable to us to make a deep analysis --

14  Q.   So no.

15  A.   -- on what could be sold.

16  Q.   So there wasn't any other proposals that he refused?

17  A.   Aside from those three that we've discussed here, no, not

18  that I can recall.

19  Q.   Okay.  Do you recall the receiver order requiring both

20  Mr. Millenkamp and yourself be involved in communications with

21  vendors and farmers and dairy buyers and that sort of thing?

22  A.   I recall -- if we want to the turn to the order, we can read

23  the language together.  I recall that there was to be some

24  collaboration there.  I don't recall the specific language.

25  Q.   So if we go to Exhibit 3020, page 13 -- well, actually page

1   12.

2   A.  I'm there.

3   Q.  Page 12, scroll down a little bit to the bottom paragraph.

4   This bottom paragraph starts what's known as the operation

5   agreement that was in that receiver order.  Correct?

6   A.  That's correct.

7   Q.  And if you'll go to the next page, the continued paragraph.

8   On that first line, there's a sentence that starts, "For so long

9   as the operation agreement is in effect --" which what was your

10  understanding on how long the operation agreement was to be in

11  effect?

12  A.  It was the 60-day exclusivity period.

13  Q.  Okay.  So as long as we're still in the pre-bankruptcy 60-

14  day period, the operation agreement's in effect.  Correct?  So

15  continuing that line, "The receiver and Mr. Millenkamp shall

16  jointly engage and communicate with milk customers, feed

17  vendors, farmers, other creditors and stakeholders."  Correct?

18  A.  Correct.

19  Q.  So when Mr. Millenkamp said, "I need to be involved in those

20  communications you're having with the vendors," he was asking

21  you to comply with the order.  Correct?

22  A.  I don't see it that way.

23  Q.  Okay.  Ultimately, the state court -- I think essentially

24  both parties brought this issue to the state court and said

25  that's not really working, Judge, and essentially agreed that

1    communications could happen without one another.  Correct?

2    A.  That sounds right.  I don't recall specifically the court

3    providing those instructions but it wouldn't surprise me if we

4    went back through the record and found that.

5    Q.  And I'll represent there wasn't any order -- written order

6    from the state court judge that said.  That was an -- it was

7    just sort of inherent in that discussion at the hearing that

8    day.

9    A.  That's fair.

10   Q.  Now, can we go to Exhibit 3014?  This is that draft

11   borrowing base that you put together.  If you'll scroll in there

12   down to -- not that far.  Right there.  On the "other than

13   cattle borrowing base," there's a producer payables line there

14   for $40,000.  Do you see that?

15   A.  $40 million, yes.

16   Q.  Sorry.  $40 million.  The lien creditors that you mention in

17   the footnote at the bottom are included in that 40 million,

18   correct?

19   A.  That's correct.

20   Q.  So the fact that they have liens wouldn't otherwise adjust

21   the numbers on this sheet, correct, because they're already

22   accounted for?

23   A.  I don't think that's accurate.

24   Q.  Okay.  What would be accurate?  If the amount owed to them

25   is already included in the deduction, what impact would the fact

1    that they have a lien have on the bottom line number?

2    A.  Yeah.  Let me strike that.  I think that is right.  Because

3    the advance percentage is reduced by 100 percent, I think your

4    statement is right.

5    Q.  Okay.  But then with regard to the Western States lease you

6    mentioned at the end, what was it that was being leased from

7    Western States?

8    A.  There were 43 roughly tractors.  These were primarily used

9    to haul feed and manure across the --

10   Q.  So they're loaders.

11   A.  Loaders.

12   Q.  Correct?

13   A.  Yes.

14   Q.  Tractors is a very broad term.  I'm trying to depict exactly

15   what this was.

16   A.  Yeah.

17   Q.  Loaders you said used to haul feed and remove manure,

18   correct?

19   A.  That's my understanding.

20   Q.  In other words, the loaders are what's lifting the feed into

21   the feed trailers.  They're not actually hauling the feed to the

22   pens, correct?

23   A.  Correct.

24   Q.  And removing the manure from the pens.

25   A.  That's correct.

1   Q.  Would you characterize those as necessary to continuing the

2   operation?

3   A.  I would character some of those as necessary.

4   Q.  Okay.  What was Western State's position at the time the

5   negotiations were happening regarding those loaders that were

6   present?

7   A.  They were threatening to and had begun to pick them up from

8   the facility.

9   Q.  Because the existing lease hadn't been paid, correct?

10  A.  They were several months in arrears.  Correct.

11  Q.  Okay.  And you -- your concern was the ability to continue

12  servicing that lease, correct?

13  A.  Yes.

14  Q.  What concern did you have for the ability to continue to

15  feed and clean up after the cattle?

16  A.  I had concern as to whether 43 were necessary.  I had

17  concern as to whether several year -- whether signing a lease

18  that would obligate the company for millions of dollars of cash

19  that we didn't have a means to pay was impairing the existing

20  creditors further.  I felt it was improper.  I felt it was

21  fraudulent to enter a lease agreement at the expense of other

22  creditors without a known ability to repay.

23  Q.  What would the impact on the creditors be if the cattle

24  didn't survive?

25  A.  It would be devastating.

 1  Q.  And that didn't play a concern?

 2  A.  It played a huge concern.

 3  Q.  What explorations did you make to find a replacement for

 4  those loaders?

 5  A.  We had several discussions with Western States as to what we

 6  could do to continue to operate the existing tractors without

 7  entering into a long-term lease agreement.

 8  Q.  And were any of those fruitful?

 9  A.  And we considered whether -- whether we needed 43.  Could we

10  get by with 25?  Those discussions were fruitful but they were

11  also undermined by discussions that were occurring at the same

12  time with the message that it's full steam ahead.  Let's keep

13  going.  So ultimately, they didn't bear fruit because there were

14  mixed signals in the market.

15  Q.  Okay.

16          MR. CHRISTENSEN:  Your Honor, that's all I have.

17          COURT:  Thank you, Mr. Christensen.  Cross-examination

18  by the United States Trustee?

19          MR. NAESS:  No.  Thank you, Your Honor.

20          MR. O'BRIEN:  None from Conterra.

21          COURT:  All right.  Any redirect?

22          MS. SCHWAGER:  No redirect.  Thank you, Your Honor.

23          COURT:  You may step down.  Thank you.

24          WITNESS:  Thank you.

25          COURT:  And does Rabo AgriFinance have additional

```
 1   witnesses that you'd like to call?

 2          MR. SCHOULDER:  Yes, Your Honor.  Rabo Finance would

 3   like to call Mr. Daniel Kokini, ITF consultant to the stand.

 4          COURT:  Please come on up to the stand and please

 5   remain standing.  Strike that.  I'll simply remind you that you

 6   were previously sworn in and you are still under oath so go

 7   ahead and have a seat.

 8                    FURTHER DIRECT EXAMINATION

 9   QUESTIONS BY MR. SCHOULDER:

10   Q.  Good morning, Mr. Kokini.

11   A.  Morning.

12   Q.  Could you state for the Court where you reside, Mr. Kokini?

13   A.  Where I reside?

14   Q.  State is fine.

15   A.  In New York.

16   Q.  And can you please tell us what your educational background

17   is, please?

18   A.  I have a bachelor's degree in finance with a concentration

19   in accounting -- financial accounting from the Pennsylvania

20   State University.

21   Q.  And what year did you obtain that degree?

22   A.  2006.

23   Q.  And after graduating, were you employed?

24   A.  I went to work at Bear Stearns in a capital markets

25   investment banking role.
```

1   Q.  And what was -- what were your functions in that role with

2   Bear Stearns?

3   A.  It was in equity and debt capital markets role so it was

4   advising companies in raising of equity and debt.

5   Q.  And at what point did you leave Bear Stearns?

6   A.  During the financial crisis, I was one of the few carrying

7   out boxes.  So 2008, I left Bear Stearns.

8   Q.  And where did you -- where did you move after Bear Stearns?

9   A.  So I did a brief stint at a company called Broadview

10  Networks and then after Broadview Networks, I went to Bank of

11  America Merrill Lynch also in an investment banking role.

12  Q.  And what year was that that you moved to Bank of America

13  Merrill Lynch?

14  A.  It would have been December, 2009.

15  Q.  And what was your title at Bank of America Merrill Lynch?

16  A.  I was an analyst.

17  Q.  And what group were you an analyst?

18  A.  The group was called corporate finance and restructuring.  I

19  focused primarily on restructuring finance.

20  Q.  And what was the scope of your duties in that role?

21  A.  So it was -- it was raising third party DIP and exit

22  financing.  So that is, you know, B of A putting up its money as

23  a third party DIP or a third party exit facility and advising

24  other companies that want to buy debtors in bankruptcy.

25  Q.  And in connection with that work, did you become familiar

1    with how DIP financing works and what types of provisions they

2    have in them?

3    A.  Yes.

4    Q.  And at what point did you leave Bank of America?

5    A.  I left in December of 2011 to go to CDG Group in January of

6    2012.

7    Q.  And what does CDG do?

8    A.  So CDG's no longer around per se.  It was acquired by FTI

9    Consulting in July of 2017.  My role has been the same

10   throughout -- you know, it's a restructuring advisory platform.

11   Q.  All right.  So you are currently with FTI Consulting?

12   A.  Correct.

13   Q.  And what's your title or position at FTI?

14   A.  I'm a senior managing director.

15   Q.  And what -- is there a particular group that you work with

16   in FTI?

17   A.  In the restructuring practice.

18   Q.  And what's your general kind of role as a senior managing

19   director in FTI's corporate and finance group -- corporate,

20   finance and restructuring group?

21   A.  So I advise companies and lenders in bankruptcy situations.

22   Obviously not both at the same time.  So I think I have a good

23   perspective of how debtors think and how lenders think.

24   Q.  Generally, are you -- withdrawn.  Generally, are you

25   representing debtors more or lenders?

1    A.  Only because I saw the data last year from 2019 through

2    September of last year, I spent 51 percent of my time

3    advertising lenders and 49 percent of my time advising

4    companies.

5    Q.  And of the matters that you worked on while at FTI, have any

6    of them been in the agricultural industry?

7    A.  Several.

8    Q.  And how would you -- withdrawn.  When you're working with

9    debtors in possession, do you have much experience working with

10   them on their debtor in possession financing arrangements?

11   A.  Yes.

12   Q.  And what's generally your role when you're working with a

13   debtor in connection with debtor in possession financing

14   arrangements?

15   A.  So when you're working for the debtor as the FA, step one is

16   always in sizing the amount of the need.  Sort of the first step

17   of that is what type of process do you expect which will guide

18   how long that process will take.

19         And so generally, you would build a budget that

20   reflects the process to come up with the overall size and that

21   would be step one.  From there, you would speak with your

22   existing lenders and, you know, you generally have an investment

23   banker involved who would go out and market and try and raise a

24   third party DIP financing, you know, from people who aren't your

25   existing lenders.

1  Q.  And what other -- what other -- you know, in your capacity

2  as a financial advisor for a debtor in possession, what other --

3  other than the sizing, what other considerations are you

4  evaluating when looking for a DIP financing?

5  A.  Yeah.  So when reviewing proposals, you're going to look at

6  the sizing relative to the overall need.  You know, what is

7  being offered relative to the overall need.  You look at the

8  economic terms, look at covenants, any other restrictions.

9  Q.  And when you're evaluating the sizing to the pricing to the

10  covenants, what are the types of metrics that you're measuring

11  to evaluate competing proposals?

12  A.  So you mean -- when you say metrics, do you mean comparing

13  interest rates and different fees and on the covenants, you

14  know, there might be -- you know, covenants can come in various

15  form in the financial covenants.  I think common ones are around

16  capex, minimum cash, variance reporting, et cetera.

17  Q.  Right.  And when you're considering a DIP financing

18  proposal, are you evaluating whether or not a company can repay

19  the DIP financing?  Is that a consideration?

20  A.  It is.

21  Q.  And what types of things would you consider in evaluating

22  whether a company can actually repay the DIP financing?

23  A.  So you're evaluating it -- in a plan context, you're

24  evaluating it in the sense that you want the reorganized

25  business to be able to sustain the capital structure when it

1    emerges.

2    Q.  And what would you typically evaluate, you know, whether

3    you're on the lender's side or the debtor's side, at the very

4    outset of evaluating proposals to determine whether the company

5    can actually repay?  What are you actually looking at?

6    A.  I mean if you're -- if you're organized and you're going

7    into the -- into a bankruptcy process organized with a plan in

8    mind, you know, you might -- you would already be thinking about

9    what is the leverage of the reorganized business and what's

10   their ability to cover cash, interest and principal.

11   Q.  Right.  And in a marketing process for DIP financing, as a

12   financial advisor for the company, if there are multiple

13   proposals, are you the person -- are you involved in the

14   discussions with the different proponents?

15   A.  Yeah.  There's always many people involved but yes.

16   Q.  And if there are multiple proposals, are you typically

17   talking to all of the proponents?

18   A.  You would talk to -- you know, it starts out wide and gets

19   skinny.  So you go out to everybody, you see what you get.  Some

20   people you throw away off the bat because the proposals don't

21   make sense and then you end up usually talking to two or three

22   and, you know, finalizing with one.

23   Q.  Right.  And what are you trying to do when you're talking to

24   all these different proponents?

25   A.  You're trying to negotiate everybody down to the terms that

1 are most favorable to the debtors.

2 Q.  Right.  You don't just ignore proponents, do you?

3 A.  You don't ignore them unless people are wildly off market.

4 I mean you'll go back and tell them they're wildly off market

5 and if they don't come back, then they're removed from the

6 process.

7 Q.  And have you had experience evaluating financing proposals

8 from a capacity other than as a financial advisor?

9 A.  I mean as, you know, someone who just pays attention in the

10 marketplace.  Like I said, a structuring person, yes.

11 Q.  Apart from your role as a senior managing director from --

12 with FTI, do you have any other jobs or roles with other

13 companies?

14 A.  So I'm on the board of directors of California Pizza

15 Kitchen.

16 Q.  And what is your title on that board?

17 A.  I am chair of the audit committee.

18 Q.  And are you an independent director or --

19 A.  I'm an independent director, yep.

20 Q.  And what is your role generally as the chair of the audit

21 committee for California Pizza Kitchen?

22 A.  It's working with the CEO and the CFO and the controller to

23 ensure that proper controls are in place.  I'm, you know, the

24 independent person that the audit team speaks to during the

25 audit process, you know, to update me and make sure the audit is

1    going smoothly and, ultimately, I'm responsible for making sure

2    that sort of an impartial audit has been completed.

3    Q.  Right.

4    A.  Represents the true facts of the company.

5    Q.  And in serving as an independent board member, are you

6    familiar with your fiduciary duties on the board?

7    A.  Yes.

8    Q.  And just generally, what's the general -- your general

9    understanding of what your fiduciary duties are?

10   A.  In that role, my fiduciary duties are to the stockholders of

11   the California Pizza Kitchen.

12   Q.  And what if -- what if California Pizza Kitchen was in

13   distress or insolvent or (inaudible) insolvency?  How would your

14   fiduciary duties change, if at all?

15   A.  If it was insolvent, then I would expect those duties to

16   change and I would owe obligations to -- I would owe a duty of

17   care and loyalty to the creditors.

18   Q.  And in -- withdrawn.  In your capacity as an independent

19   board member, have you ever had a role in evaluating financing

20   proposals?

21   A.  Yes.

22   Q.  And what was that role?

23   A.  In September of 2021, we successfully refinanced the post

24   emergence exit financing when CPK came out of bankruptcy in

25   November of 2020.

1  Q.  And what was -- can you generally describe the process for

2  that refinancing?

3  A.  Yeah.  So we -- so we hired an investment banker I think it

4  was late spring, early summer to go out and raise the financing.

5  They went out to 10's of parties, maybe 100, to first, you know,

6  see if anyone was interested in participating.  Then you see

7  who's participating.  They sign an NDA.  People who sign NDA's

8  get into data rooms.

9       Then based on the review of the data room, they might

10  make a proposal and it gets filtered along the way to ultimately

11  getting some IOI's.  You negotiate the IOI's against each other.

12  You remove people from the party, from the process and then, you

13  know, we were left with I think it was two, maybe three parties

14  that we were negotiating against each other at the end until

15  ultimately settling on I'll call them the winner.

16  Q.  Mr. Kokini, let's switch gears and talk about your role in

17  connection with Millenkamp Cattle.  Can you tell us when you

18  began working -- working on -- working on the Millenkamp matter?

19  A.  I don't know the exact date but I think it was in the summer

20  of last year.

21  Q.  And who were you working with at that time?

22  A.  Rabo AgriFinance.

23  Q.  And has that role now expanded?

24  A.  It has.

25  Q.  And that's to assist Rabo AgriFinance with the Chapter 11?

1    A.  Yes.

2    Q.  Have you had the opportunity to review the proposals for DIP

3    financing submitted by Sandton?

4    A.  Not the one that I understand was submitted last night but

5    the ones prior.

6    Q.  Last night.  Are you referring to the DIP agreement itself?

7    A.  Yeah, I don't know if terms have changed, yes.

8    Q.  But have you reviewed the different -- the two different

9    term sheets that Sandton's proposing?

10   A.  Yes, yes.

11   Q.  Okay.  Have you also reviewed the DIP budgets that have been

12   filed by the debtors?

13   A.  Yes.  The one that was filed -- what day is today?  Is today

14   Tuesday?  The one that was filed Sunday night because we were in

15   court all day yesterday.  I was able to review it in sort of

16   summary detail but not in greater detail.

17   Q.  Okay.  And have you formed a view just -- forgetting about

18   the DIP agreement that was filed yesterday evening and I

19   understand you have not had a chance to review that, just

20   talking about the proposals, the most recent proposals made by

21   Sandton as of I believe it was Saturday night, have you formed a

22   view as to that particular proposal?

23   A.  I have.

24   Q.  And could you share with the Court your view on the most

25   recent Sandton term sheet?

1    A.  I mean I think it's inferior to Rabo's proposal.

2    Q.  And why don't we turn to Exhibit 3032.  Do you have the book

3    in front of you, Mr. Kokini, or -- I know it's going up on the

4    screen as well but whatever you prefer.

5    A.  The screen's better.  Okay.

6    Q.  That's totally fine.

7    A.  Yeah.

8    Q.  This is the document that you assisted in authenticating

9    yesterday, right?

10   A.  Yeah.  I don't think -- we didn't change it, yeah.

11   Q.  All right.  Can you explain your view on the fees for the --

12   the difference in fees between Sandton and Rabo Bank?

