Sheila R. Schwager, ISB No. 5059
Brent R. Wilson, ISB No. 8936
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5261
Email: sschwager@hawleytroxell.com
        bwilson@hawleytroxell.com

Andrew J. Schoulder (pro hac vice)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com

Attorneys for Rabo AgriFinance LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE, INC.,<br><br>       Debtor. | Case No. 24-40158-NGH |
| Filing relates to:<br>☒ ALL DEBTORS<br>☐ Millenkamp Cattle, Inc.<br>☐ Idaho Jersey Girls<br>☐ East Valley Cattle<br>☐ Millenkamp Properties<br>☐ Millenkamp Properties II<br>☐ Millenkamp Family<br>☐ Goose Ranch | Jointly Administered With Case Nos.:<br><br>24-40159-NGH (Idaho Jersey Girls)<br>24-40160-NGH (East Valley Cattle)<br>24-40161-NGH (Millenkamp Properties)<br>24-40162-NGH (Millenkamp Properties II)<br>24-40163-NGH (Millenkamp Family)<br>24-40164-NGH (Goose Ranch)<br>24-40166-NGH (Black Pine Cattle)<br>24-40167-NGH (Millenkamp Enterprises)<br>24-40165-NGH (Idaho Jersey Girls Jerome<br>          Dairy)<br><br>Chapter 11 Cases |

☐ Black Pine Cattle

☐ Millenkamp Enterprises

☐ Idaho Jersey Girls Jerome Dairy

### RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION AUTHORIZING USE OF CASH COLLATERAL ON A FINAL BASIS; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION ON A FINAL BASIS

Rabo AgriFinance, LLC, in its capacity as agent and lender ("**RAF**"), hereby files this *Omnibus Objection to (I) Emergency Motion Authorizing Use of Cash Collateral on a Final Basis (Dkt. 22); and (II) Emergency Motion Authorizing the Debtors to Obtain Post-Petition Financing and Granting Adequate Protection on a Final Basis (Dkt. No. 24)*. By this Objection, RAF incorporates by reference *Rabo AgriFinance LLC's Omnibus Objection to (I) Emergency Motion Authorizing Use of Cash Collateral; and (II) Emergency Motion Authorizing the Debtors to Obtain Post-Petition Financing and Granting Adequate Protection* filed on April 3, 2024 (Dkt. No. 81) (the "**Original Objection**") as supplemented by the Supplement thereto filed on April 4, 2024 (Dkt. No. 99) (the "**First Supplement**"), as further supplemented by the Second Supplement thereto filed on April 8, 2024 (Dkt. No. 131) (the "**Second Supplement**"), and as further supplemented by the Third Supplement thereto filed on April 15, 2024 (Dkt. No. 181), (the "**Third Supplement**" and, collectively, the "**Objection**") and in support thereof states as follows:[1]

RAF recognizes that this Court has determined that the financing requested by the Debtors from Sandton is essential for the continued operations of the business and the well-being of the livestock, and that this Court has deferred to the Debtors' business judgment in choosing Sandton as the DIP lender, despite alternatives which provide less expense to the creditors of that Estate.

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objections, as applicable.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 2

59797.0007.17113473.4

Nevertheless, RAF respectfully submits that the Debtors have not met their burdens of proof to obtain approval for the amounts they seek, which significantly over-levers the Debtors' Estates. Further, the Debtors' proposed priming and purported adequate protection, is inequitable and does not meet the legal indubitable equivalent standard. Accordingly, RAF respectfully submits that the approved DIP financing should be reduced until and if the Debtors are able to provide a definite, reachable, and actual budget for all of the financing sought and that adequate protection and priming be modified to meet the standards of the Bankruptcy Code and applicable caselaw.

For the DIP Motion to be approved on a final basis, the Debtors must meet their burden of establishing that (i) a feasible plan can be filed, (ii) creditors being primed are receiving the indubitable equivalent of their interests, and (iii) creditors are adequately protected. As discussed in the Objection and based upon the evidence at the evidentiary interim hearings, the Debtors have failed to carry each of these burdens because they can neither demonstrate reliable financial controls, reliable commitments to repay the DIP loan, nor reliable sources of information and disclosure. Through the current motions, the Debtors are attempting to incur an additional $45 million of priming debt on an already leveraged company that cannot pay its debts as they become due, with the addition of premium fees and interest for the DIP lender. Yet, the Debtors have not satisfied their burden of demonstrating a feasible plan can be filed or that RAF is adequately protected. Accordingly, RAF respectfully requests that if the Court is going to continue to approve the Debtors' request for the DIP Financing, that the amounts be limited and controls put into place to protect the creditors of the Estates.

A.    **The Amount of the Proposed Financing Would Render Any Plan Infeasible**

When assessing the prospect of a priming DIP financing, the requirements of plan confirmation must be considered. *See, e.g., In re Chevy Devco*, 78 B.R. 585 (Bankr. C.D. Cal. 1987) (denying DIP financing when creditor would be denied safeguards of Chapter 11 confirmation under Debtor's proposed DIP financing, which was tantamount to a plan of

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 3

reorganization).  To confirm a plan, the Debtors will need to demonstrate, among other things, that their proposed plan is feasible. *See* 11 U.S.C. § 1129(a)(11).

Both the Debtors' long history of financial mismanagement and the evidence of the record early in these bankruptcy cases demonstrate that the Debtors will not be able to propose a feasible plan of reorganization, particularly after the Estates are subject to at least $50 million in risky, high-cost debt in the form of the requested DIP Financing, when the fees and interest are taken into account.

