```
                    UNITED STATES BANKRUPTCY COURT

                        DISTRICT OF IDAHO


MILLENKAMP CATTLE, INC.,        )   Bankruptcy Petition
471 North 300 West              )   # 24-40158-NGH
Jerome, Idaho 83338             )
                                )
                                )
Tax ID/EIN: 26-0603892          )   Twin Falls, Idaho
                                )   May 8, 2024
      Debtor.                   )
. . . . . . . . . . . . . . . . )




                        VOLUME I OF I
                       MOTIONS HEARING
           BEFORE THE HONORABLE NOAH G. HILLEN
              UNITED STATES BANKRUPTCY JUDGE
```

```
COURT RECORDER:                 TRANSCRIPTION BY:

MELANIE BATTLE                  TAMARA A. WEBER, CSR
U.S. District Court             P.O. Box 387
                                Caldwell, Idaho  83606
```

```
Proceedings recorded by electronic recording.  Transcript
produced by transcription service.
```

```
APPEARANCES:

For the Debtor:                      MR. MATTHEW T. CHRISTENSEN
                                     Johnson May, PLLC
                                     199 N. Capitol Boulevard
                                     Suite 200
                                     Boise, Idaho 83702

                                     MS. KRYSTAL R. MIKKILINENI
                                     MS. TIRZAH R. ROUSSELL
                                     Dentons Davis Brown
                                     215 Tenth Street
                                     Suite 1300
                                     Des Moines, Iowa 50309

For Metlife Real Estate             MR. RON C. BINGHAM, II
Lending LLC and Metropolitan        Attorney at Law
Life Insurance Company:             3424 Peachtree Road NE
                                     Suite 1600
                                     Atlanta, Georgia 30326

                                     MR. NIKOLAUS F. SCHANDLBAUER
                                     20 F Street NW
                                     Suite 500
                                     Washington, DC 20001

                                     MR. KIMBELL D. GOURLEY
                                     Attorney at Law
                                     P.O. Box 1097
                                     Boise, Idaho 83701

For Rabo AgriFinance, LLC:          MS. SHEILA RAE SCHWAGER
                                     Hawley Troxell Ennis & Hawley, LLP
                                     877 Main Street, Suite 200
                                     P.O. Box 1617
                                     Boise, Idaho 83702

                                     MR. ANDREW SCHOULDER
                                     Attorney at Law
                                     1301 Avenue of The Americas
                                     New York, New York 10019-6022

For Western States Equipment        MR. JON B. EVANS
Company:                             Dorsey & Whitney, LLP
                                     101 S. Capitol Boulevard
                                     Suite 1701
                                     Boise, Idaho 83702-7705
```

```
APPEARANCES:  (Cont'd)

For Conterra Holdings, LLC      MR. JOHN O'BRIEN
                                Spencer Fane, LLP
                                1700 Lincoln Street
                                Suite 2000
                                Denver, Colorado 80203

                                MR. SCOTT C. POWERS
                                Spencer Fane, LLP
                                10 Exchange Place
                                Eleventh Floor
                                Salt Lake City, Utah 84111

For Committee of Corn Silage    MR. MATTHEW W. GRIMSHAW
Growers:                        Grimshaw Law Group, P.C.
                                800 West Main Street
                                Suite 1460
                                Boise, Idaho 83702

For Viterra USA Grains, LLC     MR. DANIEL C. GREEN
and Viterra USA Ingredients,    Racine Olson, PLLP
LLC:                            201 East Center
                                P.O. Box 1391
                                Pocatello, Idaho 83204

For Land View, Inc.:            MR. GERY W. EDSON
                                Attorney at Law
                                P.O. Box 448
                                Boise, Idaho 83701

For CNH Industrial Capital      MS. KARYN LLOYD
America, LLC:                   Saetrum Law Offices
                                1609 W. Main, Suite 20
                                Boise, Idaho 83702

For Sandton Capital Partners,   MR. SCOTT GAUTIER
LLP:                            Faegre, Drinker, Biddle
                                   & Reath, LLP
                                1800 Century Park E, Ste. 1500
                                Los Angeles, California 90067

                                MR. JOHN F. KURTZ
                                Kurtz Law, PLLC
                                910 West Main
                                Suite 364
                                Boise, Idaho 83702
```

```
APPEARANCES:  (Cont'd)

For the U.S. Trustee:          MR. JASON NAESS
                               DOJ - UST
                               550 West Fort Street
                               Suite 698
                               Boise, Idaho  83701


For Creditors Raft River,      MR. RHETT MILLER
Rural Electric Co-op, Inc.,    Parsons, Loveland, Shirley
Moss Grain Partnership, Moss    & Lindstrom, LLP
Farm Operations, LLC, and      137 West 13th Street
United Electric Co-op, Inc.:   Burley, Idaho 83318


For Creditor East Valley       MS. JANINE REYNARD
Development, LLC:              Avery Law
                               3090 E. Gentry Way, Ste. 250
                               Meridian, Idaho 83642


For Creditor Progressive       MS. HOLLY ROARK
Dairy Service and Supply       Roark Law Offices
Corp, Elevation Electric,      950 Bannock Street, 11th Floor
LLC:                           Boise, Idaho 83702

For Burk's Tractor:            MR. MARK PERRY
                               Perry Law
                               2627 W. Idaho
                               Boise, Idaho 83702
```

```
                      I N D E X

DEBTOR'S WITNESSES:                           PAGE   LINE

    DAVIS, Todd Donald
Direct Examination by Ms. Mikkilineni          28    24
Cross-Examination by Mr. Schoulder             38    12
Cross-Examination by Mr. O'Brien               49     3
Redirect Examination by Ms. Mikkilineni        50     7
Recross-Examination by Mr. O'Brien             52    21

    HARDING, Gale W.
Direct Examination by Ms. Mikkilineni          54     1
Cross-Examination by Mr. Schoulder             61     2
Cross-Examination by Mr. O'Brien               66     2
Redirect Examination by Ms. Mikkilineni        66    12

    VERHOEVEN, Jonathan
Direct Examination by Ms. Mikkilineni          68     9
Cross-Examination by Mr. Schoulder             84    22
Cross-Examination by Mr. O'Brien              109    24
Redirect Examination by Ms. Mikkilineni       114     2

    MORGAN, James
Direct Examination by Ms. Mikkilineni         117     5
Cross-Examination by Ms. Schwager             130    18
Cross-Examination by Mr. O'Brien              158    12
Redirect Examination by Ms. Mikkilineni       163    11

    MILLENKAMP, William John
Direct Examination by Ms. Mikkilineni         165     3
Cross-Examination by Ms. Schwager             227     9
```

E X H I B I T S

| DEBTOR'S EXHIBITS: | PAGE | LINE |
|---|---|---|
| DX 1018 - Equipment Appraisal<br>　　　Admitted | 24 | 20 |
| DX 1019 - Livestock Appraisal<br>　　　Admitted | 24 | 20 |
| DX 1020 - Broker's Price Opinion<br>　　　Admitted | 84 | 16 |
| DX 1021 - Inventory - 4/9/24 Hearing<br>　　　Admitted | 24 | 20 |
| DX 1022 - Updated Inventory - 5/2/24<br>　　　Admitted | 24 | 20 |
| DX 1023 - Equity Cushion Analysis<br>　　　Admitted | 24 | 20 |
| DX 1024 - Rabo's Equity Cushion in<br>　　Personal Property<br>　　　Admitted | 24 | 20 |
| DX 1025 - Investment Banker Report<br>　　　Admitted | 24 | 20 |
| DX 1026 - Cash Collateral Budget<br>　　　Admitted | 24 | 20 |
| DX 1027 - Critical Vendor List<br>　　　Admitted | 24 | 20 |
| DX 1028 - Western States Lease<br>　　　Admitted | 24 | 20 |
| DX 1029 - Sandton DIP Agreement<br>　　　Admitted | 24 | 20 |

| RABO EXHIBITS: | PAGE | LINE |
|---|---|---|
| RX 3041 - Transcript of 4/9/24 Hearing<br>　　　Admitted | 26 | 4 |
| RX 3042 - Transcript of 4/10/24 Hearing<br>　　　Admitted | 26 | 4 |

```
                                                PAGE   LINE
RX 3043 - DKT 170: Supplement to
   DIP Motion - Agreed Upon
   DIP Loan Agreement
      Admitted                                   26     4

RX 3044 - Email forwarding debtor's
   revised DIP budget and revised
   Budget as of 4/17/24
      Admitted                                   26     4

RX 3045 - Email forwarding debtor's
   revised DIP Budget and revised
   budget as of 5/1/24
      Admitted                                   26     4

RX 3046 - Dkt. No. 215 Millenkamp
   Cattle, Inc. Schedules &
   Dkt. 236 Amended Millenkamp
   Cattle, Inc., Schedules
      Admitted                                   26     4

RX 3047 - Dkt. No. 220, 20
   Largest Unsecured Creditors &
   Dkt. No. 238 Amended Largest
   Unsecured Creditors
      Admitted                                   26     4

RX 3048 - Dkt. 23 East Valley
   Cattle Schedules
      Admitted                                   26     4

RX 3052 - Debtors' Variance Reports
      Admitted                                   26     4

RX 3054 - Email correspondence from
   David Heida on behalf of Bill
   Millenkamp to Douglas Gibson
   at Metlife dated 8/4/23
      Admitted                                   26     4

RX 3057 - Agreement betwee Chojnacky,
   Grant 4-D Farms, LLC, Grand & Hagan,
   Inc., Douglas J. Grant, Hollifield
   Ranches, Inc., Star Falls Farms,
   LLC, Bo Stevenson, B & A Farms,
   Triple C Farms, LLC, Alexander
   K. Reed, Standing 16 Ranch Land
   Company, LLC, Clint Thompson, Jean
   Thompson, Steel Ranch, LLC, Dusty
   Brow Farms, Inc., Millenkamp Cattle,
```

```
                                                    PAGE   LINE
     Inc. and William Millenkamp
        Admitted                                     26      4

RX 3059 - Millenkamp Monthly
   Financial Statements
   2020-2023
        Admitted                                     26      4

RX 3060 - Email Correspondence
   from D. Heida to Forbes with
   Forbes CIM
        Admitted                                    253      6

RX 3061 - Riveron CIM for Millenkamp
        Admitted                                    257      9

RX 3062 - DIP Budget Comparison
   3/22/24 - 4/30/24
        Admitted                                     26      4

RX 3063 - Email from D. Heida to
   James Brooks and Art
        Admitted                                    259     13

RX 3064 - Millenkamp Text Messages
   In re: Aaron Johnson
        Admitted                                    259     13

RX 3065 - Email from D. Heida to
   R. Rice In re: Millenkamp
   Financial Projects
        Admitted                                    260     14

RX 3066 - Email from D. Heida to
   A. Jensen In re: Current
   Financials
        Admitted                                    261     15

RX 3067 - Emails between D. Heida
   and D. Gibson In re: Millenkamp
   Restructuring Sheet
        Admitted                                    262     20

RX 3068 - Millenkamp Cattle, Inc.,
   Term Sheet, 1/31/24
        Admitted                                    264      3

RX 3072 - Email correspondence from
   Forbes to Platinum Equity in re:
   Forbes CIM
```

```
            Admitted                              133   18

RX 3073 - Audited Millenkamp Combined
    Financial Statements, Years Ended
    December 31, 2022 and 2021
        Admitted                                   26    4


METLIFE EXHIBITS:                                 PAGE  LINE

MX 2021 - UCC Statement
    (Doc # 20182631221)
        Admitted                                   25    7

MX 2022 - Amendment to UCC Statement
    filed on 10/4/2018 (Add collateral)
    (Doc # 20200576479)
        Admitted                                   25    7

MX 2023 - Amendment to UCC Statement
    filed on 10/4/18 (Add Debtor)
    (Doc # 20200576484)
        Admitted                                   25    7

MX 2024 - Amendment to UCC Statement
    filed 10/4/18 (Add collateral)
    (Doc # 20210836187)
        Admitted                                   25    7

MX 2025 - Amendment to UCC Statement
    filed 10/4/18 (Add collateral)
    (Doc # 20221487538)
        Admitted                                   25    7

MX 2026 -Amendment to UCC Statement
    filed 10/4/18 (Continuation)
    (Doc #  20230633226)
        Admitted                                   25    7

MX 2027 - UCC Statement
    (Doc # 20194572319)
        Admitted                                   25    7

MX 2028 - Amendment to UCC Statement
    filed 3/19/19 (Continuation)
    (Doc # 20231790159)
        Admitted                                   25    7
```

1                    (Proceedings begin.)

2            CLERK:  The United States Bankruptcy Court for the

3    District of Idaho is now in session.  The Honorable Noah G.

4    Hillen presiding.

5            COURT:  Thank you.  Good morning.  Please be seated.

6    All right.  We are on the record in Case No. 24-40158,

7    Millenkamp Cattle, Incorporated.  Let's go ahead and start with

8    appearances for the record, please.

9            MR. GOURLEY:  Your Honor, Kim Gourley appearing on

10   behalf of MetLife creditors and along with me is co-counsel Ron

11   Bingham and Nick Schandlbauer.

12           COURT:  Good morning.

13           MR. CHRISTENSEN:  Matt Christensen, Your Honor, on

14   behalf of the debtors.  Along with me is Krystal Mikkilineni and

15   Tirzah Russell, also co-counsel for the debtors.

16           COURT:  Good morning.

17           MS. SCHWAGER:  Good afternoon, Your Honor -- good

18   morning, Your Honor.  It's already been a long day.  Sheila

19   Schwager representing Rabo Agrifinance.  I have Jess Brocious,

20   our paralegal, with me and Andrew Schoulder who's been admitted

21   pro hac.

22           COURT:  Morning.

23           MR. NAESS:  Jason Naess for the U.S. Trustee.  Good

24   morning, Your Honor.

25           COURT:  Good morning, Mr. Naess.

1          MR. O'BRIEN:  Good morning, Your Honor.  John O'Brien

2     for Conterra.  Also Scott Powers.

3          COURT:  Good morning.  All right.  I'm sorry.  Go

4     ahead.

5          MR. KURTZ:  John Kurtz on behalf of Sandton Capital and

6     with me is Scott Gautier.

7          MR. GAUTIER:  Good morning, Your Honor.

8          MR. KURTZ:  I butchered his last name but --

9          COURT:  Can you say that again just so I've got -- I

10    can --

11         MR. GAUTIER:  Scott Gautier with Faegre and Drinker on

12    behalf of Sandton Capital.

13         COURT:  Good morning.

14         MR. GAUTIER:  Good morning.

15         MR. EVANS:  Good morning, Your Honor.  J.B. Evans on

16    behalf of Western States Equipment Company.

17         COURT:  Good morning, Mr. Evans.

18         MR. PERRY:  Mark Perry on behalf of Burk's Tractor,

19    Your Honor.

20         COURT:  Good morning.

21         MR. GREEN:  Dan Green on behalf of Viterra.

22         COURT:  Good morning.

23         MS. LLOYD:  Good morning, Your Honor.  Karen Lloyd on

24    behalf of Industrial Capital American.

25         COURT:  Good morning.

1          MR. EDSON:  Your Honor, Gery Edson for Landview.

2          COURT:  Mr. Edson.

3          MR. GRIMSHAW:  Good morning, Your Honor.  Matt Grimshaw

4   for the Ad Hoc Committee of Corn Silage Growers.

5          COURT:  Mr. Grimshaw.

6          MS. REYNARD:  Janine Reynard on behalf of East Valley

7   Development, LLC.

8          COURT:  Good morning, Ms. Reynard.

9          MS. ROARK:  Holly Roark for Progressive Dairy and

10  Elevation.

11         COURT:  Good morning.

12         MR. MILLER:  Rhett Miller, United Electric, Raft River

13  and Moss Grain.

14         COURT:  Good morning, Mr. Miller.

15         All right.  I think we've got appearances out of the

16  way.  Mr. Christensen, it looks like we have a number of matters

17  set before the Court today.  I'm wondering if there are any that

18  we could address at the top that maybe are less contested or not

19  contested?

20         MR. CHRISTENSEN:  Your Honor, I think there are -- by

21  my count, I think there's nine motions set for hearing today

22  either in a final form with a previous interim hearing or the

23  only form of hearing.  The three -- there's three larger motions

24  that I think the parties intend to present evidence on.  That's

25  the cash collateral motion, what's called the DIP motion, the

1    request for post-petition financing and the critical vendor

2    motion.

3            The remaining motions I think are ones that we can deal

4    with prior to presentation of evidence on those remaining

5    things.  Those remaining motions being the 503(b)(9) motion.

6    There was an objection from the U.S. Trustee to that motion.

7    There's a motion dealing with continuing insurance policies,

8    interim feed procedure motion, motion to assume the Western

9    States lease and the continued hearing on the prepetition wages

10   motion.

11           All of those motions there have been no objections

12   filed to and then, lastly, the utilities motion, the one

13   objection that was filed to that motion from Mr. Miller's

14   clients was resolved through a stipulation.  It had a proposed

15   form of order attached to that stipulation that was filed

16   earlier this week.  We think all of those motions, other than

17   those three, cash collateral, the DIP motion, the critical

18   vendor, we can deal with before getting into the evidence and

19   resolve those things.  That may also allow some of the attorneys

20   in the room to return to other important things.

21           COURT:  All right.  Let's just take a few of the

22   uncontested motions first.  Docket 25, motion to pay prepetition

23   wages, benefits.  This is final hearing with respect to that

24   motion.  It doesn't appear there are any objections.  Does any

25   party wish to be heard with respect to that motion?

1          All right.  Without objection, I'll go ahead and grant

2     that motion on a final basis.  Mr. Christensen, go ahead and

3     submit a proposed order to the Court.  Are there any parties

4     that wish to endorse the form of that order?  It looks like

5     that's no.  Go ahead and get that submitted, Mr. Christensen.

6          MR. CHRISTENSEN:  Thank you.

7          COURT:  With respect to Docket 169, the motion for

8     approval to maintain and pay insurance, does either party wish

9     to be heard with respect to that motion?  All right.  And

10    similarly without objection, I'll go ahead and grant that

11    motion, Mr. Christensen.  And does any party wish to endorse the

12    form of that order?  All right.  Go ahead and get that one

13    submitted -- that order submitted, Mr. Christensen.

14          Western States' motion for adequate protection and

15    debtor's motion to assume the lease with Western States.  That's

16    Docket 42 and Docket 114.  Mr. Evans, do you wish to be heard

17    with respect to that?

18          MR. EVANS:  No, Your Honor.  Unless the Court has any

19    further questions, I don't have any further presentation on the

20    motions.

21          COURT:  All right.  Does any other party wish to be

22    heard with respect to those motions?  And if the Court grants

23    the debtor's motion to assume that lease, does that moot the

24    motion for adequate protection?

25          MR. EVANS:  Your Honor, there's previously been an

1   order entered on adequate protection.  I think it contains

2   relief that is not included in what I assume will be the order

3   on the motion to assume the lease.  So I do not think it moots

4   it.  I think we should leave the existing order of the Court in

5   place.  I don't think any further order of the Court is

6   necessary on the motion for adequate protection.

7          COURT:  All right.  Go ahead and submit proposed orders

8   to the Court then with respect to those motions.

9          MR. CHRISTENSEN:  Is there any concern with just a

10  single order that addresses both motions?  Is that okay?

11         COURT:  That's fine.

12         MR. CHRISTENSEN:  Okay.

13         COURT:  Yeah.  Does either other party wish to endorse

14  the form of that order other than Mr. Evans?

15         MR. EVANS:  And to be clear, Your Honor, you do want to

16  see a further order on the adequate protection motion?

17         COURT:  I'll leave that up to the parties as to how

18  they address that and you can take care of that --

19         MR. EVANS:  Okay.  Excellent.  Thank you.

20         COURT:  -- in the combined order.

21         MR. EVANS:  Great.

22         COURT:  All right.  Let's address the motion for

23  continuation of utility services.  It looks like the parties may

24  have resolved this matter through a stipulation?

25         MR. CHRISTENSEN:  That's correct.  There was one

1    objection filed from Mr. Miller on behalf of his clients Raft

2    River and United Electric or both utility suppliers to mostly

3    Millenkamp Cattle.  I think there's a separate account that they

4    maintain for Black Pine Dairy.  The stipulation I think outlines

5    what the treatment of the prepetition amounts owed to those

6    parties will be.

7          There was a prepetition deposit for Raft River that it

8    held that some of that deposit has been applied to the

9    prepetition amount.  There's a post-petition deposit that the

10   debtor will pay to Raft River to essentially replenish some of

11   that prepetition deposit and then that resolves their objection.

12   There's some terms in the proposed order that were added.

13   There's a red line version of that I think attached to the

14   stipulation that provides remedies in the case that some of

15   those bills aren't paid on time and that sort of thing.

16         So I think that stipulation resolves the objection from

17   Mr. Miller's clients and there weren't any other objections

18   filed by any other parties to that motion.

19         COURT:  All right.  Mr. Miller, do you wish to be heard

20   with respect to that motion?

21         MR. MILLER:  No, Your Honor.  Thank you.

22         COURT:  And does any other party wish to be heard in

23   regard to the motion for continuation of utility services,

24   Docket 14?  All right.  Without opposition, I'll go ahead and

25   grant that motion.  Go ahead and submit a proposed order, Mr.

1  Christensen, endorsed by Mr. Miller.  Any other parties wish to

2  endorse?  It looks like just one endorsement on that one.

3        MR. CHRISTENSEN:  Thank you.

4        COURT:  The motion for approval of interim fees and

5  expense reimbursement procedures, Docket 16, it looks like that

6  matter is unopposed.  Do any parties wish to be heard with

7  respect to that motion?  All right.  Without opposition, I'll go

8  ahead and grant that, Mr. Christensen, and I'm assuming no party

9  wishes to endorse the form of that order?

10        MR. NAESS:  Your Honor, we would like to endorse it.

11        COURT:  All right.  We'll have the U.S. Trustee endorse

12  that one.

13        Let's take up the motion for allowance of payment of

14  the Section 503(b)(9) claims.  It looks like this one does have

15  at least a limited objection by United States Trustee's Office

16  with respect to some of the relief that's proposed in that

17  motion.

18        MR. CHRISTENSEN:  Your Honor, there was that objection

19  filed by the U.S. Trustee.  The debtor's motion, there are

20  essentially two groups of creditors with 503(b)(9) claims.

21  That's claims for goods that were provided to the debtor within

22  the 20 days prepetition.  This motion addresses only those

23  503(b)(9) claims that are not creditors included on the critical

24  vendor motion.  There are creditors on the critical vendor

25  motion that also hold 503(b)(9) claims.  This motion only

1    addresses the ones who aren't on the critical vendor list.

2            The U.S. Trustee's objection, I will probably over-

3    simplify the objection by saying it essentially in my mind was

4    two parts.  One, the code doesn't require that those payments be

5    made early in the case.  It just allows that they be made prior

6    to the effective date of the confirmed plan.  I'll fairly admit

7    the code doesn't require it be paid earlier than that.  It

8    allows that it can be paid earlier than that.  What it does is

9    sets a deadline for those claims.  They have to be paid no later

10   than the effective date.

11           The debtor's proposing that some of them be paid now in

12   order to continue operations with those and those creditors

13   holding those priority claims be paid so they are not then part

14   of the plan moving forward.  And that sort of leads to the

15   second objection that the U.S. Trustee filed which was

16   essentially this is usually something the creditors request, not

17   the debtor requesting and maybe this would be different if it

18   was a creditor making the request.

19           I'll represent to the Court some of his creditors on

20   that list would be making their own requests for payments of

21   their claims but for the debtor saying we're already making that

22   request.  You don't need to.  So I think if the motion's denied

23   on that basis, we're going to face a series of 503(b)(9) motions

24   from various individual creditors which is part of what we were

25   trying to avoid.

1          So I think the U.S. Trustee's objection as the Court

2    noted is somewhat limited.  They don't dispute there are

3    503(b)(9) claims.  It's more an issue should they be paid now

4    versus later and our position is they're priority claims.  It's

5    not going to prejudice any other unsecured creditor without a

6    prior claim by paying them now versus later because they have

7    priority.  They're going to get paid in full first anyway.  And

8    so that's I think the debtor's position if the Court has

9    questions on that motion.

10         COURT:  All right.  Let me hear from the U.S. Trustee's

11   Office with respect to that motion.

12         MR. NAESS:  Thanks, Your Honor.  Good morning.  I guess

13   to be clear, we've indicated that we don't object to the

14   designation of the creditors identified in Docket No. 15 as

15   holding 503(b)(9) claims.  As to any creditors listed in the

16   critical vendors motion, we don't believe there's any

17   delineation or hasn't been any indication as to which creditors

18   included in that motion might have 503(b)(9) claims as to which

19   might have received goods or services within 20 days prior.  So

20   our non-objection to the designation of 503(b)(9) administrative

21   claims is limited to those creditors identified in Docket No.

22   15.

23         As to the payment of those creditors, we do continue to

24   object to early payment and by early, I mean prior to

25   confirmation payment of those creditors.  The standard is a

1    three factor test that looks at, one, prejudice to the debtor,

2    hardship to the creditor and then the impact to all other

3    creditors in the case.

4        As Mr. Christensen noted, this request is somewhat

5    different in that it came from the debtor.  Typically how these

6    motions are brought is that a creditor will say I've got a

7    503(b)(9) claim and I should be paid early.  And so that's where

8    that prejudice to a debtor factor comes into play.

9        And it's really not an issue here.  Since the debtor

10   did bring it, I don't think that it weighs necessarily in favor

11   of granting preconfirmation payment or not.  We do think that

12   the other two factors are relevant here.  The second being

13   hardship to these claimants.

14       Again, we don't have any sort of evidentiary record

15   indicating one way or the other.  I don't think that the Court

16   could find that there is a hardship to these claimants in not

17   being paid prior to confirmation.  And that's all that we're

18   looking at.  You know, if they're allowed 503(b)(9) claims,

19   there's going to get some priority benefit once the plan is

20   proposed and if it's confirmed, you know, the question is can

21   they be paid early.  Our position is that prior payment is --

22   well, there's nothing to indicate that that would harm or

23   somehow be a hardship to those creditors in the record.

24       And as to the impact that it has on all the other

25   creditors in the case, looking at the budgets that have been

1   proposed by the debtor, it appears that DIP financing will be

2   required in order to pay these 503(b)(9) creditors prior to

3   confirmation.  And perhaps that's going to be the case, you

4   know, regardless of whether they pay it now or whether they pay

5   it after confirmation but prior to the effective date, you know,

6   but our position is let's wait and see, you know, if that DIP

7   financing is required.

8        If a vendor has come in and asked for financing that's

9   going to have fees and interests associated with it, fees and

10  interest that would be borne by other creditors including

11  unsecured creditors potentially in the case, rather than put

12  that burden on the back of those creditors, let's wait until a

13  plan is proposed and confirmed and then those creditors can be

14  paid prior to the effective date as required by 1129.

15       Does the Court have any questions?

16       COURT:  I don't have any questions, Mr. Naess.  Thank

17  you.

18       MR. NAESS:  Thank you.

19       COURT:  Anything further on this one, Mr. Christensen?

20       MR. CHRISTENSEN:  No, Your Honor.

21       COURT:  All right.  I'm going to grant the motion, the

22  Section 503(b)(9) motion.  It's Docket 15 in part.  There is no

23  opposition to the Court designating those creditors as holding

24  Section 503(b)(9) claims.  I'm going to set over the issue as

25  far as the timing of the payments goes to our telephonic status

```
 1   conference hearing on June 13.  That's a telephonic hearing at
 2   1:30 p.m.
 3        I think Mr. Naess is correct is that we don't really
 4   have a sufficient record to support payment of those claims at
 5   this time so the parties can determine what additional record
 6   they'd like to provide the Court at that time and I also
 7   recognize that the United States Trustee's Office is concerned
 8   that there is at least a possibility that the debtor at this
 9   time may be unable to pay all administrative expense claims in
10   full so getting past today's hearing I think will provide some
11   clarity to that issue.
12        So go ahead and grant -- provide an order to the Court
13   granting that in part and setting the remainder of that motion
14   over for an additional hearing at 1:30 on June 13, Mr.
15   Christensen.  Go ahead and have Mr. Naess endorse the form of
16   that order.  Are there any other parties that wish to endorse
17   that order?  All right.
18        All right.  If my notes are correct, that leaves us
19   with three additional motions.  Final hearing on motion for use
20   of cash collateral, final hearing on motion to pay prepetition
21   claims of critical vendors and the final hearing on debtor's
22   motion for debtor in possession financing.
23        Before we get started on those three motions, are there
24   any preliminary issues you'd like to address, Mr. Christensen?
25        MR. CHRISTENSEN:  Your Honor, there is.  There's
```

1    several additional exhibit lists that have been submitted by the

2    various parties for evidence at this hearing.  There's some

3    stipulations on admission and/or foundation for some of those

4    exhibits so I will address the debtor's exhibits and then let

5    other parties address the exhibits that they are proposing.

6              COURT:  All right.

7              MR. CHRISTENSEN:  From the debtor's standpoint, we

8    have -- and I should note I guess before I get into the

9    exhibits, there was an interim hearing held where a bunch of

10   exhibits were already admitted.  We filed a request -- a written

11   request which I guess I could renew orally to essentially have

12   the Court order as part of the record for this hearing the

13   record of that previous hearing as well so we don't have to have

14   witnesses re-testify about the same things they testified before

15   and that the exhibits admitted at the previous hearings also be

16   considered part of the record for this hearing.

17             I don't know if the Court wants to poll all the parties

18   on that request before I get into the new exhibits that we have.

19             COURT:  Are there any objections to Mr. Christensen's

20   proposal with respect to the prior record at the interim

21   hearing?

22             MS. SCHWAGER:  Your Honor, Sheila Schwager for Rabo.

23   We have no objection to it.  We just want to make sure that

24   we're not limited in still examining topics that were touched

25   upon in the interim.

24

1          MR. CHRISTENSEN:  I don't think that would be the case.

2          MR. GOURLEY:  No opposition, Your Honor.

3          COURT:  All right.  Without objection, I think that's

4     appropriate, Mr. Christensen, to have the Court consider that

5     prior testimony and the admitted exhibits.

6          MR. CHRISTENSEN:  Okay.  So Your Honor, with regard to

7     the debtor's new exhibits, we submitted Exhibits 1018 through

8     1029.  My understanding is there's an agreement from all the

9     parties to admission of all of those exhibits other than 1020

10    and 1020, the stipulation, is just to foundation of that exhibit

11    but all the rest of them would be fully admitted at this point.

12         COURT:  All right.  So that is 1018 through 1029

13    excepting 1020?

14         MR. CHRISTENSEN:  For full admission, correct.

15         COURT:  All right.  The debtor has offered Exhibits

16    1018 and 1019 and 1021 through 1029 for admission.  Are there

17    any objections to the Court admitting those exhibits?  All

18    right.  Without objection, we will go ahead and admit all of

19    those exhibits.

20              (Debtor's Exhibit Nos. 1018, 1019, 1021 through

21                1029 admitted.)

22         COURT:  All right.  Mr. Gourley.

23         MR. GOURLEY:  Yes, Your Honor.  We also on behalf of

24    the MetLife entities circulated our exhibits and my

25    understanding that Rabo, the U.S. Trustee, the debtors and

1    Conterra have all stipulated to their admission of the

2    additional exhibits and they're Exhibits 2021 through 2028.

3    They are essentially UCC financing statements, Your Honor.

4         COURT:  Is there any objection to the Court admitting

5    Exhibits 2021 through 2028?  Without objection, those will be

6    admitted.

7              (Metlife Exhibit Nos. 2021 through 2028 admitted.)

8         COURT:  Ms. Schwager.

9         MS. SCHWAGER:  Thank you, Your Honor.  I've consulted

10   with debtor's counsel and we have circulated all of the exhibits

11   to all counsel and I haven't received any objection or response

12   from any of the other counsel.  But as to debtor's counsel, the

13   following are admitted.  3041 through 3048, 3052, 3054, 3059,

14   3062 and 3073.

15        And then, Your Honor, as to foundation -- I'm sorry.

16   Did I miss -- was that right?

17        MR. CHRISTENSEN:  There's an additional one, Your

18   Honor.  3057 was also admitted.

19        MS. SCHWAGER:  Oh, sorry.  Thank you.

20        MS. SCHWAGER:  And then as to foundation, Your Honor,

21   the debtors have stipulated to foundation but not admissibility

22   yet on 3055, 3056, 3060, 3063 through 3071.  Thank you, Your

23   Honor.

24        COURT:  All right.  Rabo has offered for admission

25   Exhibits 3041 through 3048, 3052, 3054, 3057, 3059, 3062 and

1    3073.  Are there any objection by the parties to the Court

2    admitting those exhibits?  All right.  Without objection, those

3    exhibits will be admitted.

4                    (Rabo Exhibit Nos. 3041 through 3048, 3052, 3054,

5                        3057, 3059, 3062 ad 3073 admitted.)

6                COURT:  Mr. Naess, any preliminary matters?

7            MR. NAESS:  No.  Thank you, Your Honor.

8                COURT:  All right.  And counsel for Conterra, any

9    preliminary matters?

10            MR. O'BRIEN:  No new exhibits but I just want to

11    confirm that the exhibits entered into evidence at the interim

12    hearing continue to be admitted through the day at the final

13    hearing.

14                COURT:  That is my understanding.  The prior exhibits

15    will be considered admitted from the interim hearing.

16            All right.  Mr. Christensen, back to you.  Any

17    additional preliminary matters we need to discuss before we get

18    started?

19            MR. CHRISTENSEN:  Your Honor, just one last preliminary

20    matter.  The parties or at least I've discussed with Rabo's

21    attorneys, there's two witnesses that are both on our witness

22    list and their witness list.  That's Mr. Bill Millenkamp and

23    Katie Churchill.  The agreement between the parties is that

24    those witnesses will be called once.  The parties will ask

25    questions of the witness that they have without necessarily

1    having exceeding the scope of redirect and cross-examination

2    type of objections while reserving any other objection obviously

3    to questions that are asked and reserving the right to recall

4    that witness later if a need arises.

5            COURT:  All right.  Is there any objection to Mr.

6    Christensen's proposal as far as the parties questioning Ms.

7    Churchill and Mr. Millenkamp in regard to the scope of the

8    questioning and the ability for the parties to reserve the right

9    to recall that witness?  All right.  That sounds appropriate.

10           MR. CHRISTENSEN:  Okay.  I don't think there's

11   additional preliminary matters from us, Your Honor.  I will note

12   that for -- as we move into questioning of some of the

13   witnesses, Ms. Mikkilineni will be doing a lot of that

14   questioning.  So she'll probably be the next face from our side

15   you see.

16           COURT:  All right.  And are there any scheduling

17   matters that we need to take into account, Mr. Christensen, as

18   far as taking witnesses out of order or are there certain

19   witnesses that have flights to catch, for example, that we need

20   to be aware of?

21           MR. CHRISTENSEN:  Not that I think the Court needs to

22   be aware.  There's some scheduling things but they'll -- I think

23   they'll be dealt with in the order that we take the witnesses.

24           COURT:  All right.  Mr. Gourley, any additional

25   preliminary matters?

```
 1                MR. GOURLEY:  No, Your Honor.  Thank you.

 2                COURT:  Ms. Schwager.

 3                MS. SCHWAGER:  No, Your Honor.  Thank you.

 4                COURT:  Mr. Naess?

 5                MR. NAESS:  No.  Thank you.

 6                COURT:  And Mr. O'Brien?

 7                MR. O'BRIEN:  None.

 8                COURT:  All right.  Are we ready to proceed, Mr.

 9      Christensen?

10                MR. CHRISTENSEN:  I believe so, yes.

11                COURT:  All right.  Ms. Mikkilineni.

12                MS. MIKKILINENI:  Thank you, Your Honor.  We're going

13      to call Mr. Todd Davis to the stand.

14                COURT:  All right.  Mr. Davis, please come on up to the

15      witness stand and please remain standing when you arrive up here

16      so you can be sworn in.

17                CLERK:  I'll just have you come up to the witness

18      stand, please.

19                          (TODD DONALD DAVIS is sworn.)

20                CLERK:  Thank you.  Please have a seat and once seated,

21      please state your name and spell your last name for the record.

22                WITNESS:  Todd Donald Davis, D-a-v-i-s.

23                CLERK:  Thank you.

24                          DIRECT EXAMINATION

25      QUESTIONS BY MS. MIKKILINENI:
```

1    Q.  Good morning, Mr. Davis.  Can you please tell us where you

2    work?

3    A.  I have my own business, Davis Livestock, Incorporated.

4    Q.  And how long has that business been in existence?

5    A.  Well, I've been in the livestock business basically my whole

6    life but I started my own company 1980.  Incorporated probably

7    20, 25 years ago.

8    Q.  And how long have you been in the livestock industry?

9    A.  Basically my whole life.  Like I said, I started my own

10   business in 1980.  I was raised around the business.  My father

11   was in the business.  My grandfather owned an auction yard.  So

12   I've basically grown up in the business.

13   Q.  And can you tell me more about what your business does?

14   A.  Primarily brokering cattle, you know, arranging sales,

15   buying cattle.  I do keep some inventory, feed some cattle and

16   breed -- do some breeding to keep an inventory as well.

17   Q.  And when you say you broker cattle, do you -- where do you

18   do that?

19   A.  Well, all over the U.S.  We do quite a bit of exports

20   overseas, some cattle into Canada and Mexico as well as the

21   overseas business.

22   Q.  And do you do livestock appraisals?

23   A.  Well, I'm not a licensed appraiser but I have done some work

24   for some different banks, you know, that's asked me to go give

25   them an estimate of what they thought a herd of cattle was

1  worth.  I've done that in the past.

2  Q.  And how many of those types of appraisals have you done in

3  the past?

4  A.  I'd be guessing but maybe 20 or 30.

5  Q.  And how many cattle do you sell per year on average?

6  A.  In a normal -- I guess normal, if I can use that phrase,

7  year, it could be anywhere from 25 to 50,000.

8  Q.  Are you involved in any professional organizations?

9  A.  I'm a board member of the Livestock Export Association of

10  the United States and the Utah Holstein Association, Holstein

11  Association of the United -- I believe the official name's

12  Holstein Association of the United States.  National Federation

13  of Independent Businesses.  I can't think of any others off the

14  top of my head.

