UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

```
MILLENKAMP CATTLE, INC.,        )   Bankruptcy Petition
471 North 300 West              )   # 24-40158-NGH
Jerome, Idaho 83338             )
                                )
                                )
Tax ID/EIN: 26-0603892          )   Twin Falls, Idaho
                                )   May 9, 2024
      Debtor.                   )
. . . . . . . . . . . . . . . . )
```

VOLUME I OF I
CONTINUED MOTIONS HEARING
BEFORE THE HONORABLE NOAH G. HILLEN
UNITED STATES BANKRUPTCY JUDGE

COURT RECORDER:               TRANSCRIPTION BY:

MELANIE BATTLE                TAMARA A. WEBER, CSR
U.S. District Court           P.O. Box 387
                              Caldwell, Idaho  83606

Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | MR. MATTHEW T. CHRISTENSEN<br>Johnson May, PLLC<br>199 N. Capitol Boulevard<br>Suite 200<br>Boise, Idaho 83702 |
| | MS. KRYSTAL R. MIKKILINENI<br>MS. TIRZAH R. ROUSSELL<br>Dentons Davis Brown<br>215 Tenth Street<br>Suite 1300<br>Des Moines, Iowa 50309 |
| For MetLife Real Estate<br>Lending, LLC; Metropolitan<br>Life Insurance Company: | MR. RON C. BINGHAM, II<br>Attorney at Law<br>3424 Peachtree Road NE<br>Suite 1600<br>Atlanta, Georgia 30326 |
| | MR. NIKOLAUS F. SCHANDLBAUER<br>20 F Street NW<br>Suite 500<br>Washington, DC 20001 |
| | MR. KIMBELL D. GOURLEY<br>Attorney at Law<br>P.O. Box 1097<br>Boise, Idaho 83701 |
| For Rabo AgriFinance, LLC: | MS. SHEILA RAE SCHWAGER<br>Hawley Troxell Ennis & Hawley, LLP<br>877 Main Street, Suite 200<br>P.O. Box 1617<br>Boise, Idaho 83702 |
| | MR. ANDREW SCHOULDER<br>Attorney at Law<br>1301 Avenue of The Americas<br>New York, New York 10019-6022 |
| For Western States Equipment<br>Company: | MR. JON B. EVANS<br>Dorsey & Whitney, LLP<br>101 S. Capitol Boulevard<br>Suite 1701<br>Boise, Idaho 83702-7705 |

```
APPEARANCES:  (Cont'd)

For Conterra Holdings, LLC      MR. JOHN O'BRIEN
                                Spencer Fane, LLP
                                1700 Lincoln Street
                                Suite 2000
                                Denver, Colorado 80203

                                MR. SCOTT C. POWERS
                                Spencer Fane, LLP
                                10 Exchange Place
                                Eleventh Floor
                                Salt Lake City, Utah 84111

For Committee of Corn Silage    MR. MATTHEW W. GRIMSHAW
Growers:                        Grimshaw Law Group, P.C.
                                800 West Main Street
                                Suite 1460
                                Boise, Idaho 83702

For Viterra USA Grains, LLC     MR. DANIEL C. GREEN
and Viterra USA Ingredients,    Racine Olson, PLLP
LLC:                            201 East Center
                                P.O. Box 1391
                                Pocatello, Idaho 83204

For Land View, Inc.:            MR. GERY W. EDSON
                                Attorney at Law
                                P.O. Box 448
                                Boise, Idaho 83701

For CNH Industrial Capital      MS. KARYN LLOYD
America, LLC:                   Saetrum Law Offices
                                1609 W. Main, Suite 20
                                Boise, Idaho 83702

For Sandton Capital Partners,   MR. SCOTT GAUTIER
LLP:                            Faegre, Drinker, Biddle
                                    & Reath, LLP
                                1800 Century Park E, Ste. 1500
                                Los Angeles, California 90067

                                MR. JOHN F. KURTZ
                                Kurtz Law, PLLC
                                910 West Main
                                Suite 364
                                Boise, Idaho 83702
```

```
APPEARANCES:  (Cont'd)

For the U.S. Trustee:          MR. JASON NAESS
                               DOJ - UST
                               550 West Fort Street
                               Suite 698
                               Boise, Idaho  83701


For Creditors Raft River,      MR. RHETT MILLER
Rural Electric Co-op, Inc.,    Parsons, Loveland, Shirley
Moss Grain Partnership, Moss    & Lindstrom, LLP
Farm Operations, LLC, and      137 West 13th Street
United Electric Co-op, Inc.:   Burley, Idaho 83318



For Creditor East Valley       MS. JANINE REYNARD
Development, LLC:              Avery Law
                               3090 E. Gentry Way, Ste. 250
                               Meridian, Idaho 83642


For Creditor Progressive       MS. HOLLY ROARK
Dairy Service and Supply       Roark Law Offices
Corp, Elevation Electric,      950 Bannock Street, 11th Floor
LLC:                           Boise, Idaho 83702

For Burk's Tractor:            MR. MARK PERRY
                               Perry Law
                               2627 W. Idaho
                               Boise, Idaho 83702


For MWI Veterinarian Supply:   MR. JED MANWARING
                               Evans, Keane
                               1161 W. River Street, Suite 100
                               Boise, Idaho 83702
```

```
                       I N D E X

DEBTOR'S WITNESSES:                        PAGE   LINE

    MILLENKAMP, William
Cont'd Cross-Examination by Ms. Schwager      8      1
Cross-Examination by Mr. O'Brien             57     10
Redirect Examination by Ms. Mikkilineni      65     24
Recross-Examination by Ms. Schwager          74      7

    CHURCHILL, Kati
Direct Examination by Ms. Mikkilineni        76     13
Cross-Examination by Mr. Schoulder           91     16
Cross-Examination by Mr. O'Brien            116     24
Cross-Examination by Mr. Naess              119     18
Redirect Examination by Ms. Mikkilineni     126     12


RABO AGRIFINANCE WITNESS:                  PAGE   LINE

    KOKINI, Daniel
Direct Examination by Mr. Schoulder         129     15
Cross-Examination by Mr. Christensen        140      8
Redirect Examination by Mr. Schoulder       157     21


DEBTOR REBUTTAL WITNESS:                    PAGE   LINE

    MILLENKAMP, William
Direct Examination by Mr. Christensen       160      9


MOTION IN RE:  CRITICAL VENDORS            PAGE   LINE

DEBTOR'S ARGUMENT                           163     18
                                            187     23

MWI ARGUMENT                                174     16

LAND VIEW ARGUMENT                          175     10

CORN SILAGE GROWERS ARGUMENT                176      4

CONTERRA ARGUMENT                           177      4

U.S. TRUSTEE ARGUMENT                       177     19


RULING                                      191      5
```

| MOTION FOR CASH COLLATERAL AND MOTION TO OBTAIN CREDIT | PAGE | LINE |
|---|---|---|
| DEBTOR'S ARGUMENT | 197 | 2 |
|  | 252 | 13 |
| METLIFE ARGUMENT | 215 | 6 |
|  | 251 | 3 |
| RABO AGRIFINANCE ARGUMENT | 222 | 8 |
| CONTERRA ARGUMENT | 246 | 1 |
| SANDTON ARGUMENT | 250 | 6 |


E X H I B I T S

| DEBTOR'S EXHIBITS: | PAGE | LINE |
|---|---|---|
| DX 1030 - Chart of 20-day payments | | |
| Admitted | 71 | 16 |

| RABO AGRIFINANCE EXHIBITS: | PAGE | LINE |
|---|---|---|
| RX 3055 - Email correspondence between Robert Rice and Sandton and with David Heida and Bill Millenkamp re: Finance and Key Bank attachment | | |
| Admitted | 128 | 25 |
| RX 3056 - Email correspondence between Andrew Wenger and Robert Rice at Sandton Capital with David Heida Re: Attached DIP Budget | | |
| Admitted | 128 | 25 |
| RX 3069 - Email from D. Gibson to D. Heida re: Millenkamp Funding Request | | |
| Admitted | 128 | 25 |

1              (Proceedings begin.)

2         COURT:  All right.  We are back on the record in Case

3    No. 24-40158.  Before we get started, are there any preliminary

4    matters that the parties would like to discuss?

5         MR. CHRISTENSEN:  Your Honor, we have one issue.  As

6    the Court will recall yesterday, there was a document used in

7    the testimony with Mr. Millenkamp regarding the critical

8    vendors.  The chart that was the secured and 20-day payments,

9    we've made that an exhibit.  That's marked as Exhibit 1030.

10   There should be a copy in the Court's binder as well as the

11   witness binder.  I've also provided copies to all the other

12   parties.  My understanding is no one has any objection to that

13   being admitted as an actual exhibit.

14        COURT:  All right.  Any objections to the admission of

15   Exhibit 1030?  Exhibit 1030 is admitted.

16              (Debtor's Exhibit No. 1030 admitted.)

17        MR. CHRISTENSEN:  That's all we have, Your Honor.

18        COURT:  Thank you, Mr. Christensen.  Any other parties

19   have preliminary issues before we get started this morning?

20        All right.  I believe Ms. Schwager was in the middle of

21   cross-examination of Mr. Millenkamp when we left off yesterday.

22   Mr. Millenkamp, please come up to the stand.  We'll go ahead and

23   resume.  I'll remind you that you are still under oath from when

24   you were previously sworn in.  All right.  Please proceed.

25        MS. SCHWAGER:  Good morning, Your Honor.

```
1                    CONTINUED CROSS-EXAMINATION

2    QUESTIONS BY MS. SCHWAGER:

3    Q.  Good morning, Mr. Millenkamp.  Mr. Millenkamp, you had

4    testified yesterday that you intended to repay the DIP loan with

5    the refinance, correct?

6    A.  Yes.

7    Q.  And you testified that the lenders wanted to let the dust

8    settle coming out of 2023; is that correct?

9    A.  Yes.

10   Q.  So what is your backup plan if the dust does not

11   sufficiently settle?

12   A.  We are engaged in conversation with Sandton about staying in

13   on the deal.

14   Q.  I'm sorry.  You're engaging in conversations with who?

15   A.  Sandton.

16   Q.  Any -- as to how you pay them off, how you pay off the DIP

17   loan?

18   A.  Yes.  Or staying in the deal.

19   Q.  Or staying in the deal.  Okay.  Any other alternatives that

20   you're looking at if the dust doesn't settle for a refinance?

21   A.  Just all the banks that we were previously talking about.

22   Q.  And what was that?

23   A.  What's your question?

24   Q.  What other things are you doing to pay off the DIP loan

25   other than talking about having Sandton stay in it and looking
```

1   at a refinance?

2   A.   Possibly selling some assets off.

3   Q.   And what assets have you looked at selling off?

4   A.   Any or all of them.   All options are open.

5   Q.   So have you listed any of your assets?

6   A.   I've talked to -- I've engaged with a real estate broker out

7   of Twin Falls but, no, we have not listed them.

8   Q.   When you say you engaged, have you retained that broker?

9   A.   Yes.

10  Q.   Have they -- is that the broker that -- that wasn't the

11  broker that testified yesterday, right?

12  A.   Correct.

13  Q.   Have you asked for the Court -- have you filed any motions

14  with the Court to have that agent approved by the Court?

15  A.   No.

16  Q.   And why is that?

17  A.   I didn't know I had to.

18  Q.   And when did you engage this broker?

19  A.   I don't recall.   A couple, three months ago maybe.

20  Q.   And so which properties are you and the broker talking about

21  selling?

22  A.   Like I said earlier, any or all.

23  Q.   So have you talked about any specific properties with the

24  broker?

25  A.   I talked about every property I own with the broker.

1  Q.  So has the broker identified properties that the broker may

2  list to sell for you?

3  A.  Any or all of them.

4  Q.  So there's been no specific property that you've identified

5  for the broker to list.  Is that what you're saying?

6  A.  Correct.

7  Q.  Now, you've previously testified that a couple of the

8  parties you were talking to wanted to wait and see for the audit

9  of your financials that were to come in April.  Do you recall

10  that testimony?

11  A.  Yes.

12  Q.  And have you obtained those audited financials and provided

13  them to those parties?

14  A.  Not yet.

15  Q.  Why not?

16  A.  Because our current accounting firm quit after having to

17  deal with the receivership and Matt McKinley.  It burnt that

18  bridge and we just engaged with a new accounting firm out of

19  Twin Falls so there will be a delay on getting those audited

20  financials.

21  Q.  And who's the new accounting firm?

22  A.  Cooper Norman.

23  Q.  And have you requested that they be approved as a

24  professional by the Court?

25  A.  I don't know if our attorneys have or haven't.

1   Q.  And when did Eide Bailly state that they were no longer

2   going to provide services for you?

3   A.  About a week ago.

4   Q.  Why did they wait until just a week ago if it was the cause

5   of the receiver?

6   A.  I have no idea.  You'd have to ask them.

7   Q.  Okay.  And at the time of the bankruptcy filing, you owed

8   Eide Bailly 214,000.  Is that correct?

9   A.  Yes.

10  Q.  And in your budget, you had proposed to pay them 105,000.

11  Is that for post-petition work?

12  A.  I don't recall.

13  Q.  Would you have been proposing to pay Eide Bailly for

14  prepetition work in your bankruptcy?

15  A.  It's Eide Bailly just so you know.

16  Q.  Sorry.  Eide Bailly.  Sorry about that.

17  A.  Yeah, Eide Bailly.

18  Q.  Sorry about that.  I appreciate that.

19  A.  Can you reask that question?

20  Q.  Sure.  Would you -- have you asked the Court to pay Eide

21  Bailly for prepetition work?  Are they part of your critical

22  vendors?

23  A.  I believe they were.  I don't recall.

24  Q.  On the list that you had yesterday --

25  A.  I don't remember what was on the list.

 1   Q.  Okay.  So if they're not on the list, then you weren't

 2   requesting a prepetition payment to them; is that correct?

 3   A.  I don't recall.

 4   Q.  And that list that you testified yesterday, that's your list

 5   of critical vendors that you believe should be paid prepetition;

 6   is that correct?

 7   A.  Correct.

 8   Q.  It's a list you created?

 9   A.  Correct.

10   Q.  Now, any lender that's considering a refinance for you will

11   want to see those year-end audited financial statements,

12   correct?

13   A.  I'm not sure.

14   Q.  Well, at least the two that have requested it wanted to see

15   them, right?

16   A.  I think so.

17   Q.  And you testified to that about a month ago, correct?

18   A.  I don't recall when I -- if I testified to that.

19   Q.  Can we turn to Exhibit 3041 in the white binder?

20   A.  Which volume?

21   Q.  Volume 2.  And if you could turn to page 116.

22   A.  What number?

23   Q.  The exhibit is 3041 and the page is 116.  And you see on

24   page 116 at line 16, it says, "As far as I know, what I've been

25   told is they want to let the dust settle and a couple want to

1    wait and see my audit of financials that come in April."  Do you

2    see that testimony?

3    A.  Are you on 3041?

4    Q.  Uh-huh.  Page 116, line 16.

5    A.  Mine aren't numbered that way -- do you want me to go to

6    page 16?

7    Q.  116.  At the very top, it will have the page numbers.

8    A.  Mine are numbered 1 through -- I don't have anything

9    numbered like that.

10   Q.  So I'll have you turn to the top that says Exhibit 3041.

11   A.  Yes.

12   Q.  And at the top of the page, you see on the screen, it says

13   your page numbers will be at the top and there's a page no. 116?

14   A.  I see that on the screen.  That doesn't match what I have in

15   my book.

16          MS. SCHWAGER:  Your Honor, can I approach the bench?

17          COURT:  That's fine.

18          MS. SCHWAGER:  This is 116.

19          WITNESS:  That's what I said.  Yours says 116 and mine

20   says 16.  Sorry.  There's more back there?

21          MS. SCHWAGER:  Thank you, Your Honor.

22          WITNESS:  What's your question?

23   BY MS. SCHWAGER:

24   Q.  So do you see on I think that's April 8 of 2024, you had

25   testified -- sorry.  April 9.  You had testified that a couple

1   wanted to wait and see my audit of financials that come in in

2   April.  Do you see that testimony?

3   A.  Yes.

4   Q.  Does that refresh your memory?

5   A.  Yes, it does.

6   Q.  Okay.  So a month ago, you testified that parties who were

7   interested in refinancing needed to see your audited financials.

8   Why is it that you have not moved quicker to replace your

9   accountant to obtain those financials?

10  A.  I did not want to lose our accountant that I've worked with

11  for 15 years.  That was something that was, you know, created by

12  the receivership.  So as soon as I found out that they did not

13  want to work for us any longer, we found a new accounting firm

14  with less than a week so I would think that would be extremely

15  fast.

16  Q.  Well, after that hearing, why didn't you contact Eide Bailly

17  and request that they immediately provide those financials so

18  you could work on refinancing?

19  A.  They told us they were working on it.

20  Q.  And at that time, after the hearing, they told you they were

21  working on them?

22  A.  I don't remember exactly.  They crank out the audited

23  financial statements at the same time every year.  We were

24  working with them on a daily basis so we did not know at that

25  time that they were going to not do our work.

1    Q.  So when do you expect the year-end financials from the new

2    accountant firm?

3    A.  I have no idea.  We just engaged with them.

4    Q.  Did you ask them how long it would take?

5    A.  I did ask them and they did not answer because they need to

6    get into our books.

7    Q.  Did you express the urgency of obtaining those financials?

8    A.  Yes, absolutely.

9    Q.  In the East Valley Cattle, LLC's schedules, you disclosed a

10   deposit of 250,000 on the purchase of real property.  And it

11   says it's dated February 16, 2023.  What is this in regard to?

12   A.  We had a purchase agreement on a farm and it was a deposit.

13   If we didn't close the farm, they get to keep the deposit.

14   Q.  What was the terms of the purchase?

15   A.  I don't remember.  There's a time frame and if I didn't

16   close a deal by a certain time frame, then they keep that

17   deposit.

18   Q.  What was this property?

19   A.  It was a farm.

20   Q.  And how big was the farm?

21   A.  4300 acres.

22   Q.  And what was the purchase price?

23   A.  I don't remember exactly.  Somewhere around 50 million.

24   Q.  50 million.  When did you enter into -- did you enter into

25   this agreement February 16, 2023?

1    A.  No.  I think it was much -- it was prior to that.

2    Q.  And so why was the deposit made on February 16, 2023?

3    A.  I don't remember.  I think they gave us an extension and I

4    don't remember the details.

5    Q.  Is the agreement in a signed writing?

6    A.  Excuse me?

7    Q.  Is the agreement in a signed writing?

8    A.  I don't remember.

9    Q.  You don't remember signing the purchase agreement when

10    you --

11    A.  Yes, I do remember.  Yes, so the answer would be yes then.

12    Q.  Do you still have a copy of this agreement?

13    A.  I'm sure we do somewhere.

14    Q.  What was the source of money for the $250,000 deposit?

15    A.  I took it out of the operating line.

16    Q.  And that would have been funds that Rabo had a collateral

17    security interest in?

18    A.  I believe so.

19    Q.  Did you advise Rabo of this purchase contract?

20    A.  Yes, I did.

21    Q.  And who did you advise?

22    A.  I believe it was Charles Hopkins.

23    Q.  And what did you tell Mr. Hopkins?

24    A.  That we were putting a deposit down on a farm.

25    Q.  And you told him the price?

1   A.  I don't recall the conversation.

2   Q.  Did you tell him you were using collateral proceeds to make

3   a deposit on the purchase of real property?

4   A.  I think that would be common sense.  He would know that

5   since I have one operating line.

6   Q.  But you don't recall telling him the amount?

7   A.  I don't recall the exact conversation.

8   Q.  And where did the conversation occur?

9   A.  I don't recall.

10  Q.  But you recall having it?

11  A.  Yes.

12  Q.  What do you recall about having it?

13  A.  Just remember talking to Charles Hopkins about buying that

14  farm.

15  Q.  In person?

16  A.  I don't remember that.

17  Q.  Well, when you remember talking to him, were you talking on

18  the phone, was there space in front of you?

19  A.  I don't recall.

20  Q.  But you recall a conversation?

21  A.  Yes, I do.

22  Q.  And do you -- was Mr. Hopkins your relationship manager for

23  Rabo in February of 2023?

24  A.  I don't think he was then.

25  Q.  And who was your relationship manager?

```
 1    A.  I don't know if you'd call Mike Hayes a relationship manager
 2    but I believe Mike Hayes would be that guy.
 3    Q.  Did you tell Mike Hayes about the deposit of $250,000 on
 4    real property?
 5    A.  I don't remember.
 6    Q.  Would you have any reason to dispute it if Mr. Hayes says
 7    you had not told him about the $250,000 deposit?
 8    A.  No.
 9    Q.  Do you recall that you testified at the prior hearing that
10    you were in default under the forbearance agreement because your
11    borrowing base as of March 2023 was below the requisite $10
12    million?
13    A.  Yes.
14    Q.  And do you recall that in April 2023 you were granted a
15    million dollar protective advance from Rabo because you
16    contended that you had insufficient funds to feed the livestock?
17    A.  I don't remember the details but, yes, I'll agree with you.
18    Q.  You do recall there were multiple e-mails that were going to
19    Rabo prior to the receivership being filed where Rabo was told
20    that you needed -- they needed to advance millions immediately
21    or the livestock would die?
22    A.  Right.  When Rabo was sweeping all of my milk checks,
23    withholding all my proceeds, yes --
24    Q.  You've answered the question.
25    A.  They would create --
```

1    Q.   Mr. Millenkamp, you've answered the question.

2    A.   -- crisis.   Okay.

3    Q.   If Rabo were to state that that occurred -- strike that.   So

4    why are you entering into a purchase contract for real property

5    if you have a loan that's matured and you're having cash flow

6    issues?

7    A.   I believe the purchase agreement was -- I entered into that

8    deal on the farm prior to Rabo starting sweeping all of my cash.

9    Q.   But you stated that you made the deposit February 16, 2023,

10   correct?

11   A.   I don't remember when it was.

12   Q.   If that's the date that's set forth in your schedules that

13   you signed under penalty of perjury, would that not be the

14   accurate date?

15   A.   I'm assuming it would be but I just don't remember when that

16   was.

17   Q.   Okay.   Why are you entering -- why are you expanding your

18   real property when you're having issues paying your feed

19   vendors?

20   A.   We engaged with that company on the farm prior to Rabo

21   sweeping all the funds.

22   Q.   But on February 16, 2023, you were still receiving proceeds

23   from milk checks, correct?

24   A.   What's your question?

25   Q.   As of February 16, 2023, you were still receiving proceeds

1  from milk checks.

2  A.  I don't remember exactly when they started the whole

3  sweeping process.

4  Q.  Okay.  Would you have any reason to dispute that as of

5  February 16, 2023, you were receiving milk proceeds?

6  A.  No.

7  Q.  Okay.  And you admitted at the last hearing that at the time

8  you entered into the forbearance agreement which was dated

9  October 2022, quote, you couldn't find a lender that would come

10 in and find you financially stable enough to take out the Rabo

11 loan that was matured.  Yet you're attempting to expand the

12 operations during this time.  Why is that?

13 A.  Because we had promises from MetLife's broker out of Twin

14 Falls that I've done 11 deals with that they were going to fund

15 us.

16 Q.  In February of 2023?

17 A.  Yes.

18 Q.  And was that representation in writing, that promise to loan

19 in writing?

20 A.  No.  MetLife does almost everything verbally but there are

21 e-mails and texts that basically confirm it in the same way of

22 business that they've always done the loans with us.

23 Q.  But you can't -- you can't force them to provide you a loan,

24 correct, because it's not in writing.

25 A.  Correct.

1   Q.  But you still decide to put $250,000 down on a $50 million

2   purchase; is that correct?

3   A.  That's correct.  That's how we do normal course of business

4   with MetLife.

5   Q.  Even when you are not able to pay your feed vendors?

6   A.  I believed that MetLife would come through with the loan the

7   way they'd previously done over 20 years I've done business with

8   them.

9   Q.  Okay.  Now, you also identified in your schedules an

10  exclusivity agreement between Millenkamp Cattle, East Valley and

11  SKS.  What is that?

12  A.  Can you ask that again?

13  Q.  Sure.  In your schedules, it references -- and it's kind of

14  long.  I'll just -- exclusivity agreement between Millenkamp

15  Cattle, Inc., and East Valley Cattle, LLC, on the one side and

16  SKS, EVC and Mavericks, LLC, on the other side.  What is that in

17  regard to?

18  A.  That's in regard to the digester project.

19  Q.  Okay.  And that's what you've talked about where you're

20  getting penalty payments right now and you hope to have it

21  constructed by the end of the year?  Is that correct?

22  A.  Correct.

23  Q.  Anything else in regard to that agreement?

24  A.  Not unless you have particular questions about it.

25  Q.  Is that generally -- I mean it's just how you get paid under

1    the digester agreement?

2    A.  I don't know what the agreement said.  It was the company

3    that put the deal -- the digester deal together so they worked

4    with BP and Clean Energy and they also worked with us and they

5    put the deal together and then the company -- the specific

6    company is going to be the operations partner in the project.

7    Q.  Do the debtors currently have any options to purchase

8    property?

9    A.  Does who?

10   Q.  The debtors.  Do any of the debtors currently have any

11   options to purchase real property?

12   A.  Who are the debtors?  What do you mean?  Me?  What's your

13   question?

14   Q.  So you know who filed bankruptcy, right, your entities.

15   A.  Yeah.

16   Q.  Do any of the debtors have an option to purchase real

17   property?

18   A.  Not -- I don't think so.

19   Q.  What would you look at to be sure whether or not they had

20   options to purchase real property?

21   A.  I don't know.  I'd have to talk to my team.

22   Q.  Wouldn't you know whether the debtors have the right to

23   purchase real property?

24   A.  I don't think the debtors have the right -- I don't think we

25   have an option on any land.

1    Q.   Okay.   That was the question.   Do you personally have any

2    options to purchase real property?

3    A.   I don't think so.   I'd have to check.

4    Q.   And what would you check?

5    A.   I'd have to go talk to David Heida and my office.

6    Q.   Okay.   And who at your office would you talk to besides Mr.

7    Heida?

8    A.   Lisa Nelson.

9    Q.   Did you enter into a purchase agreement that Kendall Jones

10   was associated or affiliated with?

11   A.   Yes.

12   Q.   And what was that agreement?

13   A.   That was another piece of ground next to us and that is --

14   the time has expired on that.

15   Q.   And when did the time expire?

16   A.   I don't recall.

17   Q.   Was it recently or years ago?

18   A.   Probably a year ago.

19   Q.   And what was the size of that property?

20   A.   I think it was 9600 acres of dry ground.

21   Q.   And did you make a deposit for that purchase?

22   A.   I don't recall.

23   Q.   What would you look at to make that determination?

24   A.   I'd have to talk to my office manager and see if we put a

25   deposit down.

1    Q.   Do you recall what the purchase price was?

2    A.   I think it was a thousand dollars an acre on whatever the

3    acreage was.

4    Q.   So around 9600?

5    A.   Yeah.   Yes.

6    Q.   And was that agreement in writing?

7    A.   Yes.

8    Q.   Did you enter into any type of agreement in regard to the

9    potential acquisition of property?   I've seen references to

10   Cassia Creek.

11   A.   Yes, we've already talked about that.

12   Q.   And what was that?   Is that the $250,000 deposit?

13   A.   Correct.

14   Q.   Okay.   Can I have you turn to Exhibit 3054?   And that's in

15   Volume 3.

16   A.   Okay.

17   Q.   This is an e-mail from David Heida sent on your behalf to

18   Douglas Gibson dated August 4, 2023.   Who is Douglas Gibson?

19   A.   He's the guy that we deal with at MetLife.   I don't know his

20   job title.

21   Q.   Okay.   In the third paragraph of this e-mail, Mr. Heida

22   states that if the appointment of a receiver was sought that

23   Glambia would stop purchasing milk in 30 days.   Did you believe

24   that was a true statement when it was made to Mr. Gibson?

25   A.   I don't recall this e-mail.

1   Q.  Okay.  Well, do you think that as of August 4, 2023, that

2   would have been an accurate statement?

3   A.  Can you -- what statement?

4   Q.  If the appointment of a receiver was sought -- and it's in

5   the third paragraph -- that Glambia would stop purchasing milk

6   in 30 days.

7   A.   I can't speak on behalf of David Heida but, yeah, that could

8   have been a possibility.

9   Q.  Well, he says he's sending that on your behalf.  Is that a

10  false statement?

11  A.  I'm not saying it's a false statement.

12  Q.  Okay.  Did you know that he was sending an e-mail to MetLife

13  on your behalf in August of 2023?

14  A.  I don't recall this e-mail.

15  Q.  You don't recall having any discussions about it?

16  A.  The last two years, this is all we talked about.

17  Q.  And it says that -- well, and that risk exists today,

18  correct, that Glambia has no written contract that requires it

19  to purchase milk from Millenkamp.

20  A.  Glambia does not do contracts with any dairy farmers.

21  Q.  Right.  And so it could, as Mr. Heida stated, stop

22  purchasing within 30 days, correct?

23  A.  Correct.

24  Q.  And it also states that, quote, with Idaho's oversupply of

25  milk, Glambia will be able to replace Millenkamp's milk quickly.

1    Is that an accurate statement in August of 2023?

2    A.  Yes, but it's the opposite today.

3    Q.  And the -- so that can happen though where with the market,

4    there can be an oversupply and Millenkamp's milk is not

5    necessary to Glambia.

6    A.  They can pick and choose who they buy their milk from.

7    Q.  Right.  And when there's an oversupply, that increases that

8    risk, correct?

9    A.  It could.

10   Q.  And the result of Glambia ceasing to purchase milk is the

11   value of the facilities is substantially reduced, correct?

12   A.  It would be, yes.

13   Q.  What is the difference between the value of a feeder cattle

14   yard and the value of the milking facilities as a going concern

15   that's referenced by Mr. Heida?

16   A.  I wouldn't know that.

17   Q.  Okay.  And on the third page of that exhibit, in August

18   2023 -- I'm sorry.  If you want to turn to the third page.  It

19   says that the real property values identified by Mr. Heida is

20   384 million.  Do you see that reference?

21   A.  Yes.

22   Q.  Did you agree with that in August of 2023?

23   A.  It could be, yes.

24   Q.  And it says on the third page of that exhibit in August of

25   2003 that the personal property assets were between 130 million

1  and 150 million.  Do you see that?

2  A.  Yes, I see it.

3  Q.  Where were those values obtained from?

4  A.  I don't know.

5  Q.  Do you agree that those -- that that value was accurate in

6  August of 2023?

7  A.  It would take me a minute to go back in time and figure out

8  what the cattle were worth and the feed inventory and all the

9  things that go into that.  So I couldn't answer that question.

10  Q.  Do you believe that Mr. Heida in conversing with MetLife

11  would have been making truthful statements on your behalf?

12  A.  I would assume so.

13  Q.  Okay.  And did you receive a response from Mr. Gibson to

14  this e-mail?

15  A.  I don't recall.

16  Q.  The next month in September of 2023, if you turn to

17  Exhibit 3055, the next exhibit, you are requesting that Sandton

18  issue you a loan, correct?

19  A.  What is your question?

20  Q.  In September of 2023, you're request -- sending this e-mail

21  to Sandton to request that they issue you a loan.  Do you recall

22  that?

23  A.  Yes.  I remember something about that.

24  Q.  And you were requesting that Sandton refi the mature debt

25  that was owed to Rabo, correct?

1    A.  Correct.

2    Q.  As well as a refi of the debt that was secured by the German

3    Dairy so that would be -- German Dairy, Canyonlands and McGregor

4    properties.  Do you recall that?

5    A.  Yes.

6    Q.  And you were asking for loans to purchase two properties,

7    correct, Cassia Creek and Jones properties?

8    A.  Yes, I guess.  I don't remember the e-mail exactly.

9    Q.  Sure.  And that's fair.  If on the fourth page of that

10   exhibit, paragraph 2, do you see where it's talking about

11   several properties.  They're identified.  You want a refinance

12   of the German Dairy, Canyonlands, McGregor and purchase the

13   Cassia Creek and Jones properties.

14   A.  Correct.

15   Q.  And that was in September of 2023, correct?

16   A.  Correct.

17   Q.  And you are having cash flows in September of 2023, correct?

18   A.  Yes, when Rabo was sweeping -- every time Rabo swept the

19   checks, yes, we had cash flow issues.

20   Q.  And that was the only reason that you had cash flow issues

21   is because Rabo was sweeping --

22   A.  That and the default interest, the attorney's fees and the

23   financial advisors, yes, those are the cash flow issues.

24   Q.  And in 2021, were you paying default interest?

25   A.  I don't recall.

1    Q.   Okay.  And if you weren't paying default interest and you

2    had -- were not able to service your debts, would that have been

3    Rabo's fault?

4    A.   I've never missed a payment in my life.

5    Q.   Well, is that accurate, Mr. Millenkamp, because didn't you

6    have feed vendors file lawsuits for failure to pay debts?

7    A.   Absolutely.  When Rabo swept operating cash, that created

8    that issue.

9    Q.   And didn't you fail to pay the matured debt to Rabo in June

10   of 2022?

11   A.   Correct.

12   Q.   At the time that -- at this time in 2023, you have accounts

13   payable of 34 million.  Do you recall that?

14   A.   I don't recall what it was at that time.

15   Q.   Would you have any reason to dispute that?

16   A.   No.

17   Q.   So I question why you weren't working on obtaining cash to

18   pay the payables versus attempting to paying cash to buy more

19   real property.

20   A.   We were looking for financing to take out Rabo Bank.  Does

21   that answer your question?

22   Q.   No, it doesn't because you also were requesting Sandton

23   money to purchase real properties versus paying those payables.

24   A.   If we got a loan from Sandton, they wouldn't sweep money and

25   we would be able to pay our payables and purchase that property.

1   Q.  Okay.  And in requesting the loan from Sandton, you

2   contended you had equity that was almost a half a billion

3   dollars, correct?

4   A.  I don't recall.

5   Q.  Okay.  So if you turn to the sixth page of that exhibit,

6   it's a farm and ranch financial statement.

7   A.  Okay.

8   Q.  And do you see on the right-hand side under net worth, you

9   list the net worth at $426,929,387.

10  A.  I didn't create this.  This was created by a guy from Key

11  Bank.

12  Q.  Okay.  Let's talk about that.  And you'll just have to give

13  me a few minutes because Mr. Heida said something interesting

14  about that in your -- in the e-mail.  On page 2, second to last

15  paragraph.  Do you see under that -- on page 2 under Friday,

16  September 22, 2023, 2:31 p.m., it says, "This document was

17  created by Kevin Guthrie at Key Bank and has been modified by

18  Millenkamp to account for the current market valuation of 829

19  million of Millenkamp entities as a whole."  Do you see that

20  reference?

21  A.  Yes.

22  Q.  So in fact, you did have an input into this financial

23  statement.  It wasn't just a Key Bank document, correct?

24  A.  I don't recall.

25  Q.  Would that have been a false statement that would have

1    been -- would you have believed that Mr. Heida would have made a

2    false statement in making that to Sandton?

3    A.   No, I would not think he would make a false statement.

4    Q.   So here, in requesting the loan from Sandton, it sets forth

5    that you have a net worth of 426 million, correct?

6    A.   Okay.

7    Q.   So what changed from the August e-mail to MetLife to the

8    September e-mail to Sandton where the property values went from

9    384 million to 593 million?

10   A.   I believe you're comparing apples and oranges.  This one, if

11   I recall, and I'm not 100 percent sure, had the additional land

12   on there and this was Kevin Guthrie's guess on what the place

13   could be sold for with the additional land.  I think they added

14   the additional debt onto that spreadsheet.  So I don't recall

15   all the particulars but that would be one big difference on why

16   the numbers are different.

17   Q.   Right.  So if you turn to that seventh page -- is it seventh

18   page where it's the second page of that balance statement and it

19   does itemize the real properties where it comes up with 593.

20   And there is, as you say, there's the Jones property valued at

21   33 million and Cassia Creek at 55 million.  Do you see that?

22   A.   Correct.

23   Q.   But that's only 88 million.  So what accounts for the other

24   increase in just one month from 384 to 500 -- 500 million?

25   A.   You'd have to ask Kevin Guthrie.  That was his opinion on

1    what that place would sell for in the right conditions.  I think

2    that is what he was trying to represent.

3    Q.  But I'm asking you because Mr. Heida made the truthful

4    representation to Sandton that Millenkamp had reviewed and

5    modified.  So at least you would have been signing off on what

6    the values were set forth.

7    A.  I'm assuming between Kevin Guthrie and David Heida, that's

8    what they believed that the place could be sold for in the right

9    circumstances.

10   Q.  But yet just a month ago, you guys were telling MetLife that

11   the real property was valued at 384 million, correct?

12   A.  That's the current -- I believe that would have been the

13   current appraisal.  Market value and appraisal is different.

14   Q.  Oh, okay.  Now, despite these high equity net worth values

15   that you're displaying to Sandton, they did not agree to issue

16   you that requested loan in September of 2023.  Correct?

17   A.  Correct.

18   Q.  In fact, in September of 2023, they didn't agree to issue

19   you any loan at that time, correct?

20   A.  Correct.

21   Q.  And if Sandton would have issued you that loan that you

22   requested, then you would no longer have had the Conterra and

23   Rabo debt, correct?  It would have refied those two debts?

24   A.  I don't remember what the particulars were on that.  I'm

25   assuming that Conterra would have been taken out.

1   Q.  And Rabo?

2   A.  Yes.

3   Q.  Okay.  So it wouldn't have been increase in the debt.

4   Instead, it would have replaced that debt.

5   A.  Probably.

6   Q.  Except I guess for the purchase of the new property.  That

7   would have been additional debt, correct?

