UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

MILLENKAMP CATTLE, INC.,          )   Bankruptcy Petition
471 North 300 West                )    # 24-40158-NGH
Jerome, Idaho 83338               )
                                  )
                                  )
Tax ID/EIN: 26-0603892            )   Twin Falls, Idaho
                                  )   June 20, 2024
      Debtor.                     )
. . . . . . . . . . . . . . . . . )


VOLUME I OF I
MOTIONS HEARING
BEFORE THE HONORABLE NOAH G. HILLEN
UNITED STATES BANKRUPTCY JUDGE


COURT RECORDER:                TRANSCRIPTION BY:

MELANIE BATTLE                 TAMARA A. WEBER, CSR
U.S. District Court            P.O. Box 387
                               Caldwell, Idaho  83606


Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

```
APPEARANCES:

For the Debtor:                    MR. MATTHEW T. CHRISTENSEN
                                   Johnson May, PLLC
                                   199 N. Capitol Boulevard
                                   Suite 200
                                   Boise, Idaho 83702


                                   MS. KRYSTAL R. MIKKILINENI
                                   MS. TIRZAH R. ROUSSELL
                                   Dentons Davis Brown
                                   215 Tenth Street
                                   Suite 1300
                                   Des Moines, Iowa 50309

For MetLife Real Estate           MR. RON C. BINGHAM, II
Lending, LLC; Metropolitan        Attorney at Law
Life Insurance Company:           3424 Peachtree Road NE
                                   Suite 1600
                                   Atlanta, Georgia 30326


                                   MR. NIKOLAUS F. SCHANDLBAUER
                                   20 F Street NW
                                   Suite 500
                                   Washington, DC 20001


                                   MR. KIMBELL D. GOURLEY
                                   Attorney at Law
                                   P.O. Box 1097
                                   Boise, Idaho 83701

For Rabo AgriFinance, LLC:        MS. SHEILA RAE SCHWAGER
                                   Hawley Troxell Ennis & Hawley, LLP
                                   877 Main Street, Suite 200
                                   P.O. Box 1617
                                   Boise, Idaho 83702


                                   MR. ANDREW SCHOULDER
                                   Attorney at Law
                                   1301 Avenue of The Americas
                                   New York, New York 10019-6022

For Conterra Holdings, LLC:       MR. JOHN O'BRIEN
                                   Spencer Fane, LLP
                                   1700 Lincoln Street
                                   Suite 2000
```

```
APPEARANCES:  (Cont'd)

For Conterra Holdings, LLC:    MR. SCOTT C. POWERS
                               Denver, Colorado 80203
                               MR. SCOTT C. POWERS
                               Spencer Fane, LLP
                               10 Exchange Place
                               Eleventh Floor
                               Salt Lake City, Utah 84111

For Viterra USA Grains, LLC    MR. DANIEL C. GREEN
and Viterra USA Ingredients,   Racine Olson, PLLP
LLC:                           201 East Center
                               P.O. Box 1391
                               Pocatello, Idaho 83204

For Sandton Capital Partners:  MR. JOHN F. KURTZ
                               Kurtz Law, PLLC
                               910 West Main
                               Suite 364
                               Boise, Idaho 83702

For the U.S. Trustee:          MR. JASON NAESS
                               DOJ - UST
                               550 West Fort Street
                               Suite 698
                               Boise, Idaho  83701
```

```
                          I N D E X

DEBTOR'S WITNESSES:                            PAGE   LINE
```

```
   MILLENKAMP, William
Direct Examination by Ms. Mikkilineni          19     20
Cross-Examination by Ms. Schwager              28      5
Cross-Examination by Mr. Naess                 66      3
Redirect Examination by Ms. Mikkilineni        70     24


   HIGLEY, Burk
Direct Examination by Ms. Mikkilineni          76     17
Cross-Examination by Mr. Naess                 79      1
Cross-Examination by Mr. O'Brien               82     22


   NELSON, Brett James
Direct Examination by Ms. Mikkilineni          85      6


   NELSON, Cody
Direct Examination by Ms. Mikkilineni          89      6


   GOMES, Debbie
Direct Examination by Ms. Mikkilineni          94      7
Cross-Examination by Mr. Naess                 96      1
Cross-Examination by Mr. O'Brien              101     13


   QUAST, Monte
Direct Examination by Ms. Mikkilineni         102     12
Cross-Examination by Mr. Naess                104     10


   PAULSEN, Kim
Direct Examination by Ms. Mikkilineni         108     13
Cross-Examination by Mr. Naess                110     14


   LAM, Steve
Direct Examination by Ms. Mikkilineni         115      3
Cross-Examination by Mr. Naess                116     21


   OLMOS, Nino
Direct Examination by Ms. Mikkilineni         123     16
Cross-Examination by Mr. Naess                125     11


   NOBLE, Dan
Direct Examination by Ms. Mikkilineni         128      7
Cross-Examination by Mr. Naess                131     20


   MOSS, Ryan
Direct Examination by Ms. Mikkilineni         136      1
```

```
DEBTOR'S WITNESSES:  (Cont'd)                    PAGE   LINE

      BINGHAM, Jon
Direct Examination by Ms. Mikkilineni            140    11

      PARKER, Jason
Direct Examination by Ms. Mikkilineni            143    17
Cross-Examination by Mr. O'Brien                 153    25
Redirect Exam. by Ms. Mikkilineni                154    22

      HUETTIG, Brian
Direct Examination by Ms. Mikkilineni            158     4
Cross-Examination by Mr. Schoulder               165     8
Cross-Examination by Mr. Naess                   172    14

      NOFZIGER, Ken
Direct Examination by Ms. Mikkilineni            174     6
Cross-Examination by Mr. Schoulder               183     9
Redirect Exam. by Ms. Mikkilineni                217    17
Recross-Examination by Mr. Schoulder             223    15

      HEIDA, David
Direct Examination by Mr. Christensen            227    21


VITERRA'S WITNESS:                               PAGE   LINE

      BURNS, Alicia C.
Direct Examination by Mr. Green                  231     8

DEBTOR'S ARGUMENT                                237    13
                                                 283    16

METLIFE'S ARGUMENT                               256    18

UNSECURED CREDITORS' ARGUMENT                    258    17

RABO AGRIFINANCE'S ARGUMENT                      263    13

U.S. TRUSTEE'S ARGUMENT                          275    10

CONTERRA'S ARGUMENT                              280    25

VITERRA'S ARGUMENT                               282    21
```

E X H I B I T S

| DEBTOR'S EXHIBITS: | PAGE | LINE |
|---|---|---|
| DX 1031 - 503(b)(9) Amended List of Creditors | | |
| Admitted | 229 | 24 |
| DX 1032 - 503(b)(9) Invoices | | |
| Admitted | 84 | 14 |
| DX 1034 - Third Party Forage Hauling | | |
| Admitted | 14 | 22 |
| DX 1035 - Corn Silage Contracts | | |
| Admitted | 14 | 22 |
| DX 1036 - Updated Forecast | | |
| Admitted | 14 | 22 |
| DX 1037 - Burks Tractor Lease | | |
| Admitted | 14 | 22 |
| DX 1038 - Additional Invoice for Progressive Dairy Services | | |
| Admitted | 14 | 22 |
| DX 1039 - MWI Invoices | | |
| Admitted | 157 | 3 |

| RABO AGRIFINANCE EXHIBITS: | PAGE | LINE |
|---|---|---|
| RX 3074 - Dkt. 15 Motion for Allowance and Payment of Section 503(b)(9) Claims filed 2/2/24 | | |
| Admitted | 17 | 5 |
| RX 3076 - Dkt. 308 Debtor's Amended Motion for Allowance and Payment of Section 503(b)(9) Claims filed 5/20/24 | | |
| Admitted | 18 | 20 |
| RX 3077 - Dkt. 332 Johnson May's Application for Allowance of Payment for April 2024 | | |
| Admitted | 17 | 5 |

```
RABO AGRIFINANCE EXHIBITS:  (Cont'd)        PAGE    LINE

RX 3078 - Dkt. 344 Denton Davis
    Brown's Application for
    Allowance of Payment for
    April 2024
        Admitted                            17       5

RX 3079 - Certain Invoices requested
    by RAF and provided by debtors
    on May 31, 2024, to support
    503(b)(9) claims.
        Admitted                            17       5

RX 3082 - Dkt. 387 Johnson May's
    Application for Allowance for
    Payment for May 2024 filed
    June 7, 2024
        Admitted                            17       5

RX 3083 - Forbes report as of
    June 7, 2024, (under seal in
    accordance with final cash
    order, Dkt. 336)
        Admitted                            17       5

RX 3084 - Weekly Variance Report
    6/9/24
        Admitted                            17       5

RX 3085 - Dkt. 404 Debtors' June
    2024 Status Report filed 6/11/24
        Admitted                            17       5

RX 3086 - Dkt. 406 Denton Davis
    Brown's Application for
    Allowance of Payment for May
    2024 filed June 12, 2024
        Admitted                            17       5

RX 3087 - Forbes Report as of June
    12, 2024 (under seal in accordance
    with final cash order Dkt. 336)
        Admitted                            17       5

RX 3090 - FTI Sensitivity Analysis
        Admitted                            17       5
```

```
VITERRA EXHIBITS:                                  PAGE    LINE

VX 9000 - Summary of shipments of feed
    and other commodities from Viterra
    USA Grain, LLC, to the debtor within
    the 20-day prior to the petition date
        Admitted                                    18      11

VX 9001 - Summary of shipments of feed
    and other commodities from Viterra
    USA Grain, LLC, to the debtor within
    the 20-day prior to the petition date
        Admitted                                    18      11

VX 9002 - Invoices for shipments of feed
    and other commodities from Viterra USA
    Grain, LLC, to debtor within the 20-day
    prior to the petition date
        Admitted                                    18      11

VX 9003 - Invoices for shipments of feed
    and other commodities from Viterra USA
    Grain, LLC, to debtor within the 20-day
    prior to the petition date
        Admitted                                    18      11
```

1                    (Proceedings begin.)

2          CLERK:  All rise, please.  The United States Bankruptcy

3    Court, District of Idaho, is now in session.  The Honorable Noah

4    G. Hillen presiding.

5          COURT:  Thank you.  Please be seated.

6          All right.  This is Case 24-40158, Millenkamp Cattle,

7    Incorporated.  We've got a number of matters set for hearing

8    today.  Let's go ahead and start with appearances first starting

9    on my right.

10         MR. BINGHAM:  Good morning, Your Honor.  Ron Bingham,

11   Nick Schandlbauer and Kim Gourley on behalf of MetLife entities.

12         COURT:  Good morning.

13         MR. BINGHAM:  Good morning.

14         MR. KREMER:  Good morning, Your Honor.  Matthew Kremer,

15   O'Melveny & Myers, on behalf of the Official Committee of

16   Unsecured Creditors.

17         COURT:  Good morning.

18         MR. CHRISTENSEN:  Matt Christensen, Your Honor, along

19   with Ms. Mikkinlineni and Roussell for the debtors.

20         COURT:  Good morning.

21         MS. SCHWAGER:  Good afternoon, Your Honor.  Sheila

22   Schwager representing Rabo AgriFinance and with me appearing is

23   Mr. Schoulder.

24         COURT:  Good morning.

25         MR. SCHOULDER:  Good morning, Your Honor.

1        MR. NAESS:  Good morning, Your Honor.  Jason Naess,

2   U.S. Trustee.

3        COURT:  Good morning, Mr. Naess.

4        MR. O'BRIEN:  Good morning, Your Honor.  John O'Brien

5   for Conterra, Scott Powers.

6        COURT:  Good morning.

7        MR. GREEN:  Your Honor, Dan Green appearing on behalf

8   of Viterra, U.S.A.

9        COURT:  Good morning, Mr. Green.

10       All right.  Let's start with preliminary matters.  I

11  understand Rabo has an issue they want to address first.

12       MS. SCHWAGER:  Yes, Your Honor.  With the exhibits we

13  received on Tuesday night at 8:00, we received a new forecast

14  and budget and that is a matter that the financial expert for

15  Rabo would be testifying to.  He needed to stay and evaluate and

16  analyze this new information and therefore was not able to fly

17  yesterday.

18       So we requested from debtor's counsel, due to the

19  expedited nature of this matter, whether he could listen in to

20  the hearing by phone with his phone muted and we're trying to

21  avoid having to call him as a witness but, if necessary, whether

22  he could attend by Zoom in the afternoon.  Thank you, Your

23  Honor.  And debtor's counsel is in agreement with that.

24       COURT:  All right.  Counsel for MetLife, any objection?

25       MR. BINGHAM:  No objection, Your Honor.

1          COURT:  All right.  It sounds like the debtor's on

2    board; is that correct?

3          MR. CHRISTENSEN:  Debtor's on board.  I don't know if

4    you meant to skip over the creditors to me.

5          COURT:  I'm sorry.

6          MR. KREMER:  No objection.

7          COURT:  No objection.  United States Trustee's Office?

8          MR. NAESS:  No objection, Your Honor.

9          COURT:  Mr. O'Brien.

10         MR. O'BRIEN:  No objection from Conterra.

11         COURT:  Mr. Green.

12         MR. GREEN:  No objection.

13         COURT:  All right.  I understand that we're operating

14   under some truncated timelines here.  With respect to the

15   disclosures, we'll go ahead and permit it this time.  I'll just

16   say in the future, I'd like to have counsel address these issues

17   prior to the hearing or much sooner to the hearing than the day

18   before and to the extent this was necessitated by the truncated

19   disclosure deadline that we're having in this case, that's

20   something that we'll have to discuss in the future when parties

21   do seek to shorten time on hearings.

22         So we'll go ahead and have Mr. Kokini, permit him to be

23   able to call in and listen to the proceedings today and, if

24   necessary, to testify via Zoom.  I'll let you know that our

25   ability to pipe Zoom into the courtroom is not great.  He'll

1    appear on the screens but he will need to have the exhibits

2    there with him and I don't think we're going to be able to share

3    the screen while he's on there to have exhibits appear in front

4    of him.  So it's going to be a little bit more of a cumbersome

5    process than if he was here on the stand testifying.  But we can

6    make that work if need be.

7           CLERK:  Excuse me, Your Honor.  If I could have

8    Mr. Kokini's phone number when he does call in or -- because a

9    lot of people are trying to call in right now so I keep booting

10   them out so if I could get his number to make sure who it is and

11   if he can -- I'll rename him when he comes in.

12          MS. SCHWAGER:  Absolutely.

13          COURT:  That's a good point, Ms. Battle.  There have

14   been a couple times where folks have requested to call in and

15   listen to the hearings.  I'll let you know that the

16   administrative office of the U.S. courts and the Ninth Circuit

17   both have a policy that prohibits courts from broadcasting to

18   the public proceedings where there is live evidence or testimony

19   being put on.  So we can't actually pipe this out to the world

20   to let everybody listen.

21          We have discretion on non-evidentiary hearings to do

22   that but when there's actually witnesses on the stand, other

23   folks in your office can't call in.  So just be aware of that as

24   far as for future hearings.

25          All right.  Do we have any other preliminary matters

1    that we need to address?  Mr. Christensen?

2          MR. CHRISTENSEN:  Your Honor, there's several new

3    exhibits that various parties have put forth.  There's some

4    stipulations regarding those exhibits.  I think the debtor has

5    proposed Exhibits 1031 through 1038.  I believe there's a

6    stipulation from all parties, with the exception of 1032 and

7    1033, that all of the debtor's exhibits can be admitted.  There

8    may be a stipulation on one of those other two by the end of the

9    day but for now, it would be 1031 and then 1034 through 1038

10   that the debtor -- I think there's stipulations from all the

11   parties on those exhibits.

12         With regard to the exhibits from other parties, I'll

13   let them individually address them but the debtor stipulates to

14   the admission of all of the exhibits from all the other parties.

15         COURT:  All right.  Thank you, Mr. Christensen.

16   Exhibits 1031 and 1034 through 1038 have been offered for

17   admission.  Any objection?  Counsel for MetLife?

18         MR. BINGHAM:  No objection, Your Honor.

19         COURT:  Unsecure Credit Committee?

20         MR. KREMER:  No.  No objection.

21         COURT:  Rabo AgriFinance.

22         MS. SCHWAGER:  No objection, Your Honor.

23         COURT:  Mr. Naess.

24         MR. NAESS:  Your Honor, with regards to 1031, we do

25   have an ongoing -- we're not in agreement as to one of the

1   503(b)(9) claim amounts yet.  And so to the extent that that's

2   being admitted and includes that claim amount, perhaps by the

3   end of the day, we'd agree to its admission but at this point,

4   we don't.

5          COURT:  All right.  It sounds like there's at least a

6   limited objection then to Exhibit 1031 by the United States

7   Trustee's Office.

8          MR. NAESS:  Yes.

9          COURT:  All right.  Mr. O'Brien.

10         MR. O'BRIEN:  No objection, Your Honor.  And I don't

11  want to go out of order but we have the same exhibits that we've

12  had at the earlier hearing, 7001 through 7010.  I think

13  everybody's in agreement that they're admissible, be admitted as

14  well, same as before.  And they're just essentially our loan

15  documents establishing the lien position.

16         COURT:  All right.  And Mr. Green, any objection to the

17  exhibits offered by the debtor?

18         MR. GREEN:  No, Your Honor.

19         COURT:  All right.  We'll go ahead and admit Exhibits

20  1034 through 1038 and we'll reserve ruling on Exhibit 1031, 32

21  and 33 for the time being.

22      (Debtor's Exhibit Nos. 1034 through 1038 admitted.)

23         COURT:  Any additional preliminary matters that you'd

24  like to address, Mr. Christensen?

25         MR. CHRISTENSEN:  Your Honor, the only other issue is

1   the witness questioning will largely be done by Ms. Mikkilineni

2   or Ms. Roussell.  I'll be doing the closing arguments.  There

3   are several witnesses that we'll ask that they be excused once

4   their testimony is done.  I will address those as we go.

5           COURT:  All right.  Counsel, for MetLife, any

6   preliminary issues?

7           MR. BINGHAM:  Nothing from MetLife, Your Honor, no.

8           COURT:  Anything from the Official Committee of

9   Unsecured Creditors?

10          MR. KREMER:  Nothing, Your Honor.

11          COURT:  Anything further preliminary from Rabo

12   AgriFinance?

13          MS. SCHWAGER:  Yes, Your Honor.  We have stipulated to

14   exhibits with the debtor as to Rabo's exhibits.  And the debtors

15   had agreed to the admissibility of all of them.  Exhibit 3090,

16   they would like a little bit of foundation laid which will be

17   done.  But the trustee's office did e-mail this morning and they

18   have concerns about any of the declarations and if you could

19   follow through with me to make sure that I caught them all.  Is

20   it 3075, 3080, 3081 and 3089?  Are those all the declarations

21   that the U.S. Trustee's Office had concerns about admitting?

22          MR. NAESS:  It is.  And then 3088 was a duplicate I

23   believe of the 1031.  So same issue there.

24          MS. SCHWAGER:  Which is the filed supplement to the

25   debtor's amended motion for allowance of payment of 503(b)(9)

1    claims.  And we are not presenting these exhibits to be admitted

2    for the veracity but to examine the witnesses.  So we will

3    just -- to the extent that we do that, we'll move for admission

4    for those limited purposes at that time, Your Honor.

5           COURT:  All right.  So let me just go through your

6    list.  Is 3009 part of the stipulation?

7           MS. SCHWAGER:  Your Honor, for those exhibits that have

8    not yet been admitted, 3077 is stipulated to, 3078 is stipulated

9    to, 3079 is stipulated to, 3082 is stipulated to, 3083, 3084,

10   3085, 3086, 3087, 3090.  And 3074.

11          COURT:  3074?

12          MS. SCHWAGER:  Yes, Your Honor.

13          COURT:  All right.  So Rabo AgriFinance is offering for

14   admission Exhibits 3074, 3077, 3078, 3079, 3082 through 3087 and

15   3090.  Any objection by MetLife?

16          MR. BINGHAM:  No objection.

17          COURT:  Committee for Unsecured Creditors?

18          MR. KREMER:  No objection, Your Honor.

19          COURT:  Debtor?

20          MR. CHRISTENSEN:  No objection.

21          COURT:  And Mr. Naess?

22          MR. NAESS:  No.  No objection.  Thank you.

23          COURT:  Mr. O'Brien.

24          MR. O'BRIEN:  No objection.  Thank you.

25          COURT:  Mr. Green?

```
 1              MR. GREEN:  No objection.

 2              COURT:  All right.  The Court will admit Exhibits 3074,

 3    3077 through 3079, 3082 through 3087 and 3090.

 4              MS. SCHWAGER:  Thank you, Your Honor.

 5                   (Rabo AgriFinance Exhibit Nos. 3074, 3077 through

 6                   3079, 3082 through 3087 and 3090 admitted.)

 7              COURT:  Any additional preliminary matters, Ms.

 8    Schwager?

 9              MS. SCHWAGER:  No, Your Honor.  Thank you.

10              COURT:  And Mr. Naess, any preliminary matters?

11              MR. NAESS:  No.  Thank you.

12              COURT:  All right.  And Mr. O'Brien, you touched on

13    this earlier.  It sounds like Exhibits 7001 through 7010 you'd

14    like to make sure are admitted?

15              MR. O'BRIEN:  Yes, Your Honor.

16              COURT:  Any additional preliminary matters?

17              MR. O'BRIEN:  No, Your Honor.

18              COURT:  All right.  Conterra has offered exhibits 7001

19    through 7010.  Any objection by any party?  All right.  We'll go

20    ahead and admit those exhibits.

21              CLERK:  Excuse me, Your Honor.  All those were admitted

22    back in April.

23              COURT:  Okay.  Those are previously admitted.  We'll

24    just continue to note they are admitted.

25              Mr. Green, any preliminary issues?
```

1        MS. SCHWAGER:  Your Honor, did Mr. Green respond?  Oh,

2   sorry.  Sorry.  I just missed one.

3        MR. GREEN:  Thank you, Your Honor.  Your Honor, Viterra

4   has submitted exhibits 9000, 9001, 9002 and 9003.  I don't

5   believe that there are any objections to the admission of those

6   exhibits and we'd ask the Court to admit those.

7        COURT:  All right.  Viterra has offered Exhibits 9000

8   through 9003.  Any objection by any party?  All right.  The

9   Court will admit Exhibits 9000 through 9003.

10        MR. GREEN:  Thank you, Your Honor.

11         (Viterra Exhibit Nos. 9000 through 9003 admitted.)

12        COURT:  Thank you.  Ms. Schwager.

13        MS. SCHWAGER:  Sorry, Your Honor.  There was one more

14   exhibit which was 3076 that had been stipulated to which is

15   Docket 308, the amended motion for allowance of 503(b)(9)

16   claims.

17        COURT:  Any objection to the Court admitting

18   Exhibit 3076?  The exhibit will be admitted.

19        MS. SCHWAGER:  Thank you, Your Honor.

20         (Rabo AgriFinance Exhibit No. 3076 admitted.)

21        COURT:  All right.  I think we've taken care of all of

22   the preliminary matters.  I'll just let everybody know as far as

23   scheduling goes, my schedule is kind of tight this summer.  The

24   latest we'll probably be able to go tonight is about 5:30.  I'm

25   not available in the morning so if we're not done, we're going

1  to have to pick up tomorrow at 1:00 p.m. and if we don't finish

2  on Friday, we'll have to figure out an additional time.  I'll

3  let you know, I've got a conference next week so I'll be out of

4  town.  So there will be a fair amount of delay in between any

5  additional hearing after Friday.

6          So I certainly encourage the parties to be targeted and

7  efficient with their presentation of evidence and testimony

8  because we do have a lot before the Court today.

9          All right.  Mr. Christensen, Ms. Mikkilineni, go ahead.

10         MS. MIKKILINENI:  Thank you, Your Honor.  We're going

11 to call Mr. Millenkamp.

12         COURT:  All right.  Mr. Millenkamp, please come up to

13 the witness stand and remain standing when you get here so you

14 can be sworn in by Ms. Battle.

15                        (WILLIAM JOHN MILLENKAMP is sworn.)

16         CLERK:  Thank you.  Please have a seat and once seated,

17 please state your name and spell your last name for the record.

18         WITNESS:  William John Millenkamp, M-i-l-l-e-n-k-a-m-p.

19         CLERK:  Thank you.  Ms. Mikkilineni.

20                        DIRECT EXAMINATION

21 QUESTIONS BY MS. MIKKILINENI:

22 Q.  Good morning, Mr. Millenkamp.

23 A.  Good morning.

24 Q.  You've testified at hearings in this case before, right?

25 A.  Yes.

1   Q.  We're first going to talk about the motion for prepayments

2   that was filed with the Court.  When do you enter into

3   agreements for corn silage?

4   A.  Typically in the spring.

5   Q.  And when is the corn chopped?

6   A.  Starts in September through the end of October.

7   Q.  And how much corn silage do you typically need every year?

8   A.  I like to purchase between 5 and 7,000 acres.

9   Q.  And how much does that typically cost?

10  A.  Depends on the year but roughly 6 million -- 6 to 8 million

11  this year.

12  Q.  And what do you use corn silage for on your farm?

13  A.  Corn silage is used as a feed.

14  Q.  What benefit does it provide?

15  A.  Probably the main benefit, it creates more milk revenue.

16  Q.  When do you normally enter into agreements for hay silage or

17  for haylage?

18  A.  Prior to June.

19  Q.  And when is it harvested?

20  A.  Between June and October.

21  Q.  How much haylage do you typically need per year?

22  A.  I could use as much as 10 to 15,000 acres of purchased

23  haylage.

24  Q.  And about how many tons is that?

25  A.  It would be 150, 200,000 ton.

1    Q.  And how much does it typically cost for haylage?

2    A.  $35 a ton approximately.

3    Q.  When do you normally enter into agreements for straw?

4    A.  Between winter and now.

5    Q.  And how much straw do you normally need in a year?

6    A.  Over 100,000 bales.

7    Q.  And how much does it typically cost for straw?

8    A.  Probably 5 or $6 million.

9    Q.  Does that vary each year or is it pretty consistent?

10   A.  No, it varies between 80 -- say over the last few years

11   maybe between 80 and $150 a ton.

12   Q.  And the amounts of goods you just talked about that are

13   needed for the farm, do those include amounts you grow on your

14   farm?

15   A.  No, it does not.

16   Q.  Did you have any difficulty in securing suppliers for corn

17   silage, hay and straw this year?

18   A.  Yes, a lot.

19   Q.  And what happened?

20   A.  What happened is we got put into receivership by Rabo Bank

21   and now the bankruptcy.

22   Q.  Do the typical suppliers, do they still have goods?

23   A.  Some do and some do not.

24   Q.  And are they requiring anything to move forward with you?

25   A.  Yes.  The business has changed with many of them because of

1  the risk factors associated with and then the receivership and

2  the promises that were not fulfilled.  Yes, they're changing and

3  demanding more payment up front.

4  Q.  Have you ever had to provide deposits in the past?

5  A.  Yes.

6  Q.  And what was that for?

7  A.  Mostly straw and hay.

8  Q.  And do you know the amounts?

9  A.  Of deposit?

10  Q.  Yes.

11  A.  It would range from say 25 percent as high as 90 percent on

12  some of the deals we make.

13  Q.  And do you have any reason to believe the vendors won't

14  supply the goods once you've made the deposit?

15  A.  No.

16  Q.  And why is that?

17  A.  Most of the farmers that we deal with, we have an ongoing

18  relationship year after year.  We have a contract that's binding

19  but mostly their word that they'll do what they say.

20  Q.  Have you ever had anyone not provide goods that you entered

21  into an agreement for the goods?

22  A.  Not that I recall.

23  Q.  Have you ever provided a deposit and not received the goods?

24  A.  Not that I recall.

25  Q.  How much corn silage do you have on hand?

1    A.  I got enough to carry me into probably the end of this year.

2    Q.  And would there be any of the old silage left when the new

3    silage arrives?

4    A.  Yes.

5    Q.  And about how much?  Do you know?

6    A.  Probably a couple months.

7    Q.  And why do you have that overlap?

8    A.  We need that cushion because the new crop that we harvest

9    needs to ferment in the pile to make it a better feed.

10   Q.  Can you make it through another season without buying more

11   corn silage?

12   A.  Not to run the dairy as normal course, no.

13   Q.  Where would you buy corn silage if you had to wait to

14   purchase it until the fall or the winter?

15   A.  It would not be available.

16   Q.  How much haylage do you have on hand?

17   A.  We have enough haylage to get to new crop of next year.

18   Q.  And if you were able to buy more haylage now, how would that

19   impact the farm?

20   A.  Less milk production mainly.  It's not -- we're not feeding

21   the cows the optimal diet that we would like to feed.

22   Q.  And if you had to wait to buy haylage until November or

23   December, would you be able to get it?

24   A.  No.

25   Q.  And how much straw do you have on hand?

1    A.  I think around 6 or 7,000 ton.

2    Q.  And if you weren't able to buy more straw right now, how

3    would that impact the farm?

4    A.  The doom and gloom is I would say 100 percent of the calves

5    could be dead and I would say the majority of the cows would go

6    to butcher.

7    Q.  And if you had to wait to buy straw until November or

8    December, would you be able to get it?

9    A.  We have no idea.  I would say not.

10   Q.  What would happen to your business if you cannot secure corn

11   silage, hay and straw right now?

12   A.  For sure, the business will fail and go broke.

13   Q.  And how would that impact creditors?

14   A.  They would not get paid.

15   Q.  Do you know how much the salvage value is for those

16   commodities?

17   A.  Salvage value for what commodities?

18   Q.  For the corn silage, hay and straw.

19   A.  What do you mean the salvage value?

20   Q.  Do you know what the salvage value for those is if you

21   weren't able to buy those items and, like you said, the farm

22   would fail?

23   A.  The salvage value on the animals.  Not the silage.

24   Q.  Oh, I'm sorry.  Yes.

25   A.  Yeah.  Okay.  Yeah, the salvage value -- I mean currently

1  the cattle market's extremely high.  Approximately say $3,000 a

2  milk cow.  Salvage value would be a thousand dollars a cow.  So

3  we would take an $80 million hit just on the milk cows alone.

4  Q.  When does H & M provide services to Millenkamp Cattle?

5  A.  A little bit year round but the majority of the work is done

6  between May 1 and November 1.

7  Q.  And what are they chopping during the summer?

8  A.  They start chopping triticale, silage and then hay silage

9  and do corn silage.

10  Q.  And when do they start chopping corn?

11  A.  Usually about the beginning of September.

12  Q.  Now I'm going to turn to the 503(b)(9) motion.  How were the

13  503(b)(9) claims initially determined?

14  A.  They're determined by my office staff and Kander, our

15  financial advisors and myself.

16  Q.  And was that initial listing filed with the Court and served

17  on creditors?

18  A.  Yes.

19  Q.  Did Millenkamp Cattle do any additional review of the

20  503(b)(9) claims after the initial filing?

21  A.  Yes.

22  Q.  And why is that?

23  A.  I think blended in the initial list, there were some

24  services mixed in there that should have been corrected and I

25  believe that we corrected those.

1    Q.  And did you guys engage in any communications with the

2    creditors when you were doing your additional analysis?

3    A.  I believe they did.

4    Q.  If the 503(b)(9) claimants are not paid prior to

5    confirmation, what will be the impact on the debtors?

6    A.  It strains all business relationships even more than what

7    they currently are.  The critical vendor list, when that got

8    denied, that was a big hit and now a lot of our vendors are

9    waiting to see if moneys will come in through the 503(b)(9).  I

10   don't think -- I know that our company's not getting the best

11   deal from a lot of our suppliers and people that supply goods

12   because of the fact that they're carrying a lot of, you know,

13   receivable with us.

14   Q.  And how will that ultimately impact creditors?

15   A.  It would impact them all differently.  Maybe potentially

16   some of the smaller ones that unfortunately we would be an

17   extremely big customer for some of our suppliers and that would

18   hurt them say more than a larger vendor or supplier.  So each of

19   them would be different but we owe them a lot of money.

20   Q.  Now I'd like to talk about the motion to approve the Burks

21   Tractor.  I'd like to pull up Exhibit 1037.  Do you see that on

22   your screen, Mr. Millenkamp?

23   A.  Yes.

24   Q.  And do you recognize this document?

25   A.  Yes.

1    Q.    What is it?

2    A.    It's an equipment rental agreement with Burks Tractor.

3    Q.    And what type of equipment are -- does this rental agreement

4    cover?

5    A.    Loaders.

6    Q.    And what is that equipment used for in your operations?

7    A.    Loaders are used to feed cattle and to mostly manage manure

8    and say dirt and gravel.

9    Q.    And why are you entering into this rental agreement now?

10    A.    We have a current lease with Cat -- Caterpillar and that was

11    over I believe June 31.

12    Q.    And what is the term of this new agreement?

13    A.    It's a 2-year term.

14    Q.    And in your opinion, are these terms reasonable?

15    A.    Yes.

16    Q.    And why do you say that?

17    A.    They're reasonable.  I had it bid out and this was the best

18    deal we could find.

19          MS. MIKKILINENI:  I have no further questions.  Thank

20    you.

21          WITNESS:  Thank you.

22          COURT:  Counsel for MetLife.

23          MR. BINGHAM:  No questions, Your Honor.

24          COURT:  Unsecured Creditor Committee?

25          MR. KREMER:  No questions.

```
 1          COURT:  Rabo.

 2          MS. SCHWAGER:  I do have questions, Your Honor.  Thank

 3  you.

 4          COURT:  Go ahead.

 5                          CROSS-EXAMINATION

 6  QUESTIONS BY MS. SCHWAGER:

 7  Q.  Good morning, Mr. Millenkamp.

 8  A.  Good morning, Ms. Schwager.

 9  Q.  Mr. Millenkamp, in your motion for authority to pay prepay

10  deposits to vendors for future deliveries that was filed on June

11  6, you had identified a list of vendors that were willing to

12  provide corn silage on a 50 percent basis.  And the three that

13  you listed were Grant Hagen, Terry Hollifield and Moss Farms.

14  In that regard, how many acres of corn silage did you agree to

15  purchase from Grant Hagen?

16  A.  I don't recall.

17  Q.  Have you agreed to purchase a certain amount of acres from

18  Grant Hagen?

19  A.  Depends if we can find the deposit for them.

20  Q.  Has Mr. Hagen agreed that he will in fact provide corn

21  silage if he is provided a deposit?

22  A.  Yes.

23  Q.  And what is the approximate amount of corn silage he will

24  provide?

25  A.  It could be between 500 and 1,000 acres.  He hasn't decided.
```

1    Q.  And what will that decision turn on?

2    A.  Decide -- it depends on how many acres he's willing to sell

3    me.

4    Q.  And what will that decision be based on?  Is it based on

5    more than 50 percent deposit?

6    A.  I'm assuming it's based on whether they get a 50 percent

7    deposit.

8    Q.  If they don't get a 50 percent deposit, will he provide any

9    corn silage?

10   A.  I think zero corn silage.

11   Q.  So what is the determination of whether he provides 500,000

12   acres -- I'm sorry, 500 acres or 1,000 acres?

13   A.  You would have to ask Grant Hagen.

14   Q.  So you don't know.  When you're asking this Court to

15   authorize a 50 percent deposit, you don't have any idea how much

16   corn silage you can obtain from Mr. Hagen; is that correct?

17   A.  I asked Grant Hagen how much corn they had.  I told him I'd

18   buy every acre that they had and they will sell me a lot of

19   their corn if they get 50 percent down.

20   Q.  Is Mr. Hagen here to testify to that today?

21   A.  I don't know.

22   Q.  Have you talked to him about whether or not he would come to

23   court and testify to that?

24   A.  I did not talk to him about that.  Somebody else may have.

25   Q.  What would be the amount approximately of the deposit that

1    you're asking the Court to authorize for Mr. Hagen?

2    A.  Depends if it's 500 acres or 1,000 acres.

3    Q.  Okay.  So let's say if it's 500 acres, what's the

4    approximate amount of the deposit?

5    A.  300,000.

6    Q.  And if it's 1,000, then it would be --

7    A.  Correct.  Double.

8    Q.  -- 600, 000?  Is that the 50 percent?

9    A.  Approximately.

10   Q.  And then how many acres of corn silage did you agree to

11   purchase from Mr. Hollifield?

12   A.  Same as -- the answer would be the same as Grant Hagen.

13   They don't give me hard numbers on acres.  They're all waiting

14   to hear if we can come up with a deposit.

15   Q.  And what's the approximate amount of acres that he would

16   have available?

17   A.  Last year, he had approximately a thousand acres.  I don't

18   know what he's going to have this year.

19   Q.  And so would that be about the same deposit, 600,000?

20   A.  Yes.

21   Q.  And has he agreed to provide that corn silage if he is -- if

22   you obtain a 50 percent deposit?

23   A.  Yes.

24   Q.  And is he here to testify to that today?

25   A.  Not that I know.

1    Q.   Okay.  How many acres of corn silage did you agree to

2    purchase from Moss Farms?

3    A.   There's no hard number on that.  I'm not sure how many

4    acres.  The answer would be the same as the previous two

5    farmers.

6    Q.   Do they have a thousand acres?

7    A.   I don't know.

8    Q.   You have no idea an approximate amount of acreage that Moss

9    Farms could provide?

10   A.   No, I don't.

11   Q.   Do you have an approximate amount of the deposit that you

12   would be requesting be paid to Moss Farms?

13   A.   50 percent off whatever acres they decide to sell me.

14   Q.   And you have no current signed contract with those three

15   parties, correct?

16   A.   Correct.

17   Q.   Why not?

18   A.   You can't make a contract if you don't know the terms of the

19   deal.

20   Q.   Well, did you make a contract with Steel Ranch?

21   A.   For this year?

22   Q.   For the year coming up where you're requesting a 50 percent

23   deposit.

24   A.   I haven't made a deal with any farmers because they're

25   waiting to find out if I can get the deposit for them.  So no,

1  you cannot enter into a new agreement until we know the terms of

2  the deal.

3  Q.  Okay.  Can I have you turn to Debtor's Exhibit 1035?

4         MS. SCHWAGER:  Mr. Christensen, what would that

5  notebook look like for Mr. Millenkamp?

6         MR. CHRISTENSEN:  It's white -- or black I think.

7         MS. SCHWAGER:  We are pulling it up but it's the black

8  notebook.  There should be an Exhibit 1035 which is debtor's

9  exhibits.

10  BY MS. SCHWAGER:

11  Q.  So you do have a signed contract that was signed on June --

12  this month of 2024, correct, with Steel Ranch?

13  A.  I don't remember ever seeing this.

14  Q.  Who in your office would be in charge of authorizing and

15  negotiating with corn silage founders?

16  A.  Nobody negotiates corn silage other than myself.

17  Q.  Okay.  So is this not a valid contract that's been presented

18  as an exhibit?

19  A.  I don't know if it is or isn't.  I haven't seen -- like I

20  said, I haven't seen it before.

21  Q.  Okay.  And what about the second page to that exhibit which

22  is a contract that is signed by Dusty Brow?  Did you negotiate

23  this contract that was signed on June 11, 2024?

24  A.  I have never seen this.  The only other person that could be

25  negotiating would be Brian Huettig.

1    Q.  So Brian would be negotiating on behalf of -- it says Bill

2    Millenkamp, president.  Is that president of the debtors?

3    A.  What's your question?

4    Q.  It says buyer's signature, title, Bill Millenkamp,

5    president.  And it's Brian -- how do you pronounce his last

6    name?

7    A.  Huettig.

8    Q.  Huettig.  Would he be negotiating on behalf of the debtors?

9    A.  Yes.

10   Q.  And why is that?

11   A.  Because we are partners in a chopping company and he is the

12   guy that negotiates a lot of the purchasing of corn silage.

13   Q.  Do you know who drafted this contract?

14   A.  No.

15   Q.  And in this contract, you see it references the bankruptcy

16   case.  Do you see that in the second paragraph?

17   A.  Yes.

18   Q.  Where the contract has to be approved by the United States

19   Bankruptcy Court?

20   A.  I see that, yes.

21   Q.  Did you have any discussions regarding this contract?  And

22   I'm going to butcher Brian's name so --

23   A.  Brian Huettig.  Brian Huettig.  No, I've not seen this.

24   Q.  Okay.  And in this contract, it sets forth a 50 percent

25   deposit.  Is that a deposit that you're asking this Court to

1    authorize today?

2    A.  What's your question?

3    Q.  Is that a deposit that you're asking this Court to authorize

4    you to pay?  50 percent deposit to --

5    A.  I'm asking the Court to give us approval to put 50 percent

6    down on whoever is willing to sell us corn silage for this fall.

7    Q.  So you're not bringing to the Court any specific parties

8    that you are requesting authority to pay deposits to.  You're

9    asking for a lump sum, $2.5 million, for you to choose who you

10   want to pay a 50 percent deposit to.  Is that correct?

11   A.  I believe so.

12   Q.  Okay.  And under this Mr. Brow contract, it's a 50 percent

13   deposit of 134 acres that produces 32 tons at $43 per ton.  Is

14   $43 per ton acceptable to you?

15   A.  Yes, yes.

16   Q.  And so that equates to about a $92,000 deposit, correct?

17   A.  Yes.

18   Q.  And the Steel Ranch, if we can go back to that first page

19   contract which is a 50 percent deposit of 170 acres at 30 tons

20   an acre and $43, is that something that you would be willing to

21   accept on behalf of the debtors?

22   A.  Yes.

23   Q.  And so that equates to about a $109,000 deposit; is that

24   correct?

25   A.  Correct.

1    Q.  Do you know who first raised the issue about a 50 percent

2    deposit?

3    A.  There was conversations between Brian Huettig and some of

4    the farmers that provide silage for us and they're uncomfortable

5    with how we've done business in the past and they would like to

6    continue to do business but one new requirement is going to be a

7    deposit of 50 percent.

8    Q.  Did you try to negotiate a different deposit amount other

9    than 50 percent with any of the silage farmers?

10   A.  I did not myself.

11   Q.  Do you know if Mr. Huettig did?

12   A.  I don't know if he did.

13   Q.  Did you talk to him about the importance of maintaining

14   reduced expenses for the bankruptcy estate and therefore he

15   should be trying to obtain a lesser percentage than 50 percent

16   if possible?

17   A.  Yes.  He was aware of that.

18   Q.  Did you guys have a specific conversation about it?

19   A.  Yes.

20   Q.  So have you had any specific conversations about whether

21   other silage farmers will be willing to accept less than a 50

22   percent deposit?

23   A.  You cannot give one farmer a certain deposit and another

24   farmer a greater deposit.  You have to have a standard and the

25   standard that Brian and some of the farmers that he talked to

1    was 50 percent down.

2    Q.  When do you expect -- if this contract is approved by the

3    Court, when do you expect Steel Ranch and Dusty Brow to deliver

4    the silage?

5    A.  Middle of September approximately.  And to clarify, they

6    don't deliver it.

7    Q.  How do you receive it?

8    A.  We go and chop it.  We bring it in.

9    Q.  And that's H & M's company?

10   A.  Yes.

11   Q.  And then your trucking company, does that bring it back to

12   the debtor's location?

13   A.  We hire outside trucks to do that.

14   Q.  And why is that?

15   A.  Because we don't want to own 50 semis.

16   Q.  Do you know whether this form contract has been sent to any

17   other farmers?

18   A.  I don't know.

19   Q.  Would Mr. Huettig be the only person that would know whether

20   this contract had been sent out to any other farmers?

21   A.  I don't know if he's the only one.  You'd have to ask him.

22   Q.  Well, is anybody else authorized to negotiate on your behalf

23   as president of the debtors?

24   A.  There's an attorney by the name Grimshaw.  There's Rob

25   Williams.  He's an attorney out of Jerome.  David Heida who is

1    an attorney that works for me and Brian Huettig are all talking

2    about corn silage deals going on this fall.

3    Q.  Is Mr. Grimshaw or Mr. Williams authorized to negotiate on

4    your behalf?

5    A.  I don't know if they are or aren't but I know they are in

6    negotiations.

7    Q.  They're in negotiations on the part of the seller, correct?

8    Not on behalf of the debtors, correct?  Is that correct?

9    A.  Correct.

10   Q.  And Mr. Heida, he is authorized to negotiate on behalf of

11   the debtors for the silage contracting?

12   A.  He's authorized to talk to that legal counsel on the other

13   side.

14   Q.  Is he authorized to agree to any specific terms on your

15   behalf?

16   A.  No.

17   Q.  So he has to always come back to you before he can enter

18   into a binding agreement with the farmers?

19   A.  Most of the time.

20   Q.  Well, you say most of the time.  So when is he not required

21   to come back to you for authorization?

22   A.  On the silage, he would come back to me.

23   Q.  Okay.  What are the instructions that you give Mr. Huettig

24   as to what he's authorized to negotiate with the silage farmers?

25   A.  Brian and I have been doing business for 10 years.  He's

1    always lined up the silage for us.  He has the relationships

2    with the farmers.  So this is normal course of business.  The

3    only thing that's changed is that guys won't sell us silage this

4    year because they're not paid for last year.  And for Brian to

5    line up that many acres of corn silage, 50 percent down is what

6    was requested by probably several farmers for us to provide

7    feed.

8    Q.  And you say probably by several farmers.  Do you know

9    whether several farmers required that?

10   A.  From what Brian told me, yes.

11   Q.  Okay.

12   A.  And I guess on these two contracts, you would say yes.

13   Q.  But you have never seen these contracts, correct?

14   A.  I have not.

15   Q.  Okay.  And he's not required to go back to you to get

16   authorization.  He has authorization from you to agree to

17   specific terms; is that correct?

18   A.  It depends on the certain terms.

19   Q.  What does that mean?

20   A.  What are you asking?  Can you reask the question?

21   Q.  Is Mr. Huettig required to come back to you before he enters

22   into a binding contract on behalf of the debtors to make sure

23   you agree to the terms?

24   A.  He can't enter into it unless I have a signature on a

25   contract.  He's negotiating on my behalf.

1    Q.  Okay.  So when the individual for Steel Ranch signed the

2    corn silage contract, would you have been able to change those

3    terms on behalf of the debtors?

4    A.  Yes.

5    Q.  Okay.  And Mr. Huettig informed Steel Ranch that this was

6    not a binding contract authorized by you?

7    A.  I have no idea what he told them.  It's not -- I would think

8    it's not a binding contract unless I sign it as well.

9    Q.  Okay.  In your June 6 motion, you also identified two hay/

10   straw vendors to require 50 percent deposit.  That was Mr. Steve

11   Lam and Mr. Jon Bingham.  Do those two vendors supply all of

12   your hay and straw?

13   A.  No.

14   Q.  Have you ever provided those two vendors a deposit for hay

15   and straw prior to the bankruptcy filing?

16   A.  Yes.

17   Q.  And what is the amount of the deposit that you have

18   provided?

19   A.  It varies.

20   Q.  What is it conditioned upon or varied -- what causes it to

21   vary?

22   A.  A lot of it's the demand on the market of the product that

23   we're trying to buy.

24   Q.  So what is the criteria that goes into how much of a deposit

25   they charge you?

```
 1    A.   There is no specific criteria.   It changes.

 2    Q.   Is it a percentage?

 3    A.   It could be.

 4    Q.   Do you recall what it was in 2023?

 5    A.   I do not.

 6    Q.   Do you recall what the criteria was in 2023?

 7    A.   There is no criteria, set criteria.

 8    Q.   For the variance.   You said that it varies.

 9    A.   It varies, yes.

10    Q.   Do you recall what the variable would have been when you

11    paid the deposit in 2023 --

12    A.   No.

13    Q.   -- that set the price for that deposit?

14    A.   No.

15    Q.   Have you ever provided -- do you recall other hay/straw

16    vendors, paying them a deposit in 2023?

17    A.   Specifically in 2023, no, but it's very common over years of

18    business.   Yes, deposits are common.

19    Q.   So you do recall Mr. Lam and Mr. Bingham -- you specifically

20    recall in 2023 that they were provided a deposit?

21    A.   Yes.   And then I do remember Wolfe Brothers -- it's another

22    hay company -- they demanded a 90 percent down in 2023.

23    Q.   And do you recall why they demanded that?

24    A.   That's the way that they do business.

25    Q.   Okay.   Any others that you recall?
```

1  A.  No.

2  Q.  Did you cause any farm contracts like Exhibit 1035 to be

3  sent to any hay/straw vendors?

4  A.  Not that I recall.

5  Q.  Do you recall who first raised the issue of requiring a

6  deposit -- a 50 percent deposit for the purchase of hay and

7  straw from Mr. Lam?

8  A.  Can you ask that again?

9  Q.  You bet.  In your June 6 motion, you said that Mr. Lam is

10  requiring a 50 percent deposit to supply hay and straw.  Who

11  first raised the issue of a deposit with Mr. Lam?

12  A.  I believe it would be Steve Lam and the guys that he works

13  for.

14  Q.  And who did he raise that issue to?

15  A.  Me.

16  Q.  And what did he say?

17  A.  That we're going to buy -- that we got a lot of volume

18  coming in this year and to secure the amount of volume that we

19  need a 50 percent deposit is what we needed to make sure that we

20  secure the amount of straw and hay that we need to get through

21  the coming year.

22  Q.  And COD's not sufficient for Mr. Lam?

23  A.  No.

24  Q.  Why is that?

25  A.  I just answered that.

1    Q.   Because they need to set an amount of volume?   Is that what

2    you testified to?

3    A.   Yes.   A lot of it has to be paid for -- to the farmers to

4    secure it and you can't bring it all in at one time so you're

5    putting deposits down.   It's normal course of business in the

6    hay business.

7    Q.   When do you expect Mr. Lam to deliver that hay?

8    A.   Aden Brook brings in hay almost every single week to our

9    farms.

10   Q.   Have they required a deposit yet?

11   A.   I don't recall.

12   Q.   You don't recall if during this bankruptcy you've paid any

13   deposit to Mr. Lam?

14   A.   I don't recall.   I think some of it is -- I don't remember.

15   Some of it we're paying prior to some deliveries, yes, but I

16   don't remember the exact amounts and when this happened.

17   Q.   And to determine that information, would you go to your

18   books and records at your offices?

19   A.   Yes.

20   Q.   And request it from Lisa Millenkamp; is that correct?

21   A.   Yes.

22   Q.   Okay.   And what about Mr. Bingham?   Do you recall -- when's

23   the first time you recall discussing the deposit that he needs

24   in order to sell you hay and straw through the bankruptcy?

25   A.   He gets a deposit every year so I don't remember exactly

1  when we talked about this year's deposit.

2  Q.  Has it always been 50 percent?

3  A.  I don't remember what percentage it is.

4  Q.  But is he requiring 50 percent for the bankruptcy?

5  A.  Yes.

6  Q.  Okay.  Can you approximate the amount of what those deposits

7  would be?

8  A.  For who?

9  Q.  For Mr. Lam.

10  A.  It would be -- I'm going to say on the straw, it's going to

11  be 7, $800,000 on the straw and maybe a million and a half on

12  the hay side.

13  Q.  And Mr. Bingham?

14  A.  It depends on how much straw he delivers.  He won't know how

15  much he's going to deliver until the crop is harvested and baled

16  but approximately 250,000.

17  Q.  And are they providing the security interest in exchange for

18  that deposit?

19  A.  Can you repeat that?

20  Q.  Yeah.  Mr. Bingham and Mr. Lam who requested a 50 percent

21  deposit, are they granting the debtors a security interest?

22  A.  I don't know what they're granting.

23  Q.  Did you request a security interest?

24  A.  I don't know if anybody requested that or not.

25  Q.  Who would have been negotiating with them for the debtors?

1    A.  It would have been -- I negotiate the price and the terms

2    but I don't know if our office manager talked to them about a

3    security interest and our attorneys talked to their attorneys.

4    I'm not aware of every single conversation that takes place.

5    Q.  Would they have to -- would that be a material term that

6    they would have to run by you to get authority?

7    A.  Yes, I would think so.

8    Q.  Do you recall anybody requesting your authority for the

9    granting of a security interest?

10   A.  I don't recall.

11   Q.  Would that agreement be in writing with Mr. Bingham and Mr.

12   Lam?

13   A.  I don't know.  I don't recall.

14   Q.  Who are the other vendors that are demanding a deposit from

15   the $2.5 million that you are requesting?

16   A.  2.5 on the silage side or the hay?

17   Q.  On the hay and straw.

18   A.  It could vary.  It depends on who's out there that's going

19   to do business with us.  I'm assuming Wolfe Brothers if we go to

20   them again.  Another one would be Jackson -- Scott Jackson.

21   Q.  And you don't know what the amount of deposits they would

22   require?

23   A.  They're talking 50 percent as well.

24   Q.  So has Wolfe reduced it from 90 percent to 50 percent?

25   A.  I don't believe Wolfe will reduce it, no.  I think they'll

1   stay at 90.

2   Q.  But you haven't been in any direct negotiations with them in

3   that regard; is that correct?

4   A.  Correct.

5   Q.  And you have a 50 percent interest in H & M, correct?

6   A.  Correct.

7   Q.  Does Millenkamp Cattle have any signed contracts with H & M

8   regarding the chopping services?

9   A.  Not that I recall.

10  Q.  Do you recall if you've ever had a signed contract with H &

11  M?

12  A.  Not that I recall.

13  Q.  So there's no written agreement that sets forth the services

14  they provide, how they're paid, any certain time period that

15  they have to provide services.  Is that correct?

16  A.  Not that I recall.

17  Q.  Okay.  And they provide the chopping services; is that

18  correct?

19  A.  Correct.

20  Q.  And right now, you said that they're providing services?

21  A.  Yes.

22  Q.  And what services are they providing?

23  A.  They're chopping.

24  Q.  And are they chopping without requiring a deposit right now?

25  A.  For now, yes.

46

```
 1   Q.  Have you ever paid H & M a deposit before?

 2   A.  I believe -- yes.

 3   Q.  When was that?

 4   A.  I don't recall.  Maybe 6, 8 years ago.

 5   Q.  And what was the reason for that 6 or 8 years ago?

 6   A.  I don't recall.

 7   Q.  But you recall 6 or 8 years ago paying a deposit?

 8   A.  Yes, I do.

 9   Q.  Which was outside of what you normally do, correct, with H &

10   M?

11   A.  Yeah.  I probably had the money and he probably needed it so

12   I probably put a deposit down.

13   Q.  Okay.  Why would H & M need to be paid now for the $1.5

14   million deposit?

15   A.  The main reason is the risk of doing business with

16   Millenkamp Cattle.  Specifically as getting lied to by the

17   receivership and all the promises that were not fulfilled to the

18   farmers and to H & M.  So now the terms of doing business with H

19   & M have changed.

20   Q.  And you're a 50 percent member; is that correct?

21   A.  Correct.

22   Q.  And does H & M have any other customers that it provides

23   chopping services for?

24   A.  I believe one.

25   Q.  And who's that?
```

1    A.   Hurtado Dairies.

2    Q.   And is that a large customer?

3    A.   No.

4    Q.   So if they're not able to provide chopping services for

5    Millenkamp, then they're not going to generate that much in

6    proceeds, correct?

7    A.   Correct.

8    Q.   And H & M has been paid for all of their prepetition claims

9    up to date now, correct?

10    A.   I don't know where we're at.

11    Q.   Do you recall that they've been paid $4.5 million?

12    A.   I know they've been getting payments.  I don't know the

13    total amount.

14    Q.   Has Mr. Huettig informed you that you still owe him money?

15    A.   I believe we still owe H & M money.

16    Q.   I'm sorry?

17    A.   I believe Millenkamp Cattle still owes H & M money.

18    Q.   How much do you believe you owe them?

19    A.   I don't recall.  Maybe a million dollars.

20    Q.   Is that for post-petition services or prepetition?

21    A.   Pre.

22    Q.   And what is that belief based on?

23    A.   I don't remember exactly the numbers.

24    Q.   So you don't know whether you owe them a million dollars

25    prepetition; is that correct?

```
 1    A.  I don't remember.  You probably have those numbers in front

 2    of you.  You could tell me.

 3    Q.  Well, that's fine.  We will move on.  If those farmers sold

 4    you silage, hay or straw, after the bankruptcy was filed, isn't

 5    it true they would have an administrative claim -- priority

 6    administrative claim?

 7    A.  I don't know what claim they have.

 8    Q.  Okay.  So have you looked at whether there are alternatives

 9    to a deposit such as discussing with them the fact that they'll

10    have an ag lien that goes ahead of the secure creditors?

11    A.  They're not willing to do business with us until they have a

12    deposit.  They're not going to -- they fell for that through the

13    receivership and Mike Hayes and Rabo Bank.  They're not going to

14    do business with us -- as long as Rabo Bank has anything to do

15    with Millenkamp Cattle, they're not going to sell us feed this

16    fall.

17    Q.  When -- so that would be good to refinance, right, get Rabo

18    Bank out of --

19    A.  Sure.

20    Q.  When the receivership was filed and you say the receiver

21    caused problems, did you have outstanding amounts that were owed

22    to those silage farmers?

23    A.  No.

24    Q.  No.

25    A.  Sorry.  Yes, yes.
```

1  Q.  Because had lawsuits been filed against you where you were

2  enjoined from using the silage because you owed those silage

3  farmers money?

4  A.  The promises were made by Rabo prior to corn silage harvest.

5  Q.  That's not the question.  Mr. Millenkamp, that's not the

6  question.  When the receivership was filed, had there been

7  silage farmers that had filed lawsuits against you for failing

8  to pay for silage?

9  A.  Yes.

10  Q.  And had there been restraining orders issued against you

11  that required you not to use the silage?

12  A.  I'm not sure when the date -- there was restraining orders.

13  I don't know the date.

14  Q.  Okay.  Did you request that -- did you request that Mr.

15  Huettig --

16  A.  Huettig.

17  Q.  Huettig.  Did you request that he get a security interest

18  from Steel Ranch or Dusty Brow if they were going to receive a

19  50 percent deposit?

20  A.  I answered that and I said I don't remember having that

21  conversation.

22  Q.  Okay.  And I apologize.  We were talking about hay and so I

23  apologize if I asked that question before.  Are you being asked

24  to provide deposits because your vendors are concerned whether

25  you will pay them once they provide the goods?

1    A.  I just answered that.  As long as we're affiliated with

2    Rabo, there's a lot of concern and risk for the farmers.  I

3    don't blame them.  And yes, they're requesting a deposit.

4    Q.  So your vendors are concerned about whether you will pay

5    them.  Is that correct?

6    A.  Yes.

7    Q.  And that includes H & M?

8    A.  I believe so, yes.

9    Q.  So they're not confident that you'll be able to pay all

10    creditors 100 percent as you previously testified; is that

11    correct?

12    A.  I'm pretty sure most of them would say they have all the

13    trust in the world that I'm going to pay my bills but as long as

14    Rabo continues to play their shenanigans, there's risk and

15    concern for them.

16    Q.  And what shenanigans are those, Mr. Millenkamp?

17    A.  Promising Brian Huettig and a bunch of farmers that it's

18    business as usual and they're going to get paid in the fall and

19    that was a lie.  It was on e-mails and texts.

20    Q.  Mr. Millenkamp, in the bankruptcy, is Rabo or the receiver

21    involved at all with your operations?

22    A.  Thank goodness, no.

23    Q.  So why won't your vendors trust you through the bankruptcy

24    process to get them paid without a deposit?

25    A.  I answered that three times.  Because of Rabo's past

1    history.  As long as they're affiliated at all with Millenkamp

2    Cattle, they feel like there's a risk of them getting their

3    hands in it and screwing it up.  So 50 percent deposit, they're

4    going to feel a lot more comfortable.  You could ask the farmers

5    though.  You'll have a chance to ask them directly.

6    Q.  Thank you.  If you were able to get a plan confirmed that

7    set forth how you would pay creditors 100 percent, wouldn't that

8    provide the confidence they are seeking?

9    A.  I don't think so.

10   Q.  If you -- do you understand when you get a confirmed plan

11   that it's a new contract with your vendors?

12   A.  I don't think they care.  I think they want money in their

13   hand before this corn leaves their fields.  You'd have to ask

14   those guys.

15   Q.  How much have you worked on specific plan terms since you

16   filed bankruptcy?

17   A.  Plan terms?

18   Q.  Correct.

19   A.  We've worked on it some.

20   Q.  How much since you filed bankruptcy?

21   A.  Plan terms?

22   Q.  Correct.  The specific plan terms of how you're going to pay

23   all of your creditors 100 percent.

24   A.  I don't know.

25   Q.  10 hours, 100 hours?

1    A.  It's not 100 hours, no.

2    Q.  Is it 10 hours?

3    A.  Probably.

4    Q.  How would you pay your creditors in full and from what

5    sources?

6    A.  Can you ask that again?

7    Q.  Sure.  You've testified previously that you're going to pay

8    your creditors 100 percent in full.  From what source will you

9    be paying your creditors?

10   A.  Well, there will be a lot of it comes from profits.

11   Q.  So cash flow?

12   A.  Some will be cash flow.  Some will be a refinance.

13   Q.  The last time you testified on May 8 and 9, you said you

14   were going to obtain a refinance as a source of repayment of the

15   DIP lender and Rabo.  Have any lenders committed to issue you a

16   refinance?

17          MS. MIKKILINENI:  Objection, Your Honor.  This is all

18   outside the scope of what I had on direct testimony.  We didn't

19   talk about the plan or any of that.

20          COURT:  Is there any sort of agreement between the

21   parties to exceed scope of direct?

22          MS. MIKKILINENI:  No, Your Honor.

23          MS. SCHWAGER:  There's not, Your Honor, but

24   Mr. Millenkamp has been asked to be excused and so I have agreed

25   to excuse him if we could finish it up this morning.

1          MS. MIKKILINENI:  Your Honor, they did not list

2    Mr. Millenkamp on their witness list.

3          MS. SCHWAGER:  We identified any witnesses that were

4    identified by any other parties in this case.

5          COURT:  Do you anticipate calling Mr. Millenkamp as a

6    witness, Ms. Schwager?

7          MS. SCHWAGER:  I will if I am limited to the scope of

8    direct.

9          MS. MIKKILINENI:  Then she can keep going.  He has to

10   leave today so --

11         COURT:  All right.  The objection's withdrawn.

12         MS. SCHWAGER:  Thank you, Your Honor.

13   BY MS. SCHWAGER:

14   Q.  Mr. Millenkamp, the last time you had testified, you

15   testified about refinancing the DIP lender and Rabo through

16   Forbes.  Have any lenders committed to issue you a refinance?

17   A.  No.

18   Q.  Have you received any loan terms or commitments since May 8?

19   A.  No.

20   Q.  Have you personally been in negotiations with any lender as

21   to potential loan terms since May 8?

22   A.  Yes.

23   Q.  And who's that?

24   A.  I'm not going to tell you.

25   Q.  How many lenders have you personally spoke to since May 8?

```
 1   A.  Probably half a dozen.

 2   Q.  And none of those lenders have issued any loan commitments?

 3   A.  No.

 4   Q.  Have any of those half dozen lenders issued you specific

 5   loan terms that they would be willing to refi -- enter into a

 6   refi?

 7   A.  No, no.

 8   Q.  Has Mr. Heida negotiated with any lenders?

 9   A.  I don't know.

10   Q.  Would he -- would that be information that he would discuss

11   with you if he had been in contact with other lenders to

12   refinance the debtor's operations?

13   A.  I don't know what David has done.

14   Q.  Have you asked him?

15   A.  I don't recall if I did or didn't.

16   Q.  Have you discussed with the Forbes company -- anybody with

17   Forbes company whether they've obtained any interested parties

18   in issuing a refinance?

19   A.  I've talked to Forbes multiple times on a weekly basis about

20   who they're talking to.  Yes, I've talked to them.

21   Q.  And who are they talking to?

22   A.  That's something I'm not going to disclose.

23   Q.  How many parties are they talking to?

24   A.  Last I heard, it was 69.  Then it was 11 last I heard of

25   seriously interested parties.
```

1   Q.  And have any of those seriously interested parties provided

2   loan terms or commitments?

3   A.  Not that I'm aware.

4   Q.  Do you know if those parties are still awaiting additional

5   information from Millenkamp?

6   A.  I believe that they've received all the additional

7   information they requested as of this week.

8   Q.  Why was it just recently this week the necessary information

9   was sent to Forbes?

10  A.  Out of 69 people, they asked for different things so we

11  continually get pounded with new requests so the requests have

12  kind of quit coming so we think we've answered all the

13  questions.

14  Q.  Do you know whether a revised CIM was distributed to

15  interested parties?

16  A.  I have no idea.

17  Q.  Did you review a revised CIM?

18  A.  I believe the CIM -- every time a budget changes, the CIM

19  changes so, no, I don't do that on a daily basis.

20  Q.  Are you reviewed a revised CIM since May 8 and 9, since you

21  last testified?

22  A.  I don't remember the last time I reviewed a CIM.

23  Q.  Do you know whether the information that had been incorrect

24  as to Rabo has been corrected in the CIMs?

25  A.  I have no idea.

1    Q.  Would there be anybody else on behalf of the debtors that

2    would be reviewing the information from Forbes other than

3    yourself?

4    A.  I would think our financial advisor Kander.

5    Q.  Anybody else?

6    A.  Not that I'm aware.

7    Q.  Okay.  Mr. Millenkamp, can I have you -- can we pull up

8    Exhibit 1030?  And that is -- if you want to look at a hard

9    copy, that is in the white binder that says "Motion Hearing,

10   June 20."  Do you recognize that document?

11   A.  Perhaps.

12   Q.  Do you recall testifying as to that document for about an

13   hour when you were questioned by your attorney?

14   A.  I don't remember if that's the exact document or not.

15   Q.  Do you recall there was a document that you testified from

16   that discussed who your critical vendors were and that you were

17   asking the Court to pay those amounts and to pay them early?

18   A.  Yes.

19   Q.  And does this document look like the document you were

20   testifying from?

21   A.  It could be.

22   Q.  Now, you said at that May 8 hearing if you look on that

23   exhibit, you testified that JD is it Heiskell Company?

24   A.  Yes.

25   Q.  Was entitled to $113,921 -- 921.89 for goods delivered

1   within 20 days.  Do you see that reference?

2   A.  Yes.

3   Q.  And at the time you were requesting that, you were asking

4   that they get paid as a 503(b)(9) claim, correct?

5   A.  Correct.

6   Q.  And you were requesting that they get that claim early as a

7   critical vendor, correct?

8   A.  Yes.

9   Q.  Do you recall what due diligence that you conducted to

10  testify on May 8 as to the validity of that claim?

11  A.  Of JD Heiskell's claim?

12  Q.  Yes.

13  A.  I probably didn't review it.  That was information provided

14  by my office or financial advisors.

15  Q.  So when you testified to the Court that this 113,000

16  represented goods delivered within 20 days, you didn't know at

17  the time when you testified that that was accurate; is that

18  correct?

19  A.  I would have no idea if each one of those is accurate

20  because I rely on my office staff to provide me that

21  information.  I'm assuming, yes, it's accurate.

22  Q.  Now, on June 14, you took JD Heiskell off of the 503(b)(9)

23  list because they had in fact not supplied goods within the

24  requisite 20 days, correct?

25  A.  I don't recall.  If it was taken off, then it was a

1   correction.  Somebody other than me put that together.

2   Q.  Mr. Millenkamp, do you authorize and review pleadings that

3   are filed in this court on behalf of the debtors before they're

4   filed?

5   A.  Yes.

6   Q.  Okay.  Can you pull up Exhibit 3088?  And page 7.  Do you

7   see this pleading that was filed on behalf of the debtors?

8   A.  Yes.

9   Q.  And it's a supplement to debtor's amended motion for

10  allowance and payment of claims.

11  A.  Yes.

12  Q.  Do you see that JD Heiskell and Company has been completely

13  removed as a 503(b)(9) claimant now?

14  A.  Yes.

15  Q.  So it was not accurate testimony provided to the Court on

16  May 8, correct?

17  A.  Apparently not.

18  Q.  And if you go back to Exhibit 1030, you testified that

19  Automation Works should be paid $23,323.25 for goods supplied

20  within the requisite 20 days.  But then in your supplement filed

21  on June 14, you reduced that amount to $1,287.03.  Why was that

22  claim reduced on June 14?

23  A.  I think it was -- a lot of this was rushed and then when we

24  went back to review it, we found that there was a mistake so

25  they corrected the mistakes and they resubmitted it from what I

1    remember.

2    Q.  So the amount you testified on May 8, was that actually for

3    services and not goods?

4    A.  I don't remember.  If we made the corrections, I would

5    imagine some of it was services that were overstated and they

6    corrected it.

7    Q.  And Automation Works, what type of company is that?

8    A.  They provide a lot of the computer systems, the milk barns

9    and camera systems and so on.

10   Q.  So what kind of services do they provide?

11   A.  They provide those kind of services and we buy a lot of

12   equipment from them as well.  Drives and computers and cameras

13   and so on.

14   Q.  On Exhibit 2034, GJ Verti-Line Pumps.  That entire claim was

15   removed because it was for finance charges, correct?

16   A.  I don't know.

17   Q.  Can we turn to Exhibit 3079?  And it's page 4.  Do you see

18   this invoice for GJ Verti-Lines Pumps, Inc.?  And I'll

19   represent, Mr. Millenkamp, that these are invoices that your

20   office had supplied to our office when we requested support for

21   that Exhibit 1030.  Do you see that that invoice is entirely for

22   finance charges?

23   A.  Yes.

24   Q.  And if you turn to the next page, page 6.  Oh, is that the

25   next page?  And is it also entirely for finance charges?

1    A.  Yes.

2    Q.  And the next page?

3    A.  Yes.

4    Q.  And the next page?

5    A.  Yes.

6    Q.  Okay.  What about the reduction of the Progressive Dairy

7    Service and Supplies.  That had been reduced from $59,254.65 to

8    $4,858.75.

9         MS. MIKKILINENI:  Your Honor, to speed the process

10   along, we would stipulate that there have been changes made to

11   the exhibit -- what exhibit was it?  1030.  He's testified about

12   the process that was taken between that exhibit and what we

13   filed.  There were changes made based on finance charges and

14   services being included.  And so if that's what we're trying to

15   get at, we would stipulate that there have been changes made and

16   he's already testify as to the process rather than going through

17   each one.

18        MS. SCHWAGER:  Your Honor, I'm not going through each

19   one.  I am hitting some of the highlights.  Mr. Millenkamp on

20   behalf of the debtor's testified to this Court under penalty of

21   perjury that each of these were 503(b)(9) claims.  I believe

22   that we are entitled to question the due diligence that was

23   conducted and the type of claims that were requested in

24   Exhibit 1030.

25        COURT:  I'm going to overrule the objection.  I'll give

1   you a little leeway on this, Ms. Schwager.  But let's just --

2        MS. SCHWAGER:  But I will move it along.  I appreciate

3   that, Your Honor.

4        COURT:  Thank you.

5   BY MS. SCHWAGER:

6   Q.  Do you recall what the difference was for Progressive Dairy

7   Services from the $59,000 -- it would be a $55,000 difference.

8   A.  I won't recall any individual questions that you asked me.

9   Q.  But what does -- what goods does Progressive Dairy Services

10  provide to Millenkamp Dairies?

11  A.  Goods and services.  We buy dairy equipment from them, dairy

12  supplies from them and they also provide service work as well.

13  Q.  And clearly -- Clear Lakes Products that was reduced from

14  $133,592.  Do you know what happened there?

15  A.  No.

16  Q.  Now, for Butte Irrigation, Inc., you testified to the Court

17  that they were entitled to $45,241.99 as a 503(b)(9) claim,

18  correct?

19  A.  I don't recall.

20  Q.  Can you turn back to Exhibit 1030?  I think it's the next

21  page.  Do you see towards the bottom under other, it says Butte

22  Irrigation, Inc., is entitled to 503(b)(9) claim of $45,241.99.

23  Do you see that?

24  A.  Yes.

25  Q.  And does Butte Irrigation provide any goods?

1    A.  Yes.

2    Q.  Now, on June 14, you claim they were only entitled to

3    $220.30.  Do you recall the cause for that reduction?

4    A.  No.

5    Q.  Are you aware that Butte Irrigation has been in business for

6    38 years?

7    A.  No.

8    Q.  Are you aware that they state on their website that they're

9    a top 10 dealer nationwide 18 out of 20 years?

10   A.  No.  I had no clue.

11   Q.  Would you agree that they're a leader in the industry?

12   A.  I don't know.

13   Q.  Have you been doing business with them for very long?

14   A.  Yes.

15   Q.  And do you think they provided good services?

16   A.  Good services?

17   Q.  And goods.

18   A.  Yes.

19   Q.  Are they -- are they a leader in the industry?

20   A.  I don't know if they're the leader.

21   Q.  You had filed a declaration from Butte Irrigation which

22   states that the failure to receive the immediate payment of

23   $220.30 would cause Butte Irrigation substantial hardship.  Do

24   you believe that to be a true statement?

25   A.  Yes.

```
 1    Q.  And why is that?
 2    A.  Because they've cut me off from a lot of goods and services
 3    since then.
 4    Q.  And so they'll stop doing business with you if they don't
 5    get paid $220?
 6    A.  I don't know --
 7    Q.  Is that correct?
 8    A.  You'd have to ask them.
 9    Q.  Well, have you asked them?
10    A.  I would be surprised if they would quit doing business over
11    $200 but, yes, if we owe them $200,000, yes, that changes
12    things.
13    Q.  Right.  But you filed a declaration in support of this
14    motion where Butte Irrigation said that it would be a
15    substantial hardship if they weren't paid their 503(b)(9) claim
16    of $220.30 and I'm asking whether you believe that to be a true
17    statement.  That would be a hardship to Butte Irrigation.
18    A.  I answered that question.
19    Q.  And you answered it --
20    A.  No, it would not be a hardship for $200.
21    Q.  Now, you also testified on May 8 Elevation Electric was
22    entitled to an immediate payment of $141,000 but they're only
23    entitled to 5,300.  Do you recall why that reduction occurred?
24    A.  No.
25    Q.  Can I have you -- let's pull up Exhibit 3079.  Actually, I'm
```

1   going to move on.  Let's pull up -- of Exhibit 1032, let's pull

2   up page 1310.  So we're looking for 1310.  It was a big exhibit,

3   Mr. Christensen.  So this was an invoice that you had provided

4   in support of a 503(b)(9) claim of Elevation Electric.  What was

5   this $8,460 invoice in regard to?

6   A.  It's stated on there what it is.

7   Q.  What is it?

8   A.  Possibly some pipe and glue, plugs, cable and some labor.

9   Q.  What does it mean by wedding venue?

10  A.  I don't know.

11  Q.  Were those services being provided for the wedding of your

12  son that's taking place this weekend?

13  A.  Could have been.

14  Q.  What else would it be referring to when it references a

15  wedding venue?

16  A.  I'm assuming that's what it would be for.

17  Q.  And why would the debtors be paying an invoice for a wedding

18  for your son?

19  A.  It's not really for a wedding.  It's for power to get into a

20  spot on our farm.

21  Q.  For the wedding venue?

22  A.  Well, could be used for the wedding venue as well as other

23  farming practices.

24  Q.  Did you request these services because there was going to be

25  a wedding on the location?

1    A.  I wanted power where we're going to have the wedding.

2    Q.  Are there any other non-business expenses that the debtor

3    paid shortly before the bankruptcy filing?

4    A.  I don't know.  I would say this would be -- I'm not aware of

5    any.

6    Q.  Do your children live on the property of the debtor?

7    A.  Yes.

8    Q.  How many?

9    A.  Four.

10   Q.  Are they four different houses?

11   A.  Yes.

12   Q.  And do they pay rent?

13   A.  No.

14   Q.  Are there any other personal expenses that the debtors pay

15   for your children?

16   A.  Yes.

17   Q.  And what are those?

18   A.  Health insurance.

19   Q.  Anything else?

20   A.  I don't know.  Not that I recall.

21   Q.  And what would you look at to make that determination?

22   A.  I'd have to talk to my office staff.

23        MS. SCHWAGER:  Thank you, Your Honor.  I have no

24   further questions.

25        COURT:  Mr. Naess, do you have any cross-examination?

1          MR. NAESS:  Just a few questions, Your Honor.

2          COURT:  Go ahead.

3                          CROSS-EXAMINATION

4   QUESTIONS BY MR. NAESS:

5   Q.  Good morning, Mr. Millenkamp.

6   A.  Good morning.

7   Q.  I just want to go back to your answer in regards to direct

8   questioning by your counsel.  You indicated that the Millenkamp

9   Cattle companies were not getting the best deal because the

10  vendor suppliers are carrying a lot of receivables.  Can you

11  tell me what kind of conversations you've had with those vendors

12  and suppliers in regards to those receivables?

13  A.  Can you ask me specific -- specifically?

14  Q.  Yeah.  I mean I guess specifically, what I want to know is

15  had they told you you're not getting the best deal because of

16  the receivables?

17  A.  There's probably some of that but a lot of it is comparing

18  my prices to some of my peers, some friends.  And yeah, there's

19  times that I pay more than I should just because we're a bigger

20  risk to do business with and we owe these guys a lot of money.

21  Q.  Okay.  So have you had those conversations or is it more

22  just you comparing with others in the industry in the area?

23  A.  I think the majority is comparing with my peers.

24  Q.  Okay.  So do you know what the increased prices you are

25  paying is related to?  And specifically, would you agree that

1    the 503(b)(9) claims are generally less than the total claims

2    that are owed to the creditors?

3    A.  Yes, I believe so.

4    Q.  Okay.  Do you have any indication that the higher prices you

5    might be paying are related to the 503(b)(9) lesser amounts than

6    the full claim amounts?

7    A.  Can you ask that one more time?  Sorry.

8    Q.  Do you have -- what leads you to believe that the 503(b)(9)

9    claim amounts are what's causing the higher payments that you're

10   incurring?

11   A.  I just think that we owe money and when you owe money,

12   you're not going to get the best deal.

13   Q.  Okay.

14   A.  So I don't know if it's directly to the 503(b)(9) or if it's

15   to the total amount.

16   Q.  Sure.  Okay.  Okay.  And then does Brian Huettig --

17   switching gears.  Does he have a title or is he employed by

18   Millenkamp Cattle or any of the Millenkamp entities?

19   A.  No.  He is a partner on H -- he is the managing partner of

20   H & M.

21   Q.  Okay.  Is he communicating with the Millenkamp Cattle

22   entities bankruptcy counsel?

23   A.  Not that I'm aware.  I don't know.

24   Q.  Okay.  Do you know how counsel got Exhibit 1035?

25   A.  I have no clue.

1  Q.  And you testified you'd never seen it?

2  A.  I've never seen them, no.

3  Q.  Did you have a conversation with Mr. Huettig explaining the

4  Millenkamp Cattle now has fiduciary duties that it owes to its

5  creditors?

6  A.  Can you ask that again?

7  Q.  Sure.  Did you have a conversation with Mr. Huettig in which

8  you explained to him that Millenkamp Cattle owes fiduciary

9  duties to its creditors?

10 A.  I don't understand what you're getting at with the

11 fiduciary.  Whose fiduciary duty?

12 Q.  Well, Millenkamp Cattle is now a debtor in possession; is

13 that correct?

14 A.  Correct.

15 Q.  Okay.  And when we had the 341 -- or Mr. Cahoon from our

16 office had the 341 meeting, he asked you some questions about a

17 debtor in possession and being a fiduciary for creditors; is

18 that correct?

19 A.  Correct.

20 Q.  Okay.  And is it your understanding that Millenkamp Cattle

21 as a debtor in possession owes some fiduciary duties to its

22 creditors?

23 A.  Yes.

24 Q.  And Mr. Huettig is negotiating on behalf of the Millenkamp

25 Cattle debtor possession; is that correct?

```
 1   A.  Yes.  Now I understand the question and, yes, he understands

 2   that.

 3   Q.  Okay.

 4   A.  Yes.

 5   Q.  Did you have a conversation with him about those duties

 6   and --

 7   A.  Yes.

 8   Q.  Do you recall when that happened?

 9   A.  No, I don't recall exactly when that happened.

10   Q.  Okay.  And you indicated that it's the normal course of

11   business for him to be doing and engaging in those negotiations.

12   A.  Yes, that's normal course of business for him.

13   Q.  Would you agree that acting as a debtor in possession as

14   opposed to a prepetition, prebankruptcy debtor is different than

15   normal course of business?  Would you agree?

16   A.  I don't think it's any difference.  We're still -- to

17   simplify it, he's out trying to buy corn silage from farmers for

18   us.  The only thing that's changed is how are the farmers going

19   to get their money.  So the negotiations would be the same.

20   It's just the terms of the payment.

21   Q.  Okay.  But the terms of the payment are a little different

22   in that now you're being required to provide a deposit, right?

23   A.  Correct, yes.

24   Q.  And then one point, you indicated that you don't know --

25   switching gears again -- what David Heida has done in regards to
```

70

1    working with potential refinancers?

2    A.  I'm sure David Heida has had conversations on his own with

3    potential lenders.  David Heida helps provide a lot of the

4    information -- financial information that they are requesting.

5    David is getting a lot of that and sending that to them.  So I'm

6    sure he's having some sort of conversations with some of those

7    potential lenders.

8    Q.  Can you help me understand how the Millenkamp Cattle debtor

9    in possession is operating and being managed?  Is there

10   coordination going on between you and the various parties that

11   are negotiating on your behalf?

12   A.  There's not a lot of people that are negotiating.  Brian

13   Huettig on behalf of H & M is negotiating the silage part of it.

14   Other than that, most of it comes to me.

15   Q.  Okay.  Okay.

16         MR. NAESS:  No further questions, Your Honor.  Thank

17   you.

18         COURT:  Thank you, Mr. Naess.  Counsel for Conterra.

19         MR. O'BRIEN:  Conterra's questions have been asked and

20   rather than being redundant, we have no questions.

21         COURT:  All right.  Mr. Green, any cross-examination?

22         MR. GREEN:  No, Your Honor.

23         COURT:  All right.  Redirect.

24                          REDIRECT EXAMINATION

25   QUESTIONS BY MS. MIKKILINENI:

1  Q.  Mr. Millenkamp, you were asked about the Steel Ranch and

2  Dusty Brow contracts.  Do you recall that?  She pulled them up.

3  A.  Yes.

4  Q.  And have you signed those?

5  A.  No.

6  Q.  And why not?

7  A.  Because we're waiting to hear if we get approval to make 50

8  percent deposits to these farmers.

9  Q.  And are the contracts subject to bankruptcy court approval?

10 A.  Yes.

11 Q.  Will the 2 and a half million dollars as a deposit for the

12 corn silage get you the amount you need for corn silage to

13 continue operating in the ordinary course?

14 A.  Yes.

15 Q.  Will the 2 and a half million dollars as a deposit for hay

16 and straw get you the amount you need for hay and straw?

17 A.  Yes.

18 Q.  Will changing the percentage amount for the deposit change

19 the ultimate price for what you need to move forward?

20 A.  Yes.

21 Q.  The amount you need to move forward, is that the amount that

22 you need to move forward?

23 A.  No.

24 Q.  Can you explain that?

25 A.  Can you ask that question again?

```
1    Q.  So the amount that you need to move forward --

2    A.  On the deposit or overall?

3    Q.  Overall.  Is that the amount that you would need for the

4    year to buy corn silage?

5    A.  No.  It would be 50 percent of what we need.

6    Q.  Okay.  So the overall amount that you need for corn silage,

7    what would that be approximately?

8    A.  6 to 8 million.

9    Q.  Okay.

10   A.  It depends on how many acres we buy.

11   Q.  And does that amount change dependent on the percentage of

12   the deposit?

13   A.  Yes.

14   Q.  Why?

15   A.  If you don't put a deposit down, we won't be able to buy the

16   silage.

17   Q.  Okay.  But the overall amount stays the same.

18   A.  Yes.

19   Q.  Do some farmers need to know the amount that will ultimately

20   be purchased before they plant?

21   A.  Yes.

22   Q.  And does that go into the decision on whether to require a

23   deposit?

24   A.  It could.

25   Q.  Earlier, Ms. Schwager asked you about Lisa in your office
```

1   and said her last name is Millenkamp.  Is that correct?

2   A.  No.

3   Q.  Is she related to you?

4   A.  No.

5   Q.  You were asked about whether the farmers could grant a

6   security interest.  Do you know what they would grant a security

7   interest in?

8   A.  No.

9   Q.  Why were the corn silage farmers not paid during the

10  receivership?

11  A.  The receivership -- the receivers made promises to get

12  letters of credit in payment to the farmers as well as H & M and

13  it was just never honored.

14  Q.  And where were those letters of credit supposed to come

15  from?

16  A.  They were supposed to come from Rabo.  In fact, we were in

17  Ms. Schwager's office for a full day working on those.  We

18  thought that the letters of credit were going to go out.  Brian

19  Huettig thought the letters of credit were going to go out and

20  so did several other of our vendors and it never happened.

21  Q.  In the bankruptcy case, has Rabo repeatedly objected to your

22  requests to pay creditors?

23  A.  Every single time.

24  Q.  Does that continued objection worry the farmers?

25  A.  Absolutely.

```
1    Q.  Do you know if some of the additional information that
2    Forbes has requested is the accountant-prepared financial
3    records for the prepetition period?
4    A.  Yes, it is.
5    Q.  And has the accountant finished those records?
6    A.  No.  The receivership has chased off Eide Bailly, our
7    accounting firm, so that's put a delay to that.
8    Q.  And you have a new accountant now; is that correct?
9    A.  Yeah, yes.
10   Q.  I'm going to pull up Exhibit 1030 again.  Do you see that on
11   your screen?
12   A.  Yes.
13   Q.  Okay.  And do you know whether this exhibit was used in
14   connection with the critical vendor motion?
15   A.  I'm not sure.
16   Q.  But do you see it has a list of critical vendors; is that
17   correct?
18   A.  Yes, I do see that.
19   Q.  The goods delivered within the 20 days, was that based on
20   your preliminary view of the 503(b)(9) claims?
21   A.  Yes, it was.
22   Q.  And was it based on your knowledge at that time?
23   A.  Yes, it was.
24   Q.  And you've now later further analyzed and updated the
25   information; is that correct?
```

1    A.  Yes, we did.

2    Q.  Are your kids employed by the debtors?

3    A.  Yes.

4    Q.  And are the houses part of their compensation?

5    A.  Yes.

6          MS. MIKKILINENI:  No further questions, Your Honor.

7          COURT:  Thank you.  Any cross-examination?  Counsel,

8    for MetLife?

9          MR. BINGHAM:  No, Your Honor.

10         COURT:  Unsecured Creditor Committee?

11         MR. KREMER:  No, Your Honor.

12         COURT:  Rabo AgriFinance?

13         MS. SCHWAGER:  No further questions, Your Honor.

14         COURT:  Mr. Naess.

15         MR. NAESS:  No.  Thank you.

16         COURT:  Counsel for Conterra?

17         MR. O'BRIEN:  No, Your Honor.

18         COURT:  Counsel for Viterra?

19         MR. GREEN:  No, Your Honor.

20         COURT:  All right.  You may step down.

21         MS. MIKKILINENI:  Your Honor, we'd ask that Bill

22    Millenkamp be excused for the day.

23         COURT:  Is there any objection to excusing

24    Mr. Millenkamp?

25         MS. SCHWAGER:  No objection, Your Honor.

1          COURT:  All right.  That will be fine.

2          MS. MIKKILINENI:  Then I was going to mention, we do

3    have one witness that was hoping to get on and off by 11:00.  I

4    was hoping to call them as a witness and then maybe take a

5    break.  But is that all right?

6          COURT:  All right.  Go ahead.

7          MS. MIKKILINENI:  Thank you, Your Honor.  We'd like to

8    call Mr. Burk Higley.

9          COURT:  Please come up to the witness stand and remain

10   standing when you get here so you can be sworn in by Ms. Battle,

11   the courtroom deputy.

12                    (BURKE HIGLEY is sworn.)

13          CLERK:  Please have a seat.  Once seated, please state

14   your name and spell your last name for the record.

15          WITNESS:  Burke Higley, H-i-g-l-e-y.

16          CLERK:  Thank you.

17                    DIRECT EXAMINATION

18   QUESTIONS BY MS. MIKKILINENI:

19   Q.  Good morning, Mr. Higley.

20   A.  Good morning.

21   Q.  Who do you work for?

22   A.  Amalgamated Sugar Company.

23   Q.  What is your position there?

24   A.  I am the senior manager of feed products.

25   Q.  Does Amalgamated Sugar work with the debtors?

1    A.  Yes, we do.

2    Q.  What is your business relationship?

3    A.  We sell Millenkamp Cattle wet and dry beet pulp, feed.

4    Q.  Sorry.

5    A.  Feed products.

6    Q.  Okay.  How long has Amalgamated Sugar been supplying goods

7    to the debtors?

8    A.  To the best of my knowledge, since 2011.

9    Q.  Did you supply goods between March 13, 2024, and April 2,

10   2024?

11   A.  Yes, we did.

12   Q.  Does Millenkamp Cattle still owe Amalgamated Sugar money for

13   goods delivered?

14   A.  Yes, they do.

15   Q.  How much is owed for goods delivered between March 13 and

16   April 2?

17   A.  I believe it's $230,824.66.

18   Q.  What would happen to Amalgamated Sugar if that amount is not

19   paid until plan confirmation?

20   A.  That would effect some undue financial hardship on the Mini

21   Cassia facility as Mr. Millenkamp and Millenkamp Cattle are the

22   largest customer that we have contracted to that facility.

23   Q.  So when would you say you need the payment?

24   A.  As soon as we can get it.

25   Q.  What will happen to your business relationship with

1    Millenkamp Cattle if you are not paid the 503(b)(9) claim prior

2    to confirmation?

3    A.  So we are currently in contracting for our next season crop

4    feed products and if we don't receive that payment, it will be

5    very hard for us to go on and do business with Millenkamp

6    Cattle.

7    Q.  If Amalgamated Sugar does not supply goods to Millenkamp

8    Cattle, is there anyone else in the state of Idaho that can

9    provide the products at the same level as you do?

10   A.  Not the products that we provide.

11   Q.  Can you explain that a little more?

12   A.  Yeah, we are the only beet byproduct company within the

13   state of Idaho that he could, yeah, get that from.

14   Q.  Where would he have to go?

15   A.  If you wanted beet product, his nearest place would probably

16   be Colorado but he would probably look at alternative feeds.

17   Q.  Okay.

18          MS. MIKKILINENI:  No further questions at this time.

19          COURT:  Cross-examination.  Counsel for MetLife?

20          MR. BINGHAM:  No, Your Honor.

21          COURT:  Unsecured Creditor Committee?

22          MR. KREMER:  No, Your Honor.

23          COURT:  Rabo AgriFinance?

24          MS. SCHWAGER:  No, Your Honor.  Thank you.

25          COURT:  Mr. Naess?

```
 1                        CROSS-EXAMINATION

 2   QUESTIONS BY MR. NAESS:

 3   Q.  Good morning, Mr. Higley.  Can you -- so you indicated that

 4   Amalgamated Sugar is involved in feed product sales; is that

 5   correct?

 6   A.  Yes, sir.

 7   Q.  What else does Amalgamated Sugar do?

 8   A.  Produces sugar.

 9   Q.  Okay.  How does the feed product sales side of the business

10   fit into the overall Amalgamated Sugar business?  Can you

11   describe that to me?

12   A.  So, we're grouped as one.  We are separated in how we I

13   guess evaluate that business.  We're held accountable to our own

14   P and L at the end of the day.

15   Q.  Okay.

16   A.  Yeah.

17   Q.  And are there other business -- sub businesses, for lack of

18   a better word, beneath the Amalgamated Sugar umbrella?

19   A.  There is, sir.

20   Q.  What are those?

21   A.  Amalgamated Research, Incorporated.

22   Q.  Okay.  Is that the only other one?

23   A.  To my knowledge, yes.

24   Q.  Okay.  And what percentage of Amalgamated Sugar's revenue

25   would you say is generated by the feed sales aspect of the
```

1  business?

2  A.  I do not know that right off the top of my head.

3  Q.  Okay.  You mentioned that Millenkamp Cattle is the largest

4  customer of the Mini Cassia facility.

5  A.  Yes, sir.

6  Q.  What is it that the Mini Cassia facility does?

7  A.  So it does the same thing as the rest of our facilities do.

8  They'll produce a wet beet pulp product and then they'll dry

9  beet pulp product as well.

10 Q.  Okay.  And so is that a sugar processing plant?

11 A.  Yes, it is.  Yep.  And beet pulp is a byproduct of the sugar

12 processing.

13 Q.  Okay.  So the beet -- the beets are turned into sugar.

14 There's a byproduct beet pulp and then you sell the beet pulp to

15 customers like Millenkamp Cattle; is that correct?

16 A.  Yes, sir.

17 Q.  Okay.  Is the primary purpose of that facility to sell

18 byproduct or is it to make sugar?

19 A.  It's to make sugar.

20 Q.  Okay.  Do you know how much revenue the feed product sales

21 side generates in a given year?

22 A.  It's generally around 120 to $130 million.

23 Q.  Okay.  And how about (inaudible) quarter?  Do you know?

24 A.  What's that?  Per quarter?

25 Q.  Any given quarter; do you know?

1    A.   No.

2    Q.   Okay.  And the amount that we're talking about with

3    Millenkamp Cattle was 230,000 and some change?

4    A.   Uh-huh.

5    Q.   Of, what was that, 130 million?

6    A.   Yes, sir.

7    Q.   Do you recall when the last time that Amalgamated Sugar

8    received payment from Millenkamp Cattle was?

9    A.   I do not know that.

10   Q.   Okay.  Have you stopped delivering byproduct to Millenkamp

11   Cattle?

12   A.   Currently, I believe we have now, yes.

13   Q.   Okay.  Do you know when that stopped?

14   A.   I don't know that.

15   Q.   Okay.  Has Amalgamated Sugar provided byproducts since the

16   bankruptcy began?

17   A.   I don't know for sure.

18   Q.   Okay.  Do you know if it's received cash on demand payments?

19   Has it been that sort of arrangement with Millenkamp Cattle?

20   A.   I do believe even prior to the bankruptcy there was cash

21   before delivery.

22   Q.   Okay.

23   A.   Yeah.

24   Q.   But you don't know if that's happened after the bankruptcy?

25   A.   Yeah, I don't know how much has been delivered afterwards to

1   be honest with you.  I don't know.

2   Q.  Okay.  What's your understanding of bankruptcy plans and the

3   bankruptcy plan confirmation process?

4   A.  Not that much.

5   Q.  Okay.  Do you have any idea how long it takes for a plan to

6   get confirmed?

7   A.  Six months.

8   Q.  Okay.  And so I guess the question I have is what hardship

9   does a delay in the 230,000 that's owed by Millenkamp Cattle --

10  so if you're paid at six months at plan confirmation, there's a

11  six-month delay, what's the hardship there?  Can you describe

12  that for me?

13  A.  Yeah.  We will not sell -- we'll start campaigning September

14  and we will not sell Millenkamp Cattle product and we will have

15  to look elsewhere to find and generate that same revenue.

16  Q.  Okay.  Do you think that you'd be able to?

17  A.  It's a large volume and it may affect overall our price in

18  the market.

19  Q.  Okay.

20          MR. NAESS:  No further questions, Your Honor.

21          COURT:  Thank you, Mr. Naess.  Mr. O'Brien, go ahead.

22                          CROSS-EXAMINATION

23  QUESTIONS BY MR. O'BRIEN:

24  Q.  Could Millenkamp Cattle change its feed rations to

25  substitute a reasonably equivalent ingredient?

1    A.  That would be a question for a dairy nutritionist.  I

2    couldn't tell you that.

3    Q.  Does every single dairy in Idaho buy beet product from you?

4    A.  A lot of them do.  I don't think every single one does.

5    Q.  Thank you.

6            COURT:  Mr. Green.

7            MR. GREEN:  No, Your Honor.  I have nothing.

8            COURT:  All right.  Any redirect?

9            MS. MIKKILINENI:  No.

10           COURT:  All right.  You may step down.

11           MS. MIKKILINENI:  We have more witnesses but we're also

12   okay if you want to take a break at this time.

13           COURT:  All right.  I think it is a good --

14           MS. MIKKILINENI:  I'm sorry.  Can we ask that he be

15   excused for the day?

16           COURT:  Is there any objection to the witness being

17   excused?

18           MS. SCHWAGER:  No objection, Your Honor.

19           COURT:  That's fine.  Why don't we go ahead and take a

20   break.  It's about a quarter till.  Why don't we come back in

21   about 10 to 15 minutes.

22           One thing I did want to mention, Ms. Schwager, I can't

23   locate Exhibit 3074 which I believe was stipulated to previously

24   as being admitted.  I'm not finding it at least in my binder so

25   maybe during the break, we could just track that down.

1          MS. SCHWAGER:  We will fix that.  Thank you, Your

2     Honor.

3          COURT:  All right.  Thank you.

4          CLERK:  All rise, please.

5                              (Recess taken.)

6          COURT:  Please be seated.  All right.  Ms. Mikkilineni,

7     does the debtor have additional witnesses?

8          MS. MIKKILINENI:  We do have an exhibit that we wanted

9     to mention that has been stipulated to that hadn't been

10    previously.  It's Exhibit 1032.  We wanted to admit that.

11         COURT:  Okay.  All right.  Exhibit 1032 has been

12    offered for admission.  Any objection?  All right.  Exhibit 1032

13    will be admitted.

14                    (Debtor's Exhibit No. 1032 admitted.)

15         COURT:  And that reminds me, I wanted to circle back

16    with counsel for Rabo on that Exhibit 3074.  Were you able to --

17         CLERK:  Yes, Your Honor.  We figured it out.

18         COURT:  Oh, great.

19         CLERK:  3074 is in there.

20         COURT:  Great.  All right.  You ready to proceed?

21         MS. MIKKILINENI:  I'd like to call Mr. Brett Nelson to

22    the stand.

23         COURT:  All right.  Mr. Nelson, please come up to the

24    stand and remain standing when you get here so you may be sworn

25    in.

```
 1                      (BRETT JAMES NELSON is sworn.)

 2           CLERK:  Please have a seat and please state your name

 3  and spell your last name for the record.

 4           WITNESS:  Brett James Nelson, N-e-l-s-o-n.

 5           CLERK:  Thank you.

 6                         DIRECT EXAMINATION

 7  QUESTIONS BY MS. MIKKILINENI:

 8  Q.  Good morning, Mr. Nelson.

 9  A.  Good morning.

10  Q.  Who do you work for?

11  A.  I'm owner and operator of Dusty Brow Farms.

12  Q.  And what does Dusty Brow Farms do?

13  A.  We grow row crops and grains.

14  Q.  And has Dusty Brow worked with Millenkamp Cattle in the

15  past?

16  A.  Yes.

17  Q.  And what do you supply to Millenkamp Cattle?

18  A.  Corn silage.

19  Q.  And for how long have you worked with them?

20  A.  This will be the third year if we go this year.

21  Q.  Does Millenkamp Cattle currently owe you money?

22  A.  Yes.

23  Q.  And do you make agreements to sell your corn silage just in

24  general?

25  A.  Yes.
```

1   Q.  When do you make those agreements?

2   A.  Usually in the springtime.

3   Q.  And why do you make those agreements at that time?

4   A.  Just decide what I'm going to plant basically.  If I'm going

5   to plant the corn or not.  If I don't have a contract, usually

6   probably either try to look for another avenue to sell or --

7   Q.  And when is the corn silage ready for chopping?

8   A.  It would be around end of September, October.

9   Q.  We're going to pull up Exhibit 1035.  You should be able to

10  see it on your screen in a minute.  Do you see that?  Can we go

11  to the second page?

12  A.  Yes.

13  Q.  Okay.  Do you recognize this document?

14  A.  Yes.

15  Q.  And what is it?

16  A.  It's a contract that the attorneys drew up because

17  Millenkamp thought he might need silage for this year and need

18  some kind of agreement because we told him that we wouldn't

19  (inaudible) the corn silage on the same agreement we had last

20  year.

21  Q.  When you say attorneys, which attorneys?

22  A.  Rob Williams.

23  Q.  And so is this contract proposed by Dusty Brow to Millenkamp

24  Cattle?

25  A.  Yes.

1   Q.  And how many acres of corn is available for Millenkamp

2   Cattle to purchase from Dusty Brow?

3   A.  It would be 134 acres.

4   Q.  And what is the purchase price for the corn?

5   A.  I believe it was $43 a ton.

6   Q.  Is Dusty Brow requiring a deposit to move forward with this

7   sale?

8   A.  Yes.

9   Q.  And how much?

10  A.  50 percent.

11  Q.  And when is the remainder of the purchase price due?

12  A.  I believe in November.

13  Q.  And why is Dusty Brow requiring a deposit?

14  A.  Well, basically, we didn't get paid fully last year yet and

15  if I'm going to grow silage corn, I need money to pay expenses,

16  fertilizer expense, things like that.

17  Q.  Have you ever required Millenkamp Cattle to make a deposit

18  in the past?

19  A.  No.

20  Q.  And so why are you requiring one now?

21  A.  Just basically what happened last year.

22  Q.  If for some reason the corn silage does not end up being

23  available to Millenkamp after he makes the deposit, would you be

24  able to repay the deposit to Millenkamp?

25  A.  Yes.

```
 1              MS. MIKKILINENI:  I have no further questions.  Thank
 2    you.
 3              COURT:  All right.  Cross-examination.  Counsel for
 4    MetLife?
 5              MR. BINGHAM:  None, Your Honor.
 6              COURT:  Counsel for the Unsecured Creditor Committee?
 7              MR. KREMER:  No, Your Honor.
 8              COURT:  Counsel for Rabo AgriFinance?
 9              MS. SCHWAGER:  No, Your Honor.  Thank you.
10              COURT:  Mr. Naess.
11              MR. NAESS:  No.  Thank you.
12              COURT:  Counsel for Conterra?
13              MR. O'BRIEN:  No, Your Honor.
14              COURT:  And counsel for Viterra Grain?
15              MR. GREEN:  No, Your Honor.
16              COURT:  All right.  You may step down.  Thank you.
17              MS. MIKKILINENI:  Your Honor, we'd ask that Mr. Nelson
18    be excused for the day.
19              COURT:  Any objection?
20              MS. SCHWAGER:  No objection, Your Honor.
21              COURT:  Okay.  The witness is excused.
22              MS. MIKKILINENI:  We would next like to call Mr. Cody
23    Nelson.
24              COURT:  Mr. Nelson, please come up to the stand and
25    remain standing when you get here so you may be sworn in.
```

1                              (CODY NELSON is sworn.)

2              CLERK:  Thank you.  Please have a seat.  Once seated,

3      please state your name and spell your last name for the record.

4              WITNESS:  Cody Nelson, N-e-l-s-o-n.

5              COURT:  Thank you.

6                          DIRECT EXAMINATION

7      QUESTIONS BY MS. MIKKILINENI:

8      Q.  Good morning, Mr. Nelson.

9      A.  Good morning.

10     Q.  Who do you work for?

11     A.  I am the owner operator of Steel Ranch, LLC.

12     Q.  And what does Steel Ranch do?

13     A.  Farm, run a few cows.

14     Q.  I'm sorry.  Can you --

15     A.  We farm and run a few cows.  Like we run a few cow/calf

16     pairs.  We grow corn silage, beets, hay, barley, beans.

17     Q.  And does Steel Ranch currently work with Millenkamp Cattle?

18     A.  We're thinking about selling them corn silage for the 2024

19     season.

20     Q.  And has Steel Ranch worked with Millenkamp Cattle in the

21     past?

22     A.  I believe four years.

23     Q.  And what did you supply to Millenkamp Cattle?

24     A.  Only corn silage.

25     Q.  And does Millenkamp Cattle currently owe Steel Ranch money?

```
 1    A.   Yep.
 2    Q.   Do you generally make agreements to sell your corn silage?
 3    A.   Yes.
 4    Q.   And when do you make those agreements?
 5    A.   In the spring time so we kind of know what we're going to
 6    plant and you got to know how much we're going to make for the
 7    year to pay our bills.
 8    Q.   And you should have Exhibit 1035 in front of you.  Do you
 9    see that?
10    A.   Yes.
11    Q.   Do you recognize this document?
12    A.   Yep.
13    Q.   What is it?
14    A.   It's a contract that we got from our lawyers to have an
15    agreement to maybe sell corn silage to Bill Millenkamp and to
16    make sure that we have some money up front in case something
17    goes wrong again.
18    Q.   And so was this proposed by Steel Ranch to Millenkamp
19    Cattle?
20    A.   Proposed by Steel Ranch?
21    Q.   Yes.
22    A.   For this contract?
23    Q.   Yes.
24    A.   We were on open market for a while and weren't sure if we
25    were going to sell to Bill or what we were going to do with it
```

1    and this contract was -- we were kind of asked if we wanted to

2    go for him and then this contract was supplied by our lawyers

3    and looked it over and thought about it and we decided to talk

4    to lawyers about going this avenue, going this way.

5    Q.   And how many acres of corn is available for Millenkamp

6    Cattle to purchase from Steel Ranch?

7    A.   170.

8    Q.   What is the purchase price for the corn?

9    A.   43.

10   Q.   Is Steel Ranch requiring a deposit to move forward with the

11   sale?

12   A.   Yes.  We're probably just let it go for the combine instead.

13   We'll harvest it ourself and sell it somewhere else.

14   Q.   Can you say that again?  I'm sorry.

15   A.   If we don't sell through Bill, we'll probably just thresh it

16   ourselves and sell it through a different avenue.  Go through --

17   take it to grain corn instead of silage corn.

18   Q.   And you'll do that if you don't receive a deposit from Bill?

19   A.   Yep.

20   Q.   And how much is the deposit?

21   A.   50 percent down.

22   Q.   And when is the remainder of the purchase price due?

23   A.   I believe in November.

24   Q.   And so why is Steel Ranch requiring a deposit?

25   A.   We need some security because this last year was quite

1  stressful when you don't get paid.  I'm a small business -- our

2  debt wasn't very much to him but to us, it was a lot of money

3  and a lot of stress.

4  Q.  And have you ever required Millenkamp Cattle to make a

5  deposit before?

6  A.  Nope.

7  Q.  And so why are you requiring it now if you haven't in the

8  past?

9  A.  We need some money up front to know that he actually can,

10  you know, get his stuff together hopefully and get his bills

11  paid and that's a step in the right direction.  We sell hay and

12  we have -- our hay guy usually pays us 80 percent down before

13  that hay leaves our property.  It's almost bad practice that

14  farmers have had to let stuff leave their property without

15  getting some money down.  And contracts unfortunately didn't

16  seem to do much which is unfortunate.

17  Q.  And so have you required deposits in the past for any of our

18  other customers?

19  A.  Yeah.  All of our dry hay that -- our hay buyer usually

20  gives us 80 percent down.  80 percent down is usually what it is

21  on the estimated bale weight.

22  Q.  If for some reason the corn silage is not available after

23  Millenkamp Cattle makes the deposit, will you be able to repay

24  that deposit to Millenkamp Cattle?

25  A.  Yes.  I got multiple incomes that I can make -- I can make

1    it right back to him.

2         MS. MIKKILINENI:  Thank you.  I have no further

3    questions.

4         WITNESS:  Thank you.

5         COURT:  Cross-examination.  Counsel for MetLife?

6         MR. BINGHAM:  No, Your Honor.

7         COURT:  Counsel for Unsecured Creditors?

8         MR. KREMER:  No, Your Honor.

9         COURT:  Rabo?

10         MS. SCHWAGER:  No, Your Honor.  Thank you.

11         COURT:  Mr. Naess?

12         MR. NAESS:  No.  Thank you.

13         COURT:  And counsel for Conterra?

14         MR. O'BRIEN:  No, Your Honor.

15         COURT:  Counsel for Viterra?  Green?

16         MR. GREEN:  No, Your Honor.

17         COURT:  Okay.  You may step down.  Thank you.

18         MS. MIKKILINENI:  Your Honor, may he be excused for the

19    day?

20         COURT:  Any objection?

21         MS. SCHWAGER:  No objection, Your Honor.

22         COURT:  The witness is excused.

23         MS. MIKKILINENI:  I would like to call Ms. Debbie Gomes

24    to the stand, please.

25         COURT:  Ms. Gomes, please come up to the witness stand

```
 1   and remain standing so you may be sworn in.

 2                          (DEBBIE GOMES is sworn.)

 3        CLERK:  Please have a seat.  Once seated, please state

 4   your name.  Spell your last name for the record.

 5        WITNESS:  Debbie Mashado (phonetic) Gomes, G-o-m-e-s.

 6        CLERK:  Thank you.

 7                       DIRECT EXAMINATION

 8   QUESTIONS BY MS. MIKKILINENI:

 9   Q.  Good morning, Ms. Gomes.

10   A.  Good morning.

11   Q.  Who do you work for?

12   A.  Golden State Mixes d/b/a American Calf Products.

13   Q.  What is your position there?

14   A.  I'm the office manager.

15   Q.  Does American Calf Products work with Millenkamp Cattle?

16   A.  Yes.

17   Q.  What is your business relationship?

18   A.  We currently sell milk replacer and proteins and fats.

19   Q.  How long has American Calf Products been supplying these

20   goods to Millenkamp?

21   A.  Almost 10 years.

22   Q.  Did American Calf Products supply goods between par 13,

23   2024, and April 2, 2024?

24   A.  Yes.

25   Q.  Does Millenkamp Cattle still owe American Calf Products
```

1    money for goods delivered?

2    A.  Yes, yes.

3    Q.  How much is owed for goods delivered between March 13 and

4    April 2?

5    A.  Roughly $194,332.88.

6    Q.  What would happen to American Calf Products if that amount

7    is not paid until plan confirmation?

8    A.  We're a small milk replacer manufacturer.  We have a

9    location in Idaho but we're based out of California.  Just in

10   the last week, I had a tough time making payroll.  So it has

11   been an impact to the company.  For future, I don't know that we

12   will keep our Idaho location open because Millenkamp is 25

13   percent of our sales for our company.

14   Q.  What will happen to the business relationship with

15   Millenkamp Cattle if American Calf Products is not paid its

16   503(b)(9) claim prior to confirmation?

17   A.  It could potentially stop future sales.

18           MS. MIKKILINENI:  No further questions.  Thank you.

19           COURT:  Cross-examination.  Counsel for MetLife?

20           MR. BINGHAM:  No, Your Honor.

21           COURT:  Counsel for the Unsecured Creditor Committee?

22           MR. KREMER:  No, Your Honor.

23           COURT:  Counsel for Rabo AgriFinance?

24           MS. SCHWAGER:  No, Your Honor.  Thank you.

25           COURT:  Mr. Naess?

CROSS-EXAMINATION

QUESTIONS BY MR. NAESS:

Q.  Good morning, Ms. Gomes.

A.  Morning.

Q.  So you indicated that American Calf Products sells milk replacer, proteins, fats.

A.  Electrolytes, yeah.

Q.  Electrolytes, okay.  Does it do anything else besides provide those goods or services or is that it?

A.  That's it.

Q.  Okay.  And you indicated that you're based out of California?

A.  Yes.

Q.  Okay.  How many facilities in California does American Calf Products have?

A.  Just one.

Q.  Besides --

A.  Excuse me.  I'm sorry.  Excuse me.  Manufacturing?  Can you be a little more specific?

Q.  I guess what all -- describe for me American Calf Products, the organization.

A.  Okay.  We have a -- our only manufacturing plant left is in California and then we have a warehouse in (inaudible).

Q.  Okay.  Besides manufacturing facilities and warehousing facilities, are there other facilities that American Calf

1    Products has?

2    A.   Yes, in Idaho.

3    Q.   Okay.  And what kind of a facility is it in Idaho?

4    A.   In Idaho, it's just the warehouse.

5    Q.   Okay.  Besides California and Idaho, are there other states

6    where American Calf Products has facilities?

7    A.   We used to be -- have another warehouse and a manufacturing

8    plant in New Mexico but after Covid, we closed that down.

9    Q.   Okay.  And besides those three states --

10   A.   We have sales outside of those two states but no other

11   locations, no.

12   Q.   Okay.  What states does American Calf Products sell to?

13   A.   Missouri, South Dakota, Arizona, Oregon, Idaho and

14   California.

15   Q.   Okay.  And the Idaho warehousing facility, does it just

16   warehouse product for Idaho customers or does it also warehouse

17   products for customers in other states?

18   A.   Just Idaho customers.

19   Q.   Okay.  Can you give me a ball park on how many customers

20   American Calf Products has, if you know?

21   A.   I don't know.  I can tell you what our gross revenues are

22   but that's --

23   Q.   Sure.  Go ahead with that.

24   A.   24 million a year.

25   Q.   24 million a year.  Okay.  And how many employees does

1  American Calf Products have?

2  A.  Currently, 28.

3  Q.  How many employees in Idaho?

4  A.  Two.

5  Q.  Does American Calf Products currently provide any goods to

6  Millenkamp Cattle?

7  A.  Yes, we are.

8  Q.  Okay.  And what are the terms of that --

9  A.  COD.

10  Q.  Okay.  Is Millenkamp paying?

11  A.  Yes.

12  Q.  And how long has that been going on, the cash on delivery

13  arrangement?

14  A.  Over four weeks.

15  Q.  Okay.  And is the amount that you're receiving cash on

16  delivery insufficient for American Calf Products to meet

17  payroll?

18  A.  It doesn't meet our payroll, no.  It's sufficient that we

19  receive it but the back money that's owed is creating a damper

20  on the company.

21  Q.  Okay.  Can you describe for me -- when you're going to meet

22  payroll, how much of payroll is paid based on current cash

23  deliveries and how much of it relies on past due receivables?

24  A.  I'm sorry.  Can you ask that again?

25  Q.  Well, if your current cash is not sufficient to meet your

1    payroll, then you must be relying on other sources?

2    A.   Other customers, yes.

3    Q.   Right.  What are those other sources of income?

4    A.   From our other customers.  Our other customers sales.

5    Q.   Yeah.  Are they --

6    A.   From sales of --

7    Q.   Past sales?

8    A.   Yes, from previous sales.

9    Q.   Okay.  So do you have other customers that owe you money

10   currently?

11   A.   Yes, we do.

12   Q.   Is Millenkamp Cattle the only one that is not paying the

13   past due amounts?

14   A.   No, we have multiple bankruptcy cases right now open.

15   Q.   Okay.

16   A.   In California.

17   Q.   What percentage of the amounts owed in the many bankruptcies

18   would you say the 194,000 and change is?

19   A.   What percentage?  I'm sorry?

20   Q.   Of the amounts that are owed just in your bankruptcy

21   portfolio is the 194,000 --

22   A.   Probably about 80 percent.

23   Q.   80 percent?  Okay.  And so for American Calf Products, it

24   looks like the 194,000 also is the entire claim that's owed?  Is

25   that accurate or do you know?

1   A.   No.   There's a previous invoice as well that's not paid.

2   Q.   Okay.   How much is that?

3   A.   Approximately 43,000.

4   Q.   Okay.   And I'm going to propose a hypothetical to you.   A

5   hypothetical is you continue to receive cash on delivery from

6   Millenkamp Cattle for new product and you're paid the $194,333

7   within the next four to six months.   Will that lead to the

8   closure of the company?

9   A.   No.   I would assume not.   I can't predict what's going to

10  happen in the future but if we receive payment, it will help the

11  company move forward, yes.

12  Q.   Okay.   I guess what I'm trying to drill down on is the

13  timing of that payment, right?   What's the harm from not

14  immediate payment versus the payment in six months?

15  A.   Well, we'll be selling some liquid assets that we have just

16  to make payroll next week.

17  Q.   Okay.

18  A.   So it's detrimental that we receive it as soon as possible.

19  Q.   Okay.

20  A.   It's not just payroll.   It's paying our vendors obviously

21  and when we send loads to Millenkamp, obviously we have to pay

22  for that product.   Even though we're getting paid for

23  ingredients, we have expense on top of it so --

24  Q.   Okay.   And if you're paid that $194,000, will you be able to

25  make that payroll without selling those assets?

```
 1   A.  Yes.

 2   Q.  Okay.  And the payroll following that as well?

 3   A.  Yes.

 4   Q.  Okay.  Will the $194,000 allow you to make payroll between

 5   now and six months from now?

 6   A.  No.

 7   Q.  At what point will receipt of that $194,000 run out so that

 8   you're required to sell --

 9   A.  Four weeks.

10   Q.  Four weeks?  Okay.

11        MR. NAESS:  No further questions, Your Honor.

12        COURT:  Thank you, Mr. Naess.  Counsel for Conterra.

13                      CROSS-EXAMINATION

14   QUESTIONS BY MR. O'BRIEN:

15   Q.  Would you agree that a prepayment for a future delivery is

16   essentially a loan to your company for future deliveries?

17   A.  Yes.

18        MR. O'BRIEN:  Thank you.

19        COURT:  Counsel for Viterra?

20        MR. GREEN:  Nothing, Your Honor.

21        COURT:  All right.  And any redirect?

22        MS. MIKKILINENI:  No, Your Honor.

23        COURT:  All right.  You may step down.  Thank you.

24        MS. MIKKILINENI:  We would ask for Ms. Gomes to be

25   excused.
```

```
 1            COURT:  Any objection?

 2            MS. SCHWAGER:  No objection, Your Honor.

 3            COURT:  The witness is excused.

 4            MS. MIKKILINENI:  I would like to call Monte Quast to

 5       the stand, please.

 6            COURT:  All right.  Come up to the witness stand and

 7       remain standing when you arrive here so you may be sworn in.

 8                      (MONTE QUAST is sworn.)

 9            CLERK:  Please have a seat.  Once seated, please state

10       your name and spell your last name for the record.

11            WITNESS:  Monte Quast, Q-u-a-s-t.

12                      DIRECT EXAMINATION

13       QUESTIONS BY MS. MIKKILINENI:

14       Q.  Good morning, Mr. Quast.  What is your position at Carne One

15       Corp?

16       A.  President and CEO.

17       Q.  Does Carne One work with Millenkamp Cattle?

18       A.  We do.

19       Q.  What is your business relationship?

20       A.  We sell them whey.

21       Q.  Can you explain what whey is?

22       A.  Whey's a byproduct from cheese processing.

23       Q.  What does the dairy use it for?

24       A.  They use it in the rations to replace typically corn.  It's

25       a high level source of energy and so you can usually replace
```

1   some corn and cheapen up the diet.  Make it a little cheaper.

2   Q.  How long has Carne One been supplying goods to Millenkamp

3   Cattle?

4   A.  Roughly 10 years.

5   Q.  Did Carne One supply goods between March 13, 2024, and April

6   2, 2024?

7   A.  Yes, we did.

8   Q.  Does Millenkamp Cattle still owe Carne One money for goods

9   delivered?

10  A.  They do.

11  Q.  How much is owed for goods delivered between March 13 and

12  April 2?

13  A.  $131,312.90.

14  Q.  What would happen to Carne One if that amount is not paid

15  until plan confirmation?

16  A.  So we have it on our receivables.  It's aged out so we can't

17  borrow against it so it really affects cash flow and the ability

18  to borrow money on a borrowing basis.

19  Q.  When does Carne One need the payment?

20  A.  As soon as possible.

21  Q.  What will happen to your business relationship with

22  Millenkamp Cattle if Carne One is not paid its 503(b)(9) claim

23  prior to confirmation?

24  A.  I mean it's put stress on the relationship.  We'd like to do

25  continue to do business with him but it would put the business

1    relationship in jeopardy.

2           MS. MIKKILINENI:  No further questions.  Thank you.

3           COURT:  Counsel for MetLife, any cross-examination?

4           MR. BINGHAM:  No, Your Honor.

5           COURT:  Counsel for Unsecured Creditor Committee?

6           MR. KREMER:  No, Your Honor.

7           COURT:  Counsel for Rabo AgriFinance?

8           MS. SCHWAGER:  No, Your Honor.

9           COURT:  Mr. Naess?

10                      CROSS-EXAMINATION

11   QUESTIONS BY MR. NAESS:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  So is selling whey primarily what Carne One does?

15   A.  Yes.

16   Q.  Okay.  About how many customers does Carne have?

17   A.  Roughly 650.

18   Q.  Okay.  And you indicated it's a byproduct from the cheese

19   making process.  Does Carne purchase the whey and then resell it

20   or how does it get the whey that it sells?

21   A.  Basically yes.  So Carne purchases it from plants.  It can

22   be from cheese, yogurt, any kind of dairy production.  So we're

23   basically purchasing that, paying the plant for the product,

24   paying for the transportation and selling it to the dairy.

25   Q.  Okay.  And are you currently providing whey to Millenkamp

1  Cattle?

2  A.  We are.

3  Q.  Okay.  And what's the agreement that you have with

4  Millenkamp Cattle for the provision of the current product?

5  A.  COD.

6  Q.  All right.  Have you had any problems with receiving cash on

7  delivery?

8  A.  Initial setup was a little bit slow but once it was set up,

9  no, we've had no problems.

10  Q.  Okay.  Has that been happening as far as you know since the

11  bankruptcy started?

12  A.  Correct.

13  Q.  The beginning of April roughly.  Is Carne carrying any other

14  unpaid debt besides the debt to Millenkamp Cattle?

15  A.  Yeah.  The 131 is only a portion of the overall debt that's

16  owed.

17  Q.  Okay.  And are there other of the 650 other -- or 649

18  roughly other customers, do any of them also owe Carne at this

19  time?

20  A.  They would all owe us to an extent.  We generally extend,

21  you know, 30-day terms with farms.

22  Q.  Okay.  Do you know how many are 60 or 90 days past due at

23  this point of those?

24  A.  There's some for sure.  We usually run between 8 to 10

25  percent beyond 60 days.

1    Q.  Okay.  And what is Carne's annual revenue if you know?

2    A.  48 to 50 million.

3    Q.  Okay.  You indicated that there is -- that the amount

4    that -- excuse me, that Millenkamp owes is indicated as aged out

5    on Carne's receivables.  Is that a correct recollection that I'm

6    having of what you testified to?

7    A.  Yeah.  It's aged out past the 60 days.

8    Q.  The aged out amount, is that for the 131,000 or is that for

9    the entire amount that's owed to Carne?

10   A.  It would be the entire amount.

11   Q.  Okay.  Do you recall what that entire amount is?

12   A.  Not exactly.  Roughly 450,000.

13   Q.  Okay.  And have any of your lenders -- have you sought to

14   borrow funds from any lenders and been denied credit because of

15   that receivables amount that you're carrying?

16   A.  We use our borrowing base periodically.  We do have times

17   where we maximum it out but nobody's denied currently for that.

18   Q.  Okay.  And so I guess you don't know if -- well, I want

19   to -- you wouldn't know whether you had been denied for the

20   131,000 or for the whole 450.  Is that accurate?

21   A.  No.  There would be no way.

22   Q.  Do you have any projections as to what Carne's borrowing

23   needs for the next six months are?

24   A.  July is usually one of our peaks on the borrowing base of

25   when we borrow money.

1   Q.  Okay.  Do you know if you're planning to borrow at this

2   point?

3   A.  Yeah.  Yeah, we're planning on it.

4   Q.  Have you started discussions with your lenders yet about

5   that?

6   A.  We don't know that total amount yet.  I mean we've been in

7   discussions and of course have the borrowing base in place but

8   we're just in initial discussions with them on that.

9   Q.  Okay.  Through those initial discussions, have any of them

10  expressed concern over this particular receivable?

11  A.  No.

12  Q.  Okay.

13          MR. NAESS:  I don't have any further questions, Your

14  Honor.

15          COURT:  Thank you, Mr. Naess.

16          MR. NAESS:  Thanks.

17          COURT:  Counsel for Conterra?

18          MR. O'BRIEN:  No, Your Honor.

19          COURT:  Counsel for Viterra?

20          MR. GREEN:  No, Your Honor.

21          COURT:  Any redirect?

22          MS. MIKKILINENI:  No redirect.  May the witness be

23  excused?

24          COURT:  You may step down.  Any objection to excusing

25  the witness?

```
1            MS. SCHWAGER:  No objection, Your Honor.

2            COURT:  All right.  You may be excused as well.

3            Your next witness.

4            MS. MIKKILINENI:  Mr. Kim Paulsen to the stand, please.

5            COURT:  Just come up to the witness stand and remain

6    standing so you may be sworn in.

7                        (KIM PAULSEN is sworn.)

8            CLERK:  Thank you.  Please have a seat.  Please state

9    your name and spell your last name for the record.

10            WITNESS:  Kim Paulsen, P-a-u-l-s-e-n.

11            CLERK:  Thank you.

12            WITNESS:  Yep.

13                        DIRECT EXAMINATION

14    QUESTIONS BY MS. MIKKILINENI:

15    Q.  Good morning, Mr. Paulsen.

16    A.  Morning.

17    Q.  Who do you work for?

18    A.  Micro Proteins.

19    Q.  What is your position there?

20    A.  I own the company.

21    Q.  Does Micro Proteins work with Millenkamp Cattle?

22    A.  Yes, yes, uh-huh.

23    Q.  What is your business relationship?

24    A.  We supply various animal health products to Millenkamp

25    Cattle.
```

1  Q.  Can you describe what some of those products are?

2  A.  Vitamin/mineral packages, electrolytes, anti-scour type

3  products, things like that.  Everything's all natural.

4  Q.  How long has Micro Proteins been supplying goods to

5  Millenkamp?

6  A.  About 15 years.

7  Q.  Did Micro Proteins supply goods between March 13, 2024, and

8  April 2, 2024?

9  A.  Yes, yes, uh-huh.

10  Q.  Does Millenkamp Cattle still owe Micro Proteins money for

11  goods delivered?

12  A.  Yes.

13  Q.  How much is owed for goods delivered between March 13, 2024,

14  and April 2?

15  A.  I think it's around $18,954.66.

16  Q.  What would happen to Micro Proteins if that amount is not

17  paid until plan confirmation?

18  A.  Well, we're a small company so that's a huge financial

19  stress on us for cash flow, debt, receivable.  You know, paying

20  our vendors.

21  Q.  What about payroll?

22  A.  Well, absolutely.  Like I say, we're a small company.

23  Payroll's important.

24  Q.  What will happen to the business relationship with

25  Millenkamp Cattle if Micro Proteins is not paid its 503(b)(9)

page

1    claim prior to confirmation?

2    A.  Well, I mean I'd like to continue to supply them but

3    probably wouldn't be able to.  I'd have to make some big

4    decisions.

5            MS. MIKKILINENI:  No further questions.  Thank you.

6            COURT:  Counsel for MetLife.  Any cross-examination?

7            MR. BINGHAM:  No, Your Honor.

8            COURT:  Counsel for the unsecured creditor committee?

9            MR. KREMER:  No, Your Honor.

10            COURT:  And counsel for Rabo AgriFinance?

11            MS. SCHWAGER:  No, Your Honor.

12            COURT:  Mr. Naess?

13            MR. NAESS:  I have some questions.  Thanks, Your Honor.

14                        CROSS-EXAMINATION

15    QUESTIONS BY MR. NAESS:

16    Q.  Good morning, Mr. Paulsen.

17    A.  Hi.

18    Q.  So Micro Proteins provides animal health products?

19    A.  You'd have to be a little bit louder.  What?

20    Q.  Sure Micro Proteins, it provides animal health products.

21    A.  Yes.

22    Q.  Does it do anything else besides that?

23    A.  I'm sorry.  I can't hear you.  I have a hearing impairment.

24    Q.  Sure.  No problem.  Does it do anything else besides provide

25    animal health products?

1    A.   No.

2    Q.   No, okay.   Can you describe the organizational structure?

3    Is it located in Idaho only or does it have facilities

4    elsewhere?

5    A.   It's just a Sub Chapter S Corporation, family-owned company.

6    Five people.

7    Q.   Okay.   How many customers does Micro Proteins have?

8    A.   Well, probably 25.

9    Q.   Okay.   And of those 25 customers, do any of the others have

10   outstanding balances beyond 60 days besides Millenkamp Cattle?

11   A.   Probably a couple.   Maybe a couple.

12   Q.   Do you know what those amounts would be?

13   A.   I don't right offhand.

14   Q.   Okay.   What is Micro Proteins' annual revenue?

15   A.   Well, that's kind of confidential, don't you think?

16   Q.   Are you going to answer the question?

17   A.   It varies.

18   Q.   It varies.   Okay.   What's the range if you'd prefer?

19   A.   Probably 3 to 5 million.

20   Q.   Okay.   It Micro Proteins currently providing animal health

21   products?

22   A.   Say it one more time.

23   Q.   Are you currently providing animal health products to

24   Millenkamp Cattle?

25   A.   Yes, I am.

1   Q.  What's the arrangement that you have with them?  Is it cash

2   on delivery?

3   A.  You know, I can't hear you very good.  Sorry.

4   Q.  Are you providing cash on delivery?  Is that the

5   arrangement?

6   A.  Not on delivery but we invoice them and then they pay.

7   Q.  So you're still running an invoice system with them?

8   A.  Yes.

9   Q.  Are they paying?

10  A.  Yes.

11  Q.  Okay.  And is the amount that you're receiving for the

12  current deliveries insufficient to pay the suppliers that you

13  have?

14  A.  No.

15  Q.  So you have sufficient money coming in from the invoices to

16  then pay your supplies?

17  A.  It's becoming lower and lower all the time.  It's a tough

18  industry right now overall and we're such a small company that,

19  you know, we have to have the money.

20  Q.  Okay.

21  A.  We've got to get the money in because we have to pay our

22  suppliers too.

23  Q.  Sure.

24  A.  And some of our suppliers that we pay for ingredients and we

25  have to pay in 15 days; not 30 days.

1    Q.  Sure.  So is the money that you're receiving from

2    (inaudible) deliveries, is that not enough for you to pay your

3    suppliers?

4    A.  It's on the very low side.

5    Q.  Okay.  But so far you've been able to make it.  You haven't

6    missed any payments to your suppliers.

7    A.  No.  I mean if it keeps going this way, I'll probably have

8    to lay off an employee.

9    Q.  Okay.  And I didn't see that Micro Proteins has filed a

10   proof of claim in the bankruptcy yet?

11   A.  Say one more time.

12   Q.  Have you filed a claim in the bankruptcy yet?

13   A.  No.

14   Q.  Okay.  Do you know how much total amount Millenkamp Cattle

15   owes Micro Proteins?

16   A.  I don't know the exact amount.

17   Q.  Okay.  In the bankruptcy schedules, they said it was just

18   under $160,000.  It was 159,000 and some change.  Does that

19   sound right?

20   A.  That sounds right and that could be right, yeah.

21   Q.  Okay.  And the amount of the 503(b)(9) claim is roughly

22   18,000?

23   A.  19,000, yeah.

24   Q.  Okay.  What's the impact on Micro Proteins of being delayed

25   so -- if you get that $19,000 in six months but it's going to

1  take six months before that happens, what's the impact to not

2  receiving the 19,000 today or next week?

3  A.  Well, just assess our cash flow and maybe lay a person off

4  or reduce salaries or something.

5  Q.  Okay.

6         MR. NAESS:  No further questions, Your Honor.

7         COURT:  Thank you, Mr. Naess.  Counsel for Conterra?

8         MR. O'BRIEN:  No questions, thank you.

9         COURT:  Counsel for Viterra?

10        MR. GREEN:  No questions, Your Honor.

11        COURT:  Any redirect?

12        MS. MIKKILINENI:  No, Your Honor.  May the witness be

13  excused?

14        COURT:  All right.  You may step down.  Any objection

15  to excusing the witness?

16        MS. SCHWAGER:  No objection, Your Honor.

17        COURT:  You may be excused.  Do you have additional

18  witnesses?

19        MS. MIKKILINENI:  Yes.  I would like to call Mr. Steve

20  Lam to the stand, please.

21        COURT:  Come up to the witness stand and remain

22  standing so you may be sworn in.

23                    (STEVE LAM is sworn.)

24        CLERK:  Please have a seat.  Can you state your name

25  and spell your last name for the record.

```
 1              WITNESS:  Steven Lam, L-a-m.

 2              CLERK:  Thank you.

 3                      DIRECT EXAMINATION

 4   QUESTIONS BY MS. MIKKILINENI:

 5   Q.  Good morning, Mr. Lam.

 6   A.  Good morning.

 7   Q.  Who do you work for?

 8   A.  Aden Brook Trading Corp.

 9   Q.  What is your position there?

10   A.  Vice president.

11   Q.  Does Aden Brook Trading work with Millenkamp Cattle?

12   A.  They do.

13   Q.  What is the business relationship?

14   A.  Hay and straw.

15   Q.  How long has Aden Brook been supplying hay and straw to

16   Millenkamp Cattle?

17   A.  A little over three years.

18   Q.  Did Aden Brook supply goods between March 13, 2024, and say

19   2, 2024?

20   A.  We did.

21   Q.  Does Millenkamp Cattle still owe Aden Brook for money for

22   goods delivered?

23   A.  Yes.

24   Q.  How much is owed for goods between March 13 and April 2?

25   A.  $746,600 and a couple pennies.
```

1   Q.   Perfect.   What would happen to Aden Brook if that amount is

2   not paid until after confirmation?

3   A.   We would have to secure funds at a large interest rate to

4   get through, cut back our dairy division and lay off employees.

5   Q.   When would you say Aden Brook needs the payment?

6   A.   Yesterday.

7   Q.   What will happen to your business relationship with

8   Millenkamp Cattle if Aden Brook is not paid its 503(b)(9) claim

9   prior to plan confirmation?

10  A.   It will end.

11  Q.   No further questions.   Thank you.

12  A.   Thank you.

13          COURT:   Counsel for MetLife, any cross-examination?

14          MR. BINGHAM:   No, Your Honor.

15          COURT:   Counsel for the Unsecured Creditor Committee?

16          MR. KREMER:   No, Your Honor.

17          COURT:   Counsel for Rabo AgriFinance?

18          MS. SCHWAGER:   No questions, Your Honor.

19          COURT:   Mr. Naess, any questions?

20          MR. NAESS:   I do, Your Honor.

21                          CROSS-EXAMINATION

22  QUESTIONS BY MR. NAESS:

23  Q.   Do you have the exhibit binders handy?   I'm going to need

24  you to look at them in a minute.

25  A.   I don't.

1    Q.  Okay.  Are the debtor's exhibits up there?  What kind of a

2    binder is it?  There should be a row of binders there.

3    A.  All right.

4         MR. CHRISTENSEN:  The black one on the top right.

5    BY MR. NAESS:

6    Q.  So it should be a black one on the top right.

7    A.  Small one or a big one?

8         MR. CHRISTENSEN:  Big one.

9         WITNESS:  It can't be pulled up on this screen?

10         MR. NAESS:  Yeah, they're working on that.

11   BY MR. NAESS:

12   Q.  Starting at page 309.  Is Aden Brook currently providing

13   goods to Millenkamp Cattle?

14   A.  Yes, we are.

15   Q.  Okay.  Is that on cash on delivery?

16   A.  Yes.

17   Q.  Okay.  Are they paying?

18   A.  Yes.

19   Q.  Okay.  Is the cash that you're receiving on delivery

20   insufficient to pay vendors?  Is it enough for you to pay your

21   vendors the amount that you're receiving on delivery?

22   A.  Currently, yes.

23   Q.  And -- all right.  So you've got on the screen -- I think

24   you testified that the total amount of the 503(b)(9) claim was

25   $746,500.

1  A.  That's correct.

2  Q.  Do you know how you calculated --

3  A.  The total amount that they owe or --

4  Q.  The 503B -- the 503(b)(9).

5  A.  Yeah.  Yes, that's correct, yep.

6  Q.  Do you know how you calculated that amount?

7  A.  Our COO who does our financing calculated that.  Does our

8  books.

9  Q.  And that was based off of invoices during that 20-day period

10  prior to the bankruptcy filing?

11  A.  That's correct.

12  Q.  Okay.  So on your screen is one of the invoices for a ship

13  date of March 22, 2024, Invoice No. S78439.  Do you see that?

14  A.  Yes, I do.

15  Q.  And on there, there's a notation that says "revised."  Did

16  you make that notation?

17  A.  No.

18  Q.  Do you know were there two invoices for that invoice number?

19  You might not know based on your position in the company I

20  guess.

21  A.  I don't know.

22  Q.  Can you go forward to 310?  Here's another Invoice No.

23  S78439 for that same March 22 date for a different amount but

24  for the same described goods.  Is it typical practice for Aden

25  Brook to send two invoices for the same goods?

1    A.  No.  I believe I understand the situation.  The first

2    invoice that was sent was revised -- was sent at a price of

3    feeder head.

4    Q.  Okay.

5    A.  This was revised because the actual load was milk hay.

6    Q.  Okay.

7    A.  Which is a higher price.

8    Q.  Do you know which one was paid?

9    A.  I believe the higher price was paid, yes.

10   Q.  Okay.  So the value would be based on the higher price

11   value.

12   A.  That's correct.

13   Q.  Okay.  So if we're looking at the value of goods delivered

14   or received within 20 days prior, we'd be looking at the milk

15   hay value?

16   A.  No, no.  We send three levels of hay.

17   Q.  Okay.

18   A.  So there would be a feeder hay.  There will be what's called

19   a pressed hay or milk hay and there's two levels of that.  So

20   it's a level based on a relative feed value of the product based

21   on the price.

22   Q.  Okay.

23   A.  So there will be -- there will be levels of prices weekly

24   different based on the product's quality.

25   Q.  Do you know when the COO went through and calculated the

1    503(b)(9) claim amount, did they count both of these invoices?

2    Did they count only one?

3    A.  I can't answer that question.

4    Q.  And if there are other duplicate invoices in there, same

5    answer, you wouldn't know which one was counted?

6    A.  I don't have a clue.

7    Q.  All right.  But from your perspective, only one of those two

8    would be the correct one.

9    A.  That's correct.

10   Q.  Okay.  All right.  Aden Brook hasn't filed a proof of claim

11   yet; is that correct?

12   A.  That is correct.

13   Q.  Okay.  Do you know what the total amount that Millenkamp

14   Cattle owes to Aden Brook?

15   A.  I believe it's just shy of $1.4 million.

16   Q.  Okay.  I think in the schedules, Millenkamp Cattle said it

17   was 83,000 but it's 1.4 million?

18   A.  1.3, 355 or something to that effect.

19   Q.  So the 503(b)(9) would be roughly half of what's owed?

20   A.  That's correct.

21   Q.  And what's the -- can you describe for me again what's the

22   impact, the hardship on Aden Brook for a delayed payment?  So

23   not (inaudible) the best 700 and, you know, whatever the amount

24   actually is after, you know, the Court goes through and looks at

25   the invoices.  What's the impact --

1    A.  Repeat what you said about the invoices again.

2    Q.  Well, if the 746,000 is counting the invoices twice, right,

3    then that's not the right amount, is it?

4    A.  So you're saying one invoice that was corrected is a

5    duplicate of $1.4 million worth of product?

6    Q.  No.  What I'm saying --

7    A.  Well, I think you are.

8    Q.  I'm not.

9    A.  Okay.

10   Q.  I'm saying that there was a duplicate here that we looked

11   at.  There are three others that we can also look at.  You said

12   that the 503(b)(9) claim was $746,600.

13   A.  That's correct.

14   Q.  That was based on the invoices.  I'm trying to understand

15   was that based on duplicate invoices or is that based on the

16   correct invoice?

17   A.  Corrected invoices.

18   Q.  Okay.  So whatever -- when those invoices I looked at,

19   right, and we take out the incorrect one, that's going to be

20   what the 503(b)(9) claim is, would you agree, that it's only

21   based on whatever the amount is?  It's not what somebody has

22   calculated the amount is.

23   A.  It's based off of the invoice our COO calculates after

24   whatever's corrected, that's correct.

25   Q.  Okay.  The question that I was asking was, you know,

1    whatever that amount is, 700 -- let's say it's 746,000, right?

2    If you get paid that in six months versus today but you do get

3    paid it in six months, what's the hardship to Aden Brook?

4    A.  We would -- we would have to lay off probably three

5    individuals in that division.  We are trying to secure financing

6    now that is actually in underwriting but it's been held up

7    because of the bankruptcy proceedings of the amount of money

8    that's owed by Millenkamp.

9    Q.  Has it been held up because of 746,000 or because of 1.3

10   million?

11   A.  Both, both.

12   Q.  And the employees -- is the cash that you're receiving, cash

13   on delivery, is that not sufficient to pay your employees?

14   A.  No, because the arrears have had such an effect on our

15   company.  They're 10 percent of our business, Millenkamp.

16   Q.  Okay.  But if they're paying cash on delivery, how does that

17   impact your payroll?

18   A.  It impacts our payroll because we are having to go borrow

19   money at a higher percent than what our profitability was for

20   the last year.

21   Q.  Okay.  Okay.  No further questions, Your Honor.

22          COURT:  Thank you, Mr. Naess.  Counsel for Conterra?

23          MR. O'BRIEN:  No questions.

24          COURT:  Mr. Green?

25          MR. GREEN:  No questions, Your Honor.

```
1              COURT:  Any redirect?

2              MS. MIKKILINENI:  No, Your Honor.  May the witness be

3   excused?

4              COURT:  You may step down.  Any objection to excusing

5   the witness?

6              MS. SCHWAGER:  No, Your Honor.

7              COURT:  Witness is excused.  Your next witness.

8              MS. MIKKILINENI:  Mr. Nino Olmos to the stand, please.

9              COURT:  Please come up to the witness stand and remain

10  standing so you may be sworn in.

11                        (NINO OLMOS is sworn.)

12             CLERK:  Please have a seat.  Please state your name and

13  spell your last name for the record.

14             WITNESS:  Nino Olmos, O-l-m-o-s.

15             CLERK:  Thank you.

16                        DIRECT EXAMINATION

17  QUESTIONS BY MS. MIKKILINENI:

18  Q.  Good morning, Mr. Olmos?

19  A.  Good morning.

20  Q.  Who do you work for?

21  A.  ABS Global.

22  Q.  What is your position there?

23  A.  District sales manager.

24  Q.  Does ABS currently work with Millenkamp Cattle?

25  A.  Yes.
```

1    Q.  What is your business relationship?

2    A.  Genetics.

3    Q.  Can you explain what goods you sell to Millenkamp Cattle?

4    A.  So we sell the semen for the dairy cattle.

5    Q.  How long has ABS Global been supplying goods to Millenkamp

6    Cattle?

7    A.  Approximately 20 years.

8    Q.  Did ABS Global supply goods between March 13, 2024, and

9    April 2, 2024, to Millenkamp?

10   A.  Yes.

11   Q.  Does Millenkamp still owe for goods?

12   A.  Yes.

13   Q.  How much is owed for goods delivered between March 13 and

14   April 2?

15   A.  187,563.

16   Q.  What would happen if ABS Global is not paid that amount

17   until plan confirmation?

18   A.  It's going to affect the cash flow and borrowing base.

19   Q.  So when would you say ABS Global needs the payment?

20   A.  ASAP as our end of the year is coming up June 30.

21   Q.  What will happen to your business relationship with

22   Millenkamp Cattle if ABS Global is not paid it's 503(b)(9) claim

23   prior to --

24   A.  Puts it at risk on continuing business with Millenkamp

25   Cattle.

1        MS. MIKKILINENI:  No further questions.  Thank you.

2        WITNESS:  Thank you.

3        COURT:  Counsel for MetLife, any cross-examination?

4        MR. BINGHAM:  No, Your Honor.

5        COURT:  Counsel for unsecured creditor committee?

6        MR. KREMER:  No, Your Honor.

7        COURT:  Counsel for Rabo AgriFinance?

8        MS. SCHWAGER:  None, Your Honor.

9        COURT:  Mr. Naess?

10       MR. NAESS:  Thank you.  Yes.

11                         CROSS-EXAMINATION

12   QUESTIONS BY MR. NAESS:

13   Q.  Good morning, Mr. Olmos.

14   A.  Good morning.

15   Q.  Is ABS Global providing semen to Millenkamp Cattle

16   currently?

17   A.  Yes.

18   Q.  Okay.  Is that on a cash on delivery basis?

19   A.  Yep.

20   Q.  Okay.  And are they paying?

21   A.  Yeah.

22   Q.  Okay.

23   A.  Since -- yeah.

24   Q.  April or so?  Okay.  You indicated that you're borrowing

25   base will be affected.  How much total money is owed to ABS from

1    Millenkamp Cattle?

2    A.  Is this before or just in --

3    Q.  So yeah, for the entire amount that's owed in the

4    bankruptcy?

5    A.  It's about 800 -- approximately 8 hundred and some thousand.

6    Q.  And the amount of the 503(b)(9) claim is 180 --

7    A.  187,563.

8    Q.  Okay.  So it's certainly not an insignificant amount but of

9    the total amount, it's less than 25 percent.  Is that -- it's

10   less than 25 percent of the total amount that the 503(b)(9)

11   claim is -- less than 25 percent of the total claim that is owed

12   to ABS.  Is that accurate?

13   A.  That would be accurate I guess.

14   Q.  Roughly.

15   A.  Roughly.

16   Q.  Have you tried to borrow -- has ABS tried to borrow but been

17   denied borrowing because of the amount that it owes -- that it

18   is owed?

19   A.  I don't know about that question.

20   Q.  Okay.  In your position with ABS Global, do you know what

21   ABS Global's projected borrowing for the next six months is?

22   A.  I don't.

23   Q.  Okay.  And if ABS Global is paid the 187,000 but it takes

24   six months to do that, what is the hardship for not being paid

25   today but being paid in six months?

1    A.  With obviously our end of the year coming up, I mean that's

2    something that we have to report to our shareholders which in

3    return is going to affect how we do business moving forward for

4    the new fiscal year.

5    Q.  Okay.  Can you describe that for me?  I mean how is that

6    going to affect the business going forward?

7    A.  So obviously it's going to affect on how we do business

8    projections on what type of product we need to provide the

9    dairymen for the upcoming year.

10            MR. NAESS:  All right.  No further questions, Your

11   Honor.  Thanks.

12            COURT:  Thank you, Mr. Naess.  Counsel for Conterra?

13            MR. O'BRIEN:  No questions.  Thank you.

14            COURT:  Counsel for Viterra?

15            MR. GREEN:  No, Your Honor.  Thank you.

16            COURT:  And redirect by the debtor.

17            MS. MIKKILINENI:  No, Your Honor.  May the witness be

18   excused?

19            COURT:  You may step down.  Any objection to excusing

20   the witness?

21            MS. SCHWAGER:  No objection, Your Honor.

22            COURT:  You may be excused.  Do you have additional

23   witnesses?

24            MS. MIKKILINENI:  We'd like to call Mr. Dan Noble.

25            COURT:  Mr. Noble, please come on up to the witness

```
 1   stand and remain standing so you may be sworn in.
 2                      (DAN NOBLE is sworn.)
 3          CLERK:  Thank you.  Please have a seat.  State your
 4   name and spell your last name for the record.
 5          WITNESS:  Dan Noble, N-o-b-l-e.
 6          CLERK:  Thank you.
 7                      DIRECT EXAMINATION
 8   QUESTIONS BY MS. MIKKILINENI:
 9   Q.  Good morning, Mr. Noble.
10   A.  Good morning.
11   Q.  Who do you work for?
12   A.  Land View.
13   Q.  And what is your position there?
14   A.  I'm the credit manager.
15   Q.  And does Land View work with Millenkamp Cattle?
16   A.  Yes, we do.
17   Q.  What is the business relationship?
18   A.  We sell some custom lactation mineral mixes and some calf
19   replacer mixes that are custom made.
20   Q.  And how long has Land View been supplying goods to
21   Millenkamp Cattle?
22   A.  As near as I can tell, at least eight years.
23   Q.  Did Land View supply goods between March 13 and April 2 of
24   this year?
25   A.  Yes.
```

1  Q.  Does Millenkamp Cattle owe Land View money right now?

2  A.  Yes, they do.

3  Q.  What is the total amount currently owing to Land View from

4  Millenkamp Cattle?

5  A.  Nearly 9.3 million.

6  Q.  How does that $9.3 million amount relate to the total amount

7  of accounts receivable outstanding for Land View as of the

8  bankruptcy petition date?

9  A.  Just over 68 percent of receivables.

10  Q.  And how does that $9.3 million amount relate to the total

11  amount of accounts receivable outstanding for Land View right

12  now as of today's date?

13  A.  Just over 37 percent.

14  Q.  And why is there that difference in percentage?

15  A.  Because this is our peak season and other receivables from

16  (inaudible).

17  Q.  How does that $9.3 million amount relate to the total amount

18  of aged AR for Land View such as 60 days past due?

19  A.  Almost 90 percent.

20  Q.  And how much is owed for the goods delivered between March

21  13 and April 2?

22  A.  Almost 1.8 -- or 1.1 million.

23  Q.  What would happen to Land View if that amount is not paid?

24  A.  It's putting quite a bit of stress on our borrowing base,

25  the cost of capital as well as our ability to get capital.  So

1    especially in the peak season right now.

2    Q.  Can you explain how the inventory works in this relationship

3    as far as what inventory you need to use in order to supply the

4    goods to Millenkamp Cattle?

5    A.  For the custom mixes, it takes at least 13 different

6    ingredients.  Some of those ingredients are imported and so we

7    have to maintain -- to have to do it cost effective, we have to

8    be purchasing it as much as three months out to be able to

9    supply the steady supply of the product.  So that makes up about

10    $3 million of inventory that is sitting there.

11    Q.  And is that inventory exclusively used for Millenkamp

12    Cattle's products?

13    A.  Yes.

14    Q.  When does Land View need the payment of the 503(b)(9) claim?

15    A.  We've been working at a payment reduction for nearly nine

16    months but it became critical six months ago as we put a little

17    more pressure on getting a balance reduction program going.

18    Q.  Why do you need the payment now?

19    A.  Because of the stress it's putting on our capital position

20    on the borrowing base.  That $9.3 million is excluded from

21    assets that would be used to come up with the borrowing base.

22    And so as we -- in the peak season, that's even more stress

23    where we're looking at places to put capital back into our cash

24    flow, our liquidity position.

25    Q.  And what will happen to the business relationship if Land

1    View is not paid the 503(b)(9) claim prior to plan confirmation?

2    A.  Well, we'd have to weigh the costs and the risks that are

3    involved.  You know, when you get to the point where your

4    borrowing base is stressed, then, you know, where do you start

5    to free up capital and, you know, you got $3 million and it

6    would be -- well, it's been considered all along whether or not

7    we continue the relationship.  It becomes even more critical as

8    you work through our peak season as to whether or not we want to

9    maintain that $3 million in inventory for example.

10   Q.  Thank you.  I have no further questions.

11   A.  Okay.

12           COURT:  Counsel for MetLife, any cross-examination?

13           MR. BINGHAM:  No, Your Honor.

14           COURT:  Counsel for the Unsecured Creditor Committee?

15           MR. KREMER:  No, Your Honor.

16           COURT:  Counsel for Rabo AgriFinance?

17           MS. SCHWAGER:  No, Your Honor.  Thank you.

18           COURT:  Mr. Naess?

19           MR. NAESS:  Yes, Your Honor.

20                       CROSS-EXAMINATION

21   QUESTIONS BY MR. NAESS:

22   Q.  Hello, Mr. Noble.

23   A.  Hello.

24   Q.  Can you start for me by describing the Land View company?

25   What it entails -- are there multiple business units, you know?

1    What does it do in its other business units?  Where does the

2    feed product sales fit into that?

3    A.  Yeah.  We've got agronomy care products on the retail, some

4    wholesale and industrial products as well as the livestock feed

5    division.

6    Q.  Okay.  So there's three divisions if I'm understanding

7    right.  There's an agronomy care products division, a livestock

8    feed products division and then the industrial and chemical

9    formulated products division.  Is that accurate?

10   A.  Right, right.

11   Q.  Okay.  And what portion of Land View's overall business

12   would you say the feed products division is?

13   A.  I can't tell you that.  I don't know.

14   Q.  Okay.  For just the feed products division, what's the

15   annual revenue?

16   A.  I don't know that amount.  We are going to be looking more

17   at the margins than anything.  That drives the business

18   decisions is the margins.

19   Q.  Okay.  I want to drill down with you and be a little more

20   precise in the question.  You answered a lot of questions about

21   percentages of a receivable portfolio based on the $9.3 million.

22   I want to ask you in specific about the million dollars -- $1.1

23   million that are the 503(b)(9) claim.  What percentage of Land

24   View's total receivable portfolio is the administrative claim,

25   the 503(b)(9) claim?

1   A.  I haven't calculated that but it's -- you know, it's roughly

2   10 percent of our total.  Just over 10 percent.

3   Q.  Okay.  Is that 10 percent of the total for the feed products

4   division or for Land View -- the Land View company?

5   A.  That's the feed products made up of Land View and Receptor

6   Food Group.

7   Q.  Okay.  So there might be other receivables that the Land

8   View company has in the other divisions that aren't included in

9   that amount; is that correct?

10  A.  Can you rephrase that?  Pertaining to Millenkamp you mean?

11  Q.  No.  So you're saying it's 10 percent of the receivables of

12  feed products but there are also receivables for the agronomy

13  care and the industrial and chemical formulation divisions,

14  correct?

15  A.  Yes.

16  Q.  Okay.  And you talked about a 37.3 percent of the accounts

17  receivable for the 9.3 million.  What percent of the total

18  accounts receivable is the 503(b)(9) claim?

19  A.  Yeah.  That would be a relatively small amount but when

20  you're talking 37 percent, you're talking about a bigger share

21  that -- that that 9.3 million is not available to support at

22  this critical juncture.

23  Q.  Okay.  Is Land View currently providing product to

24  Millenkamp Cattle?

25  A.  Yes, they are.

1   Q.  Is that on cash on delivery?

2   A.  Yes, it is.

3   Q.  Does that satisfy Land View's concerns regarding the

4   inventory risk, the cash on delivery arrangement?

5   A.  We've been in a holding pattern on that.  Well, yes, it

6   covers the cost but that doesn't necessarily address the overall

7   risk of maintaining that level of inventory.

8   Q.  Okay.  And when you're looking at the risk, are you looking

9   at the 1.1 million or are you looking at the 9.3 million?

10   A.  Well, I'm speaking to the $3 million in inventory that has

11   to be maintained -- and the capital cost of that.

12   Q.  Okay.  And what would be the hardship to Land View's

13   business?  So talking about Land View as a whole, the three

14   divisions, of a delayed payment of $1.1 million?

15   A.  Well, it relates to our capital position.  The fact that

16   even now, we are looking at places where we can get capital,

17   early payment or more aggressive collection efforts to be able

18   to stay within our borrowing base.  And so $1 million -- $1.1

19   million is critical to the whole portfolio.

20   Q.  And the number you've got in your books for the borrowing

21   base is 9.3 though, right?  It's not 1.1?

22   A.  Yes.

23   Q.  Okay.

24          MR. NAESS:  I have no further questions, Your Honor.

25          COURT:  Thank you, Mr. Naess.  Counsel for Conterra,

1   any cross-examination?

2         MR. O'BRIEN:  None, Your Honor.  Thank you.

3         COURT:  Counsel for Viterra?

4         MR. GREEN:  No, Your Honor.

5         COURT:  Any redirect?

6         MS. MIKKILINENI:  No, Your Honor.

7         COURT:  You may step down.

8         MS. MIKKILINENI:  May he please be excused for the day?

9         COURT:  Any objection?

10        MS. SCHWAGER:  No objection, Your Honor.

11        COURT:  That's fine.  The witness is excused.  Do you

12  have additional witnesses?

13        MS. MIKKILINENI:  We do.  We have a couple of farmers

14  who I think would love to get out of here before lunch so could

15  I get them on and then maybe we break for lunch?

16        COURT:  Okay.

17        MS. MIKKILINENI:  I'd like to call Mr. Ryan Moss to the

18  stand.

19        COURT:  All right.  Please come to the stand.  Remain

20  sustaining so you may be sworn in.

21                    (RYAN DANIEL MOSS is sworn.)

22        CLERK:  Thank you.  Please have a seat.  Please state

23  your name and spell your last name for the record.

24        WITNESS:  Ryan Daniel Moss, M-o-s-s.

25        CLERK:  Thank you.

```
 1                          DIRECT EXAMINATION
 2    QUESTIONS BY MS. MIKKILINENI:
 3    Q.  Good afternoon, Mr. Moss.  Who do you work for?
 4    A.  Self-employed at my own Moss farms operations d/b/a Moss
 5    Farms and Moss Grain Partnership.
 6    Q.  And what does Moss Farms operations do?
 7    A.  Moss Farms operations is a farm in southern Idaho.  We farm
 8    row crop, grains, corn, alfalfa.
 9    Q.  And what does Moss Grain Partnership do?
10    A.  Moss Grain Partnership farms only grain and corn.
11    Q.  Have your companies worked with Millenkamp Cattle in the
12    past?
13    A.  Yes, we have.
14    Q.  And for how long?
15    A.  10-plus years.
16    Q.  What do your companies supply to Millenkamp Cattle?
17    A.  On an annual basis, we'll supply corn, hay and straw.
18    Q.  And does Millenkamp Cattle currently owe your companies
19    money?
20    A.  Yes, they do.
21    Q.  Do you typically enter into agreements to sell corn silage?
22    A.  Yes, we do.
23    Q.  When do you typically enter into those agreements?
24    A.  Typically, we always have a verbal agreement prior to
25    planting.  We don't plant corn unless we know we have a place or
```

1    a home for it to go.

2    Q.  And when is the corn silage usually ready to be chopped?

3    A.  Our corn silage is usually chopped between the end of

4    September and the first of October.

5    Q.  And do you typically enter into agreements to sell straw?

6    A.  Yes, we do.

7    Q.  And when is that harvested?

8    A.  Straw's a byproduct of the wheat that we harvest and we

9    harvest wheat typically end of July through first of September.

10   Q.  And when is the price typically set for your agreements to

11   sell straw?

12   A.  Usually mid June prior to -- or first of July prior to

13   harvest.

14   Q.  And then when is the straw paid for?

15   A.  Straw's paid for 30 days after delivery.

16   Q.  And do you typically enter into agreements to sell hay?

17   A.  Yes.

18   Q.  And do you set a price prior to delivery for those?

19   A.  Yes.

20   Q.  Are you requiring a deposit for future sales of straw and

21   silage to Millenkamp Cattle?

22   A.  Yes.

23   Q.  Why is that?

24   A.  We are still owed funds from the '23 crop and due to the

25   risk factors of doing business and the uncertainty of the

1    operation, we're requiring some down payment funds to have at

2    least some of our inputs covered.

3    Q.  And how much of a deposit would you require?

4    A.  50 percent.

5    Q.  Have you ever required a deposit from Millenkamp Cattle

6    before?

7    A.  No.

8    Q.  Why is that?

9    A.  He's always been current on his bills and we've always had a

10   good business situation.

11   Q.  Have you required deposits in the past for any of your

12   customers?

13   A.  Yes, we have.

14   Q.  And do you know how much of a deposit you have required

15   before?

16   A.  As stated earlier in the day, we do occasionally sell dry

17   hay and that varies from, you know, 50 percent to 75, 80 percent

18   down payment before you come take the dry hay.

19   Q.  And how much silage do you have that is available to sell to

20   Millenkamp Cattle?

21   A.  We'll have 320 acres this year.  Approximately 9600 ton.

22   Q.  And how much straw do you have available?

23   A.  Typically, we deliver between 35 and 4,000 tons of straw to

24   Millenkamp annually.

25   Q.  How much hay do you have?

```
1    A.  500 acres of hay that is scheduled to go to Millenkamp

2    Cattle.

3    Q.  If for some reason the goods are not available after

4    Millenkamp Cattle makes the deposit, will you be able to return

5    the deposit?

6    A.  Yes, I have adequate funds to refund.  I don't see any

7    reason why the goods and services wouldn't happen though.

8         MS. MIKKILINENI:  That's all the questions I have.

9    Thank you.

10         COURT:  Cross-examination.  Counsel for MetLife?

11         MR. BINGHAM:  No, Your Honor.

12         COURT:  Counsel for the Unsecured Creditor Committee?

13         MR. KREMER:  No, Your Honor.

14         COURT:  Counsel for Rabo AgriFinance?

15         MS. SCHWAGER:  No, Your Honor.  Thank you.

16         COURT:  Mr. Naess?

17         MR. NAESS:  No.  Thank you.

18         COURT:  Counsel for Conterra?

19         MR. O'BRIEN:  No, Your Honor.

20         COURT:  Counsel for Viterra?

21         MR. GREEN:  No, Your Honor.

22         COURT:  You may step down.  Thank you.

23         MS. MIKKILINENI:  Your Honor, may Mr. Moss be excused?

24         COURT:  Any objection?

25         MS. SCHWAGER:  No objection, Your Honor.
```

```
 1            COURT:  The witness is excused.

 2            MS. MIKKILINENI:  We'd like to call Mr. Jon Bingham to

 3    the stand.

 4            COURT:  Mr. Bingham, please come to the stand.  Remain

 5    standing so you may be sworn in, please.

 6                             (JON BINGHAM is sworn.)

 7            CLERK:  Please have a seat.  Please state your name and

 8    spell your last name for the record.

 9            WITNESS:  Jon Bingham, B-i-n-g-h-a-m.

10            CLERK:  Thank you.

11                       DIRECT EXAMINATION

12    QUESTIONS BY MS. MIKKILINENI:

13    Q.  Good afternoon, Mr. Bingham.

14    A.  Good afternoon.

15    Q.  Where do you work?

16    A.  Triple B Farms, LLC.

17    Q.  And what's your position there?

18    A.  I am a partner/manager.

19    Q.  And what does Triple B Farms do?

20    A.  We are a hay, grain, cattle, custom hay operation.

21    Q.  Has Triple B Farms worked with Millenkamp Cattle in the

22    past?

23    A.  Yes.

24    Q.  And for how long?

25    A.  16 years.
```

1    Q.  Does Millenkamp Cattle currently owe you money?

2    A.  Yes.

3    Q.  What do you supply to Millenkamp Cattle?

4    A.  Hay and straw.

5    Q.  Are you requiring a deposit to supply the hay and straw to

6    Millenkamp Cattle?

7    A.  Yes.

8    Q.  And why is that?

9    A.  Because of the faults that happened prior to him filing

10   bankruptcy with receivership promising payments that did not

11   follow through.

12   Q.  Have you required deposits from Millenkamp Cattle in the

13   past?

14   A.  We have received a small amount generally in August just

15   depending on what his finances were and where my finances were.

16   Q.  And what -- do you know the amount that was generally

17   received?

18   A.  It was generally 15, 20 percent at maximum.

19   Q.  And how much will you require for a deposit this year?

20   A.  50.

21   Q.  When will -- I'm sorry.  Strike that.  And would you require

22   a 50 percent deposit for both the corn silage and the straw --

23   or for the hay and the straw?

24   A.  Yes.  We have never had prepayment on our hay.  Only on the

25   straw.

1    Q.  If for some reason you were not able to provide the alfalfa

2    or straw after the deposit is made, will you be able to refund

3    the deposit?

4    A.  Yes.

5    Q.  I have no further questions.  Thank you.

6          COURT:  Thank you.  Counsel for MetLife, any

7    cross-examination?

8          MR. BINGHAM:  No, Your Honor.

9          COURT:  Counsel for the Unsecured Creditor Committee?

10          MR. KREMER:  No, Your Honor.

11          COURT:  Counsel for Rabo AgriFinance?

12          MS. SCHWAGER:  None, Your Honor.  Thank you.

13          COURT:  Mr. Naess?

14          MR. NAESS:  No.  Thank you.

15          COURT:  Counsel for Conterra?

16          MR. O'BRIEN:  No, Your Honor.

17          COURT:  And counsel for Viterra Grain?

18          MR. GREEN:  No, Your Honor.

19          COURT:  All right.  You may step down.  Thank you.

20          MS. MIKKILINENI:  Can Mr. Bingham please be excused for

21    the day?

22          COURT:  Any objection?

23          MS. SCHWAGER:  No objection, Your Honor.

24          COURT:  The witness is excused.

25          MS. MIKKILINENI:  I have three more witnesses but we'll

1   take a break if you'd like or we can continue on.

2          COURT:  What do you think, counsel?  Do you want to

3   keep going or should we take a break now?

4          MS. SCHWAGER:  I'm fine to keep going, Your Honor.

5          MR. NAESS:  That's fine with me, Your Honor.

6          COURT:  Let's go ahead and get through these witnesses

7   then.

8          MS. MIKKILINENI:  We'd like to call Mr. Jason Parker to

9   the stand.

10          COURT:  All right.  Mr. Parker, please come to the

11   stand.  Remain standing so you may be sworn in, please.

12                              (JASON PARKER is sworn.)

13          CLERK:  Thank you.  Please have a seat.  Please state

14   your name and spell your last name for the record.

15          WITNESS:  Jason Joseph Parker, P-a-r-k-e-r.

16          COURT:  Thank you.

17                      DIRECT EXAMINATION

18   QUESTIONS BY MS. MIKKILINENI:

19   Q.  Good afternoon, Mr. Parker.

20   A.  Good morning.

21   Q.  Who do you work for?

22   A.  Progressive Dairy Solutions.

23   Q.  And what is your position there?

24   A.  I'm a consulting dairy nutritionist and one of the -- part

25   of the ownership group.

1   Q.  And what does a nutritionist do?

2   A.  So what I do on the facilities is I will balance the diets

3   on a daily basis based on the feed ingredients that have been

4   purchased or are available to balance for all of the nutritional

5   requirements of the cattle anywhere from protein to energy

6   coming from fats, carbohydrates, fiber sources, amino acids,

7   fatty acids, different things like that.

8   Q.  And what's your educational background?

9   A.  An undergraduate in animal science and a master's degree in

10  business.

11  Q.  And what's your experience with dairy farms?

12  A.  I've been doing consulting nutrition and management of grain

13  companies for the last 27 years.

14  Q.  Are you familiar with dairy farms in Idaho?

15  A.  Yes.  All of my clients are currently in Idaho.

16  Q.  How many dairies cows in the state of Idaho do you consult

17  with?

18  A.  So just looking at just dairy milking cows and dry cows, I

19  do a little over 100,000 cows.  And in the state of Idaho,

20  there's about 600, 650,000 dairy cows and I'm also the team lead

21  for our team in Idaho that does -- so I do about 16 percent of

22  the cows in the state of Idaho.  My team does probably about 45

23  percent of the cows in the state of Idaho and our group

24  nationally works with about 50 consultants and works with about

25  1.2 million out of the 9 million cows in the United States.

1    Q.  And when you refer to cows, what type of cow are you

2    referring to?

3    A.  Just milk cows.  We do do other heifers and small young

4    stock.  Sometimes feedlot rations for people.  But what I'm

5    referring to today is just dairy milking cows.

6    Q.  Does Progressive Dairy work with Millenkamp Cattle?

7    A.  Yes.

8    Q.  And how many dairy cows on Millenkamp Cattle's farm do you

9    work with?

10   A.  They have about 40,000 between milking and dries.  They have

11   a lot of other young stock, et cetera.

12   Q.  Are you familiar with a dairy's need for corn silage?

13   A.  Yes.

14   Q.  Why do dairies need corn silage?

15   A.  So again, we could get super technical but about 40 to 50

16   percent of the cow's diet comes from foraged sources meaning

17   corn silage, alfalfa hay, haylage, triticale, beet pulp, things

18   like that.

19         Those sources of forage are critical for the cow's diet

20   in order to maintain the health and the production -- the milk

21   production and being able to breed back on a timely basis.

22   Partly because of the nutrients that those forages provide but a

23   large part is just being able to provide the fiber levels that

24   an animal needs in order to be able to keep a healthy rumen.  If

25   not, you're going to lead to significantly more digestive issues

1  and colon issues.

2  Q.  When do farmers typically buy corn silage?

3  A.  Almost always in the spring.  Typically March and April in

4  Idaho at least.

5  Q.  And why do they do that?

6  A.  Mostly because the farmers need to know what to plant.  If

7  they don't have a buyer for that product, they're probably going

8  to plant an alternative product like wheat or beets or potatoes

9  or anything else.  So they kind of have to have an agreement in

10  place on how many acres they'll sell and price before they'll

11  plant the product.  There is some variance in that in that some

12  people may grow some corn and be able to get into grain corn

13  with it instead of corn silage but that's a pretty nominal

14  opportunity.

15  Q.  Is there ever a situation where a farmer wouldn't need to

16  purchase corn silage every single year?

17  A.  A dairy farmer?  No.  Corn silage is such a basic staple of

18  diets in Idaho that it's pretty critical to do.  You could do it

19  without it but you're going to lead to increased levels of herd

20  health issues, you're going to lead to decreased milk production

21  issues which will decrease revenue and you're going to have to

22  replace it with other forage sources that are going to require

23  the same if not more down in this type of a situation of a

24  bankruptcy.

25  Q.  Are deposits ever required to buy corn silage?

1    A.  You know, last year I think was some of the first years

2    where we saw that.  The state of Idaho was short of acres of

3    corn silage and so last year was the first year where I saw some

4    of my clients requiring a deposit -- the farmers requiring a

5    deposit from my clients.  Historically, no, it's just been a

6    word of mouth agreement but it is starting to be more and more

7    the case.

8    Q.  Have you ever seen deposits required in a bankruptcy

9    setting?

10   A.  Yes.  In working for grain companies in the past in

11   management, all of those situations where they went through the

12   bankruptcies, almost everyone required deposits going forward.

13   Q.  And what would you expect to see for a down payment

14   requirements in a farm of Millenkamp Cattle's size?

15   A.  It's a tough one.  Millenkamp Cattle is so large that every

16   farmer who sells to Millenkamp Cattle is putting their business

17   at significant risk because of the volumes that are getting

18   transacted.  And so, you know, I've heard 50 percent thrown

19   around a lot this morning.  It actually surprises me that it's

20   that low.  The rumor out there from other clients is farmers are

21   requiring 80 to 90 percent in order to do business and in their

22   position, you can't blame them.

23   Q.  Are you familiar with a dairy's needs for hay and straw?

24   A.  Yes.

25   Q.  And why do dairies use hay and straw?

1    A.  Two different purposes.  Alfalfa hay again is forage source

2    whether it's in the form of dry hay or (inaudible) as haylage.

3    And it's used as a forage.  Where corn silage will have about 30

4    to 32 percent starch in it, it replaces a lot of the need for

5    ground corn coming out of the Midwest.  Alfalfa hay will test

6    anywhere between 18 and 23 percent protein so it increases --

7    decreases the demand for us to ship soybean meal, canola meal,

8    other products that are protein sources from the Midwest as well

9    as providing great digestible fiber sources for the cow that

10   will keep the cow healthy.

11          And so alfalfa is an alternative forage product but

12   they both meet different needs and requirements of the dairy

13   animal.  Straw is a different product kind of all together.

14   We'll feed slight amounts of straw to the cattle to slow down

15   rate of passage and increase digestion, but the majority of the

16   straw goes into bedding for dairy cattle or for young stock.

17          And that's critical for a different reason.  If those

18   animals are not bedded down in the wintertime, then they're

19   exposed to very wet, cold conditions and not only will you have

20   a significant increase in demand for feed then or more expensive

21   rations or inputs but you also have significantly more health

22   issues, pneumonias, et cetera, in those animals.

23   Q.  When do farmers typically buy hay?

24   A.  Hay is kind of bought throughout the year and it just

25   totally dependent.  Some people will have relationships with

1    farmers where they'll buy all of their hay and it's typically

2    contracted, you know, in that spring or summer and then they

3    take all of their cuttings.  Some of it in these tough economic

4    times that the dairy industry has been in for the last three

5    years is very hand to mouth.  They may just buy hay as needed if

6    they can find it.  And if not, then they're typically having to

7    pay a premium price to find it.  So hay is very different.

8    Q.  Is there ever a situation where a farmer wouldn't need to

9    purchase hay every year?

10   A.  No.

11   Q.  And why is that?

12   A.  Again, just because it's a critical part of the demands of

13   the dairy animal.  You could theoretically replace those pounds

14   of hay with other forage sources but then you'd have to go out

15   and find significantly more acres and tons of corn silage or

16   other products like that which we already struggle to find those

17   acres.

18   Q.  And when do farmers typically buy straw?

19   A.  Almost always in June or July.  Sometimes into August.  And

20   again, as someone mentioned, straw's a byproduct of small

21   grains, wheat, barley, et cetera, and so the farmers need to

22   know how much demand there is for that straw or a lot of times

23   they'll blow it into the ground so it decreases their need for

24   fertilizer the following year.

25   Q.  And is there ever a situation where a farmer wouldn't need

1    to purchase straw for the year?

2    A.   No.   You know, if a dairy was 100 percent cross-vent, you

3    know, then they might not have a huge demand for straw.  But any

4    dairy that's in open lot raising their young stock is always

5    going to have a demand for straw.

6    Q.   And do you know which one of those Millenkamp Cattle is?

7    A.   They're a combination but still majority of their animals

8    are outside and therefore require straw.

9    Q.   Are deposits ever required to buy hay?

10   A.   Almost always in my experience.

11   Q.   And what about deposits for straw?  Are those required?

12   A.   Usually yes, as well.  The farmers have just -- the last

13   couple of years, have had a pretty strong strangle-hold over the

14   dairies as there's been a very high demand for their products

15   and so they've been able to require stronger and stronger

16   deposits and better terms for selling the product.  And

17   especially in a situation like this where there's been some

18   financial question marks or in a bankruptcy now, it's always

19   going to be required.

20   Q.   And do you have an idea of what size of deposits you've seen

21   for hay and straw?

22   A.   All over the board historically.  Some people go as low as

23   10 percent and I've seen times when people require 80 percent

24   down.

25   Q.   And in a financial -- financially distressed situation, what

1  would you think a deposit would be?

2  A.  It will be high.  If I was selling them hay or (inaudible),

3  it would require a very, very high level of deposit.

4  Q.  In your opinion, what would happen if a dairy couldn't

5  obtain corn silage?

6  A.  It will be very detrimental to the dairy from a cash revenue

7  standpoint, from a herd health standpoint, from them

8  logistically being able to find that many alternative sources of

9  other forages.  We're already kind of behind the eight ball here

10  because these contracts haven't been made and secured already.

11  A lot of the silage that he normally buys he may have a hard

12  time finding and it's going to put him in a significant hole.

13  Q.  And what could happen to the livestock?

14  A.  You're going to -- again, you're going to see -- if you

15  don't have silage available to you and you're having to find

16  alternative forage sources, you're going to see significantly

17  more health issues with the animal, loss of production,

18  therefore loss of revenue, increased culling rates and overall

19  significantly decreased financial position of the facility and

20  also animal humanity.

21  Q.  In your opinion, what would happen if a dairy couldn't

22  obtain straw?

23  A.  Same situation if not more.

24  Q.  What do you mean by that?

25  A.  If you can't bed those animals correctly, I mean you're

1    just -- you're begging for an animal cruelty case to be dropped

2    on you if you can't keep them clean and dry.

3    Q.  And in your opinion, what would happen if a dairy couldn't

4    obtain hay?

5    A.  Hay, again, is one of those products where typically we can

6    try and find some alternative sources but it's still -- someone

7    of Millenkamp Cattle's size, it becomes incredibly difficult and

8    his ability to find other forage sources to replace that hay are

9    going to be almost impossible because they're all spoken for

10    already.  And so finding replacement forage products at the

11    stage of the game is going to be really hard.

12    Q.  And the alternatives that you mentioned for silage, straw

13    and hay, what's the availability of those particular

14    alternatives?

15    A.  Good question.  Like one of the persons mentioned earlier

16    today is beet pulp.  You know, beet pulp is another very

17    effective fiber source that we'll use on a lot of dairies.

18    Other products can be used like almond hulls or corn gluten --

19    excuse me, soy hull pellets, things like that.  But all of those

20    products are having to be shipped in by rail or by freight,

21    truck, from California, from the Midwest.  So they're at a

22    significant price disadvantage and they're not as effective.

23    Q.  Do you know -- you mentioned that they are more expensive;

24    is that correct?

25    A.  Yes.

1   Q.  Do you know what the percentage difference would be?

2   A.  Yes.  I mean it's going to vary year by year but if you had

3   to replace a significant portion of your forage that normally

4   comes from silage or alfalfa hay or haylage and you had to

5   replace that with soy hull pellets or almond hulls, you're

6   probably going to be paying at least a 20 to 30 percent premium.

7   And when 50 to 55 percent of the dairy revenue already goes to

8   feed.  When you have that much of an increase in the forage

9   portion of that, that's a huge blow.

10  Q.  Would a --

11  A.  I don't know of a single dairy in the United States that

12  doesn't feed alfalfa hay, silage, those forms of traditional

13  forages and to try and replace all those would be impossible.

14  Q.  Thank you.  I have no further questions.

15          COURT:  Cross-examination.  Counsel for MetLife?

16          MR. BINGHAM:  No, Your Honor.

17          COURT:  Counsel for the Unsecured Creditor Committee?

18          MR. KREMER:  No, Your Honor.

19          COURT:  Counsel for Rabo AgriFinance?

20          MS. SCHWAGER:  No, Your Honor.

21          COURT:  Mr. Naess?

22          MR. NAESS:  No.  Thank you.

23          COURT:  Counsel for Conterra?

24          MR. O'BRIEN:  Yes, Your Honor.  A couple.

25                       CROSS-EXAMINATION

```
1    QUESTIONS BY MR. O'BRIEN:

2    Q.  Good afternoon.

3    A.  Good afternoon.

4    Q.  What are the workable substitutes for sugar beet pulp in

5    dairy cow rations?

6    A.  Usually silage.  Corn silage specifically.

7    Q.  So sugar beet pulp is a preference ingredient, not a

8    critical ingredient to dairy rations?

9    A.  So it depends on your definition of critical because there's

10   always work-arounds but they are more difficult to find.  For

11   example, in this specific case --

12   Q.  Let me just finish my question.

13   A.  Okay.

14   Q.  So there are work-arounds for sugar beet pulp ingredients in

15   dairy cow rations.

16   A.  Sure.

17          MR. O'BRIEN:  Thank you.

18          COURT:  Counsel for Viterra Grain?

19          MR. GREEN:  No, Your Honor.

20          COURT:  Any redirect?

21          MS. MIKKILINENI:  Just one question, Your Honor.

22                      REDIRECT EXAMINATION

23   QUESTIONS BY MS. MIKKILINENI:

24   Q.  The alternatives that you just mentioned, are those -- are

25   those more or less expensive and are they effective?
```

1    A.  Yes.  They're significantly more expensive and they are not

2    as effective.  And the other problem they're going to have is,

3    like I said, the primary replacement product for wet pulp would

4    be corn silage.  And already because of the financial situation,

5    it is going to be a fraction of the amount of corn silage that

6    he normally feeds.  So going out there and trying to find more

7    silage to replace the wet pulp is not going to be possible.  In

8    other people's diets, yes.  In future years, possibly.  This

9    year?  No.  He's not going to be able to replace it with silage.

10   Q.  Thank you.  I have no other questions.

11            COURT:  Anything further, Mr. O'Brien?

12            MR. O'BRIEN:  No, Your Honor.

13            COURT:  All right.  You may step down.  Thank you.

14            WITNESS:  Thank you.

15            MS. MIKKILINENI:  Your Honor, we'd ask that Mr. Parker

16   be excused.

17            COURT:  Any objection?

18            MS. SCHWAGER:  No objection, Your Honor.

19            COURT:  The witness may be excused.

20            MS. MIKKILINENI:  Our next two witnesses, Your Honor,

21   are going to take a little bit more time I'm assuming and so now

22   might be a good time to break for lunch.

23            COURT:  Okay.  Why don't we go ahead and break for

24   lunch at this time till about --

25            MS. SCHWAGER:  1:30?  Is that too short?  Does 1:30

1   work?

2         COURT:  That should work.  All right.  Be back at 1:30.

3   Thank you, counsel.

4         CLERK:  All rise, please.

5                            (Recess taken.)

6         CLERK:  All rise, please.

7         COURT:  Thank you.  Please be seated.  All right.  We

8   are back on the record.  Before we get started, counsel, are

9   there any preliminary matters that we need to address or are we

10  ready to jump back into it?

11        MR. CHRISTENSEN:  Your Honor, there's a new exhibit,

12  1039, circulated to all the parties.  I don't have a hard copy

13  yet but I'll have one by the end of the day that we'll put in

14  the binders up here.  I also haven't talked to the parties about

15  stipulations to it but it's basically all the invoices for MWI.

16        At the request of the U.S. Trustee, there was one or

17  two missing from the big invoice exhibit so we would move to get

18  that exhibit admitted.  It's been circulated to all the

19  attorneys by e-mail.  If that exhibit gets admitted, then

20  there's also a stipulation on Exhibit 1031 for that exhibit to

21  be admitted as well.

22        COURT:  All right.  Is there any objection to the

23  admission of Exhibit 1039?

24        MS. SCHWAGER:  No objection, Your Honor.

25        MR. O'BRIEN:  No objection, Your Honor.

```
1          COURT:  All right.  There appears to be no objection to

2    Exhibit 1039.  It's admitted.

3               (Debtor's Exhibit No. 1039 admitted.)

4          COURT:  1031 as well?  Any objection to Exhibit 1031's

5    admission?

6          MS. SCHWAGER:  No objection, Your Honor.

7          MR. NAESS:  Our understanding is there will be an

8    adjustment to one of the amounts in 1031 for the claim of Aden

9    Brook.  Other than that, we're fine with that being admitted.

10   We agree with all the other claim amounts except for that one.

11   I think we've got an agreement.

12         COURT:  Okay.  Is there a modified exhibit forthcoming

13   then?

14         MR. CHRISTENSEN:  We could probably do a modified

15   exhibit but let me -- let's hold off on 1031 until we have the

16   next break.

17         COURT:  Okay.  Anything else we need to discuss,

18   counsel?

19         All right.  Ms. Mikkilineni, are you ready to proceed?

20         MS. MIKKILINENI:  Yes, Your Honor.  I'd like to call

21   Mr. Brian Huettig to the stand.

22         COURT:  Please come to the stand.  Remain standing so

23   you may be sworn in.

24               (BRIAN JAMES HUETTIG is sworn.)

25         CLERK:  Thank you.  Please have a seat.  Please state
```

1    your name and spell your last name for the record.

2              WITNESS:  Brian James Huettig, H-u-e-t-t-i-g.

3              CLERK:  Thank you.

4                        DIRECT EXAMINATION

5    QUESTIONS BY MS. MIKKILINENI:

6    Q.  Good afternoon, Mr. Huettig.  Where do you work?

7    A.  Self-employed farmer.  Partners with my parents on a farming

8    operation where we farm 6,000 acres in potatoes, sugar beets,

9    grain, hay, corn.  A partnership with Bill Millenkamp on H & M

10   Custom and then I have a seed company that I'm partners on with

11   a couple local farmers and my father.

12   Q.  And what is your position at H & M?

13   A.  The managing partner.

14   Q.  Who is control of the management decisions at H & M?

15   A.  I am.

16   Q.  Does Bill Millenkamp have any control over the management

17   decisions?

18   A.  No.

19   Q.  Who is in charge of the decisions regarding customers and

20   what to charge customers?

21   A.  I make all the decisions when it comes to what we charge for

22   chopping, all the chopping service we do.  We've been partners

23   for 10 years.  All those decisions have been made by me.

24   There's been no -- anybody that questions that rate.  It's all

25   based on talking to other customers, other chopping companies,

1    doing budgets, figuring out what it's going to take to pay the

2    bills.

3    Q.  And what types of work does H & M do for Millenkamp Cattle?

4    A.  We're exclusively their chopping company.  We do all -- 100

5    percent of the chopping of any wet feed that goes into

6    Millenkamp Cattle and is concerned with alfalfa, triticale, corn

7    silage, barlage.

8    Q.  And when are the chopping services provided throughout the

9    year?

10    A.  We start usually in mid May and it goes through mid

11    November.  Every year is a little bit different.  We started a

12    little bit later this year because of the cool spring.  There's

13    been years we go into December depending on frosts and, you

14    know, where we're at as far as chopping other people's

15    commodities.

16    Q.  Does H & M chop corn for Millenkamp Cattle's crop?

17    A.  Yes.

18    Q.  And then do you chop for other people's crop for Millenkamp

19    Cattle?

20    A.  Yes.  All the corn silage, haylage for other farmers,

21    triticale for other farmers.

22    Q.  When are the arrangements with the various farmers set up?

23    A.  Pretty much -- most of the arrangements are made the first

24    of March.  Obviously there's conversations.  We're trying to

25    figure out price of the feed beginning in January.  You know,

1    there's competition of land, what to plant depends every year.

2    You know, there's the price changes depending on what the grain/

3    corn market is, the competition for that silage.

4            So there's conversations between me, Bill Millenkamp,

5    other farmers, what other dairymen are paying.  So we have that

6    conversation January, February and then usually a contract or

7    some type of agreement is made in, you know, the first of March.

8    Q.  And who is making those arrangements with the farmers?

9    A.  For the past 10 years, as our business has grown, Bill's

10   needed more feed.  I've brought my own local farmers into the

11   business as far as growing corn for Bill Millenkamp.  He has a

12   calf ranch in Jerome where he's done business a long time there.

13   That's where he started but he has long-term relationships that

14   he deals with those farmers.

15           And then, you know, with his dairy expanding in Malta,

16   he's got some of his own customers he deals with.  But probably

17   50 percent of the customers on the corn side of things, you

18   know, I deal directly with them and then he deals directly with

19   the others.

20   Q.  Did you have any difficulty in securing suppliers this year

21   for Millenkamp Cattle?

22   A.  Yes.

23   Q.  And what's been the problem?

24   A.  Payment, the lies by Rabo, the deceit.  I don't think the

25   Court realizes what the community, what I've had to endure the

1  last six months based on what has been presented, what has been

2  told to me starting in February -- I mean, sorry, September when

3  corn season first started.

4          Obviously there was no secret as far as Bill

5  Millenkamp's financial situation.  There was rumors, there was,

6  you know, the dairy industry was suffering with low commodity

7  prices, feed costs were high so there was no -- there was

8  nothing hidden as far as the situation Millenkamp Cattle was in.

9  And there was a lot of phone conversations that I had with my

10  customers, with his customers as far as how we were going to

11  move forward in chopping that corn.

12          Bill -- Bill and I, before we started chopping corn, we

13  had real -- I questioned him as far as how he was going to pay

14  H & M, how farmers were going to get paid.  We had different

15  ideas as far as giving them the opportunity to sell their corn

16  silage elsewhere.  Put it on our own personal ground so we own

17  that silage and then Rabo got involved and told us to continue,

18  that we were going to get paid.

19          I had multiple conversations with my local advisor,

20  Todd Cook, starting February -- sorry, September 11 in regards

21  to a conversation I had with a local farmer.  He had heard from

22  his banker that there was -- they weren't going to get paid and

23  so he had called me, reached out.  I reached out to Todd Cook.

24  He told me, hey, we need the feed --

25          MR. SCHOULDER:  Hearsay.

1      COURT:  Sustained.  We're getting a bit of a narrative

2  testimony.  Can you ask some questions and guide this testimony

3  a little bit?

4      MS. MIKKILINENI:  Yes, Your Honor.

5  BY MS. MIKKILINENI:

6  Q.  The problems that you've been having with the suppliers, has

7  that ever happened before where you haven't been able to secure

8  suppliers?

9  A.  Every year's tough just because there's a lot of competition

10  for feed but this year, there's been -- I've contracted no feed.

11  There's no activity.

12  Q.  What's your impression of what it would take for farmers to

13  sell corn silage to Millenkamp this year?

14  A.  Some type of commitment that they're going to get paid.

15  Q.  And what type of commitment would you expect to see for this

16  coming year?

17  A.  Just like a lot of commodities, there's down payments.  I

18  haven't had any specific conversation as far as, you know, what

19  it's going to take to get people to release their corn silage

20  and sell it to Bill Millenkamp but, you know, as of right now, I

21  haven't tied anything up.  So until people have the security

22  that they're going to get paid for a commodity that they were

23  told they were going to get paid for last year which they

24  haven't, they're not going to sell again.

25  Q.  And do you believe that security would come in the form of a

1   deposit?

2   A.  It would be a good start.

3   Q.  How do the payments typically work for H & M's chopping

4   services?

5   A.  Each pit is a little bit different.  We start chopping

6   triticale usually so when that pit is done, we compile all the

7   loads of silage, the weights, do our dry matters, we do our own

8   analysis on our -- during the chopping and then we send one out

9   to the lab.  It takes a couple days to get all the results back.

10   Once that pit is completed, then we send the bill to Millenkamp

11   Cattle.

12   Q.  Is H & M in need of a deposit to be paid by Millenkamp

13   Cattle in order to move forward with its services?

14   A.  Yes.

15   Q.  And why is that?

16   A.  Me personally, I put a million and a half dollars into this

17   operation to keep it going, keep my vendors paid.  Yeah.

18   It's -- it's been -- I can't continue without some type of down

19   payment.

20   Q.  And absent those funds, could you continue providing the

21   same chopping services to Millenkamp Cattle at the current

22   quality and volume?

23   A.  No.

24   Q.  And why do you say that?

25   A.  Usually every year, we trade off half of our equipment.  We

1   haven't bought equipment for over a year.  I have employees that

2   require a payment when they come back.  We start chopping in

3   May.  I usually give them a payment when they get back.  We give

4   them a payment when they leave.  We pay them -- we save half of

5   that so we get them back in April and when they come back, we

6   give them a payment.  We haven't been able to give them that.

7         I have payments due coming up on the 22nd.  I have

8   truck drivers that are still owed money that -- you know, we

9   supply all the chopping but I hire all the trucking done that

10  starts in the field and goes to the pit and so I hire that out

11  and H & M pays that bill to roughly 10 independent truck driving

12  operations.

13  Q.  Do you know of any company that can provide the chopping

14  services to Millenkamp Cattle in the volume H & M provides it?

15  A.  There are chopping companies that are the size of H & M

16  Custom.  We own 8 choppers.  I sold 9.  We had 9 last year.  I

17  sold 1.  We have -- the company we deal with is Stotz Equipment.

18  We own 6 and then they provide us a spare chopper.  When one

19  breaks down, it allows us to keep the quality the same.

20  Timeliness is everything when it comes to chopping feed.  I mean

21  in one day, it can change from too wet to baling quality hay

22  which is just -- is not acceptable to Millenkamp Cattle.

23         So at this point in time with the concerns with

24  Millenkamp Cattle, the capital it takes for the equipment and

25  the manpower, there's nobody that's able to do that.

1    Q.  Thank you.  I have no further questions.

2          COURT:  Cross-examination.  Counsel for MetLife?

3          MR. BINGHAM:  No, Your Honor.

4          COURT:  Unsecured Creditor Committee?

5          MR. KREMER:  No, Your Honor.

6          COURT:  Counsel for Rabo AgriFinance?

7          MR. SCHOULDER:  Yes, Your Honor.

8                        CROSS-EXAMINATION

9    QUESTIONS BY MR. SCHOULDER:

10   Q.  Good afternoon, Mr. Huettig.

11   A.  Hi.

12   Q.  My name is Andrew Schoulder.  I'm counsel from Norton, Rose,

13   Fulbright appearing on behalf of Rabo AgriFinance.  I have a few

14   questions for you about your testimony today.  I believe you

15   testified that you are a 50 percent owner of H & M, correct?

16   A.  I am.

17   Q.  And Millenkamp Cattle is the other 50 percent owner,

18   correct?

19   A.  Yes.

20   Q.  It wasn't -- it's not Mr. Millenkamp.  It's Millenkamp

21   Cattle; is that right?

22   A.  Millenkamp Cattle, yes.

23   Q.  Okay.  And is there an operating agreement that governs the

24   operation ownership of H & M?

25   A.  Yes.

1  Q.  And under that operating agreement, that's how you are the

2  manager?

3  A.  Yes.

4  Q.  Okay.  And as the manager of H & M, you have familiarity

5  with all the material contracts and commitments.  Isn't that

6  right?

7  A.  Not all of them.  I don't see all the contracts.

8  Q.  But the material contracts though.

9  A.  As far as like the feed that's delivered?

10  Q.  Well, material contracts in terms of important relationships

11  for H & M.  Large, you know, contracts that H & M relies upon to

12  do business.

13  A.  When it comes to the contracts, H & M Custom sends out in

14  March contracts for the corn silage.  That would be the only

15  contracts H & M has any influence over.

16  Q.  Okay.  And those are contracts that H & M is entering into,

17  the ones in March?

18  A.  No.  It's done for Millenkamp Cattle.  They're the ones that

19  are buying the feed where I'm securing calling the farmers to

20  provide the feed.  We just send contracts out of our

21  relationship with Millenkamp Cattle to those farmers.

22  Q.  All right.  So we're talking about two sets of contracts.

23  So you're talking about contracts that you enter into March

24  for -- withdrawn.  Let me restate that.  The contracts that

25  you're talking about are those that Millenkamp Cattle is

```
 1   entering into in March to purchase silage and other key inputs,
 2   correct?
 3   A.  Yes.
 4   Q.  Okay.  And there are also contracts that H & M -- there are
 5   contracts that H & M is personally party to, correct?
 6   A.  As far as equipment or --
 7   Q.  Equipment, services, relationships?
 8   A.  Yes.
 9   Q.  And you would be the person that would know all those
10   material agreements; is that right?
11   A.  Like any time we purchase equipment, I sign, Bill Millenkamp
12   signs.
13   Q.  Okay.  Does H & M have a written agreement with Millenkamp
14   Cattle for the chopping services?
15   A.  I don't think we have a written agreement.  We just have a
16   partnership that we're going to shop the feed.
17   Q.  Have you ever had a written agreement with Millenkamp Cattle
18   to provide chopping services?
19   A.  I don't think we have a written contract that says, hey,
20   H & M Custom is solely the chopping company that chops for
21   Millenkamp Cattle.  It just assumed -- it's just what we have
22   done for 10 years.  So I don't know -- after 10 years, nothing
23   has changed.  We've chopped 100 percent of the feed that goes
24   into Millenkamp Cattle.
25   Q.  Okay.  And you testified earlier that Millenkamp Cattle --
```

1   H & M is exclusive chopper for Millenkamp Cattle.  Is that

2   right?

3   A.  Yes.

4   Q.  How do you enforce exclusivity?  Withdrawn.  So if there's

5   no contract, Millenkamp Cattle could use another chopper; is

6   that right?

7   A.  Yeah.

8   Q.  Even though H & M is the exclusive chopper?

9   A.  Yeah, they could.  They never have.

10  Q.  Now, you testified earlier and you just referenced the

11  contracts that you enter into in March and that's not really

12  H & M entering into them.  That's really Millenkamp Cattle,

13  correct?

14  A.  Yes, it is, yes.

15  Q.  All right.

16  A.  H & M does not sign that contract.  It's just locking in

17  that contract, you know, that feed for Millenkamp Cattle.

18  Q.  And you're the one negotiating those contracts in March with

19  the silage and hay farmers?

20  A.  The negotiation, you know, we talked about pricing-wise.

21  Bill and I talk about pricing, what we're hearing from every

22  dairyman, what farmers are hearing.  That's my connection.  My

23  connection to farmers, ears to the ground, what they're hearing

24  for pricing.  He's talking to the dairymen, what they're going

25  to pay.  Sometimes those numbers are obviously different.

1    They're trying to buy silage for cheaper.  Farmers are trying to

2    sell for higher and, you know, every year is a little bit

3    different as far as where we start and where we end.

4    Q.  Okay.  Are you an officer of Millenkamp Cattle or any of the

5    debtors?

6    A.  No.

7    Q.  Are you an employee of any of the debtors?

8    A.  No.

9    Q.  And you're negotiating the pricing for supplies that

10   Millenkamp Cattle is purchasing; is that right?

11   A.  Say that again?

12   Q.  You are the individual that is negotiating on behalf of

13   Millenkamp Cattle --

14   A.  Not all of it.  I mean it's something that we come to some

15   type of agreement, some middle ground that is going to get

16   farmers a fair price and a price to Millenkamp Cattle that is

17   competitive with what other dairymen are paying.

18   Q.  All right.  Could we pull up Exhibit 1035?  Mr. Huettig, I'm

19   not sure if you can see on this screen.  It's also -- this

20   exhibit exists in those books, whatever you prefer.

21   A.  Okay.

22   Q.  This is a contract with Steel Ranch.  Are you familiar with

23   this contract?

24   A.  No.

25   Q.  Did you enter into negotiations with Steel Ranch for the

1   purchase of corn silage?

2   A.  No.

3   Q.  So you've never seen this contract before?

4   A.  No.

5   Q.  Okay.  If we go to the next page.  How about this contract

6   with Dusty Brow, Inc.?  Are you familiar with this contract?

7   A.  I'm not.

8   Q.  Okay.  Because Mr. Millenkamp, he didn't recognize it either

9   so we're trying to figure out who's negotiating these contracts

10  on behalf of the debtor.  So have you ever spoken to Dusty Brow

11  about purchasing silage?

12  A.  His name is Cody Nelson.  He testified earlier.  I talked to

13  him.  He told me he wasn't going to sell his corn silage to Bill

14  until he got paid for his last stuff or there was some type of

15  agreement that would make a move forward with a down payment.

16  The 50 percent has been, you know, talked about as far as paying

17  up front but I've never seen this contract.  I had nothing to do

18  with that contract.

19  Q.  Okay.  Give me one moment, Mr. Huettig.  Now, in

20  connection -- let's go back to your general role in negotiating

21  contracts on behalf of the debtors.  What did Mr. Millenkamp

22  tell you about the company's bankruptcy obligations?

23          MS. MIKKILINENI:  Hearsay, Your Honor.

24          COURT:  Sustained.

25  BY MR. SCHOULDER:

1   Q.  What is your understanding of the obligations of Millenkamp

2   Cattle and the other companies that are in Chapter 11 -- that

3   because they are in Chapter 11.  What's your understanding of

4   those obligations?

5   A.  No understanding.

6   Q.  What's your understanding of the fiduciary duties that are

7   owed by a company that's in Chapter 11?

8   A.  None.

9   Q.  Do you have any sense of what fiduciary duties in general

10  are?

11  A.  I've had one other -- a local dairy in our area that H & M

12  also does business with has changed hands.  He filed bankruptcy.

13  Besides that, I've never -- this is my first real introduction

14  into bankruptcy.

15  Q.  I hope this is the last.

16  A.  Yes.

17  Q.  And you discussed earlier with counsel for the debtors that

18  you have other customers beyond Millenkamp; is that right?

19  A.  Yes.  I have one other customer that's probably 10 percent

20  of their gross receipts of H & M Custom.

21  Q.  And so if Millenkamp Cattle stopped working with H & M, that

22  would have a material impact on H & M's ability to continue to

23  do business, wouldn't it?

24  A.  Yeah.  At this point, like I said, I'm the managing partner,

25  I make the decisions.  I'm done.

1 Q. Now, earlier, you testified that you needed a deposit and

2 you mentioned that one of the reasons why you need a deposit was

3 an exchange of equipment.  Are you exchanging equipment with the

4 debtors?

5 A. I don't know if Stotz Equipment is owed money in this

6 bankruptcy.

7 Q. Well, who are you exchanging equipment with?

8 A. I'm trading that equipment off to Stotz Equipment.

9 Q. Okay.

10   MR. SCHOULDER:  I have no further questions, Your

11 Honor.

12   COURT:  Mr. Naess, do you have any questions?

13   MR. NAESS:  Just a couple short ones.  Thanks.

14        CROSS-EXAMINATION

15 QUESTIONS BY MR. NAESS:

16 Q. Good afternoon.  Just following up on your testimony that

17 you have no understanding of the debtor in possession Millenkamp

18 Cattle's obligations or fiduciary duties.  Did you ever have a

19 conversation with Mr. Millenkamp regarding the bankruptcy?

20 A. We had multiple conversations leading up to it.  I had

21 multiple conversations with Rabo leading up to it that the

22 debtors were going to get paid when Bill filed bankruptcy.

23 Q. Since the bankruptcy, have you had conversations?

24 A. Bill and I talk two or three times a week.  I can't -- I

25 can't see a particular situation when we talk about financial

```
 1    situations but nothing particular.
 2    Q.  All right.  Did he ever have a conversation with you about
 3    fiduciary duties that Millenkamp Cattle owes?
 4    A.  No.
 5    Q.  Okay.  Thank you.
 6              MR. NAESS:  No further questions, Your Honor.
 7              COURT:  Counsel for Conterra?
 8              MR. O'BRIEN:  No questions.  Thank you, Your Honor.
 9              COURT:  Counsel for Viterra Grain?
10              MR. GREEN:  No questions.
11              COURT:  Any redirect?
12              MS. MIKKILINENI:  No, Your Honor.
13              COURT:  All right.  You may step down.  Thank you.
14              MS. MIKKILINENI:  We ask that Mr. Huettig be excused.
15              COURT:  Any objection?
16              MS. SCHWAGER:  No objection, Your Honor.
17              MR. SCHOULDER:  No objection.
18              MS. SCHWAGER:  Sorry.
19              MR. SCHOULDER:  That's all right.
20              COURT:  The witness is excused.  Your next witness.
21              MS. MIKKILINENI:  Mr. Ken Nofziger.
22              COURT:  Mr. Nofziger, please come up to the witness
23    stand and remain standing so you may be sworn in, please.
24                          (KEN NOFZIGER is sworn.)
25              CLERK:  Thank you.  Please have a seat.  Please state
```

1    your name and spell your last name for the record.

2             WITNESS:  This doesn't go higher, does it?

3             CLERK:  No.

4             WITNESS:  Kenneth Nofziger, N-o-f-z-i-g-e-r.

5             CLERK:  Thank you.

6                          DIRECT EXAMINATION

7    QUESTIONS BY MS. MIKKILINENI:

8    Q.  Good afternoon, Mr. Nofziger.  Where do you work?

9    A.  I work for Kander, LLC.

10   Q.  And what's your title at Kander?

11   A.  I am a managing director and member.

12   Q.  And what's your educational background?

13   A.  I have an undergraduate degree in accounting and an MBA as

14   well.

15   Q.  What's your experience in the dairy industry?

16   A.  Over the course of my career, I've worked with probably at

17   least a dozen different dairy operations from farming operations

18   to processors as well.

19   Q.  We're going to pull up Exhibit 1034.  You should see it on

20   your screen in a minute.  Do you see that?

21   A.  Yes, I do.

22   Q.  Do you recognize this document?

23   A.  I do.

24   Q.  What is it?

25   A.  This -- this document I prepared to illustrate the cost --

1    potential cost differential of Millenkamp Cattle needing to buy

2    silage from different farmers than what they bought it from last

3    year.

4    Q.  And what are the items in that left-hand column?

5    A.  The left-hand column is the location of the farms where

6    Millenkamp bought the majority of their silage from last year.

7    Q.  And what's the average distance to the dairy?

8    A.  The average distance from those farming locations to the

9    dairy was 52.5 miles.

10   Q.  And what was the total hauling cost?

11   A.  The total hauling cost last year was approximately

12   $3,250,000.

13   Q.  And then what's in the right-hand column?

14   A.  The right-hand column reflects the other counties where a

15   significant portion of corn is grown in the state of Idaho.  So

16   if I draw your attention to the map down below, this is prepared

17   by the USDA and it shows total corn production in the entire

18   United States for 2022.  And as you can see and as probably

19   expected, the majority of the corn grown in the United States

20   occurs in what we call the I states or the Midwest: Illinois,

21   Iowa, Indiana.

22        And then you'll see on the left-hand side in the

23   western United States, there's a couple of counties, a couple of

24   pockets where there's a reasonable amount of corn grown and I'll

25   point out this is all corn both for dry corn, no. 2 corn, and

1   then also for corn silage.  So the red dot in that map in Idaho

2   represents where the dairy is located.  The surrounding counties

3   that are in the yellow and the light shade of green are counties

4   where there are other farmers available potentially to buy corn

5   from.

6           So what we did was we measured the distance from the

7   county seat basically the middle of each of those counties to

8   where the dairy's located and that average distance from those

9   county seats to the dairy's about 157 miles or three times the

10  distance of what the current farmer locations are to the dairy.

11  Q.  And what's the total hauling cost in that scenario?

12  A.  Well, I mean this is assuming that you're pulling equal

13  amounts, an average amount from each of those other counties.

14  So in the case that you had to go that far afield and get corn

15  from those locations and you hauled the same number of tons, the

16  177,000 total tons at the cost per ton per mile that Millenkamp

17  pays, your total hauling cost is close to 10 million.  $9.8

18  million.  But again, that's assuming you're pulling from all of

19  that.  If you're able to get silage closer, you know, you're

20  going to be a fraction.

21          The additional incremental mile that you're hauling

22  this 177,000 tons represents about $62,000 a mile.  So the

23  farther afield you have to go, you're paying an extra $62,000.

24          So this is just reflecting what that potential could

25  be.  I'll also point out that where the dairy's located, the red

1   dot, the counties that are shown there on the left-hand side

2   where the farms are located is also where the majority of the

3   cows in the state of Idaho are located.  Most of your major

4   dairy operations are going to be located in that Twin Falls,

5   Jerome area.  So that's where there's a much higher level of

6   competition to get corn.  And so if we're not able to buy it

7   close by and you have to go farther afield, it's just going to

8   increase the hauling cost.

9   Q.  And according to your analysis here, what is the total cost

10  to obtain silage -- what's the difference between the total cost

11  to obtain silage if you have to go outside the area?

12  A.  Just in hauling alone -- and again, this is assuming you're

13  having to get from each of those locations so maybe a worst case

14  scenario but 6 and a half million dollars.  My guess is it's

15  going to be anywhere from 2 to 3 times what the existing hauling

16  costs are.

17  Q.  I'm going to pull up Exhibit 1036.  Do you see that there?

18  A.  Yes.

19  Q.  Do you recognize that document?

20  A.  I do.

21  Q.  What is it?

22  A.  This is a cash forecast that we at Kander prepared using the

23  kind of Tuesday, the cash flow that we've been presenting in a

24  weekly variance report to all the parties in the case.  You

25  know, up until -- can you scroll to the next page, please?  So

1    it goes through the week end of June 16 which was Sunday.  So

2    anything in those green columns represents the actual cash flows

3    of the Millenkamp entities through June 16.

4            And then for the cash collateral order, we had prepared

5    a budget that went from the petition date of April 2 that went

6    all the way through August 11.  So what we've done is taken the

7    actual information we have to date, in this case, and an actual

8    starting cash balance in the case as of Sunday or Monday morning

9    of this week and we said based on what we know from all of the

10   activity that's occurred to date, including where the herd size

11   is today, what current milk prices are, what current production

12   levels are happening, you know, what the mix of cows versus

13   heifers and custom feeding cattle and we've updated the

14   assumptions for the period June 17 through August 11 based on

15   all the information, the data that we've gleaned to date in

16   order to forecast what the cash flow looks like, you know,

17   through the August 11 date.

18   Q.  So what's the total period that this forecast covers?

19   A.  The forecast is from June 17 through August 11.

20   Q.  And then what about the actuals?

21   A.  The actuals are from the petition date April 2 through June

22   16.

23   Q.  Okay.  Are the deposits that we're requesting included in

24   this forecast?

25   A.  Yes.  If you look two-thirds of the way down the page in the

1   feed line item, for next week, the week beginning June 24,

2   you'll see the feed cost is at $8,612,000.  That's your normal

3   weekly feed cost plus the sum of the deposits at $6.5 million.

4   Q.  Are the 503(b)(9) payments included in this forecast?

5   A.  Yes, they are.  In that same column, the week beginning June

6   24, you'll see in the middle of the page the 503(b)(9) payments.

7   So we've included the $5,175,953 to be paid next week.

8   Q.  Were there any changes made to this forecast compared to the

9   cash collateral budget?

10  A.  Yes.  As I mentioned before, we went through each of the

11  individual line items from milk checks to the dairy revenue

12  protection payments.  Every cash receipt and each of the

13  operating expense line items and made modifications to those

14  based on what the historic experience has been and what we're

15  looking to occur over the next six, eight weeks.

16  Q.  Are there additional DIP draws included in this forecast?

17  A.  Yes, there are.  If you can scroll down.  Nope.  Keep going.

18  Keep going.  Yes.  You'll see that this forecast, again, with

19  all the assumptions that are built into it, 1, you'll see it

20  highlighted in light red, $2 million.  That's the remaining $2

21  million on the last draw approval.  Those funds I believe were

22  wired today.  They were supposed to come out yesterday.

23          And then we've got $10 million scheduled to be drawn

24  next week in order to cover the deposits and the 503(b)(9)

25  payments.  And then if you scroll forward to the last week of

1    the budget, keep going, keep scrolling.  No, forward.  Keep

2    going.  One more.  One more.  There we go.  And then the last

3    week of the budget, the week ended August 11, you'll see there's

4    another drawn -- draw amount of $5 million in that week.

5    Q.  And I just want to clarify.  The $2 million, that's the

6    amount -- that's part of the amount that was authorized

7    previously, correct?

8    A.  That's correct.

9    Q.  Why are you projecting the need for a $10 million draw in

10   next week's forecast?

11   A.  That 10 million is required.  If the 503(b)(9) claim or

12   motion and the deposit motion are both granted, we'll need that

13   draw to fund those two payments.

14   Q.  And how much cash is on hand right now?

15   A.  I'm going to ask you to scroll back one.  On hand as of

16   Monday morning was $6.9 million.

17   Q.  And why do you need the additional $10 million to make the

18   deposits and 503(b)(9) payments if you have that amount in cash

19   right now?

20   A.  Well, the sum of those two payments are approximately $12.5

21   million and what happens in this budgeting process is we only

22   receive milk checks twice a week.  So we generally have a week

23   when we get a milk check and then we've got two weeks where

24   there's no milk check.  And then the timing of the

25   disbursements, they're averaging any given week 3 to 3 and a

1    half million in the operating and disbursements and then once a

2    month, we have interest payments that are made.  We've got

3    payroll that happens every other week.

4            So in order to maintain a cash balance that's going to

5    meet the expected obligations of the next couple of weeks,

6    particularly in the weeks where there's not a milk check, we've

7    done the calculation kind of backwards and say here's the amount

8    of draw that we need to do, here's the amount of cash that we

9    need to have on hand and then the cash on hand also needs to

10   cover -- the DIP loan has a requirement for a 1 and a half

11   million dollar cash reserve and there's also a covenant that

12   says -- regarding payment obligations, if you've got a reserve

13   on your book for expenditures, there's an obligation in there to

14   be able to make those payments.

15           So if you go down to under ending cash, during the

16   course of this case, we're accruing professional fees.  They're

17   not paid on a weekly basis.  The budget had them, you know, on a

18   cash basis.  There's procedures that all the professionals have

19   to go through so what's happening is the balance owed to the

20   professionals in this case are growing.  You know, some payments

21   will start here shortly for fee applications that have been

22   filed.  So that number's going to go up and down a little bit

23   but for the most part, it's continuing to accrue and get larger

24   during the course of the case.

25           So we've done the calculation and you can see on that

1    bottom line, you get out to the week of July 14 where with the

2    cash balance on hand, the disbursements that we've had to make

3    during those weeks, we end up with a $82,000 cash balance after

4    meeting those reserves.

5            Then the next week, a milk check comes in, cash goes

6    back up.  So you know, we base the draws based on what's needed

7    in that current week and what we're forecasting the cash flows

8    to be over the next couple of weeks.

9    Q.   And why are you projecting the need for a $5 million draw in

10   I think it's week 19?

11   A.   If you scroll back to week 19 -- you might be going the

12   wrong way.  There we go.  So you'll see at the end of August 11

13   after the $5 million comes in, we're showing about a $7.7

14   million ending cash balance and then the accrued professional

15   fees, the $1.5 million reserve, we'd have 4.3 million in cash

16   available.

17           If you go beyond the August 11 date, if you look at the

18   next two weeks, there's no milk check that comes in in those two

19   weeks and, again, we're going to have 3, 3 and a half million in

20   each of those weeks in operating expense.  You're going to have

21   payroll in one of those weeks.  So you're going to have another,

22   you know, $7 million cash disbursement need.  There's some

23   collections of cattle sales and a few other things that offset

24   that but the calculus again there was to bring it back how much

25   cash do we need to cover the next two weeks.

1    MS. MIKKILINENI:  I have no further questions.  Thank

2    you.

3    COURT:  Cross-examination.  Counsel for MetLife?

4    MR. BINGHAM:  No, Your Honor.

5    COURT:  Unsecured Creditor Committee?

6    MR. KREMER:  No, Your Honor.

7    COURT:  Counsel for Rabo AgriFinance?

8    MR. SCHOULDER:  Yes, Your Honor.

9                    CROSS-EXAMINATION

10   QUESTIONS BY MR. SCHOULDER:

11   Q.  Good afternoon, Mr. Nofziger.  I pronounce is right, right?

12   A.  Yes, excellent.

13   Q.  I was a little worried about that.  I want to start -- if we

14   could turn to Exhibit 1034, I had just a couple of questions

15   about this.

16   A.  Okay.

17   Q.  You testified that the total hauling costs on the right

18   assumes you cannot get silage from closer counties, right?

19   A.  Correct.  It's evenly spread throughout all 12 or 13 of

20   these counties.

21   Q.  Okay.  And you did say that this assumes that you can't get

22   silage closer and you testified it would be a fraction of the

23   total hauling cost on the right-hand of the screen; is that

24   right?

25   A.  I think I testified if you can't get silage that's closer,

1    then it could be as much of that.  Again, it's a series of

2    assumptions.  You know, if you could get all of it and the

3    American Falls and Blackfoot County, would it be a lower number?

4    Yes.  And again, that's the point.  62,000 per mile, that

5    differential between where the existing farms are.

6    Q.  Right.  I just want to understand what you mean by a

7    fraction.  So let's just -- you know, this is one assumption,

8    right, that you've made for purposes of coming up with, you

9    know, demonstrative analysis.

10   A.  Illustrative analysis.

11   Q.  Okay.  Now, did you calculate what the total hauling costs

12   would be using the assumption that the debtors could get silage

13   from the closer counties?

14   A.  Well, if it comes from the counties that are currently

15   there, as long as those counties are 52 and a half miles from

16   the dairy location closer, if it's 52 and a half, it would be

17   the same.  If it's shorter distance, it could be lower and if

18   it's farther -- it just depends on the exact location where

19   you're procuring the silage from.

20   Q.  Right.  But did you -- and including this illustrations, did

21   you run the numbers in terms of what the total hauling costs

22   would be using the assumption that the debtors were able to

23   procure silage from closer counties?

24   A.  I could run probably 20,000 different iterations.  So again,

25   that's what I'm saying.  It's illustrative.  The assumption is

1    if you're drawing equal amounts of silage from each one of those

2    counties, on average, they're 157 miles.  To the extent you can

3    get them closer, every mile you get closer to the farm, it's

4    $62,000 in savings.

5    Q.  Right.  And just one last question on this.  If you were to

6    use a kind of -- instead of a best case/worst case, a close

7    case/furthest case, right, in your view, where would you believe

8    this $9.7 million would fall based upon that kind of scale?

9    A.  I would need further information from Bill, from the

10   farmers, from everyone -- you know, again, I've heard testimony

11   saying how tough it is to buy silage particularly at this point

12   in time.  Again, where the location is.  Today, I know that

13   that's where most of the major dairies in the state of Idaho are

14   located.  So at this stage in the game, it's probably a

15   reasonable assumption to say it's going to be hard to find it in

16   those closer counties.  And again, if you just look at the

17   distances of all the alternative counties, there's only one of

18   them that is closer than 52 and a half miles.

19        So to the extent I have to go out to any of those

20   counties -- like I said, if you can get into American Falls,

21   Blackfoot, and Shoshone, if I can get all the silage there, then

22   yes, this number would be significantly less.  But it would --

23   the simple math is $62,000 for every mile on average that you're

24   pulling it from where we're at today.

25   Q.  You can take it off the screen.  I don't want to distract

1   Mr. Nofziger.  Let's talk a little about the deposits that the

2   debtors are requesting be made here.  In your experience as a

3   restructuring adviser, what makes a vendor critical?

4   A.  A critical vendor is someone who is supplying goods or

5   services that are absolutely necessary or adamant for continuing

6   operating the business in not only the normal course but kind of

7   the optimal course of business.

8   Q.  Assuming that the vendor meets that criteria, in that

9   scenario, just general in your experience, you would recommend

10  designating that person or parties as a critical vendor.  Is

11  that fair to say?

12  A.  Yes.

13  Q.  Now, if a vendor has a prepetition executory contract with

14  the debtors, would you still recommend giving that creditor

15  special critical vendor treatment?

16  A.  It depends on whether they're continuing doing business with

17  you going forward.

18  Q.  Well, if they couldn't terminate the contract for

19  convenience, would you recommend that they still be afforded

20  critical vendor treatment?

21  A.  Every situation is unique.  It depends on the terms of the

22  executory contract, the volumes, the level of service, when

23  they're providing it, the dollar amount associated with it.  Are

24  there alternative suppliers to it?  You got to take all of those

25  factors into consideration when making those decisions.

1    Q.  Was Kander involved in determining the deposits that are

2    being proposed to be paid in the debtor's motion?

3    A.  No.

4    Q.  Is it based upon your experience with the debtor's

5    historical budgets?  Do you -- withdrawn.  Of the $2.5 million

6    deposit that is being proposed for hay and straw for Steve Lam,

7    are you aware of what amount is going to Mr. Lam?

8    A.  No.

9    Q.  What about Mr. Jon Bingham?

10   A.  No.

11   Q.  Of the 2.5 million --

12   A.  I don't know the specifics -- I just know the dollar amounts

13   and the buckets for silage and haylage and chopping.

14   Q.  So that's the same for Mr. Hagen, Mr. Hollifield?

15   A.  Yes, yes, yes.

16   Q.  In terms of the H & M, the debtors aren't having

17   historically provided a deposit -- a deposit for H & M, have

18   they?

19   A.  Not that I've seen but I heard Mr. Huettig testify that they

20   received one, I don't know, 7, 8 years ago maybe.

21   Q.  Are you aware of whether the debtors have an executory

22   contract with H & M to provide chopping services?

23   A.  I'm not aware of a contract.

24   Q.  Were you involved in the decisions on who should be a

25   critical vendor or not?

1    A.  I sat through several meetings with Mr. Millenkamp and a

2    couple of the management team members and we went through in

3    excruciating detail every single vendor that was on the critical

4    vendor list.  What services do they provide, what do they do,

5    how much do we owe them?  What's the probability that they won't

6    continue doing business with you?

7            I'm not familiar with any of those vendors specifically

8    so to some extent, we were a scorekeeper, a record keeper.  I

9    mean we knew what the balances were on each side of it, what the

10   proposed payments were to them and we were essentially modeling

11   those and then plugging them into the various budgets that have

12   been presented throughout the case.

13   Q.  Okay.  And in terms of the -- the gory details of going

14   into, you know, each vendor, did you ask whether an executory

15   contract existed for certain vendors?

16   A.  I didn't ask about executory contracts, no.

17   Q.  The existence of an executory contract would be an important

18   factor in determining whether someone should be designated a

19   critical --

20   A.  Like I said earlier, it would be one of many different

21   factors.

22   Q.  How much did H & M receive as part of the interim critical

23   vendor motion?

24   A.  I'd have to -- I don't know off the top of my head and I

25   don't know if it's specific -- no, it's not.  It's just a

1    general one for adequate protection.  I don't know the dollar

2    amount.

3    Q.  Does 4025 sound familiar?

4    A.  I don't know -- I don't know the specific dollar amount.

5    Q.  Okay.  Can we turn to Exhibit 1030?  Do you recognize

6    Exhibit 1030?

7    A.  Yes.

8    Q.  And this is the illustrative exhibit that Mr. Millenkamp

9    testified to at the May 8 hearing, correct?

10   A.  Yes.

11   Q.  And this -- this exhibit identifies each of the 503(b)(9)

12   claimants, correct?

13   A.  The column that says goods delivered within 20 days, yes.

14   Q.  Did Kander assist in preparing the claim amounts for the

15   503(b)(9) claimants?

16   A.  Not the claim amounts.  Again, we were more of a record

17   keeper.  People would supply us with, okay, here's the dollar

18   amount of those claims.  We would plug them into these different

19   models and work sheets and present the kind of final outcome.

20   Q.  Did Kander have a role in evaluating whether a party

21   qualified for a 503(b)(9) treatment?

22   A.  No, we did not.

23   Q.  You're aware of that Mr. Millenkamp testified earlier that

24   you were involved.

25   A.  That we were involved in the process and our involvement was

190

1  simply, okay, here are the lists and, you know, Bill's team in

2  ad nauseam went through their records and, again, in most cases,

3  there's data reconciliation that has to happen with the vendors.

4  You have to really start drilling down on the specifics dates on

5  the invoices.  When was the invoice date?  When were the actual

6  goods received?  Was it goods reservices?  We weren't involved

7  in any of that analysis.  We were solely involved in, okay,

8  here's who they are.  Here's the dollar amounts.  Let's plug

9  them in here.  Here's the amount of the claim that we have and

10  that those numbers of some of them had changed during the

11  process I believe.  So it's been a bit of an iterative process.

12  But yes, our involvement has been kind of gathering the

13  information as it's presented and then putting it into these

14  cash flow budgets.

15  Q.  Okay.  So to just simplify your testimony a minute ago, you

16  were given a number for a 503(b)(9) claimant and you put it in

17  the schedule -- you put it in the budget and that was it.

18  A.  Yeah, we didn't question -- I mean is it a finance -- we

19  didn't look at any of the underlying data.  We simply received

20  the information and put it into the budget.

21  Q.  And so who was responsible for confirming that the

22  management team was complying with Section 503(b)(9) of the

23  bankruptcy code in terms of stating claim amounts?

24  A.  I believe counsel was pretty intimately involved in giving

25  instructions to Millenkamp's team, what should and shouldn't be

1   in there and then, you know, as claims were coming in and having

2   conversations with different vendors that were saying, hey, you

3   probably don't have the right number here.  You should relook at

4   this.  They were the ones that ultimately were kind of saying,

5   okay, here's the final tally of the claims.

6   Q.  So counsel was responsible for verifying whether or not the

7   503(b)(9) claims complied with section 503(b)(9)?

8   A.  I don't know if they were responsible for the final

9   verification.  I believe that was on Millenkamp's office staff.

10  I think their payables personnel has, you know, probably went

11  down to the source level and said, okay, let's gather all the

12  invoices from ABC corporation for this period of time.  And then

13  they probably went and gathered invoices for before that period

14  of time and after that period of time and then were interpreting

15  are they goods, are they services, what are they?

16          It was a fairly short time frame, the first round of

17  doing this.  And again, this is my experience not atypical in a

18  bankruptcy situation where there's kind of iterations of all

19  claims including 503(b)(9) claims.  And then had to have

20  conversations with the vendors.  Is this right?  Are these the

21  right amounts?  That's my understanding.  That's what happened.

22          So ultimately, I'd say the Millenkamp office staff had

23  the final verification on whether or not they were appropriate

24  based on -- based on Code Section 503(b)(9) and the instruction

25  that is were provided to them by counsel.

192

1   Q.  So who with experience with Chapter 11 went through the

2   backup before it was testified to before this Court to confirm

3   that the debtor's management team who are not restructuring

4   professionals were complying with Section 503(b)(9) by

5   requesting close to 5 and a half million dollars be paid?

6   A.  I don't know who ultimately.  Again, I know the instructions

7   were provided by counsel and counsel reviewed some of the

8   documents and said, hey, some of these aren't right.  You got to

9   do this.  You got to do that.  It was an iterative process with

10  multiple people involved.

11  Q.  Okay.  So this was the exhibit that was filed -- that was

12  filed with the Court and testified to by Mr. Millenkamp on May 8

13  and you testified just a minute ago that it was a very quick

14  moving process.  The debtor's filed a motion to allow and pay

15  these claims on May 20, correct?

16  A.  I don't know the exact date when the motion was filed but if

17  you say that's the date the motion was filed, then yes.

18  Q.  And are you aware of whether there was any changes in the

19  amounts from the May 8 exhibit that's in front of us and those

20  that were submitted in the motion to the Court on May 20?

21  A.  I do not know.

22  Q.  There was enough time between May 8 and May 20 to verify

23  that information then, wouldn't you agree?

24  A.  Depending on what other tasks people were doing.  You know,

25  I think it was probably understood that, yeah, we did the work

1    and it was accurate.  No one had said anything different so they

2    probably went on to doing other things.  Honestly, I don't know

3    who was responsible for what as it relates to 503(b)(9) during

4    that period, during the previous period and even today.

5    Q.  Are you aware of the difference between what was -- the

6    dollar difference between what was submitted to be paid at

7    503(b)(9) between May 8 and the updated schedule that was filed

8    with the Court on June 14?  Are you aware of what the dollar

9    difference was?

10   A.  I know -- I'd have to see it in front of me.  There was --

11   in our budget, I know there was a larger number.  Maybe 5.8

12   million approximately.  I'm sure you know the number.  I'm

13   trying to remember off the top of my head.  If you want to pull

14   up a previous budget, then I can tell you the number.

15   Q.  Would you agree that it's in the ball park of $800,000?

16   A.  Again, tell me what the number was in my previous budget and

17   this number today and I'll agree -- I'm not trying to be

18   difficult.

19   Q.  I'm not trying to pin you to a specific number.

20   A.  I need to see the budget.

21   Q.  If I told you it was approximately $801,522, would you have

22   any reason to challenge me on that number?

23   A.  That sounds precise, not approximate.  But yeah -- no.

24   Q.  (Inaudible).

25   A.  I would tend to believe that that's the right math.

1    Q.  Would you agree that's a pretty material difference in terms

2    of what was filed on May 8 and what was --

3    A.  It's a fairly large number, yes.

4    Q.  Now, earlier, when you were discussing the deposits in the

5    context of the budget, you mentioned that you identified that

6    the budget -- that the deposits were actually -- are included in

7    the budget that was currently filed.

8    A.  The forecast.

9    Q.  The forecast, sorry.

10   A.  Not budget.

11   Q.  Sorry.  I stand corrected.  Were deposits included in prior

12   forecasts filed with the bankruptcy court?

13   A.  No.

14   Q.  One question I did have.  You mentioned earlier that there

15   is a need for a million dollar cash reserve under the terms of

16   the DIP loan agreement?  Do you remember explaining that?

17   A.  1 and a half million dollars.

18   Q.  1 and a half million dollars.  Is that different than the

19   minimum cash covenant under the loan agreement?

20   A.  No.  I don't know if it's called a reserve in the loan

21   agreement.  I don't know if it's cash covenant.  I know the loan

22   agreement requires 1 and a half million dollars in cash.  So I

23   think we're calling it a reserve.  I don't know if it's -- it's

24   terminology but it's a million 5 is the number that's in the

25   loan agreement is my understanding.

1  Q.  Just turn to Exhibit 1036.  And if we just go down to the

2  next page.  All right.  Just go down one more page.  Could we

3  just move to where it has the $1.5 million reserve?  Okay.

4  Could you just Zoom -- blow it up.  I can't really see.  I'm not

5  sure if Mr. Nofziger's eyesight is better than mine.

6  A.  I've got these on.

7  Q.  So in prior forecasts, there wasn't a $1.5 million reserve

8  for accrued and unpaid professional fees cumulative reserve, was

9  there?

10  A.  Well, forecast?  This is the only forecast we've done.  In

11  the past budgets, there wasn't line items showing those.  We

12  just had an ending cash balance.

13  Q.  Okay.  Now, is it your testimony that the DIP loan agreement

14  requires that the debtors maintain a $1.5 million reserve to pay

15  accrued and unpaid professional fees?

16  A.  No.

17  Q.  It's correct that there is a minimum cash covenant, correct?

18  A.  To maintain 1 and a half million dollars, yes.  That's

19  correct.

20  Q.  So there's nothing in the DIP loan agreement that requires

21  the debtors to reserve $1.5 million to pay accrued and unpaid

22  professional fees, is there?

23  A.  There's not anything specifically stating 1.5 million.

24  There's a covenant for payment obligations that requires the

25  debtor -- and I don't have it in front of me but it requires the

1    debtor to be able to pay any accrued post-petition liabilities.

2         So when I hear that, it means I better have money set

3    aside.  It seems like prudent business judgment to make sure you

4    have money set aside to cover what those accrued post-petition

5    liabilities are.

6         So -- and we've had conversations every single week

7    when we go through the variance analysis with FTI, with Armour,

8    with Focus, with Sandton, occasionally with Conterra where we go

9    through the variance analysis and we have a conversation every

10    single week.  Okay.  We've had in the budget these are

11    professional fees and they're accruing at this rate.  We present

12    every single week what's in the accounts payable and so we have

13    those conversations and we talk about, okay, here's where we're

14    at from a cash position, here's the expenses that have happened.

15         So we're talking to people.  We're getting feedback and

16    we believe from a business judgment maintaining some level of

17    cash because if I've -- you know, we know we've got I think

18    professional fees from the attorneys I think have been approved.

19    We've got (inaudible) through all of it or scheduled repaid.  So

20    we're going to have cash needs above and beyond what was in our

21    original budget for that specific week but we had in the

22    budget -- and you know, maybe we messed up the budget, that we

23    were showing professional fees, you know, being paid on a cash

24    basis every week.

25         And then subsequently, it's like, okay, there's a

1    process that you have to go through.  So we're accumulating

2    those.  We know an estimate of what the accrued expenses are.

3    So we're just making sure we've got the funds available to pay

4    those.

5    Q.  The DIP was approved on an interim basis in April, correct?

6    A.  Was it April or early May?  Yeah.  I think it was April.

7    Q.  And then it was approved -- I'm not going to hold you to a

8    date because I actually don't know it either.

9    A.  It was approved -- the final approval was in May, I think.

10   Q.  It was approved on a final basis is May, correct?

11   A.  Yeah.

12   Q.  And the debtors -- so the debtors have made other draws in

13   the DIP facility prior to today.

14   A.  Correct, correct.

15   Q.  And they've never before drawn $1.5 million as a reserve for

16   accrued unpaid professional fees, have they?

17   A.  No.  They've drawn very specific amounts and like I said

18   earlier, the amount of their draws are based on not just that

19   reserve.  It's predicated on what's the schedule of my milk

20   checks coming in over the next couple weeks.  Here's the

21   operating disbursements.  Here's what's in payables that we know

22   need to get paid.

23        So we've kept an eye on the cash balance and the

24   projected cash balances and tried to maintain a cash level

25   that's going to not disrupt the ordinary course of business.

1    And for example, payables week to week range from 1.2 million to

2    3.3 million.  You know, part of it's on when invoices come in,

3    you know, when they're processed, how they're matched up to

4    actual receipts and then when they're paid.

5    Q.  Right.  And so this reserves covers the fees and expenses of

6    the debtor's financial advisor and their law firms, correct?

7    A.  And I don't -- I'm not calling it a reserve.  You're calling

8    it a reserve.  I'm just calling it accrued unpaid professional

9    fees.  So yes.

10   Q.  I'm reading your budget.  It's called a reserve.

11   A.  No.  The reserves the cash, 1.5 million cash.  The line

12   above that is the accrued professional fees.

13   Q.  Right.  And it's a reserve for the accrued unpaid

14   professional fees?

15   A.  Two different things.  The reserve is the 1 and a half

16   million dollars cash reserve per the loan agreement, per the

17   covenant -- and the loan agreement says the debtor has to

18   maintain a 1 and a half million dollars cash balance.  That's

19   what the 1 and a half million is.  On top of the 1 and a half

20   million and it's the line on top of it that says accrued unpaid

21   professional fees cumulative.  That's simply math that's showing

22   each week what the accrued amount of professional fees that

23   haven't been paid yet, what we expect them to have.

24          And yes, it's for -- well, it's -- it's for counsel.

25   It's for financial advisor.  I think it includes appraisals in

1    there.  It's any and all professional fees and there is -- I

2    don't think this has it.  There's a section of the budget that

3    spells it out by party, what the dollar amounts are.

4    Q.  The DIP loan agreement, just to be clear, Mr. Nofziger, it's

5    a minimum cash covenant.  Is doesn't require you to maintain a

6    reserve.  Isn't that right?

7    A.  Well, if it's a covenant that says I need to have a minimum

8    cash balance of 1.5 million and then if I don't have the 1 and a

9    half million, I'm blowing the covenant and I go into default,

10   that's -- again, that's why we're calling it a reserve.  It's

11   terminology, covenant, reserve.

12          But my understanding of the agreement and conversations

13   again that I've had with all the financial advisors in the case

14   is that the debtor should be maintaining a 1 and a half million

15   dollars cash balance so that they don't trip a covenant and the

16   loan agreement with Sandton.

17   Q.  Mr. Nofziger, you're -- I think you're -- let's just talk

18   about -- let's separate it out.  All right?

19   A.  Okay.

20   Q.  There's a minimum cash covenant that requires I believe --

21   and I could be wrong and I could be corrected, a requirement to

22   maintain a million dollars of carbon balance.

23   A.  1.5 million is my understanding.

24   Q.  If it's 1.5, then I stand corrected.

25   A.  And I could be wrong.  Again, I'm going off of memory.

```
 1   Q.  Are the debtors drawing additional funds as a reserve in
 2   addition to that 1 or 1 and a half to be able to pay
 3   accumulative -- accrued unpaid professional fees?
 4   A.  Well, you're talking two completely different things.  The 1
 5   and a half million dollars is the cash covenant.  So per the
 6   terms of the -- of the loan agreement, is my understanding, they
 7   need to maintain a 1 and a half million dollars cash balance.
 8   If you go back to the week I think that -- they've maintained at
 9   least a million and a half dollars throughout the case.
10         And then the accrued unpaid professional fees is a
11   post-petition liability that is being accrued.  It's again shown
12   on the books and records of the company and I think -- I believe
13   there's a -- there is a -- is it a covenant, yeah, in the loan
14   agreement for post-petition liabilities that says the debtor
15   must be able to pay all post-petition liabilities.
16         So the interpretation is, as this is -- this number
17   keeps getting bigger and bigger and it's shown on the books and
18   records and I'm saying we believe it's good business judgment to
19   make sure you have the funds on hand to satisfy those
20   liabilities as spelled out in the loan agreement.
21   Q.  And so you're drawing on the DIP in order to be able to fund
22   those fees at a later date?  Is that right?
23   A.  I'm drawing on the DIP in order to maintain a cash balance
24   that covers what we read in the loan agreement that the debtor
25   in his good business judgment should have on hand.
```

1   Q.  Are you drawing funds in addition to the those required to

2   satisfy the minimum cash covenant order to be able to pay

3   accrued unpaid professional fees in the future?

4   A.  We're drawing funds to cover not just that.  We're drawing

5   funds to cover what the upcoming operating expenses are, debt

6   payments, payroll, anticipated revenues, when the milk checks

7   come in and, yes, part of it is we're making sure that we're

8   maintaining a balance to cover those accrued unpaid professional

9   fees.

10  Q.  And in order to have funds to be able to pay those future

11  accrued unpaid professional fees, the estate is going to incur

12  interest and fees in order for that future payment; is that

13  right?

14  A.  They're going to incur interest and fees on whatever is

15  drawn on the line of credit.

16  Q.  Even though the professional fees may not be due and payable

17  for three months or two months from now?

18  A.  Again, I'm following a little bit of the terms of the loan

19  agreement.  It's a business judgment call.

20  Q.  Well, to be clear, the loan agreement doesn't require you to

21  have a reserve to pay professional fees.

22  A.  No, it doesn't say specifically have a reserve but it says

23  you have to be able to meet those obligations and --

24  Q.  So you're interpreting -- and so you're interpreting that to

25  be able to draw funds to be able to pay professional fees in the

1   future?

2   A.  I'm interpreting that that it's good business judgment to

3   make sure you have the funds available to cover the terms of

4   that agreement.

5   Q.  Did Mr. Millenkamp request that you take that draw to be

6   able to pay future professional fees?

7   A.  No.  Again, none of the conversation about having to take a

8   draw --

9   Q.  Did Mr. Heida -- did Mr. Heida --

10  A.  No, nobody --

11  Q.  So who decided to draw funds from the DIP in order to pay

12  future professional fees?  So far, it's not Mr. Millenkamp, it's

13  not Mr. Heida.

14  A.  It's a collect -- I mean again, this forecast and budget is

15  similar -- it's a collaborative process where Mr. Millenkamp has

16  reviewed and we've discussed about every single assumption in

17  here.  Mr. Heida's been involved in those conversations.  Lisa

18  Nelson, the office manager's, not involved in all of them.

19  She's involved in some of them.  Counsel's part of it and Kander

20  is part of it.  And also some of it -- I mean we're having

21  conversations every week with the other financial advisors

22  about -- about all of these issues that we're talking about.

23  Q.  So far, you haven't told me who from the debtors authorized

24  the debtors with authority to draw funds --

25  A.  Mr. Millenkamp and Mr. Heida have approved this forecast.

1    Q.  And they specifically approved a forecast to incur DIP

2    interest and fees to pay professional fees at a future date?  Is

3    that your testimony?

4    A.  My testimony is they approved this forecast that includes as

5    part of that forecast two line items that again we're

6    interpreting from reading the loan agreement to make sure that

7    they have maintained a cash available number after all the

8    operating expenses, all the milk checks received, et cetera.

9    And yes, that's specifically in this forecast.  That was

10   specifically approved by Mr. Millenkamp.

11   Q.  If the Court were to deny the debtor's request to pay

12   503(b)(9) claims prior to confirmation, that would reduce the

13   DIP funding by approximately $5.2 million, wouldn't it?

14   A.  Yes.

15   Q.  And if the Court were to deny the request to pay H & M a

16   deposit, that would reduce the DIP funding need by 1.5 million.

17   Isn't that right?

18   A.  Yes.

19   Q.  So that would leave the DIP funding -- and if the Court were

20   to deny the request to reserve $1.5 million to pay accrued

21   unpaid professional fees, that would reduce the DIP funding need

22   to $6.8 million, correct?

23   A.  And it's not 1.5 million for accrued professional fees.

24   That's the cash reserve but, yes, if the Court said you can't do

25   that -- and again, it's -- part of it's business judgment but,

1    yes, if the Court said no, don't take that into account, that
2    would definitely reduce the amount that would need to be drawn.
3    Q.  Would it be fair to say that between May 1 and the current
4    reporting period, the debtors have been maintaining a net cash
5    available ranging from 5 million to upwards of 12 million?
6    A.  Well, from April 29 forward -- scroll forward, please.  Yes.
7    Q.  Yet you are proposing that in addition to the maintaining
8    the million dollars of net cash available which is required
9    specifically by the loan agreement, that the debtors now draw an
10   additional $1.5 million to create an additional cushion in
11   addition to the 5 -- the cash available that's for the last
12   several reporting periods?
13   A.  We're suggesting that based on what's in this forecast,
14   these are dollar amounts that need to be drawn including those
15   accrued unpaid professional fees.
16   Q.  If we could turn to Exhibit 3090.
17        MR. SCHOULDER:  And, Your Honor, per my agreement with
18   Mr. Christensen, obviously by the title, this is not a document
19   that Kander prepared.  This is a sensitivity analysis that FTI
20   Consulting prepared using the forecast that Kander prepared and
21   filed and testified to today.
22        FTI made a number of adjustments to Kander's forecast
23   to demonstrate certain assumptions -- if certain DIP funding
24   requests were removed from the immediate DIP funding so that the
25   Court could see whether the company actually needed to draw cash

1    in the first instance, to see what's the impact of the various

2    components of expenditures that the debtors are proposing to pay

3    and to put it in several buckets, it's the 503(b)(9) payment

4    bucket and $5.2 million.  It's the deposits -- the deposits are

5    6 and a half million dollars in total.  But per our objection

6    that we filed, as long as the debtors can establish business

7    justification for the silage and the hay and the straws -- and

8    the straw farmers, Rabo would not oppose those payments.

9            And so we're only demonstrating what were to occur if

10   the $1.5 million deposit paid to H & M were -- was excluded from

11   the Court's order authorizing deposits to be paid.

12           And the last budget that this sensitivity analysis

13   shows is that the -- what were to occur if the $1.5 million

14   reserve that Mr. Nofziger and I have been discussing were also

15   to be removed from -- from the budget.

16           And to the extent that there are further questions,

17   Mr. Kokini is on the line and available for questioning but

18   hopefully we can resolve any questions that need to be brought

19   out for purposes of the evidentiary record with Mr. Nofziger's

20   testimony.

21           COURT:  All right.

22   BY MR. SCHOULDER:

23   Q.  Mr. Nofziger, have you had a chance to review this analysis?

24   A.  I have.

25   Q.  And under this analysis, would you agree that it

1   demonstrates the $2 million that is currently being forecasted

2   to be drawn in your budget -- it's forecasted here as well?

3   A.   Yes.

4   Q.   And as you testified, that $2 million is part of the prior

5   order authorizing the debtor's use of DIP funding, correct?

6   A.   Correct.

7   Q.   And would you agree that the only DIP financing that is

8   actually reflected in this analysis is the total amount of $2.75

9   million.  Is that right?

10  A.   That is shown on this analysis?  Yes.

11  Q.   Now, based upon the assumptions that are used in this

12  analysis and to review, we're backing out the $5.2 million of

13  503(b)(9) payments being paid prior to confirmation, $1.5

14  million of deposit being paid to H & M and the $1.5 million

15  reserve that we've discussed ad nauseam.

16  A.   And then I think it's 1.8 --

17  Q.   1.8?

18  A.   -- is the dollar amount at that point.  You keep saying 1.5

19  but 1.8 is what's going through my mind.

20  Q.   Would you agree that after taking account for those

21  adjustments that if the debtors only drew $2.75 million, they

22  would be cash positive without the need to draw additional DIP

23  financing towards week 19 in your forecast?

24  A.   With those specific assumptions?  The number that's shown on

25  this page is 2,750,000.

```
1    Q.  And would you agree that these numbers work?  That if you

2    make these exclusions --

3    A.  No.

4    Q.  If you exclude --

5    A.  No.

6    Q.  If you make these exclusions, then there's only $2.75

7    million of DIP financing needed to get through week 19.

8    A.  To get through week 19?  I would say yes on the one hand.

9    On the other hand, the loan agreement requires a minimum $5

10   million draw.  So, again, to be in compliance with the terms of

11   the loan agreement, we would need to draw $5 million.

12   Q.  Right.  Loan agreements can be modified, can't they?

13   A.  As long as everyone in the room and the judge approves it,

14   sure.

15   Q.  And the DIP lender --

16   A.  The DIP lender has to agree to it and we have been informed

17   by the DIP lender that, you know, they're requiring all draws in

18   increments of $5 million.

19   Q.  So the estate will incur interest -- additional interest and

20   fees to draw $5 million when under this analysis, it's only

21   2.75?

22   A.  Well, it only needs 2.75 to get through week 19 as I pointed

23   out earlier.  Weeks 20 and 21, there's no milk check coming in.

24   There's payroll and there's over $6 million in operating

25   expenses that need to be covered.  So if everything shut down
```

1  and stopped at the end of week 19, then we're probably okay.  If

2  we need to carry over into week 20 and 21 and thereafter and the

3  length of time that's -- I've noted that it takes -- to get any

4  approval on getting funds, I would suggest you need to draw more

5  money in week 19 to make sure you can cover your operations for

6  a minimum the next two weeks until you get the next paycheck --

7  or milk check.

8  Q.  In week 19 but not now.

9  A.  In week 19, yes.

10 Q.  Right.  So just to clarify what you just stated --

11 A.  Yes.

12 Q.  You can tell me if I'm wrong.  You've done it before.  If

13 the debtors drew $2.75 million today based upon these

14 assumptions, they would not need to draw additional funds until

15 week 19.

16 A.  And again, assuming the DIP lender would loan us 2.75 when

17 their agreement says it has to be a $5 million loan.  And then I

18 would suggest if you did draw 5 million today, then you would

19 have to draw fewer funds and we would have to -- we'd have to

20 rerun all the math, you know.

21      Again -- and I understand what this is, a sensitivity

22 analysis, this is one scenario.  I'm assuming other scenarios

23 were run that if the 503(b)(9) is approved, if it's not

24 approved, if the 1.5 -- you can run all the scenarios.  What I

25 would tell you is based on the outcome of all of this, what we

1    will need to do is rerun the forecast and say here's the cash

2    needed to pay whatever is approved and then we need to look at

3    that week 19 and look at the next couple of weeks and see how

4    much money will we need to fund operations on a go-forward

5    basis.  That's the calculus and the math we've been doing

6    throughout this -- these analyses.  And they're assumptions.

7    You know, if milk price drops a buck in the next week, then we

8    need to redo the whole thing.  I wish it was perfect but it's

9    not.

10   Q.  Are you involved in the debtor's efforts to obtain

11   refinancing?

12   A.  No, other than supplying information to the debtor and to

13   Forbes.

14   Q.  So you're not having any conversations with Forbes in terms

15   of the -- where they are in the process?

16   A.  No.  The conversations I've had with Forbes is where are we

17   with cash flow budgets, these different scenarios.  We've been

18   working on a 24-month cash flow forecast that they want to

19   incorporate and I understand perspective lenders are asking for

20   so we've been working on iterations of that.  We've shared a

21   draft with them.  Have walked through all the assumptions that

22   are built into that.  As soon as we get their feedback and we

23   get final approval, we'll also share that with FTI and focus --

24   we'll share it with everybody but it's still -- it's in the

25   latter stages of being completed.  That's the extent of our

1    involvement and we've walked through that ad nauseam with Forbes

2    just saying, okay, here's the size of the milking herd, here's

3    the production, here's the Glambia milk pricing, here's the

4    daily feed costs, all of those types of scenarios that we're

5    working through with them.

6    Q.  According to the testimony of your colleague, Ms. Churchill

7    on prior occurrences, the debtors have stated that they intend

8    to emerge from Chapter 11 within 130 days from the petition

9    date.  That has been the statement, correct?

10   A.  That was at early stages of the case, yes.

11   Q.  The debtors are not going to be emerging from Chapter 11

12   within 130 days from the petition date, are they?

13   A.  I would say it's highly unlikely.

14   Q.  Are you aware of there being an updated confidential

15   information memorandum from Forbes?

16   A.  Yes.  They're working on it.

17   Q.  So there's no final confidential information memorandum out

18   there?

19   A.  No.  They were waiting on data from us, one, and data from

20   the CPA firm.

21   Q.  So the investors that are out there, they don't have any

22   accurate information right now to be able to evaluate a

23   refinancing with the debtors.  Is that right?

24   A.  I can't assess as to the accuracy.  They have information

25   based on his -- I mean they've got the historic audited

1    financial statements.  What they don't have is any information

2    from January 1 through today and they don't have the latest

3    forecast based on current market conditions, current status of

4    the debtor's operations.

5    Q.  If the last version of the CIM lists the maturity date of

6    the Rabo Bank facility as maturing in June 2028, would you

7    describe that as accurate?

8    A.  If the loan agreements say otherwise, then I would say

9    that's inaccurate.

10   Q.  Right.  You're aware that the Rabo Bank facility matured on

11   June 1, 2022?

12   A.  Yes.

13   Q.  So if they are telling investors that it matures in 2028,

14   that would be inaccurate, right?

15   A.  I don't know what they're telling investors but if they are

16   saying that, then, yes, that would be inaccurate.

17   Q.  Now, based upon your general experience, I assume you've

18   been involved in assisting debtors and refinancing, right?

19   A.  Yes.

20   Q.  So based upon that experience generally, if a (inaudible)

21   receives a confidential information memorandum, the next logical

22   step would be to -- in that process would be to obtain

23   additional information from a data room.  Isn't that right?

24   A.  It depends if there's a data room available.  I've been in a

25   lot of farming operations where there's not a lot of data.

1   Q.  Well, if there's a data room --

2   A.  No, but yeah, in a typical process, yes, you have a data

3   room that's populated with certain information and sometimes it

4   depends on the kind of process you're running.  Sometimes you

5   want to get initial term sheets before you open up your data

6   room to everybody and share everything so you may hold back

7   certain information from the data room.

8           Again, somewhat what I said earlier, every situation is

9   a little unique and different but it is very typical for a data

10  room to be opened with certain information available to

11  perspective lenders, buyers, investors, whatever you want to

12  call them, yes.

13  Q.  Could we turn to Exhibit 3087?  I want to borrow your

14  knowledge, your general restructuring knowledge from having done

15  this for as long as you've been doing this.  Now, based upon

16  your experience in looking at this which is the Forbes -- the

17  most recent Forbes report -- actually it's the Forbes report as

18  of June 12.  According to this report, how many parties are in

19  the data room?

20  A.  I don't even seen the words room data room on here.

21  Q.  That would be item no. 2.

22  A.  Oh, zero.  Let me get my glasses.

23  Q.  Just let me know when you're ready.

24  A.  I got them on.  Sorry.

25  Q.  Sorry.  I was waiting for you.

1    A.   No.   No, I said zero.   Line no. 2, it says zero.

2    Q.   And in order for a party to be able to make a commitment,

3    they would more than likely have to go through the data room and

4    due diligence, wouldn't they?

5    A.   I don't know what each party they're talking to's

6    requirements but that's a standard and typical process.

7    Q.   According to item 4 of the report, it states that there are

8    11 parties actively negotiating with Forbes and the debtors.   Do

9    you see that?

10   A.   Yes.   It says 11.

11   Q.   Is it your understanding that that's the same number of

12   parties that the Forbes is in contact with as of May 4, 2024?

13   A.   I don't know.

14   Q.   Okay.   So -- withdrawn.   Below item 4, it states, "We've

15   updated participants on the process who are in turn waiting for

16   the critical requests Kander and management are drafting.   Once

17   we receive them from Kander and the company, we'll be able to

18   update the materials to provide to investors."   Do you see that?

19   A.   Yes.

20   Q.   And you've testified I believe a few minutes ago that you

21   provided those materials to Forbes so that they can actually

22   move forward with that?

23   A.   Yes.   Late I think on Friday, we produced those to them.

24   Q.   Okay.   So if no parties have accessed the data room and

25   Forbes was still waiting on the materials from you, it's fair to

1    say that the group of 11 is still relying on the information

2    from the CIM from back in May.  Is that fair to say?

3    A.  I can't tell you what that group of 11 is relying on.

4    Q.  Well, why don't we turn to Exhibit 1025.  Now, this is the

5    Forbes report that was filed in connection with the debtor's

6    request for final approval of their DIP financing.  Have you

7    seen this report before?

8    A.  Yes.

9    Q.  And this report, it identifies the 11 parties, doesn't it?

10    A.  It identifies this 11 parties.  If you say the 11, are you

11    referring to what was in the last e-mail?  Because I don't know

12    if it's the same 11 or not.

13    Q.  Well, let's go back to the last exhibit which was 10 --

14    3087.  Sorry.  3087.  Now, in item 3, it says number of new

15    parties that were engaged in initial meetings with Forbes

16    Partners.  What's the number there?

17    A.  It says zero.

18    Q.  Right.  So is it fair to assume that the 11 that are in that

19    list and the 11 that are identified in 4 are the same 11

20    parties?

21    A.  I don't know.  When it says new parties that were engaged,

22    is this new parties in this last week?  Is this new parties

23    since they've been engaged in the bankruptcy case?  I'm not in a

24    position to interpret what Forbes is saying here.

25    Q.  Okay.  It states that -- in item 4 that there are a number

1    of parties that remain actively negotiating with Forbes Partners

2    and/or the debtors.  Do you see that?

3    A.  Yes.

4    Q.  And I'm focusing on the words "actively negotiating."

5    What's your -- what's your -- in your experience, what's your

6    view what actively negotiating would mean?

7    A.  It means -- it can mean a lot of different things.  Again,

8    you're -- actively negotiating means it's somebody that hasn't

9    said no to the process, that's saying, hey, give me more

10    information.  I'm looking into this.  I may or may not be

11    interested in providing a term sheet.  I don't know what their

12    term "actively negotiating" means.

13    Q.  Do you believe that a party could actively negotiate a

14    refinancing without updating accurate financial information?

15    A.  No.  They will need active -- again, their definition may

16    mean these are parties that are sitting on the sidelines saying

17    we want to go forward but we need this information.

18    Q.  So you agree, it's pretty much impossible to have an active

19    negotiation if you don't have financial information about the

20    borrower.

21    A.  If you're negotiating on old stale information that doesn't

22    reflect the current situation, then you can negotiate but, you

23    know, once they get the information, you're going to start

24    negotiating all over again.

25    Q.  So would you agree that based upon this report, they're

1    really at ground -- I don't want to use a term but ground zero

2    in terms of the refinancing process?

3    A.  I can't tell you where they're at.  What I do know is --

4    Q.  Well, let's just -- you don't have to answer that.  Taking

5    the hypothetical that you cannot actively negotiate without

6    accurate financial information --

7    A.  Uh-huh.

8    Q.  -- is it fair to say that it would be very difficult to be

9    progressed in your refinancing process at this point in time?

10   A.  Until you get the information that they're waiting on from

11   the CPA's and from Kander, it would be very hard to move

12   forward, yes.  Very, very hard.

13   Q.  And so for the debtors to be able to get to a point where

14   they can actually reorganize and pay unsecured creditors 100

15   percent as they said they would, they would need to provide that

16   CIM, correct?

17   A.  Yes.

18   Q.  And then they would have to get these parties into a data

19   room to be educated in terms of their finances.

20   A.  Depending on what the interested parties wants but I would

21   assume they would want to see the information that's typically

22   available in a data room.

23   Q.  And then after that, they would need to receive term sheets

24   and commitment letters from the interested parties if there

25   are --

```
 1   A.  Yes, yes.

 2   Q.  And from there, that would lead to documentation of a plan,

 3   the disclosure statement, exit financing documents that could

 4   facilitate all those transactions, right?

 5   A.  Yes.

 6   Q.  In your experience, what timeline are we looking at?

 7   A.  I've seen cases move in a month or less and I've seen other

 8   ones take 12 months or more.  Typically, a minimum 3 to 6 months

 9   I would say.

10   Q.  All right.

11          MR. SCHOULDER:  No further questions, Your Honor.

12          COURT:  Thank you, Mr. Schoulder.  Mr. Naess, do you

13   have cross-examination for the witness?

14          MR. NAESS:  No.  Thank you.

15          MR. O'BRIEN:  None, Your Honor.  Thank you.

16          COURT:  Viterra?  All right.  Redirect.

17                      REDIRECT EXAMINATION

18   QUESTIONS BY MS. MIKKILINENI:

19   Q.  Mr. Nofziger, we're going to pull up Exhibit 3090.  Would

20   you mind switching it over, Ms. Roussell?  Thank you.  Do you

21   see that in front of you?

22   A.  I do.

23   Q.  Now, you've had a chance to review this, right?

24   A.  Yes.

25   Q.  And you understand what adjustments from the forecasts that
```

1    you made were made here, right?

2    A.  Yes.

3    Q.  And your forecast included the $1.5 million line item for

4    the cash balance reserve?

5    A.  Yes.

6    Q.  And does this forecast?

7    A.  No.

8    Q.  And I'm going to also pull up Exhibit 1029.  Can you go to

9    page 59 of that?  You see paragraph 6.19 there?

10   A.  Yes.

11   Q.  And what is the required minimum cash balance?

12   A.  Amount not less than $1.5 million.

13   Q.  So this is what you had included in your forecast.

14   A.  That's correct.

15   Q.  Does your forecast include a line item for accrued but

16   unpaid professional fees?

17   A.  Yes.

18   Q.  And just to be clear, that is completely separate from the

19   $1.5 million cash --

20   A.  Yes.

21   Q.  Does this analysis from FTI include the accrued but unpaid

22   professional fees?

23   A.  No.  The box at the bottom of the page says specifically

24   ending cash excluding any reserves to pay for all accrued and

25   unpaid expenses including vendors and professionals.

1    Q.  Do you believe it's a good business practice to not account

2    for accrued but unpaid expenses in a budget?

3    A.  No.

4    Q.  Why not?

5    A.  Because you've incurred -- you've received the goods and

6    services.  You know you're liable to pay them.  At some point in

7    the case or in the process or over time, you're going to have to

8    satisfy those obligations.

9    Q.  And then I'm going to pull up Exhibit 1029 again which is

10   the Sandton DIP loan agreement.  Can you go to page 53?  And

11   scroll down to paragraph 6.04.  Right there.  You were

12   discussing earlier that there's a covenant to pay all

13   post-petition obligations and liabilities, correct?

14   A.  Yes.

15   Q.  Is this the covenant you were talking about?

16   A.  Yes.

17   Q.  And so is this the covenant you're referring to when you're

18   stating that you need to account for professional fees?

19   A.  Yes.

20   Q.  Have any of the financial advisors in your -- strike that.

21   You said that you have weekly calls with all of the financial

22   advisors involved in this case; is that correct?

23   A.  Yes.

24   Q.  Have any of the financial advisors in those weekly calls had

25   an issue with the professional fees being included in the

1    forecast or budget?

2    A.   No.  The nature of the conversation every week is when we're

3    going through variances.  We're showing, hey, we've got positive

4    variances in all these different line items.  The biggest

5    positive variance from a cash disbursement is on professional

6    fees and we have the conversation every week that, yeah, it's

7    showing a million 1 or 2 or whatever the number is every week in

8    a positive variance.  However, at some point, those are going to

9    have to be paid.  And similarly, we have conversations about

10   what is in accounts payable.  So in a given week, feed numbers

11   may be low but then we say but, wait, there's a million 1 in

12   accrued feed expenses that need to be paid probably next week.

13          So what we're talking about is what we refer to as

14   timing variances.  The conversations we're having with the FA's

15   is about timing variances.

16   Q.  Have any of the financial advisors told you that you should

17   not include a line item for professional fees in the budge at

18   the time or forecast?

19   A.   No.  But we have not had a conversation with any of the

20   financial advisors since -- strike that.  The only -- we did

21   have conversations with FTI yesterday reviewing our cash

22   forecast and we talked about that.  They didn't say, no, you

23   shouldn't but they also didn't say, no, you should so -- and

24   then the other financial advisors, we have not had a call.

25   Today's our scheduled call day.  We didn't have calls today to

1   go over this forecast that was presented.  So I don't know what

2   their opinions are on it.

3   Q.  But in the prior calls you've had with them, it's never come

4   up as an issue?

5   A.  Well, you've asked about having a line item.  We've never

6   had a line item in a forecast?

7   Q.  Understood.  Are the professional fees valid post-petition

8   expenses incurred by the debtor?

9   A.  I believe so, yes.

10  Q.  Did Bill or David authorize DIP funding to pay post-petition

11  expenses?

12  A.  Yes.

13  Q.  Including professional fees?

14  A.  Yes.

15  Q.  Let's go back to Exhibit 3090, please.  You talked about

16  this a little bit but let's talk about the ending cash balance

17  again.  What's the ending cash balance on this forecast from

18  FTI?

19  A.  It's a little confusing in that the ending cash -- no, it's

20  not confusing.  The ending cash value 2 million 120 -- $123,000.

21  I was looking at the 2 million 627 and that's a different

22  calculation.

23  Q.  Okay.  So the ending cash balance is $2,123,000.  Is that --

24  A.  Correct.

25  Q.  Are you aware of the debtor's ongoing expenses?

1    A.  Yes.

2    Q.  The week following this forecast, so it would be week 20

3    from August 12 to the 19, do you have an idea of what the

4    debtor's expenses that week would be?

5    A.  It's going to be somewhere between 3 and 3 and a half

6    million dollars.

7    Q.  And what about the income that week?

8    A.  It's less than a million.  It's maybe 800,000 I think is

9    what is expected in receivable collections.

10   Q.  So would you expect the cash balance to go negative that

11   next week?

12   A.  Yes.

13   Q.  And is that a problem?

14   A.  Yes.

15   Q.  Why?

16   A.  Well, we have a covenant where we're supposed to maintain

17   $1.5 million.

18   Q.  Would you think that's good business practice to go negative

19   in that week?

20   A.  No.

21   Q.  Is there a requirement under the DIP loan to take a minimum

22   draw?

23   A.  Yes.

24   Q.  And what is that requirement again?

25   A.  $5 million.

1    Q.  And do you account for that in your forecast?

2    A.  Yes.

3    Q.  Is it accounted for in this forecast from FTI?

4    A.  No.

5    Q.  I'm sorry?  What did you say?

6    A.  No.

7    Q.  Thank you, Mr. Nofziger.

8            COURT:  Counsel for MetLife, any questions?

9            MR. BINGHAM:  Nothing, Your Honor, no.

10           COURT:  Unsecured Creditor Committee?

11           MR. KREMER:  Nothing, Your Honor.

12           COURT:  Counsel for Rabo AgriFinance?

13           MR. SCHOULDER:  Just a few questions, Your Honor.

14           COURT:  Go ahead.

15                      RECROSS-EXAMINATION

16   QUESTIONS BY MR. SCHOULDER:

17   Q.  We'll turn back to Exhibit 1029, Section 6.04.  Mr.

18   Nofziger, this provision doesn't state that the debtor should

19   have enough cash on hand to pay accrued professional fees, does

20   it?

21   A.  No.

22   Q.  It just requires that you pay administrative expenses

23   including post-petition expenses and post-petition professional

24   fees as they come due and as required by the bankruptcy code,

25   doesn't it?

```
 1   A.  It says required approval shall become due and payable --
 2   all its post-petition obligations and liabilities.  I don't see
 3   administrative anywhere in here but it says all its
 4   post-petition obligations and liabilities.
 5   Q.  And 6 point -- Section 6.04 doesn't require you to maintain
 6   a reserve to pay for accrued --
 7   A.  It does not.
 8   Q.  It does not.  And the interim cash collateral order entered
 9   by this Court does not authorize the debtors to maintain a
10   reserve to pay accrued professional fees, does it?
11   A.  No.  It's approved -- it authorized to pay a weekly dollar
12   amount for professional fees which, again, according to the
13   Court's rules for professional fees was inaccurate.  So no, it
14   does not.
15   Q.  And there's nothing in the DIP order that authorizes or
16   permits the debtors to create a reserve for accrued professional
17   fees; is that right?
18   A.  No.
19   Q.  In fact, the carve-out for accrued professional fees is
20   limited to $250,000.  Isn't that right?
21   A.  I don't know.  If that's what you say, yes.
22   Q.  And the carve-out is intended to cover accrued professional
23   fees in the event of certain unfortunate situations in a
24   restructuring.  Isn't that right?
25   A.  Yeah, if they're unpaid, then yes.
```

1    Q.  And it was limited in this case to $250,000; not 1.5

2    million, was it?

3    A.  I don't know.  If you want to pull up the order, then I

4    can -- I can affirm that.

5    Q.  I'll represent because I know everybody wants to get out

6    before -- that it was $250,000.

7    A.  Okay.

8    Q.  Now, you stated that Mr. Millenkamp and Mr. Heida authorized

9    the debtors to pay professional fees, correct?

10   A.  I stated that Mr. Heida and Mr. Millenkamp approved this

11   forecast that has been presented.

12   Q.  Well, counsel just asked you if Mr. Millenkamp and Mr. Heida

13   authorized you to pay professional fees and you answered yes,

14   they did.

15   A.  I don't recall.  They authorized to accrue them and put them

16   on the budget and then ultimately pay them, yes.  They have

17   authorized or agreed to pay professional fees in both the cash

18   collateral budget that we did because there was professional

19   fees included in that and in this forecast, they've authorized

20   it because there are professional fees included in this.  So

21   yes, they have approved paying professional fees.

22   Q.  Right, but before we testified -- before you testified, not

23   me -- that would be we.  Before you testified that

24   Mr. Millenkamp and Mr. Heida did not authorize the draw of DIP

25   financing to create a reserve for amounts that will come due in

1    the future for professional fees.  Wasn't that your testimony

2    earlier?

3    A.   They authorized the draw that is shown as a need on the

4    forecast that has been presented.

5              MR. SCHOULDER:  No further questions, Your Honor.

6              COURT:  Mr. Naess, any questions for the witness?

7              MR. NAESS:  No.  Thank you.

8              COURT:  Mr. O'Brien?

9              MR. O'BRIEN:  No, Your Honor.

10             COURT:  Mr. Green?

11             MR. GREEN:  No, Your Honor.

12             COURT:  All right.  Any additional questions, Ms.

13   Mikkilineni?

14             MS. MIKKILINENI:  No, Your Honor.

15             COURT:  Okay.  You may step down.  Thank you.

16             All right.  We've been going for a couple hours.  I'm

17   wondering if now is a good stopping point to take about a

18   10-minute break?  All right.  We'll be in recess for about 10

19   minutes.

20             CLERK:  All rise, please.

21                                  (Recess taken.)

22             CLERK:  All rise, please.

23             COURT:  Thank you.  Please be seated.  All right.  We

24   are back on the record.  Do we have additional witnesses for the

25   debtor?

1        MR. CHRISTENSEN:  Your Honor, we have one additional

2  witness that we want to call mostly to clarify a little bit of

3  confusion that's come up in the testimony earlier today.  This

4  is someone who's not necessarily on our witness list.  David

5  Heida who's a representative of the debtor.  I've discussed it

6  with Rabo's counsel.  They don't have an objection to him

7  testifying.  I haven't necessarily discussed it with anybody

8  else but because he's not on the witness list and it's not

9  really rebuttal testimony as much as clearing up some confusion

10  on a couple of contracts.

11        COURT:  All right.  Any objection by any party to Mr.

12  Heida testifying?  All right.  Go ahead and call your witness.

13        MR. CHRISTENSEN:  We call David Heida.

14        COURT:  Please come up to the stand and remain standing

15  so you can be sworn in, please.

16                (DAVID HEIDA is sworn.)

17        CLERK:  Thank you.  Please have a seat.  Please state

18  your name and spell your last name for the record.

19        WITNESS:  David Heida, last name is spelled H-e-i-d-a.

20        CLERK:  Thank you.

21                DIRECT EXAMINATION

22  QUESTIONS BY MR. CHRISTENSEN:

23  Q.  Thank you.  Mr. Heida, can you explain to the Court your

24  role with Millenkamp Cattle?

25  A.  General manager.

1  Q.  And I'm going to show you what's marked as Exhibit 1035

2  that's been admitted.  Have you seen -- this is a two-page

3  exhibit.  Have you seen this document before?

4  A.  Yes, I have.

5  Q.  And it's two different corn silage contracts; is that right?

6  A.  Yes.

7  Q.  Do you know where these contracts came from?

8  A.  Yes.  They came from -- I drafted them for Mr. Grimshaw and

9  Mr. Williams, the counsel for the Ad Hoc Silage Committee group.

10  Q.  And then for these two contracts, at some point, did you

11  receive them from either Mr. Grimshaw or Mr. Williams?

12  A.  Yeah.  It came from counsel.  I don't remember which one.

13  Q.  Okay.

14       MR. CHRISTENSEN:  That's all I have, Your Honor.  Thank

15  you.

16       COURT:  Cross-examination.  Counsel for MetLife?

17       MR. BINGHAM:  No, Your Honor.

18       COURT:  Counsel for the Unsecured Creditor Committee?

19       MR. KREMER:  No, Your Honor.

20       COURT:  Counsel for Rabo AgriFinance?

21       MS. SCHWAGER:  No, Your Honor.  Thank you.

22       COURT:  Mr. Naess with U.S. Trustee's Office?

23       MR. NAESS:  No.  Thank you.

24       COURT:  Counsel for Conterra?

25       MR. O'BRIEN:  No, Your Honor.

1     COURT:  Counsel for Viterra Grain?

2     MR. GREEN:  No, Your Honor.

3     COURT:  You may step down.  Thank you.

4     MR. CHRISTENSEN:  Your Honor, we don't have anymore

5  witnesses.  I think the Debtor's Exhibit 1039 was already

6  admitted.  1031, we have a replacement exhibit that's been

7  placed in the binders and circulated to all the parties that

8  addresses the one last issue that Mr. Naess had so I believe at

9  this point, we can admit Exhibit 1031 and then that will be all

10  of the debtor's exhibits other than 1033 being admitted.

11     COURT:  So just to clarify, the new Exhibit 1031

12  replaces any exhibit marked as 1031 that was in the binder

13  previously?

14     MR. CHRISTENSEN:  Correct.

15     COURT:  It's not a new number.  It's just we replaced

16  the exhibit wholesale.

17     MR. CHRISTENSEN:  Just a complete replacement.  All

18  that was changed was one number -- well, one number in two

19  places on that exhibit so it was easier to just change that

20  number than try and do a whole new thing.

21     COURT:  All right.  Exhibit 1031 has been offered.  Any

22  objection?  Hearing no objection, we'll go ahead and admit

23  Exhibit 1031.

24          (Debtor's Exhibit No. 1031 admitted.)

25     MR. CHRISTENSEN:  Thank you.  I think that takes care

1    of all of our evidence and testimony.

2          COURT:  All right.  At this time, the debtors rests.

3    Counsel for MetLife.  Do you have any witnesses?

4          MR. BINGHAM:  Your Honor, we do not have any witnesses.

5    We will, again, make a closing statement at the appropriate

6    time.

7          COURT:  All right.  Counsel for the Unsecured Creditor

8    Committee?

9          MR. KREMER:  Your Honor, no witnesses.  Like MetLife,

10   we'd also like to make a closing statement.

11         COURT:  Counsel for Rabo AgriFinance.

12         MS. SCHWAGER:  No further evidence, Your Honor.

13         COURT:  All right.

14         MS. SCHWAGER:  And we will have an argument if the

15   Court will allow it.

16         COURT:  All right.  Mr. Naess.

17         MR. NAESS:  No evidence.  Thank you, Your Honor.

18         COURT:  Counsel for Conterra?

19         MR. O'BRIEN:  No evidence.  A one-minute closing

20   statement.

21         COURT:  Counsel for Viterra Grain?

22         MR. GREEN:  Your Honor, I have one witness I'd like to

23   call.

24         COURT:  All right.

25         MR. GREEN:  Alicia Burns.

1       COURT:  Please come up to the witness stand and remain

2  standing so the courtroom deputy can swear you in, please.

3                  (ALICIA C. BURNS is sworn.)

4       CLERK:  Please have a seat and please state your name

5  and spell your last name for the record.

6       WITNESS:  Alicia C. Burns, B-u-r-n-s.

7       CLERK:  Thank you.

8                  DIRECT EXAMINATION

9  QUESTIONS BY MR. GREEN:

10  Q.  Ms. Burns, how are you employed?

11  A.  I'm a senior credit manager for Viterra.

12  Q.  And how long have you been in that position?

13  A.  As a senior manager, about six years.

14  Q.  And what do your duties generally entail as senior credit

15  manager?

16  A.  I evaluate the risks of our customers and determine credit

17  limits as well as monitor and work through our accounts

18  receivable to ensure we are paid promptly.

19  Q.  And what does Viterra do?

20  A.  Viterra sells grain and feed ingredients to basically feed a

21  lot of animals.

22  Q.  And has Viterra done business with the Millenkamps in this

23  case?

24  A.  Yes.

25  Q.  And what is the business that Viterra did with Millenkamp?

1    A.  Viterra's been conducting business since 2007 with

2    Millenkamp.  We've sold various products over the years.  That

3    ranges from the grain side, flaked corn, ground corn, whole

4    corn.  On the ingredients side, canola and DDG.

5    Q.  And typically, how often does Viterra supply these goods to

6    the debtor?

7    A.  Every single day.  We're moving about -- at the time of

8    bankruptcy filing, we were moving about $200,000 worth of

9    product on a daily basis.

10   Q.  So is it fair to say that the debtor is one of the major

11   companies -- or customers of Viterra?

12   A.  For our Burley office, yes, they were our number one

13   customer with about a third of our volume for that location

14   going to Millenkamp.

15   Q.  And you're aware that Millenkamp filed the Chapter 11 case

16   on April 2, 2024, correct?

17   A.  Yes.

18   Q.  Did Viterra supply feed or other goods to Millenkamp within

19   20 days prior to the filing of the bankruptcy proceeding?

20   A.  Yes.

21   Q.  And were these -- this was feed, correct, and the other

22   items that you've testified.

23   A.  Grain and feed, correct.

24   Q.  Okay.  And were those provided to Millenkamp in the ordinary

25   course of its business?

1    A.  Yes.

2    Q.  Do you have up there the exhibit book with Exhibits 9000

3    through 9003?

4            CLERK:  It will be on the bottom shelf I believe, black

5    binder.  On the very bottom shelf.

6            WITNESS:  No black binders on the bottom shelf.

7            CLERK:  Then at the very end of that whole row.

8            MR. GREEN:  And it may be white.

9            CLERK:  Oh, white?  Sorry.  There's a few.

10           WITNESS:  I brought up my declaration if that's what

11    you're after.  I have that paper in front of me, yes.

12    BY MR. GREEN:

13    Q.  Okay.  Attached to your affidavit, there were certain

14    exhibits.  Do you recall that?

15    A.  Yes, I do.

16    Q.  And could you testify and explain to the Court what those

17    exhibits were?

18    A.  Given the enormous amount of product that moves on a daily

19    basis, we've comprised separate lists that are summary lists of

20    all the invoices due.  Those are based on delivery date within

21    the -- whether that's the 503 window or just the plain proof of

22    claim both on the grain and on the ingredient side of Viterra's

23    business.

24    Q.  Okay.  So those are summaries of the invoices.  Is that

25    correct?

1   A.  So the listing, the Excel-based listing are summaries of the

2   invoices.  The additional exhibits are the actual invoices

3   themselves.

4   Q.  Okay.

5       MR. GREEN:  Your Honor, for clarification, since we

6   can't find the binder, Exhibit 9000 and 9001 are the summaries

7   of the invoices.  I believe 9000 -- 9000 is the summary for

8   Viterra U.S.A. Grain and 9001 is the summary for Viterra U.S.A.

9   Ingredients and then the last two exhibits, 9002 and 9003, are

10  the actual copies of the invoices for both of those entities.

11      COURT:  All right.

12  BY MR. GREEN:

13  Q.  So based upon those exhibits, did Viterra U.S.A. Grain, LLC,

14  deliver product to Millenkamp within 20 days of the bankruptcy

15  filing?

16  A.  Yes.

17  Q.  What is the amount owed to Viterra for product delivered 20

18  days before the -- within 20 days before the bankruptcy filing?

19  A.  That's $1,039,406.61.

20  Q.  And did Viterra U.S.A. Ingredients, LLC, deliver product to

21  the debtor within 20 days of the bankruptcy filing?

22  A.  Yes.

23  Q.  And what amount was that?

24  A.  $915,354.35.

25  Q.  So the total of those two numbers would be what Viterra is

1  claiming as its 503(b)(9) claim?

2  A.  Correct.

3  Q.  And you know what the total of those two numbers are?

4  A.  It's just shy of $2 million.  It's $1,954,760.90.

5  Q.  Now, is Viterra requesting that that amount be paid now?

6  A.  No, we're not.  A lot of the other 503 claimants have talked

7  about an undue hardship.  We don't feel that Viterra's in that

8  same boat.  We -- while it is painful and of course we wouldn't

9  mind getting payment sooner than the effective date, we are

10  requesting that we are willing to wait until the effective date

11  of the plan or earlier if the Court so chooses.  But we would

12  prefer to confirm our claim.

13  Q.  In other words, you're asking the Court to approve the

14  amount of Viterra's claim at this time but not seeking payment

15  of the claim.

16  A.  Correct.

17  Q.  In addition to the 503(b)(9) claim, does the debtor owe any

18  other prepetition amounts to Viterra?

19  A.  Yes.

20  Q.  And what are those amounts?

21  A.  The grain amount is an additional $2,042,848.90.  The

22  ingredient claim is an additional $2,532,555.38 for a combined

23  all-in total for all claims owed of 4.57 (inaudible) and change.

24  Q.  And if you subtract the 503(b)(9) claims, what does that

25  leave?

```
 1   A.  That's the math I didn't do.

 2   Q.  I'll represent to you --

 3   A.  Please do.

 4   Q.  -- it's $2,620,643.

 5   A.  Thank you.

 6          MR. GREEN:  I have nothing further, Your Honor.

 7          COURT:  Thank you, Mr. Green.  Cross-examination.

 8   Counsel for MetLife?

 9          MR. BINGHAM:  No, Your Honor.

10          COURT:  Counsel for the Unsecured Creditor Committee?

11          MR. KREMER:  No, Your Honor.

12          COURT:  Counsel for the debtor?

13          MS. MIKKILINENI:  No, Your Honor.

14          COURT:  Counsel for Rabo AgriFinance?

15          MS. SCHWAGER:  No, Your Honor.

16          COURT:  Pardon?

17          MS. SCHWAGER:  No, Your Honor.

18          COURT:  Mr. Naess.

19          MR. NAESS:  No.  Thank you.

20          COURT:  And Mr. O'Brien?

21          MR. O'BRIEN:  No, Your Honor.

22          COURT:  All right.  You may step down.  Thank you.

23          MR. GREEN:  Your Honor, one matter.  We did submit

24   those exhibits this morning and I believe they were all

25   admitted.
```

1          CLERK:  Yes, Your Honor.

2          COURT:  That's correct.  And I understand you do not

3     have any additional witnesses, Mr. Green?

4          MR. GREEN:  No, Your Honor, I don't.

5          COURT:  All right.  At this time, are there any

6     rebuttal witnesses that are going to be offered by any of the

7     parties?

8          All right.  It sounds like we might be ready to proceed

9     to closing.  I'm wondering if counsel wants to take a few

10    minutes just to gather your thoughts before we proceed or are

11    you ready to jump into it?  All right.  We're ready to proceed,

12    Mr. Christensen.

13         MR. CHRISTENSEN:  Your Honor, as the Court will recall,

14    there's four motions before the Court today.  What I've called

15    the Burks Tractor lease motion, 503(b)(9) claims motion,

16    prepayment motion and then the motion to allow the DIP draw.

17    I'm going to address those motions essentially one by one in

18    that order.

19         The Burks Tractor lease motion, there really isn't any

20    dispute from any party that the tractors are needed.  That the

21    cattle need to be fed.  The cattle need to be cleaned up after.

22    There really weren't any objections to that motion filed.

23    Mr. Millenkamp testified about the terms.  It's common for them

24    to have tractors that they lease.  Every two years, they release

25    the tractors.  The current tractors are going away the end of

1    the month.  They need new ones.

2         So unless there's questions on that motion, we would

3    request that that motion be approved and the tractor lease

4    approved.

5         COURT:  I don't have any questions on that one.

6         MR. CHRISTENSEN:  Okay.  On the 503(b)(9) claims

7    motion, I'll address that one next.  I would say the most

8    current list of 503(b)(9) claims is Exhibit 1031 as recently

9    amended based on continued conversations with the U.S. Trustee's

10   Office and I think those continued conversations exhibit how the

11   review of claims and the process for reviewing claims usually

12   works.

13        The debtor at first proposed a certain list of

14   503(b)(9) claims be approved and approved for payment.  It's

15   sort of a two-step process.  Then there were further

16   negotiations with those creditors, with the other creditors in

17   the case including Rabo, including the U.S. Trustee, eventually

18   those claims were culled down to that current list on

19   Exhibit 1031.

20        The backup for Exhibit 1031 is essentially

21   Exhibit 1032, 1038 and 1039 that show the actual invoices that

22   support the fact that those claims are valid 503(b)(9) claims.

23        So I guess the first request from the debtor and those

24   parties is for the Court to recognize those as administrative

25   section 503(b)(9) claims.  And I don't know at this point if

1   there's any objection to that part of the motion, that they be

2   recognized as administrative claims.

3        The objections tend to be aimed at the debtor's request

4   that they be paid now rather than later upon confirmation.

5   There's been testimony today from some of those administrative

6   creditors.  There's also declarations that were filed as part of

7   the record to support those requests.  There's nothing in the

8   bankruptcy code that prohibits the Court from allowing those

9   claims to be paid prior to the effective date or prior to

10  confirmation of a plan.  Of course there is a requirement that

11  they be paid on or before the effective date.  We recognize

12  that.  But it's up to the discretion of the Court whether the

13  debtor's authorized to pay them prior to confirmation.

14       There's various cases that have put forth various

15  standards.  I think the Unsecured Creditors Committee summarized

16  them pretty well in the brief that they filed.  There's

17  particular needs of an administrative creditor, expenses of the

18  estate, available assets to pay the claims, debtor's ability to

19  pay the -- all of the administrative expenses in full later and

20  sort of an underlying desire to promote orderly distribution of

21  payments to creditors.

22       In order to pay them prior to confirmation, I think one

23  of the biggest factors is that there's got to be a showing that

24  the debtor will have the ability to pay other administrative

25  expenses or the estate will have the ability to pay all other

1    administrative expenses when the plan is confirmed.  The

2    standard is not that the debtor has to pay all other unsecured

3    creditors.  It's all other administrative creditors in the case.

4        Here, as the Court's recognized in prior hearings,

5    there's a pretty significant equity cushion in the debtor's

6    assets so even if the case leads to a liquidation, there's an

7    equity cushion that would allow those administrative claims to

8    still be paid in full.

9        One of the U.S. Trustee's objections was that, well,

10   there's no -- there's no item in the currently approved cash

11   collateral budget that would support paying these claims.  I

12   think first off, that's the reason for the motion is that those

13   payments are sort of outside of the normal cash collateral

14   payments and there is a DIP loan that the Court has approved

15   that would provide funds that would allow those payments to be

16   made.  And as been evidenced through the testimony of Mr.

17   Nofziger, that DIP loan is really the funds that would be

18   available to pay the 503(b)(9) claims.

19       One of Rabo's objections is, well -- but that use of

20   the DIP proceeds -- or the DIP loan to pay those claims puts us

21   in a bad position.  I don't think that's true.  The full $45

22   million DIP loan has already been approved.  It's a draw on that

23   loan that we're asking for now.  In the context of approving

24   that full DIP loan, the Court already decided Rabo is adequately

25   protected.  So using that DIP loan for something doesn't change

1    the fact that they're already adequately protected under the

2    prior court order.

3        Additionally, approval of using the DIP loan proceeds

4    to pay the 503(b)(9) claims doesn't increase the total available

5    under the DIP loan.  It's still a $45 million loan.  It doesn't

6    become a $50 million loan just because there's some proceeds

7    used for those claims.

8        Your Honor, I think there's another factor is whether

9    immediate payment of those claims is necessary for the continued

10   operation of the debtors.  I think Mr. Millenkamp testified

11   about the impact on the debtor if those claims can't be paid.

12   Most, if not all, of the creditors who testified today also

13   testified about the impact on them if those claims aren't paid

14   immediately which for many of them would mean they're no longer

15   able to or willing to provide the supplies and goods to the

16   debtor that they have supplied in the past.  That will have a

17   very big impact on the debtor's operation.  Many of those

18   suppliers are either not easy to replace or very difficult -- or

19   impossible to replace.

20       The three factors that the U.S. Trustee identified in

21   their objection were the prejudice to the debtors, the hardship

22   to the claimants and the detriment to other creditors in the

23   case.  As I explained, the prejudice to the debtors is really

24   will the debtors be able to pay the other administrative claims

25   at the time of confirmation.  We assert that the debtor will be

1   able to whether it's at the time of confirmation or again

2   because of the equity cushion whether it's in the liquidation

3   scenario, other administrative claims have more than reasonable

4   chance of being paid.

5          Hardship to the claimants.  Again, Bill Millenkamp

6   testified about this a bit as well as the other witnesses that

7   testified.  Many of those claimants have their own borrowing

8   requirements that will affect -- the continued maintenance of a

9   large receivable will affect their own borrowing abilities.

10  Some of them will need to shut down operations at least in part

11  if not entirely.  A couple of them even mentioned having to lay

12  off employees because of the fact that they don't have those

13  funds available to continue at the same level as they have been.

14         All of those reasons testified to by those claimants

15  today, I think the Court can easily extrapolate those reasons to

16  all of the creditors who didn't testify today.  There's I think

17  26 creditors on the list of 503(b)(9) claimants at this point.

18  We provided testimony from some of them.  There's also, as I

19  mentioned, there's some declarations in the record from others.

20         The hardship to those claimants is aptly demonstrated

21  by that testimony and those declarations.  And then the

22  detriment to other creditors in the case if these payments are

23  made now versus at confirmation, the debtor argues there really

24  isn't any.  It allows the operation to continue.  It avoids the

25  risk of losing some of those necessary vendors that provide much

1    needed goods to the debtor.  It benefits all of the other

2    creditors by allowing the debtor to continue operating to

3    continue to produce the milk supply and the beef supply at the

4    levels that they have been and eventually at some point get to

5    confirmation of a plan which is the goal for everybody in the

6    case.

7         Your Honor, I'll address the specific DIP requests

8    later but as to that specific motion, I don't know that I have

9    additional comments.  I was going to move on to the next one

10   unless the Court has questions about that one.

11        COURT:  On the 503(b)(9) claims, we heard testimony

12   that it's been a bit of a moving target.  There are multiple

13   iterations of what those claims look like.  How confident are we

14   that we're at the final iteration of what those claims are?

15        MR. CHRISTENSEN:  I think the debtor's confident that

16   we're there.  I think the U.S. Trustee is confident that we're

17   there.  I'll let the other parties talk about their confidence

18   level.  We don't dispute there's been various versions of that

19   list produced.  That's what I discussed at the beginning.

20   That's the process of evaluating claims.

21        You start with what we think looks valid, other parties

22   challenge that, maybe the creditor itself comes in and

23   challenges it.  The debtor looks at further invoices and records

24   and then comes to the final conclusion.

25        I will say the debtor's not requesting authority to pay

1    an invalid 503(b)(9) claim.  I don't think we could do that.  At

2    this point, that list on Exhibit 1031, the debtor's confident

3    is -- is valid claims for each of those parties.

4         COURT:  And you mentioned earlier the standard with

5    respect to payment of those administrative claims.  The debtor

6    needs to show that it has the ability to pay all of the

7    administrative claims that it accrued, correct?

8         MR. CHRISTENSEN:  Correct.

9         COURT:  Does that include the lending or the loans on

10   the debtor in possession credit facility?

11        MR. CHRISTENSEN:  I don't believe those are classified

12   as administrative claims upon confirmation.  I think those are

13   secured claims.  There may be an administrative aspect I guess

14   to the debtor in possession claim but it's also a fully secured

15   claim.

16        COURT:  As far as paying them now though, we're doing

17   this analysis prior to confirmation, if we look at the

18   administrative -- if we look at the landscape of what

19   constitutes an administrative claim right now, does that include

20   lending that has accrued on that DIP credit facility?

21        MR. CHRISTENSEN:  I would -- I think I would agree that

22   the lending on the DIP credit facility is a post-petition

23   lending.  That is an administrative claim, yes.

24        COURT:  Does the debtor then need to establish that it

25   has the ability to pay that claim in addition to paying all the

1   other Section 503(b)(9) claims when you mention that the debtor

2   has the burden of proving that he has to pay those

3   administrative claims?

4           MR. CHRISTENSEN:  I agree that the debtor has the

5   burden of paying those administrative claims and proving that he

6   can pay those administrative claims.  The way that we're arguing

7   that that burden has been met is because even if the ultimate

8   plan that gets confirmed is a liquidation plan because no

9   refinancing ever comes to fruition, a liquidation plan, that

10  post-petition lender is in a first position lien on those

11  parties, it will get paid.  So I think even that first position

12  lien, there's sufficient grounds to -- there's sufficient proof

13  in the record that the property values are enough to pay that

14  claim, to pay all other unsecured claims and still have funds

15  for the other remaining administrative claims which is what the

16  debtor has to show.

17          COURT:  All right.

18          MR. CHRISTENSEN:  Your Honor, on the prepayment motion,

19  there's been testimony on that one from various parties.  Just a

20  recap, the debtor's requesting basically 6 and a half million, 2

21  and a half for hay and straw, 2 and a half for corn silage, 1

22  and a half for the chopping.  The hay and the straw and the corn

23  silage, there are several farmers who have agreed if we can get

24  this 50 percent payment, we'll sell you hay or straw or corn

25  silage.  The amounts that are requested are the amounts if the

1    debtor has to pay 50 percent deposit to every single corn silage

2    and hay or straw vendor that they're able to locate.  Those

3    amounts would allow them to do that.  There was some testimony

4    or attempts to sort of target in.  Okay.  Where did the 2 and a

5    half million come from?  There's this much to this guy, this

6    much to this guy, this much to this guy.  It's not a math

7    problem like that.  The debtor is saying I need 2 and a half to

8    pay to whoever will sell me that stuff and I have this group of

9    people who will and we're going to need more than just those

10   people but I need the ability to pay them this 50 percent and

11   that's what we're asking for, for the hay and the straw and the

12   corn silage.  H & M is -- I mean that's one party that said we

13   need a million and a half dollars.

14       COURT:  What is the amount of commitments that the

15   debtor has with respect to prepayments as far as folks that say

16   we will sell you silage, straw, whatever, if you give us that 50

17   percent deposit?

18       MR. CHRISTENSEN:  I think that was the testimony from

19   Mr. Millenkamp and the term commitments.  So the only written

20   commitments the debtor has are those two that were in

21   Exhibit 1035.  The other commitments are farmers who have said,

22   hey, if you can get me 50 percent, I'll sell you X amount of

23   hay.  Anywhere from 500 to a thousand acres I think was the

24   testimony for those specific farmers that he testified about.

25       So -- but there -- the commitments -- and I think there

1    was testimony at a previous hearing.  There's not always written

2    commitments between farmers on what they're going to do.  A lot

3    of this is done -- people and neighbors that have worked

4    together for years and years and years, they shake hands,

5    they're done.  So it's a lot of the commitments are exactly

6    that.  They're not in writing per se.

7         COURT:  And those two contacts that we did see, I think

8    they indicate that there would be an additional step to get

9    those approved by the bankruptcy court?  Is that correct?

10         MR. CHRISTENSEN:  I think that's what the contracts

11    indicate.  I don't know that that's officially the case.  I mean

12    purchasing straw and hay and corn silage are ordinary course

13    purchases by the debtor.  They buy those every year.

14         So what's changed with these contracts is the 50

15    percent down payment, the payment terms have changed.  The fact

16    that the debtor needs to buy corn and silage, that it needs to

17    buy hay, that it needs to buy straw, that's not new.  That's

18    something that happens every month, if not every week, if not

19    every year by the debtor.  So I don't know that the contract

20    itself needs to be approved by this Court.

21         What I think the intention was -- what needs to be

22    approved is the prepayment of the 50 percent down payment and

23    that's what we're asking for today.

24         COURT:  Okay.  So it sounds like the debtor isn't going

25    to come back after this and say you've approved the 50 percent

1    down payment.  Now I want you to approve these 10 specific

2    contracts with these farmers and here are the terms.

3         MR. CHRISTENSEN:  That would not be the debtor's

4    intention because of the fact that these are ordinary --

5    ordinary transactions.

6         COURT:  Okay.

7         MR. CHRISTENSEN:  Your Honor, there's been testimony

8    about the need for the hay and the straw and the corn silage

9    both from Mr. Millenkamp and the nutritionist Mr. Parker.

10   Potential replacement for the corn silage would be the sugar

11   beet byproduct.  There's a risk of that if Amalgamated is out of

12   the picture.  They're skittish at this point about continuing a

13   relationship with the debtor.  The time for --

14        COURT:  Is the debtor able to get that sugar beet

15   byproduct from the Nampa sugar beet factory or other

16   competitors?

17        MR. CHRISTENSEN:  The Nampa sugar beet factory is

18   Amalgamated so no.  And Mr. -- I forgot what his name was but

19   whoever the witness for Amalgamated was testified about the

20   alternatives for that sugar beet byproduct.  The closest

21   alternative at the amount that the debtor would need was in

22   Colorado.  There's no other Idaho company that produces that

23   amount of sugar beet by product.  If there was, we'd be in a

24   different situation but there isn't.

25        The time for contracting the hay, the straw, the corn

1    silage, even the chopping, is if not now, earlier in the year as

2    was testified.  Some of the corn silage farmers have already

3    sold their corn to other people because they need to lock it

4    down in order to plant and raise the corn.  So the time for

5    approval of the down payments so the debtors can make these

6    contracts is right now.

7          There was questions about historic down payments.  Has

8    the debtor done this historically with hay and straw?  Yes.

9    They've historically paid down payments to the vendors that

10   required those.  In some cases, as Mr. Millenkamp testified, all

11   the way up to 90 percent of what was purchased had to be paid

12   ahead of time.

13         The corn silage farmers, it's a new requirement from

14   them to pay the down payment.  They haven't required that in the

15   past.  That's what makes the payment terms a little bit

16   different this time than in the past.  H & M, it's, for the most

17   part, a new requirement for H & M to have a prepayment

18   requirement.  I think there was testimony it may have happened

19   once in the past six or eight years ago so that doesn't make it

20   ordinary necessarily.

21         The service that H & M provides is a service that is

22   necessary.  It's chopping all the crops.  Without the chopping,

23   the crops are just crops.  You can't feed them to the cattle.

24   The chopping that is done at the level that the debtor needs it,

25   H & M's the only company around that does that amount of

1    chopping that's available for the debtor.  As Mr. Huettig

2    testified, in order to move forward and do the debtor's chopping

3    this year, they need a million and a half down payment and he

4    explained the reasons behind that.

5            I don't think there's any dispute that the debtor needs

6    hay, the debtor needs straw, the debtor needs silage and the

7    silage needs to be chopped.  Nobody really disputes that.  The

8    issue is can we pay it ahead of time.  The only objection to

9    this motion that was filed came from Rabo and they I think admit

10   that it's -- whether to allow these payments depends on whether

11   the debtors have exercised good business judgment in seeking

12   approval for those prepayments.  I think all the testimony

13   explains why it was good business judgment.  This is the only

14   way to get some of those products, if not all of them, for this

15   coming season.

16           In that objection, they assert that H & M services

17   aren't really required until October.  That's not true.  They're

18   chopping now for the haylage and the other byproducts.  Corn

19   chopping will start later but H & M is doing work even now.

20           Also in the objection, I think they characterized

21   H & M's prepetition claim as an unsecured claim that was paid as

22   part of an interim critical vendor order.  That's not correct.

23   It's a secured claim from prepetition.  The payments that were

24   made to H & M on their prepetition claim were adequate

25   protection payments.  The first one was made under the interim

1    critical vendor order but the Court allowed it because they had

2    a lien, because it was more in the nature of an adequate

3    protection payment.  And then the later payments were fully

4    adequate protection payments and both payments were made with

5    full court approval.

6        Rabo asserts that Millenkamp should somehow -- or that

7    this Court should somehow order the third parties to give the

8    debtor a lien in something to secure these payments that the

9    debtor is making.  No allegation or nothing that they point to

10   as to what authority the Court would have to require those third

11   parties to grant the lien.  There's nothing that they point to

12   as to what a lien could be granted in.  Many of those parties

13   testified they have their own lenders who presumably already

14   have liens in their products.  There's no -- there's no vendee's

15   lien for prepayments on farm products.

16       What the debtor would have is essentially an

17   enforceable agreement with those parties.  A breach of claim if

18   they don't do it but each of those parties testified they can

19   prepay the funds if for whatever reason they don't deliver the

20   product which they have always delivered in the past.

21       Unless there's more questions on that motion, I think

22   I'm done with that one.

23       COURT:  All right.  Go ahead.

24       MR. CHRISTENSEN:  Your Honor, with regard to the draw

25   request on the debtor in possession loan, again, the Court's

1    already authorized the loan.  We're not here requesting that you

2    authorize a post-petition borrowing.  We're not asking you for a

3    new loan.  We're requesting authorization to make another draw

4    on the current loan.  The amount of the debtor's request is 15

5    million due largely to loan requirement that the draws be in

6    multiples of 5 million.  Otherwise, yeah, it would probably be

7    12 or 13 million that the debtor was requesting but it's got to

8    be a $5 million increment.

9         I think the testimony of Mr. Nofziger outlines the

10   budgetary reasons for the draw.  Based on the actual cash

11   balances right now or at least as of Sunday, the debtor has a

12   current cash balance but if you would count in that cash balance

13   for the loan requirement or the loan covenant that you maintain

14   at least a million and a half cash balance and you recognize the

15   loan covenant which is a separate covenant that the debtor pay

16   all post-petition obligations that are incurred and that's where

17   the professional fees that are accrued comes in.  The debtor

18   needs to maintain a cash cushion to keep those covenants met and

19   that's the purpose for the 10 or $15 million loan -- or draw as

20   opposed to the lower amount that Rabo asserts would be

21   necessary.

22        The updated forecast from Kander shows the reasons for

23   that additional funding.  I mean realistically, the biggest

24   reason is the 503(b)(9) payments and the prepayments.  So as

25   Mr. -- Mr. Nofziger testified, if the Court doesn't approve

1  those, then the draw request is smaller and it will require an

2  entirely new forecast be put together to support the amount

3  that's actually required.

4          Rabo suggests that the debtor operate at an even

5  riskier margin by not actively accounting further required cash

6  balance and not accounting for unaccrued but unpaid business

7  expenses which is not a good business practice.  The

8  professional fees have to be paid at some point.  If the debtor

9  doesn't maintain the funds to pay those professional fees, then

10  they risk dismissal of the case.  It obviously would be a

11  violation of the loan covenants at that point.  There's all

12  kinds of things that would be triggered if at whatever point

13  those things become due, the debtor hasn't been maintaining a

14  cash balance to pay those things.

15          Rabo suggested that the DIP order has a $250,000 cap on

16  the accrued but unpaid professional fees.  That's not true.  The

17  DIP order has a $250,000 cap on the Chapter 7 Trustee

18  compensation.  There's no cap on the unpaid professional fees

19  that are accrued by professionals for the debtors.

20          Rabo also argues in its objection that the prepayments

21  and the 503(b)(9) payments, if approved, would be payments in

22  violation of the absolute priority rule.  That's not true

23  either.  Those claims are or would be all administrative claims.

24  The 503(b)(9) claims, 100 percent are administrative claims.

25          If the prepayments aren't made and those creditors

provide product, not only would they have a lien that would

potentially make them a secured creditor, it's a post-petition

product also giving them administrative priority.  So those

payments would not be -- under the absolute priority rule

scheme, those would be administrative claims; not general

unsecured claims.

       To the extent Rabo's arguing that by paying those funds

with DIP proceeds they're somehow leap-frogging Rabo's position

and creating a secured claim rather than a general unsecured

claim, I think that's, if not incorrect, then at least ignores

the adequate protection issue that Rabo remains adequately

protected.

       Rabo -- the Court's already ruled Rabo's adequately

protected for the entire $45 million loan.  Rabo argues in their

response to the draw motion there really were two conditions.

The first one was, well, we need further adequate protection.

The Court -- like I said, we already went through this in the

first hearing.  They're adequately protected for the entire $45

million loan.  It's the same argument just now (inaudible) with

new legitimacy.  The Court's already ruled they're fully

protected.  They're trying to relitigate that issue now and this

is the risk of not allowing the full $45 million to be drawn

when the debtor needs it but have to come back to the Court

every time.

       Every time we come back for a new draw request, we

1    anticipate Rabo's going to argue they're not adequately

2    protected.  That's an issue that's already been resolved.

3         The other condition I couldn't actually find what the

4    condition was.  They mentioned professional fees but it's

5    essentially a list of the benefits that Rabo asserts it's

6    professional fees brought to the estate but there didn't seem to

7    be an actual request in there.  But nevertheless, as an over-

8    secured creditor, Rabo's got the ability to request reasonable

9    fees and expenses be paid by the debtor.  In fact, that request

10   of course will be subject to the Court's ability to review the

11   requested fees and other parties' ability to object.

12        In its argument, Rabo cites a case that -- the quote on

13   the case is the Court should not blindly follow the human cry of

14   the most vocal group.  Ironically in this case, Rabo is the most

15   vocal creditor in the case.  It's own admonition should be

16   applied to it.

17        COURT:  On the debtor's request to draw on the debtor

18   in possession credit facility, the lending facility, Viterra

19   wanted allowance of its 503(b)(9) claim but indicated it was not

20   requesting that approximate $2 million claim gets paid

21   immediately.  Does that change the landscape as far as the

22   amount of the draw that the debtor's requiring?

23        MR. CHRISTENSEN:  I think the answer to that is

24   potentially.  I think what Viterra's position is, and Mr. Green

25   can confirm this later, is we don't have to be paid right now

1  but if other parties are going to be paid right now, we want to

2  be paid right now.

3        So if the Court is going to grant the 503(b)(9) motion,

4  then I think Viterra's position is they're part of that club.

5  If the Court's going to deny the motion, then I think Viterra's

6  position is that's fine.  We'll wait till confirmation.  But I

7  think their position is we're not requiring a payment right now.

8  Mostly because we can survive without it.  But if other

9  503(b)(9) claims are going to be paid, they want to be paid as

10  well.  So it might change the landscape depending on the entire

11  motion.

12        MR. CHRISTENSEN:  That's all I have, Your Honor, unless

13  there's more questions.

14        COURT:  I don't have any additional questions at this

15  time, Mr. Christensen.  Thank you.

16        MR. CHRISTENSEN:  Thank you.

17        COURT:  All right.  Counsel for MetLife.

18        MR. BINGHAM:  Thank you, Your Honor.  Ron Bingham on

19  behalf of the MetLife entities.

20        Obviously MetLife has not filed any document in support

21  of or in opposition to the debtor's requested relief here today

22  but consistent with past practices, we've attended the hearings.

23  We've monitored them closely to address any direct threats that

24  may arise.  We continue to review every filing in this case

25  closely.  MetLife's FA's talk regularly, in fact weekly with the

1    debtor's FA's and we continue to maintain a consistent open

2    dialogue with debtor's counsel in this case.  And all of that of

3    course is completely consistent with what one would expect from

4    the largest secured creditor in the case.

5          We intend to continue actively engaging in the case, in

6    every aspect of the case but that is not to suggest, however,

7    Your Honor, that we don't expect progress in the case on behalf

8    of the debtors.  We started those discussions with debtor's

9    counsel.  We're going to continue to have those discussions.

10         We, just like all the other constituents in this case,

11   are anxious to see the debtor's Chapter 11 plan.  We'd like to

12   see what the exit strategy is.  We'd like to see what a

13   reorganized debtor may look like.  So we're going to continue to

14   press for progress in this case.

15         But with that said and at this particular point in the

16   case, MetLife supports the continued operations of the debtor.

17   I think there is little -- in fact, I would suggest no doubt

18   that the value of an ongoing enterprise far exceeds the value of

19   a closed facility, Your Honor.  I would also suggest that most,

20   if not every constituency in this case stands to recover more

21   from a reorganized process proposed by an ongoing enterprise;

22   not a closed facility.

23         So it's for those reasons, Your Honor, that we support

24   the debtor's request before the Court today.  And that's all I

25   have unless the Court has questions.

```
1        COURT:  You indicated that you're pushing for progress

2   towards the debtor reorganizing.  Are you seeing that progress,

3   at least informally?

4        MR. BINGHAM:  We have not.  We have not seen any

5   progress along that line, Your Honor.  In fact, we've had

6   discussions prior to this hearing, Mr. Christensen and I are

7   going to meet and talk today.  That's topic number one of that

8   discussion.  We understand we're closing in on the exclusivity

9   period expiring.  To the extent there's a request to extend

10  that, that is something that MetLife will look at very closely

11  depending on what that request looks like, how far, what is the

12  basis, et cetera.  We may very well object to that request.  Of

13  course I can't respond to that without having seen the motion.

14       COURT:  All right.  Thank you.

15       MR. BINGHAM:  Thank you.

16       COURT:  Counsel for the Unsecured Creditor Committee.

17       MR. KREMER:  Good afternoon, Your Honor.  Matthew

18  Kremer of O'Melveny & Myers on behalf of the Official Committee

19  of Unsecured Creditors.

20       First, I want to just open by saying, Your Honor, this

21  is the first time that the committee has appeared in person at a

22  hearing.  Just to echo the comments I said last week, we look

23  forward to appearing before you.  We have been working closely

24  since being engaged a few weeks ago with the debtor's counsel,

25  with the other parties in interest in this case.  We have our
```

1    lien investigation and other general investigation up and going.

2    We look forward to fulfilling our fiduciary duties of maximizing

3    the recoveries for unsecured creditors in these cases.

4         So with respect to the matters that are before the

5    Court today, the Unsecured Creditors Committee did file two

6    pleadings.  One in support of the 503(b)(9) motion.  That's at

7    Docket No. 382 and then a couple days ago, we filed at Docket

8    No. 432 an omnibus statement in support of the other motions

9    that are before the Court today including the DIP draw,

10   including the silage motion and including the Burks Tractor

11   lease motion.

12        So, Your Honor, one of the main objections that we saw

13   to the 503(b)(9) claim -- claimants was an evidentiary one.

14   That there wasn't evidence at the time that the motion was filed

15   with immediate and irreparable harm.  And the debtor's counsel,

16   when we discussed it with them, told us that they were planning

17   to have all of the 503(b)(9) claimants put in declarations and

18   be available to come to court today.

19        I have never seen that where every single 503(b)(9) or

20   a large portion of that actually came to court to testify but

21   I'm very pleased that the debtors actually went that extra step

22   to do that because I think we saw today some of the most

23   compelling I've ever seen in favor of payment of a 503(b)(9)

24   claim.

25        We heard about the fact that many of these claimants

1    could suffer layoffs, that they could have -- they would have to

2    cut salaries, that they have to sell non-core assets.  We heard

3    about the impact that this is having on their borrowing bases

4    and the ability for them to maintain their operations.

5            And they made it very clear that they may not be able

6    to continue to supply goods to the debtors, not out of spite,

7    but just out of the practical reality that many of these are

8    family businesses and they need this accounts receivable to

9    continue to operate.

10           So it's with this reason and in our due diligence that

11   the committee supports the 503(b)(9) motion.  And so we take all

12   of this evidence of this hardship and then we weigh it against

13   on the other side, like what's the detriment to the estate and

14   what's the detriment to the other creditors of making this

15   payment.  Well, just a couple weeks ago, we found a 47 percent

16   equity cushion, right?  A 47 percent equity cushion.  Sitting

17   here today, I don't know how we say that this case is

18   potentially administratively insolvent.

19           So on one hand, we have all of this hardship for the

20   claimants.  On the other, all we're asking is for administrative

21   claims to be paid now to really help these claimants.  Just to

22   be paid before they're going to be paid later in the case

23   because I don't think there's any doubt that this estate is

24   administratively insolvent, right?  There's no way with the

25   equity cushion that we've already found in these cases.

1          So with all of this, Your Honor, we think that the

2    testimony just really reinforced how critical it is to pay these

3    503(b)(9) claimants, how important it is to these creditors.

4    For that reason, the debtors support that motion.

5          I'll just note with respect to the reconciliation

6    point, I do agree with the debtor's counsel that what has

7    occurred here is fairly typical.  In most cases, you would seek

8    a cap -- you know, a critical vendor cap.  I'd seek court

9    authority to pay up to X amount.  That doesn't mean you're going

10   to tomorrow go write checks and send them out for that amount.

11   The committee has been working closely with the debtors to

12   diligence all of these amounts.  At this point, you know, we are

13   relatively confident that we agree with all of the 503(b)(9)

14   claims and the amended schedule for continuing to diligence that

15   issue but our position of the committee is only valid, only bona

16   fide 503(b)(9) claims are paid via this motion.

17         The order of the Court should say up to 5.1 million or

18   up to the amount that is in the amended schedule should be paid

19   but of course that can only be for 503(b)(9) claims that have

20   been diligenced and validated as under the statute.

21         COURT:  So are you envisioning essentially an

22   additional gatekeeping process should the Court approve

23   immediate payment to ensure that only valid 503(b)(9) claims are

24   paid?

25         MR. KREMER:  With respect to this, no, I'm not.  I

1    think at this point, everyone's had an opportunity to look at

2    the evidence since we're in these motions.  I think we're all

3    comfortable that the cap that has been proposed by the debtors

4    today, you know, actually only covers actual valid and bona fide

5    503(b)(9) claims.  I don't think that there needs to be another

6    step, in other words.  You know, another court stepping order to

7    pay these claims.  That is not what I'm suggesting.

8             COURT:  Okay.

9             MR. KREMER:  Finally with the silage motion, same

10   thing.  I thought the evidence today was very compelling.  The

11   committee agrees that, you know, this is a competitive market.

12   There's limited options to obtain the silage and other hay and

13   straw from other vendors.  The committee also believes that the

14   deposits today are relatively customary.  Maybe not in this --

15   not always for Millenkamp but that they are customary

16   particularly when there's an entity that's in distress and there

17   the situation to require, you know, a 50 percent deposit to

18   provide what we heard today is very, very critical goods for the

19   continued operations of the debtors' estates.

20             And finally, I just want to close with the DIP draw.

21   You know, it is -- we keep hearing that there's prejudice to the

22   debtor's estate because they're going to draw on the DIP and

23   incur interest.  Well, that incurs in 9 out of 10 bankruptcy

24   cases, right?  Most cases have a debtor in possession financing

25   facility that you necessarily incur interest under.  That's what

1    a DIP financing is.  It's the financing to fund your estates.

2          If the debtors and the committee have otherwise shown

3    that the debtors have met their burden for the payment of these

4    claims, that claim shouldn't be disallowed because the debtors

5    have to incur interest under a DIP facility.  That's counter-

6    intuitive to just everyday bankruptcy practice.  Unless Your

7    Honor has any other questions, that is all for the committee.

8          COURT:  No additional questions, Mr. Kremer.  Thank

9    you.  Counsel for Rabo AgriFinance.

10         MS. SCHWAGER:  Your Honor, if I have more than ten

11   minutes, is that okay?

12         COURT:  That's fine.  Yes.

13         MS. SCHWAGER:  Thank you, Your Honor.  Sheila Schwager

14   for Rabo AgriFinance.

15         Your Honor, on May 10, 2024, this Court entered an oral

16   ruling as to the debtor's final cash collateral motion and DIP

17   motion.  And at that oral ruling, this Court stated, with

18   respect to the debtor's motion for use of cash collateral, the

19   Court is going to grant that motion on a final basis.  The Court

20   will require that when the debtor submits an order, they will be

21   required to modify the budget that it had submitted to the Court

22   to reflect the fact that the Court did deny the debtor's

23   critical vendor motion and that there were substantial payments

24   contemplated in that cash collateral budget that were to be paid

25   to critical vendors.

1       I understand -- this Court stated, "I understand the

2   debtor may have additional motions it's going to file with

3   respect to Section 503(b)(9) claims or other secured claims that

4   intends to provide adequate protection through periodic cash

5   payments, but the majority of those critical vendor payments can

6   be stripped out of the budget."  The Court by granting the cash

7   collateral motion stated, "It is not authorizing the debtor to

8   make any critical vendor payments for purposes of adequate

9   protection."

10       Significantly, Your Honor, this Court went on to hold

11  that, quote, the Court isn't going to simply permit the debtor

12  to have unfettered access to that credit facility.  I'm going to

13  approve the debtor to request a $10 million access to that line

14  but should the debtor want to access additional funds from that

15  debtor in possession credit facility, it will require the debtor

16  to obtain additional order from the Court authorizing future

17  advances.  It will also require that the debtor justify the need

18  for the future advances.

19       Yet through the pending motions today, the debtors are

20  attempting to have that unfettered access to the credit

21  facility.  They are requesting another draw of $15 million but

22  that ignores the direction of the Court where they are not

23  specific as to where all of that money is to be spent to justify

24  the future advances.

25       By the pending motions, the debtors are attempting to

1    do a run around this Court's decision that it was not

2    authorizing the debtor to make any critical vendor payments for

3    purposes of adequate protection.  Of course this unnecessary

4    draw in the DIP credit facility does create unnecessary interest

5    in fees charged to the estate and although it may be common for

6    DIPs to have interest and fees, in this case, through the

7    hearings of which the Unsecured Creditors Committee has not had

8    the benefit to partake in, there has been substantial evidence

9    of problems with cash flow.

10          So the fact that there's property value out there does

11   not help the situation if the debtor cannot cash flow.  So to

12   increase that interest in the fees that the estate now has to

13   pay back creates cash flow issues and the debtor hasn't been

14   able to show that it has the ability to pay or to refinance so

15   that it can pay back these additional interest and fees.

16          And Your Honor, the debtors are seeking 2.5 million for

17   straw and hay early deposits.  Yet when Mr. Millenkamp was

18   questioned as to who were the vendors that were requiring those

19   deposits and how much, he admitted that he does not have them

20   lined up and he just wants the Court to authorize a blanket 2.5

21   million without the debtors providing specifics as to which

22   vendors are requiring the deposits, how much and what he's

23   getting in return.

24          The only two creditors that testified as to requiring a

25   deposit were Mr. Moss and Mr. Bingham yet they didn't testify as

1    to what they would agree to provide and how much money the

2    deposits would total.

3            Further, the debtors are seeking another 2.5 million

4    for deposits to pay the corn silage farmers yet Mr. Moss again

5    did not specify the amount of silage he would provide and what

6    the amount of the deposit that would be required.  He gave a

7    percentage.

8            So there are only two silage contracts submitted in

9    evidence and under those two contracts, only 200,000 was at

10   issue for deposits; not $2.5 million.

11           Significantly, Mr. Millenkamp, the person who was

12   requesting that this Court and the creditors defer to his

13   business judgment to draw on the DIP and have unfettered

14   discretion to spend such funds on unknown deposits had not even

15   seen those two silage contracts.  He thought his partner from

16   H & M must have negotiated them on the debtor's behalf.  This is

17   despite the fact that his partner at H & M is neither an

18   employee nor agent of the debtor's.  And despite

19   Mr. Millenkamp's testimony to the contrary, Mr. Huettig stated

20   he was not informed about fiduciary responsibilities despite

21   negotiating on behalf of the debtors.

22           And although he may not have negotiated those contracts

23   based upon Mr. Heida's testimony, Mr. Huettig did testify that

24   although he does negotiate contracts for Millenkamp silage, he

25   has not had any specific conversations and did not have anything

1    tied up with the silage farmers.

2         We then heard testimony that the contracts were drafted

3    by the vendors' attorneys, not Mr. Millenkamp's partner, and

4    then Mr. Heida testified he drafted them.  But for some reason,

5    the debtor's principal, Mr. Millenkamp, had no idea.  Your

6    Honor, I respectfully submit that this is not a debtor that's

7    paying attention and determining what is actually necessary for

8    the deposits.  Instead, he wants $5 million to exercise his

9    discretion on where and how he spends those funds.

10         They also are seeking $1.5 million deposit to the

11   insider H & M.  It is unbelievable that an insider would not

12   have more confidence in Mr. Millenkamp's stated ability to pay

13   all creditors 100 percent through a reorganization plan.  And

14   the fact that he doesn't have that confidence is alarming in and

15   of itself.

16         Further, Your Honor, Millenkamp Cattle was -- is

17   H & M's primary customer.  So it is surprising that he would --

18   he would require a $1.5 million deposit or he's not going to

19   chop anything.  He then has no business.  They're also now

20   seeking an early payment of 5.2 million for the 503(b)(9)

21   claimants instead of the represented amount of 5.8 million

22   identified in the May 20 filing.  Notably, this reduced amount

23   in supported documentation was only provided after Rabo objected

24   demonstrating that many of the amounts sought were in fact not

25   for goods despite the previous testimony of Mr. Millenkamp, but

1    instead were services and finance charges.

2         COURT:  Is Rabo comfortable that the latest iteration

3    of that Section 503(b)(9), those claims are actually valid

4    claims, there aren't services included in there, they don't

5    include deliveries outside the applicable time frame?

6         MS. SCHWAGER:  Your Honor, we did get the 2000 pages

7    Tuesday night and have -- we believe we've gotten through most

8    of them and have addressed the issues that we had with counsel.

9    So I believe that they are now supported, that 5.1 million.

10        COURT:  Okay.

11        MS. SCHWAGER:  But if there's an error, it's because it

12   was in a 24-hour span along with a whole bunch of other

13   exhibits.

14        Your Honor, apparently they're also seeking a $1.5

15   million reserve for the cash covenant and then additional funds

16   reserved for future not yet approved professional fees to make

17   sure that the professionals are paid.

18        Notably, Your Honor, this was buried in the forecast,

19   Exhibit No. 1036.  It was not disclosed to the creditors in the

20   DIP motion.  It only came at the last -- Tuesday night.  And

21   these reserves are not warranted and have not been part of any

22   of the prior budgets, even the budgets that include the DIP.

23        Indeed, the Unsecured Creditors Committee have stated

24   their belief that the debtors will be able to pay administrative

25   creditors 100 percent.  Today they stated that and also in

```
 1   Docket 382.  If that is the case, a reserve should not be
 2   necessary to obtain a comfort level that they will be paid
 3   particularly when it causes the estate to incur unnecessary
 4   interest and fees.
 5          And again, it is -- it can be an issue here due to the
 6   problems with cash flow that the debtors have had.  Your Honor,
 7   I believe that there's still an additional 1.8 million that's
 8   included in the DIP request of the 15 million that has not been
 9   explained.  Again, this is against this Court's directive.  And
10   the debtor's request that this Court simply defer to their
11   business judgment.  However, the silage request, again, is void
12   of any significant amounts of their deposits that they're
13   seeking and what amounts will be received in exchange for the
14   deposit and on what terms.  Further, there was no effort to
15   protect the estate by obtaining a security interest in the
16   silage to secure the deposit.
17          There has been no argument by Rabo that this Court
18   needs to order third parties to grant a security interest.  It
19   was that the debtor acting in the interest of the estate, if
20   he's going to -- if the debtors are going to request that they
21   be able to pay deposits, then the debtor from a business
22   perspective should be requesting from the farmers a security
23   interest to secure that department -- or that deposit in the
24   silage.
25          Further, the debtors now concede that the 503(b)(9)
```

1    claims they initially sought to be paid were not valid claims in

2    the amounts sought.  And Your Honor, it's not a simple

3    reconciliation or an oversight process.  He testified for an

4    hour and a half to this Court and at that hearing,

5    Mr. Millenkamp was asking that the Court approve them on that

6    day and allow for early payments to be made.  So that wasn't a

7    preliminary hearing or it wasn't a chance for, you know, people

8    to figure out whether -- in fact, at that point in time, the

9    debtors hadn't even provided any evidence.  It was only after

10   Rabo requested the documents to go through and try to find

11   whether or not they were supported and it was brought to the

12   attention that there were problems that the debtors then started

13   revising, amending and supplementing the 503(b)(9) requests.

14   But what we have to remember is that that actual hearing was to

15   pay the 503(b)(9) claimants early.  It was a representation to

16   this Court that they were valid 503(b)(9) goods -- unpaid goods

17   delivered within 20 days.  And clearly the due diligence hadn't

18   been done despite the testimony.  In fact, from that testimony

19   from the amended claim, there was an overstatement of $800,000

20   as to 15 of the creditors.

21        And so, Your Honor, I would question the benefit of

22   deference to the debtor's business judgment.  And it continues

23   today.  The debtors have submitted improper invoices in their

24   Exhibit 1032 in support of their requests for 503(b)(9) claims.

25   As admitted by Mr. Millenkamp, the invoice submitted for

1    Elevation Electric under Exhibit 1032 as a 503(b)(9) claim to be

2    paid early which is at page 1310 of Exhibit 1032 was actually an

3    $8,000 personal expense for his son's wedding to take place that

4    weekend.  So I guess when the Court was asking me about whether

5    they've substantiated, I would have to go back and review more

6    closely Elevation Electric because as Mr. Millenkamp testified,

7    that was not a business expense.

8            Further, the debtors filed a declaration of (inaudible)

9    irrigation.  Declared under penalty of perjury that a $200

10   invoice, if not paid, early was a substantial hardship upon

11   (inaudible) irrigation which Mr. Millenkamp conceded was not

12   accurate.

13           Yet, Your Honor, the debtor's moving forward asking for

14   extraordinary relief to pay all the claims early.  And this is

15   even true despite the fact that Viterra has said that they don't

16   have to be paid early and they have a substantial 503(b)(9)

17   claim.

18           So it's -- is the debtor really looking at it and doing

19   the fiduciary duty to evaluate whether or not these claims

20   should be paid now or is the debtor just attempting to continue

21   as business as usual and not be subject to the bankruptcy

22   restrictions.

23           Further, Your Honor, on the deposit demands by the

24   farmers, the debtor's own insider H & M and the professionals

25   wanting a reserve does demonstrate a lack of confidence in the

1    debtors and what message does it send to the rest of the

2    creditors?  What will be the avalanche of requests for

3    prepayments in this case?  It's not a good precedence to set.

4    The best way to build confidence is for the debtors to file a

5    plan that repays all creditors as Mr. Millenkamp and his

6    professionals have represented to the Court over the last 77

7    days.

8         As testified by the debtor's financial expert, even if

9    this Court were to allow the $5 million in deposits to the

10   farmers, then the only necessary DIP is 2.7 million needed to

11   get through week 19 which is a substantially less burden upon

12   the estate.  In the assumption that the DIP lender only permits

13   $5 million increments is not the history in this case.  This

14   Court entered an interim order which only permitted 8.5 million

15   and that split was issued by the DIP lender.

16        The debtor should not be authorized to stockpile

17   inventory for their future unless they have a confirmed plan.

18   Otherwise they are doing so at the detriment of the current

19   lenders and outside the priority of claims directed by the code.

20   Despite being 77 days into these cases, there has been no

21   Chapter 11 plan or disclosure statement filed and this is so

22   even though the debtors have testified on multiple occasions

23   they intend to exit the bankruptcy in 130 days.

24        If the debtors wish to pay unsecured creditors and

25   insiders in full as they propose to do, the debtor should simply

1   file a plan of reorganization within the promised time frame.

2   Instead, the debtors continue to seek more ways to pay unsecured

3   creditors prior to confirmation of the plan in violation of the

4   code and absolute priority rule.

5           In doing so, the debtors are not only skipping

6   unsecured creditors ahead of secured creditors and priority but

7   they are using an expensive priming DIP loan to the estate's

8   further detriment to do so.  To justify the treatment, the

9   debtors in their motion continue to point to an equity cushion.

10  However, as noted at prior hearings, an equity cushion will only

11  adequately protect the interests if there's a sale process to

12  maximize that equity value as they're not sufficiently cash

13  flowing.

14          Based on the most recent report from the Forbes group

15  which is the admitted Exhibit 3087, there has been effectively

16  no process in identifying a source of refinancing since prior to

17  the petition date.  It states no CIMs have been provided to new

18  parties.  No parties have accessed the data room for information

19  about the debtors and no new parties are engaged in initial

20  meetings with Forbes partners.

21          With effectively no progress from the Forbes group and

22  no Chapter 11 plan or disclosure statement submitted, it is

23  reasonably likely that we will get so far into a Chapter 11

24  process and there won't be the contingency planning for sale

25  process to actually monetize the asserted equity cushion.

1       Likewise, as the debtors continue to incur debt, their

2   silence on proposed operational improvements to address the

3   historical inability to generate sufficient cash flow to service

4   that debt.  And although Rabo believes that the debtors have not

5   met their burden to justify the advance, if a DIP advance is

6   granted, Rabo has requested adequate protection in the form of

7   being able to approve interest at the default rate which is

8   approximate to the DIP's lender rate.  Based on the debtor

9   submission, they believe they have sufficient cash resources to

10  justify preferring unsecured creditors and insiders in violation

11  of the absolute priority rule.

12       However, these payments shouldn't be to the detriment

13  of Rabo.  And as Mr. Christensen addressed, Rabo has requested

14  attorney fees and costs similar to what the DIP lender is

15  getting and the debtor's counsel as it has provided benefits to

16  the estate in reducing the costs of the DIP lending by $2

17  million with its competing bids, it's reduced interest and fees

18  on the DIP financing, through its objection and the limited

19  financing that's been authorized and the debtor's have admitted

20  that their claims had to be reduced by at least 600,000 which

21  only came after Rabo objected.

22       That being said, Your Honor, we do respectfully request

23  that the debtors are not granted unfettered discretion to obtain

24  a loan of $15 million.  The interest and fees should not be

25  incurred until and if a real specific showing and need is

1   provided.  Thank you, Your Honor.

2        COURT:  I think I know the answer to this question, Ms.

3   Schwager, but is Rabo opposing the debtor's motion for approval

4   of that post-petition tractor lease?

5        MS. SCHWAGER:  It is not, Your Honor.  We have filed --

6   I think we filed a non-objection but we're not.

7        COURT:  All right.  Thank you.

8        MS. SCHWAGER:  Thank you, Your Honor.

9        COURT:  Mr. Naess.

10       MR. NAESS:  Thanks, Your Honor.  The U.S. Trustee is

11  taking a position only on two of the motions that are before the

12  Court today.  The first of those is probably the easiest to

13  explain and that's the DIP disbursement motion.  Our position is

14  that the amount that is disbursed, if any, under that motion

15  should depend on what the Court decides to do with the other

16  motions.  If it decides to grant early payment of the 503(b)(9)

17  claims, then the DIP financing would need to be in an amount

18  sufficient to allow the payment of those claims and the same for

19  the early -- I forget what we're calling them but the early

20  payments to the hay and the corn silage creditors.

21       As to the 503(b)(9) motion which is the other motion

22  that we take a position on, the U.S. Trustee has no objection to

23  the 503(b)(9) claim amounts that are included in the admitted

24  Exhibit 1031.  The Court has asked others about their confidence

25  in those numbers and the U.S. Trustee, like Rabo, received, you

1    know, the nearly 2000 pages of invoices on Tuesday.  We went

2    through them yesterday.  I am confident that the claim amounts

3    that are included within that exhibit are valid 503(b)(9)

4    claims.  They are supported by invoices for goods within the 20

5    days prior to the petition date.

6         COURT:  Does that include the Elevated Electric invoice

7    in regard to the wedding venue that Ms. Schwager highlighted?

8         MR. NAESS:  Yeah.  So I mean that's an interesting

9    question.  I think we're comfortable allowing it in that it was

10   a good provided to the debtor and that it's on the debtor's

11   property.  Portions of that invoice, the $8,000 invoice were for

12   services which are not included in the 503(b)(9) motion.  So

13   there's only I think some piping, PVC piping that was included

14   within that 503(b)(9).

15        COURT:  Is that in the ordinary course of the debtor's

16   business?

17        MR. NAESS:  Well, I think Mr. Millenkamp himmed and

18   hawed about that a little bit, indicated that there's certainly

19   other farming related and so I guess that one might be

20   questionable depending on the credence that the Court gives to

21   his testimony as to that particular charge.

22        I did want to say that the amounts is where our

23   confidence ends.  We don't have confidence that there aren't

24   invoices that we haven't been provided.  We don't have

25   confidence that there aren't creditors that also have 503(b)(9)

given the arc of this case.  It's been a fluctuation throughout

as to who's here, who's not, who has a 503(b)(9), who doesn't,

when critical vendors was on the table, who's a critical vendor,

who isn't and what the amounts are has been in constant flux

throughout the case.

As to the early payment, the U.S. Trustee views this as

there are three elements to the analysis.  The first being

prejudice to the debtor.  If the DIP disbursement is approved --

so at the time we objected, there was no even motion on the

table for further disbursements and if that was the case, if the

debtor wasn't receiving disbursement, then it wasn't going to

have the money to pay those 503(b)(9) claims based on past

budgets and that would have been a prejudice to the debtor and

we think that that would have warranted against granting the

503(b)(9) early payments.  If the DIP is allowed, the

disbursement to cover those 503(b)(9) payments, we think that

that concern goes away.  It probably swings back in the other

direction in that it doesn't weigh against the Court granting

early payment of the 503(b)(9) if the debtors then have the

money to make those payments.

As for hardship to claimants, the Court today heard

testimony from eight of the 23 503(b)(9) claimants.  7 of them

testified to various degrees as to the hardship that they would

face and that testimony, some was more compelling than others.

What was clear that there's -- in general, the 503(b)(9) amounts

1   are small percentages of the overall claims owed to each of

2   these creditors and it's small percentages of the overall annual

3   revenue of businesses.

4          There was testimony about borrowing bases and what

5   wasn't clear was how much borrowing bases were impacted based on

6   the total claim amounts which in some cases were 9, 10 times

7   amounts -- the amount of the 503(b)(9) claims and how much the

8   borrowing would be impacted by the 503(b)(9) amounts as well as,

9   you know, what the borrowing needs were.  Was this even going to

10  be a concern for these creditors within the next 6 months.  I

11  don't think that was very conclusive.

12         There's a reference to declarations that were filed.

13  Those declarations were in the Exhibit 1033 which was included

14  on the exhibit list.  The U.S. Trustee did not stipulate to

15  admission of that because we have hearsay concerns in that those

16  were out of court statements that we didn't have the opportunity

17  and others did not have the opportunity to cross-examine and

18  question.  The parties submitted those declarations so we don't

19  believe it's appropriate for the Court to consider those.  They

20  weren't -- though it was represented that they were submitted by

21  all of the 503(b)(9) creditor, that's also not accurate.  There

22  were a larger percentage than came and testified today that did

23  file declarations but not all of them.

24         There's a suggestion that the Court could extrapolate

25  the reasoning that was expressed by the 7 creditors who

1   testified as to their varying degrees of harm.  To the rest of

2   the creditors who didn't show up and the rest of the claimants

3   who didn't show up and testify, we did have one claimant who

4   specifically testified that there was no hardship and so if the

5   Court can extrapolate that there is no hardship to testifying

6   claimants, it could also extrapolate that there's no hardship to

7   non-testifying claimants.

8          Ultimately, we don't think that that's an exercise that

9   the Court should engage in either direction.  You know, they

10  weren't here.  There isn't evidence that they're experiencing

11  hardship.

12         Detriment to other creditors is the final factor in

13  that analysis.  And this is a hard one I think primarily based

14  on the way in which this issue has presented to the Court and by

15  that, I mean by the debtors as a group.  Typically 503(b)(9)

16  requests and particularly the early payment requests are made by

17  individual creditors who are going to be harmed by non-early

18  payment or non-determination of a 503(b)(9) claim.

19         Here, we have a group of 23 creditors.  We've got 7 who

20  showed up and testified again as to varying degrees of hardship.

21  You know, I think the Court has three options.  One, it allows

22  the remaining creditors, the remaining 16 to ride the coattails

23  of those who testified.  The problem is that there's really no

24  basis in the record to support, you know, granting them early

25  payment under the factors that have been established by case

1   law.

2         The second option is to approve early payment only of

3   those that the Court found compelling evidence did show that

4   there was a hardship or potential hardship to them.  You know,

5   the potential concern there is that if certain -- even if it's

6   all 7 of those creditors are paid, next week and a month or two

7   months from now, the case gets dismissed.  At that point, you've

8   got 7 creditors who have been preferred, you know, over the rest

9   as they race to the courthouse and try to get paid.

10        Lastly, the third option is to deny the early payment

11  to all of them because of their concerns over whether or not all

12  administrative claims can be paid.

13        In regards to that, we heard testimony and the U.S.

14  Trustee believes that waiting until there's some sort of a plan,

15  at least ideally a confirmed plan makes the most sense.  Based

16  on testimony today, there have been 10 hours spent towards

17  plan -- generating plan terms.  There's a lot of work that needs

18  to take place before there's a plan ready for confirmation.  And

19  frankly, I don't think that the Court, you know, has a good

20  record before it as to the debtor's ability or intent to pay all

21  of those administrative claims in full.

22        That's all I have unless the Court has questions, Your

23  Honor.

24        COURT:  Thank you, Mr. Naess.  Counsel for Conterra.

25        MR. O'BRIEN:  Thank you, Your Honor.  As the Court

knows, Conterra has the second lien on the livestock and the third lien on the dirt and with that, I'd like to make just three points.  First, there has been a lot of effort and a lot of expense today to take care of vendors by the subordination of Conterra's lien through Sandton as an intermediary to pay off vendors.  But then at the same time, we haven't seen very much progress or effort towards a plan to eventually take care of Conterra.

We're not taking a position on today's motions but at some juncture, Conterra is going to need to be more proactive to protect its interests and that was the first point I wanted to make.

And then the second point, Your Honor, is there are two types of equity cushions.  There's equity cushions on paper and there's equity cushions in the real world and we don't know what equity cushion is really going to be the final result in this case.  And so we're not sure, you know, where we're going to wind up being in that junior position.

And then the third point I'd want to make and this goes back to the issue of the plan and where are we really going in the longer term.  But the debtor's business is a commodities business and we all know from Economics 101 in a commodity business over the long run, the average producer goes broke and I don't know how good of a producer Mr. Millenkamp is.  There's a lot of testimony he was a good producer but he certainly

1    carries a lot of debt and he has a lot of issues.  And so I

2    don't know where he comes out at the end of the day but it

3    appears at this point that it's very unlikely he's going to be

4    able to milk himself out of this unless milk prices skyrocket

5    and the chances of that happening is very remote.

6           And from what I've seen of the financials so far, it

7    does not look like he is cash flow positive and he is not cash

8    flow positive and he has not started to service the debt --

9    almost $200 million of debt to Conterra -- or to Met, 100

10   million of debt to Rabo and $20 million to us.  He's making

11   interest payments at the pre default rate but he's not servicing

12   debt.  Nothing is amortizing and it does not appear that he is

13   cash flow positive.

14          And so we are really worried where this is going to go

15   in the long-term, especially if we keep being asked to

16   subordinate our position to take care of other people.  Unless

17   the Court has any questions, that's all we have to say today.

18          COURT:  Thank you, Mr. O'Brien.

19          MR. O'BRIEN:  Thank you.

20          COURT:  Counsel for Viterra.

21          MR. GREEN:  Thank you, Your Honor.  Your Honor, I don't

22   believe that there's been any objection to the fact that Viterra

23   has a valid 503(b)(9) claim in the amount of $1,954,761 so we

24   would ask the Court to enter an order approving Viterra's

25   503(b)(9) claim in that amount.

1          When it comes to a question of timing, it was my

2     understanding -- it is my understanding that as far as early

3     payment, the cases indicate that early payments are appropriate

4     for the conditions that Mr. Naess had raised including a

5     hardship.

6          Your Honor, Viterra simply can't show that this is a

7     hardship.  If that's not an element, if that doesn't matter, you

8     know, then yes, we'd ask the Court to use its discretion.  Since

9     we have a 503(b)(9) claim and ask the Court to allow payment of

10    it because we'd like to get paid as soon as possible.  But we

11    can't show hardship.  So if that's something that the Court is

12    going to consider, then that's why we say we will wait until

13    payment under 1129(a)(9) on the effective date of the plan.

14    That's all I have, Your Honor.

15          COURT:  Thank you, Mr. Green.  Mr. Christensen.

16          MR. CHRISTENSEN:  Just a couple of quick follow-ups,

17    Your Honor.  I have a lot of notes.  I'm trying to figure out

18    where to start and where to end.  There was some argument from

19    Ms. Schwager regarding H & M's lack of confidence in the

20    testimony from Mr. Huettig.  I believe Mr. Huettig's testimony

21    was his lack of confidence is because of Rabo's involvement; not

22    because of Millenkamp itself.

23          There was also a comment that the debtor is not paying

24    attention to the case and I think I remind the parties that the

25    debtor in this case is not Bill Millenkamp.  The debtor here is

 1   Millenkamp Cattle.  Millenkamp Cattle has a general manager.  It

 2   has a finance manager.  It has FA's that are working on the

 3   case, none of whom are Bill Millenkamp.  So I don't think it's

 4   accurate to say the debtor is not paying attention.

 5        There's no request that the DIP draw be used to fund a

 6   cash reserve or to fund payment of professional fees.  The

 7   budget that was approved by the Court has weekly payments for

 8   professional fees in that budget.  They've already been part of

 9   the budget moving forward.  That same budget also had an ending

10   cash balance that always remained large enough to cover that

11   cash balance requirement.  The only thing that's been done on

12   the forecast is moving those two things to their own separate

13   line items rather than maintaining it in the cash balance and

14   rather than it being a weekly payment of professional fees, it's

15   just accruing professional fees.

16        The debtor's expert did not testify that only $2.7

17   million would be required in a DIP loan.  In fact, he testified

18   that amount is not feasible.  So I don't think it's accurate to

19   say he said that's all that would be required.  He also did

20   testify that the debtor has requested DIP increments other

21   than -- or excuse me, less than $5 million and that Sandton has

22   refused.

23        The testimony that Mr. Millenkamp gave in prior

24   hearings was for a critical vendor motion that was pending

25   before the Court.  There was no 503(b)(9) motion for these

1    payments pending at that time.  So the use of his testimony at

2    that time in objection to his testimony and others' testimony

3    today when there is a pending 503(b)(9) request for those

4    amounts I think is improper.

5            There's been comments that the debtor's not properly

6    cash flowing.  There's variance reports that the debtor produces

7    to parties every week.  There haven't been any negative

8    variances on those cash reports.  So as to the current approved

9    budget, they are cash flowing.

10           Now, admittedly as Mr. O'Brien pointed out, there's

11   just interest payments being made on those loans but as to the

12   current cash budget, it's -- the debtor's cash flowing under

13   that budget.

14           Mr. Naess brought up the fact that there might be other

15   503(b)(9) claims.  We don't dispute that.  There's no

16   requirement that if the debtor's going to pay some 503(b)(9)

17   claims early that it has to pay all 503(b)(9) claims early.  If

18   there are other 503(b)(9) claims, then the debtor can deal with

19   them at that point.

20           I think the testimony from the claimants that were here

21   today overwhelmingly was it's a hardship for them to make those

22   payments.  And that's the testimony that the Court can

23   extrapolate into the other parties that weren't able to be here

24   today.

25           Lastly, Your Honor, with regard to the prepayments,

1    there's a weekly reporting that the debtor's required to make

2    each week right now to all the secured parties plus the U.S.

3    Trustee plus the Unsecured Creditors Committee.  That reporting

4    includes variance reports and various other things.  I think the

5    debtor would have no problem including in that weekly report a

6    report of what prepayments it made to corn silage, hay or straw

7    vendors that week, who the payment was made to, what the payment

8    was for and what the debtor was purchasing with that payment or

9    prepaying with that payment.  I think that reporting may help

10   alleviate some of the transparency issues that a couple of the

11   parties raised and that will provide a way for those parties to

12   help monitor what those funds are actually being used for.  And

13   we don't have a problem including that in the report to those

14   parties.

15            Other than that, I think that's it.

16            COURT:  Thank you, Mr. Christensen.

17            MR. CHRISTENSEN:  Thank you.

18            COURT:  All right.  I'm going to quickly -- I'm running

19   out of time but I'm going to quickly rule on the motion for

20   approval for that post-petition tractor lease.  It's Docket 375.

21   It appears there is no opposition to that motion by the debtor.

22   I think the debtor's exercised reasonable business judgment in

23   going forward with that motion.  I'll go ahead and approve that

24   for the debtor.  Go ahead and submit a proposed order to the

25   Court.  Does any party wish to endorse the form of that order?

1    All right.  Looks like that could be submitted without

2    endorsement.  Go ahead and get that submitted.

3          With respect to the remaining motions, the motion to

4    allow the 503(b)(9) claims, the motion for the prepayment of the

5    hay, straw silage and chopping vendors and the motion for

6    approval to advance on the debtor in possession facility, I'm

7    going to take those matters under advisement and we'll get you a

8    decision on them as soon as we can.

9          All right.  Is there anything else that we need to

10   discuss today from any of the parties?  All right.  Thank you,

11   counsel.

12         MS. SCHWAGER:  Thank you, Your Honor.

13         CLERK:  All rise, please.

14              (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


__/s/ Tamara A. Weber_____        _7/12/24_____

Signature of Approved Transcriber                Date


__Tamara A. Weber_____

Typed or Printed Name