# EXHIBIT D

CONFIDENTIAL

*Cargill, Incorporated*

MILLENKAMP CATTLE, INC. (et al.)
UP TO $120,000,000 SENIOR SECURED EXIT REVOLVING FACILITY

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

*Set forth below in this term sheet (the "Term Sheet") is a summary of the principal terms and conditions for the Facility (as defined below). This summary of terms is for indicative purposes only.* **It has been prepared for discussion purposes only and does not constitute an offer or commitment to lend, syndicate, arrange, underwrite or act as agent or advisor with respect to any financing.** *It does not purport to summarize all terms of the Loan Documents (as defined below). The terms set forth herein are subject to change in all respects, and reference should be made to the Loan Documents for the final terms of the Facility. Capitalized terms used but not otherwise defined in this Term Sheet shall be defined in the Loan Documents.*

| | |
|---|---|
| Borrowers: | Millenkamp Cattle, Inc., an Idaho corporation, Idaho Jersey Girls LLC, an Idaho limited liability company, East Valley Cattle, LLC, an Idaho limited liability company, Millenkamp Properties, L.L.C., an Idaho limited liability company, Millenkamp Properties II, LLC, an Idaho limited liability company, Millenkamp Family LLC, an Idaho limited liability company, Goose Ranch LLC, an Idaho limited liability company, Idaho Jersey Girls Jerome Dairy LLC, an Idaho limited liability company, Black Pine Cattle LLC, an Idaho limited liability company, Millenkamp Enterprises LLC, an Idaho limited liability company, Susan Millenkamp as Trustee of the WJM 2012 Trust, William Millenkamp as Trustee of the SJM 2012 Trust, William John Millenkamp, and Susan Jo Millenkamp (each a "Borrower" and collectively, the "Borrowers"). |
| Guarantors: | All obligations under the Facility (defined below) and under any interest rate protection or other hedging arrangements entered into by the Borrowers with Cargill, any other Lender or any affiliates of the foregoing shall be fully and unconditionally guaranteed by each of the Borrowers' existing and future domestic subsidiaries and any parent holding companies (each, a "Holdco") of the Borrowers (collectively, the "Guarantors"; and together with the Borrowers, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | Cargill, Incorporated ("Cargill") (in such capacity the "Arranger"). |
| Administrative Agent: | Cargill or any other third party selected by Cargill. |

| | |
|---|---|
| Lenders: | Cargill and any other financial institution/s selected by the Arranger (collectively, the "Lenders"). |
| Closing Date: | The date on which all conditions precedent set forth on Schedule A hereto are satisfied (the "Closing Date"). |
| Facility: | Senior secured credit facilities consisting of: |
| | (a) An exit facility (the "Facility") consisting of revolving loans (the "Revolving Loans") in an aggregate principal amount of $120,000,000. |
| | (b) Uncommitted commodities hedging capacity provided by Cargill (or an affiliate thereof), to enable Borrowers to enter into commodities hedging products managed by Cargill (or an affiliate thereof). |
| Borrowing Base: | The "Borrowing Base" will equal the sum of (a) up to 75% of the Borrowers' Eligible Cattle other than Eligible Dairy Cattle, *plus* (b) up to 75% of the Borrowers' Eligible Dairy Cattle, *plus* (c) up to 75% of the Borrowers' Eligible Inventory constituting livestock feed and grain having a value equal to the lesser of (i) cost or (ii) market value, as determined by Cargill in its sole discretion, *plus* (d) up to 80% of the Borrowers' Eligible Prepaid Expenses, *plus* (e) up to 80% of the Borrowers' Eligible Accounts, *plus* (f) up to 100% of the Borrowers' Eligible Growing Crop Investments, *plus* (g) up to [80]% of the Borrowers' Eligible Accounts, *plus* (h) up to 100% of the Borrowers' Eligible Deposit Accounts less 100% of book overdrafts, uncashed checks, and other outstanding debits and obligations of Borrowers as determined by Cargill in its sole discretion, *plus* (i) up to 100% of the Borrowers' Eligible Margin Accounts, *plus* (j) up to 100% of the Borrowers' Eligible Milk Accounts, and *minus* all amounts payable by the Borrowers (i)(x) to vendors for or related to feed for Borrowers' cattle, (y) to vendors and service providers for the production, purchase, transport, storage, shelter, feeding or other maintenance of the Collateral to the extent secured by liens on the Collateral, (z) pertaining to other goods and services provided by vendors and service providers receiving payments under clauses (x) or (y) above, and (ii) which are unpaid more than 90 days after the original due date therefor. For the avoidance of doubt, the Borrowing Base shall not include prepetition accounts payable, including Conterra's mezzanine debt, so long as they are expressly subordinated to the Facility pursuant to |

