UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

IN RE:

MILLENKAMP CATTLE, INC

CASE NO: 24-40158-NGH

**DECLARATION OF MAILING
CERTIFICATE OF SERVICE**

Chapter: 11
ECF Docket Reference No. 640

On 10/2/2024, I did cause a copy of the following documents, described below,

Disclosure Statement for Chapter 11 Plan Reorganization of Millenkamp Cattle, Inc. and its Related Affiliates ECF Docket Reference No. 640

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing list exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice. com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R.Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 10/2/2024

/s/ Krystal R. Mikkilineni
Krystal R. Mikkilineni  AT0011814

Dentons Davis Brown
215 10th St
Des Moines, IA  50309
515 288 2500
krystal.mikkilineni@dentons.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

IN RE:

MILLENKAMP CATTLE, INC

CASE NO: 24-40158-NGH

**CERTIFICATE OF SERVICE**
**DECLARATION OF MAILING**

Chapter: 11
ECF Docket Reference No. 640

On 10/2/2024, a copy of the following documents, described below,

Disclosure Statement for Chapter 11 Plan Reorganization of Millenkamp Cattle, Inc. and its Related Affiliates ECF Docket Reference No. 640

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing list exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document(s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 10/2/2024

Miles Wood
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Krystal R. Mikkilineni
Dentons Davis Brown
215 10th St
Des Moines, IA  50309

USPS FIRST-CLASS MAIL TO ALL RECIPIENTS
Parties with names struck through or labeled as "Via..." were not served via First Class USPS Mail Service.

CASE INFO

LABEL MATRIX FOR LOCAL NOTICING
09768
CASE 24-40158-NGH
DISTRICT OF IDAHO
TWIN FALLS
WED OCT  2 09-49-32 MDT 2024

KRYSTAL R  MIKKILINENI
DENTONS DAVIS BROWN
215 10TH ST
STE 1300
DES MOINES IA 50309-3616

A SCOTT JACKSON TRUCKING INC
CO WILLIAMS MESERVY  LARSEN LLP
POST OFFICE BOX 168
153 EAST MAIN STREET
JEROME ID 83338-2332

AAA COW COMFORT LLC
PO BOX 307
KIMBERLY ID 83341-0307

ABS GLOBAL
1525 RIVER RD
DEFOREST WI 53532-2430

ARNOLD MACHINERY COMPANY
2975 WEST 2100 SOUTH
SALT LAKE CITY UT 84119-1273

AD HOC COMMITTEE OF CORN SILAGE GROWERS
153 EAST MAIN STREET
PO BOX 168
JEROME ID 83338-0168

ADDISON BIOLOGICAL LABORATORY INC
507 NORTH CLEVELAND ST
FAYETTE MO 65248-1083

AIRGAS USA LLC
PO BOX 734445
CHICAGO IL 60673-4445

AIRGAS USA LLC
110 WEST 7TH ST SUITE 1400
TULSA OK 74119-1077

ALEXANDER K REED
4296 N 2100 E
FILER ID 83328-5046

AMALGAMATED SUGAR
1951 S SATURN WAY
STE 100
BOISE ID 83709-2924

AMERICAN CALF PRODUCTS (GOLDEN STATE
MIXING
425 D STREET
TURLOCK CA 95380-5452

AMERICAN EXPRESS NATIONAL BANK
CO BECKET AND LEE LLP
PO BOX 3001
MALVERN  PA 19355-0701

AMORY SECURITIES LLC
200 NORTH PACIFIC HWY
SUITE 1525
EL SEGUNDO CA 90245

BRUCE A ANDERSON
320 EAST NEIDER AVENUE
SUITE 102
COEUR DALENE ID 83815-6007

AUTOMATION WERX LLC
MORROW  FISCHER PLLC
4 OGDEN AVENUE
NAMPA ID 83651-2371

AUTOMATION WERX LLC
PO BOX 3066
IDAHO FALLS ID 83403-3066

CO DAVID A COLEMAN B  H FARMING
COLEMAN RITCHIE  JACOBSON
PO BOX 525
TWIN FALLS ID 83303-0525

B  H FARMING AN IDAHO GENERAL
PARTNERSHIP
PO BOX 123
RUPERT ID 83350-0123

BS R DESIGN SUPPLIES
198 LOCUST ST S
TWIN FALLS ID 83301-7832

RICHARD BERNARD
1177 AVENUE OF THE AMERICAS
41ST FLOOR
NEW YORK NY 10036-2714

RON C BINGHAM II
3424 PEACHTREE ROAD NE
SUITE 1600
ATLANTA GA 30326-1139

BLUE CROSS OF IDAHO
CO D BLAIR CLARK ATTY
967 PARKCENTER BLVD 282
BOISE ID 83706-6721

BLUE CROSS OF IDAHO
CO D BLAIR CLARK ATTORNEY
967 E PARKCENTER BLVD 282
BOISE ID 83706-6721

BLUE CROSS OF IDAHO HEALTH SERVICE INC
CO LAW OFFICE OF D BLAIR CLARK PC
967 EAST PARKCENTER BOULEVARD 282
BOISE ID 83706-6721

BO STEVENSON DBA BA FARMS
1001 S 1900 E
HAZELTON ID 83335-5451

USPS FIRST-CLASS MAIL RECIPIENTS
Parties with names struck through or labeled CM/RECAP SERVICE served via First Class USPS Mail Service.

BRANDY A BARTHOLOMEW
CO ERIC R CLARK ATTORNEY
PO BOX 2504
EAGLE ID 83616-9118

MORTON R BRANZBURG
KLEHR HARRISON HARVEY BRANZBURG LLP
1835 MARKET ST
SUITE 1400
PHILADELPHIA PA 19103-2945

HEIDI BUCK MORRISON
RACINE OLSON PLLP
201 EAST CENTER STREET
POCATELLO ID 83201-6329

BUNGE CANADA
CO DAVID D FARRELL
THOMPSON COBURN LLP
ONE USBANK PLAZA SUITE 2700
SAINT LOUIS MISSOURI 63101-1693

BUNGE CANADA CO DAVID D FARRELL
DAVID D FARRELL ESQ
ONE BANK PLAZA
SUITE 2700
ST LOUIS MO 63101

BURKS TRACTOR COMPANY INC
3140 KIMBERLY ROAD
TWIN FALLS ID 83301-8516

BURKS TRACTOR COMPANY INC
OREN B HAKER
BLACK HELTERLINE LLP
805 SW BROADWAY SUITE 1900
PORTLAND OR 97205-3359

LAURA E BURRI
MORROW  FISCHER PLLC
4 OGDEN AVENUE
83651
NAMPA ID 83651-2371

CNH INDUSTRIAL CAPITAL AMERICA LLC
KENT CARTERGORDON REES
ONE NORTH FRANKLIN SUITE 800
CHICAGO IL 60606-3422

BRETT R CAHOON
DOJUST
550 WEST FORT ST
STE 698
BOISE ID 83724-0101

CAPITOL ONE
PO BOX 60599
CITY OF INDUSTRY CA 91716-0599

(P)CARNE I CORP
134 E HIGHWAY 81
BURLEY ID 83318-5427

W KENT CARTER
ONE NORTH FRANKLIN
SUITE 800
CHICAGO IL 60606-3422

WILLIAM K CARTER
GORDON REES SCULLY MANSUKHANI LLP
ONE NORTH WACKER
SUITE 1600
CHICAGO IL 60606-2874

ALEXANDRA O CAVAL
CAVAL LAW OFFICE PC
POB 1716
TWIN FALLS ID 83303-1716

CELLCO PARTNERSHIP DBA VERIZON WIRELESS
WILLIAM M VERMETTE
22001 LOUDOUN COUNTY PKWY
ASHBURN VA 20147-6122

(P)CENTURYTEL SERVICE GROUP LLC DBA
CENTURYLI
931 14TH STREET 9TH FLOOR
DENVER CO 80202-2994

MATTHEW T CHRISTENSEN
199 N CAPITOL BLVD
STE 200
BOISE ID 83702-6197

MATTHEW T CHRISTENSEN
JOHNSON MAY PLLC
199 N CAPITOL BLVD
SUITE 200
BOISE ID 83702-6197

CHRISTOPHER CAMARDELLO
1031 MENDOTA HEIGHTS ROAD
ST PAUL MN 55120-1419

CITI CARDS
PO BOX 78019
PHOENIX AZ 85062-8019

D BLAIR CLARK
967 E PARKCENTER BOULEVARD 282
BOISE ID 83706-6721

ERIC R CLARK
PO BOX 2504
EAGLE ID 83616-9118

CLINT D THOMPSON
298 N 200 W
JEROME ID 83338-5372

COASTLINE EQUIPMENT COMPANY
2000 E OVERLAND RD
MERIDIAN ID 83642-6665

DAVID A COLEMAN
PO BOX 525
TWIN FALLS ID 83303-0525

COLONIAL LIFE
PROCESSING CENTER
PO BOX 1365
COLUMBIA SC 29202-1365

USPS FIRST CLASS MAILING RECIPIENTS
Parties with names struck through or labeled as "Party Notice" via First Class USPS Mail Service.

CONNIE LAPASEOTES LTD
CO JOHN OBRIEN
SPENCER FANE
1700 LINCOLN STREET SUITE 2000
DENVER CO 80203-4554

CONRAD BISHCOFF INC
2251 N HOLMES
PO BOX 50106
IDAHO FALLS ID 83405-0106

CONTERRA HOLDINGS LLC DBA CONTERRA AG
CAP
SPENCER FANE
1700 LINCOLN STREET
SUITE 2000
DENVER CO 80203-4554

CONTERRA HOLDINGS LLC DBA CONTERRA AG
CAPIT
CO JOHN OBRIEN
SPENCER FANE
1700 LINCOLN STREET SUITE 2000
DENVER CO 80203-4554

DAIMLER TRUCK FINANCIAL SERVICES USA
LLC
CO RANDALL P MROCZYNSKI
COOKSEY TOOLEN GAGE DUFFY  WOOG
535 ANTON BOULEVARD SUITE 1000
COSTA MESA CA 92626-7664

DAIRY TECH LLC
1031 MENDOTA HEIGHTS ROAD
ST PAUL MN 55120-1419

DARITECH
8540 BENSON RD
LYNDEN WA 98264-9711

DAVID CLARK
CLARK AMBULATORY CLINIC INC
1019 E 1020 S
ALBION ID 83311

DAVIS LIVESTOCK INC
780 E CANNIBAL RD
LEWISTON UT 84320-2038

DOUGLAS J GRANT
2050 E 500 S
HAZELTON ID 83335-5006

DUSTY BROW FARMS INC
2601 E 1100 S
HAZELTON ID 83335-5623

THOMAS E DVORAK
POB 2720
BOISE ID 83701-2720

EAST VALLEY DEVELOPMENT LLC
CO AVERY LAW
3090 E GENTRY WAY STE 250
MERIDIAN ID 83642-3596

EAST VALLEY DEVELOPMENT LLC
CO ADAM LEWIS ESQ
MORRISON  FOERSTER LLP
425 MARKET ST
SAN FRANCISCO CA 94105-2482

CONNOR BRAY EDLUND
MCCONNELL WAGNER SYKES  STACEY PLLC
827 E PARK BLVD
STE 201
BOISE ID 83712-7782

GERY W EDSON
POB 448
BOISE ID 83701-0448

EDWARD CHOJNACKY
298 N 100 W
JEROME ID 83338-5406

ELECTRICAL WERX  CONSTRUCTION LLC
PO BOX 3066
IDAHO FALLS ID 83403-3066

ELEVATION ELECTRIC LLC
485 S IDAHO ST
WENDELL ID 83355-5241

ERIC CLARK
CLARK ASSOCIATES
PO BOX 2504
EAGLE ID 83616-9118

JON B EVANS
DORSEY  WHITNEY LLP
101 S CAPITOL BLVD STE 1701
BOISE ID 83702-7704

EVANS PLUMBING
111 GULF STREAM LANE
HAILEY ID 83333-7725

ZACHARY FAIRLIE
SPENCER FANE
1000 WALNUT
STE 1400
KANSAS CITY MO 64106-2168

ZACHARY FAIRLIE
SPENCER FANE LLP
1000 WALNUT STREET
SUITE 1400
KANSAS CITY MO 64106-2168

BRIAN FARIA
SAWTOOTH LAW OFFICES PLLC
1101 W RIVER STREET SUITE 110
83702
BOISE ID 83702-7067

FARMERS BANK
PO BOX 392
BUHL ID 83316-0392

FASTENAL COMPANY
2001 THEURER BLVD
ATTN- LEGAL
WINONA MN 55987-9902

USPS FIRST CLASS MAILING RECIPIENTS
Parties with names struck through or labeled CM/ECF SERVICE were not served via First Class USPS Mail Service.

ROBERT A FAUCHER
POB 2527
BOISE ID 83701-2527

FREDIN BROTHERS INC
CO JOHN OBRIEN
SPENCER FANE
1700 LINCOLN STREET SUITE 2000
DENVER CO 80203-4554

(P)GJ VERTILINE PUMPS INC
PO BOX 892
TWIN FALLS ID 83303-0892

DAVID W GADD
STOVER GADD  ASSOCIATES PLLC
905 SHOSHONE ST N
PO BOX 1428
TWIN FALLS ID 83303-1428

GALE W HARDING AND ASSOCIATES
329 W 7TH S
REXBURG ID 83440-9600

SCOTT F GAUTIER
1800 CENTURY PARK EAST
STE 1500
LOS ANGELES CA 90067-1501

GIVENS PURSLEY LLP
GIVENS PURSLEY LLP
601 W BANNOCK
PO BOX 2720
BOISE ID 83701-2720

GLANBIA FOODS INC
CO ROBERT A FAUCHER
POB 2527
BOISE ID 83701-2527

KIMBELL D GOURLEY
POB 1097
BOISE ID 83701-1097

GRANT  HAGAN INC
PO BOX 326
HAZELTON ID 83335-0326

GRANT 4D FARMS LLC
707 E 600 N
RUPERT ID 83350-9466

DANIEL C GREEN
RACINE OLSON PLLP
201 EAST CENTER
PO BOX 1391
POCATELLO ID 83204-1391

GREEN SOURCE AUTOMATION LLC
3506 MOORE ROAD
CERES CA 95307-9402

MATTHEW W GRIMSHAW
GRIMSHAW LAW GROUP PC
800 W MAIN STREET STE 1460
BOISE ID 83702-5983

JULIAN GURULE
400 SOUTH HOPE STREET
SUITE 1900
LOS ANGELES CA 90071-2811

JULIAN GURULE
OMELVENY  MEYERS LLP
400 SOUTH HOPE STREET
SUITE 1900
LOS ANGELES CA 90071-2811

JULIAN GURULE
OMELVENY  MYERS LLP
400 SOUTH HOPE STREET
STE 18TH FLOOR
LOS ANGELES CA 90071-2801

OREN BUCHANAN HAKER
BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND OR 97205-3359

HATFIELD MANUFACTURING INC
1823 SHOESTRING RD
GOODING ID 83330-5361

HEERINGA CONSTRUCTION LLC
18521 E QUEEN CREEK RD
105-481
QUEEN CREEK AZ 85142-5864

HOLLIFIELD RANCHES INC
22866 HIGHWAY 30
HANSEN ID 83334-5028

IRS
CENTRALIZED INSOLVENCY OPER
PO BOX 7346
PHILADELPHIA PA 19101-7346

IDAHO AGCREDIT
CO DANIEL C GREEN
RACINE OLSON PLLP
P O BOX 1391
POCATELLO ID 83204-1391

IDAHO DEPT OF LANDS
PO BOX 83720
BOISE ID 83720-0003

IDAHO MATERIALS  CONSTRUCTION
CO MILLER NASH LLP
950 W BANNOCK ST STE 1100
BOISE ID 83702-6140

IDAHO STATE BRAND DEPARTMENT
700 S STRATFORD DR
MERIDIAN ID 83642-6202

IDAHO STATE TAX COMMISSION
PO BOX 36
BOISE ID 83722-0036

USPS FIRST CLASS MAILING RECIPIENTS
Parties with names struck through or labeled CM/ECF SERVICE were not served via First Class USPS Mail Service.

(P) INNOVATIVE FOOD SOLUTIONS USA LLC
134 E HIGHWAY 81
BURLEY ID 83318-5427

INTERSTATE BILLING SERVICE INC
PO BOX 2250
DECATUR AL 35609-2250

JC HOOF TRIMMING INC
3690 N 2570 E
TWIN FALLS ID 83301-1004

JD HEISKELL HOLDINGS LLC
17220 WRIGHT ST STE 200
OMAHA NE 68130-4667

JOHN DEERE FINANCIAL
CO WELTMAN WEINBERG  REIS CO LPA
965 KEYNOTE CIRCLE
CLEVELAND OH 44131-1829

(P) JPMORGAN CHASE BANK  N A
BANKRUPTCY MAIL INTAKE TEAM
700 KANSAS LANE FLOOR 01
MONROE LA 71203-4774

JPMORGAN CHASE BANK NA
SBMT CHASE BANK USA NA
CO NATIONAL BANKRUPTCY SERVICES LLC
PO BOX 9013
ADDISON TEXAS 75001-9013

JAKE MILLENKAMP
1719 RIVER ROAD
BUHL ID 83316-5302

JAMES FARRELL  CO
13810 SE EASTGATE WAY
SUITE 520
BELLEVUE WA 98005-4467

JEAN L THOMPSON
225 N 250 W
JEROME ID 83338

JEFFREY E ROLIG
PO BOX 5455
TWIN FALLS ID 83303-5455

JEFFREY J GRIEVE
PO BOX 366
TWIN FALLS ID 83303-0366

JOHN DEERE CONSTRUCTION AND FORESTRY
COMPANY
CO WELTMAN WEINBERG  REIS CO LPA
965 KEYNOTE CIRCLE
CLEVELAND OH 44131-1829

JOHN DEERE FINANCIAL FSB
CO WELTMAN WEINBERG  REIS CO LPA
965 KEYNOTE CIRCLE
CLEVELAND OH 44131-1829

K R RENTAL INC
256 A SOUTH 600 W
HEYBURN ID 83336-9750

KEITH D AND JANET CARLSON
3866 E 3800 N
HANSEN ID 83334-5012

KENWORTH SALES COMPANY INC
CO BENOIT LAW
PO BOX 366
TWIN FALLS ID 83303-0366

KINGHORN MEDICAL LLC
248 S COLE RD
BOISE ID 83709-0934

KRAUS FARMS LLC
165 SOUTH 400 WEST
RUPERT ID 83350-9672

MATTHEW KREMER
7 TIMES SQUARE
NEW YORK NY 10036-6524

MATTHEW KREMER
OMELVENY  MYERS LLP
1301 AVENUE OF THE AMERICAS
SUITE 1700
NEW YORK NY 10019-6022

DAVID T KRUECK
HAWLEY TROXELL ENNIS  HALWEY LLP
877 W MAIN ST
SUITE 500
STE 200
BOISE ID 83702-6030

JOHN F KURTZ JR
KURTZ LAW PLLC
910 W MAIN
SUITE 364
BOISE ID 83702-5740

LES SCHWAB TIRE CENTERS OF IDAHO LLC
PO BOX 5350
BEND OR 97708-5350

(P) LAND VIEW  INC
ATTN DAN NOBLE
P O BOX 475
RUPERT ID 83350-0475

LAND VIEW INC
CO GERY W EDSON
PO BOX 448
BOISE ID 83701-0448

ADAM A LEWIS
MORRISON  FOERSTER LLP
425 MARKET STREET
SAN FRANCISCO CA 94105-2482

USPS FIRST-CLASS™ RETURN DOCUMENTS
Parties with names struck through or labeled as "Notice Only" are not being served via First Class USPS Mail Service.

ADAM AIKEN LEWIS
MORRISON  FOERSTER LLP
425 MARKET STREET
STE 32ND FLOOR
SAN FRANCISCO CA 94105-2467

KARYN LLOYD
GORDON REES SCULLY MANSUKHANI LLP
999 W MAIN STREET
100
BOISE ID 83702-9001

KARYN LLOYD
GORDON REES SCULLY MANSUKHANI LLP
999 W MAIN STREET 100
BOISE ID 83702-9001

MWI VETERINARIAN SUPPLY INC
3041 W PASADENA DRIVE
BOISE ID 83705-4776

JED W MANWARING
ELAM  BURKE PA
251 E FRONT STREET
PO BOX 1539
STE 300
BOISE ID 83701-1539

JAMES JUSTIN MAY
JOHNSON MAY
199 N CAPITOL BLVD
STE 200
BOISE ID 83702-6197

ZACHERY J MCCRANEY
HOLLAND  HART
PO BOX 2527
800 W MAIN STREET
SUITE 1750
BOISE ID 83702-5974

MERCK ANIMAL HEALTH
ATTN LEGAL DEPTANIMAL HEALTH
126 EAST LINCOLN AVENUE
PO BOX 2000
RAHWAY NJ 07065-0900

METLIFE REAL ESTATE LENDING LLC
CO KIMBELL D GOURLEY
10801 MASTIN BLVD
SUITE 700
OVERLAND PARK KS 66210-1673

METLIFE REAL ESTATE LENDING LLC
CO RON C BINGHAM II ESQ
ADAMS AND REESE LLP
3424 PEACHTREE ROAD NE SUITE 1600
ATLANTA GEORGIA 30326-1139

METROPOLITAN LIFE INSURANCE COMPANY
CO KIMBELL D GOURLEY
10801 MASTIN BLVD
SUITE 700
OVERLAND PARK KS 66210-1673

METROPOLITAN LIFE INSURANCE COMPANY A
NEW Y
CO RON C BINGHAM II ESQ
ADAMS AND REESE LLP
3424 PEACHTREE ROAD NE SUITE 1600
ATLANTA GEORGIA 30326-1139

MICHAEL CHOJNACKY
51 W 600 N
JEROME ID 83338-5016

WILLIAM MILLENKAMP
473 S 300 W
JEROME ID 83338

DEBTOR
MILLENKAMP CATTLE INC
471 NORTH 300 WEST
JEROME ID 83338-5078

RHETT MICHAEL MILLER
PARSONS LOVELAND SHIRLEY  LINDSTROM
PO BOX 910
BURLEY ID 83318-0910

MOSS FARMS OPERATIONS LLC
CO RHETT M MILLER
PO BOX 910
BURLEY ID 83318-0910

MOSS GRAIN PARTNERSHIP
CO RHETT M MILLER
PO BOX 910
BURLEY ID 83318-0910

MOSS GRAIN PARTNERSHIP
301 SCOTT AVE SUITE 4
RUPERT ID 83350-5100

JOHN D MUNDING
MUNDING PS
309 E FARWELL RD
STE 310
SPOKANE WA 99218-8209

NAPA AUTO PARTS
PO BOX 1425
TWIN FALLS ID 83303-1425

JASON RONALD NAESS
DOJUST
550 WEST FORT ST
STE 698
BOISE ID 83724-0101

JAMES NIEMEIER
MCGRATH NORTH
1601 DODGE STREET
SUITE 3700
OMAHA NE 68102-1627

JAMES J NIEMEIER
MCGRATH NORTH MULLIN  KRATZ PC LLO
1601 DODGE STREET
STE 3700
OMAHA NE 68102-1650

COOPER NORMAN
PO BOX 5399
TWIN FALLS ID 83303-5399

JOHN OBRIEN
SPENCER FANE
1700 LINCOLN STREET
STE 2000
DENVER CO 80203-4554

JOHN OBRIEN
SPENCER FANE LLP
1700 LINCOLN STEET
SUITE 2000
DENVER CO 80203-4554

USPS FIRST CLASS MAILING RECIPIENTS
Parties with names struck through or labeled as "CM/ECF SERVICE" were sent this notice via First Class USPS Mail Service.

GABRIEL L OLIVERA
7 TIMES SQUARE
NEW YORK NY 10036-6524

GABRIEL LUIS OLIVERA
OMELVENY  MYERS LLP
1301 AVENUE OF THE AMERICAS
STE 1700
NEW YORK NY 10019-6022

OREN B HAKER
BLACK HELTERLINE LLP
805 SW BROADWAY SUITE 1900
PORTLAND OR 97205-3359

OVERHEAD DOOR
489 S LOCUST
TWIN FALLS ID 83301-7849

PTG OF IDAHO LLC
CO HOLLAND N ONEIL FOLEY  LARDNER L
2021 MCKINNEY AVENUE STE 1600
DALLAS TX 75201-3340

DOMENIC E PACITTI
KLEHR HARRISON HARVEY BRANZBURG LLP
919 MARKET STREET
SUITE 1000
WILMINGTON DE 19801-3030

PAN AMERICAN LIFE INSURANCE
1778 N PLANO RD
STE 310
RICHARDSON TX 75081-1958

PERFORMIX NUTRITION SYSTEMS
2201 N 20TH STREET
NAMPA ID 83687-6849

PERFORMIX NUTRITION SYSTEMS LLC
MUNDING PS
309 E FARWELL RD STE 310
SPOKANE WA 99218-8209

MARK BRADFORD PERRY
PERRY LAW PC
POB 637
BOISE ID 83701-0637

PIVOT MAN INC
ROBIN JONES
PO BOX 355
PAUL ID 83347-0355

SCOTT C POWERS
SPENCER FANE LLP
10 EXCHANGE PLACE 11TH FLR
SALT  LAKE CITY UT 84111-2824

PRIME RIDGE BEEF LLC
CO JOHN OBRIEN
SPENCER FANE
1700 LINCOLN STREET SUITE 2000
DENVER CO 80203-4554

PRO RENTALS  SALES
PO BOX 5450
C12
KALISPELL MT 59903-5450

PRO TECH SERVICE COMPANY
1550 KIMBERLY RD
TWIN FALLS ID 83301-7341

PROGRESSIVE DAIRY SERVICE  SUPPLIES
CORP
485 S IDAHO ST
WENDELL ID 83355-5241

PROGRESSIVE DAIRY SERVICE  SUPPLY CORP
485 S IDAHO ST
WENDELL ID 83355-5241

QUILL CORPORATION
PO BOX 102419
COLUMBIA SC 29224-2419

RABO AGRIFINANCE LLC
CO SHEILA R SCHWAGER
PO BOX 1617
BOISE ID 83701-1617

RABO AGRIFINANCE LLC AS ADMINISTRATIVE
AGEN
CO SHEILA SCHWAGER
HAWLEY TROXELL ENNIS  HAWLEY LLP
PO BOX 1617
BOISE ID 83701-1617

RAFT RIVER RURAL ELECTRIC COOPERATIVE
INC
CO RHETT M MILLER
PO BOX 910
BURLEY ID 83318-0910

CHERYL RAMBO
IDAHO STATE POLICE
700 S STRATFORD DR
MERIDIAN ID 83642-6242

REXEL USA INC DBA PLATT ELECTRIC SUPPLY
MCCONNELL WAGNER SYKES + STACEY PLLC
827 E PARK BLVD STE 201
BOISE ID 83712-7782

REXEL USA INC DBA PLATT ELECTRIC SUPPLI
827 E PARK BLVD STE 201
BOISE IDAHO 83712-7782

JANINE PATRICE REYNARD
AVERY LAW
3090 E GENTRY WAY
SUITE 250
MERIDIAN ID 83642-3596

ROBERT E RICHARDS
DENTONS US LLP
233 SOUTH WACKER DRIVE
STE 7800
CHICAGO IL 60606-6459

ROBERT E RICHARDS
233 SOUTH WACKER DRIVE
SUITE 5900
CHICAGO IL 60606-6361

USPS FIRST CLASS MAILING RECIPIENTS    Parties with names struck through or labeled CM/ECF SERVICE were not served via First Class USPS Mail Service.

HOLLY ROARK
ROARK LAW OFFICES
950 BANNOCK ST STE 1100
BOISE ID 83702-6140

ROARK LAW OFFICES
950 BANNOCK ST 11TH FL
BOISE ID 83702-5999

ROCKY MOUNTAIN AGRONOMICS
1912 WEST MAIN STREET
BURLEY ID 83318-1611

ROGERS MACHINERY COMPANY INC
PO BOX 230429
PORTLAND OR 97281-0429

EVAN THOMAS ROTH
1101 W RIVER ST STE 110
BOISE ID 83702-7067

TIRZAH R ROUSSELL
215 10TH STREET
SUITE 1300
DES MOINES IA 50309-3616

TIRZAH R ROUSSELL
DENTONS DAVIS BROWN PC
THE DAVIS BROWN TOWER
215 10TH STREET
SUITE 1300
DES MOINES IA 50309-3621

MIRANDA RUSSELL
MORRISON  FOERSTER LLP
250 WEST 55TH STREET
NEW YORK NY 10019-0050

MIRANDA K RUSSELL
MORRISON  FOERSTER LLP
250 WEST 55TH STREET
NEW YORK NY 10019-0050

SANDTON CAPITAL PARTNERS LP
16 W 46TH STREET 1ST FLOOR
NEW YORK NY 10036-4503

(P)SCHAEFFER MANUFACTURING COMPANY
ATTN DENIS MCCARTHY
2600 S BROADWAY
SAINT LOUIS MO 63118-1828

NIKOLAUS F SCHANDLBAUER
20 F STREET NW
SUITE 500
WASHINGTON DC 20001-6703

SCHMIDT CATTLE HAULING
848 E 3400 N
CASTLEFORD ID 83321-6422

ANDREW SCHOULDER
1301 AVENUE OF THE AMERICAS
NEW YORK NY 10019-6022

ANDREW J SCHOULDER
NORTON ROSE FULBRIGHT US LLP
1301 AVENUE OF THE AMERICAS
NEW YORK NY 10019-6022

SCHOWS TRUCK CENTER
PO BOX 2208
DECATUR AL 35609-2208

SCHUIL AG REAL ESTATE INC
5020 W MINERAL KING AVE
VISALIA CA 93291-5364

SHEILA RAE SCHWAGER
HAWLEY TROXELL ENNIS  HAWLEY LLP
877 MAIN STREET SUITE 200
PO BOX 1617
BOISE ID 83701-1617

SHEILA R SCHWAGER
HAWLEY TROXELL ENNIS  HAWLEY LLP
PO BOX 1617
BOISE ID 83701-1617

SIX STATES DISTRIBUTORS INC
29787 NETWORK PLACE
CHICAGO IL 60673-1297

LOUIS V SPIKER
MILLER NASH LLP
950 W BANNOCK ST STE 1100
BOISE ID 83702-6140

SPRINKLERSHOP INC
PO BOX 599
PAUL ID 83347-0599

ST GENETICS
INGURAN USA INC
22575 STATE HWY 6 SOUTH
NAVASOTA TX 77868-8297

STANDING 16 RANCH LAND COMPANY LLC
335 W 300 N
JEROME ID 83338-5217

STANDLEE AG RESOURCES
CO MILLER NASH LLP
950 W BANNOCK ST STE 1100
BOISE ID 83702-6140

STANDLEE AG RESOURCES
CO MILLER NASH LLP ATTN LOUIS SPIKER
950 W BANNOCK ST STE 1100
BOISE ID 83702-6140

STAR FALLS FARMS LLC
1908 E 1300 S
HAZELTON ID 83335-5428

USPS FIRST CLASS MAILING RECIPIENTS
Parties with names struck through or labeled CM/ECF SERVICE are not being served via First Class USPS Mail Service.

STEEL RANCH LLC
2597 E 1100 S
HAZLETON ID 83335-5621

STEVEN R HOGAN II
409 S 17TH STREET 500
OMAHA NE 68102-2603

MICHAEL R STEWART
2200 WELLS FARGO CENTER
90 SOUTH SEVENTH STREET
MINNEAPOLIS MN 55402-7508

STOTZ EQUIPMENT
2670 KIMBERLY RD E
TWIN FALLS ID 83301-7984

MATTHEW A STURZEN
SHERMAN SHERMAN JOHNNIE  HOYT LLP
693 CHEMEKETA STREET NE
SALEM OR 97301-3732

SUMMIT AG APPRAISAL INC
995 S 1150 E
ALBION ID 83311-9710

THE DAIRY SOLUTIONS GROUP
409 S 17TH STREET 500
OMAHA NE 68102-2603

THE FORBES SECURITIES GROUP LLC DBA
FORBES
6400 S FIDDLERS GREEN CIRCLE
SUITE 850
GREENWOOD VILLAGE CO 80111-4994

THE SPRINKLER SHOP
PO BOX 599
PAUL ID 83347-0599

MEREDITH LEIGH THIELBAHR
GORDON  REES  SEATTLE
701 FIFTH AVENUE
STE 2100
SEATTLE WA 98104-7084

TRIPLE C FARMS LLC
474 S 500 W
JEROME ID 83338-6027

KIM J TROUT
TROUT LAW PLLC
3778 PLANTATION RIVER DR STE 101
BOISE ID 83703-3086

US COMMODITIES LLC
730 SECOND AVENUE S SUITE 700
MINNEAPOLIS MN 55402-2480

US TRUSTEE
550 WEST FORT ST STE 698
BOISE ID 83724-0101

ULINE
12575 ULINE DRIVE
PLEASANT PRAIRIE WI 53158-3686

UNITED ELECTRIC COOP INC
CO RHETT M MILLER
PO BOX 910
BURLEY ID 83318-0910

VALLEY WIDE COOPERATIVE INC
CO DAVID W GADD STOVER GADD  ASSOC
PO BOX 1428
TWIN FALLS ID 83303-1428

VALLEY WIDE COOPERATIVE INC
CO DAVID W GADD
STOVER GADD  ASSOCIATES PLLC
PO BOX 1428
TWIN FALLS IDAHO 83303-1428

VISERION GRAIN LLC
385 BROADWAY ST
BOULDER CO 80305-3303

VISERION GRAIN LLC
CO SAWTOOTH LAW OFFICES PLLC
213 CANYON CREST DR STE 200
TWIN FALLS ID 83301-3053

VITERRA USA GRAIN LLC
1331 CAPITOL AVE
OMAHA NE 68102-1197

VITERRA USA GRAIN LLC AND VITERRA USA
INGRE
CO RACINE OLSON PLLP
PO BOX 1391
POCATELLO ID 83204-1391

VITERRA USA INGREDIENTS LLC
1331 CAPITOL AVE
OMAHA NE 68102-1197

WAG SERVICES INC
8121 W HARRISON ST
TOLLESON AZ 85353-3328

JOSEPH MARK WAGER JR
MCCONNELL WAGNER SYKES  STACEY
827 E PARK BLVD SUITE 201
BOISE ID 83712-7782

WENDELL TRUCK AND AUTO
PO BOX 213
356 S IDAHO ST
WENDELL ID 83355-5209

WESTERN CONSTRUCTION INC
PO BOX 15569
BOISE ID 83715-5569

USPS FIRST CLASS MAILING RECIPIENTS
Parties with names struck through or labeled CM/ECF SERVICE were not served via First Class USPS Mail Service.

WESTERN STATES EQUIPMENT CO
500 EAST OVERLAND ROAD
MERIDIAN ID 83642-6606

WESTWAY FEED
BARR CREDIT SERVICES
3444 N COUNTRY CLUB RD
STE 200
TUCSON AZ 85716-0815

WILBURELLIS COMPANY LLC
CO MATTHEW A STURZEN
PO BOX 2247
SALEM OR 97308-2247

WILBURELLIS NUTRITION LLC
CO MATTHEW A STURZEN
PO BOX 2247
SALEM OR 97308-2247

WILLIAMS MESERVY  LARSEN
POST OFFICE BOX 168
153 EAST MAIN STREET
JEROME ID 83338-2332

BRENT RUSSEL WILSON
HAWLEY TROXELL ENNIS  HAWLEY LLP
877 MAIN STREET SUITE 200
BOISE ID 83702-6030

YOUNG CDJR OF BURLEY LLC
PO BOX 1530
LAYTON UT 84041-6553

YOUREE LAND  LIVESTOCK INC
3953 NORTH 3300 EAST
TWIN FALLS ID 83301-0348

CO DAVID A COLEMAN YOUREE LAND
LIVESTOCK
COLEMAN RITCHIE  JACOBSON
PO BOX 525
TWIN FALLS ID 83303-0525

Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
        jjm@johnsonmaylaw.com

Krystal Mikkilineni, *pro hac vice*
Robert E. Richards, *pro hac vice*
Tirzah Roussell, *pro hac vice*
DENTONS
215 10th Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
        robert.richards@dentons.com
        tirzah.roussell@dentons.com

*Attorneys for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY
COURT DISTRICT OF IDAHO**

In re:

MILLENKAMP CATTLE INC.

    Debtor.

Filing relates to:

☒ ALL DEBTORS
☐ Millenkamp Cattle, Inc.
☐ Idaho Jersey Girls
☐ East Valley Cattle
☐ Millenkamp Properties
☐ Millenkamp Properties II
☐ Millenkamp Family
☐ Goose Ranch
☐ Black Pine Cattle
☐ Millenkamp Enterprises
☐ Idaho Jersey Girls Jerome Dairy

Case No. 24-40158-NGH

Chapter 11

Jointly Administered with Case Nos.:

24-40159-NGH (Idaho Jersey Girls)
24-40160-NGH (East Valley Cattle)
24-40161-NGH (Millenkamp Properties)
24-40162-NGH (Millenkamp Properties II)
24-40163-NGH (Millenkamp Family)
24-40164-NGH (Goose Ranch)
24-40166-NGH (Black Pine Cattle)
24-40167-NGH (Millenkamp Enterprises)
24-40165-NGH (Idaho Jersey Girls Jerome Dairy)

#4125297

---

**DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN REORGANIZATION OF MILLENKAMP CATTLE, INC. AND ITS RELATED AFFILIATES**

> **NOTE: THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE**

**DISCLAIMER**

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE CHAPTER 11 PLAN OF REORGANIZATION OF DEBTORS MILLENKAMP CATTLE, INC. AND ITS AFFILIATED DEBTORS, WHICH BANKRUPTCY PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENTSHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN

2

LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' PLAN OR DISTRIBUTIONS THEREUNDER. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................... 11
    A.  Overview of the Plan ............................................................... 11
        1.  General Structure of the Plan ............................................. 11
        2.  Summary of Treatment of Claims and Interests Under the Plan ...................................................................... 12
    B.  Plan Voting Instructions and Procedures .................................. 15
        1.  Voting Rights ..................................................................... 15
        2.  Solicitation Materials ........................................................ 16
        3.  Voting Instructions and Procedures .................................. 17
        4.  Confirmation Hearing and Deadline for Objections to Confirmation ....... 19
II. BACKGROUND REGARDING THE DEBTORS ..................... 19
    A.  Overview of the Debtors ......................................................... 19
    B.  Debtors' Corporate Structure .................................................. 21
    C.  Debtors' Prepetition Capital Structure ..................................... 22
        1.  Liabilities .......................................................................... 22
            i.    Pre-Petition RLOC (Rabo) Credit Agreements ................ 23
            ii.   Metlife Secured Loans .................................................. 25
            iii.  Conterra ...................................................................... 27
            iv.   Other Secured Obligations ............................................ 28
            v.    General Unsecured Claims ............................................ 29
    D.  Events Leading to the Chapter 11 Cases ................................... 29
III. THE CHAPTER 11 CASES ............................................................ 32
    A.  First Day Orders and Initial Employment Applications ................ 32
    B.  Applications to Employ Professionals ...................................... 33
    C.  Appointment of the Unsecured Creditors' Committees ............... 33
    D.  United States Trustee ............................................................. 34
    E.  Meeting of Creditors .............................................................. 34
    F.  Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims ............................................................................. 34
    G.  Cash Collateral Motions ......................................................... 35

H.   Sandton Term Sheet and DIP Loan ...................................................................... 36
I.   503(b)(9) Motion ................................................................................................ 36
J.   Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries ........................................................................................................... 38
K.   506(b) Motion .................................................................................................... 39
L.   The Cargill Senior Secured Exit Loan Facility .................................................. 40
M.   Plan Filing & Solicitation Exclusivity ............................................................... 42

IV.   SUMMARY OF THE CHAPTER 11 PLAN ................................................................ 43
A.   Purpose and Effect of the Plan .......................................................................... 43
   1.   Classification and Voting Controversies .................................................. 43
B.   Treatment of Claims and Interests Under the Plan ............................................ 44
   1.   Unclassified Claims ................................................................................. 44
      i.   Administrative Claims .................................................................. 44
         a.   503(b)(9) Claims ................................................................. 44
      ii.   Professional Fee Claims ............................................................... 45
C.   Priority Tax Claims ............................................................................................ 46
D.   DIP Claims ........................................................................................................ 46
E.   Class 1: Other Priority Claims ........................................................................... 47
F.   Class 2: Corn Silage Group Secured Claims ...................................................... 47
G.   Class 3: Other Secured Ag Lien Claims ............................................................ 48
   1.   Class 3A: A. Scott Jackson Trucking Secured Claim ............................... 48
   2.   Class 3B: B&H Farming Secured Claim .................................................. 48
   3.   Class 3C: H&M Custom, LLC Secured Claim .......................................... 49
   4.   Class 3D: Healthy Earth Enterprises, LLC Secured Claim ....................... 49
   5.   Class 3E: Kraus Farms, LLC Secured Claim ........................................... 50
   6.   Class 3F: Milner Hay Company, LLC Secured Claim ............................... 50
   7.   Class 3G: Moss Grain Partnership Secured Claim .................................... 50
   8.   Class 3H: NorthWest Seed, Inc Secured Claim ........................................ 51
   9.   Class 3I: Performance Plus-Idaho, LLC Secured Claim............................ 51
   10.   Class 3J: Tyche, Ag, LLC Secured Claim ................................................. 51
   11.   Class 3K: Wada Farms Partnership Secured Claim ................................... 52
   12.   Class 3L: Youree Land & Livestock Secured Claim ................................. 52
   13.   Class 3M: Eagle Creek Northwest, LLC Claim......................................... 52
   14.   Class 3N: Standlee Ag Resources and Premium Products Secured Claim ........................................................................................................ 53

H.   Class 4: Metlife Secured Claims ........................................................................ 53
I.   Class 5: Rabo Secured Claims ............................................................................ 54
J.   Class 6: Conterra Secured Claims ...................................................................... 54
K.   Class 7: Secured Equipment and Vehicle Lien Claims....................................... 55
   1.   Class 7A: CNH Industrial Capital Secured Claim .................................... 55
   2.   Class 7B: Daimler Truck Financial Services USA LLC Secured Claim ... 57
   3.   Class 7C: Farmers Bank .......................................................................... 57
   4.   Class 7D: John Deere Construction & Forestry Secured Claim ................ 58
   5.   Class 7E: Western States Cat Secured Claim ........................................... 59
   6.   Class 7F: Kenworth Sales Company Secured Claim.................................. 60
L.   Class 8: Other Secured Claims ........................................................................... 61
   1.   Class 8A: MWI Veterinary Secured Claim................................................ 61
   2.   Class 8B: Performix Nutrition Systems Secured Claim ............................ 62
   3.   Class 8C: Rexel USA, Inc. d/b/a Platt Electric Supply Claim ................... 62
   4.   Class 8D: Staker & Parson Company d/b/a Idaho Materials & Construction Claim ...................................................................................................... 62
   5.   Class 8E: Les Schwab Tire Centers of Idaho, LLC Claims....................... 63
M.   Class 9: General Unsecured Claims .................................................................... 63
N.   Class 10: Intercompany Claims .......................................................................... 64
O.   Class 11: Equity Interests .................................................................................. 64
P.   Special Provisions Regarding Unimpaired Claims ............................................. 64
   1.   Debtors' Releases and Related Matters..................................................... 65
   2.   Exculpation and Limitation of Liability.................................................... 66
   3.   Term of Injunctions or Stays.................................................................... 66
   4.   Good Faith .............................................................................................. 68
Q.   Means for Implementation of Plan ..................................................................... 68
   1.   Substantive Consolidation ....................................................................... 68
   2.   Restructuring Transactions ...................................................................... 68
   3.   Sources of Consideration for Plan Distributions....................................... 69
   4.   Vesting of Assets in the Reorganized Debtors .......................................... 69
   5.   Authority ................................................................................................. 69
   6.   Corporate Existence ................................................................................ 70
   7.   Employee Obligations .............................................................................. 70
   8.   Workers Compensation Program .............................................................. 71

9.     Pursuit and Resolution of Reorganized Debtors' Causes of Action ....................... 70

10.    No Successor Liability ...................................................................... 71

11.    Preservation of Privileges and Defenses ........................................ 72

12.    Preservation of Rights of Action .................................................... 72

       a.   Maintenance of Avoidance Actions and Causes of Action ............ 72

       b.   Preservation of All Reorganized Debtors' Causes of Action Not Expressly Settled or Released ....................................................... 72

13.    Cancellation of Instruments ............................................................ 73

14.    Insurance Policies ............................................................................ 73

       a.   Insurance Policies Remain in Force ...................................... 73

       b.   Insurance Policies; Employment Practice Liability Policies .......... 73

R.     Executory Contracts and Unexpired Leases ........................................... 74

1.     Assumption and Rejection of Executory Contracts and Unexpired Leases ................................................................................................. 74

       i.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ................................................................................. 75

       ii.   Assumption of East Valley Development Contracts .................. 76

       iii.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ......................................................................... 76

       iv.   Assumption Dispute Resolution ........................................... 77

       v.    Contracts and Leases Entered Into After the Petition Date ......... 78

S.     Risk Factors ................................................................................. 78

1.     Parties May Object to the Plan's Classification of Claims and Interests  78

2.     The Debtors May Not Be Able to Obtain Confirmation of the Plan ........ 79

3.     Claims Estimation and Allowance of Claims ................................ 79

4.     Tax Considerations ........................................................................ 79

T.     Confirmation of the Plan ................................................................ 79

1.     The Confirmation Hearing .............................................................. 80

2.     Requirements for Confirmation of the Plan ........................................... 80

3.     Best Interests of Creditors ................................................................ 81

4.     Feasibility ...................................................................................... 81

5.     Acceptance by Impaired Classes ...................................................... 82

6.     Confirmation Without Acceptance by All Impaired Classes ................... 82

7.     No Unfair Discrimination ................................................................ 83

8.     Fair and Equitable Test .................................................................... 83

9.     Alternatives to Confirmation and Consummation of the Plan ................. 83

10.    Revocation, Withdrawal, or Non-Consummation ................................ 84

U.     Certain United States Federal Income Tax Consequences of the Plan ............... 84

1.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Secured Claims ............................................................................................. 86

       i.    Taxable Exchange ............................................................. 86

       ii.   Accrued Interest ............................................................... 87

       iii.  Market Discount ............................................................... 87

2.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims ............................................................................................. 88

       i.    Disputed Ownership Funds .................................................. 88

3.     Backup Withholding and Information Reporting ................................ 89

V.     RECOMMENDATION .............................................................................. 89

## EXHIBITS

**Exhibit A:** Chapter 11 Plan of Reorganization

**Exhibit B:** Liquidation Analysis

**Exhibit C:** Financial Projections/Budget

**Exhibit D:** Exit Term Loan Facility Term Sheet

**Exhibit E:** List of General Unsecured Claims

**Exhibit F:** Organizational Summary Chart

**Exhibit G:** Assumed Executory Contracts and Unexpired Leases Schedule

## GENERAL OVERVIEW

This disclosure statement (the "Disclosure Statement") (a) describes the historical background that led to the Chapter 11 Cases of Millenkamp Cattle, Inc., and its related affiliates, debtors and debtors in possession (collectively, the "Debtors"), (b) explains what has happened in the months since the Debtors commenced their Chapter 11 Cases, and (c) sets forth the treatment of creditors in the *Chapter 11 Plan of Reorganization of Millenkamp Cattle, Inc. and its Affiliates,* as amended, modified, or supplemented from time to time pursuant to its terms, (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**[1]. This Disclosure Statement is qualified in all respects by the *express* terms of the Plan.

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan, (2) advises Holders of Claims or Interests of their rights under the Plan, (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (4) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

Under the Plan, the Debtors will obtain a senior secured exit facility consisting of revolving loans in an aggregate principal amount of $120,000,000 (the "Exit Term Loan Facility"). The Exit Term Loan Facility will mature in three years. The Debtors believe that such liquidity is sufficient to fund their operations after emergence.

The funds generated by these transactions will be used, in part, to provide Distributions to creditors as follows:

- Payment in full of Administrative Claims, including all amounts due in respect of the Debtors' DIP Financing, cure costs arising from the assumption of Executory Contracts and Unexpired Leases, and accrued and unpaid Allowed professional fees;

- Payment in full of Claims arising from the Debtors' prepetition lien facilities with Rabo;

- Payment in full of Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code; and

- Payment of Claims pursuant to the Plan.

---

[1] All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan will control and govern. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence, except as otherwise expressly stated in the Plan; provided, however, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

The Debtors believe that the Plan accomplishes all of the goals that they sought to achieve by consummating the Chapter 11 Cases. If consummated, the Plan will significantly reduce the Debtors' leverage, provide the Debtors with sufficient cash to run their businesses, and provide recoveries to unsecured creditors significantly in excess of what creditors would receive in a liquidation of the Debtors' if the Plan were not consummated. The Debtors urge all holders of Claims entitled to vote on the Plan to vote to accept the Plan.

## I.   INTRODUCTION

The Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this Disclosure Statement pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan. The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, and the course of these Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

### A.   Overview of the Plan

#### 1.   General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders. The Plan contains certain provisions relating to (a) the release of the Released Parties, (b) exculpation of the Exculpated Parties, and (c) certain injunctions protecting the assets of the Estates to be distributed under the Plan as more specifically described in Section 10 of the Plan, and, if the Plan is confirmed and the Effective Date occurs, such releases, exculpations and injunctions shall be binding on the Holders of Claims and Interests except as otherwise described in Article IV. P. below.

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT

SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.

#### 2.   Summary of Treatment of Claims and Interests Under the Plan

The table below summarizes the classification and treatment of Claims and Interests under the Plan.

THE PROJECTED RECOVERIES FOR THE CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER.

| CLASS | DESCRIPTION | VOTING STATUS | Projected Recoveries |
|-------|-------------|---------------|----------------------|
| None | Administrative Claims | Not Entitled to Vote | 100% |
| None | Professional Fee Claims | Not Entitled to Vote | 100% |
| None | Priority Tax Claims | Not Entitled to Vote | 100% |
| Class 1 | Other Priority Claims | Not Entitled to Vote (deemed to accept) | 100% |
| Class 2 | Corn Silage Group Secured Claims | Impaired / Entitled to Vote | 100% |
| Class 3A | A. Scott Jackson Trucking Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 3B | B&H Farming Secured Claim | Unimpaired / Not Entitled to Vote | 100% |

| Class 3C | H&M Custom, LLC Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
|---|---|---|---|
| Class 3D | Healthy Earth Enterprises, LLC Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 3E | Kraus Farms, LLC Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 3F | Milner Hay Company, LLC Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 3G | Moss Grain Partnership Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 3H | NorthWest Seed, Inc. Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 3I | Performance Plus-Idaho, LLC Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 3J | Tyche Ag, LLC Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 3K | Wada Farms Partnership Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 3L | Youree Land & Livestock Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 3M | Eagle Creek Northwest, LLC Claim | Impaired / Entitled to Vote | 100% |
| Class 3N | Standlee Ag Resources and Premium Products Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 4 | MetLife Secured Claims | Impaired / Entitled to Vote | 100% |
| Class 5 | Rabo Secured Claims | Impaired | 100% |

| Class 6 | Conterra Secured Claims | Impaired / Entitled to Vote | 100% |
|---|---|---|---|
| Class 7A | CNH Industrial Capital Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 7B | Daimler Truck Financial Services USA LLC Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 7C | Farmers Bank | Unimpaired / Not Entitled to Vote | 100% |
| Class 7D | John Deere Construction & Forestry Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 7E | Western States Cat Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 7F | Kenworth Sales Company Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 8A | MWI Veterinary Secured Claim | Impaired / Entitled to Vote | 100% |
| Class 8B | PerforMix Nurtrition Systems Secured Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 8C | Rexel USA, Inc. d/b/a Platt Electric Supply Claim | Disputed | 0% |
| Class 8D | Staker & Parson Company d/b/a Idaho Materials & Construction Claim | Unimpaired / Not Entitled to Vote | 100% |
| Class 8E | Les Schwab Tire Centers of Idaho, LLC Claims | Impaired / Entitled to Vote | 100% |
| Class 9 | General Unsecured Claims | Impaired / Entitled to Vote | 100% |

Case 24-40158-NGH    Doc 640    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc Main
Document    Page 20 of 125

Case 24-40158-NGH    Doc 645    Filed 10/02/24    Entered 10/02/24 12:06:55    Desc Main
Document    Page 20 of 125

Case 24-40158-NGH    Doc 640    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc Main
Document    Page 20 of 125

| Class 10 | Intercompany Claims | Not Entitled to Vote (deemed to reject) | None |
| Class 11 | Equity Interests | Unimpaired<br><br>Not Entitled to Vote | None |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

### B. Plan Voting Instructions and Procedures

#### 1. Voting Rights

Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Claims in Class 2, Class 3A, Class 3E, Class 3H, Class 3I, Class 3J, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 8A, Class 8E, Class 9 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed Allowed for voting purposes are entitled to vote to accept or reject the Plan. Only Holders of Claims in Class 2, Class 3A, Class 3E, Class 3H, Class 3I, Class 3J, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 8A, Class 8E, Class 9 may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Class 1, Class 3B, Class 3C, Class 3D, Class 3F, Class 3G, Class 3K, Class 3M, Class 7A, Class 7B, Class 7C, Class 7D, Class 7E, Class 7F, Class 8B, Class 8D, Class 11 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, Intercompany Claims in Class 10 will not receive or retain any property under the Plan on account of such Intercompany Claims, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

#### 2. Solicitation Materials

Krystal R. Mikkilineni, Dentons Davis Brown, counsel to the Debtors, with the approval of the Bankruptcy Court, will serve as the voting agent (the "Voting Agent") to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- One or more Ballots, to be used in voting to accept or reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available without charge by written request to the Voting Agent at krystal.mikkilineni@dentons.com.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by electronic mail at: at krystal.mikkilineni@dentons.com.

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or

you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM FOR DISTRIBUTION PURPOSES, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

**3.    Voting Instructions and Procedures**

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot. **The deadline to vote on the Plan is [the date that is 14 calendar days prior to the Confirmation Hearing] at 5:00 p.m. (Mountain Time) (the "Voting Deadline")**. In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline at the following address:

**Physical Mail:**

**Dentons Davis Brown**
**Attn: Krystal R. Mikkilineni**
**215 10th Street, Suite 1300**
**Des Moines, IA 50309**

-or-

**Electronic Mail:**

**Email Address: krystal.mikkilineni@dentons.com**

**Subject Line: Millenkamp Ballot Submission**
**Attachment: A completed and signed ballot must be attached in PDF format.**

Only the Holders of Allowed Claims or Claims that are deemed allowed for purposes of voting on the Plan in Class 2, Class 3A, Class 3E, Class 3H, Class 3I, Class 3J, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 8A, Class 8E, Class 9 are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning those Ballots in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim either to accept or reject

the Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;
- Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot in writing, or by order of the Bankruptcy Court;
- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;
- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;
- Any Ballot cast by a Person that does not hold a Claim in the voting Class; and
- Any Ballot that is not signed or does not contain an original signature.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or making elections

on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, free of charge, an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent at the address specified above.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") prior to the Confirmation Hearing. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN BY THE VOTING DEADLINE.**

### 4.   Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than [**the date that is 14 calendar days prior to the Confirmation Hearing**]. Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Confirmation Hearing Notice, they may not be considered by the Bankruptcy Court. For further information, refer to Article VIII of this Disclosure Statement, **"Confirmation of the Plan."**

## II.   <u>BACKGROUND REGARDING THE DEBTORS</u>

### A.   Overview of the Debtors

Bill Millenkamp, principal of the Debtors, was born and raised in the Midwest where the Millenkamp name is well known in the cattle industry. In 1991, Bill Millenkamp moved to Oregon where he met his wife, Susie, who was also raised in the cattle industry. Bill and Susie eventually moved to Idaho to start their own family cattle business.

In 1996, with just 40 acres in Jerome, Idaho, 7 calves, and a small operating line of credit, Bill and Susie began a calf-raising operation. Since then, the Millenkamp's operations have grown into a large vertically integrated agribusiness, comprised of five complementary divisions in which Bill and Susie and their four children are involved.

The calf ranch is operated at our Jerome, Idaho location and is made up of several hundred acres of land where approximately 50,000 calves reside. In 2006, the Millenkamp's started operating a dairy heifer feedlot in Declo, Idaho. At this location they began raising approximately 60,000 head of dairy cattle. In 2013, Millenkamp's purchased their first dairy, and two years later,

established Idaho Jersey Girls Dairy which at the time consisted of two milk barn, two rotaries and 15,000 head of dairy cattle that are located at the Declo, Idaho facility. In 2018, Millenkamp's constructed an enclosed commodity barn and began construction of a cattle processing barn. In 2019, construction began for a second milk barn that was completed in 2020, which added an additional four rotary milking carousels to company's operations. In 2021, the Debtors further expanded with construction of a renewable energy methane digester with East Valley Development, LLC which is partnership between BP and CleanEnergy.

As of today, the company's operations encompass approximately 20,000 acres. The Debtors maintain cattle operations in three locations in Jerome, Idaho and a main dairy location in Declo, Idaho. The Debtors custom raise day-old calves for approximately twenty-five (25) separate dairies and ship milk to not less than two processors.

The Debtors' operations employ approximately 513 employees. The operations are comprised of five main divisions: (1) Idaho Jersey Girls Dairy which is located in Declo, Idaho, (2) a calf ranch which is located in Jerome, Idaho, (3) farming in Jerome, Twin Falls and Cassia Counties, (4) a feedlot located in Jerome & cow-calf operation in Declo, and (5) custom harvest & trucking through the Magic Valley.

The Debtors manage approximately 110,000 head of cattle, inclusive of Idaho Jersey Girls Dairy which consists of approximately 37,000 Jersey and Jersey mixed milking cows that produce approximately 2 million pounds of milk daily. The Debtors accomplish this with six rotary milking parlors and by utilizing programmable logic control technology, robotics, and state of the art heat recovery technology.

The Idaho Jersey Girls Dairy is approximately 11,688 acres bordered by the 4,640-acre Moonshine Ranch for a total contiguous land area of approximately 16,328 acres located in Declo, Idaho. The Idaho Jersey Girls Dairy supports approximately 65,000 head of dairy cattle and youngstock, while Moonshine Ranch maintains a 1,000 head Angus calf-cow operation.

The calf ranch operation receives approximately 250 calves per day and is home to approximately 50,000 calves. The calf ranch is approximately 782 acres located in Jerome, Idaho. The Debtors' operations also consist of farming in which they implement responsible crop rotation and nutrient management to support operations. The feedlots and cow-calf operations are additional revenue streams that increase the synergy and infrastructure of the farm and adjoining properties. For example, the Jerome Idaho Feedlots (defined below) consists of 80 acres in Jerome, Idaho and supports 2,500 head of cattle.

The Debtors also operate a trucking operation that supports all aspects of their operations. The Debtors harvest all silages used in their operations through their partnership with H & M Custom, LLC, which provides control of quality and availability for our most critical forage input costs.

### B. Debtors' Corporate Structure

As the farming operation grew, it became necessary to set up corporate entities to deal with various aspects of the operations. Through ten entities, the Debtors operate as a single enterprise, which includes common usage of debt and banking facilities.

William John Millenkamp ("Bill Millenkamp") is the Chief Executive Officer of the Debtors, Millenkamp Cattle, Inc.; Black Pine Cattle LLC; East Valley Cattle, LLC; Idaho Jersey Girls Jerome Dairy LLC; Millenkamp Enterprises, LLC; Millenkamp Family LLC; Millenkamp Properties, L.L.C.; Millenkamp Properties II LLC; Goose Ranch LLC; and Idaho Jersey Girls, LLC. Attached hereto as Exhibit F is an organizational summary chart of the Debtors.

Bill Millenkamp is also President of Millenkamp Cattle, Inc., and a Member or Managing Member of Idaho Jersey Girls Jerome Dairy LLC; Black Pine Cattle LLC; Millenkamp Enterprises, LLC; and East Valley Cattle, LLC. Millenkamp Cattle, Inc. is the sole Member of Idaho Jersey Girls, LLC.

Bill Millenkamp, Susan J. Millenkamp, William J. Millenkamp as Trustee of the SJM 2012 Trust, and Susan J. Millenkamp as Trustee of the WJM 2012 Trust are the Members of Millenkamp Family LLC, sole member of Goose Ranch LLC, Millenkamp Properties, L.L.C. and Millenkamp Properties II LLC.

Millenkamp Cattle, Inc., is the primary entity from which all operations are directed, the revenues received and the payables disbursed. Millenkamp Cattle, Inc. is the operational entity which owns all of the cattle, feed, and equipment used to care for the cattle, employs the employees, and receives and disburses the majority of the monies. Millenkamp Cattle, Inc., does not own any real property.

Idaho Jersey Girls Jerome Dairy, LLC owns 80 acres and a 1,120-animal unit concentrated animal feeding operation in Jerome, Idaho (the "Jerome Feedlot" or "Millenkamp Milkers"). The Jerome Feedlot is leased to Millenkamp Cattle, Inc.

Millenkamp Properties, L.L.C. owns 720 acres and a 6,000-animal unit concentrated animal feeding operation in Jerome Idaho (the "Calf Ranch"), a 40-acre feed storage site ("Ridgeway") and 4,638 acres in Cassia County ("Moonshine Ranch"), and another 80 acres in Jerome County (the "German Dairy"). These properties are also leased to Millenkamp Cattle, Inc.

Millenkamp Properties II LLC owns 968 acres in Twin Falls County ("Canyonlands") and 278 acres in Jerome County (the "McGregor Property"). The Canyonlands and McGregor Property are also leased to Millenkamp Cattle, Inc.

Goose Ranch LLC owns a 600-acre farm on Snake River below Minidoka Dam in Cassia County (The "Goose Ranch Property"). The Goose Ranch Property is also leased to Millenkamp Cattle, Inc.

East Valley Cattle, LLC owns a 11,668-acre farm and a 51,285-animal unit capacity dairy and feedlot in Cassia County near Declo, Idaho ("East Valley Facilities"). This is also leased to Millenkamp Cattle, Inc.

Millenkamp Cattle, Inc., leases from Mike Thompson a 1200 head feedlot ("Thompson Feedlot") in Jerome, Idaho.

Millenkamp Cattle, Inc., leases approximately 4280 irrigated acres of farm ground ("Cassia Creek") from Eagle Creek Northwest, LLC that is adjacent to the East Valley Facilities in Declo, Idaho.

As stated above, Millenkamp Cattle, Inc. operates all the real property owned or leased by the various Millenkamp entities. This includes all the farms, Calf Ranch, Idaho Jersey Girls and the East Valley Facilities.

Millenkamp Cattle, Inc. d/b/a Idaho Jersey Girls operates the German Dairy and East Valley Facilities. Millenkamp Cattle, Inc. d/b/a Black Pine Cattle also provides custom heifer raising services at the East Valley Facilities.

### C. Debtors' Prepetition Capital Structure
#### 1. Liabilities

The Debtors were parties to various prepetition loan agreements. The following table is a summary of the Debtors' most significant *secured* loan balances as of the Petition Dates:

| Lender | Loan | Claim Amount |
|---|---|---|
| Metlife | **Promissory Note A** dated September 26, 2018, and First Amendment dated April 21, 2021 | $86,855,135.96 |
| Metlife | **Promissory Note B** dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third | $51,693,035.58 |

| | Amendment dated April 21, 2021 | |
| Metlife | **Promissory Note C** dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $11,530,349.58 |
| Metlife | **Promissory Note D** dated April 21, 2021 | $16,210,086.43 |
| Metlife | **Promissory Note E** dated April 21, 2021 | $10,082,419.25 |
| Metlife | **9858 Promissory Note** dated March 12, 2019 | $5,005,171.86 |
| Rabo | Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended | $96,143,211.38 |
| Conterra | Mezzanine Loan dated October 20, 2022 | $18,884,265.52 |
| Conterra | German Promissory Note dated October 20, 2022 | $2,576,728.08 |

i.    **Pre-Petition RLOC (Rabo) Credit Agreement**

Under that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended, the "Pre-Petition RLOC Credit Agreement" and collectively with all security, pledge, intercreditor, guaranty agreements, and other documentation executed in respect thereof, the "Pre-Petition RLOC Documents," by and among the Debtors[2], collectively as borrower, the lenders from time to time party thereto (in such capacity, collectively, the "Pre-Petition RLOC Lenders"), and Rabo AgriFinance LLC ("Rabo"), as sole lead arranger, agent, and swing-line lender (in its capacity as agent for the benefit of the Pre-Petition RLOC Lenders and each Issuer (as defined in the Pre-Petition RLOC Credit Agreement), the "Pre-Petition RLOC Agent" and collectively with the Pre-Petition RLOC Lenders and the Issuers, the "Pre-Petition RLOC Secured Parties" and each, a "Pre-Petition RLOC Secured Party"), the Debtors were

provided with an asset-based revolving line of credit facility (the "Pre-Petition RLOC Facility") consisting of (a) revolving commitments in an aggregate amount of up to $91,000,000.00; (b) a swing-line credit facility for the Pre-Petition RLOC Agent to make Swing Line Advances (as defined in the Pre-Petition RLOC Credit Agreement) in an aggregate amount of up to $7,500,000.00; and (c) a letter-of-credit facility for the issuance of stand-by letters of credit in an aggregate amount of up to $1,000,000.00.

Pursuant to the terms of the Pre-Petition RLOC Credit Agreement, the Debtors granted to the Pre-Petition RLOC Agent a security interest to and in substantially all of the Debtors' and Borrowers' personal property, excluding their real property, and all other property defined as the "Collateral" in the Pre-Petition RLOC Credit Agreement (referred to herein as the "Pre-Petition RLOC Collateral" and the liens and security interests granted to or for the benefit of the Pre-Petition RLOC Secured Parties therein, the "Pre-Petition RLOC Personal Property Liens").

The Pre-Petition RLOC Collateral includes, among other interests (each as defined in the Pre-Petition RLOC Credit Agreement): all Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and, notably, the Borrowers' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Borrowers' milk and other dairy products (the "Milk Receivables"). The Pre-Petition RLOC Secured Parties' lien and security interest extends to all accessions to, substitutions for, and all replacements, products, and proceeds of the Pre-Petition RLOC Collateral. As described below, the Pre-Petition RLOC Secured Parties' interest in the Milk Receivables is subject to the First Intercreditor Agreement (as defined below) entered into between them and MetLife.

Further, as consideration for the Pre-Petition RLOC Agent to enter into that certain Forbearance Agreement, made effective as of October 22, 2022, the Borrowers granted, among other things, a second priority mortgage on the Pre-Petition MetLife Real Estate Collateral (defined below) to secure the Pre-Petition RLOC Obligations, subject to the Second Intercreditor Agreement (defined below). Accordingly, on October 20, 2022, the Borrowers executed and delivered that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (Second Priority), in favor of the Pre-Petition RLOC Agent, to secure any and all obligations owed to the Pre-Petition RLOC Secured Parties, which was recorded in Cassia County, as Instrument No. 2022-004552, Twin Falls County as Instrument No. 2022018722, and Jerome County as Instrument No. 2224759 (the "Pre-Petition RLOC Second Mortgage" and together with the Pre-Petition RLOC Personal Property Liens, the "Pre-Petition RLOC Liens").

Rabo filed a Proof of Claim in the amount of $96,143,211.38.

Proof of Claim Amount:

Principal:  $93,098,575.54

---

[2] Nondebtors Susan Millenkamp as Trustee of the WJM 2012 Trust; William Millenkamp as Trustee of the SJM 2012 Trust; William John Millenkamp and Susan Jo Millenkamp (the "Non-Debtor Borrowers") also executed the Pre-Petition RLOC Credit Agreement. The Debtors and the Non-Debtor Borrowers are referred to herein as the "Borrowers."

Interest (as of April 2, 2024): $1,818,831.21
Fees and Costs (as of April 2, 2024): $1,219,525.43
Unused Commitment Fee: $6,280.20
TOTAL: $96,143,211.38

### ii. Metlife Secured Loans

Metropolitan Life Insurance Company ("MLIC") and MetLife Real Estate Lending LLC (collectively, "MetLife") are the owners and holders of certain commercial real estate loans (collectively, the "Pre-Petition MetLife Loans" and, together with all related mortgages and other existing or future documents evidencing, securing, or executed in connection with the Pre-Petition MetLife Loans, in each case, as Amended, referred to herein as the "Pre-Petition MetLife Loan Documents") made by MetLife to the MetLife Borrowers. The Pre-Petition MetLife Loans are secured by liens in and security interests on the MetLife Borrowers' real property and certain of the MetLife Borrowers' personal property, including: (x) crops grown after a foreclosure; (y) all wells, underground pipelines, sprinklers, and similar irrigation equipment located at the real property, as well as all lines, valve openers, pipes, and similar items pertaining to such irrigation equipment; and (z) all milking equipment located at the real property (the "Pre-Petition MetLife Real Estate Collateral"). The Pre-Petition MetLife Loans are further secured, subject to the First Intercreditor Agreement (defined below), by the Milk Receivables (the "MetLife Milk Priority Claim," and collectively with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition MetLife Collateral" and all liens and security interests on and in the Pre-Petition MetLife Collateral, the "Pre-Petition MetLife Liens"). As of the Petition Date, the MetLife Borrowers were indebted to MetLife, in the aggregate amount of approximately $180,473,929.72 under the Pre-Petition MetLife Loan Documents (collectively, the "Pre-Petition MetLife Obligations").

Rabo and MetLife are parties to (i) that certain Intercreditor Agreement, dated as of September 18, 2018, (as Amended, the "First Intercreditor Agreement") and (ii) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022 (as Amended, the "Second Intercreditor Agreement" and, together with the First Intercreditor Agreement, the "MetLife Intercreditor Agreements"). Pursuant to the First Intercreditor Agreement, Rabo agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition MetLife Collateral to those of MetLife, and MetLife agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition RLOC Collateral (other than any such property that may also constitute Pre-Petition MetLife Collateral) to those of Rabo.

Additionally, the First Intercreditor Agreement recognizes that Rabo and MetLife have separately entered into Milk Check Assignment Agreements (the "Milk Agreements") with Debtor Millenkamp Cattle and a milk purchaser, Glanbia Foods, Inc. ("Milk Purchaser"). The Milk Agreements direct the Milk Purchaser to make certain payments directly to Rabo (in certain situations) and MetLife (on a monthly basis), rather than to Millenkamp Cattle. Pursuant to the

terms of the First Intercreditor Agreement, MetLife's priority interest in any Milk Receivables is equal to the aggregate amount of, in any month, the amount of the monthly installment payment of principal and accrued interest then due and payable by the applicable Debtors to MetLife, with such amount being capped at one month's principal and interest payment, unless MetLife has provided written notice to Rabo that amounts exceeding one month's principal and interest payment are due, owing, and unpaid.

On September 18, 2018, Rabo, Millenkamp Cattle, and the Milk Purchaser also entered into a Collateral Assignment of Milk Contracts, pursuant to which Millenkamp Cattle assigned to Rabo all contracts and proceeds related to certain purchase agreements between Millenkamp Cattle and the Milk Purchaser, to secure the obligations owed to the Pre-Petition RLOC Secured Parties. Subject to the foregoing, during the Borrowers' default under the Pre-Petition RLOC Documents, Rabo may collect the Milk Receivables. Other than the foregoing subordination, MetLife and Rabo expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of the Pre-Petition RLOC Secured Parties' rights, privileges, powers, or remedies with respect to the Pre-Petition RLOC Obligations or the Pre-Petition RLOC Collateral. Likewise, Rabo and MetLife expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of MetLife's rights, privileges, powers, or remedies with respect to the Pre-Petition MetLife Loans or the Pre-Petition MetLife Collateral. MetLife does not have any lien or security interest in any of the Debtors' Livestock, including, but not limited to, dairy cattle.

| Description | Principal Amount | Claim Amount | Security |
|---|---|---|---|
| **Promissory Note A** dated September 26, 2018, and First Amendment dated April 21, 2021 | $106,000,000.00 | $86,855,135.96 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note B** dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $59,400,000.00 | $51,693,035.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |

| | | | |
|---|---|---|---|
| **Promissory Note C** dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $13,000,000.00 | $11,530,349.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note D** dated April 21, 2021 | $17,954,226.00 | $16,210,086.43 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note E** dated April 21, 2021 | $15,978,409.00 | $10,082,419.25 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **9858 Promissory Note** dated March 12, 2019 | $5,508,350.00 | $5,005,171.86 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated March 12, 2019  "Canyonlands" and "McGregor" property |

### iii.    Conterra

Millenkamp Cattle, Inc., Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy LLC, East Valley Cattle, LLC, Millenkamp Family LLC, Millenkamp Properties, L.L.C., Millenkamp Properties II LLC, Goose Ranch, LLC, William J. Millenkamp and Susan J. Millenkamp (collectively, the "Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $16,500,000 which Conterra endorsed to Ag Funding (the "Mezz Loan"). The Mezz Loan is secured by second priority liens and security

interests in the Pre-Petition RLOC Collateral (the "Pre-Petition Conterra Mezz Collateral") and third priority mortgage on the Pre-Petition MetLife Real Estate Collateral (the "Pre-Petition Conterra Mezzanine Liens").

Millenkamp Cattle, Inc., Millenkamp Family LLC, Millenkamp Properties II LLC, Millenkamp Properties, L.L.C., East Valley Cattle, LLC, Idaho Jersey Girls Jerome Dairy LLC, and William J. Millenkamp (collectively, the "Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $2,549,750 (the "German Note") which Conterra endorsed to Rooster Capital IV LLC ("Rooster").

The German Note is secured by a first priority mortgage on certain real property owned by certain of the Debtors known as "German Dairy" located at 162 West 400 North, Jerome, Idaho 83338 (the "Pre-Petition Conterra Real Estate Collateral" and together with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition Real Estate Collateral" and collectively with the Pre-Petition RLOC Collateral and the Pre-Petition MetLife Collateral, the "Pre-Petition Collateral") and located in Jerome County, Idaho (the "Pre-Petition Conterra Real Estate Lien" and, together with the Pre-Petition Conterra Mezz Liens, the "Pre-Petition Conterra Liens" and collectively with the Pre-Petition Rabo Liens and the Pre-Petition MetLife Liens, the "Pre-Petition Liens"). The Pre-Petition Conterra Mezz Collateral and the Pre-Petition Conterra Real Estate Collateral is collectively referred to herein as the "Pre-Petition Conterra Collateral").

Conterra filed Proofs of Claim in the aggregate amount of $21,460,993.60.

German Note Proof of Claim Amount:
Unpaid Principal: $2,508,860.41
Accrued Interest through 4/2/24: 67,867.67
Total unpaid balance as of 4/2/24: **$2,576,728.08**

Mezz Loan Proof of Claim Amount:
Unpaid Principal: $16,500,000.00
Accrued Interest through 4/2/24: $1,457,810.41
Late Fees: $830,614.58
Reimbursable Expenses: $95,840.53
Total unpaid balance as of 4/2/24: **$18,884,265.52**

### iv.    Other Secured Obligations
#### a.    *Equipment Liens*

Certain parties have asserted secured interests in specific pieces of equipment that were owned by the Debtors and have filed UCC-1 financing statements with respect to those interests.

    *b.*   *Statutory Liens*

A number of parties have asserted liens, pursuant to applicable non-bankruptcy law, on certain of the Debtors' assets.

    **v.**   **General Unsecured Claims**

In addition to the debt discussed above, the Debtors' books and records reflect approximately $27,523,341 million, in unsecured debt incurred in the ordinary course of business, principally comprised of trade payables. Creditors and interested parties should review the Debtors' Schedules (defined below) and Proofs of Claim Filed with the Bankruptcy Court for more complete information concerning the nature and amount of the Debtors' liabilities as of the Petition Date.

Based on the Debtors' Schedules and internal estimates, the Debtors estimate that Allowed General Unsecured Claims against the Debtors collectively, is approximately $27,523,341 million. This estimate, however, is based on the Debtors' judgment and assumes the benefit of anticipated Claim objections. Thus, the total amount of Allowed General Unsecured Claims may exceed or fall short of the estimates set forth herein. A list of the General Unsecured Claims and their General Unsecured Class 9 Claim Amounts are set forth in Exhibit E to this Disclosure Statement.

    **D.**   **Events Leading to the Chapter 11 Cases**

In 2019, Millenkamp Cattle began constructing a $250 million dairy expansion to add four new state of the art rotary parlors and an enclosed cross ventilation barn to double milking capacity of the current dairy facility. The project was to be funded through Millenkamp Cattle's two lenders, Rabo, who would provide the short-term operating revolving line of credit and MetLife, who would provide the long-term lending secured by the farm ground and dairy facilities. Construction of the new project began in 2019 and ran unimpeded during the COVID pandemic through its completion in 2021.

The deal between the Debtors, Rabo and MetLife was to complete the construction project, reappraise the property after its completion and use the large equity cushion the Debtors maintained in the real property to pay down the Rabo revolving line of credit ("RLOC"). On approximately eleven separate occasions over the past twenty years, MetLife in its ordinary course of business, had refinanced the Debtors long-term real property debt to restructure its overall business financing. During this time, Rabo changed the Debtors' borrowing base margin from $0 to $10 million. This created a huge hurdle considering the Debtors were in final phases of construction. The increase in $10 million to the borrowing base was directly in contravention of Rabo lending standards to the Debtors' peers. This resulted in the undervaluing of Debtors' steers in excess of $7 million.

During the end of the construction project in August of 2021, the Debtors were left with a Hobson's Choice, trigger a default under the Rabo loan because the borrowing base would drop below the new $10 million margin or trigger a default under the MetLife loan covenants by allowing a construction lien to encumber the real property. The Debtors, upon the verbal approval of Rabo's local agent, used monies from its RLOC to bond a construction lien placed on the real property, as having clear title was a prerequisite for the new MetLife loan. MetLife and Rabo were both aware of the course of action.

In 2022, MetLife commissioned appraisals of the Debtors' real property to ensure the future loans would be within MetLife's usual 60/40 debt to equity ratios. The 2022 appraisals of the Debtors' real properties determined MetLife had approximately $393 million in appraised real property collateral while it maintained approximately $190 million in debt. The appraisals at the time did not take into account the value of the $107 million manure separation facility that had commenced construction and was to be paid for by East Valley Development, LLC, a joint venture between Clean Energy and BP to construct a renewable methane digester facility on the Debtors' property.

In June of 2022, the Rabo RLOC loan matured, and Rabo issued a notice of default. To cure the default, the Debtors and Rabo entered into a forbearance agreement. The Debtors, with the consent of MetLife through an intercreditor agreement with Rabo, provided Rabo a second position mortgage upon the real property. Additionally, Conterra provided $16.5 million of mezzanine money to bridge into the MetLife refinance and to satisfy Rabo's borrowing base margin requirements.

In February of 2023, Rabo issued another notice of default to the Debtors because the borrowing base dropped under the $10 million borrowing base loan covenant. During this time, Rabo was always paid the monthly interest it was due and MetLife continued to receive its principal and interest payments, even though the dairy industry was experiencing historically low milk prices and historically high feed prices. The Debtors were able to successfully sustain their revenues during these challenging times because of a consistent milk hedging strategy and other sectors of the Debtors' business, such as custom calf raising, fat and feeder cattle raising, farming and trucking, generated additional revenues. These revenues ensured Rabo and MetLife were paid.

In May and June of 2023, the Debtors received term sheets from two banks to refinance its existing revolving line of credit with Rabo. Both term sheets were conditioned upon MetLife providing approximately $45 million in additional financing to pay off $16.5 million in mezzanine debt and decrease the outstanding RLOC balance. Although a traditional 60/40 debt to equity ratio on approximately $500 million of appraised real property would have enabled the Debtors to borrow over $100 million from MetLife, the Debtors sought only $45 million. This would have resulted in an extremely conservative loan to debt ratio for MetLife.

On June 9, 2023, after the completion of a major construction expansion, MetLife, inconsistent with its past practices of lending monies to Millenkamp Cattle, refused to provide any further funding to the Debtors to ensure a refinance of its short-term lending RLOC. Therefore, due to MetLife refusing to fund its prior commitment of the $45 million additional funds, Rabo issued a Notice of Default in July 2023. During this time, the dairy industry was experiencing its worst financial crisis in the past twenty years and the banking environment had shut down lending on not only real property, but also RLOCs from the dairy industry's largest lenders.

In August of 2023, Rabo began sweeping steer and cull cow proceeds and has continually done so through the Petition Date.  Between August of 2023 and April 2024, Rabo swept over $25 million and failed to revolve the money back in the ordinary course to ensure cattle were fed, approximately 513 employees were paid, and accounts payable were maintained on customary terms. Rabo swept funds and added them to principal, default interest and excessive attorney and financial advisor fees.

The inability of the Debtors to use the swept steer and cull cow proceeds, slowly starved the Debtors of the working capital it needed to keep vendors paid on a timely basis. This was a deliberate action of Rabo to squeeze the Debtors and their vendors out of working capital and eventually force the Chapter 11 filings. Rabo knew the milk checks and custom calf raising funds were not enough to cover the amounts swept and would leave the Debtors with a monthly shortfall.

While Rabo continued to squeeze the Debtors of their working capital, it collected not only its interest, but also its default interest and attorneys' fees. Had Rabo simply revolved the monies that the Debtors generated from its steers and cull cows, the Debtors would have been able to pay all their vendor bills in its ordinary course of business. Similarly, MetLife has continually received its monthly interest and principal without fail. Except for 2023, the Debtors have been profitable for the past 27 years and would have been profitable in 2023 had they not been forced to pay over $15 million in default interest, attorneys fees, financial advisor fees and lost opportunity costs.

On January 22, 2024, Rabo filed its Verified Petition For Appointment of Receiver in the Fourth Judicial District of the State of Idaho, County of Ada. After extensive negotiations, on February 16, 2024, the Debtors and Rabo entered into an Order Appointing Receiver. The order provided that the Debtors had the exclusive right to file a Chapter 11 bankruptcy petition during the first 60 days of the effective date of the order and that the Debtors would continue to manage the operations like they had done historically.

The Receiver subsequently created a feeding frenzy among the Debtors' vendors by making promises to vendors on payments it could not keep. For example, Rabo and the Receiver promised millions of dollars in letters of credit to vendors, but failed to honor those promises and

instead blamed each other when the promises were not fulfilled. The Receiver continually stirred the pot to create a run by vendors in an attempt to skirt the aforementioned time frames and force an immediate Chapter 11 filing by the Receiver.

The Receivership milked the Debtors' estates of nearly $2 million with absolutely no benefit. Baseless allegations of the Receiver, in violation of its fiduciary duty to the Debtors' estates, hauled the Debtors into court on three separate occasions. The Receiver's goal was to quickly sell an $800M company under an expedited 363 sale without regard to the hundreds of millions of dollars of equity that the Debtors built over the past twenty-seven years.

The issues that led these Chapter 11 Cases were not based on the operations of the Debtors; rather, these issues were brought on by the lending institutions which refused to work cooperatively with each other and the Debtors.

### III.    THE CHAPTER 11 CASES

On the respective Petition Dates, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Chapter 11 Cases are being jointly administered under the case caption *In re Millenkamp Cattle, Inc., et al, LLC, et al.*, Case No. 24-40158 (Bankr. D. Id.). An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under Bankruptcy Code section 362(a), which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

#### A.    First Day Orders and Initial Employment Applications

On or about the Petition Date, the Debtors filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. In connection with these hearings, the Bankruptcy Court entered a series of customary "first day" orders, including the payment of employee wages and payments relating to utilities. (Docket Nos. 102, 140, 295). The Debtors also filed a Motion to Honor Prepetition Obligations to Critical Vendors (the "Critical Vendor Motion") (Docket No. 23). After a hearing on the matter, the Court entered an interim order granting the Motion to pay certain prepetition claims of critical vendors listed in the order, based largely on those vendors' secured status and the characterization of the interim payments as adequate protection payments. The Court held a final hearing on the Critical Vendor Motion, and ultimately denied the Critical Vendor Motion. (Docket No. 302).

**B.    Applications to Employ Professionals**

The Debtors have employed several professionals since the Petition Date which include:

- Dentons Davis Brown as Counsel for the Debtors: Order entered on May 24, 2024 (Docket No. 323)

- Johnson May as Counsel for the Debtors: Order entered on May 24, 2024 (Docket No. 322)

- Kander, LLC as Financial Advisor for the Debtors

- Schuil Ag Real Estate as an expert Real Estate Broker for the Debtors: Order entered on May 31, 2024 (Docket No. 357)

- Gale W. Harding and Associates as Equipment Appraiser: Order entered on May 31, 2024 (Docket No. 358)

- The Forbes Securities Group LLC dba Forbes Partners as Investment Banker: Order entered on June 5, 2024 (Docket No. 372)

- Davis Livestock, Inc. as Livestock Appraiser: Order entered on June 4, 2024 (Docket No. 371)

- Summit Ag Appraisal, Inc. as Real Estate Appraiser: Order entered on August 15, 2024 (Docket No. 556)

- Cooper Norman as Accountant: Order entered on August 14, 2024 (Docket No. 554)

- Givens Pursley as Special Counsel for the Debtors: Order entered August 26, 2024 (Docket No. 577)

- Heida Law Office as Special Counsel for the Debtors

- Lance VandeMark and Theodore Isbell of Vertex as Expert Witnesses

**C.    Appointment of the Unsecured Creditors' Committees**

On May 14, 2024, the Office of the United States Trustee for the District of Idaho (the "U.S. Trustee") appointed the following creditors to the Official Committee of Unsecured Creditors (Docket No. 297) (the "Committee"): (i) J.D. Heiskell Holding, LLC; (ii) Wilbur Ellis Nutrition-Rangen; (iii) Bunge Canada (iv) Viterra USA Grain, LLC, and (v) Land View, Inc. The Committee retained O'Melveny & Myers LLP as its lead counsel, Elaesser Anderson Chtd. as its local counsel, and Armory Securities, LLC as its financial advisor.

**D.    United States Trustee**

Jason R. Naess and Brett R. Cahoon are the trial attorneys for the U.S. Trustee in connection with these Chapter 11 Cases. The Debtors have worked cooperatively to address concerns and comments from the U.S. Trustee's office during these Chapter 11 Cases.

**E.    Meeting of Creditors**

The meetings of creditors under Bankruptcy Code section 341(a) were held via telephone. At the meetings of creditors, the U.S. Trustee and creditors asked questions of representatives of the Debtors.

**F.    Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims**

On April 23, 2024, the Debtors Filed their Schedules and Statements of Financial Affairs, as amended. A Creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated, or disputed may, but need not, have filed a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Plan[3].

On June 7, 2024, the Bankruptcy Court entered an *Order (I) Vacating the Original Bar Date and (II) Establishing a Deadline to File Proofs of Claim* (Docket No. 393) (the "Bar Date Order"), establishing July 31, 2024 as the General Claims Bar Date.

As of September 30, 2024, approximately 127 proofs of claim appeared on the official claims register for Millenkamp Cattle, Inc., approximately 10 proofs of claim appeared on the official claims register for Idaho Jersey Girls, LLC, approximately 14 proofs of claim for East Valley Cattle, approximately 1 proof of claim for Millenkamp Enterprises, LLC, approximately 9 proofs of claim for Millenkamp Properties, L.L.C., approximately 7 proofs of claim for Millenkamp Properties II LLC, approximately 9 proofs of claim for Millenkamp Family, LLC, approximately 8 proofs of claim for Goose Ranch, LLC, approximately 9 proofs of claim for Idaho Jersey Girls Jerome Dairy, LLC, and approximately 7 proofs of claim for Black Pine Cattle, LLC, although some of those claims have been withdrawn or superseded by other claims. The Debtors have not completed claim reconciliation work and do not anticipate doing so before the Effective Date of the Plan.

---

[3] A Creditor claiming to hold a prepetition Claim who neither files a proof of claim nor has its Claim set forth in the Schedules as being other than contingent, unliquidated or disputed, and whose Claim is not expressly Allowed under the Plan or in the Confirmation Order, has no right to payment or Distribution under the Plan.

**G.    Cash Collateral Motions**

In order to continue operations during the Bankruptcy Cases, including with respect to the feeding and maintenance of the cattle being cared for by the Debtors, the Debtors sought the right to use their cash collateral in accordance with the terms of a budget and providing adequate protection to certain secured creditors for any diminution in the value of their collateral during the pendency of the Bankruptcy Cases.

On April 2, 2024, the Debtors filed their *Emergency and Continuing Motion for Interim and Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and Setting a Final Hearing* (Docket No. 22). The Court held hearings on the interim use of cash collateral and subsequently, on April 8, 2024, entered an *Interim Order Granting Debtors' Emergency Motion for Authorization to Use Cash Collateral and to Schedule a Final Hearing* (Docket No. 141) and a *Second Interim Order Granting Debtors' Emergency Motion for Authorization to Use Cash Collateral* (Docket No. 180).

On June 27, 2024, the Debtors filed a *Second Motion for Continued Use of Cash Collateral* (Docket No. 464). The Court held a hearing on the Second Motion for Continued Use of Cash Collateral and entered an *Interim Order Granting Debtors' Second Motion for Continued Use of Cash Collateral* (Docket No. 524). On September 18, 2024, the Debtors filed a Supplement to their *Second Motion for Continued Use of Cash Collateral* (Docket No. 618) which contains an updated cash collateral budget.

On September 23, 2024, the Debtors, Rabo, Metlife, Sandton, Conterra, the Committee, and the United States Trustee, entered into a Stipulation in which the parties agreed that the continued use of cash collateral, as outlined in the Second Motion, shall be allowed and continue through October 29, 2024. The Stipulation also noted that the Final Hearing on the Debtors' Second Motion to Use Cash Collateral originally set for October 2 and 3, 2024 is vacated and the continued hearing on the Second Motion for Continued Use of Cash Collateral is reset to October 28 and 29, 2024. The Court subsequently entered an order consistent with these terms.

**H.    Sandton Term Sheet and DIP Loan**

On April 2, 2024, the Debtors filed a motion seeking entry of an order authorizing the Debtors to enter into a senior secured, superpriority debtor-in-possession financing facility with Sandton Capital Solutions Master Fund VI, LP (the "DIP Lender") in an aggregate principal amount of not more than $45 million (the "DIP Motion.") (Docket No. 24). On April 19, 2024, the Court entered an order authorizing the Debtors, on an interim basis, to enter into the DIP Facility, up to $8.5 million during the interim period (the "Interim DIP Order") (Docket No. 206).

On May 9th and 10th, the Court held a final hearing on Debtors' DIP Motion (the

"Hearing"). At the Hearing, the Court issued an oral ruling regarding the DIP Motion. On May 17, 2024, the Court entered the final DIP Order (the "Final DIP Order") (Docket No. 305), authorizing the Debtors to enter into the DIP Facility, which provides that the Debtors may borrow an aggregate principal amount of $45 million under the DIP Facility, in accordance with the terms of the Final DIP Order and the DIP Facility. Pursuant to the Final DIP Order, the Debtors were initially authorized to draw an additional $10 million under the DIP Facility.  The Final DIP Order provides that "[t]o access additional funds under the DIP Facility, the Debtors are required to obtain an additional order from the Court authorizing the future advances on the $45 million DIP Facility." The Final DIP Order further held that: the Debtors are required to (i) move the Court for entry of an order authorizing such future advances with notice and opportunity to be heard by other parties in interest, specifically including the Pre-Petition Secured Lenders, any Committee, and the United States Trustee, and (ii) justify the need for any such future advances. See Final DIP Order ¶ 2(b).

On June 6, 2024, the Debtors filed a Motion for Authority to Advance on the DIP Facility (Docket No. 378). On June 21, 2024, the Court entered an Order granting the Debtor's Motion for Authority to Advance on the DIP Facility in part, granting the Debtors to draw $5 million on the DIP Facility. (Docket No. 450). As of the filing of this Disclosure Statement, $18.5 million has been drawn on the DIP Facility.

**I.    503(b)(9) Motion**

On April 2, 2024, the Debtors filed a *Motion for Allowance and Payment of Section 503(b)(9) Claims* (the "503(b)(9) Motion") (Docket No. 15). On April 24, 2024, the United States Trustee (the "UST") filed a partial objection to the 503(b)(9) Motion (the "Objection") (Docket No. 230). On May 20, 2024, the Debtors filed the Amended Motion in further support of the original 503(b)(9) Motion and to amend the list of 503(b)(9) claimants (the "503(b)(9) Claimants") (Docket No. 308). Attached as Exhibit A to the Amended Motion was a list of the 503(b)(9) Claimants. On June 6, 2024, Rabo AgriFinance LLC filed an Objection to the Amended Motion arguing that some of the 503(b)(9) Claims included amounts for finance charges and costs for labor (Docket No. 273). On June 14, 2024, the Debtors filed a *Supplement to their Amended Motion for Allowance and Payment of Section 503(b)(9) Claims* (Docket No. 427), attaching an updated and finalized list of 503(b)(9) Claims.

An evidentiary hearing was conducted on the Amended 503(b)(9) Motion on June 20, 2024. At the hearing, a substitute Exhibit 1031 was submitted which updated the list of 503(b)(9) Claims. After the hearing, the Court entered an Order on June 21, 2024 which allowed the 503(b)(9) Claims, referencing a specific list of the Claims, however, the referenced list was an incorrect list. As such, on July 3, 2024, the Debtors filed a Motion to Amend Order on the Amended 503(b)(9) Motion (Docket No. 476) (the "Motion to Amend Order"). A hearing was held on the Motion to Amend Order, and on August 29, 2024, the Court entered an Order Granting

the Motion to Amend Order, attaching the list of 503(b)(9) Claims that the Court deemed as Allowed 503(b)(9) Claims. Those Allowed 503(b)(9) Claims are as follows:

| 503(b)(9) Claimant | Allowed 503(b)(9) Amount |
|---|---|
| **Feed** | |
| Aden Brook Trading Corp | $746,600.02 |
| Amalgamated Sugar | $230,824.66 |
| American Calf Products | $194,333 |
| Carne I Corp. | $131,312.90 |
| Land View, Inc-Livestock- Animal Care | $1,057,117.09 |
| MicroProteins, Inc. | $18,954.66 |
| Viterra USA Grain, LLC | $1,954,760 |
| WAG Services Inc | $685 |
| **Vet/Med** | |
| MWI Veterinary | $484,255.92 |
| **Repairs & Maintenance** | |
| Automation Werx, LLC | $1,287.03 |
| Coastline | $4,386.53 |
| Elevation Electric | $254.13 |
| Les Schwab Tire Center | $26,643.97 |
| Progressive Dairy Service and Supplies | $4,858.75 |

| | |
|---|---|
| Schow's Auto Parts | $1,274.55 |
| Tacoma Screw Products, Inc. | $3,238.17 |
| The Dairy Solutions Group | $41,264.50 |
| **Fuel** | |
| Conrad & Bischoff, Inc. | $35,299.91 |
| United Oil | $593 |
| **Chemicals** | |
| Rocky Mountain Agronomics | $44,527.47 |
| Clear Lakes Products | $592.00 |
| **Semen** | |
| ABS Global, Inc. | $187,563 |
| **Other** | |
| Butte Irrigation Inc | $220.30 |
| | |
| **Total** | **$5,170,846.56** |

> **J.    Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries**

On June 6, 2024, the Debtors filed a *Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries* (Docket No. 374) (the "Deposit Motion") as the Debtors' silage and hay/straw vendors were requiring the Debtors to make deposits of up to 50% which are necessary to maintain the health of the Debtors' livestock. The Court held an evidentiary hearing on June 20, 204, on the Deposit Motion, and on June 21, 2024, the Court entered an Order Granting the Deposit Motion, permitting the Debtors to (1) use $2.5 million to prepay vendors up to 50% of future corn silage contracts, (2) use $2.5 million to prepay vendors up to 50% of future straw and hay contracts, and (3) use $1.5 million to prepay a deposit to H&M Custom for the cost of chopping

services for hay, straw, and corn silage.

### K.   506(b) Motion

On June 27, 2024, the Debtors filed a Motion to Establish Procedures for 11 U.S.C. § 506(b) Claims. A hearing was held on the Motion and the court granted the motion, consistent with the discussion at the hearing. However, the parties have not agreed on the exact terms of the written order. Pursuant to the Debtors' proposed order, each party seeking allowance or payment of an 11 U.S.C. § 506(b) claim shall file either (a) a Proof of Claim (or Amended Proof of Claim – in either case, a "Claim") detailing the fees, costs, or charges sought to be approved; or (b) a Notice of 506(b) Claim (the "Notice") with the Court.

Pursuant to the Proposed Order, in the event a party chooses to file a Notice with the Court, any such Notice shall include, at a minimum, a specific itemization of the fees, costs or charges sought to be approved, and shall explain how each of the following conditions are satisfied:

    a.   The claim is an allowed secured claim;

    b.   The creditor is over-secured;

    c.   The fees are reasonable; and

    d.   The fees are provided for under the relevant agreement.

Any party filing a Notice shall serve a copy of such Notice on the Debtors, the United States Trustee, any other party secured by the same asset(s) securing the party filing the Notice, the Official Committee of Unsecured Creditors, any party who has requested special notice in the Debtors' Chapter 11 case, and any counsel for any of the foregoing. The Notice shall be accompanied by a Certificate of Service showing which parties were served in which manner.

In the event a party files a Notice, any objection to the allowance or payment of fees, costs, or charges itemized in the Notice must be filed with the Court and served on the Debtors, the party whose Notice is the subject of the objection, counsel for the Debtors and counsel for the Official Committee of Unsecured Creditors, within twenty-one (21) calendar days of the date that the Notice was served. If no objection is timely filed and served, the party filing the Notice may submit a proposed order allowing the fees, costs or charges itemized in the Notice. If an objection is timely filed and served, then the objecting party must obtain a hearing date on the Objection and provide sufficient notice of the hearing to all parties served with the original Notice. In the event a party files a Claim, then the standard procedures for objecting to a proof of claim outlined in Local Bankruptcy Rule 3007-1 shall apply.

Pursuant to the Plan, parties seeking to file a Professional Fee Claim through the filing of a Claim or through a 506(b) Notice must file such Claim or Notice with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court. Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of (i) final requests for

39

allowance and payment of Professional Fee Claims; (ii) an amended Proof of Claim to include the Professional Fee Claim; or (iii) a Notice of 506(b) Claim.

### L.   The Cargill Senior Secured Exit Loan Facility

The Debtors have received a term sheet from Cargill, Incorporated ("Cargill"), for a $120,000,000 Senior Secured Exit Loan Facility. The Borrowers under the Facility include all of the Debtors, and Susan Millenkamp as Trustee of the WJM 2012 Trust, William Millenkamp as Trustee of the SJM 2012 Trust, William John Millenkamp, and Susan Jo Millenkamp (the "Borrowers"). The Lenders under the Facility include Cargill and any other financial institutions selected by Cargill (collectively, the "Lenders").

The Senior Secured Exit Loan Facility consists of an exit facility of revolving loans in an aggregate principal amount of $120,000,000, and uncommitted commodities hedging capacity provided by Cargill (or an affiliate thereof), to enable the Borrowers to enter into commodities hedging products managed by Cargill (or an affiliate thereof). The Facility will mature on the date that is three years from the Closing Date. The Loans will bear interest at the one-month rate for SOFR plus an interest margin of 6.00%. Overdue amounts of principal, interest, fees and other amounts under the Facility shall bear interest at 9% above the otherwise applicable rate. All such interest shall be due on demand. The Facility also consists of a 2% arrangement fee which will be funded out of the new Facility.

The "Borrowing Base" under the Facility will equal the sum of (a) up to 75% of the Borrowers' Eligible Cattle other than Eligible Dairy Cattle, *plus* (b) up to 75% of the Borrowers' Eligible Dairy Cattle, *plus* (c) up to 75% of the Borrowers' Eligible Inventory constituting livestock feed and grain having a value equal to the lesser of (i) cost or (ii) market value, as determined by Cargill in its sole discretion, *plus* (d) up to 80% of the Borrowers' Eligible Prepaid Expenses, *plus* (e) up to 80% of the Borrowers' Eligible Accounts, *plus* (f) up to 100% of the Borrowers' Eligible Growing Crop Investments, *plus* (g) up to [80]% of the Borrowers' Eligible Accounts, *plus* (h) up to 100% of the Borrowers' Eligible Deposit Accounts less 100% of book overdrafts, uncashed checks, and other outstanding debits and obligations of Borrowers as determined by Cargill in its sole discretion, *plus* (i) up to 100% of the Borrowers' Eligible Margin Accounts, *plus* (j) up to 100% of the Borrowers' Eligible Milk Accounts, and *minus* all amounts payable by the Borrowers (i)(x) to vendors for or related to feed for Borrowers' cattle, (y) to vendors and service providers for the production, purchase, transport, storage, shelter, feeding or other maintenance of the Collateral to the extent secured by liens on the Collateral, (z) pertaining to other goods and services provided by vendors and service providers receiving payments under clauses (x) or (y) above, and (ii) which are unpaid more than 90 days after the original due date therefor. For the avoidance of doubt, the Borrowing Base shall not include prepetition accounts payable, including Conterra's mezzanine debt, so long as they are expressly subordinated to the Facility pursuant to written agreement in form and substance reasonably acceptable to Cargill.

40

The Facility and any hedging arrangements with Cargill, the other Lenders or affiliates of Lenders will be secured by a valid and perfected first priority lien (subject to liens permitted under the Loan Documents referred to below) on substantially all assets of the Borrowers and each Loan Party, whether owned on the Closing Date or thereafter acquired (collectively, the "Collateral"), including, without limitation:

(a)     All equity interests and debt held by the Borrowers or any other Loan Party (including joint ventures).

(b)     Substantially all tangible and intangible assets of the Borrowers and the other Loan Parties including but not limited to, inventory, accounts receivable, equipment, fixtures, farm products (including crops grown, growing, or to be grown, livestock, born or unborn, supplies used or produced in Borrowers' operations and products of crops or livestock in their unmanufactured state), general intangibles (including contract rights), intercompany debt, chattel paper, insurance policies, licenses, permits, intellectual property, documents, instruments, indemnification rights, tax refunds, commercial tort claims, letter of credit rights, hedge agreements, investment property, deposit and securities accounts and cash, wherever located (subject to exclusions and limitations to be agreed).

(c)     Milk or other dairy product sale proceeds, subject to the priority milk assignments, claims and rights contemplated by the existing credit facilities between one or more of the Borrowers and Metropolitan Life Insurance Company and MetLife Real Estate Lending LLC (collectively, "MetLife"), with the rights and priorities of the Lenders and MetLife subject to an intercreditor agreement in form and substance reasonably acceptable to Cargill (the "Intercreditor Agreement").

(d)     All proceeds and products of the foregoing.

The Facility and any hedging arrangements with Cargill, the other Lenders or affiliates of Lenders shall also be secured by a valid and perfected second priority lien (subject to liens permitted under the Loan Documents referred to below) on (a) all real property of the Borrowers and each Loan Party and (b) receivables and royalties relating to the Borrowers' and each Loan Party's digester equipment, in each case, as provided in the Intercreditor Agreement.

All pledges, security interests and mortgages covering the Collateral shall be created on terms and pursuant to documentation reasonably satisfactory to Cargill.

Notwithstanding the foregoing, the following assets will be excluded from Collateral: (i) all leasehold interests, (ii) all contracts, licenses and permits to the extent the grant of a security interest therein is prohibited by law or by the terms of such contracts, licenses and permits, in each case after giving effect to the Uniform Commercial Code, and (iii) upon the Borrowers' reasonable request, assets for which Cargill determines that the cost, burden or

consequences (including adverse tax consequences) of obtaining a perfected security interest in such assets substantially exceeds the practical benefit of such collateral to the Lenders. All motor vehicles and other assets subject to certificates of title shall be excluded from the Collateral and not subject to any security interest of Cargill.

The effectiveness of the loan agreement and funding the initial Revolving Loans on the Closing Date shall be subject to the conditions precedent customary for financings of this type, including, without limitation, the conditions precedent set forth on Schedule A of the Terms Sheet and shall be contingent on (i) internal Cargill approval and the approval of any other Lenders and (ii) the Successful Syndication of the commitments under the Facility.

### M.     Plan Filing & Solicitation Exclusivity

On June 27, 2024, the Debtors filed a Motion to Extend the Exclusive Period to File their Disclosure Statement and Plan (Docket No. 467). On July 19, 2024, the Court entered an Order Extending the Exclusive Periods during which the Debtors may file and confirm a Plan (Docket No. 507) (the "Order to Extend Exclusivity"). Pursuant to the Order to Extend Exclusivity, the Debtors period to file a chapter 11 plan was extended to and including September 30, 2024, and the period for Debtors to solicit ballots on a chapter 11 plan was extended to and including November 29, 2024.

### IV.     SUMMARY OF THE CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, or any other operative document, the terms of the Plan, Confirmation Order, or such other operative document, as applicable, shall govern and control; provided that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, in that order, shall govern and control over all other related documents.

## A.    Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents. Classification of Claims and Interests Under the Plan

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.

Under the Plan, Class 2, Class 3A, Class 3E, Class 3H, Class 3I, Class 3J, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 8A, Class 8E, Class 9 are impaired, and Holders of Claims or Interests in such impaired Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan (i.e., Class 10 or a Holder's Claim is subject to an objection filed by the Debtors). Ballots are being furnished herewith to all Holders of Claims in Class 2, Class 3A, Class 3E, Class 3H, Class 3I, Class 3J, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 8A, Class 8E, Class 9 that are entitled to vote to facilitate their voting to accept or reject the Plan. Class 10 is deemed to reject the Plan, and, therefore, Holders of Claims or Interests in such impaired Classes will not vote on the Plan. Class 1, Class 3B, Class 3C, Class 3D, Class 3F, Class 3G, Class 3K, Class 3M, Class 7A, Class 7B, Class 7C, Class 7D, Class 7E, Class 7F, Class 8B, Class 8D, Class 11are Unimpaired under the Plan and therefore deemed to accept the Plan.

### 1.    Classification and Voting Controversies

If a controversy arises regarding whether any Claim is properly classified under the Plan, then the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

## B.    Treatment of Claims and Interests Under the Plan

### 1.    Unclassified Claims.

#### i.    Administrative Claims.

Administrative expenses are costs or expenses of administering the Debtors' Bankruptcy Cases which are allowed under Bankruptcy Code section 507(a)(2). All Persons requesting payment of Administrative Expense Claims, including but not limited to Claims under section 503(b)(9) of the Bankruptcy Code, shall file a proof of Claim with the Court no later than the Administrative Claims Bar Date, which shall be within or no later than the first Business Day that is at least thirty (30) calendar days after the Effective Date. The Administrative Claims Bar Date shall not apply to Professional Persons requesting payment of Professional Fee Claims, DIP Claims, or Priority Tax Claims, or to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases. Objections to such applications for payment (whether by Professional Persons requesting payment of Professional Fee Claims or Persons requesting payment of Administrative Expense Claims), if any, must be written, filed with the Court, and served on the applicable parties within thirty (30) days after such application or Claim is filed (the "Administrative Claims Objection Deadline").

The Debtors or the Reorganized Debtors, as applicable, may object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

Except with respect to Professional Fee Claims, DIP Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor, or after the Effective Date, such Holder and the Reorganized Debtors agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter.

##### a.   503(b)(9) Claims.

As noted in Section III(I) above, on August 29, 2024, the Court entered an Order on

Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims (Docket Nos. 476 & 584) (the "503(b)(9) Order"). Pursuant to the 503(b)(9) Order, 503(b)(9) Claims in the amount of approximately $ 5,170,846.56 have been deemed as Allowed 503(b)(9) Claims. To the extent additional 503(b)(9) Claims exist, such Claim Holders shall file a Claim for allowance of their 503(b)(9) Claim by the Administrative Claims Bar Date. The list of 503(b)(9) Claims already deemed Allowed is noted above in Section III(I).

**ii.    Professional Fee Claims.**

<u>Final Fee Applications.</u> All final requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

<u>Non-Estate Professionals.</u> Pursuant to the Plan, Holders of 506(b) Claims must file, within forty-five (45) days after the Effective Date, either (i) an amended Proof of Claim encompassing the Holder's Professional Fee Claim; or (ii) file a Notice of 506(b) Claim pursuant to the 506(b) claim procedures. Such 506(b) claims submitted as an amended Proof of Claim or through a Notice of 506(b) Claim shall be considered a Professional Fee Claim and subject to the terms of section 3.1.2 of the Plan.

<u>Objections to Professional Fee Claims.</u> Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of (i) final requests for allowance and payment of Professional Fee Claims; (ii) an amended Proof of Claim to include the Professional Fee Claim; or (iii) a Notice of 506(b) Claim.

<u>Professional Fee Claims Estimate.</u> Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtors' Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

<u>Professional Fee Escrow.</u> As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash based on their evaluation of the Professional Fee Claims Estimates, and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow in any way. The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals and for no other Person or Entity until all Professional Fee Claims have been irrevocably paid in full; provided, that funds remaining in the Professional Fee Escrow after

all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow by the Reorganized Debtors without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

<u>Post Effective Date Fees and Expenses.</u> Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors and the Reorganized Debtors, as applicable.

**C.    Priority Tax Claims.**

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

| Priority Tax Claimant | Allowed Priority Amount |
|---|---|
| Cassia County Tax Collector | $59,591.88 |
| Department of Treasury | $1,752.63 |
| Idaho State Tax Commission | $5,612.20 |

**D.    DIP Claims.**

The DIP Claims will be paid in full on the Effective Date by the Exit Term Loan Facility.

**E.    Class 1: Other Priority Claims.**

<u>Classification.</u> Class 1 consists of all Other Priority Claims against each Debtor. There are no known Other Priority Claims.

<u>Treatment.</u> Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

<u>Voting.</u> Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

**F.    Class 2: Corn Silage Group Secured Claims.**

<u>Classification.</u> Class 2 is classified as the Corn Silage Group Secured Claims which consists of the Corn Silage Group Secured Creditors: Ed Chonjnacky, Michael Chonjnacky, Dusty Brow Farms, Inc., Grant 4-D Farms, LLC, Grant & Hagan, Inc., Douglas J. Grant, Hollifield Ranches, Inc., Standing 16 Ranch Land Company, LLC, Star Falls Farms, LLC, Steel Ranch, LLC, Bo Stevenson dba B&A Farms, Alexander K. Reed, Triple C Farms, LLC, Clint D. Thompson, and Jean L. Thompson.

| <u>Claimant</u> | <u>Allowed Claim Amount</u> |
|---|---|
| Ed Chojnacky | $312,330.00 |
| Michael Chojnacky | $393,753.60 |
| Dusty Brow Farms, Inc. | $245,000.00 |
| Grant 4-D Farms, LLC | $396,601.71 |
| Grant & Hagan, Inc. | $604,551.60 |
| Douglas J. Grant | 222,617.06 |
| Hollifield Ranches, Inc. | $2,044,794.31 |
| nding 16 Ranch Land Company, LLC | $526,454.40 |
| Star Falls Farms, LLC | $404,878.00 |
| Steel Ranch, LLC | $160,000.00 |
| Bo Stevenson dba B&A Farms | $195,478.80 |
| Alexander K. Reed | $130,674.66 |
| Triple C Farms, LLC | $1,011,955.80 |
| Clint D. Thompson | $49,000.00 |
| Jean L. Thompson | $38,000.00 |

<u>Treatment.</u> The Corn Silage Group Secured Claims will have been paid in full as of the Effective Date pursuant to monthly adequate protection payments, except as to any pre- and post-petition interest and attorneys' fees associated with their Claims. The Corn Silage Group Secured Claim Holders shall provide to the Debtors no later than five (5) Business Days before the Effective Date a statement of interest and attorneys' fees. Such interest and attorneys' fees shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

<u>Voting.</u> Class 2 is Impaired under the Plan. Each Holder of Class 2 Claims is entitled to vote to accept or reject the Plan.

**G.    Class 3: Other Secured Ag Lien Claims.**

<u>Classification.</u> Class 3 consists of the subclasses of Other Secured Ag Lien Claims that are not considered to be part of the Corn Silage Group.

**1.    Class 3A: A. Scott Jackson Trucking Secured Claim.**

<u>Classification.</u> Class 3A consists of the A. Scott Jackson Trucking Secured Claim.

<u>Treatment.</u> A. Scott Jackson Trucking filed a Proof of Claim in the amount of $184,656.30. A. Scott Jackson Trucking shall have an Allowed Class 3A Claim in the amount of $184,656.30.

Except to the extent that A. Scott Jackson Trucking and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed A. Scott Jackson Trucking Secured Claim, A. Scott Jackson Trucking shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

<u>Voting.</u> Class 3A is Impaired under the Plan. Class 3A is entitled to Vote under the Plan.

**2.    Class 3B: B&H Farming Secured Claim.**

<u>Classification.</u> Class 3B consists of the B&H Farming Secured Claim.

<u>Treatment.</u> B&H Farming filed a Proof of Claim in the amount of $474,674.79 and shall have an Allowed Class 3B Secured Claim in the amount of $474,674.79. B&H Farming has received and will receive adequate protection payments in the amount of $474,674.79 prior to the

Effective Date. As such, the B&H Farming Allowed Class 3B Secured Claim will be paid in full as of the Effective Date and B&H Farming shall receive no further Distribution under the Plan. Any pre-petition liens claimed by B&H Farming in property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3B Unimpaired under the Plan. Class 3B is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3. Class 3C: H&M Custom, LLC Secured Claim.

<u>Classification</u>. Class 3C consists of the H&M Custom, LLC ("H&M") Secured Claim.

<u>Treatment</u>. H&M filed a Proof of Claim in the amount of $4,769,170.78 and H&M shall have an Allowed Class 3C Claim in the amount of $4,769,170.78. H&M received a Court-approved $2,500,000.00 adequate protection payment during the pendency of the Chapter 11 Cases. H&M has received and will receive by the Effective Date additional adequate protection payments totaling $2,269,171.00. As such, the H&M Allowed Class 3C Secured Claim will be paid in full as of the Effective Date and H&M shall receive no further Distribution under the Plan. Any pre-petition liens claimed by H&M in property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3C is Unimpaired under the Plan. Class 3C is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 4. Class 3D: Healthy Earth Enterprises, LLC Secured Claim.

<u>Classification</u>. Class 3D consists of the Healthy Earth Enterprises, LLC ("Healthy Earth") Secured Claim.

<u>Treatment</u>. The Scheduled amount of the Healthy Earth Secured Claim is $60,000.00 and Healthy Earth did not file a Proof of Claim. Healthy Earth shall have an Allowed Class 3D Secured Claim in the amount of $60,000.00. Healthy Earth received a Court-approved $60,000.00 adequate protection payment during the pendency of the Chapter 11 Cases. No further amount will be owing by the Debtors to Healthy Earth as of the Effective Date and therefore Healthy Earth will receive no Distribution under the Plan. Any pre-petition liens claimed by Healthy Earth Enterprises in property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3D is Unimpaired under the Plan. Class 3D is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 5. Class 3E: Kraus Farms, LLC Secured Claim.

<u>Classification</u>. Class 3E consists of the Kraus Farms, LLC ("Kraus Farms") Secured Clam.

a. <u>Treatment</u>. The Scheduled amount of the Kraus Farms Secured Claim is $480,313.10. Kraus Farms filed a Proof of Claim in the amount of $499,473.53 and shall have an Allowed Class 3E Secured Claim in the amount of $499,473.53.

Except to the extent that Kraus Farms and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 3D Secured Claim, Kraus Farms shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

<u>Voting</u>. Class 3E is Impaired under the Plan. The Class 3E Claim is entitled to Vote under the Plan.

### 6. Class 3F: Milner Hay Company, LLC Secured Claim.

<u>Classification</u>. Class 3F consists of the Milner Hay Company, LLC ("Milner") Secured Claim.

<u>Treatment</u>. The Scheduled amount of the Milner Secured Claim is $64,885.00. Milner did not file a Proof of Claim. Milner shall have an Allowed Class 3F Claim in the amount of $64,885.00. Milner has received and will receive post-petition adequate protection payments totaling $64,885.00 prior to the Effective Date. No further amount will be owed by the Debtors to Milner as of the Effective Date and therefore Milner will receive no Distribution under the Plan. Any pre-petition liens claimed by Milner in any property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3F is Unimpaired under the Plan. Class 3F is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 7. Class 3G: Moss Grain Partnership Secured Claim.

<u>Classification</u>. Class 3G consists of the Moss Grain Partnership ("Moss Grain") Secured Claim.

<u>Treatment</u>. Moss Grain filed a Proof of Claim in the amount of $101,000.00 and shall have an Allowed Class 3G Secured Claim in the amount of $101,000.00. Moss Grain has received and will receive post-petition adequate protection payments totaling $101,000.00 prior to the Effective Date. No further amount will be owed by the Debtors to Moss Grain as of the Effective Date and therefore Moss Grain will receive no Distribution under the Plan. Any pre-petition liens claimed

by Moss Grain in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3G is Unimpaired under the Plan. Class 3G is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 8. Class 3H: NorthWest Seed, Inc Secured Claim.

Classification. Class 3H consists of the NorthWest Seed, Inc. ("NorthWest") Secured Claim.

Treatment. The Debtors Scheduled NorthWest as an unknown secured claim based on financing statements filed by NorthWest claiming a security interest in the Debtors' 2024 hay. The Debtors have concluded there is no amount owing to NorthWest as of the Petition Date and NorthWest did not file a Proof of Claim. As such, NorthWest will not receive a Distribution under the Plan. Any pre-petition liens claimed or asserted by NorthWest in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3H is Unimpaired under the Plan. Class 3H is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 9. Class 3I: Performance Plus-Idaho, LLC Secured Claim.

Classification. Class 3I consists of the Performance Plus-Idaho, LLC ("Performance Plus") Secured Claim.

Treatment. The Debtors Scheduled Performance Plus as a secured claim in the amount of $29,931.44. Performance Plus did not file a Proof of Claim and shall have an Allowed Class 3I Secured Claim in the amount of $29,931.44.

Except to the extent that Performance Plus-Idaho, LLC and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 3I Secured Claim, Performance Plus shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

Voting. Class 3I is Impaired under the Plan. Class 3I Claims are entitled to Vote under the Plan.

### 10. Class 3J: Tyche Ag, LLC Secured Claim.

Classification. Class 3J consists of the Tyche Ag, LLC ("Tyche") Secured Claim.

Treatment. The Debtors Scheduled Tyche as an unknown secured claim based on financing statements filed by Tyche claiming a security interest in the Debtors' 2023 hay. The Debtors have concluded there is no amount owing to Tyche as of the Petition Date and Tyche did not file a Proof of Claim. As such, Tyche will not receive a Distribution under the Plan. Any pre-petition liens claimed or asserted by Tyche in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3H is Unimpaired under the Plan. Class 3H is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 11. Class 3K: Wada Farms Partnership Secured Claim.

Classification. Class 3K consists of the Wada Farms Partnership ("Wada Farms") Secured Claim.

Treatment. The Debtors Scheduled Wada Farms as a secured claim in the amount of $374,432.50. Wada Farms did not file a Proof of Claim. It shall have an Allowed Class 3K Secured Claim in the amount of $374,432.50. Wada Farms has received and will receive post-petition adequate protection payments totaling $374,432.50 prior to the Effective Date. No further amount will be owed by the Debtors to Wada Farms as of the Effective Date and therefore Wada Farms will receive no Distribution under the Plan. Any pre-petition liens claimed or asserted by Wada Farms in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3K is Unimpaired under the Plan. Class 3K is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 12. Class 3L: Youree Land & Livestock Secured Claim.

Classification. Class 3L consists of the Youree Land & Livestock ("Youree") Secured Claim.

Treatment. Youree filed a Proof of Claim in the amount of $119,042.08 and shall have an Allowed Class 3L Secured Claim of $119,042.08. Youree has received and will receive post-petition adequate protection payments in the amount of $112,157.00 prior to the Effective Date. After payment of the adequate protection payments, the Debtors will owe Youree $6,885.06 on the Effective Date, which Plus shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

Voting. Class 3L is Impaired under the Plan. The Class 3L Secured Claim is entitled to Vote under the Plan.

### 13. Class 3M: Eagle Creek Northwest, LLC Claim.

Classification. Class 3M consists of the Eagle Creek Northwest, LLC ("Eagle Creek") Secured Claim.

Treatment. The Debtors Scheduled Eagle Creek as an unknown secured claim based on financing statements filed by Eagle Creek claiming a security interest in the Debtors' wheat, hay, potatoes, and sugar beets. The Debtors have concluded there is no amount owing to Eagle Creek as of the Petition Date and Eagle Creek did not file a Proof of Claim. As such, Eagle Creek will not receive a Distribution under the Plan. Any pre-petition liens claimed or asserted by Eagle Creek in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3M is Unimpaired under the Plan. Class 3M is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 14. Class 3N: Standlee Ag Resources and Premium Products Secured Claim.

Classification. Class 3N consists of the Standlee Ag Resources and Premium Products (collectively referred to herein as "Standlee") Secured Claim.

Treatment. Standlee filed a Proof of Claim in the amount of $214,915.55 and shall have an Allowed Class 3N Secured Claim in the amount of $214,915.55. Standlee has received and will receive post-petition adequate protection payments totaling $208,490.00 prior to the Effective Date. After payment of the adequate protection payments, the Debtors will owe Standlee $6,425.55 on the Effective Date, which shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

Voting. Class 3N is Impaired under the Plan. The Class 3N Claim is entitled to Vote under the Plan.

### H.   Class 4: MetLife Secured Claims.

Classification. Class 4 consists of MetLife's Secured Claims.

Treatment. MetLife filed Proofs of Claim in the aggregate amount of $181,376,198.66. The Debtors' books and records reflect a total amount owing to MetLife of $184,177,739.10. The Debtors are conducting a reconciliation of their books and records and MetLife's Proofs of Claim. As of the filing of this Plan, MetLife shall have an Allowed Class 4 Secured Claim in the amount of $184,177,739.10.

The Allowed Class 4 Secured Claim shall receive the following treatment:

    1) Interest-only payments at the non-default rate for the first 30 months following the Effective Date. The terms of the Pre-Petition MetLife

Loans shall remain the same, except the interest rate on the Pre-Petition MetLife Loans shall be increased to 6% per annum.

    2) MetLife shall file a Professional Fee Claim pursuant to section 3.1.2 of the Plan. Upon Allowance of MetLife's Professional Fee Claim, MetLife shall roll the amount of the Professional Fee Claim into the principal balance of the Pre-Petition MetLife Loans.

    3) At month 31 following the Effective Date, the Allowed Class 4 Secured Claim shall begin receiving monthly principal and interest payments pursuant to the Budget.

Voting. Class 4 is Impaired under the Plan. Class 4 is entitled to Vote under the Plan.

### I.   Class 5: Rabo Secured Claims.

Classification. Class 5 consists of Rabo's Secured Claims.

Treatment. Rabo filed a Proof of Claim in the amount of $96,143,211.38.

Proof of Claim Amount:

Principal:  $93,098,575.54
Interest (as of April 2, 2024): $1,818,831.21
Fees and Costs (as of April 2, 2024): $1,219,525.43
Unused Commitment Fee: $6,280.20
TOTAL: $96,143,211.38

The Debtors' books and records reflect a total principal amount owing to Rabo of $90,952,408.00. The Debtors are conducting a reconciliation of their books and records and Rabo's Proof of Claim to determine the principal balance owed to Rabo as of the Petition Date.

Rabo shall forgive the pre-petition and post-petition default interest and professional fees owing on the Rabo Secured Claims. As such, Rabo shall have an Allowed Class 5 Secured Claim in the amount of $90,952,408.00.  The Allowed Class 5 Claim shall be paid in full on the Effective Date.

Voting. Class 5 is Impaired under the Plan. Class 5 is entitled to Vote under the Plan.

### J.   Class 6: Conterra Secured Claims.

Classification. Class 6 consists of Conterra's Secured Claims.

Treatment. Conterra filed Proofs of Claim in the aggregate amount of $21,460,993.60.

German Note Proof of Claim Amount:

Unpaid Principal: $2,508,860.41

Accrued Interest through 4/2/24: 67,867.67

Total unpaid balance as of 4/2/24: **$2,576,728.08**

Mezz Loan Proof of Claim Amount:

Unpaid Principal: $16,500,000.00

Accrued Interest through 4/2/24: $1,457,810.41

Late Fees: $830,614.58

Reimbursable Expenses: $95,840.53

Total unpaid balance as of 4/2/24: **$18,884,265.52**

Conterra has an Allowed Class 6 Secured Claim in the amount of $21,460,994, plus professional fees and costs upon Allowance of any Professional Fee Claim Conterra files pursuant to section 3.1.2 of this Plan. The Debtors are conducting a reconciliation of their books and records compared to Conterra's Proofs of Claim and will update the Allowed Claim as necessary based on such reconciliation.

The German Note shall be re-amortized and paid in full within 24 months of the Effective Date through monthly principal and interest payments pursuant to the Budget. The Mezz Loan shall receive PIK interest at 15% for the first three years of the Plan, through December 2027. Starting in Year 4 of the Plan, the balance of the Mezz Loan shall be amortized over five years with principal and interest payments at 15%.

Conterra's Allowed Professional Fee Claim shall be rolled into the principal balance of the Mezz Loan.

Voting. Class 6 is Impaired under the Plan. Class 6 is entitled to Vote under the Plan.

**K.    Class 7: Secured Equipment and Vehicle Lien Claims.**

Classification: Class 7 consists of the subclasses of the Secured Equipment and Vehicle Lien Claims.

**1.    Class 7A: CNH Industrial Capital Secured Claim.**

Classification. Class 7A consists of the CNH Industrial Capital ("CNH") Secured Claim.

Treatment. CNH filed Proofs of Claim in the total aggregate amount of $17,915,944.14.

| POC # | POC Amount | Document | Collateral |
|-------|------------|----------|------------|
| Claim 110 | $1,980,095.12 | Equipment Lease 765512 | 6 Magnum Tractors |
| Claim 111 | $2,438,189.14 | Equipment Lease 765542 | 4 Case Steigers & Remotes |
| Claim 112 | $5,294,925.12 | Equipment Lease 210982 | 26 Magnum Tractors |
| Claim 113 | $4,796,579,94 | Equipment Lease 765784 | 16 Magnum Tractors |
| Claim 114 | $2,587,321.81 | Equipment Loan 765552 | 30 Case Maxxum Tractors |
| Claim 115 | $470,430.75 | Equipment Loan 765530 | 25 Kubota Tractors |
| Claim 116 | $207,310.38 | Productivity Plus Credit Line 373662 | All collateral financed/leased by CNH |
| Claim 117 | $141,091.88 | Productivity Plus Credit Line 373203 | All collateral financed/leased by CNH |

CNH shall have an Allowed Class 7A Claim in the amount of $17,915,944.14. CNH has received and will receive post-petition adequate protection payments prior to the Effective Date. Except to the extent CNH and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7A Claim, CNH shall continue to be paid in accordance with the provisions of the pre-petition contracts in the amounts required by those contracts, currently approximately $242,716.00 per month.

Voting. Class 7A is Unimpaired under the Plan. Class 7A is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 2. Class 7B: Daimler Truck Financial Services USA LLC Secured Claim.

Classification. Class 7B consists of the Daimler Truck Financial Services USA LLC ("Daimler") Secured Claim.

Treatment. Daimler filed a Proof of Claim in the amount of $1,534,278.22. Daimler shall have an Allowed Secured Claim in the amount of $1,534,278.22. Daimler has received and will receive post-petition adequate protection payments in the amount of $563,354.00 before the Effective Date.

Except to the extent Daimler and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7B Claim, Daimler shall continue to be paid in accordance with the provisions of the pre-petition contracts with Debtors, in the amounts required by those contracts, currently approximately $63,926.00 per month.

Voting. Class 7B is Unimpaired under the Plan. Class 7B is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3. Class 7C: Farmers Bank.

Classification. Class 7C consists of the Farmers Bank Secured Claim.

Treatment. Farmers Bank filed Proofs of Claim totaling $2,474,927.97.

| POC # | POC Amount | Collateral |
|---|---|---|
| Claim 35 | $294,173.07 | 2024 Ram Pickups |
| Claim 36 | $10,975.50 | Con-Dor Peecon 1700 Feed Mixer |
| Claim 37 | $96,225.11 | 2021 Ram Pickups |
| Claim 38 | $26,211.20 | Nuhn Alley Vac Manure Wagon 7000 Gal Tank |
| Claim 39 | $269,908.99 | Caterpillar Diesel Generators |
| Claim 40 | $280,789.94 | Caterpillar Diesel Generators |
| Claim 41 | $140,596.63 | SmithCo Side Dump Trailers |
| Claim 42 | $166,267.09 | 2022 Ram Pickups |
| Claim 43 | $132,902.49 | Con Dor Peecon 1700 Feed Mixer |
| Claim 44 | $56,558.60 | 2022 Mahindra UTB |
| Claim 45 | $100,364.26 | 2024 Wilson 53' Livestock Trailers |

Farmers Bank shall have an Allowed Class 7C Secured Claim in the amount of $2,474,972.97. Farmers Bank has received and will receive post-petition adequate protection payments totaling $933,289.47 prior to the Effective Date.

Except to the extent Farmers Bank and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7C Claim, Farmers Bank shall continue to be paid in accordance with the provisions of its pre-petition contract with the Debtors, in the amounts required by the contract, currently approximately $105,706.00 per month.

Voting. Class 7C is Unimpaired under the Plan. Class 7C is Unimpaired under the Plan. Class 7C is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 4. Class 7D: John Deere Construction & Forestry Secured Claim.

Classification. Class 7D consists of the John Deere Construction & Forestry ("John Deere") Secured Claim.

Treatment. John Deere filed Proofs of Claim in the aggregate amount of $948,846.69.

| POC # | POC Amount | Collateral |
|-------|-----------|------------|
| Claim 20 | $119,6060.55 | Cross Collateralized Loan with all Deere Loans/Collateral |
| Claim 21 | $121,475.50 | Hamm 10i Compactors |
| Claim 22 | $151,965.48 | Hamm 121 P |
| Claim 23 | $69,597.45 | John Deere 50G Compact Excavator |
| Claim 24 | $69,957.45 | John Deere 50G Compact Excavator |
| Claim 25 | $187,368.29 | 2023 John Deere 650P-Tier Utility Dozer |
| Claim 26 | $116,806.61 | John Deere 320 P-Tier Backhoe Loader |
| Claim 27 | $232,035.91 | 2023 John Dere 135 P-TIER Backhoe Loader AND 2023 John Deere EC13 QS60 COMPLETE SYSTEM W/ 2 BUCKETS |

John Deere shall have an Allowed Class 7D Secured Claim in the amount of $948,846.69. John Deere has received and will receive post-petition adequate protection payments in the amount of $212,083.62 prior to the Effective Date.

Except to the extent John Deere and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7D Claim, John Deere shall continue to be paid in accordance with the provisions of its pre-petition contracts with Debtors in the amounts required by the contracts.

Voting. Class 7D is Unimpaired under the Plan. Class 7D is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 5.   Class 7E: Western States Cat Secured Claim.

Classification. Class 7E consists of the Western States Cat ("Western States") Secured Claim.

Treatment. The Debtors Scheduled Western States as a secured claim in the amount of $688,964.59. Western States did not file a Proof of Claim and shall have an Allowed Class 7E Secured Claim in the amount of $688,964.59. Western States has received and will receive post-petition adequate protection payments in the amount of $596,071.02 prior to the Effective Date.

On May 22, 2024, the Bankruptcy Court approved the Debtors' assumption of the Previous Rental Agreement when it issued its Final Order (A) Granting Motion to Condition Use of WSECO's Equipment on Receipt of Adequate Protection, and (B) Granting Debtor's Motion for Order Authorizing the Debtor to Assume Unexpired Lease (Docket. No. 314). The Previous Rental Agreement expired on June 30, 2024. On July 1, 2024, the Debtors and Western States Cat entered into a New Rental Agreement (the "New Rental Agreement").

Pursuant to the New Rental Agreement, Western States shall deliver an invoice to the Debtors by the twenty-fifth (25th) of each month detailing the amount of the monthly rent and expense amounts based on the hourly usage of the equipment from the previous month and using the rate of Total Costs Per Hour (or CPH) as set forth on Exhibit B of the New Rental Agreement. The Debtors shall pay the rent and expenses due under each monthly invoice within ten (10) calendar days.

Except to the extent Western States Cat and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7E Claim, Western States Cat shall continue to be paid in accordance with the provisions of the New Rental Agreement in the amounts required by the New Rental Agreement.

Voting. Class 7E is Unimpaired under the Plan. Class 7E is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 6.   Class 7F: Kenworth Sales Company Secured Claim.

Classification. Class 7F consists of the Kenworth Sales Company ("Kenworth") Secured Claim.

Treatment. Kenworth filed a Proof of Claim in the amount of $49,359.77 and shall have an Allowed Class 7F Secured Claim in the amount of $49,359.77. Kenworth has received and will receive post-petition adequate protection payments totaling $48,677.75 prior the Effective Date.

Except to the extent Kenworth and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7D Claim, Kenworth shall continue to be paid in accordance with the provisions of

its pre-petition contracts with Debtors in the amounts required by the contracts.

Voting. Class 7F is Unimpaired under the Plan. Class 7F is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**L.    Class 8: Other Secured Claims.**

Classification. Class 8 consists of Other Secured Claims.

**1.    Class 8A: MWI Veterinary Secured Claim.**

Classification. Class 8A consists of the MWI Veterinary Secured Claim.

Treatment. MWI Veterinary filed three Proofs of Claim in the aggregate amount of $2,566,484.67.

| Case | Proof of Claim Amount |
|------|----------------------|
| Millenkamp Cattle, Inc. | $2,525,459.31 |
| Idaho Jersey Girls, LLC | $25,375.92 |
| Black Pine Cattle, LLC | $15,650.17 |

MWI Veterinary received a Court-approved adequate protection payment during the pendency of this Bankruptcy Case in the amount of $500,127.14 and has an Allowed 503(b)(9) Claim in the amount of $484,255.92. Based on the Debtors' books and records as of the filing of this Plan, MWI Veterinary is owed $2,063,428.20. After deduction of the 503(b)(9) Claim, MWI Veterinary shall have an Allowed Class 8A Secured Claim in the amount of $1,579,172.28.

Except to the extent MWI Veterinary and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 8A Secured Claim, the Allowed Class 8A Claim shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

Voting. Class 8A is Impaired under the Plan. Class 8A is entitled to Vote under the Plan.

**2.    Class 8B: Performix Nutrition Systems Secured Claim.**

Classification. Class 8B consists of the PerforMix Nutrition Systems ("PerforMix") Secured Claim.

Treatment. PerforMix filed a Proof of Claim in the amount of $213,744.20 and shall have an Allowed Class 8B Secured Claim in the amount of $213,744.20. PerforMix has received and will receive post-petition adequate protection payments totaling $213,744.20 prior to the Effective Date. No further amount will be owed by the Debtors to PerforMix as of the Effective Date and therefore PerforMix will receive no Distribution under the Plan. Any pre-petition liens claimed or asserted by PerforMix in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 8B is Unimpaired under the Plan. Class 8B is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**3.    Class 8C: Rexel USA, Inc. d/b/a Platt Electric Supply Claim.**

Classification. Class 8C consists of the Rexel USA, Inc. d/b/a Platt Electric Supply ("Platt") Claim.

Treatment. Platt filed a Proof of Claim in the secured amount of $504,414.02. The Proof of Claim is Disputed and the Debtors will be filing an objection to the full amount of the Proof of Claim. As such, the Debtors will set aside the full amount of the Class 8C Claim in the amount of $504,414.02 in the Distribution Reserve.

Voting. Class 8C is Impaired under the Plan. Class 8C Claims are entitled to Vote under the Plan as a Holder of a General Unsecured Claim in Class 9.

**4.    Class 8D: Staker & Parson Company d/b/a Idaho Materials & Construction Claim.**

Classification. Class 8D consists of the Staker & Parson Company d/b/a Idaho Material & Construction ("Idaho Material") Claim.

Treatment. Idaho Material filed an unsecured Proof of Claim in the amount of $48,207.17 in the Millenkamp Cattle, Inc. Case and a secured Proof of Claim in the amount of $48,207.17 in the East Valley Cattle, LLC Case. The Notice of Claim of Lien was recorded on April 30, 2024, as Cassia County Instrument No. 2024001489.

Idaho Material will receive by the Effective Date adequate protection payments totaling $48,207.17. As such, the Idaho Material Allowed Class 8D Secured Claim will be paid in full as of the Effective Date and Idaho Material shall receive no further Distribution under the Plan. Any

pre-petition liens claimed by Idaho Material in property of the Debtors shall be considered released and have no further effect.

    Voting. Class 8D is Unimpaired under the Plan. Class 8D is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**5.**    **Class 8E: Les Schwab Tire Centers of Idaho, LLC Claims.**

    Classification. Class 8E consists of the Les Schwab Tire Center of Idaho LLC ("Les Schwab") Claims.

    Treatment. Les Schwab filed two Proofs of Claim in the aggregate amount of $255,256.55.

| Case | Proof of Claim Amount | 503(B)(9) Claim Amount Approved |
|---|---|---|
| Millenkamp Cattle, Inc. | $151,173.71 | $26,643.97 |
| Black Pine Cattle, LLC | $102,082.84 | $0 |

    Pursuant to the 503(b)(9) Order, Les Schwab has an Allowed 503(b)(9) Claim in the amount of $26,643.97. Les Schwab will be paid, in Cash, its Allowed 503(b)(9) Claim as an Administrative Claimant in the amount of $26,643.97, on or as soon as reasonably practicable after the Effective Date. The remainder of the Les Schwab Claim, in the amount of $226,612.58, shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

    Voting. Class 8E is Impaired under the Plan. The Class 8E Claim is entitled to Vote under the Plan.

**M.**    **Class 9: General Unsecured Claims.**

    Classification. Class 9 consists of all General Unsecured Claims, in the approximate amount of $27 million (the "GUC Principal Amount"). A full listing of the General Unsecured Claims and amounts of each Claim is included as Exhibit E of the Disclosure Statement.

    Treatment. The Holders of Class 9 Claims shall receive the following treatment under the Plan:

        i.    5% quarterly interest payments for four years, through

December of 2028

        ii.    10% of the GUC Principal Amount paid as quarterly payments in 2025

        iii.    20% of the GUC Principal Amount paid as quarterly payments in 2026

        iv.    30% of the GUC Principal Amount paid as quarterly payments in 2027

        v.    40% of the GUC Principal Amount paid as quarterly payments in 2028

    The Holders of Class 9 Claims shall be 100% of their Claims through the foregoing payment schedule by December of 2028.

    Voting. Class 9 is Impaired under the Plan. The Holders of Class 9 Claims are entitled to Vote under the Plan.

**N.**    **Class 10: Intercompany Claims.**

    Classification. Class 11 consists of all Intercompany Claims.

    Treatment. On the Effective Date, all Intercompany Claims shall be extinguished. Holders of Intercompany Claims will receive no Distributions under the Plan.

    Voting. Each Holder of a Class 10 Claim will be deemed to have rejected the Plan and, therefore, are not entitled to vote on the Plan.

**O.**    **Class 11: Equity Interests.**

    Classification. Class 11 consists of all Equity Interests in the Debtors.

    Treatment. Each Debtors' pre-petition equity interests shall remain the same post-petition. Class 11 Claim Holders are retaining ownership interests in the Debtors.

    Voting. Class 11 is Unimpaired under the Plan. Class 11 is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**P.**    **Special Provisions Regarding Unimpaired Claims.**

    Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal

and equitable, with respect to any Reinstated Claim or otherwise Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or otherwise Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights and defenses with respect to any Reinstated Claim or otherwise Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 1.   Debtors' Releases and Related Matters

On the Effective Date and to the fullest extent authorized by applicable law, the Released Parties and their respective property will be expressly, unconditionally, generally, individually, and collectively released, acquitted,  and discharged by the Debtors on behalf of themselves, their estates, the Reorganized Debtors, for the good and valuable consideration provided by each of the Released Parties, from any and all actions, claims, debts, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative or deficiency claims asserted or that could be asserted by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by state law (including Idaho State partnership law), statute, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, any of the Debtors' present or former assets, the Released Parties' interests in or management of the Debtors, the Plan, the Disclosure Statement, these Chapter 11 Cases, including those that the Debtors, the Reorganized Debtors would have been legally entitled to assert or that any Holder of a Claim against or interest in the Debtors or any other Entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their Estates; *provided*, *however*, that the foregoing Debtors' Releases shall not operate to waive or release any Claims or Causes of Action of the Debtors or their Estates against a Released Party arising under any contractual obligation owed to the Debtors, the Reorganized Debtors that is entered into pursuant to the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' Releases set forth in Section 10.1(a) of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtors'

Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the Debtors' Releases; (3) in the best interests of the Estates and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar against any of the Estates, the Post-Effective Date Debtors, asserting any Claim or Cause of Action released pursuant to the Debtors' Releases

### 2.   Exculpation and Limitation of Liability

The Exculpated Parties will neither have nor incur any liability to any entity for any claims or Causes of Action arising on or after the Petition Date and prior to the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases, (ii) any other sales consummated during the Chapter 11 Cases, (iii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including the Disclosure Statement, (iv) any other post-petition act taken or omitted to be taken in connection with or in contemplation of Confirmation of the Plan, or (v) the approval of the Disclosure Statement and Plan or Confirmation or Consummation of the Plan, *provided*, *however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct.

The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and Distributions pursuant to the Plan, and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

### 3.   Term of Injunctions or Stays

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN SECTIONS 10.1 AND 10.2 OF THE PLAN, THE APPLICABLE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM

COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED UNDER THE PLAN OR THE CONFIRMATION ORDER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN OR THAT ARE SUBJECT TO THE EXCULPATORY PROVISIONS OF SECTION 10.2, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST, THE REORGANIZED DEBTORS AND EACH OF THEIR RESPECTIVE ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE. NOTHING IN THIS SECTION 10.4 SHALL ENJOIN ANY CLAIM OR CAUSE OF ACTION THAT IS

NOT RELEASED OR EXCULPATED PURSUANT TO SECTIONS 10.1, 10.2, AND 10.3 OF THE PLAN OR THE CONFIRMATION ORDER.

NOTWITHSTANDING ANY OTHER PROVISION OF THE PLAN TO THE CONTRARY, THE DEBTORS SHALL NOT RECEIVE A DISCHARGE.

### 4. Good Faith.

Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all of their respective Related Parties have acted in good faith in connection therewith.

### Q. MEANS FOR IMPLEMENTATION OF PLAN

#### 1. Substantive Consolidation

On the Effective Date, the Assets and liabilities of the Debtors shall be deemed substantively consolidated for purposes of implementing the Plan. Other than for purposes of implementing the Plan, the Debtors and their assets and liabilities shall not be deemed consolidated.

#### 2. Restructuring Transactions.

On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123

of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 3. Sources of Consideration for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions under the Plan with Cash on hand from ongoing business operations and the proceeds of the Exit Term Loan Facility.

### 4. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all the Debtors' Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5. Authority

The Reorganized Debtors shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

**a.** review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

**b.** calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

**c.** retain, compensate, and employ professionals and other Persons to represent the Reorganized Debtors with respect to and in connection with its rights and

responsibilities;

**d.** establish, maintain, and administer documents and accounts of the Debtors or Reorganized Debtors as appropriate;

**e.** maintain, conserve, collect, settle, and protect the Reorganized Debtors' Assets (subject to the limitations described herein);

**f.** sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Reorganized Debtors' Assets, or any part thereof or interest therein upon such terms as the Reorganized Debtors determine to be necessary, appropriate, or desirable;

**g.** negotiate, incur, and pay the Reorganized Debtors' Expenses; and

**h.** prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors or Reorganized Debtors that are required under the Plan, by any governmental unit, or by applicable law, including but not limited to filing any reports required by the Bankruptcy Code or Bankruptcy Rules that are due to be filed after the Effective Date and paying any fees required by 28 U.S.C. § 1930 that are due to be paid after the Effective Date.

### 6. Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), or any agreement, instrument, or other document incorporated in the Plan on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non- bankruptcy law).

### 7. Employee Obligations

Except as (i) otherwise provided in the Plan (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the

Confirmation Hearing, the Reorganized Debtors shall honor the Debtors' Employee Obligations and, to the extent not already satisfied, the Debtors' Employee Obligations shall become obligations of the Reorganized Debtors in accordance with their terms.

To the extent the Employee Obligations are executory contracts and (i) such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and plans.

On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

### 8.    Workers Compensation Program

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs.

### 9.    Pursuit and Resolution of Reorganized Debtors' Causes of Action

The Reorganized Debtors, may, and will have the exclusive right, power, and interest on behalf of the Debtors, and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Reorganized Debtors' Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided in the Plan. From and after the Effective Date, the Reorganized Debtors, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as representative of the Estates with respect to any and all Reorganized Debtors' Causes of Action that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Reorganized Debtors' Causes of Action in any court or other tribunal.

### 10.    No Successor Liability

Except as otherwise expressly provided in the Plan and Confirmation Order, the

71

Reorganized Debtors (i) are not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors prior to the Effective Date; (ii) are not, and shall not be, successors to the Debtors by any reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

### 11.    Preservation of Privileges and Defenses

The actions taken by the Debtors, the Reorganized Debtors, or any of their respective Related Parties in connection with the Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors or the Reorganized Debtors, as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtor providing any privileged information related to the Reorganized Debtors, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Reorganized Debtors Causes of Action and shall remain privileged. The Reorganized Debtors shall retain the right to waive their own privileges. Only the Reorganized Debtors shall have the right to waive the attorney- client privilege, work-product doctrine, or other protections as to the Debtors and the Reorganized Debtors.

### 12.    Preservation of Rights of Action

#### a.    Maintenance of Avoidance Actions and Causes of Action.

Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, the Reorganized Debtors will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors', the Estates', or the Reorganized Debtors' Causes of Action (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as Reorganized Debtors' Causes of Action, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as successor in interest to the Debtors and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, and the Estates to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Reorganized Debtors' Causes of Action without notice to or approval from the Bankruptcy Court. In accordance with the Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the Reorganized Debtors may compromise and settle the Reorganized Debtors' Causes of Action.

#### b.    Preservation of All Reorganized Debtors' Causes of Action Not Expressly Settled or Released

72

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Reorganized Debtors' Cause of Action is not intended to and shall not limit the rights of the Reorganized Debtors to pursue any such Avoidance Actions or Causes of Action. Unless a Reorganized Debtors' Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Causes of Action for later resolution by the Reorganized Debtors (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits.

### 13.   Cancellation of Instruments

Except to the extent necessary to give effect to the treatment of any Holder of an Allowed Claim and except with respect to any executory contracts and unexpired leases that are assumed under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be released.

### 14.   Insurance Policies

#### a.   Insurance Policies Remain in Force

Up to and including their policy expiration date(s), any and all Insurance Policies in effect as of the Effective Date shall remain in full force and effect according to their terms and the coverage obligations of the insurers and third-party administrators under such Insurance Policies shall continue following the Effective Date (including any obligations to pay, defend, and process insured claims).

#### b.   Insurance Policies; Employment Practice Liability Policies

Nothing contained in the Plan shall affect or impair the rights of any non- Debtor insured persons covered under any Insurance Policy, which expressly includes any director and officer, employment practices, or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

### R.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### 1.   Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court with the effective date of such rejection is after the Effective Date; provided, that, nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; and provided further, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its

terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti- assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

**i.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Section 3.10 of the Plan</u>, and such claims may be objected to in accordance with the Plan.

**ii.    Assumption of East Valley Development Contracts**

In 2021, the Debtors and East Valley Development ("EVD") entered into several agreements with EVD, specifically, (a) that certain Manure Supply Agreement, dated effective as of October 8, 2021, by and between Millenkamp Cattle, Inc., and EVD, and acknowledged and agreed to by East Valley Cattle, LLC as amended by that certain First Amendment to Manure Supply Agreement dated as of June 22, 2023 (as amended, the "MSA"); and (b) that certain Ground Lease Agreement dated effective as of October 8, 2021, between Millenkamp Cattle, Inc. and EVD, as amended by (i) that certain First Amendment to Ground Lease Agreement dated effective as of February 17, 2022, (ii) that certain Second Amendment to Ground Lease Agreement dated as of April 25, 2023, and (iii) that certain Third Amendment to Ground Lease Agreement dated as of June 22, 2023, (as amended, the "Ground Lease" and, together with the MSA, collectively, the "Facility Agreements"). The Debtors are assuming these contracts. As such, the EVD contracts are on the initial Assumed Executory Contracts and Unexpired Leases Schedule and will remain on such schedule.

**iii.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three (3) Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

Unless otherwise provided by an order of the Bankruptcy Court, the Debtors have attached as schedules their initial Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule. The Debtors shall file their final list of Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan, which shall supersede the initial schedule if any such initial schedule is filed. The Debtors shall cause all Filed

Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule. The Debtors may supplement or modify the Assumed Executory Contract and Unexpired Leases Schedule or Rejected Executory Contracts and Unexpired Leases Schedule up to one (1) Business Day prior to the Confirmation Hearing. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed, served and actually received by the Debtors by the later of (1) the Confirmation Objection Deadline or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contract and Unexpired Leases Schedule.

**Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Executory Contracts and Unexpired Leases Schedule as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the Assumed Executory Contracts and Unexpired Leases (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim, shall result in the full release and satisfaction of any Claims or defaults against the Debtors, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; provided, that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

#### iv. Assumption Dispute Resolution

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "Assumption Dispute") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "Adjourned Cure Dispute").

#### v. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

### S.    RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

#### 1.    Parties May Object to the Plan's Classification of

**Claims and Interests**

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2.      The Debtors May Not Be Able to Obtain Confirmation of the Plan**

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

**3.      Claims Estimation and Allowance of Claims**

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

**4.      Tax Considerations**

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Interests, and other interested parties should read carefully the discussion set forth in Article IX for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

**T.      CONFIRMATION OF THE PLAN**

**1.      The Confirmation Hearing**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **[_],** **2024, at [_:_] [_].m. (Mountain Time)**, before the Honorable Noah G. Hillen, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Idaho. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than **[14 calendar days prior to the Confirmation Hearing. Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Confirmation Hearing Notice, they may not be considered by the Bankruptcy Court**.

**2.      Requirements for Confirmation of the Plan**

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Debtors believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such

payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

### 3. Best Interests of Creditors

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accepts the Plan or (2) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the amount such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interests" test. The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan. To that end, please see the Liquidation Analysis attached here as Exhibit B, which shows the Debtors assumed distributions in a hypothetical chapter 7 case.

### 4. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors' management has prepared the financial projections, as set forth in Exhibit C (the "Financial Projections").

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims

entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that confirmation of the Plan is not likely to be followed by liquidation of the Reorganized Debtors or the need for further restructuring.

### 5. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### 6. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan

Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

### 7.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 8.    Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Debtors submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that the applicable "fair and equitable" standards are met.

### 9.    Alternatives to Confirmation and Consummation of
the Plan

The Debtors believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of analternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed

and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtors believe that the Plan will provide each Holder of an Allowed General Unsecured Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Please see the Liquidation Analysis attached here as Exhibit B.

### 10.    Revocation, Withdrawal, or Non-Consummation.

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, any Debtor, or any Causes of Action by or against any Debtor or anyother Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission ofany sort by any Debtor or any other Person.

### U.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITYAND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the U.S. Holders (as defined below) of (i) "Secured Claims" and (ii) "UnsecuredClaims". This discussion is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the Plan to any specific Holder of a Claim. The Debtors will not

seek a ruling from the Internal Revenue Service (the "IRS") and have not obtained an opinion of counsel regarding any tax consequences of the Plan to the Debtors or any Holder of a Claim. No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), or the tax consequences arising under the laws of any foreign, state, local or other jurisdiction or any income tax treaty. The Debtors intend to treat, and this discussion assumes that, the Secured Claims will be treated for U.S. federal income tax purposes in accordance with their form and as interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.

This discussion does not address any U.S. federal income tax consequences to a beneficial owner of a Secured Claim or an Unsecured Claim that is not a U.S. Holder (a "Non-U.S. Holder"). Non-U.S. Holders should consult their own independent tax advisors regarding the U.S. federal income tax consequences of the implementation of the Plan, including whether Non-U.S. Holders may be subject to any U.S. federal withholding tax or U.S. federal income tax with respect to any payment on Secured Claims or Unsecured Claims.

This discussion does not describe all of the tax consequences that may be relevant in light of a U.S. Holder's particular circumstances, including, but not limited to, the potential application of provisions of the Tax Code known as the unearned income Medicare contribution tax, or tax consequences applicable to Holders of Secured Claims or Unsecured Claims that are otherwise subject to special treatment under the Tax Code, such as: financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; persons who hold or will hold Secured Claims, or Unsecured Claims as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; U.S. Holders who hold or will hold Secured Claims or Unsecured Claims through non-U.S. brokers or other non-U.S. intermediaries; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons required to accelerate the recognition of any item of gross income with respect to the Secured Claims as a result of such income being recognized on an "applicable financial statement" (within the meaning of section 451(b) of the Tax Code); holders that are related persons with the Debtors under section 267 of the Tax Code; and holders not entitled to vote on the Plan. If an entity that is classified as a partnership for U.S. federal income tax purposes holds or will hold Secured Claims or Unsecured Claims, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the activities of the partnership. Partnerships holding or that will hold Secured Claims or Unsecured Claims and partners in such partnerships should consult their tax advisors as to the particular U.S. federal income tax consequences of owning and disposing of Secured Claims or Unsecured Claims.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Secured Claim or an Unsecured Claim that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (a) the administration of which is subject to the primary supervision of a U.S. court and that has one or more United States persons that have the authority to control all substantial decisions of the trust or (b) that has made a valid election under applicable Treasury regulations to be treated as a United States person.

**THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF SECURED CLAIMS OR UNSECURED CLAIMS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims and Interests are hereby notified that any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the IRC.*

1.      **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Secured Claims**

        i.      **Taxable Exchange**

Each U.S. Holder of a Secured Claim should recognize gain or loss in a taxable exchange of its Claim equal to the difference between (x) the sum of (a) the amount of any Cash received by such U.S. Holder and (b) the fair market value of any property received by such U.S. Holder for such Claim (excluding in the case of (a) and (b), any amount attributable to accrued but unpaid interest on such Claim, which amount will be taxable as described below), and (y) such U.S. Holder's adjusted basis, if any, in such Claim. Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Secured Claim in such U.S. Holder's hands, whether such Claim was purchased

at a discount, whether there is any accrued but unpaid interest on such Claim, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to such Claim. See Sections IX.A.2 and IX.A.3 of this Disclosure Statement entitled "Accrued Interest" and "Market Discount."

### ii.   Accrued Interest

To the extent that any amount received by a U.S. Holder of a Secured Claim is attributable to accrued but unpaid interest on the debt instruments constituting such surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Secured Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on a Secured Claim, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Secured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder of a Secured Claim should be allocated in a manner other than as provided in the Plan, which could include allocating consideration first to any accrued but unpaid interest under the aforementioned Treasury regulations.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR SECURED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST**.

### iii.   Market Discount

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than the sum of all remaining payments to be made on the debt instrument,

excluding "qualified stated interest." In general, "qualified stated interest" is interest unconditionally payable at least annually at a fixed stated rate in the form of cash or certain property. Any gain recognized by a U.S. Holder on the taxable disposition of a Secured Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 2.   Certain U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims

Pursuant to the Plan, a U.S. Holder of an Unsecured Claim will be treated as exchanging such Claim on the Effective Date for Cash in a taxable transaction. A U.S. Holder of an Unsecured Claim will recognize income, gain or loss equal to the difference between (x) the Cash received by such U.S. Holder for such Claim and (y) the U.S. Holder's adjusted tax basis, if any, in such Claim surrendered in theexchange. The U.S. federal income tax consequences to such a U.S. Holder arising from such exchange will depend, in part, on (i) whether the U.S. Holder reports income on the accrual or cash method of accounting for U.S. federal income tax purposes, (ii) whether the U.S. Holder has taken a bad debt deduction with respect to such Claim, and (iii) whether such income, gain or loss is capital or ordinary in character.

### i.   Disputed Ownership Funds

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, intends to (i) treat Reorganized Debtors' Assets reserved for Holders of Disputed Claims, Contingent Claims or Unliquidated Claims with respect to the Reorganized as one or more reserves ("Distribution Reserves") held in a "disputed ownership fund" governed by Treasury regulation section 1.468B-9 (which will be taxable as a "qualified settlement fund" if all assets of the disputed reserve are passive assets for tax purposes), and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including, without limitation, the Reorganized Debtors, and the Holders of Disputed Claims, Contingent Claims and Unliquidated Claims) will be required to report for tax purposes consistently with such treatment. Accordingly, each Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of a Distribution Reserves will be taxable to such entity.

Under such treatment, a separate U.S. federal income tax return will be filed with the IRS for each Distribution Reserve, and each Distribution Reserve will be subject to tax annually on a separate entity basis. The Reorganized Debtors will be responsible for payment of any taxes

imposed on each Distribution Reserve. Accordingly, distributions from each Distribution Reserve will be net of any taxes relating to the retention, disposition and distribution of assets in such Distribution Reserve. In the event, and to the extent of, any Cash of a Distribution Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such Distribution Reserve (including any income that may arise upon the distribution of the assets in such Distribution Reserve), assets of each Distribution Reserve may be sold to pay such taxes.

### 3.    Backup Withholding and Information Reporting

Under the Tax Code, interest and other reportable payments may, under certain circumstances, be subject to backup withholding, currently at the rate of 24%. Backup withholding may apply to payments made pursuant to the Plan, unless the U.S. Holder provides to the applicable withholding agent its taxpayer identification number, certified under penalties of perjury, as well as certain other information or otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

In addition, information reporting may apply to (i) payments made to a U.S. Holder of a Secured Claim or an Unsecured Claim and (ii) certain transactions under the Plan that result in a U.S. Holder claiming a loss in excess of specified thresholds.

U.S. Holders are urged to consult their tax advisors regarding these Treasury regulations and whether the transactions contemplated by the Plan would be subject to these Treasury regulations and require disclosure on the Holders' tax returns.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF RECEIVING ANY DISTRIBUTIONS UNDER THE PLAN.**

### V.    RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

Respectfully,

**MILLENKAMP CATTLE, INC.**

By:    /s/ William John Millenkamp
Name: William John Millenkamp
Title: President

**IDAHO JERSEY GIRLS, LLC**

By:    /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**EAST VALLEY CATTLE, LLC**

By:    /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**MILLENKAMP PROPERTIES, L.L.C.**

By:    /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**MILLENKAMP PROPERTIES II, LLC**

By:    /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**MILLENKAMP FAMILY, LLC**

By:    /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**GOOSE RANCH, LLC**

Case 24-40158-NGH   Doc 640   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc Main
Document      Page 58 of 125
Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:55   Desc Main
Document      Page 58 of 125
Case 24-40158-NGH   Doc 640   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc Main
Document      Page 58 of 102

By:      /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**BLACK PINE CATTLE, LLC**

By:      /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**MILLENKAMP ENTERPRISES, LLC**

By:      /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

**IDAHO JERSEY GIRLS JEROME DAIRY, LLC**

By:      /s/ William John Millenkamp
Name: William John Millenkamp
Title: Manager

Submitted by:

Dated:  9/30/24            **DENTONS DAVIS BROWN, PC**

_/s/Krystal R. Mikkilineni_

**JOHNSON MAY**

_/s/Matthew T. Christensen_

_Attorneys for Debtors and Debtors in Possession_

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 2 of 83

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc

EXHIBIT A   Filed 10/02/24   Entered 10/02/24 12:06:55   Desc Main
Document       Page 59 of 125

Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
        jjm@johnsonmaylaw.com

Krystal Mikkilineni, *pro hac vice*
Robert E. Richards, *pro hac vice*
Tirzah Roussell, *pro hac vice*
DENTONS DAVIS BROWN
215 10ᵗʰ Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
        robert.richards@dentons.com
        tirzah.roussell@dentons.com

Attorneys for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF IDAHO**

In re:

MILLENKAMP CATTLE, INC.,

Debtor.

Case No. 24-40158-NGH

Filing relates to:

☒ ALL DEBTORS

☐ Millenkamp Cattle, Inc.

☐ Idaho Jersey Girls

☐ East Valley Cattle

☐ Millenkamp Properties

☐ Millenkamp Properties II

☐ Millenkamp Family

☐ Goose Ranch

☐ Black Pine Cattle

☐ Millenkamp Enterprises

☐ Idaho Jersey Girls Jerome Dairy

Jointly Administered With
Case Nos.:

24-40159-NGH (Idaho Jersey Girls)
24-40160-NGH (East Valley Cattle)
24-40161-NGH (Millenkamp Properties)
24-40162-NGH (Millenkamp Properties II)
24-40163-NGH (Millenkamp Family)
24-40164-NGH (Goose Ranch)
24-40166-NGH (Black Pine Cattle)
24-40167-NGH (Millenkamp Enterprises)

24-40165-NGH (Idaho Jersey Girls Jerome Dairy)

Chapter 11 Cases

**CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC. AND ITS RELATED DEBTOR AFFILIATES, dated September 30, 2024**

#4122714

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 60 of 645
Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:55   Desc Main
Document   Page 60 of 125
Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 4 of 83

# TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................10

**ARTICLE 1 DEFINED RULES AND RULES OF INTERPRETATION** .............11

**ARTICLE 2 CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ....22

    2.1    Summary and Classification of Claims ...................................22

    2.2    Substantive Consolidation. ......................................................25

    2.3    Classification & Voting Controversies.....................................25

**ARTICLE 3 CLASSIFICATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS** ...................................................................................26

    3.1    Unclassified Claims ..................................................................26

        3.1.1    Administrative Claims ...............................................27

        3.1.2    Professional Fee Claims..............................................27

        3.1.3    Priority Tax Claims......................................................28

        3.1.4    DIP Claims....................................................................28

    3.2    Class 1: Other Priority Claims................................................28

    3.3    Class 2: Corn Silage Group Secured Claims...........................29

    3.4    Class 3: Other Secured Ag Liens.............................................30

        3.4.1    Class 3A: A. Scott Jackson Trucking Secured Claim....30

        3.4.2    Class 3B: B&H Farming Secured Claim. ...................31

        3.4.3    Class 3C: H&M Custom, LLC Secured Claim...........31

        3.4.4    Class 3D: Healthy Earth Enterprises, LLC Secured Claim .....31

        3.4.5    Class 3E: Kraus Farms, LLC Secured Claim...............32

        3.4.6    Class 3F: Milner Hay Company, LLC Secured Claim ...........32

        3.4.7    Class 3G: Moss Grain Partnership Secured Claim ...............32

        3.4.8    Class 3H NorthWest Seed, Inc. Secured Claim .......................33

        3.4.9    Class 3I: Performance Plus-Idaho, LLC Secured Claim........33

        3.4.10    Class 3J: Tyche Ag, LLC Secured Claim ..............................34

        3.4.11    Class 3K: Wada Farms Partnership Secured Claim ..............34

        3.4.12    Class 3L: Youree Land & Livestock Secured Claim .............34

        3.4.13    Class 3M: Eagle Creek Northwest, LLC Claim.......................35

        3.4.14    Class 3N: Standlee Ag Resources and Premium Products
            Secured Claim ...........................................................................35

    3.5    Class 4: Metlife Secured Claims .............................................35

    3.6    Class 5: Rabo Secured Claims.................................................38

    3.7    Class 6: Conterra Secured Claims...........................................40

    3.8    Class 7: Secured Equipment & Vehicle Lien Claims............................42

        3.8.1    Class 7A CNH Industrial Capital Secured Claim ....................42

        3.8.2    Class 7B: Daimler Truck Financial Services USA LLC Secured
            Claim.........................................................................................43

        3.8.3    Class 7C: Farmers Bank ............................................................44

        3.8.4    Class 7D: John Deere Construction & Forestry Secured Claim
            ...................................................................................................45

        3.8.5    Class 7E: Western States Cat Secured Claim ...........................46

        3.8.6    Class 7F: Kenworth Sales Company Secured Claim ...............47

    3.9    Class 8: Other Secured Claims.................................................47

        3.9.1    Class 8A: MWI Veterinary Secured Claim...............................47

        3.9.2    Class 8B: PerforMix Nutrition Systems Secured Claim..........48

        3.9.3    Class 8C: Rexel USA, Inc. d/b/a Platt Electric Supply Claim.48

        3.9.4    Class 8D: Staker & Parson Company d/b/a Idaho Materials &
            Construction Claim ...................................................................48

        3.9.5    Class 8E: Les Schwab Tire Centers ..........................................49

    3.10    Class 9: General Unsecured Claims.........................................50

    3.11    Class 10: Intercompany Claims................................................50

Case 24-40158-NGH    Doc 640-1    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization    Page 6 of 83

Case 24-40158-NGH    Doc 645    Filed 10/02/24    Entered 10/02/24 12:06:55    Desc Main
Document    Page 61 of 125

3.12    Class 11: Equity Interests..........................................................................50

3.13    Special Provisions Regarding Insured Claims ...............................................51

**ARTICLE 4 ACCEPTANCE OR REJECTION OF THE PLAN** ......................51

4.1    Impaired Class of Claims Entitled to Vote....................................................51

4.2    Voting of Claims ....................................................................................51

4.3    Procedure/Voting Deadline .......................................................................51

4.4    Acceptance by an Impaired Class................................................................51

4.5    Presumed Acceptances by Unimpaired Classes. ............................................52

4.6    Impaired Classes Deemed to Reject Plan .....................................................52

4.7    Confirmation Pursuant to Bankruptcy Code Section 1129(b) ...........................52

4.8    Elimination of Vacant Classes ...................................................................52

**ARTICLE 5 MEANS FOR IMPLEMENTATION OF THE PLAN** .................52

5.1    Substantive Consolidation ........................................................................52

5.2    Restructuring Transactions ........................................................................52

5.3    Sources of Consideration for Plan Distributions ...........................................53

5.4    Vesting of Assets in Reorganized Debtors....................................................53

5.5    Authority ...............................................................................................53

5.6    Corporate Existence .................................................................................54

5.7    Employee Obligations ..............................................................................54

5.8    Workers Compensation Program .................................................................55

5.9    Pursuit and Resolution of Reorganized Debtors' Causes of Action ....55

5.10    No Successor Liability .............................................................................55

5.11    Preservation of Privileges and Defenses ......................................................55

5.12    Preservation of Rights of Action. ...............................................................55

    5.12.1    Maintenance of Avoidance Actions and Causes of Action ......55

5.12.2    Preservation of All Reorganized Debtors' Causes of Action Not Expressly Settled or Released ....................................................56

5.13    Cancellation of Instruments .......................................................................56

5.14    Insurance Policies ...................................................................................56

    5.14.1    Insurance Policies Remain in Force. ..........................................56

    5.14.2    Insurance Policies; Employment Practice Liability Policies; Similar Policies ...................................................................................57

**ARTICLE 6 EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .........57

6.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ..................................................................................................57

6.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................................................................................................58

6.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..................................................................................................58

6.4    Assumption Dispute Resolution .................................................................60

6.5    Contracts and Leases Entered into After the Petition Date .................60

6.6    Modifications, Amendments, Supplements, Restatements, or Other Agreements............................................................................................61

6.7    Reservation of Rights ...............................................................................61

6.8    Nonoccurence of Effective Date .................................................................61

**ARTICLE 7 PROVISIONS GOVERNING DISTRIBUTIONS**........................61

7.1    Timing of Distributions for Allowed Claims .................................................61

7.2    Calculating Distributions and Related Matters...............................................61

7.3    Interest and Other Amounts Regarding Claims...............................................62

7.4    Means of Cash Payment ...........................................................................62

7.5    Form of Currency for Distributions .............................................................62

7.6    Fractional Distributions ............................................................................62

| | | |
|---|---|---|
| 7.7 | De Minimis Distributions | 62 |
| 7.8 | No Distributions with Respect to Certain Claims | 62 |
| 7.9 | Distributions and Transfers Upon Resolution of Contingent Claims, Disputed Claims, or Unliquidated Claims | 63 |
| 7.10 | Delivery of Distributions | 63 |
| 7.11 | Application of Distribution Record Date & Other Transfer Restrictions. | 64 |
| 7.12 | Withholding, Payment, and Reporting Requirements Regarding Distributions | 64 |
| 7.13 | Defenses and Setoffs | 64 |
| 7.14 | Allocation of Distributions | 65 |
| 7.15 | Joint Distributions | 65 |
| 7.16 | Forfeiture of Distributions | 65 |

**ARTICLE 8 PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO** ...

| | | |
|---|---|---|
| 8.1 | Objections to and Resolution of Disputed Claims, Including Any Claims of Excluded Parties | 65 |
| 8.2 | Claim Objections | 65 |
| 8.3 | Estimation of Certain Claims | 65 |
| 8.4 | Distributions Following Allowance. | 66 |
| 8.5 | Disposition of Assets in Reserves After Disallowance | 66 |

**ARTICLE 9 CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ........ 66

| | | |
|---|---|---|
| 9.1 | Conditions to the Effective Date. | 66 |
| 9.2 | Waiver of Conditions to the Effective Date. | 67 |
| 9.3 | Effect of Non-Occurrence of Conditions to the Effective Date | 67 |
| 9.4 | Notice of the Effective Date. | 67 |

**ARTICLE 10 RELEASES, INJUNCTION, AND RELATED PROVISIONS** ... 67

| | | |
|---|---|---|
| 10.1 | Debtors' Releases | 67 |
| 10.2 | Exculpation and Limitation of Liability | 68 |
| 10.3 | Injunction. | 68 |

**ARTICLE 11 RETENTION OF JURISDICTION AND POWER** ............... 69

| | | |
|---|---|---|
| 11.1 | Scope of Retained Jurisdiction and Power | 70 |
| 11.2 | Non-Exercise of Jurisdiction. | 71 |

**ARTICLE 12 MISCELLANEOUS PROVISIONS** ........................... 72

| | | |
|---|---|---|
| 12.1 | Payment of Statutory Fees. | 72 |
| 12.2 | Dissolution of the Committees | 72 |
| 12.3 | Modifications and Amendments | 72 |
| 12.4 | Severability of Plan Provisions | 73 |
| 12.5 | Compromises and Settlements | 73 |
| 12.6 | Binding Effect of Plan | 73 |
| 12.7 | Term of Injunctions or Stays | 73 |
| 12.8 | Revocation, Withdrawal, or Non-Consummation. | 73 |
| 12.9 | Exemption from Transfer Taxes | 73 |
| 12.10 | Computation of Time | 74 |
| 12.11 | Transactions on Business Days | 74 |
| 12.12 | Good Faith | 74 |
| 12.13 | Governing Law. | 74 |
| 12.14 | Notices. | 74 |
| 12.15 | Additional Documents | 74 |
| 12.16 | Conflicts with the Plan | 74 |

**ARTICLE 13 REQUEST FOR CONFIRMATION AND RECOMMENDATION** ........................................................... 75

13.1   Request for Confirmation..................................................75

13.2   Recommendation..................................................75

## INTRODUCTION

Millenkamp Cattle, Inc. and its affiliated debtors (the "Debtors") hereby propose this *Plan of Reorganization* (the "Plan"). Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Plan provides for the substantive consolidation of the Debtors assets and liabilities for purposes of the Plan, as described in section 5.1 below, including all distributions hereunder.

All Holders of Claims who are entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith, have been approved for use in soliciting acceptances and rejections of this Plan. Nothing in the Plan should be construed as constituting a solicitation of acceptances of the Plan unless and until the Disclosure Statement has been approved and distributed to Holders of Claims to the extent required by Bankruptcy Code section 1125.

**ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, RULE 3019 OF THE BANKRUPTCY RULES, AND ARTICLE X OF THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, SUPPLEMENT, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS CONSUMMATION.**

*-REMAINDER OF PAGE INTENTIONALLY LEFT BLANK-*

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 12 of 83

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:06:51  Desc Main
Document  Page 64 of 125

## ARTICLE 1
## DEFINED TERMS AND RULES OF INTERPRETATION

A capitalized term used in this Plan shall have the meanings set forth in this Article I. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

**1.1** **503(b)(9) Order:** On August 29, 2024, the Court entered an Order on Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims (Docket Nos. 476 & 584).

**1.2** **Administrative Claim:** Any Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases pursuant to section 327, 328, 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' business, (ii) any Professional Fee Claim, (iii) any fee or charge assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, (iv) any Allowed Claim that is to be treated as an Administrative Claim pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy Code, and (v) any Allowed Cure Claim.

**1.3** **Administrative Claims Bar Date:** The last date by which any Person must File a request for payment of an Administrative Claim, which date shall be the first Business Day that is at least thirty (30) calendar days after the Effective Date, or, alternatively, such earlier date as is set by the Bankruptcy Court. For the avoidance of doubt, post-petition statutory tax claims shall not be subject to any Administrative Claims Bar Date.

**1.4** **Allowed, Allowed Claim, or Allowed Administrative Claim:**

a.   with respect to a Claim arising prior to the Petition Date (including a Section 503(b)(9) Claim):

(i)   either (A) a proof of claim was timely Filed by the applicable Claims Bar Date, or (B) a proof of claim is deemed timely Filed either as a result of such Claim being Scheduled or by a Final Order; and

(ii)   either (A) the Claim is not a Contingent Claim, a Disputed Claim, an Unliquidated Claim, or a Disallowed Claim; or (B) the Claim is expressly allowed by a Final Order or under the Plan;

b.   with respect to a Claim arising on or after the Petition Date (excluding a Section 503(b)(9) Claim), a Claim that has been allowed by a Final Order or under the Plan.

Unless otherwise specified in the Plan or by a Final Order, an "Allowed Administrative

Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest, penalties, fees, or late charges on such Administrative Claim or Claim from and after the Petition Date. Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim. For the avoidance of doubt, any and all Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

**1.5** **Asset:** With respect to a Person, all of the right, title and interest of such Person in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property, which, for avoidance of doubt, includes insurance policies and any rights, claims or potential claims with respect thereto.

**1.6** **Assumption Notice** means a notice of the assumption or assumption and assignment, and any proposed Cure Amount provided to counterparties to executory contracts and unexpired leases pursuant to the Disclosure Statement Order.

**1.7** **Avoidance Actions:** Any and all causes of action, claims, remedies, or rights, that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code sections 542, 544, 547, 548, 549, 550, 551, or 553, or under related state or federal statutes, or pursuant to any theory or cause of action under common law, regardless whether such action has been commenced prior to the Effective Date.

**1.8** **Ballot:** The ballot form authorized by the Bankruptcy Court to indicate acceptance or rejection of the Plan and to opt out of the release provided by Section 10.2 herein.

**1.9** **Bankruptcy Code:** Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as the same may be amended from time to time to the extent applicable to the Chapter 11 Cases.

**1.10** **Bankruptcy Court:** The United States Bankruptcy Court for the District of Idaho, or in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, such other court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Idaho.

**1.11** **Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure promulgated by the Supreme Court of the United States under 28 U.S.C. § 2075, as the same may be amended from time to time to the extent applicable to the Chapter 11 Cases.

**1.12** **Bar Date:** The General Bar Date or any other date established by the Bankruptcy Court as the deadline by which Proofs of Claim or requests for payment of Administrative Claims must be filed.

**1.13** **Bar Date Order:** The Order (I) Vacating the Original Bar Date and (II) Establishing a Deadline to File Proofs of Claim (Docket No. 393).

**1.14** **Benefit Plan:** Any "employee benefit plan" as defined in section 3(3) of ERISA, compensation, employment, consulting, severance, retention or similar plan, agreement, arrangement, program or policy, or other plan, agreement, arrangement, program or policy providing for compensation, bonuses or other forms of incentive compensation, including vacation

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit A - Chapter 11 Plan of Reorganization   Page 14 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:08:11   Page 65 of 125
Document   Page 65 of 125

benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, perquisites, disability sick leave benefits or employee assistance program, in each case, that is sponsored, maintained or administered or entered into by the Debtors for the benefit of their respective employees or non-employee directors.

**1.15** **Business Day:** Any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in the State of Idaho are required or authorized to close by law or executive order.

**1.16** **Cash:** Cash and cash equivalents, including bank deposits, wire transfers, checks representing good funds, and legal tender of the United States of America or instrumentalities thereof.

**1.17** **Cash Collateral Orders:** Collectively, the Final Cash Collateral Orders and the preceding interim orders entered by the Bankruptcy Court authorizing the Debtors to use Cash and providing adequate protection.

**1.18** **Cause of Action:** any Claim, action, class action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, rights of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, loss, cost, attorneys' fees and expenses, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever, asserted or unasserted, accrued or unaccrued, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, allowable or disallowable, Allowed or Disallowed, assertible directly or derivatively (including, without limitation, under alter-ego theories), in rem, quasi in rem, in personam or otherwise, whether arising before, on or after the Petition Date, arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, in contract or in tort, at law, in equity or pursuant to any other theory or principle of law, including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, unjust enrichment, disgorgement, restitution, contribution, indemnification, rights of subrogation and joint liability, regardless of where in the world accrued or arising. For the avoidance of doubt, "Cause of Action" expressly includes (i) any Cause of Action held by a natural person who is not yet born or who has not yet attained majority as of the Petition Date or as of the Effective Date, (ii) any right of setoff, counterclaim or recoupment and any Cause of Action for breach of contract or for breach of duty imposed by law or in equity, (iii) the right to object to or otherwise contest Claims or Interests, (iv) any Cause of Action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (v) any claim or defense, including fraud, mistake, duress and usury and any other defense set forth in section 558 of the Bankruptcy Code, and (vi) any claim under any state or foreign law, including for the recovery of any fraudulent transfer or similar theory.

**1.19** **Chapter 11 Cases:** The voluntary chapter 11 bankruptcy cases commenced by the Debtors consisting of Millenkamp Cattle, Inc., Case No. 24-40158-NGH; Idaho Jersey Girls, LLC, Case No. 24-40159; East Valley Cattle, LLC, Case No. 40160; Millenkamp Properties,

L.L.C., Case No. 24-40161; Millenkamp Properties II, LLC, Case No. 24-40162; Millenkamp Family, LLC, Case No. 24-40163; Goose Ranch, LLC, Case No. 24-40164; Black Pine Cattle, LLC, Case No. 40166; Millenkamp Enterprises, LLC, Case No. 24-40167; and Idaho Jersey Girls Jerome Dairy, LLC, Case No. 24-40165, which are being jointly administered under the case caption *In re Millenkamp Cattle, Inc., et al.*, Case No. 24-40158-NGH (Bankr. D. Idaho).

**1.20** **Claim:** Any "claim" as defined in Bankruptcy Code section 101(5), against any of the Debtors or against any property of the Debtors.

**1.21** **Claims Bar Date:** As applicable, the Administrative Claims Bar Date, the General Claims Bar Date, the Governmental Claims Bar Date, any Supplemental Bar Date, or the Rejection Claims Bar Date.

**1.22** **Class:** A class of Claims or Interests designated pursuant to the Plan, or any subclass thereof pursuant to section 1122(a) of the Bankruptcy Code.

**1.23** **Collateral:** Any Estate Asset that is subject to a Lien to secure the payment or performance of a Claim, which Lien is perfected and not subject to avoidance under the Bankruptcy Code or otherwise invalid or unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

**1.24** **Confirmation:** The entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

**1.25** **Confirmation Hearing:** The hearing held by the Bankruptcy Court to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.26** **Confirmation Order:** The order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 1129.

**1.27** **Corn Silage Group.** Consists of corn silage secured creditors: Ed Chonjnacky, Michael Chonjnacky, Dusty Brow Farms, Inc., Grant 4-D Farms, LLC, Grant & Hagan, Inc., Douglas J. Grant, Hollifield Ranches, Inc., Standing 16 Ranch Land Company, LLC, Star Falls Farms, LLC, Steel Ranch, LLC, Bo Stevenson dba B&A Farms, Alexander K. Reed, Triple C Farms, LLC, Clint D. Thompson, and Jean L. Thompson.

**1.28** **Contingent Claim:** Any Claim that is Scheduled or Filed as contingent.

**1.29** **Corporate Action:** Any action, approval, authorization, decision, or other act of any kind that would be necessary on the part of any Person for any corporation, limited liability company, general partnership, or other Person to in turn act.

**1.30** **Conterra:** Conterra Holdings, LLC d/b/a Conterra Ag Capital as loan servicer and power of attorney for Ag Funding SC II LLC and Conterra Holdings, LLC d/b/a Conterra Ag Capital as loan servicer and power of attorney for Rooster Capital IV LLC.

**1.31** **Creditors' Committee:** The statutory committee of unsecured creditors appointed by the U.S. Trustee on May 14, 2024, pursuant to section 1102(a)(1) of the Bankruptcy

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 66 of 125

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:51   Page 16 of 83
Document   Page 66 of 125

Code.

**1.32** <u>**Cure Amount:**</u> The payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**1.33** <u>**Cure Claim:**</u> A Claim for a Cure Amount in connection with the assumption or assumption and assignment of an executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**1.34** <u>**Debtor**</u> or <u>**Debtors:**</u> has the meaning set forth in the introductory paragraph of the Plan.

**1.35** <u>**Debtor Exculpated Parties:**</u> The Debtors and their respective Related Parties. For the avoidance of doubt, Debtor Exculpated Parties shall include, William John Millenkamp, Susan Jo Millenkamp, Dentons Davis Brown, PC, Dentons United States, LLP, Johnson May, PLLC, and Kander, LLC.

**1.36** <u>**Debtors' Releases:**</u> The releases given on behalf of the Debtors and their Estates to the Released Parties as set forth in Section 10.1 herein.

**1.37** <u>**DIP Claims:**</u> Any Claim in respect of any DIP Obligations (as defined in the DIP Order) owed by the Debtors under the DIP Order.

**1.38** <u>**DIP Credit Agreement:**</u> That certain Secured Superpriority Debtor-in-Possession Loan Agreement dated April 22, 2024, between Millenkamp Cattle, Inc., Black Pine Cattle, LLC, East Valley Cattle, LLC, Goose Ranch LLC, Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy LLC, Millenkamp Enterprises LLC, Millenkamp Family LLC, Millenkamp Properties LLC, and Millenkamp Properties II, LLC and Sandton Capital Solutions Master Fund VI, LP.

**1.39** <u>**DIP Financing:**</u> The post-petition financing facility issued pursuant to the DIP Credit Agreement and the DIP Order.

**1.40** <u>**DIP Lender:**</u> Sandton Capital Solutions Master Fund VI, LP.

**1.41** <u>**DIP Loan Documents:**</u> As set forth in the DIP Order.

**1.42** <u>**DIP Order:**</u> The Final order Authorizing the Debtors to (A) Obtain Post-Petition Financing; and (B) Granting Adequate Protection to Pre-Petition Secured Lenders (Docket No. 503).

**1.43** <u>**Disallowed Claim:**</u> Any Claim that (a) is not Scheduled, or is listed thereon as contingent, unliquidated, disputed, or in an amount equal to zero, and whose Holder failed to timely File a proof of claim by the applicable Claims Bar Date (unless late filing was permitted by a Bankruptcy Court order), but excluding any Claim that is expressly Allowed by a Final Order or

under the Plan; or (b) has been disallowed pursuant to an order of the Bankruptcy Court.

**1.44** <u>**Disclosure Statement:**</u> That certain disclosure statement, including all exhibits and schedules thereto or referenced therein, that relates to this Plan and has been prepared and distributed by the Debtors, as plan proponents, as approved by the Bankruptcy Court pursuant to Bankruptcy Code section 1125, as the same may be amended, modified, or supplemented.

**1.45** <u>**Disclosure Statement Order:**</u> The order approving the Disclosure Statement, authorizing the Debtors to solicit acceptances of the Plan and establishing certain related procedures and deadlines.

**1.46** <u>**Disputed Claim:**</u> Any Claim:

a.    that is disputed in whole or in part under the Plan; or

b.    that is not expressly Allowed by a Final Order or under the Plan; and

    (i)    as to which a proof of claim is Filed or is deemed Filed as a result of such Claim being Scheduled; and

    (ii)    as to which either:

        (1)    an objection or request for estimation or subordination has been timely Filed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order under which the applicable period of limitation has expired, and (B) has not been denied by a Final Order or withdrawn; or

        (2)    the Claim Objection Deadline has not passed as to such Claim (unless the Debtors determined that it will not object to such Claim).

**1.47** <u>**Disputed Cure Claim:**</u> The amount that a counterparty to a Contract Dispute alleges must be paid in order for an executory contract or unexpired lease to be assumed or assumed and assigned as provided under the Plan.

**1.48** <u>**Distribution:**</u> Any initial or subsequent issuance, payment, or transfer of consideration made under the Plan.

**1.49** <u>**Distribution Date:**</u> Any date on which a Distribution is made.

**1.50** <u>**Distribution Record Date:**</u> The record date for determining entitlement of Holders of Claims to receive Distributions under the Plan, which date shall be the Effective Date.

**1.51** <u>**Distribution Reserve:**</u> One or more reserves in respect of Contingent Claims, Disputed Claims, or Unliquidated Claims established by the Debtors.

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 18 of 83

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:06:51  Desc Main
Document    Page 67 of 125

**1.52**    **Effective Date:** January 1, 2025.

**1.53**    **Entity:** The meaning as set forth in section 101(15) of the Bankruptcy Code.

**1.54**    **Estates:** Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**1.55**    **Estate Assets:** Collectively, (a) any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records and all Avoidance Actions and Causes of Action, as of the Effective Date.

**1.56**    **Estate Released Parties:** Collectively, the Debtors and their respective Related Parties, including Dentons, Johnson May, and Kander.

**1.57**    **Exit Credit Agreement:** The credit agreement to be entered into in connection with the Exit Term Loan Facility (including any guarantee agreements, pledge and collateral agreements, and other security documents), which shall be materially consistent with the Plan and which shall be in form and substance acceptable to the Debtors in good faith.

**1.58**    **Exit Term Loan Facility:** The Senior Secured Exit Term Loan Facility between the Debtors and Cargill, Inc. ("Cargill") in the amount of $120 million, bearing interest at the one month rate for SOFR plus an interest margin of 6.00%, with a 3 year maturity date.

**1.59**    **Exculpated Parties:** collectively, (i) the Debtor Exculpated Parties and(ii) the Creditors' Committee and their Related Parties.

**1.60**    **File**, **Filed**, or **Filing:** Duly and properly filed with the Bankruptcy Court and reflected on the docket of the Chapter 11 Cases.

**1.61**    **Final Decree:** An order entered pursuant to Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Chapter 11 Cases of one or any of the Debtors.

**1.62**    **Final Order:** An order or judgment of the Bankruptcy Court entered on the docket of the Chapter 11 Cases:

    a.    that has not been reversed, rescinded, stayed, modified, or amended;

    b.    that is in full force and effect; and

    c.    with respect to which (i) the time to appeal or to seek review, rehearing, remand, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

For the avoidance of doubt, no order shall fail to be a Final Order solely because of the possibility

that a motion pursuant to Bankruptcy Code section 502(j), Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 may be or has been filed with respect to such order.

**1.63**    **General Claims Bar Date:** July 31, 2024.

**1.64**    **General Unsecured Claim:** Any unsecured, non-priority Claim existing as of the Petition Date or a Rejection Claim that is asserted against one or all of the Debtors or the Estates and is not a Secured Claim, Intercompany Claim, or Subordinated Claim.

**1.65**    **Holder:** The Person that is the owner of record of a Claim or Interest, as applicable.

**1.66**    **Impaired:** Any Class of Claims or Interests that is impaired within the meaning of Bankruptcy Code section 1124.

**1.67**    **Insider:** A person as defined by Bankruptcy Code section 101(31).

**1.68**    **Insurance Policies:** All insurance policies that have been issued to, or provide coverage at, any of the Debtors and all agreements, instruments, or documents relating thereto.

**1.69**    **Insured Claim:** Any Claim or portion of a Claim (other than a Claim held by an employee of the Debtors for workers' compensation coverage under the workers' compensation program applicable in the particular state in which the employee is employed by the Debtors)that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

**1.70**    **Intercompany Claim:** A Claim against a Debtor held by another Debtor.

**1.71**    **Intercompany Interest:** Any Interest in any Debtor that is held by another Debtor.

**1.72**    **IRC:** The Internal Revenue Code of 1986, as amended.

**1.73**    **IRS:** The Internal Revenue Service.

**1.74**    **Lien:** Any lien, security interest, pledge, title retention agreement, encumbrance, leasehold, charge, mortgage, or hypothecation to secure payment of a debt or performance of an obligation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws, as set forth in section 101(37) of the Bankruptcy Code.

**1.75**    **MetLife:** MetLife Real Estate Lending LLC and Metropolitan Life Insurance Company.

**1.76**    **Person:** Any person or organization created or recognized by law, including any association, company, cooperative, corporation, entity, estate, fund, individual, joint stock company, joint venture, limited liability company, partnership, trust, trustee, unincorporated organization, government or any political subdivision thereof, or any other entity or organization

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 20 of 83

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:51   Desc Main
Document    Page 68 of 125

of whatever nature.

**1.77** **Petition Date:** April 2, 2024, the Date which Debtors filed their voluntary chapter 11 petitions for relief in the Bankruptcy Court.

**1.78** **Preference Claim:** Any Avoidance Action that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code section 547, or under related state or federal statutes, or pursuant to any theory or cause of action under common law, regardless whether such action has been commenced prior to the Effective Date.

**1.79** **Priority Claim:** A Claim that is entitled to priority under Bankruptcy Code section 507(a), other than an Administrative Claim and a Priority Tax Claim.

**1.80** **Priority Tax Claim:** Any Claim against any Debtor that is held by a Governmental Unit and of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code

**1.81** **Professional:** Any professional (other than an Ordinary Course Professional) employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 1103, or 1104 or any professional or other Person (in each case, other than an Ordinary Course Professional) seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code section 503(b)(3) or 503(b)(4).

**1.82** **Professional Fee Claim:** A Claim of a Professional for compensation or reimbursement of costs and expenses (or of members of any of the Committees for reimbursement of expenses) relating to services provided during the period from the Petition Date through and including the Effective Date.

**1.83** **Professional Fee Escrow:** The escrow established and funded by the Debtors pursuant to Section 3.1.2(c) of the Plan to provide sufficient funds to satisfy in full all unpaid Allowed Professional Fee Claims.

**1.84** **Pro Rata:** Proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the amount or number of that Allowed Claim, is the same as the ratio of (x) the amount of consideration available for Distribution on account of, as applicable, all Allowed Claims in the Class in which the particular Allowed Claim is included to (y) as applicable, the amount of all Allowed Claims of that Class, as adjusted to take into account any applicable Distribution Reserves.

**1.85** **Proof(s) of Claim:** A Proof of Claim against any of the Debtors filed in the Chapter 11 Cases in accordance with section 501 of the Bankruptcy Code.

**1.86** **Rabo:** Rabo AgriFinance LLC

**1.87** **Rejection Claim:** Any Claim for monetary damages as a result of the rejection of any prepetition executory contract or unexpired lease, whether rejected pursuant to the Confirmation Order or otherwise.

**1.88** **Rejection Claims Bar Date:** To the extent not previously established by prior order of the Bankruptcy Court, thirty (30) calendar days after the Effective Date.

**1.89** **Related Parties:** Collectively, all of the respective accountants, agents, attorneys, bankers, consultants, financial advisors, investment bankers, professional persons, representatives, and successors and assigns of the referenced Person; provided however, for the avoidance of doubt, with respect to each Committee, "Related Parties" shall include the members of such Committee but solely in their capacity as a member of such Committee, each of such member's representatives with respect to the Committee, and their counsel.

**1.90** **Released Parties:** Collectively, (a) the Debtors' and their Related Parties and (b) the Committee and its Related Parties.

**1.91** **Releasing Parties:** Collectively, (a) the Released Parties; and (b) all Holders of Claims that (i) vote to accept the Plan *provided that*, notwithstanding anything contained herein to the contrary, in no event shall the Holder of a Claim that (x) does not vote to accept or reject this Plan, or (y) votes to reject this Plan, and returns such Ballot in accordance with the Disclosure Statement Order, be a Releasing Party.

**1.92** **Reorganized Debtors**: means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**1.93** **Restructuring**: The restructuring of the existing debt and other obligations of the Debtors and their non-Debtor Affiliates on the terms and conditions set forth in the Plan.

**1.94** **Restructuring Transactions**: shall have the meaning set forth in <u>Article 5</u> hereof.

**1.95** **Sandton**: Sandton Capital Partners LP and Sandton Capital Solutions Master Fund VI, LP.

**1.96** **Scheduled**: As set forth in the Schedules.

**1.97** **Schedules**: The Schedules of Assets and Liabilities Filed by the Debtors in the Chapter 11 Cases, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

**1.98** **Section 503(b)(9) Claim**: A Claim arising under Bankruptcy Code section 503(b)(9).

**1.99** **Secured Claim**: A Claim that is secured by a valid, perfected, and enforceable Lien on property in which the Debtors or the Estates have an interest, which Lien is valid, perfected, and enforceable under applicable law and not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law. A Claim is a Secured Claim only to the extent of the value of the Holder's interest in the Debtors' interest in the Collateral or to the extent of the amount subject to set-off against a Cause of Action held by the Debtors, whichever is applicable, and as determined under Bankruptcy Code section 506(a). To the extent that the value of such interest in the Debtors' interest in the subject Collateral or the amount subject to set-off against a Cause of

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 22 of 83

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:06:51  Desc Main
Document  Page 69 of 125

Action held by the Debtors (as applicable) is less than the amount of the Claim which has the benefit of such security or is supported by such setoff right, such portion of the Claim is unsecured and shall be treated as a General Unsecured Claim unless, in any such case, the Class of which the Secured Claim is a part makes a valid and timely election in accordance with Bankruptcy Code section 1111(b) to have such Claim(s) treated as a Secured Claim to the extent Allowed.

**1.100**    **Securities Act:** The Securities Act of 1933, as amended.

**1.101**    **State:** Any U.S. state, any U.S. territory or the District of Columbia.

**1.102**    **Subordinated Claim:** Collectively, any Claim that is subordinated to General Unsecured Claims pursuant to Bankruptcy Code section 510, a Final Order, or by consent of the Holder of such Claim.

**1.103**    **Supplemental Bar Date:** Any supplemental bar date that may be established by an order of the Bankruptcy Court.

**1.104**    **U.S. Trustee:** The Office of the United States Trustee for the District of Idaho.

**1.105**    **Unimpaired:** Any Class of Claims that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.106**    **Uninsured Portion:** The portion of any Insured Claim, if any, that is not insured under the Debtors' insurance policies or that is beyond the extent of such coverage.

**1.107**    **Unliquidated Claim:** Any Claim that is Scheduled as unliquidated or that was filed in an unliquidated amount.

**1.108**    **Voting Agent:** Krystal R. Mikkilineni, Dentons Davis Brown, The Davis Brown Tower, 215 10th St., Suite 1300, Des Moines, Iowa 50309, krystal.mikkilineni@dentons.com.

**1.109**    **Voting Deadline:** The date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the Disclosure Statement Order.

**Rules of Interpretation:**

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words

"herein," "hereof," and "hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

<div align="center">

**ARTICLE 2**

**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

</div>

**2.1**    **Summary and Classification of Claims.** This Section classifies Claims—except for Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are not classified – for all purposes, including Confirmation, Distributions, and voting. A Claim is classified in a particular Class only to the extent that the Claim falls within the Class description. To the extent that part of a Claim falls within a different Class description, that part of the Claim is classified in that different Class. The following table summarizes the Classes of Claims under the Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| None | Administrative Claims | Unimpaired | Not Entitled to Vote |
| None | Professional Fee Claims | Unimpaired | Not Entitled to Vote |
| None | Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 23 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:51   Desc Main
Document   Page 70 of 125

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 24 of 83

| Class 2 | Corn Silage Group Secured Claims | Impaired | Entitled to Vote |
| Class 3A | A. Scott Jackson Trucking Secured Claim | Impaired | Entitled to Vote |
| Class 3B | B&H Farming Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 3C | H&M Custom, LLC Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 3D | Healthy Earth Enterprises, LLC Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 3E | Kraus Farms, LLC Secured Claim | Impaired | Entitled to Vote |
| Class 3F | Milner Hay Company, LLC Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 3G | Moss Grain Partnership Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 3H | NorthWest Seed, Inc. Secured Claim | Impaired | Entitled to Vote |
| Class 3I | Performance Plus-Idaho, LLC Secured Claim | Impaired | Entitled to Vote |
| Class 3J | Tyche Ag, LLC Secured Claim | Impaired | Entitled to Vote |
| Class 3K | Wada Farms Partnership Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 3L | Youree Land & Livestock Secured Claim | Impaired | Entitled to Vote |

| Class 3M | Eagle Creek Northwest, LLC Claim | Unimpaired | Not Entitled to Vote |
| Class 3N | Standlee Ag Resources and Premium Products Secured Claim | Impaired | Entitled to Vote |
| Class 4 | MetLife Secured Claims | Impaired | Entitled to Vote |
| Class 5 | Rabo Secured Claims | Impaired | Entitled to Vote |
| Class 6 | Conterra Secured Claims | Impaired | Entitled to Vote |
| Class 7A | CNH Industrial Capital Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 7B | Daimler Truck Financial Services USA LLC Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 7C | Farmers Bank | Unimpaired | Not Entitled to Vote |
| Class 7D | John Deere Construction & Forestry Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 7E | Western States Cat Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 7F | Kenworth Sales Company Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 8A | MWI Veterinary Secured Claim | Impaired | Entitled to Vote |
| Class 8B | PerforMix Nutrition Systems Secured Claim | Unimpaired | Not Entitled to Vote |
| Class 8C | Rexel USA, Inc. d/b/a Platt Electric Supply Claim | Disputed | Not Entitled to Vote |
| Class 8D | Staker & Parson Company d/b/a Idaho Materials & Construction Claim | Unimpaired | Not Entitled to Vote |
| Class 8E | Les Schwab Tire Centers of Idaho, LLC Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |

| Class 10 | Intercompany Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 11 | Equity Interests | Unimpaired | Not Entitled to Vote |

**NOTWITHSTANDING ANY OTHER TERM OR PROVISION OF THE PLAN, NO DISTRIBUTIONS WILL BE MADE ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS A DISALLOWED CLAIM.**

**2.2** **Substantive Consolidation.** For purposes of the Plan only, all remaining Assets and liabilities of the Debtors shall be deemed the Assets and liabilities of a single consolidated entity. On the Effective Date: (a) all Assets (and all proceeds thereof) and liabilities of each Debtor shall be merged or treated as though they were merged into and with the Assets and liabilities of the other Debtors, (b) no Distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (c) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated and extinguished so that any Allowed Claim against any Debtor and guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed against any Debtor shall be filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of the other Debtors. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the pre-petition legal and corporate structures of the Debtors, or the legal title ownership of any assets owned by the separate Debtors. Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for Plan purposes.

**2.3** **Classification & Voting Controversies.**

a. If a controversy arises regarding whether any Claim is properly classified under the Plan, then the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

b. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

## ARTICLE 3
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

**3.1** **Unclassified Claims.**

**3.1.1** **Administrative Claims.** Administrative expenses are costs or expenses of administering the Debtors' Bankruptcy Cases which are allowed under Bankruptcy Code section 507(a)(2). All Persons requesting payment of Administrative Expense Claims, including but not limited to Claims under section 503(b)(9) of the Bankruptcy Code, **shall file a proof of Claim with the Court no later than the Administrative Claims Bar Date, which shall be within or no later than the first Business Day that is at least thirty (30) calendar days after the Effective Date.** The Administrative Claims Bar Date shall not apply to Professional Persons requesting payment of Professional Fee Claims, DIP Claims, or Priority Tax Claims, or to the extent that an Administrative Claim has already been allowed or paid during the Chapter 11 Cases. Objections to such applications for payment (whether by Professional Persons requesting payment of Professional Fee Claims or Persons requesting payment of Administrative Expense Claims), if any, must be written, filed with the Court, and served on the applicable parties within thirty (30) days after such application or Claim is filed (the "Administrative Claims Objection Deadline").

On August 29, 2024, the Court entered an Order on Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims (Docket Nos. 476 & 584) (the "503(b)(9) Order"). Pursuant to the 503(b)(9) Order, 503(b)(9) Claims in the amount of approximately $5,170,846.56 have been deemed as Allowed 503(b)(9) Claims. To the extent additional 503(b)(9) Claims exist, such Claim Holders shall file a Claim for allowance of their 503(b)(9) Claim by the Administrative Claims Bar Date.

The Debtors or the Reorganized Debtors, as applicable, may object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

Except with respect to Professional Fee Claims, DIP Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases, or a Holder of an Allowed Administrative Claim and the applicable Debtor, or after the Effective Date, such Holder and the Reorganized Debtors, agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter.

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 28 of 83

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:06:51  Desc Main
Document  Page 72 of 125

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 28 of 83

HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.

### 3.1.2    Professional Fee Claims.

a.    Final Fee Applications. All final requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

b.    Non-Estate Professionals. Pursuant to the order approving the Debtor's motion to establish procedures for Bankruptcy Code 506(b) claims, Holders of 506(b) Claims must file, within forty-five (45) days after the Effective Date, either (i) an amended Proof of Claim encompassing the Holder's Professional Fee Claim; or (ii) file a Notice of 506(b) Claim pursuant to the 506(b) claim procedures. Such 506(b) claims submitted as an amended Proof of Claim or through a Notice of 506(b) Claim shall be considered a Professional Fee Claim and subject to the terms of this section 3.1.2.

c.    Objections to Professional Fee Claims. Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of (i) final requests for allowance and payment of Professional Fee Claims; (ii) an amended Proof of Claim to include the Professional Fee Claim; or (iii) a Notice of 506(b) Claim.

d.    Professional Fee Claims Estimate. Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtors' Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

e.    Professional Fee Escrow. As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash based on their evaluation of the Professional Fee Claims Estimates, and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow in any way. The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals and for no other Person or Entity until all Professional Fee Claims have been irrevocably paid in full; provided, that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash to such

Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow by the Reorganized Debtors without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

f.    Post Effective Date Fees and Expenses. Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors and the Reorganized Debtors, as applicable.

### 3.1.3    Priority Tax Claims. 
Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

| Priority Tax Claimant | Allowed Priority Amount |
|---|---|
| Cassia County Tax Collector | $59,591.88 |
| Department of Treasury | $1,752.63 |
| Idaho State Tax Commission | $5,612.20 |

### 3.1.4    DIP Claims. 
The DIP Claims will be paid in full on the Effective Date by the Exit Term Loan Facility.

## 3.2    Class 1: Other Priority Claims

a.    Classification. Class 1 consists of all Other Priority Claims against each Debtor. There are no known Other Priority Claims.

b.    Treatment. Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, or after the

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 30 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:55   Desc Main
Document   Page 73 of 125

Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

c.   <u>Voting</u>. Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

**3.3**   **Class 2: Corn Silage Group Secured Claims.**

a.   <u>Classification</u>. Class 2 is classified as the Corn Silage Group Secured Claims which consists of the Corn Silage Group Secured Creditors: Ed Chonjnacky, Michael Chonjnacky, Dusty Brow Farms, Inc., Grant 4-D Farms, LLC, Grant & Hagan, Inc., Douglas J. Grant, Hollifield Ranches, Inc., Standing 16 Ranch Land Company, LLC, Star Falls Farms, LLC, Steel Ranch, LLC, Bo Stevenson dba B&A Farms, Alexander K. Reed, Triple C Farms, LLC, Clint D. Thompson, and Jean L. Thompson.

| **Claimant** | **Allowed Claim Amount** |
|---|---|
| Ed Chonjnacky | $312,330.00 |
| Michael Chonjnacky | $393,753.60 |
| Dusty Brow Farms, Inc. | $245,000.00 |
| Grant 4-D Farms, LLC | $396,601.71 |
| Grant & Hagan, Inc. | $604,551.60 |
| Douglas J. Grant | 222,617.06 |
| Hollifield Ranches, Inc. | $2,044,794.31 |
| Standing 16 Ranch Land Company, LLC | $526,454.40 |
| Star Falls Farms, LLC | $404,878.00 |
| Steel Ranch, LLC | $160,000.00 |
| Bo Stevenson dba B&A Farms | $195,478.80 |
| Alexander K. Reed | $130,674.66 |
| Triple C Farms, LLC | $1,011,955.80 |
| Clint D. Thompson | $49,000.00 |
| Jean L. Thompson | $38,000.00 |

b.   <u>Treatment</u>. The Corn Silage Group Secured Claims will have been paid in full as of the Effective Date pursuant to monthly adequate protection payments, except as to any pre- and post-petition interest and attorneys' fees associated with their Claims. The Corn Silage Group Secured Claim Holders shall provide to the Debtors no later than five (5) Business Days before the Effective Date a statement of interest and attorneys' fees. Such interest and attorneys' fees shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

c.   <u>Voting</u>. Class 2 is Impaired under the Plan. Each Holder of Class 2 Claims is entitled to vote to accept or reject the Plan.

**3.4**   **Class 3: Other Secured Ag Lien Claims.**

<u>Classification</u>. Class 3 consists of the subclasses of Other Secured Ag Lien Claims that are not considered to be part of the Corn Silage Group.

**3.4.1**   **Class 3A: A. Scott Jackson Trucking Secured Claim.**

a.   <u>Classification</u>. Class 3A consists of the A. Scott Jackson Trucking Secured Claim.

b.   <u>Treatment</u>. A. Scott Jackson Trucking filed a Proof of Claim in the amount of $184,656.30. A. Scott Jackson Trucking shall have an Allowed Class 3A Claim in the amount of $184,656.30.

Except to the extent that A. Scott Jackson Trucking and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed A. Scott Jackson Trucking Secured Claim, A. Scott Jackson Trucking shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

c.   <u>Voting</u>. Class 3A is Impaired under the Plan. Class 3A is entitled to Vote under the Plan.

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization Page 32 of 83

Case 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 12:08:55 Desc Main
Document Page 74 of 125

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc

### 3.4.2   Class 3B: B&H Farming Secured Claim.

a.      Classification. Class 3B consists of the B&H Farming Secured Claim.

b.      Treatment. B&H Farming filed a Proof of Claim in the amount of $474,674.79 and shall have an Allowed Class 3B Secured Claim in the amount of $474,674.79. B&H Farming has received and will receive adequate protection payments in the amount of $474,674.79 prior to the Effective Date. As such, the B&H Farming Allowed Class 3B Secured Claim will be paid in full as of the Effective Date and B&H Farming shall receive no further Distribution under the Plan. Any pre-petition liens claimed by B&H Farming in property of the Debtors shall be considered released and have no further effect.

c.      Voting. Class 3B Unimpaired under the Plan. Class 3B is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.3   Class 3C: H&M Custom, LLC Secured Claim.

a.      Classification. Class 3C consists of the H&M Custom, LLC ("H&M") Secured Claim.

b.      Treatment. H&M filed a Proof of Claim in the amount of $4,769,170.78 and H&M shall have an Allowed Class 3C Claim in the amount of $4,769,170.78. H&M received a Court-approved $2,500,000.00 adequate protection payment during the pendency of the Chapter 11 Cases. H&M has received and will receive by the Effective Date additional adequate protection payments totaling $2,269,171.00. As such, the H&M Allowed Class 3C Secured Claim will be paid in full as of the Effective Date and H&M shall receive no further Distribution under the Plan. Any pre-petition liens claimed by H&M in property of the Debtors shall be considered released and have no further effect.

c.      Voting. Class 3C is Unimpaired under the Plan. Class 3C is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.4   Class 3D: Healthy Earth Enterprises, LLC Secured Claim.

a.      Classification. Class 3D consists of the Healthy Earth Enterprises, LLC ("Healthy Earth") Secured Claim.

b.      Treatment. The Scheduled amount of the Healthy Earth Secured Claim is $60,000.00 and Healthy Earth did not file a Proof of Claim. Healthy Earth shall have an Allowed Class 3D Secured Claim in the amount of $60,000.00. Healthy Earth received a Court-approved $60,000.00 adequate protection payment during the pendency of the Chapter 11 Cases. No further amount will be owing by the Debtors to Healthy Earth as of the Effective Date and therefore Healthy Earth will receive no Distribution under the Plan. Any pre-petition liens claimed by Healthy Earth Enterprises in property of the Debtors shall be considered released and have no

further effect.

c.      Voting. Class 3D is Unimpaired under the Plan. Class 3D is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.5   Class 3E: Kraus Farms, LLC Secured Claim.

a.      Classification. Class 3E consists of the Kraus Farms, LLC ("Kraus Farms") Secured Clam.

b.      Treatment. The Scheduled amount of the Kraus Farms Secured Claim is $480,313.10. Kraus Farms filed a Proof of Claim in the amount of $499,473.53 and shall have an Allowed Class 3E Secured Claim in the amount of $499,473.53.

Except to the extent that Kraus Farms and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 3D Secured Claim, Kraus Farms shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

c.      Voting. Class 3E is Impaired under the Plan. The Class 3E Claim is entitled to Vote under the Plan.

### 3.4.6   Class 3F: Milner Hay Company, LLC Secured Claim.

a.      Classification. Class 3F consists of the Milner Hay Company, LLC ("Milner") Secured Claim.

b.      Treatment. The Scheduled amount of the Milner Secured Claim is $64,885.00. Milner did not file a Proof of Claim. Milner shall have an Allowed Class 3F Claim in the amount of $64,885.00. Milner has received and will receive post-petition adequate protection payments totaling $64,885.00 prior to the Effective Date. No further amount will be owed by the Debtors to Milner as of the Effective Date and therefore Milner will receive no Distribution under the Plan. Any pre-petition liens claimed by Milner in any property of the Debtors shall be considered released and have no further effect.

c.      Voting. Class 3F is Unimpaired under the Plan. Class 3F is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.7   Class 3G: Moss Grain Partnership Secured Claim.

a.      Classification. Class 3G consists of the Moss Grain Partnership ("Moss Grain") Secured Claim.

b.      Treatment. Moss Grain filed a Proof of Claim in the amount of $101,000.00 and shall have an Allowed Class 3G Secured Claim in the amount of $101,000.00.

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization Page 34 of 83

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Case 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 12:04:51 Desc Main
Document Page 75 of 125

Moss Grain has received and will receive post-petition adequate protection payments totaling $101,000.00 prior to the Effective Date. No further amount will be owed by the Debtors to Moss Grain as of the Effective Date and therefore Moss Grain will receive no Distribution under the Plan. Any pre-petition liens claimed by Moss Grain in any property of the Debtors shall be considered released and have no further effect.

c. Voting. Class 3G is Unimpaired under the Plan. Class 3G is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.8 Class 3H: NorthWest Seed, Inc Secured Claim.

a. Classification. Class 3H consists of the NorthWest Seed, Inc. ("NorthWest") Secured Claim.

b. Treatment. The Debtors Scheduled NorthWest as an unknown secured claim based on financing statements filed by NorthWest claiming a security interest in the Debtors' 2024 hay. The Debtors have concluded there is no amount owing to NorthWest as of the Petition Date and NorthWest did not file a Proof of Claim. As such, NorthWest will not receive a Distribution under the Plan. Any pre-petition liens claimed or asserted by NorthWest in any property of the Debtors shall be considered released and have no further effect.

c. Voting. Class 3H is Unimpaired under the Plan. Class 3H is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.9 Class 3I: Performance Plus-Idaho, LLC Secured Claim.

a. Classification. Class 3I consists of the Performance Plus-Idaho, LLC ("Performance Plus") Secured Claim.

b. Treatment. The Debtors Scheduled Performance Plus as a secured claim in the amount of $29,931.44. Performance Plus did not file a Proof of Claim and shall have an Allowed Class 3I Secured Claim in the amount of $29,931.44.

Except to the extent that Performance Plus-Idaho, LLC and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 3I Secured Claim, Performance Plus shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

c. Voting. Class 3I is Impaired under the Plan. Class 3I Claims are entitled to Vote under the Plan.

### 3.4.10 Class 3J: Tyche Ag, LLC Secured Claim.

a. Classification. Class 3J consists of the Tyche Ag, LLC ("Tyche") Secured Claim.

d. Treatment. The Debtors Scheduled Tyche as an unknown secured claim based on financing statements filed by Tyche claiming a security interest in the Debtors' 2023 hay. The Debtors have concluded there is no amount owing to Tyche as of the Petition Date and Tyche did not file a Proof of Claim. As such, Tyche will not receive a Distribution under the Plan. Any pre-petition liens claimed or asserted by Tyche in any property of the Debtors shall be considered released and have no further effect.

b. Voting. Class 3H is Unimpaired under the Plan. Class 3H is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.11 Class 3K: Wada Farms Partnership Secured Claim.

a. Classification. Class 3K consists of the Wada Farms Partnership ("Wada Farms") Secured Claim.

b. Treatment. The Debtors Scheduled Wada Farms as a secured claim in the amount of $374,432.50. Wada Farms did not file a Proof of Claim. It shall have an Allowed Class 3K Secured Claim in the amount of $374,432.50. Wada Farms has received and will receive post-petition adequate protection payments totaling $374,432.50 prior to the Effective Date. No further amount will be owed by the Debtors to Wada Farms as of the Effective Date and therefore Wada Farms will receive no Distribution under the Plan. Any pre-petition liens claimed or asserted by Wada Farms in any property of the Debtors shall be considered released and have no further effect.

c. Voting. Class 3K is Unimpaired under the Plan. Class 3K is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.12 Class 3L: Youree Land & Livestock Secured Claim.

a. Classification. Class 3L consists of the Youree Land & Livestock ("Youree") Secured Claim.

b. Treatment. Youree filed a Proof of Claim in the amount of $119,042.08 and shall have an Allowed Class 3L Secured Claim of $119,042.08. Youree has received and will receive post-petition adequate protection payments in the amount of $112,157.00 prior to the Effective Date. After payment of the adequate protection payments, the Debtors will owe Youree $6,885.06 on the Effective Date, which Plus shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

c. Voting. Class 3L is Impaired under the Plan. The Class 3L Secured

Case 24-40158-NGH    Doc 640-1    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization    Page 36 of 83

Case 24-40158-NGH    Doc 640-1    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc
Case 24-40158-NGH    Doc 645    Filed 10/02/24    Entered 10/02/24 12:45:11    Page 36 of 83
Document    Page 76 of 125

Claim is entitled to Vote under the Plan.

### 3.4.13  Class 3M: Eagle Creek Northwest, LLC Claim.

a.     _Classification_. Class 3M consists of the Eagle Creek Northwest, LLC ("Eagle Creek") Secured Claim.

b.     _Treatment_. The Debtors Scheduled Eagle Creek as an unknown secured claim based on financing statements filed by Eagle Creek claiming a security interest in the Debtors' wheat, hay, potatoes, and sugar beets. The Debtors have concluded there is no amount owing to Eagle Creek as of the Petition Date and Eagle Creek did not file a Proof of Claim. As such, Eagle Creek will not receive a Distribution under the Plan. Any pre-petition liens claimed or asserted by Eagle Creek in any property of the Debtors shall be considered released and have no further effect.

c.     _Voting_. Class 3M is Unimpaired under the Plan. Class 3M is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.4.14  Class 3N: Standlee Ag Resources and Premium Products Secured Claim.

a.     _Classification_. Class 3N consists of the Standlee Ag Resources and Premium Products (collectively referred to herein as "Standlee") Secured Claim.

b.     _Treatment_. Standlee filed a Proof of Claim in the amount of $214,915.55 and shall have an Allowed Class 3N Secured Claim in the amount of $214,915.55. Standlee has received and will receive post-petition adequate protection payments totaling $208,490.00 prior to the Effective Date. After payment of the adequate protection payments, the Debtors will owe Standlee $6,425.55 on the Effective Date, which shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

c.     _Voting_. Class 3N is Impaired under the Plan. The Class 3N Claim is entitled to Vote under the Plan.

### 3.5    Class 4: MetLife Secured Claims.

a.     _Classification_. Class 4 consists of MetLife's Secured Claims.

Metropolitan Life Insurance Company ("MLIC") and MetLife Real Estate Lending LLC (collectively, "MetLife") are the owners and holders of certain commercial real estate loans (collectively, the "Pre-Petition MetLife Loans" and, together with all related mortgages and other existing or future documents evidencing, securing, or executed in connection with the Pre-Petition MetLife Loans, in each case, as Amended, referred to herein as the "Pre-Petition MetLife Loan Documents") made by MetLife to the MetLife Borrowers. The Pre-Petition MetLife Loans are secured by liens in and security interests on the MetLife Borrowers' real property and certain of the MetLife Borrowers' personal property, including: (x) crops grown after a foreclosure; (y) all

wells, underground pipelines, sprinklers, and similar irrigation equipment located at the real property, as well as all lines, valve openers, pipes, and similar items pertaining to such irrigation equipment; and (z) all milking equipment located at the real property (the "Pre-Petition MetLife Real Estate Collateral"). The Pre-Petition MetLife Loans are further secured, subject to the First Intercreditor Agreement (defined below), by the Milk Receivables (the "MetLife Milk Priority Claim," and collectively with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition MetLife Collateral" and all liens and security interests on and in the Pre-Petition MetLife Collateral, the "Pre-Petition MetLife Liens"). As of the Petition Date, the MetLife Borrowers were indebted to MetLife, in the aggregate amount of approximately $180,473,929.72 under the Pre-Petition MetLife Loan Documents (collectively, the "Pre-Petition MetLife Obligations").

Rabo and MetLife are parties to (i) that certain Intercreditor Agreement, dated as of September 18, 2018, (as Amended, the "First Intercreditor Agreement") and (ii) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022 (as Amended, the "Second Intercreditor Agreement" and, together with the First Intercreditor Agreement, the "MetLife Intercreditor Agreements"). Pursuant to the First Intercreditor Agreement, Rabo agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition MetLife Collateral to those of MetLife, and MetLife agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition RLOC Collateral (other than any such property that may also constitute Pre-Petition MetLife Collateral) to those of Rabo.

Additionally, the First Intercreditor Agreement recognizes that Rabo and MetLife have separately entered into Milk Check Assignment Agreements (the "Milk Agreements") with Debtor Millenkamp Cattle and a milk purchaser, Glanbia Foods, Inc. ("Milk Purchaser"). The Milk Agreements direct the Milk Purchaser to make certain payments directly to Rabo (in certain situations) and MetLife (on a monthly basis), rather than to Millenkamp Cattle. Pursuant to the terms of the First Intercreditor Agreement, MetLife's priority interest in any Milk Receivables is equal to the aggregate amount of, in any month, the amount of the monthly installment payment of principal and accrued interest then due and payable by the applicable Debtors to MetLife, with such amount being capped at one month's principal and interest payment, unless MetLife has provided written notice to Rabo that amounts exceeding one month's principal and interest payment are due, owing, and unpaid.

On September 18, 2018, Rabo, Millenkamp Cattle, and the Milk Purchaser also entered into a Collateral Assignment of Milk Contracts, pursuant to which Millenkamp Cattle assigned to Rabo all contracts and proceeds related to certain purchase agreements between Millenkamp Cattle and the Milk Purchaser, to secure the obligations owed to the Pre-Petition RLOC Secured Parties. Subject to the foregoing, during the Borrowers' default under the Pre-Petition RLOC Documents, Rabo may collect the Milk Receivables. Other than the foregoing subordination, MetLife and Rabo expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of the Pre-Petition RLOC Secured Parties' rights, privileges, powers, or remedies with respect to the Pre-Petition RLOC Obligations or the Pre-Petition RLOC Collateral. Likewise, Rabo and MetLife expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of MetLife's rights, privileges, powers, or remedies with respect to the Pre-Petition MetLife Loans or the Pre-Petition MetLife Collateral. MetLife does not have any lien or security interest in any of the Debtors' Livestock, including, but not limited to, dairy cattle.

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 38 of 83

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:06:51  Desc Main
Document  Page 77 of 125

| Description | Principal Amount | Claim Amount | Security |
|---|---|---|---|
| **Promissory Note A** dated September 26, 2018, and First Amendment dated April 21, 2021 | $106,000,000.00 | $86,855,135.96 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note B** dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment April 21, 2021 | $59,400,000.00 | $51,693,035.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note C** dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment April 21, 2021 | $13,000,000.00 | $11,530,349.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note D** dated April 21, 2021 | $17,954,226.00 | $16,210,086.43 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note E** dated April 21, 2021 | $15,978,409.00 | $10,082,419.25 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **9858 Promissory Note** dated March 12, 2019 | $5,508,350.00 | $5,005,171.86 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated March 12, 2019  "Canyonlands" and "McGregor" property |

b.  <u>Treatment.</u> MetLife filed Proofs of Claim in the aggregate amount of $181,376,198.66. The Debtors' books and records reflect a total amount owing to MetLife of $184,177,739.10. The Debtors are conducting a reconciliation of their books and records and MetLife's Proofs of Claim. As of the filing of this Plan, MetLife shall have an Allowed Class 4 Secured Claim in the amount of $184,177,739.10.

The Allowed Class 4 Secured Claim shall receive the following treatment:

1) Interest-only payments at the non-default rate for the first 30 months following the Effective Date. The terms of the Pre-Petition MetLife Loans shall remain the same, except the interest rate on the Pre-Petition MetLife Loans shall be increased to 6% per annum.

2) MetLife shall file a Professional Fee Claim pursuant to section 3.1.2 of this Plan. Upon Allowance of MetLife's Professional Fee Claim, MetLife shall roll the amount of the Professional Fee Claim into the principal balance of the Pre-Petition MetLife Loans.

3) At month 31 following the Effective Date, the Allowed Class 4 Secured Claim shall begin receiving monthly principal and interest payments pursuant to the Budget.

c.  <u>Voting.</u> Class 4 is Impaired under the Plan. Class 4 is entitled to Vote under the Plan.

**3.6  <u>Class 5: Rabo Secured Claims.</u>**

a.  <u>Classification.</u> Class 5 consists of Rabo's Secured Claims.

Under that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended, the "<u>Pre-Petition RLOC Credit Agreement</u>" and collectively with all security, pledge, intercreditor, guaranty agreements, and other documentation executed in respect

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 40 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:42:51   Desc Main
Document   Page 78 of 125

thereof, the "Pre-Petition RLOC Documents", by and among the Debtors[1], collectively as borrower, the lenders from time to time party thereto (in such capacity, collectively, the "Pre-Petition RLOC Lenders"), and Rabo, as sole lead arranger, agent, and swing-line lender (in its capacity as agent for the benefit of the Pre-Petition RLOC Lenders and each Issuer (as defined in the Pre-Petition RLOC Credit Agreement), the "Pre-Petition RLOC Agent" and collectively with the Pre-Petition RLOC Lenders and the Issuers, the "Pre-Petition RLOC Secured Parties" and each, a "Pre-Petition RLOC Secured Party"), the Debtors were provided with an asset-based revolving line of credit facility (the "Pre-Petition RLOC Facility") consisting of (a) revolving commitments in an aggregate amount of up to $91,000,00.00; (b) a swing-line credit facility for the Pre-Petition RLOC Agent to make Swing Line Advances (as defined in the Pre-Petition RLOC Credit Agreement) in an aggregate amount of up to $7,500,000.00; and (c) a letter-of-credit facility for the issuance of stand-by letters of credit in an aggregate amount of up to $1,000,000.00.

Pursuant to the terms of the Pre-Petition RLOC Credit Agreement, the Debtors granted to the Pre-Petition RLOC Agent a security interest to and in substantially all of the Debtors' and Borrowers' personal property, excluding their real property, and all other property defined as the "Collateral" in the Pre-Petition RLOC Credit Agreement (referred to herein as the "Pre-Petition RLOC Collateral" and the liens and security interests granted to or for the benefit of the Pre-Petition RLOC Secured Parties therein, the "Pre-Petition RLOC Personal Property Liens").

The Pre-Petition RLOC Collateral includes, among other interests (each as defined in the Pre-Petition RLOC Credit Agreement): all Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and, notably, the Borrowers' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Borrowers' milk and other dairy products (the "Milk Receivables"). The Pre-Petition RLOC Secured Parties' lien and security interest extends to all accessions to, substitutions for, and all replacements, products, and proceeds of the Pre-Petition RLOC Collateral. As described below, the Pre-Petition RLOC Secured Parties' interest in the Milk Receivables is subject to the First Intercreditor Agreement (as defined below) entered into between them and MetLife.

Further, as consideration for the Pre-Petition RLOC Agent to enter into that certain Forbearance Agreement, made effective as of October 22, 2022, the Borrowers granted, among other things, a second priority mortgage on the Pre-Petition MetLife Real Estate Collateral (defined below) to secure the Pre-Petition RLOC Obligations, subject to the Second Intercreditor Agreement (defined below). Accordingly, on October 20, 2022, the Borrowers executed and delivered that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (Second Priority), in favor of the Pre-Petition RLOC Agent, to secure any and all obligations owed to the Pre-Petition RLOC Secured Parties, which was recorded in Cassia County, as Instrument No. 2022-004552, Twin Falls County as Instrument No. 2022018722, and Jerome County as Instrument No. 2224759 (the "Pre-Petition RLOC Second Mortgage" and together with the Pre-Petition RLOC Personal Property Liens, the "Pre-Petition RLOC Liens").

---

[1] Nondebtors Susan Millenkamp as Trustee of the WJM 2012 Trust; William Millenkamp as Trustee of the SJM 2012 Trust; William John Millenkamp and Susan Jo Millenkamp (the "Non-Debtor Borrowers") also executed the Pre-Petition RLOC Credit Agreement. The Debtors and the Non-Debtor Borrowers are referred to herein as the "Borrowers."

DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION – PAGE 39

b.   Treatment. Rabo filed a Proof of Claim in the amount of $96,143,211.38.

Proof of Claim Amount:

Principal:  $93,098,575.54
Interest (as of April 2, 2024): $1,818,831.21
Fees and Costs (as of April 2, 2024): $1,219,525.43
Unused Commitment Fee: $6,280.20
TOTAL: $96,143,211.38

The Debtors' books and records reflect a total principal amount owing to Rabo of $90,952,408.00. The Debtors are conducting a reconciliation of their books and records and Rabo's Proof of Claim to determine the principal balance owed to Rabo as of the Petition Date.

Rabo shall forgive the pre-petition and post-petition default interest and professional fees owing on the Rabo Secured Claims. As such, Rabo shall have an Allowed Class 5 Secured Claim in the amount of $90,952,408.00. The Allowed Class 5 Claim shall be paid in full on the Effective Date.

c.   Voting. Class 5 is Impaired under the Plan. Class 5 is entitled to Vote under the Plan.

### 3.7   Class 6: Conterra Secured Claims.

a.   Classification. Class 6 consists of Conterra's Secured Claims.

Millenkamp Cattle, Inc., Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy LLC, East Valley Cattle, LLC, Millenkamp Family LLC, Millenkamp Properties, L.L.C., Millenkamp Properties II LLC, Goose Ranch, LLC, William J. Millenkamp and Susan J. Millenkamp (collectively, the "Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $16,500,000 which Conterra endorsed to Ag Funding (the "Mezz Loan"). The Mezz Loan is secured by second priority liens and security interests in the Pre-Petition RLOC Collateral (the "Pre-Petition Conterra Mezz Collateral") and third priority mortgage on the Pre-Petition MetLife Real Estate Collateral (the "Pre-Petition Conterra Mezzanine Liens").

Millenkamp Cattle, Inc., Millenkamp Family LLC, Millenkamp Properties II LLC, Millenkamp Properties, L.L.C., East Valley Cattle, LLC, Idaho Jersey Girls Jerome Dairy LLC, and William J. Millenkamp (collectively, the "Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $2,549,750 (the "German Note") which Conterra endorsed to Rooster Capital IV LLC ("Rooster").

The German Note is secured by a first priority mortgage on certain real property owned by

DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION – PAGE 40

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 79 of 125

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:11   Page 42 of 83
Document       Page 79 of 125

certain of the Debtors known as "German Dairy" located at 162 West 400 North, Jerome, Idaho 83338 (the "Pre-Petition Conterra Real Estate Collateral" and together with the Pre-Petition MetLife Real Estate Collateral, the "Pre-Petition Real Estate Collateral" and collectively with the Pre-Petition RLOC Collateral and the Pre-Petition MetLife Collateral, the "Pre-Petition Collateral") and located in Jerome County, Idaho (the "Pre-Petition Conterra Real Estate Lien" and, together with the Pre-Petition Conterra Mezz Liens, the "Pre-Petition Conterra Liens" and collectively with the Pre-Petition Rabo Liens and the Pre-Petition MetLife Liens, the "Pre-Petition Liens"). The Pre-Petition Conterra Mezz Collateral and the Pre-Petition Conterra Real Estate Collateral is collectively referred to herein as the "Pre-Petition Conterra Collateral").

        b.    <u>Treatment.</u> Conterra filed Proofs of Claim in the aggregate amount of $21,460,993.60.

<u>German Note Proof of Claim Amount:</u>

Unpaid Principal: $2,508,860.41

Accrued Interest through 4/2/24: 67,867.67

Total unpaid balance as of 4/2/24: **$2,576,728.08**

<u>Mezz Loan Proof of Claim Amount:</u>

Unpaid Principal: $16,500,000.00

Accrued Interest through 4/2/24: $1,457,810.41

Late Fees: $830,614.58

Reimbursable Expenses: $95,840.53

Total unpaid balance as of 4/2/24: **$18,884,265.52**

Conterra has an Allowed Class 6 Secured Claim in the amount of $21,460,994, plus professional fees and costs upon Allowance of any Professional Fee Claim Conterra files pursuant to section 3.1.2 of this Plan. The Debtors are conducting a reconciliation of their books and records compared to Conterra's Proofs of Claim and will update the Allowed Claim as necessary based on such reconciliation.

The German Note shall be re-amortized and paid in full within 24 months of the Effective Date through monthly principal and interest payments pursuant to the Budget. The Mezz Loan shall receive PIK interest at 15% for the first three years of the Plan, through December 2027. Starting in Year 4 of the Plan, the balance of the Mezz Loan shall be amortized over five years with principal and interest payments at 15%.

Conterra's Allowed Professional Fee Claim shall be rolled into the principal balance of the Mezz Loan.

        c.    <u>Voting.</u> Class 6 is Impaired under the Plan. Class 6 is entitled to Vote under the Plan.

### 3.8   Class 7: Secured Equipment and Vehicle Lien Claims.

        <u>Classification:</u> Class 7 consists of the subclasses of the Secured Equipment and Vehicle Lien Claims.

#### 3.8.1   Class 7A: CNH Industrial Capital Secured Claim.

        a.    <u>Classification.</u> Class 7A consists of the CNH Industrial Capital ("CNH") Secured Claim.

        b.    <u>Treatment.</u> CNH filed Proofs of Claim in the total aggregate amount of $17,915,944.14.

| POC # | POC Amount | Document | Collateral |
|---|---|---|---|
| Claim 110 | $1,980,095.12 | Equipment Lease 765512 | 6 Magnum Tractors |
| Claim 111 | $2,438,189.14 | Equipment Lease 765542 | 4 Case Steigers & Remotes |
| Claim 112 | $5,294,925.12 | Equipment Lease 210982 | 26 Magnum Tractors |
| Claim 113 | $4,796,579,94 | Equipment Lease 765784 | 16 Magnum Tractors |
| Claim 114 | $2,587,321.81 | Equipment Loan 765552 | 30 Case Maxxum Tractors |

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 44 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:55   Desc Main
Document   Page 80 of 125

| | | | |
|---|---|---|---|
| Claim 115 | $470,430.75 | Equipment Loan 765530 | 25 Kubota Tractors |
| Claim 116 | $207,310.38 | Productivity Plus Credit Line 373662 | All collateral financed/leased by CNH |
| Claim 117 | $141,091.88 | Productivity Plus Credit Line 373203 | All collateral financed/leased by CNH |

CNH shall have an Allowed Class 7A Claim in the amount of $17,915,944.14. CNH has received and will receive post-petition adequate protection payments prior to the Effective Date. Except to the extent CNH and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7A Claim, CNH shall continue to be paid in accordance with the provisions of the pre-petition contracts in the amounts required by those contracts, currently approximately $242,716.00 per month.

       d. <u>Voting</u>. Class 7A is Unimpaired under the Plan. Class 7A is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    **3.8.2** <u>**Class 7B: Daimler Truck Financial Services USA LLC Secured Claim.**</u>

       a. <u>Classification</u>. Class 7B consists of the Daimler Truck Financial Services USA LLC ("Daimler") Secured Claim.

       b. <u>Treatment</u>. Daimler filed a Proof of Claim in the amount of $1,534,278.22. Daimler shall have an Allowed Secured Claim in the amount of $1,534,278.22. Daimler has received and will receive post-petition adequate protection payments in the amount of $563,354.00 before the Effective Date.

Except to the extent Daimler and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7B Claim, Daimler shall continue to be paid in accordance with the provisions of the pre-petition contracts with Debtors, in the amounts required by those contracts, currently approximately $63,926.00 per month.

       c. <u>Voting</u>. Class 7B is Unimpaired under the Plan. Class 7B is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    **3.8.3** <u>**Class 7C: Farmers Bank**</u>

       a. <u>Classification</u>. Class 7C consists of the Farmers Bank Secured Claim.

       b. <u>Treatment</u>. Farmers Bank filed Proofs of Claim totaling $2,474,927.97.

| **POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 35 | $294,173.07 | 2024 Ram Pickups |
| Claim 36 | $10,975.50 | Con-Dor Peecon 1700 Feed Mixer |
| Claim 37 | $96,225.11 | 2021 Ram Pickups |
| Claim 38 | $26,211.20 | Nuhn Alley Vac Manure Wagon 7000 Gal Tank |
| Claim 39 | $269,908.99 | Caterpillar Diesel Generators |
| Claim 40 | $280,789.94 | Caterpillar Diesel Generators |
| Claim 41 | $140,596.63 | SmithCo Side Dump Trailers |
| Claim 42 | $166,267.09 | 2022 Ram Pickups |
| Claim 43 | $132,902.49 | Con Dor Peecon 1700 Feed Mixer |
| Claim 44 | $56,558.60 | 2022 Mahindra UTB |
| Claim 45 | $100,364.26 | 2024 Wilson 53' Livestock Trailers |

Farmers Bank shall have an Allowed Class 7C Secured Claim in the amount of $2,474,972.97. Farmers Bank has received and will receive post-petition adequate protection payments totaling $933,289.47 prior to the Effective Date.

Except to the extent Farmers Bank and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization Page 90 of 125

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc

Case 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 12:06:51 Page 46 of 83 Main Document Page 81 of 125

such Allowed Class 7C Claim, Farmers Bank shall continue to be paid in accordance with the provisions of its pre-petition contract with the Debtors, in the amounts required by the contract, currently approximately $105,706.00 per month.

        d. <u>Voting</u>. Class 7C is Unimpaired under the Plan. Class 7C is Unimpaired under the Plan. Class 7C is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.8.4   <u>Class 7D: John Deere Construction & Forestry Secured Claim.</u>

        a.    <u>Classification</u>. Class 7D consists of the John Deere Construction & Forestry ("John Deere") Secured Claim.

        b.    <u>Treatment</u>. John Deere filed Proofs of Claim in the aggregate amount of $948,846.69.

| POC # | POC Amount | Collateral |
|---|---|---|
| Claim 20 | $119,6060.55 | Cross Collateralized Loan with all Deere Loans/Collateral |
| Claim 21 | $121,475.50 | Hamm 10i Compactors |
| Claim 22 | $151,965.48 | Hamm 121 P |
| Claim 23 | $69,597.45 | John Deere 50G Compact Excavator |
| Claim 24 | $69,957.45 | John Deere 50G Compact Excavator |
| Claim 25 | $187,368.29 | 2023 John Deere 650P-Tier Utility Dozer |
| Claim 26 | $116,806.61 | John Deere 320 P-Tier Backhoe Loader |
| Claim 27 | $232,035.91 | 2023 John Dere 135 P-TIER Backhoe Loader AND 2023 John Deere EC13 QS60 COMPLETE SYSTEM W/ 2 BUCKETS |

John Deere shall have an Allowed Class 7D Secured Claim in the amount of $948,846.69. John Deere has received and will receive post-petition adequate protection payments in the amount of $212,083.62 prior to the Effective Date.

        Except to the extent John Deere and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7D Claim, John Deere shall continue to be paid in accordance with the provisions of its pre-petition contracts with Debtors in the amounts required by the contracts.

        c.    <u>Voting</u>. Class 7D is Unimpaired under the Plan. Class 7D is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.8.5   <u>Class 7E: Western States Cat Secured Claim.</u>

        a.    <u>Classification</u>. Class 7E consists of the Western States Cat ("Western States") Secured Claim.

        b.    <u>Treatment</u>. The Debtors Scheduled Western States as a secured claim in the amount of $688,964.59. Western States did not file a Proof of Claim and shall have an Allowed Class 7E Secured Claim in the amount of $688,964.59. Western States has received and will receive post-petition adequate protection payments in the amount of $596,071.02 prior to the Effective Date.

        On May 22, 2024, the Bankruptcy Court approved the Debtors' assumption of the Previous Rental Agreement when it issued its Final Order (A) Granting Motion to Condition Use of WSECO's Equipment on Receipt of Adequate Protection, and (B) Granting Debtor's Motion for Order Authorizing the Debtor to Assume Unexpired Lease (Docket. No. 314). The Previous Rental Agreement expired on June 30, 2024. On July 1, 2024, the Debtors and Western States Cat entered into a New Rental Agreement (the "New Rental Agreement").

        Pursuant to the New Rental Agreement, Western States shall deliver an invoice to the Debtors by the twenty-fifth (25th) of each month detailing the amount of the monthly rent and expense amounts based on the hourly usage of the equipment from the previous month and using the rate of Total Costs Per Hour (or CPH) as set forth on Exhibit B of the New Rental Agreement. The Debtors shall pay the rent and expenses due under each monthly invoice within ten (10) calendar days.

        Except to the extent Western States Cat and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7E Claim, Western States Cat shall continue to be paid in accordance with the provisions of the New Rental Agreement in the amounts required by the New Rental Agreement.

        c.    <u>Voting</u>. Class 7E is Unimpaired under the Plan. Class 7E is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 90 of 125

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:06:51  Desc Main
Document  Page 82 of 125

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 48 of 83

### 3.8.6    Class 7F: Kenworth Sales Company Secured Claim.

a.    Classification. Class 7F consists of the Kenworth Sales Company ("Kenworth") Secured Claim.

b.    Treatment. Kenworth filed a Proof of Claim in the amount of $49,359.77 and shall have an Allowed Class 7F Secured Claim in the amount of $49,359.77. Kenworth has received and will receive post-petition adequate protection payments totaling $48,677.75 prior the Effective Date.

Except to the extent Kenworth and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7D Claim, Kenworth shall continue to be paid in accordance with the provisions of its pre-petition contracts with Debtors in the amounts required by the contracts.

c.    Voting. Class 7F is Unimpaired under the Plan. Class 7F is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

## 3.9    Class 8: Other Secured Claims.

Classification. Class 8 consists of Other Secured Claims.

### 3.9.1    Class 8A: MWI Veterinary Secured Claim.

a.    Classification. Class 8A consists of the MWI Veterinary Secured Claim.

b.    Treatment. MWI Veterinary filed three Proofs of Claim in the aggregate amount of $2,566,485.40.

| Case | Proof of Claim Amount |
|---|---|
| Millenkamp Cattle, Inc. | $2,525,459.31 |
| Idaho Jersey Girls, LLC | $25,375.92 |
| Black Pine Cattle, LLC | $15,650.17 |

MWI Veterinary received a Court-approved adequate protection payment during the pendency of this Bankruptcy Case in the amount of $500,127.14 and has an Allowed 503(b)(9) Claim in the amount of $484,255.92. Based on the Debtors' books and records as of the filing of

this Plan, MWI Veterinary is owed $2,063,428.20. After deduction of the 503(b)(9) Claim, MWI Veterinary shall have an Allowed Class 8A Secured Claim in the amount of $1,579,172.28.

Except to the extent MWI Veterinary and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 8A Secured Claim, the Allowed Class 8A Claim shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

c.    Voting. Class 8A is Impaired under the Plan. Class 8A is entitled to Vote under the Plan.

### 3.9.2    Class 8B: PerforMix Nutrition Systems Secured Claim.

a.    Classification. Class 8B consists of the PerforMix Nutrition Systems ("PerforMix") Secured Claim.

b.    Treatment. PerforMix filed a Proof of Claim in the amount of $213,744.20 and shall have an Allowed Class 8B Secured Claim in the amount of $213,744.20. PerforMix has received and will receive post-petition adequate protection payments totaling $213,744.20 prior to the Effective Date. No further amount will be owed by the Debtors to PerforMix as of the Effective Date and therefore PerforMix will receive no Distribution under the Plan. Any pre-petition liens claimed or asserted by PerforMix in any property of the Debtors shall be considered released and have no further effect.

c.    Voting. Class 8B is Unimpaired under the Plan. Class 8B is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.9.3    Class 8C: Rexel USA, Inc. d/b/a Platt Electric Supply Claim.

a.    Classification. Class 8C consists of the Rexel USA, Inc. d/b/a Platt Electric Supply ("Platt") Claim.

b.    Treatment. Platt filed a Proof of Claim in the secured amount of $504,414.02. The Proof of Claim is Disputed and the Debtors will be filing an objection to the full amount of the Proof of Claim. As such, the Debtors will set aside the full amount of the Class 8C Claim in the amount of $504,414.02 in the Distribution Reserve.

c.    Voting. Class 8C is Impaired under the Plan. Class 8C Claims are entitled to Vote under the Plan as a Holder of a General Unsecured Claim in Class 9.

### 3.9.4    Class 8D: Staker & Parson Company d/b/a Idaho Materials & Construction Claim.

a.    Classification. Class 8D consists of the Staker & Parson Company d/b/a Idaho Material & Construction ("Idaho Material") Claim.

b.    Treatment. Idaho Material filed an unsecured Proof of Claim in the

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 50 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:51   Desc Main
Document   Page 83 of 125

amount of $48,207.17 in the Millenkamp Cattle, Inc. Case and a secured Proof of Claim in the amount of $48,207.17 in the East Valley Cattle, LLC Case. The Notice of Claim of Lien was recorded on April 30, 2024, as Cassia County Instrument No. 2024001489.

Idaho Material will receive by the Effective Date adequate protection payments totaling $48,207.17. As such, the Idaho Material Allowed Class 8D Secured Claim will be paid in full as of the Effective Date and Idaho Material shall receive no further Distribution under the Plan. Any pre-petition liens claimed by Idaho Material in property of the Debtors shall be considered released and have no further effect.

     d.    <u>Voting</u>. Class 8D is Unimpaired under the Plan. Class 8D is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 3.9.5   <u>Class 8E: Les Schwab Tire Centers of Idaho, LLC Claims.</u>

     a.    <u>Classification</u>. Class 8E consists of the Les Schwab Tire Center of Idaho LLC ("Les Schwab") Claims.

     b.    <u>Treatment</u>. Les Schwab filed two Proofs of Claim in the aggregate amount of $255,256.55.

| <u>Case</u> | <u>Proof of Claim Amount</u> | <u>503(B)(9) Claim Amount Approved</u> |
|---|---|---|
| Millenkamp Cattle, Inc. | $151,173.71 | $26,643.97 |
| Black Pine Cattle, LLC | $102,082.84 | $0 |

Pursuant to the 503(b)(9) Order, Les Schwab has an Allowed 503(b)(9) Claim in the amount of $26,643.97. Les Schwab will be paid, in Cash, its Allowed 503(b)(9) Claim as an Administrative Claimant in the amount of $26,643.97, on or as soon as reasonably practicable after the Effective Date. The remainder of the Les Schwab Claim, in the amount of $226,612.58, shall be paid pursuant to the Budget, with quarterly payments at 5% interest through December 2026.

     c.    <u>Voting</u>. Class 8E is Impaired under the Plan. The Class 8E Claim is entitled to Vote under the Plan.

### 3.10   <u>Class 9: General Unsecured Claims.</u>

     a.    <u>Classification.</u> Class 9 consists of all General Unsecured Claims, in the approximate amount of $27 million (the "GUC Principal Amount"). A full listing of the General Unsecured Claims and amounts of each Claim is included as Exhibit E of the Disclosure Statement.

     b.    <u>Treatment</u>. The Holders of Class 9 Claims shall receive the following treatment under the Plan:

     i.    5% quarterly interest payments for four years, through December of 2028

     ii.    10% of the GUC Principal Amount paid as quarterly payments in 2025

     iii.    20% of the GUC Principal Amount paid as quarterly payments in 2026

     iv.    30% of the GUC Principal Amount paid as quarterly payments in 2027

     v.    40% of the GUC Principal Amount paid as quarterly payments in 2028

The Holders of Class 9 Claims shall be 100% of their Claims through the foregoing payment schedule by December of 2028.

     c.    <u>Voting</u>. Class 9 is Impaired under the Plan. The Holders of Class 9 Claims are entitled to Vote under the Plan.

### 3.11   <u>Class 10: Intercompany Claims</u>

     a.    <u>Classification.</u> Class 11 consists of all Intercompany Claims.

     b.    <u>Treatment</u>. On the Effective Date, all Intercompany Claims shall be extinguished. Holders of Intercompany Claims will receive no Distributions under the Plan.

     c.    <u>Voting</u>. Each Holder of a Class 10 Claim will be deemed to have rejected this Plan and, therefore, are not entitled to vote on this Plan.

### 3.12   <u>Class 11: Equity Interests.</u>

     a.    <u>Classification.</u> Class 11 consists of all Equity Interests in the Debtors.

     b.    <u>Treatment</u>. Each Debtors' pre-petition equity interests shall remain the same post-petition. Class 11 Claim Holders are retaining ownership interests in the Debtors.

     c.    <u>Voting</u>. Class 11 is Unimpaired under the Plan. Class 11 is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 52 of 83

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:55   Page 52 of 83
Document   Page 84 of 125

**3.13**      <u>Special Provisions Regarding Unimpaired Claims</u>.

     **3.13.1**   Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or otherwise Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or otherwise Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights and defenses with respect to any Reinstated Claim or otherwise Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### ARTICLE 4

### ACCEPTANCE OR REJECTION OF THE PLAN

     **4.1**      <u>Impaired Class of Claims Entitled to Vote</u>. Only the votes of Holders of Allowed Claims in Class 2, Class 3A, Class 3E, Class 3H, Class 3I, Class 3J, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 8A, Class 8E, Class 9 shall be solicited with respect to the Plan.

     **4.2**      <u>Voting of Claims</u>. Each Holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 4 of the Plan shall be entitled to vote to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity shall be aggregated and treated as one Allowed Claim in such Class.

     **4.3**      <u>Procedure/Voting Deadline</u>. In order for a Ballot to count, it must be (i) completed, dated, and properly executed, and (ii) delivered to the Voting Agent by first class mail, postage prepaid, or by overnight courier, to the following address: Attn: Krystal R. Mikkilineni, Dentons Davis Brown, The Davis Brown Tower, 215 10th St., Suite 1300, Des Moines, Iowa 50309 or by email to the following address: krystal.mikkilineni@dentons.com. The Voting Agent must ACTUALLY RECEIVE Ballots on or before the Voting Deadline. Except as otherwise ordered by the Bankruptcy Court or agreed to by the Debtors, a vote may not be changed once a Ballot is submitted to the Voting Agent.

     **4.4**      <u>Acceptance by an Impaired Class</u>. In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), the Holders of

Claims in any Class entitled to vote on the Plan shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

     **4.5**      <u>Presumed Acceptances by Unimpaired Classes</u>. Class 1, Class 3B, Class 3C, Class 3D, Class 3F, Class 3G, Class 3K, Class 3M, Class 7A, Class 7B, Class 7C, Class 7D, Class 7E, Class 7F, Class 8B, Class 8D, Class 11 are Unimpaired under the Plan. Under Bankruptcy Code section 1126(f), the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Plan, and, therefore, the votes of such Holders shall not be solicited.

     **4.6**      <u>Impaired Classes Deemed to Reject Plan</u>. Holders of Intercompany Claims in Class 10 are not entitled to receive or retain any property or interests in property under the Plan. Under Bankruptcy Code section 1126(g), such Holders are deemed to have rejected the Plan, and, therefore, the votes of such Holders shall not be solicited.

     **4.7**      <u>Confirmation Pursuant to Bankruptcy Code Section 1129(b)</u>. Because at least one Impaired Class is deemed to have rejected the Plan, the Debtors will and hereby request confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

     **4.8**      <u>Elimination of Vacant Classes</u>. Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

### ARTICLE 5

### MEANS FOR IMPLEMENTATION OF THE PLAN

     **5.1**      <u>Substantive Consolidation</u>. On the Effective Date, the Assets and liabilities of the Debtors shall be deemed substantively consolidated for purposes of implementing the Plan. Other than for purposes of implementing the Plan, the Debtors and their assets and liabilities shall not be deemed consolidated.

     **5.2**      <u>Restructuring Transactions</u>. On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation,

reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**5.3     Sources of Consideration for Plan Distributions.** Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions under the Plan with Cash on hand from ongoing business operations and the proceeds of the Exit Term Loan Facility.

**5.4     Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all the Debtors' Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**5.5     Authority.** The Reorganized Debtors shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

a.     review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

b.     calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

c.     retain, compensate, and employ professionals and other Persons to represent the Reorganized Debtors with respect to and in connection with its rights and responsibilities;

d.     establish, maintain, and administer documents and accounts of the Debtors or Reorganized Debtors as appropriate;

e.     maintain, conserve, collect, settle, and protect the Reorganized Debtors'

Assets (subject to the limitations described herein);

f.     sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Reorganized Debtors' Assets, or any part thereof or interest therein upon such terms as the Reorganized Debtors determine to be necessary, appropriate, or desirable;

g.     negotiate, incur, and pay the Reorganized Debtors' Expenses; and

h.     prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors or Reorganized Debtors that are required under the Plan, by any governmental unit, or by applicable law, including but not limited to filing any reports required by the Bankruptcy Code or Bankruptcy Rules that are due to be filed after the Effective Date and paying any fees required by 28 U.S.C. § 1930 that are due to be paid after the Effective Date.

**5.6     Corporate Existence.** Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), or any agreement, instrument, or other document incorporated in the Plan and on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non- bankruptcy law).

**5.7     Employee Obligations.** Except as (i) otherwise provided in the Plan (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Confirmation Hearing, the Reorganized Debtors shall honor the Debtors' Employee Obligations and, to the extent not already satisfied, the Debtors' Employee Obligations shall become obligations of the Reorganized Debtors in accordance with their terms.

**5.7.1**     To the extent the Employee Obligations are executory contracts and (i) such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and plans.

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 56 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:51   Page 86 of 125
Document

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 56 of 83

**5.7.2** On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

**5.8** **Workers Compensation Program.** As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs.

**5.9** **Pursuit and Resolution of Reorganized Debtors' Causes of Action.** The Reorganized Debtors, may, and will have the exclusive right, power, and interest on behalf of the Debtors, and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Reorganized Debtors' Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided in the Plan. From and after the Effective Date, the Reorganized Debtors, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as representative of the Estates with respect to any and all Reorganized Debtors' Causes of Action that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Reorganized Debtors' Causes of Action in any court or other tribunal.

**5.10** **No Successor Liability.** Except as otherwise expressly provided in this Plan and Confirmation Order, the Reorganized Debtors (i) are not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors prior to the Effective Date; (ii) are not, and shall not be, successors to the Debtors by any reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

**5.11** **Preservation of Privileges and Defenses.** The actions taken by the Debtors, the Reorganized Debtors, or any of their respective Related Parties in connection with the Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors or the Reorganized Debtors, as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtor providing any privileged information related to the Reorganized Debtors, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Reorganized Debtors Causes of Action and shall remain privileged. The Reorganized Debtors shall retain the right to waive their own privileges. Only the Reorganized Debtors shall have the right to waive the attorney- client privilege, work-product doctrine, or other protections as to the Debtors and the Reorganized Debtors.

**5.12** **Preservation of Rights of Action.**

**5.12.1** **Maintenance of Avoidance Actions and Causes of Action.** Except

DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION – PAGE 55

as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, the Reorganized Debtors will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors', the Estates', or the Reorganized Debtors' Causes of Action (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as Reorganized Debtors' Causes of Action, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as successor in interest to the Debtors and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, and the Estates to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Reorganized Debtors' Causes of Action without notice to or approval from the Bankruptcy Court. In accordance with the Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the Reorganized Debtors may compromise and settle the Reorganized Debtors' Causes of Action.

**5.12.2** **Preservation of All Reorganized Debtors' Causes of Action Not Expressly Settled or Released.** The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Reorganized Debtors' Cause of Action is not intended to and shall not limit the rights of the Reorganized Debtors to pursue any such Avoidance Actions or Causes of Action. Unless a Reorganized Debtors' Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Causes of Action for later resolution by the Reorganized Debtors (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co- defendants in such lawsuits.

**5.13** **Cancellation of Instruments.** Except to the extent necessary to give effect to the treatment of any Holder of an Allowed Claim and except with respect to any executory contracts and unexpired leases that are assumed under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be released.

**5.14** **Insurance Policies.**

**5.14.1** **Insurance Policies Remain in Force.** Up to and including their policy

DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION – PAGE 56

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 58 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:51   Desc Main
Document   Page 87 of 125

expiration date(s), any and all Insurance Policies in effect as of the Effective Date shall remain in full force and effect according to their terms and the coverage obligations of the insurers and third-party administrators under such Insurance Policies shall continue following the Effective Date (including any obligations to pay, defend, and process insured claims).

**5.14.2  Insurance Policies; Employment Practice Liability Policies.** Nothing contained in this Plan shall affect or impair the rights of any non- Debtor insured persons covered under any Insurance Policy, which expressly includes any director and officer, employment practices, or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

### ARTICLE 6
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1  Assumption and Rejection of Executory Contracts and Unexpired Leases.** On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court with the effective date of such rejection is after the Effective Date; provided, that, nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; and provided further, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

**6.1.1**  Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

**6.1.2**  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in

accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

**6.1.3**  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti- assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

**6.2  Claims Based on Rejection of Executory Contracts or Unexpired Leases.** Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 3.10, and such claims may be objected to in accordance with this Plan.

**6.3  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.** The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three (3) Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization Page 60 of 83

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc

Case 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 12:06:51 Desc Main
Document Page 88 of 125

Exhibit Exhibit A - Chapter 11 Plan of Reorganization Page 60 of 83

to or action, order, or approval of the Bankruptcy Court.

**6.3.1.** Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

**6.3.2.** Unless otherwise provided by an order of the Bankruptcy Court, the Debtors have attached as schedules their initial Assumed Executory Contracts[2] and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule. The Debtors shall file their final list of Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan, which shall supersede the initial schedule if any such initial schedule is filed. The Debtors shall cause all Filed Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule. The Debtors may supplement or modify the Assumed Executory Contract and Unexpired Leases Schedule or Rejected Executory Contracts and Unexpired Leases Schedule up to one (1) Business Day prior to the Confirmation Hearing. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed, served and actually received by the Debtors by the later of (1) the Confirmation Objection Deadline or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contract and Unexpired Leases Schedule.

**6.3.3.** Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Executory Contracts and Unexpired Leases Schedule as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the Assumed Executory Contracts and Unexpired Leases (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or

---

[2] Pursuant to the Stipulation with East Valley Development ("EVD"), the Debtors have made their final decision on assumption or rejection of the EVD contracts and have made the decision to assume such contracts. As such, the EVD contracts are on the initial schedule of assumed contracts and will remain on such schedule.

Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.

**6.3.4.** Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim, shall result in the full release and satisfaction of any Claims or defaults against the Debtors, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; provided, that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

**6.4** **Assumption Dispute Resolution.** In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

**6.4.1** To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

**6.4.2** For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "**Adjourned Cure Dispute**").

**6.5** **Contracts and Leases Entered into After the Petition Date.** Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

**66** **Modifications, Amendments, Supplements, Restatements, or Other Agreements.** Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

**661** Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**67** **Reservation of Rights.** Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. For the avoidance of doubt, the Debtors reserve all rights with respect to any Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

**68** **Nonoccurrence of Effective Date.** If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

**ARTICLE 7**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**7.1** **Timing of Distributions for Allowed Claims.** Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date. Distributions made as soon as reasonably practicable after the Effective Date, or such other date set forth herein shall be deemed to have been made on such date.

**7.2** **Calculating Distributions and Related Matters.** The Reorganized Debtors shall undertake in their reasonable discretion to make in accordance with the Plan all calculations of amounts for or relating to Distributions for Holders of Allowed Claims to be made from the Reorganized Debtors or for reserves for Holders of Contingent Claims, Disputed Claims, and Unliquidated Claims to be established by the Reorganized Debtors, and, may establish and holdback from Distributions reasonable reserves for other contingencies.

**7.3** **Interest and Other Amounts Regarding Claims.** Except to the extent provided in Bankruptcy Code section 506(b) and Allowed by a Final Order or otherwise agreed, (i) in the Plan, or (ii) in the Confirmation Order, post-petition interest shall not accrue or be paid on any Claims, and no Holder of an Allowed Claim shall be entitled to interest, penalties, fees, or late charges accruing or chargeable on any Claim from and after the Petition Date.

**7.4** **Means of Cash Payment.** Cash payments under the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by checks drawn on or wire transfer, electronic funds transfer, or ACH from a domestic bank. Cash payments to foreign Creditors may be made, at the option and in the sole discretion of the Reorganized Debtors by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks shall be null and void if not cashed within 180 calendar days of the date of the issuance thereof. Requests for reissuance of any check within 180 calendar days of the date the issuance thereof shall be made directly to the Reorganized Debtors.

**7.5** **Form of Currency for Distributions.** All Distributions under the Plan shall be made in U.S. Dollars. Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim shall be calculated in U.S. Dollars based upon the currency conversion rate in place as of the Petition Date and in accordance with Bankruptcy Code section 502(b).

**7.6** **Fractional Distributions.** Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**7.7** **De Minimis Distributions.** If the amount of Cash to be distributed to the Holder of an Allowed Claim is less than fifty dollars ($50) on a particular distribution date, the Reorganized Debtors may hold the Cash distributions to be made to such Holders until the aggregate amount of Cash to be distributed to each applicable Holder is in an amount equal to or greater than fifty dollars ($50). Notwithstanding the preceding sentence, if the aggregate amount of Cash distributions owed to any Holder of an Allowed Claim under the Plan never equals or exceeds fifty dollars ($50), then the Reorganized Debtors shall not be required to distribute Cash to any such Holder.

**7.8** **No Distributions with Respect to Certain Claims.** Notwithstanding anything in the Plan to the contrary, no Distributions or other consideration of any kind shall be made on account of any Contingent Claim, Disputed Claim, or Unliquidated Claim unless and until such Claim becomes an Allowed Claim, and then only to the extent that such Claim becomes an Allowed Claim and as provided under the Plan for such Allowed Claim. Nonetheless, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of Distributions due to the Holders of Allowed Claims, each Contingent Claim, Disputed Claim, or Unliquidated Claim shall be treated as if it were an Allowed Claim (which, for Unliquidated Claims, shall mean they shall be treated as if Allowed in such amounts as determined in the reasonable discretion of the Reorganized Debtors), except that if the Bankruptcy Court estimates the likely portion of such a Claim to be Allowed or authorized or the Bankruptcy Court or the

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 90 of 125

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:06:51  Desc Main
Document  Page 90 of 125

Case 24-40158-NGH  Doc 640-1  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization  Page 64 of 83

Holder of such Claim and the Reorganized Debtors otherwise determine the amount or number that would constitute a sufficient reserve for such a Claim, such amount or number as determined by the Bankruptcy Court or by agreement of the Holder of such Claim and the Reorganized Debtors shall be used with respect to such Claim. Distributions due in respect of a Contingent Claim, Disputed Claim, or Unliquidated Claim shall be held in reserve by the Reorganized Debtors in one or more Distribution Reserves. The Reorganized Debtors may elect to treat any Distribution Reserve as a "Disputed Ownership Fund," pursuant to Treasury Regulation section 1.468B-9(c)(2)(ii). As outlined in this election, Creditors holding such Claims are not treated as transferors of the money or property transferred to the "Disputed Ownership Fund." For U.S. federal income tax purposes, a "Disputed Ownership Fund" is treated as the owner of all assets that it holds. A "Disputed Ownership Fund" is treated as a C corporation for purposes of the Internal Revenue Code unless all assets transferred to the Disputed Ownership Fund are passive investment assets for tax purposes, in which case it will be treated as a "qualified settlement fund" for U.S. federal income tax purposes. A "Disputed Ownership Fund" must file all required income and information tax returns and make all tax payments.

**7.9** **Distributions and Transfers Upon Resolution of Contingent Claims, Disputed Claims, or Unliquidated Claims.** After an objection to a Disputed Claim is resolved or a Contingent Claim or Unliquidated Claim has been determined in whole or in part by a Final Order or by agreement, an amount of Cash held in the Disputed Ownership Fund corresponding to the amount of any resulting Allowed Claim shall be transferred, net of any tax payable by the Disputed Ownership Fund with respect tothe transfer, in a taxable transaction to the Holder of the formerly Contingent Claim, Disputed Claim, or Unliquidated Claim. Upon each such resolution of a Claim against the Disputed Ownership Fund and such transfer with respect to any resulting Allowed Claim, any remaining Cash in the Disputed Ownership Fund that had been held with respect to such formerly Contingent Claim, Disputed Claim, or Unliquidated Claim prior to its resolution shall be transferred, net of any tax payable by the Disputed Ownership Fund with respect to such transfers, for payment, allocation, or reserve in accordance with the Plan for (a) unpaid or unutilized amounts for Reorganized Debtors' Expenses or (b) any post-Confirmation reserve requirements of the Reorganized Debtors in connection with the Plan, any agreements, or any Bankruptcy Court orders.

**7.10** **Delivery of Distributions.** Distributions shall be made by the Reorganized Debtors to Holders of the Allowed Claims as of the record date set for such Distribution. Distributions to Holders of Allowed Claims shall be made (a) at the addresses set forth in the proofs of claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtors. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address. The responsibility to provide the Reorganized Debtors with a current address of a Holder of an Allowed Claim shall always be the responsibility of such Holder. Amounts in respect of undeliverable Distributions made by the Reorganized Debtors shall be held in trust on behalf of the Holder of the Allowed Claim to which they are payable by the Reorganized Debtors until the earlier of the date that such undeliverable Distributions are claimed by such Holder and 180 calendar days after the date the undeliverable Distributions were made.

**7.11** **Application of Distribution Record Date & Other Transfer Restrictions.** At the close of business on the Distribution Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record holders of any Claims. Except as provided herein, the Reorganized Debtors and their Related Parties shall have no obligation to recognize any putative transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions. In addition, the Reorganized Debtors and their Related Parties shall have no obligation to recognize any putative transfer of General Unsecured Claims occurring at any time prior to the Effective Date to which the Debtors did not expressly consent and shall be entitled instead to recognize and deal for all purposes hereunder with only the Holders of General Unsecured Claims as reflected on the claims registers.

**7.12** **Withholding, Payment, and Reporting Requirements Regarding Distributions.** All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements, including, to the extent such information is not already available to the Reorganized Debtors, requiring each Holder of a Claim to provide an executed current Form W-9, Form W-8, or similar tax form as a prerequisite to receiving a Distribution. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed on the Reorganized Debtors in connection with such Distribution; and (b) no Distribution shallbe made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Reorganized Debtors for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed in connection with such Distribution.

**7.13** **Defenses and Setoffs.** Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors (as applicable), unless (i) the Debtors have consented; and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding anything set forth

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 66 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:06:51   Desc Main
Document   Page 91 of 125

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 66 of 83

in this paragraph, any set off right with respect to a Reinstated General Unsecured Claim or an assumed Executory Contract or Unexpired Lease shall be governed by applicable non-bankruptcy law, including the terms of such assumed Executory Contract or Unexpired Lease.

**7.14** **Allocation of Distributions.** All Distributions received under the Plan by Holders of Claims shall be deemed to be allocated first to the principal amount of such Claim, as determined for U.S. federal income tax purposes, and then to accrued interest, if any, with respect to such Claim through the Petition Date.

**7.15** **Joint Distributions.** The Reorganized Debtors may, in their sole discretion, make Distributions jointly to any Holder of a Claim and any other Person that the Reorganized Debtors have determined to have an interest in such Claim.

**7.16** **Forfeiture of Distributions.** If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 7.5, fails to claim an undeliverable Distribution within the time limit set forth in Section 7.11, or fails to complete and return to the Reorganized Debtors the appropriate Form W-8 or Form W-9 within 180 calendar days after a request for the completion and return of the appropriate form pursuant to Section 7.13 (or such later time as approved by a Bankruptcy Court order), then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions under the Plan. Any such forfeited Distributions shall be deemed Available Cash for all purposes, notwithstanding any federal or state escheat laws to the contrary.

**ARTICLE 8**
**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO**

**8.1** **Objections to and Resolution of Disputed Claims, Including Any Claims of Excluded Parties.** From and after the Effective Date, the Reorganized Debtors shall have the exclusive authority to compromise, resolve, and Allow any Disputed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Reorganized Debtors with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**8.2** **Claim Objections.** All objections to Claims (other than Professional Fee Claims, which shall be governed by Section 3.1.2 of the Plan) shall be Filed by the Reorganized Debtors on or before the Claim Objection Deadline, which date may be extended by order of the Bankruptcy Court. If a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was Scheduled by the Debtors but was not Scheduled as contingent, unliquidated, or disputed, then the Claim to which the proof of claim or Scheduled Claim relates will be treated as an Allowed Claim.

**8.3** **Estimation of Certain Claims.** The Reorganized Debtors may, at any time, move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such

objection, and the Bankruptcy Court shall retain jurisdiction and power to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. The estimated amount of any Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the Holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately allowed. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**8.4** **Distributions Following Allowance.** Once a Contingent Claim, a Disputed Claim, or an Unliquidated Claim becomes an Allowed Claim, in whole or in part, including pursuant to the Plan, the Reorganized Debtors shall distribute from the Distribution Reserves to the Holder thereof the Distributions, if any, to which such Holder is then entitled under the Plan. Such Distributions, if any, shall be made on the next Distribution Date after the date on which the order or judgment allowing any such Claim becomes a Final Order or on which the Claim otherwise becomes an Allowed Claim, or, if there is no applicable Distribution Date, then within ninety (90) calendar days after the date on which the Claim becomes an Allowed Claim. Unless otherwise specifically provided in the Plan or allowed by a Final Order, no interest shall be paid on Contingent Claims, Disputed Claims, or Unliquidated Claims that later become Allowed Claims.

**8.5** **Disposition of Assets in Reserves After Disallowance.** After an objection to a Disputed Claim is sustained or a Contingent Claim or Unliquidated Claim has been determined in whole or in part by a Final Order or by agreement, such that the Contingent Claim, Disputed Claim, or Unliquidated Claim is a Disallowed Claim in whole or in part, any Cash held in an applicable Distribution Reserve in respect of the particular Claim in excess of the Distributions due on account of any resulting Allowed Claim shall be used or distributed in a manner consistent with the Plan.

**ARTICLE 9**
**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**9.1** **Conditions to the Effective Date.** The occurrence of the Effective Date shall not occur, and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.2 of the Plan:

a. the Bankruptcy Court shall have entered the Confirmation Order;

b. the Confirmation Order shall not be subject to any stay;

c. all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, shall have been obtained and be in full force and effect;

d. all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of this Plan are effected or executed and delivered, as applicable;

e. the Confirmation Order shall affirm the validity and enforceability of the

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization Page 68 of 83

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Case 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 12:06:11 Desc Main
Document Page 92 of 125

various releases granted under the Plan and such releases shall be in full force and effect; and

    f.    the Professional Fee Escrow is funded pursuant to Section 3.1.2 hereof.

**9.2**     <u>Waiver of Conditions to the Effective Date.</u> The conditions to the Effective Date may be waived in writing by the Debtors at any time without further order of the Bankruptcy Court.

**9.3**     <u>Effect of Non-Occurrence of Conditions to the Effective Date.</u> If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 9.1 and 9.2 of the Plan, upon notification filed by the Debtors with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the Debtors, the Estates, and all Creditors shall be restored to the *status quo* as of the day immediately preceding the Confirmation Hearing as though the Confirmation Order was not entered; (iv) all of the Debtors' and the Estates' obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the Debtors, the Estates, or any other Person or prejudice in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

**9.4**     <u>Notice of the Effective Date.</u> Promptly after the occurrence of the Effective Date, the Reorganized Debtors or its agents shall mail or cause to be mailed to all Creditors a notice that informs such Creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (iv) the deadline established under the Plan for the filing of Administrative Claims; and (v) such other matters as the Reorganized Debtors find appropriate.

## ARTICLE 10
## RELEASES, INJUNCTION, AND RELATED PROVISIONS

**10.1**     <u>Debtors' Releases.</u>

    **10.1.1**     On the Effective Date and to the fullest extent authorized by applicable law, the Released Parties and their respective property will be expressly, unconditionally, generally, individually, and collectively released, acquitted, and discharged by the Debtors on behalf of themselves, their estates, the Reorganized Debtors, for the good and valuable consideration provided by each of the Released Parties, from any and all actions, claims, debts, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative or deficiency claims asserted or that could be asserted by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by state law (including Idaho State partnership law), statute, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, any of the Debtors' present or former assets, the Released Parties' interests in or management of the Debtors, this Plan, the Disclosure Statement, these Chapter 11 Cases, including those that the Debtors, the

Reorganized Debtors would have been legally entitled to assert or that any Holder of a Claim against or interest in the Debtors or any other Entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their Estates; *provided, however,* that the foregoing Debtors' Releases shall not operate to waive any Claims or Causes of Action of the Debtors or their Estates against a Released Party arising under any contractual obligation owed to the Debtors, the Reorganized Debtors that is entered into pursuant to this Plan.

    **10.1.2**     Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' Releases set forth in Section 10.1(a) above, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtors' Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the Debtors' Releases; (3) in the best interests of the Estates and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar against any of the Estates, the Post-Effective Date Debtors, asserting any Claim or Cause of Action released pursuant to the Debtors' Releases.

**10.2**     <u>Exculpation and Limitation of Liability.</u>

    **10.2.1**     The Exculpated Parties will neither have nor incur any liability to any entity for any claims or Causes of Action arising on or after the Petition Date and prior to the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases, (ii) any other sales consummated during the Chapter 11 Cases, (iii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of this Plan, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Disclosure Statement, (iv) any other post-petition act taken or omitted to be taken in connection with or in contemplation of Confirmation of this Plan, or (v) the approval of the Disclosure Statement and Plan or Confirmation or Consummation of the Plan, *provided, however,* that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct.

    **10.2.2**     The Exculpated Parties have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and Distributions pursuant to the Plan, and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

**10.3**     <u>Injunction.</u>

    a.    FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 70 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:05:51   Desc Main
Document   Page 93 of 125

PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

b.     FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN SECTIONS 10.1 AND 10.2, THE APPLICABLE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED UNDER THIS PLAN OR THE CONFIRMATION ORDER.

c.     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN OR THAT ARE SUBJECT TO THE EXCULPATORY PROVISIONS OF SECTION 10.2, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

d.     THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES.

e.     ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST, THE REORGANIZED DEBTORS AND EACH OF THEIR RESPECTIVE ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY

DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE. NOTHING IN THIS SECTION 10.4 SHALL ENJOIN ANY CLAIM OR CAUSE OF ACTION THAT IS NOT RELEASED OR EXCULPATED PURSUANT TO SECTIONS 10.1, 10.2, AND 10.3 OF THIS PLAN OR THE CONFIRMATION ORDER.

f.     NOTWITHSTANDING ANY OTHER PROVISION OF THIS PLAN TO THE CONTRARY, THE DEBTORS SHALL NOT RECEIVE A DISCHARGE.

## ARTICLE 11
## RETENTION OF JURISDICTION AND POWER

**11.1     Scope of Retained Jurisdiction and Power.** Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction and power over all matters arising in, arising under, or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction and power to do the following:

a.     except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

b.     hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b), 1103, and 1129(a)(4);

c.     hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

d.     effectuate performance of and payments under the provisions of the Plan and enforce remedies on any default under the Plan;

e.     hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, including the Reorganized Debtors' Causes of Action;

f.     enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

g.     hear and determine disputes arising in connection with the

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 72 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:03:51   Desc Main
Document   Page 94 of 125

interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, or to maintain the integrity of the Plan following consummation;

h.  consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

i.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

j.  enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

k.  hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and orders;

l.  enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings associated with the Plan or otherwise entered in connection with the Chapter 11 Cases (whether or not any or all of the Chapter 11 Cases have been closed);

m.  hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

n.  hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

o.  hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, the Bankruptcy Code and title 28 of the United States Code;

p.  resolve any cases, controversies, suits, or disputes related to the Debtors and Reorganized Debtors;

q.  enter a final decree closing the Chapter 11 Cases of the Debtors.

**11.2**  **Non-Exercise of Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Plan shall have no effect on, and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to, such matter.

# ARTICLE 12
## MISCELLANEOUS PROVISIONS

**12.1**  **Payment of Statutory Fees.** All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date. All such fees that relate to distributions by each Debtor after the Effective Date shall be paid by the Reorganized Debtors. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**12.2**  **Dissolution of the Committees.** The Committee shall be automatically dissolved on the Effective Date, and on the Effective Date, each member of the Committee (including each Related Party thereof) and each Professional retained by the Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Committee, the Plan, or the Chapter 11 Cases, except (i) with respect to any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Committee, and (ii) any appeals of, or related to, the Confirmation Order or any other appeal to which the Committee is a party to.

**12.3**  **Modifications and Amendments.**

a.  In the Debtors' reasonable discretion, the Debtors may alter, amend, or modify the Plan under Bankruptcy Code section 1127(a) at any time at or prior to the conclusion of the Confirmation Hearing. All alterations, amendments, or modifications to the Plan must comply with Bankruptcy Code section 1127. The Debtors shall provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Code, Bankruptcy Rules, or order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

b.  After entry of the Confirmation Order and prior to substantial consummation (as defined in Bankruptcy Code section 1101(2)) of the Plan, the Debtors or the Reorganized Debtors, as applicable, may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan. Such proceedings must comply with Bankruptcy Code section 1127. To the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 74 of 83

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:03:51   Desc Main
Document   Page 95 of 125

12.4    **Severability of Plan Provisions.** If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section 12.6, is valid and enforceable under its terms.

12.5    **Compromises and Settlements.** From and after the Effective Date, the Reorganized Debtors may compromise and settle disputes about any applicable Claims or Reorganized Debtors' Causes of Action, without any further approval by the Bankruptcy Court. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

12.6    **Binding Effect of Plan.** Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons to the fullest extent permitted by Bankruptcy Code section 1141(a). Confirmation of the Plan binds each Holder of a Claim or Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Interest is Allowed, whether or not such Holder holds a Claim or Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan.

12.7    **Term of Injunctions or Stays.** Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant as of the Confirmation Hearing (excluding any injunctions or stays contained in or arising from the Plan or the Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date.

12.8    **Revocation, Withdrawal, or Non-Consummation.** The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

12.9    **Exemption from Transfer Taxes.** Pursuant to Bankruptcy Code section 1146, the vesting of the Reorganized Debtors' Assets in the Reorganized Debtors, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording,

or other similar tax.

12.10    **Computation of Time.** Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

12.11    **Transactions on Business Days.** If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

12.12    **Good Faith.** Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all Related Parties have acted in good faith in connection therewith.

12.13    **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of Idaho shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or formation of each Debtor shall govern corporate or limited liability company governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof. Any applicable nonbankruptcy law that would prohibit, limit, or otherwise restrict implementation of the Plan based on (i) the commencement of the Chapter 11 Cases, (ii) the reorganization of some or all of the Reorganized Debtors' Assets, or (v) any other act or action to be done pursuant to or contemplated by the Plan is superseded and rendered inoperative by the Plan and federal bankruptcy law.

12.14    **Notices.** Following the Effective Date, all pleadings and notices Filed in the Chapter 11 Cases shall be served solely on (a) the Reorganized Debtors and their counsel, (b) the U.S. Trustee, (c) any Person whose rights are affected by the applicable pleading or notice, and (d) any Person Filing a specific request for notices and papers on and after the Effective Date.

12.15    **Additional Documents.** On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders receiving Distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other acts as may be necessary or advisable to effectuate the provisions and intent of the Plan.

12.16    **Conflicts with the Plan.** In the event and to the extent that any provision of the

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 96 of 125

Case 24-40158-NGH   Doc 640-1   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Filed 10/02/24   Entered 10/02/24 12:06:11   Desc Main
Document   Page 76 of 83

Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; *provided, however*, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

**ARTICLE 13**
**REQUEST FOR CONFIRMATION AND RECOMMENDATION**

**13.1**     **Request for Confirmation.** The Debtors request confirmation of the Plan in accordance with Bankruptcy Code section 1129.

**13.2**     **Recommendation.** The Debtors believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

Respectfully,

**MILLENKAMP CATTLE, INC.**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: President

**IDAHO JERSEY GIRLS, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

**EAST VALLEY CATTLE, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

**MILLENKAMP PROPERTIES, L.L.C.**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp

**Title: Manager**

**MILLENKAMP PROPERTIES II, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

**MILLENKAMP FAMILY, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

**GOOSE RANCH, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

**BLACK PINE CATTLE, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

**MILLENKAMP ENTERPRISES, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

**IDAHO JERSEY GIRLS JEROME DAIRY, LLC**

By:      /s/ William John Millenkamp
     Name: William John Millenkamp
     Title: Manager

Schedule 6.3 – Initial Schedule of Assumed Executory Contracts & Unexpired Leases

Submitted by:

Dated:  9/30/24                    **DENTONS DAVIS BROWN, PC**

                                   */s/Krystal R. Mikkilineni*

                                   **JOHNSON MAY**

                                   */s/Matthew T. Christensen*

                                   *Attorneys for Debtors and Debtors in Possession*

| Contract/Lease Party | Contract Counterparty | Contract/Lease Title | Cure Amount |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793337, dated February 6. 2024 <br><br> 6 Case IH Magnum <br><br> CNH Equipment Lease 765512 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793339, dated February 6, 2024 <br><br> 16 Case IH Magnum and 16 Case IH Real Remote <br><br> CNH Equipment Lease 765784 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793443, dated February 6, 2024 <br><br> 4 Case IH Steiger and 4 Case Rear Remote <br><br> CNH Equipment Lease 765542 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2609637, dated October 31, 2020, as amended <br><br> 26 Case IH Mangum <br><br> CNH Equipment Lease 210982 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Retail Installment Sales Contract and Security Agreement, No. 2783587 <br><br> 25 Kobuta Tractors <br><br> CNH Equipment Loan | $0.00 |

| Debtor | Counterparty | Description | Amount |
|---|---|---|---|
| | | 765530 | |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Retail Installment Sales Contract and Security Agreement, No. 2793874  30 Case IH Maxim  CNH Equipment Loan 765552 | $0.00 |
| Millenkamp Cattle, Inc. | Daimler Truck Financial Services 14372 Heritage Pkwy Suite 400 Fort Worth, TX 76177 | Note and Security Agreement dated January 2024 | $0.00 |
| Millenkamp Cattle, Inc. | Daimler Truck Financial Services 14372 Heritage Pkwy Suite 400 Fort Worth, TX 76177 | Note and Security Agreement (Multi-State) dated February 23, 2022 | $0.00 |
| Millenkamp Cattle, Inc. | East Valley Cattle LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for lease of East Valley Dairy | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Third Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Tenant) dated June 22, 2023 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | First Amendment Manure Supply Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Developer) dated June 22, 2023 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, | $0.00 |
| | | LLC (Tenant) dated October 8, 2021. | |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Manure Supply Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Developer) dated October 8, 2021 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Memorandum of Ground Lease dated June 23, 2023. | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Second Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC(Tenant) dated April 25, 2023. | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | First Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Tenant) dated February 17, 2022. | $0.00 |
| Millenkamp Cattle, Inc. | Goose Ranch LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Goose Ranch | $0.00 |
| Millenkamp Cattle, Inc. | GreatAmerica Financial Serv. PO Box 660831 Dallas, TX 75266-0831 | Lease Agreement for 8 HP E786Z Copiers; 2 HP E45028DN Copiers; 2 HP E40040DN Copiers 1931342 | $0.00 |

Case 24-40158-NGH Doc 640-1 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization Page 82 of 83

Case 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 12:08:55 Desc Main
Document Page 99 of 125

| Millenkamp Cattle, Inc. | Idaho Jersey Girls Jerome Dairy, LLC 471 N 300 W Jerome, ID 83338 | Triple net lease of Idaho Jersey Girls Jerome Dairy | $0.00 |
| Millenkamp Cattle, Inc. | Innovative Food Solutions USA Attn: Jordan Bowen 134 E. Highway 81 Burley, ID 83318 | Milk Producer Supply Agreement dated January 1, 2024 | $0.00 |
| Millenkamp Cattle, Inc. | Jake Millenkamp 1719 River Road Buhl, ID 83316 | Rental Agreement for 1719 River Road, Buhl, ID 83316 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated June 12, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreements dated May 23, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 12, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 31, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 28, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | Keith D. and Janet Carlson 3866 E 3800 N Hansen, ID 83334 | Lease Agreement dated June 1, 2020 | $0.00 |

| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | Mavrix, LLC 925 Main St., Ste. 300-18 Stone Mountain, GA 30083-3098 | Exclusivity Agreement between Millenkamp Cattle, Inc. and East Valley Cattle, LLC (Dairy) and SKS EVC, LLC and Mavrix, LLC (Developers) dated July 12, 2021. | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Canyonlands | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for McGregor | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for lease of German Dairy | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Moonshine Ranch | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Calf Ranch | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple Net Lease for Cow Palace | $0.00 |
| Black Pine Cattle, LLC | PerforMix Nutrition Systems 2201 N. 20th Street Nampa, ID 83687 | Security Agreement dated September 13, 2023 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, LLC | Eagle Creek Northwest, LLC 10 State House Square 15th Floor Hartford, CT 06103 | Lease Agreement | $0.00 |

Case 24-40158-NGH    Doc 640-1    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc
Exhibit Exhibit A - Chapter 11 Plan of Reorganization   Page 100 of 125

Case 24-40158-NGH    Doc 640-2    Filed 09/30/24    Entered
Exhibit B - Liquidation Analysis    Page 1 of 1

EXHIBIT B

Case 24-40158-NGH    Doc 645    Filed 10/02/24    Entered 10/02/24 12:00:55    Desc Main
Document    Page 100 of 125

**Schedule 6.3 – Initial Schedule of Rejected Executory Contracts & Unexpired Leases**

None.

| Assets | 12/31/2024 Forecast | Est. Ch 7 Recovery | Est. Liquidation Proceeds (Dark) | |
|---|---|---|---|---|
| Cash | $  7,583 | 0% | $  - | Assumed Used up in Wind Down |
| Accounts Receivable | 19,370 | 60% | 11,622 | Collectibility issues with EVO and Calf Ranch Customers in Wind Down |
| Feed Inventory | 27,951 | 25% | 6,988 | Used up in Wind Down, significant discount on silage/haylage in pits |
| Investment in Growing Crops | 300 | 0% | - | Included in land sales |
| Steer Inventory | 7,944 | FMV | 10,476 | 12,471 head with avg weight of 400lbs at $2.1 blended price per lb |
| Medicine & Fuel Inventory | 1,000 | 0% | - | Used up in Wind Down |
| Prepaid Expenses | 1,746 | 0% | - | |
| Dairy Herd | | | | |
| Cows | 51,866 | FMV | 76,512 | 39,850 head at $2,150 per head (Davis) (20% Cull Rate at $1,000) |
| Heifers | 40,641 | FMV | 42,925 | 34,340 head at $1,250 per head (Davis) |
| Real Property | 298,457 | | | |
| Moonshine Ranch | | FMV | 6,500 | Appraisal |
| Goose Ranch | | FMV | 12,000 | Appraisal |
| McGregor & Ridgeway | | FMV | 5,400 | Appraisal |
| Canyon Lands | | FMV | 16,000 | Appraisal |
| German Dairy | | FMV | 4,100 | Appraisal |
| Jersey Girls Dairy | | FMV | 2,700 | Appraisal |
| Calf Ranch | | FMV | | |
| Land | | FMV | 9,668 | 75% of Appraisal |
| Improvements | | FMV | 5,853 | 30% of Appraisal |
| East Valley Dairy | | FMV | | |
| Land | | FMV | 73,593 | 75% of Appraisal |
| Improvements | | FMV | 80,269 | 25% of Appraisal |
| Machinery, Trucks, Trailers & Equipment | 42,382 | FMV | 20,451 | Harding Appraisal |
| Accumulated Depreciation | (77,401) | 0% | - | |
| Deposits | 1,602 | 0% | - | |
| Lease Assets | 4,024 | 0% | - | |
| Investment in Affiliated Entities | 3,679 | 25% | 920 | |
| Investment in Patron's Equity | 1,311 | 25% | 328 | |
| Loan Fees | 1,448 | 0% | - | |
| Less Sale Costs | | | (28,038) | 7.5% cost of sale |
| Net Admin & Operating Expenses Through Wind Down | | | (10,000) | Estimated Feed, Vet, Utility, Labor, net of milk check |
| | $  433,903 | | $ 348,296 | |

| Liabilities | | |
|---|---|---|
| Administrative Expense Claims | | |
| Professional Fees | | 1,604 |
| Priority and 503(b)9 Payments | | 5,305 |
| Post Petition Accounts Payable | | 3,000 |
| Trustee Fees | | - |
| | | |
| Secured Debt | | |
| Sandton | | 21,783 |
| Rabobank | | 90,953 |
| MetLife | | 184,178 |
| Conterra | | 19,002 |
| Prepetition Accounts Payable with Liens | | 3,209 |
| Pre Petition Accrued Fees & Interest | | 3,631 |
| Post Petition Professional Fees (Secured Lenders) | | 4,750 |
| | | |
| Total Available for Unsecured Pre-Petition Payables | | $  10,881 |
| | | |
| Unsecured Pre-petition payables | | 27,894 |
| Recovery % | | 39.01% |

# EXHIBIT C

**5 Year Forecast**
**Model as of Plan Filed 09.30.24**
*Operating Fcst Assumptions as of Sept 17, 2024*

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Combined Con Stmt of Inc** | | | | | | | | | | | | |
| **REVENUES:** | | | | | | | | | | | | |
| Milk Sales | 15,731 | 14,082 | 15,398 | 15,176 | 16,394 | 16,309 | 16,944 | 16,944 | 15,914 | 16,875 | 19,141 | 18,637 |
| Custom Feeding | 1,664 | 1,503 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 |
| Steer Sales | 1,302 | 1,643 | 1,682 | 1,350 | 1,696 | 1,862 | 1,612 | 2,060 | 2,015 | 2,082 | 2,035 | 2,103 |
| Other Cattle Sales | | | | | | | | | | | | |
| Gain (Loss) on Milk Derivatives | | | | | | | | | | | | |
| Milk Dairy Revenue Protection Proceeds | | | | | | | | | | | | |
| Trucking Income | 161 | 153 | 161 | 113 | 114 | 113 | 114 | 440 | 428 | 440 | 428 | 440 |
| Government Payments | | | | | | | | | | | | |
| Patronage Dividends | | | | | | | | | | | | |
| Other | 465 | 420 | 465 | 450 | 465 | 450 | - | 125 | 125 | 125 | 125 | 125 |
| Rental Income | | | | | | | | | | | | |
| **Total Revenues** | 19,324 | 17,801 | 19,370 | 18,700 | 20,334 | 20,345 | 20,334 | 21,234 | 20,092 | 21,186 | 23,340 | 22,989 |
| **COST OF GOODS SOLD:** | | | | | | | | | | | | |
| Feed | 10,642 | 9,695 | 10,817 | 10,553 | 10,992 | 10,718 | 11,159 | 11,241 | 10,955 | 11,399 | 11,107 | 11,556 |
| *Grains, Minerals, & Milk Products* | | | | | | | | | | | | |
| *Silage* | | | | | | | | | | | | |
| *Haylage* | | | | | | | | | | | | |
| *Triticale* | | | | | | | | | | | | |
| *Hay* | | | | | | | | | | | | |
| *Straw* | | | | | | | | | | | | |
| *Rye Grass* | | | | | | | | | | | | |
| Steers | 968 | 1,092 | 1,244 | 978 | 1,255 | 1,322 | 1,206 | 1,505 | 1,505 | 1,628 | 1,604 | 1,720 |
| Steer Cost Inventoried | (1,482) | (1,354) | (1,508) | (1,477) | (1,544) | (1,502) | (1,562) | (1,370) | (1,519) | (1,589) | (1,518) | (1,568) |
| Heifer Cost Capitalized | (3,749) | (3,403) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) |
| Custom Feed | | | | | | | | | | | | |
| (Gain) Loss on Feed and Cattle Derivatives | | | | | | | | | | | | |
| Farm (Income) Loss | | | | | | (3,116) | 480 | 232 | (243) | (1,055) | 225 | 278 |
| **Total Cost of Goods Sold** | 6,379 | 6,031 | 6,785 | 6,407 | 6,936 | 7,536 | 7,642 | 7,052 | 6,635 | 7,773 | 8,219 | |
| **GROSS PROFIT** | 12,945 | 11,771 | 12,586 | 12,293 | 13,398 | 16,569 | 12,809 | 13,592 | 15,042 | 14,551 | 15,568 | 14,770 |
| GP% | 67% | 66% | 65% | 66% | 66% | 81% | 63% | 64% | 65% | 69% | 67% | 64% |
| **Herd Replacement Cost:** | | | | | | | | | | | | |
| Depreciation on Dairy Herd | 1,393 | 1,417 | 1,440 | 1,462 | 1,484 | 1,504 | 1,524 | 1,543 | 1,561 | 1,579 | 1,597 | 1,614 |
| Loss on Sale of Herd | 859 | 887 | 930 | 940 | 962 | 966 | 984 | 992 | 991 | 1,003 | 999 | 1,009 |
| (Gain) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| **Total Herd Replacement** | 2,252 | 2,304 | 2,370 | 2,403 | 2,446 | 2,470 | 2,508 | 2,535 | 2,552 | 2,582 | 2,596 | 2,623 |
| *GP % after Herd Replacement* | | | | | | | | | | | | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Salaries & Wages | 2,184 | 1,972 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 |
| Payroll Taxes | 189 | 171 | 189 | 183 | 189 | 183 | 189 | 189 | 183 | 189 | 183 | 189 |
| Employee Benefits | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| Depreciation - PP&E | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| FASB ASC842 Operating Lease Amortization | | | | | | | | | | | | |
| Rent - Land & Facilities | 7 | 23 | 37 | 10 | 8 | 10 | 14 | 10 | 15 | 17 | 12 | 12 |
| Equipment Lease | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 |
| Milk Hauling | 550 | 515 | 571 | 568 | 627 | 630 | 669 | 653 | 597 | 620 | 595 | 610 |
| Milk Promotions | 110 | 103 | 114 | 114 | 125 | 126 | 134 | 131 | 119 | 124 | 119 | 122 |
| Livestock Hauling | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Compost Turning & Hauling | 20 | 51 | 44 | 283 | 302 | 293 | 302 | 302 | 293 | 302 | 302 | 302 |
| Livestock Testing & Trimming | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 |
| Straw Bedding | (18) | (18) | (18) | (9) | (9) | (9) | (9) | (9) | (9) | (20) | 3 | 1 |
| Veterinary & Medicine | 728 | 698 | 748 | 728 | 754 | 734 | 760 | 763 | 742 | 769 | 748 | 775 |
| Semen | 221 | 211 | 225 | 218 | 225 | 218 | 225 | 225 | 218 | 225 | 218 | 225 |
| Supplies | 479 | 457 | 489 | 473 | 489 | 473 | 489 | 489 | 473 | 489 | 473 | 489 |
| Repairs & Maintenance | 379 | 396 | 426 | 423 | 370 | 390 | 409 | 407 | 393 | 415 | 391 | 418 |
| Fuel & Oil | 408 | 389 | 416 | 403 | 416 | 403 | 416 | 416 | 403 | 416 | 403 | 416 |
| Utilities | 164 | 174 | 181 | 153 | 183 | 176 | 183 | 183 | 176 | 184 | 176 | 183 |
| Trucking Expense | 39 | 30 | 43 | 45 | 36 | 43 | 43 | 36 | 43 | 36 | 43 |  |
| Professional Fees | 2,602 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Contract Services | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| Taxes & Licenses | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Insurance | | | | | | | | | | | | |
| Advertising & Donations | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Finance & Service Charges | 2,509 | 59 | 61 | 64 | 64 | 65 | 66 | 66 | 66 | 67 | 66 | 66 |
| Miscellaneous | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| **Total Operating Expenses** | 11,950 | 6,711 | 7,190 | 7,239 | 7,450 | 7,320 | 7,553 | 7,531 | 7,298 | 7,503 | 7,308 | 7,513 |

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME (LOSS) FROM OPERATIONS** | (1,257) | 2,756 | 3,026 | 2,651 | 3,502 | 6,778 | 2,748 | 3,527 | 3,190 | 4,466 | 5,664 | 4,633 |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | |
| Interest Income | | | | | | | | | | | | |
| Interest Expense | (2,414) | (2,277) | (2,582) | (2,178) | (2,157) | (2,519) | (2,123) | (2,144) | (2,488) | (2,117) | (2,173) | (2,470) |
| Investment Earnings (Loss) in H&M Custom, LLC | | | | | | | | | | | | |
| Forbearance Fee | | | | | | | | | | | | |
| Investment (Loss) in H&M Custom, LLC | | | | | | | | | | | | |
| Gain on Sale of Property, Plant, & Equipment | | | | | | | | | | | | |
| **Total Other Income (Expense)** | (2,414) | (2,277) | (2,582) | (2,178) | (2,157) | (2,519) | (2,123) | (2,144) | (2,488) | (2,117) | (2,173) | (2,470) |
| **NET INCOME (LOSS)** | (3,671) | 479 | 444 | 473 | 1,345 | 4,260 | 625 | 1,383 | 702 | 2,349 | 3,491 | 2,163 |
| Net Income % | -19% | 3% | 2% | 3% | 7% | 21% | 3% | 7% | 3% | 11% | 15% | 9% |
| **EBITDA** | 913 | 4,350 | 5,244 | 4,891 | 5,763 | 9,060 | 5,049 | 5,847 | 5,529 | 6,822 | 8,039 | 7,025 |
| Net Income % | 5% | 28% | 27% | 26% | 28% | 45% | 25% | 28% | 32% | 34% | 31% |  |
| **OWNER DRAWS** | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **CAP EX** | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 |
| **Combined Con Farming Operation** | | | | | | | | | | | | |
| **REVENUES:** | | | | | | | | | | | | |
| Crop Sales | - | - | - | - | 3,116 | 1,466 | 1,466 | 1,466 | 7,353 | - | - | - |
| Government Payments | | | | | | | | | | | | |
| Rent, Farm Land | - | - | - | 696 | - | - | - | 266 | 433 | - | | |
| **Total Revenues** | 0 | 0 | 0 | 696 | 3,116 | 1,466 | 1,466 | 1,732 | 7,785 | 0 | 0 | 0 |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Investment in Growing Crops, January 1 | 300 | - | - | - | - | - | - | - | - | - | - | - |
| Interest | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Depreciation | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| Chemicals and Fertilizer | - | - | - | 526 | 1,814 | - | 177 | 41 | 41 | 11 | - | - |
| Manure Hauling & Compost | 276 | 276 | 276 | 10 | 17 | - | 73 | 17 | - | 1 | 1 | 108 |
| Custom Farming | - | - | - | - | 131 | 134 | 70 | 18 | 21 | 56 | 48 | 20 |
| Seed | - | 7 | - | - | 482 | 357 | 124 | 50 | 61 | 74 | - | - |
| Repairs & Maintenance | 37 | 37 | 37 | 101 | 538 | 65 | 163 | 173 | 42 | 96 | 65 | 60 |
| Utilities | 15 | 15 | 15 | 15 | 161 | 185 | 273 | 280 | 187 | 83 | 27 | 15 |
| Labor | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Water M&O | 43 | 43 | 43 | 43 | 43 | 43 | - | - | - | - | - | 43 |
| Property Tax | 54 | 54 | 54 | 54 | 54 | 54 | 10 | 10 | 10 | - | - | 54 |
| Outside Rent | - | - | - | - | - | - | - | - | 1,412 | - | - | |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - |
| Fuel | - | - | - | 354 | - | - | - | - | - | - | - | - |
| Investment in Growing Crops, Period End | (413) | (560) | (553) | (917) | (3,020) | (1,753) | 954 | 954 | 954 | 4,784 | (150) | (150) |
| **Total Operating Expenses** | 0 | 0 | 0 | 0 | 696 | 0 | 1,956 | 1,698 | 1,489 | 6,729 | 225 | 278 |
| **NET INCOME (LOSS) FROM OPERATIONS** | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) | |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| **Total Other Income (Expense)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **NET INCOME (LOSS)** | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) | |

Case 24-40158-NGH   Doc 640-3   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit C - Consolidated 5 Year Model Page   Page 102 of 125
Filed 10/02/24   Entered 10/02/24 12:06:55   Desc Main

Case 24-40158-NGH   Doc 640-3   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Document   Page 4 of 20

## Combined Consolidated BS

5 Year Forecast

Model as of Plan filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | | | |
| Cash | 5,415 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Accounts Receivable | 18,464 | 16,843 | 18,181 | 17,870 | 19,113 | 19,031 | 19,595 | 19,705 | 18,705 | 19,679 | 21,939 | 21,478 |
| Feed Inventory | 25,712 | 23,680 | 21,416 | 19,204 | 16,906 | 14,672 | 18,137 | 18,325 | 18,582 | 30,794 | 28,561 | 26,247 |
| Investment in Growing Crops | 853 | 1,413 | 1,967 | 2,883 | 5,893 | 7,646 | 6,692 | 5,738 | 4,784 | — | 150 | 300 |
| Heifer Inventory | | | | | | | | | | | | |
| Steer Inventory | 8,458 | 8,719 | 8,985 | 9,484 | 9,773 | 9,953 | 10,309 | 10,373 | 10,387 | 10,337 | 10,241 | 10,089 |
| Medicine & Fuel Inventory | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Derivative Balance at ADM Investor Services, Inc. | | | | | | | | | | | | |
| Prepaid Expenses | 1,507 | 1,268 | 1,029 | 790 | 551 | 312 | 73 | 73 | 73 | 73 | 73 | 73 |
| **Total Current Assets** | 61,409 | 55,424 | 55,077 | 53,732 | 55,736 | 55,115 | 58,307 | 57,714 | 56,032 | 64,374 | 64,464 | 61,687 |
| **DAIRY HERD:** | | | | | | | | | | | | |
| Purchased Cows | | | | | | | | | | | | |
| Self-Raised Cows | 84,995 | 86,413 | 87,749 | 89,019 | 90,243 | 91,425 | 92,566 | 93,672 | 94,750 | 95,807 | 96,842 | 97,834 |
| Self-Raised Heifers | 40,504 | 39,676 | 39,243 | 38,741 | 38,385 | 37,946 | 37,646 | 37,369 | 36,999 | 36,753 | 36,409 | 36,212 |
| **Total Dairy Herd** | 125,499 | 126,089 | 126,992 | 127,760 | 128,628 | 129,371 | 130,211 | 131,041 | 131,749 | 132,560 | 133,251 | 134,046 |
| Less, Accumulated Depreciation | (32,155) | (32,478) | (32,824) | (33,190) | (33,576) | (33,981) | (34,403) | (34,841) | (35,293) | (35,759) | (36,238) | (36,730) |
| **Total Dairy Herd - Net** | 93,343 | 93,611 | 94,168 | 94,571 | 95,052 | 95,389 | 95,808 | 96,200 | 96,456 | 96,800 | 97,013 | 97,316 |
| **Total Current Assets and Dairy Herd** | 154,752 | 149,035 | 149,245 | 148,302 | 150,788 | 150,504 | 154,115 | 153,914 | 152,488 | 161,175 | 163,477 | 159,003 |
| **PROPERTY, PLANT, & EQUIPMENT:** | | | | | | | | | | | | |
| Land | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 |
| Land Improvements | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 |
| Buildings & Improvements | 262,122 | 262,414 | 262,706 | 262,997 | 263,289 | 263,581 | 263,873 | 264,164 | 264,456 | 264,747 | 265,039 | 265,331 |
| Machinery & Equipment | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 |
| Trucks, Trailers, & Vehicles | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 |
| **Total Property, Plant, & Equipment** | 341,423 | 341,714 | 342,006 | 342,298 | 342,589 | 342,881 | 343,173 | 343,464 | 343,756 | 344,048 | 344,339 | 344,631 |
| Less, Accumulated Depreciation | (78,066) | (78,732) | (79,397) | (80,062) | (80,727) | (81,392) | (82,057) | (82,727) | (83,387) | (84,052) | (84,717) | (85,382) |
| **Total Property, Plant, & Equipment - Net** | 263,356 | 262,983 | 262,609 | 262,236 | 261,862 | 261,489 | 261,116 | 260,742 | 260,369 | 259,995 | 259,622 | 259,249 |
| **OTHER ASSETS:** | | | | | | | | | | | | |
| Related Party Receivable | | | | | | | | | | | | |
| Deposits | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 |
| FASB ASC 842 Operating Lease Asset | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 |
| Investment in Affiliated Entities | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 |
| Investment in Patron's Equity | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 |
| Loan Fees, Net of Accumulated Amortization | 1,435 | 1,423 | 1,410 | 1,398 | 1,386 | 1,373 | 1,361 | 1,349 | 1,336 | 1,324 | 1,311 | 1,299 |
| **Total Other Assets** | 12,052 | 12,039 | 12,027 | 12,015 | 12,002 | 11,990 | 11,977 | 11,965 | 11,953 | 11,940 | 11,928 | 11,915 |
| **TOTAL ASSETS** | 430,160 | 424,057 | 423,881 | 422,553 | 424,653 | 423,983 | 427,208 | 426,622 | 424,809 | 433,110 | 433,027 | 430,167 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | | | |
| **CURRENT LIABILITIES:** | | | | | | | | | | | | |
| Credit Balance - Cash in Bank | | | | | | | | | | | | |
| Operating Line of Credit, Rabo Bank | | | | | | | | | | | | |
| Lines of Credit - Other | | | | | | | | | | | | |
| Post Confirmation Credit Facility | 120,000 | 110,480 | 108,620 | 106,070 | 104,323 | 101,831 | 103,939 | 101,809 | 100,411 | 106,454 | 100,616 | 99,297 |
| Unused Fee | | | | | | 4 | 10 | 7 | 14 | | 8 | 15 |
| Refinance of Post Conf. CF to Revolver | | | | | | | | | | | | |
| Pre-Petition Accounts Payable - Unsecured | 27,894 | 27,894 | 27,196 | 27,196 | 27,196 | 26,499 | 26,499 | 26,499 | 25,802 | 25,802 | 25,802 | 25,105 |
| Pre-Petition Accounts Payable - Secured | 3,209 | 3,209 | 2,808 | 2,808 | 2,808 | 2,407 | 2,407 | 2,407 | 2,006 | 2,006 | 2,006 | 1,605 |
| Accounts Payable & Accrued Expenses | 2,668 | 5,607 | 7,717 | 8,383 | 10,722 | 9,310 | 9,634 | 9,663 | 9,571 | 9,304 | 11,468 | 8,706 |
| Deferred Revenue | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 |
| Related Party Payable | | | | | | | | | | | | |
| Accrued Labor & Payroll Taxes | 1,220 | 1,106 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 |
| Accrued Interest | | | | | | | | | | | | |
| FASB ASC 842 Operating Lease Liability | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 |
| Short Term Note Payable | 17,456 | 17,674 | 17,895 | 18,119 | 18,346 | 18,575 | 18,807 | 19,042 | 19,280 | 19,521 | 19,765 | 20,012 |
| Debtor in Possession Note Payable | | | | | | | | | | | | |
| Current Portion of Long-Term Debt | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 |
| **Total Current Liabilities** | 188,797 | 182,319 | 181,806 | 180,112 | 180,974 | 176,153 | 178,863 | 177,004 | 174,601 | 180,665 | 177,203 | 172,293 |
| **LONG-TERM LIABILITIES:** | | | | | | | | | | | | |
| Long-Term Debt, Less Current Portion | 186,174 | 186,079 | 185,983 | 185,886 | 185,788 | 185,690 | 185,591 | 185,490 | 185,389 | 185,287 | 185,185 | 185,081 |
| **Total Long-Term Liabilities** | 186,174 | 186,079 | 185,983 | 185,886 | 185,788 | 185,690 | 185,591 | 185,490 | 185,389 | 185,287 | 185,185 | 185,081 |
| **EQUITY:** | | | | | | | | | | | | |
| Common Stock, Class A, No Par Value | | | | | | | | | | | | |
| 10,000 Shares Authorized & Issued | | | | | | | | | | | | |
| Additional Paid-In Capital | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 |
| Retained Earnings | 12,502 | 12,981 | 13,425 | 13,898 | 15,242 | 19,502 | 20,127 | 21,509 | 22,211 | 24,560 | 28,051 | 30,214 |
| Members' Capital | 31,043 | 31,033 | 31,023 | 31,013 | 31,003 | 30,993 | 30,983 | 30,973 | 30,963 | 30,953 | 30,943 | 30,933 |
| **Total Equity** | 55,190 | 55,659 | 56,093 | 56,556 | 57,890 | 62,140 | 62,755 | 64,127 | 64,819 | 67,158 | 70,639 | 72,792 |
| **TOTAL LIABILITIES AND EQUITY** | 430,160 | 424,057 | 423,881 | 422,553 | 424,653 | 423,983 | 427,208 | 426,622 | 424,809 | 433,110 | 433,027 | 430,167 |

## Combined Cost of Cash Flows

5 Year Forecast

Model as of Plan filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | | | | | | | |
| Net Income (Loss) | (3,671) | 479 | 444 | 473 | 1,345 | 4,260 | 625 | 1,383 | 702 | 2,349 | 3,491 | 2,163 |
| Adjustments to reconcile net income to net cash provided | | | | | | | | | | | | |
| by operating activities: | | | | | | | | | | | | |
| Depreciation | 2,058 | 2,082 | 2,105 | 2,128 | 2,149 | 2,169 | 2,189 | 2,208 | 2,226 | 2,244 | 2,262 | 2,279 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| (Gain) Loss on Sale of Dairy Herd | 859 | 887 | 930 | 940 | 962 | 966 | 984 | 992 | 991 | 1,003 | 999 | 1,009 |
| (Gain) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| (Gain) Loss on Sale of Property, Plant, & Equipm | | | | | | | | | | | | |
| (Income) Losses of H&M Custom, LLC | | | | | | | | | | | | |
| (Increase) Decrease in Accounts Receivable | 907 | 1,621 | (1,338) | 311 | (1,243) | 82 | (564) | (110) | 999 | (974) | (2,260) | 461 |
| (Increase) Decrease in Feed Inventory | 1,725 | 1,771 | 1,999 | 1,712 | 2,009 | 2,053 | (3,821) | (252) | (271) | (12,153) | 2,320 | 2,466 |
| (Increase) Decrease in Investment in Growing C | (553) | (560) | (553) | (917) | (3,010) | (1,753) | 954 | 954 | 954 | 4,784 | (150) | (150) |
| (Increase) Decrease in Forward Contracts Depo | | | | | | | | | | | | |
| (Increase) Decrease in Prepaids and Deposits | 239 | 239 | 239 | 239 | 239 | 239 | 239 | | | | | |
| (Increase) Decrease in FASB ASC 842 Lease Asset | | | | | | | | | | | | |
| (Increase) Decrease in Loan Fees | | | | | | | | | | | | |
| Increase (Decrease) in Accounts Payable and Ac | (5,568) | 2,824 | 2,224 | 628 | 2,378 | (1,450) | 362 | 29 | (131) | (228) | 2,125 | (2,724) |
| Increase (Decrease) in FASB ASC 842 Lease Liabi | | | | | | | | | | | | |
| Increase (Decrease) in Deferred Revenue | | | | | | | | | | | | |
| **NET CASH PROVIDED BY OPERATING ACTIVITIES:** | (3,992) | 9,355 | 6,062 | 5,526 | 4,841 | 6,578 | 980 | 5,216 | 5,483 | (2,962) | 8,800 | 5,517 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | | | | | | | |
| Proceeds from Sale of Cows - Dairy Herd | 712 | 911 | 888 | 895 | 883 | 889 | 879 | 877 | 882 | 872 | 878 | 868 |
| Proceeds from Sale of Wet Cows | | | | | | | | | | | | |
| Proceeds from Sale of Heifers | | | | | | | | | | | | |
| Proceeds from Sale of Land and Equipment | | | | | | | | | | | | |
| Purchase of Covanant Heifers | (51) | (79) | (47) | (55) | (42) | (51) | (38) | (36) | (44) | (31) | (40) | (27) |
| Proceeds (Purchase) of Property, Plant, & Equipm | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) |
| Cost of Feeding and Raising Heifers | (3,749) | (3,403) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) |
| Member Distribution (Contribution) of Capital in | | | | | | | | | | | | |
| (Increase) Decrease in Patron's Equity | | | | | | | | | | | | |
| (Increase) Decrease in Related Party Receivable | | | | | | | | | | | | |
| **NET CASH PROVIDED BY INVESTING A** | (3,381) | (2,863) | (3,218) | (3,097) | (3,218) | (3,099) | (3,218) | (3,218) | (3,100) | (3,218) | (3,100) | (3,218) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | | | | | | | | |
| Increase (Decrease) in Credit Balance - Cash in Ban | | | | | | | | | | | | |
| Net Proceeds (Payments) on Lines of Credit | (90,952) | | | | | | | | | | | |
| Net Proceeds (Payments) on Post Confirmation CF 120,000 | | (9,520) | (1,860) | (2,550) | (1,747) | (2,492) | 2,108 | (2,130) | (1,398) | 6,043 | (5,838) | (1,319) |
| Net Proceeds (Payments) on PCCF Unused Fee | | | | 4 | 5 | (10) | 7 | 7 | (14) | 8 | 7 | (15) |
| Net Proceeds (Payments) on Refi of Post Conf. CF | | | | | | | | | | | | |
| Prior Period Adjustment to Retained Earnings for Pre-Pet Payables | | | | | | | | | | | | |
| Increase (Decrease) in Pre-Petition Accounts Pa | (5,305) | | (697) | | | (697) | | | (697) | | | (697) |
| Increase (Decrease) in Pre-Petition Accounts Pa | | | (401) | | | (401) | | | (401) | | | (401) |
| Increase (Decrease) in Related Party Payable | | | | | | | | | | | | |
| PIK Interest/Fees on Short Term Debt | 893 | 218 | 221 | 224 | 226 | 229 | 232 | 235 | 238 | 241 | 244 | 247 |
| Proceeds from Short-Term Debt | (20,827) | (0) | 0 | 0 | 0 | (0) | (0) | (0) | 0 | 0 | 0 | 0 |
| Payments on Short-Term Debt | | | | | | | | | | | | |
| Proceeds from Long-Term Debt | 1,406 | (95) | (96) | (97) | (98) | (98) | (99) | (100) | (101) | (102) | (103) | (104) |
| Payments on Long-Term Debt | | | | | | | | | | | | |
| Owner Contribution - Capital | | | | | | | | | | | | |
| Owner Distributions | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| **NET CASH PROVIDED (USED) BY FINANCING** | 5,204 | (9,407) | (2,844) | (2,429) | (1,414) | (3,478) | 2,238 | (1,998) | (2,383) | 6,180 | (5,740) | (2,299) |
| **NET INCREASE (DECREASE) IN CASH** | (2,169) | (2,915) | (0) | — | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| **CASH AT BEGINNING OF PERIOD** | 7,583 | 5,415 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **CASH AT END OF PERIOD** | 5,415 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |

## 5 Year Forecast — Combined Con Stmt of Inc

Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | | |
| Milk Sales | 17,750 | 15,913 | 17,579 | 17,107 | 18,459 | 18,341 | 19,034 | 19,013 | 17,837 | 18,894 | 21,409 | 20,937 |
| Custom Feeding | 1,664 | 1,503 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 |
| Steer Sales | 2,113 | 1,951 | 2,135 | 2,087 | 2,156 | 2,108 | 2,178 | 2,189 | 2,140 | 2,160 | 2,160 | 2,232 |
| Other Cattle Sales | | | | | | | | | | | | |
| Gain (Loss) on Milk Derivatives | | | | | | | | | | | | |
| Milk Dairy Revenue Protection Proceeds | | | | | | | | | | | | |
| Trucking Income | 161 | 153 | 161 | 113 | 114 | 113 | 114 | 440 | 428 | 440 | 428 | 440 |
| Government Payments | | | | | | | | | | | | |
| Patronage Dividends | | | | | | | | | | | | |
| Other | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Rental Income | | | | | | | | | | | | |
| **Total Revenues** | 21,814 | 19,645 | 21,464 | 21,043 | 22,519 | 22,298 | 23,115 | 23,431 | 22,140 | 23,334 | 25,733 | 25,397 |
| **COST OF GOODS SOLD:** | | | | | | | | | | | | |
| Feed | 11,635 | 10,580 | 11,792 | 11,488 | 11,949 | 11,640 | 12,107 | 12,186 | 11,869 | 12,343 | 12,021 | 12,501 |
| Grains, Minerals, & Milk Products | | | | | | | | | | | | |
| Silage | | | | | | | | | | | | |
| Haylage | | | | | | | | | | | | |
| Triticale | | | | | | | | | | | | |
| Hay | | | | | | | | | | | | |
| Straw | | | | | | | | | | | | |
| Rye Grass | | | | | | | | | | | | |
| Steers | 1,698 | 1,429 | 1,676 | 1,596 | 1,676 | 1,596 | 1,678 | 1,667 | 1,586 | 1,666 | 1,585 | 1,665 |
| Steer Cost Inventoried | (1,568) | (1,416) | (1,567) | (1,517) | (1,567) | (1,516) | (1,567) | (1,567) | (1,516) | (1,566) | (1,516) | (1,566) |
| Heifer Cost Capitalized | (3,767) | (3,403) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) |
| Custom Feed | | | | | | | | | | | | |
| (Gain) Loss on Feed and Cattle Derivatives | | | | | | | | | | | | |
| Farm (Income) Loss | | | | | | (3,116) | 490 | 232 | (243) | (1,055) | 225 | 278 |
| **Total Cost of Goods Sold** | 7,998 | 7,190 | 8,133 | 7,922 | 8,291 | 4,958 | 8,941 | 8,751 | 8,051 | 7,620 | 8,670 | 9,110 |
| **GROSS PROFIT** | 13,816 | 12,454 | 13,331 | 13,121 | 14,228 | 17,341 | 14,174 | 14,680 | 14,090 | 15,713 | 17,063 | 16,287 |
| GP% | 63% | 63% | 62% | 62% | 63% | 78% | 61% | 63% | 64% | 67% | 66% | 64% |
| **Herd Replacement Cost:** | | | | | | | | | | | | |
| Depreciation on Dairy Herd | 1,631 | 1,646 | 1,662 | 1,676 | 1,690 | 1,704 | 1,719 | 1,733 | 1,747 | 1,762 | 1,776 | 1,791 |
| Loss on Sale of Herd | 1,010 | 987 | 1,007 | 995 | 1,001 | 986 | 992 | 988 | 973 | 978 | 964 | 969 |
| (Gain) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| **Total Herd Replacement** | 2,642 | 2,633 | 2,669 | 2,671 | 2,691 | 2,691 | 2,711 | 2,721 | 2,721 | 2,740 | 2,740 | 2,759 |
| GP % after Herd Replacement | | | | | | | | | | | | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Salaries & Wages | 2,184 | 1,972 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 |
| Payroll Taxes | 189 | 171 | 189 | 183 | 189 | 183 | 189 | 189 | 183 | 189 | 183 | 189 |
| Employee Benefits | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| Depreciation - PP&E | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| FASB ASC842 Operating Lease Amortization | | | | | | | | | | | | |
| Rent - Land & Facilities | 7 | 23 | 37 | 30 | 8 | 10 | 14 | 10 | 15 | 17 | 12 | 10 |
| Equipment Lease | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 |
| Milk Hauling | 620 | 582 | 645 | 640 | 706 | 708 | 752 | 733 | 669 | 694 | 666 | 684 |
| Milk Promotions | 124 | 116 | 129 | 128 | 141 | 142 | 150 | 147 | 134 | 139 | 133 | 137 |
| Livestock Hauling | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Compost Turning & Hauling | 20 | 51 | 44 | 283 | 302 | 293 | 302 | 302 | 293 | 302 | 293 | 302 |
| Livestock Testing & Trimming | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 |
| Straw Bedding | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | (0) | (0) |
| Veterinary & Medicine | 763 | 731 | 784 | 762 | 789 | 768 | 795 | 798 | 776 | 804 | 782 | 810 |
| Semen | 221 | 211 | 225 | 218 | 225 | 218 | 225 | 225 | 218 | 225 | 218 | 225 |
| Supplies | 479 | 457 | 489 | 473 | 489 | 473 | 489 | 489 | 473 | 489 | 473 | 489 |
| Repairs & Maintenance | 379 | 396 | 416 | 423 | 370 | 390 | 409 | 407 | 393 | 415 | 391 | 418 |
| Fuel & Oil | 408 | 389 | 416 | 403 | 416 | 403 | 416 | 416 | 403 | 416 | 403 | 416 |
| Utilities | 164 | 174 | 181 | 153 | 183 | 176 | 183 | 183 | 176 | 184 | 176 | 183 |
| Trucking Expense | 39 | 30 | 43 | 36 | | 36 | 43 | 43 | 36 | 43 | 36 | 43 |
| Professional Fees | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Contract Services | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| Taxes & Licenses | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Insurance | | | | | | | | | | | | |
| Advertising & Donations | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Finance & Service Charges | 118 | 69 | 70 | 72 | 72 | 74 | 75 | 76 | 76 | 77 | 77 | 75 |
| Miscellaneous | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| **Total Operating Expenses** | 7,195 | 6,853 | 7,341 | 7,378 | 7,598 | 7,467 | 7,705 | 7,680 | 7,438 | 7,658 | 7,434 | 7,646 |

## 5 Year Forecast — Combined Con Stmt of Inc (continued)

Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME (LOSS) FROM OPERATIONS** | 3,980 | 2,968 | 3,320 | 3,073 | 3,939 | 7,183 | 3,758 | 4,279 | 3,931 | 5,315 | 6,889 | 5,881 |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | |
| Interest Income | | | | | | | | | | | | |
| Interest Expense | (2,113) | (2,073) | (2,361) | (2,033) | (2,005) | (2,294) | (1,960) | (1,968) | (2,228) | (1,922) | (1,976) | (2,230) |
| Investment Earnings (Loss) in H&M Custom, LLC | | | | | | | | | | | | |
| Forbearance Fee | | | | | | | | | | | | |
| Gain on Sale of Property, Plant, & Equipment | | | | | | | | | | | | |
| **Total Other Income (Expense)** | (2,113) | (2,073) | (2,361) | (2,033) | (2,005) | (2,294) | (1,960) | (1,968) | (2,228) | (1,922) | (1,976) | (2,230) |
| **NET INCOME (LOSS)** | 1,867 | 895 | 960 | 1,040 | 1,934 | 4,889 | 1,798 | 2,311 | 1,703 | 3,393 | 4,913 | 3,651 |
| Net Income % | 9% | 5% | 4% | 5% | 9% | 22% | 8% | 10% | 8% | 15% | 19% | 14% |
| **EBITDA** | 6,388 | 5,392 | 5,759 | 5,526 | 6,407 | 9,665 | 6,254 | 6,790 | 6,456 | 7,854 | 9,442 | 8,449 |
| Net Income % | 29% | 27% | 27% | 26% | 28% | 43% | 27% | 29% | 29% | 34% | 37% | 33% |
| **OWNER DRAWS** | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **CAP EX** | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 |

## Combined Con Farming Operation

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | | |
| Crop Sales | | | | | | | 3,116 | 1,466 | 1,466 | 1,466 | 7,353 | |
| Government Payments | | | | | | | | | | | | |
| Rent, Corn Land | | | | | | 696 | | | | 256 | 432 | |
| **Total Revenues** | 0 | 0 | 0 | 0 | 0 | 696 | 3,116 | 1,466 | 1,466 | 1,732 | 7,785 | 0 |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Investment in Growing Crops, January 1 | 100 | | | | | | | | | | | |
| Interest | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Depreciation | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| Chemicals and Fertilizer | | | | | 526 | 1,814 | 757 | 173 | 41 | 41 | 41 | 11 |
| Manure Hauling & Compost | 276 | 276 | 276 | 10 | | 131 | 71 | 17 | 1 | 1 | | 108 |
| Custom Farming | | | | | | 131 | 134 | 70 | 18 | 21 | 56 | 48 | 20 |
| Seed | | | 7 | | | 482 | 357 | 124 | 50 | 61 | 74 | |
| Repairs & Maintenance | 37 | 37 | 37 | 101 | 538 | 65 | 163 | 173 | 42 | 96 | 65 | 60 |
| Utilities | 15 | 15 | 15 | 55 | 161 | 185 | 273 | 280 | 187 | 83 | 27 | 15 |
| Labor | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Water M&O | 43 | 43 | 43 | 43 | 43 | | | | | | | |
| Property Tax | | | | | | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Outside Rent | | | | | | 354 | | | | 1,412 | | |
| Insurance | | | | | | | | | | | | |
| Fuel | | | | | | 482 | | | | | | |
| Investment in Growing Crops, Period End | (813) | (560) | (553) | (917) | (1,010) | (1,753) | 954 | 954 | 754 | 4,784 | (150) | (150) |
| **Total Operating Expenses** | 0 | 0 | 0 | 0 | 0 | 696 | 1,956 | 1,698 | 1,489 | 6,729 | 225 | 278 |
| **NET INCOME (LOSS) FROM OPERATIONS** | 0 | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| **Total Other Income (Expense)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **NET INCOME (LOSS)** | 0 | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |

## Combined Consolidated BS

**5 Year Forecast**
Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| Combined Consolidated BS | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | | | |
| Cash | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Accounts Receivable | 20,560 | 18,655 | 20,164 | 19,861 | 21,175 | 21,018 | 21,699 | 21,703 | 20,567 | 21,635 | 24,147 | 23,694 |
| Feed Inventory | 23,924 | 21,819 | 19,680 | 17,209 | 14,854 | 12,566 | 10,066 | 16,284 | 16,571 | 32,312 | 30,008 | 27,619 |
| Investment in Growing Crops | 853 | 1,413 | 1,967 | 2,883 | 5,893 | 7,646 | 6,692 | 5,738 | 4,784 | - | 150 | 300 |
| Heifer Inventory | - | - | - | - | - | - | - | - | - | - | - | - |
| Steer Inventory | 9,958 | 9,945 | 9,837 | 9,757 | 9,648 | 9,568 | 9,457 | 9,357 | 9,287 | 9,187 | 9,118 | 9,019 |
| Medicine & Fuel Inventory | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Derivative Balance at ADM Investor Services, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| **Total Current Assets** | 58,870 | 55,406 | 55,220 | 53,284 | 55,142 | 54,373 | 57,488 | 56,656 | 54,783 | 66,708 | 66,997 | 64,206 |
| **DAIRY HERD:** | | | | | | | | | | | | |
| Purchased Cows | - | - | - | - | - | - | - | - | - | - | - | - |
| Self-Raised Cows | 98,783 | 99,691 | 100,550 | 101,409 | 102,269 | 103,128 | 103,988 | 104,848 | 105,709 | 106,570 | 107,431 | 108,292 |
| Self-Raised Heifers | 36,051 | 35,595 | 35,517 | 35,322 | 35,239 | 35,044 | 34,957 | 34,868 | 34,666 | 34,573 | 34,367 | 34,269 |
| **Total Dairy Herd** | 134,834 | 135,286 | 136,067 | 136,731 | 137,508 | 138,172 | 138,945 | 139,716 | 140,375 | 141,142 | 141,797 | 142,560 |
| Less, Accumulated Depreciation | (37,233) | (37,746) | (38,269) | (38,799) | (39,339) | (39,887) | (40,443) | (41,008) | (41,580) | (42,159) | (42,747) | (43,342) |
| **Total Dairy Herd - Net** | 97,601 | 97,540 | 97,798 | 97,932 | 98,169 | 98,285 | 98,502 | 98,709 | 98,794 | 98,983 | 99,051 | 99,219 |
| **Total Current Assets and Dairy Herd** | 156,471 | 152,946 | 152,818 | 151,216 | 153,311 | 152,658 | 155,990 | 155,365 | 153,578 | 165,690 | 166,047 | 163,425 |
| **PROPERTY, PLANT & EQUIPMENT:** | | | | | | | | | | | | |
| Land | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 |
| Land Improvements | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 |
| Buildings & Improvements | 265,622 | 265,914 | 266,206 | 266,497 | 266,789 | 267,081 | 267,372 | 267,664 | 267,956 | 268,247 | 268,539 | 268,831 |
| Machinery & Equipment | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 |
| Trucks, Trailers, & Vehicles | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 |
| **Total Property, Plant, & Equipment** | 344,923 | 345,214 | 345,506 | 345,798 | 346,089 | 346,381 | 346,673 | 346,964 | 347,256 | 347,548 | 347,839 | 348,131 |
| Less, Accumulated Depreciation | (86,047) | (86,713) | (87,378) | (88,043) | (88,708) | (89,373) | (90,038) | (90,703) | (91,368) | (92,033) | (92,698) | (93,363) |
| **Total Property, Plant, & Equipment - Net** | 258,875 | 258,502 | 258,128 | 257,755 | 257,381 | 257,008 | 256,635 | 256,261 | 255,888 | 255,514 | 255,141 | 254,767 |
| **OTHER ASSETS:** | | | | | | | | | | | | |
| Related Party Receivable | - | - | - | - | - | - | - | - | - | - | - | - |
| Deposits | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 |
| FASB ASC 842 Operating Lease Asset | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 |
| Investment in Affiliated Entities | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 |
| Investment in Patron's Equity | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 |
| Loan Fees, Net of Accumulated Amortization | 1,287 | 1,274 | 1,262 | 1,249 | 1,237 | 1,225 | 1,212 | 1,200 | 1,187 | 1,175 | 1,163 | 1,150 |
| **Total Other Assets** | 11,903 | 11,891 | 11,878 | 11,866 | 11,854 | 11,841 | 11,829 | 11,816 | 11,804 | 11,792 | 11,779 | 11,767 |
| **TOTAL ASSETS** | 427,249 | 423,338 | 422,825 | 420,837 | 422,546 | 421,507 | 424,453 | 423,442 | 421,270 | 432,996 | 432,967 | 429,959 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | | | |
| **CURRENT LIABILITIES:** | | | | | | | | | | | | |
| Credit Balance - Cash in Bank | - | - | - | - | - | - | - | - | - | - | - | - |
| Operating Line of Credit, Rabo Bank | - | - | - | - | - | - | - | - | - | - | - | - |
| Lines of Credit - Other | - | - | - | - | - | - | - | - | - | - | - | - |
| Post Confirmation Credit Facility | 94,637 | 89,249 | 89,652 | 86,324 | 83,565 | 80,762 | 81,383 | 77,862 | 75,792 | 81,429 | 79,776 | 74,668 |
| Unused Fee | 9 | 19 | - | 13 | 26 | - | 16 | 33 | - | 18 | 36 | - |
| Refinance of Post Conf. CF to Revolver | - | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Petition Accounts Payable - Unsecured | 25,105 | 25,105 | 23,710 | 23,710 | 23,710 | 22,315 | 22,315 | 22,315 | 20,920 | 20,920 | 20,920 | 19,526 |
| Pre-Petition Accounts Payable - Secured | 1,605 | 1,605 | 1,203 | 1,203 | 1,203 | 802 | 802 | 802 | 401 | 401 | 401 | - |
| Accounts Payable & Accrued Expenses | 8,437 | 8,986 | 8,670 | 8,853 | 11,192 | 9,780 | 10,103 | 10,113 | 10,040 | 12,523 | 9,095 | 9,175 |
| Deferred Revenue | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 |
| Related Party Payable | - | - | - | - | - | - | - | - | - | - | - | - |
| Accrued Labor & Payroll Taxes | 1,220 | 1,106 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 |
| Accrued Interest | - | - | - | - | - | - | - | - | - | - | - | - |
| FASB ASC 842 Operating Lease Liability | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 |
| Short Term Note Payable | 20,262 | 20,516 | 20,772 | 21,032 | 21,295 | 21,561 | 21,830 | 22,103 | 22,380 | 22,659 | 22,943 | 23,229 |
| Debtor in Possession Note Payable | - | - | - | - | - | - | - | - | - | - | - | - |
| Current Portion of Long-Term Debt | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 |
| **Total Current Liabilities** | 167,624 | 162,933 | 161,576 | 158,666 | 158,560 | 152,751 | 154,019 | 147,064 | 155,120 | 150,702 | 144,510 | 144,186 |
| **LONG-TERM LIABILITIES:** | | | | | | | | | | | | |
| Long-Term Debt, Less Current Portion | 184,977 | 184,871 | 184,765 | 184,658 | 184,550 | 184,441 | 184,331 | 184,220 | 184,108 | 183,995 | 183,881 | 183,767 |
| **Total Long-Term Liabilities** | 184,977 | 184,871 | 184,765 | 184,658 | 184,550 | 184,441 | 184,331 | 184,220 | 184,108 | 183,995 | 183,881 | 183,767 |
| **EQUITY:** | | | | | | | | | | | | |
| Common Stock, Class A, No Par Value | - | - | - | - | - | - | - | - | - | - | - | - |
| 10,000 Shares Authorized & Issued | - | - | - | - | - | - | - | - | - | - | - | - |
| Additional Paid-in Capital | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 |
| Retained Earnings | 32,081 | 32,976 | 33,935 | 34,975 | 36,909 | 41,797 | 43,595 | 45,907 | 47,610 | 51,003 | 55,916 | 59,567 |
| Members' Capital | 30,923 | 30,913 | 30,903 | 30,893 | 30,873 | 30,863 | 30,853 | 30,843 | 30,833 | 30,823 | 30,813 | 30,823 |
| **Total Equity** | 74,649 | 75,534 | 76,483 | 77,513 | 79,437 | 84,315 | 86,103 | 88,405 | 90,098 | 93,481 | 98,384 | 102,025 |
| **TOTAL LIABILITIES AND EQUITY** | 427,249 | 423,338 | 422,825 | 420,837 | 422,546 | 421,507 | 424,453 | 423,442 | 421,270 | 432,996 | 432,967 | 429,959 |

## Combined Con Stmt of Cash Flows

**5 Year Forecast**
Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| Combined Con Stmt of Cash Flows | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | | | | | | | |
| Net Income (Loss) | 1,867 | 895 | 960 | 1,040 | 1,934 | 4,889 | 1,798 | 2,311 | 1,703 | 3,393 | 4,913 | 3,651 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | | | | | | | | |
| Depreciation | 2,296 | 2,311 | 2,327 | 2,341 | 2,355 | 2,370 | 2,384 | 2,398 | 2,413 | 2,427 | 2,441 | 2,456 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| (Gain) Loss on Sale of Dairy Herd | 1,010 | 987 | 1,007 | 995 | 1,001 | 986 | 992 | 988 | 973 | 978 | 964 | 969 |
| (Gain) Loss on Sale of Wet Cows | - | - | - | - | - | - | - | - | - | - | - | - |
| (Gain) Loss on Sale of Raised Cows, Plt & Equipm | - | - | - | - | - | - | - | - | - | - | - | - |
| (Income) Losses of H&M Custom, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Accounts Receivable | 917 | 1,905 | (1,509) | 302 | (1,313) | 157 | (681) | (4) | 1,136 | (1,068) | (2,512) | 453 |
| (Increase) Decrease in Inventories | 2,453 | 2,219 | 2,447 | 2,351 | 2,464 | 2,367 | (3,388) | (118) | (217) | (15,641) | 2,373 | 2,487 |
| (Increase) Decrease in Investment in Growing C | (553) | (560) | (553) | (917) | (3,010) | (1,753) | 954 | 954 | 954 | 4,784 | (150) | (150) |
| (Increase) Decrease in Forward Contracts Depos | - | - | - | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Prepaids and Deposits | - | - | - | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in FASB ASC 842 Lease Asset | - | - | - | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Loan Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Increase (Decrease) in Accounts Payable and Ac | (269) | 434 | (202) | 145 | 2,377 | (1,450) | 362 | 30 | (131) | 2,521 | (3,466) | 118 |
| Increase (Decrease) in FASB ASC 842 Lease Liab | - | - | - | - | - | - | - | - | - | - | - | - |
| Increase (Decrease) in Deferred Revenue | - | - | - | - | - | - | - | - | - | - | - | - |
| **NET CASH PROVIDED (USED) BY OPERATING** | 7,754 | 8,103 | 4,490 | 6,269 | 5,821 | 7,577 | 2,433 | 4,571 | 6,864 | (2,593) | 4,575 | 9,996 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | | | | | | | |
| Proceeds from Sale of Cows - Dairy Herd | 866 | 886 | 861 | 870 | 856 | 863 | 851 | 849 | 857 | 845 | 852 | 840 |
| Proceeds from Sale of Wet Cows | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Sale of Heifers | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Sale of Raised Cows | (25) | (55) | (20) | (29) | (16) | (25) | (11) | (9) | (19) | (5) | (14) | (0) |
| Purchase of Cowsand Heifers | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) |
| Proceeds (Purchase) of Property, Plant, & Equipm | (3,767) | (3,403) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) | (3,767) | (3,646) | (3,767) | (3,646) | (3,767) |
| Cost of Feeding and Raising Heifers | - | - | - | - | - | - | - | - | - | - | - | - |
| Member Distribution (Contribution) of Capital in | - | - | - | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Patron's Equity | - | - | - | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in RelatedParty Receivable | - | - | - | - | - | - | - | - | - | - | - | - |
| **NET CASH PROVIDED (USED) BY INVESTING A** | (3,218) | (2,863) | (3,218) | (3,097) | (3,219) | (3,099) | (3,219) | (3,219) | (3,099) | (3,219) | (3,099) | (3,219) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | | | | | | | | |
| Increase (Decrease) in Credit Balance - Cash in Ban | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Proceeds (Payments) on Lines of Credit | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Proceeds (Payments) on Post Confirmation Cr | (4,660) | (5,388) | 403 | (3,328) | (2,760) | (2,803) | 621 | (3,520) | (2,071) | 5,637 | (1,653) | (5,108) |
| Net Proceeds (Payments) on PCCF Unused Fee | 9 | 10 | (19) | 13 | 13 | (26) | 16 | 17 | (33) | 18 | 18 | (36) |
| Net Proceeds (Payments) on Ref. Post Conf. CF | - | - | - | - | - | - | - | - | - | - | - | - |
| Prior Period Adjustment to Retained Earnings F | - | - | - | - | - | - | - | - | - | - | - | - |
| Increase (Decrease) in Pre-Petition Accounts Pa | - | - | (1,395) | - | - | (1,395) | - | - | (1,395) | - | - | (1,395) |
| Increase (Decrease) in Pre-Petition Accounts Pa | - | - | (401) | - | - | (401) | - | - | (401) | - | - | (401) |
| Increase (Decrease) in RelatedParty Payable | - | - | - | - | - | - | - | - | - | - | - | - |
| P/R Interest/Fees on Short-Term Debt | 250 | 253 | 256 | 260 | 263 | 266 | 270 | 273 | 276 | 280 | 283 | 287 |
| Proceeds from Short-Term Debt | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Payments on Short-Term Debt | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Long-Term Debt | (104) | (105) | (106) | (107) | (108) | (109) | (110) | (111) | (112) | (113) | (114) | (115) |
| Payments on Long-Term Debt | - | - | - | - | - | - | - | - | - | - | - | - |
| Owner Additional Paid-in Capital | - | - | - | - | - | - | - | - | - | - | - | - |
| Owner Distributions | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| **NET CASH PROVIDED (USED) BY FINANCING A** | (4,515) | (5,240) | (1,272) | (3,172) | (2,601) | (4,478) | 786 | (3,352) | (3,765) | 5,812 | (1,476) | (6,777) |
| **NET INCREASE (DECREASE) IN CASH** | 0 | 0 | (0) | 0 | - | (0) | - | (0) | (0) | (0) | (0) | (0) |
| **CASH AT BEGINNING OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **CASH AT END OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |

Case 24-40158-NGH Doc 640-3 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc Exhibit Exhibit C - Unredacted Projections Page 105 of 125 Filed 10/02/24 Entered 10/02/24 16:... Financial Projections Page 9 of 20

Case 24-40158-NGH Doc 640-3 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc Document Page 105 of 125 Filed 10/02/24 Entered 10/02/24 16:... Financial Projections Page 10 of 20

**5 Year Forecast**
Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

### Combined Con Stmt of Inc

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | | |
| Milk Sales | 19,786 | 17,545 | 18,980 | 18,508 | 19,783 | 19,476 | 20,026 | 19,823 | 18,430 | 19,348 | 21,730 | 20,973 |
| Custom Feeding | 1,664 | 1,503 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 |
| Steer Sales | 4,640 | 1,949 | 2,155 | 1,943 | 2,151 | 2,045 | 1,719 | 2,140 | 1,925 | 2,138 | 1,921 | 2,199 |
| Gain (Loss) on Milk Derivatives | | | | | | | | | | | | |
| Milk Dairy Revenue Protection Proceeds | | | | | | | | | | | | |
| Trucking Income | 161 | 153 | 161 | 113 | 114 | 113 | 114 | 440 | 428 | 440 | 428 | 440 |
| Government Payments | | | | | | | | | | | | |
| Patronage Dividends | | | | | | | | | | | | |
| Other | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Rental Income | | | | | | | | | | | | |
| **Total Revenues** | 26,377 | 21,276 | 23,084 | 22,300 | 23,838 | 23,370 | 23,649 | 24,193 | 22,518 | 23,716 | 25,815 | 25,401 |
| **COST OF GOODS SOLD:** | | | | | | | | | | | | |
| Feed | 12,507 | 11,271 | 12,484 | 12,086 | 12,494 | 12,095 | 12,506 | 12,513 | 12,114 | 12,522 | 12,123 | 12,531 |
| *Grains, Minerals, & Milk Products* | | | | | | | | | | | | |
| *Silage* | | | | | | | | | | | | |
| *Haylage* | | | | | | | | | | | | |
| *Triticale* | | | | | | | | | | | | |
| *Hay* | | | | | | | | | | | | |
| *Straw* | | | | | | | | | | | | |
| *Rye Grass* | | | | | | | | | | | | |
| Steers | 3,234 | 1,230 | 1,501 | 1,318 | 1,502 | 1,388 | 1,224 | 1,506 | 1,319 | 1,510 | 1,321 | 1,556 |
| Steer Cost Inventoried | (1,522) | (1,369) | (1,499) | (1,469) | (1,520) | (1,487) | (1,544) | (1,557) | (1,525) | (1,577) | (1,544) | (1,556) |
| Heifer Cost Capitalized | (3,767) | (3,402) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) |
| Custom Feeding | | | | | | | | | | | | |
| (Gain) Loss on Feed and Cattle Derivatives | | | | | | | | | | | | |
| Farm (Income) Loss | | | | | (3,116) | 390 | 252 | (243) | (1,055) | 225 | 278 | |
| **Total Cost of Goods Sold** | 10,451 | 7,729 | 8,719 | 8,290 | 8,709 | 5,234 | 8,909 | 8,926 | 8,019 | 7,633 | 8,480 | 9,003 |
| **GROSS PROFIT** | 15,925 | 13,547 | 14,366 | 14,010 | 15,128 | 18,136 | 14,740 | 15,267 | 14,499 | 16,083 | 17,335 | 16,398 |
| GP% | 60% | 64% | 62% | 63% | 63% | 78% | 62% | 63% | 64% | 68% | 67% | 65% |
| **Herd Replacement Cost:** | | | | | | | | | | | | |
| Depreciation on Dairy Herd | 1,805 | 1,828 | 1,850 | 1,871 | 1,892 | 1,913 | 1,933 | 1,953 | 1,972 | 1,991 | 2,009 | 2,027 |
| Loss on Sale of Herd | 663 | 676 | 688 | 700 | 710 | 720 | 729 | 737 | 745 | 752 | 759 | 765 |
| (Gain) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| **Total Herd Replacement** | 2,468 | 2,504 | 2,538 | 2,571 | 2,603 | 2,633 | 2,662 | 2,690 | 2,717 | 2,743 | 2,768 | 2,792 |
| *GP % after Herd Replacement* | | | | | | | | | | | | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Salaries & Wages | 2,184 | 1,972 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 |
| Payroll Taxes | 189 | 171 | 189 | 183 | 189 | 183 | 189 | 189 | 183 | 189 | 183 | 189 |
| Employee Benefits | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| Depreciation - PP&E | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| FASB ASC842 Operating Amortization | | | | | | | | | | | | |
| Rent - Land & Facilities | 7 | 23 | 37 | 10 | 8 | 10 | 14 | 10 | 15 | 17 | 12 | 12 |
| Equipment Lease | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 |
| Milk Hauling | 691 | 642 | 704 | 693 | 757 | 752 | 791 | 764 | 691 | 711 | 676 | 685 |
| Milk Promotions | 138 | 128 | 141 | 139 | 151 | 150 | 158 | 153 | 138 | 142 | 135 | 137 |
| Livestock Hauling | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Compost Turning & Hauling | 20 | 51 | 44 | 283 | 302 | 293 | 302 | 302 | 293 | 302 | 293 | 302 |
| Livestock Testing & Trimming | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 |
| Straw Bedding | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | 0 |
| Veterinary & Medicine | 803 | 804 | 804 | 805 | 806 | 807 | 808 | 809 | 810 | 810 | 811 | 811 |
| Semen | 221 | 211 | 225 | 218 | 225 | 218 | 225 | 225 | 218 | 225 | 218 | 225 |
| Supplies | 479 | 457 | 489 | 473 | 489 | 473 | 489 | 489 | 473 | 489 | 473 | 489 |
| Repairs & Maintenance | 379 | 396 | 426 | 423 | 370 | 390 | 409 | 407 | 393 | 415 | 391 | 418 |
| Fuel & Oil | 408 | 389 | 416 | 403 | 416 | 403 | 416 | 416 | 403 | 416 | 403 | 416 |
| Utilities | 164 | 174 | 181 | 153 | 183 | 176 | 183 | 183 | 176 | 184 | 176 | 183 |
| Trucking Expense | 39 | 30 | 43 | 36 | 43 | 36 | 43 | 43 | 36 | 43 | 36 | 43 |
| Professional Fees | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Contract Services | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| Taxes & Licenses | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Insurance | | | | | | | | | | | | |
| Advertising & Donations | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Finance & Service Charges | 127 | 80 | 81 | 85 | 85 | 88 | 89 | 91 | 91 | 91 | 90 | 88 |
| Miscellaneous | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| **Total Operating Expenses** | 7,329 | 7,008 | 7,443 | 7,496 | 7,687 | 7,571 | 7,779 | 7,743 | 7,512 | 7,696 | 7,489 | 7,662 |

---

**5 Year Forecast**
Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME (LOSS) FROM OPERATIONS** | 6,128 | 4,035 | 4,384 | 3,943 | 4,838 | 7,932 | 4,299 | 4,834 | 4,270 | 5,643 | 7,078 | 5,944 |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | |
| Interest Income | | | | | | | | | | | | |
| Interest Expense | (1,920) | (1,854) | (2,041) | (1,797) | (1,757) | (1,960) | (1,677) | (1,703) | (1,867) | (1,662) | (1,742) | (1,863) |
| Investment Earnings (Loss) in H&M Custom, LLC | | | | | | | | | | | | |
| Forbearance Fee | | | | | | | | | | | | |
| Gain on Sale of Property, Plant, & Equipment | | | | | | | | | | | | |
| **Total Other Income (Expense)** | (1,920) | (1,854) | (2,041) | (1,797) | (1,757) | (1,960) | (1,677) | (1,703) | (1,867) | (1,662) | (1,742) | (1,863) |
| **NET INCOME (LOSS)** | 4,208 | 2,180 | 2,343 | 2,146 | 3,082 | 5,971 | 2,623 | 3,131 | 2,403 | 3,981 | 5,336 | 4,081 |
| *Net Income %* | 16% | 10% | 10% | 10% | 13% | 26% | 11% | 13% | 11% | 17% | 21% | 16% |
| **EBITDA** | 8,710 | 6,640 | 7,011 | 6,592 | 7,508 | 10,622 | 7,030 | 7,564 | 7,020 | 8,411 | 9,865 | 8,748 |
| *Net Income %* | 33% | 31% | 30% | 30% | 31% | 45% | 30% | 31% | 31% | 35% | 38% | 34% |
| **OWNER DRAWS** | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **CAP EX** | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 |

### Combined Con Farming Operation

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | | |
| Crop Sales | | | | | | 3,116 | 1,466 | 1,466 | 1,466 | 7,353 | | |
| Government Payments | | | | | | | | | | | | |
| Rent, Farm Land | | | | | | 696 | | | | 256 | 432 | |
| **Total Revenues** | 0 | 0 | 0 | 0 | 696 | 3,116 | 1,466 | 1,466 | 1,722 | 7,785 | 0 | 0 |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Investment in Growing Crops, January 1 | 100 | | | | | | | | | | | |
| Interest | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Depreciation | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| Chemicals and Fertilizer | | | | 526 | 1,814 | 757 | 173 | 41 | 41 | 41 | 11 | |
| Manure Hauling & Compost | 276 | 276 | 276 | 10 | | 73 | 17 | | | | | 108 |
| Custom Farming | | | | | 131 | 134 | 70 | 18 | 21 | 56 | 48 | 20 |
| Seed | | 7 | | | 482 | 357 | 124 | 50 | 61 | 74 | | |
| Repairs & Maintenance | 37 | 37 | 37 | 101 | 538 | 65 | 163 | 173 | 42 | 96 | 65 | 60 |
| Utilities | 15 | 15 | 15 | 55 | 161 | 185 | 273 | 280 | 187 | 83 | 27 | 15 |
| Labor | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Water M&O | 43 | 43 | 43 | 43 | 43 | 43 | | | | | 43 | 43 |
| Property Tax | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Outside Rent | | | | | | | | | 1,412 | | | |
| Insurance | | | | 354 | | | | | | | | |
| Fuel | | | | | | | | | | | | |
| Investment in Growing Crops, Period End | (813) | (560) | (553) | (917) | (3,010) | (1,753) | 954 | 954 | 4,784 | (150) | (150) | |
| **Total Operating Expenses** | 0 | 0 | 0 | 0 | 696 | 0 | 1,956 | 1,698 | 1,489 | 6,729 | 225 | 278 |
| **NET INCOME (LOSS) FROM OPERATIONS** | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| Total Other Income (Expense) | | | | | | | | | | | | |
| **NET INCOME (LOSS)** | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |

Case 24-40158-NGH  Doc 640-3  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit C - Cash ... Page ... Doc 645  Entered 10/02/24 ... Page 106 of 125

Case 24-40158-NGH  Doc 640-3  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
... Document  Page 12 of 20

**5 Year Forecast**

Model as of Plan filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

### Combined Consolidated BS

| ASSETS | | | | | |
|---|---|---|---|---|---|
| **CURRENT ASSETS:** | | | | | |
| Cash | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Accounts Receivable | 23,017 | 20,216 | 21,697 | 21,170 | 22,437 |
| Feed Inventory | 25,237 | 23,093 | 20,717 | 18,415 | 16,034 |
| Investment in Growing Crops | 853 | 1,413 | 1,967 | 2,883 | 5,893 |
| Heifer Inventory | - | - | - | - | - |
| Steer Inventory | 7,308 | 7,447 | 7,445 | 7,597 | 7,614 |
| Medicine & Fuel Inventory | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Derivative Balance at ADM Investor Services, Inc. | - | - | - | - | - |
| Prepaid Expenses | 73 | 73 | 73 | 73 | 73 |
| **Total Current Assets** | 59,988 | 55,742 | 55,399 | 53,638 | 55,552 |

| **DAIRY HERD:** | | | | | |
|---|---|---|---|---|---|
| Purchased Cows | - | - | - | - | - |
| Self-Raised Cows | 109,650 | 110,978 | 112,274 | 113,541 | 114,778 |
| Self-Raised Heifers | 34,171 | 33,708 | 33,609 | 33,389 | 33,291 |
| **Total Dairy Herd** | 143,821 | 144,685 | 145,884 | 146,930 | 148,069 |
| Less, Accumulated Depreciation | (44,143) | (44,949) | (45,758) | (46,575) | (47,384) |
| **Total Dairy Herd - Net** | 99,678 | 99,737 | 100,126 | 100,360 | 100,685 |
| **Total Current Assets and Dairy Herd** | 159,666 | 155,479 | 155,525 | 153,999 | 156,237 |

| **PROPERTY, PLANT & EQUIPMENT:** | | | | | |
|---|---|---|---|---|---|
| Land | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 |
| Land Improvements | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 |
| Buildings & Improvements | 269,122 | 269,414 | 269,706 | 269,997 | 270,289 |
| Machinery & Equipment | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 |
| Trucks, Trailers, & Vehicles | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 |
| **Total Property, Plant, & Equipment** | 348,423 | 348,714 | 349,006 | 349,298 | 349,589 |
| Less, Accumulated Depreciation | (94,029) | (94,694) | (95,358) | (96,024) | (96,689) |
| **Total Property, Plant & Equipment - Net** | 254,394 | 254,021 | 253,647 | 253,274 | 252,900 |

| **OTHER ASSETS:** | | | | | |
|---|---|---|---|---|---|
| Related Party Receivable | - | - | - | - | - |
| Deposits | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 |
| FASB ASC 842 Operating Lease Asset | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 |
| Investment in Affiliated Entities | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 |
| Investment in Patron's Equity | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 |
| Loan Fees, Net of Accumulated Amortization | 1,138 | 1,125 | 1,113 | 1,101 | 1,088 |
| **Total Other Assets** | 11,754 | 11,742 | 11,730 | 11,717 | 11,705 |
| **TOTAL ASSETS** | 425,814 | 421,242 | 420,902 | 418,990 | 420,842 |

| **LIABILITIES AND EQUITY** | | | | | |
|---|---|---|---|---|---|
| **CURRENT LIABILITIES:** | | | | | |
| Credit Balance - Cash in Bank | - | - | - | - | - |
| Operating Line of Credit, Rabo Bank | - | - | - | - | - |
| Lines of Credit - Other | - | - | - | - | - |
| Post Confirmation Credit Facility | 66,993 | 60,244 | 59,795 | 54,893 | 52,959 |
| Unused Fee | 18 | 40 | - | 26 | 52 |
| Refinance of Post Conf. CF to Revolver | - | - | - | - | - |
| Pre-Petition Accounts Payable - Unsecured | 19,526 | 19,526 | 17,434 | 17,434 | 15,342 |
| Pre-Petition Accounts Payable - Secured | 0 | 0 | 0 | 0 | 0 |
| Accounts Payable & Accrued Expenses | 8,199 | 8,005 | 7,500 | 8,065 | 8,450 |
| Deferred Revenue | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 |
| Related Party Payable | - | - | - | - | - |
| Accrued Labor & Payroll Taxes | 1,220 | 1,106 | 1,220 | 1,182 | 1,220 |
| Accrued Interest | - | - | - | - | - |
| FASB ASC 842 Operating Lease Liability | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 |
| Short Term Note Payable | 23,520 | 23,814 | 24,111 | 24,413 | 24,718 |
| Debtor in Possession Note Payable | - | - | - | - | - |
| Current Portion of Long-Term Debt | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 |
| **Total Current Liabilities** | 135,825 | 129,082 | 126,410 | 121,162 | 114,165 |

| **LONG-TERM LIABILITIES:** | | | | | |
|---|---|---|---|---|---|
| Long-Term Debt, Less Current Portion | 183,767 | 183,767 | 183,767 | 183,767 | 183,767 |
| **Total Long-Term Liabilities** | 183,767 | 183,767 | 183,767 | 183,767 | 183,767 |

| **EQUITY:** | | | | | |
|---|---|---|---|---|---|
| Common Stock, Class A, No Par Value | - | - | - | - | - |
| 10,000 Shares Authorized & Issued | - | - | - | - | - |
| Additional Paid-in Capital | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 |
| Retained Earnings | 63,775 | 65,955 | 68,298 | 70,444 | 73,525 |
| Members' Capital | 30,803 | 30,793 | 30,783 | 30,773 | 30,763 |
| **Total Equity** | 106,223 | 108,393 | 110,726 | 112,862 | 115,933 |
| **TOTAL LIABILITIES AND EQUITY** | 425,814 | 421,242 | 420,902 | 418,990 | 420,842 |

---

**5 Year Forecast**

Model as of Plan filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

### Combined Con Stmt of Cash Flows

| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | |
|---|---|---|---|---|---|
| Net Income (Loss) | 4,208 | 2,180 | 2,343 | 2,146 | 3,082 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | |
| Depreciation | 2,470 | 2,493 | 2,515 | 2,536 | 2,557 |
| Amortization | 12 | 12 | 12 | 12 | 12 |
| (Gain) Loss on Sale of Dairy Herd | 663 | 676 | 688 | 700 | 710 |
| (Gain) Loss on Sale of Wet Cows | - | - | - | - | - |
| (Gain) Loss on Sale of Dairy, Plant, & Equipment | - | - | - | - | - |
| (Income) Losses of H&M Custom, LLC | - | - | - | - | - |
| (Increase) Decrease in Accounts Receivable | 677 | 2,801 | (1,482) | 527 | (1,267) |
| (Increase) Decrease in Inventories | 4,094 | 2,005 | 2,378 | 2,151 | 2,363 |
| (Increase) Decrease in Investment in Growing Crops | (553) | (560) | (553) | (917) | (3,010) |
| (Increase) Decrease in Forward Contracts Depo | - | - | - | - | - |
| (Increase) Decrease in Prepaids and Deposits | - | - | - | - | - |
| (Increase) Decrease in FASB ASC 842 Lease Asset | - | - | - | - | - |
| (Increase) Decrease in Loan Fees | - | - | - | - | - |
| Increase (Decrease) in Accounts Payable and Accrued | (976) | (309) | (390) | 527 | 423 |
| Increase (Decrease) in FASB ASC 842 Lease Liability | - | - | - | - | - |
| Increase (Decrease) in Deferred Revenue | - | - | - | - | - |
| **NET CASH PROVIDED (USED) BY OPERATING** | 10,596 | 9,299 | 5,511 | 7,682 | 4,871 |

| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | |
|---|---|---|---|---|---|
| Proceeds from Sale of Cows - Dairy Herd | 840 | 840 | 840 | 840 | 840 |
| Proceeds from Sale of Wet Cows | - | - | - | - | - |
| Proceeds from Sale of Heifers | - | - | - | - | - |
| Proceeds from Sale of Land and Equipment | - | - | - | - | - |
| Purchase of Consumed Heifers | (0) | (0) | (0) | (0) | (0) |
| Proceeds (Purchase) of Property, Plant, & Equipment | (292) | (292) | (292) | (292) | (292) |
| Cost of Feeding and Raising Heifers | (3,767) | (3,402) | (3,767) | (3,645) | (3,767) |
| Member Distribution (Contribution) of Capital in | - | - | - | - | - |
| (Increase) Decrease in Patron's Equity | - | - | - | - | - |
| (Increase) Decrease in Related Party Receivable | - | - | - | - | - |
| **NET CASH PROVIDED (USED) BY INVESTING** | (3,219) | (2,854) | (3,219) | (3,097) | (3,219) |

| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | |
|---|---|---|---|---|---|
| Increase (Decrease) in Credit Balance - Cash in Bank | - | - | - | - | - |
| Net Proceeds (Payments) on Lines of Credit | - | - | - | - | - |
| Net Proceeds (Payments) on Post Confirmation Cr | (7,675) | (6,750) | (449) | (4,902) | (1,934) |
| Net Proceeds (Payments) on PCCF Unused Fee | 18 | 21 | (40) | 26 | 26 |
| Net Proceeds (Payments) on Ref. of Post Conf. CF | - | - | - | - | - |
| Prior Period Adjustment to Retained Earnings | - | - | - | - | - |
| Increase (Decrease) in Pre-Petition Accounts Pa | - | - | (2,092) | - | - |
| Increase (Decrease) in Pre-Petition Accounts Pa | - | - | - | - | - |
| Increase (Decrease) in Related Party Payable | - | - | - | - | - |
| P/R Interest/Fees on Short-Term Debt | 290 | 294 | 298 | 301 | 305 |
| Proceeds from Short-Term Debt | 0 | (0) | 0 | 0 | (0) |
| Payments on Short-Term Debt | - | - | - | - | - |
| Proceeds from Long-Term Debt | - | - | - | - | - |
| Payments on Long-Term Debt | - | - | - | - | - |
| Owner Additional Paid-in Capital | - | - | - | - | - |
| Owner Distributions | (10) | (10) | (10) | (10) | (10) |
| **NET CASH PROVIDED (USED) BY FINANCING** | (7,376) | (6,444) | (2,293) | (4,585) | (1,612) |
| **NET INCREASE (DECREASE) IN CASH** | 0 | (0) | (0) | (0) | (0) |
| **CASH AT BEGINNING OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **CASH AT END OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |

**5 Year Forecast**

Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| | Forecast 31 01/31/28 2028 Jan | Forecast 29 02/01/28 2028 Feb | Forecast 31 03/01/28 2028 Mar | Forecast 30 04/01/28 2028 Apr | Forecast 31 05/01/28 2028 May | Forecast 30 06/01/28 2028 Jun | Forecast 31 07/01/28 2028 Jul | Forecast 31 08/01/28 2028 Aug | Forecast 30 09/01/28 2028 Sep | Forecast 31 10/01/28 2028 Oct | Forecast 30 11/01/28 2028 Nov | Forecast 31 12/01/28 2028 Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Combined Com Stmt of Inc** | | | | | | | | | | | | |
| **REVENUES:** | | | | | | | | | | | | |
| Milk Sales | 19,761 | 18,172 | 18,980 | 18,508 | 19,783 | 19,476 | 20,026 | 19,823 | 18,430 | 19,348 | 21,730 | 20,973 |
| Custom Feeding | 1,664 | 1,557 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 |
| Steer Sales | 2,221 | 2,328 | 2,255 | 2,160 | 2,289 | 2,282 | 2,275 | 2,277 | 2,277 | 2,277 | 2,275 | 2,275 |
| Other Cattle Sales | | | | | | | | | | | | |
| Gain (Loss) on Milk Derivatives | | | | | | | | | | | | |
| Milk Dairy Revenue Protection Proceeds | | | | | | | | | | | | |
| Trucking Income | 161 | 156 | 161 | 113 | 114 | 113 | 114 | 440 | 428 | 440 | 428 | 440 |
| Government Payments | | | | | | | | | | | | |
| Patronage Dividends | | | | | | | | | | | | |
| Other | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Rental Income | | | | | | | | | | | | |
| **Total Revenues** | 23,932 | 22,137 | 23,185 | 22,516 | 23,976 | 23,607 | 24,205 | 24,529 | 22,868 | 23,854 | 26,169 | 25,477 |
| **COST OF GOODS SOLD:** | | | | | | | | | | | | |
| Feed | 12,532 | 11,726 | 12,536 | 12,133 | 12,538 | 12,134 | 12,538 | 12,538 | 12,134 | 12,538 | 12,134 | 12,538 |
| *Grains, Minerals, & Milk Products* | | | | | | | | | | | | |
| *Silage* | | | | | | | | | | | | |
| *Haylage* | | | | | | | | | | | | |
| *Triticale* | | | | | | | | | | | | |
| *Hay* | | | | | | | | | | | | |
| *Straw* | | | | | | | | | | | | |
| *Rye Grass* | | | | | | | | | | | | |
| Steers | 1,572 | 1,413 | 1,596 | 1,485 | 1,620 | 1,566 | 1,611 | 1,612 | 1,561 | 1,612 | 1,561 | 1,611 |
| Steer Cost Inventoried | (1,597) | (1,515) | (1,605) | (1,564) | (1,610) | (1,546) | (1,609) | (1,609) | (1,566) | (1,609) | (1,566) | (1,609) |
| Heifer Cost Capitalized | (3,767) | (3,524) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) |
| Custom Feed | | | | | | | | | | | | |
| (Gain) Loss on Feed and Cattle Derivatives | | | | | | | | | | | | |
| Farm (Income) Loss | | | | | (3,116) | 490 | 252 | (263) | (1,055) | 225 | 278 | |
| **Total Cost of Goods Sold** | 8,740 | 8,100 | 8,761 | 8,408 | 8,782 | 5,372 | 9,263 | 9,006 | 8,241 | 7,719 | 8,709 | 9,051 |
| **GROSS PROFIT** | 15,193 | 14,038 | 14,425 | 14,108 | 15,194 | 18,235 | 14,942 | 15,523 | 14,627 | 16,135 | 17,460 | 16,426 |
| GP% | 63% | 63% | 62% | 63% | 63% | 77% | 62% | 63% | 64% | 68% | 67% | 64% |
| **Herd Replacement Cost:** | | | | | | | | | | | | |
| Depreciation on Dairy Herd | 2,045 | 2,062 | 2,078 | 2,095 | 2,111 | 2,126 | 2,141 | 2,156 | 2,171 | 2,185 | 2,199 | 2,212 |
| Loss on Sale of Herd | 770 | 775 | 780 | 783 | 787 | 790 | 792 | 794 | 796 | 798 | 799 | 799 |
| (Gain) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| **Total Herd Replacement** | 2,815 | 2,837 | 2,858 | 2,878 | 2,897 | 2,916 | 2,934 | 2,951 | 2,967 | 2,982 | 2,997 | 3,011 |
| *GP % after Herd Replacement* | | | | | | | | | | | | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Salaries & Wages | 2,184 | 2,063 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 |
| Payroll Taxes | 189 | 177 | 189 | 183 | 189 | 183 | 189 | 189 | 183 | 189 | 183 | 189 |
| Employee Benefits | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| Depreciation - PP&E | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| FASB ASC842 Operating Amortization | | | | | | | | | | | | |
| Rent - Land & Facilities | 7 | 23 | 37 | 10 | 8 | 10 | 14 | 10 | 15 | 17 | 12 | 14 |
| Equipment Lease | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 |
| Milk Hauling | 690 | 665 | 704 | 693 | 757 | 752 | 791 | 764 | 691 | 711 | 676 | 685 |
| Milk Promotions | 138 | 133 | 141 | 139 | 151 | 150 | 158 | 153 | 138 | 142 | 135 | 137 |
| Livestock Hauling | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Compost Turning & Hauling | 20 | 51 | 44 | 283 | 302 | 293 | 302 | 302 | 293 | 302 | 293 | 302 |
| Livestock Testing & Trimming | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 |
| Straw Bedding | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Veterinary & Medicine | 811 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 |
| Semen | 221 | 211 | 225 | 218 | 225 | 218 | 225 | 225 | 218 | 225 | 218 | 225 |
| Supplies | 479 | 457 | 489 | 473 | 489 | 473 | 489 | 489 | 473 | 489 | 473 | 489 |
| Repairs & Maintenance | 379 | 396 | 426 | 423 | 370 | 390 | 409 | 407 | 393 | 415 | 391 | 418 |
| Fuel & Oil | 408 | 389 | 416 | 403 | 416 | 403 | 416 | 416 | 403 | 416 | 403 | 416 |
| Utilities | 164 | 174 | 181 | 153 | 183 | 176 | 183 | 183 | 176 | 184 | 176 | 183 |
| Trucking Expense | 39 | 30 | 43 | 36 | 43 | 36 | 43 | 43 | 36 | 43 | 36 | 43 |
| Professional Fees | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Contract Services | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| Taxes & Licenses | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Insurance | | | | | | | | | | | | |
| Advertising & Donations | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Finance & Service Charges | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 |
| Miscellaneous | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| **Total Operating Expenses** | 7,268 | 7,099 | 7,429 | 7,477 | 7,668 | 7,548 | 7,753 | 7,715 | 7,483 | 7,667 | 7,459 | 7,634 |

---

**5 Year Forecast**

Model as of Plan Filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| | Forecast 31 01/31/28 2028 Jan | Forecast 29 02/01/28 2028 Feb | Forecast 31 03/01/28 2028 Mar | Forecast 30 04/01/28 2028 Apr | Forecast 31 05/01/28 2028 May | Forecast 30 06/01/28 2028 Jun | Forecast 31 07/01/28 2028 Jul | Forecast 31 08/01/28 2028 Aug | Forecast 30 09/01/28 2028 Sep | Forecast 31 10/01/28 2028 Oct | Forecast 30 11/01/28 2028 Nov | Forecast 31 12/01/28 2028 Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME (LOSS) FROM OPERATIONS** | 5,110 | 4,102 | 4,138 | 3,752 | 4,629 | 7,770 | 4,255 | 4,657 | 4,178 | 5,486 | 7,004 | 5,781 |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | |
| Interest Income | | | | | | | | | | | | |
| Interest Expense | (1,660) | (1,573) | (1,665) | (1,522) | (1,483) | (1,572) | (1,408) | (1,423) | (1,461) | (1,376) | (1,443) | (1,429) |
| Investment Earnings (Loss) in H&M Custom, LLC | | | | | | | | | | | | |
| Forbearance Fee | | | | | | | | | | | | |
| Gain on Sale of Property, Plant, & Equipment | | | | | | | | | | | | |
| **Total Other Income (Expense)** | (1,660) | (1,573) | (1,665) | (1,522) | (1,483) | (1,572) | (1,408) | (1,423) | (1,461) | (1,376) | (1,443) | (1,429) |
| **NET INCOME (LOSS)** | 3,450 | 2,528 | 2,472 | 2,231 | 3,146 | 6,198 | 2,847 | 3,234 | 2,716 | 4,110 | 5,560 | 4,352 |
| *Net Income %* | 14% | 11% | 11% | 10% | 13% | 26% | 12% | 13% | 12% | 17% | 21% | 17% |
| **EBITDA** | 7,932 | 6,941 | 6,953 | 6,625 | 7,517 | 10,674 | 7,174 | 7,501 | 7,126 | 8,448 | 9,980 | 8,771 |
| *Net Income %* | 33% | 31% | 30% | 29% | 31% | 45% | 30% | 31% | 31% | 35% | 38% | 34% |
| **OWNER DRAWS** | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **CAP EX** | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 |

| **Combined Con Farming Operation** | Jan-28 | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 | Oct-28 | Nov-28 | Dec-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | | |
| Crop Sales | - | - | - | - | - | 3,116 | 1,466 | 1,466 | 1,466 | 7,353 | - | - |
| Government Payments | | | | | | | | | | | | |
| Rent, Farm Land | - | - | - | - | - | 696 | - | - | 266 | 432 | - | - |
| **Total Revenues** | 0 | 0 | 0 | 0 | 0 | 696 | 3,116 | 1,466 | 1,466 | 1,732 | 7,785 | 0 |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Investment in Growing Crops, January 1 | 300 | | | | | | | | | | | |
| Interest | 100 | 100 | 100 | 100 | 100 | 100 | 100 | - | - | 100 | 100 | 100 |
| Depreciation | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| Chemicals and Fertilizer | - | - | - | 526 | 1,814 | 757 | 137 | 41 | 41 | 11 | - | - |
| Manure Hauling & Compost | 276 | 276 | 276 | 10 | - | 73 | 17 | - | - | 1 | - | 108 |
| Custom Farming | - | - | - | - | 131 | 134 | 70 | 18 | 21 | 56 | 48 | 20 |
| Seed | - | 7 | - | - | 482 | 357 | 124 | 50 | 61 | 74 | - | - |
| Repairs & Maintenance | 37 | 37 | 37 | 101 | 538 | 65 | 163 | 173 | 42 | 96 | 65 | 60 |
| Utilities | 15 | 15 | 15 | 55 | 161 | 185 | 273 | 280 | 187 | 83 | 27 | 15 |
| Labor | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Water M&O | 43 | 43 | 43 | 43 | 43 | 43 | - | - | - | - | - | - |
| Property Tax | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Outside Rent | - | - | - | - | 354 | - | - | - | - | 1,412 | - | - |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - |
| Fuel | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment in Growing Crops, Period End | (813) | (560) | (553) | (917) | (3,010) | (1,753) | 954 | 954 | 854 | 4,784 | (150) | (150) |
| **Total Operating Expenses** | 0 | 0 | 0 | 0 | 696 | 0 | 1,956 | 1,698 | 1,489 | 6,729 | 225 | 278 |
| **NET INCOME (LOSS) FROM OPERATIONS** | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| **Total Other Income (Expense)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **NET INCOME (LOSS)** | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |

Case 24-40158-NGH  Doc 640-3  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit C - Updated 5 Year Financial Projections  Page 16 of 20

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 15:25:03  Desc Main
Document   Page 108 of 125

## Combined Consolidated BS

**5 Year Forecast**

Model as of Plan filed 09.30.24
*Operating Fcst Assumptions as of Sept 17, 2024*

| | Forecast Jan-28 | Forecast Feb-28 | Forecast Mar-28 | Forecast Apr-28 | Forecast May-28 | Forecast Jun-28 | Forecast Jul-28 | Forecast Aug-28 | Forecast Sep-28 | Forecast Oct-28 | Forecast Nov-28 | Forecast Dec-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

### ASSETS
### CURRENT ASSETS:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Accounts Receivable | 22,508 | 20,877 | 21,718 | 21,213 | 22,465 | 22,135 | 22,664 | 22,493 | 21,160 | 22,082 | 24,479 | 23,738 |
| Feed Inventory | 26,600 | 24,360 | 21,965 | 19,646 | 17,250 | 14,932 | 18,436 | 18,667 | 18,975 | 34,870 | 32,552 | 30,157 |
| Investment in Growing Crops | 853 | 1,413 | 1,967 | 2,883 | 5,893 | 7,646 | 6,692 | 5,738 | 4,784 | - | 150 | 300 |
| Heifer Inventory | | | | | | | | | | | | |
| Steer Inventory | 8,646 | 8,748 | 8,756 | 8,836 | 8,825 | 8,825 | 8,824 | 8,821 | 8,825 | 8,822 | 8,826 | 8,824 |
| Medicine & Fuel Inventory | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Derivative Balance at ADM Investor Services, Inc. | | | | | | | | | | | | |
| Prepaid Expenses | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| **Total Current Assets** | 62,180 | 58,972 | 57,979 | 56,152 | 58,007 | 57,111 | 60,189 | 59,292 | 57,318 | 69,347 | 69,580 | 66,592 |

### DAIRY HERD:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchased Cows | | | | | | | | | | | | |
| Self-Raised Cows | 123,699 | 124,701 | 125,680 | 126,636 | 127,570 | 128,483 | 129,374 | 130,245 | 131,095 | 131,926 | 132,738 | 133,531 |
| Self-Raised Heifers | 32,138 | 31,797 | 31,698 | 31,478 | 31,380 | 31,160 | 31,061 | 30,963 | 30,743 | 30,644 | 30,424 | 30,326 |
| **Total Dairy Herd** | 155,837 | 156,498 | 157,378 | 158,114 | 158,950 | 159,642 | 160,435 | 161,207 | 161,838 | 162,570 | 163,162 | 163,856 |
| Less, Accumulated Depreciation | (53,921) | (54,734) | (55,546) | (56,354) | (57,160) | (57,963) | (58,763) | (59,559) | (60,351) | (61,138) | (61,922) | (62,701) |
| **Total Dairy Herd - Net** | 101,916 | 101,763 | 101,832 | 101,760 | 101,789 | 101,679 | 101,672 | 101,649 | 101,487 | 101,432 | 101,240 | 101,155 |
| **Total Current Assets and Dairy Herd** | 164,096 | 160,735 | 159,811 | 157,912 | 159,796 | 158,790 | 161,861 | 160,941 | 158,805 | 170,779 | 170,820 | 167,747 |

### PROPERTY, PLANT & EQUIPMENT:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Land | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 |
| Land Improvements | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 |
| Buildings & Improvements | 272,622 | 272,914 | 273,206 | 273,497 | 273,789 | 274,081 | 274,372 | 274,664 | 274,956 | 275,247 | 275,539 | 275,831 |
| Machinery & Equipment | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 |
| Trucks, Trailers, & Vehicles | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 |
| **Total Property, Plant, & Equipment** | 351,923 | 352,214 | 352,506 | 352,798 | 353,089 | 353,381 | 353,673 | 353,964 | 354,256 | 354,548 | 354,839 | 355,131 |
| Less, Accumulated Depreciation | (102,010) | (102,675) | (103,340) | (104,005) | (104,670) | (105,335) | (106,000) | (106,665) | (107,330) | (107,995) | (108,660) | (109,326) |
| **Total Property, Plant & Equipment - Net** | 249,913 | 249,540 | 249,166 | 248,793 | 248,419 | 248,046 | 247,673 | 247,299 | 246,926 | 246,552 | 246,179 | 245,805 |

### OTHER ASSETS:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Related Party Receivable | | | | | | | | | | | | |
| Deposits | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 |
| FASB ASC 842 Operating Lease Asset | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 |
| Investment in Affiliated Entities | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 |
| Investment in Patron's Equity | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 |
| Loan Fees, Net of Accumulated Amortization | 989 | 977 | 964 | 952 | 940 | 927 | 915 | 902 | 890 | 878 | 865 | 853 |
| **Total Other Assets** | 11,606 | 11,593 | 11,581 | 11,568 | 11,556 | 11,544 | 11,531 | 11,519 | 11,507 | 11,494 | 11,482 | 11,469 |

| **TOTAL ASSETS** | 425,615 | 421,868 | 420,558 | 418,273 | 419,772 | 418,380 | 421,065 | 419,759 | 417,237 | 428,825 | 428,481 | 425,022 |

### LIABILITIES AND EQUITY
### CURRENT LIABILITIES:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Balance - Cash in Bank | | | | | | | | | | | | |
| Operating Line of Credit, Rabo Bank | | | | | | | | | | | | |
| Lines of Credit - Other | | | | | | | | | | | | |
| Post Confirmation Credit Facility | | | | | | | | | | | | |
| Unused Fee | | | | | | | | | | | | |
| Refinance of Post Conf. CF to Revolver | 38,018 | 33,365 | 33,875 | 30,274 | 29,506 | 23,422 | 26,319 | 23,617 | 22,789 | 31,992 | 27,231 | 23,909 |
| Pre-Petition Accounts Payable - Unsecured | 11,158 | 11,158 | 8,368 | 8,368 | 5,579 | 5,579 | 5,579 | 2,790 | 2,790 | 2,790 | - | - |
| Pre-Petition Accounts Payable - Secured | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounts Payable & Accrued Expenses | 8,224 | 7,955 | 7,658 | 8,071 | 8,449 | 11,074 | 9,285 | 8,763 | 8,503 | 8,069 | 8,301 | 7,907 |
| Deferred Revenue | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 |
| Related Party Payable | | | | | | | | | | | | |
| Accrued Labor & Payroll Taxes | 1,220 | 1,144 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 |
| Accrued Interest | | | | | | | | | | | | |
| FASB ASC 842 Operating Lease Liability | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 |
| Short Term Note Payable | 26,659 | 26,351 | 26,039 | 25,723 | 25,403 | 25,079 | 24,751 | 24,419 | 24,083 | 23,742 | 23,398 | 23,049 |
| Debtor in Possession Note Payable | | | | | | | | | | | | |
| Current Portion of Long-Term Debt | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 |
| **Total Current Liabilities** | 101,628 | 96,321 | 93,509 | 89,967 | 89,295 | 82,684 | 83,504 | 79,947 | 75,695 | 84,163 | 76,250 | 72,434 |

### LONG-TERM LIABILITIES:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Long-Term Debt, Less Current Portion | 177,158 | 176,200 | 175,239 | 174,276 | 173,310 | 172,341 | 171,370 | 170,396 | 169,419 | 168,440 | 167,457 | 166,473 |
| **Total Long-Term Liabilities** | 177,158 | 176,200 | 175,239 | 174,276 | 173,310 | 172,341 | 171,370 | 170,396 | 169,419 | 168,440 | 167,457 | 166,473 |

### EQUITY:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock, Class A, No Par Value | | | | | | | | | | | | |
| 10,000 Shares Authorized & Issued | | | | | | | | | | | | |
| Additional Paid-in Capital | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 |
| Retained Earnings | 104,501 | 107,030 | 109,502 | 111,733 | 114,879 | 121,077 | 123,924 | 127,158 | 129,875 | 133,985 | 139,545 | 143,897 |
| Members' Capital | 30,683 | 30,673 | 30,663 | 30,653 | 30,643 | 30,633 | 30,613 | 30,603 | 30,593 | 30,583 | 30,573 | 30,573 |
| **Total Equity** | 146,829 | 149,348 | 151,810 | 154,031 | 157,167 | 163,355 | 166,182 | 169,416 | 172,123 | 176,223 | 181,773 | 186,115 |

| **TOTAL LIABILITIES AND EQUITY** | 425,615 | 421,868 | 420,558 | 418,273 | 419,772 | 418,380 | 421,065 | 419,759 | 417,237 | 428,825 | 428,481 | 425,022 |

## Combined Con Stmt of Cash Flows

**5 Year Forecast**

Model as of Plan filed 09.30.24
*Operating Fcst Assumptions as of Sept 17, 2024*

| | Forecast Jan-28 | Forecast Feb-28 | Forecast Mar-28 | Forecast Apr-28 | Forecast May-28 | Forecast Jun-28 | Forecast Jul-28 | Forecast Aug-28 | Forecast Sep-28 | Forecast Oct-28 | Forecast Nov-28 | Forecast Dec-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

### CASH FLOWS FROM OPERATING ACTIVITIES:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income (Loss) | 3,450 | 2,528 | 2,472 | 2,231 | 3,146 | 6,198 | 2,847 | 3,234 | 2,716 | 4,110 | 5,560 | 4,352 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | | | | | | | | |
| Depreciation | 2,710 | 2,727 | 2,743 | 2,760 | 2,776 | 2,791 | 2,806 | 2,821 | 2,836 | 2,850 | 2,864 | 2,877 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| (Gain) Loss on Sale of Dairy Herd | 770 | 775 | 780 | 783 | 787 | 790 | 792 | 794 | 796 | 798 | 799 | 799 |
| (Increase) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| (Gain) Loss on Sale of Property, Plant, & Equipment | | | | | | | | | | | | |
| (Income) Losses of H&M Custom, LLC | | | | | | | | | | | | |
| (Increase) Decrease in Accounts Receivable | 1,214 | 1,631 | (840) | 504 | (1,252) | 330 | (529) | 171 | 1,333 | (922) | (2,397) | 742 |
| (Increase) Decrease in Inventories | 2,368 | 2,138 | 2,386 | 2,239 | 2,407 | 2,319 | (3,503) | (228) | (312) | (15,892) | 2,314 | 2,397 |
| (Increase) Decrease in Investment in Growing Crops | (553) | (560) | (553) | (917) | (3,010) | (1,753) | 954 | 954 | 954 | 4,784 | (150) | (150) |
| (Increase) Decrease in Forward Contracts Deposit | | | | | | | | | | | | |
| (Increase) Decrease in Prepaids and Deposits | | | | | | | | | | | | |
| (Increase) Decrease in FASB ASC 842 Lease Asset | | | | | | | | | | | | |
| (Increase) Decrease in Loan Fees | | | | | | | | | | | | |
| Increase (Decrease) in Accounts Payable and Accrued | 291 | (346) | (220) | 375 | 416 | 2,587 | (1,750) | (522) | (298) | (395) | 193 | (356) |
| Increase (Decrease) in FASB ASC 842 Lease Liability | | | | | | | | | | | | |
| Increase (Decrease) in Deferred Revenue | | | | | | | | | | | | |
| **NET CASH PROVIDED (USED) BY OPERATING** | 10,262 | 8,905 | 6,780 | 7,988 | 5,283 | 13,273 | 1,631 | 7,237 | 8,037 | (4,655) | 9,196 | 10,674 |

### CASH FLOWS FROM INVESTING ACTIVITIES:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Proceeds from Sale of Cows - Dairy Herd | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 |
| Proceeds from Sale of Wet Cows | | | | | | | | | | | | |
| Proceeds from Sale of Heifers | | | | | | | | | | | | |
| Proceeds from Sale of Land and Equipment | | | | | | | | | | | | |
| Purchase of Consumed Heifers | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Proceeds (Purchase) of Property, Plant, & Equipment | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) |
| Cost of Feeding and Raising Heifers | (3,767) | (3,524) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) |
| Member Distribution (Contribution) of Capital in | | | | | | | | | | | | |
| (Increase) Decrease in Patron's Equity | | | | | | | | | | | | |
| (Increase) Decrease in RelatedParty Receivable | | | | | | | | | | | | |
| **NET CASH PROVIDED (USED) BY INVESTING** | (3,219) | (2,976) | (3,219) | (3,097) | (3,219) | (3,097) | (3,219) | (3,219) | (3,097) | (3,219) | (3,097) | (3,219) |

### CASH FLOWS FROM FINANCING ACTIVITIES:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Increase (Decrease) in Credit Balance - Cash in Bank | | | | | | | | | | | | |
| Net Proceeds (Payments) on Lines of Credit | | | | | | | | | | | | |
| Net Proceeds (Payments) on Post Confirmation Cr (43,792) | | | | | | | | | | | | |
| Net Proceeds (Payments) on PCCF Unused Fee | | | | | | | | | | | | |
| Net Proceeds (Payments) on Refi. of Post Conf. CF | 38,018 | (4,653) | 511 | (3,601) | (768) | (6,084) | 2,897 | (2,702) | (828) | 9,203 | (4,762) | (3,322) |
| Prior Period Adjustment to Retained Earnings? | | | | | | | | | | | | |
| Increase (Decrease) in Pre-Petition Accounts Pa | - | (2,789) | - | - | (2,789) | - | - | (2,789) | - | - | (2,789) | - |
| Increase (Decrease) in Pre-Petition Accounts Pa | | | | | | | | | | | | |
| Increase (Decrease) in RelatedParty Payable | | | | | | | | | | | | |
| PIK Interest/Fees on Short Term Debt | 337 | 333 | 329 | 325 | 322 | 318 | 313 | 309 | 305 | 301 | 297 | 292 |
| Proceeds from Short-Term Debt | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) |
| Payments on Short-Term Debt | | | | | | | | | | | | |
| Proceeds from Long-Term Debt | (955) | (958) | (961) | (963) | (966) | (969) | (971) | (974) | (977) | (979) | (982) | (985) |
| Payments on Long-Term Debt | | | | | | | | | | | | |
| Owner Additional Paid-In Capital | | | | | | | | | | | | |
| Owner Distributions | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| **NET CASH PROVIDED (USED)BY FINANCING** | (7,043) | (5,930) | (5,561) | (4,890) | (2,064) | (10,176) | 1,588 | (4,018) | (4,940) | 7,874 | (6,098) | (7,455) |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NET INCREASE (DECREASE) IN CASH** | (0) | (0) | (0) | 0 | - | (0) | (0) | 0 | 0 | (0) | 0 | 0 |
| **CASH AT BEGINNING OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **CASH AT END OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |

Case 24-40158-NGH   Doc 640-3   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit C - Updated 5 year Financial Proj   Page 17 of 20
Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 16:10:56   Desc Main
Document   Page 109 of 125
Case 24-40158-NGH   Doc 640-3   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit C - Updated 5 year Financial Proj   Page 18 of 20

## Left Panel

**5 Year Forecast**

**Model as of Plan Filed 09.30.24**
Operating Fcst Assumptions as of Sept 17, 2024

| | Forecast 31 01/31/29 2029 Jan | Forecast 28 02/28/29 2029 Feb | Forecast 31 03/31/29 2029 Mar | Forecast 30 04/30/29 2029 Apr | Forecast 31 05/31/29 2029 May-29 | Forecast 30 06/30/29 2029 Jun-29 | Forecast 31 07/31/29 2029 Jul-29 | Forecast 31 08/31/29 2029 Aug-29 | Forecast 30 09/30/29 2029 Sep-29 | Forecast 31 10/31/29 2029 Oct-29 | Forecast 30 11/30/29 2029 Nov-29 | Forecast 31 12/31/29 2029 Dec-29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Combined Con Stmt of Inc** | | | | | | | | | | | | |
| **REVENUES:** | | | | | | | | | | | | |
| Milk Sales | 19,761 | 17,545 | 18,980 | 18,508 | 19,783 | 19,476 | 20,026 | 19,823 | 18,430 | 19,348 | 21,730 | 20,973 |
| Custom Feeding | 1,664 | 1,503 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 | 1,664 | 1,611 | 1,664 | 1,611 | 1,664 |
| Steer Sales | 2,278 | 2,278 | 2,279 | 2,278 | 2,279 | 2,280 | 2,275 | 2,277 | 2,275 | 2,277 | 2,275 | 2,275 |
| Other Cattle Sales | | | | | | | | | | | | |
| Gain (Loss) on Milk Derivatives | | | | | | | | | | | | |
| Milk Dairy Revenue Protection Proceeds | | | | | | | | | | | | |
| Trucking Income | 161 | 153 | 161 | 113 | 114 | 113 | 114 | 440 | 428 | 440 | 428 | 440 |
| Government Payments | | | | | | | | | | | | |
| Patronage Dividends | | | | | | | | | | | | |
| Other | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Rental Income | | | | | | | | | | | | |
| **Total Revenues** | 23,989 | 21,604 | 23,209 | 22,634 | 23,966 | 23,605 | 24,205 | 24,329 | 22,869 | 23,855 | 26,169 | 25,478 |
| **COST OF GOODS SOLD:** | | | | | | | | | | | | |
| Feed | 12,538 | 11,325 | 12,539 | 12,134 | 12,539 | 12,134 | 12,538 | 12,538 | 12,134 | 12,538 | 12,134 | 12,538 |
| Grains, Minerals, & Milk Products | | | | | | | | | | | | |
| Silage | | | | | | | | | | | | |
| Haylage | | | | | | | | | | | | |
| Triticale | | | | | | | | | | | | |
| Hay | | | | | | | | | | | | |
| Straw | | | | | | | | | | | | |
| Rye Grass | | | | | | | | | | | | |
| Steers | 1,613 | 1,464 | 1,614 | 1,563 | 1,614 | 1,565 | 1,611 | 1,612 | 1,562 | 1,612 | 1,562 | 1,611 |
| Steer Cost Inventoried | (1,609) | (1,479) | (1,610) | (1,567) | (1,610) | (1,547) | (1,610) | (1,610) | (1,566) | (1,610) | (1,566) | (1,610) |
| Heifer Cost Capitalized | (3,767) | (3,402) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) |
| Custom Feeding | | | | | | | | | | | | |
| (Gain) Loss on Feed and Cattle Derivatives | | | | | | | | | | | | |
| Farm (Income) Loss | | | (3,116) | 490 | 252 | (263) | (1,055) | 225 | 278 | | | |
| **Total Cost of Goods Sold** | 8,775 | 7,908 | 8,775 | 8,485 | 8,776 | 5,371 | 9,263 | 9,006 | 8,241 | 7,719 | 8,709 | 9,051 |
| **GROSS PROFIT** | 15,214 | 13,697 | 14,434 | 14,149 | 15,191 | 18,234 | 14,943 | 15,323 | 14,628 | 16,136 | 17,460 | 16,426 |
| GP% | 63% | 63% | 62% | 63% | 63% | 77% | 62% | 63% | 64% | 68% | 67% | 64% |
| **Herd Replacement Cost:** | | | | | | | | | | | | |
| Depreciation on Dairy Herd | 2,226 | 2,238 | 2,251 | 2,263 | 2,275 | 2,287 | 2,299 | 2,310 | 2,321 | 2,331 | 2,342 | 2,352 |
| Loss on Sale of Herd | 800 | 800 | 799 | 799 | 798 | 797 | 795 | 794 | 792 | 790 | 788 | 785 |
| (Gain) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| **Total Herd Replacement** | 3,025 | 3,038 | 3,050 | 3,062 | 3,073 | 3,084 | 3,094 | 3,104 | 3,113 | 3,122 | 3,130 | 3,137 |
| *GP % after Herd Replacement* | | | | | | | | | | | | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Salaries & Wages | 2,184 | 1,972 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 | 2,184 | 2,113 | 2,184 | 2,113 | 2,184 |
| Payroll Taxes | 189 | 171 | 189 | 183 | 189 | 183 | 189 | 189 | 183 | 189 | 183 | 189 |
| Employee Benefits | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| Depreciation - PP&E | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 | 617 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| FASB ASC842 Operating Amortization | | | | | | | | | | | | |
| Rent - Land & Facilities | 7 | 23 | 37 | 10 | 8 | 10 | 14 | 10 | 15 | 12 | 12 | 12 |
| Equipment Lease | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 | 512 |
| Milk Hauling | 690 | 642 | 704 | 693 | 757 | 752 | 791 | 764 | 691 | 711 | 676 | 685 |
| Milk Promotions | 138 | 128 | 141 | 139 | 151 | 150 | 158 | 153 | 138 | 142 | 135 | 137 |
| Livestock Hauling | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Compost Turning & Hauling | 20 | 51 | 44 | 283 | 302 | 293 | 302 | 302 | 293 | 302 | 293 | 302 |
| Livestock Testing & Trimming | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 |
| Straw Bedding | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | 0 | 0 |
| Veterinary & Medicine | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 | 812 |
| Semen | 221 | 211 | 225 | 218 | 225 | 218 | 225 | 225 | 218 | 225 | 218 | 225 |
| Supplies | 479 | 457 | 489 | 473 | 489 | 473 | 489 | 489 | 473 | 489 | 473 | 489 |
| Repairs & Maintenance | 379 | 396 | 426 | 423 | 370 | 390 | 409 | 407 | 393 | 415 | 391 | 418 |
| Fuel & Oil | 408 | 389 | 416 | 403 | 416 | 403 | 416 | 416 | 403 | 416 | 403 | 416 |
| Utilities | 164 | 174 | 181 | 153 | 183 | 176 | 183 | 183 | 176 | 184 | 176 | 183 |
| Trucking Expense | 39 | 30 | 43 | 36 | 33 | 36 | 43 | 43 | 36 | 43 | 36 | 43 |
| Professional Fees | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Contract Services | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| Taxes & Licenses | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Insurance | | | | | | | | | | | | |
| Advertising & Donations | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Finance & Service Charges | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 |
| Miscellaneous | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| **Total Operating Expenses** | 7,269 | 6,955 | 7,429 | 7,477 | 7,668 | 7,548 | 7,753 | 7,715 | 7,483 | 7,667 | 7,459 | 7,634 |

## Right Panel

**5 Year Forecast**

**Model as of Plan Filed 09.30.24**
Operating Fcst Assumptions as of Sept 17, 2024

| | Forecast 31 01/31/29 2029 Jan-29 | Forecast 28 02/28/29 2029 Feb-29 | Forecast 31 03/31/29 2029 Mar-29 | Forecast 30 04/30/29 2029 Apr-29 | Forecast 31 05/31/29 2029 May-29 | Forecast 30 06/30/29 2029 Jun-29 | Forecast 31 07/31/29 2029 Jul-29 | Forecast 31 08/31/29 2029 Aug-29 | Forecast 30 09/30/29 2029 Sep-29 | Forecast 31 10/31/29 2029 Oct-29 | Forecast 30 11/30/29 2029 Nov-29 | Forecast 31 12/31/29 2029 Dec-29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME (LOSS) FROM OPERATIONS** | 4,920 | 3,663 | 3,954 | 3,609 | 4,450 | 7,602 | 4,095 | 4,505 | 4,032 | 5,347 | 6,872 | 5,655 |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | |
| Interest Income | | | | | | | | | | | | |
| Interest Expense | (1,357) | (1,298) | (1,244) | (1,218) | (1,175) | (1,157) | (1,101) | (1,091) | (1,081) | (1,071) | (1,061) | (1,051) |
| Investment Earnings (Loss) in H&M Custom, LLC | | | | | | | | | | | | |
| Forbearance Fee | | | | | | | | | | | | |
| Gain on Sale of Property, Plant, & Equipment | | | | | | | | | | | | |
| **Total Other Income (Expense)** | (1,357) | (1,298) | (1,244) | (1,218) | (1,175) | (1,157) | (1,101) | (1,091) | (1,081) | (1,071) | (1,061) | (1,051) |
| **NET INCOME (LOSS)** | 3,563 | 2,366 | 2,710 | 2,391 | 3,275 | 6,445 | 2,995 | 3,414 | 2,951 | 4,276 | 5,810 | 4,604 |
| *Net Income %* | 15% | 11% | 12% | 11% | 14% | 27% | 12% | 14% | 13% | 18% | 22% | 18% |
| **EBITDA** | 7,923 | 6,679 | 6,982 | 6,650 | 7,503 | 10,666 | 7,172 | 7,582 | 7,130 | 8,456 | 9,991 | 8,785 |
| *Net Income %* | 33% | 31% | 30% | 29% | 31% | 45% | 30% | 31% | 31% | 35% | 38% | 34% |
| **OWNER DRAWS** | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **CAP EX** | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 |

| **Combined Con Farming Operation** | Jan-29 | Feb-29 | Mar-29 | Apr-29 | May-29 | Jun-29 | Jul-29 | Aug-29 | Sep-29 | Oct-29 | Nov-29 | Dec-29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | | |
| Crop Sales | | | | | | | 3,116 | 1,466 | 1,466 | 1,466 | 7,353 | |
| Government Payments | | | | | | | | | | | | |
| Rent, Farm Land | | | | | | 696 | | | 266 | 432 | | |
| **Total Revenues** | 0 | 0 | 0 | 0 | 0 | 696 | 3,116 | 1,466 | 1,466 | 1,732 | 7,785 | 0 |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Investment in Growing Crops, January 1 | 100 | | | | | | | | | | | |
| Interest | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Depreciation | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| Chemicals and Fertilizer | | | | 526 | 1,814 | 757 | 173 | 41 | 41 | 41 | 11 | |
| Manure Hauling & Compost | 276 | 276 | 276 | 10 | | 73 | 17 | | | 1 | 1 | 108 |
| Custom Farming | | | | 131 | 134 | 70 | 18 | 21 | 56 | 48 | 20 | |
| Seed | | 7 | | 482 | 357 | 124 | 50 | 61 | 74 | | | |
| Repairs & Maintenance | 37 | 37 | 37 | 101 | 538 | 65 | 163 | 173 | 42 | 96 | 65 | 60 |
| Utilities | 15 | 15 | 15 | 55 | 161 | 185 | 273 | 280 | 187 | 83 | 27 | 15 |
| Labor | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Water M&O | 43 | 43 | 43 | 43 | 43 | 43 | | | | | | |
| Property Tax | 54 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Outside Rent | | | | | 354 | | | | 1,412 | | | |
| Insurance | | | | | | | | | | | | |
| Fuel | | | | 354 | | | | | | | | |
| Investment in Growing Crops, Period End | (813) | (560) | (553) | (917) | (3,020) | (1,753) | 954 | 954 | 754 | 4,784 | (150) | (150) |
| **Total Operating Expenses** | 0 | 0 | 0 | 0 | 696 | 0 | 1,956 | 1,698 | 1,489 | 6,729 | 225 | 278 |
| **NET INCOME (LOSS) FROM OPERATIONS** | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |
| **OTHER INCOME (EXPENSE):** | | | | | | | | | | | | |
| **Total Other Income (Expense)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **NET INCOME (LOSS)** | 0 | 0 | 0 | 0 | 0 | 3,116 | (490) | (232) | 243 | 1,055 | (225) | (278) |

Case 24-40158-NGH Doc 640-3 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit C - Financial Projections Page 19 of 20

Case 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 16:15:54 Desc Main Document Page 110 of 125

Case 24-40158-NGH Doc 640-3 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc Exhibit Exhibit C - Financial Projections Page 20 of 20

**Page left — Balance Sheet**

5 Year Forecast
Model as of Plan filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| Combined Consolidated BS | Jan-29 | Feb-29 | Mar-29 | Apr-29 | May-29 | Jun-29 | Jul-29 | Aug-29 | Sep-29 | Oct-29 | Nov-29 | Dec-29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | | | |
| Cash | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 6,182 | 3,505 | 5,452 | 10,362 | 1,374 | 6,429 | 12,828 |
| Accounts Receivable | 22,520 | 20,281 | 21,722 | 21,237 | 22,463 | 22,134 | 22,664 | 22,493 | 21,160 | 22,082 | 24,479 | 23,738 |
| Feed Inventory | 27,761 | 25,598 | 23,203 | 20,884 | 18,489 | 16,171 | 19,676 | 19,907 | 20,216 | 36,112 | 33,794 | 31,399 |
| Investment in Growing Crops | 853 | 1,413 | 1,967 | 2,883 | 5,893 | 7,646 | 6,692 | 5,738 | 4,784 | — | 150 | 300 |
| Heifer Inventory | | | | | | | | | | | | |
| Steer Inventory | 8,820 | 8,835 | 8,831 | 8,834 | 8,831 | 8,832 | 8,831 | 8,828 | 8,832 | 8,829 | 8,834 | 8,832 |
| Medicine & Fuel Inventory | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Derivative Balance at ADM Investor Services, Inc. | | | | | | | | | | | | |
| Prepaid Expenses | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| **Total Current Assets** | 63,527 | 59,701 | 59,296 | 57,412 | 59,249 | 62,039 | 62,442 | 64,493 | 66,428 | 69,471 | 74,759 | 78,170 |
| **DAIRY HERD:** | | | | | | | | | | | | |
| Purchased Cows | | | | | | | | | | | | |
| Self-Raised Cows | 134,305 | 135,062 | 135,801 | 136,523 | 137,228 | 137,917 | 138,590 | 139,247 | 139,889 | 140,516 | 141,129 | 141,728 |
| Self-Raised Heifers | 30,227 | 29,764 | 29,666 | 29,446 | 29,347 | 29,127 | 29,029 | 28,930 | 28,710 | 28,611 | 28,392 | 28,293 |
| **Total Dairy Herd** | 164,532 | 164,826 | 165,466 | 165,968 | 166,575 | 167,044 | 167,618 | 168,177 | 168,599 | 169,128 | 169,521 | 170,021 |
| Less, Accumulated Depreciation | (63,475) | (64,244) | (65,007) | (65,766) | (66,520) | (67,266) | (68,007) | (68,743) | (69,472) | (70,195) | (70,912) | (71,623) |
| **Total Dairy Herd - Net** | 101,057 | 100,582 | 100,459 | 100,202 | 100,056 | 99,778 | 99,611 | 99,434 | 99,127 | 98,933 | 98,609 | 98,398 |
| **Total Current Assets and Dairy Herd** | 164,585 | 160,283 | 159,755 | 157,615 | 159,305 | 161,817 | 162,053 | 163,927 | 165,555 | 168,404 | 173,367 | 176,568 |
| **PROPERTY, PLANT & EQUIPMENT:** | | | | | | | | | | | | |
| Land | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 | 35,156 |
| Land Improvements | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 |
| Buildings & Improvements | 276,122 | 276,414 | 276,706 | 276,997 | 277,289 | 277,581 | 277,872 | 278,164 | 278,456 | 278,747 | 279,039 | 279,331 |
| Machinery & Equipment | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 | 32,521 |
| Trucks, Trailers, & Vehicles | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 | 9,861 |
| **Total Property, Plant & Equipment** | 355,423 | 355,714 | 356,006 | 356,298 | 356,589 | 356,881 | 357,173 | 357,464 | 357,756 | 358,048 | 358,339 | 358,631 |
| Less, Accumulated Depreciation | (109,991) | (110,656) | (111,321) | (111,986) | (112,651) | (113,316) | (113,981) | (114,677) | (115,376) | (116,076) | (116,641) | (117,307) |
| **Total Property, Plant & Equipment - Net** | 245,432 | 245,059 | 244,685 | 244,312 | 243,938 | 243,565 | 243,191 | 242,818 | 242,445 | 242,071 | 241,698 | 241,324 |
| **OTHER ASSETS:** | | | | | | | | | | | | |
| Related Party Receivable | | | | | | | | | | | | |
| Deposits | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 | 1,602 |
| FASB ASC 842 Operating Lease Asset | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 | 4,024 |
| Investment in Affiliated Entities | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 | 3,679 |
| Investment in Patron's Equity | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 | 1,311 |
| Loan Fees, Net of Accumulated Amortization | 840 | 828 | 816 | 803 | 791 | 778 | 766 | 754 | 741 | 729 | 716 | 704 |
| **Total Other Assets** | 11,457 | 11,445 | 11,432 | 11,420 | 11,407 | 11,395 | 11,383 | 11,370 | 11,358 | 11,345 | 11,333 | 11,321 |
| **TOTAL ASSETS** | 421,474 | 416,786 | 415,872 | 413,346 | 414,651 | 416,777 | 416,627 | 418,115 | 419,358 | 421,820 | 426,398 | 429,213 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | | | |
| **CURRENT LIABILITIES:** | | | | | | | | | | | | |
| Credit Balance - Cash in Bank | | | | | | | | | | | | |
| Operating Line of Credit, Rabo Bank | | | | | | | | | | | | |
| Lines of Credit - Other | | | | | | | | | | | | |
| Post Confirmation Credit Facility | | | | | | | | | | | | |
| Unused Fee | | | | | | | | | | | | |
| Refinance of Post Conf. CF to Revolver | 17,858 | 12,518 | 10,594 | 6,524 | 5,518 | | | | | | | |
| Pre-Petition Accounts Payable - Unsecured | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pre-Petition Accounts Payable - Secured | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounts Payable & Accrued Expenses | 8,199 | 7,958 | 7,508 | 8,072 | 8,649 | 11,074 | 9,286 | 8,763 | 8,503 | 8,069 | 8,301 | 7,907 |
| Deferred Revenue | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 | 6,599 |
| Related Party Payable | | | | | | | | | | | | |
| Accrued Labor & Payroll Taxes | 1,220 | 1,106 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 | 1,182 | 1,220 | 1,220 |
| Accrued Interest | | | | | | | | | | | | |
| FASB ASC 842 Operating Lease Liability | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 | 3,908 |
| Short Term Note Payable | 22,695 | 22,338 | 21,975 | 21,609 | 21,237 | 20,861 | 20,480 | 20,095 | 19,705 | 19,310 | 18,909 | 18,504 |
| Debtor in Possession Note Payable | | | | | | | | | | | | |
| Current Portion of Long-Term Debt | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 | 5,842 |
| **Total Current Liabilities** | 66,321 | 60,268 | 57,647 | 53,736 | 52,774 | 49,466 | 47,335 | 46,429 | 45,739 | 44,948 | 44,742 | 43,981 |
| **LONG-TERM LIABILITIES:** | | | | | | | | | | | | |
| Long-Term Debt, Less Current Portion | 165,485 | 164,495 | 163,502 | 162,506 | 161,507 | 160,506 | 159,501 | 158,494 | 157,485 | 156,472 | 155,456 | 154,438 |
| **Total Long-Term Liabilities** | 165,485 | 164,495 | 163,502 | 162,506 | 161,507 | 160,506 | 159,501 | 158,494 | 157,485 | 156,472 | 155,456 | 154,438 |
| **EQUITY:** | | | | | | | | | | | | |
| Common Stock, Class A, No Par Value | | | | | | | | | | | | |
| 10,000 Shares Authorized & Issued | | | | | | | | | | | | |
| Additional Paid-in Capital | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 | 11,645 |
| Retained Earnings | 147,459 | 149,825 | 152,535 | 154,927 | 158,202 | 164,647 | 167,642 | 171,055 | 174,006 | 178,282 | 184,092 | 188,696 |
| Members' Capital | 30,563 | 30,553 | 30,543 | 30,533 | 30,523 | 30,513 | 30,503 | 30,493 | 30,483 | 30,473 | 30,463 | 30,453 |
| **Total Equity** | 189,667 | 192,023 | 194,723 | 197,105 | 200,370 | 206,805 | 209,790 | 213,193 | 216,134 | 220,400 | 226,200 | 230,794 |
| **TOTAL LIABILITIES AND EQUITY** | 421,474 | 416,786 | 415,872 | 413,346 | 414,651 | 416,777 | 416,627 | 418,115 | 419,358 | 421,820 | 426,398 | 429,213 |

**Page right — Cash Flow Statement**

5 Year Forecast
Model as of Plan filed 09.30.24
Operating Fcst Assumptions as of Sept 17, 2024

| Combined Con Stmt of Cash Flows | Jan-29 | Feb-29 | Mar-29 | Apr-29 | May-29 | Jun-29 | Jul-29 | Aug-29 | Sep-29 | Oct-29 | Nov-29 | Dec-29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | | | | | | | |
| Net Income (Loss) | 3,563 | 2,366 | 2,710 | 2,391 | 3,275 | 6,445 | 2,995 | 3,414 | 2,951 | 4,276 | 5,810 | 4,604 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | | | | | | | | |
| Depreciation | 2,891 | 2,904 | 2,916 | 2,928 | 2,940 | 2,952 | 2,964 | 2,975 | 2,986 | 2,997 | 3,007 | 3,017 |
| Amortization | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| (Gain) Loss on Sale of Dairy Herd | 800 | 800 | 799 | 799 | 798 | 797 | 795 | 794 | 792 | 790 | 788 | 785 |
| (Gain) Loss on Sale of Wet Cows | | | | | | | | | | | | |
| (Gain) Loss on Sale of Property, Plant, & Equipment | | | | | | | | | | | | |
| (Income) Losses of H&M Custom, LLC | | | | | | | | | | | | |
| (Increase) Decrease in Accounts Receivable | 1,218 | 2,238 | (1,441) | 485 | (1,226) | 329 | (530) | 171 | 1,333 | (922) | (2,397) | 742 |
| (Increase) Decrease in Inventories | 2,399 | 2,149 | 2,399 | 2,315 | 2,399 | 2,316 | (3,504) | (229) | (313) | (15,893) | 2,314 | 2,397 |
| (Increase) Decrease in Investment in Growing Crops | (553) | (560) | (553) | (917) | (3,010) | (1,753) | 954 | 954 | 954 | 4,784 | (150) | (150) |
| (Increase) Decrease in Forward Contracts Depo | | | | | | | | | | | | |
| (Increase) Decrease in Prepaids and Deposits | | | | | | | | | | | | |
| (Increase) Decrease in FASB ASC 842 Lease Asset | | | | | | | | | | | | |
| (Increase) Decrease in Loan Fees | | | | | | | | | | | | |
| Increase (Decrease) in Accounts Payable and Accrued Exp | 292 | (356) | (335) | 526 | 416 | 2,586 | (1,750) | (522) | (298) | (395) | 193 | (356) |
| Increase (Decrease) in FASB ASC 842 Lease Liabilities | | | | | | | | | | | | |
| Increase (Decrease) in Deferred Revenue | | | | | | | | | | | | |
| **NET CASH PROVIDED (USED) BY OPERATING** | 10,621 | 9,552 | 8,508 | 8,540 | 5,605 | 13,684 | 1,937 | 7,568 | 8,417 | (4,351) | 9,578 | 11,052 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | | | | | | | |
| Proceeds from Sale of Cows - Dairy Herd | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 |
| Proceeds from Sale of Wet Cows | | | | | | | | | | | | |
| Proceeds from Sale of Heifers | | | | | | | | | | | | |
| Proceeds from Sale of Property, Plant & Equipment | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Purchase of Consumed Heifers | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) | (292) |
| Proceeds (Purchase) of Property, Plant, & Equipm | (3,767) | (3,402) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) | (3,767) | (3,645) | (3,767) | (3,645) | (3,767) |
| Cost of Feeding and Raising Heifers | | | | | | | | | | | | |
| Member Distribution (Contribution) of Capital in | | | | | | | | | | | | |
| (Increase) Decrease in Patron's Equity | | | | | | | | | | | | |
| (Increase) Decrease in RelatedParty Receivable | | | | | | | | | | | | |
| **NET CASH PROVIDED (USED) BY INVESTING A** | (3,219) | (2,854) | (3,219) | (3,097) | (3,219) | (3,097) | (3,219) | (3,219) | (3,097) | (3,219) | (3,097) | (3,219) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | | | | | | | | |
| Increase (Decrease) in Credit Balance - Cash in Ban | | | | | | | | | | | | |
| Net Proceeds (Payments) on Lines of Credit | | | | | | | | | | | | |
| Net Proceeds (Payments) on PostConfirmation Cr | | | | | | | | | | | | |
| Net Proceeds (Payments) on PCCF Unused Fee | | | | | | | | | | | | |
| Net Proceeds (Payments) on Refi. of Post Conf. CF | (6,051) | (5,340) | (1,924) | (4,070) | (1,007) | (5,518) | | | | | | |
| Prior Period Adjustment to Retained Earnings/ | | | | | | | | | | | | |
| Increase (Decrease) in Pre-Petition Accounts Pa | | | | | | | | | | | | |
| Increase (Decrease) in Pre-Petition Accounts Pa | | | | | | | | | | | | |
| Increase (Decrease) in RelatedParty Payable | | | | | | | | | | | | |
| PIK Interest/Fees on Short Term Debt | 288 | 284 | 279 | 275 | 270 | 265 | 261 | 256 | 251 | 246 | 241 | 236 |
| Proceeds (Payments) on Short-Term Debt | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) | (641) |
| Payments on Short-Term Debt | | | | | | | | | | | | |
| Proceeds from Long-Term Debt | (988) | (990) | (993) | (996) | (999) | (1,001) | (1,004) | (1,007) | (1,010) | (1,013) | (1,016) | (1,018) |
| Payments on Long-Term Debt | | | | | | | | | | | | |
| Owner Additional Paid-in Capital | | | | | | | | | | | | |
| Owner Distributions | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| **NET CASH PROVIDED (USED) BY FINANCING** | (7,402) | (6,698) | (3,289) | (5,443) | (2,387) | (6,905) | (1,395) | (1,403) | (1,410) | (1,418) | (1,426) | (1,434) |
| **NET INCREASE (DECREASE) IN CASH** | 0 | (0) | 0 | 0 | 0 | 3,682 | (2,677) | 2,947 | 3,909 | (8,988) | 5,055 | 6,399 |
| **CASH AT BEGINNING OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 6,182 | 3,505 | 5,452 | 10,362 | 1,374 | 6,429 |
| **CASH AT END OF PERIOD** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 6,182 | 3,505 | 5,452 | 10,362 | 1,374 | 6,429 | 12,828 |

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 20:55:55   Desc
Document    Page 111 of 125

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit D - Exit Term Loan Facility Term Sheet   Page 2 of 16

CONFIDENTIAL

*Cargill, Incorporated*

MILLENKAMP CATTLE, INC. (et al.)
UP TO $120,000,000 SENIOR SECURED EXIT REVOLVING FACILITY

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

*Set forth below in this term sheet (the "Term Sheet") is a summary of the principal terms and conditions for the Facility (as defined below). This summary of terms is for indicative purposes only. **It has been prepared for discussion purposes only and does not constitute an offer or commitment to lend, syndicate, arrange, underwrite or act as agent or advisor with respect to any financing**. It does not purport to summarize all terms of the Loan Documents (as defined below). The terms set forth herein are subject to change in all respects, and reference should be made to the Loan Documents for the final terms of the Facility. Capitalized terms used but not otherwise defined in this Term Sheet shall be defined in the Loan Documents.*

| | |
|---|---|
| Borrowers: | Millenkamp Cattle, Inc., an Idaho corporation, Idaho Jersey Girls LLC, an Idaho limited liability company, East Valley Cattle, LLC, an Idaho limited liability company, Millenkamp Properties, L.L.C., an Idaho limited liability company, Millenkamp Properties II, LLC, an Idaho limited liability company, Millenkamp Family LLC, an Idaho limited liability company, Goose Ranch LLC, an Idaho limited liability company, Idaho Jersey Girls Jerome Dairy LLC, an Idaho limited liability company, Black Pine Cattle LLC, an Idaho limited liability company, Millenkamp Enterprises LLC, an Idaho limited liability company, Susan Millenkamp as Trustee of the WJM 2012 Trust, William Millenkamp as Trustee of the SJM 2012 Trust, William John Millenkamp, and Susan Jo Millenkamp (each a "Borrower" and collectively, the "Borrowers"). |
| Guarantors: | All obligations under the Facility (defined below) and under any interest rate protection or other hedging arrangements entered into by the Borrowers with Cargill, any other Lender or any affiliates of the foregoing shall be fully and unconditionally guaranteed by each of the Borrowers' existing and future domestic subsidiaries and any parent holding companies (each, a "Holdco") of the Borrowers (collectively, the "Guarantors"; and together with the Borrowers, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | Cargill, Incorporated ("Cargill") (in such capacity the "Arranger"). |
| Administrative Agent: | Cargill or any other third party selected by Cargill. |

| | |
|---|---|
| Lenders: | Cargill and any other financial institution/s selected by the Arranger (collectively, the "Lenders"). |
| Closing Date: | The date on which all conditions precedent set forth on Schedule A hereto are satisfied (the "Closing Date"). |
| Facility: | Senior secured credit facilities consisting of:<br><br>(a)    An exit facility (the "Facility") consisting of revolving loans (the "Revolving Loans") in an aggregate principal amount of $120,000,000.<br><br>(b)    Uncommitted commodities hedging capacity provided by Cargill (or an affiliate thereof), to enable Borrowers to enter into commodities hedging products managed by Cargill (or an affiliate thereof). |
| Borrowing Base:. | The "Borrowing Base" will equal the sum of (a) up to 75% of the Borrowers' Eligible Cattle other than Eligible Dairy Cattle, *plus* (b) up to 75% of the Borrowers' Eligible Dairy Cattle. *plus* (c) up to 75% of the Borrowers' Eligible Inventory constituting livestock feed and grain having a value equal to the lesser of (i) cost or (ii) market value, as determined by Cargill in its sole discretion, *plus* (d) up to 80% of the Borrowers' Eligible Prepaid Expenses, *plus* (e) up to 80% of the Borrowers' Eligible Accounts, *plus* (f) up to 100% of the Borrowers' Eligible Growing Crop Investments, *plus* (g) up to [80]% of the Borrowers' Eligible Accounts, *plus* (h) up to 100% of the Borrowers' Eligible Deposit Accounts less 100% of book overdrafts, uncashed checks, and other outstanding debits and obligations of Borrowers as determined by Cargill in its sole discretion, *plus* (i) up to 100% of the Borrowers' Eligible Margin Accounts, *plus* G) up to 100% of the Borrowers' Eligible  Milk Accounts, and *minus* all amounts payable by the Borrowers (x)(x) to vendors for or related to feed for Borrowers' cattle, (y) to vendors and service providers for the production, purchase, transport, storage, shelter, feeding or other maintenance of the Collateral to the extent secured by liens on the Collateral, (z) pertaining to other goods and services provided by vendors and service providers receiving payments under clauses (x) or (y) above, and (ii) which are unpaid more than 90 days after the original due date therefor. For the avoidance of doubt, the Borrowing Base shall not include prepetition accounts payable, including Conterra's mezzanine debt, so long as they are expressly subordinated to the Facility pursuant to |

Case 24-40158-NGH  Doc 640-4  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit D - Exhibit C to Fourth DS Term Sheet  Page 4 of 16

Case 24-40158-NGH  Doc 640-4  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 00:55:55  Desc Main
Document    Page 112 of 125

a written agreement in form and substance reasonably acceptable to Cargill.[1]

| | |
|---|---|
| Eligibility: | Eligible Cattle determinations shall be based upon, among other criteria, dairy and non-dairy cattle. Eligible Cattle shall have a value of not less $1,500 per head during the term of the Facility, with Cargill providing additional lending value in accordance with industry valuations as determined by Cargill in its sole discretion. Eligible Cattle other than Eligible Dairy Cattle shall have a valuation as follows: (i) cattle weighing 600 lbs. or less shall be valued based on the most recent CattleFax report; and (ii) cattle weighing more than 600 lbs. shall be valued on the "cost-to-finish" model, taking into account average daily weight gain, cost to gain, cmTent weight, and expected out-weight. The definitions of the eligible assets constituting the Borrowing Base will be determined by Cargill in its usual and customary manner and in its reasonable discretion. In addition, Cargill will retain the right, from time to time, in its reasonable discretion, to (i) establish additional standards of eligibility, (ii) reduce advance rates, and (iii) establish, increase or decrease reserves against the Borrowing Base or the Facility and (iv) to reduce one or more of the sub-limits used in computing the Borrowing Base. |
| Maturity: | The Facility shall mature on the date that is three years from the Closing Date (the "Maturity Date"). |
| Purpose and Availability: | The Revolving Loans shall be available on and after the Closing Date for the Borrowers' working capital requirements, to repay in full all pre-existing debt of the Borrowers and their subsidiaries, termination of all related commitments and release of all related liens , on terms satisfactory to the Arranger, and other general corporate purposes. Amounts borrowed under the Facility may be borrowed, repaid and rebon-owed. |
| Interest and Fees: | As set forth on Annex I. |
| Mandatory Prepayments: | Customary mandatory prepayment provisions for facilities of this type, as more fully set forth in the definitive loan documentation. |
| Voluntary Prepayments and Commitment Reductions: | Revolving Loans may be prepaid and commitments may be reduced, in whole or in part, without premium or penalty, in minimum amounts to be agreed, at the option of the Borrowers at any time upon one day's (or, in the case of a prepayment of SOFR Loans, three days') prior notice, subject to reimbursement of the Lenders' |

breakage costs in the case of a prepayment of SOFR Loans prior to the last day of the relevant interest period.

| | |
|---|---|
| Collateral: | The Facility and any hedging arrangements with Cargill, the other Lenders or affiliates of Lenders will be secured by a valid and perfected first priority lien (subject to liens pe1mitted under the Loan Documents referred to below) on substantially all assets of the Borrowers and each Loan Party, whether owned on the Closing Date or thereafter acquired (collectively, the "Collateral"), including, without limitation: |

(a)    All equity interests and debt held by the Borrowers or any other Loan Party (including joint ventures).

(b)    Substantially all tangible and intangible assets of the Borrowers and the other Loan Parties including but not limited to, inventory, accounts receivable, equipment, fixtures, fann products (including crops grown, growing, or to be grown, livestock, born or unborn, supplies used or produced in Borrowers' operations and products of crops or livestock in their unmanufactured state), general intangibles (including contract rights), intercompany debt, chattel paper, insurance policies, licenses, permits, intellectual property, documents, instruments, indemnification rights, tax refunds, commercial tort claims, letter of credit rights, hedge agreements, investment property, deposit and securities accounts and cash, wherever located (subject to exclusions and limitations to be agreed).

(c)    Milk or other dairy product sale proceeds, subject to the priority milk assignments, claims and rights contemplated by the existing credit facilities between one or more of the Borrowers and Metropolitan Life Insurance Company and MetLife Real Estate Lending LLC (collectively, "MetLife"), with the rights and priorities of the Lenders and MetLife subject to an intercreditor agreement in form and substance reasonably. acceptable to Cargill (the "Intercreditor Agreement").

(d)    All proceeds and products of the foregoing.

The Facility and any hedging arrangements with Cargill, the other Lenders or affiliates of Lenders shall also be secured by a valid and perfected second priority lien (subject to liens permitted under the Loan Documents referred to below) on (a) all real property of the Borrowers and each Loan Party and (b) receivables and royalties relating to the Borrowers' and each Loan Party's digester equipment, in each case, as provided in the Intercreditor Agreement.

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit D - Exi Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:50:55   Desc Main
Document   Page 113 of 125

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Page 6 of 16

All pledges, security interests and mortgages covering the Collateral shall be created on terms and pursuant to documentation reasonably satisfactory to Cargill.

Notwithstanding the foregoing, the following assets will be excluded from Collateral: (i) all leasehold interests, (ii) all contracts, licenses and permits to the extent the grant of a security interest therein is prohibited by law or by the terms of such contracts, licenses and permits, in each case after giving effect to the Uniform Commercial Code, and (iii) upon the Borrowers' reasonable request, assets for which Cargill determines that the cost, burden or consequences (including adverse tax consequences) of obtaining a perfected security interest in such assets substantially exceeds the practical benefit of such collateral to the Lenders.

All motor vehicles and other assets subject to certificates of title shall be excluded from the Collateral and not subject to any security interest of Cargill.

| Loan Documentation: | The definitive loan documentation for the Facility (the "Loan Documents") shall be negotiated in good faith and shall contain the terms and conditions set forth herein and such other terms as the Borrowers and Cargill shall agree. |
|---|---|
| Conditions Precedent to Initial Borrowings: | The effectiveness of the loan agreement and funding the initial Revolving Loans on the Closing Date shall be subject to the conditions precedent customary for financings of this type, including, without limitation, the conditions precedent set forth on Schedule A hereto, and shall be contingent on (i) internal Cargill approval and the approval of any other Lenders and (ii) the Successful Syndication of the commitments under the Facility. |

"Successful Syndication" means a syndication of the commitments under the Facility in an amount and to such additional Lenders that are reasonably acceptable to Cargill.

| Conditions Precedent to all Borrowings: | Each extension of credit under the Facility shall be subject to: |
|---|---|

(a)     Receipt of a notice of borrowing.

(b)     Absence of any default or event of default before, or after giving effect to, such borrowing.

(c)     The accuracy of the representations and warranties of the Borrowers and the other Loan Parties.

(d)     Borrowing Base Excess shall be greater than $5,000,000; provided, however that Cargill shall have discretion to fund if the Borrowing Base Excess is greater than $0

| Representations and Warranties: | Representations and warranties applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation, the following (subject to thresholds and/or exceptions to be agreed): corporate existence; corporate power and authority; non-contravention; authorization and enforceability of the loan documentation; no conflicts with law or contractual obligations; execution and delivery; binding effect; accuracy and completeness of financial and other information (including pro forma financial information); no material adverse change with respect to the Borrowers and their subsidiaries; compliance with applicable laws and regulations, including ERISA, the PATRIOT Act, FCPA, OFAC and other anti-corruption laws, anti-money laundering laws, and sanctions; environmental laws and Federal Reserve regulations; accuracy and completeness of disclosure; consents and approvals; ownership of property; intellectual property; subsidiaries; insurance; casualty events; labor matters; no liens; no material litigation; inapplicability of the Investment Company Act of 1940; solvency of the Borrowers and their subsidiaries on a consolidated basis; use of proceeds; payment of taxes and other obligations; no default or event of default; validity, priority and perfection of liens and security interests in the Collateral; and, status as senior debt. |
|---|---|
| Affirmative Covenants: | Affirmative covenants applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation the following (subject to exceptions to be agreed): delivery of annual audited consolidated and consolidating financial statements, quarterly and monthly unaudited financial statements and financial projections; delivery of monthly Borrowing Base certificates; delivery of quarterly updates to the Commodities Hedging Plan; delivery of quarterly updates to the Feed Payables Management Plan; delivery of compliance certificates, notices and other information (including information required under the PATRIOT Act, notices of default, litigation, ERISA events and material adverse change); delivery of notices in respect of changes in terms or conditions of any off-taker agreements (i.e., agreements with third parties pertaining to the purchase or delivery of Borrowers' or their subsidiaries ' milk or other dairy products) and copies of any notices thereunder delivered by such third parties to Borrowers or their subsidiaries; compliance with applicable laws and regulations (including ERISA, environmental laws, and Federal Reserve regulations); payment of taxes and other obligations; use of proceeds; preservation of existence, permits, licenses and approvals; |

Case 24-40158-NGH Doc 640-4 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc
Exhibit Exhibit D - Exhibit 24-40158-NGH Doc 645 Filed 10/02/24 Entered 10/02/24 Session Lower Summit Sheet Page 8 of 16
Document Page 114 of 125

Case 24-40158-NGH Doc 640-4 Filed 09/30/24 Entered 09/30/24 19:30:44 Desc

visitation and inspection rights; keeping of books and records; maintenance of properties; insurance coverage (including, without limitation, "keyman" insurance in respect of Bill Millenkamp in an amount not less than $10,000,000); performance of material contracts; entering into hedging arrangements satisfactory to Cargill, including as set forth in "Affirmative Hedging Requirements" below; compliance with FCPA, OFAC, the USA PATRIOT Act, sanctions, anti-corruption, anti-terrorism laws and anti-money laundering laws and similar laws (including the Trading with Enemy Act and all foreign asset control regulations of the United States Treasury Department, enabling legislation and executive orders relating thereto and the USA PATRIOT Act and FinCEN and the Beneficial Ownership Regulation); and further assurances.

Each such covenant shall be more fully defined· in the Loan Documents.

**Affirmative Hedging Requirements:**

The Borrowers shall enter into hedges covering (i) 75% of the Annual Milk Production (to be defined in the definitive loan documentation) for the first year after the Closing Date, (ii) 50% of the Annual Milk Production for the second year after the Closing Date and (iii) thereafter, 50% of the Annual Milk Production on a 12-month roll-forward basis.

**Financial Covenants:**

Financial covenants applicable to the Borrowers and then-subsidiaries shall include, without limitation, the following:

(a)    maintenance of a minimum Debt Service Coverage Ratio i) as of 12/31/2025 of not less than 1.50:1.0 and (ii) as of 12/31/2026 of not less than 2.00:1.0;

(b)    maintenance of a maximum Funded Debt to tangible net worth ratio; as of 12/31/2025 of not more than 4.00:1.0 and (ii) as of 12/31/2026 of not more than 3.50:1.0; (iii) as of 12/31/2027 of not more than 3:00:1.0 and thereafter

(c)    maintenance of a Leverage Ratio, measured on a quarter-end basis, beginning June 30, 2025, of not more than (i) 5.50:1.00 through September 30, 2025, (ii) 5.00:1.00 through September 30, 2026 and (ii) 4.00:1.00 thereafter; and

(d)    maintenance of minimum Borrowing Base Excess of not less than $5,000,000.

"Capital Lease" means any rental agreement that meets GAAP criteria for its treatment as an agreement for purchase of an asset rather than for use of the asset by way of a true (or operating) lease.

"Compensation" means , as applicable, salaries and other compensation paid to shareholders, members, partners, directors, managers, and officers.

"Debt Service Coverage Ratio" means the ratio of Stabilized EBITDA minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions (net of cash contributions), and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus Capital Lease payments.

"EBITDA" means at any date (a) net income, excluding any extraordinary and non-operating income (unless deemed by Cargill to be recurring in nature), of a Person for the preceding twelve months plus (b) any interest expense, income taxes, depreciation, amortization, and other noncash charges for that twelve months to the extent they were deducted from gross income to calculate net income.

"Funded Debt" means all outstanding long term liabilities for money borrowed for non-consumer purposes, other long term interest-bearing non-consumer liabilities, and Capital Leases. However, it shall specifically exclude any prepetition accounts payable, including ConteITa's mezzanine debt, so long as they are expressly subordinated to the Facility pursuant to a written agreement reasonably acceptable to Cargill.

"Leverage Ratio" means the ratio ofNet Debt to Stabilized EBITDA.

"Net Debt" means, at any date, the aggregate amount of Funded Debt of the Borrowers and their subsidiaries at such date, minus unrestricted cash and cash equivalents as at such date).

"Stabilized EBITDA" means EBITDA excluding nonrecurring, extraordinary items (includes "off farm income" if deemed to be recurring).

Each such financial covenant shall be more fully defined in the Loan Documents .

**Negative Covenants:**

Negative covenants applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation the following (subject to exceptions and baskets to be agreed):

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit D - Exhibit 24-40158-NGH   Page 10 of 16

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit D - Exhibit 24 Term Loan Term Sheet   Page 10 of 16

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:10:55   Desc Main
Document   Page 115 of 125

(a)     Limitations on debt, guarantees and hedging arrangements (including the subordination of all intercompany indebtedness on terms reasonably satisfactory to Cargill).

(b)     Limitations on liens (including a negative pledge with respect to equity interests in the Borrowers) and limitations on further negative pledges.

(c)     Limitations on voluntary prepayments, redemptions or repurchases of debt.

(d)     Limitations on mergers, consolidations, and other fundamental changes.

(e)     Limitations on sales, transfers and other dispositions of assets.

(f)     Limitations on loans and investments, including, without limitation, purchases of fa1mland and other real property.

(g)     Limitations on dividends and other distributions, stock repurchases and redemptions and other restricted payments.

(h)     Limitations on creating new subsidiaries.

(i)     Limitations on capital expenditures.

G)     Limitations on construction.

(k)     Limitations on restrictions affecting subsidiaries.

(l)     Limitations on transactions with affiliates.

(m)     Limitations on change in (i) key management or (ii) fiscal periods.

(n)     No modification or waiver of material documents (including, without limitation, charter documents of the Borrowers and their subsidiaries or any other material debt) in a manner materially adverse to the Lenders.

Each such covenant shall be more fully defined m the Loan Documents.

**Events of Default:**   Events of default applicable to the Borrowers and their subsidiaries customary and usual for financings of this type shall include, without limitation the following: failure to pay principal when due or interest or other amounts after three business days; breach of representations,

warranties or covenants; compliance with financial covenants; cross-default and cross-acceleration, including, without limitation, in respect of the MetLife credit facilities; bankruptcy and insolvency events; [2] judgment defaults; actual or asserted invalidity or impairment of any guarantees or security documents or subordination provisions; a change of control (to be defined); occurrence of a material adverse change (to be defined); and customary BRISA defaults.

**Amendments:**   Amendments and waivers of the provisions of the Loan Documents shall require the approval of Lenders holding more than 50% of the aggregate principal amount of the Revolving Loans and unused commitments under the Facility; *provided* that (a) the consent of each directly affected Lender shall be required for, among other things , (i) increases in the commitment of such Lender ; (ii) reductions of principal, interest or fees of such Lender; (iii) extensions of scheduled amortization or the Maturity Date; and (iv) releases of all or substantially all of the Collateral or all or substantially all of the value of the guarantees and (b) the consent of 100% of the Lenders shall be required for modifications to any of the voting requirements (or any applicable related definitions) and modifications to pro rata treatment.

**Assignments and Participations:**   Each Lender may assign all or part (subject to minimum amounts to be agreed) of its Revolving Loans and commitments with the consent of Cargill (such consent not to be unreasonably withheld or delayed). Cargill shall receive a processing fee of $3,500 (which may be waived or reduced at the sole discretion of Cargill) in connection with all assignments .

**Expenses and Indemnification:**   The Borrowers shall pay (a) all reasonable out-of-pocket expenses of Cargill incm Ted in connection with any syndication of the Facility and the preparation, execution, delivery, administration, amendment or waiver of the Loan Documents (including the reasonable fees, disbursements and other charges of counsel, including local counsel, to Cargill); and (b) all reasonable out-of-pocket expenses of Cargill and the other Lenders (including the fees, disbursements and other charges of counsel (including local counsel) to Cargill and the other Lenders) in connection with the enforcement of the Loan Documents, including in connection with workouts or restructurings.

Cargill and the other Lenders (and their affiliates and their respective officers, directors , employees, advisors and agents) will be indemnified and held harmless against any loss, liability, cost or expense (including the reasonable fees, disbursements and other

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit D - Exit Facility Term Sheet   Page 12 of 16

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:00:55   Desc Main
Document   Page 116 of 125

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit D - Exit Facility Term Sheet   Page 12 of 16

charges of counsel (including local counsel) to the indemnified parties, incurred in connection with the financing contemplated hereby or the use of proceeds of the Facility, except to the extent they result from such person's gross negligence or willful misconduct.

| | |
|---|---|
| Additional Provisions: | The Credit Agreement will contain (i) LSTA model EU bail-in provisions, (ii) customary provisions relating to statutory divisions of limited liability companies, (iii) customary provisions relating to supported qualified financial contracts and (iv) customary benchmark replacement provisions to be agreed. |
| Taxes, Yield Protection and Increased Costs: | The Loan Documents will contain customary provisions for facilities of this kind, including, without limitation, in respect of tax gross-ups, breakage and redeployment costs, increased costs, funding losses, capital adequacy and illegality. |
| Governing Law: | State of New York. |
| Waiver of Jury Trial: | All Loan Parties/parties to the Loan Documents waive the right to trial by jury. |
| Counsel to Cargill and the Lead Arranger: | Vinson & Elkins LLP |
| Not a Commitment to Lend: | This Term Sheet is intended for discussion purposes only and constitutes only a preliminary, non-binding indication of interest. It does not constitute an offer, agreement, or commitment by Cargill or any of its affiliates to lend, syndicate, arrange, underwrite or act as agent or advisor with respect to any financing or to enter into any transaction. It is not intended, and shall not be deemed, to create any binding obligation on the part of Cargill or any of its affiliates, to engage in any transaction with any other party or its affiliates or to continue its or their consideration or negotiation of any such transaction. |

ACKNOWLEDGED AND AGREED:

MILLENKAMP CATTLE, INC.

ne:

Title:  **Pre..**

For itself and on behalf of each of the other Borrowers

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit D - Exit Facility Term Sheet   Page 14 of 16

Case 24-40158-NGH   Doc 640-4   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit D - Exit Facility Term Sheet   Page 14 of 16

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 12:10:55   Desc Main
Document   Page 117 of 125

## SCHEDULE A

*Conditions Precedent*

Conditions precedent to the borrowing (or deemed borrowing) of Revolving Loans on the Closing Date under the Facility shall include, without limitation, unless waived by the Lenders:

(a)  **Plan.** Any chapter 11 plan of the Loan Parties (as amended, modified, or supplemented from time to time, a "Plan") and order confirming such Plan shall be in form and substance acceptable to Cargill.

(b)  **Order.** A final non-appealable order (the "Confirmation Order") of the Bankruptcy Court, in form and substance acceptable to Cargill, (a) confirming the Plan, which shall not have been reversed, vacated, amended, supplemented, or otherwise modified (other than with the written consent of Cargill) and (b) authorizing the Loan Parties to execute, deliver, and perform under all documents contemplated under the Loan Documents shall have been entered and shall have become a final order of the Bankruptcy Court.

(c)  **Successful Syndication:** Closing shall be subject to the Successful Syndication of the commitments under the Facility.

(d)  **Loan Documentation.** All Loan Documents shall have been (or shall, contemporaneously with the occurrence of the Closing Date, be) executed and delivered (or deemed executed and delivered pursuant to the Confirmation Order) and shall be in full force and effect, and shall be in form and substance acceptable to Cargill and consistent with the terms of this Term Sheet.

(e)  **Guaranties and Collateral.** Delivery of executed guarantees and security agreements required from the Loan Parties in form1 and substance satisfactory to Cargill, (i) Cargill shall have a first priority perfected security interest (subject to Permitted Liens) in all Collateral (other than real property, receivables and royalties relating to digester equipment, and other properties described in this Term Sheet as subject to a second priority perfected security interest, which, in each case, shall be subject to such second priority perfected security interest), (ii) all required filings, recordations and searches with respect to such security interests shall have been duly made, and (iii) all filings and recording fees and taxes shall have been duly paid. This clause shall be subject to post-closing matters to be reasonably agreed.

(t)  **Customary Ancillary Documents.** Delivery of (i) customary legal opinions , evidence of authority, corporate documents and records, documents from public officials, good standing certificates, solvency certificates and officers' certificates as to the Borrowers and each of the Guarantors; (ii) evidence of insurance; and

(iii) a customary notice of borrowing, each in form and substance satisfactory to Cargill.

(g)  **Approvals.** All necessary governmental and third-party approvals, consents, licenses, and permits in connection with the Facility shall have been obtained and remain in full force and effect.

(h)  **Financial Statements.** Cargill shall have received (i) the Loan Parties' unaudited financial statements for the most recent fiscal quarter ending at least 45 days prior to the Closing Date, (ii) the proforma balance sheet of the Loan Parties (after giving effect to closing), and (iii) detailed financial projections of the Loan Parties for three years after the Closing Date prepared on a quarterly basis for the first year and prepared on an annual basis for the remaining years.

(i)  **Fees and Expenses.** Payment of all fees and expenses of Cargill and the other Lenders required to be paid by the Borrowers on the Closing Date to the extent invoiced prior to the Closing Date.

(j)  **Due Diligence.** Completion by Cargill of its business, operations, collateral, tax, accounting, legal, environmental, regulatory and other due diligence review of the Borrowers.

(k)  **Commodities Hedging Plan.** Delivery of the Borrowers' current commodities hedging plan, in form and substance satisfactory to Cargill (the "Commodities Hedging Plan").

(l)  **Feed Payables Management Plan.** Delivery of the Borrowers' current feed payables management plan, in form and substance satisfactory to Cargill (the "Feed Payables Management Plan").

(m)  **Repayment of Existing Debt.** Repayment in full of all pre-existing debt for borrowed money of the Borrowers and their subsidiaries, termination of all related commitments and release of all related liens, on terms satisfactory to Cargill, other than the existing credit facilities between one or more Borrowers and MetLife, the existing credit facilities between one or more Borrowers and Conterra, and any prepetition accounts payable, which will be paid in full post-Effective Date of the Plan, pursuant to the terms and provisions of the Plan.

(n)  **No MAC.** Absence of any material adverse change in the business, operations, condition (financial or otherwise), assets or liabilities (whether actual or contingent) of the Borrowers and their subsidiaries taken as a whole since December 31, 2024.

(o)  **PATRIOT Act and Anti-Corruption Information.** Receipt by Cargill and the other Lenders, at least five business days prior to the Closing Date, of (i) all information reasonably requested by them under applicable "know-your-customer" and anti-money laundering rules and regulations, including, without limitation , the PATRIOT Act, and (ii) to the extent each of the Borrowers qualifies

Case 24-40158-NGH  Doc 640-4  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit D - Exit Facility Term Sheet  Page 16 of 16

Case 24-40158-NGH  Doc 640-4  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 12:10:55  Desc Main
Document  Page 118 of 125

as a "legal entity customer" under 31 C.F.R. § 1010.230 (the "Beneficial Ownership Regulation"), a customary FinCEN beneficial ownership certification in relation to each Borrower.

(p)  **MetLife Credit Facility.** All existing credit facilities between the Borrower and MetLife have been reinstated on the same terms as existed prior to the Loan Parties' bankruptcy filings, or have been reinstated on terms otherwise acceptable to Cargill.

(q)  **Intercreditor Agreement.** The Intercreditor Agreement shall have been (or shall, contemporaneously with the occmTence of the Closing Date, be) executed and delivered (or deemed executed and delivered pursuant to the Confirmation Order) and shall be in full force and effect, and shall be in form and substance acceptable to Cargill.

(r)  **Representations and Warranties.** As of the Closing Date, all representations and warranties contained in the Term Sheet shall be true and accurate.

(s)  **No Default.** As of the Closing Date, there shall not be any ongoing default or event of default under any debtor-in-possession financing or other financing facility of the Borrowers and the bo1mwing (or deemed borrowing) under the Facility shall not cause a default or event of default.

(t)  **No Litigation.** As of the Closing Date, there shall not be any litigation pending or known by Loan Parties to be threatened against any Loan Party drawing into question any credit transaction contemplated by Facility, or that could reasonably be expected to have a material adverse effect.

ANNEX I

| Interest and Fees: | The Loans will bear interest at the one month rate for SOFR plus an interest margin of 6.00%. |
| Default Rate: | Overdue amounts of principal, interest, fees and other amounts under the Facility shall bear interest at 9% above the otherwise applicable rate. All such interest shall be due on demand. |
| Arrangement Fee: | 2.00%, which shall be funded out the new Facility. |
| Unused Commitment Fee and Administrative Fee: | The Borrowers shall pay an unused commitment fee on the daily unused amount of the commitments under the Facility (calculated based on the actual number of days elapsed in a 360-day year) payable quarterly in arrears, from the Closing Date until the termination or expiration of the Facility, equal to .50% per annum. |
| | The Borrowers shall pay Cargill an annual administrative fee of $50,000. |
| | The Borrowers shall reimburse and indemnify Cargill for its reasonable costs and expenses associated with this matter, including the reasonable fees, disbursements and other charges of counsel, including local counsel. |
| Benchmark Replacement: | The definitive loan documentation will include language with respect to the establishment of a successor interest rate for SOFR that is reasonably acceptable to Cargill. |

Case 24-40158-NGH  Doc 640-5  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc
Exhibit Exhibit E - Schedule of General Unsecured Claims  Page 2 of 5

Case 24-40158-NGH  Doc 640-5  Filed 09/30/24  Entered 09/30/24 19:30:44  Desc

Case 24-40158-NGH  Doc 645  Filed 10/02/24  Entered 10/02/24 11:21:55  Desc Main
Document  Page 119 of 125

| Creditor | Claim Amount |
|---|---|
| A&K Trucking | $ 12,296.17 |
| AAA CowComfort, LLC | $ 48,013.58 |
| ABS Global, Inc. | $ 629,767.46 |
| Addison Biological Lab | $ 26,490.00 |
| Aden Brook Trading Corp. | $ 557,742.06 |
| ADM National Nutrition | $ 30,705.10 |
| Ag-Rows, Inc. | $ 61,022.20 |
| Ah-Zet Dairy | $ 629.75 |
| Airgas USA LLC | 8385.68 |
| All Wireless Communications | $ - |
| Allegiance Dairy Services | $ 536.23 |
| Al-Mar Dairy | $ 55,800.00 |
| Amalgamated Sugar | $ - |
| American Calf Products | $ - |
| American Express | $ 176,422.91 |
| AMI Supply | $ 84.15 |
| Arnold Machinery | $ 205,590.00 |
| Automation Werx | $ 251,143.50 |
| B&H Farming | $ - |
| Badger Bearing PTP, Inc. | $ 12,518.53 |
| Bear Necessities Portable Restrooms | $ - |
| Black Cat Dairy | $ 51,150.00 |
| Black Eagle Construction LLC | $ - |
| Black Pine Construction, LLC | $ 3,030.00 |
| BLN Huettig Farms | $ - |
| Boyce Equipment & Parts Co., Inc. | $ 10,191.19 |
| Brandi Bartholomew | |
| Brett Jensen Farms | $ 318,774.70 |
| BS&R Design & Supplies | $ 1,574.29 |
| BUNGE Canada | $ 1,159,843.85 |
| Burks Tractor | $ - |
| Butte Irrigation | $ 204,689.93 |
| Capital One | $ - |
| Carne I Corp. | $ 307,140.22 |
| Cellco Partnership dba Verizon | $ - |
| CenturyTel Service Group dba Century Link | $ - |
| Ciocca Dairy | $ 933.75 |
| Circle C Equipment | $ 15,129.59 |
| Citi Cards | $ - |
| Clear Lakes Products | $ 687,272.04 |

| Creditor | Claim Amount |
|---|---|
| Clear Water Products | $ 658,702.40 |
| Coastline Equipment | $ 7,457.35 |
| Colonial Life Processing Center | $ - |
| Commodities Plus | $ 20,472.00 |
| Connie Lapaseotes, Ltd. | |
| Conrad & Bischoff Inc. | $ - |
| Dairy Tech | $ 28,925.49 |
| Daniels Manufacturing | $ 65.98 |
| Daritech | $ 1,219.12 |
| Darling Ingredients | $ 23,841.60 |
| David Clark/Clark Ambulatory | $ 8,163.70 |
| Department of Treasury - Internal Revenue Service | $ 118,825.85 |
| Diamond B Dairy | $ 16,550.00 |
| Double V, LLC | $ 7,350.00 |
| Eagle View East | $ 1,392.50 |
| Eagle View Farms | $ 4,214.50 |
| East Valley Development, LLC | $ - |
| Eide Bailey | $ 214,291.60 |
| Electrical Werx & Construction | $ 81,740.51 |
| Element Heating & Cooling | $ 34,813.00 |
| Elevation Electric | $ 609,199.60 |
| Evans Plumbing | $ 10,624.12 |
| Farmore | $ 37,220.97 |
| Fastenal Company | $ - |
| Fergusun Enterprises, Inc. | $ 6,880.07 |
| Floyd Lilly Company, Inc. | $ 216.74 |
| Franklin Building Supply | $ 4,833.63 |
| Fredin Brothers, Inc. | |
| G.J. Verti-line Pumps, Inc. | $ 157,413.31 |
| Galeno's Trucking | $ 2,324.64 |
| Gem State Welders Supply, Inc. | $ 2,862.68 |
| Givens Pursley LLP | $ 109,955.03 |
| Great America Financial | $ - |
| Green Source Automation | $ 390,780.83 |
| Harper Family Partnership | $ 213,802.20 |
| Hatfield Manufacturing, Inc. | $ 1,729.75 |
| Heeringa Construction | $ 19,500.00 |
| High Desert Dairy System | $ 754.22 |
| Holesinksy Farms, LLC | $ 226,291.80 |
| IBA Magic Valley Dairy System | $ 3,191.74 |
| Idaho Dept of Lands | $ 546.12 |
| Idaho Power | $ - |
| Idaho State Tax Commission | $ 169.56 |

Case 24-40158-NGH   Doc 640-5   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit E - List of General Unsecured Claims   Page 4 of 5

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 11:41:06:55   Desc Main
Document   Page 120 of 125

| | | | | | |
|---|---|---|---|---|---|
| Idaho Udder Health Systems | $ | 322.00 | Rocky Mountain Agronomics | $ | 724,567.94 |
| J&C Hoof Trimming, Inc. | $ | 43,417.00 | Rocky Mountain Pharma | $ | 300.00 |
| J.D. Heiskell & Co. | $ | 619,291.96 | Rogers Machinery | $ | 40,001.71 |
| James Farrell & Company | $ | 44,041.20 | S&O Mata Trucking, LLC | $ | 24,090.00 |
| JF Farms, Inc. | $ | 205,674.88 | Schaeffer Manufacturing Co. | $ | 55,482.70 |
| JP Morgan Chase | $ | 14,410.79 | Schmidt Cattle Hauling | $ | 300.00 |
| K&R Rental, Inc. | $ | 80.00 | | | |
| Kinghorn Medical LLC | $ | 135.00 | Schow's Auto Parts & Truck Center/Interstate | | |
| Landview Inc. | $ | 8,219,236.00 | Billing Service, Inc. | $ | 46,569.15 |
| Leedstone | $ | 14,777.79 | SeCon, LLC | $ | 121,800.00 |
| Liberty Basin LLC | $ | - | Select Sires Mid America, Inc. | $ | 57,471.71 |
| Llanos Trucking LLC | $ | 52,590.00 | Silva Brothers | $ | 15,475.00 |
| Macrae Custom Farming | $ | 85,224.00 | SiteOne Landscape | $ | 34,493.64 |
| Magaw Industries | $ | 351.45 | Six States Distributors Inc. | $ | 295.39 |
| Magic Valley Equipment, Inc. | $ | 156.02 | Sprinkler Shop Inc. | $ | 11,866.50 |
| Magic Valley Hydraulics & Repair LLC | $ | 4,628.58 | ST Genetics | $ | 67,106.89 |
| McAlvain Concrete, Inc. c/o | | | State Insurance Fund | $ | - |
| Big-D Companies | $ | - | Stotz Equipment | $ | 30.26 |
| Merck Animal Health/Allflex | $ | 88,768.22 | Streamline Precision | $ | 43,090.25 |
| MicroProteins | $ | 174,851.69 | Stukenholtz Laboratory | $ | 1,470.00 |
| Minidoka Irrigation District | $ | - | T.L.K. Dairy Inc. | $ | 20,646.75 |
| Napa Auto Parts | $ | 39,093.50 | Tacoma Screw Products | $ | 26,645.49 |
| Nelson Farms LLC | $ | 94,000.00 | Taqueria Tamazula Trucking | $ | 25,498.00 |
| Nevin, Benjamin, McKay & Barlett | $ | 215.00 | The Dairy Solutions Group | $ | 289,003.41 |
| Norco, Inc. | $ | 46.38 | TMG Services | $ | 1,291.08 |
| North Side Canal Company | $ | - | Toshiba Financial Services | $ | - |
| Novoa Trucking | $ | 42,313.70 | Triple B Farms | $ | 124,965.00 |
| Overhead Door | $ | - | Twin Falls Canal Co. | $ | - |
| Pacific Steel & Recylcing | $ | 58,101.65 | Udder Health Systems | $ | 5,713.10 |
| Pan American Life Insurance | $ | - | Uline | $ | - |
| Penn Millers Insurance Co. c/o | | | United Electric Coop | $ | - |
| Chubb Agribusiness | $ | - | United Wholesale Mortgage | $ | 2,101.78 |
| Pivot Man Inc./Robin Jones | $ | 822.51 | Urgent Care of Jerome | $ | 626.35 |
| Premier Truck Group (PTG of Idaho LLC) | $ | 98,109.08 | US Commodities LLC | $ | 103,274.64 |
| Prime Ridge Beef, LLC | $ | - | V&M Trucking LLC | $ | 17,710.00 |
| Pro Rentals & Sales | $ | 20,705.49 | Valley Wide Coop | $ | 389,201.60 |
| Pro Tech Service Company | $ | 245.12 | Vanden Bosch Inc. | $ | 863.58 |
| Progressive Dairy Service & Supply | $ | 133,421.55 | Vandyk Dairy | $ | 67,100.00 |
| Quality Truss | $ | 5,207.18 | Vantage Dairy Supplies LLC | $ | 37,995.54 |
| Quill Corporation | $ | 592.38 | Viserion Grain LLC | $ | 3,528,281.42 |
| Raft River Highway District | $ | 217,606.50 | Viterra Grain LLC | $ | 2,620,644.28 |
| Raft River Rural Electric | $ | - | WAG Services | $ | 231,036.76 |
| Rangen (Wilbur-Ellis) | $ | 528,827.61 | WageWorks Inc. | $ | 582.25 |
| Riveron RTS, LLC | $ | - | Watts Hydraulic & Repair | $ | 20,723.92 |

| | | |
|---|---|---|
| Watts Machine & Fabrication | $ | 53,077.80 |
| Webb Nursery | $ | 18.11 |
| Wendell Truck and Auto | $ | 3,126.49 |
| Westec Concrete Cutting LLC | $ | 1,675.00 |
| Western Construction | $ | 2,622.47 |
| Western Waste Services | $ | - |
| Westway Feed Products | $ | 313,884.04 |
| Xavier Farm Services LLC | $ | 63,895.20 |
| Young Automotive Group | $ | 26,649.87 |
| **TOTAL GENERAL UNSECURED CLAIMS** | **$** | **27,893,728.79** |

# EXHIBIT F

1978761_19

[1] Owned by Bill as separate property pursuant to Separate Property Agreement dated effective December 31, 2012. The Millenkamp Family LLC Operating Agreement shows that Bill owns 50% of the company. However, the Unanimous Consent of Managers dated effective 12/31/2012 consented to the transfer of 38.54% of the company to The WJM 2012 Trust, all of which was Bill's separate property.
[2] Owned by Susie as separate property pursuant to Separate Property Agreement dated effective December 31, 2012. The Millenkamp Family LLC Operating Agreement shows that Susie owns 50% of the company. However, the Unanimous Consent of Managers dated effective 12/31/2012 consented to the transfer of 39.07% of the company to The SJM 2012 Trust, all of which was Susie's separate property.
[3] Currently owned by Bill. Anticipated that ownership will be transitioned to Millenkamp Family LLC at some point.
[4] The WJM 2012 Trust now owns Farm Bureau Life Insurance Company Policy # 040 01208595 (i.e., Bill's life insurance policy).
[5] Millenkamp Cattle, Inc. owns a 50% membership interest in H&M Custom, LLC, with the other 50% membership interest owned by Heuttig Custom, LLC (Brian Heuttig) of Hazelton, Idaho.
[6] Shell entity created to enter into new ventures. No activity at this time.
gf13hd01vw [7] Canyonlands Properties are comprised of various 2018 acquisitions from Toolson (a/k/a Paulson Subdivision), Baggett, Quality Truss, Kelley's Orchard, Beaudet, Eagle Creek Northwest (a/k/a UBS) and J & C Custom.
[8] Millenkamp Cattle, Inc. holds a 23% minority interest, Psoas LLC owns other 77% interest. Sole purpose of the LLC is to provide cattle to AgriBeef processing plant.



Case 24-40158-NGH   Doc 640-7   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit G - Assumed Executory Contracts and Unexpired Leases   Page 2 of 7

Case 24-40158-NGH   Doc 640-7   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc

Case 24-40158-NGH   Doc 645   Filed 10/02/24   Entered 10/02/24 20:05:55   Desc Main
Document   Page 122 of 125

# EXHIBIT G

**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES[1]**

| Contract/Lease Party | Contract Counterparty | Contract/Lease Title | Cure Amount |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793337, dated February 6, 2024 6 Case IH Magnum CNH Equipment Lease 765512 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793339, dated February 6, 2024 16 Case IH Magnum and 16 Case IH Real Remote CNH Equipment Lease 765784 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793443, dated February 6, 2024 4 Case IH Steiger and 4 Case Rear Remote CNH Equipment Lease 765542 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2609637, dated October 31, 2020, as amended 26 Case IH Mangum | $0.00 |
| | | CNH Equipment Lease 210982 | |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Retail Installment Sales Contract and Security Agreement, No. 2783587 25 Kobuta Tractors CNH Equipment Loan 765530 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company 3140 Kimberly Rd. Twin Falls, ID 83301 | Retail Installment Sales Contract and Security Agreement, No. 2793874 30 Case IH Maxim CNH Equipment Loan 765552 | $0.00 |
| Millenkamp Cattle, Inc. | Daimler Truck Financial Services 14372 Heritage Pkwy Suite 400 Fort Worth, TX 76177 | Note and Security Agreement dated January 2024 | $0.00 |
| Millenkamp Cattle, Inc. | Daimler Truck Financial Services 14372 Heritage Pkwy Suite 400 Fort Worth, TX 76177 | Note and Security Agreement (Multi-State) dated February 23, 2022 | $0.00 |
| Millenkamp Cattle, Inc. | East Valley Cattle LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for lease of East Valley Dairy | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Third Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East | $0.00 |

---

[1] If you would like a copy of any of the Assumed Executory Contracts or Leases, reach out to Debtors' counsel, tirzah.roussell@dentons.com

#4122813

Case 24-40158-NGH   Doc 640-7   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit G - Assumed Executory Contracts and Unexpired Leases   Page 3 of 7

Case 24-40158-NGH   Doc 640-7   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit G - Assumed Executory Contracts and Unexpired Leases   Page 4 of 7

Case 24-40158-NGH   Doc 646   Filed 10/02/24   Entered 10/02/24 06:55:07   Desc Main
Document   Page 123 of 125

| | | | |
|---|---|---|---|
| | | Valley Development, LLC (Tenant) dated June 22, 2023 | |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | First Amendment Manure Supply Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Developer) dated June 22, 2023 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Tenant) dated October 8, 2021. | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Manure Supply Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Developer) dated October 8, 2021 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Memorandum of Ground Lease dated June 23, 2023. | $0.00 |

| | | | |
|---|---|---|---|
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Second Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Tenant) dated April 25, 2023. | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | East Valley Development, LLC Attn: General Counsel 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | First Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Tenant) dated February 17, 2022. | $0.00 |
| Millenkamp Cattle, Inc. | Goose Ranch LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Goose Ranch | $0.00 |
| Millenkamp Cattle, Inc. | GreatAmerica Financial Serv. PO Box 660831 Dallas, TX 75266-0831 | Lease Agreement for 8 HP E786Z Copiers; 2 HP E45028DN Copiers; 2 HP E40040DN Copiers 1931342 | $0.00 |

Case 24-40158-NGH    Doc 640-7    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc
Exhibit Exhibit G - Assumed Executory Contracts and Unexpired Leases    Page 5 of 7

Case 24-40158-NGH    Doc 640-7    Filed 09/30/24    Entered 09/30/24 19:30:44    Desc
Exhibit Exhibit G - Assumed Executory Contracts and Unexpired Leases    Page 6 of 7

Case 24-40158-NGH    Doc 646    Filed 10/02/24    Entered 10/02/24 16:55:57    Desc Main
Document    Page 124 of 125

| | | | |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Idaho Jersey Girls Jerome Dairy, LLC 471 N 300 W Jerome, ID 83338 | Triple net lease of Idaho Jersey Girls Jerome Dairy | $0.00 |
| Millenkamp Cattle, Inc. | Innovative Food Solutions USA Attn: Jordan Bowen 134 E. Highway 81 Burley, ID 83318 | Milk Producer Supply Agreement dated January 1, 2024 | $0.00 |
| Millenkamp Cattle, Inc. | Jake Millenkamp 1719 River Road Buhl, ID 83316 | Rental Agreement for 1719 River Road, Buhl, ID 83316 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated June 12, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreements dated May 23, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 12, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 31, 2023 | $0.00 |

| | | | |
|---|---|---|---|
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 28, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | Keith D. and Janet Carlson 3866 E 3800 N Hansen, ID 83334 | Lease Agreement dated June 1, 2020 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, Inc. | Mavrix, LLC 925 Main St., Ste. 300-18 Stone Mountain, GA 30083-3098 | Exclusivity Agreement between Millenkamp Cattle, Inc. and East Valley Cattle, LLC (Dairy) and SKS EVC, LLC and Mavrix, LLC (Developers) dated July 12, 2021. | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Canyonlands | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for McGregor | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for lease of German Dairy | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Moonshine Ranch | $0.00 |

Case 24-40158-NGH   Doc 640-7   Filed 09/30/24   Entered 09/30/24 19:30:44   Desc
Exhibit Exhibit G - Assumed Executory Contracts and Unexpired Leases   Page 7 of 7

Case 24-40158-NGH   Doc 649   Filed 10/02/24   Entered 10/02/24 12:06:55   Desc Main
Document   Page 125 of 125

| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Calf Ranch | $0.00 |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple Net Lease for Cow Palace | $0.00 |
| Black Pine Cattle, LLC | PerforMix Nutrition Systems 2201 N. 20th Street Nampa, ID 83687 | Security Agreement dated September 13, 2023 | $0.00 |
| Millenkamp Cattle, Inc. East Valley Cattle, LLC | Eagle Creek Northwest, LLC 10 State House Square 15th Floor Hartford, CT 06103 | Lease Agreement | $0.00 |