Sheila R. Schwager, ISB No. 5059
Brent R. Wilson, ISB No. 8936
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  208.344.6000
Facsimile:  208.954.5261
Email: sschwager@hawleytroxell.com
          bwilson@hawleytroxell.com

Andrew J. Schoulder (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone:  212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com

Attorneys for Rabo AgriFinance LLC

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE, INC.,<br><br>Debtor. | Case No. 24-40158-NGH |
| Filing relates to:<br><br>☒ ALL DEBTORS<br><br>☐ Millenkamp Cattle, Inc.<br><br>☐ Idaho Jersey Girls<br><br>☐ East Valley Cattle<br><br>☐ Millenkamp Properties<br><br>☐ Millenkamp Properties II<br><br>☐ Millenkamp Family<br><br>☐ Goose Ranch | Jointly Administered With Case Nos.:<br><br>24-40159-NGH (Idaho Jersey Girls)<br>24-40160-NGH (East Valley Cattle)<br>24-40161-NGH (Millenkamp Properties)<br>24-40162-NGH (Millenkamp Properties II)<br>24-40163-NGH (Millenkamp Family)<br>24-40164-NGH (Goose Ranch)<br>24-40166-NGH (Black Pine Cattle)<br>24-40167-NGH (Millenkamp Enterprises)<br>24-40165-NGH (Idaho Jersey Girls Jerome Dairy)<br><br>Chapter 11 Cases |

☐ Black Pine Cattle

☐ Millenkamp Enterprises

☐ Idaho Jersey Girls Jerome Dairy

## RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS' CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE EXCLUSIVITY

Rabo AgriFinance, LLC, in its capacity as agent and lender ("**RAF**"), hereby files this *Objection to Debtors' Continued Use of Cash Collateral and Motion to Terminate Exclusivity* ("**Response**"). By this Response, RAF incorporates by reference *Rabo AgriFinance LLC's Omnibus Objection to (I) Emergency Motion Authorizing Use of Cash Collateral; and (II) Emergency Motion Authorizing the Debtors to Obtain Post-Petition Financing and Granting Adequate Protection* filed on April 3, 2024 (Dkt. No. 81) (the "**Original Objection**") as supplemented by the Supplement thereto filed on April 4, 2024 (Dkt. No. 99) (the "**First Supplement**"), as further supplemented by the Second Supplement thereto filed on April 8, 2024 (Dkt. No. 131) (the "**Second Supplement**"), as further supplemented by the Third Supplement thereto filed on April 15, 2024 (Dkt. No. 181) (the "**Third Supplement**") and as further supplemented by that certain *Omnibus Objection to (I) Emergency Motion Authorizing Use of Cash Collateral on a Final Basis; and (II) Emergency Motion Authorizing the Debtors to Obtain Post-Petition Financing and Granting Adequate Protection of a Final Basis* (Dkt. No. 244) (the "**Omnibus Objection**" and collectively, the "**Objection**") and in support thereof states as follows:[1]

## I.      PRELIMINARY STATEMENT

The outstanding obligations owed to RAF, as agent and Lender, is secured by, among other things, a first lien on substantially all the Debtors' personal property, including cattle, and a second

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objections, as applicable.

mortgage on all of the Debtors' real estate. During these Chapter 11 Cases, the Debtors repeatedly asserted through sworn testimony from Mr. William Millenkamp that RAF is "grossly over secured," "extremely over secured," and even "wildly over secured." Likewise, in documents filed with this Court and at each hearing, the Debtors' counsel has argued endlessly that RAF is "grossly over secured." Moreover, the Debtors filed numerous expert reports, appraisals, and other exhibits to demonstrate and advocate that RAF is "grossly over secured." Indeed, for the six months of these cases, in response to RAF's assertions that it is not adequately protected, the Debtors have continually represented to RAF and this Court that RAF is grossly, extremely, and wildly oversecured. Accordingly, pursuant to 11 U.S.C. § 506(b) and the Debtors' sworn admissions supported by the Debtors' own experts, RAF is entitled to receive from the Debtors the full value of its secured claim including its contractual post-petition default interest and its professional fees as part of its secured claim (the "**RAF Secured Claim**). Yet, the Plan, fails to provide for payment in full of the RAF Secured Claim in accordance with the Loan Documents, reflecting that RAF has not been adequately protected during the Chapter 11 Cases, as RAF has stated from the outset. For instance, even the Debtors' asserted principal sum of $90,952,00 would impose a post-petition default interest "forgiveness" in excess of at $3.4 million, through the date of the projected effective date of December 31, 2024, and fails to account for and pay Rabo's professional fees which currently exceed $2.7 million.

The Debtors cannot have it both ways. Either: (1) RAF has been and is adequately protected by virtue of being grossly oversecured, in which case the Plan must provide for full payment of the RAF Secured Claim; or (2) RAF has not been and is not adequately protected during the Chapter 11 Cases, in which case the Debtors should not, without providing RAF with sufficient additional adequate protection, be permitted to continue to use RAF's cash collateral or make further draws under the DIP facility, which is more expensive than other options made available to the Debtors.

On June 21, 2024, in denying the Debtors' requested relief under 11 U.S.C. § 503(b)(9), this Court observed that **"[t]he future of this case is remarkably unclear,** and until more progress

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 3

is made toward confirmation of a plan, no authorization for payment of § 503(b)(9) claims will be granted." Dkt. 450 (emphasis added).  Following entry of that order, the Debtors have failed to clarify the future of these cases in accordance with the Bankruptcy Code.

