Sheila R. Schwager, ISB No. 5059
Brent R. Wilson, ISB No. 8936
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  208.344.6000
Facsimile:  208.954.5261
Email: sschwager@hawleytroxell.com
        bwilson@hawleytroxell.com

Andrew J. Schoulder (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone:  212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com

Attorneys for Rabo AgriFinance LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE, INC.,<br><br>Debtor. | Case No. 24-40158-NGH |
| Filing relates to:<br><br>☒ ALL DEBTORS<br><br>☐ Millenkamp Cattle, Inc.<br><br>☐ Idaho Jersey Girls<br><br>☐ East Valley Cattle<br><br>☐ Millenkamp Properties<br><br>☐ Millenkamp Properties II<br><br>☐ Millenkamp Family | Jointly Administered With Case Nos.:<br><br>24-40159-NGH (Idaho Jersey Girls)<br>24-40160-NGH (East Valley Cattle)<br>24-40161-NGH (Millenkamp Properties)<br>24-40162-NGH (Millenkamp Properties II)<br>24-40163-NGH (Millenkamp Family)<br>24-40164-NGH (Goose Ranch)<br>24-40166-NGH (Black Pine Cattle)<br>24-40167-NGH (Millenkamp Enterprises)<br>24-40165-NGH (Idaho Jersey Girls Jerome<br>            Dairy)<br><br>Chapter 11 Cases |

59797.0007.17884136.1

☐ Goose Ranch

☐ Black Pine Cattle

☐ Millenkamp Enterprises

☐ Idaho Jersey Girls Jerome Dairy

## RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE

Rabo AgriFinance, LLC, in its capacity as agent and lender ("**RAF**"), hereby files this *Motion to Appoint a Chapter 11 Trustee* (the "**Trustee Motion**"), and in support thereof, states as follows:

### I.    PRELIMINARY STATEMENT[1]

1.    On the eve of Thanksgiving, the Debtors provided RAF with a draft of another chapter 11 plan of reorganization (the "**Insider Plan**")[2] that is incapable of being confirmed and does not fulfill the Debtors' obligations under the Bankruptcy Code.  The Insider Plan mirrors the defects of the Original Plan and layers on additional fatal flaws in an attempt to maximize the value of their estates for one stakeholder—Mr. Millenkamp.

2.    If nothing else, the Insider Plan continues to be consistent with the Debtors' history of failing to adequately protect RAF's secured creditor rights and interests.  Over the course of the last 8 months, RAF has procured sworn testimony from Mr. Millenkamp establishing 1) the Debtors' pre-petition conversion of $9 million to collateralize surety bonds;[3] 2) the pre-petition conversion of $250,000 to make a down payment for the purchase of real estate while the RLOC

---

[1]    Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them elsewhere in the Trustee Motion.

[2]    The Insider Plan is attached hereto as Exhibit 3139.  Since the draft Insider Plan is dated December 4, 2024, RAF expects that the Debtors will delay the filing of this plan until the eve of the hearing to consider RAF's Cash Collateral-Exclusivity Response.  As set forth herein, the Insider Plan is germane, and indeed, crystallizes the need for the extraordinary relief requested by this Trustee Motion.  While RAF would have preferred to submit this Trustee Motion with a filed version of the Insider Plan as an exhibit, RAF elected to proceed, as is, in light of the proximity of the hearings on December 10-11 and the need to provide the Court and parties with appropriate notice under the Rules.

[3]    Transcript of Hearing April 9, 2024, 66: 3–23.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 2

Facility had been in maturity default for 8 months;[4] 3) the purchase of six (6) brand new 2024 Dodge Ram pickups for over $296,000,[5] just months prior to the bankruptcy filing and while in material default in payments owed to feed vendors (one of which is personally driven by Mr. Millenkamp);[6] 4) the Debtors' unauthorized purchase and lease of $12 million of equipment on the eve of receivership;[7] and 5) the Debtors' foiled attempt to pay Mr. Millenkamp's personal expenses for his son's wedding as valid administrative expense claims under 11 U.S.C. § 503(b)(9).[8]  Indeed, after this Court denied the Debtors' critical vendor motion and request to pay § 503(b)(9) claimants prior to confirmation of a plan, the Debtors still disregarded this Court's clear unwillingness to permit payments to creditors outside of a plan.  Specifically, on or about July 22, 2024, RAF learned that the Debtors attempted to issue a check, dated, July 19, 2024, to Kenworth Sales Company ("**Kenworth**"), in the amount of $48,677.75 for pre-petition services.  Upon inquiry, RAF was informed by the Debtors that Kenworth was a secured creditor by a possessory lien.  That representation is contrary to the filed schedules.  In any event, nothing under the Bankruptcy Code nor this Court's orders permit the Debtors to pay Kenworth or make any unilateral determination on the payment of pre-petition creditors.  Yet, it appears from the Disclosure Statement for the Original Plan (and the Insider Plan) that the Debtors proceeded with that payment despite the lack of authority under the Bankruptcy Code or from this Court.  This was all described in RAF's *Objection to the Debtors' Motion to Use Cash Collateral and Motion to Terminate Exclusivity*, filed on October 11, 2024, as Dkt. No. 670 ("**Cash Collateral-Exclusivity Response**") and yet was not remedied by the Debtors.

---

4    Transcript of Hearing May 9, 2024, 15:9-20:25; 24:8-13.

5    Notably, Farmers Bank filed, among other claims, Proof of Claim No. 35 in the amount of $294,173.07 for these 2024 Dodge Ram pickups.  Further, according to the Insider Plan, after receiving $933,289.47 in adequate protection payments in respect of total claims of $2,474,927.97 during these cases (none of which were subject to any Court order such as RAF's adequate protection treatment), Farmers Bank will continue to receive approximately $105,706.00 per month until paid in full.

6    Transcript of Hearing May 9, 2024, 52:3–53:16.

7    *See* Creditor CNH Industrial Capital America LLC Objection to Debtor's Emergency Motion for Interim and Final Orders, Dkt. No. 126, at p. 111–115, admitted at Ex. 3037 [Dkt. 288] (attaching as exhibits equipment purchase orders).

8    *See* 503(b)(9) invoices, admitted at Ex. 1032 [Dkt. 444], p. 1310, 1-65:5.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 3

3.      Just as (if not more) troubling, is that the person in control of the Debtors' massive operations, Mr. Millenkamp, has recently been charged with aggravated battery based on allegations that he pushed a person out of a moving vehicle going 45 miles down the road—a felony charge which can lead to fifteen (15) years in prison.[9]  By themselves, these charges raise serious feasibility and adequate protection issues.  It is not just a question of whether Mr. Millenkamp will be around to manage the Debtors, but whether someone subject to these types of criminal charges should be the fiduciary responsible for the operation and protection of RAF's Collateral, valued by the Debtors at $646.343 million.[10]

4.      As highlighted therein, the Debtors have repeatedly assured this Court and the parties in interest that RAF is oversecured and adequately protected by an equity cushion of at least $300 million.[11]  However, the market has spoken and reaffirmed what the Debtors' own expert, Kander LLC admitted — the Debtors can have as large of an equity cushion as imaginable, but that still will not change whether the Debtors can generate sufficient cash flow to service debt.[12]

5.      As described in greater detail below, the Debtors have twice attempted to refinance the RAF Secured Claim — and failed.  This is despite their equity cushion.  These processes entailed, among other things, the retention of two investment bankers, who over a more than two-year time frame, solicited proposals from in excess of 100 parties, including Ag lenders, regional banks, special situation lenders, distressed lenders, parties focused on cash flow lending, and

---

[9] *See* 10.15.24 Criminal Complaint, filed in Case No. CR16-24-05423.  RAF hereby requests that the Court take judicial notice of that certain Criminal Complaint, filed on October 15, 2024, in Case No. CR16-24-05423 and the duly filed Affidavit in Support of Complaint, filed contemporaneously therewith pursuant to Federal Rule of Evidence 201(b).  The Criminal Complaint and supporting Affidavit are attached hereto and incorporated by reference herein as Exhibits 3094 and 3095, respectively.  Federal Rule of Evidence 201(b) provides, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  *See, e.g.*, *Smith v. City of New York*, 2013 WL 6158485, at *1 (S.D.N.Y. Nov. 25, 2013) (allowing judicial notice of arrest reports, criminal complaints, indictments, and criminal disposition data); *see also Lehmann v. Calhoun*, 2016 WL 11410015, at *2 (D. Idaho Mar. 1, 2016) (taking judicial notice of a criminal complaint, among other things, pursuant to FRE 201).

[10] *See* Equity Cushion Analysis, admitted at Ex. 1023.

[11] *See* Equity Cushion Analysis, admitted at Ex. 1023.

[12] Transcript of Hearing May 9, 2024, 114:21-25; 115:1-3 ("Q. Right. And so you could have as large of an equity cushion as imaginable. That's still not going to change whether you can generate sufficient cash flow to service debt, will it? A. No.").

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 4

others.  The results of those processes evidence a lack of sufficient cash flow to support a viable exit strategy as contemplated by Mr. Millenkamp.  In the words of the Debtors' own investment banker, Forbes Group, explaining the reason for the most recent failed process, *"The difficulty continues to be the amount of debt needed to take out the DIP facility and revolver and if cash flow can support that level of debt in a cyclical industry."*[13]  Indeed, Cargill, Inc., one of the Debtors' largest customers withdrew its proposed exit financing term sheet for the Original Plan. And Sandton Capital, the DIP Lender and proposed exit lender for the Insider Plan, is unwilling to commit to a refinancing that would pay RAF in full, on the effective date, consistent with the Debtors' promise and obligation under the Bankruptcy Code.  This outcome, while disappointing, is not a surprise given that the evidence presented at multiple hearings demonstrates that the Debtors are highly over-leveraged and cannot sufficiently cashflow.

6.     Mr. Millenkamp, despite the failed refinancings, has chosen to exacerbate the Debtors' dire financial straits by creating more leverage and recently incurring new loans to purchase four brand new Ram pickups for a total price of $252,560.68.[14]  Then, within the same timeframe, he has the Debtors propose an unprecedented and unconfirmable plan to extend the matured senior secured RLOC Facility, which was admittedly intended by all parties to be a "short term" loan,[15] until 2027 (five years past its Maturity Date), at a lower interest rate than what RAF is currently contractually entitled to, and only after it takes away RAF's senior secured first lien position on the RLOC Personal Property Collateral and second lien position on the Debtors' real estate.

7.     After the Debtors admittedly being unable to refinance their obligations since 2022, despite the assistance of two different investment bankers and substantial equity in the Debtors' assets, the Insider Plan's success hinges on another contingent exit refinance proposal that proposes to repay $5 million of the approximate $96.5 million owing to RAF—materially different

---

[13] The Forbes Report is attached hereto as Exhibit 3134 (emphasis added).

[14] *See* 11.12.24 Email and Notice of Purchase of Vehicles, Ex. 3126.

