Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
       jjm@johnsonmaylaw.com


Krystal Mikkilineni, *PHV*
Robert E. Richards, *PHV*
Tirzah Roussell, *PHV*
DENTONS
215 10th Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
      robert.richards@dentons.com
      tirzah.roussell@dentons.com

Attorneys for the Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE, INC.,<br><br>     Debtor. | Case No. 24-40158-NGH |
| Filing relates to:<br><br>☒  ALL DEBTORS<br><br>☐  Millenkamp Cattle, Inc.<br><br>☐  Idaho Jersey Girls<br><br>☐  East Valley Cattle<br><br>☐  Millenkamp Properties<br><br>☐  Millenkamp Properties II | Jointly Administered With<br>Case Nos.:<br><br>24-40159-NGH (Idaho Jersey Girls)<br>24-40160-NGH (East Valley Cattle)<br>24-40161-NGH (Millenkamp Properties)<br>24-40162-NGH (Millenkamp Properties II)<br>24-40163-NGH (Millenkamp Family)<br>24-40164-NGH (Goose Ranch)<br>24-40166-NGH (Black Pine Cattle)<br>24-40167-NGH (Millenkamp Enterprises)<br>24-40165-NGH (Idaho Jersey Girls Jerome |

#4269104

| | Dairy) |
|---|---|
| ☐ Millenkamp Family | |
| ☐ Goose Ranch | Chapter 11 Cases |
| ☐ Black Pine Cattle | |
| ☐ Millenkamp Enterprises | |
| ☐ Idaho Jersey Girls Jerome Dairy | |

## DEBTORS' OBJECTION TO RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE

Millenkamp Cattle, Inc. ("Millenkamp Cattle") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Case"), by and through their undersigned counsel, hereby respectfully file this objection to Rabo AgriFinance, LLC's Motion to Appoint a Chapter 11 Trustee (the "Objection"). In support of this Objection, the Debtors respectfully represent as follows:

## BACKGROUND

1.      On April 2, 2024 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for District of Idaho (the "Court") commencing the Chapter 11 cases.  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.      No trustee or examiner has been appointed in the Chapter 11 cases.

3.      On May 14, 2024, the Office of the United States Trustee (the "UST") appointed an official committee of unsecured creditors pursuant to 11 U.S.C. § 1102(a) (the "Committee") (Docket No. 297).

4.      On November 29, 2024, Rabo AgriFinance, LLC ("Rabo") filed a *Motion to Appoint a Chapter 11 Trustee* (the "Trustee Motion").

5.      On June 27, 2024, the Debtors filed a M*otion to Extend the Exclusive Period to File their Disclosure Statement and Plan* (Docket No. 467). On July 19, 2024, the Court entered an *Order Extending the Exclusive Periods* during which the Debtors may file and confirm a Plan (Docket No. 507) (the "Order to Extend Exclusivity"). Pursuant to the Order to Extend Exclusivity, the Debtors period to file a chapter 11 plan was extended to and including September 30, 2024, and the period for Debtors to solicit ballots on a chapter 11 plan was extended to and including November 29, 2024.

6.      On September 30, 2024, the Debtors filed their *First Plan of Reorganization and their Disclosure Statement* (Docket Nos. 640 & 641). The Disclosure Statement Hearing was set for November 21, 2024 (Docket No. 643). On November 11, 2024, the Debtors filed a Withdrawal of the Disclosure Statement (the "Withdrawal") (Docket No. 706). The Debtors noted in the Withdrawal that they were preparing a First Amended Chapter 11 Plan which will require an Amended Disclosure Statement.

7.      On October 11, 2024, Rabo filed a *Motion to Terminate Exclusivity* (the "Motion to Terminate") (Docket No. 670). The hearing on the Motion to Terminate is set for December 10th and 11th, 2024 at 9:00 a.m. MT at the U.S. Courthouse, 550 W. Fort Street, Boise, Idaho 83724. On November 11, 2024, the Debtors also filed a *Motion to Extend Exclusive Solicitation Period of 11 U.S.C. § 1121(c)* (the "Motion to Extend Solicitation Period") (Docket No. 707).

8.      On November 19, 2024, Debtors, Rabo, MetLife, Sandton, Conterra, the Committee, and the United States Trustee, entered into a *Stipulation* in which the parties agreed that in order to preserve the current exclusive solicitation period pending full review of the

Debtors' Motion to Extend Solicitation Period and Rabo's Motion to Terminate, the parties agreed that the Court may extend the current exclusive solicitation period deadline from November 29, 2024 to December 13, 2024 (Docket No. 723). The parties agreed that the hearing on the Debtors' Motion to Extend Solicitation Period may be reset to be heard on December 10, 2024 at 9:00 a.m. MT (in conjunction with the currently set cash collateral hearing and hearing on Rabo's Motion to Terminate).

