Sheila R. Schwager, ISB No. 5059
Brent R. Wilson, ISB No. 8936
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5261
Email: sschwager@hawleytroxell.com
bwilson@hawleytroxell.com

Andrew J. Schoulder (*pro hac vice*)
Francisco Vazquez (*pro hac admission pending*)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com

*Attorneys for Rabo AgriFinance LLC*

## UNITED STATES BANKRUPTCY
## COURT DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Case No.  24-40158-NGH |
| MILLENKAMP CATTLE INC. | Chapter 11 |
| Debtor. | |
| Filing relates to: | Jointly Administered with Case Nos.: |
| ☒ ALL DEBTORS | 24-40159-NGH (Idaho Jersey Girls) |
| ☐  Millenkamp Cattle, Inc. | 24-40160-NGH (East Valley Cattle) |
| ☐  Idaho Jersey Girls | 24-40161-NGH (Millenkamp Properties) |
| ☐  East Valley Cattle | 24-40162-NGH (Millenkamp Properties II) |
| ☐  Millenkamp Properties | 24-40163-NGH (Millenkamp Family) |
| ☐  Millenkamp Properties II | 24-40164-NGH (Goose Ranch) |
| ☐  Millenkamp Family | 24-40166-NGH (Black Pine Cattle) |
| ☐  Goose Ranch | 24-40167-NGH (Millenkamp Enterprises) |
| ☐  Black Pine Cattle | 24-40165-NGH (Idaho Jersey Girls Jerome |
| ☐  Millenkamp Enterprises | |
| ☐  Idaho Jersey Girls Jerome Dairy | |

## DISCLOSURE STATEMENT FOR CHAPTER 11 FOR MILLENKAMP CATTLE, INC. AND ITS RELATED DEBTOR AFFILIATES PROPOSED BY PLAN PROPONENTS

### To the Creditors of Millenkamp Cattle,

In April 2024, the Debtors commenced these chapter 11 cases with assurances that the three largest secured lenders were grossly oversecured and promised to emerge from bankruptcy in August 2024 under a plan of reorganization that would pay everyone in full.

As of February 3, 2025, creditors, as a whole, are no closer to payment in full than they were 11 months ago. In December 2024, the Debtors filed a Plan that continues to make this promise. However, it is a promise that the Debtors cannot deliver on as the Debtors' December Plan is incapable of being confirmed for a number of very material reasons.

To make the situation worse, once the Debtors' December Plan fails, the Debtors do not have a safety net for any creditors. Moreover, there is no backup if the Bankruptcy Court finds that the Debtors' December Plan does not satisfy all of the requirements of the Bankruptcy Code. And as currently proposed, it cannot.

What does this mean for you, as a creditor? Stated simply, without a backup plan, if the Debtors continue down the current path of seeking confirmation of a Plan that cannot be confirmed, the Bankruptcy Court will likely have no other choice than to convert the cases to cases under chapter 7 and have a chapter 7 trustee liquidate the Debtors' assets. A chapter 7 liquidation will likely result in a material loss in the value of the Debtors' assets, resulting from, in part, the additional costs associated with and the sale prices in a chapter 7 bankruptcy. Your chances of and the amount of a recovery will be diminished in a chapter 7 liquidation.

The Toggle Plan described herein attempts to avoid this path that the Debtors are on.  There are a number of reasons you should support the Toggle Plan:

1. **The Toggle Plan proposes to share the risk amongst existing equity owners and creditors alike.** More specifically, under the Reorganization Toggle, the Toggle Plan provides the existing owners of the Debtors, including Mr. William Millenkamp, with an option to reorganize and continue to operate. To achieve that, the Reorganization Toggle requires that the existing equity owners contribute $29 million of new equity into their business and, as they themselves propose, sell a small percentage of their real estate – Canyonlands and McGregor.

How is that different than the Debtors' December Plan?

- Instead of reducing the amount of debt, the Debtors are proposing to increase the amount of debt coming out bankruptcy by $45 million which increases the amount of risk to you.
- By adding more debt and no equity, the Debtors are shifting the risk to creditors by making them wait several years, if at all, to get repaid while the existing owners preserve their personal assets and keep the Debtors' equity for no consideration. Effectively, existing equity gets a free option on the backs of creditors.

59797.0007.18169759.1

The Reorganization Toggle makes it fair for everyone by requiring the existing equity owners to invest $29 million – which represents ***7% of the equity value ascribed by the Debtors***. The $29 million can come directly from the existing equity owners or from new investors. By eliminating the need for $45 million of new loans, the Debtors would emerge with less debt and increase the likelihood of being able to refinance its significant secured debt and repaying vendors and suppliers.

2. **The Toggle Plan has a backup safety net.** If the existing equity holders do not want to share the risk with creditors, the Toggle Plan provides for a marketing process to sell the Debtors' businesses as a going concern to a new owner with the financial ability to pay vendors on time in the ordinary course, preserve jobs, and inject additional cash when necessary to preserve the welfare of livestock through market downturns.

3. **The Toggle Plan has a backup to the backup safety net**. The Plan Proponent is a creditor that, like you, wants to be repaid. For that reason, we are not leaving anything to chance which is why the Toggle Plan also contemplates a sale of the Debtors' different business units – so while, the Debtors would not operate as a vertically integrated enterprise, if successful, the Debtors business units would be sold to different buyers. As the last alternative, if there aren't any interested parties for the Debtors' business units, the Debtors' assets would be liquidated.

4. **The Plan Proponent is committing to provide a $4.523 million backstop.** Under either sale scenario, the Plan Proponent is committed to providing a backstop recovery that would guarantee holders of Allowed General Unsecured Claims receive a pro rata share of a Four Million Five Hundred Twenty Three Thousand Dollars ($4,523,000) recovery from the first proceeds of the Plan Proponent's collateral.

Through the Toggle Plan, the Plan Proponent provides all stakeholders with two paths – one in which the Debtors and existing equity holders reorganize as a going concern by reducing debt and sharing the risk with their creditors or, as a backup to preserve recoveries, a path whereby the Debtors' assets are monetized to maximize the value for all creditors.

The Plan Proponent encourages you to support the Toggle Plan and urges the Debtors and their existing equity holders to do so as well.

59797.0007.18169759.1

**NOTE: THIS TOGGLE DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE**

## DISCLAIMER

THIS TOGGLE DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE CHAPTER 11 PLAN FOR MILLENKAMP CATTLE, INC. AND ITS RELATED DEBTOR AFFILIATES PROPOSED BY THE PLAN PROPONENTS (WHICH TOGGLE PLAN THE PLAN PROPONENTS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT). THE INFORMATION CONTAINED IN THIS TOGGLE DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE TOGGLE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS TOGGLE DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE TOGGLE PLAN.

THIS TOGGLE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE TOGGLE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE TOGGLE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE TOGGLE PLAN AND THIS TOGGLE DISCLOSURE STATEMENT, THE TOGGLE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ THIS TOGGLE DISCLOSURE STATEMENT AND THE TOGGLE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE TOGGLE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS TOGGLE DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. FURTHER, CERTAIN STATEMENTS CONTAINED HEREIN ARE BASED ON INFORMATION AND STATEMENTS PREVIOUSLY DISCLOSED OR MADE BY THE DEBTORS UPON WHICH THE PLAN PROPONENTS HAVE RELIED UPON FOR PURPOSES OF PREPARING THIS TOGGLE DISCLOSURE STATEMENT. ALTHOUGH THE PLAN PROPONENTS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES OR SUBSEQUENT KNOWLEDGE COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE TOGGLE PLAN, THIS TOGGLE DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT IT IS BASED ON THE DEBTORS' DISCLOSURE STATEMENT OR OTHER FILINGS, CERTAIN EVENTS DO OR DO NOT OCCUR, OR THE PLAN PROPONENTS LEARN OR DISCOVER ADDITIONAL FACTS. THE PLAN PROPONENTS HAVE REQUESTED

59797.0007.18169759.1

CERTAIN INFORMATION FROM THE DEBTORS TO ASSIST IN THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, BUT HAVE NOT RECEIVED SUCH INFORMATION AS OF THE FILING OF THIS TOGGLE DISCLOSURE STATEMENT. TO THE EXTENT THAT THE PLAN PROPONENTS OBTAIN SUCH ADDITIONAL INFORMATION OR OTHERWISE BECOME AWARE THAT INFORMATION PREVIOUSLY PROVIDED BY THE DEBTORS CAN NO LONGER BE RELIED UPON, THE PLAN PROPONENTS WILL AMEND AND MODIFY THIS TOGGLE DISCLOSURE STATEMENT ACCORDINGLY.

THIS TOGGLE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS TOGGL DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS TOGGLE DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS TOGGLE DISCLOSURE STATEMENT AND THE TOGGLE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE PLAN PROPONENTS MAKE STATEMENTS IN THIS TOGGLE DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE PLAN PROPONENTS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE TOGGLE PLAN OR DISTRIBUTIONS THEREUNDER. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS TOGGLE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE TOGGLE PLAN AND DISTRIBUTIONS THEREUNDER.

59797.0007.18169759.1

# TABLE OF CONTENTS

I.      To the Creditors of Millenkamp Cattle, ................................................................. 2

II.     INTRODUCTION ............................................................................................... 3

    A.      Overview of the Toggle Plan ..................................................................... 3

        1.      General Structure of the Toggle Plan ............................................. 3

        2.      Summary of Treatment of Claims and Interests Under the Toggle Plan .... 4

    B.      Toggle Plan Voting Instructions and Procedures ...................................... 8

        1.      Voting Rights ............................................................................ 8

        2.      Solicitation Materials ................................................................ 9

        3.      Voting Instructions and Procedures ........................................... 10

        4.      Confirmation Hearing and Deadline for Objections to Confirmation ...... 12

III.    BACKGROUND REGARDING THE DEBTORS ................................................ 13

    A.      Overview of the Debtors ......................................................................... 13

    B.      Debtors' Corporate Structure .................................................................. 14

    C.      Debtors' Prepetition Capital Structure .................................................... 15

        1.      Pre-Petition RLOC Credit Agreement ...................................... 16

        2.      MetLife Secured Loans ............................................................ 18

        3.      Conterra ................................................................................... 20

        4.      Other Secured Obligations ....................................................... 21

            i.      Equipment Liens ........................................................... 21

            ii.     Statutory Liens .............................................................. 21

        5.      General Unsecured Claims ....................................................... 21

    D.      Events Leading to the Chapter 11 Cases ................................................. 21

IV.     THE CHAPTER 11 CASES ............................................................................... 22

    A.      First Day Orders and Initial Employment Applications ........................... 23

    B.      Applications to Employ Professionals ..................................................... 23

    C.      Appointment of the Creditors' Committees ............................................. 24

    D.      United States Trustee .............................................................................. 24

    E.      Meeting of Creditors .............................................................................. 24

    F.      Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed
        Claims ................................................................................................... 24

    G.      Cash Collateral Motions ......................................................................... 25

    H.      Sandton DIP Loan .................................................................................. 26

    I.      503(b)(9) Motion ................................................................................... 26

59797.0007.18169759.1

J. Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries ................................................................................. 27

K. 506(b) Motion .................................................................................................. 28

L. Appointment of a Chief Restructuring Officer .................................................. 29

M. Debtors' Plan Filing & Solicitation Exclusivity ............................................. 29

V. SUMMARY OF THE CHAPTER 11 TOGGLE PLAN .............................................. 29

A. Purpose and Effect of the Toggle Plan ................................................................ 30

1. Classification of Claims and Interests Under the Toggle Plan ................. 30

2. Classification and Voting Controversies ...................................................... 31

B. Treatment of Administrative Claims Under the Toggle Plan ............................... 31

1. 503(b)(9) Claims ............................................................................................ 32

2. Professional Fee Claims ................................................................................. 32

C. Treatment of Priority Tax Claims under the Toggle Plan ..................................... 34

D. Treatment of DIP Claims under the Toggle Plan ................................................... 34

E. Class 1: Other Priority Claims ............................................................................. 34

F. Class 2: Corn Silage Group Secured Claims ........................................................ 35

G. Class 3: Other Secured Ag Lien Claims ............................................................... 36

1. Class 3A: A. Scott Jackson Trucking Secured Claim ............................... 36

2. Class 3B: B&H Farming Secured Claim ...................................................... 37

3. Class 3C: H&M Custom, LLC Secured Claim ............................................ 37

4. Class 3D: Healthy Earth Enterprises, LLC Secured Claim ...................... 37

5. Class 3E: Kraus Farms, LLC Secured Claim .............................................. 38

6. Class 3F: Milner Hay Company, LLC Secured Claim ............................... 38

7. Class 3G: Moss Grain Partnership Secured Claim .................................... 39

8. Class 3H: NorthWest Seed, Inc Secured Claim ........................................ 39

9. Class 3I: Performance Plus-Idaho, LLC Secured Claim .......................... 39

10. Class 3J: Tyche Ag, LLC Secured Claim .................................................... 40

11. Class 3K: Wada Farms Partnership Secured Claim .................................. 40

12. Class 3L: Youree Land & Livestock Secured Claim ................................. 41

13. Class 3M: Eagle Creek Northwest, LLC Claim......................................... 41

14. Class 3N: Standlee Ag Resources and Premium Products Secured Claim ................................................................................................................. 42

H. Class 4: MetLife Secured Claims ......................................................................... 42

I. Class 5: RLOC Secured Claims ............................................................................ 43

J. Class 6: Conterra Secured Claims........................................................................ 47

ii

K.    Class 7: Secured Equipment and Vehicle Lien Claims ......................................... 48

   1.    Class 7A: CNH Industrial Capital Secured Claim .................................... 48

   2.    Class 7B: Daimler Truck Financial Services USA LLC Secured Claim .. 50

   3.    Class 7C: Farmers Bank ........................................................................... 51

   4.    Class 7D: John Deere Construction & Forestry Secured Claim ............... 52

   5.    Class 7E: Western States Cat Secured Claim ........................................... 53

   6.    Class 7F: Kenworth Sales Company Secured Claim ................................ 54

L.    Class 8: Other Secured Claims ........................................................................... 54

   1.    Class 8A: MWI Veterinary Secured Claim .............................................. 55

   2.    Class 8B: Performix Nutrition Systems Secured Claim ........................... 56

   3.    Class 8C: Rexel USA, Inc. d/b/a Platt Electric Supply Claim .................. 56

   4.    Class 8D: Staker & Parson Company d/b/a Idaho Materials &
         Construction Claim ................................................................................... 56

   5.    Class 8E: Les Schwab Tire Centers of Idaho, LLC Claims ...................... 57

M.    Class 9: General Unsecured Claims ..................................................................... 57

N.    Class 10: Intercompany Claims ........................................................................... 58

O.    Class 11: Equity Interests .................................................................................... 58

P.    Special Provisions Regarding Unimpaired Claims .............................................. 59

VI.    RELEASES AND EXCULPATION PROVISIONS ...................................................... 59

A.    Debtors' Releases ................................................................................................. 59

B.    Exculpation and Limitation of Liability .............................................................. 60

VII.    MEANS FOR IMPLEMENTATION OF TOGGLE PLAN ........................................... 60

A.    Substantive Consolidation ................................................................................... 61

B.    Transaction Overview .......................................................................................... 61

C.    Restructuring Transactions ................................................................................... 61

D.    Vesting of Assets of the Debtors ......................................................................... 62

E.    Authority .............................................................................................................. 62

F.    Corporate Existence ............................................................................................. 63

G.    Employee Obligations .......................................................................................... 64

H.    Workers Compensation Program .......................................................................... 65

I.    Pursuit and Resolution of Estate's Causes of Action ........................................... 65

J.    No Successor Liability .......................................................................................... 66

K.    Preservation of Privileges and Defenses .............................................................. 66

L.    Preservation of Rights of Action .......................................................................... 66

   1.    Maintenance of Avoidance Actions and Causes of Action ....................... 66

iii

| | | 2. | Preservation of All Estates' Causes of Action Not Expressly Settled or Released | 67 |
| | M. | Cancellation of Instruments | | 67 |
| | N. | Insurance Policies Remain in Force | | 67 |
| | O. | Insurance Policies; Employment Practice Liability Policies | | 68 |
| | P. | Intercreditor Agreements | | 68 |
| VIII. | | REORGANIZATION TOGGLE | | 68 |
| | A. | Reorganization Toggle Requirements | | 68 |
| | B. | Pre-Confirmation Milestones | | 68 |
| | C. | Priority-GUC Reserve | | 69 |
| | D. | Effective Date Reserve | | 70 |
| | E. | Reorganized Holding Company | | 70 |
| | F. | Post-Effective Date Governance and Management. | | 70 |
| | | 1. | Initial Executive Officers | 70 |
| | | | i. | *Chief Executive Officer.* | 70 |
| | | | ii. | *Chief Financial Officer.* | 70 |
| | | 2. | Independent Board | 71 |
| | G. | Post-Effective New Common Stock Ownership | | 71 |
| | H. | Post-Effective Reorganized Preferred Ownership | | 71 |
| | I. | Animal Welfare Reserve | | 72 |
| | J. | Post-Effective Date Milestones | | 72 |
| | | 1. | Refinancing Milestones | 72 |
| | | 2. | Post-Effective Strategic Sale Milestones: | 73 |
| IX. | | GOING CONCERN 363 SALE TOGGLE | | 74 |
| | A. | Going Concern 363 Sale Toggle Event | | 74 |
| | B. | Going Concern 363 Sale | | 74 |
| | C. | Allocation of Going Concern 363 Sale Proceeds. | | 75 |
| X. | | BUSINESS UNIT 363 SALE TOGGLE | | 76 |
| | A. | Business Unit 363 Sale Toggle Event | | 76 |
| | B. | Business Unit 363 Sale | | 76 |
| | C. | No Qualified Business Unit 363 Sale Offers | | 77 |
| | D. | Distribution of Business Unit 363 Sale Proceeds | | 78 |
| XI. | | CORPORATE GOVERNANCE UNDER THE SALE TOGGLES | | 78 |
| | A. | Corporate Governance | | 78 |
| | B. | Plan Administrator Authority | | 79 |

iv

C.     GUC Backstop ............................................................... 81

D.     Avoidance Actions ........................................................ 82

XII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................................... 82

A.     Reorganization Toggle .................................................. 82

B.     Going Concern 363 Sale Toggle and Business Unit 363 Sale Toggle ................. 84

C.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ........... 84

D.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 85

E.     Assumption Dispute Resolution ...................................... 87

F.     Contracts and Leases Entered Into After the Petition Date.................................. 88

G.     Modifications, Amendments, Supplements, Restatements, or Other Agreements 88

H.     Reservation of Rights..................................................... 89

I.     Nonoccurrence of Effective Date................................... 89

XIII.  RISK FACTORS ............................................................... 89

A.     Parties May Object to the Toggle Plan's Classification of Claims and Interests.. 89

B.     The Plan Proponents May Not Be Able to Obtain Confirmation of the Toggle Plan ............................................................... 89

C.     Claims Estimation and Allowance of Claims ...................................... 90

D.     Inaccurate Statements Contained in the Toggle Disclosure Statement................. 90

E.     Inability to Satisfy Reorganization Toggle Requirements or Meeting Pre-Confirmation Milestones ................................................ 90

F.     Failure To Meet Post-Effective Date Refinancing Commitment Milestone ......... 91

G.     Failure to Obtain A Going Concern 363 Sale Qualified Purchase Price.............. 91

H.     Market Risks ............................................................... 91

I.     Change in Management .................................................. 91

J.     The DIP Facility May Be Terminated ................................ 92

K.     Risks Associated with the New Common Stock and Reorganized Preferred Stock ............................................................... 92

L.     New Equity Will Be Subordinate To The Reorganized Debtors' Debts .............. 93

M.     Implied Valuation Of New Common Stock And Reorganized Preferred Stock Is Not Indicative Of Trading Value Of New Common Stock And Reorganized Preferred Stock................................................ 93

N.     Securities Considerations................................................ 93

O.     Tax Considerations........................................................ 93

XIV.  CONFIRMATION OF THE TOGGLE PLAN ................................................. 94

A.     The Confirmation Hearing ............................................ 94

B.     Requirements for Confirmation of the Toggle Plan............................ 94

C.      Best Interests of Creditors.................................................................. 95

D.      Feasibility........................................................................................... 96

E.      Acceptance by Impaired Classes ....................................................... 96

F.      Confirmation Without Acceptance by All Impaired Classes .............. 97

G.      No Unfair Discrimination .................................................................. 97

H.      Fair and Equitable Test ..................................................................... 97

I.      Alternatives to Confirmation and Consummation of the Toggle Plan ............. 98

J.      Revocation, Withdrawal, or Non-Consummation................................. 98

XV.     CERTAIN UNITED STATES FEDERAL INCOME TAX  CONSEQUENCES OF THE
        TOGGLE PLAN ............................................................................................ 99

A.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Secured
        Claims ................................................................................................ 101

        1.      Taxable Exchange ................................................................. 101

        2.      Accrued Interest .................................................................... 101

        3.      Market Discount.................................................................... 101

B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured
        Claims ................................................................................................ 102

C.      Backup Withholding and Information Reporting ............................... 103

XVI.    CERTAIN SECURITIES LAW MATTERS ..................................................... 103

A.      Issuance of Securities Under the Toggle Plan Pursuant to Section 1145 of the
        Bankruptcy Code ............................................................................... 104

B.      Transferability of New Common Stock and Reorganized Preferred Stock ........ 104

XVII.   RECOMMENDATION..................................................................................... 105

59797.0007.18169759.1

## <u>EXHIBITS</u>

**Exhibit A**:    Chapter 11 Toggle Plan of Reorganization

**Exhibit B**:    Organizational Summary Chart

**Exhibit C**:    List of General Unsecured Claims

**Exhibit D**:    Assumed Executory Contracts and Unexpired
Leases Schedule

**Exhibit E**:    Debtors' Liquidation Analysis

**Exhibit F**:    Debtors' Financial Projections

## <u>GENERAL OVERVIEW</u>

This disclosure statement (the "**Toggle Disclosure Statement**") (a) describes the historical background that led to the Chapter 11 Cases of Millenkamp Cattle, Inc., and its related affiliates, debtors and debtors in possession (collectively, the "**Debtors**"), (b) explains what has happened in the months following the commencement of the Chapter 11 Cases, and (c) sets forth the proposed treatment of creditors in the *Chapter 11 Plan for Millenkamp Cattle, Inc. and its Related Debtor Affiliates Proposed by Plan Proponents*, dated February 3, 2025, as amended, modified, or supplemented from time to time pursuant to its terms (the "**Toggle Plan**"). A copy of the Toggle Plan is attached hereto as **Exhibit A**[1]. This Toggle Disclosure Statement is qualified in all respects by the express terms of the Toggle Plan.

The purpose of this Toggle Disclosure Statement is to set forth information that (1) summarizes the Toggle Plan, (2) advises Holders of Claims or Interests of their rights under the Toggle Plan, (3) assists parties entitled to vote on the Toggle Plan in making informed decisions as to whether they should vote to accept or reject the Toggle Plan, and (4) assists the Bankruptcy Court in determining whether the Toggle Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

In general, the Toggle Plan provides the Debtors with an opportunity to consensually restructure their debts, and failing that, it provides for a sale of the Debtors as a going concern or in parts for the benefit of the Debtors' stakeholders. Under the Toggle Plan, upon entry of the Confirmation Order, the Toggle Plan and the Confirmation Order shall provide for (a) a consensual reorganization of the Debtors in accordance with Article 6 of the Toggle Plan if the Reorganization Toggle Requirements and the Pre-Confirmation Milestones are satisfied (the "**Reorganization Toggle**"), (b) a going concern sale of the Debtors' Assets in accordance with Article 7 of the Toggle Plan if the Reorganization Toggle Requirements and/or the Pre-Confirmation Milestones are not satisfied (the "**Going Concern 363 Sale Toggle**"), and/or (c) the sale or sales of the Assets of each of the Debtors' business units if the Plan Administrator does not receive an Approved Going Concern 363 Sale Qualified Bid by the Going Concern 363 Sale Qualified Bid Deadline or does not close on such a sale following entry of a Going Concern 363 Sale Order on or before the Going Concern 363 Sale Order Deadline in accordance with Article 8 of the Toggle Plan (the "**Business Unit 363 Sale Toggle**").

Assuming all of the requisite terms and conditions of the Reorganization Toggle of the Toggle Plan are satisfied, upon emergence from these Chapter 11 Cases, the Reorganized Debtors shall continue to operate their businesses under existing management, subject to oversight by the Independent Board. Following the Effective Date, the Reorganization Toggle provides the

---

[1] All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Toggle Plan. To the extent that a definition of a term in the text of this Toggle Disclosure Statement and the definition of such term in the Toggle Plan are inconsistent, the definition included in the Toggle Plan will control and govern. The summary of the Toggle Plan provided herein is qualified in its entirety by reference to the Toggle Plan. In the event and to the extent that any provision of the Toggle Plan is inconsistent with the provisions of the Toggle Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Toggle Plan, the provisions of the Toggle Plan shall control and take precedence, except as otherwise expressly stated in the Toggle Plan; *provided*, however, that, upon entry, the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Toggle Plan, and any of the foregoing documents.

Reorganized Debtors with a path to refinance the Exit RLOC Term Note and Exit German Note by December 31, 2026. If, however, the Reorganized Debtors are unsuccessful in achieving such a refinancing, the Reorganized Debtors will be required to pursue a process to sell all or substantially all of their businesses and/or Assets.

If the Reorganize Toggle is not pursued (for whatever reason), the Toggle Plan would switch to the Sale Toggles. More specifically, the Toggle Plan provides that, following the entry of a Confirmation Order but prior to the Effective Date, a Plan Administrator will be appointed to oversee the sales of the Debtors' businesses as a going concern and/or as a separate business unit or individually.

Under the Toggle Plan, the Reorganized Debtors or the Plan Administrator, as applicable, shall fund Distributions with Cash on hand from ongoing business operations and (i) the proceeds from the Pre-Confirmation Transactions under the Reorganization Toggle, (ii) the proceeds from the Going Concern 363 Sale under the Going Concern 363 Sale Toggle, and/or (iii) the proceeds from the Business Unit 363 Sales under the Business Unit 363 Sale Toggle. The funds generated by these transactions will be used, in part, to make the Effective Date Distributions, including payment in full of Allowed Administrative Claims, DIP Claims, Allowed 503(b)(9) Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims.

The Plan Proponents believe that, if consummated, the Reorganization Toggle provides Existing Equity Holders with a path to retaining their Equity Interests by fairly and equitably sharing risk with creditors through a Cash contribution to fund Effective Date Cash needs. For the reasons discussed herein and the Toggle Plan, the Reorganization Toggle provides stakeholders with a restructuring that will significantly reduce the Debtors' leverage on the Effective Date, provide the Debtors with sufficient Cash to run their businesses, provide meaningful Distributions to Secured Creditors, and ensure that Holders of Allowed General Unsecured Claims will receive more than what they would receive in a liquidation of the Debtors' Estates if the Reorganization Toggle were not consummated. Importantly, however, the Toggle Plan provides the Debtors' Estates and their creditors with a necessary backup option. If the Existing Equity Holders and the Debtors are unwilling or unable to satisfy the Reorganization Toggle Requirements and/or Pre-Confirmation Milestones, the Toggle Plan provides a safety net to preserve creditor recoveries by maximizing the value of the Debtors' Estates through the Going Concern 363 Sale Toggle and Business Unit 363 Sale Toggle that would (i) effectuate the sale of the Debtors' businesses to purchasers(s) with the wherewithal to preserve the health and welfare of the Debtors' cattle herd and livestock, pay vendors on time, and maintain jobs for employees, (ii) contemplate a payment in full of all or substantially all Allowed Secured Claims, and (iii) ensure that Holders of Allowed General Unsecured Claims will receive more than what they would receive in a liquidation of the Debtors' Estates through the GUC Backstop.

In contrast, the Debtors' Plan is deficient in many respects, including that the Debtors' Plan (i) violates the Bankruptcy Code, particularly the absolute priority rule, by allowing Existing Equity Holders to retain their Equity Interests in the Reorganized Debtors for zero consideration, and (ii) shifts the risk to creditors by incurring significant and expensive "priming exit debt" that will make it even harder for the Reorganized Debtors to repay creditors and successfully refinance their existing debt after two failed refinancing efforts over the prior three years. For these same (and other) reasons, there is a material risk that Debtors' Plan will not be confirmed by the

2

Bankruptcy Court, leaving creditors without any contingency plan other than conversion to a chapter 7 liquidation.

The Plan Proponents urge all holders of Claims entitled to vote on the Toggle Plan to vote to accept the Toggle Plan. The Toggle Plan provides all stakeholders, including Existing Equity Holders, with a path that not only reduces indebtedness and better positions the Debtors for a successful restructuring, but also provides creditors with a critical backup option that preserves the value of the Debtors' Estates for creditor recoveries.

