Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
        jjm@johnsonmaylaw.com

Krystal Mikkilineni, *pro hac vice*
Robert E. Richards, *pro hac vice*
Tirzah Roussell, *pro hac vice*
DENTONS
215 10th Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
        robert.richards@dentons.com
        tirzah.roussell@dentons.com

*Attorneys for the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY
# COURT DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE INC.<br><br>Debtor. | Case No.  24-40158-NGH<br><br>Chapter 11 |
| Filing relates to:<br><br>☒ ALL DEBTORS<br>☐  Millenkamp Cattle, Inc.<br>☐  Idaho Jersey Girls<br>☐  East Valley Cattle<br>☐  Millenkamp Properties<br>☐  Millenkamp Properties II<br>☐  Millenkamp Family<br>☐  Goose Ranch<br>☐  Black Pine Cattle<br>☐  Millenkamp Enterprises<br>☐  Idaho Jersey Girls Jerome Dairy | Jointly Administered with Case Nos.:<br><br>24-40159-NGH (Idaho Jersey Girls)<br>24-40160-NGH (East Valley Cattle)<br>24-40161-NGH (Millenkamp Properties)<br>24-40162-NGH (Millenkamp Properties II)<br>24-40163-NGH (Millenkamp Family)<br>24-40164-NGH (Goose Ranch)<br>24-40166-NGH (Black Pine Cattle)<br>24-40167-NGH (Millenkamp Enterprises)<br>24-40165-NGH (Idaho Jersey Girls Jerome Dairy) |

**DISCLOSURE STATEMENT FOR SECOND AMENDED CHAPTER 11 PLAN REORGANIZATION OF MILLENKAMP CATTLE, INC. AND ITS RELATED AFFILIATES**

> **NOTE: THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE**

**DISCLAIMER**

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF DEBTORS MILLENKAMP CATTLE, INC. AND ITS AFFILIATED DEBTORS, WHICH BANKRUPTCY PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR

**ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' PLAN OR DISTRIBUTIONS THEREUNDER. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 11

    A.    Overview of the Plan .................................................................................. 11

        1.    General Structure of the Plan ..................................................... 11

        2.    Summary of Treatment of Claims and Interests Under the Plan ......................................................................................... 12

    B.    Plan Voting Instructions and Procedures ................................................... 14

        1.    Voting Rights ............................................................................. 14

        2.    Solicitation Materials ..................................................................15

        3.    Voting Instructions and Procedures ...........................................15

        4.    Confirmation Hearing and Deadline for Objections to Confirmation .......18

II.     BACKGROUND REGARDING THE DEBTORS .............................................18

    A.    Overview of the Debtors .............................................................................18

    B.    Debtors' Corporate Structure .....................................................................19

    C.    Debtors' Prepetition Capital Structure .......................................................21

        1.    Liabilities ...................................................................................21

            i.    Metlife Secured Loans ..............................................22

            ii.    Pre-Petition RLOC (Rabo) Credit Agreement ................................25

            iii.    Conterra .....................................................................26

            iv.    Other Secured Obligations ........................................27

            v.    General Unsecured Claims .........................................27

    D.    Events Leading to the Chapter 11 Cases ....................................................28

III.    THE CHAPTER 11 CASES ..............................................................................30

    A.    First Day Orders and Initial Employment Applications.............................31

    B.    Applications to Employ Professionals ........................................................31

    C.    Appointment of the Unsecured Creditors' Committee ...............................32

    D.    United States Trustee ..................................................................................32

    E.    Meeting of Creditors ..................................................................................32

    F.    Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims ........................................................................................ 32

| | | | |
|---|---|---|---|
| | G. | Cash Collateral Motions | 33 |
| | H. | Sandton DIP Loan | 34 |
| | I. | 503(b)(9) Motion | 35 |
| | J. | Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries | 36 |
| | K. | 506(b) Motion | 37 |
| | L. | Plan Filing & Solicitation Exclusivity | 38 |
| IV. | | SUMMARY OF THE CHAPTER 11 PLAN | 39 |
| | A. | Purpose and Effect of the Plan | 39 |
| | | 1. Classification and Voting Controversies | 40 |
| | B. | Treatment of Claims and Interests Under the Plan | 40 |
| | | 1. Unclassified Claims | 40 |
| | | i. Administrative Claims | 40 |
| | | a. 503(b)(9) Claims | 42 |
| | | ii. Professional Fee Claims | 42 |
| | C. | Priority Tax Claims | 43 |
| | D. | DIP Claims | 43 |
| | E. | Class 1: Other Priority Claims | 44 |
| | F. | Class 2: Corn Silage Group Secured Claims | 44 |
| | G. | Class 3: Outstanding Other Secured Claims | 45 |
| | H. | Class 4: Other Secured Claims Paid in Full | 46 |
| | I. | Class 5: Secured Equipment Loan and Lease Claims | 48 |
| | J. | Class 6: John Deere Financial Secured Claim | 50 |
| | K. | Class 7: Western States Cat Secured Claim | 51 |
| | L. | Class 8: Rexel USA, Inc d/b/a Platt Electric Supply Claim | 52 |
| | M. | Class 9: MetLife Secured Claims | 52 |
| | N. | Class 10: Rabo Secured Claims | 54 |
| | O. | Class 11: Conterra German Note Secured Claim | 55 |
| | P. | Class 12: Conterra Mess Loan Claim | 56 |
| | Q. | Class 13: General Unsecured Claims | 57 |
| | R. | Class 14: Intercompany Claims | 58 |
| | S. | Class 15: Equity Interests | 58 |
| | T. | Special Provisions Regarding Unimpaired Claims | 58 |
| | U. | Good Faith | 59 |

V.      Debtors' Releases and Related Matters ................................................................. 59

        1.      Conditional Release of Debtors ................................................................. 60

        2.      Exculpation and Limitation of Liability ..................................................... 60

        3.      Released Lenders: Conterra, MetLife, and Sandton ................................. 60

W.      Means for Implementation of Plan ..................................................................... 61

        1.      Substantive Consolidation ......................................................................... 61

        2.      Restructuring Transaction .......................................................................... 61

        3.      Sources of Consideration for Plan Distribution ........................................ 62

        4.      Sale of Real Estate .................................................................................... 62

        5.      Refinancing ................................................................................................ 62

        6.      Plan Administrator ..................................................................................... 62

        7.      Liquidation Process ................................................................................... 63

        8.      Sales Advisors ........................................................................................... 63

        9.      Sale Process ............................................................................................... 63

        10.     Going Concern ........................................................................................... 63

        11.     Asset Sale ................................................................................................... 64

        12.     Costs of Sale .............................................................................................. 64

        13.     Vesting of Assets in the Reorganized Debtors .......................................... 64

        14.     Authority .................................................................................................... 65

        15.     Corporate Existence ................................................................................... 66

        16.     Employee Obligations ............................................................................... 66

        17.     Workers Compensation Program ............................................................... 67

        18.     Pursuit and Resolution of Reorganized Debtor' Causes of Action ........... 67

        19.     No Successor Liability ............................................................................... 67

        20.     Preservation of Privileges and Defenses ................................................... 67

        21.     Preservation of Rights of Action ............................................................... 68

                a.      Maintenance of Avoidance Actions and Causes of Action ............. 68

                b.      Preservation of All Reorganized Debtors' Causes of Action Not
                        Expressly Settled or Released ......................................................... 69

        22.     Cancellation of Instruments ...................................................................... 69

        23.     Insurance Policies ...................................................................................... 69

a.   Insurance Policies Remain in Force ................................................... 69

b.   Insurance Policies; Employment Practice Liability Policies ........... 69

X.   Executory Contracts and Unexpired Leases ....................................................... 69

1.   Assumption and Rejection of Executory Contracts and Unexpired Leases
................................................................................................................ 69

i.   Claims Based on Rejection of Executory Contracts or Unexpired
Leases .............................................................................................. 71

ii.   Assumption of East Valley Development Contracts ..................... 71

iii.   Cure of Defaults for Assumed Executory Contracts and Unexpired
Leases .............................................................................................. 72

iv.   Assumption Dispute Resolution .................................................... 72

v.   Contracts and Leases Entered Into After the Petition Date ............ 74

Y.   Risk Factors ......................................................................................................... 74

1.   Parties May Object to the Plan's Classification of Claims and Interests .. 74

2.   The Debtors May Not Be Able to Obtain Confirmation of the Plan ........ 74

3.   Claims Estimation and Allowance of Claims ........................................... 75

4.   Tax Considerations .................................................................................... 75

Z.   Confirmation of the Plan ..................................................................................... 75

1.   The Confirmation Hearing ........................................................................ 75

2.   Requirements for Confirmation of the Plan ............................................. 76

3.   Best Interests of Creditors ......................................................................... 76

4.   Feasibility .................................................................................................. 76

5.   Acceptance by Impaired Classes ............................................................... 76

6.   Confirmation Without Acceptance by All Impaired Classes .................... 78

7.   No Unfair Discrimination .......................................................................... 78

8.   Fair and Equitable Test .............................................................................. 79

9.   Alternatives to Confirmation and Consummation of the Plan .................. 79

10.   Revocation, Withdrawal, or Non-Consummation .................................... 79

AA.   Certain United States Federal Income Tax Consequences of the Plan ................. 80

1.   Certain U.S. Federal Income Tax Consequences to U.S. Holders of Secured
Claims ........................................................................................................ 82

i.   Taxable Exchange ........................................................................... 82

ii.   Accrued Interest .............................................................................. 82

7

iii.    Market Discount ................................................................................ 83

2.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured
Claims .................................................................................................... 83

i.    Disputed Ownership Funds ............................................................ 84

3.    Backup Withholding and Information Reporting ..................................... 84

BB.    RECOMMENDATION ..................................................................................... 85

## **EXHIBITS**

**Exhibit A:** Second Amended Chapter 11 Plan of Reorganization

**Exhibit B:** Liquidation Analysis

**Exhibit C:** Budget

**Exhibit D:** List of General Unsecured Claims

**Exhibit E:** Organizational Summary Chart

**Exhibit F:** Assumed Executory Contracts and Unexpired Leases Schedule

## GENERAL OVERVIEW

This disclosure statement (the "Disclosure Statement") (a) describes the historical background that led to the Chapter 11 Cases of Millenkamp Cattle, Inc., and its related affiliates, debtors and debtors in possession (collectively, the "Debtors"), (b) explains what has happened in the months since the Debtors commenced their Chapter 11 Cases, and (c) sets forth the treatment of creditors in the *Second Amended Chapter 11 Plan of Reorganization of Millenkamp Cattle, Inc. and its Affiliates,* as amended, modified, or supplemented from time to time pursuant to its terms, (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A[1]**. This Disclosure Statement is qualified in all respects by the *express* terms of the Plan.

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan, (2) advises Holders of Claims or Interests of their rights under the Plan, (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (4) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

Earlier in this case, the Debtors obtained court approval for a post-petition DIP Loan from Sandton. Pursuant to the DIP Order, the Debtors executed the DIP Loan Documents with Sandton, which provided for up to $45 million in post-petition DIP financing. The outstanding DIP Loan as of the Effective Date will be approximately $22.939 ± million. Pursuant to the terms of the approved and executed DIP Loan documents, Sandton has agreed to amend the DIP Loan to be repayable through the Debtor's Plan, rather than on the Effective Date.

Further, the Debtors will use cash on hand to provide the following Effective Date Distributions: payment in full of Administrative Claims (including Allowed 503(b)(9) Claims) and cure costs arising from the assumption of Executory Contracts and Unexpired Leases.

The Plan provides for the sale of Canyonlands and McGregor, which will close no later than November 30, 2025. Canyonlands was appraised in June of 2024 at $16,000,000. McGregor was appraised in June of 2024 at $4,500,000. The net sale proceeds after normal and customary closing costs, shall be distributed first to Metlife in the amount of $5 million plus any allocated and Allowed Non-Estate Professionals fees and then the remaining balance of proceeds, less $2 million, will be paid to Sandton. The $2 million shall be allocated to pay the tax consequences of the sale and any amounts leftover, once the final tax amount is determined, shall remain cash of

---

[1] All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan will control and govern. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the event and to the extent that any provision of the Plan is inconsistent with the provisions of this Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence, except as otherwise expressly stated in the Plan; provided, however, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

the Reorganized Debtors. If the Reorganized Debtors are able through sale of equity or otherwise, to infuse cash into the Reorganized Debtors without raising the debt burden in order to make the timely required payments to Sandton and MetLife described above, the Reorganized Debtors shall not be required to sell the Canyonlands and McGregor properties.  In the event funds can be raised through the sale or borrowing against equity, Rabo shall release its lien on said equity.

The Plan further provides for refinancing on or before May 31, 2028 to pay Rabo and Conterra in full and final satisfaction of their Allowed Class 10, 11, and 12 claims as well as comply with the rest of the terms of the Plan.

The Debtors believe that the Plan accomplishes all of the goals that they sought to achieve by commencing the Chapter 11 Cases. If consummated, the Plan will significantly reduce the Debtors' leverage (thus making the refinance in 2028 more likely), provide the Debtors with sufficient cash to run their businesses, and provide recoveries to unsecured creditors significantly in excess of what creditors would receive in a liquidation of the Debtors' assets if the Plan were not consummated. The Debtors urge all holders of Claims entitled to vote on the Plan to vote to accept the Plan.

## I.    **INTRODUCTION**

The Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this Disclosure Statement pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan. The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This  Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and  financial  history,  their reasons  for  seeking protection  under  chapter  11  of  the Bankruptcy Code, and the course of these Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure  Statement discusses the Confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

### A.    Overview of the Plan

#### 1.    General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders. The Plan contains certain provisions relating to (a) the release of the Released Parties, (b) exculpation of the Exculpated Parties, and (c) certain injunctions protecting

the assets of the Estates to be distributed under the Plan as more specifically described in Section 10 of the Plan, and, if the Plan is confirmed and the Effective Date occurs, such releases, exculpations and injunctions shall be binding on the Holders of Claims and Interests except as otherwise described in Article IV. V. below.

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.**

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.**

2.    **Summary of Treatment of Claims and Interests Under the Plan**

The table below summarizes the classification and treatment of Claims and Interests under the Plan.

**THE PROJECTED RECOVERIES FOR THE CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER.**

| CLASS | DESCRIPTION | VOTING STATUS | PROJECTED RECOVERIES |
|-------|-------------|---------------|----------------------|
| None | Administrative Claims | Not Entitled to Vote | 100% |
| None | Professional Fee Claims | Not Entitled to Vote | 100% |
| None | Priority Tax Claims | Not Entitled to Vote | 100% |
| None | DIP Loan | Not Entitled to Vote | 100% |
| Class 1 | Other Priority Claims | Unimpaired<br><br>Not Entitled to Vote (deemed to accept) | 100% |

| Class 2 | Corn Silage Group Secured Claims | Impaired<br><br>Entitled to Vote | 100% |
|---------|----------------------------------|----------------------------------|------|
| Class 3 | Outstanding Other Secured Claims | Impaired<br><br>Entitled to Vote | 100% |
| Class 4 | Other Secured Claims Paid in Full | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 5 | Secured Equipment Loan and Lease Claims | Unimpaired<br><br>Not Entitled to Vote | 100% |
| Class 6 | John Deere Financial Secured Claim | Impaired<br><br>Entitled to Vote | 100% |
| Class 7 | Western States Cat Secured Claim | Impaired<br><br>Entitled to Vote | 100% |
| Class 8 | Rexel USA, Inc. d/b/a Platt Electric Supply Claim | Disputed | 0% |
| Class 9 | MetLife Secured Claims | Impaired<br><br>Entitled to Vote | 100% |
| Class 10 | Rabo Secured Claims | Impaired<br><br>Entitled to Vote | 100% |
| Class 11 | Conterra German Note Secured Claim | Impaired<br><br>Entitled to Vote | 100% |
| Class 12 | Conterra Mezz Loan Secured Claim | Impaired<br><br>Entitled to Vote | 100% |
| Class 13 | General Unsecured Claims | Impaired<br><br>Entitled to Vote | 100% |
| Class 14 | Intercompany Claims | Not Entitled to Vote (deemed to reject) | None |
| Class 15 | Equity Interests | Unimpaired<br><br>Not Entitled to Vote | None |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

### B. Plan Voting Instructions and Procedures

#### 1. Voting Rights

Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Holders of Claims in Class 2, Class 3, Class 6, Class 7, Class 9, Class 10, Class 11, Class 12, and Class 13 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed Allowed for voting purposes and are entitled to vote to accept or reject the Plan. Only Holders of Claims in Class 2, Class 3, Class 6, Class 7, Class 9, Class 10, Class 11, Class 12, and Class 13 may vote to accept or reject the Plan.

