Thomas E. Dvorak (ISB # 5043)
Jason J. Blakley (ISB # 9497)
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho  83701-2720
Office: (208) 388-1200
Fax: (208) 388-1300
tedservice@givenspursley.com
jasonblakley@givenspursley.com
18659328 [11054.227]

Attorneys for Claimants


### BEFORE THE AMERICAN ARBITRATION ASSOCIATION


| | |
|---|---|
| EAST VALLEY CATTLE, LLC, an Idaho limited liability company; and MILLENKAMP CATTLE, INC., an Idaho corporation, | AAA Case No. _____ |
| | **DEMAND FOR ARBITRATION** |
| Claimants, | |
| vs. | |
| EAST VALLEY DEVELOPMENT, LLC a Delaware limited liability, | |
| Respondent. | |


COME NOW East Valley Cattle, LLC ("EVC") and Millenkamp Cattle, Inc. ("Millenkamp

Cattle," and together with EVC, "Claimants"), by and through their attorneys of record,

Givens Pursley LLP, and hereby demand arbitration pursuant to an arbitration agreement with

Respondent East Valley Development, LLC ("EVD" or "Respondent") as follows:

I.    **Parties, Jurisdiction, and Choice of Law**

    A.    **The Claimants**

EVC is an Idaho limited liability company.

The address of EVC is:

> East Valley Cattle, LLC
> Attention: Bill Millenkamp
> 471 N. 300 W.
> Jerome, Idaho 83338
> Telephone: (208) 731-5518
> Email: bill@millenkamp.com

The known representatives for EVC are:

> Thomas E. Dvorak
> Jason J. Blakley
> GIVENS PURSLEY LLP
> 601 West Bannock Street
> P.O. Box 2720
> Boise, Idaho  83701-2720
> Telephone: (208) 388-1200
> Fax: (208) 388-1300
> Email: tedservice@givenspursley.com
> jasonblakley@givenspursley.com

Millenkamp Cattle is an Idaho corporation.

The address of Millenkamp Cattle is:

> Millenkamp Cattle, Inc.
> Attention: Bill Millenkamp
> 471 N. 300 W.
> Jerome, Idaho 83338
> Telephone: (208) 731-5518
> Email: bill@millenkamp.com

The known representatives for Millenkamp Cattle are:

> Thomas E. Dvorak
> Jason J. Blakley
> GIVENS PURSLEY LLP
> 601 West Bannock Street
> P.O. Box 2720
> Boise, Idaho  83701-2720
> Telephone: (208) 388-1200
> Fax: (208) 388-1300
> Email: tedservice@givenspursley.com
> jasonblakley@givenspursley.com

**DEMAND FOR ARBITRATION - 2**

**B.    The Respondent**

Upon information and belief, East Valley Development, LLC is a Delaware limited liability

company.

The address of the Respondent is:

> East Valley Development, LLC
> Attention:  General Counsel
> 4675 MacArthur Court, Suite 800
> Newport Beach, CA 92660
> Telephone:  (949) 437-1000
> Email: jim.sytsma@cleanenergyfuels.com
> nate.jensen@cleanenergyfuels.com

> William J. Flanagan
> VP, Strategic Development
> East Valley Development, LLC
> 4675 MacArthur Court, Suite 800
> Newport Beach, CA  92660
> Email: Will.Flanagan@cleanenergyfuels.com

The known representatives for the Respondent are:

> Adam Lewis
> Miranda Russell
> MORRISON & FOERSTER LLP
> 425 Market Street
> San Francisco, CA 94105
> Telephone:  (415)268-7000
> Email:  ALewis@mofo.com
> MRussell@mofo.com

**C.    Jurisdiction**

The American Arbitration Association has jurisdiction to arbitrate this matter pursuant to

a Ground Lease Agreement (the "Ground Lease") executed by EVC and EVD on October 8, 2021,

which provides in relevant part (page 22):

> 30.2.    Arbitration. Any controversy or claim arising out of or relating to
> this Lease, or the breach thereof, shall be determined by final and binding
> arbitration administered by the American Arbitration Association ("AAA")
> under its Commercial Arbitration Rules and Mediation Procedures
> ("Commercial Rules").  The award rendered by the arbitrator shall be final

and binding on the parties and may be entered and enforced in any court having jurisdiction, and any court where a party or its assets is located (to whose jurisdiction the parties consent for the purposes of enforcing the award). There shall be **one arbitrator** agreed to by the parties within twenty (20) days of receipt by respondent of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. Except as may be required by law, neither a party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both Parties, unless to protect or pursue a legal right.

(Emphasis added.) A copy of the Ground Lease and its subsequent amendments are attached hereto as **Exhibit A**.

The MSA (defined below) contains a similar provision at § 18.2.2.

**D.    Choice of Law**

The Lease further provides that it "shall be governed, interpreted, construed and regulated in accordance with the laws of the State of Idaho." Exhibit A (Ground Lease, § 30.1). Because this arbitration involves more than two parties, Claimants do not agree to conduct the arbitration under the AAA Expedited Procedures. *See* AAA Commercial Rule R-1(b).

**II.    Nature of the Claim**

1.    EVC owns certain real property in Cassia County, Idaho upon which Millenkamp Cattle owns and operates a large dairy and feedlot ("Farm Business").

2.    Millenkamp Cattle's Farm Business is comprised of state-of-the-art, first-class dairy facilities, unlike those found anywhere else in the United States.

3.    Millenkamp Cattle's Farm Business produces large quantities of manure, milking parlor water, feed lane manure, loafing pen manure, and urine (collectively, "Manure") that must be handled and disposed of in an environmentally and socially responsible manner.

4.    Respondent is a subsidiary of CE bp Renew Co, LLC (an entity that is 50% owned by bp Products North America and 50% by Clean Energy).

5.    Millenkamp Cattle and EVD entered into a Manure Supply Agreement on October 8, 2021 ("MSA") wherein EVD agreed to install, construct, own, and operate a commercial scale biogas production facility for the production of methane gas and other co-products ("Facility"), made up of an anaerobic digestion system and related equipment ("Digester") including "Manure Separation Facilities," which is intended to convert the Manure solids into saleable renewable natural gas and carbon dioxide ("Project").  A true and correct copy of the MSA is attached hereto as **Exhibit B**.

6.    The Parties amended the MSA on or about June 22, 2023.  A true and correct copy of the First Amendment to the MSA is attached hereto as **Exhibit C**.

7.    EVC and EVD entered into the Ground Lease in order to effectuate the terms of the MSA, *i.e.*, EVC leased to Respondent the ground upon which the Project would be constructed.

8.    According to the Ground Lease, Respondent promised to:

> construct the Project in a first class, workmanlike manner consistent with other similar projects in the area, in substantial compliance with the Plans and in compliance with all applicable laws, rules and regulations, including, but not limited to, all land use and building laws, rules and regulations, environmental laws, rules and regulations, and insurance requirements and codes.

Ground Lease, § 6.1 Development of Project.

9.    Respondent promised to construct the Project in accordance with the "Plans," which are found at Exhibit F of the Ground Lease. Ground Lease, § 6.3 Project Design.

10.    The Ground Lease envisions that additional detailed Plans will be created, the approval of which is governed in part by Exhibit G to the Ground Lease. Ground Lease, § 6.3 Project Design.

**FAILURE TO OBTAIN LANDLORD DESIGN APPROVAL**

11.    According to Exhibit G of the Ground Lease:

In order to keep Landlord [EVC] apprised of design progress, allow for input, and not delay design progress with formal reviews, intermediate submittal packages will be provided to be reviewed concurrent with design progression. Landlord will have access to the design engineer's file sharing folder where detailed design sheets and 3D models are updated concurrent with design development. Specific design review meetings will be setup at appropriate design stage gates to get input from Landlord regarding infrastructure integration to the existing dairy facility and consistency with overall architectural programing (established by current construction methods that are applicable to an industrial anaerobic digestion facility with gas upgrading and compression).

12.    According to Exhibit E, <u>Section 1. Manure Separation Facilities</u>, of the Ground Lease:

The Manure Separation Facilities shall be designed and constructed with adequate capacity to process all suitable manure from the dairy and include an appropriate amount of redundancy to avoid shutdowns due to mechanical or other failure.

13.    According to the Ground Lease, "in all events no changes to the Plans shall be implemented without Landlord's [EVC's] prior written consent." Ground Lease, § 6.3 <u>Project Design</u>.

14.    The Ground Lease also provides:

Following initial construction in accordance with the Plans, no alterations, additions or other improvements shall be made to the Premises, the Project or the Improvements unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

Ground Lease, § 6.3.1.

**MATERIALMEN'S LIENS**

15.    The Ground Lease also provides:

Tenant will provide, or cause to be provided to Landlord adequate payment and performance bonds to ensure timely completion of the Project.  Tenant shall insure that all construction contracts will include an acknowledgement of the applicable contractor that its lien rights with respect to the Project extend only to Tenant's

> leasehold interest in the Premises and that no contractor (including
> subcontractors) shall have the right to place a lien on Landlord's fee
> interest in the Premises or Landlord's Property.

Ground Lease, § 6.4.

16.    EVD, as of today's date, due to its own failure or the failure of its contractor to pay

various subcontracts, has caused materialman liens to be recorded against EVD's real property.

17.    EVC requested on February 6, 2024 and on May 24, 2024, that EVD provide EVC

information as to when the liens would be satisfied.

18.    As of the date of Demand, EVD has not provided EVC with any information to

indicate the materialman liens have been satisfied.

19.    Further, the Ground Lease also provides:

> Landlord shall not be liable for any work, labor or materials
> furnished or to be furnished upon credit to or for Tenant or anyone
> claiming under the Tenant, and no mechanic's or other liens shall
> attach to or affect the estate or interest of the Landlord in and to the
> Premises. Tenant shall not do or suffer anything to be done whereby
> Landlord's Property or the Premises or any part thereof may be
> encumbered by any mechanic's liens or other liens. If any
> mechanic's lien, notice or claim thereof or any other lien is filed
> against Landlord's Property, the Premises or any part thereof for
> work, labor, or materials furnished or to be furnished to Tenant, or
> anyone claiming under Tenant, Tenant shall within sixty (60) days
> from the date of filing, cause the same to be withdrawn, discharged
> or removed by deposit, bonding proceedings or otherwise. If Tenant
> fails to do so, Landlord may do so and may pay any judgments
> recovered by any such lienor. Tenant shall immediately reimburse
> Landlord for all amounts paid pursuant to this paragraph, which
> amounts shall constitute an additional obligation of Tenant under
> this Lease together with interest from the date of expenditure at the
> Default Rate. Tenant understands that the removal of liens is critical
> to Landlord's financing and any liens will cause the Landlord to
> suffer significant damages, including incurring default interest rates
> on Landlord's loans.

Ground Lease, § 8.4.

**DEMAND FOR ARBITRATION - 7**

20.     On November 21, 2024 another Mechanic's Lien was filed by L.T.D. Plumbing, Inc. for non-payment for two new watersheds, as instrument number 2024004286 in the records of the Cassia County, Idaho Recorder, for the amount of $9,392.00.  The Lien purports to lien all of Section 26 of Township 11 S, Range 27 E of the Boise Meridian, Cassia County, Idaho, and references that the labor or services were done at the request of Caribou Lake Construction Managers, Inc., who is or was EVD's construction manager (the "L.T.D. Plumbing Lien").

21.     The failure to provide information as to whether the prior liens are satisfied and the existence of the L.T.D. Plumbing Lien are defaults under the Ground Lease.

**FAILURE TO COMPLETE MANURE SEPARATION FACILITIES**

22.     Under the original Ground Lease, the Manure Separation Facilities were to be designed, constructed, installed, and commissioned on or before October 31, 2022, as provided for in Exhibit E of the Ground Lease. Ground Lease, § 6.2  Construction and Relocation of Manure Separation Facilities.

23.     As EVD was unable to complete the Manure Separation Facilities by the original deadline and otherwise comply with the Ground Lease and MSA, the parties entered into several amendments to memorialize the terms of an extension and amended understanding.

24.     On February 17, 2022, the parties entered into that certain First Amendment to Ground Lease Agreement ("First Amendment to Lease").

25.     On March 8, 2023, Notice was provided to EVD of its default of the Ground Lease based on the failure to timely construction, install, and commission the manure separation facilities.  A true and correct copy of this Notice of Default is attached hereto as **Exhibit D**.

26.     On April 25, 2023, the parties entered into that certain Second Amendment to Ground Lease Agreement ("Second Amendment to Ground Lease").

27.    On June 22, 2023, the parties entered into that certain Third Amendment to Ground Lease Agreement ("Third Amendment to Ground Lease").

28.    On June 22, 2023, the parties entered into that certain First Amendment to Manure Supply Agreement ("First Amendment to MSA").

29.    EVD failed to present timely Plans to EVC for review and preapproval, as required under Exhibit G the Ground Lease.  This includes, but is not limited to, the amount of concrete that has been poured around the Dewatering Building.

30.    Pursuant to Section 2(b) of the Third Amendment to Ground Lease, EVD was "unconditionally obligated to construct, install and commission the Manure Separation Facilities in accordance with the MSF Plans, and to use best efforts, at its sole cost and expense, to complete installation and commission of the Manure Separation Facilities on or before October 31, 2023. . . ."

31.    The Project has been plagued by the inability of EVD to manage its various contractors, subcontractors and engineers.

32.    As of the date of this Demand, EVD has not completed construction of the Manure Separation Facilities, nor has EVD used its best efforts to complete the Manure Separation Facilities.

33.    As of the date of this Demand, EVD has not completed saw cutting of a "chevron" pattern in the sand lane and reception pit area of the Manure Separation Facilities.

34.    As of the date of this Demand, EVD has not completed HVAC installation in the Dewatering Building.

35.    Pursuant to Section 2(a) of the Third Amendment to Ground Lease, "Tenant shall provide Landlord with a Manure Separation Facility construction schedule on a bi-monthly basis, on a schedule to be mutually agreed by the Parties, and a monthly (15th Business Day of the month)

expense report detailing the capital expenses of the Manure Separation Facility on a monthly, project to date and expected completion cost basis."

36.    EVD has not provided EVC with a construction schedule or a monthly, project to date and expected completion cost basis.

### FAILURE TO MEET BYPRODUCT SPECIFICATIONS; FAILURE TO MAINTAIN TEMPORARY LAGOON

37.    Additionally, Section 2(a) of the Third Amendment to the Ground Lease provides as follows:

> Commencing November 1, 2023, Tenant shall pay to Landlord $50,000 per day for manure hauling in the event the Temporary Lagoon, Temporary Facilities, Phase 2, and Phase 3A of the Project cannot process 100% of the Manure, which, for the avoidance of doubt, includes the solids of the wastewater and manure (flush waters and alley vacs) in accordance with the Byproduct Specifications articulated in Exhibit F of the MSA. If, however, on November 1, 2023, the Temporary Lagoon, Temporary Facilities, Phase 2, and Phase 3A of the Project are able to process 100% of the Manure, which, for the avoidance of doubt, includes the solids of the waste water and manure (flush waters and alley vacs) in accordance with the Byproduct Specifications articulated in Exhibit F of the MSA, then Tenant shall pay to Landlord $15,000 per day for manure hauling until the commissioning of the Manure Separation Facility.

38.    To compensate EVC for manure hauling, EVD has remitted periodic payments to compensate for its inability to meet Byproduct Specifications.

39.    On January 9, 2024, EVD provided Millenkamp Cattle with a spreadsheet tracking the Byproduct Specifications.

40.    On January 31, 2024, EVD provided Millenkamp Cattle with a spreadsheet tracking the Byproduct Specifications.

41.    On February 6, 2024, Millenkamp Cattle requested EVD provide Byproduct Specifications.  EVD failed to respond to the request.

42.    On May 24, 2024, Millenkamp Cattle requested EVD provide Byproduct Specifications.  EVD failed to respond to the request.

43.    On July 30, 2024, Millenkamp Cattle requested EVD provide Byproduct Specifications.  EVD failed to respond to the request.

44.    On October 4, 2024, EVD provided Millenkamp Cattle notice via email it had commissioned the Manure Separation Facility on August 15, 2024, "and accordingly Tenant has no further obligation from and after such date to make payments under Section 4.2 of the Ground Lease (as modified by Section 2.a of the Third Amendment to Ground Lease)."

45.    As of the date of this Demand, EVD has refused to produce proper Byproduct Specifications that justify the lower payment of $15,000 per day.

46.    EVC is entitled to compensation in the amount of $50,000 per day because the Project has not been able to process 100% of the Manure in accordance with the Byproduct Specifications.  This includes, but is not limited to, all of the fiber, solids and green water separated by the temporary equipment and dredges.

47.    After the commissioning of the Manure Separation Facilities on August 15, 2024, and as of the date of this Demand, EVD is still unable to process all of the Manure in accordance with the Byproduct Specifications.  Specifically, the FAN separators in the Dewatering Building cannot process all of the thickened manure sent to the Dewatering Building because of inadequate processing capacity and improper engineering.  This has resulted in thickened manure bypassing the Dewatering Building and being deposited in the temporary lagoon and a lack of fiber being made available for bedding Millenkamp's cattle.

48.    The temporary lagoon has accumulated significant solids as a result of the inability of EVD being able to process all of the manure in accordance with the Byproduct Specifications.

49.     EVD has refused to clean the temporary lagoon to capture additional fiber and

solids that have been deposited in the temporary lagoon.

50.     On November 8, 2024, David Heida of EVC emailed Nate Jenson, General Counsel

for EVD, and indicated:

> Please be advised that in accordance with Section 6.4.2 of the Manure Supply Agreement Millenkamp Cattle, Inc. ("Millenkamp") hereby provides notice that if East Valley Development, LLC ("EVD") does not process all of the thickened effluent created by the manure separation facility through the FAN screw presses located in the dewatering building within the next ninety-six (96) hours, Millenkamp will commence self-help measures.  These measures include but are not limited to:
>
> 1.     Replacing the FAN header manifold was not properly engineered by Montrose (i.e. 90 degree inlet fittings and inconsistent flow/pressure rates).
> 2.     Adding an additional five FAN separator to keep up with the effluent inlet flow rates.
> 3.     Ordering additional FAN separator parts to ensure adequate parts availability.
> 4.     Replacing the FAN greenwater outlets that need to be plumbed into a 45 degree outlet fitting.
> 5.     Adding an additional centrifuge to ensure adequate redundancy.
>
> EVD's inability to operate, maintain and repair the dewatering building in a manner that provides any meaningful fiber to the dairy for bedding cattle, let alone accounts for any redundancy has necessitated this action.  Please be advised that unless EVD can correct the aforementioned issues identified above within the ninety-six (96) hour time frame, Millenkamp provides further notice that the self-help measures identified above will be taken forty-eight (48) hours thereafter.  Millenkamp's self-help measures identified above will be expensed directly to EVD in accordance with Section 6.4.2 of the Manure Supply Agreement.  Please be advised that Millenkamp reserves all other rights and remedies.

51.     To date, EVD has not taken any such corrective measures.

52.     Failure to take such corrective measures is a breach of the MSA and of the Ground

Lease.

**DEMAND FOR ARBITRATION - 12**

53.     EVC is owed payment for reimbursement and damages in an amount to be proven at arbitration.

**FAILURE TO OBTAIN WATER**

54.     Pursuant to the Ground Lease, § 4.8:

> Water Rights. Tenant shall be responsible for obtaining any and all water to satisfy its requirements for the Project from third party sources or by obtaining a water right to dig a new well to be located on the Leased Property (in a location to be approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed). Landlord will use reasonable efforts to assist Tenant with obtaining such water rights. In the event that, after using commercially reasonable, good faith efforts, Tenant is unable to procure a water right as stated above, Landlord agrees to allow Tenant access to Landlord's water of up to fifty (50) gallons per minute of potable water for Tenant's operations (which the parties acknowledge does not allow use of grey water) in exchange for a fair market lease rate to be agreed to by Landlord and Tenant at such time based on the cost of such water to Landlord. In such event, Tenant will be responsible for obtaining any required regulatory approvals for such a water use transfer.

55.     EVC has notified EVD of its responsibility for obtaining water, and EVD has failed to carry out that responsibility. Nor has EVD used commercially reasonable, good faith efforts to construct a well and evidently has no desire to expend any funds in this regard.

56.     EVC's failure to dig a new well is a breach of the Ground Lease.

**24" INLET ROUTING AND FAILURE TO FILL IN SOUTHWEST SETTLING CELL**

57.     Prior to the commission of the Manure Separation Facilities, EVD used EVC's settling cells as part of their temporary manure separation measures.

58.     Since the commissioning of the Manure Separation Facilities, EVD has refused to fill in what is commonly known as the Southwest Settling Cell with adequate dirt.

59.    EVD's refusal to fill in the Southwest Settling Cell creates an unnecessary safety hazard while precluding a direct routing of EVC's 24" green water inlets into the Green Flush Building.

60.    EVD's refusal to directly route the 24" green water inlets into the Green Flush Building creates unnecessary hydraulic resistance, a loss in efficiency and unnecessary pipe joints.

**MANIFOLD BYPASS MISSING**

61.    EVD had a duty under the Ground Lease to design and construct the Manure Separation Facilities "with adequate capacity to process all suitable manure from the dairy and include an appropriate amount of redundancy to avoid shutdowns due to mechanical and other failure." Ground Lease at Exhibit E.

62.    EVD failed to do so in that it built a key portion of the piping in the Project without an adequate manifold bypass. As a consequence, when additional dairy capacity is brought on line in the future, the Manure Separation Facilities will be required to shut down for a significant period of time.

63.    Said failure was a breach of EVD's duty under the Ground Lease.

**DEFAULT UNDER MSA AND GROUND LEASE**

64.    These above-mentioned failures constitute events of default under the Ground Lease and the MSA. Ground Lease, § 17, Default; MSA § 13, Events of Default and Termination.

65.    Under the Ground Lease and MSA, Respondent has up to a maximum of ninety (90) days to cure any non-monetary default so long as Respondent "continues to diligently prosecute to completion the curing of the default." Ground Lease, § 17.1.7, Default, Events of Default; MSA, § 13.1.1, Events of Default.

**DEMAND FOR ARBITRATION - 14**

66.     EVC served Respondent with its NOTICE OF DEFAULT ("Default") concurrently with this Demand.  *See* Exhibit D attached hereto and incorporated herein by reference. Included in the March 8, 2023, Notice of Default was a Notice of Intent to Initiate Arbitration Proceedings.

67.     On or about September 30, 2022, EVC notified EVD that it would exercise its rights under Section 30.2 of the Ground Lease to compel arbitration to resolve the issues still continuing between the parties.  A true and correct copy of this letter is attached hereto as **Exhibit E**, including the draft Demand for Arbitration (and its exhibits), which accompanied the letter.  The contents of this letter are incorporated herein, as if set forth in full, by this reference.

68.     On or about December 6, 2024, EVC sent EVD a letter of Demand for Adequate Assurances and Notice of Default, and again attached a draft Demand for Arbitration.  A true and correct copy of this letter is attached hereto as **Exhibit F**.

69.     On or about December 13, 2024, EVC sent to EVD an additional Demand for Adequate Assurance and Notice of Default, including within it the additional notice as to an intent to exercise self-help.  That December 13, 2024, Notice indicated, in pertinent part:

> [U]nder Section 8.3 of the Ground Lease, if EVD "fails to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA," EVC "may take such action as [EVC] deems reasonably necessary to cause the [same] to be so maintained and [EVD] shall promptly reimburse [EVC] for [EVD's] reasonable costs and expenses in connection therewith . . .." The following constitute failures to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA:
>
> > 1.     Ordering of Additional Equipment. As Bill Millenkamp informed Mark McKenzie on December 11, 2024, and in follow-up to prior notices of intent to exercise self help, Millenkamp will be ordering an additional five fans and a centrifuge and having the same installed. As has been stated, these are absolutely necessary in order for EVD to meet its obligations under the Ground Lease Agreement ("Lease") between EVD and East Valley Cattle, LLC ("EVC") and Manure Supply Agreement ("MSA") between EVD and Millenkamp Cattle, Inc. ("Millenkamp Cattle"). . . .

**DEMAND FOR ARBITRATION - 15**

2.      Cleaning Solids Out of Settling Ponds and Lagoon. EVC has ordered a dredge to effectively clean the settling ponds and expects the same to be on site shortly after Christmas. This has required a $50,000 deposit and of course will incur an additional cost every day after. EVC may also be using long-reach track hoes to clear the settling ponds and lagoon as best as may be possible with those pieces of equipment (as noted previously, EVD's redesign of the ponds and lagoon has now resulted in the requirement of a dredge being necessary to remove solids when said solids are not properly processed by EVD). After the aforementioned fans and centrifuge are installed, EVC will consider additional measures in addition to the dredge such as a pump to pump the effluent back to be processed to the standard required under the MSA, and otherwise to avoid the buildup of sludge in the settling pond and also potentially into the main lagoon. As noted in the prior demand, the buildup in the settling ponds and lagoon is intolerable and if such build up is not immediately addressed, it will be threatening to clog the irrigation system which is used to distribute the green water and otherwise create an environmental disaster that cannot be pumped and otherwise makes it into natural water sources.

3.      Reclaiming of Gravel. [The parties have reached agreement on payment to EVC and resolved this issue since the December 2025 notice was sent].

4.      Potable Water. As noted in the prior notice, EVD has failed to obtain potable water and to reach an acceptable agreement on what it is willing to pay. It is absurd that EVD has constructed a water distribution system but so far has refused to hook water to it. In order to provide the manure it is contractually obligated to provide, Millenkamp has to hire a water truck to effectuate cleaning after the deliveries of the manure to the digester facility. Millenkamp will engage in self-help efforts to bring potable well water to and hook the same into the water system that EVD has constructed, and will begin to run water through the constructed facilities.    Millenkamp understands from talking with EVD representative Mark McKenzie that unless EVD takes action to ensure that that system is ready to receive water, that introducing water into said system could cause problems. That is why Millenkamp is giving notice of ten (10) days, i.e., until December 23, 2024, before it undertakes these efforts, so EVD may make the water piping facilities ready to receive the water.  EVC will, of course, make a reasonable cost and charges for the water as it is entitled to as part of the arbitration proceeding in this matter.

5.      Project Area Safety Concerns. There are two areas that are currently unsafe on the project and require immediate attention. One

**DEMAND FOR ARBITRATION - 16**

is the roadway on the south side of project, specifically the area adjacent to the reception pit, rotary drum building, clarifiers and green flush building. There is not a safe transition between the roads, ensuring a vehicle will tip over in the abrupt transition between two roads. A secondary area is between the settling ponds and an adjoining wall, which makes for only about a six-foot space for a loader in that area to back up when it is loading manure. It is not a matter of if, but a matter of when, a loader will fall into the settling pond immediately to the north of the sand screw separators. Immediate action is required by EVD to make these areas safe. If action is not taken by EVD within ten (10) days, Millenkamp intends to exercise its self-help remedies and correct these issues at the cost of EVD.

6.      Fill In of Unfinished Settling Ponds. The southwest settling pond is no longer in use and must be filled in for safety purposes. EVD has refused to clean and fill in this settling pond since it has no longer been used in the temporary manure separation facility. Accordingly, notice is hereby given that Millenkamp will undertake to use self-help to clean and fill in the southwest settling pond.

A true and correct copy of this letter is attached hereto as **Exhibit G**.

70.     On or about December 16, 2024, EVD provided a response to the December 6 Demand for Adequate Assurances and Notice of Default.  A true and correct copy of this letter is attached hereto as **Exhibit H**.

71.     On or about December 18, 2024, EVD provided a response to the December 13 Demand and Notice.  A true and correct copy of this letter is attached hereto as **Exhibit I**.

## CLAIM I
## Breach of Contract

72.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

73.     A "controversy" has arisen between the parties—as that term is used in § 30.2 of the Ground Lease—related to Respondent's breaches of the Ground Lease. The parties agreed to resolve such controversies in binding arbitration, utilizing the American Arbitration Association's Commercial Arbitration Rules. Ground Lease, § 30.2, Arbitration.

**DEMAND FOR ARBITRATION - 17**

74.    Respondent has a duty to provide Millenkamp Cattle with Byproduct Specifications.

75.    Respondent's failure to provide Millenkamp Cattle with Byproduct Specifications is a material breach of the Ground Lease.

76.    Respondent is obligated to compensate Claimants for manure hauling pursuant to the specified terms of the Third Amendment to the Ground Lease.

77.    Respondent's failure to properly compensate Claimants for manure hauling constitutes a material breach of the Ground Lease.

78.    Respondent is obligated to prevent liens being recorded against the real property of EVC.

79.    Respondent's failure to satisfy or bond the liens recorded against the real property of EVC is a material breach of the Ground Lease and MSA.

80.    Respondent is obligated to provide EVC with an expense report detailing the capital expenses of the Manure Separation Facilities on a monthly, project to date and expected completion cost basis.

81.    Respondent's failure to compensate EVC with an expense report is a material breach of the Ground Lease and MSA.

82.    Respond was required to "use best efforts, at its sole cost and expense, to complete installation and commission of the Manure Separation Facilities on or before October 31, 2023. . . ."

83.    Respondent's failure to saw cut a "chevron" pattern in the sand lane and reception pit area of the Manure Separation Facilities is a material breach of the Ground Lease.

84.    Respondent's failure to complete HVAC installation in the Dewatering Building is a material breach of the Ground Lease and MSA.

**DEMAND FOR ARBITRATION - 18**

85.     Respondent's failure to use its best efforts to complete the Manure Separation Facilities on or before October 31, 2023, is a material breach of the Ground Lease and MSA.

86.     After the commissioning of the Manure Separation Facilities on August 15, 2024, and as of the date of the Demand, EVD is still unable to process all of the Manure in accordance with the Byproduct Specifications.   Respondent's failure to process all of the Manure in accordance with the Byproduct Specifications is a material breach of the Ground Lease and MSA.

87.     EVD'S failure to process all of the thickened effluent created by the Manure Separation Facilities through the FAN screw presses located in the Dewatering Building is a material breach of the Ground Lease and the MSA.

88.     EVD's failure to add an additional centrifuge and FAN separators to ensure there is adequate capacity to process all manure and account for an appropriate amount of redundancy is a material breach of the Ground Lease and the MSA.

89.     EVD'S failure to attempt to drill a well is a material breach of Ground Lease and the MSA.

90.     EVD'S failure to properly route the 24" green water inlet into the Green Water Flush Building is a material breach of the Ground Lease and the MSA.

91.     EVD'S failure to fill in the Southwest Settling Cell is a material breach of Ground Lease and the MSA.

92.     EVD'S failure to provide for a key manifold bypass is a material breach of the Ground Lease and the MSA.

93.     EVD's failure to perform the actions described in the December 13, 2024 Demand for Adequate Assurances; Notice of Default is a material breach of the Ground Lease and the MSA, which in turn justified invocation of the self-help described in said Notice and in turn makes EVD liable for the cost of such self-help as an item of damage for said material breach.

**DEMAND FOR ARBITRATION - 19**

94.     As a direct result of Respondent's breaches, Claimants have been damaged in an amount to be proven in arbitration.

## CLAIM II
## Declaratory Judgment

95.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

96.     AAA Rule 47(a) allows an arbitrator to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.

97.     AAA Rule 37 allows an arbitrator to take whatever interim measures he or she deems necessary.

98.     A "controversy" has arisen between the parties, as that term is used in § 30.2 of the Ground Lease.

99.     Idaho Code section 10-1201 authorizes declaratory judgments, and Idaho Code section 10-1202 provides that a person interested under a contract may obtain a declaration of his rights, status, or other legal relations thereunder.

100.    Claimants are persons, as defined by Idaho Code section 10-1213, interested under a contract or contracts and are entitled to have a declaration of their rights, status, or other legal relations thereunder declared by the arbitrator.

101.    Idaho Code section 10-1208 provides that further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.

102.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent has failed to maintain the Project in good condition and repair, consistent with the overall appearance and quality of the maintenance of the adjacent

Dairy Operation, forcing Millenkamp Cattle to take self-help measures for which Respondent should be liable.

103.     Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent failed to use its best efforts to complete the Manure Separation Facilities on or before October 31, 2023.

104.     Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent failed to design, build and operate the Manure Separation Facilities in a manner that processes 100% of the Manure.

105.     Respondents have failed to compensate Claimants in the amount of $50,000 per day because the Project has not been able to process 100% of the Manure in accordance with the Byproduct Specifications.

106.     Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent is required to process 100% of the Manure in accordance with the Byproduct Specifications, this includes, but is not limited to, all of the fiber, solids and green water separated by the Project, temporary equipment and dredges.

107.     Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent is required to process all of the thickened effluent created by the Manure Separation Facilities through the FAN screw presses located in the Dewatering Building.

108.     Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent is required to clean the temporary lagoon.

109.     Claimants request and are entitled to an award for entry of an order and/or judgment declaring that Respondent is required to add an additional centrifuge and FAN separators to ensure

there is adequate capacity to process all manure and account for an appropriate amount of redundancy.

110.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must use commercially reasonable, good faith efforts to construct a well.

111.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must add an additional 24" inlet routing.

112.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must fill in the Southwest Settling Cell.

113.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must build the key manifold bypass.

## ATTORNEYS' FEES

In order to bring this arbitration, it has been necessary for Claimants to retain the services of legal counsel, Givens Pursley LLP, at said firm's customary rates. Pursuant to AAA Rule 47, as well as Idaho Code §§ 12-120(3) and 12-121, Idaho Rule of Civil Procedure 54(e), and the Ground Lease, Claimants are entitled to recover their costs and attorneys' fees incurred in pursuing this action together with an award of any administrative fees, expenses and arbitrator's compensation paid by Claimants, in such amounts as the arbitrator deems reasonable and just.

## PRAYER FOR RELIEF

WHEREFORE, Claimants pray for relief as follows:

1.    That the arbitrator find for Claimants on each and every Count of this Arbitration Demand and afford Claimants the relief sought in each Count herein;

2.    For an award of Claimants' costs and attorneys' fees in such amount as may be proven at the appropriate time in these proceedings;

**DEMAND FOR ARBITRATION - 22**

3.    That the arbitrator retain jurisdiction of this matter in order to resolve future controversies; and

4.    For such other and further relief as the arbitrator deems just and appropriate under the circumstances.

DATED January 17, 2025

GIVENS PURSLEY LLP


By  /s/ Thomas E. Dvorak
    Thomas E. Dvorak – Of the Firm
    Jason J. Blakley – Of the Firm
    Attorneys for Claimants

# EXHIBIT A

# GROUND LEASE AGREEMENT

This Ground Lease Agreement (this "<u>Lease</u>") is made effective as of October 8, 2021 (the "<u>Effective Date</u>"), between East Valley Cattle, LLC, an Idaho limited liability company (hereinafter, "<u>Landlord</u>"), the owner of certain real property located in Cassia County, Idaho, on which the Premises (as hereinafter defined) is located ("<u>Landlord's Property</u>") and East Valley Development, LLC, a Delaware limited liability company and subsidiary of CE bp Renew Co, LLC (which entity is owned 50% by bp Products North America and 50% by Clean Energy) (hereinafter, "<u>Tenant</u>"). Landlord and Tenant are at times collectively referred to hereinafter as the "<u>Parties</u>" or individually as a "<u>Party</u>".

## RECITALS

A.     Tenant and Millenkamp Cattle, Inc., an Idaho corporation ("<u>Dairy</u>") an affiliate of Landlord, entered into that certain Manure Supply Agreement dated as of October 8, 2021 (the "<u>MSA</u>"), pursuant to which Dairy will provide to Tenant Suitable Manure (as defined in the MSA) for Tenant's operation of the Project (as hereinafter defined);

B.     The MSA contemplates that Landlord and Tenant will enter into a ground lease for certain real property owned by Landlord in order to fully effectuate the purposes of the MSA; and

C.     The Parties desire to set forth the terms and conditions upon which Landlord shall lease to Tenant, and Tenant shall lease from Landlord, the Premises (as hereinafter defined).

## AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions and provisions set forth herein, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

2.     <u>DEFINITIONS</u>. All terms used herein shall have the same meaning as the same terms defined in the MSA, and all terms used in the MSA shall have the same meaning as the same terms defined herein. In the event of discrepancy, this Lease shall control.

"<u>Additional Rent</u>" means all monetary payments required to be made under this Lease, including, but not limited to, taxes, insurance premiums, utility payments, late charges, default interest and all other sums Tenant is obligated to pay under this Lease other than Term Rent.

"<u>Hazardous Materials</u>" shall mean any material, substance or waste that is or has the characteristic of being hazardous, toxic, ignitable, reactive or corrosive, including, without limitation, petroleum, PCBs, asbestos, materials known to cause cancer or reproductive problems and those materials, substances and/or wastes, including infectious waste, medical waste, and potentially infectious biomedical waste, which are or later become regulated by any local governmental authority, the State of Idaho or the United States Government, including, but not limited to, substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "hazardous wastes" in the Hazardous Materials Laws.

"<u>Hazardous Materials Laws</u>" shall mean any federal, state or local statute, regulation or ordinance or any judicial or administrative decree or decision, whether now existing or hereinafter enacted, promulgated or issued, with respect to any Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water

runoff, waste emissions or wells. Without limiting the generality of the foregoing, the term shall encompass each of the following statutes, and regulations, orders, decrees, permits, licenses and deed restrictions now or hereafter promulgated thereunder, and amendments and successors to such statutes and regulations as may be enacted and promulgated from time to time: (i) the Comprehensive Environmental Response, Compensation and Liability Act, (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. Section 9601 et seq.); (ii) the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.); (iii) the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.); (iv) the Toxic Substances Control Act (15 U.S.C. Section 2061 et seq.); (v) the Clean Water Act (33 U.S.C. Section 1251 et seq.); (vi) the Clean Air Act (42 U.S.C. Section 7401 et seq.); (vii) the Safe Drinking Water Act (21 U.S.C. Section 349, 42 U.S.C. Section 201 and Section 300f et seq.); (viii) the National Environmental Policy Act (42 U.S.C. Section 4321 et seq.); (ix) the Superfund Amendments and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C.); (x) Title III of the Superfund Amendment and Reauthorization Act (40 U.S.C. Section 1101 et seq.); (xi) the Uranium Mill Tailings Radiation Control Act (42 U.S.C. Section 7901 et seq.); (xii) the Occupational Safety and Health Act (29 U.S.C. Section 655 et seq.); (xiii) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. Section 136 et seq.); (xiv) the Noise Control Act (42 U.S.C. Section 4901 et seq.); and (xv) the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 1100 et seq.).

"Improvements" means the infrastructure and substructures relating to the anaerobic digestion system, including, but not limited to, mixing tanks, digester tanks, secondary digesters, the Manure Separation Facilities, biogas handling and conditioning equipment, compression and injection equipment, and all other buildings, improvements, equipment and appurtenances necessary for a complete and functioning anaerobic digester facility.

"Landlord's Lender(s)" means any entity(ies) providing financing to Landlord which is secured by Landlord's fee title interest in the Leased Property and/or this Lease.

"Manure Separation Facilities" means the permanent waste water and manure separation equipment and physical facilities described on Exhibit E attached hereto and incorporated herein.

"Permitted Use" shall have the meaning specified in Section 5.

"Project" means that certain commercial-scale biogas production facility comprised of an anaerobic digestion system, together with the Improvements, for the production of methane gas and other co-products and beneficial uses, to be located on the Leased Property, which is intended to convert manure solids into saleable renewable natural gas and carbon dioxide.

"Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, dumping, discarding, burying, abandoning, or disposing into the environment.

"Rent" means, collectively, Term Rent and Additional Rent.

"Tenant's Lender" shall have the meaning specified in Section 16.

3.    PREMISES. Landlord, for and in consideration of the rents, covenants and conditions herein set forth, does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, subject to the terms, conditions and provisions of this Lease. Subject to Section 12.2 and as otherwise provided for in this agreement the "Premises" shall include, collectively:

DocuSign Envelope ID: 29026D24-8182-42F2-86AC-EF18A84C7357

3.1     the exclusive right to use, develop and occupy that portion of Landlord's Property legally described and depicted in the map attached hereto as <u>Exhibit B</u> (the "<u>Leased Property</u>") for the purposes described in <u>Section 5</u>, subject to Landlord's permitted access rights set forth herein and in the MSA;

3.2     the right to use and occupy a residential building (but not including the water well currently associated with the residence) located on the Leased Property and to renovate and make improvements subject to Landlord's final written approval; provided, however, if at any time during the Term Tenant is not using and occupying such residential building for a consecutive period of ninety (90) days or longer, Landlord may repossess the residential building and shall have exclusive use of the residential building as Landlord desires;

3.3     the nonexclusive right to use the area located on Landlord's Property designated as the "Access Easement," as legally described and depicted in the map attached hereto as <u>Exhibit C</u> for the purpose of vehicular and pedestrian ingress and egress from the public roadway to the Leased Property (the "<u>Access Easement</u>");

3.4     the nonexclusive right to use and develop the area located on Landlord's Property designated as the "<u>Pipeline Easement</u>," as legally described and depicted in the map attached hereto as <u>Exhibit C</u> for the purpose of constructing, operating and maintaining an underground pipeline for the purpose of conveying renewable natural gas from the Project to the public right of way. Tenant agrees that the Pipeline Easement shall comply with all applicable law that pertain to such a pipeline, including but not limited to depth and top-fill of underground pipelines of the type contemplated herein;

3.5     the exclusive right and responsibility to use, operate, maintain, repair, and replace the Manure Separation Facilities for the purpose of separating manure provided by Dairy to Tenant subject to Landlord's self-help remedies described in Section 17.1.7 of this Ground Lease and Section 11.6.3 of the MSA and provided that the right to use the Manure Separation Facilities will terminate if the MSA terminates for any reason;

3.6     a license to access, maintain, repair, and replace components of the Manure Separation Facilities that are located outside of the Leased Property, including the two existing pump pits, lagoon flush pump, pipelines, and related equipment and any additional pump pits that are added to the Manure Separation Facilities; and

3.7     a license to access, maintain, repair, and replace components of the temporary manure separation facilities that will be located outside of the Leased Property.

4.     <u>TERM; RENT; ADDITIONAL RENT; TAXES AND UTILITIES</u>.

4.1     <u>Rent</u>. This Lease shall be effective as of the Effective Date. As consideration for its use of the Premises as contemplated herein, commencing on the date of Commenced Construction, Tenant shall pay to Landlord annual rent in the initial amount of [Fifteen Thousand Dollars ($15,000)] per year, which amount shall automatically increase by three percent (3%) over the prior year for each year of the Term (including, without limitation, the Extension Term, if exercised) ("<u>Term Rent</u>") for the remainder of the Term. Term Rent shall be payable annually in advance on each one (1) year anniversary of the date of Commenced Construction. The Term Rent for any partial years shall be prorated for the actual number of days in that period. All payments to be made under this Lease shall be made to Landlord at the address set forth in <u>Section 14</u> herein or to such other person, firm or place as Landlord may, from time to time, designate in writing. The rent shall be increased by an amount to be negotiated by the Landlord and the Tenant in the event that the Tenant elects to install recapture facilities over the settling ponds.

4.2    Termination by Landlord; Commencement of Initial Term. The period commencing on the Effective Date and terminating on the Commercial Operations Date (as identified in the notice thereof required to be delivered by Tenant under the MSA) shall be referred to as the "Pre-Operations Term." The "Initial Term" of this Lease shall be twenty (20) years commencing upon the Commercial Operations Date (the time period from the Commercial Operations Date until the end of such twenty (20) year period, the "Initial Term" and together with the Pre-Operations Term and the Extension Term, the "Term"). If Commenced Construction (as defined in the MSA) does not take place on or before the first anniversary of the Effective Date, then after such first anniversary, Landlord shall have the option to immediately terminate this Lease by providing written notice to Tenant; provided that Landlord may not terminate this Lease if by such first anniversary, the Manure Separation Facilities have been constructed and are fully operational by the dates and in accordance with Exhibit E. Additionally, if the Commercial Operations Date (as defined in the MSA) does not occur on or before the third anniversary of Commenced Construction, then after such third anniversary, Landlord shall have the option to immediately terminate this Lease by providing written notice to Tenant; provided, however, that Landlord may not terminate this Lease as provided in this Section if by such third anniversary, (1) the Manure Separation Facilities have been constructed and are fully operational by the dates and in accordance with Exhibit E and (2) the Commercial Operations Date is reached by the fourth anniversary of Commenced Construction. For the avoidance of any doubt, any and all Term Rent paid to Landlord prior to termination of this Lease by Landlord as provided in this Section 4.2 shall be nonrefundable to Tenant.

4.2.1    If the MSA expires, or if the MSA terminates for any reason other than Tenant's termination of the MSA for Dairy's uncured default thereunder, then this Lease will terminate concurrently with the expiration or termination of the MSA; provided, however, Tenant will have a period of thirty (30) days after any such termination to wind down Tenant's operations and to surrender and vacate the Premises, the Project and any other improvements in broom-clean condition.

4.2.2    If the MSA is terminated by Tenant due to Dairy's default under the MSA, then (a) this Lease will remain in full force and effect (provided Tenant is not in an uncured default of its obligations under this Lease); (b) Tenant acknowledges that Landlord is not under any obligation to perform any duties or obligations of Dairy under the MSA; (c) the Manure Separation Facilities will cease being part of the Premises and Tenant shall have no rights to or control over the Manure Separation Facilities; and (d) Landlord shall have the exclusive right to enter onto and use the Premises to operate, use, maintain, repair, replace or remove the Manure Separation Facilities.

4.3    Extension Term. Tenant may, at its option and subject to the conditions herein stated, extend this Lease for one (1) additional period of five (5) years (the "Extension Term"). In order to exercise the foregoing option, Tenant shall notify Landlord in writing by certified, registered mail or by nationally recognized courier service of its intention to exercise its option at least three hundred (300) days prior to the expiration of the Initial Term, said renewal to be upon the same terms and conditions set forth in this Lease except for Rent, which shall be as set forth in Section 4.2 above. Tenant's right to exercise the Extension Term option shall be subject to the following conditions precedent:

4.3.1    This Lease shall be in effect at the time notice of exercise is given and on the last day of the then-applicable Term;

4.3.2    No uncured Event of Default (as hereinafter defined) shall exist under any provision of this Lease or the MSA at the time notice is given nor on the last day of the then-applicable Term, including, without limitation, its obligation to timely pay Rent and any and all other monetary amounts under this Lease, including but not limited to amounts due to Landlord for taking corrective actions and/or any and all amounts due to Landlord or its affiliates under the MSA, including but not limited to any penalty amounts due under Section 11.6 of the MSA; and

DocuSign Envelope ID: 29026D24-8182-42F2-86AC-EF18A84C7357

4.3.3    each and every one of Tenant's material representations and warranties, as provided in this Lease, shall be true and correct as of the time notice is given, during the period from exercise of the notice through and including the last day of the then-current Term, and as of the first day of the Extension Term; and

4.3.4    Tenant shall have not suffered a material adverse change in financial condition, as determined by Landlord in its reasonable discretion.

4.4    <u>Absolute Net Rent</u>. Except as otherwise provided in this Lease, all Rent payable hereunder shall be paid as "absolute" rent without deduction or offset. It is the intent of the parties that the Rent provided to Landlord shall be absolutely net to Landlord, and Tenant shall pay to the appropriate parties all costs, charges, taxes (to the extent provided in <u>Section 4.6</u> below), utilities (to the extent provided in <u>Section 4.7</u> below), expenses and assessments of every kind and nature incurred for, against or in connection with the Premises, but excluding the cost of any insurance carried by Landlord or its affiliates.

4.5    <u>Late Charge and Default Interest</u>. If any Rent or other payment to made under this Lease or the MSA is not paid when due or within fifteen (15) days thereafter, Tenant shall promptly pay in addition to the applicable rental installment a late charge equal to ten percent (10%) of such rental installment. All amounts payable by Tenant to Landlord under any of the provisions of this Lease, or payments made by Landlord on Tenant's behalf to avoid default or cancellation, if not timely paid shall bear interest from the date they become due until paid or reimbursed at the rate equal to the lower of eighteen percent (18%) per annum or the highest lawful rate ("<u>Default Rate</u>").

4.6    <u>Taxes</u>.

4.6.1    Commencing on the first day of the calendar year in the year Commenced Construction occurs and during the remainder of the Term, Tenant shall be responsible to pay, without abatement, deduction, or offset, and prior to delinquency, any real or personal property taxes, assessments and other charges, assessments and taxes levied upon, assessed against, and applicable to the Premises, the Improvements, and all personal property owned by Tenant and located on the Premises, the leasehold estate, or any sub-leasehold estate. Notwithstanding anything herein to the contrary, Tenant shall be solely responsible for all development and impact fees for the Project and/or the Improvements and all related construction and development expenses for the Improvements from and after the Effective Date. Tenant shall make all such payments directly to the appropriate charging or taxing authority at least ten (10) days before delinquency and before any fine, interest, or penalty shall become due or be imposed by operation of law for their nonpayment. Promptly after any payment to the taxing authorities, Tenant shall supply Landlord with proof of any such payment. If Tenant fails to make any payment of taxes or assessments as required under this Section, Landlord may pay them (including any associated interest and penalties) to protect Landlord's interest, but any such payment will not relieve Tenant from its responsibility for payment of the taxes and assessments or waive any default by Tenant under this Lease. Such payment by Landlord on Tenant's behalf shall bear interest at the Default Rate. If Tenant fails to make any payment of taxes and assessments as required under this Section, and if such failure by Tenant results in an assessment of interest or penalty by the taxing authority, then Tenant shall also be responsible for the payment of such interest or penalty.

4.6.2    Tenant, at its sole cost and expense, and subject to the approval of Landlord, shall undertake all reasonable actions necessary to cause the Leased Property to be assessed separately from any other land, improvements or equipment owned by Landlord, and Landlord shall cooperate in Tenant's efforts to establish such separate tax parcel.

4.6.3    Landlord and Tenant each shall have the right to review real estate taxes by legal proceedings, instituted and conducted at the sole expense of the party commencing such proceedings, and in case, as a result of such proceedings, or otherwise, any such taxes or assessments shall be reduced, cancelled, set aside or to any extent discharged, Tenant's final liability hereunder shall be based on the amount that shall be finally imposed or be adjudicated to be due and payable on any such disputed or contested items. If Tenant commences such a proceeding, it agrees to notify Landlord and Landlord shall reasonably cooperate with Tenant in the prosecution of such proceeding provided that Tenant shall pay all expenses of such proceeding. If Landlord commences such a proceeding, Landlord shall notify Tenant and Tenant shall reasonably cooperate in the prosecution of such proceeding provided that Landlord shall pay all expenses of such proceeding. If any such proceeding shall result in the reduction, abatement or return of any such taxes, the reasonable out-of-pocket costs of such proceeding may first be recovered by the party incurring the same out of the amount of such reduction, abatement or return.

4.7    Utilities. From and after the Effective Date and continuing for the remainder of the Term, Tenant shall be solely responsible for and promptly pay all charges for heat, water, gas, electricity, telephone or any other utility or other services such as internet furnished to the Premises, including the Manure Separation Facilities and used solely in connection with the Project and the Manure Separation Facilities. Tenant shall be solely responsible for all costs to repair and extend utility lines required for the Project. Tenant shall be solely responsible for obtaining all utility services and Landlord shall not be liable for any interruption or failure in supply of any such utility to the Premises (including, without limitation, for consequential or incidental damages, or for lost revenues). Tenant shall install independent meters to record the usage of utilities to the Premises, including the Manure Separation Facilities and the Improvements, separate from Landlord's Property. In the event that the cost of additional infrastructure or system upgrades constructed to accommodate Tenant's consumption of utilities services are assessed or otherwise charged to Landlord, Tenant shall be responsible for reimbursing Landlord for the full amount of such amounts.

4.8    Water Rights. Tenant shall be responsible for obtaining any and all water to satisfy its requirements for the Project from third party sources or by obtaining a water right to dig a new well to be located on the Leased Property (in a location to be approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed). Landlord will use reasonable efforts to assist Tenant with obtaining such water rights. In the event that, after using commercially reasonable, good faith efforts, Tenant is unable to procure a water right as stated above, Landlord agrees to allow Tenant access to Landlord's water of up to fifty (50) gallons per minute of potable water for Tenant's operations (which the parties acknowledge does not allow use of grey water) in exchange for a fair market lease rate to be agreed to by Landlord and Tenant at such time based on the cost of such water to Landlord. In such event, Tenant will be responsible for obtaining any required regulatory approvals for such a water use transfer. In the event Tenant digs a new water well on the Leased Property to be used for commercial purposes, Tenant agrees that its use of such water well shall not exceed 0.04 cfs or 2,500 gallons per day, in accordance with Idaho Code Section 42-111 and Idaho Code Section 42-227.

5.    USE. Tenant shall have the right to use the Premises for the purpose of the development, construction, operation, and maintenance of the Project including but not limited to designing, constructing, maintaining and operating the Project, and uses incidental thereto, all in accordance with and set forth in this Lease and all applicable laws, and for no other uses (the "Permitted Use"). If the MSA is terminated but this Lease stays in effect as provided herein, Permitted Use shall not include the storage of manure or other feedstock for the Project nor Byproducts from the Project.

6.      CONSTRUCTION.

6.1     Development of Project. Subject to the terms of this Lease, Tenant shall construct the Project in accordance with the Plans (as defined below). Except as provided for in this Section 6.1, the Project shall be designed, developed, constructed, operated and maintained at Tenant's sole cost and expense. Tenant shall, at its sole cost and expense, provide all utility lines up to the perimeter of the Premises as necessary for the construction and operation of the Project. In conducting any grading, leveling and filling, Tenant shall make reasonable efforts to keep subsoil covered by topsoil similar to the condition that existed on the Effective Date. Tenant shall maintain the Premises and all Improvements thereon in a good condition, reasonable wear and tear excepted. Except for the Manure Separation Facilities, Tenant shall have title to and ownership of all Improvements. Tenant shall construct the Project in a first class, workmanlike manner consistent with other similar projects in the area, in substantial compliance with the Plans and in compliance with all applicable laws, rules and regulations, including, but not limited to, all land use and building laws, rules and regulations, environmental laws, rules and regulations, and insurance requirements and codes. Landlord shall reimburse Tenant for any expenses reasonably incurred by Tenant in constructing the Project, to the extent such expenses were caused by or attributable to the presence of Hazardous Materials or underground storage tanks on the Premises that existed on the Premises prior to the Effective Date hereof.

6.2     Construction and Relocation of Manure Separation Facilities. Tenant shall design, construct, install, and commission the Manure Separation Facilities as provided in Exhibit E.

6.3     Project Design. The current plans and specifications for the Project    the construction schedule for the Project, the site improvements and equipment, and the design and appearance of the exterior of the Improvements) are (or will be) attached hereto as Exhibit F (as may be amended in accordance with this Lease, the "Plans"). The Plans that are attached as Exhibit F at the execution of this Lease are deemed approved by Landlord and Tenant. Any Plans that are approved by Landlord in writing subsequent to the execution of this Lease will be attached to Exhibit F to this Lease, which approval will be governed by Exhibit G, and will not be unreasonably withheld or delayed. If there are any material changes to the Plans, Landlord and Tenant shall comply with the Project design process described on Exhibit G hereto; provided, however, that in all events no changes to the Plans shall be implemented without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed. Tenant represents and warrants to Landlord that it will construct the Project with best in class equipment so as to produce high-quality product.

6.3.1    Following initial construction in accordance with the Plans, no alterations, additions or other improvements shall be made to the Premises, the Project or the Improvements unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

6.4     Construction Contract; Contractor. Tenant will provide sufficient evidence reasonably satisfactory to Landlord of committed capital prior to the date of Commenced Construction. Tenant shall provide Landlord with a list of contractors and service providers anticipated to conduct work on site and will maintain this list on a real time basis throughout the construction period. Landlord shall reserve the right to establish reasonable rules and regulations applicable to each contractor to ensure that such contractor's onsite activities do not have any adverse material impact on the adjacent Dairy operation (including, without limitation, with respect to site clean-up and maintenance, noise, parking, and ingress and egress). Tenant shall inform all contractors of these rules and regulations and shall cause the contractors to strictly abide by the rules and regulations. Tenant will provide, or cause to be provided to Landlord adequate payment and performance bonds to ensure timely completion of the Project. Tenant shall insure that all construction contracts will include an acknowledgment of the applicable contractor that its lien

rights with respect to the Project extend only to Tenant's leasehold interest in the Premises and that no contractor (including subcontractors) shall have the right to place a lien on Landlord's fee interest in the Premises or Landlord's Property.

        6.4.1    Notwithstanding anything to the contrary contained in this Lease: (i) Tenant shall be obligated to source all concrete and gravel required for the construction of the Project from Landlord (or its affiliate), for appropriate consideration; (ii) Tenant shall reimburse Landlord based on an agreed upon hourly rate for demolition and prep work already performed, which was necessary to facilitate the Project and the Manure Separation Facilities, and which are evidenced by commercially reasonable documentation; and (iii) Tenant shall allow Landlord (or its affiliate) the opportunity to perform the existing (as of the date hereof) building demolition, grading and earth work for the Project site, for appropriate consideration based on an agreed upon hourly rate; provided that for all of the above in this 6.4.1, Landlord's consideration for such materials and/or services is at or below market rate and the delivery/performance schedule for such is equal to or less than the applicable market.

        6.5    <u>Permits and Governmental Approvals</u>. Except as provided in Exhibit E, it is understood and agreed that Tenant's ability to use the Premises for the development, construction, operation and maintenance of the Project is contingent upon Tenant obtaining all of the certificates, permits, zoning changes or variances, easements, rights of way, and other federal, state or local authorizations and/or approvals that may be required by any federal, state or local authority in connection with the Project (collectively, the "<u>Project Governmental Approvals</u>"). Landlord shall assist and cooperate, at no cost to Landlord, with Tenant in its effort to obtain the Project Governmental Approvals. Tenant shall operate the Project according to the Project Governmental Approvals. If the existence or operation of the Project requires Landlord or its affiliates to obtain any new Project Governmental Approval, or to amend any Project Governmental Approval currently held by Landlord or its affiliates, Tenant shall be responsible for any reasonable out-of-pocket costs incurred by Landlord or its affiliates in obtaining, amending and complying with such Project Governmental Approval. Tenant's obligations under this Lease are conditioned upon Tenant's receipt of all Project Governmental Approvals required for (i) Commenced Construction (as defined in the MSA) by the date which is one (1) years after the Effective Date, and (ii) the Commercial Operations Commencement (as defined in the MSA) by the date which is three (3) years after the date that Tenant Commenced Construction. If either of the conditions described in the preceding sentence are not satisfied by the applicable deadline, then Tenant shall have the right to terminate this Lease by delivering written notice to Landlord within ten (10) days of Commenced Construction or Commercial Operations, whichever is applicable. For the avoidance of any doubt, any and all Rent paid to Landlord prior to Tenant electing not to proceed as a result of the failure of the conditions set forth in this <u>Section 6.5</u> shall be nonrefundable to Tenant and Tenant shall operate the Manure Separation Facilities at its expense up to and for thirty (30) after Tenant's election not to proceed..

    7.    <u>REPRESENTATIONS AND WARRANTIES</u>.

        7.1    <u>By Tenant</u>.

        7.1.1    Tenant is duly formed, validly existing, and in good standing under the laws of the state of its formation and is fully qualified to do business in the State of Idaho;

        7.1.2    Tenant has the right and authority to enter into this Lease and to perform its obligations hereunder. The execution and delivery by Tenant of this Lease, and the performance of its obligations hereunder, will not result in the breach, contravention, or violation of any applicable law, Tenant's organizational documents, or any other agreement or arrangement between Tenant and any other person, entity, or party;

7.1.3    Each of the individuals whose signature is set forth at the end of this Lease have been duly authorized by all necessary entity action on the part of Tenant to execute this Lease and to bind Tenant.

7.2    <u>By Landlord.</u>

7.2.1    Landlord is duly formed, validly existing, and in good standing under the laws of the state of its formation and is fully qualified to do business in the State of Idaho.

7.2.2    Landlord has fee simple title to the Premises and the right and authority to enter into this Lease and to perform its obligations hereunder.

7.2.3    Subject to the written approval of Landlord's short and long-term lenders, the execution and delivery by Landlord of this Lease, and the performance of its obligations hereunder, will not result in the breach, contravention, or violation of any applicable law, Landlord's organizational documents, or other agreement or arrangement between Landlord and any other person, entity, or party.

7.2.4    Each of the individuals whose signature is set forth at the end of this Lease have been duly authorized by all necessary entity action on the part of Landlord to execute this Lease and to bind Landlord.

8.    <u>COVENANTS.</u>

8.1    <u>Hazardous Materials.</u> Tenant hereby agrees that Tenant and Tenant's officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, Tenants, subtenants, concessionaires, invitees and any other occupants of the Premises (for purpose of this Section, referred to collectively herein as **"Tenant's Representatives"**) shall not use, generate, manufacture, refine, produce, process, store or dispose of, on, under or about the Premises or transport to or from the Premises in the future for the purpose of generating, manufacturing, refining, producing, storing, handling, transferring, processing or transporting Hazardous Materials, except in compliance with all applicable Hazardous Materials Laws. Furthermore, Tenant shall, at its own expense, procure, maintain in effect and comply with all conditions of any and all Project Governmental Approvals required for the storage or use by Tenant or any of Tenant's Representatives of Hazardous Materials on the Premises, including without limitation, discharge of appropriately treated materials or wastes into or through any sanitary sewer serving the Premises. Except as discharged into the sanitary sewer or otherwise removed from the Premises in strict accordance and conformity with all applicable Hazardous Materials Laws, Tenant shall cause any and all Hazardous Materials removed from the Premises solely by duly licensed haulers to duly licensed facilities for final disposal of such materials and wastes.

8.2    <u>Applicable Laws.</u> Tenant shall use the Premises, and construct, develop, operate and maintain the Project, in accordance with (i) all applicable laws, rules and regulations, (ii) good industry practice, and (iii) in accordance with the terms of this Lease (including, but not limited to, all federal, state and local laws, rules and regulations concerning Hazardous Materials) and agrees to reasonably cooperate with Landlord regarding any compliance required by Landlord in respect to its use of the Premises.

8.3    <u>Maintenance and Operations.</u> Tenant shall maintain and operate the Project and the Manure Separation Facilities, including the Temporary Facilities as provided in the Exclusivity Agreement dated July 12, 2021 between the parties, in good condition and repair, consistent with the overall appearance and quality of maintenance of the adjacent Dairy operation, and in compliance with all applicable laws, rules and regulations, including the land use and building laws of local governmental authorities, environmental laws, rules and regulations, and insurance requirements and codes. Tenant

acknowledges and agrees that it is very important to the overall Dairy operation and brand that the exterior of the Project, the Manure Separation Facilities, and the Leased Premises be maintained in a manner consistent with the maintenance of the adjacent Dairy operation (for example, and without limitation and by way of illustration only, graveled roadways must be appropriately graded, graveled and maintained, weeds and tumbleweeds must be controlled and cleared, and exterior surfaces maintained in accordance with the requirements of this Lease). In the event that Tenant fails to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA, Landlord may take such action as Landlord deems reasonably necessary to cause the Project, Manure Separation Facilities, and/or Leased Premises to be so maintained and Tenant shall promptly reimburse Landlord for Landlord's reasonable costs and expenses in connection therewith; provided, however, so long as such delay could not reasonably be expected to have a material adverse effect on the operations of the Dairy.

8.4     <u>Liens</u>. Landlord shall not be liable for any work, labor or materials furnished or to be furnished upon credit to or for Tenant or anyone claiming under the Tenant, and no mechanic's or other liens shall attach to or affect the estate or interest of the Landlord in and to the Premises. Tenant shall not do or suffer anything to be done whereby Landlord's Property or the Premises or any part thereof may be encumbered by any mechanic's liens or other liens. If any mechanic's lien, notice or claim thereof or any other lien is filed against Landlord's Property, the Premises or any part thereof for work, labor, or materials furnished or to be furnished to Tenant, or anyone claiming under Tenant, Tenant shall within sixty (60) days from the date of filing, cause the same to be withdrawn, discharged or removed by deposit, bonding proceedings or otherwise. If Tenant fails to do so, Landlord may do so and may pay any judgments recovered by any such lienor. Tenant shall immediately reimburse Landlord for all amounts paid pursuant to this paragraph, which amounts shall constitute an additional obligation of Tenant under this Lease together with interest from the date of expenditure at the Default Rate. Tenant understands that the removal of liens is critical to Landlord's financing and any liens will cause the Landlord to suffer significant damages, including incurring default interest rates on Landlord's loans.

8.5     <u>Entry by Third Parties</u>. No employee, agent, visitor, or representative of Tenant, or any other person affiliated with the Project, other than principals of Tenant or persons employed or engaged by Tenant or its affiliates for the purpose of running the day-to-day operations of the Project, may enter Landlord's Property without prior written consent of Landlord, which may be given only upon request at least two (2) business days in advance. In the event Tenant receives notice that any regulatory or government officials request entry to Landlord's Property or provide notice of intent to enter Landlord's Property, Tenant will provide prompt notice to Landlord of the same.

8.6     <u>Intentionally Deleted</u>.

8.7     <u>Permitting and Regulations</u>.

8.7.1     Except as authorized by an applicable Project Governmental Approval or otherwise in compliance with all Hazardous Materials Laws, Tenant shall not store fuel or any other substance, including (without limitation) solid or hazardous waste, on the Premises without prior written consent of Landlord. Without limiting the foregoing and for the avoidance of doubt, Tenant may store onsite biogas necessary for the operation of the Project as well as feedstocks and other products of the Project subject to and in accordance with all applicable laws, rules and regulations. Tenant shall not take any action which would require a Spill Prevention, Containment and Countermeasures Plan under Environmental Protection Agency ("<u>EPA</u>") regulations or a Resource Conservation and Recovery Act Permit to be obtained from the Department of Environmental Quality ("<u>DEQ</u>"), except as authorized by an applicable Project Governmental Approval or otherwise in compliance with all Hazardous Materials Laws.

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

8.7.2    The Project shall not accept any substance except as provided for in the MSA. Tenant shall take no action which would result in the Project being regulated as a facility related to the generation, transport, or disposal of solid or hazardous waste under applicable laws.

8.7.3    The Parties anticipate that all effluent or other substance from the Project will be stored and used at the Dairy (as defined in the MSA) located on Landlord's Property. Tenant will not transport or dispose any effluent or other substance from the Project off-site without prior written approval from Landlord. If Tenant does engage in off-site transport or disposal, Tenant or the third-party recipient of the effluent or other substance must first obtain and provide to Landlord all required Project Governmental Approvals at no cost to Landlord or its affiliates.

8.8    <u>No Adverse Impact on Dairy</u>. Tenant acknowledges and agrees that the Premises and the Project will be located within a larger dairy and farming operation, and accordingly Tenant covenants and agrees to cooperate with Landlord at all times to ensure that the operation and use of the Project does not result in any material adverse effect upon the Dairy. Without limiting the foregoing, any use by Tenant of the Access Easements shall not interfere with Landlord's dairy and farming operations.

8.9    <u>Fencing</u>. Landlord and Tenant acknowledge and agree that no fencing around the Leased Property shall be initially installed or required; provided, however, that Landlord may require Tenant to install fencing and/or other visual barrier(s) around all or any part of the Leased Property that Landlord determines need to be screened in order to maintain the high quality appearance of the adjacent Dairy, so long as such visual barrier(s) do not materially interfere with Tenant's operations or materially increase Tenant's costs. Tenant shall be responsible for the cost of installing such fencing and/or other visual barriers, but only to the extent the same does not exceed the cost of a six (6) foot-high chain-link fence with view guard around the entire perimeter of the Leased Property (and Landlord shall be responsible for any costs associated with installing any fencing and/or other visual barriers beyond that for which Tenant is responsible pursuant to this sentence). Tenant shall maintain any such fencing and/or visual barriers(s) at Tenant's sole cost and expense.

9.    <u>INDEMNIFICATION AND MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES</u>.

9.1    <u>Indemnification</u>. Tenant shall indemnify and hold harmless Landlord against any claim of liability or loss from personal injury or property damage in connection with Tenant's, its employee's, agent's, contractor's or consultant's (each, individually, a "<u>Tenant Party</u>" and collectively, the "<u>Tenant Parties</u>") use of the Premises or Landlord's Property (including but not limited to any damage resulting from Hazardous Materials brought onto the Premises or Landlord's Property by any Tenant Party, any environmental condition caused by a Tenant Party on the Premises or Landlord's Property, or any enforcement action (whether administrative or judicial) or third-party legal action taken as a result of the Project) except to the extent caused by the negligence or willful misconduct of Landlord, its employees, agents, contractors and consultants (each, individually, a "<u>Landlord Party</u>" and collectively, the "<u>Landlord Parties</u>"); provided, however, the foregoing indemnity shall not apply with respect to any Hazardous Materials that are transferred from Landlord to Tenant pursuant to the MSA, which shall address the allocation of liability with respect to such transferred Hazardous Materials between Landlord and Tenant. Landlord shall indemnify and hold harmless Tenant against any claim of liability or loss from personal injury or property damage in connection with (a) a Landlord Party's use of the Leased Property (including but not limited to any damage to the Leased Property or Tenant's Improvements resulting from Hazardous Materials brought onto the Leased Property by a Landlord Party) or the remainder of Landlord's Property except to the extent caused by the negligence or willful misconduct of the Tenant Parties, or (b) any pre-existing condition located on or about the Premises or Landlord's Property.

9.2    MUTUAL    WAIVER    OF    CONSEQUENTIAL    DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, NEITHER PARTY WILL BE LIABLE BY REASON OF A CLAIM BROUGHT ON THE BASIS OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY, FOR ANY SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER.

10.    <u>INSURANCE</u>.

10.1    <u>Comprehensive Liability Insurance</u>. Tenant shall, at its sole cost and expense, at all times during the Term, maintain in force, for the joint benefit of Tenant (as insured) and Landlord and any holder of a mortgage on the Premises (as additional insureds), a commercial general liability insurance policy or its equivalent issued by a carrier reasonably satisfactory to Landlord and authorized to do business the State of Idaho with an A.M. Best's Insurance Guide Rating of A- (VII) or better, by the terms of which Landlord and Tenant, and any holder of a mortgage on the Premises, are named as insureds or additional insureds, as the case may be, and are indemnified against liability for damage or injury to the property or person (including death) of any invitees of Tenant or any other person entering upon or using the Premises. Such insurance policy or policies shall be maintained in the minimum amount of $1,000,000.00 per occurrence for damage to property and for bodily injury or death as to any person, with a deductible not exceeding $50,000.00. Landlord reserves the right to require reasonable increases in the limits of coverage from time to time during the Term; and the requested increase will be deemed reasonable if consistent with commercially reasonable practices for similar projects in the same geographic area. Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance which may be carried by Landlord. Evidence of said insurance shall be delivered to Landlord on the Effective Date, effective from and after the Effective Date, and evidence of renewal and proof of payment of premium therefor shall be delivered to Landlord not less than fifteen (15) days within the renewal date of any such insurance policies during the Term. Such insurance shall be cancelable only after thirty (30) days' prior written notice to Landlord and Tenant, except ten (10) days' prior notice for nonpayment of premium, however in the event insurers are not willing or able to provide such notice, then this responsibility shall be borne by Tenant. In the event Tenant fails to timely pay any premium when due, Landlord shall be authorized, but not obligated, to do so, and may charge all costs and expenses thereof, including the premium and interest at the maximum rate allowed by law, to Tenant, to be paid by Tenant as Additional Rent hereunder (together with interest at the Default Rate).

10.2    <u>Fire and Extended Coverage Property Insurance</u>. Tenant shall, at its sole cost and expense and at all times during the Term, maintain in force, to the extent there is an insurable exposure, a policy of insurance against loss or damage by fire and lightning, and such other perils as are covered under a "Cause of Loss-Special Form" policy or equivalent together with the broadest form of the "extended coverage" or "all risk" endorsements, or equivalent, available in Idaho including, but not limited to, damage by wind storm, explosion, smoke, sprinkler leakage, vandalism, malicious mischief and such other risks as are normally covered by such endorsements. The insurance shall be carried and maintained to the extent of full (actual) replacement cost of the Project, in such amounts as may be reasonably acceptable to Tenant's financing parties; provided however, that during the period of construction, Tenant may provide or cause to be provided in lieu thereof builders' risk or similar type of insurance to the full replacement costs thereof. Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance which may be carried by Landlord. The deductible for such insurance shall not exceed $250,000.00. To the extent there is an insurable exposure, evidence of said insurance, together with proof of payment of the premium thereof, shall be delivered to Landlord on the Effective Date, to be effective from and after the Effective Date. Evidence of renewal and proof of payment of premium therefor shall be delivered to Landlord not less than fifteen (15) days within the renewal date of any such insurance policies during the

Term. Such insurance shall be cancelable only after thirty (30) days' prior written notice to Landlord and Tenant, except ten (10) days' prior notice for nonpayment of premium., however in the event insurers are not willing or able to provide such notice, then this responsibility shall be borne by Tenant. In the event Tenant fails to timely pay any premium when due or otherwise fail to keep the insurance required under this Lease in full force and effect, Landlord shall be authorized, but not obligated, to do so, and may charge all costs and expenses thereof, including the premium and interest at the Default Rate, to Tenant, to be paid by Tenant as Additional Rent hereunder. Landlord shall have no obligation to obtain insurance for the benefit of Tenant. In the event of a casualty event affecting the Manure Separation Facilities: (i) Tenant shall be obligated to rebuild the Manure Separation Facilities to the same or better standard as it existed prior to such casualty event; and (ii) any insurance proceeds received by Tenant in connection with such casualty event shall first be used to rebuild the Manure Separation Facilities and all other components of the Project that are necessary for Dairy's normal operations, as reasonably determined by Landlord; provided that if this is not possible, Tenant shall obtain a separate insurance policy on the Manure Separation Facilities to be used exclusively to repair and/or rebuild the Manure Separation Facilities.

10.3    <u>Waiver of Subrogation</u>. Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by any insurance to be carried on the Project, the Premises or in connection with any improvements on or activities conducted on the Premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof, and evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to invalidate or increase the cost of such insurance coverage (provided that in the case of increased cost, the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost, thereby keeping such release and waiver in full force and effect).

11.    <u>REMOVAL UPON TERMINATION</u>. No later than two hundred seventy (270) days prior to the expiration of the Term, or sixty days (60) after termination of this Lease for Tenants uncured default, or within 30 days of Tenants election to terminate due to the failure of Conditions Precedent in the MSA, Landlord shall elect, by giving written notice to Tenant (the "<u>Removal Notice</u>") whether the Project (or any portion thereof) is to remain on or be removed from the Premises. In case of removal, and within thirty (30) days following Tenant's receipt of the Removal Notice, Tenant will commit $500,000 in the form of bond or escrow account or will obtain a commercially reasonable letter of credit from a credit-worthy institution or some other form of security reasonably acceptable to Landlord to facilitate removal. If Landlord elects to have the Project remain at the Premises upon termination, Tenant agrees that the Project shall become the sole property of Landlord and Tenant agrees (i) to execute and deliver such documents as are reasonably necessary to confirm title in the Project in Landlord's name and (ii) to assign all Project Governmental Approvals, entitlements, approvals and/or authorizations to Landlord, to the extent assignable, so as to allow Landlord to operate the Project. Notwithstanding the foregoing, if either Tenant or Landlord terminates this Lease, Landlord will give prompt written notice to Tenant whether the Project (or any portion thereof) is to remain on or be removed from the Premises, and Tenant shall remove any portion of the Project from the Premises that Landlord so elects to be removed within thirty (30) days of such written notice from Landlord. This <u>Section 11</u> shall survive termination of this Lease.

12.    <u>QUIET ENJOYMENT; ENTRY BY LANDLORD</u>.

12.1    Landlord covenants that, provided Tenant is not in default under this Lease beyond applicable cure periods, Tenant shall peaceably and quietly have, hold and enjoy the Premises. Landlord shall deliver full and actual possession of the Premises to Tenant upon the Effective Date of this Lease subject to the provisions of this Section.

12.2    Given the vital nature of the Manure Separation Facilities to the operation of the Dairy, Landlord reserves the right to enter the Premises at any time for any purpose Landlord reasonably deems necessary for the operation of the Dairy, in addition to those allowed in the MSA, provided however that . (a) representatives of Tenant shall have the right to accompany Landlord during any such entry; and (b) Landlord shall comply with any reasonable safety procedures imposed by Tenant.

13.    <u>ASSIGNMENT; SUBLEASE</u>. Except as provided in this <u>Section 13</u>, Tenant shall not sell, assign or transfer this Lease, in whole or in part, directly or indirectly or sublet all or a portion of the Premises to any third party whether voluntary or by operation of law, including by way of sale of assets, membership interests or control, merger, consolidation, reorganization, change of control or similar transaction without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall be entitled, with Landlord's review and written approval, to assign this Lease and its rights herein to a Qualified Assignee (as defined below); provided that such Qualified Assignee agrees in writing to assume and be bound by all of Tenant's rights and obligations hereunder. Landlord shall be permitted to sell, assign or transfer this Lease, in whole or in part without the consent of Tenant. Tenant shall provide written notice to Landlord of any such subleases or rights of entry. All such subleases or rights of entry shall be subject and subordinate to this Lease, and all such sublessees and holders of any rights of entry shall strictly comply with all requirements of this Lease. "Qualified Assignee", including an affiliate of Tenant, means an entity that (i) has a net worth equal to or greater than Tenant's net worth at the time of the sale, assignment, transfer or sublease and sufficient to properly operate and maintain the Improvements; and (ii) has significant experience successfully owning and operating (either itself or through affiliated entities) similar energy and/or gas projects in the United States.

14.    <u>NOTICES</u>. Any notice, demand or other communications under this Lease required or permitted to be given hereunder, unless expressly provided otherwise, shall be in writing, properly addressed, postage and delivery charges pre-paid (as applicable), and delivered by: (a) hand-delivery; (b) certified or registered mail, (return receipt requested; (c) nationally recognized overnight courier; or (d) email to the appropriate address as shown below or as otherwise designated from time to time by providing notice of other addresses. Any notice or other communications given in accordance herewith shall be deemed given on the earlier of actual delivery or attempted delivery; provided that notice given in accordance with this <u>Section 14</u> but received on any day other than a business day or after 5:00 p.m. in the place of receipt, will be deemed given on the next business day in that place. Notices delivered by email shall not be considered to be delivered unless (i) the sender has an email confirmation receipt (either from the recipient or the recipient's email server); and (ii) the notice is concurrently sent by another means allowed under this <u>Section 14</u>. Notices may be given by counsel on behalf of such counsel's client.

|  |  |
|---|---|
| to Landlord: | East Valley Cattle, LLC |
|  | Attention: Bill Millenkamp |
|  | 471 N. 300 W. |
|  | Jerome, Idaho 83338 |
|  | Telephone: (208) 731-5518 |
|  | Email: bill@millenkamp.com |
|  |  |
| With a copy to: | Givens Pursley LLP |
|  | Attention: Ed Miller |
|  | 601 W. Bannock Street |
|  | Boise, Idaho 83702 |
|  | Telephone: (208) 388-1200 |
|  | Email: edmiller@givenspursley.com |
|  |  |
| to Tenant: | East Valley Development, LLC |

DocuSign Envelope ID: 29D26D24-8182-42F2-86AE-EF18A84C7357

Attention: General Counsel
4675 MacArthur Court, Suite 800
Newport Beach, CA 92660

Telephone: 949-437-1000
Email: nate.jensen@cleanenergyfuels.com

With a copy to:          Intentionally left blank

      15.    LANDLORD'S FINANCING; SUBORDINATION. This Lease, any allowed subleases, and the MSA shall be subject and subordinate to any financing now existing or hereafter placed upon Landlord's Property, or any portion thereof, by Landlord, and to any and all advances to be made thereunder and to interest thereon and all modifications thereof (each, a "Mortgage"). The preceding provision shall be self-operative, but shall be conditioned on Tenant's receipt of a non-disturbance agreement from the holder of a Mortgage, in a form acceptable to the holder, stating that such holder shall not disturb or interrupt Tenant's continued enjoyment of the Premises, absent a breach of the Lease by Tenant beyond any applicable cure period (and subject to the rights of any Tenant's Lender pursuant to Section 16). Tenant shall, within fifteen (15) days of written notice by Landlord or Landlord's Lender, from time-to-time, execute and deliver a subordination and non-disturbance agreement required by the holder of a Mortgage, but only if any such subordination agreement provides that so long as Tenant is not in default under this Lease beyond any applicable cure period (and subject to the rights of any Tenant's Lender pursuant to Section 16), Tenant shall have the continued enjoyment of the Premises free from any disturbance or interruption by any holder of a Mortgage or any purchaser at a foreclosure or private sale of Landlord's Property. Tenant's failure to provide the agreement within the time frame shall be a default under this lease.

      16.    LEASEHOLD MORTGAGE. Tenant shall have the right to encumber all or any portion of its interest in this Lease, including the leasehold estate and all appurtenant rights thereto (collectively, the "Leasehold Interest") by deed of trust, mortgage, assignment of leases and rents, assignment, security agreement or other security interest (a "Leasehold Mortgage"); provided that any such conveyance or pledge of Tenant's interest shall be expressly subject and subordinate to the covenants, conditions and restrictions set forth in this Lease, and provided that such conveyance or pledge does not create any encumbrance of any kind on Landlord's Property other than Tenant's leasehold estate therein. Tenant covenants and agrees to pay the indebtedness secured by any Leasehold Mortgage entered into in compliance with the provisions hereof, when the same shall become due and payable, and to perform, when such performance is required, all obligations of the mortgagor thereunder. Tenant further agrees not to suffer or permit any default to occur and continue under the Leasehold Mortgage beyond any applicable cure period. The Leasehold Mortgage shall specify that the indebtedness is that of Tenant only and is not the indebtedness of Landlord and that the lien of the Leasehold Mortgage is limited to Tenant's Leasehold Interest. Said Leasehold Mortgage must, by its own terms, have a stated maturity date which is prior to the expiration of the Term, and Tenant covenants that it will be so paid and that the Leasehold Interest will be released from such lien prior to the expiration of the Term. Tenant shall cause a true, complete, and correct copy of the original of each Leasehold Mortgage, together with written notice containing the name and address of the holder thereunder ("Tenant's Lender") to be delivered to Landlord within ten (10) days of Tenant's execution and delivery of such Leasehold Mortgage. Tenant shall, from time to time, when and as requested by Landlord, deliver to Landlord a certificate from Tenant's Lender certifying as to the amount of the unpaid principal balance under the Leasehold Mortgage, together with accrued interest thereon, and, to the actual knowledge of Tenant's Lender, as to the existence or absence of defaults thereunder.

17.    DEFAULT.

17.1    Events of Default. Each of the following events shall constitute a default by Tenant, a breach of this Lease, and an "Event of Default" hereunder:

17.1.1    Tenant shall default in making the due and punctual payment of any installment of Rent, or any other impositions or monetary obligations of any nature whatsoever payable by Tenant hereunder when and as the same shall become due and payable;

17.1.2    Tenant shall be in material default in the performance or compliance with any of the agreements, terms, covenants or conditions in this Lease, or Tenant shall breach any of the representations or warranties under this Lease;

17.1.3    Tenant shall be in default beyond any applicable cure period under any Leasehold Mortgage or the MSA;

17.1.4    Abandonment of the Leased Property, or the Improvements now or hereafter constructed thereon, where such abandonment continues for a period of more than thirty (30) days in any three hundred and sixty-five day period (365).

17.1.5    The Project experiences Outages, as defined in Section 2.6 of the MSA for more than thirty (30) days in any three hundred sixty-five (365) day period (except in connection with repairs, construction or a force majeure event) ("Maximum Outages"), provided however that: (i) exceeding Maximum Outages shall not be an event of default if Tenant pays Landlord 5% of Dairy Attributable Gross Revenue plus four thousand dollars ($4,000) per day for each Outage which exceeds the Maximum Outages; and (ii) if the Project Cessation was caused by Landlord's breach of this Lease, or the Dairy's cessation of the Farm Business (as defined in the MSA), then the aforementioned thirty (30) days in any three hundred and sixty-five (365) will not commence until Landlord cures such breach and/or Dairy resumes the Farm Business;

17.1.6    The appointment of a receiver to take possession of the Premises or the Project for any reason including but not limited to assignment for benefit of creditors or voluntary or involuntary bankruptcy proceedings, unless such receivership is dismissed, discharged vacated or terminated within sixty (60) days after appointment of a receiver;

17.1.7    An assignment by Tenant for the benefit of creditors, or the filing of a voluntary or involuntary petition by or against Tenant under any law for the purpose of adjudicating Tenant bankrupt; or for extending time for payment, adjustment or satisfaction of Tenant's liabilities; or reorganization, dissolution or arrangement on account of, or to prevent bankruptcy or insolvency; unless, in case of such that are involuntary on Tenant's part, the assignment, proceedings, and all consequent orders, adjudications, custodies and supervisions are dismissed, vacated or terminated within sixty (60) days after the assignment, filing or other initial event.

If the alleged default is monetary in nature such as (but not limited to) nonpayment of Rent, taxes or any other sums required to be paid by Tenant, Landlord shall deliver written notice to Tenant of the default and Tenant will have five (5) days after the receipt of such written notice to cure the default. As to non-monetary defaults, Tenant shall have up to thirty (30) days after written notice is given by Landlord specifying the nature of the default to cure the default; provided, however, that if after exercise of due diligence and its best efforts to cure such non-monetary default Tenant is unable to do so within such thirty (30)) day period, then the curing period shall be extended for such reasonable time as may be reasonably approved by Landlord for curing such default, so long as Tenant continues to diligently prosecute to completion the

DocuSign Envelope ID: 29026D24-8182-42E2-86AC-EF18A84C7357

curing of the default, up to a maximum of ninety (90) days. As used herein, non-monetary default shall include, without limitation, a breach of any covenant of Tenant under this Lease, Tenant's failure to perform as required under this Lease, and a breach of any warranty, representation or other agreement of Tenant under this Lease. In all such events, to the extent that any such Tenant Default materially and adversely affects the operations of the Dairy, Landlord shall have the right to cure any such Tenant Default by engaging in reasonable self-help remedies, or to take any other action with respect to the Project or the Manure Separation Facilities which is reasonably necessary or desirable for Landlord to ensure the operation of the Dairy in the ordinary course of business, and Landlord shall be entitled to recover from Tenant any reasonable costs and expenses incurred in connection therewith; provided, however, so long as such delay could not reasonably be expected to have a material adverse effect on the operations of the Dairy, Landlord shall allow Tenant ten (10) days after written notice from Landlord to cure such Tenant Default before Landlord exercises its self-help remedies.

17.2    Remedies. If any default by Tenant shall continue uncured upon expiration of the applicable curing period, then, subject to any applicable cure rights of any Tenant's Lender pursuant to Section 16, Landlord may exercise any one or all of the following remedies in addition to all other rights and remedies provided by law or equity, from time to time, to which Landlord may resort cumulatively or in the alternative:

17.2.1    Termination. Landlord may, at Landlord's election, and without prior written notice except as otherwise required in this Lease, terminate this Lease. All of Tenant's rights under this Lease shall terminate upon termination of this Lease. Promptly after any such termination, Tenant shall surrender and vacate the Premises, the Project and any other improvements in broom-clean condition, and Landlord may re-enter and take possession of the Premises, the Project and all other improvement, subject to Landlord's option to elect to require Tenant to remove the Project in accordance with Section 11. Termination under this paragraph shall not relieve Tenant from the payment of any sum then due to Landlord, or from any claim for damages previously accrued, or then accruing, against Tenant.

17.2.2    Re-entry Without Termination. Landlord may, at Landlord's election, re-enter the Premises and the Project, and without terminating this Lease, at any time, relet the Premises and the Project, or any part(s) of them, for the account, and in the name of Tenant or otherwise, all upon commercially reasonable rates and terms determined by Landlord, without hereby obligating Landlord to relet the Premises and the Project or make an effort to relet either or both of them in whole or in part, at any time. Any reletting may be for the remainder of the Term, or for any longer or shorter period. Landlord may execute any leases made under this provision either in Landlord's name or in Tenant's name, and Landlord shall be entitled to all rents from the use, operation or occupancy of the Premises, the Project, or both. Landlord shall have the further right, at Landlord's option, to make such reasonable and necessary alterations, repairs, replacements and/or restorations which shall not operate or be construed to release Tenant from liability hereunder. Tenant shall nevertheless pay to Landlord on the due dates specified in this Lease the equivalent of all sums required of Tenant under this Lease, plus Landlord's expenses. Landlord shall submit an invoice and supporting documentation to Tenant for the actual, reasonable out-of-pocket costs incurred by Landlord to cure such default. No act by or on behalf of Landlord under this provision shall constitute a termination of this Lease unless Landlord gives Tenant written notice of termination.

17.2.3    Tenant's Personal Property. Landlord may, at Landlord's election, use Tenant's personal property and trade fixtures or any of such property and fixtures without compensation and without liability for use or damage, or store them for the account and at the cost of Tenant or dispose of such personal property without accountability to Tenant. The election of one remedy for any one item shall not foreclose an election of any other remedy for another item, or for the same item at a later time.

17.2.4 <u>Appointment of Receiver</u>. Landlord may, if Landlord elects to file suit to enforce this Lease and/or protect its rights hereunder, in addition to the other remedies provided in this Lease and by law, have the appointment of a receiver of the Premises and the Project.

17.2.5 <u>Operation of Project</u>. Notwithstanding anything to the contrary herein, in the event of a default by Tenant, Landlord shall have the right (but not the obligation) to take over the operation of the Project, and Tenant will cooperate to facilitate Landlord's operation thereof.

17.3 <u>Landlord Default; Effect</u>. In the event of a material default by Landlord, Landlord shall have up to thirty (30) days after written notice is given by Tenant specifying the nature of the default to cure the default; provided, however, that if after exercise of Landlord's diligent and best efforts to cure such default Landlord is unable to do so within such thirty (30)) day period, then the curing period shall be extended for such reasonable time as may be reasonably approved by Tenant for curing such default, so long as Landlord continues to diligently prosecute to completion the curing of the default, up to a maximum of ninety (90) days. In all such events, to the extent that any such Landlord default materially and adversely affects the operations of the Project, Tenant shall have the right to cure any such Landlord default by engaging in reasonable self-help remedies, or to take any other action with respect to the Project which is reasonably necessary or desirable for Tenant to ensure the operation of the Project in the ordinary course of business, and Tenant shall be entitled to recover from Landlord any reasonable costs and expenses incurred in connection therewith; provided, however, so long as such delay could not reasonably be expected to have a material adverse effect on the operations of the Project, Tenant shall allow Landlord ten (10) days after written notice from Tenant to cure such Landlord default before Tenant exercises its self-help remedies. Further, in the event of an uncured default, Tenant may, at its option, without waiving any claim for damages for breach of the Lease, terminate this Lease by written notice to Landlord prior to Landlord's cure of the breach or Tenant's exercise of any self-help remedies with respect to the uncured breach.

18. <u>HOLDOVER</u>. If Tenant remains in possession of the Premises or any part thereof after the expiration or sooner termination of the Term, Tenant shall become a tenant at sufferance and shall pay Landlord a rent equal to twice the amount of Rent paid by Tenant in the last year prior to the expiration or termination of the Lease, which shall be payable on a per diem basis, not to exceed the amount permitted to be charged by a Landlord under applicable Idaho law. Notwithstanding that Landlord may allow Tenant to continue in possession after the expiration or sooner termination of this Lease, neither that nor the provisions of this Section shall constitute a waiver of any of Landlord's rights under this Section or this Lease. Further, notwithstanding the payment of Rent by Tenant and acceptance thereof by Landlord as provided in this section, Tenant shall be in continuing default of this Lease at all times and during all periods in which Tenant is a holdover tenant.

19. <u>CASUALTY</u>.

19.1 <u>Tenant's Duty to Restore Premises</u>. At any time during the Term, and so long as no Event of Default has occurred, if any portion of the Project now or hereafter located on the Premises are damaged and/or destroyed in whole or in part by fire, theft, the elements, or any other cause, this Lease shall continue in full force and effect, and Tenant, at its sole cost and expense, shall repair and restore the damaged or destroyed Project according to the original plan hereof or according to such modified plans as shall be reasonably approved in writing by Landlord, whether or not there are sufficient insurance proceeds to cover the repair and restoration expenses. The work of repair and restoration shall be commenced by Tenant as soon as reasonably possible. Tenant shall proceed diligently to commence repairs and restoration. Once construction has commenced, Tenant shall proceed diligently thereafter to complete the construction or repair, and shall complete the same no later than three hundred sixty five (365) days after the

commencement of such construction or repair, subject to reasonable delays due to force majeure events or events beyond the reasonable control of Tenant.

        19.2    <u>Option to Terminate Lease for Destruction</u>. Notwithstanding <u>Section 19.1</u> above, in the event that during the last one hundred eighty (180) days of the Term, the Project is damaged or destroyed by fire, theft or any other casualty, through no fault of Tenant, so that it cannot be repaired and restored as required by <u>Section 19.1</u> of this Lease at a cost equal to or less than thirty-five percent (35%) of the cost to replace the Project, and if Tenant has not yet timely exercised its option to extend the Term, then Tenant and Landlord shall each have the option of terminating this Lease on the last calendar day of any month during the last year of the Lease Term by giving to Landlord or Tenant, as the case may be, at least sixty (60) days' prior written notice of Tenant's or Landlord's intent to do so; and if Tenant elects to terminate this Lease, then Tenant shall also be required to remove, at Tenant's own cost and expense, all debris and remains of the damaged improvements from the Premises (provided, however, that in such event, the proceeds of any insurance policy required to be carried by Tenant hereunder and relating to the replacement of the Manure Separation Facilities shall be paid over to Landlord). In the event, however, that Tenant has duly exercised a renewal option in accordance with the conditions of this Lease; Tenant has commenced to repair and restore in a timely manner the Project and any other damaged improvements in accordance with the terms of this Lease; Tenant has demonstrated to the reasonable satisfaction of Landlord sufficient funds and insurance proceeds to complete the work; and no Event of Default has occurred which remains uncured, Landlord agrees not to terminate this Lease. Any failure by Tenant to timely and properly repair and restore the Project and Premises, once Tenant has elected to do so, shall constitute an Event of Default hereunder.

        20.    <u>CONDEMNATION</u>. If the entire Premises is taken or so transferred, this Lease and all of the right, title and interest thereunder shall cease, terminate and be of no further force or effect on the date title to such land so taken or transferred vests in the condemning authority. In the event of the taking or transfer of only a part of the Premises, leaving the remainder of the Premises in such location, or in such form, shape or reduced size as to be not effectively and practicably usable in the good faith opinion of Tenant for the operation thereof of Tenant's business, and if Landlord agrees with Tenant's determination, which consent will not be unreasonably withheld, this Lease and all right, title and interest thereunder may be terminated by Tenant giving, within sixty (60) days of the occurrence of such event, thirty (30) days' notice to Landlord of Tenant's election to terminate. In the event of such taking or transfer of only a part of the Premises leaving the remainder of the Premises in such location and in such form, shape or size as to be used effectively and practicably in the good faith opinion of Tenant for the purpose of operation thereon of Tenant's business, this Lease shall terminate only as to the portion of the Premises so taken or transferred as of the date title to such portion vests in the condemning authority, and shall continue in full force and effect as to the portion of the Premises not so taken or transferred. From and after such date the Rent required to be paid by Tenant shall be reduced in proportion to which the square footage of the area so taken or transferred bears to the total square footage of the Premises prior to the taking or transfer. If title and possession of a portion of the Premises is taken under the power of eminent domain, and the Lease continues as to the portion remaining, all compensation and damages ("<u>Compensation</u>") payable to Tenant by reason of any improvements so taken shall be available to be used, to the extent reasonably needed, by Tenant in replacing any improvements so taken with improvements of the same type as the remaining portion of the Premises. All plans and specifications for such replacement and improvements shall be subject to Landlord's reasonable prior approval and all such repairs shall be in compliance with all then existing codes, zoning ordinances, rules and regulations governing the Premises. A voluntary conveyance by Landlord to a public utility, agency or authority under threat of a taking under the power of eminent domain in lieu of formal proceedings shall be deemed a taking within the meaning of this Section.

        21.    <u>FORCE MAJEURE</u>. A Party's obligations under this Lease (other than a party's obligation to pay money hereunder) shall be suspended and excused while the Party is hindered or prevented, in whole

or in part, from complying with any term, covenant, condition or provision of this Lease by: strikes, lockouts or other labor disturbances; delays in transportation, inability to secure labor or materials in the open market; acts of God or the elements (including, without limitation, fire, flood, washout, perils at sea, lightning, earthquake or accidents); cyber or ransomware attacks, conditions arising out of or attributable to acts of war, civil disturbances or riots; the effects of any law, statute, decree, ordinance, rule or regulation; the failure of any governmental authority to issue any permit, entitlement, approval or authorization within a reasonable time after an application for the same has been submitted; the coronavirus disease (COVID-19) or other pandemics, epidemics, plagues, infectious disease or viral outbreaks or other public health crisis, including measures of any government authority taken in response to such events such as quarantine or other employee restrictions, and any labor shortages, delays or disruptions in supply chains or the inability or unavailability of personnel to perform or provide services as a result of any such events or governmental measures; or any other matter or condition beyond the reasonable control of Tenant, whether or not similar to the matters or conditions in this Lease specifically enumerated.

22.    SURVIVAL. The provisions of the Lease relating to indemnification from one Party to the other Party shall survive any termination or expiration of this Lease. Additionally, any provisions of this Lease which require performance subsequent to the termination or expiration of this Lease shall also survive such termination or expiration.

23.    CAPTIONS AND CONSTRUCTION. The captions contained in this Lease are inserted for convenience only and are not intended to be part of this Lease. They shall not affect or be utilized in the construction or interpretation of this Lease. Where the context requires, all singular words in this Lease shall be construed to include their plural and all words of neuter gender shall be construed to include the masculine and feminine forms of such words. Notwithstanding the fact that this Lease has been prepared by one of the Parties, all of the Parties confirm that they and their respective counsel have reviewed, negotiated and adopted this Lease as the joint agreement and understanding of the Parties. This Lease is to be construed as a whole and any presumption that ambiguities are to be resolved against the primary drafting party shall not apply. This Lease is intended to be interpreted in conjunction with, and consistently with, the MSA; provided, however, to the extent there is an inconsistency in the terms of this Lease and the MSA, the parties intend for the provisions of this Lease to control.

24.    ESTOPPEL CERTIFICATES. Tenant agrees, at any time and from time to time, upon not less than twenty (20) days' prior request by Landlord or Landlord's Lender, to execute, acknowledge and deliver to Landlord (or Landlord's Lender) a statement in writing certifying, if such be the case, that this Lease is unmodified and in full force and effect (or, if there have been modifications, stating the modifications, and that the Lease as modified is in full force and effect), that there are no defenses or offsets thereto then accrued, or stating those claimed by Tenant, the dates to which Rent and other charges have been paid, and any other matter that Landlord or Landlord's Lender reasonably requests, it being intended that any such statement delivered pursuant to this paragraph may be relied upon by any prospective purchaser of, or any prospective holder of a mortgage upon, the fee of Landlord's Property, or by any other properly interested party. Landlord agrees, at any time and from time to time, upon not less than twenty (20) days' prior request by Tenant, to execute, acknowledge and deliver to Tenant a statement in writing certifying, if such be the case, that this Lease is unmodified and in full force and effect (or, if there have been modifications, stating the modifications, and that the lease as modified is in full force and effect), that Landlord is asserting no claims of default in the obligations to be performed by Tenant under this Lease, or stating the nature of any claimed default, the dates to which Rent and other charges have been paid, and any other matter that Tenant reasonably requests, it being intended that any such statement delivered pursuant to this paragraph may be relied upon by any assignee of Tenant's interest in this Lease or Landlord's Property, or by any other properly interested party, including, without limitation, Tenant's Lender. Failure to deliver an estoppel certificate within the time established in this Section 24 shall be a material breach of this Lease by the nonrequesting party and shall be conclusive upon the nonrequesting

party that (i) this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) that there are no uncured defaults in the requesting party's performance, (iii) that no rent has been paid in advance, and (iv) such other matters as are set forth in the proposed estoppel certificate are true and correct.

       25.   <u>MEMORANDUM OF LEASE</u>. At Tenant's request, Landlord shall execute and deliver to Tenant a Memorandum of Lease in the form attached hereto as <u>Exhibit D</u>, which Tenant may record at its expense. Upon the expiration or sooner termination of this Lease, Tenant shall execute and record, at its expense, a release of the recorded Memorandum of Lease; provided, however, that if Tenant fails to do so within ten (10) days of the expiration or sooner termination of this Lease, Landlord is hereby authorized to unilaterally record a release of the recorded Memorandum of Lease on Tenant's behalf. Additionally, upon a determination of the exact location of the Pipeline Easement and Access Easement, Landlord hereby consents to the recordation of commercially reasonable descriptions of such easements.

       26.   <u>CONFIDENTIALITY</u>. The Parties mutually agree and acknowledge that the amount of Rent and other compensation paid by Tenant to Landlord under the terms of this Lease is confidential. Except as expressly provided in this paragraph, a Party shall not disclose the compensation information to any third party without the other Party's prior written consent. A Party may disclose the information to their accountants, bookkeepers, attorneys, agents, employees, managers and owners; prospective purchasers, investors, and lenders; provided that such third parties are made aware of the confidential nature of the information. A Party may also disclose the information to the extent such Party may be compelled or required by any governmental entity or agency or a court or judicial proceeding. The Parties acknowledge that remedies of law may be inadequate to protect them against actual or threatened breach of this provision.

       27.   <u>COUNTERPARTS</u>. This Lease may be simultaneously executed in any number of counterparts, each of which when so executed and delivered shall be an original, but such counterparts shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Lease via facsimile or electronic transmission shall be effective as delivery of an executed original.

       28.   <u>ATTORNEY'S FEES AND COSTS</u>. In the event of any action at law or in equity between the Parties to enforce any of the provisions hereof, any unsuccessful or defaulting party to such litigation shall pay to the prevailing or non-defaulting party all reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees (including costs and expenses incurred in connection with all appeals and in any bankruptcy or similar proceedings) incurred by the prevailing or non-defaulting party, and these costs, expenses and attorneys' fees may be included in and as part of the judgment.

       29.   <u>INTEGRATION; SEVERABILITY; WAIVER</u>. It is agreed and understood that this Lease contains all agreements, promises and understandings between Landlord and Tenant and that no verbal or oral agreements, promises or understandings shall be binding upon either Landlord or Tenant in any dispute, controversy or proceeding at law, and any addition, variation or modification to this Lease shall be void and ineffective unless made in writing and signed by the Parties. In the event any provision of this Lease is found to be invalid or unenforceable, such finding shall not affect the validity and enforceability of the remaining provisions of this Lease. The failure of either Party to insist upon strict performance of any of the terms or conditions of this Lease or to exercise any of its rights under this Lease shall not waive such rights and such Party shall have the right to enforce such rights at any time and take such action as may be lawful and authorized under this Lease, either in law or in equity.

       30.   <u>GOVERNING LAW; ARBITRATION</u>.

       30.1   <u>Governing Law</u>. This Lease and the performance thereof shall be governed, interpreted, construed and regulated in accordance with the laws of the State of Idaho.

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

30.2    <u>Arbitration</u>. Any controversy or claim arising out of or relating to this Lease, or the breach thereof, shall be determined by final and binding arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules"). The award rendered by the arbitrator shall be final and binding on the parties and may be entered and enforced in any court having jurisdiction, and any court where a party or its assets is located (to whose jurisdiction the parties consent for the purposes of enforcing the award). There shall be one arbitrator agreed to by the parties within twenty (20) days of receipt by respondent of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. Except as may be required by law, neither a party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both Parties, unless to protect or pursue a legal right.

31.    <u>SUCCESSORS</u>. This Lease shall extend to and bind the heirs, personal representatives, successors and assigns of the Parties hereto.

32.    <u>ENTIRE AGREEMENT; AMENDMENT</u>. This Lease constitutes the entire agreement between the Parties concerning the subject matter hereof and supersedes any and all other communications, representations, proposals, understandings, or agreements, either written or oral, between the Parties with respect to such subject matter. This Lease may not be modified or amended, in whole or in part, except by a written agreement signed by the Parties.

33.    <u>CONSENTS; APPROVALS</u>. All consents and/or approvals and related communications to be given under this Lease must be in writing to be effective and, notwithstanding <u>Section 14</u>, may be delivered by correctly addressed and delivered email only and shall be effective when received by the recipient.

34.    <u>FURTHER ASSURANCES</u>. Each Party shall do and perform, or cause to be performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, easements, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Lease and the consummation of the transactions contemplated hereby ("<u>Further Assurances</u>"). For the avoidance of doubt, the Further Assurances include, but shall not be limited to, the Parties cooperating in good faith with each other at all times and as reasonably necessary for Tenant to receive utility services for the Project, including granting of utility easements; and (ii) to cure any defects of title that impact Tenant's rights under the Lease.

{*Signatures contained on following two pages*}

IN WITNESS WHEREOF, the Parties hereto have executed this Lease as of the date first above written.

**LANDLORD**:

EAST VALLEY CATTLE, LLC, an Idaho limited liability company

By: _Bill Millenkamp_____
Name: Bill Millenkamp
Title:  Manager

**TENANT**:

East Valley Development, LLC, a Delaware limited liability company

By: _Clay Corbus_____
By:  Clay Corbus
Its: Manager

**Exhibit A**

**Legal Description and Depiction of Landlord's Property**

**DRAFTING NOTE: TO BE ATTACHED ONCE THE EXACT LOCATION OF THE PROJECT IS DETERMINED AND A SURVEY LEGAL DESCRIPTION IS PREPARED AND APPROVED BY LANDLORD. THIS LEASE SHALL NOT BE BINDING ON EITHER LANDLORD OR TENANT UNTIL THE APPROVED LEGAL DESCRIPTION IS ATTACHED.**

**Exhibit B**

**Legal Description and Depiction of Leased Property**


The "Leased Property" is generally in the location and of the size shown on the map below. The parties agree that the exact location and size of the Leased Property shall be established upon completion of a survey.



DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

### Exhibit C

**Legal Description and Depiction of Access Easement and Pipeline Easement**

**[Legal descriptions to be added aftersurvey is complete]**

The Access Easement shall consist of a 20 foot wide easement (10 feet on either side of a centerline, over an existing access road on Landlord's Property constituting approximately 1/8 mile in length, leading to and from Leased Property to Rte. 2750 East.

The Pipeline Easement shall consist of a 20 foot wide easement (10 feet on either side of a centerline) along the northern and western boundaries of Landlord's Property, as generally depicted below.



The parties agree that the descriptions and depiction above are approximate in nature and that the exact size and location of the Access Easement and the Pipeline Easement will be established upon completion of a survey.

15736902_12
HB: 4848-4611-1439.13

**<u>Exhibit D</u>**

**Memorandum of Lease**

[to be attached]

## Exhibit E
## Permanent Wastewater and Manure Separation Facilities

**Section 1. Manure Separation Facilities**.  The Permanent Wastewater and Manure Separation Facilities ("Manure Separation Facilities") means all equipment, buildings and improvements as is required to accommodate and process the solids of the waste water and manure (barn flush waters and alley vac) from the barns and corrals produced by the Landlord at its Cassia County, Idaho Jersey Girls Dairy where the Premises are located.  The Manure Separation Facilities shall be design and constructed in such a manner so as to allow functioning and operation independent of the Project.

The Manure Separation Facilities shall include, but not be limited to all earthwork and site work; existing pump pits, pumps, agitators, generators, utility metering, pipelines, and other equipment associated with the pump pits; existing lagoon flush pump and piping (Developer to reimburse Dairy for cost of existing equipment which shall be part of Manure Separation Facilities); facilities and pipelines for Green Water return to Green Water Return Point; waste water and manure collection pit reception; sand lanes; material screw washers; storage shade; building; screw centrifuge building; rotary drum building; concrete slabs and other improvements and equipment for  storage of solids including Fiber (at least seven (7) days capacity for shaded bedding fiber and forty-five (45) days storage for all Fiber)farm fiber) and NPK Solids (as defined in the MSA); truck unloading and access; plumbing and mechanical; electrical, utility services, improvements and metering; all equipment for manure separation, including but not limited to the improvements and equipment described below; FAN Screw Presses and conveyors with  radial arm stacker; adequate concrete slabs; piping; valves; centrifuges, clarifiers, and rotary drum separator; and other ancillary equipment and miscellaneous improvements selected and approved by Landlord.

The two existing Flush Water Reception Pits (as shown on Exhibit E-2), pumps, agitators, generators, pipelines, utility metering, and related equipment are critical to the supply of manure to the Digester and, as such, shall be included as part of the Manure Separation Facilities even though they will not be located on the Leased Property. Additional pump pits and related pipelines and equipment may be needed to be added at Tenant's expense to facilitate expansion of the Dairy.

All improvements, including specifically without limitation all concrete slabs shall be designed and constructed to at least heavy industrial standards for heavy equipment loads, storage uses, and maximum long-term durability; all equipment shall be best in class. The Manure Separation Facilities shall be designed and constructed with adequate capacity to process all suitable manure from the dairy and include an appropriate amount of redundancy to avoid shutdowns due to mechanical or other failure. Tenant agrees that certain professional costs and expenses (engineering, design, etc.) will be needed to complete the Manure Separation Facilities.  Tenant, in conjunction and cooperation with the Landlord shall develop plans and specification for the Manure Separation Facilities (the "MSF Plans" as defined below) to be approved in writing by Landlord, acting reasonable and in good faith.

Attached as Exhibit E-2 ("Manure Separation Facilities Site Plan and Depiction") is a preliminary site plan and depiction for the Manure Separation Facilities located on the Premises and on licensed areas.

GROUND LEASE AGREEMENT – PAGE 28
15736902_12
HB: 4848-4611-1439.13

DocuSign Envelope ID: 29026D24-8182-42F2-86A6-EF18A84C7357

**Section 2. Obligation to Construct**.  Notwithstanding any other term of this Lease or the MSA and notwithstanding any termination or conditions to the parties obligations herein or in the MSA, Tenant agrees and is and shall be unconditionally obligated to construct, install and commission the Manure Separation Facilities in accordance with the MSF Plans (as defined herein) at its sole cost and expense on or before October 31st, 2022 and to thereafter operate, maintain and repair the Manure Separation Facilities in accordance with this Lease and the MSA. The parties agree that Tenant's obligations herein to construct, install and commission the Manure Separation Facilities shall not fail due to the lack of final plans and specifications upon the execution hereof.  Landlord and Tenant understand and agree that portions of the Manure Separation Facilities will be first constructed and located in a temporary location pursuant to that certain Exclusivity Agreement dated July 12th, 2021 (Temporary Facilities) and that at such time as the Permanent Facilities are being completed portions of the Temporary Facilities will be relocated and incorporated into the Manure Separation Facilities all in accordance with the MSF Plans. Landlord and Tenant shall cooperate and work together to insure as little disruption as possible to the Landlord's dairy and cattle operations as a result of the relocation.

Tenant understands that ongoing operation of the Temporary Facilities and completion of the Manure Separation Facilities is critically important to the dairy operations and Tenant agrees that construction of the Manure Separation Facilities shall take precedent and priority over construction of the Project. Temporary Facilities will not be located on the Leased Property.

**Section 3. Deposit - Total Costs**.  The total cost of the Manure Separation Facilities shall be determined once the  MSF Plans are final and bids obtained.  As security for performance of Tenant's obligations, upon execution of this Lease the amount of SEVEN MILLION DOLLARS ($7,000,000) shall be paid to McLanahan for equipment and THREE MILLION DOLLARS ($3,000,000) shall be paid to Archaea LLC as the general contractor ( collective the TEN MILLION DOLLARS is the "Down Payment") toward the cost of the Manure Separation Facilities.  Tenant shall reimburse Landlord for any expenses reasonably incurred by Landlord in constructing the Project. As is otherwise provided herein, the amounts paid for the Down Payment will be made in Landlord's name and become property of Landlord at the time of payment. Also, as otherwise provided herein, Landlord shall be provided with purchase agreements, purchase orders, invoices, or equivalent documentation related to the Down Payment.

The Landlord and Tenant understand and agree that the costs and expenses for completing the Manure Separation Facilities may exceed the Down Payment.  Tenant agrees to pay any and all cost and expenses of the Manure Separation Facilities that are over and above the Down Payment.

**Section 4. Ownership**.  The Manure Separation Facilities will be owned exclusively by Landlord.  Tenant shall provide an appropriate bill of sale or assignment vesting title and ownership of the Manure Separation Facilities in Landlord.  The Manure Separation Facilities will be a part of the Premises leased to and operated and maintained by Tenant under this Lease. The Manure Separation Facilities does not include any other equipment that is part of the Project owned and operated by Tenant, except as provided herein and accept as needed or used as part of the waste water and manure separation process for Landlord or for the proper operation of the dairy.

**Section 5. MSF Plans.**  The plans and specifications for the Manure Separation Facilities (as defined in Section 3 above) which shall include, without limitation, the location of the Manure Separation Facilities and all improvements, parts and portions thereto, the construction schedule for the Manure Separation Facilities, the site improvements and equipment (including existing facilities and equipment), and the design and appearance of the exterior of the Manure Separation Facilities are (or will be) attached hereto as Exhibit E-1 (the "MSF Plans"). The MSF Plans that are attached as Exhibit E-1 at the execution of this Lease, if any, are deemed approved by Landlord and Tenant. Any MSF Plans that are approved by Landlord in writing subsequent to the execution of this Lease will be attached to Exhibit E-1 to this Lease, which approval will be governed by Exhibit G-1, and will not be unreasonably withheld or delayed. If there are any material changes to the MSF Plans, Landlord and Tenant shall comply with the design process described on Exhibit G-1 hereto; provided, however, that in all events no changes to the MSF Plans shall be implemented without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed but subject to all requirements of his Lease and the MSA.. Tenant represents and warrants to Landlord that it will construct the Manure Separation Facilities with state-of-the-art equipment so as to produce high-quality product and functionality.  Tenant shall be permitted to change the supplier of the Manure Separation Facilities with the written approval of Landlord, not to be unreasonably withheld, conditioned or delayed, and so long as the specifications for the applicable portion of the Manure Separation Facilities offered by the replacement supplier are of equal or better quality than those of the initial supplier.

Following initial construction in accordance with the MSF Plans, no alterations, additions or other improvements shall be made to the Manure Separation Facilities unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

**Section 6. Construction Contract; Contractor.**  Tenant shall substantially involve Landlord in the construction of the Manure Separation Facilities including, without limitation, obtaining Landlord's approval of contractors, contracts, project design specifications, and equipment models and specifications. All orders placed for Manure Separation Facility equipment will be made in Landlord's name and become property of Landlord at the time of purchase. Landlord shall be provided with purchase agreements, purchase orders, invoices, or equivalent documentation related to the purchase of Manure Separation Facilities equipment. Landlord shall be a third party beneficiary of the Manure Separation Facilities construction contract between Developer and general contractor. Landlord shall be furnished will all documentation related to construction of the Manure Separation Facilities, including without limitation, contracts, subcontracts, invoices, schedules, bids, engineering, plans, and specifications. Tenant shall provide Landlord with a list of contractors and service providers anticipated to conduct work on site and will maintain this list on a real time basis throughout the construction period. Tenant shall have the sole responsibility to construct the Project and Landlord shall have no responsibility to construct the Project.

Landlord shall reserve the right to establish reasonable rules and regulations applicable to each contractor to ensure that such contractor's onsite activities do not have any adverse material impact on the adjacent Landlord operation (including, without limitation, with respect to site clean-up and maintenance, noise, parking, and ingress and egress). Tenant shall inform all contractors of these rules and regulations and shall cause the contractors to strictly abide by the rules and regulations. Tenant will provide, or cause to be provided to Landlord adequate payment and performance bonds to ensure timely completion of the Permanent Facilities. Tenant shall

insure that all construction contracts will include an acknowledgment of the applicable contractor that its lien rights with respect to the Project extend only to Tenant's leasehold interest in the Premises and that no contractor (including subcontractors) shall have the right to place a lien on Landlord's fee interest in the Premises or Landlord's Property.

**Section 7. Permits and Approvals.**  Tenant shall obtain all permits and approvals required to construct the Manure Separation Facilities.

**Partial Manure Separation Facilities Equipment List**.  The following is a preliminary (and incomplete) list of equipment that will be included in the final MSF Plans

**Exhibit E**

| Stage | Equipment | Manufacturer | Installer* |
|---|---|---|---|
| 1 | Screwpress (5) | FAN | Sundt/Dairy Specialties |
| 1 | Fiber Conveyor | TBD | Sundt |
| 1 | Radial Stacking Conveyor | TBD | Sundt |
| 1 | Screwpress Building | Olympia or Equiv | Sundt |
| 2 | Manure Receiving Pit (Vac/Flush) | Field Build | Sundt |
| 2 | Sand Lanes (2) | Field Build | Sundt |
| 3 | Material Screw Washers (2) | McLanahan | Sundt/McLanahan |
| 3 | Drum Screen Feed Pumps (6) | GEA or Equiv | Sundt/McLanahan |
| 3 | Rotary Drum Screens (6) | McLanahan | Sundt/McLanahan |
| 3 | Rotary Drum Building | TBD | Sundt |
| 3 | Clarifier/Thickener (2) | McLanahan | Sundt/McLanahan |
| 3 | Solids Separation Pumps (5) | GEA or Equiv | Sundt/McLanahan |
| 3 | Centrifuges (2) | Centrisys | Sundt/Dairy Specialties |
| 3 | Centrate pumps (3) | Vaughn or Equiv | Sundt/McLanahan |
| 3 | Solids storage building | TBD | Sundt |

*Anticipated

Landlord owned equipment to be as listed above or replaced by equivalent, or better equipment.

**Ground Lease**

**<u>Exhibit E-1</u>**
**MSF Plans**

***[To be added when complete]***

**Manure Separation Facilities**
**Exhibit E-2**







| Item | Fixture Description |
|------|--------------------|
| 1 | Flush Water Reception Pit |
| 2 | Flush Water Reception Pit |
| 3 | Green Water Return Manifold |
| 4 | Manure Slurry Receiving Point |

**Exhibit F**

**Plans**

**All Plans attached hereto at the execution of this Lease shall be deemed approved by the Parties; Any Plans attached subsequent to the execution of this Lease shall not be effective or binding upon Landlord until approved in writing by Landlord, such review and approval to be in accordance with Exhibit G and not to be unreasonably withheld or delayed.**

## Exhibit G

### Project Design Process

Design efforts will be in accordance with applicable design codes per the standard of care for an industrial anaerobic digester (AD) facility. Typical design codes include, but not limited to American Society of Mechanical Engineers (ASME), American Petroleum Institute (API), National Fire Protection Association (NFPA), Manual of Practice (MOP) from Water Environment Federation (WEF), National Electric Code (NEC), and the International Building Code (IBC).

In order to keep Landlord apprised of design progress, allow for input, and not delay design progress with formal reviews, intermediate submittal packages will be provided to be reviewed concurrent with design progression. Landlord will have access to the design engineer's file sharing folder where detailed design sheets and 3D models are updated concurrent with design development. Specific design review meetings will be setup at appropriate design stage gates to get input from Landlord regarding infrastructure integration to the existing dairy facility and consistency with overall architectural programing (established by current construction methods that are applicable to an industrial anaerobic digestion facility with gas upgrading and compression)

Anticipated design stage gates requiring Landlord approval to not impact design schedule:
- Site Plan and overall layout
- Facility interconnect with dairy and shared infrastructure including:
  o Power feed to AD facility
  o Biomethane pipe routing and interconnect locations
  o Architectural programming
    ▪ Buildings (siding and roof materials, colors, and exterior finishes)
  o Traffic flow of shared access points
  o Dairy water interconnect points between AD and dairy
    ▪ AD Influent (pressurized, upstream of manure thickening and green flush treatment)
    ▪ AD Effluent (gravity, downstream of covered lagoon)
    ▪ AD Effluent (bedding from fiber separation)
- Landlord will need to provide approval of proposed design aspects

Assumptions:
- Stage gates coordination meetings will be done either onsite or via screen share. An agreed upon path forward will be in-place after one round of Landlord comments and engineering revisions.
- Review comments will not inhibit overall AD process.
- Outside of aforementioned stage gate meetings, it is assumed that Landlord will review progress sets (construction sheets and 3D model) concurrent with design development and submit review comments in a timely manner as part of the design team and work within the design schedule. "

# FIRST AMENDMENT
# GROUND LEASE AGREEMENT

This First Amendment ("**First Amendment**") to that certain Ground Lease Agreement by and between East Valley Cattle, LLC, an Idaho limited liability company ("**Landlord**") and East Valley Development, LLC, a Delaware limited liability company ("**Tenant**"), dated as of October 8, 2021 (as further amended, modified or supplemented from time to time, the "**Agreement**") is made and executed, by and between Landlord and Tenant, to be effective as of the 17th, day of February 2022 ("**First Amendment Effective Date**").

Landlord and Tenant are, from time to time, referred to herein collectively as the "**Parties**". Capitalized terms used, but not defined herein shall have the meaning ascribed to such term in the Agreement.

## RECITALS

**WHEREAS**, the Parties entered into the Agreement;

**WHEREAS**, the Parties wish to amend the Agreement on the terms and conditions set forth herein; and

**WHEREAS**, capitalized terms herein shall have the same meaning as ascribed to such terms in the Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations of the Parties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AMENDMENT

1. Amendment.

(a) Notwithstanding the terms set forth in the Exclusivity Agreement (including, without limitation, any dates set forth therein), Tenant and Landlord agree that the Temporary Facilities (except the waste water and manure collection pit and sand) shall be completed on or before May 1, 2022 and the collection pit and sand lanes shall be completed on or before July 1, 2022, both subject to force majeure delays beyond Tenant's control.

(b) Tenant's obligations to operate, maintain and repair the Temporary Facilities, including those portions of the Manure Separation Facilities currently existing is extended to May 1, 2022. For the avoidance of doubt, the October 31st, 2022 date set forth in Section 2 of Exhibit E of the Agreement is and shall remain and is not modified or changed.

(c) The first paragraph in Section 3 of Exhibit E of the Agreement is hereby deleted in its entirety and replaced with the following:

1

ID #541                                                                                          (rev. 06.25.2021)

"**Section 3. Deposit – Total Costs.** The total cost of the Manure Separation Facilities shall be determined once the MSF Plans are final and bids obtained. As security for performance of Tenant's obligations, upon execution of this Lease the amount of SEVEN MILLION DOLLARS($7,000,000) shall be paid to McLanahan for equipment (the "Down Payment") toward the cost of the Manure Separation Facilities. Tenant represents that Tenant has contracted with Sundt Construction, Inc. ("Sundt") to construct the Project, including the Manure Separation Facilities, that Sundt has been directed to prioritize work on Manure Separation Facilities as required hereby, and that on or before March 15, 2022 Tenant will have paid Sundt approximately TWO MILLION ONE HUNDRED EIGHTY-EIGHT THOUSAND NINE HUNDRED FORTY-TWO DOLLARS AND SIXTY-FOUR CENTS ($2,188,942.64) toward the construction of the Project, including the Manure Separation Facilities. Tenant shall reimburse Landlord for any expenses reasonably incurred by Landlord in constructing the Project. As is otherwise provided herein, the amounts paid for the Down Payment will be made in Landlord's name and become property of Landlord at the time of payment. Also, as otherwise provided herein, Landlord shall be provided with purchase agreements, purchase orders, invoices, or equivalent documentation related to the Down Payment."

(d) Within 15 business days of the First Amendment Effective Date, Tenant shall pay SIX HUNDRED THOUSAND DOLLARS ($600,000), in cash, to Landlord for losses incurred by Landlord due to delays in constructing the Project and related Temporary Facilities.

2. Terms and Conditions of the Agreement. Other than as expressly set forth in this First Amendment, all of the terms and conditions of the Agreement shall remain in full force and effect and shall apply to this First Amendment; provided that to the extent there is a conflict between the terms of this First Amendment and the terms of the Agreement, the terms of this First Amendment shall control to the extent of such conflict.

3. Governing Law. This First Amendment shall be governed by and construed, interpreted and enforced in accordance with the laws of Idaho, excluding choice of law rules and principles.

4. Counterparts. This First Amendment may be executed in two or more counterparts, each of which shall constitute an original, but all of which when taken together shall constitute but one and the same Agreement. Signatures to this First Amendment transmitted by facsimile, email, portable document format (or .pdf) or by any other electronic means intended to preserve the original graphic and pictorial appearance of this First Amendment shall have the same effect as the physical delivery of the paper document bearing original signature.

5. Entire Agreement. This Amendment represents the entire understanding of Landlord and Tenant as to those matters contained in this First Amendment, and supersedes any prior oral or written understanding, promises or representatives with respect to those matters covered in this First Amendment, and it shall not be amended, altered or changed except by a written agreement signed by the Parties hereto.

6. No Other Amendment. Except as expressly amended hereby, the terms and provisions of the Agreement remain in full force and effect, and are ratified and confirmed by the Parties in all

2

(rev. 06.25.2021)

respects as of the First Amendment Effective Date. From and after the date of this Amendment, whenever the term "Agreement" appears in the Agreement, it shall mean the Agreement as amended by this First Amendment.

[Remainder of Page Intentionally Blank.  Signatures on Next Page.]

3

**IN WITNESS WHEREOF**, the Parties have caused this First Amendment to be signed as of the First Amendment Effective Date.

**EAST VALLEY CATTLE, LLC**,
an Idaho limited liability company

By: _____
    Name:    Bill Millenkamp
    Title:    Manager

**EAST VALLEY DEVELOPMENT, LLC** a Delaware limited liability company

By:
    By: _____
    Name:  William Flanagan
    Title:  Manager

4

(rev. 06.25.2021)

## SECOND AMENDMENT TO
## GROUND LEASE AGREEMENT

This Second Amendment to Ground Lease Agreement ("**Amendment**"), dated as of April 25, 2023 ("**Effective Date**"), is entered into by and between East Valley Cattle, LLC, an Idaho limited liability company ("**Landlord**"), and East Valley Development, LLC, a Delaware limited liability company ("**Tenant**"). Landlord and Tenant may each be referred to individually as a "**Party**" and collectively as the "**Parties**." Capitalized terms used but not defined in this Amendment shall have the meanings given to such terms in the in the Agreement (as defined below).

### RECITALS

A.    Landlord and Tenant are parties to that certain Ground Lease Agreement, dated as of October 8, 2021 ("**Original Agreement**"), as amended by that certain First Amendment dated as of February 17, 2022 ("**First Amendment**"). The Original Agreement as amended by the First Amendment is referred to herein as the "**Agreement**."

B.    The Parties desire to revise Exhibit A, Exhibit B, and Exhibit D to the Agreement as provided herein.

C.    Capitalized terms used but not defined herein shall have the same meaning as ascribed to such terms in the Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and obligations of the Parties contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Exhibit A. Exhibit A to the Agreement is hereby deleted in its entirety.

2.    Exhibit B. Exhibit B to the Agreement is hereby deleted in its entirety and replaced with Exhibit B attached to this Amendment.

3.    Exhibit D. Exhibit D to the Agreement is hereby deleted in its entirety and replaced with Exhibit D attached to this Amendment.

4.    Remainder of Agreement. All other terms, conditions and provisions of the Agreement not specifically modified by this Amendment shall remain in full force and effect.

5.    Counterparts. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Signature pages may be detached from the counterparts and attached to a single copy of this Amendment to physically form one document.

*[Remainder of page intentionally blank; signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Amendment to be signed as of the Effective Date.


**LANDLORD:**                              **TENANT:**

EAST VALLEY CATTLE, LLC,                   EAST VALLEY DEVELOPMENT, LLC,
an Idaho limited liability company         a Delaware limited liability company

                                           *William J Flanagan*

By: _____      By: _____
    Name: Bill Millenkamp                       Name:  William Flanagan
    Title:   Manager                            Title:   VP, Strategic Development

IN WITNESS WHEREOF, the Parties have caused this Amendment to be signed as of the Effective Date.

**LANDLORD:**

EAST VALLEY CATTLE, LLC,
an Idaho limited liability company

By: _____
    Name:  Bill Millenkamp
    Title:    Manager

**TENANT:**

EAST VALLEY DEVELOPMENT, LLC,
a Delaware limited liability company

By: _____
    Name:   William Flanagan
    Title:    VP, Strategic Development

## EXHIBIT B

**Legal Description and Depiction of Leased Property**

*[Pages follow]*

## Lease Area "A"

Lying within the Southeast Quarter of Section 26, Township 11 South, Range 27 East, Boise Meridian, Cassia County, Idaho:

Commencing at the Southeast Corner of said Section 26 monumented with a Brass Cap imprinted as shown on Corner Record Instrument Number 2020006016, from which the South Quarter Corner of said Section 26 monumented with a 5/8-Rebar bears South 89 Degrees 32 Minutes 23 Seconds West a distance of 2659.85 feet; *Thence* from said Southeast Corner along the South Line of said Section 26 bearing South 89 Degrees 32 Minutes 23 Seconds West a distance of 607.34 feet to a calculated point; *Thence* North 00 Degrees 25 Minutes 34 Seconds West a distance of 25.36 feet to the ***Point of Beginning***;

*Thence* parallel with and approximately 81.6 feet Northerly of the corral fence line measured by ELS shown on said Overlay Drawing bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 120.56 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 158.00 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 90.16 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 00 Degrees 25 Minutes 34 Seconds East a distance of 158.00 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 399.86 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 1200.25 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 89 Degrees 34 Minutes 26 Seconds East a distance of 610.58 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 00 Degrees 25 Minutes 34 Seconds East a distance of 1200.25 feet to the ***Point of Beginning.***

**AND**

Lease Area "B"

Lying within the Southeast Quarter of Section 26, Township 11 South, Range 27 East, Boise Meridian, Cassia County, Idaho:

Commencing at the Southeast Corner of said Section 26 monumented with a Brass Cap imprinted as shown on Corner Record Instrument Number 2020006016, from which the South Quarter Corner of said Section 26 monumented with a 5/8-Rebar bears South 89 Degrees 32 Minutes 23 Seconds West a distance of 2659.85 feet; *Thence* from said Southeast Corner along the South Line of said Section 26 bearing South 89 Degrees 32 Minutes 23 Seconds West a distance of 1277.92 feet to a calculated point; *Thence* North 00 Degrees 25 Minutes 34 Seconds West a distance of 25.76 feet to the ***Point of Beginning***;

*Thence* parallel with and approximately 81.6 feet Northerly of the corral fence line measured by ELS shown on said Overlay Drawing bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 927.65 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 227.13 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 339.39 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 287.27 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 89 Degrees 34 Minutes 26 Seconds East a distance of 1267.04 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 00 Degrees 25 Minutes 34 Seconds East a distance of 514.40 feet to the ***Point of Beginning.***



**DEPICTION PROVIDED FOR ILLUSTRATIVE PURPOSES ONLY
PRECEDING METES AND BOUNDS LEGAL DESCRIPTIONS CONTROL**

## <u>EXHIBIT D</u>

**Memorandum of Lease**

*[Pages follow]*

Recording Requested by and
After Recording Return to:

GIVENS PURSLEY LLP
Attn: L. Edward Miller
601 W. Bannock Street
Boise, Idaho 83702

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

## MEMORANDUM OF GROUND LEASE

THIS MEMORANDUM OF GROUND LEASE (this "**Memorandum**") is made and entered into as of _____ ___, 2023, by and between EAST VALLEY CATTLE, LLC, an Idaho limited liability company ("**Landlord**"), and EAST VALLEY DEVELOPMENT, LLC, a Delaware limited liability company ("**Tenant**"). Landlord and Tenant may each be referred to individually as a "**Party**" and collectively as the "**Parties**."

### WITNESSETH:

1.      Ground Lease. Landlord and Tenant are the current ground lessor and ground lessee (respectively) pursuant to that certain Ground Lease Agreement dated October 8, 2021 (the "**Lease**") for the premises described in Exhibit A, attached hereto and incorporated herein.

2.      Term.  Subject to the terms and conditions contained in the Lease, the Premises is leased for an initial term of twenty (20) years, with an additional five (5) year extension term (collectively, the "Term"). The Term of the lease will commence as provided in the Lease.

3.      Incorporation of Lease and Conflicts. Landlord and Tenant enter into and record this Memorandum for the purpose of providing written notice of the Lease. Reference is hereby made to the Lease for all matters not specifically set forth herein, which matters are hereby incorporated herein by this reference and made a part hereof. In the event of a conflict between the terms of this Memorandum and the terms of the Lease, the terms of the Lease shall control.

4.      Miscellaneous. All capitalized terms not defined herein shall have the same meanings as set forth in the Lease. This Memorandum may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

5.      Binding Effect. The rights and obligations set forth herein shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, personal representatives, successors, and assigns.

6.      Termination. Upon expiration of the Term or in the event that the Lease has been terminated, the Landlord shall provide ten (10 days) written Notice to Tenant of Landlord's intent to record a termination of the Memorandum. Landlord shall have the right to record a termination of this Memorandum accompanied by an affidavit of Landlord which shall have the effect of terminating this Memorandum when recorded in the public record.

*[Remainder of page intentionally blank; signature page(s) follows]*

IN WITNESS WHEREOF, the parties have executed this Memorandum of Ground Lease as of the Effective Date.

**LANDLORD**:

EAST VALLEY CATTLE, LLC, an Idaho limited liability company

_____

By: Bill Millenkamp
Its: Manager

STATE OF IDAHO     )
                      ) ss.
County of _____    )

On this _____ day of _____, 2023 before me, a Notary Public in and for said State, personally appeared Bill Millenkamp, known or identified to me to be the Manager of East Valley Cattle, LLC, and acknowledged to me that by said person's signature on the foregoing instrument, the foregoing named limited liability company executed the same.

_____
Notary Public for the State of Idaho
Residing at _____
My Commission expires: _____

**TENANT**:

EAST VALLEY DEVELOPMENT, LLC, a Delaware
limited liability company

By: _____
Print        Name:        William        Flanagan
        Title:    VP, Strategic Development

STATE OF CALIFORNIA          )
                             )  ss.
County of _____       )

      On this _____ day of _____, 2023 before me, a Notary Public in and for said
State, personally appeared _____, known or identified to me to be the
_____ of _____, and acknowledged to me that by said
person's signature on the foregoing instrument, the foregoing named limited liability company executed
the same.

_____
Notary Public for the State of _____
Residing at _____
My Commission expires: _____

## EXHIBIT A

### Legal Description

### Lease Area "A"

Lying within the Southeast Quarter of Section 26, Township 11 South, Range 27 East, Boise Meridian, Cassia County, Idaho:

Commencing at the Southeast Corner of said Section 26 monumented with a Brass Cap imprinted as shown on Corner Record Instrument Number 2020006016, from which the South Quarter Corner of said Section 26 monumented with a 5/8-Rebar bears South 89 Degrees 32 Minutes 23 Seconds West a distance of 2659.85 feet; *Thence* from said Southeast Corner along the South Line of said Section 26 bearing South 89 Degrees 32 Minutes 23 Seconds West a distance of 607.34 feet to a calculated point; *Thence* North 00 Degrees 25 Minutes 34 Seconds West a distance of 25.36 feet to the *Point of Beginning*;

*Thence* parallel with and approximately 81.6 feet Northerly of the corral fence line measured by ELS shown on said Overlay Drawing bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 120.56 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 158.00 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 90.16 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 00 Degrees 25 Minutes 34 Seconds East a distance of 158.00 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 399.86 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 1200.25 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 89 Degrees 34 Minutes 26 Seconds East a distance of 610.58 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 00 Degrees 25 Minutes 34 Seconds East a distance of 1200.25 feet to the *Point of Beginning.*

**AND**

Lease Area "B"

Lying within the Southeast Quarter of Section 26, Township 11 South, Range 27 East, Boise Meridian, Cassia County, Idaho:

Commencing at the Southeast Corner of said Section 26 monumented with a Brass Cap imprinted as shown on Corner Record Instrument Number 2020006016, from which the South Quarter Corner of said Section 26 monumented with a 5/8-Rebar bears South 89 Degrees 32 Minutes 23 Seconds West a distance of 2659.85 feet; *Thence* from said Southeast Corner along the South Line of said Section 26 bearing South 89 Degrees 32 Minutes 23 Seconds West a distance of 1277.92 feet to a calculated point; *Thence* North 00 Degrees 25 Minutes 34 Seconds West a distance of 25.76 feet to the ***Point of Beginning***;

*Thence* parallel with and approximately 81.6 feet Northerly of the corral fence line measured by ELS shown on said Overlay Drawing bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 927.65 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 227.13 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 89 Degrees 34 Minutes 26 Seconds West a distance of 339.39 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 00 Degrees 25 Minutes 34 Seconds West a distance of 287.27 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing North 89 Degrees 34 Minutes 26 Seconds East a distance of 1267.04 feet to a 1/2-inch rebar surmounted with a purple plastic cap imprinted "PLS 13762";

*Thence* at a right angle bearing South 00 Degrees 25 Minutes 34 Seconds East a distance of 514.40 feet to the ***Point of Beginning.***



**DEPICTION PROVIDED FOR ILLUSTRATIVE PURPOSES ONLY**
**PRECEDING METES AND BOUNDS LEGAL DESCRIPTIONS CONTROL**

# Second Amendment to Ground Lease (Millenkamp - BP Digester) (execution copy 6-23-23)

Final Audit Report                                    2023-06-23

| | |
|---|---|
| Created: | 2023-06-23 |
| By: | Maureen Schmitz (Maureen.Schmitz@cleanenergyfuels.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAw-Z4tJCqfgb5RNpAxsNyP_jxRg1FJhL_ |

## "Second Amendment to Ground Lease (Millenkamp - BP Digester) (execution copy 6-23-23)" History

📄 Document created by Maureen Schmitz (Maureen.Schmitz@cleanenergyfuels.com)
   2023-06-23 - 10:07:58 PM GMT

📧 Document emailed to Will Flanagan (will.flanagan@cleanenergyfuels.com) for signature
   2023-06-23 - 10:09:28 PM GMT

📄 Email viewed by Will Flanagan (will.flanagan@cleanenergyfuels.com)
   2023-06-23 - 10:15:00 PM GMT

🖊 Document e-signed by Will Flanagan (will.flanagan@cleanenergyfuels.com)
   Signature Date: 2023-06-23 - 10:15:07 PM GMT - Time Source: server

✅ Agreement completed.
   2023-06-23 - 10:15:07 PM GMT

**Adobe Acrobat Sign**

*Execution Version*

## THIRD AMENDMENT TO
## GROUND LEASE AGREEMENT

This Third Amendment to Ground Lease Agreement ("**Third Amendment**"), dated as of June 22, 2023 ("**Third Amendment Effective Date**"), is entered into by and between East Valley Cattle, LLC, an Idaho limited liability company ("**Landlord**"), and East Valley Development, LLC, a Delaware limited liability company ("**Tenant**"). Landlord and Tenant are, from time to time, referred to herein collectively as the "**Parties"** and individually as a "**Party**". Capitalized terms used, but not defined in this Third Amendment have the meanings given to such terms in the in the Agreement (as defined below).

Landlord and Tenant are parties to that certain Ground Lease Agreement, dated as of October 8, 2021 ("**Original Agreement**"), as amended by that certain First Amendment dated as of February 17, 2022 ("**First Amendment**"), and by that certain Second Amendment dated as of April 25, 2023 ("**Second Amendment**"). The Original Agreement as amended by the First Amendment and the Second Amendment is referred to herein as the "**Agreement**".

Landlord's affiliate, Millenkamp Cattle, Inc. ("**Dairy**"), and Tenant are parties to that certain Manure Supply Agreement, dated as of October 8, 2021 ("**MSA**"), under which Dairy agreed to supply Manure to Tenant for use in Tenant's Facility (as such terms are defined in the MSA). Dairy and Tenant are entering into a First Amendment to Manure Supply Agreement dated of even date herewith ("**MSA First Amendment**") in order to amend the MSA.

This Third Amendment will not be effective unless and until the MSA First Amendment has been duly executed and delivered by all of the parties thereto.

The Parties desire to amend the Agreement on the terms and conditions set forth in this Third Amendment.

The Parties therefore agree as follows:

1.    **Tenant Payment**.

    a.    In consideration for Landlord entering into this Third Amendment, Tenant will, if it has not done so already, (i) within one business day after the Third Amendment Effective Date, pay to Landlord, in cash, the amount of $3,500,000.00 together with interest at the rate of twelve percent (12%) per annum commencing from November 1, 2022 until paid ("**Tenant Payment**"), and (ii) make the payments described in amended Section 4.2 of the Agreement (as set forth below). The Tenant Payment consists of: (1) $2,800,000.00 to reimburse Landlord for Milk Barn #1 and Milk Barn #2 flush water reception pits, and their integrated motors, piping, and work associated with Flush Water Reception Pits as required by Sections 1 and 3 of Exhibit E of the Ground Lease, and the balance to (2) pay Landlord the demolition value of the house situated on the Leased Property, (3) compensate Landlord for delays in constructing and operating the Manure Separation Facility and Temporary Facilities up and until November 1, 2022, and (4) reimburse Landlord for costs related to flush water hydro jetting, flush water line clean out installations, potable water installation by Landlord into the Temporary Facilities, Pacific Pumping main

lagoon clean out costs, financial losses of Landlord incurred due to the inability of the Temporary Facilities to produce fiber bedding.

For the avoidance of doubt, the Tenant Payment does not relieve Tenant of its agreement to reimburse Landlord for costs incurred with procuring gravel, bollards, moving dirt to grade, pump pit spare parts inventory, back up power and generator costs for both flush water reception pits and power and operating costs of operating and maintaining the Flush Delivery Point (as defined in the MSA) pits and removing sand and gravel from the crossvent barn (collectively, the "**Reimburseable Costs**"), which shall be billed separately and paid within one business day after the Third Amendment Effective Date, if it has not already done so (as long as Tenant timely receives the separate bill contemplated above). Invoices for Reimbursable Costs, along with documentation supporting the invoiced charges, will be sent monthly in arrears by Landlord to Tenant and payment shall be net ten (10) days from the date Tenant receives each such invoice.

Furthermore, Tenant Payment does not alleviate the Tenant from reimbursing Landlord for its monthly costs in maintaining and repairing the pump pits, monthly pump pit power costs, hydrojetting, sand and gravel removal from the crossvent barn (collectively, the "**Maintenance Costs**"). Landlord shall invoice Tenant for such costs as follows: manual labor consisting of shovel work is $50 per hour; repairs and maintenance is $100 per hour; and mini-excavator, loader, dump truck, or heavy equipment is $150 per hour. Parts and third party technicians will be billed at cost plus 20% of such cost. Invoices for Maintenance Costs, along with documentation supporting the invoiced charges, will be sent monthly in arrears by Landlord to Tenant and payment shall be net ten (10) days from the date Tenant receives each such invoice.

As of the date of this Agreement, Tenant has paid Landlord or its designated assign, $2,800,000 of the $3,500,000 Tenant Payment and $349,449.21 in Reimbursable Costs and Maintenance Costs. For the avoidance of doubt, the Tenant Payment will have interest accrued and assessed at the rate of eighteen percent (18%) per annum from November 1, 2022, until paid. The undisputed portions of each invoice for Reimbursable Costs and Maintenance Costs, if not paid when due (as provided above), will accrue interest at the rate of twenty four percent (24%) per annum from the date following the due date until paid in full. In the event any disputed Reimbursable Costs or Maintence Costs are awarded to Landlord in accordance with the provisions of Section 30.2, Arbitration, any decision of the arbitrator shall accrue interest at the rate of twenty four percent (24%) per annum from the net ten day due date to the date it is paid.

b.    The Parties also acknowledge that Tenant, acting in good faith and at its sole cost and operating expense, constructed a temporary manure separation lagoon and installed centrifuges (collectively, the "**Lagoon**") to help maximize the Dairy's fiber and manure solids production. Tenant's construction of the Lagoon, future obligation to clean out the solids of the Lagoon and future expansion of the Lagoon will be deemed additional consideration for Landlord entering into this Third

*Execution Version*

Amendment. For the avoidance of doubt, Tenant shall continue to operate and maintain the Lagoon in a commercially reasonable manner to help maximize solids and fiber separation until commissioning of the Manure Separation Facilities.

**2.**     **Project Schedule Adjustments**.

a.     Excluding Section 4.2.1 and Section 4.2.2 of the Agreement, which remain unchanged, Section 4.2 of the Agreement is amended to add the following after the last sentence of that Section 4.2:

"Notwithstanding anything herein to the contrary, Landlord shall have no right to terminate this Agreement or the MSA for any reason (including the commissioning of the Manure Separation Facilities) other than a future uncured breach of this Agreement, if Tenant pays the following amounts, unconditionally and without offset as compensation for manure hauling for the following dates: (a) $50,000 per day from November 1, 2022, to April 30, 2023, (b) $45,000 per day from May 1, 2023, through June 30, 2023, and (c) $50,000 per day from July 1, 2023, through October 31, 2023.

Commencing November 1, 2023, Tenant shall pay to Landlord $50,000 per day for manure hauling in the event the Temporary Lagoon, Temporary Facilities, Phase 2, and Phase 3A of the Project cannot process 100% of the Manure, which, for the avoidance of doubt, includes the solids of the wastewater and manure (flush waters and alley vacs) in accordance with the Byproduct Specifications articulated in Exhibit F of the MSA. If, however, on November 1, 2023, the Temporary Lagoon, Temporary Facilities, Phase 2, and Phase 3A of the Project are able to process 100% of the Manure, which, for the avoidance of doubt, includes the solids of the waste water and manure (flush waters and alley vacs) in accordance with the Byproduct Specifications articulated in Exhibit F of the MSA, then Tenant shall pay to Landlord $15,000 per day for manure hauling until the commissioning of the Manure Separation Facility. Upon commissioning of the Manure Separation Facility, Tenant shall have no further obligation to make payments under this Section 4.2. However, Tenant shall not be relieved of any other obligation under the Agreement or the MSA. Tenant shall make all payments on the 5th and the 20th day of each month, unless such days fall on a weekend or holiday, in which case they will be due on the next business day following such date. For example, payments covering the dates of January 16-31, 2023, would be due on February 5, 2023, and payments covering the dates of February 1-15, 2023, would be due on February 20, 2023.  Furthermore, any payments that would otherwise have been due before the Third Amendment Effective Date shall accrue interest at the rate of eighteen percent (18%) per annum from the applicable date until the date paid in full. For example, payments for the period of November 1-15, 2022, would accrue interest from November 20, 2022, until paid in full. Any other payments will accrue interest at the rate of twenty four percent (24%) per annum from the day following the due date until the date paid in full if such payments are not not paid when due.

THIRD AMENDMENT TO GROUND LEASE AGREEMENT – 3

*Execution Version*

Tenant shall provide Landlord with a Manure Separation Facility construction schedule on a bi-monthly basis, on a schedule to be mutually agreed by the Parties, and a monthly (15th Business Day of the month) expense report detailing the capital expenses of the Manure Separation Facility on a monthly, project to date and expected completion cost basis.

The term "Temporary Lagoon" means, collectively, the temporary manure separation lagoon and associated centrifuges constructed and installed by Tenant for Tenant's operation."

All payments described above that would otherwise have been due and payable before the execution of this Third Amendment will be due and payable, together with interest as provided above, upon full execution of this Third Amendment and Tenant shall pay those amounts (as additional payments to Landlord) at the same time as Tenant pays the Tenant Payment to Landlord, as contemplated by Section 1.a of this Third Amendment."

b.    The first sentence of Section 2 of Exhibit E to the Agreement is amended and restated to read in its entirety as follows:

"Notwithstanding any other term of this Lease or the MSA and notwithstanding any termination of the MSA or conditions to the parties obligations herein or in the MSA, Tenant agrees to and is and shall be unconditionally obligated to construct, install and commission the Manure Separation Facilities in accordance with the MSF Plans (as defined herein), and to use best efforts, at its sole cost and expense, to complete installation and commission of the Manure Separation Facilities on or before October 31, 2023, and to thereafter operate, maintain and repair the Manure Separation Facilities in accordance with this Lease and the MSA."

## 3.    Green Water Building.

a.    Excluding Section 6.3.1 which shall remain unchanged, Section 6.3 of the Agreement is amended and restated to read in its entirety as follows:

6.3    Project Design. The current plans and specifications for the Project, the construction schedule for the Project, the site improvements and equipment, and the design and appearance of the exterior of the Improvements) are (or will be) attached hereto as Exhibit F (as may be amended in accordance with this Lease, the "Plans"). The Plans that are attached as Exhibit F at the execution of this Lease are deemed approved by Landlord and Tenant. As more particularly described in Exhibit F, the Project and the Plans include a green water building, approximately 120 feet by 40 feet in size (the "Green Water Building"). Tenant will be solely responsible for and will pay all costs and expenses related to the design and construction of the Green Water Building.  Landlord will own, and Tenant will operate and maintain the Green Water Building at Tenant's sole cost and expense. Tenant will design and construct the Green Water Building in a manner that enables Tenant to deliver green water to the Green Water Return Points depicted in

THIRD AMENDMENT TO GROUND LEASE AGREEMENT – 4

*Execution Version*

Exhibit D to the MSA and in <u>Exhibit E</u> and <u>Exhibit F</u> to this Agreement and design and build the Green Water Building in such a manner the automation of the building and its associated processes, including but not limited to the pumps, level sensors and other critical mechanical, electrical and/or hydraulic operations are made available to the Dairy via remote electronic monitoring and synchronization on a "read only" basis. Landlord and Tenant acknowledge the mechanical and green water flush capabilities of the Green Water Building are critical to meeting their obligations under this Lease, and that the Green Water Building will be built in phases to accommodate additional green water flush requirements of the Dairy as it builds additional crossvent barns. However, at all times the Green Water Building shall be initially constructed to have redundant power, mechanical and green water flush capabilities and account for the additional flush requirements of the Dairy. Landlord is solely responsible and liable for Dairy's use of green water between Tenant's Green Water Return Points and Landlord's Flush Water Reception Pits; Tenant expressly disclaims all liability related to such use by Landlord. Nevertheless, provided (i) that no Dairy event of default has occurred and is continuing under either this Lease or the MSA and (ii) that such odor or water quality is not the result of Dairy's introduction of Non-Suitable Manure Materials (as that term is defined in the MSA), the Parties will each use commercially reasonable efforts to work together to ensure that the Return Water is free from obnoxious odors and is otherwise not of a quality that creates potentially hazardous footing for cattle or results in the growth of contaminants. By way of example only and in no way limiting the aforementioned commercially reasonable efforts of the Parties, the Parties acknowledge the use of polymers may be required in the event the Return Water exhibits obnoxious odors and is otherwise not of a quality that is conducive to Dairy's needs. The commitment in the foregoing sentence to work together is a good faith commitment only and is not intended to impose or create a Non-Suitable Deliverable or an Event of Default and Tenant will not be obligated to introduce any product to the Return Water that would result in Tenant delivering Non-Suitable Deliverables under the MSA. Any Plans that are approved by Landlord in writing subsequent to the execution of this Lease will be attached to <u>Exhibit F</u> to this Lease, which approval will be governed by <u>Exhibit G</u>, and will not be unreasonably withheld or delayed. If there are any material changes to the Plans, Landlord and Tenant shall comply with the Project design process described on <u>Exhibit G</u> hereto; provided, however, that in all events no changes to the Plans shall be implemented without Landlord's prior written consent, not to be unreasonably withheld, conditioned, or delayed. Tenant represents and warrants to Landlord that it will construct the Project with best in class equipment so as to produce high-quality product.

b.   The diagram (an aerial photograph) depicting the various flush water reception pits, Green Water Return Points, and Manure Slurry Receiving Point attached as the last page of Exhibit E to the Agreement is deleted in its entirety and replaced with the document attached as **Exhibit E** to this Third Amendment.

**4.** **<u>Maintenance Shop</u>**. The Project and the Plans will include a maintenance shop, approximately 60 feet by 90 feet in size (the "**Maintenance Shop**"), which Tenant will

THIRD AMENDMENT TO GROUND LEASE AGREEMENT – 5

*Execution Version*

construct at its sole cost and expense subject to Landlord's approval, which approval shall not be unreasonably withheld, delayed, or conditioned.

5.  **Plans – Exhibit F**. Exhibit F to the Agreement is amended and restated to read in its entirety as set forth on **Exhibit F** to this Third Amendment.

6.  **Design Approval Process – Exhibit G**. Exhibit G to the Agreement is amended and restated to read in its entirety as set forth on **Exhibit G** to this Third Amendment.

7.  **Ownership of Equipment**. Tenant acknowledges that notwithstanding the Tenant Payment all existing and planned equipment referenced in Section 1.a of this Third Amendment and more specifically described in set forth in **Exhibit I** to this Third Amendment (collectively, the "**Equipment**") and all related warranties for such Equipment is and shall be the property of and owned by Landlord and Tenant hereby assigns, transfers, conveys and delivers to Landlord all such equipment and relinquishes any ownership therein.

8.  **Residential Building**.  The following sentence is added to the last sentence of Section 3.2 of the Agreement:

    "Notwithstanding the foregoing, Landlord directed Tenant to demolish the residential building and Tenant did thereafter demolish the residential building."

9.  **Tenant's Force Majeure Claims**. Prior to the Third Amendment Effective Date Tenant has provided Landlord with written notification of Tenant's claims for force majeure relief pursuant to Section 21 of the Agreement ("**Prior Force Majeure Claims**"). Tenant with prejudice withdraws and waives Tenant's Prior Force Majeure Claims; provided that Tenant reserves all rights to claim force majeure relief under the Agreement in the future, so long as the basis for any such claim has arisen after execution of this Third Amendment.

10. **Landlord's Cooperation**. The Agreement is amended to add the following Section 6.1.1 immediately following Section 6.1:

    6.1.1   Landlord will coordinate and cooperate with Tenant in order to facilitate Tenant's design and construction of the Project and the temporary and permanent Manure Separation Facilities in an efficient and timely manner. Landlord will not unreasonably interfere with Tenant's (or Tenant's vendors' or subcontractors') work on the design or construction of the Project or the temporary and permanent Manure Separation Facilities, and will not communicate directly with Tenant's vendors or subcontractors with respect to the Project insofar as they do not relate to the Dairy's use of green water or the temporary and permanent Manure Separation Facilities, which are critical to the operation of the Dairy. Should Landlord have concerns regarding deviations from approved construction plans or relating to matters of safety, Landlord shall communicate directly with Tenant and the Parties shall use commercially reasonable efforts to resolve those concerns; provided that with respect to safety matters posing immediate risk of harm to persons or property, Landlord may communicate directly with the necessary parties and thereafter communicate with Tenant regarding such matter.

*Execution Version*

However, nothing in this Section 6.1.1 will prevent Landlord from communicating with such parties on matters unrelated to the Project. Landlord will ensure that all concrete and gravel sourced by Tenant from Landlord or Landlord's affiliates pursuant to <u>Section 6.4.1</u> is delivered timely to Tenant so as not to delay or hinder Tenant's construction of the Project and the temporary and permanent Manure Separation Facilities.

**11.**    <u>**Claims of Breach and Default**</u>. Each of the Parties releases and forever discharges the other Party from, and waives, all claims it now has against the other Party in any way arising out of or relating to the other Party's breach of or default under, or alleged breach of or default under, the Agreement before the Third Amendment Effective Date and relating to the subject matter of this Third Amendment To Ground Lease Agreement.

**12.**    <u>**No Admission of Liability**</u>. Nothing in this Third Amendment, including without limitation any payment from Tenant to Landlord, is an admission by any Party of any breach or liability under the Agreement or the MSA, or of any other wrongdoing or noncompliance with any federal, state, city, or local rule, ordinance, constitution, statute, contract, agreement, public policy, tort law, common law, contract, or any other unlawful conduct, liability, wrongdoing, or breach of any duty whatsoever. The Parties specifically disclaim and deny any wrongdoing or liability.

**13.**    <u>**Reservation of Rights**</u>. Subject to Section 12, each of the Parties reserves each and every one of its rights, remedies, powers, recourses, and privileges under or related to the Agreement at law, or in equity, and all such rights, remedies, powers, recourses, and privileges are and shall remain in full force and effect, enforceable by the Parties at law or in equity.

**14.**    <u>**Condition Precedent**</u>. This Third Amendment will not be effective, and Landlord shall not be obligated and shall not execute this Third Amendment and MSA First Amendment, unless and until Tenant has: (a) executed this Third Amendment; (b) executed the MSA First Amendment; and (c) on or before April 21, 2023, Tenant has paid the Tenant Payment and any other monies currently due and owing Landlord under this Third Amendment less the amount of $7,500,000 that Tenant wired to Landlord on April 14, 2023, as partial payment upon the Tenant Payment and any other monies currently due and owing Landlord under this Third Amendment. In the event any of these conditions precedent have not been fulfilled, this Third Amendment to Ground Lease Agreement and MSA First Amendment shall be null and void. For the avoidance of doubt, the partial payment of $7,500,000 does not in any way or manner relieve Tenant of the prompt and timely performance of any and all obligations under the Lease, this Third Amendment, the MSA, or MSA First Amendment. If Tenant timely performs all of its obligations under this Section 14, Landlord shall immediately execute and deliver to Tenant this Third Amendment and the MSA First Amendment.

**15.**    <u>**Terms and Conditions of the Agreement**</u>. Other than as expressly set forth in this Third Amendment, all of the terms and conditions of the Agreement shall remain in full force and effect and shall apply to this Third Amendment; provided that to the extent there is a

*Execution Version*

conflict between the terms of this Third Amendment and the terms of the Agreement, the terms of this Third Amendment shall control to the extent of such conflict.

16.    **Governing Law**. This Third Amendment shall be governed by and construed, interpreted and enforced in accordance with the laws of Idaho, excluding choice of law rules and principles.

17.    **Counterparts**. This Third Amendment may be executed in two or more counterparts, each of which will constitute an original, but all of which when taken together shall constitute the same Agreement. Signatures to this Third Amendment transmitted by facsimile, email, portable document format (or .pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of this Third Amendment have the same effect as the physical delivery of the paper document bearing original signature. Each Party agrees that this Third Amendment and any other documents to be delivered in connection herewith may be electronically signed, and that any electronic signatures appearing on this Third Amendment or such other documents are the same as handwritten signatures for all purposes.

18.    **Entire Agreement**. This Third Amendment represents the entire understanding of Landlord and Tenant as to those matters contained in this Third Amendment, and supersedes any prior oral or written understanding, promises or representatives with respect to those matters covered in this Third Amendment, and it shall not be amended, altered or changed except by a written agreement signed by the Parties hereto.

19.    **No Other Amendment**. Except as expressly amended hereby, the terms and provisions of the Agreement remain in full force and effect, and are ratified and confirmed by the Parties in all respects as of the Third Amendment Effective Date. From and after the Third Amendment Effective Date, whenever the term "Agreement" appears in the Agreement, it means the Agreement as amended by the First Amendment and this Third Amendment.

*[Signature Page Follows]*

60452.0001.15917202.3

*Execution Version*

**IN WITNESS WHEREOF**, the Parties have caused this Third Amendment to be signed as of the Third Amendment Effective Date.

EAST VALLEY CATTLE, LLC,
an Idaho limited liability company

By: _____
    Name: Bill Millenkamp
    Title:  Manager

EAST VALLEY DEVELOPMENT, LLC,
a Delaware limited liability company

By: _____
    Name:  William J. Flanagan
    Title:  VP, Strategic Development

SIGNATURE PAGE TO THIRD AMENDMENT TO GROUND LEASE AGREEMENT

*Execution Version*

**IN WITNESS WHEREOF**, the Parties have caused this Third Amendment to be signed as of the Third Amendment Effective Date.

EAST VALLEY CATTLE, LLC,
an Idaho limited liability company


By: _____
     Name: Bill Millenkamp
     Title:   Manager



EAST VALLEY DEVELOPMENT, LLC,
a Delaware limited liability company

By: _____
     Name:  William J. Flanagan
     Title:   VP, Strategic Development

SIGNATURE PAGE TO THIRD AMENDMENT TO GROUND LEASE AGREEMENT

60452.0001.15917202.3

*Execution Version*

**EXHIBIT E**

**Depiction of Flush Water Reception Pit; Green Water Return Points; and
Slurry Receiving Point**

The Delivery Point for Suitable Manure Slurry, the Flush Water Reception Pits, the Green Water
Flush Building, and the Green Water Return Points, are each shown on the diagram on this
Exhibit E.



EXHIBIT E TO THIRD AMENDMENT TO GROUND LEASE AGREEMENT

60452.0001.15917202.3

*Execution Version*

## EXHIBIT F

### Exhibit F
### Ground Lease Agreement

### Plans

All Plans attached hereto at the execution of this Lease and at any time thereafter up to and including the date of execution of the Third Amendment To Ground Lease Agreement shall be deemed approved by the Parties. Any Plans attached subsequent to the execution of the Third Amendment To Ground Lease Agreement shall not be effective or binding upon Landlord until approved in writing by Landlord, such review and approval to be accordance with Exhibit G which is attached as Exhibit G of the Third Amendment To Ground Lease Agreement.

All Plans, including but not limited to, specifications for the Green Water Building, Maintenance Shop, Hard Surface Areas, fusion pipe from the main lagoon to the candy cane reception pit to accommodate pumping of lagoon solids into the candy cane reception pit, and any other plans and specifications shall be reviewed and approved in accordance with Exhibit G which is attached as Exhibit G of the Third Amendment To Ground Lease Agreement.

EXHIBIT F TO THIRD AMENDMENT TO GROUND LEASE AGREEMENT

60452.0001.15917202.3

**EXHIBIT G**

<u>Exhibit G</u>
<u>Ground Lease Agreement</u>

**Project Design Process**

Design efforts will be in accordance with applicable design codes per the standard of care for an industrial anaerobic digester (AD) facility. Typical design codes include, but are not limited to American Society of Mechanical Engineers (ASME), American Petroleum Institute (API), National Fire Protection Association (NFPA), Manual of Practice (MOP) from Water Environment Federation (WEF), National Electric Code (NEC), and the International Building Code (IBC).

In order to keep Landlord apprised of design progress, allow for input, and not delay design progress with formal reviews, intermediate submittal packages will be provided to be reviewed concurrent with design progression. Landlord will have access to the design engineer's file sharing folder where detailed design sheets and 3D models are updated concurrent with design development. Specific design review meetings will be set up at appropriate design stage gates to get input from Landlord regarding infrastructure integration to the existing dairy facility and consistency with overall architectural programing (established by current construction methods that are applicable to an industrial anaerobic digestion facility with gas upgrading and compression).

Anticipated design stage gates requiring Landlord approval to not impact design schedule:

- Site Plan and overall layout
- Facility interconnect with dairy and shared infrastructure including:
  o Power feed to AD facility
  o Biomethane pipe routing and interconnect locations
  o Architectural programming
    • Buildings (siding and roof materials, colors, and exterior finishes)
  o Traffic flow of shared access points
  o Dairy water interconnect points between AD and dairy
    • AD Influent (pressurized, upstream of manure thickening and green flush treatment)
    • AD Effluent (gravity, downstream of covered lagoon)
    • AD Effluent (bedding from fiber separation)
- Landlord will need to provide approval of proposed design aspects

Assumptions:

- Stage gates coordination meetings will be done either onsite or via screen share. An agreed upon path forward will be in-place after one round of Landlord comments and engineering revisions.
- Review comments will not inhibit overall AD process.
- Outside of aforementioned stage gate meetings, it is assumed that Landlord will review progress sets (construction sheets and 3D model) concurrent with design

EXHIBIT G TO THIRD AMENDMENT TO GROUND LEASE AGREEMENT

*Execution Version*

development and submit review comments in a timely manner as part of the design team and work within the design schedule.

Landlord and Tenant agree as follows:

1.  Tenant will deliver to Landlord reasonably detailed written documentation for each Project design element or change to a Project design element proposed by Tenant (each, a "<u>Design Proposal</u>"). Landlord will promptly review each Design Proposal and deliver to Tenant within 14 days after Landlord's receipt of the Design Proposal (the "<u>Response Period</u>") either (i) Landlord's written approval of the Design Proposal or (ii) Landlord's written disapproval of the Design Proposal together with a reasonably detailed description of Landlord's objections and requested changes. If Landlord does not provide to Tenant, within the Response Period, Landlord's written approval or written disapproval of a Design Proposal in accordance with the preceding sentence, then Landlord will be deemed to have approved the Design Proposal in all respects; provided, that in no event will Landlord's approval be construed to extend to any aspect of Project construction or design that was not indicated expressly in the Design Proposal. Landlord agrees that it will not issue any field directives or request any changes if construction of the Project is undertaken in accordance with a Design Proposal that Landlord has approved or is deemed to have approved.

2.  Landlord and Tenant will cooperate in good faith to select a neutral third party ("<u>Third Party</u>") who, if a design dispute arises, will promptly meet with the Parties on site, if appropriate, consider all relevant information, and attempt to mediate a non-binding resolution to the dispute that is acceptable to both Parties. The Parties will enter into a written agreement memorializing the resolution of each such design dispute. The Third Party shall also give due attention to all of the terms of the Ground Lease and the MSA in making such recommendation.

3.  Tenant will engage a full time project manager on site, who will serve as a liaison between Landlord and Tenant. If Tenant (working in conjunction with its project manager) and Landlord cannot resolve a design dispute, either Landlord or Tenant may bring the dispute to the attention of the Third Party. If such a dispute is brought to the Third Party's attention, representatives of Landlord and Tenant will meet with and discuss the matter with the Third Party.

EXHIBIT G TO THIRD AMENDMENT TO GROUND LEASE AGREEMENT

*Execution Version*

## EXHIBIT I

## Equipment List

The Parties will provide at a later date.

EXHIBIT I TO THIRD AMENDMENT TO GROUND LEASE AGREEMENT

60452.0001.15917202.3

# Third (fka Second) Amendment to Ground Lease Agreement - EVC and EVD (Signature 6-23-2023)

Final Audit Report                                                                2023-06-23

| | |
|---|---|
| Created: | 2023-06-23 |
| By: | Maureen Schmitz (Maureen.Schmitz@cleanenergyfuels.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAbYCrEyQ6GFepB_MYjl3Uwqj49ZBFBeux |

## "Third (fka Second) Amendment to Ground Lease Agreement - EVC and EVD (Signature 6-23-2023)" History

📄 Document created by Maureen Schmitz (Maureen.Schmitz@cleanenergyfuels.com)
2023-06-23 - 10:09:54 PM GMT

✉ Document emailed to Will Flanagan (will.flanagan@cleanenergyfuels.com) for signature
2023-06-23 - 10:10:55 PM GMT

📄 Email viewed by Will Flanagan (will.flanagan@cleanenergyfuels.com)
2023-06-23 - 10:14:38 PM GMT

🖊 Document e-signed by Will Flanagan (will.flanagan@cleanenergyfuels.com)
Signature Date: 2023-06-23 - 10:14:53 PM GMT - Time Source: server

✅ Agreement completed.
2023-06-23 - 10:14:53 PM GMT

Adobe Acrobat Sign

EXHIBIT B

**EXHIBIT B**

**MANURE SUPPLY AGREEMENT**

This Manure Supply Agreement (this "**Agreement**") by and between Millenkamp Cattle, Inc., an Idaho corporation ("**Dairy**"), and **East Valley Development, LLC**, a Delaware limited liability company and subsidiary of CE bp Renew Co, LLC (which entity is owned 50% by bp Products North America and 50% by Clean Energy) ("**Developer**"), is effective as of October 8, 2021 (the "**Effective Date**"). Dairy and Developer are hereafter sometimes collectively referred to as the "**Parties**" and individually as a "**Party**."

R E C I T A L S

A.      An affiliate of Dairy, East Valley Cattle, L.L.C., an Idaho limited liability company ("**EVC**"), owns that certain parcel of land located in Cassia County, Idaho, as more particularly described on Exhibit A (the "**Subject Property**"), and Dairy owns and operates a dairy and feedlot operation on the Subject Property and neighboring property, as further described (in its current condition) on Exhibit B (the "**Farm Business**").

B.      Dairy produces large quantities of manure, milking parlor water, dairy flush lanes water, feed lane manure, loafing pen manure, and urine, generated from its operation of the Farm Business at the Subject Property (collectively, "**Manure**") that must be handled and disposed of in an environmentally and socially responsible manner and such waste handling requires a significant expenditure of time and resources by Dairy;

C.      On the Leased Property (as defined in the Lease), Developer desires to install, construct, own, and operate a commercial-scale biogas production facility for the production of methane gas and other co-products, and other beneficial uses, which facility is made up of the following components (collectively, the "**Facility**"): An anaerobic digestion system and related equipment (the "**Digester**"), which includes Digester required Manure Separation Facilities (defined in Section 6.4.1).

D.      The Facility will rely upon Manure meeting the quality requirements in Exhibit C ("**Suitable Manure**") as a feedstock, and by using such Suitable Manure as a feedstock, greatly reduce Dairy's Manure handling requirements and significantly reduce the associated environmental impacts for Dairy; and

E.      Developer and EVC are parties to that certain Ground Lease Agreement dated as of October 8, 2021 (as it may be amended or restated from time to time, the "**Lease**") in order to fully effectuate the purposes of this Agreement.

A G R E E M E N T

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions, and provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      **Term.**

      1.1.      Term. This Agreement shall become effective on the Effective Date, and, unless earlier terminated in accordance with its terms, shall remain in effect throughout the Startup Term, the Initial Term, and any Extended Term, as defined below. The

Startup Term, Initial Term, and any Extended Term are collectively referred to as the "**Term**" of this Agreement. Developers obligations under Exhibit E of the Lease shall commence as described therein.

1.2.    Startup Term. The "**Startup Term**" of this Agreement shall begin on the Effective Date and continue until the Commercial Operations Date, as defined below. Dairy has the option (but not the obligation) to terminate this Agreement by written notice to Developer if Developer has not Commenced Construction (as defined below) prior to the date which is one (1) year after the Effective Date; provided however that Dairy may not terminate this Agreement if by the Commenced Construction date, the Manure Separation Facilities have been constructed and are fully operational by the dates and in accordance with Exhibit E of the Lease. "**Commenced Construction**" means that Developer has issued a notice to proceed ("**NTP**") to Developer's contractor for the Digester under the relevant construction contract and grading and site work has commenced. Developer shall provide Dairy with a copy of such NTP when it is issued to the contractor. Dairy has a second option (but not the obligation) to terminate this Agreement by written notice to Developer if the Commercial Operations Date (as defined below) does not occur prior to the date which is three (3) years after the Commenced Construction date; provided however, that Dairy may not terminate this Agreement as provided in this Section if within three (3) years of the Commenced Construction Date (i) the Manure Separation Facilities have been constructed and are fully operational by the dates and in accordance with Exhibit E, and (ii) the Commercial Operations Date is reached by within four (4) years of the Commenced Construction date. Developer will use all Commercially Reasonable Efforts (defined below) to achieve Commenced Construction and the Commercial Operations Date as expeditiously as possible. Construction of the Manure Separation Facilities does not result in Commenced Construction as defined in this Section 1.2.

1.3.    Initial Term. This Agreement and all of the terms, conditions, and provisions hereof shall be effective and binding upon the Effective Date, notwithstanding that the Initial Term commences on a later date. The "**Initial Term**" of this Agreement shall begin on the date on which Developer notifies Dairy that the Digester has commenced full commercial operations, as such date is determined by Developer in its reasonable discretion but not later than the dates described in Section 1.2 of this Agreement (the "**Commercial Operations Date**") (provided, however, that the Commercial Operations Date shall in no event be any later than the date on which Developer delivers methane gas to the pipeline connected to the Facility for sale to a gas purchaser) and shall extend until the date that is twenty (20) years from the Commercial Operations Date. Developer shall provide Dairy a minimum of sixty (60) days advance written notice of the expected Commercial Operations Date and shall provide Dairy notice of any change to the expected Commercial Operations Date (or any revised Commercial Operations Date) as far in advance thereof as is practicable given the circumstances. Commencement of operations at the Manure Separation Facilities does not result in the Commercial Operation Date as defined in this Section 1.3.

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

1.4. <u>Extended Term</u>. Upon expiration of the Initial Term, this Agreement shall automatically renew for one (1) additional five (5) year period after the Initial Term (the "**Extended Term**"), *provided, however,* that if an Event of Default exists on the date which is six (6) months before such Extended Term is to begin, the non-defaulting Party may provide written notice to the defaulting Party of non-renewal at any time during the pendency of such Event of Default and before the expiration of the then-current Term. If the non-defaulting Party provides such timely notice of non-renewal, then, unless otherwise sooner terminated in accordance with its terms, the Term of this Agreement shall end on the expiration of the Initial Term.

1.5. <u>Relationship to Lease Term</u>. In all events, upon the termination or expiration of the Lease for any reason, this Agreement shall terminate.

**2.** **<u>Delivery and Acceptance of Suitable Manure.</u>**

2.1. <u>Quality</u>. Dairy will use Commercially Reasonable Efforts to ensure that all Manure delivered to Developer pursuant to this Agreement is Suitable Manure that conforms to the specifications set forth on <u>Exhibit C; provided however that Dairy is not obligated to take any action that Dairy determines would negatively affect Dairy's operations</u>. "**Commercially Reasonable Efforts**" means the taking of such actions that a similar business entity who wishes to achieve an objective would reasonably take in similar circumstances to accomplish such objective.

2.2. <u>Deliveries during Startup Term</u>. During the Startup Term, and subject to the other terms of this Agreement, Dairy will use Commercially Reasonable Efforts to complete its ramp up from 25,000 dairy head to 37,500 dairy head on flush, as shown in more detail on <u>Exhibit B</u> (the "**Ramp-Up**"). During the Startup Term, Developer may request that Dairy deliver Suitable Manure by providing written notice to Dairy specifying the requested delivery date and quantity of Suitable Manure, provided that Developer must make such written notice no less than ten (10) days prior to each requested delivery date. On the date of such requested delivery, Dairy shall deliver the specified quantity of Manure to the "**Manure Delivery Point**" and flush water to the "**Flush Delivery Points**" as the Manure Delivery Point and the Flush Delivery Points are depicted in <u>Exhibit D</u>, or such other locations as may be agreed by Developer and Dairy in writing (collectively the "**Delivery Points**"), and Developer shall accept and take title to such Suitable Manure when unloaded at the Delivery Points.

2.3. <u>Deliveries Following the Commercial Operations Date</u>. After the Commercial Operations Date, and throughout the remainder of the Term, but subject to the limitations in this Agreement, Dairy shall make continuous deliveries to the Delivery Point of all available Suitable Manure from the Subject Property, managed in accordance with <u>Exhibit C</u>.

2.4. <u>Expansion</u>. Dairy or any of Dairy's Affiliates may, but is not obligated to, continue to expand its operations to more than 37,500 dairy head after Ramp-up at the Subject Property or open new dairy facilities within twenty five (25) miles of the Subject

Property (an "**Expansion**"). If practical, Dairy shall provide Developer with no less than one-hundred eighty (180) days prior written notice of the date that any Expansion shall be complete ("**Expansion Completion Date**"). If an Expansion of the Dairy necessitates additional Manure Separation Facilities, equipment, improvements, updates, and/or expansion of the Manure Separation Facilities Developer shall pay for those costs of such additional Manure Separation Facilities, equipment, improvements, updates and/or expansion. The plans and specifications for any additional Manure Separation Facilities, equipment, improvements, updates, and/or expansion of the Manure Separation Facilities shall be subject to written approval of both Parties. Subject to the terms of this Agreement, Developer may, but shall not be obligated to, expand the Digester to accommodate additional Manure from an Expansion so long as any Manure, which cannot be accommodated by the Digester, shall be routed around the Digester to complete the Manure separation process. For the avoidance of any doubt, it is critical to the operation of the Dairy that the Manure Separation Facility have the capacity and the ability to process the Manure produced at the Dairy, including any additional Manure produced as a result of an Expansion.

Expansion of the head count on the Subject Property shall be included in the numerator for the calculation of the be Dairy Attributable Feedstock Percentage and will be subject to the suitability requirements of this agreement specifically those in Exhibits C and the Byproduct Standards in Exhibit F. For the avoidance of doubt, all costs related to meeting the Byproduct Standards shall be borne by the Developer to meet those requirements in Exhibit F.

For purposes of this Agreement, "**Affiliate**" of any party means any other person or entity that, directly or indirectly through one (1) or more intermediaries, Controls, is Controlled by or is under common Control with that person or entity; and "**Control**" means (a) the ability to control and effect the day-to-day management and control of the person or entity; or (b) ownership or control of greater than fifty percent (50%) of the partnership interests, membership interests, voting stock or other equity interests of the person or entity.

2.5.    <u>Other Feedstock</u>. Upon advanced written notice to and written approval by Dairy, in Dairy's sole discretion (except as otherwise provided in Section 5.3.2 and 5.4), Developer may accept and process Manure and other materials from non-Dairy sources. Such notice from Developer to Dairy shall detail whether, and how, the processing of such additional Manure or other materials may negatively impact Dairy or the Farm Business operations or cause a change in the zoning classification of Dairy or the Farm Business.

2.6.    <u>Outages</u>. Developer shall notify Dairy in writing within a reasonable time prior to any planned Outage of the Digester, and, to the extent reasonably practicable, within a reasonable time prior to any other event or condition that may result in a decrease in or delay of acceptance of Suitable Manure from Dairy. Developer shall have no obligation to accept deliveries of Manure from Dairy during any Outage but will use

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

Commercially Reasonable Efforts to cooperate with Dairy during the Outage and in all events shall bypass the Digester by routing the Manure around the Digester to complete the Manure separation process and continue to operate and maintain the Manure Separation Facilities as needed to meet the Byproduct Standards (defined in Section 11.6 below).  Developer will design, construct, and operate the Facility to allow for such bypass. "**Outage**" shall mean any event which causes the Digester to operate at less than fifty percent (50%) of maximum capacity, which maximum capacity is one thousand five hundred forty-five (1545) MMBtu of RNG per day on average.

2.7.  <u>Appropriate Training; Facility Rules</u>. Dairy shall ensure that all of its employees, agents, and subcontractors, including drivers delivering Suitable Manure to the Delivery Point, are appropriately trained, experienced, and qualified, and that all such employees, agents, and subcontractors comply with any and all Facility rules, including Facility safety rules. Developer shall ensure that all of its employees, agents, and subcontractors, including those operating and maintaining the Manure Separation Facilities, are appropriately trained, experienced, and qualified, and that all such employees, agents, and subcontractors comply with any and all Dairy rules, including Dairy safety rules. Dairy and Developer shall cooperate and work with each other to facilitate each Party's training obligations hereunder.

2.8.  <u>Facility Operations</u>. Except as otherwise explicitly provided in this Agreement, Developer will be responsible for all Facility operational costs. Excluding temporary shut downs due to maintenance, repair, emergencies, or in the ordinary course of business, Developer shall, on a continuous basis (i.e., 24 hours per day, 7 days per week), (a) operate the Facility so as to not create any material disruption to the operations of the Farm Business and in fulfillment of the terms and conditions of this Agreement, and (b) operate and maintain the Manure Separation Facilities in accordance with Section 6.4.2. Except in the case of emergencies, Developer shall coordinate any scheduled shut downs with Dairy so as to minimize any disruptions to the Farm Business operations. Developer shall carry out Facility operations with industry best management practices as determined by Developer in its discretion. For the avoidance of any doubt, Developer shall be obligated in all events to operate the Manure Separation Facilities 24 hours a day and 7 days a week and Developer acknowledges and agrees that such operation, as more fully described in Section 6.4.2, is an essential term of this Agreement.

3.  **Transportation and Title.**

3.1.  <u>Delivery Responsibility</u>. Dairy shall have the sole responsibility for delivering its Suitable Manure, other than as provided in Section 2.4, to the Delivery Point as provided for in Section 2. Dairy has no obligation for the delivery of any Suitable Manure other than all of its Suitable Manure generated at the Subject Property.

3.2.  <u>Title.</u> Subject to Developer's right to reject deliveries of Manure as provided in Section 11, title to, risk in, and responsibility for (including responsibility for any Release of) Suitable Manure shall pass from Dairy to Developer when delivered and accepted at the Delivery Point. Accordingly, any Releases of Manure prior to the

Delivery Point shall be the sole responsibility of Dairy and any Releases of Suitable Manure at or after the Delivery Point shall be the responsibility of Developer, except that title to (including responsibility for any Release of) (a) Return Water shall pass back to Dairy at the applicable Return Water Delivery Point, (b) Fiber shall pass back to Dairy at the Fiber Delivery Point, and (c) NPK Solids shall pass back to Dairy at the NPK Solids Delivery Point, each as provided in Section 6. As used in this Agreement, "**Release(s)**" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, dumping, discarding, burying, abandoning, or disposing into the environment. The Parties agree that, to the extent permitted by law, the provisions of this Section 3 and Section 6 shall supersede the provisions of the Uniform Commercial Code as in effect in the State of Idaho with respect to the subject matter herein. Suitable Manure is delivered to Developer as-is, and Dairy makes no representations or warranties regarding the nature of composition of Suitable Manure except as expressly provided in this Agreement.

4.    **Not Used.**

5.    **Farm Business Operations.**

5.1.    <u>Collection of Manure</u>. Dairy shall use Commercially Reasonable Efforts to ensure that all Suitable Manure delivered under this Agreement is collected in accordance with the following:

5.1.1.    Dairy will continue to use the systems that it is currently using for the collection of Manure except that Dairy shall not be precluded from replacing, repairing, or upgrading its systems so long as the system continues to have at least the capacity that it possessed upon the execution of this Agreement ("**Manure Handling Facilities**"). Dairy will reasonably maintain its Manure Handling Facilities as necessary in order to provide the supply of Suitable Manure provided for in this Agreement.

5.1.2.    Dairy shall collect and deliver Suitable Manure on at least a daily basis so as to minimize the loss of volatile solids from such Suitable Manure, with allowance for severe weather events and Force Majeure events (as defined below). Severe weather events are defined as days in which freezing temperatures or other conditions cause Manure to be in a condition that it is not able to be collected with conventional vacuum scrape methods. If Developer desires to have this Manure collected and delivered to the Facility during severe weather events, subject to Dairy's agreement as to an alternative collection method, Developer will pay Dairy the incremental additional cost of the next most efficient collection method.

5.1.3.    Dairy shall use commercially reasonable methods to minimize the collection of extraneous materials (e.g., sand and gravel, wire, chemical contaminants, etc.) along with the Suitable Manure, and Dairy will make all reasonable modifications to its Manure Handling Facilities as is or becomes necessary to prevent the mixture of such extraneous materials into Suitable Manure during collection.

5.2.  <u>Continuous Operation</u>. Dairy will be responsible for all Farm Business operational costs, including production, collection, and transportation of Suitable Manure to the Delivery Point. So long as and to the extent Dairy operates a Farm Business on the Subject Property, Dairy shall, on a continuous basis, operate the Farm Business so as to not create any material disruption to the operations of the Facility and in fulfillment of the terms and conditions of this Agreement. A "material disruption" to the operations of the Facility shall not be deemed to occur unless and until Dairy ceases operation of the Farm Business for a period of more than thirty (30) consecutive days or of more than ninety (90) days in any three hundred sixty (360) day period, and in no event shall a "material disruption" be deemed to occur in the event of (a) a temporary shutdown of the Dairy down due to maintenance, repairs, emergencies, construction, a Force Majeure event, or as required by Dairy's Lender(s); (b) a Cessation Notice; or (c) during shut downs in the ordinary course of business. Except in the case of emergencies, Dairy shall coordinate any scheduled shut downs with Developer so as to minimize any disruptions in the flow of Manure to the Facility. Dairy shall carry out Farm Business operations with industry best management practices as determined by Dairy in its reasonable discretion.

5.3.  <u>Head Count Requirement</u>. During the Initial Term and any Extended Term (that is, after the Ramp-Up), Dairy will use Commercially Reasonable Efforts to operate at or above the following level on the Subject Property: (a) 37,500 dairy head; (b) 28,000 heifers and dry cows; comprising a total of 65,500 head (the "**Head Count Requirement**"). If, during any period of the Initial Term or Extended Term, Dairy operates at a level below 49,125 head (i.e., 75% of the Head Count Requirement), then Developer, as its sole and exclusive remedies, may do either or both of the following:

5.3.1.  deduct from the compensation otherwise then or thereafter due to Dairy pursuant to Section 7.1 an amount equal to the additional Facility Gross Revenues which would have been anticipated if Dairy had not operated below the Head Count Requirement – that is, the Facility Gross Revenues which would have been generated by the Suitable Manure between the actual level of operation and the Head Count Requirement, *provided, however,* that Developer may not deduct in any quarter more than fifty percent (50%) of such compensation otherwise due to Dairy pursuant to Section 7.1 in such quarter; and

5.3.2.  notwithstanding Section 2.5, and subject to all of Dairy's rights and remedies under Section 11.6 and 11.7, upon advance written notice to Dairy (but without any requirement for approval by Dairy), accept and process Manure and other materials from dairy sources and  material from non-dairy sources (collectively, "**Non-Dairy Feedstock**") provided that the percentage of Byproducts attributable to such Non-Dairy Feedstock shall not be delivered to the Return Water Delivery Points, the NPK Solids Delivery Point, the Fiber Delivery Point, or otherwise to the Subject Property, and Dairy shall not be responsible for any processing or handling of such Non-Dairy Feedstock attributable Byproducts.

5.4.    Cessation of Farm Business. Notwithstanding any other provision of this Agreement, Developer acknowledges and agrees that Dairy's obligations under this Section 5 or elsewhere in this Agreement apply if, and only to the extent, Dairy operates a Farm Business on the Subject Property, and that nothing in this Agreement obligates Dairy to operate any Farm Business on the Subject Property. If Dairy ceases operation of a Farm Business on the Subject Property, then Dairy will provide a written notice thereof to Developer, which notice must state the future date, if any and to the extent known, that Dairy intends to restart a Farm Business on the Subject Property (the "**Cessation Notice**"). If Dairy resumes a Farm Business on the Subject Property during the Term of this Agreement, Dairy will so notify Developer in writing (a "**Resumption Notice**"). Developer has the option (but not the obligation) to terminate this Agreement by written notice to Dairy if Dairy issues a Cessation Notice, which option expires upon Dairy's issuance of a Resumption Notice.  Notwithstanding Section 2.5, during the pendency of a Cessation Notice, upon advance written notice to Dairy (but without any requirements for approval by Dairy), Developer may accept and process Manure and other materials from dairy sources and Non-Dairy Feedstock and sell any and all Byproducts produced as part of the operation to Dairy or a third-party off-taker, in Developer's sole discretion.

6.    **Offtake of Facility Byproducts.**

6.1.    Byproducts Generally and Right of Entry.

6.1.1.    In addition to a mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane combustible gas ("**BioGas**") which will be sold by Developer to generate Facility revenues, the Facility will produce the following byproducts ("**Byproducts**") as part of its operation: (a) fibrous material that is screened from the digester effluent, which may be used by Dairy for various dairy and farm purposes, including, without limitation, indoor cattle bedding ("**Fiber**"); (b) "green" waters which are processed through clarifier(s) and routed to Dairy through a tank and pump system rather than entering the Digester ("**Green Water**"); (c) water and remaining suspended solids which are a byproduct of the Manure Separation Facilities and are routed to Dairy's settling ponds and lagoons ("**Lagoon Water**" and collectively with Green Water, "**Return Water**"); and (d) a semi-solid mixture of potash, phosphorous, and nitrogen which is a byproduct of the Manure Separation Facilities ("**NPK Solids**"). Other than Fiber, Return Water, and NPK Solids, any and all BioGas, bio-methane, renewable natural gas, electricity, Environmental Attributes (defined below), or any other products of the anaerobic digestion process shall belong solely and exclusively to Developer and title to such products shall not pass back to Dairy after processing the Suitable Manure in the Facility.

6.1.2.    Dairy may enter the Leased Property to the extent reasonably necessary (a) without prior notice to Developer, to pick up deliveries of Fiber and NPK Solids at the Fiber Delivery Point and NPK Solids Delivery Point, respectively;

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

(b) to exercise Dairy's or Landlord's rights under the Lease (c) to exercise Self-Help Measures, defined herein, when otherwise allowed by this Agreement; and (d) to operate, maintain, and/or repair the Manure Separation Facilities when allowed by Section 6.4.2. Developer acknowledges and agrees that Dairy's right to enter and inspect the Leased Property is critical to the operation of the Dairy and is an essential term of this Agreement.

6.2.    Fiber and NPK Solids.

6.2.1.    Developer shall deliver all of the Fiber produced by the Facility to Dairy at a point on the Leased Property, as further described on Exhibit D, or such other locations as may be agreed by Developer and Dairy in writing (the "**Fiber Delivery Point**"), and, if delivered, Dairy shall accept such Fiber subject to Section 11.6. The Fiber shall be delivered to Dairy as required herein, and Developer makes no representations or warranties regarding the nature of composition of the Fiber except as expressly provided in this Agreement. Title to, risk in, and responsibility for Fiber shall pass from Developer to Dairy upon delivery to the Fiber Delivery Point.

6.2.2.    Developer shall deliver all of the NPK Solids produced by the Facility to Dairy at a point on the Leased Property, as further described on Exhibit D, or such other locations as may be agreed by Developer and Dairy in writing (the "**NPK Solids Delivery Point**"), and, if delivered, Dairy shall accept such NPK Solids. The NPK Solids are delivered to Dairy as-is, and Developer makes no representations or warranties regarding the nature of composition of the NPK Solids except as expressly provided in this Agreement. Title to, risk in, and responsibility for NPK Solids shall pass from Developer to Dairy upon delivery to the NPK Solids Delivery Point.

6.3.    Return Water.

6.3.1.    Delivery of Return Water. At any time during the Term, Developer will deliver (a) Green Water to the pump system owned by Dairy for distribution to the Dairy, as shown on Exhibit D attached hereto and incorporated herein (the "**Green Water Return Point**") and (b) Lagoon Water to the settling ponds located on the Subject Property, as shown on Exhibit D attached hereto and incorporated herein (the "**Lagoon Water Delivery Point**" and collectively with the Green Water Return Pooint, the "**Return Water Delivery Points**") or at other point(s) as are from time to time agreed to in writing by the Parties, and, if delivered, Dairy shall accept (except as otherwise provided in Section 6.3.2 as to non-Dairy sources), all Return Water up to a maximum amount equal to the amount of Return Water attributable to Manure delivered by Dairy to the Facility (the "**Maximum Return Water Amount**"). Dairy agrees that if the settling pond being used for the return of Return Water is full, Developer may change the Return Water Delivery Point to the

next closest settling pond by providing written notice of such change to Dairy up to the Maximum Return Water Amount, at no cost to Developer except if such change is necessitated by the direct acts or omissions of Developer. Title to such Return Water, and responsibility for any Releases, shall pass from Developer to Dairy upon delivery to the respective Return Water Delivery Points. The Return Water is delivered to Dairy as-is, and Developer makes no representations or warranties regarding the nature or composition of the Return Water, except as expressly provided in this Agreement.

6.3.2.  Records; Remedies for Exceeding Maximum Return Water. Developer shall maintain true and accurate records of each respective type of Return Water delivered to the respective Return Water Delivery Points, which records shall be available for inspection or review by Dairy upon reasonable notice. Upon Dairy's determination that (a) Developer has exceeded or is exceeding the Maximum Return Water Amount (amounts above such maximum, the "**Excess Return Water**"), and (b) such Excess Return Water was caused by Developer's use of third-party Manure in the Facility, Dairy shall notify Developer in writing of the Excess Return Water, which notice shall contain reasonable evidence of the delivery of Excess Return Water to the applicable Return Water Delivery Point and the amount of such excess. Within seventy-two (72) hours of receipt of notification of Excess Return Water, Developer shall reduce the quantity of Return Water to the Maximum Return Water Amount. Should Developer fail within thirty (30) days of receipt of notification of Excess Return Water to reduce the quantity of Return Water to the Maximum Return Water Amount, Dairy shall have the right to dispose of the Excess Return Water in another manner and shall notify Developer in writing of the actual, documented cost of any such substitute disposal methods. Developer shall pay such cost to Dairy within thirty (30) days of receipt of invoices (or other reasonable evidence of Dairy's actual costs); *provided, however,* that Developer's obligation to reimburse Dairy's costs of disposing of Excess Return Water is conditioned upon Dairy's utilization of the most cost-effective disposal means reasonably available, including, without limitation: (a) pumping or trucking Excess Return Water to fields that are capable of receiving the Excess Return Water; (b) evaporation of lagoon water; (c) beneficial use of Return Water, such as in greenhouses and/or algae ponds; or (d) any other means of disposing of or beneficially utilizing the Excess Return Water.

6.4.  Manure Separation Facilities.

6.4.1.  Manure Separation Facilities Installation and Leaseback. The Facility shall include the installation of Manure Separation Facilities, as defined in the Lease (the "Manure Separation Facilities"). Developer shall construct, install, operate, maintain repair and replace the Manure Separation Facilities (including Temporary Facilities as provided in the Exclusivity Agreement dated July 12, 2021) as provided herein and in the Lease. EVC shall be granted and shall have full ownership of the Manure Separation Facilities

and all subsequent repairs, replacements, and improvements, and it will be leased to Developer pursuant to the Lease.

6.4.2.  Operation, Maintenance, Repair and Replacement of Manure Separation Facilities. Beginning on the date that the Manure Separation Facilities are installed, commissioned and operational, Developer shall be solely responsible for, and bear the cost of, operating, maintaining, repairing and replacing the Manure Separation Facilities in a good and workmanlike manner in accordance with the operation and maintenance standards of the manufacturer of the Manure Separation Facilities. Without limiting the foregoing, Developer shall operate and maintain the Manure Separation Facilities to extract the maximum amounts of NPK Solids. Developer shall operate the Manure Separation Facilities on a continuous basis (i.e., 24 hours per day, 7 days per week), including during an Outage, except during unanticipated downtime beyond the reasonable control of Developer, or Force Majeure events, which precludes operation of the Manure Separation Facilities. Developer and Dairy agree to develop an optimization and maintenance, repair and replacement plan, including a budget and inventory of maintenance, repair, and replacement parts, so as to minimize the number of disruptions in the operation of the same (and Developer shall keep the replacement parts identified in such optimization plan on hand at the Facility).  Developer's operations plans shall include provisions and criteria for prompt response to make repairs and otherwise keep the Manure Separation Facilities operating continuously and in a manner to meet the Byproduct Standards. The cost of maintenance, repair, and replacement parts required by the Manure Separation Facilities shall be Developer's sole cost and expense. In the event that Developer fails to operate, maintain, repair and/or replace the Manure Separation Facilities in accordance with this Section 6.4.2, Dairy may (subject to the same conditions and requirements of Dairy as would apply to Self-Help Measures under Section 11.6.3) undertake such operation, maintenance, and/or repair at Developer's expense, and Developer shall promptly reimburse Dairy for all costs and expenses incurred by Dairy thereof. Developer and Dairy acknowledge and agree that Dairy shall incur no expense and suffer no liability whatsoever with respect to the operation, maintenance, repair and/or replacement of the Manure Separation Facilities.

**7.      Dairy Compensation.**

7.1.    Compensation During Operations. For the first sixteen (16) quarterly periods following the Commercial Operations Date, Developer shall pay to Dairy on a quarterly basis in arrears an amount equal to the greater of (i) $375,000 per quarter (1.5 million per year) or (ii) five percent (5%) of Dairy Attributable Gross Revenues. Thereafter, throughout the remainder of the Term, Developer shall pay to Dairy on a quarterly basis in arrears an amount equal to five percent (5%) of Dairy Attributable Gross Revenues. Such Compensation During Operations shall be due and payable to Dairy no later than thirty (30) days following the end of the applicable calendar

quarter. Developer's obligations under this Section 7.1 shall begin on the Commercial Operations Date as defined herein even if actual Digester operations begin later than the outside Commercial Operations Date and for the avoidance of doubt, the amounts due for the first sixteen (16) quarters shall be a guaranteed amount due to Dairy.

7.2.    <u>Compensation During Outages</u>. If the Digester experiences Outages in excess of Maximum Outages (as defined in Section 13.1.5 herein), Developer shall pay Dairy the amounts as described in Section 13.1.5 herein to avoid defaulting under this Agreement. In the event of an Outage, Developer shall continue to maintain and operate the Manure Separation Facilities as required herein.

7.3.    <u>Right to Audit</u>. In accordance with Section 15 of this Agreement, Dairy shall have the right to cause an inspection of Developer's books and records with respect to Dairy Attributable Gross Revenues. If such inspection discloses an underpayment to Dairy under Section 7.1, Developer shall, promptly after a written demand including reasonable evidence and analysis of such underpayment, pay such amount to Dairy. If the inspection discloses an underpayment in excess of five percent (5%) of the Dairy Attributable Gross Revenues for the subject quarter, Developer shall be obligated to pay Dairy's reasonable costs associated with such inspection (which otherwise would be at Dairy's sole cost and expense under Section 15.2).

7.4.    <u>Monthly Reporting</u>. Each month Developer shall provide information to Dairy showing Dairy Attributable Gross Revenues, Dairy Attributable Percentage, and Facility Gross revenues for that month.

7.5.    <u>Definitions</u>. As used in this Section 7, the following definitions apply:

7.5.1.    "**Dairy Attributable Gross Revenues**" shall mean, for a given calendar month, an amount equal to the Dairy Attributable Percentage multiplied by Facility Gross Revenues.

7.5.2.    "**Dairy Attributable Percentage**" shall mean a fraction, expressed as a percentage or decimal, the numerator of which is the total feedstock fed into the Facility in a given calendar month that was delivered to the Facility Delivery Point by Dairy under the terms of this Agreement and the denominator of which is the total feedstock fed into the Facility in such calendar month.

7.5.3.    "**Facility Gross Revenues**" shall mean, for a given calendar month, Developer's total gross revenues attributable to its operation of the Facility, including, but not limited to, income from tipping fees, sales of Fiber, sales of BioGas, or sales of other Facility products or other remunerations. Developer shall provide Dairy with a quarterly report with reasonably detailed supporting information regarding of all revenues contributing to Facility Gross Revenues.

**8.    <u>Barn # 2 Revenue Share Advance</u>**

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

8.1.    Barn # 2 Financial Support. Dairy has completed construction of its first cross-vent barn ("Barn #1") and plans to build two (2) additional cross-vent barns ("**Barn #2**" and "**Barn #3**) similar size and functionality as Barn #1. Dairy and is seeking financial support from Developer related to the construction cross-vent barn ("**Barn #2**").

8.2.    Barn # 2 Advance. Within 6 months after the Effective Date, *and* subject to (i) EVC obtaining a written commitment on financing sufficient to complete the construction of Barn #2 and (ii) EVC making a firm commitment to have Barn #2 completed prior to the Commercial Operations Date, Developer (or an Affiliate) shall advance $12,000,000 in cash (the "**Barn #2 Advance**") to Dairy for the construction of Barn #2.

8.3.    Repayment of Barn #2 Advance. The sole source of repayment for the Barn #2 Advance shall be the Dairy Compensation contemplated in Section 7.1, provided, however, that (a) if the Barn #2 Advance is provided to Dairy in accordance with Section 8.2, the Dairy Compensation shall be increased during the first twenty (20) quarterly periods following the date of the $12,000,000 Advance as described in Section 8.2 to the greater of (i) $600,000 per quarter or (ii) five percent (5%) of Dairy Attributable Gross Revenues and (b) if Dairy terminates this Agreement for any reason other than an Event of Default by Developer, any remaining unpaid balance of the Barn #2 Advance shall become repayable by Dairy within twelve (12) months.

**9.    Conditions Precedent.**

9.1.    Conditions Precedent - Developer. Developer's obligations under this Agreement, other than its obligation to construct and operate the Manure Supply Agreement, are conditioned upon the satisfaction of the following "**Conditions Precedent**":

9.1.1.    Developer has received all necessary permits prior to Commenced Construction.

9.1.2.    Developer has Commenced Construction by Commenced Construction Date.

9.1.3.    Developer has commenced operations of the Digester by the Commercial Operations Date.

9.2.    Failure of Developer to Complete Conditions Precedent. If the conditions in Section 9.1 are not waived or met Developer may cease any further obligations under this Agreement by providing written notice to Dairy within ten (10) days of the applicable date, provided however that notwithstanding such termination, Developer shall remain obligated to construct the Manure Separation Facilities as provided herein and in the Lease and shall not be relieved of its obligations that survive termination of this Agreement or the Lease. If Developer fails to timely provide written notice, the condition shall be waived and/or satisfied and no longer applicable.

DocuSign Envelope ID: 29026D24-8182-42F2-86AC-EF18A84C7357

9.3.    <u>Obligations Not Subject to Conditions Precedent</u>. The terms and conditions set forth in <u>Section 18</u> are effective upon the Effective Date and not subject to the Conditions Precedent set forth in this Section 9. Developer may, in a writing to Dairy, waive the requirement that any of the Conditions Precedent have been satisfied.

9.4.    <u>Commercial Efforts</u>. Developer and Dairy shall each use Commercially Reasonable Efforts to cause or facilitate the conditions precedent described in Section 9.1 above to be timely satisfied.

**10.    Representations and Warranties.**

10.1.    <u>Dairy's Representations and Warranties</u>. As of the Effective Date, and on an ongoing basis throughout the Term, Dairy represents and warrants that:

10.1.1.    Dairy is duly formed, validly existing, and in good standing under the laws of the state of its formation and is fully qualified to do business in the State of Idaho;

10.1.2.    Dairy has the right and authority to enter into this Agreement and to perform its obligations hereunder subject to obtaining all necessary Lender consents and approvals. The execution and delivery by Dairy of this Agreement, and the performance of its obligations hereunder, will not result in the breach, contravention, or violation of any applicable law, Dairy's organizational documents, or other agreement or arrangement between Dairy and any other person, entity, or party, except that Dairy's obligations under this Agreement shall be subject in all respects to Section 18.13;

10.1.3.    Each of the individuals whose signature is set forth at the end of this Agreement have been duly authorized by all necessary entity action on the part of Dairy to execute this Agreement and to bind Dairy;

10.1.4.    Subject to the provisions of this Agreement, Dairy will use Commercially Reasonable Efforts to ensure that all deliveries of Manure contain only Suitable Manure meeting the suitability criteria set forth in <u>Exhibit C</u>;

10.1.5.    Dairy will deliver the Suitable Manure to the Delivery Point free and clear of any liens or encumbrances of any type;

10.1.6.    Dairy will not use or allocate any Suitable Manure produced at the Subject Property for purposes other than deliveries under this Agreement if delivered to the Delivery Point unless Developer fails its duties related to future Dairy Expansion under Section 2.4 herein;

10.1.7.    Subject to the provision of this Agreement, Developer will use Commercially Reasonable Efforts to ensure that all Developer deliverables and byproducts meet the Byproduct Standards in accordance with  Exhibit F;

10.1.8.    Subject to the provisions of this Agreement Dairy, its members, representatives, employees, agents, and invitees will not disturb or interfere

with the operation of the Facility by Developer or Developer's representatives, employees, agents, and invitees; and

10.1.9. Dairy will diligently pursue, obtain, maintain, keep in full force and effect, and comply with all provisions of all licenses and permits, and comply with all laws, rules, and regulations, which may now or in the future be applicable to or required by its operations.

10.2. <u>Developer's Representations and Warranties</u>. As of the Effective Date, and on an ongoing basis throughout the Term, Developer represents and warrants that:

10.2.1. Developer is duly formed, validly existing, and in good standing under the laws of the state of its formation and is fully qualified to do business in the State of Idaho;

10.2.2. Developer has the right and authority to enter into this Agreement and to perform its obligations hereunder. The execution and delivery by Developer of this Agreement, and the performance of its obligations hereunder, will not result in the breach, contravention, or violation of any applicable law, Developer's organizational documents, or any other agreement or arrangement between Developer and any other person, entity, or party;

10.2.3. Each of the individuals whose signature is set forth at the end of this Agreement have been duly authorized by all necessary entity action on the part of Developer to execute this Agreement and to bind Developer;

10.2.4. Developer, its members, representatives, employees, agents, and invitees will not disturb or interfere with Dairy's operations on the Subject Property or with any of Dairy's representatives, employees, agents, and invitees;

10.2.5. Developer will diligently pursue, obtain, maintain, keep in full force and effect, and comply with all provisions of all licenses and permits, and comply with all laws, rules, and regulations, which may now or in the future be applicable to or required by its operations.

**11.    <u>Records, Testing, and Rejection.</u>**

11.1. <u>Records</u>. Developer shall maintain true and accurate records reflecting the tons of Suitable Manure received and accepted. The records shall be available for inspection or review by Dairy upon reasonable notice.

11.2. <u>Quantity Disputes</u>. If either Party has reason to believe that the recorded quantity of Suitable Manure delivered and accepted is inaccurate by an amount in excess of one percent (1%), that Party shall, within five (5) days after discovery of the discrepancy, present the other Party with documentation supporting such determination and the Parties will confer, in good faith, within ten (10) business days of delivery of the supporting documentation, on the causes for the discrepancy and shall proceed to correct such causes and correct the record of the quantity if warranted.

11.3.  <u>Testing</u>. Developer shall have the right (but no obligation) to inspect or test any quantity of Manure delivered to the Delivery Point, but Developer's exercise or failure to exercise such testing and inspection rights shall not relieve Dairy of its responsibility to deliver only Suitable Manure meeting the specifications in <u>Exhibit C</u>. All testing conducted by Developer shall be at the sole cost of Developer, but Dairy shall be permitted, but not required, to have an on-site operator be present for and oversee any inspection or testing activities, and Dairy shall have the option to collect duplicate samples of the material tested by Developer and have such samples tested at Dairy's sole cost and expense. Developer shall maintain records and supporting documentation of any such testing, including sampling, chain-of-custody documents, and laboratory testing results.

11.4.  <u>Manure Quality Disputes and Remedies for Non-Suitable Manure Materials</u>. If, within a reasonable time following delivery, Developer determines that any materials delivered by Dairy do not comply with the specifications in <u>Exhibit C</u> or otherwise with the terms of this Agreement or cannot lawfully be processed or used by Developer (any such material, "**Non-Suitable Manure Materials**"), Developer may, concurrently with providing written notice to Dairy, immediately do any or all of the following (provided, however, that in the event Developer elects any of the following remedies, Developer shall continue to allow Dairy to send Manure through the Manure Separation Facilities and shall continue to operate the Manure Separation Facilities as required by this Agreement):

11.4.1.  Suspend acceptance of deliveries by Dairy under this Agreement until Developer is satisfied, in its discretion, that the non-compliance with <u>Exhibit C</u> or other quality issues have been resolved.

11.4.2.  Obtain cover Manure in the same volume as the identified Non-Suitable Manure Materials, at Dairy's expense, as provided in Section 11.5.

11.4.3.  Inform Dairy of its rejection (or revocation of acceptance) of such Non-Suitable Manure Materials, and Dairy shall be solely responsible for the handling, loading, transportation, and disposal of such Non-Suitable Manure Materials within a reasonable time of such notice of rejection or revocation of acceptance. If such handling, loading, transportation, and disposal of such Non-Suitable Manure Materials is not complete within a reasonable time of such notice of rejection or revocation of acceptance, Dairy shall reimburse Developer as provided in Section 11.5.

11.5.  <u>Non-Suitable Manure Materials Costs and Title</u>. Subject to the limitations herein, Dairy shall reimburse Developer (within thirty (30) days after receipt of an invoice) for Developer's actual damages and reasonable costs and expenses relating to any remedy under Section 11.4, including, but not limited to, general overhead and administrative costs and any costs of cover or handling, loading, transportation, or disposal of any Non-Suitable Manure Materials (but excluding any consequential damages, including loss of use). If Developer is in possession of Non-Suitable Manure Materials at any time, title and risk of loss to such Non-Suitable Manure Materials shall not pass to Developer at the Delivery Point, but shall at all times remain with

Dairy. Non-Suitable Manure Materials shall not be deemed delivered...

iv.    The liquidated damages due to Dairy for Developer's failure to meet the Byproduct Standards shall be as follows and shall be in addition to reimbursement of Dairy's cost to obtain cover Fiber:

- For days 1-10 from the end of the Initial Cure Period until the issue is Corrected, the sum of FIVE THOUSAND DOLLARS ($5,000) per day; and
- Thereafter for day 11 from the end of the Initial Cure Period and beyond until the issue is Corrected, the sum of TEN THOUSAND DOLLARS ($10,000) per day;
- In no case shall the delivery of Non-Suitable Deliverables be considered an Event of Default under Section 13 below, except as provided herein, rather the amounts specifically agreed to herein and payable by Developer to Dairy for failure to meet the Byproduct Standards are intended to be Dairy's sole and absolute remedies as a liquidated damage amount to compensate Dairy for the cost, expense, and disruption to Dairy's Farm Business and not as a penalty. Dairy shall not have any other remedies at law or as described in other sections of this Agreement; provided that if Developer fails to timely pay the liquidated damages as provided herein, Dairy shall be entitled to all remedies under this Agreement and the applicable law.

v.    Developer shall pay Dairy, in cash or by wire transfer of immediately available funds to a Dairy bank account designated by Dairy in writing, the amounts provided in subsection (iv) not later than fifteen (15) days from the day the liquidated damage is accrued and shall continue to pay such amounts to Dairy until the issue is Corrected. As an example only, within fifteen (15) days of day 1, the liquidated damage for day 1 shall be paid to Dairy; within fifteen (15) days of day 2, the liquidated damage for day 2 shall be paid to Dairy, and so on.

vi.    As relates to liquidated damages only, Developer may only make use of the Initial Cure Periods in response to the first three (3) notices from Dairy of Non-Suitable Deliverables in any consecutive twelve (12) month period. A fourth and any following notice in the same 12-month period would trigger immediate liquidated damages at the rates set forth in subsection (iv) above until the issue is Corrected. The allowance of three (3) notices is automatically reset to a new 12-month period if tenant does not exceed three (3) in that same 12-month period, *provided, however,* that in order to reset the allowance after surpassing the limit of three (3) notices, Developer must operate for six (6) consecutive months from the time of the most recent notice of Non-Suitable Deliverables (regardless of how the issue was Corrected or whether liquidated damages were levied).

DocuSign Envelope ID: 29026D24-8182-42F2-86AE-EF18A84C7357

    vii.    The procedure in this Section 11.6.1 will only apply after the Commercial Operations Date. Developer and Dairy will each use Commercially Reasonable Efforts to resolve any quality issues arising prior to the Commercial Operations Date, but (a) Developer will not be liable for liquidated damages until after the Commercial Operations Date and (b) delivery of Non-Suitable Deliverables before the Commercial Operations Date is not considered an Event of Default under Section 12 below.

11.6.2.  If Developer delivers Non-Suitable Deliverables to Dairy, then, in addition to and simultaneously with the procedure in Section 11.6.1 above, Dairy may immediately do either or both of the following:

    i.    Suspend acceptance of deliveries of the Byproduct(s), as applicable to the quality issue, under this Agreement until the issue is Corrected.

    ii.    Obtain cover Fiber (but not to the extent that such Fiber would be Excess Fiber) in the same volume as the identified Non-Suitable Deliverables, at Developer's expense, as provided in Section 11.7, until the issue is Corrected.

11.6.3.  Only after following the procedure in Section 11.6.1 above, including Developer's failure to Correct the issue within the Initial Cure Periods, Dairy may enter onto the Leased Property and may use the Manure Separation Equipment for any reasonable self-help measures which are necessary or desirable to make such Non-Suitable Deliverables acceptable to Dairy, and/or to ensure the operation of the Dairy in the ordinary course of business (subject to Dairy's compliance with all of the conditions of this Section 11.6.3, the "**Self-Help Measures**"), *provided, however,* that (a) Dairy shall provide forty eight (48) hours' advance written notice to Developer of its intent to undertake any Self-Help Measures; (b) Self-Help Measures may not include the use of any part of the Facility other than the Manure Separation Equipment; (c) Developer shall be permitted to have an on-site operator accompany Dairy in the exercise of Dairy's Self-Help Measures; and (d) Dairy shall be responsible for any damage to the Facility proximately caused by Dairy's Self-Help Measures. As a condition precedent to Dairy's exercise of any Self-Help Measures, Dairy must make a determination, acting reasonably and in good faith, that such Self-Help Measures are necessary to protect the operation of the Farm Business (including, without limitation, compliance with all regulatory requirements applicable to the Farm Business operation).

11.7.    <u>Non-Suitable Deliverables - Costs</u>. Developer shall reimburse Dairy (within thirty (30) days after receipt of an invoice) for Dairy's actual damages and reasonable costs and expenses relating to any remedy under Section 11.6.2, including, but not limited to, general overhead and administrative costs and any costs of cover Fiber (but excluding any consequential damages, including loss of use).

**12.** **Force Majeure.**

12.1.   Definition of Force Majeure. As used herein, "**Force Majeure**" shall mean, with respect to either Party, any of the following circumstances, insofar as the circumstance is beyond the reasonable control of that Party and prevents, impedes, or delays fulfillment by that Party of its obligations under this Agreement: (a) fires, explosions, earthquakes, droughts, floods, tornados, and other natural disasters; (b) war, hostilities, invasion, act of foreign enemies, governmental requisition, or embargo; (c) rebellion, revolution, insurrection, or civil war; (d) riot, commotion, strikes, slow-downs, lock outs, or public disorder, unless solely restricted to the employees of either Party; (e) acts or threats of terrorism; (f) cyber or ransomware attacks or (g) the coronavirus disease (COVID-19) or other pandemics, epidemics, plagues, infectious disease or viral outbreaks or other public health crisis, including measures of any government authority taken in response to such events such as quarantine or other employee restrictions, and any labor shortages, delays or disruptions in supply chains or the inability or unavailability of personnel to perform or provide services as a result of any such events or governmental measures.

12.2.   Notice of Force Majeure. If performance by either Party is delayed or precluded by an event of Force Majeure, the affected Party shall notify the other Party as soon as reasonably practicable of the nature and extent of the event and the expected impact on performance under this Agreement, including the expected length of time the Force Majeure is anticipated to interfere with performance.

12.3.   Effect of Force Majeure. Notwithstanding any other provisions of this Agreement, neither Party shall be deemed to be in breach of this Agreement or otherwise be liable to the other Party for any delay in performance or non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to Force Majeure, and the time for performance of that obligation shall be extended accordingly. The Party invoking Force Majeure shall use reasonable efforts to remedy the situation so far as reasonably possible and in the meantime will comply with its other obligations under this Agreement. The Party invoking Force Majeure shall give prompt written notice to the other Party of the cessation of the cause thereof. If such failure or delay in performance caused by Force Majeure continues for more than one hundred and eighty (180) days, the other Party shall have the option to terminate this Agreement by written notice, this Agreement shall be of no further force and effect, and the Parties each shall be relieved of any and all further obligations to each other, save and except for (a) any obligations and liabilities incurred by a Party prior to the date of termination and (b) provisions of this Agreement that are specifically designated as surviving termination of this Agreement.

**13.** **Events of Default and Termination.**

13.1.   Events of Default. Subject to Section 12.3, the following shall constitute an "**Event of Default**" under this Agreement:

13.1.1. Other than as explicitly provided otherwise in this Agreement, a failure by either Party to perform any material covenant, condition, or obligation under this Agreement or the material breach by either Party of any representation or warranty under this Agreement where such failure continues for thirty (30) days after such Party's receipt of written notice from the other Party; provided that, if the nature of the subject failure or breach is such that it cannot reasonably be cured within such 30-day period but the defaulting Party commences and diligently pursues such cure within such 30-day period, then the cure period for such default shall be extended for such additional period of time as is reasonably necessary to effect such cure, up to a maximum of ninety (90) days;

13.1.2. The commencement of any bankruptcy, insolvency, liquidation, or similar proceeding by or against either Party; the consent by either Party to the appointment of or taking possession by a receiver, liquidator, trustee in bankruptcy, or custodian of such Party or any substantial part of its assets; or any assignment of all or substantially all of the assets of either Party for the benefit of its creditors; provided, in the case of the commencement of an involuntary petition or proceeding or entry of a judgment or judicial order that includes or seeks to cause any of the above events, such petition, proceeding, judgment, or order is not discharged or dismissed within ninety (90) days;

13.1.3. A failure by either Party to comply with any federal, state, or local law or regulation related to either Party's performance of this Agreement or to the acceptance, handling, storage, treatment, use, management, or disposition of the Manure, provided that there is a failure to cure such non-compliance within thirty (30) days after receiving written notice from the other Party or any agency or court with jurisdiction thereof;

13.1.4. There is an Event of Default by Developer or EVC beyond any applicable notice and cure period under the Lease (such an Event of Default by EVC under the Lease is an Event of Default by Dairy under this Agreement);

13.1.5. Except when a Cessation Notice is in effect, the Project experiences Outages, as, defined in Section 2.6 herein, for more than sixty (60) days in any three hundred sixty-five (365) day period (except in connection with repairs, replacements, and construction which are all completed in a prompt manner and consistent with the terms of this agreement and the Lease, matters that are beyond Developer's reasonable control, or a Force Majeure event)("Maximum Outages"); provided however that (i) exceeding Maximum Outages shall not be an event of default if Developer pays Dairy 5% Dairy Attributable Gross Revenue plus four thousand dollars ($4,000) per day for each Outage which exceeds the Maximum Outages ; and (ii) if the Project Cessation was caused by Landlord's breach of this Lease, or the Dairy's cessation of the Farm Business (as defined in the MSA), then the aforementioned sixty (60) days in any three hundred and sixty-five (365) will

not commence until Landlord cures such breach and/or Dairy resumes the Farm Business; or

13.1.6. Except when a Cessation Notice is in effect, Dairy ceases operation of the Farm Business for a period of more than thirty (30) consecutive days or of more than ninety (90) days in any three hundred sixty (360) day period (except (a) a temporary shut of the Dairy down due to maintenance, repairs, emergencies, construction, a Force Majeure event, or as required by Dairy's Lender(s) or (b) during shut downs in the ordinary course of business); *provided, however,* that notwithstanding anything to the contrary in this Agreement (including, without limitation, Section 13.2.2), Developer's sole remedies in the event of a default under this Section 13.1.6 shall be to terminate this Agreement in accordance with Section 13.2.1 and/or to cease compensation payments to Dairy under Section 7.

13.2.    Termination for Event of Default.

13.2.1. Upon the occurrence of an Event of Default, the non-defaulting Party shall be entitled to terminate this Agreement upon ten (10) days' prior written notice to the defaulting Party of its intent to exercise its termination rights.

13.2.2. The rights to terminate this Agreement given by this Section 13.2 shall not prejudice any other contractual, legal, or equitable remedies the non-defaulting Party has, or any other right or remedy of the non-defaulting Party with respect to the Event of Default at issue or any other Event of Default, including the right to recover that Party's actual damages arising out of the Event of Default, subject to the limitations of this Agreement (including the limitations of Section 13.4, 13.5, and 13.6). If Developer terminates this Agreement under this Section 13.2, Dairy shall pay Developer the reasonable additional costs and expenses (if any) incurred by Developer in sourcing and securing alternative Manure for the remainder of the Term, not to exceed fifty percent (50%) of the compensation Developer has actually paid to Dairy pursuant to Section 7. This Section 13.2.2 shall survive termination of this Agreement. In addition, Dairy shall be obligated to repay Developer within twelve (12) months for Developer's actual cost of the Manure Separation Equipment.

13.3.    Termination by Agreement. The Parties may terminate this Agreement by mutual written agreement at any time.

13.4.    MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, NEITHER PARTY WILL BE LIABLE BY REASON OF A CLAIM BROUGHT ON THE BASIS OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY, FOR ANY SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER.

13.5.　<u>NO PERSONAL LIABILITY</u>. No provision of this Agreement shall be construed to impose any personal or pecuniary liability upon any officer, employee, director, stockholder, or member of either Party.

13.6.　<u>LIMITATION OF LIABILITY</u>. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, EXCEPT FOR (A) DEVELOPER'S OBLIGATION TO PAY DAIRY PURSUANT TO SECTION 7 HEREOF, (B) CLAIMS BASED ON THE GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT OF A PARTY AND (C) CLAIMS MADE BY AN INDEMNITEE PURSUANT TO SECTION 16, BELOW, BASED UPON THIRD PARTY CLAIMS, SUITS, PROCEEDINGS OR CAUSES OF ACTION ASSERTED AGAINST SUCH INDEMNITEE, NEITHER PARTY WILL BE LIABLE BY REASON OF A CLAIM BROUGHT ON THE BASIS OF THIS AGREEMENT (WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, TORT, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY OF LAW OR EQUITY) FOR ANY AMOUNT THAT EXCEEDS THE AMOUNT THAT DEVELOPER ACTUALLY PAYS TO DAIRY PURSUANT TO SECTION 7 HEREOF.

13.7.　<u>Survival</u>. The provisions of Sections 13.4, 13.5, and 13.6 shall survive the termination of this Agreement.

**14.　Insurance.**

14.1.　<u>Obligation to Obtain and Maintain Insurance</u>. Throughout the Term, each Party shall, at its sole cost and expense, obtain and maintain in full force and effect insurance in the type and amount of coverage as set forth in <u>Exhibit E</u>. Each Party shall provide the other Party with copies of the certificates of insurance and any applicable additional insured endorsements for all insurance coverage required by this Section 14. This Section 14 shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a Party hereto to indemnify, defend, or hold the other harmless under this Agreement).

14.2.　<u>Insurance Requirements</u>. Each Party shall ensure that all insurance policies required pursuant to this Section 14:

14.2.1.　are issued by insurance companies reasonably acceptable to the other Party;

14.2.2.　provide that such insurance carriers give the other Party at least ten (10) days prior written notice of cancellation or non-renewal of policy coverage (to the extent such provision is available on commercially reasonable terms);

14.2.3.　provide that such insurance is primary insurance and any similar insurance in the name of or for the benefit of the other Party shall be excess and non-contributory;

14.2.4.　name the other Party as an additional insured; provided that this Section 14.2.4 shall apply only to liability insurance policies not including workers compensation and employers liability insurance; and

14.2.5.  waive any right of subrogation of the insurers against the other Party.

14.3.  <u>Violations, Cancellations, or Reductions of Insurance</u>. Neither Party shall do or permit to be done anything that will violate or invalidate any insurance policy maintained by said Party hereunder. Any cancellation or reduction (or threatened cancellation or reduction) of any insurance coverage carried by a Party by reason of the conduct or activity of the Party, if that Party fails to remedy such condition within five (5) business days after notice thereof, shall be an Event of Default subject to Section 13.2.

**15.    <u>Inspection of Books and Records</u>**

15.1.  <u>Maintenance of Books and Records</u>. Developer shall keep full and accurate books and records relating to its performance under this Agreement as are necessary for Dairy to verify such compliance, including, without limitation, records relating to: (a) quantities of Manure delivered to or received at the Delivery Point; (b) quantities of Return Water delivered to and received by Dairy at the Return Water Delivery Point; (c) quantities of Fiber delivered to the Fiber Delivery Point; (d) quantities of NPK Solids delivered to the NPK Solids Delivery Point; and (e) records with respect to Dairy Attributable Gross Revenues; Provided Dairy shall not be obligated to create any book or record Dairy does not normally maintain. Dairy shall keep (and provide to Developer at the beginning of each calendar quarter) such records relating to its performance under this Agreement and operation of the Farm Business as are necessary for Developer to remain in compliance with any governmental programs or as are necessary for revenue generation from Environmental Attributes. Each Party shall retain such books and records for at least three (3) years following the period to which they relate. Developer financial records shall be kept in accordance with GAAP.

15.2.  <u>Inspection</u>. At any time during the Term, and for a period of twelve (12) months after the Term, a Party may, upon notice to the other Party, designate an independent third party that is reasonably satisfactory to the other Party to inspect such other Party's books and records that relate solely to performance of obligations under this Agreement. The other Party shall not unreasonably withhold or delay its approval of the inspector and shall cooperate with such inspector. Any inspection shall (a) require fifteen (15) business days' advanced written notice, (b) be conducted during normal business hours, (c) be at the inspecting Party's sole cost and expense and (d) occur no more frequently than twice per year. Whichever Party orders the inspection shall pay for the inspection.

15.3.  <u>Confidentiality</u>. Except as reasonably necessary for Developer to remain in compliance with any governmental programs or for revenue generation from Environmental Attributes, all books and records, and any copies thereof, shall be considered the Confidential Information of the Party to whom such books and records belong, and be handled in the same manner as other Confidential Information in Section 18.1, and neither Party shall use such information of the other Party for any reason other than validating the other Party's proper performance under this Agreement.

15.4.   Survival. This Section 15 shall survive for one (1) year following the last day of the Term or until completion of any inspection initiated within such period.

16.   **Indemnification**. To the greatest extent permitted by applicable law, and subject to the limitations of this Agreement, each Party (the "**Indemnitor**") shall indemnify, defend (with counsel reasonably acceptable to the Indemnitees), and hold harmless the other Party and its members, managers, directors, contractors, employees, agents, officers, representatives, successors, and assigns ("**Indemnitees**") from and against all liability, loss, penalty, claim, demand, fine, judgment, action, costs, and expenses (including reasonable attorneys' fees and expenses), and proceedings of any nature whatsoever based upon or arising out of damage to property, injury to persons (including death) or violation of law, to the extent the same is caused by or attributable to the Indemnitor's, or its employees', agents', contractors', or representatives' (a) failure to perform any obligation under this Agreement, or (b) negligent, intentional, or wrongful acts or omissions relating to this Agreement. The Parties' obligations under this Section 16 shall survive termination of this Agreement, but only as relates to events occurring before such termination.

17.   **Environmental Incentives and Credits**. Any carbon credits, greenhouse gas offsets, green tags, renewable energy credits, production tax credits, allowances for air emissions, RIN or LCFS credits under the federal Renewable Fuels Standard, state-based Low Carbon Fuels Standard, any other local, state, regional, federal, or international environmental programs providing incentives or credits, or any other environmental attributes associated with renewable natural gas, renewable transportation fuels, bio-fertilizers, or other products generated by the anaerobic digestion, processing of organic materials (including the processing of Manure), or otherwise from operation of the Facility, and any credits, grants, or incentive payments derived therefrom (collectively, "**Environmental Attributes**") shall belong to or become the property of Developer. Dairy agrees to assist and cooperate with Developer in securing Environmental Attributes. Dairy agrees that it will apply for or claim any Environmental Attributes that arise because of or are related to this Agreement, and, if Dairy can secure all or a portion of the value of the benefit of such Environmental Attributes, such benefit shall inure to Developer. Dairy shall ensure such Environmental Attributes are vested in Developer, including by executing all necessary documents (including documents transferring such Environmental Attributes to Developer, without further compensation); provided, however, that Developer agrees to pay for all reasonable out-of-pocket costs associated with such efforts.

18.   **Miscellaneous.**

18.1.   Public Statements; Confidentiality. Neither Party shall make any public disclosure, including any press release or announcement, either in writing or orally, with respect to this Agreement or the transactions contemplated herein without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Neither Party shall publish, release, disclose, or disseminate to any third party any Confidential Information, as defined below, without the prior written consent of the other Party; *provided, however,* that Confidential Information may be disclosed to a Party's directors, partners, officers, employees, members, managers, advisors, attorneys, accountants, financing sources (including equity providers and Lenders,

as defined in Section 18.12) or representatives (collectively, "**Representatives**"), provided that (a) such Representatives shall be informed by the Party of the confidential nature of such Confidential Information and shall be directed to keep such information confidential, and (b) each Party shall be liable for any breaches of this Section 18.1 by any of its Representatives. The confidentiality obligations of this Section 18.1 do not apply to any information, knowledge, or data (x) that is or becomes publicly available through no act or omission of the Party wishing to disclose the information, knowledge, or data, (y) that is required to be disclosed by any law, regulation, legal process, court, regulatory body, or governmental authority, including in connection with the resolution of any dispute hereunder. The provisions of this Section 18.1 shall survive termination of this Agreement. As used in this Agreement, "**Confidential Information**" means (a) any information, knowledge, or data which is disclosed by either Party to the other pursuant to or in connection with this Agreement (whether orally or in writing, and whether or not such information is expressly stated to be confidential or marked as such) and (b) the terms and conditions of this Agreement.

18.2.    Dispute Resolution.

18.2.1. Any claim, dispute, or other matter arising out of or related to this Agreement shall be initially escalated to a principal of each Party. The Party with the claim, dispute, or other matter shall provide a written request to the other Party to meet during a thirty (30) day period on at least one occasion, and the first meeting shall occur within ten (10) business days of delivery of the written request. The purpose of the meetings is to attempt in good faith to achieve resolution of the claim, dispute, or other matter.

18.2.2. If resolution of a particular claim, dispute or other matter arising out of or related to this Agreement cannot be achieved through one or more meetings, then either Dairy or Developer may demand by notice to the other party that the claim, dispute or other matter be determined by final and binding arbitration. Unless Dairy and Developer otherwise agree, the arbitration will be administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules"). The award rendered by the arbitrator shall be final and binding on the parties and may be entered and enforced in any court having jurisdiction, and any court where a party or its assets is located (to whose jurisdiction the parties consent for the purposes of enforcing the award). There shall be one arbitrator agreed to by the parties within twenty (20) days of receipt by respondent of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. Except as may be required by law, neither a party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both Parties, unless to protect or pursue a legal right.

18.2.3. Notwithstanding anything to the contrary in this Section 18.2, nothing herein limits the Parties from immediately seeking injunctive relief or specific performance of a breach or threatened breach of Section 18.1.

18.3. <u>Intellectual Property</u>. Both Parties agree that nothing set forth in this Agreement will vest in the other Party any right, title, or interest in or to any intellectual property, patents, process designs, or inventions associated with the other Party's operations ("**Intellectual Property**"). Both Parties acknowledge and agree that it has no rights, title, or claim to any Intellectual Property of the other Party and both Parties agree to maintain as Confidential Information any Intellectual Property it might learn or obtain in relation to the other Party's operations.

18.4. <u>Application of Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Idaho.

18.5. <u>Attorney's Fees and Costs</u>. In the event of any action at law or in equity between the Parties to enforce any of the provisions hereof, any unsuccessful or defaulting Party to such litigation shall pay to the prevailing or non-defaulting Party all costs and expenses, including reasonable attorneys' fees (including costs and expenses incurred in connection with all appeals and in any bankruptcy or similar proceeding) incurred by the prevailing or non-defaulting Party, and these costs, expenses and attorneys' fees may be included in and as part of the judgment.

18.6. <u>Headings; Interpretation</u>. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement. This Agreement has been reviewed and negotiated by the Parties and their respective legal counsel and it shall be given a fair and reasonable interpretation in accordance with the words contained in it without any weight being given to whether a provision was drafted by that Party or its legal counsel. All documents incorporated into this Agreement shall be construed and interpreted as a whole and to harmonize and give effect to all of the provisions of such documents. As used in this Agreement, "including" shall mean "including without limitation," and "shall" means mandatory and imperative. This Agreement is intended to be interpreted in conjunction with, and consistently with, the Lease; provided, however, to the extent there is an inconsistency in the terms of this Agreement and the Lease, the Parties intend for the provisions of the Lease to control.

18.7. <u>Calculation of Time Periods</u>. If the final day of a period or date of performance under this Agreement falls on a Saturday, Sunday, or legal holiday in the State of Idaho, then the final day of the period or the date of performance shall be deemed to fall on the next day which is not a Saturday, Sunday, or legal holiday. As used herein, a "business day," whether capitalized or not, is any day other than a Saturday, Sunday, or legal holiday in the State of Idaho.

18.8. <u>Independent Contractor; No Partnership</u>. Each Party hereto is and shall perform this Agreement as an independent contractor, and, as such, shall have and maintain

complete control over all of its employees, agents, and operations. Neither Party, nor any of its agents or employees, shall be, represent, act, purport to act, or be deemed to be the agent, representative, employee, partner, or servant of the other Party. Nothing in this Agreement shall be construed as constituting a joint venture or partnership between the Parties.

18.9.    <u>Notices</u>. All notices, requests, demands, and other communications hereunder shall be given in writing and shall be: (a) personally delivered; (b) sent by email or other electronic means of transmitting written documents; or (c) sent to the Parties at their respective addresses indicated herein by registered or certified U.S. mail, return receipt requested and postage prepaid, or by private overnight mail courier service. All such notices, demands, or requests shall be to the following addresses, or to such other address as either Party may designate, in writing, from time to time:

**If to Dairy:**

Millenkamp Cattle, Inc.
471 North 300 West
Jerome, Idaho 83338
Attention: Bill Millenkamp, President
Voice and Text: 208-731-5518
Email: <u>mailto:bill@millenkamp.com</u>

**With a copy to:**

Givens Pursley LLP
601 W. Bannock
Boise, Idaho 83701
Attention: Ed Miller
Telephone: (208) 388-1200
Email: edmiller@givenspursley.com

**If to Developer:**

East Valley Development, LLC
4675 MacArthur Court, Suite 800
Newport Beach, CA 92660
Attention: General Counsel
Telephone: 949-437-1000
Email: nate.jensen@cleanenergyfuels.com

**With a copy to:**

**Intentionally left blank**

Notices shall be deemed given on the earlier of actual delivery or refusal of a Party to accept delivery thereof provided that notices sent electronically shall be deemed given on the date delivered, but only if delivered before 5:00 PM Pacific Standard Time as shown on an electronic transmittal confirmation sheet and simultaneously transmitted by another means allowed hereunder. Notices may be given by counsel to a Party.

18.10.  <u>Non-Waiver</u>. Any failure of either Party to enforce any of the provisions of this Agreement, or to require compliance with any of its terms, shall in no way affect the validity of this Agreement, or any part here of, and shall not be deemed a waiver of the right of such Party thereafter to enforce any part of this Agreement.

18.11.  <u>Assignment</u>. Except as provided in this Section 18.11, Developer shall not sell assign or transfer this Agreement in whole or in part, directly or indirectly, whether voluntary or by operation of law, including by way of sale of assets, membership interests or control, merger, consolidation, reorganization, change of control or similar transaction without the prior written consent of Dairy, which consent shall not be unreasonably withheld, conditioned or delayed. Developer shall be entitled, with Dairy's review and approval to assign this Agreement and its rights herein as it may determine, in its discretion, to a Qualified Assignee (as defined below); provided that the Qualified Assignee agrees in writing to assume and be bound by all of Developer's rights and obligations hereunder. "Qualified Assignee" means an entity that (i) has a net worth equal to or greater than Developer's net worth at the time of the sale, assignment, transfer or sublease and sufficient to properly operate and maintain the Improvements; and (ii) has significant experience successfully owning and operating (either itself or through affiliated entities) similar energy and/or gas projects in the United States. Developer may also freely assign a collateral or similar interest in this Agreement for purposes of financing, in which case Dairy shall provide appropriate consents and other information as Developer's Lenders or other financing parties may reasonably require. Dairy shall be entitled to assign this Agreement and its rights and obligations herein if it conveys Dairy's interest in the Subject Property and Farm Business to a third party; provided that such third party agrees in writing to assume and be bound by all of Dairy's rights and obligations hereunder, and in such event Dairy will have no further obligations under this Agreement arising from and after date of conveyance and third party's agreement to be bound by this Agreement. Dairy may also freely assign a security or similar interest in this Agreement for purposes of financing, in which case Developer shall provide appropriate consents and other information as Dairy's Lenders or other financing parties may reasonably require.

18.12.  <u>Accommodation of Lenders</u>. Dairy hereby consents to the assignment by Developer of this Agreement and any or all of its rights hereunder to one or more Lenders, and the granting of a security interest therein, provided that Dairy receives notice of such assignment or grant. Dairy shall cooperate with Developer in connection with any such financing, provided that written notice of such financing has been delivered to Dairy in advance. In addition, Dairy shall execute and deliver to any such Lenders such consents, agreements, opinions, or other such other documentation as shall be typically requested by lenders in limited recourse project financings. Developer hereby consents to the assignment by Dairy of this Agreement and any or all of its

rights hereunder to one or more Lenders, and the granting of a security interest therein, provided Developer receives notice of such assignment. Developer shall cooperate with Dairy in connection with any such financing, provided that written notice of such financing has been delivered to Developer in advance. In addition, Developer shall execute and deliver to any such Lenders such subordinations, consents, agreements, opinions, or other such other documentation as shall be reasonably and typically requested by Dairy's Lenders, *provided, however,* that Developer will not be required to put any such Lenders in a preferred position to Developer or Developer's financing partners. As used in this Agreement, "**Lender(s)**" means any person(s) (or mortgagees, trustees, or agents on such Lender's behalf) providing money or extending credit (including any capital lease) to Developer or Dairy for (a) the construction, term, or permanent financing of the Facility or Farm Business or (b) working capital or other ordinary business requirements for Developer for the Facility or Dairy for the Farm Business.

18.13.  <u>Subordination</u>. Developer acknowledges that Dairy's ability to expand and operate the Farm Business will depend on Dairy's ability to secure first-position financing, and that Lenders providing first position financing will require this Agreement to be subordinate to its financing. Prior to execution of this Agreement, and thereafter on an ongoing basis during the Term, Dairy shall use commercially reasonable efforts to obtain any necessary approval of its obligations under this Agreement and the Lease from Dairy's Lenders. Accordingly, as a material consideration for Dairy entering into this Agreement, and as an express condition precedent to Dairy's performance of any of its obligations under this Agreement, Developer will (a) enter into a subordination and non-disturbance agreement reasonably requested from time-to-time by any Lender providing financing for the Subject Property or Farm Business if such subordination and non-disturbance agreement contains the provisions required of such an agreement under the Section 15 of the Lease and (b) will reasonably cooperate with, and provide reasonably requested documents and agreements to, any Lender providing financing for the Subject Property or Farm Business and/or title insurer providing title insurance with respect to the Subject Property. Dairy agrees to seek such subordination and non-disturbance agreement if requested by Developer in connection with a financing by Developer. Dairy agrees to reasonably cooperate with, and provide reasonably requested documents and agreements to, any title insurer providing title insurance with respect to the Facility or the Lease.

18.14.  <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal, or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

18.15.  <u>Entire Agreement; Amendment</u>. This Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof and supersedes any and all other communications, representations, proposals, understandings, or agreements, either written or oral, between the Parties with respect to such subject

matter. This Agreement may not be modified or amended, in whole or in part, except by a written agreement signed by the Parties.

18.16.   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall, for all purposes, be deemed an original and all of such counterparts, taken together, shall constitute one and the same agreement.

18.17.   <u>Approvals and Exercise of Discretion</u>. Any approvals to be given by a Party and any discretion to be exercised by a Party as provided herein shall be made in a timely manner under the circumstances, in good faith, and in a commercially reasonable manner unless otherwise specifically provided herein. Notwithstanding Section 17.9, a correctly addressed and delivered email is sufficient to create a writing for any provision of this Agreement requiring a change or document to be approved in writing by the Parties.

19.   **Uniform Commercial Code**. To the extent permitted by law, the Parties intend that the provisions of this Agreement shall supersede the Uniform Commercial Code as in effect in the State of Idaho from time-to-time, including, without limitation, the provisions of Idaho Code Section 28-2-401. For purposes of Idaho Code Section 28-2-306, Dairy shall be deemed to be exercising "good faith" and/or, to the extent applicable, "best efforts" so long as Dairy is acting within its reasonable business judgment or at the direction of any applicable governmental authority.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE(S) FOLLOW]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above,

**Dairy:**               **Millenkamp Cattle, Inc.**

an Idaho corporation

DocuSigned by:

*Bill Millenkamp*

E280058F290D444...

By: Bill Millenkamp

Its: President

Date: 10/29/2021

**Developer:**       **East Valley Development, LLC,**

a Delaware limited liability company

DocuSigned by:

*Clay Corbus*

245380A08D36408

By: Clay Corbus

Its: Manager

Date: 10/28/2021

Acknowledged and agreed:

**East Valley Cattle, LLC**,

an Idaho limited liability company

DocuSigned by:

*Bill Millenkamp*

E280058F290D444...

By: _____

Name: Bill Millenkamp

Title:  Manager

{00785831;29}

**M**ANURE **S**UPPLY **A**GREEMENT – **S**IGNATURE **P**AGE

15736866.1.docx

**HB: 4812-6427-8394.11**

**120352766**

**EXHIBIT A**
**SUBJECT PROPERTY**

Township 11 South Range 27 East of the Boise Meridian, Cassia County, Idaho

Section 35:  ALL

**EXHIBIT B**
**DESCRIPTION OF FARM BUSINESS AND RAMP UP**

1.  Name of Dairy: Millenkamp Cattle, Inc
2.  Address of Dairy: 471 North 300 West, Jerome, Idaho 83338
3.  Location of Dairy: Cassia County, ID
4.  Dairy Site Plan: N/A
5.  Dairy Access & Routing Plan: N/A
6.  Breed (e.g., Holstein, Guernsey, etc.): Jersey
7.  Average number of lactating cows: 15,000
8.  Average number of dry cows: 12,500
9.  Average number of replacements: 4,000
10. Respective fraction of the manure from the milking herd, dry cows, and replacements collected for the Project: >70%
11. Type(s) of manure collection system (e.g., scrape, flush, etc.) and frequency of manure collection: Flush, Vacuum

**Ramp up schedule\***

| Month | Milking Head | Heifers | Dry Head | Total Head |
|-------|-------------|---------|----------|------------|
| 3/2/2021 | 27,000 | 27,000 | 3,000 | 57,000 |
| 6/1/2021 | 30,000 | 26,500 | 3,500 | 60,000 |
| 9/1/2021 | 35,000 | 25,000 | 4,000 | 64,000 |
| 12/1/2021 | 37,500 | 24,000 | 4,500 | 66,000 |

\*The dates listed in the table above are intended to be approximate and gradual in nature. Monthly totals may vary.

**EXHIBIT C**
**SUITABLE MANURE**

As used in this Agreement, "**Suitable Manure**" shall mean Manure that complies with all of the requirements of this Exhibit C, as measured at the Delivery Point.

1. **Manure Quality**. As measured at the Delivery Points, all Manure shall:
   a. Have been delivered as excreted from the head count described in Exhibit B and Section 5.3; and
   b. Have no commercially or operationally significant (e.g., sufficient to adversely affect the operation or the quality or quantity of gas or other product output of an anaerobic digester, or operationally significant in another way) amounts of contaminants, including, but not limited to:
      i. Chemicals, such as disinfectants (other than residual amounts from usual and customary equipment cleaning), toxic or hazardous materials, strong acids or caustic chemicals, pesticides and herbicides and pharmaceuticals (including antibiotics) that are unsuitable for anaerobic digester Manure.
      ii. Foreign materials, such as trash, wood, bone, soil, sand and gravel, metal or glass debris, rope or cables, plastic, and any other inorganic content in volumes greater than would be expected utilizing best management practices for the applicable collection method.
      iii. Significant quantities of other foreign, introduced materials that are unsuitable for anaerobic digester Manure, in volumes greater than would be expected utilizing best management practices for the applicable collection method.
   Provided however that contaminants that result from Dairy's normal and customary operational practices from time-to-time shall not be considered commercially or operationally significant.

2. **Farm Business.**
   a. Except to the extent reasonably necessary (whether for reasons of good husbandry or requirements of law), water, other than flush water, shall not be added to the Manure.
   b. No less than two (2) weeks prior to making material changes in any antibiotic, cleaning, or disinfecting agents that mix with Manure (each a "**Cleaner**"), Dairy shall notify Developer and provide information regarding the Cleaner and the anticipated quantities that will be used.

3. **Exclusion for Hazardous Materials.** Suitable Manure specifically excludes any and all Hazardous Materials.
   a. As used in this Agreement, "**Hazardous Materials**" means unlawful quantities of each and every element, compound, chemical mixture, contaminant, pollutant, material, waste or other substance which is defined, determined or identified as hazardous or toxic under any Environmental Law.
   b. "**Environmental Law**" shall mean any federal, state or local statute, regulation or ordinance or any judicial or administrative decree or decision, whether now existing or hereinafter enacted, promulgated or issued, with respect to any Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water runoff, waste emissions or wells. Without limiting the generality of the foregoing, the term "Environmental Law" shall encompass each of the

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

following statutes, and regulations, orders, decrees, permits, licenses and deed restrictions now or hereafter promulgated thereunder, and amendments and successors to such statutes and regulations as may be enacted and promulgated from time to time: (i) the Comprehensive Environmental Response, Compensation and Liability Act (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. Section 9601 et seq.) ("CERCLA"); (ii) the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.) ("RCRA"); (iii) the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.); (iv) the Toxic Substances Control Act (15 U.S.C. Section 2061 et seq.); (v) the Clean Water Act (33 U.S.C. Section 1251 et seq.); (vi) the Clean Air Act (42 U.S.C. Section 7401 et seq.); (vii) the Safe Drinking Water Act (21 U.S.C. Section 349, 42 U.S.C. Section 201 and Section 300f et seq.); (viii) the National Environmental Policy Act (42 U.S.C. Section 4321 et seq.); (ix) the Superfund Amendments and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C.); (x) Title III of the Superfund Amendment and Reauthorization Act (40 U.S.C. Section 1101 et seq.); (xi) the Uranium Mill Tailings Radiation Control Act (42 U.S.C. Section 7901 et seq.); (xii) the Occupational Safety and Health Act (29 U.S.C. Section 655 et seq.); (xiii) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. Section 136 et seq.); (xiv) the Noise Control Act (42 U.S.C. Section 4901 et seq.); and (xv) the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 1100 et seq.).

c.   Without limiting the generality of Subsection (a), the term "Hazardous Materials" shall mean and include:

- "Hazardous Substance(s)" as defined in CERCLA, the Superfund Amendments and Reauthorization Act of 1986, or Title III of the Superfund Amendment and Reauthorization Act, each as amended, and regulations promulgated thereunder including, but not limited to, asbestos or any substance containing asbestos, polychlorinated biphenyls, any explosives, radioactive materials, chemicals known or suspected to cause cancer or reproductive toxicity, pollutants, effluents, contaminants, emissions, infectious wastes, any petroleum or petroleum-derived waste or product or related materials and any items defined as hazardous, special or toxic materials, substances or waste;

- "Hazardous Waste" as defined in the Resource Conservation and Recovery Act of 1976, as amended, and regulations promulgated thereunder;

- "Materials" as defined as "Hazardous Materials" in the Hazardous Materials Transportation Act, as amended, and regulations promulgated thereunder; and

- "Chemical Substance or Mixture" as defined in the Toxic Substances Control Act, as amended, and regulations promulgated thereunder.

## EXHIBIT D
## DELIVERY POINT DESCRIPTIONS

The Facility "Delivery Point" for Suitable Manure, the "Fiber Delivery Point," the "Flush Water Delivery Point," the "Lagoon Water Delivery Point," the "Green Water Return Point", and the "NPK Solids Delivery Point," are each shown on the diagram in this Exhibit D.



DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

**EXHIBIT E**
**INSURANCE REQUIREMENTS**

Throughout the Term of this Agreement, each Party agrees to provide and keep in force

1. Commercial general liability insurance in the amounts of one million dollars ($1,000,000.00) per occurrence, and two million dollars ($2,000,000) in the aggregate, in respect to bodily injuries (including death) and property damage.
2. Statutorily required workers' compensation insurance.

Said insurance policies shall provide that, to the extent such notice of cancellation provision is available on commercially reasonable terms, it shall not be canceled except on thirty (30) days' prior written notice (except ten (10) days for nonpayment of premium) to the other Party. Each Party agrees to name the other Party and the other Party's Lenders (if given written notice of the identity of such Lender in advance) as additional insured parties under such policies, except workers compensation insurance, and to deliver the other Party and the other Party's Lenders certificates evidencing such coverage.

The insurance policy limits set forth in this Exhibit E shall in no way be construed as limits on the Parties' liability or obligations under this Agreement. Any failure of a Party to procure or maintain policies, or a failure to cause such policies to conform to the requirements of this Agreement, shall not result in a waiver by the other Party of its rights under this Agreement.

{00785831;29}
**EXHIBIT F TO MANURE SUPPLY AGREEMENT - 1**
15736866.1.docx
**HB: 4812-6427-8394.11**

120352766

**EXHIBIT F**
**BYPRODUCT STANDARDS**

| Byproduct Specifications | | |
|---|---|---|
| | | |
| **Return Water** | **Not to Exceed** | **Non-Suitable Deliverable Trigger Point** |
| McLanahan (Clarifier) | 1% TSS | Greater than 1% TSS |
| **Bedding Fiber** | **Not Less Than** | **Non-Suitable Deliverable Trigger Point** |
| FAN Screwpress | 32% DM | Less than 32% DM |
| | | |
| TSS = Total Suspended Solids | | |
| DM = Dry Matter | | |

120352766

# EXHIBIT C

# EXHIBIT C

*Execution Version*

**FIRST AMENDMENT TO MANURE SUPPLY AGREEMENT**

This First Amendment to Manure Supply Agreement ("**First Amendment**"), dated as of June 22, 2023 ("**First Amendment Effective Date**"), is entered into by and between Millenkamp Cattle, Inc., an Idaho corporation ("**Dairy**"), and East Valley Development, LLC, a Delaware limited liability company ("**Developer**"). Dairy and Developer are, from time to time, referred to herein collectively as the "**Parties**" and individually as a "**Party**." Capitalized terms used, but not defined in this First Amendment have the meanings given to such terms in the Agreement (as defined below).

Dairy and Developer are parties to that certain Manure Supply Agreement, dated as of October 8, 2021 ("**Agreement**"), under which Dairy agreed supply Manure to Developer for use in Developer's Facility.

Developer, as Tenant, and Dairy's affiliate, East Valley Cattle, LLC, an Idaho limited liability company, as Landlord ("**Landlord**"), are parties to that certain Ground Lease Agreement, dated as of October 8, 2021 ("**Original Lease**"), as amended by that certain First Amendment dated as of February 17, 2022 ("**First Lease Amendment**"), and by that certain Second Amendment dated as of April 25, 2023 ("**Second Lease Amendment**"). The Original Lease as amended by the First Lease Amendment and the Second Lease Amendment is the "**Lease**." Developer and Landlord are entering into a Third Amendment to Ground Lease Agreement dated of even date herewith ("**Lease Third Amendment**") in order to amend the Lease.

This First Amendment will not be effective unless and until the Lease Third Amendment has been duly executed and delivered by all of the parties thereto.

The Parties desire to amend the Agreement on the terms and conditions set forth in this First Amendment.

The Parties therefore agree as follows:

1.   **Delivery Points**. Exhibit D to the Agreement is deleted in its entirety and replaced with the document attached as **Exhibit D** to this First Amendment. For clarity, the "Green Water Return Points" will be located as more particularly shown on Exhibit D to this First Amendment.

2.   **Barn#2**. Excluding Section 8.1 of the Agreement, which remains unchanged, Section 8 of the Agreement is amended and restated to read in its entirety as follows:

     8.2     Barn # 2 Advance. Upon (i) Dairy obtaining a written commitment for financing sufficient to complete the construction of Barn #2 and (ii) Dairy making a firm commitment to have Barn #2 Substantially Complete before April 30, 2024 (clauses (i) and (ii) above are the "**Barn #2 Advance Conditions**"), Developer (or an Affiliate) shall advance up to $12,500,000 in cash to Dairy for the construction of Barn #2 as follows: (a) within five (5) Business Days after both Barn #2 Advance

*Execution Version*

Conditions are met, $8,000,000 (the "**Barn #2 First Advance**"); and (b) $4,500,000 on or about December 31, 2023 (but in any case in 2023) (the "**Barn #2 Second Advance**," and collectively with the Barn #2 First Advance, the "**Barn #2 Advance**"). Developer's obligation to make the Barn #2 Second Advance is conditioned upon Dairy certifying, at the time of payment, that (i) it has financing sufficient to complete the construction of Barn #2 on or before April 30, 2024, and that no event of default has occurred and is continuing with respect to that financing; and (ii) that the construction of Barn #2 is on schedule to be Substantially Complete on or before April 30, 2024. The term "**Substantially Complete**" means, with respect to Barn #2, that (i) construction on Barn #2 is complete such that Dairy can occupy or utilize Barn #2, (ii) Barn #2 is operational, and (iii) Barn #2 is occupied with not less than seventy five percent of its designed capacity for cattle.

8.3.    Repayment of Barn #2 Advance. The sole source of repayment for the Barn #2 Advance shall be the Dairy Compensation contemplated in Section 7.1, provided, however, that (a) if the Barn #2 Advance is provided to Dairy in accordance with Section 8.2, the Dairy Compensation shall be increased during the first twenty (20) quarterly periods following the date of the Barn #2 Second Advance as described in Section 8.2 to the greater of (i) $600,000 per quarter or (ii) five percent (5%) of Dairy Attributable Gross Revenues and (b) if Dairy terminates this Agreement for any reason other than an Event of Default by Developer, any remaining unpaid balance of the Barn #2 Advance shall become repayable by Dairy within twelve (12) months. Further, if Dairy fails to Substantially Complete Barn #2 on or before July 30, 2024, any remaining unpaid balance of the Barn #2 Advance will become due and payable, in full, by Dairy no later than August 1, 2025.  For the avoidance of doubt, repayment of the Barn #2 Advance shall be Developer's sole and exclusive remedy if Dairy fails to Substantially Complete Barn #2 on or before July 30, 2024, and the failure to complete by such date shall not qualify as an Event of Default under the Agreement.  Until the Barn #2 Advance is repaid in full, Developer may offset any amounts owed to Dairy as Dairy Compensation under Section 7.1 against amounts owing to Developer under the Barn #2 Advance.

**3.**    **Developer Deliverables – Byproduct Standards**.

a.    Section 11.6 of the Agreement is amended by adding the following as a new second sentence of Section 11.6, with the rest of that Section 11.6 remaining unchanged:

"Measurement of Return Water solids quantities will be measured at the outlet of the final point of Byproduct processing and prior to the introduction to the Green Water Flush Building."

*Execution Version*

b.    Add the following as new Section 11.8:

11.8    <u>Limitation of Developer's Liability</u>. Except for its obligations with respect to liquidated damages for providing Non-Suitable Deliverables and with respect to Dairy's Self-Help Measures, as provided in Section 11.6, and Non-Suitable Deliverables-Costs, as provided in Section 11.7 Developer will have no liability to Dairy or any other party with respect to any Non-Suitable Deliverables. Without limiting the generality of the foregoing, Developer is not liable for and expressly disclaims any liability with respect to the health of Dairy's cows, any Dairy operating losses, and other Dairy losses so long as the Byproduct Standards are met. The Parties agree that the Byproduct Standard for Return Water shall be measured at the outlet of the final point of Byproduct processing, and prior to the introduction to the Green Water Flush Building.

4.    **Exhibit C Suitable Manure.**

a.    Exhibit C, Section 2, Farm Business, of the Agreement is amended to add the following:

c.    Upon reasonable notice to Developer, the Dairy may introduce accumulated lagoon solids into the Manure so long as the accumulated solids do not exceed the processing capacity of the Manure Separation Facility or have a detrimental effect on the capacity or performance of the Digesters after the Developer has made commercially reasonable efforts to accommodate lagoon solids.

5.    **Claims of Breach and Default**. Each of the Parties releases and forever discharges the other Party from, and waives, all claims it now has against the other Party in any way arising out of or relating to the other Party's breach of or default under, or alleged breach of or default under, the Agreement before the First Amendment Effective Date and relating to the subject matter of this First Amendment.

6.    **No Admission of Liability**. Nothing in this First Amendment, including without limitation any payment from Developer to Dairy, is an admission by any Party of any breach or liability under the Agreement or the Lease, or of any other wrongdoing or noncompliance with any federal, state, city, or local rule, ordinance, constitution, statute, contract, agreement, public policy, tort law, common law, contract, or any other unlawful conduct, liability, wrongdoing, or breach of any duty whatsoever. The Parties specifically disclaim and deny any wrongdoing or liability.

7.    **Reservation of Rights**. Subject to Section 5, each of the Parties reserves each and every one of its rights, remedies, powers, recourses, and privileges under or related to the Agreement at law, or in equity, and all such rights, remedies, powers, recourses, and privileges are and shall remain in full force and effect, enforceable by the Parties at law or in equity.

*Execution Version*

8. **Condition Precedent**. This First Amendment will not be effective, and Landlord shall not be obligated under and shall not execute this First Amendment or the Lease Third Amendment, unless and until Tenant has: (a) executed the Lease Third Amendment; (b) executed this First Amendment; and (c) on or before April 21, 2023, Tenant has paid the Tenant Payment and any other monies currently due and owing Landlord under the Lease Third Amendment less the amount of $7,500,000 that Tenant wired to Landlord on April 14, 2023, as partial payment upon the Tenant Payment and any other monies currently due and owing Landlord under the Lease Third Amendment.  In the event any of these conditions precedent have not been fulfilled, this First Amendment and the Lease Third Amendment shall be null and void.  For the avoidance of doubt, the partial payment of $7,500,000 does not in any way or manner relieve Tenant of the prompt and timely performance of any and all obligations under the Agreement, the Lease, or the Lease Third Amendment. If Tenant timely performs all of its obligations under this Section 8, Landlord shall immediately execute and deliver to Tenant this First Amendment and the Lease Third Amendment.

9. **Terms and Conditions of the Agreement**. Other than as expressly set forth in this First Amendment, all of the terms and conditions of the Agreement remain in full force and effect and apply to this First Amendment; provided that to the extent there is a conflict between the terms of this First Amendment and the terms of the Agreement, the terms of this First Amendment control to the extent of such conflict.

10. **Governing Law**. This First Amendment shall be governed by and construed, interpreted, and enforced in accordance with the laws of Idaho, excluding choice of law rules and principles.

11. **Entire Agreement**. This First Amendment represents the entire understanding of Dairy and Developer as to those matters contained in this First Amendment, and supersedes any prior oral or written understanding, promises or representatives with respect to those matters covered in this First Amendment, and it shall not be amended, altered, or changed except by a written agreement signed by the Parties hereto.

12. **No Other Amendment**. Except as expressly amended hereby, the terms and provisions of the Agreement remain in full force and effect, and are ratified and confirmed by the Parties in all respects as of the First Amendment Effective Date. From and after the First Amendment Effective Date, whenever the term "Agreement" appears in the Agreement, it means the Agreement as amended by this First Amendment.

13. **Counterparts**. This First Amendment may be executed in two or more counterparts, each of which will constitute an original, but all of which when taken together will constitute the same Agreement. Signatures to this First Amendment transmitted by facsimile, email, portable document format (or .pdf) or by any other electronic means intended to preserve the original graphic and pictorial appearance of this First Amendment have the same effect as the physical delivery of the paper document bearing original signature. Each Party agrees that this First Amendment and any other documents to be delivered in

***Execution Version***

connection herewith may be electronically signed, and that any electronic signatures appearing on this First Amendment or such other documents are the same as handwritten signatures for all purposes.

[*Signature Page Follows*]

*Execution Version*

**IN WITNESS WHEREOF**, the Parties have caused this First Amendment to be signed as of the First Amendment Effective Date.

**Dairy:**

**Millenkamp Cattle, Inc.,**
an Idaho corporation

By: _____
Bill Millenkamp, President

**Developer:**

**East Valley Development, LLC,**
a Delaware limited liability company

By: _____
Name: William J. Flanagan,
Title:   VP, Strategic Development

SIGNATURE PAGE TO FIRST AMENDMENT TO MANURE SUPPLY AGREEMENT

60452.0001.15737687.3

*Execution Version*

**IN WITNESS WHEREOF**, the Parties have caused this First Amendment to be signed as of the First Amendment Effective Date.

**Dairy:**

**Millenkamp Cattle, Inc.,**
an Idaho corporation


By: _____
       Bill Millenkamp, President




**Developer:**

**East Valley Development, LLC**,
a Delaware limited liability company

By: _____
Name: William J. Flanagan,
Title:   VP, Strategic Development

**EXHIBIT D**

**Exhibit D**
**Delivery Point Descriptions**

The Delivery Point for Suitable Manure, the Fiber Delivery Point, the Flush Water Delivery Points, the Lagoon Water Delivery Point, the Green Water Return Points, and the NPK Solids Delivery Point are each shown on the diagram on this Exhibit D.



# First Amendment to Manure Supply Agreement Millenkamp and EVD (Signature 6-23-2023) (002)

Final Audit Report                                                                      2023-06-23

| | |
|---|---|
| Created: | 2023-06-23 |
| By: | Maureen Schmitz (Maureen.Schmitz@cleanenergyfuels.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA-TVXeiyeIO-EkJ_5ldo2mdNtb5R5Egbq |

## "First Amendment to Manure Supply Agreement Millenkamp and EVD (Signature 6-23-2023) (002)" History

📄 Document created by Maureen Schmitz (Maureen.Schmitz@cleanenergyfuels.com)
   2023-06-23 - 10:06:58 PM GMT

📧 Document emailed to Will Flanagan (will.flanagan@cleanenergyfuels.com) for signature
   2023-06-23 - 10:07:35 PM GMT

📄 Email viewed by Will Flanagan (will.flanagan@cleanenergyfuels.com)
   2023-06-23 - 10:15:14 PM GMT

✒️ Document e-signed by Will Flanagan (will.flanagan@cleanenergyfuels.com)
   Signature Date: 2023-06-23 - 10:15:21 PM GMT - Time Source: server

✅ Agreement completed.
   2023-06-23 - 10:15:21 PM GMT

![Adobe Acrobat Sign logo] Adobe Acrobat Sign

EXHIBIT D

EXHIBIT D

# EAST VALLEY CATTLE, LLC

471 North 300 West
Jerome, Idaho 83338
(208) 324-2350

March 8, 2023

Certified Mail (Return Receipt Requested)
and Email (Will.Flanagan@cleanenergyfuels.com)

East Valley Development, LLC
Attn: Will Flanagan and General Counsel
4675 MacArthur Court, Suite 800
Newport Beach, CA 92660

> Re:  *Notice of Intent to Serve Default of Ground Lease and Initiate Arbitration Proceedings*

Dear Will:

East Valley Development, LLC's ("EVD") obligation under the October 8, 2021 Ground Lease Agreement ("Lease") to construct, install and commission the Manure Separation Facilities is again not being met. EVD is more than four months beyond the promised October 31, 2022 completion date with no clear end in sight. Therefore, we have prepared the enclosed Notice of Default and Demand for Arbitration complaint, which we intend to file Monday if I do not receive from you by 5:00 p.m. Friday, March 10, 2023 unequivocal written assurance that EVD agrees with each of the monetary conditions contained in my March 2, 2023 email to you.

Sincerely,

David Heida

Enclosures
cc:  Ed Miller
     Tom Dvorak
     Jason Blakley

# GIVENS PURSLEY LLP

### Attorneys and Counselors at Law

601 W. Bannock Street
PO Box 2720
Boise, ID 83701
Telephone: 208-388-1200
Facsimile: 208-388-1300

www.givenspursley.com

Jason J. Blakley
208 388 1268
jasonblakley@givenspursley.com

| | | |
|---|---|---|
| Gary G. Allen | Don Z. Gray | Samuel F. Parry |
| Charlie S. Baser | Paul G. Hawkins | Randall A. Peterman |
| Christopher J. Beeson | Brian J. Holleran | Blake W. Ringer |
| Jason J. Blakley | Kersti H. Kennedy | Michael O. Roe |
| Clint R. Bolinder | Elizabeth A. Koeckeritz | Danielle M. Strollo |
| Jeff W. Bower | Neal A. Koskella | Robert B. White |
| Preston N. Carter | Michael P. Lawrence | Michael V. Woodhouse |
| Chynna K. Castoro | Franklin G. Lee | |
| Jeremy C. Chou | David R. Lombardi | |
| Michael C. Creamer | Kimberly D. Maloney | William C. Cole (Of Counsel) |
| Charlotte V. Cunnington | Kenneth R. McClure | |
| Joshua C. Dickinson | Alex P. McLaughlin | |
| Amber N. Dina | Melodie A. McQuade | Kenneth L. Pursley (1940-2015) |
| Bradley J. Dixon | Christopher H. Meyer | James A. McClure (1924-2011) |
| Thomas E. Dvorak | L. Edward Miller | Raymond D. Givens (1917-2008) |
| Rebecca M. Fitz | Judson B. Montgomery | |
| Morgan D. Goodin | Deborah E. Nelson | |

March 13, 2023

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED,**
**AND EMAIL**
William J. Flanagan
VP, Strategic Development
East Valley Development, LLC
4675 MacArthur Court, Suite 800
Newport Beach, CA  92660
Will.Flanagan@cleanenergyfuels.com

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED,**
**AND EMAIL**
East Valley Development, LLC
Attention: General Counsel
4675 MacArthur Court, Suite 800
Newport Beach, CA  92660
jim.sytsma@cleanenergyfuels.com
nate.jensen@cleanenergyfuels.com

  Re:  Notice of Default

   Notice is hereby given that you are in default of the Ground Lease Agreement dated October 8, 2021, specifically Exhibit E, Section 2, Obligation to Construct the Manure Separation Agreement, requiring you "to construct, install and commission the Manure Separation Facilities in accordance with the MSF Plans (as defined herein) at its sole cost and expense on or before October 31st, 2022."  Your failure to timely construct, install and commission the Manure Separation Facility on or before October 31, 2022, is a material default pursuant to Section 17.1.2 of the Lease.

      Sincerely,

      Jason J. Blakley

/JJB
cc: Client
16656314_1.docx [11054.187]

Thomas E. Dvorak (ISB # 5043)
Jason J. Blakley (ISB # 9497)
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho  83701-2720
Office: (208) 388-1200
Fax: (208) 388-1300
tedservice@givenspursley.com
jasonblakley@givenspursley.com
16656186_3 [11054.187]

Attorneys for Claimants

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| EAST VALLEY CATTLE, LLC, an Idaho limited liability company; and MILLENKAMP CATTLE, INC., an Idaho corporation,<br><br>Claimants,<br><br>vs.<br><br>EAST VALLEY DEVELOPMENT, LLC a Delaware limited liability,<br><br>Respondent. | AAA Case No. _____<br><br>**DEMAND FOR ARBITRATION** |

COME NOW East Valley Cattle, LLC ("EVC") and Millenkamp Cattle, Inc. ("Millenkamp

Cattle," and together with EVC, "Claimants"), by and through their attorneys of record, Givens

Pursley LLP, and hereby demand arbitration pursuant to an arbitration agreement with Respondent

East Valley Development, LLC ("EVD" or "Respondent") as follows:

**I.      Parties, Jurisdiction, and Choice of Law**

    **A.      The Claimants**

EVC is an Idaho limited liability company.

The address of EVC is:

       East Valley Cattle, LLC
       Attention: Bill Millenkamp
       471 N. 300 W.
       Jerome, Idaho 83338
       Telephone: (208) 731-5518
       Email: bill@millenkamp.com

The known representatives for EVC are:

       Thomas E. Dvorak
       Jason J. Blakley
       GIVENS PURSLEY LLP
       601 West Bannock Street
       P.O. Box 2720
       Boise, Idaho  83701-2720
       Telephone: (208) 388-1200
       Fax: (208) 388-1300
       Email: tedservice@givenspursley.com
              jasonblakley@givenspursley.com

Millenkamp Cattle is an Idaho corporation.

The address of Millenkamp Cattle is:

       Millenkamp Cattle, Inc.
       Attention: Bill Millenkamp
       471 N. 300 W.
       Jerome, Idaho 83338
       Telephone: (208) 731-5518
       Email: bill@millenkamp.com

The known representatives for Millenkamp Cattle are:

       Thomas E. Dvorak
       Jason J. Blakley
       GIVENS PURSLEY LLP
       601 West Bannock Street
       P.O. Box 2720
       Boise, Idaho  83701-2720
       Telephone: (208) 388-1200
       Fax: (208) 388-1300
       Email: tedservice@givenspursley.com
              jasonblakley@givenspursley.com

**DEMAND FOR ARBITRATION - 2**

**B.      The Respondent**

Upon information and belief, East Valley Development, LLC is a Delaware limited liability

company.

The address of the Respondent is:

> Attention:  General Counsel
> 4675 MacArthur Court, Suite 800
> Newport Beach, CA 92660
> Telephone:  (949) 437-1000
> Email: jim.sytsma@cleanenergyfuels.com

> William J. Flanagan
> VP, Strategic Development
> East Valley Development, LLC
> 4675 MacArthur Court, Suite 800
> Newport Beach, CA  92660
> Email: Will.Flanagan@cleanenergyfuels.com

The known representatives for the Respondent are:

> James L. Martin
> Steve Frinsko
> Hawley Troxell
> 877 W. Main St., Ste. 200
> P.O. Box 1617
> Boise, ID  83701
> Telephone:  (208) 344-6000
> Email:  jmartin@hawleytroxell.com
>             sfrinsko@hawleytroxell.com

**C.      Jurisdiction**

The American Arbitration Association has jurisdiction to arbitrate this matter pursuant to

a Ground Lease Agreement (the "Lease") executed by EVC and EVD on October 8, 2021, which

provides in relevant part (page 22):

> 30.2.    Arbitration. Any controversy or claim arising out of or relating to
> this Lease, or the breach thereof, shall be determined by final and binding
> arbitration administered by the American Arbitration Association ("AAA")
> under its Commercial Arbitration Rules and Mediation Procedures
> ("Commercial Rules").  The award rendered by the arbitrator shall be final
> and binding on the parties and may be entered and enforced in any court

having jurisdiction, and any court where a party or its assets is located (to whose jurisdiction the parties consent for the purposes of enforcing the award). There shall be **one arbitrator** agreed to by the parties within twenty (20) days of receipt by respondent of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. Except as may be required by law, neither a party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both Parties, unless to protect or pursue a legal right.

(Emphasis added.) A copy of the Lease is attached hereto as **Exhibit A**.

The MSA (defined below) contains a similar provision at § 18.2.2.

### D.    Choice of Law

The Lease further provides that it "shall be governed, interpreted, construed and regulated in accordance with the laws of the State of Idaho." Exhibit A (Lease, § 30.1). Because this arbitration involves more than two parties, Claimants do not agree to conduct the arbitration under the AAA Expedited Procedures. *See* AAA Commercial Rule R-1(b).

## II.    Nature of the Claim

1.    EVC owns certain real property in Cassia County, Idaho upon which Millenkamp Cattle owns and operates a large dairy and feedlot ("Farm Business").

2.    Millenkamp Cattle's Farm Business is comprised of state-of-the-art, first-class dairy facilities, unlike those found anywhere else in the United States.

3.    Millenkamp Cattle's Farm Business produces large quantities of manure, milking parlor water, feed lane manure, loafing pen manure, and urine (collectively, "Manure") that must be handled and disposed of in an environmentally and socially responsible manner.

4.    Respondent is a subsidiary of CE bp Renew Co, LLC (an entity that is 50% owned by bp Products North America and 50% by Clean Energy).

5.    Millenkamp Cattle and EVD entered into a Manure Supply Agreement on October 8, 2021 ("MSA") wherein EVD agreed to install, construct, own, and operate a

**DEMAND FOR ARBITRATION - 4**

commercial scale biogas production facility for the production of methane gas and other co-products ("Facility"), made up of an anaerobic digestion system and related equipment ("Digester") including "Manure Separation Facilities," which is intended to convert the Manure solids into saleable renewable natural gas and carbon dioxide ("Project").

6.     EVC and EVD entered into the Lease in order to effectuate the terms of the MSA, *i.e.*, EVC leased to Respondent the ground upon which the Project would be constructed.

7.     According to the Lease, Respondent promised to:

> construct the Project in a first class, workmanlike manner consistent with other similar projects in the area, in substantial compliance with the Plans and in compliance with all applicable laws, rules and regulations, including, but not limited to, all land use and building laws, rules and regulations, environmental laws, rules and regulations, and insurance requirements and codes.

Lease, § 6.1 Development of Project.

8.     Respondent promised to construct the Project in accordance with the "Plans," which are found at Exhibit F of the Lease. Lease, § 6.3 Project Design.

9.     The Lease envisions that additional detailed Plans will be created, the approval of which is governed in part by Exhibit G to the Lease. Lease, § 6.3 Project Design.

10.     According to Exhibit G of the Lease:

> In order to keep Landlord [EVC] apprised of design progress, allow for input, and not delay design progress with formal reviews, intermediate submittal packages will be provided to be reviewed concurrent with design progression. Landlord will have access to the design engineer's file sharing folder where detailed design sheets and 3D models are updated concurrent with design development. Specific design review meetings will be setup at appropriate design stage gates to get input from Landlord regarding infrastructure integration to the existing dairy facility and consistency with overall architectural programing (established by current construction methods that are applicable to an industrial anaerobic digestion facility with gas upgrading and compression).

**DEMAND FOR ARBITRATION - 5**

11.     According to the Lease, "in all events no changes to the Plans shall be implemented without Landlord's [EVC's] prior written consent." Lease, § 6.3 <u>Project Design</u>.

12.     The Lease also provides:

> Following initial construction in accordance with the Plans, no alterations, additions or other improvements shall be made to the Premises, the Project or the Improvements unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

Lease, § 6.3.1.

13.     Under the Lease, the Manure Separation Facilities are to be designed, constructed, installed, and commissioned on or before October 31, 2022, as provided for in Exhibit E of the Lease. Lease, § 6.2 <u>Construction and Relocation of Manure Separation Facilities</u>.

14.     The Lease additionally holds:

> The parties agree that Tenant's obligations herein to construct, install and commission the Manure Separation Facilities shall not fail due to the lack of final plans and specifications upon the execution hereof.

Lease, Exhibit E, Section 2. <u>Obligation to Construct</u>.

15.     Exhibit E of the Lease sets forth particular standards for the construction of the Manure Separation Facilities and affords EVC a wide latitude of design and approval rights as they pertain to the Manure Separation Facilities, including, but not limited to:

> **<u>Section 1. Manure Separation Facilities</u>**.  Tenant, in conjunction and cooperation with the Landlord shall develop plans and specification for the Manure Separation Facilities (the "MSF Plans" as defined below) to be approved in writing by Landlord, acting reasonable and in good faith.

> **<u>Section 3. Deposit - Total Costs</u>**. The Landlord and Tenant understand and agree that the costs and expenses for completing the Manure Separation Facilities may exceed the Down Payment. Tenant agrees to pay any and all cost and expenses of the Manure Separation Facilities that are over and above the Down Payment.

**DEMAND FOR ARBITRATION - 6**

**Section 5. MSF Plans**. Tenant represents and warrants to Landlord that it will construct the Manure Separation Facilities with state-of-the-art equipment so as to produce high-quality product and functionality.

16.    EVC bargained for the aforementioned rights to provide input into and otherwise preapprove the Project's design so it would ultimately match the cleanliness, organizational layout, efficiency, redundancy, and industrial architecture of EVC's first-class Farm Business.  EVC was also concerned based on its awareness that other digester and manure separation projects have been abandoned by other operators or otherwise gone into default, leaving the dairyman owner to have to operate the facility.

17.    Respondent has consistently failed to present timely Plans to EVC for review and preapproval, as required under the Lease.

18.    Respondent has also failed to timely install, construct, and commission the Manure Separation Facilities on or before October 31, 2022, as required under the Lease.

19.    These failures constitute events of default under the Lease. Lease, § 17, <u>Default</u>.

20.    Under the Lease, Respondent has up to a maximum of ninety (90) days to cure any non-monetary default so long as Respondent "continues to diligently prosecute to completion the curing of the default."  Lease, § 17.1.7, <u>Default, Events of Default</u>.

21.    EVC served Respondent with its NOTICE OF DEFAULT ("<u>Default</u>") on the 13th day of March, 2023.  *See* Exhibit A attached hereto and incorporated herein by reference.

22.    Respondent's failure to timely install, construct, and commission the Manure Separation Facilities by the October 31, 2022 deadline has created a condition by which Respondent cannot cure the Default within the applicable cure period of the Lease.

**DEMAND FOR ARBITRATION - 7**

## CLAIM I
## <u>Breach of Contract</u>

23.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

24.     A "controversy" has arisen between the parties—as that term is used in § 30.2 of the Lease—related to Respondent's breaches of the Lease. The parties agreed to resolve such controversies in binding arbitration, utilizing the American Arbitration Association's Commercial Arbitration Rules. Lease, § 30.2, <u>Arbitration</u>.

25.      Respondent had a duty to install, construct, and commission the Manure Separation Facilities on or before October 31, 2022.

26.     Respondent's failure to install, construct, and commission the Manure Separation Facilities on or before October 31, 2022 is a material breach of the Lease.

27.     As a direct result of Respondent's breach, Claimants have been damaged in an amount to be proven in arbitration.

## CLAIM II
## <u>Declaratory Judgment</u>

28.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

29.     AAA Rule 47(a) allows an arbitrator to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.

30.     AAA Rule 37 allows an arbitrator to take whatever interim measures he or she deems necessary.

31.     A "controversy" has arisen between the parties, as that term is used in § 30.2 of the Lease.

32.     Idaho Code section 10-1201 authorizes declaratory judgments, and Idaho Code section 10-1202 provides that a person interested under a contract may obtain a declaration of his rights, status, or other legal relations thereunder.

33.     Claimants are persons, as defined by Idaho Code section 10-1213, interested under a contract or contracts and are entitled to have a declaration of their rights, status, or other legal relations thereunder declared by the arbitrator.

34.     Idaho Code section 10-1208 provides that further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.

35.     Respondent has previously declared certain "force majeure" events, citing the same for Respondent's failures to complete Project tasks in a timely manner.

36.     Claimants request and are entitled to an order and/or judgment from the arbitrator declaring that Respondent's prior "force majeure" declarations are invalid and do not serve to negate Respondent's failure to complete Project tasks in a timely manner.

## CLAIM III
## Declaratory Judgment (Impossibility of Performance)

37.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

38.     AAA Rule 47(a) allows an arbitrator to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.

39.     AAA Rule 37 allows an arbitrator to take whatever interim measures he or she deems necessary.

40.     A "controversy" has arisen between the parties, as that term is used in § 30.2 of the Lease.

**DEMAND FOR ARBITRATION - 9**

41.     Idaho Code section 10-1201 authorizes declaratory judgments, and Idaho Code section 10-1202 provides that a person interested under a contract may obtain a declaration of his rights, status, or other legal relations thereunder.

42.     Claimants are persons, as defined by Idaho Code section 10-1213, interested under a contract or contracts and are entitled to have a declaration of their rights, status, or other legal relations thereunder declared by the Arbitrator.

43.     Idaho Code section 10-1208 provides that further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.

44.     Claimants request and are entitled to an order and/or judgment from the arbitrator declaring that:

    a.  Respondent cannot construct, install, and commission the Manure Separation Facilities within the default cure period established in the Lease;

    b.  The Lease is terminated; and

    c.  Respondent must vacate and surrender the premises as a result of its breach(es).

## **ATTORNEYS' FEES**

In order to bring this arbitration, it has been necessary for Claimants to retain the services of legal counsel, Givens Pursley LLP, at said firm's customary rates. Pursuant to AAA Rule 47 as well as Idaho Code §§ 12-120(3) and 12-121, Idaho Rule of Civil Procedure 54(e), and the Lease, Claimants are entitled to recover their costs and attorneys' fees incurred in pursuing this action together with an award of any administrative fees, expenses, and arbitrator's compensation paid by Claimants, in such amounts as the arbitrator deems reasonable and just.

**DEMAND FOR ARBITRATION - 10**

## **PRAYER FOR RELIEF**

WHEREFORE, Claimants pray for relief as follows:

1.     That the arbitrator find for Claimants on each and every Count of this Arbitration Demand and afford Claimants the relief sought in each Count herein;

2.     For an award of Claimants' costs and attorneys' fees in such amount as may be proven at the appropriate time in these proceedings;

3.     That the arbitrator retain jurisdiction of this matter in order to resolve future controversies; and

4.     For such other and further relief as the arbitrator deems just and appropriate under the circumstances.

DATED: March ___, 2023.

GIVENS PURSLEY LLP


By _/s/ Jason J. Blakley_____
      Thomas E. Dvorak – Of the Firm
      Jason J. Blakley – Of the Firm
      Attorneys for Claimants

**DEMAND FOR ARBITRATION - 11**

**EXHIBIT E**

# GIVENS PURSLEY LLP

Attorneys and Counselors at Law

601 W. Bannock Street
PO Box 2720
Boise, ID 83701
Telephone: 208-388-1200
Facsimile: 208-388-1300

www.givenspursley.com

Thomas E. Dvorak
(208) 388-1245
ted@givenspursley.com

| | | |
|---|---|---|
| Gary G. Allen | Brian J. Holleran | Samuel F. Parry |
| Charlie S. Baser | Kersti H. Kennedy | Randall A. Peterman |
| Christopher J. Beeson | Elizabeth A. Koeckeritz | Blake W. Ringer |
| Jason J. Blakley | Neal A. Koskella | Michael O. Roe |
| Clint R. Bolinder | Michael P. Lawrence | Danielle M. Strollo |
| Jeff W. Bower | Franklin G. Lee | Robert B. White |
| Preston N. Carter | David R. Lombardi | Michael V. Woodhouse |
| Chynna K. Castoro | Lars E. Lundberg | |
| Jeremy C. Chou | Kimberly D. Maloney | |
| Michael C. Creamer | Kenneth R. McClure | William C. Cole (Of Counsel) |
| Joshua C. Dickinson | Alex P. McLaughlin | |
| Amber N. Dina | Melodie A. McQuade | |
| Bradley J. Dixon | Christopher H. Meyer | Kenneth L. Pursley (1940-2015) |
| Thomas E. Dvorak | L. Edward Miller | James A. McClure (1924-2011) |
| Morgan D. Goodin | Judson B. Montgomery | Raymond D. Givens (1917-2008) |
| Donald Z. Gray | Deborah E. Nelson | |

September 30, 2022

*Via Email*

James L. Martin
Steve Frinsko
Hawley Troxell
877 W. Main St., Ste. 200
Boise, ID 83702
jmartin@hawleytroxell.com
sfrinsko@hawleytroxell.com

Re:     East Valley Cattle / East Valley Development

Dear Jim and Steve:

As I made clear to Steve during my call on Monday, the current status and apparent impasse is unacceptable to our client East Valley Cattle, LLC ("EVC") and we wanted to hear from you if there was a way for our respective clients to move forward together on this. I have not heard back. Accordingly, on Monday, EVC will exercise its right under Section 30.2 of the October 8, 2021 Ground Lease Agreement ("Agreement") to compel arbitration to resolve the controversy that has arisen between the parties under the Agreement. Enclosed herewith is our Demand for Arbitration to the AAA, which we will be filing with the AAA on Monday.

Sincerely,

Thomas E. Dvorak

TED:slc
Enclosure
16426574_1.docx  (11054-187)

Thomas E. Dvorak (ISB # 5043)
Jason J. Blakley (ISB # 9497)
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho  83701-2720
Office: (208) 388-1200
Fax: (208) 388-1300
tedservice@givenspursley.com
jasonblakley@givenspursley.com
16422360 [11054.187]

Attorneys for East Valley Cattle, LLC


BEFORE THE AMERICAN ARBITRATION ASSOCIATION


| | |
|---|---|
| EAST VALLEY CATTLE, LLC, an Idaho limited liability company, and MILLENKAMP CATTLE, INC., an Idaho corporation,<br><br>              Claimants,<br><br>vs.<br><br>EAST VALLEY DEVELOPMENT, LLC a Delaware limited liability ,<br><br>              Respondent. | AAA Case No. _____<br><br>**DEMAND FOR ARBITRATION** |


COME NOW East Valley Cattle, LLC ("EVC") and Millenkamp Cattle, Inc. ("Millenkamp Cattle," and together with EVC, "Claimants"), by and through their attorneys of record, Givens Pursley LLP, and hereby demand arbitration pursuant to an arbitration agreement with Respondent East Valley Development, LLC ("EVD" or "Respondent") as follows:

## I.    Parties, Jurisdiction, and Choice of Law

### A.    The Claimants

EVC is an Idaho limited liability company.

DEMAND FOR ARBITRATION - 1

The address of EVC is:

      East Valley Cattle, LLC
      Attention: Bill Millenkamp
      471 N. 300 W.
      Jerome, Idaho 83338
      Telephone: (208) 731-5518
      Email: bill@millenkamp.com

The known representatives for EVC are:

      Thomas E. Dvorak
      Jason J. Blakley
      GIVENS PURSLEY LLP
      601 West Bannock Street
      P.O. Box 2720
      Boise, Idaho  83701-2720
      Office: (208) 388-1200
      Fax: (208) 388-1300
      Email: tedservice@givenspursley.com
             jasonblakley@givenspursley.com

Millenkamp Cattle is an Idaho corporation.

The address of Millenkamp Cattle is:

      Millenkamp Cattle, Inc.
      Attention: Bill Millenkamp
      471 N. 300 W.
      Jerome, Idaho 83338
      Telephone: (208) 731-5518
      Email: bill@millenkamp.com

The known representatives for Millenkamp Cattle are:

      Thomas E. Dvorak
      Jason J. Blakley
      GIVENS PURSLEY LLP
      601 West Bannock Street
      P.O. Box 2720
      Boise, Idaho  83701-2720
      Office: (208) 388-1200
      Fax: (208) 388-1300
      Email: tedservice@givenspursley.com
             jasonblakley@givenspursley.com

B.      **The Respondent**

Upon information and belief, East Valley Development, LLC is a Delaware limited liability

company.

The address of the Respondent is:

>       Attention:  General Counsel
>       4675 MacArthur Court, Suite 800
>       Newport Beach, CA 92660
>       Telephone:  (949) 437-1000
>       Email: jim.sytsma@cleanenergyfuels.com
>
>       William J. Flanagan
>       VP, Strategic Development
>       East Valley Development, LLC
>       4675 MacArthur Court, Suite 800
>       Newport Beach, CA  92660
>       Email: Will.Flanagan@cleanenergyfuels.com

The known representatives for the Respondent are:

>       James L. Martin
>       Steve Frinsko
>       Hawley Troxell
>       877 W. Main St., Ste. 200
>       P.O. Box 1617
>       Boise, ID  83701
>       Telephone:  (208) 344-6000
>       Email:  jmartin@hawleytroxell.com
>               sfrinsko@hawleytroxell.com

C.      **Jurisdiction**

The American Arbitration Association has jurisdiction to arbitrate this matter pursuant to

a Ground Lease Agreement (the "Lease") executed by EVC and EVD on October 8, 2021, which

provides in relevant part (page 22):

>       30.2.    Arbitration. Any controversy or claim arising out of or relating to
>       this Lease, or the breach thereof, shall be determined by final and binding
>       arbitration administered by the American Arbitration Association ("AAA")
>       under its Commercial Arbitration Rules and Mediation Procedures
>       ("Commercial Rules").  The award rendered by the arbitrator shall be final
>       and binding on the parties and may be entered and enforced in any court

having jurisdiction, and any court where a party or its assets is located (to whose jurisdiction the parties consent for the purposes of enforcing the award). There shall be **one arbitrator** agreed to by the parties within twenty (20) days of receipt by respondent of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. Except as may be required by law, neither a party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both Parties, unless to protect or pursue a legal right.

(Emphasis added.) A copy of the Lease is attached hereto as **Exhibit A**.

The MSA (defined below) contains a similar provision at § 18.2.2.

### D.    Choice of Law

The Lease further provides that it "shall be governed, interpreted, construed and regulated in accordance with the laws of the State of Idaho." Exhibit A (Lease, § 30.1). Because this arbitration involves more than two parties, Claimants do not agree to conduct the arbitration under the AAA Expedited Procedures. See AAA Commercial Rule R-1(b).

## II.    Nature of the Claim

1.    EVC owns certain real property in Cassia County, Idaho upon which Millenkamp Cattle owns and operates a large dairy and feedlot ("Farm Business").

2.    Millenkamp Cattle's Farm Business is comprised of state of the art, first class dairy facilities, unlike those found anywhere else in the United States.

3.    Millenkamp Cattle's Farm Business produces large quantities of manure, milking parlor water, feed lane manure, loafing pen manure, and urine (collectively, "Manure") that must be handled and disposed of in an environmentally and socially responsible manner.

4.    Respondent is a subsidiary of CE bp Renew Co, LLC (an entity that is 50% owned by bp Products North America and 50% by Clean Energy).

5.    Millenkamp Cattle and EVD entered into a Manure Supply Agreement on October 8, 2021 ("MSA") wherein EVD agreed to install, construct, own, and operate a commercial scale

**DEMAND FOR ARBITRATION - 4**

biogas production facility for the production of methane gas and other co-products ("Facility"),

made up of an anaerobic digestion system and related equipment ("Digester") including "Manure

Separation Facilities," which is intended to convert the Manure solids into saleable renewable

natural gas and carbon dioxide ("Project").

6.    EVC and EVD entered into the Lease in order to effectuate the terms of the MSA,

*i.e.*, EVC leased to Respondent the ground upon which the Project would be constructed.

7.    According to the Lease, Respondent promised to:

> construct the Project in a first class, workmanlike manner consistent
> with other similar projects in the area, in substantial compliance
> with the Plans and in compliance with all applicable laws, rules and
> regulations, including, but not limited to, all land use and building
> laws, rules and regulations, environmental laws, rules and
> regulations, and insurance requirements and codes.

Lease, § 6.1 Development of Project.

8.    Respondent promised to construct the Project in accordance with the "Plans,"

which are found at Exhibit F of the Lease. Lease, § 6.3 Project Design.

9.    The Lease envisions that additional more detailed Plans will be created, the

approval of which is governed in part by Exhibit G to the Lease. Lease, § 6.3 Project Design.

10.    According to Exhibit G of the Lease:

> In order to keep Landlord [EVC] apprised of design progress, allow
> for input, and not delay design progress with formal reviews,
> intermediate submittal packages will be provided to be reviewed
> concurrent with design progression. Landlord will have access to the
> design engineer's file sharing folder where detailed design sheets
> and 3D models are updated concurrent with design development.
> Specific design review meetings will be setup at appropriate design
> stage gates to get input from Landlord regarding infrastructure
> integration to the existing dairy facility and consistency with overall
> architectural programing (established by current construction
> methods that are applicable to an industrial anaerobic digestion
> facility with gas upgrading and compression)

11.     According to the Lease, "in all events no changes to the Plans shall be implemented without Landlord's [EVC's] prior written consent." Lease, § 6.3 Project Design.

12.     The Lease also provides:

> Following initial construction in accordance with the Plans, no alterations, additions or other improvements shall be made to the Premises, the Project or the Improvements unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

Lease, § 6.3.1.

13.     Under the Lease, the Manure Separation Facilities are to be designed, constructed, installed, and commissioned as provided for in Exhibit E of the Lease. Lease, § 6.2 Construction and Relocation of Manure Separation Facilities.

14.     Exhibit E of the Lease sets forth particular standards for the construction of the Manure Separation Facility and affords EVC a wide latitude of design and approval rights as they pertain to the Manure Separation Facility, including but not limited to:

> **Section 1. Manure Separation Facilities**.  Tenant, in conjunction and cooperation with the Landlord shall develop plans and specification for the Manure Separation Facilities (the "MSF Plans" as defined below) to be approved in writing by Landlord, acting reasonable and in good faith.

> **Section 3. Deposit - Total Costs**. The Landlord and Tenant understand and agree that the costs and expenses for completing the Manure Separation Facilities may exceed the Down Payment. Tenant agrees to pay any and all cost and expenses of the Manure Separation Facilities that are over and above the Down Payment.

> **Section 5. MSF Plans**. Tenant represents and warrants to Landlord that it will construct the Manure Separation Facilities with state-of-the-art equipment so as to produce high-quality product and functionality.

15.     EVC bargained for the aforementioned rights to provide input into and otherwise preapprove the Project's design so it would ultimately match the cleanliness, organizational layout,

**DEMAND FOR ARBITRATION - 6**

efficiency, redundancy, and industrial architecture of EVC's first-class Farm Business. EVC was also concerned based on its awareness that other digester and manure separation projects have been abandoned by other operators or otherwise gone into default, leaving the dairyman owner to have to operate the facility.

16.    Respondent has consistently failed to present Plans to EVC prior to implementation or otherwise afford EVC its review and preapproval rights under the Lease.

17.    A non-exhaustive list of outstanding Project elements upon which Respondent has failed to afford EVC its review and preapproval rights includes:

> a. Concrete flat work locations throughout the Project;
>
> b. Push up wall by the screws and size and dimensions;
>
> c. Greenwater building 40' x 80';
>
> d. Greenwater redundancy-our lagoon hookup;
>
> e. Shop location and size;
>
> f. Potable Water locations;
>
> g. Potable Water Line Map;
>
> h. Potable Water Source;
>
> i. Wash down hose locations;
>
> j. Bathrooms;
>
> k. Candy Cane Reception Pit;
>
> l. Road finish and grade;
>
> m. Clarifier-architectural details, Green Flush Tank, FAN pumps;
>
> n. Control information from Revere;
>
> o. Dewatering, Radial Stacker, Fiber Storage, Centrifuge Building;

**DEMAND FOR ARBITRATION - 7**

        p. Rotary Drum Building-dimensions and specs; and

        q. House demolition.

18.     Despite the Lease's requirements, Respondent has failed to provide sufficient detail to EVC on these Project components and has failed to schedule a meeting to discuss these items.

19.     EVC remains ready and willing to provide good faith feedback on these items but has not been presented with sufficient information by Respondent as to the design intent for these items such that any such good faith feedback can be provided at this time.

## CLAIM I
## <u>Declaratory Judgment</u>

20.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

21.     AAA Rule 47(a) allows an arbitrator to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.

22.     AAA Rule 37 allows an arbitrator to take whatever interim measures he or she deems necessary.

23.     A "controversy" has arisen between the parties, as that term is used in § 30.2 of the Lease.

24.     Idaho Code section 10-1201 authorizes declaratory judgments, and Idaho Code section 10-1202 provides that a person interested under a contract may obtain a declaration of his rights, status or other legal relations thereunder.

25.     Claimants are persons, as defined by Idaho Code section 10-1213, interested under a contract or contracts and are entitled to have a declaration of their rights, status or other legal relations thereunder declared by the Arbitrator.

**DEMAND FOR ARBITRATION - 8**

26.    Idaho Code section 10-1208 provides that further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.

27.    Claimants request and are entitled to an order and/or judgment from the Arbitrator declaring:

      a.      That EVC has satisfied all of its obligations under the Lease;

      b.      That Respondent has failed to satisfy its obligations under the Lease to provide EVC with sufficient design detail before attempting to construct new components of the Project;

      c.      That Respondent has failed to satisfy its obligations under the Lease to obtain EVC's prior written approval before attempting to construct new components of the Project; and

      d.      That Respondent, moving forward, must comply with its obligations under the Lease to: (a) provide EVC with sufficient design detail before attempting to construct new components of the Project, and (b) obtain EVC's prior written approval before attempting to construct new components of the Project.

## CLAIM II
## Declaratory Judgment

28.    Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

29.    AAA Rule 47(a) allows an arbitrator to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.

30.    AAA Rule 37 allows an arbitrator to may take whatever interim measures he or she deems necessary.

31.     A "controversy" has arisen between the parties, as that term is used in § 30.2 of the Lease.

32.     Idaho Code section 10-1201 authorizes declaratory judgments, and Idaho Code section 10-1202 provides that a person interested under a contract may obtain a declaration of his rights, status or other legal relations thereunder.

33.     Claimants are persons, as defined by Idaho Code section 10-1213, interested under a contract or contracts and are entitled to have a declaration of their rights, status or other legal relations thereunder declared by the Arbitrator.

34.     Idaho Code section 10-1208 provides that further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.

35.     Respondent has previously declared certain "force majeure" events, citing the same for Respondent's failures to complete Project tasks in a timely manner.

36.     Claimants request and are entitled to an order and/or judgment from the Arbitrator declaring that Respondent's prior "force majeure" declarations are invalid and do not serve to negate Respondent's failure to complete Project tasks in a timely manner.

### CLAIM III
### Request that Arbitrator Retain Jurisdiction to Resolve Future Disputes Threatened by this Ongoing Controversy

37.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

38.     AAA Rule 47(a) allows an arbitrator to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.

39.     AAA Rule 37 allows an arbitrator to may take whatever interim measures he or she deems necessary.

**DEMAND FOR ARBITRATION - 10**

40.     AAA Rule 47(b) allows an arbitrator, in addition to a final award:

> to may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

41.     Respondent has given no indication that it intends to abide by its obligations under the Lease to: (a) provide EVC with sufficient design detail before attempting to construct new components of the Project, or (b) obtain EVC's prior written approval before attempting to construct new components of the Project.

42.     Based on Respondent's prior conduct, Claimants have valid reasons to believe that Respondent will continue to shirk its duties to: (a) provide EVC with sufficient design detail before attempting to construct new components of the Project, and/or (b) obtain EVC's prior written approval before attempting to construct new components of the Project.  In other words, this ongoing controversy will continue to play out in specific design details.

43.     As a matter of efficiency and expediency, Claimants request that the Arbitrator retain jurisdiction of this matter and keep the present arbitration ongoing while the Project construction is ongoing in order to quickly and expeditiously resolve the specific aspects of the ongoing controversy that forms the basis of this arbitration demand. The arbitrator may do so by simply entering "interim awards" under AAA Rule 37(d) and AAA Rule 47(b) or other applicable rules or law until such time as the construction of the Project is complete under the Lease and only entering a "final award" at that time.

**<u>Attorneys' Fees</u>**

In order to bring this arbitration, it has been necessary for Claimants to retain the services of legal counsel, Givens Pursley LLP, at said firm's customary rates. Pursuant to AAA Rule 47 as well as Idaho Code §§ 12-120(3) and 12-121, Idaho Rule of Civil Procedure 54(e), and the Lease,

**DEMAND FOR ARBITRATION - 11**

Claimants are entitled to recover their costs and attorneys' fees incurred in pursuing this action together with an award of any administrative fees, expenses and arbitrator's compensation paid by Claimants, in such amounts as the arbitrator deems reasonable and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Claimants pray for relief as follows:

1.      That the Arbitrator find for Claimants on each and every Count of this Arbitration Demand and afford Claimants the relief sought in each Count herein;

2.      For an award of Claimants' costs and attorneys' fees in such amount as may be proven at the appropriate time in these proceedings;

3.      That the Arbitrator retain jurisdiction of this matter in order to resolve future controversies; and

4.      For such other and further relief as the Arbitrator deems just and appropriate under the circumstances.

DATED: October ___, 2022.

GIVENS PURSLEY LLP


By_____
        Thomas E. Dvorak – Of the Firm
        Jason J. Blakley – Of the Firm
        Attorneys for East Valley Cattle, LLC

# Exhibit  A

**Exhibit  A**

## GROUND LEASE AGREEMENT

This Ground Lease Agreement (this "<u>Lease</u>") is made effective as of October 8, 2021 (the "<u>Effective Date</u>"), between East Valley Cattle, LLC, an Idaho limited liability company (hereinafter, "<u>Landlord</u>"), the owner of certain real property located in Cassia County, Idaho, on which the Premises (as hereinafter defined) is located ("<u>Landlord's Property</u>") and East Valley Development, LLC, a Delaware limited liability company and subsidiary of CE bp Renew Co, LLC (which entity is owned 50% by bp Products North America and 50% by Clean Energy) (hereinafter, "<u>Tenant</u>"). Landlord and Tenant are at times collectively referred to hereinafter as the "<u>Parties</u>" or individually as a "<u>Party</u>".

## RECITALS

A.      Tenant and Millenkamp Cattle, Inc., an Idaho corporation ("<u>Dairy</u>") an affiliate of Landlord, entered into that certain Manure Supply Agreement dated as of October 8, 2021 (the "<u>MSA</u>"), pursuant to which Dairy will provide to Tenant Suitable Manure (as defined in the MSA) for Tenant's operation of the Project (as hereinafter defined);

B.      The MSA contemplates that Landlord and Tenant will enter into a ground lease for certain real property owned by Landlord in order to fully effectuate the purposes of the MSA; and

C.      The Parties desire to set forth the terms and conditions upon which Landlord shall lease to Tenant, and Tenant shall lease from Landlord, the Premises (as hereinafter defined).

## AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions and provisions set forth herein, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

2.      <u>DEFINITIONS</u>. All terms used herein shall have the same meaning as the same terms defined in the MSA, and all terms used in the MSA shall have the same meaning as the same terms defined herein. In the event of discrepancy, this Lease shall control.

"<u>Additional Rent</u>" means all monetary payments required to be made under this Lease, including, but not limited to, taxes, insurance premiums, utility payments, late charges, default interest and all other sums Tenant is obligated to pay under this Lease other than Term Rent.

"<u>Hazardous Materials</u>" shall mean any material, substance or waste that is or has the characteristic of being hazardous, toxic, ignitable, reactive or corrosive, including, without limitation, petroleum, PCBs, asbestos, materials known to cause cancer or reproductive problems and those materials, substances and/or wastes, including infectious waste, medical waste, and potentially infectious biomedical waste, which are or later become regulated by any local governmental authority, the State of Idaho or the United States Government, including, but not limited to, substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "hazardous wastes" in the Hazardous Materials Laws.

"<u>Hazardous Materials Laws</u>" shall mean any federal, state or local statute, regulation or ordinance or any judicial or administrative decree or decision, whether now existing or hereinafter enacted, promulgated or issued, with respect to any Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water

runoff, waste emissions or wells. Without limiting the generality of the foregoing, the term shall encompass each of the following statutes, and regulations, orders, decrees, permits, licenses and deed restrictions now or hereafter promulgated thereunder, and amendments and successors to such statutes and regulations as may be enacted and promulgated from time to time: (i) the Comprehensive Environmental Response, Compensation and Liability Act, (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. Section 9601 et seq.); (ii) the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.); (iii) the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.); (iv) the Toxic Substances Control Act (15 U.S.C. Section 2061 et seq.); (v) the Clean Water Act (33 U.S.C. Section 1251 et seq.), (vi) the Clean Air Act (42 U.S.C. Section 7401 et seq.); (vii) the Safe Drinking Water Act (21 U.S.C. Section 349, 42 U.S.C. Section 201 and Section 300f et seq.); (viii) the National Environmental Policy Act (42 U.S.C. Section 4321 et seq.); (ix) the Superfund Amendments and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C.); (x) Title III of the Superfund Amendment and Reauthorization Act (40 U.S.C. Section 1101 et seq.); (xi) the Uranium Mill Tailings Radiation Control Act (42 U.S.C. Section 7901 et seq.); (xii) the Occupational Safety and Health Act (29 U.S.C. Section 655 et seq.); (xiii) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. Section 136 et seq.); (xiv) the Noise Control Act (42 U.S.C. Section 4901 et seq.); and (xv) the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 1100 et seq.).

"Improvements" means the infrastructure and substructures relating to the anaerobic digestion system, including, but not limited to, mixing tanks, digester tanks, secondary digesters, the Manure Separation Facilities, biogas handling and conditioning equipment, compression and injection equipment, and all other buildings, improvements, equipment and appurtenances necessary for a complete and functioning anaerobic digester facility.

"Landlord's Lender(s)" means any entity(ies) providing financing to Landlord which is secured by Landlord's fee title interest in the Leased Property and/or this Lease.

"Manure Separation Facilities" means the permanent waste water and manure separation equipment and physical facilities described on Exhibit E attached hereto and incorporated herein.

"Permitted Use" shall have the meaning specified in Section 5.

"Project" means that certain commercial-scale biogas production facility comprised of an anaerobic digestion system, together with the Improvements, for the production of methane gas and other co-products and beneficial uses, to be located on the Leased Property, which is intended to convert manure solids into saleable renewable natural gas and carbon dioxide.

"Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, dumping, discarding, burying, abandoning, or disposing into the environment.

"Rent" means, collectively, Term Rent and Additional Rent.

"Tenant's Lender" shall have the meaning specified in Section 16.

3.    PREMISES. Landlord, for and in consideration of the rents, covenants and conditions herein set forth, does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, subject to the terms, conditions and provisions of this Lease. Subject to Section 12.2 and as otherwise provided for in this agreement the "Premises" shall include, collectively:

GROUND LEASE AGREEMENT – PAGE 2
15736902_12
HB: 4848-4611-1439.13

3.1     the exclusive right to use, develop and occupy that portion of Landlord's Property legally described and depicted in the map attached hereto as <u>Exhibit B</u> (the "<u>Leased Property</u>") for the purposes described in <u>Section 5</u>, subject to Landlord's permitted access rights set forth herein and in the MSA;

3.2     the right to use and occupy a residential building (but not including the water well currently associated with the residence) located on the Leased Property and to renovate and make improvements subject to Landlord's final written approval; provided, however, if at any time during the Term Tenant is not using and occupying such residential building for a consecutive period of ninety (90) days or longer, Landlord may repossess the residential building and shall have exclusive use of the residential building as Landlord desires;

3.3     the nonexclusive right to use the area located on Landlord's Property designated as the "Access Easement," as legally described and depicted in the map attached hereto as <u>Exhibit C</u> for the purpose of vehicular and pedestrian ingress and egress from the public roadway to the Leased Property (the "<u>Access Easement</u>");

3.4     the nonexclusive right to use and develop the area located on Landlord's Property designated as the "<u>Pipeline Easement</u>," as legally described and depicted in the map attached hereto as <u>Exhibit C</u> for the purpose of constructing, operating and maintaining an underground pipeline for the purpose of conveying renewable natural gas from the Project to the public right of way. Tenant agrees that the Pipeline Easement shall comply with all applicable law that pertain to such a pipeline, including but not limited to depth and top-fill of underground pipelines of the type contemplated herein;

3.5     the exclusive right and responsibility to use, operate, maintain, repair, and replace the Manure Separation Facilities for the purpose of separating manure provided by Dairy to Tenant subject to Landlord's self-help remedies described in Section 17.1.7 of this Ground Lease and Section 11.6.3 of the MSA and provided that the right to use the Manure Separation Facilities will terminate if the MSA terminates for any reason;

3.6     a license to access, maintain, repair, and replace components of the Manure Separation Facilities that are located outside of the Leased Property, including the two existing pump pits, lagoon flush pump, pipelines, and related equipment and any additional pump pits that are added to the Manure Separation Facilities; and

3.7     a license to access, maintain, repair, and replace components of the temporary manure separation facilities that will be located outside of the Leased Property.

4.     <u>TERM; RENT; ADDITIONAL RENT; TAXES AND UTILITIES</u>.

4.1     <u>Rent</u>. This Lease shall be effective as of the Effective Date. As consideration for its use of the Premises as contemplated herein, commencing on the date of Commenced Construction, Tenant shall pay to Landlord annual rent in the initial amount of [Fifteen Thousand Dollars ($15,000)] per year, which amount shall automatically increase by three percent (3%) over the prior year for each year of the Term (including, without limitation, the Extension Term, if exercised) ("<u>Term Rent</u>") for the remainder of the Term. Term Rent shall be payable annually in advance on each one (1) year anniversary of the date of Commenced Construction. The Term Rent for any partial years shall be prorated for the actual number of days in that period. All payments to be made under this Lease shall be made to Landlord at the address set forth in <u>Section 14</u> herein or to such other person, firm or place as Landlord may, from time to time, designate in writing. The rent shall be increased by an amount to be negotiated by the Landlord and the Tenant in the event that the Tenant elects to install recapture facilities over the settling ponds.

    4.2    <u>Termination by Landlord; Commencement of Initial Term</u>. The period commencing on the Effective Date and terminating on the Commercial Operations Date (as identified in the notice thereof required to be delivered by Tenant under the MSA) shall be referred to as the "<u>Pre-Operations Term</u>." The "<u>Initial Term</u>" of this Lease shall be twenty (20) years commencing upon the Commercial Operations Date (the time period from the Commercial Operations Date until the end of such twenty (20) year period, the "<u>Initial Term</u>" and together with the Pre-Operations Term and the Extension Term, the "<u>Term</u>"). If Commenced Construction (as defined in the MSA) does not take place on or before the first anniversary of the Effective Date, then after such first anniversary, Landlord shall have the option to immediately terminate this Lease by providing written notice to Tenant; provided that Landlord may not terminate this Lease if by such first anniversary, the Manure Separation Facilities have been constructed and are fully operational by the dates and in accordance with Exhibit E. Additionally, if the Commercial Operations Date (as defined in the MSA) does not occur on or before the third anniversary of Commenced Construction, then after such third anniversary, Landlord shall have the option to immediately terminate this Lease by providing written notice to Tenant; provided, however, that Landlord may not terminate this Lease as provided in this Section if by such third anniversary, (1) the Manure Separation Facilities have been constructed and are fully operational by the dates and in accordance with Exhibit E and (2) the Commercial Operations Date is reached by the fourth anniversary of Commenced Construction. For the avoidance of any doubt, any and all Term Rent paid to Landlord prior to termination of this Lease by Landlord as provided in this <u>Section 4.2</u> shall be nonrefundable to Tenant.

    4.2.1    If the MSA expires, or if the MSA terminates for any reason other than Tenant's termination of the MSA for Dairy's uncured default thereunder, then this Lease will terminate concurrently with the expiration or termination of the MSA; provided, however, Tenant will have a period of thirty (30) days after any such termination to wind down Tenant's operations and to surrender and vacate the Premises, the Project and any other improvements in broom-clean condition.

    4.2.2    If the MSA is terminated by Tenant due to Dairy's default under the MSA, then (a) this Lease will remain in full force and effect (provided Tenant is not in an uncured default of its obligations under this Lease); (b) Tenant acknowledges that Landlord is not under any obligation to perform any duties or obligations of Dairy under the MSA; (c) the Manure Separation Facilities will cease being part of the Premises and Tenant shall have no rights to or control over the Manure Separation Facilities; and (d) Landlord shall have the exclusive right to enter onto and use the Premises to operate, use, maintain, repair, replace or remove the Manure Separation Facilities.

    4.3    <u>Extension Term</u>. Tenant may, at its option and subject to the conditions herein stated, extend this Lease for one (1) additional period of five (5) years (the "<u>Extension Term</u>"). In order to exercise the foregoing option, Tenant shall notify Landlord in writing by certified, registered mail or by nationally recognized courier service of its intention to exercise its option at least three hundred (300) days prior to the expiration of the Initial Term, said renewal to be upon the same terms and conditions set forth in this Lease except for Rent, which shall be as set forth in <u>Section 4.2</u> above. Tenant's right to exercise the Extension Term option shall be subject to the following conditions precedent:

    4.3.1    This Lease shall be in effect at the time notice of exercise is given and on the last day of the then-applicable Term;

    4.3.2    No uncured Event of Default (as hereinafter defined) shall exist under any provision of this Lease or the MSA at the time notice is given nor on the last day of the then-applicable Term, including, without limitation, its obligation to timely pay Rent and any and all other monetary amounts under this Lease, including but not limited to amounts due to Landlord for taking corrective actions and/or any and all amounts due to Landlord or its affiliates under the MSA, including but not limited to any penalty amounts due under Section 11.6 of the MSA; and

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

4.3.3    each and every one of Tenant's material representations and warranties, as provided in this Lease, shall be true and correct as of the time notice is given, during the period from exercise of the notice through and including the last day of the then-current Term, and as of the first day of the Extension Term; and

4.3.4    Tenant shall have not suffered a material adverse change in financial condition, as determined by Landlord in its reasonable discretion.

4.4    <u>Absolute Net Rent</u>. Except as otherwise provided in this Lease, all Rent payable hereunder shall be paid as "absolute" rent without deduction or offset. It is the intent of the parties that the Rent provided to Landlord shall be absolutely net to Landlord, and Tenant shall pay to the appropriate parties all costs, charges, taxes (to the extent provided in <u>Section 4.6</u> below), utilities (to the extent provided in <u>Section 4.7</u> below), expenses and assessments of every kind and nature incurred for, against or in connection with the Premises, but excluding the cost of any insurance carried by Landlord or its affiliates.

4.5    <u>Late Charge and Default Interest</u>. If any Rent or other payment to made under this Lease or the MSA is not paid when due or within fifteen (15) days thereafter, Tenant shall promptly pay in addition to the applicable rental installment a late charge equal to ten percent (10%) of such rental installment. All amounts payable by Tenant to Landlord under any of the provisions of this Lease, or payments made by Landlord on Tenant's behalf to avoid default or cancellation, if not timely paid shall bear interest from the date they become due until paid or reimbursed at the rate equal to the lower of eighteen percent (18%) per annum or the highest lawful rate ("<u>Default Rate</u>").

4.6    <u>Taxes</u>.

4.6.1    Commencing on the first day of the calendar year in the year Commenced Construction occurs and during the remainder of the Term, Tenant shall be responsible to pay, without abatement, deduction, or offset, and prior to delinquency, any real or personal property taxes, assessments and other charges, assessments and taxes levied upon, assessed against, and applicable to the Premises, the Improvements, and all personal property owned by Tenant and located on the Premises, the leasehold estate, or any sub-leasehold estate. Notwithstanding anything herein to the contrary, Tenant shall be solely responsible for all development and impact fees for the Project and/or the Improvements and all related construction and development expenses for the Improvements from and after the Effective Date. Tenant shall make all such payments directly to the appropriate charging or taxing authority at least ten (10) days before delinquency and before any fine, interest, or penalty shall become due or be imposed by operation of law for their nonpayment. Promptly after any payment to the taxing authorities, Tenant shall supply Landlord with proof of any such payment. If Tenant fails to make any payment of taxes or assessments as required under this Section, Landlord may pay them (including any associated interest and penalties) to protect Landlord's interest, but any such payment will not relieve Tenant from its responsibility for payment of the taxes and assessments or waive any default by Tenant under this Lease. Such payment by Landlord on Tenant's behalf shall bear interest at the Default Rate. If Tenant fails to make any payment of taxes and assessments as required under this Section, and if such failure by Tenant results in an assessment of interest or penalty by the taxing authority, then Tenant shall also be responsible for the payment of such interest or penalty.

4.6.2    Tenant, at its sole cost and expense, and subject to the approval of Landlord, shall undertake all reasonable actions necessary to cause the Leased Property to be assessed separately from any other land, improvements or equipment owned by Landlord, and Landlord shall cooperate in Tenant's efforts to establish such separate tax parcel.

4.6.3    Landlord and Tenant each shall have the right to review real estate taxes by legal proceedings, instituted and conducted at the sole expense of the party commencing such proceedings, and in case, as a result of such proceedings, or otherwise, any such taxes or assessments shall be reduced, cancelled, set aside or to any extent discharged, Tenant's final liability hereunder shall be based on the amount that shall be finally imposed or be adjudicated to be due and payable on any such disputed or contested items. If Tenant commences such a proceeding, it agrees to notify Landlord and Landlord shall reasonably cooperate with Tenant in the prosecution of such proceeding provided that Tenant shall pay all expenses of such proceeding. If Landlord commences such a proceeding, Landlord shall notify Tenant and Tenant shall reasonably cooperate in the prosecution of such proceeding provided that Landlord shall pay all expenses of such proceeding. If any such proceeding shall result in the reduction, abatement or return of any such taxes, the reasonable out-of-pocket costs of such proceeding may first be recovered by the party incurring the same out of the amount of such reduction, abatement or return.

4.7    Utilities. From and after the Effective Date and continuing for the remainder of the Term, Tenant shall be solely responsible for and promptly pay all charges for heat, water, gas, electricity, telephone or any other utility or other services such as internet furnished to the Premises, including the Manure Separation Facilities and used solely in connection with the Project and the Manure Separation Facilities. Tenant shall be solely responsible for all costs to repair and extend utility lines required for the Project. Tenant shall be solely responsible for obtaining all utility services and Landlord shall not be liable for any interruption or failure in supply of any such utility to the Premises (including, without limitation, for consequential or incidental damages, or for lost revenues). Tenant shall install independent meters to record the usage of utilities to the Premises, including the Manure Separation Facilities and the Improvements, separate from Landlord's Property. In the event that the cost of additional infrastructure or system upgrades constructed to accommodate Tenant's consumption of utilities services are assessed or otherwise charged to Landlord, Tenant shall be responsible for reimbursing Landlord for the full amount of such amounts.

4.8    Water Rights. Tenant shall be responsible for obtaining any and all water to satisfy its requirements for the Project from third party sources or by obtaining a water right to dig a new well to be located on the Leased Property (in a location to be approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed). Landlord will use reasonable efforts to assist Tenant with obtaining such water rights. In the event that, after using commercially reasonable, good faith efforts, Tenant is unable to procure a water right as stated above, Landlord agrees to allow Tenant access to Landlord's water of up to fifty (50) gallons per minute of potable water for Tenant's operations (which the parties acknowledge does not allow use of grey water) in exchange for a fair market lease rate to be agreed to by Landlord and Tenant at such time based on the cost of such water to Landlord. In such event, Tenant will be responsible for obtaining any required regulatory approvals for such a water use transfer. In the event Tenant digs a new water well on the Leased Property to be used for commercial purposes, Tenant agrees that its use of such water well shall not exceed 0.04 cfs or 2,500 gallons per day, in accordance with Idaho Code Section 42-111 and Idaho Code Section 42-227.

5.    USE. Tenant shall have the right to use the Premises for the purpose of the development, construction, operation, and maintenance of the Project including but not limited to designing, constructing, maintaining and operating the Project, and uses incidental thereto, all in accordance with and set forth in this Lease and all applicable laws, and for no other uses (the "Permitted Use"). If the MSA is terminated but this Lease stays in effect as provided herein, Permitted Use shall not include the storage of manure or other feedstock for the Project nor Byproducts from the Project.

6.    CONSTRUCTION.

    6.1    Development of Project. Subject to the terms of this Lease, Tenant shall construct the Project in accordance with the Plans (as defined below). Except as provided for in this Section 6.1, the Project shall be designed, developed, constructed, operated and maintained at Tenant's sole cost and expense. Tenant shall, at its sole cost and expense, provide all utility lines up to the perimeter of the Premises as necessary for the construction and operation of the Project. In conducting any grading, leveling and filling, Tenant shall make reasonable efforts to keep subsoil covered by topsoil similar to the condition that existed on the Effective Date. Tenant shall maintain the Premises and all Improvements thereon in a good condition, reasonable wear and tear excepted. Except for the Manure Separation Facilities, Tenant shall have title to and ownership of all Improvements. Tenant shall construct the Project in a first class, workmanlike manner consistent with other similar projects in the area, in substantial compliance with the Plans and in compliance with all applicable laws, rules and regulations, including, but not limited to, all land use and building laws, rules and regulations, environmental laws, rules and regulations, and insurance requirements and codes. Landlord shall reimburse Tenant for any expenses reasonably incurred by Tenant in constructing the Project, to the extent such expenses were caused by or attributable to the presence of Hazardous Materials or underground storage tanks on the Premises that existed on the Premises prior to the Effective Date hereof.

    6.2    Construction and Relocation of Manure Separation Facilities. Tenant shall design, construct, install, and commission the Manure Separation Facilities as provided in Exhibit E.

    6.3    Project Design. The current plans and specifications for the Project    the construction schedule for the Project, the site improvements and equipment, and the design and appearance of the exterior of the Improvements) are (or will be) attached hereto as Exhibit F (as may be amended in accordance with this Lease, the "Plans"). The Plans that are attached as Exhibit F at the execution of this Lease are deemed approved by Landlord and Tenant. Any Plans that are approved by Landlord in writing subsequent to the execution of this Lease will be attached to Exhibit F to this Lease, which approval will be governed by Exhibit G, and will not be unreasonably withheld or delayed. If there are any material changes to the Plans, Landlord and Tenant shall comply with the Project design process described on Exhibit G hereto; provided, however, that in all events no changes to the Plans shall be implemented without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed. Tenant represents and warrants to Landlord that it will construct the Project with best in class equipment so as to produce high-quality product.

        6.3.1    Following initial construction in accordance with the Plans, no alterations, additions or other improvements shall be made to the Premises, the Project or the Improvements unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

    6.4    Construction Contract; Contractor. Tenant will provide sufficient evidence reasonably satisfactory to Landlord of committed capital prior to the date of Commenced Construction. Tenant shall provide Landlord with a list of contractors and service providers anticipated to conduct work on site and will maintain this list on a real time basis throughout the construction period. Landlord shall reserve the right to establish reasonable rules and regulations applicable to each contractor to ensure that such contractor's onsite activities do not have any adverse material impact on the adjacent Dairy operation (including, without limitation, with respect to site clean-up and maintenance, noise, parking, and ingress and egress). Tenant shall inform all contractors of these rules and regulations and shall cause the contractors to strictly abide by the rules and regulations. Tenant will provide, or cause to be provided to Landlord adequate payment and performance bonds to ensure timely completion of the Project. Tenant shall insure that all construction contracts will include an acknowledgment of the applicable contractor that its lien

rights with respect to the Project extend only to Tenant's leasehold interest in the Premises and that no contractor (including subcontractors) shall have the right to place a lien on Landlord's fee interest in the Premises or Landlord's Property.

   6.4.1 Notwithstanding anything to the contrary contained in this Lease: (i) Tenant shall be obligated to source all concrete and gravel required for the construction of the Project from Landlord (or its affiliate), for appropriate consideration; (ii) Tenant shall reimburse Landlord based on an agreed upon hourly rate for demolition and prep work already performed, which was necessary to facilitate the Project and the Manure Separation Facilities, and which are evidenced by commercially reasonable documentation; and (iii) Tenant shall allow Landlord (or its affiliate) the opportunity to perform the existing (as of the date hereof) building demolition, grading and earth work for the Project site, for appropriate consideration based on an agreed upon hourly rate; provided that for all of the above in this 6.4.1, Landlord's consideration for such materials and/or services is at or below market rate and the delivery/performance schedule for such is equal to or less than the applicable market.

   6.5 <u>Permits and Governmental Approvals</u>. Except as provided in Exhibit E, it is understood and agreed that Tenant's ability to use the Premises for the development, construction, operation and maintenance of the Project is contingent upon Tenant obtaining all of the certificates, permits, zoning changes or variances, easements, rights of way, and other federal, state or local authorizations and/or approvals that may be required by any federal, state or local authority in connection with the Project (collectively, the "<u>Project Governmental Approvals</u>"). Landlord shall assist and cooperate, at no cost to Landlord, with Tenant in its effort to obtain the Project Governmental Approvals. Tenant shall operate the Project according to the Project Governmental Approvals. If the existence or operation of the Project requires Landlord or its affiliates to obtain any new Project Governmental Approval, or to amend any Project Governmental Approval currently held by Landlord or its affiliates, Tenant shall be responsible for any reasonable out-of-pocket costs incurred by Landlord or its affiliates in obtaining, amending and complying with such Project Governmental Approval. Tenant's obligations under this Lease are conditioned upon Tenant's receipt of all Project Governmental Approvals required for (i) Commenced Construction (as defined in the MSA) by the date which is one (1) years after the Effective Date, and (ii) the Commercial Operations Commencement (as defined in the MSA) by the date which is three (3) years after the date that Tenant Commenced Construction. If either of the conditions described in the preceding sentence are not satisfied by the applicable deadline, then Tenant shall have the right to terminate this Lease by delivering written notice to Landlord within ten (10) days of Commenced Construction or Commercial Operations, whichever is applicable. For the avoidance of any doubt, any and all Rent paid to Landlord prior to Tenant electing not to proceed as a result of the failure of the conditions set forth in this <u>Section 6.5</u> shall be nonrefundable to Tenant and Tenant shall operate the Manure Separation Facilities at its expense up to and for thirty (30) after Tenant's election not to proceed..

  7.  <u>REPRESENTATIONS AND WARRANTIES</u>.

   7.1 <u>By Tenant.</u>

   7.1.1 Tenant is duly formed, validly existing, and in good standing under the laws of the state of its formation and is fully qualified to do business in the State of Idaho;

   7.1.2 Tenant has the right and authority to enter into this Lease and to perform its obligations hereunder. The execution and delivery by Tenant of this Lease, and the performance of its obligations hereunder, will not result in the breach, contravention, or violation of any applicable law, Tenant's organizational documents, or any other agreement or arrangement between Tenant and any other person, entity, or party;

7.1.3    Each of the individuals whose signature is set forth at the end of this Lease have been duly authorized by all necessary entity action on the part of Tenant to execute this Lease and to bind Tenant.

7.2    By Landlord.

7.2.1    Landlord is duly formed, validly existing, and in good standing under the laws of the state of its formation and is fully qualified to do business in the State of Idaho.

7.2.2    Landlord has fee simple title to the Premises and the right and authority to enter into this Lease and to perform its obligations hereunder.

7.2.3    Subject to the written approval of Landlord's short and long-term lenders, the execution and delivery by Landlord of this Lease, and the performance of its obligations hereunder, will not result in the breach, contravention, or violation of any applicable law, Landlord's organizational documents, or other agreement or arrangement between Landlord and any other person, entity, or party.

7.2.4    Each of the individuals whose signature is set forth at the end of this Lease have been duly authorized by all necessary entity action on the part of Landlord to execute this Lease and to bind Landlord.

8.    COVENANTS.

8.1    Hazardous Materials. Tenant hereby agrees that Tenant and Tenant's officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, Tenants, subtenants, concessionaires, invitees and any other occupants of the Premises (for purpose of this Section, referred to collectively herein as "Tenant's Representatives") shall not use, generate, manufacture, refine, produce, process, store or dispose of, on, under or about the Premises or transport to or from the Premises in the future for the purpose of generating, manufacturing, refining, producing, storing, handling, transferring, processing or transporting Hazardous Materials, except in compliance with all applicable Hazardous Materials Laws. Furthermore, Tenant shall, at its own expense, procure, maintain in effect and comply with all conditions of any and all Project Governmental Approvals required for the storage or use by Tenant or any of Tenant's Representatives of Hazardous Materials on the Premises, including without limitation, discharge of appropriately treated materials or wastes into or through any sanitary sewer serving the Premises. Except as discharged into the sanitary sewer or otherwise removed from the Premises in strict accordance and conformity with all applicable Hazardous Materials Laws, Tenant shall cause any and all Hazardous Materials removed from the Premises solely by duly licensed haulers to duly licensed facilities for final disposal of such materials and wastes.

8.2    Applicable Laws. Tenant shall use the Premises, and construct, develop, operate and maintain the Project, in accordance with (i) all applicable laws, rules and regulations, (ii) good industry practice, and (iii) in accordance with the terms of this Lease (including, but not limited to, all federal, state and local laws, rules and regulations concerning Hazardous Materials) and agrees to reasonably cooperate with Landlord regarding any compliance required by Landlord in respect to its use of the Premises.

8.3    Maintenance and Operations. Tenant shall maintain and operate the Project and the Manure Separation Facilities, including the Temporary Facilities as provided in the Exclusivity Agreement dated July 12, 2021 between the parties, in good condition and repair, consistent with the overall appearance and quality of maintenance of the adjacent Dairy operation, and in compliance with all applicable laws, rules and regulations, including the land use and building laws of local governmental authorities, environmental laws, rules and regulations, and insurance requirements and codes. Tenant

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

acknowledges and agrees that it is very important to the overall Dairy operation and brand that the exterior of the Project, the Manure Separation Facilities, and the Leased Premises be maintained in a manner consistent with the maintenance of the adjacent Dairy operation (for example, and without limitation and by way of illustration only, graveled roadways must be appropriately graded, graveled and maintained, weeds and tumbleweeds must be controlled and cleared, and exterior surfaces maintained in accordance with the requirements of this Lease). In the event that Tenant fails to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA, Landlord may take such action as Landlord deems reasonably necessary to cause the Project, Manure Separation Facilities, and/or Leased Premises to be so maintained and Tenant shall promptly reimburse Landlord for Landlord's reasonable costs and expenses in connection therewith; provided, however, so long as such delay could not reasonably be expected to have a material adverse effect on the operations of the Dairy.

8.4    Liens. Landlord shall not be liable for any work, labor or materials furnished or to be furnished upon credit to or for Tenant or anyone claiming under the Tenant, and no mechanic's or other liens shall attach to or affect the estate or interest of the Landlord in and to the Premises. Tenant shall not do or suffer anything to be done whereby Landlord's Property or the Premises or any part thereof may be encumbered by any mechanic's liens or other liens. If any mechanic's lien, notice or claim thereof or any other lien is filed against Landlord's Property, the Premises or any part thereof for work, labor, or materials furnished or to be furnished to Tenant, or anyone claiming under Tenant, Tenant shall within sixty (60) days from the date of filing, cause the same to be withdrawn, discharged or removed by deposit, bonding proceedings or otherwise. If Tenant fails to do so, Landlord may do so and may pay any judgments recovered by any such lienor. Tenant shall immediately reimburse Landlord for all amounts paid pursuant to this paragraph, which amounts shall constitute an additional obligation of Tenant under this Lease together with interest from the date of expenditure at the Default Rate. Tenant understands that the removal of liens is critical to Landlord's financing and any liens will cause the Landlord to suffer significant damages, including incurring default interest rates on Landlord's loans.

8.5    Entry by Third Parties. No employee, agent, visitor, or representative of Tenant, or any other person affiliated with the Project, other than principals of Tenant or persons employed or engaged by Tenant or its affiliates for the purpose of running the day-to-day operations of the Project, may enter Landlord's Property without prior written consent of Landlord, which may be given only upon request at least two (2) business days in advance. In the event Tenant receives notice that any regulatory or government officials request entry to Landlord's Property or provide notice of intent to enter Landlord's Property, Tenant will provide prompt notice to Landlord of the same.

8.6    Intentionally Deleted.

8.7    Permitting and Regulations.

8.7.1    Except as authorized by an applicable Project Governmental Approval or otherwise in compliance with all Hazardous Materials Laws, Tenant shall not store fuel or any other substance, including (without limitation) solid or hazardous waste, on the Premises without prior written consent of Landlord. Without limiting the foregoing and for the avoidance of doubt, Tenant may store onsite biogas necessary for the operation of the Project as well as feedstocks and other products of the Project subject to and in accordance with all applicable laws, rules and regulations. Tenant shall not take any action which would require a Spill Prevention, Containment and Countermeasures Plan under Environmental Protection Agency ("EPA") regulations or a Resource Conservation and Recovery Act Permit to be obtained from the Department of Environmental Quality ("DEQ"), except as authorized by an applicable Project Governmental Approval or otherwise in compliance with all Hazardous Materials Laws.

8.7.2    The Project shall not accept any substance except as provided for in the MSA. Tenant shall take no action which would result in the Project being regulated as a facility related to the generation, transport, or disposal of solid or hazardous waste under applicable laws.

8.7.3    The Parties anticipate that all effluent or other substance from the Project will be stored and used at the Dairy (as defined in the MSA) located on Landlord's Property. Tenant will not transport or dispose any effluent or other substance from the Project off-site without prior written approval from Landlord. If Tenant does engage in off-site transport or disposal, Tenant or the third-party recipient of the effluent or other substance must first obtain and provide to Landlord all required Project Governmental Approvals at no cost to Landlord or its affiliates.

8.8    No Adverse Impact on Dairy. Tenant acknowledges and agrees that the Premises and the Project will be located within a larger dairy and farming operation, and accordingly Tenant covenants and agrees to cooperate with Landlord at all times to ensure that the operation and use of the Project does not result in any material adverse effect upon the Dairy.  Without limiting the foregoing, any use by Tenant of the Access Easements shall not interfere with Landlord's dairy and farming operations.

8.9    Fencing. Landlord and Tenant acknowledge and agree that no fencing around the Leased Property shall be initially installed or required; provided, however, that Landlord may require Tenant to install fencing and/or other visual barrier(s) around all or any part of the Leased Property that Landlord determines need to be screened in order to maintain the high quality appearance of the adjacent Dairy, so long as such visual barrier(s) do not materially interfere with Tenant's operations or materially increase Tenant's costs. Tenant shall be responsible for the cost of installing such fencing and/or other visual barriers, but only to the extent the same does not exceed the cost of a six (6) foot-high chain-link fence with view guard around the entire perimeter of the Leased Property (and Landlord shall be responsible for any costs associated with installing any fencing and/or other visual barriers beyond that for which Tenant is responsible pursuant to this sentence). Tenant shall maintain any such fencing and/or visual barriers(s) at Tenant's sole cost and expense.

9.    INDEMNIFICATION AND MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES.

9.1    Indemnification. Tenant shall indemnify and hold harmless Landlord against any claim of liability or loss from personal injury or property damage in connection with Tenant's, its employee's, agent's, contractor's or consultant's (each, individually, a "Tenant Party" and collectively, the "Tenant Parties") use of the Premises or Landlord's Property (including but not limited to any damage resulting from Hazardous Materials brought onto the Premises or Landlord's Property by any Tenant Party, any environmental condition caused by a Tenant Party on the Premises or Landlord's Property, or any enforcement action (whether administrative or judicial) or third-party legal action taken as a result of the Project) except to the extent caused by the negligence or willful misconduct of Landlord, its employees, agents, contractors and consultants (each, individually, a "Landlord Party" and collectively, the "Landlord Parties"); provided, however, the foregoing indemnity shall not apply with respect to any Hazardous Materials that are transferred from Landlord to Tenant pursuant to the MSA, which shall address the allocation of liability with respect to such transferred Hazardous Materials between Landlord and Tenant. Landlord shall indemnify and hold harmless Tenant against any claim of liability or loss from personal injury or property damage in connection with (a) a Landlord Party's use of the Leased Property (including but not limited to any damage to the Leased Property or Tenant's Improvements resulting from Hazardous Materials brought onto the Leased Property by a Landlord Party) or the remainder of Landlord's Property except to the extent caused by the negligence or willful misconduct of the Tenant Parties, or (b) any pre-existing condition located on or about the Premises or Landlord's Property.

9.2    MUTUAL    WAIVER    OF    CONSEQUENTIAL    DAMAGES.
NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY,
NEITHER PARTY WILL BE LIABLE BY REASON OF A CLAIM BROUGHT ON THE BASIS OF
THIS AGREEMENT, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, TORT,
NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY, FOR ANY
SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL, EXEMPLARY, OR CONSEQUENTIAL
DAMAGES OF ANY KIND OR CHARACTER.

10.    <u>INSURANCE</u>.

10.1    <u>Comprehensive Liability Insurance</u>. Tenant shall, at its sole cost and expense, at
all times during the Term, maintain in force, for the joint benefit of Tenant (as insured) and Landlord and
any holder of a mortgage on the Premises (as additional insureds), a commercial general liability insurance
policy or its equivalent issued by a carrier reasonably satisfactory to Landlord and authorized to do business
the State of Idaho with an A.M. Best's Insurance Guide Rating of A- (VII) or better, by the terms of which
Landlord and Tenant, and any holder of a mortgage on the Premises, are named as insureds or additional
insureds, as the case may be, and are indemnified against liability for damage or injury to the property or
person (including death) of any invitees of Tenant or any other person entering upon or using the Premises.
Such insurance policy or policies shall be maintained in the minimum amount of $1,000,000.00 per
occurrence for damage to property and for bodily injury or death as to any person, with a deductible not
exceeding $50,000.00. Landlord reserves the right to require reasonable increases in the limits of coverage
from time to time during the Term; and the requested increase will be deemed reasonable if consistent with
commercially reasonable practices for similar projects in the same geographic area. Such insurance policy
or policies shall be stated to be primary and noncontributing with any insurance which may be carried by
Landlord. Evidence of said insurance shall be delivered to Landlord on the Effective Date, effective from
and after the Effective Date, and evidence of renewal and proof of payment of premium therefor shall be
delivered to Landlord not less than fifteen (15) days within the renewal date of any such insurance policies
during the Term. Such insurance shall be cancelable only after thirty (30) days' prior written notice to
Landlord and Tenant, except ten (10) days' prior notice for nonpayment of premium, however in the event
insurers are not willing or able to provide such notice, then this responsibility shall be borne by Tenant. In
the event Tenant fails to timely pay any premium when due, Landlord shall be authorized, but not obligated,
to do so, and may charge all costs and expenses thereof, including the premium and interest at the maximum
rate allowed by law, to Tenant, to be paid by Tenant as Additional Rent hereunder (together with interest
at the Default Rate).

10.2    <u>Fire and Extended Coverage Property Insurance</u>. Tenant shall, at its sole cost and
expense and at all times during the Term, maintain in force, to the extent there is an insurable exposure, a
policy of insurance against loss or damage by fire and lightning, and such other perils as are covered under
a "Cause of Loss-Special Form" policy or equivalent together with the broadest form of the "extended
coverage" or "all risk" endorsements, or equivalent, available in Idaho including, but not limited to, damage
by wind storm, explosion, smoke, sprinkler leakage, vandalism, malicious mischief and such other risks as
are normally covered by such endorsements. The insurance shall be carried and maintained to the extent of
full (actual) replacement cost of the Project, in such amounts as may be reasonably acceptable to Tenant's
financing parties; provided however, that during the period of construction, Tenant may provide or cause
to be provided in lieu thereof builders' risk or similar type of insurance to the full replacement costs thereof.
Such insurance policy or policies shall be stated to be primary and noncontributing with any insurance
which may be carried by Landlord. The deductible for such insurance shall not exceed $250,000.00. To the
extent there is an insurable exposure, evidence of said insurance, together with proof of payment of the
premium thereof, shall be delivered to Landlord on the Effective Date, to be effective from and after the
Effective Date. Evidence of renewal and proof of payment of premium therefor shall be delivered to
Landlord not less than fifteen (15) days within the renewal date of any such insurance policies during the

Term. Such insurance shall be cancelable only after thirty (30) days' prior written notice to Landlord and Tenant, except ten (10) days' prior notice for nonpayment of premium., however in the event insurers are not willing or able to provide such notice, then this responsibility shall be borne by Tenant. In the event Tenant fails to timely pay any premium when due or otherwise fail to keep the insurance required under this Lease in full force and effect, Landlord shall be authorized, but not obligated, to do so, and may charge all costs and expenses thereof, including the premium and interest at the Default Rate, to Tenant, to be paid by Tenant as Additional Rent hereunder. Landlord shall have no obligation to obtain insurance for the benefit of Tenant. In the event of a casualty event affecting the Manure Separation Facilities, (i) Tenant shall be obligated to rebuild the Manure Separation Facilities to the same or better standard as it existed prior to such casualty event; and (ii) any insurance proceeds received by Tenant in connection with such casualty event shall first be used to rebuild the Manure Separation Facilities and all other components of the Project that are necessary for Dairy's normal operations, as reasonably determined by Landlord; provided that if this is not possible, Tenant shall obtain a separate insurance policy on the Manure Separation Facilities to be used exclusively to repair and/or rebuild the Manure Separation Facilities.

10.3    Waiver of Subrogation. Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by any insurance to be carried on the Project, the Premises or in connection with any improvements on or activities conducted on the Premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof, and evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to invalidate or increase the cost of such insurance coverage (provided that in the case of increased cost, the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost, thereby keeping such release and waiver in full force and effect).

11.    REMOVAL UPON TERMINATION. No later than two hundred seventy (270) days prior to the expiration of the Term, or sixty days (60) after termination of this Lease for Tenants uncured default, or within 30 days of Tenants election to terminate due to the failure of Conditions Precedent in the MSA, Landlord shall elect, by giving written notice to Tenant (the "Removal Notice") whether the Project (or any portion thereof) is to remain on or be removed from the Premises. In case of removal, and within thirty (30) days following Tenant's receipt of the Removal Notice, Tenant will commit $500,000 in the form of bond or escrow account or will obtain a commercially reasonable letter of credit from a credit-worthy institution or some other form of security reasonably acceptable to Landlord to facilitate removal. If Landlord elects to have the Project remain at the Premises upon termination, Tenant agrees that the Project shall become the sole property of Landlord and Tenant agrees (i) to execute and deliver such documents as are reasonably necessary to confirm title in the Project in Landlord's name and (ii) to assign all Project Governmental Approvals, entitlements, approvals and/or authorizations to Landlord, to the extent assignable, so as to allow Landlord to operate the Project. Notwithstanding the foregoing, if either Tenant or Landlord terminates this Lease, Landlord will give prompt written notice to Tenant whether the Project (or any portion thereof) is to remain on or be removed from the Premises, and Tenant shall remove any portion of the Project from the Premises that Landlord so elects to be removed within thirty (30) days of such written notice from Landlord. This Section 11 shall survive termination of this Lease.

12.    QUIET ENJOYMENT; ENTRY BY LANDLORD.

12.1    Landlord covenants that, provided Tenant is not in default under this Lease beyond applicable cure periods, Tenant shall peaceably and quietly have, hold and enjoy the Premises. Landlord shall deliver full and actual possession of the Premises to Tenant upon the Effective Date of this Lease subject to the provisions of this Section.

GROUND LEASE AGREEMENT – PAGE 13
15736902_12
HB: 4848-4611-1439.13

12.2    Given the vital nature of the Manure Separation Facilities to the operation of the Dairy, Landlord reserves the right to enter the Premises at any time for any purpose Landlord reasonably deems necessary for the operation of the Dairy, in addition to those allowed in the MSA, provided however that . (a) representatives of Tenant shall have the right to accompany Landlord during any such entry; and (b) Landlord shall comply with any reasonable safety procedures imposed by Tenant.

13.    ASSIGNMENT; SUBLEASE. Except as provided in this Section 13, Tenant shall not sell, assign or transfer this Lease, in whole or in part, directly or indirectly or sublet all or a portion of the Premises to any third party whether voluntary or by operation of law, including by way of sale of assets, membership interests or control, merger, consolidation, reorganization, change of control or similar transaction without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall be entitled, with Landlord's review and written approval, to assign this Lease and its rights herein to a Qualified Assignee (as defined below); provided that such Qualified Assignee agrees in writing to assume and be bound by all of Tenant's rights and obligations hereunder. Landlord shall be permitted to sell, assign or transfer this Lease, in whole or in part without the consent of Tenant. Tenant shall provide written notice to Landlord of any such subleases or rights of entry. All such subleases or rights of entry shall be subject and subordinate to this Lease, and all such sublessees and holders of any rights of entry shall strictly comply with all requirements of this Lease. "Qualified Assignee", including an affiliate of Tenant, means an entity that (i) has a net worth equal to or greater than Tenant's net worth at the time of the sale, assignment, transfer or sublease and sufficient to properly operate and maintain the Improvements; and (ii) has significant experience successfully owning and operating (either itself or through affiliated entities) similar energy and/or gas projects in the United States.

14.    NOTICES. Any notice, demand or other communications under this Lease required or permitted to be given hereunder, unless expressly provided otherwise, shall be in writing, properly addressed, postage and delivery charges pre-paid (as applicable), and delivered by: (a) hand-delivery; (b) certified or registered mail, (return receipt requested; (c) nationally recognized overnight courier; or (d) email to the appropriate address as shown below or as otherwise designated from time to time by providing notice of other addresses. Any notice or other communications given in accordance herewith shall be deemed given on the earlier of actual delivery or attempted delivery; provided that notice given in accordance with this Section 14 but received on any day other than a business day or after 5:00 p.m. in the place of receipt, will be deemed given on the next business day in that place. Notices delivered by email shall not be considered to be delivered unless (i) the sender has an email confirmation receipt (either from the recipient or the recipient's email server); and (ii) the notice is concurrently sent by another means allowed under this Section 14. Notices may be given by counsel on behalf of such counsel's client.

|  |  |
|---|---|
| to Landlord: | East Valley Cattle, LLC |
|  | Attention: Bill Millenkamp |
|  | 471 N. 300 W. |
|  | Jerome, Idaho 83338 |
|  | Telephone: (208) 731-5518 |
|  | Email: bill@millenkamp.com |
|  |  |
| With a copy to: | Givens Pursley LLP |
|  | Attention: Ed Miller |
|  | 601 W. Bannock Street |
|  | Boise, Idaho 83702 |
|  | Telephone: (208) 388-1200 |
|  | Email: edmiller@givenspursley.com |
|  |  |
| to Tenant: | East Valley Development, LLC |

Attention: General Counsel
4675 MacArthur Court, Suite 800
Newport Beach, CA 92660

Telephone: 949-437-1000
Email: nate.jensen@cleanenergyfuels.com

With a copy to:        Intentionally left blank

15.    LANDLORD'S FINANCING; SUBORDINATION. This Lease, any allowed subleases, and the MSA shall be subject and subordinate to any financing now existing or hereafter placed upon Landlord's Property, or any portion thereof, by Landlord, and to any and all advances to be made thereunder and to interest thereon and all modifications thereof (each, a "Mortgage"). The preceding provision shall be self-operative, but shall be conditioned on Tenant's receipt of a non-disturbance agreement from the holder of a Mortgage, in a form acceptable to the holder, stating that such holder shall not disturb or interrupt Tenant's continued enjoyment of the Premises, absent a breach of the Lease by Tenant beyond any applicable cure period (and subject to the rights of any Tenant's Lender pursuant to Section 16). Tenant shall, within fifteen (15) days of written notice by Landlord or Landlord's Lender, from time-to-time, execute and deliver a subordination and non-disturbance agreement required by the holder of a Mortgage, but only if any such subordination agreement provides that so long as Tenant is not in default under this Lease beyond any applicable cure period (and subject to the rights of any Tenant's Lender pursuant to Section 16), Tenant shall have the continued enjoyment of the Premises free from any disturbance or interruption by any holder of a Mortgage or any purchaser at a foreclosure or private sale of Landlord's Property. Tenant's failure to provide the agreement within the time frame shall be a default under this lease.

16.    LEASEHOLD MORTGAGE. Tenant shall have the right to encumber all or any portion of its interest in this Lease, including the leasehold estate and all appurtenant rights thereto (collectively, the "Leasehold Interest") by deed of trust, mortgage, assignment of leases and rents, assignment, security agreement or other security interest (a "Leasehold Mortgage"); provided that any such conveyance or pledge of Tenant's interest shall be expressly subject and subordinate to the covenants, conditions and restrictions set forth in this Lease, and provided that such conveyance or pledge does not create any encumbrance of any kind on Landlord's Property other than Tenant's leasehold estate therein. Tenant covenants and agrees to pay the indebtedness secured by any Leasehold Mortgage entered into in compliance with the provisions hereof, when the same shall become due and payable, and to perform, when such performance is required, all obligations of the mortgagor thereunder. Tenant further agrees not to suffer or permit any default to occur and continue under the Leasehold Mortgage beyond any applicable cure period. The Leasehold Mortgage shall specify that the indebtedness is that of Tenant only and is not the indebtedness of Landlord and that the lien of the Leasehold Mortgage is limited to Tenant's Leasehold Interest. Said Leasehold Mortgage must, by its own terms, have a stated maturity date which is prior to the expiration of the Term, and Tenant covenants that it will be so paid and that the Leasehold Interest will be released from such lien prior to the expiration of the Term. Tenant shall cause a true, complete, and correct copy of the original of each Leasehold Mortgage, together with written notice containing the name and address of the holder thereunder ("Tenant's Lender") to be delivered to Landlord within ten (10) days of Tenant's execution and delivery of such Leasehold Mortgage. Tenant shall, from time to time, when and as requested by Landlord, deliver to Landlord a certificate from Tenant's Lender certifying as to the amount of the unpaid principal balance under the Leasehold Mortgage, together with accrued interest thereon, and, to the actual knowledge of Tenant's Lender, as to the existence or absence of defaults thereunder.

17.    DEFAULT.

17.1    Events of Default. Each of the following events shall constitute a default by Tenant, a breach of this Lease, and an "Event of Default" hereunder:

17.1.1    Tenant shall default in making the due and punctual payment of any installment of Rent, or any other impositions or monetary obligations of any nature whatsoever payable by Tenant hereunder when and as the same shall become due and payable;

17.1.2    Tenant shall be in material default in the performance or compliance with any of the agreements, terms, covenants or conditions in this Lease, or Tenant shall breach any of the representations or warranties under this Lease;

17.1.3    Tenant shall be in default beyond any applicable cure period under any Leasehold Mortgage or the MSA;

17.1.4    Abandonment of the Leased Property, or the Improvements now or hereafter constructed thereon, where such abandonment continues for a period of more than thirty (30) days in any three hundred and sixty-five day period (365).

17.1.5    The Project experiences Outages, as defined in Section 2.6 of the MSA for more than thirty (30) days in any three hundred sixty-five (365) day period (except in connection with repairs, construction or a force majeure event) ("Maximum Outages"), provided however that: (i) exceeding Maximum Outages shall not be an event of default if Tenant pays Landlord 5% of Dairy Attributable Gross Revenue plus four thousand dollars ($4,000) per day for each Outage which exceeds the Maximum Outages; and (ii) if the Project Cessation was caused by Landlord's breach of this Lease, or the Dairy's cessation of the Farm Business (as defined in the MSA), then the aforementioned thirty (30) days in any three hundred and sixty-five (365) will not commence until Landlord cures such breach and/or Dairy resumes the Farm Business;

17.1.6    The appointment of a receiver to take possession of the Premises or the Project for any reason including but not limited to assignment for benefit of creditors or voluntary or involuntary bankruptcy proceedings, unless such receivership is dismissed, discharged vacated or terminated within sixty (60) days after appointment of a receiver;

17.1.7    An assignment by Tenant for the benefit of creditors, or the filing of a voluntary or involuntary petition by or against Tenant under any law for the purpose of adjudicating Tenant bankrupt; or for extending time for payment, adjustment or satisfaction of Tenant's liabilities; or reorganization, dissolution or arrangement on account of, or to prevent bankruptcy or insolvency; unless, in case of such that are involuntary on Tenant's part, the assignment, proceedings, and all consequent orders, adjudications, custodies and supervisions are dismissed, vacated or terminated within sixty (60) days after the assignment, filing or other initial event.

If the alleged default is monetary in nature such as (but not limited to) nonpayment of Rent, taxes or any other sums required to be paid by Tenant, Landlord shall deliver written notice to Tenant of the default and Tenant will have five (5) days after the receipt of such written notice to cure the default. As to non-monetary defaults, Tenant shall have up to thirty (30) days after written notice is given by Landlord specifying the nature of the default to cure the default; provided, however, that if after exercise of due diligence and its best efforts to cure such non-monetary default Tenant is unable to do so within such thirty (30)) day period, then the curing period shall be extended for such reasonable time as may be reasonably approved by Landlord for curing such default, so long as Tenant continues to diligently prosecute to completion the

curing of the default, up to a maximum of ninety (90) days. As used herein, non-monetary default shall include, without limitation, a breach of any covenant of Tenant under this Lease, Tenant's failure to perform as required under this Lease, and a breach of any warranty, representation or other agreement of Tenant under this Lease. In all such events, to the extent that any such Tenant Default materially and adversely affects the operations of the Dairy, Landlord shall have the right to cure any such Tenant Default by engaging in reasonable self-help remedies, or to take any other action with respect to the Project or the Manure Separation Facilities which is reasonably necessary or desirable for Landlord to ensure the operation of the Dairy in the ordinary course of business, and Landlord shall be entitled to recover from Tenant any reasonable costs and expenses incurred in connection therewith; provided, however, so long as such delay could not reasonably be expected to have a material adverse effect on the operations of the Dairy, Landlord shall allow Tenant ten (10) days after written notice from Landlord to cure such Tenant Default before Landlord exercises its self-help remedies.

      17.2    <u>Remedies</u>. If any default by Tenant shall continue uncured upon expiration of the applicable curing period, then, subject to any applicable cure rights of any Tenant's Lender pursuant to <u>Section 16</u>, Landlord may exercise any one or all of the following remedies in addition to all other rights and remedies provided by law or equity, from time to time, to which Landlord may resort cumulatively or in the alternative:

      17.2.1    <u>Termination</u>**.** Landlord may, at Landlord's election, and without prior written notice except as otherwise required in this Lease, terminate this Lease. All of Tenant's rights under this Lease shall terminate upon termination of this Lease. Promptly after any such termination, Tenant shall surrender and vacate the Premises, the Project and any other improvements in broom-clean condition, and Landlord may re-enter and take possession of the Premises, the Project and all other improvement, subject to Landlord's option to elect to require Tenant to remove the Project in accordance with <u>Section 11</u>. Termination under this paragraph shall not relieve Tenant from the payment of any sum then due to Landlord, or from any claim for damages previously accrued, or then accruing, against Tenant.

      17.2.2    <u>Re-entry Without Termination</u>. Landlord may, at Landlord's election, re-enter the Premises and the Project, and without terminating this Lease, at any time, relet the Premises and the Project, or any part(s) of them, for the account, and in the name of Tenant or otherwise, all upon commercially reasonable rates and terms determined by Landlord, without hereby obligating Landlord to relet the Premises and the Project or make an effort to relet either or both of them in whole or in part, at any time. Any reletting may be for the remainder of the Term, or for any longer or shorter period. Landlord may execute any leases made under this provision either in Landlord's name or in Tenant's name, and Landlord shall be entitled to all rents from the use, operation or occupancy of the Premises, the Project, or both. Landlord shall have the further right, at Landlord's option, to make such reasonable and necessary alterations, repairs, replacements and/or restorations which shall not operate or be construed to release Tenant from liability hereunder. Tenant shall nevertheless pay to Landlord on the due dates specified in this Lease the equivalent of all sums required of Tenant under this Lease, plus Landlord's expenses. Landlord shall submit an invoice and supporting documentation to Tenant for the actual, reasonable out-of-pocket costs incurred by Landlord to cure such default. No act by or on behalf of Landlord under this provision shall constitute a termination of this Lease unless Landlord gives Tenant written notice of termination.

      17.2.3    <u>Tenant's Personal Property</u>. Landlord may, at Landlord's election, use Tenant's personal property and trade fixtures or any of such property and fixtures without compensation and without liability for use or damage, or store them for the account and at the cost of Tenant or dispose of such personal property without accountability to Tenant. The election of one remedy for any one item shall not foreclose an election of any other remedy for another item, or for the same item at a later time.

17.2.4  <u>Appointment of Receiver</u>. Landlord may, if Landlord elects to file suit to enforce this Lease and/or protect its rights hereunder, in addition to the other remedies provided in this Lease and by law, have the appointment of a receiver of the Premises and the Project.

17.2.5  <u>Operation of Project</u>. Notwithstanding anything to the contrary herein, in the event of a default by Tenant, Landlord shall have the right (but not the obligation) to take over the operation of the Project, and Tenant will cooperate to facilitate Landlord's operation thereof.

17.3  <u>Landlord Default; Effect</u>. In the event of a material default by Landlord, Landlord shall have up to thirty (30) days after written notice is given by Tenant specifying the nature of the default to cure the default; provided, however, that if after exercise of Landlord's diligent and best efforts to cure such default Landlord is unable to do so within such thirty (30)) day period, then the curing period shall be extended for such reasonable time as may be reasonably approved by Tenant for curing such default, so long as Landlord continues to diligently prosecute to completion the curing of the default, up to a maximum of ninety (90) days. In all such events, to the extent that any such Landlord default materially and adversely affects the operations of the Project, Tenant shall have the right to cure any such Landlord default by engaging in reasonable self-help remedies, or to take any other action with respect to the Project which is reasonably necessary or desirable for Tenant to ensure the operation of the Project in the ordinary course of business, and Tenant shall be entitled to recover from Landlord any reasonable costs and expenses incurred in connection therewith; provided, however, so long as such delay could not reasonably be expected to have a material adverse effect on the operations of the Project, Tenant shall allow Landlord ten (10) days after written notice from Tenant to cure such Landlord default before Tenant exercises its self-help remedies. Further, in the event of an uncured default, Tenant may, at its option, without waiving any claim for damages for breach of the Lease, terminate this Lease by written notice to Landlord prior to Landlord's cure of the breach or Tenant's exercise of any self-help remedies with respect to the uncured breach.

18.   <u>HOLDOVER</u>. If Tenant remains in possession of the Premises or any part thereof after the expiration or sooner termination of the Term, Tenant shall become a tenant at sufferance and shall pay Landlord a rent equal to twice the amount of Rent paid by Tenant in the last year prior to the expiration or termination of the Lease, which shall be payable on a per diem basis, not to exceed the amount permitted to be charged by a Landlord under applicable Idaho law. Notwithstanding that Landlord may allow Tenant to continue in possession after the expiration or sooner termination of this Lease, neither that nor the provisions of this Section shall constitute a waiver of any of Landlord's rights under this Section or this Lease. Further, notwithstanding the payment of Rent by Tenant and acceptance thereof by Landlord as provided in this section, Tenant shall be in continuing default of this Lease at all times and during all periods in which Tenant is a holdover tenant.

19.   <u>CASUALTY</u>.

19.1  <u>Tenant's Duty to Restore Premises</u>. At any time during the Term, and so long as no Event of Default has occurred, if any portion of the Project now or hereafter located on the Premises are damaged and/or destroyed in whole or in part by fire, theft, the elements, or any other cause, this Lease shall continue in full force and effect, and Tenant, at its sole cost and expense, shall repair and restore the damaged or destroyed Project according to the original plan hereof or according to such modified plans as shall be reasonably approved in writing by Landlord, whether or not there are sufficient insurance proceeds to cover the repair and restoration expenses. The work of repair and restoration shall be commenced by Tenant as soon as reasonably possible. Tenant shall proceed diligently to commence repairs and restoration. Once construction has commenced, Tenant shall proceed diligently thereafter to complete the construction or repair, and shall complete the same no later than three hundred sixty five (365) days after the

commencement of such construction or repair, subject to reasonable delays due to force majeure events or events beyond the reasonable control of Tenant.

19.2    Option to Terminate Lease for Destruction. Notwithstanding Section 19.1 above, in the event that during the last one hundred eighty (180) days of the Term, the Project is damaged or destroyed by fire, theft or any other casualty, through no fault of Tenant, so that it cannot be repaired and restored as required by Section 19.1 of this Lease at a cost equal to or less than thirty-five percent (35%) of the cost to replace the Project, and if Tenant has not yet timely exercised its option to extend the Term, then Tenant and Landlord shall each have the option of terminating this Lease on the last calendar day of any month during the last year of the Lease Term by giving to Landlord or Tenant, as the case may be, at least sixty (60) days' prior written notice of Tenant's or Landlord's intent to do so; and if Tenant elects to terminate this Lease, then Tenant shall also be required to remove, at Tenant's own cost and expense, all debris and remains of the damaged improvements from the Premises (provided, however, that in such event, the proceeds of any insurance policy required to be carried by Tenant hereunder and relating to the replacement of the Manure Separation Facilities shall be paid over to Landlord). In the event, however, that Tenant has duly exercised a renewal option in accordance with the conditions of this Lease; Tenant has commenced to repair and restore in a timely manner the Project and any other damaged improvements in accordance with the terms of this Lease; Tenant has demonstrated to the reasonable satisfaction of Landlord sufficient funds and insurance proceeds to complete the work; and no Event of Default has occurred which remains uncured, Landlord agrees not to terminate this Lease. Any failure by Tenant to timely and properly repair and restore the Project and Premises, once Tenant has elected to do so, shall constitute an Event of Default hereunder.

20.    CONDEMNATION. If the entire Premises is taken or so transferred, this Lease and all of the right, title and interest thereunder shall cease, terminate and be of no further force or effect on the date title to such land so taken or transferred vests in the condemning authority. In the event of the taking or transfer of only a part of the Premises, leaving the remainder of the Premises in such location, or in such form, shape or reduced size as to be not effectively and practicably usable in the good faith opinion of Tenant for the operation thereon of Tenant's business, and if Landlord agrees with Tenant's determination, which consent will not be unreasonably withheld, this Lease and all right, title and interest thereunder may be terminated by Tenant giving, within sixty (60) days of the occurrence of such event, thirty (30) days' notice to Landlord of Tenant's election to terminate. In the event of such taking or transfer of only a part of the Premises leaving the remainder of the Premises in such location and in such form, shape or size as to be used effectively and practicably in the good faith opinion of Tenant for the purpose of operation thereon of Tenant's business, this Lease shall terminate only as to the portion of the Premises so taken or transferred as of the date title to such portion vests in the condemning authority, and shall continue in full force and effect as to the portion of the Premises not so taken or transferred. From and after such date the Rent required to be paid by Tenant shall be reduced in proportion to which the square footage of the area so taken or transferred bears to the total square footage of the Premises prior to the taking or transfer. If title and possession of a portion of the Premises is taken under the power of eminent domain, and the Lease continues as to the portion remaining, all compensation and damages ("Compensation") payable to Tenant by reason of any improvements so taken shall be available to be used, to the extent reasonably needed, by Tenant in replacing any improvements so taken with improvements of the same type as the remaining portion of the Premises. All plans and specifications for such replacement and improvements shall be subject to Landlord's reasonable prior approval and all such repairs shall be in compliance with all then existing codes, zoning ordinances, rules and regulations governing the Premises. A voluntary conveyance by Landlord to a public utility, agency or authority under threat of a taking under the power of eminent domain in lieu of formal proceedings shall be deemed a taking within the meaning of this Section.

21.    FORCE MAJEURE. A Party's obligations under this Lease (other than a party's obligation to pay money hereunder) shall be suspended and excused while the Party is hindered or prevented, in whole

or in part, from complying with any term, covenant, condition or provision of this Lease by: strikes, lockouts or other labor disturbances; delays in transportation, inability to secure labor or materials in the open market; acts of God or the elements (including, without limitation, fire, flood, washout, perils at sea, lightning, earthquake or accidents); cyber or ransomware attacks, conditions arising out of or attributable to acts of war, civil disturbances or riots; the effects of any law, statute, decree, ordinance, rule or regulation; the failure of any governmental authority to issue any permit, entitlement, approval or authorization within a reasonable time after an application for the same has been submitted; the coronavirus disease (COVID-19) or other pandemics, epidemics, plagues, infectious disease or viral outbreaks or other public health crisis, including measures of any government authority taken in response to such events such as quarantine or other employee restrictions, and any labor shortages, delays or disruptions in supply chains or the inability or unavailability of personnel to perform or provide services as a result of any such events or governmental measures; or any other matter or condition beyond the reasonable control of Tenant, whether or not similar to the matters or conditions in this Lease specifically enumerated.

22.     SURVIVAL. The provisions of the Lease relating to indemnification from one Party to the other Party shall survive any termination or expiration of this Lease. Additionally, any provisions of this Lease which require performance subsequent to the termination or expiration of this Lease shall also survive such termination or expiration.

23.     CAPTIONS AND CONSTRUCTION. The captions contained in this Lease are inserted for convenience only and are not intended to be part of this Lease. They shall not affect or be utilized in the construction or interpretation of this Lease. Where the context requires, all singular words in this Lease shall be construed to include their plural and all words of neuter gender shall be construed to include the masculine and feminine forms of such words. Notwithstanding the fact that this Lease has been prepared by one of the Parties, all of the Parties confirm that they and their respective counsel have reviewed, negotiated and adopted this Lease as the joint agreement and understanding of the Parties. This Lease is to be construed as a whole and any presumption that ambiguities are to be resolved against the primary drafting party shall not apply. This Lease is intended to be interpreted in conjunction with, and consistently with, the MSA; provided, however, to the extent there is an inconsistency in the terms of this Lease and the MSA, the parties intend for the provisions of this Lease to control.

24.     ESTOPPEL CERTIFICATES. Tenant agrees, at any time and from time to time, upon not less than twenty (20) days' prior request by Landlord or Landlord's Lender, to execute, acknowledge and deliver to Landlord (or Landlord's Lender) a statement in writing certifying, if such be the case, that this Lease is unmodified and in full force and effect (or, if there have been modifications, stating the modifications, and that the Lease as modified is in full force and effect), that there are no defenses or offsets thereto then accrued, or stating those claimed by Tenant, the dates to which Rent and other charges have been paid, and any other matter that Landlord or Landlord's Lender reasonably requests, it being intended that any such statement delivered pursuant to this paragraph may be relied upon by any prospective purchaser of, or any prospective holder of a mortgage upon, the fee of Landlord's Property, or by any other properly interested party. Landlord agrees, at any time and from time to time, upon not less than twenty (20) days' prior request by Tenant, to execute, acknowledge and deliver to Tenant a statement in writing certifying, if such be the case, that this Lease is unmodified and in full force and effect (or, if there have been modifications, stating the modifications, and that the lease as modified is in full force and effect), that Landlord is asserting no claims of default in the obligations to be performed by Tenant under this Lease, or stating the nature of any claimed default, the dates to which Rent and other charges have been paid, and any other matter that Tenant reasonably requests, it being intended that any such statement delivered pursuant to this paragraph may be relied upon by any assignee of Tenant's interest in this Lease or Landlord's Property, or by any other properly interested party, including, without limitation, Tenant's Lender. Failure to deliver an estoppel certificate within the time established in this Section 24 shall be a material breach of this Lease by the nonrequesting party and shall be conclusive upon the nonrequesting

party that (i) this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) that there are no uncured defaults in the requesting party's performance, (iii) that no rent has been paid in advance, and (iv) such other matters as are set forth in the proposed estoppel certificate are true and correct.

25.    <u>MEMORANDUM OF LEASE</u>. At Tenant's request, Landlord shall execute and deliver to Tenant a Memorandum of Lease in the form attached hereto as <u>Exhibit D</u>, which Tenant may record at its expense. Upon the expiration or sooner termination of this Lease, Tenant shall execute and record, at its expense, a release of the recorded Memorandum of Lease; provided, however, that if Tenant fails to do so within ten (10) days of the expiration or sooner termination of this Lease, Landlord is hereby authorized to unilaterally record a release of the recorded Memorandum of Lease on Tenant's behalf. Additionally, upon a determination of the exact location of the Pipeline Easement and Access Easement, Landlord hereby consents to the recordation of commercially reasonable descriptions of such easements.

26.    <u>CONFIDENTIALITY</u>. The Parties mutually agree and acknowledge that the amount of Rent and other compensation paid by Tenant to Landlord under the terms of this Lease is confidential. Except as expressly provided in this paragraph, a Party shall not disclose the compensation information to any third party without the other Party's prior written consent. A Party may disclose the information to their accountants, bookkeepers, attorneys, agents, employees, managers and owners; prospective purchasers, investors, and lenders; provided that such third parties are made aware of the confidential nature of the information. A Party may also disclose the information to the extent such Party may be compelled or required by any governmental entity or agency or a court or judicial proceeding. The Parties acknowledge that remedies of law may be inadequate to protect them against actual or threatened breach of this provision.

27.    <u>COUNTERPARTS</u>. This Lease may be simultaneously executed in any number of counterparts, each of which when so executed and delivered shall be an original, but such counterparts shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Lease via facsimile or electronic transmission shall be effective as delivery of an executed original.

28.    <u>ATTORNEY'S FEES AND COSTS</u>. In the event of any action at law or in equity between the Parties to enforce any of the provisions hereof, any unsuccessful or defaulting party to such litigation shall pay to the prevailing or non-defaulting party all reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees (including costs and expenses incurred in connection with all appeals and in any bankruptcy or similar proceedings) incurred by the prevailing or non-defaulting party, and these costs, expenses and attorneys' fees may be included in and as part of the judgment.

29.    <u>INTEGRATION; SEVERABILITY; WAIVER</u>. It is agreed and understood that this Lease contains all agreements, promises and understandings between Landlord and Tenant and that no verbal or oral agreements, promises or understandings shall be binding upon either Landlord or Tenant in any dispute, controversy or proceeding at law, and any addition, variation or modification to this Lease shall be void and ineffective unless made in writing and signed by the Parties. In the event any provision of this Lease is found to be invalid or unenforceable, such finding shall not affect the validity and enforceability of the remaining provisions of this Lease. The failure of either Party to insist upon strict performance of any of the terms or conditions of this Lease or to exercise any of its rights under this Lease shall not waive such rights and such Party shall have the right to enforce such rights at any time and take such action as may be lawful and authorized under this Lease, either in law or in equity.

30.    <u>GOVERNING LAW; ARBITRATION</u>.

30.1    <u>Governing Law</u>. This Lease and the performance thereof shall be governed, interpreted, construed and regulated in accordance with the laws of the State of Idaho.

DocuSign Envelope ID: 29D26D24-8182-42F2-86AC-EF18A84C7357

30.2    <u>Arbitration</u>. Any controversy or claim arising out of or relating to this Lease, or the breach thereof, shall be determined by final and binding arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules"). The award rendered by the arbitrator shall be final and binding on the parties and may be entered and enforced in any court having jurisdiction, and any court where a party or its assets is located (to whose jurisdiction the parties consent for the purposes of enforcing the award). There shall be one arbitrator agreed to by the parties within twenty (20) days of receipt by respondent of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. Except as may be required by law, neither a party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both Parties, unless to protect or pursue a legal right.

31.    <u>SUCCESSORS</u>. This Lease shall extend to and bind the heirs, personal representatives, successors and assigns of the Parties hereto.

32.    <u>ENTIRE AGREEMENT; AMENDMENT</u>. This Lease constitutes the entire agreement between the Parties concerning the subject matter hereof and supersedes any and all other communications, representations, proposals, understandings, or agreements, either written or oral, between the Parties with respect to such subject matter. This Lease may not be modified or amended, in whole or in part, except by a written agreement signed by the Parties.

33.    <u>CONSENTS; APPROVALS</u>. All consents and/or approvals and related communications to be given under this Lease must be in writing to be effective and, notwithstanding <u>Section 14</u>, may be delivered by correctly addressed and delivered email only and shall be effective when received by the recipient.

34.    <u>FURTHER ASSURANCES</u>. Each Party shall do and perform, or cause to be performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, easements, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Lease and the consummation of the transactions contemplated hereby ("<u>Further Assurances</u>"). For the avoidance of doubt, the Further Assurances include, but shall not be limited to, the Parties cooperating in good faith with each other at all times and as reasonably necessary for Tenant to receive utility services for the Project, including granting of utility easements; and (ii) to cure any defects of title that impact Tenant's rights under the Lease.

*{Signatures contained on following two pages}*

IN WITNESS WHEREOF, the Parties hereto have executed this Lease as of the date first above written.

**LANDLORD**:

EAST VALLEY CATTLE, LLC, an Idaho limited liability company

By: _____
    Name: Bill Millenkamp
    Title:  Manager

**TENANT**:

East Valley Development, LLC, a Delaware limited liability company

By: _____
    By:  Clay Corbus
    Its: Manager

**Exhibit A**

**Legal Description and Depiction of Landlord's Property**

**DRAFTING NOTE: TO BE ATTACHED ONCE THE EXACT LOCATION OF THE PROJECT
IS DETERMINED AND A SURVEY LEGAL DESCRIPTION IS PREPARED AND APPROVED
BY LANDLORD. THIS LEASE SHALL NOT BE BINDING ON EITHER LANDLORD OR
TENANT UNTIL THE APPROVED LEGAL DESCRIPTION IS ATTACHED.**

**Exhibit B**

**Legal Description and Depiction of Leased Property**

The "Leased Property" is generally in the location and of the size shown on the map below. The parties agree that the exact location and size of the Leased Property shall be established upon completion of a survey.



## Exhibit C

**Legal Description and Depiction of Access Easement and Pipeline Easement**

**[Legal descriptions to be added aftersurvey is complete]**

The Access Easement shall consist of a 20 foot wide easement (10 feet on either side of a centerline, over an existing access road on Landlord's Property constituting approximately 1/8 mile in length, leading to and from Leased Property to Rte. 2750 East.

The Pipeline Easement shall consist of a 20 foot wide easement (10 feet on either side of a centerline) along the northern and western boundaries of Landlord's Property, as generally depicted below.



The parties agree that the descriptions and depiction above are approximate in nature and that the exact size and location of the Access Easement and the Pipeline Easement will be established upon completion of a survey.

## Exhibit D

**Memorandum of Lease**

[to be attached]

## Exhibit E
## Permanent Wastewater and Manure Separation Facilities

**Section 1. Manure Separation Facilities**.  The Permanent Wastewater and Manure Separation Facilities ("Manure Separation Facilities") means all equipment, buildings and improvements as is required to accommodate and process the solids of the waste water and manure (barn flush waters and alley vac) from the barns and corrals produced by the Landlord at its Cassia County, Idaho Jersey Girls Dairy where the Premises are located.  The Manure Separation Facilities shall be design and constructed in such a manner so as to allow functioning and operation independent of the Project.

The Manure Separation Facilities shall include, but not be limited to all earthwork and site work; existing pump pits, pumps, agitators, generators, utility metering, pipelines, and other equipment associated with the pump pits; existing lagoon flush pump and piping (Developer to reimburse Dairy for cost of existing equipment which shall be part of Manure Separation Facilities); facilities and pipelines for Green Water return to Green Water Return Point; waste water and manure collection pit reception; sand lanes; material screw washers; storage shade; building; screw centrifuge building; rotary drum building; concrete slabs and other improvements and equipment for  storage of solids including Fiber (at least seven (7) days capacity for shaded bedding fiber and forty-five (45) days storage for all Fiber)farm fiber) and NPK Solids (as defined in the MSA); truck unloading and access; plumbing and mechanical; electrical, utility services, improvements and metering; all equipment for manure separation, including but not limited to the improvements and equipment described below; FAN Screw Presses and conveyors with  radial arm stacker; adequate concrete slabs; piping; valves; centrifuges, clarifiers, and rotary drum separator; and other ancillary equipment and miscellaneous improvements selected and approved by Landlord.

The two existing Flush Water Reception Pits (as shown on Exhibit E-2), pumps, agitators, generators, pipelines, utility metering, and related equipment are critical to the supply of manure to the Digester and, as such, shall be included as part of the Manure Separation Facilities even though they will not be located on the Leased Property. Additional pump pits and related pipelines and equipment may be needed to be added at Tenant's expense to facilitate expansion of the Dairy.

All improvements, including specifically without limitation all concrete slabs shall be designed and constructed to at least heavy industrial standards for heavy equipment loads, storage uses, and maximum long-term durability; all equipment shall be best in class. The Manure Separation Facilities shall be designed and constructed with adequate capacity to process all suitable manure from the dairy and include an appropriate amount of redundancy to avoid shutdowns due to mechanical or other failure. Tenant agrees that certain professional costs and expenses (engineering, design, etc.) will be needed to complete the Manure Separation Facilities.  Tenant, in conjunction and cooperation with the Landlord shall develop plans and specification for the Manure Separation Facilities (the "MSF Plans" as defined below) to be approved in writing by Landlord, acting reasonable and in good faith.

Attached as Exhibit E-2 ("Manure Separation Facilities Site Plan and Depiction") is a preliminary site plan and depiction for the Manure Separation Facilities located on the Premises and on licensed areas.

**Section 2. Obligation to Construct**.  Notwithstanding any other term of this Lease or the MSA and notwithstanding any termination or conditions to the parties obligations herein or in the MSA, Tenant agrees and is and shall be unconditionally obligated to construct, install and commission the Manure Separation Facilities in accordance with the MSF Plans (as defined herein) at its sole cost and expense on or before October 31st, 2022 and to thereafter operate, maintain and repair the Manure Separation Facilities in accordance with this Lease and the MSA. The parties agree that Tenant's obligations herein to construct, install and commission the Manure Separation Facilities shall not fail due to the lack of final plans and specifications upon the execution hereof.  Landlord and Tenant understand and agree that portions of the Manure Separation Facilities will be first constructed and located in a temporary location pursuant to that certain Exclusivity Agreement dated July 12th, 2021 (Temporary Facilities) and that at such time as the Permanent Facilities are being completed portions of the Temporary Facilities will be relocated and incorporated into the Manure Separation Facilities all in accordance with the MSF Plans. Landlord and Tenant shall cooperate and work together to insure as little disruption as possible to the Landlord's dairy and cattle operations as a result of the relocation.

Tenant understands that ongoing operation of the Temporary Facilities and completion of the Manure Separation Facilities is critically important to the dairy operations and Tenant agrees that construction of the Manure Separation Facilities shall take precedent and priority over construction of the Project. Temporary Facilities will not be located on the Leased Property.

**Section 3. Deposit - Total Costs**.  The total cost of the Manure Separation Facilities shall be determined once the  MSF Plans are final and bids obtained.  As security for performance of Tenant's obligations, upon execution of this Lease the amount of SEVEN MILLION DOLLARS ($7,000,000) shall be paid to McLanahan for equipment and THREE MILLION DOLLARS ($3,000,000) shall be paid to Archaea LLC as the general contractor ( collective the TEN MILLION DOLLARS is the "Down Payment") toward the cost of the Manure Separation Facilities.  Tenant shall reimburse Landlord for any expenses reasonably incurred by Landlord in constructing the Project. As is otherwise provided herein, the amounts paid for the Down Payment will be made in Landlord's name and become property of Landlord at the time of payment. Also, as otherwise provided herein, Landlord shall be provided with purchase agreements, purchase orders, invoices, or equivalent documentation related to the Down Payment.

The Landlord and Tenant understand and agree that the costs and expenses for completing the Manure Separation Facilities may exceed the Down Payment.  Tenant agrees to pay any and all cost and expenses of the Manure Separation Facilities that are over and above the Down Payment.

**Section 4. Ownership**.  The Manure Separation Facilities will be owned exclusively by Landlord.  Tenant shall provide an appropriate bill of sale or assignment vesting title and ownership of the Manure Separation Facilities in Landlord.  The Manure Separation Facilities will be a part of the Premises leased to and operated and maintained by Tenant under this Lease. The Manure Separation Facilities does not include any other equipment that is part of the Project owned and operated by Tenant, except as provided herein and accept as needed or used as part of the waste water and manure separation process for Landlord or for the proper operation of the dairy.

**Section 5. MSF Plans.**  The plans and specifications for the Manure Separation Facilities (as defined in Section 3 above) which shall include, without limitation, the location of the Manure Separation Facilities and all improvements, parts and portions thereto, the construction schedule for the Manure Separation Facilities, the site improvements and equipment (including existing facilities and equipment), and the design and appearance of the exterior of the Manure Separation Facilities are (or will be) attached hereto as Exhibit E-1 (the "MSF Plans"). The MSF Plans that are attached as Exhibit E-1 at the execution of this Lease, if any, are deemed approved by Landlord and Tenant. Any MSF Plans that are approved by Landlord in writing subsequent to the execution of this Lease will be attached to Exhibit E-1 to this Lease, which approval will be governed by Exhibit G-1, and will not be unreasonably withheld or delayed. If there are any material changes to the MSF Plans, Landlord and Tenant shall comply with the design process described on Exhibit G-1 hereto; provided, however, that in all events no changes to the MSF Plans shall be implemented without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed but subject to all requirements of his Lease and the MSA.. Tenant represents and warrants to Landlord that it will construct the Manure Separation Facilities with state-of-the-art equipment so as to produce high-quality product and functionality.  Tenant shall be permitted to change the supplier of the Manure Separation Facilities with the written approval of Landlord, not to be unreasonably withheld, conditioned or delayed, and so long as the specifications for the applicable portion of the Manure Separation Facilities offered by the replacement supplier are of equal or better quality than those of the initial supplier.

Following initial construction in accordance with the MSF Plans, no alterations, additions or other improvements shall be made to the Manure Separation Facilities unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

**Section 6. Construction Contract; Contractor.**  Tenant shall substantially involve Landlord in the construction of the Manure Separation Facilities including, without limitation, obtaining Landlord's approval of contractors, contracts, project design specifications, and equipment models and specifications. All orders placed for Manure Separation Facility equipment will be made in Landlord's name and become property of Landlord at the time of purchase. Landlord shall be provided with purchase agreements, purchase orders, invoices, or equivalent documentation related to the purchase of Manure Separation Facilities equipment. Landlord shall be a third party beneficiary of the Manure Separation Facilities construction contract between Developer and general contractor. Landlord shall be furnished will all documentation related to construction of the Manure Separation Facilities, including without limitation, contracts, subcontracts, invoices, schedules, bids, engineering, plans, and specifications. Tenant shall provide Landlord with a list of contractors and service providers anticipated to conduct work on site and will maintain this list on a real time basis throughout the construction period. Tenant shall have the sole responsibility to construct the Project and Landlord shall have no responsibility to construct the Project.

Landlord shall reserve the right to establish reasonable rules and regulations applicable to each contractor to ensure that such contractor's onsite activities do not have any adverse material impact on the adjacent Landlord operation (including, without limitation, with respect to site clean-up and maintenance, noise, parking, and ingress and egress). Tenant shall inform all contractors of these rules and regulations and shall cause the contractors to strictly abide by the rules and regulations. Tenant will provide, or cause to be provided to Landlord adequate payment and performance bonds to ensure timely completion of the Permanent Facilities. Tenant shall

insure that all construction contracts will include an acknowledgment of the applicable contractor that its lien rights with respect to the Project extend only to Tenant's leasehold interest in the Premises and that no contractor (including subcontractors) shall have the right to place a lien on Landlord's fee interest in the Premises or Landlord's Property.

**Section 7. Permits and Approvals.**  Tenant shall obtain all permits and approvals required to construct the Manure Separation Facilities.

**Partial Manure Separation Facilities Equipment List**.  The following is a preliminary (and incomplete)  list of equipment that will be included in the final MSF Plans

### Exhibit E

| Stage | Equipment | Manufacturer | Installer* |
|---|---|---|---|
| 1 | Screwpress (5) | FAN | Sundt/Dairy Specialties |
| 1 | Fiber Conveyor | TBD | Sundt |
| 1 | Radial Stacking Conveyor | TBD | Sundt |
| 1 | Screwpress Building | Olympia or Equiv | Sundt |
| 2 | Manure Receiving Pit (Vac/Flush) | Field Build | Sundt |
| 2 | Sand Lanes (2) | Field Build | Sundt |
| 3 | Material Screw Washers (2) | McLanahan | Sundt/McLanahan |
| 3 | Drum Screen Feed Pumps (6) | GEA or Equiv | Sundt/McLanahan |
| 3 | Rotary Drum Screens (6) | McLanahan | Sundt/McLanahan |
| 3 | Rotary Drum Building | TBD | Sundt |
| 3 | Clarifier/Thickener (2) | McLanahan | Sundt/McLanahan |
| 3 | Solids Separation Pumps (5) | GEA or Equiv | Sundt/McLanahan |
| 3 | Centrifuges (2) | Centrisys | Sundt/Dairy Specialties |
| 3 | Centrate pumps (3) | Vaughn or Equiv | Sundt/McLanahan |
| 3 | Solids storage building | TBD | Sundt |

*Anticipated

Landlord owned equipment to be as listed above or replaced by equivalent, or better equipment.

**Ground Lease**

**<u>Exhibit E-1</u>**
**MSF Plans**

*[To be added when complete]*

## Manure Separation Facilities
## Exhibit E-2







| Item | Fixture Description |
|------|---------------------|
| 1 | Flush Water Reception Pit |
| 2 | Flush Water Reception Pit |
| 3 | Green Water Return Manifold |
| 4 | Manure Slurry Receiving Point |

**Exhibit F**

**Plans**

**All Plans attached hereto at the execution of this Lease shall be deemed approved by the Parties; Any Plans attached subsequent to the execution of this Lease shall not be effective or binding upon Landlord until approved in writing by Landlord, such review and approval to be in accordance with Exhibit G and not to be unreasonably withheld or delayed.**

GROUND LEASE AGREEMENT – PAGE 35
15736902_12
HB: 4848-4611-1439.13

DocuSign Envelope ID: 29D26D24-8182-42E2-86AC-EF18A84C7357

**Exhibit G**

**Project Design Process**

Design efforts will be in accordance with applicable design codes per the standard of care for an industrial anaerobic digester (AD) facility. Typical design codes include, but not limited to American Society of Mechanical Engineers (ASME), American Petroleum Institute (API), National Fire Protection Association (NFPA), Manual of Practice (MOP) from Water Environment Federation (WEF), National Electric Code (NEC), and the International Building Code (IBC).

In order to keep Landlord apprised of design progress, allow for input, and not delay design progress with formal reviews, intermediate submittal packages will be provided to be reviewed concurrent with design progression. Landlord will have access to the design engineer's file sharing folder where detailed design sheets and 3D models are updated concurrent with design development. Specific design review meetings will be setup at appropriate design stage gates to get input from Landlord regarding infrastructure integration to the existing dairy facility and consistency with overall architectural programing (established by current construction methods that are applicable to an industrial anaerobic digestion facility with gas upgrading and compression)

Anticipated design stage gates requiring Landlord approval to not impact design schedule:
- Site Plan and overall layout
- Facility interconnect with dairy and shared infrastructure including:
  - Power feed to AD facility
  - Biomethane pipe routing and interconnect locations
  - Architectural programming
    - Buildings (siding and roof materials, colors, and exterior finishes)
  - Traffic flow of shared access points
  - Dairy water interconnect points between AD and dairy
    - AD Influent (pressurized, upstream of manure thickening and green flush treatment)
    - AD Effluent (gravity, downstream of covered lagoon)
    - AD Effluent (bedding from fiber separation)
- Landlord will need to provide approval of proposed design aspects

Assumptions:
- Stage gates coordination meetings will be done either onsite or via screen share. An agreed upon path forward will be in-place after one round of Landlord comments and engineering revisions.
- Review comments will not inhibit overall AD process.
- Outside of aforementioned stage gate meetings, it is assumed that Landlord will review progress sets (construction sheets and 3D model) concurrent with design development and submit review comments in a timely manner as part of the design team and work within the design schedule. "

EXHIBIT F

EXHIBIT F

# GIVENS PURSLEY LLP

Attorneys and Counselors at Law

601 W. Bannock Street
PO Box 2720
Boise, ID 83701
Telephone: 208-388-1200
Facsimile: 208-388-1300

www.givenspursley.com

Thomas E. Dvorak
(208) 388-1245
ted@givenspursley.com

Taylor J. Barton
Charlie S. Baser
Jeff S. Beelaert
Christopher J. Beeson
Jason J. Blakley
Clint R. Bolinder
Jeff W. Bower
Preston N. Carter
Chynna K. Castoro
Jeremy C. Chou
Charlotte V. Cunnington

Joshua C. Dickinson
Amber N. Dina
Bradley J. Dixon
Thomas E. Dvorak
Morgan D. Goodin
Don Z. Gray
Brian J. Holleran
Kersti K. Kennedy
Elizabeth A. Koeckeritz
Neal A. Koskella
Michael P. Lawrence

Franklin G. Lee
Matthew E. Liebertz
David R. Lombardi
Kimberly D. Maloney
Kenneth R. McClure
Alex P. McLaughlin
Melodie A. McQuade
Megann E. Meier
Christopher H. Meyer
L. Edward Miller
Judson B. Montgomery

Deborah E. Nelson
Randall A. Peterman
Blake W. Ringer
Michael O. Roe
Danielle M. Strollo
Marcus H. Waterman
Robert B. White
Michael V. Woodhouse

Kenneth L. Pursley (1940-2015)
James A. McClure (1924-2011)
Raymond D. Givens (1917-2008)

December 6, 2024

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED,**
**AND EMAIL**
William J. Flanagan
VP, Strategic Development
East Valley Development, LLC
4675 MacArthur Court, Suite 800
Newport Beach, CA  92660
Will.Flanagan@cleanenergyfuels.com

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED,**
**AND EMAIL**
East Valley Development, LLC
Attention: General Counsel
4675 MacArthur Court, Suite 800
Newport Beach, CA  92660
jim.sytsma@cleanenergyfuels.com

Adam Lewis
Miranda Russell
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
ALewis@mofo.com
MRussell@mofo.com

Re:    Demand for Adequate Assurances; Notice of Default to East Valley
Development, LLC ("EVD")

Dear EVD General Counsel,

I write concerning East Valley Development, LLC's ("EVD") obligations and conduct under both the Ground Lease Agreement between EVD and East Valley Cattle, LLC ("EVC") dated October 8, 2021 ("Lease") and Manure Supply Agreement between EVD and Millenkamp Cattle, Inc. ("Millenkamp Cattle") of the same date ("MSA").  The purpose of this letter is two-fold—(1) to request adequate assurances of resolution of an immediate and pressing concern—the maintenance of the settling pond and sewage lagoon, and (2) to give Notice of Default.

**DEMAND FOR ADEQUATE ASSURANCES**

The following facts and circumstances constitute a threatened breach of EVD's obligation under the Lease and the MSA:

1.  EVD has utilized EVC's manure settling lagoons to gravity settle solids, as the temporary manure separation methods and the permanent Manure Separation Facilities

December 6, 2024
Page 2

do not have the capability to process 100% of the effluent produced by Millenkamp Cattle. EVC and Millenkamp Cattle, prior to the installation of EVD's temporary lagoon, used long-arm track hoes to manually clean out the settling lagoons and the original design of those settling lagoons was such to facilitate easy access by such track hoe.

2. After installation of a new temporary lagoon by EVD, using a long-arm track to remove solids was no long possible because of the design and size of the temporary lagoon. EVD recognized its responsibility to keep down the sludge in the temporary lagoon by hiring a third party with a dredge and utilizing centrifuges to process the manure that accumulated in the temporary lagoon.

3. EVD recently has ceased utilizing the dredge and otherwise neglected and has outright refused to timely clean out the temporary lagoon and the associated settling lagoons. EVD has cited a lack of money as a reason for this conduct.

4. As a consequence, the associated settling lagoons are almost full of solids and the temporary lagoon is threatened to fill once the settling lagoons as so compromised.

5. EVD has refused to provide a dredge to clean out the solids.

6. From approximately November to March of each and every year, the main lagoon fills up with green water and does not mix with any freshwater as the irrigation season has concluded.

7. In approximately March of each year effluent is mixed with fresh water and the mixture is used to irrigate crops.

8. As of April each year, Millenkamp Cattle as part of its operation needs to have water in the lagoons that is utilizable for irrigation purposes by Spring of 2025. Without proper cleaning of the settling lagoons and temporary lagoon, the water threatens to become so full of solids that it cannot even be pumped for irrigation purposes, i.e., the solids will plug the irrigation equipment of Millenkamp Cattle and EVC.

9. The irrigation equipment of Millenkamp Cattle and EVC is the only method by which Millenkamp Cattle can apply its green water in accordance with the environmental rules established by the Idaho Department of Agriculture.

10. Thus, the amount of solids accumulating in the lagoons due to EVD's failure to perform this maintenance directly threatens to create an environmental disaster, for reasons including that such when such water cannot be pumped, the resulting overflow will then inevitably reach and then contaminate other waterways such as the Raft River. The Raft River is a tributary of the Snake River and both rivers are considered "waters of the United States" by the Environmental Protection Agency. Any discharge of effluent into the "waters of the United States" will violate the Clean Water Act.

December 6, 2024
Page 3

11. As a separate matter, EVD has failed to maintain certain roads within the Premises of the Lease in the manner required by the Lease. Specifically, EVD has failed to properly slope the road adjacent to the clarifiers, reception pit and dewatering building and the lack of such maintenance and slope is having a detrimental impact on the joint use and safety of such roads by Millenkamp Cattle for dairy operations.

Under Section 8.3 of the Lease, EVD is required to "maintain and operate the Project and the manure Separation Facilities, including the Temporary Facilities . . . in good condition and repair, consistent with the overall appearance and quality of maintenance of the adjacent Dairy operation, and in compliance with all applicable laws, rules and regulations, including the land use and building laws of local governmental authorities, environmental laws, rules and regulations . . . .. Tenant acknowledges and agrees that it is very important to overall Dairy operations and brand that the exterior of the Project, the Manure Separation Facilities, and the Leased Premises be maintained in a manner consistent with the maintenance of the adjacent Dairy operation (for example, and without limitation and by way of illustration only, graveled roadways must be appropriately graded, graveled and maintained . . ..)." Section 8.8 of the Lease provides that EVD has agree to cooperate to ensure that EVD's "operation and use of the Project does not result in any material adverse effect upon the Dairy." And, an uncured breach of the Lease is a breach of the MSA under Section 13.1.4 of the MSA.

EVC hereby demands adequate and reasonable written assurances that EVD will immediately perform its obligations under the Lease with respect to cleaning the lagoons and repairing the roads.

Under Section 8.3 of the Lease, if EVD "fails to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA," EVC "may take such action as [EVC] deems reasonably necessary to cause the [same] to be so maintained and [EVD] shall promptly reimburse [EVC] for [EVD's] reasonable costs and expenses in connection therewith . . .."

If EVC does not receive such adequate and reasonable written assurances within one week's time, EVC will deem such failure to provide such adequate and written assurances as confirmation that EVD does not intend to perform such obligations under Section 8.3 and a breach of EVC's obligations under Sections 8.3 and 8.8. EVC will then avail itself of its rights under Section 8.3. Such actions may include, without limitation, (a) with respect to the lagoon maintenance, taking steps to clean the lagoons or sending the lagoon green water back through the dairy's systems to be reprocessed by EVD; and (b) taking action to repair the roads.

Nothing contained within this demand for adequate assurances, or EVC's action in responding to any lack of such assurances under Sections 8.3 and 8.8 relinquishes or releases any rights of EVC or Millenkamp Cattle for default as provided for elsewhere in the Lease, MSA or at law or equity.

**NOTICE OF DEFAULT**

Notice is hereby given that EVD is in default of various obligations under both the Ground Lease Agreement dated October 8, 2021 ("Lease") and Manure Supply Agreement of the same

December 6, 2024
Page 4

date ("MSA"). Specifically, as further described in the enclosed Demand for Arbitration ("Arbitration Demand") and incorporated herein by reference, EVD is in violation of the following provisions cited in the Arbitration Demand, including without limitation: (1) Section 6.4 of the Lease (*see* Arbitration Demand, ¶¶ 13-16); (2) Section 8.3 of the Lease (*see* Arbitration Demand, ¶¶ 17-20); (3) Section 6.2 and Exhibit E of the Lease (*see* Arbitration Demand, ¶¶ 21-30); (4) Section 2(a) of the June 22, 2023 Third Amendment to Ground Lease Agreement ("Third Amendment to Lease") regarding your obligation to submit certain schedules and documents (*see* Arbitration Demand, ¶¶ 31-32); and (5) Section 2(a) of the Third Amendment to Lease regarding your obligation to make certain payments for failure to meet the standards contained in Exhibit F of the MSA (*see* Arbitration Complaint, ¶¶ 33-42).

**TENDER OF CLAIM**

I wanted to call out a recent item of import specifically that is described in the enclosed draft Arbitration Demand and also tender the claim and defense of this claim. On November 21, 2024 a Mechanic's Lien was filed by L.T.D. Plumbing, Inc. for nonpayment for two new watersheds as instrument number 2024004286 in the records of the Cassia County, Idaho Recorder for the amount of $9,392.00. The Lien purports to lien all of Section 26 of Township 11 S, Range 27 E of the Boise Meridian, Cassia County, Idaho, and references that the labor or services were done at the request of Caribou Lake Construction Managers, Inc., who is or was EVD's construction manager.

The Lease provides, in pertinent part:

Landlord shall not be liable for any work, labor or materials furnished or to be furnished upon credit to or for Tenant or anyone claiming under the Tenant, and no mechanic's or other liens shall attach to or affect the estate or interest of the Landlord in and to the Premises. Tenant shall not do or suffer anything to be done whereby Landlord's Property or the Premises or any part thereof may be encumbered by any mechanic's liens or other liens. If any mechanic's lien, notice or claim thereof or any other lien is filed against Landlord's Property, the Premises or any part thereof for work, labor, or materials furnished or to be furnished to Tenant, or anyone claiming under Tenant, Tenant shall within sixty (60) days from the date of filing, cause the same to be withdrawn, discharged or removed by deposit, bonding proceedings or otherwise. If Tenant fails to do so, Landlord may do so and may pay any judgments recovered by any such lienor. Tenant shall immediately reimburse Landlord for all amounts paid pursuant to this paragraph, which amounts shall constitute an additional obligation of Tenant under this Lease together with interest from the date of expenditure at the Default Rate. Tenant understands that the removal of liens is critical to Landlord's financing and any liens will cause the Landlord to suffer significant damages, including incurring default interest rates on Landlord's loans.

Lease at 8.4.

Tender of this claim of lien is hereby made and demand is further made that EVD take immediate action to clear this lien in accordance with Section 8.4 within sixty days of its initial filing.

December 6, 2024
Page 5


      Should EVD fail to cure each of the aforementioned defaults within the time periods prescribed in the Lease and MSA, East Valley Cattle, LLC and Millenkamp Cattle, Inc. will lodge the enclosed Demand for Arbitration with the American Arbitration Association and proceed with arbitration pursuant to Section 30 of the Lease. Your immediate attention to this matter is required.


      Sincerely,


      Thomas E. Dvorak

TED/JJB
Enclosure
cc:    Client
18668114 [11054.187]

Thomas E. Dvorak (ISB # 5043)
Jason J. Blakley (ISB # 9497)
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho  83701-2720
Office: (208) 388-1200
Fax: (208) 388-1300
tedservice@givenspursley.com
jasonblakley@givenspursley.com
18659328 [11054.187]

Attorneys for Claimants


BEFORE THE AMERICAN ARBITRATION ASSOCIATION


| | |
|---|---|
| EAST VALLEY CATTLE, LLC, an Idaho limited liability company; and MILLENKAMP CATTLE, INC., an Idaho corporation,<br><br>　　　　　　　Claimants,<br><br>vs.<br><br>EAST VALLEY DEVELOPMENT, LLC a Delaware limited liability,<br><br>　　　　　　　Respondent. | AAA Case No. _____<br><br>**DEMAND FOR ARBITRATION** |


COME NOW East Valley Cattle, LLC ("EVC") and Millenkamp Cattle, Inc. ("Millenkamp

Cattle," and together with EVC, "Claimants"), by and through their attorneys of record, Givens

Pursley LLP, and hereby demand arbitration pursuant to an arbitration agreement with Respondent

East Valley Development, LLC ("EVD" or "Respondent") as follows:

**I.       Parties, Jurisdiction, and Choice of Law**

    **A.       The Claimants**

EVC is an Idaho limited liability company.

**DEMAND FOR ARBITRATION - 1**

The address of EVC is:

     East Valley Cattle, LLC
     Attention: Bill Millenkamp
     471 N. 300 W.
     Jerome, Idaho 83338
     Telephone: (208) 731-5518
     Email: bill@millenkamp.com

The known representatives for EVC are:

     Thomas E. Dvorak
     Jason J. Blakley
     GIVENS PURSLEY LLP
     601 West Bannock Street
     P.O. Box 2720
     Boise, Idaho  83701-2720
     Telephone: (208) 388-1200
     Fax: (208) 388-1300
     Email: tedservice@givenspursley.com
          jasonblakley@givenspursley.com

Millenkamp Cattle is an Idaho corporation.

The address of Millenkamp Cattle is:

     Millenkamp Cattle, Inc.
     Attention: Bill Millenkamp
     471 N. 300 W.
     Jerome, Idaho 83338
     Telephone: (208) 731-5518
     Email: bill@millenkamp.com

The known representatives for Millenkamp Cattle are:

     Thomas E. Dvorak
     Jason J. Blakley
     GIVENS PURSLEY LLP
     601 West Bannock Street
     P.O. Box 2720
     Boise, Idaho  83701-2720
     Telephone: (208) 388-1200
     Fax: (208) 388-1300
     Email: tedservice@givenspursley.com
          jasonblakley@givenspursley.com

**DEMAND FOR ARBITRATION - 2**

**B.    The Respondent**

Upon information and belief, East Valley Development, LLC is a Delaware limited liability

company.

The address of the Respondent is:

> East Valley Development, LLC
> Attention:  General Counsel
> 4675 MacArthur Court, Suite 800
> Newport Beach, CA 92660
> Telephone:  (949) 437-1000
> Email: jim.sytsma@cleanenergyfuels.com
> nate.jensen@cleanenergyfuels.com

> William J. Flanagan
> VP, Strategic Development
> East Valley Development, LLC
> 4675 MacArthur Court, Suite 800
> Newport Beach, CA  92660
> Email: Will.Flanagan@cleanenergyfuels.com

The known representatives for the Respondent are:

> Adam Lewis
> Miranda Russell
> MORRISON & FOERSTER LLP
> 425 Market Street
> San Francisco, CA 94105
> Telephone:  (415)268-7000
> Email:  ALewis@mofo.com
> MRussell@mofo.com

**C.    Jurisdiction**

The American Arbitration Association has jurisdiction to arbitrate this matter pursuant to

a Ground Lease Agreement (the "Lease") executed by EVC and EVD on October 8, 2021, which

provides in relevant part (page 22):

> 30.2.    Arbitration. Any controversy or claim arising out of or relating to
> this Lease, or the breach thereof, shall be determined by final and binding
> arbitration administered by the American Arbitration Association ("AAA")
> under its Commercial Arbitration Rules and Mediation Procedures
> ("Commercial Rules").  The award rendered by the arbitrator shall be final

and binding on the parties and may be entered and enforced in any court having jurisdiction, and any court where a party or its assets is located (to whose jurisdiction the parties consent for the purposes of enforcing the award). There shall be **one arbitrator** agreed to by the parties within twenty (20) days of receipt by respondent of the request for arbitration or in default thereof appointed by the AAA in accordance with its Commercial Rules. Except as may be required by law, neither a party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both Parties, unless to protect or pursue a legal right.

(Emphasis added.) A copy of the Lease is attached hereto as **Exhibit A**.

The MSA (defined below) contains a similar provision at § 18.2.2.

**D.    Choice of Law**

The Lease further provides that it "shall be governed, interpreted, construed and regulated in accordance with the laws of the State of Idaho." Exhibit A (Lease, § 30.1). Because this arbitration involves more than two parties, Claimants do not agree to conduct the arbitration under the AAA Expedited Procedures. *See* AAA Commercial Rule R-1(b).

**II.    Nature of the Claim**

1.    EVC owns certain real property in Cassia County, Idaho upon which Millenkamp Cattle owns and operates a large dairy and feedlot ("Farm Business").

2.    Millenkamp Cattle's Farm Business is comprised of state-of-the-art, first-class dairy facilities, unlike those found anywhere else in the United States.

3.    Millenkamp Cattle's Farm Business produces large quantities of manure, milking parlor water, feed lane manure, loafing pen manure, and urine (collectively, "Manure") that must be handled and disposed of in an environmentally and socially responsible manner.

4.    Respondent is a subsidiary of CE bp Renew Co, LLC (an entity that is 50% owned by bp Products North America and 50% by Clean Energy).

5.    Millenkamp Cattle and EVD entered into a Manure Supply Agreement on October 8, 2021 ("MSA") wherein EVD agreed to install, construct, own, and operate a

**DEMAND FOR ARBITRATION - 4**

commercial scale biogas production facility for the production of methane gas and other co-products ("Facility"), made up of an anaerobic digestion system and related equipment ("Digester") including "Manure Separation Facilities," which is intended to convert the Manure solids into saleable renewable natural gas and carbon dioxide ("Project").

6.      EVC and EVD entered into the Lease in order to effectuate the terms of the MSA, *i.e.*, EVC leased to Respondent the ground upon which the Project would be constructed.

7.      According to the Lease, Respondent promised to:

> construct the Project in a first class, workmanlike manner consistent with other similar projects in the area, in substantial compliance with the Plans and in compliance with all applicable laws, rules and regulations, including, but not limited to, all land use and building laws, rules and regulations, environmental laws, rules and regulations, and insurance requirements and codes.

Lease, § 6.1 Development of Project.

8.      Respondent promised to construct the Project in accordance with the "Plans," which are found at Exhibit F of the Lease. Lease, § 6.3 Project Design.

9.      The Lease envisions that additional detailed Plans will be created, the approval of which is governed in part by Exhibit G to the Lease. Lease, § 6.3 Project Design.

**FAILURE TO OBTAIN LANDLORD DESIGN APPROVAL**

10.     According to Exhibit G of the Lease:

> In order to keep Landlord [EVC] apprised of design progress, allow for input, and not delay design progress with formal reviews, intermediate submittal packages will be provided to be reviewed concurrent with design progression. Landlord will have access to the design engineer's file sharing folder where detailed design sheets and 3D models are updated concurrent with design development. Specific design review meetings will be setup at appropriate design stage gates to get input from Landlord regarding infrastructure integration to the existing dairy facility and consistency with overall architectural programing (established by current construction methods that are applicable to an industrial anaerobic digestion facility with gas upgrading and compression).

**DEMAND FOR ARBITRATION - 5**

11.　　According to Exhibit E, **Section 1. Manure Separation Facilities**, of the Lease:

>　The Manure Separation Facilities shall be designed and constructed with adequate capacity to process all suitable manure from the dairy and include an appropriate amount of redundancy to avoid shutdowns due to mechanical or other failure.

12.　　According to the Lease, "in all events no changes to the Plans shall be implemented without Landlord's [EVC's] prior written consent." Lease, § 6.3 Project Design.

13.　　The Lease also provides:

>　Following initial construction in accordance with the Plans, no alterations, additions or other improvements shall be made to the Premises, the Project or the Improvements unless pursuant to plans and specifications approved by Landlord in writing, not to be unreasonably withheld or delayed.

Lease, § 6.3.1.

## MATERIALMEN'S LIENS

14.　　The Lease also provides:

>　Tenant will provide, or cause to be provided to Landlord adequate payment and performance bonds to ensure timely completion of the Project. Tenant shall insure that all construction contracts will include an acknowledgement of the applicable contractor that its lien rights with respect to the Project extend only to Tenant's leasehold interest in the Premises and that no contractor (including subcontractors) shall have the right to place a lien on Landlord's fee interest in the Premises or Landlord's Property.

Lease § 6.4.

15.　　EVD as of today's date, due to its own failure or the failure of its contractor to pay various subcontracts, has caused materialman liens to be recorded against EVD's real property.

16.　　EVC requested on February 6, 2024 and on May 24, 2024, that EVD provide EVC information as to when the liens would be satisfied.

**DEMAND FOR ARBITRATION - 6**

17.    As of the date of Demand, EVD has not provided EVC with any information to indicate the materialman liens have been satisfied.

18.    Further, the Lease also provides:

> Landlord shall not be liable for any work, labor or materials furnished or to be furnished upon credit to or for Tenant or anyone claiming under the Tenant, and no mechanic's or other liens shall attach to or affect the estate or interest of the Landlord in and to the Premises. Tenant shall not do or suffer anything to be done whereby Landlord's Property or the Premises or any part thereof may be encumbered by any mechanic's liens or other liens. If any mechanic's lien, notice or claim thereof or any other lien is filed against Landlord's Property, the Premises or any part thereof for work, labor, or materials furnished or to be furnished to Tenant, or anyone claiming under Tenant, Tenant shall within sixty (60) days from the date of filing, cause the same to be withdrawn, discharged or removed by deposit, bonding proceedings or otherwise. If Tenant fails to do so, Landlord may do so and may pay any judgments recovered by any such lienor. Tenant shall immediately reimburse Landlord for all amounts paid pursuant to this paragraph, which amounts shall constitute an additional obligation of Tenant under this Lease together with interest from the date of expenditure at the Default Rate. Tenant understands that the removal of liens is critical to Landlord's financing and any liens will cause the Landlord to suffer significant damages, including incurring default interest rates on Landlord's loans.

Lease, § 8.4.

19.    On November 21, 2024 another Mechanic's Lien was filed by L.T.D. Plumbing, Inc. for non-payment for two new watersheds as instrument number 2024004286 in the records of the Cassia County, Idaho Recorder for the amount of $9,392.00.  The Lien purports to lien all of Section 26 of Township 11 S, Range 27 E of the Boise Meridian, Cassia County, Idaho, and references that the labor or services were done at the request of Caribou Lake Construction Managers, Inc., who is or was EVD's construction manager (the "L.T.D. Plumbing Lien").

20.    The failure to provide information as to whether the prior liens are satisfied and the existence of the L.T.D. Plumbing Lien are defaults under the Lease.

**DEMAND FOR ARBITRATION - 7**

**MAINTENANCE OF PROJECT; GRAVEL PROVIDED**

21.    The Lease also provides:

> [T]he Leased Premises be maintained in a manner consistent with the maintenance of the adjacent Dairy operation (for example, and without limitation and by way of illustration only, graveled roadways must be appropriately graded, graveled and maintained, weeds and tumbleweeds must be controlled and cleared, and exterior surfaces maintained in accordance with the requirements of this Lease). In the event that Tenant fails to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA, Landlord may take such action as Landlord deems reasonably necessary to cause the Project, Manure Separation Facilities, and/or Leased Premises to be so maintained and Tenant shall promptly reimburse Landlord for Landlord's reasonable costs and expenses in connection therewith…

Lease § 8.3.

22.    EVD failed to maintain the Project in good condition and repair, consistent with the overall appearance and quality of the maintenance of the adjacent Dairy Operation, forcing Millenkamp Cattle to grade and provide gravel to the Project.

23.    Millenkamp Cattle invoiced EVD for the aforementioned costs.

24.    As of the date of this Demand, EVD has refused to pay for the costs of Millenkamp Cattle grading and providing gravel to the Project.

**FAILURE TO COMPLETE MANURE SEPARATION FACILITIES**

25.    Under the original Lease, the Manure Separation Facilities were to be designed, constructed, installed, and commissioned on or before October 31, 2022, as provided for in Exhibit E of the Lease. Lease, § 6.2 Construction and Relocation of Manure Separation Facilities.

26.    As EVD was unable to complete the Manure Separation Facilities by the original deadline and otherwise comply with the Lease and MSA, the parties entered into several amendments to memorialize the terms of an extension and amended understanding.

**DEMAND FOR ARBITRATION - 8**

27.     On February 17, 2022, the parties entered into that certain First Amendment to Ground Lease Agreement ("First Amendment to Lease").

28.     On April 25, 2023, the parties entered into that certain Second Amendment to Ground Lease Agreement ("Second Amendment to Lease").

29.     On June 22, 2023, the parties entered into that certain Third Amendment to Ground Lease Agreement ("Third Amendment to Lease").

30.     On June 22, 2023, the parties entered into that certain First Amendment to Manure Supply Agreement ("First Amendment to MSA").

31.     EVD failed to present timely Plans to EVC for review and preapproval, as required under Exhibit G the Lease.  This includes, but is not limited to, the amount of concrete that has been poured around the Dewatering Building.

32.     Pursuant to Section 2(b) of the Third Amendment to Lease, EVD was "unconditionally obligated to construct, install and commission the Manure Separation Facilities in accordance with the MSF Plans, and to use best efforts, at its sole cost and expense, to complete installation and commission of the Manure Separation Facilities on or before October 31, 2023. . . ."

33.     The Project has been plagued by the inability of EVD to manage its various contractors, subcontractors and engineers.

34.     As of the date of this Demand, EVD has not completed construction of the Manure Separation Facilities, nor has EVD used its best efforts to complete the Manure Separation Facilities.

35.     As of the date of this Demand, EVD has not completed saw cutting of a "chevron" pattern in the sand lane and reception pit area of the Manure Separation Facilities.

**DEMAND FOR ARBITRATION - 9**

36.    As of the date of this Demand, EVD has not completed HVAC installation in the Dewatering Building.

37.    Pursuant to Section 2(a) of the Third Amendment to Lease, "Tenant shall provide Landlord with a Manure Separation Facility construction schedule on a bi-monthly basis, on a schedule to be mutually agreed by the Parties, and a monthly (15th Business Day of the month) expense report detailing the capital expenses of the Manure Separation Facility on a monthly, project to date and expected completion cost basis."

38.    EVD has not provided EVD with a construction schedule or a monthly, project to date and expected completion cost basis.

### FAILURE TO MEET BYPRODUCT SPECIFICATIONS; FAILURE TO MAINTAIN TEMPORARY LAGOON

39.    Additionally, Section 2(a) of the Third Amendment to the Lease provides as follows:

> Commencing November 1, 2023, Tenant shall pay to Landlord $50,000 per day for manure hauling in the event the Temporary Lagoon, Temporary Facilities, Phase 2, and Phase 3A of the Project cannot process 100% of the Manure, which, for the avoidance of doubt, includes the solids of the wastewater and manure (flush waters and alley vacs) in accordance with the Byproduct Specifications articulated in Exhibit F of the MSA. If, however, on November 1, 2023, the Temporary Lagoon, Temporary Facilities, Phase 2, and Phase 3A of the Project are able to process 100% of the Manure, which, for the avoidance of doubt, includes the solids of the waste water and manure (flush waters and alley vacs) in accordance with the Byproduct Specifications articulated in Exhibit F of the MSA, then Tenant shall pay to Landlord $15,000 per day for manure hauling until the commissioning of the Manure Separation Facility.

40.    To compensate EVC for manure hauling, EVD has remitted periodic payments to compensate for its inability to meet Byproduct Specifications.

41.     On January 9, 2024, EVD provided Millenkamp Cattle with a spreadsheet tracking the Byproduct Specifications.

42.     On January 31, 2024, EVD provided Millenkamp Cattle with a spreadsheet tracking the Byproduct Specifications.

43.     On February 6, 2024, Millenkamp Cattle requested EVD provide Byproduct Specifications.  EVD failed to respond to the request.

44.     On May 24, 2024, Millenkamp Cattle requested EVD provide Byproduct Specifications.  EVD failed to respond to the request.

45.     On July 30, 2024, Millenkamp Cattle requested EVD provide Byproduct Specifications.  EVD failed to respond to the request.

46.     On October 4, 2024, EVD provided Millenkamp notice via email it had commissioned the Manure Separation Facility on August 15, 2024, "and accordingly Tenant has no further obligation from and after such date to make payments under Section 4.2 of the Ground Lease (as modified by Section 2.a of the Third Amendment to Ground Lease)."

47.     As of the date of this Demand, EVD has refused to produce proper Byproduct Specifications that justify the lower payment of $15,000 per day.

48.     EVC is entitled to compensation in the amount of $50,000 per day because the Project has not been able to process 100% of the Manure in accordance with the Byproduct Specifications.  This includes, but is not limited to, all of the fiber, solids and green water separated by the temporary equipment and dredges.

49.     After the commissioning of the Manure Separation Facility on August 15, 2024, and as of the date of the Demand, EVD is still unable to process all of the Manure in accordance with the Byproduct Specifications.  Specifically, the FAN separators in the dewatering building cannot process all of the thickened manure sent to the dewatering building.  This has resulted in

thickened manure bypassing the dewatering building and being deposited in the temporary lagoon and a lack of any meaningful fiber being made available for bedding Millenkamp's cattle.

50.    The temporary lagoon has accumulated significant solids as result of the inability of EVD being able to process all of the manure in accordance with the byproduct specifications.

51.    EVD has refused to clean the temporary lagoon to capture additional fiber and solids that have been deposited in the temporary lagoon.

52.    On November 8, 2024, David Heida of EVC emailed Nate Jenson, General Counsel for EVD, and indicated:

> Please be advised that in accordance with Section 6.4.2 of the Manure Supply Agreement Millenkamp Cattle, Inc. ("Millenkamp") hereby provides notice that if East Valley Development, LLC ("EVD") does not process all of the thickened effluent created by the manure separation facility through the FAN screw presses located in the dewatering building within the next ninety-six (96) hours, Millenkamp will commence self-help measures. These measures include but are not limited to:
>
> 1.    Replacing the FAN header manifold was not properly engineered by Montrose (i.e. 90 degree inlet fittings and inconsistent flow/pressure rates).
> 2.    Adding an additional five FAN separator to keep up with the effluent inlet flow rates.
> 3.    Ordering additional FAN separator parts to ensure adequate parts availability.
> 4.    Replacing the FAN greenwater outlets that need to be plumbed into a 45 degree outlet fitting.
> 5.    Adding an additional centrifuge to ensure adequate redundancy.
>
> EVD's inability to operate, maintain and repair the dewatering building in a manner that provides any meaningful fiber to the dairy for bedding cattle, let alone accounts for any redundancy has necessitated this action. Please be advised that unless EVD can correct the aforementioned issues identified above within the ninety-six (96) hour time frame, Millenkamp provides further notice that the self-help measures identified above will be taken forty-eight (48) hours thereafter. Millenkamp's self-help measures identified above will be expensed directly to EVD in accordance with Section 6.4.2

**DEMAND FOR ARBITRATION - 12**

of the Manure Supply Agreement. Please be advised that Millenkamp reserves all other rights and remedies.

53.     To date, EVD has not taken any such corrective measures.

54.     Failure to take such corrective measures is a breach of the MSA and of the Lease.

55.     EVC is owed payment for reimbursement and damages in an amount to be proven at arbitration.

### FAILURE TO OBTAIN WATER

56.     Pursuant to the Lease, § 4.8

Water Rights. Tenant shall be responsible for obtaining any and all water to satisfy its requirements for the Project from third party sources or by obtaining a water right to dig a new well to be located on the Leased Property (in a location to be approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed). Landlord will use reasonable efforts to assist Tenant with obtaining such water rights. In the event that, after using commercially reasonable, good faith efforts, Tenant is unable to procure a water right as stated above, Landlord agrees to allow Tenant access to Landlord's water of up to fifty (50) gallons per minute of potable water for Tenant's operations (which the parties acknowledge does not allow use of grey water) in exchange for a fair market lease rate to be agreed to by Landlord and Tenant at such time based on the cost of such water to Landlord. In such event, Tenant will be responsible for obtaining any required regulatory approvals for such a water use transfer.

57.     EVC has notified EVD of its responsibility for obtaining water and EVD has failed to carry out that responsibility. Nor has EVD used commercial reasonable, good faith efforts to construct a well and evidently has no desire to expend any funds in this regard.

58.     EVC's failure to dig a new well is a breach of the Lease.

### 24" INLET ROUTING AND FAILURE TO FILL IN SOUTHWEST SETTLING CELL

59.     Prior to the commission of the Manure Separation Facilities, EVD used EVC's settling cells as part of their temporary manure separation measures.

**DEMAND FOR ARBITRATION - 13**

60.    Since the commissioning of the Manure Separation Facilities, EVD has refused to fill in what is commonly known as the Southwest Settling Cell with adequate dirt.

61.    EVD's refusal to fill in the Southwest Settling Cell creates an unnecessary safety hazard while precluding a direct routing of EVC's 24" green water inlets into the Green Flush building.

62.    EVD's refusal to directly route the 24" green water inlets into the Green Flush building creates unnecessary hydraulic resistance, a loss in efficiency and unnecessary pipe joints.

**MANIFOLD BYPASS MISSING**

63.    EVD had a duty under the Lease to design and construct the Manure Separation Facilities "with adequate capacity to process all suitable manure from the dairy and include an appropriate amount of redundancy to avoid shutdowns due to mechanical and other failure." Lease at Exhibit E.

64.    EVC failed to do so in that it built a key portion of the piping in the project without an adequate manifold bypass.  As a consequence, when additional dairy capacity is brought on line in the future, the Manure Separation Facilities will be required to be shut down for a significant period of time.

65.    Said failure was a breach of EVD's duty under the Lease.

**DEFAULT UNDER MSA AND LEASE**

66.    These above-mentioned failures constitute events of default under the Lease and the MSA. Lease, § 17, Default; MSA § 13, Events of Default and Termination.

67.    Under the Lease and MSA, Respondent has up to a maximum of ninety (90) days to cure any non-monetary default so long as Respondent "continues to diligently prosecute to completion the curing of the default." Lease, § 17.1.7, Default, Events of Default; MSA, § 13.1.1, Events of Default.

**DEMAND FOR ARBITRATION - 14**

68.     EVC served Respondent with its NOTICE OF DEFAULT ("Default") concurrently with this Demand.  *See* Exhibit A attached hereto and incorporated herein by reference.

## CLAIM I
## Breach of Contract

69.     Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

70.     A "controversy" has arisen between the parties—as that term is used in § 30.2 of the Lease—related to Respondent's breaches of the Lease. The parties agreed to resolve such controversies in binding arbitration, utilizing the American Arbitration Association's Commercial Arbitration Rules. Lease, § 30.2, Arbitration.

71.     Respondent has a duty to provide Millenkamp Cattle with Byproduct Specifications.

72.     Respondent's failure to provide Millenkamp Cattle with Byproduct Specifications is a material breach of the Lease.

73.     Respondent is obligated to compensate Claimant for manure hauling pursuant to the specified terms of the Third Amendment to the Lease.

74.     Respondent's failure to properly compensate Claimant for manure hauling constitutes a material breach of the Lease.

75.     Respondent is obligated to prevent liens being recorded against the real property of EVC.

76.     Respondent's failure to satisfy or bond the liens recorded against the real property of EVC is a material breach of the Lease and MSA.

77.    Respondent is obligated to compensate Millenkamp Cattle for providing grading and gravel to the Project when the Project failed to meet the overall appearance and quality of the maintenance of the adjacent Dairy Operation.

78.    Respondent's failure to compensate Millenkamp Cattle for the grading and gravel is a material breach of the Lease and MSA.

79.    Respondent is obligated to provide EVC with an expense report detailing the capital expenses of the Manure Separation Facility on a monthly, project to date and expected completion cost basis.

80.    Respondent's failure to compensate EVC with an expense report is a material breach of the Lease and MSA.

81.    Respond was required to "use best efforts, at its sole cost and expense, to complete installation and commission of the Manure Separation Facilities on or before October 31, 2023. . . ."

82.    Respondent's failure to saw cut a "chevron" pattern in the sand lane and reception pit area of the Manure Separation Facilities is a material breach of the Lease.

83.    Respondent's failure to complete HVAC installation in the Dewatering Building is a material breach of the Lease and MSA.

84.    Respondent's failure to use its best efforts to complete the Manure Separation Facilities on or before October 31, 2023, is a material breach of the Lease and MSA.

85.    After the commissioning of the Manure Separation Facility on August 15, 2024, and as of the date of the Demand, EVD is still unable to process all of the Manure in accordance with the Byproduct Specifications.  Respondent's failure to process all of the Manure in accordance with the Byproduct Specifications is material breach of the Lease and MSA.

**DEMAND FOR ARBITRATION - 16**

86.    EVD'S failure to process all of the thickened effluent created by the manure separation facility through the FAN screw presses located in the dewatering building is a material breach of the Lease and the MSA.

87.    EVD's failure to add an additional centrifuge and FAN separators to ensure there is adequate capacity to process all manure and account for an appropriate amount of redundancy is a material breach of the Lease and the MSA.

88.    EVD'S failure to attempt to drill a well is a material breach of Lease and the MSA.

89.    EVD'S failure to properly route the 24" green water inlet into the Green Water Flush Building is a material breach of Lease and the MSA.

90.    EVD'S failure to fill in the Southwest Settling Cell in is a material breach of Lease and the MSA.

91.    EVD'S failure to provide for a key manifold bypass is a material breach of Lease and the MSA.

92.    As a direct result of Respondent's breach, Claimants have been damaged in an amount to be proven in arbitration.

## CLAIM II
## Declaratory Judgment

93.    Claimants hereby incorporate all foregoing paragraphs as though fully restated and set forth.

94.    AAA Rule 47(a) allows an arbitrator to grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.

95.    AAA Rule 37 allows an arbitrator to take whatever interim measures he or she deems necessary.

96.    A "controversy" has arisen between the parties, as that term is used in § 30.2 of the Lease.

97.    Idaho Code section 10-1201 authorizes declaratory judgments, and Idaho Code section 10-1202 provides that a person interested under a contract may obtain a declaration of his rights, status, or other legal relations thereunder.

98.    Claimants are persons, as defined by Idaho Code section 10-1213, interested under a contract or contracts and are entitled to have a declaration of their rights, status, or other legal relations thereunder declared by the arbitrator.

99.    Idaho Code section 10-1208 provides that further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.

100.    Respondent has refused to reimburse EVC for grading and gravel.

101.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent's failure to maintain the Project in good condition and repair, consistent with the overall appearance and quality of the maintenance of the adjacent Dairy Operation, forcing Millenkamp Cattle to grade and provide gravel to the Project do not serve to negate Respondent's failure to reimburse Claimants for said costs.

102.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent failed to use its best efforts to complete the Manure Separation Facilities on or before October 31, 2023.

103.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent failed to design, build and operate the Manure Separation facility in a manner that processes 100% of the Manure.

104.    Respondents have failed to compensate Claimants in the amount of $50,000 per day because the Project has not been able to process 100% of the Manure in accordance with the Byproduct Specifications.

105.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent is required to process 100% of the Manure in accordance with the Byproduct Specifications, this includes, but is not limited to all of the fiber, solids and green water separated by the Project, temporary equipment and dredges.

106.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent is required to process all of the thickened effluent created by the manure separation facility through the FAN screw presses located in the dewatering building.

107.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent is required to clean the temporary lagoon.

108.    Claimants request and are entitled to an award for entry of an order and/or judgment declaring that Respondent is required to add an additional centrifuge and FAN separators to ensure there is adequate capacity to process all manure and account for an appropriate amount of redundancy.

109.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must use commercial reasonable, good faith efforts to construct a well.

110.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must add additional 24" inlet routing.

111.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must fill in the Southwest Settling Cell.

**DEMAND FOR ARBITRATION - 19**

112.    Claimants request and are entitled to an award for entry of an order and/or judgment from the arbitrator declaring that Respondent must build the key manifold bypass.

## ATTORNEYS' FEES

In order to bring this arbitration, it has been necessary for Claimants to retain the services of legal counsel, Givens Pursley LLP, at said firm's customary rates. Pursuant to AAA Rule 47 as well as Idaho Code §§ 12-120(3) and 12-121, Idaho Rule of Civil Procedure 54(e), and the Lease, Claimants are entitled to recover their costs and attorneys' fees incurred in pursuing this action together with an award of any administrative fees, expenses, and arbitrator's compensation paid by Claimants, in such amounts as the arbitrator deems reasonable and just.

## PRAYER FOR RELIEF

WHEREFORE, Claimants pray for relief as follows:

1.    That the arbitrator find for Claimants on each and every Count of this Arbitration Demand and afford Claimants the relief sought in each Count herein;

2.    For an award of Claimants' costs and attorneys' fees in such amount as may be proven at the appropriate time in these proceedings;

3.    That the arbitrator retain jurisdiction of this matter in order to resolve future controversies; and

4.    For such other and further relief as the arbitrator deems just and appropriate under the circumstances.

DATED: _____.

GIVENS PURSLEY LLP


By____DRAFT_____
      Thomas E. Dvorak – Of the Firm
      Jason J. Blakley – Of the Firm
      Attorneys for Claimants

**DEMAND FOR ARBITRATION - 20**



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Adam Lewis
Miranda Russell
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

9590 9402 7844 2234 2449 49

2. Article Number (Transfer from service label)
7020 1290 0000 6137 1652

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

---

**U.S. Postal Service™** TED W054-187
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☒ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)       $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required          $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$

Postmark
Here

Sent To  Adam Lewis
         Miranda Russell
Street and Apt. No., or PO Morrison & Foerster LLP
                           425 Market Street
City, State, ZIP+4®   San Francisco, CA 94105

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7020 1290 0000 6137 1652



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

East Valley Development, LLC
Attention: General Counsel
4675 MacArthur Court, Suite 800
Newport Beach, CA 92660

9590 9402 7844 2234 2449 63

2. Article Number (Transfer from service label)
7020 1290 0000 6137 1669

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

**U.S. Postal Service™ CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

TED 11054-187

For delivery information, visit our website at www.usps.com®.

**OFFICIAL USE**

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☑ Return Receipt (hardcopy)     $
☑ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required      $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$
Sent To   East Valley Development, LLC
          Attention: General Counsel
Street and Apt. No., or 4675 MacArthur Court, Suite 800
City, State, ZIP+4® Newport Beach, CA 92660

Postmark
Here

PS Form 3800, April 2015 PSN 7530-02-000-9047          See Reverse for Instructions

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

William J. Flanagan
VP, Strategic Development
East Valley Development, LLC
4675 MacArthur Court, Suite 800
Newport Beach, CA 92660

9590 9402 7844 2234 2449 56

2. Article Number (Transfer from service label)

7020 1290 0000 6137 1676

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt



**CERTIFIED MAIL**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**U.S. Postal Service™**
TED 11054-187
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☒ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required          $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$

Postmark
Here

Sent To    William J. Flanagan
           VP, Strategic Development
Street and Apt. No., or PO Box No.  East Valley Development, LLC
           4675 MacArthur Court, Suite 800
City, State, ZIP+4®  Newport Beach, CA 92660

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

7020 1290 0000 6137 1676
7020 1290 0000 6137 1676

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Adam Lewis
Miranda Russell
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

9590 9402 8077 2349 1453 56

2. Article Number *(Transfer from service label)*

9589 0710 5270 0695 9335 98

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

TED 11054
187

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☑ Return Receipt (hardcopy)    $ _____
☐ Return Receipt (electronic)    $ _____
☐ Certified Mail Restricted Delivery    $ _____
☐ Adult Signature Required    $ _____
☐ Adult Signature Restricted Delivery    $ _____

Postmark Here
DEC 24

Postage
$

Total Postage and Fees
$    11.82

Sent To    Adam Lewis
              Miranda Russell
Street and Apt. No., or PO Box No. Morrison & Foerster LLP
                                                   425 Market Street
City, State, ZIP+4®    San Francisco, CA 94105

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

9589 0710 5270 0695 9335 98

EXHIBIT G

EXHIBIT G

# GIVENS PURSLEY LLP
Attorneys and Counselors at Law

601 W. Bannock Street
PO Box 2720
Boise, ID 83701
Telephone: 208-388-1200
Facsimile: 208-388-1300

www.givenspursley.com

Thomas E. Dvorak
(208) 388-1245
ted@givenspursley.com

Taylor J. Barton
Charlie S. Baser
Jeff S. Beelaert
Christopher J. Beeson
Jason J. Blakley
Clint R. Bolinder
Jeff W. Bower
Preston N. Carter
Chynna K. Castoro
Jeremy C. Chou
Charlotte V. Cunnington

Joshua C. Dickinson
Amber N. Dina
Bradley J. Dixon
Thomas E. Dvorak
Morgan D. Goodin
Don Z. Gray
Brian J. Holleran
Kersti K. Kennedy
Elizabeth A. Koeckeritz
Neal A. Koskella
Michael P. Lawrence

Franklin G. Lee
Matthew E. Liebertz
David R. Lombardi
Kimberly D. Maloney
Kenneth R. McClure
Alex P. McLaughlin
Melodie A. McQuade
Megann E. Meier
Christopher H. Meyer
L. Edward Miller
Judson B. Montgomery

Deborah E. Nelson
Randall A. Peterman
Blake W. Ringer
Michael O. Roe
Marcus H. Waterman
Robert B. White
Michael V. Woodhouse

Kenneth L. Pursley (1940-2015)
James A. McClure (1924-2011)
Raymond D. Givens (1917-2008)

December 13, 2024

**VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED,
AND EMAIL**
William J. Flanagan
VP, Strategic Development
East Valley Development, LLC
4675 MacArthur Court, Suite 800
Newport Beach, CA  92660
Will.Flanagan@cleanenergyfuels.com

**VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED,
AND EMAIL**
East Valley Development, LLC
Attention: General Counsel
4675 MacArthur Court, Suite 800
Newport Beach, CA  92660
jim.sytsma@cleanenergyfuels.com

Adam Lewis
Miranda Russell
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
ALewis@mofo.com
MRussell@mofo.com

Re:    Demand for Adequate Assurances; Notice of Default to East Valley
       Development, LLC ("EVD")

Dear EVD General Counsel,

In furtherance to the Notice of December 6, 2024, additional notice as to an intent to exercise self-help is given as to the following matters.  Some or all of these were the subject of prior notice on November 8, 2024.

More specifically, under Section 8.3 of the Lease, if EVD "fails to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA," EVC "may take such action as [EVC]  deems reasonably necessary to cause the [same] to be so maintained and [EVD] shall promptly reimburse [EVC] for [EVD's] reasonable costs and expenses in connection therewith . . .."  The following constitute failures to maintain or operate the Project, Manure Separation Facilities, and/or the Leased Premises in accordance with the foregoing and the MSA:

1. Ordering of Additional Equipment.  As Bill Millenkamp informed Mark McKenzie
   on December 11, 2024, and in follow-up to prior notices of intent to exercise self-

December 13, 2024
Page 2

help, Millenkamp will be ordering an additional five fans and a centrifuge and having the same installed. As has been stated, these are absolutely necessary in order for EVD to meet its obligations under the Ground Lease Agreement ("Lease") between EVD and East Valley Cattle, LLC ("EVC") and Manure Supply Agreement ("MSA") between EVD and Millenkamp Cattle, Inc. ("Millenkamp Cattle"). Without five more fans and a third centrifuge, EVD cannot meet its obligations nor have the required redundancy. It is anticipated the order for this equipment will be made within the next week.

2. <u>Cleaning Solids Out of Settling Ponds and Lagoon</u>. EVC has ordered a dredge to effectively clean the settling ponds and expects the same to be on site shortly after Christmas. This has required a $50,000 deposit and of course will incur an additional cost every day after. EVC may also be using long-reach track hoes to clear the settling ponds and lagoon as best as may be possible with those pieces of equipment (as noted previously, EVD's redesign of the ponds and lagoon has now resulted in the requirement of a dredge being necessary to remove solids when said solids are not properly processed by EVD). After the aforementioned fans and centrifuge are installed, EVC will consider additional measures in addition to the dredge such as a pump to pump the effluent back to be processed to the standard required under the MSA, and otherwise to avoid the buildup of sludge in the settling pond and also potentially into the main lagoon. As noted in the prior demand, the buildup in the settling ponds and lagoon is intolerable and if such build up is not immediately addressed, it will be threatening to clog the irrigation system which is used to distribute the green water and otherwise create an environmental disaster that cannot be pumped and otherwise makes it into natural water sources.

3. <u>Reclaiming of Gravel.</u> In the vicinity of the to-be-built shop area that is under construction, Millenkamp supplied gravel so that the equipment utilized by EVD would not be parking in mud and unsuitable areas. EVD has refused to pay for this gravel. Accordingly, demand is made that EVD remove the equipment from said area by next Wednesday, December 18, 2024, at 5:00 p.m. Thereafter, Millenkamp and EVC will proceed to remove its gravel from that area. If EVD wishes to make payment for that gravel before that time, please advise immediately and make arrangements. The amount due is $87,422.40 plus interest to date at the statutory rate of interest at 12% from December 29, 2023 through today in the amount of $10,059.56 for a total amount of $97,481.96.

4. <u>Potable Water</u>. As noted in the prior notice, EVD has failed to obtain potable water and to reach an acceptable agreement on what it is willing to pay. It is absurd that EVD has constructed a water distribution system but so far has refused to hook water to it. In order to provide the manure it is contractually obligated to provide, Millenkamp has to hire a water truck to effectuate cleaning after the deliveries of the manure to the digester facility. Millenkamp will engage in self-help efforts to bring potable well water to and hook the same into the water system that EVD has constructed, and will begin to run water through the constructed facilities. Millenkamp understands from talking with EVD representative Mark McKenzie that unless EVD takes action to ensure that that system is ready to receive water, that

December 13, 2024
Page 3

introducing water into said system could cause problems. That is why Millenkamp is giving notice of ten (10) days, i.e., until December 23, 2024, before it undertakes these efforts, so EVD may make the water piping facilities ready to receive the water. EVC will, of course, make a reasonable cost and charges for the water as it is entitled to as part of the arbitration proceeding in this matter.

5. <u>Project Area Safety Concerns</u>. There are two areas that are currently unsafe on the project and require immediate attention. One is the roadway on the south side of project, specifically the area adjacent to the reception pit, rotary drum building, clarifiers and green flush building. There is not a safe transition between the roads, ensuring a vehicle will tip over in the abrupt transition between two roads. A secondary area is between the settling ponds and an adjoining wall, which makes for only about a six-foot space for a loader in that area to back up when it is loading manure. It is not a matter of if, but a matter of when, a loader will fall into the settling pond immediately to the north of the sand screw separators. Immediate action is required by EVD to make these areas safe. If action is not taken by EVD within ten (10) days, Millenkamp intends to exercise its self-help remedies and correct these issues at the cost of EVD.

6. <u>Fill In of Unfinished Settling Ponds</u>. The southwest settling pond is no longer in use and must be filled in for safety purposes. EVD has refused to clean and fill in this settling pond since it has no longer been used in the temporary manure separation facility. Accordingly, notice is hereby given that Millenkamp will undertake to use self-help to clean and fill in the southwest settling pond.

All costs associated with the self-help described above are claimed as the responsibility of EVD and any costs for EVC performing this work are claimed as damages to be pursued in the arbitration together with interest at the Idaho statutory rate of 12% on the same as of the date they are incurred. Further, all of the forgoing in addition to being noticed for the remedy of self help are also noticed as items for arbitration as well.

Nothing contained within this notice relinquishes or releases any rights of EVC or Millenkamp Cattle for default as provided for elsewhere in the Lease, MSA or at law or equity. Your immediate attention to this matter is required.

Sincerely,

Thomas E. Dvorak

TED/JJB
cc:     Client
18689780.3 [11054.187]

EXHIBIT H

EXHIBIT H

# ⅢORRISON FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BERLIN, BOSTON, BRUSSELS,
DENVER, HONG KONG, LONDON, LOS
ANGELES, MIAMI, NEW YORK, PALO
ALTO, SAN DIEGO, SAN FRANCISCO,
SHANGHAI, SINGAPORE, TOKYO,
WASHINGTON, D.C.

Writer's Direct Contact
+1 (415) 268-7232
ALewis@mofo.com

December 16, 2024

East Valley Cattle, LLC
Millenkamp Cattle, Inc.

C/O

Givens Pursley LLP
601 W. Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Attention: Thomas E. Dvorak, Esq.
Email: ted@givenspursley.com

> Re:    Demand for Adequate Assurances; Notice of Default to
>         East Valley Development, LLC ("EVD")

Dear Mr. Dvorak:

We write in response to your letter dated December 6, 2024 (the "Letter") concerning East Valley Development, LLC's ("EVD") alleged obligations and conduct under both the Ground Lease Agreement between EVD and East Valley Cattle, LLC ("EVC") dated October 8, 2021 (as amended, the "Lease") and the Manure Supply Agreement between EVD and Millenkamp Cattle, Inc. ("Millenkamp Cattle" and together with EVC, the "Debtors") of the same date (as amended, the "MSA" and together with the Lease, the "Facility Agreements").  In response (this "Initial Response") to (1) your request of adequate assurances of resolution regarding the maintenance of the settling pond and sewage lagoon, and (2) the Notice of Default, EVD respectfully states as follows:

**IIIORRISON FOERSTER**

December 16, 2024
Page Two

## DEMAND FOR ADEQUATE ASSURANCE

### A.    Allegations with respect to lagoon maintenance

EVD disagrees that there is a threatened or actual breach of EVD's obligations under the Facility Agreements with respect to the maintenance of any lagoon, including, without limitation, the Lagoon[1] as defined in that certain Third Amendment to the Lease dated as of June 22, 2023 (the "Third Amendment") located on the Leased Property (as defined in the Lease) (collectively, the "Leased Property Lagoons"). EVD has fulfilled its obligations under the Lease to maintain and clean the Leased Property Lagoons in accordance with the requirements of the Facility Agreements and applicable law.

1.   With respect to item 1, the terms of the Facility Agreements do not require that the Manure Separation Facilities have the capability of processing 100% of the effluent produced by Millenkamp Cattle. The Manure Supply Agreement has no quantity guarantee with respect to the effluent produced by Millenkamp Cattle. Moreover, pursuant to Section 6.3.1 of the MSA, the Debtors have agreed to accept the effluent produced by the Facility as is, subject to the Byproduct Standards set forth in Section 11.6 of the MSA, with which EVD has been in compliance. *See* MSA § 6.3.1 ("The Return Water is delivered to Dairy as-is, and Developer makes no representations or warranties regarding the nature or composition of the Return Water, except as expressly provided in this Agreement."); MSA § 11.6 ("Developer will provide for daily testing of Fiber and Return Water and regular testing of NPK Solids to ensure that material is in accordance with Exhibit F (the "Byproduct Standards")). Additionally, the assertions set forth in items 1 and 2 of the Letter regarding actions taken by the Debtors prior to entering into the Facility Agreements are irrelevant to any breach allegations.

2.   With respect to items 2, 3, and 5, EVD disagrees that EVD's previous hiring of a third party to facilitate processing manure in the Leased Property Lagoons with a dredge and utilizing centrifuges was a recognition by EVD of any additional responsibility with respect to maintenance of the Lagoon that is not expressly set forth in the Facility Agreements. With respect to the maintenance of the Leased Property pursuant to Section 8.3 of the Lease, "maintenance" or "maintain" is not defined. The Facility Agreements impose no express obligation on EVD to maintain the Leased Property Lagoons in the manner in which the Letter demands.

3.   With respect to item 10, EVD is not responsible for the maintenance of the north lagoon, which is not located on the Premises. As stated above, the Dairy has agreed to accept the effluent produced by the Facility as is. EVD is unaware of and expressly disclaims any potential "environmental disaster" threatened by EVD's alleged conduct or alleged lack of conduct relating to the Leased Property Lagoons or any of EVD's obligations under the Facility Agreements.

ny-2833788

**ⅢORRISON FƆERSTER**

December 16, 2024
Page Three

4.  As to the remaining contentions, we take no position at this time because they relate to obligations belonging to the Debtors.

To EVD's knowledge, EVD is maintaining the Leased Property "in compliance with all applicable laws, rules and regulations, including the land use and building laws of local governmental authorities, environmental laws, rules and regulations, and insurance requirements and codes" as contemplated by Section 8.3 of the Lease.  None of EVD's conduct or lack of conduct in connection with the Leased Property Lagoons has resulted in a material adverse effect (environmental, economic, or otherwise) upon the Debtors.  EVD's manure management pursuant to the Facility Agreements significantly lowers the Debtors' net operations costs for maintaining all lagoons (including the Leased Property Lagoons) overall.  Additionally, if the Debtors believe that the state of the north lagoon (which is not the responsibility of EVD) is creating an adverse environmental impact, then the Debtors can take appropriate actions to remedy such impact, but those actions would be outside the scope of EVD's obligations under the Facility Agreements and are the responsibility of the Debtors.

Accordingly, EVC's self-help and reimbursement rights pursuant to Section 8.3 of the Lease are not available because EVD has not breached its obligations under Section 8.8 of the Lease or Section 8.3 of the Lease.  EVD expressly disclaims responsibility for any costs for actions taken by the Debtors (including by the Debtors' employees, vendors, or contractors) in connection with any lagoon maintenance activities.

**B.    Allegations with respect to road maintenance**

With respect to item 11, EVD requests that the Debtors provide more clarity as to which roads are being referenced.  EVD would be grateful if the Debtors could please specifically identify such roads on a physical or digital map so that EVD can understand whether such roads are located within the Premises or not.  EVD also requests that the Debtors specifically indicate the basis in the Facility Agreements for the Debtors' assertion that EVD is required to "properly slope the road adjacent to the clarifiers, reception pit and dewatering building" as set forth in item 11 of the Letter.  Accordingly, until additional clarification is provided with respect to this demand for adequate assurance, EVC's self-help and reimbursement rights pursuant to Section 8.3 of the Lease are not available.  EVD expressly disclaims responsibility for any costs for actions taken by the Debtors (including by the Debtors' employees, vendors, or contractors) in connection with any road maintenance activities.

**NOTICE OF DEFAULT AND DRAFT ARBITRATION DEMAND**

EVD expressly reserves all rights with respects to the specific allegations set forth in the Letter and the attached draft Arbitration Demand (as defined in the Letter) with respect to alleged defaults by EVD.  EVD submits that it is not in default of any of its obligations under the Facility Agreements.

ny-2833788

# �Illᴏᴙᴙɪꙅᴏᴎ ꟻᴏᴇᴙꙅᴛᴇᴙ

December 16, 2024
Page Four

**TENDER OF CLAIM**

EVD is conducting an independent lien search and investigation with respect to the alleged mechanic's lien referenced in this section of the Letter. EVD reserves all rights with respect thereto.

**ADDITIONAL RESERVATION OF RIGHTS**

EVD is committed to continuing to safely operate and maintain the Project in a commercially reasonable manner alongside the Debtors and will continue to meet all contractual obligations under the Facility Agreements. EVD hereby reserves all of its rights and remedies provided under the Facility Agreements and at law or equity with respect to the foregoing and without prejudice to any other matters pending or outstanding between EVD and the Debtors.

EVD further completely reserves its rights with respect to all facts, allegations, and legal analysis set forth in the Letter. The fact that EVD may not take a position or dispute a specific assertion and/or allegation set forth in the Letter in this Initial Response shall not be deemed or construed as agreement that such assertion and/or allegation is true.

EVD further completely reserves its rights with respect to the Letter and the Facility Agreements to raise additional issues and concerns, including the right to supplement, amend, or modify this Initial Response including, without limitation, as a result of future events, the discovery and analysis of additional information, the correction of any errors, the resolution of disputes, and the assertion of any rights of setoff or recoupment. EVD expressly reserves any and all defenses, claims, and counterclaims, including, without limitation, the right of setoff, recoupment, lien right, or similar right, remedy, or defense against any claims or counterclaims asserted by the Debtors or any trustee in relation to the Facility Agreements, or otherwise described in the Letter. Further, EVD reserves the right to assert any and all defenses to any actions commenced against EVD by the Debtors, any trustee, or any party with standing (derivative or otherwise) to bring such claims in any forum such claims may be commenced.

This Initial Response is not an election of remedies and is without prejudice to EVD's rights to assert claims against any other entity or person, whether arising out of or relating to the facts and circumstances underlying the Letter, the Facility Agreements, or otherwise. EVD hereby expressly preserves any and all rights, claims, causes of action, defenses, counterclaims, or objections, or any similar rights, remedies, or defenses against all persons or entities in any forum, whether currently existing or arising in the future, against whom it determines to have claims.

This Initial Response is not intended as, and shall not be deemed or construed as, consent by EVD to the jurisdiction of any court or tribunal, including, without limitation, the American Arbitration Association.

ny-2833788

# ⅢORRISON ⅎOERSTER

December 16, 2024
Page Five

/s/ Adam A. Lewis
Adam A. Lewis, Esq.
alewis@mofo.com
Morrison & Forrester LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415-268-7000

-and-

Miranda Russell, Esq.
mrussell@mofo.com
Morrison & Foerster LLP
250 W. 55th Street
New York, NY 10019-9601
Telephone: 212-468-8000

*Counsel for East Valley Development, LLC*

With copy to:
Jason J. Blakley, Esq.
Email: jasonblakley@givenspursley.com

Will Flanagan
Email: will.flanagan@cleanenergyfuels.com

Jim Sytsma, Esq.
Email: jim.systsma@cleanenergyfuels.com

Tammy Hom, Esq.
Email: tammy.hom@cleanenergyfuels.com

Crystal Lineberry, Esq.
Email: crystal.lineberry@cleanenergyfuels.com

ny-2833788

EXHIBIT I

EXHIBIT I

# ΙΙΟRRISON FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BERLIN, BOSTON, BRUSSELS,
DENVER, HONG KONG, LONDON, LOS
ANGELES, MIAMI, NEW YORK, PALO
ALTO, SAN DIEGO, SAN FRANCISCO,
SHANGHAI, SINGAPORE, TOKYO,
WASHINGTON, D.C.

Writer's Direct Contact
+1 (415) 268-7232
ALewis@mofo.com

December 18, 2024

East Valley Cattle, LLC
Millenkamp Cattle, Inc.

C/O

Givens Pursley LLP
601 W. Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Attention: Thomas E. Dvorak, Esq.
Email: ted@givenspursley.com

Re:    Demand for Adequate Assurances; Notice of Default to
East Valley Development, LLC ("EVD")

Dear Mr. Dvorak:

We write in response to your letter dated December 13, 2024 (the "December 13 Letter")
concerning East Valley Development, LLC's ("EVD") alleged obligations and conduct under both
the Ground Lease Agreement between EVD and East Valley Cattle, LLC ("EVC") dated October
8, 2021 (as amended, the "Lease") and the Manure Supply Agreement between EVD and
Millenkamp Cattle, Inc. ("Millenkamp Cattle" and together with EVC, the "Debtors") of the same
date (as amended, the "MSA" and together with the Lease, the "Facility Agreements").  In response
(this "Second Initial Response") to the Debtors' notice as to an intent to exercise self-help, EVD
respectfully states as follows:

**RESPONSE**

With respect to item 1 of the December 13 Letter claiming that without five more fans and a third
centrifuge, EVD cannot have the required redundancy, EVD expressly disagrees.  EVD submits
that it has maintained the appropriate amount of redundancy as required under the Lease, including,
without limitation, through maintenance of the entire lagoon system and keeping spare parts
available.  Millenkamp Cattle approved the 3D model for the Manure Separation Facilities with
the understanding that EVD was planning to install the current quantity of equipment.

ny-2837460

# ᴍORRISON ᖴOERSTER

December 18, 2024
Page Two

With respect to items 2 and 6 of the December 13 Letter, as stated in Adam Lewis' letter to Thomas Dvorak dated as of December 16, 2024 (the "First Initial Response"), the Facility Agreements impose no obligation on EVD to maintain any lagoon, including, without limitation, the Lagoon[1] as defined in that certain Third Amendment to the Lease dated as of June 22, 2023 (the "Third Amendment") located on the Leased Property (as defined in the Lease) (collectively, the "Leased Property Lagoons") in the manner in which the December 13 Letter demands. EVD's previous hiring of a third party to facilitate processing manure in the Leased Property Lagoons with a dredge and utilizing centrifuges was not a recognition by EVD of any additional responsibility with respect to maintenance of the Leased Property Lagoons that is not expressly set forth in the Facility Agreements. Moreover, as stated in the First Initial Response, EVD is unaware of and expressly disclaims any potential "environmental disaster" threatened by EVD's alleged conduct or alleged lack of conduct relating to the Leased Property Lagoons or any of EVD's obligations under the Facility Agreements. Finally, the Facility Agreements impose no direct obligation to fill in any settling cell.

With respect to item 3 of the December 13 Letter, EVD acknowledges that there was a certain portion of the Project that was at a lower elevation than other areas of the Project, which for approximately two years after entering into the Facility Agreements was not an issue for the Debtors. On October 9, 2023, David Heida then requested that EVD raise up this portion by bringing in fill. In response, on October 10, 2023, EVD advised Millenkamp Cattle (through its counsel David Heida) not to proceed with filling this area, stating "we do not think we are responsible for rebuilding your road to increase the slope. We also do not think it is a good use of your money or our money to invest in back backfill or gravel to the temp lay down area, which is part of the leased property. It is in the construction site, so we would prefer to limit traffic and will need to excavate there this spring. We do not agree to reimburse you for work we don't authorize or agree with." The Debtors decided at their own cost, expense, and risk to perform this work anyway. The Debtors have not identified any basis in the Facility Agreements for their request that EVD remove its staged material and equipment so that they can remove that gravel. EVD reserves its rights to claim damages with respect to additional costs incurred as a result of Millenkamp Cattle's actions.

With respect to item 4 of the December 13 Letter, while the December 13 Letter contends that it is "absurd," EVD has no obligation under Section 4.8 of the Lease (or otherwise) to hook water to a water distribution system. EVD and the Debtors have previously discussed the potential routing of an underground pipe, but these discussions are ongoing and no go-forward agreement has been reached. Moreover, EVD has no obligation under the Lease to drill a well. The Lease permits EVD to obtain water from a third-party source as an alternative. *See* Lease § 4.8.

---

[1] The "Lagoon" collectively is defined as a temporary manure separation lagoon and installed centrifuges.

# ⅢORRISON FOERSTER

December 18, 2024
Page Three

With respect to item 5 of the December 13 Letter, as stated in the First Initial Response, EVD requests that the Debtors provide more clarity as to which roads are being referenced. Please specifically identify such roads on a physical or digital map so that EVD can understand whether such roads are located within the Premises or not.

Accordingly, with respect to all six items of the December 13 Letter, EVC's self-help and reimbursement rights pursuant to Section 8.3 of the Lease are not available because EVD has not breached its obligations under Sections 8.8 or 8.3 of the Lease (or otherwise). EVD expressly disclaims responsibility for any costs for actions taken by the Debtors (including by the Debtors' employees, vendors, or contractors) in connection with any of the foregoing. EVD further expressly disclaims responsibility for the costs (inclusive of any alleged interest due and owing) outlined in the statement dated November 30, 2024 requesting payment in the amount of $9,242,956.38.

Any of the proposed self-help remedies proposed in the December 13 Letter will be undertaken at the full cost and risk of the Debtors, not EVD, should the Debtors choose to proceed as outlined in the December 13 Letter. Moreover, EVD reserves all rights to claim breach of the covenant of quiet enjoyment under Section 12 of the Lease and any and all other available remedies should the Debtors proceed to take any such actions. EVD also preserves and has not waived its right to assert a claim for breach in connection with previous "self help" remedies undertaken on the Premises by the Debtors without authority to do so under the Facility Agreements.

## ADDITIONAL RESERVATION OF RIGHTS

EVD is committed to continuing to safely operate and maintain the Project in a commercially reasonable manner alongside the Debtors and will continue to meet all contractual obligations under the Facility Agreements. EVD hereby reserves all of its rights and remedies provided under the Facility Agreements and at law or equity with respect to the foregoing and without prejudice to any other matters pending or outstanding between EVD and the Debtors.

EVD further completely reserves its rights with respect to all facts, allegations, and legal analysis set forth in the December 13 Letter. The fact that EVD may not take a position or dispute a specific assertion and/or allegation set forth in the December 13 Letter in this Second Initial Response shall not be deemed or construed as agreement that such assertion and/or allegation is true.

EVD further completely reserves its rights with respect to the December 13 Letter and the Facility Agreements to raise additional issues and concerns, including the right to supplement, amend, or modify this Second Initial Response including, without limitation, as a result of future events, the discovery and analysis of additional information, the correction of any errors, the resolution of disputes, and the assertion of any rights of setoff or recoupment. EVD expressly reserves any and all defenses, claims, and counterclaims, including, without limitation, the right of setoff, recoupment, lien right, or similar right, remedy, or defense against any claims or counterclaims

**ℿORRISON ƎOERSTER**

December 18, 2024
Page Four

asserted by the Debtors or any trustee in relation to the Facility Agreements, or otherwise described in the December 13 Letter.  Further, EVD reserves the right to assert any and all defenses to any actions commenced against EVD by the Debtors, any trustee, or any party with standing (derivative or otherwise) to bring such claims in any forum such claims may be commenced.

This Second Initial Response is not an election of remedies and is without prejudice to EVD's rights to assert claims against any other entity or person, whether arising out of or relating to the facts and circumstances underlying the December 13 Letter, the Facility Agreements, or otherwise. EVD hereby expressly preserves any and all rights, claims, causes of action, defenses, counterclaims, or objections, or any similar rights, remedies, or defenses against all persons or entities in any forum, whether currently existing or arising in the future, against whom it determines to have claims.

*[Remainder of page intentionally left blank]*

ny-2837460

# ⅢORRISON FOERSTER

December 18, 2024
Page Five

/s/ Adam A. Lewis
Adam A. Lewis, Esq.
alewis@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415-268-7000

-and-

Gregory B. Koltun, Esq.
gkoltun@mofo.com
Morrison & Foerster LLP
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Telephone: (213) 892-5200

-and-

Miranda Russell, Esq.
mrussell@mofo.com
Morrison & Foerster LLP
250 W. 55th Street
New York, NY 10019-9601
Telephone: 212-468-8000

*Counsel for East Valley Development, LLC*

With copy to:
Jason J. Blakley, Esq.
Email: jasonblakley@givenspursley.com

**⊪ORRISON ⸬OERSTER**

December 18, 2024
Page Six

Will Flanagan
Email: will.flanagan@cleanenergyfuels.com

Jim Sytsma, Esq.
Email: jim.systsma@cleanenergyfuels.com

Tammy Hom, Esq.
Email: tammy.hom@cleanenergyfuels.com

Crystal Lineberry, Esq.
Email: crystal.lineberry@cleanenergyfuels.com

ny-2837460