Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
       jjm@johnsonmaylaw.com

*Attorneys for the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>MILLENKAMP CATTLE, INC.,<br><br>Debtor. | Case No. 24-40158-NGH |
| Filing relates to:<br><br>☒  ALL DEBTORS<br><br>☐  Millenkamp Cattle, Inc.<br><br>☐  Idaho Jersey Girls<br><br>☐  East Valley Cattle<br><br>☐  Millenkamp Properties<br><br>☐  Millenkamp Properties II<br><br>☐  Millenkamp Family<br><br>☐  Goose Ranch<br><br>☐  Black Pine Cattle<br><br>☐  Millenkamp Enterprises<br><br>☐  Idaho Jersey Girls Jerome Dairy | Jointly Administered With<br>Case Nos.:<br><br>24-40159-NGH (Idaho Jersey Girls)<br>24-40160-NGH (East Valley Cattle)<br>24-40161-NGH (Millenkamp Properties)<br>24-40162-NGH (Millenkamp Properties II)<br>24-40163-NGH (Millenkamp Family)<br>24-40164-NGH (Goose Ranch)<br>24-40166-NGH (Black Pine Cattle)<br>24-40167-NGH (Millenkamp Enterprises)<br>24-40165-NGH (Idaho Jersey Girls Jerome Dairy)<br><br>Chapter 11 Cases |

<u>THIRD AMENDED PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC.
AND ITS RELATED DEBTOR AFFILIATES, dated March 17, 2025</u>

### TABLE OF CONTENTS

**<u>INTRODUCTION</u>** ...........................................................................................9

**ARTICLE 1 <u>DEFINED TERMS AND RULES OF INTERPRETATION</u>** ..........10

**ARTICLE 2 <u>CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS</u>** ...23

    2.1    Summary and Classification of Claims ................................................23

    2.2    Substantive Consolidation. ................................................................. 24

    2.3    Classification & Voting Controversies. ............................................. 25

**ARTICLE 3 <u>CLASSIFICATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS</u>** ...............................................................................25

    3.1    Unclassified Claims ..........................................................................25

        3.1.1    Administrative Claims .........................................................25

        3.1.2    Professional Fee Claims .......................................................27

        3.1.3    Priority Tax Claims. .............................................................27

        3.1.4    DIP Loan .............................................................................28

    3.2    Class 1: Other Priority Claims .......................................................... 28

    3.3    Class 2: Corn Silage Group Secured Claims ......................................29

    3.4    Class 3: Outstanding Other Secured Claims ......................................30

    3.5    Class 4: Other Secured Claims Paid in Full .....................................31

    3.6    Class 5: Secured Equipment Loan and Lease Claims .........................33

    3.7    Class 6: John Deere Financial Secured Claim ....................................35

    3.8    Class 7: Western States Cat Secured Claim .......................................36

3.9      Class 8: Rexel USA, Inc. d/b/a Platt Electric Supply Claim.................37

3.10     Class 9: MetLife Secured Claims.................................................37

3.11     Class 10: Rabo Secured Claims .................................................43

3.12     Class 11: Conterra German Note Secured Claim................................45

3.13     Class 12: Conterra Mezz Loan Claim ..........................................46

3.14     Class 13: General Unsecured Claims ...........................................48

3.15     Class 14: Intercompany Claims..................................................49

3.16     Class 15: Equity Interests........................................................49

3.17     Special Provisions Regarding Unimpaired Claims .............................50

**ARTICLE 4 <u>ACCEPTANCE OR REJECTION OF THE PLAN</u>** ........................50

4.1      Impaired Class of Claims Entitled to Vote.......................................50

4.2      Voting of Claims ..................................................................50

4.3      Procedure/Voting Deadline ......................................................50

4.4      Acceptance by an Impaired Class................................................50

4.5      Presumed Acceptances by Unimpaired Classes. ................................51

4.6      Impaired Classes Deemed to Reject Plan. ......................................51

4.7      Confirmation Pursuant to Bankruptcy Code Section 1129(b). ............51

4.8      Elimination of Vacant Classes ..................................................51

**ARTICLE 5 <u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>** ...................51

5.1      Substantive Consolidation.......................................................51

5.2      Post-Confirmation Reporting Requirements.............................51

5.3      Chief Restructuring Officer.............................................53

5.4      Restructuring Transactions.......................................................54

5.5      Sources of Consideration for Plan Distributions...............................54

5.6     Sale of Canyonlands and McGregor ..............................................54

5.7     Refinancing ....................................................................................54

5.8     Plan Administrator ........................................................................54

5.9     Sales Process Commencement .......................................................55

5.10    Refinancing Process Extension…………………………………55

5.11    Sales Advisors ...............................................................................55

5.12    Sales Process .................................................................................55

5.13    Sale as a Going Concern ...............................................................55

5.14    Asset Sale.......................................................................................56

5.15    Expiration of Sales Process and Allocation of Sales Proceeds.........56

5.16    Costs of Sale ..................................................................................56

5.17    Vesting of Assets of Reorganized Debtors .....................................57

5.18    Authority .......................................................................................57

5.19    Corporate Existence .......................................................................58

5.20    Employee Obligations.....................................................................58

5.21    Workers Compensation Program ....................................................59

5.22    Pursuit and Resolution of Reorganized Debtors' Causes of Action ....59

5.23    No Successor Liability....................................................................59

5.24    Preservation of Privileges and Defenses.........................................59

5.25    Preservation of Rights of Action.....................................................60

            5.25.1  Maintenance of Avoidance Actions and Causes of Action......60

            5.25.2  Preservation of All Reorganized Debtors' Causes of Action Not
                        Expressly Settled or Released ..................................................60

5.26    Insurance Policies. .........................................................................61

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE,
INC., AND ITS RELATED DEBTOR AFFILIATES – Page 4

5.26.1 Insurance Policies Remain in Force. ........................................61

5.26.2 Insurance Policies; Employment Practice Liability Policies; Similar Policies. ........................................61

**ARTICLE 6 <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>** .........61

6.1    Assumption and Rejection of Executory Contracts and Unexpired Leases. ........................................61

6.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases ........................................62

6.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........................................63

6.4    Assumption Dispute Resolution ........................................64

6.5    Contracts and Leases Entered into After the Petition Date ........................................65

6.6    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................................65

6.7    Reservation of Rights ........................................65

6.8    Nonoccurence of Effective Date ........................................65

**ARTICLE 7 <u>PROVISIONS GOVERNING DISTRIBUTIONS</u>** ........................................66

7.1    Timing of Distributions for Allowed Claims. ........................................66

7.2    Calculating Distributions and Related Matters. ........................................66

7.3    Interest and Other Amounts Regarding Claims ........................................66

7.4    Means of Cash Payment. ........................................66

7.5    Form of Currency for Distributions. ........................................66

7.6    Fractional Distributions. ........................................67

7.7    De Minimis Distributions. ........................................67

7.8    Delivery of Distributions. ........................................67

7.9     Application of Distribution Record Date & Other Transfer Restrictions ..................................................................................................67

7.10    Withholding, Payment, and Reporting Requirements Regarding Distributions ...........................................................................................68

7.11    Defenses and Setoffs. ...........................................................................68

7.12    Joint Distributions. ...............................................................................68

7.13    Forfeiture of Distributions....................................................................69

**ARTICLE 8 <u>PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO</u>** ..................................................................................................69

8.1     Objections to and Resolution of Disputed Claims, Including Any Claims of Excluded Parties..................................................................................69

8.2     Claim Objections..................................................................................69

8.3     Estimation of Certain Claims ...............................................................69

**ARTICLE 9 <u>CONDITIONS PRECEDENT TO THE EFFECTIVE DATE</u>**.........70

9.1     Conditions to the Effective Date. .........................................................70

9.2     Waiver of Conditions to the Effective Date. ........................................70

9.3     Effect of Non-Occurrence of Conditions to the Effective Date. ..........70

9.4     Notice of the Effective Date. ................................................................70

**ARTICLE 10 <u>RELEASES, INJUNCTION, AND RELATED PROVISIONS</u>** ....71

10.1    Debtors' Releases..................................................................................71

10.2    Conditional Release of Debtors. ..........................................................72

10.3    Exculpation of Liability .......................................................................72

10.4    Released Lenders: Conterra, MetLife, and Sandton ............................73

**ARTICLE 11 RETENTION OF JURISDICTION AND POWER** ....................73

11.1    Scope of Retained Jurisdiction and Power. ...........................73

11.2    Non-Exercise of Jurisdiction. ................................................75

**ARTICLE 12 MISCELLANEOUS PROVISIONS** ...................................75

12.1    Payment of Statutory Fees ....................................................75

12.2    Default ...................................................................................75

12.2.1 Events of Default...................................................75

12.2.2 Cure of Prior Defaults ..........................................76

12.2.3 Consequences of Default .......................................76

12.3    Dissolution of Committee. ....................................................77

12.4    Modifications and Amendments. ..........................................77

12.5    Severability of Plan Provisions ............................................78

12.6    Compromises and Settlements ..............................................78

12.7    Binding Effect of Plan. .........................................................78

12.8    Term of Injunctions or Stays ................................................78

12.9    Revocation, Withdrawal or Non-Consummation .................79

12.10   Exemption from Transfer Taxes ...........................................79

12.11   Computation of Time. ...........................................................79

12.12   Transactions on Business Days .............................................79

12.13   Good Faith. ............................................................................79

12.14   Governing Law. .....................................................................79

12.15   Notices ..................................................................................79

12.16   Additional Documents ...........................................................79

12.17   Conflicts with the Plan .........................................................79

**ARTICLE 13 <u>REQUEST FOR CONFIRMATION AND RECOMMENDATION</u>**
.................................................................................................................81

    13.1    Request for Confirmation....................................................................81

    13.2    Recommendation.................................................................................81

# INTRODUCTION

Millenkamp Cattle, Inc. and its affiliated debtors (the "Debtors") hereby propose this *Second Amended Plan of Reorganization* (the "Plan"). Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Plan provides for the substantive consolidation of the Debtors assets and liabilities for purposes of the Plan, as described in section 5.1 below, including all distributions hereunder.

No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith, have been approved for use in soliciting acceptances and rejections of this Plan. Nothing in the Plan should be construed as constituting a solicitation of acceptances of the Plan unless and until the Disclosure Statement has been approved and distributed to Holders of Claims to the extent required by Bankruptcy Code section 1125.

**ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, RULE 3019 OF THE BANKRUPTCY RULES, AND ARTICLE X OF THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, SUPPLEMENT, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS CONSUMMATION.**

*-REMAINDER OF PAGE INTENTIONALLY LEFT BLANK-*

# ARTICLE 1

## DEFINED TERMS AND RULES OF INTERPRETATION

A capitalized term used in this Plan shall have the meanings set forth in this Article I. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

**1.1** **503(b)(9) Order:** On August 29, 2024, the Court entered an Order on Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims (Docket Nos. 476 & 584).

**1.2** **Administrative Claim:** Any Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases pursuant to section 327, 328, 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' business, (ii) any Professional Fee Claim, (iii) any fee or charge assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, (iv) any Allowed Claim that is to be treated as an Administrative Claim pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy Code, and (v) any Allowed Cure Claim.

**1.3** **Administrative Claims Bar Date:** The last date by which any Person must File a request for payment of an Administrative Claim, which date shall be the first Business Day that is at least thirty (30) calendar days after the Effective Date, or, alternatively, such earlier date as is set by the Bankruptcy Court. For the avoidance of doubt, post-petition statutory tax claims shall not be subject to any Administrative Claims Bar Date.

**1.4** **Allowed, Allowed Claim, or Allowed Administrative Claim:**

a. with respect to a Claim arising prior to the Petition Date (including a Section 503(b)(9) Claim):

(i) either (A) a proof of claim was timely Filed by the applicable Claims Bar Date, or (B) a proof of claim is deemed timely Filed either as a result of such Claim being Scheduled or by a Final Order; and

(ii) either (A) the Claim is not a Contingent Claim, a Disputed Claim, an Unliquidated Claim, or a Disallowed Claim; or (B) the Claim is expressly allowed by a Final Order or under the Plan;

b. with respect to a Claim arising on or after the Petition Date (excluding a Section 503(b)(9) Claim), a Claim that has been allowed by a Final Order or under the Plan.

Unless otherwise specified in the Plan or by a Final Order, an "Allowed Administrative Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest, penalties, fees, or late charges on such Administrative Claim or Claim from and after the Petition Date. Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim. For the avoidance of doubt, any and all Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

**1.5** **Asset:** With respect to a Person, all of the right, title and interest of such Person in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property, which, for avoidance of doubt, includes insurance policies and any rights, claims or potential claims with respect thereto.

**1.6** **Assumption Notice** means a notice of the assumption or assumption and assignment, and any proposed Cure Amount provided to counterparties to executory contracts and unexpired leases pursuant to the Disclosure Statement Order.

**1.7** **Avoidance Actions:** Any and all causes of action, claims, remedies, or rights, that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code sections 542, 544, 547, 548, 549, 550, 551, or 553, or under related state or federal statutes, or pursuant to any theory or cause of action under common law, regardless whether such action has been commenced prior to the Effective Date.

**1.8** **Ballot:** The ballot form authorized by the Bankruptcy Court to indicate acceptance or rejection of the Plan.

**1.9** **Bankruptcy Code:** Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as the same may be amended from time to time to the extent applicable to the Chapter 11 Cases.

**1.10** **Bankruptcy Court:** The United States Bankruptcy Court for the District of Idaho, or in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, such other court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Idaho.

**1.11** **Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure promulgated by the Supreme Court of the United States under 28 U.S.C. § 2075, as the same may be amended from time to time to the extent applicable to the Chapter 11 Cases.

**1.12** **Bar Date**: The General Bar Date or any other date established by the Bankruptcy Court as the deadline by which Proofs of Claim or requests for payment of Administrative Claims must be filed.

**1.13** **Bar Date Order**: The Order (I) Vacating the Original Bar Date and (II) Establishing a Deadline to File Proofs of Claim (Docket No. 393).

**1.14**    **Benefit Plan:** Any "employee benefit plan" as defined in section 3(3) of ERISA, compensation, employment, consulting, severance, retention or similar plan, agreement, arrangement, program or policy, or other plan, agreement, arrangement, program or policy providing for compensation, bonuses or other forms of incentive compensation, including vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, perquisites, disability sick leave benefits or employee assistance program, in each case, that is sponsored, maintained or administered or entered into by the Debtors for the benefit of their respective employees or non-employee directors.

**1.15**    **Business Day:** Any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in the State of Idaho are required or authorized to close by law or executive order.

**1.16**    **Budget:** The budget attached as Exhibit C to the Disclosure Statement, as the same may be amended, modified, or supplemented by Order of the Court, unless otherwise authorized in this Plan.

**1.17**    **Canyonlands**: 732 ± acre tract of land located at 1657 River Road, Buhl, Idaho.

**1.18**    **Cash:** Cash and cash equivalents, including bank deposits, wire transfers, checks representing good funds, and legal tender of the United States of America or instrumentalities thereof.

**1.19**    **Cash Collateral Orders:** Collectively, the Final Cash Collateral Orders and the preceding interim orders entered by the Bankruptcy Court authorizing the Debtors to use Cash and providing adequate protection.

**1.20**    **Cause of Action:** any Claim, action, class action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, rights of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, loss, cost, attorneys' fees and expenses, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever, asserted or unasserted, accrued or unaccrued, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, allowable or disallowable, Allowed or Disallowed, assertible directly or derivatively (including, without limitation, under alter-ego theories), in rem, quasi in rem, in personam or otherwise, whether arising before, on or after the Petition Date, arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, in contract or in tort, at law, in equity or pursuant to any other theory or principle of law, including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, unjust enrichment, disgorgement, restitution, contribution, indemnification, rights of subrogation and joint liability, regardless of where in the world accrued or arising. For the avoidance of doubt, "Cause of Action" expressly

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 12

includes (i) any Cause of Action held by a natural person who is not yet born or who has not yet attained majority as of the Petition Date or as of the Effective Date, (ii) any right of setoff, counterclaim or recoupment and any Cause of Action for breach of contract or for breach of duty imposed by law or in equity, (iii) the right to object to or otherwise contest Claims or Interests, (iv) any Cause of Action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (v) any claim or defense, including fraud, mistake, duress and usury and any other defense set forth in section 558 of the Bankruptcy Code, and (vi) any claim under any state or foreign law, including for the recovery of any fraudulent transfer or similar theory.

  **1.21**  <u>Chapter 11 Cases</u>**:** The voluntary chapter 11 bankruptcy cases commenced by the Debtors consisting of Millenkamp Cattle, Inc., Case No. 24-40158-NGH; Idaho Jersey Girls, LLC, Case No. 24-40159; East Valley Cattle, LLC, Case No. 40160; Millenkamp Properties, L.L.C., Case No. 24-40161; Millenkamp Properties II, LLC, Case No. 24-40162; Millenkamp Family, LLC, Case No. 24-40163; Goose Ranch, LLC, Case No. 24-40164; Black Pine Cattle, LLC, Case No. 40166; Millenkamp Enterprises, LLC, Case No. 24-40167; and Idaho Jersey Girls Jerome Dairy, LLC, Case No. 24-40165, which are being jointly administered under the case caption *In re Millenkamp Cattle, Inc., et al.*, Case No. 24-40158-NGH (Bankr. D. Idaho).

