UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| IN RE:<br><br>MILLENKAMP CATTLE, INC.,<br><br>    Debtor. | Case No. 24-40158-NGH |
| Filing relates to:<br>☒ ALL DEBTORS<br>☐ Millenkamp Cattle, Inc.<br>☐ Idaho Jersey Girls<br>☐ East Valley Cattle<br>☐ Millenkamp Properties<br>☐ Millenkamp Properties II<br>☐ Millenkamp Family<br>☐ Goose Ranch<br>☐ Black Pine Cattle<br>☐ Millenkamp Enterprises<br>☐ Idaho Jersey Girls Jerome Dairy | Jointly Administered With Case Nos.:<br><br>24-40159-NGH (Idaho Jersey Girls)<br>24-40160-NGH (East Valley Cattle)<br>24-40161-NGH (Millenkamp Properties)<br>24-40162-NGH (Millenkamp Properties II)<br>24-40163-NGH (Millenkamp Family)<br>24-40164-NGH (Goose Ranch)<br>24-40166-NGH (Black Pine Cattle)<br>24-40167-NGH (Millenkamp Enterprises)<br>24-40165-NGH (Idaho Jersey Girls<br>    Jerome Dairy)<br><br>Chapter 11 Cases |

MEMORANDUM OF DECISION

**INTRODUCTION**

    On March 27, 2025, Forbes Securities Group LLC d/b/a Forbes Partners ("Forbes") filed an Amended First and Final Application for Allowance and Payment of

MEMORANDUM OF DECISION - 1

Compensation and Designation as a 503(b)(2)[1] Administrative Claim ("Fee Application").  Doc. No. 1000.  On April 22, 2025, Debtor objected to the Amended Application, Doc. No. 1115, and Forbes filed a response on May 1, 2025, Doc. No. 1165.  The Court conducted a hearing on September 11, 2025, after which it took the matter under advisement.  This decision constitutes the Court's findings of fact and conclusions of law in accordance with Rules 7052 and 9014.

**RELEVANT FACTS**

The various debtor entities associated with the Millenkamp dairy, farming, and cattle operations filed petitions under chapter 11 of the Bankruptcy Code on April 2, 2024, and those cases were jointly administered under *In re Millenkamp Cattle, Inc.*, 24-40158-NGH.  Prior to the filings, on March 21, 2024, Debtors executed an engagement letter to employ Forbes as their investment banker ("Engagement Letter").  Ex. 1132.  Following the bankruptcy filings, on May 6, 2024, Debtors filed an application to employ Forbes under § 327(a), stating Forbes would support Debtors "as an investment banker in marketing the Debtors and assisting them with finding new capital for restructuring."  Ex. 1143 at ¶ 15.  On June 5, 2024, the Court granted the application to employ pursuant to § 327(a).  Ex. 1146.

On April 2, 2024, after the Engagement Letter was executed but before the application to employ Forbes was filed, Debtors sought the Court's approval to enter into an agreement with Sandton Capital Solutions Master Fund VI, LP ("Sandton") for a

---

[1] Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101–1532, and all citations to "Rule" are to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 2

debtor-in-possession financing facility of up to $45,000,000 ("DIP Facility").  Doc. No. 24.  On April 16, 2024, the Court granted Debtors' motion to access the DIP Facility, first on an interim basis, and then on May 10, 2024, it orally granted the final motion and a corresponding order was entered on the docket on May 17, 2024.  Doc. Nos. 190, 206, 292; Ex. 11,105a.  The DIP Facility was necessary for Debtors to preserve their estates and provide funding during the bankruptcy process but was never intended as an exit facility.  Rather, Jon Wiley ("Wiley"), a managing director of Forbes, testified at hearing that the end goal of Forbes' involvement was to look for financing to "take Rabo [Agrifinance, LLC, one of Debtors' largest creditors] out."  However, he testified Forbes was also to seek out prospective lenders who would be interested in providing DIP financing, as many lenders do not offer such credit facilities.

