UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

IN RE:

MILLENKAMP CATTLE, INC.,

     Debtor.

Filing relates to:

☐ ALL DEBTORS

☒ Millenkamp Cattle, Inc.

☐ Idaho Jersey Girls

☐ East Valley Cattle

☐ Millenkamp Properties

☐ Millenkamp Properties II

☐ Millenkamp Family

☐ Goose Ranch

☐ Black Pine Cattle

☐ Millenkamp Enterprises

☐ Idaho Jersey Girls Jerome Dairy

Case No. 24-40158-NGH

Jointly Administered With
Case Nos.:

24-40159-NGH (Idaho Jersey Girls)
24-40160-NGH (East Valley Cattle)
24-40161-NGH (Millenkamp Properties)
24-40162-NGH (Millenkamp Properties II)
24-40163-NGH (Millenkamp Family)
24-40164-NGH (Goose Ranch)
24-40166-NGH (Black Pine Cattle)
24-40167-NGH (Millenkamp Enterprises)
24-40165-NGH (Idaho Jersey Girls
             Jerome Dairy)

Chapter 11 Cases

**MEMORANDUM OF DECISION**

    Millenkamp Cattle, Inc. ("Debtor") filed this chapter 11 case in April of 2024.

Doc. No. 1. Connie Lapaseotes, Ltd., Fredin Brothers, Inc., and Prime Ridge Beef LLC

(collectively the "Cattlemen") each filed proofs of claim in the main case. *See* Claim

Nos. 83, 84, 85. Debtor objected to the Cattlemen's claims. Doc. Nos. 1183, 1184, 1185.

MEMORANDUM OF DECISION - 1

The Court held a hearing on Debtor's objections.  After final submission of the parties'

closing arguments, the Court took the matter under advisement.

**TUELL DEPOSITION**

As a preliminary matter, the Cattlemen designated the deposition of Trevor Tuell

as a trial exhibit.  Doc. No. 1631.  Debtor objected to the designation.  Doc. No. 1633.

Civil Rule 32,[1] made applicable to contested matters by Rule 9014, provides the

circumstances under which a deposition may be used at trial against a party, including if

the deposed witness is "unavailable" to attend.  Specifically, a party may use the

deposition of a witness if the court finds "that the witness is more than 100 miles from

the place of hearing or trial or is outside the United States, unless it appears that the

witness's absence was procured by the party offering the deposition."  Civil Rule

32(a)(4)(B).

Debtor argues the Cattlemen have not met their burden of demonstrating that Mr.

Tuell is unavailable under Civil Rule 32.  However, the Cattlemen point to Mr. Tuell's

deposition testimony that he lives and works in Windsor, Colorado, which is over 100

miles from Boise.  *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914 (9th Cir.

2008) (affirming district court's consideration of witness's deposition testimony in

finding witness was unavailable).  Debtor has not presented any evidence to the contrary.

Furthermore, the list enumerated in Civil Rule 32(a)(4) contains the disjunctive "or"

indicating that, contrary to Debtor's assertion, it is not necessary for the Cattlemen to also

---

[1] Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, 11 U.S.C.
§§ 101–1532, and all citations to "Rule" are to the Federal Rules of Bankruptcy Procedure and to "Civil
Rule" are to the Federal Rules of Civil Procedure.

MEMORANDUM OF DECISION - 2

demonstrate that they could not procure Mr. Tuell's attendance by subpoena. Finally, Debtor argues Mr. Tuell's deposition was not properly noticed as a "trial deposition," but did not cite a rule, order, or case suggesting that such designation is required before the deposition may be used at trial, nor is the Court persuaded that requiring such a designation would be practical or appropriate. Additionally, the Court does not find that the deposition's admission would be unfair or prejudicial to Debtor solely because it was not noticed as a trial deposition.

Although there is a strong preference in favor of live witness testimony, the Court finds that Mr. Tuell is unavailable within the meaning of Civil Rule 32 and, in the exercise of its discretion, admits Mr. Tuell's deposition testimony as designated by the Cattlemen and as counter designated by Debtor.

## BACKGROUND

Debtor and the Cattlemen were introduced in June of 2023. Fredin Brothers, Inc. ("Fredin") is in the business of buying and selling cattle. Connie Lapaseotes, Ltd. ("Lapaseotes") and Prime Ridge Beef LLC ("Prime Ridge") are in the business of feeding cattle to weight and then selling the cattle to packers at a profit. Prime Ridge and Lapaseotes purchase cattle from Fredin. These entities have done business together for many years. At the time they met Debtor, the Cattlemen were in the market for an ongoing calf supplier and met with several dairies in the Idaho area. After touring the Debtor's facility and meeting with the president of Debtor, Bill Millenkamp, the Cattlemen decided to enter such an arrangement with Debtor. Mr. Millenkamp spoke highly about Debtor's operation and told the Cattlemen he was the best calf raiser in

MEMORANDUM OF DECISION - 3

Idaho, if not the country. The Cattlemen believed him. The parties entered into an oral contract under which the Cattlemen purchased calves from Debtor and Debtor fed and raised the calves at its facility. The Cattlemen intended to eventually transfer the calves to Dinklage feed yard in Colorado, which was owned by Fredin and Lapaseotes, and then to sell them to a packer for profit. After purchasing the calves from Debtor, Fredin transferred half an interest in the calves to Lapaseotes and half to Prime Ridge.[2] The price of the calves varied from time to time, and the parties agreed to a custom feed rate of $3.70 per day per calf. The daily rate included the costs associated with feed and labor, necessary veterinary care and vaccinations, boarding, and other calf-raising services.