13   A.  Yeah.  Rabo Bank's proposal has significantly less interest

14   in fees than Sandton's.  It has 5 and a half percent less

15   interest, 50 basis points less issuance fee, 75 basis points

16   less exit fee, 50 basis points less renewal fee and no unused

17   fee.

18   Q.  And what's the -- what's the variance between the Rabo Bank

19   and the -- withdrawn.  Mr. Kokini, my understanding from the

20   line that's called implied interest and fee costs that you

21   calculated what you believed to be the estimated fees and

22   interest using the commitment amounts and the various

23   percentages, how did you arrive at these numbers?

24   A.  Can we scroll down just a little bit so I can see the two

25   boxes at the bottom?  Thank you.  A little more.  So we -- if

1   you also don't mind just showing the footnotes.  Thank you.  So

2   you know, every term sheet was, you know, relatively vague.

3   They're not finalized documents so the best that we could, we

4   tried to follow the language of those term sheets.

5          So, you know, interest expense.  I think in the case of

6   the Sandton proposal, it was 25 million that would be funded on

7   the interim date and then there would be draws thereafter if

8   necessary in $5 million increments.

9          In Rabo's proposal, I believe, you know, prior to the

10  new budget coming out, it was a $15 million interim draw.  That

11  would be funded all at once and then 5 million draws thereafter.

12  So, you know, interest starts as soon as the money is drawn,

13  right?  So the interest is calculated based on when the money is

14  drawn.  The unused fee is calculated based on the difference of

15  the size and what's not drawn.  The upfront fee is based on the

16  total size and the exit fee -- the language is tricky on the

17  exit fee.  It's not very clear from the term sheet exactly how

18  it should be calculated.  What we did was to apply the

19  percentage against the commitment amount; not the full principal

20  amount after various (inaudible), interest and fees.

21  Q.  And based upon your analysis of the fees, what's the

22  variance between the Rabo Bank proposal and the Sandton

23  proposal?

24  A.  So if the case only goes through nine months -- if you can

25  scroll up a little bit, please, to the middle -- yeah, that's

1    fine.  If the case was only to go nine months, then -- just so I

2    can see the headers on this a little bit?  Right there.  Thank

3    you.  And then the variance in the fees is $3 million better for

4    the Rabo proposal versus the Sandton proposal.

5    Q.  All right.  Now, in this chart, you reference a minimum cash

6    covenant.  Can you explain what that is?

7    A.  So it's a requirement that the debtors maintain a cash

8    balance of 1 and a half million.  Unclear if that's daily, end

9    of the week, end of the month.

10   Q.  And from advising -- from advising debtors while you've been

11   with FTI, is it better or worse for the debtor to have a minimum

12   cash covenant or no minimum cash covenant?

13   A.  It's certainly better for the lenders.  I think for the

14   debtors, you know, it effectively reduces the commitment amount.

15   Q.  All right.  And if the DIP is used to fund the minimum cash

16   covenant, is that good or bad for the debtor?

17   A.  It's bad because it reduces the commitment amount.  I think

18   in this case, you know, it is a reduction to the commitment

19   amount because, you know, I understand their cash balance has

20   been below a million dollars and a half dollars for a while.  So

21   they have to borrow to fund the minimum cash.

22   Q.  What's your understanding?  Would they have to pay interest

23   and fees on that $1.5 million?

24   A.  On anything that's borrowed.

25   Q.  And just to be clear, Rabo Bank doesn't have a minimum cash

1    covenant, does it?

2    A.  Correct.

3    Q.  So that's -- that would weigh in favor of the Rabo Bank

4    proposal, wouldn't it?

5    A.  Correct.

6    Q.  Mr. Kokini, what's your view on a larger -- on the

7    difference in size of the facilities, a $45 million facility

8    versus a $35 million facility?

9    A.  On the face of it, 45 is bigger than 35 and that's a good

10   thing but when you look at the budget, the budget shows no need

11   for anything that large and so all that really does in effect is

12   increase the fees that are ultimately paid to Sandton.

13   Q.  Mr. Kokini, I want to turn your attention to Exhibit 3033

14   and before we discuss this document, let me ask you, are you

15   familiar with leverage ratios?

16   A.  Yes.

17   Q.  And could you explain to the Court what your understanding

18   of leverage ratios are?

19   A.  The math is, you know, the amount of debt relative to the

20   amount of EBITDA, EBITDA being a measure of operating cash flow

21   before the impact of working capital.

22   Q.  And as a financial advisor, what would you use a leverage

23   ratio for?

24   A.  To understand the debt burden on the business.

25   Q.  And is there any relationship between a leverage ratio and

1   cash flow?

2   A.  And cash flow?  No.

3   Q.  Just turning your attention to 3033 right now, do you

4   recognize this document?

5   A.  Yes.

6   Q.  And who prepared this document?

7   A.  My team and I prepared this document.

8   Q.  And what information did you use in preparing this document?

9   A.  So we used really whatever was -- I was going to say

10  publicly available.  That's not totally true.  We used the debt

11  balances from I believe it was Mr. Millenkamp's first day

12  declaration in support of the filing.  We used -- the EBITDA

13  came from -- 2023, the EBITDA came from a file that Rabo

14  AgriFinance received I think as part of its regular reporting

15  that showed income statement financial results for 2023 and then

16  in estimating a 2024 EBITDA because we don't have gap income

17  statement projections, you know, we came up with an estimate

18  backing into EBITDA using the cash flow budget.

19  Q.  All right.  Did you request any additional information from

20  the debtors in order to assist in refining this analysis either

21  directly or indirectly through counsel?

22  A.  I can't recall specifically.

23  Q.  And is this document a true and accurate reflection of your

24  analysis subject to the assumptions that you had to make you

25  just testified to?

1    A.  Yes.

2           MR. SCHOULDER:  Your Honor, subject to debtor's --

3    debtor's objections, we would move Exhibit 3033 into evidence.

4           COURT:  Any objections?

5           MR. CHRISTENSEN:  No, Your Honor.

6           MR. GOURLEY:  No, Your Honor.

7           MR. NAESS:  No, Your Honor.

8           COURT:  Exhibit 3033 is admitted.

9           MR. SCHOULDER:  Thank you, Your Honor.

10              (Rabo AgriFinance Exhibit No. 3033 admitted.)

11   BY MR. SCHOULDER:

12   Q.  Mr. Kokini -- Mr. Kokini, sorry, can you walk us through the

13   leverage summary of this exhibit, please?

14   A.  Yeah.  So the first column shows the amount of debt

15   outstanding as of the petition date.  As I said, the debt

16   amounts are pulled directly from Mr. Millenkamp's first day

17   declaration.  The $45 million represents the Sandton proposal.

18   Cash I believe also comes from the first day declaration.

19           So what it shows is total debt prior to filing --

20   immediately prior to filing of 292 million.  There was -- if you

21   scroll down a little bit, for 2023, the information that we

22   received showed -- a little bit lower -- an FY 23 EBITDA of 36

23   million so that 292 on 36 million represents I think it says

24   8.1 -- if you go back up to the top.  Sorry.  8.1 times

25   leverage.  So there's eight times as much debt on the business

1    as there is EBITDA as of the end of 2023.

2              When you include the impact of the full DIP facility,

3    that leverage increases to 9.3 times and that does not take into

4    account the impact of all of the PIK fees and interest.

5    Q.  Right.  And that's as of fiscal year 2023, correct?

6    A.  It's a mix.  I believe the debt balances in the filing are

7    more or less as of the end of March and FY 23 EBITDA is for

8    fiscal year 23.  As far as I know, the debt balances prepetition

9    did not change materially from the end of '23 to March except

10   maybe actually it would have gone down to pay MetLife's

11   principal.

12   Q.  Okay.  And is 9.3 times -- you know, what's your view on 9.3

13   times in your experience?

14   A.  It's a lot.  It's for sure in the zone of stressed to

15   distressed.

16   Q.  Now, on the right, we have estimated fiscal year 2024.  Can

17   you explain how you -- the significance, if at all, of the data

18   in the right-hand side, underestimated fiscal year 2024?

19   A.  Yeah.  So it's the same overall calculation using the same

20   debt balances.  Again, not including the impact of the PIK fees

21   and interest on the Sandton debt.  But we use a EBITDA that is

22   our calculation, not the debtor's calculation again backing into

23   an estimate based on the cash flow budgets.

24              So if you scroll down a little bit, please.  A little

25   bit.  Sorry.  Up to that middle box.  So we had received from

1   Kander the -- what was a long-term forecast that included full

2   year '24 cash flow results and, you know, we -- looking at that,

3   we try to isolate what's true operating cash flow not inclusive

4   of one-time items like various restructuring items and costs.

5          Now, the way the cash flow is shown, you know, it shows

6   MetLife's principal and interest coming directly out of the milk

7   checks.  It shows Rabo's interest as its own line in the cash

8   flow.  I can't recall if Conterra specifically within the milk

9   checks -- I think as some point it's deducted out of the milk

10  checks and at some point it's not.  But regardless, it doesn't

11  change the answer.  You know, we came up with a view of

12  operating cash flow excluding one-time items and then added back

13  the interest and principal that would not be factored in to

14  calculating EBITDA.

15         In addition, I believe it's my understanding of that

16  forecast that effectively all of the expenses are paid COD

17  through August 11 and then August 11, there's assumption that

18  the debtors will get some working capital benefit from its

19  vendors, some normal case AP expansion.  It doesn't appear to be

20  anything out of the ordinary course but that's worth about $10

21  million.

22         So when we add back that working capital impact to just

23  get to the true expenses, in this case I add it back as a

24  deduction because it's a benefit in the cash flow, we get to an

25  EBITDA of 2 million.

1      So all of those debt numbers, the 292 to the 337, you

2   know, relatively to a EBITDA of 2 million results in some large

3   leverage multiples.

4   Q.  So just the ones on the right?

5   A.  Yes.

6   Q.  And does the analysis that you have in the leverage summary,

7   does that give you any concerns with respect to the Sandton DIP?

8   A.  Yeah.  I mean leverage that high is not sustainable.

9   Q.  In terms of the refinance ability of the current capital

10  structure, do you have any views on that?

11  A.  My view is it's -- it would be very hard to refinance this

12  full capital structure.  Can you scroll up a little bit, please?

13  Q.  Can you explain why?

14  A.  It's unlikely that any new lender would want to step in to

15  this amount of leverage that points to at best stressed

16  nature -- stressed business if not distressed.

17  Q.  And in terms of the ability to refinance or repay the $90

18  million approximately owed to Rabo, does the Sandton proposal on

19  the leverage give you any concerns?

20  A.  It just makes it harder to pay off the already matured RLOC.

21  Q.  And in terms of evaluating a DIP proposal, what -- in terms

22  of its ability to get repaid, what type of information would you

23  consider here?

24  A.  Can you repeat the question?

25  Q.  I'll rephrase that.

1   A.  Yeah.

2   Q.  In evaluating whether or not the Sandton proposal is capable

3   of being repaid, what information would you want to consider to

4   make that evaluation?

5   A.  I think if -- if this is going down a plan process, right, a

6   reorganization, then I would expect there to ultimately be a

7   disclosure statement with, you know, valuation and a set of

8   projections and it's that type of information that supports the

9   going concern viability of the business.  I think given that

10  we're talking about priming existing lenders, we're essentially

11  having that conversation today and that detail doesn't exist

12  that I've seen.

13  Q.  Okay.  And in your experience, do you typically have access

14  to information at the outset of a case when incurring debtor in

15  possession financing that would allow you to evaluate whether

16  DIP can be repaid?

17  A.  You would generally have at least some of that, yeah.

18  Q.  And do we have -- do you have any access to that information

19  right now?

20  A.  I don't have it.

21  Q.  Switching gears, are you familiar with the concept of an

22  equity cushion?

23  A.  Yes.

24  Q.  And could you generally provide the Court with your

25  understanding of what an equity cushion is?

1   A.  It's, you know, value that you would expect to receive

2   beyond the amount of the debt, you know, in the overall value of

3   the business.

4   Q.  So for real estate assets, typically what -- what type of

5   information would be look at to establish whether there's an

6   equity cushion?

7   A.  I think you'd want as recent an appraisal as possible would

8   be one thing.

9   Q.  And what's the reason for that?

10  A.  I'm not -- I'm not a real estate expert but, you know,

11  market conditions are always changing.  You know, I understand

12  interest rates play a big role in the value of real estate.

13  What happens to the value of the land over time from the time

14  you do one appraisal to the other, whether it's the quality of

15  the land or the infrastructure that's on it, I think there are

16  variety of factors that influence the value of the land.

17  Q.  And you just mentioned market conditions.  What would you

18  typically do to make sure that you understand what the value of

19  the real estate is in connection with market conditions?

20  A.  I would rely on that appraisal.

21  Q.  And would you seek -- you mentioned that you're not an

22  expert in real estate.  In order to get that expertise, what

23  would you do?

24  A.  I would hire a broker to at least evaluate the land and the

25  value of the land and I would get an appraisal.

1    Q.  And you're not aware of any broker being engaged by the

2    Millenkamp debtors, are you?

3    A.  I'm not aware, no.

4    Q.  What about personal property?  What would you look for in

5    evaluating the value of personal property for purposes of an

6    equity cushion?

7    A.  Again, similarly, you know, an appraisal, whether it's going

8    concern use of PP&E or, you know, orderly liquidation, net

9    liquidation value type appraisals.

10   Q.  Okay.  You're not aware of Mr. Millenkamp seeking to

11   liquidate his assets, are you?

12   A.  No.  I think that that's the last thing that he would want.

13   Q.  And so what would you look for in terms of information to

14   determine value on a going concern basis which is what

15   Mr. Millenkamp intends to do?

16   A.  Of the full business?

17   Q.  Yes.

18   A.  Two things.  You know, you could run a full M and A process

19   to gauge market interest.  At a minimum, you would at least have

20   an independent third party valuation of the business on a going

21   concern basis.

22   Q.  Could we turn to Exhibit 3039?  Mr. Kokini, are you familiar

23   with this document?

24   A.  Yes.

25   Q.  And can you tell us what this document is?

 1   A.  I believe it's the credit agreement -- I guess draft credit

 2   agreement for the Rabo proposal.

 3        MR. SCHOULDER:  Your Honor, I spoke with Mr.

 4   Christensen earlier and we were in agreement that this would --

 5   this be admitted into evidence unless any party has any

 6   objection.

 7        COURT:  Any objection to the admission of Exhibit 3039?

 8        MR. NAESS:  No, Your Honor.

 9        MR. GOURLEY:  No, Your Honor.

10        COURT:  Exhibit 3039 is admitted.

11          (Rabo AgriFinance Exhibit No. 3039 admitted.)

12        WITNESS:  I guess it says here also cash collateral

13   use.

14   BY MR. SCHOULDER:

15   Q.  Could you -- strike that.  Could you turn to section 6.13

16   which is page 44 of the document; not the PDF which the PDF is

17   page 56.

18   A.  Which exhibit is this, Mr. Schoulder?

19   Q.  This is 3039, Exhibit A.  It's up on the screen as well.

20   A.  Okay.

21   Q.  Are you familiar with this provision?

22   A.  I am.

23   Q.  And could you describe to the Court what this provision is?

24   A.  It's a provision that would require the debtors to provide a

25   budget as a part of the financing.  That budget would then be

1   updated periodically.  I think what's proposed here is a 13-week

2   budget that would be updated again at the end of that 13 weeks.

3   Q.  And is this a typical provision that you're used to seeing

4   in DIP financing?

5   A.  Yes.

6   Q.  Are you aware of any other financial covenants in the DIP

7   agreement?

8   A.  No.

9   Q.  Now, if we could just turn --

10  A.  There is -- I mean to maybe just to be clear, there is

11  variance reporting which could be considered a form of financial

12  covenant.

13  Q.  They're related.  Is that --

14  A.  Yes.

15  Q.  Okay.  Could we now turn to the Exhibit B in the back?  It's

16  on page 108 of the PDF.  Are you familiar with this document

17  which is Exhibit B?

18  A.  I think these are certain requirements within the cash

19  collateral motion; is that right?  I think so.

20  Q.  Yes.

21  A.  Okay.

22  Q.  Mr. Kokini, are you -- these aren't part of the DIP

23  covenants, are they?

24  A.  No.

25  Q.  And is it your understanding that these would -- that these

1    covenants would exist whether or not Rabo Bank is selected as a

2    DIP financing lender?

3    A.  That is my understanding.

4    Q.  So these are different covenants?

5    A.  Yes.

6    Q.  Could you walk us through the first covenant?

7    A.  So the first is, you know, a requirement to provide

8    borrowing base reporting weekly.

9    Q.  And what's the purpose of this covenant?

10   A.  To be able to monitor the underlying collateral of the loan.

11   Q.  And the -- you see down below, you see covenant regarding

12   cattle sale proceeds?  It's on no. 3.

13   A.  Scroll down further, please.  Yep.

14   Q.  Are you familiar with that provision as well?

15   A.  Yes.

16   Q.  Could you explain what this provision is?

17   A.  So it's a requirement that as -- I might get some of the

18   terminology wrong.  I'm not a dairyman or cattle rancher but

19   that as the cattle and steer are sold that those proceeds are

20   put in a segregated account.  Those proceeds can be used to then

21   effectively reinvest in new cattle and steers to replenish the

22   borrowing base.

23   Q.  So if steers are sold, are the -- if the steers are sold,

24   are they required -- and Mr. Millenkamp purchases new steers,

25   new cows, what happens?

1   A.  So the net effect you think should be zero.  You know, I

2   think the idea is the purpose of the covenant is to simply

3   ensure that cattle are not liquidated and, you know, the goal is

4   to as those -- as those cattle are sold that the money is

5   reinvested back into that part of the business again which

6   Mr. Millenkamp said is, you know, the best part of the business

7   right now given what's happened with milk prices.

8   Q.  So if Mr. Millenkamp under this provision sells steers and

9   purchases new cattle, there's no impact to the business under

10  this provision?  Is that your testimony right now?

11  A.  I would not expect there to be.

12  Q.  Okay.  And this doesn't require Mr. Millenkamp to use steer

13  sale proceeds to pay Millenkamp when he's purchasing steers,

14  does it?

15  A.  Can you say that again?

16  Q.  So if Mr. Millenkamp is liquidating collateral, what's the

17  net effect of this provision?

18  A.  If he's liquidating collateral, then there's cash that gets

19  built up into a segregated account.