**1.    No Plan Could Be Feasible Given The Debtors' Lack of Financial Controls.**

The Debtors' lack of financial controls and ability to generate sustained positive cash flow is fatal to prospects of proposing a feasible plan.  In the first twenty-nine (29) days since the Petition Date, the Debtors have submitted no less than four (4) versions of a 13-week budget - first, on April 2 (the **"First Budget"**)[2], then on April 8 (the **"Second Budget"**)[3], again on April 17 (the **"Third Budget"**),[4] and just hours before the objection deadline yet a fourth revised budget submitted on May 1, 2024 (**"Fourth Budget"**)[5].  At the Interim Hearing, the Debtors' financial advisor, Kati Churchill of Kander LLC, testified that she has been preparing the Debtors' forecasting and budgets since the Summer of 2021.[6]  Ms. Churchill further testified that the Debtors currently plan to exit chapter 11 within 130 days of the Petition Date.[7] According to her testimony, the Second Budget was prepared based on "deep conversations with the Millenkamp

---

[2] Ex. 3030.

[3] Ex. 1015.

[4] Ex. 3044.

[5] On April 24, 2024, RAF's counsel requested confirmation of the final DIP budget.  On April 25, 2024, Debtors' counsel responded that they intended to file a *new* budget with the Exhibits on May 3, 2024.  When it was pointed out that would be after the deadline of May 1st and that the creditors and UST were entitled to know what was being requested well in advance of the objection deadline, the Debtors forwarded a new budget to the UST and RAF's counsel on the afternoon of May 1, 2024.  RAF submits that such late submissions do not provide due notice and adequate time to fully analyze the budgeted requests.

[6] Ex. 3041, April 9, 2024 Hr'g Tr. 211:20-211:24.

[7] Ex. 3041, April 9, 2024 Hr'g Tr. 264:3-264:4.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A
FINAL BASIS - 4

management team."[8]  Yet, when Mr. Millenkamp was pressed for an explanation of, among other things, why the Debtors were initially requesting $35 million of financing when the First Budget and Second Budget projected a need of only $19.3 million for the first 130 days of their Chapter 11 Cases, Mr. Millenkamp had no explanation for the $15.7 million difference.  Indeed, Mr. Millenkamp testified, "I'm not sure why the difference is. You'd have to ask Kander."[9]

The Debtors' lack of financial controls is made apparent when viewing the material jumps in projections for total funding needs for the first 120 days of the Chapter 11 Cases – with the First Budget requiring $19.3 million, the Second Budget requiring $24.6 million, and the Third and Fourth Budget requiring $30.0 million.[10]  The Court should take notice that over the span of 29 days, the various budgets have increased DIP draws in the forecast period by at least $10 million, or over 50% from the First Budget, which is not a nominal movement around the margins.

Likewise, in the exercise of their fiduciary duties, the Debtors' exercised no independent evaluation when seeking to increase the DIP Facility from $35 million to $45 million between April 2 and April 8. The Debtors' financial advisor, Ms. Churchill, testified that despite being the Debtors' financial advisor since 2021 she made no attempt to evaluate the Debtors' leverage ratio in evaluating the DIP Facility.[11]  Instead, Ms. Churchill confirmed that the Debtors simply accepted the business judgement of Sandton, the proposed DIP Lender:

> **Q.** Was it the debtors that came to the conclusion that $45 million needed or was it Sandton?
> **A.** This term letter says that the lender believes that.
> **Q.** Right. So this was a decision being made by Sandton for the benefit of the estates.  Not the debtor's for the benefit of the estates. Is that right?
> **A.** The debtors have not come to a $45 million conclusion if that is what you're asking.

---

[8] Ex. 3041, April 9, 2024 Hr'g Tr. 212:13-212:18.

[9] Ex. 3041, April 9, 2024 Hr'g Tr. 143:3-143:8; 140:13-140:24.

[10] Exs. 3030, 1015, 3044.

[11] Ex. 3041, April 9, 2024 Hr'g Tr. 259:8-260:20.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 5

Ex. 3041, April 9, 2024 Hr'g Tr. 252:4-252:11.

The Debtors' inability to project their financial needs is compounded by the Debtors' history of spending money while insolvent, but acting as if they were able to steadily remain cash flow positive – which they did not and still have provided insufficient evidence they can do. *In re Smitty Inv. Grp., LLC*, No. 07-00020-TLM, 2008 WL 2095523, at *7 (Bankr. D. Idaho May 16, 2008) (where projections "are incredible or simply unrealistic" or "[w]hen the financial realities do not support the projections or where the proponents' projections are unreasonable," the court should find the plan not feasible and refuse to confirm it.); *In re Claar Cellars LLC*, 623 B.R. 578, 597 (Bankr. E.D. Wash. 2021) ("Because the plan projections are unduly optimistic and unrealistic given the debtors' recent performance and the current state of affairs, those projections cannot establish a reasonable probability that the debtors' plan will succeed"); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006) ("section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.").