15        MS. MIKKILINENI: Your Honor, we'd like to qualify Mr.

16  Davis as an expert in livestock valuations.

17        COURT:  Any objection?  All right.  That's fine.  Go

18  ahead.

19  BY MS. MIKKILINENI:

20  Q.  Has Davis Livestock filed an application to be employed in

21  this case?

22  A.  I have.

23  Q.  I'm going to pull up Exhibit 1019.  It should appear on your

24  screen there.  Do you see that?

25  A.  Yes, I do.

1    Q.   And do you recognize this document?

2    A.   I do.

3    Q.   What is it?

4    A.   It's an appraisal exhibit I guess you'd call it that we

5    prepared for this.

6    Q.   And who created this appraisal?

7    A.   I did.

8    Q.   When was the appraisal conducted?

9    A.   This is dated the 2nd but I actually think that I went and

10   looked at the cattle a few days prior to that.

11   Q.   And did you go to the farm then to look at the cattle?

12   A.   Yes.

13   Q.   How often have you been to the farm in the past?

14   A.   Numerous times.  Like probably dozens of times.  I've done

15   business with Millenkamp for a number of years.  I was just

16   going to say where the dairy facility is, I mean I did when that

17   was nothing but a feedlot at that point.  But I have been --

18   since it's been a dairy facility, I've also been there numerous

19   times.  Let me clarify that.

20   Q.   And did anyone assist you in conducting the appraisal?

21   A.   No, I did it myself.

22   Q.   In your opinion, what's the condition and quality of the

23   cattle?

24   A.   I'd say they're in excellent condition.  If I can clarify

25   that a little bit, I'd say that that dairy is probably one of

1    the neatest or cleanest.  It appears to be very, very well run.

2    Actually a lot of our overseas clients, they all -- always want

3    to take tours of dairy farms and, traditionally, that's been one

4    that I've taken them to since it's been in existence just

5    because they like to see the big -- you know, they like to see

6    the nicer dairies.  That's one of three or four that I take them

7    to.

8    Q.  Where is the livestock located?

9    A.  Which livestock?  I mean do you want me to go like through

10   what I looked at or --

11   Q.  No, just generally the livestock that you appraised.  What

12   towns are they -- like where did you go?  What towns are they

13   in?

14   A.  Declo I think officially.  I always call it Malta but I

15   think it's officially -- the address of the dairy is Declo and

16   then Jerome, Idaho.

17   Q.  What information did you look at in determining the value?

18   A.  Again, it's different -- different for the dairy versus the

19   cows.  Do you want me to just like go through it or --

20   Q.  Let's talk about the dairy cows first.  What information did

21   you look at to determine those values?

22   A.  On the dairy cows, to use -- I used a couple of the most

23   recent dairy dispersals that I knew about that were more large

24   scale.  Obviously not the scale of this but larger dairies that

25   have been conducted by Overland Stock Yards as well as some

1  private sales that I knew very recently.  Even some of my own

2  sales.  I just used that as a comparison.

3  Q.  And what kind of dairy cows are these?  Are they Jersey?

4  A.  Jersey, correct.

5  Q.  Did you take that into consideration?

6  A.  I did.  The sales that I used were on Holstein cows, the two

7  large ones, that were just within a few weeks of me doing this

8  appraisal.  And even though I don't know they necessarily would

9  have to be that way because often times the Jerseys and

10  Holsteins are very comparably priced, I did discount it some

11  where they're being Jerseys, there might not be quite as many

12  buyers out there.  So I did discount it some taking into account

13  that they were Jerseys versus Holsteins.

14  Q.  And how about the beef cattle?  What did you look at in

15  determining the value of those?

16  A.  I believe the day that I started to prepare this, I looked

17  at the futures which is readily available to anybody.  I mean I

18  just pulled up what the futures were doing on that particular

19  day.  I think I pulled up a CattleFax report which just

20  indicates trends and looked at -- also researched on that

21  particular day cattle -- you know, cattle numbers historically I

22  guess you would say.

23  Q.  How did you know the amount of cattle?  Were you provided

24  with anything?

25  A.  I was provided an inventory list from Mr. Heida.

1  Q.  How about the -- go ahead.

2  A.  I'll just clarify.  I did not go personally count, you know,

3  100,000 cattle.  I will say that I based it off the numbers that

4  I was provided.

5  Q.  And how about the fat cattle?  How did you value those?

6  A.  Again, I looked at the futures report, the fat and feeder

7  cattle.  I based my numbers on what the market was that day.

8  Q.  And the way that you valued the dairy cows, the beef cattle

9  and the fat cattle, is that how you would typically value

10  cattle?

11  A.  Yeah.  I just use the approach as if I were going to -- if I

12  was going to be the middleman in the deal let's say, the broker,

13  just to put what I thought would be a fair market value of the

14  cattle.

15  Q.  I'm going -- we're going to turn to page 7 of the exhibit.

16  Is this all the livestock you viewed and included in your

17  appraisal?

18  A.  These are the numbers that I was provided.

19  Q.  What was the total number of cattle?

20  A.  84,285.

21  Q.  The report that you were given by Mr. Heida for the

22  inventory, what did it include?  What types of things were on

23  it?

24  A.  Initially, it had some of the dairy cattle lumped into

25  groups and I asked him if he could break it down for me month by

1    month and the other cattle were pretty self-explanatory other

2    than what I would call -- what I would term the open heifers,

3    the 6 to 13 months.  I asked them to provide a breakdown of

4    month by month.  So all these numbers were provided to me by Mr.

5    Heida.

6    Q.  And what is the total market value of the debtor's cattle

7    based on your appraisal?

8    A.  $140,862,986.

9    Q.  The value of cattle in the last one to two years, has it

10   remained pretty steady?

11   A.  I would say cattle today are higher -- well, I'm not going

12   to just say.  I know that cattle today are higher than they've

13   ever been in my lifetime.  Fat cattle have reached record highs

14   and even two of these sales that I quoted, they had a few groups

15   of cattle bring in excess of 3,000.  I personally have never

16   sold loads of cattle -- commercial dairy cattle for that amount.

17   I still haven't to this day but I've seen it happen.  So based

18   on all of that, I would say it's not even an assumption.  The

19   fact is that cattle are higher.  They're at record highs right

20   now.

21   Q.  And do you anticipate any sort of decrease in the value of

22   cattle in the next one to two years?

23   A.  Based on the numbers that I see and the reports that I read,

24   no, I wouldn't -- unless there's some catastrophe of some kind,

25   I wouldn't expect them to go down.  The heifer numbers which is

1   something that I follow quite closely, the heifer replacement

2   cattle which are cattle that are being grown to, you know, go

3   into the dairies, the numbers are at their lowest levels in 20,

4   25 years.  And the feeder cattle market numbers are down.  The

5   last report I read, it showed numbers I believe at about 4

6   percent off a year ago numbers.  Looking at that, in my opinion,

7   and also the interest that's being expressed, we've had probably

8   more inquiries the last six months from overseas buyers than at

9   any time since probably 2012.

10   Q.  What was in 2012?

11   A.  It just was one of our biggest years for export.  I think

12   the conditions were right.  The value of the dollar and price of

13   the cattle, things of that nature, just made it a large export

14   year.

15   Q.  If you were to take this many cattle to market at once, what

16   could happen?

17   A.  Well, as far as -- I mean what would happen as far as the

18   values or what it would do to the market or what --

19   Q.  Yeah.  What it would do to both, the market, the price.

20   A.  I would say often it's going to take a special buyer if you

21   were going to sell all these in one lump or even just the milk

22   cows and parceled the other cattle out as well.  I think it

23   could be -- if you found the right buyer that was going to buy a

24   dairy of this size, I think it could actually possibly help the

25   value because it would be virtually impossible, unless they

1   already had the cattle somewhere, to populate a dairy this size.

2   So it could actually -- it could be a benefit.

3         I mean if you just held a fire sale is a term that I

4   use, then obviously I think it would bring the value down

5   because -- that's just a term we always use, a fire sale, you

6   know.  Just dump them out and bring what they may.  Obviously I

7   don't think that would bring their best value if that answers

8   your question.

9   Q.  Yes, it does.  Thank you.  Has the bird flu had an impact on

10  the value of livestock?

11  A.  When it initially came out, there was a little -- the feeder

12  cattle market took a bit of a hit for a few days and there's

13  been I think far more -- this is something I've had to deal with

14  quite a bit over the last month because we actually had a

15  shipment in port that was supposed to load the day that the USDA

16  finally announced it and they were going to Turkey and we had to

17  test them all for the bird flu before they would let us load.

18        So in that respect, it's had an impact on my business

19  but not on the values.  It just -- through some additional

20  testing, they've since come out with a national I guess mandate,

21  whatever you would call it, that any lactating cows have to be

22  tested before they can be transported across state lines.  But

23  on the heifers or nonlactating cattle, feeder cattle, stuff

24  like -- things of that nature, it hasn't affected the trade.

25  The only effect that I've seen is the testing for lactating

1    cattle across state lines.

2    Q.  So the value wasn't gone down.

3    A.  I haven't seen a change in the value.  And both the sales

4    that I referenced were -- especially the Grandview heifer sale

5    was in -- you know, in the midst of all this.

6    Q.  I have no further questions.  Thank you.

7    A.  Okay.  Thank you.

8          COURT:  Counsel for MetLife?

9          MR. GOURLEY:  No questions, Your Honor.

10          COURT:  For the Rabo Agrifinance?

11          MR. SCHOULDER:  Yes, Your Honor.

12                    CROSS-EXAMINATION

13    QUESTIONS BY MR. SCHOULDER:

14    Q.  Good morning.  Andrew Schoulder of Norton, Rose, Fulbright

15    for Rabo Agrifinance.  Good morning, Mr. Davis.

16    A.  Good morning.

17    Q.  You testified earlier that you've done 20 to 30 appraisals

18    in your career; is that correct?

19    A.  I think I said that was a guesstimate, yeah.

20    Q.  That's okay.

21    A.  Yeah.

22    Q.  And have you received any appraisal training in connection

23    with those appraisals?

24    A.  No, based on my knowledge of the business I guess you could

25    say and I think I stated I'm not a licensed appraiser.

1    Q.  And have you had any training in appraisal methodologies?

2    A.  All I was asked to do was provide what I thought was a fair

3    market value and that's what I did.

4    Q.  All right.  But have you received any training in appraisal

5    methodologies though?

6    A.  Other than being in the business for 44 years, I mean formal

7    training as like go to school?  I'm not sure of your question.

8    Q.  All right.  I'll restate it.  Would you agree that if you're

9    valuing cattle in connection with a transaction, it would have a

10    transactional value, correct?

11    A.  Correct.

12    Q.  Right.  And if you're valuing cattle in connection with a

13    liquidation, it would have a different value, wouldn't it?

14    A.  Depending on how the cattle were liquidated, it could, yes.

15    Q.  Right.

16    A.  No disagreement there.

17    Q.  And just going back like just to tie it back, so I asked you

18    before if you've had any training in appraisal methodologies.  I

19    believe your answer is you have not, correct?

20    A.  As far as like formal education, you know, go to a class to

21    learn about appraisal, no, I've not.

22    Q.  Okay.  Now, just going back to what you just said -- what we

23    were just discussing before in terms of appraisal for a

24    transactional -- more like a transaction versus liquidation, all

25    right, does your valuation of $140 million account for the costs

1   to maintaining the herd while you're trying to liquidate a

2   hundred and -- 85,000 head of cattle?

3   A.  My valuation was a snapshot of that day.

4   Q.  Right.  But if you value the herd at $140 million and you're

5   trying to liquidate the herd of 85,000 cattle, you would have to

6   care for the herd during that time that you're liquidating,

7   wouldn't you?

8   A.  Milking cows are going to be milked but they're also

9   producing milk, you know.  They're producing income.  The

10  heifers -- like I said, the valuation is a snapshot of that day.

11  If the cattle weren't sold for three months, I'm just -- like

12  for reference, I think to answer your question, obviously the

13  values of the younger cattle would go up because they would be

14  older and bigger and that type of thing.  So like I said, my

15  valuation is a snapshot of the cattle on that day.

16  Q.  Right.  I'm just trying to get a sense of what is actually

17  implied in your valuation, what factors you took into account in

18  arriving at the valuation.  So for instance, you'd have to feed

19  the cattle, correct?

20  A.  That's correct.

21  Q.  Right?  And there's a cost to feeding the cattle?

22  A.  There's also gain every day.

23  Q.  Right.  But we're talking about the cost of feeding, the

24  cattle, correct?  So there's a cost.

25  A.  There is a cost of feeding cattle.

1  Q.  Right.  We could talk about the gain too but just there is a

2  cost of feeding the cattle, correct?

3  A.  Correct.

4  Q.  Right.  And you'd have to feed the cattle until you sold

5  them, correct?

6  A.  They absolutely would need -- to get their full fair market

7  value, they would have to be cared for as if they weren't being

8  sold I guess would be a good way to put it.

9  Q.  Right.  But your total herd collateral value of $140

10  million, does that account for the cost of feeding the herd?

11  A.  No.  As I stated, it's a value of the cattle on that day.

12  For instance, if a sale had been arranged, what I thought a fair

13  market value was if the cattle were to be sold on that day to a

14  buyer or various buyers what I felt like the value would be.

15  Q.  Right.  So if you had to apply a discount, Mr. Davis, to

16  account for the fact that you have to feed the cattle until you

17  could sell all 85,000, what discount would you apply?

18  A.  I don't think I could throw a number out there.  It depends

19  on how long you were going to feed them.

20  Q.  Well, let me ask you, how long do you think it would take to

21  sell 85,000 head of cattle and capture $140 million in value?

22  A.  I think it would take some time to find a buyer.  You don't

23  know.  You might find a buyer in two days.  You might not find

24  one for two months or six months.  I can't really answer that

25  question.  I mean it's obviously a very large group of cattle.

1    I do think there are people out there that would be interested

2    in buying a dairy that size.  As I stated earlier, obviously

3    it's going to take a special buyer.  It's a huge dairy.

4    Q.  Right.  And a special buyer means that there's probably a

5    smaller pool of buyers that are going to be interested in buying

6    85,000 head of cattle, correct?

7    A.  Correct.  And if I can clarify that a little bit, there

8    are -- just looking at the numbers here.  11, 13 -- around 14 --

9    14,000-plus are not dairy cattle so approximately -- well, so it

10   would be approximately 70,000 dairy cattle.  Still a huge

11   number.

12   Q.  Right.  And not every special buyer's going to want a mix of

13   dairy cattle and fat cattle?

14   A.  No.  I wouldn't think you'd have a buyer -- they would

15   obviously go different directions.  Fat cattle are very easy to

16   liquidate quickly.  You call a slaughter plant and they give you

17   a kill date and away you go.

18   Q.  Right.

19   A.  Feeder cattle, easy to market.  You contact bigger feed

20   lots, negotiate whatever the market value is on that day and

21   start getting trucks under them.

22   Q.  In regard to trucks, it would -- did you factor in the cost

23   of transporting 85,000 head of cattle into your collateral

24   value?

25   A.  I've -- the value I placed is on the cattle where they

1    stood.  Typically buyers arrange their own transportation.

2    Q.  Right.  So the debtor's not going to recover 140,000 -- $140

3    million.  It's going to have to reduce the $140 million by the

4    cost of transport if it has to transport them, correct?

5    A.  I believe I just testified that the buyers typically arrange

6    their own transport.  When I buy cattle, I arrange my own

7    transport.  I pay a price wherever the cattle are located.  I

8    arrange my own transport to take the cattle where they're going

9    to go.  So I would assume in most of the deals that I do, if you

10   sold 10,000 -- if you parceled it out is the term I would use

11   and someone bought 5,000 or 10,000 or whatever the number would

12   be, they would arrange their own transportation.

13   Q.  Okay.  But just to go back to the cost of feeding, the

14   debtors would not be able to recover $140 million.  It would be

15   140 million less whatever the cost of the feed is for however

16   long you're feeding those cattle, correct?

17   A.  That's correct.

18   Q.  Right.  And the debtors are incurring that cost, correct?

19   A.  Yeah.  They would be in charge of feeding the cattle,

20   milking them, taking care of them.  I guess a term I would use

21   would be typical animal husbandry practices.

22   Q.  And veterinary supplies as well?  That would also have to

23   come off the $140 million value.

24   A.  They would need to maintain the cattle, any cattle, you

25   know, that are sick or unmerchantable.  Obviously I would as a

1    seller, if it were me and I would assume they would do the same,

2    you don't want to just let your cattle go.

3    Q.  Right.  And talking about sick cattle, before, you were

4    testifying about the impact of bird flu, right?  You wouldn't be

5    able to sell a cow that has tested positive for bird flu, would

6    you?

7    A.  No.

8    Q.  All right.  So there would be another delay in being able to

9    sell that -- any cow that has been tested positive for bird flu,

10   right?

11   A.  Yeah.  The cow probably wouldn't be sold.

12   Q.  Right.  So do you have a discount that you would apply for

13   the cost of feeding the cows that we should consider in your

14   experience as an appraiser?

15   A.  My -- like I said, obviously there's a cost to feed the

16   cattle.  My appraisal is based on a snapshot of if the cattle

17   were sold that day.  I don't know what their costs are to feed

18   the cattle.

19   Q.  Right.  I understand.  But you can't sell that many cows in

20   one day, can you?

21   A.  If you had a buyer for the entire dairy.  Again, I'm going

22   to separate dairy from the three groups of cattle at the bottom

23   of that appraisal, then, yes, they would be sold all in one day

24   if you had the right -- a particular buyer for the whole thing.

25   If you had to parcel it out, it's going to take awhile.

1  Q.  Right, you testified before that it would take some time to

2  find a special buyer, correct?

3  A.  I think my testimony was it could take a couple of days, a

4  couple of months or six months.  I --

5  Q.  Right.  I'm asking you in your 20 to 30 years of experience

6  appraising cattle and selling cattle, what discount would you

7  apply for finding that special buyer to the $140 million given

8  that we can't sell them in one day based upon your testimony?

9  A.  I would say the value of the cattle -- I'm not sure I

10  understand your question.  I wouldn't discount the cattle.

11  These values would stay what they were.  They're going to have

12  to feed the cattle until you found a buyer.  I mean that's --

13  that's a total unknown.  You don't know when you're going to

14  find them if you're trying to sell them all at once.

15        If you want to just fire sale it, you could arrange a

16  sale in a few weeks time and auction the whole place off, you

17  know.  Buyers would come from all over the country.  So it

18  depends on how you marketed the cattle and I have no idea when a

19  buyer would be found.  I just have no idea.

20  Q.  Right.  And cattle prices, they fluctuate, correct?

21  A.  They do.

22  Q.  Right.  And so if it takes a day, obviously, as you said, it

23  would capture the value, correct?

24  A.  Correct.

25  Q.  And the price of cattle could fluctuate in six months,

1    right?

2    A.  Yes, it could.

3    Q.  So by the time you find that special buyer, it's possible

4    that the total herd collateral of $140 million could decrease

5    based upon market fluctuations, correct?

6    A.  Yes.  It could increase as well.

7    Q.  Now, you testified earlier that you've bought cattle from

8    Mr. Millenkamp before, correct?

9    A.  That's correct.

10   Q.  And you've sold cattle to him?

11   A.  That's correct.

12   Q.  And so you have an existing business relationship, is that

13   right, with Mr. Millenkamp?

14   A.  I haven't done any buying or selling of cattle with him

15   probably in five or six years.  Primarily when he -- I bought

16   cattle from him primarily when he was -- when where the dairy

17   facility is now was a feedlot.  It was full of heifers that he

18   had acquired at that time.  I marketed quite a few.  That's been

19   2012 -- I don't know.  A long time ago.  And I did sell him a

20   lot of cattle once he started building the dairy to help him

21   populate that.  Since he's had it running, I think I bought 200

22   heifers from him one time for an export deal.  Probably in the

23   last five to seven years, that's the nature of my business

24   relationship with him.

25   Q.  Okay.  Now, earlier you discussed the comps that you were

1  using and you mentioned that some of those comps involved

2  Holstein cows, right?

3  A.  That's correct.

4  Q.  And what discount did you apply to take account for the fact

5  that much of Mr. Millenkamp's herd is Jersey?

6  A.  Going from memory, I believe the Grandview dairy sale which

7  was the one closest to it, they included 5 or 600 heifers in the

8  overall average of that sale.  They sold just a small portion of

9  longer bred heifers with the cows.  That sale averaged -- I

10  don't have my paperwork in front of me.  I believe that sale

11  averaged $2725.  So that would be a discount of 4 to 600 off of

12  the values that I placed here.  I don't believe the Arroya sale

13  that I used was quite as high as the Grandview sale.

14  Q.  And none of those comps, the sellers, they weren't in

15  Chapter 11, were they?

16  A.  No.

17  Q.  And were they under any time frame to liquidate, to sell

18  their cattle?

19  A.  To my knowledge, they just wanted to get -- you know, just

20  wanted to get out.

21  Q.  So they weren't in as much of a need to find a special

22  buyer, were they?

23  A.  I don't think it takes a special buyer to buy the cattle

24  whether they're in bankruptcy or not.  I mean buyers want to

25  buy.

1   Q.  Before you also testified that the -- you inspected the

2   cattle; is that right?

3   A.  That's correct.

4   Q.  And you testified they're in excellent condition, correct?

5   A.  They looked to me to be in excellent condition.

6   Q.  Did you review the production numbers?

7   A.  I did.

8   Q.  And do you believe that their production numbers also

9   represent cattle that are in excellent condition?

10  A.  For the size of the dairy, I would say they're pretty good.

11  I maybe would think the milk production would be 2 to 4 pounds

12  higher but on that size of a herd, it seemed fine to me.

13  Q.  So were their numbers -- were their production numbers

14  higher or lower than industry standards right now?

15  A.  Well, I can't tell you exactly what an average production on

16  a Jersey dairy is.  I didn't look at that number on a nationwide

17  basis.  Most of the Jersey dairies that I see are in the 50's on

18  milk production and these cows were in the lower end of the

19  50's.  I think 50 -- it varied a few pounds month by month.  But

20  I think around 54 pounds as I recall.

21          MR. SCHOULDER:  No further questions, Your Honor.

22  Thank you, Mr. Davis.

23          COURT:  Thank you, counsel.  Mr. Naess, any

24  cross-examination?

25          MR. NAESS:  No.  Thank you.

```
 1              COURT:  Counsel for Conterra?

 2              MR. O'BRIEN:  Yes, Your Honor.

 3                        CROSS-EXAMINATION

 4   QUESTIONS BY MR. O'BRIEN:

 5   Q.  Good morning, Mr. Davis.  My name is John O'Brien.  I'm the

 6   attorney for Conterra.  I just have a couple of short questions.

 7   A.  Sure.

 8   Q.  Was it your understanding and assumption that Millenkamp

 9   Cattle has good title to all of the animals that are the subject

10   of your appraisal report, Exhibit 1019?

11   A.  As far as good title, I mean I'm not familiar with some of

12   these legal terms.

13   Q.  That Millenkamp Cattle in fact owns all the animals that are

14   the subject of your appraisal report, Exhibit 1019?

15   A.  My assumption was that they were owned by Millenkamp.

16   Q.  And are you aware of any liens other than the liens in favor

17   of Rabo or Conterra on those animals?

18   A.  Well, I seen a list of all the creditors but I don't know

19   who's owed what for what.

20   Q.  Okay.  Last question.  Open-ended question.  If your report

21   gives a current snapshot value, why would you look at the

22   futures market to assist you in preparing your --

23   A.  I believe my testimony was I looked at the futures on the

24   feeder cattle and what the -- the board, what the price of fat

25   cattle was on that day.
```

```
 1    Q.  Okay.

 2    A.  It had nothing to do with the dairy cattle.

 3    Q.  Thank you.

 4    A.  Okay.

 5            COURT:  Thank you, counsel.  Ms. Mikkilineni, any

 6    redirect?

 7                    REDIRECT EXAMINATION

 8    QUESTIONS BY MS. MIKKILINENI:

 9    Q.  Just a couple more questions, Mr. Davis.

10    A.  Okay.

11    Q.  Do you normally apply a discount for cost of feed when

12    you're valuing cattle for this type of snapshot valuation?

13    A.  No.  That would be the value when I bought the cattle.  I

14    came to you and said I was going to give you X amount of dollar

15    for some cattle if I picked them up today, tomorrow or in four

16    or five days, whatever we agreed on would be the price.

17    Q.  And if you were to apply a discount for course of feed,

18    would you also account for an increase in value for larger

19    cattle and any milk produced?

20    A.  Well, I wouldn't be receiving the proceeds from the milk.  I

21    would assume -- again, it depends on the time frame.  A few

22    days, it's not going to really change the value of the cattle.

23    I mean if they weren't sold for two months, then obviously

24    everything is going to be older.  Many more cattle will be

25    pregnant at that point.  There will be more cattle born.  Cattle
```

1   will be calved and put over into the milk string so it's going

2   to change -- it would change the dynamics of the -- of like the

3   value or the appraisal because there's going to be different

4   numbers.

5          Like I said, there's going to be cattle born that will

6   be part of the equation.  Everything else will be older.  Cattle

7   will be calved and in the milk string.  Obviously there will be

8   cull cows that had gone out.  So I don't know if that answers

9   your question or not.

10  Q.  Yeah.  So if you have a decrease for the cost of taking care

11  of the cattle while you're trying to sell them, you would also

12  have an increase for --

13         MR. SCHOULDER:  Leading.

14  BY MS. MIKKILINENI:

15  Q.  Would you have an increase --

16         COURT:  Hold on.  I'll sustain the objection.

17         WITNESS:  Okay.

18  BY MS. MIKKILINENI:

19  Q.  If you have a decrease for the cost of caring for the

20  cattle, would there also be any sort of increase during that

21  time frame in the value?

22  A.  On a herd of milk cows, there's the milk production -- the

23  daily milk production, obviously that's producing income.  The

24  open heifers -- again -- and I don't know if this really answers

25  your question but to answer it properly, some of it would depend

1    on the timing obviously.  A few days is not going to change the

2    values.  A few months is going to entirely change the whole

3    thing because of cattle being born, cattle calving, going into

4    the milk string, cattle being called out of the dairy.

5            Now, we're addressing dairy cattle primarily.  On the

6    fat cattle and the feeder cattle, there's cost of feed but like

7    on the feeder cattle especially, they're sold by the pound and

8    those cattle are probably gaining 2 and a half, 3 pounds a day

9    so they're gaining in value every day.

10   Q.  Thank you.

11           MS. MIKKILINENI:  No further questions.

12           COURT:  Any additional questions from counsel for

13   MetLife?

14           MR. GOURLEY:  No, Your Honor.

15           COURT:  Counsel for Rabo Agrifinance?

16           MR. SCHOULDER:  No, Your Honor.

17           COURT:  United States Trustee's Office?

18           MR. NAESS:  No.  Thank you.

19           COURT:  Counsel for Conterra?

20           MR. O'BRIEN:  I just want to ask you a final question.

21                        RECROSS-EXAMINATION

22   QUESTIONS BY MR. O'BRIEN:

23   Q.  Your valuation was based upon the current board and not the

24   futures market.

25   A.  I looked at the futures and what they were doing on that

```
 1   day.  I believe it was April 30.  I have the report there if
 2   you'd like me to look at it and tell you the day.
 3   Q.  Thank you.
 4   A.  Okay.
 5           COURT:  All right.  You may step down.  Thank you.
 6           WITNESS:  Thank you.
 7           COURT:  All right.  Counsel for the debtors, do you
 8   have an additional witness that you would like to call at this
 9   time?
10           MS. MIKKILINENI:  Can Mr. Davis be excused as a
11   witness?
12           COURT:  Any objection?  That would be fine.  Go ahead.
13           WITNESS:  Thank you.
14           MS. MIKKILINENI:  I'd like to call Mr. Gale Harding to
15   the stand.
16           COURT:  Mr. Harding, please come step up to the witness
17   stand.  Remain standing when you arrive here so you can be sworn
18   in by the courtroom deputy.
19           CLERK:  Raise your right hand.
20                          (GALE HARDING is sworn.)
21           CLERK:  Thank you.  Please have a seat.  And once
22   seated, please state your name and spell your last name for the
23   record.
24           WITNESS:  My name is Gale W. Harding, H-a-r-d-i-n-g.
25           CLERK:  Thank you.
```

DIRECT EXAMINATION

QUESTIONS BY MS. MIKKILINENI:

Q.  Good morning, Mr. Harding.  Will you please tell us where you work.

A.  I work in Rexburg, Idaho.

Q.  And what do you do?

A.  I am a professional auctioneer.  Also, I'm a licensed appraiser -- agricultural appraiser for farm machinery.

Q.  And what's the name of your business?

A.  Gale W. Harding and Associates.

Q.  And what does your business do?

A.  My business is I sell farm machinery at auction and I also sell horse sales and I have a snow scraping business.  Anything that I got free time to do, I do.  That's part of Gale Harding and Associates.

Q.  And are you affiliated with a university?

A.  I worked for the University of Idaho Extension Service for 37 years, retired about 15 years ago and became full-time employed through my business as a professional auctioneer and equipment appraiser and snow scraper and general farm laborer.

Q.  And what's your educational background?

A.  I have a Bachelor of Science Degree in animal science.  I have a master's degree in agricultural education and I've had advanced training in appraisals through the American Society of Ag Appraisers.

1   Q.  And how long have you been a member of that society?

2   A.  About 25 years.

3   Q.  How long have you been doing auctions?

4   A.  Since 1980.

5   Q.  And can you explain more what your work -- what you do for

6   the University of Idaho?

7   A.  I was a farm advisor.  Even though I had my degree in animal

8   science, where I lived, we raised a lot of potatoes and grain --

9   grain products and for me, I had to go into more crop production

10  rather than using my animal science.  So I had advanced training

11  becoming a crop advisor for our local farmers as well as for all

12  of southeastern Idaho and the State of Idaho as a farm advisor

13  which included educating farmers on research data that has been

14  collected to increase their production of their farming

15  entities.

16  Q.  And has that type of consulting work just been in Idaho?

17  A.  The consulting has been all over.  In the early 2000's, the

18  United States Ddepartment of Agriculture asked me to be a

19  consultant to go to the Republic of Georgia, Kazakhstan,

20  Novgorod, Russia and Kenya, Africa to advise farmers on the

21  proper way of increasing values of potato production.

22  Q.  Are you involved in any professional organizations?

23  A.  Yes.  I'm a member -- lifetime member of The American

24  Quarter Horse Association; The National Auctioneer's

25  Association, a lifetime member; The American Society of the Ag

1    Appraisers and various community organizations which are

2    professional.

3    Q.  And what's your personal background in farming?

4    A.  I grew up on a farm.  I had high school.  I had a little 20

5    head Angus herd that I had in the Future Farmers of America and

6    after I graduated, I sold them to take the money to further my

7    education.  I was the first one out of a three generation family

8    farm that completed an education and I own farms now.

9    Q.  How many auctions have you conducted?

10   A.  I would say that I've had anywhere from 150 to 200 auctions

11   over my career.

12   Q.  What type of experience have you gained from conducting

13   these auctions?

14   A.  My experience in conducting auctions, I realize that

15   they're -- you know, auctions are usually a quick sale at a time

16   where a person has to make an immediate decision on whether to

17   buy something.  And at that time, I try to encourage people to

18   bid and that's where I got my expertise and somewhat loyal

19   following.  People knew that I could always coax the last dollar

20   out of a piece of machinery to somebody whether it was machinery

21   or horses.

22   Q.  And what type of resources do you use when you're appraising

23   equipment?

24   A.  The resources I use, I get online.  I have a database in my

25   computer of the auctions that I've received but now the computer

1  makes it so accessible that you can just put in a piece of

2  machinery, the year of it, and you can find any kind of a piece

3  all over Canada or the United States and it will have a value

4  that they're trying to retail that value for.  So it's very --

5  very easy to find values.  A lot easier than it used to be.

6  Q.  And when you're doing appraisals, are you doing those for

7  fair market value?

8  A.  The majority of my appraisals have been fair market value

9  with a sales comparison and I can name a few that I've done a

10  fair market value and liquidation value for different banks.

11        MS. MIKKILINENI:  Your Honor, we'd like to qualify

12  Mr. Harding as an expert on equipment valuations.

13        COURT:  Any objection?

14        MR. SCHOULDER:  No, Your Honor.

15        COURT:  That's fine.  Please proceed.

16  BY MS. MIKKILINENI:

17  Q.  I can pause for you to get a drink of water.

18  A.  Thank you.

19  Q.  Has Harding and Associates filed an application to employ in

20  this case?

21  A.  Yes.

22  Q.  We're going to pull up Exhibit 1018.  It should appear on

23  your screen there.  Do you see that?

24  A.  Yes.

25  Q.  Do you recognize this document?

1    A.   Yes.   That's the one I compiled.

2    Q.   Is it the appraisal?

3    A.   It's the appraisal of the equipment of Millenkamp Livestock

4    and Farm equipment.

5    Q.   And who created this document?

6    A.   I did.

7    Q.   Are you familiar with the debtor's equipment?

8    A.   Yes, I am.

9    Q.   And how familiar are you with it?

10   A.   Well, for about the last three or four years, Rabo Finance

11   contacted me to do an appraisal the first time I was dealing

12   with Millenkamp and so I'm very, very familiar with the

13   equipment since I started appraising this equipment.

14   Q.   When you conducted this appraisal, did you go on site to

15   view the equipment?

16   A.   Yes, I did.   April 22, I initiated a day.   Mr. Heida gave me

17   the information on the equipment and we visited the various

18   pieces of machinery.   Not all pieces were there but I had a

19   general idea where the machinery was and what it looked like.

20   Q.   And can you explain the types of equipment you appraised?

21   A.   I appraised farming equipment of what I could see.   You

22   know, it's kind of hard on the dairy where they're that large

23   that you just -- you just don't have a complete view of all the

24   machinery in one place because they were farming with it.   But

25   as we drove around, we saw the various pieces being used in the

1   dairy operation and then as I was going around the farms, I saw

2   several pieces of machinery in the fields.

3   Q.  And to your knowledge, did your equipment include all of the

4   equipment on Millenkamp's farm?

5   A.  Yes, my appraisal included all the machinery and livestock

6   equipment that was provided to me from Millenkamps.

7   Q.  Do you know whether it included leased equipment?

8   A.  The leased equipment was originally given to me and then I

9   found out that they had leased equipment so a separate document

10  was given to me with the leased equipment but it was not

11  included in the appraisal.

12  Q.  Did you have any assistance when you were conducting the

13  appraisal in writing the report?

14  A.  No.

15  Q.  We're going to page 9 of the exhibit.  Is this the listing

16  of the equipment that you viewed for your appraisal?

17  A.  Yes.

18  Q.  What's the condition of the equipment?

19  A.  The equipment at Millenkamp I would say is probably one of

20  the most well kept equipment appraisals that I've done in the

21  last 30 years.  Very well maintained.  As I inspect equipment,

22  as I drive up to the properties, I have a visual look of what

23  kind of condition the site is and you can tell at firsthand what

24  kind of condition the equipment's going to be by the conditions

25  of the farm and the surrounding areas.  And so when I first did

1    the appraisal in 2021 I believe, I was amazed at how clean

2    everything was for a dairy.

3    Q.  And what approach did you use in determining the appraisal

4    values of the equipment listed in this appraisal?

5    A.  Because of the condition of the equipment that was so well

6    maintained and in good condition, I used the fair market value

7    comparison sales across the United States and Canada.  And when

8    I look at those, you can get different values.  I take a

9    conservative approach when I'm evaluating equipment.  So I would

10   say on a sales comparison, I would be on the lower end of the

11   appraisal on a fair market value.

12   Q.  And why did you use the sales comparison approach?

13   A.  To be fair, for my fiduciary responsibility and my I guess

14   ethics in appraising, I felt like this would get the most value

15   out of this equipment because it was in such good equipment --

16   it was in such good condition.

17   Q.  What's the total fair market value of the equipment based on

18   your appraisal?

19   A.  I believe it was $20,500,000.

20   Q.  Thank you.

21           MS. MIKKILINENI:  I have no further questions.

22           COURT:  Cross-examination, counsel for MetLife?

23           MR. GOURLEY:  No questions, Your Honor.

24           COURT:  Cross-examination, counsel for Rabo

25   Agrifinance?

1          MR. SCHOULDER:  Yes, Your Honor.

2                    CROSS-EXAMINATION

3     QUESTIONS BY MR. SCHOULDER:

4     Q.  Good morning, Mr. Harding.

5     A.  Good morning.

6     Q.  I'm Andrew Schoulder from Norton, Rose, Fulbright.  Counsel

7     for Rabo Agrifinance.  Just a few questions for you.

8     A.  Make them easy.

9     Q.  I'll try.  You take it easy on me.  You just testified that

10    you used the sales comparison approach because it would get the

11    most value for the equipment.  Correct?

12    A.  Yes.

13    Q.  Sales comparison approach is an evaluation methodology where

14    there's a transaction, isn't it?

15    A.  It's a transaction over a longer period of time rather than

16    a liquidation period.

17    Q.  Right.  And fair market value implies there's a willing

18    buyer and a willing seller, correct?

19    A.  That's correct.

20    Q.  Right.  And if we are selling I believe your valuation is

21    something like $20,000 of equipment, it would be in the context

22    of a liquidation, wouldn't it?

23    A.  No.  I appraised it at a sales comparison value and the

24    reason I did that is because of the condition of the equipment

25    to do justice for it because it's so well maintained.  Even if

1   you have a liquidation sale, people -- agriculture people know

2   the condition so they use a little higher value than what

3   liquidation would be at the spur of the moment.

4   Q.  Right.  But you do agree that liquidation value would still

5   be less than sales comparison value.

6   A.  Since Covid, liquidation prices have held pretty consistent

7   to sales comparison because manufacturers didn't have the

8   necessary equipment to meet the demands of the general public so

9   used machinery was usually higher than it's ever been.  So the

10  sales comparison is probably within 10 to 15 percent -- our

11  liquidation value is probably 10 to 15 percent less than what

12  the sales comparison value would be.

13  Q.  All right.  And so if we were to -- withdrawn.  Are you

14  aware of whether Mr. Millenkamp intends to liquidate his assets?

15  A.  I have no idea.

16  Q.  And so if we were to consider what the liquidation value

17  would be of the equipment based upon your appraisal, is your

18  testimony that we would look -- we would apply a 10 to 15

19  percent discount?