8   A.  Correct.

9   Q.  But now with the current DIP request, you not only have the

10  Conterra debt and the Rabo debt but you're also asking for

11  authority to increase the debt with a $45 million debt owed to

12  Sandton, correct?

13  A.  Correct.

14  Q.  Now, in that statement we were just looking at that itemized

15  the real property, I was just curious because it lists the

16  property you wanted to purchase which was the Jones property at

17  15 million but you state that the value's 33 million.  Why would

18  that be the case?

19  A.  Because the farm will appraise much higher than the purchase

20  price.

21  Q.  Why is that?  Why isn't the seller seeking the full value?

22  A.  You'd have to ask the seller.

23  Q.  You don't have any idea why you would get a steal for that

24  property?

25  A.  He likes me.

1   Q.   Interesting.  Okay.  So you have the right under the Sandton

2   DIP facility to request one three-month extension of the

3   maturity date, correct?

4   A.   Yes.

5   Q.   And that extension's in the sole and absolute discretion of

6   Sandton, correct?

7   A.   I believe so.

8   Q.   And if Sandton doesn't give you that extension or you don't

9   have the $675,000 extension fee, then you only have nine months

10  to pay that DIP loan, correct?

11  A.   Correct.

12  Q.   And if you do get 12 months and pay the 675,000 extension

13  fee, that reduces the amount of money you have to pay your other

14  creditors, correct?

15  A.   Correct.

16  Q.   And if you don't pay Sandton the full amount due and owing

17  on the maturity date, then it can foreclose on your assets,

18  correct?

19  A.   Correct.

20  Q.   It can sell your dairy cattle?

21  A.   I believe so.

22  Q.   And what happens to your operations at that point if a

23  foreclosure starts on your dairy cattle?

24  A.   We would not be milking cows no longer.

25  Q.   And that would -- so that would be a dark dairy?

1    A.  Yes, it would be.

2    Q.  And that would negatively affect the value of your

3    properties, correct?

4    A.  Yes.

5    Q.  Now, you received payments under the digester contract due

6    to the delay in construction, correct?

7    A.  Can you ask that again, please?

8    Q.  You bet.  You received payments under the digester contract

9    due to the delay in construction.  Is that correct?

10   A.  Correct.

11   Q.  Is that 15,000 a day?

12   A.  It was between 15 and $50,000 a day.

13   Q.  And what makes -- is it currently -- what is the current

14   penalty per day?

15   A.  Right now, it's 15,000.

16   Q.  What makes the difference between 15 and 50?

17   A.  They have to provide me with liquid waste back to our

18   lagoons at a certain threshold along with the dry manure that

19   comes off the equipment.  So we look at that and the price is

20   based off that.

21   Q.  Is the budget amount for Sandton -- not Sandton, for the

22   digester that you have for income, is that in your budget, is it

23   all for penalties?

24   A.  I don't remember.

25   Q.  What else would it be for?  It goes through August of 2024,

1  your budget.

2  A.  There will be penalties going into August for sure because

3  they will not have the facility done by then and then I don't

4  remember what they did after August, whether they went off the

5  $15,000 a day or what the revenue stream will be off --

6  Q.  So we have no budget after August.  So what I'm asking is

7  for the income that you've budgeted for the digester, is that

8  all penalty payments?

9  A.  I don't recall.  You'd have to ask Kander.

10  Q.  What else would you be entitled to under the digester as of

11  August of 2024 beside penalty payments?

12  A.  I believe just penalty payments.

13  Q.  Okay.  So do you have any reason to believe it exists of

14  anything other than penalty payments?

15  A.  Up to August?

16  Q.  Yeah.

17  A.  No.

18  Q.  Okay.  And is that run at 15,000 a day then through your

19  budget or is it 50?

20  A.  Like I answered before, I don't remember what number they

21  put in up till August.

22  Q.  Would they get that number from you?

23  A.  Yes, they would get the number from me but I don't know what

24  number they put in the budget.  You'd have to ask Katie.

25  Q.  Is that number susceptible to change between now and August?

1    A.  It could change, yes.

2    Q.  It could go up or down?

3    A.  Like I said, it could go between 50 and 15 a day.

4    Q.  Okay.  Did you review what Kander put in the budget to make

5    sure that it was accurate so you knew you would have that income

6    coming in?

7    A.  I had some input, yes.

8    Q.  And just sitting here today, you don't recall what that was.

9    Is that correct?

10    A.  No, I don't.  But Katie can answer that.

11    Q.  Okay.  Great.  Did you -- when you entered into the digester

12    contract, did you receive any cash payments up front?

13    A.  Yes.

14    Q.  And what did you receive?

15    A.  I don't remember exactly but I think it was around $3

16    million that they bought -- they bought some existing

17    infrastructure from us and we put it onto the Rabo line.

18    Q.  You put the 3 million onto the Rabo line?  Is that what

19    you're saying?

20    A.  Yes, that's what I'm saying.

21    Q.  And when was that?

22    A.  I don't remember.

23    Q.  Was that a payment on your loan or it went into the

24    operating account?

25    A.  I just put it in the operating line.

1    Q.   Do you have an approximation of when that occurred?

2    A.   Maybe two years ago, a year ago.

3    Q.   Would it have been when you signed the agreement?

4    A.   I don't remember.

5    Q.   Would you have received that money without a written

6    agreement?

7    A.   I believe there was a written agreement on that.  There will

8    be documentation somewhere to support that.

9    Q.   Okay.  Any other upfront payments besides the 3 million?

10   A.   Not that I remember.

11   Q.   And any other payments you've received other than that 3

12   million and the penalty payments in regard to the digester

13   contract?

14   A.   Not that I recall.

15   Q.   So Mr. Heida had informed Mr. Rice of Sandton in September

16   of 2023 that you had received 16 million under that contract.

17   What was that amount in regard to?

18   A.   Probably the combination between the purchase of the

19   existing infrastructure and the penalty payments.

20   Q.   And the penalty payments.  Because when did the penalty

21   payments start?

22   A.   I don't recall.

23   Q.   But there wouldn't have been any other cash that could have

24   been included within that 16 million is what you're saying?

25   A.   Not that I remember.

1    Q.  What would you look at to determine if that -- to refresh

2    your memory to make sure that that's an accurate statement?

3    A.  I would call my office manager and see the amount of money

4    that we got and what it applies to, what invoices.  Some of

5    these -- let me clarify.  We deal also with a digester company.

6    We do some -- we do some work for maintenance on some of the

7    equipment that's already there.  They hire us to maintain it so

8    some of that income would be for work that I do for those guys.

9    Q.  Under the digester contract?

10   A.  I don't know if it's under the contract or not but we do

11   some work for those guys.

12   Q.  Okay.

13   A.  And it's relatively significant out of the 16 million.  And

14   then we also did some dirt work, excavation work.  We did some

15   gravel work for them.  We did some trucking for them.  So those

16   would be the other invoices.

17   Q.  Now, in your budget, you had budgeted trucking and -- it's

18   not a lot.  It's 78,000 for April but there hasn't been any

19   income come in for trucking.  Why is that?

20   A.  Can you ask that again and what time frame are you talking?

21   Q.  Sure.  So since you filed bankruptcy through the end of

22   April, you had budgeted 78,000 in trucking income but there

23   hasn't been any trucking income come in.  I was just curious

24   what was going on with the trucking.

25   A.  We're not doing any outside hauling right now on compost

1   because the weather was so -- a lot of the trucking we do is

2   hauling compost to farmers and since we had an incredibly wet

3   spring, we did not have the opportunity to do the same work we

4   do on a normal year.

5   Q.  Did you know that when you executed the budget?

6   A.  I don't know what the weather's going to be tomorrow, no.

7   Q.  Would you be able to make up that 78,000 in the following

8   weeks?

9   A.  I don't know.  I don't know what the weather is.  I don't

10  know what the demands will be from the farmers.  I don't know.

11  Q.  Okay.  What expenses have you reduced in your operation

12  budget going forward?

13  A.  Soap.

14  Q.  You said soap?

15  A.  Yeah, soap.

16  Q.  Anything else?

17  A.  Window washing.

18  Q.  So no longer three times a week?

19  A.  Yeah, correct.

20  Q.  How often are the windows washed now?

21  A.  Probably twice a week.

22  Q.  Anything else you've reduced --

23  A.  The rule of thumb is the cows don't know what your financial

24  statements are.  We run the business the same, same feed.  We

25  don't defer maintenance.  We try to stay the course.  We try not

1    to do any capital improvements is where we focus.

2    Q.  And your witnesses that were called on behalf of the debtors

3    yesterday, they testified that the dairy facilities are the

4    cleanest they've ever seen and one mentioned that there's

5    beautiful brand-new concrete.  It's not cheap to maintain those

6    type of facilities at that level, correct?

7    A.  Correct.

8    Q.  But you could operate at a lesser level and have money from

9    the operations to pay your creditors like your feed vendors,

10   correct?

11   A.  No, I disagree.

12   Q.  Isn't it true that dairies are able to operate and be

13   successful that are not as pristine and clean as your dairy?

14   A.  I don't think they make as much money, no.  I disagree.

15   Q.  When the U.S. Attorney's Office questioned you at the prior

16   hearing about critical vendors, you testified that all of your

17   vendors were critical.  Do you recall that testimony?

18   A.  Yes.

19   Q.  And by that statement, you believe that all of them should

20   be paid for their prepetition obligations right now rather than

21   wait for the plan, correct?

22   A.  Incorrect.  We didn't put all -- every vendor down as a

23   critical vendor.  Just the ones that we put down we felt like

24   they were critical.

25   Q.  Well, I'm just going back to your testimony that all of them

1    were critical.  When you made that statement, you were making

2    that to say that they should all be paid prepetition, correct?

3    A.  I don't recall if I was -- I think I was referring to the

4    list that we created.  So yes.  If they were on the list, I

5    would have made it --

6    Q.  You testified that many of them are your friends.

7    A.  I don't recall what I testified to as far -- but a lot of

8    them are my friends, yeah.

9    Q.  And it's true to how large your dairy and business

10   operations are that many vendors rely upon the Millenkamp

11   operations to sustain their own business operations, correct?

12   A.  I would assume that, yes.

13   Q.  You're a large part of their business so if you don't buy

14   their product or services, then their own profit is affected by

15   that, correct?

16   A.  I would assume that, yes.

17   Q.  So isn't it true that there is an economic incentive for

18   many of those vendors to continue to do business with you if you

19   are to pay them cash on delivery so then at least then they're

20   still being able to sell product and get paid?

21   A.  On some.  Every vendor's different.

22   Q.  And that helps their future operations to get profit in the

23   door, correct?

24   A.  You'd have to ask them.

25   Q.  Well, you just testified that you're important to their

1    operations because you're such a large purchaser, correct?

2    A.  I would assume I'm important to several of those vendors,

3    yes.

4    Q.  In fact, many have continued to sell to you or provide

5    services on a COD basis even though a court order has not yet

6    been entered allowing for prepetition payments, correct?

7    A.  Correct.

8    Q.  And in your prior testimony, you stated that, quote, H & M

9    is probably the most unique critical vendor because it's the

10   only one I'm involved with.  And I would put them as the most --

11   the highest critical vendor because of the services they

12   provide.  Do you recall that testimony?

13   A.  I do.

14   Q.  But if you owned half of H & M, why couldn't you convince

15   H & M to hold off in getting prepetition payments or at least

16   not getting 100 percent of those payments while you worked on a

17   reorganization plan for your creditors.

18   A.  Well, we had -- Millenkamp Cattle owed H & M $4 and a half

19   million and we have payments and labor to pay.  So no, you can't

20   talk -- I couldn't talk myself into it and I couldn't talk my

21   partner into it.  The business would shut down without a

22   payment.  There's no other company in Idaho that can handle that

23   volume of chopping.

24   Q.  You couldn't convince yourself to just hold off on payments

25   so that you could pay other creditors?

1   A.  We'd have to sell every piece of equipment.  We owe people

2   money and we have labor on that company.  So no, they could not

3   hold off.

4   Q.  And the payments that were made which was almost 100 percent

5   of what you're requesting to be made to H & M, none of that

6   includes profit?  It's just for payments of debts that are owed

7   by H & M?

8   A.  That company runs with almost no profit.

9   Q.  You actually increased H & M from the initial budget you

10  filed in this case from 4 million to 4.25 million.  Do you

11  recall that?

12  A.  I don't recall.

13  Q.  Is Millenkamp Cattle going to receive any money from H & M?

14  A.  No.

15  Q.  Are you personally going to receive any money from H & M?

16  A.  I've never received money from H & M.  I give H & M money.

17  Q.  Okay.  Are you a personal guarantor on any of the

18  obligations owed to any of the critical vendors that you

19  testified about yesterday?

20  A.  I believe just H & M.

21  Q.  And at the last hearing, you said that the DIP loan was

22  needed on an emergency basis immediately or the livestock would

23  not be fed.  Do you recall that?

24  A.  Yes.  When Rabo's threatening to not give me money, I can't

25  buy feed, yes, that becomes an emergency.

1   Q.  But this is not about Rabo.  This was about your DIP loan.

2   So at the hearing, the prior hearing, April 8 and 9, you said

3   that the DIP loan was needed on an emergency basis immediately

4   or the livestock would not be fed.  Do you recall that?

5   A.  Yes.

6   Q.  And isn't it true that the DIP loan in fact was not issued

7   until the last week of April, 2024?

8   A.  Yes.

9   Q.  And the livestock were still fed, correct?

10  A.  Correct.

11  Q.  Why was their delay in the issuance of the DIP financing?

12  A.  Why was there a delay?

13  Q.  Yeah.  From the time that the order was entered, there was

14  no DIP financing until the end of April but you said you needed

15  it immediately.

16  A.  What's your -- I don't understand your question.

17  Q.  Why was the DIP loan not received upon the entry of the

18  order?  Why was there a delay?

19  A.  You'd have to ask the judge here.  I don't know.

20  Q.  Actually, because the order was entered the first part of

21  April and the DIP loan didn't come in until April -- the last

22  week of -- April 30.  Why was there that delay between the order

23  being entered and you receiving the funds?

24  A.  I don't know.  I don't understand your question.  I don't

25  know how to answer it.

1    Q.  Were you concerned when you didn't have the DIP funds right

2    after the order was entered?

3    A.  Yes.

4    Q.  And did you talk to anybody about that?

5    A.  Yes.  I talked to a lot of vendors.

6    Q.  Did you talk to Sandton about it?

7    A.  I don't recall if Dave did or not.

8    Q.  Do you recall talking to Dave asking whether Sandton was

9    going to issue the DIP loan?

10   A.  I remember having a lot of conversations with David about

11   Sandton.  I don't recall that particular one.

12   Q.  You don't recall asking -- you're saying that you're talking

13   to the vendors who want to get paid but you don't recall talking

14   to Mr. Heida about why don't we have the DIP loan yet.

15   A.  I don't recall.

16   Q.  Okay.  So was it an inaccurate statement to the Court that

17   the DIP loan had to be entered immediately or the livestock were

18   not going to get fed?

19   A.  There's a risk every single day that the cattle won't be

20   fed.  It just depends on how the vendors want to handle our

21   account.

22   Q.  And you were able to get the vendors to still feed the

23   livestock without the DIP loan.

24   A.  Temporarily because they got their fingers crossed on this

25   hearing.  So yes, I --

1   Q.  In your schedules, you identify plan support agreements.  Do

2   you recall entering into plan support agreements with the silage

3   farmers?

4   A.  Possibly.

5   Q.  Do you recall it?  Do you recall what a plan support

6   agreement is?

7   A.  What is it?

8   Q.  Okay.  Can I have you turn to Exhibit 3057?  Do you recall

9   this agreement, Mr. Millenkamp?

10  A.  Possibly.

11  Q.  What was this agreement in regard to?

12  A.  Paying the corn silage farmers.

13  Q.  And the farmers are fully secured, correct, these silage

14  farmers?

15  A.  I believe they are, yes.

16  Q.  Was this agreement ever fully executed by all of the

17  farmers?

18  A.  I don't recall.

19  Q.  What was the purpose of entering into the agreement?

20  A.  I don't recall.  I'm assuming something to do with making

21  sure they get paid.

22  Q.  So in your schedules, you list it as a plan support

23  agreement.  Were you soliciting their approval for a plan that

24  hasn't been filed yet in your bankruptcy?

25  A.  I never talk to them.

1   Q.  Well, you signed the agreement.  Did you read it?

2   A.  Yeah, I read it.

3   Q.  Okay.  Why did you sign this agreement?

4   A.  I believe it was the agreement that the farmers presented to

5   us so they would get paid.

6   Q.  And in that agreement, they're agreeing that if they get

7   paid pursuant to those terms, then they will support a Chapter

8   11 plan; is that correct?

9   A.  I believe so.

10  Q.  And have you complied with this agreement?

11  A.  I believe we have.

12  Q.  And what is your current intent to this agreement?  Do you

13  intend to fully comply with this agreement?

14  A.  Yes.

15  Q.  Are there any other creditors that you've entered into a

16  plan support agreement with?

17  A.  I don't recall.

18  Q.  You don't recall if you entered into one with MetLife?

19  A.  I don't recall that.

20  Q.  Conterra?

21  A.  I don't recall.

22  Q.  Okay.  Is this the only one you recall entering into?

23  A.  Yes.

24  Q.  And do you recall if it was signed by you before your

25  bankruptcy was filed or after?

```
 1    A.  I don't remember.

 2    Q.  So it could have been after your bankruptcy was filed?

 3    A.  I don't remember.

 4    Q.  Okay.  Do you have any agreement with MetLife regarding how

 5    MetLife will be treated in a proposed plan of reorganization?

 6    A.  I don't recall.

 7    Q.  Do you recall if you have an agreement with Sandton?

 8    A.  I don't recall what agreements we have with all the banks

 9    anymore.

10    Q.  Or Conterra?

11    A.  Yes, or Conterra.

12    Q.  Okay.  Now, in your equity cushion analysis that you

13    presented yesterday, you state that the personal property you

14    value at 178 million was decreased by all equipment liens and ag

15    liens.  Do you recall that testimony?

16    A.  Yes.

17    Q.  And can I have you turn to Exhibit 1022 -- or we'll put it

18    on the screen for you.  It's debtor's exhibit.  And under this

19    exhibit, you show that you've deducted 11,848,316 for ag liens.

20    Do you see that?

21    A.  Yes.

22    Q.  And then you deducted 2,979,658 for equipment liens; is that

23    correct?

24    A.  Yes.

25    Q.  But isn't it true that in your schedules, you identify
```

1  equipment liens that exceed $8 million?

2  A.  I don't recall what numbers.

3  Q.  Okay.  So let's turn to Exhibit 3046.  It should still be

4  that Volume 3.  And I'll have you flip through that exhibit.  If

5  you flip through that exhibit at the top, it will have page 39

6  of 155.

7  A.  What number was it?

8  Q.  It's the very first exhibit, 3046 and Volume 3.  And at the

9  top of that exhibit, if you start flipping through it, it will

10  start telling you it's 155 pages and I'm on page 39 of 155.  Are

11  you on that page?

12  A.  Yes.

13  Q.  Do you see CNH is listed as an equipment lienholder of

14  $3,046,088?

15  A.  Yes.

16  Q.  So that's -- that exceeds that 2.9 million, correct?

17  A.  Yes.

18  Q.  And then if you turn to the next page, page 40, do you see

19  that -- is it Daimler truck?

20  A.  Daimler.

21  Q.  Yeah.

22  A.  Yes.

23  Q.  Do you see that it's listed as having liens of

24  $1,741,693.25?

25  A.  Yes.

1   Q.  And then if you turn to page 41 of that schedule, do you see

2   that Farmers Bank has an equipment lien of $2,448,221.01?

3   A.  Yes.

4   Q.  And then if you turn to page 43, do you see that John Deere

5   has an equipment lien of $945,151.56?

6   A.  Yes.

7   Q.  And if you added those up, they exceed $8 million.

8   A.  Yes.

9   Q.  So really, that deduction on the equipment lien should have

10  at least been $8 million, correct?

11  A.  I'd have to look and see what equipment they put on as owned

12  and make sure some of that's not a lease.

13  Q.  Well, do you want to go through the appraisal on the CNH

14  and --

15  A.  I could but I don't think I could answer all that right now.

16  Q.  Do you have any reason to believe that the Farmers Bank lien

17  of $2,448,221.01 is a lease?

18  A.  I believe that one's not a lease.

19  Q.  Do you have any reason to believe that the truck financial

20  services of $1,741,693.25 is a lease?

21  A.  Some of those are lease to purchase.  I'd have to check with

22  the Lisa on how we did all those and what's -- I mean I could

23  find out.

24  Q.  Well, we actually have it in the documentation but -- so I

25  will pull that up after a break and then we can go through and

1    see that the 8 million is a purchase for equipment liens.

2    A.  Okay.

3    Q.  In your schedules, you also identify that you own 200 -- or

4    that you own 6 -- not 200 -- 2024 Dodge Ram pickups.  Do you

5    recall that?

6    A.  Yes.

7    Q.  And who drives those trucks?

8    A.  I don't remember who drives them all.

9    Q.  Do you drive one?

10   A.  I have one, yeah.

11   Q.  Does Mr. Heida drive one?

12   A.  I don't remember.

13   Q.  You don't remember who drives the brand-new Dodge Ram

14   pickups at your operations?

15   A.  I don't know -- I've got about 60 pickups.  I don't know

16   who's driving all the new ones.

17   Q.  Okay.

18   A.  I think -- I don't think Dave drives the new ones.

19   Q.  Do you have more new ones than these 6 that we're talking

20   about?

21   A.  No.  I think that's all we bought that year.

22   Q.  What was the cost of those six vehicles?

23   A.  I don't recall.

24   Q.  If the appraiser -- well, do you remember when you purchased

25   them?

1    A.  No.

2    Q.  Would it have been after the receivership was filed?

3    A.  I don't remember.  There's always a big difference between

4    when we sign the papers and order them and delivery date so I

5    can't recall that on every piece of equipment.

6    Q.  Was it after feed vendors had filed lawsuits to recover?

7    A.  I don't remember.  I could find out for you though.

8    Q.  Okay.  If your appraiser valued them at $280,000, would that

9    have been close to what the purchase price was?

10   A.  I don't recall.

11   Q.  Does that sound right, a value of 280,000 for those 2024 new

12   pickups?

13   A.  It could be, yes.

14   Q.  And they were obtained after the Rabo's loan matured,

15   correct?

16   A.  I don't remember.

17        MS. SCHWAGER:  Your Honor, if we could just take a

18   break and I'll get together the lease and purchase information

19   and then I'll be done.

20        COURT:  About how much time do you need, Ms. Schwager?

21        MS. SCHWAGER:  Five minutes.

22        COURT:  All right.  We'll be in recess for about five

23   minutes.

24        MS. SCHWAGER:  Thank you, Your Honor.

25        CLERK:  All rise, please.

```
 1                              (Recess taken.)

 2              COURT:  Please be seated.  All right.  Ms. Schwager,

 3      are you ready to proceed?

 4              MS. SCHWAGER:  I am, Your Honor.

 5              COURT:  Go ahead.

 6      BY MS. SCHWAGER:

 7      Q.  Mr. Millenkamp, can I have you turn to debtor's

 8      Exhibit 1018?

 9      A.  Which book is that?

10              MS. SCHWAGER:  Your books are the black ones, correct?

11              MR. CHRISTENSEN:  There's one black one.  It's the

12      black one.

13              MS. SCHWAGER:  The black one.

14              WITNESS:  Okay.

15      BY MS. SCHWAGER:

16      Q.  And can you -- you're at 1018?

17      A.  Yes.

18      Q.  Debtor's exhibit?

19      A.  Yes.

20      Q.  Can you turn to the 14th page of that exhibit?  It starts at

21      the top 2024 Case IH Magnum tractor and it's identified as a

22      lease.  Do you see that to get to the right page?

23      A.  Is it on the screen?

24      Q.  It is on the screen, yeah, and it's the 14th page of that

25      exhibit.
```

1    A.  Okay.

2    Q.  So do you see in the fifth line, it starts with the 2024

3    Case IH Maximum 115 tractor?

4    A.  Yes.

5    Q.  And it goes down.  So it's 95,000 a pop and there's 1, 2, 3,

6    4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,

7    21, 22, 23, 24, 25, 26, 27, 28, 29, 30 -- 30 that are purchased.

8    Do you see that?

9    A.  Yes.

10   Q.  And that alone exceeds -- maybe equates to the 2.9 million

11   that you have identified as liens -- equipment liens; is that

12   correct?

13   A.  I'm not sure.

14   Q.  And then if you turn to the 19th page, there's a whole bunch

15   of Freightliners identified.  What were the vehicles that were

16   identified as the equipment liens for the name I couldn't even

17   identify?  What were the type of vehicle that are liened by

18   the -- I'm still going to say it wrong.  Daimler.

19   A.  Daimler.

20   Q.  Daimler.  What type of trucks do they have?

21   A.  Freightliner semis.

22   Q.  Are those the Freightliners that are on page 19?

23   A.  Yes, I'm assuming so.

24   Q.  So those are not leased, correct?

25   A.  I was trying to figure that out.  It's kind of a lease

1    purchase so I don't know how the accountants applied that.

2    Q.  Well, do you recall that your expert testified that he did

3    not provide any values to leased vehicles?

4    A.  Yes, I think so.

5    Q.  Okay.  And I mean flipping back to that page 14 where you've

6    got all of the Cases that are identified -- Case tractors that

7    are identified as leases, there's no value there, right?

8    A.  Correct.

9    Q.  So if your appraiser has appraised them at a value, then he

10   did not identify them as being leased, correct?

11   A.  Correct.

12   Q.  And then it follows on the next page.  There's a whole bunch

13   more Freightliners.  And then if you turn to page 22 of that

14   appraisal, there's -- it starts out with a couple of -- three

15   Kenworths but then there's 2024 Kubota tractors and it looks

16   like they're purchased because they've got values and there's 1,

17   2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19,

18   20, 21, 22, 23, 24, 25.  So there's 25 brand-new Kubota

19   tractors, correct?

20   A.  Correct.

21   Q.  And they would be subject to that CNH equipment lien,

22   correct?

23   A.  Correct.

24   Q.  And then the following page, there's John Deere loaders that

25   are identified.  Would they be subject to the John Deere equity

1   lien -- I'm sorry, not equity lien -- equipment lien that you've

2   got identified in your schedules?

3   A.  I'm not sure.

4       MS. SCHWAGER:  Your Honor, I have no further questions.

5   The schedules are in the record.  Thank you.

6       COURT:  Thank you, Ms. Schwager.  Does the United

7   States Trustee's Office have questions for --

8       MR. NAESS:  I don't.  Thank you, Your Honor.

9       COURT:  Counsel for Conterra.

10                          CROSS-EXAMINATION

11  QUESTIONS BY MR. O'BRIEN:

12  Q.  Good morning, Mr. Millenkamp.

13  A.  Good morning.

14  Q.  I think I said yesterday I was going to try and do this in

15  12 to 15 minutes.  We'll see if we can even beat that.  I wanted

16  to ask about Mr. Davis' appraisal yesterday which I think was

17  Exhibit 1019 on the livestock that came in with a value of $140

18  million.  Do you recall that?

19  A.  Yes.

20  Q.  And then also, your livestock inventory report that I think

21  was Exhibit 1022 that reconciled that appraisal and also values

22  your livestock at $140 million.  Do you recall that?

23  A.  Yes.

24  Q.  Okay.  And I just wanted to confirm I think again that all

25  those livestock worth the $140 million are owned by Millenkamp

1  Cattle.

2  A.  Yes.

3  Q.  And no other debtor owns any livestock.  Just Millenkamp

4  Cattle owns livestock.

5  A.  On this report, yes.

6  Q.  Okay.  Now, Millenkamp Cattle also custom grows or feeds

7  livestock for some of its customers, correct?

8  A.  Yes.

9  Q.  And none of those customers' livestock are on Exhibits 1022

10  or Exhibit 1019.

11  A.  Correct.

12  Q.  Okay.  And have you also given periodic borrowing based

13  reports to Rabo?

14  A.  Ever since we've done business monthly, yes.

15  Q.  Monthly borrowing.  That was going to be my next question

16  whether they were weekly or monthly but they've been monthly

17  borrowing base reports to Rabo?

18  A.  Yes.

19  Q.  And were any of those monthly borrowing base reports

20  interrupted when the forbearance period had expired or through

21  the receivership or anything like that?

22  A.  Yes.

23  Q.  Okay.  So when was there a lapse in those monthly borrowing

24  base reports; do you know?

25  A.  It was either -- for two or three months it's been off

```
 1    schedule a little bit.  I think we've been turning them out but

 2    usually our accounting firm does it but I don't really know the

 3    exact status of that.

 4    Q.  Do you know approximately when there was that gap in the

 5    monthly borrowing base reports?

 6    A.  And again, I think we're turning out the borrowing base

 7    reports but not with the help of our accounting firm.

 8    Q.  Okay.  Do those borrowing base reports also itemize the

 9    livestock inventory count?

10    A.  Yes.

11    Q.  Did Rabo recently complete a livestock inspection?

12    A.  I think they've done either two or three in the last few

13    months, yes.

14    Q.  Okay.  And has the results of those livestock inspections

15    reconciled to the numbers presented in the borrowing base

16    report?

17    A.  Yes, very accurately.

18    Q.  And so there's been no concerns or allegations of livestock

19    shortages or anything like that?

20    A.  No.  They seemed happy with it.

21    Q.  Okay.  I want to focus now on the milk production which you

22    said varies between 59 and 61 pounds a day?

23    A.  Yes.

24    Q.  Okay.  And you indicated that that varies by seasonality and

25    weather?
```

1    A.  Yes.

2    Q.  And has there been any other variances lately in the milk

3    production for other reasons, for example, changes in rations?

4    A.  The one that I recall was maybe a month ago that -- it was

5    whenever Rabo was sweeping.  We literally had to switch our

6    ration drastically and our cows took a big hit for a week or so.

7    They lost five, six pounds of milk and since then, we've

8    recovered.

9    Q.  Okay.  That was my question.  Also, has there been any

10   change in the overall milk production due to the composition of

11   the herd?

12   A.  No.

13   Q.  Have there been any animal health issues that's impacted

14   production in the last 6 or 12 months?

15   A.  Zero.

16   Q.  I want to get into a new topic, generally the company's

17   revenues.  Let me -- related to that, for each pound per head

18   per day of milk production, how many dollars does that equate to

19   for you on a daily basis?

20   A.  A pound, 7 million dollars a year.  Excuse me, no.  A pound

21   would be $2 million a year.

22   Q.  And then milk is sold by the CWT?

23   A.  Correct.

24   Q.  So the quantity of your sales to Glambia or whoever is in a

25   hundred pound unit?

1    A.  Yes.

2    Q.  And then for each one cent change in CWT, what does that

3    equate to your dollars on a daily basis?

4    A.  You're giving me a math test, John.

5    Q.  Either that or if you want to do it on my --

6    A.  A dollar a hundredweight -- a dollar a hundredweight is $7

7    million a year.  So it would be one-hundredth of that.

8    Q.  And do you have an opportunity -- I heard the testimony you

9    have no contract with Glambia so you sell essentially on the

10   spot market?

11   A.  All Glambia customers sell on the spot market.

12   Q.  Okay.  So you're a plan B?

13   A.  What's that?

14   Q.  You're at Glambia.  Did you say plan B?

15   A.  No, it's Glambia.

16   Q.  Oh, Glambia.  Okay.

17   A.  Sorry.  Yeah.  That's how Glambia does it.

18   Q.  Okay.  And you have no hedges on your milk production?

19   A.  We have a lot of hedges on, yes.  We use different tools out

20   there, yes.

21   Q.  Do you currently have hedges on your milk?

22   A.  Some, yes.

23   Q.  And is that through a third-party broker?

24   A.  Some of it's, yes, through a third-party broker.  Ever Ag is

25   the name of the company.  Sometimes we sell direct to Glambia on

1   like a fixed cheese contract.

2   Q.  Okay.  I might at a later date want to get more information

3   from you on your broker account.  Do you get monthly position

4   reports?

5   A.  Yes.

6   Q.  You talked a little yesterday about your growing crops and I

7   think you put a valuation on your investment in the growing

8   crops in your Exhibit 1022.

9   A.  Yes.

10  Q.  And you grow haylage, alfalfa, triticale.  Are those some of

11  your crops that you grow?

12  A.  Yes.

13  Q.  And how many acres do you have planted in haylage?

14  A.  Like 7,000.

15  Q.  And is --

16  A.  And John, it would be hay, you know, turned into haylage.

17  Q.  Okay.  And that's a multi-year crop.  You don't need to seed

18  it every year.

19  A.  Yes, four or five years.

20  Q.  Okay.  And so that's 7,000 acres of haylage was growing

21  prepetition.

22  A.  Yes.

23  Q.  And federal multi peril crop insurance is not available on a

24  haylage crop; is that right?

25  A.  Correct.

```
 1   Q.  So your haylage is currently uninsured?

 2   A.  Correct.

 3   Q.  And then with respect to your corn and silage, how many

 4   acres do you anticipate planting in 2024?

 5   A.  5700 acres.

 6   Q.  And was any of that planted prior to April 2, the petition

 7   date?

 8   A.  No.

 9   Q.  Do you anticipate getting multi peril crop insurance on the

10   5700 acres of corn?

11   A.  No.

12   Q.  So have you ever participated in --

13   A.  No.

14   Q.  Why is that?

15   A.  I just don't insure the corn.  We have never had a wreck on

16   corn.

17   Q.  I'm going to change to a topic, your enterprises.  So you

18   have a dairy enterprise.

19   A.  Yes.

20   Q.  And you have a farming enterprise.

21   A.  Yes.

22   Q.  And you have a custom cattle feeding enterprise.

23   A.  Yes.

24   Q.  And you have a trucking enterprise.

25   A.  Yes.
```

1  Q.  Do you have any other enterprises of note?

2  A.  Not really.

3  Q.  Okay.  And so you're larger and more vertically integrated

4  than many dairies.

5  A.  Yeah, I guess you could -- John, you could add beef.  Beef

6  cattle.  That would be the other enterprise.  And yes, we would

7  be much more vertically integrated than the average dairy by

8  far.

9  Q.  Have you ever conducted an analysis to determine the

10 profitability of each of these enterprises on a stand-alone

11 basis?

12 A.  Roughly we have, yes.

13 Q.  Are some of them more profitable than others?

14 A.  Yes.

15 Q.  And if you were to go down the list, which would be the more

16 profitable to the least profitable?

17 A.  Over what time period?

18 Q.  Two years.

19 A.  I would say beef would be number one, then dairy and

20 farming, trucking would be last.  The calf ranch would be second

21 last.

22 Q.  Do any of those enterprises show consistent losses?

23 A.  Dairy over the last 16 months showed a steady loss.

24 Q.  Have you considered divesting some of the enterprises that

25 are not as profitable as maybe what the jewels may be?

1    A.  No.

2    Q.  With respect to your cattle operation, those beef cattle you

3    sell, do you hedge those or how --

4    A.  We usually just forward contract those.

5    Q.  Okay.  And who do you forward contract to?

6    A.  On the feeder cattle, we go direct to the buyers.  We sell a

7    lot to private feedlots in Canada.  So we just do a direct

8    contract with those.  And on fat cattle, sometimes we hedge

9    them, sometimes we don't.  For example, True West, we could

10   hedge those if we liked.

11   Q.  Is that through the same brokerage that you hedge --

12   A.  No, we just sell them direct to them.

13   Q.  You just do it under a future contract with your hedge.

14   A.  Yep.

15   Q.  Okay.  With respect to the data room that you've created at

16   Forbes, do you have any problem if as additional adequate

17   protection Conterra and its professionals get access to that

18   data room?

19   A.  I have no problem with that.

20   Q.  Okay.

21       MR. O'BRIEN:  That's all I have.  Thank you.

22       COURT:  Thank you, Mr. O'Brien.  Does the debtor have

23   additional redirect?

24                        REDIRECT EXAMINATION

25   QUESTIONS BY MS. MIKKILENENI:

1    Q.   Good morning, Mr. Millenkamp.

2    A.   Good morning.

3    Q.   Yesterday, you were asked by Rabo's counsel about

4    refinancing efforts.  Do you recall that?

5    A.   Yes.

6    Q.   Will having the DIP approved help with your refinancing

7    efforts?

8    A.   Absolutely.

9    Q.   You were also asked about the Riveron sum.  Do you remember

10   that?

11   A.   Yes.

12   Q.   Do you know who Riveron reached out to?

13   A.   Tiverten (phonetic) was one.  They were not good

14   communicators on who they were supposedly reaching out to but I

15   do know Tiverten was one because we got some feedback from them

16   after the fact.

17   Q.   And do you know if Forbes is going to reach out to different

18   people than Riveron reached out to?

19   A.   I would not know but, yes, I would assume Forbes would be

20   reaching out to an entirely different group.

21   Q.   I'd like to discuss the digester a little bit.  How much

22   annual revenue do you anticipate coming in once the digester is

23   complete?

24   A.   Around $10 million a year.

25   Q.   And once it's complete, will you have an ownership interest

1   in the digester?

2   A.  I will own a lot of the assets that were built on my

3   facility, yes.

4   Q.  Do you have any idea of the value of the part that you'll

5   own?

6   A.  Out of the 220 million, around $100 million is kind of part

7   of the dairy.  So close to 100 million.

8   Q.  And that will be a new asset for the dairy then.

9   A.  Yes.

10  Q.  I'm going to pull up Exhibit 3054.  Do you see that in front

11  of you?

12  A.  Yes.

13  Q.  This is an exhibit that Rabo's counsel was asking you about.

14  Do you recall that?

15  A.  Yes.

16  Q.  And this is an e-mail from David Heida to Doug Gibson; is

17  that correct?

18  A.  Yes.

19  Q.  So if we scroll down to page 3, do you see there in that

20  paragraph where Mr. Heida represented that the real estate

21  assets are worth 384 million; is that correct?

22  A.  Yes.

23  Q.  And if we go to Exhibit 3055, do you recognize this document

24  that Rabo's counsel was discussing with you?