| | |
|---|---|
| | a written agreement in form and substance reasonably acceptable to Cargill.[1] |
| Eligibility: | Eligible Cattle determinations shall be based upon, among other criteria, dairy and non-dairy cattle. Eligible Dairy Cattle shall have a value of not less $1,500 per head during the term of the Facility, with Cargill providing additional lending value in accordance with industry valuations as determined by Cargill in its sole discretion. Eligible Cattle other than Eligible Dairy Cattle shall have a valuation as follows: (i) cattle weighing 600 lbs. or less shall be valued based on the most recent CattleFax report; and (ii) cattle weighing more than 600 lbs. shall be valued on the "cost-to-finish" model, taking into account average daily weight gain, cost to gain, current weight, and expected out-weight. The definitions of the eligible assets constituting the Borrowing Base will be determined by Cargill in its usual and customary manner and in its reasonable discretion. In addition, Cargill will retain the right, from time to time, in its reasonable discretion, to (i) establish additional standards of eligibility, (ii) reduce advance rates, and (iii) establish, increase or decrease reserves against the Borrowing Base or the Facility and (iv) to reduce one or more of the sub-limits used in computing the Borrowing Base. |
| Maturity: | The Facility shall mature on the date that is three years from the Closing Date (the "Maturity Date"). |
| Purpose and Availability: | The Revolving Loans shall be available on and after the Closing Date for the Borrowers' working capital requirements, to repay in full all pre-existing debt of the Borrowers and their subsidiaries, termination of all related commitments and release of all related liens, on terms satisfactory to the Arranger, and other general corporate purposes. Amounts borrowed under the Facility may be borrowed, repaid and reborrowed. |
| Interest and Fees: | As set forth on Annex I. |
| Mandatory Prepayments: | Customary mandatory prepayment provisions for facilities of this type, as more fully set forth in the definitive loan documentation. |
| Voluntary Prepayments and Commitment Reductions: | Revolving Loans may be prepaid and commitments may be reduced, in whole or in part, without premium or penalty, in minimum amounts to be agreed, at the option of the Borrowers at any time upon one day's (or, in the case of a prepayment of SOFR Loans, three days') prior notice, subject to reimbursement of the Lenders' |

---

breakage costs in the case of a prepayment of SOFR Loans prior to the last day of the relevant interest period.

Collateral: The Facility and any hedging arrangements with Cargill, the other Lenders or affiliates of Lenders will be secured by a valid and perfected first priority lien (subject to liens permitted under the Loan Documents referred to below) on substantially all assets of the Borrowers and each Loan Party, whether owned on the Closing Date or thereafter acquired (collectively, the "Collateral"), including, without limitation:

(a)     All equity interests and debt held by the Borrowers or any other Loan Party (including joint ventures).

(b)     Substantially all tangible and intangible assets of the Borrowers and the other Loan Parties including but not limited to, inventory, accounts receivable, equipment, fixtures, farm products (including crops grown, growing, or to be grown, livestock, born or unborn, supplies used or produced in Borrowers' operations and products of crops or livestock in their unmanufactured state), general intangibles (including contract rights), intercompany debt, chattel paper, insurance policies, licenses, permits, intellectual property, documents, instruments, indemnification rights, tax refunds, commercial tort claims, letter of credit rights, hedge agreements, investment property, deposit and securities accounts and cash, wherever located (subject to exclusions and limitations to be agreed).