On September 30, 2024, in an apparent attempt to file "a plan" to extend their exclusivity, the Debtors filed, among other things, a disclosure statement [Dkt. 640] ("**Disclosure Statement**"), liquidation analysis [Dkt. 640-2] ("**Liquidation Analysis**"), a five-year projection, [Dkt. 640-3] (the "**Projections**") and chapter 11 plan of reorganization, [Dkt. 641] (the "**Plan**"). Notably and significantly the Plan is patently unconfirmable on its face for the reasons set forth below.  Thus, rather than clarify the future of these cases, the only thing that has become apparent from the filing of the Plan is that the Debtors are conducting these chapter 11 cases for the benefit of Mr. Millenkamp and his wife, Susan Millenkamp (the "**Millenkamp Family**"), rather than the creditors of the bankruptcy Estate as required by the Bankruptcy Code.

The Plan, if nothing else, is consistent with the Debtors' history of failing to adequately protect RAF's secured creditor rights and interests.  Over the course of the last 6 months, RAF has procured sworn testimony from Mr. Millenkamp establishing 1) the Debtors' pre-petition conversion of $9 million to collateralize surety bonds;[2] 2) the pre-petition conversion of $250,000 to make a down payment for the purchase of real estate while the RLOC Facility had been in maturity default for 8 months;[3] 3) the purchase of six (6) brand new 2024 Dodge Ram pickups for over $296,000;[4] just a couple months prior to the bankruptcy filing,  (one of which is personally driven by Mr. Millenkamp);[5] 4) the Debtors' unauthorized purchase and lease of $12 million of

---

[2] Transcript of Hearing April 9, 2024, 66: 3–23.

[3] Transcript of Hearing May 9, 2024, 15:9-20:25; 24:8-13.

[4] Notably, Farmers Bank filed, among other claims, Proof of Claim No. 35 in the amount of $294,173.07 for these 2024 Dodge Ram pickups. Further, according to the Plan, after receiving $933,289.47 in adequate protection payments in respect of total claims of $2,474,927.97 during these cases (none of which were subject to any Court order such as RAF's adequate protection treatment), Farmers Bank will continue to receive approximately $105,706.00 per month until paid in full. Unlike RAF, the Debtors are not proposing that Farmers Bank forgive any of its secured claims.

[5] Transcript of Hearing May 9, 2024, 52:3–53:16.

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 4

equipment on the eve of receivership;[6] and 5) the Debtors' undisclosed attempt to pay Mr. Millenkamp's personal expenses for his son's wedding as valid administrative expense claims under 11 U.S.C. § 503(b)(9).[7]  Indeed, after this Court denied the Debtors' critical vendor motion and request to pay § 503(b)(9) claimants prior to confirmation of a plan, the Debtors still disregarded this Court's clear unwillingness to permit payments to creditors outside of a plan. Specifically, on or about July 22, 2024, RAF learned that the Debtors attempted to issue a check, dated, July 19, 2024, to Kenworth Sales Company, in the amount of $48,677.75 for pre-petition services between December 21, 2023, and March 31, 2023.  Upon inquiry, RAF was informed by the Debtors that Kenworth, the subject creditor, was a secured creditor holding a possessory lien. That representation is contrary to the filed schedules.  In any event, nothing under the Bankruptcy Code nor this Court's orders permit the Debtors to pay Kenworth Sales Company or make any unilateral determination on the payment of pre-petition creditors.  Yet, it appears through the Plan that the Debtors proceeded with that payment despite the issue being raised by RAF.

Now, via the Plan, the Debtors are not even attempting to disguise what can only be described as a blatant derogation of their fiduciary duties and basic tenets of the Bankruptcy Code by proposing a chapter 11 plan of reorganization that:

- Impairs the RAF Secured Claim by seeking to eviscerate RAF's rights under section 506(b) by unilaterally compelling RAF to **forgive the pre-petition and post-petition default interest and professional fees owing on the Rabo Secured Claims."** Plan, § 3.6(b).

- Through the Debtors' own liquidation analysis, evidences that the **$348,296,000 of Estimated Liquidation Proceeds (Dark) would be more than sufficient to pay**, in full, the Debtors' **$327,506,000 of secured claims**, including **the full amount of the RAF Secured Claim**. *See* Liquidation Analysis.

---

[6] *See* Creditor CNH Industrial Capital America LLC Objection to Debtor's Emergency Motion for Interim and Final Orders, Dkt. No. 126, at p. 111–115, admitted at Ex. 3037 [Dkt. 288] (attaching as exhibits equipment purchase orders).

[7] *See* 503(b)(9) invoices, admitted at Ex. 1032 [Dkt. 444], p. 1310, 1-65:5.

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 5

- With **$0 of new value being contributed by the Millenkamp Family**, leaves the **Millenkamp Family unimpaired** by providing that "each Debtors' pre-petition equity interests shall remain the same post-petition. Class 11 Claim Holders **are retaining ownership interests in the Debtors**." Plan, § 3.12(b).

- With **$0 of new value being contributed by the Millenkamp Family, who are non-Debtor obligors for the full amount of the RAF Secured Claim**, seeks to protect the Millenkamp Family with broad release, exculpations, and injunctions. Plan, § 10.1; 10.2; 10.3.