[15] Transcript of Hearing April 9, 2024, 36:12–37:10; 135:6-17.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 5

from the 100 cent plan that the Debtors have overpromised for 8 months.  Instead of repaying the RAF Secured Claim in full on the effective date, according to the Debtors, the Insider Plan purports to "*provide for a Refinancing Facility in 2027 to pay the Exit Term Loan Facility in full as well as pay the Rabo Allowed Class 5 Secured Claim in full.*"[16]  There is no Refinancing Facility in 2027, let alone a lender to provide such "Refinancing Facility."  Rather, this is simply one among many visionary attempts of the Debtors to mislead unknowing suppliers, vendors, and employees into believing in the Debtors' fictional 100 cent plan.  Indeed, FTI Consulting's analysis of the Debtors' projections shows that the Debtors expect to have the substantially same level of debt in March 2027 as they did on the Petition Date — which they could not support, repay, or refinance:[17]



8.      RAF has proactively agreed to extensions of the exclusivity period to provide the Debtors with the necessary time to obtain exit financing that would refinance the matured RAF Secured Claim, in full, in cash, on the effective date as promised.  Yet, instead of using that eight-month allotted time (double the exclusivity period provided under the Bankruptcy Code) to obtain the promised refinancing, the Debtors wasted that time by filing another plan that is not confirmable on its face while Mr. Millenkamp apparently engaged in further conduct that calls into

---

[16] S*ee* Disclosure Statement for the Insider Plan, attached hereto as Exhibit 3140 (the **"New Disclosure Statement"**) (emphasis added).

[17] *See* FTI Chart as Exhibit 3136.

question his fitness as an estate fiduciary.  In addition, the Debtors' delay in these bankruptcy cases has caused the Sandton DIP loan to closely approach its "Maturity Date" (*see* Exhibit 1029; Dkt. No. 170 (stating it matures 9 months from the closing date)), which will potentially cause the Debtors to incur an "Extension Fee" of 1.50% (approximately $675,000) of the aggregate amount of the "Commitments" under the loan and further burden the estates with additional debt.

9.      In short, Mr. Millenkamp used the Debtors' equity cushion for eight months to support the Debtors' unsupportable contention that a refinancing was feasible and RAF was adequately protected.  If the equity cushion had truly been adequate protection, the Insider Plan would be now seeking to monetize its value for the benefit of all stakeholders once it was determined it could not facilitate a refinancing of the RAF Secured Claim and DIP Facility. However, the moment the failure to refinance was revealed, Mr. Millenkamp pivoted to keeping that equity cushion for himself through a plan that is full of  "self-dealing."

10.     In particular, the Insider Plan is patently incapable of being confirmed in that it:

- Reinstates the equity interests of Mr. Millenkamp, his wife, and related trusts for no consideration and without any independent marketing process;[18]
- Grants releases and exculpations for the benefit of Mr. Millenkamp, his wife, and related trusts for no consideration and without any independent evaluation of potential causes of action against them;[19]
- Seeks to now cram-up the RAF Secured Claim in respect of a loan that matured 22 months prior to the Petition Date through an unconventional and non-consensual subordination of RAF's first priority liens on personal property and second priority lien on real estate;[20]
- Ignores the Debtors' cumulative negative leveraged cash flow as further discussed in paragraphs 43 - 45, below;[21]
- Proposes to emerge from chapter 11 with more leverage than what existed prior to the Petition Date;[22] and

---

[18] *See* Insider Plan, § 3.12(b)

[19] *See* Insider Plan §§ 10.1-10.2.

[20] *See* New Disclosure Statement, III(L), page 40 ("The Exit Term Loan Facility shall be secured by a first priority lien and security interest in all of the existing and after-acquired real property and personal property assets, tangible and intangible of the Borrowers . . .").

[21] *See* Exhibit 3138.

[22] *See* Exhibit 3138.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 7

- Continues to place the operation of the Debtors' businesses and protection of RAF's Collateral, valued by the Debtors at $646.343 million[23], in the hands of Mr. Millenkamp, who is at risk of being incarcerated on charges of felony battery and misdemeanor false imprisonment.[24]

11.    Despite the oversight of this Court, the U.S. Trustee's Office, and an Official Committee of Unsecured Creditors, Mr. Millenkamp has utilized these chapter 11 cases principally for his personal benefit, and not for the benefit of the Debtors' estates and creditors. To allow the continued course to remain in place, without immediately addressing the over-leverage and breach of fiduciary duty issues, will hurt the Debtors and their estates.  Given the terms of the Insider Plan and related support, it is clear that the Debtors' current management is unwilling to address those issues; warranting the appointment of a chapter 11 Trustee.

12.    Section 1104(a) (1) and (2) mandates the appointment of a chapter 11 trustee where cause exists, including where there is evidence of gross mismanagement and conflicts of interest, or when doing so is in best interest of creditors.

13.    The Debtors' own Liquidation Analysis evidences that the $348,296,000 of Estimated Liquidation Proceeds (Dark) would be more than sufficient to pay, in full, the Debtors' $327,506,000 of secured claims, including the full amount of the RAF Secured Claim.[25]  Instead, the Debtors have proposed a visionary scheme that ignores the fact that the Debtors can pay RAF pursuant to a confirmable plan as required by the Bankruptcy Code through the sale of real estate, livestock, an infusion of equity, or a combination thereof.  To date, the Debtors have refused to solicit realistic proposals for such an outcome.  Instead, the Debtors have engaged in a process engineered to result in Mr. Millenkamp retaining his equity (for no consideration) and impairing creditors (with no legal basis).  By the Insider Plan, the Debtors continue to ignore the Bankruptcy Code's requirements and are once again attempting to burden creditors to benefit Mr. Millenkamp. Allowing the Debtors to stay on their current track and seek confirmation of a patently

---

[23] See Equity Cushion Analysis, admitted at Ex. 1023.

[24] See Exhibits 3094 and 3095.

[25] See Liquidation Analysis, Ex. 3099 (Dkt. No. 340-2).

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 8

unconfirmable plan serves no purpose other than to increase the Debtors' liabilities, delay payment to creditors, and further deteriorate the Debtors' assets.[26]

14. RAF respectfully submits that the Debtors, under the auspices of a chapter 11 trustee, will have an opportunity to preserve current value and provide future income to all stakeholders—just under different control independent of Mr. Millenkamp. As a fiduciary, a chapter 11 trustee would, presumably, explore all available options, including a sale of the Debtors as a going concern to a new purchaser with the wherewithal to infuse new capital in the Debtors to address their debt, preserve jobs for the community, and pay suppliers and vendors in a timely manner. In contrast, Mr. Millenkamp has effectively commandeered the Debtors and their assets for his personal benefit and refused to pursue any alternative that does not preserve his equity.

15. Until independent management is installed to act for the benefit of all stakeholders, Mr. Millenkamp's self-serving strategy will continue, resulting in a dark dairy under the oversight of a chapter 7 trustee.[27] The appointment of a chapter 11 trustee is the least invasive means by which this Court can protect the interests of all stakeholders, including creditors, suppliers, customers, employees, livestock, and even shareholders. There is still time to preserve the value of the Debtors' estates for the benefit of all stakeholders, but action is needed immediately to do so. Accordingly, RAF respectfully requests that this Court appoint an independent chapter 11 trustee pursuant to § 1104(a)(1) and (a)(2) to oversee the Debtors' estates and pursue a value maximizing sale for the benefit of all stakeholders.

---

[26] Under the Sandton exit proposal, the Debtors are seeking to pay Sandton Capital an additional $2.250 million as a "Break-Up Fee" if the Insider Plan is not confirmed for any reason. *See* Term Sheet, attached hereto as Exhibit 3137. Through this Trustee Motion and the Cash Collateral-Exclusivity Response, RAF has already identified numerous flaws that would prevent the Insider Plan from being confirmed today. If the Debtors' estates are allowed to procced to confirmation with the Insider Plan in spite of that knowledge, the Debtors will be guaranteeing a $2.250 million payment for Sandton Capital.

[27] It should be noted, as further support for the appointment of a chapter 11 trustee, cause exists for the conversion of these cases under 11 U.S.C. § 1112(b) which, provides, in relevant part, that "on request of a party in interest . . . the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause." 11 U.S.C. § 1112(b)(l). Since there are equally valid grounds to convert these cases to chapter 7 pursuant to § 1112(b), and RAF is requesting the least extraordinary of the available remedies, RAF submits that the appointment of a chapter 11 trustee is fair, equitable, and in the best interest of the bankruptcy estates

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 9

## II.    JURISDICTION, VENUE, AND AUTHORITY

16.    This Court has jurisdiction over this Trustee Motion pursuant to 28 U.S.C. §1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  In addition, RAF consents to the entry of a final order by this Court on the Trustee Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments on the Trustee Motion consistent with Article III of the U.S. Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief requested herein is 11 U.S.C. § 1104(a)(1) and (2) and Federal Rule of Bankruptcy Procedure 2007.1.

## III.    BACKGROUND

17.    On or about April 21, 2021, the Debtors and certain non-Debtor affiliates—including William "Bill" Millenkamp and Susan "Susie" Millenkamp ("**Millenkamp Insiders**")—executed and delivered to RAF, as agent for the secured lenders, that certain Third Amended and Restated Loan and Security Agreement, consisting of, *inter alia*, a loan in the original principal sum of $91,000,000 (as further amended, the "**RLOC Agreement**" and, together with all notes and other documents evidencing or related to the loan, each as amended, the "**RLOC Documents**" and the related credit facility, the "**RLOC Facility**"), which provided the Debtors with financing to support their dairy operations.  Under the RLOC Facility, the Debtors granted to RAF, as agent, a security interest in and to substantially all of the Debtors' (and certain of their affiliates') personal property, excluding their real property (the "**RLOC Personal Property**"), but including, among other interests, all General Intangibles, Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and notably, the Debtors' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Debtors' milk and other dairy products.

18.    On June 1, 2022, the RLOC Facility matured and the Maturity Date (as defined in the RLOC Documents) occurred.  Despite not being repaid, RAF continued to work with the Debtors toward a consensual solution.  Effective October 20, 2022, RAF granted a long-term forbearance that provided in excess of eight (8) months of breathing room for the Debtors to

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 10

obtain a refinance ("**Forbearance Agreement**") as promised by the Debtors. Pursuant to the Forbearance Agreement, the Debtors granted RAF, among other things, a second priority lien on substantially all of their real estate as consideration for the long-term forbearance (together with the RLOC Personal Property Collateral, the "**RLOC Collateral**" or the "**Collateral**"). On July 1, 2023, the Forbearance Agreement expired by its terms after the Debtors failed to refinance the RLOC Facility. The Debtors offered no alternative plans for addressing the matured loan. Nevertheless, RAF did not terminate the Forbearance Agreement. Instead, RAF continued to support the Debtors' efforts in reliance of the Debtors' representations that a commitment from a reputable agribusiness lender was imminent. After discovering the Debtors' undisclosed conversion of cattle sale proceeds, on August 14, 2023, RAF terminated the Forbearance Agreement.

19.     On January 22, 2024, RAF commenced the Receivership Action against each of the Debtors and certain of their non-Debtor affiliates, including the Millenkamp Insiders.[28] Thereafter, the State Court entered the *Order Appointing Receiver* (the "**Receivership Order**") upon stipulation between the Debtors and RAF and after finding grounds for the Receiver's appointment under Idaho Code § 8-601A(2).

20.     On April 2, 2024 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for chapter 11. On June 7, 2024, RAF filed Proof of Claim 97, evidencing a secured claim of $96,143,211.38, as of the Petition Date. On November 25, 2024, RAF filed an amendment to Proof of Claim 97-1, evidencing a secured claim as of October 31, 2024, of $96,469,917.04 (the "**RAF Secured Claim**").