9.      On December 5, 2024, the Debtors filed their *First Amended Plan of Reorganization* (the "<u>First Amended Plan</u>") (Docket No. 776) and their *First Amended Disclosure Statement* (the "<u>First Amended Disclosure Statement</u>") (Docket No. 777). The Debtors also filed a Notice of Amended Disclosure Statement Hearing, setting the hearing on the First Amended Disclosure Statement for January 29, 2025, at 9:00 a.m. MT.

10.     In the first paragraph of the Trustee Motion, Rabo states that "on the eve of Thanksgiving, the Debtors provided RAF with a draft of another chapter 11 plan of reorganization (the "Insider Plan") that is incapable of being confirmed and does not fulfill the Debtor's obligations to the Bankruptcy Code." Trustee Motion ¶ 1.

11.     From the very beginning of the Trustee Motion, Rabo makes it clear that its primary purpose and concern in filing the Trustee Motion is due to the fact that the Debtors have filed their First Amended Plan that Rabo does not favor. Dissatisfaction with a plan of reorganization of a creditor is not "cause" to justify the appointment of a Chapter 11 Trustee.

12.     The Debtors file this Objection to the appointment of a Chapter 11 Trustee as Rabo has failed to prove that sufficient cause exists to justify the appointment of a Chapter 11 Trustee.

## SHORTENED NOTICE PERIOD IS NOT REASONABLE AND IS PREJUDICIAL NOT ONLY TO THE DEBTORS BUT TO ALL PARTIES IN INTEREST

13.      Rabo also filed a notice of hearing setting the hearing on the Trustee Motion for December 10 and 11, 2024 at 9:00 a.m. (MT), or as soon thereafter as the hearing may be held.

14.      The notice requirements for the appointment of a Chapter 11 trustee are governed by Bankruptcy Code section 1104 and related rules. According to section 1104(a), the court may appoint a trustee "after notice and a hearing". 11 U.S.C. § 1104. The phrase "after notice and a hearing" is defined in Bankruptcy Code section 102(1) to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances" *In re Basil St. Partners, LLC,* 477 B.R. 856, 866 (Bankr. M.D. Fla. 2012) (citing *In re Casco Bay Lines, Inc*., 17 B.R. 946, 950 n. 3 (1st Cir. BAP 1982)). The Debtors note that Rabo did not caption the Trustee Motion as an emergency motion. The Trustee Motion was also filed a mere eleven (11) days before Rabo set a hearing on the matter (which includes four weekend days). The Debtors are diligently and extensively preparing for the cash collateral and exclusivity hearings already set for December 10 and 11, 2024 in this case. As such, the Debtors and other parties in interest are prejudiced by the expedited timeline of the hearing set on the Trustee Motion.

## LAW AND ARGUMENT

15.      Section 1104(a) of the Bankruptcy Code governs appointment of a chapter 11 trustee. It provides:

> a)      At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of

assets or liabilities of the debtor; or

              (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

16.    At the outset it is important to recognize some basic principles which govern appointment of trustees in Chapter 11 cases. Bankruptcy Code sections 1107 and 1108 and case law all reiterate that there is a presumption in favor of the continuation of the debtor's operations as a debtor in possession. 5 *Collier on Bankruptcy* § 1104.01[7][b], pp. 1104-19-20 (15th Ed. 1988). As such, the appointment of a Chapter 11 Trustee is considered to be an extraordinary remedy which should not be taken lightly. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (noting "the appointment of a §1104 trustee is an extraordinary remedy"); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule.") (collecting cases).

17.    "[T]he standard for a § 1104 appointment is very high ..." *In re Smart World Technologies, LLC*, 423 F.3d 166, 176 (2d Cir. 2005). That is because there is a "strong presumption against appointing an outside trustee." *In re Marvel Enter. Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998).

18.    There is a strong presumption that a debtor should remain in possession absent a clear showing of a need for the appointment of a trustee. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990). This presumption is based on the general assumption that the debtor-in-possession is better suited to control the business and manage the reorganization process for the benefit of creditors and the estate. *See In re Costa Bonita Beach Resort Inc.*, 479 B.R. 14, 44 (Bankr. D. P.R. 2012); see also *In re Marvel Enter. Group, Inc.*, 140 F.3d. at 471 (Debtor's

"familiarity with the business it had already been managing at the time of the bankruptcy filing ...

often mak[es] it the best party to conduct operations during the reorganization.").  In addition, the

presumption against the appointment of a trustee is based upon the practicality that there is often

no need for one. *Official Committee of Asbestos Claimants v. G-I Holdings Inc. (In re G-IHoldings*

*Inc, et al),* 385 F.3d 313 (3rd Cir. 2004).  Further, the appointment of a trustee is accompanied by

a significant administrative burden. *In re Crescent Beach Inn, Inc*., 22 B.R. 155 (Bankr. D. Me.