# I.    <u>INTRODUCTION</u>

Rabo AgriFinance LLC, in its capacity as agent and lender ("**RLOC Agent**" together with any other plan proponent, the "**Plan Proponents**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby submits this Toggle Disclosure Statement pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Toggle Plan. The purpose of this Toggle Disclosure Statement is to enable Holders of Claims that are Impaired under the Toggle Plan and that are entitled to vote on the Toggle Plan to make an informed decision when exercising their right to accept or reject the Toggle Plan. This Toggle Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the event leading to the filing of the Chapter 11 Cases, and the course of these Chapter 11 Cases. This Toggle Disclosure Statement also describes certain terms and provisions of the Toggle Plan, certain effects of Confirmation of the Toggle Plan, certain risk factors associated with the Toggle Plan, and the manner in which Distributions will be made under the Toggle Plan. In addition, this Toggle Disclosure Statement discusses the Confirmation process and the voting and election procedures that, subject to entry of the Toggle Disclosure Statement Order, Holders of Claims and Interests entitled to vote under the Toggle Plan must follow for their votes to be counted.

### A.    Overview of the Toggle Plan

#### 1.    General Structure of the Toggle Plan

A bankruptcy plan, generally, is a vehicle for satisfying the rights of holders of claims and equity interests in a debtor. Consummation of a bankruptcy plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and its creditors and equity interest holders. In this instance, the Toggle Plan contains certain additional provisions relating to (a) the release of the Released Parties and (b) exculpation of the Exculpated Parties, as more specifically described in Article 14 of the Toggle Plan.

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE TOGGLE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR ASSETS OR INTEREST IN PROPERTY OR ASSETS UNDER THE TOGGLE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR**

(III) FAILED TO VOTE TO ACCEPT OR REJECT THE TOGGLE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE TOGGLE PLAN.

**THE PLAN PROPONENTS BELIEVE THAT THE TOGGLE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS THAT ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE TOGGLE PLAN.**

2.    **Summary of Treatment of Claims and Interests Under the Toggle Plan**

The table below summarizes the classification and treatment of Claims and Interests under the Toggle Plan.

**THE PROJECTED RECOVERIES FOR THE CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER. THE PROJECTED RECOVERIES MAY BE DIFFERENT UNDER THE REORGANIZATION TOGGLE, THE GOING CONCERN 363 SALE TOGGLE, AND THE BUSINESS UNIT 363 SALE TOGGLE. BASED ON AVAILABLE INFORMATION, THE PLAN PROPONENTS BELIEVE THAT HOLDERS OF ALLOWED CLAIMS WILL RECEIVE AN EQUAL OR BETTER RECOVERY UNDER THE REORGANIZATION TOGGLE AS THE DEBTORS PROJECT THEY WOULD RECEIVE UNDER THE DEBTORS' PLAN.**

| CLASS | DESCRIPTION | VOTING STATUS | Projected Recoveries[2] |
|-------|-------------|---------------|-------------------------|
| None | Administrative Claims | Not Entitled to Vote | 100% |
| None | Professional Fee Claims | Not Entitled to Vote | 100% |
| None | Priority Tax Claims | Not Entitled to Vote | 100% |

---

[2] The projected recoveries to Holders of Secured Claims and General Secured Claims under the Sale Toggles is subject to several factors, including, without limitation, (1) whether the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, assumes the pertinent executory contract or unexpired lease, if any, entered into between a particular Debtor and the Holder of an Allowed Claim, and (2) the value of the Collateral when sold or monetized. Moreover, with respect to the Holders of Allowed General Unsecured Claims, in addition to the total amount of Allowed General Unsecured Claims, their recoveries will largely depend on whether the contracts with East Valley Development, LLC ("**EVD**") are assumed or rejected in accordance with the Bankruptcy Code and/or the Toggle Plan. According to its Proof of Claim, upon the rejection of its contracts, EVD will have a Claim in the amount of $104,311,374 (as of July 11, 2024) against the Debtors. The Plan Proponents have concluded that if the contracts with EVD are rejected, the General Unsecured Claims against the Debtors would total $132,234,326, while if such contracts are assumed, the General Unsecured Claims against the Debtors would total $27,922,952. For purposes of estimating recoveries, the Plan Proponents assume that the contracts with EVD would (1) be assumed under the Going Concern 363 Sale Toggle, and (2) be rejected under the Business Unit 363 Sale Toggle. It is possible that the Plan Administrator, in its discretion and subject to the Toggle Plan, may elect to assume and assign the contracts with EVD in connection with a Business Unit 363 Sale. However, for purposes of projecting recoveries under the Toggle Plan, the Toggle Disclosure Statement has not reflected that scenario.

59797.0007.18169759.1

| CLASS | DESCRIPTION | VOTING STATUS | Projected Recoveries[2] |
|---|---|---|---|
| Class 1 | Other Priority Claims | Not Entitled to Vote | 100% |
| Class 2 | Corn Silage Group Secured Claims | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 3A | A. Scott Jackson Trucking Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 3B | B&H Farming Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 3C | H&M Custom, LLC Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 3D | Healthy Earth Enterprises, LLC Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 3E | Kraus Farms, LLC Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 3F | Milner Hay Company, LLC Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 3G | Moss Grain Partnership Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 3H | NorthWest Seed, Inc. Secured Claim | Unimpaired<br><br>Not Entitled to Vote | None[3] |
| Class 3I | Performance Plus-Idaho, LLC Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100% |

[3] According to the Debtors' Disclosure Statement and Debtors' Plan, the Debtors have concluded there is no amount owing to NorthWest as of the Petition Date and NorthWest did not file a Proof of Claim. As such, NorthWest will not receive a Distribution under the Toggle Plan.

59797.0007.18169759.1

| CLASS | DESCRIPTION | VOTING STATUS | Projected Recoveries[2] |
|---|---|---|---|
| | | | Sale Toggles: 0-100% |
| Class 3J | Tyche Ag, LLC Secured Claim | Unimpaired<br><br>Not Entitled to Vote | None[4] |
| Class 3K | Wada Farms Partnership Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 3L | Youree Land & Livestock Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 3M | Eagle Creek Northwest, LLC Claim | Unimpaired<br><br>Not Entitled to Vote | None[5] |
| Class 3N | Standlee Ag Resources and Premium Products Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 4 | MetLife Secured Claims | Impaired<br><br>Entitled to Vote | 100% |
| Class 5 | RLOC Secured Claims | Impaired<br><br>Entitled to Vote | 100% |
| Class 6 | Conterra Secured Claims | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Going Concern 363 Sale Toggle: 100%<br><br>Business Unit 363 Sale Toggle: 0-100% |

---

[4] According to the Debtors' Disclosure Statement and Debtors' Plan, the Debtors have concluded there is no amount owing to Tyche as of the Petition Date and Tyche did not file a Proof of Claim. As such, Tyche will not receive a Distribution under the Toggle Plan.

5 According to the Debtors' Disclosure Statement and Debtors' Plan, the Debtors have concluded there is no amount owing to Eagle Creek as of the Petition Date and Eagle Creek did not file a Proof of Claim. As such, Eagle Creek will not receive a Distribution under the Toggle Plan.

59797.0007.18169759.1

| CLASS | DESCRIPTION | VOTING STATUS | Projected Recoveries[2] |
|---|---|---|---|
| Class 7A | CNH Industrial Capital Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 7B | Daimler Truck Financial Services USA LLC Secured Claim | Reorganization Toggle: Unimpaired<br>Not entitled to Vote<br><br>Sale Toggles:<br>Impaired<br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 7C | Farmers Bank | Reorganization Toggle: Unimpaired<br>Not entitled to Vote<br><br>Sale Toggles:<br>Impaired<br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 7D | John Deere Construction & Forestry Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 7E | Western States Cat Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 7F | Kenworth Sales Company Secured Claim | Reorganization Toggle: Unimpaired<br>Not entitled to Vote<br><br>Sale Toggles:<br>Impaired<br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 8A | MWI Veterinary Secured Claim | Impaired<br><br>Entitled to Vote | Reorganization Toggle: 100%<br><br>Sale Toggles: 0-100% |
| Class 8B | PerforMix Nutrition Systems Secured Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |

7

| CLASS | DESCRIPTION | VOTING STATUS | Projected Recoveries[2] |
|-------|-------------|---------------|-------------------------|
| Class 8C | Rexel USA, Inc. d/b/a Platt Electric Supply Claim | Disputed<br><br>Entitled to Vote | 0%[6] |
| Class 8D | Staker & Parson Company d/b/a Idaho Materials & Construction Claim | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 8E | Les Schwab Tire Centers of Idaho, LLC Claims | Impaired<br><br>Entitled to Vote | <u>Reorganization Toggle</u>: 100%<br><br><u>Sale Toggles</u>: 0-100% |
| Class 9 | General Unsecured Claims | Impaired<br><br>Entitled to Vote | <u>Reorganization Toggle</u>: 100%<br><br><u>Going Concern 363 Sale Toggle</u>: 16-100%<br><br><u>Business Unit 363 Sale Toggle</u>: 3.4-100% |
| Class 10 | Intercompany Claims | Not Entitled to Vote (deemed to reject) | None |
| Class 11 | Equity Interests | <u>Reorganization Toggle</u>: Entitled to Vote<br><br><u>Sale Toggles</u>: Not entitled to vote (deemed to reject) | <u>Reorganization Toggle</u>: 90-100%<br><br><u>Sale Toggles</u>: 0% |

**THE PLAN PROPONENTS BELIEVE THAT THE TOGGLE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE TOGGLE PLAN.**

      **B.**      **Toggle Plan Voting Instructions and Procedures**

      1.      **Voting Rights**

      Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote

---

[6] According to the Debtors' Disclosure Statement and Debtors' Plan, the Debtors dispute Platt's Claim. As such, the Plan Proponents estimate that Platt will not receive a Distribution under the Toggle Plan.

to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the plan only if two-thirds in amount and a majority in number of Holders of Allowed Claims that actually vote cast their Ballots in favor of acceptance of the plan.

Pursuant to the Toggle Plan, Claims in Class 2, Class 3A, Class 3E, Class 3I, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 7A, Class 7D, Class 8A, Class 8C, Class 8E, and Class 9 shall be solicited with respect to the Toggle Plan regardless of the toggle being pursued. The votes of Holders of Allowed Claims in Class 7B, Class 7C, and Class 7F shall be solicited only if the Going Concern 363 Sale Toggle and/or Business Unit 363 Sale Toggle is being pursued under the Toggle Plan. Holders of Allowed Class 11 Equity Interests shall be solicited only if the Reorganization Toggle is being pursued under the Toggle Plan.

Pursuant to the Toggle Plan, Claims in Class 1, Class 3B, Class 3C, Class 3D, Class 3F, Class 3G, Class 3H, Class 3J, Class 3K, Class 3M, Class 7E, Class 8B, and Class 8D, are Unimpaired by the Toggle Plan, and such Holders are deemed to have accepted the Toggle Plan and are therefore not entitled to vote on the Toggle Plan. Claims in Class 7B, Class 7C, Class 7F are Unimpaired by the Toggle Plan if the Reorganization Toggle is implemented and therefore will not be entitled to vote on the Toggle Plan in that scenario.

Pursuant to the Toggle Plan, Intercompany Claims in Class 10 will not receive or retain any property under the Toggle Plan on account of such Intercompany Claims, and are therefore deemed to reject the Toggle Plan and are not entitled to vote on the Toggle Plan. Likewise, Claims in Class 11 are deemed to reject the Toggle Plan and not entitled to vote on the Toggle Plan if Going Concern 363 Sale Toggle or Business Unit 363 Sale Toggle is implemented.

2.      **Solicitation Materials**

Under the Reorganization Toggle, Krystal R. Mikkilineni, Dentons Davis Brown, counsel to the Debtors, will serve as the voting agent and under the Going Concern 363 Sale Toggle and/or Business Unit 363 Sale Toggle, Sheila Schwager, Hawley Troxell Ennis & Hawley LLP, counsel to the RLOC Agent, will serve as the voting agent (as applicable, the "**Voting Agent**") to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "**Solicitation Package**"):

59797.0007.18169759.1

- This Toggle Disclosure Statement, including the Toggle Plan and all other Exhibits and Schedules thereto;

- The Bankruptcy Court order approving this Toggle Disclosure Statement (the "**Toggle Disclosure Statement Order**") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Toggle Plan and related matters, and (ii) the deadline for filing objections to Confirmation of the Toggle Plan (the "**Confirmation Hearing Notice**");

- One or more Ballots, to be used in voting to accept or to reject the Toggle Plan and applicable instructions with respect thereto (the "**Voting Instructions**");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

Subject to entry of the Toggle Disclosure Statement Order, the Plan Proponents, through the Voting Agent, will distribute the Solicitation Package in accordance with the Toggle Disclosure Statement Order. The Solicitation Package is also available without charge by written request to the Voting Agent at krystal.mikkilineni@dentons.com under the Reorganization Toggle and sschwager@hawleytroxell.com under the Going Concern 363 Sale Toggle and/or the Business Unit 363 Sale Toggle.

If you are the Holder of a Claim and believe that you are entitled to vote on the Toggle Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by electronic mail at: krystal.mikkilineni@dentons.com under the Reorganization Toggle and sschwager@hawleytroxell.com under the Going Concern 363 Sale Toggle and/or the Business Unit 363 Sale Toggle.

If your Claim is subject to a pending claim objection and you wish to vote on the Toggle Plan, you must File a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Toggle Plan.

**THE PLAN PROPONENTS RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE TOGGLE PLAN OR CONFIRMATION ORDER.**

3. **Voting Instructions and Procedures**

As set forth in the Toggle Disclosure Statement Order, all votes to accept or reject the Toggle Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Plan Proponents or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.

59797.0007.18169759.1

After carefully reviewing the Toggle Plan, this Toggle Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Toggle Plan by voting in favor of or against the Toggle Plan on the accompanying Ballot. The Plan Proponents anticipate that the Toggle Disclosure Statement Order will provide that **the deadline to vote on the Toggle Plan will be the date that is 14 calendar days prior to the Confirmation Hearing at 5:00 p.m. (Mountain Time) (the "Voting Deadline")**. In order for your vote to be counted, it must be (i) completed, dated, and properly executed, and (ii) delivered to the applicable Voting Agent by first class mail, postage prepaid, or by overnight courier, to (x) under the Reorganization Toggle: Krystal R. Mikkilineni, Dentons Davis Brown, The Davis Brown Tower, 215 10th St., Suite 1300, Des Moines, Iowa 50309, email: krystal.mikkilineni@dentons.com, or (y) under the Going Concern 363 Sale Toggle and/or the Business Unit 363 Sale Toggle: Sheila Schwager, Hawley Troxell Ennis & Hawley LLP, 877 W. Main Street, Suite 200, P.O. Box 1617, Boise, Idaho 83701-1617. The Voting Agent must ACTUALLY RECEIVE Ballots on or before the Voting Deadline. Except as otherwise ordered by the Bankruptcy Court or agreed to by the Plan Proponents, a vote may not be changed once a Ballot is submitted to the Voting Agent.

Only the Holders of Allowed Claims or Claims that are deemed allowed for purposes of voting on the Toggle Plan in Class 2, Class 3A, Class 3E, Class 3I, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 7A, Class 7D, Class 8A, Class 8C, Class 8E, and Class 9 are entitled to vote to accept or reject the Toggle Plan. Likewise, Holders of Allowed Claims or Claims that are deemed allowed for purposes of voting on the Toggle Plan in Class 7B, Class 7C, and Class 7E, are entitled to vote to accept or reject the Toggle Plan if the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle is implemented. Holders of Claims in Class 11 are entitled to vote to accept or reject the Toggle Plan if the Reorganization Toggle is implemented. Holders of such Claims vote by completing the appropriate Ballots and returning those Ballots in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim either to accept or to reject the Toggle Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Toggle Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Toggle Plan;

- Any Ballot received after the Voting Deadline, except if the Plan Proponents have granted an extension of the Voting Deadline with respect to such Ballot in writing, or by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest;

59797.0007.18169759.1

- Any Ballot cast by a Person that does not hold a Claim in the voting Class; and

- Any Ballot that is not signed or does not contain an original signature.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Toggle Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party that has delivered a properly completed Ballot for the acceptance or rejection of the Toggle Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, free of charge, an additional copy of the Toggle Plan, this Toggle Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the applicable Voting Agent at the address specified above.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Toggle Plan and will File a voting report (the "**Voting Report**") prior to the Confirmation Hearing. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS OR INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE TOGGLE PLAN BY THE VOTING DEADLINE.**

4.    **Confirmation Hearing and Deadline for Objections to Confirmation**

Subject to entry of the Toggle Disclosure Statement Order, objections to Confirmation of the Toggle Plan must be Filed and served on the Plan Proponents and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than **the date that is 14 calendar days prior to the Confirmation Hearing**. Unless objections to Confirmation of the Toggle Plan are timely served and filed in compliance with the

12

Confirmation Hearing Notice, they may not be considered by the Bankruptcy Court. For further information, refer to Article XIV of this Toggle Disclosure Statement, "Confirmation of the Toggle Plan."

## II.    BACKGROUND REGARDING THE DEBTORS[7]

### A.    Overview of the Debtors

The Debtors operate a large vertically integrated agribusiness, comprised of five complementary divisions.

The Calf Ranch (as defined below) is operated at the Debtors' Jerome, Idaho location and is made up of several hundred acres of land where approximately 50,000 calves reside. In 2006, the Debtors started operating a dairy heifer feedlot in Declo, Idaho. In 2013, the Debtors purchased their first dairy, and two years later, established a dairy (the "**Idaho Jersey Girls Dairy**"), which at the time consisted of one milk barn, two rotaries and 15,000 head of dairy cattle that are located at the Declo, Idaho facility. In 2018, the Debtors constructed an enclosed commodity barn and began construction of a cattle processing barn. In 2019, construction began for a second milk barn that was completed in 2020, which added an additional four rotary milking carousels to the Debtors' operations. In 2021, the Debtors further expanded with construction of a renewable energy methane digester with EVD.

As of today, the Debtors' operations encompass approximately 20,000 acres. The Debtors maintain cattle operations in three locations in Jerome, Idaho and a main dairy location in Declo, Idaho. The Debtors custom raise day-old calves for approximately twenty-five (25) separate dairies and ship milk to not less than two processors.

The Debtors' operations employ approximately 513 employees. The operations are comprised of five main divisions: (1) the Idaho Jersey Girls Dairy, which is located in Declo, Idaho, (2) the Calf Ranch located in Jerome, Idaho, (3) farming in Jerome, Twin Falls and Cassia Counties, (4) a feedlot located in Jerome & cow-calf operation in Declo, and (5) a custom harvest and trucking division.

The Debtors manage approximately 110,000 head of cattle, inclusive of the Idaho Jersey Girls Dairy, which consists of approximately 37,000 Jersey and Jersey mixed milking cows that produce approximately 2 million pounds of milk daily. The Debtors accomplish this with six rotary milking parlors and by utilizing programmable logic control technology, robotics, and state of the art heat recovery technology.

The Idaho Jersey Girls Dairy is approximately 11,688 acres bordered by the 4,640-acre Moonshine Ranch (as defined below) for a total contiguous land area of approximately 16,328 acres located in Declo, Idaho. The Idaho Jersey Girls Dairy supports approximately 65,000 head

---

[7] The Plan Proponents have largely adopted this "Background Regarding The Debtors" Section from the Debtors' Disclosure Statement. The Plan Proponents do not make any representation regarding or warrant the accuracy of any of the Debtors' statements upon which they rely. The Plan Proponents reserve the right to alter, amend, or otherwise modify this Section and other Sections of the Toggle Disclosure Statement based on the Debtors' Disclosure Statement if the Plan Proponents obtain additional information or otherwise become aware that the information previously provided by the Debtors is not accurate.

13

of dairy cattle and youngstock, while Moonshine Ranch maintains a 1,000 head Angus calf-cow operation.

The Calf Ranch operation receives approximately 250 calves per day and is home to approximately 50,000 calves. The Calf Ranch is approximately 782 acres located in Jerome, Idaho. The Debtors' operations also include farming, pursuant to which they implement responsible crop rotation and nutrient management to support operations. The feedlots and cow-calf operations are additional revenue streams that increase the synergy and infrastructure of the farm and adjoining properties.

The Debtors also operate a trucking operation that supports all aspects of their operations. The Debtors harvest all silages used in their operations through their partnership with H & M Custom, LLC, which provides control of quality and availability for our most critical forage input costs.

### B.      Debtors' Corporate Structure

Through ten entities, the Debtors operate as a single enterprise, which includes common usage of debt and banking facilities.

William John Millenkamp ("**Bill Millenkamp**") is the Chief Executive Officer of the Debtors, Millenkamp Cattle, Inc.; Black Pine Cattle LLC; East Valley Cattle, LLC; Idaho Jersey Girls Jerome Dairy LLC; Millenkamp Enterprises LLC; Millenkamp Family LLC; Millenkamp Properties, L.L.C.; Millenkamp Properties II LLC; Goose Ranch LLC; and Idaho Jersey Girls, LLC. Attached hereto as **Exhibit B** is an organizational summary chart of the Debtors that was attached to the Debtors' Disclosure Statement and upon which the Plan Proponents rely.

Bill Millenkamp is also President of Millenkamp Cattle, Inc., and a Member or Managing Member of Idaho Jersey Girls Jerome Dairy LLC; Black Pine Cattle LLC; Millenkamp Enterprises, LLC; and East Valley Cattle, LLC. Millenkamp Cattle, Inc. is the sole Member of Idaho Jersey Girls, LLC.

Bill Millenkamp, Susan J. Millenkamp, William J. Millenkamp as Trustee of the SJM 2012 Trust, and Susan J. Millenkamp as Trustee of the WJM 2012 Trust are the Members of Millenkamp Family LLC, sole member of Goose Ranch LLC, Millenkamp Properties, L.L.C. and Millenkamp Properties II LLC.

Millenkamp Cattle, Inc., is the primary entity from which all operations are directed, the revenues received and the payables disbursed. Millenkamp Cattle, Inc. is the operational entity which owns all of the cattle, feed, and equipment used to care for the cattle, employs the employees, and receives and disburses the majority of the monies. Millenkamp Cattle, Inc., does not own any real property.

Idaho Jersey Girls Jerome Dairy, LLC owns 80 acres and a 1,120-animal unit concentrated animal feeding operation in Jerome, Idaho, which is leased to Millenkamp Cattle, Inc.

Millenkamp Properties, L.L.C. owns 720 acres and a 6,000-animal unit concentrated animal feeding operation in Jerome Idaho (the "**Calf Ranch**"), a 40-acre feed storage site, 4,638

14

acres in Cassia County ("**Moonshine Ranch**"), and the German Dairy, which is located in Jerome County. These properties are also leased to Millenkamp Cattle, Inc.

Millenkamp Properties II LLC owns Canyonlands, which is located in Twin Falls County and McGregor, which is located in Jerome County. The Canyonlands and McGregor are also leased to Millenkamp Cattle, Inc.

Goose Ranch LLC owns a 600-acre farm on Snake River below Minidoka Dam in Cassia County which is also leased to Millenkamp Cattle, Inc.

East Valley Cattle, LLC owns a 11,668-acre farm and a 51,285-animal unit capacity dairy and feedlot in Cassia County near Declo, Idaho ("**East Valley Facilities**"). This is also leased to Millenkamp Cattle, Inc.

Millenkamp Cattle, Inc. leases from Mike Thompson a 1,200 head feedlot in Jerome, Idaho.

Millenkamp Cattle, Inc. leases approximately 4280 irrigated acres of farm ground from Eagle Creek Northwest, LLC that is adjacent to the East Valley Facilities in Declo, Idaho.

As stated above, Millenkamp Cattle, Inc. operates all the real property owned or leased by the various Millenkamp entities. This includes all the farms, Calf Ranch, Idaho Jersey Girls Dairy and the East Valley Facilities.

Millenkamp Cattle, Inc. d/b/a Idaho Jersey Girls operates the German Dairy and East Valley Facilities. Millenkamp Cattle, Inc. d/b/a Black Pine Cattle also provides custom heifer raising services at the East Valley Facilities.

## C.    Debtors' Prepetition Capital Structure

The Debtors are parties to various prepetition loan agreements. The following table is a summary of the Debtors' most significant secured loan balances as of the Petition Dates:

| Lender | Loan | Claim Amount |
|--------|------|--------------|
| MetLife | Promissory Note A dated September 26, 2018, and First Amendment dated April 21, 2021 | $86,855,135.96 |
| MetLife | Promissory Note B dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $51,693,035.58 |

15

| Lender | Loan | Claim Amount |
|--------|------|--------------|
| MetLife | Promissory Note C dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $11,530,349.58 |
| MetLife | Promissory Note D dated April 21, 2021 | $16,210,086.43 |
| MetLife | Promissory Note E dated April 21, 2021 | $10,082,419.25 |
| MetLife | 9858 Promissory Note dated March 12, 2019 | $5,005,171.86 |
| RLOC Agent | Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended | $96,469,917.04 |
| Conterra | Mezzanine Loan dated October 20, 2022 | $18,884,265.52 |
| Conterra | German Promissory Note dated October 20, 2022 | $2,576,728.08 |

1. **Pre-Petition RLOC Credit Agreement**

Under that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended, the "**Pre-Petition RLOC Credit Agreement**" and collectively with all security, pledge, intercreditor, guaranty agreements, and other documentation executed in respect thereof, the "**Pre-Petition RLOC Documents**", by and among the Debtors[8], collectively as borrower, the lenders from time to time party thereto (in such capacity, collectively, the "**Pre-Petition RLOC Lenders**"), and the RLOC Agent, as sole lead arranger, agent, and swing-line lender (in its capacity as agent for the benefit of the Pre-Petition RLOC Lenders and each Issuer (as defined in the Pre-Petition RLOC Credit Agreement), the RLOC Agent and collectively with the Pre-Petition RLOC Lenders and the Issuers, the "**Pre-Petition RLOC Secured Parties**"), the Debtors were provided with an asset-based revolving line of credit facility, consisting of (a) revolving commitments in an aggregate amount of up to $91,000,00.00; (b) a swing-line credit

---

[8] Non-Debtors Susan Millenkamp as Trustee of the WJM 2012 Trust; William Millenkamp as Trustee of the SJM 2012 Trust; William John Millenkamp and Susan Jo Millenkamp (the "**Non-Debtor Borrowers**") also executed the Pre-Petition RLOC Credit Agreement.

59797.0007.18169759.1

facility for the RLOC Agent to make "Swing Line Advances" (as defined in the Pre-Petition RLOC Credit Agreement) in an aggregate amount of up to $7,500,000.00; and (c) a letter-of-credit facility for the issuance of stand-by letters of credit in an aggregate amount of up to $1,000,000.00.

Pursuant to the terms of the Pre-Petition RLOC Credit Agreement, the Debtors granted to the RLOC Agent a security interest to and in substantially all of the Debtors' personal property, excluding their real property, and all other property defined as the "Collateral" in the Pre-Petition RLOC Credit Agreement (referred to herein and in the Toggle Plan as the "**Pre-Petition RLOC Collateral**" and the Liens and security interests granted to or for the benefit of the Pre-Petition RLOC Secured Parties therein, the "**Pre-Petition RLOC Personal Property Liens**").

The Pre-Petition RLOC Collateral includes, among other interests (each as defined in the Pre-Petition RLOC Credit Agreement): all Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and, notably, the Debtors' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Debtors' milk and other dairy products (the "**Milk Receivables**"). The Pre-Petition RLOC Secured Parties' Lien and security interest extends to all accessions to, substitutions for, and for all replacements, products, and proceeds of the Pre-Petition RLOC Collateral. As described below, the Pre-Petition RLOC Secured Parties' interest in the Milk Receivables is subject to the First Intercreditor Agreement entered into between them and MetLife.

Further, as consideration for the RLOC Agent to enter into that certain Forbearance Agreement, made effective as of October 22, 2022, the Debtors and the Non-Debtor Borrowers granted, among other things, a second priority mortgage on the Pre-Petition MetLife Real Estate Collateral to secure the Pre-Petition RLOC Obligations, subject to the Second Intercreditor Agreement. Accordingly, on October 20, 2022, the Debtors and the Non-Debtor Borrowers executed and delivered that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (Second Priority), in favor of the RLOC Agent, to secure any and all obligations owed to the Pre-Petition RLOC Secured Parties, which was recorded in Cassia County, as Instrument No. 2022-004552, Twin Falls County as Instrument No. 2022018722, and Jerome County as Instrument No. 2224759 (the "**Pre-Petition RLOC Second Mortgage**" and together with the Pre Petition RLOC Personal Property Liens, the "**Pre-Petition RLOC Liens**").

The RLOC Agent filed an Amended Proof of Claim in the amount of $96,469,917.04, consisting of the following amounts:

Principal: $88,950,202.73
Pre-Petition Interest (as of April 2, 2024): $149,105.24
Post-Petition Interest (as of October 31, 2024): $2,751,368.26
Pre-Petition Professional Fees: $1,255,548.19
Post-Petition Professional Fees and Costs (as of April 2, 2024): $1,219,525.43
Unused Commitment Fee: $6,280.00
Total: $96,469,917.04

17

2.    **MetLife Secured Loans**

MetLife owns and holds certain commercial real estate loans (collectively, the "**Pre-Petition MetLife Loans**" and, together with all related mortgages and other existing or future documents evidencing, securing, or executed in connection with the Pre-Petition MetLife Loans, in each case, as Amended, referred to herein as the "**Pre-Petition MetLife Loan Documents**") made by MetLife to certain Debtors. The Pre-Petition MetLife Loans are secured by Liens in and security interests on such Debtors' real property and certain of such Debtors' personal property, including: (x) crops grown after a foreclosure; (y) all wells, underground pipelines, sprinklers, and similar irrigation equipment located at the real property, as well as all lines, valve openers, pipes, and similar items pertaining to such irrigation equipment; and (z) all milking equipment located at the real property (the "**Pre-Petition MetLife Real Estate Collateral**"). The Pre-Petition MetLife Loans are further secured, subject to the First Intercreditor Agreement, by the Milk Receivables (the "**MetLife Milk Priority Claim**," and collectively with the Pre-Petition MetLife Real Estate Collateral, the "**Pre-Petition MetLife Collateral**" and all Liens and security interests on and in the Pre-Petition MetLife Collateral, the "**Pre-Petition MetLife Liens**"). As of the Petition Date, the Debtors were indebted to MetLife, in the aggregate amount of approximately $180,473,929.72 under the Pre-Petition MetLife Loan Documents.