Pursuant to the Plan, Holders of Claims in Class 1, Class 4, Class 5, and Class 15 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, Intercompany Claims in Class 14 will not receive or retain any property under the Plan on account of such Intercompany Claims and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

### 2.    Solicitation Materials

Matthew T. Christensen, counsel to the Debtors, with the approval of the Bankruptcy Court, will serve as the voting agent (the "Voting Agent") to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order"), which will include the notice of (i) the date, time and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan and submission of Ballots;

- 

- One or more Ballots, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available without charge by written request to the Voting Agent at mtc@johnsonmaylaw.com.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by electronic mail at: at mtc@johnsonmaylaw.com.

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM FOR DISTRIBUTION PURPOSES, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

### 3.    Voting Instructions and Procedures

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot. **The deadline to vote on the Plan will be set forth in the Disclosure Statement Order (the "<u>Voting Deadline</u>")**. In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline at the following address:

<u>**Physical Mail**</u>:

**Matthew T. Christensen**
**JOHNSON MAY**
**199 N. Capitol Blvd., Ste 200**
**Boise, ID 83702**


**-or-**

<u>**Electronic Mail**</u>:

**Email Address: <u>mtc@johnsonmaylaw.com</u>**

**Subject Line: Millenkamp Ballot Submission**
**Attachment: A completed and signed ballot must be attached in PDF format.**


Only the Holders of Allowed Claims or Claims that are deemed allowed for purposes of voting on the Plan in Class 2, Class 3, Class 6, Class 7, Class 9, Class 10, Class 11, Class 12, and Class 13 are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning those Ballots in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim either to accept or to reject the Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;
- Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot in writing, or by order of the Bankruptcy Court;
- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;
- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;
- Any Ballot cast by a Person that does not hold a Claim in the voting Class; and
- Any Ballot that is not signed or does not contain an original signature.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, free of charge, an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent at the address specified above.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept

or reject the Plan and will File a ballot summary (the "Ballot Summary") prior to the Confirmation Hearing. The Ballot Summary will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN BY THE VOTING DEADLINE.**

### 4. Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than **the date provided in the Disclosure Statement Order**. Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court. For further information, refer to Article VIII of this Disclosure Statement, "Confirmation of the Plan."

## II.   <u>BACKGROUND REGARDING THE DEBTORS</u>

### A.   Overview of the Debtors

Bill Millenkamp, principal of the Debtors, was born and raised in the Midwest where the Millenkamp name is well known in the cattle industry. In 1991, Bill Millenkamp moved to Oregon where he met his wife, Susie, who was also raised in the cattle industry. Bill and Susie eventually moved to Idaho to start their own family cattle business.

In 1996, with just 40 acres in Jerome, Idaho, 7 calves, and a small operating line of credit, Bill and Susie began a calf-raising operation. Since then, the Millenkamp's operations have grown into a large vertically integrated agribusiness, comprised of five complementary divisions in which Bill and Susie and their four children are involved.

The calf ranch is operated at our Jerome, Idaho location and is made up of several hundred acres of land where approximately 50,000 calves reside.  In 2006, the Millenkamp's started operating a dairy heifer feedlot in Declo, Idaho.  At this location they began raising approximately 60,000 head of dairy cattle.  In 2013, Millenkamp's purchased their first dairy, and two years later, established Idaho Jersey Girls Dairy which at the time consisted of one milk barn, two rotaries and 15,000 head of dairy cattle that are located at the Declo, Idaho facility. In 2018, Millenkamp's constructed an enclosed commodity barn and began construction of a cattle processing barn. In 2019, construction began for a second milk barn that was completed in 2020, which added an additional four rotary milking carousels to company's operations. In 2021, the Debtors further

expanded with construction of a renewable energy methane digester with East Valley Development, LLC which is partnership between BP and CleanEnergy.

As of today, the company's operations encompass approximately 20,000 acres. The Debtors maintain cattle operations in three locations in Jerome, Idaho and a main dairy location in Declo, Idaho.  The Debtors custom raise day-old calves for approximately twenty-five (25) separate dairies and ship milk to not less than two processors.

The Debtors' operations employ approximately 513 employees. The operations are comprised of five main divisions: (1) Idaho Jersey Girls Dairy which is located in Declo, Idaho, (2) a calf ranch which is located in Jerome, Idaho, (3) farming in Jerome, Twin Falls and Cassia Counties, (4) a feedlot located in Jerome & cow-calf operation in Declo, and (5) custom harvest & trucking through the Magic Valley.

The Debtors manage approximately 110,000 head of cattle, inclusive of Idaho Jersey Girls Dairy which consists of approximately 37,000 Jersey and Jersey mixed milking cows that produce approximately 2 million pounds of milk daily. The Debtors accomplish this with six rotary milking parlors and by utilizing programmable logic control technology, robotics, and state of the art heat recovery technology.

The Idaho Jersey Girls Dairy is approximately 11,688 acres bordered by the 4,640-acre Moonshine Ranch for a total contiguous land area of approximately 16,328 acres located in Declo, Idaho. The Idaho Jersey Girls Dairy supports approximately 65,000 head of dairy cattle and youngstock, while Moonshine Ranch maintains a 1,000 head Angus calf-cow operation.

The calf ranch operation receives approximately 250 calves per day and is home to approximately 50,000 calves. The calf ranch is approximately 782 acres located in Jerome, Idaho. The Debtors' operations also consist of farming in which they implement responsible crop rotation and nutrient management to support operations. The feedlots and cow-calf operations are additional revenue streams that increase the synergy and infrastructure of the farm and adjoining properties. For example, the Jerome Idaho Feedlots (defined below) consists of 80 acres in Jerome, Idaho and supports 2,500 head of cattle.

The Debtors also operate a trucking operation that supports all aspects of their operations. The Debtors harvest all silages used in their operations through their partnership with H&M Custom, LLC, which provides control of quality and availability for our most critical forage input costs.

### B.    Debtors' Corporate Structure

As the farming operation grew, it became necessary to set up corporate entities to deal with various aspects of the operations. Through ten entities, the Debtors operate as a single enterprise, which includes common usage of debt and banking facilities.

William John Millenkamp ("Bill Millenkamp") is the Chief Executive Officer of the Debtors, Millenkamp Cattle, Inc.; Black Pine Cattle LLC; East Valley Cattle, LLC; Idaho Jersey Girls Jerome Dairy LLC; Millenkamp Enterprises LLC; Millenkamp Family LLC; Millenkamp Properties, L.L.C.; Millenkamp Properties II LLC; Goose Ranch LLC; and Idaho Jersey Girls, LLC. Attached hereto as Exhibit E is an organizational summary chart of the Debtors.

Bill Millenkamp is also President of Millenkamp Cattle, Inc., and a Member or Managing Member of Idaho Jersey Girls Jerome Dairy LLC; Black Pine Cattle LLC; Millenkamp Enterprises, LLC; and East Valley Cattle, LLC. Millenkamp Cattle, Inc. is the sole Member of Idaho Jersey Girls, LLC.

Bill Millenkamp, Susan J. Millenkamp, William J. Millenkamp as Trustee of the SJM 2012 Trust, and Susan J. Millenkamp as Trustee of the WJM 2012 Trust are the Members of Millenkamp Family LLC, sole member of Goose Ranch LLC, Millenkamp Properties, L.L.C. and Millenkamp Properties II LLC.

Millenkamp Cattle, Inc., is the primary entity from which all operations are directed, the revenues received and the payables disbursed. Millenkamp Cattle, Inc. is the operational entity which owns all of the cattle, feed, and equipment used to care for the cattle, employs the employees, and receives and disburses the majority of the monies. Millenkamp Cattle, Inc., does not own any real property.

Idaho Jersey Girls Jerome Dairy, LLC owns 80± acres and a 1,120-animal unit concentrated animal feeding operation in Jerome, Idaho (the "Jerome Feedlot" or "Millenkamp Milkers"). The Jerome Feedlot is leased to Millenkamp Cattle, Inc.

Millenkamp Properties, L.L.C. owns 720± acres and a 6,000-animal unit concentrated animal feeding operation in Jerome Idaho (the "Calf Ranch"), a 40± acre feed storage site ("Ridgeway") and 4,638± acres in Cassia County ("Moonshine Ranch"), and another 80± acres in Jerome County (the "German Dairy"). These properties are also leased to Millenkamp Cattle, Inc.

Millenkamp Properties II LLC owns 732 ± in Twin Falls County ("Canyonlands") and 278 ± acres in Jerome County (the "McGregor Property"). The Canyonlands and McGregor Property are also leased to Millenkamp Cattle, Inc.

Goose Ranch LLC owns a 600-acre farm on Snake River below Minidoka Dam in Cassia County (The "Goose Ranch Property"). The Goose Ranch Property is also leased to Millenkamp Cattle, Inc.

East Valley Cattle, LLC owns a 11,668± acre farm and a 51,285-animal unit capacity dairy and feedlot in Cassia County near Declo, Idaho ("East Valley Facilities"). This is also leased to Millenkamp Cattle, Inc.

Millenkamp Cattle, Inc., leases from Mike Thompson a 1200 head feedlot ("Thompson Feedlot") in Jerome, Idaho.

Millenkamp Cattle, Inc., leases approximately 4280 irrigated acres of farm ground ("Cassia Creek") from Eagle Creek Northwest, LLC that is adjacent to the East Valley Facilities in Declo, Idaho.

As stated above, Millenkamp Cattle, Inc. operates all the real property owned or leased by the various Millenkamp entities.  This includes all the farms, Calf Ranch, Idaho Jersey Girls and the East Valley Facilities.

Millenkamp Cattle, Inc. d/b/a Idaho Jersey Girls operates the German Dairy and East Valley Facilities. Millenkamp Cattle, Inc. d/b/a Black Pine Cattle also provides custom heifer raising services at the East Valley Facilities.

### C.   Debtors' Prepetition Capital Structure

#### 1.   Liabilities

The Debtors were parties to various prepetition loan agreements. The following table is a summary of the Debtors' most significant *secured* loan balances as of the Petition Dates:

| Lender | Loan | Claim Amount |
|---|---|---|
| Metlife | Promissory Note A dated September 26, 2018, and First Amendment dated April 21, 2021 | $86,855,135.96 |
| Metlife | Promissory Note B dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $51,693,035.58 |

| Metlife | Promissory Note C dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $11,530,349.58 |
|---|---|---|
| Metlife | Promissory Note D dated April 21, 2021 | $16,210,086.43 |
| Metlife | Promissory Note E dated April 21, 2021 | $10,082,419.25 |
| Metlife | 9858 Promissory Note dated March 12, 2019 | $5,005,171.86 |
| Rabo | Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended | $90,361,000.00 |
| Conterra | Mezz Loan dated October 20, 2022 | $18,884,265.52 |
| Conterra | German Note dated October 20, 2022 | $2,576,728.08 |

### i.    Metlife Secured Loans

Metropolitan Life Insurance Company ("MLIC") and MetLife Real Estate Lending LLC (collectively, "MetLife") are the owners and holders of certain commercial real estate loans (collectively, the "Pre-Petition MetLife Loans" and, together with all related mortgages and other existing or future documents evidencing, securing, or executed in connection with the Pre-Petition MetLife Loans, in each case, as Amended, referred to herein as the "Pre-Petition MetLife Loan Documents") made by MetLife to the MetLife Borrowers.  The Pre-Petition MetLife Loans are secured by liens in and security interests on the MetLife Borrowers' real property and certain of the MetLife Borrowers' personal property, including: (x) crops grown after a foreclosure; (y) all wells, underground pipelines, sprinklers, and similar irrigation equipment located at the real property, as well as all lines, valve openers, pipes, and similar items pertaining to such irrigation equipment; and (z) all milking equipment located at the real property (the "MetLife Real Estate Collateral").  The Pre-Petition MetLife Loans are further secured, subject to the First Intercreditor Agreement (defined below), by the Milk Receivables (the "MetLife Milk Priority Claim," and collectively with the Pre-Petition MetLife Real Estate Collateral, the "MetLife Collateral" and all liens and security interests on and in the Pre-Petition MetLife Collateral, the "MetLife Liens").  As of the Petition Date, the MetLife Borrowers were indebted to MetLife, in the aggregate amount of approximately $180,473,929.72 under the Pre-Petition MetLife Loan Documents (collectively, the

"MetLife Obligations").

Rabo and MetLife are parties to (i) that certain Intercreditor Agreement, dated as of September 18, 2018, (as Amended, the "First Intercreditor Agreement") and (ii) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022 (as Amended, the "Second Intercreditor Agreement" and, together with the First Intercreditor Agreement, the "MetLife Intercreditor Agreements"). Pursuant to the First Intercreditor Agreement, Rabo agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition MetLife Collateral to those of MetLife, and MetLife agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition RLOC Collateral (other than any such property that may also constitute Pre-Petition MetLife Collateral) to those of Rabo.

Additionally, the First Intercreditor Agreement recognizes that Rabo and MetLife have separately entered into Milk Check Assignment Agreements (the "Milk Agreements") with Debtor Millenkamp Cattle and a milk purchaser, Glanbia Foods, Inc. ("Milk Purchaser"). The Milk Agreements direct the Milk Purchaser to make certain payments directly to Rabo (in certain situations) and MetLife (on a monthly basis), rather than to Millenkamp Cattle. Pursuant to the terms of the First Intercreditor Agreement, MetLife's priority interest in any Milk Receivables is equal to the aggregate amount of, in any month, the amount of the monthly installment payment of principal and accrued interest then due and payable by the applicable Debtors to MetLife, with such amount being capped at one month's principal and interest payment, unless MetLife has provided written notice to Rabo that amounts exceeding one month's principal and interest payment are due, owing, and unpaid.

On September 18, 2018, Rabo, Millenkamp Cattle, and the Milk Purchaser also entered into a Collateral Assignment of Milk Contracts, pursuant to which Millenkamp Cattle assigned to Rabo all contracts and proceeds related to certain purchase agreements between Millenkamp Cattle and the Milk Purchaser, to secure the obligations owed to the Pre-Petition RLOC Secured Parties. Subject to the foregoing, during the Borrowers' default under the Pre-Petition RLOC Documents, Rabo may collect the Milk Receivables. Other than the foregoing subordination, MetLife and Rabo expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of the Pre-Petition RLOC Secured Parties' rights, privileges, powers, or remedies with respect to the Pre-Petition RLOC Obligations or the Pre-Petition RLOC Collateral. Likewise, Rabo and MetLife expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of MetLife's rights, privileges, powers, or remedies with respect to the Pre-Petition MetLife Loans or the MetLife Collateral. MetLife does not have any lien or security interest in any of the Debtors' Livestock, including, but not limited to, dairy cattle.

| Description | Principal Amount | Claim Amount | Security |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **Promissory Note A** dated September 26, 2018, and First Amendment dated April 21, 2021 | $106,000,000.00 | $86,855,135.96 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note B** dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $59,400,000.00 | $51,693,035.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note C** dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $13,000,000.00 | $11,530,349.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note D** dated April 21, 2021 | $17,954,226.00 | $16,210,086.43 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **Promissory Note E** dated April 21, 2021 | $15,978,409.00 | $10,082,419.25 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 |
| **9858 Promissory Note** dated March 12, 2019 | $5,508,350.00 | $5,005,171.86 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated March 12, 2019 "Canyonlands" and "McGregor" property |

|  |  |  |  |
|---|---|---|---|

### ii.    Pre-Petition RLOC (Rabo) Credit Agreement

Under that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended, the "Pre-Petition RLOC Credit Agreement" and collectively with all security, pledge, intercreditor, guaranty agreements, and other documentation executed in respect thereof, the "Pre-Petition RLOC Documents", by and among the Debtors , collectively as borrower, the lenders from time to time party thereto (in such capacity, collectively, the "Pre-Petition RLOC Lenders"), and Rabo, as sole lead arranger, agent, and swing-line lender (in its capacity as agent for the benefit of the Pre-Petition RLOC Lenders and each Issuer (as defined in the Pre-Petition RLOC Credit Agreement), the "Pre-Petition RLOC Agent" and collectively with the Pre-Petition RLOC Lenders and the Issuers, the "Pre-Petition RLOC Secured Parties" and each, a "Pre-Petition RLOC Secured Party"), the Debtors were provided with an asset-based revolving line of credit facility (the "Pre-Petition RLOC Facility") consisting of (a) revolving commitments in an aggregate amount of up to $91,000,00.00; (b) a swing-line credit facility for the Pre-Petition RLOC Agent to make Swing Line Advances (as defined in the Pre-Petition RLOC Credit Agreement) in an aggregate amount of up to $7,500,000.00; and (c) a letter-of-credit facility for the issuance of stand-by letters of credit in an aggregate amount of up to $1,000,000.00.