  **1.22**  <u>Claim</u>**:** Any "claim" as defined in Bankruptcy Code section 101(5), against any of the Debtors or against any property of the Debtors.

  **1.23**  <u>Claims Bar Date</u>**:** As applicable, the Administrative Claims Bar Date, the General Claims Bar Date, the Governmental Claims Bar Date, any Supplemental Bar Date, or the Rejection Claims Bar Date.

  **1.24**  <u>Class</u>**:** A class of Claims or Interests designated pursuant to the Plan, or any subclass thereof pursuant to section 1122(a) of the Bankruptcy Code.

  **1.25**  <u>Collateral</u>**:** Any Estate Asset that is subject to a Lien to secure the payment or performance of a Claim, which Lien is perfected and not subject to avoidance under the Bankruptcy Code or otherwise invalid or unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

  **1.26**  <u>Confirmation</u>**:** The entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

  **1.27**  <u>Confirmation Hearing</u>**:** The hearing held by the Bankruptcy Court to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

  **1.28**  <u>Confirmation Order</u>**:** The order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 1129.

  **1.29**  <u>Corn Silage Group.</u> Consists of corn silage secured creditors: Ed Chojnacky, Michael Chojnacky, Dusty Brow Farms, Inc., Grant 4-D Farms, LLC, Grant & Hagan, Inc., Douglas J. Grant, Hollifield Ranches, Inc., Standing 16 Ranch Land Company, LLC, Star Falls

Farms, LLC, Steel Ranch, LLC, Bo Stevenson dba B&A Farms, Alexander K. Reed, Triple C Farms, LLC, Clint D. Thompson, and Jean L. Thompson.

**1.30** **Contingent Claim:** Any Claim that is Scheduled or Filed as contingent.

**1.31** **Corporate Action:** Any action, approval, authorization, decision, or other act of any kind that would be necessary on the part of any Person for any corporation, limited liability company, general partnership, or other Person to in turn act.

**1.32** **Conterra:** Conterra Holdings, LLC d/b/a Conterra Ag Capital as loan servicer and power of attorney for Ag Funding SC II LLC and Conterra Holdings, LLC d/b/a Conterra Ag Capital as loan servicer and power of attorney for Rooster Capital IV LLC. "Conterra" shall include Ag Funding SC II LLC and Rooster Capital IV LLC.

**1.33** **Conterra German Note:** The Promissory Note issued by Conterra Agricultural Capital LLC serviced by Conterra Holdings LLC dba Conterra Ag Capital as loan servicer and power of attorney for Rooster Capital IV LLC, which is secured by the Debtors' "German Dairy" property.

**1.34** **Court.** The Bankruptcy Court for the District of Idaho.

**1.35** **Creditor:** The meaning as set forth in section 101(10) of the Bankruptcy Code.

**1.36** **Creditors' Committee:** The statutory committee of unsecured creditors appointed by the U.S. Trustee on May 14, 2024, pursuant to section 1102(a)(1) of the Bankruptcy Code.

**1.37** **CRO.** Chief Restructuring Officer, Robert Marcus.

**1.38** **Cure Amount:** The payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**1.39** **Cure Claim:** A Claim for a Cure Amount in connection with the assumption or assumption and assignment of an executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**1.40** **Debtor** or **Debtors:** has the meaning set forth in the introductory paragraph of the Plan.

**1.41** **Debtor Exculpated Parties:** The Debtors and their respective Related Parties, including the Debtors' current officers and directors and their duly employed professionals in these Bankruptcy Cases.

**1.42**　　**Debtors' Releases:**  The releases given on behalf of the Debtors and their Estates to the Released Parties as set forth in Section 10.1 herein.

**1.43**　　**DIP Loan Agreement:**  That certain Secured Superpriority Debtor-in-Possession Loan Agreement dated April 22, 2024, between Millenkamp Cattle, Inc., Black Pine Cattle, LLC, East Valley Cattle, LLC, Goose Ranch LLC, Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy LLC, Millenkamp Enterprises LLC, Millenkamp Family LLC, Millenkamp Properties LLC, and Millenkamp Properties II, LLC and Sandton Capital Solutions Master Fund VI, LP.

**1.44**　　**DIP Loan:** The post-petition financing facility issued pursuant to the DIP Loan Agreement and the DIP Order.

**1.45**　　**DIP Liens:** Liens in property granted by the DIP Loan Agreement, DIP Security Agreement, DIP Loan Documents, and authorized pursuant  to the DIP Order.

**1.46**　　**DIP Lender:** Sandton Capital Solutions Master Fund VI, LP ("Sandton").

**1.47**　　**DIP Loan Collateral:** The Collateral set forth in the DIP Loan Agreement, DIP Security Agreement and the DIP Order.

**1.48**　　**DIP Loan Documents:** As set forth in the DIP Order, the executed DIP Loan Agreement, the DIP Security Agreement and all other documents contemplated therein.

**1.49**　　**DIP Order:** The Final order Authorizing the Debtors to (A) Obtain Post-Petition Financing; and (B) Granting Adequate Protection to Pre-Petition Secured Lenders (Docket No. 305).

**1.50**　　**DIP Security Agreement:** That certain Security Agreement dated April 22, 2024, between Millenkamp Cattle, Inc., Black Pine Cattle LLC, East Valley Cattle, LLC, Goose Ranch LLC, Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy, LLC, Millenkamp Enterprises LLC, Millenkamp Family LLC, Millenkamp Properties LLC, and Millenkamp Properties II LLC and Sandton Capital Solutions Master Fund VI, LP.

**1.51**　　**DIP Superpriority Claim:**  The DIP Lender's superpriority Administrative Claim under 11 U.S.C. § 364(c) that is entitled to superpriority administrative expense claim status in the Chapter 11 Cases of each Debtor as set forth in the DIP Order.

**1.52**　　**Disallowed Claim:** Any Claim that (a) is not Scheduled, or is listed thereon as contingent, unliquidated, disputed, or in an amount equal to zero, and whose Holder failed to timely File a proof of claim by the applicable Claims Bar Date (unless late filing was permitted by a Bankruptcy Court order), but excluding any Claim that is expressly Allowed by a Final Order or under the Plan; or (b) has been disallowed pursuant to an order of the Bankruptcy Court.

**1.53**　　**Disclosure Statement:** That certain disclosure statement, including all exhibits

and schedules thereto or referenced therein, that relates to this Plan and has been prepared and distributed by the Debtors, as plan proponents, as approved by the Bankruptcy Court pursuant to Bankruptcy Code section 1125, as the same may be amended, modified, or supplemented.

       **1.54**      **Disclosure Statement Order:** The order approving the Disclosure Statement, authorizing the Debtors to solicit acceptances of the Plan and establishing certain related procedures and deadlines.

       **1.55**      **Disputed Claim:** Any Claim:

    a.      that is disputed in whole or in part under the Plan; or

    b.  that is not expressly Allowed by a Final Order or under the Plan; and

        (i)      as to which a proof of claim is Filed or is deemed Filed as a result of such Claim being Scheduled; and

        (ii)     as to which either:

            (1)      an objection or request for estimation or subordination has been timely Filed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order under which the applicable period of limitation has expired, and (B) has not been denied by a Final Order or withdrawn; or

            (2)      the Claim Objection Deadline has not passed as to such Claim (unless the Debtors determined that it will not object to such Claim).

       **1.56**      **Disputed Cure Claim:** The amount that a counterparty to a Contract Dispute alleges must be paid in order for an executory contract or unexpired lease to be assumed or assumed and assigned as provided under the Plan.

       **1.57**      **Distribution:** Any initial or subsequent issuance, payment, or transfer of consideration made under the Plan.

       **1.58**      **Distribution Date:** Any date on which a Distribution is made.

       **1.59**      **Distribution Record Date:** The record date for determining entitlement of Holders of Claims to receive Distributions under the Plan, which date shall be the Effective Date.

       **1.60**      **Distribution Reserve:** One or more reserves in respect of Contingent Claims, Disputed Claims, or Unliquidated Claims established by the Debtors.

**1.61**      **Effective Date:** The first business day of the first month following entry of an order confirming the Plan and all conditions precedent pursuant to Article 9 herein have been satisfied or waived, which is anticipated to be June 2, 2025. All dates herein reflect an Effective Date of June 2, 2025. If the Effective Date does not occur on June 2, 2025, then all dates set forth herein shall automatically be adjusted accordingly based on the actual Effective Date.

**1.62**      **Entity:** The meaning as set forth in section 101(15) of the Bankruptcy Code.

**1.63**      **Estates:** Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**1.64**      **Estate Assets:** Any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records and all Avoidance Actions and Causes of Action, as of the Effective Date.

**1.65**      **Estate Released Parties:** Collectively, the Debtors and their respective Related Parties, including Dentons, Johnson May, and Kander.

**1.66**      **Exculpated Parties:** collectively, (i) the Debtor Exculpated Parties and (ii) the Creditors' Committee and their Related Parties.

**1.67**      **File**, **Filed**, or **Filing:** Duly and properly filed with the Bankruptcy Court and reflected on the docket of the Chapter 11 Cases.

**1.68**      **Final Decree:** An order entered pursuant to Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Chapter 11 Cases of one or any of the Debtors.

**1.69**      **Final Order:** An order or judgment of the Bankruptcy Court entered on the docket of the Chapter 11 Cases:

    a.   that has not been reversed, rescinded, stayed, modified, or amended;

    b.   that is in full force and effect; and

    c.   with respect to which (i) the time to appeal or to seek review, rehearing, remand, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

For the avoidance of doubt, no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Bankruptcy Code section 502(j), Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 may be or has been filed with respect to such order.

**1.70**      **General Claims Bar Date:** July 31, 2024.

**1.71**        **General Unsecured Claim:** Any unsecured, non-priority Claim existing as of the Petition Date or a Rejection Claim that is asserted against one or all of the Debtors or the Estates and is not a Secured Claim, Administrative Convenience Claim, Intercompany Claim, or Subordinated Claim.

**1.72**        **Holder:** The Person that is the owner of record of a Claim or Interest, as applicable.

**1.73**        **Impaired:** Any Class of Claims or Interests that is impaired within the meaning of Bankruptcy Code section 1124.

**1.74**        **Insider:** A person as defined by Bankruptcy Code section 101(31).

**1.75**        **Insurance Policies:** All insurance policies that have been issued to, or provide coverage at, any of the Debtors and all agreements, instruments, or documents relating thereto.

**1.76**        **Insured Claim:** Any Claim or portion of a Claim (other than a Claim held by an employee of the Debtors for workers' compensation coverage under the workers' compensation program applicable in the particular state in which the employee is employed by the Debtors) that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

**1.77**        **Intercompany Claim:** A Claim against a Debtor held by another Debtor.

**1.78**        **Intercompany Interest:** Any Interest in any Debtor that is held by another Debtor.

**1.79**        **IRC:** The Internal Revenue Code of 1986, as amended.

**1.80**        **IRS:** The Internal Revenue Service.

**1.81**        **Johnson May.** Johnson May, PLLC, an Idaho limited liability company.

**1.82**        **Kander.** Kander LLC.

**1.83**        **Lien:** Any lien, security interest, pledge, title retention agreement, encumbrance, leasehold, charge, mortgage, or hypothecation to secure payment of a debt or performance of an obligation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws, as set forth in section 101(37) of the Bankruptcy Code.

**1.84**        **MetLife:** MetLife Real Estate Lending LLC and Metropolitan Life Insurance Company.

**1.85**        **McGregor:** 278 ± acre tract of land located at 1050 South 2300 East, Hazelton, Idaho.

**1.86**      **Other Secured Claims Paid in Full:** Consists of Allowed Secured Claims of the following: B&H Farming, Eagle Creek Northwest, LLC, Healthy Earth Enterprises, LLC, H&M Custom, LLC, Milner Hay Company, Moss Grain Partnership, PerforMix Nutrition Systems, Staker & Parson Company d/b/a Idaho Materials and Construction, Tyche Ag, LLC, and Wada Farms Partnership.

**1.87**      **Outstanding Other Secured Claims**: Consists of Claims of the following Secured Creditors: A. Scott Jackson Trucking, CNH, Kenworth Sales Company, Kraus Farms, LLC, Les Schwab Tire Centers of Idaho, LLC, MWI Veterinary, Performance Plus-Idaho, LLC, Standlee Ag Resources and Premium Products, and Youree Land & Livestock.

**1.88**      **Person:** Any person or organization created or recognized by law, including any association, company, cooperative, corporation, entity, estate, fund, individual, joint stock company, joint venture, limited liability company, partnership, trust, trustee, unincorporated organization, government or any political subdivision thereof, or any other entity or organization of whatever nature.

**1.89**      **Petition Date:** April 2, 2024, the Date which Debtors filed their voluntary chapter 11 petitions for relief in the Bankruptcy Court.

**1.90**      **Plan Administrator:** The Plan Administrator is Robert Marcus. The Plan Administrator shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan and to effectuate the Distributions provided for thereunder. In the event that the Person serving as the Plan Administrator is unable, unwilling or terminated, MetLife, Sandton and Conterra shall, by majority decision, shall select a Person (to be retained by the Debtors) to fulfill the obligations of the Plan Administrator under the Plan.

**1.91**      **Preference Claim:** Any Avoidance Action that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code section 547, or under related state or federal statutes, or pursuant to any theory or cause of action under common law, regardless whether such action has been commenced prior to the Effective Date.

**1.92**      **Priority Claim:** A Claim that is entitled to priority under Bankruptcy Code section 507(a), other than an Administrative Claim and a Priority Tax Claim.

**1.93**      **Priority Tax Claim:** Any Claim against any Debtor that is held by a Governmental Unit and of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code

**1.94**      **Professional:** Any professional (other than an Ordinary Course Professional) employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 1103, or 1104 or any professional or other Person (in each case, other than an Ordinary Course Professional) seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code section 503(b)(3) or 503(b)(4).

**1.95**     **Professional Fee Claim:** A Claim of a Professional for compensation or reimbursement of costs and expenses (or of members of any of the Committees for reimbursement of expenses) relating to services provided during the period from the Petition Date through and including the Effective Date.

**1.96**     **Pro Rata:** Proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the amount or number of that Allowed Claim, is the same as the ratio of (x) the amount of consideration available for Distribution on account of, as applicable, all Allowed Claims in the Class in which the particular Allowed Claim is included to (y) as applicable, the amount of all Allowed Claims of that Class, as adjusted to take into account any applicable Distribution Reserves.

**1.97**     **Proof(s) of Claim:** A Proof of Claim against any of the Debtors filed in the Chapter 11 Cases in accordance with section 501 of the Bankruptcy Code.

**1.98**     **Rabo**: Rabo AgriFinance LLC.

**1.99**     **Rejection Claim:** Any Claim for monetary damages as a result of the rejection of any prepetition executory contract or unexpired lease, whether rejected pursuant to the Confirmation Order or otherwise.

**1.100**     **Rejection Claims Bar Date:** To the extent not previously established by prior order of the Bankruptcy Court, thirty (30) calendar days after the Effective Date.

**1.101**     **Related Parties:** Collectively, all of the respective professionals duly employed by the Debtors, including the professionals' representatives, and successors and assigns of the referenced professionals; provided however, for the avoidance of doubt, with respect to each Committee, "Related Parties" shall include the members of such Committee but solely in their capacity as a member of such Committee, each of such member's representatives with respect to the Committee, and their counsel.

**1.102**     **Released Parties:** Collectively, (a) the Debtors and their Related Parties and (b) the Committee and its Related Parties.

**1.103**     **Releasing Parties:** Collectively, (a) the Released Parties; and (b) all Holders of Claims that (i) vote to accept the Plan *provided that*, notwithstanding anything contained herein to the contrary, in no event shall the Holder of a Claim that (x) does not vote to accept or reject this Plan, or (y) votes to reject this Plan, and returns such Ballot in accordance with the Disclosure Statement Order, be a Releasing Party.

**1.104**     **Reorganized Debtors**: means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**1.105**     **Restructuring**: The restructuring of the existing debt and other obligations of the Debtors and their non-Debtor Affiliates on the terms and conditions set forth in the Plan.

**1.106**     <u>**Sales Advisors**</u>: Schuil Ag Real Estate, Inc. and Overland Stock Yard.

**1.107**     <u>**Sandton**</u>: Sandton Capital Partners LP and Sandton Capital Solutions Master Fund VI, LP.

**1.108**     <u>**Scheduled:**</u> As set forth in the Schedules.

**1.109**     <u>**Schedules:**</u> The Schedules of Assets and Liabilities Filed by the Debtors in the Chapter 11 Cases, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

**1.110**     <u>**Section 503(b)(9) Claim**</u>: A Claim arising under Bankruptcy Code section 503(b)(9).

**1.111**     <u>**Secured Claim:**</u> A Claim that is secured by a valid, perfected, and enforceable Lien on property in which the Debtors or the Estates have an interest, which Lien is valid, perfected, and enforceable under applicable law and not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law. A Claim is a Secured Claim only to the extent of the value of the Holder's interest in the Debtors' interest in the Collateral or to the extent of the amount subject to set-off against a Cause of Action held by the Debtors, whichever is applicable, and as determined under Bankruptcy Code section 506(a). To the extent that the value of such interest in the Debtors' interest in the subject Collateral or the amount subject to set-off against a Cause of Action held by the Debtors (as applicable) is less than the amount of the Claim which has the benefit of such security or is supported by such setoff right, such portion of the Claim is unsecured and shall be treated as a General Unsecured Claim unless, in any such case, the Class of which the Secured Claim is a part makes a valid and timely election in accordance with Bankruptcy Code section 1111(b) to have such Claim(s) treated as a Secured Claim to the extent Allowed.