There is no dispute Forbes engaged in its usual and extensive process of gathering information and soliciting lenders.  Its employees learned about Debtors' business model and financial condition and created an executive summary that they used to market to lenders. Ex. 1147.  They created a data room and regularly updated it.  Forbes' employees compiled a list of 123 lenders and reached out to each one, and 100 of them responded.  Ex. 1134.  They obtained non-disclosure agreements and engaged in conversations with a number of those lenders, but despite their efforts, Forbes was unable to obtain exit financing for the Debtors.

Nevertheless, Forbes seeks approval of fees it claims are due under the Engagement Letter that provides, in part, that Forbes will familiarize itself with Debtors' operations, and use this information to develop a marketing strategy and due diligence

MEMORANDUM OF DECISION - 3

materials with the goal of completing a "transaction."  Debtors contend that Forbes did not facilitate the formation of any "transaction" entered into by Debtors, and therefore no fee was earned.  Forbes disagrees and seeks compensation totaling $1,125,000 based upon Debtors' DIP Facility with Sandton.

**ANALYSIS**

    A.  Employment Under § 327(a)

The Code provides that a professional who has been employed under § 327(a) may be allowed "reasonable compensation for actual, necessary services rendered by [that] professional person, or attorney and by any paraprofessional person employed by any such person" as well as "reimbursement for actual, necessary expenses."  § 330(a)(1)(A)–(B).  In determining the amount of reasonable compensation, the Court should "consider the nature, the extent, and the value of such services, taking into account all relevant factors[.]"  § 330(a)(3).  Those relevant factors include the time spent and rates charged for such services, whether the services were necessary to the administration of the bankruptcy case, whether the services were performed within a reasonable amount of time under the circumstances, whether the professional has demonstrated skill and experience in the bankruptcy field, and whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners.  *See* § 330(a)(3)(A)–(F).  The Court cannot allow compensation for services that were not reasonably likely to benefit the estate or necessary for administration of the case.  *See* § 330(a)(4)(A)(i)–(ii).

MEMORANDUM OF DECISION - 4

The burden of establishing entitlement to compensation and its reasonableness is on the applicant. *In re Genay-Wolf*, No. 09-20810-TLM, 2012 WL 2064527, at *2 (Bankr. D. Idaho June 7, 2012). The Court may reduce or deny an applicant's compensation if the requirements of the statute or case law are not met. *See* § 330(a)(2).

B.  The Engagement Letter

As a threshold matter, the resolution of Debtors' objection to Forbes' requested fee depends on whether Forbes performed under the Engagement Letter. Such analysis requires an examination of its terms. The Engagement Letter defines a "transaction" as any of the following events:

> i.  secured, senior or subordinated debt, revolving lines of credit, equipment lease financing, purchase order financing, accounts receivable financing or any other type of debt financing, none of which have any form of equity participation,
>
> ii.  senior, subordinated or other debt with warrants or any other form of equity participation, or
>
> iii.  equity, including any common stock, preferred stock, convertible preferred stock, convertible debt, or any other securities convertible into common stock.

("Transaction"). *Id.* at ¶ 2. The fees associated with Forbes' services are set forth as follows:

> As compensation for the Services, you agree to pay to Forbes:
>
> a.  Advisory Fees: Nonrefundable, one-time fees ("Advisory Fees") as follows:
>
> > i.  Kick-off. $15,000, for Forbes preparation of diligence requests, project plan, initial financial model template, kick-off meeting, and other process mobilization

MEMORANDUM OF DECISION - 5

        activities and deliverables, payable upon execution of this Engagement Letter (the "Engagement Fee"),

    ii.    Closing. $15,000, for Forbes communications and negotiations with the final target and its advisors, development and management of closing process trackers (open issues, closing deliverables, etc.), development and management of the due diligence process and data room, and other closing process activities and deliverables, payable upon Company execution of a term sheet, letter of intent, or other form of agreement with an Approved Contact.