Beginning on September 15, 2023, Debtor sent the Cattlemen a bi-weekly invoice detailing the calves born in the preceding two weeks. Debtor also sent a bi-weekly invoice for the custom feed charges during the same period. The number of calves each day on the custom feed invoice reflected additional calves born during that period minus calves that had died. By January 15, 2024, the Cattlemen had bought 4,735 calves from Debtor. It is undisputed the Cattlemen paid the invoices for the purchase of newborn calves and the related custom feed services through January 15, 2024. By all accounts, the Cattlemen had paid Debtor promptly upon receiving invoices up until that date.

On January 31, 2024, the Cattlemen obtained a copy of a letter from Debtor directed to its "Custom Calf Raising Clients" (the "Letter") while at an industry

---

[2] The parties also entered several purchase and sale agreements for midweight cattle. These transactions were relatively straightforward and, for the most part, are not in dispute.

MEMORANDUM OF DECISION - 4

conference.[3]  Debtor did not send the Letter to the Cattlemen.  In the Letter, Debtor detailed its ongoing disputes with its lender, Rabo AgriFinance LLC, and the Cattlemen became concerned Debtor would be unable to perform under their agreement.  The Cattlemen decided not to purchase more calves from Debtor.

On January 31, 2024, Debtor sent an invoice to the Cattlemen for the sale of 668 calves born between January 16 and January 31.[4]  Debtor also sent an invoice to the Cattlemen for custom feeding services between January 16 and January 31, the total amount of which included feeding and caring for the 4,735 calves already purchased and for the additional 668 calves born during that same period.[5]  The Cattlemen did not pay either invoice.  On February 15, 2024, Debtor sent an invoice for the sale of 621 calves born between February 1 and February 15, and custom feeding services during that period.[6]  The total amount due on the feed invoice included the 621 newborn calves.  The Cattlemen did not pay either invoice.

On February 16, 2024, an Idaho state court entered an order appointing a receiver (the "Receiver") to take possession of receivership assets and entities, including Debtor and its accounts (the "Receivership Order").[7]  Pursuant to paragraph 5 of the Receivership Order, the Receiver had all management powers, authorities, rights and privileges of Debtor's officers, directors, and managers, including authority "to take all

---

[3] Ex. 12008.

[4] Ex. 12009 at 1.

[5] Ex. 12010.

[6] Ex. 12011 at 1; Ex. 12012.

[7] Ex. 12013.

MEMORANDUM OF DECISION - 5

corporate actions, to contract, to sue, to be sued, continue any business or business activities" of Debtor.  The Receiver also had authority "to settle, compromise, litigate, or contest any matter for and on behalf of the Receivership Estate."[8]  Such authority was subject to the "Operating Agreement," which provided Mr. Millenkamp would continue operating the businesses and had "exclusive management control over the businesses," including the "ability to direct the day-to-day operation of the Receivership Assets in the Borrowers' businesses" for a period of sixty days following entry of the Receivership Order.[9]  Mr. Millenkamp was required to report to and cooperate with the Receiver in connection with the performance of his duties under the Operating Agreement.

On February 22, 2024, the Cattlemen visited the Debtor's facility to see the calves and had dinner with Mr. Millenkamp in Twin Falls.  The Cattlemen did not inquire about the Letter or Debtor's financial condition.  The next day, the Cattlemen sent a written demand for adequate assurances ("Assurance Agreement") to the Receiver, with a signing deadline of February 27th.  The Assurance Agreement had a space for Debtor and Rabo's consent, but the agreement was drafted as between the Cattlemen and the Receiver.  The Cattlemen did not send a copy to Mr. Millenkamp, but sent the Assurance Agreement to Mr. Heida, Debtor's general manager, the following day.  The Assurance Agreement was not executed by the February 27 deadline.

---

[8] Paragraph 8(h) provided the Receiver's power to sue and be sued was subject to the Operating Agreement and "effective 60 days after entry" of the Receivership Order.

[9] The sixty-day period ended April 16, 2024.  Debtor filed a chapter 11 bankruptcy prior to that date.