20  Q.  And what happens with the cash then?

21  A.  Can we scroll down a little bit?  No, right there is fine.

22  So, you know, it says funds deposited in the cattle sales

23  reserve account shall be held for the benefit of the prepetition

24  RLOC secured parties for distribution to such parties on the

25  effective date of the debtor's plan of reorganization or in

 1    connection with debtor's plan of liquidation or as may be

 2    otherwise ordered by this Court.  So it keeps the money

 3    segregated until there are final distributions made in the case.

 4    Q.  And based upon the budget that you've reviewed prepared by

 5    the debtors, is there any intent to liquidate cattle?

 6    A.  I don't believe so.

 7    Q.  All right.  So I want to bring you back up to the DIP

 8    agreement.  So to review one more covenant with us and so we're

 9    going to go back to -- it's page 45 on the document and it's

10    page 57 on the PDF, please.  If you scroll down to 16.4, please.

11    Could you explain what this is, Mr. Kokini?

12    A.  So these are milestones in connection with the DIP

13    financing.

14    Q.  And what are these milestones?

15    A.  So there are two milestones -- two sets of milestones I

16    guess.  The first set is, you know, milestones just to ensure

17    that the DIP agreement is ultimately entered into on a final

18    basis.  And then the second mile stone as a group is a milestone

19    towards a confirmable plan of reorganization.

20    Q.  And in your experience with working with DIP agreements in

21    the past, is this a typical milestone you'll see?

22    A.  Yes.

23    Q.  Are there usually more or less milestones?

24    A.  In a situation where there is not, you know -- where there's

25    not a lot of planning going into bankruptcy which I think this

1  qualifies as that, you would usually also see milestones, you

2  know, towards a sale process.  So you would do what we call a

3  dual track.  You would run a sale process while at the same

4  time, you know, drafting plan documents and moving towards a

5  reorganization.

6  Q.  So the Rabo Bank milestones do not require a sale process or

7  a liquidation process.

8  A.  Correct.

9  Q.  Could you please turn to page 43 of the PDF?  And I'm going

10  to call your attention to paragraph (iii) -- I'm sorry, (ii).  I

11  apologize.  Based upon your reading of this provision and

12  specifically the first three sentences of (ii), what is your

13  understanding of Rabo Bank's proposed priming in terms of the

14  timing?

15  A.  That it would only occur on a final order.

16  Q.  Are you aware of how the Sandton proposal handles priming in

17  terms of timing?

18  A.  I understand from the term sheet that it would be priming on

19  an interim basis.

20  Q.  Okay.  And we're going to go to page 38 of the PDF and I'm

21  going to call your attention to paragraph H, please.  Can you

22  tell us what this provision is, Mr. Kokini?

23  A.  I believe this is the subsection that allows the maturity to

24  extend.

25  Q.  Okay.  And who has the choice to extend the maturity date in

1  this provision?

2  A.  The debtors.

3  Q.  And in this provision, does Rabo Bank have the discretion to

4  deny that extension?

5  A.  I don't believe that they do.

6  Q.  Okay.  Let's now move to Exhibit 3040.

7  A.  The computer says noon.  I think the clock says 11:00.  I'm

8  just curious what the actual time is.

9        MR. CHRISTENSEN:  The computer's on central time.

10        WITNESS:  Okay.

11        MR. SCHOULDER:  You won't miss your flight unless Mr.

12  Christensen has something to do with it.

13        Your Honor, I spoke with Mr. Christensen earlier.  This

14  is -- the debtor's filed a draft DIP agreement last night and he

15  and I have agreed that this can be moved into evidence unless

16  anybody has an objection.

17        COURT:  Are there any objections?

18        MR. NAESS:  No objection, Your Honor.

19        MR. GOURLEY:  No objection, Your Honor.

20        MR. CHRISTENSEN:  No objection.

21        COURT:  Without objection, the Court will admit

22  Exhibit 3040.

23              (Rabo AgriFinance Exhibit No. 3040 admitted.)

24  BY MR. SCHOULDER:

25  Q.  Okay.  Mr. Kokini, I'm going to put you on the spot.  I know

1    you have not had a chance to review this agreement.  We heard

2    testimony yesterday that it wasn't available and it was filed

3    last night.  So I'll take it easy on you in terms of your

4    familiarity with these provisions.  Could you please turn to

5    page 9 of this document -- of the PDF?  I'm sorry.  I've got the

6    wrong page reference.  It's actually -- yeah.  All right.  So if

7    you scroll down to the definition of asset sale, please?  Could

8    you take a look at this provision and tell me what it

9    encompasses?

10   A.  All right.  Don't judge my reading speed, please.  Can I see

11   the romanette, please?  Are there more after the third?  Okay.

12   So what's the question?

13   Q.  Would the sale of livestock fall within that provision?

14   A.  I mean it's all written pretty broadly.  It appears that

15   asset sale basically includes the sale of any asset but I am

16   reading this for the first time.

17   Q.  Okay.  Can we turn to page 36 of the PDF?  I'm going to call

18   your attention to section 2.06A.  Could you take a look at

19   section 2.06A and tell me what -- what this requires if there's

20   an asset sale under the agreement?

21   A.  It says that any receipts by any borrower shall prepay the

22   loans.  Proceeds from asset sales have to go to pay off the

23   loan.

24   Q.  So under this provision, the sale of steers would have to go

25   to be repaid to go to pay down the DIP loan, correct?

1    A.  Correct.

2    Q.  And they could not be utilized in the business.  Is that

3    right?

4    A.  Correct.

5    Q.  Let's move down to -- stay with me on 2.06.  Just move down

6    to 2.06D, please.  All right.  To save you the time, I'm going

7    to read to you what the definition of extraordinary receipts is

8    and then to make this a little faster, extraordinary receipts

9    means -- I'm going to skip over A and it's going to go to sub

10   part B of the definition of extraordinary receipts.  "After

11   approval of the application thereof to the obligations pursuant

12   to the final DIP order, all proceeds of avoidance actions."  So

13   that's the definition of extraordinary receipts, Mr. Kokini.

14   What does this provision require that the debtors to do with

15   proceeds of avoidance actions?

16   A.  It says those proceeds shall prepay the loans as set forth

17   in subsection D.

18   Q.  Are you aware of whether the Rabo Bank DIP facility

19   requires -- requires a reason on avoidance actions?

20   A.  I don't believe that it does.

21   Q.  And it doesn't have a lien on proceeds of avoidance actions

22   either, does it?

23   A.  I don't believe that it does.

24   Q.  If we could move to page 16 -- I'm sorry.  Strike that I'm

25   going to skip over some stuff to spare you.  If we can go to

1   page 35 of the PDF, please?  Down to section 2.04.  Could you

2   please read this provision to yourself?

3   A.  Okay.

4   Q.  How is the renewal extension in the Sandton proposal

5   different from the extension provision in the Rabo Bank DIP

6   proposal?

7   A.  So it says, "Any such extension shall not be effective

8   unless the lender provides a written consent to such extension

9   which may be withheld in its sole -- sole and absolute

10  discretion."  So it's -- the renewal in the Sandton proposal is

11  contingent on Sandton agreeing to that extension in their sole

12  and absolute discretion.  In the Rabo Bank proposal, it's at the

13  debtor's discretion.

14  Q.  And the Rabo Bank proposal, does Rabo Bank have discretion

15  to deny that request if made?

16  A.  I don't believe so.

17         MR. SCHOULDER:  I have no further questions, Your

18  Honor.

19         COURT:  Cross-examination by counsel for MetLife.

20         MR. GOURLEY:  No, Your Honor.

21         COURT:  Counsel for the debtor.

22                      CROSS-EXAMINATION

23  QUESTIONS BY MR. CHRISTENSEN:

24  Q.  Mr. Kokini, I want to start with Exhibit 3032.  This is the

25  comparison chart that you put together of the different DIP

1  proposals, correct?

2  A.  Yes.

3  Q.  Correct?

4  A.  Correct.

5  Q.  Is there -- is there -- this chart is tracking the financial

6  terms of those proposals.  Is that fair to say?

7  A.  Correct.

8  Q.  It doesn't really track the non-financial elements of the

9  different proposals.  Is that fair?

10  A.  Correct.

11  Q.  In your testimony, you said that you believed Sandton's

12  proposal was inferior to Rabo's.  Was that based purely on an

13  economic analysis of the two proposals?

14  A.  It's based on the economic elements as well as the financial

15  covenants.

16  Q.  Okay.  Anything else out of those two elements?

17  A.  I'll call it a learning -- because I didn't review the

18  agreement until literally just now.  So I think the ability to

19  renew appears to be more favorable in the Rabo proposal as well.

20  Q.  Okay.  On this chart, you've got the section for the minimum

21  cash covenant, the million 5 that Sandton required.  Do you see

22  that part?  It says -- yeah, right there in the center sections.

23  A.  Yes.

24  Q.  And I think your testimony was that that million 5 decreases

25  the commitment amount of the loan.  Did I summarize that okay?

1   A.  I think so.  I would also add if I didn't then to the extent

2   it needs to be borrowed to fund it.

3   Q.  There's interest and expenses that would be charged,

4   correct?

5   A.  Yes.

6   Q.  And those interest -- I mean that's included in the issuance

7   fee that you've got calculated above, correct?

8   A.  The issuance fee is on the full commitment.  The exit fee is

9   on the full commitment.  The unused fee is the difference

10  between what's drawn and what's committed and the interest

11  expense is just on what's been funded.

12  Q.  Correct.  So if the initial interim funding was used in part

13  to pay that million 5, the interest that's occurring on that

14  million 5 is part of the 675 issuance fee.

15  A.  Correct.  That's right.

16  Q.  Right?

17  A.  That's right.

18  Q.  Or excuse me.  Part of the PIK interest expense.

19  A.  There is no incremental interest from 1 and a half.

20  Q.  There's no additional --

21  A.  Yeah.

22  Q.  Okay.

23  A.  In that scenario.

24  Q.  What's your understanding of what would happen with that

25  million 5 when the loan is repaid?

1   A.  The covenant or the --

2   Q.  The funds much the money in the account.  Can the debtor use

3   it?

4   A.  Yes, I believe they could.

5   Q.  So it doesn't really decrease the funded amount.  It just

6   postpones the use of it, a million 5, till later, correct?

7   A.  Yeah, I think that's fair.

8   Q.  Now, if you'd jump to Exhibit 3033.  This is the leverage

9   analysis that you did, correct?

10  A.  Correct.

11  Q.  And the analysis here contemplates a $45 million DIP

12  facility, correct?

13  A.  Correct.

14  Q.  So the assumption is that's Sandton's DIP facility.

15  A.  Correct.

16  Q.  Did you do a similar analysis for Rabo's DIP facility?

17  A.  I did not.

18  Q.  And calculate what Rabo's estimated '24 leverage coverage

19  would be?

20  A.  I did not.

21  Q.  Okay.  And in that calculation, you're using an EBITDA -- I

22  may not use the proper terminology.

23  A.  That's fine.

24  Q.  But basically the leverage is based on an EBITDA number,

25  correct?

84

1   A.  Yes, that's right.

2   Q.  In part at least.  And you reviewed the 2023 financial

3   reports from the debtor, correct?

4   A.  I wouldn't say the reports plural.  We have -- FTI received

5   the 2023 income statements for fall 2023.

6   Q.  And you were able to either extract or see on those a $36

7   million EBITDA for 2023?

8   A.  Correct.

9   Q.  Okay.

10  A.  I believe it was calculated by the debtors.

11  Q.  Did you review any financial documents from prior years?

12  A.  No, no, I don't have them.

13  Q.  So for 2022, you wouldn't know what the EBITDA for 2022 for

14  the debtor was?

15  A.  No.  I haven't seen them.

16  Q.  Okay.  And then the 2024 EBITDA that you calculated is in

17  that little box there in the middle of the page, correct?

18  Scroll down just a little bit.

19  A.  Yes.  That's right.

20  Q.  Right here?  Correct?

21  A.  Correct.

22  Q.  And the EBITDA you calculated as essentially 2 million for

23  2024 estimated?

24  A.  Correct.

25  Q.  Is EBITDA a cash basis accounting tool or an accrual basis

1   accounting tool?

2   A.  Accrual.

3   Q.  Okay.  And in calculating that EBITDA, what did you use to

4   calculate that?

5   A.  So we -- for 2024, the only financial information we have is

6   the set of weekly cash flows from I guess it's April 1 or end of

7   March through the end of -- through August 11 and then I think

8   it's monthly -- I don't know if there's a stub period for

9   August.  I just can't recall but then it's monthly thereafter

10  for the rest of 2024.

11       So we used that cash flow and, as I said earlier, we

12  came up with a view of what's, you know, normal operating cash

13  flow.  I think the way it's being shown now sort of includes all

14  the disbursements together is my recollection again not having

15  the budget in front of me.  So we take out things that are one

16  time or specific to the restructuring to get to a view of

17  operating cash flow in that period.

18       I did not say earlier but I will say it now.  We then

19  annualize it.  It's on the page here.  We annualize that figure.

20  You know, our understanding is that the business is not very

21  seasonal so annualization should be an appropriate methodology

22  and then we add back principal and interest payments that are

23  paid to MetLife, to Rabo Bank and Conterra through that cash

24  flow and we then subtract the benefit of the vendor contraction

25  to get to the true expenses.

1    Q.  So the cash flow budget that you used, is that -- is that in

2    the record at all?

3    A.  The period from March -- it was either end of March or

4    beginning of April through August 11 is in the record.  The

5    period after that I don't believe is in the record.

6    Q.  Okay.  And the period from March --

7    A.  When you say "the record," you mean -- sorry.  When you say

8    "the record," do you mean --

9    Q.  Exhibits that have been admitted.

10   A.  I don't recall if Ms. Churchill discussed the first budget

11   that was filed in addition to what was filed Sunday night.  But

12   this is based on the one that we had that was filed initially.

13   Q.  With the motion.

14   A.  Yes.

15   Q.  Okay.  And that one only went through August?

16   A.  Through August 11, correct.

17   Q.  On that budget through August 11, there aren't principal

18   payments listed for Rabo, MetLife or Conterra, correct?

19   A.  They are not listed.  MetLife's principal and interest are

20   paid directly out of the milk checks.  So if the budget shows a

21   net milk check line --

22   Q.  And that's for principal and interest or just interest on

23   that budget?

24   A.  That net milk check line is lower, again, not having it in

25   front of me.  Recollection is there's a methodology change that

1    happens after August 11 in the cash flow that we're using but

2    it's getting -- it's getting to the same place.  So the net milk

3    check line --

4    Q.  So let me stop you and put an exhibit up on hear.

5    A.  Sure.

6    Q.  Can you go to Exhibit 3015?

7         MR. CHRISTENSEN:  Your Honor, this is one of Rabo's

8    exhibits, 3015.  It hasn't been admitted.  At this point, I

9    think there's a stipulation to admit it.

10        COURT:  All right.  Exhibit 3015.  It's been offered.

11   Any objections?  Exhibit 3015 is admitted.

12             (Rabo AgriFinance Exhibit No. 3015 admitted.)

13   BY MR. CHRISTENSEN:

14   Q.  Okay.  Is this the sort of longer term budget that you were

15   looking at that went beyond August?

16   A.  For the period beyond August so yes.  Yes, it is, that's

17   right.

18   Q.  Okay.  Now, if you go back -- well, you're on the first

19   page.  So on that page, scroll down -- well, in that first

20   category, there's net milk checks.  Do you see that?

21   A.  Yes.

22   Q.  And there's some later pages that describe how that net is

23   calculated.

24   A.  Correct.

25   Q.  Correct?  Scroll down a little on the first page.  There is

1    there a Rabo interest payment, correct?

2    A.  Correct.

3    Q.  Those were proposed to be paid not directly through the milk

4    company but by the debtor, correct?

5    A.  I believe that's correct.

6    Q.  Okay.  And this one is Rabo interest payment.  Correct?

7    A.  That's what the line says, yes.

8    Q.  Okay.  Now, go down a few pages to the milk part.  Keep

9    going.  Keep going.  Stop.  So on this page which is page 7 of

10   the exhibit, this is where the net milk check calculation is,

11   correct?

12   A.  Correct.

13   Q.  And it has Conterra and MetLife listed there?  There's a

14   little yellow box next to them, correct?

15   A.  Correct.

16   Q.  And that yellow box is interest only.  It's not a principal

17   payment, correct?

18   A.  Yes.

19   Q.  For at least the weeks depicted here.

20   A.  Yes.

21   Q.  Now, if you go a few more pages.  You're going too fast.  I

22   can't watch them.  Keep going.  Go back up.  I'm trying to get

23   to the part that shows where the monthly split is.  Where August

24   becomes September, October, et cetera.  Keep going.  Go back.

25   Right there.  So right here, we start the month one, month two

1    on the milk calculation, correct?

2    A.  Correct.

3    Q.  And starting with the month of August so the green section

4    at the top, the interest only line, there's nothing there

5    anymore, correct?

6    A.  Correct.  That's right.

7    Q.  Below that, there's Conterra interest and Conterra

8    principal, MetLife interest and Met principal.  Correct?

9    A.  Where do you see the Conterra principal and MetLife

10   principal?

11   Q.  Well, where Conterra and MetLife interest only was before,

12   that just has dashes now.

13   A.  Yep.

14   Q.  Directly below that, you've got Conterra interest and

15   principal and MetLife interest and principal.

16   A.  Yes, that's right.

17   Q.  Correct?

18   A.  Correct.

19   Q.  So starting in August or September is when the principal

20   payments start.

21   A.  Correct.

22   Q.  Right?  So to calculate on your maturity date sheet, that

23   annualized information, you were essentially using the end of

24   August till the end of the year 2024, correct?

25   A.  Correct.

```
 1   Q.  And extrapolating that into the beginning part of the year.
 2   Correct?
 3   A.  Correct.
 4   Q.  But there wasn't any principal payments made in the
 5   beginning part of the year for the first eight months.  Correct?
 6           MR. SCHOULDER:  Objection.  Just Matt, can you clarify
 7   what year?
 8           MR. CHRISTENSEN:  Well, we're talking about 2024.
 9           MR. SCHOULDER:  I just wanted to make sure.
10           WITNESS:  That appears to be right, yeah.
11   BY MR. CHRISTENSEN:
12   Q.  Okay.  So the number that you've got here for 9 million and
13   principal interest -- principal and interest of 18 million,
14   that's incorrect, right?  It should be higher.
15   A.  I guess I'm not prepared to say yes or no.
16   Q.  Okay.  But in any case, the cash flow budget is a cash based
17   system, correct?
18   A.  Correct.
19   Q.  It's not an accrual system.
20   A.  That's correct.
21   Q.  So you're using a cash basis to come up with a EBITDA that's
22   an accrued based number, correct?
23   A.  That's the starting point, correct.
24   Q.  Okay.  What else did you do to use that accrual base number
25   as a basis for the leverage calculation?
```

1    A.  All right.  So there is a section in the model that shows

2    the expenses and then the timing of when those expenses are paid

3    through and including the week ended August 11.  I believe all

4    the expenses or virtually all of the expenses are paid COD.  So

5    the expense equals the cash in the period.  After August 11, the

6    cash payments do not equal the expense because it assumes a

7    degree of sort of trade expansion.  You get terms from your

8    vendors.  So we -- by taking out the working capital benefit for

9    the trade, we're going back to the expense -- the accrual based

10   expense.