Ms. Churchill, the Debtors' financial advisor, testified that even with full access to milk receivables and steer sale proceeds, the Debtors still cannot generate sufficient cash flow to sustain operations without incurring more debt.[12] Indeed, FTI Consulting, LLC ("**FTI**") analyzed the Debtors' historical financial information dating back to 2021 through present. According to that analysis, the Debtors are unable to generate sufficient cash flow to operate their business and to service their debt. For a company that is already over-levered, the incurrence of an additional $45 million of priming debt, plus at least $5 million of unnecessary fees and interest, is untenable and not feasible. Specifically, FTI analyzed the Debtors' adjusted unlevered free cash flow from core operating activities as reported in their audited financials for fiscal year 2021, audited financials for fiscal year 2022, and unaudited financials for fiscal year 2023 (the "**Adj. Unlevered Free Cash Flow**"). Even after making certain assumptions favorable to the Debtors, FTI's analysis clearly

---

[12] Ex. 3041, April 9, 2024 Hr'g Tr. 266:25-267:15; April 16, 2024 Hr'g.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 6

demonstrates the Debtors' inability to generate free cash flow anywhere near sufficient to service their historical debt as reported in their financials:

| ($ in thousands) | FY21 | FY22 | FY23 |
|---|---|---|---|
| **Historical Debt Service:** | | | |
| Cash payments for interest, net of capitalized interest | $8,649 | $15,083 | $16,879 |
| Payments on Long-Term Debt | 13,935 | 11,112 | 11,537 |
| **Total Debt Service** | **$22,584** | **$26,195** | **$28,417** |
| **Operating Cash Flow Incl. Historical Debt Service** | **($15,773)** | **($14,789)** | **($6,223)** |

To bring the analysis forward, FTI analyzed the Adj. Unlevered Free Cash Flow against the Debtors' total current estimated debt service – namely, the Debtors' payment obligations (at the non-default rates) to RAF, MetLife and Conterra. The numbers speak for themselves:

| ($ in thousands) | FY21 | FY22 | FY23 |
|---|---|---|---|
| **Est. Current Debt Service:** | | | |
| Est. Current Debt Service | $28,923 | $28,923 | $28,923 |
| **Total Est. Current Debt Service** | **$28,923** | **$28,923** | **$28,923** |
| **Operating Cash Flow Incl. Current Debt Service** | **($22,111)** | **($17,517)** | **($6,730)** |

Notably, the FTI analysis does not even account for the impact of the DIP Facility. Utilizing the Debtors' own financial information, the FTI analysis demonstrates a clear lack of feasibility.

The Debtors' inability to operate within their means is a pattern identified in Mr. Matthew McKinlay's testimony. Specifically, at the Interim Hearing, Mr. Matthew McKinlay, the receiver of the Debtors and fiduciary by order of the District Court of the Fourth District of the State of Idaho, in and for the County of Ada, testified with respect to his observations of the Debtors' financial controls during his appointment:

> **Q.** In your review and oversight as a receiver, did you believe that the debtors were financially acting as if they were insolvent?
> **A.** No.
> **Q.** Why is that?

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 7

**A.** Well, as a turnaround professional, I'm taught that when a company enters into the *zone of insolvency, its fiduciary duties change. The debtor becomes obligated to act on behalf of the interests of the creditors of the estate rather than the equity holders for example. And Millenkamp was very much in growth mode*. Millenkamp was ordering new tractors. He was committing to custom farmers to farm and plant and cultivate a 2024 crop. It was - - any efforts that the receiver made to bring cash into the business such as selling nonperforming assets were met with resistance and that's not typical for a borrower that's in an insolvent situation.

**Q.** Did you see expenses incurred- - just regular expenses being incurred that you would not normally see in an insolvent situation?

**A.** Yes.

**Q.** And what were those?

**A.** The debtor's facilities were beautiful. They're white lapped-side dairy facilities, tile floors, beautiful kitchens, and we observed that windows were being washed three times a week in those facilities. The janitors were constantly cleaning the facilities. There were graders several times a week grading the parking lots of the operations to keep things smooth. Typically in a situation like this, *I see companies seek to look for ways to save money, to pare back their expense structure. I didn't see that here.*

Ex. 3042, April 10, 2024 Hr'g Tr. 33:10-34:7.

Mr. McKinlay's observations are further bolstered by Mr. Millenkamp's testimony in which he could not recall whether he committed the Debtors to incur in excess of $12 million debt for new equipment just days prior to the appointment of a receiver.[13] When Mr. Millenkamp was confronted with the signed contracts, he had to admit that just days before the receivership hearing he purchased 25 new Kubota tractors, 48 new Case IH Maxum Tractors, and entered into new equipment leases totaling $12.1 Million[14]. Expenses of which the Debtors' Estates now have to address through the DIP Financing budget.

The United States Trustee (the "**US Trustee**"), in its objection to the Critical Vendor Motion (Dkt. No. 231, the "**UST Objection**"), further demonstrates the lack of financial controls and excessive spending relative to cash flow. Specifically, the UST Objection points out that the

---

[13] Ex. 3041, April 9, 2024 Hr'g Tr. 79:18-82:12.

[14] Ex, 3041, April 9, 2024 Hr'g Tr. 111:4-114:5, Ex. 3037.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 8

Debtors have already filed two significantly different critical-vendor lists, expanding their original list of 24 vendors to 47; and Mr. Millenkamp even testified that nearly *all* 47 "critical vendors" were secured creditors with agricultural liens, but later revealed that, in fact, only *five* of the vendors' claims were secured.  UST Objection, ¶¶ 1-5.  Following the filing of the Debtors' schedules, the US Trustee uncovered additional discrepancies, noting that certain purportedly "critical" vendors were *omitted* from the Debtors' schedules (*i.e.*, admitting that they are not even creditors) while other creditors' scheduled prepetition claims were materially less than the amounts that the Debtors are seeking to pay to such creditors through their critical vendor motion. *Id.,* pp. 4-5.  The US Trustee's observation in reviewing the requested critical vendor relief is apt here: "Th[e] [Debtors'] proposals [to pay non-creditors and pay other creditors amounts far in excess of their claims] call into suspicion the appropriateness of all requests contained in the Motion. If these identifiable discrepancies exist, how are parties in interest to know other discrepancies are not also present?" *Id.,* p. 6.