20  A.  That is correct.

21  Q.  Okay.  Now, in evaluating the equipment, did you take into

22  account whether any of the equipment is subject to a purchase

23  money security interest?

24  A.  No, I did not.

25  Q.  And so if there is $20,000 of value, that you would have to

1    reduce that $20,000 of value by any purchase money security

2    interests.  Isn't that right?

3    A.  Yes.

4    Q.  Right.

5    A.  The valuations that I do are just based upon my appraisal

6    not knowing any --

7    Q.  I'm sorry.  I thought you were finished.  Go ahead.

8    A.  Just not knowing of any liens that are against the --

9    Q.  Okay.  That's helpful.  And you testified that all of the

10   equipment were in excellent condition, right?

11   A.  I would say very good to excellent condition.

12   Q.  All right.  But you also testified that a lot of it -- when

13   you were touring the premises, a lot of the equipment was in

14   use, correct?

15   A.  That's correct.

16   Q.  So you wouldn't be able to inspect that equipment, would

17   you?

18   A.  Over the last three -- no, that's correct.  But when I go

19   and look at equipment, I look at the inside, I look at tires, I

20   look at the general condition.  I look where they've been parked

21   to see if there's any oil leaks and I did not see any of that.

22   But I did look at the pieces that I did observe, the tires, the

23   inside of the equipment, the wear and tear on it and it's been

24   well maintained.

25   Q.  Right.  So offhand, how many pieces of equipment comprise

1    your appraisal?

2    A.  On this appraisal?  I believe there's over 600 items.

3    Q.  Right.  And not all 600 items were on the premises.

4    A.  No, no.

5    Q.  And ball park, what's -- of the 600 items that you

6    appraised, how many were on the property?

7    A.  On the April 22 date, I would say there was probably about

8    250 pieces but over the last couple three years, I'd say I've

9    seen 80 percent of it.

10   Q.  Right.  But those -- those 400 -- 350 pieces.  Let's say 350

11   to 400 pieces of equipment that weren't there, those pieces of

12   equipment, they could have -- that you saw three years ago, they

13   could have been traded in for something else, correct?

14   A.  Well, on the appraisal, you know, I was putting the trust in

15   the appraise -- or the sheet that I was given that they were all

16   there.  There were four or five tractors that were sold prior to

17   my appraisal.  I do know that.

18   Q.  Right.  But if you saw a piece of equipment three years ago,

19   it could have deteriorated in condition in those three years,

20   right?

21   A.  Yeah, that's fair but the last three years, I've been given

22   a different list so I just assumed that the list that was given

23   to me most recently was a list of all the equipment.

24   Q.  All right.  And did you apply a discount to your valuation

25   to reflect the fact that you only saw 250 out of 600 pieces of

1   equipment?

2   A.  No.  I did not discount it because I did see the other

3   pieces.

4   Q.  Right.  So the pieces may not -- the pieces that -- let's

5   see, the 350 pieces, we wouldn't know if they were in horrible

6   condition or even existed, would we?

7   A.  Knowing the equipment that I see, I just can't see them

8   hiding the poor equipment.  I can give you an example.  Every

9   farmer that I know of has a junk pile.  On the Millenkamp

10  property, I saw the neatest junk pile I've ever seen in my life

11  which would make some farmers envious of a junk pile.  They were

12  lined up.  They were neat.  So why would they hide, you know,

13  equipment that wasn't in good shape?  I just took a general idea

14  of what all the other machinery looked like.

15  Q.  Right.  In your experience, if you had applied a discount to

16  reflect the fact that you haven't seen the majority of the

17  equipment that you're appraising, what would a fair discount be?

18  A.  I wouldn't discount because the list that I was given, I

19  would say that that was on their inventory.  The creditors

20  should have that list so I wouldn't discount it.

21  Q.  Okay.

22          MR. SCHOULDER:  No further questions, Your Honor.

23          COURT:  Thank you, counsel.  Mr. Naess, do you have any

24  questions for the witness?

25          MR. NAESS:  No.  Thank you.

```
 1            COURT:  Counsel for Conterra.
 2                       CROSS-EXAMINATION
 3   QUESTIONS BY MR. O'BRIEN:
 4   Q.  Mr. Harding, just briefly.  Is any of the equipment that is
 5   in your appraisal a fixture to the real estate?
 6   A.  No.
 7   Q.  And so the items that you appraised are not likely to also
 8   be included in a real estate appraisal?
 9   A.  No.
10            MR. O'BRIEN:  Thank you.
11            COURT:  Any additional questions, Ms. Mikkilineni?
12                      REDIRECT EXAMINATION
13   QUESTIONS BY MS. MIKKILINENI:
14   Q.  Just a few more questions.  Did you do prior valuations of
15   this equipment for Rabo?
16   A.  Yes.
17   Q.  And what was the valuation methodology you used for those
18   valuations?
19   A.  I did fair market value sales comparison.
20   Q.  And was that method used because that's -- let me rephrase.
21   Did Rabo ask you to use a certain valuation methodology?
22   A.  I asked Rabo what kind of an evaluation they would like to
23   use and that was what they wanted, fair market value sales
24   comparison.
25   Q.  And did you discount prior appraisals for not seeing
```

1   everything?

2   A.  No.

3   Q.  Do you have any reason to believe that the equipment you

4   didn't see is not in good condition?

5   A.  From what I seen, I think it's all going to be good to

6   excellent condition.  Very good to excellent condition.

7   Q.  Thank you.

8           MS. MIKKILINENI:  I have no further questions.

9           COURT:  Questions from MetLife?

10          MR. GOURLEY:  No questions, Your Honor.  Thank you.

11          COURT:  Any additional questions from Rabo Agrifinance?

12          MR. SCHOULDER:  No, Your Honor.

13          COURT:  Mr. Naess?

14          MR. NAESS:  No.  Thank you.

15          COURT:  Conterra?  All right.  You may step down.

16  Thank you.

17          MS. MIKKILINENI:  Your Honor, may Mr. Harding be

18  excused as a witness?

19          COURT:  Any objection?

20                      (Break in audio.  Recess taken.)

21          COURT:  Thank you.  Please be seated.  All right.  We

22  are back on the record.  Ms. Mikkilineni, does the debtor have

23  additional witnesses that you would like to call?

24          MS. MIKKILINENI:  Yes, Your Honor.  We'd like to call

25  Jonathan Verhoeven.

1           COURT:  All right.  Mr. Verhoeven, please come up to

2      the stand.  Remain standing when you arrive so you can be sworn

3      in by the courtroom deputy.

4                          (JONATHAN VERHOEVEN is sworn.)

5           CLERK:  Please have a seat.  And once seated, please

6      state your name and spell your last name.

7           WITNESS:  Jonathan Verhoeven, V-e-r-h-o-e-v-e-n.

8           CLERK:  Thank you.

9                       DIRECT EXAMINATION

10     QUESTIONS BY MS. MIKKILINENI:

11     Q.  Good morning, Mr. Verhoeven.

12     A.  Good morning.

13     Q.  Where do you work?

14     A.  I work for Schuil Ag Real Estate.

15     Q.  And what's your position there?

16     A.  I am a partner in the brokerage and an agent.

17     Q.  And how long have you been there?

18     A.  I've been an agent for almost ten years now.  I've been a

19     partner for a little over four years.

20     Q.  And how long has Schuil been in business?

21     A.  We celebrated 40 years last year.

22     Q.  Does Schuil do a lot of work in the ag. industry?

23     A.  Yes.  The majority of the work that we do is ag real estate.

24     Hence the name Schuil Ag Real Estate.  We are based in

25     California where we do the bulk of our transactions servicing

1    all types of ag from open land.  That would be grazing land, row

2    crops, specialty nuts, stone fruit, you name it, but it includes

3    ag facilities, specifically dairies which we do all over the

4    United States.

5    Q.  And how many active dairy listings does Schuil currently

6    have?

7    A.  I believe we have around 20 dairies on our website right

8    now.

9    Q.  And do you know how many dairies Schuil has sold?

10    A.  I don't.  I would guess it's in the hundreds though.

11    Q.  What's your background in this industry?

12    A.  Prior to sales, I was a staff accountant at Genskie, Mulder

13    and Company in Modesto, California for approximately three

14    years.  Prior to that, I did bookkeeping work for dairies and

15    various entities.  I was interim company controller for a dairy

16    in New Mexico and Arizona that was in the process of being sold.

17    Q.  And what does Genskie, Mulder do?

18    A.  Genskie, Mulder is an accounting firm that is well known

19    throughout the dairy community across the United States.

20    Q.  And do you in particular have experience in agriculture?

21    A.  I do.  I grew up on a dairy.  My dad operated a dairy from

22    prior to my birth to 2003 and after that time, I continued

23    working on various dairies for family operations, friends of

24    mine, cousins of mine.  I still have family in the dairy

25    industry today.

1    Q.  How many broker price opinions have you conducted in the

2    past?

3    A.  We do price opinions frequently.  Most of our listings begin

4    with a price opinion in some capacity.  Sometimes that's

5    informal.  Just a seller asking me what my -- what his farm's

6    worth and I do my best in that instance, but we supply price

7    opinion letters for lenders to estate planners and CPA's.  We've

8    done price opinion letters for conservators, court examiners.

9    So we're engaged to do a lot of price opinion letters for

10   various reasons.

11   Q.  Are you involved in any professional organizations?

12   A.  Yes.  As a realtor, I'm a member in the Tuolumne County

13   Association of Realtors, the California Association of Realtors,

14   the National Association of Realtors.  We're also often sponsors

15   of the Global Ag Investment Conference in New York City.  I've

16   been a featured speaker there.  I did that back in 2022.

17          MS. MIKKILINENI:  Your Honor, we'd like to qualify Mr.

18   Verhoeven as an expert in brokers price opinions and valuations.

19          COURT:  Is there any objection?  All right.  That's

20   fine.  Please proceed.

21   BY MS. MIKKILINENI:

22   Q.  Has Schuil filed an application to be employed in this case?

23   A.  Yes.

24   Q.  You should see in front of you Exhibit 1020.  Do you see

25   that?

1    A.  Yes, I do.

2    Q.  Can you scroll down a little bit?  And do you recognize this

3    document?

4    A.  Yes.   This is the Schuil Ag Real Estate broker price opinion

5    letter.

6    Q.  And what is a broker's price opinion?

7    A.  That's an opinion of value, the current market value based

8    upon recent sales activity and also incorporating trends that

9    I've seen between buyers and sellers.  There are some

10   assumptions here as to what market value constitutes, namely a

11   willing and able buyer, competitive market and, you know, other

12   factors such as a reasonable knowledge of the asset in question

13   and the ability to negotiate in one's best interest.

14   Q.  And who created this BPO?

15   A.  I primarily created this document with the assistance from

16   my team.  We employ a full-time marketing staff.  We've got

17   editors, full-time photographer, videographer.  We also have an

18   administrative team that is able to go back into our records and

19   help compile sales information.

20   Q.  Once you completed it, was it reviewed by anyone on your

21   team?

22   A.  Yes.  I operate in a sales team with Mark Schuil and Scott

23   Schuil.  We worked very closely together on this and also with

24   some of the other agents in our office.  But the final review

25   went to Michael Schuil who is a licensed broker in the state of

1    Idaho.

2    Q.  And what valuation approach do you use in this BPO?

3    A.  Well, as a part of my licensing requirements, continuing ed,

4    we are made aware of and we answer questions on the three

5    generally accepted approaches to value.  We do our best to

6    incorporate those but primarily we focus on comparable sales as

7    well as again some of the information that are not public record

8    that we are privy to that we cannot disclose as it would be a

9    violation of our responsibility to our clients.

10   Q.  And what goes into the valuation?

11   A.  Generally, we start with an overview of land prices which

12   can be highly region specific due to climate, due to soil type,

13   due to water rights and so we spend time reaching out to

14   appraisers, other brokers that we've had prior relationships

15   with to get their -- their take on anything we need to be aware

16   of in terms of regional differences.  But fundamentally, we're

17   looking for land values and then we give consideration to the

18   improvements on site based on my experience in dairy sales all

19   over the United States.

20   Q.  I'm sorry if I already said this.  Do you take into

21   consideration the number of cattle as all?

22   A.  Yes.  So dairy facilities typically are arrived at a value

23   based on the number of milk cows that the facilities themselves

24   can handle.  A feedlot typically is valued based on the length

25   of bunk space and values are assigned between buyers and sellers

1   not always matching up of course but buyers typically approach

2   it with that in mind.

3   Q.  And did you personally go to the farm?

4   A.  I did.

5   Q.  What is your impression from seeing the farm?

6   A.  My impression was that they -- as it's been stated earlier,

7   they're incredibly well maintained.  Very clean.  I didn't note

8   anything that needed to be repaired.  They're some of the nicest

9   facilities that I've ever stepped on.

10  Q.  And does the condition of the property play a role in the

11  valuations?

12  A.  It does.  It can be hard to quantify but it does typically

13  help the marketing side of things.  We often encourage our

14  clients to do some repairs and maintenance before going to

15  market.  Maybe maintain roads, keep dust down, remove trash and

16  so it helps for showings that can help drive offers.  Those

17  offers are less likely to include a deduction due to deferred

18  maintenance or any repairs and maintenance that the buyer deems

19  appropriate to get things up to their standards.  I think this

20  is a facility that exceeds the standard of most dairy operators

21  frankly.

22  Q.  Did you see any deferred maintenance at Millenkamp Cattle?

23  A.  There was none that I noted.  I mean even down to the wood

24  that was up as a windbreak for the heifers was in reasonably

25  good condition.  I noted a lot of relatively new seemingly

1    concrete which is pretty impressive.

2    Q.  We're going to scroll to page 7.  Could you maybe zoom out a

3    little bit?  Is this an overview of all the properties that are

4    included in the BPO?

5    A.  It is.

6    Q.  I'd like to go through each of the properties Schuil

7    reviewed and valued.  So what is the -- I'm sorry.  Is that on

8    the page below this?  Never mind.  Go back up.  Sorry.  What is

9    the total value for Canyonlands?

10   A.  If you could scroll up to page 4.  The Canyonlands Ranch, in

11   my professional opinion, has a value of $11,520,000.

12   Q.  What does this total include?

13   A.  There's approximately 400 acres of irrigated cropland, 168

14   acres of pasture land and 120 acres of dwellings and

15   improvements.

16   Q.  And how did you determine the value of Canyonlands?

17   A.  The majority of the value really comes down to the irrigated

18   cropland and so I was able to obtain sales activity from, again,

19   brokers and appraisers in the area to come to a value on that.

20   There's a token amount granted to pasture land.  It is minimal

21   but that typically does impact the water rights and it has its

22   uses so there is some value attached to that.  And the dwellings

23   and improvements, I believe there was a shop as well as some

24   corrals for some cattle so I gave additional consideration to

25   that.

1          But I noted in my site visit that around the

2    Canyonlands Ranch, there are several home sites with custom

3    homes on it.  I believe my approach to value here to be somewhat

4    conservative as I did not give additional consideration to some

5    of the smaller parcels that could likely be sold off for home

6    site development.

7    Q.  What is the total value of East Valley Dairy?

8    A.  In my professional opinion, the value of the East Valley

9    Dairy is $395 million.

10   Q.  And what does the East Valley Dairy total include?

11   A.  There's over 8,000 acres of irrigated cropland, 2,500 acres

12   of pasture land and a dairy site with additional facilities on

13   over 1,050 acres.  The dairy has permits for over 51,000 animal

14   units.  I estimated about 35,000 milk cows to take a slightly

15   conservative approach on that.  There's six 106 stall rotaries

16   which are massive but exceptionally efficient for milking cows.

17   That is the industry standard today.  They have a milk capacity

18   of over 6,000 cows each.  There's an estimated mature cow

19   capacity of over 37,000 head and an estimated heifer capacity of

20   over 17,000 head.

21   Q.  And how did you determine the value for East Valley Dairy?

22   A.  This again was -- we start with the irrigated crop value

23   which is not quite the same as land around Jerome so I did

24   factor in the regional differences there through discussions

25   with brokers and appraisers.  There's a value for the pasture

1    land as well but ultimately, we break down the value of the

2    facilities based on the number of milk cows that it's permitted

3    for and could reasonably house with an additional value given to

4    some of the improvements that aren't necessarily typical of

5    dairies in other regions.

6            Namely, there's a feed center which generates a return

7    in the form of efficiency gains.  You don't lose as much feed to

8    shrink.  Your feeders are typically more consistent because they

9    can -- they can accomplish their task much faster.  And there's

10   also a cattle facility where intake is conducted and treatments

11   are conducted which allow for a lot easier treatment of animals

12   as well as assessing your animals as they come in from other

13   facilities or shipping them out for sale purposes.

14           So those are two facilities in particular that add

15   value that aren't necessarily facilities that I've seen on very

16   many dairies.  So very impressive there.  But also there's a

17   methane digester in the works and so I gave some consideration

18   for that as well because when that becomes productive, it should

19   generate additional revenue.

20   Q.  Do you ever use replacement cost for things like this?

21   A.  We do consider replacement cost, especially given that the

22   cost to build facilities has increased drastically over the past

23   four or five years and many dairies across the United States are

24   trying to convert to this style of dairy with the rotary parlors

25   and the cross-vent style barns.

1              Typically buyers don't pay dollar for dollar value in a

2      transaction.  Well, I say typically.  They practically never do.

3      But typically, dairies that are being sold are far more

4      depreciated than this dairy.  It is quite new and, again, very

5      well maintained.  And so I gave some consideration to that.  But

6      ultimately, I'm still back on what I'm seeing in ongoing

7      negotiation it is and, again, that's not public record but it is

8      a consideration that I give in how buyers are approaching dairy

9      facilities like this.

10     Q.  What is the German Dairy total value?

11     A.  The German total value, in my opinion, is $4,770,000.

12     Q.  And what does this total include?

13     A.  German Dairy is an 80-acre parcel.  53 acres of irrigated

14     cropland.  It has a special needs dairy on site with a double 8

15     parallel milk parlor.  Arguably, the nicest double 8 milk parlor

16     you're going to see in the world.

17     Q.  And how did you determine the value of the German Dairy?

18     A.  Again, that started with the irrigated cropland comparable

19     sales that I was able to obtain as well as the approach to value

20     I spoke on about how dairies are typically valued.  And I gave

21     consideration to the fact that this is not a cross-vent rotary

22     parlor style dairy operation so it was discounted when compared

23     against the East Valley Dairy but since it's smaller in size and

24     scale, I also believe that it could generate a more competitive

25     bidding environment.

1    Q.  And what is the total value of Jersey Girls Dairy?

2    A.  The Jersey Girls Dairy, in my opinion, is valued at

3    $3,444,000 -- $3,440,000.

4    Q.  And what does this include?

5    A.  It's another 80-acre parcel.  It is very near the German

6    Dairy.  There's 35 acres of irrigated cropland.  Dairy site on

7    about 44 acres.  It's permitted for 1,120 animal units.  It

8    contains a double 16 parallel milk parlor.  It's not currently

9    operational as a dairy.  It is used as a feedlot and so I built

10   that into my valuation as well to take a more comparative

11   approach given that it's not currently milking cows but it could

12   potentially be restarted in the future.

13   Q.  So is this based on land sales?

14   A.  Yes.  Primarily start with land sales and then billed out

15   the pricing of the facilities as we discussed earlier.

16   Q.  What is the total value of Goose Ranch?

17   A.  Goose Ranch, in my opinion, has a total value of

18   $10,850,000.

19   Q.  And what is included in this total?

20   A.  The Goose Ranch has over 604 acres of irrigated cropland and

21   57 acres of improvements including dwellings, barns, corrals.

22   Q.  And how did you determine the value of Goose Ranch?

23   A.  I determined the value of Goose Ranch, again, based on

24   comparable sales in that region as well as some additional

25   consideration for those improvements.  On this one, I would

1    argue that I took a conservative approach again given that there

2    is a home along the Snake River and could potentially be

3    parceled off in some places to sell as home sites as well.

4    Q.    What is the total value of the calf ranch?

5    A.    The total value of the calf ranch, in my opinion, is $30

6    million.

7    Q.    And what does this total include?

8    A.    There's over 400 acres of irrigated cropland, almost 70

9    acres of pasture land and there's a 300-acre facility.  It is

10   not a dairy.  I see now that it says dairy on here.  That's

11   incorrect.  This is a custom calf raising facility and feedlot.

12   It's permitted for 600 animal units and has an estimated pen

13   capacity of over 18,000 head of dairy calves.

14   Q.    And you just said 600 animal units?

15   A.    I'm sorry.  6,000 animal units, yes.

16   Q.    And how did you determine the value of calf ranch?

17   A.    The calf ranch, again, since it's got irrigated cropland, we

18   start by building up pricing on that based on recent sales

19   information that was provided to me by appraisers and through

20   conducting my own research.  There's a consideration for the

21   pasture land but the facilities, since it's not a dairy, are

22   typically going to be based primarily on the bunk space.

23   There's a price associated with that.  I've seen sales

24   specifically in Texas that are very clear indicators of what

25   facility like this could be worth.  I do believe those inferior

1    to quality in a lot of regards.

2            I've also been a part of ongoing negotiations around

3    custom calf raising facilities with irrigated cropland that

4    helped influence my approach to value.  And given that there's a

5    main residence on site with some offices, I think this is a

6    fairly conservative approach on those improvements given that

7    Mr. Millenkamp's home would likely be multi million dollars

8    elsewhere and would probably get lost in the shuffle in a sale

9    like this as part of the business.

10   Q.   What is the total value of McGregor?

11   A.   The McGregor Ranch is valued at, in my opinion, $4,170,000.

12   Q.   And what does this total include?

13   A.   The McGregor Ranch is almost entirely irrigated cropland and

14   so, again, based on recent sales in the area, I came up with an

15   approach to value based on that.

16   Q.   And what is the total value of Ridgeway?

17   A.   In my opinion, the Ridgeway Ranch is valued at $670,000.

18   Q.   And what does this total include?

19   A.   There's 44.44 acres of feed storage and staging area.  I

20   valued that based on the utility it has in relation with the

21   McGregor Ranch and that allows the Millenkamp operation to store

22   feed there and direct it as needed between the multiple

23   facilities.

24           I think it could potentially have additional value

25   given the proximity of both of those ranches to a highway that

1    maybe there's another use for for other possible buyers but,

2    again, I took the approach of its value to the operation and as

3    farmland and the staging area without trying to add some

4    additional zoning.

5    Q.  And what is the total value of Moonshine Ranch?

6    A.  In my opinion, the value of the Moonshine Ranch is $7

7    million.

8    Q.  And what's included in this total?

9    A.  That would be over 4,600 acres of rangeland and

10   approximately 10 acres of dwellings and improvements.  Namely

11   some corrals for storing beef animals.

12   Q.  And how did you determine the value of Moonshine Ranch?

13   A.  That was based largely on sales that I could find for

14   rangeland.  This Moonshine Ranch does have access to original

15   BLM land and there are some leases associated with that but I

16   also have experience in selling rangeland elsewhere so I gave

17   some consideration to that as well.

18   Q.  And based on your opinion and as noted in the BPO, what is

19   the fair market value of all of the debtor's real estate?

20   A.  My opinion, the total value of the real estate is

21   $467,420,000.

22   Q.  Did you take into consideration current market conditions to

23   determine this value?

24   A.  I did.  Again, a lot of my valuations are based on ongoing

25   negotiations and how buyers and sellers may be approaching

1    values.  But that said, with the current beef market being as

2    strong as it has been, I believe that that helps generate a more

3    I guess competitive market for a lot of these assets.  The calf

4    ranch is in an excellent area given the number of dairies --

5    large scale dairies in the region I believe would be

6    exceptionally competitive as well and actually in the time since

7    I've submitted my price opinion letter, the milk market futures

8    are significantly above where they have been.  Those are futures

9    and they're subject to change of course but I've noted an uptake

10   in buyer activity even just from that movement alone.

11   Q.  We're going to turn to page 11 of this exhibit.  Can you

12   explain the farmland classification chart and how this affects

13   your analysis?

14   A.  Yes.  So any time we do a price opinion letter, we do some

15   mapping based on soil types.  So this is a farmland

16   classification from the USDA web soil survey site.  This gives

17   me a really broad overview of how productive the sales may or

18   may not be.  It's not a perfect tool.  Some of these samples

19   were taken 100 years ago and so with farming practices, assuming

20   people exercise good regenerative farming practices, soil can be

21   improved greatly and you can see some of these ratings even

22   state prime farm land in irrigated which means that the sale

23   samples were taken prior to farming.

24          But this allows me to compare with other ranches in the

25   region.  Sometimes you might see two sales that are close in

1    time, fairly close in date and this can give a little bit of an

2    indication as to why one may be higher or lower than another.

3    Q.  And what did you find for Millenkamp's soil?

4    A.  I found that there's -- they're pretty well par for the

5    course given the sales that I've seen in the area.  There's

6    certainly quite a bit of highly productive farmland.  There's

7    some areas, especially along some hillsides, that maybe aren't

8    as productive obviously but that's to be expected.

9    Q.  What are the general trends for real estate and farmland?

10   A.  The general trend for real estate and farmland across the

11   United States is a steadily increasing market.  Now obviously,

12   there's declines here and there.  You can zoom in but the joke

13   we use in our office, and this is tongue and cheek, is that if

14   you didn't make money in real estate, you didn't live long

15   enough.

16   Q.  If milk prices continue to improve, how would that impact

17   this BPO?

18   A.  I believe it would help create a more competitive

19   environment.  It would drive more buyers to be interested in

20   these assets and so I believe that can only help with marketing

21   and with sales.  It would strengthen these numbers.

22   Q.  What's your opinion on selling a going concern dairy versus

23   a dark dairy?

24   A.  My opinion is that it is extremely beneficial to continue

25   operating a dairy during marketing period.  Typically buyers

1    perceive that an empty dairy is going to have a real cost to

2    restart it even if it's only been dark for a couple of weeks.

3    And so we typically advise our sellers to continue operating as

4    if they are going to own things long-term and that's partially

5    based on the fact that marketing periods for a dairy are

6    extremely variable and can be very long.  So obviously the

7    revenue is a big part of that versus paying down interest on an

8    asset that isn't generating any sort of return.

9            MS. MIKKILINENI:  I have no further questions but, Your

10   Honor, I would like to admit Exhibit 1020 for admission.

11           COURT:  Any objections to the admission of

12   Exhibit 1020?

13           MR. SCHOULDER:  No, Your Honor.

14           COURT:  Exhibit 1020 is admitted.

15           MS. MIKKILINENI:  Thank you.

16                 (Debtor's Exhibit No. 1020 admitted.)

17           COURT:  All right.  Cross-examination, counsel for

18   MetLife?

19           MR. GOURLEY:  No, Your Honor.

20           COURT:  And cross-examination, counsel for Rabo

21   Agrifinance?

22                       CROSS-EXAMINATION

23   QUESTIONS BY MR. SCHOULDER:

24   Q.  I have to keep on looking at my watch, Mr. Verhoeven, just

25   to make sure I'm greeting people properly with time zones.

1    A.  Sure.

2    Q.  Mr. Verhoeven, my name is Andrew Schoulder.  I'm counsel

3    from Norton, Rose, Fulbright asking questions on behalf of Rabo

4    Agrifinance.  During your examination with counsel, you

5    testified that valuation is region specific.  Do you recall

6    testifying to that?

7    A.  I do.

8    Q.  You also testified as to -- provided testimony based upon

9    ongoing negotiations.  Do you remember that?

10   A.  Yes, I do.

11   Q.  Okay.  Have you -- you're not a licensed real estate broker

12   in Idaho, are you?

13   A.  I'm not.

14   Q.  And you're not a licensed real estate appraiser in the state

15   of Idaho, correct?

16   A.  Correct.

17   Q.  And you haven't sold properties in the state of Idaho then,

18   have you?

19   A.  I've consulted but since I'm not licensed, no, I have not

20   officially sold any property in Idaho, that's correct.

21   Q.  And you wouldn't have been involved in ongoing negotiations

22   in connection with sales in the state of Idaho, would you?

23   A.  Again, with my dairy expertise, I've been consulted on how

24   to approach values several times but I am not on those offers,

25   correct.

1  Q.  Okay.  And just to be clear on -- in your opinion letter,

2  you're the signatory for the opinion letter for the Millenkamp

3  properties, correct?

4  A.  That is correct.

5  Q.  Right?  Not Mr. Schuil, right, who is licensed in Idaho?

6  A.  Correct.

7  Q.  Turning to the -- do you have your opinion letter in front

8  of you, Exhibit 1020?

9  A.  I do.

10  Q.  In the second paragraph, you state "In accordance with your

11  detailed instructions."  Do you see that?

12  A.  I do.

13  Q.  Can you tell us what your detailed instructions were?

14  A.  My instructions were to provide a broker price opinion

15  letter of the assets as they were outlined to me, stated to me

16  and subject to my site visit.

17  Q.  Receive any other instructions?

18  A.  No.

19  Q.  Okay.  And were those instructions written or were they

20  provided to you orally?

21  A.  They were provided orally I believe.  I did submit an

22  engagement letter that outlined this exact request of providing

23  a price opinion letter.

24  Q.  Okay.  And in that same paragraph, you state that you

25  conducted a meticulous review of the information provided.  Do

87

1  you see that?

2  A.  Yes.

3  Q.  Could you tell us what information you were provided?

4  A.  I was provided a previous appraisal mostly for the purpose

5  of ensuring that I wasn't missing any parcels and that I had the

6  specs of all of the improvements involved in the business

7  operations.

8  Q.  And is that the extent of the information you were provided

9  with the previous appraisal?

10  A.  I provided extra questions that I may have had to Mr. Heida

11  and he did respond by phone or by e-mail.

12  Q.  Okay.  And those questions that you posed to Mr. Heida, were

13  they in writing?

14  A.  I don't recall.

15  Q.  Okay.  In the third paragraph now, the paragraph that

16  begins, "This figure reflects," you reference prevailing market

17  conditions.  Could you explain what you -- what is -- in your

18  view, what the prevailing market conditions are?

19  A.  Yes.  Generally it's the approach that buyers are using to

20  evaluate large scale dairy facilities based on, again, it's land

21  prices and improvement values based on the number of cows that

22  can be housed and milked or fed on a feedlot.

23  Q.  All right.  Are you taking into account the current -- the

24  fact that we're coming out of what Mr. Millenkamp calls a

25  historical dairy downturn?

1    A.  I believe that would be included in that, yes.

2    Q.  Okay.  And were you taking into account the fact that we are

3    in Chapter 11 and not outside?

4    A.  As I stated earlier, I referred to it as undue outside

5    pressure.  This is not necessarily indicative of a fire sale or,

6    as I would call it, a forced liquidation.  This is my opinion of

7    value based on a normal marketing period which could, again,

8    take years potentially.

9    Q.  So it would take years in your opinion to achieve a sale of

10   $467 million.  Is that what your testimony is?

11   A.  Again, it depends on the approach taken for marketing.  I've

12   seen dairies sell very quickly and I've seen them sell over a

13   very long period.

14   Q.  All right.

15   A.  So that is possible that it could be much shorter, too.

16   Q.  Right.  Are you aware of the time frame in which the Chapter

17   11 case proceeds on?

18   A.  I'm familiar with it, yes.

19   Q.  All right.  So would you call that a reasonable time frame

20   based upon your experience?

21   A.  My experience largely was bankruptcy in Oregon and it was a

22   somewhat rushed marketing period.  However, there were over --

23   there were other factors to consider that are vastly different

24   than this but that was another extremely large scale dairy that

25   eventually due to operator missteps, debtor in possession

1    missteps rendered the dairy virtually obsolete.

2    Q.  And would you agree the rushed sale process would -- could,

3    could result in a lower value than $467 million?

4    A.  Potentially, yes.

5    Q.  Right.  Did you take that into account in your valuation?

6    A.  No.  As it states here, that was not -- I've not provided a

7    liquidation value of what I think it would take -- or what it

8    would likely bring in in a forced sale situation, no.

9    Q.  Right.  Because I believe your engagement letter -- and we

10   can go back to see it if you need to refresh, but I believe your

11   engagement letter contemplated that you'd be providing a

12   valuation in the context of the Chapter 11 cases, correct?

13   A.  At that time, it was something we were considering but

14   decided not to pursue, yes.

15   Q.  Have you amended your engagement letter?

16   A.  I have not.

17   Q.  So at the time you prepared this valuation, you were

18   preparing this valuation based upon your services in connection

19   with the Chapter 11 cases, correct?

20   A.  I'm sorry.  Could you repeat that?

21   Q.  So at the time you prepared -- you started working on this

22   appraisal, were you working under the fuise of a valuation in

23   the context of a Chapter 11 case?

24   A.  If you're asking if I understood that the operation was in

25   Chapter 11, I was aware of that fact, yes.

1    Q.  Right.  And yet you've taken no discount to address the fact

2    that we are in Chapter 11.

3    A.  Not specifically but, again, I took some conservative

4    approaches on these facility values based on the fact that

5    buyers do not reimburse for replacement costs but they do --

6    they typically come in at a much lower valuation.  So that's

7    been considered.  What hasn't been considered is the market

8    value in the event -- again, as we discussed, liquidating the

9    animals and selling a dark dairy, that would be more indicative

10   of that type of fire sale based on the experiences I've had.

11   Q.  All right.  Are you aware of the purpose of your opinion in

12   these Chapter 11 cases?

13   A.  I don't know.

14   Q.  Are you aware of the use of the valuation that the debtors

15   are making of your opinion -- withdraw and let me restate that.

16   Have you been advised of what purpose your valuation opinion is

17   being used for in these Chapter 11 cases?

18   A.  Not specifically.  I was just asked to provide a valuation.

19   Q.  So if the values would need several months to maybe --

20   several years to be realized, they wouldn't do much good today,

21   would they?

22   A.  Well, I don't know because a big part of that is even if you

23   attempted to force a sale today, there's no guarantee that

24   buyers show up anyway.  So I don't think that's an answer that

25   anyone would know for certain.  Again, my experience has been

1    that some dairies sell very quickly and some do not.  And often

2    times, there's -- yeah, it's a matter of how do you get buyers

3    to show up.  So I'm not sure I know what you're asking

4    specifically.

5    Q.  You stated before that you were provided with the appraisals

6    down in 2022, correct?

7    A.  That's correct.

8    Q.  And if I told you that the appraised value for East Valley

9    in 2022 was $325 million, would you have any reason to believe

10   that isn't the case?

11   A.  No, I don't have any reason to believe that's not the case.

12   Q.  Now, going to page 4 of the PDF for your appraised value of

13   east valley -- it's not showing up on my screen.  That's all

14   right.  Do you have it in front of you?

15   A.  I don't.

16   Q.  Okay.  She'll work her magic in a second.

17   A.  Okay.  There it is.  It's up.

18   Q.  And it's Exhibit 1020 in your binder.

19   A.  I see the page.

20   Q.  All right.  It moved.  All right.  Between the time I looked

21   at you and I looked at the screen, it changed.  So according to

22   your opinion, you've appraised East Valley at $395 million,

23   correct?

24   A.  That's correct.

25   Q.  So ball park, that's an increase of $69 million between 2022

1    and today.

2    A.   That's correct.

3    Q.   And in your opinion, you note certain characteristics of the

4    East Valley that you considered as part of your process,

5    correct?

6    A.   That's correct.

7    Q.   Total acres of pasture land, total acres of cropland,

8    various features of the dairy site such as permits, parlors and

9    pen capacity.

10   A.   Correct.

11   Q.   Would you agree that these same features were also included

12   in the 2022 appraisal?

13   A.   I agree that they were -- they were listed there, yes.  Many

14   aspects were still under construction at the time, have since

15   been completed and another consideration that I added was the

16   progress of the methane digester which again will be a revenue

17   stream for the ongoing business and that when I conducted my

18   site visit was in the process of being connected to put manure

19   through with the purpose of generating gas by early next year

20   was my understanding.

21   Q.   Right.  Let's talk about the digester then.  How much value

22   did you attribute to the digester in increasing the valuation

23   from what it was in 2022 to $395 million?

24   A.   I don't recall specifically but it was -- I don't know.

25   10's of millions potentially.

1   Q.   More than 40 million, less than 40 million?

2   A.   That would probably be a fair ball park figure.

3   Q.   Digester isn't complete, is it?

4   A.   No, it's not.

5   Q.   Right.  It hasn't -- it was supposed to be completed how

6   long ago?  Do you remember?

7   A.   I don't recall.

8   Q.   Would you have any reason to believe that it was supposed to

9   be completed at least a year ago?

10  A.   I have no reason to dispute that.

11  Q.   Do you have any reason to believe that it's going to be

12  completed any time sooner than the next year?

13  A.   Sooner than next year?

14  Q.   In the next year?

15  A.   No, I have no reason to believe -- well, sure.  Sometime

16  within the next year is the expectation.

17  Q.   The expectation so that was also the same expectation last

18  year too, wasn't it?

19  A.   Sure, as you say.

20  Q.   Did you account for the uncertainty of that digester revenue

21  when you included it in your valuation?

22  A.   Yes.  I'm not adding the full value of that asset to the

23  entire operation so there is a discount given that I considered.

24  Q.   Right.  But we don't know what value specifically you

25  attributed to the digester so we have a hard time figuring out

1    what the discount would be, right?

2    A.  Correct.

3    Q.  So it's possible the digester just never gets completed for

4    whatever reason.

5    A.  That is a possibility I suppose.

6    Q.  Right.  And an incomplete digester is not necessarily

7    something that other buyers could value on the same basis that

8    you could, right?

9    A.  I believe they would give some consideration to the progress

10   that's already been done because starting from scratch, as you

11   said, there's often delays, there's costs associated with this.

12   This can be stepped into as a revenue stream potentially much

13   faster.  So I don't know that I agree that they would attribute

14   no value to the asset that's already there.

15   Q.  Were you factoring in the revenue stream as part of your

16   valuation?

17   A.  I gave it consideration but it wasn't -- I didn't use an

18   income approach to valuating it because, again, that's not

19   typically what we use in dairies.  But it would add value.  I

20   have strong reason to believe based on prior sales that a

21   methane digester helps drive a more competitive market at higher

22   values per cow than other operations would.

23   Q.  A complete digester though does, right?

24   A.  Correct.

25   Q.  Now, considering the East Valley valuation, did you -- you

1    mentioned water rights before, didn't you?