25  A.  Can you show it to me?

1  Q.  This is the one with the Key Bank --

2  A.  Okay.  Thanks.

3  Q.  And if we scroll clear to the bottom.  Yeah, right there.

4  Sorry.  Go down.  So this is a listing of the real estate from

5  that financial statement, correct?

6  A.  Yes.

7  Q.  Do you see -- what are the last three items listed there?

8  A.  Jones Farm, digester and Cassia Creeks Farm.

9  Q.  Do you know whether those three were included in the 384

10 million that Mr. Heida talked about in that last e-mail?

11 A.  They were not.

12 Q.  They were not.  So would that be the difference between the

13 two?

14 A.  That is the difference, yes.

15 Q.  What would the purchase of Cassia and Jones properties do

16 for your business?

17 A.  They're large contiguous chunks of land that are next to

18 impossible to get.  It would create a larger land base to grow

19 feed and to haul manure on.  Also, it would give us additional

20 animal units so if we want to expand our cattle -- our cattle

21 facilities, whether it's dairy or feedlot or whatever, we need

22 additional animal units and the only way you get animal units

23 are through purchasing land.

24        So the Kendall Jones land is very appealing to me

25 because you can get a lot of land which means you get a lot of

1    animal units for a very inexpensive price.  So that was the --

2    that was the reason.  And it's contiguous and close and that's

3    the reason.

4    Q.  And what would that eventually do to your cash flow?

5    A.  It would help my cash flow.  More feed, cheaper -- cheaper

6    manure hauling because it's closer.  Growing your own feed is a

7    hedge so get some protection there on feed costs going into the

8    future.

9    Q.  The interim DIP order was entered on April 19 which was a

10   Friday.

11   A.  Yes.

12   Q.  When was the DIP funding received?

13   A.  I believe it was the following Monday or Tuesday.  I think

14   it was Monday.

15   Q.  Was Sandton ready to fund as soon as the DIP order was

16   entered?

17   A.  I believe so.  We got the money the following Monday.

18   Q.  So was it possible for them to fund over the weekend?

19   A.  I'm assuming it was impossible to wire money on a weekend.

20   Q.  So were the funds received on the next business day?

21   A.  I believe they were.

22   Q.  If we go back to Debtor's Exhibit 1021 -- I'm sorry, 1022.

23   You were correct.  If we can scroll down to the equipment.  You

24   were discussing this with Ms. Schwager, correct?

25   A.  Yes.

1    Q.  She asked you about the amount owing on the schedules versus

2    the amount in liens here for the equipment.  Correct?

3    A.  Correct.

4    Q.  The amount owing on the schedules to CNH, did that include

5    any amounts owing for leased equipment?

6    A.  I believe it was, yes.

7    Q.  And the appraisal did not include property for leased

8    equipment; is that correct?

9    A.  Correct.

10   Q.  So the value here, the 20 million, would not have included

11   leased equipment.

12   A.  Correct.

13   Q.  And so the liens here also would not include liens for

14   leased equipment.

15   A.  Correct, yes.

16   Q.  And even if we were to put $11 million in here instead of

17   2.9 which would be a difference of about $8 million; is that

18   correct?

19   A.  Yes.

20   Q.  Even if we were to do that, it would change the bottom line

21   to about 170 million; is that correct?

22   A.  Well, I think the other mistake is that the $4 and a half

23   million that's not recognized that's been paid so it would be

24   less than that.

25   Q.  The $4 and a half million paid to feed vendors?

1    A.   To the corn silage growers and the H & M.

2    Q.   Okay.

3    A.   That's forgotten on that.

4    Q.   Okay.  And so once you take into consideration that change

5    and if there were a change to the equipment liens, you would

6    wind up at about 175 million?

7            UNIDENTIFIED SPEAKER:  Leading.

8    BY MS. MIKKILINENI:

9    Q.   How much would you --

10           COURT:  Hold on.

11           MS. MIKKILINENI:  Sorry.

12           COURT:  Sustained.  Go ahead and rephrase your

13   question.

14   BY MS. MIKKILINENI:

15   Q.   How much would you end up with for the total -- the total

16   amount for personal property?

17   A.   For sure, the $4 and a half million is a mistake and I don't

18   know where we're at on the equipment.  But even if we're 100

19   percent wrong on the equipment, we would be 4 or $5 million less

20   than that.

21   Q.   Okay.  And how much again is Rabo owed?

22   A.   92 million.

23   Q.   And so are they -- how secured are they in the personal

24   property?

25   A.   Double secure.

1    Q.  The critical vendor list that we went over yesterday, did

2    you create that list by yourself?

3    A.  No.  Some of my employees helped me with it.

4    Q.  I believe you testified yesterday regarding that but could

5    you tell us again who helped you in determining the critical

6    vendor list?

7    A.  David Heida, Katie from Kander, Jake Millenkamp, Mario

8    Orcanonza, Mark Harrison.

9    Q.  And in creating that list, was any of that based on

10   conversations you had with those creditors?

11   A.  Most of it was based off conversations we had.

12   Q.  Did any of those vendors tell you they would not continue

13   COD --

14            UNIDENTIFIED SPEAKER:  Hearsay.

15            COURT:  Sustained.

16   BY MS. MIKKILINENI:

17   Q.  Can you describe your conversations with those vendors and

18   whether they would continue with you on a COD basis?

19   A.  Every conversation was different.  A lot of them were very

20   unpleasant because they were so jerked around during the

21   receivership.  There was a lot of mistrust where they've never

22   had it and they -- a lot of them were taking a pretty aggressive

23   approach that they're going to be patient for this month that

24   we're dealing on this and after that, you know, I was told by

25   numerous -- numerous vendors that they would no longer do work

1   for us.  And my son and the rest of those people I named other

2   than Katie had similar conversations.

3   Q.  And do you have any reason not to believe them?

4   A.  No.  Some of them have tested the water and they've jerked

5   my chain, walked out.  For example, our hoof trimmers did not

6   show up.  First time ever.  And that's a friend of mine.  He

7   goes, "I'm not working for you."  You know, we had miscellaneous

8   things like that.  Feed not getting delivered.  Just one

9   thing -- it's a daily job for me to try to figure that out and

10  it's still that way.

11  Q.  For H & M, do you control that company?

12  A.  No.  Brian Hudick is the managing partner.

13  Q.  Is he a partner?

14  A.  He is a partner, yes.

15  Q.  And how many partners are there?

16  A.  Two.  Brian Hudick and myself.

17  Q.  And what role exactly -- I'm sorry.  Can you explain what

18  role exactly he plays again?

19  A.  He runs the whole -- he buys all the equipment, runs the

20  labor.  He is in charge -- does the banking.  He's in charge of

21  it.

22  Q.  You testified that the people on the critical vendor list,

23  some of them are your friends; is that right?

24  A.  Yes.

25  Q.  Are there vendors not on that list that are also your

1  friends?

2  A.  Yes.

3         MS. MIKKILINENI:  That's all the questions I have.

4  Thank you.

5         COURT:  Counsel from MetLife?  Counsel for Rabo?

6         MS. SCHWAGER:  Just a couple of questions, Your Honor.

7                    RECROSS-EXAMINATION

8  QUESTIONS BY MS. SCHWAGER:

9  Q.  Mr. Millenkamp, did you just testify that the CNH secured

10  lien that's identified of $3,046,088.44 included leases?

11  A.  I'm not sure.  We're trying to figure that out right now.

12  Q.  Well, did you just testify to that in response to your

13  counsel's question?

14  A.  I testified that we have -- I believe what I was answering,

15  we have a lot of lease equipment and we purchase equipment from

16  them.

17  Q.  Okay.  Can we go back to your Exhibit 1018 which is in the

18  black book?  And we identified on this page 14 that these

19  brand-new Case tractors that were financed by CNH were part of

20  that lien amount, correct?

21  A.  Correct.

22  Q.  And if you add up those -- and we also established that your

23  appraiser did not value leased equipment, correct?

24  A.  Yes.

25  Q.  So if you add up those $95,000 of brand-new tractors, that

1   equals 2,850,000, correct?

2   A.  Correct.

3   Q.  And then if you turn to page 22 which discusses the Kubota

4   tractors, the brand-new Kubota tractors which you stated were

5   within that lien amount of CNH.  So it goes 2024 Kubota tractor,

6   it goes all the way down.  It starts out at 30,000 and goes down

7   to 48 thousand.  If I were to represent to you that that total

8   was 576 -- is that what it was?  576,000?  Would you have any

9   reason to dispute that?

10  A.  No.

11  Q.  And so those amounts exceed what that -- and those are the

12  purchase amounts.  So those amounts exceed -- establish what

13  that lien amount is that's set forth on CNH, correct, 2.6 in

14  your schedules?

15  A.  Correct.

16  Q.  So it doesn't include these amounts, correct?

17  A.  Correct.

18  Q.  Thank you.

19          MS. SCHWAGER:  Your Honor, I have no further questions.

20          COURT:  Mr. Naess?

21          MR. NAESS:  No.  Thank you.

22          COURT:  Mr. O'Brien.

23          MR. O'BRIEN:  None.  Thank you.

24          COURT:  All right.  You may step down, Mr. Millenkamp.

25  Thank you.

1          All right.  Does the debtor have additional witnesses

2    it would like to call?

3          MS. MIKKILINENI:  Yes, Your Honor.  We'd like to call

4    Kati Churchill.

5          COURT:  All right.  Ms. Churchill, please come up to

6    the stand.  Remaining standing when you get here so Ms. Battle,

7    the courtroom deputy, can swear you in.

8                    (KATI CHURCHILL is sworn.)

9          CLERK:  Please have a seat.  Once seated, please state

10   your name and spell your last name for the record.

11         WITNESS:  My name is Kati Churchill, C-h-u-r-c-h-i-l-l.

12         CLERK:  Thank you.

13                    DIRECT EXAMINATION

14   QUESTIONS BY MS. MIKKILINENI:

15   Q.  Good morning, Ms. Churchill.

16   A.  Good morning.

17   Q.  You testified at the last hearing on April 9; is that

18   correct?

19   A.  That's correct, yes.

20   Q.  Will you briefly describe again your involvement in this

21   case?

22   A.  Yes.  I am a director with Kander, LLC, and Kander's engaged

23   as a financial advisor to the debtors.

24   Q.  I'm going to pull up Exhibit 1026.  Do you see that in front

25   of you?

1    A.  I do, yes.

2    Q.  Do you recognize this document?

3    A.  Yes.

4    Q.  And who prepared it?

5    A.  Kander.  So myself and Ken Nofziger along with the debtor's

6    management team.  So Bill, David, Lisa.

7    Q.  And when was this budget created?

8    A.  This is a revision of the 4/17 budget and the revision was

9    published on 4/30.

10   Q.  And what is the time frame this budget runs through?

11   A.  It runs from April 2 through August 11 I believe is the last

12   day.

13   Q.  Would you like to see that last page?

14   A.  Yes, please, just in case.  Yes, August 11.

15   Q.  What time frame is that meant to cover?

16   A.  That's meant to cover the time until confirmation.  This

17   was --

18   Q.  Go ahead.

19   A.  This was the anticipated time until confirmation that these

20   budgets were pulled together.

21   Q.  Does it take into consideration the DIP funds?

22   A.  It does.

23   Q.  When is the next anticipated draw on the DIP?

24   A.  It's in the budget here for next week so that would be -- if

25   you could scroll up for me, please?  That would be week 6, the

1    week ending -- I'm sorry.  Can you scroll down just a moment all

2    the way to the yellow line?  There we go.  I believe -- scroll

3    up for me just a moment.  Second to last column.  Week 7.  So

4    that is next week.  $16.5 million.

5    Q.  What would happen to the budget if the DIP funds were not

6    available?

7    A.  The debtor would not be able to make the critical vendor

8    payments in the budget and there would be a shortfall.

9    Q.  What does this budget show for the amount of DIP needed to

10   make it through to August?

11   A.  The total amount through August 11 in this budget is $30

12   million.

13   Q.  And why did the debtors agree to a DIP of $45 million if the

14   cash need is only 30 million?

15   A.  Well, the cash need through this period is 30 million.  The

16   anticipated confirmation date of August 11 is not a set in stone

17   date so there's a possibility that the time frame could run

18   longer and that time frame would start putting the debtor into a

19   harvest period.  So there would be more farming expenses

20   potentially and also the harvest costs and the feed that would

21   be harvested.

22   Q.  So if we run beyond the August 11 date for confirmation, do

23   you anticipate needing more than 30 million?

24   A.  There's a possibility, yes.

25   Q.  Were there differences in this budget over the last four

1    weeks?

2    A.  Yes, there were.

3    Q.  I'm going to pull up Rabo's Exhibit 3062.

4    A.  Okay.

5    Q.  Have you had an opportunity to review this?

6    A.  I have, yes.

7    Q.  Have different budgets been submitted during this case?

8    A.  Yes, they have.

9    Q.  Do you know the main differences between each of the

10   submitted budgets?

11   A.  I do, yes.

12   Q.  I'd like to walk through those differences.

13   A.  Okay.

14   Q.  What were the differences in receipts between the April 2

15   budget and the April 8 budget?

16   A.  So the differences between the April 2 and the April 8

17   budget on receipts -- first, I would just like to point out that

18   the April 2 budget and the April 8 budget are a different start

19   date by one day.  So the one on April 2 started on April 1

20   whereas the April 8 budget starts on April 2.  So there was just

21   some timing adjustment there for the April 1 date.

22           The starting cash amount is somewhat different.  But on

23   the receipts, you'll see that there is one milk check that is to

24   be received on April 1 so the difference from the 2nd -- the

25   budget on the 2nd to the budget on the 8th reflects that that

1    milk check was not received into the debtor's operational cash

2    flow but held by Rabo.

3            And then there's a $1.7 million difference in net

4    cattle sales receipts and that is the collection of a

5    prepetition sale of cattle.  The reason it's reflected in net

6    cattle sales receipts versus AR collections is the AR

7    collections is meant to reflect what was in the reported AR as

8    of the -- as of the filing date.  So that amount was not in AR

9    because it had not -- the invoice for it yet had not been

10    entered.

11    Q.  And what were the differences in critical vendor payments

12    between the 2nd and the 8th?

13    A.  Sure.  So there's an addition of about $2.1 million in

14    critical vendors from the 2nd to the 8th and without the full

15    list of critical vendors in front of me, I couldn't speak to

16    exactly which vendors those were.  But there have been, as

17    Mr. Millenkamp has testified to, ongoing conversations with

18    vendors regarding the need for critical vendor payments to them

19    to keep operations moving and most of these that are related to

20    feed have liens.

21    Q.  What were the differences in operating disbursements between

22    the 2nd and the 8th?

23    A.  Sure.  So one of the updates between the 2nd and the 8th, by

24    the time we got to the 8th, the first week had already passed so

25    from the 2nd to the 7th.  So week 1 of the budget was updated to

1   reflect actuals.  Also I believe in the week -- in the budget on

2   the 2nd, it had anticipated a first small round of DIP

3   collections there so essentially that budget was updated to

4   reflect what had actually happened from the 2nd to the 7th,

5   April 2 to April 7.

6   Q.  What were the differences in the DIP amount between the 2nd

7   and the 8th?

8   A.  Sure.  So the difference in the DIP amount went from 19.3

9   million on the April 2 budget to 24.6 million on the 4/8 budget.

10  And again, you can see there's a difference in starting cash.

11  There's a difference in timing of payments and there's also an

12  additional amount added to the critical vendor payments.

13  Q.  And what were the differences in receipts between the April

14  8 budget and the April 17 budget?

15  A.  There are no differences in receipts from the April 8 to the

16  April 17 budget.

17  Q.  What were the differences in critical vendor payments

18  between the 8th and the 17th?

19  A.  So there are no differences in the amounts but there were

20  differences in the timing.  If you'll recall from the 8th to the

21  17th, that's when there was the telephonic hearing about which

22  portion of those -- there was an agreement on which critical

23  vendor payments were during the interim period and then there

24  was discussion about what amount of DIP financing would be

25  available during the interim period.  So the adjustment from 4/8

1  to 4/17 is primarily to adjust for the timing.

2  Q.  What were the differences in operating disbursements between

3  the 8th and the 17th?

4  A.  So between the 8th and the 17th, in the original form of the

5  budget, there had been different timing for when the DIP funding

6  would be coming in.  As we made it to the 17th, there was a lot

7  more certainty about the timing of the DIP funding during the

8  interim period so week 1, 2 and 3 in the 17th were closer

9  adjusted to -- sorry.  Let me restate that.

10        Without the DIP financing available in week 1 and 2 of

11  the budget, the actual outflows of cash during that time were

12  different.  So essentially, the difference in week -- in the

13  17th budget is again just timing, sliding things from left to

14  right as DIP financing became available.

15  Q.  What were the differences in the DIP between the 8th and the

16  17th?

17  A.  So the differences in the DIP between the 8th and the 17th

18  was 24.6 million to 30 million.  That's about 5.4 million

19  dollars.  And in that time frame, that is when the $1.5 million

20  reserve amount was contemplated into that calculation.  And the

21  DIP amount is available in $5 million increments.  So as you

22  triggered that $1.5 million minimum, the additional amount

23  needed doesn't jump up by the $10,000 maybe that you go over it.

24  It triggers a new round of $5 million.

25        So you'll see that the ending cash from the 4/8 budget

1    to the 4/17 is not -- you're not ending with the same cash but

2    you are adding more to the DIP funding if that's makes sense the

3    way I'm saying that.

4    Q.   What were the differences in receipts between the April 17

5    budget and the April 30 budget?

6    A.   You'll see that there is a difference in net milk check

7    receipts.  This doesn't -- this is a reformatting of where

8    interest payments are reflected.  So in each previous version of

9    this budget, interest payments to MetLife and Conterra were

10   below the line down into -- they were -- I'm sorry.  They were

11   above the line.  They were up here in net milk checks as a

12   reduction to net milk check.  That's how everything was done

13   prior to the filing.

14           But in the current period, those milk checks will not

15   have a reduction for the payments to Conterra and MetLife.  So

16   we've just reformatted this to show the full amount coming into

17   the milk check and then leaving as a cash disbursement.

18   Q.   And so were the interest payments to MetLife and Conterra

19   added in as a separate line item?

20   A.   Yes.  So down below in disbursements -- and I guess I'm

21   addressing it as a whole unit because it's two sides of the same

22   adjustment.  So yes, down in -- down in disbursements, you'll

23   see MetLife and Conterra interest payments as a line that had

24   nothing reflected on them before.  And that's not because they

25   weren't receiving payments.  It's just because they were netted

1  off the milk check.  But now you see them broken out as separate

2  line items.

3  Q.  And are there any other changes in disbursements between the

4  17th and 30th?

5  A.  There are minor changes in here as well.  So another

6  reformatting.  The repair and maintenance line and the loan

7  lease payments.  There was one vendor where essentially -- it's

8  Western States where they were all categorized into repair and

9  maintenance.  And then half of those payments truly are loan and

10  lease so it was just split and reformatted so you'll see a

11  re-categorization, you know, $300,000 from repair and

12  maintenance to loan and lease.

13         There's a slight increase to the vet med line item and

14  that's based on conversations with the debtor on needs for vet

15  med.  And there is an increase to the Conterra interest amount.

16  So in every previous iteration of the budget, Conterra's

17  payments have been based on kind of the historical payments that

18  have been netted off the milk check.  And through conversations,

19  it became apparent that there would be interest payments for

20  both around a $20,000 amount and a $70,000 amount.  One is for

21  the real estate piece, I believe the German Dairy, and the

22  second is for the mezzanine amount, the 16.5 million.  So there

23  is -- to clarify, there is additional interest payment

24  disbursements reflected for Conterra in this budget over the

25  other.

1    Q.  What were the differences in critical vendor payments

2    between the 17th and 30th?

3    A.  There was an additional approximately $1 million and this is

4    made up of four to five vendors in feed, for silage vendors,

5    that have -- have liens that were added into the critical vendor

6    list at the request and kind of knowledge of Mr. Millenkamp, Mr.

7    Heida and Lisa Nelson.

8    Q.  What were the differences in the DIP between the 17th and

9    the 30th?

10   A.  There were no differences.

11   Q.  So what are the reasons why the DIP loan increased from 19.3

12   million on April 2 to $30 million now?

13   A.  Sure.  So part of the difference is -- and this will just be

14   a summation of kind of each iterative difference that we've

15   talked about.  But the first, you'll notice that the 19.3

16   million on April 2, that included the receipt of a milk check on

17   April 1 that is no longer part of the budget.  So that was not

18   received.

19          Additional changes in here are going to be relating

20   partially to timing so you'll see that that one started on April

21   1 whereas all the rest start on April 2.  But the primary

22   pieces, aside from that milk check, are going to be the critical

23   vendor payments.  So from April 2 to the April 30 budget,

24   critical vendors has increased by approximately $3 million and

25   then, like I said, the Conterra interest payments of the $70,000

1    portion of their payment is now reflected in the 4/30 budget so

2    that is part of the increase as well.  And sorry.  Let me just

3    make sure that I'm touching on each piece.

4         Milk checks, critical vendors.  I mean there's the

5    small portion that we discussed earlier about the vet med.  And

6    then on interest payments, I guess one more thing that I would

7    point out is that the 4/30 budget does show the cadence of the

8    interest payments was adjusted to reflect ongoing discussions

9    that have been occurring.

10        So you'll notice that between the forecast 5 and

11   forecast 6, there's an additional amount in Rabo interest

12   payments.  That's just based on, again, kind of timing and

13   cadence of when those payments are going out.  So an extra one

14   got swept into this window that we're looking at.  It doesn't

15   necessarily reflect a difference in (inaudible).  It's just a

16   timing issue.

17   Q.  Have the budgets since the petition date included cattle

18   sales?

19   A.  Yes, they have.

20   Q.  Does the value of non-milking cattle increase in value every

21   day?

22   A.  It does.

23   Q.  How are the non-milking cattle valued?

24   A.  So non-milking cattle are valued on a weight basis, like a

25   pound per animal.

1    Q.  And when the non-milking cattle is sold, is that particular

2    cow replaced in the operation.

3          MR. SCHOULDER:  Leading.  She's leading the witness,

4    Your Honor.

5          COURT:  Sustained.  Go ahead and rephrase your

6    question.

7    BY MS. MIKKILINENI:

8    Q.  Are the non-milking cattle replaced at any point in the

9    operation?

10   A.  They are.  Yes, they are replaced in the operation through

11   the standard life cycle of the operation.  So the cattle that

12   are sold are replaced by the cattle that are directly behind

13   them in the life cycle.  And as everything moves to that life

14   cycle, the ones that are born and the ones that are purchased,

15   those are day-old cattle.  They begin at the early side of the

16   cycle and each one moves up every day in its weight close.

17         So it is not replaced by the baby cow directly.  It's

18   replaced by the cow that's one day younger than it.  I'm sorry.

19   I'm using the word "cow."  That's inaccurate.  It's replaced by

20   the animal that's one day younger than it.  So there is a push-

21   through cycle that replaces it.

22   Q.  I'm going to turn to Rabo's Exhibit 3052.  Do you recognize

23   this?

24   A.  I do, yes.

25   Q.  What is it?

1   A.  This is the weekly variance reporting that is being produced

2   to show the variance between the budget and the actual results

3   of the business on a weekly basis.

4   Q.  And who prepares these reports?

5   A.  Kander prepares these reports in concert with the Millenkamp

6   team.  They provide reports.  They review the information and

7   Kander does the Excel magic of the reporting.

8   Q.  And what are these reports used for?

9   A.  These reports are used both internally and with the -- for

10  reporting purposes to the lenders.  Management team uses these

11  to review where they are cumulatively on the budget and the

12  other parties that receive this are reviewing them in connection

13  I guess with the requirements of the DIP loan and also the cash

14  collateral.

15  Q.  And who receives these reports?

16  A.  Management and the secured lenders and their financial

17  advisors.

18  Q.  Do you discuss these reports with the parties who receive

19  them?

20  A.  I do.  Kander has weekly calls with the financial advisor

21  teams and with Sandton regarding these reports.  We also discuss

22  budget actual and variance with the management team frequently,

23  often.

24  Q.  What's the variance requirement for the DIP loan?

25  A.  The total cash receipts are not to be below 20 percent and

1  the total cash disbursements are not to be 20 percent over

2  budget.  And this is for like a rolling four-week period.

3  Q.  Was there also a line by line variance requirement for the

4  DIP loan?

5  A.  There was.  It's my understanding that that has been waived

6  in favor of an aggregate variance.

7  Q.  Are the debtors currently in compliance with the variance

8  requirements?

9  A.  They are.

10  Q.  Were you involved in the preparation of the bankruptcy

11  schedules?

12  A.  Yes.

13  Q.  Were you involved in the preparation of the amendment to the

14  Millenkamp Cattle schedules?

15  A.  Yes, I was.

16  Q.  Were you involved in the preparation of the critical vendor

17  list?

18  A.  Yes.

19  Q.  Can you explain -- can you explain why there were amendments

20  to the schedules?

21  A.  Sure.  In the original version of the schedules, the amount

22  included only included the past due accounts payable and when we

23  recognized that, it was adjusted so that it included the entire

24  accounts payable as of 4/1.

25  Q.  Why did the critical vendor amounts change?

1    A.  Well, in relation to the schedule update, there was a small

2    handful of vendors who critical vendor amount was determined

3    based off of the previously scheduled amounts.  So as those were

4    updated, their total amount due was brought in line with their

5    actual scheduled amount.

6    Q.  Are the amended schedules and the critical vendor list now

7    aligned and show the same amounts?

8    A.  That's my belief, yes.

9    Q.  Do you believe the secured and unsecured creditor schedules

10   for Millenkamp Cattle are now accurate?

11   A.  That would be my belief, yes.

12   Q.  Are you working on long-term cash projections for Millenkamp

13   Cattle?

14   A.  Yes.  Kander and Millenkamp are working on those.

15   Q.  I'm sorry.  I want to rephrase what I asked.  I asked you if

16   you were working on long-term cash projections for Millenkamp

17   Cattle.  But are you working on long-term cash projections for

18   all the debtors?

19   A.  Yes.  I apologize.  When I answered, that is also what I

20   assumed for the debtors.

21   Q.  Will those long-term cash projections include exit

22   financing?

23   A.  Yes, they will.

24   Q.  At this point, what percentage are you assuming unsecured

25   creditors will receive?

```
 1   A.  At this point, we're assuming that it will be 100 percent.

 2   Q.  Will debtors be able to generate free cash flow sufficient

 3   to service their debts?

 4   A.  That is our belief.  It's, you know, of course based on

 5   certain assumptions and those assumptions are that their milk

 6   prices remain in a favorable place.  It assumes that the debtors

 7   are able to successfully exit bankruptcy and it assumes that the

 8   critical vendor -- like the ongoing operations of the business

 9   through bankruptcy are able to continue uninterrupted.

10   Q.  I have no further questions.  Thank you.

11   A.  Thank you.

12           COURT:  Counsel for MetLife.

13           MR. GOURLEY:  No questions, Your Honor.

14           COURT:  Counsel for Rabo AgriFinance.

15           MR. SCHOULDER:  Yes, Your Honor.

16                          CROSS-EXAMINATION

17   QUESTIONS BY MR. SCHOULDER:

18   Q.  Good morning, Ms. Churchill.

19   A.  Good morning.

20   Q.  You don't have any plane scheduled today.

21   A.  No, I'm not.

22   Q.  So we can take our time?

23   A.  I'm here, yes.

24   Q.  Okay.  Ms. Churchill, just going back to your testimony just

25   a few minutes ago, you were talking about the adequate
```

1    protection payments that are in the new budget and you testified

2    that Conterra is receiving adequate protection payments for the

3    German farm -- alone on the German farm; is that right?

4    A.  Yes.

5    Q.  Conterra is not being primed by the DIP on the Conterra

6    farm; is that right?

7    A.  I'm unaware of the status of those.

8    Q.  Right.  So you're not aware whether the DIP is priming

9    Conterra on the German farm note?

10   A.  I guess what I testified to is just the cash payment of

11   their interest.

12   Q.  Okay.  Do the debtors have restatement GAAP financials for

13   March of 2024 yet?

14   A.  No.

15   Q.  And February 2024?

16   A.  No.  Mr. Millenkamp had testified earlier today that their

17   accounting relationship -- they've just engaged a new accountant

18   so --

19   Q.  Well, I believe it was in the context of the audited

20   financial statements.  I wasn't sure if there was a difference

21   between --

22   A.  Sorry.  I --

23   Q.  I'm talking about the March GAAP financials for the debtors.

24   Do they exist?

25   A.  No.

```
 1   Q.  And February?

 2   A.  No.

 3   Q.  January?

 4   A.  No.

 5   Q.  Okay.  And we've already cleared the record that they don't

 6   have audited financial statements.

 7   A.  That's correct.

 8   Q.  In your experience as a financial advisor, have you worked

 9   on lending transactions before?

10   A.  Could you -- I need to understand the context of the

11   question I guess.

12   Q.  Sure.  In your experience as a financial advisor to

13   companies, have you worked on financing transactions on behalf

14   of the borrower?

15   A.  Yes.  Kander's role in this particular case is reporting so

16   we are doing the reporting internally for management.  We're

17   also turning out these weekly cash reporting.  So the scope of

18   our engagement here is primarily focused on reporting.

19   Q.  Right.  But generally, your other experiences in your career

20   where your role is greater than reporting, have you worked with

21   companies on financing transactions?

22   A.  Yes, although the scope of this engagement is more limited.

23   Q.  I understand.

24   A.  Okay.

25   Q.  Would you agree that having GAAP financial statements would
```

1   be an important piece of data for prospective lenders?  Would

2   you agree with that?

3   A.  I would agree with that.  I believe Mr. Millenkamp has

4   testified to the reason why the monthly financials are not

5   available at this time for January through the current period.

6   Q.  Right.  But I'm asking you about your experience as a

7   financial advisor involved in lending transactions.  And so is

8   it correct that your testimony is that in your experience, GAAP

9   financial statements are important for prospective lenders?

10  A.  Yes.

11  Q.  And audited financial statements would also be -- year-end

12  audited financial statements would also be important for

13  prospective lenders; is that right?

14  A.  Yes.

15  Q.  And would you agree that the absence of audited financial

16  statements will make it more difficult for the debtor's

17  refinancing efforts?  Would you agree with that?

18  A.  I don't think the debtor has any intention of not having

19  monthly or audited financial statements and they have been

20  working towards securing an accounting relationship that would

21  produce those.  So I don't believe that there's any intention to

22  not produce those and, as Mr. Millenkamp testified earlier

23  today, they have Cooper Norman lined up to come in and do their

24  accounting, produce their monthlies and produce the audited

25  amounts.

1   Q.  I understand that.  That wasn't my question though.  My

2   question was do you agree, based upon your experience, that the

3   absence of audited financial statements and monthly GAAP

4   financial statements for 2024 would make it more difficult for

5   the lenders -- for the debtors to obtain refinancing as part of

6   their Chapter 11 cases?

7   A.  I do agree that not having those would make it more

8   difficult but what I also believe I'm saying is that the debtor

9   has every intention of having those available.  They aren't at

10  this moment but their new accounting relationship should be

11  producing those and I know they've got to get up to speed but,

12  yes, at the current moment, there are not monthly financials.

13  Q.  Right.  And since they have to get up to speed, that's going

14  to take additional time, right?

15  A.  Yeah.  I'm not aware of how much time it will take but I

16  think everyone would agree that it does take a little time to

17  get the new accountant up to speed.

18  Q.  Right.  And that could also delay the goal of emerging from

19  Chapter 11 by August 11.  I think that's the date in your

20  budget.

21  A.  Yeah.  I know that Mr. Millenkamp and David Heida and those

22  that are talking with Cooper Norman have certainly impressed the

23  importance of speed in getting this all set up.

24  Q.  Just a quick question while we're on the topic of financial

25  statements.  Do you agree that EBITDA is a -- withdrawn.  EBITDA

1    is not a GAAP metric, is it?

2    A.   I'm sorry.

3    Q.   I'll restate it.

4    A.   Thank you.

5    Q.   Is it your understanding that EBITDA is not a GAAP metric?

6    A.   Yes.

7    Q.   Is cash flow a GAAP metric?

8    A.   I'm not certain the intention of the question.

9    Q.   It's just a yes or no.  It's just generally based upon your

10   experience with financial statements and financial reporting.

11   A.   My experience with financial reporting particularly in the

12   context of bankruptcy is cash is -- and I believe we heard

13   yesterday testimony that you could ask anyone what cash flow

14   means -- we're talking about cash in the door and cash out the

15   door and so my experience in this case particularly and in most

16   of the cases that I've worked on is cash receipts and cash

17   disbursements.

18   Q.   Are part of GAAP.  It's not a trick question.

19   A.   No.  I understand.  I'm -- I'm not doing GAAP accounting.

20   I'm doing cash -- checkbook accounting.

21   Q.   Okay.  What's the --

22   A.   Reporting.  I apologize.  Checkbook reporting.

23   Q.   I'm sorry.  I didn't mean to cut you off.

24   A.   No.  And I stalled.

25   Q.   Okay.  Ms. Churchill, what's the current value of a fat

1  steer based upon the debtor's inventory report?  And I could

2  pull that up for you if you don't know offhand.

3  A.  Yeah.  The inventory report is not something that I directly

4  work with so I would have to see that if you were asking a

5  question.

6  Q.  Could we pull up Exhibit 1022 which I believe is the updated

7  inventory report?  And by reference, just to clarify, when you

8  reference a fat steer, I'm referring to what's in the line item

9  for cattle sale receipts.

10  A.  Okay.  So you're asking here for the fat cattle?

11  Q.  Right.  What's the price?

12  A.  $2100 that they've got on here, yes.

13  Q.  Okay.  And according to the latest budget that you assisted

14  in preparing that was filed on May 1 or April 30, the debtors

15  intend to sell approximately $13 million of steers.  Is that

16  right?

17  A.  The $13 million, without having it directly in front of me,

18  I believe that that is for all cattle sales.

19  Q.  Okay.

20  A.  Since we say steers, I just want to clarify.

21  Q.  Okay.  Thank you.  And when the debtors realize the benefit

22  of that $13 million, they aren't using any portion of those

23  funds to pay down Rabo's facility, are they?

24  A.  The payment to Rabo that is in the current budget is

25  interest payments only.

1   Q.  Right.  So before you testified that when the debtors sell a

2   steer -- we'll just stick with steers for now.

3   A.  Okay.

4   Q.  Is it your understanding that the debtors intend to replace

5   that steer with a baby calf?

6   A.  I think that oversimplifies the cycle.  If you're selling a

7   feeder cattle, for example, that is approximately 450 pounds,

8   they get to be 450 pounds through weight gain daily.  So you're

9   selling an animal -- I'm going to pick the wrong day but I'm

10  going to use it as an example.

11          So if you're selling an animal on the 60th day of their

12  life cycle, they've had 60 days worth of weight gain, the animal

13  that you're replacing it with is the one that's had 59 days

14  worth of gain.  So the one right behind it -- as you move

15  everything up through the cycle, the one that replaces the day-

16  old is the one that's born this day or the one that's purchased

17  as a day old.  So the purchase doesn't directly replace the

18  animal that you sold that has 60 days worth of gain but it

19  backfills the cycle.

20  Q.  The cycle is approximately 18 months, isn't it, before

21  you're able to sell it out to the market and get top dollar?

22  A.  18 months for a -- yeah.  I believe so.

23  Q.  We don't have to use -- approximately 18 months is the life

24  cycle?

25  A.  Sure.  Okay.  Yes.

1    Q.  And so if you have -- in that 18 month -- after 18 months,

2    that steer, that animal, just to keep it generic, that animal is

3    let's just say $2100, correct?

4    A.  Okay.  Yes.

5    Q.  And when you have the animal that is in its life cycle at 60

6    days, that animal is worth less than the animal that you sold

7    for $2100, right?

8    A.  Yes.  But the animal that you're selling at 18 months is one

9    month fatter than the animal that you have in your 17-month

10   category.

11   Q.  But the value's not the same, is it?

12   A.  No.  Because they are valued by weight and they gain weight

13   daily.

14   Q.  Right.

15   A.  So -- and there's births and there are purchases daily and

16   weekly.

17   Q.  For Rabo Bank to realize on the value of the growth of that

18   cattle, of that animal, Rabo would have to wait another 18

19   months.  Is that right?

20   A.  For the baby.

21   Q.  Right.

22   A.  But not for the 17-month.

23   Q.  So there's a gap period where a fully matured marketable

24   animal is sold for top dollar --

25   A.  I really -- I don't agree.

1   Q.  -- and is replaced on day 1, right?  We're just capturing a

2   moment in time because that's what the appraisers -- the

3   appraiser's doing.  He's looking at that as of I believe we'll

4   just say May 1, right, because I don't remember what his

5   appraisal said.

6   A.  Sure.

7   Q.  His appraisal doesn't look forward 18 months, does it?

8   A.  No.

9   Q.  And his appraisal doesn't look 30 days ahead, does it?

10  A.  No.

11  Q.  He's looking at it as of May 1.

12  A.  At a moment in time.  Correct.

13  Q.  So if we were to sell a steer from that May 1 report and

14  replace it with another animal of -- a younger animal, the value

15  would go down on that May 1 report, wouldn't it?

16  A.  No.  If we're selling one 18-month-old animal --

17  Q.  For a 60-day animal.

18  A.  Well, I'll use 18 months since that what we're talking

19  about.  I used 60 days as just a reference point.  But if we're

20  selling an 18-month animal and an animal is also born that day,

21  the 18-month animal's value is 18 months worth of gain.  So

22  you're not replacing it with the baby that is also born on that

23  Tuesday.  You're replacing it with the animal that was born the

24  day after it.  So the animal that was born the day after it is

25  three pounds less fat.