(c)     Milk or other dairy product sale proceeds, subject to the priority milk assignments, claims and rights contemplated by the existing credit facilities between one or more of the Borrowers and Metropolitan Life Insurance Company and MetLife Real Estate Lending LLC (collectively, "MetLife"), with the rights and priorities of the Lenders and MetLife subject to an intercreditor agreement in form and substance reasonably acceptable to Cargill (the "Intercreditor Agreement").

(d)     All proceeds and products of the foregoing.

The Facility and any hedging arrangements with Cargill, the other Lenders or affiliates of Lenders shall also be secured by a valid and perfected second priority lien (subject to liens permitted under the Loan Documents referred to below) on (a) all real property of the Borrowers and each Loan Party and (b) receivables and royalties relating to the Borrowers' and each Loan Party's digester equipment, in each case, as provided in the Intercreditor Agreement.

4881-8411-6201v.44882-5579-8503v.3            4

|  |  |
|---|---|
|  | All pledges, security interests and mortgages covering the Collateral shall be created on terms and pursuant to documentation reasonably satisfactory to Cargill. |
|  | Notwithstanding the foregoing, the following assets will be excluded from Collateral: (i) all leasehold interests, (ii) all contracts, licenses and permits to the extent the grant of a security interest therein is prohibited by law or by the terms of such contracts, licenses and permits, in each case after giving effect to the Uniform Commercial Code, and (iii) upon the Borrowers' reasonable request, assets for which Cargill determines that the cost, burden or consequences (including adverse tax consequences) of obtaining a perfected security interest in such assets substantially exceeds the practical benefit of such collateral to the Lenders. |
|  | All motor vehicles and other assets subject to certificates of title shall be excluded from the Collateral and not subject to any security interest of Cargill. |
| Loan Documentation: | The definitive loan documentation for the Facility (the "Loan Documents") shall be negotiated in good faith and shall contain the terms and conditions set forth herein and such other terms as the Borrowers and Cargill shall agree. |
| Conditions Precedent to Initial Borrowings: | The effectiveness of the loan agreement and funding the initial Revolving Loans on the Closing Date shall be subject to the conditions precedent customary for financings of this type, including, without limitation, the conditions precedent set forth on Schedule A hereto, and shall be contingent on (i) internal Cargill approval and the approval of any other Lenders and (ii) the Successful Syndication of the commitments under the Facility. |
|  | "Successful Syndication" means a syndication of the commitments under the Facility in an amount and to such additional Lenders that are reasonably acceptable to Cargill. |
| Conditions Precedent to all Borrowings: | Each extension of credit under the Facility shall be subject to: |
|  | (a)    Receipt of a notice of borrowing. |
|  | (b)    Absence of any default or event of default before, or after giving effect to, such borrowing. |
|  | (c)    The accuracy of the representations and warranties of the Borrowers and the other Loan Parties. |

|  |  |
|---|---|
|  | (d) Borrowing Base Excess shall be greater than $5,000,000; provided, however that Cargill shall have discretion to fund if the Borrowing Base Excess is greater than $0 |
| Representations and Warranties: | Representations and warranties applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation, the following (subject to thresholds and/or exceptions to be agreed): corporate existence; corporate power and authority; non-contravention; authorization and enforceability of the loan documentation; no conflicts with law or contractual obligations; execution and delivery; binding effect; accuracy and completeness of financial and other information (including pro forma financial information); no material adverse change with respect to the Borrowers and their subsidiaries; compliance with applicable laws and regulations, including ERISA, the PATRIOT Act, FCPA, OFAC and other anti-corruption laws, anti-money laundering laws, and sanctions; environmental laws and Federal Reserve regulations; accuracy and completeness of disclosure; consents and approvals; ownership of property; intellectual property; subsidiaries; insurance; casualty events; labor matters; no liens; no material litigation; inapplicability of the Investment Company Act of 1940; solvency of the Borrowers and their subsidiaries on a consolidated basis; use of proceeds; payment of taxes and other obligations; no default or event of default; validity, priority and perfection of liens and security interests in the Collateral; and, status as senior debt. |
| Affirmative Covenants: | Affirmative covenants applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation the following (subject to exceptions to be agreed): delivery of annual audited consolidated and consolidating financial statements, quarterly and monthly unaudited financial statements and financial projections; delivery of monthly Borrowing Base certificates; delivery of quarterly updates to the Commodities Hedging Plan; delivery of quarterly updates to the Feed Payables Management Plan; delivery of compliance certificates, notices and other information (including information required under the PATRIOT Act, notices of default, litigation, ERISA events and material adverse change); delivery of notices in respect of changes in terms or conditions of any off-taker agreements (i.e., agreements with third parties pertaining to the purchase or delivery of Borrowers' or their subsidiaries' milk or other dairy products) and copies of any notices thereunder delivered by such third parties to Borrowers or their subsidiaries; compliance with applicable laws and regulations (including ERISA, environmental laws, and Federal Reserve regulations); payment of taxes and other obligations; use of proceeds; preservation of existence, permits, licenses and approvals; |