The Plan (as currently on file) is *prima facie* evidence that the Debtors have no intention of complying with their statutory obligations and fiduciary duties by moving these cases forward toward a fair and equitable resolution. *See Off. Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.)*, 282 B.R. 444, 453 (9th Cir. BAP 2002) (noting exclusivity must facilitate moving the case forward toward a fair and equitable resolution). Contrary to this instruction, the Plan is clearly designed to preserve the rights of the Debtors' principals at RAF's expense. Indeed, the Plan unfairly and with no justification discriminates against and impairs RAF, as RAF is the only stakeholder that will receive less than a full recovery. Such a result is clearly contrary to the dictates of the Bankruptcy Code. Moreover, it is driven by Mr. Millenkamp's animus toward RAF, which he has demonstrated repeatedly while testifying.

The Debtors have the ability and opportunity to pay RAF in full in accordance with the Bankruptcy Code through the sale of real estate, livestock, or an infusion of equity. Upon information provided by the Debtors, the Debtors have real estate with an appraised value of $21 million that could be monetized for at least $15 million, after repaying MetLife. Indeed, prior to the filing of the Plan, the Debtors circulated various restructuring scenarios that contemplated the sale of properties. Yet, rather than pursuing such a sale to repay RAF in full, the Debtors have instead sought to retain those assets and attempt to impose a "forgiveness" obligation on RAF. At

its core, rather than leaving the Millenkamp Family unimpaired,[8] the Plan improves and enhances the Millenkamp Family's rights by permitting them to preserve all of the Debtors' assets and retain equity, with projected book value as of January 2025 of $55 million[9] for free while attempting to force RAF to "forgive" secured debt.

The Debtors have been afforded enough time and opportunity to put forward a confirmable plan of reorganization in good faith that would fund their promised 100 cent plan, which would enable the Millenkamp Family to maintain their 100% equity. Instead, to achieve their goal, the Plan attempts to foist the burden of a 100% return to equity on RAF by requiring RAF to "forgive" amounts required to be paid under the Code. Clearly, the Debtors have no interest in treating RAF as an oversecured creditor, and no intention of adequately protecting RAF's interests.

Allowing the Debtors to stay on their current track and seek confirmation of the patently unconfirmable Plan serves no purpose other than to increase the Debtors' liabilities, delay payment to creditors, and further deteriorate the Debtors' assets. RAF is concerned that the Debtors' current strategy will leave the Estates with no alternative other than liquidation under the supervision of a chapter 11 or chapter 7 trustee. Accordingly, RAF respectfully urges this Court to condition the Debtors' continued use of cash collateral on the adequate protection treatment set forth herein; namely, payment of default interest and professional fees, and the pursuit of a parallel contingent process. Additionally, RAF believes that the patent failings and lack of good faith evidenced by the Plan demonstrate a clear lack of progress and good faith necessitating the termination of exclusivity.

---

[8] A claim is unimpaired if its treatment under a proposed plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1) (emphasis added).

[9] *See Projections*, p. 3.

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 7

## II.    OBJECTION: RAF IS NOT ADEQUATELY PROTECTED AND EXCLUSIVITY SHOULD BE TERMINATED BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE

### A.    RAF IS OVERSECURED

1.    Throughout these Chapter 11 cases, especially at every hearing to consider the Debtors' use of cash collateral and use of DIP financing, the Debtors have repeatedly asserted that RAF is adequately protected by the "substantial: equity cushion in RAF's collateral. Indeed, the Debtors have described this equity cushion from being everything from "grossly over secured" to "extremely over secured" and even "wildly over secured." As just a few examples:[10]

- On April 9, 2024, Mr. Millenkamp testified that RAF was oversecured by "over 200 million" and based upon these valuations was "extremely" oversecured.[11]

- On April 10, 2024, the Debtors' counsel argued that a 56% equity cushion exists with respect to $671 million in assets against $294 million owed to secured lenders.[12] Further, Debtors' counsel argued that as to RAF, "[RAF] is owed approximately $88 million and the personal property is valued at $178 million. That leaves a collateral cushion of approximately $90 million, resulting in an equity cushion of approximately 50%."[13]

- On May 8, 2024, Mr. Millenkamp testified that based upon his own personal property valuations, RAF is "wildly oversecured by $90 million."[14]

- On May 9, 2024, Mr. Millenkamp testified that RAF is "double secure" in the personal property alone.[15]

- On May 9, 2024, the Debtors' counsel alleged that RAF is "wildly oversecured on their personal property . . . ."[16]

---

[10] Additional testimony by the Debtors with respect to RAF being grossly oversecured can be found at Exhibit [].

[11] Transcript of Hearing April 9, 2024, 42:7–43:8; 50:6–17.

[12] Transcript of Hearing April 10, 2024 116: 10-14.

[13] Transcript of Hearing April 10, 2024 116: 15–21.

[14] Transcript of Hearing May 8, 2024 173:22–24.

[15] Transcript of Hearing May 9, 2024 71:23–25.

[16] Transcript of Hearing May 9, 2024 209:14–15.