## IV.     BASIS FOR RELIEF TO APPOINT CHAPTER 11 TRUSTEE

21.     Chapter 11 is designed to allow a debtor-in-possession to retain control of the debtor's business operations provided that current management "can be depended upon to carry

---

[28] A more detailed explanation of the events leading up to the Petition Date is set forth in the *Verified Petition for Appointment of Receiver* (the "**Verified Petition**") filed in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada (the "**State Court**") under case number CV01-24-01156 (the "**Receivership Action**").

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE** - 11

out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).  It is well established, however, that a debtor-in-possession owes fiduciary duties to the bankruptcy estate and must, among other things, operate and preserve property for the benefit of its creditors and "refrain [] from acting in a manner which could damage the estate, or hinder a successful reorganization of the business." *In re Ionosphere Clubs, Inc*., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (quoting *In re Sharon Steel Corp*., 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989)); *see also In re Hartland MMI, LLC*, No. 20-12409-MKN, 2020 Bankr. LEXIS 2263, at *7 (Bankr. D. Nev. Aug. 20, 2020) (debtor-in-possession has a fiduciary duty to all creditors of the estate rather than to its officers, managers, shareholders, or members).  If a debtor-in-possession defaults in that respect, then alternative management should be appointed in the form of a chapter 11 trustee.  *See Fukutomi v. United States Tr. (In re Bibo, Inc)*, 76 F.3d 256, 257-58 (9th Cir. 1996) (affirming the bankruptcy court's *sua sponte* appointment of a chapter 11 trustee when the bankruptcy court determined, among other things "that the actions of Robert Fukutomi as principal of the debtor-in-possession have been in the best interest only of his own financial gain and that of his family members and not for the benefit of creditors . . . . It is abundantly clear to this Court that the interests of creditors are not being promoted by Robert Fukutomi's management of this debtor"); *In re Tel-Net Hawaii, Inc*., 105 B.R. 594, 595 (Bankr. D. Haw. 1989) ("conflicting interests preclude the proper and effective operations of Debtor and dictate the appointment of an impartial trustee") (citing *In re Cohoes Industrial Terminal, Inc.,* 65 B.R. 918, 922 (Bankr. S.D.N.Y. 1986) ("where the debtor's president and his wife had varying interests relating to debtor's assets [they were] in no position to exercise undivided loyalty to the rights of all interested parties")).

22.    Section 1104 provides that the Court "shall order the appointment of a trustee (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management . . . [or] (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate . . . ."  *See* 11 U.S.C. § 1104(a)(1) and (2); *see also In re North*, 212 F. App'x 626, 626 (9th Cir. 2006); *In re Cajun Elec.*

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 12

*Power Coop.*, 191 B.R. 659, 661 (Bankr. D. La. 1995), *aff'd*, 74 F.3d 599 (5th Cir.), *cert denied*, 519 U.S. 808 (1996).  By employing the word "shall," § 1104 mandates the appointment of a trustee upon a showing of "cause" <u>or</u> where evidence demonstrates that the appointment is in the interests of the parties.  *In re V. Savino Oil & Heating Co. Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) (once the court has found that cause exists under § 1104(a)(1) there is no discretion; an independent trustee must be appointed).

23.    For "cause" to be present, the Court is not required to find "fraud, dishonesty, incompetence, or gross mismanagement."  Those types of cause specifically enumerated in section 1104(a)(1), are merely illustrative, rather than exhaustive.  *See* 11 U.S.C. § 102(3) (stating that the terms "includes" and "including" are not limiting); *see also In re Casco Bay Lines, Inc.*, 17 B.R. 946, 950 n.4 (1st Cir. BAP 1982) (noting that appellants who substituted the phrase "in the nature of," for the Code's expansive use of the word "including" erroneously attempted to limit the available factors constituting cause).  In addition to fraud and gross mismanagement, courts have found that conflicts of interest, continuing losses, and acrimonious relationships between management and creditors is cause to appoint a chapter 11 trustee.  *See In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *6 (Bankr. N.D. Tex. Mar. 14, 2008).

24.    Here, caselaw suggests it is critical for the Court to consider under § 1104(a)(1) the "sole question" of "whether the acts or omissions of current management, whether committed before or after filing the Chapter 11 petition, supply the 'cause' . . . to trigger the appointment of a trustee." *V. Savino Oil & Heating Co., Inc.*, 99 B.R. at 526.

25.    Alternatively, this Court's discretion to appoint a trustee in this case is even broader under § 1104(a)(2).  Under § 1104(a)(2), the Court has the discretion to appoint a trustee to address the "interests of the creditors, [ ] and other interests of the estate" even if no cause exists. *In re Minesen Co.*, No. 19-00849, 2022 Bankr. LEXIS 2786, at *3 (Bankr. D. Haw. Oct. 3, 2022) (it is not necessary to find fault on the part of the debtor to appoint a chapter 11 trustee pursuant to subsection (a)(2)); *In re Sharon Steel Corp.*, 871 F.2d at 1228-29.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 13

26.     In making the determination of whether to exercise their equitable powers to appoint a trustee under § 1104(a)(2), courts "look to the practical realities and necessities inescapably involved in reconciling competing interests." *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980); *see also In re Sharon Steel Corp.*, 86 B.R. at 457; *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. at 527 n.11 ("[F]actors constituting a basis for appointment of a trustee under § 1104(a)(2) are amorphous, diverse and necessarily involve a great deal of judicial discretion."); *In re SunCruz Casinos, LLC*, 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003) (noting the "cost/benefit analysis is particularly germane to a Court's exercise of its broad discretion to appoint a trustee under section 1104(a)(2)").  Under applicable caselaw, appointment of a trustee should be strongly considered under § 1104(a)(2) when a reorganization is not possible and a debtor's principal "may be motivated to protect his own interests rather than the interests of creditors." *Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016); *In re Nautilus of New Mexico, Inc.*, 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (finding cause to appoint trustee where debtor's principal and acting manager was incapable of performing fiduciary duties).

27.     In general, however, in deciding motions brought pursuant to section 1104(a)(2), courts consider the following factors:

> (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence or lack thereof of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

*In re Ionosphere Clubs, Inc.*, 113 B.R. at 169 (internal citations omitted); *In re Cajun Elec. Power Coop.*, 191 B.R. at 661-662.  Hence, "[d]eterminations made pursuant to § 1104 of the Bankruptcy Code are fact intensive[,]" and the court has "particularly wide discretion" under § 1104(a)(2), specifically.  *In re Bellevue Place Assocs.*, 171 B.R. 615, 621 (Bankr. N.D. Ill. 1994).  Furthermore, "[s]ection 1104(a) represents a potentially important protection that courts should not lightly

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE** - 14

disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re V. Savino Oil & Heating Co*., 99 B.R. at 525.

28.     In this instance, for the reasons discussed herein, all of these factors weigh heavily in favor of the appointment of a chapter 11 trustee.  In particular, it has become abundantly clear, through two failed refinancing processes, that the Debtors' levered cash flow is a material risk to the future viability of the Debtors' estates.  Indeed, after 8 months of incurring expenses pursuing a refinancing process for a 100 cent plan, even Sandton Capital is unwilling to take the risk given that the proposed exit facility is limited to $45 million and not even close to the full amount needed by the Debtors to fulfill the promised repayment of the RAF Secured Claim in full and funding of a confirmable plan.

29.     Further, as set forth herein, the Debtors' management is neither willing nor capable of managing the Debtors' estates in a manner consistent with their fiduciary duties to creditors. *See, e.g.*, *In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) ("An independent trustee should be appointed under §1104(a)(2) when [management] suffers from material conflicts of interest, and cannot be counted on to conduct independent investigations of questionable transactions in which they were involved.").  In addition, the Debtors have not provided confidence of being able to propose a confirmable plan given the patent defects in the Original Plan and the Insider Plan.  *See In re Hotel Assocs., Inc*., 3 B.R. at 345 (stating that "because the only chance for the unsecured creditors of the debtor to receive any payment on their claims [was] a successful reorganization and because the present plan [did] not appear to be the panacea that all had hoped for, there [was] a need for the proposal of a plan by a person other than the debtor and such a need [was] a justification for the appointment of a trustee under Section 1104(a)(2)").

30.     For the reasons set forth herein and RAF's Cash Collateral-Exclusivity Response (as supplemented), which is incorporated herein by reference, RAF respectfully submits that ample cause exists in light of (a) the historical and current gross mismanagement and bad acts; (b)

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 15

historical and continued negative levered cash flow; and (c) the conflicts of interest and fiduciary breaches.

### V. CAUSE FOR RELIEF REQUESTED

31.     Despite multiple promises and stated confidence over several years of the Debtors being able to refinance the matured RAF RLOC Facility, the Debtors have not been able to obtain financing sufficient to pay off the outstanding obligations.  During the past twenty-nine (29) months, the Debtors have been grossly mismanaged and there have been numerous instances of blatant conversion and breaches of fiduciary duties.  The Debtors have been given multiple opportunities to fulfill their fiduciary duties to their stakeholders, but have squandered them at the behest of and for the benefit of their controlling shareholders—the Millenkamp Insiders—who also occupy and control through the titles of President, Secretary and Board Directors.[29]

### A.     Gross Mismanagement and Bad Acts

32.     Prior to the Petition Date, neither loan agreements, forbearance agreements, the State Court judge, nor court-appointed Receiver were able to compel the Debtors and their principals into compliance with their legal or contractual obligations.  Many of the prepetition transgressions were only uncovered post-petition after being disclosed in the Debtors' Schedules and Statement of Financial Affairs and other filings with this Court.  Based on previously known bad acts and those uncovered through these cases, there is ample cause for the relief requested herein.  Namely, among other things,

- on or about August 9, 2021, the Debtors converted approximately $9 million of RAF's cash to collateralize surety bonds,[30]

- on February 16, 2023, while operating under the Forbearance Agreement, the Debtors converted and did not disclose a down payment of $250,000 for the potential purchase of $50 million of real estate to expand their operations despite being in default of many of their obligations, including the matured RAF RLOC Facility;[31]

---

[29] *See* Corporate Resolutions, Ex. 3127.

[30] Transcript of Hearing April 9, 2024, 66: 3–23 ("Q. Do you see that you had agreed that you had unauthorized transfer to an encumbrance by Argonaut Insurance Company of approximately $9 million called the transfer assets pursuant to the control agreement dated August 9, 2021. Do you see that? A. Yes. Q. So does that refresh your memory that there was a transfer default under the terms of the forbearance agreement that you signed? A. Yes.").

[31] Transcript of Hearing May 9, 2024, 15:9-20:25; 24:8-13.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 16

- on August 10, 2023, the Debtors revealed that they had been converting cash collateral from the sale of livestock and using those proceeds in violation of the RLOC Documents;[32] and

- prior to the Receivership, the Debtors purchased 6 brand new 2024 Dodge Ram pickups (one of which is personally driven by Mr. Millenkamp), through a loan in excess of $280,000, despite being over-leveraged and in default to feed vendors and the matured RAF RLOC Facility.[33]

33.     The issues caused by the Debtors' pre-petition conversion and bad acts were compounded by the Debtors' disregard for managing their businesses in a financially responsible manner.  At the outset of these chapter 11 cases, the Receiver shared the following observations of the Debtors' financial controls in his testimony before this Court:

> Q. In your review and oversight as a receiver, did you believe that the debtors were financially acting as if they were insolvent?
> A. No.
> Q. Why is that?
> A. Well, as a turnaround professional, I'm taught that when a company enters into the zone of insolvency, its fiduciary duties change.  The debtor becomes obligated to act on behalf of the interests of the creditors of the estate rather than the equity holders for example.  And Millenkamp was very in growth mode.  Millenkamp was ordering new tractors.  He was committing to custom farmers to farm and plant and cultivate a 2024 crop.  It was - - any efforts that the receiver made to bring cash into the business such as selling nonperforming assets were met with resistance and that's not typical for a borrower that's in an insolvent situation.
> Q.  Did you see expenses incurred- - just regular expenses being incurred that you would not normally see in an insolvent situation?
> A. Yes.
> Q.  And what were those?
> A.  The debtor's facilities were beautiful.  They're white lapped-side dairy facilities, tile floors, beautiful kitchens, and we observed that windows were being washed three times a week in those facilities.  The janitors were constantly cleaning the facilities.  There were graders several times a week grading the parking lots of the operations to keep things smooth.  Typically

---

[32] *See* August 11, 2023 email from Borrower ("**August 11 Conversion Email**"), Ex. 3009.