1982).

19.    Given this strong presumption, the majority view is that the moving party must

prove by clear and convincing evidence that a Chapter 11 Trustee should be appointed.  *In re*

*Adelphia Communications Corp*., 336 B.R. 610, 656 (Bankr. S.D. N.Y. 2006), judgment aff'd, 342

B.R. 122 (S.D. N.Y. 2006); *In re National Staffing Services, LLC*, 338 B.R. 31, 33 (Bankr. N.D.

Ohio 2005).  While neither the Ninth Circuit nor the Ninth Circuit BAP appear to have addressed

the burden of proof under section 1104(a), bankruptcy courts in this circuit have applied the "clear

and convincing" evidence standard. *See, e.g., In re Minesen Co*., 2022 WL 5223909, * 1 (Bankr.

D. Haw., Oct. 3, 2022); *In re Briarwood Capital, LLC*, 2010 WL 2884949, *3 (Bankr. S.D. Cal.,

July 19, 2010); *In re Sonicblue Inc*., 2007 WL 926871, * 12 (Bankr. N.D. Cal., Mar. 26, 2007).

20.    Thus, the party seeking the appointment of a trustee must provide evidence which:

produces in the mind of the trier of fact a firm belief or conviction as to the truth of
the allegations sought to be established, evidence so clear, direct and weighty and
convincing as to enable [the factfinder] to come to a clear conviction, without
hesitancy, of the truth of the precise facts in issue.

*Official Committee of Asbestos Claimants v. G-I Holdings Inc. (In re G-I Holdings Inc, et*

*al),* 295 B.R. 502 (D. N.J. 2003) (citations omitted).

21.    The party seeking appointment of a Chapter 11 Trustee has the burden of showing,

by clear and convincing evidence, "cause" under section 1104(a)(1), or the need for a trustee under

section 1104(a)(2). *Euro- 7 American Lodging Corp*., 365 B.R. at 426; *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006) (citing *In re Marvel Entertm't Group, Inc*., 140 F.3d 463, 471 (3d Cir. 1998)).

**I.      No Cause Exists to Appoint a Chapter 11 Trustee under Section 1104(a)(1)**

22.    Rabo asserts that a Chapter 11 Trustee should be appointed for "cause" pursuant to section 1104(a)(1) of the Bankruptcy Code. Section 1104(a)(1) of the Bankruptcy Code provides that, upon request of a party in interest or the United States Trustee, the court shall order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause ...." 11 U.S.C. § 1104(a)(1). Examples of non-enumerated misconduct found by courts to constitute cause include: (i) failure to comply with provisions of the Bankruptcy Code; (ii) failure to make required filings; (iii) failure to abide by Court Orders; (iv) failure to file tax returns; (v) conflicts of interest; (vi) creditors lack confidence in the debtor; and (vii) failure to discharge fiduciary duties." *In re Eletson Holdings Inc*., 659 B.R. 426, 443 (Bankr. S.D.N.Y. 2024) (quoting *In re Sillerman*, 605 B.R. 631, 641–42 (Bankr. S.D.N.Y. 2019) (internal citations omitted).

23.    Section 1104(a)(1) recognizes that some degree of mismanagement exists in every bankruptcy case. A certain degree of pre-petition mismanagement of the debtor will not be cause for the appointment of a trustee. *In re Ionosphere Clubs, Inc*., 113 B.R. at 168. Even "in circumstances where fraud or mismanagement is present, the legislative history of section 1104(a)(1) suggests that the court ... 'balance the benefit to be gained from such an appointment against the detriment to the reorganization effort and the rights of the debtor that may result from such an appointment.'" *In re Hamilton*, No. 11–07491, 2012 WL 2204904, at *3 (Bankr.E.D.N.C.

June 14, 2012) (citations omitted).

24.    Rabo must prove by clear and convincing evidence that the appointment of a Chapter 11 Trustee is necessary due to the fraud, dishonesty, incompetence, or gross mismanagement of Debtors by current management. Rabo has failed to do so and has in fact based its Trustee Motion on incorrect facts, hearsay, unsupported allegations, and issues not relevant to the appointment of a trustee.

25.    Throughout this case Rabo has elected to make expansive arguments that are more appropriately considered in the context of confirmation than in connection with the Trustee Motion. This unfortunate and continued practice comes at enormous cost to the Debtors and their estates.