RLOC Agent and MetLife are parties to (i) that certain Intercreditor Agreement, dated as of September 18, 2018, (as Amended, the "**First Intercreditor Agreement**") and (ii) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022 (as Amended, the "**Second Intercreditor Agreement**" and, together with the First Intercreditor Agreement, the "**MetLife Intercreditor Agreements**"). Pursuant to the First Intercreditor Agreement, RLOC Agent agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition MetLife Collateral to those of MetLife, and MetLife agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition RLOC Collateral (other than any such property that may also constitute Pre-Petition MetLife Collateral) to those of the RLOC Agent.

Additionally, the First Intercreditor Agreement recognizes that the RLOC Agent and MetLife have separately entered into Milk Check Assignment Agreements (the "**Milk Agreements**") with Debtor Millenkamp Cattle and a milk purchaser, Glanbia Foods, Inc. ("**Milk Purchaser**"). The Milk Agreements direct the Milk Purchaser to make certain payments directly to the RLOC Agent (in certain situations) and MetLife (on a monthly basis), rather than to Millenkamp Cattle. Pursuant to the terms of the First Intercreditor Agreement, MetLife's priority interest in any Milk Receivables is equal to the aggregate amount of, in any month, the amount of the monthly installment payment of principal and accrued interest then due and payable by the applicable Debtors to MetLife, with such amount being capped at one month's principal and interest payment, unless MetLife has provided written notice to the RLOC Agent that amounts exceeding one month's principal and interest payment are due, owing, and unpaid.

On September 18, 2018, the RLOC Agent, Millenkamp Cattle, and the Milk Purchaser also entered into a Collateral Assignment of Milk Contracts, pursuant to which Millenkamp Cattle assigned to the RLOC Agent all contracts and proceeds related to certain purchase agreements between Millenkamp Cattle and the Milk Purchaser, to secure the obligations owed to the Pre-Petition RLOC Secured Parties. Subject to the foregoing, during the Debtors and Non-Debtor Borrowers' default under the Pre-Petition RLOC Documents, the RLOC Agent may collect the

18

Milk Receivables. Other than the foregoing subordination, MetLife and the RLOC Agent expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of the Pre-Petition RLOC Secured Parties' rights, privileges, powers, or remedies with respect to the Pre-Petition RLOC Obligations or the Pre-Petition RLOC Collateral. Likewise, the RLOC Agent and MetLife expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of MetLife's rights, privileges, powers, or remedies with respect to the Pre-Petition MetLife Loans or the Pre-Petition MetLife Collateral. MetLife does not have any Lien or security interest in any of the Debtors' Livestock, including, but not limited to, dairy cattle.

| Description | Principal Amount | Claim Amount | Security |
|---|---|---|---|
| Promissory Note A dated September 26, 2018, and First Amendment dated April 21, 2021 | $106,000,000.00 | $86,855,135.96 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| Promissory Note B dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $59,400,000.00 | $51,693,035.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| Promissory Note C dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $13,000,000.00 | $11,530,349.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| Promissory Note D dated April 21, 2021 | $17,954,226.00 | $16,210,086.43 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| Promissory Note E dated April 21, 2021 | $15,978,409.00 | $10,082,419.25 | Mortgage, Assignment of Rents, Security Agreement, |

59797.0007.18169759.1

| Description | Principal Amount | Claim Amount | Security |
|---|---|---|---|
| | | | Fixture Filing dated September 26, 2018 |
| 9858 Promissory Note dated March 12, 2019 | $5,508,350.00 | $5,005,171.86 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated March 12, 2019 "Canyonlands" and "McGregor" property |

3.      **Conterra**

Millenkamp Cattle, Inc., Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy LLC, East Valley Cattle, LLC, Millenkamp Family LLC, Millenkamp Properties, L.L.C., Millenkamp Properties II LLC, Goose Ranch, LLC, William J. Millenkamp and Susan J. Millenkamp executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $16,500,000 which Conterra endorsed to Ag Funding (the "**Mezz Loan**"). The Mezz Loan is secured by second priority Liens and security interests in the Pre-Petition RLOC Collateral (the "**Pre-Petition Conterra Mezz Collateral**") and third priority mortgage on the Pre-Petition MetLife Real Estate Collateral.

Conterra's rights and interests in the Pre-Petition Conterra Mezz Collateral and in the Pre-Petition MetLife Real Estate Collateral are subject to (i) that certain Intercreditor and Subordination Agreement, among Conterra and the RLOC Agent, date as of October 20, 2022 (the "**RLOC-Conterra Intercreditor Agreement**") and (ii) that certain Subordination and Intercreditor Agreement, among Conterra and MetLife, dated as of October 20, 2022 (the "**MetLife-Conterra Intercreditor Agreement**").

Millenkamp Cattle, Inc., Millenkamp Family LLC, Millenkamp Properties II LLC, Millenkamp Properties, L.L.C., East Valley Cattle, LLC, Idaho Jersey Girls Jerome Dairy LLC, and William J. Millenkamp executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $2,549,750 (the "**German Note**"), which Conterra endorsed to Rooster.

The German Note is secured by a first priority mortgage on the German Dairy, which is located at 162 West 400 North, Jerome, Idaho 83338 (the "**Pre-Petition Conterra Real Estate Collateral**").

Conterra filed Proofs of Claim in the aggregate amount of $21,460,993.60.

German Note Proof of Claim Amount:
Unpaid Principal: $2,508,860.41

20

Accrued Interest through 4/2/24: 67,867.67
Total unpaid balance as of 4/2/24: $2,576,728.08

Mezz Loan Proof of Claim Amount:
Unpaid Principal: $16,500,000.00
Accrued Interest through 4/2/24: $1,457,810.41
Late Fees: $830,614.58
Reimbursable Expenses: $95,840.53
Total unpaid balance as of 4/2/24: $18,884,265.52

### 4.    Other Secured Obligations

#### i.    Equipment Liens

Certain parties have asserted secured interests in specific pieces of equipment that were owned by the Debtors and have filed UCC-1 financing statements with respect to those interests.

#### ii.    Statutory Liens

A number of parties have asserted liens, pursuant to applicable non-bankruptcy law, on certain of the Debtors' assets.

### 5.    General Unsecured Claims

In addition to the debt discussed above, the Debtors' books and records reflect approximately $27,922,952 in unsecured debt incurred in the ordinary course of business, principally comprised of trade payables, which amount does not reflect EVD's Claim discussed above. Creditors and interested parties should review the Schedules and Proofs of Claim Filed with the Bankruptcy Court for more complete information concerning the nature and amount of the Debtors' liabilities as of the Petition Date.

Based on the Schedules and Debtors' Disclosure Statement, the Plan Proponents estimate that General Unsecured Claims against the Debtors collectively, is approximately $27,922,952 (not including EVD's Claims). This estimate, however, is based on the Debtors' books and records and Filings with the Bankruptcy Court. The total amount of Allowed General Unsecured Claims may exceed or fall short of the estimates set forth herein. Attached hereto as **Exhibit C** is copy of the list of the General Unsecured Claims (including their amounts) that was attached to the Debtors' Disclosure Statement and upon which the Plan Proponents rely.

### D.    Events Leading to the Chapter 11 Cases

In 2019, Millenkamp Cattle began constructing a $250 million dairy expansion to add four new state of the art rotary parlors and an enclosed cross ventilation barn to double milking capacity of the current dairy facility. The project was to be funded through Millenkamp Cattle's two lenders: the RLOC Agent, who would provide the short-term operating revolving line of credit and MetLife, who would provide the long-term lending secured by the farm ground and dairy facilities. Construction of the new project began in 2019.

21

In June 2022, the Pre-Petition RLOC Credit Agreement loan matured, and the RLOC Agent issued a notice of default. After extensive negotiations between May 2022 and October 2022, the RLOC Agent and the Debtors and the Non-Debtor Borrowers entered into a long-term Forbearance Agreement made effective as of October 20, 2022 ("**Long-Term Forbearance Agreement**"). The Long Term Forbearance Agreement provided the Debtors until July 2023 to obtain a refinancing ("**Forbearance Period**"). As consideration for entering into the Long Term Forbearance Agreement, the Debtors, with the consent of MetLife through an intercreditor agreement with the RLOC Agent, provided the RLOC Agent a second position mortgage upon the Pre-Petition MetLife Real Estate Collateral. Additionally, as an additional condition to the Long Term Forbearance Agreement, Conterra provided the Mezz Loan, consisting of $16.5 million of mezzanine financing to the Debtors.

In February 2023, the RLOC Agent issued another notice of default to the Debtors because the Debtors' borrowing base dropped under the $10 million borrowing base loan covenant. During this time, the RLOC Agent was paid the monthly interest it was due and MetLife continued to receive its principal and interest payments, even though the dairy industry was experiencing historically low milk prices and historically high feed prices.

In May and June 2023, the Debtors received term sheets from two banks to refinance the outstanding obligations under Pre-Petition RLOC Credit Agreement. Both term sheets, however, were conditioned upon MetLife providing approximately $45 million in additional financing to pay off the $16.5 Mezz Loan and decrease the outstanding amounts under the Pre-Petition RLOC Credit Agreement.

On June 9, 2023, MetLife declined the requested financing. By July 1, 2023, the Debtors had failed to refinance the Pre-Petition RLOC Credit Agreement during the Forbearance Period as required by the Long-Term Forbearance Agreement, and the Forbearance Period expired. On August 11, 2023, the RLOC Agent was forced to terminate the Forbearance Agreement, issue a Notice of Default, and enforce its contractual and legal remedies.

On January 22, 2024, the RLOC Agent filed its Verified Petition for Appointment of Receiver in the Fourth Judicial District of the State of Idaho, County of Ada. After extensive negotiations, on February 16, 2024, the Debtors and the RLOC Agent agreed to the entry of a consensual order appointing a receiver to oversee the Debtors' estates ("**Receivership Order**"). The Receivership Order gave Bill Millenkamp the ability to continue as the Debtors' business operator with (i) exclusive management control of the day-to-day operations, and (ii) the exclusive right to file a bankruptcy petition on behalf of any of the Debtors, for a period of sixty (60) days from the date of the Receivership Order.

On April 2, 2024, the Debtors commenced the Chapter 11 Cases by Filing voluntary petitions for relief with the Bankruptcy Court.

## III.    THE CHAPTER 11 CASES

The Chapter 11 Cases are being jointly administered under the case caption *In re Millenkamp Cattle, Inc., LLC, et al.*, Case No. 24-40158 (Bankr. D. Idaho). An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under

Bankruptcy Code section 362(a), which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date. Section 16.7 of the Toggle Plan expressly provides that the automatic stay will remain in effect during the period following the Confirmation Date to the Effective Date.

### A.    First Day Orders and Initial Employment Applications

On or about the Petition Date, the Debtors Filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief. In connection with these hearings, the Bankruptcy Court entered a series of customary "first day" orders, including the payment of employee wages and payments relating to utilities. (Docket Nos. 102, 140, 295). The Debtors also filed a Motion to Honor Prepetition Obligations to Critical Vendors (the "**Critical Vendor Motion**") (Docket No. 23). After a hearing on the matter, the Bankruptcy Court entered an interim order granting the Motion to pay certain prepetition claims of critical vendors listed in the order, based largely on those vendors' secured status and the characterization of the interim payments as adequate protection payments. The Bankruptcy Court held a final hearing on the Critical Vendor Motion, and ultimately denied the Critical Vendor Motion. (Docket No. 302).

### B.    Applications to Employ Professionals

The Debtors have employed several professionals following the Petition Date, including:

- Johnson May as Counsel for the Debtors: Order entered on May 24, 2024 (Docket No. 322)

- Dentons Davis Brown as Counsel for the Debtors: Order entered on May 24, 2024 (Docket No. 323)

- Schuil Ag Real Estate as an expert Real Estate Broker for the Debtors: Order entered on May 31, 2024 (Docket No. 357)

- Gale W. Harding and Associates as Equipment Appraiser: Order entered on May 31, 2024 (Docket No. 358)

- Davis Livestock, Inc. as Livestock Appraiser: Order entered on June 4, 2024 (Docket No. 371)

- The Forbes Securities Group LLC dba Forbes Partners as Investment Banker: Order entered on June 5, 2024 (Docket No. 372)

- Cooper Norman as Accountant: Order entered on August 14, 2024 (Docket No. 554)

- Summit Ag Appraisal, Inc. as Real Estate Appraiser: Order entered on August 15, 2024 (Docket No. 556)

- Givens Pursley as Special Counsel for the Debtors: Order entered August 26, 2024 (Docket No. 577)

- Heida Law Office as Special Counsel for the Debtors (Docket No. 673)

23

- Kander, LLC as Financial Advisor for the Debtors (Docket No. 674)

- Lance VandeMark and Theodore Isbell of Vertex as Expert Witnesses (Docket No. 688)

- Robert Marcus as Chief Restructuring Officer (approved at Docket No. 848)

### C.    Appointment of the Creditors' Committees

On May 14, 2024, the Office of the United States Trustee for the District of Idaho (the "**U.S. Trustee**") appointed the following creditors to the Official Committee of Unsecured Creditors (Docket No. 297) (the "**Creditors' Committee**"): (i) J.D. Heiskell Holding, LLC; (ii) Wilbur Ellis Nutrition-Rangen; (iii) Bunge Canada; (iv) Viterra USA Grain, LLC; and (v) Land View, Inc. The Creditors' Committee retained O'Melveny & Myers LLP as its lead counsel, Elsaesser Anderson Chtd. as its local counsel, and Armory Securities, LLC as its financial advisor.

### D.    United States Trustee

Jason R. Naess and Brett R. Cahoon are the trial attorneys for the U.S. Trustee in connection with these Chapter 11 Cases.

### E.    Meeting of Creditors

The meetings of creditors under Bankruptcy Code section 341(a) were held via telephone. At the meetings of creditors, the U.S. Trustee and creditors asked questions of representatives of the Debtors.

### F.    Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims

On April 23, 2024, the Debtors Filed their Schedules and Statements of Financial Affairs. (Docket No. 215) (as amended, the "**Schedules**"). A Creditor whose Claim is set forth in the Schedules and is not identified as contingent, unliquidated, or disputed may, but need not, have Filed a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Toggle Plan[9].

On June 7, 2024, the Bankruptcy Court entered an *Order (I) Vacating the Original Bar Date and (II) Establishing a Deadline to File Proofs of Claim* (Docket No. 393) (the "**Bar Date Order**"), establishing July 31, 2024 as the General Claims Bar Date.

As of September 30, 2024, approximately 127 proofs of claim appeared on the official claims register for Millenkamp Cattle, Inc., approximately 10 proofs of claim appeared on the official claims register for Idaho Jersey Girls, LLC, approximately 14 proofs of claim for East Valley Cattle, approximately 1 proof of claim for Millenkamp Enterprises, LLC, approximately 9

---

[9] A Creditor asserting a prepetition Claim that neither files a Proof of Claim nor has its Claim set forth in the Schedules as being other than contingent, unliquidated or disputed, and whose Claim is not Allowed by an Order of the Bankruptcy Court, under the Toggle Plan, or in the Confirmation Order, is not entitled to a Distribution under the Toggle Plan.

24

proofs of claim for Millenkamp Properties, L.L.C., approximately 7 proofs of claim for Millenkamp Properties II LLC, approximately 9 proofs of claim for Millenkamp Family, LLC, approximately 8 proofs of claim for Goose Ranch, LLC, approximately 9 proofs of claim for Idaho Jersey Girls Jerome Dairy, LLC, and approximately 7 proofs of claim for Black Pine Cattle, LLC, although some of those claims have been withdrawn or superseded by other claims. The Debtors have not completed claim reconciliation work and do not anticipate doing so before the Effective Date of the Toggle Plan.

### G.    Cash Collateral Motions

On April 2, 2024, the Debtors filed their *Emergency and Continuing Motion for Interim and Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and Setting a Final Hearing*. (Docket No. 22). The Bankruptcy Court held hearings on the interim use of cash collateral and subsequently, on April 8, 2024, entered an *Interim Order Granting Debtors' Emergency Motion for Authorization to Use Cash Collateral and to Schedule a Final Hearing* (Docket No. 141) and a Second Interim Order Granting Debtors' *Emergency Motion for Authorization to Use Cash Collateral*. (Docket No. 180). These orders approved an interim draw of $8.5 million under the proposed $45 million priming DIP facility.

On June 27, 2024, the Debtors filed a *Second Motion for Continued Use of Cash Collateral* (Docket No. 464). The Bankruptcy Court held a hearing on the Second Motion for Continued Use of Cash Collateral and entered an *Interim Order Granting Debtors' Second Motion for Continued Use of Cash Collateral*. (Docket No. 524) ("**Second Motion**"). On September 18, 2024, the Debtors filed a Supplement to their *Second Motion for Continued Use of Cash Collateral* (Docket No. 618), which contained an updated cash collateral budget.

On September 23, 2024, the Debtors, the RLOC Agent, MetLife, Sandton, Conterra, the Creditors' Committee, and the United States Trustee, entered into a stipulation to resolve potential objections to the Debtors' continued use of cash collateral, in which the parties agreed that the continued use of cash collateral, as outlined in the Second Motion, would be allowed to continue through October 29, 2024, provided that there was no material diminution of the Pre-Petition RLOC Collateral. The Stipulation also required the Debtors to provide additional financial reporting. The Stipulation was intended to allow the Debtors additional time to obtain a refinancing to fund a plan of reorganization, including repayment of the RLOC Secured Claims in full, in Cash.

On October 11, 2024, the RLOC Agent—following the filing of the Debtors' first plan of reorganization—filed an *Objection to Continued Use of Cash Collateral*. (Docket No. 670). On October 21, 2024, the Debtors, the RLOC Agent, MetLife, Sandton, Conterra, the Creditors' Committee, and the United States Trustee, entered into a further stipulation in which the continued cash collateral hearing set for October 28 and 29, 2024, on the Debtors' Second Motion would be vacated and reset for December 10 and 11, 2024. The parties agreed that the continued use of cash collateral, as outlined in the Second Motion, would be allowed and continue through December 11, 2024. (Docket No. 682).

On November 15, 2024, the Debtors filed a *Third Motion for Continued Use of Cash Collateral* (the "**Third Cash Collateral Motion**"). (Docket No. 716). Pursuant to the Third Cash Collateral Motion, the Debtors sought to continue to use Cash Collateral in accordance with the

59797.0007.18169759.1

budget attached as Exhibit A to the Third Cash Collateral Motion. Following a hearing on December 10 and 11, 2024, the Bankruptcy Court granted the Debtors' Third Cash Collateral Motion and permitted the use of cash collateral through April 30, 2025. (Docket No. 815).

### H.    Sandton DIP Loan

On April 2, 2024, the Debtors filed a motion seeking entry of an order authorizing the Debtors to enter into a senior secured, superpriority debtor-in-possession financing facility with the DIP Lender in an aggregate principal amount of not more than $45 million (the "**DIP Motion**"). (Docket No. 24). On April 19, 2024, the Bankruptcy Court entered an order authorizing the Debtors, on an interim basis, to enter into the DIP Credit Agreement, and borrow up to $8.5 million during the interim period. (Docket No. 206).

On May 9th and 10th, the Bankruptcy Court held a final hearing on Debtors' DIP Motion and issued an oral ruling regarding the DIP Motion. On May 17, 2024, the Bankruptcy Court entered the DIP Order (Docket No. 305), authorizing the Debtors to enter into the DIP Credit Agreement (the "**DIP Credit Agreement**"), which provides that the Debtors may borrow an aggregate principal amount of $45 million under the DIP Credit Agreement, in accordance with the terms of the DIP Order and the DIP Loan Documents. Pursuant to the DIP Order, the Debtors were initially authorized to draw an additional $10 million under the DIP Credit Agreement. The DIP Order provides that "[t]o access additional funds under the DIP Facility, the Debtors are required to obtain an additional order from the [Bankruptcy] Court authorizing the future advances on the $45 million DIP Facility." The DIP Order further held that: the Debtors are required to (i) move the Bankruptcy Court for entry of an order authorizing such future advances with notice and opportunity to be heard by other parties in interest, and (ii) justify the need for any such future advances. See DIP Order ¶ 2(b).

On June 6, 2024, the Debtors filed a Debtors' *Motion for Authority to Advance on the DIP Facility* (Docket No. 378), which sought authority to incur an additional $15 million in loans under the DIP Credit Agreement. On June 18, 2024, the RLOC Agent filed an *Omnibus Objection to Debtor's Motions.* (Docket No. 431). On June 21, 2024, the Bankruptcy Court limited the Debtors' DIP draw to $5 million. (Docket No. 450).

As of the filing of this Toggle Disclosure Statement, $18.5 million has been drawn on the DIP Credit Agreement.

### I.    503(b)(9) Motion

On April 2, 2024, the Debtors filed a *Motion for Allowance and Payment of Section 503(b)(9) Claims.* (Docket No. 15) (the "**503(b)(9) Motion**"). On April 24, 2024, the U.S. Trustee filed a partial objection to the 503(b)(9) Motion (Docket No. 230). On May 20, 2024, the Debtors amended the 503(b)(9) Motion and requested authority to pay, prior to confirmation of a plan, $5,815,545.00 to Holders of Section 503(b)(9) Claims. (Docket No. 308) (the "**503(b)(9) Claimants**"). Following the filing of *RAF's Limited Objection to Debtors' Amended Motion for Allowance and Payment of Section 503(B)(9) Claims*, (Docket. No. 373), the Debtors reduced the proposed administrative claim amount by $644,698.44. Upon this reduction, and after an evidentiary hearing, the Bankruptcy Coe approved the Allowance of the 503(b)(9) Claimants, but

26

denied the Debtors' request to pay the 503(b)(9) Claimants prior to Confirmation of a chapter 11 plan. Subsequently, additional Section 503(b)(9) Claims were submitted through motions filed with the Bankruptcy Court or through the creditors' Proofs of Claim. To date, Allowed Section 503(b)(9) Claims are as follows:

| | | |
|---|---|---|
| St. Genetics | $ | 21,963.50 |
| Aden Brook Trading Corp | $ | 724,600.02 |
| Amalgamated Sugar | $ | 230,824.66 |
| American Calf Products | $ | 194,333.00 |
| Carne I Corp. | $ | 131,312.90 |
| Land View, Inc. | $ | 1,057,117.09 |
| MicroProteins, Inc. | $ | 18,954.66 |
| Viterra USA Grain, LLC | $ | 1,954,760.00 |
| WAG Services Inc. | $ | 685.00 |
| MWI Veterinary | $ | 484,255.92 |
| Automation Werx, LLC | $ | 1,287.03 |
| Coastline | $ | 4,386.53 |
| Elevation Electric | $ | 254.13 |
| Les Schwab Tire Center | $ | 26,643.97 |
| Progressive Dairy Services and Supplies | $ | 4,858.75 |
| Schow's Auto Parts | $ | 1,274.55 |
| Tacoma Screw Products, Inc. | $ | 3,238.17 |
| The Dairy Solutions Group | $ | 41,264.50 |
| Conrad & Bischoff, Inc. | $ | 35,299.91 |
| United Oil/United Electric Coop | $ | 593.00 |
| Rocky Mountain Agronomics | $ | 44,527.47 |
| Clear Lakes Products | $ | 592.00 |
| ABS Global, Inc. | $ | 187,563.00 |
| Butte Irrigation Inc. | $ | 220.30 |
| Valley Wide Cooperative | $ | 67,132.81 |
| Premier Truck Group (PTG of Idaho LLC) (Penske) | $ | 20,386.60 |
| **TOTAL** | **$** | **5,258,329.47** |

**J.    Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries**

On June 6, 2024, the Debtors filed a *Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries* (Docket No. 374) (the "**Deposit Motion**") as the Debtors' silage and hay/straw vendors were requiring the Debtors to make deposits of up to 50%. The Bankruptcy Court held an evidentiary hearing on June 20, 204, on the Deposit Motion, and on June 21, 2024, the Bankruptcy Court entered an Order Granting the Deposit Motion, permitting the Debtors to (1) use $2.5 million to prepay vendors up to 50% of future corn silage contracts, (2) use $2.5 million to prepay vendors up to 50% of future straw and hay contracts, and (3) use

27

$1.5 million to prepay a deposit to H&M Custom for the cost of chopping services for hay, straw, and corn silage. (Docket No. 450).

### K.      506(b) Motion

On June 27, 2024, the Debtors filed a Motion to Establish Procedures for 11 U.S.C. § 506(b) Claims. A hearing was held on that motion and the Bankruptcy Court approved modified procedures than those set forth in the motion. However, no order has been entered at this time. Pursuant to the Bankruptcy Court's oral ruling, each party seeking allowance or payment of an 11 U.S.C. § 506(b) claim shall file either (a) a Proof of Claim (or Amended Proof of Claim) detailing the fees, costs, or charges sought to be approved; or (b) a Notice of 506(b) Claim with the Bankruptcy Court.

Under the Bankruptcy Court's oral ruling, any party filing a Notice of 506(b) Claim shall serve a copy of such Notice of 506(b) Claim on the Debtors, the United States Trustee, any other party secured by the same asset(s) securing the party filing the Notice, the Creditors' Committee, any party who has requested special notice in the Debtors' Chapter 11 case, and any counsel for any of the foregoing. The Notice shall be accompanied by a Certificate of Service showing which parties were served in which manner.

Under the Toggle Plan, all Persons requesting payment of Administrative Expense Claims, including but not limited to Section 503(b)(9) Claims, **shall file a Proof of Claim with the Bankruptcy Court no later than the Administrative Claims Bar Date**. The Toggle Plan provides for two different Administrative Claims Bar Dates. Under the Reorganization Toggle, the Administrative Claims Bar Date shall be a date set forth in the Toggle Disclosure Statement Order; *provided* that a Person may file a subsequent or amended Proof of Claim if permitted by a subsequent order of the Bankruptcy Court, which could be the Confirmation Order. Under the Going Concern 363 Sale Toggle and/or Business Unit 363 Sale Toggle, the Administrative Claims Bar Date shall be the first Business Day that is at least thirty (30) calendar days after the Effective Date of the Toggle Plan, or, alternatively, such earlier date as is set by the Bankruptcy Court.

The Administrative Claims Bar Date shall not apply to Estate Professionals or Secured Creditors' Professionals asserting Claims under section 506(b), or to the extent a Holder is requesting payment of Professional Fee Claims under section 506(b), DIP Claims, or Priority Tax Claims. Under the Toggle Plan, all final requests for allowance and payment of Estate Professional Fee Claims under section 506(b) must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court. Additionally, Holders of Secured Claims (other than a Plan Proponent) must file, on or before the Confirmation Date, either (i) an amended Proof of Claim encompassing the Holder's Professional Fee Claim; or (ii) file a Notice of 506(b) Claim. A Secured Creditor that is a Plan Proponent must file, on or before the Confirmation Date, an amended Proof of Claim encompassing the Holder's Professional Fee Claim, which Professional Fee Claim shall be automatically deemed Allowed in full in accordance with their contractual arrangements and as a condition precedent to Confirmation, in part as consideration for developing and proposing the Toggle Plan.

### L.    Appointment of a Chief Restructuring Officer

On December 10, 2024, the Debtors filed their *Debtors' Application to Employ Robert Marcus as Chief Restructuring Officer*. (Docket No. 791) ("**CRO Motion**"). Following a hearing on January 9, 2024, the Bankruptcy Court granted the Debtors' CRO Motion and appointed Robert Marcus as Chief Restructuring Officer of the Debtors.

### M.    Debtors' Plan Filing & Solicitation Exclusivity

On June 27, 2024, the Debtors filed a Motion to Extend the Exclusive Period to File their Disclosure Statement and Plan. (Docket No. 467). On July 19, 2024, the Bankruptcy Court entered an Order Extending the Exclusive Periods during which the Debtors may file and confirm a Plan. (Docket No. 507) (the "**Order to Extend Exclusivity**"). Pursuant to the Order to Extend Exclusivity, the Debtors' exclusive period to file a chapter 11 plan was extended to and including September 30, 2024, and the period for Debtors to solicit ballots on a chapter 11 plan was extended to and including November 29, 2024.