Pursuant to the terms of the Pre-Petition RLOC Credit Agreement, the Debtors granted to the Pre-Petition RLOC Agent a security interest to and in substantially all of the Debtors' and Borrowers' personal property, excluding their real property, and all other property defined as the "Collateral" in the Pre-Petition RLOC Credit Agreement (referred to herein as the "Pre-Petition RLOC Collateral" and the liens and security interests granted to or for the benefit of the Pre-Petition RLOC Secured Parties therein, the "Pre-Petition RLOC Personal Property Liens").

The Pre-Petition RLOC Collateral includes, among other interests (each as defined in the Pre-Petition RLOC Credit Agreement):  all Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and, notably, the Borrowers' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Borrowers' milk and other dairy products (the "Milk Receivables").  The Pre-Petition RLOC Secured Parties' lien and security interest extends to all accessions to, substitutions for, and all replacements, products, and proceeds of the Pre-Petition RLOC Collateral.  As described below, the Pre-Petition RLOC Secured Parties' interest in the Milk Receivables is subject to the First Intercreditor Agreement (as defined below) entered into between them and MetLife.

Further, as consideration for the Pre-Petition RLOC Agent to enter into that certain Forbearance Agreement, made effective as of October 22, 2022, the Borrowers granted, among other things, a second priority mortgage on the Pre-Petition MetLife Real Estate Collateral (defined below) to secure the Pre-Petition RLOC Obligations, subject to the Second Intercreditor

Agreement (defined below).  Accordingly, on October 20, 2022, the Borrowers executed and delivered that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (Second Priority), in favor of the Pre-Petition RLOC Agent, to secure any and all obligations owed to the Pre-Petition RLOC Secured Parties, which was recorded in Cassia County, as Instrument No. 2022-004552, Twin Falls County as Instrument No. 2022018722, and Jerome County as Instrument No. 2224759 (the "Pre-Petition RLOC Second Mortgage" and together with the Pre-Petition RLOC Personal Property Liens, the "Pre-Petition RLOC Liens"). On June 7, 2024, Rabo filed a Proof of Claim in the amount of $96,143,211.38. On November 25, 2025, Rabo filed an Amended Proof of Claim in the amount of $96,469,917.04.

<u>Amended Proof of Claim Amount:</u>

Principal:  $88,950,202.73
Pre-Petition Interest (as of April 2, 2024): $149,105.24
Post-Petition Interest (as of October 31, 2024): $2,751,368.26
Pre-Petition Professional Fees: $1,255,548.19
Post-Petition Professional Fees (as of October 31, 2024): $3,357,410.62
Unused Commitment Fee: $6,280.00
TOTAL: $96,469,917.04

The Debtors' books and records reflect a total principal amount owing to Rabo of $90,952,408.00.  The Debtors and Rabo conducted a reconciliation of Rabo's Claim amount as of the Petition Date and determined the amount owing to Rabo as of the Petition Date was $90,361,000.00. The Debtors dispute Rabo's default interest and post-petition professional fee amounts.

### iii.    Conterra

Millenkamp Cattle, Inc., Millenkamp Family LLC, Millenkamp Properties II LLC, Millenkamp Properties, L.L.C., East Valley Cattle, LLC, Idaho Jersey Girls Jerome Dairy LLC, and William J. Millenkamp (collectively, the "Rooster Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $2,549,750 (the "German Note") which Conterra endorsed to Rooster Capital IV LLC ("Rooster").

The German Note is secured by a first priority mortgage on certain real property owned by certain of the Debtors known as the "German Dairy" located at 162 West 400 North, Jerome, Idaho 83338 (the "Conterra German Collateral") and located in Jerome County, Idaho (the "Pre-Petition German Real Estate Lien").

<u>German Note Proof of Claim Amount:</u>

Unpaid Principal: $2,508,860.41
Accrued Interest through 4/2/24: 67,867.67
Total unpaid German Note balance as of 4/2/24: $2,576,728.08

Millenkamp Cattle, Inc., Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy LLC, East Valley Cattle, LLC, Millenkamp Family LLC, Millenkamp Properties, L.L.C., Millenkamp Properties II LLC, Goose Ranch, LLC, William J. Millenkamp and Susan J. Millenkamp (collectively, the "Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $16,500,000 which Conterra endorsed to Ag Funding (the "Conterra Mezz Loan"). The Conterra Mezz Loan is secured by second priority liens and security interests in the Pre-Petition RLOC Collateral (the "Conterra Mezz Collateral") and third priority mortgage on the Pre-Petition MetLife Real Estate Collateral (the "Conterra Mezzanine Liens").

<u>Mezz Loan Proof of Claim Amount:</u>

Unpaid Principal: $16,500,000.00
Accrued Interest through 4/2/24: $1,457,810.41
Late Fees: $830,614.58
Reimbursable Expenses: $95,840.53
Total unpaid Mezz Loan balance as of 4/2/24: $18,884,265.52

### iv.    Other Secured Obligations

a.    <u>Equipment Liens</u>

Certain parties have asserted secured interests in specific pieces of equipment that were owned by the Debtors and have filed UCC-1 financing statements with respect to those interests.

b.    <u>Statutory Liens</u>

A number of parties have asserted liens, pursuant to applicable non-bankruptcy law, on certain of the Debtors' assets.

### v.    General Unsecured Claims

In addition to the debt discussed above, the Debtors' books and records reflect approximately $27,922,952.00 in unsecured debt incurred in the ordinary course of business, principally comprised of trade payables. Creditors and interested parties should review the Debtors' Schedules (defined below) and Proofs of Claim Filed with the Bankruptcy Court for more complete information concerning the nature and amount of the Debtors' liabilities as of the Petition Date.

Based on the Debtors' Schedules and internal estimates, the Debtors estimate that Allowed General Unsecured Claims against the Debtors collectively, is approximately $27,922,952.00. This estimate, however, is based on the Debtors' judgment and assumes the benefit of anticipated Claim objections. Thus, the total amount of Allowed General Unsecured Claims may exceed or fall short of the estimates set forth herein. A list of the General Unsecured Claims and their General Unsecured Class 9 Claim Amounts are set forth in Exhibit D to this Disclosure Statement.

### D.        Events Leading to the Chapter 11 Cases

In 2019, Millenkamp Cattle began constructing a $250 million dairy expansion to add four new state of the art rotary parlors and an enclosed cross ventilation barn to double milking capacity of the current dairy facility.  The project was to be funded through Millenkamp Cattle's two lenders, Rabo, who would provide the short-term operating revolving line of credit and MetLife, who would provide the long-term lending secured by the farm ground and dairy facilities. Construction of the new project began in 2019 and ran unimpeded during the COVID pandemic through its completion in 2021.

The deal between the Debtors, Rabo and MetLife was to complete the construction project, reappraise the property after its completion and use the large equity cushion the Debtors maintained in the real property to pay down the Rabo revolving line of credit ("RLOC").  On approximately eleven separate occasions over the past twenty years, MetLife in its ordinary course of business, had refinanced the Debtors long-term real property debt to restructure its overall business financing.  During this time, Rabo changed the Debtors' borrowing base margin from $0 to $10 million.  This created a huge hurdle considering the Debtors were in final phases of construction.  The increase in $10 million to the borrowing base was directly in contravention of Rabo lending standards to the Debtors' peers.  This resulted in the undervaluing of Debtors' steers in excess of $7 million.

During the end of the construction project in August of 2021, the Debtors were left with a Hobson's Choice, trigger a default under the Rabo loan because the borrowing base would drop below the new $10 million margin or trigger a default under the MetLife loan covenants by allowing a construction lien to encumber the real property.  The Debtors, upon the verbal approval of Rabo's local agent, used monies from its RLOC to bond a construction lien placed on the real property, as having clear title was a prerequisite for the new MetLife loan.  MetLife and Rabo were both aware of the course of action.

In 2022, MetLife commissioned appraisals of the Debtors' real property to ensure the future loans would be within MetLife's usual 60/40 debt to equity ratios.  The 2022 appraisals of the Debtors' real properties determined MetLife had approximately $393 million in appraised real property collateral while it maintained approximately $190 million in debt.  The appraisals at the time did not take into account the value of the $107 million manure separation facility that had commenced construction and was to be paid for by East Valley Development, LLC, a joint venture between Clean Energy and BP to construct a renewable methane digester facility on the Debtors' property.

In June of 2022, the Rabo RLOC loan matured, and Rabo issued a notice of default.  To cure the default, the Debtors and Rabo entered into a forbearance agreement.  The Debtors, with the consent of MetLife through an intercreditor agreement with Rabo, provided Rabo a second

position mortgage upon the real property.  Additionally, Conterra provided $16.5 million of mezzanine money to bridge into the MetLife refinance and to satisfy Rabo's borrowing base margin requirements.

In February of 2023, Rabo issued another notice of default to the Debtors because the borrowing base dropped under the $10 million borrowing base loan covenant.  During this time, Rabo was always paid the monthly interest it was due and MetLife continued to receive its principal and interest payments, even though the dairy industry was experiencing historically low milk prices and historically high feed prices.  The Debtors were able to successfully sustain their revenues during these challenging times because of a consistent milk hedging strategy and other sectors of the Debtors' business, such as custom calf raising, fat and feeder cattle raising, farming and trucking, generated additional revenues.  These revenues ensured Rabo and MetLife were paid.

In May and June of 2023, the Debtors received term sheets from two banks to refinance its existing revolving line of credit with Rabo.  Both term sheets were conditioned upon MetLife providing approximately $45 million in additional financing to pay off $16.5 million in mezzanine debt and decrease the outstanding RLOC balance.  Although a traditional 60/40 debt to equity ratio on approximately $500 million of appraised real property would have enabled the Debtors to borrow over $100 million from MetLife, the Debtors sought only $45 million.  This would have resulted in an extremely conservative loan to debt ratio for MetLife.

On June 9, 2023, after the completion of a major construction expansion, MetLife, inconsistent with its past practices of lending monies to Millenkamp Cattle, refused to provide any further funding to the Debtors to ensure a refinance of its short-term lending RLOC.  Therefore, due to MetLife refusing to fund its prior commitment of the $45 million additional funds, Rabo issued a Notice of Default in July 2023.  During this time, the dairy industry was experiencing its worst financial crisis in the past twenty years and the banking environment had shut down lending on not only real property, but also RLOCs from the dairy industry's largest lenders.

In August of 2023, Rabo began sweeping steer and cull cow proceeds and has continually done so through the Petition Date.  Between August of 2023 and April 2024, Rabo swept over $25 million and failed to revolve the money back in the ordinary course to ensure cattle were fed, approximately 513 employees were paid, and accounts payable were maintained on customary terms.  Rabo swept funds and added them to principal, default interest and excessive attorney and financial advisor fees.

The inability of the Debtors to use the swept steer and cull cow proceeds, slowly starved the Debtors of the working capital it needed to keep vendors paid on a timely basis.  This was a deliberate action of Rabo to squeeze the Debtors and their vendors out of working capital and

eventually force the Chapter 11 filings.  Rabo knew the milk checks and custom calf raising funds were not enough to cover the amounts swept and would leave the Debtors with a monthly shortfall.

While Rabo continued to squeeze the Debtors of their working capital, it collected not only its interest, but also its default interest and attorneys' fees.  Had Rabo simply revolved the monies that the Debtors generated from its steers and cull cows, the Debtors would have been able to pay all their vendor bills in its ordinary course of business. Similarly, MetLife has continually received its monthly interest and principal without fail.  Except for 2023, the Debtors have been profitable for the past 27 years and would have been profitable in 2023 had they not been forced to pay over $15 million in default interest, attorneys fees, financial advisor fees and lost opportunity costs.

On January 22, 2024, Rabo filed its Verified Petition For Appointment of Receiver in the Fourth Judicial District of the State of Idaho, County of Ada.  After extensive negotiations, on February 16, 2024, the Debtors and Rabo entered into an Order Appointing Receiver.  The order provided that the Debtors had the exclusive right to file a Chapter 11 bankruptcy petition during the first 60 days of the effective date of the order and that the Debtors would continue to manage the operations like they had done historically.

The Receiver subsequently created a feeding frenzy among the Debtors' vendors by making promises to vendors on payments it could not keep.  For example, Rabo and the Receiver promised millions of dollars in letters of credit to vendors, but failed to honor those promises and instead blamed each other when the promises were not fulfilled. The Receiver continually stirred the pot to create a run by vendors in an attempt to skirt the aforementioned time frames and force an immediate Chapter 11 filing by the Receiver.

The Receivership milked the Debtors' estates of nearly $2 million with absolutely no benefit.  Baseless allegations of the Receiver, in violation of its fiduciary duty to the Debtors' estates, hauled the Debtors into court on three separate occasions.  The Receiver's goal was to quickly sell an $800M company under an expedited 363 sale without regard to the hundreds of millions of dollars of equity that the Debtors built over the past twenty-seven years.

The issues that led these Chapter 11 Cases were not based on the operations of the Debtors; rather, these issues were brought on by the lending institutions which refused to work cooperatively with each other and the Debtors.

## III.    THE CHAPTER 11 CASES

On the respective Petition Dates, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Chapter 11 Cases are being jointly

administered under the case caption *In re Millenkamp Cattle, Inc., et al, LLC, et al.*, Case No. 24-40158 (Bankr. D. Id.). An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under Bankruptcy Code section 362(a), which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

### A.    First Day Orders and Initial Employment Applications

On or about the Petition Date, the Debtors filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. In connection with these hearings, the Bankruptcy Court entered a series of customary "first day" orders, including the payment of employee wages and payments relating to utilities. (Docket Nos. 102, 140, 295). The Debtors also filed a Motion to Honor Prepetition Obligations to Critical Vendors (the "Critical Vendor Motion") (Docket No. 23). After a hearing on the matter, the Bankruptcy Court entered an interim order granting the Motion to pay certain prepetition claims of critical vendors listed in the order, based largely on those vendors' secured status and the characterization of the interim payments as adequate protection payments. The Court held a final hearing on the Critical Vendor Motion, and ultimately denied the Critical Vendor Motion. (Docket No. 302).