**1.112**     <u>**Securities Act:**</u> The Securities Act of 1933, as amended.

**1.113**     <u>**State**</u>: Any U.S. state, any U.S. territory or the District of Columbia.

**1.114**     <u>**Supplemental Bar Date:**</u> Any supplemental bar date that may be established by an order of the Bankruptcy Court.

**1.115**     <u>**U.S. Trustee:**</u> The Acting United States Trustee for Region 18 (covering  the District of Idaho).

**1.116**     <u>**Unimpaired:**</u> Any Class of Claims that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.117**     <u>**Uninsured Portion:**</u> The portion of any Insured Claim, if any, that is not insured under the Debtors' insurance policies or that is beyond the extent of such coverage.

**1.118**     <u>**Unliquidated Claim:**</u> Any Claim that is Scheduled as unliquidated or that was

filed in an unliquidated amount.

      **1.119**     **Voting Agent:** Matthew T. Christensen, Johnson May, 199 N. Capitol Blvd., Ste 200, Boise, ID 83702, mtc@johnsonmaylaw.com.

      **1.120**     **Voting Deadline:** The date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the Disclosure Statement Order.

      **1.121**     **Rules of Interpretation:** For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

# ARTICLE 2

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

      **2.1**     **Summary and Classification of Claims.** This Section classifies Claims—except for Administrative Claims, Professional Fee Claims, and Priority Tax Claims, and the DIP Loan which are not classified – for all purposes, including Confirmation, Distributions, and voting. A Claim is classified in a particular Class only to the extent that the Claim falls within the Class description. To the extent that part of a Claim falls within a different Class description, that part of the Claim is classified in that different Class. The following table summarizes the Classes of Claims under the Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|-------|-------------|----------------------|---------------|
| None | Administrative Claims | Unimpaired | Not Entitled to Vote |
| None | Professional Fee Claims | Unimpaired | Not Entitled to Vote |
| None | Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| None | DIP Loan | Unimpaired | Not Entitled to Vote |
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 2 | Corn Silage Group Secured Claims | Impaired | Entitled to Vote |
| Class 3 | Outstanding Other Secured Claims | Impaired | Entitled to Vote |
| Class 4 | Other Secured Claims Paid in Full | Unimpaired | Not Entitled to Vote |
| Class 5 | Secured Equipment Loan and Lease Claims | Unimpaired | Not Entitled to Vote |

| Class 6 | John Deere Financial Secured Claim | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 7 | Western States Cat Secured Claim | Impaired | Entitled to Vote |
| Class 8 | Rexel USA, Inc. d/b/a Platt Electric Supply Claim | Disputed | Not Entitled to Vote |
| Class 9 | MetLife Secured Claims | Impaired | Entitled to Vote |
| Class 10 | Rabo Secured Claims | Impaired | Entitled to Vote |
| Class 11 | Conterra German Note Secured Claim | Impaired | Entitled to Vote |
| Class 12 | Conterra Mezz Loan Secured Claim | Impaired | Entitled to Vote |
| Class 13 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 14 | Intercompany Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 15 | Equity Interests | Unimpaired | Not Entitled to Vote |

**NOTWITHSTANDING ANY OTHER TERM OR PROVISION OF THE PLAN, NO DISTRIBUTIONS WILL BE MADE ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS A DISALLOWED CLAIM.**

     **2.2**     **Substantive Consolidation.** For purposes of the Plan only, all remaining Assets and liabilities of the Debtors shall be deemed the Assets and liabilities of a single consolidated entity. On the Effective Date: (a) all Assets (and all proceeds thereof) and liabilities of each Debtor shall be merged or treated as though they were merged into and with the Assets and liabilities of the other Debtors, (b) no Distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (c) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated and extinguished so that any

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 24

Allowed Claim against any Debtor and guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed against any Debtor shall be filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of the other Debtors. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the pre-petition legal and corporate structures of the Debtors, or the legal title ownership of any assets owned by the separate Debtors, or the DIP Liens authorized by the DIP Order. Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for Plan purposes.

### 2.3 **Classification & Voting Controversies.**

a. If a controversy arises regarding whether any Claim is properly classified under the Plan, then the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

b. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

## ARTICLE 3

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 3.1 **Unclassified Claims.**

**3.1.1** **Administrative Claims.** Administrative expenses are costs or expenses of administering the Debtors' Bankruptcy Cases which are allowed under Bankruptcy Code section 507(a)(2). All Persons requesting payment of Administrative Expense Claims, including but not limited to Claims under section 503(b)(9) of the Bankruptcy Code (other than those already allowed by Court order), **shall file a proof of Claim with the Court no later than the Administrative Claims Bar Date, which shall be within or no later than the first Business Day that is at least thirty (30) calendar days after the Effective Date.** The Administrative Claims Bar Date shall not apply to Professional Persons requesting payment of Professional Fee Claims, DIP Loan, or Priority Tax Claims, or to the extent that an Administrative Claim has already been Allowed or paid during the Chapter 11 Cases. Objections to such applications for payment (whether by Professional Persons requesting payment of Professional Fee Claims or Persons requesting payment of Administrative Expense Claims), if any, must be written, filed with the

Court, and served on the applicable parties within thirty (30) days after such application or Claim is filed (the "Administrative Claims Objection Deadline").

On August 29, 2024, the Court entered an Order on Debtors' Motion to Amend Order on the Amended Motion to Allow and Pay 503(b)(9) Claims (Docket Nos. 476 & 584) (the "503(b)(9) Order"). Pursuant to the 503(b)(9) Order, 503(b)(9) Claims in the amount of approximately $5,170,846.56 have been deemed as Allowed 503(b)(9) Claims. Additional 503(b)(9) Claims have been allowed through motions and/or agreements with the Debtors. A full listing of the Allowed 503(b)(9) Claims as of the date of this Plan are included in the Disclosure Statement, totaling $5,258,329.47. To the extent additional 503(b)(9) Claims exist, such Claim Holders shall file a Claim for allowance of their 503(b)(9) Claim by the Administrative Claims Bar Date.

The Debtors or the Reorganized Debtors, as applicable, may object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

Except with respect to Professional Fee Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases, or a Holder of an Allowed Administrative Claim and the applicable Debtor (or after the Effective Date, such Holder and the Reorganized Debtors) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon the filing of a Proof of Claim on or before the Administrative Claims Bar Date and no objection to that Proof of Claim being filed before the Administrative Claims Objection Deadline. In the event an Administrative Claim is asserted through a Proof of Claim that is subject to an objection, that Administrative Claim will be paid after entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A PROOF OF CLAIM OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

### 3.1.2    **Professional Fee Claims.**

a.    Fee Applications. All requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court, pursuant to the fee application procedure set by the Court in its Order Establishing Interim Fee and Expense Reimbursement Procedures (the "Fee Order") (Docket No. 303), and payments shall be made in the ordinary course, upon Court approval, unless otherwise ordered by the Bankruptcy Court.

b.    Non-Estate Professionals.    Pursuant to the order approving the Debtor's motion to establish procedures for Bankruptcy Code 506(b) claims, Holders of 506(b) Claims must file, within forty-five (45) days after the Effective Date, either (i) an amended Proof of Claim encompassing the Holder's Professional Fee Claim; or (ii) file a Notice of 506(b) Claim pursuant to the 506(b) claim procedures. Such 506(b) claims submitted as an amended Proof of Claim or through a Notice of 506(b) Claim shall be considered a Professional Fee Claim and subject to the terms of this section 3.1.2 and the terms of the court's Order Establishing 506(b) Claim Procedures (Docket No. 937). However, these Non-Estate Professional Fees shall be paid solely by the lender to whom they represent, and only the Court approved amount of the Claim shall be added to the principal balance of that lender's loan(s). For the avoidance of doubt, the Reorganized Debtors will not pay any of the Non-Estate Professional Fees approved by the Court directly to the professionals; rather the approved Non-Estate Professional Fees will be added to the principal balance(s) of the loan(s) of the lender represented by the Non-Estate Professional, and paid by the Reorganized Debtors directly to the applicable lender pursuant to the repayment terms of this Plan.

c.    Objections to Professional Fee Claims. Pursuant to the Fee Order, any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of (i) final requests for allowance and payment of Professional Fee Claims; or (iii) a Notice of 506(b) Claim.

d.    Post Effective Date Fees and Expenses. Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors and the Reorganized Debtors, as applicable.

### 3.1.3    **Priority Tax Claims.** Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

| **Priority Tax Claimant** | **Allowed Priority Amount** |
|---|---|
| Cassia County Tax Collector | $59,591.88 |
| Department of Treasury | $1,752.63 |
| Idaho State Tax Commission | $5,612.20 |

3.1.4    **DIP Loan.** Under the terms and upon entry of the DIP Order, the DIP Loan is entitled to superpriority administrative expense claim status in the Chapter 11 Cases of each Debtor. The outstanding DIP Loan as of the Effective Date will be $22.939 ± million. The DIP Loan and/or DIP Loan Documents shall be modified as follows (to be more fully described by an amendment to the DIP Loan Documents):

1) The DIP Superpriority Claim is Allowed and shall have the priority accorded to it in the DIP Order.

2) The DIP Lender shall receive a 2% extension fee to be added to the loan balance as of the Effective Date.

3) The DIP Lender shall receive Payment in Kind ("PIK") interest at 15% per annum on a monthly basis.

4) The DIP Lender shall receive one payment of at least $12.931 million in or before November 2025 from the sale proceeds of Canyonlands and McGregor, followed by five monthly payments in the amount $2.4 million beginning in March 2026, with a final payment of all outstanding amounts due in an estimated amount of $1.495 million in August 2026, pursuant to the Budget.

5) The default rate, pursuant to the DIP Loan Agreement, will be replaced by a default fee of 4% of the outstanding balance at the date of default.

6) The 1.5% exit fee, pursuant to the DIP Loan Agreement, will be replaced by a 1.0% exit fee.

3.2    **Class 1: Other Priority Claims**

a.    Classification. Class 1 consists of all Other Priority Claims against each Debtor. There are no known Other Priority Claims.

b.    Treatment. Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion

of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

c.     Voting. Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 3.3     Class 2: Corn Silage Group Secured Claims.

a.     Classification. Class 2 is classified as the Corn Silage Group Secured Claims which consists of the Corn Silage Group Secured Creditors: Ed Chojnacky, Michael Chojnacky, Dusty Brow Farms, Inc., Grant 4-D Farms, LLC, Grant & Hagan, Inc., Douglas J. Grant, Hollifield Ranches, Inc., Standing 16 Ranch Land Company, LLC, Star Falls Farms, LLC, Steel Ranch, LLC, Bo Stevenson dba B&A Farms, Alexander K. Reed, Triple C Farms, LLC, Clint D. Thompson, and Jean L. Thompson.

| Claimant | Allowed Claim Amount |
|---|---|
| Ed Chojnacky | $312,330.00 |
| Michael Chojnacky | $393,753.60 |
| Dusty Brow Farms, Inc. | $245,000.00 |
| Grant 4-D Farms, LLC | $396,601.71 |
| Grant & Hagan, Inc. | $604,551.60 |
| Douglas J. Grant | 222,617.06 |
| Hollifield Ranches, Inc. | $2,044,794.31 |
| Standing 16 Ranch Land Company, LLC | $526,454.40 |
| Star Falls Farms, LLC | $404,878.00 |
| Steel Ranch, LLC | $160,000.00 |
| Bo Stevenson dba B&A Farms | $195,478.80 |
| Alexander K. Reed | $130,674.66 |
| Triple C Farms, LLC | $1,011,955.80 |
| Clint D. Thompson | $49,000.00 |
| Jean L. Thompson | $38,000.00 |

b.     The Corn Silage Group Secured Claims have been paid in full as of the Effective Date pursuant to monthly adequate protection payments, except as to any pre- and post-petition interest and attorneys' fees associated with their Claims, which are estimated to be in the amount of approximately $639,536.05.  The Corn Silage Group Secured Claim Holders shall provide to the Debtors no later than fifteen (15) Business Days before the Effective Date a statement of accrued interest, and shall comply with the professional fee procedures outlined in

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 29

part 3.1.2 of this Plan. Such interest and any allowed attorneys' fees shall be paid, pursuant to the Budget, with monthly payments at 5% per annum interest in the amount of approximately $80,000.00 through January 2026.  The Corn Silage Group Secured Claims Liens shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

        c.     <u>Voting</u>. Class 2 is Impaired under the Plan. Each Holder of Class 2 Claims is entitled to vote to accept or reject the Plan.

    **3.4**    <u>**Class 3: Outstanding Other Secured Claims.**</u>

        a.     <u>Classification</u>. Class 3 is classified as Outstanding Other Secured Claims which consists of Allowed Secured Claims of the following Secured Creditors: A. Scott Jackson Trucking, CNH, Kenworth Sales Company, Kraus Farms, LLC, Les Schwab Tire Centers of Idaho, LLC, MWI Veterinary, Performance Plus-Idaho, LLC, Standlee Ag Resources and Premium Products, and Youree Land & Livestock.

| <u>**Claimant**</u> | <u>**Allowed Class 3 Claim Amount**</u> | <u>**Non-503(b)(9) Amount Owed as of the Effective Date[1]**</u> | <u>**503(b)(9) Claim Amount**</u> |
|---|---|---|---|
| A. Scott Jackson Trucking | $184,656.30 | $184,656.30 | |
| CNH[2] Productivity Plus BP 373203 | $141,091.88 | $141,091.88 | |
| CNH Productivity Plus MC 373662 | $207,310.38 | $207,310.38 | |
| Kenworth Sales Company | $49,359.77 | $682.02 | |
| Kraus Farms, LLC | $499,473.53 | $499,473.53 | |
| Les Schwab Tire Centers of Idaho, LLC | $226,612.58 | $199,968.61 | $26,643.97 |

---

[1] Some of the Class 3 Outstanding Other Secured Claimants received adequate protection payments prior to the Effective Date. This is the amount they are owed as of the Effective Date.

[2] CNH filed Proofs of Claim in the total aggregate amount of $17,915,944.14. CNH has received and will receive post-petition adequate protection payments prior to the Effective Date. The CNH Productivity Plus Loans are being treated in Class 3 as Allowed Class 3 Claims. The CNH Equipment Leases and Equipment Loans are being treated in Class 5, and CNH shall continue to be paid in accordance with the provisions of the pre-petition contracts.

| MWI Veterinary | $2,063,428.20. | $1,579,172.28 | $484,255.92 |
|---|---|---|---|
| Performance Plus-Idaho, LLC | $29,931.44 | $29,931.44 | |
| Standlee Ag Resources and Premium Products | $214,915.55 | $6,425.55 | |
| Youree Land & Livestock | $119,042.08 | $6,885.06 | |

b.    Treatment.

Some of the Class 3 Claimants have received post-petition adequate protection payments during the bankruptcy. As such, the amounts owed to such Claimants as of the Effective Date are listed above. Some of the Class 3 Claimants also have separate 503(b)(9) Claims which will be paid as an Administrative Claim pursuant to section 3.1.1 herein.

Except to the extent that Class 3 Outstanding Other Secured Claims and Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 3 Claims, Class 3 shall be paid pursuant to the Budget, with monthly payments at 5% per annum interest through January 2026.  The Class 3 Outstanding Other Secured Liens shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

c.    Voting. Class 3 is Impaired under the Plan. Each Holder of a Class 3 Claim is entitled to Vote under the Plan.