  b.  Transaction Fee. For any Transaction, an additional fee shall be payable by wire on the date of closing, determined as follows (the "Transaction Fee"):

For any Transaction, the Transaction Fee shall be payable in cash and equal to:

    2.5% of the gross proceeds provided up to $60,000,000; and

    1.5% of any gross proceeds provided in excess of $60,000,000

    The Transaction Fee will be based on the entire capital commitment regardless of whether it is fully drawn at closing.

  c.  Transaction Fee – Minimum. Notwithstanding the above, a minimum fee of $1,000,000 (the "Minimum Fee"), payable in cash, will be due upon closing for any Transaction, or if a Transaction is withdrawn or canceled as a result of Company's intentional or willful misrepresentation.

*Id.* at ¶ 3.

### C. Kickoff and Closing Fees

The Court will begin by addressing the kickoff and closing fees. The testimony at the hearing was that the kickoff fee of $15,000 was paid by the Debtors, though Forbes'

MEMORANDUM OF DECISION - 6

employment application characterizes this payment as a retainer. Ex. 1143 at ¶ 16. However, Forbes has not sought approval of this payment in the Fee Application, and as such, the Court will make no determination of its reasonableness under § 330. Under the terms of the Engagement letter, the closing fee is payable on the execution of a term sheet, letter of intent, or other form of agreement. The closing fee has not been sought, paid, or included in Forbes' Fee Application. Accordingly, the Court will not address it here.

### D.  Transaction Fees

The Court now turns to the transaction fee. As no exit financing was obtained, Forbes pins its rights to a fee on the DIP Facility Debtors executed with Sandton. In opposing Forbes' fee application, Debtors contend they had agreed with Sandton on DIP financing prior to Forbes' involvement with Debtors, and therefore no fee was earned. In response, Forbes argues the DIP Facility closed during the term of its agreement with Debtors and was thus a "transaction" for fee purposes. Moreover, because § 364(d) permits DIP financing secured by an equal or senior lien only if the debtor could not obtain financing otherwise, Forbes contends its efforts helped Debtors satisfy this requirement.

A close examination of the Engagement Letter shows it began on March 21, 2024 and extended until the closing of a transaction, nine months from the beginning of the engagement, or 30 days after any party gives written notice of termination, whichever was earlier. Ex. 1132 at ¶ 7. The Court first orally authorized Debtors to access the Sandton DIP Facility on April 16, 2024, and as such, that transaction closed during the

MEMORANDUM OF DECISION - 7

term of Forbes' engagement. Moreover, there is no question the DIP Facility nominally falls within the definition of a "transaction" as provided in the Engagement Letter, and no apparent dispute that Forbes provided "services." The crux of the dispute is whether Forbes is entitled to fees under the agreement.

The transaction fee is a percentage of the "gross proceeds provided" whether the full amount is drawn or not. Ex. 1132 at ¶ 3.b. Because the DIP Facility committed a ceiling of $45 million, Forbes claims a fee of 2.5% of that amount, or $1,125,000. Doc. No. 1000. Moreover, under the terms of the Engagement Letter, the minimum fee of $1,000,000 is due upon the closing of any transaction. Ex. 1132 at ¶ 3.c. Forbes' witnesses testified this is a standard agreement in the industry. They also testified regarding the importance of exclusivity in their arrangement with Debtors. The introductory paragraph of the Engagement Letter indicates Forbes was hired on an exclusive basis, so that all transactions must go through them. Moreover, the Standard Terms and Conditions applicable to the Engagement Letter required Debtors to refer "all potential transaction targets" to Forbes during the engagement period. Ex. 1133 at ¶ 14. The reason for this exclusivity arrangement is plain. If it were not so, Forbes might find itself competing with its clients to bring in offers, and clients might be motivated to circumvent Forbes and avoid the fee.