MEMORANDUM OF DECISION - 6

On February 28, the Cattlemen and Mr. Millenkamp discussed the Cattlemen picking up three truckloads of calves.[10]  Mr. Millenkamp said it was too early to transport the calves, and they needed more time at the facility, but the Cattlemen disagreed.  Mr. Millenkamp asked, "Are you going to want them all out early then agreed upon?"[11]  To which the Cattlemen replied, "We are picking up the 3 loads, and will make a decision on the rest after we get the 3 loads tomorrow morning."[12]  On February 29, the Cattlemen picked up 370 calves, all of which were approximately 160 days old.  The Cattlemen indicated they intended to pick up the rest of the calves over the next few days.  On the 29th, Mr. Millenkamp told the Cattlemen they owed almost $1,000,000 in outstanding bills and they had a "lot to talk about" before they sent more trucks.[13]  Mr. Millenkamp attempted to discuss the outstanding balance and having the Assurance Agreement signed but the Cattlemen did not engage other than telling Mr. Millenkamp to have Debtor's attorney, Mr. Christensen, call their attorney, Mr. O'Brien.

On March 1, the parties went back and forth through counsel about the Cattlemen's attempts to pick up the calves and Mr. Millenkamp's resistance.[14]  The Receiver's counsel informed the Cattlemen that the calves were not within the Receivership Assets and not within the Receiver's control, stating "the Receiver has no

---

[10] Ex. 1166 at 15.

[11] *Id.*

[12] *Id.*

[13] Ex. 12022.

[14] At one point, Mr. Christensen told Mr. O'Brien he would instruct Mr. Millenkamp to cooperate and allow the Cattlemen to pick up the calves.  However, that conversation took place before he learned the Cattlemen were past due on their invoices, at which time he told Mr. O'Brien that there was an agister's lien on the calves.

MEMORANDUM OF DECISION - 7

jurisdiction or ability to do anything to cause [the calves] to be transported or released."[15] Furthermore, if the calves were Receivership Assets, the Receiver's counsel noted that responsibility for the physical control of the calves "for the first 60 days after entry of the Order falls to Bill Millenkamp," in reference to the Operating Agreement.

Through counsel, the Cattlemen represented to Mr. Christensen they would pursue relief in state court via an order of replevin if Mr. Millenkamp continued to interfere and prevent them from picking up the calves.[16] Mr. Christensen responded that Debtor had an agister lien on the calves to secure payment for the past due invoices, and Mr. Millenkamp would release the calves once the payment issues were resolved.[17] That same afternoon, Mr. Millenkamp texted the Cattlemen: "Another idea for you guys is we could just refund 100% of all your money I have another guy that will take your deal over and leave the cattle there if it's easier."[18]

The following Monday, Mr. Christensen emailed Mr. O'Brien that a third party was willing to purchase the calves and was "willing to pay the amounts your client has paid for the existing calves to date, plus an 8% return on that amount."[19] Mr. Christensen indicated he understood this resolution could be completed fairly quickly. Over the next week, the parties went back and forth regarding the terms of the sale. Then, on March 15, Prime Ridge and Lapaseotes executed a bill of sale with Reynolds Creek Calf Ranch,

---

[15] Ex. 12027 at 4.

[16] Ex. 12027 at 3-4.

[17] Ex. 12027 at 3, 8-9.

[18] Ex. 12022.

[19] Ex. 1175 at 2.

MEMORANDUM OF DECISION - 8

LLC ("Reynolds").[20] For a total price of $2,460,000, Reynolds purchased the 4,365 calves that remained at the Debtor's facility and assumed the outstanding feed bills owed to Debtor for care rendered after January 16, 2024. Debtor executed a consent to the bill of sale, representing its agreement to the terms and to "release any and all claims against" the Cattlemen.

Now, the Cattlemen assert claims for damages in excess of $4,500,000 from Debtor's alleged breaches of the agreement. They assert these damages represent lost profits they would have realized had they been able to finish feeding the calves and then sold them to a packer as planned, rather than having sold them prematurely to Reynolds.

**ANALYSIS**

"A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes '*prima facie* evidence of the validity and amount of the claim' pursuant to Bankruptcy Rule 3001(f)." *Lundell v. Anchor Constr. Specialists Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). If a party objects and "produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Id.* (quoting *Ashford v. Consol. Pioneer Mortg. (In re Consol. Pioneer Mortg.)*, 178 B.R.

---

[20] Ex. 12040.

MEMORANDUM OF DECISION - 9

222, 226 (9th Cir. BAP 1995)).  "The ultimate burden of persuasion remains at all times upon the claimant."  *Id.* (citation omitted).

### A.    Fredin

After the Cattlemen's case-in-chief, Debtor moved to dismiss Fredin's claims. Given the structure of the parties' transaction, wherein Fredin purchased the calves from Debtor and then transferred a one-half interest to Lapaseotes and the other half to Prime Ridge, Debtor asserts Fredin does not have standing to assert damages for lost profits because it did not own the calves at the time they were sold to Reynolds.  If and to the extent Fredin seeks damages, the Court agrees.