11   Q.  So if the calf payments during the 130-day period through

12   August also included payment to critical vendors on prepetition

13   amounts, in other words, not a COD basis, how would it account

14   for that?

15   A.  So we took critical vendors payments out in the calculation

16   of our sort of operating cash flow.

17   Q.  Okay.  On the top part of this chart, you reference I think

18   the 9.3X for 2023 as indicating a stressed or distressed

19   company.  Correct?

20   A.  Correct.

21   Q.  Would it surprise you that a Chapter 11 debtor is a stressed

22   or distressed company?

23   A.  It would not.

24   Q.  That's normal, correct?

25   A.  Correct.

1   Q.  So it's not entirely surprising that trying to get

2   post-petition exit financing, you're going to be a distressed

3   company.

4   A.  The goal is when you -- yeah.  Post-petition DIP financing,

5   yes, you'll be a stressed or distressed business.

6   Q.  Okay.  Now, if you'll go to Exhibit 3039.  In that exhibit,

7   if you'll jump to page 25 I think.  Keep going.  Scroll to the

8   bottom.  Well, the next page.  26.  So 2026 -- or page 26 starts

9   definitions of what matured default means under the Rabo DIP

10  agreement, correct?

11  A.  Uh-huh.

12  Q.  If you'll scroll to paragraph R or subparagraph R.  Will you

13  read that paragraph just to yourself?

14  A.  Sure.  Would you mind -- can I see the lead-in?  You know,

15  the first paragraph before the small letters?

16  Q.  So back where the maturity --

17  A.  Yeah.

18  Q.  Yeah.

19  A.  Just because it -- okay.  Can you go back to R, please?

20  Q.  What's your understanding of what subparagraph R means?

21  A.  It means that if the debtors -- if the debtors support

22  anyone's motion to effectively disallow the financing, the loan

23  agreement or challenge any of the liens that are confirmed by

24  the Court, then that would result in a matured default.

25  Q.  So an objection to Rabo's claim or their prepetition liens

1  would be a default under the DIP agreement whether that

2  objection's by the debtors or whether the debtor supports

3  someone else doing it, correct?

4  A.  After the Court has confirmed this on a final basis, yes.

5  Q.  Now if you'll scroll down to X.  So paragraph X.

6         MR. SCHOULDER:  Objection.  Actually, I just -- Mr.

7  Christensen just misstated the provision that he was reading

8  from.

9         MR. CHRISTENSEN:  Well, he already answered the

10  question so I don't know what the objection is.

11        MR. SCHOULDER:  Well, it was your statement on the

12  record that he agreed to so I think we should stick to what the

13  actual provision says as posed to what you said.

14        COURT:  I'm going to overrule the objection.  It's

15  already been answered.  You can explore this on redirect.

16  BY MR. CHRISTENSEN:

17  Q.  Well, then read subparagraph X if you would.

18  A.  Is this all still under matured default?

19  Q.  Correct.  It's subparagraph to the matured default.  What's

20  your understanding of that paragraph?

21  A.  If the court enters an order that is adverse in any material

22  respect to the rights and remedies of the agent or their lenders

23  in their capacities under this agreement -- so not under

24  their -- not under the prepetition RLOC but specifically under

25  the DIP, then --

1   Q.  Or in any of the Chapter 11 cases, correct?

2   A.  Yeah.  I'll say I don't know how to interpret the "or in any

3   of the Chapter 11 cases."

4   Q.  Okay.  And how do you interpret "adverse in any material

5   respect"?

6   A.  Material is not defined so I don't know.

7   Q.  Okay.  Would the entry of the DIP order with the priming

8   lien violate that provision because it adversely impacts the

9   existing position of Rabo?

10  A.  I mean is this a part of the DIP or the cash collateral.

11  Q.  This is the DIP agreement proposed by Rabo.

12  A.  Right.  So can you ask your question one more time, please?

13  Q.  Would the entry of the DIP order granting Rabo a priming

14  lien on the collateral that it seeks to have a priming lien on

15  violate that term of the agreement?

16  A.  I don't think so because it says -- it's talking about

17  rights and remedies of agent or the lenders in their capacity as

18  such under this agreement and this agreement is the DIP.  I'll

19  concede I don't know how to interpret "or in any of the Chapter

20  11 cases."

21  Q.  Okay.  Now if you'll go to page 57 of that same exhibit.

22  This is the milestones section again.  Scroll down.  So

23  paragraph C and D.  In your testimony, you reference that these

24  are milestones related to a confirmable plan.  That's not what

25  the paragraphs say, correct?  They are milestones related to an

1    acceptable plan and that's capitalized, correct?

2    A.  Yes, that's correct, yep.

3    Q.  So it's not a confirmable plan.  It's an acceptable plan.

4    A.  Yes, that's right.

5    Q.  Okay.  Now, if you'll go to page 14.  Scroll down.  Read

6    that definition of acceptable plan.

7    A.  Okay.

8    Q.  What's your understanding of what an acceptable plan under

9    this agreement would be?

10   A.  One that is satisfactory to the required lender's defined

11   term which -- can you go to what the definition of required

12   lenders is?  I think I know what it is but --

13   Q.  I don't know what page that is.  It doesn't necessarily

14   matter for purposes of this.  We can look it up later.

15   A.  Sure.

16   Q.  But it's a plan that's satisfactory to the required lenders.

17   Presumably that includes Rabo?

18   A.  Yes.

19   Q.  It's also a plan that provides for full satisfaction of the

20   liabilities and that contains market standard exculpations,

21   indemnities and releases in favor of the agent which is Rabo

22   AgriFinance, correct?

23   A.  I don't think that's the agent.

24   Q.  Okay.  The lenders, the other secured parties and their

25   respective related parties.  Correct?

1   A.  Correct.

2   Q.  Okay.  Last question I have I think.  You had testified that

3   the budgets prepared by the debtors, there was no intent to

4   liquidate cattle in those budgets?  Did I hear that correctly?

5   A.  In the big B budget -- budgets that were filed, I don't

6   believe there's an intent to liquidate cattle meaning not

7   reinvested into the business.

8   Q.  So that's what I wanted to clarify.  There is an intent to

9   sell cattle, correct?

10  A.  Yes, that's correct.

11  Q.  Not just -- we're not selling the entire herd of cattle

12  under any of those budgets.

13  A.  Correct.  When I used the word "liquidated," it specifically

14  meant sell and not reinvest.

15  Q.  Okay.

16          MR. CHRISTENSEN:  That's all I have, Your Honor.

17          COURT:  All right.  Counsel, I know we've been going

18  for some time.  It sounds like we may have some travel schedules

19  to accommodate though?  Do you know how long you have until you

20  need to leave?

21          WITNESS:  It's a 1:30 flight.  You guys tell me.

22          COURT:  It sounds like we better continue then.  Any

23  additional cross-examination?

24          MR. O'BRIEN:  I have about two minutes.

25          COURT:  Go ahead.

CROSS-EXAMINATION

QUESTIONS BY MR. O'BRIEN:

Q.  Can I ask you to please pull up Exhibit 3033?  And page 1 of
that.  And were you here in the courtroom earlier where
Mr. Millenkamp discussed that Conterra, my client, services two
loans?  Were you --

A.  Yesterday, yes.

Q.  And the first loan we've called the Rooster loan in the
original principle amount of about 2 and a half million dollars
secured by a first lien on the German Dairy?

A.  Yes.

Q.  And then the second loan is the much bigger loan in the
original principal amount of $16,500,000 that we've generally
described as the mez loan.

A.  Yes, I heard that yesterday.

Q.  Okay.  And if I could invite your attention to Exhibit 2033
and just for clarity on Conterra's claim, you can see in the
first group a chart, the third entry says Conterra mortgage and
outstanding amount 3 for $3 million.

A.  Uh-huh.

Q.  And does that tie to the Rooster loan secured by the first
lien on the German Dairy?

A.  Yes, that's correct.

Q.  And then if you scroll further down that exhibit -- well --

A.  The 17.

1    Q.  Not that far.  Right there.  Where it says Conterra mez

2    debt, $17 million, does that identify Conterra's second loan?

3    A.  Correct.

4    Q.  And that's all I have.  Thank you very much.

5    A.  You're welcome.

6         COURT:  All right.  Redirect?

7         MR. SCHOULDER:  Yes, Your Honor, very briefly.

8                     REDIRECT EXAMINATION

9    QUESTIONS BY MR. SCHOULDER:

10   Q.  Mr. Kokini, is there a time in connection with your analysis

11   that you requested income statements, balance statements, cash

12   flows for 2022, 2023 and 2024?

13   A.  I know we've requested information at various times since

14   last August.  I don't know what we've requested specifically

15   since that entire time.

16   Q.  Have you received recently in the last -- since the debtor's

17   commenced these cases, have you received any financial

18   information that was not -- from the debtors that was not

19   publicly available?

20   A.  Was not publicly available?  I again I guess the various

21   draft budgets were not publicly available until --

22   Q.  From the debtors.  Have the debtors provided FTI with any

23   new financial information --

24   A.  No.  No new gap financial reporting.

25   Q.  And would that information have helped you to refine your

1   analysis?

2   A.  Yes.

3   Q.  Can we just turn very quickly to Exhibit 3039?  I'm going to

4   go to page 27 of the PDF, please.  And if we go down to N,

5   please.  All right.  This is the provision that Mr. Christensen

6   was discussing with you earlier.

7          MR. CHRISTENSEN:  No, it's not.

8          WITNESS:  That was R.

9   BY MR. SCHOULDER:

10  Q.  That was?

11  A.  R and X I believe.

12  Q.  Sorry.  I had the wrong sticky.  Sorry.  No, it's N.

13         MR. CHRISTENSEN:  I did not discuss N ever.

14         MR. SCHOULDER:  Yes, you did.

15         MR. CHRISTENSEN:  I went over R.  Even he agrees it was

16  R.

17         MR. SCHOULDER:  It's file in support of motion on the

18  pleading.

19         MR. CHRISTENSEN:  No.

20         MR. SCHOULDER:  Sorry.  Mr. Christensen's right.

21         MS. SCHWAGER:  On the record.

22         MR. SCHOULDER:  I know.  Get a copy of that transcript,

23  Matt.

24  BY MR. SCHOULDER:

25  Q.  In the subsection R that you were discussing with Mr.

1    Christensen, if the debtors do not support an objection from a

2    party, would this -- would it constitute a default under this

3    provision?

4    A.   If the debtors do not support -- say that one more time,

5    please.

6    Q.   If a third party files an objection and the debtors do not

7    support that objection, would this constitute a default?

8    A.   I believe this subsection -- a mature default would occur

9    under this provision only if the debtors supported a third

10   party's proposal.

11   Q.   Thank you.  That's it.

12          COURT:  Any additional cross-examination, Mr.

13   Christensen?

14          MR. CHRISTENSEN:  No, Your Honor.  Thank you.

15          COURT:  Mr. Naess?

16          MR. NAESS:  No.

17          COURT:  Mr. O'Brien, anything?

18          MR. O'BRIEN:  No.  No further questions.  Thank you.

19          COURT:  All right.  You may step down.

20          WITNESS:  Thank you.

21          COURT:  And is there any objection by any of the

22   parties to the Court excusing Mr. Kokini?

23          MS. SCHWAGER:  No objection from Rabo, Your Honor.

24          MR. CHRISTENSEN:  No, Your Honor.

25          COURT:  All right.  You are excused.  Thank you.

1          WITNESS:  Thanks.

2          COURT:  All right.  It's about 20 minutes before noon.

3    Do we have additional witnesses you amend calling?

4          MS. SCHWAGER:  We do not, Your Honor.  Rabo rests.

5          COURT:  All right.  Mr. Naess, do you anticipate

6    putting on any witnesses?

7          MR. NAESS:  No, thank you.

8          MR. O'BRIEN:  No, Your Honor.

9          COURT:  All right.  It sounds like at least the initial

10   cases in chief are done.  Mr. Christensen, do you anticipate any

11   rebuttal witnesses?

12         MR. CHRISTENSEN:  I think we will have at least one

13   rebuttal witness, Your Honor.  I would like to regroup before we

14   start with that witness if we can.

15         COURT:  All right.

16         MR. CHRISTENSEN:  So if it's okay to break for lunch

17   now and come back at 1:00, I think that's okay.

18         COURT:  I think that's appropriate.  One preliminary

19   matter I forgot to discuss this morning with you, Mr.

20   Christensen.  Do you know what the status of the joint

21   administration order is?

22         MR. CHRISTENSEN:  It's on my list of things to discuss

23   with the U.S. Trustee's Office on the reporting that they wanted

24   done but it's not been submitted yet.  We've been busy with

25   other things.

```
 1              COURT:  All right.  I understand.  All right.  We'll go
 2     ahead and break until 1:00 and resume at that time.  Thank you,
 3     counsel.
 4              CLERK:  All rise, please.
 5                                        (Recess taken.)
 6              COURT:  Thank you.  Please be seated.  All right.  We
 7     are back on the record.  Mr. Christensen, we discussed rebuttal
 8     witnesses just prior to our last recess.
 9              MR. CHRISTENSEN:  That's correct, Your Honor.  We would
10     like to call Bill Millenkamp to the stand again.
11              COURT:  All right.  Mr. Millenkamp, please come up to
12     the stand.  And you've already been sworn in so I'll just remind
13     you that you're under oath.  Please have a seat.
14                           DIRECT EXAMINATION
15     QUESTIONS BY MR. CHRISTENSEN:
16     Q.  Mr. Millenkamp, I want to go back to a couple of the topics
17     the receiver covered this morning.  You were here for that
18     testimony, right?
19     A.  Yes.
20     Q.  Specifically with regard to the loaders that you leased from
21     Western States, when you lease that equipment from Western
22     States, how are the payments for that equipment calculated?
23     A.  They're calculated per hour.  Cost per hour.
24     Q.  So what's the process?  How does that negotiation happen
25     between you and Western States?
```

1   A.   On Western States, the deal is similar to the tractor deals

2   with Case.  We sit down and talk about the amount of hours per

3   year that we need to use these loaders or tractors and then we

4   deal with them on what's the cheapest cost of our -- that they

5   could offer and we talk about how many loaders that would take

6   to get us the cheapest cost per hour.

7   Q.   So does the equipment dealer have like a maximum per hour

8   limit for any individual loader?

9   A.   Yes, they do.

10  Q.   And is that part of the calculation of if I need X number of

11  hours, that equals X number of loaders?

12  A.   Correct.

13  Q.   And who creates that calculation?

14  A.   The dealership.

15  Q.   So there was testimony about you having 43 loaders under the

16  current agreement, correct?

17  A.   Correct.

18  Q.   How was that number of 43 loaders come to?

19  A.   Rough numbers.  We put about 100,000 hours a year per

20  loader.  We like doing two-year leases.  That's what the

21  dealership likes as well.  So it's a couple hundred thousand

22  hours we're talking about.  We divide that by the amount of

23  hours they would like to see the loaders returned at which is

24  close to 4,000 hours on most of those.  So 200,000 divided by

25  4,000 hours.

1  Q.  Okay.  And once you come to that number, let's say in this

2  case, that's 43, could you go to the dealer and say, "I don't

3  want 43 loaders.  I just want 25"?

4  A.  It wouldn't work out because we'd have too many hours per

5  loader.

6  Q.  Would the dealer agree to reduce the number of loaders you

7  took?

8  A.  No.

9  Q.  Would the number of loaders you have affect the number of

10  hours of use you need?

11  A.  Yes.

12  Q.  How?

13  A.  The less loaders you have, the more hours you would put on

14  each individual loader.

15  Q.  Okay.  So in other words, the number of hours you need to

16  use a loader doesn't really change based on the number of

17  loaders you have.  You just have a loader that's going to have a

18  higher number of hours individually on it.

19  A.  Correct.

20  Q.  Okay.  What impact would it have on the business of having

21  lower numbers of loaders?

22  A.  It would make it -- it would not make it feasible to run our

23  operation.

24  Q.  Why?

25  A.  The demands on the amount of loaders we have are much

```
 1   greater in the winter because of snow removal.  We'll have up to
 2   200 pieces of equipment at one time moving snow so we need a
 3   certain amount of loaders in the wintertime.
 4   Q.  And under those leases, are they -- they're a two-year
 5   lease?
 6   A.  Most of them.
 7   Q.  And it's not like we're going to lease 43 in the wintertime
 8   and we're going to have lower than that in the summertime.  It's
 9   all year long, we have the same number?
10   A.  Yes.
11   Q.  As part of Millenkamp's operation, do you regularly sell
12   cull cows?
13   A.  Yes, almost daily.
14   Q.  Can you describe for me what a cull cow is?
15   A.  A cull cow is a milking cow that is no longer profitable
16   that we're getting rid of to go to slaughter.
17   Q.  And you said almost weekly you're culling cows?
18   A.  Almost daily.
19   Q.  Almost daily?  What's the criteria for deciding a cow needs
20   to be culled?
21   A.  Profitability is the main thing but there's lots of criteria
22   but the main thing is cows that are not pregnant that are not
23   breaking even on cost.
24   Q.  And that's something you're looking at almost on daily basis
25   in your operation?
```

1  A.  We look at it on a daily basis and that's something I'm

2  involved with actually myself.

3  Q.  Does your system allow you to track on a daily basis the

4  milk production per cow?

5  A.  Every time -- yes.  Every time a cow gets milked in our

6  facilities, we know exactly how much milk she produces.

7  Q.  Okay.  You were involved with the receiver case prior to the

8  bankruptcy, correct?

9  A.  Yes.

10  Q.  Do you know what the amount owed to Rabo in principal at the

11  time the receiver -- the receivership petition was filed was?

12  A.  Right at 95 million.

13  Q.  Do you or the Millenkamp people have access to an electronic

14  system that lets you see what the current balances owed to Rabo

15  are?

16  A.  Yes.

17  Q.  Do you know what the balance owed to Rabo in principal on

18  the petition date of the bankruptcy case was April 2?