At the very least this indicates that the amount of the DIP Financing the Debtors are approved for should not exceed any budget of which the creditors of the Estate have not been provided due notice to fully vet and evaluate.  In this case, as of the filing of this Objection, there is *no budget* that identifies the need and use of all of the requested $45 Million.  Indeed, despite this issue being raised at the interim hearing, the Debtors' *Fourth* Budget only addresses $30 Million.

     2.          **The Debtors Have No Plan for Repayment.**

In the *two years* since the RLOC Facility matured with RAF, Mr. Millenkamp has continued to make representations about impending refinancing prospects that have never come to fruition.  To this day, the Debtors still do not have a plan or commitment to refinance the RLOC Facility or even repay the requested DIP Financing.[15]  Now, however, Mr. Millenkamp is expecting this Court to approve the Debtors' incurrence of at least an additional $45 million of

---

[15] Ex. 3041, April 9, 2024 Hr'g Tr. 259:2-259:7.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 9

super-priority priming debt on those same unsupported representations.  However, hopes and speculations are not enough to support the Debtors' burden to incur an incremental $45 million of priming debt, alongside approximately $5 million of interest and fees.  *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 893 (Bankr. E.D. Pa. 2017) (debtor's historical inability to generate profits and speculative projections prevented post-petition financing that would not "shore up the floundering enterprise" and did not account for how the post-petition loan would be repaid at maturity); *In re Timber Prod., Inc.*, 125 B.R. 433, 440 (Bankr. W.D. Pa. 1990) (debtor denied post-petition financing where proposed repayment plan was unrealistic and would not generate sufficient profits to repay debts or adequately protect subordinated lenders).

The Debtors have not provided any evidence of their ability or a plan to repay the DIP Facility, let alone the RLOC Facility, which matured two years ago.  Instead, to demonstrate their ability to the full amount of priming debt, the Debtors rely on conversations Mr. Millenkamp is purportedly having with unidentified "sources of money."[16]  When asked what has changed in the last two years that would enable Mr. Millenkamp to refinance the DIP Facility but not the $90 million RLOC Facility, Mr. Millenkamp explained that "[w]ith the 2023 dairy crisis, everything's put the brakes on.  They're being very cautious.  It takes time to do a deal of this size."[17]  Yet, given the Debtors' inability to repay the RLOC Facility after two years, the Debtors have had more than enough time to find "sources of money."  Indeed, as noted by Mr. Daniel Kokini of FTI, given the Debtors' leverage ratio, the incurrence of the DIP Facility will make it more difficult to refinance the RLOC Facility.[18]  Indeed, very few lenders would want to step into the capital structure. *Id.*  The Debtors have failed in their burden to establish otherwise.

With no evidence of a commitment to refinance or repay the DIP Facility, the Debtors rely upon a "handshake"[19] agreement between the Debtors (*i.e.*, Mr. Millenkamp) and Sandton—

---

[16] Ex. 3041, April 9, 2024 Hr'g Tr. 152:5-152:22.

[17] Ex. 3041, April 9, 2024 Hr'g Tr. 154:22-155:6.

[18] Ex. 3042, April 10, 2024 Hr'g Tr. 67:9-67:20.

[19] Ex. 3042 April 9, 2024 Hr'g Tr. 147:20-147:25.

expressed in a single line of Section 2.13[20] the DIP Agreement—which is merely a promise, to "consider" in Sandton's *sole and absolute discretion*, converting the Sandton DIP Financing into an exit facility.[21] Yet, in the absence of a binding exit-financing commitment *and* a viable plan for generating positive cash flow upon emergence, any plan proposed by the Debtors would not be feasible. The Debtors' reliance on unidentified conversations with "sources of money" and Sandton's illusory "commitment" is the paradigmatic "visionary scheme" that Ninth Circuit courts refuse to allow debtors force upon their stakeholders. *In re Las Vegas Monorail Co.*, 462 B.R. 795, 802 (Bankr. D. Nev. 2011). ("While poor planning undertaken by prior management may have contributed to [the debtor's] economic woes, [the debtor] has never shown the ability to service the massive debt incurred in its construction. On top of this wobbly base, the current economic situation simply threw gas on an existing fire—it worsened, rather than created, [the debtor's] problems. Nonetheless, [the debtor] now asks the court to trust that it will do, over the next several years, that which it has been unable to do since its inception. [The debtor's] embrace of these multiple speculative future events to establish feasibility underscores its questionable strategy.").

---

[20] Ex. 3043, Dkt. No. 170, Ex. A, Section 2.13. ("The Lender in its sole discretion may elect to convert some or all of the Obligations into exit financing in connection with a Reorganization Plan.").