2    A.  I did mention water rights at one point.

3    Q.  And water rights of a dairy operation, that would impact

4    value, wouldn't they?

5    A.  They would, yes.

6    Q.  It could materially impact the valuation of a dairy.

7    A.  That's correct.

8    Q.  And did you evaluate the specific water rights of East

9    Valley in connection with your analysis?

10   A.  No, I'm not a -- I don't claim to be a water expert in that

11   regard and so I was using assumptions based on information

12   available to me specifically in the appraisal about the number

13   of irrigated acres and the water rights associated with those

14   irrigated acres.

15   Q.  You mentioned earlier that you had a number of questions for

16   Mr. Heida about the property, didn't you?

17   A.  I did.

18   Q.  Right.  Did you ask him for information about the water

19   rights so you could evaluate it as part of your analysis?

20   A.  I did ask him some -- I believe I asked him some questions

21   about water, yes.

22   Q.  Right.  And did he give you information that you needed to

23   complete the analysis to evaluate the impact of water rights on

24   the property?

25   A.  I don't believe he supplied me with any sort of written

1    information but we discussed water in that part of the valley,

2    yes.

3    Q.  So there was no analysis of water rights in connection with

4    the valuation of 395; is that right?

5    A.  None beyond what I believe an appraiser conducted

6    previously.

7    Q.  Right.  But a buyer would look at the water rights, wouldn't

8    they?

9    A.  I believe they should, yes.

10   Q.  Right.  And a buyer probably would discount based upon their

11   analysis of the water rights, wouldn't they?

12   A.  If you're asserting that the water rights are subpar or

13   there's not enough water to supply this many animals or crops

14   but that's not my understanding.

15   Q.  Well, you didn't do the analysis so how do you understand

16   that to be?

17   A.  I suppose that was an assumption I made but, yeah, if a

18   buyer were to find that they were subpar, I believe there would

19   be a discount.  But I have no reason to believe that to be the

20   case.

21   Q.  So seeing as how you've done no water right evaluation of

22   East Valley, did you apply any discount to the evaluation to

23   reflect that you're making assumptions that it's all above board

24   and par?

25   A.  No.

1    Q.  All right.  If you had to apply discounts to reflect the

2    fact that you did not do an evaluation of water rights for East

3    Valley, what would that discount be?

4    A.  Why would I apply a discount to something that I don't have

5    reason to believe is subpar?  There's no discount value I would

6    throw on that because, again, my assumption is that it's there.

7    If in due diligence that turns out to be false, then we would

8    address it.  That's how --

9    Q.  What would a willing buyer do if they found water right

10   issues?  What do you think --

11   A.  They would likely renegotiate as needed which is something

12   that we've experienced.

13   Q.  And they surely wouldn't pay fair market value of 395

14   million if there were water right issues, would they?

15   A.  They would pay the fair market value according to the water

16   rights so there would be some adjustments made to say the

17   irrigated cropland or the number of animals that could be

18   milked.  But to apply a discount rate doesn't really -- it

19   doesn't really work.  Again, it's still a per unit pricing basis

20   which I've already applied here.  So I suppose there would be an

21   adjustment for that.

22   Q.  For something that you testified before as could have a

23   material impact on value, is there a reason why you didn't

24   evaluate the water rights?

25   A.  Again, I don't make a claim to be a water attorney or an

1    expert to make that type of evaluation in the same way that an

2    appraiser doesn't do that either.  They do inquire as to the

3    amounts, they provide some calculations as to how much water

4    that would typically provide and that was contained in the

5    appraisals that I received.

6    Q.  And just to confirm, you didn't do any analysis of water

7    rights for any of the other properties, did you?

8    A.  Aside from what was listed in the appraisal and outlined

9    there, no, I did not conduct an extensive review of the water

10   rights.

11   Q.  And so just to be clear, we're relying on your opinion

12   today; not the one from 2022, correct?

13   A.  I'm here to talk about my opinion as submitted in this

14   exhibit, yes.

15   Q.  Right.  So before, you testified about dark dairies and you

16   mentioned specifically that the Jersey Girls is being used as a

17   feedlot.  Is that right?

18   A.  That's correct.

19   Q.  Is it your understanding that if a dairy remains non-

20   operative for a period of time, they could lose their

21   certification to function as a dairy?

22   A.  Yes.

23   Q.  And that would impact value, correct?

24   A.  Yes, but we're still -- they don't necessarily lose their

25   permits based on animal units.  It's more a matter of having an

1    off-taker for the milk typically.  That would need to be dealt

2    with.  But as that dairy is not completely empty, I believe that

3    the permits to operate would likely still be in place to house

4    animals and if a milk contract could be obtained, it could be

5    restarted as a dairy facility.

6    Q.  Right.  But if it's not being used as a dairy, then there is

7    a risk that it could loss a certification, correct?

8    A.  Which certification are we talking about?  I'm not sure.

9    Q.  Well, there are several certifications that you need to

10   operate a dairy, aren't there?  I couldn't just go open a dairy

11   tomorrow, could I?

12   A.  No, you would need a permit but there's animal permits,

13   there's use permits there in place.

14   Q.  Right.  And if they would -- were they to lose their permits

15   to serve as a dairy, that would impact value, wouldn't it?

16   A.  Again, they still have the permits for the animals but it's

17   more a matter of securing a milk contract at that point because

18   it is a dairy facility.  So I'm not sure.  I think we may be

19   talking about some different certifications that I don't know

20   that I'm familiar with.

21   Q.  Okay.  You talked about milk contracts.  What milk contracts

22   are you referring to?

23   A.  There's a number of handlers in that that could be secured.

24   That's more a matter at this stage to the buyer but I know of a

25   few creameries in the area.

1    Q.  Right.  Is it your understanding that there are creameries

2    in the area that are giving milk contracts?

3    A.  Not specifically, no.  But a buyer could either through some

4    influence that they have with a creamery or by moving cows from

5    elsewhere, they could potentially secure those contracts.

6    Q.  And you're including that assumption in your valuation?

7    A.  I gave consideration to the fact that there's a dairy

8    facility site there but, again, it was made known to me that it

9    was being operated as a feedlot so there was a discount from the

10   pricing that I would otherwise apply for an active dairy

11   facility.

12   Q.  Right.  Would you agree with the fact that Mr. Millenkamp is

13   a pretty influential guy in the dairy community of Idaho?

14   A.  Sure, yeah.

15   Q.  Mr. Millenkamp doesn't have a dairy -- a milk contract with

16   Glambia, does he?

17   A.  My understanding is that Glambia offers month to month

18   contracts to several operators in the area.

19   Q.  Not to Mr. Millenkamp.

20   A.  I don't know that for sure.

21   Q.  But that would impact your value?  You just assumed that

22   there were milk contracts as part of your analysis.  So if

23   Mr. Millenkamp does not have milk contracts with Glambia, its

24   largest purchaser, would that impact your value?

25   A.  My value assumes that there would be a spot for that milk in

1    a normal transaction, yes.  So it could potentially impact the

2    value if it became known that no buyer would be able to obtain

3    milk contracts.

4    Q.  Right.  If a new buyer came in that was not Mr. Millenkamp,

5    Glambia would not be under any obligation to continue to

6    purchase that milk, would they?

7    A.  That's correct, and it's typical to see that as a

8    contingency of any offer.

9    Q.  All right.  Did you take that into account in your analysis

10   of the fair market value of $495 million?

11   A.  As I stated, that is typical of any offer.  Almost every

12   offer is going to contain a contingency based on the ability to

13   ship it.  So that was considered, yes.

14   Q.  And what discount did you apply?

15   A.  There's no specific discount.  It's part of the value,

16   right?  So you're going to field an offer that has that as a

17   contingency.  If it can't be fulfilled, then we have to go back

18   to the drawing board and come up with another -- potentially

19   another buyer or another solution for where to take that milk.

20   Q.  In your letter to the Dentons team, you state that $467

21   million is indicative of the price at which the property is

22   likely to transact on the open market.  Correct?

23   A.  I don't see it in front of me but I have no reason to

24   dispute that.

25   Q.  Could we put it on page 2, please?  Do you see where I'm

1    referring to?

2    A.  Could you repeat the line that you referred to?

3    Q.  So you state in here as arrived at the professional -- the

4    following professional opinion of fair market value of property

5    in its current as-is condition, $467 million, correct?

6    A.  That is correct.

7    Q.  All right.  And for there to be -- withdrawn.  When you

8    consider fair market value, you're assuming there is a willing

9    buyer and willing seller, aren't you?

10   A.  That's a fair assumption, yes.

11   Q.  And are you aware of any intention of Mr. Millenkamp to sell

12   any of his real estate?

13   A.  Not that I'm aware of, no.

14   Q.  That would be somewhat of an impediment to achieving $467

15   million, wouldn't it?

16   A.  It would.  The assumption here is that the buyer and seller

17   with reasonable knowledge acting in their best interest free

18   from undue pressure in a reasonable time frame.  So yes, that is

19   a consideration that I've given in my valuation is what a

20   reasonable seller would use to arrive at a transaction.

21   Q.  Now, when you refer to the property, right?  You see that

22   right above the $467 million?

23   A.  Yes.

24   Q.  It's not one property, is it?

25   A.  Correct.  I had broken it out into multiple ranches.  That

1    is correct.

2    Q.  So there's, what, nine separate properties that's comprised

3    of the word "property," right?

4    A.  That seems correct to me, yes.

5    Q.  And many of the nine properties that you have appraised,

6    they're part of an integrated operation for the Millenkamp

7    debtors.  So there's dairy operations, correct?

8    A.  Correct.

9    Q.  And all nine properties are integrated into that, aren't

10   they?

11   A.  I believe there's multiple entities involved but, yes, it

12   operates as a unit in some capacity.

13   Q.  Right.  And then there's the custom calf raising?  That's

14   integrated within the nine properties, correct?

15   A.  To a certain extent but I believe that involves raising

16   cattle for others.

17   Q.  So let me ask you something.  Would you agree if the fair

18   market value of the nine properties on an aggregate /-D basis,

19   would that limit, in your opinion, the number of potential

20   purchasers?

21   A.  If it were to be sold all as one together?  That's your

22   question?

23   Q.  Correct.

24   A.  Yes, that would limit the number of suit /ORS potentially

25   but as I've given values for ranches specifically, I've

1   attempted to break it out to help generate a more competitive

2   environment for a potential sale.

3   Q.  How many of the ranches that you've sold are integrated like

4   Mr. Millenkamp's operations?

5   A.  To this extent -- I mean this is a massive scale so I would

6   say this is fairly unique in that regard but I would argue that

7   there are many operators who raise their own heifers from date

8   of birth all the way through to milking and to beef.  So it's

9   hard tore say how many.

10  Q.  I'm sure there are but my question to you is how many

11  integrated operations like Mr. Millenkamp's have you actually

12  sold?

13  A.  You mean who raised their own heifers and then sell all the

14  way up to --

15  Q.  And have a dairy operation with a digester -- incomplete

16  digester, all that?

17  A.  I don't have a number.  It would be several though.  We've

18  sold several dairies that had heifer raising facilities on site.

19  Maybe they did not have a digester at the time but, yeah, we've

20  sold integrated operations in our experience, yes.

21  Q.  Are they listed on your closed deal list?

22  A.  Can we scroll down that page?

23  Q.  Sure.  It's all the way in the back.  I'll tell you exactly

24  where it is.  It's page 61 of the PDF, please, or about there.

25          So let's just start on this page.  Which of these

1  active listings are similar to Mr. Millenkamp's in terms of all

2  the various operations, trucking, custom calf dairy?

3  A.  When you ask all, I would say they don't all contain that

4  level of integration.  But I see even the second and third

5  properties listed there contained permits for mature animals as

6  well as support stock.  They're raising many of their own

7  heifers on site there as well.  Maybe not all of them are

8  raising calves in addition to that but certainly some sizable

9  operations there.  But to this scale, none of those listings are

10 this large.

11 Q.  Right.  I'll make it easy.  We won't have to go by the

12 listing, closed deal, active.  Is it fair to say that this is

13 the largest scaled operation that you've sold -- that you've

14 worked on?

15 A.  That would be fair to say, yes.

16 Q.  So you don't really have a point of comparison based upon

17 your experience to really compare it to, do you?

18 A.  Not to this full scale, no.

19 Q.  And if there are less purchasers because of the scale of the

20 operation, there's going to be less competition for that -- for

21 those assets, isn't there?

22 A.  Presumably.

23 Q.  Right.  If there's less competition, wouldn't that decrease

24 the potential value that you could capture?

25 A.  It's possible but sometimes all you need is two potential

1    suitors and that maximize value.  Those two suitor in

2    competition with each other will drive a market value -- a fair

3    market value.

4    Q.  Okay.  And would you agree that the $467 million fair market

5    value by itself, the sheer number, would limit the pool of

6    potential parties who participate in this auction?  Is that fair

7    to say?

8    A.  Sure, yes.

9    Q.  And that would also contribute to limiting the competition

10   for the assets, wouldn't it?

11   A.  It could.  Again, all you need is two people to be a

12   competition.

13   Q.  Now, would you agree if -- there would be certain potential

14   interested parties that would be interested in the dairy

15   operation but not the custom calf raising operation?

16   A.  I believe that's likely which is why I've split it out into

17   multiple ranches, yes.

18   Q.  But when you provide an aggregate value, it's $467 million,

19   right?

20   A.  That's when you add up all of those ranches individually.

21   That is the number it comes to, yes.

22   Q.  So when you provide your fair market value, are you

23   providing an assumption that they're all being purchased as one

24   for $467 million?

25   A.  That was not necessarily the way I approached it.  Again, I

1   split it out into multiple ranches.  I believe that would help

2   maximize value.

3   Q.  Right.  So if -- would you agree that if the operation -- if

4   the various properties are not integrated, some would actually

5   get more value, wouldn't they?

6   A.  Potentially, yes.

7   Q.  Would they get less value?

8   A.  Being sold individually?

9   Q.  Correct.

10  A.  I don't have the ability to see into the future in that

11  regard but I have no reason to think they would drive less value

12  being sold individually, no.

13  Q.  So if we sold the real estate off by specific lot, you

14  believe your opinion is that it would probably capture more

15  value, not less?

16  A.  That was the statement I made, yes.

17  Q.  All right.  Now, before you agreed with me that a good

18  measure of fair market value is what a willing buyer and a

19  willing seller is willing to transact on, right?

20  A.  Correct.

21  Q.  Are you aware that the debtors received an offer for a sale

22  lease back transaction for certain of the properties that you

23  appraised?

24  A.  I am not aware of that, no.

25  Q.  Would that have contributed to your analysis on value?

1   A.  Not necessarily.  We see a lot of sale lease back offers.

2   Effectively, the seller gets to establish their own lease rate

3   in that structure.  I don't necessarily believe that that's

4   indicative of the top of the market in a competitive

5   environment.

6   Q.  But you think that a comp from a completely different parcel

7   of property potentially in a different state would provide a

8   better point of comparison as opposed to one where the party is

9   making a specific order -- offer on a specific property?

10  A.  I think you can ask appraisers how they feel about using

11  that approach.  They often do.  So I believe that that gives

12  you -- and especially in an environment where in this magnitude,

13  a buyer would be seeking financing potentially, that appraisal

14  method would be involved.  So yes, I think that's -- that's

15  pretty well industry standard to compare other operations to the

16  one -- the subject's property.

17  Q.  Is it industry standard to ignore an offer that was made for

18  the exact property you're appraising?

19  A.  I don't know that ignore's the right word but I don't know.

20  I'm unaware of any such offer.

21  Q.  Did you ask Mr. Heida, the debtor's general manager, if they

22  had received any proposals for the properties?

23  A.  I did not.

24  Q.  And when a company is in distress, would you agree with me

25  that potential purchasers, they will tend to try to offer less

1   than fair market value?

2   A.  That is typically what happens, yes, in a distressed sale.

3   Q.  Right.  And this would -- if there was to be a sale here,

4   right, in connection with these Chapter 11 cases, it would be a

5   distressed sale, wouldn't it?

6   A.  If that were being forced, yes.

7   Q.  Now, there was no discount to reflect the fact that this

8   will be a distressed sale, was there?

9   A.  I did not treat it as such, no.

10  Q.  Even though we are in Chapter 11.

11  A.  Correct.

12  Q.  Do you agree that if a business is unable to generate enough

13  cash flow to service its debt, that would impact value of the

14  asset being sold?

15  A.  My experience has been that a dairy sale using a different

16  valuation than the income approach and that would include cash

17  flows.

18          MR. SCHOULDER:  No further questions, Your Honor.

19          COURT:  Thank you, Mr. Schoulder.  Mr. Naess, any

20  questions?

21          MR. NAESS:  No.  Thank you.

22          COURT:  Mr. O'Brien?

23          MR. O'BRIEN:  Yes.

24                          CROSS-EXAMINATION

25  QUESTIONS BY MR. O'BRIEN:

1    Q.  Good afternoon,, I think you testified that you reviewed the

2    2022 appraisals as a part of your analysis.

3    A.  Those were supplied to me, yes.

4    Q.  And were those appraisals with an effective date of was it

5    August of 2022?

6    A.  I don't recall but that sounds roughly accurate, yes.

7    Q.  And those appraisals therefore would be about 18 months

8    roughly old.

9    A.  Correct.

10   Q.  And are those the same appraisals that the debtor has

11   admitted into evidence earlier in this case I think as Exhibits

12   1000 through roughly 1008?

13   A.  I don't know.

14   Q.  Okay.

15        MR. CHRISTENSEN:  Just to clarify the record, those

16   appraisals were not admitted into evidence earlier.

17        MR. O'BRIEN:  Okay.  Thanks.

18   BY MR. O'BRIEN:

19   Q.  The German Dairy you indicated you think it has a broker's

20   opinion of value of $4,770,000.  Is that right?

21   A.  Could we get that up on the screen, please?  It will be page

22   4 or 5.  4,770,000.  That's correct.

23   Q.  And the 2022 appraisal on that was $4,225,000; is that

24   correct?

25   A.  That sounds correct to me.

1  Q.  So you're coming in about 15 percent higher than the 2022

2  appraisal.

3  A.  That's correct.

4  Q.  And I'm more focused on the German Dairy because that's the

5  property on which Conterra has the first lean.  But as a general

6  overall question, are you about 15 percent higher on all the

7  properties than the 2022 appraisal?

8  A.  I don't know that that's the case.  That wasn't how I was

9  evaluating these properties.  Again, I was looking at recent

10 sales activity as well as ongoing discussions that I've seen in

11 the market.

12 Q.  Do you know what your percentage is in terms of being higher

13 than the 2022 appraisals?

14 A.  I don't know.  I didn't evaluate it that way.

15 Q.  You testified about a national farmland trend which I think

16 you said is steadily increasing.

17 A.  I said it tends to steadily increase.  That is the general

18 trend over long periods of time.

19 Q.  And if I understood the question and your answer, that

20 sounded generally like a national farmland trend.

21 A.  Correct.

22 Q.  What would be your answer with respect to the farmland that

23 the debtor owns in these three counties in Idaho?  Is that the

24 same answer or different?

25 A.  I've seen an increase generally speaking in land values in

1   that region.

2   Q.  I'd like to ask you a little bit more about the digester

3   that I don't know very much about or I don't know very much

4   about this specific digester to put it more accurately.  How

5   close to complete is this digester?

6   A.  As I said, during my site visit, they were beginning to

7   connect pipelines to deliver manure into the digester itself.

8   But I don't -- I don't know specifically off the top of my head

9   how close to completion that makes it.

10  Q.  Is the digester going to be marketing the methane or is it

11  just going to get energy credits for retiring gases?  Do you

12  know?

13  A.  I don't recall.  I think that's a part of the revenue share

14  agreement with the group that's building the digester.

15  Q.  So they were hooking up pipelines to bring the manure into

16  the digester?

17  A.  Yes.

18  Q.  What about pipelines to sell or market the gas that comes

19  out of the other end of the digester?

20  A.  Right.  I was told that there was a pipeline that was

21  directly putting that gas into -- I don't know the correct

22  terminology but it was not going to be bottled and trucked out

23  of the facility.  It was directly tied into a pipeline to supply

24  gas.

25  Q.  And do you know is that pipeline complete to market?

1    A.  I don't know the answer to that right now.

2    Q.  And maybe this was already answered but I couldn't hear a

3    specific answer in my mind anyway.  How much value did you place

4    on the digester in your opinion?

5    A.  I don't recall specifically.  I believe counsel offered up

6    40 million as an estimate and I said that that maybe is close.

7    I don't recall specifically though.

8    Q.  Okay.  Is the digester located on ground that the debtor

9    owns or is it owned by the digester company and just integrated

10   into the debtor's operation?

11   A.  I believe it's on ground owned by the debtor but I don't

12   know.  I don't want to say that with certainty.

13   Q.  Why hasn't the digester been complete?  Is there ongoing

14   construction or is construction paused or --

15   A.  It seemed to me that there was ongoing construction but why

16   it was delayed, I don't know.

17   Q.  And do you know who's funding that ongoing construction?

18   A.  I don't recall.

19   Q.  As you did your work, were you aware of any water right

20   violations?

21   A.  No.

22   Q.  None that you're aware of?

23   A.  Not that I'm aware of.

24   Q.  Okay.  Thank you.

25        COURT:  Thank you, Mr. O'Brien.  Ms. Mikkilineni,

1    additional questions?

2                      REDIRECT EXAMINATION

3    QUESTIONS BY MS. MIKKILINENI:

4    Q.  Mr. Verhoeven, is it necessary to be a licensed broker to

5    conduct a BPO?

6    A.  No.

7    Q.  Do you have the requisite knowledge to conduct a reliable

8    BPO?

9    A.  I believe so.

10   Q.  And are there licensed brokers on your team?

11   A.  There are.

12          MR. SCHOULDER:  Leading, Your Honor.  Multiple.

13          COURT:  Overruled.

14   BY MS. MIKKILINENI:

15   Q.  And did someone on your team with a license review this BPO?

16   A.  Yes.  Michael Schuil is licensed in the State of Idaho.  He

17   conducted a review.  Mark Schuil's a licensed broker in multiple

18   states who I work closely with.  In fact, he is my father-in-law

19   but he is a part of the sales team I am.

20   Q.  And did they give any feedback on the BPO?

21   A.  We spent several hours speaking to each other and speaking

22   with our fellow associates in-house who are also dairy experts

23   about our valuation, yes.

24   Q.  And in your typical process, do they sign off at some point

25   on the BPO?

1    A.  Verbally, yeah.

2    Q.  And did they do that in this case?

3    A.  They did.

4    Q.  Did the previous 2022 appraisal include any valuation for

5    the digester; do you know?

6    A.  I don't recall.

7    Q.  Does the digester as of today, as it stands today, does it

8    have value?

9    A.  I believe that it does.

10    Q.  And what will happen to the value once it's completed?

11    A.  It would increase.

12    Q.  Do you normally include an analysis of water rights in a

13    BPO?

14    A.  I do not.  Not a full scale analysis.  I may, based on my

15    understanding of different water regions and knowledge available

16    to me, provide some background on that but not a full scale

17    analysis, no.

18    Q.  And do you have any reason to believe there are water issues

19    at any of the Millenkamp's properties?

20    A.  No, I do not.

21         MS. MIKKILINENI:  I have no further questions, Your

22    Honor.

23         COURT:  Thank you.  Counsel for MetLife, any additional

24    questions?

25         MR. GOURLEY:  No, Your Honor.

```
1              COURT:  Counsel for Rabo Agrifinance?

2              MR. SCHOULDER:  No, Your Honor.

3              COURT:  United States Trustee?

4              MR. NAESS:  No.  Thank you.

5              COURT:  Conterra?

6              MR. O'BRIEN:  No, Your Honor.

7              COURT:  All right.  You may step down.  Thank you.

8              MS. MIKKILINENI: Your Honor, we'd ask that Mr.

9   Verhoeven be excused as a witness.

10             COURT:  Are there any objections to excusing Mr.

11  Verhoeven?  That's acceptable.

12             All right, counsel.  It is 12:05.  It looks like it

13  might be a good stopping time for lunch.  Return at 1:15.  Will

14  that be acceptable to the parties?  All right.  We will be in

15  recess until about 1:15.  Thank you, counsel.

16             CLERK:  All rise, please.

17                             (Recess taken.)

18             COURT:  Thank you.  Please be seated.  All right.  We

19  are back on the record in Case No. 24-40158.  Does the debtor

20  have additional witnesses that it would like to call?

21             MS. MIKKILINENI:  Yes, Your Honor.  We'd like to call

22  Mr. James Morgan to the stand.

23             COURT:  Please come to the stand, Mr. Morgan and remain

24  standing so the courtroom deputy can swear you in.

25                             (JAMES MORGAN is sworn.)
```

1          CLERK:  Please have a seat.  Once seated, please state

2     your name and spell your last name for the record.

3          WITNESS:  James Morgan, M-o-r-g-a-n.

4          CLERK:  Thank you.

5                         DIRECT EXAMINATION

6     QUESTIONS BY MS. MIKKILINENI:

7     Q.  Good afternoon, Mr. Morgan.  Where do you work?

8     A.  I work at Forbes Partners.  I'm based out of Salt Lake City

9     and my company's based out of Denver.

10    Q.  What does Forbes do?

11    A.  Forbes is an SEC registered investment bank based out of

12    Denver.  We've operated for about 20 years and we specialize in

13    the advisory work on behalf of typically private (inaudible)l

14    businesses and about a quarter of our business is what we call

15    capital formation which is led by my colleague on the team Jon

16    Wiley where we use structure data and we engage in refinances.

17    Q.  And what is your position at Forbes?

18    A.  I'm a managing director of the firm.

19    Q.  And how long have you been there?

20    A.  I started in November of 2019.

21    Q.  What's your educational background?

22    A.  I have an undergrad in business.  I have a joint MBA and law

23    degree.  I am SEC registered and I'm a CFA candidate.

24    Q.  How long have you been involved in this industry?

25    A.  I started working in the investment banking industry in

1    2000.  First with a firm Socha Capital also in New York working

2    for city group global markets and with HSPC Securities in New

3    York as well.  My roles in the industry have ranged from

4    investment banking sector coverage where you work on equity

5    capital markets, credit refinances, general sector coverage to

6    MNA execution, both in the public, private and cross border

7    markets and I spent four years as a relationship manager for the

8    private equity space which was helping to execute leverage

9    finance deals and leverage credit deals for private equity

10   firms.

11   Q.  And do you have a background in agriculture?

12   A.  In my career, I have worked in transactions personally that

13   touched the space.  I worked on the demutualization of a company

14   in Canada that's now Viterra.  I've engaged in coverage with

15   farm equipment companies like Deere and Caterpillar.  My firm

16   more broadly has experience in the space typically across the

17   processing world where we successfully closed a transaction in

18   2021 in the animal attrition space.  In market right now with a

19   protein processing business and Jon Wiley and myself have worked

20   in the past as project finance underlying the manure digesting

21   space that's quite relevant to this case as well.

22   Q.  And who's on your team for this particular project for

23   Millenkamp?

24   A.  Forbes has a unique model where every transaction always has

25   two managing directors.  So myself and Jon Wiley are leading the

1    transaction.  Jon spends all of his time on capital formation

2    deals so he's the head of our debt structuring team.  I, you

3    know, cover both the Intermountain West area and work, you know,

4    on an M&A execution perspective in adjacent industries and we

5    have an associate analyst as well and our associate is

6    particularly focused on the consumer food and beverage and ag

7    space.

8    Q.  Do you have experience working with this large of an

9    enterprise in food and ag?

10   A.  Our firm closed a deal in 2021 where they did a roll up of I

11   think three or four entities and sold it to Archer Daniels

12   Midland and that deal size exceeded this enterprise value of

13   Millenkamp.

14   Q.  Are you involved in any professional organizations?

15   A.  I'm the chair of the Utah Chapter of the Alliance of M&A

16   Advisors.  I do work with the Association for Corporate Growth

17   in Utah.  I'm SEC registered, Series 7-63-79 and I'm involved

18   professionally in the Salt Lake market as a board member of the

19   Alta Club.

20        MS. MIKKILINENI:  Your Honor, we'd like to have

21   Mr. Morgan recognized as an expert witness on investment

22   banking, leverage lending and capital markets.

23        COURT:  Any objection?

24        MS. Schwager:  No objection, Your Honor.

25        COURT:  That's fine.  Please proceed.

BY MS. MIKKILINENI:

Q.  Mr. Morgan, what is Forbes' role in this case?

A.  We initially had contact with Millenkamp sometime in March
and were formally engaged around March 21 and our role was to
work with the company to create a strategy and to structure a
process for the refinancing of the company.

        Initially, the focus was to engage in a refinancing
either with or without members of the existing syndicate prior
to bankruptcy.  Obviously when it became apparent that it was
slipping into the Chapter 11 process, we began to work on
various permutations of financing that would be, you know,
congruent with the Chapter 11 process.

        But basically, our duties are to work with the company
in terms of helping to communicate, you know, marketing
materials that would outline, you know, the company, the assets,
the collateral, the current cap structure, the situation.  And
then we would suggest to the company a series of lenders to go
out to for a refinancing process and that would be approved by
the company and then we would engage in that contact and it
would be the broader process that's still ongoing to seek a
financing solution for a permanent capital structure coming out
of the Chapter 11 process.

Q.  And has Forbes filed an application to be employed in this
case?

A.  Yes.

1   Q.  When did you begin marketing Millenkamp?

2   A.  Well, as I mentioned, we were officially engaged around

3   March 21.  Some time was definitely of the essence because we

4   were told that it was a fast-moving process and so because of

5   confidentiality, you start off engaging in kind of market

6   sounding with leading lenders that you have relationships

7   around, you know, the U.S. and Canada.

8          Once we were engaged, we developed a list for contact

9   and that was approved by the company and basically we had to hit

10  the market as fast as we could in terms of getting the

11  opportunity in front of people and really having all the right

12  information.  So we began the marketing process kind of

13  immediately after we were engaged and worked very quickly

14  leading up to the formal filing in early April.

15  Q.  We're going to pull up Exhibit 1025.  You should see it on

16  your screen.

17  A.  I do.

18  Q.  Okay.  Do you recognize this?

19  A.  Yes.

20  Q.  And what is it?

21  A.  It's an e-mail from myself to the company providing an

22  update on where we are at.  We call this a funnel of the idea

23  that you go out to a perspective number of counter parties.

24  That's part of the process.  You know, how did people react and

25  who remains as part of an uninterested party looking to, you

1    know, review formally the refi and hopefully present term sheets

2    and a solution for the cap structure.

3    Q.  And how many parties or potential lenders have you reached

4    out to regarding the debtors?

5    A.  Officially, we've reached out to 69 and as the e-mail

6    states, we had response from 39 of which 19 kind of passed and

7    said we're not interested in doing the NDA and reviewing the

8    marketing materials.  That's very typical as you go to some

9    direct lenders or some credit funds and they basically come back

10   and say, you know, we only do private equity deals.  It's too

11   far afoot from our world.

12        But basically, we cast the net reasonably broadly

13   within the realm of specialty finance companies which could

14   include private equity related credit funds, what's called a BDC

15   or business development corporation, direct lenders, family

16   offices, people who understand kind of the special situations

17   aspect of a specialty financing lending or leverage lending.

18   Q.  And how many are still interested?

19   A.  There's still 11 and that group could grow.  You know, we

20   continue to have people, you know, circling back to us but there

21   are 11 groups.  Of the people, we've continued to speak with

22   them following the filing in early April and updated them on the

23   process.

24        And really the feedback that we've received is, you

25   know, as there's certainly on the formalization of the DIP that

1    people are ready to go and pick up the conversation from a

2    couple weeks ago.

3    Q.  How do you determine who to reach out to?

4    A.  My partner Jon Wiley spends his entire time as the head of

5    our capital formation group speaking to all of these lenders

6    around the country.  He's been in the industry for, you know,

7    well over 20 years and so the idea of this process was to go out

8    to people who understood it as a special situation, understood

9    it as maybe some combination of asset-based lending or some

10   combination of what could be eventually equity plus debt.  And

11   the idea was to go to specialty lenders to kind of add a twist

12   to the current cap structure and put something in place that

13   would be constructive as they emerge out of Chapter 11.  So most

14   of the names came from my partner Jon Wiley just because he's in

15   the market all the time.

16          I helped him based off of some personal relationships I

17   have and also thinking of the Idaho or Intermountain West angle

18   in terms of bringing in family offices or people who would like

19   the local story and gain comfort with the Millenkamp management

20   team and ownership.

21   Q.  What is your current plan on marketing Millenkamp moving

22   forward to find exit financing?

23   A.  Well, I think that the -- the first step is to remove the

24   uncertainty from the process and to formalize the debtor in

25   possession arrangement.  And there are a lot of different

1    permutations that may arise from the current situation.  There

2    may be a scenario where, you know, we have multiple classes of

3    both secured and unsecured lenders or people in the existing

4    syndicate.  You know, there's a permutation where you say, okay,

5    maybe X, Y and Z would like to stick around and maybe there's a

6    role for bringing in new people and someone else leads the

7    facility.

8          There is also a permutation where you bring in one,

9    maybe two specialty lenders that are experienced in distress

10   situations and they find comfort in the macro story and the cash

11   flow profile of the company and they would basically take out

12   most of the current senior structure and replace it with

13   something that would eventually turn into a long-term cap

14   structure.

15         So I guess the punch line is that there's many

16   permutations which may or may not involve current members but it

17   would be very much focused on a very different class of cash

18   flow lender on what we call the specialty finance space.

19   Q.  And will you be reaching out to more parties than the 11

20   that are remaining currently?

21   A.  We plan on it.  In fact, we have visibility into additional

22   parties to add to the process.  Really, the issue is we have to

23   formalize the DIP relationship or the arrangement because that's

24   when you can go out to the market and say here's the update,

25   here's the new information, here's the new filings.  Take it to

1  your investment committees and let's figure out a solution.

2  Q.  Will the DIP being finalized create more interest?

3  A.  It will because it removes uncertainty and it allows us to

4  maybe cast the net a little bit more and basically unfortunately

5  it's put things on pause for a couple of weeks where we're

6  beholding to updating people and being able to, you know, put in

7  new information as we can just to keep folks warm.

8  Q.  How many clients has Forbes worked with to assist them in

9  refinancing efforts in the past five years?

10  A.  Our firm at any point in time has between 23 and 30 mandates

11  that are live across our ten managing directors.  And the

12  typical rule of thumb at our firm is that an MD does about three

13  or four deals a year.  So Jon Wiley who's leading the

14  transaction himself, that's all he does.  So if you did three to

15  four deals a year times five, you'd kind of end up with that

16  kind of roundabout number.  It's a very active pipeline.

17  Q.  Are you familiar with the debtor's refinancing efforts last

18  year?

19  A.  I am.  The discussion mainly came around when we formally

20  presented the company with our list for approval of who we'd

21  like to go out to and they said, yes, I like that person.  No,

22  that person doesn't make any sense.  I mean there was very

23  little overlap.  But our understanding is that during their

24  process last year, it was focused very much on ag lenders,

25  regional lenders.  I mean I wouldn't say probably regional banks

1   whereas what we are doing is completely different.  It's focused

2   on special situations, it's focused on distressed, it's focused

3   on cash flow lending and people really looking at things less

4   from the lens of ag and more about what's the collateral base,

5   what's the situation and how do we find a constructive solution.

6   Q.  For these interested lenders, what's drawing them to have

7   interest in Millenkamp?

8   A.  I think that the conversation has really been around how do

9   we find comfort in the macro and what's interesting throughout

10  the past, you know, few months is that all of the monthly

11  updates financially from the company show a cash flow profile

12  that is in line with that reversion back to a kind of, you know,

13  pre-2023 view of cash flows.

14      The second thing is the collateral base is quite

15  attractive not only from the borrowing base that existed with

16  the prior structure but the idea that when the digester comes on

17  line, there's an additional level of collateral and there's

18  potential options in terms of a second lien on existing real

19  estate.

20      So they like the fact that they're living up to the

21  expectations of that story of reverting to a normalized level of

22  free cash flow.  They also like the cap X profile in the fact

23  that the company has spent a significant level of funds creating

24  milking parlors and the right kind of operating equipment to

25  have a state of the art facility.  And the fact that that cap X

1    is completed and the digester really the cap X that's required

2    to be paid for by the actual company is more diminimous.  They

3    like that as well.

4            And the reaction from a number of prospective lenders

5    has been basically why is this company going through this

6    process and the answer that we give back is it's a dislocation

7    in their cap structure and that's our job working with them to

8    find something that's constructive and gets them beyond the

9    Chapter 11 process and allow the company to survive to the next

10   phase.

11   Q.  Based on your experience, how do you perceive the lending

12   and refinancing prospects in the next year?

13   A.  Well, it's very interesting because if you open up a

14   newspaper over the past 18 months, the world's been doom and

15   gloom in terms of the interest rate environment.  And what the

16   popular press doesn't reflect is that since 2015 coming out of

17   the global financial crisis, banks were told through Dodd-Frank

18   to exit leverage lending or kind of risky cap structures.  And

19   the growth in what's called private credit assets since 2015 has

20   increased about 270 percent.  So it's just an explosive

21   availability of specialty lending capital for this type of

22   situation.

23           So not only do you have that going on, the market is

24   expected to be very robust because non-investment grade lending

25   which is usually defined as BB credit and below up to CCC,

1  there's an estimated 370 billion that will need to be refinanced

2  over the next two years.

3          And then to add a step further in terms of the health

4  of the market, the way the world typically looks at how healthy

5  is the credit market is that direct lenders and credit funds,

6  when they lend into situations and develop a (inaudible) of

7  credits outstanding, the security ties it into the market.  It's

8  called a CLO issuance.  And when you monitor those stats, if you

9  look at the past four quarters, the issuance on a quarterly

10  basis is between 6 to 10 billion a quarter and if you look at

11  the four quarters before that, it was typically kind of 2 to 5

12  billion.

13          And so that's from LCD and the idea is that more and

14  more money is being securitized into the market and what that

15  tells you is that there's more and more activity going on.

16          So when people look at the surface, they say, oh,

17  there's been such an increase in interest rates.  But people are

18  more comfortable with the curve.  There's a lot of money

19  available in the specialty finance market and the issuance shows

20  that it's just getting better.  So it should be -- the

21  availability is there for the right situation.