1  Q.  What do you mean by "it"?  I just --

2  A.  I'm sorry.  The one that you're selling.

3  Q.  Just so that we're talking about the same animal.

4  A.  Yes, yes.  So the animal that you're selling, the 18-month-

5  old animal has had 18 months worth of weight gain and its value

6  is based on its weight.  So you're selling pounds.  You're

7  selling pounds of animal and the animal that is a day less old

8  than it is a day less weighty, a day less fat.

9       So the animal that you are selling -- also, you're

10  feeding all these other animals and they are getting fatter and

11  they are accumulating value as they get larger.  So the one

12  that -- the newest animal that comes into the herd that day is a

13  baby but the one that backfills the one you sold is the one

14  that's only one day less old and one day less fat.

15  Q.  Right.  The only way you can get to the -- keeping the herd

16  at the same number which is your prior testimony is by bringing

17  in that baby animal into the inventory, isn't it?

18  A.  Yes.  You have to bring animals in as you bring animals out.

19  Q.  Right.  So the number has stayed the same but when you bring

20  that baby animal into the herd, into the inventory, that baby

21  animal that you're bringing into the inventory to keep the

22  numbers steady state --

23  A.  Uh-huh.

24  Q.  -- that baby animal is not worth the same as the steer you

25  just sold that had 18 months of weight, is it?

1    A.  No.  The big animal is replacing the day old animal in your

2    chain.  So the baby animal is born and it comes in and it pushes

3    the one that was at 1 day now to 2 days.  So they keep moving

4    up.  So you're always -- you are always valuing the herd on

5    babies to the day before 18 months -- 17 months and 30 days.  So

6    as you push one out, one comes in.  And this amount stays the

7    same.

8    Q.  So the way that the amount stays the same is because you're

9    introducing a baby animal into the inventory, correct?  So

10   one --

11   A.  And time goes on.

12   Q.  But we're looking at -- we're looking -- on the appraisal

13   report, we're looking at it from a day snapshot, correct?

14   A.  Yes.

15   Q.  Right?  So we don't have the opportunity to wait for 18

16   months for that --

17   A.  We're not talking about 18 months.  I'm talking about one

18   day of weight gain.

19   Q.  Right.  But I'm talking about the snap shot on the piece of

20   paper, right, that we're relying on for value purposes --

21   A.  Yes.

22   Q.  -- that we're trying to set adequate protection based upon,

23   correct?

24   A.  Yes.

25   Q.  Right?  That is what the debtors are relying on for purposes

1   of adequate protection, that piece of paper, right?

2   A.  Yes.

3   Q.  Right?  And so if you take a $2100 steer off of the

4   inventory, then you have one less animal on the inventory,

5   correct?

6   A.  Yes.  More animals are born, yes.

7   Q.  And then the only way to get the inventory count to be back

8   to what it was was to -- is to add a baby animal onto it,

9   correct?

10  A.  Yes.

11  Q.  That baby animal on that day 1 snapshot is going to be worth

12  less than the $2100 animal that was just sold, correct?

13  A.  I mean I --

14  Q.  Just in the snapshot.  Just in the snapshot, Ms. Churchill.

15  A.  No, I understand.  I think we're splitting hairs of if the

16  animals are sold at noon and the baby's born at 2:00 p.m.  The

17  window of time, there's always animals in the herd at every age

18  and every daily weight gain amount.

19  Q.  Ms. Churchill, if I went and sold the baby animal on the

20  date of that sheet, what would I get for it?

21  A.  I don't have that number in front of me.

22  Q.  Approximately.  Would it be 2100?

23  A.  No.

24  Q.  Would it be a thousand?

25  A.  No.

1    Q.  Would it be 500?

2    A.  I don't know.

3    Q.  So -- withdrawn.  Now, let's turn to Exhibit 3056, please.

4    Did you get that -- or do you want to use the books, Ms.

5    Churchill?

6    A.  Oh, probably a little bit of both.  Which books are we

7    looking at?

8    Q.  It's Volume 3, right?

9    A.  Okay.

10   Q.  Volume 3 of the Hawley Troxell white books.

11   A.  Okay.  And which exhibit again?

12   Q.  3056.

13   A.  Yes.  Okay.

14   Q.  Okay.  Could you scroll down to the budget?  Too fast.  Too

15   fast.  Sorry.  Do you recognize that e-mail?

16   A.  I do, yes.

17   Q.  What do you recognize that e-mail to be?

18   A.  That is an e-mail from me to Bill, David and Ken with the

19   attached DIP loan calculation worksheet.

20   Q.  Okay.  And according to this e-mail from you, what does the

21   DIP loan need as of March 22?

22   A.  The DIP loan need for the attached budget here was 8.5

23   million.

24   Q.  Okay.  Could we scroll down to the budget, please?  All the

25   way down.  Right there.  And so that e-mail is consistent with

1   the key assumptions and cash disbursements on this page,

2   correct?

3   A.  Yes.

4   Q.  And this budget that you prepared and if you want to flip

5   through it just to make sure it's the right budget you prepared

6   back then --

7   A.  I trust that it is.

8   Q.  This budget assumes an 8.5 million DIP financing need,

9   doesn't it?

10  A.  With the assumptions that were built into this budget and

11  for the purposes that it was produced, yes.

12  Q.  And this budget was provided to Sandton in connection with a

13  Sandton DIP financing, correct?

14  A.  That's correct.

15  Q.  It wasn't prepared for any other lender or other lending

16  structure.  Just Sandton?

17  A.  That's my understanding, yes.

18  Q.  Right.  So it didn't contemplate the steer sales or anything

19  like that that would have been part of a prebankruptcy Rabo Bank

20  DIP proposal, right?

21  A.  It contemplated the sale of animals.  It didn't contemplate

22  the proceeds.

23  Q.  Okay.  So did management approve this budget for $8.5

24  million?

25  A.  They did, yes.

1   Q.  And did you have conversations with management about the

2   critical vendor payments that were assumed in this -- in this

3   DIP budget?

4   A.  If you could scroll down to the next part of the budget for

5   me, that would be helpful.

6   Q.  Sure.

7   A.  My eyes are good but not that good.  Thank you.  Yes.  The

8   question was did we discuss critical vendors.  Yes.

9   Q.  And as part of the -- earlier you testified about your

10  process of going through critical vendors.  You have

11  conversations with management and you come to who the critical

12  vendors are and what they should receive, correct?

13  A.  That's correct.

14  Q.  And did you go through that process with the debtor's

15  management team in connection with this --

16  A.  Every iteration of this budget, we've done that.

17  Q.  Okay.  So they've signed off on all these payments?

18  A.  That's correct.

19  Q.  Right.  And so could we just go to Exhibit 3030?  And if we

20  could go to Exhibit C, page 45 of the PDF.  Just let me know

21  when you're in there, Ms. Churchill.

22  A.  Give me just a moment.  3030?

23  Q.  That's correct.

24  A.  Okay.

25  Q.  Exhibit C, page 45.  It's your April 2 budget that was filed

1    on the first day.

2    A.  Okay.  Got it.  Thank you.

3    Q.  You're welcome.

4    A.  All right.  I'm there.

5    Q.  So this was a budget that was filed on April 2 in connection

6    with the commencement of the Chapter 11 cases, right?

7    A.  Yes.

8    Q.  And this DIP budget shows a $19.3 million DIP financing need

9    for -- against a $35 million total commitment, correct?

10   A.  That's correct.

11   Q.  And prior to this point, there had been -- you know, had

12   there been any negotiations with critical vendors at this point?

13   A.  I'm not party to the negotiations but my understanding is

14   that there is ongoing conversations between Millenkamp's team

15   and their vendors -- all their vendors but particularly their

16   critical vendors.

17   Q.  Right.  But there hadn't been a critical vendor motion filed

18   at this point in time at the time this -- well, withdrawn.  In

19   connection with the filing of this budget, that was when -- that

20   was when the critical vendor motion was filed for the first

21   time, correct?

22   A.  That's my understanding, yeah.

23   Q.  So a lot of the conversations with critical vendors

24   typically take place after the filing of the critical vendor

25   motion.  Isn't that right?

1   A.  I'm not sure.

2   Q.  And you weren't aware based upon your conversations with

3   management about the very -- over the various versions of the

4   budgets whether critical vendor conversations were happening?

5   A.  I know that critical vendor -- conversations with vendors

6   who were on the critical vendor list were ongoing based on

7   operational need of their services.

8   Q.  So I'm just trying to figure out that before the case is

9   even filed that the critical vendor component went up by

10  approximately $8 million between the time you filed the March --

11  prepared the March 25 budget and the time you filed the April 2

12  budget.  So it's $8 million increase before the case has even

13  commenced.  Is that right?

14  A.  That's correct.

15  Q.  And who made the decision to increase the $8 million before

16  the case was even filed?

17  A.  All of the decisions for what goes into the critical vendor

18  payment, as Mr. Millenkamp has testified to, are made through

19  discussions with his team and then communicated with Kander to

20  include in the budgets for the -- I'm trying to think of -- the

21  situation is constantly changing and he needs access to these

22  vendors and if they are -- he needs access to their services to

23  keep his operations ongoing.  And so between the time that the

24  budget on 3/22 was published and the budget on 4/2 was

25  published, things change.  The vendors who are unwilling to work

1   with you, unless they get critical vendor payments, changes.

2   Q.  Mr. Millenkamp couldn't have known who was going to stop

3   working with him after he filed for bankruptcy on April 2, could

4   he?

5   A.  I think Mr. Millenkamp knows his business very well.  I

6   think he knows his vendors very well and I think he is having

7   conversations with them daily about what they -- what services

8   they are providing to him daily and if they will continue

9   providing those services, if they're saying they will not keep

10  working with him.

11  Q.  You can't tell who's going to stop working with you when you

12  file for bankruptcy until you file for bankruptcy, can you?

13          MR. CHRISTENSEN:  Leading.

14          MR. SCHOULDER:  It's cross-examination.

15          MR. CHRISTENSEN:  Well, that's not what the agreement

16  was.

17          COURT:  Is there an objection?

18          MR. SCHOULDER:  Ms. Churchill's not my witness,

19  counselor.

20          MR. CHRISTENSEN:  She's listed on your witness list.

21          COURT:  Hold on.  Is there an objection?  I didn't hear

22  what Mr. Christensen said.

23          MR. CHRISTENSEN:  No, no.

24          COURT:  Please continue.

25          WITNESS:  I'm sorry.  Can you reask the question?

1  BY MR. SCHOULDER:

2  Q.  That's a great question.  I forgot what it was.  You can't

3  know who is going to stop working with you when you file for

4  bankruptcy until you file for bankruptcy, can you?

5  A.  I mean I don't -- I don't know that I necessarily understand

6  the nature of the question.

7  Q.  Isn't it a little speculative to assume that people are

8  going to stop working with you if you file for bankruptcy until

9  you actually file for bankruptcy and see who stops working with

10  you?

11  A.  I don't think it's speculative when Mr. Millenkamp has

12  vendors saying that they're not bringing feed tomorrow and he

13  has no replacement for that feed.  I don't think that's

14  speculative.

15  Q.  Now, the original budget that was approved by the Court as

16  part of the interim process, how much did that contemplate

17  spending on critical vendors?

18  A.  This would have been the 4/8 budget; is that correct?

19  Q.  That's right.

20  A.  If you could pull that up for me, that would be helpful.

21  Q.  That is Exhibit 1018.

22  A.  1018.  I don't think it is.

23  Q.  That's fine.  Withdrawn.  That's fine.  Ms. Churchill, do

24  the debtors have projections going out further than the 13

25  weeks?

1    A.  We're working on them with the debtors right now, the cash

2    projections for that period.

3    Q.  And do you have projections showing the use of the $15

4    million that is incremental to the $30 million that's being

5    sought for approval?

6    A.  The projections are still in progress.

7    Q.  So the debtor's don't have any current view on how the $15

8    million is going to be spent; is that right?

9    A.  I wouldn't say that they don't have a view on how it would

10    be spent.  We just don't have a formalized version of that

11    long-term budget.  It's still in progress.  But I know, as I

12    testified to earlier, if it goes beyond this August 11 date,

13    Mr. Millenkamp has discussed that you're in a window for farming

14    and for harvest that might necessitate a greater cash need at

15    that time.

16    Q.  In your role of preparing budgets and projections, would you

17    agree that the debtor's cash flow from operating activities is

18    an important data point?

19    A.  Yes.

20    Q.  And would you agree that for fiscal year 2021, the debtors

21    did not generate enough cash flow from their operating

22    activities to service their debt?  Would you agree with that?

23    A.  I don't have that in front of me.  I'm sorry.

24    Q.  Well, you've been working with the debtors since 2021.

25    A.  I understand.  I don't -- I don't see that in front of me.

1    Q.  Is that an important data point to be aware of in terms of

2    modeling future cash flows?

3    A.  If historical market landscapes was indicative of future

4    market landscape.  But I think Mr. Millenkamp has testified many

5    times to the fact that the last couple years have been somewhat

6    brutal on milk prices and his professional fees necessary and

7    his default interest payments.

8    Q.  Was 2022 a brutal year for the dairy industry?

9    A.  You'd have to ask Mr. Millenkamp to testify to that.

10   Q.  Don't you have a degree in agriculture?

11   A.  I do.

12   Q.  And haven't you been working with the debtor's budgets and

13   projections since 2021?

14   A.  Yes.

15   Q.  So wouldn't you be aware of what milk prices were in 2021,

16   2022 and 2023?

17   A.  Yes.  I'm saying I don't have that information in front of

18   me.

19   Q.  So was 2022 a bad year for milk prices?

20   A.  I don't recall.

21   Q.  Was Mr. Millenkamp paying default interest in 2022?

22   A.  I don't recall.

23   Q.  Was he having his steer sales swept in 2022?

24   A.  I don't recall.  I don't believe in 2022 he was having his

25   steer sales swept, no.

1    Q.  And do you remember in 2022 whether the debtors were able to

2    generate sufficient cash flow to service their debt at that

3    point?

4    A.  I don't recall.

5    Q.  If the debtors have an equity cushion of let's say a

6    thousand percent of all the lenders' indebtedness, would that

7    enable the debtors to generate enough cash flow to service their

8    debt?

9    A.  I'm sorry.  Can you ask -- can you ask me that question

10   again?

11   Q.  Sure.  I'll say it even slower.  Sorry.  I try to take the

12   New York out of me.  If the debtors have an equity cushion of a

13   thousand percent of all their indebtedness, would that enable

14   the debtors to generate sufficient cash flow to service their

15   debt?

16   A.  I'm sorry.  I'm sorry.  Hold on.

17   Q.  I'll withdraw it and I'll rephrase it.  Does an equity

18   cushion have anything to do with the ability to generate cash

19   flow to service debt?

20   A.  An equity cushion has everything to do with financeability.

21   Q.  Right.  But it has nothing to do with generating cash flow,

22   does it?

23   A.  It depends on what strategic options you're looking at.

24   Q.  Being able to service your debt.  How about that?  If I have

25   a billion dollar equity cushion but I don't have enough cash

1  flow -- you're talking to me.  I'll withdraw that part.

2         I have a billion dollar equity cushion.  Will that

3  enable me to generate enough cash flow from my operations to

4  service my debt?

5  A.  I'm just slowly thinking through the right way to answer

6  this question.

7  Q.  That's all right.  I'm not rushing you.

8  A.  I understand.  An equity cushion is just -- not in and of

9  itself cash flow but it does represent -- there are strategic

10 decisions that management could make if they are -- if they have

11 an equity cushion that large.  There are -- there is asset sales

12 that someone could do, right?  But the operational cash flow is

13 based on milk prices and feed prices and operational expenses.

14 So they are two different discussions.  They're both important.

15 So I think I'm -- I don't understand what you are asking me and

16 I'm sorry if I'm asking you to restate this multiple times.  I

17 just --

18 Q.  That's okay.  Equity cushion is a product of your collateral

19 value, correct?

20 A.  Yes.

21 Q.  It's not a -- equity cushion is not -- and your collateral

22 value is not -- has nothing to do with whether you can generate

23 cash flow, does it?

24 A.  No.

25 Q.  Right.  And so you could have as large of an equity cushion

1    imaginable.  That's still not going to change whether you can

2    generate sufficient cash flow to service debt, will it?

3    A.  No.

4    Q.  Unless to your point you sell assets to repay the debt,

5    correct?

6    A.  And I mean I believe in Mr. Millenkamp's case, the assets

7    that he has in his business are there supporting the operations

8    of the business.  So his ability to generate cash flow is

9    predicated on the assets that are part of his business, the

10   entire vertical integration of his business.

11   Q.  Right.

12   A.  So that's how I see them as connected I guess.

13   Q.  But if the integrated nature of all the collateral skill

14   cannot generate enough cash flow to service debt, then it has --

15   as much of the value of the equity cushion could be, it could be

16   a billion dollars, that's not going to help him generate enough

17   cash flow to service his existing debt, is it?

18   A.  I'm sorry.  I just -- I'm not sure what you're trying to ask

19   me.  I'm not --

20   Q.  What generates cash flow?

21   A.  Sales.

22   Q.  Right.  Does sales have anything to do with the value of

23   your collateral?

24   A.  They don't have anything -- it is not based on the value of

25   your collateral per se but it is based on the assets that are

1    underlying that collateral.

2    Q.  I'm going to ask a little different way.

3    A.  Okay.

4    Q.  You could have a collateral base of a billion dollars,

5    right?  Just generally.  This is nothing to do with the debtors.

6    You have a billion dollars collateral base.  If you're a

7    horrible operator, does the billion dollars collateral base

8    allow you to generate enough cash flow to service your debt?

9    A.  In that specific scenario that you're saying to me, no.

10   Q.  Right.

11   A.  It doesn't.

12   Q.  So even though they had a billion dollars collateral base,

13   that still doesn't help them generate enough cash to service

14   their debt, correct?

15   A.  Correct.

16   Q.  Okay.

17          MR. SCHOULDER:  I have no further questions, Your

18   Honor.  Thank you, Ms. Churchill.

19          WITNESS:  Thank you.

20          COURT:  Counsel for Conterra?  I'm sorry.  I skipped

21   you, Mr. Naess.

22          MR. NAESS:  Yeah.  Just circle after he's done, that's

23   fine.  Go ahead.  Go ahead.

24                          CROSS-EXAMINATION

25   QUESTIONS BY MR. O'BRIEN:

```
 1    Q.  Good afternoon.

 2    A.  Good afternoon.

 3    Q.  So without adding to the confusion about a livestock animal

 4    flow and how it holds value, if I can summarize, you're saying

 5    that the overall value of the animals in the cycle will hold

 6    their value because each day, they replace the one that's a day

 7    ahead of them.

 8    A.  That's correct.  That's a summary of what I'm saying.

 9    Q.  And each day, if they get fed, they gain weight?

10    A.  That's correct, yes.

11    Q.  And the animals sell by the pound.

12    A.  Correct.

13    Q.  And so with all other things being equal, as long as the

14    animals get fed, that value of the animals in that animal cycle

15    will stay steady.

16    A.  That's correct.

17    Q.  That's what I thought you said.  Okay.  Now, all of this

18    assumes that the animal is going to get fed.

19    A.  That is correct.

20    Q.  And of course it would be fed out of a feed pile of some

21    sort.

22    A.  That's correct.

23    Q.  And Mr. Millenkamp testified that that would be haylage or

24    corn or corn silage or something -- ingredients that go into

25    rations.
```

1    A.  Correct.

2    Q.  And would you agree with me that as a corn pile gets fed, it

3    gets smaller?

4    A.  Yes, correct.

5    Q.  And would you agree with me that a smaller corn pile is

6    worth less than a bigger corn pile?

7    A.  Correct.

8    Q.  And with Conterra having the second lien on the corn pile

9    behind Rabo, the value of its corn pile collateral would shrink

10   every day as that gets fed into the animal flow.

11   A.  That's correct.

12   Q.  Okay.  I think that was the point that was missed in that

13   long dialogue.  Would you agree?

14   A.  Yes, I do.  I think that as we simplify the movement of

15   cattle and inventory, it's helpful to understand.

16   Q.  Okay.  Were you in the courtroom earlier when Mr. Millenkamp

17   testified about his hedging arrangements?

18   A.  I was, yes.

19   Q.  And does the budget take into account the hedge position

20   that is Mr. Millenkamp's described?

21   A.  The budget is based on net receipts for milk checks.  So,

22   yes.  The budget is based on net milk check receipts and those

23   are estimated by volume and pricing that has been provided to me

24   by David Heida and Mr. Millenkamp.

25   Q.  Does the budget have a line item for gains or losses on

1  hedge positions as they get closed out?

2  A.  No.

3  Q.  Have you reviewed any of the monthly position reports that

4  Mr. Millenkamp testified that he receives from Ever.Ag?

5  A.  I have not.

6  Q.  Do you track any of the hedge closeouts on either the milk

7  or the livestock?

8  A.  I do not.

9  Q.  Have you reviewed any of the future delivery prices in the

10  future delivery contracts on the beef cattle?

11  A.  No, I have not.

12  Q.  As you sit here today, do you know how many of the debtor's

13  beef cattle are under a hedge under a future delivery contract?

14  A.  I do not.

15          MR. O'BRIEN:  No further questions.  Thank you.

16          WITNESS:  Thank you.

17          COURT:  Thank you, Mr. O'Brien.  Mr. Naess.

18                      CROSS-EXAMINATION

19  QUESTIONS BY MR. NAESS:

20  Q.  Good afternoon.

21  A.  Good afternoon.

22  Q.  Can you briefly describe for me what your role is in

23  populating the budget?

24  A.  Sure.  I'm delivered reports from the company and I format

25  those reports into -- into the reporting package that you've all

1   received and that we've seen in the exhibits.

2   Q.  Okay.  And what kind of information is it that you receive?

3   A.  Receiving QuickBook reports on cash accounts and milk

4   production reports, herd count reports and cattle sale reports.

5   Q.  Okay.

6   A.  The top few.  I'm sure there are other reports that we

7   receive as well.

8   Q.  Okay.  And as far as developing like proceeds, revenue

9   forecasts, how are you doing that?  What kind of information are

10  you receiving?

11  A.  So for the receipts portion of our budget, we have discussed

12  with the business what the different forms of incoming cash

13  flows are and talked about the timing schedules with those so

14  that the cash flow cycles and the primary one on there is milk

15  checks.  So we've estimated the milk check receipts based on the

16  timing cycle, based on the herd count and based on the

17  production -- daily production that Mr. Millenkamp has provided.

18  Q.  Okay.  Do you have any estimate on when you might be telling

19  everyone what's going to be done with the other $15 million?

20  A.  I'm sorry.  What?

21  Q.  Do you have an estimate on when you might be telling

22  everyone when the next budget will be coming out to tell

23  everyone what's going --

24  A.  We're working on it right now so I don't have an estimate

25  but I don't expect it to be too much longer.  We just need to

1    kind of open up the scope and see the full range.

2    Q.  Sure.  Can you turn to Exhibit 1026?  I think it's the black

3    binder is what it's been described as.

4    A.  Yes.

5    Q.  And down there looking at week 7.  I think that's when 16

6    and a half million dollars was supposed to be received or

7    anticipated to be received --

8    A.  Yes.

9    Q.  -- from the DIP financing.  I believe your indication is

10   that if that's not received, one of the impacts is that the

11   critical vendor payments will not be able to be made.  Is that

12   accurate?

13   A.  Yes.

14   Q.  And is there any need for that debtor in possession

15   financing besides to make the critical vendor amounts?

16   A.  Over the course of this budget, there are -- there's

17   critical vendor payments between now and August 11 and I know

18   the total amount in this budget is 19.8 million and of that, 5.2

19   has already been paid so 19.8 minus 5.2.  Make me do math on the

20   spot but there's a certain portion of 14-something million of

21   cash disbursements in this period that are related to critical

22   vendor payments.

23           There's also -- during this period, you've got farming

24   cash expenses so there's -- there's of course ongoing operations

25   but the critical vendor payments make up a big portion of the

1  need during this period as well as financing some of the farming

2  that needs to happen in a certain period of time.

3  Q.  And I guess you don't happen to know what the breakdown

4  between those two might be.

5  A.  Like I said, it looks like critical vendor payments here is

6  19.9 and we've already made -- in total.  We've made 5.2 of

7  that.  19.9 minus 5.2.  14.6, 14.7 is critical vendor payments.

8  Line items in here like chemicals, seed, custom farming, those

9  are related to farming expenses and of course during this

10 period, there's professional fees related to the bankruptcy.

11 Q.  Okay.  I'm going to switch topics a little bit.  You talked

12 a little bit about changes that were made to the schedules and

13 changes that were made to the critical vendor list.

14 A.  Yes.

15 Q.  When those changes were made to the critical vendor list,

16 what types of changes were those?  Were they --

17 A.  In regards to that change to the critical vendor list as it

18 relates to schedules, there was -- and I'm going to recall from

19 memory and I might be off by one vendor or two vendors.  But

20 there was two to three vendors who as we updated the schedules,

21 the critical vendor payment, it was -- there was a trucking

22 vendor that I think we had scheduled for $50,000 critical vendor

23 payment and as the schedules were updated, they were only owed

24 25,000 so their critical vendor payment was reduced so that it

25 wasn't more than what they were owed.  There was two to three of

1   those vendors.  So that was the adjustment bringing it in line

2   with what the scheduled amounts were.

3   Q.  Sure.  So, you know, I guess the question that leads me to

4   is what's leading the development of those figures that are

5   included in the critical vendor lists?  You know, is it the

6   amount that was owed?  Is it the amount that the vendor is

7   communicating here's what I need to get paid to keep providing

8   services?  I mean did that trucking company say I need $50,000

9   or I'm going to stop providing services?

10  A.  It's different for each of the vendors.  So certain vendors,

11  there has been communication with Mr. Millenkamp of we need X

12  amount and other communications have been we need to be caught

13  up on our billing.  And the two vendors that were adjusted,

14  those two, were amounts that they needed to be paid in full.

15  And again, it was about 20,000 -- $25,000 to continue doing the

16  work that Mr. Millenkamp needs them for.

17         But it's not that every critical vendor payment was set

18  at what are you owed?  This is what we're putting on the

19  critical vendor list for, each individual conversation for each

20  line that he went through yesterday.

21  Q.  Sure.  So are those critical vendors being paid in full in

22  the revised list?

23  A.  Those two vendors are being paid and, again, I believe that

24  they're being paid nearly the amount that they are owed, those

25  two specifically.  I believe it was the vet and there was a

1    trucking company too.  So those were the two changes.

2    Q.  Okay.  And yesterday -- well, I guess this morning, there

3    was admitted an Exhibit 1030.  Were you involved at all in the

4    development of that exhibit?

5    A.  Can you remind me what 1030 is?

6    Q.  Sure.  It's the list that Mr. Millenkamp went through

7    yesterday of the critical vendors and the payments that were

8    made within 20 days.

9    A.  Oh, yes.  My involvement in that list was producing the 20-

10   day portion of that report I did not have direct input into

11   producing.  If we could open -- do we have that exhibit that I

12   could see?

13            MR. CHRISTENSEN:  It's in the black binder.

14            WITNESS:  In the black binder?

15            MS. SCHWAGER:  Matt, we can put it on the --

16            WITNESS:  Yes.  I worked on a part of this exhibit.

17   BY MR. NAESS:

18   Q.  Okay.  And the part that you worked on was provided the 20-

19   day --

20   A.  No.  That was -- that was a part that I did not work on so

21   I -- I put together the summary of the critical vendor payment

22   amounts on here.

23   Q.  Okay.

24   A.  Just I mean -- and by put together, I mean bring into one

25   document.  Not create on my own.  But I consolidated the

1    critical vendor payments into this list and I also assisted with

2    the scheduled amount of the claim on this list.

3    Q.  Okay.  Do you know then, and you might not, whether the

4    goods delivered within 20 days, is that cumulative to the amount

5    of the critical vendor payments?  So is it in addition to that

6    amount or is it generally incorporated into the amount that

7    they're to be paid as critical vendors?

8    A.  I couldn't speak to that specifically.

9    Q.  Okay.  All right.  Looking at the budget, the (inaudible)

10   1026, maybe I missed it.  Can you show me in that budget where

11   the administrative claims or the 503(b)(9) claims are scheduled

12   to be paid?

13   A.  So during this -- during this period so prior to

14   confirmation, the payments that are scheduled in here are just

15   the critical vendor payments and the kind of ongoing operating

16   expenses.  So the 503(b)(9) payments, it's my understanding,

17   that those are at confirmation or after if I'm correct.

18   Maybe -- and perhaps I'm misspeaking.

19   Q.  Well, I'm just asking the budget that's been produced and

20   put out to anybody, those payments aren't showing as being paid

21   prior to confirmation.  Is that accurate?

22   A.  Yeah.  So again, you're speaking to the 20-day amounts that

23   are -- that were on the schedule that we just looked at?

24   Q.  Sure.  On the 1030 schedule as well as there's been another

25   motion for another 150,000 and change of 503(b)(9)

1    administrative claims.  I'm just wondering if that's included in

2    that budget anywhere.

3    A.  Yeah, I can't speak to that specifically.  My apologize.

4    Q.  Okay.  Thank you.

5            MR. NAESS:  No further questions, Your Honor.

6            COURT:  All right.  It's about 12:15, do we want to

7    break until 1:30?  We can come back at that time.  Do you have

8    additional redirect?

9            MS. MIKKILINENI:  I just have like two questions so I

10    could wrap it up real quick here.

11            COURT:  Let's go ahead and do that now then.

12                        REDIRECT EXAMINATION

13    QUESTIONS BY MS. MIKKILINENI:

14    Q.  Ms. Churchill, was a critical vendor motion anticipated when

15    we were preparing for bankruptcy?

16    A.  It's my understanding that there was, yes.

17    Q.  And do you know whether creditors in this case knew a

18    bankruptcy was forthcoming?

19    A.  I believe that they did.

20    Q.  Was there a restructuring support agreement negotiated with

21    creditors prior to filing?

22    A.  I'm sorry?  Can you repeat that?

23    Q.  Was there a restructuring support agreement negotiated with

24    certain creditors prior to filing?

25    A.  I'm not -- I don't know that I'm the one to speak to that.

1    I'm not sure.

2    Q.  Okay.

3           MS. MIKKILINENI:  I have no further questions.

4           WITNESS:  Thank you.

5           COURT:  Any questions from counsel for MetLife?

6    Counsel for Rabo AgriFinance, United States Trustee?

7           MR. NAESS:  No.  Thank you.

8           COURT:  Conterra?

9           MR. O'BRIEN:  No, Your Honor.

10          COURT:  All right.  This is probably a good time to

11   break for lunch at this time.  Does the debtor anticipate

12   calling additional witnesses when we return?

13          MS. MIKKILINENI:  No, Your Honor.  But we would reserve

14   the right to call Mr. Millenkamp and Ms. Churchill for rebuttal

15   purposes if necessary.  But we have no further witnesses on

16   direct.

17          COURT:  All right.  That sounds like the debtor's

18   resting case in chief.  Will MetLife be putting on any evidence

19   or testimony?

20          UNIDENTIFIED SPEAKER:  No evidence, Your Honor.  Just

21   as I said yesterday, a couple of issues to address.

22          COURT:  All right.  Rabo AgriFinance, will you have

23   witnesses to call?

24          MR. SCHOULDER:  Yes, Your Honor.  Just one witness.

25          COURT:  All right.  Mr. Naess, do you anticipate

```
 1   putting on witnesses?
 2           MR. NAESS:  No.
 3           COURT:  And Conterra?
 4           MR. O'BRIEN:  No.
 5           COURT:  All right.  Let's go ahead and break till about
 6   1:30.  At that time, we'll give Rabo the opportunity to call
 7   witnesses.
 8           CLERK:  All rise, please.
 9                         (Recess taken.)
10           COURT:  Thank you.  Please be seated.  All right.  We
11   are back on the record in Case No. 24-40158.  Do we have any
12   preliminary matters that we need to address before we get
13   started?
14           MS. SCHWAGER:  Good afternoon, Your Honor.  I just have
15   three exhibits that I thought I had moved to admit and had
16   failed to do so and Mr. Christensen has agreed to the submission
17   of these three exhibits which we discussed I think yesterday.
18   And they are 3069, 3055 and 3056.
19           COURT:  3069, 3055 and 3056?
20           MS. SCHWAGER:  Correct, Your Honor.
21           COURT:  All right.  Any objection to the admission of
22   those exhibits?
23           MR. CHRISTENSEN:  No.
24           COURT:  Exhibits 3069 and 3055 and 3056 are admitted.
25                   (Rabo AgriFinance Exhibit Nos. 3069,
```

```
 1                      3055 and 3056 admitted.)

 2          COURT:  Any other preliminary matters we need to

 3     address?  All right.  Are you ready to proceed, counsel for Rabo

 4     AgriFinance?

 5          MR. SCHOULDER:  Thank you, Your Honor.  Calling Daniel

 6     Kokini to the stand, Your Honor.

 7          COURT:  All right.  Please come up to the stand and

 8     remain standing so you can be sworn in by Ms. Battle, the

 9     courtroom deputy.

10                      (DANIEL KOKINI is sworn.)

11          CLERK:  Please have a seat.  And once seated, please

12     state your name and spell your last name for the record.

13          WITNESS:  Daniel Kokini, K-o-k-i-n-i.

14          CLERK:  Thank you.

15                      DIRECT EXAMINATION

16     QUESTIONS BY MR. SCHOULDER:

17     Q.  Mr. Kokini, can you remind the Court who you are employed by

18     and your title?

19     A.  FTI Consulting and I'm a senior managing director.

20     Q.  And who is your client in connection with these cases?

21     A.  Rabo AgriFinance.

22     Q.  Mr. Kokini, are you aware of the concept of feasibility?

23     A.  Yes.

24     Q.  And could you explain how you have come to be aware of the

25     concept of feasibility?
```

1  A.  From 14 years of restructuring work.

2  Q.  And have you personally worked on evaluating a company's

3  feasibility?

4  A.  Yes.

5  Q.  And when valuing a company's feasibility, what are the types

6  of things that you look for?

7  A.  We look at the company's capital structure, their ability to

8  generate free cash flow and service debt.  We look at the

9  management team's ability to execute on that business plan.  We

10  look at overall economic conditions affecting that business

11  plan.

12  Q.  Have you evaluated the debtor's ability to generate free

13  cash flow to support operating expenses and debt service?

14  A.  Yes.

15  Q.  And what did you rely on in evaluating the debtor's ability

16  to generate free cash flow?

17  A.  We looked at the company's historical audits, monthly

18  financials for '23 as provided by the company or by Kander and

19  other publicly available information on the company's docket --

20  on the docket.

21  Q.  And why did you limit your analysis to historical

22  financials?

23  A.  Because that's all that was available.  There were no GAAP 3

24  statement financial projections for the company.

25  Q.  I want to turn your attention to Exhibit 3058.

1    A.  For the record, that's GAAP, G-a-a-p, just to make sure.

2    Q.  All right.  Just to clear something up from yesterday while

3    we're talking about the GAAP and cash flow, yesterday, the

4    debtor's expert from Forbes group, Mr. Morgan, he testified that

5    the confidential information memorandum uses EBITDA projections

6    because it is a GAAP metric.  Do you agree with Mr. Morgan's

7    statement?

8    A.  EBITDA is a non-GAAP metric.

9    Q.  And Mr. Morgan also testified that he's talking to cash flow

10   lenders.  In your experience, what type of financial information

11   would a cash flow lender look for?

12   A.  They're going to do their diligence and, you know, look at

13   all the financial information of the company.  That's going to

14   include all three financial statements including the cash flow

15   statement.

16   Q.  And did you read the forms -- the Forbes confidential

17   information memorandum?

18   A.  I did.

19   Q.  Was there any cash flow statement in the confidential

20   information memorandum?

21   A.  There was not.

22   Q.  So turning your attention to Exhibit 3058, do you recognize

23   this document, Mr. Kokini?

24   A.  I do.

25   Q.  And what do you recognize this document to be?

1    A.  It's an analysis of the company's historical financials

2    estimating their ability to generate unlevered free cash flow.

3    Q.  And did you -- were you personally involved in the

4    preparation of this document?

5    A.  I was.

6    Q.  And is this a true and fair representation of your analysis?

7    A.  Yes.

8         MR. SCHOULDER:  Your Honor, I would move Exhibit 3058

9    into evidence.

10         COURT:  Any objection?  Exhibit 3058 is admitted.

11         (Rabe AgriFinance Exhibit No. 3058 admitted.)

12   BY MR. SCHOULDER:

13   Q.  So Mr. Kokini, just looking at this chart, at the top of the

14   chart and without going into specifics, could you just give the

15   Court a general sense of what this chart is calculating?

16   A.  It's calculating the unlevered free cash flow from --

17   through the core operating activities of the business.

18   Unlevered meaning before the impact of debt service.

19   Q.  Now, what importance, if any, does the adjusted unlevered

20   free cash flow have in evaluating a company's feasibility?

21   A.  So it's with unlevered free cash flow that the company is

22   then able to make interest payments, make principal payments on

23   the debt, potentially pay dividends.

24   Q.  Okay.  Let's walk through the chart.  Start at the top.  You

25   list net cash from operating activities.  What is that

1  information?

2  A.  So all of this came from the company's financial statements

3  and net cash from operating activities is from the same line

4  item on their cash flow statement.  So it's the cash from

5  operating activities on the cash flow statement.

6  Q.  And the next line, it says cash payments for interest net of

7  capitalized interest.  What are you doing here with this

8  information?

9  A.  So interest is a deduction in the calculation of cash from

10  operating activities.  So we're adding it back to get to an

11  unlevered view of cash from operations.

12  Q.  Is that a favorable or unfavorable adjustment to the

13  company?

14  A.  It is favorable.

15  Q.  And in the next line, could you explain what is happening

16  here with the net cash -- net cash used for investing

17  activities?

18  A.  So this is also directly from the cash flow statement and

19  it's, you know, all of the cash used for investing activities

20  from the cash flow statement.

21  Q.  So then we get to the line of unlevered free cash flow.  Can

22  you explain the adjustment you are making in the line right

23  below it where it says "capitalized improvements and purchases

24  of land, equipment and trucks"?