visitation and inspection rights; keeping of books and records; maintenance of properties; insurance coverage (including, without limitation, "keyman" insurance in respect of Bill Millenkamp in an amount not less than $10,000,000); performance of material contracts; entering into hedging arrangements satisfactory to Cargill, including as set forth in "Affirmative Hedging Requirements" below; compliance with FCPA, OFAC, the USA PATRIOT Act, sanctions, anti-corruption, anti-terrorism laws and anti-money laundering laws and similar laws (including the Trading with Enemy Act and all foreign asset control regulations of the United States Treasury Department, enabling legislation and executive orders relating thereto and the USA PATRIOT Act and FinCEN and the Beneficial Ownership Regulation); and further assurances.

Each such covenant shall be more fully defined in the Loan Documents.

| | |
|---|---|
| Affirmative Hedging Requirements: | The Borrowers shall enter into hedges covering (i) 75% of the Annual Milk Production (to be defined in the definitive loan documentation) for the first year after the Closing Date, (ii) 50% of the Annual Milk Production for the second year after the Closing Date and (iii) thereafter, 50% of the Annual Milk Production on a 12-month roll-forward basis. |
| Financial Covenants: | Financial covenants applicable to the Borrowers and then-subsidiaries shall include, without limitation, the following: |

(a)     maintenance of a minimum Debt Service Coverage Ratio i) as of 12/31/2025 of not less than 1.50:1.0 and (ii) as of 12/31/2026 of not less than 2.00:1.0;

(b)     maintenance of a maximum Funded Debt to tangible net worth ratio; as of 12/31/2025 of not more than 4.00:1.0 and (ii) as of 12/31/2026 of not more than 3.50:1.0; (iii) as of 12/31/2027 of not more than 3:00:1.0 and thereafter

(c)     maintenance of a Leverage Ratio, measured on a quarter-end basis, beginning June 30, 2025, of not more than (i) 5.50:1.00 through September 30, 2025, (ii) 5.00:1.00 through September 30, 2026 and (ii) 4.00:1.00 thereafter; and

(d)     maintenance of minimum Borrowing Base Excess of not less than $5,000,000.

"Capital Lease" means any rental agreement that meets GAAP criteria for its treatment as an agreement for purchase of an asset rather than for use of the asset by way of a true (or operating) lease.

"Compensation" means, as applicable, salaries and other compensation paid to shareholders, members, partners, directors, managers, and officers.

"Debt Service Coverage Ratio" means the ratio of Stabilized EBITDA minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions (net of cash contributions), and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus Capital Lease payments.

"EBITDA" means at any date (a) net income, excluding any extraordinary and non-operating income (unless deemed by Cargill to be recurring in nature), of a Person for the preceding twelve months plus (b) any interest expense, income taxes, depreciation, amortization, and other noncash charges for that twelve months to the extent they were deducted from gross income to calculate net income.

"Funded Debt" means all outstanding long term liabilities for money borrowed for non-consumer purposes, other long term interest-bearing non-consumer liabilities, and Capital Leases. However, it shall specifically exclude any prepetition accounts payable, including Conterra's mezzanine debt, so long as they are expressly subordinated to the Facility pursuant to a written agreement reasonably acceptable to Cargill.

"Leverage Ratio" means the ratio of Net Debt to Stabilized EBITDA.

"Net Debt" means, at any date, the aggregate amount of Funded Debt of the Borrowers and their subsidiaries at such date, minus unrestricted cash and cash equivalents as at such date).