- On June 20, 2024, the Debtors' counsel argued that because "there's a pretty significant equity cushion in the debtor's assets so even if the case leads to a liquidation, there's an equity cushion that would allow those administrative claims to still be paid in full."[17]

2. In opposition to the Debtors' requests, RAF urged this Court to find that an equity cushion is not enough to adequately protect RAF given the Debtors' historical inability to generate sufficient cash flow to service debt. Omnibus Objection, pg. 13; *See also In re Stoney Creek Techs., LLC*, 364 B.R. 882 (Bankr. E.D. Pa. 2017) (denying DIP financing despite apparent equity cushion when debtor had historically been unable to generate profits and could not demonstrate how the proposed DIP loan would change that circumstance); *In re Smitty Inv. Grp., LLC*, No. 07-00020-TLM, 2008 WL 2095523, at *7 (Bankr. D. Idaho May 16 2008) (stating "[w]hen the financial realities do not support the projections or where the proponents' projections are unreasonable," the court should refuse to confirm a plan); *In re Claar Cellars LLC,* 623 B.R. 578 597 (Bankr. E.D. Wash. 2021) ("Because the plan projections are unduly optimistic and unrealistic given the debtors' recent performance and the current state of affairs, those projections cannot establish a reasonable probability that the debtors' plan will succeed."). Indeed, Mr. Daniel Kokini, a Senior Managing Director of FTI Consulting, testified that the Debtors' historical level of cash flow cannot satisfy their pre-petition debt burden.[18]

3. Based on the Debtors' evidence, the Debtors obtained authorization to use RAF's cash collateral. That same equity cushion was also proffered by the Debtors as the basis to approve the Debtors' "business judgment" to select a DIP Financing that was two times more expensive than the DIP financing supported by RAF. As a result, the Estate is now subject to $1.8 million more in debt service in respect of the DIP Facility.

4. Now, after 6 months of waiting for the Debtors to complete their 100 cent plan, the Debtors' actual Plan crystallizes the concerns and objections raised by RAF since the Petition Date. Namely, despite the $200 million to $300 million equity cushion, the Debtors do not intend

---

[17] Transcript of Hearing June 20, 2024 240:4–8.

[18] Transcript of Hearing April 9, 2024, 136:18–23.

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 9

(and have never intended) to pay RAF the full value of its RAF Secured Claim, thereby conclusively establishing that RAF is not adequately protected.

### B. THE PLAN DEMONSTRATES THAT RAF IS NOT ADEQUATELY PROTECTED.

5. Despite RAF being "grossly," "extremely," and even "wildly" over secured, the Plan dictates that RAF "forgive" material portions of its oversecured claim. Specifically, the proposed treatment under the Plan impairs the RAF Secured Claim under § 506(b) by unilaterally imposing an obligation whereby "**Rabo shall forgive the pre-petition and post-petition default interest and professional fees owing on the Rabo Secured Claims.**" Plan, § 3.6(b). Such treatment is patently unconfirmable as there is no statutory basis or otherwise to require RAF—an oversecured creditor—to "forgive" debt.

6. Under 11 U.S.C. § 1129(a)(7), each holder of an impaired claim or interest must "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). Known as the "best interest test," this section requires that a creditor's treatment under a plan of reorganization must have a present value equal to a creditor's treatment under a hypothetical chapter 7 liquidation. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'shp. (In re Ambanc La Mesa Ltd. P'shp.)*, 115 F.3d 650, 657 (9th Cir. 1997). Where a creditor is oversecured, a plan must provide payment in full to satisfy the best interest test. *See In re Zanetos*, No. SA 05-48272 TA, 2006 Bankr. LEXIS 2465, at *11 (Bankr. C.D. Cal. July 14, 2006) (holding where creditor was fully secured any plan must provide for his payment in full to "pass muster").

7. As stated above, the Debtors have consistently relied upon and strenuously advocated their assertions that RAF is grossly oversecured to extract this Court's approval of the continued use of cash collateral and access to the DIP facility. Further, the Debtors' Liquidation Analysis filed in conjunction with the Plan clearly demonstrates that the **$348,296,000 of Estimated Liquidation Proceeds (Dark) would be more than sufficient to pay**, in full, all of

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 10

the Debtors' $327,506,000 of secured claims, including **the full amount of the RAF Secured Claim**. *See Liquidation Analysis*.

8.    If RAF is adequately protected by an equity cushion, RAF is definitionally oversecured and must be paid in full (including default interest and professional fees) in either a confirmable plan or a chapter 7 liquidation. 11 U.S.C. § 506(b) (oversecured creditors can recover post-petition interest as part of its allowed claim); *see also In re New Investments, Inc.,* 840 F.3d 1137, 1142 (9th Cir. 2016) (oversecured creditor is entitled to default interest at the contractual rate); *In re Epicenter Partners, L.L.C.,* 789 F. App'x 632, 634 (9th Cir. 2020) (the Ninth Circuit will "apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law.")   The Debtors' Plan as written is patently unconfirmable and demonstrates that RAF is not adequately protected.

**C.    THE MILLENKAMP FAMILY CANNOT RETAIN THEIR EQUITY INTERESTS FOR FREE WHILE SENIOR CLAIMS ARE IMPAIRED.**

9.    Despite seeking to impair RAF's oversecured claim (among other creditors' claims), the Plan provides that the Millenkamp family is "**unimpaired**" and "**are retaining ownership interests in the Debtors.**" Plan, § 3.12(b).