[33] Transcript of Hearing May 9, 2024, 52:3–53:16; Proof of Claim No. 35 in the amount of $294,173.07 for these 2024 Dodge Ram pickups.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 17

> in a situation like this, I see companies seek to look for ways to save money,
> to pare back their expense structure.  I didn't see that here.

Ex. 3042, April 10, 2024 Hr'g Tr. 33:10-34:7.  The issues being raised herein are not isolated to these chapter 11 cases and this Court.  The veracity of the Receiver's testimony to this Court was tested by another trier of fact—the State Court, a few weeks prior to the Petition Date.  On March 20, 2024, faced with a similar pattern of behavior for the disregard of inconvenient laws, the State Court was required, upon an emergency motion of the Receiver, to order and direct the Debtors to cease violating and comply with the State Court's prior orders requiring the Debtors to provide the Receiver with access and control over their bank accounts, records, and the Debtors' facilities.[34]

34.     Initially, RAF hoped that the Debtors (while in chapter 11) would comply with their obligations under the oversight of this Court, the U.S. Trustee's office, and the Official Committee of Unsecured Creditors.  That has not been the case.  Indeed, when asked what expenses he reduced in his operating budget going forward, Mr. Millenkamp testified flippantly that his only attempt was to reduce "soap" and window washing from 3 days a week to 2 days.[35]  Mr. Millenkamp further testified that the "rule of thumb is the cows don't know what your financial statements are. We run the business the same, same feed.  We don't defer maintenance.  We try to stay the course."[36]

35.     Yet, the rule of thumb to stay the course has resulted in the Debtors historically being unable to generate enough cash flow to support operations and service debt, which has continued during the pendency of these cases.  And while the cows do not know what the Debtors' financial statements are, the Debtors' current secured lenders and prospective replacement lenders certainly are very aware of the Debtors' financial statements and the historical and present over-levered cash flow evidenced therein.

---

[34] *See* Order Appointing Receiver, filed February 16, 2024, admitted Ex. 3020.

[35] *See* Ex. 3092,  May 9, 2024, Hr'g Tr. 39:11-41:13.

[36] Transcript of Hearing May 9, 2024, 40:23–25.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE** - 18

36.     If nothing else, the Debtors' rule of thumb has resulted in consistent mismanagement.  Similar to the Debtors' undisclosed and unilateral decision to purchase 6 new pickups on the eve of receivership for approximately $280,000, on or about November 6, 2024, the Debtors purchased 4 additional new pickups for a significant purchase price of $252,560.68.[37] To put this purchase decision in perspective, on September 30, 2024, the Debtors filed a chapter 11 plan of reorganization (Dkt. No. 641) (the "**Original Plan**") premised on a non-binding exit financing term sheet from Cargill Inc. that was still insufficient to repay RAF's secured claim in full without imposing a non-consensual "forgiveness obligation." [38] Yet, despite this material shortfall in the ability to repay the RAF Secured Claim in full, the Debtors thought it prudent to purchase $252,560.68 of new pickup trucks on their already extended credit.  And now, the Debtors' latest plan is premised on another non-binding exit financing term sheet—this time for a loan that is at least 60% less than the proposal from Cargill—with the Debtors proposing to impermissibly cram-up RAF's Secured Claim in order for the Millenkamp Insiders to retain their equity interests for free.

37.     Further, on May 20, 2024, the Debtors filed their *Amended Motion for Allowance and Payment of Section 503(b)(9) Claims*, (Dkt. No. 308) (the "**Amended 503(b)(9) Motion**") in which they sought to allow and pay, prior to confirmation of a plan, $5,815,545.00 pursuant to § 503(b)(9) (the "**Original 503(b)(9) Claims**").  Only after RAF invested significant resources to identify material issues with respect to the validity of the Original 503(b)(9) Claims, leading to the filing of *RAF's Limited Objection to Debtors' Amended Motion for Allowance and Payment of Section 503(B)(9) Claims*, (Dkt. No. 373), did the Debtors actually admit the invalidity of many of the claims, resulting in a reduction of the proposed administrative claim amount by $644,698.44.[39]

---

[37] *See* 11.12.24 Email and Notice of Purchase of Vehicles, Ex. 3126.

[38] *See* Cash Collateral-Exclusivity Response ¶ 5–8.

[39] *Order on Debtors' Motion to Amend Order on amended Motion to Allow and Pay 503(B)(9) Claims*, (Dkt. No. 584).

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 19

38.    The Debtors' proffer of $644,698.44 of claims for treatment under Section 503(b)(9) was not simply a typo or scrivener's error.  On May 8, 2024, Mr. Millenkamp provided hours of extensive sworn testimony validating each of the Original 503(b)(9) Claims as satisfying the standards under § 503(b)(9).[40]  Moreover, of the $644,698.44 of claims at issue, the Debtors included an invoice for $8,460 in respect of personal wedding expenses for Mr. Millenkamp's son.[41] That was not a simple oversight where the invoice specifically referenced "wedding."[42] Indeed, after this Court denied the Debtors' critical vendor motion and request to pay § 503(b)(9) claimants prior to confirmation of a plan, the Debtors still breached their duties and obligations by disregarding this Court's clear unwillingness to permit payments to creditors outside of a plan, as the evidence will show at the upcoming hearing.  *See supra* ¶ 2 (discussing Debtors' unauthorized payments to Kenworth for pre-petition services).

39.    As discussed in further detail below, the Debtors' gross mismanagement will only further deplete the Debtors' estates if the Debtors are allowed to pursue a plan that is patently incapable of being confirmed.  This is not the typical scenario where the Debtors simply need additional time to negotiate some discreet plan issues.  As discussed below, despite having eight (8) months to propose a feasible plan supported by sufficient funding, the Debtors have proposed a plan that is fatally defective on multiple levels.

**B.    Inability to Generate Positive Leveraged Cash Flow**

40.    The continuing losses to the estates and the Debtors' inability to stem these losses warrant the appointment of a chapter 11 trustee.  *See In re Ionosphere Clubs, Inc.*, 113 B.R. at 170 ("the continuing enormous operating losses being sustained by the estate, mandate that this Court order the appointment of a trustee 'for cause, including . . . incompetence' under Code § 1104(a)(1) . . . The magnitude of the Debtors' losses together with the Debtors' inability to make reliable forecasts, even over a short period of time, supports a finding that [Debtors'] owner manager, as

---

[40] Transcript of Hearing May 8, 2024, 175:4-219:13.

[41] Transcript of Hearing June 20, 2024, 64:1–65:1.

[42] *See* 503(b)(9) invoices, admitted at Ex. 1032 [Dkt. 444], p. 1310.

personified by the Chairman of the Board of both the parent and the Debtor, is not competent to reorganize this estate.").

41.    Early in these cases, through the testimony of Mr. Daniel Kokini, a Senior Managing Director of FTI Consulting, RAF provided uncontroverted evidence that the Debtors' historical cash flow could not satisfy their debt burden.[43] Mr. Kokini's testimony was supported by financial analysis, created from the Debtors' own information, demonstrating the Debtors' inability to generate enough cash flow to service their historical debt as reported in their financials (the "**Historical Levered Negative Cash Flow**"):[44]

| ($ in thousands) | FY21 | FY22 | FY23 |
|---|---|---|---|
| **Est. Current Debt Service:** | | | |
| Est. Current Debt Service | $28,923 | $28,923 | $28,923 |
| **Total Est. Current Debt Service** | **$28,923** | **$28,923** | **$28,923** |
| | | | |
| **Operating Cash Flow Incl. Historical Debt Service** | **($22,111)** | **($17,517)** | **($10,675)** |

42.    The foregoing analysis centered on the Debtors' pre-petition debt burden and cash flow. When asked what the inclusion of the Sandton DIP financing would do, Mr. Kokini testified that the inclusion of such debt would make the situation worse.[45] Indeed, Mr. Kokini testified that, "it would be very hard to refinance this full capital structure" because "it's unlikely that any new lender would want to step into this amount of leverage that points to at best stressed nature – stressed business if not distressed" and that the Sandton proposal would "just make it harder to pay off the already matured RLOC."[46]

43.    If nothing else, the prior eight (8) months have provided an opportunity to evaluate actual cash flow performance relative to the Historical Levered Negative Cash Flow. On a conservative basis, before even accounting for any incremental pre-petition debt service costs (such as amortization and default interest that is not currently being paid) FTI's analysis for the

---

[43] Transcript of Hearing April 9, 2024, 136:18–23.

[44]  *See* FTI Cash Flow Analysis, admitted at Ex. 3058.

[45] Transcript of Hearing April 10, 2024, 67:6–68:20.

[46] Transcript of Hearing April 10, 2024, 67:11–12, 14–16.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 21

adjusted actual leveraged cash flow during the pendency of these cases is as follows (the "**Base Chapter 11 Negative Levered Cash Flow**"):[47]

| ($ in thousands) | | Total | Adj. Total |
|---|---|---|---|
| | *Beg. Date* | 2-Apr | 2-Apr |
| | *End Date* | 17-Nov | 17-Nov |
| **Base Ch. 11 Levered Cash Flow** | | **($1,967)** | **($6,760)** |

44.    After adjusting the Base Chapter 11 Negative Levered Cash Flow, to reflect the impact of the Debtors' fulfilling their contractual obligations to make amortization payments not currently being paid to MetLife and default interest not currently being paid to MetLife, RAF, and Conterra, the Debtors' levered negative cash flow worsens (the "**Base Chapter 11 Negative Levered Cash Flow with Contractual Terms**"):[48]

| ($ in thousands) | | Total | Adj. Total |
|---|---|---|---|
| | *Beg. Date* | 2-Apr | 2-Apr |
| | *End Date* | 17-Nov | 17-Nov |
| **Base Ch. 11 Levered Cash Flow with Contractual Costs** | | **($21,515)** | **($26,308)** |

45.    To fully appreciate the Debtors' levered cash flow, FTI analyzed the Debtors' cash flow for the prior eight (8) months utilizing the Debtors' assumptions for the post-effective date debt service with respect to MetLife and Conterra, while using sensitized assumptions for RAF debt service to reflect that, to be confirmable, the Insider Plan would need to pay RAF, at minimum, at the current contractual default rate under the RLOC Facility (the "**Base Chapter 11 Negative Levered Cash Flow at POR Terms**") (together, with the Base Chapter 11 Negative Levered Cash Flow and Base Chapter 11 Negative Levered Cash Flow with Contractual Terms, "**Levered Negative Cash Flow**"):[49]

---

[47] The below is an abridged version of the complete analysis in Exhibit 3138, p. 1, attached hereto.