26.    Simple mismanagement does not constitute "gross mismanagement" justifying a trustee's appointment. *See  In re William A. Smith Const. Co., Inc.,* 77 B.R. 124, 126 (Bankr. N.D. Ohio 1987); *see also Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980)("The proper standard is … gross mismanagement, as opposed to mere mismanagement."). *In Anchorage Boat Sales, Inc.*, the bankruptcy court noted that "[s]ince one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11, the Court must find something more aggravated than simple mismanagement in order to appoint a trustee." *Matter of Anchorage Boat Sales, Inc.*, 4 B.R. at 645.

27.    Rabo has failed to meet the gross mismanagement standard.

**A.  Pre-petition Conduct**

28.    On multiple occasions, Rabo has continued to revive past history of the Debtors and this effort continues  in its Trustee Motion. While it is true that, under section 1104(a)(1), pre-

petition wrongs can sometimes be the basis for the appointment of a Chapter 11 trustee, the Bankruptcy Code focuses on a debtor's post-petition actions. Rare is the bankruptcy case that is not preceded by some mismanagement, which is why the microscope is on post-petition actions. *See, e.g., In re General Oil Distributors Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) (rejecting argument that pre-petition wrongful actions alone should lead to appointment of trustee and noting that "[t]he philosophy of chapter 11 is to give the debtor a 'second chance' and, consistent with such philosophy, current management should be permitted to identify and correct its past mistakes").

29.     Rabo, again, brings up many issues that were pre-petition and even pre-receivership. Rabo has argued several of these issues in prior hearings. Most, if not all, of these issues were precipitated by Rabo's own pre-bankruptcy actions. Without taking too much time to waste the Court and parties' time with a recitation of history, the Debtors would like to remind Rabo and this Court of the following which have been mentioned in the Debtors' First Day Motions, Cash Collateral Motions, during evidentiary hearings on cash collateral and DIP financing, and most recently in the Debtors' Disclosure Statement.

30.     In February of 2023, Rabo issued a notice of default to the Debtors because the borrowing base dropped under the $10 million borrowing base loan covenant. During this time, Rabo was always paid the monthly interest it was due, and MetLife continued to receive its principal and interest payments, even though the dairy industry was experiencing historically low milk prices and historically high feed prices. The Debtors were able to successfully sustain their revenues during these challenging times because of a consistent milk hedging strategy and other sectors of the Debtors' business, such as custom calf raising, fat and feeder cattle raising, and farming and trucking, generated additional revenues. These revenues ensured Rabo and MetLife

were paid.

31.     In May and June of 2023, the Debtors received term sheets from two banks to refinance its existing revolving line of credit with Rabo.  Both term sheets were conditioned upon MetLife providing approximately $45 million in additional financing to pay off $16.5 million in mezzanine debt and decrease the outstanding RLOC balance.  Although a traditional 60/40 debt to equity ratio on approximately $500 million of appraised real property would have enabled the Debtors to borrow over $100 million from MetLife, the Debtors sought only $45 million.  This would have resulted in an extremely conservative loan to debt ratio for MetLife.

32.     On June 9, 2023, after the completion of a major construction expansion, MetLife, inconsistent with its past practices of lending monies to Millenkamp Cattle, refused to provide any further funding to the Debtors to ensure a refinance of its short-term lending RLOC.  Therefore, due to MetLife refusing to fund its prior commitment of the $45 million additional funds, Rabo issued a Notice of Default in July 2023.  During this time, the dairy industry was experiencing its worst financial crisis in the past twenty years and the banking environment had shut down lending on not only real property, but also RLOCs from the dairy industry's largest lenders.

33.     In August of 2023, Rabo began sweeping steer and cull cow proceeds and continued to do so through the Petition Date (including over $5 million taken the day before Rabo knew the petition was being filed).  Between August of 2023 and April 2024, Rabo swept over $25 million and failed to revolve the money back in the ordinary course to ensure cattle were fed, approximately 513 employees were paid, and accounts payable were maintained on customary terms.  Rabo swept funds and added them to principal, default interest and excessive attorney and financial advisor fees.

34.     The inability of the Debtors to use the swept steer and cull cow proceeds slowly

DEBTORS' OBJECTION TO RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11
TRUSTEE  11

starved the Debtors of the working capital it needed to keep vendors paid on a timely basis. This was a deliberate action by Rabo to squeeze the Debtors and their vendors out of working capital and eventually force the Chapter 11 filings. Rabo knew the milk checks and custom calf raising funds were not enough to cover the amounts swept and would leave the Debtors with a monthly shortfall.