On September 30, 2024, the Debtors filed their *First Plan of Reorganization and their Disclosure Statement* (Docket Nos. 640 & 641), which were contingent on a refinancing proposal from Cargill, Inc. ("**Cargill**"). The hearing to consider such disclosure statement was set for November 21, 2024. (Docket No. 643). On November 11, 2024, following the failure to consummate the refinancing proposal with Cargill, the Debtors filed a Withdrawal of the Disclosure Statement. (Docket No. 706). Thereafter, the Debtors filed their *Chapter 11 Amended Plan of Reorganization of Millenkamp Cattle, Inc. and its Related Debtor Affiliates*. (Docket No. 776) (the "**Debtors' Plan**").[10]

On October 11, 2024, the RLOC Agent filed a Motion to Terminate Exclusivity (the "**Motion to Terminate**"). (Docket No. 670). On November 11, 2024, the Debtors filed a *Motion to Extend Exclusivity Period for Filing a Chapter 11 Toggle Plan and Disclosure Statement* (the "**Motion to Extend Exclusivity**"). (Docket No. 707).

On December 17, 2024, the Bankruptcy Court granted the Motion to Terminate and denied the Debtors' Motion to Extend Exclusivity (Docket No. 807). By denying the Debtors' Motion to Extend Exclusivity, the Bankruptcy Court observed that the Debtors have "struggled to make progress" in refinancing or otherwise proposing a plan to pay the RLOC Agent in full, and noted the Debtors' two prior attempts to refinance. The attempt to refinance, the Bankruptcy Court said, may be "running out of road" and that the potential for a competing chapter 11 plan filed by a third party may serve as a "catalyst" to move the case forward towards a fair and equitable resolution.

## IV.    SUMMARY OF THE CHAPTER 11 TOGGLE PLAN

This section provides a summary of the structure and means for implementation of the Toggle Plan and the classification and treatment of Claims and Interests under the Toggle Plan and

---

[10] To the extent the Debtors file a subsequent or amended chapter 11 plan, the Plan Proponents reserve the right to alter, amend, or otherwise modify the Toggle Plan and the Toggle Disclosure Statement to address the Debtors' revisions or amendments.

59797.0007.18169759.1

is qualified in its entirety by reference to the Toggle Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Toggle Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Toggle Plan or documents referred to therein, and reference is made to the Toggle Plan and to such documents for the full and complete statement of such terms and provisions.

The Toggle Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Toggle Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Toggle Plan, and other parties in interest. In the event of any conflict, inconsistency, or discrepancy between this Toggle Disclosure Statement and the Toggle Plan, the Confirmation Order, or any other operative document, the terms of the Toggle Plan, Confirmation Order, or such other operative document, as applicable, shall govern and control; *provided* that, in any event, the terms of (1) the Confirmation Order and then (2) the Toggle Plan, in that order, shall govern and control over all other related documents.

### A.    Purpose and Effect of the Toggle Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents.

### 1.    Classification of Claims and Interests Under the Toggle Plan

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under a plan, and (c) contains other provisions necessary to implement a plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.

Under the Toggle Plan, Class 2, Class 3A, Class 3E, Class 3I, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 7A, Class 7D, Class 8A, Class 8C, Class 8E, and Class 9 are Impaired regardless of the toggle being pursued, and Holders of Claims or Interests in such Impaired Classes are entitled to vote to accept or reject the Toggle Plan unless such Classes of Claims or Interests are deemed to reject the Toggle Plan. Under the Toggle Plan, Class 7B, Class 7C, and Class 7F are Impaired if either of the Sale Toggles are pursued. Ballots are being furnished herewith to all Holders of Claims in Class 2, Class 3A, Class 3E, Class 3I, Class 3L, Class 3N, Class 4, Class 5, Class 6, Class 7A, Class 7B, Class 7C, Class 7D, Class 7F, Class 8A, Class 8C, Class 8E, and Class 9 that are entitled to vote to facilitate their voting to accept or reject the Toggle Plan. Class 10 is deemed to reject the Toggle Plan, and, therefore, Holders of Claims or Interests in such Class will not vote on the Toggle Plan. Class 11 is Impaired regardless of the toggle pursued, but is only

30

entitled to vote if the Reorganization Toggle is pursued. Class 1, Class 3B, Class 3C, Class 3D, Class 3F, Class 3G, Class 3H, Class 3J, Class 3K, Class 3M, Class 7E, Class 8B, and Class 8D are Unimpaired under the Toggle Plan regardless of the toggle being pursued. Class 7B, Class 7C, and Class 7F are Unimpaired if the Reorganization Toggle is being pursued under the Toggle Plan. Under Bankruptcy Code section 1126(f), the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Toggle Plan, and, therefore, the votes of such Holders Claims in such Unimpaired Classes shall not be solicited.

2.  **Classification and Voting Controversies**

If a controversy arises regarding whether any Claim is properly classified under the Toggle Plan, then the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Toggle Plan.

B.  **Treatment of Administrative Claims Under the Toggle Plan**

Administrative expenses are costs or expenses of administering the Debtors' Bankruptcy Cases which are allowed under Bankruptcy Code section 507(a)(2). All Persons requesting payment of Administrative Expense Claims, including but not limited to Claims under section 503(b)(9) of the Bankruptcy Code, shall file a Proof of Claim with the Bankruptcy Court no later than the Administrative Claims Bar Date. The Administrative Claims Bar Date shall not apply to Estate Professionals or Secured Creditors' Professionals, or to the extent a Holder is requesting payment of Professional Fee Claims, DIP Claims, or Priority Tax Claims, or to the extent that an Administrative Claim has already been Allowed or paid during the Chapter 11 Cases. Objections to such applications for payment (whether by Estate Professionals requesting payment of Estate Professional Fee Claims or Persons requesting payment of Administrative Expense Claims), if any, must be written, filed with the Court, and served on the applicable parties within thirty (30) days after such application or Claim is filed (the "**Administrative Claims Objection Deadline**").

The Debtors, Reorganized Debtors, Plan Proponents, or Plan Administrator, as applicable, may object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors, Reorganized Debtors, Plan Proponents, or Plan Administrator (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors, Reorganized Debtors, Plan Proponent, or Plan Administrator object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

Except with respect to Professional Fee Claims, DIP Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases, or a Holder of an Allowed Administrative Claim and the applicable Debtor, or after the Effective Date, such Holder and the Reorganized Debtors or the Plan Administrator, as applicable, agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter.

1.    **503(b)(9) Claims**

On August 29, 2024, the Bankruptcy Court entered an Order on Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims. (Docket Nos. 476 & 584) (the "**503(b)(9) Order**"). Pursuant to the 503(b)(9) Order, Claims in the amount of approximately $5,170,846.56 have been deemed as Allowed Section 503(b)(9) Claims. Additional Section 503(b)(9) Claims have been allowed through motions and/or agreements with the Debtors. A full list of the Allowed Section 503(b)(9) Claims totaling $5,258,329.47 is described at Section IV.I of this Toggle Disclosure Statement. To the extent additional 503(b)(9) Claims exist, such Claim Holders shall file a Claim for allowance of their 503(b)(9) Claim by the Administrative Claims Bar Date.

2.    **Professional Fee Claims**

Final Fee Applications. Under Section 3.2.2(a) of the Toggle Plan, all final requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

Secured Creditors' Professionals. Under Section 3.2.2(b) of the Toggle Plan, Holders of Secured Claims (other than a Plan Proponent) must file, on or before the Confirmation Date, either (i) an amended Proof of Claim encompassing the Holder's Professional Fee Claim; or (ii) file a Notice of 506(b) Claim. The amount asserted by such Holder as a Secured Creditor's Professional Fee Claim shall be Allowed, subject to Section 3.2.2(d) of the Toggle Plan (discussed below) and shall be capitalized, added to, and treated in the same manner as the Holder's Secured Claim under the Toggle Plan.

Plan Proponents. A Secured Creditor that is a Plan Proponent must file, on or before the Confirmation Date, an amended Proof of Claim encompassing the Holder's Professional Fee Claim, which Professional Fee Claim shall be automatically deemed Allowed in full as a condition precedent to Confirmation, in part as consideration for developing and proposing the Toggle Plan. A Plan Proponent may thereafter deliver an invoice to the Debtors for any additional amounts incurred through and including the Effective Date, which amounts shall also be automatically deemed Allowed in full. The amount asserted by such Holder as a Secured Creditor's Professional Fee Claim shall be treated in the same manner and fashion as the Holder's Secured Claim. In the case of the RLOC Agent, the RLOC Agent's Professional Fee Claim shall be treated in accordance with Section 3.7 of the Toggle Plan.

32

Objections to Professional Fee Claims. Under Section 3.2.2(d) of the Toggle Plan, any objections to Professional Fee Claims asserted under Section 3.2.2(a) or 3.2.2(b) of the Toggle Plan described above that are not otherwise Allowed pursuant to the Toggle Plan or the Confirmation Order shall be Filed and served no later than twenty-one (21) days after the filing of (i) final requests for allowance and payment of Professional Fee Claims; (ii) an amended Proof of Claim to include the Professional Fee Claim; or (iii) a Notice of 506(b) Claim.

Professional Fee Claims Estimate. Estate Professionals shall estimate in good faith their unpaid Estate Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtors' Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors and the Plan Proponents no later than five (5) Business Days prior to the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Estate Professional's final request for payment. If an Estate Professional does not provide an estimate, the Plan Proponents, in consultation with the Debtors, shall estimate in good faith the unpaid and unbilled fees and expenses of such Estate Professional.

Estate Professional Fee Escrow. As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, under the Reorganization Toggle, the Reorganized Debtors shall establish and fund the Estate Professional Fee Escrow with Cash based on their evaluation of the Estate Professional Fee Claims estimates from the Effective Date Reserve. In connection with the Going Concern 363 Sale Toggle or Business Unit 363 Sale Toggle, the Estate Professional Fee Escrow shall be established from proceeds of the applicable sale process. No Liens, Claims, or Interests shall encumber the Estate Professional Fee Escrow in any way. The Estate Professional Fee Escrow (including funds held in the Estate Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Estate Professionals and for no other Person or Entity until all Allowed Estate Professional Fee Claims have been irrevocably paid in full; *provided*, that funds remaining in the Estate Professional Fee Escrow after all Allowed Estate Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors or the Plan Administrator, as applicable. Allowed Estate Professional Fee Claims shall be paid in Cash to such Estate Professionals from funds held in the Estate Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' obligations with respect to Estate Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Estate Professional Fee Escrow.

If the amount of funds in the Estate Professional Fee Escrow is insufficient to fund payment in full of all Allowed Estate Professional Fee Claims and any other Allowed amounts owed to Estate Professionals, the deficiency shall be promptly funded to the Estate Professional Fee Escrow by the Reorganized Debtors or the Plan Administrator, as applicable, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

Post Effective Date Fees and Expenses. Except as otherwise specifically provided in the Toggle Plan, on and after the Effective Date, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and/or

33

consummation of the Toggle Plan incurred by the Debtors, Reorganized Debtors, Plan Administrator, or Plan Administration Board, as applicable.

### C.    Treatment of Priority Tax Claims under the Toggle Plan

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

| Priority Tax Claimant | Allowed Priority Amount |
|---|---|
| Cassia County Tax Collector | $59,591.88 |
| Department of Treasury | $1,752.63 |
| Idaho State Tax Commission | $5,612.20 |

### D.    Treatment of DIP Claims under the Toggle Plan

The DIP Claims will be paid in full on the Effective Date from the Effective Date Reserve under the Reorganization Toggle, proceeds of the Going Concern 363 Sale under the Going Concern 363 Sale Toggle, or from proceeds of Business Unit Sales under the Business Unit 363 Sale Toggle.

### E.    Class 1: Other Priority Claims

Classification. Class 1 consists of all Other Priority Claims against each Debtor. There are no known Other Priority Claims.

Treatment Generally. Holders of Allowed Other Priority Claim will receive the same treatment under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, but different treatment under the Reorganization Toggle.

Treatment Under Reorganization Toggle. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment with the applicable Debtor prior to the Effective Date, or after the Effective Date, the applicable Reorganized Debtor, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim from the Effective Date Reserve on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed, each Holder of Allowed Other Priority Claims shall receive its Pro Rata share of the GUC Backstop until paid in full, with balance of the GUC Backstop being distributed to Holders of Allowed Class 9 General Unsecured Claims. Based on the known amount of Allowed Other Priority Claims, the GUC

59797.0007.18169759.1

Backstop will enable each Holder to receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable for payment of Allowed Other Priority Claims.

Treatment Under Business Unit 363 Sale Toggle. Same treatment as under the Going Concern 363 Sale Toggle.

Voting. Class 1 is Unimpaired under the Toggle Plan. Class 1 is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

### F.    Class 2: Corn Silage Group Secured Claims

Classification. Class 2 is classified as the Corn Silage Group Secured Claims which consists of the Corn Silage Group Secured Creditors: Ed Chonjnacky, Michael Chonjnacky, Dusty Brow Farms, Inc., Grant 4-D Farms, LLC, Grant & Hagan, Inc., Douglas J. Grant, Hollifield Ranches, Inc., Standing 16 Ranch Land Company, LLC, Star Falls Farms, LLC, Steel Ranch, LLC, Bo Stevenson dba B&A Farms, Alexander K. Reed, Triple C Farms, LLC, Clint D. Thompson, and Jean L. Thompson.

| Claimant | Allowed Claim Amount |
|---|---|
| Ed Chojnacky | $312,330.00 |
| Michael Chojnacky | $393,753.60 |
| Dusty Brow Farms, Inc. | $245,000.00 |
| Grant 4-D Farms, LLC | $396,601.71 |
| Grant & Hagan, Inc. | $604,551.60 |
| Douglas J. Grant | $222,617.06 |
| Hollifield Ranches, Inc. | $2,044,794.31 |
| Standing 16 Ranch Land Company, LLC | $526,454.40 |
| Star Falls Farms, LLC | $404,878.00 |
| Steel Ranch, LLC | $160,000.00 |
| Bo Stevenson dba B&A Farms | $195,478.80 |
| Alexander K. Reed | $130,674.66 |
| Triple C Farms, LLC | $1,011,955.80 |
| Clint D. Thompson | $49,000.00 |
| Jean L. Thompson | $38,000.00 |

Treatment Generally. Holders of the Corn Silage Group Secured Claims will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. The Corn Silage Group Secured Claims will have been paid in full as of the Effective Date pursuant to monthly adequate protection payments, except as to any pre- and post-petition interest and attorneys' fees associated with their Claims. Notwithstanding anything to the contrary, the Corn Silage Group Secured Claim Holders shall provide to the Plan Proponents no later than five (5) Business Days before the Effective Date a statement of interest and attorneys' fees. Such interest and attorneys' fees shall be paid pursuant to the Budget, with quarterly interest payments at 5% per annum through March 2027.

35

Treatment Under the Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, assumed, a Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities, including any priorities of payment set forth in the Toggle Plan. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under the Business Unit 363 Sale Toggle. Unless otherwise agreed, a Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 2 is Impaired under the Toggle Plan. Each Holder of Class 2 Claims is entitled to vote to accept or reject the Toggle Plan.

### G.    Class 3: Other Secured Ag Lien Claims

Classification. Class 3 consists of the subclasses of Other Secured Ag Lien Claims that are not considered to be part of the Corn Silage Group.

#### 1.    Class 3A: A. Scott Jackson Trucking Secured Claim

Classification. Class 3A consists of the A. Scott Jackson Trucking Secured Claim.

Treatment Generally. A. Scott Jackson Trucking filed a Proof of Claim in the amount of $184,656.30. A. Scott Jackson Trucking shall have an Allowed Class 3A Secured Claim in the amount of $184,656.30. Holders of an Allowed Class 3A Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. Except to the extent that A. Scott Jackson Trucking agrees to a less favorable treatment with the Debtors prior to the Effective Date, or after the Effective Date, the Reorganized Debtors, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 3A Secured Claim, A. Scott Jackson Trucking shall be paid pursuant to the Budget, with quarterly interest payments at 5% per annum through March 2027.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

<u>Voting</u>. Class 3A is Impaired under the Toggle Plan. Class 3A is entitled to vote under the Toggle Plan.

### 2.    **Class 3B: B&H Farming Secured Claim**

<u>Classification</u>. Class 3B consists of the B&H Farming Secured Claim.

<u>Treatment</u>. B&H Farming filed a Proof of Claim in the amount of $474,674.79 and shall have an Allowed Class 3B Secured Claim in the amount of $474,674.79. B&H Farming has received and will receive adequate protection payments in the amount of $474,674.79 prior to the Effective Date. As such, the Allowed Class 3B Secured Claim will be paid in full as of the Effective Date and B&H Farming shall receive no further Distribution under the Toggle Plan. Any pre-petition Liens claimed by B&H Farming in property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3B is Unimpaired under the Toggle Plan. Class 3B is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

### 3.    **Class 3C: H&M Custom, LLC Secured Claim**

<u>Classification</u>. Class 3C consists of the H&M Custom, LLC ("**<u>H&M</u>**") Secured Claim.

<u>Treatment</u>. H&M filed a Proof of Claim in the amount of $4,769,170.78 and H&M shall have an Allowed Class 3C Claim in the amount of $4,769,170.78. H&M received a Bankruptcy Court-approved $2,500,000.00 adequate protection payment during the pendency of the Chapter 11 Cases. H&M has received and will receive by the Effective Date additional adequate protection payments totaling $2,269,171.00. As such, the Allowed Class 3C Secured Claim will be paid in full as of the Effective Date and H&M shall receive no further Distribution under the Toggle Plan. Any pre-petition Liens claimed by H&M in property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3C is Unimpaired under the Toggle Plan. Class 3C is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

### 4.    **Class 3D: Healthy Earth Enterprises, LLC Secured Claim**

<u>Classification</u>. Class 3D consists of the Healthy Earth Enterprises, LLC ("**<u>Healthy Earth</u>**") Secured Claim.

<u>Treatment</u>. The Scheduled amount of the Healthy Earth Secured Claim is $60,000.00 and Healthy Earth did not file a Proof of Claim. Healthy Earth shall have an Allowed Class 3D Secured Claim in the amount of $60,000.00. Healthy Earth received a Bankruptcy Court-approved $60,000.00 adequate protection payment during the pendency of the Chapter 11 Cases. No further amount will be owing by the Debtors to Healthy Earth as of the Effective Date and therefore Healthy Earth will receive no Distribution under the Toggle Plan. Any pre-petition Liens claimed by Healthy Earth Enterprises in property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3D is Unimpaired under the Toggle Plan. Class 3D is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

5.     **Class 3E: Kraus Farms, LLC Secured Claim**

<u>Classification</u>. Class 3E consists of the Kraus Farms, LLC ("**Kraus Farms**") Secured Clam.

<u>Treatment Generally</u>. The Scheduled amount of the Kraus Farms Secured Claim is $480,313.10. Kraus Farms filed a Proof of Claim in the amount of $499,473.53 and shall have an Allowed Class 3E Secured Claim in the amount of $499,473.53. Holders of an Allowed Class 3E Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

<u>Treatment Under Reorganization Toggle</u>. Except to the extent that Kraus Farms agrees to a less favorable treatment with the Debtors prior to the Effective Date, or after the Effective Date, the Reorganized Debtors, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 3E Secured Claim, Kraus Farms shall be paid pursuant to the Budget, with quarterly interest payments at 5% per annum through March 2027.

<u>Treatment Under Going Concern 363 Sale Toggle</u>. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

<u>Treatment Under Business Unit 363 Sale Toggle</u>. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

<u>Voting</u>. Class 3E is Impaired under the Toggle Plan. The Class 3E Claim is entitled to vote under the Toggle Plan.

6.     **Class 3F: Milner Hay Company, LLC Secured Claim**

<u>Classification</u>. Class 3F consists of the Milner Hay Company, LLC ("Milner") Secured Claim.

<u>Treatment</u>. The Scheduled amount of the Milner Secured Claim is $64,885.00. Milner did not file a Proof of Claim. Milner shall have an Allowed Class 3F Claim in the amount of $64,885.00. Milner has received and will receive post-petition adequate protection payments totaling $64,885.00 prior to the Effective Date. No further amount will be owed by the Debtors to Milner as of the Effective Date and therefore Milner will receive no Distribution under the Toggle Plan. Any pre-petition Liens claimed by Milner in any property of the Debtors shall be considered released and have no further effect.

59797.0007.18169759.1

<u>Voting</u>. Class 3F is Unimpaired under the Toggle Plan. Class 3F is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

### 7.    **Class 3G: Moss Grain Partnership Secured Claim**

<u>Classification</u>. Class 3G consists of the Moss Grain Partnership ("**Moss Grain**") Secured Claim.

<u>Treatment</u>. Moss Grain filed a Proof of Claim in the amount of $101,000.00 and shall have an Allowed Class 3G Secured Claim in the amount of $101,000.00. Moss Grain has received and will receive post-petition adequate protection payments totaling $101,000.00 prior to the Effective Date. No further amount will be owed by the Debtors to Moss Grain as of the Effective Date and therefore Moss Grain will receive no Distribution under the Toggle Plan. Any pre-petition Liens claimed by Moss Grain in any property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3G is Unimpaired under the Toggle Plan. Class 3G is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

### 8.    **Class 3H: NorthWest Seed, Inc Secured Claim**

<u>Classification</u>. Class 3H consists of the NorthWest Seed, Inc. ("**NorthWest**") Secured Claim.

<u>Treatment</u>. The Debtors Scheduled NorthWest as an unknown Secured Claim based on financing statements filed by NorthWest claiming a security interest in the Debtors' 2024 hay. The Debtors have concluded there is no amount owing to NorthWest as of the Petition Date and NorthWest did not file a Proof of Claim. As such, NorthWest will not receive a Distribution under the Toggle Plan. Any pre-petition Liens claimed or asserted by NorthWest in any property of the Debtors shall be considered released and have no further effect.

<u>Voting</u>. Class 3H is Unimpaired under the Toggle Plan. Class 3H is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

### 9.    **Class 3I: Performance Plus-Idaho, LLC Secured Claim**

<u>Classification</u>. Class 3I consists of the Performance Plus-Idaho, LLC ("**Performance Plus**") Secured Claim.

<u>Treatment Generally</u>. The Debtors Scheduled Performance Plus as a Secured Claim in the amount of $29,931.44. Performance Plus did not file a Proof of Claim and shall have an Allowed Class 3I Secured Claim in the amount of $29,931.44. Holders of an Allowed Class 3E Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

<u>Treatment under Reorganization Toggle</u>. Except to the extent that Performance Plus-Idaho, LLC agrees to a less favorable treatment with the Debtors prior to the Effective Date, or after the Effective Date, the Reorganized Debtors, in full and final satisfaction, compromise, settlement,

39

release, and discharge of and in exchange for such Allowed Class 3I Secured Claim, Performance Plus shall be paid pursuant to the Budget, with quarterly interest payments at 5% per annum through March 2027.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 3I is Impaired under the Toggle Plan. Class 3I Claims are entitled to vote under the Toggle Plan.

10.    **Class 3J: Tyche Ag, LLC Secured Claim**

Classification. Class 3J consists of the Tyche Ag, LLC ("**Tyche**") Secured Claim.

Treatment. The Debtors Scheduled Tyche as an unknown Secured Claim based on financing statements filed by Tyche claiming a security interest in the Debtors' 2023 hay. The Debtors have concluded there is no amount owing to Tyche as of the Petition Date and Tyche did not file a Proof of Claim. As such, Tyche will not receive a Distribution under the Toggle Plan. Any pre-petition Liens claimed or asserted by Tyche in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3H is Unimpaired under the Toggle Plan. Class 3H is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

11.    **Class 3K: Wada Farms Partnership Secured Claim**

Classification. Class 3K consists of the Wada Farms Partnership ("**Wada Farms**") Secured Claim.

Treatment. The Debtors Scheduled Wada Farms as a Secured Claim in the amount of $374,432.50. Wada Farms did not file a Proof of Claim. It shall have an Allowed Class 3K Secured Claim in the amount of $374,432.50. Wada Farms has received and will receive post-petition adequate protection payments totaling $374,432.50 prior to the Effective Date. No further amount will be owed by the Debtors to Wada Farms as of the Effective Date and therefore Wada Farms will receive no Distribution under the Toggle Plan. Any pre-petition Liens claimed or asserted by Wada Farms in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3K is Unimpaired under the Toggle Plan. Class 3K is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

59797.0007.18169759.1

12.     **Class 3L: Youree Land & Livestock Secured Claim**

Classification. Class 3L consists of the Youree Land & Livestock ("**Youree**") Secured Claim.

Treatment Generally. Youree filed a Proof of Claim in the amount of $119,042.08 and shall have an Allowed Class 3L Secured Claim of $119,042.08. Youree has received and will receive post-petition adequate protection payments in the amount of $112,157.00 prior to the Effective Date. Holders of an Allowed Class 3L Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. After payment of the adequate protection payments, the Debtors will owe Youree $6,885.06 on the Effective Date, which amount shall be paid pursuant to the Budget, with quarterly interest payments at 5% per annum through March 2027.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 3L is Impaired under the Toggle Plan. The Class 3L Secured Claim is entitled to vote under the Toggle Plan.

13.     **Class 3M: Eagle Creek Northwest, LLC Claim**

Classification. Class 3M consists of the Eagle Creek Northwest, LLC ("**Eagle Creek**") Secured Claim.

Treatment. The Debtors Scheduled Eagle Creek as an unknown secured claim based on financing statements filed by Eagle Creek claiming a security interest in the Debtors' wheat, hay, potatoes, and sugar beets. Any pre-petition Liens claimed or asserted by Eagle Creek in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 3M is Unimpaired under the Toggle Plan. Class 3M is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

41

14. **Class 3N: Standlee Ag Resources and Premium Products Secured Claim**

Classification. Class 3N consists of the Standlee Ag Resources and Premium Products (collectively referred to herein as "**Standlee**") Secured Claim.

Treatment Generally. Standlee filed a Proof of Claim in the amount of $214,915.55 and shall have an Allowed Class 3N Secured Claim in the amount of $214,915.55. Standlee has received and will receive post-petition adequate protection payments totaling $208,490.00 prior to the Effective Date. Holders of an Allowed Class 3N Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. After payment of the adequate protection payments, the Debtors will owe Standlee $6,425.55 on the Effective Date, which shall be paid pursuant to the Budget, with quarterly interest payments at 5% per annum through March 2027.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business 363 Unit Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 3N is Impaired under the Toggle Plan. The Class 3N Claim is entitled to vote under the Toggle Plan.

**H.    Class 4: MetLife Secured Claims**

Classification. Class 4 consists of the MetLife Secured Claims.

Treatment Generally. MetLife filed Proofs of Claim in the aggregate amount of $181,376,198.66. The Debtors' books and records reflect a total amount owing to MetLife of $184,177,739.10. The Debtors are conducting a reconciliation of their books and records and MetLife's Proofs of Claim. As of the filing of the Toggle Plan, MetLife shall have an Allowed Secured Claim in the amount of $184,177,739.10. Upon completion of the Debtors' reconciliation, the Toggle Plan will be amended as necessary based on such reconciliation. The Allowed Class 4 MetLife Secured Claims may be amended to include additional accrued and unpaid post-petition default interest and professional fees, and upon amendment, shall be Allowed. Holders of an Allowed Class 4 MetLife Secured Claims will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. The Allowed Class 4 MetLife Secured Claims shall receive the following treatment:

59797.0007.18169759.1

1. On the Effective Date, MetLife will receive the net sale proceeds of Canyonlands and McGregor as necessary to pay the allocable portion of MetLife Secured Claim arising from the 9858 Promissory Note dated March 12, 2019 referred to above.

2. On the Effective Date, the Reorganized Debtors shall use the Effective Date Reserve to pay down Three Million Dollars ($3,000,000) of the Allowed Class 4 MetLife Secured Claims to be applied by MetLife in its sole and absolute discretion.

3. The balance of the unpaid Allowed Class 4 MetLife Secured Claims shall be reclassified and capitalized as senior term loan obligations on the same terms existing prior to the Petition Date, except that (a) MetLife shall receive interest-only payments at the non-default rate for the first thirty (30) months following the Effective Date and (b) the non-default interest rate on the Pre-Petition MetLife Loans shall be increased to 7% per annum (the "**Exit MetLife Term Notes**").

4. At month thirty-one (31) following the Effective Date, the Exit MetLife Term Notes shall begin receiving monthly principal and interest payments pursuant to the Budget and the terms of the Exit MetLife Term Notes.

5. The Allowed Class 4 MetLife Secured Claims shall continue to be secured to the same extent, validity and priority in the Collateral subject to the Pre-Petition MetLife Liens (except with respect to Canyonlands and McGregor).

Treatment Under Going Concern 363 Sale Toggle. If the Plan Administrator closes on a Going Concern 363 Sale pursuant to a Going Concern 363 Sale Order in accordance with the Approved Going Concern 363 Sale Qualified Bid, if no competing bids were submitted, or the Successful Going Concern 363 Sale Auction Bid, as the case may be, unless otherwise agreed with the Holder of the Allowed Class 4 MetLife Secured Claims, the proceeds of such sale shall be used to satisfy the Allowed Class 4 MetLife Secured Claims in full.

Treatment Under the Business Unit 363 Sale Toggle. If the Plan Administrator does not receive at least one Approved Going Concern 363 Sale Qualified Bid or the Bankruptcy Court does not enter the Going Concern 363 Sale Order, the Plan Administrator will proceed to sell the Debtors' Assets in accordance with the Business Unit 363 Sale Toggle. Unless otherwise agreed with the Holder of the Allowed Class 4 MetLife Secured Claims, the proceeds of such sale(s) shall be Distributed to such Holder of the Allowed Class 4 MetLife Secured Claims in accordance with their respective lawful and contractual Lien and payment priorities, subject to the GUC Backstop.