### B.    Applications to Employ Professionals

The Debtors have employed several professionals since the Petition Date which include:

- Dentons Davis Brown as Counsel for the Debtors: Order entered on May 24, 2024 (Docket No. 323)

- Johnson May as Counsel for the Debtors: Order entered on May 24, 2024 (Docket No. 322)

- Kander, LLC as Financial Advisor for the Debtors

- Schuil Ag Real Estate as an expert Real Estate Broker for the Debtors: Order entered on May 31, 2024 (Docket No. 357)

- Gale W. Harding and Associates as Equipment Appraiser: Order entered on May 31, 2024 (Docket No. 358)

- The Forbes Securities Group LLC dba Forbes Partners as Investment Banker: Order entered on June 5, 2024 (Docket No. 372)

- Davis Livestock, Inc. as Livestock Appraiser: Order entered on June 4, 2024 (Docket No. 371)

- Summit Ag Appraisal, Inc. as Real Estate Appraiser: Order entered on August 15, 2024 (Docket No. 556)

- Cooper Norman as Accountant: Order entered on August 14, 2024 (Docket No. 554)

- Givens Pursley as Special Counsel for the Debtors: Order entered August 26, 2024 (Docket No. 577)

- Heida Law Office as Special Counsel for the Debtors

- Lance VandeMark and Theodore Isbell of Vertex as Expert Witnesses

- Robert Marcus as Chief Restructuring Office: Order entered on January 9, 2025 (Docket No. 848)

**C.    Appointment of the Unsecured Creditors' Committees**

On May 14, 2024, the Office of the United States Trustee for the District of Idaho (the "U.S. Trustee") appointed the following creditors to the Official Committee of Unsecured Creditors (the "Committee") (Docket No. 297): (i) J.D. Heiskell Holding, LLC; (ii) Wilbur Ellis Nutrition-Rangen; (iii) Bunge Canada (iv) Viterra USA Grain, LLC, and (v) Land View, Inc. The Committee retained O'Melveny & Myers LLP as its lead counsel, Elaesser Anderson Chtd. as its local counsel, and Armory Securities, LLC as its financial advisor.

**D.    United States Trustee**

Brett R. Cahoon is the trial attorney for the U.S. Trustee in connection with these Chapter 11 Cases. The Debtors have worked cooperatively to address concerns and comments from the U.S. Trustee's office during these Chapter 11 Cases.

**E.    Meeting of Creditors**

The meetings of creditors under Bankruptcy Code section 341(a) were held on May 10, 2024, and May 30, 2024, via telephone. At the meetings of creditors, the U.S. Trustee and creditors asked questions of representatives of the Debtors.

**F.    Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims**

On April 23, 2024, the Debtors Filed their Schedules and Statements of Financial Affairs, as amended. A Creditor whose Claim is set forth in the Schedules and not identified as contingent,

unliquidated, or disputed may, but need not, have filed a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Plan[2].

On June 7, 2024, the Bankruptcy Court entered an *Order (I) Vacating the Original Bar Date and (II) Establishing a Deadline to File Proofs of Claim* (Docket No. 393) (the "Bar Date Order"), establishing July 31, 2024 as the General Claims Bar Date.

As of February 4, 2025, approximately 130 proofs of claim appeared on the official claims register for Millenkamp Cattle, Inc., approximately 10 proofs of claim appeared on the official claims register for Idaho Jersey Girls, LLC, approximately 14 proofs of claim for East Valley Cattle, approximately 1 proof of claim for Millenkamp Enterprises, LLC, approximately 9 proofs of claim for Millenkamp Properties, L.L.C., approximately 7 proofs of claim for Millenkamp Properties II LLC, approximately 9 proofs of claim for Millenkamp Family, LLC, approximately 8 proofs of claim for Goose Ranch, LLC, approximately 9 proofs of claim for Idaho Jersey Girls Jerome Dairy, LLC, and approximately 7 proofs of claim for Black Pine Cattle, LLC, although some of those claims have been withdrawn or superseded by other claims. The Debtors have not completed claim reconciliation work but anticipate doing so before the Effective Date of the Plan.

### G.      Cash Collateral Motions

In order to continue operations during the Bankruptcy Cases, including with respect to the feeding and maintenance of the cattle being cared for by the Debtors, the Debtors sought the right to use their cash collateral in accordance with the terms of a budget and providing adequate protection to certain secured creditors for any diminution in the value of their collateral during the pendency of the Bankruptcy Cases.

On April 2, 2024, the Debtors filed their *Emergency and Continuing Motion for Interim and Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and Setting a Final Hearing* (Docket No. 22). The Bankruptcy Court held hearings on the interim use of cash collateral and subsequently, on April 8, 2024, entered an *Interim Order Granting Debtors' Emergency Motion for Authorization to Use Cash Collateral and to Schedule a Final Hearing* (Docket No. 141) and a *Second Interim Order Granting Debtors' Emergency Motion for Authorization to Use Cash Collateral* (Docket No. 180).

On June 27, 2024, the Debtors filed a *Second Motion for Continued Use of Cash Collateral* (the "Second Motion") (Docket No. 464). The Bankruptcy Court held a hearing on the Second Motion and entered an *Interim Order Granting Debtors' Second Motion for Continued Use of Cash Collateral* (Docket No. 524). On September 18, 2024, the Debtors filed a *Supplement* to their Second Motion (Docket No. 618) which contained an updated cash collateral budget.

---

[2] A Creditor claiming to hold a prepetition Claim who neither files a proof of claim nor has its Claim set forth in the Schedules as being other than contingent, unliquidated or disputed, and whose Claim is not expressly Allowed under the Plan or in the Confirmation Order, has no right to payment or Distribution under the Plan.

On September 23, 2024, the Debtors, the Committee, Conterra, Metlife, Rabo, Sandton, and the United States Trustee, entered into a *Stipulation* in which the parties agreed that the continued use of cash collateral, as outlined in the Second Motion, shall be allowed and continue through October 29, 2024. The Stipulation also noted that the Final Hearing on the Debtors' Second Motion originally set for October 2 and 3, 2024 was vacated and the continued hearing on the Second Motion was reset to October 28 and 29, 2024. The Bankruptcy Court subsequently entered an order consistent with these terms.

On October 11, 2024, Rabo filed an *Objection to Continued Use of Cash Collateral* (Docket No. 670). On October 21, 2024 the Debtors, the Committee, Conterra, Metlife, Rabo, Sandton, and the United States Trustee, entered into a *Stipulation* in which the continued cash collateral hearing set for October 28th and 29th, 2024, on the Debtors' Second Motion would be vacated and reset for December 10 and 11, 2024. The parties agreed that the continued use of cash collateral, as outlined in the Second Motion, shall be allowed and continue through December 11, 2024 (Docket No. 682).

On November 15, 2024, the Debtors filed a *Third Motion for Continued Use of Cash Collateral* (the "Third Motion") (Docket No. 716). Pursuant to the Third Motion, the Debtors sought to continue use of cash collateral in accordance with the budget attached as Exhibit A to the Third Motion through April 30, 2025. The hearing on the Third Motion was held on December 10 and 11, 2024. On December 19, 2024, the Bankruptcy Court entered an *Order Granting the Debtors' Third Cash Collateral Motion* (the "Third Cash Collateral Order") (Docket No. 815). Pursuant to the Third Cash Collateral Order, the Debtors are authorized to use cash collateral through April 30, 2025.

### H.    Sandton DIP Loan

On April 2, 2024, the Debtors filed a motion seeking entry of an order authorizing the Debtors to enter into a senior secured, superpriority debtor-in-possession financing facility with Sandton Capital Solutions Master Fund VI, LP (the "DIP Lender") in an aggregate principal amount of not more than $45 million (the "DIP Motion.") (Docket No. 24). On April 19, 2024, the Bankruptcy Court entered an order authorizing the Debtors, on an interim basis, to enter into the DIP Facility, up to $8.5 million during the interim period (the "Interim DIP Order") (Docket No. 206).

On May 9th and 10th, the Bankruptcy Court held a final hearing on Debtors' DIP Motion (the "Hearing"). At the Hearing, the Bankruptcy Court issued an oral ruling regarding the DIP Motion. On May 17, 2024, the Bankruptcy Court entered the final DIP Order (the "Final DIP Order") (Docket No. 305), authorizing the Debtors to enter into the DIP Facility, which provides that the Debtors may borrow an aggregate principal amount of $45 million under the DIP Facility, in accordance with the terms of the Final DIP Order and the DIP Facility. Pursuant to the Final DIP Order, the Debtors were initially authorized to draw an additional $10 million under the DIP

Facility.  The Final DIP Order provides that "[t]o access additional funds under the DIP Facility, the Debtors are required to obtain an additional order from the Bankruptcy Court authorizing the future advances on the $45 million DIP Facility." The Final DIP Order further held that: the Debtors are required to (i) move the Bankruptcy Court for entry of an order authorizing such future advances with notice and opportunity to be heard by other parties in interest, specifically including the Pre-Petition Secured Lenders, any Committee, and the United States Trustee, and (ii) justify the need for any such future advances. See Final DIP Order ¶ 2(b).

On June 6, 2024, the Debtors filed a Motion for Authority to Advance on the DIP Facility (Docket No. 378). On June 21, 2024, the Bankruptcy Court entered an Order granting the Debtor's Motion for Authority to Advance on the DIP Facility in part, granting the Debtors to draw $5 million on the DIP Facility. (Docket No. 450). The outstanding DIP Loan as of the Effective Date will be $22.939 ± million.

### I.        503(b)(9) Motion

On April 2, 2024, the Debtors filed a *Motion for Allowance and Payment of Section 503(b)(9) Claims* (the "503(b)(9) Motion") (Docket No. 15). On April 24, 2024, the United States Trustee (the "UST") filed a partial objection to the 503(b)(9) Motion (the "Objection") (Docket No. 230). On May 20, 2024, the Debtors filed the Amended Motion in further support of the original 503(b)(9) Motion and to amend the list of 503(b)(9) claimants (the "503(b)(9) Claimants") (Docket No. 308). Attached as Exhibit A to the Amended Motion was a list of the 503(b)(9) Claimants. On June 6, 2024, Rabo AgriFinance LLC filed an Objection to the Amended Motion arguing that some of the 503(b)(9) Claims included amounts for finance charges and costs for labor (Docket No. 273). On June 14, 2024, the Debtors filed a *Supplement to their Amended Motion for Allowance and Payment of Section 503(b)(9) Claims* (Docket No. 427), attaching an updated and finalized list of 503(b)(9) Claims.

An evidentiary hearing was conducted on the Amended 503(b)(9) Motion on June 20, 2024. At the hearing, a substitute Exhibit 1031 was submitted which updated the list of 503(b)(9) Claims. After the hearing, the Bankruptcy Court entered an Order on June 21, 2024 which allowed the 503(b)(9) Claims, referencing a specific list of the Claims, however, the referenced list was an incorrect list. As such, on July 3, 2024, the Debtors filed a Motion to Amend Order on the Amended 503(b)(9) Motion (Docket No. 476) (the "Motion to Amend Order"). A hearing was held on the Motion to Amend Order, and on August 29, 2024, the Bankruptcy Court entered an Order Granting the Motion to Amend Order, attaching the list of 503(b)(9) Claims that the Bankruptcy Court deemed as Allowed 503(b)(9) Claims.  Additional 503(b)(9) Claims have been submitted through motions filed with the Bankruptcy Court or through the creditors' proofs of claim.  To-date, Allowed 503(b)(9) Claims are as follows:

| | |
|---|---|
| St. Genetics | $21,963.50 |

| | |
|---|---:|
| Aden Brook Trading Corp | $724,600.02 |
| Amalgamated Sugar | $230,824.66 |
| American Calf Products | $194,333.00 |
| Carne I Corp. | $ 131,312.90 |
| Land View, Inc. | $1,057,117.09 |
| MicroProteins, Inc. | $18,954.66 |
| Viterra USA Grain, LLC | $1,954,760.00 |
| WAG Services Inc. | $685.00 |
| MWI Veterinary | $484,255.92 |
| Automation Werx, LLC | $1,287.03 |
| Coastline | $4,386.53 |
| Elevation Electric | $254.13 |
| Les Schwab Tire Center | $26,643.97 |
| Progressive Dairy Services and Supplies | $4,858.75 |
| Schow's Auto Parts | $1,274.55 |
| Tacoma Screw Products, Inc. | $3,238.17 |
| The Dairy Solutions Group | $41,264.50 |
| Conrad & Bischoff, Inc. | $35,299.91 |
| United Oil/United Electric Coop | $593.00 |
| Rocky Mountain Agronomics | $ 44,527.47 |
| Clear Lakes Products | $592.00 |
| ABS Global, Inc. | $187,563.00 |
| Butte Irrigation Inc. | $ 220.30 |
| Valley Wide Cooperative | $67,132.81 |
| Premier Truck Group (PTG of Idaho LLC) (Penske) | $20,386.60 |
| TOTAL | $5,258,329.47 |

### J.    Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries

On June 6, 2024, the Debtors filed a *Motion for Authority to Pre-Pay Certain Silage and Hay/Straw Vendors for Future Deliveries* (the "Deposit Motion") (Docket No. 374) as the Debtors' silage and hay/straw vendors were requiring the Debtors to make deposits of up to 50% which are necessary to maintain the health of the Debtors' livestock. The Bankruptcy Court held an evidentiary hearing on June 20, 204, on the Deposit Motion, and on June 21, 2024, the Bankruptcy

Court entered an Order Granting the Deposit Motion, permitting the Debtors to (1) use $2.5 million to prepay vendors up to 50% of future corn silage contracts, (2) use $2.5 million to prepay vendors up to 50% of future straw and hay contracts, and (3) use $1.5 million to prepay a deposit to H&M Custom for the cost of chopping services for hay, straw, and corn silage.

### K.    506(b) Motion

On June 27, 2024, the Debtors filed a Motion to Establish Procedures for 11 U.S.C. § 506(b) Claims.  A hearing was held on the Motion and the Bankruptcy Court granted the motion, consistent with the discussion at the hearing.  Pursuant to the Debtors' proposed order, each party seeking allowance or payment of an 11 U.S.C. § 506(b) claim shall file either (a) a Proof of Claim (or Amended Proof of Claim – in either case, a "Claim") detailing the fees, costs, or charges sought to be approved; or (b) a Notice of 506(b) Claim (the "Notice") with the Bankruptcy Court.

Pursuant to the Proposed Order, in the event a party chooses to file a Notice with the Bankruptcy Court, any such Notice shall include, at a minimum, a specific itemization of the fees, costs or charges sought to be approved, and shall explain how each of the following conditions are satisfied:

a. The claim is an allowed secured claim;
b. The creditor is over-secured;
c. The fees are reasonable; and
d. The fees are provided for under the relevant agreement.

Any party filing a Notice shall serve a copy of such Notice on the Debtors, the United States Trustee, any other party secured by the same asset(s) securing the party filing the Notice, the Official Committee of Unsecured Creditors, any party who has requested special notice in the Debtors' Chapter 11 case, and any counsel for any of the foregoing.  The Notice shall be accompanied by a Certificate of Service showing which parties were served in which manner.

In the event a party files a Notice, any objection to the allowance or payment of fees, costs, or charges itemized in the Notice must be filed with the Bankruptcy Court and served on the Debtors, the party whose Notice is the subject of the objection, counsel for the Debtors and counsel for the Official Committee of Unsecured Creditors, within twenty-one (21) calendar days of the date that the Notice was served. If no objection is timely filed and served, the party filing the Notice may submit a proposed order allowing the fees, costs or charges itemized in the Notice.  If an objection is timely filed and served, then the objecting party must obtain a hearing date on the Objection and provide sufficient notice of the hearing to all parties served with the original Notice. In the event a party files a Claim, then the standard procedures for objecting to a proof of claim outlined in Local Bankruptcy Rule 3007-1 shall apply.

Case 24-40158-NGH    Doc 889    Filed 02/05/25    Entered 02/05/25 18:37:27    Desc Main
Document    Page 38 of 88

Pursuant to the Plan, Holders of 506(b) Claims must file, within forty-five (45) days after the Effective Date, either (i) an amended Proof of Claim encompassing the Holder's Professional Fee Claim; or (ii) file a Notice of 506(b) Claim pursuant to the 506(b) claim procedures. Such 506(b) claims submitted as an amended Proof of Claim or through a Notice of 506(b) Claim shall be considered a Professional Fee Claim and subject to the terms of section 3.1.2 of the Plan. However, these Non-Estate Professional Fees shall be paid solely by the lender to whom they represent, and only the Bankruptcy Court approved amount of the Claim shall be added to the principal balance of that lender's loan(s). For the avoidance of doubt, the Debtors will not directly pay any of the Non-Estate Professional Fees approved by the Bankruptcy Court rather the approved Non-Estate Professional Fees will be added to the principal balance(s) of the loan(s) of the lender represented by this Non-Estate Professional.