**3.5    Class 4: Other Secured Claims Paid in Full.**

a.    Classification. Class 4 is classified as Other Secured Claims Paid in Full which consists of the Allowed Secured Claims of the following: B&H Farming, Eagle Creek Northwest, LLC, Healthy Earth Enterprises, LLC, H&M Custom, LLC, Milner Hay Company, Moss Grain Partnership, PerforMix Nutrition Systems, Staker & Parson Company d/b/a Idaho Materials and Construction, Tyche Ag, LLC, and Wada Farms Partnership.

| **Claimant** | **Court Approved Adequate Protection Payments Received Prior to Effective Date** |
|---|---|
| | |

| | |
|---|---|
| B&H Farming | $474,674.79 |
| Eagle Creek Northwest, LLC[3] | $0 (no amount owing as of Petition Date) |
| Healthy Earth Enterprises, LLC | $60,000.00 |
| H&M Custom, LLC | $4,769,170.78 |
| Milner Hay Company | $64,885.00 |
| Moss Grain Partnership | $101,000.00 |
| PerforMix Nutrition Systems | $213,744.20 |
| Staker & Parson Company d/b/a Idaho Materials & Construction | $48,207.17 |
| Tyche Ag, LLC[4] | $0 (no amount owing as of Petition Date) |
| Wada Farms Partnership | $374,432.50 |

       b.    <u>Treatment</u>. The Allowed Class 4 Other Secured Claims have received adequate protection payments in the full amount of their Allowed Secured Claims prior to the Effective Date[5]. As such, the Allowed Class 4 Other Secured Claims Paid in Full shall receive no further Distribution under the Plan. Any pre-petition liens claimed by the Allowed Class 4 Claimants in property of the Debtors shall be considered released and have no further effect.

       c.    <u>Voting</u>. Class 4 is Unimpaired under the Plan. Class 4 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

---

[3] The Debtors Scheduled Eagle Creek Northwest, LLC as an unknown secured claim based on financing statements filed by Eagle Creek claiming a security interest in the Debtors' wheat, hay, potatoes, and sugar beets. The Debtors have concluded there is no amount owing to Eagle Creek as of the Petition Date and Eagle Creek did not file a Proof of Claim. As such, Eagle Creek will not receive a Distribution under the Plan.

[4] The Debtors Scheduled Tyche Ag, LLC as an unknown secured claim based on financing statements filed by Tyche claiming a security interest in the Debtors' 2023 hay. The Debtors have concluded there is no amount owing to Tyche as of the Petition Date and Tyche did not file a Proof of Claim. As such, Tyche will receive no Distribution under the Plan.

[5] Tyche Ag, LLC and Eagle Creek Northwest, LLC have not received any adequate protection payments.

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 32

**3.6**     **Class 5: Secured Equipment Loan and Lease Claims.**

a.     Classification. Class 5 consists of the CNH Equipment Loans and Equipment Lease Claims (the "CNH Equipment Loans and Leases"), Daimler Truck Financial Services USA LLC ("Daimler") Secured Claim, the Farmers Bank Secured Claims, and the John Deere Construction & Forestry ("John Deere") Loan Claims.

b.     Treatment. CNH filed Proofs of Claim in the total aggregate amount of $17,915,944.14. The CNH Equipment Leases and Equipment Loans Proofs of Claim total an aggregate of $17,567,541.90 and CNH shall have an Allowed Class 5 Claim in the amount of $12,272,616.80. The CNH Productivity Plus Credit Lines are being treated in Class 3.

| CNH POC # | POC Amount | Document | Collateral |
|---|---|---|---|
| Claim 110 | $1,980,095.12 | Equipment Lease 765512 | 6 Magnum Tractors |
| Claim 111 | $2,438,189.14 | Equipment Lease 765542 | 4 Case Steigers & Remotes |
| Claim 112[6] | $5,294,925.12 | Equipment Lease 210982 | 26 Magnum Tractors |
| Claim 113 | $4,796,579,94 | Equipment Lease 765784 | 16 Magnum Tractors |
| Claim 114 | $2,587,321.81 | Equipment Loan 765552 | 30 Case Maxxum Tractors |
| Claim 115 | $470,430.75 | Equipment Loan 765530 | 25 Kubota Tractors |

Daimler filed a Proof of Claim in the amount of $1,534,278.22 and has an Allowed Secured Class 5 Claim in the amount of $1,534,278.22.

| DAIMLER POC # | POC Amount | Collateral |
|---|---|---|
| Claim 101 | $1,534,278.22 | PT126DC Freightliners |

---

[6] Claim 112 has been paid in full.

Farmers Bank filed Proofs of Claim totaling $2,474,927.97 and Farmers Bank has an Allowed Secured Class 5 Claim in the amount of $2,437,741.27.

| **FARMERS BANK POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 35 | $294,173.07 | 2024 Ram Pickups |
| Claim 36[7] | $10,975.50 | Con-Dor Peecon 1700 Feed Mixer |
| Claim 37 | $96,225.11 | 2021 Ram Pickups |
| Claim 38[8] | $26,211.20 | Nuhn Alley Vac Manure Wagon 7000 Gal Tank |
| Claim 39 | $269,908.99 | Caterpillar Diesel Generators |
| Claim 40 | $280,789.94 | Caterpillar Diesel Generators |
| Claim 41 | $140,596.63 | SmithCo Side Dump Trailers |
| Claim 42 | $166,267.09 | 2022 Ram Pickups |
| Claim 43 | $132,902.49 | Con Dor Peecon 1700 Feed Mixer |
| Claim 44 | $56,558.60 | 2022 Mahindra UTB |
| Claim 45 | $1,000,364.26 | Equipment Line of Credit |

John Deere filed Proofs of Claim totaling an amount of $717,170.78, and John Deere has an Allowed Class 5 Claim in the amount of $717,170.78.

| **JOHN DEERE POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 21 | $121,475.50 | Hamm 10i Compactors |
| Claim 22 | $151,965.48 | Hamm 121 P |
| Claim 23 | $69,597.45 | John Deere 50G Compact Excavator |

---

[7] Claim 36 has been paid in full.
[8] Claim 38 has been paid in full.

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 34

| Claim 24 | $69,957.45 | John Deere 50G Compact Excavator |
| Claim 25 | $187,368.29 | 2023 John Deere 650P-Tier Utility Dozer |
| Claim 26 | $116,806.61 | John Deere 320 P-Tier Backhoe Loader |
| Claim 27 | $232,035.91 | 2023 John Deere 135 P-TIER Backhoe Loader AND 2023 John Deere EC13 QS60 COMPLETE SYSTEM W/ 2 BUCKETS |

CNH (Equipment Leases and Loans), Daimler, Farmers Bank, and John Deere have received and will receive post-petition adequate protection payments before the Effective Date.

Except to the extent CNH and the Debtors, Daimler and the Debtors, Farmers Bank and the Debtors, or John Deere and the Debtors, agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 5 Claim, CNH, Daimler, Farmers Bank, and John Deere shall continue to be paid in accordance with the provisions of the pre-petition contracts with Debtors. For the loan and lease payments, CNH receives approximately $197,316.00 per month, Daimler receives approximately $63,926.00 per month, Farmers Bank receives approximately $97,705.82 per month, and John Deere receives approximately 26,542.87 per month.

The Allowed Class 5 Claimants' Liens shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, subject to the terms and conditions of the DIP Order.

        c.     <u>Voting</u>. Class 5 is Unimpaired under the Plan. Class 5 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**3.7**     <u>**Class 6: John Deere Financial Secured Claim.**</u>

        a.     <u>Classification</u>. Class 6 consists of the John Deere Financial, f.s.b ("John Deere Financial") Secured Claim.

        b.     <u>Treatment</u>. John Deere Financial filed a Proof of Claim in the amount of $119,606.55. John Deere Financial shall have an Allowed Class 6 Secured Claim in the amount of $119,606.55.

| **JOHN DEERE FINANCIAL POC #** | **POC Amount** | **Collateral** |
|---|---|---|
| Claim 20 | $119,606.55 | Cross Collateralized Loan with all Deere Loans/Collateral |

Except to the extent John Deere Financial and the Debtors agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Class 6 Claim, John Deere Financial shall receive the following treatment:

1) John Deere Financial shall be paid monthly payments at 15.15% per annum interest through January 2026, pursuant to the Budget.

2) The John Deere Financial Secured Claim Lien shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

   c. <u>Voting</u>. Class 6 is Impaired under the Plan and is entitled to Vote under the Plan.

  **3.8**  **Class 7: Western States Cat Secured Claim.**

   a. <u>Classification</u>. Class 7 consists of the Western States Cat ("Western States") Secured Claim.

   b. <u>Treatment</u>. The Debtors Scheduled Western States as a secured claim in the amount of $688,964.59. Western States has received post-petition adequate protection payments in the amount of $596,071.02 prior to the Effective Date.

On May 22, 2024, the Bankruptcy Court approved the Debtors' assumption of the Western States rental agreement when it issued its Final Order (A) Granting Motion to Condition Use of WSECO's Equipment on Receipt of Adequate Protection, and (B) Granting Debtor's Motion for Order Authorizing the Debtor to Assume Unexpired Lease (Docket. No. 314). The rental agreement expired on June 30, 2024. Upon the return of the rented equipment after the expiration of the rental agreement, Western States notified Debtors it was owed approximately $244,994.48 due to damage to the rented equipment and other repairs. As such, Debtors made a post-petition payment to Western States in the amount of $244,994.48 pursuant to the rental agreement.

Western States later presented an updated actual expense itemization, asserting that the Debtors owed an additional administrative claim for an amount at or higher than $57,000.00. Western States has agreed to accept $40,000.00 as payment in full and final satisfaction and discharge of and in exchange for such Allowed Class 7 Claim. Western States shall be paid a lump sum payment in the amount of $40,000.00 on or before 90 days after the Effective Date.

c.      <u>Voting</u>. Class 7 is Impaired under the Plan and is entitled to Vote under the Plan.

### 3.9    <u>Class 8: Rexel USA, Inc. d/b/a Platt Electric Supply Claim.</u>

a.      <u>Classification</u>. Class 8 consists of the Rexel USA, Inc. d/b/a Platt Electric Supply ("Platt") Claim.

b.      <u>Treatment</u>. Platt filed a Proof of Claim in the secured amount of $504,414.02. The Proof of Claim is Disputed and the Debtors will be filing an objection to the full amount of the Proof of Claim. Until resolution of the objection to Platt's Proof of Claim, the Platt Secured Claim Lien shall retain the same validity, perfection, priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

The Debtors reserve their rights to seek any and all causes of action against third parties who may be liable for the Platt Claim in the event the Court allows Platt's claim.

c.      <u>Voting</u>. Class 8 Claims are Disputed and are not entitled to Vote under the Plan.

### 3.10    <u>Class 9: MetLife Secured Claims.</u>

a.      <u>Classification.</u> Class 9 consists of MetLife's Secured Claims.

Metropolitan Life Insurance Company ("MLIC") and MetLife Real Estate Lending LLC (collectively, "MetLife") are the owners and holders of certain commercial real estate loans (collectively, the "Pre-Petition MetLife Loans" and, together with all related mortgages and other existing or future documents evidencing, securing, or executed in connection with the Pre-Petition MetLife Loans, in each case, as Amended, referred to herein as the "Pre-Petition MetLife Loan Documents") made by MetLife to the MetLife Borrowers. The Pre-Petition MetLife Loans are secured by liens in and security interests on the MetLife Borrowers' real property and certain of the MetLife Borrowers' personal property, including: (x) crops grown after a foreclosure; (y) all wells, underground pipelines, sprinklers, and similar irrigation equipment located at the real property, as well as all lines, valve openers, pipes, and similar items pertaining to such irrigation equipment; and (z) all milking equipment located at the real property (the "MetLife Real Estate Collateral"). The Pre-Petition MetLife Loans are further secured, subject to the First Intercreditor Agreement (defined below), by the Milk Receivables (the "MetLife Milk Priority Claim," and collectively with the Pre-Petition MetLife Real Estate Collateral, the "MetLife Collateral" and all liens and security interests on and in the Pre-Petition MetLife Collateral, the "MetLife Liens"). As

of the Petition Date, the MetLife Borrowers were indebted to MetLife, in the aggregate amount of approximately $181,376,198.66 under the Pre-Petition MetLife Loan Documents (collectively, the "MetLife Obligations").

Rabo and MetLife are parties to (i) that certain Intercreditor Agreement, dated as of September 18, 2018, (as Amended, the "First Intercreditor Agreement") and (ii) that certain Subordination and Intercreditor Agreement, dated as of October 20, 2022 (as Amended, the "Second Intercreditor Agreement" and, together with the First Intercreditor Agreement, the "MetLife Intercreditor Agreements").  Pursuant to the First Intercreditor Agreement, Rabo agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition MetLife Collateral to those of MetLife, and MetLife agreed to subordinate any interests it may have or thereafter acquire in the Pre-Petition RLOC Collateral (other than any such property that may also constitute Pre-Petition MetLife Collateral) to those of Rabo.

Additionally, the First Intercreditor Agreement recognizes that Rabo and MetLife have separately entered into Milk Check Assignment Agreements (the "Milk Agreements") with Debtor Millenkamp Cattle and a milk purchaser, Glanbia Foods, Inc. ("Milk Purchaser").  The Milk Agreements direct the Milk Purchaser to make certain payments directly to Rabo (in certain situations) and MetLife (on a monthly basis), rather than to Millenkamp Cattle.  Pursuant to the terms of the First Intercreditor Agreement, MetLife's priority interest in any Milk Receivables is equal to the aggregate amount of, in any month, the amount of the monthly installment payment of principal and accrued interest then due and payable by the applicable Debtors to MetLife, with such amount being capped at one month's principal and interest payment, unless MetLife has provided written notice to Rabo that amounts exceeding one month's principal and interest payment are due, owing, and unpaid.

On September 18, 2018, Rabo, Millenkamp Cattle, and the Milk Purchaser also entered into a Collateral Assignment of Milk Contracts, pursuant to which Millenkamp Cattle assigned to Rabo all contracts and proceeds related to certain purchase agreements between Millenkamp Cattle and the Milk Purchaser, to secure the obligations owed to the Pre-Petition RLOC Secured Parties. Subject to the foregoing, during the Borrowers' default under the Pre-Petition RLOC Documents, Rabo may collect the Milk Receivables.  Other than the foregoing subordination, MetLife and Rabo expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of the Pre-Petition RLOC Secured Parties' rights, privileges, powers, or remedies with respect to the Pre-Petition RLOC Obligations or the Pre-Petition RLOC Collateral. Likewise, Rabo and MetLife expressly agreed that the First Intercreditor Agreement does not materially impair or adversely affect any of MetLife's rights, privileges, powers, or remedies with respect to the Pre-Petition MetLife Loans or the MetLife Collateral.  MetLife does not have any lien or security interest in any of the Debtors' Livestock, including, but not limited to, dairy cattle.

| Description | Principal Amount | Claim Amount | Security | Loan Rate Adjustment Date | Loan Maturity Date |
|---|---|---|---|---|---|
| **Promissory Note A** dated September 26, 2018, and First Amendment dated April 21, 2021 | $106,000,000.00 | $86,855,135.96 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 | 9/15/2028 | 8/15/2038 |
| **Promissory Note B** dated September 26, 2018, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April 21, 2021 | $59,400,000.00 | $51,693,035.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 | 9/15/2028 | 8/15/2038 |
| **Promissory Note C** dated April 15, 2020, and First Amendment dated April 15, 2020, Second Amendment dated August 15, 2020 and Third Amendment dated April | $13,000,000.00 | $11,530,349.58 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 | 9/15/2028 | 8/15/2038 |

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 39

| | | | | | |
|---|---|---|---|---|---|
| 21, 2021 | | | | | |
| **Promissory Note D** dated April 21, 2021 | $17,954,226.00 | $16,210,086.43 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 | 9/15/2028 9/15/2035 | 3/15/2041 |
| **Promissory Note E** dated April 21, 2021 | $15,978,409.00 | $10,082,419.25 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated September 26, 2018 | 3/15/2026 | 3/15/2028 |
| **9858 Promissory Note** dated March 12, 2019 | $5,508,350.00 | $5,005,171.86 | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing dated March 12, 2019 "Canyonlands" and "McGregor" property | 8/25/2028 8/25/2038 | 12/25/2038 |

    <u>Treatment.</u> MetLife filed Proofs of Claim in the aggregate amount of $181,376,198.66. The obligations owed pursuant to the MetLife Loans shall be treated as fully secured for all purposes in this case including, but not limited to, 11 U.S.C. § 506(b). MetLife shall have an allowed secured claim in the Debtors' bankruptcy cases for the balance due under the MetLife Loans, as of April 2, 2024, in the amount of $181,376,198.66 (the "MetLife Claim"). Pursuant to agreement of the Parties, the MetLife Claim shall continue to accrue interest (per the terms herein) and together with all fees and expenses incurred by MetLife after April 2, 2024, will become fully due and payable at Maturity as defined in the underlying loan documents (collectively, the MetLife Loan Documents)[9]. Any post-petition Professional Fees as allowed by the Court pursuant to the

---

[9] Capitalized terms used in this Section 3.10 not defined herein shall have the meaning ascribed to them in the MetLife Loan Documents.

professional fee disclosures outlined in part 3.1.2 above, shall be added pro rata to the six (6) MetLife loan balances comprising the MetLife Claim.

The Allowed Class 9 Secured Claim shall receive the following treatment (to be more fully described by an amendment to the MetLife Loan Documents):

**Promissory Notes A, B, & C**

1) The Loan Initial Rate shall be increased to 7.0% per annum. Interest-only payments at the Loan Initial Rate until December 15, 2027. The terms of Promissory Notes A, B, and C shall otherwise remain the same, except as otherwise outlined in this Plan.

2) On December 15, 2027, MetLife shall begin receiving monthly principal and interest payments on Promissory Notes A, B, and C pursuant to the Budget and adjusted consistent with the MetLife Loan Documents to reflect interest at the Loan Contract Rate, over the period from December 15, 2027 to August 15, 2038.