The facts presented here establish that Forbes knew Debtors were working with Sandton on DIP financing when they signed the Engagement Letter. The evidence is also clear that Forbes played no part in targeting Sandton for DIP financing or in finalizing the

MEMORANDUM OF DECISION - 8

terms of the DIP Facility. Instead, they focused squarely on finding exit financing.

Consider the following timeline:

| | |
|---|---|
| 9/21/23: | Sandton employee Robert Rice ("Rice") signed a non-disclosure agreement and met with Debtors in Idaho. Ex. 1154. |
| 2/2024: | Debtors were facing a bankruptcy filing and began discussing DIP financing with Sandton. Rice testified that he was Sandton's only point of contact with Debtor at that time. |
| 3/2024: | Rice testified that in early March 2024, Sandton and Debtors began exchanging term sheets and had reached a deal by the middle of March 2024, but waited to execute it until after the April 2, 2024 bankruptcy filing. Forbes was not involved in this process. |
| 3/21/24: | Debtors signed the Engagement Letter with Forbes. Ex. 1132. |
| 3/22/24: | Forbes sent a list of potential lenders to Debtors. Ex. 1134. |
| 3/2024: | Near the end of March, Wiley spoke to Jordan Levy from Sandton and learned that Rice was the main contact for Sandton with Debtor. Late March was the first time Rice learned Forbes was involved. All of his interactions were direct with the Debtor. |
| 3/28/24: | Rice sent Debtors a Sandton DIP financing term sheet for their consideration. Ex. 1137. |
| 4/2/24: | Bankruptcy petitions were filed. Debtors also filed the motion to obtain DIP financing. Doc. No. 24. |
| 4/5/24: | Forbes' James Morgan ("Morgan") apprised the Forbes team that new non-disclosure agreements were being signed and "interest remains for financing role out of chapter 11." Ex. 11,008. In the same email, Morgan updated the team on the status of Debtors' attempt to get DIP financing, indicating changes to Sandton's terms, and a note that both Rabo Agrifinance and Conterra[2] also had term sheets for consideration. *Id*. In terms of next steps, the email states, "Millenkamp to check that [Forbes'] engagement contract remains valid through the ch. 11 process and that we will be entitled to a fee in the advisory around new financing sources?" *Id*. |

---

[2] Conterra Holdings, LLC is one of Debtors' larger creditors.

MEMORANDUM OF DECISION - 9

| | |
|---|---|
| 4/16/24: | Hearing on the motion to use the DIP Facility and the Court's oral ruling allowing interim access. |
| 4/17/24: | A Forbes associate updated the team about the Court's approval of the Sandton DIP Facility and in the "Next Steps" section of the email was a note to have a copy of the DIP Facility contract sent over. Ex. 1141. Later that day, Debtors sent a copy of the DIP Facility term sheet to Forbes. Exs. 1139; 11092. |
| 5/2/24: | Morgan sent to David Heida[3] ("Heida") a "summary of the process to date." Ex. 1142. It listed the potential lenders that were still active and noted that Forbes "remain[s] engaged in on-going updates with remaining potential lenders, and continue[s] to work with them as Millenkamp confirms its debtor-in-possession financing." |
| 5/6/24: | Application to employ Forbes filed in the bankruptcy case. Ex. 1143. |
| 5/16/24: | Wiley asked his associate at Forbes to see if Debtors' bankruptcy counsel could expedite the Court's approval of the motion to employ Forbes, stating "[o]ur fee is contingent on success so we can't keep working on this in hopes that it will be approved in a month. If that is the date, we can start gathering information from the client but we need to let everyone know that we won't be having any discussions with lenders or sharing any work product until we know our engagement is approved." Ex. 1144. |

Thus it is clear that Debtors' negotiations with Sandton for DIP financing were well underway when the Forbes Engagement Letter was signed. Heida testified that he informed Wiley that Debtors already had DIP proposals and the discussions were for exit financing to take out Rabo Agrifinance. Moreover, although Forbes monitored Debtors' progress toward attaining DIP financing, and inquired of its lender list about which entities might be interested in providing DIP financing, it had no input on the particulars

---

[3] Heida is Debtors' general manager.