At trial, Fredin clarified that its claim relates to the warranty of title deriving from the midweight sales.  Specifically, Fredin seeks relief to the extent Debtor's confirmed chapter 11 plan strips implied warranties of title from the midweight cattle.  However, as noted by Debtor, Fredin does not identify a present controversy, only a contingent, hypothetical concern about the effect of the confirmed plan and whether Rabo or a successor to Rabo may eventually assert some claim against the cattle.[21]  The Court is not inclined to enter an order that may impact the rights of Rabo or another entity who is not

---

[21] Since the Cattlemen are in the business of raising cattle and selling them to packers, it is likely these cattle were previously slaughtered, making it difficult for a third-party such as Rabo to assert a claim as to these cattle.

MEMORANDUM OF DECISION - 10

a party to this proceeding, especially when no real controversy is known to exist.  If an actual dispute arises concerning title, the Cattlemen may seek appropriate relief.

### B.      Breach of Contract

#### 1.      UCC or Common Law

The Cattlemen assert claims against Debtor for lost profits under chapter 2 of the Idaho Uniform Commercial Code, Idaho Code §§ 28-2-101 to -725 (the "UCC").  The UCC applies to contracts for the sale of goods.  Idaho Code § 28-2-102.  Debtor, on the other hand, asserts the UCC claims fail because

> for the calves actually underlying the lost-profit claim, the relevant relationship had moved beyond a simple sale-delivery dispute.  Prime Ridge and Lapaseotes owned the calf interests, and the calves remained at Millenkamp under an ongoing custom-calf raising arrangement, which was a service relationship rather than a sale of goods.  The immediate dispute was therefore about invoices, unpaid custom feed charges, early removal, and asserted possessory rights under the service arrangement, not an unperformed sale contract.

Millenkamp Closing, Doc. No. 1691 at 19 (emphasis in original).  The Cattlemen do not address this point in reply.  *See* Doc. No. 1695.

Under Idaho law, "[i]f an agreement contains terms for the sale of goods and services, the contract is a hybrid contract."  *Silicon Int'l Ore, LLC v. Monsanto Co.*, 314 P.3d 593, 601 (Idaho 2013) (citing *Fox v. Mountain W. Elec., Inc.*, 52 P.3d 848, 854 (2002)).  Idaho courts have rejected parsing out such contracts for purposes of applying the UCC and common law.  *See Pittsley v. Houser*, 875 P.2d 232, 235 (Idaho Ct. App. 1994) (cited with approval and adopted by *Fox*, 52 P.3d at 855) ("Severing contracts into various parts, attempting to label each as goods or nongoods and applying different law

MEMORANDUM OF DECISION - 11

to each separate part clearly contravenes the UCC's declared purpose 'to simplify, clarify

and modernize the law governing commercial transactions.'").  Instead, to determine

whether a hybrid contract is subject to the UCC, Idaho courts apply the "predominant

factor" test, considering "whether the predominant factor, the thrust, the purpose of the

agreement is a transaction of sale, with labor incidentally involved.  If the primary thrust

of the contract is for the sale of goods, the UCC will apply to the entire contract."[22]

*Silicon Int'l Ore, LLC*, 314 P.3d at 601 (citing *Fox*, 52 P.3d at 854 and *Pittsley*, 875 P.2d

at 234).  Courts consider all factors, objective and subjective, to determine the

predominant factor.  *Alcala v. Verbruggen Palletizing Sols., Inc.*, 531 P.3d 1085, 1102

(Idaho 2023) (citing *Linden v. Cascade Stone Co.*, 699 N.W.2d 189, 196 (Wis. 2005))

(analyzing hybrid transactions in the context of determining whether a purchaser is a

statutory employer noting analytical similarity to UCC cases).  "This involves examining

the 'totality of the circumstances,' including the contractual language used by the parties,

the nature of the businesses involved, the ultimate goal or primary objective of the

transaction, and the amounts or ratios paid for the goods and services portions of the

contract, respectively."  *Id.* (collecting UCC cases).

   Here, the Cattlemen and Debtor's agreement concerning the calves is a hybrid

contract because it concerns the sale of goods (calves) and furnishing of services (calf

raising).  Therefore, the Court considers the totality of circumstances to determine the

---

[22] For example, in a contract for the purchase (goods) and installation (services) of carpet, one
aspect considered in determining the contract was predominantly for the sale of goods "was that the
purchaser was more concerned with the goods and less concerned with the installation, either who would
provide it or the nature of the work."  *Fox*, 52 P.3d at 855 (citing *Pittsley*, 875 P.2d at 235).

MEMORANDUM OF DECISION - 12

predominant factor.  Among other ventures, Debtor is in the business of selling and

raising newborn calves.  Debtor raises approximately 50,000 calves at a time, up to

90,000 calves in a year.  The Cattlemen are in the business of buying and feeding cattle to

be sold to packers for profit.  As stated by Mr. Fredin, the primary objective of the

transaction was to get calves "every month to start them [in Idaho] and then bring them

back to our feedyards at Dinklage and finish."  The Cattlemen were interested in

purchasing calves, to be sure, but the calf-raising services associated with the purchased

calves were hardly incidental to the transaction.  The Cattlemen were interested in finding

an entity that could also care for and feed the newborn calves to an acceptable weight

before they moved them to Dinklage.  The Cattlemen decided to do business with Debtor

after touring the facility and Mr. Millenkamp's representations concerning the quality of

the calf-raising operation, including that it was the "best" in Idaho.  The costs associated

with custom feed charges for the length of time or to the weight the Cattlemen considered

to be ideal greatly outweigh the cost of the calves.  Although the Cattlemen characterize

the custom feed arrangement as Debtor selling the Cattlemen feed as a good, it is clear

the daily feeding rate encompassed much more than formula, hay, and supplements—it

encompassed boarding the animals, veterinary care, bottle feeding, labor, waste,

management, and other care.