19  A.  I was told it was 89,900,000.

20  Q.  So around 90 million?

21  A.  Under 90 million.

22  Q.  In your opinion, during the receiver case, did Rabo's

23  principal position get worse or better?

24  A.  Better by 5 million.

25          MR. CHRISTENSEN:  Your Honor, that's all I have.

1    Thanks.

2            COURT:  Thank you, Mr. Christensen.  Questions,

3    MetLife?

4            MR. GOURLEY:  No questions from MetLife.  Thank you,

5    Your Honor.

6            COURT:  Counsel for Rabo AgriFinance?

7            MS. SCHWAGER:  No questions.

8            COURT:  Mr. Naess?

9            MR. NAESS:  No, thank you.

10           COURT:  Mr. O'Brien?

11           MR. O'BRIEN:  None.  No.  Thank you.

12           COURT:  All right.  You may step down.  Thank you.  Do

13   you have additional rebuttal witnesses, Mr. Christensen?

14           MR. CHRISTENSEN:  No, Your Honor.  Thank you.

15           COURT:  All right.  Any rebuttal witnesses?

16           MS. SCHWAGER:  No, Your Honor.

17           COURT:  Mr. Naess?

18           MR. NAESS:  No, thank you.

19           COURT:  Mr. O'Brien?  All right, at this point, it

20   appears the evidentiary record is closed.  The parties

21   comfortable with the record as it stands?

22           MS. SCHWAGER:  Your Honor, I'm sorry.  There were two

23   exhibits.

24           COURT:  All right.

25           MS. SCHWAGER:  3036 is that redline term sheet that

1    Brent talked to you about this morning.  That was stipulated to,

2    3036.  And then 3037 is the CMH objection.  I'd move for the

3    entry the completing (inaudible).

4         COURT:  Any objection to the admission of exhibits 3036

5    and 3037?  Exhibits 3036 and 3037 are admitted.

6         MR. GOURLEY:  Your Honor, I apologize.  I had listed

7    3035 and 3036 were going to be appraisals but I don't think they

8    were ever discussed or testified to.  So I'm not tracking with

9    3036 but I may be in error.  There were two exhibits that were

10   sent by Mr. Wilson I think yesterday morning about 8:10 a.m. or

11   so.

12        MS. SCHWAGER:  That were appraisals?

13        MR. CHRISTENSEN:  They weren't appraisals.

14        MR. GOURLEY:  I had them listed in my notes as

15   appraisals.

16        MS. SCHWAGER:  No.

17        MR. GOURLEY:  Okay.

18        MR. CHRISTENSEN:  This is 3036 right here.  It's just

19   Rabo's --

20        MR. GOURLEY:  Okay.

21        MS. SCHWAGER:  Right.  And the 3037 was the docket

22   number --

23        COURT:  It's Docket 126, the objection filed by CNH.

24        MR. GOURLEY:  No objection to 3036, Your Honor.

25        COURT:  And 3037?

1          MR. GOURLEY:  No objection to that one either.

2          COURT:  All right.  Both 3036 and 3037 are admitted.

3          (Rabo AgriFinance Exhibit Nos. 3036 and 3037 admitted.)

4          COURT:  Any other evidentiary housekeeping matters we

5     need to attend to, counsel?

6          MS. SCHWAGER:  No, Your Honor.

7          COURT:  All right.  Mr. Christensen, do you want to

8     proceed to closing?

9          MS. MIKKILINENI:  Thank you, Your Honor.  The debtors

10    filed their cash collateral motion on April 2 and are seeking an

11    interim authorizing use of cash collateral in which Rabo,

12    MetLife and Conterra assert a security interest, an interim

13    order authorizing the debtors to grant adequate protection to

14    these secured lenders.

15          As proved through testimony of Mr. Millenkamp and Ms.

16    Churchill, the debtor's use of cash collateral is necessary to

17    avoid immediate and irreparable harm to the business operations,

18    employees and livestock.  The most imminent and necessary

19    expenses over the next four weeks are highlighted in green on

20    the budget.  These necessary expenses include payments to

21    vendors in order to keep the livestock fed.  The items

22    highlighted in orange are expenses the debtors believe can be

23    delayed until after final approval of cash collateral.

24          Including in the necessary interim expenses are $7.5

25    million in critical vendor payments which Mr. Millenkamp

 1    testified to as being extremely necessary to his operations.

 2    These vendors are the only vendors that can supply the quantity

 3    of goods needed for his operations in the time frame that he

 4    needs them.

 5             COURT:  Do I have authority to approve those payments

 6    under Ninth Circuit case law?

 7             MS. MIKKILINENI:  I'm sorry.  What was the question,

 8    Your Honor?

 9             COURT:  Does Ninth Circuit case law allow me to approve

10    those critical vendor payments?

11             MS. MIKKILINENI:  There is no binding authority in

12    Idaho that we cannot go forward with the critical vendor motion

13    and we do cite to cases in our motion within the Ninth Circuit

14    that do support the motion.

15             COURT:  I know recently --

16             MS. MIKKILINENI:  Or maybe not.

17             COURT:  -- the district of Oregon that, the BNW

18    Enterprises case was binding with respect to critical vendor

19    payments to general unsecured creditors and that a bankruptcy

20    court did not have the ability to elevate general unsecured

21    prepetition claims above other claims even if there is a

22    demonstrated need and somebody is a critical vendor.

23             MS. MIKKILINENI:  It's my understanding that that

24    Oregon case did not address Rule 6003(b) which is what we're

25    relying on.  And that states that early payment of prepetition

1  claims is allowed when it's necessary to avoid immediate and

2  irreparable harm which we have through Mr. Millenkamp's

3  testimony.

4      COURT:  I guess the issue I have with the critical

5  vendor payments is there -- is that BNW Enterprises case binding

6  authority?  Do I really have much discretion to contradict the

7  holding in that case because it's controlling by the Ninth

8  Circuit.

9      MS. MIKKILINENI:  We don't believe that it's binding

10  and we think it's distinguishable from the facts here.

11      COURT:  And when you say the budget, is this -- I

12  believe it's the April 8, budget?

13      MS. MIKKILINENI:  Yes, Your Honor.  The one that was

14  submitted to the Court on Monday night.

15      COURT:  All right.  And do you have the reference for

16  that exhibit?

17      MS. MIKKILINENI:  1015, Your Honor.

18      COURT:  1015.  Go ahead.

19      MS. MIKKILINENI:  Thank you, Your Honor.  To provide

20  adequate protection to the secured lenders for the use of cash

21  collateral, the debtors propose providing replacement liens,

22  monthly interest payments to each of Rabo, MetLife and Conterra,

23  will provide reporting, maintain their insurance and if there is

24  diminution value, the secured lenders will receive a super

25  priority administrative expense claim.

1    The debtors have discussed the cash collateral motion

2  with MetLife and have agreed to certain provisions being

3  included in the interim order.  They were already included in

4  the interim order that granted use of cash collateral through

5  yesterday, now today.  So we'll continue to include those

6  provisions in the next interim cash collateral order.  And

7  Conterra has not indicated an objection to use of cash

8  collateral.

9    In addition to the cash collateral motion, the debtors

10  also filed a motion to authorize the debtor to obtain

11  post-petition financing.  Immediate DIP financing is necessary

12  to fund operations, pay employees, feed the livestock and

13  maintain the value of the estates for the creditors.

14    The debtors initially solicited DIP financing proposals

15  prepetition including from the prepetition secured lenders and

16  received three DIP financing proposals.  All three proposals

17  required a priming lien.  The debtors also solicited but not

18  received -- did not receive a proposal from MetLife.

19    The debtors ultimately determined to go with the

20  Sandton DIP proposal that's before the Court.  The Sandton's DIP

21  proposal provides interim funding of $25 million.  Sandton has

22  agreed to provide $3 million dollars of that $25 million initial

23  draw by Friday because of the immediate need of that DIP

24  financing.  And then the remainder of that $25 million will be

25  provided next week by Sandton if this is approved.

1         The total DIP amount is up to $45 million.  The DIP

2    proceeds will provide liquidity up to 12 months for the debtors.

3    We have received the Sandton DIP credit agreement at this point

4    and we have redlined it.  We filed the redline version with the

5    Court last night and we are very close to having a finalized

6    version of the Sandton credit agreement.

7         COURT:  Am I able to approve DIP financing when there

8    is no final version of the credit agreement that parties are

9    able to view and offer comments or objections to?

10        MS. MIKKILINENI:  We believe on an interim basis, it

11   would be allowed based on the term sheet and what's on the

12   docket so far.  And I mean we'd be prepared to provide the

13   finalized DIP loan agreement by this afternoon.  We are very

14   close to having it finalized.

15        COURT:  Is Sandton willing to lend in the absence of a

16   signed agreement?  In other words, if I approve it on an interim

17   basis but there is no signed credit facility, what obligation

18   does Sandton even have to provide those funds?

19        MS. MIKKILINENI:  It's my understanding that Sandton

20   will provide the $3 million in DIP financing based on an interim

21   order being entered this week.  Sandton's attorney is here and

22   I'm sure he can -- or he can tell --

23        MR. BERNARD:  Your Honor, Richard Bernard.  I

24   confirm -- I confirmed that with counsel before the hearing.

25   Yes, we're very close and thank counsel over here for pointing

1   out a couple more revisions we need to make to the final loan

2   documents.  They're all circulated.  We expect to have them done

3   shortly.  But even if the loan documents are not signed up,

4   we're prepared to advance by Friday the $3 million that the

5   debtors need for their liquidity this week based upon entry of

6   the interim order.

7          COURT:  Thank you.

8          MS. MIKKILINENI:  The Sandton DIP proposal does provide

9   for a priming lien but Sandton has agreed to not prime any of

10  the PMSI interests so we believe CNH's objection is resolved at

11  this point.  Sandton has also agreed not to prime Conterra's

12  first security interest on the German Dairy and so Conterra's

13  objection regarding the priming issue is also resolved.

14         COURT:  On the PMSI issue, does the debtor have a list

15  or a good idea of just what is all of the equipment that's

16  subject to a purchase money security interest?

17         MS. MIKKILINENI:  Yes, we do have a list going and

18  so -- and we'll be including that in the schedules.

19         COURT:  So we'll have sufficient information to

20  determine there are these pieces of equipment, for example, that

21  are excluded from the priming lien?

22         MS. MIKKILINENI:  Yes, Your Honor.

23         COURT:  Okay.

24         MS. MIKKILINENI:  Priming is allowed under Section

25  364(d)(1) if the debtors show that they were unable to obtain

such credit otherwise and if the other secured parties are
adequately protected.

Here, the debtors were unable to obtain unsecured
credit.  Further, the prepetition secured lender's interests and
then collateral are adequately protected.  As such, the priming
liens proposed to the DIP loan are allowed.

To demonstrate the required credit was not obtainable
on an unsecured basis, the debtors need only demonstrate by a
good faith effort that the unsecured credit was not available.
Mr. Millenkamp testified as to this.  The debtors reached out to
many possible lenders, all of whom submitted a proposal
requiring priming liens.

The debtors may obtain secured credit with priming
liens if the existing secured creditors' interests are
adequately protected.  The debtors propose the following
adequate protection to the prepetition secured lenders:  Monthly
interest payments, replacement liens, the equity cushion is
maintained and super priority administrative expense claims if
diminution in value occurs.

The debtors have proposed a reasonable package for
adequate protection.  The purpose of adequate protection is to
compensate a secured lender solely for the diminution in value
of its collateral.  It is not meant to be a guarantee that a
creditor will be paid in full.

The debtors will be granting replacement liens,

1    interest payments and super priority claims as adequate

2    protection here which is very commonplace.  Further, an equity

3    cushion standing alone provides adequate protection.

4         Courts have uniformly held that an equity cushion of 20

5    percent or more constitutes adequate protection.  You heard a

6    lot of evidence throughout these two days about the valuation

7    for the real estate and the personal property.  Mr. Millenkamp

8    testified that the debtor's assets are valued at approximately

9    $671 million which is made up of $493 million in real property

10   and $178 million in personal property.  So that's $671 million

11   in assets.  The total owed to the secured lenders is

12   approximately $294 million.  That's $371 million in equity.

13   That's a 56 percent equity cushion, well above the 20 percent

14   threshold.

15        If you consider personal property alone which is what

16   Rabo has a first priority interest on, we can look at how Rabo

17   is owed approximately $88 million and the personal property is

18   valued at $178 million.  That leaves a collateral cushion of

19   approximately $90 million resulting in an equity cushion in the

20   personal property of approximately 50 percent.  Again, well

21   above the 20 percent threshold.

22        Even if you put the 45 million DIP into this analysis,

23   the equity cushion is still at 50 percent.  As such, there can

24   be no argument that the prepetition secured lenders are not

25   adequately protected.

1        Therefore, the debtors have satisfied the Section 364

2    requirements that they are unable to obtain a non-priming DIP

3    and that the prepetition secured lenders are adequately

4    protected.  As such, the Court should authorize the priming

5    lien.

6        The debtors further argue the proposed DIP loan is

7    fair, reasonable and in the best interests of the estates.  It

8    is necessary to support the debtor's ongoing operations and will

9    ensure the highest quality of care to the livestock.  Further,

10   based on the debtor's efforts to obtain the DIP terms from

11   multiple parties, it has determined Sandton's DIP facility is

12   the best financing available and is well within the exercise of

13   sound business judgment.  The DIP term sheet was further

14   negotiated in good faith and at arm's length.

15       Bankruptcy courts consistently defer to a debtor's

16   business judgment on most business decisions including the

17   decision to borrow money.  In exercising its business judgment,

18   courts also recognize a debtor is entitled if not required to

19   consider non-economic benefits offered by a proposed

20   post-petition facility.

21       In Ion Media Networks in -- sorry.  Let me back up.  In

22   Ion Media Networks, the court noted that it recognizes the

23   debtors are motivated to obtain financing on the best terms but

24   that a business decision to obtain credit from a particular

25   lender is almost never based purely on economic terms.  The

1    Court noted that other factors must be evaluated including non-

2    economic elements such as the impact on creditor constituencies

3    and the likelihood of a successful reorganization.  The court

4    concluded that this is particularly true in a bankruptcy setting

5    where cooperation with creditor groups would be a vital part of

6    building support for a restructuring plan that may lead to a

7    confirmable reorganization plan.

8            There are many non-economic considerations to take --

9    to address here.  There is a very substantial risk of an

10   intercreditor agreement dispute between MetLife and Rabo and

11   then a possible appeal.  This would increase litigation expenses

12   and cause delay.  It may even result in the DIP not being

13   approved and would leave the debtor without a DIP loan.

14           We've seen this already from the letter that Rabo sent

15   to Conterra where they basically bullied Conterra out of their

16   DIP loan.  Conterra ended up withdrawing the DIP proposal.  Rabo

17   is also not willing to consider converting some or all of the

18   DIP into an exit financing facility.  They specifically deleted

19   that language in their redline of Sandton's term sheet so we

20   know that they are not willing to convert any of this to an exit

21   facility.  Sandton is and that is an important consideration.

22           COURT:  Sandton is but at least on the version of the

23   credit facility that's on file, that decision is solely in the

24   discretion of Sandton so there's no requirement that the exit --

25   there is an exit facility.

1          MS. MIKKILINENI:  That is true but they are willing to

2     consider it whereas we know that Rabo is not willing to consider

3     it.

4          Sandton's DIP facility is at $45 million and Rabo's is

5     at $35 million.  There is much more flexibility for the debtors

6     and it's a benefit to the estate to have that extra $10 million.

7     You must also consider the general working relationship between

8     the debtors and the vendors.  Mr. Millenkamp testified as to how

9     the vendors do not trust Rabo because of the receivership.  They

10    will not continue going on if Rabo is the DIP lender here.  They

11    don't have these issues with Sandton.  Sandton has a good

12    reputation in the industry.

13         We also have to consider that the Rabo DIP loan will

14    likely require a sale lease back in the future.  This is based

15    on their initial DIP proposal to us which required a private

16    sale lease back to a party involved in their facility at over a

17    30 percent discount to fair market value.  Sandton does not

18    require a sale lease back.

19         We also have to consider that the Rabo DIP loan will

20    most likely require at least $12 million of steer sales going to

21    Rabo.  And again, this is based on prior discussions with Rabo

22    and I'll get into how flexible their loan agreement is in favor

23    of them.  But because of those restrictive provisions in their

24    loan agreement, we believe that they could put that back in

25    there.

1          Now, getting into some of the restrictive provisions in

2     their loan agreement, they define acceptable plan.  In their

3     definition of acceptable plan, it states that it must fully

4     satisfy all DIP liabilities and include indemnities and releases

5     of the Rabo parties.  They are again trying to put a release

6     into this DIP loan.  The Sandton agreement also requires paying

7     DIP liabilities but they are willing to convert it to an exit

8     facility so that helps in that regard.

9          In the definition of matured default, Rabo can decide a

10    30-day cure event can't be cured within the 30-day cure -- grace

11    period and therefore cut off the grace period.  Sandton's

12    agreement does not include that concept.

13         The debtors are not allowed to challenge Rabo's

14    post-petition claims and liens if they go forward with this Rabo

15    DIP loan.  Another event of default happens when an order is

16    entered that is adverse in any material respect to the rights

17    and remedies of Rabo under the agreement or in any of the

18    Chapter 11 cases.  This is extremely vague and can mean so many

19    things triggering a default.

20         There are conditions to extending the maturity date.

21    In the inspection report section, it states that the loan

22    advances are subject to inspection reports in a form and

23    substance satisfactory to Rabo.  So the loan advances are yet

24    again subject to another thing.  They're subject to inspection

25    reports that have to be satisfactory to Rabo so we don't even

1   know if the loans can come in.

2        One of the conditions to making a loan is that debtors

3   shall have paid all fees and expenses of Rabo.  So another

4   condition on receiving loans.  We have to pay all their fees and

5   expenses which we don't even know what those are.  We've asked

6   for them several times.

7        All orders in this case must be satisfactory to Rabo.

8   Rabo must approve each instance of the critical vendor payments

9   even if we have an approved critical vendor motion.  Rabo's

10  representations and warranty sections are overall more detailed

11  and burdensome than Sandton and can lead to Rabo declaring a

12  technical default.  Many provisions -- there are many provisions

13  throughout their loan agreement that could lead to a technical

14  default.  And it's in their -- in their budget section, it's

15  unclear whether Rabo will work with us on future budgets or

16  updated budgets.

17       Rabo has yet again made promises that on their face

18  appear to be fair and reasonable and instead have very unfair

19  and very restrictive provisions into their credit agreement that

20  will harm the debtor's estates and creditors.