[21] Given that Sandton has made it clear that Sandton will not provide the DIP Facility without priming liens on the real estate and personal property, it is unclear how Sandton could even provide a "priming exit facility" unless Sandton intends, at minimum, to refinance the RLOC Facility, in full, in cash. To do otherwise, would invite another expensive, uncertain, and unlikely to succeed priming fight to establish that a plan of reorganization provides RAF with the "indubitable equivalent" of having its first priority senior lien on a "short term" facility subordinated post-bankruptcy after having been matured for over 2-years by the time of the confirmation hearing. RAF has been unable to identify more than three cases that have dealt with a "priming exit facility" under the indubitable equivalent standard, none of which were in the context of an operating company. *LightSquared, Inc.*, 513 B.R. 56, 95 (Bankr. SDNY 2014) (priming exit facility failed to provide indubitable equivalent of senior lien and could not be approved despite offering junior loan, replacement collateral, and premium finance terms because lender was exposed to increased risk) *distinguishing Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.)*, 80 B.R. 171, 174-75 (9th Cir. B.A.P. 1987) (single asset real estate lender to a non-operating debtor received promissory notes junior to a construction loan that would develop the property); *Affiliated Nat'l Bank-Englewood v. TMA Assocs., Ltd.*, 160 B.R. 172, 176 (D. Col. 1993) (single asset real estate lender to a non-operating debtor received indubitable equivalent of its lien through promise of future land sales). Suffice to say, even if the Court were to ignore the Debtors' other material feasibility issues, any such relief would be rare, exceptional, and would guaranty the Debtors' estates and their creditors further delay, uncertainty, likely failure, and costs through the appeals process. *See e.g. In re Made in Detroit, Inc.*, 299 B.R. 170 (Bankr. E.D. Mich. 2003), aff'd, 414 F.3d 576 (6th Cir. 2005)(Denying confirmation for lack of feasibility when the supposed exit financing "had so many contingencies that Debtor's Plan was conditional at best).

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 11

**B.**    **The Debtors Cannot Satisfy the Indubitable Equivalent Standard**

When assessing whether creditors that will be primed by the Sandton DIP Financing are adequately protected, courts determine whether a creditor will receive the "indubitable equivalent" of its claim, using the same indubitable equivalent standard that applies to plan confirmation. *See In re Hollister*, 628 B.R. 154, 158 (Bankr. C.D. Cal. Mar. 8, 2021). The indubitable equivalent standard is an extremely high bar. *See e.g. In re Cady*, No. 06-00502, 2007 WL 2215384, *3 (Bankr. D. Idaho July 30, 2007) (noting that proposed adequate protection meets the indubitable equivalent standard if "there is ***no reasonable doubt*** that the [creditor] will receive the full value of what it bargained for when it made the contract with the debtor.") (emphasis added). Given the very real (if not inevitable) risk of the Debtors' inability to propose a feasible plan, the "indubitable equivalent" of RAF's claim requires the Debtors to account for that risk and provide RAF with the full value of its claim in a manner that is "too evident to be doubted." *Arnold & Baker Farms v. United States ex rel. United States Farmers Home Admin. (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1421 (9th Cir. 1996).

Mr. Millenkamp testified multiple times at the April 9 hearing that RAF was the Debtors' ***short-term*** lender.[22] By Mr. Millenkamp's own definition, "short term lender" means a loan with an earlier maturity date.[23] And yet, the Debtors have failed to repay the RLOC Facility for almost two years after maturity and now propose, as adequate protection, to replace RAF's first priority lien position in cash and personal property, with a second restricted lien in real property *behind* the Debtors' long term lender, MetLife, with no viable exit strategy while RAF's collateral continues to deteriorate. Nevertheless, the Debtors argue that RAF is receiving the indubitable equivalent of its claim based on an equity cushion of uncertain and diminishing value.

As a threshold matter, the extent to which RAF is oversecured still remains uncertain as Mr. Millenkamp's opinions on valuation at the Interim Hearing were entirely based on

---

[22] *See e.g.* Ex. 3041, April 9, 2024 Hr'g Tr., 34:22-34:25; 135:6-135:17.

[23] Ex. 3041, April 9, 2024 Hr'g Tr. 135:9-135:13.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 12

conversations with an unidentified "network of peers."[24] *See In re Arnold & Baker Farms*, 85 F.3d at 1422 (plan deemed unconfirmable where value of the property was "far from certain" and, therefore, the increased risk exposure foreclosed finding of indubitable equivalent); *In re Tempe Land Co., LLC*, No. 2:08-bk-17587-JMM, 2009 WL 1211622, at *2 (Bankr. D. Ariz. May 1, 2009) (evidence based only on opinions is not reliable enough to satisfy indubitable equivalent standard). Mr. Millenkamp admitted that he has not received any education in valuation methodologies and while testifying to his knowledge of such methodologies could not recall whether he used any valuation approaches utilized by appraisers.[25] When asked for the underlying compilations used in his valuations, he testified, "They're in my head."[26] Further and notably, as the equity owner of the Debtors' estates, Mr. Millenkamp has a strong self-interest to inflate values to preserve his own potential upside.

But even assuming the equity cushion exists at Mr. Millenkamp's inflated levels, the presence of an equity cushion alone is not determinative of whether the indubitable equivalent standard for adequate protection or confirmation has been satisfied, particularly, in the present case where the Debtors are seeking to actively deplete the equity cushion through the sale of steers. *See e.g. In re Stoney Creek Techs., LLC*, 364 B.R. 882 (Bankr. E.D. Pa. 2017) (denying DIP financing despite apparent equity cushion when debtor had historically been unable to generate profits and could not demonstrate how the proposed DIP loan would change that circumstance). In light of the significant feasibility risks identified above, the Debtors must provide more to meet this standard as courts in this Circuit and elsewhere are unequivocal that "providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." *In re Arnold & Baker Farms*, 85 F.3d at 1422; *see also In re Fleming*, No. 6:17-BK-19513-MW, 2020 WL 1170722 at *5-*6 (B.A.P. 9th Cir. Mar. 10, 2020) (deeming plan not feasible where replacement collateral was insufficient to provide secured creditor with indubitable equivalent of its secured

---

[24] Ex. 3041, April 9, 2024 Hr'g Tr. 118:4-118:12; 125:11-125:19; 129:3-129:22.

[25] Ex. 3041, April 9, 2024 Hr'g Tr. 107:5-107:9 123:18-123:23.