22  Q.  Do you think there's a higher probability of getting

23  refinancing?

24  A.  A higher probability of -- within the current market?

25  Q.  Well, in the next -- in the next one to two years -- in the

1   next year.

2   A.   I would say that the market is very robust right now and it

3   has been for the past 6 to 12 months and so the probability is

4   kind of the same just because it is quite a strong market.   The

5   only kind of hiccups that you've seen in the leverage finance

6   market was in 2022 in the syndicated finance market which is

7   more to do with banks.   They were hung with a lot of deals and

8   in 2022 coming into 2023, there was -- things kind of jammed up

9   for a bit as banks kind of handled their losses.   But that's not

10  relevant to what we call the specialty finance market.

11  Q.   Did Forbes assist the debtors in trying to find DIP

12  proposals?

13  A.   We did.   The initial strategy just because we were engaged

14  and had to move very, very quickly was to try to make contact

15  with the market, get a number of interested potential parties,

16  potential lenders and then the thought process was to work

17  within the receivers and the current syndicate to say let's just

18  hold off the bankruptcy process and we can find the solution.

19          Unfortunately, we found that the April 2 deadline or

20  April 3 was imminent and so we began to canvas the existing

21  people that were in the process and said, hey, the DIP could be

22  available.   Would you like to submit a term sheet?

23  Unfortunately, timing became so quick that it just wasn't

24  possible.   There were interested parties that looked at it and

25  wanted to do something on a constructive basis but the

1    timetables just didn't line up.

2    Q.  Do you know how many people you reached out to regarding DIP

3    financing?

4    A.  I don't know the exact number but if you look at the e-mail

5    in Exhibit 1025, I think you can assume of the 11 active, all of

6    them are contacted and if memory serves me correctly, there are

7    approximately I'm going to say three lenders that showed

8    interest and put their hand up to take a look.

9    Q.  And of the two to three who responded regarding the DIP

10   option, was anyone interested in lending on an unsecured basis?

11   A.  Not that I know of.

12            MS. MIKKILINENI:  I have no further questions.

13            COURT:  Thank you.  Counsel for MetLife.

14   Cross-examination?

15            MR. GOURLEY:  No, Your Honor.

16            COURT:  Counsel for Rabo Agrifinance.

17            MS. SCHWAGER:  Yes, Your Honor.  Thank you.

18                         CROSS-EXAMINATION

19   QUESTIONS BY MS. SCHWAGER:

20   Q.  Good afternoon.

21   A.  Hi.

22   Q.  How are you?

23   A.  Good, thanks.

24   Q.  There's a notebook, Volume 3 next to you.

25   A.  I see it.

1   Q.  There's a notebook.  So you can actually see the document.

2   A.  Okay.

3   Q.  And it's -- what I'm referring to is 3072 if you wouldn't

4   mind turning there.

5   A.  Okay.

6   Q.  And have you seen this document?  Do you know what this

7   document is?

8   A.  It looks like an e-mail trail from my colleague to a

9   financial sponsor that has a credit fund.

10  Q.  When you say financial sponsor, is that the Platinum Equity?

11  A.  Yeah.  Apologies.  Platinum Equity is a private equity firm

12  that has a credit strategy and this would be their credit people

13  within the private equity firm.

14  Q.  Okay.  And you're copied on that e-mail; is that correct?

15  A.  Yes.

16  Q.  And did you review this e-mail when it went out?

17  A.  I don't know.

18  Q.  Did you review -- I'll refer to it as a CIM.  Does that

19  sound -- is that the jargon in the industry?

20  A.  Yes.

21  Q.  Did you review the CIM that's attached to Exhibit 3072?

22  A.  Likely.  This CIM would have been reviewed and then approved

23  by the company and would have been scrubbed internally and each

24  recipient would receive a different CIM with a water mark.  It

25  would be the same document but for process purposes, it would

1   be -- yes -- so yes, I have.

2   Q.  When you're talking about -- there's watermark on this one

3   that's Platinum; is that correct?

4   A.  Should be, yes.

5   Q.  And so those you send it out to receive the same information

6   but it will be different because it has a watermark that

7   indicates who it's going to; is that correct?

8   A.  Yes.

9   Q.  And did you personally work on the CIM that is attached?

10  A.  Personally meaning --

11  Q.  You as a person --

12  A.  No, I get it but do you mean did I help compile the

13  PowerPoint?

14  Q.  And the document and what information went into the

15  document?

16  A.  We would have all had reviewed it, yes.

17  Q.  Did you have any back and forth with -- well, let me back

18  up.  Where would you get the information to put in the CIM?

19  A.  The company.  I mean given the time constraints, I think

20  what we had was fairly bare bones but the idea was here's the

21  situation, here's the current cap structure, here's the

22  collateral base, here's the financials and here's some guidance

23  on that that would have come from the company, yes.

24  Q.  Okay.  Do you remember who you spoke to at the company to

25  get the information?

1    A.  It would have been David Heida.

2    Q.  Okay.  Did you ever speak to Mr. Millenkamp or correspond

3    with him for information?

4    A.  We would have had a number of update calls and kind of

5    discussed things at a high level, yes.

6    Q.  That Mr. Millenkamp was on that call; is that correct?

7    A.  Yes.

8    Q.  And Mr. Heida?

9    A.  Yes.

10   Q.  Do you recall anybody else from the Millenkamp organization

11   that was on the call?

12   A.  No.

13   Q.  Or calls, I'm sorry.

14   A.  Not that I recall, no.

15        MS. SCHWAGER:  Your Honor, I'd move for the admission

16   of Exhibit 3072.

17        COURT:  Any objection?  Exhibit 3072 is admitted.

18            (Rabo Agrifinance Exhibit No. 3072 admitted.)

19        MS. SCHWAGER:  Thank you.

20   BY MS. SCHWAGER:

21   Q.  Can I bother you to turn to -- at the bottom of the CIM, it

22   looks like it has page numbers that say "executive summary" and

23   then it will have a page number and I was looking at executive

24   summary page 5.

25   A.  Okay.

1    Q.  It says on this executive summary that Rabo pursued a

2    forbearance agreement in 2022 from Triggered Covenants.  Do you

3    see that reference?

4    A.  Yes.

5    Q.  What were you told about Rabo and the Triggered Covenants?

6    A.  I believe that if you look at the company's financial

7    statements that were compiled by Eide Bailly, it's in all the

8    notes.  So we didn't really for this stuff rely on the company

9    because the thought was people are going to want discussion on

10   this and the most mutual way to show it would be directly in the

11   Eide Bailly statements.  So I believe there's a narrative in

12   their annual statements.

13   Q.  Okay.  And did you talk to the Millenkamp group at all about

14   what was going on with Rabo?

15   A.  We would talk about timelines for various meetings and

16   discussions.  We would talk about, you know -- we would ask them

17   about, you know, meetings and conversations they had because our

18   thought was how do we work within the existing syndicate to find

19   a solution that meets everyone's objectives.  So I can't think

20   of any specific commentary.

21         Frankly, we -- the objective here was to move as

22   quickly as possible in putting this CIM together and we prefer

23   to take things out of the annual statements because there's so

24   much detail on that -- this narrative from the notes.

25   Q.  Would the annual statements show any other defaults with the

1    Rabo loan like maturity or anything like that?

2    A.  I would have to -- I would have to review them again.  I

3    believe there was a timeline in terms of maturity, breach,

4    forbearance.  I think the narrative's all there.  I haven't

5    looked at it for six, eight weeks or so.

6    Q.  Do you recall if anybody at the Millenkamp organization told

7    you that the forbearance agreement had been terminated and that

8    it was a matured -- that it was a loan that was in default and

9    Rabo had started taking some recovery efforts?

10   A.  I honestly don't remember having to ask the question because

11   it was so clear in all of the financial statements.

12   Q.  Okay.  So why wouldn't that information rather than just

13   saying that the forbearance agreement -- there was a forbearance

14   agreement that was from Triggered Covenants but it doesn't

15   explain that it's a matured default?

16   A.  I don't think it's an industry practice for what you're

17   espousing would be necessary because basically what you do is

18   you get this document out and then you have a data room and you

19   up load all the documents.  So it all would have eventually have

20   been there.

21   Q.  But doesn't this give the impression that Rabo is in a

22   forbearance right now and it's merely because of covenant

23   defaults?

24   A.  I respectfully disagree.  I don't know what to say.  I don't

25   feel that way but you can put whatever narrative you'd like into

1    the marketing document.

2    Q.  I'm not trying to put words in your mouth.  I'm just trying

3    to understand when you send out a CIM to potential -- you're

4    trying to get a lender, is that correct, for an investor?  Is

5    that what you're trying to do is get interest in lending to the

6    Millenkamp organization?

7    A.  We're trying to find a solution for something that would be

8    amicable to Rabo.  So that's what we're trying to do, yes.

9    Q.  So when the SIMs go out, you don't want to provide to

10   potential lenders or investors information that the loan is in

11   default going out front -- front-end of it.  You kind of want to

12   downplay what's going on?

13   A.  The reason I disagree with you is that our firm is regulated

14   by FINRA and we have our compliance (inaudible).  I don't think

15   there's anything misleading in this.  And the fact that you

16   probably look at everything from the entire body of the data

17   room and the model that's been provided by the company, I get

18   what you're asking.  I just don't see that narrative here.

19   Q.  You don't think that it's important to upfront advise third

20   parties who are looking at whether to make a loan or invest --

21   A.  I think it's important to put the right information that's

22   not misleading and I don't see that here.

23   Q.  Well, does it inform any lenders or investors that

24   Millenkamp has a matured loan from Rabo for two years versus

25   just being in a forbearance based on covenant default?

1    A.  I honestly don't know how to answer that.  All I would ask

2    is maybe you can help us write the CIM next time.

3    Q.  Okay.  What I'm just trying to understand is the information

4    that you're providing to third parties and whether it's

5    accurate.

6    A.  I think it's very accurate.

7    Q.  Because it shows that there's a matured loan of two years?

8    A.  I'm not following you so --

9    Q.  Does your CIM disclose --

10   A.  Yep.

11   Q.  -- that there's a matured loan of two years?

12   A.  Isn't that in the cap table?

13   Q.  Is it?  What page?

14   A.  Where's the line of credit?  And it was -- all I would say

15   is that I don't think you can look at the CIM on its own.  I

16   think you look at what would be in the data room and I think all

17   that would be there.

18   Q.  Okay.  But right now, we're talking about a CIM and what

19   third parties receive.  Can I have you turn to page 8 of the

20   executive summary?

21   A.  Okay.

22   Q.  And it talks about key loans.

23   A.  Uh-huh.

24   Q.  Do you see that reference?

25   A.  Uh-huh.

1    Q.  Do you see that it says that the Rabo Bank is listed as a

2    key loan?

3    A.  Uh-huh.

4    Q.  And it says a maturity date of March 15, 2028.  Why would it

5    say that?

6    A.  I don't know.  If that's an error, then it must be an error.

7    Q.  Because that would be misleading, right, if it was actually

8    a matured loan from June of 2022 to say that the Rabo loan is

9    actually not maturing until March 15 of 2028?

10   A.  I think misleading would imply that there was an intention

11   to do that.  No.

12   Q.  Definitely not trying to make that assertion.

13   A.  Okay.

14   Q.  But if a third party read that, they would not know that the

15   Rabo Bank had -- actually loan had matured for two years.

16   A.  Right.  But if we sent out the CIM and had multiple calls

17   with prospective lenders and they had access to a data room and

18   had access to a broader totality of information, one could

19   assume that that likely would have come out.  So there would

20   never be that issue.  But I get what you're saying.

21   Q.  And it also sets forth that Rabo Bank's interest rate is

22   SOFER plus 12.63 percent.  Do you see that?

23   A.  Uh-huh.

24   Q.  Did the debtors inform you that actually the default rate

25   under the Rabo loan documents is SOFER plus 8.11 percent?

1    A.  If I remember the approach that our group did is that they

2    looked at the current rates that were implied from -- because it

3    wasn't just one rate.  I mean there was -- if you looked at the

4    bottom of the statement, there were a lot of related fees

5    related to the pending bankruptcy process and I think that -- I

6    think that that rate was an estimate based on what they were

7    currently paying I believe if memory serves me correctly.

8    Q.  And was this -- at what point in time was it that you

9    created the CIM?  I'm trying to understand why you thought the

10   interest was --

11   A.  It would have been the third week of March and it would have

12   been based off of historical data.  I believe the idea was they

13   were trying to approximate it because there were so many moving

14   parts.

15   Q.  Did anybody ask the debtors what the actual interest rate

16   was under the loan documents with Rabo?

17   A.  I think we had the loan documents.

18   Q.  And you think from the loan documents that you get a SOFER

19   plus 12.63 percent?

20   A.  If I remember the process is that we tried to estimate it if

21   I recall and we worked on it with the company and the intent was

22   to really look at what the implied rate was.

23   Q.  So why doesn't it disclose that it's an estimated interest

24   rate rather than set forth -- than stating that's the interest

25   rate?

```
1   A.  Because I believe it was based off of historical data.

2   Q.  But if a third party's picking up the CIM and trying to

3   figure out what they're being asked to be interested in?

4   A.  If a third party's picking up a CIM and then has multiple

5   calls and then looks at the data room and looks at the totality

6   of information.

7   Q.  Do you think that a third party who gets information that

8   doesn't disclose a two-year maturity and instead says the

9   maturity's in another four years that that may put off a lender

10  or investor because the information they're receiving in the CIM

11  wasn't accurate?

12  A.  I don't.  I think that this process moved so quickly.  We

13  basically were hired and then, you know, there was basically two

14  weeks to get everything up and running and things moved so

15  quickly.

16  Q.  So why in this CIM are you not referencing the receivership,

17  disclosing that the debtor's under receivership?

18  A.  We actually didn't know of the existence of the receiver

19  till after we were engaged.  And then we had a call, a meeting

20  with the receiver and things were just so fluid.

21  Q.  You don't think that would be relevant information for

22  somebody looking at whether to loan or invest in the company?

23  A.  Well, we talked verbally but the way the process was

24  going -- I mean as I mentioned, things moved very, very quickly.

25  Q.  Okay.  At this point in time, was there a Chapter 11 when
```

1   the CIM'S being created?

2   A.  We didn't have a knowledge of the probability and we didn't

3   have a knowledge of any specific timeline, no.

4   Q.  Okay.  Are you -- have you now updated the SIMS to disclose

5   that you're seeking financing and/or investor on behalf of a

6   debtor in possession?

7   A.  Well, we haven't sent this out.

8   Q.  You haven't sent any out since this March -- when did this

9   go out?

10  A.  I don't believe we sent any out since the filing.  That's my

11  understanding.

12  Q.  Okay.

13  A.  But yes, of course we would.

14  Q.  And maybe go back and fix the interest rate and the maturity

15  dates, things like that?

16  A.  Thank you.

17  Q.  Is that something you would do?

18  A.  Of course.

19  Q.  You would go back and --

20  A.  Of course we would.

21  Q.  So you want to project accurate information in the SIMs?

22  A.  But not only, yes, but we're SEC registered.

23  Q.  Right.  Now, on page 6 -- so I guess I'm having you jump

24  around a little bit.  On page 6 of the executive summary, it

25  states that Millenkamp is going to grow revenue through dairy

1   herd expansion.  Do you see that reference?

2   A.  I'm trying to find it.  The paragraph?

3   Q.  Third paragraph, and growing revenue through dairy

4   expansion, the current facilities.

5   A.  I think the idea here was to show that the entity was a

6   going concern and that the situation here was a dislocation of

7   capital structure rather than a deterioration of the business to

8   the point that it would, you know, have a different result and

9   the idea was to look on a long-term basis five, ten years from

10  now that there would be an element of expansion.

11  Q.  But it doesn't say five to ten years, right?  It says a near

12  term plan to expand.

13  A.  And what's your question or your point?

14  Q.  Well, you just said that you thought the intent of this was

15  to show that it's a going concern and that it would be

16  expending -- expanding in five to ten years but your disclosure

17  says executing on a near term plan.

18  A.  Right.  Well, I think the idea here was to say here we have

19  a situation where the lead bank wants out of syndicate.  There's

20  a dislocation in the cap structure.  Other syndicate members and

21  other lenders have shown a willingness to stick around and the

22  idea of our process from the outset was to try to keep it out of

23  bankruptcy and try to refi and if that was the case and you had

24  that kind of long turn cap structure, yes, that would be -- that

25  would be the idea.

1              Obviously if it fell in a different manner as it has

2      now, that would not be an investment highlight because the goal

3      would be to maintain the business and emerge from bankruptcy.

4      Q.  Right.  And in that instance, you wouldn't be expanding

5      through the bankruptcy process, correct?

6      A.  No.  I think your focus would be on your cap structure.

7      Q.  Right.  And so -- but this -- this is going out at a time

8      when they're in the receivership so they wouldn't be expanding

9      through a receivership either, right?

10     A.  Well, I think the idea here was our strategy at the time was

11     if we can -- if we can go back to the existing syndicate and say

12     we have a solution for you, let's avoid bankruptcy and let's

13     just move on, that was -- that was the strategy of our process

14     and that didn't happen that way.  But these documents reflect

15     the strategy as of kind of March 21 when the ideas -- we don't

16     even know if there's going to be bankruptcy.  We did have

17     knowledge of the receivership a few days after that.

18     Q.  So when you were engaged, the receivership wasn't disclosed

19     to you initially, right when you were engaged.  The debtors did

20     not disclose the receivership to you?

21     A.  I honestly can't impress enough on this room that our time-

22     line was so fast.

23     Q.  Sure.  But the debtor knows it's in receivership and that's

24     got a significant factor.  Correct?  Is that correct?

25     A.  It would be a significant factor and typically when we go to

1    market, in the process, sometimes things take two months, three

2    months, we went to market in a week and a half just to hit the

3    ground and get in front of folks and try to find a solution that

4    would be amicable to everyone as fast as possible.

5    Q.   Sure.  I'm just trying to understand why you didn't think --

6    why the borrowers -- or the debtors wouldn't tell you about a

7    receivership regardless about how fast things are moving why

8    that's not a material factor to go into a CIM?

9    A.   Well, I would say that, you know, the CIM goes out.  You

10   begin to have calls.  They dig in.  They look in the data room

11   and all of that information in real time I'm sure was relayed in

12   the right manner because if you don't relay that, people aren't

13   interested in participating in the process.

14   Q.   Exactly.

15   A.   But here we are -- here we are with 11 parties that are

16   still interested so maybe that's the proof in the pudding.

17   Q.   Or maybe those parties haven't been disclosed about the

18   receivership or the debtor in possession or the fact that you've

19   got a matured loan for two years.

20   A.   Yeah.  I just disagree on that.

21   Q.   Okay.  On the next page, page 7 next to attractive

22   collateral base, it states that the debtors have 494 million in

23   real estate and facilities.  Do you see that reference?

24   A.   Yes, uh-huh.

25   Q.   Do you know if that includes the digester?

1    A.  I don't believe so because I believe what we tried to do was

2    rely on the hard reports that we had and used existing reports

3    and the idea was that we talked about the digester verbally

4    because the impact the digester when it was completed, it would

5    expand the collateral base but it would also have -- it would

6    enhance the operating profile of the business.  But I don't

7    think --

8    Q.  But you really shouldn't include it until it's completed and

9    that value's there.

10   A.  I don't think we did.

11   Q.  I'm just -- I'm trying to understand what you said.  Is that

12   correct?

13   A.  I agree with that assertion, yes.

14   Q.  Can I have you turn to page 18 of the executive summary and

15   do you see here where it's identifying each of the real estate

16   holdings?

17   A.  Uh-huh.

18   Q.  And it's the $494 million number that you have in your CIM

19   earlier?

20   A.  Uh-huh.

21   Q.  Do you see that the digester is included --

22   A.  I do.

23   Q.  -- as a value of 107,000?

24   A.  I do.

25   Q.  I'm sorry.  107 million.  So is that another error on the

1   CIM and that should be revised?

2   A.  Yes.

3   Q.  And so with -- when you're sending out the CIM to correct

4   that error, you would be saying that the real property appraised

5   value is 494 minus 107, correct?

6   A.  Yeah.  Our lenders weren't really as focused on the

7   appraised value of the real property because there was an

8   existing lien against it.  So this -- despite your assertion,

9   this will be very secondary information because the financing

10  partner we would be bringing in would be looking at the senior

11  part of the cap structure whereas kind of this real estate value

12  is basically already spoken for so you're offering up the

13  potential discussion towards the second lien.

14  Q.  Is it fully spoken for?

15  A.  I don't know.

16  Q.  Okay.

17  A.  I mean it's not part of the conversation.

18  Q.  So you don't know how much the first lien is against the

19  real property?

20  A.  Well, if memory serves me, it's 180 off of the base of the

21  appraised assets.  The reason I say memory serves me is that

22  it's very secondary because the people we're going out to, our

23  cash flow lenders and the existing cap structure had that level

24  of security against the appraised real estate.

25  Q.  But looking at the overall operations of the Millenkamp -- I

1    mean $107 million of an overstatement of a collateral value

2    would be significant and material.

3    A.  Well, like I just said, we're talking to cash flow

4    lenders --

5    Q.  Sure.

6    A.  -- who would look at the cash flows.  When you have this

7    number that's in the right column, that's already secured by a

8    first lien to the MetLife debt so people aren't basing their

9    decision on this.  They're looking at cash flows.

10   Q.  But overall when they're looking at the value and the

11   strength of this debtor, is real estate not important based on

12   who you're talking about?

13   A.  Well, frankly, no, because like I said, you would be going

14   out to people and saying here's the cash flows of the business.

15   Here's the reversion of the cash flows back to a normalized

16   level.  Here's the cash flow that's available to service a new

17   kind of top part of the cap structure.

18   Q.  Do you have that in the CIM where you go through the cash

19   flow analysis?

20   A.  Well, there's financials in the CIM, yes.

21   Q.  In this document.

22   A.  Yeah.

23   Q.  Okay.  Can you just point me to where it walked through the

24   cash flow, that they have a positive cash flow and how that

25   would --

1    A.  Well, if you look it on page 21, they have the historical

2    and 2024 income statement.  There's 2023.  And then there's an

3    EBITA number up on page 6 and basically, the way these guys

4    operate is they look at that and then they look at what's in the

5    data room and then they have conversations with them and then

6    they look at, you know, where to expect revenue.  Even cap X

7    cash flow went forward and that's basically how they would size

8    the debt.

9    Q.  Did you review the financials and note that there was a

10   negative cash flow that the debtor wasn't able to produce enough

11   income to actually pay its expenses without going and getting

12   more loans?

13   A.  How's that defined?

14   Q.  I'm just asking you when you're looking at cash flow, were

15   you able to determine that the debtor historically has been able

16   to pay its debts from the cash flow from its operations, income.

17   A.  The challenge with cash flow is it's not really a -- it's

18   not a gap concept and so if you ask everyone in this room,

19   you'll come back with 30 definitions of what cash flow is.  So

20   basically what you look at is you say what if cash flow's

21   (inaudible) business if this bankruptcy process didn't exist and

22   what was available for debt service and we did feel there was

23   positive cash flow if you stripped out where we were at now,

24   this is what you could do with the business.

25   Q.  And do you have -- you have an analysis of that?

1    A.  No.  With these types of buyers, they do the work and we

2    help them with it.  Sorry, we discuss the parameters and outlook

3    with them and then they do the work.

4    Q.  Okay.  On that page 7.  Sorry.  We'll go back to page 7.  On

5    the collateral base, you have in there that the personal

6    property assets are 70 million and 150 million which totals 210.

7    A.  Okay.

8    Q.  In this case, did you realize the debtors have filed

9    purported value of their personal property of 170 million, that

10   same property?

11   A.  I don't know where the personal property concept comes from.

12   I think that this ties to the current assets which is usually a

13   concept when people are looking at what's the networking

14   capital.  So the reason you bring that up is to talk about

15   what's the cash flow that underlies the development of free cash

16   flow.

17   Q.  But they're talking about personal property assets and

18   they're valuing --

19   A.  Well, maybe they're in that number.

20   Q.  I'm sorry.

21   A.  Current assets is a defined accounting term on the balance

22   sheet and I believe that number ties quite well.  I don't think

23   there will be any expectation that there would be any kind of

24   security against that number.  I think that people usually look

25   at it to see what's the working cap obligation that's going

1    forward.

2    Q.  So why are you putting in the CIM what the value of the

3    personal property is?

4    A.  That's not what we're doing.  So we're putting -- so a

5    balance sheet has current assets and current liabilities and

6    when you take out the cash that's on the balance sheet, you try

7    to derive what the working cap number is and so the reason we're

8    highlighting that is not to say this is your collateral.  It's

9    to say it just -- it helps you define what the cash flows are of

10   the business.

11   Q.  How does it -- how does it help you design cash flow to say

12   that the personal property assets on a balance sheet are worth

13   210 million?

14   A.  You put in the phrase personal property assets.  I put in

15   current assets and so they're just unrelated concepts.  You're

16   talking about ascribing an -- appraise the value like it's a

17   fixed asset.

18   Q.  Okay.

19   A.  I'm telling you that when you work with these lenders,

20   they're going to look at the cash flows and part of the cash

21   flows is an understanding of as the cash flows vary throughout

22   the year throughout a cycle, what are the requirements from a

23   working cap prospectus.  That's why you bring up (inaudible).

24   That's why you bring up current assets.

25   Q.  Okay.  Can you turn to page 17 which identifies those

1    assets?

2    A.   Okay.

3    Q.   And you see that you have the -- I think you called them

4    current assets of 70 million which are the AR's, the feed

5    inventory, steer inventory, prepaid expenses there on the

6    left-hand side?

7    A.   Uh-huh.

8    Q.   And on the right-hand side, you have livestock, machines,

9    vehicles.  Do you see that?

10   A.   Uh-huh.

11   Q.   Why would the values that you have listed here and they're

12   identified as values on an asset be 40 million more than what

13   the debtor has now filed schedules on stating what the value of

14   its assets are?

15   A.   Well, I think this is from the accounting statements.  And

16   by the way, why don't we take a step back.

17   Q.   Well, let's just answer the questions that are asked.  So

18   you took them from the accounting statements?

19   A.   I believe we relied -- I'm sorry?

20   Q.   You took them from the accounting statements?

21   A.   Yes.  Well, there would be -- there would be the annual

22   statements and then there would be the monthlies and I think we

23   looked at the latest statements that were available.

24   Q.   Did you send these to the debtors to review and confirm?

25   A.   We worked with the company.

1   Q.  And they allowed these values to go out as represented

2   values of their assets?

3   A.  I don't believe it's a current value concept.  I believe

4   that you're looking at accounting values.  And if we could just

5   take a step back, one of the challenges with this process is

6   you're not dealing with one type of lender.  You're going out to

7   four or five different types of lenders and saying, hey, what do

8   you think about doing an ABL plus debt?  What do you think about

9   doing an equity deal?  What do you think about doing a cash flow

10  deal or something that has a second lien?

11          And so you have to show all the various facets.  So I

12  don't believe that we're representing here that you can lend

13  money against those receivables but the legacy facility that was

14  in place had a collateral base.  So we're just trying to lay

15  everything out there to say, hey, what do you think?

16  Q.  But is that an accurate statement for asking what they think

17  when the debtor has filed schedules saying that the value's

18  actually 170 million versus you sending out a CIM that says it's

19  210 million?

20  A.  You'll have to explain the 210 amount.  I apologize.

21  Q.  That's fine.  We'll leave it.

22  A.  But I would -- to your question, I would disagree with you.

23  Q.  We're fine.  Can you turn to page 8 of the executive summary

24  which again we had talked about this before where the Rabo Bank

25  has an incorrect maturity date.  It's that page.

1    A.  Okay.

2    Q.  On here when you -- you said you would update it.  Are you

3    going to include DIP financing under the use of proceeds and key

4    loans?

5    A.  Of course we would.

6    Q.  So when it goes out, it's actually going to increase the

7    amount that is being sought; is that correct?

8    A.  I'd have to look at the numbers at the time when it goes

9    back up.

10   Q.  But if you have a DIP financing that comes in at 45 million,

11   then that's going to add to what the use of the proceeds are

12   that you're seeking from the lenders and investors; is that

13   correct?

14   A.  Well, I don't know because, for example, when you look at

15   this 120 need, that included earmarking 25.9 million to pay off

16   certain creditors.  So maybe some of that number -- because the

17   DIP is actually doing that right now --

18   Q.  Right.

19   A.  -- so the reason I'm saying I don't know is I don't know

20   what would happen in the wash when you look at those two items

21   too to be able to give you a figure either way.  That would be

22   in the spirit of it but to say it's fully added, I don't know if

23   that's right.

24   Q.  Right.  And I don't know that it's fully added as well but

25   you have to account for a DIP loan so if it's a $45 million DIP

1   loan that they're seeking and if they use 25 of it to pay these

2   accounts payable, then it's still going to increase what you're

3   seeking in the CIM.

4   A.  It could.  It could if the amount outstanding is greater

5   than 25.9, yes.

6   Q.  If the amount of the DIP loan that is sought -- that

7   actually is obtained by the debtors is greater than 25.9?

8   A.  I'm just saying you don't know because you don't know upon

9   that refi event what that second line will be.  So the spirit of

10  what you're saying is correct.  Who knows the magnitude of it

11  because you don't know at what point that those DIP funds have

12  actually paid down creditors.

13  Q.  We had talked about on page 20 where it had -- it talked

14  about expanding the dairy herd.  It also talks about buying new

15  property.  Would you anticipate that would happen in a

16  bankruptcy?

17  A.  No.

18  Q.  Okay.  Now, you said that you had sent out and received 11

19  responses of interest and you were drawing interest.  Have there

20  been any letters of intent signed or issued?

21  A.  Well, it wouldn't be a letter of intent.  We'd receive a

22  term sheet.

23  Q.  Okay.  Have you received a term sheet?

24  A.  The reason we haven't is because the timeline slipped away

25  from us and basically people were like, well, I'll just have to

1    wait till everything's formalized.

2    Q.  So the answer's no, you haven't received it.

3    A.  Well, the answer's no --

4    Q.  Thank you.

5    A.  -- but it's not because of our efforts.  It's because of the

6    process.

7    Q.  Definitely not trying to slight your efforts.  Just trying

8    to figure out what the results have been.  In your scope of

9    engagement, you testified about financing and refinancing.

10   There wasn't any discussion about deleveraging.  Are you engaged

11   to do that?

12   A.  Well, the market would decide what the appropriate cap

13   structure is and if that involves deleveraging, that would be

14   the result so --

15   Q.  Is that an option that you have discussed with the debtors?

16   A.  Like deleveraging in terms of here's the long-term cap

17   structure and here's -- I mean what does that mean?  On a dollar

18   basis or multiple basis or loan to value basis?

19   Q.  What are you understanding?

20   A.  There's so many moving parts that it's hard to give a yes or

21   no answer.

22   Q.  Well, have you had any discussions with the borrowers or

23   debtors about deleveraging in any form or fashion?

24   A.  We've had discussions with the lead bank to talk about ways

25   of taking them out and they've been very brief discussions and

1    the answer was let's focus on the process and where it's going.

2    Q.  So what about the debtors?  Have you had any discussions

3    with the debtors in any form of deleveraging?

4    A.  I mean the market will speak for itself.

5    Q.  That wasn't the question.

6    A.  Well, it's kind of the answer because --

7    Q.  Well, no, it's not.

8    A.  Okay.

9    Q.  Because it's a factual correction.  Have you had any

10   conversations with the debtors about deleveraging?

11   A.  We've had conversations about putting a long-term cap

12   structure that fits the market and wherever that quantum ends

13   up, it is what it is.

14   Q.  Was the word "deleveraging" used in that conversation?

15   A.  The word was we will come up with a solution and that will

16   be the market solution.

17   Q.  Okay.  So it sounds like no, that word wasn't used?

18   A.  Well, it wasn't but it's kind of not -- it's not --

19   Q.  That's all I needed to know.

20   A.  Okay.

21   Q.  Now, special -- you talked about special situation lending.

22   That's more expensive to the debtors, correct?

23   A.  Expensive relative to --

24   Q.  Conventional lending.

25   A.  It's very similar to the current cap structure in Chapter

1    11.

2    Q.  But it is more expensive than conventional lending, correct?

3    A.  It is.

4    Q.  Did you review -- well, strike that.  You said that the

5    market's been robust for the last 6 to 12 months, correct?

6    A.  Yes.

7    Q.  But yet you would acknowledge that the debtors have not been

8    able to obtain refinancing during that robust period.

9    A.  Well, as I discussed earlier, our understanding of the

10   process is that they went out to conventional lenders, other

11   regional banks or ag lenders and that's a different universe.

12   Q.  So explain that to me.  You said it was relevant to testify

13   that the market's been robust but you don't think that that's

14   relevant to Millenkamp not being able to obtain financing.

15   A.  The market in the leverage lending market which could be

16   defined as direct lenders, credit funds, family offices issuing

17   private debt is very robust.  To go out to conventional lenders

18   which we believe is what Millenkamp did would be a different

19   discussion because they would see the element of distress

20   through the financials and their current cap structure and you

21   wouldn't find the proper universe to come up with a solution.

22   Q.  They would see the distress in the cash flow.  Why wouldn't

23   those who are looking at it who you're sending it out to, why

24   wouldn't they see those same financials?

25   A.  Because they're more investment grade lenders.

1    Q.  And did you realize that Mr. Millenkamp had engaged another

2    investment banker prior to your firm and hadn't been able to

3    obtain refinancing?

4    A.  Not that I recall.

5    Q.  Okay.

6            MS. SCHWAGER:  I have no further questions.

7            COURT:  Thank you, Ms. Schwager.

8            MS. SCHWAGER:  Thank you, Your Honor.

9            COURT:  Cross-examination from the U.S. Trustee.

10           MR. NAESS:  No, Your Honor.  Thank you.

11           COURT:  Cross-examination from Conterra.

12                             CROSS-EXAMINATION

13   QUESTIONS BY MR. O'BRIEN:

14   Q.  Good afternoon, Mr. Morgan.  Just a few brief things.  Does

15   the CIM also propose or is it open to an equity deal or is it

16   just a refinancing?

17   A.  An equity deal is always something that would be

18   contemplated by prospective lenders.  Our thought -- because

19   when the CIM went out, the idea was to run a process where you

20   would come up with a solution to keep people out of bankruptcy.

21   An equity deal wouldn't be part of that.  So does the CIM

22   contemplate it when you read those pages?  No.  But obviously

23   it's a fluid discussion with multiple lenders and as things

24   progress, the premise of equity or the probability of that being

25   a part of the cap structure could be part of the discussion down

1    the road.

2    Q.   Okay.  I notice that the CIM doesn't reference the Sandton

3    loan but, in fairness, the CIM was prepared in March before

4    Sandton entered into the picture.  Would it be fair to say that

5    a revised CIM would discuss the Sandton debt?

6    A.   Of course it would.

7    Q.   And does the current CIM propose a refinancing of the

8    Conterra debt?

9    A.   I mean anything would be on the table.  Our interaction with

10   Conterra implied that they were flexible to a number of

11   permutations.  So if it ended up being refied, that's possible

12   but, you know, our view is put forth the best case and just see

13   where it goes because it's not like you put out a CIM and say,

14   here's the deal.  Who's up for it?  This is the kind of market

15   -- it's a private market where people kind of come back at you

16   and say here's our potential solution.  Let's talk about this.

17         So in the first instance, that wasn't the first premise

18   but you'd always be flexible for various roles, whatever they'd

19   like to do.

20   Q.   There was a reference in the CIM that the proposed new

21   lender might have a second priority lien on the real estate; is

22   that correct?

23   A.   That was something that was just discussed.  You know, there

24   may be other unencumbered assets.  There may be a second lien.

25   It's not by any stretch central to any discussion.

1    Q.  Understood.  I'm just trying to laser beam in.  You're aware

2    that Conterra has the third priority lien on the real estate

3    behind Rabo, right?  And so for a new lender to come in and have

4    a second priority lien, they'd have to take out Conterra.  Do

5    you understand that to be the case?

6    A.  I did not until now.

7    Q.  Okay.  So any revised CIM would need to indicate if a new

8    lender's going to have a second priority lien, they need to take

9    out Conterra as well.  Do you understand that now?

10   A.  Sure.

11   Q.  Okay.  So one of the Rabo exhibits I think indicated that

12   Bank of Montreal or BOM has a 37 and a half participatory

13   interest in Rabo's loan.  Has there been any discussions about

14   taking out BOM as well or just the Rabo component of the Rabo

15   loan?

16   A.  We attempted to reach out to BMO because our solution was

17   let's get a solution that fits all parties.  And we reached out

18   to them and then Rabo reached out to us and informed that they

19   would beat all conversations.  So we haven't had any actual

20   dialogue with BMO as to what their intentions are what the

21   permutations could be.

22   Q.  So you don't know as you sit here today whether or not BMO

23   wants in or out?

24   A.  I don't know.  The thought process is that, you know, with

25   their acquisition of Bank of the West and Bank of the West's

1    former presence in the region that there could be interest.

2    Again, this is all about a fluid situation where people come

3    back at you and say, hey, let's propose taking out Rabo and

4    maybe BMO wants to stay.  Maybe Conterra would like to have a

5    different kind of covenant structure but it's more fluid than

6    that.

7    Q.  I got it.  The CIM indicated that the rate of interest on

8    the Conterra loan is 15 or 16 percent if I read it correctly.

9    Do you understand that that rate is 18 percent and that any

10   revised CIM would need to use the correct rate?

11   A.  Sure.

12   Q.  Okay.  Has the data room been opened yet?

13   A.  Yes.

14   Q.  Okay.  And what does it take to get credentials into the

15   data room?  Is that signing a confidentiality agreement and

16   contacting you or how does somebody go about getting

17   credentials?

18   A.  Our (inaudible) NDA.  You'd be allowed access to it.

19   Q.  Okay.  And does somebody contract you about signing off on

20   an NDA?

21   A.  As we would reach out to folks, we'd send them an NDA and

22   then it take anywhere from 45 minutes to 3-plus weeks to

23   complete.

24   Q.  Okay.  I saw a reference in the CIM to a statement of milk

25   production per cow by pounds.  Do you understand that's how the

1   normal gauge is?  Did you happen to notice if the production

2   rate of the Millenkamp cows in the CIM was consistent with Mr.