25  A.  Yeah.  So that line also comes from the cash flow statement.

1    It's effectively purchases of PP&E and, you know, it was our

2    understanding that that's largely been debt financed because

3    we're not showing the debt financing coming in above to support

4    it.  We're adding it back giving the company the benefit of that

5    cash outflow that they perhaps would not have made if not for

6    the financing.

7    Q.  Is that a favorable adjustment for the company?

8    A.  It is favorable.

9    Q.  Okay.  And then we have proceeds from the sale of property

10   and equipment.  Could you explain what that adjustment is for?

11   A.  Yeah.  So it's a reduction for sales of PP&E.  You know, we

12   don't have the specifics exactly of what that PP&E is but I

13   don't think it's in the normal course for the business to sell

14   significant amounts of PP&E so, you know, we've -- we're

15   reducing it -- we are reducing the cash flow for those numbers.

16   Q.  Is that a favorable or unfavorable adjustment for the

17   company?

18   A.  That is slightly unfavorable.

19   Q.  Now, we get to where it states an adjustment for reverse

20   estimated stretched AP.  Can you explain what that is?

21   A.  So in 2023, the AP balance grew a little under 20 million.

22   I think it's 19.7 million.  And so, you know, that increase is

23   factored into the net cash from operating activities.  That

24   increase makes the net cash from operating activities more

25   positive in 2023.  It's also effectively a form of unsecured

1    financing.

2         We don't think that, you know, the company's normal

3    course of operation -- that in their normal course of operation,

4    they intend to stretch their vendors beyond normal terms so, you

5    know, based on guidance from Kander, you know, we made an

6    estimate about how much of that change in AP is related to that

7    stress and we estimate that it's about 11.8 million.

8    Q.   Is that a favorable or unfavorable adjustment for the

9    company?

10   A.   That is unfavorable.

11   Q.   And so we get to the adjusted unlevered free cash flow in

12   the gray area.  Could you explain now what you are doing with

13   the box called historical debt service?

14   A.   So historical debt service is the company's historical debt

15   service.  It's both the cash interest and the cash payments on

16   principal or, you know, otherwise called amortization.  So the

17   cash payments for interest, net of capitalized interest, that

18   first line is the same as the second line on the top of the

19   page.  So if you see 8.6 million in 2021 is the same as the 8.6

20   million on the second line of the page.  The second line in the

21   historical debt service is the principal payments.

22   Q.   And where did you get this data from?

23   A.   From the company's financial statements.

24   Q.   And what does it show in the line item called operating cash

25   flow including historical debt service?

1    A.  So it says that the company did not generate enough

2    unlevered free cash flow in 2021, 2022 or '23 in order to -- in

3    order to satisfy its debt service.

4    Q.  Now, there's another box here that is called estimated

5    current debt service.  Could you explain the purpose of this

6    box?

7    A.  So, you know, because of the principal payments over time,

8    because the company took on additional debt in 2022, we're

9    estimating projected interest expense based on the current loan

10   balances and current interest rates to estimate what future

11   interest and principal payments will be after 2023 on an annual

12   basis.  So we're estimating just under 29 million of interest

13   and principal payments.

14   Q.  And where do you get this information from to make these

15   calculations?

16   A.  From the audit and from loan documents and other documents

17   filed in the docket.

18   Q.  And so after making these adjustments and the calculations,

19   what does the operating cash flow including current debt service

20   tell you?

21   A.  Again, the company would not -- based on the historical

22   level of cash flow, the company would be unable to satisfy this

23   level of debt burden -- of debt service burden.

24   Q.  Now, just to clarify, where it says the line item I just

25   read, "operating cash flow including current debt service," does

1    that include the Sandton DIP?

2    A.  It does not.

3    Q.  And so is that what is intended to be captured by the next

4    line item?

5    A.  Correct.  The next line item called DIP to exit facility

6    debt service is -- it is an assumption of if the Sandton DIP was

7    to convert to an exit facility and pay cash interest of the same

8    PIK rate what that annual burden would be.  And so after

9    interest and fees, assuming a nine-month process, that DIP loan

10   would grow to about $50 million assuming it's fully drawn and

11   would have a cash interest rate of about 12 and a half percent

12   equating to $6.2 million per year.

13   Q.  And based upon this analysis, what conclusions do you reach,

14   if any, about the company's feasibility?

15   A.  Well, the incremental cash interest from a potential Sandton

16   exit financing would just make the problem worse.

17   Q.  Mr. Kokini, based upon your experience, does the current DIP

18   financing create more or less risk for Rabo AgriFinance?

19   A.  More.

20   Q.  And why is that?

21   A.  Because it puts $50 million of debt ahead of Rabo Bank and

22   it effectively subordinates Rabo's claims.

23   Q.  And what does that mean to a lender like Rabo AgriFinance?

24   A.  Can you -- I'm not sure what you mean by the question.

25   Q.  Sure.  Withdrawn.  What does it mean to a lender like Rabo

1  AgriFinance or Sandton who are short-term lenders?

2  A.  So, you know, they -- Rabo Bank made a loan under a

3  different risk profile.  This is a much different risk profile

4  than the one they entered into that's since matured two years

5  ago.  So they're in a significantly worse position than they

6  were previously.

7  Q.  And does the majority of the Rabo AgriFinance facility have

8  anything to do with your risk analysis?

9  A.  It does.  The fact that it's been matured for two years

10 increases the risk of ever being paid back.

11 Q.  Now, Mr. Kokini, are you aware of the adequate protection

12 that's being offered to Rabo AgriFinance under the currently

13 proposed DIP order?

14 A.  Yes.

15 Q.  And what is your understanding of that?

16 A.  That it would include interest at the non-default rate as

17 well as certain regular reporting requirements and replacement

18 liens.

19 Q.  Let's talk about the interest rate first.  Based upon your

20 experience and the analysis that you've done so far, do you

21 believe that the interest at the non-default rate adequately

22 protects Rabo AgriFinance for its increased risk?

23 A.  No.

24 Q.  Can you explain why?

25 A.  Yeah.  Again, the -- the loan was done at a time when the

1    company was in a very different position.  There wasn't $50

2    million of debt ahead of it.  It was first lien on the operating

3    collateral so it was just a very different risk profile than

4    the -- than Rabo agreed to for the contractual rate, the non-

5    default rate.

6    Q.  Well, what about the replacement liens?  In your experience,

7    do you believe that the replacement liens in real estate

8    adequately protect Rabo for being primed on its first priority

9    liens on personal property?

10   A.  I don't because, you know, like Sandton, Rabo is lending --

11   Rabo's, you know, first choice collateral is the operating

12   collateral.  That's what it agreed to lend against.  That's

13   what's more liquid.  The real estate collateral is very illiquid

14   and is not easily monetizable.

15   Q.  Now, are you aware of Rabo AgriFinance's proposed

16   proportional priming that he has put forward to the Court?

17   A.  Yes.

18   Q.  And could you explain to the Court what is intended by the

19   proportional priming?

20   A.  The idea is that the priming would be spread across all of

21   the first liened collateral in proportion to the debt that

22   exists against that collateral.

23   Q.  And how -- how would that adequately protect Rabo's

24   interests?

25   A.  So the idea is we don't -- it doesn't make a lot of sense

1    for Sandton really to be able to disproportionately affect any

2    one lender by cherry picking the collateral that it wants

3    liquidated.  And so by spreading the burden of the priming

4    proportionately, you know, it fairly allocates that risk across

5    all of the collateral.

6            MR. SCHOULDER:  No further questions, Your Honor.

7            COURT:  Counsel for MetLife.  Counsel for debtors.

8                        CROSS-EXAMINATION

9    QUESTIONS BY MR. CHRISTENSEN:

10   Q.  Mr. Kokini, my name is Matt Christensen.  We've met before.

11   I represent the debtor in this case or the debtors in this case.

12   I have a couple questions about the Exhibit 3058 but I want to

13   ask a couple background questions first.

14   A.  Sure.

15   Q.  You talked about that a lot of the data on here is based on

16   the debtor's financials.  Which financials from the debtor were

17   you able to review to create this data?

18   A.  The 2021 and 2022 columns are entirely based on the audited

19   financials.  2023 is based on the monthly financials that the

20   company self reports.

21   Q.  And the audited financials are the financials that Eide

22   Bailly put together and did the audit for, correct?

23   A.  Correct.

24   Q.  And do you know if those are in the record somewhere today?

25   A.  I believe they are in the record because I talked about them

1   with counsel on Monday or Tuesday.

2   Q.  Do you know if those same audited financials are the

3   financials that Forbes used to put together their CIM?

4   A.  I don't know what Forbes used to put together their CIM.

5   Q.  Okay.  But you have reviewed Forbes' CIM?

6   A.  I have.

7   Q.  Including the financial information on there?

8   A.  Yes.

9   Q.  Do you dispute anything about the financial information they

10  included on their CIM?

11  A.  The only thing is that EBITDA numbers on the income

12  statement page don't reconcile to the EBITDA numbers in the

13  company's self-reported monthly financials but I think the rest

14  of the line items reconcile on the income statement.

15  Q.  Okay.  And I'm concerned more with the balance sheet on the

16  CIM.  Would you agree the balance sheet on the CIM accurately

17  states the '21, '22 data from those audited financials?

18  A.  I believe it does from when I looked at it.  It would be

19  helpful if I had both documents to look at.

20  Q.  Okay.  On Exhibit 3058, I just want to make sure of a couple

21  of the numbers that you've got here.  So in -- and it's still up

22  on the screen which is helpful.  The estimated current debt

23  service -- I don't know who's controlling that at this point.

24  Can you scroll down a little bit?  So in that estimated current

25  debt service box, the 28,923 includes interest payments,

1    correct?

2    A.   Correct.

3    Q.   Okay.  And then the -- midway through that box, you've got

4    operating cash flow including current debt service.  What

5    numbers were -- what's the formula to come up with that number?

6    A.   Yes.  So estimated current debt service includes both

7    interest and principal and then the gray line, operating cash

8    flow including debt service is the 6812.  It's the gray line

9    that says adjusted unlevered free cash flow from core operating

10   activities minus 28,923.

11   Q.   And the 6812 at the top includes those interest payments,

12   correct, 8,649 in interest payments?

13   A.   Correct.  It's been added back.

14   Q.   So is it being counted twice in the 22,111 number?

15   A.   No.  No, so the 6812 would have been lower by 8,649 had I

16   not added it back.  So it's -- because I added it back, it's

17   looking at the cash flow as if the company has no debt on it at

18   all.

19   Q.   Okay.  On the box just above that, historical debt service

20   box, the cash payments for interest and the payments on

21   long-term debt, can you describe for me what those numbers --

22   like what those interest payments actually are, who are they

23   paying interest to?

24   A.   So I believe primarily, it's interest to Rabo Bank, MetLife

25   and Conterra -- I think Conterra beginning in 2022.  It's -- you

1    know, there's a sub schedule at the bottom of the financial

2    statement that says cash payments for interest, net of

3    capitalized interest.

4    Q.  Okay.  And the next line, payments on long-term debt.  Who

5    are those payments to?

6    A.  I believe that's primarily -- primarily MetLife.  There's

7    regular amortization and those notes.

8    Q.  And so that would be a principal payment to MetLife?

9    A.  Correct.  That's correct.

10   Q.  Are there any principal payments to Conterra in that line?

11   A.  I don't know exactly how the mortgage note is structured so

12   I don't know off the top of my head if there would be any for

13   that.  I don't believe there's any amortization on the 16 and a

14   half million term loan.

15   Q.  Okay.  Are there any principal payments to Rabo included in

16   that line?

17   A.  I don't believe so.

18   Q.  Were there principal payments to Rabo in 2023 when Rabo was

19   sweeping the cash from the beef sales?

20   A.  I can't recall because I don't have a schedule that builds

21   up to it.

22   Q.  Okay.  If there were principal payments on Rabo debt in

23   2023, that's not reflected on this chart, correct?

24   A.  If there were, it should be because the company should be

25   showing those principal payments.

1    Q.   For 2023, you don't have audited financials, correct?

2    A.   I have what's been provided by the company.

3    Q.   And do you know if those have been audited?

4    A.   I understand that they are not audited.

5    Q.   Okay.  And do you know if Rabo has provided the company an

6    accounting for the funds that it swept from the beef sales?

7    A.   I don't know.

8    Q.   So if the company didn't have an accounting of what Rabo

9    applied to principal, how would it provide you with an

10   accounting of what was applied to principal?

11   A.   I don't know what's been --

12   Q.   It couldn't, right?  It can't provide you something it

13   doesn't have.

14   A.   Any payment to Rabo Bank should be included somewhere in

15   their financial statements, whether it's interest or principal.

16   Assuming it's in either of those two lines, it should be

17   included in the financials as either interest or principal and I

18   would therefore be capturing it.

19   Q.   Okay.

20   A.   If it's included somewhere else, I wouldn't know.

21   Q.   And you don't know if that number for 2023, payments on

22   long-term debt, includes any principal payment to Rabo?

23   A.   I don't know because I don't have a breakdown.

24   Q.   Okay.  Does the 2023 numbers include any -- well, let me ask

25   a different question.  Did you include any adjustments in the

1    2023 numbers that aren't reflected on this sheet?

2    A.  No, I don't think so.

3    Q.  Okay.  Do you know if the debtor was paying default interest

4    to Rabo in 2023?

5    A.  I understand there was a lot of back and forth between the

6    company and Rabo Bank about what rate the company felt was

7    appropriate.  I don't know ultimately what was ever paid.

8    Q.  Okay.  Do you know if there was default interest paid to

9    Rabo in '21 or '22?

10   A.  I don't know.

11   Q.  So is there an adjustment in here for default interest that

12   was paid one year but wasn't paid in other years?

13   A.  So all interest is added back whether it's default or not

14   default.

15   Q.  I understand.  But you're using this to try and project a

16   future potential income, correct?

17   A.  And so the future -- the future interest is based on the

18   non-default rate.

19   Q.  Okay.  So is there an adjustment for default rates being

20   paid in previous years?

21   A.  Well, there is because we're adding it back.  I've given the

22   company the benefit of adding it back as if it never had to pay

23   it assuming it was paid.

24   Q.  But then you're pulling it out as a debt service payment,

25   correct, without any adjustment?

1    A.  Not in the estimated current debt service, no.  In the

2    estimated current debt service line -- so that line that says

3    estimated current debt service, that totals 28,923 each year,

4    that's based on the schedule below it that shows estimated

5    current debt service detail and within that, the Rabo interest

6    of 7.8 million is based on, if you scroll down, I can see it

7    better in the footnote, but footnote 4, it's the non-default

8    rate and a balance of 92.2 million.

9    Q.  Okay.  Do you know if the debtor had increased professional

10   or bank fees in 2023 versus the previous two years?

11   A.  I've heard Mr. Millenkamp say that.

12   Q.  Do you dispute that there were?

13   A.  I have no accounting of what they are.  I've only heard him

14   say it.

15   Q.  So is it also fair to say there's no adjustment in your

16   sheet here for an increase in professional and bank fees in 2023

17   that wasn't there for previous years?

18   A.  You know, we used -- we used the information that was given

19   to us and, you know, whatever supporting detail we had.

20   Q.  I understand, but you came up with the adjustments on the

21   sheet, correct?

22   A.  Correct.

23   Q.  And there's no adjustment for professional fees or increased

24   bank fees.

25   A.  There's not.

1    Q.  Okay.

2    A.  Well, for increased bank fees, there is because it's already

3    added back.  Any interest is added back.

4    Q.  Do you know if the debtor engages in any hedging practices?

5    A.  I recall a line on the cash flow statement that shows the

6    change in the value of those hedges.

7    Q.  Okay.

8    A.  I don't know the context of them but there is a line in the

9    cash flow.

10   Q.  And you heard Mr. Millenkamp testify that he wasn't able to

11   do any hedging practices in 2023, correct?

12   A.  I honestly don't recall.

13   Q.  Do you recall that testimony?

14   A.  I do not.

15   Q.  Okay.  Assuming he testified to that fact, is there an

16   adjustment on this sheet for lack of hedging ability in 2023?

17   A.  For lack of hedging ability?  No.

18   Q.  Okay.  Now, going back to the top part of that chart --

19   scroll up to the top part.  On some of these adjustments that

20   you've made at the top, I want specifically to look at the

21   unlevered free cash flow just below that.  Capitalized

22   improvements and purchases of land, equipment and trucks.  Do

23   you see that line?

24   A.  Yes.

25   Q.  That only includes land, equipment and trucks, correct?

1   A.  Correct.

2   Q.  And you got that information from those financial

3   statements?

4   A.  It's a line on the cash flow statement.

5   Q.  Okay.  Did you also include an adjustment for increase in

6   herd size or feed inventory?

7   A.  No.  Because as far as I know, that's all normal course for

8   the business.

9   Q.  The increase in herd size year over year is normal course

10  for the business?

11  A.  I assume there's volatility in all aspects of the business.

12  It's a commodity driven business.

13  Q.  Can you pull up Exhibit 3072?  So Mr. Kokini, this is one of

14  Rabo's exhibits.  The important part is the last few pages.

15  It's the CIM from Forbes from earlier this year.  If you'll go

16  to the very last page of that exhibit.

17  A.  Uh-huh.

18  Q.  So this is the balance sheet information summarized on the

19  Forbes CIM.  Do you understand that?

20  A.  Yes.

21  Q.  And you testified previously, to the best of your knowledge,

22  this accurately matches the financial statements that you looked

23  at, correct?

24  A.  Yes.

25  Q.  And you see on here, there's a line for inventory.

1    A.  Yes.

2    Q.  And then separately from that, there's a line for dairy herd

3    down a few lines.

4    A.  Uh-huh.

5    Q.  And then separately from that, there's a line for PP&E.  Do

6    you see that?

7    A.  Yep.

8    Q.  Would you therefore understand that inventory and dairy herd

9    on this sheet are different from PP&E?

10   A.  Yes.

11   Q.  And on your Exhibit 3058, the purchases of land, equipment

12   and trucks, equipment and trucks is part of PP&E, right?

13   A.  Correct.

14   Q.  So if you look at this summary sheet from Forbes, the

15   inventory changed from 2020 at 30.4 -- I think that's in

16   millions -- to 43.5 million in 2021.  Would you agree that's a

17   $13 million increase in inventory during that year?

18   A.  Yes.

19   Q.  And that it took cash to buy that inventory?

20   A.  Yes.

21   Q.  And further down on the dairy herd, there's an increase from

22   83.6 to 92.8.

23   A.  Yes.

24   Q.  And it took cash to increase that inventory too.

25   A.  Yes.

1    Q.  So why isn't there an adjustment on your sheet for 2021 for
2    those capital purchases?
3    A.  So if you go to the next page, I think you'll also see that
4    revenue has grown pretty considerably --
5    Q.  As is the last page.
6    A.  So the page before that.  Mr. Millenkamp has been growing
7    the business, right?
8    Q.  Correct.
9    A.  It grew from 152 to 179 to 270 and those are purchases
10   supporting the growth of the business.
11   Q.  Okay.  But they're capital purchases, correct?
12   A.  Well, they're not -- I don't know what you mean by capital
13   purchases.
14   Q.  Okay.
15   A.  So we added back the benefit of the PP&E because we
16   understood that all or most of it is effectively debt financed.
17   And because it was debt financed, the debt shows up in the
18   financing section of the cash flow statement and we're not
19   showing the benefit of that so we added back the cash cost.
20   Q.  Okay.
21   A.  So this is money -- these are expenses that are being made
22   to support the growth of the business that I don't believe are
23   being debt financed.  They're just purchases to support the
24   business.
25   Q.  The PP&E that you added back in are purchases to support the

1    business?

2    A.  The inventory and the herd size.

3    Q.  Okay.

4    A.  The PP&E is debt financed, growth as well but it's debt

5    financed.

6    Q.  But it's not debt financed by Rabo, Conterra or MetLife,

7    correct?

8    A.  So to that, I can't specifically say but I do know that the

9    debt balance -- the debt balances grew in '21, '22 and '23

10   albeit at different rates and our understanding, that was

11   largely to support the PP&E.  If it didn't support the PP&E,

12   then I would have reduced cash flow even further for the PP&E.

13   Q.  Did any of those three entities provide new financing other

14   than protective advances to the debtor during 2021?

15   A.  There are net borrowings in all three of those years.

16   Q.  From those three lenders?

17   A.  The cash flow statement doesn't distinguish.

18   Q.  I understand that.  But you have looked at all the finances

19   for the debtor, correct?

20   A.  I've looked at the audited financials and the monthly

21   financials that they provided in Excel.

22   Q.  Okay.  And what else have you looked at as far as the

23   financial history of the debtor?

24   A.  That's primarily it.  I can't recall other sources.

25   Q.  And how long have you been engaged by Rabo for this process?

1    A.  Since August.  July, August.

2    Q.  Of '23?

3    A.  Of last year, yeah.

4    Q.  And since August of '23, the only financials you've looked

5    at for the debtor are what you just listed?

6    A.  They're the monthly financials and this audit.

7    Q.  Okay.

8    A.  Yeah.

9    Q.  You have not looked at the loan agreements?

10   A.  I don't consider those financials.

11   Q.  Have you looked at any financial records for the debtor in

12   the last year going back five years of the debtor's history?

13   A.  I've looked at the -- so for what it's worth, Kander has an

14   Excel file that includes all the historical financials.  So I've

15   looked at those financials going back to 2018.  Those do not

16   reconcile to the audits and so I don't put a lot of weight on

17   that before 2023.  I rely on the audits for the figures before

18   2023.  Because there is no audit for '23, I rely on those

19   financials, the ones provided by Kander in Excel.

20   Q.  Okay.  But the loan documents for Conterra, MetLife and

21   Rabo, you've reviewed those?

22   A.  I have not reviewed -- I have not reviewed the entirety of

23   those loan documents.

24   Q.  Okay.  But you reviewed them enough to be able to calculate

25   the interest to put on your form, correct?

1   A.  Correct.  That's correct, yeah.

2   Q.  When were those loans made?  Prior to 2021?

3   A.  Except for the Conterra loan -- loans, yeah.

4   Q.  Okay.  But Rabo didn't fund anything after 2021 other than

5   protective advances, correct, any new loans to purchase capital?

6   A.  I don't know for sure but I believe that's correct.

7   Q.  And MetLife hasn't provided any additional capital loans

8   since 2021, correct?

9   A.  I believe that's correct as well.

10  Q.  Did Conterra provide capital -- capital loans?

11  A.  They provided loans in 2022.

12  Q.  Was it for the purpose of purchasing capital -- capital

13  investments?

14  A.  So I asked for sources and uses of how those funds were used

15  and never received one so I don't know.

16  Q.  But there's no adjustment on your 3058 for capital

17  investment in inventory or herds, correct?

18  A.  Again, that's -- you know --

19  Q.  It's just yes or no.

20  A.  No, there's no adjustment for normal operating expenses of

21  the business.

22  Q.  Okay.  Are you -- as part of -- well, I know you've

23  testified before about the types of businesses that you're

24  familiar with and worked with in the past.  I assume dairies are

25  a common business that you evaluate.  Is that fair to say?

1   A.   No.   This is the first dairy separately.   You know, I've did

2   some work on Dean Foods who was a milk -- was a milk processor

3   but they were not a dairy.

4   Q.   Okay.   Do you have any occasion to follow the milk price per

5   day on the market?

6   A.   It's not something I look at regularly.

7   Q.   Okay.

8   A.   I'm not a dairyman like Mr. Millenkamp.

9   Q.   Would you agree Mr. Millenkamp does follow the milk price

10  every day?

11  A.   I'm sure he does.   I hope he does.

12  Q.   When you're evaluating the potential future debt service,

13  what else should you be looking at besides the past debt

14  service?

15  A.   So we asked the company for financial projections for GAAP

16  financial projections beyond 2023 and there aren't any.   So, you

17  know, if we had them, we would be looking at those financial

18  projections.

19  Q.   Okay.   So there isn't anything that you've looked at in

20  calculating the potential for future debt service.   All you've

21  used is '21, '22, '23 financial records from the debtor,

22  correct?

23  A.   That's correct.   The debtor doesn't have projections.

24  Q.   Would you agree with me that milk prices have increased

25  since last year?

1    A.  I honestly don't know.

2    Q.  Do you know what feed prices have done since last year?

3    A.  I don't know.

4    Q.  Do you know what the price for beef has done since last

5    year?

6    A.  I don't know.

7          MR. CHRISTENSEN:  Your Honor, could I just get one

8    minute to check with counsel?

9          COURT:  That's fine.

10    BY MR. CHRISTENSEN:

11    Q.  Mr. Kokini, you testified towards the beginning about

12    feasibility.  Do you remember that?

13    A.  Uh-huh.

14    Q.  And I think you said in evaluating a company's feasibility,

15    there's four things that should be looked at?

16    A.  I don't think it's --

17    Q.  Capital structure, the ability to service date with its free

18    cash flow, the management team and the overall economic

19    conditions of the market.  Do you remember that?

20    A.  I don't think it's exclusively those four but those four are

21    key considerations.

22    Q.  Okay.  You at least named four.

23    A.  Yes.

24    Q.  Is it fair to say your 3858 chart only deals with the

25    ability to service debt with cash flow?  It doesn't address

1    those other three factors that you listed?

2    A.  The cash flow here -- the debt service -- the debt service

3    is based on the overall capital structure that exists currently.

4    So I think it relates to the historical ability to generate free

5    cash flow and the capital structure -- this is not a business

6    plan.  This is historical financials.

7    Q.  When you say capital structure, what do you mean by that?

8    A.  The capital structure's all of the debt and equity that, you

9    know, is used to finance the business.

10   Q.  So does the equity in the business have an impact on the

11   cash flow?

12   A.  No.

13   Q.  Then why did you just tie those together or did I

14   misunderstand you tying them together?

15   A.  I think you misunderstood, yeah.

16   Q.  Okay.  So say what you said again.

17   A.  I said the capital structure is effectively all of the --

18   all of the debt and equity together that's used to finance the

19   business.  So when you think about your cost of capital and you

20   think about capital structure, you think about all of those

21   different components.

22   Q.  And does the equity in the assets owned by the company

23   affect the cost of the capital?  In other words, if a lender's

24   going to be wildly over-secured, will that affect the interest

25   rate that that lender wants to receive?

1    A.  If a lender actually has the ability to tap the equity,

2    then, yeah, it should have an impact.  If there's no actual

3    ability to monetize the assets to tap that equity, then it

4    doesn't really provide any value at all.

5    Q.  Okay.  But in a roundabout way, the equity value in the

6    assets does affect the capital structure which then may affect

7    the cash flow, correct?

8    A.  I don't think it affects the cash flow.

9    Q.  But the capital structure affects the cash flow.

10   A.  The debt stack affects the levered cash flow of the

11   business.

12   Q.  Okay.

13          MR. CHRISTENSEN:  Your Honor, that's all I have.

14          COURT:  Any cross-examination, Mr. Naess?

15          MR. NAESS:  No.  Thank you.

16          COURT:  Mr. O'Brien?

17          MR. O'BRIEN:  Conterra has no cross-examination for

18   Rabo's expert.

19          COURT:  Any redirect?

20          MR. SCHOULDER:  Very brief, Your Honor.

21                        REDIRECT EXAMINATION

22   QUESTIONS BY MR. SCHOULDER:

23   Q.  Mr. Kokini, what is the current default interest rate of

24   Rabo if you know it?

25   A.  I believe it's SOFR plus 8.11 percent.

```
 1   Q.  And based upon what your understanding of where SOFR is

 2   currently, what does that translate into?

 3   A.  I think SOFR'S roughly 5 and a quarter percent so it's

 4   roughly 13.36 percent.

 5   Q.  And that's the default rate.

 6   A.  Correct.

 7   Q.  Do you know what the non-default rate of Sandton is?

 8   A.  Of Sandton?

 9   Q.  Sandton's DIP.

10   A.  I believe it's 12 and a half percent.

11   Q.  And that's their non-default rate.

12   A.  Correct.

13   Q.  Are you aware of the types of lenders that Forbes is seeking

14   out as part of its process?

15   A.  I'm aware, yeah.

16   Q.  What would you characterize those types of lenders that

17   Forbes is seeking out as?  Are they traditional lenders, special

18   situation lenders?

19   A.  I think they're largely special situation cash flow lenders.

20   Some real estate were on there.

21   Q.  And what types of pricing are special situation lenders

22   typically charging?

23   A.  Expensive.

24   Q.  As expensive as Sandton's non-default rate?

25   A.  I would say at least that much and often they want warrants
```

1    and board seats and other types of assurances.

2    Q.  And does that matter if there's a lot of equity cushion?

3    A.  I think they look at the risk profile of the business and

4    they make a determination about what they want and given the

5    leverage here, it's likely going to be an expensive piece of

6    paper where they also try to tap into the equity if the business

7    is able to successfully grow.

8    Q.  So if Forbes finds a replacement lender from the group of 11

9    special situation lenders and who refinances Rabo and Sandton,

10   is the debt service going to get cheaper or more expensive in

11   your opinion?

12   A.  More likely than not, more expensive.

13            MR. SCHOULDER:  No further questions, Your Honor.

14            COURT:  Mr. Christensen?

15            MR. CHRISTENSEN:  No more.

16            COURT:  Any other questions?  All right.  You may step

17   down.  Thank you.

18            WITNESS:  Thank you.

19            COURT:  All right.  Does Rabo AgriFinance have

20   additional witnesses to call?

21            MS. SCHWAGER:  No, we don't, Your Honor.

22            COURT:  All right.  United States Trustee's Office.

23            MR. NAESS:  No.  No witnesses.  Thank you.

24            COURT:  And counsel for Conterra.

25            MR. O'BRIEN:  No witnesses.  Thank you, Your Honor.

1    COURT:  All right.  At this point, I'll ask the debtors

2  if you anticipate any rebuttal witnesses?

3    MR. CHRISTENSEN:  I do have one rebuttal witness, Your

4  Honor.  We'd like to recall Bill Millenkamp to the stand.

5    COURT:  All right.  Please come to the stand,

6  Mr. Millenkamp.  Please have a seat.  I'll remind you you are

7  still under oath from being sworn in previously.

8    MR. CHRISTENSEN:  Thank you.

9                DIRECT EXAMINATION

10  QUESTIONS BY MR. CHRISTENSEN:

11  Q.  Mr. Millenkamp, are you familiar with the milk price for

12  dairy on a daily basis?

13  A.  Yes.

14  Q.  And are you familiar with the costs of feed on a daily

15  basis?

16  A.  Yes.

17  Q.  Do you know what the current price for class 3 milk is today

18  compared with what it was at this time one year ago?

19  A.  Yes.

20  Q.  And what is that difference?

21  A.  Class 3 is $4 a hundredweight higher than it was a year ago.

22  Q.  And would you be able to apply that difference in price to

23  the dairy herd that you have and the milk that your dairy

24  produces?

25  A.  I want to clarify that.  So if I looked at it a year ago for

 1    the year ahead and right now, a year ahead, the difference is

 2    $4.

 3    Q.  Okay.  So are you receiving -- so a dairyman selling milk

 4    today would make $4 per hundredweight more than that exact same

 5    sale a year ago?

 6    A.  Yes.

 7    Q.  And have you -- are you able to apply that then to your herd

 8    and the milk that you produce?

 9    A.  Yes.

10    Q.  And what would that difference be on a yearly basis for this

11    year?

12    A.  It's an increase of about $30 million.

13    Q.  Okay.  And you're also aware of the feed costs for feeding

14    those cows?

15    A.  Yes.

16    Q.  Do you know what the change in feed costs between today and

17    a year ago has been?

18    A.  Yes.

19    Q.  And what is that change?

20    A.  It's a little over $2 per cow per day difference.

21    Q.  And as applied to the cows at your facility, what does that

22    change equate to on an annual basis?

23    A.  Just on the milk cows, 25 million plus whatever it saves on

24    the heifers and beef herd.

25    Q.  So the income to your dairy potentially will be 30 million

1  more this year with 25 million less in expenses?

2  A.  Or more, yes.

3  Q.  And you were here as we went through the chart with

4  Mr. Kokini, his exhibit of cash flow?

5  A.  Yes.

6  Q.  Did you see any adjustments on that chart for the change in

7  milk price?

8  A.  I did not.

9  Q.  Or feed price this year?

10  A.  I did not.

11  Q.  Okay.

12          MR. CHRISTENSEN:  Nothing more, Your Honor.

13          COURT:  Counsel for MetLife?  Counsel for Rabo

14  AgriFinance?

15          MS. SCHWAGER:  No questions, Your Honor.

16          COURT:  Mr. Naess?

17          MR. NAESS:  No.  Thank you.

18          COURT:  Mr. O'Brien.

19          MR. O'BRIEN:  No questions.  Thank you.

20          COURT:  All right.  You may step down.  Thank you.  Any

21  additional questions?

22          MR. CHRISTENSEN:  No, Your Honor.  Thank you.

23          COURT:  All right.  At this time, are the parties

24  comfortable with the evidentiary record as it stands?

25          MS. SCHWAGER:  Yes, Your Honor.

1             MR. CHRISTENSEN:  Yes.

2             COURT:  All right.  The parties wanting to proceed with

3       closing arguments?

4             MR. CHRISTENSEN:  I think we all want to proceed with

5       closing arguments so we can get things finished.

6             From our side, for the three remaining motions, the

7       critical vendor motion, the cash collateral motion, I will be

8       arguing the critical vendor motion.  Ms. Mikkilineni will be

9       arguing the other two.  So I don't know if you want to address

10      one first and then do the other two or do the other two and then

11      the other but it needs to be separated is what I'm saying.

12            COURT:  All right.  Do we want to address the critical

13      vendor motion now?  Perhaps then we can take a recess and the

14      parties can collect their thoughts and we'll come back for the

15      remaining two motions.

16            MR. CHRISTENSEN:  Fine with me.

17            COURT:  All right.  Let's do that.

18            MR. CHRISTENSEN:  Your Honor, on the critical vendor

19      motion, there's -- there's only one objection.  I think there

20      were two objections, maybe -- never mind.  Three objections I

21      think technically to that motion.  Two of them were resolved.

22      There was an objection from Mr. Miller's client related to Moss

23      Grain Partnership.  Moss Grain was added as a vendor on the

24      critical vendor list which resolved that objection on behalf of

25      his client.  He did inform me yesterday that's why he didn't

1    stay around for the rest of the hearing because that had been

2    resolved.

3         The other objection I believe was filed by Standlee and

4    that objection essentially said it's the wrong Standlee entity

5    that's listed.  It should be this other Standlee entity.  We

6    don't dispute that.  So whatever final order gets entered, if

7    they're allowed to critical vendor payments, we would name the

8    correct Standlee in that motion or in that order.

9         So the one remaining objection was the one filed by the

10   U.S. Trustee.  I'll address that motion -- or that objection and

11   then get into some of the legal bases for the motion that were

12   outlined in our memorandum that we filed last week.

13        First, to go over the facts a little bit,

14   Mr. Millenkamp testified pretty extensively regarding each of

15   those vendors on the current critical vendor list, Exhibit 1030,

16   and why they're on that list, the process for how they were put

17   on that list.  Mr. Millenkamp and I believe Ms. Churchill also

18   testified a bit about the process for coming up with the

19   proposed payment to those critical vendors on those critical

20   vendor claims.

21        They're not all receiving 100 percent of their claim.

22   Many of them are not receiving 100 percent of their claims.

23   Some of those critical vendors only wanted to be listed on the

24   critical vendor list but didn't insist on an actual payment

25   being issued to them.  They just wanted their name on the list

1   and were willing to go COD after that.

2          So Exhibit 1030 sort of outlines what the payments

3   proposed to those vendors are, scheduled amounts of the claims

4   and those are based on the most recent schedules which were

5   filed partially in response to U.S. Trustee's objection and I

6   think largely resolved the trustee's objection.  The objection

7   was two-fold really.  One, that there were some payments

8   proposed on creditors who weren't even on the schedules and then

9   the second objection was there's some payments proposed in

10  excess of the scheduled amount owed to that party.

11         So the debtor reviewed again -- and I can get into the

12  background of why the schedules ended up the way they were if

13  the Court wants me to.  But the final version of the schedules

14  that was filed I think is the most correct version, correctly

15  lists out those vendors.  As a result of that review, some of

16  the critical vendors' payments went down and/or were eliminated

17  because the number was either so low or wasn't actually positive

18  at all that was owed to them.  So I think those schedules

19  resolved the U.S. Trustee's objection.

20         The remaining objection that they had I think was

21  addressed by Mr. Millenkamp going through and testifying about

22  each of those vendors.  I don't think there's any dispute from

23  those vendors that there are vendors that won't work with the

24  debtor moving forward if they don't get some payment on their

25  prepetition claim.

1      COURT:  Is there anything in the record other than the

2   testimony from Mr. Millenkamp on that issue?

3      MR. CHRISTENSEN:  I think there's a little bit from Ms.

4   Churchill but not necessarily on whether or not they'll move

5   forward with work and payments absent of pre -- working with COD

6   basis absent the prepetition claim.

7      I know some of those creditors on that list are

8   represented here today and I understand some of those attorneys

9   intend to make some comments to the Court as well.  But other

10   than Mr. Millenkamp's testimony, there's nothing in the record

11   either further supporting his testimony or disputing his

12   testimony at all.  There's no record that anything he said was

13   untrue.

14      He explained I believe the reasons why those vendors

15   are critical to the debtor.  I think importantly too, setting

16   aside the criticality of those vendors, many of them, especially

17   the farmer groups, have liens on the assets that the debtor

18   needs to use.  That's largely why they're on that list because

19   you can't use the asset without making a payment to them on that

20   prepetition claim.

21      COURT:  Why didn't the debtor address those particular

22   claims outside of the context of a critical vendor motion?  I

23   mean those folks may have secured claims in this case and

24   therefore may be entitled to adequate protection and cash

25   interim -- or cash payments can constitute adequate protection

1    under Section 361.