"Stabilized EBITDA" means EBITDA excluding nonrecurring, extraordinary items (includes "off farm income" if deemed to be recurring).

Each such financial covenant shall be more fully defined in the Loan Documents.

| | |
|---|---|
| Negative Covenants: | Negative covenants applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation the following (subject to exceptions and baskets to be agreed): |

(a) Limitations on debt, guarantees and hedging arrangements (including the subordination of all intercompany indebtedness on terms reasonably satisfactory to Cargill).

(b) Limitations on liens (including a negative pledge with respect to equity interests in the Borrowers) and limitations on further negative pledges.

(c) Limitations on voluntary prepayments, redemptions or repurchases of debt.

(d) Limitations on mergers, consolidations, and other fundamental changes.

(e) Limitations on sales, transfers and other dispositions of assets.

(f) Limitations on loans and investments, including, without limitation, purchases of farmland and other real property.

(g) Limitations on dividends and other distributions, stock repurchases and redemptions and other restricted payments.

(h) Limitations on creating new subsidiaries.

(i) Limitations on capital expenditures.

(j) Limitations on construction.

(k) Limitations on restrictions affecting subsidiaries.

(l) Limitations on transactions with affiliates.

(m) Limitations on change in (i) key management or (ii) fiscal periods.

(n) No modification or waiver of material documents (including, without limitation, charter documents of the Borrowers and their subsidiaries or any other material debt) in a manner materially adverse to the Lenders.

Each such covenant shall be more fully defined in the Loan Documents.

| | |
|---|---|
| Events of Default: | Events of default applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation the following: failure to pay principal when due or interest or other amounts after three business days; breach of representations, |

|  |  |
|---|---|
|  | warranties or covenants; compliance with financial covenants; cross-default and cross-acceleration, including, without limitation, in respect of the MetLife credit facilities; bankruptcy and insolvency events; [2] judgment defaults; actual or asserted invalidity or impairment of any guarantees or security documents or subordination provisions; a change of control (to be defined); occurrence of a material adverse change (to be defined); and customary ERISA defaults. |
| Amendments: | Amendments and waivers of the provisions of the Loan Documents shall require the approval of Lenders holding more than 50% of the aggregate principal amount of the Revolving Loans and unused commitments under the Facility; *provided* that (a) the consent of each directly affected Lender shall be required for, among other things, (i) increases in the commitment of such Lender; (ii) reductions of principal, interest or fees of such Lender; (iii) extensions of scheduled amortization or the Maturity Date; and (iv) releases of all or substantially all of the Collateral or all or substantially all of the value of the guarantees and (b) the consent of 100% of the Lenders shall be required for modifications to any of the voting requirements (or any applicable related definitions) and modifications to pro rata treatment. |
| Assignments and Participations: | Each Lender may assign all or part (subject to minimum amounts to be agreed) of its Revolving Loans and commitments with the consent of Cargill (such consent not to be unreasonably withheld or delayed). Cargill shall receive a processing fee of $3,500 (which may be waived or reduced at the sole discretion of Cargill) in connection with all assignments. |
| Expenses and Indemnification: | The Borrowers shall pay (a) all reasonable out-of-pocket expenses of Cargill incurred in connection with any syndication of the Facility and the preparation, execution, delivery, administration, amendment or waiver of the Loan Documents (including the reasonable fees, disbursements and other charges of counsel, including local counsel, to Cargill); and (b) all reasonable out-of-pocket expenses of Cargill and the other Lenders (including the fees, disbursements and other charges of counsel (including local counsel) to Cargill and the other Lenders) in connection with the enforcement of the Loan Documents, including in connection with workouts or restructurings. |
|  | Cargill and the other Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will be indemnified and held harmless against any loss, liability, cost or expense (including the reasonable fees, disbursements and other |