10.    Such a provision blatantly ignores a core tenet of bankruptcy law—equity interest holders are not permitted to keep their equity under a plan if all senior claims are not paid in full. *Northern Pacific Railway Co. v. Boyd*, 228 U.S. 482 (1913) (holding a sale by which stockholders were keeping their ownership interest before junior creditors were paid was not permitted); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939) (holding shareholders must do more than continue to participate in the debtor's business to retain their equity). Coined the "absolute priority rule" the rule was a response to "concern ... [regarding] the ability of a few insiders, whether representatives of management or major creditors, to use the reorganization process to gain an unfair advantage." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 536 U.S. 434 (1999); *see also Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653-54. (9th Cir. 1997); *In re Zaleha*, Case No. 93-00638, 1995 Bankr. LEXIS 2167, at *8 (Bankr. D. Idaho Mar. 10, 1995).

11.     As the most junior of all stakeholders, the Millenkamp Family should not be permitted to abscond with equity interests with a book value of approximately $55 million by the Debtors' Projections, while simultaneously forcing RAF to "forgive" any portion of its secured claims. *In re Zaleha*, No. 93-00638, 1995 Bankr. LEXIS 2167, at *8 (Bankr. D. Idaho Mar. 10, 1995) (citing *Norwest Bank Worthington, v. Ahlers*, 485 U.S. 197, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988)); *see also Wells Fargo Bank, NA v. Sahuarita Self-Storage LLC (In re Mariposa Rd. Self-Storage Assocs. LLC)*, 693 F. App'x 486, 486 (9th Cir. 2017) (finding plan did not comply with absolute priority rule because existing equity holders would be allowed to retain their equity interests while bank's guarantee claims remained unpaid).

12.     If the members of the Millenkamp Family want to retain their equity interests, they must provide for the payment in full of RAF's secured claims.[19]  A far cry from simply being "unimpaired" under the Plan, the Millenkamp Family stands to materially benefit from the Plan without contributing any money to the Estates.  RAF is only seeking to be repaid, in full, as the Debtors and Mr. Millenkamp represented they would do for the last 6 months.  Yet, the Debtors attempt to have RAF "forgive" a portion of their obligations, while the Millenkamp Family retains equity interests with a book value of $55 million for free.

**D.     OTHER ABSOLUTE PRIORITY ISSUES AND POTENTIAL ADMINISTRATIVE INSOLVENCY**

13.     According to the Plan, the Debtors intend to pay all Administrative Claims (including Professional Fee Claims) and Priority Claims in full on the Effective Date.  Based on the Liquidation Analysis, the Debtors intend to pay approximately $9.9 million in respect of such claims.

---

[19] Moreover, even should the Millenkamp Family offer to contribute towards a plan of reorganization in an effort to retain their equity interests, the Millenkamp Family should not be afforded the exclusive right to do so. *LaSalle*, 526 U.S. at 458. A plan that provides for "vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan" should fail. *Id.* at 434.  Instead, any proposed contribution that would purport to allow the Millenkamp Family to retain their equity interest must be market tested, and must allow additional parties to bid for the opportunity to acquire the reorganized debtors' equity interests. *In re Ambanc La Mesa Ltd. P'ship,* 115 F.3d at 653-54.

14.     Given that the Plan does not provide for the payment in full of the over-secured RAF Secured Claim, it is unclear how the Debtors intend to pay $9.9 million in Administrative Claims and Priority Claims without violating the Absolute Priority Rule as discussed above. 11 U.S.C. § 1129(b).  Indeed, given the Debtors' inability (or unwillingness) to pay the RAF Secured Claim without requiring "forgiveness," it is unclear whether the Estate should be paying any administrative claims at this juncture until the Debtors have demonstrated a clear path towards a confirmable plan that complies with the Bankruptcy Code. *See* 11 U.S.C. § 1129(b).

### E.     THE PLAN SEEKS TO RELEASE, EXCULPATE, AND ENJOIN CAUSES OF ACTION AGAINST THE MILLENKAMP FAMILY WITHOUT CONSIDERATION.

15.     Despite the United States Supreme Court's ruling in *Harrington v. Purdue Pharma, L.P.* just four months ago in June 2024, the Plan seeks to grant releases, exculpations, and injunctions to non-debtors, particularly the Millenkamp Family, without any consideration. As Justice Gorsuch noted at the outset of the Supreme Court's opinion in *Harrington v. Purdue Pharma, L.P.*, "beneath th[e] complexity [of the Bankruptcy Code] lies a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors." 144 S. Ct. 2071, 2078 (2024).

16.     In an apparent attempt to disguise the grant of Estate releases to the Millenkamp Family (and other non-debtors), the Plan broadly defines Debtors' Related Parties as "representatives"—which is ambiguous and loose enough to include the Millenkamp Family, and even Mr. David Heida— the Debtors' General Manager who purports to act on behalf of the Debtors on a regular basis.  Plan, § 1.89.  Under the terms of the Plan, the Debtors' Related Parties—which would include so-called "representatives"—are "released, acquitted and discharged by the Debtors on behalf of themselves, their estates, the Reorganized Debtors, **for the good and valuable consideration provided by each of the Released Parties.**" Plan, § 10.1 (emphasis added). Beyond the platitudes of consideration, it is unclear what consideration each of the Released Parties has contributed to the Plan.  Surely, if such non-Debtor parties made such a

contribution, it would be disclosed in the Debtors' Disclosure Statement but there is no mention of any such consideration.