[48] The below is an abridged version of the complete analysis in Exhibit 3138, p. 2, attached hereto.

[49] The below is an abridged version of the complete analysis in Exhibit 3138, p. 3, attached hereto.

| *($ in thousands)* | | Total | Adj. Total |
|---|---|---|---|
| | *Beg. Date* | 2-Apr | 2-Apr |
| | *End Date* | 17-Nov | 17-Nov |
| **Base Ch. 11 Levered Cash Flow at POR Terms** | | **($10,494)** | **($15,287)** |

46. Notably, even with robust milk and cattle prices, under each scenario, the Debtors' financial situation is untenable, and by itself, warrants the appointment of a chapter 11 trustee. *In re Ionosphere Clubs, Inc.*, 113 B.R. at 170 (finding that operating losses sustained by the estate mandated the appointment of a trustee for cause).

47. To put the Levered Negative Cash Flow in better perspective, on two (2) separate occasions, the Debtors attempted to increase their indebtedness under the DIP Financing— the first time, seeking to draw the entire $45 million, (Dkt. No. 24), and the second time seeking to increase borrowings to $33.5 million, (Dkt. No 378). RAF, at its expense, was the only stakeholder that opposed each of these requests to increase the Debtors' leverage and limit additional borrowings to their current level of approximately $18.5 million. If RAF had not opposed each of the Debtors' requests to incur more debt, the Debtors' situation and their Levered Negative Cash Flow would be far more dire.

## C.   Breach of Fiduciary Duties and Conflicts of Interest

48. The Millenkamp Insiders occupy every seat with authority to direct the Debtors— (i) Mr. Millenkamp and his wife hold, directly or indirectly through trusts controlled by the Millenkamp Insiders, 100% of the equity or membership interests in the Debtors; (ii) the Millenkamp Insiders are the sole board members for the Debtors; and (iii) Mr. Millenkamp controls every aspect of the Debtors' operations.[50]

49. An insolvent debtor's first and foremost duty, however, is its fiduciary duty to its creditors.[51] *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994); *In re Murrell*,

---

[50] *See* Corporate Resolutions, Ex. 3127.

[51] That fiduciary responsibility also rests with bankruptcy counsel for the debtor in possession. *Hong v. Liu (In re Liu)*, No. 8:19-CV-00131-JLS, 2020 U.S. Dist. LEXIS 169725, at *5-6 (C.D. Cal. Sep. 14, 2020); *In re Perez*, 30 F.3d 1209, 1219 (9th Cir. 1994) ("Counsel for the estate must keep firmly in mind that his client is the estate and not the

2004 WL 1895200, at *8 n. 23 (Bankr. D. Idaho Aug. 12, 2004) ("the directors of insolvent corporations are deemed to hold the corporation's assets in trust, as a 'trust fund' for corporate creditors, and cannot properly prefer themselves to such creditors in the disposition of assets.") (citing *La Voy Supply Co. v. Young*, 369 P.2d 45, 50 (Idaho 1962)).  Courts routinely appoint chapter 11 trustees for cause where a debtor's management team is conflicted and cannot act as an independent fiduciary.  *See, e.g., In re Ionosphere Clubs, Inc*., 113 B.R. at 169 ("When a debtor-in-possession is incapable of performing [its fiduciary] duties, a Chapter 11 trustee may be appointed."); *In re Sillerman*, 605 B.R. 631, 646-47 (Bankr. S.D.N.Y. 2019) (collecting cases to demonstrate that a conflict of interest "can constitute cause for appointment of a trustee" including instances where the debtor "will not fulfill its fiduciary duty to pursue potential causes of action on behalf of the estate" or "otherwise puts its own self-interest above that of its creditors"); *In re Nautilus of New Mexico, Inc.*, 83 B.R. at 789 (finding cause to appoint trustee where debtor's principal and acting manager was incapable of performing fiduciary duties).  But, the Millenkamp Insiders, and by extension the Debtors, are not acting as fiduciaries.  Instead, the Debtors filed the Insider Plan that is patently incapable of being confirmed, aimed clearly to benefit the Millenkamp Insiders.

### i.   *Two Back-to-Back Failed Refinancing Processes*

50.   Since the Petition Date, when considering whether RAF was adequately protected, the Debtors have urged this Court to ignore their Historical Levered Negative Cash Flow and focus on extensive testimony and representations that RAF is "grossly," "extremely," and "wildly" oversecured, as well as numerous assurances that the Debtors would emerge from chapter 11 with a 100 cent plan.[52]

---

debtor individually."). "Under no circumstances, . . . may the lawyer for a bankruptcy estate pursue a course of action, unless he [or she] has determined in good faith and as an exercise of his professional judgment that the course complies with the Bankruptcy Code and serves the best interests of the estate." *In re Perez*, 30 F.3d at 1219.  It is incumbent upon the Debtors' professionals to pursue a plan that complies with the basic tenets of the Bankruptcy Code, even if it is inconsistent with the wishes of the Millenkamp Insiders.

[52] *See, e.g.,* Transcript of Hearing on April 9, 2024, 264:3-4 (testimony of Ms. Churchill of Kander stating a 130-day exit is the Debtors' intent).

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 24

51.     Notwithstanding RAF's objections, the Debtors have continued to use RAF's cash collateral and have further leveraged their estates by at least $18.5 million of DIP financing (exclusive of premium DIP financing fees and interest) to pursue a refinancing process through their investment banker, Forbes Group (the "**Plan Refinancing Process**").  As noted above, on several occasions, the Debtors sought the use of substantially more funds from the DIP financing, which after objection by RAF, this Court denied or limited.  In any event, Forbes Group was not the first advisory group to represent the Debtors in connection with a refinancing process.  Pre-petition, Riveron Consulting advised the Debtors in their failed efforts to refinance RAF's RLOC Facility (the "**Pre-Petition Refinancing Process**").  According to testimony from Forbes Group, the Pre-Petition Refinancing Process was not successful because it was focused on agriculture lenders or regional banks.[53]

52.     Mr. Millenkamp, on the other hand, attributed other reasons for the failure of the Pre-Petition Financing Process.  Notably, Mr. Millenkamp attributed blame to everything from RAF's purported interference, to MetLife's refusal to provide the Debtors with an additional $40 million, and to the 2023 milk prices.[54]  According to Forbes Group, its process would be different than the Pre-Petition Refinancing Process because it would focus on special situation lenders, distressed lenders, parties focused on cash flow lending, and "people really looking at things less from the lens of ag and more about what's the collateral base, what's the situation and how do we find a constructive solution."[55]  Forbes Group also testified that the Plan Refinancing Process would be different because the market is "very robust" and "there's a lot of money available in the specialty finance market and the issuance shows that it's just getting better."[56]  Despite these

---

[53] Transcript of Hearing on May 8, 2024, 125:17–126:5.

[54] Transcript of Hearing on April 9, 2024, 116:1-117:13 (RAF's fault); Transcript of Hearing on May 8, 2024, 256:5-15 (MetLife's fault), 267:3-268:18 (dairy market's fault), Transcript of Hearing on May 9, 2024, 27:16-29:25 (RAF's fault).

[55] Transcript of Hearing on May 8, 2024, 125:17–126:5.

[56] Transcript of Hearing on May 8, 2024, 127:24, 128:18-20.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 25

assurances, and marketing the Debtors to more than 100 parties for exit financing, the Plan Refinancing Process came up empty.

53.    The Debtors were afforded every opportunity to find a source of refinancing to fund their 100 cent plan and pay the RAF Secured Claim, in full, in cash, on the effective date.  On three separate occasions, RAF unilaterally offered the Debtors more time to exhaust their efforts and not burden the Court with unnecessary hearings, which resulted in stipulations with the Debtors for the extended use of cash collateral, (Dkt. Nos. 485, 628, 682), and a stipulation to extend the Debtors' exclusivity period while the Debtors continued to seek a refinancing commitment, (Dkt. No. 485).  During this time, RAF expressed concerns with respect to the progress and requested that the Debtors begin to consider a concurrent contingency plan to minimize harm to the estates if the Debtors were unsuccessful in their refinancing efforts.  Specifically, by letter date August 19, 2024, with the Creditors' Committee on copy, RAF requested that the Debtors engage an independent investment banker to begin a process to pursue a sale of some assets, equity, property, and/or businesses that would generate sufficient proceeds to fund a successful reorganization of the Debtors ("**Exclusivity Letter**"). [57]  The Debtors ignored this request.  The Creditors' Committee remained silent.

54.    After 2 years and 5 months, and two separate advisory firms, no lender was willing to provide the Debtors with sufficient funding to refinance the RAF Secured Claim.  Even Cargill, one of the Debtors' largest customers, ultimately declined.

55.    Mr. Kokini's prediction with respect to the prospects of a refinancing at the April 10, 2024 hearing was correct.[58]  And in the end, Forbes Group agreed, despite their previous optimism.  In a report, dated August 21, 2024, Forbes Group explains the challenges with finding a source of refinancing ("**Forbes Report**"):[59] "*The difficulty continues to be the amount of debt*

---

[57] The Exclusivity Letter is attached hereto as Exhibit 3133.

[58] *See supra* ¶ 40 (discussing that Mr. Kokini testified that, "it would be very hard to refinance this full capital structure" because "it's unlikely that any new lender would want to step into this amount of leverage that points to at best stressed nature – stressed business if not distressed" and that the Sandton proposal would "just make it harder to pay off the already matured RLOC").

[59] *See* Forbes Report, Exhibit 3134.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 26

*needed to take out the DIP facility and revolver and if cash flow can support that level of debt in a cyclical industry*." Yet, unlike most debtors in possession that use chapter 11 to reduce leverage, the Debtors' Insider Plan seeks to emerge with more debt than on the Petition Date.

### ii. *The Unconfirmable Insider Plan*

56.      Shortly after learning of Cargill's withdrawal of its term sheet, by letter with copy to the Creditors' Committee, RAF again requested that the Debtors engage an independent investment banker and/or broker to commence a sale process to explore options for maximizing the value of the Debtors' estates for all stakeholders (the "**Fiduciary Duty Letter**").[60]  Like the Exclusivity Request, the Debtors ignored the Fiduciary Duty Letter.  The Creditors' Committee remained silent.

57.      Apart from abdicating their long-promised repayment of the RAF Secured Claim under a 100 cent plan, the Insider Plan suffers from some of the same facial defects as the Original Plan.  With respect to those defects, RAF respectfully refers this Court to the Cash Collateral-Exclusivity Response, which is incorporated herein by reference, but in sum:

- **Millenkamp Insiders Cannot Retain Equity Interests For Free.**  Like the Original Plan, with **$0 of new value being contributed by the Millenkamp Insiders**, the Insider Plan leaves the **Millenkamp Insiders unimpaired** by providing that "each Debtors' pre-petition equity interests shall remain the same post-petition. Class 11 Claim Holders **are retaining ownership interests in the Debtors**." Insider Plan, § 3.12(b).  The Millenkamp Insiders should not be permitted to abscond with equity interests with a book value of at least, on the effective date, of $39.484 million[61] according to the Debtors' New Projections while impairing RAF's grossly oversecured claim through a cram-up structure that is dead on arrival.  *In re Zaleha*, No. 93-00638, 1995 Bankr. LEXIS 2167, at *8 (Bankr. D. Idaho Mar. 10, 1995) (citing *Norwest Bank Worthington, v. Ahlers*, 485 U.S. 197, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988)); *see also Wells Fargo Bank, NA v. Sahuarita Self-Storage LLC (In re Mariposa Rd. Self-Storage Assocs. LLC)*, 693 F. App'x 486, 486 (9th Cir. 2017) (finding plan did not comply with absolute priority rule because existing equity holders would be allowed to retain their equity interests while bank's guarantee claims remained unpaid).[62]

---

[60] The Fiduciary Duty Letter is attached hereto as Exhibit 3135.