35.    While Rabo continued to squeeze the Debtors of their working capital, it collected not only its interest, but also its default interest and attorneys' fees. Had Rabo simply revolved the monies that the Debtors generated from its steers and cull cows, the Debtors would have been able to pay all their vendor bills in its ordinary course of business. Similarly, MetLife has continually received its monthly interest and principal without fail. Except for 2023, the Debtors have been profitable for the past 27 years and would have been profitable in 2023 had they not been forced to pay over $15 million in default interest, attorneys fees, financial advisor fees and lost opportunity costs.

36.    The issues that led these Chapter 11 Cases were not based entirely on the operations of the Debtors; rather, these issues were brought on by the lending institutions which refused to work cooperatively with each other and the Debtors.

37.    Based on the foregoing, Rabo has not provided sufficient evidence that Debtors' pre-petition conduct warrants the appointment of a Chapter 11 Trustee.

**B. Post-Petition Conduct**

38.    Rabo also hasn't met its high burden of proving post-petition wrongdoings constituting "cause" that warrant the appointment of a Chapter 11 Trustee. The Trustee Motion says nearly nothing of substance about post-petition misconduct. The  evidence of material post-petition misconduct is threadbare.

39.     Throughout the bankruptcy process, the Debtors have shown nothing but respect for the bankruptcy process by cooperating fully with the Court, the Committee, the United States Trustee, Rabo, Metlife, Conterra, and other parties in interest.

40.     The Debtors have acted in good faith and have remained responsive to all reasonable requests of creditors in these chapter 11 cases despite being compelled to fight a multi-front battle with Rabo nearly every step of the way.

41.     The Debtors have been very transparent and have worked cooperatively with Rabo, MetLife, Conterra, (collectively, the "Pre-Petition Secured Lenders"), and the Committee and their professionals. In fact, Kander, the Debtors' financial advisors, have weekly meetings with the financial advisors of the Pre-Petition Secured Lenders and the Committee in which the parties discuss the Debtors' financial models, budgets, weekly reporting, and other potential concerns.

42.     The Debtors also provide the Pre-Petition Lenders, Sandton, and the Committee with the following financial and other reporting.

   a.  Weekly variance reports (i.e., reports reflecting the difference between the budgeted amount of revenue and expenses and the actual amounts);

   b.  Weekly borrowing base certificate;

   c.  Sales reports prepared by or on behalf of the Debtors' product off-takers;

   d.  The Debtors have provided all potential term sheets to the financial advisors of the Pre-Petition Secured Lenders and Committee; and

   e.  The Debtors, upon reasonable request of the Pre-petition Secured Lenders, Sandton, or the Committee, provide access to appraisals of all assets and contracts/agreements tied to the budget/forecast.

43.     Notably, none of the parties have raised any issues in the eight months this case has

been pending regarding the Debtors' reporting.

44.    In paragraph 40 of the Trustee Motion, Rabo cites to *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 180, (Bankr. S.D.N.Y. 1990), and states that "continuing losses to the estates and Debtors' inability to stem these losses warrant the appointment of a trustee."

45.    In *In re Ionosphere Clubs, Inc.*, the court held that cause existed to appoint a Chapter 11 Trustee due to the following factors: (1) debtor's continuous failure to meet operating projections and (2) debtor's inability to meet the terms of reorganization agreements with the creditor's committee. The court emphasized that the debtor not only missed its operating projections but that actual losses were much greater than the projected losses. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 179, 180, (Bankr. S.D.N.Y. 1990). The losses were 136% and 170% more than the projected losses for two time periods. *See id.*

46.    In contrast, the Debtors have shown through their budgets and through the most recent cash collateral budget and plan projections filed with the Court, that the Debtors have been operating at a better cash flow than projected. In fact, the Debtors have not had to make any additional draws on the DIP loan as previously anticipated and approved.

47.    Most of Rabo's post-petition arguments are in regard to the Debtors' efforts in refinancing and the filing of their First Amended Plan and First Amended Disclosure Statement.

48.    From the very beginning of the Trustee Motion, Rabo makes it clear that its primary purpose and concern in filing the Trustee Motion is that Rabo does not favor the Debtors' First Amended Plan.

49.    Courts have denied motions to appoint a Chapter 11 Trustee when a creditor's obvious purpose is to keep a plan from being confirmed. *See In re Shotwell Landfill, Inc.*, No. 13-02590-8-SWH, 2014 WL 4377721, at *4 (Bankr. E.D.N.C. Sept. 4, 2014); *see also In re RMS*

*Titanic, Inc.,* No. 3:16-BK-2230-PMG, 2018 WL 11205929, at *3 (Bankr. M.D. Fla. June 29, 2018) (court held that the trustee motion should be denied at the time, "and the sale proponents should be permitted to develop their liquidation plans in accordance with the procedures of Chapter 11.); *see also In re Sundale, Ltd.,* 400 B.R. 890, 907 (Bankr. S.D. Fla. 2009) ("[W]hile there have been missteps, the case is moving forward, the Debtors have filed the Joint Plan and their ability to reorganize will be tested through the confirmation process.").