Voting. Class 4 is Impaired under the Toggle Plan. Class 4 is entitled to vote under the Toggle Plan.

### I.    Class 5: RLOC Secured Claims

Classification. Class 5 consists of the RLOC Secured Claims.

Treatment Generally. The RLOC Agent filed an Amended Proof of Claim in the amount of $96,469,917.04.

Proof of Claim Amount:

Principal: $88,950,202.73
Pre-Petition Interest (as of April 2, 2024): $149,105.24
Post-Petition Interest (as of October 31, 2024): $2,751,368.26
Pre-Petition Professional Fees: $1,255,548.19
Post-Petition Professional Fees and Costs (as of April 2, 2024): $1,219,525.43
Unused Commitment Fee: $6,280.00
Total: $96,469,917.04

For purposes of the Toggle Plan, the Class 5 RLOC Secured Claims shall be Allowed in the amount of $96,469,917.04 (as of October 31, 2024). The Class 5 RLOC Secured Claims shall be further amended to include additional accrued and unpaid post-petition default interest and professional fees, and upon amendment, shall be Allowed.

Holders of an Allowed Class 5 RLOC Secured Claims will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

<u>Treatment Under Reorganization Toggle</u>. The Allowed Class 5 RLOC Secured Claims shall receive the following treatment:

1. On the Effective Date, the Reorganized Debtors shall use the Effective Date Reserve to pay down $12.1 million of the Class 5 RLOC Secured Claims, to be applied by the RLOC Agent in its sole and absolute discretion, some of which is deemed to be partial consideration for the RLOC Agent releasing its Lien on the equity interests in the Debtors and the New Common Stock.

2. The balance of the unpaid Class 5 RLOC Secured Claims shall be reclassified and recapitalized as a senior term loan obligation (the "**Exit RLOC Term Note**"). The Exit RLOC Term Note shall (a) mature on December 31, 2026, (b) accrue interest at a rate equal to the sum of one month SOFR plus 6% per annum, subject to a floor of 10% with accrued interest being due and payable on the last day of each month until the Exit RLOC Term Note matures, is refinanced, or otherwise repaid in full, (c) accrue interest at 2.17% per annum paid in kind (the "**Exit RLOC PIK Interest**"), (d) continue to be secured to the same extent, validity and priority in the Collateral subject to the Pre-Petition RLOC Liens, (e) provide for three (3) quarterly payments following the Effective Date, in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000) per quarter, and (f) provide for one payment in the amount of One Million Nine Hundred Twenty Five Thousand Dollars ($1,925,000) on June 30, 2026.

3. In the event of a default under the Exit RLOC Term Note, interest on the Exit RLOC Term Note shall accrue at an additional 6% interest which shall be added to the rates set forth above.

4. The Exit RLOC Term Note shall contain customary and market covenants, including, but not limited to:

44

a. There shall be no outstanding amounts beyond thirty (30) days after the date of an invoice at any time owing to cattle or feed vendors or any other vendor or supplier by the Reorganized Debtors that could result in such vendor or supplier asserting a Lien on Collateral securing the Exit RLOC Term Note. The total amount owing to such vendors shall not exceed Ten Million Dollars ($10,000,000) at any time;

b. Proceeds from sales or other dispositions of equipment in an amount not less than 60% of the value of the applicable equipment sold or otherwise disposed (and not used to purchase, lease, or otherwise obtain new equipment) shall be immediately applied to pay amounts outstanding in respect of the Exit RLOC Term Note or to make any other payments expressly required under the Toggle Plan;

c. Financial covenants, including (i) leverage ratio, which shall be measured on a monthly basis (specific covenant levels to be determined), (ii) limitations on capital expenditures, and (iii) limitations on repair and maintenance expenditures (together with the covenants identified in (a) and (b) above, the "**Exit RLOC Financial Covenants**");

d. Compliance with the Animal Welfare Reserve Covenant;

e. The RLOC Agent shall have the right to conduct frequent inspections of the Collateral securing the Exit RLOC Term Note on terms no less favorable than those set forth in the Pre-Petition RLOC Credit Agreement; and

f. Other covenants substantially similar to those set forth in the Pre-Petition RLOC Credit Agreement or the Sandton Exit Term Loan Facility.

5. The Exit RLOC Note shall also include the following covenant: In connection with the occurrence of the Effective Date, the Reorganized Debtors shall have prepared and delivered to the RLOC Agent a report in form and substance satisfactory to the RLOC Agent setting forth the market value of the Reorganized Debtors' cow and steer inventory as of the Effective Date based upon mutually acceptable third party market value assessments of comparable cow and steer assets (the "**Baseline Valuation Report**"). On the first Business Day of every other calendar week, commencing with the first full calendar week after the Effective Date, the Reorganized Debtors shall deliver to the RLOC Agent a cow and steer inventory valuation report (each, an "**Inventory Valuation Report**"), which report shall be in form and substance satisfactory to the RLOC Agent. The Reorganized Debtors shall calculate the valuations based upon mutually acceptable third-party market value assessments of comparable cow and steer assets. In the event the market value of the Reorganized Debtors' cow and steer inventory, as set forth in the most recent Inventory Valuation Report (as applicable, the "**Current Market Value**"), is less than the remainder of (x) ninety five percent (95%) of the market value of such inventory as set forth in the Baseline Valuation Report minus (y) the amount of Cash then on deposit in the Inventory Reserve Account (as defined below) minus

45

(z) any principal payments applied to the Exit RLOC Term Note after the Effective Date but prior to the date of the most recent Inventory Valuation Report (such remainder amount, the "**Threshold Amount**"), the Reorganized Debtors shall immediately deposit Cash in an amount equal to the difference between the Threshold Amount and the Current Market Value into a deposit account which shall be subject to a deposit account control agreement in form and substance satisfactory to the RLOC Agent (the "**Inventory Reserve Account**"). Upon the delivery of an Inventory Valuation Report at a time when Cash is on deposit in the Inventory Reserve Account, in addition to any deposit of Cash required pursuant to the preceding paragraph:

    a.    if such report establishes that the Current Market Value is less than the then current Threshold Amount, any Cash on deposit in the Inventory Reserve Account shall be applied by the RLOC Agent to amounts outstanding in respect of the Exit RLOC Term Note;

    b.    if such report establishes that the Current Market Value is greater than or equal to the then current Threshold Amount, Cash on deposit in the Inventory Reserve Account in an amount equal to the excess of the Current Market Value over the Threshold Amount shall be released to the Reorganized Debtors; *provided*, *however*, that such release of Cash shall occur no more than two (2) times prior to the maturity date of the Exit RLOC Term Note; and

    c.    after such time, if ever, that the Reorganized Debtors shall have received a second release of Cash under clause (b) above, any Cash on deposit or required to be deposited in the Inventory Reserve Account shall be applied by the RLOC Agent to amounts outstanding in respect of the Exit RLOC Term Note.

6.    The Exit RLOC Note shall include customary and market remedies upon the occurrence of an event of default, including remedies substantially similar to those set forth in the Pre-Petition RLOC Credit Agreement or the Sandton Exit Term Loan Facility.

7.    If the Exit RLOC Term Note is refinanced or otherwise repaid in full on or before June 30, 2026, the Exit RLOC PIK Interest will be waived and the Reorganized Debtors will be relieved of any obligation to pay such accrued amounts.

8.    On the Effective Date, the RLOC Agent shall release its liens on and security interests in the Equity Interests and the New Common Stock solely in connection with the Cash Equity Infusion.

<u>Treatment Under Going Concern 363 Sale Toggle</u>. If the Plan Administrator closes on a Going Concern 363 Sale pursuant to a Going Concern 363 Sale Order in accordance with the Approved Going Concern 363 Sale Qualified Bid, if no competing bids were submitted, or the Successful Going Concern 363 Sale Auction Bid, as the case may be, unless otherwise agreed with

the Holder of the Allowed Class 5 RLOC Secured Claims, the proceeds of such sale shall be used to satisfy the Allowed Class 5 RLOC Secured Claims in full, subject to the GUC Backstop.

Treatment Under Business Unit 363 Sale Toggle. If the Plan Administrator does not receive at least one Approved Going Concern 363 Sale Qualified Bid or the Bankruptcy Court does not enter the Going Concern 363 Sale Order, the Plan Administrator will proceed to sell the Debtors' Assets in accordance with the Business Unit 363 Sale Toggle. Unless otherwise agreed with the respective Holders, the proceeds of such sale(s) shall be Distributed to Holders in accordance with the their respective lawful and contractual Lien and payment priorities, subject to the GUC Backstop.

Voting. Class 5 is Impaired under the Toggle Plan. Class 5 is entitled to vote under the Toggle Plan.

## J.    Class 6: Conterra Secured Claims

Classification. Class 6 consists of the Conterra Secured Claims.

Treatment. Conterra filed Proofs of Claim in the aggregate amount of $21,460,993.60.

German Note Proof of Claim Amount:
Unpaid Principal: $2,508,860.41
Accrued Interest through 4/2/24: 67,867.67
Total unpaid balance as of 4/2/24: $2,576,728.08

Mezz Loan Proof of Claim Amount:
Unpaid Principal: $16,500,000.00
Accrued Interest through 4/2/24: $1,457,810.41
Late Fees: $830,614.58
Reimbursable Expenses: $95,840.53
Total unpaid balance as of 4/2/24: $18,884,265.52

Conterra has an Allowed Class 6 Conterra Secured Claim in the amount of $21,460,994 (subject to reconciliation), plus professional fees and costs upon Allowance of its Secured Creditor's Professional Fee Claim Filed pursuant to Section 3.2.2 of the Toggle Plan. Of Conterra's Allowed Secured Creditor's Professional Fee Claim, 12% shall be allocated and added to the principal balance of the German Note with the remaining 88% allocated to the principal balance of the Mezz Loan. The Debtors are conducting a reconciliation of their books and records compared to Conterra's Proofs of Claim and the Toggle Plan will be amended as necessary based on such reconciliation. Holders of an Allowed Class 6 Conterra Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. The Allowed Class 6 Conterra Secured Claim will receive the following treatment:

1.    The balance of the unpaid monetary claims or obligations under the German Note shall be reclassified and recapitalized as a senior term loan obligation (the "**Exit**

**German Note**"). The Exit German Note shall (a) mature on December 31, 2026, (b) bear interest at the same rate as the German Note, (c) contain terms and conditions and covenants consistent with the German Note, and (d) be secured by a first priority security interest in the Pre-Petition Conterra Real Estate Collateral.

2.  The balance of the unpaid monetary claims or obligations under the Mezz Loan shall be reclassified and capitalized as a junior term loan obligation (the "**Exit Mezz Note**") and receive monthly interest at 18% until March 31, 2027. The interest payments shall be split, with one-half being paid in Cash and one-half being PIK. Beginning April 1, 2027, the Exit Mezz Loan principal balance shall be re-amortized over three years and will receive monthly Cash interest payments at 18%.

Treatment Under Going Concern 363 Sale Toggle. If the Plan Administrator closes on a Going Concern 363 Sale pursuant to a Going Concern 363 Sale Order in accordance with the Approved Going Concern 363 Sale Qualified Bid, if no competing bids were submitted, or the Successful Going Concern 363 Sale Auction Bid, as the case may be, after satisfying the Allowed Class 4 MetLife Secured Claims and the Allowed Class 5 RLOC Secured Claims in full, subject to the GUC Backstop, the proceeds of such sale shall be used to satisfy the Allowed Class 6 Conterra Secured Claims in full, subject to the GUC Backstop.

Treatment Under Business 363 Sale Toggle. In the event that the Plan Administrator does not receive at least one Approved Qualified Bid or the Bankruptcy Court does not enter the Going Concern 363 Sale Order, the Plan Administrator will proceed to sell the Debtors' Assets in accordance with the Business Unit 363 Toggle. Unless otherwise agreed with the respective Holders, the proceeds of such sale(s) shall be distributed to Holders in accordance with the Toggle Plan and their respective lawful and contractual Lien and payment priorities, subject to the GUC Backstop.

Voting. Class 6 is Impaired under the Toggle Plan. Class 6 is entitled to vote under the Toggle Plan.

### K.    Class 7: Secured Equipment and Vehicle Lien Claims

Classification: Class 7 consists of the subclasses of the Secured Equipment and Vehicle Lien Claims.

### 1.    Class 7A: CNH Industrial Capital Secured Claim

Classification. Class 7A consists of the CNH Industrial Capital ("**CNH**") Secured Claim.

Treatment. CNH filed Proofs of Claim in the total aggregate amount of $17,915,944.14.

| POC # | POC Amount | Document | Collateral |
|---|---|---|---|
| Claim 110 | $1,980,095.12 | Equipment Lease 765512 | 6 Magnum Tractors |

| Claim 111 | $2,438,189.14 | Equipment Lease 765542 | 4 Case Steigers & Remotes |
|---|---|---|---|
| Claim 112 | $5,294,925.12 | Equipment Lease 210982 | 26 Magnum Tractors |
| Claim 113 | $4,796,579,94 | Equipment Lease 765784 | 16 Magnum Tractors |
| Claim 114 | $2,587,321.81 | Equipment Loan 765552 | 30 Case Maxxum Tractors |
| Claim 115 | $470,430.75 | Equipment Loan 765530 | 25 Kubota Tractors |
| Claim 116 | $207,310.38 | Productivity Plus Credit Line 373662 | All collateral financed/leased by CNH |
| Claim 117 | $141,091.88 | Productivity Plus Credit Line 373203 | All collateral financed/leased by CNH |

CNH shall have an Allowed Class 7A Claim in the amount of $17,915,944.14. CNH has received and will receive post-petition adequate protection payments prior to the Effective Date. Holders of an Allowed Class 7A Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. Allowed Class 7A Secured Claim will receive the following treatment:

1.    For the CNH Equipment Leases and Equipment Loans, CNH shall continue to be paid in accordance with the provisions of the pre-petition contracts in the amounts required by those contracts, currently approximately $242,716.00 per month.

2.    For the CNH Productivity Plus Credit Lines, totaling $348,402.26, CNH shall receive quarterly interest payments at 5% per annum through March of 2027 pursuant to the Budget.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

49

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 7A is Impaired under the Toggle Plan and is entitled to vote under the Toggle Plan.

2.    **Class 7B: Daimler Truck Financial Services USA LLC Secured Claim**

Classification. Class 7B consists of the Daimler Truck Financial Services USA LLC ("**Daimler**") Secured Claim.

Treatment Generally. Daimler filed a Proof of Claim in the amount of $1,534,278.22. Daimler shall have an Allowed Secured Claim in the amount of $1,534,278.22. Daimler has received and will receive post-petition adequate protection payments before the Effective Date. Holders of an Allowed Class 7B Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. Except to the extent Daimler agrees to a less favorable treatment with the Debtors prior to the Effective Date, or after the Effective Date, the Reorganized Debtors, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7B Claim, Daimler shall continue to be paid in accordance with the provisions of the pre-petition contracts with Debtors, in the amounts required by those contracts, currently approximately $63,926.00 per month.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 7B is Unimpaired under the Reorganization Toggle. As long as the Reorganization Toggle is implemented, each Holder of an Allowed Class 7B Claim is conclusively presumed to have accepted the Toggle Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Class 7 B Claim are not entitled to vote to accept or reject the Toggle Plan. If the Toggle Plan is being implemented pursuant to the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle, Class 7B is Impaired under the Toggle Plan and is entitled to vote under the Toggle Plan.

59797.0007.18169759.1

3. **Class 7C: Farmers Bank**

Classification. Class 7C consists of the Farmers Bank Secured Claim.

Treatment. Farmers Bank filed Proofs of Claim totaling $2,474,927.97.

| POC # | POC Amount | Collateral |
|-------|-----------|------------|
| Claim 35 | $294,173.07 | 2024 Ram Pickups |
| Claim 36 | $10,975.50 | Con-Dor Peecon 1700 Feed Mixer |
| Claim 37 | $96,225.11 | 2021 Ram Pickups |
| Claim 38 | $26,211.20 | Nuhn Alley Vac Manure Wagon 7000 Gal Tank |
| Claim 39 | $269,908.99 | Caterpillar Diesel Generators |
| Claim 40 | $280,789.94 | Caterpillar Diesel Generators |
| Claim 41 | $140,596.63 | SmithCo Side Dump Trailers |
| Claim 42 | $166,267.09 | 2022 Ram Pickups |
| Claim 43 | $132,902.49 | Con Dor Peecon 1700 Feed Mixer |
| Claim 44 | $56,558.60 | 2022 Mahindra UTB |
| Claim 45 | $100,364.26 | 2024 Wilson 53' Livestock Trailers |

Farmers Bank shall have an Allowed Class 7C Secured Claim in the amount of $2,474,972.97. Farmers Bank has received and will receive post-petition adequate protection payments totaling $933,289.47 prior to the Effective Date. Holders of an Allowed Class 7C Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. Except to the extent Farmers Bank agrees to a less favorable treatment with the Debtors prior to the Effective Date, or after the Effective Date, the Reorganized Debtors, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7C Claim, Farmers Bank shall continue to be paid in accordance with the provisions of its pre-petition contract with the Debtors, in the amounts required by the contract, currently approximately $105,706.00 per month.

51

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 7C is Unimpaired under the Reorganization Toggle. As long as the Reorganization Toggle is implemented, each Holder of an Allowed Class 7C Claim is conclusively presumed to have accepted the Toggle Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Class 7C Claims are not entitled to vote to accept or reject the Toggle Plan. If the Toggle Plan is being implemented pursuant to the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle, Class 7C is Impaired under the Toggle Plan and is entitled to vote under the Toggle Plan.

4. **Class 7D: John Deere Construction & Forestry Secured Claim**

Classification. Class 7D consists of the John Deere Construction & Forestry ("**John Deere**") Secured Claim.

Treatment. John Deere filed Proofs of Claim in the aggregate amount of $948,846.69.

| POC # | POC Amount | Collateral |
|-------|-----------|------------|
| Claim 20 | $119,606.55 | Cross Collateralized Loan with all Deere Loans/Collateral |
| Claim 21 | $121,475.50 | Hamm 10i Compactors |
| Claim 22 | $151,965.48 | Hamm 121 P |
| Claim 23 | $69,597.45 | John Deere 50G Compact Excavator |
| Claim 24 | $69,957.45 | John Deere 50G Compact Excavator |
| Claim 25 | $187,368.29 | 2023 John Deere 650P-Tier Utility Dozer |
| Claim 26 | $116,806.61 | John Deere 320 P-Tier Backhoe Loader |
| Claim 27 | $232,035.91 | 2023 John Dere 135 P-TIER Backhoe Loader AND 2023 John Deere EC13 QS60 COMPLETE SYSTEM W/ 2 BUCKETS |

John Deere shall have an Allowed Class 7D Secured Claim in the amount of $1,068,453.34. John Deere has received and will receive post-petition adequate protection payments in the amount of $212,083.62 prior to the Effective Date. Holders of an Allowed Class 7D Secured Claim will

receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. Except to the extent John Deere agrees to a less favorable treatment with the Debtors prior to the Effective Date, or after the Effective Date, the Reorganized Debtors, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 7D Claim, John Deere shall receive the following treatment:

1.    For Claims 21, 22, 23, 24, 25, 26, and 27, John Deere shall continue to be paid in accordance with the provisions of its pre-petition contracts with Debtors in the amounts required by the contracts.

2.    For Claim 20, John Deere shall be paid quarterly interest payments at 15.15% per annum through March of 2027 pursuant to the Budget.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Allowed Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 7D is Impaired under the Toggle Plan and is entitled to vote under the Toggle Plan.

5.    **Class 7E: Western States Cat Secured Claim**

Classification. Class 7E consists of the Western States Cat ("**Western States**") Secured Claim.

Treatment. The Debtors Scheduled Western States as a Secured Claim in the amount of $688,964.59. Western States has received post-petition adequate protection payments in the amount of $596,071.02 prior to the Effective Date. On May 22, 2024, the Bankruptcy Court approved the Debtors' assumption of the Western States rental agreement when it issued its Final Order (a) Granting Motion to Condition Use of WSECO's Equipment on Receipt of Adequate Protection, and (b) Granting Debtor's Motion for Order Authorizing the Debtor to Assume Unexpired Lease (Docket. No. 314). Upon the return of the rented equipment, Western States notified Debtors it was owed approximately $244,994.48 due to damage to the rented equipment and other repairs. As such, Debtors made a post-petition payment to Western States in the amount of $244,994.48 pursuant to the rental agreement. Western States later presented an updated actual expense itemization, asserting that the Debtors owed an additional $6,882.63. However, the Debtors dispute certain items on the expense itemization, in the aggregate amount of $82,351.74, thus offsetting any amounts still owed to Western States. Consequently, all pre-petition and post-

53

petition amounts due and owing to Western States have been paid. As such, Western States shall not receive any further Distribution under the Toggle Plan. Any pre-petition Liens claimed by Western States Cat shall be considered released and have no further effect.

Voting. Class 7E is Unimpaired under the Toggle Plan. Class 7E is conclusively presumed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

### 6.    **Class 7F: Kenworth Sales Company Secured Claim**

Classification. Class 7F consists of the Kenworth Sales Company ("**Kenworth**") Secured Claim.

Treatment Generally. Kenworth filed a Proof of Claim in the amount of $49,359.77 and shall have an Allowed Class 7F Secured Claim in the amount of $49,359.77. Kenworth has received and will receive post-petition adequate protection payments totaling $48,677.75 prior the Effective Date. Holders of an Allowed Class 7F Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. After payment of the adequate protection payments, the Debtors will owe Kenworth $682.02 on the Effective Date, which shall be paid in full as a Distribution on the Effective Date.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 7F is Unimpaired under the Reorganization Toggle. As long as the Reorganization Toggle is implemented, each Holder of an Allowed Class 7F Claim is conclusively presumed to have accepted the Toggle Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Class 7F Claims are not entitled to vote to accept or reject the Toggle Plan. If the Toggle Plan is being implemented pursuant to the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle, Class 7F is Impaired under the Toggle Plan and is entitled to vote under the Toggle Plan.

### L.    **Class 8: Other Secured Claims**

Classification. Class 8 consists of Other Secured Claims

59797.0007.18169759.1

1.    **Class 8A: MWI Veterinary Secured Claim**

Classification. Class 8A consists of the MWI Veterinary Secured Claim.

Treatment. MWI Veterinary filed three Proofs of Claim in the aggregate amount of $2,566,484.67.

| **Case** | **Proof of Claim Amount** |
|---|---|
| Millenkamp Cattle, Inc. | $2,525,459.31 |
| Idaho Jersey Girls, LLC | $25,375.92 |
| Black Pine Cattle, LLC | $15.650.17 |

MWI Veterinary received a Bankruptcy Court-approved adequate protection payment during the pendency of this Bankruptcy Case in the amount of $500,127.14 and has an Allowed 503(b)(9) Claim in the amount of $484,255.92. Based on the Debtors' books and records as of the filing of the Toggle Plan, MWI Veterinary is owed $2,063,428.20. After deduction of the 503(b)(9) Claim, MWI Veterinary shall have an Allowed Class 8A Secured Claim in the amount of $1,579,172.28. Holders of an Allowed Class 8A Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. Except to the extent MWI Veterinary agrees to a less favorable treatment with the Debtors prior to the Effective Date, or after the Effective Date, the Reorganized Debtors, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 8A Secured Claim, the Allowed Class 8A Claim shall be paid pursuant to the Budget, with quarterly interest payments at 5% per annum through March 2027.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 8A is Impaired under the Toggle Plan. Class 8A is entitled to vote under the Toggle Plan.

59797.0007.18169759.1

2.    **Class 8B: Performix Nutrition Systems Secured Claim**

Classification. Class 8B consists of the PerforMix Nutrition Systems ("**PerforMix**") Secured Claim.

Treatment. PerforMix filed a Proof of Claim in the amount of $213,744.20 and shall have an Allowed Class 8B Secured Claim in the amount of $213,744.20. PerforMix has received and will receive post-petition adequate protection payments totaling $213,744.20 prior to the Effective Date. No further amount will be owed by the Debtors to PerforMix as of the Effective Date and therefore PerforMix will receive no Distribution under the Toggle Plan. Any pre-petition liens claimed or asserted by PerforMix in any property of the Debtors shall be considered released and have no further effect.

Voting. Class 8B is Unimpaired under the Toggle Plan. Class 8B is deemed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

3.    **Class 8C: Rexel USA, Inc. d/b/a Platt Electric Supply Claim**

Classification. Class 8C consists of the Rexel USA, Inc. d/b/a Platt Electric Supply ("**Platt**") Claim.

Treatment. Platt filed a Proof of Claim in the secured amount of $504,414.02. According to the Debtors' Plan, the Proof of Claim is Disputed and the Debtors will be filing an objection to the full amount of the Proof of Claim. As such, the Debtors will set aside the full amount of the Class 8C Claim in the amount of $504,414.02 in the Distribution Reserve.

Voting. Class 8C is Impaired under the Toggle Plan. Class 8C Claims are entitled to vote under the Toggle Plan.

4.    **Class 8D: Staker & Parson Company d/b/a Idaho Materials & Construction Claim**

Classification. Class 8D consists of the Staker & Parson Company d/b/a Idaho Material & Construction ("**Idaho Material**") Claim.

Treatment. Idaho Material filed an unsecured Proof of Claim in the amount of $48,207.17 in the Millenkamp Cattle, Inc. Case and a secured Proof of Claim in the amount of $48,207.17 in the East Valley Cattle, LLC Case. The Notice of Claim of Lien was recorded on April 30, 2024, as Cassia County Instrument No. 2024001489. Idaho Material will receive by the Effective Date adequate protection payments totaling $48,207.17. As such, the Idaho Material Allowed Class 8D Secured Claim will be paid in full as of the Effective Date and Idaho Material shall receive no further Distribution under the Toggle Plan. Any pre-petition Liens claimed by Idaho Material in property of the Debtors shall be considered released and have no further effect.

Voting. Class 8D is Unimpaired under the Toggle Plan. Class 8D is deemed to have accepted the Toggle Plan and is not entitled to vote to accept or reject the Toggle Plan.

59797.0007.18169759.1

5.     **Class 8E: Les Schwab Tire Centers of Idaho, LLC Claims**

Classification. Class 8E consists of the Les Schwab Tire Center of Idaho LLC ("**Les Schwab**") Claims.

Treatment. Les Schwab filed two Proofs of Claim in the aggregate amount of $255,256.55.

| **Case** | **Proof of Claim Amount** | **503(B)(9) Claim Amount Approved** |
|---|---|---|
| Millenkamp Cattle, Inc. | $151,173.71 | $26,643.97 |
| Black Pine Cattle, LLC | $102,082.84 | $0 |

Pursuant to the 503(b)(9) Order, Les Schwab has an Allowed Section 503(b)(9) Claim in the amount of $26,643.97. Les Schwab will be paid, in Cash, its Allowed Section 503(b)(9) Claim in the amount of $26,643.97, on or as soon as reasonably practicable after the Effective Date. Holders of an Allowed Class 8A Secured Claim will receive different treatment under the Reorganization Toggle, the Going Concern 363 Sale Toggle, and the Business Unit 363 Sale Toggle.

Treatment Under Reorganization Toggle. The remainder of the Les Schwab Claim, in the amount of $226,612.58, shall be paid pursuant to the Budget, with quarterly interest payments at 5% interest per annum through March 2027.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Treatment Under Business Unit 363 Sale Toggle. Unless otherwise agreed or executory contract/unexpired lease, if any, is assumed, Holder will receive the proceeds of sales of its Collateral up to the amount of its Secured Claim in accordance with its respective lawful and contractual Lien and payment priorities. The balance of its Allowed Claim, if any, will be treated as a Class 9 General Unsecured Claim.

Voting. Class 8E is Impaired under the Toggle Plan. The Class 8E Claim is entitled to vote under the Toggle Plan.

**M.     Class 9: General Unsecured Claims**

Classification. Class 9 consists of all General Unsecured Claims, in the approximate amount of $27 million (the "**GUC Principal Amount**"). A full listing of the General Unsecured Claims and amounts of each Claim, which was attached to the Debtors' Disclosure Statement, is attached as **Exhibit C** to this Toggle Disclosure Statement.

Treatment. Holders of Allowed Class 9 General Unsecured Claims will receive the same treatment under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, but will receive different treatment under the Reorganization Toggle.

Treatment Under Reorganization Toggle. In full and final satisfaction of Allowed Class 9 General Unsecured Claims, Holders shall receive a Pro Rata share of: (a) the Priority-GUC Reserve, (b) the Preferred Equity GUC Allocation, as reduced by the New Equity Holder Reallocation, if at all, and (c) the New Equity Holder Contribution Amount to the extent of the New Equity Holder Reallocation, if any.

Treatment Under Going Concern 363 Sale Toggle. Unless otherwise agreed or a Holder's executory contract/unexpired lease, if any, is assumed, each Holder of an Allowed General Unsecured Claim will receive its pro rata share of (i) the GUC Backstop, and (ii) after the Class 4 MetLife Secured Claim, Class 5 RLOC Secured Claims and Class 6 Conterra Secured Claims have been paid in full from their respective Collateral, including the GUC Backstop True-Up.

Treatment Under Business Unit 363 Sale Toggle. Same treatment as under the Going Concern 363 Sale Toggle.