### L.    Plan Filing & Solicitation Exclusivity

On June 27, 2024, the Debtors filed a *Motion to Extend the Exclusive Period to File their Disclosure Statement and Plan* (Docket No. 467). On July 19, 2024, the Bankruptcy Court entered an *Order Extending the Exclusive Periods* during which the Debtors may file and confirm a plan (Docket No. 507) (the "Order to Extend Exclusivity"). Pursuant to the *Order to Extend Exclusivity*, the Debtors period to file a chapter 11 plan was extended to and including September 30, 2024, and the period for Debtors to solicit ballons on a chapter 11 plan was extended to and including November 29, 2024.

On September 30, 2024, the Debtors filed their *First Plan of Reorganization* and their *Disclosure Statement* (Docket Nos. 640 & 641). The Disclosure Statement Hearing was set for November 21, 2024 (Docket No. 643). On November 11, 2024, the Debtors filed a *Withdrawal of the Disclosure Statement* (the "Withdrawal") (Docket No. 706). The Debtors noted in the Withdrawal, that they are preparing a First Amended Chapter 11 Plan which will require an Amended Disclosure Statement.

On October 11, 2024, Rabo filed a *Motion to Terminate Exclusivity* (the "Motion to Terminate") (Docket No. 670). On November 11, 2024, the Debtors also filed a *Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* (the "Motion to Extend Exclusivity") (Docket No. 707). In their Motion to Extend Exclusivity, the Debtors requested the exclusive period for solicitation of acceptances of the Debtors' plan (as amended) be extended to and including March 31, 2024 (an additional 122 days), which does not extend beyond twenty (20) months after the order for relief.

On November 19, 2024, Debtors, the Committee, Conterra, Metlife, Rabo, Sandton, and the United States Trustee, entered into a *Stipulation* in which the parties agreed that in order to preserve the current exclusive solicitation period pending full review of the Debtors' Motion to Extend Exclusivity and Rabo's Motion to Terminate, the parties agreed that the Bankruptcy Court may extend the current exclusive solicitation period deadline from November 29, 2024 to

38

December 13, 2024 (Docket No. 723). The parties agreed to reset the hearing on the Debtors' Motion to Extend Exclusivity to December 10, 2024.

The hearing on the Motion to Terminate and Motion to Extend Exclusivity was held on December 10 and 11, 2024. On December 17, 2024, the Bankruptcy Court entered an *Order Denying the Motion to Extend Exclusivity* (Docket No. 804). On December 15, 2024, Rabo filed a *Motion to Establish Time for Filing Competing Disclosure Statement and Chapter 11 Plan* (the "Motion to Establish Time") (Docket No. 805). On December 19, 2024, the Debtors filed an *Objection to Rabo's Motion to Establish Time* (Docket No. 816). On December 20, 2024, Rabo and the Debtors entered into a *Stipulation* agreeing to vacate the Debtors' hearing date of January 29, 2025, at 9:00 a.m. (MT) for the Bankruptcy Court to consider the Debtors' Disclosure Statement and reset the hearing on the Debtors' Disclosure Statement and any other disclosure statements to be filed in these cases to March 6 and 7, 2025, at 9:00 a.m. (MT) in person at the U.S. Courthouse, 550 W. Fort Street, Boise, Idaho 83724.

## IV.    SUMMARY OF THE CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the schedules thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, or any other operative document, the terms of the Plan, Confirmation Order, or such other operative document, as applicable, shall govern and control; *provided* that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, in that order, shall govern and control over all other related documents.

### A.    Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents. Classification of Claims and Interests Under the Plan

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.

Under the Plan, Class 2, Class 3, Class 6, Class 7, Class 9, Class 10, Class 11, Class 12, and Class 13 are Impaired, and Holders of Claims or Interests in such Impaired Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan (i.e., Class 14 or a Holder's Claim is subject to an objection filed by the Debtors). Ballots are being furnished herewith to all Holders of Claims in Class 2, Class 3, Class 6, Class 7, Class 9, Class 10, Class 11, Class 12, and Class 13 that are entitled to vote to facilitate their voting to accept or reject the Plan. Class 14 is deemed to reject the Plan, and, therefore, Holders of Claims or Interests in such Class will not vote on the Plan. Class 1, Class 4, Class 5, and Class 15 are Unimpaired under the Plan and therefore deemed to accept the Plan.

### 1.    Classification and Voting Controversies

If a controversy arises regarding whether any Claim is properly classified under the Plan, then the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

### B.    Treatment of Claims and Interests Under the Plan

#### 1.    Unclassified Claims

##### i.    Administrative Claims

Administrative expenses are costs or expenses of administering the Debtors' Bankruptcy

Cases which are allowed under Bankruptcy Code section 507(a)(2). All Persons requesting payment of Administrative Expense Claims, including but not limited to Claims under section 503(b)(9) of the Bankruptcy Code (other than those already allowed by Court order), **shall file a proof of Claim with the Court no later than the Administrative Claims Bar Date, which shall be within or no later than the first Business Day that is at least thirty (30) calendar days after the Effective Date.** The Administrative Claims Bar Date shall not apply to Professional Persons requesting payment of Professional Fee Claims, DIP Loan, or Priority Tax Claims, or to the extent that an Administrative Claim has already been Allowed or paid during the Chapter 11 Cases. Objections to such applications for payment (whether by Professional Persons requesting payment of Professional Fee Claims or Persons requesting payment of Administrative Expense Claims), if any, must be written, filed with the Court, and served on the applicable parties within thirty (30) days after such application or Claim is filed (the "Administrative Claims Objection Deadline").

On August 29, 2024, the Court entered an Order on Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims (Docket Nos. 476 & 584) (the "503(b)(9) Order"). Pursuant to the 503(b)(9) Order, 503(b)(9) Claims in the amount of approximately $5,170,846.56 have been deemed as Allowed 503(b)(9) Claims. Additional 503(b)(9) Claims have been allowed through motions and/or agreements with the Debtors. A full listing of the Allowed 503(b)(9) Claims as of the date of this Plan are included in the Disclosure Statement, totaling $5,258,329.47. To the extent additional 503(b)(9) Claims exist, such Claim Holders shall file a Claim for allowance of their 503(b)(9) Claim by the Administrative Claims Bar Date.

The Debtors or the Reorganized Debtors, as applicable, may object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

Except with respect to Professional Fee Claims, DIP Loan, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases, or a Holder of an Allowed Administrative Claim and the applicable Debtor (or after the Effective Date, such Holder and the Reorganized Debtors) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon the filing of a Proof of Claim on or before the Administrative Claims Bar Date and no objection to that Proof of Claim being filed before the Administrative Claims Objection Deadline. In the

event an Administrative Claim is asserted through a Proof of Claim that is subject to an objection, that Administrative Claim will be paid after entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter.

a. **503(b)(9) Claims**

As noted in section IV(B)(1)(i) above, on August 29, 2024, the Bankruptcy Court entered an Order on Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims (Docket Nos. 476 & 584) (the "503(b)(9) Order"). Pursuant to the 503(b)(9) Order, 503(b)(9) Claims in the amount of approximately $ 5,170,846.56 have been deemed as Allowed 503(b)(9) Claims. Additional 503(b)(9) Claims have been allowed through motions and/or agreements with the Debtors. A full listing of the Allowed 503(b)(9) Claims as of the date of this Plan are included in the Disclosure Statement, totaling $5,258,329.47. To the extent additional 503(b)(9) Claims exist, such Claim Holders shall file a Claim for allowance of their 503(b)(9) Claim by the Administrative Claims Bar Date. The list of 503(b)(9) Claims already deemed Allowed is noted above in section IV(B)(1)(i).

### ii. Professional Fee Claims

Fee Applications. All requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court, pursuant to the fee application procedure set by the Court in its Order Establishing Interim Fee and Expense Reimbursement Procedures (the "Fee Order") (Docket No. 303), and payments shall be made in the ordinary course, upon Court approval, unless otherwise ordered by the Bankruptcy Court.

Non-Estate Professionals. Pursuant to the order approving the Debtor's motion to establish procedures for Bankruptcy Code 506(b) claims, Holders of 506(b) Claims must file, within forty-five (45) days after the Effective Date, either (i) an amended Proof of Claim encompassing the Holder's Professional Fee Claim; or (ii) file a Notice of 506(b) Claim pursuant to the 506(b) claim procedures. Such 506(b) claims submitted as an amended Proof of Claim or through a Notice of 506(b) Claim shall be considered a Professional Fee Claim and subject to the terms of this section 3.1.2. However, these Non-Estate Professional Fees shall be paid solely by the lender to whom they represent, and only the Court approved amount of the Claim shall be added to the principal balance of that lender's loan(s). For the avoidance of doubt, the Reorganized Debtors will not pay any of the Non-Estate Professional Fees approved by the Court directly to the professionals; rather the approved Non-Estate Professional Fees will be added to the principal balance(s) of the loan(s) of the lender represented by the Non-Estate Professional, and paid by the Reorganized Debtors directly to the applicable lender pursuant to the repayment terms of this Plan.

Objections to Professional Fee Claims. Pursuant to the Fee Order, any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of (i) final requests for allowance and payment of Professional Fee Claims; or (iii) a Notice

of 506(b) Claim.

Post Effective Date Fees and Expenses. Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors and the Reorganized Debtors, as applicable.

### C.    Priority Tax Claims

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

| Priority Tax Claimant | Allowed Priority Amount |
|---|---|
| Cassia County Tax Collector | $59,591.88 |
| Department of Treasury | $1,752.63 |
| Idaho State Tax Commission | $5,612.20 |

### D.    DIP Loan

The outstanding DIP Loan as of the Effective Date will be $22.939 ± million.  The DIP Loan and/or DIP Loan Documents shall be modified as follows:

1) The DIP Lender shall receive a 2% extension fee to be added to the loan balance as of the Effective Date.

2) The DIP Lender shall receive PIK interest at 15% per annum on a monthly basis.

3) The DIP Lender shall receive one payment of at least $12.931 million in or before November 2025 from the sale proceeds of Canyonlands and McGregor, followed by five monthly payments in the amount $2.4 million beginning in March 2026, with a final payment of all outstanding amounts due in an estimated amount of $1.495 million in August 2026, pursuant to the Budget.

4) The default rate, pursuant to the DIP Loan Agreement, will be replaced

by a default fee of 4% of the outstanding balance at the date of default.

5) The 1.5% exit fee, pursuant to the DIP Loan Agreement, will be replaced by a 1.0% exit fee.

### E.    Class 1: Other Priority Claims

Classification. Class 1 consists of all Other Priority Claims against each Debtor. There are no known Other Priority Claims.

Treatment. Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).Voting. Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

Voting. Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### F.    Class 2: Corn Silage Group Secured Claims

Classification. Class 2 is classified as the Corn Silage Group Secured Claims which consists of the Corn Silage Group Secured Creditors: Ed Chonjnacky, Michael Chonjnacky, Dusty Brow Farms, Inc., Grant 4-D Farms, LLC, Grant & Hagan, Inc., Douglas J. Grant, Hollifield Ranches, Inc., Standing 16 Ranch Land Company, LLC, Star Falls Farms, LLC, Steel Ranch, LLC, Bo Stevenson dba B&A Farms, Alexander K. Reed, Triple C Farms, LLC, Clint D. Thompson, and Jean L. Thompson.

| Claimant | Allowed Claim Amount |
|---|---|
| Ed Chonjnacky | $312,330.00 |
| Michael Chonjnacky | $393,753.60 |
| Dusty Brow Farms, Inc. | $245,000.00 |
| Grant 4-D Farms, LLC | $396,601.71 |
| Grant & Hagan, Inc. | $604,551.60 |

| | |
|---|---|
| Douglas J. Grant | 222,617.06 |
| Hollifield Ranches, Inc. | $2,044,794.31 |
| ...nding 16 Ranch Land Company, LLC | $526,454.40 |
| Star Falls Farms, LLC | $404,878.00 |
| Steel Ranch, LLC | $160,000.00 |
| Bo Stevenson dba B&A Farms | $195,478.80 |
| Alexander K. Reed | $130,674.66 |
| Triple C Farms, LLC | $1,011,955.80 |
| Clint D. Thompson | $49,000.00 |
| Jean L. Thompson | $38,000.00 |

Treatment. The Corn Silage Group Secured Claims have been paid in full as of the Effective Date pursuant to monthly adequate protection payments, except as to any pre- and post-petition interest and attorneys' fees associated with their Claims, which are estimated to be in the amount of approximately $639,536.05.  The Corn Silage Group Secured Claim Holders shall provide to the Debtors no later than fifteen (15) Business Days before the Effective Date a statement of accrued interest, and shall comply with the professional fee procedures outlined in part 3.1.2 of this Plan. Such interest and any allowed attorneys' fees shall be paid, pursuant to the Budget, with monthly payments at 5% per annum interest in the amount of approximately $80,000.00 through January 2026.  The Corn Silage Group Secured Claims Liens shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

Voting. Class 2 is Impaired under the Plan. Each Holder of Class 2 Claims is entitled to vote to accept or reject the Plan.

### G.   Class 3: Outstanding Other Secured Claims

Classification. Class 3 is classified as Outstanding Other Secured Claims which consists of Allowed Secured Claims of the following Secured Creditors: A. Scott Jackson Trucking, CNH, Kenworth Sales Company, Kraus Farms, LLC, Les Schwab Tire Centers of Idaho, LLC, MWI Veterinary, Performance Plus-Idaho, LLC, Standlee Ag Resources and Premium Products, and Youree Land & Livestock.

| **Claimant** | **Allowed Class 3 Claim Amount** | **Non-503(b)(9) Amount Owed as of** | **503(b)(9) Claim Amount** |
|---|---|---|---|
| | | | |

| | | the Effective Date[3] | |
|---|---|---|---|
| A. Scott Jackson Trucking | $184,656.30 | $184,656.30 | |
| CNH[4] Productivity Plus BP 373203 | $141,091.88 | $141,091.88 | |
| CNH Productivity Plus MC 373662 | $207,310.38 | $207,310.38 | |
| Kenworth Sales Company | $49,359.77 | $682.02 | |
| Kraus Farms, LLC | $499,473.53 | $499,473.53 | |
| Les Schwab Tire Centers of Idaho, LLC | $226,612.58 | $199,968.61 | $26,643.97 |
| MWI Veterinary | $1,579,172.28. | $1,079,045.14 | $484,255.92 |
| Performance Plus-Idaho, LLC | $29,931.44 | $29,931.44 | |
| Standlee Ag Resources and Premium Products | $214,915.55 | $6,425.55 | |

Treatment. Some of the Class 3 Claimants have received post-petition adequate protection payments during the bankruptcy. As such, the amounts owed to such Claimants as of the Effective Date are listed above. Some of the Class 3 Claimants also have separate 503(b)(9) Claims which will be paid as an Administrative Claim pursuant to section 3.1.1 of the Plan.

Voting. Class 3 is Impaired under the Plan. Each Holder of a Class 3 Claim is entitled to Vote under the Plan.

H.    Class 4: Other Secured Claims Paid in Full

Classification. Class 4 is classified as Other Secured Claims Paid in Full which consists of the Allowed Secured Claims of the following: B&H Farming, Eagle Creek Northwest, LLC,

---

[3] Some of the Class 3 Outstanding Other Secured Claimants received adequate protection payments prior to the Effective Date. This is the amount they are owed as of the Effective Date.

[4] CNH filed Proofs of Claim in the total aggregate amount of $17,915,944.14. CNH has received and will receive post-petition adequate protection payments prior to the Effective Date. The CNH Productivity Plus Loans are being treated in Class 3 as Allowed Class 3 Claims. The CNH Equipment Leases and Equipment Loans are being treated in Class 5, and CNH shall continue to be paid in accordance with the provisions of the pre-petition contracts.