3) Promissory Notes A, B, and C shall be reamortized and adjusted accordingly on the first Regular Payment Date following each Rate Adjustment, consistent with the MetLife Loan Documents providing for the original maturity date of August 15, 2038. Promissory Notes A, B, and C will be paid in full through the originally scheduled balloon payment on August 15, 2038.

**Promissory Note D**

1) The Initial Rate shall be increased to 7.0% per annum. Interest-only payments at the Initial Rate until December 15, 2027. The terms of Promissory Note D shall otherwise remain the same, except as otherwise outlined in this Plan.

2) On December 15, 2027, MetLife shall begin receiving monthly principal and interest payments on Promissory Note D pursuant to the Budget and adjusted consistent with the MetLife Loan Documents to reflect interest at the Loan Contract Rate, over the period from December 15, 2027 to March 15, 2041.

3) Promissory Note D shall be reamortized, and adjusted accordingly on the first Regular Payment Date following each Rate Adjustment, consistent with the MetLife Loan Documents providing for the original maturity date of March 15, 2041. Promissory Note D will be paid in full through the originally scheduled balloon payment on March 15, 2041.

**Promissory Note E**

1) The Initial Rate shall be increased to 7.0% per annum.  Interest-only payments at the Initial Rate until December 15, 2027.  The terms of Promissory Note E shall otherwise remain the same, except as otherwise outlined in this Plan.

2) On December 15, 2027, MetLife shall begin receiving monthly principal and interest payments on Promissory Note E pursuant to the Budget, and adjusted consistent with the MetLife Loan Documents to reflect interest at the Loan Contract Rate, over the period from December 15, 2027 to March 15, 2028.

4) Promissory Note E shall be reamortized consistent with and adjusted accordingly on the first Regular Payment Date following each Rate Adjustments, with the MetLife Loan Documents providing for the original maturity date of March 15, 2028. Promissory Note E will be paid in full through the originally scheduled balloon payment on March 15, 2028.

**9858 Promissory Note**

1) The Initial Rate shall be increased to 7.0% per annum.  Interest-only payments at the Initial Rate following the Effective Date until the sale of Canyonlands and McGregor, when the 9858 Promissory Note will be paid in full pursuant to the MetLife Loan Documents except as modified herein.  The terms of the 9858 Promissory Note shall otherwise remain the same, except as otherwise outlined in this Plan.

Until such time as the MetLife Claim in the Debtors' bankruptcy cases is paid in full, MetLife shall retain its liens on the MetLife Collateral as contemplated by 11 U.S.C. § 1129(b)(2)(A)(i)(I), except as subordinated pursuant to the DIP Order.

Effective upon confirmation of the Debtors' Plan, the Debtors and the guarantors will reaffirm its/their obligations under the MetLife Loan Documents and MetLife's security interests in the MetLife Collateral and execute all documentation required by MetLife to substantiate and memorialize the final terms of treatment and repayment of the MetLife Claim including, but not limited to, an omnibus amendment to the MetLife Loan Documents incorporating the terms and conditions of MetLife's treatment under Class 9.

b.    Voting.  Class 9 is Impaired under the Plan. Class 9 is entitled to Vote under the Plan.

### 3.11    Class 10: Rabo Secured Claims.

      a.     Classification. Class 10 consists of Rabo's Secured Claims.

Under that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021, as Amended, the "Pre-Petition RLOC Credit Agreement" and collectively with all security, pledge, intercreditor, guaranty agreements, and other documentation executed in respect thereof, the "Pre-Petition RLOC Documents", by and among the Debtors[10], collectively as borrower, the lenders from time to time party thereto (in such capacity, collectively, the "Pre-Petition RLOC Lenders"), and Rabo, as sole lead arranger, agent, and swing-line lender (in its capacity as agent for the benefit of the Pre-Petition RLOC Lenders and each Issuer (as defined in the Pre-Petition RLOC Credit Agreement), the "Pre-Petition RLOC Agent" and collectively with the Pre-Petition RLOC Lenders and the Issuers, the "Pre-Petition RLOC Secured Parties" and each, a "Pre-Petition RLOC Secured Party"), the Debtors were provided with an asset-based revolving line of credit facility (the "Pre-Petition RLOC Facility") consisting of (a) revolving commitments in an aggregate amount of up to $91,000,00.00; (b) a swing-line credit facility for the Pre-Petition RLOC Agent to make Swing Line Advances (as defined in the Pre-Petition RLOC Credit Agreement) in an aggregate amount of up to $7,500,000.00; and (c) a letter-of-credit facility for the issuance of stand-by letters of credit in an aggregate amount of up to $1,000,000.00.

Pursuant to the terms of the Pre-Petition RLOC Credit Agreement, the Debtors granted to the Pre-Petition RLOC Agent a security interest to and in substantially all of the Debtors' and Borrowers' personal property, excluding their real property, and all other property defined as the "Collateral" in the Pre-Petition RLOC Credit Agreement (referred to herein as the "Pre-Petition RLOC Collateral" and the liens and security interests granted to or for the benefit of the Pre-Petition RLOC Secured Parties therein, the "Pre-Petition RLOC Personal Property Liens").

The Pre-Petition RLOC Collateral includes, among other interests (each as defined in the Pre-Petition RLOC Credit Agreement): all Accounts, Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and, notably, the Borrowers' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Borrowers' milk and other dairy products (the "Milk Receivables"). The Pre-Petition RLOC Secured Parties' lien and security interest extends to all accessions to, substitutions for, and all replacements, products, and proceeds of the Pre-Petition RLOC Collateral. As described below, the Pre-Petition RLOC Secured Parties' interest in the Milk Receivables is subject to the First Intercreditor Agreement (as defined below) entered into between them and MetLife.

---

[10] Nondebtors Susan Millenkamp as Trustee of the WJM 2012 Trust; William Millenkamp as Trustee of the SJM 2012 Trust; William John Millenkamp and Susan Jo Millenkamp (the "Non-Debtor Borrowers") also executed the Pre-Petition RLOC Credit Agreement. The Debtors and the Non-Debtor Borrowers are referred to herein as the "Borrowers."

Further, as consideration for the Pre-Petition RLOC Agent to enter into that certain Forbearance Agreement, made effective as of October 22, 2022, the Borrowers granted, among other things, a second priority mortgage on the Pre-Petition MetLife Real Estate Collateral (defined below) to secure the Pre-Petition RLOC Obligations, subject to the Second Intercreditor Agreement (defined below). Accordingly, on October 20, 2022, the Borrowers executed and delivered that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (Second Priority), in favor of the Pre-Petition RLOC Agent, to secure any and all obligations owed to the Pre-Petition RLOC Secured Parties, which was recorded in Cassia County, as Instrument No. 2022-004552, Twin Falls County as Instrument No. 2022018722, and Jerome County as Instrument No. 2224759 (the "Pre-Petition RLOC Second Mortgage" and together with the Pre-Petition RLOC Personal Property Liens, the "Pre-Petition RLOC Liens").

a.    Treatment. On June 7, 2024, Rabo filed a Proof of Claim in the amount of $96,143,211.38. On November 25, 2025, Rabo filed an Amended Proof of Claim in the amount of $96,469,917.04.

Amended Proof of Claim Amount:

Principal: $88,950,202.73
Pre-Petition Interest (as of April 2, 2024): $149,105.24
Post-Petition Interest (as of October 31, 2024): $2,751,368.26
Pre-Petition Professional Fees: $1,255,548.19
Post-Petition Professional Fees (as of October 31, 2024): $3,357,410.62
Unused Commitment Fee: $6,280.00
TOTAL: $96,469,917.04

The Debtors and Rabo conducted a reconciliation of Rabo's Claim amount as of the Petition Date and determined the amount owing to Rabo as of the Petition Date was $90,361,000.00. The Debtors dispute Rabo's default interest and pre- and post-petition professional fee amounts. Rabo shall provide the Debtors no later than fifteen (15) Business Days before the Effective Date a calculation of its post-petition interest.

Any Professional Fees as agreed to by the Debtors, or approved by the Court, shall be added to Rabo's loan balance, and will be subject to the procedures outlined in part 3.1.2.

Rabo shall receive the following (to be more fully described by an amendment to the Rabo Loan Documents):

1) Interest-only payments, payable on a monthly basis, at the rate of 9.5% per annum following the Effective Date until Rabo receives payment in full.

2) Once Sandton is paid in full, which is anticipated to be August 2026, Rabo will also receive monthly principal payments in the amount of

$1,350,000.00 per month, pursuant to the Budget. The Debtors estimate Rabo will receive an approximately 30% principal paydown from the Effective Date until November 30, 2027.

3) On December 1, 2027, Rabo shall receive payment in full of the remainder of its Allowed Class 10 Secured Claim (subject to extension pursuant to section 5.10 of this Plan).

The Pre-Petition RLOC Liens shall retain the same validity, perfection, and priority, and extent as existing on the Petition Date, except as subordinated pursuant to the DIP Order.

b.    <u>Voting</u>. Class 10 is Impaired under the Plan. Class 10 is entitled to Vote under the Plan.

### 3.12    <u>Class 11: Conterra German Note Secured Claim.</u>

a.    <u>Classification.</u> Class 11 consists of Conterra's German Note Claim.

Millenkamp Cattle, Inc., Millenkamp Family LLC, Millenkamp Properties II LLC, Millenkamp Properties, L.L.C., East Valley Cattle, LLC, Idaho Jersey Girls Jerome Dairy LLC, and William J. Millenkamp (collectively, the "Rooster Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $2,549,750 (the "German Note") which Conterra endorsed to Rooster Capital IV LLC ("Rooster").

The German Note is secured by a first priority mortgage on certain real property owned by certain of the Debtors known as the "German Dairy" located at 162 West 400 North, Jerome, Idaho 83338 (the "Conterra German Collateral") and located in Jerome County, Idaho (the "Pre-Petition German Real Estate Lien").

b.    <u>Treatment.</u>

<u>German Note Proof of Claim Amount:</u>

Unpaid Principal: $2,508,860.41

Accrued Interest through 4/2/24: 67,867.67

Total unpaid balance as of 4/2/24: $2,576,728.08

Conterra has an Allowed Class 11 Secured Claim in the amount of $2,576,728.08, plus professional fees and costs allowed by the Court pursuant to section 3.1.2 of this Plan.  Any post-petition Professional Fees as agreed to by the Debtors, or approved by the Court, shall be added to the loan balance.

The obligations owed pursuant to the Conterra German Note shall be treated as fully

secured for all purposes in this case including, but not limited to, 11 U.S.C. § 506(b). Conterra shall have an Allowed Secured Claim in the Debtors' bankruptcy cases for the balance due under the German Note, as of April 2, 2024, in the amount of $2,576,728.08 (the "Conterra German Note Claim"). Pursuant to agreement of the Parties, the Conterra German Claim shall continue to accrue interest (per the terms herein).

The Allowed Class 11 Secured Claim shall receive the following treatment (to be more fully described by an amendment to the Conterra German Note Loan Documents):

1) Interest-only payments, payable on a monthly basis, at the rate of 10.25% per annum following the Effective Date until the German Note receives payment in full.

2) Once Sandton is paid in full, which is anticipated to be August 2026, Conterra will receive monthly principal payments on the German Note in the amount of $480,000 per month, pursuant to the Budget, until this claim is paid in full.

3) In the event Conterra's German Note claim is paid in full pursuant to this Plan, Conterra will waive any further claim for additional interest (at a default rate or otherwise) due between the Petition Date and the Confirmation Date..

Until such time as the Conterra German Note Claim in the Debtors' bankruptcy cases is paid in full, Conterra shall retain its liens on the Conterra German Collateral as contemplated by 11 U.S.C. § 1129(b)(2)(A)(i)(I), subject to the terms and conditions of the DIP Order.

c.      Voting. Class 11 is Impaired under the Plan. Class 11 is entitled to Vote under the Plan.

### 3.13   Class 12: Conterra Mezz Loan Claim

a.      Classification. Class 12 consists of Conterra's Mezz Loan Claim.

Millenkamp Cattle, Inc., Idaho Jersey Girls, LLC, Idaho Jersey Girls Jerome Dairy LLC, East Valley Cattle, LLC, Millenkamp Family LLC, Millenkamp Properties, L.L.C., Millenkamp Properties II LLC, Goose Ranch, LLC, William J. Millenkamp and Susan J. Millenkamp (collectively, the "Borrowers") executed and delivered to Conterra a promissory note dated October 20, 2022 in the original principal amount of $16,500,000 which Conterra endorsed to Ag Funding (the "Conterra Mezz Loan"). The Conterra Mezz Loan is secured by second priority liens and security interests in the Pre-Petition RLOC Collateral (the "Conterra Mezz Collateral") and third priority mortgage on the Pre-Petition MetLife Real Estate Collateral (the "Conterra Mezzanine Liens"), all subject to the DIP Order.

b.      Treatment.

Mezz Loan Proof of Claim Amount:

Unpaid Principal: $16,500,000.00

Accrued Interest through 4/2/24: $1,457,810.41

Late Fees: $830,614.58

Reimbursable Expenses: $95,840.53

Total unpaid balance as of 4/2/24: $18,884,265.52

Conterra has an Allowed Class 12 Secured Claim in the amount of $18,884,265.52, plus professional fees and costs upon pursuant to section 3.1.2 of this Plan.

The obligations owed pursuant to the Conterra Mezz Loan shall be treated as fully secured for all purposes in this case including, but not limited to, 11 U.S.C. § 506(b). Conterra shall have an Allowed Secured Claim in the Debtors' bankruptcy cases for the balance due under the Conterra Mezz Loan, as of April 2, 2024, in the amount of $18,884,265.52 (the "Conterra Mezz Loan Claim"). Pursuant to agreement of the Parties, the Conterra Mezz Loan Claim shall continue to accrue interest (per the terms herein).

The Allowed Class 12 Secured Claim shall receive the following treatment (to be more fully described by an amendment to the Conterra Mezz Loan Documents):

1) The Conterra Mezz Loan will accrue PIK interest at the rate of 13.538% per annum following the Effective Date until the Conterra Mezz Loan receives payment in full..

2) On December 1, 2027 (subject to extension pursuant to section 5.10 of this Plan), Conterra shall receive payment in full of the outstanding amount of its Allowed Class 12 Secured Claim.

3) In the event Conterra's Mezz Note claim is paid in full by December 1, 2027 (subject to extension pursuant to section 5.10 of this Plan), Conterra agrees to waive any claim for additional interest (at a default rate or otherwise) accrued between the Petition Date and the Effective Date.  In the event Conterra's Mezz Note claim is not paid in full by this date, Conterra's claim may include the additional unpaid post-petition, pre-Confirmation Date, interest accrued in the amount of approximately $3,100,000.00.

Until such time as the Conterra Mezz Loan Claim in the Debtors' bankruptcy cases is paid in full, Conterra shall retain its liens on the Conterra Mezz Collateral as contemplated by 11 U.S.C. § 1129(b)(2)(A)(i)(I), subject to the terms and conditions of the DIP Order.

      c.   <u>Voting.</u> Class 12 is Impaired under the Plan. Class 12 is entitled to Vote under the Plan.

**3.14   <u>Class 13: General Unsecured Claims.</u>**

      a.   <u>Classification.</u> Class 13 consists of all General Unsecured Claims, in the approximate amount of $28 million (the "GUC Principal Amount"). A full listing of the General Unsecured Claims and amounts of each Claim is included as Exhibit D of the Disclosure Statement.

      b.   <u>Treatment.</u> Each Holder of an Allowed General Unsecured Claim shall, at such Holder's election, be entitled to distributions pursuant to either option (i) or (ii) below. Such election must be made pursuant to the election procedures set forth below.

      (i)   **Single Cash Payment (Convenience Class)**: A single cash payment equal to the lesser of (i) $25,000, or (ii) 70% of such Holder's Allowed General Unsecured Claim. Any Holder of an Allowed General Unsecured Claim that elects to receive a single cash payment pursuant to this Section 3.14(b)(i) must affirmatively make such election either (i) on the Ballot/Election Form or (ii) in writing to the Debtors within seven months of the Effective Date (the "Election Date"). The cash payment made to any Holder of an Allowed General Unsecured Claim that elects treatment under this section after the Effective Date, will be credited to deduct any interest payments such Holder received between the Effective Date and the Election Date on account of its Allowed General Unsecured Claim.

      (ii)   **Deferred Principal and Interest Payments**: Following the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive (i) at the end of each calendar quarter through April 2028,[11] interest-only cash payments based on such Holder's outstanding balance at 7% per annum, (ii) commencing on May 1, 2028 through December 2029, monthly interest payments based on such Holder's outstanding balance at 7% per annum; (iii) on May 1, 2028, a single principal payment equal to 5/24 of the principal balance owed to such Holder as of the

---

[11] Payments to be made, or shall accrue, on March 31, May 31, August 31, and December 31 of each calendar year.