MEMORANDUM OF DECISION - 10

of the DIP Facility and only learned of its specific terms after the Court approved it. Exs. 11,008–11,011.

Instead, Forbes undertook the significant challenge of finding exit financing for Debtors. The Court acknowledges the considerable effort Forbes expended in trying to locate a lender and finalize a transaction. *See generally* Exs. 11,016–11,021; 11,024–11,039; 11,045–11,092; 11,094–11,099; 11,100–11,105; and 11,106–11,128. As noted at the hearing, factors complicating its task included the up and down nature of the dairy industry, the fact that certain lenders were unwilling to work with Bill Millenkamp, Debtors' highly leveraged financial situation, the question of fees in bankruptcy, the consolidated nature of the operation, and the general consensus that Debtors' contentious relationship with Rabo Agrifinance was driving the bus. In short, the exit financing required too much money under these circumstances, and though Forbes expended significant effort, it was unable to find a lender. However, Forbes' decision to downshift and assert a right to collect a fee on the DIP Facility after its unsuccessful attempt to obtain exit financing is not supported under the facts of this case. First, it is not entitled to the fee under the terms of the Engagement Letter, and second, awarding such a fee is not reasonable under § 330.

The Engagement Letter expressly provides that fees are due "[a]s compensation for the Services" Forbes undertook pursuant to the agreement. Those "services" include formulating a strategy, procedures, and timetables for completing a transaction; learning about Debtors' operations; assisting Debtors with due diligence materials including the formation of a data room; identifying potential investors and coordinating meetings with

MEMORANDUM OF DECISION - 11

them; and assisting Debtors with negotiating and consummating the terms of the transaction. Ex. 1132. While Forbes contends that any transaction Debtors entered into during the period of its engagement is sufficient to require payment of the fee, the Court disagrees.

Given that the terms of the DIP Facility were actively being negotiated at the time the Engagement Letter was executed, it is impossible that Forbes provided the "services" contracted for under the terms of the Engagement Letter sufficient to trigger the "Fees" portion of that agreement with respect to the DIP Facility. Indeed, Wiley characterized the transaction fee as a "success" fee, yet there was never a closing of a transaction that Forbes originated. On September 3, 2024, well after the DIP Facility had closed, Wiley sent an invoice for $2,500 from Forbes to Debtors' counsel for the data room, indicating "[n]o other fees will be due until a term sheet is signed." Ex. 1149. Moreover, on November 4, 2024, as Forbes was close to closing a deal with an entity named Cargill, it sent Debtors and their counsel an invoice for the transaction fees under the Engagement Letter associated with the Cargill transaction. Ex. 1152. But when that transaction fell through and no others were forthcoming, Forbes shifted its reliance to the exclusivity provided in the Engagement Letter and argued the transaction fee applied to the DIP Facility deal, regardless of who originated the transaction and negotiated its terms.

The Court disagrees. In terms of exclusivity, the Standard Terms and Conditions document required Debtors to "promptly refer to Forbes any and all potential transaction targets . . . related to a potential transaction with the [Debtors] that come to the [Debtors'] attention during the engagement period." Ex. 1133 at ¶ 14. However, the terms of the

MEMORANDUM OF DECISION - 12

Sandton DIP Facility were largely negotiated prior to the beginning of the engagement period, and Sandton does not qualify as a "potential transaction target"—at least as concerns the DIP Facility—during the engagement.

Next, Forbes attempts to argue that when it was engaged, it was instructed to go look for DIP financing as well as exit financing. However, there is no indication Forbes did any work to obtain DIP financing beyond asking potential lenders if they would be interested in providing such financing. No formal executive summary was created specifically for DIP financing.