Based on the totality of circumstances, the Court concludes the predominant

factor, the thrust of the transaction, was not the sale of the calves (goods), but the calf

raising (services).  The agreement is therefore governed by common law, not the UCC.

The Court notes the Cattlemen's breach of contract claims rest on the conclusion that the

MEMORANDUM OF DECISION - 13

UCC applies to the agreement.  Because the Court has determined common law applies, the Court will consider the Cattlemen's claims under common law to the extent there is an analogous doctrine.  However, the UCC claims without a common law equivalent will be denied.

### 2.      Breach of Contract

"To succeed on a breach of contract claim, a plaintiff must demonstrate: '(a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages.'"  *TCR, LLC v. Teton County*, 559 P.3d 302, 323 (Idaho 2024) (quoting *Safaris Unlimited, LLC v. Von Jones*, 353 P.3d 1080, 1084 (Idaho 2015)).  "The plaintiff has the burden to prove that he was injured and his injury was the result of the defendant's breach; 'both amount and causation must be proven with reasonable certainty.'"  *Hull v. Giesler*, 331 P.3d 507, 516 (Idaho 2014).  Here, the parties do not dispute the existence of a contract.

### a.      Whether Debtor breached its obligations by preventing the Cattlemen from picking up the calves

In Idaho, breach of contract has been defined as:

> Failure, without legal excuse[,] to perform any promise which forms the whole or part of a contract.  Prevention or hindrance by party to contract of any occurrence or performance requisite under the contract for the creation or continuance of a right in favor of the other party or the discharge of a duty by him. Unequivocal, distinct and absolute refusal to perform agreement.

*Fox v. Mountain W. Elec., Inc.*, 52 P.3d 848, 855 (Idaho 2002) (quoting *Hughes v. Idaho State Univ.*, 835 P.2d 670, 672 (Idaho Ct. App. 1992)).  "Once a party to a contract has proven another's breach of that contract, the breaching party has the burden of pleading

MEMORANDUM OF DECISION - 14

and proving affirmative defenses that may legally excuse performance." *Rice v. Sallaz*, 357 P.3d 1256, 1262 (Idaho 2015).  "One such defense is that 'a party sued for damages may defend on the grounds that its performance was excused by the other party's material breach.'" *Taylor v. Taylor*, 504 P.3d 342, 353 (Idaho 2022) (quoting *Melaleuca, Inc. v. Foeller*, 318 P.3d 910, 914 (Idaho 2014)).  "A material breach is more than incidental and touches the fundamental purpose of the contract, defeating the object of the parties entering into the agreement." *Rice*, 357 P.3d at 1262.  Whether a breach occurred and the materiality of such breach is a question of fact.  *Id.*

The Cattlemen assert Debtor breached the agreement when it prevented the Cattlemen from recovering the calves.  According to the Cattlemen, there was no agreement regarding how long the calves were required to remain at the facility and they were therefore permitted to remove the calves at any time.  Debtor disagrees, asserting the parties agreed the calves would remain at the facility for approximately 180 days or until the calves reached 400-450lbs.  However, Mr. Fredin testified this was discussed as being the "ideal scenario," not a binding commitment.  Based on the testimony of the parties and the limited evidence on this point, it is apparent there was no meeting of the minds with respect to how long the calves would remain at the facility.  Essentially, either party could terminate the agreement at any time.  Therefore, in isolation, Debtor's failure to release the calves may have constituted a breach of the agreement.[23]  *See Star Phoenix Mining Co. v. Hecla Mining Co.*, 939 P.2d 542, 550 (Idaho 1997) (noting that a

---

[23] The Cattlemen argue that under the UCC Debtor breached the agreement because it "failed to deliver the calves" when it did not authorize their removal.

MEMORANDUM OF DECISION - 15

contract may contain implied terms "as are necessary to effectuate the intention of the parties, and as arise from the specific circumstances under which the contract was made").

However, Debtor's failure to release the remaining calves is not viewed in isolation, and it was not done without excuse. By not paying custom feed invoices for services rendered after January 15, the Cattlemen were in breach of the agreement. Such breach touched on the fundamental purpose of the contract—payment in exchange for Debtor's feeding and care of the calves. Therefore, Debtor's obligation to release the calves was excused or suspended until the breach was cured. Although the Cattlemen contend they were justified in withholding payment due to alleged inaccuracies in the invoices, there is no question that at least some amounts were owed to Debtor for feeding and caring for the calves.[24] The Cattlemen's allegation that Debtor fabricated invoice disputes as a pretext to keep the calves at the facility is not supported by the record. It was the Cattlemen who sought to remove the calves before addressing the disputed charges or paying the portion of the invoice that was due and owing. Therefore, Debtor did not breach the agreement when it failed to release the calves.