21       The Court should defer to the debtor's business

22  judgment in choosing the Sandton proposal.  The Sandton DIP

23  proposal is in the best interests of the debtor's estates and

24  creditors.  Based on the foregoing, the debtors seek an interim

25  order authorizing use of cash collateral including the critical

1    vendor payments and granting adequate protection to Rabo,

2    MetLife and Conterra for use of the cash collateral and the

3    debtors further request the Court authorize the debtors to

4    obtain the DIP loan with Sandton on an interim basis, grant the

5    adequate protection and set a final hearing.  Thank you, Your

6    Honor.

7         COURT:  Thank you.  Counsel for MetLife?

8         MR. SCHANDLBAUER:  Good afternoon, Your Honor.  Nick

9    Schandlbauer.  I'm from Adams and Reese in Washington, D.C.  I

10   represent the MetLife lenders.  It's nice to be in your city --

11   your beautiful city and may it please the court.

12        Your Honor, we have had a front row seat to the last

13   couple months of fireworks and even though there were fireworks,

14   it certainly can't be described as (inaudible), unique or

15   unusual.  It's a distressed enterprise in desperate need of the

16   relief that it's asking for.

17        So leaving aside any editorial commentary, it's no

18   secret that -- and we've had our documentation admitted into the

19   Court's evidentiary record that we have the biggest existing

20   prepetition loan with the debtors, that we have two robust

21   intercreditor agreements with our fellow member of the capital

22   staff, Rabo, and that it's crystal clear that MetLife has the

23   first prepetition lien on all of the real estate save the German

24   Dairy and that Rabo, with an important exception, has a first on

25   the personal property such as it is of these debtors.

1          Your Honor, we see nothing offensive in either the cash

2     collateral proposal or the interim DIP financing proposal.

3          COURT:  Are you troubled at all by the fact that you

4     haven't seen the final DIP credit agreement?

5          MR. SCHANDLBAUER:  We've seen the draft, Your Honor.

6     We've also experienced the pace of Chapter 11 and the robust

7     participation of the creditor body as you've seen evidenced by

8     the last two days of active participation is enough to protect

9     our sensibility.  Would the Court like to --

10         COURT:  I'm sorry.  We're getting a fair amount of

11    background noise unfortunately.

12         CLERK:  I don't know what to do, Your Honor.

13         COURT:  Go ahead.

14         MR. SCHANDLBAUER:  Have I answered your question, Your

15    Honor?

16         COURT:  Yes.

17         MR. SCHANDLBAUER:  As apropos adequate protection, we

18    do believe the debtor's proposal includes a proposal acceptable

19    to us.  We acknowledge the sagacity of our underwriting team and

20    their decision to make this loan in the first place, at least at

21    this moment, and we accept that on an interim basis what's been

22    proposed as adequate protection to our interests have been

23    satisfied.

24         That adequate protection is interwoven with those

25    robust intercreditor agreements that we've heard alluded to,

1    described particularly in the advocacy of the debtors and in

2    fairness in the advocacy of the Rabo group.

3         So we've decided after careful consideration not to

4    object to either the debtor's use of cash collateral on an

5    interim basis nor its subjecting our first lien to a priming DIP

6    facility.

7         But here's what our decision to abstain from

8    objection -- here's what it doesn't mean.  It doesn't mean we're

9    going to cease to monitor vigilantly the debtor's financial

10   reporting, the debtor's progress through Chapter 11 and to that

11   end, we have struck written agreement -- we've seen it in an

12   order already -- that we'll get all the same information that

13   the priming DIP lender will receive including those weekly

14   variance reports, whatever financial information is requested by

15   Sandton.

16        We've also received what we believe is a robust

17   handshake agreement to allow our financial advisors to meet

18   periodically with the debtor's financial advisors with a view to

19   an open and candid and real-time exchange of information.

20        What it does not mean is that MetLife has infinite

21   patience.  We expect and we've privately communicated that we

22   expect constructive progress; not the daily tit for tat that

23   we've seen and you heard about on the stand that's been the

24   hallmark of the last couple months.  And it does not mean that

25   we will not protest and caterwaul when a party with whom we are

1   in a contractual privy lobs a grenade at our rights or takes

2   cynical measures to end around the robust intercreditor

3   agreements that have been in place in one situation since 2018.

4   We will be watching out for that as well.

5        So unless this Court has any questions for me at this

6   lectern, I have nothing further.

7        COURT:  No further questions.  Thank you.

8        MR. BERNARD:  Your Honor, can I beg your indulgence?  I

9   have a flight today at 3:00 and if I have any chance of catching

10  that -- otherwise it's 5:30 a.m. tomorrow morning.

11       COURT:  Yeah.

12       MR. BERNARD:  I'm going to be very brief.

13       COURT:  Go ahead.

14       MR. BERNARD:  Richard Bernard, Faegre Drinker.  I'm

15  here with local counsel John Kurtz on behalf of Sandton.  We

16  just had probably a minute of words to say but we heard a lot of

17  testimony yesterday and today about the relationship between

18  Rabo and the debtors.  Clearly that's broken.  It is a broken

19  relationship and it would be a mistake for this Court to

20  substitute Rabo's or FTI's judgment for the business judgment of

21  the debtor.  The decision under the bankruptcy code for choosing

22  a financing package is the debtor's business judgment.

23       Pricewise -- well, put it this way.  Initially, there

24  were three offers -- loan offers on the table.  For whatever

25  reason, there are two.  Conterra has pulled their offer.  So now

we're left with Sandton's proposal and Rabo's proposal.

Pricewise, obviously Rabo's proposal is less expensive on its

face but that's just math.

The Sandton -- our proposal does have more flexibility,

especially with the exit -- the potential bankruptcy exit and

what can be structured there.  We have come way down on our

pricing because of the competitive process so I think that has

also benefitted the estate there.  Our interest is paid in kind

so that's not a cash burden for the estate.  We're just going to

pick the interest.

The additional liquidity offer through a $45 million

loan instead of a $35 million loan, if the debtor doesn't need

the extra funds, it won't draw them.  But if it does to get

runway -- and, Your Honor, this case, this business is a

commodity business.  Whether you're selling milk or steak, those

are commodities.  They're subject to pricing fluctuations and

I've seen it before where time can be friendly to a debtor.  It

may not be detrimental.  The extra ability to fund in our DIP

can provide that extra runway if the debtor needs it.

But the real issue here I think, Your Honor, is interim

priming and the bankruptcy code allows priming even on an

interim basis.  I understand the guidelines -- the local

guidelines here say it's rarely given.  If there is a case that

interim priming is appropriate, it would be this case under the

facts and circumstances here.  We require it but so did the

1  other two proposals -- loan proposals that came in for DIP

2  financing.  They all required priming liens.

3          COURT:  Rabo's did not require interim priming,

4  however.

5          MR. BERNARD:  It did initially I believe.  And maybe

6  they've changed that provision on the interim but -- which is

7  unclear.  So if they advance money on an interim basis, it's not

8  priming and it's never going to be priming or does it become

9  priming after the final hearing when the money's already been

10  put in.  So it's just not clear to me.  We're new to the

11  situation so we have no existing liens.  They do so it's -- it's

12  a bit of apples and oranges between the two of us on that

13  respect.

14          But -- and the reality here is, Your Honor, the debtors

15  need funding this week.  We're willing to accommodate.  We can

16  fund even if we don't actually have our loan agreement signed

17  up.  But as I told Your Honor, we're very close to having them

18  signed up but we're funding Friday if this Court enters an order

19  approving the debtor's decision to select Sandton as the DIP

20  lender.

21          And as we said, the -- I think counsel pointed out we

22  have a few things to fix in there.  We're taking out

23  obviously -- obviously the sale proceeds going to pay down the

24  loan would be for sales outside the ordinary course of business

25  so we'll clarify that.  And we do not have a lien -- we're not

 1   going to have a lien on proceeds or on avoidance actions or

 2   proceeds thereof.  Thank you, Your Honor.

 3        COURT:  Thank you.  All right.  Counsel for Rabo

 4   AgriFinance.

 5        MS. SCHWAGER:  Thank you very much, Your Honor.  Sheila

 6   Schwager for Rabo AgriFinance.

 7        Your Honor, if I could first address the issues that

 8   were raised by counsel in her argument regarding a comparison of

 9   Sandton and Rabo.

10        First, Your Honor, we would submit that the debtor

11   should not be able to approve a DIP loan of which the creditors

12   have not had a sufficient opportunity to even review the terms

13   of the DIP loan agreement.  It was filed last night.  We have

14   been requesting it since the motion was filed for the DIP

15   request.  And we -- and it certainly being filed last night does

16   not -- was it filed last night?  I'm like -- certainly, you

17   know, being filed last night on the eve of this emergency

18   hearing does not provide an ample opportunity for all interested

19   parties to review.

20        Your Honor, as to the terms that counsel went through

21   in regarding -- in regard to exit financing or other terms that

22   the debtors do not like in the proposed Rabo loan -- DIP loan

23   agreement which was provided, they've never come back to express

24   that.  They've never said, "These are terms that we don't like

25   and will you in fact provide exit financing?"  So to speculate

1  as to what Rabo would or would not do, they haven't given Rabo

2  that opportunity.

3        And Your Honor, the testimony -- I'm sorry.  Not the

4  testimony.  The argument that the vendors will not in fact

5  supply feed to the debtors if Rabo is the DIP lender, there was

6  not one single vendor that was called to the stand that

7  testified to that fact.

8        So Your Honor, if I could start at the June 1, 2022.

9  That's the maturity date for the RLOC facility that was issued

10  by Rabo AgriFinance as agent and lender.  And Rabo has given the

11  debtors 22 months since that date to provide the promised

12  refinancing of approximately $90 million of senior secured

13  matured debt.

14        Initially, Rabo granted a long-term forbearance that

15  provided in excess of eight months that was based on the

16  debtor's representations that was sufficient time to obtain

17  refinancing.  Yet the debtors did not provide such financing.

18  And during this time, and prior to the receivership, Rabo made

19  in excess of $16 million of protective advances to address the

20  debtor's constant inability to maintain positive cash flow on a

21  steady basis.  This was $16 million on top of the milk proceeds

22  of which Rabo had not exercised its direct assignment rights

23  which the debtors state in their budget generate proceeds of 50

24  million in a four-month time frame.

25        Further after the receivership, Rabo granted an

1    additional protective advances of 5.8 million.  And this is

2    significant as the testimony from Mr. Millenkamp was, one, he

3    did not recall what Sandton's terms were for maturity but, two,

4    it did not matter because he intends to pay Sandton's DIP loan

5    off with the refinance due the equity that he proclaims to have

6    in the assets.

7         When questioned about that recovery source,

8    Mr. Millenkamp stated he had interested parties to refinance

9    that debt which he did not specifically identify and notably was

10   the same representation that he made to Rabo as a part of the

11   forbearance agreement yet it's nearly two years after the RLOC

12   matured and he has not ever found a source to refinance Rabo.

13        It cannot be ignored that if Mr. Millenkamp is wrong

14   about a refinance to pay off Sandton like he was with Rabo

15   nearly two years ago, it could be the death nail for the

16   bankruptcy estate.  And at that point, the DIP lender Sandton

17   who believes the estate should have access to DIP financing of

18   $45 million will have the ability to foreclose upon all of the

19   assets of the estate as the first lienholder if the priming DIP

20   were approved.

21        It is for these very type of reasons that this

22   jurisdiction enacted local Bankruptcy Rule 4001.1 and the

23   appendix which expressly mandates that the debtors identify

24   whether the debtors are proposing any provisions contained in

25   the guidelines regarding motions to use cash collateral or to

1    obtain credit and to clearly identify those provisions.

2    Significantly the guidelines expressly state that, quote, the

3    following provisions are approved rarely, if ever, on an interim

4    basis which includes, quote, provisions that prime the liens

5    and/or security interests of security creditors who are not

6    parties to the agreement unless consented to by the affected

7    creditor.

8          Not only have the debtors failed to comply with the

9    local rule by setting forth the provisions that are not favored

10   by the Court, but they seek to utilize almost $25 million on an

11   interim basis and have failed to provide on that interim -- on

12   the interim based standard any unique and substantial basis for

13   priming the liens of Rabo and the other secured creditors where

14   such terms are, quote, rarely, if ever, approved.

15         The burden of the debtors to prime all of the secured

16   lenders cannot be ignored.  As set forth in the legal authority

17   cited in Rabo's briefing, priming is an extraordinary relief.

18   It requires a strong showing that the loan to be subordinated is

19   adequately protected.

20         Bankruptcy judges are required to grant Section 364(d)

21   financing only upon a tangible demonstration of adequate

22   protection.  Because priming has grave consequences to the

23   creditor that is being primed, courts must be particularly

24   cautious when evaluating whether the subordinated creditor is

25   adequately protected.

1        This was set forth in the In Re: Stony Creek Techs case

2    cited in the briefing where the court found that although in

3    that case, there was an equity cushion, the court denied the DIP

4    request finding that, quote, even if the court gave credence to

5    the debtor's speculative projections, it was clear that the

6    proposed financing will not shore up the floundering enterprise

7    as the debtor could not account for how the loan would be repaid

8    at maturity which has a similar ring to this case.

9        But more importantly, despite the burden of a

10    requirement of a strong showing, the debtors do not call

11    certified appraisers to testify who would be subject to

12    cross-examination as to the value of the real or personal

13    property.  Instead, they choose to rely upon the vague and over-

14    generalized testimony of Mr. Millenkamp who admittedly has

15    absolutely no training and no education as to how to appraise

16    property yet he opines to a half a billion value of eight

17    different real properties.

18        And as to the personal property, Mr. Millenkamp asserts

19    values with no supporting documentation being submitted into the

20    evidence or supported other than compilations in his head.

21    Notably, if the values were as purported by Mr. Millenkamp, it

22    would seem odd that he would not have been able to obtain the

23    financing, the refinancing of the RLOC DIP for over two years.

24        When pushed as to what personal property he was opining

25    about he merely references a list that was attached to a

1  purported third party appraisal that was never admitted into

2  evidence and of which the appraiser was not subject to

3  cross-examination.

4      Further, despite the contention that the value was of

5  April 2004 (sic), the list of equipment testified by

6  Mr. Millenkamp was at least a year earlier and did not account

7  for property that had been sold, released or the new property in

8  corresponding liens.

9      I would respectfully submit that the debtors do not

10  meet their high burden of establishing that the secured lenders

11  are protected by an equity cushion by the unsupported vague

12  speculations of Mr. Millenkamp.

13      Further, Your Honor, Ms. Churchill, the debtor's

14  financial analyst, did not verify valuations or conduct a

15  marketing appraisal process.

16      As admitted by Mr. Millenkamp, the debtor's adequate

17  protection proposal for both the use of cash collateral and the

18  DIP loan is to replace Rabo's interest which currently consists

19  of a first position in immediate available cash and personal

20  property that could be liquidated and/or sold in a fairly easy

21  manner with instead a junior lien on real property of which

22  there's no dispute Rabo is restricted in certain recovery rights

23  until MetLife is paid in full.  That I submit is not adequate

24  protection.

25      COURT:  But this isn't a case where the Court is

1   providing an adequate protection lien on real property.  You

2   came into the bankruptcy with that second position as

3   essentially a backstop to provide additional equity and security

4   for your lender.

5          MS. SCHWAGER:  First position personal property,

6   correct.  We came in with first position personal property and a

7   backstop on real estate that's restricted.  So in this backstop

8   on real estate, Rabo has no ability to foreclose and recover

9   upon that debt until MetLife is paid in full.  Rabo didn't come

10  in -- I'm sorry.

11         COURT:  And that's due to -- that's due to an inter-

12  creditor agreement which your client voluntarily entered into.

13         MS. SCHWAGER:  Correct, when it had a first position in

14  personal property.  That's correct, Your Honor.  Does that

15  answer your question?

16         COURT:  I guess it seems like you may have more merit

17  to your argument if the adequate protection that was being

18  proposed was a junior position in the real property which you

19  didn't have going into the bankruptcy as far as whether that

20  would be the indubitable equivalent and constitute adequate

21  protection.  But here, you came into the bankruptcy with the

22  personal property lien first and already having that second real

23  property lien, already entered into that intercreditor agreement

24  so the Court isn't necessarily forcing you to accept a

25  replacement lien on that real property.

1          MS. SCHWAGER:  Your Honor, it is --

2          COURT:  It was voluntary.

3          MS. SCHWAGER:  If it takes away the first -- the

4     position that we -- that Rabo is in in the personal property and

5     it's replacing it with this second lien restricted right, that's

6     not the bargain that Rabo made with the parties.

7          COURT:  But that lien already -- that second lien

8     already serves as security now for the collateral so it's not a

9     replacement.

10         MS. SCHWAGER:  But it is a replacement, Your Honor, if

11    you're taking away the value of the personal property and you're

12    putting it into that restrictive second position.  So it's --

13    that value from the first -- from the first position lien

14    personal property is not being adequately protected by putting

15    it into a restrictive junior lien position.

16         As admitted by Mr. Millenkamp, the debtor's adequate

17    protection proposal for both the use of cash collateral and the

18    DIP lone is to replace Rabo's interest -- sorry.  I don't want

19    to restate and go back through that argument.

20         Mr. Millenkamp asserts it is in the debtor's best

21    interest -- in the best business judgment to move forward in

22    this matter, but the recent history of this debtor's business

23    judgment is that while insolvent and just three days before the

24    receivership hearing, just two months prior to the bankruptcy

25    filing, the debtors purchased and leased 81 brand-new tractors

that caused the estate to be burdened with debt of 12 million --

$12.2 million.

And as you heard from the testimony of Mr. McKinlay,

that's not how an insolvent business gets turned around.

Instead an insolvent business looks at ways to save money which

may be having to use equipment that is not the newest but still

gets the job done.  That for an insolvent company potentially

allows for additional funds to be utilized to pay those feed

vendors that are not being paid.

And going back to the terms of the forbearance

agreement, the debtors have agreed to certain milestones and

financial covenants which they also want to agree with the

proposed DIP lender although it has not yet been identified as

to what those exact terms will be.  But under the terms of the

forbearance agreement, they were not able to meet many of the

milestones and covenants that at the time they represented that

they could do.

And further, under the receivership state court order,

the debtors had specific obligations to the receiver so that the

receiver could fully evaluate the financial situation and work

on potential resolutions that could stabilize the financial

situation for the betterment of the creditors of the

receivership estate.  But instead of abiding by the court order,

the receiver was forced to go into court several times, request

the court direct the debtors to comply with the terms of the

order which the court indeed admonished and directed the debtors

to do.