[26] Ex. 3041, April 9, 2024 Hr'g Tr. 126:9-126:10.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A
FINAL BASIS - 13

claim). In this case, while the personal property continues to deteriorate with no equivalent compensation to RAF, the Debtors propose to place RAF behind the long term lender of which it is restricted from recovering against such property until after the long term lender is paid. That certainly is not adequate protection to an admitted short term lender, which loan matured two years ago.

The compensation and protections that the Debtors propose to provide Sandton are illustrative. As described above, Sandton has made clear that it is only willing to extend financing secured by priming liens on the Debtor's personal property *and* real estate.[27] Thus, while occupying the ***most secure*** position in the Debtors' capital structure, Sandton is still charging 12.5% interest, which when combined with the litany of other fees, will cost the estates approximately $5 million for the first 9 months of the chapter 11 cases, or $7.4 million if the Debtors seek to extend the maturity date by three (3) months (subject to Sandton's sole discretion).[28] Yet, the Debtors allege that RAF will receive the indubitable equivalent of its claim when it is (1) being primed, (2) having repayment delayed by at least another 9 months after the RLOC Facility matured approximately 2 years prior to the Petition Date, (3) receiving non-default interest, and (4) having its equity cushion eroded while the Debtors simultaneously disburse millions in interest and fees to their new short-term lender, which sits in the most protected, least risk position; and all despite the existence of the less expensive Alternative Rabobank Proposal.

### C.   The DIP Facility Discriminates Unfairly

Generally speaking, as of the Petition Date, the Debtors' first priority senior secured indebtedness was comprised of (i) approximately $185 million of term loan indebtedness owed to MetLife and secured primarily by a first priority mortgage on the Debtors' real estate (other than the "German Dairy," which is pledged to Conterra), (ii) the RLOC Facility of approximately $89 million secured by a first priority security interest on substantially all personal property, subject to the First Intercreditor Agreement between RAF and MetLife, (iii) approximately $2.25 million of

---

[27] April 16, 2024 Hr'g.

[28] Ex. 3032.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 14

term loan indebtedness owed to Conterra and secured by a first priority mortgage on the "German Dairy," and (iv) a still to-be-verified amount of equipment financing indebtedness (collectively the **"Total First Lien Senior Indebtedness"**). The DIP Motion proposes to prime each of MetLife and RAF up to the full amount of the $45 million commitment irrespective of the amount of indebtedness owing to a particular senior secured debtor and the nature of the collateral pledged to such lender in terms of the ability to liquidate. While RAF's first priority security interest in the Debtors' personal property is being primed by the DIP Facility, the Debtors propose more favorable (and discriminatory) treatment to Conterra by limiting the DIP Facility to a second lien position on the German Dairy behind Conterra's first mortgage.

To put this construct into context, according to Mr. Millenkamp's testimony, he believes that he can sell in excess of 100,000 head of cattle within a month without taking a discount on his asserted cattle valuation.[29] In comparison, Mr. Millenkamp provided testimony with respect to the low number of dairy real estate sales that would enable him to obtain a comparable comparison, particularly since there are few properties comparable to the size of the Debtors' dairy.[30] Mr. Millenkamp testified that, if approved, the DIP Motions will provide Sandton priority over RAF so that it no longer has the first priority right to easily converted cash collateral and replace RAF's lien with a junior lien in real estate that has restricted recovery rights.[31] Specifically, RAF (a "short term lender") would receive an increased second lien in the real estate "as adequate protection" that could not be realized upon until MetLife is paid off in full on its $185 million of debt that does not mature until 2038 and is secured by illiquid real estate. Likewise, Conterra would continue to retain its first mortgage position on the German Dairy yet receive the same adequate protection as RAF, ***including the payment of non-default interest***. In that scenario, neither MetLife nor Conterra suffer any harm with respect to the collateral securing their first lien positions. Indeed,

---

[29] Ex. 3041, April 9, 2024 Hr'g Tr. 120:5 -121:2.

[30] Ex. 3041, April 9, 2024 Hr'g Tr. 128:7 – 128:23.

[31] Ex. 3041, April 9, 2024 Hr'g Tr. 136:3-137:1.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 15

Conterra is receiving a windfall, particularly relative to RAF through Conterra's receipt of post-petition interest as "adequate protection" while continuing to maintain its first lien mortgage. The grant of a second lien in restricted real estate is not the indubitable equivalent for a "short term lender" with a first lien in highly-liquid cattle and personal property that can be liquidated within a month for a quick and speedy recovery. The Debtors provide no factual or legal basis for the disparate treatment and lack of protections to prevent RAF from bearing the burden for its real estate lenders. *See* 11 U.S.C. § 1129(b)(1). *In re Arnold & Baker Farms*, 85 F.3d at 1420; *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (plans that propose disparate treatment of similarly situated creditors are unfairly discriminatory and cannot be confirmed). Accordingly, the DIP Loan, as proposed, should not be approved.

In the alternative, RAF requests that the Court modify the marshalling provisions of the Final DIP Order to provide that each senior secured lender (including purchase money financers and lessors) are primed proportionately by the DIP Facility. An equitable apportionment would be an amount equal to the product of (i) the total DIP Facility, multiplied by (ii) a fraction, the numerator of which is such pre-petition senior secured lenders aggregate indebtedness as of the Petition Date, and the denominator of which is the aggregate of all Total First Lien Senior Indebtedness as of the Petition Date.[32] The proposed limitation is consistent with the equitable principles of marshalling given the practical realities with respect to the two different categories of the Debtors' collateral and the current unfair and discriminatory framework. *In re Brazier Forest Prod., Inc.*, 921 F.2d 221, 223 (9th Cir. 1990) ("Marshaling is an equitable remedy and the decision to grant or deny marshaling of assets rests within the discretion of the trial court.")(internal citations omitted); *Assocs. Realty Credit Ltd. v. Brune*, 568 P.2d 787, 792 (1977) ("[Marshaling] is designed, not to protect the debtor's interests, but rather those of the junior lienor,

---

[32] For the avoidance of doubt, references to pre-petition senior secured lenders is only intended to include the indebtedness of lenders holding a first priority right (under law or contract) with respect to the applicable collateral securing such obligations.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 16

59797.0007.17113473.4

by requiring the senior lienor to exhaust other securities readily available to him before resorting to a fund which is the junior lienor's only security.") (internal citations omitted).