3   Davis' testimony, that production is about 54 pounds on the

4   Millenkamp cows?

5   A.  The process structure that we're leading and the types of

6   lenders we're going out to are looking at cash flow.  They're

7   looking at what's the monthly performance.  They're looking at

8   what is the free cash flow profile.  They're looking at what's

9   the networking cap profile.  And they're looking at collateral

10  base.

11  Q.  Okay.

12  A.  So I think, wow, that would be an important thing to look

13  at.  It would be not only secondary but tertiary in the first,

14  you know, instance of diligence by a prospective lender.

15  Q.  Okay.  So this was a dairy and it sells milk, right?

16  A.  Yep.

17  Q.  And the quantity of the product that it sells is pounds of

18  milk?

19  A.  Uh-huh.

20  Q.  So the pounds of milk is an important component of what the

21  CIM should present to a potential investor, correct?

22  A.  May or may not be because if you're going out to a

23  conventional lender who is an ag lender, they would completely

24  zero in on that because they're investment grade lenders and

25  they would -- they would -- that would be the depth of their

1    analysis.  We're going out to specialty lenders who are going to

2    be looking at that as part of five or six other things.  So it's

3    much more complex given the nature of the distress situation.

4    So it's important but it's one of six things whereas probably

5    with a regional lender would be.

6    Q.  As you sit here today, what does the current CIM show for

7    milk production per cow per day?

8    A.  I don't know.

9    Q.  Thank you.

10          COURT:  Thank you, Mr. O'Brien.  Redirect?

11                      REDIRECT EXAMINATION

12   QUESTIONS BY MS. MIKKILINENI:

13   Q.  Mr. Morgan, are the 11 remaining parties aware of the

14   bankruptcy?

15   A.  Yes.

16   Q.  Are there generally parties who are still interested in the

17   transaction even if the bankruptcy is going on?

18   A.  Yes.

19   Q.  Do you anticipate parties still being interested after you

20   disclose the bankruptcy to further parties?

21   A.  Yes, because really all that's left is to remove uncertainly

22   in the process which starts with the formalization of the DIP.

23          MS. MIKKILINENI:  That's all the questions I have.

24   Thank you.

25          COURT:  Any additional questions?  Counsel for Met

1   Life.

2          MR. GOURLEY:  No, Your Honor.

3          COURT:  Counsel for Rabo Agrifinance.

4          MS. SCHWAGER:  No, Your Honor.  Thank you.

5          COURT:  U.S. Trustee?

6          MR. NAESS:  No, Your Honor.

7          COURT:  Conterra?

8          MR. O'BRIEN:  No.

9          COURT:  All right.  You may step down.  Thank you.

10          WITNESS:  Thank you.

11          MS. MIKKILINENI:  Your Honor, we'd ask that Mr. Morgan

12   be excused as a witness.

13          COURT:  Any objection to excusing Mr. Morgan as a

14   witness?

15          MS. SCHWAGER:  No objection, Your Honor.

16          COURT:  All right.  You're excused.  Thank you.

17          Do you have additional witnesses, Ms. Mikkilineni?

18          MS. MIKKILINENI:  We do, Your Honor.  We're going to

19   call Mr. Bill Millenkamp to the stand.

20          COURT:  Mr. Millenkamp, please come to the witness

21   stand and remain standing when you arrive so the courtroom

22   deputy may swear you in.

23                    (WILLIAM JOHN MILLENKAMP is sworn.)

24          CLERK:  Please have a seat and once seated, please

25   state your name and spell your last name for the record.

1          WITNESS:  William John Millenkamp, M-i-l-l-e-n-k-a-m-p.

2          CLERK:  Thank you.

3                         DIRECT EXAMINATION

4    QUESTIONS BY MS. MIKKILINENI:

5    Q.  Good afternoon, Mr. Millenkamp.  You testified in the last

6    hearing on April 9; is that correct?

7    A.  Correct.

8    Q.  Will you briefly describe again your involvement in

9    Millenkamp?

10   A.  I'm the owner and operator of Millenkamp Cattle.

11   Q.  We're going to pull up Exhibit 1029.  Is that appearing on

12   your screen?

13   A.  Yes.

14   Q.  Do you recognize this document?

15   A.  Yes, I do.

16   Q.  And what is it?

17   A.  It says it's the secured (inaudible) debtor in possession

18   loan agreement.

19   Q.  And who is this with?

20   A.  Sandton Capital.

21   Q.  Is this the same loan agreement you were proposing be

22   approved at the April 9 hearing?

23   A.  Yes.

24   Q.  Is it still for a $45 million DIP loan?

25   A.  Yes.

1    Q.  Is exit financing still an option under the (inaudible)

2    agreement?

3    A.  Yes.

4    Q.  Why does the debtor need these DIP funds?

5    A.  We need the funds to pay critical vendors and perhaps use it

6    for ongoing operations.

7    Q.  And why do you need 45 million?

8    A.  The 45 million is a little more than what the budget says

9    but we want to make sure that going into this coming fall's

10   harvest season that we have enough funds available to mainly buy

11   straw and corn silage and the harvest cost associated with both

12   those things and the cost of that is around $15 million for the

13   straw and corn silage.

14   Q.  Does harvest have any impact on how you do business with

15   vendors?

16   A.  Yes.

17   Q.  Can you explain that?

18   A.  My biggest vendors are grain companies and corn farmers.

19   Yearly we go out and buy several thousand acres of standing corn

20   from numerous farmers.  A lot of these guys have been doing this

21   since I've been in business and it's hard to establish a good

22   group of farms to continually buy corn from on a yearly basis

23   so --

24   Q.  What will happen to the livestock if you don't receive these

25   DIP funds?

1    A.  Worst case scenario, you could have a lot of cattle without

2    feed which could lead to death and sick cattle and other issues.

3    Q.  What would happen to milk production?

4    A.  Milk production would fail without the right amount of feed.

5    Q.  And what will happen to the employees if you don't receive

6    the DIP funds?

7    A.  If we don't have DIP financing, we don't have paychecks for

8    them and they'll no longer work for us.

9    Q.  And how many employees do you have?

10   A.  Close to 500.

11   Q.  Does Millenkamp Cattle play any sort of role in the

12   communities in which your businesses are in?

13   A.  As far as like donations, we do some of that and then as far

14   as maybe vendors, we do business with I think around 7 to 800

15   vendors over a two-year period.

16   Q.  In your opinion, what will happen to those communities if

17   the debtor does not receive additional DIP funds?

18   A.  It will affect -- I don't remember the number -- around 250

19   vendors directly that we owe money to.  Every vendor's a little

20   bit different.  On the doom and gloom case, there's certain

21   smaller vendors that they don't get paid from me, it could break

22   their company.

23   Q.  What would happen to your customers if you don't receive the

24   DIP funds?

25   A.  When you use the term "customers," I use it probably in two

1    different ways.  One is we raise baby calves for other dairy

2    farmers.  We don't get financing.  We're at high risk of losing

3    customers.  We've already lost a good portion of our customer

4    base due to the receivership and how that was handled.  The next

5    fear is having enough DIP financing to keep rolling and to feed

6    the cattle and care for the cattle the way we've done for the

7    last 25 years.

8            The second thing as far as customers would be who we

9    sell our milk to.  Glambia would be the one that would have the

10   biggest problem.  We're their largest shipper.  Finally, thank

11   goodness, the milk supply is tight across the United States and

12   Idaho.  It would be very, very bad for Glambia.

13   Q.  And what will happen to the digester agreement if you don't

14   receive the DIP funds?

15   A.  If there's no dairy, there will be no -- there will be no

16   digester.  They'll walk.

17   Q.  Who will walk?

18   A.  The owners of the digester.

19   Q.  What will ultimately happen to the creditors if the debtor

20   doesn't receive the additional DIP funding?

21   A.  Like I stated earlier, numerous things could happen.  A lot

22   of them won't -- I'm sure a lot of them will not do business

23   with us.

24   Q.  What will happen to the Millenkamp businesses if you do not

25   receive the additional DIP funding?

1    A.   The company will go out of business.

2    Q.   Did you hear the testimony from Schuil regarding the real

3    estate value?

4    A.   Yes.

5    Q.   And did you review the Schuil BPO?

6    A.   Yes, I did.

7    Q.   And what was the total amount they valued the real estate

8    at?  Do you remember?

9    A.   I think it was 467,000 -- 467 million.

10   Q.   And which lenders have security interest in the real estate?

11   A.   MetLife, Rabo, Conterra and now Sandton.

12   Q.   And how much are they collectively owed?

13   A.   A little under 300 million.

14   Q.   So how secure are the secured lenders in the real estate?

15   A.   Around 170 million's oversecured.

16   Q.   I want to pull up Exhibit 1022.  Do you recognize this

17   document?

18   A.   Yes, I do.

19   Q.   What is this?

20   A.   It's an inventory report.

21   Q.   And who created this?

22   A.   We did.

23   Q.   Who's we?

24   A.   David Heida, my general manager, and I.

25   Q.   And the cattle inventory report at the top there, how did

1  you derive at the value for the cattle?

2  A.  These values were derived from Todd Davis.

3  Q.  If you can scroll down to show the full feed description.

4  And in this next section, the feed description, what was the

5  value for the silage?

6  A.  The value for the silage was 19,600,000.

7  Q.  And how did you derive at the value for the silage?

8  A.  Market value of the silage when it was harvested.

9  Q.  And what's the value for the hay and other feed?

10  A.  2,700,000.

11  Q.  How did you arrive at that value?

12  A.  Current market value.

13  Q.  Has the value of the feed changed since your last inventory

14  that you talked about at the April 9 hearing?

15  A.  Yes.

16  Q.  And how come?

17  A.  It changes according to how we store the feed.  I'll talk

18  about the silage first.  It's stored in big piles in different

19  locations bought from different farms.  So there would be a

20  different cost.  Maybe I bought the feed for a different price

21  from an individual farmer versus another farmer and then the

22  transportation, harvest cost on each farm would be different

23  because of the location between where we store it and where the

24  farm is.  It could be a different cost in the inoculant we put

25  on and/or the cost of covering the silage as well and then with

1    the hay and other feeds, we buy hay, straw and other commodities

2    on a daily basis and those prices move on a daily basis as well.

3    Q.  And then there's a line item in here for deducting the liens

4    from the total feed amount; is that correct?

5    A.  Yes.

6    Q.  And is that amount still accurate, the $11.8 million in

7    lien?

8    A.  No.  It's inaccurate.

9    Q.  What should it be?

10   A.  It should be 4 and a half million dollars less than the

11   $11.8.  We've paid 4 and a half million dollars of that feed

12   since the last time.

13   Q.  And was that from the critical vendor payments?

14   A.  Yes, it was.

15   Q.  And so the total equity in the feed that we have at almost

16   10.5 million, that would go up 4 and a half million; is that

17   right?

18   A.  It would be 15 million approximately.

19   Q.  Can you explain the growing crop investment?

20   A.  Yes.  The growing crop investment is the cost that we have

21   associated to our input cost and our crops.  Most of that is put

22   in the -- is spent in the fall on crops that we'll harvest the

23   following summer.

24   Q.  And what did you put down as a value for that?

25   A.  The value is whatever we paid for the fertilizer, seed, our

1    associated tillage that we put into the crop.

2    Q.   And you had that at 3.8 million on here; is that right?

3    A.   Yes.

4    Q.   And are there any ag liens other than the senior secured

5    lenders on the growing crop?

6    A.   No.

7    Q.   For the equipment and rolling stock line item on here, how

8    did you arrive at the value for that?

9    A.   We had Gale Harding, the appraiser, come in and do an

10   appraisal recently.

11   Q.   And what is the total equity in the equipment after

12   deduction of the lien amounts?

13   A.   17 and a half million.

14   Q.   Will you please explain the supplies, parts and inventory

15   category?

16   A.   Supplies, parts and inventory are supplies and parts

17   associated to keep our whole operation going.  It could be

18   things from mechanicing to irrigation parts to parts to keep

19   these rotary milking facilities going, electrical supplies,

20   manure handling equipment and so on and so forth.

21   Q.   And how did you value these?

22   A.   The cost that we paid for the products.

23   Q.   And are there any liens above the senior secured lenders on

24   the supplies, parts and inventory?

25   A.   No.

1  Q.  Will you please explain the calf hutches category?

2  A.  The calf hutches are housing that we use to hold a baby calf

3  which would be a calf from one day old to roughly 100 days old

4  so it would be like a little dog house for each baby calf.

5  Q.  And how did you value these?

6  A.  We valued those really conservatively.  You can go to town,

7  buy them from different companies and then we looked at maybe

8  recent sales of used hutches and we put a cost on it.

9  Q.  And you have that valued at 2.12 million.  Is that right?

10 A.  Correct.

11 Q.  Are there any liens above the senior secured lenders on the

12 calf hutches?

13 A.  No.

14 Q.  So after deduction of the lien amounts, what's the amount

15 left over?

16 A.  Close to 180 million.

17 Q.  And it would actually be higher once you take into

18 consideration the 4.5 that you took off of the --

19 A.  Yes, for 185 million.

20 Q.  And how much is currently owed to Rabo?

21 A.  I believe 92 million.

22 Q.  So based on your personal property valuations, is Rabo over-

23 secured?

24 A.  I would say they're wildly over-secured by $90 million.

25 Q.  And do they also have a second security interest on the real

```
 1   estate?
 2   A.  Yes.
 3   Q.  I'm going to pull up Exhibit 1021.  Do you have that in
 4   front of you?
 5   A.  Yes.
 6   Q.  Do you recognize this document?
 7   A.  Yes.
 8   Q.  What is it?
 9   A.  It was the value of the livestock on April 2.
10   Q.  And is this what we had admitted as an exhibit during the
11   last hearing?
12   A.  Yes.
13   Q.  Are the values you included on this inventory from the April
14   9 hearing similar to the values on the inventory for this
15   hearing?
16   A.  Yes, they would be similar, within about 1 percent I think.
17   Q.  So were your values similar to the appraised values for the
18   cattle and the equipment?
19   A.  Yes.  Even though I'm uneducated, I guess I'm a good guesser
20   on cattle values.
21   Q.  You have the requisite experience for these, correct?
22            MS. SCHWAGER:  Leading.
23   BY MS. MIKKILINENI:
24   Q.  Do you have the requisite experience for these values?
25            MS. SCHWAGER:  Objection.  Leading.
```

```
1              COURT:  Overruled.

2              WITNESS:  I have 30 years of experience.

3    BY MR. CHRISTENSEN:

4    Q.  We're going to pull up Exhibit 1027.  Do you recognize this

5    document, Mr. Millenkamp?

6    A.  Yes.

7    Q.  Are these the creditors you've identified as critical?

8    A.  Yes.

9    Q.  And who made these determinations?

10   A.  There was a group of my employees, David Heida, my son Jake,

11   Mario Orcanonza (phonetic), my operations manager Mark Harrison.

12   We talked about these things.

13   Q.  And I'd actually like to pull up a different document.  Do

14   you have the other critical vendor list?  Just one minute.  Do

15   you see that document in front of you?

16   A.  Yes.

17             MS. MIKKILINENI:  Your Honor, we don't have this marked

18   as an exhibit.  We're using it for him to refresh his memory on

19   liens and goods delivered within 20 days.  We're happy to mark

20   it as an exhibit if you'd like.

21             MS. SCHWAGER:  Your Honor, he hasn't been shown not to

22   have a memory in order for it to be refreshed yet.

23             COURT:  Go ahead and ask your questions first.  Go

24   ahead and take -- can you take it off the screen for the time

25   being?
```

BY MS. MIKKILINENI:

Q.  Mr. Millenkamp, do you remember off the top of your head all
the critical vendors and -- all the critical vendors that have
liens?

A.  Not off the top of my head, not every one of them.  I could
take a good stab at it.

Q.  And do you remember off the top of your head which critical
vendors received goods within the 20 days prior to the
bankruptcy being filed?

A.  On some of them, I would remember.

Q.  But not all of them?

A.  No, not without that list.

MS. MIKKILINENI:  Your Honor, may we pull up the
document so that he can see the liens associated with each
critical vendor as we go through it?

COURT:  Any objection?

MS. SCHWAGER:  No objection, Your Honor.

COURT:  Go ahead.

MS. MIKKILINENI:  Thank you.

BY MS. MIKKILINENI:

Q.  Okay.  Mr. Millenkamp, we're going to go through each
critical vendor line by line here, okay?  What's does Aden Brook
Trading Corporation do?

A.  Aden Brook Trading is a hay broker.

Q.  And how long have you been using them?

1    A.   I believe like three years.

2    Q.   And how often do you need these goods or services?

3    A.   Daily.

4    Q.   What's your payment structure with Aden Brook?

5    A.   Now it's COD.

6    Q.   Do you know of any vendors who could provide the same goods

7    or services of the same quality in the same time frame that you

8    need them?

9    A.   No.

10   Q.   Does this vendor have a lien?

11   A.   No.

12   Q.   Did this party provide goods within the 20 days prior to the

13   bankruptcy filing?

14   A.   Yes.

15   Q.   And what's the amount?

16   A.   Around 800,000.

17   Q.   And what does American Calf Products do?

18   A.   American Calf Products is where we buy our milk replacer for

19   baby calves.

20   Q.   And how long have you been using them?

21   A.   Maybe 15 years or more.

22   Q.   And how often do you need their services or goods?

23   A.   Daily.

24   Q.   What's your payment structure with them?

25   A.   COD.

1  Q.  Do you know of other vendors who could provide the same

2  goods or services of the same quality in the time frame needed?

3  A.  No.

4  Q.  Does this vendor have a lien?

5  A.  No.

6  Q.  Did this party provide goods within the 20 days prior to

7  bankruptcy?

8  A.  Yes.

9  Q.  And what's the amount?

10  A.  195,000.

11  Q.  What does B & H Farming do?

12  A.  They're farmers.

13  Q.  And what do they do for Millenkamp?

14  A.  We buy corn silage and straw, sometimes haylage, a few other

15  things at times but mostly silage.

16  Q.  And how long have you been using them?

17  A.  Probably 12 years, 14 years.

18  Q.  And how often do you need those goods?

19  A.  Daily.

20  Q.  Do you have other vendors who could provide the same goods

21  and services of the same quality in the same time frame that you

22  need them?

23  A.  No.

24  Q.  Are there other silage farmers on this list?

25  A.  Yes.

1    Q.  And if you identify someone else on this list as a silage

2    farmer, are your answers for the questions I just asked the same

3    as your answers for B & H?

4    A.  Yes.

5    Q.  Does this -- does B & H have a lien?

6    A.  Yes.

7    Q.  Did B & H provide goods within the 20 days prior to the

8    bankruptcy filing?

9    A.  No.

10   Q.  Bunge Canada do?

11   A.  Bunge is a grain company.

12   Q.  And how long have you been using them?

13   A.  On and off for 20 years.

14   Q.  How often do you need their goods or services?

15   A.  Daily.

16   Q.  What's your payment structure with them?

17   A.  COD.

18   Q.  Do you know of other vendors who could provide the same

19   goods or services of the same quality in the time frame needed?

20   A.  No.

21   Q.  Are there other feed suppliers like Bunge on this list?

22   A.  Yes.

23   Q.  If you identify someone else on this list as a feed

24   supplier, are your answers for the questions I just asked the

25   same as your answers for Bunge?

1   A.  Yes.

2   Q.  Does Bunge have a lien?

3   A.  No.

4   Q.  Do you think Bunge -- did Bunge provide goods within the 20

5   days prior to the bankruptcy filing?

6   A.  No.

7   Q.  What does -- I might mispronounce this -- Carne I

8   Corporation, what do they do?

9   A.  They deliver feed.

10  Q.  They're a feed supplier?

11  A.  Yes.

12  Q.  And how long have they been -- how long have you been using

13  them?

14  A.  Maybe 15 years.

15  Q.  And how often do you need their goods and services?

16  A.  Daily.

17  Q.  Does Bunge have a lien?

18  A.  Sorry.  You said Carne I think.

19  Q.  Oh, Carne.  Sorry.  Does Carne have a lien?

20  A.  No.

21  Q.  Did they provide goods within the 20 days prior to the

22  bankruptcy filing?

23  A.  Yes.

24  Q.  What was the amount?

25  A.  144,000.

1    Q.  What does H & M Custom do?

2    A.  They harvest our silage.

3    Q.  Are they similar to B & H, the silage farmer?

4    A.  No.  They are a company that owns the equipment that does

5    all the chopping.

6    Q.  And how long have you been using H & M?

7    A.  Eleven years.

8    Q.  How often do you need their goods or services?

9    A.  Over about 8 months -- 8 out of 12 months, they're working

10   for us.

11   Q.  And what's your payment structure with them?

12   A.  Generally within 30 days.

13   Q.  And do you know of other vendors who could provide the same

14   goods or services of the same quality in the time frame needed?

15   A.  No.

16   Q.  Does H & M have a lien?

17   A.  Yes.

18   Q.  And did they provide goods within 20 days prior to the

19   bankruptcy filing?

20   A.  No.

21   Q.  What does Healthy Earth Enterprises do?

22   A.  Healthy Earth is a company that provides composting so it's

23   equipment.  They provide equipment to turn raw material into

24   compost.  And they also custom spread that compost.

25   Q.  How long have you been using them?

1    A.  Over 15 years.

2    Q.  How often do you need their goods or services?

3    A.  They probably have somebody on my farm almost half the year.

4    Weekly.  Let's call it weekly.

5    Q.  What's your payment structure with them?

6    A.  30 days.

7    Q.  Do you know of other vendors who could provide the same

8    goods or services of the same quality in the time frame needed?

9    A.  No.

10   Q.  Does Healthy Earth have a lien?

11   A.  Yes.

12   Q.  And did they provide goods within the 20 days prior to the

13   bankruptcy filing?

14   A.  No.

15   Q.  What does Holinski (phonetic) Farms do?

16   A.  Holinski?

17   Q.  That one.

18   A.  He's a farmer.

19   Q.  What do they do for Millenkamp?

20   A.  They grow silage for us.

21   Q.  And how long have you been using them?

22   A.  I've been doing business with him for 15 to 20 years.

23   Q.  And since they're a silage farmer, do they go in the same

24   silage farmer bucket as B & H?

25   A.  Yes.

1    Q.   Do they have a lien?

2    A.   No.

3    Q.   Did they provide goods within the 20 days prior to the

4    bankruptcy filing?

5    A.   No.

6    Q.   What does J.D. Heiskell and Company do?

7    A.   It's J.D. Heiskell and Company and they are a grain company.

8    Q.   And what do they do for Millenkamp?

9    A.   We buy grain and minerals from them.

10   Q.   And how long have you been using them?

11   A.   25 years.

12   Q.   How much do you need their goods or services?

13   A.   Daily.

14   Q.   What's your payment structure with them?

15   A.   30 days.

16   Q.   Do you know of any vendors who could provide the same goods

17   and services of the same quality in the time frame needed?

18   A.   No.

19   Q.   Do they have a lien?

20   A.   No.

21   Q.   Did this -- did they provide goods within the 20 days prior

22   to the bankruptcy filing?

23   A.   Yes.

24   Q.   What was the amount?

25   A.   113,000.

1    Q.   What does Cody Uri (phonetic) do?

2    A.   He's a corn farmer.

3    Q.   What does he do for Millenkamp?

4    A.   Sells us corn.

5    Q.   What is the corn used for?

6    A.   Silage.  Corn silage.

7    Q.   And so he's a silage farmer?

8    A.   He's a silage farmer, yes.

9    Q.   And how long have you been using them?

10   A.   About six years I think.

11   Q.   And does he have a lien?

12   A.   No.  Or yes.

13   Q.   And did he provide goods within the 20 days prior to the

14   bankruptcy filing?

15   A.   No.

16   Q.   What does Landview do?

17   A.   Landview's a grain company and they also pre mix all my

18   feed.

19   Q.   And how long have you been using them?

20   A.   Maybe five years.

21   Q.   How often do you need their goods or services?

22   A.   Daily.

23   Q.   And what's your payment structure with them?

24   A.   30 days.

25   Q.   Do you know of other vendors who could provide the same

1   goods or services of the same quality in the time frame needed?

2   A.  No.

3   Q.  Do they have a lien?

4   A.  No.

5   Q.  Did they provide goods within the 20 days prior to the

6   bankruptcy filing?

7   A.  Yes.

8   Q.  And what was the amount?

9   A.  1.1 million.

10  Q.  What does Miller Hay Company do?

11  A.  They provide hay and straw.

12  Q.  And are they considered a silage farmer?

13  A.  They're considered a feed company.

14  Q.  A feed supplier?

15  A.  A feed supplier.

16  Q.  And how long have you been using them?

17  A.  20 years.

18  Q.  Do they have a lien?

19  A.  Yes.

20  Q.  And did they provide goods within the 20 days prior to the

21  filing?

22  A.  No.

23  Q.  What does Moss Grain Partnership do?

24  A.  They sell us corn silage and they rent potato ground from

25  us.

1    Q.  So they're one of the silage farmers?

2    A.  Yes.

3    Q.  And how long have you been using them?

4    A.  15 years.

5    Q.  Do they have a lien?

6    A.  Yes.

7    Q.  Did they provide goods within the 20 days prior to the

8    bankruptcy filing?

9    A.  No.

10   Q.  What does PerforMix Nutrition Systems do?

11   A.  They're a feed company that provides liquid feed with all

12   the vitamins and minerals for my calf ranch.  And they also

13   supply the nutritionist that does the nutrition work for all of

14   my heifers and steers.

15   Q.  And how long have you been using them?

16   A.  27 years.

17   Q.  How often do you need their goods and services?

18   A.  Daily.

19   Q.  And what's your payment structure with them?

20   A.  30 days.

21   Q.  Do you know of any vendors who could provide the same goods

22   and services at the same quality in the time frame needed?

23   A.  No.

24   Q.  Do they have a lien?

25   A.  Yes.

1    Q.  And did they provide goods within the 20 days prior to the

2    bankruptcy filing?

3    A.  Yes.

4    Q.  What was the amount?

5    A.  208,000.

6    Q.  What does Receptor Food Group do?

7    A.  It's a feed company.

8    Q.  Are they one of your feed suppliers?

9    A.  Yes.

10   Q.  How long have you been using them?

11   A.  I think 4 years.

12   Q.  Do they have a lien?

13   A.  Yes -- or no.  Sorry.  No.

14   Q.  Did they provide goods within the 20 days prior to the

15   bankruptcy filing?

16   A.  Yes.

17   Q.  What was the amount?

18   A.  114,000.

19   Q.  What does Standlee Premium Products do?

20   A.  It's a hay company that we buy hay and corn silage from.

21   Q.  So are they one of the silage farmers?

22   A.  Yes.

23   Q.  And how long have you been using them?

24   A.  Over 15 years.

25   Q.  And do they have a lien?

```
 1    A.  No.
 2    Q.  Did they provide -- did they provide goods within the 20
 3    days prior to filing?
 4    A.  No.
 5    Q.  What does Wada Farms do?
 6    A.  Wada Farms is a hay farmer and we also sell them compost.
 7    Q.  Are they one of the silage farmers as well?
 8    A.  No.
 9    Q.  And how long have you been using them?
10    A.  10 years.
11    Q.  And how often do you need their goods or services?
12    A.  Almost daily.
13    Q.  What's your payment structure with them?
14    A.  30 days.
15    Q.  Do you know of any vendors who could provide the same goods
16    or services of the same quality in the time frame needed?
17    A.  No.
18    Q.  Does Wada Farms have a lien?
19    A.  Yes.
20    Q.  Did they provide goods within the 20 days prior to filing?
21    A.  No.
22    Q.  What does Viserion Grain, LLC, do?
23    A.  They're a grain company.
24    Q.  And how long have you been using them?
25    A.  Viserion, just a few years but they were -- the company they
```

1    bought out probably for 15 or 20 years.

2    Q.   They took over operations for a company that you used?

3    A.   That I used previously.

4    Q.   And you said that was for 15 years?

5    A.   Yeah.  They bought out Gravilon.

6    Q.   How often do you need Viserion's goods or services?

7    A.   Daily.

8    Q.   What's your payment structure with them?

9    A.   30 days.

10   Q.   Do you know of other vendors who can provide the same goods

11   and service of the same quality in the time frame needed?

12   A.   No.

13   Q.   And do they have a lien?

14   A.   No.  And I misspoke on that.  I get Viserion and Viterra

15   mixed up.  Viterra bought out Gravilon.

16   Q.   Okay.  And did Viserion provide goods within the 20 days

17   prior to the bankruptcy filing?

18   A.   No.

19   Q.   And what is Viterra USA Grain, LLC?

20   A.   A grain company.

21   Q.   And how long have you been using them?

22   A.   So back to Viserion, that would have been probably 5 years

23   and then with Viterra would be probably closer to 15 years.

24   Q.   And how often do you need Viterra's goods and services?

25   A.   Daily.

1    Q.   What's your payment structure with them?

2    A.   30 days.

3    Q.   Do you know of other vendors who could provide the same

4    goods and services at the same quality in the time frame needed?

5    A.   No.

6    Q.   And do they have a lien?

7    A.   No.

8    Q.   Did they provide goods within the 20 days prior to the

9    bankruptcy filing?

10    A.   Yes.

11    Q.   What was the amount?

12    A.   $2 million.

13    Q.   What does Wag Services do?

14    A.   Wag Services is a company that covers our silage pits with

15    plastic.

16    Q.   And how long have you been using them?

17    A.   15 years.

18    Q.   And how often do you need their services?

19    A.   Weekly.

20    Q.   And what's your payment structure with them?

21    A.   30 days.

22    Q.   Do you know of other vendors who could provide the same

23    services of the same quality in the time frame needed?

24    A.   No.

25    Q.   And do they have a lien?

```
 1   A.  No.
 2   Q.  Did they provide goods within the 20 days prior to the
 3   bankruptcy filing?
 4   A.  Yes.
 5   Q.  What was the amount?
 6   A.  $684.
 7   Q.  And I am not going to pronounce the next one correctly.  Can
 8   you pronounce that one?
 9   A.  Shagnasty.
10   Q.  And what do they do?
11   A.  They're farmers.  Corn farmers.
12   Q.  And let's see.  How long have you been using them?
13   A.  15 years.
14   Q.  And what's your payment structure with them?
15   A.  When we buy the corn in the fall, we would pay -- we would
16   harvest it in September and pay for 50 percent in November and
17   50 percent in January.
18   Q.  And how often do you need their goods?
19   A.  We feed it sometimes daily.
20   Q.  And do you know of other vendors who could provide the same
21   goods or services of the same quality in the time frame needed?
22   A.  No.
23   Q.  Does -- let's see.  Do they have a lien?
24   A.  Yes.
25   Q.  And did they provide goods within the 20 days prior to the
```

```
 1   bankruptcy filing?

 2   A.  No.

 3   Q.  What does Grant 4-D Farms do?

 4   A.  We buy corn from them.  Corn silage.

 5   Q.  Are they one of the silage farmers?

 6   A.  Yes.

 7   Q.  How long have you been using them?

 8   A.  12 years.

 9   Q.  Do they have a lien?

10   A.  Yes.

11   Q.  And did they provide goods within the 20 days prior to

12   filing?

13   A.  No.

14   Q.  What does Douglas J. Grant do?

15   A.  Corn farmer.

16   Q.  Let's back up one second.  Did I ask you about Grant &

17   Hagan?  I don't believe I did.

18   A.  No, you didn't.

19   Q.  Can you tell me what Grant & Hagan does?

20   A.  Grant & Hagan are corn farmers and we buy hay from them and

21   we buy straw from them.

22   Q.  Are they a silage farmer?

23   A.  Yes.

24   Q.  And how long have you been using them?

25   A.  13 or 14 years.
```

```
 1   Q.  Does Grant & Hagan have a lien?

 2   A.  Yes.

 3   Q.  Did they provide goods within the 20 days prior to filing?

 4   A.  No.

 5   Q.  Let's go back to Douglas Grant.  What did you say they do?

 6   A.  They're corn silage farmers.

 7   Q.  And how long have you been using them?

 8   A.  Five years.

 9   Q.  And do they have a lien?

10   A.  Yes.

11   Q.  And did they provide goods within the 20 days prior to

12   filing?

13   A.  No.

14   Q.  What does Hollifield Ranches do?

15   A.  Corn farmers and we buy hay from them and triticale, silage

16   and we sell them compost.

17   Q.  So are they one of the silage farmers?

18   A.  Yes.  And all the farmers, they all buy compost from us as

19   well.

20   Q.  And how long have you been using them?

21   A.  Ten years.

22   Q.  And do they have a lien?

23   A.  Yes.

24   Q.  And did they provide goods within the 20 days prior to

25   filing?
```

1    A.  No.

2    Q.  What does Star Falls do?

3    A.  Corn farmers and hay farmers.

4    Q.  Are they a silage farmer?

5    A.  Yes.

6    Q.  And how long have you been using them?

7    A.  I think eight years.

8    Q.  Do they have a lien?

9    A.  Yes.

10   Q.  Did they provide goods within the 20 days prior to filing?

11   A.  No.

12   Q.  What does Bo Stevenson, BNA Farms do?

13   A.  Corn farmer.

14   Q.  Are they a silage farmer?

15   A.  Yes.

16   Q.  And how long have you been using them?

17   A.  Probably six or eight years.

18   Q.  And do they have a lien?

19   A.  Yes.

20   Q.  And did they provide goods within the 20 days prior to

21   filing?

22   A.  No.

23   Q.  What does Triple C Farms do?

24   A.  Corn silage farmer.

25   Q.  And how long have you been using them?

```
 1    A.   Ten years.

 2    Q.   Do they have a lien?

 3    A.   Yes.

 4    Q.   And did they provide goods within the 20 days prior to

 5    filing?

 6    A.   No.

 7    Q.   What does Reed Farms do?

 8    A.   Corn silage farmer.

 9    Q.   How long have you been using them?

10    A.   I think four years.

11    Q.   Do they have a lien?

12    A.   Yes.

13    Q.   And did they provide goods within the 20 days prior to

14    filing?

15    A.   No.

16    Q.   What does Standing 16 Ranch do?

17    A.   They're corn farmers and -- corn silage farmers and hay

18    farmers.

19    Q.   How long have you been using them?

20    A.   20 years.

21    Q.   Do they have a lien?

22    A.   Yes.

23    Q.   Did they provide goods within the 20 days prior to filing?

24    A.   Yes.

25    Q.   What was the amount?
```

1    A.  5,000.

2    Q.  What does Clint Thompson do?

3    A.  He's a corn silage farmer and hay farmer.

4    Q.  And how long have you used -- been using him?

5    A.  20 years.

6    Q.  Does he have a lien?

7    A.  Yes.

8    Q.  And did he provide goods within 20 days prior to filing?

9    A.  No.

10   Q.  What do Ken or Jean Thompson do?

11   A.  Corn and hay farmers.

12   Q.  They're silage farmers?

13   A.  Yes.

14   Q.  And how long have you been using them?

15   A.  20 years.

16   Q.  Do they have a lien?

17   A.  No.

18   Q.  I believe this chart says they do.  Is that correct?

19   A.  I'm sorry.  Yes.  Sorry.

20   Q.  And did they provide goods within the 20 days prior to

21   filing?

22   A.  No.

23   Q.  And what does Steel Ranch do?

24   A.  Corn silage farmers.

25   Q.  And how long have they been using them?

```
 1    A.   Six or seven years.

 2    Q.   And do they have a lien?

 3    A.   Yes.

 4    Q.   And did they provide goods within the 20 days prior to the

 5    filing?

 6    A.   No.

 7    Q.   What does Dusty Brow Farms do?

 8    A.   Corn silage farmer.

 9    Q.   And how long have you been using them?

10    A.   About seven or eight years.

11    Q.   And do they have a lien?

12    A.   Yes.

13    Q.   And did they provide goods within the 20 days prior to

14    filing?

15    A.   No.

16    Q.   What does David Clark do?

17    A.   David Clark is my veterinarian.

18    Q.   And how long have you been using him?

19    A.   Since 2004.

20    Q.   And how often do you need his services?

21    A.   Five days a week.

22    Q.   And what's your payment structure with him?

23    A.   30 days.

24    Q.   Do you know of other vendors who could provide the same

25    services of the same quality in the time frame needed?
```

1   A.  No.

2   Q.  Does he have a lien?

3   A.  No.

4   Q.  And did he provide goods within the 20 days prior to the

5   filing?

6   A.  Yes.

7   Q.  Look at the chart again.  Do you think he did?

8   A.  No.

9   Q.  He provides just services, correct?

10  A.  Yes.

11  Q.  And what does MWI do?

12  A.  I buy all my pharmaceuticals from them.

13  Q.  And how long have you been using them?

14  A.  Probably 20 years.

15  Q.  And how often do you need their goods?

16  A.  Daily.

17  Q.  What's your payment structure with them?

18  A.  30 days.

19  Q.  And do you know of other vendors who could provide the same

20  goods and services of the same quality in the time frame needed?

21  A.  No.

22  Q.  Does MWI have a lien?

23  A.  Yes.

24  Q.  Did they provide goods within the 20 days prior to the

25  filing?

1    A.   Yes.

2    Q.   And what was the amount?

3    A.   509,000.

4    Q.   What does Automation Werx do?

5    A.   Automation Werx is a company that we used to put all of it

6    our computer systems and PLC's and SCADA screens.  They're the

7    company that makes a lot of our equipment run.  They also

8    provide some electrical services like an electrician.

9    Q.   How long have you been using them?

10   A.   11 years.

11   Q.   How often do you need their goods or services?

12   A.   Weekly.

13   Q.   And what's your payment structure with them?

14   A.   30 days.

15   Q.   Do you know of other vendors who could provide the same

16   goods or services of the same quality in the time frame needed?

17   A.   No.

18   Q.   And do they have a lien?

19   A.   No.

20   Q.   Did they provide goods within the 20 days prior to the

21   filing?

22   A.   Yes.

23   Q.   What was the amount?

24   A.   23,000.

25   Q.   What does Boyce Equipment and Parts do?

1  A.  They provide parts for certain types of equipment that we

2  can't find from anybody else.

3  Q.  And how long have you been using them?

4  A.  Probably 15 years.

5  Q.  And how often do you need their goods or services?

6  A.  Weekly.

7  Q.  And what's your payment structure with them?

8  A.  30 days.

9  Q.  Do you know of other vendors who could provide the same

10  goods or services of the same quality in the time frame needed?