2         MR. CHRISTENSEN:  I agree with that, Your Honor.  We

3    chose to file a single motion addressing all of the theories for

4    why they could be paid including the 503(b)(9) status of some of

5    them rather than a critical vendor motion and an adequate

6    protection motion and a separate 503 motion.  We tried to

7    combine them all into one.  I think the point is whether it's an

8    allowance because they're a critical vendor or an allowance

9    because, in addition to that, they've got a lien on the asset

10   and/or they provided -- provided goods within the last 20 days.

11   Any of those provide a basis for allowing those payments to be

12   made.

13        So at this point, we've outlined which ones have liens

14   on the property.  Largely it's the corn silage farmers on the

15   piles of silage and/or feed suppliers and which vendors had

16   payments within the 20 days.  Even the 20-day amounts -- and I

17   think this was a question from Mr. Naess to Mr. Millenkamp.  The

18   20-day amounts listed on the chart are the value of the goods

19   that were provided in the 20 days.

20        That number doesn't necessarily correlate with the

21   proposed critical vendor payment.  In some cases, the 20-day

22   amount is much higher than the proposed critical vendor amount.

23   And that's based on negotiations with that creditor.  In some

24   cases, the 20-day amount is lower than what the proposed

25   critical vendor amount is because there's a much higher amount

1  still owed to that party.

2        So I think factually, the only thing in the record is

3  that these are critical vendors to the debtor in order to keep

4  operating and keep the cattle fed, keep the machines working,

5  keep things going without significant disruption to the process.

6        So I think a separate important issue from whether

7  these vendors are actually critical is does the Court have the

8  authority to even grant the motion.  That was not an objection

9  raised by any of the parties.  That is something the Court

10 raised I think at the original hearing.

11       We outlined in the briefing that we filed the various

12 theories that have been adopted around the country for this type

13 of motion and addressed the cases, to the extent there are cases

14 binding on this Court or at least persuasive on this Court

15 because they're also from the Ninth Circuit, we tried to address

16 those in the briefs.  I can also address them a bit today and,

17 largely, we're discussing the B & W case and the MacMillan case

18 from the District of Oregon.

19       I think realistically, both of those cases factually

20 are very dissimilar from this one.  The MacMillan case which was

21 the most recent one, you were dealing with one vendor.  It was a

22 hay cutter essentially on a debtor who had a piece of property

23 right in the middle of farming country who testified that he

24 couldn't find someone else to come cut his hay, that this person

25 was necessary because of that.  It was about a $12,000 claim

1    that they wanted to pay.

2          I think the court decision there doesn't really discuss

3    the criticalness of that vendor but I think that was an

4    underlying concern of the court, is he really a critical vendor.

5    What that court case does do is goes through some of the

6    theories for approving the motion and essentially says -- B & W

7    said those don't work.

8          I think that was an overly broad reading of what the B

9    & W decision dealt with.  The B & W decision was really looking

10   at the theories that applied to the old railroad cases, the

11   doctrine of necessity and the -- I forgot what they call the

12   other one -- and essentially saying those apply in railroad

13   cases.  This is not a railroad case.  Therefore they don't

14   apply.

15         The problem with the necessity doctrine is that was a

16   court created doctrine back in the 1800's when the -- I think

17   1800's when the railroad cases were important and you didn't

18   have a bankruptcy act even or a bankruptcy code that said what

19   courts had authority to do.  Now you've got a specific

20   bankruptcy code reference that says the court's going to enter

21   orders as necessary and ordinary in the course of that case.

22   That's Section 105.

23         At the same time at this point, I think we have to

24   recognize 105 by itself isn't enough to give the Court

25   authority.  There's got to be some other code tie and so -- but

1    105 is what takes us outside of the realm of doctrine of

2    necessity which B & W was focused on and gets us into necessary

3    and proper.  Excuse me, necessary and appropriate is the

4    language in Section 105.

5          So there's various other code sections, 363(b), 362(d)

6    potentially.  My view is Section 1107 is the strongest reason

7    outside of Section 105 that this Court has authority to

8    essentially change the priority scheme that's found elsewhere in

9    the code.  That's the section that requires the debtor to

10   protect and preserve the estate.

11         And the MacMillan decision discounted that by saying,

12   well, this is just the doctrine of necessity and the Ninth

13   Circuit said you can't do that.  But they didn't discuss that

14   Section 1107 in the context of the Section 105 reference.

15         A couple of the additional -- we referenced Rule 6003.

16   Again 503(b)(9) allows, at least for the 20-day amounts,

17   payments to be made.  I think the sort of underlying tension

18   here is you've got one section of the bankruptcy code that says

19   here's the priority scheme.  This is how we pay creditors.  And

20   generally speaking, unsecured creditors, you have to wait till

21   after the plan is confirmed.  But you also have other code

22   sections that say debtor has a duty to protect and preserve the

23   estate.

24         If the debtor, in order to protect and preserve the

25   estate, needs to pay some creditors on a preconfirmation basis

1   to keep that estate going to keep that estate protected, that's

2   a separate goal that has been recognized by both the Ninth

3   Circuit and the Supreme Court that can potentially trump the

4   priority of distributions.  The Ninth Circuit in the Adams Apple

5   case and then the Jevic case from the U.S. Supreme Court.

6        I think the last point, Your Honor, is there's been a

7   lot of testimony today about the equity that exists in all the

8   assets on the property and the equity that even will exist after

9   the DIP loan potentially is granted.  There's a reasonable

10   chance that this case is going to be 100 percent payment to

11   creditors case.  The liquidation analysis will have to be

12   performed.  For it to come out in a way that doesn't provide 100

13   percent payment to creditors will require some fairly

14   significant gymnastics.

15        So the risk to the other non-critical vendor creditors

16   in this case that they will be treated differently than those

17   critical vendors I think is extremely low and that's a factor

18   that I think the Court can consider.

19        On the other hand, if the critical vendor motion

20   doesn't get granted and these vendors aren't allowed to receive

21   payments, there's a very good chance that things will get

22   extremely chippy between the debtors and all of those critical

23   vendors and the debtor won't be able to continue operating

24   successfully in the future.

25        So unless the Court has more questions, I'm through

1    everything I was going to say.

2         COURT:  Talk to me about notice a little bit, Mr.

3    Christensen.  The initial critical vendor motion was served on

4    the master mailing matrix but there have been multiple

5    iterations of that critical vendor budget that have been filed

6    since then that changes the amounts that are being paid to

7    creditors and the identity of the creditors that are going to be

8    paid if the motion is approved.

9         Has there been sufficient notice and an opportunity to

10   object by all parties in interest if we don't have notice on all

11   creditors of this latest iteration of the critical vendor

12   budget?

13        MR. CHRISTENSEN:  So I would say two things.  First of

14   all, the first budget, the first motion with the original

15   critical vendor list and proposed payment was served on all

16   creditors.  So if there was a creditor who objected to them not

17   being on the list or this other guy being on the list when I'm

18   not there, whatever objection they wanted to make, they were

19   served with that original motion.

20        And then secondly, the latest critical vendor list was

21   filed I believe early last week and also served on all the

22   creditors in the case, my recollection.  And so I think both the

23   original -- the combination of the original motion being served

24   on everyone and the most current list being served on everyone

25   addresses that notice issue.  If a party wanted to be on the

1   list and they weren't there, they've known since April 2 that

2   they're not on the list.

3          And I will -- I guess one other issue that may come up

4   later when Mr. Naess argues, one of the proposals from him was

5   to include in the critical vendor order some provision that

6   would essentially allow a non-critical creditor to challenge any

7   payment to a critical vendor.  And if they were able to prevail

8   on that challenge, to require that payment be disgorged from

9   that creditor and they be treated as a normal creditor.

10          As the Court will recall under the motion, there's a

11   monthly report that the debtor will be filing as to which

12   critical vendors were paid that month and so that report would

13   then trigger -- and Mr. Naess and I haven't worked out any

14   potential language for the order, but we're amenable to that

15   addition to the order that allows a non-critical creditor --

16   unsecured creditor to essentially come in and argue that that

17   payment shouldn't have been made and then require that other

18   creditor to disgorge it if it needs to happen.

19          So we're open to that addition to the order.  I think

20   we can work out whatever that language is with Mr. Naess.

21          COURT:  Thank you, Mr. Christensen.  MetLife, are you

22   weighing in with respect to the critical vendor motion?  Rabo

23   AgriFinance?

24          MS. SCHWAGER:  We are not, Your Honor.

25          COURT:  Mr. Naess.

1          MR. MANWARING:  Your Honor, may I be heard in support

2     of the motion?

3          COURT:  Do you want to wait, Mr. Naess?

4          MR. NAESS:  That's fine.

5          COURT:  That's fine, Mr. Manwaring.

6          MR. MANWARING:  Your Honor, Jed Manwaring representing

7     MWI Veterinarian Supply which is on the proposed critical vendor

8     list.  That entity wants the Court to know that it supports the

9     debtor's motion and adopts the arguments made therein and asked

10    me to inform the Court that its present intention is to not

11    continue dealing with the debtor in the event MWI is not

12    approved as a critical vendor in the present motion.  Thank you.

13         COURT:  And your client was already paid pursuant to

14    the interim order, correct, Mr. Manwaring?

15         MR. MANWARING:  Yes, I believe so.  I don't know for

16    sure but I haven't heard that it didn't occur as it was

17    previously approved.

18         MR. CHRISTENSEN:  Your Honor, I can address that a

19    little bit.  On the chart, Exhibit 1030, the Court will notice

20    there's five vendors who have critical vendor payments in red.

21    Those are the five vendors who received a payment under the

22    interim order.  Mr. Manwaring's client is a proposed payment of

23    a million 5.  The interim payment was 500,000.  So there's still

24    a million that would be paid on a critical vendor basis going

25    forward.

1     Same is true with H & M Custom and the farmers silage

2     group.  There's additional amounts.  The interim payment wasn't

3     the full amount that's listed under that column.  It was a

4     subset of that.

5          COURT:  All right.

6          MR. MANWARING:  Thank you.

7          COURT:  Are there any additional parties that wish to

8     address this motion before I turn to Mr. Naess from the U.S.

9     Trustee's Office?

10         MR. EDSON:  Thank you, Your Honor.  Gery Edson on

11    behalf of Land View.  Your Honor, Land View is an unsecured

12    creditor.  It has a claim in excess of $9 million.  My client

13    supports the debtor's motion for the critical vendor early

14    payments.  And my client, Your Honor, would like the Court to

15    know that the product they provide to the debtor is a

16    proprietary mixture of feed that even to gather the correct

17    materials to produce it takes a minimum of three months to order

18    those and then the processing of it and delivery.  So if my

19    client steps away from providing that material to the debtor,

20    the debtor may well be out of supply for up to four months.

21         I think that's the gist.  Your Honor, we've looked at

22    the same cases.  We think that the argument that was presented

23    by the U.S. Trustee is not well founded in relying exclusively

24    on that case from Oregon.  I think the Court's probably already

25    looked at those other cases but we feel that the Court

1    definitely has that authority.  The U.S. Supreme Court has

2    stated as much in the Jacimi (phonetic) case.  Thank you.

3              COURT:  Thank you.

4              MR. GRIMSHAW:  Well, good afternoon, Your Honor.  Matt

5    Grimshaw for the corn silage growers.  There's been extensive

6    testimony with regard to the need for the corn silage and the

7    need to use that or my client's collateral in connection with

8    feeding the cattle.

9              Exhibit 3057 is an agreement that was entered into

10   prepetition between Mr. Millenkamp's entities and my clients

11   with regard to the terms under which we would consent to the use

12   of our collateral -- my client's collateral and that requires

13   significant payments.

14             Whether you term it under a critical vendor motion as

15   adequate protection or otherwise, the use of my client's

16   collateral's got to be paid for.  And the only reason that we

17   have not right now sought a motion to prohibit use and to demand

18   adequate protection is because of this pending motion.  We fully

19   support it.  We ask the Court to grant it and allow the debtor

20   to make the payments necessary to keep the herd fed.

21             COURT:  Your client group have agriculture commodity

22   liens that encumber the silage, correct?

23             MR. GRIMSHAW:  Correct.  They're all perfected.

24             COURT:  All right.  Thank you, Mr. Grimshaw.

25             MR. GRIMSHAW:  Thank you, Your Honor.

1          COURT:  Are there any additional parties that wish to

2     be heard with respect to the critical vendor motion?

3     Mr. O'Brien?

4          MR. O'BRIEN:  Yes, Your Honor.  Very briefly.  Conterra

5     has not taken a position on the critical vendor motion and still

6     doesn't.  Just the new thing that I heard was the possibility of

7     disgorgement and then the question would be if that was written

8     in the order and if there was disgorgement, to whom would the

9     disgorgement go.  And when you think about it, the critical

10    vendors are being paid on the back of the secured creditors.

11    They're being paid out of collateral.  They're being somewhat

12    washed through Sandton but Sandton is funding it by popping

13    ahead of us on the collateral pool.

14         So I just mention the idea if there is disgorgement in

15    it, it shouldn't go back to the estate as a whole.  It should go

16    back to the creditors that are bearing the burden of that.  I

17    think those are the secured creditors.  Thank you, Your Honor.

18         COURT:  Thank you, Mr. O'Brien.  All right, Mr. Naess.

19         MR. NAESS:  Thanks, Your Honor.  I'll start with the

20    question of disgorgement and the question that I posed to Mr.

21    Christensen last week in an e-mail exchange that perhaps that it

22    might be language that could be included to somehow allow people

23    to challenge a critical vendor payment once those reports are

24    filed.

25         That primarily was proposed in frustration due to the

 1   continuing shifting nature of the critical vendors, the adding

 2   of new vendors.  It's likely not a great idea and we've been

 3   thinking about whether it's appropriate or not.  I think Mr.

 4   O'Brien raises some concerns with that.  Our preference would be

 5   that if the Court allows for critical vendors that that be a

 6   specified list according to the list that has currently been

 7   proposed without any further additions to that list.

 8        You know, that's where that frustration was coming from

 9   is are we going to continue to see new vendors added throughout

10   the process prior to confirmation.  So, you know, how do we deal

11   with that without, you know, the notice to all of the other

12   unfavored vendors having the opportunity to weigh in as to the

13   appropriateness of those payments.

14        You know, at this point, we're not working on a clean

15   slate in this case.  We've had four different lists of 20

16   largest unsecured creditors, two versions of the schedules.  All

17   of those have varied wildly.  Additions of new creditors,

18   removal of creditors on the 20 largest.  There were creditors

19   that actually weren't creditors on the initial one.  And so it's

20   been frustrating and confusing and it creates some question in

21   our mind as to what can be relied on as far as what is a

22   critical vendor payment and who's actually owed and what they've

23   indicated would be needed in order to keep making payments.

24        The Court noted or asked the question about notice.

25   You know, we do have some concerns about notice.  Minor concerns

1    about notice as to the list itself.  More of a concern about

2    what an order might be based on.  So in the brief that was filed

3    last week, there was some additions, primarily Section 362(d)

4    and Section 1107 that weren't cited in the motion as possible

5    grounds for granting this relief.

6          In the motion, the debtor cited Section 105, Section

7    363(b) and then Section 503(b)(9) as potential support or reason

8    to why the Court might be able to grant the relief being sought.

9    Parties in interest haven't had notice that they needed to

10   respond if they had interest in a 362(d) theory or an 1107

11   theory.

12         If the Court decides it has authority and I guess just

13   to Mr. Edson's comment, the U.S. Trustee has not taken a

14   position -- is not taking a position as to whether or not this

15   Court has the authority to grant the relief that's requested.

16   We're not weighing in on the B & W issue or on the MacMillan

17   issue.  That's not a position that we're taking.

18         If the Court decides it has authority, you know, we

19   want to make sure that whenever standard is being looked at has

20   been met as far as the debtor's burden of proof but we're not

21   weighing in as to whether or not the Court has authority to

22   grant the motion or not.

23         The difficulty the Court has, and as Mr. Christensen

24   noted, balancing the necessity of keeping this operation going

25   at this early stage with the priority scheme that's identified

within the code.  The debtor asserts that the primary focus

should be rehabilitation and reorganization of the debtors.  And

the <u>Jevic</u> case certainly indicates that, at times, courts have

found that there are some code-based objectives that justify

violating the priority scheme that's in the code.

It also noted, however, that those courts have found

that when they've allowed that, it was to enable a successful

reorganization that would benefit all of the creditors including

the unfavored creditors; that all of them would be better off.

There's at least two competing objectives in the

Chapter 11 context that are at play again.  The reorganization

of the business and there are certainly important factors for

the Court to consider in regards to reorganization of the

business.  You know, with that, there are creditor recoveries

that come through a successful reorganization.

There's the maintenance and preservation of jobs that

comes with the successful reorganization.  At the same time, the

code does require equal treatment of creditors and I think that

was one of the primary concerns that the <u>K-Mart</u> case out of the

Seventh Circuit was addressing was there had been an instance

where certain critical vendors had been approved and got a

significant recovery and when it came to the unfavored

creditors, I think they were getting something like 10 cents on

the dollar.  And the question was is that fair for those

critical vendors to have received a much larger recovery when

1    all of those creditors were of the same class.

2         So if -- and K-Mart looked primarily at the 363(b)(1)

3    theory and essentially said that there are two things that a

4    debtor needs to prove.  Under that theory, one is that the

5    disfavored creditors will be as well off with reorganization as

6    with liquidation.  And the second is that they were actually

7    critical.

8         Just to briefly address -- we only heard evidence from

9    the debtor as to what the value of its assets are compared to

10   the value of the debts.  And certainly the evidence that we

11   heard shows that the value of the assets exceeds the value of

12   the debts.

13        There's some question as to fair market value versus

14   liquidation value and I don't know how, you know -- Mr.

15   Christensen described it as some gymnastics that will be

16   required if the debtor wanted to share the liquidation value

17   (inaudible) due to the high fair market value.  So it's likely

18   that the debtors have probably shown that disfavored creditors

19   will be as well off under -- if the critical vendor motion is

20   approved.

21        The second factor, the critical vendors must have

22   ceased deliveries if old debts were left unpaid.  The Court

23   noted that all we have really are testimony from the debtor's

24   representatives, Mr. Millenkamp and the representative from

25   Kander, indicating that there have been communications to them

1   that various parties -- I guess now we have Mr. --

2          MR. MANWARING:  Manwaring.

3          MR. NAESS:  -- Manwaring's claims indicating that it

4   would stop providing services.  I'm sorry.

5          COURT:  At least an argument before the Court but that

6   doesn't necessarily mean that's admissible as evidence and the

7   Court could rely on that in making a decision.

8          MR. NAESS:  Sure, sure.  So -- and looking at the

9   K-Mart case, I think that there was some discussion that perhaps

10  at a higher burden that there is language in that case talking

11  about how anyone can come in and say I've been told they're

12  going to stop paying -- making payments but there are other

13  principles that might go against that.  You know, one of those

14  being that those that are receiving the payments, if they're

15  receiving cash on demand, you know, there's a profit motive for

16  those creditors to continue doing business even absent a

17  critical vendor payment.

18          I guess to avoid confusion as to whether -- so included

19  in the list of critical vendors, talking about critical vendors

20  here, indicate they would cease deliveries if old debts were

21  left unpaid.  There are six creditors included on that list who

22  are not scheduled to receive any payments.  I believe

23  Mr. Millenkamp yesterday testified that he has negotiated with

24  those creditors, that they will continue to provide services and

25  goods on a cash on demand basis.

1          So we would ask that those six at least if an order is

2     entered be excluded from the order as critical vendors and those

3     are Bunge Canada, PerforMix, Nutrition Services, Viserion Grain,

4     LLC, Viterra, U.S. Grain, LLC, and Floyd (inaudible) Company and

5     Schow's Truck Center.  We don't believe that they've been shown

6     to be critical vendors who have indicated they will stop

7     providing services if they're not paid.

8          Lastly, I wanted to address the 503(b)(9) issue.  And

9     in paragraph 15 of the critical vendor motion -- so I guess the

10    U.S. Trustee's office is a little confused as to what the debtor

11    is asking for.  I'm just going to read what that paragraph in of

12    the motion says.  It says, "The estimated amounts of critical

13    vendor claims set forth herein are exclusive of any amounts that

14    might be owed to critical vendors that may be entitled to

15    administrative expense priority pursuant to Section 503(b)(9) of

16    the bankruptcy code."

17         "By this motion, the debtors also request authority to

18    pay the 503(b)(9) claims of any critical vendor to the extent

19    the debtors determine it is necessary and appropriate and in

20    accordance with the procedures and protocols set forth herein,

21    provided, however, any amounts paid by the debtors in

22    satisfaction of such 503(b)(9) claims shall not be included in

23    or subject to the critical vendor cap.  The critical vendor

24    503(b)(9) claims amount to approximately $750,000."

25         So what we're confused by is the 503(b)(9) portion,

something in addition to what's listed in the critical vendor

list.  Per that paragraph, it sounds like it is.  We're not told

exactly what those claims might be.  We're not told who the

claimants might be.  We're told collectively there's $750,000 of

503(b)(9) claims that might be included here.

It wasn't until yesterday's testimony that we were

first told, you know, who those claimants are and how much each

claim might be.  We're not sure if the debtor's asking for those

claimants to be recognized by the Court as holding 503(b)(9)

administrative claims that are entitled to priority when a plan

is developed.

There is one sentence later in the motion I believe on

page 18 or 19 that indicates that the Court -- let me find --

the sentence says, "The payment of claims for supplies and

services received by debtor's critical vendors within 20 days

prior to petition date must be allowed as administrative

expenses and this Court should allow the debtors to pay these

claims in accordance with the relief requested in this motion."

That's the extent of what we could see as potentially

being a request that the Court grant a 503(b)(9) administrative

claim to those parties that receive payments within 20 days.

If that's enough, we still think that there is concerns

about not knowing who those claimants were or what the claimed

amounts were until yesterday's testimony.  There's certainly not

been any notice to any parties in interest regarding those

1    requests.

2          And notably, the motion indicated that there might be a

3    cumulative $750,000 worth of claims.  The claims that were

4    identified yesterday exceeded $5 million.  So certainly I think

5    there's a notice issue in regards to the 503(b)(9) aspect of the

6    motion.

7          COURT:  And there was a 503(b)(9) motion that the Court

8    ruled on earlier --

9          MR. NAESS:  Correct.

10         COURT:  -- and with respect to that motion, the U.S.

11   Trustee's office objected to the immediate payment of those

12   claims out of concern that the debtor may be unable to satisfy

13   all of its administrative expense claims.

14         MR. NAESS:  Correct, Your Honor, yes.  And I think we

15   noticed today and asked Kander for clarification regarding the

16   budgets that there's nothing in the budgets showing that those

17   payments will be made prior to confirmation either.

18         And even given that, you know, that they're not

19   included in the budget, there was also testimony that the DIP

20   financing that's being procured is needed in order to pay the

21   critical vendor payments.  So I think even if those 503(b)(9)

22   have been included in the budget, we'd still be in the same

23   situation where, again, those payments would be financed by DIP

24   financing and our analysis would be the same as what we

25   explained at the start of yesterday's hearing where there's a

1   three-prong analysis and one of those prongs is the detriment to

2   all the other creditors in the case and we believe there would

3   be if financing is required in order to make those payments

4   prior to confirmation.

5        COURT:  If U.S. Trustee's Office is taking the position

6   that 503(b)(9) claims shouldn't be paid prior to confirmation,

7   doesn't it follow that the U.S. Trustee's Office would have

8   similar concerns with respect to just general unsecured claims

9   being paid, at least in part, immediately through these critical

10  vendor motions?

11       MR. NAESS:  Sure, yeah.  We haven't been able to

12  connect the dots that the same analysis applies in regards --

13  there appears to be a separation of issues in the case law where

14  503(b)(9) has this distinct three-prong analysis that gets

15  applied and critical vendor payments, you know, have been all

16  over the board.

17       You know, some courts have said, yes, they're allowed.

18  Some courts haven't.  But there hasn't been a defined analytical

19  structure that we were able to find, you know, as to when

20  payments might be appropriate or not other than, you know,

21  they're shown to be critical and in general, it doesn't harm

22  other unfavored creditors.

23       COURT:  One question for you, Mr. Naess.  This may be

24  slightly unrelated.  What is the status of the U.S. Trustee's

25  efforts to solicit representation of an unsecured creditor

1    committee?

2          MR. NAESS:  Sure.  That's a good question, Your Honor.

3    We've received several responses.  The issue that we have run

4    into and we have our office of general counsel working on it now

5    is that all of the responses except for one and the one was just

6    a recently added creditor to the list of 20 largest who we

7    haven't gotten a formal questionnaire back from.  All the others

8    are included on the critical vendor list.

9          Now, some of those are not receiving payments and so if

10   those that aren't receiving payments are excluded from the

11   order, that would probably help us along in the process of

12   identifying whether or not an unsecured creditor committee is

13   going to be appointed in this case.

14         So we do have a handful of responses but the issue that

15   we're running into is this critical vendor list and the

16   identification of those that have responded as being critical

17   vendors or potential critical vendors.

18         COURT:  Thank you, Mr. Naess.

19         MR. NAESS:  I have nothing further unless the Court has

20   further questions.

21         COURT:  No additional questions.  Mr. Christensen, I'll

22   give you an opportunity to respond.

23         MR. CHRISTENSEN:  Just a couple of points, Your Honor.

24   With regard to the notice issue that Mr. Naess raised about the

25   legal basis for the Court to grant the motion and the fact that

the most recent memorandum included additional potential legal

bases for the Court to grant the motion, I don't believe that is

something that all of the creditors were necessary to receive.

They received the original motion.  If they wanted to object to

the Court doesn't have authority to grant the motion under any

legal theory, they had the opportunity to do that.

They knew that the request was out there and whether it

was because the Court has authority under Section 363 or 362 or

1107 or some other code provision, the request for the Court to

take the action was there.  Every party had notice of that for

the last month.

With regard to the evidence and the testimony that's

been presented from Mr. Millenkamp is unrefuted by any other

witness, is unrefuted by any other document that those vendors

are not willing to work with the debtor without receiving the

critical vendor payments.  There's no other evidence that's been

presented to the Court to dispute that.

Mr. Millenkamp testified that both Land View and MWI

weren't willing to continue to work with him moving forward.

That is evidence that's before the Court.  The attorneys for

those two groups who are two of the very largest unsecured

creditors in the crowd confirmed that before the Court today.

So I think while Mr. Manwaring and Mr. Edson's comments aren't

evidence before the Court, they support the evidence that is

before the Court that their clients are walking out the door if

1  they don't get that critical vendor payment.

2       I think that's all I have unless there's additional

3  questions.

4       COURT:  What about Mr. Naess' comments with respect to

5  the request for Section 503(b)(9) claims in that initial

6  critical vendor motion -- what exactly is the debtor asking for

7  and is it possible for the Court to grant any relief when we

8  really didn't find out what the extent of those Section

9  503(b)(9) claims were until yesterday through the testimony of

10  Mr. Millenkamp and I believe, at this point, there's an exhibit

11  that's been admitted that does show which creditors did deliver

12  goods 20 days prior to the bankruptcy and how much.  But that's

13  not something that was provided to all creditors.

14       MR. CHRISTENSEN:  Meaning the list of who provided what

15  in what dollar amounts wasn't provided to creditors.

16       COURT:  Right.  So the actual amounts of the specific

17  Section 503(b)(9) claims that would be at issue.

18       MR. CHRISTENSEN:  The fact that there were Section

19  503(b)(9) claims that potentially provided further support for

20  the critical vendor status was outlined in the original motion

21  that was served on every creditor.  So the specific dollar

22  amounts for specific creditors is the only thing that hasn't

23  been served on every person but it's been presented at the

24  hearing today.  The theory was included in the original motion.

25       I will I guess admit that the word "exclusive" in that

1    sentence probably was confusing.  The point of that wasn't that

2    there's a critical vendor payment that we're proposing and

3    separately from that a 503(b)(9) payment.  The point was there's

4    a lot of these creditors who also have a 503(b)(9) issue.  We're

5    proposing a critical vendor payment and that's in the amount of

6    the critical vendor payment column on that chart.  That's the

7    one and only payment -- well, it might be several payments over

8    time but that's the amount that's being proposed to be paid to

9    those creditors.

10            The point of the 503(b)(9) issue is that's another

11   legal basis that could support the Court saying this creditor's

12   entitled to be paid.  They have that administrative claim status

13   but we're not requesting that that administrative claim be paid.

14   We're requesting that the critical vendor payment be paid.  It

15   just further supports the fact that it's a critical vendor.

16            COURT:  So the debtor through the critical vendor

17   motion is not seeking allowance of Section 503(b)(9) claims.

18   Simply noting that that is a potential path forward or

19   additional support that would provide support for some sort of

20   payment.

21            MR. CHRISTENSEN:  I would prefer it be characterized as

22   an additional path for support for some sort of payment.  I'm

23   not proposing that we now file a separate 503(b)(9) motion

24   unless the Court completely denies the critical vendor motion

25   which we're really hoping doesn't happen.

1      COURT:  All right.

2      MR. CHRISTENSEN:  Thank you.

3      COURT:  Any additional comments?

4      MR. CHRISTENSEN:  No.

5      COURT:  All right.  The Ninth Circuit Bankruptcy

6  Appellate Panel remarked in Dietz versus Florida, it's In Re:

7  Dietz, 2012 decision found at 469 BR 11 at page 22 that a

8  bankruptcy court is bound to follow Ninth Circuit precedent

9  unless that precedent is overturned by the Supreme Court.  And I

10  think the question really before the Court today with respect to

11  this critical vendor motion is what extent that B & W

12  Enterprises decision is controlling on this Court and this

13  Court's ability to enter a critical vendor order.

14      The parties are quite familiar with that MacMillan

15  decision from the District of Oregon in which the Court held

16  that B & W Enterprises was binding authority with respect to

17  that issue.  And the B & W court considered whether the claims

18  of certain unsecured creditors could be elevated over other

19  creditors of the same class and the circuit concluded in that

20  decision that that simply wasn't a power given to the court --

21  given to bankruptcy courts under the bankruptcy code.  It's at

22  page 537 of the B & W decision.

23      I find that MacMillan decision to be persuasive and I'm

24  going to adopt similar reasoning here.  That MacMillan decision

25  is found at 652 BR 812, decision from the District of Oregon in

1    2023.

2    Now, I recognize there's a tension between that <u>B & W</u>

3    <u>Enterprises</u> decision and some of the language that the U.S.

4    Supreme Court used in the <u>Jevic</u> decision.  And in <u>Jevic</u>, the

5    Supreme Court considered whether bankruptcy courts possess

6    authority to order the distribution of estate assets in a manner

7    that's inconsistent with the bankruptcy code's priority scheme

8    over the objection of an agreed creditor as part of a structured

9    dismissal.

10    And the court answered that question in the negative

11    concluding that a distribution scheme ordered in connection with

12    the dismissal of a Chapter 11 case cannot, without the consent

13    of the affected parties, deviate from the basic priority rules

14    that apply under the primary mechanisms the bankruptcy code

15    establishes for final distributions of estate value in business

16    bankruptcies.

17    And in reaching that conclusion, the <u>Jevic</u> court

18    juxtaposed circumstances in which bankruptcy courts have

19    approved interim distributions that violate ordinary priority

20    rules and the court cited several examples of these permissible

21    interim transactions intended to serve significant code related

22    objectives.  But the court noted a wholesale structure dismissal

23    implementing a final disposition of estate property did not

24    advance anything the court considered a significant offsetting

25    bankruptcy related justification.

1      In the court's efforts to distinguish distribution

2  schemes that violate both the text and the objectives of the

3  bankruptcy code against schemes involving interim distributions

4  that aren't strictly faithful to the former but designed to

5  promote the latter is interesting and it does create attention

6  between the court's holding in B & W Enterprises and some of

7  that analysis in Jevic.  But the Jevic decision did not overrule

8  B & W Enterprises and since the time Jevic was decided, the

9  Ninth Circuit has not concluded that B & W Enterprises is no

10 longer good law.  And to that extent, the decision is still

11 controlling upon this court and this bankruptcy court is bound

12 by that decision and its controlling authority.

13     A couple other reasons that support denial of the

14 motion is that first, even if critical vendor payments are

15 permissible, I don't think the debtor's carried its burden of

16 proof to show that payments here are critical and that's based

17 upon the evidentiary record of what constitutes a critical

18 vendor in this case and what should be paid to that particular

19 critical vendor.  That is largely based upon the testimony of

20 the debtor's principal and, by and large, that testimony was

21 informed by conversations with other parties which constitutes

22 hearsay and it's not necessarily something the Court can rely

23 upon.

24     I'm also mindful of a case that Mr. Naess brought up in

25 that K-Mart decision which discussed the need for more than --

1    more supporting evidence when considering these critical vendor

2    motions than simply the testimony of a chief officer of a

3    company in order to support those.  I think a more robust

4    evidentiary record is required and to the extent Mr. Manwaring

5    and other parties have provided argument to the Court that their

6    clients may be unwilling to continue to do business with the

7    debtor in the future, that's simply an argument before the Court

8    and does not constitute an evidentiary record which the Court

9    can rely.

10           Finally, I do have some notice issues.  The debtor did

11   cite to Section 363 in that additional supplement regarding

12   authority for critical vendor payments as a use of property

13   under Section 363(b) which would potentially permit these

14   critical vendor payments to be made.

15           I note that Rule 2002(a)(2) requires 21 days notice by

16   mail of any proposed use, sale or lease of estate property and I

17   question whether that notice was appropriately given here since

18   we've had multiple iterations of the critical vendor budget that

19   has changed the amounts that was proposed to be paid to certain

20   critical vendors and certain vendors were added or removed from

21   that list ultimately.

22           As such, the Court's going to deny the critical vendor

23   motion on a final basis.  Now, as we've discussed, there is a

24   path forward regarding some of those claims that are set forth

25   in that critical vendor motion.  Some of those creditors have

1    valid state law liens such as an agricultural commodity lien and

2    those folks who hold secured claims are entitled to adequate

3    protection.  Section 361(1) provides that periodic cash payments

4    are contemplated as a form of adequate protection.

5         So if the debtor feels like it needs approval of those

6    specific adequate protection payments at issue that are

7    associated with those secured claims, then I would encourage the

8    debtor to tee that issue up before the Court.  Otherwise, I

9    think that's probably something that the debtor could probably

10   handle within the context of a cash collateral budget and

11   request approval to use cash collateral or debtor in possession

12   financing.

13        Additionally, as we've discussed, there is potentially

14   a path forward with respect to Section 503(b)(9) with some of

15   those claims and the debtor did clarify that it was not

16   requesting allowance of those 503(b)(9) claims in connection

17   with the critical vendor motion.

18        Mr. Christensen, would you like a formal order denying

19   that motion?

20        MR. CHRISTENSEN:  I would, Your Honor.  I assume Mr.

21   Naess will sign off on it.

22        COURT:  Any other parties wish to endorse the form of

23   that order?

24        MS. SCHWAGER:  No, Your Honor.

25        COURT:  All right.  Go ahead and submit that order, Mr.

1   Christensen, with Mr. Naess' endorsement.

2         MR. CHRISTENSEN:  Thank you.

3         COURT:  All right.  We've got two additional motions to

4   address.  Now might be a good time to take a break, allow the

5   parties to collect their thoughts before continuing with respect

6   to closing.  Do we want to -- how much time do the parties need

7   before we proceed?

8         UNIDENTIFIED SPEAKER:  Ten minutes.

9         MS. SCHWAGER:  Five minutes.

10         MR. O'BRIEN:  We can do five as well, Your Honor.

11         UNIDENTIFIED SPEAKER:  Four minutes.

12         COURT:  There we go.  And Conterra wins.  Let's take

13   about a 15-minute break.  That should give the parties

14   sufficient time to collect their thoughts and we will come back

15   on the record at about a quarter to 4:00 and address those

16   remaining motions.

17         CLERK:  All rise, please.

18                    (Recess taken.)

19         COURT:  Thank you.  Please be seated.

20         All right.  We are back on the record in Case No.

21   24-40158.  We have two pending motions before the Court.  Motion

22   for use of cash collateral and motion for debtor in possession

23   financing.

24         Ms. Mikkilineni, do you want to address both or --

25         MS. MIKKILINENI:  Yes, Your Honor.

1          COURT:  Go ahead.

2          MS. MIKKILINENI:  Thank you, Your Honor.  The debtors

3     filed their cash collateral motion on April 2 and are seeking a

4     final order authorizing use of cash collateral in which Rabo,

5     MetLife and Conterra assert a security interest.  And we're

6     seeking a final order authorizing the debtors to grant adequate

7     protection to these secured lenders.

8          All of the debtor's cash and accounts receivable are

9     collateral of the secured lenders.  As proven through testimony

10    of Mr. Millenkamp and Ms. Churchill, the debtor's use of cash

11    collateral is necessary to avoid immediate and irreparable harm

12    to the businesses, operations, employees and livestock.

13          To provide adequate protection to the secured lenders

14    for use of the cash collateral, the debtors propose providing

15    adequate protection replacement liens, monthly interest

16    payments, reporting, debtor's maintenance of their insurance and

17    if there is diminution in value, the secured lenders will

18    receive a super priority administrative expense claim.

19          MetLife and Conterra have not indicated an objection to

20    final use of cash collateral and we plan on submitting a

21    proposed order for final use of cash collateral that includes

22    the provisions MetLife and Conterra requested to be included in

23    the interim cash collateral order.

24          In addition to cash collateral, the debtors also filed

25    a motion to authorize --

1      COURT:  Just a couple of questions with respect to cash

2  collateral before we move on.

3      MS. MIKKILINENI:  Yes, Your Honor.

4      COURT:  Are there any disputes between the parties with

5  respect to reporting requirements?

6      MS. MIKKILINENI:  Not that I'm aware of.

7      COURT:  There was that cattle reserve fund that was

8  included in the initial cash collateral order.  Are the parties

9  in agreement as far as including that fund on a final basis

10  going forward?