| | |
|---|---|
| | charges of counsel (including local counsel) to the indemnified parties, incurred in connection with the financing contemplated hereby or the use of proceeds of the Facility, except to the extent they result from such person's gross negligence or willful misconduct. |
| Additional Provisions: | The Credit Agreement will contain (i) LSTA model EU bail-in provisions, (ii) customary provisions relating to statutory divisions of limited liability companies, (iii) customary provisions relating to supported qualified financial contracts and (iv) customary benchmark replacement provisions to be agreed. |
| Taxes, Yield Protection and Increased Costs: | The Loan Documents will contain customary provisions for facilities of this kind, including, without limitation, in respect of tax gross-ups, breakage and redeployment costs, increased costs, funding losses, capital adequacy and illegality. |
| Governing Law: | State of New York. |
| Waiver of Jury Trial: | All Loan Parties/parties to the Loan Documents waive the right to trial by jury. |
| Counsel to Cargill and the Lead Arranger: | Vinson & Elkins LLP |
| Not a Commitment to Lend: | This Term Sheet is intended for discussion purposes only and constitutes only a preliminary, non-binding indication of interest. It does not constitute an offer, agreement, or commitment by Cargill or any of its affiliates to lend, syndicate, arrange, underwrite or act as agent or advisor with respect to any financing or to enter into any transaction. It is not intended, and shall not be deemed, to create any binding obligation on the part of Cargill or any of its affiliates, to engage in any transaction with any other party or its affiliates or to continue its or their consideration or negotiation of any such transaction. |

ACKNOWLEDGED AND AGREED:

MILLENKAMP CATTLE, INC.

By: _____[signature]_____
Name: __Bill Millenkamp__
Title: __President__

For itself and on behalf of each of the other Borrowers

SCHEDULE A

*Conditions Precedent*

Conditions precedent to the borrowing (or deemed borrowing) of Revolving Loans on the Closing Date under the Facility shall include, without limitation, unless waived by the Lenders:

(a) **Plan**. Any chapter 11 plan of the Loan Parties (as amended, modified, or supplemented from time to time, a "Plan") and order confirming such Plan shall be in form and substance acceptable to Cargill.

(b) **Order**. A final non-appealable order (the "Confirmation Order") of the Bankruptcy Court, in form and substance acceptable to Cargill, (a) confirming the Plan, which shall not have been reversed, vacated, amended, supplemented, or otherwise modified (other than with the written consent of Cargill) and (b) authorizing the Loan Parties to execute, deliver, and perform under all documents contemplated under the Loan Documents shall have been entered and shall have become a final order of the Bankruptcy Court.

(c) **Successful Syndication**: Closing shall be subject to the Successful Syndication of the commitments under the Facility.

(d) **Loan Documentation**. All Loan Documents shall have been (or shall, contemporaneously with the occurrence of the Closing Date, be) executed and delivered (or deemed executed and delivered pursuant to the Confirmation Order) and shall be in full force and effect, and shall be in form and substance acceptable to Cargill and consistent with the terms of this Term Sheet.

(e) **Guaranties and Collateral**. Delivery of executed guarantees and security agreements required from the Loan Parties in form and substance satisfactory to Cargill, (i) Cargill shall have a first priority perfected security interest (subject to Permitted Liens) in all Collateral (other than real property, receivables and royalties relating to digester equipment, and other properties described in this Term Sheet as subject to a second priority perfected security interest, which, in each case, shall be subject to such second priority perfected security interest), (ii) all required filings, recordations and searches with respect to such security interests shall have been duly made, and (iii) all filings and recording fees and taxes shall have been duly paid. This clause shall be subject to post-closing matters to be reasonably agreed.

(f) **Customary Ancillary Documents**. Delivery of (i) customary legal opinions, evidence of authority, corporate documents and records, documents from public officials, good standing certificates, solvency certificates and officers' certificates as to the Borrowers and each of the Guarantors; (ii) evidence of insurance; and

(iii) a customary notice of borrowing, each in form and substance satisfactory to Cargill.

(g) **Approvals**. All necessary governmental and third-party approvals, consents, licenses, and permits in connection with the Facility shall have been obtained and remain in full force and effect.

(h) **Financial Statements**. Cargill shall have received (i) the Loan Parties' unaudited financial statements for the most recent fiscal quarter ending at least 45 days prior to the Closing Date, (ii) the pro forma balance sheet of the Loan Parties (after giving effect to closing), and (iii) detailed financial projections of the Loan Parties for three years after the Closing Date prepared on a quarterly basis for the first year and prepared on an annual basis for the remaining years.