17.    However, the Plan does not stop there as it then attempts an end-run around RAF's contractual and statutory rights against the Millenkamp Family.  As set forth in the Disclosure Statement, the Millenkamp Family are borrowers under the RLOC Facility.  *See* Disclosure Statement, p. 23, n. 2.  Prior to the Petition Date, RAF initiated steps to foreclose upon and sell the equity interests of the Debtors pursuant to Section 9-610 of the Idaho Uniform Commercial Code (the "**UCC-9 Equity Sale**").  In an effort to reach a consensual resolution, RAF postponed the UCC-9 Equity Sale in the hope that the Debtors would fulfill their promise and adequately protect RAF and propose a plan that pays RAF (and other stakeholders) in full.[20]

18.    As noted above, since the commencement of these cases, the Debtors have repeatedly represented their intention to file a 100 cent plan.  Based on those representations, RAF has not sought to enforce its contractual and statutory rights against the non-Debtor Millenkamp Family by continuing with the UCC-9 Equity Sale or otherwise.  However, in the event that RAF is subject to any deficiency on its over-secured claim, RAF fully intends to satisfy such deficiency against the non-Debtor Millenkamp Family, which the Millenkamp Family cannot avoid through the Debtors' Plan, as set forth by the United States Supreme Court in *Harrington*.

19.    Aware of that intent, the Debtors' Plan includes broad exculpation and injunction provisions for the benefit of non-Debtors, including the Millenkamp Family, that would likely bar RAF from pursuing a UCC-9 Equity Sale against the Millenkamp Family to satisfy its deficiency claim.  Again, despite recitations about consideration being given for these protections, there is no

---

[20] The automatic stay does not apply to non-debtors.  *Boucher v. Shaw*, 572 F.3d 1087, 1092 (9th Cir. 2009) ("As a general rule, the automatic stay protects *only* the debtor, property of the debtor or property of the estate. ... The stay 'does not protect non-debtor parties or their property.' ").  Therefore, causes of action against a non-debtor do not implicate the automatic stay, *In re Nilhan Devs., LLC*, 622 B.R. 795, 803 (Bankr. N.D. Ga. 2020), nor does the automatic stay protect the property interests of non-debtors "even if the property in question is stock in the debtor corporation." *In re Advanced Ribbons & Off. Prod., Inc.*, 125 B.R. 259, 263 (9th Cir. BAP 1991) (holding where shareholder pledged stock as security for obligation of the debtor the automatic stay did not prevent foreclosure action against the shareholder's interest).

evidence of any consideration being tendered by the Millenkamp Family, or any other non-Debtor beneficiary, in exchange for the protection of these broad exculpations and injunctions. Exculpation provisions, like releases, likewise may not extend their protections to non-debtors. *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 438 (5th Cir. 2022). Glaringly, unlike *Purdue* where the non-debtor principles offered a $5.5–$6 billion settlement in exchange for their releases (and still were unsuccessful), the Millenkamp Family expects to obtain the benefit of releases, exculpations, and injunctions for no consideration. According to the principals set forth by Justice Gorsuch, the Millenkamp Family must uphold their end of the bankruptcy bargain and place their assets on the table for the benefit their creditors, if they wish to be absolved of their liabilities.

20.    Again, the Debtors' disregard for the Bankruptcy Code at the behest of the Millenkamp Family raises serious concerns. But at the very least, the Debtors' willingness to ignore their duties to their Estates and issue releases, exculpations, and injunctions to the benefit of the Millenkamp Family for no consideration demonstrates that the Plan as constructed does not adequately protect RAF's interests.

### F.    THE PLAN UNFAIRLY DISCRIMINATES AGAINST RAF.

21.    Apart from intercompany claims, of the 36 Classes of stakeholders in the Plan (inclusive of Administrative Claims, Professional fee Claims, Priority Tax Claims, Other Priority Claims and Equity Interests), the only stakeholder that the Debtors attempt to force the receipt of less than a full recovery under the Plan is RAF. *See* Plan, § 3. Indeed, as of the Petition Date, at least $12,842,204 will have been paid out to pre-petition creditors prior to the Petition Date in complete satisfaction of their claims as "adequate protection" payments. *See Plan*, §§ 3.4.2; 3.4.3; 3.4.4; 3.4.6; 3.4.7; 3.4.11; 3.9.2; 3.9.4.

22.    A non-consensual plan of reorganization may only be confirmed if, among other requirements, the plan does not discriminate unfairly. 11 U.S.C. § 1129(b)(1). While not all discrimination is impermissible, discrimination is only authorized if: (1) the discrimination is supported by a reasonable basis, (2) the proposed plan could not be confirmed or consummated without the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree

of discrimination is directly related to its basis. *See In re Ambanc La Mesa*, 115 F.3d at 656. A plan discriminates unfairly if it singles out the holder of some claim or interest for particular treatment. *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994); *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) ("[A] plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes.").

23.     The Plan, as proposed, singles out, in a clear discriminatory manner, RAF as the only party that will not receive a full recovery under the Plan. Indeed, the Debtors propose to pay the professional fees of both MetLife and Conterra, despite Conterra being in a junior position to RAF. Further, as noted above, the Millenkamp Family, which have the lowest priority of all stakeholders, are not only unimpaired but are improving their equity interests at the expense of RAF. Putting the confirmation issue aside, for this and other reasons,[21] the Plan as proposed clearly demonstrates that the Debtors do not intend to adequately protect RAF's oversecured claim, and the Debtors should not be afforded the ability to use cash collateral (or make further draws on the DIP Facility) without further adequate protection.