[61] While the Debtors' New Projection ascribe a book value $39.484 million, Mr. Millenkamp and the Debtors have provided testimony and evidence ascribing a market value to the Debtors' equity of $305,541,946.20.  *See* Equity Cushion Analysis, admitted at Ex. 1023

[62] Cash Collateral-Exclusivity Response, ¶ 9–12.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 27

- **Millenkamp Insiders Cannot Receive Releases and Exculpations Without Consideration**. The Insider Plan (like the Original Plan) seeks to grant estate releases and exculpations to non-debtors, particularly the Millenkamp Insiders, without any consideration. *See In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 438 (5th Cir. 2022) (exculpations may not extend protections to nondebtors). Moreover, void from the New Disclosure Statement (or Original Disclosure Statement) is any indication that the Debtors conducted any independent evaluation of potential claims and causes of action against the Millenkamp Insiders as part of arms' length negotiation that resulted in the grant of gratis releases and exculpations.[63]

- **Insider Plan Fails the Best Interests Test**. The Debtors' own Liquidation Analysis evidences that the $348,296,000 of Estimated Liquidation Proceeds (Dark) would be more than sufficient to pay, in full, the Debtors' $327,506,000 of secured claims, including the full amount of the RAF Secured Claim.[64] Under 11 U.S.C. § 1129(a)(7), each holder of an impaired claim or interest must "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). Known as the "best interest test," this section requires that a creditor's treatment under a plan of reorganization must have a present value equal to a creditor's treatment under a hypothetical chapter 7 liquidation. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'shp. (In re Ambanc La Mesa Ltd. P'shp.)*, 115 F.3d 650, 657 (9th Cir. 1997). Where a creditor is oversecured, a plan must provide payment in full to satisfy the best interest test. *See In re Zanetos*, No. SA 05-48272 TA, 2006 Bankr. LEXIS 2465, at *11 (Bankr. C.D. Cal. July 14, 2006) (holding where creditor was fully secured any plan must provide for his payment in full to "pass muster"). As discussed further herein and the Cash Collateral-Exclusivity Response, the Insider Plan's proposed treatment of the RAF Secured Claim is incapable of satisfying this fundamental requirement.[65]

Notably, even after identifying these black and white infirmities in the Original Plan, the Debtors continued to insist on these same defects in the Insider Plan.

58.     For these and two additional primary reasons, the Insider Plan is facially defective, namely—(1) feasibility and (2) the inability to satisfy the indubitable equivalent standards.[66] In most instances, courts require a trial on the merits to make a determination with respect to these

---

[63] Cash Collateral-Exclusivity Response, ¶ 15–20.

[64] *See* Liquidation Analysis, Ex. 3099 (Dkt. No. 340-2).

[65] Cash Collateral-Exclusivity Response, ¶ 5–8.

[66] For purposes of this Motion, RAF is only addressing certain key issues that render the Insider Plan patently incapable of being confirmed and further support the appointment of a Chapter 11 Trustee. RAF does not waive the right (and expressly reserves the right) to raise additional issues and concerns in the future, to the extent necessary.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 28

particular issues.  With the Insider Plan, however, the defects are so facially apparent (and numerous) that it would be a grave waste of estate resources to proceed any further.

**Feasibility**

59.     To confirm a plan, the Debtors must demonstrate, among other things, that their proposed plan is feasible in that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11); *In re Wiersma*, 227 F. App'x 603, 605–06 (9th Cir. 2007).  This requirement is commonly called the "feasibility" test and "requires the debtor to demonstrate that the plan has a reasonable probability of success." *In re Claar Cellars LLC*, 623 B.R. 578, 595 (Bankr. E.D. Wash. 2021).  Establishing feasibility requires more than a "promise, hope, or unsubstantiated prospect of success." *Id.*; *see also In re Smitty Inv. Grp., LLC*, No. 07-00020-TLM, 2008 WL 2095523, at *7 (Bankr. D. Idaho May 16, 2008) (where projections "are incredible or simply unrealistic" or "[w]hen the financial realities do not support the projections or where the proponents' projections are unreasonable," the court should find the plan not feasible and refuse to confirm it.).

60.     In evaluating feasibility, courts consider the debtor's financial structure, the earning power of the debtor's business, economic conditions, and the ability of debtor's management.  *In re Smitty Inv. Grp.,* 2008 WL 2095523, at *7; *see also In re Hobble-Diamond Cattle Co*., 89 B.R. 856, 858 (Bankr. D. Mont. 1988) ("where a Chapter 11 Plan contemplates funding the Plan payments from operating revenues, its past and present financial records are probative of feasibility.").

61.     Applying these principles, the Insider Plan is incapable of satisfying the feasibility requirements for a number of reasons:

    **i.**        ***Ability of Debtors' Management***

62.     First, it has come to the attention of RAF that Mr. Millenkamp is currently facing criminal charges of (a) felony Aggravated Battery under Idaho Code §18-903, 18-907 in connection with allegations that Mr. Millenkamp pushed a passenger from a moving vehicle while travelling at 45 miles per hour, and (b) misdemeanor False Imprisonment under Idaho Code §18-

2901 (collectively, the "**Criminal Charges**").[67]  Upon information and belief, the Criminal Charges expose Mr. Millenkamp to up to 15-years of incarceration.  Thus, as an initial matter, it is possible that Mr. Millenkamp may be incarcerated and unable to continue in his role as chief executive officer and operator of the Debtors' businesses at or after the effective date of the Insider Plan.  Given the complexity of these operations and the Debtors' financial distress, the Criminal Charges pose a real risk to the feasibility and certainty of the ability of the Debtors to execute on any post-effective date business plan.

63.     The Criminal Charges, on their own, raise serious feasibility concerns.  Moreover, through his de facto sole equity ownership, board dominance, and sole executive authority, Mr. Millenkamp exercises sole control over assets that the Debtors value at in excess of $646.344 million.  Given the nature of the Criminal Charges, and Mr. Millenkamp's roles with the Debtors, Mr. Millenkamp himself poses significant feasibility concerns, and at a minimum, material adequate protection risks with respect to RAF's Collateral.

**ii.      _Earning Power of the Debtors' Business_**

64.     Even if Mr. Millenkamp was not facing Criminal Charges, the Debtors' financial projections pose real and material risks that the Debtors will need to file bankruptcy a second time shortly after emerging from these chapter 11 cases.  The Debtors' lack of financial controls, inability to generate sustained positive levered cash flow, and failure to de-lever their balance sheet is fatal to prospects of proposing a feasible plan.  _In re Trans Max Techs., Inc._, 349 B.R. 80, 92 (Bankr. D. Nev. 2006) ("section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan."); _see also In re Smitty Inv. Grp.,_ 2008 WL 2095523, at *7; _In re Hobble-Diamond Cattle Co.,_ 89 B.R. at 858.

65.     As it stands, FTI's analysis of the Historical Levered Negative Cash Flow and Levered Negative Cash Flow demonstrate that the Debtors' financial situation is not an anomaly.  The Debtors are not currently paying amortization or default interest and are benefiting from

---

[67] _See_ 10.15.24 Criminal Complaint, filed in Case No. CR16-24-05423, Ex. 3094.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 30

improved milk and cattle prices—yet their levered cash flow continues to remain materially negative with little to no signs of improvement.

66.     Moreover, as further evidence of the Debtors' inability to generate sufficient cash flow, the Debtors are proposing to emerge from chapter 11 *with more debt than they started with on the Petition Date*.  As of the Petition Date, the Debtors had a least $300 million of secured debt. Given the Debtors' sustained inability to generate sufficient cash flow to support debt service on those obligations, it is incredulous that the Debtors would propose utilizing estate resources over another five months to pursue confirmation of a plan that would increase their total secured indebtedness by another $45 million.  *See In re Las Vegas Monorail Co.*, 462 B.R. 795, 802 (Bankr. D. Nev. 2011) ("While poor planning undertaken by prior management may have contributed to [the debtor's] economic woes, [the debtor] has never shown the ability to service the massive debt incurred in its construction.  On top of this wobbly base, the current economic situation simply threw gas on an existing fire—it worsened, rather than created, [the debtor's] problems. Nonetheless, [the debtor] now asks the court to trust that it will do, over the next several years, that which it has been unable to do since its inception. [The debtor's] embrace of these multiple speculative future events to establish feasibility underscores its questionable strategy.").

67.     Notwithstanding, the additional indebtedness of $45 million that the Debtors intend to incur, the Debtors now assert that they will be cash flow positive beginning in Q1 2025.  Apart from reductions in "soap" and window washing from 3 days a week to 2 days, the Debtors have not identified any operational changes in the New Disclosure Statement or otherwise that support such an unprecedent change in their leveraged cash flow.[68]  Given the facts presented to this Court to date, there is no reason to trust the Debtors' conclusion and find the Debtors can become cash flow positive in the next 3 to 4 months. *See In re Smitty Inv. Grp., LLC*, 2008 WL 2095523, at *11 (plan not feasible where debtor was "unable to generate the minimal amount needed to 'break even' post-petition, and [had] shown no prospective change in ability to generate funds needed for

---

[68] *See supra* ¶ 32 (discussing Debtors' refusal to make any operational changes that could improve leveraged cash flow).

even bare maintenance of operations"); *In re Las Vegas Monorail Co.*, 462 B.R. at 804 ("under its current plan and its own projections, [the debtor] has failed to show this reorganization is not likely to be followed by the need for further financial reorganization. Its plan seeks to saddle [the debtor] with debt more than twice its value. It[s] financial expert projects accounting losses of not less than $15 million each year for the next seven years. Its management acknowledges that the plan underfunds [the debtor]'s needs by $38.4 million over that same period. For these and other reasons, its current plan dooms it to failure, if not in the next few years, certainly by 2019. Its plan is thus not feasible, and thus the strong creditor support it has garnered is largely irrelevant.").