50.     In *In re Shotwell Landfill, Inc.,* the court denied the motion to appoint a Chapter 11 trustee, where the court determined that the issues raised in the motion were appropriate for resolution in the confirmation process, which was underway. *In re Shotwell Landfill, Inc.,* No. 13-02590-8-SWH, 2014 WL 4377721, at *4. In *Shotwell Landfill,* the court specifically asked the party's counsel who filed the motion to appoint a Chapter 11 trustee whether the purpose of the motion was to "keep a plan from being confirmed, not because there are now emergency situations that require a Chapter 11 trustee." *Id.* The movant's counsel told the court that wasn't true and that they had been investigating filing the motion for a long time. The movant argued that they had "a situation where we are finding out more and more as time goes on…both operational problems and self dealing and all the other stuff. It continues post petition." *Id.*

51.     The movant also argued that it affects confirmation "because Mr. King is the same person who would be operating this for however many years his plan goes on and the creditors can't depend ... on him to be open, much less that he will meet his obligations. He's shown himself to be untrustworthy. That's the short answer that I would give to you." *Id.* at 5. The court then responded noting "and that, of course would go to feasibility." *Id.* In its analysis, the court noted that "based upon all the evidence presented, it appeared to the court that what movants primarily sought to establish was that the debtors' owner Mr. King could simply not be trusted to work with

DEBTORS' OBJECTION TO RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE  15

or for any of the debtors in any capacity, based upon his actions both pre- and post-petition." *Id.*
The court noted that "Mr. King's performance may be imperfect, but it appears to be in all respects
competent, such that Mr. King's ongoing involvement with the coordinated operation of Shotwell
and the related companies is very likely in the debtors' and creditors' best interests, at least for the
foreseeable future."

52.    The court then analyzed the arguments of financial misconduct and self-dealing of
Mr. King. In that analysis, the court stated that "this has been an acrimonious case as between the
parties, and movants' use of hyperbole and unnecessarily voluminous filings has done nothing but
exacerbate matters." *Id*. at 7. The court concluded, based on the testimonial evidence presented
over two days of hearings and in the thousands of pages of supporting material, that

> management of the debtors' finances will require professional, outside intervention
> to determine the current status of each of the debtors and to establish crucial
> protocols going forward. That does not, however, warrant the appointment of a
> Chapter 11 trustee over the debtors' objections. As discussed above, not only did
> movants fail to establish that Mr. King is incompetent to remain involved in the
> debtors' operations, the court was instead left with the solid impression that Mr.
> King's present involvement in landfill operations is appropriate at this time.

> *Id.* at 8.

53.    The facts in *Shotwell Landfill* are remarkably similar to those in this case. This has
been a highly contentious case in which Rabo has filed "several unnecessary voluminous filing
that have done nothing but exacerbate matters." See *id*. at 7. Like *Shotwell Landfill,* most of Rabo's
arguments are arguments against plan confirmation, not in favor of the appointment of a trustee.
Rabo chose not to file the Trustee Motion until it received a draft of the First Amended Plan, that
it obviously does not support. The Debtors are also unique, as the Debtors consist of one of the
largest diaries in the country. There are very few people who can manage the Debtors of this size
and complexity. There have been no arguments from other parties, specifically creditors and

vendors, regarding Mr. Millenkamp's ability to manage the Debtors. Coincidentally enough, Rabo has not suggested someone who would be able to come in and manage the Debtors. Parties are already aware of what happened when a receiver was appointed which caused mass chaos with Debtors' vendors.

54.     Moreover, there is no evidence that Rabo has provided that the Debtors are being operated poorly. In fact, cash flow is better than expected as the Debtors have not had to advance on the last authorized DIP advance.

55.     Further, in *In re RMS Titanic, Inc.,* the court denied the motion to appoint a Chapter 11 trustee even though it had been two years since the bankruptcy case was filed and the debtor had proposed three separate methods to sell some or all of its assets. *In re RMS Titanic, Inc.,* 2018 WL 11205929, at *3. The court considered the unique nature of the debtor's assets and the current progress toward plan confirmation. Like *RMS Titanic*, the Debtors have a unique, large, and complex operation, however, unlike that case, the Debtors have only been in bankruptcy for eight (8) months. This is much less time, especially considering the Debtors' operations.