Voting. Class 9 is Impaired under the Toggle Plan. The Holders of Class 9 Claims are entitled to vote under the Toggle Plan.

**N.      Class 10: Intercompany Claims**

Classification. Class 10 consists of all Intercompany Claims.

Treatment. On the Effective Date, all Intercompany Claims shall be extinguished. Holders of Intercompany Claims will receive no Distributions under the Toggle Plan.

Voting. Each Holder of a Class 10 Claim will be deemed to have rejected the Toggle Plan and, therefore, are not entitled to vote on the Toggle Plan.

**O.      Class 11: Equity Interests.**

Classification. Class 11 consists of all Equity Interests in the Debtors.

Treatment Generally. On the Effective Date, all Equity Interests will be cancelled, released and extinguished, and will be of no further force or effect. Holders of Class 11 Equity Interests will receive the same treatment under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, but will receive different treatment under the Reorganization Toggle.

Treatment Under Reorganization Toggle. Upon the Effective Date, Holders of Equity Interests (or their designees) shall receive the right to receive (i) their Pro Rata share of New Common Stock as consideration for the Cash Equity Infusion and (ii) their Pro Rata share of the New Equity Holder Reallocation to the extent of their applicable New Equity Holder Contribution Amount, if any.

59797.0007.18169759.1

<u>Treatment Under Going Concern 363 Sale Toggle</u>. Holders of Equity Interests will receive a recovery only if all Allowed General Unsecured Claims and any subordinated claims are paid in full.

<u>Treatment Under Business Unit 363 Sale Toggle</u>. Same treatment as under the Going Concern 363 Sale Toggle.

<u>Voting</u>. Class 11 is Impaired under the Reorganization Toggle. As long as the Reorganization Toggle is implemented, each Holder of an Allowed Class 11 Equity Interest is entitled to vote under the Toggle Plan. If the Toggle Plan is being implemented pursuant to the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle, Holders of Equity Interests in Class 11 are not entitled to receive or retain any property or interests in property. Under Bankruptcy Code section 1126(g), such Holders are deemed to have rejected the Toggle Plan, and, therefore, the votes of such Holders shall not be solicited.

## P.    Special Provisions Regarding Unimpaired Claims

Except as otherwise specifically provided in the Toggle Plan, nothing herein or in the Toggle Plan shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or otherwise Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or otherwise Unimpaired Claims; and, except as otherwise specifically provided in the Toggle Plan, nothing herein or in the Toggle Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Toggle Plan. Except as otherwise specifically provided in the Toggle Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights and defenses with respect to any Reinstated Claim or otherwise Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

## V.    <u>RELEASES AND EXCULPATION PROVISIONS</u>

This section sets forth the releases and exculpation provisions contained in Article 14 of the Toggle Plan.

### A.    Debtors' Releases

**On the Effective Date and to the fullest extent authorized by applicable law, the Released Parties and their respective property will be expressly, unconditionally, generally, individually, and collectively released, acquitted, and discharged by the Debtors on behalf of themselves, their estates, the Reorganized Debtors, for the good and valuable consideration provided by each of the Released Parties, from any and all actions, claims, debts, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative or deficiency claims asserted or that could be asserted by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured,**

59

existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by state law (including Idaho State partnership law), statute, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, any of the Debtors' present or former Assets, the Released Parties' interests in or management of the Debtors, the Toggle Plan, the Toggle Disclosure Statement, these Chapter 11 Cases, including those that the Debtors, the Reorganized Debtors would have been legally entitled to assert or that any Holder of a Claim against or interest in the Debtors or any other Entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their Estates; *provided*, *however*, that the foregoing Debtors' Releases shall not operate to waive or release any Claims or Causes of Action of the Debtors or their Estates against a Released Party arising under any contractual obligation owed to the Debtors, the Reorganized Debtors that is entered into pursuant to the Toggle Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' Releases set forth in Article 14 of the Toggle Plan, which includes by reference each of the related provisions and definitions contained in the Toggle Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtors' Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the Debtors' Releases; (3) in the best interests of the Estates and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar against any of the Estates, the Post-Effective Date Debtors, asserting any Claim or Cause of Action released pursuant to the Debtors' Releases.

### B.    Exculpation and Limitation of Liability

The Exculpated Parties will neither have nor incur any liability to any entity for any claims or Causes of Action arising on or after the Petition Date and prior to the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases, (ii) any sales contemplated in connection with the Toggle Plan, (iii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Toggle Plan, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Toggle Plan, including this Toggle Disclosure Statement, (iv) any other post-petition act taken or omitted to be taken in connection with or in contemplation of Confirmation of the Toggle Plan, or (v) the approval of the Disclosure Statement and Toggle Plan or Confirmation or Consummation of the Toggle Plan, *provided*, *however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct. The foregoing provisions shall also not apply to malpractice liability of legal professionals.

### VI.    MEANS FOR IMPLEMENTATION OF TOGGLE PLAN

60

### A.    Substantive Consolidation

On the Effective Date, the Assets and liabilities of the Debtors shall be deemed substantively consolidated for purposes of implementing the Toggle Plan. Other than for purposes of implementing the Toggle Plan, the Debtors and their Assets and liabilities shall not be deemed consolidated.

### B.    Transaction Overview

Upon entry of for the Confirmation Order, the Toggle Plan and the Confirmation Order shall provide for (a) a consensual reorganization of the Debtors in accordance with Article 6 of the Toggle Plan if the Reorganization Toggle Requirements and the Pre-Confirmation Milestones are satisfied (i.e., the Reorganization Toggle), (b) a going concern sale of the Debtors' Assets in accordance with Article 7 of the Toggle Plan if the Reorganization Toggle Requirements and/or the Pre-Confirmation Milestones are not satisfied (i.e., the Going Concern 363 Sale Toggle), and/or (c) the sale or sales of each of the Debtors' business units and/or their respective Assets if the Plan Administrator does not receive a Going Concern 363 Sale Qualified Bid by the Going Concern 363 Sale Qualified Bid Deadline or does not close on such a sale following entry of a Going Concern 363 Sale Order on or before the Going Concern 363 Sale Order Deadline in accordance with Article 8 of the Toggle Plan (i.e., the Business Unit 363 Sale Toggle). Each of the different toggles is described below.

Except as otherwise provided in the Toggle Plan or the Confirmation Order, the Reorganized Debtors or the Plan Administrator, as applicable, shall fund Distributions under the Toggle Plan with (i) Cash on hand from ongoing business operations and (ii)(a) the proceeds from the Pre-Confirmation Transactions and the New Equity Holder Contribution Amount (if any) under the Reorganization Toggle, (b) the proceeds from the Going Concern 363 Sale under the Going Concern 363 Sale Toggle, or (c) the proceeds from the Business Unit 363 Sale under the Business Unit 363 Sale Toggle

### C.    Restructuring Transactions

On or after the Confirmation Date, the Debtors or the Plan Administrator, as applicable, may take all actions consistent with the Toggle Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Toggle Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Toggle Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Toggle Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, formation, reincorporation, merger, consolidation, designation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions.

59797.0007.18169759.1

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to affect any transaction described in, approved by, contemplated by, or necessary to effectuate the Toggle Plan, including the Restructuring Transactions.

### D. Vesting of Assets of the Debtors

Pursuant to Section 5.5 of the Toggle Plan, except as otherwise provided in the Toggle Plan, or any agreement, instrument, or other document incorporated in the Toggle Plan, on the Effective Date, all property in each Estate, all the Estates' Causes of Action, all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor entities, shall, under the Reorganization Toggle, vest in the Reorganized Debtors, and, under the Going Concern 363 Sale Toggle and/or the Business Unit 363 Sale Toggle, revest in the Debtors or a purchaser of a particular Asset(s) pursuant to the Going Concern 363 Sale Order or the Business Unit 363 Sale Order, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Toggle Plan, the Confirmation Order, Going Concern 363 Sale Order or the Business Unit 363 Sale Order, as applicable. For the avoidance of doubt, and without limiting Section 5.5 of the Toggle Plan, Section 3.13 of the Toggle Plan shall not operate to extinguish or otherwise abandon Interests held by the Debtors in non-Debtor entities, including but not limited to KANS LLC, H&M Custom LLC, East Valley Development LLC, and Raft River Rechargeable Group LLC, all of which are expressly preserved and vested in the Debtors or Reorganized Debtors, as applicable, under the Toggle Plan. On and after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may operate the business of the Reorganized Debtors or the Debtors, as applicable, and may use, acquire, or dispose of property or the Estates' Assets, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### E. Authority

The Reorganized Debtors or the Plan Administrator, as applicable, shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Toggle Plan) to carry out and implement all applicable provisions of the Toggle Plan, including to, among other things:

    a)      review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Toggle Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

    b)      calculate and make Distributions and calculate and establish reserves under and in accordance with the Toggle Plan;

    c)      subject to the limitations set forth in each of the toggles, retain, compensate, and employ professionals and other Persons to represent the Reorganized Debtors, Plan Administrator, and/or the Plan Administration Board, as

62

applicable, with respect to and in connection with their respective rights and responsibilities;

d) establish, maintain, and administer documents and accounts of the Debtors, Reorganized Debtors, or Plan Administrator, as appropriate;

e) maintain, conserve, collect, settle, and protect the Debtors or Reorganized Debtors' Assets, as applicable, (subject to the limitations described in the Toggle Plan);

f) sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Assets (or any part thereof) of the Debtors, in the case of the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle and the Reorganized Debtors, in the case of the Reorganization Toggle;

g) negotiate, incur, and pay the Expenses of the Reorganized Debtors, the Plan Administrator, and/or the Plan Administration Board; and

h) prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors or Reorganized Debtors that are required under the Toggle Plan, by any governmental unit, or by applicable law, including but not limited to filing any reports required by the Bankruptcy Code or Bankruptcy Rules that are due to be filed after the Effective Date and paying any fees required by 28 U.S.C. § 1930 that are due to be paid after the Effective Date.

### F.    Corporate Existence

Except as otherwise provided in the Toggle Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Toggle Plan), or any agreement, instrument, or other document incorporated in the Toggle Plan on and after the Effective Date of the Reorganization Toggle, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Toggle Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Toggle Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non- bankruptcy law).

Notwithstanding but without limiting Section 5.7.1 of the Toggle Plan, following the Confirmation Date under the Going Concern 363 Sale Toggle and/or Business Unit 363 Sale Toggle, the Plan Administrator shall have the discretion to make any and all decisions regarding the Debtors' continued corporate existence following the consummation of the Going Concern 363 Sale or the Business Unit 363 Sale(s), as applicable. The Plan Administrator shall have the

59797.0007.18169759.1

authority and right to make such decisions with respect to the Debtors' continued corporate existence without the need for Bankruptcy Court approval. Except if the Plan Administrator determines otherwise, in its discretion, on the Effective Date, under the Going Concern 363 Sale Toggle and/or Business Unit 363 Sale Toggle all persons acting as directors and/or officers of the Debtors (other than the Plan Administrator) shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith.

### G.    Employee Obligations[11]

Except as (i) otherwise provided in the Toggle Plan (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Confirmation Hearing:

In connection with the Reorganization Toggle,

a)    the Reorganized Debtors shall perform the obligations and exercise the rights of the Debtors under any Benefit Plan in the ordinary course consistent with the terms and conditions of any such Benefit Plan. Nothing in the Toggle Plan, however, shall alter or limit the ability of the Reorganized Debtors or the Plan Administrator, as applicable, to amend, modify, or terminate any Benefit Plan consistent with the terms and conditions of any such Benefit Plan;

b)    to the extent the Debtors' Benefit Plans are executory contracts and (i) such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be performed in the ordinary course consistent with the terms thereof; *provided*, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and plans; and

c)    except as otherwise provided in the Toggle Plan, on the Effective Date, each of the Debtors' Benefit Plans will be deemed assumed and shall become

---

[11] The Plan Proponents have relied on the Debtors' Plan and the Debtors' Disclosure Statement in addressing the Debtors' obligations to employees under the Toggle Plan. Given certain ambiguities in the Debtors' Plan, the Plan Proponents reserve the right to alter, amend, or otherwise modify the manner in which the Reorganized Debtors or the Plan Administrator, as applicable, shall address the Debtors' obligations to employees, including workers compensation, under the Toggle Plan.

59797.0007.18169759.1

obligations of the Reorganized Debtors in accordance with the terms and conditions of any such Benefit Plan.

In connection with the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, the Plan Administrator, on behalf of the Debtors and their Estates, shall have the discretion to continue to perform, assume, assign, or reject the Debtors' Benefit Plans based on the best interests of the Debtors' Estates and the terms of the sale of the Debtors' Assets pursuant to the Going Concern 363 Sale Order or Business Unit 363 Sale Order. In no event shall the Plan Administrator be considered an employer of the Debtors' employees under any statute governing the employer-employee relationship or conduct in the workplace

### H. Workers Compensation Program

In connection with the Reorganization Toggle, as of the Effective Date, the Reorganized Debtors shall continue to perform their obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs.

In connection with the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, the Plan Administrator, on behalf of the Debtors and their Estates, shall have the discretion to continue to perform, assume, assign, or reject the obligations and/or arrangements identified in Section 5.9.1(i) of the Toggle Plan and (ii) based on the best interests of the Debtors' Estates and the terms of the sale of the Debtors' Assets pursuant to the Going Concern 363 Sale Order or Business Unit 363 Sale Order.

### I. Pursuit and Resolution of Estate's Causes of Action

The Reorganized Debtors and the Plan Administrator, as applicable, may, and will have the exclusive right, power, and interest on behalf of the Debtors, and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Estates' Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided in the Toggle Plan. From and after the Effective Date, the Reorganized Debtors and the Plan Administrator, as applicable, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as representative of the Estates with respect to any and all Causes of Action that were Estate Assets or Assets of a Debtor and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Causes of Action in any court or other tribunal.

On or before the one year anniversary of the Confirmation Date, the Reorganized Debtors or the Plan Administrator, as applicable, shall have completed its review, analysis, and evaluation of the Estates' Causes of Action, including Avoidance Actions, and Filed a report with the Bankruptcy Court summarizing its conclusions and stating its intent to litigate, settle, transfer,

59797.0007.18169759.1

release or abandon and/or compromise in any manner any and all such Causes of Action and delivered such report to the Independent Board or Plan Administration Board, as applicable

### J.    No Successor Liability

Except as otherwise expressly provided in the Toggle Plan or Confirmation Order, the Plan Proponents, the Reorganized Debtors and the Plan Administrator, as applicable, (i) are not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors prior to the Effective Date; (ii) are not, and shall not be, successors to the Debtors by any reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

### K.    Preservation of Privileges and Defenses

The actions taken by the Debtors, the Plan Proponents, the Reorganized Debtors, the Plan Administrator, the Plan Administration Board, as applicable, or any of their respective Related Parties, in connection with the Toggle Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors, the Plan Proponents, the Reorganized Debtors, the Plan Administrator, or the Plan Administration Board as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtor or Plan Proponent providing any privileged information related to the Reorganized Debtors, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Estate's Causes of Action and shall remain privileged. The Plan Proponents, the Reorganized Debtors, the Plan Administrator and the Plan Administration Board, as applicable, shall retain the right to waive their own privileges. Only the Reorganized Debtors and the Plan Administrator, as applicable, shall have the right to waive the attorney- client privilege, work-product doctrine, or other protections as to the Debtors and the Reorganized Debtors.

### L.    Preservation of Rights of Action.

#### 1.    Maintenance of Avoidance Actions and Causes of Action

Except as otherwise provided in the Toggle Plan or the Confirmation Order, from and after the Effective Date, the Reorganized Debtors and the Plan Administrator, as applicable, will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors', the Estates', or their Causes of Action (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Plan Administrator or the Reorganized Debtors, as applicable successors in interest to the Debtors, and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, and the Estates to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Estates' Causes of Action, without notice to or approval from the Bankruptcy Court. In accordance with the Toggle Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without

66

any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, in connection with the (i) Reorganization Toggle, the Reorganized Debtors may compromise and settle the Estates' Causes of Action and (ii) the Going Concern 363 sale Toggle or the Business Unit 363 Sale Toggle, the Plan Administrator may compromise and settle the Estates' Causes of Action.

2. **Preservation of All Estates' Causes of Action Not Expressly Settled or Released**

The failure to specifically identify in the Toggle Disclosure Statement or the Toggle Plan any potential or existing Estates' Causes of Action is not intended to and shall not limit the rights of the Reorganized Debtors or the Plan Administrator, as applicable, to pursue any such Avoidance Actions or Causes of Action. Unless a Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Toggle Plan or any Final Order (including the Confirmation Order), such Causes of Action are preserved for later resolution by the Reorganized Debtors or the Plan Administrator, as applicable, including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors or the Plan Proponents may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors or the Plan Proponents at this time or facts or circumstances that may change or be different from those the Debtors or the Plan Proponents now believe to exist. As such, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Toggle Plan based on the Toggle Disclosure Statement, the Toggle Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits.

M. **Cancellation of Instruments**

Except as otherwise provided in the Toggle Plan, except to the extent necessary to give effect to the treatment of any Holder of an Allowed Claim, and except with respect to any executory contracts and unexpired leases that are assumed under the Toggle Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be released.

N. **Insurance Policies Remain in Force**

Up to and including their policy expiration date(s), any and all Insurance Policies in effect as of the Effective Date shall remain in full force and effect according to their terms and the coverage obligations of the insurers and third-party administrators under such Insurance Policies

59797.0007.18169759.1

shall continue following the Effective Date (including any obligations to pay, defend, and process Insured Claims).

### O. Insurance Policies; Employment Practice Liability Policies

Nothing contained in the Toggle Plan shall affect or impair the rights of any non-Debtor insured persons covered under any Insurance Policy, which expressly includes any director and officer, employment practices, or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

### P. Intercreditor Agreements

Under the Reorganization Toggle, the MetLife Intercreditor Agreements, RLOC-Conterra Intercreditor Agreement, and MetLife-Conterra Intercreditor Agreement shall remain enforceable in accordance with their terms, subject to reasonably acceptable amendments necessary to conform to the terms of the Toggle Plan. For the avoidance of doubt, the MetLife Intercreditor Agreements, the RLOC-Conterra Intercreditor Agreement, and the MetLife-Conterra Intercreditor Agreement shall remain enforceable in accordance with their terms under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle.

## VII. REORGANIZATION TOGGLE

### A. Reorganization Toggle Requirements

The Debtors will (a) withdraw any plan previously filed by the Debtors prior to February 14, 2025 (the "**Toggle Date**"), (b) execute and deliver a joinder agreement with the Plan Proponents agreeing to support and cooperate in the pursuit of the Toggle Plan (the "**Joinder Agreement**"), and (c) receive and deliver to the Plan Proponents a Joinder Agreement duly executed by or on behalf of each of the Existing Equity Holders (the "**Reorganization Toggle Requirements**").

If the Reorganization Toggle Requirements are not satisfied by the Toggle Date and/or the Pre Confirmation Milestones are not met, the Toggle Plan will automatically and irrevocably switch to the sole pursuit of the Going Concern 363 Sale Toggle and the Plan Proponents shall pursue Confirmation and implementation of the Going Concern 363 Sale Toggle.

### B. Pre-Confirmation Milestones

Notwithstanding the satisfaction of the Reorganization Toggle Requirements, in the event the Debtors fail to meet any of the following milestones (the "**Pre-Confirmation Milestones**"), subject to the express prior written waiver by each of the Non-Debtor Plan Proponents, the Toggle Plan will automatically and irrevocably switch to the sole pursuit of the Going Concern 363 Sale Toggle and the Plan Proponents shall pursue Confirmation and implementation of the Going Concern 363 Sale Toggle:

59797.0007.18169759.1

1.      On or before February 21, 2025, the Debtors shall file a motion for authority to commence the process to implement the Real Estate Sales and the Cash Equity Infusion (collectively, the "**Pre-Confirmation Transactions**").

2.      On or before February 24, 2025, the Debtors shall file a motion for an order by the Bankruptcy Court authorizing the Debtors to retain  a real estate broker mutually acceptable to the Plan Proponents to conduct the Real Estate Sales.

3.      By March 1, 2025, the Debtors shall retain an executive recruitment firm that shall assist the Debtors in identifying three potential candidates for the position of chief financial officer of the Reorganized Debtors.

4.      No later than five (5) days prior to the Confirmation Hearing for the Toggle Plan, the Existing Equity Holders shall provide the Non-Debtor Plan Proponents with copies of their personal financial statements as of the date thereof and reaffirm their liability to the RLOC Agent under the Pre-Petition RLOC Credit Agreement.

5.      On or before May 1, 2025, (a) the Bankruptcy Court shall enter orders authorizing the Debtors to consummate the Real Estate Sales with net proceeds of no less than Fifteen Million Six Hundred Thousand Dollars ($15,600,000) and (b) the Existing Equity Holders and/or their designees (collectively, the "**New Equity Holders**") shall have delivered binding commitments and statements of wherewithal (the "**Equity Commitment**") for Cash Equity Infusions totaling no less than Twenty-Nine Million Dollars ($29,000,000) (the "**Cash Equity Infusion**") in exchange for the New Common Stock.

6.      On or before May 6, 2025, the Debtors shall have closed on the Real Estate Sales, which shall have generated net proceeds of no less than Fifteen Million, Six Hundred Thousand Dollars ($15,600,000); provided that if the Real Estate Sales and the Cash Equity Infusion, when combined with Cash on hand, would generate net proceeds to the Estates of less than Fifty-Three Million, Six Hundred Thousand Dollars ($53,600,000) in the aggregate (the "**Aggregate Cash Target**"), the Debtors and/or the Existing Equity Holders may obtain additional cash equity contributions from the New Equity Holders to achieve the Aggregate Cash Target.

## C.      Priority-GUC Reserve

The Cash Equity Infusion shall be used for, among other things, funding Two Million, Eight Hundred Thousand Dollars ($2,800,000) million of Distributions to Holders of Allowed Class 1 Other Priority Claims and Allowed Class 9 General Unsecured Claims solely in connection with the Reorganization Toggle (the "**Priority-GUC Effective Date Distribution**"). Upon receipt of the proceeds of the Cash Equity Infusion, the Debtors shall segregate Two Million Eight Hundred Thousand Dollars ($2,800,000) therefrom for purposes of making the Priority-GUC Effective Date

69

Distribution (the "**Priority-GUC Reserve**"). The Priority-GUC Reserve shall not be funded with any other proceeds or Assets of the Debtors' Estates and if not so funded in accordance with this Section 6.3 and the Toggle Plan, Holders of Allowed Class 1 Other Priority Claims and Allowed Class 9 General Unsecured Claims shall not be entitled to receive the Priority-GUC Effective Date Distribution.

### D.    Effective Date Reserve

Upon completion of the Pre-Confirmation Transactions, and as a condition precedent to the Effective Date, the Debtors shall reserve the net proceeds from the Pre-Confirmation Transactions (after payment of applicable and reasonable expenses in respect of the Real Estate Sales) for the following, among other, uses on the Effective Date of the Reorganization Toggle (the "**Effective Date Reserve**"): (i) payment of the Allowed DIP Claims, in full; (ii) satisfaction of Allowed Administrative Claims, in full; (iii) pay down $8 million of the Allowed Class 4 MetLife Secured Claim, which includes a portion of the proceeds from the Real Estate Sales in full satisfaction of the mortgages and loans related to Canyonlands and McGregor; (iv) pay down $12.1 million of the Allowed Class 5 RLOC Secured Claims; (v) establishing the Priority-GUC Reserve; (vi) creation of a working capital reserve in the amount of $4 million for use by the Reorganized Debtors in accordance with a budget and terms and conditions reasonably acceptable to the Plan Proponents; and (vii) creation of the Animal Welfare Reserve (the "**Effective Date Distributions**").

### E.    Reorganized Holding Company

Following entry of the Confirmation Order and prior to the Effective Date, the Debtors shall create MC Holdings LLC (or such other name acceptable to the New Equity Holders), an Idaho limited liability company ("**MC Holdings**") or such other corporate form acceptable to the Plan Proponents. On the Effective Date, each of the Debtors shall emerge as direct or indirect subsidiaries of MC Holdings.

### F.    Post-Effective Date Governance and Management

1.    **Initial Executive Officers**. On the Effective Date, the new executive officers of the Reorganized Debtors shall include, among others:

   i.    *Chief Executive Officer.* Mr. William Millenkamp will continue in his role as chief executive officer, with an annual market compensation to be agreed with the Independent Board and Plan Proponents prior to the Effective Date.

   ii.    *Chief Financial Officer.* Within 30 days of the Effective Date, the Independent Board shall select and appoint a chief financial officer reasonably acceptable to the Plan Proponents who shall report directly to the Independent Board and have primary oversight of, among other things, the Reorganized Debtors' pursuit of a Successful Refinancing Event. For the avoidance of doubt, the Chief Financial Officer role may not be filled by any individual currently or formerly affiliated or employed by the Debtors or Kander LLC.

59797.0007.18169759.1

2.    **Independent Board**. On the Effective Date, the Reorganized Debtors, along with MC Holdings, shall emerge with a duly appointed Board of Directors comprised of 5 members (the "**Independent Board**"). The initial directors of the Independent Board shall be (a) Mr. William Millenkamp, for so long as he serves as Chief Executive Officer of the Reorganized Debtors; (b) an independent designee of the RLOC Agent, (c) an independent designee of the Creditors' Committee, and (d) two independent directors, either with industry or restructuring experience, in each case reasonably acceptable to Mr. Millenkamp, the independent designee of the RLOC Agent, and the independent designee of the Creditors' Committee. The Independent Board may be discharged upon the effectiveness of a Successful Refinancing Event.

### G.    Post-Effective New Common Stock Ownership

Upon the Effective Date, as consideration for the Cash Equity Infusion, the New Equity Holders shall receive New Common Stock representing 100% of the issued and outstanding voting equity interests of MC Holdings, subject to dilution by the Reorganized Preferred Stock. On a fully diluted and as-converted basis, the New Common Stock received in connection with the Cash Equity Infusion shall represent 90% of the issued and outstanding voting equity interests of MC Holdings.

### H.    Post-Effective Reorganized Preferred Ownership

Upon the Effective Date, subject to the New Equity Holder Reallocation, in full and final satisfaction of Allowed Class 9 General Unsecured Claims, Holders of Allowed General Unsecured Claims shall receive, on a Pro Rata basis, a beneficial interest in cumulative convertible redeemable perpetual non-voting preferred equity of MC Holdings (the "**Reorganized Preferred Stock**") that, on a fully diluted as-converted basis, shall represent 10% of the total outstanding New Common Stock (the "**Preferred GUC Allocation**"). On the Effective Date, subject to the New Equity Holder Reallocation, if any, the Reorganized Preferred Stock shall have a par value of Ten Million Dollars ($10,000,000) (the "**Preferred Effective Date Par Value**").

Prior to the Effective Date, the New Equity Holders shall have a non-assignable right to contribute Cash in an amount up to the Preferred Effective Date Par Value (such contribution, the "New Equity Holder Contribution Amount"), in which case the Preferred GUC Allocation shall be reduced on a dollar for dollar basis (the "**New Equity Holder Reallocation**"). The New Equity Holder Contribution Amount, if any, shall be deposited in the Priority-GUC Reserve for Distributions, on a Pro Rata basis, on the Effective Date, to Holders of Allowed Class 1 Other Priority Claims and Allowed Class 9 General Unsecured Claims. In the event that the New Equity Holder Reallocation is not exercised prior to the Effective Date, the Reorganized Preferred Stock shall not otherwise be redeemable except in accordance with the applicable certificate of designation which shall be filed in connection with the Toggle Plan Supplement.

In the event that the New Equity Holders exercise the New Equity Holder Reallocation in accordance with Section 6.8 of the Toggle Plan, in lieu of Reorganized Preferred Stock, the New Equity Holders shall receive New Common Stock representing the percentage ownership of the

Preferred GUC Allocation that would have otherwise been issued to Holders of Allowed Class 9 General Unsecured Claims.

The form of the certificate of designation for the Reorganized Preferred Stock shall be set forth in the Plan Supplement. The certificate of designation shall include, among other terms, (i) customary conversion rights and anti-dilution protections, (ii) a dividend of 5% per annum, paid quarterly, for perpetuity, *provided* that dividends not declared and paid in Cash in an applicable quarter will automatically be capitalized to the stated value of the Reorganized Preferred Stock, (iii) customary redemption rights in connection with designated liquidity events, and (iv) rights and procedures for the Reorganized Debtors and/or the New Equity Holders to redeem the Reorganized Preferred Stock, at their election.

## I.        Animal Welfare Reserve

On the Effective Date, the Debtors and/or Reorganized Debtors shall deposit Two Million Dollars ($2,000,000) into a segregated account for the express purpose of ensuring the health, safety and welfare of the Reorganized Debtors' cattle herd (the "**Animal Welfare Reserve**"). On each month following the Effective Date, until the Exit RLOC Term Note is repaid in full, the Reorganized Debtors shall deposit Seven Hundred Fifty Thousand Dollars ($750,000) per month into the Animal Welfare Reserve until the Animal Welfare Reserve totals Five Million Dollars ($5,000,000) (the "**Animal Welfare Reserve Covenant**"). The Reorganized Debtors shall be permitted to use the Animal Welfare Reserve in accordance with a budget and conditions reasonably acceptable to the Non-Debtor Plan Proponents, subject to continued compliance with the Animal Welfare Reserve Covenant.