Healthy Earth Enterprises, LLC, H&M Custom, LLC, Milner Hay Company, Moss Grain Partnership, PerforMix Nutrition Systems, Staker & Parson Company d/b/a Idaho Materials and Construction, Tyche Ag, LLC, and Wada Farms Partnership.

| Claimant | Court Approved Adequate Protection Payments Received Prior to Effective Date |
|---|---|
| B&H Farming | $474,674.79 |
| Eagle Creek Northwest, LLC[5] | $0 (no amount owing as of Petition Date) |
| Healthy Earth Enterprises, LLC | $60,000.00 |
| H&M Custom, LLC | $4,769,170.78 |
| Milner Hay Company | $64,885.00 |
| Moss Grain Partnership | $101,000.00 |
| PerforMix Nutrition Systems | $213,744.20 |
| Staker & Parson Company d/b/a Idaho Materials & Construction | $48,207.17 |
| Tyche Ag, LLC[6] | $0 (no amount owing as of Petition Date) |
| Wada Farms Partnership | $374,432.50 |

Treatment. The Allowed Class 4 Other Secured Claims have received adequate protection payments in the full amount of their Allowed Secured Claims prior to the Effective Date . As such, the Allowed Class 4 Other Secured Claims Paid in Full shall receive no further Distribution under

---

[5] The Debtors Scheduled Eagle Creek Northwest, LLC as an unknown secured claim based on financing statements filed by Eagle Creek claiming a security interest in the Debtors' wheat, hay, potatoes, and sugar beets. The Debtors have concluded there is no amount owing to Eagle Creek as of the Petition Date and Eagle Creek did not file a Proof of Claim. As such, Eagle Creek will not receive a Distribution under the Plan.

[6] The Debtors Scheduled Tyche Ag, LLC as an unknown secured claim based on financing statements filed by Tyche claiming a security interest in the Debtors' 2023 hay. The Debtors have concluded there is no amount owing to Tyche as of the Petition Date and Tyche did not file a Proof of Claim. As such, Tyche will receive no Distribution under the Plan.

the Plan. Any pre-petition liens claimed by the Allowed Class 4 Claimants in property of the Debtors shall be considered released and have no further effect.The Allowed Class 4 Secured Claim shall receive the following treatment:

Voting. Class 4 is Unimpaired under the Plan. Class 4 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

## I.    Class 5: Secured Equipment Loan and Lease Claims

Classification. Class 5 consists of the CNH Equipment Loans and Equipment Lease Claims (the "CNH Equipment Loans and Leases"), Daimler Truck Financial Services USA LLC ("Daimler") Secured Claim, the Farmers Bank Secured Claims, and the John Deere Construction & Forestry ("John Deere") Loan Claims.

Treatment.  CNH filed Proofs of Claim in the total aggregate amount of $17,915,944.14. The CNH Equipment Leases and Equipment Loans Proofs of Claim total an aggregate of $17,567,541.90 and CNH shall have an Allowed Class 5 Claim in the amount of $12,272,616.80. The CNH Productivity Plus Credit Lines are being treated in Class 3.

| CNH POC # | POC Amount | Document | Collateral |
|---|---|---|---|
| Claim 110 | $1,980,095.12 | Equipment Lease 765512 | 6 Magnum Tractors |
| Claim 111 | $2,438,189.14 | Equipment Lease 765542 | 4 Case Steigers & Remotes |
| Claim 112[7] | $5,294,925.12 | Equipment Lease 210982 | 26 Magnum Tractors |
| Claim 113 | $4,796,579,94 | Equipment Lease 765784 | 16 Magnum Tractors |
| Claim 114 | $2,587,321.81 | Equipment Loan 765552 | 30 Case Maxxum Tractors |
| Claim 115 | $470,430.75 | Equipment Loan 765530 | 25 Kubota Tractors |

Daimler filed a Proof of Claim in the amount of $1,534,278.22 and has an Allowed Secured Class 5 Claim in the amount of $1,534,278.22.

---

[7] Claim 112 has been paid in full.

| **DAIMLER POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 101 | $1,534,278.22 | PT126DC Freightliners |

Farmers Bank filed Proofs of Claim totaling $2,474,927.97 and Farmers Bank has an Allowed Secured Class 5 Claim in the amount of $2,437,741.27.

| **FARMERS BANK POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 35 | $294,173.07 | 2024 Ram Pickups |
| Claim 36[8] | $10,975.50 | Con-Dor Peecon 1700 Feed Mixer |
| Claim 37 | $96,225.11 | 2021 Ram Pickups |
| Claim 38[9] | $26,211.20 | Nuhn Alley Vac Manure Wagon 7000 Gal Tank |
| Claim 39 | $269,908.99 | Caterpillar Diesel Generators |
| Claim 40 | $280,789.94 | Caterpillar Diesel Generators |
| Claim 41 | $140,596.63 | SmithCo Side Dump Trailers |
| Claim 42 | $166,267.09 | 2022 Ram Pickups |
| Claim 43 | $132,902.49 | Con Dor Peecon 1700 Feed Mixer |
| Claim 44 | $56,558.60 | 2022 Mahindra UTB |
| Claim 45 | $1,000,364.26 | Equipment Line of Credit |

John Deere filed Proofs of Claim totaling an amount of $717,170.78, and John Deere has an Allowed Class 5 Claim in the amount of $717,170.78.

| **JOHN DEERE POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 21 | $121,475.50 | Hamm 10i Compactors |
| Claim 22 | $151,965.48 | Hamm 121 P |

---

[8] Claim 36 has been paid in full.
[9] Claim 38 has been paid in full.

| Claim 23 | $69,597.45 | John Deere 50G Compact Excavator |
| Claim 24 | $69,957.45 | John Deere 50G Compact Excavator |
| Claim 25 | $187,368.29 | 2023 John Deere 650P-Tier Utility Dozer |
| Claim 26 | $116,806.61 | John Deere 320 P-Tier Backhoe Loader |
| Claim 27 | $232,035.91 | 2023 John Deere 135 P-TIER Backhoe Loader AND 2023 John Deere EC13 QS60 COMPLETE SYSTEM W/ 2 BUCKETS |

CNH (Equipment Leases and Loans), Daimler, Farmers Bank, and John Deere have received and will receive post-petition adequate protection payments before the Effective Date.

Except to the extent CNH and the Debtors, Daimler and the Debtors, Farmers Bank and the Debtors, or John Deere and the Debtors, agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 5 Claim, CNH, Daimler, Farmers Bank, and John Deere shall continue to be paid in accordance with the provisions of the pre-petition contracts with Debtors. For the loan and lease payments, CNH receives approximately $197,316.00 per month, Daimler receives approximately $63,926.00 per month, Farmers Bank receives approximately $97,705.82 per month, and John Deere receives approximately 26,542.87 per month.

The Allowed Class 5 Claimants' Liens shall retain the same validity, perfection, priority, and extent as existing on the Petition Date.

Voting. Class 5 is Unimpaired under the Plan. Class 5 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

## J.    Class 6: John Deere Financial Secured Claim

Classification. Class 6 consists of the John Deere Financial, f.s.b ("John Deere Financial") Secured Claim.

Treatment.  John Deere Financial filed a Proof of Claim in the amount of $119,606.55. John Deere Financial shall have an Allowed Class 6 Secured Claim in the amount of $119,606.55.

| **JOHN DEERE FINANCIAL POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 20 | $119,606.55 | Cross Collateralized Loan with all Deere Loans/Collateral |

Except to the extent John Deere Financial and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 6 Claim, John Deere Financial shall receive the following treatment:

1) John Deere Financial shall be paid monthly payments at 15.15% per annum interest through January 2026, pursuant to the Budget.

2) The John Deere Financial Secured Claim Lien shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

Voting. Class 6 is Impaired under the Plan. Class 6 is entitled to Vote under the Plan.

### K.    Class 7: Western States Cat Secured Claim

Classification: Class 7 consists of the Western States Cat ("Western States") Secured Claim.

Treatment. The Debtors Scheduled Western States as a secured claim in the amount of $688,964.59.  Western States has received post-petition adequate protection payments in the amount of $596,071.02 prior to the Effective Date.

On May 22, 2024, the Bankruptcy Court approved the Debtors' assumption of the Western States rental agreement when it issued its Final Order (A) Granting Motion to Condition Use of WSECO's Equipment on Receipt of Adequate Protection, and (B) Granting Debtor's Motion for Order Authorizing the Debtor to Assume Unexpired Lease (Docket. No. 314). The rental agreement expired on June 30, 2024.  Upon the return of the rented equipment after the expiration of the rental agreement, Western States notified Debtors it was owed approximately $244,994.48 due to damage to the rented equipment and other repairs.  As such, Debtors made a post-petition payment to Western States in the amount of $244,994.48 pursuant to the rental agreement.

 Western States later presented an updated actual expense itemization, asserting that the Debtors owed an additional administrative claim for an amount at or higher than $57,000.00. Western States has agreed to accept $40,000.00 as payment in full and final satisfaction and discharge of and in exchange for such Allowed Class 7 Claim. Western States shall be paid a lump sum payment in the amount of $40,000.00 on or before 90 days after the Effective Date.

<u>Voting</u>. Class 7A is Impaired under the Plan and is entitled to Vote under the Plan.

**L.** **Class 8: Rexel USA, Inc. d/b/a Platt Electric Supply Claim**

<u>Classification</u>. Class 8 consists of the Rexel USA, Inc. d/b/a Platt Electric Supply ("Platt") Claim.

<u>Treatment</u>. Platt filed a Proof of Claim in the secured amount of $504,414.02. The Proof of Claim is Disputed and the Debtors will be filing an objection to the full amount of the Proof of Claim.  Until resolution of the objection to Platt's Proof of Claim, the Platt Secured Claim Lien shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

<u>Voting</u>. Class 8 Claims are Disputed and are not entitled to Vote under the Plan.

**M.** **Class 9: Metlife Secured Claims**

<u>Classification</u>. Class 9 consists of MetLife's Secured Claims.

<u>Treatment</u>. MetLife filed Proofs of Claim in the aggregate amount of $181,376,198.66. The obligations owed pursuant to the MetLife Loans shall be treated as fully secured for all purposes in this case including, but not limited to, 11 U.S.C. § 506(b). MetLife shall have an allowed secured claim in the Debtors' bankruptcy cases for the balance due under the MetLife Loans, as of April 2, 2024, in the amount of $181,376,198.66 (the "MetLife Claim"). Pursuant to agreement of the Parties, the MetLife Claim shall continue to accrue interest (per the terms herein) and together with all fees and expenses incurred by MetLife after April 2, 2024, will become fully due and payable at Maturity as defined in the underlying loan documents. Any post-petition Professional Fees as allowed by the Court pursuant to the professional fee disclosures outlined in part 3.1.2 above, shall be added pro rata/evenly to Metlife's loan balances.

The Allowed Class 9 Secured Claim shall receive the following treatment:

**<u>Promissory Notes A, B. & C</u>**

    1) Interest-only payments at 7% per annum until December 2027.  The terms of Promissory Notes A, B, & C shall otherwise remain the same, except as otherwise outlined in this Plan.

    2) In December 2027, Metlife shall begin receiving monthly principal and interest payments on Promissory Notes A, B, & C pursuant to the

Budget.

3) Promissory Notes A, B, & C shall be reamortized to original maturity of August 15, 2038. Promissory Notes A, B, & C will be paid in full through the original ballon payment on August 15, 2038.

## Promissory Note D

1) Interest-only payments at 7% per annum until December 2027. The terms of Promissory Note D shall otherwise remain the same, except as otherwise outlined in this Plan.

2) In December 2027, Metlife shall begin receiving monthly principal and interest payments on Promissory Note D pursuant to the Budget.

3) Promissory Note D will reamortize to original maturity of March 15, 2041. Promissory Note D will be paid in full through the original balloon payment on March 15, 2041.

## Promissory Note E

1) Interest-only payments at 7% per annum until December 2027.  The terms of Promissory Note E shall otherwise remain the same, except as otherwise outlined in this Plan.

2) In December 2027, Metlife shall begin receiving monthly principal and interest payments on Promissory Note E pursuant to the Budget.

4) Promissory Note E will reamortize to original maturity of March 15, 2028. Promissory Note E will be paid in full through the original balloon payment on March 15, 2028.

## 9858 Promissory Note

1) Interest-only payments at 7% per annum following the Effective Date until the sale of Canyonlands and McGregor, when the 9858 Promissory Note will be paid in full.  The terms of the 9858 Promissory Note shall otherwise remain the same, except as otherwise outlined in this Plan.

Until such time as the MetLife Claim in the Debtors' bankruptcy cases is paid in full, MetLife shall retain its liens on the MetLife Collateral as contemplated by 11 U.S.C. § 1129(b)(2)(A)(i)(I), except as subordinated pursuant to the DIP Order.

Effective upon confirmation of the Debtors' Plan, the Debtors and the Guarantors will reaffirm its/their obligations under the Loan Documents and MetLife's security interests in the MetLife Collateral and execute all documentation required by MetLife to substantiate and memorialize the final terms of treatment and repayment of the MetLife Claim including, but not limited to, an omnibus amendment to the existing loan documents subject to the approval of MetLife in its sole discretion.

Voting.  Class 9 is Impaired under the Plan. Class 9 is entitled to Vote under the Plan.

### N.   Class 10: Rabo Secured Claims

Classification. Class 10 consists of Rabo's Secured Claims.

Treatment. On June 7, 2024, Rabo filed a Proof of Claim in the amount of $96,143,211.38. On November 25, 2025, Rabo filed an Amended Proof of Claim in the amount of $96,469,917.04.

Amended Proof of Claim Amount:

Principal:  $88,950,202.73
Pre-Petition Interest (as of April 2, 2024): $149,105.24
Post-Petition Interest (as of October 31, 2024): $2,751,368.26
Pre-Petition Professional Fees: $1,255,548.19
Post-Petition Professional Fees (as of October 31, 2024): $3,357,410.62
Unused Commitment Fee: $6,280.00
TOTAL: $96,469,917.04

The Debtors and Rabo conducted a reconciliation of Rabo's Claim amount as of the Petition Date and determined the amount owing to Rabo as of the Petition Date was $90,361,000.00. The Debtors dispute Rabo's default interest and pre- and post-petition professional fee amounts. Rabo shall provide the Debtors no later than fifteen (15) Business Days before the Effective Date a calculation of its post-petition interest.

Any Professional Fees as agreed to by the Debtors, or approved by the Court, shall be added to Rabo's loan balance, and will be subject to the procedures outlined in section 3.1.2 of the Plan.

Rabo shall receive the following:

1) Interest-only payments, payable on a monthly basis, at the rate of 8.5% per annum following the Effective Date until Rabo receives payment in full.

2) Once Sandton is paid in full, which is anticipated to be August 2026,

Rabo will also receive monthly principal payments in the amount of $1,350,000.00 per month, pursuant to the Budget. The Debtors estimate Rabo will receive an approximately 30% principal paydown from the Effective Date until April 30, 2028.

3) On May 31, 2028, Rabo shall receive payment in full of the remainder of its Allowed Class 10 Secured Claim.

The Pre-Petition RLOC Liens shall retain the same validity, perfection, and priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

Voting. Class 10 is Impaired under the Plan. Class 10 is entitled to Vote under the Plan.

## O.    Class 11: Conterra German Note Secured Claim

Classification. Class 11 consists of Conterra's German Note Claim.

Treatment. German Note Proof of Claim Amount:

Unpaid Principal: $2,508,860.41

Accrued Interest through 4/2/24: 67,867.67

Total unpaid balance as of 4/2/24: $2,576,728.08

Conterra has an Allowed Class 11 Secured Claim in the amount of $2,576,728.08, plus professional fees and costs allowed by the Court pursuant to section 3.1.2 of this Plan. Any post-petition Professional Fees as agreed to by the Debtors, or approved by the Court, shall be added to the loan balance.

The obligations owed pursuant to the Conterra German Note shall be treated as fully secured for all purposes in this case including, but not limited to, 11 U.S.C. § 506(b). Conterra shall have an Allowed Secured Claim in the Debtors' bankruptcy cases for the balance due under the German Note, as of April 2, 2024, in the amount of $2,576,728.08 (the "Conterra German Note Claim"). Pursuant to agreement of the Parties, the Conterra German Claim shall continue to accrue interest (per the terms herein).