Effective Date; (iv) on June 1, 2028 through December 2029, principal payments equal to 1/24 of the principal balance owed to such Holder as of the Effective Date, paid on a monthly basis; provided that if the Debtors elect to repay General Unsecured Creditors within thirty (30) months of the Effective Date (the "Payoff Date"), the payoff amount owed to each Holder of a General Unsecured Claim shall be reduced on a pro rata basis by (i) the total amount of the Committee's professional fees accrued through the Effective Date of the Plan and paid by the Debtors following approval by the Court and (ii) all interest payments made on General Unsecured Claims from the Effective Date through the Payoff Date (the "Payoff Option"). The Payoff Date is subject to the six-month extension pursuant to section 5.10 of this Plan and will automatically be extended if the extension is granted.

The Holders of Class 13 Claims shall be paid 100% of their Claims in full and final satisfaction through the foregoing payment schedule.

2      Voting. Class 13 is Impaired under the Plan. The Holders of Class 13 Claims are entitled to Vote under the Plan.

### 3.15    Class 14: Intercompany Claims

a.      Classification. Class 14 consists of all Intercompany Claims.

b.      Treatment. On the Effective Date, all Intercompany Claims shall be extinguished. Holders of Intercompany Claims will receive no Distributions under the Plan.

c.      Voting. Each Holder of a Class 14 Claim will be deemed to have rejected this Plan and, therefore, are not entitled to vote on this Plan.

### 3.16    Class 15: Equity Interests.

a.      Classification. Class 15 consists of all Equity Interests in the Debtors.

b.      Treatment. Each Debtors' pre-petition equity interests shall remain the same post-petition. Class 15 Claim Holders are retaining ownership interests in the Debtors subject to the terms and conditions of the DIP Order.

c.      Voting. Class 15 is Unimpaired under the Plan. Class 15 is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**3.17**     **Special Provisions Regarding Unimpaired Claims.**

**3.17.1**  Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or otherwise Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or otherwise Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights and defenses with respect to any Reinstated Claim or otherwise Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

# ARTICLE 4

# ACCEPTANCE OR REJECTION OF THE PLAN

**4.1**     **Impaired Class of Claims Entitled to Vote**. Only the votes of Holders of Allowed Claims in Class 2, Class 3, Class 6, Class 7, Class 9, Class 10, Class 11, Class 12, and Class 13 shall be solicited with respect to the Plan.

**4.2**     **Voting of Claims.** Each Holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 4 of the Plan shall be entitled to vote to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity shall be aggregated and treated as one Allowed Claim in such Class.

**4.3**     **Procedure/Voting Deadline.** In order for a Ballot to count, it must be (i) completed, dated, and properly executed, and (ii) delivered to the Voting Agent by first class mail, postage prepaid, or by overnight courier, to the following address: Attn: Matthew T. Christensen, Johnson May, 199 N. Capitol Blvd., Ste 200, Boise, ID 83702, or by email to the following address: mtc@johnsonmaylaw.com. The Voting Agent must ACTUALLY RECEIVE Ballots on or before the Voting Deadline. Except as otherwise ordered by the Bankruptcy Court or agreed to by the Debtors, a vote may not be changed once a Ballot is submitted to the Voting Agent.

**4.4**     **Acceptance by an Impaired Class.**  In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), the Holders of Claims in any

Class entitled to vote on the Plan shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

**4.5** **Presumed Acceptances by Unimpaired Classes.** Class 1, Class 4, Class 5, and Class 15 are Unimpaired under the Plan. Under Bankruptcy Code section 1126(f), the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Plan, and, therefore, the votes of such Holders shall not be solicited.

**4.6** **Impaired Classes Deemed to Reject Plan.** Holders of Intercompany Claims in Class 14 are not entitled to receive or retain any property or interests in property under the Plan. Under Bankruptcy Code section 1126(g), such Holders are deemed to have rejected the Plan, and, therefore, the votes of such Holders shall not be solicited.

**4.7** **Confirmation Pursuant to Bankruptcy Code Section 1129(b).** Because at least one Impaired Class is deemed to have rejected the Plan, the Debtors will and hereby request confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

**4.8** **Elimination of Vacant Classes.** Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).


# ARTICLE 5

# MEANS FOR IMPLEMENTATION OF THE PLAN


**5.1** **Substantive Consolidation.** On the Effective Date, the Assets and liabilities of the Debtors shall be deemed substantively consolidated for purposes of implementing the Plan. Other than for purposes of implementing the Plan, the Debtors and their assets and liabilities shall not be deemed consolidated as described in Article 2.2 of the Plan.

**5.2** **Post-Confirmation Reporting Requirements**:  Beginning on the Effective Date, the Debtors shall provide to MetLife, Rabo, Conterra and Sandton the following:

> **5.2.1** A monthly operational dashboard report which shows weekly performance metrices will be provided no later than fourteen (14) days after month end.  This dashboard report will include monthly cash receipts and monthly cash disbursements;

**5.2.2**      A monthly borrowing base certificate, in the same form as the Debtors currently use, that shall quantify the Reorganized Debtors' then-current herd count and value, accounts receivable and milk accounts, utilizing the valuation principles and advance rates applicable to such assets in a manner consistent with the preparation of borrowing base certificates pursuant to the Pre-Petition RLOC Credit Agreement. Debtors may add new cattle (whether raised or purchased by Debtors in accordance with past and normal business practices) to the borrowing base. Said borrowing base certificate shall be due within thirty (30) days of the end of each month;

**5.2.3**      Monthly production or sales reports, beginning on the first business day of the first full month after the Effective Date, prepared by or on behalf of the Debtors' milk product off-takers; Monthly cattle sales reports will be prepared by the Debtor and if requested will include copies of cattle sale remittance advices. Said production or sales reports shall be due within thirty (30) days of the end of each month;

**5.2.4**      Within forty-five (45) days of each month end, monthly accrual financial statements prepared on a basis consistent with the company's annual audited financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP Financials");

**5.2.5**      A Financial Strength Monitor and a monthly Variance Report will be provided within seven (7) days after the delivery of the GAAP Financials. The Variance Report will reflect the difference between the budgeted amount of revenue and income/loss from operations and the actual amounts in the same format as the Budget. Parties receiving the report may make reasonable requests for additional terms or details regarding the Variance Reports provided by the Debtors;

**5.2.6**      No later than 30 days prior to the beginning of the next fiscal year, Debtors shall deliver a forecast, monthly cash budget, and capital expenditure plan for the ensuing year, and the Debtor will report performance to the Plan as well as to the forecast; and

**5.2.7**      If the Sales Process commences, the Plan Administrator shall provide a weekly cash budget within thirty (30) days.

**5.2.8**   These reporting requirements will terminate upon payment in full of MetLife, Conterra and Sandton's claims (each as paid pursuant to the Plan), or termination of this Plan, whichever occurs first.

**5.2.9**   The reports set forth above shall also be made available to any holder of an Allowed General Unsecured Claim upon request of such holder. Any such holder that requests copies of the reports above will be required to execute a non-disclosure agreement in a form acceptable to the Reorganized Debtors.

**5.3**    **Chief Restructuring Officer**. On and after the Effective Date, and subject to the terms herein, the Debtors' CRO shall continue to advise, represent and assist the Reorganized Debtors in carrying out their duties under the Plan by, among other things, performing the applicable professional services set forth in the Debtors' Application to Employ Robert Marcus as Chief Restructuring Officer [Dkt. 791], to wit:

  i.    Oversight of the day-to-day operations of the Debtors;

  ii.    Advise and assist the Debtors' management team in the operation of their business;

  iii.    Advise and assist the Debtors in the preparation of on-going financial reports and disclosures to the Secured Lenders regarding the Debtors' post Effective Date operations;

  iv.    In the name of, and on behalf of, the Debtors, to negotiate, make, execute and deliver, either jointly and severally, all amendments, supplements, modifications, extensions, replacements, agreements, documents, and instruments relating to the oversight of the [Second Amended] Chapter 11 Plan, subject to the requisite Bankruptcy Court approval;

  v.    Advise and assist the Debtors in the operation of their business, evaluate and monitor the values of the Debtors' assets and liabilities outstanding, and assist with implementation of the [Second Amended] Plan;

  vi.    Assist in claims management and reconciliation processes, including assisting with disputes regarding the nature and extent of appropriate professional fees and expenses associated with the objection to claims process; and

  vii.    Assist with reporting obligations of the Debtors on a periodic basis, including attesting or confirmation of results and reports to the creditor body.

**5.4**    **Restructuring Transactions.** On or before the Effective Date or as soon as reasonably practicable thereafter, the CRO or Plan Administrator, as applicable, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the restructuring transactions under and in connection with this Plan (collectively, the "Restructuring Transactions"), including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer,

dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions.

The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**5.5**    **Sources of Consideration for Plan Distributions.** Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions under the Plan with Cash on hand from ongoing business operations, the net sale proceeds from the sale of Canyonlands and McGregor, and the proceeds from the Refinancing Facility.

**5.6**    **Sale of Canyonlands and McGregor**.  On or before the Effective Date, the Reorganized Debtors shall employ a broker to market and sell Canyonlands and McGregor for fair market value and for no less than the appraised value of each.  The sale shall close no later than November 30, 2025.  Canyonlands was appraised in June of 2024 at $16,000,000.  McGregor was appraised in June of 2024 at $4,500,000. The net sale proceeds after normal and customary closing costs, shall be distributed first to MetLife in full satisfaction of all amounts due and owing under the 9858 Promissory Note and the MetLife Loan Documents including any allocated Non-Estate Professionals fees and then the remaining balance, less $2 million, to the DIP Lender. The $2 million shall be allocated to pay the tax consequences of the sale and any amounts leftover, once the final tax amount is determined, shall remain cash of the Reorganized Debtors. The Reorganized Debtors shall file a report of sale with the Court upon closing of the sale transaction for Canyonlands and McGregor.  If the Reorganized Debtors are able through sale of equity, to infuse cash into the Reorganized Debtors without increasing the debt burden or otherwise adversely affecting the Reorganized Debtors' financial condition or performance in order to make the timely required payments to MetLife in full satisfaction of the 9858 Promissory Note and to the DIP Lender in an amount of not less than $13,500,000.00, the Reorganized Debtors shall not be required to sell the Canyonlands and McGregor properties.  In the event funds can be raised through the sale or borrowing against equity, Rabo shall release its lien on said equity.

**5.7**    **Refinancing.**  By November 30, 2027, the Debtors shall have closed on refinancing (the "Refinancing Facility") to pay Rabo and Conterra in full and final satisfaction of their Allowed Class 10, 11, and 12 claims as well as comply with the rest of the terms of the Plan.

**5.8**    **Plan Administrator.** Upon Default under Section 12.2 of the Plan, or as otherwise required by the terms herein, the Debtors' CRO (Robert Marcus) will cease acting as CRO and assume the duties and responsibilities of Plan Administrator.  In cooperation and

coordination with the Sales Advisors, the Plan Administrator will administer the Sales Process, including valuing assets, marketing them for sale, reporting to the creditor body, managing the sales process and the distribution of proceeds to creditors according to the confirmed Plan and pursuant to the specific process outlined below.

5.9    **Sales Process Commencement.** The Sales Process of the Reorganized Debtors will irrevocably commence, on the earliest of: (i) the occurrence of an uncured Default,  (ii) the Reorganized Debtors failure to secure an executed definitive term sheet by August 31, 2027 for the Refinancing Facility required under the Plan, or (iii) the failure of the Reorganized Debtor to have closed, including funding, on the Refinancing Facility by November 30, 2027.

5.10    **Refinancing Process Extension**.  The deadlines provided in this Article Five for obtaining an executed definitive term sheet or closing on the Refinancing Facility are subject to an extension of up to six months at the request of the Reorganized Debtors with the consent of MetLife in its sole discretion.

5.11    **Sales Advisors.** Within fourteen (14) days of commencement of the Sales Process, the Plan Administrator shall retain Schuil Ag Real Estate, Inc. and Overland Stock Yard (collectively, "Sales Advisors") as professionals to work with the Plan Administrator to sell all of the Reorganized Debtors assets consistent with the terms herein.

5.12    **Sales Process**.  Initially the Plan Administrator in coordination and cooperation with the Sales Advisors shall pursue a sale of all the Reorganized Debtors' business operations as a going concern.  If the going concern sale process results in no bona fide letters of intent or other bona fide expressions of interest within the deadlines set forth in the Plan, then and in such event the going concern sale process shall be deemed unsuccessful and the Plan Administrator in coordination and cooperation with the Sales Advisors shall conduct organized Asset Sales of all the Reorganized Debtors' assets consistent with the Plan.

5.13    **Sale as a Going Concern.** Upon commencement of the Sales Process, the Plan Administrator in coordination and cooperation with the Sales Advisors will gather specific information related to the Reorganized Debtors' ongoing business operations, including but not limited to financial statements, herd performance and health data, surveys, environmental reports, third party water reports, employee data, fixed asset and real property listings, and farming data ("Diligence Information") and use such information to prepare an information memorandum that will be used to convey such information to prospective purchasers in connection with the sale  ("Information Book").  The Information Book will be discussed with and approved by the Plan Administrator and the Sale Advisors before distribution to any prospective purchasers and will be completed no later than 60 days after commencement of the Sales Process.  Simultaneously, the Sales Advisors will prepare a list(s) of potential purchasers ("Potential Purchasers") and present it to the Plan Administrator for approval.  Within 7 days of receipt of the Information Book and the Potential Purchasers or, as applicable, on December 1, 2027, if the Reorganized Debtors have failed to obtain the Refinancing Facility, the Sales Advisors will contact approved Potential Purchasers who have been approved by the Plan Administrator to solicit their interest in the sale

and provide them with the Information Book and Diligence Information (the "Solicitation Date"). The Sales Advisors and Plan Administrator will organize, implement and participate in a negotiating process with the approved Potential Purchasers, including participating in due diligence visits and meetings with the condition of obtaining an executed Term Sheet for the sale of the business operations as a going concern within 60 days of the Solicitation Date and the closing of such sale within 120 days of the Solicitation Date, or as otherwise extended by consent of the secured lenders.

      **5.14**    **Asset Sale.** Should the going concern sale process outlined above not result in a signed term sheet that is acceptable to the Plan Administrator, Sales Advisors and supported by the Secured Lenders consistent with the deadlines set forth in the Plan, , then the Plan Administrator in cooperation with the Sales Advisors, any other required professionals and the Secured Lenders will orchestrate and conduct an orderly liquidation to sell all of the Debtors' assets in accordance with the specific processes and the temporal milestones to be provided by the Plan Administrator and Sales Advisors. Such process and milestones will include an orderly culling of the herd and sale of individual parcels of real property and may ultimately conclude with sales of the herd, equipment, other personal property and real estate.

      **5.15**    **Expiration of Sales Process and Allocation of Sales Proceeds**. Regardless of the sale process (either a Sale as a Going Concern or an Asset Sale), the Sales Process must conclude no later than 365 days (one year) after the Solicitation Date. Upon expiration of that date without payment to secured creditors, secured creditors may seek relief required to execute their foreclosure remedies. In the event of an Asset Sale, the Plan Administrator shall provide a Notice of Sale for any proposed Asset Sales, with notice provided to any party holding a security interest in the assets to be sold. If an Asset Sale does not pay creditors with a security interest in the sold assets in full, the Notice of Sale shall include the proposed payments to secured creditors. Any party receiving a Notice of Sale shall have ten (10) days to object to the proposed sale. If no notice of objection is provided, that party will be deemed to have consented to the sale. If an objection is filed, the sale process shall be paused pending further negotiation or a court order approving the sale. Net proceeds of the Sales Process (i.e., proceeds after payment of fees due to the Sales Advisors, the Plan Administrator, or any other professional hired to assist with the sale, and normal and customary closing costs, taxes, expenses and prorations) (regardless of whether a Sale as a Going Concern or Asset Sale) must satisfy in full the secured lenders in order of lien priority as modified by the DIP Order. If sales proceeds are insufficient to satisfy secured lenders in full, closing of that sale would require consent of the secured lenders whose property is being sold, or by further order of the court. Sales proceeds payable to secured creditors shall be paid to secured creditors either at closing on the sale or upon receipt of the sales proceeds by the Plan Administrator. Any net proceeds above that required to satisfy applicable secured lenders in full shall be distributed to Holders of Allowed General Unsecured Claims until such claims are satisfied in accordance with this Plan.

      **5.16**    **Costs of Sale.** The Debtors shall be responsible for all due diligence requirements (e.g., surveys, environmental reports, third party water reports, third party cattle health reports, etc.) necessary to support any sale process and as identified and requested by the

Plan Administrator and the Sales Advisors.

Under either approach, the Sales Advisors will be compensated via a reasonable sliding scale success fee commission and not out of the working capital of the Debtors. The Plan Administrator will be compensated via a reasonable sliding scale success similar to Chapter 11 Trustee fees and not out of the working capital of the Reorganized Debtors. Notwithstanding the foregoing, any reasonable expenses necessary for the sale or to maintain the operations and preserve the assets shall be reimbursed as they are incurred out of the working capital of the Reorganized Debtors.