The Court also notes two additional reasons why closing the DIP Facility did not entitle Forbes to a transaction fee under the Engagement Letter. First, Forbes never sought a closing fee when the Court approved the DIP Facility and the parties formally entered into that transaction. A plain reading of the Engagement Letter makes it clear why. The $15,000 Closing fee was for:

> Forbes communications and negotiations with the final target and its advisors, development and management of closing process trackers (open issues, closing deliverables, etc.), development and management of the due diligence process and data room, and other closing process activities and deliverables, payable upon [Debtors'] execution of a term sheet, letter of intent, or other form of agreement with an Approved Contact.

Ex. 1132 at ¶ 3.a.ii. When the DIP Facility was approved a very short time after the Engagement Letter was executed, Forbes had provided none of those services to Debtors or interacted with Sandton in this way.

Second, if the DIP Facility triggered payment of a transaction fee, Forbes' engagement with Debtors should have concluded. The Engagement Letter provides the

MEMORANDUM OF DECISION - 13

term of the engagement ends at the closing of the transaction, as it would have been the earliest of the three possible triggering events. Ex. 1132 at ¶ 7. When asked whether the closing of the DIP Facility transaction terminated the Forbes engagement, Wiley replied, "Yes, I suppose it does." Yet, Forbes continued to work diligently to find exit financing for Debtors for many more months. Clearly, it did not consider the DIP Facility as a fee-triggering transaction until it was left with no alternative.

    E.  Reasonableness Under § 327(a)

Because Forbes' employment was approved under § 327(a), only "reasonable" compensation for "actual, necessary services rendered" may be awarded. § 330(A)(1)(a). While Forbes undoubtedly expended considerable effort in attempting to find exit financing for Debtors, that work was ultimately not necessary to the administration of the bankruptcy case.

Forbes argues it sought DIP financing to ensure the requirements of § 364(d) were met. That statute permits the Court, after notice and a hearing, to authorize Debtors to obtain credit or incur debt secured by a senior or equal lien on property of the estate already subject to a lien if the trustee is unable to obtain such credit otherwise. The difficulty for Forbes is that Debtors were already exchanging term sheets with Sandton when Forbes was engaged. Moreover, two other lenders, Rabo Agrifinance and Conterra, had already provided term sheets for DIP financing for Debtors' consideration. Finally, the motion to approve the DIP Facility with Sandton was filed the same day as the bankruptcy petition. Those facts demonstrate Forbes did no work to prove Debtors had to utilize DIP financing that included a priming lien because nothing better was available.

MEMORANDUM OF DECISION - 14

Rather, Debtors had already considered the competing DIP financing options available to them and had selected the financing offered by Sandton.  While it is true Morgan testified at the May 8, 2024 hearing prior to the Court's entry of the final order on the DIP Facility, his testimony concerned the status of Forbes' work on locating exit financing, specifically noting that he expected more interest after the DIP was finalized, as Debtors' finances would be more settled.

Additionally, Forbes requested only the transaction fee provided in the Engagement Letter.  Having concluded that Forbes is not entitled to that fee under the circumstances presented here, the Court has no basis upon which to otherwise award fees.  Under § 330, Forbes had the burden of providing detailed records of its actual and necessary services that would permit the Court to fulfill its statutory obligation to carefully examine the requested compensation and evaluate all relevant factors.  The record is wholly devoid of evidence of billing rates or hours expended by Forbes in working to obtain exit financing on behalf of the Debtor.  Because Forbes bears the burden of establishing its entitlement to compensation and the reasonableness thereof, the Court concludes Debtors' objection to Forbes' amended application for compensation must be sustained.

A separate order will be entered.

DATED:  November 18, 2025

_____
NOAH G. HILLEN
Chief U.S. Bankruptcy Judge

MEMORANDUM OF DECISION - 15