---

[24] There is conflicting testimony regarding if and/or when the Cattlemen notified Debtor that they were not purchasing additional calves. However, even if the Court were to accept the Cattlemen's argument that they rejected the calves when they did not pay the purchase invoices after January 15, Debtor would not have known of any such rejection before sending the January 31 invoice. Notably, the record is devoid of any attempt by the Cattlemen to obtain corrected feed invoices from Debtor or raise their concerns in a way that would have afforded Debtor a reasonable opportunity to respond before attempting to recover the calves.

MEMORANDUM OF DECISION - 16

**b.**        **Whether Debtor anticipatorily breached the contract**

The Cattlemen, citing the UCC, argue the Letter gave them reasonable grounds for insecurity regarding Debtor's ability to perform.  As such, they were entitled to request adequate assurance of future performance and suspend their own performance until receiving such assurances.  And, because they did not receive adequate assurances, Debtor repudiated the agreement.  Unlike the UCC, however, the adequate assurances doctrine is generally unavailable at common law.  *See Davis v. Blast Props., Inc.*, 2022 WL 43877, at *11 (D. Idaho Jan. 4, 2022) (declining to apply adequate assurances doctrine outside of UCC noting "Idaho has not adopted the Restatements (Second) on Contracts § 251 or an analogous doctrine").  Although not identical to the UCC, Idaho courts recognize an "anticipatory breach of a contract," which has been defined as "a repudiation [by the promisor] of his contractual duty *before the time fixed in the contract for his performance has arrived*."  *Trumble v. Farm Bureau Mut. Ins. Co.*, 456 P.3d 201, 215 (Idaho 2019) (citation omitted) (alteration in original).  The Court will consider the Cattlemen's arguments under this related doctrine.

In order "to repudiate a contract, a party must make 'a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.'"  *Tricore Invs., LLC v. Estate of Warren*, 485 P.3d 92, 112 (Idaho 2021) (quoting *Minidoka Irrigation Dist. v. Dep't of Interior*, 154 F.3d 924, 926 (9th Cir. 1998)).  "A repudiating party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform."  *Id.*  "[A] statement of repudiation must threaten a breach of sufficient gravity that, 'if the breach actually

MEMORANDUM OF DECISION - 17

occurred, it would of itself give the obligee a claim for damages for total breach.'"

*Trumble*, 456 P.3d at 216 (quoting Restatement (Second) of Contracts § 250 (1981)).

The Letter, while it acknowledged the tenuous state of Debtor's relationship with

Rabo, does not constitute a repudiation of Debtor's contract with the Cattlemen.[25]  It

states that if Rabo continues to deprive Debtor of "normal operating funds . . . it will

starve your youngstock."  However, it also states Debtor has "continued to provide your

youngstock with the highest standard of care" and is "taking aggressive measures to

ensure that your cattle will continue to receive first class care."  Furthermore, Debtor's

stated goal "is to continue to provide your livestock with the best care possible during

these challenging times."

Taken as a whole, the Letter is not an unconditional and unequivocal declaration

that Debtor will not or cannot perform.  Moreover, Debtor did not send the Letter to the

Cattlemen.  Thus, it is doubtful that it could serve as Debtor's repudiation of the contract

between the parties.  *See Trumble*, 456 P.3d at 215 (quoting Restatement (Second) of

Contracts § 250 (1981)) (noting a repudiation is a "statement by the obligor to the

obligee").  Therefore, the Court does not find that Debtor repudiated the agreement.

### c.   Whether Debtor breached the covenant of good faith and fair dealing

"Idaho law recognizes a cause of action for breach of an implied covenant of good

faith and fair dealing."  *Gordon v. U.S. Bank N.A.*, 455 P.3d 374, 390 (Idaho 2019).  "The

implied covenant of good faith and fair dealing requires parties in a contract 'to perform,

---

[25] Ex. 12008.

MEMORANDUM OF DECISION - 18

in good faith, the obligations required by their agreement, and a violation of the covenant occurs when either party violates, nullifies or significantly impairs any benefit of the contract.'" *Id.* at 390-91 (quoting *Fox v. Mountain W. Elec., Inc.*, 52 P.3d 848, 855-56 (Idaho 2002)).  This implied covenant "does not create independent obligations, it merely applies to contractual obligations." *Silicon Int'l Ore, LLC v. Monsanto Co.*, 314 P.3d 593, 607 (Idaho 2013).  Additionally, a "party does not breach the covenant of good faith and fair dealing 'by merely exercising its express rights' under the contract in question." *Gordon*, 455 P.3d at 391 (quoting *First Sec. Bank of Idaho, N.A. v. Gaige*, 765 P.2d 683, 687 (Idaho 1988)).  *Taylor v. Browning*, 927 P.2d 873, 880-81 (Idaho 1996) (declining to find "mere fact that there was a dispute between the parties regarding the amount each owed" necessarily gives "rise to a breach of the implied covenant of good faith and fair dealing").