Further, what the evidence in the record demonstrates

is that while the 22 months had passed since the RLOC maturity

date, the RLOC collateral has continued to declined in value.

Indeed based on the debtor's own borrowing base certificate, in

just one, the RLOC collateral has declined in value by at least

$18 million between March 31, 2023, and February 29, 2024.

In reviewing the debtor's own budget on page 47 of

Docket 24, the debtors have projected to burn through 20.4

million for the first five months of the case and if you add in

the 11 million of livestock that they want to sell, it totals

31.6 million.  If you back out the critical vendor payments and

the professional fees, the cash burned in just five months is

9.1 million.

The business is not cyclical and is not building

inventory or accounts during those five months so a cash loss is

pending.  To address that, the debtors want to add on top of

that significant debt.

The testimony Mr. Millenkamp blames -- in the

testimony, Mr. Millenkamp blames MetLife for not issuing a loan

and Rabo AgriFinance for not revolving a matured loan.  Now

Mr. Millenkamp blames the receiver and Rabo for the lack of

liquidity during the receivership.

Notably, there's no accountability or responsibility on

the part of the debtors for the current financial situation
which is significant as that means that changes will not be
proposed by the debtor in possession for the benefit of the
estate.

All that the new debt will do is further over-leverage
the company and hurt its existing creditors.  The debtors have
ignored fixing the financial problems by alternatives such as
mezzanine debt, private equity or selling assets as a solution.
Instead, the offered solution is a significant and material debt
that the debtors have provided absolutely no plan as to how they
can repay that debt.

The increase from 35 million to 45 million ignores the
reality that these debtors have not been able to repay the 90
million RLOC matured loan for almost two years.  How will they
repay the DIP and the RLOC?  No one knows because the debtors
haven't articulated a plan to do so other than unspecified and
hopeful refinancing which has not occurred over the past two
years.

Despite the legal authorities which provide that to
comply with Section 364, the debtors must demonstrate that no
suitable alternative financing is available from other sources.
It was clear through Mr. Millenkamp's testimony that regardless
that Rabo Bank's terms are better for the estate as a whole, he
would not consider them.  What was the reason he gave?  Because
he stated he does not trust Rabo to comply with the terms of the

1    agreement.  Yet in making that assertion, Mr. Millenkamp

2    admitted that the complaints he did have with Rabo arose out of

3    Rabo exercising their expressed rights granted under the

4    agreements they both signed.  Thus I would submit that this

5    Court and debtor's counsel are quite capable of addressing any

6    party that does not comply with the terms of an agreement that

7    this Court has approved.

8         And to the contrary of Sandton's proposal, the DIP

9    proposal offered by Rabo Bank has significantly lower fees.  It

10   has more definite and transparent terms and there are means to

11   repay that obligation by taking seriously the suggested

12   solutions.  Each of the proposals submitted by Rabo are better

13   for the estate than the Sandton proposals and yet between April

14   3 and April 6, not a single representative of the debtors made

15   any effort to negotiate and solidify terms with Rabo for the

16   benefit of the estate.

17        As to the claim that speculative intercreditor disputes

18   make Sandton's proposal better is nonsense.  This Court is quite

19   capable of reviewing fully integrated agreements and determining

20   those issues just as the state receiver court did when it

21   received MetLife's arguments as to the ability of Rabo to seek a

22   receiver with the powers to file bankruptcy where the court

23   denied MetLife's interpretation after a single hearing and oral

24   argument.  In reality, if a creditor claims the other breached

25   the agreement, then those purported damages and arguments to the

1    contrary could be resolved in state court between those two

2    creditors.

3          Importantly, Mr. Millenkamp is a fiduciary of the

4    estate but in his testimony, it was clear he does not appreciate

5    that role.  Instead, he made it obvious that he's carrying this

6    grudge against Rabo into this bankruptcy as he did the last two

7    years because he thinks that Rabo has done him wrong although he

8    admitted it was enforcing the terms of the loan documents when

9    in reality Rabo is offering him, his companies and his creditors

10   a better deal, a less expensive deal for the estate.

11         And it is noteworthy that Mr. Millenkamp did not review

12   the DIP agreement or Rabo proposals.  I'm sorry.  Well, yeah.

13   And the financial -- their financial analyst did not review the

14   DIP agreement or Rabo proposals nor did she analyze the leverage

15   ratio before adding $45 million more in debt.

16         As to the use of cash collateral, Your Honor, Rabo is

17   willing to consent to the use of cash collateral.  It only

18   requests that the debtors comply with the bankruptcy code and

19   provide it real adequate protection.  In that regard, in

20   addition to the interest payments and replacement liens on the

21   RLOC post-petition collateral including milk proceeds and other

22   personal property, Rabo has requested the covenants that are

23   filed at Docket No. 143 be approved which consists of a covenant

24   regarding a borrowing base contraction, allows for the

25   replacement of livestock provided the debtors are in compliance

1   with the borrowing base, provides on a daily basis any and all

2   production of sales reports with consent being able to be

3   withdrawn if the debtors fail to pay within 45 days the accounts

4   payable at a designated amount so that those payables are not

5   increasing and that all critical vendors are required to release

6   their liens upon payment.

7          Of course paramount to that consent would be there is

8   no priming on that first position personal property.  In that

9   regard though, Rabo does reserve the right to address the rate

10  of interest and any additional payments to what was testified as

11  insider H & M at the final hearing.

12         Your Honor, based upon the record in this case, Rabo

13  does respectfully submit that the debtors DIP motion should be

14  denied in its entirety but at the very least, no interim priming

15  relief should be granted pending a final hearing in accordance

16  with the local rules.

17         And as to the use of cash collateral, Rabo will consent

18  to that use provided that certain adequate protections are in

19  place as designated herein and in Docket 143.

20         COURT:  Have there been discussions with the debtor

21  with respect to providing consent for use of cash collateral

22  along those lines with those covenants?

23         MS. SCHWAGER:  Your Honor, we have provided them twice

24  and we have not received any response to that.

25         COURT:  As to the cash collateral budget itself, is

1    there any concerns?

2              MS. SCHWAGER:  There's not, Your Honor.  The cash

3    collateral -- for the interim period?

4              COURT:  For the interim period.

5              MS. SCHWAGER:  Right.

6              COURT:  Is your client taking a position with respect

7    to the critical vendor order?

8              MS. SCHWAGER:  No.  They have no objection to the

9    critical vendor.

10             COURT:  All right.

11             MS. SCHWAGER:  Thank you, Your Honor.

12             COURT:  Thank you, Ms. Schwager.

13             MS. SCHWAGER:  Except to the extent the H & M

14   payments -- it reserves the right as to after the interim order

15   period to evaluate that insider and just make sure that it's

16   fair and reasonable.  So interim relief for the critical vendors

17   that have been requested is acceptable.

18             COURT:  And I think that does include payments to

19   H & M Custom.

20             MS. SCHWAGER:  It does.  And the interim proposed

21   payments, it has no objection to the interim proposed payment

22   but reserves the right as to any payments after the final

23   hearing so that it can be adequately vetted and evaluated and

24   addressed at the hearing after everyone's had due notice.

25             COURT:  All right.  Thank you, Ms. Schwager.

1          MS. SCHWAGER:  Thank you.

2          COURT:  Mr. Naess.

3          MR. NAESS:  Thanks, Your Honor.  The U.S. Trustee has

4    some concern about the critical vendors issue.  The debtors are

5    requesting extraordinary relief.  They're requesting relief

6    that's not explicitly authorized by the provisions of the

7    bankruptcy code.  Instead, they're relying upon a doctrine of

8    necessity that's been developed through case law.

9          And as the Court noted, you know, that case law and

10   that doctrine are not universally accepted.  The Court mentioned

11   the BNW case, a Ninth Circuit decision, which refused to extend

12   that doctrine beyond railroad cases.  And there have been

13   decisions since then that have distinguished the Ninth Circuit

14   decision but as the Court notes, last June in the McMillan case,

15   the District of Oregon at least found that BNW precluded

16   payments to critical vendors under the doctrine of necessity as

17   well as under Sections 363 and 507 and 105.

18         So I think there is question as to whether or not the

19   Court is authorized.  The U.S. Trustee at this time is not

20   making a substantive argument that the Court can't authorize it.

21   Rather, our concerns are that at this period of time, parties

22   who do have a pecuniary interest in the debtor's operations who

23   might be unfavored, unsecured creditors have not had the

24   opportunity to review or to come and voice their opinions or

25   potential objections to the request.

1          Part of the concern is that there's a substantial

2    request in connection with the First Day motion.  The First Day

3    motion that was sent out as documented in the certificate of

4    service was for $31.6 million total with $5.2 million in the

5    interim.  And the motion itself, the critical vendor motion did

6    not include a list of who those critical vendors were or what

7    the payments would be made to them according to any sort of

8    schedule, but rather refer to the cash collateral motion and the

9    cash collateral budget where near the end of that budget, those

10   payments are identified.

11         So there's question as to whether or not, you know,

12   parties were sufficiently directed to the cash collateral budget

13   to be able to identify what those payments were.  A bigger

14   concern to the U.S. Trustee, however, is that the night prior to

15   the commencement of yesterday's hearing so on Monday night,

16   there's a supplement that increased the amount of interim -- the

17   interim to 7 and a half million dollars from 5.2 million and the

18   total payments to 40.1 million.

19         And it did so even though the -- so in doing so, there

20   were a number of critical vendors that were added to that list.

21   The initial list included 15.  The supplemental list included

22   41.  So there's a substantial increase in the number of critical

23   vendors that were going to be paid.  The amounts of critical

24   vendor payments didn't increase as significantly.  It was

25   roughly $2.1 million and an increase from the initial motion to

the supplemental cash collateral budget.  That said, nearly that
whole $2 million or more, 2.3, was an increase in the interim
payment that's being requested.

         Based on our review of the docket, the only parties
that have received notice of the increased cash collateral
budget request are those that are receiving electronic notice.
So the vast majority of unsecured creditors, others who might be
aware of the relationships that might indicate that these aren't
appropriate critical vendor payments or that might have
knowledge that would raise an objection that have not received
notice that there's been an increased request in the amount or
in the number of the vendors to be paid.

         So our request is that if the Court does decide to
enter an interim critical vendors order, it be limited to no
more than the initial $5.2 million request.  We're here on
shortened notice we recognize but that's necessary but shortened
notice is better than no notice and we don't think there's been
any notice -- or any substantial notice of the increase to 7 and
a half million dollars.

         The code requires substantially similar claims to be
treated similarly and the debtors are proposing to favor a
subset of their creditors over others that are in a
substantially similar situation.  Some unsecured creditors will
be favored with critical vendor payments prior to confirmation
of the plan where others will not be.

1       The debtor's representative testified that their intent

2   is to have a plan confirmed within 130 days and so from our

3   perspective, the question is who is necessary to pay a

4   prepetition debt within that 130-day period prior to

5   confirmation of a plan.

6       Rule 6003(b) lends a bit of a direction to the Court

7   within at least the first 21 days of the case's commencement

8   that there needs to be a finding that there was a necessity to

9   avoid irreparable harm.  The burden of showing that there's that

10  necessity rests with the debtor and relating back to the

11  increase in the number of creditors, the evidence that was put

12  on was evidence in regards to generalities that all of these

13  creditors are required to provide.  There's nobody else that can

14  provide the service.  We require these creditors to provide a

15  service.  These creditors are going to stop providing the

16  service if they don't get these prepetition payments.

17      Generalities might be fine when we're talking about 15

18  creditors who are going to receive payments.  When we're talking

19  about 41 creditors who are going to receive payments, then

20  generalities become less effective in determining whether or not

21  each specific critical vendor on that list is actually necessary

22  to avoid immediate and irreparable harm.

23      We note that all this is being done outside of a plan

24  prior to a disclosure statement and prior to even schedules

25  being filed.  At this point, nobody even knows what the scope of

1   the unsecured creditors are or how much of each unsecured

2   creditor's claim is being proposed to be paid as a critical

3   vendor payment.  The only creditor that we're aware of is H & M

4   which is the insider of the debtor who is proposed to be paid I

5   think $4.25 million on a $4.5 million prepetition claim.  That's

6   nearly the entire -- nearly the entire claim would be paid

7   through the critical vendor payment.

8        I think the reality is that in every case, there are

9   creditors who would like to be paid earlier than other

10  creditors.  The race to a debtor's pocketbook is what the

11  bankruptcy code is designed to prevent to ensure quality of

12  treatment among creditors of a class.

13       Given the scope of the request and the potential harm

14  to unfavored creditors who have not yet received much notice of

15  this case or the potential harm, the Court should be judicious

16  in its approval particularly in the interim request.

17       The purpose -- I guess we'd note, you know, there has

18  been testimony that the debtor has over 100,000 head of cattle

19  and it's important that not only are these vendors potentially

20  critical to the debtor's operation, but the debtor provides

21  critical financial input into the vendors' operations as well.

22  And we didn't hear much about, you know, the leverage that that

23  gives the debtor to potentially negotiate at least for 130 days

24  to hold some of those creditors at bay to keep them providing

25  service.

1          The purpose of the increase from $31.6 million request

2    to a $40.1 million request is unknown and unexplained at this

3    time.  Per the -- as I noted, the per the debtor's initial

4    request, they were asking for roughly $16 million in total

5    critical vendor payments.  Now they're asking for $18 million

6    and the -- while they're asking for an increase in the critical

7    vendor cap of 8 and a half million dollars.  So it's unclear to

8    us why they need -- why the cap has gone from $31.6 million to

9    $40.1 million when the budget that they've proposed only shows a

10   need for roughly $2.1 million more in critical vendor payments

11   over the 130 days that they anticipate needing these payments

12   for in order to meet their target for getting a plan confirmed.

13         Two points to end.  The first is that the United States

14   Trustee intends to form an unsecured creditors committee in this

15   case if there's sufficient interest from qualified creditors.

16   We've started to receive responses.  People are interested.  I

17   anticipate that we will be forming a committee -- or appointing

18   a committee.

19         Doing so, however, may prove difficult in this case.

20   The United States Trustee will not appoint a critical vendor

21   payment recipient to an unsecured creditor committee.  It makes

22   no sense to have a committee that has creditors who are being

23   favored over other creditors of the same type trying to work

24   together to express a common interest.

25         For that purpose, we've requested that the reporting

1    that the debtor has identified in what it calls its

2    accountability requirements in its critical vendor motion be

3    either weekly or at least some period of time more frequent than

4    monthly so that we can be sure that the unsecured creditor

5    committee does not include vendors who are receiving critical

6    vendor payments.

7           Lastly, we disagree with the proposal to keep those

8    reports under seal under Section 107 and the general principles

9    of bankruptcy.  Transparency is key to the process and I don't

10   believe that the Court has the authority to allow the debtor to

11   file those orders under seal.  Section 107 identifies certain

12   specific situations in which filing a document under seal is

13   appropriate.  Critical vendor payment reports is not one of

14   those.

15          Does the Court have any questions?

16          COURT:  Thank you, Mr. Naess.  No questions.

17          MR. NAESS:  Thank you.

18          COURT:  All right.  Counsel for Conterra.

19          MR. FAIRLIE:  Good afternoon, Your Honor.  Zach Fairlie

20   on behalf of Conterra.

21          Your Honor, my client does not take a position on cash

22   collateral or on the critical vendor motion so that leaves the

23   DIP motion.  We did file an objection that had three components.

24   No. 1 was adequate protection; no. 2 was the priming lien on the

25   German Dairy and no. 3 was the cost of the DIP.

1          As my colleague explained this morning, the stipulation

2     takes care of those first two items and so what remains is the

3     cost of the DIP and so I think we've heard that Rabo has

4     proposed the cheapest DIP and that's what we're in favor of.

5     Whatever the outcome, Your Honor, we're going to work with all

6     parties and we look forward to working with all parties.  So I'm

7     going to keep it short and sweet unless Your Honor has anything

8     you'd like to ask of Conterra.

9          COURT:  I don't have any additional questions.  Thank

10     you.

11          MR. FAIRLIE:  Thank you, Your Honor.

12          COURT:  I'll circle back to Ms. Mikkinlineni.  Any

13     response to the comments you just heard?

14          MS. MIKKILINENI:  Yes, Your Honor.  I just want to

15     address some points raised by Rabo's counsel.  They've been

16     saying that we have been unwilling to negotiate with Rabo since

17     receiving their DIP term sheet and that's because we had made

18     the determination that based on the noneconomic reasons, we

19     would not be going forward with Rabo and decided not to continue

20     negotiating with them because we decided to go with Sandton's

21     DIP proposal on that Saturday, I think it was April 6.

22          I mean even their witness from FTI said that you start

23     with a big pool of potential lenders.  You weed them out.  Once

24     you weed them out, you stop going -- you stop negotiating with

25     them.  So we think that is very reasonable for us to do that.

1          The valuations that were talked about and about how we

2    didn't get an appraiser.  This is a very fast moving case right

3    now.  We relied on Mr. Millenkamp because he is the property

4    owner.  He has experience in his equipment and his land and he

5    has enough knowledge to put valuations on his property.  Rabo

6    also did not provide any evidence to rebut that evidence.

7          For the personal property equity cushion, I stated that

8    there's a 50 percent equity cushion if you take into

9    consideration just the amount owed to Rabo.  But even if you add

10   in the $45 million DIP amount to just the personal property

11   equation, there's still a 25 percent equity cushion there.  So

12   still sufficient equity cushion to provide adequate protection

13   to Rabo.

14         Rabo's counsel stated that there were speculative

15   intercreditor disputes.  That's not true.  They are not

16   speculative.  We have spoken to MetLife's counsel about what

17   would happen if we went forward with Rabo's proposed DIP terms

18   and they have told us that they will be vigorously object to

19   that DIP proposal based on those intercreditor agreements.  So

20   it's not speculative in any sort of nature.

21         To just address briefly some of the comments made by

22   the UST on the critical vendor motion, I did want to point out

23   that 80 percent of the critical vendors on that list have liens

24   and we are also okay with not filing the reports under seal.

25   That was actually left in there from a prior version on accident

1   and so we won't be filing those under seal and we're okay with

2   providing the reports more timely.  Weekly would be fine.  Thank

3   you.

4           COURT:  Thank you.  All right, counsel.  I want to take

5   about a 15-minute recess just to kind of collect my thoughts and

6   we'll come back out on the record.

7           CLERK:  All rise, please.

8                               (Recess taken.)