### D.   Reduction of Sandton Fees and Interest Is Warranted

Sandton's interest rate and fees under the Sandton DIP Agreement, which are secured in a first lien priming position of which the Debtors strenuously argue is well collateralized, should be reduced. The premium pricing that is customarily associated with debtor-in-possession financing typically compensates a lender for lending to a distressed entity when less expensive financing options are not available. *See In re Grupo HIMA San Pablo, Inc.*, No. 23-02510 (ESL), 2023 WL 5498101, at *5 (Bankr. D.P.R. Aug. 24, 2023) ("Due to the high risk of lending monies to a distressed debtor in bankruptcy, DIP lenders require special security of their interests, such as the priming of a first priority lien"); *In re Tamarack Resort, LLC,* No. 09-03911-TLM, 2010 WL 4117459, at *11 (Bankr. D. Idaho Oct. 19, 2010) ("[w]hile certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender") (citing *In re Def. Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (courts have implicitly held that the Bankruptcy Code authorizes interest, cross-collateralization, and other protections on postpetition loans as compensation for the use of the lender's money and for the risk of nonpayment).

That is not the case here. In this case, there is no dispute that Rabobank offered the lowest pricing. There is similarly no dispute that the Debtors selected Sandton's proposal for "non-economic reasons"—namely, that Mr. Millenkamp, the Debtors' equity owner, does not like Rabobank, due to its affiliation with RAF, which is a lender that Mr. Millenkamp admitted was simply exercising its rights under the signed loan documents due to the Debtors' defaults.[33] However, Mr. Millenkamp's personal dispute with RAF does not justify the payment of premium

---

[33] Ex. 3041, April 9, 2024 Hr'g Tr. 158:12-14.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 17

pricing to Sandton, especially when the cost of such premium pricing is borne by the estates and their creditors, rather than Mr. Millenkamp. Therefore, the Sandton DIP Agreement should be revised to strike the proposed premium pricing. To do otherwise, requires the Debtors' stakeholders to bear the burden for Mr. Millenkamp's personal grievances – that is not an equitable result. In the alternative, Sandton should not receive the benefit of priming liens to the extent of the difference between the Sandton interest and fees and the rates proposed in the Alternative Rabobank Proposal.[34]

### E.  Additional Terms Are Necessary For Adequate Protection

Based on the foregoing analysis and reasons, RAF respectfully submits that the Court should not grant the relief being requested by the Debtors. However, if the Court elects to do so, RAF respectfully requests the terms below be incorporated into the final orders to mitigate the risks to RAF and the entire creditor body.

### 1.  The Final DIP Order – RAF Interest Payments And Attorney Fees

If the Court is inclined to allow Sandton to receive the benefit of both premium pricing and priming liens, at an interest rate of 12.5%, RAF requests interest at its contractual default rate of SOFR[35] + 8.11%. The RLOC Facility matured approximately 2 years ago. As the Debtors' existing "short-term" lender, RAF will be forced to expand and extend the scope of its risk beyond what had been agreed to in underwriting the RLOC Facility for at least an additional nine months until confirmation, if not longer, all while losing its first-lien priority and watching its collateral position erode. Further Sandton receives repayment of its attorney fees and costs on a monthly basis. If Sandton is entitled to 12.5% interest, millions in fees, and monthly attorney fees and costs, to account for its "risk" in offering the most-secure loan in the capital structure when less expensive financing was made available to the Debtors, then RAF should be entitled to default

---

[34] Dkt. No. 170, Ex. Ex. A.

[35] As of May 1, 2024, the approximate SOFR rate was 5.32%.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A
FINAL BASIS - 18

interest of approximately the same value to compensate for it being forced to bear additional risk, as well as payment of its monthly attorney fees and costs.

### 2.        Final DIP Order: Funding Milestone

As discussed above, the Debtors have not proposed a viable strategy to repay the DIP Facility or RLOC Facility. This complete lack of direction and planning places the entire creditor body at risk and, warrants funding milestones in the Final Order as a safeguard. *Accord* 11 U.S.C. § 1129(a)(11) (requiring the court to find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization); *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) ("the purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes"). According to Kander's testimony, the Debtors intend to emerge from Chapter 11 within 130 days of the Petition Date.[36] In light of this testimony and the Debtors' inability to accurately project their funding needs over the course of four budgets filed within a 29-day period, as well as the failure to submit any budget that actually discloses what the entire DIP Financing will be utilized for, a limit to the Debtors' DIP borrowings to no more than $24.6 million[37] for the first 130 days of the Chapter 11 Cases is warranted, to prevent the Debtors from becoming further overleveraged without demonstrating a clear path to repayment.

### 3.        Final DIP Order: GAAP Monthly Reporting

In light of the lack of financial controls and inconsistent reporting, RAF requests that the Debtors be required to provide RAF (and the other pre-petition lenders) with monthly financial statements calculated in accordance with GAAP within 45 days of fiscal month end. The Debtors should also be required to provide RAF (and the other pre-petition lenders) with January, February, and March financial statements calculated in accordance with GAAP within three (3) calendar

---

[36] Ex. 3041, April 9, 2024 Hr'g Tr., 264:3-264:4.