11  A.  No.

12  Q.  Do they have a lien?

13  A.  No.

14  Q.  Did they provide goods within the 20 days prior to filing?

15  A.  No.

16  Q.  What does Clear Water Products do?

17  A.  Clear Water Products is a company out of Colorado that

18  brings out dredging equipment that we use on our lagoons to get

19  our manure waste out of these liquid lagoons.  And they dredge

20  it out for us and they're on our farm daily.

21  Q.  And how long have you been using them?

22  A.  About a year and a half.

23  Q.  What's your payment structure with them?

24  A.  30 days.

25  Q.  Do you know of other vendors who could provide the same

```
 1   goods or services of the same quality in the time frame needed?
 2   A.  No.
 3   Q.  Do they have a lien?
 4   A.  No.
 5   Q.  Did they provide goods within the 20 days prior to filing?
 6   A.  No.
 7   Q.  What does Coastline do?
 8   A.  Coastline is a John Deere loader dealership out of Jerome.
 9   Q.  And how long have you been using them?
10   A.  26 years.
11   Q.  And what do they do for Millenkamp?
12   A.  We buy equipment and they repair equipment for us.
13   Q.  And how often do you need those services?
14   A.  Weekly.
15   Q.  What's your payment structure with them?
16   A.  30 days.
17   Q.  Do you know of other vendors who could provide the same
18   goods and services of the same quality in the time frame needed?
19   A.  No.
20   Q.  Do they have a lien?
21   A.  Yes.
22   Q.  And did they provide goods within the 20 days prior to
23   filing?
24   A.  Yes.
25   Q.  What was the amount?
```

1    A.  $8,400.

2    Q.  What does electrical works and construction do?

3    A.  Electrical Werx and Construction is a sister company to

4    Automation Werx.  They do -- they're electrical contractors

5    basically.

6    Q.  And how long have you been using them?

7    A.  11 years.

8    Q.  And how often do you need their services?

9    A.  Weekly.

10   Q.  What's your payment structure with them?

11   A.  30 days.

12   Q.  And do you know of other vendors who could provide the same

13   services of the same quality in the time frame needed?

14   A.  No.

15   Q.  Do they have a lien?

16   A.  No.

17   Q.  Did they provide any goods within 20 days prior to filing?

18   A.  No.

19   Q.  What does Elevation Electric do?

20   A.  They are an electrical contractor.

21   Q.  And how do they differ from Electrical Werx?

22   A.  They're the company that does all of our large electrical

23   jobs, any new construction.  They're the company that

24   provides -- they've done all my electrical work since I've been

25   in business.

1    Q.   So how long have you been using them?

2    A.   Those guys, probably 23 or 4 years.

3    Q.   How often do you need their services?

4    A.   Daily or weekly.

5    Q.   And what's your payment structure with them?

6    A.   30 days.

7    Q.   Do you know of other vendors who could provide the same

8    goods or services of the same quality in the time frame needed?

9    A.   No.

10   Q.   Does this vendor have a lien?

11   A.   No.

12   Q.   Did they provide goods within the 20 days prior to filing?

13   A.   Yes.

14   Q.   What was the amount?

15   A.   141,000.

16   Q.   What does Ferguson Enterprises do?

17   A.   They're a company that provides a lot of miscellaneous farm

18   supplies like fittings and small farm miscellaneous things you'd

19   use and consume.

20   Q.   And how long have you been using them?

21   A.   26 years.

22   Q.   How often do you need their goods?

23   A.   Daily.

24   Q.   And what's your payment structure with them?

25   A.   30 days.

1  Q.  Do you know of other vendors who could provide the goods of

2  the same quality in the time frame needed?

3  A.  No.

4  Q.  Do they have a lien?

5  A.  No.

6  Q.  Did they provide goods within 20 days prior to filing?

7  A.  Yes.

8  Q.  And what was the amount?

9  A.  $96.

10  Q.  What does Floyd Lilly Company do?

11  A.  Floyd Lilly does about the same thing for us and does

12  miscellaneous farm parts.

13  Q.  And how long have you been using them?

14  A.  26 years.

15  Q.  And how often do you need their goods?

16  A.  Daily.

17  Q.  What's your payment structure with them?

18  A.  30 days.

19  Q.  Do you know of other vendors who could provide the same

20  goods of the same quality in the time frame needed?

21  A.  No.

22  Q.  Do they have a lien?

23  A.  No.

24  Q.  And did they provide goods within the 20 days prior to

25  filing?

1    A.  Yes.

2    Q.  And what was the amount?

3    A.  $64.

4    Q.  What does G.J. Verti-Line Pumps do?

5    A.  They're a company that does all of my irrigation pump work

6    so irrigation wells that we have, they'll put new pumps in or

7    refurbish them or fix them as needed.

8    Q.  And how long have you been using them?

9    A.  17 years.

10   Q.  And how often do you need those goods or services?

11   A.  Almost weekly.

12   Q.  What's your payment structure with them?

13   A.  30 days.

14   Q.  Do you know of other vendors who could provide the same

15   goods and services of the same quality in the time frame needed?

16   A.  No.

17   Q.  Do they have a lien?

18   A.  No.

19   Q.  Did they provide goods within the 20 days prior to filing?

20   A.  Yes.

21   Q.  What was the amount?

22   A.  $1,300.

23   Q.  What does Green Source Automation do?

24   A.  Green Source is a company that we -- we bought a bunch of

25   robots for our milking.  To milk our cows, we milk them on

1    rotary -- on the rotaries.  We use robots.  They're the company

2    that we bought the robots from and they have -- we have a

3    service contract with them.

4    Q.  And how long have you been using them?

5    A.  11 years.

6    Q.  How often do you need their goods or services?

7    A.  Daily.

8    Q.  What's your payment structure with them?

9    A.  30 days.

10   Q.  And do you know of other vendors who could provide the same

11   goods or services at the same quality in the time frame needed?

12   A.  No.

13   Q.  Do they have a lien?

14   A.  No.

15   Q.  Did they provide goods within the 20 days prior to filing?

16   A.  No.

17   Q.  What does Progressive Dairy Service & Supplies do?

18   A.  It's a dairy equipment business.  We have those guys -- we

19   hire those guys to fix certain dairy equipment on our farms and

20   they also -- we have a service contract with them.  They provide

21   24-hour-a-day service labor for our farm.

22   Q.  And how long have you been using them?

23   A.  Over 20 years.

24   Q.  And how often do you need their goods or services?

25   A.  Daily.

1    Q.   What's your payment structure with them?

2    A.   30 days.

3    Q.   Do you know of other vendors who could provide the same

4    goods or services of the same quality in the time frame needed?

5    A.   No.

6    Q.   And does this vendor have a lien?

7    A.   No.

8    Q.   Did they provide goods within 20 days prior to the

9    bankruptcy filing?

10   A.   Yes.

11   Q.   What was the amount?

12   A.   59,000.

13   Q.   What does Schow's Truck Center do?

14   A.   Schow's Truck Center and the next one, Schow's Auto Parts,

15   both of those are sister companies, same building.  They provide

16   parts and service for us.

17   Q.   And how long have you been using them?

18   A.   Probably 13, 14 years.

19   Q.   And how often do you need their goods or services?

20   A.   Daily or weekly.

21   Q.   What's your payment structure with them?

22   A.   30 days.

23   Q.   Do you know of other vendors who could provide the same

24   goods or services of the same quality and the time frame needed?

25   A.   No.

```
1    Q.  Do they have a lien?

2    A.  No.

3    Q.  And did they provide goods within the 20 days prior to the

4    filing?

5    A.  Yes.

6    Q.  What was the amount?

7    A.  Around $1,200.

8    Q.  And that was Schow's Auto Parts; is that correct?

9    A.  Yes.

10   Q.  What does the Dairy Solutions Group do?

11   A.  The Dairy Solutions Group is the company that we bought all

12   of our dairy equipment from.  We will hire those guys for new

13   construction or maintenance and repairs on the existing

14   equipment and we also have a 24-hour-a-day service contract with

15   that company as well.

16   Q.  And how long have you been using them?

17   A.  12 years.

18   Q.  And how often do you need their goods or services?

19   A.  Daily.

20   Q.  What's your payment structure with them?

21   A.  30 days.

22   Q.  Do you know of other vendors who could provide the same

23   goods or services of the same quality in the time frame needed?

24   A.  No.

25   Q.  And do they have a lien?
```

1    A.   No.

2    Q.   Did they provide goods within the 20 days prior to the

3    bankruptcy filing?

4    A.   Yes.

5    Q.   What was the amount?

6    A.   75,000.

7    Q.   What does Western States Cat do?

8    A.   Western States Cat is the company that we buy all of our

9    loaders from.

10   Q.   And how long have you been using them?

11   A.   Almost four years.

12   Q.   And how often do you need their goods or services?

13   A.   Daily.

14   Q.   What's your payment structure with them?

15   A.   30 days.

16   Q.   Do you know of other vendors who could provide the same

17   goods or services of the same quality in the time frame needed?

18   A.   No.

19   Q.   Do they have a lien?

20   A.   No.

21   Q.   Did they provide goods within the 20 days prior to filing?

22   A.   No.

23   Q.   What does Xavier Farm Services do?

24   A.   Xavier is an equipment dealer.  We buy all of it, our feed

25   wagons and some of their handling equipment, from them.

```
 1   Q.  How long have you been using them?

 2   A.  Over 10 years.

 3   Q.  And how often do you need their goods?

 4   A.  Daily.

 5   Q.  What's your payment structure with them?

 6   A.  30 days.

 7   Q.  Do you know of other vendors who could provide the same

 8   goods or services of the same quality and the same time frame

 9   needed?

10   A.  No.

11   Q.  Do they have a lien?

12   A.  No.

13   Q.  Did they provide goods within 20 days prior to filing?

14   A.  No.

15   Q.  What is Rocky Mountain Agronomics do?

16   A.  They're the company that we do all of our agronomy with.

17   They provide an agronomist and we buy almost all of our

18   fertilizer and herbicides and pesticides from them.

19   Q.  And how long have you been using them?

20   A.  For 13 years I believe.  Sorry, no, 20 years.  20 years.

21   Q.  How often do you need their goods or services?

22   A.  Almost daily.

23   Q.  And what's your payment structure with them?

24   A.  30 days.

25   Q.  Do you know of other vendors who could provide the same
```

1   goods or services of the same quality in the time frame needed?

2   A.  No.

3   Q.  Do they have a lien?

4   A.  No.

5   Q.  Did they provide goods within the 20 days prior to filing?

6   A.  Yes.

7   Q.  What was the amount?

8   A.  55,000.

9   Q.  What does Clear Lakes Products do?

10  A.  Clear Lakes Products is a company that we buy all of our

11  dairy and calf ranch chemicals.  As an example, like chlorine or

12  sanitizers, udder dips for the cows.

13  Q.  And how long have you been using them?

14  A.  About ten years.

15  Q.  And how often do you need their goods or services?

16  A.  Daily.

17  Q.  What's your payment structure with them?

18  A.  Monthly.

19  Q.  Do you know of other vendors who could provide the same

20  goods or services of the same quality in the time frame needed?

21  A.  No.

22  Q.  Do they have a lien?

23  A.  No.

24  Q.  Did they provide goods within the 20 days prior to filing?

25  A.  Yes.

```
1    Q.  What was the amount?

2    A.  133,000.

3    Q.  What does ABS Global do?

4    A.  ABS Global is a company that we -- they provide all the

5    labor so about ten full-time employees to artificially

6    inseminate our cows and we buy all the semen from that company

7    as well.

8    Q.  And how long have you been using them?

9    A.  For about 14 years.

10   Q.  And how often do you need those goods or services?

11   A.  Daily.

12   Q.  What's your payment structure with them?

13   A.  Monthly.

14   Q.  Do you know of any vendors who could provide the same goods

15   or services of the same quality in the time frame needed?

16   A.  No.

17   Q.  Do they have a lien?

18   A.  No.

19   Q.  Did they provide goods within the 20 days prior to filing?

20   A.  No -- oh, yes.  Sorry.  Yes.

21   Q.  And what was the amount?

22   A.  187,000.

23   Q.  What does JF Farms do?

24   A.  JF Farms provides trucking for silage and manure hauling.

25   Q.  And how long have you been using them?
```

1  A.  15 years.

2  Q.  And how often do you need their services?

3  A.  About 8 months -- 8 of the 12 months we use these --

4  actually, sorry, almost 12 months out of 12 months.

5  Q.  And what's your payment structure with them?

6  A.  Monthly.

7  Q.  And do you know of other vendors who could provide the same

8  goods or the same services of the same quality in the time frame

9  needed?

10  A.  No.

11  Q.  Do they have a lien?

12  A.  No.

13  Q.  Did they provide goods within the 20 days prior to filing?

14  A.  No.

15  Q.  The rest of the entities in this box, do they all do

16  trucking?

17  A.  This whole group does the exact same thing.  They all work

18  with our chopping, hauling silage and manure hauling.

19  Q.  And would all -- would all of your answers for the questions

20  I just asked about JF Farms be the same as your answers for the

21  rest of these?

22  A.  Yes.

23  Q.  And what does Butte Irrigation do?

24  A.  Butte Irrigation is an irrigation company we buy the

25  majority of our pivots, irrigation equipment and parts for those

1    pivots from them and new installations, underground piping,

2    manifolds, stuff like that.

3    Q.  And how long have you been using them?

4    A.  20 years.

5    Q.  How often do you need their goods or services?

6    A.  Weekly.

7    Q.  And what's your payment structure with them?

8    A.  Monthly.

9    Q.  Do you know of other vendors who could provide the same

10   goods and service of the same quality in the time frame needed?

11   A.  No.

12   Q.  Do they have a lien?

13   A.  No.

14   Q.  Did they provide goods within the 20 days prior to filing?

15   A.  Yes.

16   Q.  And what was the amount?

17   A.  45,000.

18   Q.  What does Darling Ingredients do?

19   A.  Darling Ingredients are dead cattle removal.

20   Q.  And how long have you been using them?

21   A.  25 years.

22   Q.  How often do you need their services?

23   A.  Daily.

24   Q.  What's your payment structure with them?

25   A.  Monthly.

1    Q.  And do you know of other vendors who could provide the same

2    services of the same quality in the time frame needed?

3    A.  No.

4    Q.  Do they have a lien?

5    A.  No.

6    Q.  And did they provide goods within the 20 days prior to

7    filing?

8    A.  No.

9    Q.  What does J & C Hoof Trimming do?

10   A.  It's a company that provides labor to do cow hoof trimming.

11   Q.  How long have you been using them?

12   A.  15 years.

13   Q.  How often do you need their services?

14   A.  Almost daily.

15   Q.  Do you know -- what's your payment structure with them?

16   A.  Monthly.

17   Q.  Do you know of other vendors who could provide the same

18   services of the same quality in the time frame needed?

19   A.  No.

20   Q.  Do they have a lien?

21   A.  No.

22   Q.  And do they provide goods within the 20 days prior to

23   filing?

24   A.  No.

25   Q.  Are any of the vendors on this list not receiving payment on

1   their prepetition debt prior to confirmation?

2   A.  Can you ask that again?

3   Q.  Do any of these vendors on this list, are any of them not

4   expected to receive payment until confirmation of the plan?

5   A.  No.

6   Q.  How about Bunge Canada?  Is it anticipated to receive

7   payments from now until confirmation?

8   A.  No.

9   Q.  And how PerforMix, is it anticipated to receive payments

10  from now until confirmation?

11  A.  No.

12  Q.  And how about Verserion, is it anticipated to receive

13  payments between now and confirmation?

14  A.  No.

15  Q.  How about Viterra?  Is it anticipated to receive payments

16  between now and confirmation?

17  A.  No.

18  Q.  And what about Floyd Lilly?  Is it anticipated to receive

19  payments between now and confirmation?

20  A.  No.

21  Q.  And what about Schow's Truck Center, is it anticipated to

22  receive payments between now and confirmation?

23  A.  No.

24  Q.  And why are they going to continue -- well, are they going

25  to continue working with you during this time period?

```
 1    A.  Yes.

 2    Q.  And why are they willing to continue working with you absent

 3    payments during this period between now and confirmation?

 4    A.  Just because I could negotiate that.

 5    Q.  And will they be working with you on a COD basis?

 6    A.  Yes.

 7    Q.  Did they -- why are they listed on the critical vendor list?

 8    A.  Because I believe they will quit me if they don't get put

 9    down as a critical vendor.  It's important to them.

10    Q.  Why do you think that?

11    A.  I can't answer that question.  It's important to them.

12    Q.  Did you work with all of these vendors during the

13    receivership?

14    A.  Yes.

15    Q.  Were these -- were these vendors impacted during the

16    receivership?

17    A.  Greatly.

18    Q.  How so?

19    A.  They were used to dealing with me and being able to call me

20    and getting a straight answer and that changed when the

21    receivership started.

22    Q.  Have you had discussions with each of these vendors

23    regarding an ongoing relationship with them?

24    A.  I think all of them, yes.

25    Q.  And based on those discussions, do you believe they will
```

1  continue to work with the company if they don't get paid for at

2  least some of the prepetition amount?

3  A.  I'm afraid no.  A lot of them will not.

4  Q.  What would happen if you couldn't receive these services and

5  goods from these vendors?

6  A.  My business would go into crisis mode.

7  Q.  Would it survive?

8  A.  No.

9  Q.  Did you solicit proposals for DIP financing prior to filing

10  bankruptcy?

11  A.  Yes.

12       MS. MIKKILINENI:  Your Honor, I think we'd like to take

13  a quick break.  Is that all right?

14       COURT:  If we're at a good stopping point, why don't we

15  go ahead and take about a 10-minute break or so.  All right?

16       MS. MIKKILINENI:  Thank you.

17       COURT:  We'll be in recess.

18       CLERK:  All rise, please.

19                              (Recess taken.)

20       COURT:  Thank you.  Please be seated.  All right.  We

21  are back on the record.  Are you ready to proceed, Ms.

22  Mikkilineni?

23       MS. MIKKILINENI:  Yes.  Thank you, Your Honor.

24       COURT:  Please go ahead.

25  BY MS. MIKKILINENI:

1   Q.  Mr. Millenkamp, going back to this critical vendor list just

2   for a minute, you testified about Standlee Premium Products; is

3   that correct?

4   A.  Correct.

5   Q.  Do you agree that based on Standlee's objection, the correct

6   party you owe funds to is the one listed in the objection and

7   not this one?

8   A.  Yes.

9   Q.  And on the critical vendor summary for the 20 day claim

10  amounts, you rounded the amount owed to the nearest dollar on

11  quite a few of them.  Is the true amount that's owed what's

12  listed on this sheet?

13  A.  Yes.

14  Q.  And did you solicit proposals for DIP financing prior to

15  filing bankruptcy?

16  A.  Yes.

17  Q.  And who did you contact?

18  A.  MetLife, Rabo, Sandton, Conterra.

19  Q.  And did you engage Forbes?

20  A.  And Forbes, yes.

21  Q.  Did you engage in negotiations with any of those lenders?

22  A.  Yes.

23  Q.  Who did you engage in negotiations with?

24  A.  Rabo, Sandton and Idaho Milk.

25  Q.  Were you able to find any financing that would have been

1    unsecured?

2    A.   No.

3    Q.   Were you able to find any financing that did not include a

4    priming lien?

5    A.   No.

6    Q.   And how many parties submitted DIP proposals?

7    A.   Two.

8    Q.   Who were those?

9    A.   Sandton and Rabo.

10    Q.   And did Idaho Milk submit one as well?

11    A.   They did.

12    Q.   Did you engage in negotiations with Sandton prior to filing

13    the DIP motion?

14    A.   Yes.

15    Q.   And who did you speak with?

16    A.   Bobby Rice.

17    Q.   Were the negotiations fair?

18    A.   Yes.

19    Q.   And why do you say that?

20    A.   We did a little due diligence on them on some dairy work

21    that they did a few years ago and guys that I know.  So that's

22    where we started.

23    Q.   And was Millenkamp Cattle represented by counsel during the

24    negotiations?

25    A.   Yes.

1    Q.  Did you negotiate with Sandton after the DIP motion was

2    filed?

3    A.  Yes.

4    Q.  Did the debtors raise and sell steer?

5    A.  Yes.

6    Q.  Will you please explain how this operation works?

7    A.  My steer operation, all the cattle that we get come in as

8    baby calves.  The two sources is my own dairy and the second

9    source is other dairy farmers that we buy calves from and when

10   we sell them, we usually sell them in two different buckets.

11   One is a feeder calf -- so feeder cattle and the second one

12   would be fats.  So we have cattle coming and going all the time.

13   Q.  And what happens to the sale proceeds from the sale of the

14   steer?

15   A.  They get deposited into our operating line.

16   Q.  And what do you use the funds for?

17   A.  We buy more feed and buy more calves.

18   Q.  Are you ever liquidating steer and not replacing them?

19   A.  Only when Rabo takes the money.

20   Q.  So does your business model include liquidation of steers

21   with no replacement?

22   A.  No.

23   Q.  Has the herd size materially changed since December?

24   A.  No.

25   Q.  Does your cattle inventory on a rolling three-month basis

1    change significantly?

2    A.   No.

3    Q.   Do you have any water issues on your farm?

4    A.   Not that I know of.

5    Q.   Are there any projects to increase availability water

6    supply?

7    A.   Yes.

8    Q.   And what is that?  What are those?

9    A.   The main one that we're working on right now, it's called

10   the Raft River Recharge Group and it's a project that seven

11   farmers and I are going to go together and build a pipeline

12   that's 13 miles long from the Snake River up into our farms.

13        It started off that we were going to privately fund it.

14   The purpose of the pipeline is to bring river water in and

15   recharge the aquifer with it.  And for those of you that don't

16   know what that is, right now, this is the type of year you'll

17   have extra water that we can't hold all the water in our

18   reservoirs so the governor controls it and sends it to the

19   ocean.

20        And instead of doing that, he says you can go use it

21   and by using it, we'll pump the water out of the river when we

22   have high flows into the aquifer and the aquifer's like a piggy

23   bank.  So when we put water into the ground through recharge,

24   it's metered and then later that water can be pumped back out of

25   the ground and used as irrigation.

```
1          So that would be part of a mitigation plan on any of
2   our farms that if we're short on water or potentially if we have
3   any sort of future water call, we would be able to mitigate our
4   issues by using that water.
5          And also the second thing we're doing with that pipe-
6   line is we'll either buy or rent water.  There are people in
7   Idaho that have extra water and we can rent it so we'll actually
8   bring water in the same pipe and direct irrigate our ground.  So
9   that pipeline is two additional sources of water that we
10  previously don't have.
11         The farm by itself, the water rights, the actual
12  physical water on my farm is very good.  This will make it
13  exceptionally good.  We're doing that for unforeseen things in
14  the future.  We've been able to get some federal and state
15  grants.  $50 million project.  We've got 32 million dollars
16  worth of funding so far and are digging to find a little bit.
17  So it's an exciting project.  So the answer's we have great
18  water.
19  Q.  And for the digester, who's financing the digester?
20  A.  The digester's owned by BP, British Petroleum and Clean
21  Energy.
22  Q.  And so do they pay for the construction?
23  A.  Yes.  They pay for 100 percent of the construction and we
24  lease them the ground that it's being built on.
25  Q.  And do you have any concerns it won't be completed?
```

1    A.  I have no concerns that it will be completed.

2    Q.  And what's the current status of the construction of the

3    digester?

4    A.  Somebody brought up that the project is late.  Yes, the

5    construction project is late.  It has nothing to do with us.  It

6    had to do with some construction issues.  But yeah, there's 100

7    and some construction guys out there as of yesterday so unless

8    they all walked out this morning, there's 100 men out there

9    putting it together and actually yesterday was the first day we

10   started supplying the digester with manure.  So that was kind of

11   exciting on the dairy side of things and hopefully by early next

12   spring, we'll be selling gas -- generating gas and selling gas.

13   Q.  Did the 2022 appraisal include any value for the digester?

14   A.  No.

15   Q.  The livestock appraisal conducted by Todd Davis, did it

16   include any cattle that were not owned by Millenkamp Cattle?

17   A.  No.  And Todd was made aware of the fact that we raise

18   cattle for other people and was told which color tags and whose

19   cattle those were.

20   Q.  And so were those custom calves included in his total amount

21   on the inventory?

22   A.  No.  And every dairy's calves are identified with individual

23   colored ear tags.  Most of them have the dairy names in the tags

24   along with brands -- physical brands so it would be very -- next

25   to impossible for him to miss identify the cattle.

1    Q.  Other than your junk pile of equipment, is any of your

2    equipment in a condition different from what Mr. Harding saw?

3    A.  No.  Only the pickup I drive.

4    Q.  If you were to put your whole operation on the market, would

5    there be a competitive market for it?

6    A.  That's a good question.  I would say there would be a very

7    competitive market.  People will try to put a twist on it that

8    it's too big.  It can't be sold.  I kind of laugh at that.

9           There's a lot of rich people, a lot of rich companies

10   in the United States.  I know at least a dozen diarymen that are

11   big enough to buy something like that.  These are guys across

12   the United States I know personally with dairies much larger

13   than I.  For example, Nelson Faria out of Texas milks 200,000.

14   Ron Offutt of Columbia River who's the biggest John Deere dealer

15   in the United States, multi billionaire, he would like to buy

16   it.  Tim (inaudible), Riverview Dairies, they milk 120, 30,000

17   cows.  The LDS church, Bill Gates.  Now Elon Musk is buying

18   ground and then our place is unique.

19          To find a dairy that's big enough and then you bring up

20   the water with a fantastic water, that's unique.  Big enough to

21   build a milk plant on.  That would be highly sought after by

22   potential -- probably potential milk processors or, you know,

23   other companies like that.

24   Q.  What's the measurement for how much milk a cow should

25   produce?

1    A.  There's -- there was four people in this room that could

2    understand milk production in here today.  Two of them work for

3    Kander.  Dave Heida's the other one and Todd Davis just left.

4    Otherwise most everybody here don't understand milk production

5    so it's funny to listen to people talk about something they

6    don't know.

7         Todd misspoke.  Cows are getting 59 pounds of milk.

8    That's not 54 pounds of milk and you cannot judge one herd

9    against another.  My herd's extremely young.  It's got a lot of

10   heifers.  First lactation, they don't get much milk.  So for

11   anybody to talk about my cows versus the next herd of cows,

12   you'd have to know the exact age of my cows, where they're at on

13   their lactation curve and lots of other things.  My cows are

14   best of class.

15   Q.  And how do you measure how much milk a cow should produce?

16   A.  It's pounds of milk.  Our milking equipment has meters so we

17   know every time the cow gets milked how much milk it gives.  It

18   shows up on my phone several times a day how much milk we're

19   getting.

20   Q.  And do you know what Millenkamp Cattle's average milk

21   production is?

22   A.  61 pounds as of today.  60 yesterday and over the last 30

23   days, like 59 pounds.

24   Q.  And how does that current number compare with the past year?

25   A.  Similar.  Milk goes down in the winter and comes up in the

 1    summer.  That's just how cows work.

 2            MS. MIKKILINENI:  I have no further questions.

 3            WITNESS:  I got to clarify.  There's a (inaudible) in

 4    the back row that might know something about milk production

 5    too.

 6            COURT:  All right.  Cross-examination.  Counsel for

 7    Rabo Agrifinance.

 8            MS. SCHWAGER:  Yes, Your Honor.

 9                          CROSS-EXAMINATION

10    QUESTIONS BY MS. SCHWAGER:

11    Q.  Good afternoon, Mr. Millenkamp.

12    A.  Hi, Sheila.

13    Q.  Mr. Millenkamp, do you recall in your initial budget that

14    you filed for Sandton that you filed on April 2, 2024, you had

15    contemplated selling $11 million worth of livestock and then

16    using those proceeds to operate?  Do you recall that?

17    A.  I'm not sure.  You talked a lot about a lot of different

18    things.

19    Q.  Okay.  So if I can have you turn to Exhibit 3030 in the

20    white notebook or you can look at the screen.

21    A.  What do you want me to look at?

22    Q.  So you have on net cattle sales receipts, you have that you

23    anticipate by August -- August 11, 2024, selling 11,231,000.  Do

24    you see that?

25    A.  What is this?  I don't even know what I'm looking at.

1  Q.  This would be the budget that you filed in support of your

2  motion to obtain financing from Sandton on April 2, 2024.  And

3  the exhibits are in the white binders if you want to look at the

4  entire exhibit rather than one page.  So the question was do you

5  recall that in that budget that you anticipated selling $11

6  million worth of livestock and using those proceeds to operate?

7  A.  Over what period of time?

8  Q.  Well, in the budget that you filed with the Court, it says

9  through August 11, 2024.  So as part of your DIP budget, you

10 were proposing to sell livestock of approximately $11 million.

11 Do you recall that?

12 A.  Yes.

13 Q.  Okay.  And now in your new budget, you are proposing to sell

14 almost 13 million.  It was $12,942,475 worth of livestock.  Do

15 you recall that?  Would you like to see that exhibit?

16 A.  I don't need to.  I'll agree with you on that.

17 Q.  Okay.  So I had a question of why from the April 2 budget to

18 the current budget you filed on May 1 that you've increased the

19 sale of livestock from the 11 million to the 13 million.

20 A.  The income off those cattle probably went up that much.

21 Q.  So it's not that you're selling additional cattle?

22 A.  I don't think so.

23 Q.  Well, it's your budget.  So what do you -- what do you

24 recall when you put in 13 million?

25 A.  I don't 100 percent recall but if I had to take a guess, I'm

1    going to say that we increased the income off the cattle.

2    Q.  Okay.  And is that -- so are you speculating what cattle are

3    going to bring -- that it's going to bring in 2 million more in

4    this May 1 budget than in the April 2 budget?  Let me ask it a

5    different way.  That wasn't a fair question.  Why do you believe

6    that now that the value of the livestock is $2 million more?

7    A.  I'll answer it the way that Todd Davis did.  Off the board,

8    off cattle -- what cattle are bringing.  But again, I'm not

9    educated so I can only go off what I know, Sheila.  Cattle are

10   bringing more.

11   Q.  So we can't rely upon the $13 million because you're not

12   educated?  Is that what you're saying?

13   A.  That's up to you to decide.

14   Q.  Okay.  Fair enough.

15   A.  But my team thinks that's what the cattle are going to

16   bring.

17   Q.  Okay.  And who's on your team?

18   A.  David Heida, Kander and I talked to Todd Davis and a lot of

19   other people in the cattle industry.

20   Q.  Okay.  And now you want to use these $13 million in

21   livestock proceeds to operate, correct?

22   A.  Correct.

23   Q.  Now, at the last hearing when I pointed out the fact that

24   you did not propose to apply the $11 million in cattle proceeds

25   to the loans that were owed to Rabo for the loss of that

1    collateral, you said, quote, that's because we're going to

2    replace them with another $11 million worth of cattle.  Do you

3    recall that testimony?

4    A.  Yes.

5    Q.  And you testified that the value of the cattle will stay the

6    same during the process.  Do you recall that testimony?

7    A.  Yes.

8    Q.  But isn't it true that after that hearing, you stated that

9    the livestock would only be replaced with calves, correct?

10   A.  Correct.

11   Q.  And calves are not valued as the value of the livestock

12   being sold to generate the $13 million, correct?

13   A.  I don't understand -- I don't understand what you just said.

14   Q.  Sure.  So you said we're going to replace it with the same

15   value but the livestock you sold for 13 million, when you

16   purchase the calves, the calves are not worth 13 million when

17   you purchase them, correct?

18   A.  Correct.

19   Q.  So it's not a true statement that during the process, the

20   value of the cattle will stay the same?

21   A.  Sheila, talking to you about this is like talking milk

22   production.  It's a -- it's a revolving circle when you --

23   Q.  First of all -- first of all, we're in court.

24   A.  Yes.

25   Q.  So it's Ms. Schwager.

1    A.   Okay.

2    Q.   Go ahead.

3    A.   When you're in court then, don't laugh at me.

4         COURT:   Let's try and answer the question, folks.

5         WITNESS:   Sorry.

6    BY MR. CHRISTENSEN:

7    Q.   Go ahead.

8    A.   Can you ask the question again?

9    Q.   Okay.  You said that you were going to replace -- that the

10   value during the process would remain the same.  That's what

11   your testimony was.  But if you're replacing the sold cattle

12   that you bring in $13 million in proceeds with calves, on that

13   day, those calves are not valued as high of what you just sold.

14   Correct?

15   A.   I can't answer that question.  It doesn't make sense.

16   Q.   When you sell a beef cow, I think you testified -- estimated

17   1500 a head, right?

18   A.   Is that a question?

19   Q.   Yeah.

20   A.   What's your question?

21   Q.   Are beef cattle 1500 a head?  Is that what you estimate that

22   you could sell it for?

23   A.   What kind of beef cow?

24   Q.   Any beef cow.

25   A.   Some would bring 1500.  Some would bring more.  Some would

1    bring less, yes.

2    Q.   Okay.  And when you buy on that same day -- so you sell that

3    beef cattle for 1500 a head.

4    A.   Uh-huh.

5    Q.   And you bur a calf, how much is that calf worth?

6    A.   Every day, it's different.  Today they're worth $750.

7    Q.   Right.  So when you replace the $11 million or the $13

8    million of cattle that you just sold with calves, they do not

9    equate to the same value of what you just sold on that day that

10   you buy them.

11   A.   Your questioning does not make sense.  I can't answer that.

12   It doesn't make sense.

13   Q.   Why doesn't it make sense?  You said the cow's worth 700

14   when you buy it and you just sold a beef cow for 1500.  So on

15   that day, your livestock value is not -- does not equate to the

16   1500.  It's 700, correct?

17   A.   If you're asking me what a $1500 animal's worth, I guess I'd

18   say it's 15 and if you're asking me what a baby calf's worth,

19   it's 7, 750.

20   Q.   Correct.

21   A.   I don't get the rest of your questioning.

22   Q.   That's fine.

23   A.   Because you have to take feed -- the feed that you put into

24   the animals daily adds to the value of the whole herd.

25   Q.   Sure.  But if you have to liquidate on the day that you just

1  bought that calf, you're not going to get 1500, correct?  You're

2  going to get 700.  So the value does not consistently stay the

3  same during the process.

4  A.  You don't buy $1500/$700 calves on one day and that's how it

5  works.

6  Q.  Well, are you intending to buy -- let me step back.  Are you

7  intending that on -- that the value of the livestock will never

8  be less on any given day?

9  A.  I'm saying it rotates but it's going to stay real close to

10  the same value.

11  Q.  When you replace the livestock, you're not replacing it with

12  a cow that is worth as much as what you just sold.  Correct?

13  A.  Correct.

14  Q.  So the value does go down from the day you sell the cow and

15  you purchase the calf.

16  A.  No.

17  Q.  Tell me why not on that day --

18  A.  I don't think you can understand it, Sheila.

19  Q.  You're right.

20  A.  Ms. Schwager, sorry.

21  Q.  But why don't you try me.

22  A.  I tried.

23  Q.  I haven't heard an explanation.

24  A.  I told you that a calf costs $750.  You got -- you have to

25  figure out the feed that we're putting into it daily and you

1  don't want to talk about that so I can't answer your question.

2  Q.  Well, actually the question was on the day that you sell the

3  $1500 livestock --

4  A.  Yes.

5  Q.  -- and you purchase the $700 calf.  If there was a

6  foreclosure on that day, then the lender does not receive $1500.

7  It receives 700, correct?

8  A.  I can't answer your question, Sheila.  It makes no sense.

9  Q.  That's all right.  We'll do the math.  Okay.  Can I have you

10 turn to Exhibit 1026 and that -- you guys have a binder up

11 there, don't you?  Can you turn to the -- it's a smaller binder

12 and it has Exhibit 1026.

13 A.  What's the binder say?

14 Q.  What's your binder say?

15        CLERK:  It should be 2.

16        MR. CHRISTENSEN:  Yeah.  It's the one that doesn't have

17 anything on the end.

18        WITNESS:  Okay.  What page?

19 BY MR. CHRISTENSEN:

20 Q.  It's Exhibit 1026.

21 A.  Do you know which one?  This one has all 3000's.

22 Q.  No.  It's the black binder that doesn't have the label.

23 A.  1026?

24 Q.  Correct.

25 A.  I got it.

235

1    Q.  And do you recognize Exhibit 1026 as the budget that you've

2    submitted before this Court to request DIP financing?

3    A.  Yes.

4    Q.  And if you turn to the third page of that exhibit, if you

5    don't get a DIP loan, you would be short as of August 11, 2024,

6    by 27,187,314, correct?

7    A.  Do you have a page?

8    Q.  Yeah.  Page 3.

9    A.  Mine says -- the third page of Exhibit 1026?

10   Q.  Correct.

11   A.  My page says 8 of 26.

12   Q.  Correct.

13   A.  Okay.

14   Q.  And you see -- so making sure I'm reading this budget

15   correctly, it appears that as of August 11, 2024, that if you

16   don't receive a DIP loan, you are short 27,187,314; is that

17   correct?

18   A.  Correct.

19   Q.  So the income that's being generated from your operations is

20   insufficient to pay all the expenses of the operations, correct?

21   A.  Correct.

22   Q.  And you're seeking 45 million for the DIP financing; not the

23   27 million that's set forth in the budget.  Is that correct?

24   A.  Correct.

25   Q.  Why didn't you present a budget that encompassed the entire

1    DIP loan request?

2    A.  I don't know why the financial advisors turned it in like

3    that.

4    Q.  And did you ask them?

5    A.  This goes to August.  We don't buy silage until September

6    and October.  Perhaps that's the reason that we didn't ask for

7    the additional funds for the upcoming harvest.

8    Q.  But you are asking the Court to authorize $45 million.  So

9    why not present a budget that would advise your creditors what

10   you intend to specifically spend that money on?

11   A.  I'm not sure.  I think we were asked to provide a budget up

12   to August 11 and I think that's what the needs were up to that

13   date.

14   Q.  So are you asking for 45 million or are you asking for 27

15   million?

16   A.  45.

17   Q.  Okay.  And you don't -- do you have a current budget back at

18   the office that actually details and goes through a $45 million

19   request?

20   A.  I don't know if we have one at the office.

21   Q.  You haven't seen one?

22   A.  Not that I recall.

23   Q.  Okay.  Now, at the prior hearing, you testified that prior

24   to the bankruptcy, Rabo was willing to provide a DIP loan but

25   only up to the amount that you could sell certain real property.