11      MS. MIKKILINENI:  No, Your Honor.  We are not in

12  agreement on that provision.

13      COURT:  Okay.  Why don't you address that.

14      MS. MIKKILINENI:  So Rabo keeps trying to argue that

15  their interest in the collateral -- in the cattle is decreasing

16  when an animal is sold.  But as Ms. Churchill testified, the

17  collateral value of the cattle is always growing.  You can sell

18  one animal and it wouldn't necessarily decrease the value of the

19  herd because the cattle are always growing in weight and value.

20  That's why the replacement animal is not a newborn but the one-

21  day younger animal.  It just keeps on moving through that cycle.

22  There are no permanent reductions in the size of the herd.

23      As for the decrease in the pile of feed that

24  Mr. O'Brien mentioned, because you're feeding the cattle, as

25  they continue operating, they will continue buying feed.

 1  Therefore continuously increasing the pile of feed and therefore

 2  no decrease in the collateral.  So throughout this whole

 3  process, there's no decrease in the value of the herd or the

 4  value of the collateral so we don't think that provision is

 5  necessary or should be included in the cash collateral order.

 6       COURT:  And to this point in the bankruptcy, has the

 7  size of the herd decreased?

 8       MS. MIKKILINENI:  Not that I'm aware of.  I think over

 9  the last three months, correct -- over a three-month rolling

10  period, it has not decreased in size.

11       COURT:  All right then.  And I think that cattle

12  reserve fund and that interim order required I think the debtor

13  to deposit up to $3 million based on the cattle sale proceeds

14  that were used for operation purposes during the interim period?

15       MS. MIKKILINENI:  Yes, Your Honor.

16       MR. CHRISTENSEN:  No.

17       MS. MIKKILINENI:  Well, no?

18       MR. CHRISTENSEN:  The interim order, Your Honor, allows

19  beef cattle to -- or cattle to be sold, proceeds could be used

20  first for the purchase of replacement cattle, second, up to 3

21  million used for operating expenses and then the excess of 3

22  million was to be put in a special reserve account.  There

23  wasn't more than 3 million in cattle sales so there wasn't ever

24  anything put in the reserve account.

25       COURT:  So there won't be a need for the debtor to fund

1   the cattle reserve account upon the entry of a final order for

2   use of cash collateral?

3           MS. MIKKILINENI:  Correct, Your Honor.  Correct.

4           COURT:  All right.

5           MS. MIKKILINENI:  In addition to cash collateral, the

6   debtors also filed a motion to authorize the debtor to obtain

7   post-petition financing.  DIP financing is necessary to fund

8   operations, pay employees, feed the livestock and maintain the

9   value of the estates for the creditors.

10          The debtors initially solicited DIP financing proposals

11  prepetition including from the prepetition secured lenders and

12  received three DIP financing proposals.  All three proposals

13  required a priming lien.

14          Following the interim hearing held on April 4, the

15  parties received three updated DIP proposals:  One from Sandton,

16  one from Idaho Milk and one from Rabo.  The debtors were copied

17  on communications sent from Rabo to Idaho Milk and Conterra

18  regarding Rabo's assertions that Conterra was violating its

19  intercreditor agreement with Rabo by submission of the Idaho

20  Milk DIP proposal so Idaho Milk withdrew its DIP proposal.

21          The debtors ultimately selected the DIP proposal

22  submitted by Sandton which proposes a secured super priority DIP

23  financing facility up to a total lending amount of $45 million

24  and granting DIP liens and DIP super priority claims.  The DIP

25  proceeds will provide liquidity for the case up to 12 months.

1    The debtor's proposed to provide security to the DIP

2    lender in the form of first priority priming liens,

3    unsubstantially all the debtor's assets subject to the carve

4    out. The debtors further propose providing the DIP lender with

5    super priority administrative expense claims.

6    Bankruptcy Code Section 362(c)(2) provides for use of

7    cash collateral if the secured party consents or the Court

8    authorizes such use.  Here, MetLife and Conterra have not filed

9    an objection to final use of cash collateral.  We did have the

10   stipulation with Conterra that the priming lien would not apply

11   to the German Dairy so they have the first priority on the

12   German Dairy and Sandton has the second.  With that stipulation,

13   it's my understanding that took care of Conterra's objection.

14   We have also spoken to Conterra and to Sandton

15   regarding issues with the proposed DIP order that we filed of

16   record I think when we were required to file it.  I don't

17   remember the exact date.  But the issues have been worked out

18   and we'll be providing a new proposed DIP order to take care of

19   those issues.

20   Rabo has filed an objection.  Section 363(e) provides

21   that the Court shall condition use of cash collateral as is

22   necessary to provide adequate protection of a secured party's

23   interest.  Section 364(c) further provides that if a debtor is

24   unable to obtain unsecured credit as an administrative expense,

25   the Court may authorize the obtaining of credit with priority

 1    over all administrative expenses secured by a lien on property

 2    of the estate that is not otherwise subject to a lien or secured

 3    by a junior lien on property of the estate that is subject to a

 4    lien.

 5         Courts apply a three-part test.  First, the debtors may

 6    incur post-petition financing under 364(c) if they demonstrate,

 7    first, they cannot obtain unsecured credit.  Mr. Millenkamp

 8    testified that he solicited DIP proposals from multiple parties

 9    and was unable to obtain unsecured financing.  Mr. Morgan with

10    Forbes further testified that out of the parties he reached out

11    to for DIP financing, none offered an unsecured option.

12         The second factor is that the DIP facility is necessary

13    to preserve the assets of the estates.  Mr. Millenkamp testified

14    that without the DIP facility, the milk production will

15    decrease.  The cattle will possibly die.  The 500 employees will

16    lose their jobs.  The vendors and customers will lose

17    Millenkamp's business which would be detrimental to those

18    vendors' and customers' businesses.  All of these outcomes would

19    have a substantial negative impact on the communities in which

20    Millenkamp operates.

21         He further testified that the absence of DIP funding --

22    I'm sorry.  He further testified that absent the DIP funding,

23    the creditors would not be paid back which would risk the

24    survival of some of those creditors and the businesses would

25    fail thus resulting in the estates being unable to preserve

1    their assets and succeed at a repayment plan.

2         The third factor is that the terms of the DIP facility

3    are fair, reasonable and adequate given the circumstances of the

4    debtor and the proposed lender.  The debtors argue the proposed

5    DIP loan is fair, reasonable and in the best interests of the

6    estate.

7         It is necessary to support the debtor's ongoing

8    operations and will ensure the highest quality of care for the

9    livestock.  Further, based on the debtor's efforts to obtain DIP

10   terms from multiple parties, it has determined Sandton's DIP

11   facility is the best financing available and is well within the

12   exercise of sound business judgment.  The DIP loan was further

13   negotiated in good faith and at arm's length.

14        Mr. Millenkamp testified the debtors engaged in

15   negotiations with Sandton prior to filing the DIP motion and

16   after once additional DIP offers were made post-petition.  Ms.

17   Churchill testified that the $45 million is enough to get the

18   debtors through confirmation of the plan and through harvest

19   time if confirmation is extended past August.  You also heard

20   testimony on how the interest rates and fees under the DIP loan

21   are fair and reasonable.

22        Section 364(d)(1) provides that a debtor may obtain

23   credit secured by a senior lien on the property of the estate

24   that is subject to a lien only if the debtor is unable to obtain

25   such credit otherwise and there is adequate protection of the

1  interests of the holder of the lien on the property of the

2  estate on which such senior lien is proposed to be granted.

3      Here, the debtors are unable to obtain the required

4  funds in the form of unsecured credit.  Further, the prepetition

5  secured lenders' interests in the collateral are adequately

6  protected.  As such, the priming liens proposed through the DIP

7  loan are allowed.

8      To demonstrate the required credit is not obtainable on

9  an unsecured basis, the debtors need only demonstrate by a good

10  faith effort that unsecured credit was not available.

11  Mr. Millenkamp and Mr. Morgan at Forbes testified there were no

12  unsecured credit offers when they reached out to multiple

13  parties to find DIP funding.

14      The debtors may obtain secured credit with priming

15  liens if the existing secured creditors' interests are

16  adequately protected.  Debtors propose the following adequate

17  protection to the prepetition secured lenders.  Monthly interest

18  payments, replacement liens, preservation of the equity cushion

19  through continuous maintenance of the real property, super

20  priority administrative expense claims if diminution in value

21  occurs which shall have priority except as to the DIP liens, the

22  DIP super priority claim and the carve-out over all admin

23  expenses and unsecured creditors in this case.

24      The debtors have proposed a reasonable package of

25  adequate protection.  The purpose of adequate protection is to

 1    compensate a secured lender solely for the diminution in value

 2    in its collateral.  It is not meant to be a guarantee that a

 3    creditor will be paid in full.  The debtors will be granting

 4    replacement liens, interest payments and super priority claims

 5    as adequate protection here which is very commonplace.  Further,

 6    an equity cushion, standing alone, provides adequate protection.

 7          Although the bankruptcy code does not explicitly define

 8    adequate protection, Section 361 provides that it may take the

 9    form of a cash or periodic cash payments to the extent there is

10    a decrease in the lienholder's property interest, additional or

11    replacement lien to the extent there is a decrease in the

12    property interest or other relief that will result in a secured

13    party's realizing the certain equivalent of its property

14    interest.

15          Courts have held that the existence of an equity

16    cushion seems to be the preferred test in determining whether

17    priming of a senior lien is appropriate under Section 364.

18          Under the equity cushion theory, if a debtor has equity

19    in a property sufficient to sheild the creditor from either the

20    declining value of the collateral or an increase in the claim

21    from accrual of interest or expenses, then the creditor is

22    adequately protected.  Courts have uniformly held that an equity

23    cushion of 20 percent or more constitutes adequate protection.

24          I'd like to bring up a couple of the exhibits to show

25    this equity cushion argument.

1          Exhibit 1023.  As shown by our equity cushion analysis,

2     the real estate has been valued at 467 million.  That's based on

3     Schoul's BPO.  The personal property has been valued at 178

4     million.  This is based on the cattle livestock appraisal -- I'm

5     sorry, the livestock appraisal and it's also based on the

6     equipment appraisal, both done by two of our experts.  It is

7     also based on Mr. Millenkamp's testimony regarding the remainder

8     of the personal property and the value associated with those.

9          The total value of property, real estate and personal

10    property, is approximately $646 million.  If you subtract the

11    debt from MetLife, Rabo, Conterra and Sandton, it would equal

12    340 million.  That equals total equity of $305 million which is

13    a 47.26 percent equity cushion that is well above the 20 percent

14    threshold.

15         Even if you were to take into consideration that the

16    personal property being valued at 178 million, if you take out

17    the amount that Rabo's counsel pointed out in the equipment

18    liens that if that was inaccurate --

19         COURT:  That and the purchase money security -- the $8

20    million?

21         MS. MIKKILINENI:  Yes.  If you take that out but then

22    you also add in the fact that we have 4 and a half million

23    dollars in feed liens that have been paid, you still arrive at

24    approximately $178 million in personal property.  Even if you

25    subtract $2 million off of this analysis, you're still above 45

1  percent equity cushion, well above.

2  Q.  On the feed liens, I think the valuation we saw with respect

3  to the feed was on Exhibit 1022 or summarizing it?

4        MS. MIKKILINENI:  Yes.

5        COURT:  There were approximately $12 million in feed

6  liens listed on that particular exhibit.  Does that account for

7  the $4.5 million in liens that were paid pursuant to that

8  interim order?

9        MS. MIKKILINENI:  No.  That's what I was just touching

10  on.  So you would have to decrease that $12 million by

11  approximately 4 and a half million dollars that was paid during

12  the interim period so it would bring that bottom number up in

13  value.  So the personal property value is actually higher by 4

14  and a half million dollars.  Does that make sense?

15        COURT:  Yes.  Okay.

16        MS. MIKKILINENI:  And then I'm going to bring up

17  Exhibit 1024.  So this is a calculation of Rabo's equity cushion

18  in the personal property alone in which it has a first security

19  interest.

20        The personal property again we valued at $178 million

21  on this exhibit.  It might be $5 million less by the time that

22  you take things in and out in what we just talked about.  But by

23  our calculations -- by our calculations, if we correct

24  Exhibit 1022, you're at 178,167,601 instead of 178,814,000.  So

25  you're pretty much the same.

1     And then you subtract the debt -- the Sandton debt at

2     45 million and the Rabo debt at 93 million.  You arrive at total

3     debt -- or total equity of 39.9 million.  That equates to a

4     22.35 percent interest -- equity cushion.

5     Even if you were to in the $5 million in fees and

6     interest that would accrue on Sandton's loan if they take out

7     the full 45 million, you would still be at a 20 percent equity

8     cushion.  In just the personal property alone.  Keep in mind

9     that Rabo has a second on all of the real property.

10     COURT:  Is there any sort of apportionment on that

11     Sandton lien between the personal property and the real property

12     or is it simply all of the debtor's property is

13     collateralized -- serves as collateral for that loan?

14     MS. MIKKILINENI:  All of the property serves as

15     collateral for the loan.

16     COURT:  So in essence, Sandton would have the ability

17     to choose whether to pursue the personal property or the real

18     property if there was ever a default under that agreement.

19     MS. MIKKILINENI:  As of right now, I believe that is

20     the understanding, yes.  I don't think there's any sort of

21     marshaling type of --

22     COURT:  And I know that Rabo has argued that there

23     needs to be some sort of proportionality as to how the lien

24     attaches to the debtor's property.

25     MS. MIKKILINENI:  Uh-huh.

1      COURT:  Does the debtor contest that or have any

2   opinion as to whether or not the Court should explore that?

3      MS. MIKKILINENI:  I don't think that's how a priming

4   lien normally works.  You get a first priority lien on all of

5   the debtor's property.  I don't think it's usually taken in

6   proportionality.  I mean there is a settlement agreement with

7   Conterra on that one piece of property that was a stipulation.

8   They were willing to work with us on that matter and do not

9   object to DIP because of it.  So it --

10      COURT:  Rabo on the other hand does object to that

11   particular collateral being excluded from the priming because it

12   essentially requires they bear an additional burden and more of

13   the property that's subject to their collateral gets primed.

14      MS. MIKKILINENI:  Uh-huh.  They are still wildly over-

15   secured on their personal property.  I mean that doesn't even

16   take into consideration the real property.  So I don't think

17   leaving the German Dairy off of that affects them too much based

18   on the equity cushion.

19      COURT:  What about the agriculture lienholders?  Are

20   they primed?

21      MS. MIKKILINENI:  No, they are not.  We specifically

22   included that in the DIP order.

23      COURT:  And the purchase money security interests?  Are

24   they subject to the priming lien?

25      MS. MIKKILINENI:  No, Your Honor.

1          COURT:  All right.

2          MS. MIKKILINENI:  There can be no argument that the

3    prepetition secured lenders are not adequately protected here.

4    Further, each of the experts who testified regarding value

5    testified that this is the cleanest, nicest and best maintained

6    dairy facility they have ever seen.  This impacts the value of

7    the collateral.  The livestock, equipment and real estate are

8    well taken care of and maintained and will continue to be well

9    maintained if the DIP funds are received.

10         Rabo argues that the debtors have not provided any

11   evidence of their ability for reorganizing and exiting

12   bankruptcy.  While some courts have considered a debtor's

13   prospect of reorganizing and exiting bankruptcy when determining

14   whether to approve DIP financing, it is not very common and most

15   courts do not consider or heavily weigh this factor in their

16   analysis, especially when there is a significant equity cushion.

17   In fact, the Ninth Circuit has held that the existence of an

18   equity cushion is the classic form of protection for a secured

19   debt.

20         Further, Ninth Circuit Courts have held the existence

21   of an equity cushion standing alone can provide adequate

22   protection.  This factor regarding the ability to reorganization

23   and exit bankruptcy is also not required under the bankruptcy

24   code.

25         Rabo further cites to a few cases noting that some

courts have considered whether the debtor has the burden to
prove that it has any prospect of a successful reorganization in
the context of determining whether the secured lenders are
adequately protected.

These cases can all be distinguished from the debtors.
In those cases, the courts determined that the debtors appeared
to not have any reasonable possibility for reorganization.  That
is not the case here.  Mr. Morgan with Forbes testified that the
prospects for refinancing are high and that the parties he plans
to reach out to regarding refinancing are not the same parties
that the debtor reached out to last year.  We have further
provided testimony that the milk prices are much better now than
they were last year when the debtors were attempting to find
refinancing.

Further, Ms. Churchill testified that they are working
on long-term cash projections which include exit financing and
are assuming unsecured creditors will receive 100 percent
repayment.  The projections also provide that the debtors will
be able to generate free cash flow sufficient to service their
debts.

The beef futures have increased.  The milk prices have
increased exponentially.  The feed costs have gone down
dramatically.  This will create a positive to the cash flow
moving forward.  This was all in testimony.  The debtors have
shown a reasonable possibility for reorganization.

1    The debtors do not disagree that the debtor's plan for

2    reorganization and exit from bankruptcy is considered throughout

3    a Chapter 11 process.  However, we are still at the early stages

4    of this case and the debtors are not required to have a

5    finalized plan at this stage.  It is not reasonable to conclude

6    the debtors would have a complete finalized plan when the

7    debtors have been trying to first receive DIP funding through a

8    highly contested process due to Rabo in order to make it through

9    this case.

10    In its objection, Rabo cited to In Re: Las Vegas

11    Monorail Company.  Notably, that argument was not based on

12    debtor's motion for cash collateral or DIP financing.  In fact,

13    it was regarding feasibility of a debtor's proposed plan.  This

14    is not plan confirmation and the debtors are not proving up

15    feasibility of a plan at this stage.  The debtors are not

16    required to provide all the specifics at this stage of a Chapter

17    11 plan, especially in this case where there is this large of an

18    equity cushion.

19    As the debtor's investment banker noted through his

20    testimony, the debtors are in the process of marketing their

21    assets and finding new capital and have several interested

22    parties.  They have a plan on additional parties they are going

23    to reach out to and how they are going to do so.  They have been

24    waiting on DIP funding to be approved as approval of the DIP

25    funding will help in their efforts to find refinancing

1   opportunities.

2        Therefore, the debtors have satisfied the Section 364

3   requirements that they are unable to obtain a non-priming

4   unsecured DIP loan and that the prepetition secured lenders are

5   adequately protected.

6        As such, a priming lien is allowed.  Bankruptcy courts

7   consistently defer to a debtor's business judgment on most

8   business decisions including the decision to borrow money unless

9   such decision is arbitrary.  In exercising its business

10  judgment, courts also recognize a debtor is entitled, if not

11  required, to consider non-economic benefits offered by proposed

12  post-petition facility.

13       We had previously discussed the non-economic reasons

14  the debtors chose the Sandton DIP over Rabo's DIP proposal and

15  continue to stand by and assert those non-economic factors in

16  its decision to seek final approval of the Sandton DIP proposal.

17       As such, the Court should defer to the debtor's

18  business judgment in choosing the Sandton proposal.  The Sandton

19  DIP proposal is in the best interests of the debtors, creditors

20  and their estates.  Based on the foregoing, the debtors seek

21  authority -- the debtors seek a final order authorizing use of

22  cash collateral and granting adequate protection to the secured

23  lenders for use of cash collateral and the debtors further

24  request the Court authorize the debtors to obtain the DIP loan

25  with Sandton on a final basis of 2 -- $45 million and grant

1    adequate protection.  Thank you, Your Honor.

2         COURT:  One final question.  A significant portion of

3    the need for the DIP facility was to pay critical vendors.  The

4    Court just denied the critical vendor motion which would

5    presumably mean that there is substantially less need for that

6    entire $45 million from the debtor.  Does the debtor really need

7    that entire $45 million now that the critical vendor motion has

8    been denied?

9         MS. MIKKILINENI:  Yes, Your Honor.  We intend to

10   provide adequate protection payments for each creditor who has a

11   lien and secured interest and so I haven't done the calculation

12   but that adds up to a significant amount.

13        We also -- if we go through -- let me back up.  The

14   503(b)(9) claims, even if we don't pay them right now, they will

15   be paid at confirmation and so that's a significant amount that

16   will need to come from the DIP financing.  And then if we go

17   into harvest time prior to getting confirmation, that also

18   increases the cost.  So we do anticipate we'll still need up to

19   $45 million.

20        COURT:  But you don't have a specific calculation of

21   what those additional 503(b)(9) claims and additional secured

22   claims in which the debtor proposes to provide adequate

23   protection are?  You don't know what that amount is?

24        MS. MIKKILINENI:  We have not had the time to take that

25   exhibit that we've submitted and calculate the amount that's

1    owing for each of the lien holders and the amount that's owing

2    for the 503(b)(9) claimants.  We can do that calculation.  We

3    just need a little bit more time.  We didn't have time during

4    the 15-minute break.

5              COURT:  All right.  Counsel for MetLife.

6              MR. SCHANDLBAUER:  Thank you, Your Honor.  Good

7    afternoon, Your Honor.  I am Nick Schandlbauer from Adams and

8    Reese in Washington DC.  I represent MetLife -- MetLife lenders

9    as we're referred to, Metropolitan Life Insurance Company of New

10   York.  It's good to be back in Boise and may it please the

11   court.

12             So we sat in that corner of your courtroom and listened

13   to four days of testimony during which everybody has heard at

14   length about the relative positions of the prepetition secured

15   lenders such as we are.  First, you have MetLife.  We've got the

16   debtor's land including the East Valley Ranch valued in and of

17   itself at a big number.  We have other liens.  You've got Rabo,

18   the current asset lender, the operational lender.  Liens on

19   cattle and equipment.  Cattle.  The debtor's equipment.  Their

20   current assets.  And pretty importantly, a second lien on

21   everything that MetLife has.  You've got Conterra as well.

22   They've got a first lien on the German Dairy which we've heard

23   all about over the last two days and a third on everything else.

24   And creditor agreements exist between all of these parties.

25             So last month, this Court, you, determined that the DIP

1   was at a priming DIP, at least on an interim basis, was

2   essential for the continued operation of the debtors and the

3   health and safety of their livestock, the source of their

4   business, the milk business at least.

5          And so we're here a month later and we're here to

6   provide our complete support of the debtor's access to the full

7   ask of the $45 million priming Sandton DIP facility which is the

8   subject of today's hearing and the debtor's motion.

9          And we do this for the same reason we explained just a

10  month ago on April 9.  Namely, that we feel that the adequate

11  protection that's been proposed to us including the equity

12  cushion, including the monthly interest payment are just as they

13  sound, adequately -- they adequately protect our interest.

14         We also like the idea obliquely and directly testified

15  to by some of the witnesses including the experts that there

16  will be an aspect of finality or at least greater certainty as

17  whether or not the debtor is going to die in the crib or live to

18  fight until a confirmation process can be assembled, a plan can

19  be proposed and the dust further settle.  We support the

20  debtor's effort to get the Sandton priming lien.

21         Just like last month -- just like I told you last

22  month, the fact that we support this doesn't mean we're going to

23  put a bag over our head and cease to be vigilant.  We expect

24  progress.  We expect reporting, accurate reporting.  We expect

25  day-to-day effort.  Not just to hope that the milk price will go

1   up and the feed price will go down but to stay on their

2   resources that you've heard that are sought to be retained,

3   namely the Forbes Investment Bank and word of mouth and whoever

4   knows who's going to get the word into Elon Musk's ear.  That's

5   an option too.  We're going to look for that.  We're going to

6   stay vigilant.  And if our equity cushion is threatened or it

7   becomes patted that there's no possible feasible plan that can

8   be proposed, like any secured lender, like any creditor, we'll

9   adjust to that circumstance when and if it occurs.

10          But what our support doesn't mean, it doesn't mean

11  either that we won't complain on our bargained for risk.  We've

12  heard that word from the Rabo group.  When our risks are

13  threatened and when our contractual -- when our contractual

14  expectations are brazenly attempted to be violated.

15          So a week ago, maybe eight days ago, Rabo filed it's

16  omnibus objection.  That's at Docket 244.  You've heard about it

17  from debtors and in that document at Section C on page 16,

18  there's kind of a remarkable request and that request recites

19  that -- and you've just eluded to it.  If you're inclined to

20  approve the Sandton DIP facility, you should do so only after

21  altering the marshaling provisions in the final DIP order.

22  Namely to limit whatever priming occurs to the prepetition

23  secured creditors to an amount proportional to each prepetition

24  secured creditor's debt as of the petition date.  In other

25  words, our debt divided by the aggregate.  Rabo's debt divided

 1   by the aggregate.  Conterra's divided by the aggregate.

 2            It's not going to surprise you to learn that we object,

 3   object to what might be, you know, in some martian landing,

 4   never understanding what contractual relations are, a logical

 5   quest.  Hey, we're suffering.  Circumstances have changed.

 6            Their request is that you get in -- get into the middle

 7   of that DIP order and blew pencil in a marshaling provision to

 8   make it fair to the junior creditor that Rabo describes itself

 9   to be.

10            But Your Honor, the request, it flaps the plainest

11   provision in the 2018 intercreditor agreement that what's

12   admitted into evidence in this hearing and as Rabo 3003 and

13   MetLife 2015.  Those are identical exhibits.  We'll get to the

14   text of that agreement in a second.  But the idea that Rabo is

15   now subject, as it recites in its written docks, it's subject to

16   unfair and discriminatory -- unfair and discriminatory

17   framework.  It's absurd.

18            Surely this Court can judicially notice that MetLife

19   and Rabo are gigantic institutions and capable of hiring

20   sophisticated counsel to document their interests.  This unfair

21   and discriminatory framework was precisely what Rabo bargained

22   for when it agreed to become the debtor's operations lender.

23            Their omnibus objection makes it clear that you have

24   the discretion to exercise a decision to grant or deny a

25   marshaling request when it's necessary to protect the junior

1    lender.

2         You just heard that Rabo's not a junior lender even on

3    it's own -- on its own primary collateral.  Let's call it that.

4    Its collateral includes the land.  Let's make no mistake.  But

5    on the primary collaterol, it's not even a junior lender.  It

6    doesn't need the Court's discretion to protect it when it's

7    specifically bargained for the exact risk profile that we're

8    facing here and that was contemplated by the four corners of the

9    exhibit before you, Exhibit 3003.

10        So I'm going to ask Ms. Roussell to please scroll down

11   to what I would argue is the least ambiguous provision of the

12   whole agreement which is paragraph 13.  Paragraph 13 -- here we

13   come.  Lucky 13.  Paragraph 13 is the parties' agreement.

14   Rabo's agreement, MetLife's agreement to waive any -- waive and

15   renounce any rights under any applicable statutes which each may

16   have whether law or in equity to require the other party to

17   marshal collateral or any portion thereof.

18        And later in the same agreement and, Ms. Russell, could

19   you scroll down to paragraph no. 21?  There's no question that

20   the parties agreed then and what the parties intended then would

21   happen if we found ourselves here in your court.  So this one

22   has a separate title that's effect of bankruptcy.  This

23   agreement shall be and remain enforceable notwithstanding any

24   bankruptcy or other insolvency proceeding by or against the

25   borrower or its principles.  Well, here we are.

1    Subordination agreements are enforceable in bankruptcy.

2  Subsection A of Section 510 of the code recites plainly that a

3  subordination agreement is enforceable in case under this title

4  to the same extent that such agreement is enforceable under

5  applicable non-bankruptcy law.  And thanks to the excellent

6  counsel that we've obtained, Mr. Gourley, I understand that

7  Idaho courts recognize contractual agreements between creditors

8  and enforce the contract.

9    But for the general proposition, I'd cite to you the In

10  Re:  Erickson Retirement Communities, LLC, at 425 BR 309 which

11  not in an adversary proceeding like context to seek damages from

12  the other.  The Court just declined to give a particular

13  creditor subject to one of these agreements standing to obtain

14  or to seek the appointment of an examiner.  And the court in

15  that case said that if the junior creditor was allowed even to

16  support the appointment of an examiner, that action was

17  tantamount to pursuing a remedy and the commencement of an

18  action which directly contradicted the agreement in place there.

19    But that required that bridge tantamount.  There's

20  nothing tantamount here.  There's direct.  You heard the word

21  marshaling.  They said it.  They wrote it.  They asked their

22  expert to talk about it and how fair it was.  We didn't hear too

23  much about the discriminatory and inequitable framework but we

24  now know having looked at this agreement, negotiated and

25  consummated it 60 years ago, that they anticipated that we'd be

1    here.  They opened that this -- the risk of marshaling one or

2    the other could say my collateral's no good anymore.  I want

3    some of yours or I want more or I want you to get less for the

4    time being because it's unfair.

5         The marshaling scheme is directly inimical to this

6    agreement which you have the authority to enforce.  For that

7    reason, we'd ask that you ignore the request to blue pencil an

8    agreement that's on its fours directly incompatible,

9    inconsistent with the agreement between the parties that's

10   before you as a part of this evidentiary record.

11        If the Court has any questions, I'm happy to address

12   them.

13        COURT:  The debtor lodged a proposed file order

14   granting the debtor in possession financing at Docket 229.  Does

15   MetLife have specific objections to provisions in that order?

16        MR. SCHANDLBAUER:  Only to the extent they have

17   included a marshaling provision which I don't believe that they

18   have as to the bilateral relationship between us and Rabo.

19        Let me jump back and talk about a practical consequence

20   of this.  There's no reason to do that now.  If we have rights

21   under that agreement, we can enforce them in an AP if we need

22   to.  Those won't obtain necessarily -- it won't have any

23   practical effect till the absolute destruction and dismemberment

24   of this debtor and the sort of distribution of proceeds.  We're

25   capable of protecting ourselves.  We just don't think it's

1   necessary for you to get in and turn wrenches.

2          But no, we didn't see anything in the proposed DIP

3   order that caused us alarm or concern, Your Honor.  Sorry for

4   taking so long to answer that question.

5          COURT:  Thank you.

6          MR. SCHANDLBAUER:  Thank you.

7          COURT:  Counsel for Rabo AgriFinance.

8          MR. SCHOULDER:  Good afternoon, Your Honor.  I'm going

9   to take the stand just to address MetLife's issues, the state

10  court issues, and then I'll hand it over to Ms. Schwager to

11  address the final DIP order considerations.

12         Your Honor, counsel is right for MetLife.  You know,

13  the Court should consider things in the four corners of a

14  document.  But before I even go there, there's a threshold issue

15  which is that this is not the proper venue for MetLife's

16  complaints.  If you look at the four corners of the agreement,

17  there is no adjunctive relief provision in any of the

18  intercreditor agreements and counsel only mentioned one of the

19  intercreditor agreements, not two of them, which I'll go through

20  with you, Your Honor, for your benefit.

21         Thus even if MetLife had a colorable claim under the

22  intercreditor agreement, the proper venue for that is really

23  state court because it's a state court dispute between two

24  parties as to whether a breach of contract occurred or not.  And

25  putting that aside, even if this Court were to consider

1    MetLife's claims, it's not a complex issue that we're dealing

2    with.  We dealt with the same issue.  MetLife raised issues in

3    the state court receivership that were actually in breach of

4    their obligations under the intercreditor agreement and the

5    state court judge resolved those issues, overruled MetLife

6    within an afternoon.

7            So the issues that MetLife are raising, while they're

8    not appropriate for this venue, they're not complex and can't be

9    resolved quickly and as I'll walk through with the Court, the

10   four corners of the agreement, they do speak for themselves.

11   Just not in the way that MetLife is articulating them.

12           The first issue with MetLife's argument is that they're

13   not looking at the right agreement.  There are two intercreditor

14   agreements, Your Honor, and counsel for MetLife looked at the

15   wrong one.

16           Now, there's a 2018 intercreditor agreement that

17   counsel for MetLife identified for this Court.  And then, there

18   is a second intercreditor agreement that was entered into by

19   MetLife and Rabo Bank -- Rabo AgriFinance in October of 2022.

20   That 2022 agreement, that is the agreement that the parties

21   should be looking at because that is the agreement that

22   expressly controls and governs the property.  That agreement is

23   found at Exhibit 3007.

24           So Your Honor, if we look at this agreement and we turn

25   to page 6 of the PDI and if we look at recital C.  Sorry.

1    You'll see it defines the word "property" and we'll get to the

2    significance of the word "property" in a minute.  It defines the

3    word "property" as the 2019 mortgage property and the 2018

4    mortgage property which is effectively, Your Honor, without

5    having to go through all the minutia, it's the property that is

6    pledged to MetLife that MetLife has a first lien mortgage on and

7    Rabo has a second lien on and Conterra has a third lien on.

8           Once we define what property is, page 7 of the PDF, and

9    that's Section 1, tells us what property it's not.  And Section

10   1 is very clear as to what this agreement covers and what this

11   agreement does not cover.

12          Section 1 states, "The first lender stipulates and

13   agrees term property as used herein shall not include crops,

14   (inaudible) receivables, rolling stock, RAF priority collateral,

15   MetLife personal property collateral and any other collateral

16   pledged to the second lender as defined in the 2018 creditor

17   agreement."

18          Importantly, Your Honor, for purposes of your

19   consideration and MetLife's arguments, the parties specifically

20   say first lender and second lender stipulate and agree that

21   notwithstanding anything to the contrary in, the 2018

22   intercreditor agreement shall exclusively control the first

23   lender's and second lender's rights with respect to the 2018

24   intercreditor collateral.  And to the extent of any conflict or

25   inconsistency between the terms and conditions of this agreement

1   and the terms and the conditions of the 2018 creditor agreement,

2   the 2018 creditor agreement shall control.  So we got to what --

3   what MetLife is complaining about.  It's the apportionment.

4        First, Your Honor, it's unclear how MetLife is harmed.

5   MetLife has already consented to being primed by $45 million of

6   DIP financing.  What we're proposing, proportionment would

7   actually reduce the amount of priming on MetLife.  So it's

8   unclear what counsel's complaining about is how the

9   apportionment would actually harm MetLife and where a purported

10  breach would result in any damages.

11       But, Your Honor, the agreement in the four corners

12  don't stop there so it's important to understand what the

13  parties actually negotiated in connection with the grant of a

14  second lien on MetLife's real estate.  And that takes us to

15  Section 3 of this intercreditor agreement and -- I'm sorry.  If

16  you could just go down to page 8 of the PDF.  There we go.

17       There's a defined term here, Your Honor, for

18  anti-subordination limitation.  It says, "Further, in the event

19  and to the extent that both first lender and second lender have

20  under the respective loan documents certain approval and consent

21  rights over the property, second lender agrees that first lender

22  may exercise the approval rights set forth in the first lender's

23  loan documents.  And second lender shall follow the decision of

24  first lender with respect to any such action or approval made by

25  first lender."

1        The idea is is that if there are certain consent rights

2    that govern the use of the property or title or things of that

3    nature and Metlife needs to consent to the borrower doing

4    something or not doing something, that the second line there

5    will basically give its proxy to the first lender in that

6    situation except when it comes to what the parties expressly

7    carved out.

8        The paragraph goes on to state, "Provided that the

9    foregoing shall not apply to any act or consent that would

10   directly subordinate or otherwise have the effect of

11   subordinating the priority, both the lien and payment of second

12   lender's mortgage or second lender's rights under the 2018

13   intercreditor agreement."

14       Here, the parties expressly consented to Rabo Bank's

15   ability to challenge and not be primed even if MetLife itself

16   agrees to be primed.

17       Your Honor, that is precisely what Rabo Bank is

18   proposing to do with its apportionment proposal.  It is saying

19   don't prime Sandton, don't prime us as much as you want to.

20   Apportion it based upon each first lender's pro rata portion of

21   the total first lien debt.

22       This provision expressly contemplates exactly what Rabo

23   Bank is doing here in its objection and in the request to this

24   Court.  So anything, Your Honor, MetLife by challenging our

25   right to do so is in direct breach of their intercreditor

1    obligations.

2          So I'm not going to ignore what MetLife stated in terms

3    of the paragraph 13 of the 2018 intercreditor agreement but I

4    will also point out that even if the anti-subordination was not

5    expressly agreed to by the parties, under this agreement which

6    governs MetLife's rights, there are protections in here for

7    MetLife in connection with a bankruptcy expressly provided by

8    the parties, more so than in the 2018 agreement and those are

9    found in Section 8.  Could we turn to that?  That's page 9 of

10   the PDF.

11          All right.  So this paragraph Section 8 expressly

12   contemplates what will happen in a Chapter 11 and what each

13   party can and can't do and, as you'll see, it states -- if

14   second lender is a creditor of any of the debtors in any

15   proceeding, second lender shall not challenge the validity or

16   amount of any claim arising under first lender's loan documents

17   submitted in good faith by first lender or any evaluations of

18   the property or any portions thereof submitted in good faith by

19   first lender."

20          Your Honor, we are not challenging the validity or the

21   amount of MetLife's claim.  The paragraph goes on.  "Or take any

22   other action in such proceeding which is adverse to first

23   lender's enforcement of its claim with respect to the first

24   lender's indebtedness in respect to the property."  Your Honor,

25   we are not challenging MetLife's ability to assert its claims in

1    the full amount of the secured debt it is owed.

2            And then it goes on.  "Or first lender's right to

3    receive -- first lender's receipt of adequate protection."  Your

4    Honor, no where in our objection do we oppose MetLife's ability

5    to receive interest at the non-default rate, replacement liens,

6    super priority lien -- added protection for purposes of

7    diminution or their right to receive (inaudible) reporting.

8            Those, those are the adequate protections that have

9    been negotiated and agreed to amongst MetLife and the debtors.

10   We are not objecting to MetLife's adequate protection.

11           COURT:  What about the challenge to the replacement

12   lien as to the milk receivables?

13           MR. SCHOULDER:  Your Honor, that is a separate issue

14   which I can more than address and that is -- that is a request

15   that falls under the 2018 intercreditor agreement which is

16   expressly contemplated by the 2018 intercreditor agreement.  So

17   why don't we move to that and I'll address Your Honor's

18   question.