(i) **Fees and Expenses**. Payment of all fees and expenses of Cargill and the other Lenders required to be paid by the Borrowers on the Closing Date to the extent invoiced prior to the Closing Date.

(j) **Due Diligence**. Completion by Cargill of its business, operations, collateral, tax, accounting, legal, environmental, regulatory and other due diligence review of the Borrowers.

(k) **Commodities Hedging Plan**. Delivery of the Borrowers' current commodities hedging plan, in form and substance satisfactory to Cargill (the "Commodities Hedging Plan").

(l) **Feed Payables Management Plan**. Delivery of the Borrowers' current feed payables management plan, in form and substance satisfactory to Cargill (the "Feed Payables Management Plan").

(m) **Repayment of Existing Debt**. Repayment in full of all pre-existing debt for borrowed money of the Borrowers and their subsidiaries, termination of all related commitments and release of all related liens, on terms satisfactory to Cargill, other than the existing credit facilities between one or more Borrowers and MetLife, the existing credit facilities between one or more Borrowers and Conterra, and any prepetition accounts payable, which will be paid in full post-Effective Date of the Plan, pursuant to the terms and provisions of the Plan.

(n) **No MAC**. Absence of any material adverse change in the business, operations, condition (financial or otherwise), assets or liabilities (whether actual or contingent) of the Borrowers and their subsidiaries taken as a whole since December 31, 2024.

(o) **PATRIOT Act and Anti-Corruption Information**. Receipt by Cargill and the other Lenders, at least five business days prior to the Closing Date, of (i) all information reasonably requested by them under applicable "know-your-customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, and (ii) to the extent each of the Borrowers qualifies

as a "legal entity customer" under 31 C.F.R. § 1010.230 (the "Beneficial Ownership Regulation"), a customary FinCEN beneficial ownership certification in relation to each Borrower.

(p) **MetLife Credit Facility**. All existing credit facilities between the Borrower and MetLife have been reinstated on the same terms as existed prior to the Loan Parties' bankruptcy filings, or have been reinstated on terms otherwise acceptable to Cargill.

(q) **Intercreditor Agreement**. The Intercreditor Agreement shall have been (or shall, contemporaneously with the occurrence of the Closing Date, be) executed and delivered (or deemed executed and delivered pursuant to the Confirmation Order) and shall be in full force and effect, and shall be in form and substance acceptable to Cargill.

(r) **Representations and Warranties**. As of the Closing Date, all representations and warranties contained in the Term Sheet shall be true and accurate.

(s) **No Default**. As of the Closing Date, there shall not be any ongoing default or event of default under any debtor-in-possession financing or other financing facility of the Borrowers and the borrowing (or deemed borrowing) under the Facility shall not cause a default or event of default.

(t) **No Litigation**. As of the Closing Date, there shall not be any litigation pending or known by Loan Parties to be threatened against any Loan Party drawing into question any credit transaction contemplated by Facility, or that could reasonably be expected to have a material adverse effect.

ANNEX I

| | |
|---|---|
| Interest and Fees: | The Loans will bear interest at the one month rate for SOFR plus an interest margin of 6.00%. |
| Default Rate: | Overdue amounts of principal, interest, fees and other amounts under the Facility shall bear interest at 9% above the otherwise applicable rate. All such interest shall be due on demand. |
| Arrangement Fee: | 2.00%, which shall be funded out the new Facility. |
| Unused Commitment Fee and Administrative Fee: | The Borrowers shall pay an unused commitment fee on the daily unused amount of the commitments under the Facility (calculated based on the actual number of days elapsed in a 360-day year) payable quarterly in arrears, from the Closing Date until the termination or expiration of the Facility, equal to .50% per annum. |
| | The Borrowers shall pay Cargill an annual administrative fee of $50,000. |
| | The Borrowers shall reimburse and indemnify Cargill for its reasonable costs and expenses associated with this matter, including the reasonable fees, disbursements and other charges of counsel, including local counsel. |
| Benchmark Replacement: | The definitive loan documentation will include language with respect to the establishment of a successor interest rate for SOFR that is reasonably acceptable to Cargill. |

4881-8411-6201v.4