## III.     **RELIEF REQUESTED**

### A.     **THE DEBTORS MUST PROVIDE ADEQUATE PROTECTION FOR CONTINUED USE OF CASH COLLATERAL**

24.     A debtor may only access cash collateral with the creditor's consent or if the court, after notice and a hearing, finds the creditor is adequately protected and authorizes its use. 11 U.S.C. § 363(c)(2). Absent creditor consent, therefore, the debtor bears the burden to demonstrate that the secured creditor's interest is adequately protected. 11 U.S.C. § 363(e). The general purpose of adequate protection is to ensure that a secured creditor ultimately receives what it would have

---

[21] While jointly administered, the Debtors' cases are actually comprised of ten (10) chapter cases for ten (10) separate legal entities, each of which RAF has a secured claim against for the full amount of the RAF Secured Claim. Upon information and belief, no other pre-petition creditor, including MetLife, has a secured claim against each of these separate Debtor entities. RAF would note that sections 2.2 and 5.5 of the Plan purports to substantively consolidate each of these Debtor entities for purposes of voting and distributions. Plan, §§2.2; 5.5. To the extent that the Court does not terminate exclusivity, as requested herein, RAF would note that the proposed substantive consolidation poses a material obstacle to the approval of the Disclosure Statement and confirmation of the Plan, particularly as the Debtors have provided no articulable basis supporting substantive consolidation.

received had not bankruptcy intervened. "Although stripped of the right to immediate possession of its property, the creditor receives assurances that the value it could have received through foreclosure will not decline." *Security Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 441 (9th Cir. BAP 2004).

25.     Since the Petition Date, the entire premise supporting this Court's prior findings that RAF was adequately protected has been the Debtors' extensive testimony and representations that RAF is "grossly," "extremely," and "wildly" oversecured, as well as numerous assurances that the Debtors would emerge from chapter 11 with a 100 cent plan.[22]  Immediately upon the filing of the Plan, that underlying premise ceased to be true.

26.     The new record set by the Plan with respect to RAF's adequate protection may be summarized as follows:

- The Debtors are seeking to short-pay RAF on its secured claims despite (i) extensive testimony and expert reports showing RAF is over-secured by at least $200 million and an equity cushion of at least 50% and (ii) the Debtors' Liquidation Analysis clearly showing distributable value even after paying the RAF Secured Claim in full. **That is not adequate protection**.

- The illegal releases, exculpations, and injunctions (for no consideration) would prevent RAF from seeking a recovery of deficiency claims against the Millenkamp Family (non-Debtor borrowers) pursuant to a UCC-9 Equity Sale. **That is not adequate protection**.

- The Debtors are proposing to give the Millenkamp Family the equity of the Reorganized Debtors, with a book value of $55 million, for free. **That is not adequate protection**.

- The Debtors have not stated any intention, nor engaged in a process, to sell real estate, steers, or equity to generate proceeds sufficient to satisfy the RAF Secured Claim in full. **That is not adequate protection**.

- Other than RAF, the Debtors are not asking any other creditor to forgive any portion of their claims. **That is not adequate protection**.

---

[22] *See, e.g.,* Transcript of Hearing on April 9, 2024, 264:3-4 (testimony of Ms. Churchill of Kander stating a 130-day exit is the Debtors' intent).

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 17

27.    Should the Debtors be allowed to further pursue confirmation of this Plan (or any plan), it is clear from the Debtors' actions that the next several months will be dominated by additional litigation, further diminution of the value of the Estates, further deterioration of cash flow, and the ultimate failure of the unconfirmable Plan. The Debtors must propose a confirmable plan that provides (as repeatedly promised by the Debtors) payment of RAF's oversecured claim in full. Given the Debtors' own financial reporting, there is simply no legitimate reason for the Debtors not to propose such a plan. RAF and other creditors should not continue to be held hostage to the Debtors' efforts to benefit the Millenkamp Family to the determent of the Estates and stakeholders.

28.    Until that time, the Debtors should not be able to continue to use RAF's cash collateral without additional adequate protection. Specifically, in light of the foregoing, RAF respectfully requests that the Court condition any continued use of cash collateral on the following:

- Interest at the Default Rate. Based on the Plan, the Debtors clearly believe they have sufficient cash resources to justify preferring unsecured creditors and insiders in violation of the absolute priority rule. However, these payments should not be to the detriment of RAF. Specifically, RAF requests that the Court condition any further draws on RAF being paid interest during the pendency of the cases at the default rate.

- Professional Fees. Since the commencement of these chapter 11 cases, RAF has incurred substantial professional fees that have benefited all stakeholders, including the Debtors. RAF is contractually entitled to payment of its professional fees as an oversecured creditor.

- Milestones. Because the Plan is patently unconfirmable, the lack of direction and planning places the entire creditor body at risk and warrants appropriate milestones as a safeguard. The Debtors should be required to file an amended plan of reorganization within 14 days that meets the requirements of the Bankruptcy Code, including payment of the RAF Secured Claim in full. Indeed, the values reflected in the Debtors' Liquidation Analysis and scenarios delivered prior to the filing of the Plan, reveal a viable path to a confirmable plan of reorganization that includes the sale of real estate, personal property, or the sale of equity interests. All of these options remain available and should have been explored as part of the Debtors' fiduciary duties to the Estates throughout the pendency of these bankruptcy cases. The Millenkamp Family's wishes to foist the burden of their own returns to equity should not continue to be foisted upon RAF and the Debtors' Estates.