### iii.   *The Debtors' Financial Structure*

68.   Incredibly, following two failed refinancing processes over two years, the Insider Plan's solution to paying the RAF Secured Claim in full is yet another bid to obtain refinancing – but in March 2027.  The Insider Plan is so bold to actually suggest that the March 2027 Refinancing Facility is part of the treatment of the RAF Secured Claim, stating "[o]n March 31, 2027, Rabo shall receive payment in full of the remainder of its Allowed Class 5 Secured Claim" and including the Refinancing Facility in the Sources of Consideration for Plan Distributions as if it actually will exist on the effective date of the Insider Plan.[69]

69.   The Insider Plan's proposed repayment of the RAF Secured Claim is exactly the reason courts are directed to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Las Vegas Monorail Co.*, 462 B.R. at 801. Specifically, promises of forthcoming funding are woefully insufficient to support a confirmable plan "in the absence of concrete evidence that the contributors are willing to give and capable of giving." *Id.* (quoting *Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)–COS, LLC*, 632 F.3d 168, 173 n.8 (5th Cir. 2011)). Therefore, it is well established that a court should refuse to confirm a plan that relies on future sales or refinancing absent adequate showing that such refinancing is likely to occur. *In re Curiel*, 651 B.R. 548, 567 (9th Cir. BAP 2023) (debtor must establish this reasonable likelihood by

---

[69] *See* Insider Plan § 3.6(b); § 5.13.

presenting credible, concrete evidence demonstrating the debtor's prospects for selling or refinancing the property); *In re Claar Cellars LLC*, 623 B.R. at 596 (plan unconfirmable where refinance was not likely to happen); *In re Made in Detroit, Inc.*, 299 B.R. 170, 179–80 (Bankr. E.D. Mich. 2003) (plan not confirmed when proponent made inadequate showing of ability to obtain financing). As the well-established body of caselaw suggests, the Court and stakeholders should not rely on the mere belief that new money may come into the estate at some uncertain date. *In re Trans Max Techs., Inc.*, 349 B.R. at 93.

70.    The Insider Plan's promise to pay RAF with the proceeds of a March 2027 refinancing facility is at best a hope. But hope is not a plan. The Insider Plan is simply a concept of a plan with the goal to "employ an investment banker to secure a Refinancing Facility in the amount of $125 million."[70] The Insider Plan fails to identify any potential lenders willing to give and capable of giving, much less the concrete details necessary to demonstrate that such lender is reasonably likely to deliver those funds by a date certain. Nor could it. Since June 1, 2022 (and prior to that in October 2022), the Debtors have been actively engaged in securing a refinancing facility. But the market has spoken—two independent brokers polled over 100 parties, with the most recent being the prior 8 months of these cases, and both were unable to obtain a refinancing facility capable of paying the RAF Secured Claim and funding a confirmable plan of reorganization.[71]

71.    Moreover, based on FTI's analysis of the New Projections, the Debtors' total indebtedness in March 2027 will almost be exactly the same level that existed as of the Petition Date:[72]

---

[70] *See* Insider Plan § 5.6.

[71] *Supra* ¶ 46–53 (discussing the failed refinancing processes)

[72] *See* FTI Chart as Exhibit 3136.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 33

| ($ in millions) | Amounts Outstanding as of | |
| Debt Facility | 4/2/24 | 2/28/27 |
|---|---|---|
| Sandton DIP | – | – |
| Sandton Exit Financing | – | 40 |
| 1L Rabo RLOC | 90 | – |
| MetLife Loans | 184 | 181 |
| **Total 1L Debt** | **$275** | **$221** |
| 2L/3L Rabo RLOC/Term Loan | – | 68 |
| Conterra - Mezz | 17 | 20 |
| Conterra - German Dairy Mortgage | 3 | – |
| **Total Conterra Loans** | **$19** | **$20** |
| **Total Funded Debt** | **$294** | **$310** |
| *Total Funded Debt Compared to Filing Date* | *n/a* | *$16* |
| Unsecured/Secured Prepetition AP | 45 | 21 |
| Leases | 4 | 4 |
| **Total Debt** | **$343** | **$335** |
| *Total Debt Compared to Filing Date* | *n/a* | *$8* |

72.     Neither the Insider Plan nor the New Disclosure Statement have identified a single reason why the Debtors will achieve a different result with the same capital structure that existed as of the Petition Date – the same capital structure that Forbes Group identified as being difficult to refinance because of the amount of debt needed to take out the DIP facility and revolve in light of cash flow concerns in a cyclical industry.[73]

### iv. Proposed Asset Sales

73.     In another "visionary scheme" to deflect from the shift of paying RAF in full, in cash, on the effective, the Insider Plan proposes to sell real estate known as Canyonlands and McGregor with an appraised value of $21.4 million and apply the net proceeds, of $15,575,039, to the RAF Secured Claim (the **"Future Real Estate Sales"**).[74]   The primary issue with the

---

[73] *See* The Forbes Report, Exhibit 3134.

[74] While section 3.6(b) of the Insider Plan purports to apply the net proceeds of real estate sale proceeds to the RAF Secured Claim, when reading the small print, i.e. section 5.5 of the Insider Plan, the hypothetical and contingent nature of such payment is made clear. *Compare* Insider Plan § 3.6(b) *to* Insider Plan § 5.5.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 34

Debtors' planned sale is that it is entirely hypothetical and will not occur until some unidentified time *after* the effective date of the Insider Plan, if at all.  First, the Insider Plan does not require the Debtors to consummate the Future Real Estate Sales – just to engage a broker within 30 days of the effective date.[75]  Further, the only obligation to affect the Future Real Estate Sales arises if the Debtors have not repaid the Exit Term Loan Facility by June 30, 2026.[76]  Otherwise, the Debtors are under no such obligation. Like the 2027 Refinancing Facility, this too is another visionary scheme as (1) there is no certainty that the Debtors will actually be able to sell all or any real estate to a purchaser as the Debtors do not appear to have started any sale process,[77] (2) there is no certainty with respect to actual amount of net proceeds available to RAF with respect to such a sale, (3) if the Debtors, taking direction from the Millenkamp Insiders, decide to change their minds because they are no longer subject to this Court's direction, RAF will have no more success at enforcing its contractual rights than it did for the 22 months that the RAF RLOC Facility was in default prior to the Petition Date–especially since any such enforcement would likely be subject to subordination restrictions, and (4) the sale requirement arises under the Exit Term Loan Facility, and would consequently be waivable by Sandton Capital.  *See Las Vegas Monorail Co.*, 462 B.R. at 800 ("Against this background, courts have refused to confirm plans whose feasibility turned on future sales of property, or future refinancings, absent an adequate showing that such sales or refinancings would be likely to occur.") (citing cases).

74.    However, the Debtors' visionary schemes of future value maximizing transactions do not stop with the Future Real Estates and the 2027 Refinancing Facility.  The Insider Plan also promises to pursue a sale process for all or substantially all of the Reorganized Debtors' assets if the a term sheet or commitment for the 2027 Refinancing Facility is not received by January 2027,

---

[75] *See* Insider Plan § 5.5.

[76] *See* New Disclosure Statement, III(L), page 41**.**

[77] To the extent that the Debtors have commenced a sales process during the pendency of these cases, RAF expects that the Debtors would have sought this Court's authority to do so and disclosed such process(es) in the New Disclosure Statement.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 35

with such sale to close by March 2027 ("**Strategic Sale Obligation**").[78]  If nothing else, the Strategic Sale Obligation demonstrates that either the Debtors and/or Sandton Capital have their own doubts as to the Debtors' feasibility if they are already planning for the Debtors' failure within less than two years of emerging from these chapter 11 cases.

75.      At best, these visionary schemes promise RAF another breach of contract claim, not repayment in full.  To confirm a plan that rests upon some future sales, the debtor must establish the likelihood of the sale with concrete evidence demonstrating the debtor's prospects of selling the property and the future value of the property.  *In re Curiel*, 651 B.R. at 569 (reversing bankruptcy court and ruling a plan unconfirmable where future sale of property was unsubstantiated).  Courts require debtors to offer more than speculation and hope about the source of plan funding—plans that fail to provide specific details regarding (i) specific dates for the sale of real estate, (ii) the identity of a potential purchaser, and (iii) the expected sales price cannot be confirmed.  *In re Walker*, 165 B.R. 994, 1003 (E.D. Va. 1994).  To hold otherwise would require the creditors and the courts to rely upon the "honesty and good intentions" of the debtors.  *Id*. (citing *In re BBT*, 11 B.R. 224, 235 (Bankr. D. Nev. 1981)); *see also In re Sutton*, 78 B.R. 341, 342 (Bankr. S.D. Fla. 1987) ("[The] Debtor's chapter 11 plan . . . boils down to nothing more than an announced hope that he will sell his stock by February 6, 1988 for enough to satisfy the debt . . . . He has produced no specific offer of purchase, no specific sale date, and no credible basis to value the stock. He asks this court to hold the corporate creditor at bay another five months from today to see if he can do what he hopes to do, but has failed to do for the past ten months.").

76.      RAF should not be required to rely on the sincerity of the Debtors' proposal to sell their assets, particularly given that the Debtors ignored the Exclusivity Letter and the Fiduciary Duty Letter.  *In re Made in Detroit, Inc*., 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003), *aff'd*, 414 F.3d 576 (6th Cir. 2005) ("Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises.").

<u>**Indubitable Equivalent**</u>

---

[78] *See* Insider Plan § 5.7.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 36

77.     In their latest proposal to protect the Millenkamp Insiders' control over the Debtors, the Debtors are proposing a "cram-up" plan that is unconventional and unprecedented not just for this District and the 9th Circuit, but for most other jurisdictions, including bankruptcy courts in the Second, Third, and Fifth Circuits.  Under the Insider Plan, on the effective date, the Debtors are proposing to pay $5 million, in cash, to RAF instead of the promised 100% of RAF's $96,469,917.04 secured claim.[79]  The Debtors purport to fill this $90 million delta by forcing RAF to take replacement debt with a subordinated lien position and a two-year term.  Taken together with the unfeasible Future Real Estate Sales and 2027 Refinancing Facility, this treatment does not provide RAF with the "certainty of payment beyond a reasonable doubt" that is required by the Bankruptcy Code.

78.     Instead of attempting to restore RAF to its status quo, the Insider Plan **subordinates RAF's first lien on substantially all of the Debtors' personal property to a second lien position while also subordinating RAF's second lien on the Debtors' real estate to a third lien position**.[80]  Simply put, there is no basis in law for such treatment over RAF's objection.

79.     Further, the Insider Plan proposes to repay the RAF Secured Claim in full (if the Debtors receive their refinancing) by March 31, 2027.[81]  By the time of the proposed effective date of the Insider Plan, the RAF RLOC Facility will be within 2-3 months short of the 3-year anniversary of the Maturity Date—**thus, extending the Maturity Date by 5 years, in total**.  To put that in perspective, the RLOC Facility was entered into on an amended and restated basis on April 21, 2021.  The RLOC Facility matured on June 1, 2022, and Mr. Millenkamp himself testified on multiple occasions that RAF is a "short term lender."[82]  Through the Insider Plan, the

---

[79] *See* Insider Plan, § 3.6.

[80] *See* New Disclosure Statement, III(L), page 39 ("The Exit Term Loan Facility shall be secured by a first priority lien and security interest in all of the existing and after-acquired real property and personal property assets, tangible and intangible of the Borrowers . . .").

[81] *See* Insider Plan § 3.6.

[82] Transcript of Hearing April 9, 2024, 36:12–37:10; 135:6-17.

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 37

Debtors are effectively converting RAF's short-term loan into long-term permanent capital but with the Millenkamp Insiders retaining all of the equity for no consideration.

80.    To purportedly compensate RAF for this increased risk, the Debtors are proposing to pay 8% interest in respect of this replacement debt while compensating Sandton Capital, as the new exit lender, 15% PIK interest for its "risk" as the new priming first lien lender on all of the Debtors' personal property and real estate with a "wild" equity cushion. At present, based on the contractual default rate under the RLOC Facility, RAF is entitled to receive 12.69% interest. Thus, at minimum, the Insider Plan would need to provide RAF with at least 15% current pay interest given that the risk to RAF is far greater than the risk to Sandton Capital and not what RAF negotiated for in April 2021. However, to properly compensate RAF with an appropriate interest rate would also add to the Insider Plan's financial burdens and feasibility issues.