56.     Also in *In re Sundale, Ltd.*, the court acknowledged that the debtor had many missteps since the bankruptcy filing, however, the court noted that "the case is moving forward, the Debtors have filed the Joint Plan and their ability to reorganize will be tested through the confirmation process." Like *Sundale*, the Debtors are moving this case forward and have filed their First Amended Plan and First Amended Disclosure Statement. The Debtors' ability to reorganize will be tested through the confirmation process as the bankruptcy contends.

57.     Based on the foregoing, Rabo has not met their high burden that "cause" exists under section 1104(a)(1) to warrant appointment of a Chapter 11 Trustee.

## II.      The Appointment of a Chapter 11 Trustee is Not in the Best Interests of Creditors or Other Parties in Interest

58.      Rabo has also failed to show that the appointment of a Chapter 11 Trustee would be "in the interests of creditors, any equity security holders, and other interests of the estate." *See* 11 U.S.C. § 1104(a)(2). The determination of best interests is a fact intensive inquiry that courts make on a case-by-case basis. *See In re New Orleans Paddlewheels, Inc*., 350 B.R. 667, 692 (Bankr. E.D. La. 2006). Courts analyzing whether the appointment of a Chapter 11 Trustee is in the best interest of creditors have examined numerous factors, including: "(a) the trustworthiness of the debtor; (b) the debtor's past and present performance and prospects for rehabilitation; (c) the confidence—or lack thereof—of the business community and of creditors in present management; and (d) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment." *In re Sillerman*, 605 B.R. 631, 652 (Bankr. S.D.N.Y. 2019).

59.      Appointment of a trustee is likely **not** to be in the best interests of parties where current management's experience and knowledge are essential to the debtor's future. *See In re Stein & Day, Inc*., 87 B.R. 290, 295 (Bankr. S.D.N.Y. 1988) (emphasis added).   Where the debtor's business affects a large segment of the public, the public interest and confidence has been held to be a significant factor in the decision to appoint a trustee. *See In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D. N.Y. 1990). Further, appointment will be denied where a trustee would benefit only one creditor while burdening the entire estate. *In re Stein and Day, Inc*., 87 B.R. 290 (Bankr. S.D. N.Y. 1988) (motion denied where made by one secured creditor and vigorously opposed by other secured creditor and unsecured creditors).

60.      As set forth in *WorldCom*, "[u]nder section 1104(a)(2), a creditor group, no matter how dominant, cannot justify the appointment of a trustee simply by alleging that it would be in its interests." *In re WorldCom, Inc*., No. 02-13553 (AJG), 2003 Bankr. LEXIS

2192, at *19 (Bankr. S.D.N.Y. May 16, 2003) (citations omitted). The *WorldCom* court went on to say "[i]t is important to remember that the "interests" standard requires a finding that appointment of a trustee would be in the interest of essentially all interested constituencies." The *WorldCom* court also held that the appointment of a Chapter 11 Trustee at the stage right before plan confirmation, "could significantly delay the progress that has been made on the eve of potential solicitation of the Debtors' amended plan." *Id.* The court noted that the appointment would not only cause delay, but would also be costly.

61.     One of the significant factors is that of cost. A Chapter 11 Trustee will invariably impose an administrative burden on the estate, in many cases exacerbated by the reality that the appointment of a trustee can often curtail or even end business operations that might otherwise have generated cash flow for the enterprise in bankruptcy. *In re Eletson Holdings Inc*., 659 B.R. 426, 453 (Bankr. S.D.N.Y. 2024). *See id.* Courts are often quite reluctant to impose such a burden, especially if the court believes that the person ultimately penalized will be whomever is appointed. Like in *WorldCom*, the Debtors have proposed a plan, and appointment of a Chapter 11 Trustee at this stage would be costly. *See id.*

62.     As mentioned above, the Debtors have been transparent and cooperative with all parties, especially their Pre-Petition Secured Lenders, the Committee, and the United States Trustee. The Debtors have acted in good faith and remained responsive to all reasonable requests.

63.     During the eight (8) months that the bankruptcy cases have been pending, no objections or concerns have been raised respecting the operation and management of the Debtors, the receipt and disbursement of funds or the sufficiency of the financial reporting. Accordingly, there is no issue with respect to the Debtors' post-petition operations. Debtors, through their current management, have also proposed a First Amended Plan that will pay in full all nonpriority

unsecured creditors, all priority unsecured creditors, and Rabo, Conterra and Sandton (leaving just MetLife with a continuing financial commitment). Current management, including Mr. Millenkamp, skillfully manage their relationships with most of the Debtors' creditors to maximize the possibility for survival for the ultimate benefit of stakeholders.