## J.        Post-Effective Date Milestones

The Confirmation Order and the New Bylaws shall require compliance with the following milestones after the occurrence of the Effective Date:

1.        **Refinancing Milestones**

   i.        Within 21 days of the Effective Date, the Independent Board, in consultation with the Chief Financial Officer, shall have engaged an acceptable investment banker from a list of at least two (2) institutions acceptable to the Non-Debtor Plan Proponents and identified in the Toggle Plan Supplement (the "**List of Acceptable Investment Bankers**"), or another reputable institution acceptable to the Non-Debtor Plan Proponents.

   ii.        On or before September 30, 2026, the Independent Board shall have received all binding commitment letters from prospective financing sources in an amount sufficient to consummate and close on a Successful Refinancing Event (the "**Post-Effective Date Refinancing Commitment Milestone**").

   iii.        On or before December 31, 2026, the Reorganized Debtors shall have consummated and closed on a Successful Refinancing Event.

59797.0007.18169759.1

2.    **Post-Effective Strategic Sale Milestones**

i.    In the event that the Reorganized Debtors have not received a binding commitment for a Successful Refinancing Event by the Post-Effective Date Refinancing Commitment Milestone, or a Material Milestone Default occurs, the Independent Board shall engage an investment banker from the List of Acceptable Investment Bankers or another reputable institution acceptable to the Non-Debtor Plan Proponents to market and sell (i) the Reorganized Debtors as a going concern, (ii) the Reorganized Debtors' Assets, in whole or in part, and (iii) all or a portion of the equity in the Reorganized Debtors (the "**Post-Effective Date Strategic Sale**"). The Post-Effective Date Strategic Sale will be pursued in parallel with continued efforts to achieve a Successful Refinancing Event.

ii.    On or before January 31, 2027, the Independent Board shall receive all binding commitment letters that, among other things (a "**Post-Effective Date Qualified Bid**"), (i) are from reputable parties with demonstrated wherewithal to pay the purchase price at closing and maintain the welfare of animals, preserve jobs for employees, and pay vendors in accordance with ordinary course terms, as determined by the Independent Board, in its discretion and (ii) provide for a purchase price with net Cash proceeds that, at closing, will be sufficient to repay the outstanding indebtedness under the Exit RLOC Term Note, and the Exit MetLife Term Note in full, without being subject to any reserves, holdbacks, or other deductions except to the extent that each of the RLOC Agent and MetLife agreed to lesser amount (the "**Post-Effective Date Qualified Sale Price**").

iii.    If the Independent Board does not receive at least one Post-Effective Date Qualified Bid, the Independent Board will cause the Reorganized Debtors to immediately pursue the sale or sales of the Reorganized Debtors' business units and/or their Assets (a "**Post-Effective Date Business Unit Sale**").

iv.    On or before March 31, 2027, the Reorganized Debtors shall have consummated and closed on the Post-Effective Date Strategic Sale and distributed the applicable amounts of the Post-Effective Date Qualified Sale Price in accordance with applicable lawful and contractual Lien and payment priorities; *provided*, *however*, that in the event that the Reorganized Debtors are required to pursue a Post-Effective Date Business Unit Sale, the Reorganized Debtors shall have consummated and closed on the sale of: (i) substantially all non-real estate assets by no later than April 30, 2027 and (ii) all real estate assets by no later than July 1, 2027, with all net proceeds

73

therefrom distributed in accordance with applicable lawful and contractual Lien and payment priorities and on a timeframe determined by the Independent Board but consistent with the Toggle Plan, the Confirmation Order, and the New Bylaws.

## VIII.   GOING CONCERN 363 SALE TOGGLE

### A.   Going Concern 363 Sale Toggle Event

If the Debtors do not satisfy the Reorganization Toggle Requirements on or before the Toggle Date and/or fail to satisfy the Pre-Confirmation Milestones, the Toggle Plan shall automatically irrevocably be deemed to seek confirmation of a chapter 11 plan that embodies the Going Concern 363 Sale Toggle.

### B.   Going Concern 363 Sale

Following entry of the Confirmation Order and prior to the occurrence of the Effective Date, the Plan Administrator shall commence the Going Concern 363 Sale process as follows:

1.   Within three (3) days of the Confirmation Date, the Plan Administrator shall have selected and retained an investment banker from the List of Acceptable Investment Bankers or another reputable institution acceptable to the Non-Debtor Plan Proponents to pursue a Going Concern 363 Sale;

2.   Within forty-five (45) days of the Confirmation Date, the Plan Administrator shall have obtained an order from the Bankruptcy Court authorizing the retention of an investment banker identified on the List of Acceptable Investment Bankers or another reputable institution acceptable to the Non-Debtor Plan Proponents to pursue a Going Concern 363 Sale;

3.   Within forty-five (45) days of the Confirmation Date, the Plan Administrator shall have obtained an order from the Bankruptcy Court approving bidding procedures for the Going Concern 363 Sale and Business Unit 363 Sale, which shall include, among other things, a requirement that all interested parties submit binding indications of interest for the Going Concern 363 Sale and/or the Business Unit 363 Sale (the "**Sale Toggle Bidding Procedures Order**") by the Going Concern 363 Sale Qualified Bid Deadline;

4.   Within one hundred twenty (120) days from the entry of the Sale Toggle Bidding Procedures Order (the "**Going Concern 363 Sale Qualified Bid Deadline**"), the Plan Administrator shall receive all binding indications of

74

interest, which shall include, among other things, a proposed purchase agreement; and

5.  In the event that the Plan Administrator receives at least one Going Concern 363 Sale Qualified Bid on or before the Going Concern 363 Sale Qualified Bid Deadline, the Going Concern 363 Sale will be conducted as follows:

   i.  The Plan Administrator and the Plan Administration Board shall evaluate and determine the highest or best Going Concern 363 Sale Qualified Bid (the "**Approved Going Concern 363 Sale Qualified Bid**");

   ii.  The Plan Administrator will file a notice of Approved Going Concern 363 Sale Qualified Bid ("**Notice of Approved Going Concern 363 Sale Qualified Bid**") with the Bankruptcy Court, attaching such Approved Going Concern 363 Sale Qualified Bid, and requiring all interested parties to provide the Plan Administrator with (i) notice of intent to provide a competing bid at auction and (ii) a binding commitment to satisfy the applicable overbid requirement ("**Going Concern 363 Sale Competition Notice**"). The Plan Administrator will require all interested parties to deliver a Going Concern 363 Sale Competition Notice within five (5) days of filing a Notice of Approved Going Concern 363 Sale Qualified Bid (the "**Going Concern 363 Sale Competition Notice Deadline**").

   iii.  In the event that the Plan Administrator receives at least one Going Concern 363 Sale Competition Notice, the Plan Administrator shall schedule and conduct an auction within three (3) days of the Going Concern 363 Sale Competition Notice Deadline at which the Plan Administrator and Plan Administration Board shall select the Successful Going Concern 363 Sale Auction Bid.

   iv.  On or before 35 days after the Going Concern 363 Sale Competition Notice Deadline (the "**Going Concern 363 Sale Order Deadline**"), the Bankruptcy Court shall enter an order approving the Going Concern 363 Sale in accordance with the Approved Going Concern 363 Sale Qualified Bid, if no competing bids were submitted, or the Successful Going Concern 363 Sale Auction Bid, as the case may be (the "**Going Concern 363 Sale Order**").

   v.  The Plan Administrator shall close the Going Concern 363 Sale no later than 3 days from entry of the Going Concern 363 Sale Order by the Bankruptcy Court.

## C.   Allocation of Going Concern 363 Sale Proceeds

Except to the extent an executory contract or unexpired lease is assumed by the Going Concern 363 Sale purchaser, or a party agrees to different treatment with the Plan Administrator,

59797.0007.18169759.1

the proceeds from a Going Concern 363 Sale shall be used to pay secured creditors and unsecured creditors in accordance with their respective lawful and contractual Lien and payment priorities.

## IX.    BUSINESS UNIT 363 SALE TOGGLE

### A.    Business Unit 363 Sale Toggle Event

In the event that the Plan Administrator does not receive at least one Approved Going Concern 363 Sale Qualified Bid on or before the Going Concern 363 Sale Qualified Bid Deadline or the Bankruptcy Court does not enter the Going Concern 363 Sale Order on or before the Going Concern 363 Sale Order Deadline, the Plan Administrator will proceed to sell the Assets of each of the Debtors, either as a separate business unit or individually. The Plan Administrator shall file with the Bankruptcy Court a notice informing the Bankruptcy Court and other parties in interest that the Plan Administrator will proceed to implement the Business Unit 363 Sale Toggle (the "**Business Unit 363 Sale Toggle Notice**"). The Plan Administrator will complete the sale of the Debtors' Assets in the manner set forth in the Toggle Plan, with all proceeds, net of reasonable expenses, deposited in a segregated, interest bearing account (the "**Business Unit 363 Sale Reserve Account**").

### B.    Qualified Business Unit 363 Sale Offers

Following the filing of the Business Unit 363 Sale Toggle Notice, the Plan Administrator shall commence the Business Unit 363 Sale process as follows:

1.    If, during the Going Concern 363 Sale process, the Plan Administrator received bids or expressions of interest from prospective purchasers for the acquisition of one or more, but not all, of the Debtors' business units ("**Business Unit 363 Sale Offers**"), the Plan Administrator and the Plan Administration Board shall evaluate such Business Unit 363 Sale Offers. If the Plan Administrator and the Plan Administrator determine, in consultation with the Plan Sale Professionals, that the Business Unit 363 Sale Offers, on an aggregated basis, equal or, in the reasonable opinion of the Plan Sale Professionals, in connection with an auction would reasonably likely equal or exceed, the Going Concern 363 Sale Qualified Bid amount ("**Qualified Business Unit 363 Sale Offers**"), the Plan Administrator will file a notice of intent to conduct a Business Unit 363 Sale auction ("**Business Unit 363 Sale Auction Notice**") with the Bankruptcy Court within fourteen (14) days of the Business Unit 363 Sale Toggle Notice. The Business Unit 363 Sale Auction Notice shall, among other things, (i) schedule the auction for no later than seven (14) days from the Business Unit 363 Sale Auction Notice, (ii) attach a schedule of the higher or best Qualified Business Unit 363 Sale Offers for each of the Debtors' business units, and (iii) require all interested parties to deliver a binding commitment to satisfy the applicable overbid requirement ("**Business Unit 363 Sale Competition Notice**") within (7) days of the date of the Business Unit 363 Sale Auction Notice (the "**Business Unit 363 Sale Competition Notice Deadline**"). The Plan Administrator shall have the discretion to establish

59797.0007.18169759.1

bidding procedures designed to maximize the value of the Debtors' Estates and/or Assets, which procedures may take into account the costs and benefits of Qualified Business Unit 363 Sale Offers that seek to purchase a single business unit versus multiple business units.

2.    If, after receiving and reviewing all Business Unit 363 Sale Competition Notices, the Plan Administrator and the Plan Administration Board, in their discretion, elect to conduct a Business Unit 363 Sale auction, the Plan Administrator shall schedule and conduct such auction within three (3) days of the Business Unit 363 Sale Competition Notice Deadline. The Plan Administrator and the Plan Administration Board shall conduct the auction and select the highest or best offers, in their discretion.

3.    Within five (5) days of the completion of such auction, the Plan Administrator shall file a schedule with the Bankruptcy Court identifying the final results for the Business Unit 363 Sales (the "**Successful Business Unit 363 Sales Offers**") and scheduling a hearing to approve such offers no later than thirty (30) days after the Business Unit 363 Sale Competition Notice Deadline (the "**Business Unit 363 Sale Order Deadline**"), at which time the Bankruptcy Court shall enter an order approving the Business Unit 363 Sale(s) in accordance with the Successful Business Unit 363 Sale Offers be (the "**Business Unit 363 Sale Order**").

4.    The Plan Administrator shall close the Business Unit 363 Sales no later than three (3) days from entry of the Business Unit 363 Sale Order by the Bankruptcy Court.

## C.    No Qualified Business Unit 363 Sale Offers

1.    Pursuant to Section 8.3.1 of the Toggle Plan, if the Plan Administrator does not receive Qualified Business Unit 363 Sale Offers or the Bankruptcy Court does not enter the Business Unit 363 Sale Order on or before the Business Unit 363 Sale Order Deadline, the Plan Administrator shall commence sales of the Debtors' Assets as set forth below:

i.    By no later than one hundred twenty (120) days after the filing of the Business Unit 363 Sale Toggle Notice with the Bankruptcy Court, the Plan Administrator shall have completed the sale of the Debtors' cattle herd and livestock;

ii.    By no later than one hundred fifty (150) days of after the filing of the Business Unit 363 Sale Toggle Notice with the Bankruptcy Court, the Plan Administrator shall have completed the sale of the Debtors' dairy inventory, feed, medicine, supplements, and other inventory;

iii.    By no later than one hundred eighty (180) days after the filing of the Business Unit 363 Sale Toggle Notice with the Bankruptcy Court,

59797.0007.18169759.1

the Plan Administrator shall have completed the sale or abandonment of substantially all of the Debtors' equipment and vehicles; and

iv.    By no later than two hundred seventy (270) days of after the filing of the Business Unit 363 Sale Toggle Notice with the Bankruptcy Court, the Plan Administrator shall have completed the sale or abandonment of the Debtors' real estate, subject to reasonable extensions to permit the sale or abandonment of any miscellaneous and/or remaining Assets.

2.    The Plan Administrator shall not be required to obtain approval of the Business Unit 363 Sales conducted pursuant to Section 8.3.1 of the Toggle Plan, *provided* that the Plan Administrator shall be required to file monthly reports with the Bankruptcy Court pursuant to which the Plan Administrator shall disclose the Assets sold in each category identified in Section 8.3.1 of the Toggle Plan and the aggregate net purchase price agreed to for such Assets, a copy of which shall be provided to each Plan Proponent.

**D.    Distribution of Business Unit 363 Sale Proceeds**

1.    Pursuant to Section 8.4 of the Toggle Plan, except to the extent a party agrees to different treatment, the proceeds from Business Unit 363 Sales shall be used to pay secured creditors and unsecured creditors in accordance with their respective lawful and contractual Lien and payment priorities.

2.    The Plan Administrator and the Plan Administration Board shall, in their reasonable, determine the applicable Distribution Dates for proceeds of Business Unite 363 Sales generated pursuant to Section 8.3 of the Toggle Plan; *provided* that the Plan Administrator shall be required to make final Distributions no later than 1-year from the date of the Business Unit 363 Sale Toggle Notice, except to the extent that the Plan Administrator has, upon motion to the Bankruptcy Court with notice to the Plan Administration Board and Plan Proponents, obtained entry of an order granting an extension of such Distribution deadline.

3.    Holders of Allowed Class 4 MetLife Secured Claims and Allowed Class 5 RLOC Secured Claims may, upon motion to the Bankruptcy Court, with notice to the Plan Administrator, seek entry of an order from the Bankruptcy Court authorizing and directing the Plan Administrator to make earlier Distributions to the extent that the Bankruptcy Court finds that such Distributions would be reasonably likely to reduce interest expense to the Debtors' estates, or for other cause shown.

**X.    <u>CORPORATE GOVERNANCE UNDER THE SALE TOGGLES</u>**

**A.    Corporate Governance** Upon entry of the Confirmation Order in connection with the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle, the Plan

78

Administrator shall be entrusted with managing the Debtors' operations and the sale of the Debtors' Assets under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, as applicable, subject to oversight by the Plan Administration Board. The Plan Proponents will designate the identity of the Plan Administrator in the Toggle Plan Supplement.

**B.    Plan Administrator Authority**

1.    In accordance with and subject to the terms of the Toggle Plan, and in addition to the authority granted under Section 5.6 of the Toggle Plan, the Plan Administrator will be vested, subject to the authority of the Plan Administration Board, with complete corporate control over the Debtors, their operations, and their Assets and shall, among other things:

i.    control and administer the Debtors' Assets and businesses in accordance with and pursuant to the terms of the Going Concern 363 Sale Toggle and/or the Business Unit 363 Sale Toggle, as applicable;

ii.    conduct, negotiate, authorize, implement, consummate, and close the transactions contemplated under the Going Concern 363 Sale Toggle, the Business Unit 363 Sale Toggle, the Going Concern 363 Sale Order, and the Business Unit 363 Sale Order; as applicable;

iii.    have the power and authority to retain, as an expense of the Debtors and their Estates, and to dismiss the Plan Sales Professionals, attorneys, advisors, accountants, investment bankers, auctioneers, and other professionals and employees as may be appropriate to perform the duties, functions, responsibilities, and obligations required of the Plan Administrator under the Confirmation Order, the Going Concern 363 Sale Toggle, the Business Unit 363 Sale Toggle, the Going Concern 363 Sale Order, or the Business Unit 363 Sale Order, in each case within the Plan Administrator's reasonable discretion, unless otherwise set forth in the Toggle Plan;

iv.    have the power and authority to obtain credit and incur debt, as appropriate or necessary to assist the Plan Administrator in administering the Debtors' Assets and business and in otherwise performing the function, responsibilities, and obligations required of the Plan Administrator under the Confirmation Order, the Going Concern 363 Sale Toggle, the Business Unit 363 Sale Toggle, the Going Concern 363 Sale Order, or the Business Unit 363 Sale Order;

v.    evaluate and determine strategy with respect to the Contingent Claims, Disputed Claims, Unliquidated Claims, Disputed Cure Claims, and the Estates' Causes of Action, and to litigate, settle, transfer, release or abandon and/or compromise in any manner any and all such Claims or Causes of Action on any terms and conditions

as it may determine in good faith based on the best interests of the Debtors' Estates;

vi.    make all calculations of amounts for or relating to Distributions for Holders of Allowed Claims to be made from the Debtors or for reserves for Holders of Contingent Claims, Disputed Claims, and Unliquidated Claims and Disputed Cure Claims to be established under the Toggle Plan, and, may establish and holdback from Distributions reasonable reserves for other contingencies;

vii.    make Distributions to Holders of Allowed Claims as provided in the Toggle Plan, the Confirmation Order, the Going Concern 363 Sale Order, or the Business Unit 363 Sale Order;

viii.    have the right to receive reasonable compensation for performing services as the Plan Administrator and, in consultation with the Plan Administration Board, to pay the reasonable fees, costs and expenses of the Plan Administration Board and its members, any Plan Sales Professionals, attorneys, advisors, accountants, investment bankers, auctioneers, and other professionals and employees as may be contemplated or necessary to assist the Plan Administrator in performing the functions, responsibilities, and obligations required of the Plan Administrator under the Confirmation Order, the Going Concern 363 Sale Toggle, the Business Unit 363 Sale Toggle, the Going Concern 363 Sale Order, or the Business Unit 363 Sale Order;

ix.    File, litigate, settle, compromise, or withdraw any objection to Claims as permitted under the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle;

x.    be considered the representative of the Debtors and their Estates as contemplated or necessary to assist the Plan Administrator in performing the functions, responsibilities, and obligations required of the Plan Administrator under the Confirmation Order, the Going Concern 363 Sale Toggle, the Business Unit 363 Sale Toggle, the Going Concern 363 Sale Order, or the Business Unit 363 Sale Order;

xi.    have the right to File with the Bankruptcy Court and/or provide periodic reports and updates to creditors regarding the status of the administration of the Debtors' Assets, as contemplated or necessary to assist the Plan Administrator in performing the functions, responsibilities, and obligations required of the Plan Administrator under the Confirmation Order, the Going Concern 363 Sale Toggle, the Business Unit 363 Sale Toggle, the Going Concern 363 Sale Order, or the Business Unit 363 Sale Order; and

xii.    have the right to File any papers with the Bankruptcy Court or any other court of competent jurisdiction as contemplated, appropriate, or necessary to assist the Plan Administrator in performing the function, responsibilities, and obligations required of the Plan Administrator under the Confirmation Order, the Going Concern 363 Sale Toggle, the Business Unit 363 Sale Toggle, the Going Concern 363 Sale Order, or the Business Unit 363 Sale Order, including a motion for entry of a Final Decree (at the appropriate time).

2.    Upon entry of the Confirmation Order, a board (the "**Plan Administration Board**") will be established to oversee the Plan Administrator on certain matters, including, (i) instructing and supervising the Plan Administrator with respect to its responsibilities under the Toggle Plan and reviewing and approving decisions of the Plan Administrator, (ii) reviewing and approving the Plan Administrator's selection of Plan Sale Professionals, (iii) reviewing and approving proposals for the sale and/or other monetization of the Debtors' Assets, (iv) Approving the prosecution of Avoidance Actions, Causes of Action, and adversary and other proceedings, including approving proposed settlements thereof, (v) reviewing and approving objections to and proposed settlements of Claims, and (vi) performing such other duties as the Plan Administration Board determines may be necessary and proper to assist the Plan Administrator and the Plan Administrator's retained professionals.

3.    The Plan Administration Board shall be comprised of (i) an independent designee of the RLOC Agent, (ii) an independent designee of MetLife, and (iii) an independent designee of the Creditors' Committee. The Toggle Plan Supplement shall provide the names and professional biographies for each designee.

### C.    GUC Backstop

Under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, the RLOC Agent will agree to subordinate up to Four Million Five Hundred Twenty Three Thousand Dollars ($4,523,000) (the "**GUC Backstop Amount**") of its Allowed Class 5 RLOC Secured Claims to enable Holders of Allowed Class 1 Other Priority Claims and Allowed Class 9 General Unsecured Claims to receive a recovery in an amount in Cash not less than they would receive in a liquidation based on the Debtors' Liquidation Analysis as follows:

1.    Prior to the Effective Date, the RLOC Agent shall designate certain of its Collateral or proceeds thereof (at the discretion of the RLOC Agent, in consultation with the Plan Administrator), with an appraised value of an

59797.0007.18169759.1

amount necessary to fund the GUC Backstop Amount (the "**Designated GUC Backstop Assets**").

2.  On the Effective Date, solely with respect to the Designated GUC Backstop Assets, (i) the RLOC Agent shall cause a limited release of the applicable Pre-Petition RLOC Liens with respect to such Designated GUC Backstop Assets, and (ii) Conterra shall cause a limited release of the applicable Pre-Petition Mezz Liens with respect to such Assets, *provided* that in the event Conterra does not grant such limited Lien release, the RLOC Agent, in its capacity as attorney-in-fact for Conterra pursuant to section 2.9.1 of the RLOC-Conterra Intercreditor Agreement, shall cause such limited release of the Pre-Petition Mezz Liens.

3.  Once the GUC Backstop is fully funded, proceeds of the Pre-Petition RLOC Collateral from a Going Concern 363 Sale or Business Unit 363 Sale as well as proceeds from Avoidance Actions shall be allocated as follows (the "**GUC Backstop True-Up**"):

    i.   first, to the RLOC Agent in an amount equal to the Allowed Class 5 RLOC Secured Claim, less the GUC Backstop Amount;

    ii.  second, to Conterra, in an amount equal to the GUC Backstop Amount;

    iii. third, to the RLOC Agent until the Allowed Class 5 RLOC Secured Claims have been paid in full;

    iv.  fourth, to Conterra until the Allowed Class 6 Secured Mezz Claims have been paid in full; and

    v.   fifth, to Holders in accordance with the their respective lawful and contractual Lien and payment priorities.

**D.    Avoidance Actions**

Avoidance Actions and other Causes of Action that are not otherwise expressly released by the Toggle Plan and their proceeds shall be preserved for the benefit of Allowed Other Priority Claims and Allowed General Unsecured Claims, subject to repayment of the GUC Backstop True-Up.

**XI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.    Reorganization Toggle**

1.  Pursuant to Section 10.1.1 of the Toggle Plan, on the Effective Date of the Reorganization Toggle, except as otherwise provided in the Toggle Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor

59797.0007.18169759.1

with and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court with the effective date of such rejection is after the Effective Date; *provided*, that, nothing in the Toggle Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; and provided further, that the Reorganized Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Toggle Plan and Confirmation Order.

2.      Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Toggle Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Toggle Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Toggle Plan are effective as of the Effective Date.

3.      Each Executory Contract or Unexpired Lease assumed pursuant to the Toggle Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption,

59797.0007.18169759.1

assumption and assignment, or rejection, as applicable, as of the Effective Date.

4. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Toggle Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti- assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Toggle Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Toggle Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

### B.    Going Concern 363 Sale Toggle and Business Unit 363 Sale Toggle

Pursuant to Section 10.1.2 of the Toggle Plan, subject to the Plan Administrator's compliance with section 365 of the Bankruptcy Code, the Toggle Plan and the Confirmation Order, the Plan Administrator shall have the right to enforce Section 10.1.1 of the Toggle Plan in connection with, and based upon the outcome of, the completion of the Going Concern 363 Sale Toggle or Business Unit 363 Sale Toggle.

### C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors (if applicable), the Estates, or property of the foregoing parties, without the need for any objection by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 3.11 of the Toggle Plan, and such Claims may be objected to in accordance with the Toggle Plan.

59797.0007.18169759.1

**D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

1. The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three (3) Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors or the Plan Administrator, as applicable, may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

2. Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

3. Unless otherwise provided by an order of the Bankruptcy Court:

   i.    In connection with the Reorganization Toggle, the Plan Proponents have attached as schedules their initial Assumed Executory Contracts[12] and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule. In further connection with the Reorganization Toggle, the Plan Proponents shall file their final Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Reorganization Toggle of the Toggle Plan, which shall supersede the initial schedule if any such initial schedule is filed. In connection with the Reorganization Toggle, the Plan Proponents shall cause all Filed Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Toggle Plan that are identified in such schedule. The Plan Proponents s may supplement or modify

---

[12] According to the Debtors' Disclosure Statement, the Debtors have made their final decision on assumption or rejection of their contracts with EVD and have made the decision to assume such contracts. As such, such contracts are on the Assumed Executory Contracts and Unexpired Leases Schedule and will remain on such schedule.

59797.0007.18169759.1

the Assumed Executory Contract and Unexpired Leases Schedule or Rejected Executory Contracts and Unexpired Leases Schedule up to one (1) Business Day prior to the Confirmation Hearing for the Reorganization Toggle of the Toggle Plan. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Reorganization Toggle of the Toggle Plan must be Filed, served and actually received by the Debtors by the later of (1) the Confirmation Objection Deadline or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contract and Unexpired Leases Schedule.

ii.   In connection with the Going Concern 363 Sale Toggle and/or Business Unit 363 Sale Toggle, the Plan Administrator shall, subject to further Order from the Bankruptcy Court, file its Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the hearing to consider the Plan Administrator's request for entry of the Going Concern 363 Sale Order or Business Unit 363 Sale Order, as applicable. The Plan Administrator shall cause all Filed Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Toggle Plan that are identified in such schedule. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle must be Filed, served and actually received by the Plan Administrator no later than two (2) Business Days prior to hearing to consider the Going Concern 363 Sale Order or the Business Unit 363 Sale Order.

iii.   Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Executory Contracts and Unexpired Leases Schedule as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and

86

enjoined from disputing the amount of the Cure Claim set forth on the Assumed Executory Contracts and Unexpired Leases (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.

iv.    Assumption of any Executory Contract or Unexpired Lease pursuant to the Toggle Plan or otherwise, subject to the payment of the applicable Cure Claim, shall result in the full release and satisfaction of any Claims or defaults against the Debtors and/or Reorganized Debtors, as applicable, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors and/or Reorganized Debtors, as applicable, assume such Executory Contract or Unexpired Lease; *provided*, that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

### E.    Assumption Dispute Resolution

1.    In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; or (ii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, including an objection premised on the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court, which in the case of the Reorganization Toggle may be the Confirmation Order, or in the case of the Going Concern 363 Sale Toggle or Business Unit 363 Sale Toggle by a Final Order entered by the Bankruptcy Court prior to the closing of such a sale, which may be the Going Concern 363 Sale Order or Business Unit 363 Sale Order, as applicable, or as may be agreed upon by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

2.    To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Reorganized Debtors or Plan Administrator, as applicable, may

59797.0007.18169759.1

assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; *provided*, that the Reorganized Debtors or the Plan Administrator, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Estates, the Reorganized Debtors or the Plan Administrator, as applicable, may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

3.    For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing, or, if in connection with the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle, at the hearing to consider entry of the Going Concern 363 Sale Order or the Business Unit 363 Sale Order, as applicable, subject to further Order from the Bankruptcy Court.

## F.    Contracts and Leases Entered Into After the Petition Date

Unless otherwise rejected pursuant to the Toggle Plan, contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations.

## G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Toggle Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Toggle Plan. Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

59797.0007.18169759.1

### H.        Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Toggle Plan, shall constitute an admission by the Debtors, the Reorganized Debtors, or the Plan Administrator that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. For the avoidance of doubt, the Debtors reserve all rights with respect to any Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

### I.        Nonoccurrence of Effective Date

In accordance with Section 10.8 of the Toggle Plan, if the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## XII.    RISK FACTORS

Prior to voting on the Toggle Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Toggle Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Toggle Plan and its implementation.