The Allowed Class 11 Secured Claim shall receive the following treatment:

1) Interest-only payments, payable on a monthly basis, at the rate of 10.25% per annum following the Effective Date until the German Note receives payment in full.

2) Once Sandton is paid in full, which is anticipated to be August 2026,

Conterra will receive monthly principal payments on the German Note in the amount of $40,000 per month, pursuant to the Budget. The Debtors estimate that Conterra will receive an approximately 30% principal paydown from the Effective Date until April 30, 2028.

3) On May 31, 2028, Conterra shall receive payment in full of the remainder of its Allowed Class 11 Secured Claim.

Until such time as the Conterra German Note Claim in the Debtors' bankruptcy cases is paid in full, Conterra shall retain its liens on the Conterra German Collateral as contemplated by 11 U.S.C. § 1129(b)(2)(A)(i)(I), except as subordinated pursuant to the DIP Order.

<u>Voting.</u>  Class 11 is Impaired under the Plan. Class 11 is entitled to Vote under the Plan.

### P.  Class 12: Conterra Mezz Loan Claim

<u>Classification.</u> Class 12 consists of Conterra's Mezz Loan Claim.

<u>Treatment.</u>

<u>Mezz Loan Proof of Claim Amount:</u>

Unpaid Principal: $16,500,000.00

Accrued Interest through 4/2/24: $1,457,810.41

Late Fees: $830,614.58

Reimbursable Expenses: $95,840.53

Total unpaid balance as of 4/2/24: $18,884,265.52

Conterra has an Allowed Class 12 Secured Claim in the amount of $18,884,265.52, plus professional fees and costs upon pursuant to section 3.1.2 of this Plan.

The obligations owed pursuant to the Conterra Mezz Loan shall be treated as fully secured for all purposes in this case including, but not limited to, 11 U.S.C. § 506(b). Conterra shall have an Allowed Secured Claim in the Debtors' bankruptcy cases for the balance due under the Conterra Mezz Loan, as of April 2, 2024, in the amount of $18,884,265.52 (the "Conterra Mezz Loan Claim"). Pursuant to agreement of the Parties, the Conterra Mezz Loan Claim shall continue to accrue interest (per the terms herein).

The Allowed Class 12 Secured Claim shall receive the following treatment:

1) Interest-only payments at 15.00% per annum following the Effective Date until the Conterra Mezz Loan receives payment in full. The interest payments shall be split, with 10.25% being paid in cash on a monthly basis and 4.75% PIK.

2) Once Sandton is paid in full, which is anticipated to be August 2026, Conterra will receive monthly principal payments on the Conterra Mezz Loan in the amount of $440,000 per month, pursuant to the Budget. The Debtors estimate that Conterra will receive a 30% principal paydown on the Conterra Mezz Loan from the Effective Date until April 30, 2028.

3) On May 31, 2028, Conterra shall receive payment in full of the remainder of its Allowed Class 12 Secured Claim.

Until such time as the Conterra Mezz Loan Claim in the Debtors' bankruptcy cases is paid in full, Conterra shall retain its liens on the Conterra Mezz Collateral as contemplated by 11 U.S.C. § 1129(b)(2)(A)(i)(I), except as subordinated pursuant to the DIP Order.

Voting. Class 12 is Impaired under the Plan. Class 12 is entitled to Vote under the Plan.

## Q.    Class 13: General Unsecured Claims

Classification. Class 13 consists of all General Unsecured Claims, in the approximate amount of $28 million (the "GUC Principal Amount"). A full listing of the General Unsecured Claims and amounts of each Claim is attached hereto as Exhibit D.

Treatment. The Holders of Class 13 Claims shall receive the following treatment under the Plan:

1) After the Effective Date, at the end of each calendar quarter through April 2028, Class 13 Claimants shall receive interest-only payments based on their outstanding balance at 5% per annum.

2) In May 2028, Class 13 Claimants shall receive monthly interest payments based on their outstanding balance at 5% per annum.

3) In May 2028, Class 13 Claims shall receive a single principal payment equal to 5/24 of the principal balance owed to Class 13, followed by 19 principal payments equal to 1/24 of the principal balance owed to Class 13, paid on a monthly basis after May 2028.

The Holders of Class 13 Claims shall be paid 100% of their Claims in full and final satisfaction through the foregoing payment schedule by December 2029.

Voting. Class 13 is Impaired under the Plan. The Holders of Class 13 Claims are entitled to Vote under the Plan.

## R.      Class 14: Intercompany Claims

Classification. Class 14 consists of all Intercompany Claims.

Treatment. On the Effective Date, all Intercompany Claims shall be extinguished. Holders of Intercompany Claims will receive no Distributions under the Plan.

Voting. Each Holder of a Class 14 Claim will be deemed to have rejected this Plan and, therefore, are not entitled to vote on this Plan.

## S.      Class 15: Equity Interests

Classification. Class 15 consists of all Equity Interests in the Debtors.

Treatment.  Each Debtors' pre-petition equity interests shall remain the same post-petition. Class 15 Claim Holders are retaining ownership interests in the Debtors.

Voting. Class 15 is Unimpaired under the Plan. Class 15 is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

## T.      Special Provisions Regarding Unimpaired Claims

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or otherwise Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or otherwise Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights and defenses with respect to any Reinstated Claim or otherwise Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### U.    Good Faith

Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all of their respective Related Parties have acted in good faith in connection therewith.

### V.    Debtors' Releases and Related Matters

**On the Effective Date and to the fullest extent authorized by applicable law, the Released Parties and their respective property will be expressly, unconditionally, generally, individually, and collectively released, acquitted,  and discharged by the Debtors on behalf of themselves, their estates, the Reorganized Debtors, for the good and valuable consideration provided by each of the Released Parties, from any and all actions, claims, debts, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative or deficiency claims asserted or that could be asserted by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by state law (including Idaho State partnership law), statute, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, any of the Debtors' present or former assets, the Released Parties' interests in or management of the Debtors, this Plan, the Disclosure Statement, these Chapter 11 Cases, including those that the Debtors, the Reorganized Debtors would have been legally entitled to assert or that any Holder of a Claim against or interest in the Debtors or any other Entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their Estates; *provided*, *however*, that the foregoing Debtors' Releases shall not operate to waive or release any Claims or Causes of Action of the Debtors or their Estates against a Released Party arising under any contractual obligation owed to the Reorganized Debtors that is entered into pursuant to this Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' Releases set forth in Section 10.1.1 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtors' Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the Debtors' Releases; (3) in the best interests of the Estates and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and**

opportunity for hearing; and (6) a bar against any of the Estates, the Post-Effective Date Debtors, asserting any Claim or Cause of Action released pursuant to the Debtors' Releases

### 1.      Conditional Release of Debtors

Except as otherwise provided in the Plan, no Debtor and/or any such Debtors' parent, subsidiaries, affiliates, related Entities, officers, directors, agents and/or employees shall be released and/or discharged of any liabilities under the Plan except as specifically provided in the Plan. Consequently, except as specifically provided in the Plan, all Debtors shall remain liable to the extent presently provided under any applicable law with respect to any claims against any such Entities.

Upon consummation of the Liquidation Process, upon certification of the Plan Administrator that the Debtors collaborated fully and in good faith with the Liquidation Process, all Debtors shall be released from liability, claims and causes of action through the Confirmation Date.

### 2.      Exculpation and Limitation of Liability

The Exculpated Parties will neither have nor incur any liability to any entity for any claims or Causes of Action arising on or after the Petition Date and prior to the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases,  (ii) any sales contemplated in connection with the Plan, (iii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of this Plan, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Disclosure Statement, (iv) any other post-petition act taken or omitted to be taken in connection with or in contemplation of Confirmation of this Plan, or (v) the approval of the Disclosure Statement and Plan or Confirmation or Consummation of the Plan, *provided*, *however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct.  The foregoing provisions shall also not apply to malpractice liability of legal professionals.

### 3.      Released Lenders: Conterra, Metlife, and Sandton

Release of Claims.  Effective upon confirmation of the Debtors' Plan, the Debtors and the Guarantors in connection with the omnibus amendment to the existing loan documents as recited above will release Conterra, MetLife, and Sandton (collectively, "Released Lenders")  from any and all claims held, as of the date of confirmation, by or on behalf of the Debtors and/or the Guarantors (including claims relating to the validity and avoidability of the liens held by those

parties), except as modified by this Plan.

## W.    MEANS FOR IMPLEMENTATION OF PLAN

### 1.    Substantive Consolidation

For purposes of the Plan only, all remaining Assets and liabilities of the Debtors shall be deemed the Assets and liabilities of a single consolidated entity. On the Effective Date: (a) all Assets (and all proceeds thereof) and liabilities of each Debtor shall be merged or treated as though they were merged into and with the Assets and liabilities of the other Debtors, (b) no Distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (c) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated and extinguished so that any Allowed Claim against any Debtor and guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed against any Debtor shall be filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of the other Debtors. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the pre-petition legal and corporate structures of the Debtors, or the legal title ownership of any assets owned by the separate Debtors. Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for Plan purposes.

### 2.    Restructuring Transactions

On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring

Transactions.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 3.      Sources of Consideration for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions under the Plan with Cash on hand from ongoing business operations, the net sale proceeds from the sale of Canyonlands and McGregor, and the proceeds from the Refinancing Facility.

### 4.      Sale of Real Estate

On or before the Effective Date, the Reorganized Debtors shall employ a broker to market and sell Canyonlands and McGregor for fair market value and for no less than the appraised value of each.  The sale shall close no later than November 30, 2025.  Canyonlands was appraised in June of 2024 at $16,000,000.  McGregor was appraised in June of 2024 at $4,500,000. The net sale proceeds after normal and customary closing costs, shall be distributed first to Metlife in the amount of $5 million plus any allocated Non-Estate Professionals fees and then the remaining balance, less $2 million, to Sandton. The $2 million shall be allocated to pay the tax consequences of the sale and any amounts leftover, once the final tax amount is determined, shall remain cash of the Debtors. The Reorganized Debtors shall file a report of sale with the Court upon closing of the sale transaction for Canyonlands and McGregor.  If the Reorganized Debtors are able through sale of equity or otherwise, to infuse cash into the Reorganized Debtors without raising the debt burden in order to make the timely required payments to Sandton and MetLife described above, the Reorganized Debtors shall not be required to sell the Canyonlands and McGregor properties.  In the event funds can be raised through the sale or borrowing against equity, Rabo shall release its lien on said equity. Claims, payment of the Conterra German Note, an initial payment to Rabo, and operating Cash.

### 5.      Refinancing

On May 31, 2028, the Debtors shall have closed on refinancing to pay Rabo and Conterra in full and final satisfaction of their Allowed Class 10, 11, and 12 claims as well as comply with the rest of the terms of the Plan.

### 6.      Plan Administrator

Upon Default under Section 12.2 of the Plan, or as otherwise required by the terms herein,

the Plan Administrator, in cooperation and coordination with the Sales Advisors, will administer the Liquidation Process, including valuing assets, marketing them for sale, managing proceeds, and distributing funds to creditors according to the confirmed Plan and pursuant to the specific process outlined below.

### 7.    Liquidation Process

The Liquidation Process of the Reorganized Debtors will commence, on the earliest of: (i) an uncured timely default pursuant to this Plan,  (ii) the Reorganized Debtors failure to secure an executed definitive term sheet by February 28, 2028 for the Refinancing Facility required under section 5.5 of the Plan, or (iii) the failure of the Reorganized Debtors to have closed, including funding, on the Refinancing Facility by May 31, 2028.

### 8.    Sales Advisors

Upon commencement of the Liquidation Process, the Plan Administrator shall retain Schuil Ag Real Estate, Inc. ("Schuil") and Overland Stock Yard ("Overland") (collectively, "Sales Advisors") as professionals to work with the Plan Administrator to sell all of the Reorganized Debtors assets.

### 9.    Sale Process

Initially the Plan Administrator in coordination and cooperation with the Sales Advisors shall pursue a sale of all of the Reorganized Debtors' business operations as a going concern.  If the going concern sale process is unsuccessful then the Plan Administrator in coordination and cooperation with the Sales Advisors shall conduct an organized liquidation of all of the Reorganized Debtors' assets.

### 10.    Going Concern

In connection with the Going Concern Sales Process, the Sales Advisors upon commencement of the Liquidation Process will gather specific information related to the Reorganized Debtors' ongoing business operations, including but not limited to financial statements, herd performance and health data, surveys, environmental reports, third party water reports, employee data, fixed asset and real property listings, and farming data ("Diligence Information") and use such information to prepare an information memorandum that will be used to convey such information to prospective purchasers in connection with the sale  ("Information Book").  The Information Book will be discussed with and approved by the Plan Administrator before distribution to any prospective purchasers and will be completed no later than May 31, 2028.  Simultaneously, the Sales Advisors will prepare a list(s) of potential purchasers ("Potential Purchasers") and present it to the Plan Administrator for approval. On June 1, 2028, if the Reorganized Debtors have failed to obtain the Refinancing Facility, the Sales Advisors will contact

approved Potential Purchasers who have been approved by the Plan Administrator to solicit their interest in the sale and provide them with the Information Book and Diligence Information. The Sales Advisors and Plan Administrator will organize, implement and participate in a negotiating process with the approved Potential Purchases, including participating in due diligence visits and meetings with the objective of entering into a letter of intent for the sale of the business operations as a going concern by no later than November 30, 2028 with the closing of such sale by December 31, 2028.

### 11.    Asset Sale

Should the going concern sale process outlined above not result in a letter of intent or signed term sheet that is acceptable to the Plan Administrator, Sales Advisors and supported by the Secured Lenders or order of the Court on or before November 30, 2028 or a closing of such sale by December 31, 2028, then and in either event, the Plan Administrator in cooperation with the Sales Advisors and any other required professionals will orchestrate and conduct an orderly liquidation to sell all of the Debtors' assets in accordance with the specific processes and the temporal milestones to be provided by the Plan Administrator and Sales Advisors. Such process and milestones will include an orderly culling of the herd and sale of individual parcels of real property and may ultimately conclude with auction(s) of the herd, equipment, other personal property and real estate no later than March 31, 2029. In the event a Refinancing Facility is secured and funded by May 31, 2028, the going concern sale or asset sale shall cease immediately. In any event, no asset sales shall move forward to close until after May 31, 2028.

### 12.    Costs of Sale

The Debtors shall be responsible for all due diligence requirements (e.g., surveys, environmental reports, third party water reports, third party cattle health reports, etc.) necessary to support any sale process and as identified and requested by the Plan Administrator and the Sales Advisors.

Under either approach, the Sales Advisors will be compensated via a sliding scale success fee commission and not out of the working capital of the Debtors. The Plan Administrator will be compensated via a sliding scale success similar to Chapter 11 Trustee fees and not out of the working capital of the Reorganized Debtors. Notwithstanding the foregoing, any reasonable expenses necessary for the sale or to maintain the operations and preserve the assets shall be reimbursed as they are incurred out of the working capital of the Reorganized Debtors.

The proceeds of all sales of the Collateral, after payment of fees due to the Sales Advisors, the Plan Administrator, or any other professional hired to assist with the sale, and normal and customary closing costs, expenses and prorations, shall be paid in accordance with lien priority.

### 13.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all the Debtors' Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, the Reorganized Debtors may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 14.    Authority

The Reorganized Debtors shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

a.    review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

b.    calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

c.    retain, compensate, and employ professionals and other Persons to represent the Reorganized Debtors with respect to and in connection with its rights and responsibilities;

d.    establish, maintain, and administer documents and accounts of the Debtors or Reorganized Debtors as appropriate;

e.    maintain, conserve, collect, settle, and protect the Reorganized Debtors' Assets (subject to the limitations described herein);

f.    sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Reorganized Debtors' Assets, or any part thereof or interest therein upon such terms as the Reorganized Debtors determine to be necessary, appropriate, or desirable;

g.    negotiate, incur, and pay the Reorganized Debtors' Expenses; and

h.    prepare and file any and all informational returns, reports,

statements, returns, and other documents or disclosures relating to the Debtors or Reorganized Debtors that are required under the Plan, by any governmental unit, or by applicable law, including but not limited to filing any reports required by the Bankruptcy Code or Bankruptcy Rules that are due to be filed after the Effective Date and paying any fees required by 28 U.S.C. § 1930 that are due to be paid after the Effective Date.