**5.17    Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all the Debtors' Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, the Reorganized Debtors may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**5.18    Authority.** The Reorganized Debtors in coordination and cooperation with the Plan Administrator shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

a.    review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

b.    calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

c.    retain, compensate, and employ professionals and other Persons to represent the Reorganized Debtors with respect to and in connection with its rights and responsibilities;

d.    establish, maintain, and administer documents and accounts of the Debtors or Reorganized Debtors as appropriate;

e.    maintain, conserve, collect, settle, and protect the Reorganized Debtors' Assets (subject to the limitations described herein);

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 57

f.      sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Reorganized Debtors' Assets, or any part thereof or interest therein upon such terms as the Reorganized Debtors determine to be necessary, appropriate, or desirable;

g.      negotiate, incur, and pay the Reorganized Debtors' Expenses; and

h.      prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors or Reorganized Debtors that are required under the Plan, by any governmental unit, or by applicable law, including but not limited to filing any reports required by the Bankruptcy Code or Bankruptcy Rules that are due to be filed after the Effective Date and paying any fees required by 28 U.S.C. § 1930 that are due to be paid after the Effective Date.

**5.19**      **Corporate Existence**. Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan),  or any agreement, instrument, or other document incorporated in the Plan on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non- bankruptcy law).

**5.20**      **Employee Obligations.** Except as (i) otherwise provided in the Plan (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Confirmation Hearing, the Reorganized Debtors shall honor the Debtors' Employee Obligations and, to the extent not already satisfied, the Debtors' Employee Obligations shall become obligations of the Reorganized Debtors in accordance with their terms.

**5.20.1**      To the extent the Employee Obligations are executory contracts and (i) such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 58

plans.

5.20.2        On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

**5.21        Workers Compensation Program.** As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs.

**5.22        Pursuit and Resolution of Reorganized Debtors' Causes of Action.** The Reorganized Debtors, may, and will have the exclusive right, power, and interest on behalf of the Debtors, and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Reorganized Debtors' Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided in the Plan. From and after the Effective Date, the Reorganized Debtors, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as representative of the Estates with respect to any and all Reorganized Debtors' Causes of Action that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Reorganized Debtors' Causes of Action in any court or other tribunal.

**5.23        No Successor Liability**. Except as otherwise expressly provided in this Plan and Confirmation Order, the Reorganized Debtors (i) are not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors prior to the Effective Date; (ii) are not, and shall not be, successors to the Debtors by any reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

**5.24        Preservation of Privileges and Defenses.** The actions taken by the Debtors, the Reorganized Debtors, or any of their respective Related Parties in connection with the Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors or the Reorganized Debtors, as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtor providing any privileged information related to the Reorganized Debtors, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Reorganized Debtors Causes of Action and shall remain privileged. The Reorganized Debtors shall retain the right to waive their own privileges. Only the Reorganized Debtors shall have the right to waive the attorney- client privilege, work-product doctrine, or other

protections as to the Debtors and the Reorganized Debtors.

     **5.25**         **Preservation of Rights of Action.**

        **5.25.1**     **Maintenance of Avoidance Actions and Causes of Action.** Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, the Reorganized Debtors will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors', the Estates', or the Reorganized Debtors' Causes of Action (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as Reorganized Debtors' Causes of Action, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as successor in interest to the Debtors and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, and the Estates to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Reorganized Debtors' Causes of Action without notice to or approval from the Bankruptcy Court. In accordance with the Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the Reorganized Debtors may compromise and settle the Reorganized Debtors' Causes of Action.  However, the Debtors, the Estates, and/or the Reorganized Debtors shall not pursue any Avoidance Action or Preference Claim against Holders of Allowed General Unsecured Claims.  If such Avoidance Actions or Preference Claims have already commenced, they will be dismissed as against Holders of Allowed General Unsecured Claims with prejudice upon the Effective Date or within five (5) days of the General Unsecured Claim being determined as an Allowed Claim.

        **5.25.2**     **Preservation of All Reorganized Debtors' Causes of Action Not Expressly Settled or Released.** The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Reorganized Debtors' Cause of Action is not intended to and shall not limit the rights of the Reorganized Debtors to pursue any such Avoidance Actions or Causes of Action. Unless a Reorganized Debtors' Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Causes of Action for later resolution by the Reorganized Debtors (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co- defendants in such lawsuits.

5.26    **Insurance Policies.**

5.26.1  **Insurance Policies Remain in Force.** Up to and including their policy expiration date(s), any and all Insurance Policies in effect as of the Effective Date shall remain in full force and effect according to their terms and the coverage obligations of the insurers and third-party administrators under such Insurance Policies shall continue following the Effective Date (including any obligations to pay, defend, and process insured claims).

5.26.2  **Insurance Policies; Employment Practice Liability Policies.** Nothing contained in this Plan shall affect or impair the rights of any non- Debtor insured persons covered under any Insurance Policy, which expressly includes any director and officer, employment practices, or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

## ARTICLE 6

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    **Assumption and Rejection of Executory Contracts and Unexpired Leases.** On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court with the effective date of such rejection is after the Effective Date; provided, that, nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; and provided further, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

6.1.1    Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to

sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

6.1.2    Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

6.1.3    To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti- assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

**6.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases.** Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the

rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 3.14, and such claims may be objected to in accordance with this Plan.

**6.3** **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**
The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three (3) Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

**6.3.1.** Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

**6.3.2.** Unless otherwise provided by an order of the Bankruptcy Court, the Debtors have attached as schedules their initial Assumed Executory Contracts[12] and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule. The Debtors shall file their final list of Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan, which shall supersede the initial schedule if any such initial schedule is filed. The Debtors shall cause all Filed Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule. The Debtors may supplement or modify the Assumed Executory Contract and Unexpired Leases Schedule or Rejected Executory Contracts and Unexpired Leases Schedule up to one (1) Business Day prior to the Confirmation Hearing. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed, served and actually received by the Debtors by the later of (1) the Confirmation Objection Deadline or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory

---

[12] Pursuant to the Stipulation with East Valley Development ("EVD"), the Debtors have made their final decision on assumption or rejection of the EVD contracts and have made the decision to assume such contracts. As such, the EVD contracts are on the initial schedule of assumed contracts and will remain on such schedule.

Contract and Unexpired Leases Schedule.

**6.3.3.    Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Executory Contracts and Unexpired Leases Schedule as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the Assumed Executory Contracts and Unexpired Leases (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

**6.3.4.** Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim, shall result in the full release and satisfaction of any Claims or defaults against the Debtors, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; provided, that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

**6.4      Assumption Dispute Resolution.** In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

**6.4.1** To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably

to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

   6.4.2  For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "**Adjourned Cure Dispute**").

   6.5  **Contracts and Leases Entered into After the Petition Date**. Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

   6.6  **Modifications, Amendments, Supplements, Restatements, or Other Agreements.** Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

   6.6.1  Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

   6.7  **Reservation of Rights.** Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. For the avoidance of doubt, the Debtors reserve all rights with respect to any Causes of Action or other right with respect to any Executory Contract or Unexpired Lease except as provided in this Plan.

   6.8  **Nonoccurrence of Effective Date.** If the Effective Date fails to occur, the

Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.


# ARTICLE 7
## PROVISIONS GOVERNING DISTRIBUTIONS

**7.1** **Timing of Distributions for Allowed Claims.** Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date. Distributions made as soon as reasonably practicable after the Effective Date, or such other date set forth herein shall be deemed to have been made on such date.

**7.2** **Calculating Distributions and Related Matters.** The Reorganized Debtors shall undertake in their reasonable discretion to make in accordance with the Plan all calculations of amounts for or relating to Distributions for Holders of Allowed Claims to be made from the Reorganized Debtors or for reserves for Holders of Contingent Claims, Disputed Claims, and Unliquidated Claims to be established by the Reorganized Debtors, and, may establish and holdback from Distributions reasonable reserves for other contingencies.


**7.3** **Interest and Other Amounts Regarding Claims.** Except to the extent provided in Bankruptcy Code section 506(b) and Allowed by a Final Order or otherwise agreed, (i) in the Plan, or (ii) in the Confirmation Order, post-petition interest shall not accrue or be paid on any Claims, and no Holder of an Allowed Claim shall be entitled to interest, penalties, fees, or late charges accruing or chargeable on any Claim from and after the Petition Date.


**7.4** **Means of Cash Payment.** Cash payments under the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by checks drawn on or wire transfer, electronic funds transfer, or ACH from a domestic bank. Cash payments to foreign Creditors may be made, at the option and in the sole discretion of the Reorganized Debtors by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks shall be null and void if not cashed within 180 calendar days of the date of the issuance thereof. Requests for reissuance of any check within 180 calendar days of the date of the issuance thereof shall be made directly to the Reorganized Debtors.


**7.5** **Form of Currency for Distributions.** All Distributions under the Plan shall be made in U.S. Dollars. Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim shall be calculated in U.S. Dollars based upon the currency conversion rate in place as of the Petition Date and in accordance with Bankruptcy Code section 502(b).

**7.6** **Fractional Distributions.** Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**7.7** **De Minimis Distributions.** If the amount of Cash to be distributed to the Holder of an Allowed Claim is less than fifty dollars ($50) on a particular distribution date, the Reorganized Debtors may hold the Cash distributions to be made to such Holders until the aggregate amount of Cash to be distributed to each applicable Holder is in an amount equal to or greater than fifty dollars ($50). Notwithstanding the preceding sentence, if the aggregate amount of Cash distributions owed to any Holder of an Allowed Claim under the Plan never equals or exceeds fifty dollars ($50), then the Reorganized Debtors shall not be required to distribute Cash to any such Holder.

**7.8** **Delivery of Distributions.** Distributions shall be made by the Reorganized Debtors to Holders of the Allowed Claims as of the record date set for such Distribution as stated in this Plan. Distributions to Holders of Allowed Claims shall be made (a) at the addresses set forth in the proofs of claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtors. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address. The responsibility to provide the Reorganized Debtors with a current address of a Holder of an Allowed Claim shall always be the responsibility of such Holder. Amounts in respect of undeliverable Distributions made by the Reorganized Debtors shall be held in trust on behalf of the Holder of the Allowed Claim to which they are payable by the Reorganized Debtors until the earlier of the date that such undeliverable Distributions are claimed by such Holder and 180 calendar days after the date the undeliverable Distributions were made.

**7.9** **Application of Distribution Record Date & Other Transfer Restrictions.** At the close of business on the Distribution Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record holders of any Claims except as provided in this Plan. Except as provided herein, the Reorganized Debtors and their Related Parties shall have no obligation to recognize any putative transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions. In addition, the Reorganized Debtors and their Related Parties shall have no obligation to recognize any putative transfer of General Unsecured Claims occurring at any time prior to the Effective Date to which the Debtors did not expressly consent and shall be entitled instead to recognize and deal for all purposes hereunder with only the Holders of General Unsecured Claims as reflected on the claims registers.

**7.10** **Withholding, Payment, and Reporting Requirements Regarding Distributions.** All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements, including, to the extent such information is not already available to the Reorganized Debtors, requiring each Holder of a Claim to provide an executed current Form W-9, Form W-8, or similar tax form as a prerequisite to receiving a Distribution. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed on the Reorganized Debtors in connection with such Distribution; and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Reorganized Debtors for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed in connection with such Distribution.

**7.11** **Defenses and Setoffs.** Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors (as applicable), unless (i) the Debtors have consented; and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding anything set forth in this paragraph, any set off right with respect to a Reinstated General Unsecured Claim or an assumed Executory Contract or Unexpired Lease shall be governed by applicable non-bankruptcy law, including the terms of such assumed Executory Contract or Unexpired Lease.

**7.12** **Joint Distributions.** The Reorganized Debtors may, in their sole discretion, make Distributions jointly to any Holder of a Claim and any other Person that the Reorganized Debtors have determined to have an interest in such Claim.

**7.13** **Forfeiture of Distributions.** If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 7.4, fails to claim an undeliverable Distribution within the time limit set forth in Section 7.8, or fails to complete and return to the Reorganized Debtors the appropriate Form W-8 or Form W-9 within 180 calendar days after a request for the completion and return of the appropriate form pursuant to Section 7.10 (or such later time as approved by a Bankruptcy Court order), then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions under the Plan. Any such forfeited Distributions shall be deemed Available Cash for all purposes, notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE 8

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO

**8.1** **Objections to and Resolution of Disputed Claims, Including Any Claims of Excluded Parties.** From and after the Effective Date, the Reorganized Debtors shall have the exclusive authority to compromise, resolve, and Allow any Disputed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Reorganized Debtors with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**8.2** **Claim Objections.** All objections to Claims (other than Professional Fee Claims, which shall be governed by Section 3.1.2 of the Plan) shall be Filed by the Reorganized Debtors on or before the Claim Objection Deadline, which date may be extended by order of the Bankruptcy Court. If a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was Scheduled by the Debtors but was not Scheduled as contingent, unliquidated, or disputed, then the Claim to which the proof of claim or Scheduled Claim relates will be treated as an Allowed Claim.

**8.3** **Estimation of Certain Claims.** The Reorganized Debtors may, at any time, move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction and power to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. The estimated amount of any Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the Holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately allowed. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

# ARTICLE 9

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**9.1**    **Conditions to the Effective Date.** The occurrence of the Effective Date shall not occur, and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.2 of the Plan:

  a.  the Bankruptcy Court shall have entered the Confirmation Order;

  b.  the Confirmation Order shall not be subject to any stay;

  c.  all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, shall have been obtained and be in full force and effect;

  d.  all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of this Plan are effected or executed and delivered, as applicable;

  e.  the Confirmation Order shall affirm the validity and enforceability of the various releases granted under the Plan and such releases shall be in full force and effect.

  f.  there shall be no new advances on the DIP Loan prior to or after the Effective Date.

**9.2**    **Waiver of Conditions to the Effective Date.** The conditions to the Effective Date, other than Article 9.1(a), may be waived in writing by the Debtors at any time without further order of the Bankruptcy Court.

**9.3**    **Effect of Non-Occurrence of Conditions to the Effective Date.** If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 9.1 and 9.2 of the Plan, upon notification filed by the Debtors with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the Debtors, the Estates, and all Creditors shall be restored to the *status quo* as of the day immediately preceding the Confirmation Hearing as though the Confirmation Order was not entered; (iv) all of the Debtors' and the Estates' obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the Debtors, the Estates, or any other Person or prejudice in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

**9.4**    **Notice of the Effective Date.** Promptly after the occurrence of the Effective Date, the Reorganized Debtors or its agents shall mail or cause to be mailed to all Creditors a notice that informs such Creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the rejection of executory contracts

and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (iv) the deadline established under the Plan for the filing of Administrative Claims; and (v) such other matters as the Reorganized Debtors find appropriate.

## ARTICLE 10

## RELEASES, INJUNCTION, AND RELATED PROVISIONS

**10.1**     **Debtors' Releases**.

**10.1.1**     **On the Effective Date and to the fullest extent authorized by applicable law, the Released Parties and their respective property will be expressly, unconditionally, generally, individually, and collectively released, acquitted, and discharged by the Debtors on behalf of themselves, their estates, the Reorganized Debtors, for the good and valuable consideration provided by each of the Released Parties, from any and all actions, claims, debts, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative or deficiency claims asserted or that could be asserted by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by state law (including Idaho State partnership law), statute, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, any of the Debtors' present or former assets, the Released Parties' interests in or management of the Debtors, this Plan, the Disclosure Statement, these Chapter 11 Cases, including those that the Debtors, the Reorganized Debtors would have been legally entitled to assert or that any Holder of a Claim against or interest in the Debtors or any other Entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their Estates; *provided*, *however*, that the foregoing Debtors' Releases shall not operate to waive or release any Claims or Causes of Action of the Debtors or their Estates against a Released Party arising under any contractual obligation owed to the Reorganized Debtors that is entered into pursuant to this Plan.**

**10.1.2**     **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' Releases set forth in Section 10.1.1 above, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtors' Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the Debtors' Releases; (3) in the best interests of the Estates and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar against any of the Estates, the Post-Effective Date Debtors, asserting any Claim or Cause of Action released pursuant to the Debtors' Releases.**

10.2     **Conditional Release of Debtors.**

Except as otherwise provided in the Plan, no Debtor and/or any such Debtors' parent, subsidiaries, affiliates, related Entities, officers, directors, members, managers, agents and/or employees shall be released and/or discharged of any liabilities under the Plan except as specifically provided in the Plan. Consequently, except as specifically provided in the Plan, all Debtors shall remain liable to the extent presently provided under any applicable law with respect to any claims against any such Entities.

Upon consummation of the Sales Process, upon certification of the Plan Administrator that the Debtors collaborated fully and in good faith with the Sales Process, all Debtors shall be released from liability, claims and causes of action through the Confirmation Date.

To be clear, nothing in this Plan acts as a release of any liability of any party that is obligated as a co-obligor or guarantor for any of amounts owed to MetLife, Conterra or the DIP Lender.

10.3     **Exculpation and Limitation of Liability.**

The Exculpated Parties will neither have nor incur any liability to any entity for any claims or Causes of Action arising on or after the Petition Date and prior to the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases, (ii) any sales contemplated in connection with the Plan, (iii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of this Plan, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Disclosure Statement, (iv) any other post-petition act taken or omitted to be taken in connection with or in contemplation of Confirmation of this Plan, or (v) the approval of the Disclosure Statement and Plan or Confirmation or Consummation of the Plan, *provided*, *however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct. The foregoing provisions shall also not apply to malpractice liability of legal professionals.