The Cattlemen generally claim that Debtor did not act in good faith in connection with the agreement but fail to identify what specific acts by Debtor breached this implied covenant.  The Cattlemen did not put forth credible evidence that Debtor charged them a daily feeding rate for dead calves or otherwise acted in bad faith in preparing or sending invoices.  On the contrary, the evidence demonstrates Debtor's good faith efforts to perform its obligations under the agreement and work with the Cattlemen to resolve their disputes.  For example, Mr. Millenkamp repeatedly attempted to communicate with the Cattlemen regarding the Assurance Agreement and the past due amounts on the invoices.  Given the breakdown in communication between the Cattlemen and Debtor, Mr. Millenkamp testified his goal in proposing a buyer who could purchase the calves was to

MEMORANDUM OF DECISION - 19

provide the Cattlemen with "options" in resolving their dispute.  The fact that Debtor

would financially benefit from an arrangement that kept the calves at its facility does not

mandate the conclusion that Debtor acted in bad faith or dealt with the Cattlemen unfairly

in performing its obligations.  The Cattlemen, apprised by counsel of their options under

the circumstances, decided to move forward with the sale to Reynolds.

Therefore, based on the record before it, the Court does not find Debtor breached

the implied covenant of good faith and fair dealing.

### C.      Fraud

#### 1.      Fraudulent Misrepresentation

The Cattlemen assert Debtor fraudulently misrepresented its financial ability to

feed and deliver the calves.  A party alleging common law fraud must establish nine

elements:

> (1) a statement of fact; (2) its falsity; (3) its materiality; (4) the
> speaker's knowledge of its falsity; (5) the speaker's intent to
> induce reliance; (6) the hearer's ignorance of the falsity of the
> statement; (7) reliance by the hearer; (8) the hearer's right to
> rely; and (9) consequent and proximate injury.

*Gilbert v. Progressive Northwestern Ins. Co.*, 577 P.3d 519, 532 (Idaho 2025).  The

Cattlemen do not identify a statement of fact made to them regarding Debtor's financial

condition but appear to rely on Mr. Millenkamp's representations that he was the best

calf-raiser in Idaho and had an excellent operation.  However, these and similar

statements identified by the Cattlemen are statements of opinion, not of fact.  "A

representation which is expressed and understood as nothing more than a statement of

opinion, cannot constitute fraud, and this is especially true when the opinion expressed is

MEMORANDUM OF DECISION - 20

honestly entertained." *Nelson v. Hoff*, 218 P.2d 345, 349 (Idaho 1950). The evidence does not suggest Mr. Millenkamp's opinions were false and made with the intent of deceiving or misleading the Cattlemen. *See April Beguesse, Inc. v. Rammell*, 328 P.3d 480, 490 (Idaho 2014). The Cattlemen failed to establish the elements necessary to prevail on their claim of fraudulent misrepresentation.

### 2.      Fraudulent Concealment

Idaho courts have recognized fraud may be established by "silence where the defendant has a duty to speak." *McOmber v. Thompson*, 572 P.3d 736, 749 (Idaho 2025) (quoting *James v. Mercea*, 277 P.3d 361, 365 (Idaho 2012)). In general, a duty to speak arises under the following circumstances:

> (1) If there is a fiduciary or other similar relation of trust and confidence between the two parties; (2) in order to prevent a partial statement of the facts from being misleading; or (3) if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it.

*Id.* The Cattlemen argue they trusted Debtor and that trust created a duty to disclose Debtor's allegedly precarious financial condition. However, "[a] vendor-vendee relationship does not, by itself, create a fiduciary or other similar relation of trust and confidence." *James*, 277 P.3d at 366 (considering "simple arms length transaction" did not create duty to disclose). Apart from their general claim of trust in Debtor, the Cattlemen did not establish circumstances giving rise to a duty to disclose Debtor's financial condition.

MEMORANDUM OF DECISION - 21

**D.      Conversion**

The Cattlemen contend Debtor committed conversion by refusing to release the calves.  In Idaho, conversion is defined as "any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein, such as a tortious taking of another's chattels, or any wrongful exercise or assumption of authority, . . . over another's goods, depriving him of the possession, permanently or for an indefinite time."  *Heath v. Denny's Wrecker Serv., Inc.*, 560 P.3d 1089, 1111 (Idaho 2024) (citation omitted).  To prevail on a claim of conversion, a plaintiff must establish three elements:  "(1) that the charged party wrongfully gained dominion of property; (2) that property is owned or possessed by plaintiff at the time of possession; and (3) [that] the property in question is personal property."  *Id.* (quoting *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010)) (alteration in original).