9           COURT:  All right.  We are back on the record in Case

10  N. 24-40158.  We've got three matters before the Court:  The

11  debtor's request for use of cash collateral which is Docket 22;

12  debtor's critical vendor motion, Docket 23, and debtor's request

13  for debtor in possession financing, Docket 24.  I want to make

14  just a couple prefatory comments before ruling, maybe give the

15  parties an opportunity to respond.

16          I've got concerns with respect to two of the motions

17  and I'll start with the critical vendor motion.  And my concern

18  there is, first, there's potentially Ninth Circuit authority

19  that is binding that would prohibit the Court from granting the

20  relief that's requested in that interim motion.  And I'm

21  inclined to simply continue this matter out for a final hearing

22  and let the parties address that issue and provide additional

23  briefing as to whether or not that BNW Enterprises case is in

24  fact controlling Ninth Circuit case law as some of my colleagues

25  in Oregon have concluded.

1          That being said, with respect to some of the critical

2     vendors, based on the record, it appears that some of those

3     vendors are secured lenders and they have liens encumbering the

4     debtor's property as of the petition date.  And I think there is

5     a path forward on an interim basis for those folks in that to

6     the extent they have a valid lien encumbering the property,

7     they're entitled to adequate protection and I think it's

8     possible for the debtor to make some interim payments on that

9     basis.

10          I also have a notice issue with respect to the critical

11     vendor motion as Mr. Naess brought up in that it ought to be

12     served on the entire creditor body so there is notice and

13     opportunity to object by all parties who potentially could be

14     impacted by that motion.

15          The other motion that I have concerns about is the DIP

16     motion and I think really, my job is to give the debtor an up or

17     down vote as to what it's put forward.  I'm not going to

18     substitute my business judgment for the debtor's and tell the

19     debtor you need to take Rabo's debtor in possession financing

20     agreement or somebody else's financing agreement.

21          The debtor's made a decision that the Sandton agreement

22     is the agreement that it would like to proceed with and I'm

23     prepared to give the debtor an up or down vote on that.  That

24     being said, I have concerns with the fact that 4000 -- Rule

25     4001(c) requires that that credit agreement be filed with the

1   DIP motion and we don't have that here.

2         In fact, we don't have a final credit agreement even

3   today at the conclusion of the evidentiary hearing and I think

4   that's a problem from a due process standpoint in that parties

5   in interest should be given notice and an opportunity to object

6   to the terms of that credit agreement and I also have

7   reservations about signing off on an order where the debtor in

8   possession credit facility isn't yet finalized and the parties

9   are still negotiating the terms and that what the parties

10  negotiate could potentially change certain terms even after the

11  Court gives some sort of approval.

12        So that being said, kind of my concerns, I'm wondering

13  what the path forward looks like from the parties' perspective

14  today.  Do the parties simply want me to rule on the motions or

15  is there an alternative?

16                   (Break in proceedings.)

17        COURT:  Thank you.  Please be seated.  All right.

18  We're back on the record in Case 24-40158.  All right.  Does

19  debtor counsel want to bring me up to speed as to where the

20  parties are after their conversation?

21        MR. CHRISTENSEN:  Your Honor, as the Court recognized,

22  there's three motions before the Court:  The critical vendor

23  motion, the cash collateral motion I'll discuss first and then

24  the DIP motion after that.

25        On the -- well, maybe I'll actually do it a little bit

1    differently.  The DIP motion -- the final credit agreement with

2    Sandton, I think we can get that finalized and submitted to the

3    Court tonight so the request would be on that one that the Court

4    hold over ruling on that motion until we get that filed and of

5    record with the Court.

6            I think on an interim basis, the Court could, assuming

7    it's inclined to do so, grant the motion on an interim basis

8    subject to final approval of the loan and the terms of that --

9    of that credit agreement.  I think even if the credit agreement

10   had been filed as an attachment to the original motion, that's

11   what the Court would be doing.  Not a final approval of the

12   agreement at the interim hearing.  So we would get that of

13   record so it's at least before the Court in time for that ruling

14   on that motion.

15           We're told that the soonest the Court could do that

16   hearing would be Tuesday at 3:00.  If there's any way of making

17   that sooner, we would not object to it being sooner than

18   Tuesday.  I don't anticipate there would be additional argument

19   on that.  Just the ruling from the Court with that now being of

20   record.  So that's the proposal on the DIP motion.

21           The other two motions, we would request approval of

22   today on an interim basis.  Cash collateral motion of course

23   subject to some of those things on the cash collateral budget

24   being dependent on the DIP motion that would come later but at

25   least getting that motion approved today avoids having to have

1    another one or two or three-day-long cash collateral order in

2    the meantime.  So that one we'd request be approved on an

3    interim basis today.

4            As far as the critical vendor motion, as the Court

5    recognized, there are some of the vendors listed on that

6    critical vendor list that do have security interests in certain

7    things that the debtor owns.  So there's potentially three

8    categories that those vendors could fit into.  One is a critical

9    vendor.  One is a vendor with a lien that needs adequate

10   protection payments and lastly on a couple of them at least is

11   the debtor is not currently receiving products from those

12   vendors because of the liens that they've enforced and we aren't

13   able to access the silage for instance.

14           So for those ones, it's almost a COD payment to those

15   creditors saying we'll pay you X amount and we'll use that

16   amount of the corn silage over some period of time.

17           So I can identify for the Court the five vendors from

18   the critical vendor list that have security interests in

19   something and I'll explain what they have something in and I've

20   discuss that had with Mr. Naess who's in agreement that those

21   five could be approved on an interim basis.  The rest of them

22   would wait for final approval at the final hearing on May 8.

23           Those five vendors with leans on things are first H & M

24   Custom.  The second is the corn silage group, the corn farmers,

25   and I said there's five vendors.  I guess in that group, there's

1 technically 15 farmers but we treat it as one on the budget.

2 Those two creditors -- the corn silage farmers have liens in

3 certain of the corn silage pits that the debtors have claim to.

4 They grew the crop that's in that pit.

5   H & M Custom as the chopping company has a lien on

6 those pits as well as some other pits as well that the corn

7 farmers aren't necessarily part of so that's the nature of the

8 liens that both of those parties have.

9   Both of those two were parties that had prepetition

10 state court lawsuits with the debtors that had TRO's entered in

11 those lawsuits that prevent the debtor from currently using the

12 corn silage absent the agreement of those parties.  We basically

13 have agreement with those parties provided we make the payments

14 that we can then use the silage in the pits.  So those are the

15 first two.

16   Third is an entity known as Healthy Earth is a hey

17 supplier.  The interim payment to them is approximately $60,000

18 and they have liens on the hay that the debtor still hasn't used

19 yet or at least some portion of it.

20   I mentioned the amount to be paid to H & M Customs is

21 2.5 over that time period.  Silage group is 2 million.  The

22 fourth entity is MWI.  MWI is the medicine supplier to the

23 debtor.  They are providing medicine on a COD basis but the

24 debtor has a stock of medicine that they maintain a lien on for

25 what hasn't been paid.  The payments to them over the interim

1    period will be approximately 500,000.

2         And then the last entity is Coastline which is an

3    equipment repair place that has equipment of the debtor at there

4    facility right now that they're holding until we pay for it.  So

5    that lien would justify the payment to them of approximately

6    140,000.

7         So my quick math is with all of them, it's about 5.7

8    million, maybe a little more, 5.74 million and interim payments

9    to those vendors on whatever theory it is that they get paid and

10   then, like I said, the rest of the critical vendors on that list

11   would be held till the final hearing.

12        I discussed that with Mr. Naess.  He has no objection

13   to it.  Also discussed it with -- or ran it by Rabo.  I don't

14   think they object either.  Technically, I haven't discussed it

15   with Met or Conterra but -- so we request that motion be

16   approved on an interim basis subject to the final hearing and,

17   at the final hearing, we can address the authority issue that

18   the Court brought up as well as the remaining critical vendors

19   on the list.  I think that's it.

20        COURT:  All right.  Thank you, Mr. Christensen.

21   Comments from counsel for MetLife.

22        MR. GOURLEY:  No problem.

23        MR. SCHANDLBAURER:  Nothing, Your Honor.  We're fine.

24   Thank you.

25        COURT:  Rabo AgriFinance.

```
 1              MS. SCHWAGER:  No objection, Your Honor.  Just that the
 2    reservation of rights that's already been set for (inaudible).
 3              COURT:  And with respect to the cash collateral motion,
 4    Ms. Schwager, is there an understanding between the parties on
 5    an interim basis at least as to acceptable reporting
 6    requirements?
 7              MS. SCHWAGER:  As to accept what, Your Honor?
 8              COURT:  Reporting requirements.
 9              MS. SCHWAGER:  We have not received -- I thought we
10    were just now talking about the critical vendor motion.  Not the
11    cash collateral.
12              COURT:  Well, we can --
13              MS. SCHWAGER:  I just wanted to make sure I didn't
14    miss --
15              COURT:  Yeah, that's fine.  I was just curious on cash
16    collateral.  Is there a --
17              MS. SCHWAGER:  We, Your Honor, had submitted the terms
18    that we would consent to and we haven't received any objection
19    but I haven't received any response.
20              COURT:  Okay.  Mr. Naess, on the critical vendor
21    motion, it sounds like you're in agreement with Mr.
22    Christensen's proposal as to that 5.74 million?
23              MR. NAESS:  We are.  Maybe I misheard.  I think the
24    math's closer to 5.2 if it's 2.5 to 60,000, 500,000 and 40,000
25    but we can work on the math in the order.  That's fine.
```

```
 1                COURT:  All right.

 2                MR. O'BRIEN:  No objection from Conterra.

 3                COURT:  Okay.  All right.  So with respect to the

 4     critical vendor motion, the Court is prepared to grant that

 5     motion consistent with the parties' understanding.  So we'll

 6     grant it on an interim basis as to those five lenders just

 7     outlined by Mr. Christensen in those payments.

 8                As far as those creditors that have liens encumbering

 9     the debtor's property, we'll set this over for a final hearing

10     May 8 at 9:00 a.m.?

11                CLERK:  Yes, Your Honor.  That is in person.

12                COURT:  That is in person.  Mr. Christensen, go ahead

13     and provide an interim order to the Court consistent with that

14     proposal you made that the parties do not object to.  Which

15     parties would like to endorse the form of that order?

16                MS. SCHWAGER:  Rabo does not need to endorse that

17     order, Your Honor.

18                MR. NAESS:  We would like to, Your Honor.  Thank you.

19                MR. O'BRIEN:  We don't need to.  Thank you, Your Honor.

20                MR. GOURLEY:  MetLife does not need to.  Thank you,

21     Your Honor.

22                COURT:  All right.  Go ahead and just obtain Mr. Naess'

23     endorsement on the form of that order, Mr. Christensen.

24                And with respect to that critical vendor motion, to the

25     extent that the debtor does want to seek the additional critical
```

1    vendor payments, there is that second increase that was filed.

2    I think Mr. Naess' comments earlier were correct in that you

3    ought to provide notice in connection with the final hearing to

4    all of the parties in interest in the case so parties do have an

5    opportunity to object to that if they want to.

6            All right.  With respect to the debtor in possession

7    motion, I appreciate the parties' efforts in getting that credit

8    agreement finalized and filed with the Court tonight.  We'll set

9    an additional continued interim hearing on that for Tuesday

10   which is Tuesday, April 16 at 3:00 p.m.  That will be

11   telephonic.  As far as notice, I'd like to have you also provide

12   a supplement to all parties in interest with that debtor in

13   possession credit agreement and to the extent any party wishes

14   to object and be heard at that telephonic hearing, they can.

15           So in connection with providing that supplement to the

16   parties in interest as to the credit agreement itself, why don't

17   you go ahead and provide a notice of hearing to those folks as

18   well so if there's a general unsecured creditor that does want

19   to weigh in, they would be apprised of the hearing and that

20   credit agreement.

21           All right.  Do we need to address anything further on

22   cash collateral as far as comments from the parties?

23           All right.  With respect to -- that's Docket 22, the

24   cash collateral motion.  I'm prepared to grant the debtor's

25   motion and approve the requested interim relief with respect to

1    the cash collateral motion.  I think it's appropriate here that

2    the debtor be authorized to use cash collateral in order to

3    avoid immediate and irreparable harm that would occur should the

4    debtor be deprived of the use of that cash collateral.  The

5    cattle in this case need to be cared for and fed in order to

6    preserve the value of the debtor's operation.

7         And I think the debtor's established pursuant to

8    Section 363(c)(3) that there's a reasonable likelihood that the

9    debtor will prevail at the final hearing given the record that

10   the parties made to the Court.

11        So the Court will grant that motion.  That will be

12   subject to the creditors with an interest in that cash

13   collateral getting a replacement lien to the same validity,

14   priority and extent as existed on the petition date and of the

15   other adequate protection items that the debtor included in

16   there as far as interest being paid to lenders at a non-default

17   contract rate as of the petition date.  The requirement that

18   insurance be maintained and continue in place.

19        With respect to reporting, that weekly variance

20   reporting will be required as well.  I know that Rabo's

21   requested a daily sale report with respect to cattle that are

22   sold.  At least for the interim period, I'd like to see that at

23   least on a weekly basis and also the weekly borrowing base

24   certification for Rabo and we can see whether or not those

25   reporting requirements need to be adjusted once we get to the

1  final hearing.

2          With respect to endorsing the form of that order, I'm

3  assuming Rabo AgriFinance will want to endorse the form of that?

4          MS. SCHWAGER:  We would, Your Honor.  And I did have a

5  question.  We had requested and objected to the cattle being

6  sold and the proceeds -- we had agreed in the one-week extension

7  that the cattle proceeds would be replenished by a DIP lender in

8  an account that would be issued in favor of Rabo.  We would

9  request that if there are any of Rabo's cattle that has a first

10  priority lien in are sold between now and the final hearing that

11  that same condition applies.

12          COURT:  All right.  Is there any object by the debtor

13  to that requirement?

14          MR. CHRISTENSEN:  Yes, because we intend to sell some

15  cattle and replace those cattle with new cattle.  So to the

16  extent we have to sell cattle and set aside all the proceeds of

17  those cattle, we can't replace them.  That's the whole point of

18  the revolving cattle production.  So if the request is if we

19  sell a cow and don't replace it with something new that those

20  funds be set aside, we maybe can live with that but the debtor's

21  intention is to replace the cattle as they're sold.

22          COURT:  All right.  And I think in your covenants, you

23  had indicated it would be acceptable to Rabo for those proceeds

24  to be used to purchase additional cattle?

25          MS. SCHWAGER:  Correct, Your Honor.  And in fact in the

1  docket number -- is it 143 which the debtors have not responded

2  to, we had placed in there a covenant regarding the borrowing

3  base and that if the cattle sales could occur so long as the

4  borrowing base was not being declined but to the extent it was

5  declined, then those proceeds would be -- you could use those

6  proceeds but they would be utilized -- I'm sorry.  The DIP

7  financing would have it in an account similar to the initial

8  interim order in favor of Rabo.  So it's if the borrowing base

9  declined where when they're replacing it, there's no value.

10 That value is being decreased to Rabo.

11     COURT:  All right.  So are the parties going to be able

12 to put language in the order that's acceptable to both of the

13 parties as to the requirements with respect to steer and other

14 cattle sale proceeds do you think?

15     MS. SCHWAGER:  I would ask that we have a response to

16 the cash collateral terms that we submitted that we said would

17 be acceptable to Rabo so that we can determine whether or not we

18 can reach a resolution.

19     MR. CHRISTENSEN:  I think that response will be in the

20 draft order that we submit to Rabo for approval.

21     MS. SCHWAGER:  And then if we don't reach an agreement,

22 then we'll deal with that Tuesday?

23     COURT:  If the parties are unable to -- I mean the cash

24 collateral issue needs to get resolved sooner rather than later

25 so if the parties aren't able to come to any sort of agreement

1  with respect to cash collateral use, contact Ms. Battle tomorrow

2  and if we need to get some telephonic hearing and tee that

3  dispute up, we can.

4        MS. SCHWAGER:  Okay.

5        COURT:  I'll leave it up to the parties to work

6  together and see if they can narrow that dispute or resolve it

7  amongst themselves on this cattle use proceeds.

8        MS. SCHWAGER:  Thank you.

9        MR. O'BRIEN:  Your Honor, if I may just briefly address

10  that.  Conterra has the second priority lien on the livestock so

11  we would like to sign off on the order.  We would like to see

12  the same weekly reports that Rabo is getting and we would like

13  Conterra's junior lien to be recognized in the order and we're

14  okay with Rabo's requirements, whenever they might be, but we

15  just want to make sure that our junior lien is recognized in

16  whatever it looks like.

17        COURT:  All right.

18        MR. GOURLEY:  And Your Honor, MetLife would like to

19  sign off on that cash collateral order as well.

20        COURT:  Okay.  All right.  So go ahead and put that

21  order towing, Mr. Christensen, with the endorsements of the

22  parties.  If there is an issue that arises as far as the parties

23  not being in agreement with some of the specific cash collateral

24  terms, contact Ms. Battle and we'll give you a ruling if we can

25  on those.

1          I forgot to mention too with respect to the debtor in

2     possession financing, there is that requirement in our local

3     rules that a party include a statement of whether the DIP

4     agreement itself contains non-standard provisions as set forth

5     in that appendix.  And it also requires that the parties

6     identify within the credit agreement where those provisions are.

7     So if you could provide some sort of supplement as well that

8     cross references where those non-standard provisions are in the

9     agreement, that would be helpful and also comply with our local

10    rule.

11         All right.  I think that addresses the three motions

12    that were set for hearing today.  Mr. Naess, are you going to

13    enforce the form of that cash collateral order?

14         MR. NAESS:  Yes, Your Honor, please.

15         COURT:  Okay.

16         MR. NAESS:  Thank you.

17         COURT:  Is there anything else that we need to discuss

18    from the debtor's perspective?

19         MR. CHRISTENSEN:  No, Your Honor.

20         COURT:  Rabo Agrifinance?

21         MS. SCHWAGER:  No, Your Honor.  Thank you for your

22    time.

23         COURT:  Mr. Naess.

24         MR. NAESS:  No, thank you.

25         COURT:  Conterra.

1          MR. O'BRIEN:  No, Your Honor.

2          COURT:  And MetLife?

3          MR. GOURLEY:  No, Your Honor.

4          COURT:  All right, counsel.  We are concluded.  Thank

5    you.

6          CLERK:  All rise, please.  We're adjourned.  Thank you.

7                        (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


  /s/ Tamara A. Weber                    4/22/24

Signature of Approved Transcriber          Date


  Tamara A. Weber

Typed or Printed Name