[37] While the Third and Fourth Budget contemplates a total funding need of $30 million through August 2024, the Debtors have not provided any evidence in support (or explanation) of this newest funding demand. For that reason, the Debtors' funding should be limited to the $24.6 million reflected in the Second Budget.

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 19

days of the entry of the Final Order.  In doing so, the Debtors' significant stakeholders will have a
more reliable measure of evaluating the Debtors' financial performance.

### 4. Final Cash Collateral Order: Cattle Sale Reserve

The Cash Collateral Order should continue to incorporate a permanent "cattle sale" reserve
mechanism consistent with the Interim Order to protect RAF's collateral base from deterioration
during the Chapter 11 cases.  This is consistent with Mr. Millenkamp's testimony that the "value
of the cattle will stay the same during the process."[38]  To provide otherwise allows the Debtors to
sell the collateral and instead of maintaining the value, permits the proceeds to be used in
operations, which erodes the collateral without providing adequate protection.

### 5. The Cash Collateral Order Should Address the Liens Being Granted In Post-Petition Milk Receivables.

To the extent Debtors' proposed Final Cash Collateral Order grants replacement liens in
the Milk Receivables, such replacement liens should flow exclusively to RAF and Conterra
(subject to the terms of the intercreditor agreement).  As a result of the security interest held by
RAF and Conterra in Debtors' livestock, RAF and Conterra have a continuing security interest in
the post-petition Milk Receivables by virtue of Bankruptcy Code section 552(b). *See, e.g., In re
Hollie,* 42 B.R. 111, 119 (Bankr. M.D. Ga. 1984) (finding that, when a creditor has a prepetition
interest in dairy cattle, products, and proceeds, under section 552(b) the creditor retains its lien on
postpetition milk proceeds); *see also In re Dettman,* 84 B.R. 662 (applying *Hollie* and finding that
creditor had security interest in post-petition proceeds of grapevines that existed pre-petition).
MetLife, however, has a security interest solely in the milk itself, not the cattle, and thus MetLife's
security interest in the Milk Receivables is extinguished when the last of the pre-petition milk is
sold. *See* 11 U.S.C. § 552(a); *In re Trans-Texas Petroleum Corp.,* 33 B.R. 67, 69 (Bankr. N.D.
Tex. 1983). ("Once a bankruptcy case is filed § 552 of the Bankruptcy Code abrogates the effect
of all pre-petition security interests in subsequently acquired property except those security
interests in proceeds to the extent recognized by applicable state law.").  Further, the Debtors have

---

[38] Ex. 3041, April 9, 2024 Hr'g Tr. 142:2-4.

not demonstrated any legal or equitable basis to grant post-petition liens in the Milk Receivables to MetLife. Accordingly, to adequately protect RAF's interests, RAF requests that the Final Cash Collateral Order is clear that MetLife's interests in the post-petition Milk Receivables cease to exist pursuant section 552(b) of the Bankruptcy Code.

WHEREFORE, for the reasons set forth herein, the Objection, and the evidence presented at the hearings, RAF objects to the proposed DIP Financing. Nevertheless, to the extent the DIP Financing is approved, RAF respectfully requests that the Debtors not be able to have unlimited use to $45 million of financing, where the Debtors have failed to timely submit a budget that actually discloses why such financing is necessary and what the financing is actually proposed to be spent on. To date the Debtors have not provided a budget regarding the full financing, contrary to the code requirements of full disclosures and fiduciary requirements for the benefit of all creditors. The proposed terms are not equitable and do not meet the standards of adequate protection. Accordingly, to the extent the DIP Financing is approved, RAF respectfully requests that the approved terms be modified as set forth herein.

Dated: May 1, 2024

HAWLEY TROXELL ENNIS & HAWLEY LLP

Sheila R. Schwager, ISB No. 5059
Attorneys for Rabo AgriFinance LLC

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of May, 2024, I electronically filed the foregoing Objection to Post-Petition Financing and Use of Cash Collateral On a Final Basis, with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| Krystal R. Mikkilineni | krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | tirzah.roussell@dentons.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Jon B. Evans | evans.jb@dorsey.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine Patrice Reynard | janine@averylaw.net |
| Sheila Rae Schwager | sschwager@hawleytroxell.com |
| Brent Russel Wilson | bwilson@hawleytroxell.com |
| Zachary Fairlie | zfairlie@spencerfance.com |
| John O'Brien | jobrien@spencerfane.com |
| Gery W. Edson | gedson@gedson.com |
| Aaron Bell | abell@evanskeane.com |
| Brian Faria | brian@sawtoothlaw.com |
| Robert A. Faucher | rfaucher@hollandhart.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| Karen Lloyd | klloyd@grsm.com |
| James Justin May | jjm@johnsonmaylaw.com |
| Rhett Michael Miller | rmiller@magicvalley.law |
| Robert E. Richards | robert.richards@dentons.com |
| Holly Roark | holly@roarklawboise.com |
| Evan Thomas Roth | evan@sawtoothlaw.com |

OBJECTION TO POST-PETITION FINANCING AND USE OF CASH COLLATERAL ON A FINAL BASIS - 22

59797.0007.17113473.4

Meredith Leigh Thielbahr                     mthielbahr@grsm.com

John F. Kurtz, Jr.                           jfk@kurtzlaw.com

And any others receiving cm/ecf notices

Sheila R. Schwager