1  Do you recall that testimony?

2  A.  Correct.

3  Q.  And you stated that Homestead had made an offer of 16

4  million on that real property.  Do you recall that?

5  A.  Yes.

6  Q.  And you thought that was too low of a purchase price.  Is

7  that correct?

8  A.  Correct.

9  Q.  What did you think it was worth?

10  A.  Significantly higher.

11  Q.  How much higher?  Did you have a number that you thought was

12  the appropriate value?

13  A.  Yeah.  My uneducated guess would have been 30, 40 percent

14  less than what market is.  But maybe even higher.

15  Q.  And what was market?

16  A.  What was market?  I don't remember.  Whatever the appraisal

17  would say.

18  Q.  You have an appraisal on the Homestead property?

19  A.  On the --

20  Q.  On the property that Homestead had offered to do a sell

21  lease back?

22  A.  Can you ask that again?

23  Q.  Yeah.  Do you have an appraisal on the property that

24  Homestead was interested in?

25  A.  We have an appraisal for -- on all of our ground.

1   Q.  And what is the value of the property in the appraisal that

2   Homestead was interested in?

3   A.  I don't recall off the top of my head.

4   Q.  Was it -- you said 16 million -- you testified that 16

5   million was substantially below value.  You had to have a value

6   in mind to determine that it was below that value.

7   A.  I didn't go -- I didn't go real hard to analyze or run any

8   spreadsheets on it because it was so grossly undervalued by you

9   guys.  I didn't put a lot of thought to it.

10  Q.  And why do you say it's undervalued by you guys?  Wasn't it

11  Homestead that had made that offer?

12  A.  Rabo and Homestead is the same in my mind.

13  Q.  And why do you think they're the same?

14  A.  Because Rabo had a participant who was Bank of the West on

15  my loan.  They started getting into some sort of quarrels over

16  my account and they had a tie vote.  So Rabo wasn't getting

17  their way so they needed to bring another bank in which was

18  Homestead so they could have a tie breaking vote.  That was --

19  in my opinion, that was Homestead doing Rabo a favor and in

20  return, the favor back to Homestead would be selling my farm 30,

21  40 percent under market value to them.  That's what I believe

22  was being done.

23  Q.  Was Rabo the one selling your farm?

24  A.  Rabo was the one forcing me to sell my farm to their old

25  partner.

```
1    Q.  Did you sell the farm?

2    A.  No, I didn't sell my farm because I found Sandton.

3    Q.  Did you look at any other parties to see if they were

4    interested in purchasing the Homestead property -- I call it the

5    Homestead property.  The property that Homestead was interested

6    in.

7    A.  No.

8    Q.  And why is that?

9    A.  I didn't need to.  We found Sandton.

10   Q.  Because you don't want to sell any real property; is that

11   correct?

12   A.  I leave all options on the table open.

13   Q.  So if all options are left on the table -- because you're

14   still going to have to pay back Sandton, right?

15   A.  Yes.

16   Q.  So if all options are on the table, why haven't you looked

17   at selling that property to another party for a higher price?

18   A.  Because the banks that I'm talking to refinancing me would

19   rather have me keep land and not sell land.

20   Q.  Which banks have you talked to that have told you they don't

21   want you to sell any land?

22   A.  Idaho Ag Credit, American Ag, MetLife, Sandton.

23   Q.  I'm sorry.  Sorry.  Slow down for me.  Idaho Ag.  Who was

24   the second one?

25   A.  American Ag.
```

1    Q.  And MetLife?

2    A.  MetLife.

3    Q.  And Sandton.

4    A.  Sandton.

5    Q.  They told you they don't want you to sell any of your

6    property.

7    A.  Idaho Ag and American Ag says they feel like we're much more

8    financeable and profitable having a larger land base.  Talking

9    to MetLife, MetLife's not going to want us to sell land off so

10   they can just finance buildings.  Buildings are sometimes a

11   depreciable asset.  Land's an appreciable asset.  So yes, we've

12   had conversations with them.  And the brief conversations I had

13   with Bobby Rice, he likes land.  We didn't go into depth great

14   detail on exit.

15   Q.  You said Mr. Rice who's Sandton's -- that's your main

16   contact at Sandton?

17   A.  Yes.

18   Q.  That they like real property.  Is that what you just said?

19   A.  They like guys that make money and they know our land base

20   makes money so we didn't get into a lot of detail about selling

21   off chunks of ground.

22   Q.  Because do you recall that at the argument -- oral argument,

23   they stated that they're not an ag lender -- or real property

24   lender and so they didn't want to release their interest in

25   personal property.  Do you recall that?

```
 1   A.  Can you ask that again?

 2   Q.  Yeah.  Do you recall at oral argument that Sandton argued

 3   they did not want to release -- they still wanted to prime the

 4   personal property because they are not a real property lender?

 5   A.  Yes.

 6   Q.  Okay.  Has Idaho Ag agreed to --

 7          MR. KURTZ:  Your Honor, we'll object on behalf of

 8   Sandton.  Sandton did not testify or give argument.  I'll just

 9   put that on the record.

10          MR. CHRISTENSEN:  Okay.  That's fine.

11          COURT:  The objection's overruled.

12   BY MR. CHRISTENSEN:

13   Q.  At the -- did Idaho Ag provide a loan to you?

14   A.  No.  They provided a term sheet to me.

15   Q.  Right.  And so they weren't willing to refinance; is that

16   correct?

17   A.  No.

18   Q.  Even though they discussed with you about you keeping your

19   land base; is that correct?

20   A.  Correct.

21   Q.  And then who was the second one?  American?

22   A.  American Ag.

23   Q.  Did American Ag agree to refinance you?

24   A.  American Ag and Idaho Ag work together.  They're two

25   participants.
```

1    Q.   So is that a no?

2    A.   That means they work together on the same one.

3    Q.   Right.  Did they not agree to refinance you?

4    A.   No, they did not.

5    Q.   Okay.  And then you had asked for additional loans from

6    MetLife.  Did MetLife agree to issue you additional loans?

7    A.   Not yet.

8    Q.   Have they provided you a term sheet of a loan that they will

9    issue to you?

10   A.   Not yet.

11   Q.   Now, earlier today, you testified about a loan agreement

12   that you had reached with Sandton on April 11, 2024.  Do you

13   recall that?

14   A.   Yes.

15   Q.   Did you ever sign that loan agreement?

16   A.   With Sandton?

17   Q.   Right.

18   A.   I believe we did.

19   Q.   Can I have you turn to Exhibit 1029?  It's in that same

20   notebook that you're looking at.  Can you go to the signature

21   pages?  So this is the loan agreement that was filed with the

22   Court and it was refiled as Exhibit 1029 for today's hearing and

23   I didn't understand why it wasn't a signed agreement.  Do you

24   know?

25   A.   No.

1   Q.  But you do recall physically signing a loan agreement for

2   Sandton?

3   A.  I think so.

4   Q.  Why do you think so?

5   A.  I just think we did.

6   Q.  But you don't recall physically doing it?

7   A.  I believe we did, yes.

8   Q.  Okay.  Do you know whether there were any changes made

9   before you signed it from the document that's filed with the

10  Court versus what you signed?

11  A.  I don't remember.

12  Q.  Now, under the terms of this unsigned agreement, but I will

13  go with your testimony that you signed one, you have to repay

14  the DIP loan within nine months or earlier, depending on what

15  occurs during the bankruptcy.  Is that correct?  That's your

16  maturity date?

17  A.  I think it's nine months plus three maybe.

18  Q.  And you can -- three is if you pay a fee; is that correct?

19  A.  I believe so.

20  Q.  Is it a $675,000 fee?

21  A.  Yes.

22  Q.  How do you expect to pay that DIP loan back in 9 months or

23  12 months?

24  A.  I hope to be refinanced.

25  Q.  And again, do you have any term sheets for a refinance at

1    this point?

2    A.  Not yet.

3    Q.  You testified a month ago that you were talking to multiple

4    people to obtain a refinance.  Have you reached an agreement

5    with any of those people?

6    A.  No.

7    Q.  And no term sheets I guess.  Have you discussed any loan

8    terms with any lender since the last hearing a month ago?

9    A.  No.  Not in great detail.

10   Q.  So at this point in time, it's a hope that you are able to

11   find a lender that can refinance that DIP loan; is that correct?

12   A.  Correct.

13   Q.  Now, you signed an engagement letter with Forbes in March --

14   on March 22, 2024, correct?

15   A.  Correct.

16   Q.  And this was after Rabo had filed its petition for the

17   appointment of a receivership, correct?

18   A.  Correct.

19   Q.  Can I have you turn to Exhibit 3060 which is in the black

20   binder and it's Volume 3.

21   A.  Which one?

22   Q.  Exhibit 3060.  So it's Volume 3.

23   A.  3060?

24   Q.  Yeah.  Are you there?

25   A.  I'm here.

```
 1   Q.  Okay.  And this is an e-mail from David Heida to you and
 2   others at Forbes, correct?
 3   A.  Yes.
 4   Q.  And David Heida's your general manager; is that correct?
 5   A.  Yes.
 6   Q.  And so did both you and David review what I refer to as the
 7   CIM?
 8   A.  I don't remember.
 9   Q.  If you reviewed it?
10   A.  I don't remember if we specifically went over it.
11   Q.  Okay.  So on page 1 -- page 1, it said that there were
12   several -- several notes from Bill.  Please see the attached for
13   review.  There are several notes from Bill and I.  Does that
14   refresh your memory of whether or not you have reviewed the CIM?
15   A.  No.
16   Q.  Okay.  Well, let's take a look at it and see if that can
17   refresh your memory.  And before we do that, did you ultimately
18   approve a final CIM?
19   A.  I don't remember.
20   Q.  What do you remember about Forbes and the CIM process?
21   A.  I knew there was a CIM being created and there was
22   information and requests being made by Forbes to David and there
23   was a lot of information going back and forth.
24   Q.  And were you having discussions with David or were you
25   letting him run with it?
```

```
 1    A.  I think he was taking the lead on it but we did have some
 2    discussions.
 3    Q.  Okay.  Can you turn to the page that says executive summary,
 4    page 5 on the bottom.  It has page numbers.  Were you here
 5    earlier today when I was examining the Forbes witness?
 6    A.  Yes, I was.
 7    Q.  So you recall that we talked about the fact that the CIM
 8    doesn't disclose a maturity forbearance.  Instead, it refers to
 9    that there was a forbearance entered from trigger covenants.  Do
10    you see that?
11    A.  Yes.
12    Q.  Do you know what that reference means, trigger covenants?
13    A.  I'm not sure.
14    Q.  Do you have financial covenants that your loan documents are
15    subjected to?
16    A.  Yes.
17    Q.  Do you think that that's what it was referring to?
18    A.  Probably.
19    Q.  Do you ever remember reviewing a page of a CIM that
20    discussed Rabo and the loan and default?
21    A.  No.
22    Q.  Is that not something that would have -- you would have been
23    involved in to attempt to obtain financing?
24    A.  I don't remember reviewing this.
25    Q.  If you had reviewed it and saw that it referenced triggered
```

1    covenants and that's why Rabo entered into the forbearance

2    agreement, would you have requested that they disclose about the

3    matured loan of June of 2022?

4    A.  I suppose I would if I was asked, yeah.

5    Q.  Okay.  Do you expect Mr. Heida to provide that information

6    to your investment banker?

7    A.  I don't know what the investment banker knew or didn't know.

8    Q.  Would it concern you if a document goes out to potential

9    lenders that doesn't reflect the true situation with Rabo?

10   A.  Can you ask that again?

11   Q.  Yeah.  Does it actually -- no.  I can't.  Sorry.  But that

12   was good.  Would you expect Mr. Heida to provide accurate

13   information and have the CIM disclose accurate information --

14   A.  Yes.

15   Q.  -- for potential lenders?

16   A.  Yes.

17   Q.  And would you expect the CIM to disclose the fact that you

18   were in receivership?

19   A.  Yes.  Actually, I don't know what the CIM'S supposed to have

20   or not have so I don't know what the rules are of what Forbes

21   should be doing.

22   Q.  Do you think that it's relevant to potential lenders if

23   Millenkamp operations are in a receivership or not?

24   A.  I think it's funny that it gets brought up because if you

25   Google Millenkamp, it says bankruptcy.  So there's not a person

1    in the country that's going to look me up and not know the

2    position I'm in.  So I actually think it's irrelevant.  But yes,

3    I would like it disclosed, of course.

4    Q.  But you don't think it would be relevant to a lender who was

5    trying to determine whether or not to provide financing?  Is

6    that what you just said?

7    A.  I don't believe there's a lender in the country that will

8    borrow that much money without doing their due diligence.  And

9    anybody that is going to borrow me a couple hundred million is

10   going to know exactly where we're at.

11   Q.  So it would be relevant if you were in receivership is what

12   you're saying.

13   A.  I don't know if it would be relevant to a lender or not.

14   Q.  Okay.

15   A.  They're going to know our financials, they're going to know

16   where they're at -- where we're at and they're going to do their

17   own due diligence.  So I don't know if it would make a

18   difference to them whether we're in receivership or not.

19   Q.  Are healthy companies -- healthy financial companies often

20   times in receivership?

21   A.  I believe I'm a healthy company that's in a banking issue.

22   Q.  Okay.  Let's go to the next page, page 6.  And on this page,

23   it states that you're going to grow revenue through a dairy herd

24   expansion.  Is that an accurate statement?

25   A.  We could.

1   Q.  During the bankruptcy?

2   A.  Probably not.

3   Q.  So would that be an inaccurate statement going out to

4   potential lenders?

5   A.  It depends how you look at that.  I mean milk price has gone

6   up 4 bucks recently.  I mean that's kind of changed our world in

7   the last month.

8   Q.  So are you anticipating expanding your dairy herd during the

9   bankruptcy?

10  A.  Are you talking expansion on revenue or expansion on actual

11  milking cows?

12  Q.  Well, this says expanding the dairy herd.

13  A.  We're going to have some internal growth on the cattle that

14  are coming in so maybe that's what they're talking about.

15  Q.  Well, they're getting this information from Millenkamp

16  operations, correct?

17  A.  Our herd is going to grow itself with the cattle that we

18  have in our possession right now so I don't know if they're

19  referring to that or what they're referring to.  I would have to

20  ask James.

21  Q.  But you're not intending to expand the dairy herd and to

22  purchase real property during the bankruptcy process.  Is that

23  correct?

24  A.  That is correct.

25  Q.  Okay.  The CIM also represents that the personal property

1  assets are totaled at 210 million.  Do you recall that?

2  A.  Yes.

3  Q.  But in this case, you have filed a value of 170 million in

4  your exhibits so why is the value stated so much higher in the

5  CIM?

6  A.  I don't understand.  He explained it and I didn't catch what

7  he was saying so I can't help you with that.

8  Q.  But that's not an accurate statement, right, that it was 210

9  million, your personal property?

10 A.  I believe the way that he was portraying it, it was accurate

11 the way he was doing it.

12 Q.  But you didn't understand what he said?

13 A.  No, I did not.

14 Q.  And on -- it also identifies key loans and were you here for

15 the testimony -- that the Rabo loan is misstated as having a

16 maturity date of 2028?

17 A.  I didn't know that was misstated but I heard you say that.

18 Q.  Do you believe that the Rabo loan's maturity date is 2028?

19 A.  Maybe Mike changed it.  That was a joke.

20 Q.  Are you talking about Mr. Hayes of Rabo?

21 A.  No.

22 Q.  Do you know whether Mr. Hayes of Rabo changed the maturity

23 date to 2028?

24 A.  No.  No, I do not know that.

25 Q.  Okay.  Do you believe that that occurred?

1    A.  I do not believe that occurred.

2    Q.  Okay.  Can we go to page 8?  Can you turn to page 8 of that

3    exhibit?  Do you understand that the maturity date of the Rabo

4    loan was June of 2022?

5    A.  Yes.

6    Q.  And so it's been in default for two years, correct?

7    A.  Yes.  We had a forbearance after that.

8    Q.  So it states on page -- and has the forbearance been

9    terminated?

10   A.  Yes.

11   Q.  Because you defaulted on the forbearance, correct?

12   A.  I'm not sure why.

13   Q.  We will just rely on the testimony you already testified to

14   regarding the default.  Can we go to page 20 of this exhibit,

15   please?  On page 20, the CIM talks about expanding your dairy

16   herd by 38 percent and buying new property and you said that

17   that's not your intent in the bankruptcy?

18   A.  No.

19   Q.  Do you know why that's set forth in the CIM?

20   A.  I'm sure this is what he's going to -- this is what it's

21   going to look like after we're out of bankruptcy.  That's

22   probably what he's trying to sell there.

23   Q.  But it doesn't reference a bankruptcy, right?  It doesn't

24   identify -- it's page 20?

25   A.  I don't know.

1    Q.  Well, can you turn to page 20?  So your additional

2    opportunity to acquire a large contiguous lot of 10,000 acres

3    and the lot would allow the dairy herd to increase 20,000 head.

4    What is this contiguous lot that you're referring to, the 10,000

5    acres?

6    A.  We have an opportunity to buy some ground and to add to our

7    dairy if we get the finance lien that we need to do it.  I think

8    that's what he's referring to.

9    Q.  And what are the terms of that opportunity?

10   A.  I don't know the terms.  We got to find the new bank.

11   Q.  So you have no written agreement in regard to the adjacent

12   land?

13   A.  We verbally talked to people about particular farms that we

14   could potentially buy.

15   Q.  And that's talking about 2025 and beyond but do you see that

16   it says growth in the existing facility for 2024?

17   A.  Yes.

18   Q.  Potentially expanding the dairy herd 38 percent.

19   A.  Correct, correct.

20   Q.  In two years increasing the milk output substantially.

21   A.  So what -- do you have a question?

22   Q.  Is that your -- was that your intent when the CIM went out?

23   A.  I didn't create that.  It was -- I'm guessing that Forbes

24   wanted to show the new potential banks what it would look like.

25           MS. SCHWAGER:  Your Honor, can I move to admit

1    Exhibit 360?

2              COURT:  That was Exhibit 360?  3060?  I'm sorry.

3              MS. SCHWAGER:  Sorry, yes.  3060.

4              COURT:  All right.  Any objection?  Exhibit 3060 is

5    admitted.

6                   (Rabo Agrifinance Exhibit No. 3060 admitted.)

7    BY MS. SCHWAGER:

8    Q.  Mr. Millenkamp, can I have you turn to Exhibit 3061?

9    A.  Yes.

10   Q.  In November of 2022, you tried to generate interest from

11   lenders and investors by having a development banking -- banking

12   company generate and circulate a CIM, correct?

13   A.  I don't recall.  Can you tell me who that was?

14   Q.  Riveron?

15   A.  Yeah.

16   Q.  And is exhibit --

17   A.  Excuse me.  I didn't know Riveron was an investment banker.

18   I thought they were financial advisors that Rabo forced upon me

19   so I didn't know that they acted as a development banker.

20   Q.  And Riveron created this confidential information

21   memorandum, a CIM, correct?

22   A.  Yes.

23   Q.  And if you turn to the next page and flip through it, this

24   is information that Millenkamp operations had provided to

25   Riveron similar to what you had -- what Millenkamp operations

1    provided to Forbes, correct?

2    A.  I'm sure some of the information that they got on their own

3    and some was given to them.

4    Q.  Similar to what went through the Forbes process?

5    A.  Possibly.

6    Q.  Oh, except Riveron was actually at your location, is that

7    correct, so it had some of the financial information?

8    A.  Riveron I think was only on my farm maybe three times.  So

9    no, they really weren't on my farm.

10   Q.  So most of the information was obtained through Millenkamp

11   operations?

12   A.  Or they put it together just through information from the

13   bank.

14   Q.  Do you ever remember reviewing it?

15   A.  I remember seeing it, yes.

16   Q.  And did you obtain any lenders or investors to refinance

17   from those efforts?

18   A.  No.  And the reason -- the big reason for that is your cup

19   half full or half empty and after the fact, I found out they

20   were not trying to work on my behalf in good faith.  Same as our

21   receiver, Matt McKinlay.  So that was one of the reasons that we

22   didn't get too far with the Riveron group.

23   Q.  And why do you think they weren't acting in good faith?

24   A.  Because Riveron does exactly what Rabo Bank wants done and

25   that's not to see me succeed.

1   Q.  Do you agree that Rabo wanted its loan to be paid?

2   A.  Yeah.  You know what?  Now I don't think Rabo wants to be

3   repaid because they got a cash cow with me.  So no, I don't

4   think -- Rabo has had an opportunity to get bought out by

5   Conterra Bank and they refuse to engage in a conversation.  So

6   no, I do not think Rabo wants to get rid of me while they can

7   milk me.

8   Q.  Were you part of those conversations between Conterra and

9   Rabo?

10  A.  No, but I trust Paul Erickson that told me the information.

11  Q.  So it would be hearsay.

12  A.  Hearsay from a guy that I believe that wouldn't lie.

13  Q.  And do you know what the terms that were offered to Rabo for

14  the loan?  Was it to pay Rabo off in full?

15  A.  Close.  Not in full from what I heard.

16  Q.  So why if Riveron was doing what Rabo wanted and Rabo wants

17  to get paid off, why do you think Riveron wasn't attempting to

18  obtain lenders or investors?

19  A.  Riveron was charging me $80,000 a week and they were milking

20  me also so that was a great gig for them.  They charged me 2.6

21  million.  Brought no value to my operation.  So why would they

22  want to get rid of me?

23  Q.  So you believe that they didn't even attempt to find any

24  lenders or investors for you.  Is that your testimony?

25  A.  I believe they went through the motions with no effort.

1   From what I hear from other people that Riveron dealt with about

2   my operation, they said they did a very poor job trying to sell

3   my company to another bank.  Terrible job.

4   Q.  Did you take out the CIM and attempt to obtain lenders?

5   A.  Yes, I did.  Sorry.  I did not take out the CIM.  I did try

6   to find other lenders.

7   Q.  And were you successful?

8   A.  Yeah, I got a term sheet from Rabo Bank and I got a term

9   sheet from Farm Credit.

10  Q.  Were you successful in obtaining a loan to take out Rabo

11  Bank?

12  A.  No, because I could not get the money from MetLife that I

13  was promised, no.

14  Q.  So that was MetLife's fault.

15  A.  Yes, it was.

16  Q.  Okay.

17          MS. SCHWAGER:  And Your Honor, I'd move to admit

18  Exhibit 3061.

19          COURT:  Any objection?

20          MS. MIKKILINENI:  Objection, Your Honor.  This hasn't

21  been -- the foundation hasn't been laid for it.  It's also not

22  relevant.

23          MS. SCHWAGER:  Your Honor, he testified that Millenkamp

24  operations had provided the information for the CIM, that he had

25  reviewed the SIMs and that he knew Riveron was out using the

1    SIMs to solicit lenders and investors.

2           And the Forbes witness testified that the reason

3    Mr. Millenkamp couldn't obtain financing from the robust period

4    is because that nobody was out there providing SIMs and going to

5    those different type of lenders.  So I would say that it is

6    relevant and a sufficient foundation has been laid.

7           COURT:  I'm going to overrule the objection.

8    Exhibit 3061 is admitted.

9               (Rabo Agrifinance Exhibit No. 3061 admitted.)

10   BY MS. SCHWAGER:

11   Q.  Mr. Millenkamp, can I have you turn to Exhibit 3063?  Are

12   you there?

13   A.  Yes.

14   Q.  And who are James Brooks and Art Moessner?

15   A.  James Brooks works for Idaho Ag and Art Moessner works for

16   American Ag Credit.

17   Q.  And what was the amount of the loan you were attempting to

18   obtain from them in June of 2023?

19   A.  I think it was 150 million total.

20   Q.  And you did not get that loan?

21   A.  I did not get that loan.

22   Q.  Why not?

23   A.  One condition, Rabo had the same condition as Farm Credit is

24   that I receive a loan from MetLife and that never happened.

25   Q.  So this one was because of MetLife.  And then if you turn to

1    Exhibit 3064, do you recall -- do you recognize this as text

2    messages with you?

3    A.  Yes.

4    Q.  Who is -- what company is Aaron Johnson from?

5    A.  I think it's called Glendale Ag.

6    Q.  Was he attempting to facilitate a loan from Idaho Ag?

7    A.  Yes.

8    Q.  And on the second page of that exhibit, you essentially

9    state you did not like the deal being offered by Mr. Johnson.

10   Do you recall that?

11   A.  Yes.

12   Q.  Was this the $150 million deal that you just talked about?

13   A.  I was not referring to the loan amount.  I was referring to

14   what Glendale Ag, they come in with their deal.  Kind of Johnny-

15   come-lately with some extreme cost so we were also negotiating

16   that.

17   Q.  Was it like a broker?

18   A.  Yeah.

19   Q.  He was a broker?  And so it wasn't that you didn't like the

20   Idaho Ag deal.  You didn't like the additional fee?

21   A.  I loved the Idaho Ag deal.  It was a great deal.  But no, we

22   were still working on the Glendale part of it.

23   Q.  So what were the extreme costs that you were being asked to

24   pay --

25   A.  I don't remember.  It was a percentage of whatever they

1    wanted and some other miscellaneous stuff.

2    Q.  And you don't remember what the percentage was?

3    A.  I don't.

4    Q.  How did those costs relate to what you're paying Sandton's

5    fees?

6    A.  I don't recall.

7            MS. SCHWAGER:  Your Honor, can I move for the admission

8    of Exhibit 3063?

9            COURT:  Objections?  Exhibit 3063 is admitted.

10           MS. SCHWAGER:  And Your Honor, may I please move to

11   admit Exhibit 3064 which is what we just talked about.

12           COURT:  Any objections?  3064 is also admitted.

13       (Rabo Agrifinance Exhibit Nos. 3063 and 3064 admitted.)

14   BY MS. SCHWAGER:

15   Q.  And Mr. Millenkamp, can I have you turn to Exhibit 3065?

16   A.  Okay.

17   Q.  In this document, it appears that you're sending financials

18   to Sandton in September of 2023.  Do you recall why you were

19   doing that?

20   A.  No.

21   Q.  And you also sent Sandton at this time the Idaho Ag Credit

22   $150 million term sheet, correct?

23   A.  Correct.

24   Q.  Why did you do that?

25   A.  I believe we were talking to Sandton maybe about getting

```
 1   some additional financing.
 2   Q.   In September of 2023?
 3   A.   Yes.
 4   Q.   So in sending them the Idaho Ag Credit term sheet, were you
 5   wanting them to meet those terms or were they to be the MetLife
 6   aspect of it?
 7   A.   Possibly the MetLife or a piece of MetLife.
 8   Q.   Is that what you recall?
 9   A.   I was looking for options at the time.
10   Q.   Okay.
11        MS. SCHWAGER:  Your Honor, I move for the admission of
12   Exhibit 3065.
13        COURT:  Any objections?  Exhibit 3065 is admitted.
14        (Rabo Agrifinance Exhibit No. 3065 admitted.)
15   BY MS. SCHWAGER:
16   Q.   And then Mr. Millenkamp, can I have you turn to Exhibit
17   3066?
18   A.   Okay.
19   Q.   And in this e-mail, it looks like you're talking with Adam
20   Jensen about an Idaho Ag Credit loan in December of 2023; is
21   that correct?
22   A.   Correct.
23   Q.   And you're talking to Conterra about a $25 million loan; is
24   that correct?
25   A.   I don't see it on this document.
```

1    Q.  If you turn to the second page, do you see that it says

2    collateralized term loan, 25 million, and the lender is Conterra

3    Agricultural Capital?

4    A.  Okay, yes.

5    Q.  Do you recall that?

6    A.  Yes.

7    Q.  And what was going on here?

8    A.  We were talking to Conterra about refinancing a portion of

9    my land.

10   Q.  And did that come to fruition?

11   A.  No.

12         MS. SCHWAGER:  Your Honor, can I move for the admission

13   of Exhibit 3066?

14         COURT:  Any objection?  Exhibit 3066 is admitted.

15           (Rabo Agrifinance Exhibit No. 3066 admitted.)

16   BY MS. SCHWAGER:

17   Q.  Can I have you turn to the next exhibit, 3067?

18   A.  Okay.

19   Q.  So in December of 2023, did you also request that MetLife

20   advance new money of $10 million?

21   A.  I believe so.

22   Q.  And what was their response?

23   A.  They were not able to advance the money.

24   Q.  And that was despite the fact that you state that they're in

25   the first lien position of property that's valued in excess of

1    490,000, correct?

2    A.  Correct.

3    Q.  And you claim that MetLife has a substantial equity

4    position; is that correct?

5    A.  Yes.

6    Q.  Why did MetLife refuse to provide you a $10 million loan

7    despite their equity position?

8    A.  I have no clue.  You'd have to ask MetLife.

9    Q.  You'd have to ask who?

10   A.  MetLife.

11   Q.  So they didn't tell you?

12   A.  No.

13   Q.  Did you ask?

14   A.  We asked numerous times.  From what we know, MetLife is not

15   doing much lending right now in our space and they're very quiet

16   about what's going on.  So yes, it's a mystery.

17          MS. SCHWAGER:  Your Honor, can I move for the admission

18   of 3067?

19          COURT:  Any objections?  Exhibit 3067 is admitted.

20             (Rabo Agrifinance Exhibit No. 3067 admitted.)

21   BY MS. SCHWAGER:

22   Q.  And then can I have you turn to Exhibit 3068, please,

23   Mr. Millenkamp?

24   A.  Okay.

25   Q.  And this is an updated term sheet from Conterra to issue a

1    $25 million loan, correct?

2    A.  Correct.

3    Q.  And it required a commitment from Farm Credit.  What type of

4    commitment did you have to get?

5    A.  I don't recall.  Probably the whole operating line.

6    Q.  To pay off Rabo?

7    A.  Correct.

8    Q.  And did you get that from Farm Credit?

9    A.  No.

10   Q.  Why not?

11   A.  Because we needed MetLife to get us $10 million and we

12   couldn't get it done.

13   Q.  So if you could have found another lender besides MetLife,

14   then you would have satisfied the terms of Farm Credit, right?

15   A.  Correct.

16   Q.  So did you seek other lenders to try to satisfy that

17   requirement?

18   A.  Yes.  We were seeking financing from numerous banks and it

19   was -- what the (inaudible) from Conterra and Farm Credit

20   changed as we went so it was a moving target.  But yes, we were

21   talking to different banks.

22   Q.  And you weren't able to get that financing; is that correct?

23   A.  Correct.

24   Q.  And then if you turn to exhibit --

25        MS. SCHWAGER:  Did I move to -- I don't think I moved

1    to admit that, Your Honor.  Can I move to admit Exhibit 3068?

2            COURT:  Objections?  Exhibit 3068 is admitted.

3            (Rabo Agrifinance Exhibit No. 3068 admitted.)

4    BY MS. SCHWAGER:

5    Q.  Mr. Millenkamp, can I have you turn to Exhibit 3069?

6    A.  Yes.

7    Q.  In February, you went back to MetLife pursuant to this

8    exhibit and requested one of three items:  Either a $25 million

9    loan on the same terms as the other MetLife note or a $10

10   million loan of interest only payments for 18 months or three

11   interest only payments on the current note for 18 months and a

12   release of property so that another lender could issue you a

13   loan.  Do you recall that?

14   A.  Yes.

15   Q.  And this third option, a release of property based upon the

16   amount of equity you purport to have in the real property, why

17   wouldn't a new lender just be okay proceeding in a junior lien

18   position?  Why do you have to have property release?

19   A.  What's your question?

20   Q.  Sure.  You said that -- you've testified today that there's

21   this huge equity cushion in your real property.  Why do you have

22   to get MetLife to release real property rather than just get

23   another lender to come in on a junior position?

24   A.  They won't borrow the money in a junior position.

25   Q.  Why is that if there's always this equity and it's so great

1    for lenders?

2    A.  You'd have to ask Conterra.

3    Q.  And Conterra's not the only lender, right?  So what about --

4    I mean there were no lenders that would come in in a junior

5    position?

6    A.  You guys have the junior position.  Rabo has the junior --

7    Q.  You're looking for loans to take Rabo out, correct?

8    A.  Can you ask the whole question again?  I guess I don't know

9    your question.

10   Q.  Yeah, you bet.  So you're looking -- in this proposal to

11   MetLife, you're telling MetLife I need you to release real

12   property so that I can get a loan from another lender.  My

13   question is if you have all this equity in the real property,

14   why couldn't you get a lender to come in in a junior position

15   and issue a loan?

16   A.  Because Rabo has a second on all my real estate.

17   Q.  Sure.  But you are seeking a loan to take Rabo out so Rabo

18   wouldn't be there anymore.  With this new lender coming in, it

19   would be in a second position.

20   A.  Uh-huh.

21   Q.  Why can't you get a loan from another lender to go in a

22   second position on this real property where it has so much

23   equity?

24   A.  I'm working on it.  I don't know why.  You asked me why I

25   can't get another short-term lender?  Is that your question?

1    Q.  I'm asking why you're having -- why it's necessary to have

2    MetLife release a lien on real property in order to get a new

3    loan.  Why won't a lender make a new loan and come in on a

4    junior position?

5              MS. MIKKILINENI:  Objection, Your Honor.  This is

6    speculation.

7              COURT:  I'm going to --

8              MS. SCHWAGER:  Your Honor, he's testifying that he's

9    talking to all these lenders and that he's going to be able to

10   get a refinance to pay the DIP off before it matures.  If he

11   doesn't, the creditors, not only Rabo but unsecured creditors

12   are going to be harmed.  We should be able to talk about whether

13   or not this equity cushion is real for financiers.  And he's the

14   one having the conversations with the lenders.

15             MS. MIKKILINENI:  Your Honor, she's asking him to

16   speculate on what those lenders are going to say.  It's all

17   speculation what those lenders would say.  He wouldn't know.

18             COURT:  I'm going to sustain the objection.

19             MS. SCHWAGER:  I'll move on.  Thank you, Your Honor.

20             COURT:  And we're getting close to 5:00 as well, Ms.

21   Schwager:  I'm wondering are you getting close to a stopping

22   point?

23             MS. SCHWAGER:  I am.  I am.  Just a couple more

24   questions on this and then we'll be able to move on.

25             COURT:  Okay.

1          MS. SCHWAGER:  Or release for the day.

2    BY MS. SCHWAGER:

3    Q.  So Mr. Millenkamp, MetLife refused all three options that

4    you requested, correct?

5    A.  Correct.

6    Q.  Despite their equity position in the real property, correct?

7    A.  Correct.

8    Q.  In reviewing all of these attempts to obtain financing and

9    the refuse that followed, doesn't it mean that having equity in

10   property is not sufficient for lenders to underwrite and issue

11   loans?

12   A.  I believe there's another reason why Rabo's not borrowing

13   money.

14   Q.  This isn't about Rabo.

15   A.  Sorry.  MetLife.  Misspoke.

16   Q.  Sure.  But we talked about more lenders than just MetLife.

17   We talked about Idaho Ag, we talked about Conterra.  I mean if

18   there's this amount of equity in the real property, why can't

19   you find lenders to issue you a loan?

20   A.  For one, we just went through the worst dairy year in

21   history so all the banks want to see the smoke settle and see

22   the financials to see how bad it was.  That's one reason.

23   MetLife, the money that I have borrowed from MetLife is like 4

24   percent interest which is super cheap.  They would not be

25   motivated to borrow me a lot of money because if I have another

1    bank take them out, they can take my $180 million and replace it

2    at double the interest rate.  So they're in a good position just

3    sitting still, not helping.  If I have another bank take them

4    out, they're going to be in great shape.  So yeah, I -- and now

5    the smoke has settled.  The dairy markets have turned and as the

6    Forbes guy said, there's a lot of interest in what's going on.

7    Q.  The 11 out of the 69, correct?

8    A.  Yeah.

9    Q.  But the Forbes expert also testified that there has been

10   great robust financing over the last 6 to 12 months, correct?

11   A.  He wasn't specifically talking about the dairy industry.

12   What he said there's a lot of money available to be borrowed

13   which is a good starting point.

14   Q.  But when he testified to there being a robust financing for

15   the last 6 to 12 months, he was testifying on your behalf,

16   correct?  I mean --

17   A.  You'd have to ask him.

18   Q.  Okay.

19          MS. SCHWAGER:  Thank you, Your Honor.  I have no

20   further questions.

21          COURT:  All right, counsel.  It's about 5:00.

22          MS. SCHWAGER:  Today.  I have no further questions

23   today.

24          COURT:  It sounds like you'd like to pick up again

25   tomorrow, Ms. Schwager.  Go ahead and step down, Mr. Millenkamp.

1    I just wanted to briefly discuss what tomorrow's going to look

2    like with the parties.

3          I know that there has been some conversations between

4    counsel and Ms. Battle about a start time.  Mr. Christensen, I

5    think you had represented a 9:00 start would be sufficient as

6    far as getting us done tomorrow?  Do you still think that we're

7    on track to get done tomorrow if we start at 9:00 a.m.?

8          MR. CHRISTENSEN:  Your Honor, I can't speak to the

9    witnesses that Rabo has for tomorrow.  I know from the debtor's

10   perspective, we anticipate I guess being done tomorrow morning.

11   That of course depends on the extent of additional questioning

12   for Mr. Millenkamp and Ms. Churchill but I think even with that,

13   probably still done tomorrow morning.  It would depend on how

14   much time Rabo expects with their witnesses.

15         COURT:  All right.

16         MS. SCHWAGER:  I think we're fine at 9:00, Your Honor.

17         COURT:  All right.  Comments from other parties as far

18   as what tomorrow's going to look like?  Are we all confident

19   that we're going to be able to get done?

20         MR. O'BRIEN:  I think I have about 12 to 15 minutes of

21   questions for Mr. Millenkamp.

22         UNIDENTIFIED SPEAKER:  Your Honor, we have no

23   evidentiary issues but we do have a couple of issues we'll take

24   up at closing tomorrow.

25         COURT:  All right.  All right.  Well, it sounds like at

1    least we are on track then.  Let's go ahead and reset for the

2    day.  We'll reconvene at 9:00 a.m. and you can pick up with

3    additional cross-examination at that time, Ms. Schwager.  All

4    right.  Thank you, counsel.

5            CLERK:  All rise, please.

6                    (Proceedings concluded.)

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


  /s/ Tamara A. Weber                            7/2/24

Signature of Approved Transcriber       Date


  Tamara A. Weber

Typed or Printed Name