19           So the 2018 is -- okay.  Thank you.  So Your Honor,

20   just as background, the way the milk check priority claim works

21   under the intercreditor agreement is that on a monthly basis,

22   when the debtors receive a milk check from Glambia or Innovative

23   Food Solutions, the monthly amount of the principal and interest

24   that would get paid to MetLife in that month gets funded

25   directly from that milk check and they have a priority on that

1    milk check up to the amount of the monthly payment.  The balance

2    of that milk check is then the security -- is the collateral of

3    Rabo AgriFinance under this agreement and that's just very

4    general.

5        Now, that presumes that MetLife has a valid security

6    interest in the milk check by operation of law.  If we go to

7    Section 11 of the intercreditor agreement and the section called

8    Effectiveness of Subordination.  And this specifically provides

9    as follows:  "The subordination agreements and priorities set

10   forth herein are expressly conditioned upon the non-avoidance

11   and perfection of a security interest, encumbrances and/or liens

12   to which another security interest, encumbrance and/or lien is

13   subordinated."

14       And importantly here, "If the security interest,

15   encumbrances and/or liens to which another security interest is

16   subordinated are not perfected or are avoided for any reason,

17   then the subordination provided for herein shall not be

18   effective as to that particular collateral which is the subject

19   of the unperfected or avoided security interest."

20       Your Honor, by operation of law, specifically 552(b),

21   it's not something that Rabo is inventing.  It is by automatic

22   application of 552(b).  MetLife ceased to have a valid security

23   interest in milk receivables that are generated post-petition.

24   To simplify it, Rabo has a security interest in the dairy cows

25   that make the milk.  We have -- Rabo has a security interest in

1    the milk itself and the milk receivable.  MetLife, on the other

2    hand, just has a security interest in the milk receivable and

3    the dairy.

4            So by operation of 552(b) and the case law that we have

5    cited in our objections, once the Millenkamp team milks a cow a

6    day after the petition date, that by operation of 552(b), that

7    milk is no longer subject to MetLife's liens and security

8    interest by operation of law.  Not anything that we're doing

9    which is by operation of 552(b).

10           If Rabo Bank cannot point out a fact that an event

11   occurred by which a counter party to the contract's lien ceases

12   to exist, it somewhat obviates and undermines our contractual

13   rights if we simply cannot point out without being in breach.

14   And that is what our objection does.  Our objection points out

15   that 552(b) exists and it occurred with respect to MetLife's

16   security interest.  And as a result, we want to make sure that

17   our cash collateral, namely the proceeds from the sale of dairy,

18   as well as Conterra's interest in that same collateral are

19   protected under the bankruptcy code and the clear provisions of

20   what 552(b) was intended to accomplish.

21           So I'm not sure, Your Honor, if that addresses your

22   question.

23           COURT:  So MetLife has a valid prepetition security

24   interest with respect to the milk receivables?

25           MR. SCHOULDER:  Correct, Your Honor.  So if there was

1   milk that the Millenkamp team produced on April 1 and it is

2   sold, we do not dispute that MetLife would have a valid

3   continuing security interest in those -- in that dairy and the

4   receivables from that dairy.  They're absolutely entitled to

5   that.

6        COURT:  Why wouldn't MetLife be entitled to a

7   replacement lien to the same extent validity and priority has

8   existed as of the petition date as a form of adequate

9   protection?

10       MR. SCHOULDER:  Your Honor, that would run up against

11  the fact that they don't have a lien in the cows and that would

12  entitle them to -- that would entitle them to collateral that

13  they do not currently have under their existing documents.

14       The milk is the product of the cow.  They do not have a

15  lien on the cow.  To give them a senior security interest --

16       COURT:  Do they have a security agreement with the

17  debtor that pledges first priority -- first priority lien with

18  respect to the milk receivables?

19       MR. SCHOULDER:  To the milk receivables and the milk

20  but not the cow that produces it.  So by operation of law, Rabo

21  Bank has a senior security interest in those receivables.  So if

22  they take a replacement lien that is junior to Rabo Bank and

23  Conterra's interests, then that might be okay.  But by virtue of

24  552(b), Rabo Bank should not be prejudiced by the adequate

25  protection.

1          COURT:  Doesn't it just preserve the prepetition status

2     quo?

3          MR. SCHOULDER:  Well, they have -- the status quo is

4     driven by the intercreditor agreement and the intercreditor

5     agreement specifically provides them a priority claim to the

6     extent that they have a valid lien.  And if that lien ceases to

7     exist by operation of law, then the priority structure on the

8     intercreditor agreement by the four corners of the document no

9     longer applies.

10          And so as a result, Rabo Bank should not have to

11     subordinate itself any longer during the pendency of the case.

12     Just what (inaudible) operates, Rabo Bank should not have to

13     comply with a provision that is normal or applicable and that

14     is -- that is what MetLife would seek to enforce.

15          So to the extent that Rabo Bank's security interest

16     remains senior during the pendency of the case, that is the only

17     thing that we're seeking to protect here, Your Honor.

18          COURT:  If the debtor's able to continue to use those

19     milk receivable proceeds to operate, does it really matter?

20     It's not like the milk proceeds are going to go into Rabo's

21     pocket.

22          MR. SCHOULDER:  No, it's not, Your Honor, but that

23     is -- it's a future looking question, right, and that's the

24     reason why we're all sitting here and talking about equity

25     cushions and replacement liens and diminution.  We're planning

for the worst case scenario that -- I mean if everything goes

according to the plan -- and Rabo Bank does want to get repaid

in full.  We don't want to see the debtors fail.  But if there

is an issue and the debtors do fail, that treatment will

actually make a difference in terms of our recovery.  And so

while we can't predict, we would like to make sure that if

things don't go according to plan that we are at least protected

in the future.

COURT:  We'll get back to MetLife and I assume you're

going to have a response.  But go ahead.

MR. SCHOULDER:  The last issue just to address, Your

Honor, is MetLife pointed to Section 13 which is the marshaling

provision.  Your Honor, even if this agreement was applicable

and it doesn't because the parties expressly agreed that the

2022 agreement would apply, so this 13 is really just

inapplicable here.  This is -- Sandton is not a party to this

agreement.  This waiver of marshaling provision is vis-à-vis

MetLife and Rabo.

It says MetLife and RAF each waive and renounce any

rights under any applicable statutes whether a law or in equity

to require the other party hereto to marshal any collateral or

any portion thereof.  We are not requesting that MetLife marshal

collateral.  What we are requesting is that Sandton pro rate its

priming lien on collateral.  If Sandton was party to this

agreement, they may have a basis to complain.  But Sandton is

1   not a party to this agreement and so the marshaling provision is

2   irrelevant to what Rabo Bank is seeking of Sandton; not MetLife.

3   Unless Your Honor has any questions.

4       COURT:  I don't have any additional questions.  It

5   looks like Ms. Schwager has additional argument.

6       MR. SCHOULDER:  Yeah.  She's going to start hitting me.

7       MS. SCHWAGER:  I was just going to say good evening,

8   Your Honor.  I'll try to be brief.

9       Your Honor, there is no dispute in this case that Rabo

10  is over-secured.  The important questions are to what extent the

11  risk of loss that a dark dairy would have on that secured

12  position and the debtors having the ability to provide the

13  indubitable equivalent adequate protection that is required

14  under the bankruptcy code.

15      In this case, the evidence is clear that the debtor's

16  estates are already over-leveraged.  They cannot pay their

17  expenses from their own cash flow.  They cannot pay their debts

18  without getting more loans and then they have no definitive plan

19  of how they're going to repay those loans.  That subjects the

20  estates to a substantial and material risk of a dark dairy and

21  fire sale liquidations which doesn't do any of the creditors any

22  good.

23      Indeed each of those who the debtors called to testify

24  about values recognized that if the property is sold via

25  distressed circumstance such as a Chapter 11 that the values

1  would not be fair market value nor this snapshot value they each

2  testified to.

3       Mr. Davis testified it would take a special buyer to

4  realize his stated value of 140 million of livestock and

5  acknowledged that there was a small pool of buyers.  He further

6  testified it would take months to try and find that buyer

7  because a fire sale of that many head of cattle would negatively

8  affect value and the market.

9       He also acknowledged that he could not say what the

10  value would be in that six months because the herd changes.  And

11  despite these facts, no discount or analysis was taken into

12  account as to the valuation.

13       As to the valuation of the equipment, the appraiser

14  testified that the value should be deducted by 10 to 15 percent

15  to apply a liquidation value which is the relevant value in

16  analyzing the effect upon Rabo as a junior lienholder.  That

17  reduces his value to approximately 17 million.  Then the PMSI's

18  indicated in the schedules are at least $8 million.

19       Your Honor, I did not take this Court -- or the debtor

20  through every single PMSI that is listed in those schedules.

21  The point was is that when the debtor testified that they had

22  reduced the liens by the amount of the PMSI's, it was inaccurate

23  and it does affect the value that they were testifying to.  And

24  the appraiser only physically inspected a third of the items

25  that were appraised further bringing question as to value.

1          As to the feed that was testified stating that it

2     decreased the lien -- it would be higher because the DIP

3     financing had paid off the liens, that also would decrease the

4     amount of feed because feed had been used so the value of that

5     feed would be less as well.

6          As to the real property --

7          COURT:  Was all of that -- that $4.5 million worth of

8     feed, was all of that consumed in the interim period?

9          MS. SCHWAGER:  That is what they were -- yes.  That's

10    my understanding but I'm not a livestock expert and no evidence

11    was provided.

12         As to the real property, Your Honor, the broker who has

13    not conducted any sales in the state of Idaho admitted that a

14    dark dairy would negatively affect the value as well as any fire

15    sale.  Notably, he acknowledged that when a debtor is

16    distressed, the value would be much less than he opined.  And he

17    admitted that a Chapter 11 sale is a distressed sale.

18         Further, the debtors chose to cause the estates to

19    incur materially more fees for DIP financing than the other

20    alternatives.  This again creates risk for all of the creditors

21    of the estate including unsecureds.

22         And there isn't a big enough equity cushion that can

23    hide the fact that for the last three years, the debtors have

24    not been able to generate enough cash flow from operations to

25    service debt.  Equity does not address the fundamental issue

1   that needs to be considered when deciding whether to authorize

2   the debtors to incur more debt and that fundamental issue is for

3   the last three years, the debtors have not been able to generate

4   sufficient cash flow from operations to pay for ordinary course

5   expenses and service debt.

6           As this Court noted at the hearing on April 16, even

7   with the sale of steers and access to milk checks, the debtor's

8   budgets show that the debtors are unable to generate sufficient

9   cash flow to support operations without relying on the DIP loan

10  to fund operations.  This is not a new issue.  Using the

11  debtor's own financial information for 2021, '22 and '23, FTI

12  demonstrated that the debtors were unable to service their debt

13  from operating cash flow.

14          FTI further provided unrefuted evidence the operating

15  cash flow after accounting for historical debt service was

16  negative 15.7 million for 2021, negative 14.7 million for 2022

17  and negative 6.2 million for 2023.

18          Indeed after two years of not being able to refinance

19  the 90 million matured debt which was out of $295 million of

20  debt, if this Court authorizes the debtors to incur 45 million

21  of DIP financing, the debtors will now have a $340 million

22  problem.

23          And what did the debtor's own witness testify from

24  Forbes?  He testified that for the last 6 to 12 months, the

25  financing market has been strong.  When he was questioned as to

why then the debtors had not been able to obtain financing, he

testified that they were going to be -- they were going to

conventional lenders; not those that investment bankers seek out

which was wrong.

Riveron had attempted to locate lenders and investors

through a detailed CIM as well in November 2022 as set forth in

Exhibit 3061.  And still Mr. Millenkamp was not able to obtain

financing in that robust market.

Notably, Mr. Millenkamp testified yesterday that at

this point, the plan for refinancing is a hope as he currently

has no letters of intent or term sheets.  But hope is not the

legal standard that DIP loans are approved under.  The bottom

line is the size of the equity cushion is a distraction from the

reality.  As FTI testified, you can have the biggest equity

cushion and still it won't solve your cash flow shortfalls.

That means that the DIP request fails the element of

feasibility.  And Your Honor, there are ways to fix this

problem.  You could generate significant more cash flow but

other than betting on milk prices continuing to go up, we've

seen no evidence or heard no testimony that suggests the debtors

have any plan to increase that cash flow in the material amounts

necessary.  Indeed the evidence shows that the debtor's only

plan is to borrow more debt to grow.  Not shrink as most

distressed companies will do to normalize.

Two, you can significantly reduce expenses.  The

debtors have not demonstrated that they can achieve that.  If anything, the debtors have shown the opposite.  The DIP budget as of March 22, 2024, showed a DIP financing need of 8.5 million.  Within 26 days, the debtor filed three more DIP budgets that would increase the DIP financing request to 30 million.  Further, according to Mr. Millenkamp's testimony, the only expenses the debtors have reduced is, one, soap, and, two, they have reduced window washing one day a week.

Further, while feed vendors were not being paid and the Rabo loan was over a year and a half in default, Mr. Millenkamp purchases and leases brand-new tractors for $12 million days before the receivership hearing.  Further, the testimony today was he purchased six new 2004 (sic) Ram pickups, again, while in default on his payment obligations that are valued at 280,000.

This is no different from the observations that Mr. Matthew McKinlay, the court-appointed receiver, shared with this Court.  The debtors are in growth mode instead of looking at how to pare back the expense structure despite being insolvent.

Another option, Your Honor, would be to reduce the loans, to de-leverage.  Yet again, the evidence does not support the debtors choosing this option.  Instead the evidence was the debtors do not intend to reduce their debt service.  They intend to increase it.  There was no real and definitive plans to sell assets or equity as indicated by the inability of the Forbes

1    investment banker to recall any conversations where the debtors

2    had specifically discussed a de-leverage option.

3              In light of the inability of the debtors to demonstrate

4    to this Court feasibility and a plan to pay the debt back so

5    that there is no default, the debtors shouldn't be given free

6    reign to obtain a loan at the amounts that they have not even

7    provided a budget for.  They have only provided a budget for 30

8    million; not 45 million.

9              Understanding that this Court has concerns about not

10   authorizing the loan, then for any DIP financing that is

11   approved, the amount should be limited and there should be

12   scrutiny and controls in place so that creditors' harm of the

13   additional debt load is not exacerbated.

14             And Your Honor, it is also significant that the debtors

15   have not provided any signed loan documents with Sandton nor can

16   Mr. Millenkamp recall whether any changes have been made to the

17   unsigned exhibit that was presented.  The creditors are entitled

18   to know the terms of what is being requested to be authorized.

19             And Your Honor, just quickly on the 503(b)(9) claims,

20   the contention that the DIP financing is needed at the level

21   being requested because the 503(b)(9) even if paid at

22   confirmation would need to be paid.  But generally, 503(b)(9)

23   claims are paid from exit facilities; not from DIP financing.

24             And then further, Your Honor, we would respectfully

25   submit that the DIP facility does discriminate unfairly against

1    Rabo and, if granted, should be apportioned among the secured

2    lenders.

3          One of the fundamental aspects of bankruptcy is the

4    prohibition of disparative treatment among similar classes.

5    Outside of bankruptcy, debtors are free under state law to

6    prefer one creditor over another but not in bankruptcy.

7          In this case, Sandton has made it clear that it is not

8    a real estate lender.  This occurred at the April 16 hearing

9    when this Court asked Sandton's counsel, Mr. Bernard, whether

10   Sandton was willing to prime real estate rather than personal

11   property at least during the interim period.  And Mr. Bernard

12   responded, no, it does not -- Sandton does not do real estate

13   loans.  This is because it wants that first priority lien on

14   personal property so he that it can easily recover if there's a

15   default.  And who does that impair?  Rabo, the first lienholder

16   in the personal property.

17         The DIP motion proposes to prime Rabo up to the full

18   amount of the 45 million commitment irrespective of the amount

19   of indebtedness owing to any particular senior secured debtor or

20   the nature of the collateral pledged to such lender in terms of

21   the ability to liquidate.

22         Indeed while Rabo's first priority security interest in

23   the debtor's personal property is being primed by the DIP

24   facility, the debtor's proposed more favorable and

25   discriminatory treatment to Conterra by eliminating the DIP

facility to a second lien position on the German Dairy behind Conterra's first mortgage.

Mr. Millenkamp testified during the interim hearing that if approved, the DIP motions will provide Sandton priority over Rabo so that it no longer has that first priority right to easily convert cash collateral and replace Rabo's lien with a junior lien in real estate that has restricted recovery rights.

Specifically, Rabo, an admitted short-term lender, would receive an increase second lien in real estate as adequate protection that cannot be realized upon until MetLife is paid in full on its $185 million debt that does not mature until 2038 and is secured by illiquid real estate.

Likewise, Conterra would continue to retain its first mortgage position on the German Dairy. Yet receive the same adequate protection as Rabo including the payment of non-default interest on both Conterra loans -- on both Conterra loans which includes that secured by the German Dairy. In that scenario, neither MetLife nor Conterra suffer any harm with respect to the collateral securing their first lien position. Indeed, Conterra's receiving a windfall particularly relative to Rabo through Conterra's receipt of post-petition interest as adequate protection while continuing to maintain its first lien mortgage.

The grant of a second lien in restrictive real estate is not the equivalent for a short-term lender with a first lien

1   in highly liquid cattle and personal property that can be

2   liquidated within a month for a quick and speedy recovery.

3        The debtors provide no factual or legal basis for the

4   disparative treatment and lack of protections to prevent Rabo

5   from bearing the burden for its lenders.  Thus Rabo does request

6   that if the Court does still decide to allow any of the DIP

7   financing requested by the debtors that the Court modify the

8   marshaling provisions of the DIP order to provide that each

9   senior secured lenders are primed proportionately by the DIP

10  facility according to the amount of the debt.  The proposed

11  limitation is consistent with the equitable principles of

12  marshaling.

13       And finally, Your Honor, as to the adequate protection,

14  if the debtors are willing to pay Sandton monthly professional

15  fees and an interest rate of 12.5 percent which would be the

16  secured lender in the most protected position, then for adequate

17  protection, Rabo should get its monthly professional fees and

18  its current contract rate which is SOFER plus 8.11 percent.

19  Notably that rate is currently very close to what Sandton in the

20  first lien position is currently getting.  Yet it is Rabo that's

21  being forced to lose its bargained for relied upon first lien

22  position.

23       And, Your Honor, in addition, if the debtors have to

24  use livestock proceeds for their operational expenses because

25  they cannot adequately fund their operations from cash flow and

1   they are not replacing those liens as initially proposed with

2   cattle of equal value, then Rabo should be entitled to adequate

3   protection for that loss of collateral.

4         And Your Honor, that cattle that is growing -- you

5   know, they talked about the testimony that every day, the cattle

6   get fed and so they're worth more and so their value will grow.

7   Well, all of that cattle that's growing is already the

8   collateral.  The question is when you sell one of the pieces of

9   collateral, are you replacing it with the same value.  And

10  you're not.  You're replacing it with a calf who now still needs

11  to eat for the next 18 months to get up to that same value.

12        Accordingly as in the interim budget, the debtor should

13  be required to hold and reserve in an account issued in favor of

14  Rabo the loss of the value of that collateral when it is sold.

15  To provide otherwise allows the debtors to sell the collateral

16  and instead of maintaining the value, permits the proceeds to be

17  used in the operations which erodes the collateral without

18  providing adequate protection.

19        And then finally, Your Honor, as to -- I think I've

20  said finally a couple times.  I apologize for that.  But as to

21  the reporting, I understand that there's weekly variance reports

22  but Rabo had also requested monthly financial statements that

23  were calculated in accordance with GAAP within 45 days of fiscal

24  month end and has received no response as to whether that -- the

25  debtors are willing to proceed with that reporting.  But in

1    doing so, the debtor's significant stakeholders will have a more

2    reliable measure of evaluating the debtor's financial

3    performance.  Thank you, Your Honor.

4         COURT:  A couple of questions, Ms. Schwager.  Does Rabo

5    dispute the debtor's contention that it could not obtain

6    financing on an unsecured or junior lien basis?

7         MS. SCHWAGER:  No.

8         COURT:  You talked a little bit about the equity

9    cushion.  What is the amount of the equity cushion in the

10   personal property?

11        MS. SCHWAGER:  I cannot tell you the exact amount of

12   that because it -- because the values that were provided were at

13   fair market value or snapshot value and didn't take into account

14   for instance all of the PMSI liens and the fact that if it's a

15   fire sale which is what it would be subjected to if we had to

16   recover, that the value's a lot less than what was opined to.

17        COURT:  So you don't have a particular number in mind

18   other than it appears that Rabo is oversecured.

19        MS. SCHWAGER:  Correct.

20        COURT:  All right.  Thank you.

21        MS. SCHWAGER:  Thank you, Your Honor.

22        COURT:  Mr. Naess.

23        MR. NAESS:  The U.S. Trustee takes no position on these

24   motions.  Thanks, Your Honor.

25        COURT:  Mr. O'Brien.

1          MR. O'BRIEN:  Good afternoon, Your Honor.  Summarizing

2    the evidence, Conterra's in the third lien position on the real

3    estate collateral totem pole and Conterra's on the second lien

4    position on the personal property collateral totem pole,

5    especially the livestock.  That's where the real value is.  I

6    think that MetLife misspoke when they said that we were third.

7    We're actually second on the personal property collateral.

8    MetLife does not have a position on the personal property

9    collateral and that's why we're second.

10          So Conterra is more at risk than Rabo here and

11   yesterday and today was very useful to Conterra because it gave

12   us a lot more data points on where we are and where we're going

13   to go.  And we do appreciate the debtor's consent to giving us

14   access to the data room that Forbes has created and that's going

15   to help a lot and we do also understand that the revised DIP

16   order that has not been submitted to the Court will incorporate

17   a solution to Conterra's objection about the Conterra

18   stipulation not being set forth in the one that was filed with

19   the Court.

20          So the short of it is assuming the order that gets

21   filed covers at least what I've discussed with debtor's counsel,

22   I think that we're there.  But I do want to say that we are 40

23   days into a 120 day exclusively period and at this juncture,

24   what we say here today is at this juncture and at this juncture,

25   we're not resisting the DIP proposal.  We're not resisting the

1    cash collateral motion.

2          We note that the debtor's budget goes out to August 11

3    or so which is about 127 days more or less.  If the case loses

4    momentum towards a feasible exit plan to pay off Conterra in the

5    next, you know, 90 or 120 days, then that will be a similar ball

6    game.  MetLife and I did not collaborate on our closing

7    positions but it just happens, you know, we both feel very

8    strongly on those issues.

9          So at this juncture of the case, we're okay with where

10   it's at.  It could change dramatically in 90 days when they wind

11   up bringing in our own experts at that juncture.

12         I wanted to just address a couple of these other

13   things.  I wanted to discuss the reporting.  We feel very

14   strongly that their needs to be timely, accurate and

15   understandable recording -- reporting of the debtor's ongoing

16   financial condition, especially since we are the most vulnerable

17   of the creditors on this side of the bar anyway.

18         And I will say the reporting is going to be needed on

19   everything including the cattle operation.  Buying feed takes

20   money.  The only source of that money is Sandton.  Sandton

21   disburses that money and erodes our position by getting a

22   primary lien ahead of us and so it is Conterra that is at risk

23   from the feed purchases.

24         And to say that the cattle hold their value through a

25   feeding cycle without also considering that the feed pile

1   shrinks is double dipping.  And if feeding cattle was a sure

2   thing, we would all cash in our 401(k)'s and buy a pen of cattle

3   at the Millenkamp property.  So we need to have that financial

4   reporting to make sure that we are not at risk during the next

5   90 days or so.

6        I do want to just mention something that came in about

7   Idaho Milk, that they're a potential DIP lender.  When we saw

8   the high priced Sandton DIP proposal, we were concerned about

9   the price of it as was everybody.  And so we did what we thought

10  was the best thing and we organized a competing DIP proposal

11  that was going to be cheaper, you know, with the objective of

12  helping everybody out.  And -- but at the same time, we had

13  contractual obligations to Rabo and when they asked us to halt

14  those efforts, we did.  So in many respects, you know, we're

15  just a pawn here of these two folks.  And so -- but we've tried

16  to assess and we've tried to honor our contractual obligations.

17        And the last point I really want to make is on this

18  marshaling.  From our standpoint, it may not make much of a

19  difference because whether you take it out of the real estate

20  pool or whether you take it out of the livestock pool or whether

21  you pro rate it, we're behind both these creditors in terms of

22  priority and so it's probably not going to make much of a

23  difference to us.

24        If I heard the Sandton folks at the earlier hearing

25  correctly, they were more interested in getting taken out of --

1    if there was a problem being taken out through the liquidation

2    of the livestock which of course is much more liquid than the

3    liquidation of real estate.  And so I was under the impression

4    that what Sandton wanted to do was look primarily at the

5    livestock as their way to get out if there was a problem.

6            But the marshaling, you know, again, we're a pawn in

7    that dispute and we're not really taking a position but I will

8    say that how we look at all of the cases, not cases jointly

9    administered, it's not substantively consolidated but at least

10   how we look at it in our view with everything that's happening

11   and now with potentially the statutory lien folks getting paid

12   out of this stuff, how we look at it, there is a collateral pool

13   with respect to the real estate and the livestock as it relates

14   to us and who gets paid first, you know, ahead of us is just

15   going to happen as it happens.  But at the end of the day as it

16   trickles down, we hope to get paid out of either the real estate

17   or the livestock.

18           And it's a little early to figure out where this

19   marshaling thing could go but it's going to get a little bit

20   more complicated as we go on and we just want to make sure that

21   it doesn't get complicated in a way that prejudices Conterra

22   because we are just trying to help out as best we can being a

23   pawn of the big boys that are here.

24           So unless the Court has any questions, that's all I

25   have.

1        COURT:  Thank you.  All right.  Before I circle back to

2   MetLife and the debtor, I know there are probably some other

3   folks out there who may not have presented evidence that may

4   want to weigh in today.  Does counsel for Sandton want to

5   address the Court.

6        MR. GAUTIER:  Your Honor, Scott Gautier with Faegre

7   Drinker on behalf of Sandton.  I have been admitted pro hoc in

8   this court.

9        It's late.  I don't want to say a lot other than Boise

10  is a gorgeous city.  Never been here before and this is truly a

11  wonderful court and I think the professionals that have been

12  before the Court have done a fantastic job.

13       So what I would say, the only thing the debtors have

14  asked me to address is to make it clear Sandton has not been --

15  we have been asked -- Sandton has been asked and will not agree

16  to lend on different terms.  So what Sandton is offering to do I

17  think which is very standard for DIP lenders is to have a lien

18  on -- a blanket lien on the entirety of the collateral.  Would

19  not want to be involved in taking a piece of a lien on

20  everything and having to deal with that.

21       COURT:  The marshaling concept is a non-starter from

22  Sandton's perspective.

23       MR. GAUTIER:  Thank you, Your Honor.

24       COURT:  Any additional parties that would like to weigh

25  in?

1          All right.  Between the debtor and MetLife, who wants

2      to go first?   MetLife?

3          MR. SCHANDLBAUER:  Thank you, Your Honor.  The colloquy

4      you heard, first me, then Mr. Schoulder and Ms. Schwager

5      underscores the whole point which I'd like to underscore which

6      is that at this juncture, at this watershed, we're going to ask

7      you to decline to get in under the hood and blue pencil some

8      marshaling provisions in which may or may not be justified under

9      whichever of the two agreements that are between MetLife and

10     Rabo and whichever one shall control.

11         But apropos to the milk proceeds and whatever

12     interference that constitutes with the Rabo collateral or the

13     2018 collateral, we don't have the benefit of the draft cash

14     collateral order.  That's coming.  But we heard from counsel

15     that it's going to duplicate the same status quo preservation

16     terms that were in the interim order which we were absolutely

17     happy with.  We're going to have a lien to the same nature,

18     extent and priority that we might have had prepetition.

19         If by operation of law or by a commencement of a state

20     court proceeding or an adversary proceeding or some such we are

21     found not to have a lien, that will resolve itself then.  Why

22     commence the adversary now at 5:20 on the second day of a

23     hearing for a rather well needed tip.

24         And I'd say one last thing.  MetLife accepts its

25     obligations under the 2018 intercreditor agreement which the

1    2022 intercreditor agreement states that in the event that

2    there's any conflict between the two, the 2018 agreement's

3    provisions shall control and I'd observe and it's part of the

4    evidentiary record that the definition of collateral which is

5    the subject of the renunciation of marshaling in paragraph 13,

6    the definition of collateral includes real and personal

7    property.  It's affected by it.  They've renounced it.  We've

8    renounced it.  We accept our obligations under that agreement.

9    Why commence this now, Your Honor?  Decline to blue pencil the

10   order.  Thank you.

11         COURT:  Thank you, Mr. Schandlbauer.  All right.

12   Counsel for the debtor.

13         MS. MIKKILINENI:  Thank you, Your Honor.  We were able

14   to do some quick math on the liens and the 503(b)(9) claims and

15   so, in total, we're calculating $16.5 million for the secured

16   creditors and 503(b)(9) claims.  Do you have a question?

17         COURT:  Is there a breakdown between those two?

18         MS. MIKKILINENI:  Yes.  Do you have that?

19         MR. CHRISTENSEN:  The secured claims, Your Honor, in

20   total are about 10 and a half million.  The 503(b)(9) claims,

21   both the ones on the critical vendor list and the ones subject

22   to the 503(b)(9) motion, total for those two is about 5.8

23   million.

24         COURT:  And the secured claims of 10.5 million, does

25   that account for the interim order which approved the 4 and a

1    half million dollar payments?

2        MR. CHRISTENSEN:  That's the remaining amount, yes, on

3    those secured claims.  So it doesn't include the 4.5 already

4    paid -- well, it was 5.2 that was paid because some of those

5    payments weren't -- the 4.5 was for the silage people.  There

6    was an additional 700 or so that was paid to MWI, the vet

7    person, a hay provider and an auto repair place.  But all of

8    those are not part of that 10 and a half.

9        COURT:  So the additional 10 and a half million dollar

10    unsecured claims, are those all feed -- feed liens?

11        MR. CHRISTENSEN:  I believe so, Your Honor.  I'm just

12    checking.  Either feed or silage.

13        COURT:  All right.

14        MS. MIKKILINENI:  We also wanted to point out that

15    without the critical vendor status, there are likely some

16    creditors that will require deposits to move forward on a COD

17    basis.  So we do need to factor in that consideration when we're

18    looking at the total amount of DIP that is needed.

19        Also in that regard, the unused fee on the DIP is

20    fairly low and so it will not have that much of an impact and

21    the funds will still be available if needed if we do the $45

22    million DIP.

23        We have shown sufficient evidence that there is a

24    reasonable probability of reorganization here and if the DIP

25    motion is denied, the dairy will go dark.  Rabo's counsel just

1   stated that they are worried about a dark dairy.  We are too.

2   We're trying to avoid that.  That's why we need the DIP funds.

3   We are proposing a reorganization.  We need the DIP funds to

4   make it there.

5        There was information or -- let me back up.  Rabo's

6   counsel touched on whether the use of feed was taken into

7   consideration and the inventory values.  It was.  You can look

8   at the two different inventories.  We provided one from April 9

9   and then the one from this hearing and the use of feed was taken

10  into consideration in formulating those values.

11       Ms. Churchill testified as to the reasons the DIP

12  amounts increased throughout the various budgets and I just

13  wanted to point out what those reasonings were.  It wasn't

14  because the debtor increased their expenses a whole bunch.  It

15  was because, first, Rabo took a 4 and a half million dollar milk

16  check that we originally had in the budget.  We had an increase

17  in critical vendors.  We had an increase in the Conterra

18  interest payments because we have added on the (inaudible)

19  interest payments and there is an additional Rabo interest

20  payment because we made -- we made a difference in how the

21  interest payments are being paid going forward.  They're all

22  being paid on May 10 so that final budget had a difference

23  because of that change.

24       Regarding the DIP agreement and whether it's been

25  signed, it has been signed and there have been no changes since

 1   it was approved in the interim hearing.  There is -- this

 2   argument regarding the beef sales and how that all works, there

 3   is no decrease in collateral when we are selling the cattle.

 4   The herd size does not decrease.  You are replacing that animal

 5   with the one that is one day younger.  It continues to move up

 6   in the cycle.  That animal is not replaced with a baby animal.

 7   It just moves up in the cycle.

 8          The reporting requirement that Rabo would like, we have

 9   no issue with that reporting requirement if we get an

10   accountant.  We've had numerous issues getting the accountant.

11          COURT:  Didn't the debtor hire, what is it, Cooper

12   Norman?

13          MS. MIKKILINENI:  We have Cooper Norman lined up.  We

14   do not have an application to employ on file yet.  We are

15   working on that application and I think we'll get it on file

16   next week.  So once we get that approved and they are actually

17   engaged, then we don't have a problem with that reporting

18   requirement.  It's just that we need the accountant in order to

19   do that.

20          COURT:  And I think the proposal was 45 days from the

21   entry of the order to get those GAAP approved financials.  Would

22   that be for all of 2024?

23          MR. SCHOULDER:  Your Honor, it's exactly how a

24   financial reporting works under our existing loan agreement.

25   It's 45 days after the -- the end of each month.  That's I

1    believe what would be proposed in our objection.

2         MS. SCHWAGER:  Right.

3         COURT:  What about the prior months where we don't have

4    GAAP approved reporting for January, February, March, April?

5         MR. SCHOULDER:  Recognizing that when we drafted the

6    objection, we weren't aware that they did not have so we

7    requested them I believe three days within entry of the order.

8    It's kind of -- I can't speculate as to when they will have

9    those but I suppose if we set it, you know, as soon as you have

10   them released to you that we'll receive them.  I can't speculate

11   as to when you'll have them.

12        MR. CHRISTENSEN:  Right.  If I can, Your Honor, I would

13   propose we put a term in the order after we have a chance to

14   speak with Cooper Norman about their timing on preparing those

15   and then we can just build that into the order based on their

16   input.  I just don't want to commit them to something right now

17   without even talking to them about what their process is going

18   to be because they have no history with the debtor at all.  And

19   2023 year-end reports aren't GAAP prepared either so they're

20   going to have to start with that before they even get to the

21   monthly ones.

22        COURT:  Okay.

23        MS. MIKKILINENI:  My last point is that I just want to

24   point out that the values that we -- that we proved up today and

25   yesterday regarding the equity cushion, that's the only evidence

1    in the record for value.  Rabo did not provide any different

2    evidence regarding value so the debtor's evidence stands and we

3    have shown a huge equity cushion.  Thank you, Your Honor.

4         COURT:  All right.  Thank you, counsel.  With respect

5    to cash collateral use, I think the prior interim order use has

6    expired; is that correct?

7         MR. CHRISTENSEN:  I think it expired yesterday, Your

8    Honor.  The budget attached to that order went through the end

9    of this week so I mean depending on when the Court plans on

10   ruling on the motion -- I don't know if that's right now or

11   later.

12        COURT:  The reason I ask is we're past 5:30.  I'm

13   reluctant to rule tonight if we're going to get out of here

14   before 6:00.  I'm contemplating just doing a telephonic ruling

15   tomorrow.  I know that there's a first meeting of creditors in

16   this case.  I think it starts at 9:00 a.m. so it will probably

17   be in the afternoon tomorrow.

18        I think I have availability at 3:00 p.m.  I guess my

19   question is from a cash collateral use perspective, is the

20   debtor --

21        MR. CHRISTENSEN:  If the Court's going to rule tomorrow

22   afternoon, I'll comment on that in just a minute, I think the

23   budget that was in that previous interim order gets us through

24   the end of the week.  If the Court wants to just include on the

25   minute entry for today that cash collateral's approved through

1    May 11 under the budget listed on that previous order, I'm okay

2    with that approach.

3            With regard to tomorrow afternoon, I do know there's a

4    lot of travel plans for tomorrow.  I think there's a lot of the

5    attorneys that will probably be in the air tomorrow afternoon.

6    I don't know if that matters to them.  It doesn't affect me.

7    I'm just bringing it up for the Court's consideration.

8            COURT:  All right.  And I think it would be cash

9    collateral use through May 10 is tomorrow?

10            MR. CHRISTENSEN:  If the Court's ruling tomorrow, May

11   10's fine.

12            COURT:  Yeah.  Okay.  I'm fine with just including an

13   entry in our minute order that the debtor's cash collateral use

14   is authorized through May 10 pursuant to the prior interim cash

15   collateral budget that is of record.  Is there any objection

16   from any party to that provision?

17            MS. SCHWAGER:  No objection, Your Honor.

18            COURT:  All right.  As far as availability for an oral

19   ruling tomorrow at 3:00 p.m., is that problematic?

20            MR. SCHANDLBAUER:  Your Honor, it will not work for me

21   but I believe my colleague will be available so for MetLife --

22            MR. BINGHAM:  I'm scheduled to land before then eastern

23   time.  Thank you.

24            COURT:  All right.  Anybody else?

25            MR. CHRISTENSEN:  Your Honor, can I ask a quick

 1    question?  Will there be a recording of that oral ruling?  If

 2    so, I think that will help with the parties that can't actually

 3    attend.

 4         CLERK:  There will be.  It will not be on (inaudible).

 5    I will try but it will -- if anyone wants a copy, they'll have

 6    to probably ask for one.

 7         COURT:  All right.  Before we adjourn for the day, is

 8    there anything else that we need to address from any of the

 9    parties?  Okay.  We will reconvene tomorrow for a telephonic

10    hearing at 3:00 p.m. for an oral ruling with respect to the

11    remaining two motions.  I suspect we'll probably put the dial-in

12    information in the minute entry?

13         CLERK:  Yes, Your Honor.

14         COURT:  We will.  So that will be available on the

15    docket for the parties.  All right.  Thank you, counsel.

16         CLERK:  All rise, please.

17                        (Proceedings concluded.)

18

19

20

21

22

23

24

25

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


 /s/ Tamara A. Weber                           7/7/24

Signature of Approved Transcriber              Date


 Tamara A. Weber

Typed or Printed Name