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 18

59797.0007.17679590.6

**B.    EXCLUSIVITY SHOULD BE TERMINATED**

29.    Section 1121(b) preserves a debtor's exclusive right to file a plan of reorganization only during the first 120 days after the date of the order for relief. Extension to this exclusive period may only be afforded upon a finding of "cause," which should demonstrate that such an extension *will facilitate moving the case forward toward a fair and equitable resolution*.[23] *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. at 453. Thus, exclusivity should not be extended where a debtor cannot demonstrate an actionable and viable path forward; a key requirement which is proof of the probable success of the debtor's reorganization effort. *In re Yellowstone Mt. Club, LLC*, Nos. 08-61570-11, 08-61571-11, 08-61572-11, 08-61573-11, 2009 Bankr. LEXIS 4462, at *15 (Bankr. D. Mont. Feb. 18, 2009).

30.    Mired in these bankruptcy cases for nearly six months, the facts and circumstances of this case viewed through the lens of these relevant factors demonstrate the Debtors' patent inability (or unwillingness) to address their liabilities and satisfy their fiduciary duty to their creditors. Where a debtor cannot demonstrate an ability to confirm a plan of reorganization, exclusivity should not be extended. *In re Corp. Colocation*, No. 2:21-bk-12812-ER, 2022 Bankr. LEXIS 727, at *5 (Bankr. C.D. Cal. Mar. 21, 2022); *In re New Meatco Provisions, LLC*, No. 2:13-bk-22155-PC, 2014 Bankr. LEXIS 914, at *1 (Bankr. C.D. Cal. Mar. 10, 2014).

31.    At minimum, the Debtors must propose a feasible and confirmable plan that complies with the absolute priority rule and provides for the payment in full of the RAF Secured

---

[23] Specifically, courts consider:
(a)    The size and complexity of the case;
(b)    The necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information
(c)    the existence of good faith progress toward reorganization
(d)    the fact that the debtor is paying its bills as they become due
(e)    whether the debtor has demonstrated reasonable prospects for filing a viable plan
(f)    whether the debtor has made progress in negotiations with its creditors
(g)    the amount of time which has elapsed in the case
(h)    whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
(i)    whether an unresolved contingency exists.
*Henry Mayo Newhall*, 282 B.R. at 452 (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997)).

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 19

Claim.  Unless the Debtors can deliver such a plan, other parties should be afforded the opportunity to propose an actionable path forward, and perhaps encourage the Debtors to come forward with their own plan that meets their fiduciary duties to their estates.  *Henry Mayo Newhall*, 282 B.R. at 453 (noting a likely consequence of the denial of an extension of exclusivity is "not that creditor plans will be proposed and approved, but that the threat of such plans will cause the debtor to come forward more quickly than he might otherwise."); *In re Yellowstone Mt. Club, LLC*, 2009 Bankr. LEXIS 4462, at *16 (noting terminating exclusivity will encourage other parties to propose a plan and give creditors a choice about treatment and payment of their claims).

32.     That the Debtors refuse to do so, calls into question whether these cases are being run for the benefit of the Debtors' Estates or for the benefit of the Millenkamp Family. The Estates should not be subjected further to these tactics.  Exclusivity should be terminated to allow additional parties to propose and solicit actionable and confirmable plans of reorganization.  To do otherwise creates a substantial risk of liquidation.

## IV.      CONCLUSION

For the foregoing reasons, RAF respectfully requests the Court (i) condition any further use of cash collateral upon the additional adequate protection requested herein and (ii) terminate the Debtors' exclusivity.

Dated: __10/11/2024__

HAWLEY TROXELL ENNIS & HAWLEY LLP

_____
Sheila R. Schwager, ISB No. 5059
Attorneys for Rabo AgriFinance LLC

Dated: October 11, 2024

NORTON ROSE FULBRIGHT US LLP

__/s/ Andrew J. Schoulder_____
Andrew J. Schoulder, *pro hac vice*
Attorneys for Rabo AgriFinance LLC

RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS'
CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE
EXCLUSIVITY - 20

59797.0007.17679590.6

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of October, 2024, I electronically filed the foregoing RABO AGRIFINANCE LLC'S OBJECTION TO DEBTORS' CONTINUED USE OF CASH COLLATERAL AND MOTION TO TERMINATE EXCLUSIVITY with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| Krystal R. Mikkilineni | krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | tirzah.roussell@dentons.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Jon B. Evans | evans.jb@dorsey.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine Patrice Reynard | janine@averylaw.net |
| Sheila Rae Schwager | sschwager@hawleytroxell.com |
| Brent Russel Wilson | bwilson@hawleytroxell.com |
| Zachary Fairlie | zfairlie@spencerfance.com |
| John O'Brien | jobrien@spencerfane.com |
| Gery W. Edson | gedson@gedson.com |
| Aaron Bell | abell@evanskeane.com |
| Brian Faria | brian@sawtoothlaw.com |
| Robert A. Faucher | rfaucher@hollandhart.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| Karen Lloyd | klloyd@grsm.com |
| James Justin May | jjm@johnsonmaylaw.com |
| Rhett Michael Miller | rmiller@magicvalley.law |
| Robert E. Richards | robert.richards@dentons.com |

59797.0007.17679590.6

Holly Roark                            holly@roarklawboise.com

Evan Thomas Roth                       evan@sawtoothlaw.com

Meredith Leigh Thielbahr               mthielbahr@grsm.com

John F. Kurtz, Jr.                     jfk@kurtzlaw.com

And any others receiving cm/ecf notices


Sheila R. Schwager