81.    By any standards, the Debtors' proposed "indubitable equivalent" is incapable of being confirmed. Section 1129 limits the circumstances in which a court may confirm a debtor's plan of reorganization without creditor consent. To obtain confirmation, debtors must:

> prove by a preponderance of the evidence either (1) the plan meets all of the § 1129(a) requirements or, (2) if the only requirement not satisfied is the § 1129(a)(8) requirement that all impaired classes accept the plan, the plan satisfies the "cramdown" alternative of § 1129(b).

*In re Hoyle*, No. 10-01484-TLM, 2013 WL 210254, at *16 (Bankr. D. Idaho Jan. 17, 2013) (citing *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997)); *see also* 11 U.S.C. § 1129(a)(8), 1129(b). Because RAF, an impaired class, will oppose any plan that does not provide for payment in full, in cash, on the effective date, the Insider Plan must consequently conform to the "cramdown" provision of § 1129(b) in order to be confirmed.

82.    Section 1129(b)(1) provides that, for a plan to be "crammed down" on an objecting class, it must not discriminate unfairly and must be "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan. 11 U.S.C. § 1129(b)(1). In the

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 38

present case, the Debtors' only recourse for confirmation is to comply with § 1129(b)(2)(A)(iii) and provide RAF with the indubitable equivalent of its original lien.[83] **The Insider Plan does not.**

83. The Bankruptcy Code does not define "indubitable equivalent." Nevertheless, it is well-recognized that Congress derived the phrase from Judge Hand's opinion in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935), holding that the bankruptcy statute did not intend to "deprive" a mortgagee of his first-position lien "unless by a substitute of the most indubitable equivalent." *Id.* at 942; *see In re Arnold & Baker Farms*, 85 F.3d 1415, 1422 n.8 (9th Cir. 1996); *In re Am. Mariner Indus., Inc.*, 734 F.2d 426, 433 (9th Cir. 1984) (abrogated on other grounds); *Aspen Club*, 2020 WL 4251761, at *13; *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298, 319 (10th Cir. BAP 2006). The Ninth Circuit "has recognized two components of an indubitably equivalent substitute": "[i]t must both 'compensate for present value' and 'insure the safety of the principal.'" *In re Wiersma*, 227 F. App'x 603, 607 (9th Cir. 2007) (citing *Am. Mariner*, 734 F.2d at 433).

84. The "common thread" through cases evaluating whether the "indubitable equivalent" test is met is whether the objecting secured creditor has "***certainty of payment beyond a reasonable doubt** and adequate plan protections."* *In re NESV Ice, LLC*, 661 B.R. 427, 467 (Bankr. D. Mass. 2024) (emphasis added); *see also In re Hollister*, No. 21-55380, 2021 WL 6124757, at *1 (9th Cir. Dec. 28, 2021) ("too evident to be doubted"); *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298, 324 (10th Cir. BAP 2006) ("the absence of any reasonable doubt that the secured creditor will receive the payments to which it is entitled"); *LightSquared*, 513 B.R. at 93 ("there be no doubt that replacement recoveries are equal to existing security interests"). Other

---

[83] First, the Insider Plan does not propose a sale of RAF's collateral, which rules out one option for cram-down. 11 U.S.C. § 1129(b)(2)(A)(ii). Second, the Insider Plan proposes exit financing that will prime RAF's first-priority interests in the RLOC Personal Property Collateral and second lien in the real estate collateral. Courts have held that where a plan proposes to subordinate a secured claimant's interest, such claimant does not "retain" their interest for the purpose of section 1129(b)(2)(A)(i). *See e.g.*, *In re Aspen Club & Spa, LLC*, No. BAP CO-19-043, 2020 WL 4251761, at *12 (10th Cir. BAP (Colo.) July 24, 2020) (subsection (A)(i) "does not apply to altering the priority of a lien"); *In re LightSquared Inc.*, 513 B.R. 56, 93 (Bankr. S.D.N.Y. 2014) (plan noncompliant with subsection (A)(i) "inasmuch as it replaces [creditor's] first lien with a third lien"); *In re Cottonwood Corners Phase V, LLC*, No. 11-11-12663 JA, 2012 WL 566426, at *23 (Bankr. D.N.M. Feb. 17, 2012) (subsection (A)(i) not satisfied where subordination and non-disturbance provisions modify creditor's lien); *In re Ford Prod. Corp.*, 159 B.R. 693, 695 (Bankr. S.D.N.Y. 1993) (requirement for secured claimants to subordinate interests is "fatal flaw which violates the requirement that they retain their liens").

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 39

factors court have considered include (i) the feasibility of the plan; (ii) the likelihood the creditor's claim would become "even partially unsecured"; and (iii) increase in the collateral's value due to the new first-position loan. *In re Wiersma*, 324 B.R. 92, 112 (9th Cir. BAP 2005) (reversed in part on other grounds).

85.     Courts have overwhelmingly concluded that subordinating a lien—as proposed by the Insider Plan—falls short of the "indubitable equivalent" standard. *See e.g.*, *Hollister*, 2021 WL 6124757, at *1 (proposed priming loan did not provide primed lienholder with indubitable equivalent of their interest); *In re Murel Holding Corp.*, 75 F.2d at 942 (reversing denial of relief from the bankruptcy stay to allow a first mortgagee to foreclose on its property, where plan proposed to subordinate the mortgagee's lien); *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 438 (C.D. Cal. 1993) (to confirm plan over secured creditor's objection, bankruptcy court must, as part of the "indubitable equivalent" formula, specify whether secured creditor would be "paid in full before a junior class… and the compelling reason, if any, to depart from such absolute priority"); *LightSquared Inc.*, 513 B.R. at 99 ("far riskier third lien treatment subordinated behind at least $2.2 billion of senior debt" was not indubitable equivalent of lienholder's original first lien).

86.     Moreover, the Insider Plan is easily distinguishable from the "few and far between" cases where a subordinated lien has been held to constitute an indubitable equivalent. *LightSquared Inc.*, 513 B.R. at 95 (distinguishing *Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.)*, 80 B.R. 171, 174-75 (9th Cir. BAP 1987) (single asset real estate lender to a non-operating debtor received promissory notes junior to a construction loan that would develop the property); *Affiliated Nat'l Bank-Englewood v. TMA Assocs., Ltd.*, 160 B.R. 172, 176 (D. Col. 1993) (single asset real estate lender to a non-operating debtor received indubitable equivalent of its lien through promise of future land sales)). For example, the court in *In re Pine Mountain, Ltd.*, permitted a plan to subordinate a first deed of trust to a construction loan to real estate entity (as compared to a vertically integrated dairy operation subject to commodity fluctuations and four years of sustained negative levered cash flow), where it found (i) the plan feasible, (ii) the creditors

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE** - 40

protected by "several safeguards" including that they would receive "payment *in full*" within 46 months of the plan effective date, and (iii) that "the value of the property will likely increase" due to the new priming construction loan. *Pine Mountain*, 80 B.R. at 174-175 (emphasis in original). Similarly, in *In re TMA Assocs., Ltd.*, where the debtor's sole asset was a single commercial property (as opposed to a vertically integrated dairy operation subject to commodity fluctuations and four years of sustained negative levered cash flow), the court allowed a plan to create a partially junior and partially senior creditor to the original senior lienholder, noting that the original senior lienholder would, in due course, be paid in full from the senior component of its lien. *TMA Assocs.* 160 B.R. at 176. None of those safeguards exist here.

87.    Moreover, according to the Insider Plan, the proposed priming exit facility will not be used to increase the value of the Collateral. Rather, the proposed priming exit facility will be used to repay the Sandton DIP Facility (including approximately $4.5 million of excessive debt service costs that Mr. Millenkamp lobbied for) and administrative expense claims that are currently junior to the RAF Secured Claim but would effectively be elevated and prime the RAF Secured Claim by virtue of the Insider Plan. When taken together with the other feasibility issues raised herein, along with the other patent defects discussed above, RAF submits that the rigorous standard for indubitable equivalent cannot be satisfied based on the facts and circumstances already known to this Court, as of the date hereof.

88.    For the reasons set forth herein, not the least of which the Insider Plan is not confirmable on its face, RAF respectfully request that the Court order the appointment of a chapter 11 trustee to evaluate and pursue a value maximizing sale of all or substantially all of the Debtors' assets. To that end, and upon a suitable appointment, RAF would consent to the continued to use of its cash collateral, subject to a reasonably agreed budget and other protections.

## VI.    CONCLUSION

WHEREFORE, for the reasons described above and the record in this case, RAF respectfully requests that the Court appoint a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a).

Dated: November 29, 2024                    HAWLEY TROXELL ENNIS & HAWLEY LLP


                                            */s/ Brent R. Wilson*_____
                                            Brent R. Wilson, ISB No. 8936
                                            Attorneys for Rabo AgriFinance LLC


                                            NORTON ROSE FULBRIGHT US LLP


                                            __*/s/ Andrew J. Schoulder*_____
                                            Andrew J. Schoulder, pro hac vice
                                            Attorneys for Rabo AgriFinance LLC


**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 42

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of November, 2024, I electronically filed the foregoing **RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE** with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| Krystal R. Mikkilineni | krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | tirzah.roussell@dentons.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Jon B. Evans | evans.jb@dorsey.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine Patrice Reynard | janine@averylaw.net |
| Sheila Rae Schwager | sschwager@hawleytroxell.com |
| Brent Russel Wilson | bwilson@hawleytroxell.com |
| Zachary Fairlie | zfairlie@spencerfance.com |
| John O'Brien | jobrien@spencerfane.com |
| Gery W. Edson | gedson@gedson.com |
| Aaron Bell | abell@evanskeane.com |
| Brian Faria | brian@sawtoothlaw.com |
| Robert A. Faucher | rfaucher@hollandhart.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| Karen Lloyd | klloyd@grsm.com |
| James Justin May | jjm@johnsonmaylaw.com |
| Rhett Michael Miller | rmiller@magicvalley.law |
| Robert E. Richards | robert.richards@dentons.com |
| Holly Roark | holly@roarklawboise.com |
| Evan Thomas Roth | evan@sawtoothlaw.com |

**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 43

Meredith Leigh Thielbahr                    mthielbahr@grsm.com

John F. Kurtz, Jr.                          jfk@kurtzlaw.com

And any others receiving cm/ecf notices


      I FURTHER CERTIFY that on this such date I caused my staff to serve the foregoing on the following parties via US Mail, Postage Paid:

Millenkamp Cattle, Inc.                     Idaho Jersey Girls LLC
471 North 300 West                          471 North 300 West
Jerome, ID 83338                            Jerome, ID 83338

East Valley Cattle, LLC                     Millenkamp Properties, L.L.C.
471 North 300 West                          471 North 300 West
Jerome, ID 83338                            Jerome, ID 83338

Millenkamp Properties II LLC                Millenkamp Family LLC
471 North 300 West                          471 North 300 West
Jerome, ID 83338                            Jerome, ID 83338

Goose Ranch LLC                             Idaho Jersey Girls Jerome Dairy LLC
471 North 300 West                          471 North 300 West
Jerome, ID 83338                            Jerome, ID 83338

Black Pine Cattle LLC                       Millenkamp Enterprises LLC
471 North 300 West                          471 North 300 West
Jerome, ID 83338                            Jerome, ID 83338


      /s/ Brent R. Wilson
      Brent R. Wilson


**RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE**- 44