64.    Also as stated above, the Debtors' operations are complex and current management and Mr. Millenkamp have built relationships and trust with current vendors and Debtors' employees for over 20 years.  In fact, Rabo's own witness at the April 10, 2024 hearing, Mr. McKinley with Ampleo, the state-court receiver, testified that "Mr. Millenkamp is an exceptional operator. He knows how to operate a dairy and a calf ranch." Transcript of Hearing, April 10, 2024, 28:6-7.

65.    Appointing a Chapter 11 Trustee will revert back to the mistrust of the Debtors' vendors and employees of the receiver during the receivership.  Further, appointment of a Trustee would very likely result in Mr. Millenkamp discontinuing further involvement with the company and vendors, and many other key employees would also likely begin searching for new employment.  The Chapter 11 Trustee would undoubtedly be faced with operating a complex company without the institutional knowledge of current management.

66.    Rabo has provided no evidence of public mistrust of Debtors' current management nor have they provided evidence of other creditors' distrust in current management. Like many of the matters throughout this case, this is essentially a two party dispute between Rabo and the Debtors.

67.    In the Trustee Motion, Rabo raised issues related to a pending criminal charge against Mr. Millenkamp.  The Debtors have filed a Motion in Limine to exclude any evidence of this charge, which remains pending.  However, even accepting the allegations of the criminal

charge as true, those allegations are unrelated to any work Mr. Millenkamp does for the Debtors, including his management or operation of the Debtors.  Those allegations cannot, and should not, create "cause" for appointment of a Chapter 11 Trustee.  At best, the unproven allegations may raise a feasibility issue in the context of plan confirmation – but that issue is not yet before the Court.

68.    The appointment of a Chapter 11 Trustee under the facts set forth would likely result in a diminished recovery for creditors and interest holders alike, as appointing a trustee would dramatically increase the administrative costs associated with the case and would delay plan confirmation.

69.    The appointment of a Chapter 11 Trustee is not in the best interest of debtors' creditors and other interested parties. There is no evidence before this Court that the Debtors have abused the bankruptcy system to the high standard necessary for appointing a Chapter 11 Trustee.

70.    Rabo has failed to meet their burden that appointment of a trustee would be in the interest of essentially all interested parties.

## **CONCLUSION**

71.    Rabo has preemptively attempted to make arguments that are more appropriate for plan confirmation, has failed to meet its high burden that "cause" exists for appointment of a trustee, and has failed to meet its high burden that appointment of a trustee would be in the interest of essentially all interested parties.

**WHEREFORE**, the Debtors respectfully request the Court enter an order denying Rabo AgriFinance, LLC's Motion to Appoint a Chapter 11 Trustee, and for any further relief as is just and equitable under the circumstances.

DEBTORS' OBJECTION TO RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE  21

Dated: December 7, 2024                    Respectfully submitted,


**DENTONS**


*/s/ Krystal R. Mikkilineni*
Krystal R. Mikkilineni


**JOHNSON MAY**


*/s/ Matthew T.  Christensen*
Matthew T. Christensen

Attorneys for Debtors

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 7th day of December 2024, I caused to be served a true and correct copy of the foregoing document electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| J. Justin May | jjm@johnsonmaylaw.com |
| Krystal R. Mikkilineni | krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | Tirzah.rousell@dentons.com |
| US Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Gery W. Edson | gedson@gedson.com |
| J.B. Evans | evans.jb@dorsey.com |
| Zachary Fairlie | zfairlie@spencerfane.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| John O'Brien | jobrien@spencerfane.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine P. Reynard | janine@averylaw.net |
| Sheila R. Schwager | sschwager@hawleytroxell.com |
| Brent R. Wilson | bwilson@hawleytroxell.com |
| Brian Faria | brian@sawtoothlaw.com |
| Robert A. Foucher | rfaucher@hollandhart.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| John F. Kurtz | jfk@kurtzlawllc.com |
| Jed W. Manwaring | jmanwaring@evanskeane.com |
| Rhett M. Miller | rmiller@magicvalley.law |
| John D. Munding | john@mundinglaw.com |
| Jason R. Naess | jason.r.naess@usdoj.gov |
| Holly Roark | holly@roarklawboise.com |
| Evan R. Roth | evan@sawtoothlaw.com |
| Julian Gurule | jgurule@omm.com |
| Matthew Kremer | mkremer@omm.com |
| Gabriel L. Olivera | golivera@omm.com |

Any others as listed on the Court's ECF Notice.

/s/ *Krystal R. Mikkilineni*
Krystal R. Mikkilineni

DEBTORS' OBJECTION TO RABO AGRIFINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE  23