### A.        Parties May Object to the Toggle Plan's Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a chapter 11 plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the classification of the Claims and Interests under the Toggle Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.        The Plan Proponents May Not Be Able to Obtain Confirmation of the Toggle Plan

With regard to any proposed chapter 11 plan, a plan proponent may not receive the requisite acceptances for confirmation. In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Toggle Plan, the Plan Proponents intend to seek Confirmation of the Toggle Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Plan Proponents may not be able to obtain Confirmation of the Toggle Plan. Even if the requisite acceptances of a proposed Toggle Plan are received, the Bankruptcy Court still might not confirm the Toggle Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

59797.0007.18169759.1

If the Toggle Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative chapter 11 plan would be on terms as favorable to any Holders of Claims as the terms of the Toggle Plan. In addition, there can be no assurance that the Plan Proponents will be able to successfully develop, prosecute, confirm, and consummate an alternative chapter 11 plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

### C.    Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Toggle Disclosure Statement, which are based on the Debtors' books and records and Filings with the Bankruptcy Court, are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

### D.    Inaccurate Statements Contained in the Toggle Disclosure Statement

The Plan Proponents have adopted certain portions of the Debtors' Disclosure Statement, including, without limitation, the Debtors' Liquidation Analysis and the Debtors' Financial Projections. Further, the Plan Proponents have relied on the Debtors' Filings with the Bankruptcy Court in coming to certain conclusions and making the projected recoveries under the Toggle Plan. The Plan Proponents do not make any representations or warrant the accuracy of any of the Debtors' statements upon which they rely, including but not limited to the Debtors' Liquidation Analysis and the Debtors' Financial Projections. Consequently, the Toggle Disclosure Statement, including the projected recoveries set forth herein, may be inaccurate to the extent premised on the Debtors' statements.

### E.    Inability to Satisfy Reorganization Toggle Requirements or Meeting Pre-Confirmation Milestones

Under the Toggle Plan, the Reorganization Toggle may be implemented only if the Reorganization Toggle Requirements are satisfied and after the Pre-Confirmation Milestones are met. Accordingly, it is possible that the Debtors and Existing Equity Holders satisfy the Reorganization Toggle Requirements but fail to satisfy the Pre-Confirmation Milestones. Thus, if either of those condition precedents are not satisfied, the Toggle Plan will automatically and irrevocably switch to the sole pursuit of the Going Concern 363 Sale Toggle and the Plan Proponents shall pursue Confirmation and implementation of the Going Concern 363 Sale Toggle.

Under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, Holders of Allowed Class 9 General Unsecured Claims will be entitled to share pro rata in the GUC Backstop, which will ensure that such Holders will receive a recovery in an amount in Cash not less than they would receive in a liquidation based on the Debtors' Liquidation Analysis. The Debtors' Plan does not provide similar protections. Thus, Holders of Allowed Class 9 General Unsecured Claims are exposed to greater risk, as discussed herein, under the Debtors' Plan.

### F.    Failure To Meet Post-Effective Date Refinancing Commitment Milestone

Under the Reorganization Toggle, the Reorganized Debtors are required to obtain a binding commitment for a Successful Refinancing Event by the Post-Effective Date Refinancing Commitment Milestone. If the Reorganized Debtors do not timely receive such a commitment, then the Reorganized Debtors must pursue a Post-Effective Date Strategic Sale, which may consist of a sale of the Reorganized Debtors as a going concern, a sale of the equity in the Reorganized Debtors, or a sale of the Reorganized Debtors' Assets.

### G.    Failure to Obtain A Going Concern 363 Sale Qualified Purchase Price

Under the Toggle Plan, a Going Concern 363 Sale Qualified Bid must be for at least the Going Concern 363 Sale Qualified Price. If the Plan Administrator receives a bid for less than the Going Concern 363 Sale Qualified Price, the bid may be accepted by the Plan Administrator if agreed to by the RLOC Agent and MetLife. If the Plan Administrator does not receive at least one Approved Going Concern 363 Sale Qualified Bid on or before the Going Concern 363 Sale Qualified Bid Deadline or the Bankruptcy Court does not enter the Going Concern 363 Sale Order on or before the Going Concern 363 Sale Order Deadline, the Plan Administrator will toggle to the Business Unit 363 Sale Toggle and proceed to sell the Assets of each of the Debtors, either as a separate business unit or individually.

### H.    Market Risks

The Debtors' cattle and dairy operations are susceptible to market factors, including commodity prices for dairy, cattle, and feed, which fluctuate daily. Indeed, the likelihood that the Reorganized Debtors will receive the Aggregate Cash Target or achieve a Successful Refinancing Event under the Reorganization Toggle, and the price for which the Debtors are sold, either as a going concern or in parts, under the different toggles will depend on, among other things, cattle, dairy, and feed prices and values at the pertinent time. The Toggle Plan relies on the accuracy and correctness of the Debtors' assumptions for these market risks in the Debtors' Financial Projections. The Plan Proponents make no warranty or representation with respect to such assumptions. Similarly, the projected recoveries under the Toggle Plan (and the Debtors' Plan) will also depend on, among other things, cattle, dairy, and prices and value. However, as noted above, the Toggle Plan provides Holders of Allowed Class 9 General Unsecured Claims with recourse to the GUC Backstop to ensure that they receive under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle at least as much as they would receive under a liquidation, based on the Debtors' Liquidation Analysis.  The Debtors' Plan does not provide a similar protection or backup option.

### I.    Change in Management

Bill Millenkamp, the Chief Executive Officer of the Debtors, has previously testified that he would likely not remain with the Reorganized Debtors should he no longer be in control of the Debtors' Assets or business. Thus, the Plan Proponents anticipate that Mr. Millenkamp would resign from his positions with the Debtor if the Going Concern 363 Sale Toggle or the Business Unit 363 Sale Toggle is being pursued under the Toggle Plan. Under those circumstances, the Plan Proponents anticipate that the Plan Administrator would engage a reputable third party operator

with a significant operational team on site at the Debtors to manage and operate the Debtors' businesses and, among other things, administer and control their Assets, care for the Debtors' cattle herd and livestock, manage the Debtors' current workforce, and continue to conduct business with the Debtors' vendors and suppliers.

### J.    The DIP Facility May Be Terminated

The Debtors have not publicly filed the final executed DIP Credit Documents, as such, there can be no assurances as to what rights and remedies Sandton, in its capacity as lender thereunder, may or may not exercise under the terms of the DIP Credit Documents. More specifically, the maturity date of the DIP Credit Documents is purportedly set to expire on an unidentified date in January 2025, unless extended by the Debtors in exchange for the payment of an extension fee of $675,000. Based on communications with the Debtors' financial advisor, the Plan Proponents understand, but cannot confirm, that the Debtors have been invoiced by Sandton in the amount of $675,000, to be paid in kind, for such extension. However, as of the date hereof, the Debtors have not provided notice to the Bankruptcy Court or parties in interest as to whether the Debtors have actually exercised such extension right or the terms of such extension. In the event that the Debtors have not exercised the extension right, or the Bankruptcy Court invalidates the purported extension terms, an event of default will have occurred and be occurring under the DIP Credit Documents. Upon an event of default, the DIP Credit Documents provide Sandton, in its capacity as lender thereunder, with the right to exercise remedies with respect to the Debtors after providing notice thereof. Further, section 6(d) of the DIP Order authorizes the Debtors, subject to applicable notice, to begin remitting proceeds of the DIP Claim Collateral to Sandton until the DIP Claims are paid in full, which would include among other things cash collateral. The Plan Proponents believe that the occurrence of such events would have a material negative impact on the Debtors' Estates and creditor recoveries.

Assuming that the Debtors exercised the extension right under the DIP Credit Documents, any such extension would be limited to a three (3) month period. If the Chapter 11 Cases take longer than expected to conclude, an event of default would be deemed to occur at such time. Unless the Debtors and Sandton agree to an additional extension fee or amendment, which may impose incremental material costs and obligations to the Estates, the Debtors' Estates would be subject to the enforcement risks identified above. As a result, the orderly functioning of the Debtors' business and their values may be materially impaired.

### K.    Risks Associated with the New Common Stock and Reorganized Preferred Stock

The New Common Stock and Reorganized Preferred Stock to be issued under the Toggle Plan will not be listed on or traded on any nationally recognized market or exchange as of the Effective Date. Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to the Toggle Plan and any and all settlement agreements incorporated in the Toggle Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring

59797.0007.18169759.1

registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution, or sale of securities. In addition, any and all New Common Stock and Reorganized Preferred Stock shall be non-transferable and the anticipated value of such New Common Stock and Reorganized Preferred Stock may not be realized by the applicable New Equity Holders or Holders of Allowed Class 9 General Unsecured Claims.

### L.    New Equity Will Be Subordinate To The Reorganized Debtors' Debts

In any subsequent reorganization, liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock and Reorganized Preferred Stock would rank below all Claims against the Reorganized Debtors. As a result, holders of the New Common Stock and Reorganized Preferred Stock will not be entitled to receive any payment or other distribution upon the reorganization, liquidation, dissolution, or winding up of the Reorganized Debtors until after all of the Reorganized Debtors' obligations to their creditors have been satisfied.

### M.    Implied Valuation Of New Common Stock And Reorganized Preferred Stock Is Not Indicative Of Trading Value Of New Common Stock And Reorganized Preferred Stock

Neither the valuation of the Reorganized Debtors nor the Preferred Effective Date Par Value is intended to represent the trading value of New Common Stock or Reorganized Preferred Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. The actual market price of the New Common Stock and Reorganized Preferred Stock is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock and Reorganized Preferred Stock to rise and fall. Accordingly, neither the implied value nor the Preferred Effective Date Par Value of the New Common Stock or Reorganized Preferred Stock to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for these securities in the public or private markets.

### N.    Securities Considerations

There are several material securities law considerations, risks, and uncertainties associated with consummation of the Toggle Plan. Holders of Claims or Interests and other interested parties should read carefully the discussion set forth in Article XVI for a discussion of certain matters arising under federal and state securities laws relating to the transactions contemplated under the Toggle Plan.

### O.    Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Toggle Plan. Holders of Claims, Holders of Interests, and other interested parties should read carefully the discussion set forth in Article XV for a discussion of

59797.0007.18169759.1

certain U.S. federal income tax consequences of the transactions contemplated under the Toggle Plan.

## XIII.  <u>CONFIRMATION OF THE TOGGLE PLAN</u>

### A.  The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Toggle Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Toggle Plan.

In accordance with the Toggle Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing to commence on [**TBD**], 2025, at [ : ] [_].m. (Mountain Time), before the Honorable Noah G. Hillen, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Idaho. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Toggle Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Toggle Plan must be Filed and served so that they are actually received by no later than **[14] calendar days prior to the Confirmation Hearing. Unless objections to Confirmation of the Toggle Plan are timely served and Filed in compliance with the Confirmation Hearing Notice, they may not be considered by the Bankruptcy Court**.

### B.  Requirements for Confirmation of the Toggle Plan

Among the requirements for the Confirmation of the Toggle Plan is that the Toggle Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Toggle Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Toggle Plan satisfies the requirements of Bankruptcy Code section 1129. The Plan Proponents believe that: (i) the Toggle Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Plan Proponents have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Toggle Plan has been proposed in good faith. More specifically, the Plan Proponents believe that the Toggle Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

- The Toggle Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

- The Toggle Plan has been proposed in good faith by the Plan Proponents and not by any means forbidden by law.

- Any payment made or promised under the Toggle Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Toggle Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Toggle Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Toggle Plan.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Toggle Plan, or each such Holder will receive or retain under the Toggle Plan on account of such Claim property of a value, as of the Effective Date of the Toggle Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Toggle Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Toggle Plan will have accepted the Toggle Plan, or at least one Class of Impaired Claims will have accepted the Toggle Plan, determined without including any acceptance of the Toggle Plan by any insider holding a Claim in that Class, and the Toggle Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Toggle Plan.

- Except to the extent a different treatment is agreed to, the Toggle Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## C.    Best Interests of Creditors

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accepts the Toggle Plan or (2) receives or retains under the Toggle Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interests" test. The Plan Proponents believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Toggle Plan. For purposes of this Toggle Disclosure Statement and the Toggle Plan, the Plan Proponents have adopted the Debtors' Liquidation Analysis attached here as **Exhibit E**, which shows the Debtors assumed distributions in a hypothetical chapter 7 case.[13] Under any of the toggles of the Toggle Plan, each Holder of an Allowed Impaired Claim or Interest would receive at least as much (if not more) under the Toggle Plan than they would under the attached Liquidation Analysis.

---

[13] As noted above, the Plan Proponents have adopted certain portions of the Debtors' Disclosure Statement, including, without limitation, the Debtors' Liquidation Analysis. The Plan Proponents do not make any representations or warrant the accuracy of any of the Debtors' statements upon which they rely. Consequently, the Toggle Disclosure Statement, including the projected recoveries set forth herein, may be inaccurate to the extent premised on the Debtors' statements.

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Toggle Plan. For purposes of demonstrating that the Toggle Plan meets this "feasibility" standard, the Plan Proponents have adopted financial projections, as set forth in **Exhibit F** (the "**Debtors' Financial Projections**"), which were attached to the Debtors' Disclosure Statement.[14]

The Plan Proponents have adopted the Debtors' Financial Projections (prepared by the Debtors) solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims entitled to vote under the Toggle Plan to make an informed judgment about the Toggle Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors. The Plan Proponents' reliance on the Debtors' Financial Statements, the Debtors' Liquidation Analysis, the Debtors' Disclosure Statement, or the Debtors' other Filings, however, is not an admission by the Plan Proponents that they agree with any of the statements in those documents or the data therein.

Based upon the Debtors' Financial Projections, the Plan Proponents believe that the Reorganized Debtors and/or the Plan Administrator, as applicable, will be able to make all Distributions and payments under the Reorganization Toggle and Going Concern 363 Sale Toggle, respectively, and that confirmation of the Toggle Plan implementing either of those two toggles is not likely to be followed by liquidation of the Debtors or the Reorganized Debtors, as applicable, or the need for further restructuring. Based upon the Debtors' Financial Projections and according to the Debtors' Liquidation Analysis, the Plan Proponents believe that the Plan Administrator will be able to make all Distributions and payments required under the Business Unit 363 Sale Toggle. Upon conclusion of the Business Unit 363 Sale Toggle, the Plan Proponents do not anticipate a further liquidation of the Debtors' Assets as the Business Unit 363 Sale, upon consummation, provides for the sale or abandonment of all of the Debtors' Assets.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a Toggle Plan accept the Toggle Plan. A class that is not "impaired" under a Toggle Plan is deemed to have accepted the Toggle Plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a Toggle Plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for

---

[14] As noted above, the Plan Proponents have adopted certain portions of the Debtors' Disclosure Statement, including, without limitation, the Debtors' Financial Projections. The Plan Proponents do not make any representations or warrant the accuracy of any of the Debtors' statements upon which they rely. Consequently, the Toggle Disclosure Statement, including the projected recoveries set forth herein, may be inaccurate to the extent premised on the Debtors' statements.

59797.0007.18169759.1

certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code section 1126(c) defines acceptance of a Toggle Plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the Toggle Plan. Thus, a Class of Impaired Claims will have voted to accept the Toggle Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

## F.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a Toggle Plan even if all impaired classes have not accepted that Toggle Plan, *provided* that the Toggle Plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the Toggle Plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the Toggle Plan, such Toggle Plan will be confirmed, at the Toggle Plan proponent's request, in a procedure commonly known as "cramdown," so long as the Toggle Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the Toggle Plan.

To the extent that any Impaired Class rejects the Toggle Plan or is deemed to have rejected the Toggle Plan, the Plan Proponents will request Confirmation of the Toggle Plan under Bankruptcy Code section 1129(b). The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Toggle Plan, the Toggle Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

## G.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a Toggle Plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such Toggle Plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a Toggle Plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a Toggle Plan discriminates unfairly, and, accordingly, a Toggle Plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Plan Proponents submit that if they are required to "cramdown" the Toggle Plan pursuant to Bankruptcy Code section 1129(b), the Toggle Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

## H.    Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a Toggle Plan and are of different priority and status vis-à-vis another class (e.g., secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general

59797.0007.18169759.1

requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Plan Proponents submit that if they are required to "cramdown" the Toggle Plan pursuant to Bankruptcy Code section 1129(b), the Toggle Plan is structured such that the applicable "fair and equitable" standards are met.

### I.    Alternatives to Confirmation and Consummation of the Toggle Plan

The Plan Proponents believe that the Toggle Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Toggle Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Toggle Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Plan Proponents believe that the Toggle Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative chapter 11 plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Plan Proponents believe that the Toggle Plan will provide each Holder of an Allowed General Unsecured Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Plan Proponents under chapter 7 of the Bankruptcy Code.

As it stands, creditors are most susceptible to these risks under Debtors' Plan as the Debtors have not provided any other alternative to their proposed reorganization. However, as noted further herein, the Toggle Plan is effectively three plans and provides creditors with various backup options to preserve value – if the Reorganization Toggle is not pursued (for whatever reason), the Toggle Plan switches to the Going Concern 363 Sale Toggle, and if that toggle is not successful at maximizing value for creditors, the Toggle Plan switches to the Business Unit 363 Sale. In contrast, if the Debtors' Plan is not confirmed several months from now on the Confirmation Date, creditors will likely have to wait many more months for the Debtors to develop and pursue a new alternative plan, if any, which will further add costs to the Estates and dimmish recoveries for creditors.

### J.    Revocation, Withdrawal, or Non-Consummation.

Pursuant to Section 16.8 of the Toggle Plan, the Plan Proponents reserve the right to revoke or withdraw the Toggle Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Plan Proponents revoke or withdraw the Toggle Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Toggle Plan shall be null and void in all respects; and (b) nothing contained in the Toggle Plan, and no acts taken in preparation for consummation of the Toggle Plan, shall (i) constitute or be deemed to constitute a waiver or release

of any Claims against, or any Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

## XIV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE TOGGLE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE TOGGLE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE TOGGLE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

The following discussion summarizes certain U.S. federal income tax consequences of the Toggle Plan to the U.S. Holders (as defined below) of (i) "Secured Claims" and (ii) "Unsecured Claims." This discussion is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the Treasury regulations promulgated thereunder, judicial decisions and published administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. Events subsequent to the date of this Toggle Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Toggle Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the Toggle Plan to any specific Holder of a Claim. The Plan Proponents will not seek a ruling from the U.S. Internal Revenue Service (the "**IRS**") and have not obtained an opinion of counsel regarding any tax consequences of the Toggle Plan to the Debtors or any Holder of a Claim. No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), or the tax consequences arising under the laws of any foreign, state, local or other jurisdiction or under any income tax treaty. This discussion assumes that the Secured Claims and Unsecured Claims will be treated for U.S. federal income tax purposes in accordance with their form (*i.e.*, as debt) and as interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.

This discussion does not address any U.S. federal income tax consequences to a beneficial owner of a Secured Claim or an Unsecured Claim that is not a U.S. Holder (a "**Non-U.S. Holder**"). Non-U.S. Holders should consult their own independent tax advisors regarding the U.S. federal, state, local and non-U.S. tax consequences of the implementation of the Toggle Plan, including whether Non-U.S. Holders may be subject to any U.S. federal withholding tax or U.S. federal income tax with respect to any payment on Secured Claims or Unsecured Claims.

This discussion does not describe all of the tax consequences that may be relevant in light of a U.S. Holder's particular circumstances, including, but not limited to, the potential application of provisions of the Tax Code known as the unearned income Medicare contribution tax, or tax

99

consequences applicable to Holders of Secured Claims or Unsecured Claims that are otherwise subject to special treatment under the Tax Code, such as: financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; persons who hold or will hold Secured Claims, or Unsecured Claims as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; U.S. Holders who hold or will hold Secured Claims or Unsecured Claims through non-U.S. brokers or other non-U.S. intermediaries; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons required to accelerate the recognition of any item of gross income as a result of such income being recognized on an "applicable financial statement" (within the meaning of section 451(b) of the Tax Code); Holders that are related persons with the Debtors under section 267 of the Tax Code; and Holders not entitled to vote on the Toggle Plan. If an entity or arrangement that is classified as a partnership for U.S. federal income tax purposes holds or will hold Secured Claims or Unsecured Claims and partners in such partnerships should consult their own tax advisors as to the particular U.S. federal income tax consequences of the Toggle Plan to them in light of their own circumstances.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Secured Claim or an Unsecured Claim that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident alien of the U.S.;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (a) the administration of which is subject to the primary supervision of a U.S. court and that has one or more United States persons that have the authority to control all substantial decisions of the trust or (b) that has made a valid election under applicable Treasury regulations to be treated as a United States person.

**THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF SECURED CLAIMS OR UNSECURED CLAIMS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE TOGGLE PLAN TO THEM IN LIGHT OF THEIR OWN CIRCUMSTANCES.**

59797.0007.18169759.1

A. **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Secured Claims**

1. **Taxable Exchange**

Each U.S. Holder of a Secured Claim should recognize gain or loss in a taxable exchange of its Claim equal to the difference between (x) the sum of (a) the amount of any Cash received by such U.S. Holder and (b) the fair market value of any property received by such U.S. Holder for such Claim (excluding in the case of (a) and (b), any amount attributable to accrued but unpaid interest on such Claim, which amount will be taxable as described below), and (y) such U.S. Holder's adjusted basis, if any, in such Claim. Whether the gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Secured Claim in such U.S. Holder's hands, whether such Claim was purchased at a discount, whether there is any accrued but unpaid interest on such Claim, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to such Claim.

2. **Accrued Interest**

To the extent that any amount received by a U.S. Holder of a Secured Claim is attributable to accrued but unpaid interest on the debt instruments constituting such surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Secured Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on a Secured Claim, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Toggle Plan, the aggregate consideration to be distributed to U.S. Holders of Secured Claims will be allocated in accordance with the terms of the underlying agreement, or in the case of Holders of certain Secured Claims, in accordance with their discretion. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder of a Secured Claim should be allocated in a manner other than as provided in the Toggle Plan, which could include allocating consideration first to any accrued but unpaid interest under the aforementioned Treasury regulations.

3. **Market Discount**

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt

instrument is less than the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest." In general, "qualified stated interest" is interest unconditionally payable at least annually at a fixed stated rate in the form of Cash or certain property. Any gain recognized by a U.S. Holder on the taxable disposition of a Secured Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### B.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims

The U.S. federal income tax consequences for Holders of Allowed General Unsecured Claim under the Toggle Plan will depend, in part, on the toggle that is implemented.

Under the Reorganization Toggle, Holders of Allowed General Unsecured Claim will receive a Pro Rata share of the Priority-GUC Reserve, the Preferred Equity GUC Allocation, as reduced by the New Equity Holder Reallocation, if at all, and the New Equity Holder Contribution Amount to the extent of the New Equity Holder Reallocation, if any.  The U.S. federal income tax consequences of the receipt of consideration pursuant to the Reorganization Toggle will depend on whether the exchange of the Unsecured Claims constitutes a fully taxable transaction or a partially tax-deferred transaction.   Whether the receipt of the consideration under the Reorganization Toggle will qualify as a partially tax-deferred transaction is complex and depends on a number of factors and information that is not available as of the date of this Toggle Disclosure Statement.   Therefore, Holders of Unsecured Claims should assume that their receipt of consideration under the Reorganization Toggle will be a fully taxable transaction.  As a result, a U.S. Holder of an Unsecured Claim will recognize income, gain or loss equal to the difference between (x) the sum of (a) the amount of any Cash received by such U.S. Holder and (b) the fair market value of any property received by such U.S. Holder for such Claim (excluding in the case of (a) and (b), any amount attributable to accrued but unpaid interest on such Claim, which amount will be taxable as described below), and (y) such U.S. Holder's adjusted basis, if any, in such Claim.

Under the Going Concern 363 Sale Toggle and the Business Unit 363 Sale Toggle, each Holder of an Allowed General Unsecured Claim will receive, at minimum, its pro rata share of the GUC Backstop. As a result, a U.S. Holder of an Unsecured Claim will recognize income, gain or loss equal to the difference between (x) the Cash received by such U.S. Holder for such Claim and (y) the U.S. Holder's adjusted tax basis, if any, in such Claim surrendered in the exchange.

For all Holders of Allowed General Unsecured Claims, the U.S. federal income tax consequences to them arising from the exchange will depend, in part, on (i) whether the U.S. Holder reports income on the accrual or cash method of accounting for U.S. federal income tax purposes, (ii) whether the U.S. Holder has taken a bad debt deduction with respect to such Claim, and (iii) whether such income, gain or loss is capital or ordinary in character.  As a result, all Holders of Unsecured Claims should consult their own tax advisors regarding the tax consequences to them in light of their own circumstance.

### C.    Backup Withholding and Information Reporting

Under the Tax Code, interest and other reportable payments may, under certain circumstances, be subject to backup withholding, currently at the rate of 24%. Backup withholding may apply to payments made pursuant to the Toggle Plan, unless a U.S. Holder provides to the applicable withholding agent its taxpayer identification number, certified under penalties of perjury, as well as certain other information or otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

In addition, information reporting may apply to (i) payments made to a U.S. Holder of a Secured Claim or an Unsecured Claim and (ii) certain transactions under the Toggle Plan that result in a U.S. Holder claiming a loss in excess of specified thresholds.

U.S. Holders are urged to consult their own tax advisors regarding whether the transactions contemplated by the Toggle Plan would be required to be specifically disclosed on the their own tax returns.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF RECEIVING ANY DISTRIBUTIONS UNDER THE TOGGLE PLAN IN LIGHT OF THEIR OWN CIRCUMSTANCES.**

### XV.    CERTAIN SECURITIES LAW MATTERS

Except as otherwise provided herein and in the Toggle Plan, the New Common Stock and Reorganized Preferred Stock to be issued under the Toggle Plan will be issued without registration under the Securities Act or any other similar U.S. federal, state, or local Law in reliance upon either (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (b) including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to, in each case, other applicable securities Laws.

The Plan Proponents believe that the New Common Stock and Reorganized Preferred Stock to be issued pursuant to the Toggle Plan may, constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "**Blue Sky Law**"). The Plan Proponents further believe that the offer, sale, issuance and initial distribution of the New Common Stock and Reorganized Preferred Stock to be issued pursuant to the Toggle Plan is exempt from federal and state securities registration requirements under the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law, as described in more detail below. No registration statement for the New Common Stock and Reorganized Preferred Stock to be issued pursuant to the Toggle Plan will be filed under the Securities Act or any state securities laws.

103

The following discussion of the issuance and transferability of the New Common Stock and Reorganized Preferred Stock to be issued pursuant to the Toggle Plan relates solely to matters arising under federal and state securities laws. The rights of Holders of the New Common Stock and Reorganized Preferred Stock to be issued under the Toggle Plan will also be governed by the applicable governance documents referenced in the Toggle Plan Supplement.

### A.      Issuance of Securities Under the Toggle Plan Pursuant to Section 1145 of the Bankruptcy Code

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of Securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be Securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or "principally" in exchange for such claim or interest and "partly" for Cash or property.

The Plan Proponents believe that the issuance of the New Common Stock and Reorganized Preferred Stock should satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code, to the extent permitted and available with respect to any respective New Equity Holder or Holder of an Allowed Class 9 General Unsecured Claim, subject to other applicable securities law. No registration statement will be filed under the Securities Act or any local or state securities laws. Recipients of the New Common Stock and Reorganized Preferred Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law or other local law. As discussed below, the exemptions provided for in section 1145(a)(1) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### B.      Transferability of New Common Stock and Reorganized Preferred Stock

Any right of an Existing Equity Holder (or its designee(s)), a Holder of an Allowed Class 1 Other Priority Claim, or a Holder of an Allowed Class 9 General Unsecured Claim entitled to receive a Distribution or other payment in the form New Common Stock or Reorganized Preferred Stock shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of MC Holdings. Further, any right of an Existing Equity Holder (or its designee(s)), a Holder of an Allowed Class 1 Other Priority Claim, or a Holder of an Allowed Class 9 General Unsecured Claim to receive a Distribution or other payment in the form of New Common Stock or Reorganized Preferred Stock shall be nontransferable and nonassignable except in accordance with the Toggle Plan (including but not limited to Section 3.13 of the Toggle Plan), by will, intestate, succession, or operation of law. Any rights to receive a Distribution or other payment in respect of the New Common Stock and Reorganized Preferred Stock shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

59797.0007.18169759.1

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE PLAN PROPONENTS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE TOGGLE PLAN. THE PLAN PROPONENTS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE TOGGLE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

## XVI.  RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Toggle Plan is the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Toggle Plan to vote in favor of and support confirmation of the Toggle Plan.

-SIGNATURE PAGES FOLLOW-

59797.0007.18169759.1

Respectfully,

Dated: February 3, 2025                HAWLEY TROXELL ENNIS & HAWLEY LLP

                                      /s/ Sheila R. Schwager

                                      _____
                                      Sheila R. Schwager, ISB No. 5059
                                      Attorneys for Rabo AgriFinance LLC

Dated: February 3, 2025                HAWLEY TROXELL ENNIS & HAWLEY LLP

                                      /s/ Brent R. Wilson

                                      _____
                                      Brent R. Wilson, ISB No. 8936
                                      Attorneys for Rabo AgriFinance LLC

Dated: February 3, 2025                NORTON ROSE FULBRIGHT US LLP

                                      /s/ Andrew J. Schoulder

                                      _____
                                      Andrew J. Schoulder, *pro hac vice*
                                      Attorneys for Rabo AgriFinance LLC

[SIGNATURE PAGE TO RAF DISCLOSURE STATEMENT]

59797.0007.18169759.1