### 15.    Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan),  or any agreement, instrument, or other document incorporated in the Plan on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non- bankruptcy law).

### 16.    Employee Obligations

Except as (i) otherwise provided in the Plan (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Confirmation Hearing, the Reorganized Debtors shall honor the Debtors' Employee Obligations and, to the extent not already satisfied, the Debtors' Employee Obligations shall become obligations of the Reorganized Debtors in accordance with their terms.

To the extent the Employee Obligations are executory contracts and (i) such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and plans.

On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

### 17.    Workers Compensation Program

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs.

### 18.    Pursuit and Resolution of Reorganized Debtors' Causes of Action

The Reorganized Debtors, may, and will have the exclusive right, power, and interest on behalf of the Debtors, and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Reorganized Debtors' Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided in the Plan. From and after the Effective Date, the Reorganized Debtors, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as representative of the Estates with respect to any and all Reorganized Debtors' Causes of Action that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Reorganized Debtors' Causes of Action in any court or other tribunal.

### 19.    No Successor Liability

Except as otherwise expressly provided in the Plan and Confirmation Order, the Reorganized Debtors (i) are not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors prior to the Effective Date; (ii) are not, and shall not be, successors to the Debtors by any reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

### 20.    Preservation of Privileges and Defenses

The actions taken by the Debtors, the Reorganized Debtors, or any of their respective Related Parties in connection with the Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors or the Reorganized Debtors, as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtor providing any

privileged information related to the Reorganized Debtors, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Reorganized Debtors Causes of Action and shall remain privileged. The Reorganized Debtors shall retain the right to waive their own privileges. Only the Reorganized Debtors shall have the right to waive the attorney- client privilege, work-product doctrine, or other protections as to the Debtors and the Reorganized Debtors.

## 21.    Preservation of Rights of Action

### a.    Maintenance of Avoidance Actions and Causes of Action.

Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, the Reorganized Debtors will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors', the Estates', or the Reorganized Debtors' Causes of Action (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as Reorganized Debtors' Causes of Action, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as successor in interest to the Debtors and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, and the Estates to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Reorganized Debtors' Causes of Action without notice to or approval from the Bankruptcy Court. In accordance with the Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the Reorganized Debtors may compromise and settle the Reorganized Debtors' Causes of Action.

### b.    Preservation of All Reorganized Debtors' Causes of Action Not Expressly Settled or Released

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Reorganized Debtors' Cause of Action is not intended to and shall not limit the rights of the Reorganized Debtors to pursue any such Avoidance Actions or Causes of Action. Unless a Reorganized Debtors' Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Causes of Action for later resolution by the Reorganized Debtors (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such

Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits.

### 22.    Cancellation of Instruments

Except to the extent necessary to give effect to  the Exit Term Loan Facility and the Exit Term Loan Facility Liens on the Exit Term Loan Facility Collateral the treatment of any Holder of an Allowed Claim and except with respect to any executory contracts and unexpired leases that are assumed under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be released.

### 23.    Insurance Policies

#### a.  Insurance Policies Remain in Force

Up to and including their policy expiration date(s), any and all Insurance Policies in effect as of the Effective Date shall remain in full force and effect according to their terms and the coverage obligations of the insurers and third-party administrators under such Insurance Policies shall continue following the Effective Date (including any obligations to pay, defend, and process insured claims).

#### b.  Insurance Policies; Employment Practice Liability Policies

Nothing contained in the Plan shall affect or impair the rights of any non- Debtor insured persons covered under any Insurance Policy, which expressly includes any director and officer, employment practices, or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

## X.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court with the effective date of such rejection is after the Effective Date; provided, that, nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; and provided further, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date

To the maximum extent permitted by law, to the extent any provision in any Executory

Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti- assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

### i.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with section 3.10 of the Plan, and such claims may be objected to in accordance with the Plan.

### ii.    Assumption of East Valley Development Contracts

In 2021, the Debtors and East Valley Development ("EVD") entered into several agreements with EVD, specifically, (a) that certain Manure Supply Agreement, dated effective as of October 8, 2021, by and between Millenkamp Cattle, Inc., and EVD, and acknowledged and agreed to by East Valley Cattle, LLC as amended by that certain First Amendment to Manure Supply Agreement dated as of June 22, 2023 (as amended, the "MSA"); and (b) that certain Ground Lease Agreement dated effective as of October 8, 2021, between Millenkamp Cattle, Inc. and EVD, as amended by (i) that certain First Amendment to Ground Lease Agreement dated effective as of February 17, 2022, (ii) that certain Second Amendment to Ground Lease Agreement dated as of April 25, 2023, and (iii) that certain Third Amendment to Ground Lease Agreement dated as

of June 22, 2023, (as amended, the "Ground Lease" and, together with the MSA, collectively, the "Facility Agreements"). The Debtors are assuming these contracts.  As such, the EVD contracts are on the initial Assumed Executory Contracts and Unexpired Leases Schedule and will remain on such schedule.

### iii.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three (3) Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

Unless otherwise provided by an order of the Bankruptcy Court, the Debtors have attached as schedules their initial Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule. The Debtors shall file their final list of Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan, which shall supersede the initial schedule if any such initial schedule is filed. The Debtors shall cause all Filed Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule. The Debtors may supplement or modify the Assumed Executory Contract and Unexpired Leases Schedule or Rejected Executory Contracts and Unexpired Leases Schedule up to one (1) Business Day prior to the Confirmation Hearing. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed, served and actually received by the Debtors by the later of (1) the Confirmation Objection Deadline or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the

Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contract and Unexpired Leases Schedule.

**Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Executory Contracts and Unexpired Leases Schedule as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the Assumed Executory Contracts and Unexpired Leases (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim, shall result in the full release and satisfaction of any Claims or defaults against the Debtors, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; provided, that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

### iv. Assumption Dispute Resolution

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "Assumption Dispute") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash

in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "Adjourned Cure Dispute").

### v.   Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

## Y.   RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

### 1.   Parties May Object to the Plan's Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.   The Debtors May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Classes entitled to vote are

received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

### 3.    Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

### 4.    Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Interests, and other interested parties should read carefully the discussion set forth in Article IX for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## Z.    CONFIRMATION OF THE PLAN

### 1.    The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court will schedule the Confirmation Hearing in the Disclosure Statement Order, which will occur before the  Honorable  Noah G. Hillen, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Idaho. The Disclosure Statement Order, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without

further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by the deadline provided in the Disclosure Statement Order. **Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### 2.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Debtors believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without

including any acceptance of the Plan by any insider holding a Claim in that Class, and the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

### 3.    Best Interests of Creditors

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accepts the Plan or (2) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interests" test. The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan. To that end, please see the Liquidation Analysis attached here as Exhibit B, which shows the Debtors assumed distributions in a hypothetical chapter 7 case.

### 4.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors' management has prepared the financial projections and budget, as set forth in Exhibit C.

The Debtors have prepared the Budget solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that confirmation of the Plan is not likely to be followed by liquidation of the Reorganized Debtors or the need for further restructuring.

### 5.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in

the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

## 6. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

## 7. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a

plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

## 8.    Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Debtors submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that the applicable "fair and equitable" standards are met.

## 9.    Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtors believe that the Plan will provide each Holder of an Allowed General Unsecured Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Please see the Liquidation Analysis attached here as Exhibit B.

## 10.    Revocation, Withdrawal, or Non-Consummation.

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

## AA.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the U.S. Holders (as defined below) of (i) "Secured Claims" and (ii) "Unsecured Claims". This discussion is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the Plan to any specific Holder of a Claim. The Debtors will not seek a ruling from the Internal Revenue Service (the "IRS") and have not obtained an opinion of counsel regarding any tax consequences of the Plan to the Debtors or any Holder of a Claim. No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), or the tax consequences arising under the laws of any foreign, state, local or other jurisdiction or any income tax treaty. The Debtors intend to treat, and this discussion assumes that, the Secured Claims will be treated for U.S. federal income tax purposes in accordance with their form and as interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.

This discussion does not address any U.S. federal income tax consequences to a beneficial owner of a Secured Claim or an Unsecured Claim that is not a U.S. Holder (a "Non-U.S. Holder"). Non-U.S. Holders should consult their own independent tax advisors regarding the U.S. federal income tax consequences of the implementation of the Plan, including whether Non-U.S. Holders may be subject to any U.S. federal withholding tax or U.S. federal income tax with respect to any payment on Secured Claims or Unsecured Claims.

This discussion does not describe all of the tax consequences that may be relevant in light of a U.S. Holder's particular circumstances, including, but not limited to, the potential application of provisions of the Tax Code known as the unearned income Medicare contribution tax, or tax consequences applicable to Holders of Secured Claims or Unsecured Claims that are otherwise subject to special treatment under the Tax Code, such as: financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; persons who hold or will hold Secured Claims, or Unsecured Claims as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; U.S. Holders who hold or will hold Secured Claims or Unsecured Claims through non-U.S. brokers or other non-U.S. intermediaries; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons required to accelerate the recognition of any item of gross income with respect to the Secured Claims as a result of such income being recognized on an "applicable financial statement" (within the meaning of section 451(b) of the Tax Code); holders that are related persons with the Debtors under section 267 of the Tax Code; and holders not entitled to vote on the Plan. If an entity that is classified as a partnership for U.S. federal income tax purposes holds or will hold Secured Claims or Unsecured Claims, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the activities of the partnership. Partnerships holding or that will hold Secured Claims or Unsecured Claims and partners in such partnerships should consult their tax advisors as to the particular U.S. federal income tax consequences of owning and disposing of Secured Claims or Unsecured Claims.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Secured Claim or an Unsecured Claim that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (a) the administration of which is subject to the primary supervision of a

U.S. court and that has one or more United States persons that have the authority to control all substantial decisions of the trust or (b) that has made a valid election under applicable Treasury regulations to be treated as a United States person.

**THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL  PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF SECURED CLAIMS OR UNSECURED CLAIMS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims and Interests are hereby notified that any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the IRC.*

**1.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Secured Claims**

**i.    Taxable Exchange**

Each U.S. Holder of a Secured Claim should recognize gain or loss in a taxable exchange of its Claim equal to the difference between (x) the sum of (a) the amount of any Cash received by such U.S. Holder and (b) the fair market value of any property received by such U.S. Holder for such Claim (excluding in the case of (a) and (b), any amount attributable to accrued but unpaid interest on such Claim, which amount will be taxable as described below), and (y) such U.S. Holder's adjusted basis, if any, in such Claim. Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Secured Claim in such U.S. Holder's hands, whether such Claim was purchased at a discount, whether there is any accrued but unpaid interest on such Claim, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to such Claim. See Sections IX.A.2 and IX.A.3 of this Disclosure Statement entitled "Accrued Interest" and "Market Discount."

**ii.    Accrued Interest**

To the extent that any amount received by a U.S. Holder of a Secured Claim is attributable to accrued but unpaid interest on the debt instruments constituting such surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Secured

Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on a Secured Claim, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Secured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder of a Secured Claim should be allocated in a manner other than as provided in the Plan, which could include allocating consideration first to any accrued but unpaid interest under the aforementioned Treasury regulations.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR SECURED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST**.

### iii.    Market Discount

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest." In general, "qualified stated interest" is interest unconditionally payable at least annually at a fixed stated rate in the form of cash or certain property. Any gain recognized by a U.S. Holder on the taxable disposition of a Secured Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 2.    Certain U.S. Federal Income Tax Consequences to U.S.

**Holders of Unsecured Claims**

Pursuant to the Plan, a U.S. Holder of an Unsecured Claim will be treated as exchanging such Claim on the Effective Date for Cash in a taxable transaction. A U.S. Holder of an Unsecured Claim will recognize income, gain or loss equal to the difference between (x) the Cash received by such U.S. Holder for such Claim and (y) the U.S. Holder's adjusted tax basis, if any, in such Claim surrendered in the exchange. The U.S. federal income tax consequences to such a U.S. Holder arising from such exchange will depend, in part, on (i) whether the U.S. Holder reports income on the accrual or cash method of accounting for U.S. federal income tax purposes, (ii) whether the U.S. Holder has taken a bad debt deduction with respect to such Claim, and (iii) whether such income, gain or loss is capital or ordinary in character.

### i.    Disputed Ownership Funds

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, intends to (i) treat Reorganized Debtors' Assets reserved for Holders of Disputed Claims, Contingent Claims or Unliquidated Claims with respect to the Reorganized as one or more reserves ("Distribution Reserves") held in a "disputed ownership fund" governed by Treasury regulation section 1.468B-9 (which will be taxable as a "qualified settlement fund" if all assets of the disputed reserve are passive assets for tax purposes), and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including, without limitation, the Reorganized Debtors, and the Holders of Disputed Claims, Contingent Claims and Unliquidated Claims) will be required to report for tax purposes consistently with such treatment. Accordingly, each Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of a Distribution Reserves will be taxable to such entity.

Under such treatment, a separate U.S. federal income tax return will be filed with the IRS for each Distribution Reserve, and each Distribution Reserve will be subject to tax annually on a separate entity basis. The Reorganized Debtors will be responsible for payment of any taxes imposed on each Distribution Reserve. Accordingly, distributions from each Distribution Reserve will be net of any taxes relating to the retention, disposition and distribution of assets in such Distribution Reserve. In the event, and to the extent of, any Cash of a Distribution Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such Distribution Reserve (including any income that may arise upon the distribution of the assets in such Distribution Reserve), assets of each Distribution Reserve may be sold to pay such taxes.

### 3.    Backup Withholding and Information Reporting

Under the Tax Code, interest and other reportable payments may, under certain circumstances, be subject to backup withholding, currently at the rate of 24%. Backup withholding

may apply to payments made pursuant to the Plan, unless the U.S. Holder provides to the applicable withholding agent its taxpayer identification number, certified under penalties of perjury, as well as certain other information or otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

In addition, information reporting may apply to (i) payments made to a U.S. Holder of a Secured Claim or an Unsecured Claim and (ii) certain transactions under the Plan that result in a U.S. Holder claiming a loss in excess of specified thresholds.

U.S. Holders are urged to consult their tax advisors regarding these Treasury regulations and whether the transactions contemplated by the Plan would be subject to these Treasury regulations and require disclosure on the Holders' tax returns.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF RECEIVING ANY DISTRIBUTIONS UNDER THE PLAN.**

## BB.  <u>RECOMMENDATION</u>

The Debtors believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

-SIGNATURE PAGES FOLLOW-

Respectfully,

**MILLENKAMP CATTLE, INC.**

By:

Name: William John Millenkamp
Title: President

**IDAHO JERSEY GIRLS, LLC**

By:

Name: William John Millenkamp
Title: Manager

**EAST VALLEY CATTLE, LLC**

By:

Name: William John Millenkamp
Title: Manager

**MILLENKAMP PROPERTIES, L.L.C.**

By:

Name: William John Millenkamp
Title: Manager

**MILLENKAMP PROPERTIES II, LLC**

By:

Name: William John Millenkamp
Title: Manager

**MILLENKAMP FAMILY, LLC**

By:

Name: William John Millenkamp
Title: Manager

**GOOSE RANCH, LLC**

By: _____
Name: William John Millenkamp
Title: Manager

**BLACK PINE CATTLE, LLC**

By: _____
Name: William John Millenkamp
Title: Manager

**MILLENKAMP ENTERPRISES, LLC**

By: _____
Name: William John Millenkamp
Title: Manager

**IDAHO JERSEY GIRLS JEROME DIARY,
LLC**

By: _____
Name: William John Millenkamp
Title: Manager

<u>Submitted by</u>:

Dated: 2/5/2025                    **DENTONS DAVIS BROWN, PC**

*/s/Krystal R. Mikkilineni*


**JOHNSON MAY**

*/s/Matthew T. Christensen*


*Attorneys for Debtors and Debtors in Possession*