To be clear, nothing in this Section 10.3 acts as a release of any liability of any party as a co-obligor or guarantor for any of amounts owed to MetLife, Conterra or the DIP Lender.

10.4    **Released Lenders: Conterra, MetLife, and Sandton.**

  10.4.1. **Release of Claims.**  On the Effective Date of the Debtors' Plan, the Debtors and the guarantors in connection with any amendments to the existing loan documents as recited above will release Conterra, MetLife, and Sandton (collectively, "Released Lenders")  from any and all claims held, as of the Effective Date, by or on behalf of the Debtors and/or the guarantors (including claims relating to the validity and avoidability of the liens held by those parties), except as specifically set forth in the Plan.

# ARTICLE 11

# RETENTION OF JURISDICTION AND POWER

11.1 **Scope of Retained Jurisdiction and Power.** Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction and power over all matters arising in, arising under, or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction and power to do the following:

  a. except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, to Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

  b. hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b), 1103, and 1129(a)(4);

  c. hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

  d. effectuate performance of and payments under the provisions of the Plan and enforce remedies on any default under the Plan;

  e. hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, including the Reorganized Debtors' Causes of Action;

  f. enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and

other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

g.      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, or to maintain the integrity of the Plan following consummation;

h.      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

i.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

j.      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

k.      hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, the DIP Order or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and orders;

l.      enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings associated with the Plan or otherwise entered in connection with the Chapter 11 Cases including, but not limited to, the DIP Order (whether or not any or all of the Chapter 11 Cases have been closed);

m.      hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

n.      hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

o.      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, the Bankruptcy Code and title 28 of the United States Code;

p.      resolve any cases, controversies, suits, or disputes related to the Debtors and Reorganized Debtors;

q.      enter a final decree closing the Chapter 11 Cases of the Debtors.

**11.2** **Non-Exercise of Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Plan shall have no effect on, and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to, such matter.

# ARTICLE 12

## MISCELLANEOUS PROVISIONS

**12.1** **Payment of Statutory Fees.** All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date. All such fees that relate to distributions by each Debtor after the Effective Date shall be paid by the Reorganized Debtors. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**12.2** **Default.**

**12.2.1** **Events of Default.**

The following shall be Events of Default under the Plan:

a. After the Confirmation Date, the failure of the Reorganized Debtors to make any payment required under the Plan when due; provided, however, that except as otherwise provided in the Plan, no default shall be deemed to have occurred if such missed payment is made within ten (10) days of its due date.

b. Provided no agreement exists to extend or modify the terms of any agreement between the Reorganized Debtors and third-party vendors or Creditors, failure of the Reorganized Debtors to pay when due all debts and expenses in the ordinary course of its financial affairs.

c. Failure to comply with any provision of this Plan.

d. Failure of the Reorganized Debtors to comply with any orders entered, agreements and/or documents executed as part of this Plan.

e. The Reorganized Debtors sale of any assets outside of this Plan or outside of the ordinary course.

f. The Reorganized Debtors incurring new or additional indebtedness with the exception of any replacement indebtedness.

g. The Reorganized Debtors' failure to financially perform in a manner

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 75

typical for a business of this nature including but not limited to: the Reorganized Debtors' revenues and income/loss from operations to remain within 20% of their rolling monthly projections as disclosed in the Budget.

    h.  Failure of the Reorganized Debtors to maintain inventory and property, plant, and equipment in good standing typical for a business of this nature.

To the extent any of the Loan Documents between the Debtors and MetLife, Rabo, Conterra or Sandton contain additional "events of default," those default terms in those Loan Documents are superseded by this Plan and shall have no effect unless re-stated or otherwise incorporated into the contemplated amendments to the respective loan documents, if any, contemplated by each of MetLife, Rabo, Conterra or Sandton. Each such amendment shall govern the bilateral relationship between the Reorganized Debtor and each of MetLife, Rabo, Conterra or Sandton, provided the amendments are consistent with the terms of this Plan. The above list of Events of Default shall be the ***only*** grounds for declaring a default in the Plan terms against the Reorganized Debtors.

## 12.2.2  Cure of Prior Defaults.

    As of the Effective Date, any defaults by the Debtors under any non-bankruptcy agreement shall be deemed cured and notice of default or sale recorded by any Creditor prior to the Effective Date shall be deemed null, void, and to have no further force or effect.

## 12.2.3  Consequences of Default.

    Except as otherwise provided by this Plan or by an order of the Bankruptcy Court issued upon application by a party in interest, if a non-monetary event of default under this Plan occurs under section 12.2.1 of the Plan, and is not cured within thirty (30) days after service of written notice of default on the Reorganized Debtors, the Plan Administrator assumes control and, in cooperation and coordination with the Sales Advisor, will administer the Sales Process.

    If the Plan Administrator subsequently defaults, and the event of default under this Plan occurs and is not cured within thirty (30) days after service of written notice of default on the Plan Administrator and on counsel for the Reorganized Debtors, any Holder of an Allowed Claim, subject to the provisions of this Plan, may immediately pursue their rights and remedies under applicable non-bankruptcy law against the Reorganized Debtors.

    Notwithstanding the foregoing, the Reorganized Debtors or another party in interest may seek an order of the Bankruptcy Court staying any Creditor from pursuing its default rights and remedies based on appropriate grounds. Except as otherwise specified in this Plan, such grounds may include, among others, that no uncured default has occurred. The Reorganized Debtors shall bear the burden of proof with respect thereto.

    Notices pursuant to this Article shall be served as follows:

**Counsel for the Reorganized Debtors**:

Matthew T. Christensen
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Email: mtc@johnsonmaylaw.com

**CRO/Plan Administrator:**

Robert Marcus
Kander, LLC
341 N. Lafayette St.
Macomb, IL 61455
rob@kanderllc.com with a cc to: natalia@kanderllc.com

**Reorganized Debtors:**

Millenkamp Cattle, Inc.
Attn: William Millenkamp
471 N 300 W
Jerome, ID 83338

**12.3**     **Dissolution of the Committee.** The Committee shall be automatically dissolved on the Effective Date, and on the Effective Date, each member of the Committee (including each Related Party thereof) and each Professional retained by the Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Committee, the Plan, or the Chapter 11 Cases, except (i) with respect to any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Committee, and (ii) any appeals of, or related to, the Confirmation Order or any other appeal to which the Committee is a party to.

**12.4**     **Modifications and Amendments.**

**12.4.1** In the Debtors' reasonable discretion, the Debtors may alter, amend, or modify the Plan under Bankruptcy Code section 1127(a) at any time at or prior to the conclusion of the Confirmation Hearing. All alterations, amendments, or modifications to the Plan must comply with Bankruptcy Code section 1127. The Debtors shall provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Code, Bankruptcy Rules, or order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

**12.4.2** After entry of the Confirmation Order and prior to substantial consummation (as defined in Bankruptcy Code section 1101(2)) of the Plan, the Debtors or the Reorganized Debtors, as applicable, may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan. Such proceedings must comply with Bankruptcy Code section 1127. To the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

**12.5** **Severability of Plan Provisions.** If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section 12.5, is valid and enforceable under its terms.

**12.6** **Compromises and Settlements.** From and after the Effective Date, the Reorganized Debtors may compromise and settle disputes about any applicable Claims or Reorganized Debtors' Causes of Action, without any further approval by the Bankruptcy Court. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

**12.7** **Binding Effect of Plan.** Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons to the fullest extent permitted by Bankruptcy Code section 1141(a). Confirmation of the Plan binds each Holder of a Claim or Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Interest is Allowed, whether or not such Holder holds a Claim or Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan.

**12.8** **Term of Injunctions or Stays.** Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant as of the Confirmation Hearing (excluding any injunctions or stays contained in or arising from the Plan or the Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date.

**12.9**      **Revocation, Withdrawal, or Non-Consummation.** The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

**12.10**      **Exemption from Transfer Taxes.** Pursuant to Bankruptcy Code section 1146, the vesting of the Reorganized Debtors' Assets in the Reorganized Debtors, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**12.11**      **Computation of Time.** Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

**12.12**      **Transactions on Business Days.** If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

**12.13**      **Good Faith.** Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all Related Parties have acted in good faith in connection therewith.

**12.14**      **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of Idaho shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or formation of each Debtor shall govern corporate or limited liability company governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof. Any applicable non-bankruptcy law that would prohibit, limit, or otherwise restrict implementation of

the Plan based on (i) the commencement of the Chapter 11 Cases, (ii) the reorganization of some or all of the Reorganized Debtors' Assets, or (v) any other act or action to be done pursuant to or contemplated by the Plan is superseded and rendered inoperative by the Plan and federal bankruptcy law.

**12.15** **Notices**. Following the Effective Date, all pleadings and notices Filed in the Chapter 11 Cases shall be served solely on (a) the Reorganized Debtors and their counsel, (b) the U.S. Trustee, (c) any Person whose rights are affected by the applicable pleading or notice, and (d) any Person Filing a specific request for notices and papers on and after the Effective Date.

**12.16** **Additional Documents.** On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders receiving Distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other acts as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**12.17** **Conflicts with the Plan.** In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; *provided, however*, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.  The operation and effect of this Section 12.17 specifically exclude the bilateral amendments to certain loan documents contemplated by this Plan as to MetLife, Rabo, Conterra and/or Sandton, provided those bilateral amendments are consistent with terms of this Plan and the DIP Order.

/

/

/

/

/

/

/

/

/

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF MILLENKAMP CATTLE, INC., AND ITS RELATED DEBTOR AFFILIATES – Page 80

# ARTICLE 13

## REQUEST FOR CONFIRMATION AND RECOMMENDATION

**13.1** **Request for Confirmation.** The Debtors request confirmation of the Plan in accordance with Bankruptcy Code section 1129.

**13.2** **Recommendation.** The Debtors believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

Respectfully,

**William J. Millenkamp**

**President/Manager**

**MILLENKAMP CATTLE, INC.; IDAHO JERSEY GIRLS, LLC; EAST VALLEY CATTLE, LLC; MILLENKAMP PROPERTIES, LLC; MILLENKAMP PROPERTIES II, LLC; MILLENKAMP FAMILY, LLC; GOOSE RANCH, LLC; BLACK PINE CATTLE, LLC; MILLENKAMP ENTERPRISES, LLC; IDAHO JERSEY GIRLS JEROME DAIRY, LLC**

Submitted by:

Dated:  3/17/2025

**JOHNSON MAY**

*/s/Matthew T. Christensen*

Attorneys for Debtors and Debtors in Possession

**Schedule 6.3 – Initial Schedule of Assumed Executory Contracts & Unexpired Leases**

| Contract/Lease Party | Contract Counterparty | Contract/Lease Title | Cure Amount |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Burks Tractor Company<br>3140 Kimberly Rd.<br>Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793337, dated February 6. 2024<br><br>6 Case IH Magnum<br><br>CNH Equipment Lease 765512 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company<br>3140 Kimberly Rd.<br>Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793339, dated February 6, 2024<br><br>16 Case IH Magnum and 16 Case IH Real Remote<br><br>CNH Equipment Lease 765784 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company<br>3140 Kimberly Rd.<br>Twin Falls, ID 83301 | Equipment Operating Lease Agreement, No. 2793443, dated February 6, 2024 | $0.00 |

| | | 4 Case IH Steiger and 4 Case Rear Remote<br><br>CNH Equipment Lease 765542 | |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Burks Tractor Company<br>3140 Kimberly Rd.<br><br>Twin Falls, ID 83301 | Retail Installment Sales Contract and Security Agreement, No. 2783587<br><br>25 Kobuta Tractors<br><br>CNH  Equipment Loan 765530 | $0.00 |
| Millenkamp Cattle, Inc. | Burks Tractor Company<br>3140 Kimberly Rd.<br><br>Twin Falls, ID 83301 | Retail Installment Sales Contract and Security Agreement, No. 2793874<br><br>30 Case IH Maxim<br><br>CNH  Equipment Loan 765552 | $0.00 |
| Millenkamp Cattle, Inc. | Daimler Truck Financial Services<br>14372 Heritage Pkwy<br>Suite 400<br>Fort Worth, TX 76177 | Note and Security Agreement dated January 2024 | $0.00 |

| Millenkamp Cattle, Inc. | Daimler Truck Financial Services<br><br>14372 Heritage Pkwy<br><br>Suite 400<br><br>Fort Worth, TX 76177 | Note and Security Agreement (Multi-State) dated February 23, 2022 | $0.00 |
| Millenkamp Cattle, Inc. | East Valley Cattle LLC<br>471 N 300 W<br><br>Jerome, ID 83338 | Triple net lease for lease of East Valley Dairy | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | East Valley Development, LLC<br><br>Attn: General Counsel<br><br>4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Third Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC (Tenant) dated June 22, 2023 | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | East Valley Development, LLC<br><br>Attn: General Counsel<br><br>4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | First Amendment Manure Supply Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC<br><br>(Developer) dated June 22, 2023 | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | East Valley Development, LLC<br><br>Attn: General Counsel | Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East | $0.00 |

| | | | |
|---|---|---|---|
| | 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Valley Development, LLC<br><br>(Tenant) dated October 8, 2021. | |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | East Valley Development, LLC<br><br>Attn: General Counsel<br><br>4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Manure Supply Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC<br><br>(Developer) dated October 8, 2021 | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | East Valley Development, LLC<br><br>Attn: General Counsel<br><br>4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Memorandum of Ground Lease dated June 23, 2023. | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | East Valley Development, LLC<br><br>Attn: General Counsel<br><br>4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Second Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East Valley Development, LLC(Tenant) dated April 25, 2023. | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | East Valley Development, LLC<br><br>Attn: General Counsel | First Amendment to Ground Lease Agreement between East Valley Cattle, LLC and Millenkamp Cattle, Inc. (Landlord) and East | $0.00 |

| | 4675 MacArthur Ct., Ste. 800 Newport Beach, CA 92660 | Valley Development, LLC<br><br>(Tenant) dated February 17, 2022. | |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Goose Ranch LLC<br><br>471 N 300 W<br><br>Jerome, ID 83338 | Triple net lease for Goose Ranch | $0.00 |
| Millenkamp Cattle, Inc. | GreatAmerica Financial Serv. PO Box 660831<br><br>Dallas, TX 75266-0831 | Lease Agreement for 8 HP E786Z Copiers; 2 HP E45028DN Copiers; 2 HP E40040DN Copiers<br><br>1931342 | $0.00 |
| Millenkamp Cattle, Inc. | Idaho Jersey Girls Jerome Dairy, LLC<br><br>471 N 300 W<br><br>Jerome, ID 83338 | Triple net lease of Idaho Jersey Girls Jerome Dairy | $0.00 |
| Millenkamp Cattle, Inc. | Innovative Food Solutions USA<br><br>Attn: Jordan Bowen<br><br>134 E. Highway 81<br><br>Burley, ID 83318 | Milk Producer Supply Agreement dated January 1, 2024 | $0.00 |
| Millenkamp Cattle, Inc. | Jake Millenkamp 1719 River Road<br><br>Buhl, ID 83316 | Rental Agreement for 1719 River Road, Buhl, ID 83316 | $0.00 |

| | | | |
|---|---|---|---|
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry One John Deere Place<br><br>Moline, IL 61265 | Loan Contract -Security Agreement dated June 12, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company<br><br>One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreements dated May 23, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company<br><br>One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 12, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company<br><br>One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 31, 2023 | $0.00 |
| Millenkamp Cattle, Inc. | John Deere Const. & Forestry Company<br><br>One John Deere Place Moline, IL 61265 | Loan Contract -Security Agreement dated July 28, 2023 | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, Inc. | Mavrix, LLC<br><br>925 Main St., Ste. 300-18 Stone Mountain, GA 30083-3098 | Exclusivity Agreement between Millenkamp Cattle, Inc. and East Valley Cattle, LLC<br><br>(Dairy) and SKS EVC, LLC and Mavrix, LLC | $0.00 |

| | | (Developers) dated July 12, 2021. | |
|---|---|---|---|
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Canyonlands | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for McGregor | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for lease of German Dairy | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Moonshine Ranch | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties LLC 471 N 300 W Jerome, ID 83338 | Triple net lease for Calf Ranch | $0.00 |
| Millenkamp Cattle, Inc. | Millenkamp Properties II LLC 471 N 300 W Jerome, ID 83338 | Triple Net Lease for Cow Palace | $0.00 |

| | | | |
|---|---|---|---|
| Black Pine Cattle, LLC | PerforMix Nutrition Systems<br><br>2201 N. 20th Street<br><br>Nampa, ID 83687 | Security Agreement dated September 13, 2023 | $0.00 |
| Millenkamp Cattle, Inc.<br><br>East Valley Cattle, LLC | Eagle Creek Northwest, LLC<br><br>10 State House Square<br><br>15th Floor<br><br>Hartford, CT 06103 | Lease Agreement | $0.00 |

**<u>Schedule 6.3 – Initial Schedule of Rejected Executory Contracts & Unexpired Leases</u>**

None.