The parties do not dispute that the calves were owned by the Cattlemen at the time of Debtor's possession and the calves constitute personal property.  Nor do the parties dispute that the calves were in Debtor's lawful possession pursuant to the agreement.  Therefore, the Court must consider whether Debtor "wrongfully gained dominion of property."  The Cattlemen contend Debtor, as a bailee in possession of the calves, "decisively indicated a repudiation of the [Cattlemen's] right to [their] property" by refusing to allow the Cattlemen to pick up the calves, which constitutes conversion.  *See Torix v. Allred*, 606 P.2d 1334, 1339 (Idaho 1980).  However, "[c]onversion, being a wrongful and tortious act, cannot originate in the exercise of a legal right."  *Heath*, 560 P.3d at 1111.

MEMORANDUM OF DECISION - 22

Purchase invoices aside, there were outstanding amounts due and owing under the calf-raising invoices at the time the Cattlemen sought to obtain possession of the calves. Debtor asserts it held an ongoing agister's lien on the calves under Idaho Code § 45-805(b), which provides: "Livery or boarding or feed stable proprietors, and persons pasturing livestock of any kind, have a lien, dependent on possession, for their compensation in caring for, boarding, feeding or pasturing such livestock." It is well established that a lien "dependent on possession" is extinguished if the lienholder voluntarily parts with possession of the property. *See Twin Falls County v. Coates*, 80 P.3d 1043, 1046 (Idaho 2003); *O Bar Cattle Co. v. Owyhee Feeders, Inc.*, 2010 WL 678970, at *6 (D. Idaho Feb. 24, 2010). Debtor asserts it had such a possessory lien on the calves at the time the Cattlemen sought to recover them and, as such, its possession of the calves did not constitute conversion.

The Cattlemen argue that Debtor could not assert an agister's lien under three general theories. First, they contend it was the Receiver, not Debtor, who had the ability to assert an agister's lien given the terms of the Receivership Order. However, the Receivership Order did not provide the Receiver with immediate and unfettered authority regarding Debtor. For example, the Receiver's power to bring legal actions or pursue claims and demands which could be brought by the receivership estate was subject to the Operating Agreement and only effective "60 days after entry" of the Receivership Order.[26] Debtor asserted the lien was in existence before expiration of the 60-day period while the Operating Agreement was in effect. Additionally, while the Cattlemen are

---

[26] Ex. 12013 at 9.

MEMORANDUM OF DECISION - 23

correct that Mr. Millenkamp could not "bind" Debtor under the Receivership Order, it is unclear how an agister's lien serves to bind Debtor. As to the Cattlemen's claims that the Receiver had allowed the Cattlemen to pick up the calves or otherwise sanctioned their removal of the calves, such claims are unsupported by the record. The Receiver expressly disavowed the authority to "do anything to cause [the calves] to be transported or released," noting that even if they were within the Receivership Assets, such physical control rested with Mr. Millenkamp under the Receivership Order.[27]

Second, the Cattlemen argue that Debtor did not meet the requirements to have statutory agister's lien rights. They assert the Receiver had lawful possession of the calves, not Debtor. The Receiver had possession of the Receivership Assets and receivership entities, including Debtor. That does not mean, however, that Debtor did not have possession of the calves or that such possession was unlawful. Furthermore, by the Receiver's own account the calves were not Receivership Assets. The Cattlemen also contend there were no lien rights because Debtor was not "due" anything from the Cattlemen. They point to the Receivership Order, which directed any person owing a debt to the receivership entities to pay the Receiver, and the Receiver's "receipt for such payment shall have the same force and effect as if the Receivership Entities had received such payment."[28] However, the responsibility to collect money owing to Debtor does not transform the Receiver into the creditor or a party to Debtor's contracts.

---

[27] Ex. 12027 at 4.

[28] Ex. 12013 ¶ 27.

MEMORANDUM OF DECISION - 24

Finally, the Cattlemen argue that Debtor's assertion of an agister's lien was improper because, as they describe it, it is a "tool to secure a valid debt if the vendor has reasonable grounds to believe that the vendee cannot pay." Cattlemen Reply, Doc. No. 1680 at 112. The Cattlemen cite no authority in support of this position that an agister's lien is not appropriate because they had always paid their bills promptly. Under the facts, the Cattlemen failed to pay the invoices immediately prior to demanding recovery of their calves, leaving a past due balance owed to Debtor. The Cattlemen also argue that Debtor improperly asserted the agister's lien as a "sword" rather than a "shield," and that one cannot assert an agister's lien before providing an accurate bill. Again, the Cattlemen cite no authority in support. As stated above, the Cattlemen's claims that Debtor refused to cooperate in preparing an accurate invoice is unsupported by the record, and their assertion that the invoice was inaccurate and it was not necessary to pay the amounts due and owing due to such inaccuracies does not hold sway.

Because Debtor had a possessory lien on the calves, Debtor's actions did not constitute conversion.

**CONCLUSION**

For the reasons set forth above, the Court will sustain Debtor's objections to the Cattlemen's claims. Debtor shall submit an order consistent with this decision.

DATED: August 13, 2026



_____

NOAH G. HILLEN
Chief U.S. Bankruptcy Judge

MEMORANDUM OF DECISION - 25